# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

v.

TIMOTHY BARTON,                         C.A. No.: 3:22-cv-2118-X
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,                               Jury Trial Demanded
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

                    Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

                    Relief Defendants.

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EXPEDITED MOTION FOR APPOINTMENT OF RECEIVER AND BRIEF IN SUPPORT

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..................................................................................... ii

TABLE OF AUTHORITIES ........................................................................iii-iv

FEDERAL STATUES ........................................................................................v

I.      INTRODUCTION ...................................................................................1

II.     RECEIVERSHIP DEFENDANTS .......................................................2

III.    FACTUAL SUMMARY .........................................................................4

       A.  The Wall Offerings ......................................................................4

       B.  The Barton Defendants Defrauded the Investors .........................6

            1.  Misappropriation of investor funds........................................6

            2.  Inflation of property purchase prices .....................................8

            3.  Worthless guarantee...............................................................10

            4.  Lulling statements..................................................................11

IV.    ARGUMENT AND AUTHORITIES ...................................................11

       A.  Legal Standard for Appointment of Receiver ............................11

       B.  Prima Facie Showing of Antifraud Violations...........................14

       C.  The Appointment of a Receiver is Warranted ............................18

V.      REQUEST FOR EXPEDITED CONSIDERATION .........................20

VI.    REQUEST FOR RELIEF ...................................................................20

# TABLE OF AUTHORITIES

**Federal Cases**

*Aaron v. SEC,*
    446 U.S. 680 (2d Cir. 1980) ...................................................................... 15

*Bookout v. Atlas Fin. Corp.,*
    395 F. Supp. 1338 (N.D. Ga. 1974) ........................................................... 13

*Broad v. Rockwell, Int'l Corp.,*
    642 F.2d 929 (5th Cir. 1981) (en banc) .................................................... 15

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (7th Cir. 1976) ..................................................................... 15

*Esbitt v. Dutch-American Mercantile Corp.,*
    335 F.2d 141 (2d Cir. 1964) ...................................................................... 12

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*
    2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) .............................................. 14

*Lockyer v. Mirant Corp.,*
    398 F.3d 1098 (9th Cir. 2005) ................................................................... 14

*SEC v. American Bd. of Trade, Inc.,*
    830 F.2d 431 (2d Cir. 1987) ...................................................................... 12

*SEC v. AmeriFirst Funding, Inc.,*
    2007 WL 2192632 (N.D. Tex. July 31, 2007) ................................. 11, 12, 13

*SEC v. Better Life Club of American, Inc.,*
    995 F. Supp. 167 (D.D.C. 1998) ............................................................... 16

*SEC v. Brooks,*
    1999 WL 493052 (N.D. Tex. July 12, 1999) .............................................. 17

*SEC v. Evolution Cap. Advisors, LLC,*
    2011 WL 6754070 (S.D. Tex. Dec. 22, 2011) ........................................... 13

*SEC v. Fehn*
    97 F.3d 1276 (9th Cir. 1996) ..................................................................... 15

*SEC v. First Fin. Grp. of Texas,*
    645 F.2d 429 (5th Cir. 1981) ........................................... 12, 13, 14, 18

*SEC v. Gann,*
    565 F.3d 932 (5th Cir. 2009) ..................................................................... 14

*SEC v. Glenn W. Turner Enterprises, Inc.,*
    474 F.2d 476 (9th Cir. 1973) ..................................................................... 16

*SEC v. Harris,*
    2010 WL 11617972 (N.D. Tex. June 24, 2010) ................................................... 12

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082, 1089 (2d Cir. 1972) ...................................................... 11, 12, 15

*SEC v. Seghers,*
    298 F. App'x 318, 319 (5th Cir. 2008) ..............................................................14

*SEC v. Sethi,*
    910 F.3d 198 (5th Cir. 2018) ............................................................................ 15

*SEC v. Smart,*
    2011 WL 2297659 (D. Utah June 8, 2011) ...................................................... 16

*SEC v. Straub,*
    921 F.Supp.2d 244 (S.D.N.Y. 2013) ............................................................... 14

*SEC v. Tyler,*
    2002 WL 32538418 at *7 (N.D. Tex. Feb. 21, 2002) .................................. 14, 16

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990) .......................................................................... 12

*SEC v. W.J. Howey Co.,*
    328 U.S. 293–99 (1946) ................................................................................... 16

*Smith v. SEC,*
    653 F.3d 121 (2d Cir. 2011) ............................................................................ 13

*Southland Sec. Corp. v. INSpire Ins. Solution, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ........................................................................... 15

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (7th Cir. 1976) ........................................................................... 15

**Federal Statutes**

Securities Exchange Act of 1934:

Section 10(b),
        [15 U.S.C. § 78j(b)] ................................................................................14

Section 21,
        [15 U.S.C. § 78u] ................................................................................ 12

Rule 10b-5,
        [17 C.F.R. § 240.10b-5] ......................................................................14

Securities Act of 1933:

Section 2(a)(1),
        [15 U.S.C. § 77b(a)(1)] ......................................................................16

Section 3(a)(10),
        15 U.S.C. § 78c(a)(10) ......................................................................16

Section 17(a),
        [15 U.S.C. § 77q(a)] ..........................................................................14

The Securities and Exchange Commission ("SEC") submits this Expedited Motion for Appointment of Receiver and Brief in Support, and respectfully shows the Court as follows:

## I.   INTRODUCTION

Timothy Barton ("Barton"), a Texas-based real estate developer, raised approximately $26 million from over 100 investors -- most of whom are Chinese nationals -- in unregistered, fraudulent securities offerings related to real-estate investments in Texas.[1]

Barton offered and sold investment loans issued by a series of special-purpose "Wall" entities he controls.  Barton promised that the Wall entities would use investors' funds, together with funds from the Wall entities themselves, to purchase specific parcels of land at specific prices set forth in the offering materials.  He also promised investors that they would get their principal back in two years along with annual interest payments.

Instead, Barton misappropriated nearly all the investor funds, misusing them to, among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions, pay expenses associated with unrelated real estate development projects, and fund his lifestyle.  Barton also inflated the land purchase prices in the offering materials, which enabled him to raise more money from investors, overstated the value of the assets securing the investments, and concealed that the Wall entities were not actually contributing any funds themselves.

Among his misappropriations, Barton, acting through various entities he controls, misused a significant portion of the investor funds to purchase real property interests, including

---

[1] To implement the scheme, Barton partnered with Defendants Stephen Wall ("Wall"), an experienced Texas home builder, and Haoqiang (Michael) Fu ("Fu"), a Chinese businessman.  Because the SEC is only seeking a receiver over the Barton-controlled entities, this Motion does not directly address Fu's and Wall's role in the fraud.  At a high level, and among other acts, Fu marketed the investments to Chinese investors and misused investor funds to pay himself undisclosed fees and commissions, and Wall lent his name to the project and helped to provide the inflated land prices.

several parcels of raw land in Texas.  *See* Declaration of Carol Hahn ("Hahn Dec.") at ¶¶ 33-26 & Ex. B.[2]  (App. 14 & 17)  The property interests could potentially result in a meaningful recovery for investors.  However, there is a substantial risk to the value of the property interests if a steward is not put in place to protect them.

For these reasons, the SEC respectfully requests the Court to appoint a receiver over the Barton-controlled entities to determine the value of the property interests (and any other assets) and to secure, preserve, and potentially monetize that value for the benefit of defrauded investors.  The evidence provided in support of this Motion provides a basis for inferring that a violation of the federal securities laws has occurred, and thus satisfies the SEC's burden for obtaining the requested ancillary relief. As discussed at Section IV.C below, the SEC has proposed a receiver candidate for the Court's consideration.

On September 20, 2022, the U.S. Attorney's Office for the Northern District of Texas indicted Barton on seven counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of securities fraud relating to his misconduct in connection with the investments at issue.  *See USA v. Barton*, Case No. 3-22-cr-00352-K (N.D. Tex).

As demonstrated herein, Barton has been commingling, transferring, dissipating, and encumbering investor funds and assets purchased with investor funds.  The SEC therefore believes time is of the essence, and requests that its motion be considered on an expedited basis.

## II.    RECEIVERSHIP DEFENDANTS

The SEC is seeking appointment of a receiver for the purpose of marshaling and preserving the assets owned, controlled, or possessed by the following Barton-controlled entities (collectively, "Receivership Defendants"):

---

[2] The SEC's evidence is set forth in its contemporaneously filed appendix in support of this Motion ("App. __").

- Defendants Wall007, LLC ("Wall 7"), Wall009, LLC ("Wall 9"), Wall010, LLC ("Wall 10"), Wall011, LLC ("Wall 11"), Wall012, LLC ("Wall 12"), Wall016, LLC ("Wall 16"), Wall017, LLC ("Wall 17"), Wall018, LLC ("Wall 18"), and Wall019, LLC ("Wall 19") (each a "Wall Entity," and collectively, "Wall Entities"). The "Wall Entities" are the special-purpose entities that offered the investment loans.[3]

- Defendant Carnegie Development, LLC ("Carnegie Development"). Barton controls Carnegie Development and is its president. Carnegie Development is the managing member for each of the Wall Entities, and Barton signed the loan agreements at issue on behalf of Carnegie Development. Barton, Carnegie Development, and the Wall Entities are referred to herein as the "Barton Defendants."

- Relief Defendants DJD Land Partners, LLC ("DJD") and LDG001, LLC ("LDG001"). DJD and LDG001 are additional Barton controlled-entities that improperly received interests in real property purchased with investor funds or the proceeds of the sale of property purchased with investor funds.

- Any other entities that Barton directly or indirectly controls, including, but not limited to, the following additional Barton-controlled entities that, based on available information, received investor funds, real property interests purchased with investor funds, or own property interests that were improved with or otherwise have benefited from the use of investor funds: BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development

---

[3] Barton recently filed voluntary petitions for Chapter 11 for all of the Wall Entities. As discussed in the legal section below, pursuant to the government exception to the automatic stay, the SEC is not stayed from proceeding with its enforcement action against those entities and they can be included in the receivership. The bankruptcy cases are: *In re WALL007 LLC, et al.,* No. 22-41049 (Bankr. E.D. Tex.).

LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions

Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC;

Villita Towers LLC; and 126 Villita LLC.  *See* Hahn Dec. at ¶ 37 & Ex. C.[4]  (App. 15 & 18)

### III.    FACTUAL SUMMARY

**A.  The Wall Offerings.**

Barton is a Texas-based real estate developer that controls the Barton Defendants, DJD,

LDG001, and several other related entities.  *See* May 24, 2021 Investigative Testimony of

Timothy Barton ("Barton Tr.") at 172:3-173:2; 173:19-174:5; 192:8-193:24; 200:17-22; 236:8-

16 (App. 231-233; 240-243); List of Barton-Controlled Entities.  (App. 23-24)

From approximately March 2017 through June 2019, Barton, acting through Carnegie

Development and the Wall Entities, raised approximately $26 million from over 100 investors in

securities offerings related to real estate investments in Texas.  *See* Hahn Dec. at ¶ 14.  (App. 6)

The investments were offered through a series of investment contracts styled as "Agency

and Loan Agreements" ("Loan Agreements") that each Wall Entity issued as the offering entity.

*See e.g.,* Wall 9 Loan Agreement at 1 (App. 25); Wall 12 Loan Agreement at 1.  (App. 49)

Though dealing with separate parcels of land, the Loan Agreements followed a similar

template and contained similar terms.  Each Wall Entity:

- borrowed a fixed amount from individual investors;

- promised to repay the funds after two years;

- promised to pay interest after the first and second years;

---

[4] Barton controls multiple other entities that may have also received or benefited from investor funds.  Barton's counsel provided the SEC with a list of Barton-controlled entities.  *See* List of Barton-Controlled Entities (App. 23-24).  However, without full access to Barton's records, and as a result of his extensive comingling and transferring of properties and funds, the SEC has been unable confirm all of the entities Barton controls and their assets.  Hahn Dec. at ¶ 37.  (App. 15)

- promised regular progress reports;

- represented that the invested funds would be combined with other investors' funds and funds contributed by the offering entity itself (or, for Wall 7, contributed by Fu and Wall);

- the combined funds would be used to acquire a specific parcel of land identified in the loan agreement;

- specified the purchase price of the land; and

- pledged the Wall Entities' membership interests as collateral to secure the investments.

*See e.g.,* Wall 9 Loan Agreement at 1-7.  (App. 25-31)

Barton developed, authorized, and approved the contents of the Loan Agreements, and he signed the Loan Agreements on behalf of Carnegie Development, the managing member of each of the Wall Entities.  *Id.* at 8 (App. 32)*; see also* August 27, 2017 Loan Agreement Approval Email at 1 (App. 143); July 20, 2021 Investigative Testimony of Haoqiang (Michael) Fu ("Fu Tr.") at 153:9-12.  (App. 263).

Fu, acting directly or through personnel at his company, solicited Chinese investors living in China and in one or more U.S. states via emails, social media applications (*e.g.*, "WeChat"), internet sites, telephone and VOIP calls, and in-person presentations using the Loan Agreements, written investor presentations, and oral pitches.  *See e.g.,* Wall 10 Investor Presentation (with English translation) (App. 66-109); Wall 12 Investor Presentation (Chinese only) (App. 110-142); Fu Tr. at 30:1-14; 30:25-31:15; 139:15-24; 153:17-19; 157:14-158:18.  (App. 260-265)

Investors invested money to obtain a fixed investment return, and their funds were pooled with other investors' funds (and were also supposed to be pooled with funds from the Wall Entities).  *See, e.g.* Wall 9 Loan Agreement at 1-2 (App. 25-26); Hahn Dec. at ¶ 15.  (App. 6-7)

These were entirely passive investments: the investors had no role or say in the operations or management of the Wall Entitles or the underlying real-estate projects, and the

investors were entirely dependent upon, and expecting to profit solely from, the Barton

Defendants' and Wall's expertise and efforts to manage the real-estate ventures. *See, e.g.,*

January 25, 2021 Investigative Transcript of Stephen Wall ("Wall Tr.") at 53:19-54:14 (App.

271-272); Barton Tr. at 294:3-296:17.  (App. 247-249)

### B.  The Barton Defendants Defrauded the Investors.

### 1.  Misappropriation of investor funds.

Each of the Loan Agreements represented that *all* investor funds would be used to buy a

specific, identified piece of land.  For example, the Wall 12 Loan Agreement represented that the

investor funds:

> **shall be used to acquire 172 acres located in Fort Worth ETJ, Parker County, State of Texas for residential lot development known as Lyons Ranch ("Property")**.  The Property has a purchase price of $5,250,000 and the balance of funds will be provided by Borrower. (emphasis added)

Wall 12 Loan Agreement at 2 (App. 50); *see also* March 9, 2022 Investigative Testimony of

investor Hong Chen ("Chen Tr.") at 36:2-38-1 (App. 285-287); March 15, 2022 Investigative

Testimony of investor Sun Yun ("Yun Tr.") at 5:25-6:13; 23:10-24:6; 26:7-25; 30:22-31-7.

(App. 299-305)

These representations were false.  Of the approximately $26.3 million raised, only two

Wall Entities (Wall 7 and Wall 9) actually purchased the property described in their agreements

for a total purchase price of approximately $2.6 million.  Hahn Dec. at ¶ 17.  (App. 7)

Even in those two limited instances, neither Wall 7 nor Wall 9 used its own investors'

funds to purchase its property, and instead used commingled funds from one or more other

offerings.  *Id*.  (App. 7)  None of the other Wall Entities acquired the properties described in their

respective agreements.  *Id*. at ¶ 22.  (App. 9)

6

Instead, Barton misappropriated and misused the remaining approximately $23.7 million of investor funds to, among other things:

- pay personal expenses of Barton and his family, including exorbitant credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- to make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies (including LDG001 and DJD) and using funds from a different Wall Entity;[5]

- pay professional fees (such as engineering, surveying, and land development) for, in most cases, properties unrelated to the offerings; and

- make payments to Wall.

Hahn Dec. at ¶¶ 22-27 (App. 9-11); *see also* Barton Tr. at 345:7-14; 346:4-11; 349:1-350:17; 357:8-24.  (App. 250-254)

Barton controlled the bank accounts for the Wall Entities and Carnegie Development, and he had signatory authority over most of the accounts.  Hahn Dec. at ¶ 12 (App. 5-6); *see also* Barton Tr. at 178:2-12; 181:2-6; 187:12-190:20 (App. 234-239); Fu Tr. at 192:4-18.  (App. 266) Barton often directed his administrative assistant to make the improper transfers.  *See* Barton Tr. at 178:2-12 (App. 234); March 10, 2022 Investigative Testimony of Saskya Bedoya ("Bedoya

---

[5] LDG001 used commingled investor funds to purchase the property that the Wall 18 Loan Agreement stated Wall 18 was supposed to purchase, and DJD used the proceeds of a partial sale of a property purchased with investor funds to purchase the property that the Wall 11 Loan Agreement stated Wall 11 was supposed to purchase.  Hahn Dec. at ¶¶ 23-24.  (App. 9)  Upon information and belief, LDG001 and DJD continue to hold these properties purchased with investor proceeds.  *Id.* at ¶ 33 and Ex. B (App. 14 & 17).

Tr.") at 129:14-130:20 (App. 277-278); June 27, 2017, November 15, 2017, and January 9, 2019 Examples of Barton Payment Instruction Emails.  (App. 152-155)

Barton also took out loans on properties acquired with investor funds, and he used the loan proceeds (which were also commingled with investor funds) to, among other things, purchase other properties, support his businesses, and fund his lifestyle.  Hahn Dec. at ¶ 29-30. (App. 12-13)

Despite promising to make annual interest payments and to return investors' principal, the Barton Defendants never returned any of the principal to investors as promised, and failed to pay over 80% of the promised interest payments.  Hahn Dec. at ¶ 28.  (App. 11-12)

Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements, he received copies of Loan Agreements, and he was a signatory to the Loan Agreements.  Supra at 5.  Barton knew the investor funds were being misused and misappropriated, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes.  Supra at 7-8.

**2.  Inflation of property purchase prices.**

The Loan Agreements represented that the Wall Entity would purchase a specific parcel of land with the investor funds, and represented that the offering entity would also contribute money to fund the purchase.

For example, the Wall 9 Loan Agreement had a total offering amount of $2,320,000.  It represented that the purchase price for the property was $2,900,000, and the offering entity would fund the difference between the offering amount and the purchase price:

> [The Loans] shall be used to acquire 100 acres located in Venus, Texas for residential lot development known as Venus 100 located on Country Rd 501 and West of FM157 in Venus, Texas ("Property").  **The Property has a purchase**

**price of $2,900,000 and the balance of funds will be provided by Borrower**. (emphasis added)

Wall 9 Loan Agreement at 2.  (App. 26)

The representations about the purchase prices were also false.  The disclosed purchase prices were inflated.  At the time of the offerings, the Barton Defendants had already secured, or were in the process of negotiating, purchase prices for the properties that were significantly lower than the prices set forth in the Loan Agreements.  Hahn Dec. at ¶¶ 31-32.  (App. 13-14)

For example, Wall 10 issued a Loan Agreement on October 18, 2017 that set a land purchase price of $4,400,000.  Wall 10 Loan Agreement at 2.  (App. 34)  However, Barton had already executed a contract months earlier to purchase the Wall 10 property for $2,200,000.  *See* May 2, 2017 Lost Creek Price Email at 1 (App. 157); Lost Creek Land Sale Contract at 1 and 13 (App. 195 & 207).[6]

As another example, Wall 11 issued a Loan Agreement on February 7, 2018 that set a land purchase price of $2,950,000.  *See* Wall 11 Loan Agreement at 2.  (App. 42)  Yet, Barton had already executed a contract months earlier to purchase the Wall 11 property for $1,577,125. *See* Anastasia Land Sale Contract at 1 and 8 (App. 219 & 226).

Barton knew that the inflated purchase prices were being provided to investors, because he and Fu and Wall secretly agreed to inflate the prices.  *See* August 29, 2016 Wall to Barton Markup Email at 1 (App. 160); February 28, 2019 Wall to Fu and Barton Markup Email at 1 (App. 176); November 3, 2016 Fu to Wall Markup Email (forwarded to Barton) at 1-4.  (App. 177-179).  Further, as discussed above, he was involved in underlying purchase negotiations (or

---

[6] The Wall 9 property purchase price referenced in the previous paragraph was also inflated.  The actual purchase price was approximately $1,014,900.  *See* Hahn Dec. at ¶ 32.  (App. 13)

received details on the purchase transactions) setting the real prices, and he executed the Loan Agreements containing the inflated prices.

By overstating the purchase prices, Barton could use the inflated prices to raise more funds from investors in each offering.  The inflated purchase prices also created the false appearance that the investments were safer than they were.  The Loan Agreements pledged the Wall Entities' membership interests to secure the investment.  *See, e.g.* Wall 9 Loan Agreement at 6.  (App. 30)  Barton was leading investors to believe that the Wall Entities were obtaining properties at the higher prices that could be sold to pay back investors via their share of the membership interests if necessary, when in fact the properties, and thus the Wall Entities, had far lower values.

The representations about the contributions of the Wall Entities' funds were also false. Neither the Wall Entities nor any of the other Defendants contributed funds towards the purchase of the properties.  Hahn Dec. at ¶ 31.  (App. 13)  The inflation of the purchase prices was used to mask this misrepresentation.  Indeed, in the two instances where the Wall Entities actually purchased their specified properties, no developer contribution was necessary to pay the balance of the difference between the offering amount and the purchase price, because the actual purchase price was lower than the offering amount.  Hahn Dec. at ¶¶ 17, 32.  (App. 7 & 13-14)

### 3.  Worthless guarantee.

The Loan Agreements for many of the offerings also included a purported corporate guarantee by one of Barton's other entities, JMJ Holdings, for "up to the principal loan amount in the event of default."  *See, e.g.,* Wall 10 Loan Agreement at 6 (App. 38); Wall 12 Loan Agreement at 6.  (App. 54)

Barton approved the guarantees after learning that certain Chinese investors considered them to be an important consideration for their investment decision.  *See* January 23, 2019 Barton Guarantee Email at 1.  (App. 181)  Barton also executed a balance sheet purportedly showing that JMJ Holdings had total assets of more than $100 million.  *See, e.g.,* Wall 10 Investor Presentation at 27 (App. 92); Wall 12 Investor Presentation at 19 (App. 128); Chen Tr. at 48:16-49:24.  (App. 288-289)

The purported guarantees were simply more deception.  In reality, JMJ Holdings is a dormant company that has never done any business or had any assets.  Barton Tr. at 252:22-253:18; 254:1-24.  (App. 244-246)

### 4.  Lulling statements

The Loan Agreements required the Wall Entities to provide investors with quarterly progress reports about the status of the relevant real estate development.  One of Barton's other controlled entities, JMJ Development, acting on behalf of the Wall Entities, sent investors progress reports that misrepresented the actual status of the projects.

For example, a fourth quarter 2019 update sent to investors stated that "all of [the Wall Entities] appear to be tracking with the initial … development plans."  2019 Q4 Lender Update at 2 (App. 184); *see also* Yun Tr. at 33:7-16; 34:20-35:7; 36:4-14.  (App. 306-309)  Yet, most of the properties were never actually acquired by a Wall Entity, much less developed as planned.

## IV.    ARGUMENT AND AUTHORITIES

### A.  Legal Standard for Appointment of Receiver.

Federal courts have broad equitable powers to fashion appropriate ancillary remedies necessary to grant full relief.  *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103-4 (2d Cir. 1972); *SEC v. AmeriFirst Funding, Inc.*, No. 3:07-CV-1188-D, 2007 WL 2192632, at *3

(N.D. Tex. July 31, 2007).  Exchange Act Section 21(d)(5) provides: "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).

The SEC's burden for ancillary relief is *lower* than what it must prove to obtain a temporary restraining order.  *See SEC v. Harris,* No. 3:09-CV-1809-B, 2010 WL 11617972, at *3 (N.D. Tex. June 24, 2010) ("The Commission's burden is lower with regards to an asset freeze, receivership and other ancillary relief than with a traditional injunction."); *SEC v. Unifund SAL,* 910 F.2d 1028, 1041 (2d. Cir. 1990) ("[A]n ancillary remedy may be granted, even in circumstances where the elements to support a traditional SEC injunction have not been established[.]").  The SEC establishes that ancillary relief is warranted by providing a basis for inferring a violation of the federal securities laws.  *See, e.g.*, *Harris,* 2010 WL 11617972, at *3.

The appointment of a receiver is a well-established form of ancillary relief in SEC enforcement actions.  *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 438 (5th Cir. 1981) ("The appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief."); *AmeriFirst Funding*, 2007 WL 2192632, at *3.

Courts will appoint a receiver to, among other protective actions, protect injured investors from further despoliation of their property or rights; preserve the status quo while transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct; and/or marshal and prevent the dissipation of a defendant's assets pending further action by the court. *First Fin. Grp.*, 645 F.2d at 438; *SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964).

The Court may appoint a receiver on a prima facie showing of fraud and mismanagement.  *See First Fin. Grp.*, 645 F.2d at 438; *see also SEC v. Evolution Cap. Advisors, LLC,* No. H-11-2945, 2011 WL 6754070, at *5 (S.D. Tex. Dec. 22, 2011) ("In fact, upon a showing of fraud and mismanagement, appointment of a receiver 'becomes a necessary implementation of injunctive relief.'") (citing *First Financial Group*); *Amerifirst Funding,* 2007 WL 2192632, at *3 (same).

An evidentiary hearing is not required on the SEC's request to appoint a receiver where the record discloses sufficient facts to warrant such an appointment.  *See Bookout v. Atlas Fin. Corp.*, 395 F. Supp. 1338, 1342 (N.D. Ga. 1974), *aff'd*, 514 F.2d 757 (5th Cir. 1975).

Ancillary relief may also be properly directed to non-defendant parties who hold assets on a defendant's behalf.  *See, e.g., Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) ("The plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action.  Rather, '[f]ederal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten gains; and (2) does not have a legitimate claim to those funds.'") (citation omitted).

In addition, the SEC is not stayed from proceeding with an enforcement action against the Wall Entities that are currently in bankruptcy, or any of the other subject entities who may subsequently file for bankruptcy.  Section 364(b)(2) of the Bankruptcy Code allows the SEC to initiate or continue an enforcement action against a debtor in bankruptcy.  11 U.S.C. § 362(b)(4).

This governmental exception to the automatic stay further allows the SEC to take action to obtain possession or control of bankruptcy estate property, including the appointment of a receiver.  *First Fin. Grp.*, 645 F.2d at 439 (upholding the appointment of a receiver to take

13

control of the debtor's assets to safeguard the estate from dismemberment and dissipation of assets); *see also SEC v. Tyler*, No. 3:02-CV-0282, 2002 WL 32538418 at \*7 (N.D. Tex. Feb. 21, 2002) (same).[7]  Accordingly, while the SEC is stayed from enforcing a money judgment against estate property as a collection measure, seeking a receiver and corporate manager to take control and possession of estate property properly falls within the scope of Section 362(b)(4).

### B.  Prima Facie Showing of Antifraud Violations.

The Commission alleges that the Barton Defendants violated the antifraud provisions of the Securities Act and the Exchange Act.  Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] prohibits fraud in the offer or sale of a security, and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] prohibit fraud in connection with the purchase or sale of any security.

To establish a violation under these sections, the Commission must prove by a preponderance of the evidence: (1) that in connection with the purchase, offer, or sale of any security; (2) the Barton Defendants made a material misrepresentation or omission of material fact, or employed a fraudulent device; (3) with the requisite mental state.  *See generally*, *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009); *SEC v. Seghers*, 298 F. App'x 319, 327-28 (5th Cir. 2008).[8]

---

[7] This Court has jurisdiction to determine whether the automatic applies to a motion for receivership.  *First Fin. Grp.*, 645 F.2d at 439 (the district court has the jurisdiction to determine whether the SEC's civil enforcement action comes within the § 362(b)(4) exception to the automatic stay); *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107 (9th Cir. 2005) ("We therefore hold, in accordance with established law, that a district court has jurisdiction to decide whether the automatic stay applies to a proceeding pending before it, over which it would otherwise have jurisdiction.").

[8] Both statutes require that securities be offered or sold through the use of interstate communications, commerce, or the mails.  The Loan Agreements were offered and sold using wires, emails, phone calls, and internet applications. Supra at 5; Hahn Dec. at ¶ 15 (App. 6); *see also SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce"); *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No. 08CV1402, 2009 WL 3233110, at \*4 (E.D.N.Y. Oct. 2, 2009) (holding that wire transfers were instrumentalities of interstate commerce).

Liability arises not only from affirmative representations but also from failures to disclose material information.  *See SEC v. Fehn* 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (the antifraud provisions impose a "duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.").

Establishing a violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 requires proof of scienter.  *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).  To prove scienter, the SEC need only show the defendant acted with "severe recklessness."  *SEC v. Sethi,* 910 F.3d 198, 206 (5th Cir. 2018) (citing *Broad v. Rockwell, Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981) (en banc).[9] Negligence is sufficient to show a violation of Sections 17(a)(2) and (3) of the Securities Act. *See Aaron*, 446 U.S. at 701-02.

To establish violations of Sections 17(a) and 10(b) and Rule 10b-5 based on misrepresentations or omissions, the facts at issue must be material.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *Id; SEC v. Seghers*, 298 F. App'x 318, 328 (5th Cir. 2008).

The evidence set forth in support of the SEC's motion more than makes a prima facie showing of the Barton Defendants' violations of these fraud-based claims:

*First*, the Barton Defendants offered and sold securities.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other

---

[9] A company's scienter can be imputed from individuals who control it.  *See Manor Nursing Ctrs., Inc.,* 458 F.2d at 1089, n.3; *Southland Sec. Corp. v. INSpire Ins. Solution, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

instruments, any "investment contract" or "note."  15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).

The Loan Agreements are "investment contracts."[10]  The investors invested money that was pooled in a common enterprise with the expectation of investment returns based and dependent solely on the efforts of the promoters.  Supra at 5-6; *see also SEC v. Better Life Club of American, Inc.*, 995 F. Supp. 167, 173-174 (D.D.C. 1998), *aff'd* 203 F.3d 54 (D.C. Cir. 1999) (holding loan agreements in which investors contributed funds to common enterprise with expectation of receiving profits based solely on the efforts of the promoters were securities, and finding it "hard to imagine a more perfect example" of an "investment contract").

The Loan Agreements are also securities, because they are "notes."  "The Supreme Court has held that the definition of 'note' may 'be viewed as a relatively broad term that encompasses instruments with widely varying characteristics,' and as with the term 'security,' the definition of 'note' looks to the economic reality and surrounding circumstances of a transaction."  *Tyler*, 2002 WL 32538418 at *7 (internal citation omitted).  Here, the Loan Agreements evidence a promise to pay a financial return on set terms and are notes in economic substance.  *See Tyler*, 2002 WL 32538418 at *7 (holding letters outlining maturity date and annual rate of return for viaticals investment were both notes and investment contracts); *SEC v. Smart*, Civ. No. 2:09-CV-00224, 2011 WL 2297659, at 12-14 (D. Utah June 8, 2011) (note agreements that pooled investor funds and promised fixed returns were securities as either investment contracts or notes).  The subscription agreements provided to several investors also represented the investment was a note.  *See, e.g.,* Wall 19 Subscription Agreement at 1 ("I hereby subscribe to the Note (promissory note) as co-lender.") (App. 57).

---

[10] An investment contract exists where: (1) individuals are led to invest money; (2) in a common enterprise; and (3) with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves.  *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99 (1946).  Courts do not take the word "solely" literally. *See, e.g.*, *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973).

*Second*, the Barton Defendants made material misstatements and omissions and engaged in deceptive acts in connection with the offer, purchase, and sale of the securities:

- The Barton Defendants falsely told investors the Wall Entities would use their money to purchase a specific parcel of land, but then misappropriated the money and spent it on a litany of improper purposes.  A reasonable investor would consider the fact that their investment would not be used for the represented investment purpose important in deciding whether to invest.  *SEC v. Brooks*, No. 3:99-cv-1326-D, 1999 WL 493052 at *2 (N.D. Tex. July 12, 1999) (misrepresentations about use of investor funds are material); *see also* Chen Tr. at 36:2-38-1 (App. 285-287); Yun Tr. at 23:10-24:6; 26:7-25.  (App. 301-303)

- The Barton Defendants misstated the land purchase prices.  A reasonable investor would consider the fact that the promoter was intentionally inflating the value of the collateral securing their investments important in deciding whether to invest.

- The Barton Defendants falsely told the investors that the Wall Entities would be contributing funds towards the land purchases.  A reasonable investor would consider the fact that promoter was lying about putting its own money into a venture side-by-side with the investors important in deciding whether to invest.  *See e.g.,* Chen Tr. at 63:5-64:21; 65:8-12.  (App. 290-292).

- The Barton Defendants claimed to certain investors that their investments were fully guaranteed by one of Barton's other companies, but omitted that the guaranteeing company had no assets.  A reasonable investor would consider the fact that he or she was receiving a worthless guarantee important in deciding whether to invest.

*Third*, Barton acted with scienter.  Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements and he was a signatory to the Loan Agreements.  Barton knew the investor funds were being misused, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes.  Barton also knew the inflated purchase prices were being provided to investors, because he agreed to the scheme with Fu and Wall, he was involved in underlying purchase negotiations setting the actual prices, and he executed the Loan Agreements containing the inflated prices.  Finally, Barton knew that the company he was using to guarantee the investments had no assets.[11]

## C.  The Appointment of a Receiver is Warranted.

"The district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought."  *First Fin. Grp. of Texas*, 645 F.2d at 438 (citations and footnotes omitted).

A receivership is warranted here given the Barton Defendants' fraud and the resulting harm to investors.  Barton mismanaged and misused substantially all of the investor proceeds.  Appointing a receiver for the all of the entities, including those currently in bankruptcy, will provide for uniformity in administration of all entities by a single fiduciary who is subject to the

---

[11] The evidence of scienter here is overwhelming.  However, the SEC's antifraud claims under Section 17(a)(2) and (3) of the Securities Act only require a showing of negligence.  There is no question that Barton did not exercise reasonable care in his use of investor funds and in making the other misstatements and omissions.

supervision and jurisdiction of this Court.  Further, a receiver is critical here to determine how and whether the bankruptcy cases should proceed, the most cost effective way of utilizing the bankruptcy cases, and how best to maximize asset recovery for all defrauded investors. Consequently, appointment of a receiver over the entities, including those in Chapter 11, is necessary to protect investors.

As noted above, Barton, acting through various entities that he directly or indirectly controls, misused a significant portion of the investor funds to purchase real property interests, including several parcels of raw land.  Barton, who has now been indicted on multiple felony counts, has previously encumbered and transferred assets.  There is a substantial risk that the values of the real property assets will not be maximized or worse, will be further degraded, if a receiver is not put in place immediately to steward the assets.

The receivership will seek to efficiently and expeditiously gather, manage, and potentially liquidate receivership assets for the benefit of harmed investors.  In the immediate term, the receivership would focus on determining the value of the real property interests and any other assets, determining what (if anything) can be done to secure and preserve that value, and taking steps to protect documents, data, technology, and other sources of information. Thereafter, the receivership would focus on monetizing any value in the real property interests or other identified assets.

Longer term, the receivership will also focus on: (1) tracing of funds; (2) asset recovery; and (3) evaluation and prosecution of potential litigation.  Generally, claims may exist against persons or entities that directly or indirectly received property or other assets from a Receivership Defendant.  Claims may also exist against persons or entities that directly or indirectly were involved in the solicitation of funds which were paid to Receivership Defendants.

The SEC has vetted candidates to make a recommendation to the Court, identifying receiver candidates who: (i) possess skill and experience in this area; (ii) agree to standard billing and reporting requirements; (iii) agree to reduce professional fees; (iv) have personnel poised for immediate action; and (v) have cleared conflicts.

In that regard, submitted herewith is a biography for David Wallace (Trigild, Inc.) for the Court's consideration.  (App. 312).  Wallace presents significant benefits as a receivership candidate for this matter.  First, Wallace has agreed to obtain the title work and broker's opinions of value for the properties at no cost to the receivership.  These are expected to be the primary costs incurred to determine the value of the properties.  Second, Mr. Wallace's firm believes it will be able to obtain discounted brokerage fees on the sale of the properties.  This could also result in a significant cost savings if the receivership moves to the monetization stage.  Third, Mr. Wallace and his firm have extensive experience valuing and selling real estate assets and handling receiverships involving real estate issues.

## V.  REQUEST FOR EXPEDITED CONSIDERATION

Time is of the essence to protect the assets at issue, and the SEC therefore respectfully requests that its motion be considered on an expedited basis.

## VI.    REQUEST FOR RELIEF

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's motion, enter the proposed order appointing a receiver, and grant the SEC such other or further relief as this Court may deem just, proper, and equitable.

Dated: September 26, 2022                         Respectfully submitted,

                                                 /s/ *Keefe M. Bernstein*
                                                 Keefe M. Bernstein
                                                 Texas Bar No. 24006839
                                                 David B. Reece
                                                 Texas Bar No. 24002810
                                                 James E. Etri
                                                 Texas Bar No. 24002061
                                                 Securities and Exchange Commission
                                                 801 Cherry Street, Suite 1900
                                                 Fort Worth, Texas 76102
                                                 (817) 900-2607 (KMB phone)
                                                 (817) 978-4927 (facsimile)
                                                 bernsteink@sec.gov

                                                 Counsel for Plaintiff
                                                 Securities and Exchange Commission

## CERTIFICATE OF CONFERENCE

I affirm that on September 25, 2022, I conferred with Khudabuksh Walji, Defendant Barton's counsel during the SEC's pre-suit investigation, and then Richard Roper, Defendant Barton's criminal counsel, about the relief requested in this Motion.  Barton is currently incarcerated, and no counsel has appeared yet on behalf of any defendants in this case. However, based on these discussions it is my understanding that the Barton Defendants and Relief Defendants are currently opposed to the relief sought in this Motion.

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein

## CERTIFICATE OF SERVICE

I affirm that on September 26, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

I further certify that on the same day I caused the foregoing to be served via email (with the appendix via electronic file sharing) to the following.

Khudabuksh K. Walji, Esq.
Law Office of K. Walji, P.C.
The Atrium Building
10701 Corporate Drive, Suite 350
Stafford, Texas 77477
281-401-9672
k.walji@waljilaw.com

*Counsel for the Timothy Barton during the SEC's investigation*

Richard B. Roper
Holland and Knight
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas  75201
214-969-1210
richard.roper@hklaw.com

*Criminal counsel for Timothy Barton*

Eric Chartan
Bryan Cave Leighton Paisneer LLP
JP Morgan Chase Tower
2200 Ross Avenue, Suite 3300
Dallas, Texas  75201
214-721-8106
eric.chartan@bclplaw.com

*Counsel for Haoqiang (a/k/a Michael) Fu during the SEC's investigation*

Michael P. Heiskell
Johnson Vaughn & Heiskell
5601 Bridge Street, Suite 220
Fort Worth, Texas 76112
817-457-2999
mheiskell@johnson-vaughn-heiskell.com

*Counsel for Steven Wall during the SEC's investigation*

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein