**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

v.

TIMOTHY BARTON,         C.A. No.: 3:22-cv-2118-X
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,          Jury Trial Demanded
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

       Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

       Relief Defendants.

**DECLARATION OF CAROL HAHN IN SUPPORT OF**
**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**<u>EXPEDITED MOTION FOR APPOINTMENT OF RECEIVER</u>**

**APP001**

I, Carol Hahn, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and that I am competent to testify to the matters stated herein:

1.    I am currently employed as a Staff Accountant with the United States Securities and Exchange Commission (the "Commission") in its Fort Worth Regional Office in Fort Worth, Texas.  I have been employed by the Commission since April 2005.  I hold a Bachelor of Science in Economics from Texas A&M University.  I am a Certified Fraud Examiner.  The facts set forth herein are based upon my personal knowledge or upon information contained in the files of the Commission.

2.    As a Staff Accountant with the Commission, my responsibilities include, but are not limited to, analyzing financial records of non-public corporations, partnerships, limited liability companies, other entities, and individuals.  During the course of these responsibilities, I routinely trace financial transactions to determine how they occurred and their ultimate disposition, summarize that information and data into various schedules and charts, and testify to such at hearings and trials.

3.    As part of my official duties, I have been involved in a Commission investigation related to Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC ("Wall 7"), Wall009, LLC ("Wall 9"), Wall010, LLC ("Wall 10"), Wall011, LLC ("Wall 11"), Wall012, LLC ("Wall 12"), Wall016, LLC ("Wall 16"), Wall017, LLC ("Wall 17"), Wall018, LLC ("Wall 18"), and Wall019, LLC ("Wall 19"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall") (collectively, "Defendants") and DJD Land Partners, LLC ("DJD") and LDG001, LLC ("LDG001") (collectively, "Relief Defendants"), to determine whether there have been violations of the federal securities laws.

**APP002**

4.      In connection with this investigation, and pursuant to subpoenas and standard documents requests, I, and other members of the Commission staff, reviewed various documents related to the Defendants, including but not limited to, various offering materials, bank account records, title company records, public records, and records produced to the Commission by other third-parties.

## Bank Records Analysis

5.      As part of my official duties in this case, I have reviewed and analyzed bank records and other documents to determine the sources and uses of funds in connection with the Defendants' efforts to raise money from investors through investment loans issued by nine special-purpose entities formed to purchase specific pieces of land.  The nine special-purpose entities are Defendants Wall 7, Wall 9, Wall 10, Wall 11, Wall 12, Wall 16, Wall 17, Wall 18, and Wall 19 (each a "Wall Entity" or collectively, the "Wall Entities").

6.      From this review, I learned that Barton received investor funds directly into Wall Entity bank accounts in addition to bank accounts held in the name of entities controlled (directly or indirectly) by Barton, including JMJ Development, LLC ("JMJ Development") (investor funds were kept in that account), JMJ Hospitality, LLC ("JMJ Hospitality"), JMJAV LLC ("JMJAV"), and into his personal account.

7.      Wall received Wall Entity investor funds into his personal accounts and into accounts in the name of Carnegie Homes LLC, an entity Wall owns and controls, which were then deposited into a Wall Entity account.

APP003

8.      Fu received Wall Entity investor funds through one of his companies which were either wired to a Wall Entity account or were kept by Fu to offset fees and commissions purportedly owed to him.[1]

9.      The chart below identifies the 15 bank accounts in the names of the Wall Entities (together, the "Wall Entity Bank Accounts") that received Wall Entity investor funds or loan proceeds secured by a Wall Entity property:

| Bank Name | Account Name | Account Number (Last 4 Digits) |
|---|---|---|
| Capital One Bank N.A. | Wall007, LLC | -5436 |
| Capital One Bank N.A. | Wall007, LLC | -1714 |
| J.P. Morgan Chase Bank N.A. | Wall007, LLC | -3096 |
| Capital One Bank N.A. | Wall009, LLC | -6246 |
| J.P. Morgan Chase Bank N.A. | Wall009, LLC | -0075 |
| Capital One Bank N.A. | Wall010, LLC | -3851 |
| J.P. Morgan Chase Bank N.A. | Wall010, LLC | -0861 |
| Capital One Bank N.A. | Wall011, LLC | -1846 |
| J.P. Morgan Chase Bank N.A. | Wall011, LLC | -9823 |
| J.P. Morgan Chase Bank N.A. | Wall012, LLC | -0510 |
| J.P. Morgan Chase Bank N.A. | Wall016, LLC | -1761 |
| J.P. Morgan Chase Bank N.A. | Wall017, LLC | -2529 |
| J.P. Morgan Chase Bank N.A. | Wall017, LLC | -2081 |
| J.P. Morgan Chase Bank N.A. | Wall018, LLC | -6910 |
| J.P. Morgan Chase Bank N.A. | Wall019, LLC | -6359 |

---

[1] As discussed below, Barton also paid out additional investor funds to Fu as purported fees and commissions from various entity accounts he controlled.

4

APP004

10.     In addition to the Wall Entity Bank Accounts, there were investor funds received into the following additional accounts controlled, directly or indirectly, by Barton (together, the "Additional Barton Controlled Accounts"):

| Bank Name | Account Name | Account Number (Last 4 Digits) |
|---|---|---|
| Wells Fargo Bank N.A. | Timothy Barton | -2748 |
| Capital One Bank N.A. | Carnegie Development LLC | -1331 |
| J.P. Morgan Chase Bank N.A. | Carnegie Development LLC | -7036 |
| J.P. Morgan Chase Bank N.A. | JMJ Development LLC | -5193 |
| Capital One Bank N.A. | JMJ Development LLC | -1622 |
| Capital One Bank N.A. | JMJ Hospitality LLC | -0660 |
| Capital One Bank N.A. | JMJAV LLC | -5459 |

11.     Although bank statements were originally obtained for the time period January 1, 2015 to June 30, 2021, my review focused on the time period starting from January 1, 2017 through July 2019 (the "relevant period"), the last date that Wall Entity investor funds were obtained from investors based on the currently available evidence.[2]  For each account, when available, I reviewed account opening documents and signature cards[3], monthly account statements, transaction data files, deposit and withdrawal supporting documentation, and any correspondence.

12.     From my review of the bank records, I determined that Barton was a signatory, along with his administrative assistant, on the vast majority of the Wall Entity Bank Accounts and the Additional Barton Controlled Accounts.  His administrative assistant was the sole signatory on

---

[2] There are bank accounts for the Wall Entities and Additional Barton Controlled Accounts that are not listed in the charts above primarily because the dates of those accounts fall outside the relevant period.

[3] The bank did not produce a signature card for the Wall 17 (-2529) account.

APP005

the following accounts: Wall 10 (-3851) and JMJ Hospitality, LLC (-0660).  Barton was the sole

signatory on his personal account (-2748), JMJ Development (-1662), and JMJAV (-5459).

13.    As part of my analysis, I classified financial transactions based on several factors,

including the name of the payee or payor, annotations or memo notations associated with deposits

or disbursements, and information gathered during the course of the Commission staff's

investigation in this case.

14.    Based on this review, I determined that from approximately March 2017 through

June 2019, the Wall Entities raised over $26.3 million from over 100 investors as shown in the

chart below.

| Offering | Offering Dates[4] | Total Funds Raised[5] | |
|---|---|---|---|
| Wall  7 | March - April 2017 | $ | 2,759,293 |
| Wall  9 | May - July 2017 | $ | 2,320,091 |
| Wall 10 | September - November 2017 | $ | 2,279,897 |
| Wall 11 | December 2017 - February 2018 | $ | 2,024,723 |
| Wall 12 | April - July 2018 | $ | 3,986,062 |
| Wall 16 | July - November 2018 | $ | 1,879,804 |
| Wall 17 | October 2018 - February 2019 | $ | 7,798,471 |
| Wall 18 | March - June 2019 | $ | 2,363,286 |
| Wall 19 | May 2019 | $ | 900,000 |
| | | $ | 26,311,627 |

15.    Investors were primarily located in China; however, there were at least two

investors located in the United States at the time of their investments.  Investments consisted

primarily of wire transfers but there were also Fedwire credits, book transfers, other types of

credits, and deposits.  Investor funds were pooled and commingled within the Wall Entity Bank

---

[4] These dates are based on receipt of investor funds in the bank accounts.

[5] These amounts include investor funds that were received and kept by Fu to offset commissions (approximately $1,051,400) and never deposited into a Wall Entity or related bank account. These amounts do not include funds from any investors whose interests in a prior Wall Entity were rolled over to a later Wall Entity, nor do they include a $2 million investment from a Chinese investor in a prior unrelated offering who entered into an arrangement to be given credit in a Wall Entity for this prior investment.

APP006

Accounts and further transferred and commingled among the Wall Entity Bank Accounts and the Additional Barton Controlled Accounts multiple times through the relevant period.

### Misuse of Investor Funds

16.     Barton misappropriated investor funds from the outset.  From March 10, 2017 to April 28, 2017, a total of $2,073,869.28 was raised from Wall 7 investors and of this, $572,000 was transferred to JMJ Development, commingled with other funds, and used for a variety of purposes not related to the purchase of a Wall Entity property, including funds that were transferred or paid to related entities and individuals, used for the purchase of other non-Wall Entity properties, and used to make credit card payments.  In addition, $115,600 from these investor funds was paid to Fu as commissions.

17.     In fact, of the approximately $26.3 million raised, only two Wall Entities -- Wall 7 and Wall 9 -- actually purchased the property described in their agreements for a total purchase price of approximately $2.6 million (or approximately 10% of investor funds raised).  However, even in those two limited instances, Wall 7 and Wall 9 purchased their respective properties not with their own investor funds, but with each other's commingled investor funds in a series of roundtrip transactions meant to support the false, inflated purchase price for each property.

18.     More specifically, on May 1, 2017, Wall 7 transferred $1,300,000 to Carnegie Development and then to a bank account for an unrelated, non-Wall Entity offering Barton was involved in where the Wall 7 investor funds were commingled with investor funds from that unrelated offering and then sent to a title company to purchase that unrelated offering's property. The seller of that property, ASCO Land, LLC (a company formed by Michael Matthews, an individual associated with Barton), then sent these sales proceeds, consisting primarily of Wall 7 investor funds, to JMJ Development.  JMJ Development transferred $1,100,000 of this money

**APP007**

through Carnegie Development to Wall 9 and from Wall 9 to a title company as earnest money to purchase Wall 9's property from LYNCO Ventures, LLC ("LYNCO Ventures") (also a Michael Matthews company). LYNCO Ventures received this earnest money on May 4, 2017 and, on the same day, Michael Matthews wired $1,015,190.46 to a different title company to purchase the Wall 9 property from a third party for $1,014,900.[6]

19.    In July 2017, $200,000 of investor funds was transferred from Wall 7 through Carnegie Development to Wall 9 and combined with $1,600,470.53 of Wall 9 investor funds that were then wired ($1,800,470.53) to a title company, supposedly as additional funds to purchase Wall 9's property from LYNCO Ventures. However, LYNCO Ventures received these funds and sent them (combined with funds remaining from the $1,100,000 referenced above) to JMJ Development, of which $1,600,000 was transferred to Carnegie Development. Then on September 5, 2017, a majority of these primarily Wall 9 investor funds were transferred from Carnegie Development to Wall 7 and then sent to a title company as earnest money for Wall 7's property purchase from Manlyn Land Partners, LLC ("Manlyn") (a Michael Matthews company). Manlyn received these funds and sent $1,500,000 to JMJ Development on September 7, 2017, which was then transferred through Carnegie Development to Wall 7. From Wall 7, it was sent to a title company on September 8, 2017 as additional funds to purchase Wall 7's property from Manlyn. The title company wired the $1,500,000 to Manlyn on September 11, 2017. On September 19, 2017, Manlyn wired $1,565,300.25 to a different title company, and it is believed that this is the approximate amount and date when Wall 7's property was actually purchased from a third party.

20.    In addition, on November 3, 2017, $375,000 of Wall 10 investor funds were transferred through Carnegie Development to Wall 7. From Wall 7, these funds were then wired

---

[6] The original sales contract states a sales price of $1,006,800 but title company documentation shows a contract sales price of $1,014,900 at closing.

APP008

to the title company on November 6, 2017 as the final funds to purchase Wall 7's property from Manlyn. Manlyn received $356,645.87 of these funds on November 7, 2017 and sent the same amount to JMJ Development on November 13, 2017.

21. Thereafter, there was a partial sale in June 2018 of Wall 7's property to a third party for $2,200,000. The net proceeds of $1,991,059.92 that were paid at the time of the sale included $1,095,528.92 wired to Wall 7 and $895,531 wired to JMJ Development. JMJ Development further transferred the proceeds it received to Wall 7 a few days later in June 2018. The majority of these Wall 7 sale proceeds were then transferred from Wall 7 through Carnegie Development to Wall 11 to purchase Wall 11's property in the name of a non-Wall entity.

22. The remaining $23.7 million, or approximately 90%, of investor funds raised were misused by Barton as described below. In fact, the only other properties identified in the loan agreements that were purchased during the relevant period were the properties identified in the Wall 11, Wall 18, and Wall 19 loan agreements. However, these properties were not acquired by a Wall Entity, much less the correct Wall Entity.

23. Wall 11's property was acquired by Relief Defendant DJD in June 2018 after $1,609,000 was transferred from Wall 7 (from sale proceeds) to Carnegie Development and then to Wall 11 where two wires totaling $1,608,059.97 were wired to a title company and credited to DJD for DJD to purchase the property.

24. Wall 18's property was acquired by Relief Defendant LDG001 in August 2018 after $1,660,000 of investor funds from Wall 12 and $220,000 of investor funds from Wall 16 were transferred to Carnegie Development. Carnegie Development then wired $1,878,179.37 to LDG001 who wired the funds ($1,878,579.27) to a title company to purchase the property[7].

---

[7] Previous to this wire, Carnegie Development had sent funds totaling $106,170.25 to the title company as earnest money/other funds toward this purchase.

APP009

25.     Finally, Wall 19's property was acquired by BM318 LLC, a Barton controlled entity, in November 2018 after investor funds from Wall 16 ($60,000) and Wall 17 ($1,440,000) were transferred to Carnegie Development, combined with funds from JMJAV ($500,000), and then wired to a title company to purchase Wall 19's property.

26.     Barton continued this pattern of commingling funds from all Wall Entity offerings by transferring investor funds from the Wall Entity Bank Accounts to JMJ Development and Carnegie Development bank accounts, and from those accounts to other accounts and entities controlled by Barton, and vice versa.  There was also Wall Entity investor funds transferred from one Wall Entity account through Carnegie Development or JMJ Development to a different Wall Entity account and used for various purposes, including to pay Fu commissions/fees and to make Ponzi payments.  In addition, Wall Entity investor funds were commingled with loan proceeds, title company proceeds, and non-Wall Entity investor funds, among other unknown deposits or transfers.  For an example of the commingling of investor funds, see the chart at Exhibit A.

27.     Commingled investor funds not spent to acquire a Wall Entity property were used by Barton to:

- Acquire, develop, or for the benefit of different unrelated properties for other direct or indirect Barton-controlled entities, including but not limited to: Villita Towers LLC, Mansions Apartment Homes at Marine Creek LLC, MO 2999TC LLC, JMR 100 LLC, JMJ Acquisitions LLC, FHC Acquisition LLC, D4DS LLC, D4FR LLC, and D4KL LLC;

- transfer funds to other Barton-controlled entities, including but not limited to: Lajolla Construction Management LLC, Goldmark Hospitality LLC, Enoch Investments LLC, and JMJAV;

APP010

- pay for professional services (such as engineering, surveying, land development, and consulting) related to the acquisition, development, and build out of multiple real estate properties, the majority of which are believed to be for non-Wall Entity properties;

- pay credit card payments (over $2.5 million), including for Barton and his family members;

- pay other personal expenses of Barton and his family, including to purchase vehicles or make car payments, pay rent, make retail purchases, and purchase an airplane;

- to make political contributions;

- pay principal and interest payments on multiple loans that Barton obtained, including loans for other non-Wall Entity properties;

- make payments to Fu for purported commissions and fees (at least approximately $3.76 million);[8]

- make payments to Wall, Carnegie Homes LLC, or a Wall related entity (at least approximately $535,000);[9] and

- make interest payments to investors, some of which were Ponzi payments.

**Ponzi/Interest Payments to Investors**

28.     The Wall Entity loan agreements promised a fixed rate annual return to investors after the first and second years, and a return of principal after the second year.  Barton did make the first-year interest payments to some of the Wall Entity investors.  However, some of these payments were Ponzi payments, whereby Barton used later Wall Entity investors to pay interest payments to earlier investors.  Specifically, Barton used $201,333 of Wall 17 investor funds to

---

[8] This includes payments that were wired to an offshore account at the direction of Fu.

[9] This does not include $500,000 paid to Carnegie Homes LLC from proceeds of the sale of a prior unrelated offering's property.

APP011

make Ponzi payments to Wall 11 investors, and he used $196,500 of Wall 12 investor funds to make Ponzi payments to Wall 9 investors.  Barton used an additional $609,614 of commingled investor funds to make interest payments to Wall Entity investors.  In total, of the approximately $6.3 million in interest payments owed to investors over two years, Barton only paid $1,007,447 (or 16%) to investors.  And Barton didn't return any of the investors' principal during the relevant period.[10]

### Loans Secured by Wall Entity Properties

29.     Barton also took out loans secured by certain Wall Entity properties, but he did not use the majority of the loan proceeds to develop the corresponding Wall Entity property.  For example, Barton used Wall 7 to obtain a short-term bridge loan of $1,854,000 in May 2018 secured by part of Wall 7's property.  Barton, however, only used approximately $40,000 of the loan proceeds to pay an engineering firm for plans related to Wall 7's property.  Instead, in June 2018, Barton sent $1,036,763.69 of the loan proceeds to a title company to be used in the purchase of a property referred to as Marine Creek Apartments in Fort Worth, Texas by Mansions Apartment Homes at Marine Creek LLC, a Barton entity.  Barton also wired $160,000 in June 2018 from Wall 7 to an account that he controlled in the name of Mansions Apartment Homes at Marine Creek LLC C/O JMJ Holdings LLC.

30.     Most of the remaining Wall 7 loan proceeds were transferred from Wall 7 to JMJ Development or Carnegie Development and used in part to pay legal fees, credit card bills, make car payments, and transferred or paid to related entities and individuals.  When the note became due a year later, Barton had Wall 7 enter into another loan agreement for $2,800,000 from a different lender to pay off the first loan plus interest.  Barton defaulted on this second loan, caused

---

[10] Except for one investor that received a refund of their investment.

Wall 7 to change ownership of Wall 7's property to Orchard Farms Village LLC, a Barton entity, and then entered into a loan agreement with a third lender to assume Wall 7's note, owing the original principal ($2,800,000) plus over $440,000 in interest and fees.

**Defendants Inflated the Purchase Prices of Properties**

31.     The Defendants inflated the purchase prices of the Wall Entity properties in the Wall Entity loan agreements and other offering/marketing materials.  Wall 7's loan agreement represents that Wall and Fu would contribute funds (equal to 20%) toward the purchase price of the properties but this never occurred.  Subsequent Wall Entity loan agreements represented that the Wall Entity who was borrowing the funds would contribute funds (equal to 10% to 20%) toward the purchase prices of the properties; this also never occurred.  Further, marketing materials for all of the Wall Entities represented that Wall, Barton (or in some instances the Wall Entities), and one of Fu's companies would contribute funds (equal to 20%) toward the purchase prices of the properties; this likewise did not occur.

32.     The staff's investigation revealed that the property purchase prices were inflated in part to cover this 10% to 20% contribution by the Defendants.  The chart below shows the represented purchase prices versus the actual purchase prices for the Wall Entity properties:

| Offering | Represented Purchase Price[11] | Actual Purchase Price[12] | Difference |
|---|---|---|---|
| Wall  7 | $3,450,000.00 | $1,565,300.00 | $1,884,700.00 |
| Wall  9 | $2,900,000.00 | $1,014,900.00 | $1,885,100.00 |
| Wall 10 | $4,400,000.00 | $2,200,000.00 | $2,200,000.00 |

---

[11] The loan agreements for Wall 18 and Wall 19 use the term transactional cost versus purchase price.

[12] For certain of the Wall Entities, the actual purchase price is an estimate based on funds wired to title companies or calculated based on a price per acre versus a stated purchase price.  For Wall 17, the purchase price is based on email correspondence.

**APP013**

| | | | |
|---|---|---|---|
| Wall 11 | $2,950,000.00 | $1,577,125.00 | $1,372,875.00 |
| Wall 12 | $5,250,000.00 | $3,626,448.00 | $1,623,552.00 |
| Wall 16 | $4,850,000.00 | $3,373,440.00 | $1,476,560.00 |
| Wall 17 | $11,000,000.00 | $10,000,000.00 | $1,000,000.00 |
| Wall 18 | $6,250,000.00 | $1,984,749.52 | $4,265,250.48 |
| Wall 19 | $4,189,650.00 | $1,440,070.00[13] | $2,749,580.00 |

## Property Ownership and Assets

33.    Based on the most recent available information, Commission staff believes that the following Barton-controlled entities still own property acquired, at least in part, with Wall Entity investor funds: DJD, LDG001, and Carnegie Development.

34.    In addition, Commission staff believes the following Barton controlled entities received Wall Entity investor funds that were used for the benefit of properties they still own (for development, mortgage payments, etc.): D4DS LLC, D4FR, LLC, and FHC Acquisition LLC.

35.    Attached as Exhibit B is a chart showing the properties that, based on available information, were purchased in whole or in part with investor funds or benefited from the use of investor funds, including an estimate of their value determined from public records.    These valuations do not reflect any outstanding liens on the properties.

36.    There were also numerous other properties acquired, at least in part, with Wall Entity investor funds, or where investor funds used in connection with the properties, that were

---

[13] For Wall 19, the addendum to the purchase and sales contract for this property states a price per acre of $17,000. Barton through BM318 LLC purchased 118 acres not 84.71 acres as represented in the Wall 19 loan agreements. The 84.71 acres at $17,000 an acre should have cost $1,440,070.

14

APP014

sold, some within the last year, but Commission staff has not traced the disposition of the proceeds from those sales. These sold properties are also included on Exhibit B.

37.     Attached as Exhibit C is a list, based on currently available information, of the Barton-controlled entities that received investor funds, real property interests purchased, at least in part, with investor funds, or own property interests that were improved with or otherwise have benefited from the use of investor funds. In addition, Barton controls multiple other entities that may have also received or benefited from investor funds, including the sales proceeds from the recent property sales. Without full access to Barton's records, and as a result of his extensive comingling and transferring of properties and funds, the Commission staff has been unable confirm all of the entities Barton controls and their assets.

38.     Based on updated account records for the Wall Entity Bank Accounts and the Additional Barton Controlled Accounts, it appears that there is a total of $187.46 remaining in those accounts as of July 29, 2022.[14]

I state under penalty of perjury that the foregoing is true and correct.

Dated: September 23, 2022               _____
                                        Carol Hahn

---

[14] This is the total based on the last statement dates obtained by the Commission and for some accounts this date is prior to July 29, 2022.

APP015



**EXHIBIT**

**A**

| **Account Name: Carnegie Development, LLC** | | | | | |
|---|---|---|---|---|---|
| Time Period: 2/11/2019 - 2/13/2019 | | | | | |
| **Beginning Account Balance @ 02/11/2019** | $ | 4,596.43 | | | |
| Transferred from Wall017 (Wall017 investor funds) | $ | 1,085,000.00 | | | |
| **Total Deposits** | $ | **1,085,000.00** | | | |
| **Use of Funds:** | | | **JMJ Development** | | |
| Transferred to JMJ Development | $ | (955,000.00) ⟶ | 2/12/2019 | $ 955,000.00 | |
| | | | 2/12/2019 | $ (259,000.00) | Wired to JMR 100, LLC (affiliated entity) |
| | | | 2/12/2019 | $ (650,937.94) | Wired to Reunion Title to purchase 99.963 acres in Aledo, TX[1] |
| | | | **Wall011** | | |
| Transferred to Wall011 | $ | (127,000.00) ⟶ | 2/13/2019 | $ 127,000.00 | |
| | | | 2/13-2/28 | $ (110,000.00) | Wall011 Investor Interest Payments |
| | | | 2/13/2019 | $ (6,710.00) | Loan Payment to Southern Star Capital |
| | | | 2/25/2019 | $ (10,000.00) | Transferred to JMJAV, LLC (affiliated entity) |
| Check Paid to an individual | $ | (135.67) | | | |
| **Total Withdrawals** | $ | **(1,082,135.67)** | | | |
| **Ending Account Balance @ 02/13/2019** | $ | 7,460.76 | | | |

---

[1] Wall017's property is 200 acres in Forney, TX.

**EXHIBIT B**

**Properties Owned**

| Current Owning Entity | Approximate Address and/or Description | County | State | Valuation / Total Market Value (2022) |
|---|---|---|---|---|
| DJD Land Partners LLC | 11417 CR 501 Venus, TX (Abst 857, TR 7, A Williams) | Johnson | TX | $ 71,271.00 |
| DJD Land Partners LLC | 11417 CR 501 Venus, TX | Johnson | TX | $ 5,000.00 |
| DJD Land Partners LLC | 11417 CR 501 Venus, TX | Johnson | TX | $ 554,933.00 |
| DJD Land Partners LLC | 1025 N FM 157 (Abst 857, TR 8, A Williams) | Johnson | TX | $ 53,883.00 |
| LDG001 LLC | 980 CR 110 Venus, TX | Johnson | TX | $ 767,276.00 |
| LDG001 LLC | 324 W CR 109 Venus, TX | Johnson | TX | $ 597,963.00 |
| LDG001 LLC | 940 CR 110 Venus, TX | Johnson | TX | $ 182,224.00 |
| Carnegie Development LLC | 10901 CR 507 (Abst 261, Tr 3 Pt, 4, J N Ely) Venus, TX | Johnson | TX | $ 523,801.00 |
| Carnegie Development LLC | 11129 CR 506 (Abst 261, Tr 3 Pt, 4, J N Ely) Venus, TX | Johnson | TX | $ 5,000.00 |
| Carnegie Development LLC | 11101 CR 506 (Abst 261, Tr 3 Pt, 4, J N Ely) Venus, TX | Johnson | TX | $ 150,000.00 |
| Carnegie Development LLC | 11129 N FM 157 (Abst 261, Tr 3, 4, J N Ely) Venus, TX | Johnson | TX | $ 150,000.00 |
| Carnegie Development LLC | 11129 N FM 157 (Abst 261, Tr 3, 4, J N Ely) Venus, TX | Johnson | TX | $ 150,000.00 |
| D4DS LLC | 841 S Polk St Desoto, TX | Dallas | TX | $ 27,508,160.00 |
| D4DS LLC | 841 S Polk St Desoto, TX | Dallas | TX | $ 216,840.00 |
| D4FR LLC | Parc at Windmill Farms Add, Block A, Lot 1 Forney, TX | Kaufman | TX | $ 35,000,000.00 |
| FHC Acquisition LLC | Syria Gate Way (Gate The, Blk A, Lot 13) Frisco, TX | Collin | TX | $ 6,425,154.00 |

**Properties Sold**

| Current Owning Entity | Prior Owning Entity (Barton or Related Entity) | Approximate Address and/or Description | County | State | Valuation / Total Market Value (2022) |
|---|---|---|---|---|---|
| NMP - Killeen LP | D4KL LLC / JMJ Acquisitions LLC | 3701 Rosewood Dr, Killeen | Bell | TX | $ 701,094.00 |
| NS MF Partners-SAT LLC | Villita Towers LLC | 112-120 Villita St, San Antonio | Bexar | TX | $ 2,500,000.00 |
| NS MF Partners-SAT LLC | 126 Villita LLC | 126 Villita St, San Antonio | Bexar | TX | $ 2,500,000.00 |
| HNGH Turtle Creek LLC | MO 2999TC, LLC | 2999 Turtle Creek Blvd, Dallas | Dallas | TX | $ 14,500,000.00 |
| Chen Haining, Chen Feiling, Zhou Jie, Zhao Lianfang | JMJAV LLC | 24923 Alberti Sonata Drive Katy, TX; 24915 Alberti Sonata Drive, Katy, TX; 24903 Alberti Sonata Drive, Katy, TX; 24715 Alberti Sonata Drive, Katy, TX. (Camillo Lakes Section 1) | Harris | TX | $ 1,378,589.00 |
| Ronrush Investment Inc. | JMR 100 LLC | 99.963 acres White Settlement Rd, Aledo | Parker | TX | $ 2,499,080.00 |
| The Dixon Water Foundation | BM318 LLC | Bradley James Survey | Parker | TX | $ 1,862,440.00 |
| DLP Winter Haven Ventures LLC | JMJ Acquisitions LLC | 3800 Avenue J NW Winter Haven (42nd St Warehouse Center) | Polk | FL | $ 1,700,172.00 |
| Marine Creek Ventures LLC | Mansions Apartment Homes at Marine Creek LLC | Marine Creek Apartments, Fort Worth (4600 Shadydell Cir, 5201 Shadydell Dr, 5224 Shadydell Dr, 5325 Shadydell Dr) | Tarrant | TX | $ 1,749,570.00 |
| Orchard Farms Ventures LLC | Orchard Farms Village LLC | 2850 Shelby Rd, Fort Worth | Tarrant | TX | $ 972,840.00 |
| Orchard Farms Ventures LLC | Orchard Farms Village LLC | 2800 Shelby Rd, Fort Worth | Tarrant | TX | $ 19,910.00 |
| Orchard Farms Ventures LLC | Orchard Farms Village LLC | 9400 Rendon Rd, Fort Worth | Tarrant | TX | $ 447,380.00 |
| Orchard Farms Ventures LLC | Orchard Farms Village LLC | 3000 Shelby Rd, Fort Worth | Tarrant | TX | $ 40,000.00 |
| Orchard Farms Ventures LLC | Orchard Farms Village LLC | 3000 Shelby Rd, Fort Worth | Tarrant | TX | $ 144,400.00 |
| Orchard Farms Ventures LLC | Orchard Farms Village LLC | Shelby Rd, Fort Worth | Tarrant | TX | $ 350,000.00 |
| Orchard Farms Ventures LLC | Orchard Farms Village LLC | Shelby Rd, Fort Worth | Tarrant | TX | $ 420.00 |

# EXHIBIT C

**List of Entities:**

- BM318 LLC
- Carnegie Development LLC
- D4DS LLC
- D4FR LLC
- D4KL LLC
- DJD Land Partners LLC
- Enoch Investments LLC
- FHC Acquisition LLC
- Goldmark Hospitality LLC
- JMJ Acquisitions LLC
- JMJ Development LLC
- JMJAV LLC
- JMR100 LLC
- Lajolla Construction Management LLC
- LDG001 LLC
- Mansions Apartment Homes at Marine Creek LLC
- MO 2999TC LLC
- Orchard Farms Village LLC
- Villita Towers LLC
- 126 Villita LLC
- Wall007 LLC
- Wall009 LLC
- Wall010 LLC
- Wall011 LLC
- Wall012 LLC
- Wall016 LLC
- Wall017 LLC
- Wall018 LLC
- Wall019 LLC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

SECURITIES AND EXCHANGE COMMISSION,

           Plaintiff,

v.

TIMOTHY BARTON,
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

           Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

           Relief Defendants.

C.A. No.: 3:22-cv-2118-X

Jury Trial Demanded

## DECLARATION OF JASON BRAUN IN SUPPORT OF
## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
## EXPEDITED MOTION FOR APPOINTMENT OF RECEIVER

**APP019**

I, Jason Braun, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and that I am competent to testify to the matters stated herein:

1.    I am currently employed as a Staff Attorney with the United States Securities and Exchange Commission (the "SEC"), Division of Enforcement in its Fort Worth Regional Office ("FWRO") in Fort Worth, Texas.  I have been employed by the SEC since July 2015.  I am an attorney licensed by the State Bar of Texas.

2.    My official duties with the SEC include participating in fact-finding inquiries and investigations to determine whether the federal securities laws have been violated and assisting in the SEC's litigation of securities laws violations.  This includes analyzing the law, interviewing and taking testimony from witnesses, and reviewing and analyzing financial and other records of various entities and individuals.

3.    As part of my official duties, I have been a member of the SEC investigative team responsible for the investigation related to Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC ("Wall 7"), Wall009, LLC ("Wall 9"), Wall010, LLC ("Wall 10"), Wall011, LLC ("Wall 11"), Wall012, LLC ("Wall 12"), Wall016, LLC ("Wall 16"), Wall017, LLC ("Wall 17"), Wall018, LLC ("Wall 18"), and Wall019, LLC ("Wall 19"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall") (collectively, "Defendants").  In that role, I investigated whether the Defendants violated the federal securities laws.

4.    During the course of that investigation, I and other members of the investigative team collected a number of documents using public and government sources, voluntary requests, and subpoenas.  I also obtained investigative testimony from several witness.  True and correct (PII

2

redacted) copies of certain of these documents and excerpts from investigative testimony are attached as follows:

- Exhibit 1:  Barton-controlled entities list provided by Barton's counsel in March 2021.

- Exhibit 2:  Example Loan Agreement for Wall 9.

- Exhibit 3:  Example Loan Agreement for Wall 10.

- Exhibit 4:  Example Loan Agreement for Wall 11.

- Exhibit 5:  Example Loan Agreement for Wall 12.

- Exhibit 6: Example Note Subscription Agreement for Wall 19.

- Exhibit 7:  Investor Presentation for Wall 10 received from Fu with a side-by-side English translation that was included in the produced document.

- Exhibit 8:  Investor Presentation for Wall 12 (Chinese only).

- Exhibit 9:  August 27, 2017, Email from Mark Adams to Barton, Wall, and Fu.

- Exhibit 10:  June 27, 2017 Email string involving Barton and Saskya Bedoya.

- Exhibit 11:  November 15, 2017 Email string involving Barton and Saskya Bedoya.

- Exhibit 12:  January 9, 2019 Email string involving Barton and Saskya Bedoya.

- Exhibit 13:  Email string between April 26, 2017 and May 2, 2017 involving Barton and Michael Matthews.

- Exhibit 14:  June 6, 2017 Email from Barton to Michael Matthews in which Barton forwards an August 29, 2016 Email from Wall to Barton

- Exhibit 15:  February 28, 2019 Email from Wall to Fu and Barton forwarding a February 28, 2019 Email from Fu to Barton and Wall.

- Exhibit 16:  Email string between October 24, 2016 and December 28, 2016 involving Fu and Wall and then Barton, Fu, and Wall.

3

APP021

- Exhibit 17:   Email string between January 16, 2019 and January 23, 2019 involving Barton, Saskya Bedoya, Lyne Zhou, and Hongpeng Lin.

- Exhibit 18:  February 14, 2020 Email string involving Hongpeng Lin and Krista Vassallo attaching a Lender Update - 2019 Q4.

- Exhibit 19: Lost Creek Land Sale Contract.

- Exhibit 20:  Anastasia Land Sale Contract.

- Exhibit 21:  Excerpts from the May 24, 2021 Investigative Testimony of Timothy Barton.

- Exhibit 22:  Excerpts from the July 20, 2021 Investigative Testimony of Haoqiang (Michael) Fu.

- Exhibit 23:  Excerpts from the January 25, 2021 Investigative Testimony of Stephen Wall.

- Exhibit 24:  Excerpts from the March 10, 2022 Investigative Testimony of Saskya Bedoya.

- Exhibit 25:  Excerpts from the March 9, 2022 Investigative Testimony of Hong Chen.

- Exhibit 26:  Excerpts from the March 15, 2022 Investigative Testimony of Sun Yun.

I state under penalty of perjury that the foregoing is true and correct.

Dated: September 20, 2022

Jason Braun

| # | Corporate Entity Name |
|---|---|
| 1 | 126 VILLITA, LLC |
| 2 | 2999TC ACQUISITIONS MZ, LLC |
| 3 | 2999TC ACQUISITIONS, LLC |
| 4 | 2999TC FOUNDERS, LLC |
| 5 | 2999TC JMJ CMGR, LLC |
| 6 | 2999TC JMJ EQUITY, LLC |
| 7 | 2999TC JMJ MGR, LLC |
| 8 | 2999TC JMJ, LLC |
| 9 | 2999TC LP, LLC |
| 10 | 2999TC MM, LLC |
| 11 | 2999TC MZ, LLC |
| 12 | AVEG WW, LLC |
| 13 | BARTON TEXAS WATER DISTRICT, LLC |
| 14 | BARTON WATER DISTRICT LLC |
| 15 | BC ACQUISITIONS, LLC |
| 16 | BEE2019, LLC |
| 17 | BM318 LLC |
| 18 | BROADVIEW HOLDINGS, LLC |
| 19 | CARNEGIE DEVELOPMENT  LLC |
| 20 | CARNEGIE FINANCE, LLC |
| 21 | CYNKFP, LLC |
| 22 | D4AT LLC |
| 23 | D4AVEG LLC |
| 24 | D4BM LLC |
| 25 | D4BR, LLC |
| 26 | D4DS LLC |
| 27 | D4FR LLC |
| 28 | D4IN, LLC |
| 29 | D4KL LLC |
| 30 | D4MC LLC |
| 31 | D4OP LLC |
| 32 | D4OPM, LLC |
| 33 | D4SMC, LLC |
| 34 | D4WP LLC |
| 35 | DALLAS REAL ESTATE INVESTORS LLC |
| 36 | DALLAS REAL ESTATE LENDERS, LLC |
| 37 | DALLAS REAL ESTATE MANAGEMENT, LLC |
| 38 | DJD LAND PARTNERS, LLC |
| 39 | ENOCH INVESTMENTS, LLC |
| 40 | FHC ACQUISITION, LLC |
| 41 | FIVE STAR GM, LLC |
| 42 | FIVE STAR MM, LLC |
| 43 | FIVE STAR MM, LLC |
| 44 | FIVE STAR TC, LLC |
| 45 | GOLDMARK HOSPITALITY LLC |
| 46 | ILLUMINATE DALLAS, LLC |
| 47 | JMJ ACQUISITIONS MANAGEMENT LLC |
| 48 | JMJ ACQUISITIONS, LLC |
| 49 | JMJ CENTRE LLC |
| 50 | JMJ DEVELOPMENT FUND INC |
| 51 | JMJ DEVELOPMENT INC. (LLC) |
| 52 | JMJ HOLDING US LLC |
| 53 | JMJ HOLDINGS LLC |
| 54 | JMJ HOLDINGS USA, INC. |
| 55 | JMJ HOME BUILDING, INC. |
| 56 | JMJ HOSPITALITY, LLC |
| 57 | JMJ LAND ACQUISITIONS, INC. |
| 58 | JMJ LAND DEVELOPMENT, INC. |
| 59 | JMJ MEZZANINE, INC. |
| 60 | JMJ MF DEVELOPMENT, LLC |
| 61 | JMJ MULTIFAMILY, INC. |
| 62 | JMJ RESIDENTIAL, LLC |
| 63 | JMJ VALLEY CENTER LLC |
| 64 | JMJ VC MANAGEMENT LLC |
| 65 | JMJAV LLC |
| 66 | JMJD4 LLC |
| 67 | JMJD4ALLENSVILLE, LLC |
| 68 | JMJKH, LLC |
| 69 | JMR100, LLC |
| 70 | LAJOLLA CONSTRUCTION MANAGEMENT, LLC |
| 71 | LC ALEDO TX, LLC |

**APP023**



EXHIBIT
JH 5-24-2021
73
JMJ, FW-04420

EXHIBIT
1

| # | Corporate Entity Name |
|---|---|
| 72 | LDG001, LLC |
| 73 | LYNN INVESTMENTS, LLC |
| 74 | MANSIONS APARTMENT HOMES AT MARINE CREEK LLC |
| 75 | MCFW, LLC |
| 76 | MCRS2019, LLC |
| 77 | MYRA PARK 635, LLC |
| 78 | NORTHSTAR PM, LLC |
| 79 | NORTHSTAR114, LLC |
| 80 | ONE AGENT TEXAS, LLC |
| 81 | ONE AGENT, LLC |
| 82 | ONE FHC, LLC |
| 83 | ONE MFD4, LLC |
| 84 | ONE PASS INVESTMENTS, LLC |
| 85 | ONE SF RESIDENTIAL, LLC |
| 86 | ORCHARD FARMS VILLAGE, LLC |
| 87 | RIDGEVIEW ADDITION, LLC |
| 88 | SEAGOVILLE FARMS, LLC |
| 89 | SF ROCK CREEK, LLC |
| 90 | SK CARNEGIE LLC |
| 91 | STL PARK, LLC |
| 92 | TRWF LLC |
| 93 | TRWF LODGE LLC |
| 94 | VENUS59, LLC |
| 95 | VENUSBK195, LLC |
| 96 | VENUSPARK201, LLC |
| 97 | VILLITA TOWERS LLC |
| 98 | WALL007 LLC |
| 99 | WALL009 LLC |
| 100 | WALL010 LLC |
| 101 | WALL011 LLC |
| 102 | WALL012 LLC |
| 103 | WALL016 LLC |
| 104 | WALL017 LLC |
| 105 | WALL018 LLC |
| 106 | WALL019, LLC |
| 107 | WRL2019, LLC |

APP024

DocuSign Envelope ID: 6BF4A021-E53A-495F-8E02-54373941BBAA

## AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated ___June 15__, 2017, and is between __Li Qiuying___ (Passport No <span style="color:red">REDACTED</span>), ("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 009, LLC ("Borrower").

## ARTICLE ONE

### The Loan

1.1    The Loan.    Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

(a)    Agency:  Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan.  Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

(b)    Terms of Lender Commitment:  Co-Lender agrees to lend $ 100,000.00 of the total loan amount of $2,320,000 ("Commitment").  Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment.  If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal:  USD  $100,000.00  –  One  Hundred  Thousand  and  No/100 Dollars

Interest:    Interest  amount  equal  to  ten  percent  (10%)  per  annum commencing on July 1, 2017, or such later date that the Loan is funded to Borrower.  The first year's interest will be due to the Lender, within ten (10) business days after July 1, 2018.  The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of July 1, 2019.  Sums not paid by such times, shall bear interest at the rate of fourteen percent (14%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans.  Agent's fee for such services shall be paid by Borrower.  Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.

**EXHIBIT**

**2**



**EXHIBIT**

JH 5-24-2021

**54**

JMJ, FW-04420

1

**APP025**

AGENCY AND LOAN AGREEMENT
927968_1
CONFIDENTIAL TREATMENT REQUESTED by WALL009, LLC                    WALL009-000109

DocuSign Envelope ID: 6BF4A021-E53A-495F-8E02-54373941BBAA

(c)    Loan Purpose:

(i)    The Loan shall be evidenced by this Agreement.  The Loans and the Additional Loans shall be used to acquire 100 acres located in Venus, Texas for residential lot development known as Venus 100 located on Country Rd 501 and West of FM157 in Venus, Texas ("Property").  The Property has a purchase price of $2,900,000 and the balance of funds will be provided by Borrower.

(ii)    No Commitment for Additional/Permanent Financing:  **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2.    Pre-payment.  Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest.  Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal.  Prepayments shall be applied to payments next due under the Loan.


## ARTICLE TWO

### Representations of Borrower

Borrower represents, covenants, and warrants that:

2.1    Representations.  All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2    Power and Authority:  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification.  The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

2

AGENCY AND LOAN AGREEMENT
927968_1
CONFIDENTIAL TREATMENT REQUESTED by WALL009, LLC                    WALL009-000110

2.3    <u>Violation of Law; Breach of Agreements</u>.  The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

(a)    Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

(b)    Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4    <u>Enforceability</u>.  The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5    <u>Taxes</u>.  All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.

## ARTICLE THREE

### Affirmative Covenants of Borrower

3.1    <u>Covenants</u>

(a)    Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b)    All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c)    Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2    Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the

3

<span style="color:blue">**APP027**</span>

CONFIDENTIAL TREATMENT REQUESTED by WALL009, LLC                    WALL009-000111

DocuSign Envelope ID: 6BF4A021-E53A-495F-8E02-54373941BBAA

occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

3.3    Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4    Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5    Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6    Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.

## ARTICLE FOUR
### Default and Acceleration

4.1    Events of Default.    An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

(a)    Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

(b)    Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2    Optional Acceleration.  Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable,

4

**APP028**

DocuSign Envelope ID: 6BF4A021-E53A-495F-8E02-54373941BBAA

without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4.3     Automatic Acceleration.  All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4     Right of Set Off.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party.  The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5     Progress Reporting.  Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include:  the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land.


## ARTICLE FIVE

### Miscellaneous

5.1     Definitions.  Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2     Construing Loan Papers.  This Loan Agreement, and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3     Renewals and Extensions.  This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

**APP029**

AGENCY AND LOAN AGREEMENT
927968_1
CONFIDENTIAL TREATMENT REQUESTED by WALL009, LLC                    WALL009-000113

5.4     Texas Law.  This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

5.5     Maximum Rate of Interest.  The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled.  In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan.  The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6     Collateral.  100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders.  Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7     Notice.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

| | |
|---|---|
| TO AGENT: | Platinum Investment Corporation |
| | Attn:  Michael Fu |
| | <span style="color:red">REDACTED</span> |
| | Michael@yding.cn |
| | |
| TO BORROWER: | Wall 009, LLC |
| | c/o Steve Wall |
| | 2005 NE Green Oaks Blvd., Suite 150 |
| | Arlington, TX  76006 |
| | Steve.Wall@wall.com |
| | 817-276-3417 (office) |
| | |
| TO CO-LENDER: | Li Qiuying |
| | <span style="color:red">REDACTED</span> |

5.8     Place of Payment.  All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

AGENCY AND LOAN AGREEMENT
927968_1
CONFIDENTIAL TREATMENT REQUESTED by WALL009, LLC                    WALL009-000114

DocuSign Envelope ID: 6BF4A021-E53A-495F-8E02-54373941BBAA

5.9     <u>Representations Survive</u>.  All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan.  All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.10    <u>No Waiver</u>.  No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.11    <u>Confidentiality</u>.  The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency.  The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

**APP031**

AGENCY AND LOAN AGREEMENT
927968_1
CONFIDENTIAL TREATMENT REQUESTED by WALL009, LLC                    WALL009-000115

DocuSign Envelope ID: 6BF4A021-E53A-495F-8E02-54373941BBAA

**"CO-LENDER"**

Li Qiuying

Li Qiuying

**"BORROWER"**

WALL 009, LLC

By:
Tim Barton as President of Carnegie Development, LLC,
The Managing Member of Wall 009, LLC

**"AGENT"**

PLATINUM INVESTMENT CORPORATION

By:
Name: Michael Fu
Title:   Chief Executive Officer

AGENCY AND LOAN AGREEMENT
927968_1

CONFIDENTIAL TREATMENT REQUESTED by WALL009, LLC

WALL009-000116

DocuSign Envelope ID: 9BD5C791-A915-495B-9B69-EFD8C474EC69

## AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated ___October 18_, 2017, and is between __Wenjun Wang_ (Passport No _ REDACTED __),("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 010, LLC ("Borrower").

### ARTICLE ONE

### The Loan

1.1    The Loan.    Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

(a)    Agency:  Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan.  Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

(b)    Terms of Lender Commitment:  Co-Lender agrees to lend $ 50,000.00 of the total loan amount of $3,520,000 ("Commitment").  Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment.  If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal: USD $50,000.00 – _ Fifty Thousand and No/100 Dollars

Interest:  Interest amount equal to _ Ten _ percent (_10_%) per annum commencing on __November 1, 2017___, or such later date that the Loan is funded to Borrower.  The first year's interest will be due to the Lender, within ten (10) business days after _November 1, 2018__.  The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of __November 1, 2019_.  Sums not paid by such times, shall bear interest at the rate of fourteen percent (14%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans.  Agent's fee for such services shall be paid by Borrower.  Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.

**EXHIBIT 3**

**EXHIBIT**
JH 5-24-2021
**55**
JMJ, FW-04420

1

**APP033**

(c)    Loan Purpose:

(i)    The Loan shall be evidenced by this Agreement. The Loans and the Additional Loans shall be used to acquire 160 acres located in the City Limits of Aledo, County of Tarrant, State of Texas for residential lot development known as Lost Creek ("Property"). The Property has a purchase price of $4,400,000 and the balance of funds will be provided by Borrower.

(ii)    No Commitment for Additional/Permanent Financing:  **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2.    Pre-payment.  Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest. Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal. Prepayments shall be applied to payments next due under the Loan.

## ARTICLE TWO

### Representations of Borrower

Borrower represents, covenants, and warrants that:

2.1    Representations.  All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2    Power and Authority:  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification. The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

2.3    Violation of Law; Breach of Agreements.  The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

2

AGENCY AND LOAN AGREEMENT
927968_010
CONFIDENTIAL TREATMENT REQUESTED by WALL010, LLC                    WALL010-000096

(a)     Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

(b)     Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4     Enforceability.  The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5     Taxes.  All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.


**ARTICLE THREE**

**Affirmative Covenants of Borrower**

3.1     Covenants

(a)     Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b)     All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c)     Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2     Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

**APP035**

AGENCY AND LOAN AGREEMENT
927968_010
CONFIDENTIAL TREATMENT REQUESTED by WALL010, LLC                    WALL010-000097

3.3     Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4     Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5     Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6     Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.

## ARTICLE FOUR
### Default and Acceleration

4.1     Events of Default.     An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

(a)     Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

(b)     Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2     Optional Acceleration.  Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable, without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4

**APP036**

DocuSign Envelope ID: 9BD5C791-A915-495B-9B69-EFD8C474EC69

4.3    <u>Automatic Acceleration</u>.  All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4    <u>Right of Set Off</u>.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party.  The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5    <u>Progress Reporting</u>.  Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include:  the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land.


**ARTICLE FIVE**

**<u>Miscellaneous</u>**

5.1    <u>Definitions</u>.  Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2    <u>Construing Loan Papers</u>.  This Loan Agreement, and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3    <u>Renewals and Extensions</u>.  This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

5.4    <u>Texas Law</u>.  This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

**APP037**

AGENCY AND LOAN AGREEMENT
927968_010
CONFIDENTIAL TREATMENT REQUESTED by WALL010, LLC                    WALL010-000099

5.5     Maximum Rate of Interest.  The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled.  In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan.  The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6     Collateral.  100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders.  Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7     Guarantee.  JMJ Holdings, as Guarantor, hereby provides a corporate guarantee up to the principal loan amount in the event of default by Borrower.

5.8     Notice.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO AGENT:     Platinum Investment Corporation
Attn:  Michael Fu

**REDACTED**

Michael@yding.cn


TO BORROWER:     Wall 010, LLC
c/o Steve Wall
2005 NE Green Oaks Blvd., Suite 150
Arlington, TX  76006
Steve.Wall@wall.com
817-276-3417 (office)


TO CO-LENDER:     Wenjun Wang

**REDACTED**


5.9     Place of Payment.  All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

AGENCY AND LOAN AGREEMENT
927968_010
CONFIDENTIAL TREATMENT REQUESTED by WALL010, LLC     WALL010-000100

5.10    Representations Survive.  All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan.  All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.11    No Waiver.  No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.12    Confidentiality.  The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency.  The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

7

AGENCY AND LOAN AGREEMENT
927968_010

CONFIDENTIAL TREATMENT REQUESTED by WALL010, LLC                    WALL010-000101

**"CO-LENDER"**

Wenjun Wang

**"BORROWER"**

WALL 010, LLC

By: Tim Barton as President of Carnegie Development, LLC,
The Managing Member of Wall 010, LLC

**"AGENT"**

PLATINUM INVESTMENT CORPORATION

By:
Name: Michael Fu
Title:   Chief Executive Officer

8

**APP040**

AGENCY AND LOAN AGREEMENT
927968_010
CONFIDENTIAL TREATMENT REQUESTED by WALL010, LLC                    WALL010-000102

DocuSign Envelope ID: 8EC04A2C-540B-40AC-A9EB-F35352227AD5

## AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated ___February 7_, 2018, and is between __Ji Cunxiang_ (Passport N REDACTED  ), ("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 011, LLC ("Borrower").

## ARTICLE ONE

### The Loan

1.1    The Loan.    Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

(a)    Agency:  Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan.  Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

(b)    Terms of Lender Commitment:  Co-Lender agrees to lend $ 100,000.00 of the total loan amount of $2,360,000 ("Commitment").  Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment.  If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal:  USD  $100,000.00  –   One  Hundred  Thousand and No/100 Dollars

Interest:  Interest amount equal to _Twelve_ percent (_12_%) per annum commencing on __February 11, 2018___, or such later date that the Loan is funded to Borrower.  The first year's interest will be due to the Lender, within ten (10) business days after _February 11, 2019__.  The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of __February 11, 2020_.  Sums not paid by such times, shall bear interest at the rate of fourteen percent (14%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans.  Agent's fee for such services shall be paid by Borrower.  Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.



**EXHIBIT**

**4**

**EXHIBIT**

JH 5-24-2021

**56**

JMJ, FW-04420

1

AGENCY AND LOAN AGREEMENT
927968_011

CONFIDENTIAL TREATMENT REQUESTED by WALL011, LLC              WALL011-000080

DocuSign Envelope ID: 8EC04A2C-540B-40AC-A9EB-F35352227AD5

(c)     Loan Purpose:

(i)     The Loan shall be evidenced by this Agreement.  The Loans and the Additional Loans shall be used to acquire 128 acres located in the City Limits of Venus, County of Johnson, State of Texas for residential lot development known as The Gates at Venus ("Property").  The Property has a purchase price of $2,950,000 and the balance of funds will be provided by Borrower.

(ii)    No Commitment for Additional/Permanent Financing:  **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2.    Pre-payment.  Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest.  Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal.  Prepayments shall be applied to payments next due under the Loan.

## ARTICLE TWO

### Representations of Borrower

Borrower represents, covenants, and warrants that:

2.1     Representations.  All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2     Power and Authority:  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification.  The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

2

**APP042**

DocuSign Envelope ID: 8EC04A2C-540B-40AC-A9EB-F35352227AD5

2.3     <u>Violation of Law; Breach of Agreements</u>.  The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

(a)     Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

(b)     Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4     <u>Enforceability</u>.  The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5     <u>Taxes</u>.  All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.

**ARTICLE THREE**

**<u>Affirmative Covenants of Borrower</u>**

3.1     <u>Covenants</u>

(a)     Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b)     All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c)     Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2     Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the

AGENCY AND LOAN AGREEMENT
927968_011

CONFIDENTIAL TREATMENT REQUESTED by WALL011, LLC                    WALL011-000082

occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

3.3    Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4    Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5    Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6    Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.

## ARTICLE FOUR
### Default and Acceleration

4.1    Events of Default.    An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

(a)    Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

(b)    Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2    Optional Acceleration.  Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable,

4

<span style="color:blue">APP044</span>

DocuSign Envelope ID: 8EC04A2C-540B-40AC-A9EB-F35352227AD5

without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4.3     Automatic Acceleration.   All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4     Right of Set Off.   Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured.   The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party.   The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5     Progress Reporting.   Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include:   the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land.

**ARTICLE FIVE**

**Miscellaneous**

5.1     Definitions.   Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2     Construing Loan Papers.   This Loan Agreement, and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3     Renewals and Extensions.   This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

5

AGENCY AND LOAN AGREEMENT
927968_011
CONFIDENTIAL TREATMENT REQUESTED by WALL011, LLC                WALL011-000084

DocuSign Envelope ID: 8EC04A2C-540B-40AC-A9EB-F35352227AD5

5.4     Texas Law.  This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

5.5     Maximum Rate of Interest.  The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled.  In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan.  The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6     Collateral. 100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders.  Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7     Guarantee.  JMJ Holdings, as Guarantor, hereby provides a corporate guarantee up to the principal loan amount in the event of default by Borrower.

5.8     Notice.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO AGENT:          Platinum Investment Corporation
                   Attn:  Michael Fu

                   <span style="color:red">REDACTED</span>

                   Michael@yding.cn


TO BORROWER:       Wall 011, LLC
                   c/o Steve Wall
                   2005 NE Green Oaks Blvd., Suite 150
                   Arlington, TX  76006
                   Steve.Wall@wall.com
                   817-276-3417 (office)

TO CO-LENDER:      Ji Cunxiang

                   <span style="color:red">REDACTED</span>

AGENCY AND LOAN AGREEMENT
927968_011
CONFIDENTIAL TREATMENT REQUESTED by WALL011, LLC                    WALL011-000085

DocuSign Envelope ID: 8EC04A2C-540B-40AC-A9EB-F35352227AD5

5.9    Place of Payment.  All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

5.10    Representations Survive.  All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan.  All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.11    No Waiver.  No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.12    Confidentiality.  The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency.  The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

AGENCY AND LOAN AGREEMENT
927968_011

CONFIDENTIAL TREATMENT REQUESTED by WALL011, LLC                WALL011-000086

DocuSign Envelope ID: 8EC04A2C-540B-40AC-A9EB-F35352227AD5

**"CO-LENDER"**

Ji Cunxiang

**"BORROWER"**

WALL 011, LLC

By: Tim Barton as President of Carnegie Development, LLC,
The Managing Member of Wall 011, LLC

**"AGENT"**

PLATINUM INVESTMENT CORPORATION

By:
Name:  Michael Fu
Title:   Chief Executive Officer

8

AGENCY AND LOAN AGREEMENT
927968_011
CONFIDENTIAL TREATMENT REQUESTED by WALL011, LLC                    WALL011-000087

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

CONFIDENTIAL TREATMENT REQUESTED

## AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated __June 25____, 2018, and is between __Dong Pengfei_ (Passport No ~~REDACTED~~ ____), ("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 012, LLC ("Borrower").

### ARTICLE ONE

### The Loan

1.1    The Loan.    Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

    (a)    Agency:  Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan.  Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

    (b)    Terms of Lender Commitment:  Co-Lender agrees to lend $ _100,000__ of the total loan amount of $4,200,000 ("Commitment").  Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment.  If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal: USD $_100,000___- _One Hundred Thousand___and No/100 Dollars

Interest:  Interest amount equal to ____Ten__ percent (_10_%) per annum commencing on _July 1st, 2018___, or such later date that the Loan is funded to Borrower.  The first year's interest will be due to the Lender, within ten (10) business days after _July 1st, 2019____.  The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of ____July 1st, 2020____.  Sums not paid by such times, shall bear interest at the rate of ____Twelve_____ percent (_12__%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans.  Agent's fee for such services shall be paid by Borrower.  Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.



EXHIBIT
5

EXHIBIT
JH 5-24-2021
57
JMJ, FW-04420

1

AGENCY AND LOAN AGREEMENT Wall012
4052018_012
CONFIDENTIAL TREATMENT REQUESTED by WALL012, LLC                    WALL012-000084

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

    (c)    <u>Loan Purpose</u>:

        (i)    The Loan shall be evidenced by this Agreement.  The Loans and the Additional Loans shall be used to acquire 172 acres located in in Ft Worth ETJ, Parker County, State of Texas for residential lot development known as Lyons Ranch ("Property").  The Property has a purchase price of $5,250,000 and the balance of funds will be provided by Borrower.

        (ii)    <u>No Commitment for Additional/Permanent Financing</u>:  **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2.    <u>Pre-payment</u>.  Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest.  Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal.  Prepayments shall be applied to payments next due under the Loan.

**ARTICLE TWO**

**<u>Representations of Borrower</u>**

    Borrower represents, covenants, and warrants that:

2.1    <u>Representations</u>.  All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2    <u>Power and Authority</u>:  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification.  The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

2.3    <u>Violation of Law; Breach of Agreements</u>.  The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

2

**APP050**

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

(a)     Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

(b)     Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4     Enforceability.  The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5     Taxes.  All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.

## ARTICLE THREE

### Affirmative Covenants of Borrower

3.1     Covenants

(a)     Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b)     All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c)     Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2     Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

AGENCY AND LOAN AGREEMENT Wall012
4052018_012
CONFIDENTIAL TREATMENT REQUESTED by WALL012, LLC                    WALL012-000086

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

3.3     Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4     Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5     Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6     Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.


### ARTICLE FOUR
### Default and Acceleration

4.1     Events of Default.     An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

(a)     Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

(b)     Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2     Optional Acceleration.  Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable, without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4

AGENCY AND LOAN AGREEMENT Wall012
4052018_012
CONFIDENTIAL TREATMENT REQUESTED by WALL012, LLC                    WALL012-000087

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

4.3     <u>Automatic Acceleration</u>.  All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4     <u>Right of Set Off</u>.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party.  The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5     <u>Progress Reporting</u>.  Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include:  the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land.


## ARTICLE FIVE

### <u>Miscellaneous</u>

5.1     <u>Definitions</u>.  Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2     <u>Construing Loan Papers</u>.  This Loan Agreement, and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3     <u>Renewals and Extensions</u>.  This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

5.4     <u>Texas Law</u>.  This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

5

**APP053**

CONFIDENTIAL TREATMENT REQUESTED by WALL012, LLC                    WALL012-000088

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

5.5     <u>Maximum Rate of Interest</u>.  The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled.  In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan.  The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6     <u>Collateral</u>. 100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders.  Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7     <u>Guarantee</u>.  JMJ Holdings, as Guarantor, hereby provides a corporate guarantee up to the principal loan amount in the event of default by Borrower.

5.8     <u>Notice</u>.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO AGENT:             Platinum Investment Corporation
                      Attn:  Michael Fu

                              REDACTED

                      Michael@yding.cn


TO BORROWER:          Wall 012, LLC
                      c/o Tim Barton
                      1755 Wittington Place, Suite 340
                      Dallas, TX  75234
                      tbarton@jmjdevelopment.net
                      972-385-9934 (office)

TO CO-LENDER:         Dong Pengfei
                              REDACTED


5.9     <u>Place of Payment</u>.  All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

AGENCY AND LOAN AGREEMENT Wall012
4052018_012
CONFIDENTIAL TREATMENT REQUESTED by WALL012, LLC                    WALL012-000089

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

5.10    Representations Survive.    All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan.   All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.11    No Waiver.   No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.12    Confidentiality.   The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency.   The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

**APP055**

AGENCY AND LOAN AGREEMENT Wall012
4052018_012
CONFIDENTIAL TREATMENT REQUESTED by WALL012, LLC                WALL012-000090

DocuSign Envelope ID: C0DE4097-F074-4BD1-A241-D3F7771B613C

**"CO-LENDER"**

Dong Pengfei


**"BORROWER"**

WALL 012, LLC

By:

Tim Barton as President of Carnegie Development, LLC,
The Managing Member of Wall 012, LLC


**"AGENT"**

PLATINUM INVESTMENT CORPORATION

By:
Name: Michael Fu
Title:   Chief Executive Officer

**APP056**

AGENCY AND LOAN AGREEMENT Wall012
4052018_012
CONFIDENTIAL TREATMENT REQUESTED by WALL012, LLC                    WALL012-000091

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

# Wall019 LLC
**13901 MIDWAY ROAD Suite #102, Dallas, TX 75244**
**Phone: 972-385-9934   Fax: 972-241-4484**

## Subscription

I hereby subscribe to the Note (promissory note) as co-lender. My personal information for this application to this Note (promissory note) is as blow:

| | |
|---|---|
| Name | Xiao Ruiling |
| Passport Number | |
| Gender | REDACTED |
| Mobile Phone | |
| Email Address | |
| | REDACTED |

I agree for the below Terms and Conditions of this subscriptions:

| | |
|---|---|
| Total Loan amount | $3,770,685 |
| My subscription amount | $300,000 |
| Interest rate | 12% |
| Effecting Date of Note | June 1st, 2019 (effected only if all the funds are received prior to this date) |
| 1st year interest due date | June 1st, 2020 (Issue within 10 business days to remitter) |
| 2nd year interest due date | June 1st, 2021 (Issue within 10 business days to remitter) |
| others | |

I hereby confirm that the information above is true, accurate and complete. I agree to execute the contract through DocuSign.



Co-Lender: Xiao Ruiling    5/22/2019
594EBD42AA16486...

We have verified the above information and found accurate. We are keeping this information in our office records. As your agent, we forward this subscription as agreed.

PIC: Michael Fu    5/23/2019
86EE266F063C423...

**EXHIBIT 6**

APP057

1

AGENCY AND LOAN AGREEMENT Wall019
4272019_019
CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC          WALL019-000059



DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

## AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated ___May 22___, 2019, and is between __Xiao Ruiling__ (Passport No: REDACTED__), ("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 019, LLC ("Borrower").

## ARTICLE ONE

### The Loan

1.1     The Loan.     Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

(a)     Agency: Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan. Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

(b)     Terms of Lender Commitment: Co-Lender agrees to lend $___300,000__ of the total loan amount of $3,770,685 ("Commitment"). Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment. In the event the loan is not fully funded within a 4 month period, then upon request, the Co-Lender shall be entitled to receive their initial funded amount within a five days following the end of the 4 month period. If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal: USD $_300,000__ - _Three Hundred Thousand____and No/100 Dollars

Interest: Interest amount equal to __Twelve___ percent (_12_%) per annum commencing on _June 1st, 2019__, or such later date that the Loan is funded to Borrower. The first year's interest will be due to the Lender, within ten (10) business days after _June 1st, 2020___. The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of _June 1st, 2021__. Sums not paid by such times, shall bear interest at the rate of ____Fourteen__ percent (_14_%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans. Agent's fee for

2

CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC                    WALL019-000060

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

such services shall be paid by Borrower.  Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.

(c)    Loan Purpose:

(i)    The Loan shall be evidenced by this Agreement.  The Loans and the Additional Loans shall be used to acquire 84.71 acres located in Aledo, Parker County, State of Texas for residential lot development known as Aledo Ranch ("Property").  The Property has a transactional cost of $4,189,650 and the balance of funds will be provided by Borrower.

(ii)    No Commitment for Additional/Permanent Financing:  **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2.    Pre-payment.  Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest.  Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal.  Prepayments shall be applied to payments next due under the Loan.

## ARTICLE TWO

## Representations of Borrower

Borrower represents, covenants, and warrants that:

2.1    Representations.  All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2    Power and Authority:  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification.  The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

3

**APP059**

AGENCY AND LOAN AGREEMENT Wall019
4272019_019
CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC                    WALL019-000061

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

2.3     Violation of Law; Breach of Agreements.  The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

(a)     Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

(b)     Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4     Enforceability.  The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5     Taxes.  All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.

## ARTICLE THREE

### Affirmative Covenants of Borrower

3.1     Covenants

(a)     Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b)     All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c)     Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2     Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the

4     **APP060**

CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC                    WALL019-000062

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

3.3     Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4     Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5     Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6     Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.


## ARTICLE FOUR
### Default and Acceleration

4.1     Events of Default.     An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

    (a)     Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender or Agent to Borrower.

    (b)     Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender or Agent to Borrower.

4.2     Optional Acceleration.  Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable,

**APP061**

AGENCY AND LOAN AGREEMENT Wall019
4272019_019
CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC                    WALL019-000063

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4.3    Automatic Acceleration.  All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4    Right of Set Off.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party.  The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5    Progress Reporting.  Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include:  the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land.

## ARTICLE FIVE

### Miscellaneous

5.1    Definitions.  Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2    Construing Loan Papers.  This Loan Agreement, and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3    Renewals and Extensions.  This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

6

**APP062**

AGENCY AND LOAN AGREEMENT Wall019
4272019_019
CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC                    WALL019-000064

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

5.4    <u>Texas Law</u>.  This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

5.5    <u>Maximum Rate of Interest</u>.  The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled.  In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan.  The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6    <u>Collateral</u>.  100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders.  Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7    <u>Notice</u>.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO AGENT:    Platinum Investment Corporation
Attn:  Michael Fu
REDACTED

Michael@yding.cn

TO BORROWER:    Wall 019, LLC
c/o Tim Barton
1755 Wittington Place, Suite 340
Dallas, TX  75234
tbarton@jmjdevelopment.net
972-385-9934 (office)

TO CO-LENDER:    Xiao Ruiling
REDACTED

5.8    <u>Place of Payment</u>.  All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

7    **APP063**

AGENCY AND LOAN AGREEMENT Wall019
4272019_019
CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC    WALL019-000065

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

5.9    <u>Representations Survive</u>.  All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan.  All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.10    <u>No Waiver</u>.  No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.11    <u>Confidentiality</u>.  The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency.  The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

**APP064**

AGENCY AND LOAN AGREEMENT Wall019
4272019_019
CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC                    WALL019-000066

DocuSign Envelope ID: 2F87A8F5-0842-4BE9-9274-258B522E8502

**"CO-LENDER"**



Xiao Ruiling                    5/22/2019
594FBD42AA16486...

**"BORROWER"**

WALL 019, LLC



By:    Tim Barton                    5/31/2019
55E2C214E42B42F...

Tim Barton as President of Carnegie Development, LLC,
The Managing Member of Wall 019, LLC

**"AGENT"**

PLATINUM INVESTMENT CORPORATION

Michael Fu                    5/23/2019

By:    86EE266E063C423...
Name: Michael Fu
Title:   Chief Executive Officer

AGENCY AND LOAN AGREEMENT Wall019
4272019_019
CONFIDENTIAL TREATMENT REQUESTED by WALL019, LLC                    WALL019-000067



达拉斯地产母基金第四期
**Dallas Real Estate Fund of Funds IV**

逸鼎投资版权所有
**Copyright © Yiding Investment All Rights Reserved**

CONFIDENTIAL
APP066

本公司对本资料所载内容的准确性、足够性、完整性及其使用的适当性等不作任何担保，任何其他人不得依赖本资料作任何其他用途。在任何情况下，我公司不就本资料中的对任何投资行为做出任何形式的担保。未经我公司许可，任何人士不得披露、引用或引述本资料的全部或部分内容。

The Company makes no warranty as to the accuracy, adequacy, completeness and appropriateness of the information contained in this material, and no other person can rely on this material for any other purpose. In no event shall we make any warranty whatsoever with respect to any investment in this material.  No part of this publication may be disclosed, quoted or quoted by any person without our permission.

CONFIDENTIAL

APP067



CONFIDENTIAL

# 中国投资美国房地产的发展与趋势
## The development and trend of Chinese investment in American real estate

路透社（Reuters）2016年5月16日报道：

Reuters reported on May 16, 2016:

- 从2010到2015年，中国投资人在美国已经购买了接近930亿美元的住宅地产，以及170亿美元的商业地产。

From 2010 to 2015, Chinese investors have bought nearly $93 billion in residential real estate in the U.S. and $17 billion in commercial real estate.

- 仅2015年，中国买家的投资总额达到290亿美元，平均投资额为831,800美元。

In 2015 alone, Chinese buyers totaled $29 billion, with an average investment of $831,800.

- 2015年，中国投资人首次超越加拿大成为购买美国房产最多的海外买家。

For the first time in 2015, Chinese investors overtook Canada as the largest overseas buyer of U.S. property



**Estimated value of sales to international clients**

数据来源：WSJ

资料来源：http://www.reuters.com/article/us-usa-china-realestate-idUSKCN0Y802T

CONFIDENTIAL

**APP069**

# 中国投资美国房产主要目的与需求

**Chinese investment in the United States the main purpose and demand for real estate**



子女接受更好的教育
(2005-2015年留学人数)
Mainland Chinese students at U.S. universities and colleges

居住和移民（2000-2014）
Investing to live in the U.S.

The New York Times | Sources: U.S. State Department; Open Doors Report, Institute of International Education

# 中国投资美国房地产的地理分布

## Geographical distribution of China's investment in U.S. real estate

集中于东西海岸地区，向中西部地区发展
**Focus on the East coasts,to the development of the central and Westerm Regions**

截至2015年5月，中国在全球主要房地产市场的投资规模与项目数量
As of May 2015,China's investment in the real estate market  and the number of projects in the world





Chinese overseas home buyers interested in the country (top ten)

CONFIDENTIAL

APP071

# 房产周期循环时钟图
**Real estate cycle clock**

**房产市场周期顶峰**
**Real estate marketcycle peak**

失业率维持平稳Unemployment rate goes high
房屋均价连续上升Average housing prices fall
空置率维持平稳小幅上升Vacancy rate decreases
租金回报率下降Rental yield remains stable
房屋成交量逐渐加大Housing turnover remains stable at low level

失业率上升Rising unemployment
房屋均价创新高Average housing price reaches a record high
空置率创新高Vacancy rates reach a record high
租金回报率创新低Rental yield fall to record low
房屋成交量快速回落Housing turmover drops rapidly



**房产市场上升周期**
**The housing market is on the rise**

12

9    3

6

**房产市场回调周期**
**Real estate market call-back period**



夫业率大大降低The unemployment rate is greatly reduced
房屋均价小幅回升Average housing price rebounds slightly
空置率创新低Vacancy rates fall to record low
租金回报率与贷款利率差距值最小Minimum gap between rental yield and loan rate
房屋成交量开始回升Housing turnover rebounds

失业率继续攀升Unemployment rate remains stable
房屋均价回落Average housing prices go up
空置率降低Vacancy rate remains stable and rises slightly
租金回报率企稳 Rental yield falls
房屋成交量维持低位水平Housing turnover increases gradually

**房产市场周期底部**
**Real estate market cycle bottom**

CONFIDENTIAL

APP072

# Contents



**1** 项目要素
Project elements

**2** 投资亮点
Investment Highlights

**3** 交易对象
Transaction object

**4** 项目介绍
Project introduction

CONFIDENTIAL

APP073



Part ONE

项 目 要 素
**Project elements**

CONFIDENTIAL

APP074



# 2 Part

## 项目要素Project elements

| | |
|---|---|
| 项目名称Project name | 美国达拉斯·沃斯堡高尔夫球场352万美金地产母基金第四期<br>The fourth phase of the US$3.52 million real estate fund of funds of Dallas Fort Worth Golf Course, USA |
| 投资目标Investment objective | 位于沃斯堡160英亩（971.2亩）土地<br>160 acres (971.2 acres) of land in Fort Worth |
| 投资投向Investment orientation | Wall010 LLC(管理公司) Wall010 LLC (management company) |
| 产品期限Product term | 24个月 24 months |
| 增信措施Measures to enhance trust | 1、开发商出10%资金做劣后The developer contributes 10% as posterior funds.；<br>2 、逸鼎投资出10%资金做劣后；PIC contributes 10% as posterior funds<br>3 、开发商和客户直接签署借贷合同，保证本金和利息。The investors sign the loan contract direct with the developer. And the principal and interest is guaranteed. |
| 起投资金<br>(10万美元起)<br>Investment funds($100,000 and above) | 1: 10-20万美金(不含)　承诺10%年化收益 $100,000-$200,000 (excluding), ensure 10% annual interest rate<br>2: 20-50万美金(不含)　承诺 11%年化收益 $200,000-$500,000 (excluding), ensure 11% annual interest rate<br>3: 50万美金及以上　　承诺 12%年化收益 $500,000 and above, ensure 12% annual interest rate |
| 管理费Management expense | 不收取 Not charged |
| 认购费Subscription fee | 不收取 Not charged |
| 收入分配Income distribution | 利息按年结算，每年一付。众筹资金本息未支付完之前，劣后资金不得退出<br>Interest is paid annually. The posterior funds shall not be withdrew until all the principal and interest were paid. |
| 转让限制Transfer restrictions | 1、在投资封闭期内，投资人不得以任何理由撤回投资款项。 Investors are not allowed to withdraw the funds for any reason during the investment period.<br>2、在投资封闭期内，允许投资人提出债权转让申请，经管理公司审核通过后操作。Investors are allowed to apply for assignment of debt during the investment period. After the check passed, the management company will carry out the operation. |
| 解散清算Dissolution liquidation | 投资封闭期结束后，管理公司应按照合同条款，履行兑付本金及利息的义务。After the end of the investment period, the management company shall, in accordance with the terms and conditions of the contract, perform the obligation of paying principal and interest. |

CONFIDENTIAL

APP076

# 3 | 资金流向 Fund Flow
Par



CONFIDENTIAL

# 4 Par 股权结构Ownership Structure





Stephen T. Wall

股权比例
**Proportion of shares**
**50%**

Timothy Barton

股权比例
**Proportion of shares**
**50%**

Wall010 LLC

**Wall010 LLC** 由Wall Homes创始人Stephen T. Wall先生，联合JMJ Development创始人 Timothy Barton先生共同控股，专项开发达拉斯沃斯堡土地众筹项目。

**Wall010 LLC** is established to develop the land in Dalls Fort Worth by Stephen T.Wall and Timothy Barton who are respectively the founder of Wall Homes and JMJ Development

CONFIDENTIAL

APP078



# 公司资质Company qualification

**Part 5**



Wall 010 LLC Company Certification

CONFIDENTIAL

APP079

# JMJ担保文件 JMJ Guarantee Document



**Part 6**



翻译稿
Translation

**7** Part

## 产权证明Proof of Property



翻译稿
Translation

2017 年 10 月 11 日

Villita Towers, LLC

1755 wittington Place, Suite 340

Dallas, Texas 75234

回复: 文件编号. 2078850-SA31

资产地址: 112-120 Villita Street, San Antonio, TX

亲爱的 Barton 先生,

　　谢谢您选择 First American Title 公司以完成以上所提到的资产的购买。请以此邮件当做 Villita towers,LLC 已经完成地址位于 112-120 Villita Street, San Antonio, Texas 的资产的购买并拥有此资产的确认。

　　在不久的将来, 您将会通过邮件收到您所购资产的产权保险保单。该保单包含了有关您所购资产买卖转让细节的重要信息, 所以请存仔细阅读并和您其他有价值的文件一起保存。

　　First American Title 保险公司根据上述分配的文件编号保存有关您的交易记录的完整文件。这些记录将对将来产权相关事宜的处理有所帮助。

　　最后, 再次感谢您选择 First American 产权保险公司。

诚挚的,

First American 产权保险公司

Claudia Ramirez

1846 N. Loop 1604 W., Suite 101, San Antonio, TX 78248

(210) 390-3600 电话 (866) 385-0650 传真

CONFIDENTIAL



投 资 亮 点
**Investment Highlights**

TWO

Part

CONFIDENTIAL

APP082



# 投资亮点 Investment Highlights





美国经济持续向好
U.S. Economy continues to grow



Wallhomes前期已有深度合作
Wallhomes has deep cooperation in the early stage



非预估收益，保本保息
Capital and interest guaranteed



没有任何募集和管理费用
No subscription and management fees



双重担保，保证本金安全
Double guarantee to ensure the safety of the principal

CONFIDENTIAL

APP083

## **2** Par | 资金来源The fund sources



| 资金来源The fund sources | |
| --- | --- |
| 土地购买价格<br>Land purchase price | $ 4,400,000 |
| 开发商+逸鼎投资<br>Develops+PIC | $ 880,000 |
| 投资者众筹投资<br>Investors | $ 3,520,000 |

**CONFIDENTIAL**

**APP084**

# THREE Part

**交 易 对 象**
**Transaction object**

CONFIDENTIAL





**1** Part

# 股东介绍Shareholders to introduce





## Stephen T. Wall



**职位**
**position**

Wall Homes创始人兼首席执行官（CEO）
Wall Homes - Steve Wall – Founder and CEO



**职责**
**Business Experience**

负责控制公司的整体运营、制定经营方向，致力于把 Wall Homes打造成为豪宅品牌。
Responsible for controlling the overall operation of the company, setting up the management direction, and dedicated to building Wall Homes into a luxury brand.



**成就**
**Recognition**



● 《专业建筑师》杂志颁布的年度最杰出CEO
CEO of the year by Professional Builder magazine
● 被SMU Cox 商学院评为年度最杰出企业家
 Selected #1 SMU Cox Business School of Business    fastest growing companies
● 获得Ernst入围奖以及年度年轻企业家奖
Finalist for the Ernst & Young Entrepreneur of the Year Award
● UTA工商管理学院咨询委员会成员
Member of the Advisory Board for the UTA College of Business Administration
● Arlington 商会执行董事会成员
Member of the Executive Board of Directors of the Arlington Chamber of Commerce
● Fort Worth建筑商协会董事会成员
Member of the Board of Directors for the Fort Worth Builders Association
● The Oakridge 学校董事长
Chairman of the Board at The Oakridge School

CONFIDENTIAL

# 2 | Part 股东介绍Shareholders to introduce



**Wall Homes** 成立于2005年，美国德克萨斯州本地顶级开发商，公司以"用合理低廉的价格让住户享受奢华"为其理念，成为德州最值得信赖的开发商之一。

Wall Homes founded in late 2005, was branded on affordability with touches of luxury. It grew steadily and closed over 700 homes in 2008. And The company is poised to grow in Texas markets.

● 公司已负责建造和交付超35,000套住房
The companies under Mr. Wall's leadership have been responsible for the construction and delivery of over 35,000 homes

● 已成功完成超过500个社区的成功建设
Mr. Wall has been responsible for the successful homebuilding operations in more than 500 communities.

● 被SMU Cox商学院选为发展最快的公司
Selected #1 SMU Cox Business School of Business fastest growing companies

● "建筑师"杂志颁布的年度最杰出家具建筑技术执行奖
CEO of the year by Professional Builder magazine

CONFIDENTIAL

APP087



## 3 | 股东介绍Shareholders to introduce
**Part**



PIC CEO     Michael Fu
&
Wall Home CEO   Stephen T.Wall

CONFIDENTIAL                                    **APP088**



**4**
**Part**

# 股东介绍 Shareholders to introduce





**职 位**
**position**

## JMJ Development的创始人
Timothy Barton is the founder of JMJ Development



**Timothy Barton**



**职 责**
**Business Experience**

负责企业项目开发管理、收购、资本运作，致力于打造卓越的、世界级的项目。
Responsible for enterprise project development management, acquisition, capital operation, committed to creating outstanding, world-class projects.



**成 就**
**Recognition**

●完成超50亿美金的商地产业及住宅地产建设
Completed the construction of commercial real estate and residential real estate with more than 5 billion U.S. dollars
●已建成项目遍及美国各个州，有全国市场的建设经验
The completed projects are in all states in the United States, and have construction experience in the national market
●JMJ为墨西哥的RosewoodMayakobá和Cabo Pacifica集团建设的酒店项目，荣膺美国酒店科学学院颁发的五星级钻石奖
The hotel project built by JMJ for Mexico's Rosewood Mayakobá and Cabo Pacifica Group won the five-star diamond award from the American Academy of Hotel Sciences

CONFIDENTIAL

APP089



**5**
Part

## 股东介绍 Shareholders to introduce





JMJ Development成立于1984年，主要从事住宅及商业综合性项目的开发、建设，项目遍布美国境内。 JMJ开发的优质项目提倡在建筑创意方面为居民和周围社区提供了优质的服务。 Developer – JMJ Development, LLC have been involved in the development of multifamily properties across the country since 1984. JMJ has a proven track record for developing premium mixed-use commercial projects and upscale master-planned communities on its own account as well as for select clients. Each enterprise demonstrates an acute sense of architectural creativity and delivers unsurpassed service to both residents and the surrounding community.

● 公司参与投资、开发超12,000套住房
The company is involved in investment and development of more than 12,000 housing units
● 公司全程参与物业开发及物业管理的项目超过19个
The company is involved in property development and property management for more than 19 projects
● 预估公司建筑总价值超50亿美金
The estimated value of the company's buildings is over $5 billion

CONFIDENTIAL

APP090

# 6 Part
## 股东介绍 Shareholders to introduce



领导项目团队开发和销售市中心高档住宅项目
Led the project team to develop and sell high-end residential projects



收购、开发和管理超过3,000套房产，价值3.13亿美元。
Directed the Acquisition, development and management of more than 3000 sets of real estate, worth $313 million.



**1988**          **1997**          **2006**          **2015**



完成1100多套房产和45万平方英尺的商业空间设计和开发工作
Completed more than 1 thousand and 100 sets of real estate and the design and development of commercial space of 450 thousand square feet



完成6亿美金住宅建设，及1.61亿美金的酒店公寓开发 Completed the construction of 600 million U.S. dollars, and the development of $161 million hotel apartment

CONFIDENTIAL

APP091



# JMJ土地担保资产负债表 JMJ Land Guarantee Balance Sheet

**JMJ HOLDINGS**
**Consolidated Balance Sheet**
**As of July 2017**

**Assets**
*Current Asset*

| | | |
|---|---|---|
| Cash | | $456,175 |
| 1 Account Receivables | | $1,595,000 |

note 1 All short term receivables renew every 30 days and are callable within a 30 day notice.

| | | |
|---|---|---|
| Prepaid Expenses | | $0 |
| 2 Working Capital Loans | | $617,675 |

note 2 TR Carnegie and Lajolla working Capital revolvers callable with 30 days notice

| | |
|---|---|
| **Total Current Assets** | **$2,668,850** |

*Fixed (Long-Term) Assets*

| | | |
|---|---|---|
| 4 Account Receivables | | $3,278,000 |

note 4 All long term receivables are stated at 12 months.

| | | |
|---|---|---|
| Villital Towers | | $8,000,000 |
| Bellwether | | $24,766,400 |
| Parc at Windmill Farms | | $42,988,946 |
| Allensville | | $17,178,700 |
| Long Term Investments | | $3,600,000 |
| Art Work | | $12,670,000 |
| (less accumulated depreciation) | | ($63,000.00) |
| Other | | $237,329 |
| Intangible Assets | | $0 |
| **Total Fixed Assets** | | **$112,656,375** |

*Other Assets*

| | | |
|---|---|---|
| Deferred Income | | $0 |
| 5 Other | | $1,543,000 |

note 5 shares in private company and is not liquid

| | |
|---|---|
| **Total Other Assets** | **$1,543,000** |
| **Total Assets** | **$116,868,225** |

**Liabilities and Owners Equity**
*Current Liabilities*

| | |
|---|---|
| Accounts Payable | $81,345 |
| Villita Towers | $2,100,000 |
| Bellwether | $19,331,000 |
| Parc at Windmill Farms | $36,540,600 |
| Allensville | $15,191,700 |
| 6 Long-term Loans | $868,311 |

note 6 inter company note due 3/17/2019

| | |
|---|---|
| Income Tax Payable | $0 |
| Accrued Salaries and Wages | $0 |
| Unearned Revenue | $0 |
| 7 Current portion of Long-Term Debt | $2,150,311 |

note 7 Goldmark note matures 9/19 and will be refinanced at that time

| | |
|---|---|
| **Total Liabilities** | **$76,263,267** |

*Owner's equity*

| | |
|---|---|
| Owner's Investments | $40,604,958 |
| Retained Earnings | $0 |
| Other | $0 |
| **Total Owner's Equity** | **$40,604,958** |
| **Total Liabilities and Owner's Equity** | **$116,868,225** |

To the best of my knowledge, the above statement is true and correct

**Tim Barton**
in capacity as Trustee

CONFIDENTIAL

APP092



Part

FOUR

项 目 介 绍
Project introduction

CONFIDENTIAL                                                                                APP093



# 项目介绍Project introduction

## 地理位置Geographic location

4101 Lost Creek Blvd, Aledo, TX 76008





CONFIDENTIAL

APP094

# 2 Par | 项目介绍Project introduction



项目距离**Fort Worth**市中心**19**分钟车程
**The project is a 19-minute drive from downtown Fort Worth**



CONFIDENTIAL

APP095



# 项目介绍Project introduction

CONFIDENTIAL

APP096

#  项目介绍Project introduction



CONFIDENTIAL                                                              **APP097**



# 项目介绍Project introduction

白人比例很高
High percentage of whites

# 项目介绍Project introduction



项目位置房价比周边房价要高，收入水平高于当地平均水平

The housing price of the project location is higher than the surrounding housing prices, and the income level is higher than the local average level

CONFIDENTIAL

APP099



# 项目介绍Project introduction



项目位置租金比周边租金要高很多

The rent of the project location is much higher than that of the surrounding area

CONFIDENTIAL

APP100