# 8
Part

# 项目设计(参考图)



**APP141**

SEC-FW-04420-E-0305907



APP142

SEC-FW-04420-E-0305908

**From:**    Mark Adams <MAdams@jmjdevelopment.com>
**To:**     Tim Barton <tbarton@jmjdevelopment.com>, Steve Wall <Steve.Wall@Wall.com>, 傅浩强 <michael@yding.cn>
**Subject:** Wall010 loan agreement for Investors
**Sent:**    Sun, 27 Aug 2017 17:18:50 -0500

Gentalmen, Mr. Barton as reviewed and approved the attached loan agreement to go out to each of you. Upon your review and approval, this will be the document to proceed with. If you have any comments please let me know.

Thanks
**Mark Adams**
**Capital Markets**
**JMJ Development**
**1755 Wittington Place, Suite 340**
**Dallas, Texas 75234**
**Office: 972-385-9934**
**email:** madams@jmjdevelopment.net

***CONFIDENTIALITY NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information, which is intended only for the named recipient. If you are not the intended recipient, please reply to the sender that you have received the message in error and delete it. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the intended recipient is strictly prohibited. ***

EXHIBIT

9

APP143

## AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated _____, 2017, and is between _____ (Passport No _____), ("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 010, LLC ("Borrower").

## ARTICLE ONE

### The Loan

1.1    The Loan.    Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

(a)    Agency: Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan. Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

(b)    Terms of Lender Commitment: Co-Lender agrees to lend $ _____ of the total loan amount of $3,520,000 ("Commitment"). Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment. If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal: USD $_____.00 – _____ and No/100 Dollars

Interest: Interest amount equal to _____ percent (___%) per annum commencing on _____, or such later date that the Loan is funded to Borrower. The first year's interest will be due to the Lender, within ten (10) business days after _____. The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of _____. Sums not paid by such times, shall bear interest at the rate of fourteen percent (14%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans. Agent's fee for such services shall be paid by Borrower. Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.

1

AGENCY AND LOAN AGREEMENT
927968_010

APP144

(c)   Loan Purpose:

(i)   The Loan shall be evidenced by this Agreement.  The Loans and the Additional Loans shall be used to acquire 160 acres located in the City Limits of Aledo, County of Tarrant, State of Texas for residential lot development known as Lost Creek ("Property").  The Property has a purchase price of $4,400,000 and the balance of funds will be provided by Borrower.

(ii)   No Commitment for Additional/Permanent Financing:  **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2.   Pre-payment.  Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest.  Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal.  Prepayments shall be applied to payments next due under the Loan.

## ARTICLE TWO

### Representations of Borrower

Borrower represents, covenants, and warrants that:

2.1   Representations.  All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2   Power and Authority:  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification.  The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

AGENCY AND LOAN AGREEMENT
927968_010

**APP145**

2.3     Violation of Law; Breach of Agreements.  The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

     (a)     Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

     (b)     Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4     Enforceability.  The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5     Taxes.  All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.

## ARTICLE THREE

### Affirmative Covenants of Borrower

3.1     Covenants

     (a)     Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

     (b)     All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

     (c)     Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2     Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the

3

AGENCY AND LOAN AGREEMENT
927968_010

APP146

occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

3.3    Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4    Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5    Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6    Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.

**ARTICLE FOUR**
**Default and Acceleration**

4.1    Events of Default.    An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

    (a)    Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

    (b)    Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2    Optional Acceleration.  Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable,

4

APP147

without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4.3     Automatic Acceleration.  All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4     Right of Set Off.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party.  The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5     Progress Reporting.  Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include:  the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land.

## ARTICLE FIVE

## Miscellaneous

5.1     Definitions.  Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2     Construing Loan Papers.  This Loan Agreement, and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3     Renewals and Extensions.  This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

AGENCY AND LOAN AGREEMENT
927968_010

5.4     <u>Texas Law</u>.  This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

5.5     <u>Maximum Rate of Interest</u>.  The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled.  In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan.  The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6     <u>Collateral</u>.  100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders.  Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7     <u>Guarantee</u>.  JMJ Holdings, as Guarantor, hereby provides a corporate guarantee up to the principal loan amount in the event of default by Borrower.

5.8     <u>Notice</u>.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO AGENT:              Platinum Investment Corporation
                       Attn:  Michael Fu
                        REDACTED
                       Hangzhou
                        REDACTED


TO BORROWER:           Wall 010, LLC
                       c/o Steve Wall
                       2005 NE Green Oaks Blvd., Suite 150
                       Arlington, TX  76006
                       Steve.Wall@wall.com
                       817-276-3417 (office)


TO CO-LENDER:          _____
                       _____
                       _____
                       _____

5.9     <u>Place of Payment</u>.  All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

6

AGENCY AND LOAN AGREEMENT
927968_010

**APP149**

5.10    <u>Representations Survive</u>.    All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan.    All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.11    <u>No Waiver</u>.    No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.12    <u>Confidentiality</u>.    The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency.    The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

AGENCY AND LOAN AGREEMENT
927968_010

APP150

**"CO-LENDER"**

_____


**"BORROWER"**

WALL 010, LLC


By: _____
               Tim Barton as President of Carnegie Development, LLC,
               The Managing Member of Wall 010, LLC


**"AGENT"**

PLATINUM INVESTMENT CORPORATION


By: _____
Name: Michael Fu
Title:   Chief Executive Officer

8

AGENCY AND LOAN AGREEMENT
927968_010

**APP151**

# Re: :)

| | |
|---|---|
| **From:** | Tim Barton <tbarton@jmjdevelopment.com> |
| **To:** | Saskya Bedoya <sbedoya@jmjdevelopment.com> |
| **Date:** | Tue, 27 Jun 2017 17:44:59 -0500 |

009 to JMJ to villita
009 to carnigie to segoville

Sent from my BlackBerry 10 smartphone.

**From:** Saskya Bedoya
**Sent:** Tuesday, June 27, 2017 6:29 PM
**To:** Tim Barton
**Subject:** :)

Need money in Seagoville (7,500)
Need money in Villita (10,000)

Take from 007 or 009

Wall to Carnegie Development to Seagoville (or to JMJ then to Seagoville)?

Wall to Carnegie Development to JMJ to Villita

EXHIBIT

10

EXHIBIT

97

JMJ, FW-04420

SEC-FW-04420-E-0133035

**APP152**

# Re: from david maniatis

| | |
|---|---|
| **From:** | Tim Barton <tbarton@jmjdevelopment.com> |
| **To:** | Saskya Bedoya <sbedoya@jmjdevelopment.com> |
| **Date:** | Wed, 15 Nov 2017 14:29:14 -0600 |

Do it take

From wall 010

Sent from my BlackBerry 10 smartphone.

---

**From:** Saskya Bedoya
**Sent:** Wednesday, November 15, 2017 3:25 PM
**To:** Tim Barton
**Subject:** from david maniatis

---

David made a deal with architect on bridgmore

He does have constructing drawing and he will give us his password

He will give us his claim and also potential San Marcus

10,000 for bridgmore – he wants to buy it today

Another 20,000 for san Marcos

Saskya Bedoya
**JMJ Development, Inc.**
1755 Wittington Place
Suite 340
Dallas, TX 75234
P: 972.385.9934
F: 972.241.4484

sbedoya@jmjdevelopment.net
www.jmjdevelopment.net

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and / or privileged material. Any review, retransmission, dissemination or other use of, or taking action of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from all computers.



EXHIBIT

11

EXHIBIT

99

JMJ, FW-04420

**APP153**

SEC-FW-04420-E-0162517

# Re: Invoice 1515 from BHEI

| | |
|---|---|
| **From:** | Tim Barton <tbarton@jmjdevelopment.com> |
| **To:** | Saskya Bedoya <sbedoya@jmjdevelopment.com> |
| **Date:** | Wed, 09 Jan 2019 15:51:43 -0600 |

Wall

Sent from my BlackBerry 10 smartphone.

---

**From:** Saskya Bedoya
**Sent:** Wednesday, January 9, 2019 3:46 PM
**To:** Tim Barton
**Subject:** RE: Invoice 1515 from BHEI

---

Use wall017 money or from lajolla ?

---

**From:** Tim Barton <TBarton@jmjdevelopment.net>
**Sent:** Wednesday, January 9, 2019 3:41 PM
**To:** Saskya Bedoya <SBedoya@jmjdevelopment.net>
**Subject:** Re: Invoice 1515 from BHEI

Yes

Sent from my BlackBerry 10 smartphone.

---

**From:** Saskya Bedoya
**Sent:** Wednesday, January 9, 2019 3:39 PM
**To:** Tim Barton
**Subject:** RE: Invoice 1515 from BHEI

---

Pay amex?

---

**From:** Tim Barton <TBarton@jmjdevelopment.net>
**Sent:** Wednesday, January 9, 2019 3:38 PM
**To:** Saskya Bedoya <SBedoya@jmjdevelopment.net>
**Subject:** Re: Invoice 1515 from BHEI

Ok

Sent from my BlackBerry 10 smartphone.

---

**From:** Saskya Bedoya
**Sent:** Wednesday, January 9, 2019 3:28 PM
**To:** Tim Barton
**Subject:** RE: Invoice 1515 from BHEI

---

23k?

I need to pay down amex 150k

---

**From:** Tim Barton <TBarton@jmjdevelopment.net>
**Sent:** Wednesday, January 9, 2019 3:05 PM
**To:** Saskya Bedoya <SBedoya@jmjdevelopment.net>
**Subject:** Fw: Invoice 1515 from BHEI

**APP154**

EXHIBIT
12

EXHIBIT
101
JMJ, FW-04420

SEC-FW-04420-E-0173736

Pay credit card

Sent from my BlackBerry 10 smartphone.

**From:** mmatthews@cynergydev.com
**Sent:** Wednesday, January 9, 2019 2:28 PM
**To:** Beverly Roberts
**Cc:** Tim Barton
**Subject:** FW: Invoice 1515 from BHEI

This is for Rogers JMR.
Need to keep these guys working.

Michael Matthews
Cynergy Development Advisors
214.287.0090

**From:** Nichol Herron <nichol@b-hei.com>
**Sent:** Wednesday, January 9, 2019 2:09 PM
**To:** tbarton@jmjdevelopment.net
**Cc:** mmatthews@cynergydev.com
**Subject:** Invoice 1515 from BHEI



## BHEI

**Invoice** Due:12/07/2018
1515                                      Amount Due: **$23,176.00**

Dear Tim Barton:

Your invoice-1515 for 23,176.00 is attached. This is now 31 days past due. I was under the impression that it would be paid prior to the Holidays. Please remit payment at your earliest convenience.

Thank you for your business - we appreciate it very much.

Sincerely,
BHEI

817-341-4242

**APP155**

SEC-FW-04420-E-0173737

**APP156**

SEC-FW-04420-E-0173738

REDACTED

# Fw: golf site

| | |
|---|---|
| **From:** | Tim Barton <tbarton@jmjdevelopment.com> |
| **To:** | M Matthews <mmatthews@cynergydev.com> |
| **Date:** | Tue, 02 May 2017 18:01:25 -0500 |

We need to fix the word doc u had to be like the PDF I sent which say 5 days after preliminary plat we end feasibility

And change it to cash price $1875,000
And terms 2,200,000 with 1 mm down and the 600 after 12 months then last 600 six months later

Sent from my BlackBerry 10 smartphone.

---

**From:** Chris Digesualdo <▇▇▇▇▇▇▇▇▇▇▇▇▇>
**Sent:** Monday, May 1, 2017 8:26 PM
**To:** Tim Barton
**Cc:** Steve Wall (steve.wall@wall.com); 'gr▇▇▇▇▇▇▇▇▇▇
**Subject:** Re: golf site

---

Tim, thanks for responding to Rhonda & I on your latest offer.

Neither of us have experience in the development or building of homes, however, we do understand land value. Therefore, we are responding with the following:

We accept $2,100,000M cash at closing or $2,300,000M over an 18 month period. $1,100,000M at closing, $600,000K end of twelve (12) months & $600,000K end of six (6)months. The balance of funds will be accruing 7% interest until paid out in full.

We are very interested in selling the real estate, therefore, look forward in hearing from you.

Regards

Rhonda & Chris

Sent from my iPhone
A

On Apr 27, 2017, at 6:34 PM, Tim Barton <TBarton@jmjdevelopment.net> wrote:

> Chris
>
> We are looking at closing the full course and have no view to keeping 9 holes
>
> There is serious cost to get the lots in shape to sell. So the cost that you may think it is to develop is much greater than one would think in a simple review
> The site has several separate parcels and that makes the cost multiply if it was one connected tract that would be different
>
>
> Your comment
> The real estate we are offering is improved with streets, electrical, water, sewage and zoned residential, which would save cost on developing.
>
>
> Further the fact that it has what your comments says is no different than any other sites it has utilites.

**EXHIBIT**

**13**

exhibitsticker.com

**APP157**

This has significant risk as well from the current home owners

I am sure you are not under stress to sell for money but none the less every month you are losing money.

We are qualified and able and have funding and are ready to do the deal.

For you to find another such party will take time. Time is money to you

I suggest the following

We will increase our price to $1,875,000 with the same terms

Or as you said you don't need funds we would increase the offer to $2 million but we would pay you $1,000,000 at closing and then we would be paid back $500,000 in 12 months and the final $500,000 in 6 more months. The balance of funds would accrue a 5% interest until paid.

This would get you very close to your number and also give you a good tax strategy to delay taxes also helping you.

Once you decide which we can meet and sign the LOI and get a contract done

Regards

Timothy Barton

**From:** Chris Digesualdo <█████████████████>
**Date:** April 26, 2017 at 1:32:16 PM CDT
**To:** Rhonda Artz <gr█████████████>
**Subject: Response to T Barton**

Dear Mr. Barton

We are in receipt of your letter JMJ acquisition LLC, dated, April 24, 2017, for the purchase of 165 acres located on lost Creek golf course property for the purchase price of $1,750,000 (One Million Seven Hundred Fifty). We consider your offer not only far below the value of comparable real estate in the surrounding communities and our asking price in a development with an established infrastructure needed to develop home at a reduced cost.

Therefore we must reject your offer of $1,750,000.

We feel very confident our price of $2,500,000 presented to you is fair and well below asking price on unimproved comparable real estate in the area. The real estate we are offering is improved with streets, electrical, water, sewage and zoned residential, which would save cost on developing.

With the deletion of the proposed 9 hole golf course, it
gives you the option of developing more of the land. This could generate an additional 250 lots for a total of 500+.

Tim, Rhonda & I are not selling because we are in the need of money, but because we have run our course trying to manage a golf course, therefore, we decided to move on to new adventures.

If you are truly interested in purchasing this real estate, I believe we can negotiate this to the satisfaction of both parties. Therefore, we look forward in hearing from you whatever your decision might be.

Regards:

Rhonda & Chris

Sent from my iPad

**APP158**

Timothy Barton
**President**
*JMJ Development, LLC*
13901 Midway Road
Suite 102-LB243
Dallas, TX 75244
(972) 385-9934
tbarton@jmjdevelopment.net

---

Total Control Panel                                                                 Login

To: tbarton@jmjdevelopment.net      Remove this sender from my allow list
From: chris.digesualdo@att.net

*You received this message because the sender is on your allow list.*

**APP159**

SEC-FW-04420-E-0050010

# Fw: CONFIDENTIAL: Sample of PPT for China 145 Acres South Fort Worth

| | |
|---|---|
| **From:** | Tim Barton <tbarton@jmjdevelopment.com> |
| **To:** | M Matthews <mmatthews@cynergydev.com> |
| **Date:** | Tue, 06 Jun 2017 19:36:21 -0500 |
| **Attachments:** | Wall Homes -145Acres.pptx (11.61 MB) |

Sent from my BlackBerry 10 smartphone.

**From:** Steve Wall <Steve.Wall@Wall.com>
**Sent:** Monday, August 29, 2016 4:57 PM
**To:** Tim Barton
**Subject:** FW: CONFIDENTIAL: Sample of PPT for China 145 Acres South Fort Worth

**From:** Steve Wall
**Sent:** Monday, August 29, 2016 4:34 PM
**To:** Tim Barton
**Subject:** CONFIDENTIAL: Sample of PPT for China 145 Acres South Fort Worth

Tim,

This is the deal I was working on with Welborns and Michael Vu.
The sales price was actually about 1.5 million so you can see we had a markup.

Steve

Total Control Panel                                                                 Login

To: tbarton@jmjdevelopment.net     Remove this sender from my allow list
From: steve.wall@wall.com

*You received this message because the sender is on your allow list.*

**EXHIBIT**

**14**

**EXHIBIT**

**188**

JMJ, FW-04420

**APP160**

SEC-FW-04420-E-0045487



# Fort Worth 145 Acres

EXCLUSIVE and CONFIDENTIAL OFFERING PREPARED ONLY FOR MICHAEL VU

**APP161**

SEC-FW-04420-E-0045488

# Summary Description of 144.574 Acre Tract
# Fort Worth, Texas USA

* **Location**
  * Within Fort Worth City Limits and Everman School District
  * The overall tract fronts on heavily traveled roads, all slated to become major arterials
    * Existing Everman Parkway/Shelby Road along the northern boundary
    * Existing Rendon Road along the eastern boundary
    * Future extension of Risinger Road along the southern boundary
  * Adjoins new and attractive Everman Junior High School
  * Within ½ mile of Everman High School
  * Less than 2 miles east of major employment center
  * 2 miles east of I.H.35W
  * 2 miles south of I.H.20
  * Less than 11 miles south of Downtown Fort Worth
  * Within 15 minutes driving time of regional shopping facilities

* **Utilities**
  * Water line traverses north property line
  * Sewer at southeast corner of property
  * Electricity - Adjoining properties currently served

* **Zoning**
  * "CR" (approx. 58.5 Acres) and "R-2" (Approx. 86.1 Acres)
    * Permits up to 12 units per acre for the following types of housing: multi-family, townhouses, duplexes, cluster housing, zero-lot line, garden homes and single family (minimum lot size for single family uses is 2500 s.f.)
    * Example numbers of lots allowed by zoning on net acreage are estimated as follows:
      * All Townhome - 1,560 Lots
      * 40 acres Townhome and 90 Acres Single Family (Ave. 45 ft. Lots) – 978
      * All Single Family (Ave. 50 ft. Lots) – 650 Lots
      * All Single Family (Ave. 60 ft. Lots) – 585 Lots

* **Site Characteristics**
  * Vacant, flat and mostly open with sparse clusters of trees and a remnant of an orchard next to the adjoining junior high school
  * Drainage follows gentle slope from north to southeast
  * Most of property used for agriculture
  * No drilling pad sites on property
  * Gas pipelines on perimeter of property

**APP162**

SEC-FW-04420-E-0045489

# Investment Summary
## Potential of 1,560 Zoned Lots

- Land Purchase Price:                    $ 3,450,000
- Wall Homes Investment:               $    455,000
- Loan Amount Investor:                  $ 2,995,000
- Investor Interest 2 years:
  (17%/Year):                                 $  1,018,300
- Total Capital Return Investor      $  4,013,300
- Wall Homes Interest 2 years:
  (17%/Year):                                 $     154,700
  Total Capital Return Wall:           $     609,700

**APP163**

SEC-FW-04420-E-0045490

# DFW Map



**APP164**

SEC-FW-04420-E-0045491

# Market Area Map



**APP165**

SEC-FW-04420-E-0045492

# Local School and Employment Map



**APP166**

SEC-FW-04420-E-0045493

# TAD Site Map

Tarrant Appraisal District

https://tad.maps.arcgis.com/apps/webappviewer/index.html?id=89623a2c35ff41f5b4



**APP167**

SEC-FW-04420-E-0045494

# Survey



**APP168**

# Survey



**APP169**

# Zoning Map



**APP170**

SEC-FW-04420-E-0045497