## CONTRACT FOR SALE AND PURCHASE OF
## UNIMPROVED REAL PROPERTY

**THIS CONTRACT** is made and entered into by and between JMJ Acquisitions, LLC and or permitted assigns (the "**Purchaser**" or "Buyer") and Somerset-Lost Creek Golf, LTD (the "**Seller**").

## WITNESSETH:

**WHEREAS,** Seller is the owner of that certain parcel of real property (the "**Property**") consisting of five (5) tracts of land consisting of approximately 145.4999 acres of land located in the City Limits of Aledo, County of Tarrant, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof by reference for all purposes; and

**WHEREAS,** Purchaser is desirous of purchasing the Property, subject to the conditions and the other agreements hereinafter set forth, and Seller is agreeable to such sale on the terms, conditions and agreements set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the respective undertakings of the parties hereinafter set forth, the receipt and sufficiency of which consideration is hereby acknowledged, it is hereby agreed as follows:

1.    **Sale of Property.** Seller shall sell the Property to Purchaser, and Purchaser shall purchase the Property from Seller, together with, but without warranty, all and singular the rights and appurtenances pertaining to the Property, if any, including any right, title and interest of Seller in and to adjacent streets, alleys, strips and gores, and rights-of-way, together with improvements, fixtures and personal property, if any, owned by Seller and situated on or attached to the Property, for the sum of Two Million Two Hundred Thousand and NO/100 Dollars ($2,200,000.00) (the "**Purchase Price**"), such Purchase Price to be paid as set out in Paragraph 3 hereof.

(a)    all buildings, structures and other improvements located on the Land (collectively, the "**Improvements**") (the Land and the Improvements are hereinafter collectively referred to as the "**Real Property**");

(b)    all right, title and interest of Seller in and to the personal property set forth on Exhibit A-1 hereto shall be retained by Seller (collectively, the "**Personalty**");

(c)    all right, title and interest of Seller in and to (a) all transferable permits, licenses, approvals, utility rights, development rights and similar rights related to the Real Property, if any, whether granted by governmental authorities or private persons, and (b) all assignable warranties and guaranties (to the extent assignable without the consent of the warranty or guaranty provider) covering all or any part of the Real Property (collectively, the "**Intangibles**").

Land Contract – Page 1
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

**APP195**

(d)    "Leases" means collectively the Equipment Lease. "Service Contracts" means all contracts to which Seller is a party relating to the operation, maintenance or management of the Real Property, all which Seller will terminate at Close of Escrow, at no cost to Buyer.

2.A    Conveyance of Property. Seller shall convey the Property to Purchaser at the Closing subject to all liens, encumbrances, conditions, easements, assessments, and restrictions (the "Permitted Exceptions"), which are the exceptions as may be approved, or deemed approved, by Purchaser in accordance with the terms hereof. Purchaser acknowledges that Seller will close the Golf Course and related operations on the day of Closing.

2.B    Seller's On Site Auctions or Sales of Personal Property After Closing. Seller's delivery of possession of the Property at Closing is subject to Seller's right to conduct auctions or sales on the Property at any time within 1 week after Closing, at which auctions or sales Seller will sell its existing equipment and personal property utilized in the maintenance or operation of the Golf Course, parking lot, Pro Shop, restaurant and related entities (collectively "Golf Course Equipment & Personalty"). Seller hereby indemnifies Purchaser from and against any damage, cost, or liability that may arise from such auctions or sales of the Golf Course Equipment and Personalty.

*SEE DERA*

3.    Closing. The Closing shall be held at the offices of ~~Alamo~~ Title Company, ~~c/o W. Michael Greene, P.C., 1501 West Randol Mill Rd., Arlington, Texas 76021-32 ATTN: Mike Greene, Tel. (817) 633-3700 Fax (817) 277-1359 mike@wmichaelgreene.com~~ ("Title Company") or at such other location as may be acceptable to Purchaser and Seller, commencing at 10:00 a.m. on that date which is thirty (30) days ~~form~~ from the end of the Review Period, (the "Closing" or "Closing Date") or this Contract will terminate. At the Closing, Seller shall deliver to Purchaser a special warranty deed executed and acknowledged by Seller in recordable form, conveying the Property to Purchaser.

4161 McKinney Avenue, Suite 410, Dallas, Tx 75204

~~LEGAL COUNSEL'S DUAL REPRESENTATION OF SELLER AND TITLE COMPANY.~~ MS. RHONDA ARTZ ("RHONDA") AND MR. CHRIS DIGESUALDO ("CHRIS") ARE PRINCIPALS IN THE SELLER IN THIS TRANSACTION. W. MICHAEL GREENE, P.C. (THE "LAW FIRM") HAS PREVIOUSLY REPRESENTED RHONDA AND CHRIS, AND ENTITIES IN WHICH RHONDA, OR CHRIS, WAS A DIRECTOR, OFFICER, PARTNER, OR EQUITY OWNER. IN ADDITION, THE LAW FIRM HAS REPRESENTED ALAMO TITLE COMPANY ("ALAMO") FOR MORE THAN 20 ~~YEARS.~~

~~IN THIS TRANSACTION THE LAW FIRM REPRESENTS BOTH: (1) ALAMO, AND (2)~~ THE SELLER. SELLER AND BUYER BOTH ACKNOWLEDGE AND UNDERSTAND THAT LAW FIRM REPRESENTS ALAMO, IN ADDITION TO THE SELLER, AND THAT LAW FIRM WILL RECEIVE A PERCENTAGE OF THE TITLE POLICY PREMIUM PAID TO ALAMO AT CLOSING IN THIS TRANSACTION. LAW FIRM REPRESENTS TO BUYER AND SELLER THAT ALAMO HAS CONSENTED TO THE LAW FIRM'S DUAL REPRESENTATION BY SEPARATE ~~AGREEMENT, STATEMENT, OR ACKNOWLEDGEMENT.~~

APP196

At the Closing, Purchaser shall deliver to Seller a cash down payment in an amount of $1,000,000.00 and shall execute a Seller note ("Note") in an amount of $1,200,000.00 with a set maturity date on the last day of the 18th month following the closing date as set herein. Interest on the unpaid balance of the purchase price shall accrue at a rate of 6% until paid at maturity. Borrower shall make a principal reduction payment of $600,000 due 12 months from the closing date as set herein. Borrower shall make a final payment of $600,000 plus all accrued interest on the 18th month following the closing date. The Note shall be secured by a Vendor's Lien in Seller's Deed, and a First Lien, purchase money deed of trust. The form of the Note and deed of trust shall be on the general format proscribed by the State Bar of Texas, and will include a due on sale clause containing such terms as Seller may require, in Seller's sole discretion. The initial cash payment or other evidence of good funds acceptable to the Title Company (hereinafter defined) shall be delivered for immediate disbursement at Closing.

At the Closing, Purchaser and Seller each shall deliver a statement addressed to the Title Company stating its true and correct Federal Taxpayer Identification Number, and stating whatever other information is requested by the Title Company or other "person" so that any "person" responsible under the Tax Reform Act of 1986 for filing a form 1099 regarding this sale will have all the information required by then current IRS regulations.

4.    **Title Insurance.** At the Closing, Seller shall cause Title Company to commit to issue to Purchaser a Texas Form T-1 Owner's Policy of Title Insurance (the "**Owner's Title Policy**") in the full amount of the Purchase Price, insuring Purchaser as owner of the Property, in fee simple, and containing no exceptions to title other than the standard printed exceptions (provided that the exception for restrictive covenants shall be endorsed "None of Record" or limited to restrictions approved or deemed approved by Purchaser, and the exception for taxes shall be limited to the year in which the Closing occurs and subsequent years and subsequent assessments for prior years due to change in land usage or ownership and endorsed "Not Yet Due and Payable"), the Permitted Exceptions, and any other exceptions which have been approved or deemed approved by Purchaser. Seller shall pay the premium charged for the basic Owner's Title Policy provided for above, and Purchaser shall pay the full premium charged for any endorsements thereto, and all other closing costs shall be paid by Seller or Purchaser in the manner in which such costs are customarily paid by such parties on the Closing Date in transactions involving unimproved real property in the County where the Property is located; provided, each party shall be responsible for its own attorneys' fees and such other costs as specifically provided herein.

5.    **Title Commitment and Survey.** Seller shall deliver the following items to Purchaser within ten (10) days after the date hereof:

(a)    An Owner's Title Policy Commitment (the "**Commitment**") covering the Property, issued by the Title Company, together with copies of all items referred to therein as exceptions.

(b)    Seller has no existing Survey of the Property. Purchaser shall, at its own expense, obtain a current Survey of the Property, certified to Seller, Buyer, and the Title Company (the "**Survey**"), containing an itemization of the number of square feet

Land Contract – Page 3
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2 –

**APP197**

contained in the Property, and the metes and bounds description thereof. Purchaser will deliver a copy of the Survey to Seller and the Title Company. At Closing, Seller shall reimburse Purchaser for the cost of the Survey, up to a maximum of $2,500.00.

6.      **Title Review Period.** Purchaser shall have seven (7) days after receipt of the Commitment and the Survey in which to approve or disapprove such items. If Purchaser, during such seven (7) day period, shall fail to give written notice to Seller of any objection(s) it may have to the Survey or Commitment, Purchaser shall have waived its rights to object to any such item(s) and all title exceptions reflected in the Commitment or the Survey shall be deemed approved by Purchaser. If Purchaser shall provide Seller with written notice of any objections to title to the Property within such seven (7) day period Seller shall have a period of five (5) days thereafter to cure or correct such items, Seller having no duty or obligation to cure or correct any such title objections. If Seller shall fail or refuse during such five (5) day period to cure or correct any title objection noted by Purchaser, Purchaser may elect to terminate this Contract by giving Seller written notice thereof within three (3) days following Seller's five (5) day cure period, whereupon all Earnest Money previously deposited, less the cost of the Survey and the Commitment, shall be immediately refunded to Purchaser and the parties hereto shall have no further obligations or liabilities one to the other, or Purchaser may elect to waive such title deficiencies and proceed to close the transaction contemplated herein. Further, by its execution hereof, the Purchaser hereby approves all Permitted Exceptions as exceptions to the title to the Property and waives all rights to object to any such items.

7.      **Purchaser's Review Period.** Purchaser shall have a period (the "**Review Period**") that shall ends 5 days from Purchaser's receipt of a Preliminary Plat approved by the City of Fort Worth and any other necessary governing governmental authority to do the following:

          (a)      To conduct any and all inspections, engineering and feasibility studies which Purchaser deems necessary, in an effort to determine whether or not to proceed with the Closing of this transaction. In this regard, Seller hereby agrees that Purchaser, and/or Purchaser's agents or employees, may have unlimited access to the Property during such period to conduct such studies and inspections. Purchaser hereby indemnifies and holds Seller and the Property harmless from any and all costs and expenses incurred in relation to the inspections and studies described herein, and to restore the Property to its pre-existing condition following the completion of such tests and studies. Purchaser's indemnifications of Seller and the Property and restoration obligation(s) will survive Closing, in favor of Seller.

          (b)      To obtain such assurances or approvals from the appropriate governmental authorities as Purchaser deems necessary in relation to Purchaser's intended use of the Property.

In the event Purchaser is dissatisfied, for any reason with the information it obtains relative to the Property or is unable to obtain the governmental assurances or approvals it deems necessary, during the Review Period, Purchaser may terminate this Contract by giving written notice thereof to Seller prior to the expiration of the Review Period, in which event this Contract

Land Contract – Page 4
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2 –

**APP198**

shall terminate, the Earnest Money, shall be returned to Purchaser, and the parties hereto shall have no further obligations one to the other

8. **Possession of Property**. Purchaser shall be entitled to full possession of the Property at Closing, subject only to rights of tenants under any tenant leases or rights of parties in possession, and Seller's right to conduct the auctions or sales of the Golf Course Equipment & Personalty.

9. **Prorations**. Rents, if any, and ad valorem taxes on the Property for the current year shall be prorated at the Closing, effective as of the Closing Date. If tax assessments for the Property for the current year are unavailable as of the Closing Date, said ad valorem taxes shall be prorated based upon the immediately preceding tax year figures with said proration to be adjusted in cash between the parties, based on actual taxes for the current year at the time such actual taxes are determined, and at Closing the parties shall enter into an agreement specifying the method of such adjustment. At Closing, Seller shall pay any taxes assessed for prior years due to any change of use or ownership of the Property ("Rollbacks").

10. **Commissions**. No real estate commissions are payable by Seller or Purchaser in connection with this transaction. Purchaser and Seller each represent and warrant to the other that it, its partners, officers, directors, agents or employees, have taken no actions which would give rise to any real estate commission, or similar fee, with regard to this transaction, and each party shall indemnify and hold the other harmless against any such commissions, fees, or claims, regarding same, including costs and expenses incurred by the indemnified party in defending against such claims, including attorneys fees.

11. **Earnest Money**. *TITLE Company* Contemporaneous with the full execution hereof, Purchaser shall deposit with the ~~Seller~~ the sum of $ 65,000.00 (the "**Earnest Money**"), such Earnest Money to be credited to the cash portion of the Purchase Price due at Closing. In the event that this Contract fails to close, the Earnest Money shall be distributed as provided herein. If Purchaser timely notifies Seller of its decision to terminate this Contract pursuant to the terms hereof, all of the Earnest Money, less $5,000.00 as independent contract consideration (the "Independent Contract Consideration") to be paid to the Seller, shall be refunded to Purchaser immediately upon request, and all further rights and obligations of the parties under this Contract shall terminate except for all indemnity obligations of the parties hereto or other provisions of this Contract that expressly survive the termination of this Contract. Seller acknowledges that Purchaser may, but is not obligated to, expend time, money, and other resources in connection with the examination and investigation of the Property, and that, notwithstanding the fact that this Contract may terminate, the payment of the Independent Contract Consideration, together with such time, money, and other resources that may be expended, constitute adequate consideration for Seller's execution of and entry into this Contract.

12. **Seller's Remedies**. In the event Purchaser fails to close this transaction for any reason, other than due to Seller's default or due to the termination hereof by Purchaser in strict accordance with the applicable provisions hereof, Purchaser agrees that the Seller may retain the Earnest Money as liquidated damages, the parties agreeing that the damages to Seller would be difficult or inconvenient to ascertain, and such sum represents a reasonable amount to be paid to

Land Contract – Page 5
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

Seller in light of all aspects of this transaction. The failure by Seller to terminate this Contract for any reason pursuant to this Paragraph 12 shall in no way waive, alter or modify any rights of Seller in regard to the covenants and agreements of Purchaser herein.

13.    **Purchaser's Remedies.** If Seller defaults in performing any of Seller's obligations under this Contract, Purchaser may, at its option, either terminate this Contract and receive a full and immediate refund of the Earnest Money previously deposited or seek to enforce specific performance of this Contract, as its sole and exclusive remedies, Purchaser hereby waiving any right to seek damages from Seller for any breach of the terms of this Contract.

14.    **Assignment of Contract.** Purchaser shall have the right to assign this Contract at any time without the prior written consent and approval of Seller, and following any such assignment, Seller agrees to close this transaction with the approved assignee of Purchaser.

15.    **REPRESENTATIONS AND WARRANTIES.**

A.    For any representations and warranties of Seller set forth herein, "the knowledge of" or "to the best knowledge of" Seller and similar phrases shall mean the current, actual, knowledge of Chris Digesualdo ("**Key Person**"), without requirement for any investigation or inquiry of any scope. In order to induce Buyer to enter into this Agreement and to complete the Transaction, Seller makes the following representations and warranties to Buyer as of the date of this Agreement:

(a)    Seller has been duly organized and is validly existing and in good standing under the laws of the State of Texas. Seller has the limited partnership power to enter into this Agreement, to perform its obligations under this Agreement and to complete the Transaction as contemplated by this Agreement. Seller has taken all limited partnership action necessary to authorize the execution and delivery of this Agreement.

(b)    This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity.

(c)    No action, suit or proceeding is pending or, to Seller's knowledge, threatened against Seller or the Property.

(d)    Except for consents required under Service Contracts and consents, approvals, authorizations and filings already completed, Seller is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Seller of its obligations under this Agreement or the completion of the Transaction as contemplated by this Agreement.

(e)    To Seller's knowledge, there are no Service Contracts other than those listed on Exhibit I to this Agreement, and to Seller's knowledge the copies of the Service

Land Contract – Page 6
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

**APP200**

Agreements delivered or to be delivered by Seller to Buyer are true and complete copies of such Service Agreements and all amendments thereto, if any.

(f)    Seller has not received any written notice of any condemnation proceeding which is currently pending in connection with the Property.

(g)    Seller has no knowledge, nor has received any notice of any violation of law or ordinance affecting the Property, including without limitation any law regarding environmental or hazardous substances issues.

B.    Buyer, to induce Seller to enter into this Agreement and to complete the Transaction, makes the following representations and warranties to Seller, which representations and warranties are true and correct as of the date of this Agreement:

(a)    Buyer has been duly organized and is validly existing under the laws of the State of Texas. Buyer has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the Transaction as contemplated by this Agreement. Buyer has taken all action necessary to authorize the execution and delivery of this Agreement and the performance by Buyer of its obligations under this Agreement.

(b)    This Agreement has been duly executed and delivered by Buyer and constitutes a valid, binding and enforceable obligation of Buyer, subject to bankruptcy and other debtor relief laws and principles of equity.

(c)    There is no action, suit, proceeding, inquiry or investigation (including any bankruptcy or other debtor relief proceeding), pending or to the knowledge of Buyer threatened, against Buyer by or before any court or governmental authority that would prevent or hinder the performance by Buyer of its obligations under this Agreement or the completion of the Transaction as contemplated by this Agreement.

(d)    Except for consents, approvals, authorizations and filings already completed, Buyer is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement or the completion of the Transaction as contemplated by this Agreement.

C.    FOR THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT OR CONTAINED IN ANY OF THE SELLER DOCUMENTS TO BE DELIVERED AT THE CLOSE OF ESCROW, SELLER FOR ITSELF, OR ANY AFFILIATE OF SELLER SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PROPERTY OR ITS CONDITION OR THE

Land Contract – Page 7
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY. THE DISCLAIMERS IN THIS SECTION 15(C) SPECIFICALLY EXTEND TO (1) MATTERS RELATING TO HAZARDOUS MATERIALS (DEFINED HEREIN) AND COMPLIANCE WITH ENVIRONMENTAL LAWS (DEFINED HEREIN), (2) GEOLOGICAL CONDITIONS, INCLUDING SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND STREAMS AND RESERVOIRS AND OTHER UNDERGROUND WATER CONDITIONS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER, EARTHQUAKE FAULTS, AND MATTERS RELATING TO FLOOD PRONE AREAS, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARDS, (3) DRAINAGE, (4) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, CONDITIONS OF SOIL FILL, SUSCEPTIBILITY TO LANDSLIDES, AND THE SUFFICIENCY OF ANY UNDERSHORING, (5) ZONING AND SUBDIVISION AND COMPLIANCE WITH ZONING AND SUBDIVISION LAWS, (6) THE VALUE AND PROFIT POTENTIAL OF THE PROPERTY AND (7) DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY AND PHYSICAL CONDITION OF THE PROPERTY AND COMPLIANCE OF THE PROPERTY WITH ANY LAWS (INCLUDING BUILDING CODES AND SIMILAR LAWS, THE AMERICANS WITH DISABILITIES ACT OF 1990 AND THE FAIR HOUSING AMENDMENTS ACT OF 1988, EACH AS AMENDED). BUYER REPRESENTS AND WARRANTS TO THE SELLER PARTIES THAT BUYER IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED BUYER OF REAL ESTATE. BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT AND IN THE SELLER DOCUMENTS TO BE DELIVERED AT CLOSE OF ESCROW, BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY STATEMENT OF ANY SELLER PARTIES OR ANY OFFICER, DIRECTOR, TRUSTEE, AGENT, EMPLOYEE OR OTHER PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF ANY SELLER PARTY. BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED OR WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS AS TO THE CONDITION OF THE PROPERTY AND ALL MATTERS BEARING UPON THE PROPERTY AND THE CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT OR CONTAINED IN ANY OF THE SELLER DOCUMENTS TO BE DELIVERED AT THE CLOSE OF ESCROW, BUYER IS ACQUIRING THE PROPERTY "AS IS", "WHERE IS" AND WITH ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS. UPON CLOSE OF ESCROW, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT OR CONTAINED IN ANY OF THE SELLER DOCUMENTS TO BE DELIVERED AT THE CLOSE OF ESCROW, BUYER WILL ACCEPT THE PROPERTY SUBJECT TO ADVERSE STRUCTURAL, PHYSICAL, ECONOMIC OR ENVIRONMENTAL CONDITIONS THAT MAY THEN EXIST AND THAT WERE OR WERE NOT REVEALED BY THE INSPECTIONS AND INVESTIGATIONS CONDUCTED BY BUYER, AND BUYER

Land Contract – Page 8
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

SPECIFICALLY WAIVES AND RELEASES (1) ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PROPERTY OR ITS CONDITION OR THE CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY AND (2) ALL RIGHTS, CLAIMS, REMEDIES, RECOURSE OR OTHER BASIS FOR RECOVERY (INCLUDING ANY RIGHTS, REMEDIES, RECOURSE OR BASIS FOR RECOVERY BASED ON NEGLIGENCE OR STRICT LIABILITY) THAT BUYER WOULD OTHERWISE HAVE AGAINST THE SELLER, ANY PERSON WHO HOLDS A DIRECT OR INDIRECT OWNERSHIP INTEREST IN ANY SELLER PARTY AND THE RESPECTIVE OFFICERS, DIRECTORS, TRUSTEES, AGENTS AND EMPLOYEES OF EACH SUCH PERSON IN RESPECT OF (I) THE CONDITION OF THE PROPERTY (INCLUDING BUT NOT LIMITED TO EXISTENCE OF ANY HAZARDOUS MATERIALS ON OR UNDER THE LAND OR ANY PROPERTY NEAR THE LAND), (II) WHETHER THE PROPERTY OR ITS USE COMPLY WITH APPLICABLE LAW, (III) THE CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY, (IV) ANY MATTER RELATING TO THE LEASE, OR (V) ANY OTHER MATTER RELATING TO THE PROPERTY. BUYER ACKNOWLEDGES AND AGREES THAT THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH IN THIS SECTION 15(C) ARE AN INTEGRAL PART OF THIS AGREEMENT AND THAT SELLER WOULD NOT HAVE AGREED TO COMPLETE THE SALE ON THE TERMS PROVIDED IN THIS AGREEMENT WITHOUT THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH IN THIS SECTION 15(C).

The representations and warranties in Section 15(A) and Section 15(B) will survive the Close of Escrow, but only for a period of six (6) months no claim shall be allowed on any such representation or warranty unless written notice of the claim is delivered by the claimant to the other party within such six (6) month period. NOTHING IN THIS SECTION LIMITS THE DISCLAIMERS, WAIVERS AND RELEASES IN SECTION 15(C), ALL OF WHICH WILL SURVIVE CLOSE OF ESCROW WITHOUT LIMIT AS TO TIME.

16.    **Entire Contract.** This Contract embodies the entire agreement between the parties hereto and cannot be amended or varied without the express written agreement of the parties hereto. Furthermore, neither party has made any representations, warranties or covenants to the other concerning any tax benefits or tax treatment which may accrue or be given to the other party in connection with the transactions contemplated hereby. Each party has relied upon its own examination of the Contract and the provisions thereof, and the counsel of its own advisors, and no promise, representation, warranty or covenant not included in this Contract has been or is relied upon by either party. In the event that any litigation arises hereunder, it is specifically stipulated that this Contract shall be interpreted and construed according to the laws of the State of Texas, and shall be performable in Tarrant County, Texas. Further, the prevailing

Land Contract – Page 9
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

party in any such litigation between the parties shall be entitled to recover reasonable attorneys' fees.

17.   **Binding Effect; Performance.** This Contract and the terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, legal representatives, successors and permitted assigns wherever the context so requires or admits; provided, however, no third party shall have any rights, claims, benefits or obligations accruing hereunder unless such third party is claiming same under operation of law or a valid and permitted assignment made in accordance with the terms hereof. Time is of the essence in the performance of all obligations or requirements contemplated herein; provided, however, if the final date of any period set forth herein (including, but not limited to, the Closing Date) falls on a Saturday, Sunday or legal holiday under the laws of the State of Texas or the United States of America, the final date of such period shall be extended to the next day that is not a Saturday, Sunday or legal holiday. The term "days" as used herein shall mean calendar days. The term "business days" as used herein shall mean calendar days except Saturdays, Sundays or legal holidays under the laws of the State of Texas, or the United States of America.

18.   **Headings.** The article headings contained herein are for purposes of identification only and shall not be considered in construing this Contract.

19.   **Notices.** Any notice, request, demand or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing and shall be deemed to be delivered on receipt, if hand delivered, or when sent by registered or certified mail, return receipt requested, to the addresses as set out as follows, or such other notice address as either party may hereafter provide to the other or when sent by confirmed email:

TO SELLER:

| | |
|---|---|
| Name | Somerset-Lost Creek, Ltd., a Texas Limited Partnership |
| Address | 4101 Lost Creek Boulevard |
| City State | Aledo, Texas 76008  ATTN:  Rhonda Aertz, |
| Attn: | Rhonda Artz, President, Member & Manager of |
| | Somerset-Lost Creek Management, LLC , sole General Partner |
| Tel: | Rhonda  AND                    Chris |
| Email: | AND |

With Copy To:

| | |
|---|---|
| Name | W. Michael Greene |
| Address | 1501 West Randol Mill Road |
| City State | Arlington, TX   76012 |
| Attn: | Mike Greene |
| Tel: | (817) 633-3700 |
| Email: | mike@wmichaelgreene.com |

Land Contract – Page 10
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

APP205

TO PURCHASER:

Name JMJ Acquisitions, LLC
Address 1755 Wittington Place, Suite 340
City State Dallas, Texas 75234
Attn: Tim Barton
Tel: 972-385-9934
Email: t.barton@jmjdevelopment.net

20.  **Effective Date.** All references in this Contract to the "date hereof" or the effective date of this Contract shall be deemed to refer to the last date, in point of time, on which all parties hereto have fully executed (and, if required, initialed) this Contract.

21.  **No Recordation.** Purchaser shall neither record this Contract nor a memorandum of the terms hereof in any public records without the prior written consent to such recordation from the Seller. Any unauthorized recording of this Contract, or a memorandum of the terms hereof, by Purchaser shall constitute an event of default by the Purchaser in the terms hereof, whereupon this Contract shall immediately and automatically terminate and all Earnest Money deposited by Purchaser hereunder shall be retained by the Seller as liquidated damages in accordance with the terms hereof. Further, the placing of record by Seller of an affidavit reciting the unauthorized recording of this Contract, or a memorandum of the terms hereof, by Purchaser and the subsequent termination of this Contract due to such unauthorized recording shall constitute full and sufficient evidence of the termination of this Contract and any third parties shall have the right to rely upon such termination of this Contract in accordance with the terms hereof.

22.  **Termination of Offer.** This Contract constitutes an offer by Seller to sell the Property to Purchaser on the terms and conditions set forth herein, and this offer shall expire and be of no further force and effect, unless sooner withdrawn, unless accepted by Purchaser by June 12, 2017.

23.  **Seller not a Foreign Person.** Seller hereby represents to Purchaser that it is not a foreign person, corporation, partnership, trust or estate (as those terms are defined in the Internal Revenue Code of 1954, as amended, and the regulation promulgated and in force with respect thereto), and Seller will, at Closing, deliver to Purchaser a certificate confirming such representation in a form satisfying the requirements of applicable law or regulations.

*[signature pages follow]*

Land Contract – Page 11
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2

EXECUTED by Seller this _____ 13th day of July , 2017.

SELLER:

Somerset-Lost Creek Golf, Ltd
a Texas Limited Partnership

By: Somerset-Lost Creek Management, LLC
a Texas Limited Liability Company
and its General Partner

By: _____
Printed Name:  Rhonda Artz  Title: President, Member &
Manager

Land Contract – Page 12
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2 – _____

**APP206**

EXECUTED by Purchaser this __17__ day of __July__, 2017.

PURCHASER:

JMJ Acquisitions, LLC and or Assigns

By: _____

Printed Name: Tim Barton, Manager

Receipt of Executed Contact

The undersigned hereby acknowledges receipt of the Contract For Unimproved Real Property fully executed by Seller and Purchaser as of the __17__ day of __July__ 2017.

SENDERA
~~Alamo~~ Title Insurance Company

Receipt of Earnest Money

The undersigned hereby acknowledges receipt of earnest money in the amount of $65,000.00 as of the __17__ day of __July__, 2017.

SENDERA
~~Alamo~~ Title Insurance Company

Land Contract – Page 13
928983_1 – JMJ – Somerset Lost Creek Golf-- Contract2 – _____

APP207

APP208

**EXHIBIT "A"**

Land Contract – Page 14
928983_1 – JMJ – Somerset Lost Creek Golf – Contract2 – _____

LEGAL DESCRIPTION FOR
LOST CREEK GOLF COURSE

BEING Tracts 1, 2, 3, 4 & 5 situated in the C.E. Burkham Survey, Abstract No. 246, the J. Burleson Survey, Abstract No. 78 and the J.H. Bursey Survey, Abstract No. 241, Tarrant County, Texas and being portions of the 170.44 acre tract as described by deed to Lost Creek Country Club and recorded in Volume 7142, Page 551, County Records, Tarrant County, Texas and being more particularly described by metes and bounds as follows:

TRACT 1:

BEGINNING at a point in the west line of said Burkham Survey, 1480.40 feet from its southwest corner, said point being a westerly southwest corner of said 170.44 acre tract;

THENCE N 00°10'15"E, 728.77 feet along the west line of said Burkham Survey and said 170.44 acre tract to the southwest corner of Lot 35, Block 3, Lost Creek Addition as recorded in Plat Volume 388/115, Page 97, said County Records;

THENCE along the southerly line of said Block 3, Lost Creek Addition, the following bearings and distances:

N 74°25'32"E, 207.01 feet;

N 65°08'00"E, 320.06 feet;

N 56°48'00"E, 405.88 feet;

N 68°37'31"E, 100.07 feet to the southeast corner of Lot 43, said Block 3;

THENCE S 87°01'44"E, 56.13 feet to an iron rod found;

THENCE N 08°01'55"E, 50.00 feet to an iron rod found;

THENCE N 82°15'05"E, 9.37 feet to an iron rod found;

THENCE N 10°55'05"E, 29.86 feet to an iron rod found;

THENCE N 19°26'05"W, 84.02 feet to an iron rod found in the southerly right-of-way line of Blue Creek Drive;

THENCE N 85°34'15"E, 88.58 feet along said southerly right-of-way line to a point in the westerly right-of-way line of Lost Creek Boulevard as recorded in Plat Volume 388/215, Page 86 of Phase 2, Lost Creek Addition;

THENCE along the westerly line of said Phase 2, Lost Creek Addition, the following bearings and distances:

S 00°31'15"W, 423.04 feet to the beginning of a curve to the left;

123.29 feet along the arc of said curve to the left through a central angle of 14°21'29", a radius of 492.00 feet and a long chord of S 06°39'37"E, 122.97 feet;

N 90°00'00"W, 119.40 feet to an iron rod found;

S 60°22'06"W, 330.36 feet to an iron rod found;

S 61°56'05"W, 290.00 feet;

S 09°29'17"W, 130.09 feet;

S 13°06'53"E, 99.98 feet to an iron rod found;

S 58°01'05"E, 70.64 feet to an iron rod found;

S 32°39'05"E, 520.74 feet to an iron rod found;

S 03°24'57"E, 784.56 feet to an iron rod found;

C&B Job No. 971380010

March 1998          **APP209**

S 89°37'25"E, 240.00 feet to an iron rod found;

N 17°36'19"E, 298.11 feet to an iron rod found;

N 63°12'13"W, 87.41 feet to an iron rod found;

N 03°32'28"W, 472.49 feet to a point from which an iron rod found bears N 71°30'40"E, 0.36 feet;

S 70°15'20"E, 302.92 feet to an iron rod found;

N 37°46'59"E, 611.21 feet to an iron rod found in the westerly right-of-way line of Lost Creek Boulevard;

S 44°14'12"E, 113.74 feet along said westerly right-of-way line to an iron rod found;

S 48°21'00"W, 115.00 feet, leaving said westerly right-of-way line to an iron rod found;

S 46°25'31"E, 284.54 feet to an iron rod found;

THENCE S 49°22'26"W, 414.35 feet, leaving the westerly line of said Phase 2, Lost Creek Addition to an iron rod found, the beginning of a curve to the left;

THENCE 265.89 feet along the arc of said curve to the left through a central angle of 29°32'16", a radius of 515.77 feet and a long chord of S 34°36'19"W, 262.96 feet to an iron rod found;

THENCE S 19°50'12"W, 528.98 feet;

THENCE S 41°39'04"W, 53.84 feet;

THENCE S 83°30'35"W, 81.60 feet;

THENCE N 89°36'29"W, 90.00 feet;

THENCE S 00°27'44"W, 119.28 feet;

THENCE N 89°36'29"W, 274.94 feet;

THENCE N 00°11'10"E, 119.34 feet to an iron rod found;

THENCE N 89°36'29"W, 210.00 feet;

THENCE N 00°11'10"E, 809.66 feet to an iron rod found, the beginning of a non-tangent curve to the left;

THENCE 298.41 feet along the arc of said curve to the left through a central angle of 61°03'50", a radius of 280.00 feet and a long chord of N 52°07'56"W, 284.49 feet to an iron rod found;

THENCE N 00°12'14"E, 142.35 feet to an iron rod found;

THENCE N 44°49'25"W, 99.00 feet to an iron rod found;

THENCE N 89°47'35"W, 255.13 feet to the POINT OF BEGINNING and containing 34.319 acres of land, more or less.

TRACT 2

BEGINNING at an iron rod found at the southeast corner of Parcel 7, a 2.6857 acre tract as described by deed to Interwest Savings Association as recorded in Volume 8167, Page 597, said County Records;

THENCE S 00°20'23"W, 43.79 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 34°24'19"W, 56.56 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 13°09'12"W, 89.39 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 03°18'13" W, 37.06 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 02°23'18" E, 130.54 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 12°44'41" W, 89.94 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 09°54'28" W, 83.90 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 00°45'38"E, 107.17 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 09°44'58"E, 91.70 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE S 06°12'42"E, 86.16 feet to an iron rod with plastic cap stamped "Carter & Burgess" set;

THENCE N 89°42'42"W, 98.40 feet to an iron rod found, the southeast corner of Lot 3, Block 25, said Phase II Lost Creek Addition;

THENCE along the southerly line and then the easterly line of said Phase II, Lost Creek Addition, also the easterly right-of-way line of Lost Creek Boulevard, the following bearings and distances:

N 00°21'50"E, 251.94 feet to an iron rod found;

N 89°42'42"W, 170.02 feet to an iron rod found;

S 00°21'50"W, 136.05 feet to an iron rod found;

N 89°38'50"W, 1000.26 feet to a spike in concrete found;

S 60°20'59"W, 424.92 feet to an iron rod found;

S 84°51'06"W, 99.98 feet to an iron rod found;

S 43°30'04"W, 84.50 feet to an iron rod found in the easterly right-of-way line of Lost Creek Boulevard, the beginning of a non-tangent curve to the left;

325.50 feet along the arc of said curve to the left through a central angle of 19°37' 53", a radius of 950.00 feet and a long chord of N 56°14'32"W, 323.91 feet;

N 66°03'26"W, 31.43 feet to the beginning of a curve to the right;

337.42 feet along the arc of said curve to the right through a central angle of 21°49' 14", a radius of 886.00 feet and a long chord of N 55°08'49"W, 335.39 feet to an iron rod found;

N 44°14'12"W, 249.71 feet;

N 53°12'36"W, 468.08 feet to an iron rod found, the beginning of a curve to the right;

401.37 feet along the arc of said curve to the right through a central angle of 53°43'51", a radius of 428.00 feet and a long chord of N 26°20'41"W, 386.82 feet;

N 00°31'15"E, 388.17 feet;

THENCE N 64°08'29"E, 45.66 feet, leaving the easterly line of said Phase II, Lost Creek Addition and also the easterly right-of-way line of said Lost Creek Boulevard, to the beginning of a non-tangent curve to the right, said point being in the westerly line of Lot A-R-1 Block 1, Lost Creek Addition as recorded in Plat Cabinet A, Slide 600, said County Records;

THENCE 24.99 feet along the arc of said curve to the right through a central angle of 03°18'52", a radius of 432.06 feet and a long chord of N 24°12'33"W, 24.99 feet to a point in the southerly right-of-way line of Blue Creek Drive, the beginning of a non-tangent curve to the right;

THENCE along the southerly right-of-way line of said Blue Creek Drive, the following bearings and distances:

254.07 feet along the arc of said curve to the right through a central angle of 35°30'01", a radius of 410.05 feet and a long chord of S 76°40'46"E, 250.02 feet;

S 58°55'45"E, 143.74 feet to the beginning of a curve to the left;

101.38 feet along the arc of said curve to the left through a central angle of 18°49'29", a radius of 308.56 feet and a long chord of S 68°20'30"E, 100.92 feet, to an iron rod found, the northwesterly corner of Lot 1-R-1, as recorded in Plat Cabinet A, Slide 600;

THENCE S 06°25'54"E, 168.77 feet along the westerly line of said Lot 1-R-1, to an iron rod found;

THENCE S 24°54'58"E, 72.80 feet along the southerly line of said Lot 1-R-1;

THENCE S 65°05'02"E, 72.80 feet along the southerly line of said Lot 1-R-1;

THENCE N 40°53'40"E, 19.50 feet along the southerly line of said Lot 1-R-1 to the southwest corner of Lot 2R, Block 11, Lost Creek Addition, as recorded in Plat Volume 388/122, Page 28 of said County Records;

THENCE along the southerly line and the easterly line of said Block 11, Lost Creek Addition as recorded in Plat Volume 388/122, Page 28 and 388/115, Page 97, the following bearings and distances:

N 73°40'48"E, 104.40 feet;

S 67°49'10"E, 107.70 feet;

S 72°55'18"E, 104.40 feet;

N 80°10'31"E, 101.61 feet;

S 80°31'50"E, 101.27 feet;

S 74°59'29"E, 413.37 feet;

N 79°04'09"E, 101.98 feet;

N 68°39'52"E, 256.60 feet;

N 76°06'52"E, 372.52 feet;

N 00°25'00"E, 65.00 feet to the northeast corner of Lot 13, said Block 11, Lost Creek Addition in the north line of said Bursey Survey and the south line of the S. Petitt Survey, Abstract No. 1234;

THENCE S 89°35'00"E, 650.50 feet;

THENCE S 00°21'37"W, 50.00 feet to the beginning of a non-tangent curve to the left;

THENCE 86.54 feet along the arc of said curve to the left through a central angle of 99°10'32", a radius of 50.00 feet and a long chord of S 46°43'16"W, 76.14 feet;

THENCE S 74°27'23"W, 229.87 feet;

THENCE S 67°32'37"E, 367.15 feet;

THENCE S 74°52'15"E, 217.92 feet to the POINT OF BEGINNING and containing 63.606 acres of land, of which 1.228 acres are within Whispering Creek Street, 8.155 acres Save and Except Tract 1, 2.196 acres Save and Except Tract VI, leaving a net area of 52.027 acres of land, more or less.

TRACT 3

BEGINNING at an iron rod found at the southwest corner of Lot 3, Block 4, Lost Creek Addition as recorded in Plat Volume 388/115, Page 97, said County Records;

THENCE N 89°34'00"E, 341.68 feet along the south line of said Block 4 to a point in the westerly right-of-way line of Lost Creek Boulevard;

THENCE S 15°26'00"E, 100.00 feet along said westerly right-of-way line to an iron rod found, the northeast corner of Lot 48, said Block 4, Lost Creek Addition;

THENCE S 74°34'00"W, 110.00 feet along the north line of said Lot 48 to an iron rod found at its northwest corner;

THENCE southerly along the west line of said Block 4, the following bearings and distances:

S 15°26'00"E, 217.74 feet to the beginning of a curve to the right;

220.85 feet along the arc of said curve through a central angle of 30°00'00", a radius of 421.80 feet and a long chord of S 00°26'00"E, 218.34 feet;

S 14°34'00"W, 41.69 feet to the beginning of a curve to the left;

332.24 feet along the arc of said curve to the left through a central angle of 13°59'49", a radius of 1360.02 feet and a long chord of S 07°34'06"W, 331.42 feet;

S 00°34'11"W, 1186.90 feet to an iron rod found, the southwest corner of Lot 29, said Block 4;

THENCE S 89°25'49"E, 110.00 feet to the southeast corner of said Lot 29 in the westerly right-of-way line of Lost Creek Boulevard;

THENCE S 00°34'11"W, 127.30 feet to a point in the northerly right-of-way line of Blue Creek Drive;

THENCE S 85°34'15"W, 158.19 feet, along said northerly right-of-way line to an iron rod found, the beginning of a curve to the left;

THENCE 20.90 feet along the arc of said curve to the left through a central angle of 01°55'28", a radius of 622.58 feet and a long chord of S 84°36'33"W, 20.90 feet to the southeast corner of Lot 28, said Block 4 from which an iron rod found bears N 74°21'22"W, 0.95 feet;

THENCE N 04°25'45"W, 110.97 feet to the northeast corner of said Lot 28, Block 4;

THENCE S 85°34'15"W, 200.00 feet to the northwest corner of Lot 27 and the southeast corner of Lot 25, Block 4;

THENCE N 00°34'54"E, 2154.51 feet along the east line of said Block 4 to the POINT OF BEGINNING, and containing 14.877 acres of land, Save and Except Tract II, .333 acres deeded to Max H. Eubank and Billy Joe Smith in Volume 9111, Page 1039, said County Records, and Save and Except Tract V, (Lot 49R) 0.274 acres, leaving a net area of 14.270 acres of land, more or less.

## TRACT 4

BEGINNING at the southwest corner of Lot 1, Block 2, Lost Creek Addition as recorded in Plat Volume 388/115, Page 97, said County Records, said point being in the easterly right-of-way line of Lost Creek Boulevard;

THENCE N 89°34'00"E, 356.41 feet along the south line of said Block 2 to the southeast corner of Lot 4;

THENCE N 39°34'00"E, 46.69 feet to an iron rod found;

THENCE S 50°26'00"E, 45.00 feet to an iron rod found;

THENCE N 39°34'00"E, 150.00 feet;

THENCE N 50°26'00"W, 45.00 feet to a point in the easterly line of Lot 5, Block 1;

THENCE N 39°34'00"E, 168.53 feet along the east line of said Lot 5, Block 1, to the northeast corner of same lot from which an iron rod found bears S 68°42'37"E, 0.49 feet;

THENCE N 89°34'00"E, 909.09 feet to an iron rod found in the east line of said 170.44 acre tract;

THENCE S 00°41'00"W, 130.73 feet along the east line of said 170.44 acre tract to the northeast corner of Lot 25, Block 8, Lost Creek Addition as recorded in Plat Volume 388/122, Page 28, said County Records;

THENCE S 84°33'12"W, 280.98 feet along the north line of Lots 25 and 26, said Block 8 to an iron rod found, the northwest corner of said Lot 26;

THENCE S 00°54'39"W, 120.00 feet to an iron rod found, the southwest corner of said Lot 26, Block 8;

THENCE S 89°19'00"E, 59.82 feet along the south line of said Lot 26, Block 8;

THENCE S 00°41'00"W, 45.00 feet to a point in the north line of Lot 21, Block 7, Lost Creek Addition as recorded in Plat Volume 388/115, Page 97, said County Records;

THENCE N 89°19'00"W, 60.00 feet to an iron rod found, the northwest corner of said Lot 21;

THENCE along the west line and then the north line of said Block 7, the following bearings and distances:

S 00°53'57"W, 1280.09 feet to an iron rod found, the northeast corner of Lot 8, said Block 7;

S 79°24'57"W, 75.94 feet;

N 81°21'00"W, 234.58 feet to an iron rod found, the beginning of a curve to the right;

495.14 feet along the arc of said curve to the right through a central angle of 49°58'00", a radius of 567.77 feet and a long chord of N 56°22'00"W, 479.60 feet to an iron rod found, the northerly corner of Lot 1, said Block 7;

S 58°37'00"W, 110.00 feet to an iron rod found, the westerly corner of said Lot 1, Block 7, in the northerly right-of-way line of Ben Creek Court;

THENCE N 31°23'00"W, 187.54 feet along said northerly right-of-way line to the beginning of a curve to the left;

THENCE 299.32 feet along the arc of said curve to the left and continuing along said northerly right-of-way line through a central angle of 58°02'45", a radius of 295.45 feet and a long chord of N 60°24'23"W, 286.68 feet to an iron rod found;

THENCE N 89°25'45"W, 3.03 feet continuing along said northerly right-of-way line to an iron rod found in the easterly right-of-way line of Lost Creek Boulevard, the beginning of a non-tangent curve to the right;

THENCE 146.16 feet along the arc of said curve to the right and along the easterly right-of-way line of Lost Creek Boulevard through a central angle of 07°00'49", a radius of 1194.02 feet and a long chord of N 11°03'35"E, 146.07 feet;

THENCE N 14°34'00"E, 4.57 feet along said easterly right-of-way line to an iron rod found, the southwest corner of Lot 18, Block 5 of said Lost Creek Addition;

THENCE along the outside boundary line of said Block 5, the following bearings and distances:

S 87°26'00"E, 30.04 feet to the beginning of a curve to the right;

27.02 feet along the arc of said curve to the right through a central angle of 30°00'00", a radius of 51.60 feet and a long chord of S 72°26'00"E, 26.71 feet to an iron rod found;

S 57°26'00"E, 142.00 feet to an iron rod found, the beginning of a curve to the left;

130.20 feet along the arc of said curve to the left through a central angle of 13°00'00", a radius of 573.84 feet and a long chord of S 63°56'00"E, 129.92 feet;

S 70°26'00"E, 306.51 feet to the beginning of a curve to the left;

429.58 feet along the arc of said curve to the left through a central angle of 116°00'00", a radius of 212.18 feet and a long chord of N 51°34'00"E, 359.88 feet;

N 06°26'00"W, 249.50 feet to the beginning of a curve to the left;

494.00 feet along the arc of said curve to the left through a central angle of 122°00'00", a radius of 232.00 feet and a long chord of N 67°26'00"W, 405.82 feet;

S 51°34'00"W, 227.47 feet to the beginning of a curve to the left;

172.78 feet along the arc of said curve to the left through a central angle of 32°00'00", a radius of 309.37 feet and a long chord of S 35°34'00"W, 170.55 feet;

S 19°34'00"W, 2.00 feet to the westerly corner of Lot 1, said Block 5 in the northerly right-of-way line of Pine Creek Court;

THENCE N 57°26'00"W, 47.66 feet along said northerly right-of-way line of Pine Creek Court to an iron rod found, the beginning of a curve to the left;

THENCE 110.79 feet along the arc of said curve to the left and along said northerly right-of-way line through a central angle of 30°00'00", a radius of 211.60 feet and a long chord of N 72°26'00"W, 109.53 feet;

THENCE N 87°26'00"W, 9.52 feet along said northerly right-of-way line to an iron rod found at the easterly right-of-way line of Lost Creek Boulevard, the beginning of a non-tangent curve to the left;

APP214

THENCE 183.19 feet along the arc of said curve to the left and along said easterly right-of-way line of Lost Creek Boulevard through a central angle of 17°51'27", a radius of 587.80 feet and a long chord of N 06°30'18"W, 182.45 feet to an iron rod found;

THENCE N 15°26'00"W, 302.73 feet continuing along said easterly right-of-way line to the POINT OF BEGINNING and containing 26.256 acres of land, Save and Except Tract III 0.487 acres deeded to Max H. Eubank and Billy Joe Smith in Volume 9111, Page 1029, said County Records, leaving a net area of 25.769 acres of land, more or less.

### TRACT 5

BEGINNING at the northwest corner of Lot 14, Block 9, Lost Creek Addition as recorded in Plat Volume 388/122, Page 28, said County Records, said point being in the easterly right-of-way line of Lost Creek Boulevard;

THENCE N 00°34'11"E, 682.81 feet along said easterly right-of-way line to an iron rod found, the beginning of a curve to the right;

THENCE 95.27 feet along the arc of said curve to the right and along said easterly right-of-way line through a central angle of 04°34'17", a radius of 1194.02 feet and a long chord of N 02°51'20"E, 95.24 feet to an iron rod found in the southerly right-of-way line of Ben Creek Court;

THENCE S 89°25'45"E, 8.09 feet along the southerly right-of-way line of Ben Creek Court to the beginning of a curve to the right;

THENCE 248.66 feet along the arc of said curve to the right and along said southerly right-of-way line through a central angle of 58°02'45", a radius of 245.45 feet and a long chord of S 60°24'23"E, 238.17 feet;

THENCE S 31°23'00"E, 187.54 feet continuing along said southerly right-of-way line to an iron rod found, the beginning of a curve to the left;

THENCE 13.49 feet along the arc of said curve to the left and continuing along said southerly right-of-way line through a central angle of 01°03'43", a radius of 727.77 feet and a long chord of S 31°54'52"E, 13.49 feet to an iron rod found, the northerly corner of Lot 1-R, Block 8, Lost Creek Addition as recorded in Plat Volume 388/122, Page 97, said County Records;

THENCE S 19°17'00"W, 134.80 feet to the westerly corner of said Lot I-R, Block 8, the beginning of a non-tangent curve to the left;

THENCE 631.17 feet along the arc of said curve to the left and along the southerly line of said Block 8, through a central angle of 43°09'58", a radius of 837.77 feet and a long chord of S 59°44'53"E, 616.35 feet;

THENCE S 81°21'00"E, 311.52 feet continuing along the southerly line of said Block 8 to an iron rod found;

THENCE S 86°16'00"E, 321.23 feet continuing along the southerly line of said Block 8 to an iron rod found, the southeast corner of Lot 10, in the easterly line of said 170.44 acre tract;

THENCE S 00°41'00"W, 786.54 feet along said easterly line to an iron rod found, the northeast corner of Lot 13, Block 10, Lost Creek Addition as recorded in Plat Volume 388/122, Page 28, said County Records;

THENCE N 89°19'00"W, 85.95 feet to the northwest corner of said Lot 13, Block 10;

THENCE S 17°58'05"W, 128.10 feet to the southwest corner of said Lot 13, Block 10 in the north line of Blue Creek Drive, the beginning of a non-tangent curve to the left;

THENCE along the northerly right-of-way line of said Blue Creek Drive, the following bearings and distances;

50.08 feet along the arc of said non-tangent curve to the left through a central angle of 18°31'20", a radius of 154.94 feet and a long chord of N 85°20'05"W, 49.87 feet;

S 85°24'15"W, 70.00 feet to the beginning of a curve to the right;

63.14 feet along the arc of said curve to the right through a central angle of 22°40'00", a radius of 159.61 feet and a long chord of N 83°15'45"W, 62.73 feet;

N 71°55'45"W, 69.44 feet to the beginning of a curve to the left;

109.62 feet along the arc of said curve to the left through a central angle of 26°00'00", a radius of 241.57 feet and a long chord of N 84°55'45"W, 108.68 feet;

S 82°04'15"W, 89.52 feet to the beginning of a curve to the right;

141.82 feet along the arc of said curve to the right through a central angle of 43°59'47", a radius of 184.69 feet and a long chord of N 75°55'49"W, 138.37 feet to the beginning of a curve to the left;

117.18 feet along the arc of said curve to the left through a central angle of 24°59'52", a radius of 268.58 feet and a long chord of N 66°25'49"W, 116.25 feet;

N 78°55'45"W, 126.00 feet to the beginning of a curve to the right;

90.25 feet along the arc of said curve to the right through a central angle of 20°00'00", a radius of 258.56 feet and a long chord of N 68°55'45"W, 89.80 feet;

N 58°55'45"W, 143.74 feet to the beginning of a curve to the left;

285.04 feet along the arc of said curve to the left through a central angle of 35°30'00", a radius of 460.05 feet and a long chord of N 76°40'45"W, 280.51 feet;

S 85°34'15"W, 13.11 feet to a point in the easterly right-of-way line of Lost Creek Boulevard, the beginning of a non-tangent curve to the right;

THENCE 122.58 feet along the arc of said non-tangent curve to the right and along the easterly right-of-way line of Lost Creek Boulevard through a central angle of 16°15'20", a radius of 432.06 feet and a long chord of N 07°33'29"W, 122.17 feet to the southwest corner of Lot 1, Block 10, said Lost Creek Addition, the beginning of a non-tangent curve to the left;

THENCE along the southerly line of said Block 10, the following bearings and distances:

111.72 feet along the arc of said curve to the left through a central angle of 11°58'28", a radius of 534.60 feet and a long chord of N 84°34'57"E, 111.52 feet;

N 78°34'15"E, 243.00 feet to the beginning of a curve to the right;

208.15 feet along the arc of said curve to the right through a central angle of 35°00'00", a radius of 340.74 feet and a long chord of S 83°55'45"E, 204.92 feet;

S 66°25'45"E, 20.00 feet to the beginning of a curve to the left;

344.07 feet along the arc of said curve to the left through a central angle of 20°00'00", a radius of 985.69 feet and a long chord of S 76°25'45"E, 342.33 feet;

S 86°25'45"E, 287.06 feet to the southeast corner of Lot 12, said Block 10;

THENCE N 03°34'15"E, 60.00 feet along the east line of said Lot 12;

THENCE S 86°25'45"E, 45.00 feet;

THENCE N 03°34'15"E, 150.00 feet;

THENCE N 86°25'45"W, 45.00 feet to a point in the east line of Lot 12, Block 9, said Lost Creek Addition;

THENCE N 03°34'15"E, 60.00 feet along the east line of said Lot 12, Block 9 to the northeast corner of said Lot 12;

THENCE along the northerly line of said Block 9, the following bearings and distances:

N 86°25'45"W, 287.06 feet to the beginning of a curve to the right;

249.82 feet along the arc of said curve to the right through central angle of 20°00'00", a radius of 715.69 feet and a long chord of N 76°25'45"W, 248.56 feet;

N 66°25'45"W, 20.00 feet to the beginning of a curve to the left;

373.08 feet along the arc of said curve to the left through a central angle of 35°00'00", a radius of 610.74 feet and a long chord of N 83°55'45"W, 367.31 feet;

S 78°34'15"W, 299.00 feet to the northwest corner of Lot 1, said Block 9 in the easterly line of Lost Creek Boulevard;

THENCE N 00°34'11"E, 20.00 feet along said easterly right-of-way line to the southwest corner of Lot 13, Block 9, Lost Creek Addition as recorded in Volume 388/122, Page 28, said County Records;

THENCE N 78°34'15"E, 112.46 feet along the south line of said Lot 13, Block 9 to its southeast corner;

THENCE N 00°34'11"E, 196.62 feet to an iron rod found, the northeast corner of Lot 14, Block 9;

THENCE N 89°25'49"W, 110.00 feet to the POINT OF BEGINNING and containing 25.366 acres of land.

SAVE & EXCEPT TRACT I:

BEING a tract situated in the J.H. Bursey Survey, Abstract No. 241, Tarrant County, Texas and being a portion of the 170.44 acre tract as described by deed to Lost Creek Country Club and recorded in Volume 7142, Page 551, and a portion of Parcel "A" as described by deed to Lost Creek County Club as recorded in Volume 8167, Page 583, said County Records, said save and except tract being more particularly described by metes and bounds as follows:

BEGINNING at an iron rod found at the most southerly southwest corner of said Parcel "A";

THENCE N 00°21'50"E, 127.29 feet to a point from which an iron rod found bears N 58°16'29"E, 0.37 feet;

THENCE N 88°28'35"W, 1086.18 feet;

THENCE N 01°31'25"E, 270.00 feet to an iron rod found;

THENCE N 86°24'06"E, 1055.56 feet;

THENCE S 11°37'21"E, 373.00 feet to an iron rod found;

THENCE S 00°21'50"W, 127.22 feet to an iron rod found;

THENCE N 89°42'42"W, 50.00 feet to the POINT OF BEGINNING and containing 8.155 acres of land, more or less.

SAVE & EXCEPT TRACT II:

BEING a tract of land situated in the J. Burleson Survey, Abstract No. 78, Tarrant County, Texas and being a portion of the 170.44 acre tract as described by deed to Lost Creek Country Club and recorded in Volume 7174, Page 551, said County Records and being more particularly described by metes and bounds as follows:

BEGINNING at the southeast corner of Lot 29, Block 4, Lost Creek Addition as recorded in Plat Volume 388/115, Page 97, said County Records;

THENCE S 00°34'11"W, 127.30 feet to a point in the north right-of-way line of Blue Creek Drive;

THENCE S 85°34'15"W, 110.41 feet along said north right-of-way line;

THENCE N 00°34'11"E, 136.92 feet to an iron rod found, the southwest corner of said Lot 29, Block 4;

THENCE S 89°25'49"E, 110.00 feet to the POINT OF BEGINNING and containing 0.333 acres of land, more or less.

SAVE AND EXCEPT TRACT III:

BEING Lots 1 and 2, Block 2A, of LOST CREEK ADDITION, as recorded in Cabinet B, Slide 283, Plat Records of Tarrant County, Texas, and being a tract of land situated in the J. Burleson Survey, Abstract No. 78, Tarrant County, Texas, and being a portion of the 170.44 acre tract as described by deed to Lost

Creek Country Club and recorded in Deed Volume 7174, Page 551, said County Records, said tract being more particularly described by metes and bounds as follows:

COMMENCING at the southwest corner of Lot 1, Block 2, LOST CREEK ADDITION as recorded in Plat Volume 388-115, Page 97, said County Records, said point being in the easterly right-of-way line of Lost Creek Boulevard;

THENCE S 15°26'00"E, 20.00 feet along said easterly right-of-way line to the POINT OF BEGINNING;

THENCE N 89°34'00"E, 110.00 feet;

THENCE S 15°26'00"E, 200.00 feet;

THENCE S 89°34'00"W, 110.00 feet to a point in the easterly right-of-way line of Lost Creek Boulevard;

THENCE N 15°26'00"W, 200.00 feet to the POINT OF BEGINNING, and containing 0.487 acres of land, more or less.

SAVE & EXCEPT TRACT V:

BEING a tract of land situated in the J. Burleson Survey, Abstract No. 78, Tarrant County, Texas and being all of Lot 49R, Block 4, Lost Creek Addition as recorded in Cabinet B, Slide No. 197 said County Records, and containing 0.274 acres of land more or less.

SAVE & EXCEPT TRACT VI:

BEING Lots 2, 3, 4, and 5, Block 15 of LOST CREEK ADDITION, as recorded in Cabinet B, Slide 163, Plat Records of Tarrant County, Texas, and being more particularly described by metes and bounds as follows:

COMMENCING at the southwest corner of Lot 39, Block 16, Phase II, Lost Creek Addition as recorded in Plat Volume 388/215, Page 86, said County Records, said point being in the westerly right-of-way line of Lost Creek Boulevard;

THENCE N 39°20'36"E, 64.41 feet to the POINT OF BEGINNING in the easterly right-of-way line of Lost Creek Boulevard;

THENCE N 44°14'12"W, 76.72 feet along said easterly right-of-way line;

THENCE N 53°12'36"W, 324.22 feet continuing along said easterly right-of-way line;

THENCE N 36°47'24"E, 162.02 feet;

THENCE N 66°47'24"E, 21.76 feet;

THENCE N 36°47'24"E, 82.13 feet;

THENCE S 51°00'02"E, 242.15 feet;

THENCE S 07°24'02"E, 74.82 feet;

THENCE S 53°12'36"E, 95.00 feet;

THENCE S 36°47'24"W, 211.97 feet to the POINT OF BEGINNING and containing 2.196 acres of land, more or less.

C&B Job No. 971380010

March 2, 1998

APP218

## CONTRACT FOR SALE AND PURCHASE OF
## UNIMPROVED REAL PROPERTY

**THIS CONTRACT** is made and entered into by and between JMJ Acquisitions, LLC and or assigns (the **"Purchaser"**) and Anastasia Energy, LLC (the **"Seller"**).

### WITNESSETH:

WHEREAS, Seller is the owner of that certain parcel(s) of real property containing approximately 128 acres located along the North and South side of County Road 501 in Johnson County, Texas, (the **"Property"**), and being more particularly described on Exhibit "A" attached hereto and made a part hereof by reference for all purposes; and

WHEREAS, Purchaser is desirous of purchasing the Property, subject to the conditions and the other agreements hereinafter set forth, and Seller is agreeable to such sale on the terms, conditions and agreements set forth herein.

NOW, THEREFORE, in consideration of the premises and the respective undertakings of the parties hereinafter set forth, the receipt and sufficiency of which consideration is hereby acknowledged, it is hereby agreed as follows:

1.      **Sale of Property.** Seller shall sell the Property to Purchaser, and Purchaser shall purchase the Property from Seller, together with, but without warranty, all and singular the rights and appurtenances pertaining to the Property, if any, including any right, title and interest of Seller in and to adjacent streets, alleys, strips and gores, and rights-of-way, together with improvements, fixtures and personal property, development plans and approvals, if any, owned by Seller and situated on or attached to the Property except oil, gas, mineral and other hydrocarbons which are reserved by Seller (**"Seller's Mineral Interests"**), for the sum of $1,577,125.00 (the **"Purchase Price"**), such Purchase Price to be paid as set out in Paragraph 3 hereof.

2.      **Conveyance of Property.** Seller shall convey the Property to Purchaser at the Closing subject to all liens, encumbrances, conditions, easements, assessments, and restrictions (the **"Permitted Exceptions"**), which are the exceptions as may be approved, or deemed approved, by Purchaser in accordance with the terms hereof. Deed shall contain a clause that Seller shall have no reservation of surface right of any kind, except as permitted and required by Seller's reservation of Seller's Mineral Interests and existing mineral interest leases.

3.      **Closing.** The Closing shall be held at the offices of **Sendera Title Insurance Company, 4161 McKinney Avenue, Suite 410, Dallas, Texas 75204** (**"Title Company"**) or at such other location as may be acceptable to Purchaser and Seller, commencing at 10:00 a.m. on that date which is on or before thirty (30) days after the expiration of the Review Period (**"Initial Closing Date"**); provided, however, at the option of Purchaser, to be exercised by notice to Seller on or before five (5) days prior to the Initial Closing Date, together with an additional non-refundable Earnest Money Deposit of $25,000.00 (**"First Extension Earnest Money"**), the Initial Closing Date shall be extended thirty (30) days. As used herein, the term **"Closing"** or **"Closing Date"**, shall be either the Initial Closing Date or the First Extended Closing Date. Upon receipt by

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract          1

**EXHIBIT**

**20**

APP219

SEC-SENDERAT-E-0003732

Title Company of the First Extension Earnest Money, Title Company shall release the Earnest Money and the First Extension Earnest Money to Seller.

At the Closing, Seller shall deliver to Purchaser at Closing a special warranty deed executed and acknowledged by Seller in recordable form, conveying the Property to Purchaser.

At the Closing, Purchaser shall deliver to Seller the Purchase Price, payable in cash or by other evidence of good funds acceptable to the Title Company (hereinafter defined) for immediate disbursement at Closing.

At the Closing, Purchaser and Seller each shall deliver a statement addressed to the Title Company stating its true and correct Federal Taxpayer Identification Number, and stating whatever other information is requested by the Title Company or other "person" so that any "person" responsible under the Tax Reform Act of 1986 for filing a form 1099 regarding this sale will have all the information required by then current IRS regulations.

4.    **Title Insurance.**  At the Closing, Seller shall cause Title Company to commit to issue to Purchaser a Texas Form T-1 Owner's Policy of Title Insurance (the "**Owner's Title Policy**") in the full amount of the Purchase Price, insuring Purchaser as owner of the Property, in fee simple, and containing no exceptions to title other than the standard printed exceptions (provided that the exception for restrictive covenants shall be endorsed "None of Record" or limited to restrictions approved or deemed approved by Purchaser, and the exception for taxes shall be limited to the year in which the Closing occurs and subsequent years and subsequent assessments for prior years due to change in land usage or ownership and endorsed "Not Yet Due and Payable"), the Permitted Exceptions, and any other exceptions which have been approved or deemed approved by Purchaser.  Seller shall pay the premium charged for the basic Owner's Title Policy provided for above, and Purchaser shall pay the full premium charged for any endorsements thereto, and all other closing costs shall be paid by Seller or Purchaser in the manner in which such costs are customarily paid by such parties on the Closing Date in transactions involving unimproved real property in the County where the Property is located; provided, each party shall be responsible for its own attorneys' fees and such other costs as specifically provided herein.

5.    **Title Commitment and Survey.**  Seller shall deliver the following items to Purchaser within ten (10) days after the date hereof:

(a)    An Owner's Title Policy Commitment (the "**Commitment**") covering the Property, issued by the Title Company, together with copies of all items referred to therein as exceptions.

(b)    A copy of Seller's existing survey (the "**Survey**") of the Property, containing an itemization of the number of square feet contained in the Property, and the metes and bounds description thereof.

6.    **Title Review Period.**  Purchaser shall have seven (7) days after receipt of the Commitment and the Survey in which to approve or disapprove such items.  If Purchaser, during such seven (7) day period, shall fail to give written notice to Seller of any objection(s) it may have to the Survey or Commitment, Purchaser shall have waived its rights to object to any such item(s)

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract    2

APP220

SEC-SENDERAT-E-0003733

and all title exceptions reflected in the Commitment or the Survey shall be deemed approved by Purchaser. If Purchaser shall provide Seller with written notice of any objections to title to the Property within such seven (7) day period Seller shall have a period of five (5) days thereafter to cure or correct such items, Seller having no duty or obligation to cure or correct any such title objections. If Seller shall fail or refuse during such five (5) day period to cure or correct any title objection noted by Purchaser, Purchaser may elect to terminate this Contract by giving Seller written notice thereof within three (3) days following Seller's five (5) day cure period, whereupon all Earnest Money previously deposited, less the cost of the Survey and the Commitment, shall be immediately refunded to Purchaser and the parties hereto shall have no further obligations or liabilities one to the other, or Purchaser may elect to waive such title deficiencies and proceed to close the transaction contemplated herein.

7.    **Purchaser's Review Period.** Purchaser shall have a period (the "Review Period") of <u>seventy-five (75)</u> days from the effective date of this Contract to do the following:

(a)    To conduct any and all inspections, engineering and feasibility studies which Purchaser deems necessary, in an effort to determine whether or not to proceed with the Closing of this transaction. In this regard, Seller hereby agrees that Purchaser, and/or Purchaser's agents or employees, may have unlimited access to the Property during such the feasibility period to conduct such studies and inspections. Purchaser agrees to indemnify and hold Seller and the Property harmless from any and all costs and expenses incurred in relation to the inspections and studies described herein, and to restore the Property to its pre-existing condition following the completion of such tests and studies.

(b)    To obtain such assurances or approvals from the appropriate governmental authorities as Purchaser deems necessary in relation to Purchaser's intended use of the Property.

(c)    If, within the Review Period, Purchaser shall, for any reason in Purchaser's sole discretion, judgment and opinion, disapprove or be dissatisfied with any aspect of the Property or the Submitted Materials, or for no reason at all, then Purchaser may terminate this Contract by giving written notice thereof to Seller prior to the expiration of the Review Period and the Earnest Money previously deposited by Purchaser with Title Company, less the option fee specified below, shall be immediately returned by Title Company to Purchaser, whereupon this Contract shall automatically be terminated and thereafter neither Seller nor Purchaser shall have any further obligations or liabilities to the other hereunder. Notwithstanding anything set forth herein to the contrary, in the event that Purchaser does not affirmatively and unequivocally elect, by written notice to Seller thereof prior to the expiration of the Review Period, to waive its right to terminate this Contract pursuant to this paragraph 7(c), Purchaser shall be deemed to have terminated this Contract pursuant to this paragraph 7(c) as of the expiration of the Review Period and the Earnest Money previously deposited by Purchaser with Title Company shall be immediately returned by Title Company to Purchaser less One Hundred and 00/100 Dollars ($100.00) as consideration, whereupon this Contract shall automatically be terminated and thereafter neither Seller nor Purchaser shall have any further obligations or liabilities to the other hereunder.

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract    3

**APP221**

SEC-SENDERAT-E-0003734

(d) Within five (5) days from the Effective Date, Seller shall deliver to Purchaser copies of all mineral leases in effect with regard to the Property and contact information for the existing Lessees.

8.      **Possession of Property.**   Purchaser shall be entitled to full possession of the Property at Closing, subject only to rights of tenants under any tenant leases or rights of parties in possession.

9.      **Closing Cost and Prorations.**

(a)      Purchaser will pay (1) the cost of recording the Deed, (2) the costs of recording documentation associated with Purchaser's financing of the purchase of the Property, (3) the entire cost of the "survey deletion" premium to the Title Policy, and the entire costs of any endorsements or other modifications to the Title Policy, if any, and (4) one half of the escrow fee. Seller will pay (1) one half of the escrow fees charged by the Title Company, (2) the cost of all documentation necessary to evidence the cancellation or satisfaction of any liens Seller is obligated to remove as provided in Section 6, and (3) the basic premium for the Title Policy for coverage in the amount of the Purchase Price.   Purchaser and Seller each will pay their own respective attorneys' fees.   Other costs will be paid by Seller or Purchaser, as applicable, as specified by other provisions of this Agreement or, if no provision is made in this Agreement, in accordance with local custom.

(b)      Rents, if any, and ad valorem taxes on the Property for the current year shall be prorated at the Closing, effective as of the Closing Date.   If tax assessments for the Property for the current year are unavailable as of the Closing Date, said ad valorem taxes shall be prorated based upon the immediately preceding tax year figures with said proration to be adjusted in cash between the parties, based on actual taxes for the current year at the time such actual taxes are determined, and at Closing the parties shall enter into an agreement specifying the method of such adjustment.

10.      **Commissions.**   Seller and Purchaser acknowledge that a brokerage fee of $54,250.00 shall be paid to Robert Sandlin shall be paid by Seller and a fee of $54,250.00 shall be paid to Michael Matthews to be paid by Purchaser.

11.      **Earnest Money.**   Within five (5) business days after the Effective Date, Purchaser shall deliver the sum of Twenty-Five Thousand Dollars ($25,000.00) (together with the interest earned thereon, the "Initial Earnest Money Deposit", in the form of cash or wire transfer to Sendera Title Insurance Company, 4161 McKinney Avenue, Suite 410, Dallas, Texas 75204 (hereinafter "Escrow" and the "Title Company") to be held in escrow. The Deposit shall be refundable upon termination of the Contract at any time prior to the expiration of the Feasibility Period (hereinafter defined). The Earnest Money Deposits shall be applied as a credit to the Purchase Price (as hereinafter defined) due to Seller at the Closing (as hereinafter defined).

12.      **Seller's Remedies.**   In the event Purchaser fails to close this transaction for any reason, Purchaser agrees that the Seller may retain the Earnest Money as liquidated damages, the parties agreeing that the damages to Seller would be difficult or inconvenient to ascertain, and such sum represents a reasonable amount to be paid to Seller in light of all aspects of this transaction.

Land Contract

Anastasia Energy, LLC / JMJ Acquisitions Contract      4

**APP222**

SEC-SENDERAT-E-0003735

The failure by Seller to terminate this Contract for any reason pursuant to this Paragraph 12 shall in no way waive, alter or modify any rights of Seller in regard to the covenants and agreements of Purchaser herein.

13.     **Purchaser's Remedies.** If Seller defaults in performing any of Seller's obligations under this Contract, Purchaser may seek to enforce specific performance of this Contract, as its sole and exclusive remedy, Purchaser hereby waiving any right to seek damages from Seller for any breach of the terms of this Contract.

14.     **Assignment of Contract.** Purchaser shall have the right to assign this Contract at any time without the prior written consent and approval of Seller, and following any such permitted assignment, Seller agrees to close this transaction with the assignee of Purchaser.

15.     **Representations and Warranties.**    For any representations and warranties of Seller set forth herein, "the knowledge of" or "to the best knowledge of Seller, without requirement for any investigation or inquiry of any scope.

A.     In order to induce Purchaser to enter into this Agreement and to complete the Transaction, Seller makes the following representations and warranties to Purchaser as of the date of this Agreement:

(a)     Seller has been duly organized and is validly existing and in good standing under the laws of the State of Texas. Seller has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the Transaction as contemplated by this Agreement. Seller has taken all action necessary to authorize the execution and delivery of this Agreement.

(b)     This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity.

(c)     No action, suit or proceeding is pending or, to Seller's knowledge, threatened against Seller or the Property.

(d)     Except for consents required under Service Contracts and consents, approvals, authorizations and filings already completed, Seller is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Seller of its obligations under this Agreement or the completion of the Transaction as contemplated by this Agreement.

(e)     Seller has not received any written notice of any condemnation proceeding which is currently pending in connection with the Property.

(f)     Seller has no knowledge, nor has received any notice of any violation of law or ordinance affecting the Property, including without limitation any law regarding environmental or hazardous substances issues.

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract     5

**APP223**

SEC-SENDERAT-E-0003736

B.    Purchaser, to induce Seller to enter into this Agreement and to complete the Transaction, makes the following representations and warranties to Seller, which representations and warranties are true and correct as of the date of this Agreement:

(a)    Purchaser has been duly organized and is validly existing under the laws of the State of Texas.  Purchaser has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the Transaction as contemplated by this Agreement.  Purchaser has taken all action necessary to authorize the execution and delivery of this Agreement and the performance by Purchaser of its obligations under this Agreement.

(b)    This Agreement has been duly executed and delivered by Purchaser and constitutes a valid, binding and enforceable obligation of Purchaser, subject to bankruptcy and other debtor relief laws and principles of equity.

(c)    There is no action, suit, proceeding, inquiry or investigation (including any bankruptcy or other debtor relief proceeding), pending or to the knowledge of Purchaser threatened, against Purchaser by or before any court or governmental authority that would prevent or hinder the performance by Purchaser of its obligations under this Agreement or the completion of the Transaction as contemplated by this Agreement.

(d)    Except for consents, approvals, authorizations and filings already completed, Purchaser is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Purchaser of its obligations under this Agreement or the completion of the Transaction as contemplated by this Agreement.

The representations and warranties in Section 15(A) and Section 15(B) will survive the Close of Escrow, but only for a period of six (6) months no claim shall be allowed on any such representation or warranty unless written notice of the claim is delivered by the claimant to the other party within such six (6) month period.

16.    **Entire Contract.**  This Contract embodies the entire agreement between the parties hereto and cannot be amended or varied without the express written agreement of the parties hereto.  Furthermore, neither party has made any representations, warranties or covenants to the other concerning any tax benefits or tax treatment which may accrue or be given to the other party in connection with the transactions contemplated hereby.  Each party has relied upon its own examination of the Contract and the provisions thereof, and the counsel of its own advisors, and no promise, representation, warranty or covenant not included in this Contract has been or is relied upon by either party.  In the event that any litigation arises hereunder, it is specifically stipulated that this Contract shall be interpreted and construed according to the laws of the State of Texas, and shall be performable in Dallas County, Texas.  Further, the prevailing party in any such litigation between the parties shall be entitled to recover reasonable attorneys' fees.

17.    **Binding Effect; Performance.**  This Contract and the terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, legal

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract    6

**APP224**

SEC-SENDERAT-E-0003737

representatives, successors and permitted assigns wherever the context so requires or admits; provided, however, no third party shall have any rights, claims, benefits or obligations accruing hereunder unless such third party is claiming same under operation of law or a valid and permitted assignment made in accordance with the terms hereof. Time is of the essence in the performance of all obligations or requirements contemplated herein; provided, however, if the final date of any period set forth herein (including, but not limited to, the Closing Date) falls on a Saturday, Sunday or legal holiday under the laws of the State of Texas or the United States of America, the final date of such period shall be extended to the next day that is not a Saturday, Sunday or legal holiday. The term "days" as used herein shall mean calendar days. The term "business days" as used herein shall mean calendar days except Saturdays, Sundays or legal holidays under the laws of the State of Texas, or the United States of America.

18.    **Headings.** The article headings contained herein are for purposes of identification only and shall not be considered in construing this Contract.

19.    **Notices.** Any notice, request, demand or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing and shall be deemed to be delivered on receipt, if hand delivered, or when sent by registered or certified mail, return receipt requested, to the addresses as set out as follows, or such other notice address as either party may hereafter provide to the other or when sent by confirmed email:

TO SELLER:

| | |
|---|---|
| Name: | Anastasia Energy, LLC |
| Address: | |
| City/State: | REDACTED |
| Attn: | Stephen Khoury |
| Tel: | |
| Email: | |

TO PURCHASER:

| | |
|---|---|
| Name: | JMJ Acquisitions, LLC |
| Address: | 1755 Wittington Place, Suite 340 |
| City/State: | Dallas, TX 75234 |
| Attn: | Tim Barton |
| Tel: | 972-385-9934 |
| Email: | tbarton@jmjdevelopment.net |

20.    **Effective Date.** All references in this Contract to the "date hereof" or the effective date of this Contract shall be deemed to refer to the last date, in point of time, on which all parties hereto have fully executed (and, if required, initialed) this Contract.

21.    **No Recordation.** Purchaser shall neither record this Contract nor a memorandum of the terms hereof in any public records without the prior written consent to such recordation from the Seller. Any unauthorized recording of this Contract, or a memorandum of the terms hereof,

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract    7

**APP225**

SEC-SENDERAT-E-0003738

by Purchaser shall constitute an event of default by the Purchaser in the terms hereof, whereupon this Contract shall immediately and automatically terminate and all Earnest Money deposited by Purchaser hereunder shall be retained by the Seller as liquidated damages in accordance with the terms hereof. Further, the placing of record by Seller of an affidavit reciting the unauthorized recording of this Contract, or a memorandum of the terms hereof, by Purchaser and the subsequent termination of this Contract due to such unauthorized recording shall constitute full and sufficient evidence of the termination of this Contract and any third parties shall have the right to rely upon such termination of this Contract in accordance with the terms hereof.

22.    **Seller not a Foreign Person.** Seller hereby represents to Purchaser that it is not a foreign person, corporation, partnership, trust or estate (as those terms are defined in the Internal Revenue Code of 1954, as amended, and the regulation promulgated and in force with respect thereto), and Seller will, at Closing, deliver to Purchaser a certificate confirming such representation in a form satisfying the requirements of applicable law or regulations.

EXECUTED by Seller this _30th_ day of _October_, 2017.

SELLER:

Anastasia Energy, LLC

By: _____

Name: _____

Title: _Managing Member_

EXECUTED by Purchaser this _30th_ day of _October_, 2017.

PURCHASER:

JMJ Acquisitions, LLC

By_____

Tim Barton, President

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract    8

**APP226**

SEC-SENDERAT-E-0003739

## Receipt of Executed Contact

The undersigned hereby acknowledges receipt of the Contract For Unimproved Real Property
fully executed by Seller and Purchaser as of the ___/___ day of ___/___, 2017.

**Sendera Title Insurance Company**
**4161 McKinney Avenue, Suite 410, Dallas, Texas 75204**

## Receipt of Earnest Money

The undersigned hereby acknowledges receipt of earnest money in the amount of $25,000.00 as
of the _____ day of _____, 2017.

**Sendera Title Insurance Company**
**4161 McKinney Avenue, Suite 410, Dallas, Texas 75204**

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract        9

APP227

SEC-SENDERAT-E-0003740

APP228

## EXHIBIT "A"

**Tract One**
Legal              ABST 857, TR 7 PT, A WILLIAMS
Page #:                             0264
Volume #:                       3969
GEO Num:             126.0857.00051
Land Acres                127.1500

**Tract Two**
Legal              ABST 857, TR 7, A WILLIAMS
Page #:                             0264
Volume #:                       3969
GEO Num:             126.0857.00050
Land Acres                   1.0000

Land Contract
Anastasia Energy, LLC / JMJ Acquisitions Contract     10

SEC-SENDERAT-E-0003741

160

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:    )

                     ) File No. FW-04420-A

JMJ HOLDINGS         )


WITNESS:  Timothy Barton

PAGES:    160 through 418

PLACE:    Securities and Exchange Commission

          801 Cherry Street, Suite 1900, Unit 18

          Fort Worth, Texas 76102

DATE:     Monday, May 24, 2021


     The above-entitled matter came on for a

hearing via Webex, pursuant to notice, at 9:29 a.m.

EXHIBIT
21

          Diversified Reporting Services, Inc.

                 (202) 467-9200

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP229

161

APPEARANCES:

On Behalf of the Securities and Exchange Commission:

    JASON BRAUN, ESQ.

    CAROL HAHN, Accountant

    JAMES ETRI, ESQ., Assistant Director

    Fort Worth Regional Office

    801 Cherry Street, Suite 1900, Unit 18

    Fort Worth, Texas 76102

On Behalf of the Witness:

    KHUDABUKSH K. WALJI, ESQ.

    Law Office of K. Walji, P.C.

    6300 Hillcroft, Suite 310

    Houston, Texas 77081

Also Present:

    Jamie Haussecker, Paralegal

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP230

172

15?

A   Yes.

Q   Okay.  I'm going to ask if you are, or have you ever been a beneficial owner, directly or indirectly, of any privately-held company. And you say yes, but then you list just two entities, JMJ Development at -- L.L.C., and JMJ Holdings, L.L.C.

Are there more entities, in which you are a beneficial owner, directly or indirectly?

A   So those two listed are the ones that I had in my personal name, and then I provided a -- a list of additional ones that are not in my personal name.  And in one way or another, I'm a beneficiary or a -- control those companies, those private companies.  Those are a lot of the ones that we create for entities and maybe used or may never have gotten used, but that list has been given to Mr. K. now, and I believe he's going to send that over because it's, you know, quite expensive of -- of each and everyone that, in one way or another, I would consider having control of, but not is -- in personal ownership of.  Okay?

Q   Okay.  And you -- you said your

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP231

lawyer has a copy of that and can send it over?

A    That is correct.

MR. BRAUN:  K., if -- can you send that over to us, K.

MR. WALJI:  Yes, I'm just getting it -- if I can just have a few minutes.  It's being finalized.

MR. BRAUN:  You'll do it --

MR. WALJI:  Say again?

MR. BRAUN:  Okay.  No, while you're -- that's fine.  Go ahead.  If you can just focus on that, and I'll just keep asking some questions --

MR. WALJI:  Yes, please.

MR. BRAUN: -- while you're getting that done.

MR. WALJI:  Yes.

BY MR. BRAUN:

Q    So, Mr. Barton, Question Number 16, where you -- the question is:  "Are you now, or have you ever been a manager or a member of any privately-held company?"

In response to that, you say:

Approximately, 50 privately-held companies -- information of each company is being obtained,

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP232

174

and their details are to be supplemented.

All those all of the different entities you were just referring to that you have, in one way or the other, control over?

A    Correct.

Q    Okay.  Well, let's -- I'm going to put a pin in that, and we'll come back to that once we get this list; and we can get a chance to look over it during a break.

Let me have you go to Page 5.

A    Okay.  Page 5, yes.

Q    Do you see the section on "Bank Accounts"?

A    Which number are we talking about?

Q    Question Number -- Question Number 20, there's a -- there's a heading for "Bank Accounts"?

A    20, yes, sir.

Q    Question Number 20 asks for a listing of all accounts held in your name, and any financial institution over the last three years.

You list a personal checking bank account at Capital One in Dallas.

Do you see that?

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

**APP233**

that I know of.

Q    How did you go about gathering the information to compile this list of bank accounts?

A    I called Saskya Bedoya, and told her to put the information together.

Q    Okay.  And for the record, could you tell us the -- Ms. Saskya Bedoya, what her relationship is to you?

A    She's been an administrative assistant, and involved with me probably for the last ten years.

Q    And it -- an administrative assistant to you personally?

A    Yes.

Q    Does she also hold positions in any of your companies?

A    I think from time-to-time, there's surgery secretary, or roles such as that, yes.

Q    What is her role with each of the Wall entities?

A    I have to look at the documents, but it's possible she was a secretary on those companies, I would -- I would surmise.  I need to look at the documents, but...

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP234

the other.

Q    Are there any -- are there any accounts for any of your companies that you don't have control over?

A    I don't believe so.  I would not -- I don't believe that could happen.

Q    Let me have you go to Question Number 25, which is on Page 7 of Exhibit 11?

A    25, yes, sir.

Q    The question is:  Have you been -- ever been deposed in connection with any court proceedings?  And you put yes, and you listed, you know, approximately ten, but the -- it says: Details are being obtained and to be supplemented.

Has that information been compiled?

A    Yes, and actually, from what I understand, it's less.  I think that has been given to Mr. K., but -- but because of David Ramolia, versus JMJ deposition, and then --

Q    Can you spell --

A    Say it again?

Q    Can you spell that name David -- can you spell David's last name?

A    R-A-M-O-L-I-A.

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP235

187

look at what's been marked as Exhibit 12.

A    Okay.

Q    Can you look through Exhibit 12, tell me if you recognize these documents.  It's a series of signature cards for the various Wall entities.  And then, there's a Wall019 resolution at the end of the signature.

A    Okay.  I think I've seen them all.

Q    Do you recognize those, the -- that signature card, and the resolution for Wall019?

A    Yes.

Q    Let me have you go to the first page of Exhibit 12.  The first document.  It is a -- account title is Wall007, L.L.C.?

A    Okay.

Q    And the account number -- the account number ends in 3096.  Do you see that?

A    Yes.

Q    And in to -- for all these Wall entities we're going to talk about -- we talked about these entities at your last testimony, as well.  For Wall007, Wall009, it -- I mean, all these Wall entities, you control all of those entities, correct?

A    Correct.

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP236

188

Q    On Exhibit 12, this first document, the signatories on this account are Saskya P. Bedoya and Timothy L. Barton.  Do you see that?

A    Yes.

Q    Is the -- is that information accurate as of today, as well?

A    I believe so, yes.

Q    Are there any other individuals with any type of authority over this Wall007 account, besides you and Ms. Bedoya?

A    I don't believe so.

Q    Has there ever been anybody with control over the Wall007 account, besides you and Ms. Bedoya?

A    I don't believe so.

Q    Let me have you go to the second page of Exhibit 12.  And on the top, you'll see this is a signature card for Wall009, L.L.C., account ending in 0075.

A    Okay.

Q    The signature -- the signatories are Timothy L. Barton and Saskya P. Bedoya?

A    Yes.

Q    Is that an -- is -- as of today, are you and Ms. Bedoya the only signatories on that

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP237

account?

A     I believe so.

Q     Has there ever been any other --
anybody other than you and Ms. Bedoya with
control over this Wall009 account?

A     I don't believe so.

Q     The next page.  This is a Wall012,
L.L.C., account ending in -- I'm actually
having a hard time reading that account -- the
last four digits of that account number.

A     I think 0 -- 0510.

Q     Okay.  And again, you and Ms. Bedoya
are listed as the signatories.  And is that
accurate as of today?

A     Yes.

Q     Has anybody, other than Ms. Bedoya
and you, have control over this Wall012
account?

A     I don't believe so.

Q     Next page of Exhibit 12.  This is a
Wall016 --

A     Correct.

Q     -- L.L.C., account ending in 17 -- it
looks like -- 61.  Is that what you see?

A     Yes, sir.

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP238

Q    And you and Ms. Bedoya are listed as the signatories.  Is that accurate as of today?

A    I believe so.

Q    Have you and Ms. -- has there been anybody other than you and Ms. Bedoya with control over this account?

A    I do not believe so.

Q    Let me have you go to the next page in Exhibit 12, which is a Wall017 business signature card, account ending in 2081, I believe it is.

A    Yes.

Q    You and Ms. Bedoya are listed as signatories on the account.  Is that accurate as of today?

A    Correct.

Q    Has anybody else ever had control over this Wall017 account, besides you and Ms. Bedoya?

A    I do not believe so.

Q    Let me have you go to the last page of Exhibit 12.  And this is a Wall019, L.L.C., resolution, dated November 13, 2020.  And it states that:  "The company -- meaning Wall019 -- acknowledges and accepts that Saskya

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP239

192

got Saskya Bedoya's signature as treasurer of -- of Wall019.  Do you see that?

A    Yes.

Q    And then, you are signing as president of Carnegie Development, L.L.C., correct?

A    Correct.

Q    What is Carnegie Development, L.L.C.?

A    It's the managing member of Wall019.

Q    Is it also the managing member of the other Wall entities?

A    I believe that is correct.

Q    In -- when was Carnegie Development, L.L.C., formed?  You don't have to give me the exact date.

A    Yes, I'm assuming sometime in 17 whenever Wall -- the first Wall was created.

Q    And what was the reason for forming Carnegie Development, L.L.C.?

A    So that all the walls had the same managing member and the same ownership.

Q    And have you always been president for Carnegie Development, L.L.C.?

A    I believe so, yes.

Q    Who were -- and you are a member of

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP240

Carnegie Development, L.L.C.?

A    I would need to confirm that, if I'm a member of it or not.  I -- I know that I'm the president and I might be the managing member, but I need to check the records for that.

Q    Does Carnegie Development, L.L.C., have any other members?

A    Well, there is an entity that is a member of Carnegie Development.  I think it's TRWF or -- L.L.C., I think is the member that -- that -- so it wouldn't be anybody else than that entity.

Q    And is -- and, I'm sorry, is it -- you said TRWF, L.L.C.?

A    I believe so, but that -- you know, I just like to check that and confirm it, but that is from my memory, yes, sir.

Q    And in -- and you control TRWF, L.L.C.?

A    So it's owned by a trust and I'm the beneficiary of the trust, and I'm the president of those entities so that, yes, I'm in control of them.

Q    And what's the name of the trust?

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

**APP241**

200

No problem.

MS. HAHN:  And have you ever paid any personal credit card bills out of that account?

THE WITNESS:  Oh, yes.  I -- I would imagine from time-to-time that could have happened, yes.

MS. HAHN:  And would you have paid any personal credit card bills of any family members from that account?

THE WITNESS:  I don't believe so, no.

MS. HAHN:  And what about any personal credit cards of Saskya Bedoya from that account?

THE WITNESS:  No.

MS. HAHN:  That's all I have, Jason.

BY MR. BRAUN:

Q    Mr. Barton, are you the sole shareholder in JMJ Development, Inc.?

A    Correct.

Q    Have you always been the sole shareholder?

A    Correct.

(SEC Exhibit No. 14 was marked for identification.)

Q    Let me have you open up what's been

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

**APP242**

236

(A brief recess was taken.)

(SEC Exhibit No. 73 was

marked for identification.)

MR. BRAUN:  So we're back on the record at 11:40 a.m.

MR. WALJI:  Let me just rearrange the computer so you get Mr. Barton there.  Okay.

MR. BRAUN:  Okay.  We have marked as Exhibit 73 the corporate entity list that you provided to us just a few minutes ago, K.

MR. WALJI:  Okay.

BY MR. BRAUN:

Q    Mr. Barton, do you see the corporate entity list that we've identified as Exhibit 73?

A    Yes.

Q    Let just go down the list and -- and I want to get a basic understanding of what these various entities do.  So let's just start and go down.

126 Villita, L.L.C., what does that entity do?

A    A piece of land to build multi-family apartments.

Q    Is it still in existence?

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP243

252

And then, of course, we've got, PRWF, L.L.C., and TRWF Lodge, L.L.C., were both -- didn't they have a -- some connection to the Wall entities at some point when they -- when referring to ownership?

A    So I -- I don't know where -- lodge is like an old entity that -- that was -- maybe at one time, there was a registered agent, but the T -- TRWF, L.L.C., is the entity that owns Carnegie. And, of course, we have to have Carnegie on there. We're -- we have that Carnegie Development, L.L.C. -- yeah, you already said that, right, yeah.

Yeah, so you could put those two on there for now, but I think we're going to find that it's just the TRWF, L.L.C.

Q    Okay. So you've got all those listed. Anything else?

A    I think that -- I think that's it from -- looking at it from here, but we can certainly check some more for you. No problem.

Q    Yeah. I think we got JMJ Holdings, L.L.C.?

A    But that has nothing to do with any of this. It's a -- it's a dormant company that

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP244

took -- well, let me tell you about JMJ Holdings while we're here, right. So when I started, I was like, oh, I want to have a holding company. I'm going to be this big developer. You know, you -- you have big dreams and big plans, and JMJ Holdings -- the lawyer said, oh, that should be the holding company for everything. Well, we never really got around to getting that put together and be a holding company for anything before it got sued. In fact, it got sued by a Robert Kemp, who is a lawyer who works for me today, for a frivolous lawsuit about a broker and a deal, which is normally what they're about.

So the short answer of JMJ Holdings is is: It never done any business, it never had anything, and all it's been doing its whole life is getting sued. Like, it's the mother ship of everything. It's -- so it does -- it doesn't have anything to do with these Wall people, and again, the lawyers are in their mindset saying, oh, go after the holding company. Like, they go after Tim Barton, they go after wherever they think, except for the entities that were involved. So...

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP245

Q    Has JMJ Holdings, L.L.C., ever held any assets?

A    I don't believe ever, no.

Q    Has it -- and does it have any -- any money whatsoever?  Any bank accounts with money in it in?  Anything like that?

A    No, no.  In fact, it's got a -- you know, a certain kind of dormant -- what do you call it on it?  You know, a judgment, I think, with some other broker down in San Antonio, there's -- so there's nothing in it because of that problem.  It's always been getting sued.

Q    Does JMJ Holdings, L.L.C., have any employees?

A    No.

Q    Does it ever have any employees?

A    I'd have to check if ever because it's been around awhile, but not -- not in the last three years.

Q    Has it ever done any business at all?

A    I don't believe so, no, but --

Q    You had no revenues from -- sorry, go ahead.

A    No.  I don't believe so, no.

Q    No revenues coming in?

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP246

294

and he was representing those people.  So my interaction was with Michael Fu.

Q    If you look at the first page of Exhibit 54.  Under "Principal and interest", you will see that the loan was for $100,000.

Do you see that?

A    Yes, sir.

Q    And then, the terms is going to be a 10 percent interest rate per year for two years. And the second year is the 10 percent interest, but in addition to that, you're also paying back the principal.  That's the way it was supposed to work, correct?

A    Correct.

Q    What was the basis for the promise that we pay a 10 percent interest rate on that $100,000?

A    Well, you mean -- what was the -- say that again.  I don't understand the question.

Q    Sure.  So you -- Wall009 is promising to pay a 10 percent interest rate per year for two years.

A    Right.

Q    How is it expecting to pay 10 percent a year?

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP247

295

A    Yeah, it was going to go -- and once the -- once the master fund -- the master loan was fully funded, they would take those funds and throw them in real estate, make money and pay back the loan.

Q    But certainly, you've been doing this a long time.  I mean, real estate, construction delays.  You know, you could have rain, you could have any number of things that are going to create delays where a project may not get completed on time, right?

A    Yes, sir.

Q    So how did you know you'd be able to pay 10 percent interest rate per year on these loans?

A    You want to -- you mean, to pay it back in two years?

Q    To pay back 10 -- so the first -- the first year, you're supposed to be getting $10,000; and the second year, you're supposed to get another 10,000 plus pay back for principal. So how are you expecting to do that with --

A    Very simply.  You buy the land, you get your construction loan that gives you all

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP248

your -- your development money, and any of your other capital that you need. And so with those funds, you -- you know, the first two years -- if it doesn't get done in two years, you have the -- the construction loan proceeds to deal with that cost of capital for the partnership. And then, have you read the last part: "Sums not paid by such time shall bear interest at the rate of 14 percent per annum from the dates payments per due." Now that line, I put in, because there are things that I certainly paid attention to. And in the development business, you know, you need to have a -- ability to take a little longer, as you mentioned. And if that happens, you just pay a little bit more interest, and everybody's okay with it. And so that's what this agreement allowed for.

Q    Okay. And I purchased a few houses, but I've never built a house from scratch. So educate us a little bit on the types of things that happen to delay projects, and, you know, get into this issue where more -- more interest has to be paid because of those delays or problems. Walk us through some of those types of things that happen?

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP249

entities, correct?

A    Well, pretty much.  As we see, Michael Fu did -- did make some variations throughout the process, apparently.

Q    Okay.  So I want to go through -- I want to focus on a couple of the loan purposes. So for Exhibit 57, Page 2, the Loan Purpose was: To acquire 172 acres located in Fort Worth ETJ Parker County, State of Texas for the Lyons Ranch.

And again, that was one of these projects that was not purchased, and the money was instead diverted to other stuff, correct?

A    Correct.

(SEC Exhibit No. 58 was marked for identification.)

Q    Excuse me, let me have you look at Exhibit 58.  Do you recognize this as one of the agency loan agreements for the Wall016?

A    Yes, sir.

Q    And go to Page 2, the Loan Purpose. It's supposed to be for a 160 acre -- again, it looks like it's the same thing, Lyons Ranch.

Is that accurate?

A    What happened is -- that's a bigger

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP250

346

piece of land, and Steve and Michael wanted to split it into two entities.  And this is, like, east and the west.

Q    And again, that project -- that property wasn't purchased.  The money was diverted to something else, correct?

A    Correct.

Q    And the -- what it was diverted to is what you referred to as the Bear Creek project, correct?

A    Correct.

(SEC Exhibit No. 59 was marked for identification.)

Q    Let me have you look at Exhibit 59.

A    Yes, sir.

Q    Okay.  You recognize this as an agency and loan agreement for the Wall017?

A    Yes, sir.

Q    Let's go to Page 2, the land -- the Loan Purpose, rather.  200 acres located in Forney, Kaufman County, State of Texas for residential lot developments known as Windmill Farms.  Again, Windmill Farms was not purchased for $11 millions.  This money was diverted to something else, correct?

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP251

Q    And on Page 2, the Loan Purpose is to" acquire 157 acres in Venus, Johnson County, State of Texas for a residential lot development known as Griffin, that -- and the purchase price was supposed to be $6,250,000. That money was not used to acquire that property, correct?

A    I don't believe so, no.

Q    That money, in fact, was -- the money that was loaned by the Chinese individuals was, in fact, not used for that Loan Purpose, but was instead, redirected to acquire or attempt to acquire a different property, which you referred to as a Bear Creek property, correct?

A    What number are we on?  What entity?

Q    Wall018.

A    Yes, there was a very -- you know, this -- we have to confirm what was raised here, you know, what lenders actually funded because very little funds came in.  This commitment of what they said they were going to do did -- did not happen, but there was not any -- you know, we haven't confirmed the amount of funds --

Q    Regardless --

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP252

350

A    -- of the loan.

Q    Fair enough.  Regardless of the amount of funds, they weren't used to acquire referenced Page 2 of Exhibit 60, correct?

A    Correct.

Q    And the money, instead, was put towards a different project, correct?

A    Correct.

Q    And that project that it was put toward was -- it was locked in with some of the other monies and some of the other Wall entities to be able to work on acquiring the Bear Creek property, correct?

A    It was applied to the Bear Creek, that's -- that's correct.  We spoke with Michael Fu about it, and that's what we did, yes.

Q    Let me have you go to the last page of Exhibit 60, and I just wanted to ask you -- I think I know the answer, but I want to confirm. If you look at the first page of Exhibit 60, on the top it says "Docusign Envelope ID", and it gives an ID number.  And then, the last page of 60, it has the signature lines, it's got the dates, but it doesn't have

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP253

357

it described, the 84 acres is inside the total larger piece of property.  So those funds were used for acquiring a part of the Bear Creek.

Q    Just not this -- just not this piece that's described on Page 2?

A    Well, this piece is inside the larger piece.  So, yes, it's part of it.

Q    Okay.  So -- so if I understand you correctly, you used money from Wall011, Wall012, 016, 017, 018, and 019 together to by the bigger piece of Bear Creek, which included the land described in Exhibit 61 on Page 2?

A    Correct.

Q    And did you acquire that Bear Creek property?

A    Yes.

Q    Who -- who -- what entity currently owns that Bear Creek property?

A    I believe it's the BM318.

Q    And why is it one of the Wall entities?

A    Because we were applying the -- the -- basically, the Wall did not have enough of the funds to do it as supposed to.  And so it was loaning the money to the other entity to

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP254

Page 417

PROOFREADER'S CERTIFICATE

In The Matter of:    JMJ HOLDINGS

Witness:    Timothy Barton

File Number:    FW-04420-A

Date:    Monday, May 24, 2021

Location:    Fort Worth, TX

This is to certify that I, Maria E. Paulsen, (the undersigned), do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.

_____    _____
(Proofreader's Name)    (Date)

APP255

C E R T I F I C A T E

STATE OF NEW YORK)
                                    :ss
COUNTY OF NEW YORK)


        I, TIFFANIE JONES, a Notary Public within and for the State of New York, do hereby certify:

        That the examination, which hereinbefore set forth was duly sworn and that such an is a true record of the testimony given.

        I further certify that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of May, 2021.


                                        _Tiffanie Jones_
                                        Tiffanie Jones

**APP256**

1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION:


In the Matter of:    )

                     ) File No.  FW-04420-A

JMJ HOLDINGS, LLC    )


WITNESS:  Haoqiang Michael Fu

PAGES:    1 through 209

PLACE:    Securities and Exchange Commission

          801 Cherry Street

          Fort Worth, Texas 76102

DATE:     Tuesday, July 20, 2021


     The above-entitled matter came on for hearing,

pursuant to notice, at 9:41 a.m. Central Time.

Diversified Reporting Services, Inc.

(202) 467-9200

**EXHIBIT**

**22**

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

**APP257**

2

APPEARANCES:


On behalf of the Securities and Exchange Commission:

JASON BRAUN, ESQ.

CAROL HAHN, STAFF ACCOUNTANT

Division of Enforcement

Securities and Exchange Commission

Fort Worth Regional Office

801 Cherry Street

Fort Worth, Texas 76102

(817) 978-3821

braunj@sec.gov


On behalf of the Witness:

SILVIA L. SERPE, ESQ.

Serpe, LLC

16 Madison Square West

New York, New York 10010

(212) 257-5010

sserpe@serpellc.com


ALSO PRESENT:

Jamie Haussecker, Staff Paralegal

Gang Li, Mandarin Interpreter


[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP258

A    Correct.

MS. SERPE:  Also, Jason, I apologize, but the last page is, I'm noticing -- I just want to direct his attention because, I don't know that it's part of the questionnaire.  Is that how it was sent to the SEC?

Jason, can you represent whether that -- that last page, was -- was that attached?  Because I can represent that Mr. Fu at the time --

A    This is not relevant information.

MR. BRAUN:  Yeah.  Let me jump -- so, I can't -- I can look at a break to go back and look at the e-mail.  I would -- I would tell you, I -- I would say that's probably true, Silvia, because I don't -- that certainly isn't my writing.  It looks like it's written in some type of Mandarin.  So, yeah, I'll go back and check.  This is probably how it came.

Q    Is this an inadvertent -- did you not -- is this not part of the background questionnaire as an attachment, for example, Mr. Fu?

MS. SERPE:  Was it a mistake to include --

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP259

30

A    So, majority of our investors, I -- I don't know them.

Q    Yeah, but you said something.  So, when -- when you were going to communicate with them, is it -- is it e-mail?

A    No.  Most likely with -- by mobile phone or by WeChat.

Q    Okay.  That's what I wanted to find out.

So, when you communicate with them it's typically by text message from your phone or -- or using WeChat?

A    Even not text.  Majorly using WeChat or by mobile phone call.

Q    Okay.  If you look at question number 12 --

MS. SERPE:  And I'm sorry, Jason, but because -- to be clear, he is answering with respect to him individually.  'Cause he had referenced the sales team.  So, I just want to make sure that that's clear on the record that he was answering with respect to himself.

MR. BRAUN:  Yeah.  Well, I mean, let me just --

Q    Mr. Fu, I'm just trying to find out,

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP260

whether it's you individually or you in your capacity working at your company, when you communicate with these different Chinese individuals about the -- the Wall entities and the loans and things like that, what I understand to be is you saying that it's typically by phone call or WeChat; is that correct?

A    Correct.

Q    Okay.  And -- and it's sometimes you might text from your phone, but that's pretty rare? Is that kind of what I -- is that correct?

A    That for me, but I think my sales may use like e-mails, phone calls, WeChat chat message as well.

Q    Got you.

A    But for me, to my understanding, I majorly just use phone call or by WeChat.

Q    All right.

MS. SERPE:  Yeah.  I didn't hear a text, Jason.

THE WITNESS:  No.  Usually I don't text.

MS. SERPE:  I did not hear that.

Q    Okay, got it.

So, Mr. Fu, if you look at question

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP261

139

2:26.

MS. SERPE:  2:30.  Yeah, sounds good. I said we might as well just say 2:30.

MR. BRAUN:  Oh, yeah, you guys -- you guys are an hour -- let's just, let's take five minutes.  We'll come back in five minutes.  Off the recorded.

(A brief recess was taken.)

MR. BRAUN:  Let's go back on the record at 2:33 p.m.

BY MR. BRAUN:

Q   Mr. Fu, we just took a short break. You understand you're still under oath?

A   Yes.

Q   Okay.  Let me -- I want to go back real quick to something I was thinking of.  You had mentioned the different ways -- there was four different ways that -- that the -- that these investors could pay the money to the Wall entities. Do you recall that?

A   Not pay.  Wire the money.  Manage to wire the money.

Q   Wire the money?

A   Yes.

Q   Okay.  And -- and -- and one of those

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP262

153

A    No.

Q    Did Platinum Investment Corporation make any changes to these agreements?

A    We discuss -- I think my commercial -- my lady in charge of commercial business side discussed some details with -- with Tim.  And I think we didn't change a lot of them. Maybe some slides.  And we have all the record of that.

Q    So, the -- is it correct that the agency and loan agreements were drafted primarily by Tim Barton and his people?

A    Yes.

Q    Let's talk about the marketing that was done to try to -- you know, the efforts to try to find Chinese individuals that would loan money to all these Wall entities.

Did -- did Mr. Barton ever travel to China for presentations?

A    Twice.

Q    Do you recall approximately when he made those visits?

A    I didn't remember the time.

Q    And you -- I mean, can you ballpark it at all?  Was it 2018, 2019, summer of 2018?  I mean, can you --

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP263

157

or any type of written materials to -- to show people?

A    I do remember he used some slides, but what -- to my understanding, it's like a general -- like general introduction of JMJ, that's it.

Q    And did he talk about -- and so, this was -- this was after a couple of the Wall entities had already been existing and doing some of the loan and agency agreements?

A    Correct.  'Cause this in year '18. We started this business from later half of '15 I think.

Q    The agency -- so, what type of a -- what type of materials were given to individuals in China to let them know about these investment opportunities for the various Wall entities?

A    Okay.  I received specified data numbers, like, pro forma, like, purchasing price from Steve Wall.  And my internal marketing team will add some general economy data and -- and -- and my sales team will use this kind of data to talk to the potential investors individually.

Q    So, Steven Wall and -- sends over information on the -- the land that a Wall entity

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP264

wants to purchase that they've -- that they've identified, the numbers, some of the -- the financial --

A    Yes.

Q    The financial figures?

A    All of the financial numbers.

Q    Okay.  And then your sales team includes -- adds its -- kind of -- kind of spice it up with information on the American economy in general, investing in America?

A    Not my company.  My marketing team. My internal marketing team will translate into Chinese and put on some after general economy information of the U.S.A.

Q    Okay.

A    Then, through the sales team, they -- they pass the information to individual customers.

Q    Okay.  And then, the -- how do they get that information to the customers?  Do they e-mail it to them?  Do they do a -- make a presentation?  How do they get it to the customers?

A    Actually, I don't know the details 'cause most -- I don't -- I don't know most of

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP265

192

Chinese lenders to any type of agreements or anything -- well, let me strike that. Back up. Strike that.

Did Mr. Barton ever ask you for your approval acting on behalf of Platinum Investment Corporation on -- approval on how to spend the -- the money that was loaned to the Wall entities?

A    No.  As I stated before, he -- he -- Mr. Barton and -- between Mr. Barton and Steve Wall and me would make it very clearly.  And Mr. Barton actually before we started business he emphasized, he is the only one to control and use the money. So, we cannot stop him.  And I do give him suggestion that we set up a committee to -- when -- when spend some major money, we should get a signature from committee, and he refused. He -- he said nobody can do that, to stop him doing that.

Q    So, when it comes to the agency and loan agreements once they're signed, once the money is wired over to the Wall entity -- any of the Wall entities, at that point, does Platinum Investment Corporation have any control over how that money is spent?

A    No.

[7/20/2021 9:41 AM] Fu, Haoqiang _Michael_ - Vol. I.20210720...

APP266

PROOFREADER'S CERTIFICATE

In The Matter of:    JMJ HOLDINGS, LLC

Witness:             Haoqiang "Michael" Fu

File No.             FW-04420-A

Date:                Tuesday, July 20, 2021

Location:            Fort Worth, TX

This is to certify that I, Maria E. Paulsen, (the undersigned), do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.

8/2/2021

(Proofreader's Name)            (Date)

CERTIFICATE

I, SHAUNNA H. MORAN, a Certified Shorthand Reporter of the State of New Jersey, a Registered Professional Reporter, and Notary Public of the States of New York, New Jersey and The District of Columbia, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

SHAUNNA H. MORAN, C.S.R.
Certified Shorthand Reporter
License No. X100213700

**APP268**

1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )

                           ) File No. FW-04420-A

JMJ HOLDINGS, LLC          )


WITNESS:   Stephen Thad Wall

PAGES:     1 through 134

PLACE:     Securities and Exchange Commission

           801 Cherry Street, #19

           Fort Worth, Texas 76102

DATE:      Monday, January 25, 2021


     The above-entitled matter came on for hearing,

via WebEx, pursuant to notice, at 12:29 p.m.

**EXHIBIT**

**23**

exhibitsticker.com

2

Diversified Reporting Services, Inc.

(202) 467-9200

APPEARANCES:


On behalf of the Securities and Exchange Commission:

JASON BRAUN, ESQ.

JAMES ERI, ESQ.

AYESHA AHMED, Accountant

Securities and Exchange Commission

801 Cherry Street, #19

Fort Worth, Texas 76102

(817) 978-3821


On behalf of the Witness:

MICHAEL HEISKELL, ESQ.

Johnson Vaugn & Heiskell

5601 Bridge Street, Suite 220

Fort Worth, Texas 76112

(817) 457-2999


Also Present:

Jamie Haussecker, Paralegal

Q   So your main role with the structure of what was all going to happen and what has happened now, your role in it was to build homes that would ultimately be sold to Chinese investors?  And also something that you did was you would help to identify certain targets or places that you thought would be good for building?

A   If Mr. Barton had an idea, okay, that is probably a place where I can go develop to get these starter homes that Mr. Fu seems to have a target audience for in China, with the exception of when I first said, I mean the Chinese would only buy, you know, a small percentage of the homes from me.  Most of my sales, over ninety percent of my sales are domestic customers.  These were not exclusively Chinese customer neighborhoods.  They were neighborhoods to get lots to go sell houses and build houses for the public in general.

Q   The last little piece of this, and we will keep going on further is the Chinese investors.

So is there anything else that you would put it under in terms of the description of their role besides being the source of funds to invest, to make all of this happen so people actually had money to try to do the stuff that they are talking about

doing, building properties, developing land and all of that stuff?

A    Any other role for the Chinese investors?

Q    Right, other than just being the money.

A    I mean, they were making investments into the deals.  So I don't know of another role for any of them.

Q    I don't know that there was.

A    I mean, I think Michael had a couple of his people that worked for him that actually did invest in some of these deals.

So in that case that would be little bit different but generally, no, they had no other role other than investing.

Q    I think, Mr. Wall, I think we are at a pretty good spot.  We are going to talk more about this, but I know that we have the roles down, and this is a good spot to take a little break.

Do you want to take a ten-minute break and come back at 2:10?

A    Certainly.

MR. HEISKELL:  Let us do that.

MR. BRAUN:  We are off the record at 1:57 p.m.

(Recess was taken.)

PROOFREADER'S CERTIFICATE

In the Matter of:   JMJ HOLDINGS, LLC

Witness:   Stephen Wall

File No:   FW-04420-A

Date:       Monday, January 25, 2021

Location: Fort Worth, Texas

          This is to certify that I, Christine Boyce, (the undersigned) do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.

*Christine E. Boyce*                    2-2-21
_____
(Proofreader's Name)

REPORTER'S CERTIFICATE

I, Michele Koss, reporter, hereby certify that the foregoing transcript of 132 pages is a complete, true and accurate transcript of the testimony indicated, held on 1-25-21 at Fort Worth, TX, in the matter of:

JMJ HOLDINGS, LLC

I further certify that this proceeding was recorded by me, and that the foregoing transcript has been prepared under my direction.

Date: 2-2-21

Official Reporter: *Michele Koss*

1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION:

In the Matter of:                )

                                 )   File No.  FW-04420-A

JMJ HOLDINGS, LLC                )

WITNESS:  Saskya Bedoya

PAGES:    1 through 235

PLACE:    Securities and Exchange Commission

          801 Cherry Street, Suite 1900

          Fort Worth, Texas

DATE:     Thursday, March 10, 2022

     The above-entitled matter came on for hearing,

pursuant to notice, at 10:16 a.m. Central Time.

          Diversified Reporting Services, Inc.

               (202) 467-9200

**EXHIBIT**

**24**

2

APPEARANCES:


On behalf of the Securities and Exchange Commission:

JASON BRAUN, ESQ.

JAMES ETRI, ESQ.

CAROL HAHN, ESQ.

JAMIE HAUSSECKER, Staff Paralegal

Division of Enforcement

United States Securities and Exchange Commission

Fort Worth Regional Office

801 Cherry Street, Suite 1900

Fort Worth, Texas 76102

(817) 900-2639

braunj@sec.gov


On behalf of the Witness:

KHUDABUKSH K. WALJI, ESQ.

U.S. & International Legal Advisor

Law Office of K. Walji, P.C.

10701 Corporate Drive, Suite 250

Stafford, Texas 77479

(281) 401-9672

k.walji@waljilaw.com

129

Q   I want to show you what's been marked as Exhibit 101.  And please tell me if you recognize this document.  I'll start at the bottom and I'll work my way up.  This again, is Exhibit 101.

A   I'm not familiar with that company.

Q   I'm -- just let me go through the whole thing.  If I go through too fast, let me know. I'm just going to go through.  You're not on these e-mails yet.  I'll point that out.  You're on the original e-mail.  You're going to be added to the chain as we go.  So, here we come.  This is now you being added.

A   Okay.

Q   So, we're now at the top of this e-mail and the top of the e-mail chain of Exhibit 101.  Do you recognize this e-mail chain?

A   Yes.

Q   Okay.  Now, it was a common thing for you to pay Mr. Barton's American Express card, correct?

A   Yes.

Q   And you paid those American Express bills out of various funds -- or, I'm sorry, various accounts in which you and Mr. Barton were signers, correct?

A    We -- yes.  To answer the question, I believe when we paid the Amex bill it was from the JMJ account.

Q    But here you're asking Mr. Barton -- or you're saying, Pay American Express -- Pay Amex?

A    Yes.

Q    And this is on January 9th.  And then he writes back, Yes.  And you ask him, Use Wall 17 money or from La Jolla?  Again, this is all January 9th.  It looks like that was five minutes after.  Do you notice the time stamp?

A    Yes.

Q    Wednesday, January 19th you're asking him and he says, Yes.  And you five minutes later you say, Wall 17 or from La Jolla?  And he says, Wall.  And then, you did in fact use money from the Wall 17 account to pay for Mr. Barton's American Express bill, correct?

A    From my recollection that is what the instructions were.

Q    And -- and these types of -- and this was not -- well, that's fine.  Let me back that out.

You've seen -- you -- you created a lot of the various, you know, we talked about earlier, the templates for the Wall agreements.  You

Page 234

PROOFREADER'S CERTIFICATE

In the Matter of:      JMJ HOLDINGS, INC.

Witness:              Saska Bedoya

File Number:          FW-04420-A

Date:                 Thursday, March 10, 2022

Location:             Fort Worth, Texas

This is to certify that I, Christine Boyce, (the undersigned), do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.



(Proofreader's Name)                3-18-2022

CERTIFICATE

I, SHAUNNA H. MORAN, a Certified Shorthand Reporter of the State of New Jersey, a Registered Professional Reporter, and Notary Public of the States of New York, New Jersey and The District of Columbia, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

SHAUNNA H. MORAN, C.S.R.
Certified Shorthand Reporter
License No. X100213700

APP280

1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:    )

                     ) File No. FW-04420-A

JMJ HOLDINGS, LLC    )



WITNESS:  Hong Chen

PAGES:    1 through 81

PLACE:    Securities and Exchange Commission

          801 Cherry Street, Suite 1900, Unit 18

          Fort Worth, Texas 76102

DATE:     Wednesday, March 9, 2022


    The above entitled matter came on for hearing via

Webex, pursuant to notice, at 9:05 a.m.


                Diversified Reporting Services, Inc.

                      (202) 467-9200

**EXHIBIT**

**25**

2

APPEARANCES:


On behalf of the Securities and Exchange Commission:

JASON BRAUN, ESQ.

JAMES E. ETRI, ESQ.

CAROL HAHN, ACCOUNTANT

JAMIE HAUSSECKER, PARALEGAL

Securities and Exchange Commission

Division of Enforcement

801 Cherry Street, Suite 1900, Unit 18

Fort Worth, Texas 76102


On behalf of the Witness:

CHARLES WOODS, ESQ.

Law Offices of Charles Woods

9638 Greenville Avenue

Dallas, Texas 75243


ALSO PRESENT:

WILLIAM A. PIGG, ESQ.

PING CHEN, Mandarin interpreter

3

C O N T E N T S

WITNESS:                                    EXAMINATION

Hong Chen


EXHIBITS:       DESCRIPTION                 IDENTIFIED

156      Confirmation and receipt 19

157      PowerPoint presentation  23

158      Lender update      42

159      Balance sheet      48

160      Resolution       55

161      Forbearance      58

4

P R O C E E D I N G S

MR. BRAUN:  Let's go on the record at 9:05 a.m. on March 9th, 2022.

Ms. Chen, before we begin, I want to go over a few protocols that we talked about previously with your counselor.  But I just want to make sure we have an agreement on the record with you and your counsel for today's testimony.

You and your counsel understand and agree that the oath or affirmation to tell the truth will be administered by audio-visual means, like we're doing right now, rather than in person but will have the same effect as if administered in person.

Do you understand and agree to that?

MS. CHEN:  Yes, I do.

MR. BRAUN:  And, Counsel, do you agree to that as well?

MR. WOODS:  Yes.

MR. BRAUN:  And, Ms. Chen, you and your counsel agree that neither of you nor any other party under your control will make a recording of the testimony, whether through the Webex system or with a separate device.

Do you agree to that?

MS. CHEN:  Yes.

36

A    Yes.  It's very important.

Q    I'm going to go back to Exhibit 60.  This is the Wall018 agreement that we looked at earlier (indicating).  Do you notice that the -- I'm on -- I'm on page 2 of Exhibit 60, and this is the loan purpose.

Do you see this right here (indicating)?

A    Yes, I can see it.

Q    So it states that the loan purpose -- that the loans and the additional loans shall be used to acquire 157 acres located in Venus, Johnson County, state of Texas, for residential lot development.  Now, your understanding was that all of the money that you, Beyond Barcode, invested and the other Chinese investors, all of their money was supposed to be used to buy the land, correct?

A    That's correct.

Q    And were you ever told that some of your money would be used to pay commissions to different people?

A    No.

Q    Would you have agreed to invest in Wall018 if you were told that your money would be going to pay commissions or compensation to salespeople?

A    No.  But I think there are probably 6 to 8 percent will be normal operation for Wall018 to pay

[3/9/2022 9:05 AM] Chen, Hong - 3-09-22

**APP285**

them, but it's not included in my loan agreement.

Q    In addition to the agreement itself, the Wall018 agreement, did Platinum Investment, any of the employees from Platinum Investment, did they tell you that the money would be used just to buy the land?

A    Excuse me.  Would you repeat the question?

Q    What were you told by the Platinum Investment Corporation people about what the money would be used for?

A    They told me the money funded directly and only to purchase the land.

Q    Would you have agreed to invest in Wall018 if you knew that some of your money would be used to pay personal expenses for people?

A    No, never.

Q    Would you have agreed to invest in Wall018 if you knew that your money wasn't going to be used only to acquire that land in Venus, Johnson County, Texas?

A    No, never.  I will never agree that -- agree with that, no.

Q    Your 150 -- or Beyond Barcode's $150,000, did you ever receive any interest payments?

A    No.  I didn't receive any interest from Wall018.

Q    Did you ever receive your $150,000 back?

38

A    No, I didn't.

Q    Did you ever attend a presentation that was done? I know you said that you received this PowerPoint presentation that's Exhibit 157.  But did you ever attend a presentation for investors where there was a big screen and people were altogether being told about investments in the Wall entities?

A    No, I didn't.

Q    Did you ever meet Mr. Barton?

A    You mean before or after I invested to Wall018?

Q    Great question.  Let's start with before. Did you ever meet Mr. Barton before Beyond Barcode invested?

A    No, I didn't.

Q    Did you meet Mr. Barton after --

A    Yes.

Q    -- Beyond Barcode invested?

A    Yes, I did.

Q    And when did you meet Mr. Barton?

A    It's before the Chinese New Year.  I think it's around January -- January 2020.  I think is probably at the end of January 2020.

Q    And why did you meet Mr. Barton?

A    At that time I have heard from many times

48

Q    But that otherwise was fine and there was no problems?

A    Yes, yes.

MR. BRAUN:  Let's go off the record at 11:05 a.m.

(A brief recess was taken.)

MR. BRAUN:  Let's go on the record at 11:34 a.m.

Q    Ms. Chen, we just took a brief break.  You understand that you're still under oath?

A    Yes, I understand.

Q    You mentioned earlier receiving a packet of documents before Beyond Barcode invested in Wall018, correct?

A    That's correct.

Q    I'm showing you what we're going to mark as Exhibit 159.  It's a JMJ Holdings consolidated balance sheet as of the 15th of February 2019.

(SEC Exhibit No. 159 was marked for identification.)

Q    Is this one of the documents that you recall receiving before you invested?

A    Would you please let me have a look at the document?

Q    Oh, I'm so sorry.  I'm not sharing.  Let me

[3/9/2022 9:05 AM] Chen, Hong - 3-09-22

49

share this.  I'm so sorry.

There you go.  That's what's been marked as Exhibit --

A    Yes.

Q    -- what we're going to mark as Exhibit 159 (indicating).

A    Yes, That's the document.

Q    Okay.  So you received this document as part of the initial packet of documents that you reviewed and relied upon in deciding whether or not Beyond Barcode would invest in Wall018, correct?

A    That's correct.

Q    Why was this document important to your decision to invest in Wall018?

A    I think this JMJ company has some -- had listed some assets and they are -- they are -- have ability to repay in the case Wall018 is default.  So because JMJ will be the 50 percent shareholder of -- and Carnegie will be the 100 percent shareholder of Wall018.  So they're in the case, and they are willing to repay in the case of Wall018 default so -- if they have enough assets.  So I think they will be very safe. They are willing to repay.  So the financial report is very important to let me make the decision to invest.

Q    Would you have invested or would have --

[3/9/2022 9:05 AM] Chen, Hong - 3-09-22

**APP289**

A    Yes.

Q    I'm going to go back to Exhibit 60, which is the Wall018 agreement.  And on page 1, that has -- sorry. Just one second.

So if you see on page 1, it states that the co-lender that -- that the co-lender agrees to lend 200,000 for this one of the total loan amount of --

A    Yes.

Q    -- 5,625,000.  Do you see that?

A    Yes.  I see the amount.

Q    But the purchase price or the transactional cost down in page 2 of Exhibit 60 is more.  It's 6,250,000. Do you see that?

A    Yes.  That's because I ask Willis specifically regarding this amount.  Willis told me that because the project company will have their own funds to provide the -- the rest amount.  So --

Q    So --

A    -- as investors, we only need 5 million or more and they will provide their own.

Q    Yeah.  And it says here that the balance of funds will be provided by borrower, meaning the Wall018 entity --

A    Yes.

Q    -- correct?

64

A    Yes, that's correct.

Q    Was it important to your decision to invest --

A    Yes.

Q    -- to --

A    Yes.

Q    Sorry.  Let me finish.  Sorry.  One second.

Was it important to your decision to invest in Wall018 that the -- that Wall018, the borrower, was going to put in so much money into the investment?

A    Yes.  That's very important to me, yes.

Q    Why is that?

A    That means they -- they have financial means to purchase the -- to finish the transaction and they are willing to put their own money into this and they make me more confident.  So the project is real and the -- our money and their money combined, they have more -- I mean confidence.  So if it's just our money, then I will consider a pool -- fund pool.  So their money is coming in, so I think it's a real project and think we will do it, as they -- what they said.

Q    Would you have agreed to invest if the Wall entity or the -- if they weren't going to put in any money at all?

(The witness conferred with the interpreter.)

[3/9/2022 9:05 AM] Chen, Hong - 3-09-22

**APP291**

THE INTERPRETER: Counsel, could you please repeat your question?

MR. BRAUN: Sure.

Q   You just said that it was important that the Wall entity was going to put in their own money, correct?

A   Yes.

Q   If the Wall entity was not going to put in any money and it was just going to be -- everything was going to be only the Chinese investors, would you still have invested?

A   No, no.

MR. BRAUN: Let's go off the record at 12:02.

(Whereupon, at 12:02 p.m., a luncheon recess was taken.)

A F T E R N O O N   S E S S I O N

MR. BRAUN: Let's go on the record at 12:38 p.m.

Q   Ms. Chen, you understand that you're still under oath?

A   Yes, I understand.

Q   Walk us through, if you can, who are all the people that you spoke with that are related to Mr. Barton's company, anybody with JMJ?  Who did you speak with?

[3/9/2022 9:05 AM] Chen, Hong - 3-09-22

**APP292**

PROOFREADER'S CERTIFICATE

In The Matter of:   JMJ HOLDINGS

Witness:            Hong Chen

File No.            FW-04420-A

Date:               Wednesday, March 9, 2022

Location:           Fort Worth, TX

This is to certify that I, Maria E. Paulsen, (the undersigned), do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.

_____          3/16/2022

(Proofreader's Name)                      (Date)

APP293

CERTIFICATION

I, NICOLE WEXLER, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness(es) whose testimony is herein before set forth, was duly sworn by me; and

THAT the within transcript is a true and accurate record of the testimony given by said witness(es).

I further certify that I am not related either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of March 2022.

_____Nicole Wexler_____

NICOLE WEXLER

1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION:

In the Matter of:    )

                     ) File No.  FW-04420-A

JMJ HOLDINGS, LLC    )


WITNESS:  Yun Sun

PAGES:    1 through 52

PLACE:    Securities and Exchange Commission

          801 Cherry Street, Suite 1900

          Fort Worth, Texas 76102

DATE:     Tuesday, March 15, 2022


     The above-entitled matter came on for hearing via

Webex, pursuant to notice, at 1:22 p.m. Central Time.

                Diversified Reporting Services, Inc.

                        (202) 467-9200

**EXHIBIT**

**26**

          [3/15/2022 1:22 PM] Sun, Yun - 3-15-22

**APP295**

2

APPEARANCES:


On behalf of the Securities and Exchange Commission:

JASON BRAUN, ESQ.

JAMIE HAUSSECKER, STAFF PARALEGAL

Division of Enforcement

Securities and Exchange Commission

Fort Worth Regional Office

801 Cherry Street, Suite 1900

Fort Worth, Texas 76102

(817) 900-2639

braunj@sec.gov


On behalf of the Witness:

WILLIAM A. PIGG, ESQ.

CHARLES WOODS, ESQ.

9638 Greenville Avenue

Dallas, Texas 75243

clwoods@pigglawfirm.com


Also Present:

Ping Chen, Mandarin Interpreter

3

C O N T E N T S

WITNESS:                                        EXAMINATION

Sun Yun                                              5

EXHIBITS:        DESCRIPTION                    IDENTIFIED

 1              Form 1662                            7

 158            E-mail                               31

 185            Wall 16 investment documents       15

 186            Wall 17 investment documents       25

 187            Wall 18 investment documents       27

**APP297**

4

P R O C E E D I N G S

MR. BRAUN:  Let's go on the record at 1:22 p.m. on March 15th, 2022.

Ms. Sun, before we begin I want to go over a few protocols that were agreed upon by you and your counsel for today's testimony.

MS. CHEN:  Okay.

MR. BRAUN:  You and your counsel understand and agree that the oath or affirmation to tell the truth will be administered by audio-visual means rather than in person, but will have the same effect as if administered in person.

MS. CHEN:  Yes.

MR. PIGG:  Agreed.

MR. BRAUN:  And you and your counsel agree that neither of you, nor any party under your control, will make a recording of your testimony whether through the Webex system or with a separate device.

MS. CHEN:  Yes, I agree.

MR. PIGG:  Agreed.

MR. BRAUN:  And you and your counsel agree that you will not copy, print, save, screen shot or reproduce any portions of any exhibit.

MS. CHEN:  Yes, that's my obligation.

MR. PIGG:  Agreed.

MR. BRAUN:  Would you please raise your right hand.

Do you swear to tell the truth, the whole truth and nothing but the truth?

MS. CHEN:  Yes.  I will tell all the truth that I know.

Whereupon,

YUN SUN

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BRAUN:

Q   Okay.  And you can put your hand down.

Do you understand that you'll remain under oath throughout these proceedings today?

A   Understood.

Q   Would you please state and spell your full name for the record?

A   My name -- my family name is S-U-N. My given name is Y-U-N.  So, my full name is Sun Yun, S-U-N, Y-U-N.

Q   And, Ms. Sun, my understanding is that

6

you do not understand or speak or read in the English language; is that correct?

A   Yes.  Except the very simple English like hello.  I cannot speak or understand what I hear in -- for whole sentence.

Q   And because of that we have a translator here today that you've met.  And she will translate anything I say to you.  And then I'll wait for her to translate and then I'll wait for you to give her your answer and for her to translate it back to me and that's how it will work today on these questions and answers.

A   Okay.  Understood.

Q   Ms. Sun, my name is Jason Braun. Also attending this testimony via the Webex is paralegal Jamie Haussecker.  We are both Officers of the Commission for the purposes of this proceeding.

A   Thank you.

Q   The other -- yeah.

And the other -- the other woman that you see on the screen is our court reporter, Shaunna, who will be taking down everything we say today, okay?

A   Okay.

[3/15/2022 1:22 PM] Sun, Yun - 3-15-22

23

A   Okay.

Q   The agreement for Wall 16 provides that the loans and the additional loans shall be used to acquire 160 acres located in Fort Worth ETJ, Parker County, State of Texas.

MR. BRAUN:  Is she -- can you read that to her please.

A   I see it now.

MR. BRAUN:  And was it her --

Q   Was it your understanding that the -- your money and the other Chinese investors' money was only supposed to be used to purchase that 160 acres in Fort Worth, Texas?

A   Yes.

Q   Would you have invested in the Wall 16 entity if you knew that your money would be used to pay personal expenses that were unrelated to the purchase of the property?

A   Of course not.

Q   Would you have invested if you knew that your money was going to be used for anything other than the purchase of the property in Fort Worth, Texas?

A   No.

Q   Were you ever told that some of your

[3/15/2022 1:22 PM] Sun, Yun - 3-15-22

24

money would be used to pay commissions to people?

A    No.

MR. BRAUN:  So, her understanding was that 100 percent of her money was going to be going toward the purchase of that property?

A    Yes.

Q    Okay.  I've -- I've scrolled down on the screen to page six of the agreement for Wall 16 which is contained in Exhibit 185.  And do you see this section 5.7 Guarantee where it states that, JMJ Holdings, as guarantor, hereby provides a corporate guarantee up to the principal loan amount in the event of default by borrower?

A    I see it now.

Q    Was the fact that JMJ Holdings guaranteed or purported to -- strike that.

MR. BRAUN:  Was the fact that this guarantee is in the Wall 16 agreement an important factor for her decision to invest?

A    To be honest, I didn't pay attention to this paragraph.  I see it now.

Q    And on -- I'm on page eight of the Wall 16 agreement Exhibit 185.  Is this your signature?

A    Yes.

26

A    I see it now.

Q    And the -- it states that the property has a purchase price of $11 million and the balance of funds will be provided by borrower. Do you see that?

A    Yes.

Q    And was it your understanding that your investment and all the other money from the Chinese investors was supposed to only be used to purchase that 100 -- that 200 acres in Forney?

A    Yes.

Q    Would you have invested in the Wall 17 investment if you knew that your money would be used to pay for something other than the purchase of the 200 acres in Forney?

A    No.

Q    And just like with Wall 16, is it true that you were not told about commissions that would be paid to anybody?

A    Right.

Q    And your understanding was that 100 percent of your $100,000.00 investment was going to only be used to acquire this 200 acres in Forney?

A    Of course.

30

to sign it.

MR. BRAUN:  Did she ever see any presentations about the Wall entities?

A    Before I signed Wall 16 and Wall 17 I never saw any presentations because I signed Wall 16 in September 2018.  I signed Wall 17 in November 2018.  It was in December 2018 when I attended the annual meeting in Hangzhou City I saw the presentation during that conference.

MR. BRAUN:  And did -- was that presentation that she saw, was it for Wall 18?

A    I don't think it was just about Wall 18.  It was introduction about the Wall series project including 009, 010, 011.  And they updated us the status of all the ongoing projects.

Q    Ms. Sun, how old are you?

A    I am 58 years old.

Q    58 or 68?

MS. CHEN:  Five, eight.

MR. BRAUN:  Five, eight.

Is she retired now?

A    Yes.

MR. BRAUN:  And what did she do for a living before retiring?

31

A    Before I retired I worked at the China Post Office in charge of the PMS Express Service.

Q    What percentage of your savings was this $300,000.00 that you invested in Wall 16, 17 and 18?

A    I think it's between 30 percent and 40 percent.

MR. BRAUN:  Okay.  Let's go off the record at 2:52 p.m.

(A brief recess was taken.)

MR. BRAUN:  Let's go back on the record at 3:27 p.m.

BY MR. BRAUN:

Q    Ms. Sun, we were just off the record for a little bit to resolve some tech issues.  Do you understand you're still under oath?

A    Yes.

(SEC Exhibit No. 158 was marked for identification.)

Q    Okay.  I'm showing you what's been previously marked as Exhibit 158.  Do you recognize this e-mail and its attachment?

So, this is the cover e-mail here on the first page and then this is the attachment to it.

and Wall 17.  The first time I met with him was in December 2018.  And the rest two times that I met with him was in Dallas.  And those two meetings were between April the 2nd and the 6th in 2019.

Q    Okay.  Okay.

MR. BRAUN:  So, she met Mr. Barton after she invested in Wall 16 and 17, but before Wall 18, correct?

A    Right.

Q    Okay.

MR. BRAUN:  And when was -- when was the first time that she met him?

A    It was in December 2018.  And I met him during the annual conference which was held in Hangzhou City, H-A-N-G-Z-H-O-U.

Q    And that was an annual conference for -- for Platinum Investment Corporation, the investors?

A    So, it was the annual meeting held by Yding Company.  So, in China usually some companies would held kind of annual company at the beginning of one year to thank their clients for work they did in the previous year or they would hold such a kind of meeting at the end of

34

one year to thank their clients for -- for that current year. It was held by Yding -- Yding Company, but I don't know if it was -- has any relationship with Platinum Investment Corporation. It was later on Mr. Fu told us that they have a company formed in the United States.

Q   So, Mr. Barton was at this annual meeting?

A   Yes.

Q   Was Mr. Wall at the meeting?

A   Wall was not in this meeting, but to my knowledge, Mr. Wall attended an annual meeting which was held in Beijing in January 2019. I did not attend that meeting in Beijing.

Q   What did Mr. Barton -- well, let me back it up.

MR. BRAUN:  Did she actually talk to Mr. Barton or did she just see him when he was giving a presentation?

A   I just saw him during the presentation because my English is poor. So, I did not have any direct conversation with him.

Q   Was -- was -- was what Mr. Barton saying translated into Mandarin?

A   Yes. It was translated by Michael Fu.

[3/15/2022 1:22 PM] Sun, Yun - 3-15-22

**APP307**

35

Q   Did Mr. Barton make any statements about the safety of the investments?

A   Yes.  He said that all the operations of the projects will handled normally and their communications with the government agents were also very smoothful.  So, everything was going forward okay.

Q   Did he make any -- did Mr. Barton make any statements -- well, strike that.

MR. BRAUN:  When -- earlier in her testimony she said that the Yding salesperson had told her things like the investment was safe, that it was low risk, things like that.  And I want to find out, did Mr. Barton make statements about the -- how safe and -- and how the investments weren't risky?

A   Mr. Barton mainly focus on how smooth the projects were conducted and everything was on the right track.  Either had been Michael Fu and Weili Jiang who emphasized the safety and low risk of the investments.

Q   And -- okay.  And tell me again the exact date for that presentation in -- in Hangzhou where -- the meeting where Mr. Barton was?

36

A    I do not remember the exact date because it has been such a long time, but it was in December 2018.

Q    So, Mr. Barton talked about the -- that all of the various Wall entities were moving along smoothly and there weren't any problems; is that fair?

A    Yes.  He -- he did say that.  He didn't say anything about any issues that our -- our investment may have and that -- he also didn't mention any problems that the -- the projects may be going through.  And during that conference they -- he -- they -- they were promoting the Wall 19 project.

MR. BRAUN:  Let's go off the record at 3:42 p.m.

(A brief recess was taken.)

MR. BRAUN:  Let's go back on the record at 3:51 p.m.

BY MR. BRAUN:

Q    We just took a brief break.  You understand you're still under oath, Ms. Sun?

A    Yes, I know it.

Q    When was the next -- so, the first time that you met Mr. Barton was at the annual

[3/15/2022 1:22 PM] Sun, Yun - 3-15-22

**APP309**

PROOFREADER'S CERTIFICATE

In The Matter of:    JMJ HOLDINGS, LLC

Witness:    Yun Sun

File No.    FW-04420-A

Date:    Tuesday, March 15, 2022

Location:    Fort Worth, TX

        This is to certify that I, Maria E. Paulsen, (the undersigned), do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.

3/21/2022

(Proofreader's Name)        (Date)

APP310

# C E R T I F I C A T E

I, SHAUNNA H. MORAN, a Certified Shorthand Reporter of the State of New Jersey, a Registered Professional Reporter, and Notary Public of the States of New York, New Jersey and The District of Columbia, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

SHAUNNA H. MORAN, C.S.R.
Certified Shorthand Reporter
License No. X100213700

**APP311**

TRIGILD IVI

# DAVID WALLACE
*Chief Operating Officer and General Counsel*

(O) 858.242.1197
(C) 214.789-9424
**david.wallace@trigild.com**

David Wallace, J.D., Chief Operating Officer and General Counsel, oversees Trigild's day-to-day operations and corporate legal matters and serves as one of the firm's principal receivers. Federal and state courts throughout the country have appointed Wallace as receiver over all types of commercial properties, including offices, malls, shopping centers, apartments, hotels, and SFR housing portfolios. Wallace is also an approved fiduciary in the State of New York.

In addition to his receivership work, Wallace has led Trigild in the resolution of several large bankruptcy cases with claims exceeding $30 million, including his appointment as a Chapter 11 Trustee in the Eastern District of Texas. Wallace has successfully prosecuted dozens of fraudulent transfer claims, recovering millions of dollars for rightful creditors. As the lead in a Chapter 11 liquidation, Wallace administered claims against the estate, obtained exit financing for the debtor, and liquidated more than 30 assets on behalf of the Liquidating Trust.

Wallace began his legal career as an attorney practicing at an AmLaw 100 law firm where he represented a broad range of clients in both litigation and transactional matters. Wallace represented several master and special servicers in connection with CMBS loan transactions and workouts. Additional clients included pharmaceutical and device manufacturers, banks, oil and gas companies, and other Fortune 500 companies across an array of industries.

Wallace received his J.D. from the Southern Methodist University Dedman School of Law where he graduated cum laude, and he received a B.B.A. from Texas Christian University where he was the Outstanding Scholar Athlete Award winner.

## REPRESENTATIVE MATTERS
- Led team in Chapter 11 Liquidation Plan with $70 million in claims, recovering over 60% for unsecured creditors
- Chapter 11 and Liquidating Trustee over real estate holding company that liquidated $50+ million in assets
- Led federal equity receivership in recovering more than $60 million for defrauded Ponzi-scheme investors
- Receiver over 550,000 sq. ft. mall
- Receiver representative over portfolio of skilled nursing homes
- Receiver over portfolio of 40+ SFR

## MEMBERSHIPS / ASSOCIATIONS
- Texas State Bar, Member
- National Association of Federal Equity Receivers, Member
- California Receivers Forum, Member
- Turnaround Management Association, Member
- Commercial Real Estate Finance Council, Member

**APP312**

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, Texas 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, California 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, New Jersey 07042
973/226/1950