**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **No. 3:22-CV-2118-X** |
| **TIMOTHY LYNCH BARTON** | § | |
| **CARNEGIE DEVELOPMENT, LLC** | § | **Jury Trial Demanded** |
| **WALL007, LLC** | § | |
| **WALL009, LLC** | § | |
| **WALL010, LLC** | § | |
| **WALL011, LLC** | § | |
| **WALL012, LLC** | § | |
| **WALL016, LLC** | § | |
| **WALL017, LLC** | § | |
| **WALL018, LLC** | § | |
| **WALL019, LLC** | § | |
| **HAOQIANG FU (a/k/a MICHAEL FU)** | § | |
| **STEPHEN T. WALL** | § | |
| | § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC** | § | |
| **LDG001, LLC** | § | |
| | § § | |
| *Relief Defendants.* | § | |

**DEFENDANT BARTON'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EXPEDITED**
<u>**MOTION FOR APPOINTMENT OF RECEIVER AND BRIEF IN SUPPORT**</u>

Defendants Timothy L. Barton, in his capacity and as an officer for those corporations

twelve corporate defendants with which he is associated, Carnegie Development, LLC, Wall007

LLC, Wall009 LLC, Wall010 LLC, Wall011 LLC, Wall012 LLC, Wall016 LLC, Wall017 LLC,

Wall018, LLC, Wall019 LLC, DJD Land Partners, LLC, and LDG001, LLC (the "Relief

Defendants"), file this Response in opposition to Plaintiff Securities and Exchange

- 1 -

Commission's Expedited Motion for Appointment of Receiver ("Receivership Motion" or "Motion") (ECF No. 6). Defendant Timothy Barton further respectfully moves for a stay of this proceeding pending the resolution of the criminal proceeding simultaneously initiated, regarding the same subject matter, by Plaintiff's sister agency, the United States Department of Justice.

## I.    INTRODUCTION

This Court should reject the request of Plaintiffs the Securities and Exchange Commission to appoint a roving receiver with sweeping powers.  The authorities sought by the Commission include the powers to take and sell all the assets of Mr. Barton and any corporation the receiver decides is associated with him and to waive the attorney-client privilege of anything associated with Mr. Barton at will.  *See* Proposed Order [ECF No. 6-1].

The Commission's request is not happening in a vacuum.  The request for a receiver— described by the courts as a "drastic remedy"—comes just three days after the Commission and the Department of Justice launched parallel civil and criminal proceedings against Mr. Barton. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980) (holding that receiverships are a "drastic" measure).  This dramatic coordinated action was punctuated by the FBI and Dallas Police showing up at Mr. Barton's home, at 5am on a Friday morning, to arrest him, without any prior indication of a criminal investigation to Mr. Barton or his counsel.

The Commission's requested receivership remedy is presented to the Court as an urgent emergency, requiring "expedited" treatment and imposition before any discovery or serious adversarial proceedings to establish the operative facts.  The reality of the Commission's investigation shows no such urgency.  Its investigation started two years ago this month.  *See* SEC Investigation Order (Barton App. 006), dated Oct. 8, 2020.  The SEC's core allegation, that subject loan proceeds were used for real estate development projects other than the ones initially indicated, was known early in the investigation.  Yet, the SEC took no action for more than a year, running to this Court only when convenient for the shock and awe initiation of the parallel criminal and civil remedies.  There is substantial risk that the Commission's request is nothing more than an effort to force an early defense against the Government's fraud allegations,

imperiling his criminal procedural rights on pain of otherwise losing all of his assets and financial ability to defend himself against the criminal charges. Courts have recognized this peril before, and the Plaintiff's inexcusably delayed request should be viewed with extreme skepticism.

Contrary to the Plaintiff's incorrect assertion of the legal standard for imposing a pretrial receiver, the Plaintiff must show that fraud occurred and that a receiver is *necessary* to stop the flight of assets that are otherwise required to compensate alleged victims. The Commission has not made that showing here. With regard to its required showing of fraud, the Commission alleges that Mr. Barton deceived lenders to divert loan proceeds to real estate development projects other than the ones originally identified to the lenders. The Commission omits from its account, however, that Mr. Barton took action to advance those original projects, confronted obstacles (common in development) that made finishing those projects infeasible, offered to return the funds, and was instructed by the contractual agent of the lenders (Michael Fu) to deploy them to alternative and feasible projects. When this happened, loan documentation gave the lenders recourse against the corporate entity supervising those alternative projects. The Plaintiff also omits extensive efforts in 2019 to send funds back to lenders' accounts in China, which were blocked by Mr. Fu's refusal to provide the identification and account information necessary to withhold taxes and to avoid money laundering risks as required by U.S. law. These efforts involved soliciting the help of current and former U.S. Government official. All these facts are inconvenient for the Commission's assertion of fraud, and the Commission deals with none of them in its motion seeking a quick finding of the fraud necessary for appointing a receiver.

The Commission also must show an imminent risk of the flight of assets that are otherwise necessary to pay back, in this case, the lenders.  The Plaintiff has not done so.  This is not a situation with liquid assets that are easy to move.  As the Commission's own motion alleges, loan proceeds have been deployed for alternative *real estate* projects with stationary assets that are subject to public recordation and monitoring.  Indeed, the SEC has identified real estate assets in its motion more than sufficient to pay back lender principal and interest.  At the same time, transferring title and control of assets to a receiver would disrupt time-sensitive development steps in projects to which the Wall Entities loan proceeds are directly related, destroying value in those projects.   The Court is required to balance the risks and costs of a receivership with its benefits.  *See Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).  Here, a receivership is a greater threat to the value of existing assets and their ability to repay subject lenders than any benefit it might provide to the parties, the lenders, and the Court.

What the receivership is certain to do is to hamper Mr. Barton's ability to fund his defense against parallel criminal proceedings, making the same allegations and threatening his liberty.  This civil proceeding, including the premature effort to lock up all Mr. Barton's assets represented by the instant motion, should be stayed and the Defendant's cross motion to do so should be granted.  Courts have recognized that basic principle of due process and fairness counsel in favor of a stay of government civil proceedings when parallel criminal proceedings are initiated.  *See, e.g., United States v. Pinnacle Quest Int'l*, No. 3:08-CV-136-RV-EMT, 2008 WL 4274498, at *2 (N.D. Fla. Sept. 11, 2008).

In the event that the Court is entertaining a potential receivership-like remedy, and it should not, the Court should instead consider instead appointing a monitor for certain corporate entities. A Court-appointed monitor would have to approve certain decisions affecting corporate

assets, such as the sale or transfer of assets, but this structure would permit the development team remain in place, to see the projects to fruition, and to ensure that the value of the subject assets is maximized.

## II.    BACKGROUND

Timothy Lynch Barton is a well-known real estate developer in Dallas, who has overseen a number of successful developments throughout his career.  He and the various companies that he oversees have been responsible for, among other projects, the Frisco Bridges development that contributed greatly to growth in Frisco, Texas.

From 2017 to 2019, Mr. Barton was working on a number of real estate development projects across Texas, in which he and his team did mostly pre-development entitlement, zoning, and utility work, while another developer (Stephen Wall) would construct homes on the lots. Aspects of these projects were funded by loans arranged by Michael Fu, a Chinese national with deep connections abroad.  Mr. Fu in the loan agreements signed by the lenders was appointed as the representative of the lenders to the projects.  As explained below, the original projects encountered permitting and logistical problems making their completion economically infeasible. When the lenders' representative was informed of these obstacles, the representative instructed the development team to deploy those loan proceeds into alternative and available real estate development projects that appeared to be feasible.

In October 2020, the Securities and Exchange Commission initiated an investigation into these loans and the use of loan proceeds.  Mr. Barton sat for a transcribed interview in that proceeding.  That loan proceeds were deployed into alternative real estate projects was known from the earliest phases of the investigation.

Mr. Barton was arrested by the Federal Bureau of Investigation at his home at 5:00 a.m. on Friday, September 23. The Department of Justice had unsealed a nine-count criminal indictment, making allegations of fraud almost identical to the Plaintiff's civil suit filed the same day. That criminal case is pending before Judge Kinkeade of this district. *See* Criminal Case No. 3:22-cr-352. Days later, the SEC filed the present Receivership Motion, in which they sought extraordinary pretrial relief in the form of a receivership, that was intended to encompass essentially everything that Mr. Barton owned as well all assets of the development companies that he managed. This was a blatant and surprise two-front attack by the civil and criminal service arms of the government, with a clear goal of depriving Mr. Barton of all of his property, assets, and money, thereby rendering him unable to manage his businesses and fund a proper legal defense to the baseless claims against him.

The Receivership Motion itself is propped up on unsupported summaries or excerpts of documents and transcripts, which often rely on incompletely detailed or analytically inappropriate inferences. Underscoring these evidentiary issues, the SEC has not provided complete copies of the documents that it excerpts or the data supporting its conclusory analysis on various points. All the while, the parallel actions of the Department of Justice prevent Mr. Barton from testifying at the risk of prematurely waiving his Fifth Amendment privilege against self-incrimination. Many of the other witnesses with relevant knowledge who could assist in defending the SEC's threadbare evidentiary citations are tied up with coordinated criminal investigatory assaults by the government.

With heavy objection to the nature and fairness in the surprise assault made by the SEC on Mr. Barton's livelihood and property rights through its Motion, the Mr. Barton submits this

response in his personal capacity and on behalf of 12 corporate defendants in his capacity as an officer of those corporations.

### III.    LEGAL STANDARD

Plaintiff's Motion seeks to have this Court enter a receivership over at least 12 different corporate Defendants under Section 21(d)(5) of the Exchange Act, which authorizes "equitable relief" only when "appropriate or necessary." *See* Mot. at 12 (citing 15 U.S.C. § 78u(d)(5)). The imposition of a receivership, however, is a "drastic measure" that is not appropriate or necessary in every case where the SEC alleges violations of the Securities Exchange Act or fraud. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (holding that receivership is "an extraordinary remedy that should be employed with the utmost caution"). Receiverships are designed by their nature to "interfere seriously with a defendant's property rights by ousting it from control and even possession." *SEC v. Republic Nat. Life Ins. Co.*, 378 F. Supp. 430, 437 (S.D.N.Y. 1974); *see also SEC v. Petrofunds, Inc.*, 414 F. Supp. 1191, 1198 (S.D.N.Y. 1976) (denying receivership in light of its potential "disastrous" effect on defendants). Thus, prior to ordering the extraordinary remedy of a receivership, courts must undertake careful consideration whether the evidence supports findings of fraud, the risk of future dissipation of assets in the absence of a receivership, the receivership's likely effect on the Defendants' business interests and ability to defend themselves, and the availability of less intrusive alternatives to a receivership. *See Sec. & Exch. Comm'n v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980); *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).

As a threshold requirement to seek a receivership, the SEC must make a "prima facie showing of fraud and mismanagement." *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 438 (5th

Cir. 1981).  *But see SEC v. AmeriFirst Funding, Inc.*, No. CIV A 307-CV-1188-D, 2007 WL 2192632, at *2 (N.D. Tex. July 31, 2007) (Fitzwater, J.) ("All factual findings in this memorandum opinion are based on a preponderance of the evidence.").  But this showing alone does not support the imposition of the requested receivership relief. The Fifth Circuit has held that receiverships are justified only when there is a clear necessity to protect a party's interest in certain property, there are no other adequate legal or less drastic equitable remedies available, and the benefits of receivership outweigh its burden on the affected defendants.  *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012); *see also SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980) (holding that the "detrimental business effects of [a receivership] should be carefully considered" before ordering such drastic relief).  District courts in the Northern District of Texas have similarly considered: (1) the validity of the claims by the party seeking receivership; (2) the probability that a plaintiff's claim will be frustrated by fraudulent conduct that has occurred or will occur; (3) imminent danger that property will be lost, concealed, or diminished in value; and (4) facts suggesting that a receiver will do more harm than good.  *See Kimmis v. Atchley*, No. 3:10-CV-1535-D, 2014 WL 6805478, at *2 (N.D. Tex. Dec. 3, 2014) (Fitzwater, J.); *see also U.S. SEC v. Quan*, No. CIV. 11-723 ADM JSM, 2011 WL 1667985, at *8 (D. Minn. May 3, 2011) ("[T]he Court is not persuaded of the likelihood that a receiver would do more good than harm, and the request to appoint a receiver over ABRG is denied.");  *SEC v. Phillip A. Michael Sec., Inc.*, No. 74 CIV. 2158, 1974 WL 416, at *2 (S.D.N.Y. June 26, 1974) (finding that the effect of the SEC's proposed receivership would be punitive of past security violations, rather than remedial in purpose).

In an effort to minimize the showing it must make to seek a receivership, the SEC's Motion discusses none of the factors encompassing the analysis that courts must make in

determining whether a receivership is appropriate or necessary. *See* 15 U.S.C. § 78u(d)(5) (requiring equitable relief to be "appropriate or necessary"). The SEC instead relies on quotes from out-of-jurisdiction decisions and citations to factually-distinguishable district court orders as the basis to craft justifications for the relief it seeks.[1]   But here, SEC has a burden to establish a valid claim, a clear necessity to seize the Barton Defendants' property through a pre-judgment receivership, and that the benefits of the proposed receivership do not outweigh its burden.

Here, the SEC has not met this standard in light of the extraordinary harm that would be opposed on the livelihood of the Barton Defendants, who are innocent of the civil charges against them.

## IV.    RESPONSE ARGUMENT & AUTHORITIES

### A.    The Motion's Summary Account of Plaintiff's Securities Fraud Allegations Omits Significant Key Facts and Falls Short of the Evidentiary Showing Necessary for a Receivership

According to the SEC, a receivership is warranted as the beginning of the civil process to punish Defendant Barton for alleged securities fraud.   *See* Mot. [ECF No. 6]; *see generally* Proposed Order Appointing Receiver [ECF No. 6-1] at 2 (basis of order to be "penalizing past unlawful conduct"). That analysis is putting the cart before the horse.  The SEC has no authority to seek, and the Court has no authority to order, a receivership in the first days of civil case as a

---

[1] Even brief examinations of the Texas district court cases cited by the SEC reveal stark differences with the factual considerations at issue here.  The present Receivership Motion is not focused on cash assets, *SEC v. Harris*, No. 3:09-CV-1809-B, 2010 WL 11617972, at *4 (N.D. Tex. June 24, 2010) (appointing a receiver because of the "ease with which cash assets can be hidden or dissipated"), a temporary receiver who has already identified "unwarranted or improper expenditures" leading to a "shortfall" in the millions, *SEC v. AmeriFirst Funding, Inc.*, No. CIV A 307-CV-1188-D, 2007 WL 2192632, at *2 (N.D. Tex. July 31, 2007), substantial evidence including the defendant's *concession* of losses, *SEC. v. Evolution Cap. Advisors, LLC*, 866 F. Supp. 2d 661, 674 (S.D. Tex. 2011), or defendants resisting receivership based on seemingly nothing more than the fact of a parallel bankruptcy.  *SEC. v. Tyler*, No. CIV.A.3:02 CV 0282 P, 2002 WL 32538418, at *8 (N.D. Tex. Feb. 21, 2002).

mechanism to *punish* a defendant for alleged securities fraud. Instead, the sole legitimate purpose for an early stage receiver sought here would be to secure assets that are necessary to pay back investors and that are otherwise likely to be stolen, and only if the SEC shows that securities fraud has occurred. The Plaintiff's motion has not assembled the evidence necessary to meet this requirement.

The Plaintiff's account of the facts, to support its claims of fraud, omits significant events that cast substantial doubt on its claims that fraud occurred. First, the SEC claims that Mr. Barton committed fraud by using loan proceeds in a particular Wall corporate entity, for a project or projects that were not the originally identified use of the funds. As an initial matter, the SEC submits absolutely no evidence that either Mr. Barton or anyone else intended at the time it entered into any loan agreement to use loan proceeds for the a project other than the one specified in that agreement. Nor did the loan agreements provide the lender with a security interest in or lien the particular project or property associated with the corporate entity in question, such that deploying the loan proceeds to an alternative, productive real estate project use would have affected the collateral used the secure the loan. *See, e.g.,* Agency and Loan Agreement (SEC App. 038) § 5.6.

In any event, Plaintiff's account completely leaves out the role of Michael Fu *as representative and agent of the lenders*. In each loan document, Michael Fu and his company, Platinum Investment Corporation, was set up as the official representative of the lender to make all decisions on its behalf. The evidence will show that the development team had every intention of pursuing to completion each of the real estate projects identified in the loan agreements when those agreements were made. But, as often happens in real estate development, some of the intended projects later encountered insurmountable obstacles that

made acquiring the subject land and completing the development economically infeasible.  These obstacles ranged from denial of permission to convert a golf course into residences to the economic infeasibility of building bridges into a property that were later required by government transportation officials.   When these obstacles were encountered, Michael Fu was informed and given the option to have the funds returned to the original lenders.  Mr. Fu rejected this option, instructing on the lender's behalf that the funds be rolled over into another pending real estate development project available to Mr. Barton.  *See, e.g.,* Barton Dep. 350:2-17 (SEC App. 253). When that happened, loans from the relevant Wall entities to other development entities were made and documented, giving the lender recourse against the assets of the alternative development project.  This course of events does not reflect fraud; it instead shows a real estate development team dealing with risks and events that often occur in the course of real estate development projects, particularly the early stage projects into which the Wall loans were made.

As a separate theory, the SEC contends that loan documents stated false purchase prices for properties that were to be acquired by the Wall entities.  To support this claim, the SEC cites one loan document, from February 7, 2017, which provides that funds would be used by the Wall 10, LLC, to purchase property "for residential lot development" at the price of $2,950,000.  *See* Mot. at 9 (citing SEC App. 42).  The SEC goes on to posit that this statement must be untrue because a non-Wall entity—JMJ Acquisitions, LLC—had *previously* purchased the raw acreage four months earlier for $1,577,125.  *See* Mot. at 9 (citing SEC App. 219 & 226).  There is an analytical gap in this evidentiary theory.   As reflected, the SEC attempts to conflate the acquisition price by JMJ during a prior transaction with the subsequent purchase acquisition by the Wall 10, LLC for residential development.   The SEC also makes no mention of the significant expense and work in the interim periods to obtain pre-development entitlement,

zoning, road, or utility work, and the resulting significant increase to the property's value at the time of sale into the corporate entity.  The evidence will show that the increase in appraised value made through pre-development investment is routine in real estate development, hardly an indication of fraud.  These facts are important, yet summarily disregarded in the SEC's Motion.

Importantly, none of the SEC's unsubstantiated claim theories, based on misleading or incomplete recitations of the evidence, should justify the extraordinary remedy of ordering a receiver over all of the 12 Barton Defendants and their personal assets.  At a minimum, the Barton Defendants should be provided with the opportunity of an evidentiary hearing to show that the "ready, fire, then aim" exercise of the SEC has not been completely forthcoming.

**B.    The SEC Has Not Established That a Receivership Is Necessary to Address an Imminent and Substantial Risk of Asset Flight**

**1. The SEC Does Not Present Detailed and Credible Evidence That Significant Amounts of Loan Proceeds Have Been Diverted to Mr. Barton's Personal Use**

The Plaintiff's principal contention is that Mr. Barton participated in efforts to put loan proceeds to work in real estate projects other than those originally identified to the lender.  The premise underneath the contention is that loan proceeds are investments in ongoing *real estate* projects.  Real estate is different than bearer bonds or transferrable securities that have a tendency to walk.  Real estate is stationary; it is not going anywhere, and the assets are identified on the face of the Plaintiff's motion.  Transferring effective ownership and control of those real estate assets to a receiver, and significantly interfering with the property rights that surround them, is not justified by an substantiated concern of asset flight.

The Plaintiff's motion shows a recognition that its allegation that loan proceeds were deployed into alternative hard real estate assets and projects is insufficient to justify a receivership.  Instead, the Plaintiff must show that a risk that assets will be diverted in such a

way that they will be unrecoverable by the Plaintiff in the event that it prevails in this matter and seeks to use this case as a mechanism to compensate lenders. So the Plaintiff asserts that certain loan proceeds were diverted to the personal use of Mr. Barton and his family. This assertion, however, is accompanied with detail of the supposed transactions, much less a sense of the monetary scale of these alleged personal uses. *See, e.g.,* Mot. at 7-8; Hahn Decl. (SEC App. 7) at 7-11. The Plaintiff also does not disclose facts pertaining to this allegation relating to the distributions by JMJ Development LLC, a company that has legitimate reason to pay Mr. Barton personally.

This is important, as the SEC is not alleging that any Wall entity directly paid any personal expense of Mr. Barton. Instead, the silent premise of the SEC's analysis is that loan proceeds made their way into the accounts of other corporate entities and that, those other corporate entities, paid certain personal expenses of Mr. Wall. In short, the Plaintiff's allegations depends on a highly contentious fund tracing exercise in which the details are not provided. The failure of the Plaintiff to show this work, and to allow the parties and the Court to test the accuracy and sufficiency of its tracing analysis, is simply not consistent with the SEC's burden to set forth evidence demonstrating a receiver is necessary to safeguard assets.

Nor does the Plaintiff provide any evidence regarding the magnitude of these alleged personal uses. The Plaintiff is alleging that there is a problem with some $26 million in loan proceeds, but the record does not even contain an assertion that that alleged personal uses exceeded $1 million. And even such an assertion would turn on an argument, which is impossible to evaluate on the current record, that traces the funds from loan proceeds through other companies to the company paying Mr. Barton or his expenses, along with a claim that there was no other way for his development company to do so. In short, the current record does not

establish that a historical pattern of diverting loan proceeds to personal use, much less a risk of future diversion necessary to justify the massive intrusion of a receivership.

### 2. The SEC Omitted from Its Factual Account an Extensive 2019 to Return Funds to Chinese Lenders, Thwarted by Defendant Michael Fu

The evidence will show significant activities have been directed at returning lender funds not absconding with them. Missing from the Plaintiff's account are the significant undertakings in 2019 to return the loan proceeds to the lenders. Mr. Barton made numerous demands on the lenders' agent for the identification and account information necessary to withhold taxes from the remittances that would return the funds. But Mr. Fu refused to provide this information and demanded that all funds be sent directly to the accounts of his company, without withholding of any U.S. taxes. If Mr. Barton complied with this demand, significant questions would be raised regarding anti-money laundering and U.S. tax compliance. In the face of Mr. Fu's refusals and demands, Mr. Barton undertook significant efforts to uncover the lender information Mr. Fu refused to disclose and sent letters and correspondence to the lenders in China in an effort to make arrangements to legally return the funds. The evidence will also show that Mr. Barton sent emissaries to China and Hong Kong to attempt to meet with the actual lenders and secure the return arrangements and even sought the assistance of current and former U.S. Government officials to address the problem. In the meantime, Mr. Barton put these assets to work, in and beyond the originally identified real estate projects, so that they could pay the accruing interest when and if arrangements were finally made to return the funds. The Plaintiff does not disclose these key facts, much less makes effort any effort to square them with its account that a receivership is necessary to ensure that loan proceeds are returned the lenders.

3. **The SEC Makes No Effort to Show a Significant Risk That, Absent a Receiver and in the Event of Finding Liability, There Will Be Insufficient Funds to Compensate the Lenders at Issue in this Case**

In addition, the Plaintiff makes no effort to show that there is risk that Mr. Barton—in the future—will hide or dissipate his corporate or personal assets in a way that risks the compensation of investors. *Cf. SEC v. ABS Manager, LLC*, No. 13CV319-GPC JMA, 2013 WL 1164413, at \*6 (S.D. Cal. Mar. 20, 2013) ("In support of its motion to freeze assets, the SEC has offered no evidence that [the defendant] will likely dissipate his own personal assets or the corporate assets."). Among Mr. Barton's associated corporate assets is a fully self-sufficient $70 million apartment complex. *See also* Hahn Decl. at Ex. B. (App. 17). Those assets are not going anywhere, but the Plaintiff has provided no explanation for why they must be put in receivership in order to ensure the return of an alleged $26 million in loan proceeds, merely a third of the value of those assets.

This case is unlike the SEC's efforts in other cases to impose a receiver in civil enforcements actions, where there is a history of moving massive sums internationally and concealing resources that would pay investors if found. Unlike resolutions where the SEC has successfully sought and imposed a monitor, there are no sordid facts here of the Barton Defendants creating offshore bank accounts in the Caymans, transferring funds to shady or unknown third parties, or undertaking other red flag activities characteristic of asset flight. *See, e.g.* Order Appointing Receiver, *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N (N.D. Tex. Feb. 17, 2009) (appointing a receiver based on showings that, inter alia, over $8 billion was sent to an Antiguan bank and the bank's president failed to appear for testimony after representing that he would appear in the United States); *SEC v. Levine*, 671 F. Supp. 2d 14, 36 (D.D.C. 2009)

(imposing a receivership when the "defendants continu[ally] . . . violate[d] court orders" designed to prevent asset dissipation); *C.F.T.C. v. Lake Shore Asset Mgmt. Ltd.*, No. 07 C 3598, 2007 WL 2915647, at *17 (N.D. Ill. Oct. 4, 2007) (imposing a receivership when the defendants were, inter alia, trying to release assets overseas and refusing to answer questions or provide information about relevant business operations).  Nor has the SEC otherwise attempted to substantiate a risk of any such activities occurring in the future.  As with the apartment assets, Mr. Barton's resources are in real estate and are in plain sight, detailed with the benefit of public property records.

### 4.    A Court-Appointed Receiver Poses a Significant Risk to the Real Estate Asset Value in the Uninterrupted Continuation of Time Sensitive Development Work

The benefits of a receiver must be balanced against the risks and costs that the very existence of a Court-appointed receiver would pose to the value of the assets.  *See Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (requiring an analysis of benefit versus burden prior to the imposition of a receivership).  Here, a receiver would pose a significant threat to the continuity of valuable and ongoing real estate development projects.  The Plaintiff's motion does not attempt account for the destruction of value in this real estate projects that would result from the imposition of the proposed receivership.

Many of the relevant assets are in the midst of comprehensive and late-stage development.  These types of development projects are not ones that can simply be handed over to a new team.  It takes the right party, with history in and knowledge about the Project, to oversee the complex and time-consuming process of bringing entitlements, government permissions, permits, and infrastructure to each property in the development process.  Securing these government permissions and progressing the development activities all will significantly

increase the value of these assets, well beyond the costs of that development work. This is value that would compensate the lenders, from assets against which they have direct recourse, instead of dipping into Mr. Barton's unrelated assets.

Even if a Court-appointed receiver after investigation could get up to speed on the development activities and did decide to continue pursuing them, value would have been lost. That is because many of these projects have time-sensitive milestones that, if not achieved in a timely way, will damage the project and property value.

But one example is the continuing development of property in Venus, Texas, just south of the Dallas Fort Worth metropolitan area. Some of this land was purchased with Wall loan proceeds. All of it is currently under intense development work, including the planning and building of roads, utilities, and other essentials for the commencement of home building. The day-to-day management of this Project includes Mr. Barton and Mr. T. Kirk Wilson, who had no role in arranging or handling of any Wall loan proceeds. *See* Wilson Letter (Barton App. 004-005). Through daily and persistent efforts, Project managers are on the cusp of securing city approval for necessary utilities and other permits to turn the property into a 4,159 building lots. If this approval occurs, the value of the property will increase by $20 to 50 million, against which increased value Wall lenders would have recourse. *See* Wilson Letter (Barton App. 004-005). But even weeks of disruption and delay in these efforts could threaten the chances to secure these approvals and the value that would be available to Wall lenders. Handing these assets over to a receiver, and supplanting the experienced development team, would be precisely the type of severe turbulence that would harm the parties and the lenders, not benefit them.

**5.  The Direct Costs and Threats to the Integrity of the Pending Criminal Case Posed By a Court-Appointed Receiver Outweighs any Benefits**

Again, the benefits of a receiver must be balanced against the risks and costs threatened by a receiver.  *See Netsphere, Inc.*, 703 F.3d at 305.  When the costs and risks of a receiver in addition to the disruption of ongoing, value-generating development proceedings are considered, the balancing test firmly counsels against a receiver's appointment.  As an initial matter, the only thing that can really be guaranteed from a receivership is that existing assets will be drained by the professional and administrative fees associated with the receiver, which can often be exorbitant.  *See, e.g., SEC v. ABS Manager, LLC*, No. 13CV319-GPC JMA, 2013 WL 1164413, at *8 (S.D. Cal. Mar. 20, 2013) ("[A]ppointing a receiver and hiring other professionals to investigate would only further dissipate the assets of the investors. Accordingly, at this time, the Court DENIES Plaintiff's motion for an order appointing a receiver.").  There is good reason why commentators often lament on harmful receivership waste.  *See* Lauren Kyger & Alison Fitzgerald Kodjak, *Majority of funds recovered in Stanford Ponzi scheme spent by receiver*, CTR. FOR PUB. INTEGRITY (Oct. 10, 2013), https://publicintegrity.org/inequality-poverty-opportunity/majority-of-funds-recovered-in-stanford-ponzi-scheme-spent-by-receiver/  ("Unlike the investors, [the SEC-appointed receiver], who has billed from $340 to $400 an hour for his services, is making out quite well. To date, [the receiver] and his team have recovered $234.9 million from the bankrupt Stanford Financial Group and spent more than half the total — approximately $124 million — on personnel and other expenses."); Ted Bunker, *Investors Question Receivership Costs in SEC Fraud Cases*, WALL ST. J. (Oct. 12, 2022), https://www.wsj.com/articles/investors-question-receivership-costs-in-sec-fraud-cases-11665603351 ("The cost of the receiver and her team exceeded $255,000 just for the first two

weeks of their involvement, court filings show."). For these reasons, it is important that the Court not lightly enter a receivership in this case, and certainly not one of the extraordinary breadth requested by the SEC.

Next, the federal Government's decision simultaneously to bring criminal and civil charges against Mr. Barton strongly counsels against the appointment of a receiver *or any other efforts to use this parallel civil proceeding* to make Mr. Barton answer allegations of fraud here, just three weeks later, on pain of losing all his assets. And the parallel criminal proceedings should require a heightened showing of the receivership's necessity, given the significant risk that the receivership could be used to starve the Defendant of the resources necessary to defend himself against a criminal proceedings threatening his liberty and to force a criminal resolution short of trial that is not in the interests of justice. After sitting on an investigation for well over a year, the SEC only questionably now claims to need "emergency" action mere *days* after the U.S. Attorney of the Northern District of Texas filed a separate criminal action against Mr. Barton individually.

The reason for this coordinated attack is clear, as the government seeks to encumber the assets of the receivership defendants through the more lenient measures in the civil process, rather than in the criminal proceedings. But doing so circumvents the protections that the criminal justice system affords defendants. Among other things, the criminal code provides that conditions of pretrial release may not "impose a financial condition that results in the pretrial detention of the person." 18 U.S.C. § 3142(c)(2). Moreover, criminal forfeiture is generally limited to seizing a defendant's property that is involved in the particular counts on which the defendant is convicted. Fed. R. Crim. P. 32.2(b)(1)(A). Even civil judicial forfeiture, which requires no criminal conviction, requires the government to prove in court that the specific

property being forfeited was linked to criminal activity.  18 U.S.C. § 985.  This stands in stark contrast to the SEC's argument here, that they need only make out "a prima facie showing of fraud and mismanagement" to seize everything that Mr. Barton owns. Mot. at 13.  Such a minimized (although incorrect, *see* Section I.A *supra*) recitation by the SEC of what it takes to undermine basic rights of a defendant presents a threat to one of the most fundamental aspects of our law: the presumption of innocence.  While the criminal justice system has built-in protections and hurdles the government must surmount before reaching a defendant's assets, the civil regime the SEC would have this court adopt includes no such thing.  There is no "fundamental fairness [in] allowing a receiver broad powers, even to liquidate an entire corporation, before a jury is even impaneled." Megan Smith, *SEC Receivers and the Presumption of Innocence: The Problem with Parallel Proceedings in Securities Cases and the Ever Increasing Powers of the Receivers*, 11 Hous. Bus. & Tax L.J. 203, 229 (2011).  Even worse, when the Commission seeks to place into receivership entities with no connection to the loans that are the subject of this matter and which constitute a significant portion of Mr. Barton's assets, there is a real risk that he will be suffocated of resources to adequately defend himself from prosecution. If so, "the wound could be deep: wrongful imprisonment." *United States v. Michelle's Lounge*, 126 F.3d 1006, 1008 (7th Cir. 1997) (affirming a district court order releasing civilly forfeited funds to a defendant in a parallel criminal proceeding).

The effort by the SEC to pursue this extraordinary relief presents further unfairness concerns, as the only way that Mr. Barton could fully defend this civil enforcement action, or even the claims that he engaged in fraud that the Plaintiff must establish to obtain a receiver, is if he were to waive his Fifth Amendment privilege against self-incrimination.  Indeed, defending this motion is forcing Mr. Barton into that choice, through the deadlines in a civil proceeding

voluntarily initiated by the same federal Government, before Mr. Barton has been provided any disclosures or discovery from the Department of Justice that would be required before answering criminal charges at trial.   This is not just.   In fact, courts frequently stay civil actions by the government during the pendency of parallel criminal proceedings for this reason, such as would be appropriate here.  *See, e.g., United States v. Pinnacle Quest Int'l*, No. 3:08-CV-136-RV-EMT, 2008 WL 4274498, at *2 (N.D. Fla. Sept. 11, 2008) ("After applying all of the above factors, I easily conclude that a stay is appropriate. . . .  [G]iven the very real potential for a fifth amendment violation, the burden imposed on the defendants is significant."); *Chao v. Fleming*, 498 F. Supp. 2d 1034, 1039 (W.D. Mich. 2007) ("[R]equiring Defendants to choose between asserting their Fifth Amendment rights (thereby subjecting themselves to the very real possibility of adverse inferences) and defending themselves in this action imposes a substantial burden upon Defendants, especially because the government is the real party in interest in both cases . . . ."); *In re Adelphia Commc'ns Sec. Litig.*, No. 02-1781, 2003 WL 22358819, at *3 (E.D. Pa. May 13, 2003) ("If criminal indictments are returned against the civil defendants, then a court should strongly consider staying the civil proceedings until the related criminal proceedings are resolved.").

In sum, the SEC's Receivership Motion appears to be hardly more than a stunning and collective weight on Mr. Barton to deprive him of assets and pressure him into some unattractive resolution.   These efforts should be denied.

**C.    The Duration of the SEC's Investigation and the Absence of Prior Action to Secure Any Defendant Assets Counsel Against the Court Exercising its Equitable Authorities on an Emergency Basis**

This Court should reject assertions by the Plaintiff that appointment of a receiver is an emergency need and the Court should decide this request at the outset of the case, before any

serious inquiry into the facts.  *See* Mot. at 20 (seeking "expedited consideration" because "time is of the essence").  In support of the need for urgent action, the SEC summarily claimed a risk of asset flight and labeled the motion as expedited, with no detail as to any urgent threat to the assets.  *Id.* at 19-20.

The timeline of the SEC's investigation shows that this claimed urgency is false.  The SEC has been investigating this matter *two years*. *See* SEC Investigation Order (Barton App. 006), dated Oct. 8, 2020.  Documents were produced and transcribed interviews were taken, including from Mr. Barton, more than a year ago.  *See* Barton Dep. (SEC App. 229), from May 24, 2021.  The SEC's key allegation is that the Defendant has been using Wall loan proceeds for real estate development projects other than the one originally briefed to the lender.  While the SEC's recitation of that allegation omits any facts regarding the roadblocks encountered on the original projects and the instructions by the lenders agents to put these assets into an alternative use, that these funds were being put to use in alternative projects has been apparent to the SEC since the earliest days of its investigation.  *See* Barton Dep. 345:7-14, 346:4-11, 349:1-350:17; 357:8-24 (SEC App. 250-53), from May 14, 2021.

Nonetheless, the Securities and Exchange Commission took no action to stop deployment of these funds for the alternative projects or otherwise to safeguard the assets.  That inaction simply cannot be squared with the claims of an emergency and the need for expedited treatment claimed in its current motion.  Indeed, any delay in initiating these proceedings and in seeking a receivership is likely due to the Plaintiff's strategic decision to secretly consult with the Department of Justice and to launch simultaneous civil and criminal proceedings in this matter.  Perhaps the lengthy time that coordination took made sense as an Government effort to bring the shock and awe of flashing blue lights outside Mr. Barton's residence at 5am on Friday morning,

with no consultation with counsel or any hint of criminal charges much less civilized arrangements for a surrender, to force an early resolution based on the fear such efforts instilled. But it is no justification for the SEC claiming the need for an expedited proceeding, based on hints of evidence that has not been tested, that would seize a defendant's resources and handicap his ability to defend himself.  At a minimum, the Court should reject the Plaintiff's effort to impose this drastic remedy, on an expedited basis, without discovery, a proper evidentiary hearing, or even an opportunity for the parties and the Court to be fully informed.

Courts have rejected expedited efforts seeking dramatic effects on a party's rights,  when the moving party has sat on its rights.  If there was no emergency during the height of investigation, there is no emergency now—well over a year later.  *Cf.* Wright & Miller 11A FEDERAL PRACTICE AND PROCEDURE § 2946 (3d ed. 2022) ("[U]nnecessary delay . . . may be viewed inconsistent with a claim that plaintiff is suffering great injury or . . . that there is an urgent need for immediate relief [such] that a judgment would be rendered ineffective unless some restraint is imposed on defendant pending an adjudication on the merits."); *see also SEC v. Phillip A. Michael Sec., Inc.*, No. 74 CIV. 2158, 1974 WL 416, at *1 (S.D.N.Y. June 26, 1974) (weighing the SEC's inaction despite knowledge of security violation in connection with denying receivership relief).

Importantly, the SEC is asking the Court to exercise its equitable authorities to impose a receiver.  *See* 15 U.S.C.A. § 78u(d)(5) (requiring that equitable relief be "*appropriate or necessary* for the benefit of investors." (emphasis added)); *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (holding that receiverships are justified only when there is a clear necessity to protect a party's interest in certain property).  Here, the SEC's long knowledge of its key allegation and failure to establish facts requiring urgent action now, as opposed the year-and-

a-half it has been sitting on this claim, is ample reason to reject the SEC's request to appoint a receiver, in this setting and through these truncated procedures in which the factual basis for Plaintiff's request cannot be thoroughly tested.

**D.    A Court-Appointed Monitor Would Secure the Lender Protection Sought by the SEC Without Devastating the Barton Defendants' Livelihood**

Notwithstanding the Barton Defendants' disagreement regarding a need for pre-litigation equitable relief, there are much less burdensome alternatives than receivership that will achieve the protection purportedly sought by SEC. *See Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (holding that a receivership is only appropriate when there are no other adequate legal or less drastic equitable remedies available). The most tenable and effective option would be the Court appointing an independent monitor who would have to approve major decisions of specified corporate entities (such as the sale or transfer of assets) that would present any risk of future dissipation of assets. At the same time, Mr. Barton and his development team would be allowed to continue to drive the development process and the creation of asset value for the affected lenders while these proceedings are pending.

In such circumstances, a monitor should be imposed only on those corporate entities in direct possession of Wall loan proceeds and where development work with those proceeds continues. The Court should hold an evidentiary hearing to determine which corporate entities satisfy these criteria.

This remedy—without disrupting the ongoing, project-specific expertise of the Barton team in their development of the properties—will ensure that all major financial decisions are validated, require that real property assets be frozen unless transferred with authorization from the monitor, and resolve the SEC's concerns regarding the dissipation of assets. The use of such less burdensome measures is favored. *See Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir.

2012); *see also SEC v. Quan*, No. CIV. 11-723 ADM JSM, 2011 WL 1667985, at *8 (D. Minn. May 3, 2011) ("However, given the asset freeze over the Settlement Proceeds, there is no imminent danger that property held by Acorn 'will be concealed, lost, or diminished in value.' . . . [T]he Court is not persuaded of the likelihood that a receiver would do more good than harm, and the request to appoint a receiver over ABRG is denied.").

**E.    The SEC's Proposed Receivership Order Is Impermissibly Vague and Overreaching**

In the event the Court were inclined to appoint a receiver in this matter, it should reject the terms of the Plaintiff's proposed order.  *See* Proposed Order [ECF No. 6-1].  The terms of the SEC's proposed receivership order are stunningly overreaching.

As it stands, the draft order would allow the new third-party receiver to seize management and control over all real property, financials, and other assets for over 12 entity Defendants, 17 other identified non-party entities who have received no notice of this lawsuit to date, and any other company that is arguably "directly or indirectly control[led]" by Tim Barton. *See id.* at ¶ 1.  The SEC has laid no factual basis for why these roving authorities are necessary, as is required by the Securities Exchange Act and governing precedent before providing any requested power to a receiver.

Paragraph 36 of the proposed order is also completely unjustified.  This paragraph, if entered, would authorize the receiver, without needing any additional court permission, to "transfer, compromise, or otherwise dispose" of any of non-realty property or other assets owned by the Mr. Barton.  Read to its literal conclusion, this means the receiver could start his first day by walking into Mr. Barton's offices, kicking him to the road, and selling all of his belongings. In reality, the SEC does not need, and frankly cannot be given, any right to liquidate the

Defendants' property during the pendency of this lawsuit, absent any final finding of wrongdoing proportionate to such liquidation.

Another problematic example is paragraph 43, which would allow the receiver to unilaterally waive the Barton Defendants' attorney-client privilege.  This right does not even make sense.  By implication, the paragraph arguably would take away Mr. Barton's right, as a company agent, to independently exercise this legal privilege and open the floodgates for the SEC to destroy the confidentiality between lawyer and client.  For a Government agency to come in on week three, and seek the appointment of a third party (not even a judge) with the power to force a waiver of the attorney-client privilege, amidst Commission and criminal prosecutor efforts to gather facts to support their parallel civil and criminal cases, is a direct attack on the structure of the civil and criminal justice systems.  *See Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (holding as part of criminal investigation matter that "[t]he attorney-client privilege is one of the oldest recognized privileges for confidential communications," so much so that it "survives the death of the client").

These are just initial examples.  But the point is clear: the Court should not grant the SEC's proposed receivership order as submitted.

## V.    CROSS-MOTION TO STAY PROCEEDINGS

This Court should stay the instant proceedings—including the instant undercooked receivership motion seeking to force the Defendant to answer effectively the same allegations in the criminal case on pain of losing all his assets—pending the outcome of Defendant Barton's related criminal prosecution.  It is within this Court's discretion to do so, *United States v. Little Al*, 712 F.2d 133, 136 (5th Cir.1983), and this case presents the hallmark "special circumstances [that] warrant a stay." *Heller Healthcare Fin., Inc. v. Boyes*, 2002 WL 1558337, at *2 (N.D. Tex.

July 15, 2002) (Fitzwater, J.).  Courts in this jurisdiction apply a six-factor test to determine whether a stay under these circumstances is warranted.  *See SEC v. Offill*, No. CIV.A.3:07-CV-1643-D, 2008 WL 958072, at *2 (N.D. Tex. Apr. 9, 2008) (Fitzwater, J.).

*First*, "the issues in the criminal case overlap with those presented in the civil case" completely. *Id*. Both the instant complaint and the indictment against Defendant Barton allege that he and Chinese investors entered into loan agreements to purchase and develop real estate, *Compare U.S. v. Barton*, Case No. 3:22-cr-352, Indictment [ECF No. 1] at 3, *with SEC v. Barton et al.*, No. 3:22-cv-2118, Complaint [ECF No. 1] at 2; that Barton made misrepresentations and omitted material facts, Indictment at 4-7; Complaint at 9-16; that Barton misappropriated funds, Indictment at 4-7; Complaint at 9-16, and that these acts violated securities laws. Indictment at 12; Complaint at 23-27.

*Second*, Barton "ha[s] been indicted. *See Offill*, No. CIV.A.3:07-CV-1643-D, 2008 WL 958072, at *2. "[A] party under indictment [being] required to defend a civil or administrative action involving the same matter," presents "the strongest case for deferring civil proceedings." *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375–76 (D.C. Cir. 1980); *see Fid. Funding v. Reinhold*, 190 F.R.D. 45, 48 (E.D.N.Y. 1997) ("[T]he major factor in determining whether a court will grant a stay is whether a defendant has been indicted."); *In re Adelphia Commc'ns Sec. Litig.*, No. 02-1781, 2003 WL 22358819, at *3 (E.D. Pa. May 13, 2003) (same).

*Third*, "the private interests and burden on the defendants" weigh in favor of a stay. *Offill*, No. CIV.A.3:07-CV-1643-D, 2008 WL 958072, at *2. Conducting parallel proceedings imposes a "significant" burden on the defendants "given the very real potential for a fifth amendment violation." *United States v. Pinnacle Quest Int'l*, No. 3:08-CV-136-RV-EMT, 2008 WL 4274498, at *2 (N.D. Fla. Sept. 11, 2008); *Chao v. Fleming*, 498 F. Supp. 2d 1034, 1039

(W.D. Mich. 2007) (same). Consider that the SEC's receivership motion alone has required Mr. Barton to come forward with evidence in an effort to merely stave off the Court's seizure of personal and corporate assets. This burden will only increase under the auspices of civil discovery. Forcing Barton to choose between adverse inference and waiving the Fifth Amendment can, and should, be avoided.

*Fourth*, a stay serves "the interests of the courts" because "conducting the criminal proceedings first advances judicial economy." *Offill*, No. CIV.A.3:07-CV-1643-D, 2008 WL 958072, at *2-3. Resolving the criminal case first "may increase prospects for settlement of the civil case," and "the possibility always exists for a collateral estoppel or res judicata effect on some or all of the overlapping issues." *Id.* (citations and internal quotation marks omitted).

Because four of the six factors cut in favor of a stay, and the other two factors are neutral at best, in particular the fact that Defendant Barton has been indicted, which presents "the strongest case for deferring civil proceedings," *Dresser*, 628 F.2d at 1375–76, this Court should stay the instant case.

## VI.    REQUEST FOR EVIDENTIARY HEARING

The Barton Defendants respectfully request an evidentiary hearing to address the legal and factual matters put at issue by the SEC's Receivership Motion.

## VII.    CONCLUSION & PRAYER

For the foregoing reasons, the Defendant Barton on behalf of himself, and on behalf of the corporate defendants in his capacity as an officer for those corporations, respectfully requests that the Court (1) deny Plaintiff's Expedited Motion for Appointment of Receiver (ECF No. 6); and (2) grant Defendant Barton's Cross-Motion to Stay Proceeding.

Dated: October 17, 2022

Respectfully submitted,

By: */s/ Ted A. Huffman*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*application for admission pending*)
medney@huntonak.com
Sean B. O'Connell
State Bar No. 24103142 *(application for admission forthcoming)*
soconnell@huntonak.com
Michael Dingman
Virginia Bar No. 95762
DC Bar No. 90001474 (*application for admission forthcoming*)
mdingman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

Ted A. Huffman
State Bar No. 24089015
thuffman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Phone: (214) 979-3000
Facsimile: (214) 740-7110

Richard Roper
State Bar No. 17233700
richard.roper@hklaw.com
Javan Porter
State Bar No. 24116912
javan.porter@hklaw.com
**HOLLAND & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Phone: (214) 969-1345
Facsimile: (214) 999-9252

**COUNSEL FOR TIMOTHY LYNCH BARTON IN HIS INDIVIDUAL CAPACITY AND ON BEHALF OF CARNEGIE DEVELOPMENT, LLC, WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, WALL017 LLC, WALL018, LLC, WALL019 LLC, DJD LAND PARTNERS, LLC, AND LDG001, LLC IN HIS CAPACITY AS A CORPORATE OFFICER OF THOSE COMPANIES**

## CERTIFICATE OF SERVICE

On October 17, 2022 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Ted A. Huffman*
Ted A. Huffman