# EXHIBIT

# A

## AMENDED AND RESTATED COMPANY AGREEMENT OF
### Gillespie Villas LLC,
## A TEXAS LIMITED LIABILITY COMPANY

This Company Agreement of GILLESPIE VILLAS, LLC, a Texas limited liability company is executed as of APRIL 28, 2022 (the "Effective Date") by the persons who sign and are identified as "Members" and "Managers" in this Agreement.

## ARTICLE I
## DEFINITIONS

1.01    **Definitions.**    As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Amended and Restated Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

---

Company Agreement                                                                 Page 1
GILLESPIE VILLAS, LLC

APP-0002

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means GILLESPIE VILLAS, LLC, a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including,

without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01 **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02 **Name.** The name of the Company is "GILLESPIE VILLAS, LLC " and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03 **Registered Office and Registered Agent.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of

---

Company Agreement                                                                 Page 3
GILLESPIE VILLAS, LLC

business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

2.05 **Purposes.** The primary purposes of the Company shall be any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06 **Powers.** The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09 **Mergers and Exchanges.** The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10 **No State-Law Partnership.** The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

## ARTICLE III
## MEMBERSHIP

3.01 **Initial Members, Capital Commitments, and Percentage Interests.** The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company. Set forth opposite the name of each Member

---

**Company Agreement**                                                     **Page 4**
GILLESPIE VILLAS, LLC

listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws. The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02 **Additional Members.** Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by unanimous consent of the Managers. The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Managers.

3.03 **Member Rights Specified in Agreement.** Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04 **Representations and Warranties.** Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity: (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06 **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07 **Withdrawal.** A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

**ARTICLE IV**

---

## CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

4.02 **No Further Contributions.** No Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Loans by Members.** If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or

manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

### 5.01 **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken. If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

### 5.02 **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Percentage Interests, an amount in cash equal to that excess.

---

**Company Agreement**                                                                 **Page 7**
GILLESPIE VILLAS, LLC

APP-0008

(b) From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Managers take action to authorize such a distribution pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

## ARTICLE VI
## MANAGEMENT

6.01 **Designation of Manager and Management by Managers.** MXBA, LLC is hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder, including a Fundamental Business Transaction;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c) maintaining the assets of the Company in good order;

(d) collecting sums due the Company;

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes, and disposing of any asset of the Company;

(g) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(i) obtaining insurance for the Company;

(j) determining distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(k) establishing a seal for the Company; and

(l) designating one or more committees, each of which shall be comprised of one or more Managers, to exercise any authority of the Managers in the management, business and affairs of the Company.

6.02 **Restrictions.** Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) do any act which requires the prior approval of the Members;

(e) possess Company property or assign rights in Company property, other than for a Company purpose; or

(f) amend this Agreement, except as expressly permitted by this Agreement.

6.03 **Conflicts of Interest.** Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

6.04 **Contracts or Transactions with Interested Directors or Officers.** This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers, or of a committee of the Managers, Members or officers that authorizes the contract or transaction,

or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if: (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by (a) the Managers, Members or officers or a committee of the Managers, Members or officers and the Managers, Members or officers or committee in good faith authorize the contract or transaction by the affirmative vote of the majority of the disinterested Managers, Members or officers or committee members, regardless of whether the disinterested Managers, Members or officers or committee members constitute a quorum; or (b) the Members of the Company, and the Members in good faith approve the contract or transaction by vote of the Members; or (2) the contract or transaction is fair to the Company when the contract or transaction is authorized, approved, or ratified by the Managers, Members or officers, a committee of the Managers, Members or officers, or the Members of the Company.

6.05  **Number and Term of Office.**  The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers. If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06  **Vacancies; Removal; Resignation.**  Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled by election at an annual or special meeting of Members called for that purpose. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by a Super Majority. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07  **Compensation.**  For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by a Simple Majority of the Members.

6.08  **Reimbursement.**  The Managers are not required to advance any funds to pay costs and expenses of the Company. However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities.

6.09  **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of

business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010 **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11 **Action Without Meeting.** Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such

committee, as the case may be. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 **Broad Discretion and Authority of Managers.** Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member. Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information.** The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information. The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.02. **Specific Performance**. The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of a Simple Majority are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by

---

mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02  **Voting List**. The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Percentage Interests held by each. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03  **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04  **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority

of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05 **Action by Unanimous Written Consent Without Meeting**.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this paragraph, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06 **Action by Telephone Conference or Other Remote Communications Technology**. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07 **Classes of Members; Voting**. At an annual or special meeting called for that purpose, the Members may from time to time establish classes or groups of Members. One or more of the

---

Company Agreement
GILLESPIE VILLAS, LLC

Page 15

APP-0016

Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

## ARTICLE IX
## OFFICERS

9.01  **Qualification.** The Managers may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Texas, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers. Any number of offices may be held by the one person.

9.02.  **Compensation.** The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03.  **Resignation.** Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04.  **Removal.** Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05  **Appointment of Officers.** The President is Maximilien Barton. The Secretary and Treasurer is Niusha Karki. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions. Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company.

## ARTICLE X
## INDEMNIFICATION

10.01  **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is

Company Agreement                                                    Page 16
GILLESPIE VILLAS, LLC

APP-0017

involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 **Non-exclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 **Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01 **Tax Returns.** The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

> (a) to adopt the calendar year as the Company's fiscal year;

> (b) to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."** A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII

## TRANSFERS

13.01  **Limited Right to Transfer**.  No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the unanimous consent of the Managers; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement.  Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio.*

13.02  **Rights of an Assignee**.

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company.  The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee.  If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default.  In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03  **Legal Opinion**.  For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations.  The Managers, however, may waive the requirements of this paragraph.

13.04  **Admission as Substituted Member**.  An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this

---

**Company Agreement**
GILLESPIE VILLAS, LLC

Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05 **Transfer to Existing Member**. In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06 **Third Party Offer**. In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest. If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07 **Reasonable Expenses**. The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

14.01 **Termination of Marital Relationship**.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"),

either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member**. Commencing upon the death of a Member, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Company and/or the other Members in accordance with the option or obligation established by this paragraph.

14.03 **Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04 **Insufficient Surplus**. If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05 **Option by Other Members**. If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of

time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company.

14.06 **Exercise of Option**. Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07 **Determination of Fair Value**. The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08 **Fees and Expenses of Appraiser**. In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09 **Right to Withdraw Option**. In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10 **Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows:  (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing.  Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty.   In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company.   The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.**  If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas;

(d) reducing the Defaulting Member's Membership Interest or other interest in the Company;

(e) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member;

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV;

(g) forfeiture of the Defaulting Member's Membership Interest; or

(h) exercising any other rights and remedies available at law or in equity.

15.02  **Security.**  Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas.  It is expressly agreed that the security interest

created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 **Compromise or Release.** The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the unanimous consent of the Managers. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04 **Expulsion**. A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination**. The Company shall begin to wind up its affairs upon the first of the following to occur:

    (a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

    (b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

    (c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02 **Business May Be Continued.** Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation.** As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably

determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed (a) with the unanimous consent of the Managers or (b) by a Super Majority of the Members.

17.02 **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification reducing a Member's Percentage Interest or increasing its Capital Commitment (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent.

(b) An amendment or modification reducing the required Percentage Interest or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the Percentage Interest or other measure theretofore required.

(c) An amendment to establish the relative rights and preferences of the Membership Interests of any class or series may be made by a committee of Managers, within the authority of Managers or otherwise provided in the Certificate of Formation, the TBOC, or resolutions by Members forming the committee.

(d) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01 **Construction.** Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02 **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03 **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> 1800 Valley View Lane, Suite 300
> Farmers Branch, Texas 75234

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04  **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05  **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company.  Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06  **Binding Effect.**  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.  However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07  **Governing Law.**  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08  **Severability.**  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09  **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10  **Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11  **Indemnification.**  To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date set forth above.

**MANAGER:**

MXBA LLC
MAX BARTON, PRESIDENT

**MEMBERS:**

MXBA LLC
MAX BARTON, PRESIDENT

## EXHIBIT "A"
## MEMBERS OF GILLESPIE VILLAS, LLC

| Member's<br>Name and Address | Percentage<br>Interest |
|---|---|
| MXBA LLC<br>1755 WITTINGTON PLACE,<br>SUITE 340<br>DALLAS, TEXAS 75234 | 100% |

18.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01 **Compliance with Regulation D of the Securities Act of 1933.** THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02 **Notice to Members.** By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03 **Limitation of Liability**. Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

# EXHIBIT

# B

APP-0035

**AMENDED AND RESTATED
COMPANY AGREEMENT OF
VENUS59, LLC
A TEXAS LIMITED LIABILITY COMPANY**

This Amended and Restated Company Agreement of VENUS 59, LLC a Texas limited liability company is executed as of AUGUST 24, 2021 (the "Effective Date") by the persons who sign and are identified as "Members" and "Managers" in this Agreement and replaces any and all prior company agreements of Venus 59, LLC.

## ARTICLE I
## DEFINITIONS

1.01  **Definitions.**  As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by

APP-0036

Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means **Venus 59, LLC,** a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01 **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02 **Name.** The name of the Company is "Venus 59, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03 **Registered Office and Registered Agent.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered

agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

2.05 **Purposes.** The primary purposes of the Company shall be:

(a)     The closing of a purchase contract ("59 Acre Contract") to acquire approximately 59 acres of land in Venus, Johnson County, Texas ("Large Tract") which is due to close ("Closing") on August 31, 2021 ("Closing Date");

(b)     The closing of a purchase contract ("3 Acre Contract" with the 3 Acre Contract and 59 Acre Contract referred to collectively as the "Purchase Contract") to purchase a 3.44 acre adjacent tract of land in Venus, Johnson County, Texas ("Small Tract" with the Large Tract and Small Tract collectively consisting of 62.4 acres being the "Property") which will close simultaneously with the Closing of the 59 Acre Contract.

(c)     Plat the Property into residential subdivision known as Mustang Meadows consisting of approximately 304 50 ft. single family lots or approximately 379 40 ft single family lots (or mix thereof) and associated street rights-of-way, detention areas and common area amenities ("Project") which Company intends sell or otherwise such horizontal development as necessary to develop the Project for the purpose of selling developed lots to home builders; and

(d)     Otherwise, any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06 **Powers.** The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for

the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09  **Mergers and Exchanges.**  The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10  **No State-Law Partnership.**  The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

## ARTICLE III
## MEMBERSHIP

3.01  **Initial Members, Capital Commitments, and Percentage Interests.**  The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company.  Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest.  Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.  Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws.  The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02  **Additional Members.**  Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by unanimous consent of the Managers.  The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto.  The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Managers.

3.03  **Member Rights Specified in Agreement.**  Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04  **Representations and Warranties.**  Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity: (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's

authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06 **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07 **Withdrawal.** A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.


## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

4.02 **No Further Contributions.** No Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Loans by Members.** If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01 **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

APP-0042

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken. If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

5.02 **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Percentage Interests, an amount in cash equal to that excess.

(b) From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Managers take action to authorize such a distribution pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

## ARTICLE VI
## MANAGEMENT

6.01 **Designation of Manager and Management by Managers.** The Manager identified on Exhibit "B" are hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a)     entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in connection with the purposes of the Company at the Manager's reasonable and sole discretion (except entering into any contract with or a sale to any related entity of any Member

that is not for fair value or upon terms standard for the industry that would be conducted as an arms-length transaction) and making all decisions and waivers thereunder.

(b)     entering into and executing agreements in the ordinary course of business and related to the capital assets of the Company including those related to construction, development, sales (including assets), management, marketing and promotion of the Company and the Project.

(c)     opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money;

(d)     maintaining the assets of the Company in good order;

(e)     collecting sums due the Company;

(f)     to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(g)     utilizing for Company purposes any asset of the Company;

(h)     borrowing money or otherwise committing the credit of the Company for Company activities to further the Purpose and voluntary prepayments or extensions of debt and in the event required by a creditor which may be guaranteed by the Manager and/or Timothy Barton on behalf of the Company;

(i)     selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(j)     obtaining and maintaining insurance for the Company;

(k)     enter into and close on a Fundamental Business Transaction so long as the transaction is at fair value and conducted on terms substantially similar to an arms length transaction.

(l)     disposition of Company property in the ordinary course of business;

(m)     disposition of Company property not in the ordinary course of business;

(n)     designating Members or other individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(o)     borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(p)     incurring any debt or liability (or agreeing to incur any debt or liability)     on behalf of the Company;

(q)     determining the amount and timing of distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

---

(r)     appoint officers of the Company and provide such officers with authorities, powers, and any type of compensation or remuneration;

(s)     sell or issue additional Membership Interests and admit Members of the Company subject to the restrictions in this Agreement; and

(t)     delegate any responsibilities to any Member, officer, or person retained by the Manager to perform certain tasks.

(u)     where the Company is a member, shareholder, partner, or joint venture in any partnership or entity, execute any necessary resolution, consent, or agreement on behalf of the Company including voting the interests of the Company in the best interests of the Company as reasonably determined by the Manager.

6.02 **Restrictions.**  Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) do any act which requires the prior approval of the Members;

(e) possess Company property or assign rights in Company property, other than for a Company purpose; or

(f) amend this Agreement, except as expressly permitted by this Agreement.

6.03 **Conflicts of Interest.**  Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

6.04 **Contracts or Transactions with Interested Directors or Officers.**  This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers,

or of a committee of the Managers, Members or officers that authorizes the contract or transaction, or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if: (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by (a) the Managers, Members or officers or a committee of the Managers, Members or officers and the Managers, Members or officers or committee in good faith authorize the contract or transaction by the affirmative vote of the majority of the disinterested Managers, Members or officers or committee members, regardless of whether the disinterested Managers, Members or officers or committee members constitute a quorum; or (b) the Members of the Company, and the Members in good faith approve the contract or transaction by vote of the Members; or (2) the contract or transaction is fair to the Company when the contract or transaction is authorized, approved, or ratified by the Managers, Members or officers, a committee of the Managers, Members or officers, or the Members of the Company.

6.05 **Number and Term of Office.** The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers. If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06 **Vacancies; Removal; Resignation.** Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled by election at an annual or special meeting of Members called for that purpose. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by a Super Majority. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07 **Compensation.** For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by a Simple Majority of the Members.

6.08 **Reimbursement.** The Managers are not required to advance any funds to pay costs and expenses of the Company. However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities.

6.09 **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in,

APP-0046

the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010 **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11 **Action Without Meeting.** Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such

consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 **Broad Discretion and Authority of Managers**. Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member. Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

**ARTICLE VII**
**CONFIDENTIAL INFORMATION**

7.01 **Confidential Information**. The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information. The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.02. **Specific Performance**. The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of a Simple Majority are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not

less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02 **Voting List**. The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Percentage Interests held by each. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03 **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 **Conduct of Meetings**. All meetings of the Members shall be presided over by the

---

chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05 **Action by Unanimous Written Consent Without Meeting**.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this paragraph, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06 **Action by Telephone Conference or Other Remote Communications Technology**. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07 **Classes of Members; Voting**. At an annual or special meeting called for that purpose,

the Members may from time to time establish classes or groups of Members. One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

# ARTICLE IX
# OFFICERS

9.01 **Qualification.** The Managers may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Texas, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers. Any number of offices may be held by the one person.

9.02. **Compensation.** The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03. **Resignation.** Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04. **Removal.** Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05 **Appointment of Officers.** The initial President, Treasurer, Secretary and any other Officers, if any, are designated on Exhibit B. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis and may delegate any such rights, powers, or authorities to any other officer or an authorized representative of the Company as appointed by the President. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions. Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company and each shall be a signatory on such accounts without the need for any further consent

# ARTICLE X
# INDEMNIFICATION

10.01 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his

---

APP-0053

appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 **Non-exclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 **Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01 **Tax Returns.** The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and

records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."** A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

11.04 **Employment Identification Number**. A separate individual as authorized by the Company may have originally obtained an Employment Identification Number ("EIN") from the IRS on behalf of the Company which designated such person as a member or sole member of the Company on its letter issuing the EIN as a result of the limitations of the IRS's online EIN request process but such designation by the IRS is not determinative of such person's capacity or ownership interests in the Company and as such as of the Effective Date, such person has no rights or interests in the Company except to the extent specifically stated in this Agreement.

APP-0055

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01 **Limited Right to Transfer.** No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the unanimous consent of the Managers; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

13.02 **Rights of an Assignee.**

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee. If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

---

13.03 **Legal Opinion**. For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations. The Managers, however, may waive the requirements of this paragraph.

13.04 **Admission as Substituted Member**. An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05 **Transfer to Existing Member**. In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06 **Third Party Offer**. In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest. If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

APP-0057

13.07 **Reasonable Expenses**. The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

14.01 **Termination of Marital Relationship**.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member**. Commencing upon the death of a Member, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Company and/or the other Members in accordance with the option or obligation established by this paragraph.

14.03 **Bankruptcy of Member**. If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its

representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04 **Insufficient Surplus.** If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05 **Option by Other Members.** If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company.

14.06 **Exercise of Option.** Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07 **Determination of Fair Value.** The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08 **Fees and Expenses of Appraiser.** In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

---

14.09 **Right to Withdraw Option.** In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10 **Terms of Purchase.**

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.** If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement,

the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas;

(d) reducing the Defaulting Member's Membership Interest or other interest in the Company;

---

**Company Agreement**                                                                    **Page  26**
Venus 59, LLC

(e) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member;

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV;

(g) forfeiture of the Defaulting Member's Membership Interest; or

(h) exercising any other rights and remedies available at law or in equity.

15.02  **Security.**  Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas.  It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas.  On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article.  Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article.  At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03  **Compromise or Release.**  The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the unanimous consent of the Managers.  Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04  **Expulsion.**  A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company.  Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01.  The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination**. The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02 **Business May Be Continued.** Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation**. As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a

Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed (a) with the unanimous consent of the Managers or (b) by a Super Majority of the Members.

17.02 **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification reducing a Member's Percentage Interest or increasing its Capital Commitment (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent.

(b) An amendment or modification reducing the required Percentage Interest or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the Percentage Interest or other measure theretofore required.

(c) An amendment to establish the relative rights and preferences of the Membership Interests of any class or series may be made by a committee of Managers, within the authority of Managers or otherwise provided in the Certificate of Formation, the TBOC, or resolutions by Members forming the committee.

(d) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01 **Construction.** Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is

APP-0065

only one Manager, then references to Members in the plural should also be construed as singular.

18.02 **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03 **Notices.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person.  All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> 13901 Midway, Suite 102-243
> Farmers Branch, Texas 75244

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04 **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05 **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company.  Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06 **Binding Effect.**  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.  However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07 **Governing Law.**  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08 **Severability.**  If any provision of this Agreement or the application thereof to any

APP-0066

person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09   **Further Assurances.**   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10   **Waiver of Certain Rights.**   Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11   **Indemnification.**   To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12   **Counterparts.**   This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

### ARTICLE XIX
### NOTICES AND DISCLOSURES

19.01   **Compliance with Regulation D of the Securities Act of 1933**.   THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02   **Notice to Members.**   By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03   **Limitation of Liability**.   Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a

---

Company Agreement
Venus 59, LLC

Page 32

APP-0067

maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

*[Signature Page to Follow]*

**IN WITNESS HEREOF**, the Managers and Members have adopted and executed this Company Agreement as of the Effective Date set forth above.

**MANAGER:**

ONE SF Residential, LLC
a Delaware limited liability company

Maximilien Barton
President

**MEMBERS:**

ONE SF Residential, LLC
a Delaware limited liability company

Maximilien Barton
President

MXBA, LLC
a Delaware limited liability company

Maximilien Barton
President

## EXHIBIT "A"
## MEMBERS

| Member Name & Address | Initial Capital Contributions | Interest | Profit/Loss |
|---|---|---|---|
| MXBA, LLC | $99.00 | 99.00% | 99.00% |
| ONE SF Residential, LLC | $1.00 | 1.00% | 1.00% |

## EXHIBIT "B"
## MANAGER AND OFFICERS

**Manager:** ONE SF Residential, LLC

**President:** Maximilien "Max" Barton

**Treasurer**: Saskya Bedoya

**Secretary**: Saskya Bedoya

# EXHIBIT
# C

APP-0071

**From: ONE SF Residential, LLC**

**To: Venus59, LLC**

**Subject: Resignation of ONE SF Residential, LLC**

Please be advised that effective immediately ONE SF Residential, LLC is resigning from its position as Manager of Venus59, LLC. This letter serves to inform the Members of Venus59, LLC pursuant to Article IX Section 9.03 of the Company Agreement

**Respectfully,**

*President*
10/31/22

**ONE SF Residential, LLC**

APP-0072

# EXHIBIT
# D

APP-0073

**AMENDED AND RESTATED**
**COMPANY AGREEMENT OF**
**VENUS59, LLC**
**A TEXAS LIMITED LIABILITY COMPANY**

This Amended and Restated Company Agreement of VENUS 59, LLC a Texas limited liability company is executed as of AUGUST 31, 2021 by the persons who sign and are identified as "Members" and "Managers" in this Agreement but shall not be effective unless and until the closing of the acquisition of the Property under the terms of the Purchase Contract as described herein (the "Effective Date"), or as otherwise contemplated in the Funding Agreement entered into among the Members as of the date hereof.

**ARTICLE I**
**DEFINITIONS**

1.01 **Definitions.** As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent all Members consent otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which

---

**Company Agreement**                                                                 **Page    1**
Venus 59, LLC

national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means **Venus 59, LLC,** a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Good Cause" or similar language means (i) conviction of a crime of moral turpitude, (ii) action or inaction constituting willful misconduct or gross negligence, or (iii) a material breach of this Agreement which remains uncured thirty (30) days after written notice from any Member and/or Manager as applicable.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as

provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" or "Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

"Unanimous Consent" including "consent of all" or similar language means consent of 100% of such persons entitled to vote or consent on such matters and in reference to the Members means 100% of all Membership Interests in the Company entitled to vote. Where consent of the Members is required such shall mean Unanimous Consent unless a Majority, Super Majority, or other specific consent is specifically stated.

Other terms defined herein have the meaning so given them.

---

## ARTICLE II
## ORGANIZATION

2.01 **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02 **Name.** The name of the Company is "Venus 59, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03 **Registered Office and Registered Agent**. The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

2.05 **Purposes.** The purposes of the Company shall be:

(a) The closing of a purchase contract ("59 Acre Contract") to acquire approximately 59 acres of land in Venus, Johnson County, Texas ("Large Tract") which is due to close ("Closing") on August 31, 2021 ("Closing Date");

(b) The closing of a purchase contract ("3 Acre Contract" with the 3 Acre Contract and 59 Acre Contract referred to collectively as the "Purchase Contract") to purchase a 3.44 acre adjacent tract of land in Venus, Johnson County, Texas ("Small Tract" with the Large Tract and Small Tract collectively consisting of 62.4 acres being the "Property") which will close simultaneously with the Closing of the 59 Acre Contract;

(c) Create a preliminary plat of the Property to create a residential subdivision known as Mustang Meadows consisting of approximately 304 50 ft. single family lots or approximately 379 40 ft single family lots (or mix thereof) and associated street rights-of-way, detention areas and common area amenities ("Paper Lots") which Company, unless otherwise agreed to by all Members, shall sell to a third party on terms as consented to by all Members (and which shall not be unreasonably withheld so long as such are sold at fair market value under an arms length transaction) ("Project");

(d) Otherwise, Company may perform horizontal development on the Property in order to develop the Paper Lots into single family lots in a form ready for vertical construction and which may be sold to third party home builders ("Horizontal Development") only upon the Unanimous Consent of the Members and only upon such terms as further agreed to

by all Members and which will include the payment of a development fee of three percent (3%) of the total development costs to be paid to a related entity of MXBA as the developer; and

(e) No other purposes whatsoever.

2.06 **Powers.** The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09 **Mergers and Exchanges.** The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10 **No State-Law Partnership.** The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

2.11 **Budget**. Upon closing of the Property, the Members shall unanimously agree to a development budget for any Horizontal Development of the Property and upon approval, the Manager shall have the power to spend money or incur liabilities in the ordinary course of business in accordance with the approved budget. Otherwise, the Manager is authorized to expend up to $100,000.00 for the purpose of creating Paper Lots including for reasonably necessary engineering costs ("Paper Lot Expenses").

**ARTICLE III**
**MEMBERSHIP**

3.01 **Initial Members, Capital Commitments, and Percentage Interests.** The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest. Exhibit A may

be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.  Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws.  The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02    **Additional Members.**  Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by Unanimous Consent of the Members.  The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto.  The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties.  The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed by all Members.

3.03  **Member Rights Specified in Agreement.**  Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04  **Representations and Warranties.**  Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity:  (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05  **No Authority.**  Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06  **Liability to Third Parties.**  No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07  **Withdrawal.**  A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

**ARTICLE IV**
**CAPITAL CONTRIBUTIONS**

---

**Company Agreement**                                                                 Page    6
Venus 59, LLC

4.01 **Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

4.02 **Additional Contributions.** Except for the additional Capital Contribution to be made by the Members Daniel Crow and MXBA up to the amounts described as the "Crow Additional Contribution" and "MXBA Additional Contribution" set forth on the *Use of Proceeds from Capital Contributions of Members* included as part of Exhibit A as attached to this Agreement, which amounts shall be a required additional Capital Contribution of such Members, no Member shall be required to make any Capital Contributions other than those specifically described by this Agreement unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions except as provided for in section 5.02. An unrepaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Loans by Members.** If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent without further consent of the Members and may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of

Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g).  A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired.  On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01  **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken.  If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

(e)  Notwithstanding any terms of this Section 5.01 to the contrary, at the request of Daniel Crow and without the need of any further consent from any other Member, this Section shall be modified so as to allocate any losses to Daniel Crow, up to the amount of his Capital

---

**Company Agreement**                                                                            Page   8
Venus 59, LLC

Contribution, before the allocation of any losses to any other Member hereunder. All of the Members hereto acknowledge that this subsequent modification is in consideration for Daniel Crow's joinder as a Member of the Company immediately prior to the close of escrow on the acquisition of the Large Tract, and that the limitations of time prior thereto made consultation with a tax lawyer impracticable. No other Member shall impose any conditions on such further modification of this Section.

5.02 **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve ("Distributable Cash"). If such an excess exists, the Managers shall cause the Company to distribute to the Members, in the following order:

(a) Reimbursement of all capital contributions of the Member, Daniel Crow

(b) Reimbursement of all capital contributions of the other Members.

(c) in accordance with their Percentage Interests, an amount in cash equal to that excess.

Notwithstanding the above, no distributions shall be paid until the Project is generating income or otherwise has closed on the sale of a sufficient number of lots sufficient to create Distributable Cash. The distributions made under this section for the purpose of paying back Capital Contributions shall not result in the reduction of any the Membership Interests of the Members. The Manager may require any and all loans to Members including any rate of return on such loans be paid prior to distributing any Distributable Cash.

## ARTICLE VI
## MANAGEMENT

6.01 **Designation of Manager and Management by Managers.** The Manager identified on Exhibit "B" are hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in connection with the purposes of the Company at the Manager's reasonable and sole discretion (except entering into any contract with or a sale to any related entity of any Member that is not for fair value or upon terms standard for the industry that would be conducted as an arms-length transaction) and making all decisions and waivers thereunder.

---

(c)    opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money in accordance with the Budget or as authorized in this Agreement;

(d)    maintaining the assets of the Company in good order;

(e)    collecting sums due the Company;

(f)    to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(g)    utilizing the assets of the Company for the approved Purposes of the Company;

(i)    selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(j)    obtaining and maintaining insurance for the Company;

(l)    disposition of Company property in the ordinary course of business except for any capital assets including the Property which shall require Unanimous Consent of the Members;

(n)    designating Members or other individuals with authority to sign or give instructions with respect to those accounts and arrangements as authorized in this Agreement;

(p)    incurring any debt or liability (or agreeing to incur any debt or liability) on behalf of the Company which is consented to by all Members as part of an approved Budget or as otherwise authorized in this Agreement;

(q)    determining the amount and timing of distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(r)    appoint officers of the Company and provide such officers with authorities, powers,;

(t)    delegate any responsibilities to any Member, officer, or person retained by the Manager to perform certain tasks (except any payment or remuneration paid to such person shall require Unanimous Consent of the Members).

(u)    where the Company is a member, shareholder, partner, or joint venture in any partnership or entity, execute any necessary resolution, consent, or agreement on behalf of the Company including voting the interests of the Company in the best interests of the Company as reasonably determined by the Manager.

(v)    perform all necessary action on behalf of the Company in order to create Paper Lots as described in section 2.05(c) and expend up to $100,000.00 for the Paper Lot Expenses (as defined in section 2.11) without the necessity to obtain further consent of the Members.

6.02 **Restrictions.**  Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Manager(s) may not cause the Company to do any of the following which shall require the Unanimous

---

Consent of all Members and shall comply with any other applicable requirements as may be set forth in this Agreement:

    (a)  enter into a Fundamental Business Transaction

    (b)  do any act in violation of this Agreement;

    (c)  sell or issue additional Membership Interests or admit new Members of the Company;

    (d)  do any act which requires the prior consent or approval of the Members;

    (e)  possess Company property or assign rights in Company property, other than for a Company purpose;

    (f)  amend or terminate this Agreement, except as expressly permitted by this Agreement.

    (g)  sell, transfer, assign, convey, encumber the Property except as necessary to plat the Property to create Paper Lots.

    (h)  enter into any contract or expend funds which would exceed the Budget or as otherwise authorized in this Agreement.

    (i)  enter into any development agreement, perform Horizontal Development, or perform any other material work on the Property not otherwise authorized in this Agreement for the purpose of creating Paper Lots.

    (j)  borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

    (k)  agreeing to or paying any type of compensation or remuneration to any Manager, Officer, or Member or other employee of the Company which is not otherwise authorized in this Agreement

    (l)  entering into and executing agreements in the ordinary course of business and related to the capital assets of the Company including those related to construction, development, sales (including assets), management, marketing and promotion of the Company and the Project.

6.03  **Conflicts of Interest**.  Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

6.04  **Contracts or Transactions with Interested Directors or Officers**.  This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers, or of a committee of the Managers, Members or officers that authorizes the contract or

---

**Company Agreement**                            **Page  11**
Venus 59, LLC

transaction, or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if: the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by the Members of the Company, and the disinterested Members in good faith approve the contract or transaction by vote of the disinterested Members.

6.05   **Number and Term of Office.**   The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers.  If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers.  Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal.  Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06  **Vacancies; Removal; Resignation.**  Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled upon the Unanimous Consent of the Members  at an annual or special meeting of Members called for that purpose.  A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office.  At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by Unanimous Consent of the Members and otherwise may be removed upon any material breach of this Agreement which is not cured following thirty (30) days written notice from any Member, Manager, or Officer or for Good Cause (as defined in section 15.04) by a Majority of the Members.  Any Manager may resign at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07   **Compensation**.   For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by the Unanimous Consent of the Members.

6.08  **Reimbursement**.  The Managers are not required to advance any funds to pay costs and expenses of the Company.  However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities, provided that any such reimbursed amounts are promptly reported to all the Members.

6.09  **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers.  A Manager who is present at a meeting of the

Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers.  At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members.  Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager.  Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement.  Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010  **Approval or Ratification of Acts or Contracts by Members.**  The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract.  Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11  **Action Without Meeting**.  Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts.  An email, telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph.  Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be.  The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 **Broad Discretion and Authority of Managers**. Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member. Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

6.14 **Sale of Paper Lots**. Unless otherwise consented to by all Members including where the Members have agreed to perform Horizontal Construction, the Manager shall cause the sale and closing of the Paper Lots at fair market value on an arms-length transaction basis subject to commercial reasonable terms to a third party that is not related to any Member ("**Sale Parameters**") and shall ensure that at least fifty (50%) of the Paper Lots or total acreage of the Property is sold on or before the expiration of two (2) years following the closing of all Property ("**Sales Objective**"). Regardless of any conflict in this Agreement, in the event that Manager fails to achieve the Sales Objective, the Manager may be removed and replaced by a Majority of the Members following thirty (30) days' written notice during which period the Manager fails to cure and meet the Sales Objective. So long as Manager enters into a purchase contract on behalf of the Company and closes on the sale of Paper Lots in accordance with the Sale Parameters, then the Members shall not unreasonably withhold or delay any required consent to the sale and otherwise, such consent shall be deemed given.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information**. The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information. The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member

shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.02. **Specific Performance**. The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of 100% of the Membership Interests are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

---

Company Agreement                                                                 Page  15
Venus 59, LLC

APP-0088

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02 **Intentionally Omitted.**

8.03 **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 **Conduct of Meetings.** All meetings of the Members shall be presided over by the

chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers.  The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05  **Action by Unanimous Written Consent Without Meeting**.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of all Members or committee members, as the case may be, setting forth the action so taken which may be evidenced by the delivery of an email, fax, or similar transmission or electronic consent delivered by a Member, or any copy, facsimile or similar reproduction of a writing signed by a Member or other written consent delivered to and received by the Manager.   Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts.  The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers including by electronic transmission.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06  **Action by Telephone Conference or Other Remote Communications Technology**.  Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other.  Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant.  Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07  **Classes of Members; Voting.**  At an annual or special meeting called for that purpose, the Members may from time to time establish classes or groups of Members.  One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

## ARTICLE IX
## OFFICERS

9.01  **Qualification**.  The Managers may, from time to time, designate one or more persons to be officers of the Company upon the Unanimous Consent of the Members.  No officer need be a resident of the State of Texas, a Member or a Manager.  Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them.  The Managers may assign titles to particular officers.  Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph.  Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided.  Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers.  Any number of offices may be held by the one person.

9.02.  **Compensation**.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.  However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03.  **Resignation**.  Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04.  **Removal**.  Any officer may be removed for any material breach of this Agreement which is not cured following thirty (30) days written notice from any Member, Manager, or Officer or for Good Cause (as defined in section 15.04) by a Majority of the Members provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05  **Appointment of Officers**. The initial President, Treasurer, Secretary and any other Officers, if any, are designated on Exhibit B who shall serve the Company without compensation. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis and may delegate any such rights, powers, or authorities to any other officer or an authorized representative of the Company as appointed by the President. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions.  Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company and each shall be a signatory on such accounts without the need for any further consent.

## ARTICLE X
## INDEMNIFICATION

10.01  **Right to Indemnification.**  Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director,

---

**Company Agreement**                                                                                           Page  18
Venus 59, LLC

officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder.  The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal.  It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02  **Advance Payment.**  The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03  **Indemnification of Officers, Employees and Agents.**  The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04  **Appearance as a Witness.**  Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05  **Non-exclusivity of Rights.**  The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or

hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06   **Insurance.**   The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07   **Member Notification.**   To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08   **Savings Clause.**   If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01   **Tax Returns.**   The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement.  Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02   **Tax Elections.**   The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."**  A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority.  Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code.  Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.  Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the Unanimous Consent of the Members, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

11.04 **Employment Identification Number**. A separate individual as authorized by the Company may have originally obtained an Employment Identification Number ("EIN") from the IRS on behalf of the Company which designated such person as a member or sole member of the Company on its letter issuing the EIN as a result of the limitations of the IRS's online EIN request process but such designation by the IRS is not determinative of such person's capacity or ownership interests in the Company and as such as of the Effective Date, such person has no rights or interests in the Company except to the extent specifically stated in this Agreement.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.**  The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers.  The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement.  The calendar year shall be the accounting year of the Company.  The Members shall have full access to the Company's books of account, and any other financial or other records of the Company, upon reasonable advance notice.

12.02  **Accounts.**  The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine.  The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01  **Limited Right to Transfer**.  No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the Unanimous Consent of the Members; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement.  Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

13.02  **Rights of an Assignee**.

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company.  The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee.  If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default.  In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03  **Legal Opinion**.  For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations.  The Managers, however, may waive the requirements of this paragraph.

13.04  **Admission as Substituted Member**.  An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05  **Transfer to Existing Member**.  In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06  **Third Party Offer**.  In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members.  Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members.  Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer.  If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest.  If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07  **Reasonable Expenses**.  The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due.  If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

**ARTICLE XIV**

## BUYOUT OF MEMBERSHIP INTEREST

14.01  **Termination of Marital Relationship**.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed.  Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse.  Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement.  If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust.  Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust.  Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02  **Intentionally Omitted.**

14.03  **Bankruptcy of Member.**  If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers.  In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04  **Insufficient Surplus**.  If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01 or 14.02 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05  **Option by Other Members**.  If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms

available to the Company.

14.06  **Exercise of Option**.  Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07  **Determination of Fair Value**.  The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement.  In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose.  The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08  **Fees and Expenses of Appraiser**.  In the case of a purchase and sale of Membership Interest under paragraph 14.01 of this Agreement (in the event of divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company.  In the case of a purchase and sale of Membership Interest under paragraph 14.02 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company.  Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09  **Right to Withdraw Option**.  In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.08 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee.  In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10  **Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows:  (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly

installments, with the first payment due thirty (30) days after the date of closing.  Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty.  In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company.  The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01  **Failure to Contribute.**  If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

---

Company Agreement                                                                                      Page  26
Venus 59, LLC

APP-0099

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) proportionately reducing the Defaulting Member's Membership Interest or other interest in the Company;

(d) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member; OR

(e) exercising any other rights and remedies available at law or in equity.

15.02 **Security.**  Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas.  It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas.  On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article.  Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article.  At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 **Compromise or Release.**  The obligation of a Defaulting Member or its legal

---

**Company Agreement**                                                                 Page  27
Venus 59, LLC

representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the u Unanimous Consent of the non defaulting Members.  Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04  **Suspension**.  A Member's right to vote and otherwise exercise the rights of a Member in the Company  may be suspended upon the Unanimous Consent of all other Members (not including the Member to be suspended) for such period as determined by such other Members which may be indefinite if that Member is found to have (a) willfully and knowingly violated any material provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) knowingly engaged in wrongful conduct that such person should have known would adversely and materially affects the business or operation of the Company and which actually adversely and materially affected the business or operation of the Company (collectively, "Good Cause").  Such a Member shall be considered in breach of this Agreement, and the Company or other Members may also exercise any available remedies as provided in this Agreement or at law or in equity.  The Company may offset any damages to the Company or its Members occasioned by the misconduct of the breaching Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

### ARTICLE XVI
### WINDING UP AND TERMINATION

16.01  **Event Requiring Termination**.  The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02  **Business May Be Continued.**  Except as provided in paragraph 16.01(b) of this

---

Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.06 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation**. As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

---

APP-0102

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed with the Unanimous Consent of the Members.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01  **Construction**.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02  **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03  **Notices.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person.  All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> 13901 Midway, Suite 102-243
> Farmers Branch, Texas 75244

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04  **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05  **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company.  Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06  **Binding Effect.**  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.  However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07  **Governing Law.**  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW

OF ANOTHER JURISDICTION.

18.08  **Severability**.  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09  **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10  **Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11  **Indemnification.**  To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12  **Counterparts.**  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01  **Compliance with Regulation D of the Securities Act of 1933**.  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.  THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS.  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02  **Notice to Members.**  By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation.  Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03  **Limitation of Liability**.  Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil

---

Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services.  By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

*[Signature Page to Follow]*

IN WITNESS HEREOF, the Managers and Members have adopted and executed this Company Agreement as of the Effective Date set forth above.

**MANAGER:**

ONE SF Residential, LLC
a Delaware limited liability company

_____

Maximilien Barton
President

**MEMBERS:**

ONE SF Residential, LLC
a Delaware limited liability company

_____

Maximilien Barton
President

MXBA, LLC
a Delaware limited liability company

_____

Maximilien Barton
President

_____

Daniel Crow, Individually

25 Aug 20

APP-0107

**EXHIBIT "A"**
**MEMBERS**

| Member Name & Address | Initial Capital Contributions | Membership Interest % | Profit/Loss |
|---|---|---|---|
| MXBA, LLC | $122,329.01* | 39.00% | 39.00% |
| ONE SF Residential, LLC | $10.00 | 1.00% | 1.00% |
| Daniel Crow | $1,058,000.00* | 60.0% | 60.00% |

*As itemized and detailed on the following *Use of Proceeds from Capital Contributions of Members*.

# EXHIBIT

# E

APP-0109

## Form 424—General Information
## (Certificate of Amendment)

> **The attached form is drafted to meet minimal statutory filing requirements pursuant to the relevant code provisions.** *This form and the information provided are not substitutes for the advice and services of an attorney and tax specialist.*

## Commentary

Sections 3.051 to 3.056 of the Texas Business Organizations Code (BOC) govern amendments to the certificate of formation of a Texas filing entity. A filing entity may amend its certificate of formation at any time and in as many respects as may be desired, *as long as the certificate as amended contains only such provisions as could have been included in the original certificate of formation.* Amendments may be adopted to change the language of an existing provision, to add a new provision, or to delete an existing provision. If extensive amendments are proposed, the entity should consider filing a restated certificate of formation pursuant to section 3.059 of the BOC (Form 414).

## Procedural Information by Entity Type

> Please note that a document on file with the secretary of state is a public record that is subject to public access and disclosure. Do not include confidential information, such as social security numbers. If amending information relating to directors or governing persons, use a business or post office box address rather than a residence address if privacy concerns are an issue.

### For-profit or Professional Corporation
Sections 21.052 to 21.055 of the BOC set forth the procedures for amending the certificate of formation for a for-profit corporation or professional corporation. The board of directors adopts a resolution setting forth the proposed amendment and directing that it be submitted to a vote at a meeting of the shareholders. Written or printed notice setting forth the proposed amendment is given to each shareholder of record entitled to vote not later than the 10th day and not earlier than the 60th day before the date of the meeting, either personally, by electronic transmission, or by mail (BOC § 21.353). (Please refer to chapters 6 and 21 of the BOC for further information.)

Pursuant to section 21.364 of the BOC, the proposed amendment is adopted on receiving the affirmative vote of two-thirds of the outstanding shares entitled to vote. If any class or series of shares is entitled to vote as a class, the amendment must also receive the affirmative vote of two-thirds of the shares within each class or series that is entitled to vote as a class. Any number of amendments may be submitted to the shareholders and voted on at one meeting. Alternatively, amendments may be adopted by unanimous written consent of the shareholders.

If no shares have been issued, the amendment is adopted by a resolution of the board of directors and the provisions for adoption by shareholders do not apply.

An officer must sign the certificate of amendment. If no shares have been issued and the amendment was adopted by the board of directors, a majority of the directors may sign the certificate of amendment.

### Professional Association
The provisions of chapters 20 and 21 of the BOC apply to a professional association, unless there is a conflict with a specific provision in title 7. A professional association may amend its certificate of formation by following the procedures set forth in its certificate of formation. If the certificate of

Form 424                                        1

formation does not provide a procedure for amending the certificate, the certificate of formation is amended by a two-thirds vote of its members.

An officer must sign the certificate of amendment.

Nonprofit Corporation
Sections 22.105 to 22.108 of the BOC set forth the procedures for amending the certificate of formation for a nonprofit corporation. If the corporation has members with voting rights, the board of directors adopts a resolution setting forth the proposed amendment and directing that it be submitted to a vote at a meeting of the members, which may be either an annual or special meeting. The proposed amendment is adopted on receiving two-thirds of the votes that members present, in person or by proxy, were entitled to cast (BOC § 22.164). Any number of amendments may be submitted to the members and voted on at one meeting. Alternatively, the amendment may be adopted without a meeting if a written consent, setting forth the action to be taken, is signed by all the members entitled to vote. (Please refer to chapters 6 and 22 of the BOC for further information.)

If the corporation has no members or no members with voting rights, the amendment is adopted by a majority vote of the board of directors.

An officer of the nonprofit corporation must sign the certificate of amendment.

> A nonprofit corporation formed for a special purpose under a statute or code other than the BOC may be required to meet other requirements for a certificate of amendment than those imposed by the BOC. This form may not comply with the requirements imposed under the special statute or code governing the special purpose corporation. Please refer to the statute or code governing the special purpose corporation for specific filing requirements for a certificate of amendment.

Cooperative Association
Section 251.052 of the BOC sets forth the procedure for amending the certificate of formation of a cooperative association. The board of directors may propose an amendment to the certificate of formation by a two-thirds vote of the board members. Notice of the meeting to consider the proposed amendment must be provided to the members no later than the 31st day before the date of the meeting. To be approved, the amendment must be adopted by the affirmative vote of two-thirds of the members voting on the amendment. The cooperative association must file the certificate of amendment with the secretary of state within thirty (30) days after its adoption by the members.

An officer of the cooperative association must sign the certificate of amendment.

Limited Liability Company or Professional Limited Liability Company
Chapter 101 of the BOC governs limited liability companies. Pursuant to section 101.356(d), an amendment to the certificate of formation must be approved by the affirmative vote of all of the company's members. If the company has managers, but has yet to admit its initial member, the amendment would be approved by the affirmative vote of the majority of all the company's managers as permitted by section 101.356(e).

If the limited liability company has managers, an authorized manager must sign the certificate of amendment. If the company does not have managers and is managed by its members, an authorized managing-member must sign the certificate of amendment.

Form 424                                    2

Limited Partnership

Chapter 153 of the BOC governs limited partnerships. A certificate of limited partnership may be amended at any time for any proper purpose determined by the general partners. However, section 153.051 *requires* a certificate of amendment when there is:

(1) a change of name of the partnership;
(2) an admission of a new general partner; or
(3) a withdrawal of a general partner.

Section 153.051 of the BOC also requires that a limited partnership amend its certificate of formation when there is a change of address for the registered office or a change of name or address of the registered agent of the partnership. However, rather than filing an amendment, the partnership may file a statement of change pursuant to section 5.202 of the BOC to effect a change to its registered agent or registered office.

Pursuant to section 153.553, at least one general partner must sign the certificate of amendment. In addition, each general partner designated as a new general partner also must sign the certificate of amendment. A withdrawing general partner need not sign the certificate of amendment. The execution of a certificate by a general partner is an oath or affirmation, under a penalty of perjury, that to the best of the executing party's knowledge and belief, the facts contained in the certificate are true and correct (BOC §153.553(c)).

### Instructions for Form

- **Entity Information:** The certificate of amendment must contain the legal name of the entity and identify the type of filing entity. *If the amendment changes the name of the entity, the name as it currently appears on the records of the secretary of state should be stated.* It is recommended that the date of formation and file number assigned by the secretary of state be provided to facilitate processing of the document.

- **Amendments:    1. Amended Name.** This form is designed to provide a standardized amendment form to effect a change of name for the filing entity. If the legal name of the entity is to be changed, state the new name of the entity in section 1. Please note that the legal name of the entity must include an appropriate organizational designation for the entity type.

  The new entity name will be checked for availability on submission of the certificate of amendment. Under section 5.053 of the BOC, if the new name of the entity is the same as, deceptively similar to, or similar to the name of an existing domestic or foreign filing entity, or any name reservation or name registration filed with the secretary of state, the document cannot be filed. The administrative rules adopted for determining entity name availability (Texas Administrative Code, title 1, part 4, chapter 79, subchapter C) may be viewed at *www.sos.state.tx.us/tac/index.shtml.* If you wish the secretary of state to provide a preliminary determination on name availability, you may call (512) 463-5555, dial 7-1-1 for relay services, or e-mail your name inquiry to *corpinfo@sos.state.tx.us.* A final determination cannot be made until the document is received and processed by the secretary of state. Do not make financial expenditures or execute documents based on a preliminary clearance. Also note that the preclearance of a name or the issuance of a certificate under a name does not authorize the use of a name in violation of another person's rights to the name.

- **Amendments:    2. Changes to Registered Agent and/or Registered Office.** It is not necessary to file a certificate of amendment if the entity seeks only to change its registered agent or its

Form 424                                3

registered office. A filing entity may file a statement of change of registered agent/registered office pursuant to section 5.202 of the BOC.

However, if the entity is changing its name or making other changes to its certificate of formation, any changes to the registered agent or registered office may be included in a certificate of amendment. Section 2 can be completed to effect a change to the registered agent or registered office address. The registered agent can be either (option A) a domestic entity or a foreign entity that is registered to do business in Texas or (option B) an individual resident of the state. The filing entity cannot act as its own registered agent.

*Consent:* Effective January 1, 2010, a person designated as the registered agent of an entity must have consented, either in a written or electronic form, to serve as the registered agent of the entity. Although the consent of the person designated as registered agent is required, a copy of the written or electronic consent need not be submitted with a certificate of correction that corrects the name of the registered agent. *The liabilities and penalties imposed by sections 4.007 and 4.008 of the BOC apply with respect to a false statement in a filing instrument that names a person as the registered agent of an entity without that person's consent.* (BOC § 5.207)

*Amendment to Registered Office:* The registered office address must be located at a street address where service of process may be personally served on the entity's registered agent during normal business hours. Although the registered office is not required to be the entity's principal place of business, the registered office may not be solely a mailbox service or telephone answering service (BOC § 5.201).

- **Amendments:    3. Other Provisions to be Added, Altered, or Deleted.** Section 3 of this form contains three text areas that may be used to make alterations or changes to other provisions in the certificate of formation or to identify those provisions to be deleted. If the space provided in a text area is insufficient, include the provisions as an attachment to this form.

  ➢ **Add:** If the amendment is an addition to the certificate of formation, check the "Add" statement and provide an identification or reference for the added provision and the full text of each provision added in the text area.
  ➢ **Alter:** If the amendment alters or changes an existing article or provision in the certificate of formation, check the "Alter" statement and provide an identification of the article number or description of the altered provision and the text of the article or provision as it is amended to read in the text area.
  ➢ **Delete:** If the amendment deletes an existing article or provision in its entirety, check the "Delete" statement and provide a reference to the article number or provision being deleted in the text area.

- **Statement of Approval:** As required by section 3.053 of the BOC, the form includes a statement regarding the approval of the amendment. In general, amendments are adopted and approved in the manner set forth in the title of the BOC governing the entity. General procedural information relevant to each filing entity that may use this form precedes the instructions for completing the form.

- **Effectiveness of Filing:** A certificate of amendment becomes effective when filed by the secretary of state (option A). However, pursuant to sections 4.052 and 4.053 of the BOC the effectiveness of the instrument may be delayed to a date not more than ninety (90) days from the date the instrument is signed (option B). The effectiveness of the instrument also may be delayed on the occurrence of a

Form 424                                        4

future event or fact, other than the passage of time (option C). If option C is selected, you must state the manner in which the event or fact will cause the instrument to take effect and the date of the 90th day after the date the instrument is signed. In order for the certificate to take effect under option C, the entity must, within ninety (90) days of the filing of the certificate, file a statement with the secretary of state regarding the event or fact pursuant to section 4.055 of the BOC.

On the filing of a document with a delayed effective date or condition, the computer records of the secretary of state will be changed to show the filing of the document, the date of the filing, and the future date on which the document will be effective or evidence that the effectiveness was conditioned on the occurrence of a future event or fact.

- **Execution:** Pursuant to section 4.001 of the BOC, the certificate of amendment must be signed by a person authorized by the BOC to act on behalf of the entity in regard to the filing instrument. Please refer to the procedural information relating to the specific entity type for further information on execution requirements. Generally, a governing person or managerial official of the entity signs a filing instrument.

  The certificate of amendment need not be notarized. However, before signing, please read the statements on this form carefully. <u>The designation or appointment of a person as the registered agent by a managerial official is an affirmation by that official that the person named in the instrument has consented to serve as registered agent.</u> (BOC § 5.2011, effective January 1, 2010)

  *A person commits an offense under section 4.008 of the BOC if the person signs or directs the filing of a filing instrument the person knows is materially false with the intent that the instrument be delivered to the secretary of state for filing. The offense is a Class A misdemeanor unless the person's intent is to harm or defraud another, in which case the offense is a state jail felony.*

- **Payment and Delivery Instructions:** The filing fee for a certificate of amendment is **$150**, unless the filing entity is a nonprofit corporation or a cooperative association. The filing fee for a certificate of amendment for a nonprofit corporation or a cooperative association is **$25**. Fees may be paid by personal checks, money orders, LegalEase debit cards, or American Express, Discover, MasterCard, and Visa credit cards. Checks or money orders must be payable through a U.S. bank or financial institution and made payable to the secretary of state. Fees paid by credit card are subject to a statutorily authorized convenience fee of 2.7 percent of the total fees.

  Submit the completed form in duplicate along with the filing fee. The form may be mailed to P.O. Box 13697, Austin, Texas 78711-3697; faxed to (512) 463-5709; or delivered to the James Earl Rudder Office Building, 1019 Brazos, Austin, Texas 78701. If a document is transmitted by fax, credit card information must accompany the transmission (Form 807). On filing the document, the secretary of state will return the appropriate evidence of filing to the submitter together with a file-stamped copy of the document, if a duplicate copy was provided as instructed.

Revised 05/11

Form 424

5

APP-0114

**Form 424**
**(Revised 05/11)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: See instructions**

This space reserved for office use.

**Certificate of Amendment**

# Entity Information

The name of the filing entity is:

TRTX Properties, LLC
_____

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation               ☐ Professional Corporation

☐ Nonprofit Corporation                ☐ Professional Limited Liability Company

☐ Cooperative Association              ☐ Professional Association

☑ Limited Liability Company            ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  801308593
_____

The date of formation of the entity is:   08/20/2010
_____

# Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

TRTX Properties, LLC
_____

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424                               6

APP-0115

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☑ A. The registered agent is an organization (cannot be entity named above) by the name of:

ONE Agent Texas, LLC
_____
**OR**

☐ B. The registered agent is an individual resident of the state whose name is:

_____
*First Name*                          *M.I.*          *Last Name*                          *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C.  The business address of the registered agent and the registered office address is:

815 Brazos St., Suite 500                          Austin                          TX    78701
_____
*Street Address (No P.O. Box)*                          *City*                          *State*    *Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

> ☑ **Add** each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:
>
> The MXBA Trust
> 2999 Turtle Creek Blvd
> Dallas TX 75219
> Manager

> ☐ **Alter** each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

> ☑ **Delete** each of the provisions identified below from the certificate of formation.
>
> TRWF LLC as Manager

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                          7

APP-0116

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:    07/20/2020

By: _____

_____
Signature of authorized person

Max Barton, President
_____
Printed or typed name of authorized person (see instructions)

APP-0117

# EXHIBIT
# F

APP-0118

## The MXBA TRUST

THIS IS A TRUST AGREEMENT dated June 1, 2020 between Timothy Barton, of Dallas, Texas (the "Grantor") and Saskya Bedoya as General Trustee (the "Trustee").

WHEREAS, the Grantor desires to create a trust; and

WHEREAS, the Trustee is willing to accept the trust hereby created and covenants to discharge faithfully the duties of a Trustee hereunder;

NOW, THEREFORE, the Grantor hereby transfers property described on Schedule A hereto annexed, to the Trustee, IN TRUST, and the Trustee agrees to accept the property and to hold, manage and distribute the property under the terms of this Trust Agreement.

## ARTICLE I
## Trust Name

This Trust Agreement and the trust hereunder may be referred to as The MXBA Trust

## ARTICLE II
## Beneficiary

The "Beneficiary" of the trust shall be Max Barton and all property transferred to the Trustee during the Beneficiary's lifetime shall be held for the Beneficiary under the terms of the Beneficiary's Separate Trust hereunder.  Max Barton currently has no children.

## Article III

## Crummey Rights of Withdrawal

Immediately following each contribution (as defined below) to the trust, the Beneficiary may withdraw from the trust a portion of the value of each contribution, the amount of which, and the limitations, rules and procedures applicable to which shall be set forth later in this Trust Agreement.

## Article IV
### Beneficiary's Separate Trust

The Beneficiary's Separate Trust shall be held, administered, and distributed as provided in this Article.

A.    **During Beneficiary's Life.**    The following provisions shall apply during the Beneficiary's life:

1.    The Trustee shall distribute to or for the benefit of any one or more of the Beneficiary and the Beneficiary's descendants as much of the net income and principal of the Beneficiary's Separate Trust as the Trustee may at any time and from time to time determine, in such amounts or proportions as the Trustee may from time to time select for the health, education, maintenance or support of the Beneficiary and Beneficiary's descendants in his or her accustomed manner of living.

2.    Any net income not so distributed shall be accumulated and annually added to principal.

3.    The Beneficiary shall have the right individually at any time to withdraw principal for the Beneficiary's health, education, maintenance or support, in his or her accustomed manner of living.

4.    Notwithstanding anything herein to the contrary, the Trustee shall not make any distribution of income and/or principal to any beneficiary other than the Beneficiary unless the Trustee gives the Beneficiary written notice of the intention of the Trustee to make a distribution to a beneficiary other than the Beneficiary at least thirty (30) days prior to making such intended distribution and, if the Beneficiary advises the Trustee not to make such intended distribution, the Trustee shall not make such intended distribution.

5.    Without limiting the Trustee's discretion, the Trustee may consider the needs of the Beneficiary as more important than the needs of any other beneficiary.

B.    **Upon Beneficiary's Death.**    Upon the Beneficiary's death, the property then held in his or her trust shall be:

1.    distributed to such one or more persons (other than the Grantor or the Grantor's Spouse, the Grantor or the Grantor's Spouse's creditors or estate, the creditors of the Grantor or the Grantor's Spouse's estate, the Beneficiary, the Beneficiary's estate, the Beneficiary's

creditors or the creditors of the Beneficiary's estate) on such terms as the Beneficiary may appoint by a Will or other signed writing that is acknowledged before a notary public specifically referring to this power of appointment, or, in default of appointment or insofar as an appointment is not effective;

2.      retained in trust under Article V herein as "Descendants' Trusts" for the benefit of Beneficiary's descendants, or if none of Beneficiary's descendants shall survive Beneficiary, in accordance with Article VI, herein.

C.      **Maximum Duration for Trusts.**  Any trust under this Article still in existence upon the expiration of the Maximum Duration for Trusts as defined elsewhere in this Trust Agreement shall thereupon terminate and the remaining trust property shall be distributed to the Beneficiary of the trust.

## ARTICLE V
### Descendants' Trusts

Property that is to be held in the Descendants' Trusts shall be held under this Article and all references to "Descendants' Trusts" shall be to the separate trusts held under this Article.

A.      **Division**.  Upon the death of Beneficiary Max Barton, the remaining Trust property shall be divided into as many equal separate trust shares as shall be necessary to create one equal trust share for each of MAX BARTON's children, *per stirpes*.  The beneficiary of a Descendant's Trust share shall be the child or grandchild for whose benefit the trust share was created.

B.      **Distributions of Principal and Income.**  The following provisions shall apply during the lifetime of the beneficiary of a Descendant's Trust share :

1.      The Trustee shall distribute or for the benefit of the beneficiary of a Descendants' Trust Share as much of the net income and principal of the trust as the Trustee may at any time and from time to time determine, in such amounts or proportions as the Trustee may from time to time select for the health, education, maintenance or support of beneficiary in his or her accustomed manner of living.  Any net income not so distributed shall be accumulated and annually added to principal.

C.    **Distribution upon Death of Beneficiary.**

1.    Limited Power of Appointment. The beneficiary of a Descendant's Trust share under this Article V shall have the limited testamentary power to appoint to or for the benefit of his or her descendants, either by a valid last will and testament or by a valid living trust agreement executed by the beneficiary, all or any portion of the principal and any accrued and undistributed net income of the beneficiary's Descendants' Trust share as it exists at the beneficiary's death. In exercising this limited power of appointment, the beneficiary of the Descendant's Trust share shall specifically refer to this power. The beneficiary of the Descendant's Trust share shall have the sole and exclusive right to exercise this limited power of appointment.

2.    Non-exercise of the Limited Power of Appointment. To the extent the above limited power of appointment is not exercised by the beneficiary of the Descendant's Trust share, the Trustee shall distribute the then remaining trust property of the Descendants' Trust share to the then living descendants of the beneficiary of the Descendant's Trust share, *per stirpes*. If the beneficiary has no then living descendants, the Trustee shall distribute the remaining Descendant's Trust share property for the benefit of the descendants of MAX BARTON, per stirpes. If MAX BARTON has no then living descendants, the Trustee shall distribute the remaining trust property as provided in Article VI.

D.    **Maximum Duration for Trusts.** Any trust under this Article still in existence upon the expiration of the Maximum Duration for Trusts as defined elsewhere in this Trust Agreement shall thereupon terminate and the remaining trust property shall be distributed to the beneficiary of that trust share.

# ARTICLE VI
## Takers of Last Resort

The Trustee shall distribute any property that is not otherwise disposed of under this Trust Agreement to those persons who would be the heirs of MAX BARTON had he died intestate owning such property. The distribution of trust property, for purposes of this Article, shall be determined by the laws of descent and distribution for intestate estates in the state of Texas as such laws are in effect at the time of any distribution under this Article.

## ARTICLE VII
### Insurance Policies

The Trustee may acquire and retain life insurance on the life of any individual (or the joint lives of any individuals) in which any beneficiary has an insurable interest. The Trustee (excluding, however, any Insured Trustee, who shall not participate in any decision involving a life insurance policy on such Trustee's life or its proceeds) shall have all rights of an owner over life insurance policies assigned to or otherwise owned by the Trustee, exercisable in such Trustee's absolute discretion, including without limitation each of the following rights that applies to a policy:

A.    **Right to Borrow.** To retain the policy and to pay premiums and interest on policy loans thereon by using income or principal or by borrowing on the policy.

B.    **Minimum Deposit.** To adopt a minimum deposit or similar arrangement regarding the policy, even though that may reduce the amount of the death benefit or result in the *de facto* conversion of a cash value life policy into a term policy.

C.    **Split Dollar Plans.** To enter into and to terminate split-dollar or similar plans.

D.    **Designate Beneficiary.** To designate the beneficiary under the policy and to exercise non-forfeiture provisions, conversion privileges and other options available under the policy.

E.    **Miscellaneous.** The Trustee shall have no duty to pay premiums on the insurance policies payable to or owned by the Trustee. The companies issuing insurance policies payable to the Trustee shall have no responsibility for the application of the proceeds or the fulfillment of the trusts hereunder. The direct payment of a premium on an insurance policy shall be treated as an addition to the trust to the extent it is treated as a gift by a living person.

## ARTICLE VIII
### Maximum Duration for Trusts

A.    **Maximum Duration for Trusts Defined.** The Maximum Duration for Trusts shall end on the date twenty-one (21) years after the death of the last to die of the measuring lives described in the paragraph below entitled "Measuring Lives."

B.    **Measuring Lives.**  The measuring lives under the paragraph above entitled "Maximum Duration for Trusts Defined" shall consist of those of the following individuals who are living at the time that the application of such rules limiting the maximum duration of trusts is deemed to begin:  MAX BARTON and all of the Descendants of MAX BARTON.

C.    **Powers of Appointment.**  This Article shall also apply to a trust created by the exercise of a power of appointment conferred by this Trust Agreement (unless the exercise of the power of appointment expressly commences a new rule against perpetuities or similar rule that limits the time that property may remain in trust).

## ARTICLE IX
### Certain Income Taxes

The Trustee may, but shall not be required to reimburse the Beneficiary from assets of any trust hereunder for the Beneficiary's income tax (Federal, state, local, or foreign) on the amount (if any) of the gross income of such trust that is reportable directly on the Beneficiary's return under Code Sec. 671.

## ARTICLE X
### Spendthrift Provision

A.    **No Assignment.**  Each trust shall be a spendthrift trust to the maximum extent permitted by law and no interest in any trust hereunder shall be subject to a beneficiary's liabilities or creditor claims, assignment or anticipation.

B.    **Protection from Creditors.**  If the Trustee shall determine that a beneficiary would not benefit as greatly from any outright distribution of trust income or principal because of the availability of the distribution to the beneficiary's creditors, the Trustee shall instead expend those amounts for the benefit of the beneficiary.  This direction is intended to enable the Trustee to give the beneficiary the maximum possible benefit and enjoyment of all the trust income and principal to which the beneficiary is entitled.

C.    **Protection from Marital Claims.**  All benefits granted to a beneficiary under this instrument shall be the separate and individual property of such beneficiary (as distinguished from marital property, community property, quasi-community property or any other form of property as to which such beneficiary's Spouse might have a claim or interest arising out of the marital

THE MXBA TRUST |                                                                    P a g e | 6

relationship under the law of any jurisdiction, domestic or foreign). All benefits granted to a beneficiary hereunder shall also be free of any interference from, or control or marital power of, his or her Spouse. For purposes of this paragraph, the term "benefits" shall include real or personal property, tangible or intangible, and the provisions of this paragraph shall apply not only to benefits actually paid to any beneficiary but also to trust property allocated to a trust in which the beneficiary possesses an interest hereunder.

## ARTICLE XI
## Payments to Minors

Whenever property becomes distributable to a person under thirty (30) years of age (described herein as the "Minor" regardless of the actual legal age of majority) for any reason, the Trustee may make the distribution in any way in which the Trustee shall deem appropriate, including (but not limited to) those enumerated in this Article:

A.      **Distribution to Trust.** The Trustee may hold the property in a separate trust for the Minor until the Minor attains thirty (30) years of age. The Trustee may distribute to the Minor as much of the net income and/or principal of the trust as the Trustee may at any time and from time to time determine, for any purpose, annually adding to principal any undistributed net income. When the Minor reaches thirty (30) years of age, the Trustee shall distribute the property to the Minor. If the Minor dies before reaching thirty (30) years of age, then upon the Minor's death, the Trustee shall distribute the property held in trust for the Minor as follows:

1.      to the Minor's descendants surviving the Minor, per stirpes; or if there are no such descendants then living, then

2.      to the descendants then living, per stirpes, of the Minor's nearest ancestor, or if there are no such descendants then living, then

3.      to the Grantor's descendants then living, per stirpes.

Any trust under this paragraph entitled "Distribution to Trust" shall terminate upon the expiration of the Maximum Duration for Trusts as defined elsewhere in this Trust Agreement, and the remaining trust property shall be distributed to the Minor in one of the other ways authorized in this Article.

APP-0125

B.    **Distribution to Custodian.** The Trustee may distribute the property to a custodian or successor custodian under any state's version of the Uniform Transfers (or Gifts) to Minors Act, including a custodian selected by the Trustee. The Trustee may select any age for termination of the custodianship permitted under the Act, giving due consideration to selecting twenty-one (21) years of age if that is permitted, and may designate successor custodians.

C.    **Distribution to a Guardian of a Minor's Property.** The Trustee may distribute the property to a Guardian of the Minor's estate.

D.    **Distribution to a Minor's Parent.** The Trustee may distribute the property to a parent of the Minor even if the parent does not assume any formal fiduciary capacity concerning the property.

E.    **No Distribution to Grantor.** Nothing in this Article shall authorize distribution of any trust property to or for the benefit of the Grantor, either individually or in any fiduciary capacity.

F.    **Exoneration of Fiduciary for Distributions for Minor.** The Trustee shall be free from any responsibility for the subsequent disposition of property following the disposition of such property by the Trustee in one of the ways specified in this Article.

## ARTICLE XII
### Payments to Incapacitated Persons

Whenever property becomes distributable to a person whom the Trustee reasonably and in good faith shall determine is experiencing substantial difficulty in managing financial matters and that such difficulty is not expected to be short-term (described herein as "an Incapacitated Person" regardless of whether a court of competent jurisdiction has determined such person to be incompetent and regardless of whether a guardian, conservator or other legal representative has been appointed for such person), the Trustee may make the distribution in any way in which the Trustee shall deem appropriate, including (but not limited to) those enumerated in this Article:

A.    **Distribution to Trust.** The Trustee may hold the property in a separate trust for the Incapacitated Person until the Incapacitated Person is no longer incapacitated as defined above. The Trustee may distribute to the Incapacitated Person as much of the net income and/or principal of the trust as the Trustee may at any time and from time to time determine, for any purpose, annually adding to principal any undistributed net income. When the Incapacitated Person is no

THE MXBA TRUST |                                                                    P a g e | 8

APP-0126

longer incapacitated, the Trustee shall distribute the property to the formerly Incapacitated Person. If the Incapacitated Person dies before the property is distributed to him or her, then upon the Incapacitated Person's death, the Trustee shall distribute the property to the Independent Executor of the Incapacitated Person.

B.      **Distribution to Incapacitated Person of a Power.**  The Trustee may actually distribute the property to anyone serving as Trustee under this Trust Agreement, in a manner so that it then vests in the Incapacitated Person, to hold the same as donee of a power during incapacity, such donee to have all the powers of a Trustee under this Trust Agreement (including the power to apply the property for the Incapacitated Person) and to be compensated as if the property were a separate trust, but with no duty to account to any court periodically or otherwise.

C.      **Distribution to a Guardian of Incapacitated Person's Property.**  The Trustee may distribute the property to a Guardian of the Incapacitated Person's estate.

D.      **Distribution to Incapacitated Person's Spouse or Parent.**  The Trustee may distribute the property to a Spouse or parent of the Incapacitated Person even if the Spouse or parent does not assume any formal fiduciary capacity concerning the property.

E.      **No Distribution to Grantor.**  Nothing in this Article shall authorize distribution of any trust property to or for the benefit of the Grantor, either individually or in any fiduciary capacity.

F.      **Exoneration of Fiduciary for Distributions for Incapacitated Person.**  The Trustee shall be free from any responsibility for the subsequent disposition of the property if it is distributed in one of the ways specified in this Article.

## ARTICLE XIII
### Exercise of Powers Created Hereunder

A.      **Form of Appointment.**  A power of appointment conferred hereunder upon a person in his or her individual capacity (a "Non-Fiduciary Power") may be exercised in favor of one or more persons to or for whom the power may be exercised, in any proportions, in any lawful estates and interests, whether absolute or in further trust.  Such a Non-Fiduciary Power may be exercised to create further Non-Fiduciary Powers which may be made exercisable in the same or a different manner.  A limited power of appointment may be exercised to confer a limited or general power, including a presently exercisable limited or general power.

THE MXBA TRUST |                                                          P a g e  | 9

APP-0127

B.      **Trustees under Appointment.** The Trustee under an appointment in further trust may be any person not prohibited from serving as Trustee under this Trust Agreement and may be given fiduciary powers (including discretionary powers over distributions), exercisable, however, only in favor of permissible objects of the exercised power.

C.      **Testamentary Power.** A Non-Fiduciary Power, if any, that is exercisable only by the powerholder's last will and testament, may also be exercised by a separate written instrument signed by the powerholder (other than the powerholder's last will and testament) if the powerholder's last will and testament contains a direction that the exercise in the other instrument be honored.

## ARTICLE XIV

### Irrevocability

This Trust Agreement shall be revocable.  The Grantor shall have the right to alter it or amend it in any way and, notwithstanding any other provision hereof, none of the principal and none of the income therefrom shall ever be payable to the Grantor, to the Grantor's estate, or to the creditors of the Grantor's estate, or to discharge any obligation of the Grantor to the Grantor's creditors, to the Grantor's estate or to the creditors of the Grantor's estate.  The authorization to distribute income or principal for a beneficiary's support does not include authority to make distributions that would discharge or substitute for any obligation of the Grantor to support the beneficiary.  The Grantor intends that no distribution from a trust hereunder shall be deemed to discharge or substitute for the Grantor's obligation to support a beneficiary of a trust hereunder, and the Grantor directs that no distribution shall be made that would have that effect.

## ARTICLE XV

### Outright Transfers if Trust Already Terminated in Whole or Part

Where property is directed under this Trust Agreement to be held in trust and the time for termination of such trust has been reached, then the property shall not pass in trust but rather shall pass as the remainder of such trust is directed to be transferred at the time for termination of such trust.  In addition, if property is directed under this Trust Agreement to be distributed to a trust, the terms of which direct a partial distribution of the assets of the trust upon the occurrence of a specified date or event (referred to in this Article as the "Distribution Event"), and the Distribution

Event has occurred, the portion of such property subject to partial distribution shall not pass in trust but shall instead pass as such property is directed to pass upon the occurrence of the Distribution Event.

## ARTICLE XVI
### Trustees

A.    **Appointment of Trustee.**

1.    **Appointment of Initial General Trustee.**  The Grantor appoints Saskya Bedoya to serve as the Initial Trustee hereunder (collectively referred to in this instrument as the Trustee).

2.    **Appointment of First Level Successor General Trustee.**  If Saskya Bedoya is unable or ceases to serve as General Trustee for any reason, Grantor appoints Francis Barton Jr. to serve as successor Trustees hereunder.  If either of them is unable to serve or ceases to serve the other may serve alone.

B.    **Co-Trustees.**  A Co-Trustee may be appointed by a then serving Trustee (the "appointing Trustee") at any time when the only persons serving as trustee are also beneficiaries. A Co-Trustee so appointed hereunder shall serve while the appointing Trustee serves, and shall continue to serve if the appointing Trustee fails or ceases to serve only if no successor has been named or identified by the Grantor or all successors named or identified by the Grantor are unable or unwilling to serve.  Any appointment of a Co-Trustee hereunder shall be made by an acknowledged instrument delivered to any and all other Trustees who may then be serving.

C.    **Successor Trustees.**  If a specific successor Trustee is named to succeed a particular Trustee named in this Article, such specific successor Trustee shall serve as successor as appointed above.  In all other cases, a Trustee (the "appointing Trustee") may appoint successor Trustees in accordance with this paragraph:

1.    Any trustee serving at any time may appoint a successor trustee to serve when the appointing trustee fails or ceases to serve as trustee.

2.    If an appointing Trustee names a successor Trustee, and if the Grantor has also named or provided for the appointment of one or more successor Trustees herein, the appointments the Grantor has made herein shall take priority, unless the appointing Trustee

provides otherwise in the instrument by which the appointing Trustee appoints the successor Trustee.

   3. Any appointment of a successor Trustee shall be made by an acknowledged instrument delivered to any and all other Trustees who may then be serving.

   D. **Acceptance of Appointment.**  Each Trustee appointed hereunder shall accept the appointment by executing an acknowledged instrument filed with the trust records, within 30 days of the date such person is advised of the opportunity to become a successor Trustee hereunder.

   E. **Trustee Exclusions.**  No successor Trustee or Co-Trustee appointed by a beneficiary shall be a person or entity that is related or subordinate to such beneficiary within the meaning of Code Sec. 672(c) and the Regulations thereunder.

   F. **Removal of Trustees.**

   1. A majority of the adult and competent Beneficiaries of a trust shall have the right to remove any Trustee hereunder other than TIMOTHY L. BARTON, whether that Trustee is currently serving or has been named or designated to serve in the future, for any reason or no reason at all.  If any Trustee is removed under this paragraph, any successor Trustee appointed by the removed Trustee shall not take office.

   2. The power to remove a particular Trustee may be released by the person who holds the power to remove and such release may be limited to such person or also may be made binding upon any and all persons who may have a power to remove.

   3. Notwithstanding anything herein contained to the contrary, the power conferred to remove one or more Trustees shall not be exercised more than once every calendar year.  The power to remove may not be exercised with respect to any Trustee for another calendar year once the power has been used to remove a Trustee even if fewer than all of Trustees acting at the time of removal were removed by the exercise of that power.

   G. **Filling Trustee Vacancies.**  If there is neither an effectual appointment of a successor Trustee nor any effectual provision otherwise hereunder for the appointment of a successor Trustee, a majority of the beneficiaries of the trust then eligible to receive distributions of income or principal may designate a successor trustee.

   H. **Compensation of Trustees.**  Individual Trustees shall receive reasonable compensation in accordance with the law of the State of Texas in effect at the time of payment, unless the Trustee waives compensation; provided, however, no descendant of the Grantor who is

THE MXBA TRUST |                       P a g e | **12**

APP-0130

named herein or otherwise appointed to serve as Trustee hereunder shall receive compensation for serving as Trustee hereunder. A corporate Trustee shall be compensated by agreement with the individual Trustee or, in the absence of such agreement, in accordance with its fee schedule as in effect at the time of payment. The Grantor authorizes a corporate Trustee to charge additional fees for services it provides to a trust hereunder that are not comprised within its duties as Trustee; for example, a fee charged by a mutual fund it administers in which a trust hereunder invests, a fee for providing an appraisal or a fee for providing corporate finance or investment banking services. The Grantor also recognizes that a corporate Trustee may charge separately for some services comprised within its duties as Trustee; for example, a separate fee for investing cash balances or preparing tax returns. Such separate charges shall not be treated as improper or excessive merely because they are added on to a basic fee in calculating total compensation for service as Trustee. In calculating any compensation based on the value of a trust, a policy of insurance on the life of a living person shall be deemed to have no value.

I.      **Beneficiary.** For purposes of this Article, the term "beneficiary" shall mean any person who is named as a recipient of property under this Trust Agreement or who is, or in the future may be, eligible to receive income or principal under any trust created hereunder, or have the right to use any property owned by any trust created hereunder. A person shall be considered a beneficiary for purposes of this Article even if his or her only interest is as a potential distributee or user of trust property under a discretionary power held by a Disinterested Trustee of any trust created hereunder, but shall not be considered a beneficiary for such purposes if his or her only interest hereunder is as a potential appointee under any non-fiduciary power of appointment held by another person which has not yet been exercised or the exercise of which can take effect only in the future, such as a testamentary power held by a living person.

## ARTICLE XVII
### Fiduciary Provisions

A.      **General Provisions Regarding Changes in Fiduciaries.**

1.      In the event that the sole Trustee of a trust is a beneficiary of the trust, the Trustee may appoint, but shall not be required to appoint, a Co-Trustee as provided herein. A beneficiary's interest shall not be merged or converted into a legal life estate or estate for years

APP-0131

because the beneficiary is the sole Trustee. If this would still happen under applicable law, then a Co-Trustee shall be appointed in preference to such merger or conversion.

2. Separate trusts hereunder may have different Trustees.

3. To the extent not prohibited by applicable law, any Trustee may resign at any time without court approval, whether or not a successor has been appointed, provided the resigning Trustee complies with any applicable state law governing the resignation of the Trustee that may not be waived by a governing instrument. Such resignation shall be by acknowledged instrument executed by the resigning Trustee and delivered to any other fiduciary acting hereunder, or if none, to the Grantor's then living eldest adult and competent descendant (who, if a Trustee is resigning, is a beneficiary of the trust of which such Trustee is resigning), or if none, then to the guardian of the Grantor's then living eldest descendant (who, if a Trustee is resigning, is a beneficiary of the trust of which such Trustee is resigning), or, if such descendant is a minor and no guardian for such minor has been appointed and is acting, then to the parent of such descendant or other individual with whom such minor resides.

4. No individual serving as Trustee shall be liable for any mistake or error of judgment but shall be liable for dishonesty, gross negligence and willful malfeasance.

5. No successor Trustee shall be personally liable for any act or failure to act of any predecessor Trustee or shall have any duty to examine the records of any predecessor Trustee. A successor Trustee may accept the account rendered and the property delivered to the successor Trustee by or on behalf of the predecessor Trustee as a full and complete discharge of the predecessor Trustee without incurring any liability or responsibility for so doing. The successor Trustee shall be indemnified out of trust property for any and all claims, demands, losses, liabilities, damages and expenses arising from any act or omission of a prior Trustee occurring before the date the trust property was received by the successor Trustee.

6. No individual fiduciary hereunder shall participate in any decision with respect to any tax election or option, under Federal, state or local law that could enlarge, diminish or shift his or her beneficial interest hereunder from or to the beneficial interest hereunder of another person. Any such tax election or option shall be made only by a fiduciary or fiduciaries that do not have a beneficial interest hereunder or whose beneficial interest could not be enlarged, diminished or shifted by the election or option. If the only fiduciary or fiduciaries who otherwise could exercise such tax election or option hold beneficial interests hereunder that could be so

enlarged, diminished or shifted, another individual or a bank or trust company (but not an individual, bank or trust company that is related or subordinate within the meaning of Code Sec. 672(c) to any acting fiduciary hereunder) shall be appointed by the fiduciary or fiduciaries by an acknowledged instrument delivered to the person so appointed and the fiduciary so appointed shall alone exercise any such election or option.

7.      If any Trustee is removed, resigns or otherwise ceases to act as Trustee of any trust hereunder, the Trustee shall immediately surrender all records maintained by the Trustee with respect to such trust to the then acting Trustees or, if no other Trustee is then acting with respect to such trust, to the successor Trustee upon receipt of written notice of the designation of the successor Trustee from the person appointing such successor Trustee.

B.      **Accountings and Other Proceedings.**

1.      The Grantor directs that a trust hereunder be subject to independent administration with as little court supervision as the applicable state law allows. The Trustee shall not be required to render to any court annual or other periodic accounts, or any inventory, appraisal, or other returns or reports, except as required by applicable state law. The Trustee shall take such action for the settlement or approval of accounts at such times and before such courts or without court proceedings as the Trustee shall determine. The Trustee shall pay the costs and expenses of any such action or proceeding, including (but not limited to) the compensation and expenses of attorneys and guardians, out of the property of the trust. The Trustee shall not be required to register any trust hereunder except as required by law.

C.      **Authorization of Conflict of Interest.** The Grantor has appointed the persons named in this Trust Agreement as the Trustee hereunder, cognizant of the fact that they may also serve as general and limited partners, managers, directors, officers, accountants, employees and/or other owners with respect to the partnerships, corporations and other business entities which may form a substantial part of any trust hereunder, and that their interests as Trustee hereunder may conflict with their individual interests as such general and limited partners, managers, directors, officers, accountants, employees and/or other owners with respect to the partnerships, corporations and other business entities. Notwithstanding the foregoing, the Grantor wishes these persons to serve as Trustee because of the Grantor's confidence in their individual skills and because they are the most appropriate persons as a result of their involvement with the partnerships, corporations or other business entities to manage and operate the partnerships, corporations or other business

APP-0133

entities, including making decisions related to the sale of any real property held by any such partnership, corporation or other business entity and the reinvestment of the proceeds of sale in a new real estate project. In addition, the Grantor expressly authorizes any Trustee to act as general and limited partners, managers, directors, officers, accountants, employees and/or other owners with respect to the partnerships, corporations and other business entities, and to receive compensation for his, her or its services.

D.      **Fiduciary to Fiduciary Self-Dealing.**  Except to the extent a restraint on self-dealing may not be waived under applicable local law by a governing instrument, the Grantor authorizes any Trustee acting hereunder, without court approval or notice, (i) to purchase or otherwise acquire assets from and (ii) to sell, transfer, exchange or loan any assets to any trust of which such Trustee is acting as a trustee and/or any estate of which such Trustee is acting as an Independent Executor in any manner, at any time or times, and upon such terms, credits and conditions as the Trustee may deem advisable notwithstanding that such participation otherwise may be an act of self-dealing under applicable state law.

E.      **Continuation of Trustee's Powers.**  Powers granted to the Trustee hereunder or by applicable law shall continue with respect to all property held hereunder to be exercisable by the Trustee until property is actually distributed to a beneficiary. By way of illustration and not by way of limitation, the Trustee may invest and reinvest and take all investment action with respect to property that has been directed to be distributed and notwithstanding any direction that the property be distributed "as it is then constituted" until such property is actually distributed.

F.      **Additional General Provisions Regarding Fiduciaries.**

1.      Under this Trust Agreement, if two or more separate trusts with the same beneficiaries and same terms are created, either by direction or pursuant to the exercise of discretion, the Grantor intends that the separate trusts may but need not have the same investments and may, but need not, follow the same pattern of distributions. The Trustee's powers shall be exercisable separately with respect to each trust.

2.      Except to the extent, if any, specifically provided otherwise in this Trust Agreement, references to the Trustee shall, in their application to a trust hereunder, refer to all those from time to time acting as Trustee and, if two Trustees are eligible to act .on any given matter, they shall act unanimously, and if more than two Trustees are eligible to act on a given matter, they shall act by majority. In the exercise of discretion over distributions, if this Trust

Agreement provides that certain Trustees may participate in distributions limited by an ascertainable standard while a different set of Trustees may participate in distributions for any purpose, and if the two sets of Trustees (each acting by its own majority) want to distribute the same item of income or principal to different recipients, then the distribution desired by the set of Trustees participating in distributions for any purpose shall prevail.

3.    The Trustee shall be entitled to reimbursement for any out-of-pocket expenditures made or incurred in the proper administration of the trusts under this Trust Agreement or in furtherance of his or her fiduciary duties and obligations.

4.    No Trustee shall be liable to anyone for anything done or not done by any other Trustee or any beneficiary.

5.    The fact that a Trustee is active in the investment business shall not be deemed a conflict of interest. Purchases and sales of investments may be made through a corporate Trustee or through any firm of which a corporate or individual Trustee is a partner, member, shareholder, proprietor, associate, employee, owner, subsidiary, affiliate or the like. Property of a trust hereunder may be invested in individual securities, mutual funds, partnerships, LLCs, private placements or other forms of investment promoted, underwritten, managed or advised by a Trustee or such a firm.

6.    The Trustee may employ and rely upon advice given by investment counsel, delegate discretionary investment authority over investments to investment counsel and pay investment counsel reasonable compensation in addition to fees otherwise payable to the Trustee, notwithstanding any rule of law otherwise prohibiting such dual compensation. The Trustee may acquire and retain investments that present a higher degree of risk than would normally be authorized by the applicable rules of fiduciary investment and conduct, may make short sales of any type, and may engage in any other type of financial investment or arrangement even if not specifically described herein and even if not currently used in markets at the time of execution of this Trust Agreement. No investment, no matter how risky or speculative, shall be absolutely prohibited, so long as prudent procedures are followed in selecting and retaining the investment. The Trustee may, but need not, favor retention of assets originally owned by the Grantor. The Trustee shall not be under any duty to diversify investments, regardless of any rule of law requiring diversification, and any such duty is hereby waived. The Trustee may retain and acquire property

THE MXBA TRUST |                                                                                    P a g e  | 17

that does not produce income, subject to any restrictions or qualifications of this power set forth elsewhere in this Trust Agreement.

7.    The fact that a Trustee (or a firm of which a Trustee is a member or with which a Trustee is otherwise affiliated) renders legal or other professional services to a trust hereunder shall not be deemed a conflict of interest, and the Trustee may, if permitted by applicable state law, pay fees for such services to such Trustee or firm without prior approval of any court or any beneficiary, whether or not there is a Trustee to approve such payment. An attorney or other Trustee who also renders professional services shall receive full compensation for both services as a Trustee and the professional services rendered, except as specifically limited by law.

8.    No state law restraint on acts of self-dealing by a fiduciary shall apply to a Trustee who is the Grantor's Spouse or a descendant of the Grantor, except to the extent (but only to the extent) such restraint may not be waived under applicable local law by a governing instrument. Except when prohibited by another provision of this Trust Agreement, such Trustee may enter into transactions on behalf of a trust hereunder in which that Trustee is personally interested so long as the terms of such transaction are fair to the trust. For example, such Trustee may purchase property from the trust at its then fair market value without court approval.

9.    If the Grantor has given the Trustee discretion concerning distributions of income or principal, that discretion shall be absolute and uncontrolled and subject to correction by a court only if the Trustee should act utterly without reason, in bad faith, or in violation of specific provisions of this Trust Agreement. If the Grantor has set forth general guidelines (as opposed to directions or dollar limits) for the Trustee in making distributions, those guidelines shall be merely suggestive and shall not create an enforceable standard whereby a distribution could be criticized or compelled. It is the Grantor's strong belief that the Trustee will be in the best position to interpret and carry out the intentions expressed herein under changing circumstances. This paragraph shall not, however, apply to any standards framed in terms of health, education, maintenance or support (including support in an accustomed manner of living), as those words shall create an ascertainable standard for Federal tax purposes under Code Sec. 2041(b), when applied to a Trustee's power or a power held individually, although even in those cases the holder of the power shall have as much discretion as is consistent therewith. An Interested Trustee who is otherwise authorized to make distributions to himself or herself subject to an ascertainable standard may exercise such discretion,

THE MXBA TRUST |                                                                    P a g e  |18

notwithstanding any contrary rule of law, unless such authorization would cause the trust property to be subject to the claims of the creditors of such Interested Trustee.

10.    Notwithstanding any other provision of this Trust Agreement, each Trustee is prohibited from making, voting on or otherwise participating in any discretionary distribution of income or principal from a trust that would discharge or substitute for a legal obligation of that Trustee, including the obligation to support a beneficiary of the trust.  Further, notwithstanding any other provision of this Trust Agreement, any Trustee authorized to distribute income or principal for his or her own health, education, maintenance or support in his or her accustomed manner of living, as those words shall create an ascertainable standard for Federal tax purposes under Code Sec. 2041(b), shall consider all resources reasonably available to himself or herself. Subject to that, in exercising discretion over distributions, the Trustee may consider or disregard other resources available to any beneficiary.

11.    A Trustee may irrevocably release one or more powers held by the Trustee while retaining other powers.

12.    Any Trustee may delegate to a Co-Trustee any power held by the delegating Trustee, but only if the Co-Trustee is authorized to exercise the power delegated.  A delegation may be revocable, but while it is in effect the delegating Trustee shall have no responsibility concerning the exercise of the delegated power.

13.    Unless the Grantor has specifically provided otherwise, and subject to any ascertainable standard governing its exercise for Federal tax purposes under Code Sec. 2041(b), the Trustee's discretionary power to distribute income or principal includes the power to distribute all of such income and/or principal to one or more members of a class to the exclusion of others, whether or not the terms of the trust specifically mention that possibility.

G.    **Waiver of Bond.**  No Trustee shall be required to give bond or other security in any jurisdiction and, if despite this exoneration, a bond is nevertheless required, no sureties shall be required.

H.    **Amending, Revoking or Modifying Instrument.**  Notwithstanding any provision contained in this document or any statute or common law, the Grantor shall have no right, either alone or in conjunction with any other person(s) to revoke, amend or modify this Trust Agreement or any trust created by it.

# ARTICLE XVIII
## Governing Law and Trustee Powers

The interpretation and operation of the trust shall be governed by the laws of the State of Texas. The Trustee may, without prior authority from any court, exercise all powers conferred by this Trust Agreement or by common law or by the Texas Trust Code or other statute of the State of Texas or any other jurisdiction whose law applies to the trust, including without limitation, the Texas Trust Code V.T.C.A., Property Code §§101 seq, or other statute of Texas or any other jurisdiction whose law applies to the trust, which are hereby incorporated into this Trust Agreement. The Trustee shall have sole and absolute discretion in exercising these powers. Except as specifically limited by this Trust Agreement, these powers shall extend to all property held by the Trustee until actual distribution of the property. The powers of the Trustee shall include the following:

A.    **Powers of General Trustee.** In addition to any other power granted by applicable law or herein granted, the General Trustee, shall have the sole and absolute authority (acting alone and without the consent or approval of any other Trustee acting hereunder), in the exercise of sole and absolute discretion, to exercise all powers conferred by applicable law to the extent such powers have not been specifically granted exclusively to another Trustee or Trustees hereunder.

B.    **Special Trustee Liability Provision.** Some persons may be hesitant to serve as Trustee hereunder because of a concern about potential liability. Therefore, with respect to any trust created hereunder (i) no Trustee shall incur any liability by reason of any error of judgment, mistake of law, or action of any kind taken or omitted to be taken in connection with the administration of any trust created hereunder if in good faith reasonably believed by such Trustee to be in accordance with the provisions and intent hereof, except for matters involving such Trustee's willful misconduct or gross negligence proved by clear and convincing evidence, (ii) no Trustee shall have any fiduciary responsibility to observe, monitor or evaluate the actions of any other Trustee and shall not be liable to any party for the failure to seek to remedy a breach of trust, or in a recurring situation to request instructions from a court having jurisdiction over the trust, even if a Trustee may be guilty of a gross violation of fiduciary duties hereunder, and (iii) each Trustee shall be fully indemnified by the trust estate against any claim or demand by any trust beneficiary or trust creditor, except for any claim or demand based on such Trustee's willful

APP-0138

misconduct or gross negligence proved by clear and convincing evidence. Expenses incurred by a Trustee in defending any such claim or demand shall be paid by the trust estate in advance of the final disposition of such claim or demand, upon receipt of an undertaking by or on behalf of such Trustee to repay such amount if it shall ultimately be determined that such Trustee is not entitled to be indemnified as authorized by this paragraph. In no event shall any Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

C.    **Allocate Receipts and Disbursements.**  The Trustee (excluding, however, any Interested Trustee) may allocate receipts and disbursements, to income or principal in such manner as the Trustee (excluding, however, any Interested Trustee) shall determine, even though a particular allocation may be inconsistent with otherwise applicable state law.

D.    **Oil and Gas.**  The Trustee may, with respect to rights or interests in oil, natural gas, minerals and other natural resources (together with related equipment), including oil and gas royalties and leases, whether owned in fee, as lessee, lessor, licensee, concessionaire or otherwise, or alone or jointly as partner, joint tenant, joint venturer or in any other noncorporate manner: (i) drill, test, explore, maintain, develop and otherwise exploit, either alone or jointly with others, any such rights or interests; (ii) enter into operation, farm-out, pooling or unitization agreements in connection with any or all of such rights and interests; and (iii) extract, remove, process, convert, retain, store, sell or exchange such rights and interests and the production therefrom, all in any manner, to any extent, on any terms and for any consideration.

E.    **Negating Power of Appointment for Interested Trustee as Beneficiary.** Notwithstanding any other provision of this Trust Agreement, no Interested Trustee who is a beneficiary of any trust created hereunder shall ever participate as Trustee of that trust in (i) the exercise, or decision not to exercise, any discretion over beneficial payments, distributions, applications, uses or accumulations of income or principal by the Trustee to or for any beneficiary other than pursuant to an ascertainable standard, if any, expressly set forth and authorized in this Trust Agreement, or (ii) the exercise of any general power of appointment described in Code Sec. 2041 or 2514 (but this shall not apply to a general power of appointment, if any, granted in a non-fiduciary capacity). If any Trustee is under a duty to support a beneficiary or is acting as a guardian, conservator, or similar fiduciary of any person who is a beneficiary, such Trustee shall not participate in the exercise, or decision not to exercise, any discretion over beneficial payments,

distributions, applications or uses of trust property in discharge of any obligation of support. No Trustee shall participate in the exercise of any discretion (including, but without limitation, any discretion which would constitute an "incident of ownership" within the meaning of Code Sec. 2042(2)) with respect to any insurance policy on his or her life held hereunder. In each case, the determination of the remaining Trustee or Trustees shall be final and binding upon the beneficiaries of such trust. In addition, no individual shall have any power of appointment over or power to direct the beneficial enjoyment of the fractional share of any trust hereunder consisting of disclaimed property, including any accumulated income of that share, unless such power to direct the beneficial enjoyment is limited by an ascertainable standard.

F. **Security Interests.** The Trustee may grant security interests and execute all instruments creating such interests upon such terms as the Trustee may deem advisable.

G. **Tax Elections and Allocations.** The Trustee may make all tax elections and allocations the Trustee may consider appropriate; provided, however, this authority is exercisable only in a fiduciary capacity and may not be used to enlarge or shift any beneficial interest except as an incidental consequence of the discharge of fiduciary duties. Tax elections and allocations made in good faith shall not require equitable adjustments.

H. **Investment Responsibility.** The Trustee may retain any property originally owned by the Grantor and invest and reinvest in all forms of real and personal property, whether inside or outside the United States, including, without limitation, common trust funds of a corporate Trustee, mutual funds, partnerships (including a partnership in which a Trustee is a partner) and other forms of joint investment (which may but need not be managed by, advised by or affiliated with a Trustee), without regard to any principle of law limiting delegation of investment responsibility by the Trustee.

I. **Compromise Claims or Debts.** The Trustee may compromise claims or debts and abandon or demolish any property which the Trustee shall determine to be of little or no value.

J. **Borrowings.** The Trustee may borrow from anyone, even if the lender is a Trustee under this Trust Agreement, and may pledge property as security for repayment of the funds borrowed, including the establishment of a margin account. No Trustee shall be personally liable for any such loan, and such loan shall be payable only out of assets of the trust.

K. **Sale or Exchange of Property.** The Trustee may sell property at public or private sale, for cash or upon credit, exchange property for other property, lease property for any period

THE MXBA TRUST |                                                                 Page |22

of time and give options of any duration for sales, exchanges or leases. The Trustee may give such warranties or indemnifications as the Trustee may deem advisable.

L.      **Participation in Mergers and Reorganizations.** The Trustee may join in any merger, reorganization, voting-trust plan or other concerted action of security holders and delegate discretionary powers (including investment powers) in entering into the arrangement.

M.      **Allocate Gain to Income or Principal.** The Trustee (other than any Interested Trustee) may allocate within the meaning of Reg. §1.643(a)-3(b) to income or to principal, or partly to income and partly to principal, all or part of the realized gains from the sale or exchange of trust assets; provided, however, that, if income is defined under an applicable state statute as a unitrust amount and the trust is being administered pursuant to such statute, the allocation of gains to income must be exercised consistently and the amount so allocated may not be greater than the excess of the unitrust amount over the amount of distributable net income determined without regard to Reg. §1.643(a)-3(b).

N.      **Character of Unitrust Amount Paid.** The Trustee (other than any Interested Trustee) may, within the meaning of Reg. §1.643(a)-3(e), specify the tax character of any unitrust amount paid hereunder. The Trustee (other than any Interested Trustee) may take any action that may be necessary in order for such specification to be respected for tax purposes.

O.      **Distributions as Paid from Capital Gains.** The Trustee (other than any Interested Trustee and other than the Grantor) may deem, within the meaning of Reg. §1.643(a)-3(e), any discretionary distribution of principal as being paid from capital gains realized during the year. The Trustee (other than any Interested Trustee and other than the Grantor) may take any action that may be necessary in order for such deeming to be respected for tax purposes.

P.      **Distributions in Cash or Kind.** The Trustee may distribute in cash or in kind, even though a Trustee has an interest affected by the distribution and even though different beneficiaries entitled to the same sum or share may thereby receive different mixes of assets, possibly with different income tax bases, as long as the fair market value of property on the date of distribution is used in determining the extent to which any distribution satisfies a sum or share. The decision of the Trustee in dividing any portion of the trust property between or among multiple beneficiaries shall be binding on all persons.

Q. **Application of Property.** The Trustee may apply to the use or for the benefit of any individual, any property whether principal or income, that otherwise would or could be distributed directly to such individual.

R. **Improvements to Property.** The Trustee may, with respect to any real property: (i) partition, subdivide or improve such property and enter into agreements concerning the partition, subdivision, improvement, zoning or management of any real estate in which a trust hereunder has an interest and impose or extinguish restrictions on any such real estate; (ii) sell, exchange, lease for any period, mortgage, alter or otherwise dispose of such property and execute any instrument necessary to do that; and (iii) charge to principal the net loss incurred in operating or carrying non-income producing real property.

S. **Hold Trusts as Combined Fund.** The Trustee may hold two or more trusts hereunder as a combined fund (allocating ratably to such trusts all receipts from, and expenses of, the combined fund) for convenience in investment and administration, but no combination of trusts for this purpose may alter their status as separate trusts.

T. **Division of Trusts.** The Trustee may divide any trust into two or more separate trusts and administer them as separate trusts, either before or after the trust is funded, to enable the GST Exemption to be allocated separately to one of the trusts, to enable the election under Code Sec. 2652(a)(3) to be made separately over one of them or otherwise to make possible a separate trust with a zero inclusion ratio because the trusts have different transferors for GST purposes or for any other tax or non-tax purpose. Any such division shall be by fractional shares and each share shall participate pro rata in income, appreciation and depreciation to the time of division. Any relevant pecuniary amount (such as the obligation to pay an annuity, or the right to withdraw that amount referred to in Code Sec. 2514(e)(1) (currently, Five Thousand Dollars ($5,000)) shall be applied to the separate trusts based on the fractional shares into which they are divided. If a trust is divided pursuant to this paragraph into two trusts, one that is exempt from Federal generation-skipping transfer tax ("GST Exempt Trust") and one that is not exempt from Federal generation-skipping transfer tax ("GST Non-Exempt Trust"), then, without limiting the Trustee's discretion, hereunder the Grantor suggests that no distribution of principal be made from such GST Exempt Trust until the principal of such GST Non-Exempt Trust is exhausted, unless there is a compelling reason to do so.

U.    **Loans.**  The Trustee may make loans to, may buy property from, and generally shall have the power to make contracts with the Grantor's estate or the Grantor's Spouse's estate or the trustee of any trust subject to any wealth transfer tax upon either of their deaths, regardless of the fact that one or more or all of the persons serving as Trustee hereunder are also serving as a selling or borrowing or otherwise contracting Independent Executor or Trustee; provided that such loans shall be for adequate interest and shall be adequately secured, and such purchases shall be for the property's then fair market value.

V.    **Reliance Upon Advice.**  The Trustee may employ and rely upon advice given by accountants, attorneys, investment bankers, and other expert advisors and employ agents, clerks and other employees and pay reasonable compensation to such advisors or employees in addition to fees otherwise payable to the Trustee, notwithstanding any rule of law otherwise prohibiting such dual compensation.

W.    **Trustee as Agent.**  Trustees serving in any jurisdiction in which a corporate trustee is unable to serve as Trustee may use such corporate trustee as an agent to perform any task that may lawfully be performed by such an agent in that jurisdiction, and may pay to such corporate trustee such compensation for its services as an agent as shall be agreed upon by all Trustees.

X.    **Custodian Employed.**  The Trustee may employ a custodian, hold property unregistered or in the name of a nominee (including the nominee of any bank, trust company, brokerage house or other institution employed as custodian), and pay reasonable compensation to a custodian in addition to any fees otherwise payable to the Trustee, notwithstanding any rule of law otherwise prohibiting such dual compensation.

Y.    **No Portion of Trust Includible in Gross Estate.**  It is the Grantor's intent that no portion of any trust hereunder be includible in the Grantor's gross estate or the gross estate of the Grantor's Spouse for Federal estate tax purposes.  Accordingly, and notwithstanding any provision herein contained to the contrary, this Trust Agreement shall be construed and the trusts hereunder administered in accordance with and to achieve that intention.

Z.    **Distribution of Trust Principal to Further Trust.**  The Trustee shall be an "authorized trustee" as that term is used in Section 112.071(1) of the Texas Property Code and is granted "Limited Discretion" as that term is used in Section 112.071(6) of the Texas Property Code to make distributions from any trust herein to a "Second Trust" as that term is used in Section

112.071(9) of the Texas Property Code in accordance with Section 112.073 and Subchapter D of Chapter 112 of the Texas Property Code.

AA.    **Power to Merge Similar Trusts.**    The Trustee may merge and consolidate any trust created in this agreement with any other trust created by Grantor or any other person at any other time, if the other trust contains substantially the same terms for the same beneficiaries, and has at least one trustee in common with the trust or trusts created in this agreement. The Trustee may administer such merged and consolidated trusts as a single trust or unit. If, however, such a merger or consolidation does not appear feasible, as determined in the sole and absolute discretion of the Trustee, the Trustees may consolidate the assets of such trusts for purposes of investment and trust administration while retaining separate records and accounts for the respective trusts.

# ARTICLE XIX

## S Corporation Stock

Before the date on which any "S Corporation Shares" (defined below) otherwise would pass to or be treated as held by an "Ineligible Trust" (defined below), the Trustee (excluding, however, any Interested Trustee) may elect to hold these S Corporation Shares in one or more separate trusts or shares as set forth in this Article. The Trustee (excluding, however, any Interested Trustee) may elect to hold such S Corporation Shares under the paragraph entitled "Qualified Subchapter S Trusts" or the paragraph entitled "Electing Small Business Trusts," as the Trustee (excluding, however, any Interested Trustee) shall deem appropriate, considering the changes that such provisions would require from the terms and conditions under which such shares otherwise would be held under this Trust Agreement.

A.    **Qualified Subchapter S Trusts.**    Any S Corporation Shares held under this paragraph shall be on the following terms:

1.    Each trust held under this paragraph shall be a separate trust or substantially separate and independent share, as defined in Code Sec. 1361(d)(3), held for the benefit of one beneficiary. Any reference in this paragraph to a beneficiary's separate trust shall refer equally to any substantially separate and independent trust share.

2.    Until the "QSST Termination Date" (defined below), the Trustee shall annually distribute all the trust's "Net Income" (defined below) to the sole beneficiary of each trust held under this paragraph, together with as much of that trust's principal as is appropriate under

THE MXBA TRUST |

APP-0144

the standard contained in the trust which otherwise would have held such S Corporation Shares. The Trustee shall not distribute income or principal to anyone other than the beneficiary to whom Net Income is distributable until the QSST Termination Date.

3.    Upon the QSST Termination Date, the Trustee shall distribute the remaining trust assets to the beneficiary to whom Net Income was then distributable, if then living, or otherwise in accordance with the terms of the Trust which would otherwise have held such S Corporation Shares.

4.    The Trustee shall notify the sole beneficiary of each trust held under this paragraph that he or she must timely and properly elect under Code Sec. 1361(d)(2) to cause such trust held to be treated as a Qualified Subchapter S Trust for Federal income tax purposes, and if the beneficiary fails or refuses to do so, the Trustee shall hold such S Corporation Shares under the paragraph entitled "Electing Small Business Trusts."

5.    The Trustee (excluding, however, any Interested Trustee) shall administer any trust under this paragraph as a Qualified Subchapter S Trust, as defined in Code Sec. 1361(d)(3).

6.    In the event there is more than one income beneficiary of an Ineligible Trust (defined below), the Trustee shall divide the S Corporation Shares that will be held under this paragraph into separate trusts, based on each beneficiary's interest in the income of the Ineligible Trust that otherwise would have held those shares. If no beneficiary was entitled to income of such Ineligible Trust at that time, the Trustee may divide the S Corporation Shares into separate trusts for the beneficiaries of such Ineligible Trusts in such manner as the Trustee (excluding, however, any Interested Trustee) shall deem appropriate.

B.    **Electing Small Business Trusts.**  Any S Corporation Shares held under this paragraph shall be held on the following terms:

1.    The Trustee (excluding, however, any Interested Trustee) shall apportion to the trusts under this paragraph a reasonable share of the unallocated expenses of all trusts under this Trust Agreement in a manner consistent with the applicable Internal Revenue Code and Treasury Regulations.

2.    The Trustee shall make that election required by Code Sec. 1361(e)(3) to qualify the trust under this paragraph as an Electing Small Business Trust under Code Sec. 1361(e).

3.      The Trustee (excluding, however, any Interested Trustee) shall administer each trust under this paragraph as an Electing Small Business Trust under Code Sec. 1361(e).

C.      **Implementation.**  The Trustee (excluding, however, any Interested Trustee) shall manifest its selection of the form in which it shall hold any S Corporation Shares by written notice to all persons who would be eligible or entitled at the time of such writing to receive income from the Ineligible Trust that otherwise would hold such S Corporation Shares.

D.      **Definitions.**  The following definitions apply for purposes of this Article:

1.      "Ineligible Trust" means a trust whose ownership of any S Corporation Shares would cause the termination of that corporation's election to be taxed under subchapter S of the Code.

2.      "Net Income" means income, as defined in Code Sec. 643(b).

3.      "S Corporation Shares" means shares of any stock of a corporation that then operates or that the Trustee shall deem likely to operate in the future under an election to have its earnings taxed directly to its stockholders under subchapter S of the Code.

4.      The "QSST Termination Date" means, separately, with respect to each trust held under the paragraph entitled "Qualified Subchapter S Trusts," the earlier of the date on which the beneficiary dies and the date on which the trust terminates.

# ARTICLE XX
## The Closely-Held Business

A.      **Authority to Operate.**  The Trustee may operate "the Business" (as defined below) and retain any equity interests in the Business, even if these interests otherwise would be a speculative or inappropriate investment for a trust.  The Trustee may do all things related to the operation of the Business, in a fiduciary capacity:

1.      The Trustee may enter into and carry out the terms of any option or buy-sell agreements.

2.      The Trustee may sell or liquidate any of the Business interests at such price and on such terms as the Trustee may deem advisable.

3.      The Trustee may arrange for and supervise the continued operations of the Business.

4.      The Trustee may vote (in person or by proxy) as stockholder or otherwise and in any matter involving the Business on behalf of the trust.

5.      The Trustee may grant, exercise, sell, or otherwise deal in any rights to subscribe to additional interests in the Business.

6.      The Trustee may take any actions appropriate to cause the capital stock or securities in the Business to be registered for public sale under any state or Federal securities act; may enter into any underwriting agreements or other agreements necessary or advisable for this registration and sale; and may grant indemnities to underwriters and others in connection with such registration.

7.      The Trustee may participate in any incorporation, dissolution, merger, reorganization or other change in the form of the Business and, where appropriate, deposit securities with any protective committees and participate in voting trusts.

8.      The Trustee may delegate to others discretionary power to take any action with respect to the management and affairs of the Business.

9.      The Trustee may invest additional capital in, subscribe to additional stock or securities of and loan money or credit to the Business from the trust.

10.     The Trustee may accept as correct financial or other statements rendered by the Business as to its conditions and operations except when having actual notice to the contrary.

B.      **Compensation.**   The Trustee shall be entitled to additional reasonable compensation for the performance of services with respect to the Business, which may be paid to the Trustee from the Business, the trust, or both, as the Trustee may deem advisable.

C.      **Conflict of Interest Waived.**  The Trustee may exercise the authorities granted under this Article even if the Trustee shall own personally an interest in the Business.

D.      **The "Business" Defined.** The "Business" means any interest the Trust shall own representing, in the aggregate, at least five percent (5%) of the total equity interests in any actively-conducted trade or business, whether incorporated or unincorporated.  The "Business" does not include any interests that are regularly traded on an established exchange or over-the-counter.

## ARTICLE XXI
### Real Estate Investments

A.    **Authority to Retain.** The Trustee may retain all interests that the Trust may own in any real estate that the Trustee shall determine to have been held primarily for investment, even if it otherwise would be a speculative or inappropriate investment.

B.    **Authority to Manage.** The Trustee may lease any real estate on such terms and conditions as the Trustee may deem advisable, and these leases may extend beyond the term of the administration of the trust.  For this purpose, the Trustee may make any instruments and grant such covenants and warranties as the Trustee may deem advisable.

C.    **Environmental Issues.** The Trustee shall take into account any environmental law that may be relevant to any real estate included in the trust.

1.    The Trustee may inspect property held directly or indirectly as part of the trust, including any interests in incorporated or unincorporated business entities, comply with environmental laws affecting this property and respond to a change in, or any actual or threatened violation of, any environmental law affecting property held as part of the trust.

2.    The Trustee may appropriately respond to a change in, or prevent, abate or otherwise remedy any actual or threatened violation of any environmental law affecting property held as part of the trust, either before or after the initiation of an enforcement action by any governmental body.

3.    The Trustee shall not be personally liable to any beneficiary for any decrease in value because of the compliance by the Trustee with any environmental law, including any reporting requirement.  Neither the acceptance by the Trustee of property nor the failure by the Trustee to inspect property shall create any inference as to whether or not there is or may be any liability under any environmental law with respect to such property.

D.    **"Environmental Law" Definition.** "Environmental law" means any Federal, state or local law relating to the protection of the environment or human health, and "hazardous substances" means any substances defined as hazardous or toxic or otherwise regulated by any environmental law.

## ARTICLE XXII

## Crummey Rights of Withdrawal: Rules, Limitations and Procedures

The withdrawal rights created in the Article entitled "Crummey Rights of Withdrawal" shall be subject to the rules, limitations and procedures contained in this Article.

A. **Withdrawal Rights of Beneficiary.** The Beneficiary shall have a right of withdrawal of any property contributed to the Trustee

1. The amount withdrawable by the Beneficiary shall be cumulative, and shall lapse on the last day of each calendar year, or, if earlier, thirty (30) days after the contribution to which it relates in an amount equal to the greater of that sum referred to in Code Sec. 2514(e)(1) (currently, Five Thousand Dollars ($5,000)) or that percentage referred to in Code Sec. 2514(e)(2) (currently, Five Percent (5%)) of the trust corpus out of which, or the proceeds of which, the exercise of this withdrawal right could be satisfied. Any right of withdrawal that does not lapse at the end of a calendar year shall continue to be exercisable by the Beneficiary subject to this same limited annual lapse. Rights of withdrawal that do not lapse at the end of a calendar year are thereafter exercisable by the Beneficiary only with the consent of a Non-Adverse Trustee. If there is no then-serving Non-Adverse Trustee when the Beneficiary wishes to exercise such a right of withdrawal, the then-serving Trustee shall appoint a Non-Adverse Trustee, who shall serve at least until the lapse of such withdrawal right. Notwithstanding anything herein contained to the contrary, with respect to any contributions, no lapse of a power of withdrawal held by any individual hereunder shall occur with respect to any contributions until the later of the time specified above for such lapse to occur and thirty (30) days after notice of such right of withdrawal is given to such individual.

B. **Notice.** The Trustee shall promptly notify the Beneficiary if competent and adult of all contributions to which the Beneficiary's right relates. The Trustee shall notify the Beneficiary if the Beneficiary is under a legal disability, including by notifying.

1. the legal guardian or conservator of the individual's property, who is hereby authorized to exercise the withdrawal rights;

2. any living parent of the individual;

3. any other person taking care of the individual or with whom the individual resides; or

4.　　any other appropriate adult individual selected by the Trustee.

C.　　**Exercise of Withdrawal Right.**　Withdrawal rights under this Article shall be exercisable by a writing delivered to the Trustee.　The person to whom notice is properly given if the Beneficiary is under a legal disability may decide whether to exercise the Beneficiary's withdrawal right, unless that person receiving notice is the donor of the contribution to which the withdrawal right relates, in which case the Trustee shall designate another appropriate adult individual to make such decision.

D.　　**Satisfaction of Withdrawal Right.**　A withdrawal under this Article may be satisfied from the contribution itself or from other trust assets, as the Trustee shall choose.　A distribution under this Article may be made to the person who makes the withdrawal or who is, under this Article, entitled to act for the minor or disabled individual.

E.　　**Power to Exclude.**　The Grantor may, by an instrument in writing executed before a contribution, exclude the Beneficiary from having withdrawal rights over that contribution or any future contribution or both.　The Grantor may not, however, limit or alter any rights resulting from prior contributions.

F.　　**Power to Amend.**　The Trustee may, by an instrument in writing, amend this Article to the extent the Trustee shall deem it appropriate to assure that contributions to this trust qualify for the gift tax annual exclusion for Federal gift tax purposes.　The Trustee may not amend the trust in any manner that would cause any portion of the trust funds to be included in the Grantor's gross estate, that of the Grantor's Spouse, or that of the Beneficiary to a greater extent than before such amendment.　An amendment made in good faith shall be conclusive on all persons interested in the trust and the Trustee shall not be liable for the consequences of any amendment or for not having amended the trust.　No amendment shall limit or alter the rights of a beneficiary in any trust funds held by the Trustee before the amendment.　No Interested Trustee or Insured Trustee may participate in any action under this paragraph.

G.　　**Priority of Withdrawal Rights.**　No Trustee may make any discretionary distributions of principal or income that would reduce the available trust principal below the total amount of the then-existing withdrawal rights without advance notice to the Beneficiary if the Beneficiary who is entitled to make a withdrawal, or who is, under this Article, entitled to act for the Beneficiary if under a legal disability.

H.    **Special Definitions and Rules.**  The following definitions and rules apply for purposes of this Article:

1.    "Contribution" means any cash or other assets transferred to the Trustee to be held as part of the trust funds, in a manner that constitutes a gift for Federal gift tax purposes. A contribution also includes any direct or indirect payment of the premiums on a policy of insurance held by the Trustee to the extent it constitutes a gift for Federal gift tax purposes. The amount of a contribution is its Federal gift tax value.

2.    The amounts involved in a power to withdraw described as "an amount equal to the greater of that sum referred to in Code Sec. 2514(e)(1) (currently, Five Thousand Dollars ($5,000)) or that percentage referred to in Code Sec. 2514(e)(2) (currently, Five Percent (5%)) of the trust corpus" shall be measured after subtracting all other amounts that the same person could have withdrawn during the same calendar year from this or any other fund, to the extent that such powers must, under applicable Federal gift tax law, be aggregated in determining whether the lapse of the withdrawal power under this Article is a release of a general power of appointment.

3.    If the Trustee shall incorrectly determine the amount that should be distributed to the Beneficiary under this Article, then within a reasonable period after the correct amount is finally determined, the Trustee shall receive from the beneficiary, or the beneficiary shall receive from the Trustee, as the case may be, an amount equal to the difference between the amount that should properly have been distributed and the amount actually distributed.

4.    All withdrawal rights with respect to a contribution to which this Article applies shall arise immediately upon such contribution to the Trust.

5.    The Trustee may without liability assume that no prior gifts to any holder of a withdrawal power under this Article were made by a donor or a donor's Spouse other than contributions to the trust, unless the Trustee shall have actual notice to the contrary.

## ARTICLE XXIII
### Not a Grantor Trust

It is intended that the Grantor not be treated under Subpart E of Part I of Subchapter J of Chapter 1 of the Code as the owner of any trust created hereunder and this instrument shall be construed and all trusts hereunder administered to achieve that intention and the Grantor directs

that this Trust Agreement shall be construed and the trusts hereunder administered in accordance with and to carry out that intent. Accordingly, during the Grantor's lifetime and notwithstanding any other provision of this Trust Agreement, neither the Grantor nor any other "nonadverse party" as that term is used in Code Sec. 672(b) shall have the power (1) to purchase, exchange or otherwise deal with or dispose of any principal or income of any trust hereunder for less than an adequate consideration in money or money's worth, or (2) to borrow any principal or income of any trust hereunder, directly or indirectly, without adequate interest or adequate security; no person in a non-fiduciary capacity shall have the power (1) to vote or direct the voting of stock or other securities of a corporation in which the holdings of the Grantor and any trust hereunder are significant from the viewpoint of voting control, (2) to control the investment of any trust assets either by directing investments or reinvestment or by vetoing proposed investments or reinvestment, to the extent that the trust assets consist of stocks or securities of a corporation in which the holdings of the Grantor and the trust are significant from the viewpoint of voting control, or (3) to reacquire any trust assets or any portion thereof by substituting other property of an equivalent value; the Trustee shall not use any income of any trust hereunder within the meaning of Code Sec. 677 (including, without limitation, capital gain) directly or indirectly to pay premiums on policies of insurance on the life of the Grantor and/or the Grantor's Spouse (including, but without limitation, any form of split-dollar arrangement with respect to such insurance); no income or corpus shall be paid or appointed to or for the benefit of the Grantor's Spouse or the Grantor (other than any trust hereunder which may qualify, by election or otherwise, for the Federal marital deduction); no one (including, but not limited, to the Grantor's Spouse and the Grantor)) shall hold or participate in the disposition in respect of the beneficial enjoyment of the principal or income of any trust hereunder within the meaning of Code Sec. 674(a) except that the Trustee (other than the Grantor's Spouse or the Grantor) at least half of whom are neither related nor subordinate to the Grantor's Spouse and the Grantor may, to the extent otherwise expressly set forth herein, exercise the powers set forth in Code Sec. 674(c), and except that the Trustee (other than the Grantor's Spouse) may, to the extent otherwise expressly set forth herein, exercise the powers set forth in Code Sec. 674(d), and except that the Trustee may, to the extent otherwise expressly set forth herein, exercise the power set forth in Code Sec. 674(b)(4), and except that, if a beneficiary hereunder (other than the Grantor's Spouse) is expressly granted a power of appointment hereunder in a non-fiduciary capacity, such beneficiary may exercise a power of appointment only by Will,

APP-0152

as otherwise expressly set forth herein, to the extent described in Code Sec. 674(b)(3); no court, other than a court within the United States, shall exercise primary supervision over the administration of any trust hereunder and no person, other than a United States person, shall have the authority to control any substantial decision of any trust hereunder, within the meaning of Code Sec. 7701(a)(30)(E).

Notwithstanding the foregoing, it is intended that the Beneficiary be treated, during the Beneficiary's lifetime, under Code Sec. 678 as the owner of each trust created hereunder and this instrument shall be construed and all trusts hereunder administered also to achieve that intention.

## ARTICLE XXIV
### Definitions and Miscellaneous Provisions

The following definitions and miscellaneous provisions shall apply under this Trust Agreement:

A.    **Children and Descendants.** References to "children" and "descendants" shall include children and descendants whenever born.

B.    **Spouse.** An individual's "Spouse" (other than with respect to the Grantor) is the person (if any) to whom that individual is married at any given time.

C.    **Surviving Spouse.** The "surviving Spouse" of an individual, other than with respect to the Grantor, is the person (if any) who survives that individual and who is married to and living with that individual as a married couple at the time of his or her death.

D.    **Determining Descendants.** One's children and other descendants shall be determined according to applicable law, except to the extent modified by this Article or by other specific provisions of this Trust Agreement.

1.    A child adopted before he or she attains eighteen (18) years of age (but not after attaining that age) shall be treated under this Trust Agreement as a child of his or her adopting parents and a descendant of their ancestors.

2.    A biological child shall not be treated as a child or descendant of any biological parent of the child or as a descendant of the ancestors of such biological parent if the child has been surrendered for adoption with the consent of such biological parent and the child's adoptive parent substitutes for the consenting parent under applicable state law.

3.    Adoptions and marriages that are recognized under this Trust Agreement shall not affect prior distributions or other interests that have previously vested in possession, but they shall enable a person to receive distributions from or remainder or other interests in a trust still in existence. The descendants of a person who is treated as a child or descendant under this Article shall also be treated as descendants of such person's ancestors. The descendants of a person who is treated as not being a child or descendant under this Article shall also be treated as not being descendants of such person's ancestors.

4.    The term "child" or "descendant" (and any plural form thereof) in this Trust Agreement shall include any biological child or descendant of the Grantor (who has not been adopted by a person who is not a descendant of the Grantor unless the adoptive parent is married to a descendant of the Grantor or unless the adoptive parent was married to a descendant of the Grantor who died prior to the adoption) whose conception has resulted from the use of a frozen gamete of a deceased descendant of the Grantor and gamete of the Grantor's deceased descendant's surviving Spouse and that posthumously conceived descendant has been born or is in utero by the time of the determination of the descendants who would take property outright or for whom it would be placed into separate trusts for descendants of the Grantor under this Trust Agreement; provided, however that proof that such posthumously conceived person is the biological child or descendant of the Grantor shall be established by DNA or equally reliable testing.

E.    **Minor and Adult.** Whether an individual is a minor or an adult shall be determined under the laws of the individual's domicile at the time in question.

F.    **Code and Regulations.** References to the "Internal Revenue Code" or "Code" or to provisions thereof are to the Internal Revenue Code of 1986, as amended at the time in question. References to the "Regulations" and "Regs." are to the Regulations under the Code. If, by the time in question, a particular provision of the Code has been renumbered, or the Code has been superseded by a subsequent Federal tax law, the reference shall be deemed to be to the renumbered provision or the corresponding provision of the subsequent law, unless to do so would clearly be contrary to the Grantor's intent as expressed in this Trust Agreement. A similar rule shall apply to references to the Regulations.

G.    **Interested Trustee.** With respect to any trust, an "Interested Trustee" is a Trustee who is (i) a transferor of property to the trust, including a person whose qualified disclaimer resulted in property passing to the trust; or (ii) a person who is, or in the future may be, eligible to

receive income or principal pursuant to the terms of the trust. A Trustee described in (i) is an Interested Trustee only with respect to the transferred property (including income and gain on, and reinvestment of, such property). A person is described in (ii) even if he or she has a remote contingent remainder interest, but is not described in (ii) if the person's only interest is as a potential appointee under a non-fiduciary power of appointment held by another person which has not yet been exercised or the exercise of which can take effect only in the future, such as a testamentary power held by a living person. A Trustee who is not an Interested Trustee is a "Disinterested Trustee."

H.      **Per Stirpes.** Property that is to be divided among an individual's surviving or then-living descendants "per stirpes" or in "per stirpital shares" shall be divided into as many equal shares as there are children of the individual who are then living or who have died leaving surviving or then-living descendants. A share allocated to a deceased child of the individual shall be divided further among such deceased child's surviving or then-living descendants in the same manner.

I.      **Independent Executor.** Whenever herein a reference is made to the Grantor's or another person's Independent Executor, such reference shall be to those serving as the fiduciary of that person's estate, whether or not their title is Independent Executor under applicable state law.

J.      **Incapacitated Trustee.** A Trustee shall be deemed to be "incapacitated" (and while incapacitated shall not serve as a Trustee) if another then-serving Trustee or, if there is none, the next successor Trustee receives written certification that the examined individual is physically or mentally incapable of managing the affairs of the trust, or is an "incapacitated person" as defined in the Texas Estates Code, whether or not there is an adjudication of incapacity.

1.      This certification shall be valid only if it is signed by at least two (2) licensed physicians, each of whom has personally examined the Trustee.

2.      This certification need not indicate any cause for the Trustee's incapacity.

3.      A certification of incapacity shall be rescinded when a serving Trustee receives a certification that the former Trustee is capable of managing the trust's affairs. This certification, too, shall be valid only if it is signed by at least two (2) licensed physicians, each of whom has personally examined the Trustee.

4.    No person is liable to anyone for actions taken in reliance on the certifications under this paragraph or for dealing with a Trustee other than the one removed for incapacity based on these certifications.

K.    **Gross Estate.**  "Gross estate" means the Grantor's gross estate as determined for Federal estate tax purposes (or for state death tax purposes where relevant).

L.    **Change of Situs.**  The situs of the property of any trust created hereunder may be maintained in any jurisdiction, in the discretion of the Trustee (other than an Interested Trustee), and thereafter transferred at any time or times to any jurisdiction selected by the Trustee (other than an Interested Trustee).  Upon any such transfer of situs, the trust estate of that trust may thereafter, at the election of the Trustee (other than an Interested Trustee) of said trust, be administered exclusively under the laws of (and subject, as required, to the exclusive supervision of the courts of) the jurisdiction to which it has been transferred.  Accordingly, if the Trustee (other than an Interested Trustee) of any trust created hereunder elects to change the situs of any such trust, said Trustee is hereby relieved of any requirement of having to qualify in any other jurisdiction and of any requirement of having to account in any court of such other jurisdiction.

## ARTICLE XXV
### Captions

The captions used in this Trust Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Trust Agreement or the intent of any provision therein.

APP-0156

IN WITNESS WHEREOF, the Trustee and the Grantor have signed this Trust Agreement, effective the day and year first above written and executed by each of them on the dates set forth below.

Dated: June 17, 2020

_____
TIMOTHY L. BARTON, Grantor


_____
SASKYA BEDOYA, Trustee

THE MXBA TRUST |                                                                      Page | 39

APP-0157

STATE OF TEXAS     )

                       )

COUNTY OF DALLAS    )

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

The foregoing trust agreement was acknowledged before me on June ⎯⎯ 17, 2020, by TIMOTHY L. BARTON, as Grantor.

_____

Bella D Khusal

Notary Public, State of Texas

STATE OF TEXAS     )

                       )

COUNTY OF DALLAS    )

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

The foregoing trust agreement was acknowledged before me on June ⎯⎯ 17, 2020, by SASKYA BEDOYA, as Trustee.

_____

Notary Public, State of Texas

THE MXBA TRUST |

Page |40

## SCHEDULE A

$2,000.00

THE MXBA TRUST                                                   SCHEDULE A|

# EXHIBIT
# G

COMPANY AGREEMENT OF
MXBA, LLC

THIS COMPANY AGREEMENT (this "Agreement") of MXBA, LLC, a Delaware limited liability company (the "Company"), is executed by the Members and Managers of the Company as set for on Exhibit A effective as of August 24, 2020.

1.      Formation. The Company was formed pursuant to the Certificate of Formation (the "Certificate") of the Company filed with the Secretary of State of the State of Delaware effective as of August 24, 2020 (the "Formation Date").

2.      Term. Except as otherwise provided in the General Corporation Law of the state of Delaware ("Statutes"), the Company shall exist perpetually and shall continue until terminated in accordance with the Statutes including as such may be amended from time to time.

3.      Registered Office. The registered office of the Company required by the Statutes to be maintained in the State of Delaware shall be at 919 N Market St Ste 950, Wilmington, DE 19801-3036 or such other office (which need not be a place of business of the Company) as the Manager may designate, from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Manager may designate, from time to time, which need not be in the State of Delaware, and the Company shall maintain records there as required by the Statutes. The Company may have such other offices as the Manager may designate from time to time.

4.      Purpose. The purposes of the Company shall be to engage in any activities that are permitted under applicable laws. Subject to the limitations under the Statutes and applicable laws, the Company shall have and may exercise the power to do any and all acts reasonably related to its purposes.

5.      Foreign Qualification. Prior to the Company's conducting business in any jurisdiction other than Delaware, the Managers shall cause the Company to comply with all requirements necessary or advisable to qualify the Company as a foreign limited liability company in that jurisdiction.

6.      Membership.

    6.1     Members. The current Members of the Company are listed on Exhibit A hereof.

    6.2     Liability to Third Parties. The Members of the Company shall not be liable for any debts, obligations or liabilities of the Company, including, without limitation, under a judgment decree or order of any court.

    6.3     Admission of New Members. The Managers may admit one or more persons as an additional member(s) at such times and on such terms and conditions as the Member shall determine. Such persons shall be admitted as members only upon execution of an amendment to this Agreement, signed by the all of the members, reflecting the admission of the additional member(s) as a member of the Company, and providing for allocations of profits and losses and distributions among the members (if there is more than one) and such other matters as determined by the Manager.

    6.4     Membership Interests. Membership Interests in the Company shall be represented by issued and outstanding Units (the "Units"), which may be divided into one or more types, classes or series. Each type, class, or series of Units shall have the privileges, preference, duties, liabilities, obligations, and rights, including

APP-0161

voting rights, if any, set forth in this Agreement with respect to such type, class, or series, or as agreed upon by the Members of the Company unanimously from time to time.

For purposes of this Agreement, "Membership Interest" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable: (a) to distributions of income and other items of income, gain, loss and deduction of the Company; (b) to a share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the Statutes.

7.    Capital Contributions and Capital Accounts.

7.1    Capital Accounts. A separate Capital Account shall be maintained for each Member in accordance with Section 704(b) of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

8.    Allocations and Distributions.

8.1    Allocations of Profits and Losses. All profits and losses of the Company will be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 8.2, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to Section 11.3 if the Company were dissolved, its affairs wound up, and its assets sold for cash equal to their fair market value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the fair market value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with Section 11.3, to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

For purposes of this Agreement, "Company Minimum Gain" has the meaning of "partnership minimum gain" in Treasury Regulation Section 1.704-2(d), and "Member Nonrecourse Debt" has the meaning of "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

8.2    Regulatory and Special Allocation Provisions.

8.2.1. If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 8.2.1 is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

8.2.2. Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net

decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 8.2.2 is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith. For purposes of this Agreement, "Member Nonrecourse Deductions" has the meaning of "partner nonrecourse deductions" set forth in Treasury Regulations Section 1.704-2(b)(i)(1) and shall be determined in accordance with 1.704-2(i)(2).

8.2.3. In the event any Member unexpectedly receives any adjustments, allocations, or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or Distributions as quickly as possible. This Section 8.2.3 is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

8.2.4. The allocations set forth in Sections 8.2.1, 8.2.2, and 8.3.3 above (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this Section 8 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating profits and losses among Members so that, to the extent possible, the net amount of such allocations of profits and losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

8.2.5. The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulation Section 1.704-1(b)(4)(xii)(c) ("Forfeiture Allocations") result from the allocations of profit and loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make Forfeiture Allocations and, once required by applicable final or temporary guidance, allocations of profit and loss will be made in accordance with Proposed Treasury Regulation Section 1.704- 1(b)(4)(xii)(c) or any successor provision or guidance.

8.3    Distributions.

8.3.1. Generally. Subject to Sections 8.3.2 and 8.3.3, the Managers shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

8.3.2. Priority of Distributions. After making all Distributions required for a given fiscal year under Section 8.3.3 and subject to the priority of Distributions pursuant to Section 11.3, if applicable, all Distributions determined to be made by the Managers pursuant to Section 8.3.1 shall be made to all Members Pro Rata in proportion to their aggregate holdings of Units.

8.3.3. Tax Distributions. Notwithstanding Section 8.3.2 and prior to making any Distributions pursuant to Section 8.3.2, the Company shall distribute, to the extent it may lawfully do so, to each Member to pay the federal, state, and local income tax liability of such Member in an amount equal to the excess of (a) the product of (i) the taxable income allocated or allocable to such Member since the date of this Agreement and (ii) the sum of the highest federal individual tax rates applicable to such taxable income, over (b) the aggregate amount of any distributions previously made to such Member pursuant to Section 8.3.2 and this Section 8.3.3 since the date of this Agreement ("Tax Distributions"). The Managers may increase the amount of required Tax Distributions for any period to include an estimate of state and local individual income taxes applicable to taxable income for such period taking into account the source of the Company's taxable income, or the residence of the Company's Members, or both, and taking into account the deductibility of such taxes for U.S. federal income tax purposes. The amount of such increase in required Tax Distributions for any Unit of a particular class held by a Member may be different from the amount of such increase for Units of the same class held by another Member. Tax Distributions shall be made on a quarterly or other basis in a manner determined by the Managers to enable each Member to satisfy both estimated and final income tax payment requirements. The amount of any Tax Distributions made to a Member pursuant to this Section 8.3.3 shall be considered advance Distributions and shall be deducted from the amount of any future Distributions that would otherwise be paid to such Member pursuant to Section 8.3.2.

8.3.4. In-kind Distributions. The Managers are hereby authorized, in their sole discretion, to make Distributions to the Members in the form of securities (provided such Distributions of securities comply with applicable federal and state securities laws) or other property held by the Company; provided that Tax Distributions shall only be made in cash. In any in-kind Distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property would be distributed among the Members pursuant to Section 8.3.2.

9.    Management of the Company    .

    9.1    Number of Managers; Initial Managers. The number of Managers of the Company shall be fixed from time to time by resolution of the Managers. Until otherwise fixed by resolution of the Managers, the number of Managers shall be one (1). The initial Manager of the Company is designated in Exhibit "A." No decrease in the number of Managers shall have the effect of reducing the term of any incumbent Managers. Managers' shall serve a perpetual term until each resigns or is removed in accordance with this Agreement or the Statutes. Any Manager may be removed upon the unanimous consent of the Members. Unless a Manager is removed by the Members resulting from a breach of this Agreement, the Statutes, fraud, willful misconduct, a breach of a fiduciary duty, or gross negligence upon with such removal shall have immediate effect, a Manager shall hold office until his successor is elected and qualified. Managers need not be residents of the State of Delaware nor Members of the Company. Managers may also serve as officers of the Company.

    Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 9.2 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

APP-0164

9.1.1. entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in connection with the purposes of the Company at the Manager's reasonable and sole discretion (except entering into any contract with or a sale to any related entity of any Member that is not for fair value or upon terms standard for the industry that would be conducted as an arms-length transaction) and making all decisions and waivers thereunder.

9.1.2. entering into and executing agreements in the ordinary course of business and related to the capital assets of the Company including those related to construction, development, sales (including assets), management, marketing and promotion of the Company and the Project.

9.1.3. opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money;

9.1.4. maintaining the assets of the Company in good order;

9.1.5. collecting sums due the Company;

9.1.6. to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

9.1.7. utilizing for Company purposes any asset of the Company;

9.1.8. borrowing money or otherwise committing the credit of the Company for Company activities to further the Purpose and voluntary prepayments or extensions of debt and in the event required by a creditor which may be guaranteed by the Manager and/or President on behalf of the Company;

9.1.9. selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

9.1.10. obtaining and maintaining insurance for the Company;

9.1.11. enter into and close on a Fundamental Business Transaction so long as the transaction is at fair value and conducted on terms substantially similar to an arms length transaction.

9.1.12. disposition of Company property in the ordinary course of business;

9.1.13. disposition of Company property not in the ordinary course of business;

9.1.14. designating Members or other individuals with authority to sign or give instructions with respect to those accounts and arrangements;

9.1.15. borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

9.1.16. incurring any debt or liability (or agreeing to incur any debt or liability) on behalf of the Company;

APP-0165

9.1.17.　　determining the amount and timing of distributions of Company cash and other property as provided in in this Agreement;

9.1.18.　　appoint officers of the Company and provide such officers with authorities, powers, and any type of compensation or remuneration;

9.1.19.　　sell or issue additional Membership Interests and admit Members of the Company subject to the restrictions in this Agreement; and

9.1.20.　　delegate any responsibilities to any Member, officer, or person retained by the Manager to perform certain tasks.

9.1.21.　　where the Company is a member, shareholder, partner, or joint venture in any partnership or entity, execute any necessary resolution, consent, or agreement on behalf of the Company including voting the interests of the Company in the best interests of the Company as reasonably determined by the Manager.

9.2　　Restrictions. Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

9.2.1. enter into a fundamental business transaction, without complying with the applicable procedures set forth in the Statutes regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

9.2.2. do any act in violation of this Agreement;

9.2.3. admit a Member, except as expressly permitted by this Agreement;

9.2.4. do any act which requires the prior approval of the Members;

9.2.5. possess Company property or assign rights in Company property, other than for a Company purpose; or

9.2.6. amend this Agreement, except as expressly permitted by this Agreement.

9.3　　Vacancies. Subject to other provisions of this Article 9, any vacancy occurring among the Managers may be filled by the affirmative vote of a majority of the remaining Managers. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. The Members may also terminate the term of office of all or any of the Managers by written resolution. Such removal shall be effective immediately upon such member action even if successors are not elected simultaneously, and the vacancy or vacancies among the Managers caused by such action shall be filled only by election by the Members.

9.4　　Powers of Managers. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, its Managers, who (acting as a body as provided elsewhere herein) may do or cause to be done all such lawful acts and things, as are not by the Statutes, the Certificate or this Agreement directed or required to be exercised or done by the Members.

9.5    Action by Unanimous Consent. Any action required or permitted to be taken at any meeting of the Managers may be taken without a meeting if a written consent, setting forth the action so taken, is signed by all the Managers and such written consent shall have the same force and effect as a unanimous vote at a meeting of the Managers.

9.6    Liability: Indemnification. No Manager or officer shall be liable or accountable, in damages or otherwise, to the Company or to the Members or other Managers for any error of judgment, for any mistake of fact or law, or for anything which they may do or refrain from doing hereafter in connection with the business and affairs of the Company, except in the case of willful misconduct or fraud. As such, each Manager and officer shall be indemnified, defended, and held harmless by the Company for any liabilities, costs, or claims incurred or asserted against such person, including all legal fees, or incurred by such person as related to any legal action, proceedings, claims, or liabilities asserted or incurred by the Company or any related person.

10.    Officers.

10.1   The Manager may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Manager. The Manager shall designate the salary and/or bonuses the Officers are to receive, if any. Officers need not be Members, the Manager or residents of the State of Delaware. Any officer may be removed by the Manager at any time, with or without cause. Each officer shall hold office perpetually until his or her successor shall be duly designated and take office or until the earlier of the officer's death, resignation or removal. Any number of offices may be held by the same person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed by the Manager.

10.2   The initial President, Treasurer, and Secretary, if any, are designated on Exhibit A. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis and may delegate any such rights, powers, or authorities to any other officer or an authorized representative of the Company as appointed by the President. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions. Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company and each shall be a signatory on such accounts without the need for any further consent.

11.    Accounting and Administrative Matters.

11.1   Records and Accounting. The Managers shall keep or cause to be kept appropriate books and records with respect to the Company's business. Those books and records shall at all times be kept at the principal office of the Company or such other office as the Managers may designate for such purposes. Any books and records maintained by the Company in the regular course of its business, including books of account and records of Company proceedings, may be kept on any information storage device, provided that the books and records so kept are convertible into clearly legible written form within a reasonable period of time.

11.2   Nonentity for Federal Income Tax Purposes. The Company shall not make elections or file returns for federal income tax purposes. The Company shall conduct its affairs so as to be disregarded for federal income tax purposes as an entity separate from its Members pursuant to Treasury Regulation § 301.7701-3(b)(1)(ii).

11.3   Fiscal Year. The fiscal year of the Company shall be the calendar year (the "Fiscal Year").

12.    Winding Up and Termination.

APP-0167

12.1  Events Requiring Winding Up. The Company shall commence winding up procedures in accordance with the Statutes upon the first to occur of (a) a decision by the majority of Units to wind up and terminate the Company; or (b) an event specified in the Statutes requiring the winding up or termination of the Company. The event giving rise to the winding up of the Company may be revoked or cancelled as provided in the Statutes.

12.2  Distribution of Proceeds. On winding up the Company, the Company's properties or the proceeds from the liquidation of the properties shall be applied and distributed first, to the extent permitted by law, to creditors in accordance with their relative rights and priorities to satisfy the liabilities of the Company, and second, to the extent of any remaining properties or proceeds, as set forth in Section 8.3.

12.3  No Member Deficit Restoration Obligation· The Members shall not be liable to the Company or to a third party for the repayment of any deficit in each Member's Capital Account, except as provided in Code Section 101.206.

12.4  Termination. The Company shall terminate (a) on the completion of the winding up of the Company business, (b) when there are no members; or (c) on a merger or conversion of the Company as provided in the Statutes if the Company is not one of the surviving entities. The Manager(s) shall execute and record all documents required to effectuate the termination of the Company. If the Company is terminated, it may be reinstated in the manner and subject to the conditions provided in the Statutes.

13.  Miscellaneous.

13.1  Banking. The funds of the Company shall be kept in such accounts as may be designated by the Managers. All withdrawals therefrom shall be made on such signature or signatures as shall be designated by the Managers.  As such, both the President and Treasurer may open bank accounts or any other accounts and be a signatory on such accounts.

13.2  Governing Law. This Agreement shall be governed by the laws of the State of Delaware.

13.3  Other Instruments. The Managers will execute other agreements and instruments that the Managers determine to be appropriate to carry out the terms hereof or any provision of this Agreement.

*[Signature Pages Follow]*

APP-0168

IN WITNESS WHEREOF, the Members and Manager have executed this agreement os of the date first set forth above.

**MANAGER:**

Maximilien Barton
President

**MEMBERS:**

Maximilen Barton
President

APP-0169

## EXHIBIT "A"
## MEMBERS

| Member Name & Address | Initial Capital Contributions | Interest | Profit/Loss |
|---|---|---|---|
| MXBA Trust | $100.00 | 100.00% | 100.00% |

## EXHIBIT "B"
## OFFICERS

**President:** Maximilien Barton

Company Agreement – MXBA, LLC                                             10

APP-0170

# EXHIBIT
# H

APP-0171

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## TITAN INVESTMENTS, LLC

### (Single-Member Delaware  Limited Liability Company)

This Limited Liability Company Agreement of **TITAN INVESTMENTS, LLC** (this "Agreement" or these ``Regulations"), dated as of **August 19, 2020**, are adopted, executed and agreed to by the sole Member (as defined below).

1.      Formation. **TITAN INVESTMENTS, LLC**, a Delaware limited liability company (the ``Company") has been organized as a Texas limited liability company under the Delaware Limited Liability Company Act, 6 *Del. C. § 18-101 et seq.*,  as amended from time to time (the "LLC Act") by filing of the Certificate of Formation for the Company in the office of the Secretary of State of Delaware, on **August 19, 2020**, file number **3477768.**

2.    Sole Member. **MAXIMILIEN BARTON,** shall be the sole member of the Company (the "Member").

3.    Contributions. The Member has made an initial contribution to the capital of the Company in the amount of $100.00. Without creating any rights in favor of any third party, the Member may, from time to time, make additional contributions of cash or property to the capital of the Company, but shall have no obligation to do so.

4.    Distributions. The Member shall be entitled (a) to receive all distributions (including, without limitation, liquidating distributions) made by the Company, and (b) to enjoy all other rights, benefits and interests in the Company.

5.    Management.  Management by Managers. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Manager(s), who shall make all decisions and take all actions for the Company. No Member (other than a Manager or an Officer) has the right, power or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. The Initial Manager(s) of the Company shall be: **MAXIMILIEN BARTON.**

### Officers:

SECTION 1. NUMBER; TITLES AND TERM OF OFFICE. The officers of the Company shall be a President, one or more Vice-Presidents and a Secretary-Treasurer, and such other officers as the Manager(s) may from time to time elect or appoint.  Each officer shall hold office until his successor shall be duly elected and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.  Any two (2) or more offices may be held by the same person.

**LIMITED LIABILITY COMPANY AGREEMENT OF
TITAN INVESTMENTS, LLC**- Page 1

SECTION 2.  SALARIES.  The salaries or other compensation of the officers and agents of the Company shall be fixed from time to time by the Manager(s).

SECTION 3.  REMOVAL.  Any officer or agent or member of a committee elected or appointed by the Manager(s) may be removed by the Manager(s) whenever in its judgment the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

SECTION 4. VACANCIES.  Any vacancy occurring in any office of the Company may be filled by the Manager(s).

SECTION 5. POWERS AND DUTIES OF THE CHIEF EXECUTIVE OFFICER. The President shall be the chief executive officer of the Company, unless the Manager(s) designates the Chairman of the Board as chief executive officer.  Subject to the control of the Manager(s) and the executive committee (if any), the chief executive officer shall have general executive charge, management and control of the properties, business and operations of the Company with all such powers as may be reasonably incident to such responsibilities; he may agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Company and may sign all certificates for shares of capital stock of the Company; and shall have such other powers and duties as designated in accordance with these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 6.  POWERS AND DUTIES OF THE CHAIRMAN OF THE BOARD. If elected, the Chairman of the Board shall preside at all meetings of the shareholders and of the Manager(s); and the Chairman shall have such other powers and duties as designated in these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 7.  POWERS AND DUTIES OF THE PRESIDENT. The President, unless the Manager(s) otherwise determines, shall have the authority to agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Company; and, unless the Manager(s) otherwise determines, he shall, in the absence of the Chairman of the Board or if there be no Chairman of the Board, preside at all meetings of the shareholders and (should he be a director) of the Manager(s); and the President shall have such other powers and duties as designated in accordance with these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 8. VICE PRESIDENTS.  In the absence of the Chairman of the Board (if any), or President, or in the event of their inability or refusal to act, a Vice President designated by the Manager(s) shall perform the duties of the Chairman of the Board (if any), or the President.  In the absence of a designation by the Manager(s) of a Vice President to perform the duties of the Chairman of the Board (if any) or President, or in the event of their absence or inability or refusal to act, the Vice President who is present and who is senior in terms of time as a Vice President of the Company shall so act.  The Vice

**LIMITED LIABILITY COMPANY AGREEMENT OF**
**TITAN INVESTMENTS, LLC**- Page 2

APP-0173

Presidents shall perform such other duties and have such other powers as the Manager(s) may from time to time prescribe.

SECTION 9. TREASURER. The Treasurer shall have responsibility for the custody and control of all the funds and securities of the Company. He shall perform all acts incident to the position of Treasurer subject to the control of the chief executive officer and the Manager(s); and the Treasurer shall, if required by the Manager(s), give such bond for the faithful discharge of his duties in such form as the Manager(s) may require.

SECTION 10. ASSISTANT TREASURERS. Each Assistant Treasurer shall have the usual powers and duties pertaining to his office, together with such other powers and duties as may be assigned to him by the chief executive officer or the Manager(s). The Assistant Treasurers shall exercise the powers of the Treasurer during that officer's absence or inability or refusal to act.

SECTION 11. SECRETARY. The Secretary shall keep the minutes of all meetings of the Manager(s) and the minutes of all meetings of the shareholders, in books provided for that purpose; he shall attend to the giving and serving of all notices; he may in the name of the Company affix the seal of the Company to all contracts of the Company and attest thereto; he may sign with the other appointed officers all certificates for shares of capital stock of the Company; he shall have charge of the certificate books, transfer books and stock ledgers, and such other books and papers as the Manager(s) may direct, all of which shall at all reasonable times be open to inspection of any director upon application at the office of the Company during business hours, and he shall in general perform all duties incident to the office of Secretary, subject to the control of the chief executive officer and the Manager(s).

SECTION 12. ASSISTANT SECRETARIES. Each Assistant Secretary shall have the usual powers and duties pertaining to his office, together with such other powers and duties as may be assigned to him by the Chief Executive Officer or the Manager(s) or the Secretary. The Assistant Secretaries shall exercise the powers of the Secretary during that officer's absence or inability or refusal to act.

Officers. The initial officers of the Company shall be:
**Maximilien Barton – President, Secretary & Treasurer.**

**LIMITED LIABILITY COMPANY AGREEMENT OF
TITAN INVESTMENTS, LLC**- Page 3

APP-0174

6.    Dissolution. The Company shall dissolve and its affairs shall be wound up at such time, if any, as the Member may elect.

7.    Governing Law. THIS LIMITED LIABILITY COMPANY AGREEMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (EXCLUDING ITS CONFLICT-OF-LAWS RULES).

MEMBER(S):

MAXIMILIEN BARTON

Being the sole Member of the Company

MANAGER(S):

MAXIMILIEN BARTON

Being the sole Manager(s) of the Company

LIMITED LIABILITY COMPANY AGREEMENT OF
TITAN INVESTMENTS, LLC- Page 4

APP-0175

# EXHIBIT

# I

## RESIGNATION
## TITAN INVESTMENTS, LLC

(Resignation of Mr. Timothy L. Barton)

In accordance with the General Corporation Law of Delaware (the "GCL"), the undersigned, respecting **TITAN INVESTMENTS, LLC**, a Delaware limited liability company (the "Company"), hereby provides as follows:

I, the undersigned, **Timothy L. Barton,** hereby resign in all respects from any capacity as authorized signatory, or agent or agency of any kind or character whatsoever respecting the Company, if any; said resignation to become effective immediately:

_____
**Timothy L. Barton**

RESOLVED, that the undersigned manager(s) and or member(s) of the Company hereby acknowledge receipt and acceptance of the following resignation, effective October 6, 2022.

**TITAN INVESTMENTS, LLC**
**A Delaware limited liability company**

By: _____
Maximilien Barton, President

**RESIGNATION; AND ACCEPTANCE THEREOF**
**(TITAN INVESTMENTS, LLC)- Page** 1

APP-0177

# EXHIBIT

# J

# AMENDED AND REINSTATED
# COMPANY AGREEMENT OF
# Goldmark Hospitality, LLC
# A TEXAS LIMITED LIABILITY COMPANY

This Company Agreement of **Goldmark Hospitality, LLC** , a Texas limited liability company is executed as of July 20, 2020 (the "Effective Date") by the persons who sign and are identified as "Members" and "Managers" in this Agreement.

## ARTICLE I
## DEFINITIONS

1.01    **Definitions.**   As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by

---

Company Agreement                                                                Page 1
**Goldmark Hospitality, LLC**

Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means **Goldmark Hospitality, LLC**, a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01 **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02 **Name.** The name of the Company is **"Goldmark Hospitality, LLC"** and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

---

APP-0181

2.03  **Registered Office and Registered Agent.**  The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law.  The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04  **Principal Office and Other Offices.**  The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas.  The Company may have such other offices as the Managers may designate from time to time.

2.05  **Purposes.**  The primary purposes of the Company shall be any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06  **Powers.**  The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07  **Foreign Qualification.**  Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08  **Term.**  The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09  **Mergers and Exchanges.**  The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10  **No State-Law Partnership.**  The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

---

Company Agreement                                                                                        **Page 4**
**Goldmark Hospitality, LLC**

## ARTICLE III
## MEMBERSHIP

3.01 **Initial Members, Capital Commitments, and Percentage Interests.** The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws. The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02 **Additional Members.** Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by unanimous consent of the Managers. The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Managers.

3.03 **Member Rights Specified in Agreement.** Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04 **Representations and Warranties.** Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity: (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06 **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07 **Withdrawal.** A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

# ARTICLE IV
# CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

4.02 **No Further Contributions.** No Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Loans by Members.** If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01 **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken. If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

5.02 **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Percentage Interests, an amount in cash equal to that excess.

(b) From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Managers take action to authorize such a distribution pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

## ARTICLE VI
## MANAGEMENT

6.01 **Designation of Manager and Management by Managers.** TRTX PROPERTIES, LLC is hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder, including a Fundamental Business Transaction;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c) maintaining the assets of the Company in good order;

(d) collecting sums due the Company;

---

Company Agreement                                                                 Page 8
**Goldmark Hospitality, LLC**

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes, and disposing of any asset of the Company;

(g) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(i) obtaining insurance for the Company;

(j) determining distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(k) establishing a seal for the Company; and

(l) designating one or more committees, each of which shall be comprised of one or more Managers, to exercise any authority of the Managers in the management, business and affairs of the Company.

6.02 **Restrictions.** Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) do any act which requires the prior approval of the Members;

(e) possess Company property or assign rights in Company property, other than for a Company purpose; or

(f) amend this Agreement, except as expressly permitted by this Agreement.

6.03 **Conflicts of Interest.** Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the

Company or any other Member, Manager or officer the right to participate therein.

6.04  **Contracts or Transactions with Interested Directors or Officers.** This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers, or of a committee of the Managers, Members or officers that authorizes the contract or transaction, or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if:  (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by (a) the Managers, Members or officers or a committee of the Managers, Members or officers and the Managers, Members or officers or committee in good faith authorize the contract or transaction by the affirmative vote of the majority of the disinterested Managers, Members or officers or committee members, regardless of whether the disinterested Managers, Members or officers or committee members constitute a quorum; or (b) the Members of the Company, and the Members in good faith approve the contract or transaction by vote of the Members; or (2) the contract or transaction is fair to the Company when the contract or transaction is authorized, approved, or ratified by the Managers, Members or officers, a committee of the Managers, Members or officers, or the Members of the Company.

6.05  **Number and Term of Office.**  The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers.  If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers.  Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal.  Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06  **Vacancies; Removal; Resignation.**  Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled by election at an annual or special meeting of Members called for that purpose.  A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office.  At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by a Super Majority.  Any Manager may resign at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07  **Compensation.**  For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to

---

Company Agreement
**Goldmark Hospitality, LLC**

Page 10

APP-0188

time by a Simple Majority of the Members.

6.08 **Reimbursement**. The Managers are not required to advance any funds to pay costs and expenses of the Company. However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities.

6.09 **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010 **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been

approved or ratified by every Member of the Company.

6.11    **Action Without Meeting**.    Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts.  A telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph.  Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be.  The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12    **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other.  Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant.  Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13    **Broad Discretion and Authority of Managers**.  Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member.  Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

**ARTICLE VII**
**CONFIDENTIAL INFORMATION**

7.01    **Confidential Information.**  The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that

information. The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.02. **Specific Performance**. The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

**ARTICLE VIII**
**MEETING OF MEMBERS**

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of a Simple Majority are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such

Company Agreement    **Page 13**
**Goldmark Hospitality, LLC**

place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02 **Voting List**. The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Percentage Interests held by each. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03 **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who

shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05 **Action by Unanimous Written Consent Without Meeting.**

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this paragraph, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been

given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06 **Action by Telephone Conference or Other Remote Communications Technology**. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07 **Classes of Members; Voting.** At an annual or special meeting called for that purpose, the Members may from time to time establish classes or groups of Members. One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

## ARTICLE IX
## OFFICERS

9.01 **Qualification**. The Managers may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Texas, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers. Any number of offices may be held by the one person.

9.02. **Compensation**. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03. **Resignation**. Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04. **Removal**. Any officer may be removed as such, either with or without cause, by the

---

Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05 **Appointment of Officers**. The President is Max Barton. The Secretary and Treasurer is Saskya Zuniga. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions. Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company.

**ARTICLE X**
**INDEMNIFICATION**

10.01 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such

indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 **Non-exclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 **Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have

been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01 **Tax Returns.** The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."** A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority, but this sentence does

---

Company Agreement                                                                                   Page 19
**Goldmark Hospitality, LLC**

not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01 **Limited Right to Transfer.** No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the unanimous consent of the Managers; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

13.02 **Rights of an Assignee.**

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee. If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the

---

Company Agreement                                                    Page 20
**Goldmark Hospitality, LLC**

Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03 **Legal Opinion.** For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations. The Managers, however, may waive the requirements of this paragraph.

13.04 **Admission as Substituted Member.** An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05 **Transfer to Existing Member.** In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06 **Third Party Offer.** In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to

that Member's Percentage Interest.  If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07 **Reasonable Expenses**.  The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due.  If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

# ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

14.01 **Termination of Marital Relationship**.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed.  Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse.  Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement.  If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust.  Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust.  Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member**.  Commencing upon the death of a Member, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers.  Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted

in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Company and/or the other Members in accordance with the option or obligation established by this paragraph.

14.03  **Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04  **Insufficient Surplus.** If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05  **Option by Other Members.** If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company.

14.06  **Exercise of Option.** Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07  **Determination of Fair Value.** The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08  **Fees and Expenses of Appraiser.** In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a

Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09 **Right to Withdraw Option**. In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10 **Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members.

The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.** If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending

Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas;

(d) reducing the Defaulting Member's Membership Interest or other interest in the Company;

(e) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member;

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV;

(g) forfeiture of the Defaulting Member's Membership Interest; or

(h) exercising any other rights and remedies available at law or in equity.

15.02 **Security.** Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas. It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 **Compromise or Release.** The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the unanimous consent of the Managers. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04 **Expulsion.** A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated

any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination.** The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02 **Business May Be Continued.** Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring

---

Company Agreement                                                                 Page 27
**Goldmark Hospitality, LLC**

winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation.** As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company

during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed (a) with the unanimous consent of the Managers or (b) by a Super Majority of the Members.

17.02 **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification reducing a Member's Percentage Interest or increasing its Capital Commitment (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent.

(b) An amendment or modification reducing the required Percentage Interest or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the Percentage Interest or other measure theretofore required.

(c) An amendment to establish the relative rights and preferences of the Membership Interests of any class or series may be made by a committee of Managers, within the authority of Managers or otherwise provided in the Certificate of Formation, the TBOC, or resolutions by

---

**Company Agreement**                                                              **Page 29**
**Goldmark Hospitality, LLC**

Members forming the committee.

(d) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01  **Construction.**  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02  **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03  **Notices.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person.  All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> 13901 Midway Rd
> Suite 102-243
> Dallas TX 75248

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04  **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05  **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company.  Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period

---

has run.

18.06 **Binding Effect.** Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07 **Governing Law.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08 **Severability.** If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01 **Compliance with Regulation D of the Securities Act of 1933.** THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. THE OWNERSHIP

INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02 **Notice to Members.**  By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation.  Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03 **Limitation of Liability.**  Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services.  By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date set forth above.

**MANAGER:**

TRTX PROPERTIES, LLC

_____
MAX BARTON, PRESIDENT

**MEMBERS:**

TRTX PROPERTIES, LLC

_____
MAX BARTON, PRESIDENT

APP-0211

EXHIBIT "A"
MEMBERS OF
Goldmark Hospitality, LLC

| Member's<br>Name and Address | Percentage<br>Interest |
|---|---|
| TRTX PROPERTIES, LLC<br>13901 MIDWAY RD,<br>SUITE 102-243<br>DALLAS, TX 75244 | 100% |

APP-0212