IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § | |

RECEIVER'S INITIAL STATUS REPORT

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits the following 30-day status report pursuant to this Court's Order Appointing Receiver [Dkt. 29] (the "Receivership Order" or "RO") and would respectfully show as follows:

Pursuant to the Receivership Order, the Receiver is directed to submit quarterly reports that contain the following information:

A.    A summary of the operations of the Receiver;

RECEIVER'S INITIAL STATUS REPORT – PAGE 1

B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations."

In addition to the mandate of quarterly reporting, the Receivership Order also requires that the Receiver submit (a) within thirty days of the RO, a report as to recommended disposition of certain bankruptcy cases pending in the Eastern District of Texas and (b) within ninety days of the RO, a Liquidation Plan.[1]

The Receiver has chosen to file this Initial Status Report, rather than waiting until the filing of the initial quarterly report on January 30, 2023, because the Report (1) provides the most efficient means of describing—for the Court, potential victims of the Defendant's alleged fraud, and other interested persons—the extensive activities that have occurred over the past 30 days; (2) outlines the Receiver's initial proposals for continued fulfillment of the Receivership Order's

---

[1] Capitalized terms used but not defined herein shall have the meanings provided in the Receivership Order and the SEC's Complaint in this matter.

directives; and (3) responds to the Court's instruction in Paragraph 49 of the Receivership Order. In accordance with the Receivership Order, the Receiver will submit his Initial Quarterly Status Report, including all of the information outlined above, on or before January 30, 2022.

## I.
## INTRODUCTION

At a most basic level, the Court appointed the undersigned in this case because, after considering certain evidence submitted by the SEC, the Court found that a receiver was "necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities." RO at 2. To that end, the Receivership Order confers certain general powers and duties on the Receiver, including (A) "to determine the nature, location, and value of all property interests of the Receivership Entities[;] . . . (B) to take custody, control, and possession of all Receivership Property[;] . . . (C) to manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court; (D) to use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver; [and] (G) to take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property . . . ." RO ¶ 39. The Court further clarified the Receiver's ability to sell personal property in its November 16, 2023 Order Granting Motion for Order Governing Administration of Receivership Estate [Dkt. 63]. As to real property, the Receiver is authorized "to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates," pursuant to 28 U.S.C. § 2001. *Id.* ¶¶ 40-41.

As of the date of this Report, while the amount of investor monies flowing into the Wall Entities has not yet been fully determined (and will not be fully determined until the conclusion of the forensic accounting and claims processes discussed below), the SEC claims that at least $26 million flowed into the Wall Entities from potentially impacted investors. *See* Compl. ¶ 1. As further outlined below, through extensive efforts to identify and freeze all Receivership Entity bank accounts, less than $75,000 in cash has been frozen to date, despite the fact that the Receiver is aware of several million dollars in receipts flowing into the Receivership Entities during the last twelve months alone. While the Receiver is optimistic that he will be able to sell several properties that have considerable equity, almost every property identified to date has significant debt and other legal issues that make ultimate recovery by the Receiver impossible to predict. All the while, the dearth of capital remaining in the Receivership Entities' accounts presents immense challenges for the Receiver to carry out his most fundamental duties of securing and maintaining assets. In short, as outlined below, the Receiver proposes (1) that the Receivership continue, (2) that upon motion and court approval he be allowed to sell certain assets of the Receivership Entities in order to preserve the remaining assets of the Receivership and to continue to administer the Receivership, and (3) that such efforts to preserve and sell assets not be hindered or stayed, as Defendant Barton appears to believe is approriate (*see* Dkt. 56 at 5).

**II.**
**SUMMARY OF THE OPERATIONS OF THE RECEIVER AND DESCRIPTION OF KNOWN RECEIVERSHIP PROPERTY AND CLAIMS HELD BY THE RECEIVERSHIP ESTATE**

**A.      SUMMARY OF SEC ALLEGATIONS AND STATUS OF PROCEEDINGS**

On September 23, 2022, the SEC filed its Complaint [Dkt. 1] against Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC,

Wall018, LLC, Wall019, LLC (collectively, the "Wall Entities"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall" and together with Barton, Carnegie Development, the Wall Entities, and Fu, the "Defendants").

Among other things, the SEC alleges that between March 2017 and June 2019, Barton "raised approximately $26 million from over 100 investors . . . in unregistered, fraudulent securities offerings related to real-estate investments in Texas." Compl. ¶ 1. The SEC further alleges that Barton "partnered with Wall . . . and Fu . . . to offer and sell investment loans issued by" the Wall Entities. *Id.* ¶ 2. More specifically, the SEC alleges that Defendants promised that funds raised by the Wall Entities would be used to purchase specific parcels of land at specific prices set forth in the offering materials, those parcels would then be developed by Barton into residential lots, and then Wall would build homes on the lots and sell them. *Id.* ¶ 3.

While the Wall Entities purportedly promised investors that they would receive their principal back in two years along with annual interest payments, the SEC contends that Defendants misappropriated nearly all of the investor funds and misused them to, among other things:

- pay personal expenses of Barton and his family, including credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies and using funds from a different Wall Entity;

- pay professional fees (such as engineering, surveying, and land development) related to, in most cases, properties unrelated to the offerings; and

RECEIVER'S INITIAL STATUS REPORT – PAGE 5

- make payments to Wall.

*Id.* ¶¶ 3-5, 35.  In the end, the SEC alleges that the Wall Entities "were left with little or no assets, the projects were not developed, and the investors were never paid back."  *Id.* ¶ 5.

On September 26, 2022, the SEC filed a Motion for Appointment of Receiver [Dkt. 6], requesting that United States District Judge Brantley Starr appoint a federal equity receiver over the Wall Entities, Carnegie Development, certain Relief Defendants (DJD Land Partners, LLC and LDG001, LLC) and "[a]ny other entities that Barton directly or indirectly controls, including but not limited to "BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, the "Receivership Entities").  On October 17, 2022, Barton filed a Response [Dkt. 24] in opposition to the appointment of a Receiver.

On October 18, 2022, the Court entered an Order Appointing Receiver [Dkt. 29], which appointed the undersigned, Cortney C. Thomas, to serve as Receiver over the Receivership Entities.

## B.    FIRST DAY

Upon receiving the notice of appointment around lunch time on October 18, the Receiver and several members of his team participated in a coordinated effort to take control of assets belonging to the Receivership estates (the "Receivership Assets").

First, members of the Receiver's team travelled to the address of record for JMJ Development, 1755 Wittington Pl #340, Dallas, TX 75234.  Upon arrival, they discovered that other than some limited office furniture and documents, the office had been vacant for some time.

After a short investigation of other potential office locations for the Receivership Entities, the Receiver and his team them decided to investigate 2999 Turtle Creek ("the Turtle Creek Office") to determine whether that location had any ties to Defendant Barton or the Receivership Entities. Upon arrival, the Receiver was greeted by Victoria Barton, Defendant Barton's daughter. After presenting her with a copy of the Receivership Order, Ms. Barton connected the Receiver with Mr. Edney, lead counsel to Defendant Barton in this case. Eventually, Mr. Edney agreed to tell Ms. Barton and the other employees in the office to leave the premises. During this same time, the Receiver's counsel interviewed certain lawyers who officed at the Turtle Creek Office and performed certain services for Barton.

The Receiver and his team next travelled throughout the building to ensure that it was secure. In the process, the Receiver discovered that an individual (J.M.) was living on the second floor. After explaining the receivership order to J.M., he agreed to leave the premises without incident. The Receiver then set about securing all exterior doors, posting Receivership signs in accordance with the Receivership Order, and disconnecting external internet access to the property.

## C.    OTHER FIRST MONTH ACTIVITIES OF THE RECEIVER

During the remainder of the first thirty days, the Receiver and his attorneys have also engaged in the following:

Establishment of National Jurisdiction for Recovery of Receivership Assets.    Pursuant to 28 U.S.C. § 754,  within ten days of his appointment, the Receiver filed the Complaint and the Receivership Order in 15 judicial districts in which Receivership Assets or Receivership Records may exist. The Receiver also filed the pleadings in the districts in which investors or recipients of investor funds were known to reside.

Establishment of Receivership Website.    The Receiver created a website for the receivership: www.bartonreceivership.com (the "Receivership Website").   The Receivership Website will enable the Receiver to quickly, inexpensively, and broadly convey information regarding the Receivership, particularly to potentially impacted investors who live overseas.  The Receiver has and will continue to update the website periodically as the Receivership progresses, including posting a copy of this Report on the website.  The Receiver intends to post information and links to any potential sales or auctions of real estate or other property on the Receivership Website.

Employment of Professionals.  The Receivership Order authorizes the Receiver to "solicit persons and entities . . . to assist him in carrying out the duties and responsibilities described in th[e] Order," but requires that the Receiver first obtain Court approval authorizing any such engagement.  RO ¶ 62.  Accordingly, upon being informed of his appointment as Receiver, the Receiver obtained leave from this Court to engage the services of the law firm of Brown Fox PLLC to serve as counsel to the Receiver.  Brown Fox PLLC (particularly the Receiver and Receiver's counsel, Charlene Koonce) has extensive experience in federal receiverships.  The Receiver also obtained leave from this Court to engage the services of the accounting firm of Ahuja & Clark, PLLC, which also has considerable experience with federal receiverships and extensive background in forensic accounting.  Finally, the Receiver also obtained leave from this Court to engage the services of Veracity Forensics LLC to secure and begin an inventory and analysis of the computers, servers (both physical and virtual), and other electronic information of the Receivership Entities.  To date, no payments have been made to the Receiver or any of the professionals retained by the Receiver for the services rendered.  In accordance with the

RECEIVER'S INITIAL STATUS REPORT – PAGE 8

Receivership Order, the Receiver will submit his first fee application, which will cover fees incurred between October and December 2022, on or before February 15, 2022.

Supplementation of Receivership Order.  The Receivership Order states that the Court took "exclusive jurisdiction and possession of the assets . . . of . . . "any other entities that Defendant Timothy Barton directly or indirectly controls . . . ." RO ¶ 1.  While several of these entities are included in the Receivership Order, the Receiver quickly discovered from a review of formation binders in the Turtle Creek Office that over 100 entities controlled by Defendant Barton had not been specifically listed in the Receivership Order.  Because certain banks and lenders have refused to follow the Receivership Order's mandates absent specific identification of certain companies as "Receivership Entities," on November 1, 2022, the Receiver filed a Motion to Supplement Order Appointing Receiver [Dkt. 41], asking the Court to supplement its Order to specifically list each of these entities.  Defendant Barton opposed the motion [Dkt. 55], as did his son Max Barton [Dkt. 53].  On November 16, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62] and directed the Receiver to file supplemental briefing addressing certain Max Barton-related entities.

Administrative Procedures Motion.  On November 4, 2022, the Receiver filed a Motion for Order Governing Administration of the Receivership Estate [Dkt. 47], which sought to clarify the specific methods and procedures with which the Receiver may sell Receivership assets.  Defendant Barton once again opposed the requested relief [Dkt. 56], and the Court granted the Receiver's motion on November 16 [Dkt. 56].

Attempts to Obtain Information from Defendant Barton.  Pursuant to ¶¶ 8-10 and 18 of the Receivership Order, the Receiver asked Defendant Barton to provide various information for Receivership Entities that had been under his control, including "the identity, location, and

estimated value of all Receivership Property," identification of every bank account held by the Receivership Entities, and identification of all Receivership Property. While on one occasion the Receiver was able to communicate with Barton through counsel to discuss properties the Receiver had already identified, the information otherwise provided to date has been incomplete and sporadic at best. These delays have in turn severely hampered the speed and efficiency with which the Receiver has been able to identify and secure bank accounts and Receivership assets. In many instances, requests for information, such as the owner of various personalty, have simply been ignored.

Interviews. In the days and weeks following October 18, the Receiver and his team informally interviewed and/or met with various individuals connected with the Receivership Entities and Barton, including former employees, attorneys, lenders, equity investors, and family members.

Photographic Inventories. The Receiver and his team also took extensive photographic inventories of the contents of the Turtle Creek Office and the Rock Creek Residence.

Inventory of IT Assets. In accordance with ¶ 16 of the Receivership Order, the Receiver's team has identified and catalogued all IT assets in the Turtle Creek Office. The Receiver understands that the Receivership Entities' email and accounting servers are maintained in the cloud. However, to date Defendant Barton and his counsel have refused to assist the Receiver in securing this information. Most recently, after the Receiver finally identified a third-party IT contractor who has access to this information, counsel to Defendant Barton objected to the Receiver's attempts to secure the Receivership Entities usernames and passwords. Additionally, despite multiple requests to Defendant Barton and former employees of the Receivership Entities, no one has provided usernames and passwords for the Receivership Entities QuickBooks

accounting records.   Moreover, Defendant Barton and former employees have largely been unwilling to even identify the name of the individual who was in charge of accounting for the Receivership Entities, despite the fact that this individual appears (1) to have lived on site and (2) was well known to all employees of the Receivership Entities.   This obstruction of the Receiver's efforts to obtain access to the Receivership Entities' accounting system has greatly impacted the Receiver's investigation into where the Wall Entity investors' monies have flowed, severely hampering the Receiver's ability to fulfill his mandate.   It also raises serious questions as to why this information, which unquestionably belongs to the Receivership Estate and is Receivership Property (RO ¶¶ 16, 18) is being withheld.   While refusing to provide login credentials to the Receivership Entities' accounting systems, in the same breath Defendant Barton has objected that the Receiver has not traced investor funds to specific Receivership Entities.   *See generally* Dkt. 55.[2]

Review of Documents in Turtle Creek Office.   During the first days of the Receivership, the Receiver and his team began the process of reviewing documents to identify assets (including mainly properties and bank accounts) and continuing liabilities (particularly utility, insurance, and debt payments).   Indeed, given the lack of information provided by Barton, these documents have provided the single greatest source of information for the Receiver.   From the outset, however, Defendant Barton has objected to the Receiver's review of documents in his office and an adjoining office, contending that certain of these documents contain privileged documents related to Barton's criminal defense.   Despite the fact that the Receiver now holds the privilege of the

---

[2] Besides the fact that Barton's own lack of cooperation has made such tracing impossible within the first thirty days of the Receivership, that argument is a red herring and was properly rejected by the Court— each of these entities was already a Receivership Entity under the Receivership Order [Dkt. 29] because it was controlled by Defendant Barton.  The Supplemental Order simply identifies these additional entities with specificity.

Receivership Entities and these documents are housed in the Turtle Creek Office, the Receiver has nevertheless endeavored to collaborate with Defendant Barton and his counsel to determine the most efficient protocol for review of these records. Indeed, as an agent of the Court who is not an arm of the Department of Justice or the SEC, the Receiver is uniquely situated to quickly and efficiently set aside any potentially privileged documents without impacting the agencies' investigations or Barton's privilege concerns. However, to date Barton's counsel has refused to agree to a protocol, and the Receiver still has yet to review these documents. If agreement cannot be reached, the Receiver anticipates asking for Court intervention during November or December 2022.

Freeze Letters and Requests for Information. The Receiver and his attorneys have sent dozens if not hundreds of letters providing notice of the Receivership Order and its provisions, including its stay of collection activities, asking individuals and entities to turn over any assets belonging to the Receivership Entities, and requesting information or documents relevant to the Receiver's investigation.

UPS Store. Several of the Receivership Entities have listed addresses that match a UPS Store in Farmer's Branch. During the first days of the Receivership, the Receiver travelled to the UPS Store to share a copy of the Receivership Order and inquire whether the Receivership Entities received mail at that location. The manager of the store confirmed that the Receivership Entities did in fact receive mail at this location and agreed to provide this mail to the Receiver. The mail received by the UPS Store is now being forwarded to the Receiver.

Other Miscellaneous Activities. Among other things, the Receiver and his team have also (1) begun securing access to the Receivership Entities' bank records, (3) sent letters to the list of potential defrauded investors, as identified by the SEC and after review of records, (4) ensured

forwarding of all U.S. Mail, (5) coordinated the transfer of utilities for the various properties into the Receiver's name, and (6) coordinated the filing of notices of stay in dozens of pending litigation matters, including speaking with prior counsel to the Receivership Entities and opposing counsel. The Receiver has also begun the process of identifying potential third-party claims and other sources of recovery.

**D.      RECOVERY OF MONIES IN BANK ACCOUNTS**

Because, as discussed above, Barton has to date refused to provide a even a list of the Receivership Entities' bank accounts, the Receiver has been forced to send letters and copies of the Receivership Order to any banks that may have ties to the Receivership Entities. This process has been particularly problematic because of the number of entities controlled by Barton. To date, the Receiver has sent freeze letters to a number of banking institutions, including: Bank of America, Capital One, First Guaranty Bank, Happy State Bank, JP Morgan Chase, Louisiana National Bank, PNC Bank, Prosperity Bank, Regions Bank, Texas Brand Bank, Texas Republic, Third Coast Bank, Veritex, Vista, and Wells Fargo.

Despite the number of properties identified below, the amount of funds the SEC alleges were received from investors between 2017 and 2019, and the sheer amount of payments to Receivership Entities in 2021 and 2022 from certain property sales (discussed in the following section), very limited funds were found in the Receivership Entities' bank accounts. Indeed, as of the date of this Report, only $73,183.78 in unencumbered funds has been identified in accounts owned or controlled by the Receivership Entities:

|  |  |
|---|---|
| First Guaranty Bank | $673.96 |

| | |
|---|---|
| JP Morgan Chase | $5,773.26[3] |
| Regions Bank | $11.00 |
| Texas Brand Bank | $33,223.28 |
| Vista Bank | $33,502.28[4] |

**Total: $73,183.78**

To the extent such funds have not been transferred to the Receivership's bank already, the Receiver anticipates coordinating these transfers during November and December 2022.  However, absent sale of Receivership Assets, these funds alone will not be sufficient to continue operating the Receivership, even before payment of the Receiver and his team's fees.

**E.    IDENTIFIED REAL ESTATE ASSETS**

The overwhelming majority of the Receiver's time during the first thirty days of the Receivership has been dedicated to identifying real estate-related assets of the Receivership Entities, reaching out to lenders and other interested parties on each property, determining insurance, utility, tax, and other payments coming due on each of the properties, identifying and communicating with a host of potential purchases of each of the properties, identifying brokers and other professionals who can assist in the initial valuation and eventual sale of these properties, identifying appraisers who will be able to help carry out the mandates of 28 U.S.C. § 2001, and reviewing lien reports and title commitments on the properties.  By and large, these properties are heavily leveraged, with some having favorable interest rates and others having abnormally high rates.  Given the uncertainty of the current economic environment and interest rates moving

---

[3] Certain other accounts at JP Morgan Chase are in the name of the Receivership Entities but are used by third-party property management companies to manage the multifamily properties discussed below or are used to pay loans on these properties.

[4] The majority of these funds are attributable to the Amerigold Suites (as that term is defined below) and are needed to continue paying utilities and contractors managing the property.

forward, the overwhelming majority of industry participants with whom the Receiver has spoken have advised that attempting to sell assets in the near future will likely result in greater values than waiting three or six months to begin a sales process.[5]

Based on the information now known by the Receiver, the Receiver believes the following real estate assets may result in sources of recovery for the receivership:

### 1.    4107 Rock Creek Drive

While reviewing documents at the Turtle Creek Office, the Receiver's team discovered documents indicating loans and insurance payments on a property located at 4107 Rock Creek Drive in Dallas (the "Rock Creek Residence").   Upon further examination, the Receiver determined that this property was owned by SF Rock Creek, LLC, a Receivership Entity controlled by Defendant Barton.   *See* Dkt. 41 ¶¶ 6-7.   Accordingly, the Rock Creek Residence is a Receivership Asset.

The Receiver has received an opinion of value that the property is worth approximately $1.45 million.  Although the Receiver is still waiting for loan documents on this property, it appears that the Rock Creek Residence was financed with a "house flipping loan" with a higher interest rate.   Moreover, the property is saddled with continuing obligations to pay utilities, insurance, and taxes.   These facts, combined with the dearth of liquid assets with which the Receiver is able to administer the Receivership and the ease of selling a residential property (at least compared to commercial properties), led the Receiver to list this property for sale as expeditiously as possible through a respected, independent broker.  After receiving several offers

---

[5] While the Receiver has extensive experience litigating commercial real estate transactions, as well as negotiating large commercial and raw land purchase and sale transactions, he has thus far relied heavily upon the advice of a variety of well-respected industry professionals who have been willing to assist the Receiver at no charge to the Receivership Estate.

on the property (most of which were between $1.25 million and $1.35 million), the Receiver has ultimately agreed, subject to Court approval, to sell the Rock Creek Residence to the potential purchaser with the highest offer for a total payment price of $1.4 million. In accordance with 28 U.S.C. § 2001 and the Court's Administration Order [Dkt. 63], the Receiver is currently in the process of securing independent appraisals on the Property and—assuming that the $1.4MM sales prices exceeds 2/3rds of the value of the property—anticipates seeking the Court's appointment of these appraisers, approval of their appraisals, and, after hearing, eventual approval of the sale. Such process will be instituted via a forthcoming separate motion upon receipt of the appraisals.

The Receiver notes that on November 15, 2022, Defendant Barton filed an Appendix in Support of his Response to Motion to Supplement Order Appointing Receiver [Dkt. 58], in which he attaches a June 2022 appraisal of the Rock Creek Residence indicating a value of $2 million for the property. Based upon information collected by the Receiver and the level of interest he has received in the property during the time it has been listed for sale at $1.45 million, the Receiver anticipates that the actual value of the property will be close to $1.4 million once his three independent appraisers have completed their work. The protections of 28 U.S.C. § 2001 will ensure that the property is sold at an appropriate value. Even more importantly, however, because the Receivership Entities' bank accounts were laid bare prior to the initiation of the Receivership, the sale of this property within the next thirty days is currently necessary to ensure proper administration and preservation of the other Receivership Assets.

The Receiver is still waiting for the final title commitment and loan payoff information for this property. After payment of the existing loan (which appears to exceed $1.1 million), existing and/or potential mechanics and judgment liens on the property, taxes, closing costs, and broker

commissions, the Receiver anticipates this sale resulting in net proceeds of between $100,000 and $200,000 into the Receivership Estate.

### 2.    Frisco Gate Property

Receivership Entity FHC Acquisitions, LLC owns approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate Property").  The Receiver has obtained multiple broker's opinions of value for this property that generally estimate the property's value to fall between $8.9MM and $10.8MM.  Through a broker previously retained by Barton, and with Barton's cooperation, a potential purchaser of the Frisco Gate Property approached the Receiver about selling the Frisco Gate Property for $9,000,000.  Such a sale would allow the Receiver to accomplish a sale of the property (a) quickly and without a listing process and (b) without having to pay any broker fees (the potential purchaser of the property has agreed to pay its broker separately and outside of the sale proceeds).  The Receiver has executed a letter of intent with the potential purchaser and is currently in the process of negotiating the sales contract with the purchaser.  The receiver anticipates obtaining appraisals in accordance with 28 U.S.C. § 2001 during November and December 2022 and seeking the Court's approval of the sale upon completion of the 30-day due diligence period under the parties' agreement.

The Receiver is still waiting for the final title commitment and loan payoff information for this property.  After payment of the existing loan (which appears to exceed $3 million), a second investment/loan of approximately $3.5 million, taxes, and closing costs, the Receiver currently anticipates this sale resulting in net proceeds of approximately $2 million into the Receivership Estate.  However, such closing will not occur until mid- to late-February at the earliest.

### 3.    2999 Turtle Creek

Receivership Entity 2999TC Acquisitions, LLC is or was the owner of the Turtle Creek Office, having purchased the property in or around September of 2019.  In connection with this

purchase, 2999TC Acquisitions, LLC or its predecessor secured a loan in the amount of $32,500,000.  Through protracted litigation in the bankruptcy court—and millions of dollars in payments from the Receivership Entities to the lender, HNGH Turtle Creek, LLC ("HNGH")—the Bankruptcy Court eventually entered an Order on September 28, 2022 that finds, among other things, that HNGH now "owns" the Turtle Creek Office, not 2999TC Acquisitions, LLC.  That Order was appealed shortly after it was entered, and the appeal, which is also with this Court, was automatically stayed upon the Receiver's October 18, 2022 appointment.

As will be explained in greater detail in future filings, HNGH claims that the bankruptcy court's September 28 order confirms that as of May 2022, HNGH owned the Turtle Creek Office. At this time, the Receiver is without sufficient information to determine how or why the institution of the Receivership may impact prior agreements, actions, and decisions in the Bankruptcy Court, which if allowed to stand will essentially give the lender a windfall at the expense of potentially impacted investors.  However, even if the Receiver is ultimately successful in unwinding the determination that HNGH is the owner of the property, substantial amounts will still be due and owing to HNGH under the loan, with interest continuing to accrue daily.  Further complicating the situation, the Receiver has seen prior "independent" appraisals and opinions of value from within the last two years that value the property anywhere between $35MM and $71.5MM.  The Receiver is diligently seeking to obtain legitimate opinions of value and appraisals of this property and is also analyzing the potential value and cost of pursuing various options.  The Receiver intends to propose a path forward as soon as possible, but is targeting December 2022 for that recommendation.  As of the date of this Report, however, the Receiver is unable to determine what value—in any, in light of HNGH's claims and the September 28 bankruptcy order—lies in Receivership Entities' interest in the Turtle Creek Office.

4.      **Bellwether Ridge (DeSoto)**

Receivership Entity D4DS, LLC is the record owner and HUD borrower on a certain apartment complex located at 841 S. Polk Street in DeSoto, Texas.  The Receiver is currently in the process of securing opinions of value and eventually appraisal(s) on this property.  However, on November 14, 2022 Defendant Barton filed an opinion of value—prepared by an individual that is connected to Mr. Barton on other transactions—that estimates the value of Bellwether Ridge to be between $26.7 million and $28.0 million.  [Dkt. 57 at 7]  While the Receiver is still trying to determine current loan balances on this property, the most recent loan statement located from the HUD lender indicates that approximately $18 million is still owed on the property.

Moreover, Pillar Asset Management ("Pillar") contends it provided a second loan to the Receivership Entities in connection with the development of Bellwether Ridge and that the original principal amount of the loan was $3.8 million.  While the Receiver is similarly still working to determine the current balance on the Pilar loan, it bears noting that Pillar has taken the position that it exercised certain purported contractual rights to convert its loan rights in Bellwether Ridge into an equity interest such that the Receivership Entities purportedly no longer hold any ownership position in the property.  While the Receiver intends to contest this position and maintain, preserve, and maximize the Receivership Entities' interest in this property, if Pillar is successful in its challenge, limited value may exist in this asset.

Assuming (1) that Pillar will be treated as a lender and not an equity holder, (2) that, for purposes of calculation only, the amount owed on Pillar's loan is approximately $3.8 million, and (3) that the Receiver is able to sell Bellwether Ridge for an amount within Barton's suggested

opinion of value,[6] the best-case sale scenario on DeSoto prior to closing costs, broker commissions, and attorneys' fees would be approximately $5 million to $6 million. Moreover, to maximize this value, a potential purchaser of this asset will very likely wish to assume the current HUD loan and its favorable interest rate, which process alone is likely to take four months at minimum and more likely somewhere between six and twelve months.[7]

### 5.    Parc at Windmill Farms (Forney)

Receivership Entity D4FR, LLC is the record owner and HUD borrower on a certain apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126. The Receiver is currently in the process of securing opinions of value and eventually appraisal(s) on this property. The opinion of value filed by Defendant Barton on November 14, 2022 estimates the value of Windmill Farms to be between $53.3 million and $56.0 million. [Dkt. 57 at 7]. While the Receiver is still working to determine current loan balances on this property, the most recent loan statement located from the HUD lender indicates that approximately $35.5 million is still owed on the property.

Pillar has once again taken the position that prior to entry of the Receivership Order, it converted its original loan position ($7.3 million in principal) to equity. Once again, the Receiver intends to contest any windfalls to Pillar at the expense of the Receivership Estate and potential impacted investors. The Receiver will seek to obtain additional information disclosing the amounts likely owed to Pillar on these properties, if its equity assertion fails. If Pillar is successful in its challenge, however, limited value likely exists in this asset.

---

[6] Prior to receipt of these opinions of value from Mr. Howell, Barton had indicated (via email through a family member) that he believed the value of this property to be roughly $30 million.

[7] The Receiver has only recently received the loan documents for the HUD loans discussed herein and has not yet reviewed the documents in depth. However, for purposes of this report, the Receiver has assumed that the HUD loans are assumable.

Assuming (1) that Pillar will be treated as a lender and not an equity holder, (2) that, for purposes of calculation only, the amount owed on Pillar's loan is approximately $7.3 million, and (3) that the Receiver is able to sell Windmill Farms for an amount within Barton's suggested opinion of value,[8] the best-case sale scenario on DeSoto prior to closing costs, broker commissions, and attorneys' fees would be approximately $10.5 million to $13 million. And, again, a potential purchaser will likely want to go through the longer process of assuming the current HUD loan and its favorable interest rate.

Finally, in Defendant Barton's recently filed Response [Dkt. 56] to the Receiver's Motion for Order Governing Administration of Receivership Estate, Barton has indicated that the sale of Bellwether Ridge and Windmill Farms alone "will produce, per an independent valuation, well in excess of $26 million in liquid funds." [Dkt. 56 at 5]. Barton argues that sale of these properties would "obviate the need for any receivership," but that the Receiver "seems fixated on selling items that are particularly dear to Mr. Barton, but will raise no more than trivial amounts of money." *Id.* at 6. To the contrary, however, (1) there is no guarantee that the sale of Bellwether Ridge and Windmill Farms will result in *any* value to the Receivership Estate if Pillar is successful in its efforts; (2) even if the Receiver is able to achieve the best-case scenario sale of these properties under Barton's own valuation, net proceeds before closing costs, commissions, and attorneys' fees would be $19 million after a minimum four-month process; and (3) there is no personal animus against Mr. Barton at all—the Receivership Estate is in dire need of capital, and sale of the Rock Creek Residence is (a) much faster than the sale of a large commercial property and (b) necessary to stop the wasting away of what limited equity is there. In short, while the

---

[8] Prior to receipt of these opinions of value from Mr. Howell, Barton had indicated (via email through a family member) that he believed the value of this property to be much more inflated, at roughly $70 million. However, with his filing he now appears to concede the value is actually much lower.

Receiver waits for the longer-term sales of larger assets surrounded by legal challenges and in an unpredictable market, he cannot sit idly by and instead must sell other assets to continue administering the Receivership. Had the Receivership Entities' bank accounts not been drained, the same level of exigency might not exist; however, the dire financial situation is one of Barton and the Receivership Entity's own making.

### 6.    Parc at Ingleside (Corpus Christi area)

Receivership Entity D4IN, LLC is the record owner and HUD borrower on a certain apartment complex located at 2850 Ave. J, Ingleside, TX, 78362. Construction on Ingleside only recently completed, and the property is currently in the process of rent stabilization. The Receiver is currently in the process of securing opinions of value and eventually appraisal(s) on this property. Similar to Bellwether Ridge and Windmill Farms, Ingleside has both a HUD loan and additional funding from Pillar, and Pillar once again alleges that it converted its debt to equity prior to institution of the Receivership. While the Receiver believes that Ingleside presents value to the Receivership Estate, at this time it is impossible to predict what that value will be.

### 7.    Parc at Opelika (Alabama)

Receivership Entity D4OP, LLC is the record owner and HUD borrower on a certain apartment complex located at 1375 McCoy Street, Opelika, AL 36801. Construction on Opelika is nearing completion and the rental process has begun. Certification with HUD has not yet occurred, and the Receiver is in contact with the lender on the property. There is no guarantee that certification will occur at this time, but the Receiver is currently optimistic that it will occur. Similar to Bellwether Ridge, Windmill Farms, and Ingleside, Opelika has both a HUD loan as well as additional funding from Pillar, and Pillar once again alleges that it converted its debt to equity prior to institution of the Receivership. While the Receiver believes that Opelika presents value to the Receivership Estate, at this time it is impossible to predict what that value will be.

### 8. Amerigold Suites

Receivership Entity Goldmark Hospitality, LLC is the record owner of an extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas.  While the four apartment complexes discussed above have third-party property managers, employees of the Receivership Entities coordinated with contractors to manage the Amerigold Suites themselves.  In the months prior to the institution of the Receivership, it appears that that the Amerigold Suites had negative cashflow because of a large number of vacant units as well as the generally poor condition of some of the units.  Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off to the property, and that significant water bills were owed.  The Receiver has been forced to expend scarce Receivership resources to preserve this asset and ensure that operations continue.

The Receiver is currently analyzing the best path towards preserving and maximizing the value of this property, particularly in light of its considerable liabilities.  Significant debt on the property is owed to at least two lenders, but the Receiver anticipates value to the Receivership even after loan payoffs based upon initial estimates of value that he has received.  The Receiver anticipates having an update on this property by the time of his next report.

### 9. Venus Development

Prior to the Receiver's appointment, the Receivership Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development agreement with the City of Venus.  If the development agreements are finalized with the City, the value of the properties will increase significantly.  However, as of the date of this Report, the Receiver is unable to predict (1) whether the development agreements will ultimately be finalized with the City of Venus and (2) if the development agreements are finalized, what value will ultimately be realized by the Receivership Estate.  The Receiver has been in contact with

consultants who assisted the Receivership Entities with the entitlements process, as well as potential developers who are interested in continuing the development of the project.  Each of the properties associated with this development have significant debt.  At this time it is impossible to ascertain whether the Receiver will be able to recover any value to the Receivership Estate from the Venus Development or, if there is value, what that value will ultimately be.

### 10.   Ridgeview Addition

Receivership Entity Ridgeview Addition, LLC owns approximately 2 acres on Bulldog Road in Venus, Texas.  The Receiver understands that this property has been platted and was under contract to sell prior to his appointment, with the contract being set to close in the near future.  This property also has significant loan responsibilities.  While Defendant Barton claims that the sale of this property will bring in "approximately $265,000 in immediate cash equity into the Receivership," (1) closing still has yet to occur because of the ongoing discussion regarding certain closing conditions allegedly unfulfilled by the Receivership Entities and (2) at least one lender on the property has indicated that this property is cross-collateralized and a sale may result in no value to the Receivership. While the Receiver is optimistic that these issues will be dealt with in the near future, as of the date of this Report there is still no guarantee what amount of funds will be transferred to the Receivership and when such transfer will occur.

### 11.   Participation Agreements

During the twelve months prior to the appointment of the Receiver (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida.  In connection with these sales, the Receivership Entities often (though not always) received millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms, and Winter Haven:

- $800,000 on March 14, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $500,000 on March 14, 2022 to Orchard Farms Village, LLC

- $200,000 on May 6, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $2,000,000 on May 9, 2022 to AVG West, LLC (Winter Haven)

Although the Receiver has not yet obtained all bank accounts and his accountants have not yet performed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Defendant Broadview Holdings LLC.   A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms.   These few examples alone demonstrate the necessity for the forensic accounting described below.

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC).  The Receiver is currently analyzing the value of the Receivership Entities' participation interest in these various properties.  While it is impossible to predict the amount of value these contractual interests will ultimately bring to the Receivership, the Receiver is optimistic that some value will be realized.

### 12.    Other Properties and Property Interests

As will be discussed more fully in the Receiver's forthcoming supplemental briefing regarding certain entities purportedly controlled by Defendant's son, Max Barton, there are additional properties (including on Hall Street and Gillespie Street in Dallas) that the Receiver

believes were financed with monies and/or loans from Receivership Entities. Moreover, the Receiver has reason to believe the entities owning these properties were controlled, whether directly or indirectly, by Defendant Barton.

The Receiver continues to investigate additional properties that he believes may be Receivership assets as well.

## F.     OTHER IDENTIFIED ASSETS

Based on the information now known by the Receiver, the Receiver believes the following assets may be additional sources of recovery for the receivership:

Artwork at Turtle Creek Office. The Turtle Creek office contains a large bronze casting of Michelangelo's Bacchus. The Receiver has been told my multiple individuals that more than $100,000 was paid for this sculpture and that an appraisal exists that indicates the sculpture is worth well in excess of that amount. Defendant Barton and his lawyers have suggested that the Receiver should liquidate this sculpture to help pay for administration of the Receivership. To date, however, Heritage Auctions has indicated that it has no interest in selling this piece of art because its estimated value is in fact well less than $100,000. The Receiver has other individuals coming to evaluate this sculpture and two other sculptures to provide their opinions of its value. At this time, the Receiver is unable to predict what value may inure to the Receivership from the sale of these pieces of art.

Artwork at Rock Creek Residence. Upon securing possession of the Rock Creek Residence, the Receiver noticed that there were several holes in the wall indicating that artwork had been removed prior to his visit to the residence. Despite multiple oral requests, as well as confirmation to Barton's attorney in writing, to date the Receiver still has not received a list of the artwork from the house, nor pictures of the artwork. However, on November 15, Defendant Barton disclosed, perhaps inadvertently, pictures of some of the artwork that was removed from the walls.

*See* Dkt. 58 at 29, 30, 33, 35.  If Defendant Barton will not voluntarily disclose the list of artworks in his possession, as well as the source of funds for purchase of that artwork, the Receiver will ultimately seek to have him compelled to do so in accordance with the Receivership Order. Without additional information regarding these pieces of art and their current location, it is impossible to ascertain the amount of any value to the Receivership Estate.

Contents of Turtle Creek Office and Rock Creek Residence.  Both the Turtle Creek Office and the Rock Creek Residence contain several pieces of office furniture, antiques, and other items that have value.  To date, Defendant Barton has not provided any information indicating whether these items were purchased by him individually or by the Receivership Entities.  In connection with potential sales of the Rock Creek Residence and the Turtle Creek Office, the Receiver must dispose of all personal property in these locations in accordance with the Order Governing Administration of the Receivership [Dkt. 63].

Vehicles.  The Receiver has identified multiple vehicles that may have been purchased in whole or in part with money from the Receivership Entities. The Receiver anticipates determining what ownership interest the Receivership Entities have in these vehicles during November and December 2022 and will provide a further update in his initial quarterly report.

Airplane.  One of the Receivership Entities owns an airplane that is located in Arlington, Texas.  The Receiver has received information indicating a significant loan on the plane, as well as a mechanic's lien and unpaid maintenance bills.  The Receiver has also been told that the plane is not currently functioning and needs extensive work.  The Receiver's investigation of value is ongoing.

Recovery of False Profits.  To the extent any investors received monies in excess of their principal investment, the Receiver may seek the return of those "false profits."

Fraudulent Transfer Claims. Based upon the forensic accounting to be conducted by the Receiver's accountant, the Receiver will evaluate the disposition of investor funds to determine whether he has a valid fraudulent conveyance claim against the recipient of the funds. The Receiver will also evaluate the potential defenses, whether each transfer of funds was exchanged in good faith and for reasonably equivalent value, in advance of pursuing these claims. From a cursory review of the Broadview Holdings bank statements, it appears that hundreds of thousands of dollars may have been fraudulently transferred from that account between July and October 2022 alone.

Potential Damages Claims. The Receiver is investigating the role of other persons and entities associated with the Defendants and the Receivership Entities.

## G.   FORENSIC ACCOUNTING

The Receiver has taken possession of all documents and computers belonging to the Receivership Entities that are housed in the Turtle Creek office. However, as discussed above, to date the Receiver still has not received access to the Receivership Entities' Quickbooks or Microsoft365 accounts. The Receiver is hopeful that the Quickbooks account will enable his accounting team to avoid the time and expense associated with manually entering the overwhelming majority of transactions involved in tracing the disposition of the investors' funds. It is anticipated that the Receiver's accounting firm will begin the forensic audit during end of the Fourth Quarter of 2022, depending upon the Receiver's recovery efforts outlined above.

## H.   RECOMMENDATION REGARDING PENDING BANKRUPTCY MATTER

On August 19, 2022, the Wall Entities and Seagoville Farms, LLC filed voluntary Chapter 11 bankruptcy petitions in the Eastern District of Texas.[9] Paragraph 49 of the Receivership Order

---

[9] These cases are styled In re: *WALL007, LLC*, No. 22-41049; *In re: WALL009, LLC*, No. 22-41113; *In re: WALL011, LLC*, No. 22-41114; *In re: WALL010, LLC*, No. 22-41125; *In re: WALL012, LLC*, No. 22-

directs the Receiver to, within thirty days of his appointment, "report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership." Prior to the Receiver's appointment, counsel for the Debtors and the US Trustee's office agreed that the bankruptcy filings should be dismissed. The Receiver has been told by counsel to the debtors that the purpose of these bankruptcy filings was to identify all investors in the Wall Entities. Assuming this to be the case, these bankruptcy filings are unnecessary because one of the central purposes of the claims process in the Receivership is to identify investors in the Wall entities. Moreover, it does not appear that there is any monetary value to be gained by proceeding with those cases.

Accordingly, in the near future, the Receiver will likely concede to the lifting of the stay in the Wall Entities' bankruptcy cases to permit their agreed dismissal.

## I.      OTHER STAYED LITIGATION MATTERS

During the first day of the Receivership, the Receiver and his team interviewed multiple lawyers who officed in the Turtle Creek office who were aware of (and in many respects involved in) dozens of active and closed litigation matters involving the Receivership Entities. During the past thirty days, the Receiver has become aware of several additional active litigation matters involving the Receivership Entities. Pursuant to ¶¶ 34-36 of the Receivership Order, all civil legal proceedings of any nature are stayed until further order of the Receivership Court. As the Receiver became aware of litigation matters, he and his team filed notices of stay in all pending proceedings.

Included below is a list of the active (but stayed) litigation matters of which the Receiver is currently aware. As to each of these matters, the Receiver does not yet have enough information

---

41135; *In re: WALL016, LLC*, No. 22-41136; *In re: WALL017, LLC*, No. 22-41137; *In re: WALL018, LLC*, No. 22-41176; *In re: WALL019, LLC*, No. 22-41177; *In re: Seagoville Farms, LLC*, No. 22-41181.

to make a recommendation to the Court regarding whether and when the stay should be lifted or how the cases should be resolved. However, the Receiver anticipates he will being making recommendations on these cases in his initial quarterly report. List of stayed cases:

1.  *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLC, JMJ Development, LLC and Timothy Barton* No. 141-316567-20, (141st District Court Tarrant County, Texas)

2.  *In re 2999TC LP, LLC*, Chap. 11 BK , No. 4:20-BK-43204 (US Bk Ct, ND Fort Worth Division)

3.  *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLP, JMJ Development, LLC and Timothy Barton*, No. 141-328490-21 (141st District Court, Tarrant County, Texas)

4.  *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. DC-19-11030 (191st District Court, Dallas County, Texas)

5.  *Timothy Barton and JMJ Development, LLC v. A.J. Babaria, Bilal Khaleeq and Dan Morenof*, No. DC-20-17086, (Related case DC-19-11030) (191st District Court, Dallas County, Texas)

6.  *JMJ Development, LLC and Timothy Barton v. "David" Dhiraj Ramolia*, No. 05-21-01100-CV (From DC-19-11030, 5th Court of Appeals)

7.  *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. 02-0922 (Appellate Case (to Sup. Ct.) Supreme Court from 5th Court of Appeals)

8.  *TRTX Properties, LLC and JMJ Development v. Dhirah "David" Ramolia*, No. 471-00033-2022 (471st District Court, Collin County, Texas)

9.  *Sun Yun, Qu Yi, Ma Jinghui, Gao Huaizen v. WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, Platinum Investment Corporation (PIC), JMJ Holdings, LLC*, No. DC-20-04575 (44th District Court, Dallas County, Texas)

10. *JMJAV, LLC v. Michael Fu, Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, Shirley Qing, and Michele Guo*, No. 2020-00720 (281st District Court, Harris County, Texas)

11. *Rone Engineering Services, Ltd. v. JMJ Development, LLC, WALL017, LLC, WALL009, LLC, and Seagoville Farms, LLC*, No. DC-19-20384 (116th District Court, Dallas County, Texas)

12. *The Somerset-Lost Creek Golf Ltd.v. Timothy Barton, LC Aledo TX LLC, WALL010, LLC, JMJ Acquisitions*, No. 096-319595-20 (96th District Court, Tarrant County, Texas)

13. *BM318, LLC v. Dixon Water Foundation*, No. 4:20-BK-42789 (US Bk Ct, ND Dallas Division)

14. *BM318, LLC v. Dixon Water Foundation*, Adversary No. 4:21-AP-4051, Related to 4:20-BK-42789 (United States Bankruptcy Court, Northern District of Texas, Dallas Division)

15. *BM318, LLC v. Lumar Land Cattle, et al*., WF AP: 4:21-AP-4051 (United States Bankruptcy Court, Northern District of Texas, Dallas Division, Related to 4:20-BK-42789)

16. *JMJAV v. Elite Jet*, No. 017-333443-22 (17th District Court, Tarrant County)

17. *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County)

18. *2999TC Acquisitions, LLC*, Chap. 11 Bk, No. 3:21-bk-31954 (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

19. *2999TC Acquisitions, LLC v. HNGH*, No. 22-03061-swe (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

20. *2999 Turtle Creek, LLC v. Timothy Lynch Barton*, No. DC-20-12133 (192nd District Court Dallas County, Texas)

21. *Serena Badgley, As Next Friend of Bryson Badgley, Minor v. Goldmark Hospitality, LLC*, No. CC-21-02991-B (County Court at Law No. 2, Dallas County, Texas)

22. *BGE, Inc. v. JMJ Development, LLC*, No. 471-03497-2020 (471st District Court, Collin County, Texas)

23. *Deshazo Group v. Timothy Barton, JMJ Development*, No. CC-22-04381-B (County Court at Law No. 2, Dallas County, Texas)

24. *Nitya Capital, LLC v. 2999TC Acquisitions MZ, LLC*, No. DC-22-09841 (14th District Court, Dallas County, Texas)

25. *Stream SPE LTD. v. Goldmark Hospitality by and through its General Partner, TRTX Properties, LLC*, No. 2021-81644 (80th District Court, Harris County, Texas

26. *Pamela Kirby v. Timothy L. Barton, John McElwee, JMJ Development, LLC, 2999TC Acquisitions, LLC, 2999TC Founders, LLC, 2999TC JMJ, LLC, 2999TC JMJ GM, LLC, 2999 Five Star GM, LLC, Five Star GM, LLC, Five Star MM, LLC, Five Star TC, LLC*, No. 3:22-CV-01447-M (United States District Court for the Northern District of Texas, Dallas Division)

27. *John Dowdall v. 2999TC JMJ MGR, LLC and Timothy Barton*, No. DC-22-14770 (193rd District Court, Dallas County, Texas)

28. *In Re: 2999FC Finders, LLC* (Bk.), No. 22-40911 (United States Bankruptcy Court for the Eastern District of Texas)

29. *In Re: Dallas Real Estate Investors Palisades TC, LLC, Individually and on behalf of Five Star GM, LLC v. Dallas Real Estate Investors, LLC et al.*, No. 21-04073US Bk Ct, (United States District Court for the Northern District of Texas, Fort Worth Division)

30. *In Re: Dallas Real Estate Investors*, No. 21-41488 (US Bk Ct, ND Fort Worth Division)

31. *In Re: FM 544 Park Vista, Ltd. and Pavist, LLC*, No. 17-34255-SGJ-11/17-34274-SJG-11 (US Bk Ct, ND Dallas Division)

32. *JMJ Development, LLC, et al. v. Roger Sefzik, et al.*, No. 3:22-CV-02254-L (related to 17-34255-sgj11) (USDC, ND)

33. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-21-00414-CV (Second Court of Appeals, Fort Worth Division)

34. *Cardno, Inc. v. JMJ Development, LLC, Villita Towers, LLC and Tim Barton*, No. DC-22-10928 (160th District Court Dallas County)

35. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-22-00288-CV (2nd COA, Fort Worth)

36. *Circle H Contractors, LP,* No. DC-C202200522 (18th Dist. Ct. Johnson Cnty., Tex.)

## III.
## AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES

To administer the receipt and disposition of monies in the receivership, the Receiver opened receivership accounts at Veritex Bank. As of November 17, 2022, the balance held in the receivership accounts at Veritex Bank is $24,990.00. Additional amounts (cumulatively totaling less than $75,000) have been frozen but have not yet been transferred to Veritex for a variety of

reasons. No receivership fees or expenses have been paid to date from this account. However, certain electricity, insurance, and maintenance payments have come due and will be paid in the near future. Additionally, as discussed above, certain utility, insurance, and maintenance expenses accrued on the Amerigold Suites property during the first thirty days of the Receivership. These expenses will be outlined in detail in the Receiver's initial quarterly report.

## IV.
## INVESTORS AND CREDITORS CLAIMS

### A.    INVESTORS

On November 7, 2022, the Receiver sent letters to approximately 100 investors who had previously been identified as potential investors in Wall Entities. The letters also included a request for information. This letter and request for information were also posted to the Receivership Website. Dozens of the investors have already completed the information forms, which the Receiver continues to receive on a daily basis. Through the forensic accounting process, the Receiver will continue to identify and cross-reference potential investors in the Wall Entities.

### B.    OTHER INVESTORS AND CREDITORS

In addition to investors in the Wall Entities, the Receiver has begun the process of identifying other lenders, equity investors, and creditors (both secured and unsecured) of the Receivership Entities. While the Receiver's efforts to date have focused primarily upon identifying investors and assets, several creditors have already been identified, and the Receiver anticipates receiving creditor claims once a Claims Process begins. The Receiver's eventual distribution plan will address the proposed treatment of the various categories of creditors.

## V.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership are (1) continuing to secure and maintain the assets of the Receivership, including liquidating assets of the Receivership

where necessary to preserve their value and continue the administration of the Receivership; (2) performing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered. Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting very likely will be the best means of determining where investor monies flowed.

## VI.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the first report from the Receiver and as such there is much work remaining for the Receiver to accomplish in this case, including securing, maintaining and selling assets; recovering any fraudulent conveyances; investigating damages claims against third parties; administering the investor and creditor claims; and, upon a determination of liability, agreement of Defendants, or further order of this Court, eventually making distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.

Dated: November 17, 2022

Respectfully submitted,

**RECEIVER CORTNEY C. THOMAS**

By: */s/ Cortney C. Thomas*
Cortney C. Thomas
State Bar No. 24075153
cort@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.