**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **No. 3:22-CV-2118-X** |
| **TIMOTHY LYNCH BARTON** | § | |
| **CARNEGIE DEVELOPMENT, LLC** | § | **Jury Trial Demanded** |
| **WALL007, LLC** | § | |
| **WALL009, LLC** | § | |
| **WALL010, LLC** | § | |
| **WALL011, LLC** | § | |
| **WALL012, LLC** | § | |
| **WALL016, LLC** | § | |
| **WALL017, LLC** | § | |
| **WALL018, LLC** | § | |
| **WALL019, LLC** | § | |
| **HAOQIANG FU (a/k/a MICHAEL FU)** | § | |
| **STEPHEN T. WALL** | § § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC** | § § | |
| **LDG001, LLC** | § § | |
| *Relief Defendants.* | § § | |

**APPENDIX IN SUPPORT OF DEFENDANT TIMOTHY BARTON'S
MOTION FOR STAY PENDING APPEAL**

Defendant Timothy L. Barton files this Appendix in Support of his Motion to Stay Pending

Appeal.  The Appendix has been consecutively paginated App. 001 –App. 020 as follows:

| APPENDIX PAGE | DOCUMENT |
|---|---|
| App. 004 – 009 | CEI Letter of Intent, dated November 21, 2022 |
| App. 010 - 020 | Order Appointing Independent Monitor, *People v. Trump*, No. 452564/2022 (N.Y. Sup. Ct. Oct. 13, 2022) |

**MOTION APPENDIX – Page 1**

**App. 001**

Dated: November 28, 2022          Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 *(Admitted to NDTX)*
medney@huntonak.com
Sean B. O'Connell
State Bar No. 24103142 *(application for admission forthcoming)*
soconnell@huntonak.com
Michael Dingman
Virginia Bar No. 95762
DC Bar No. 90001474 (*admitted pro hac vice*)
mdingman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

Ted A. Huffman
State Bar No. 24089015
thuffman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Phone: (214) 979-3000
Facsimile: (214) 740-7110

– and –

Richard Roper
State Bar No. 17233700
richard.roper@hklaw.com
Javan Porter
State Bar No. 24116912
javan.porter@hklaw.com
**HOLLAND & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Phone: (214) 969-1345
Facsimile: (214) 999-9252

**COUNSEL FOR TIMOTHY LYNCH BARTON**

**MOTION APPENDIX – Page 2**

**App. 002**

## <u>CERTIFICATE OF SERVICE</u>

On November 28, 2022 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Michael J. Edney*
Michael J. Edney

LOS ANGELES | DENVER | S. FLORIDA
DALLAS | NEW JERSEY | CHICAGO

November 21, 2022

Enoch Investments LLC
*Via email*

      **RE: Letter of intent to purchase the multifamily assets referred to as Parc @ Windmill Farms, Bellwether Ridge, Parc @ Ingleside**

Sir or Madam,

Cypress Equity Investments LLC, in partnership with DVO Real Estate ("**CEI**" or "**Buyer**"), is pleased to present this letter of intent and expression of interest in purchasing the Property described below (the "**LOI**"). The purpose of this LOI is to set forth the principal terms and conditions of CEI's interest and should not be interpreted as a binding offer or commitment to enter into the transaction outlined herein (the "**Transaction**"), except for the sections entitled "Brokerage," "Exclusivity," "Confidentiality," and "General Conditions" (the "**Binding Provisions**"), all of which shall be fully binding. This LOI is subject to certain terms and conditions, as contained herein, and is predicated upon completion of due diligence by CEI. The terms of the proposed Transaction shall be more particularly set forth in definitive Transaction documents that shall contain the following material terms and conditions:

| | |
|---|---|
| **CEI:** | CEI or its assignee as described in "Assignment" section below. |
| **Property Description:** | The land and all improvements associated with (i) the 273-unit multifamily property called Parc @ Windmill Farms in Forney, Texas, (ii) the 150-unit multifamily property called Bellwether Ridge in DeSoto, Texas, and (iii) the 192-unit multifamily property called Parc @ Ingleside in Ingleside, Texas (collectively, as a portfolio, together with assignment of all leases, assumed contracts, personal and intangible property pertaining thereto, the "**Property**") |
| **Owner:** | D4FR LLC, D4DS LLC and D4IN LLC (collectively, "**Owner**") |
| **Purchase Price:** | $107,000,000 (the "**Purchase Price**") |
| | The Property shall be deeded to CEI free of any monetary liens, excepting current property tax liens, and free of encumbrances and restrictions other than as approved by CEI in its sole and absolute discretion. |

**App. 004**

**Escrow:**

Upon the execution of a definitive purchase agreement and escrow instructions ("**Purchase Agreement**") by CEI and Owner, an escrow (the "**Escrow**") for the transaction shall be opened at Old Republic Title Insurance Company, Attn: Michael Atkins ("**Escrow Agent**" and "**Title Company**"). CEI and Owner shall deposit with Escrow Agent an executed copy of the Purchase Agreement.

**Feasibility Period:**

After execution of this LOI, Owner agrees to promptly deliver to CEI the deliverables as set forth on Exhibit A to the extent in Owner's possession or control (the "**Due Diligence Materials**").

CEI shall have 60 days after the mutual execution of the Purchase Agreement and receipt of the Due Diligence Materials to perform any and all non-invasive inspections required by CEI in its sole discretion (the "**Feasibility Period**"). If CEI does not approve of its inspection of the Property or the Due Diligence Materials in its sole and absolute discretion on or before the expiration of the Feasibility Period, the Purchase Agreement shall automatically terminate.

**Deposits:**

CEI shall deposit the sum of $1,500,000 (the "**Deposit**") in escrow within five business days after the execution of the Purchase Agreement. The full sum of the Deposit shall remain fully refundable until the expiration of the Feasibility Period. Subsequent to the expiration of the Feasibility Period, the Deposit shall be non-refundable except upon the occurrence of certain customary refund events, including (a) Owner's default under the Purchase Agreement, (b) the occurrence of a material casualty or pending or threatened material condemnation with respect to all or a portion of the Property, (c) Owner's lender's failure to consent to the assumption by CEI of the existing financing encumbering the Property on terms acceptable to CEI (including customary modifications to the documents evidencing such financing, including transfer provisions) (the "**Loan Assumption**"), or (d) the failure of a closing condition for the benefit of CEI to be satisfied (including, without limitation, the consummation of the Loan Assumption). The Deposit shall be applied toward the Purchase Price at Closing, and any interest earned on the Deposit shall be credited to CEI.

**Closing:**

The closing of the Transaction (the "**Closing**") shall occur on the date that is the later of (i) 30 days after the expiration of the Feasibility Period or (ii) seven business days after the approval by Owner's lender of the Loan Assumption; provided Closing shall not occur after April 30, 2023.

**Closing Costs:**

Property taxes will be prorated at Closing. Owner shall pay for the premium of an Owner's ALTA standard coverage title policy in an amount equal to the Purchase Price, documentary transfer tax, and any reconveyance costs. CEI and Owner shall each pay one-half of the escrow fee charged by Escrow Agent. CEI shall pay any

additional premiums for ALTA extended coverage and endorsements requested by CEI. All other closing costs shall be paid in accordance with local custom in the jurisdiction in which the Property is located.

**Assignment:** CEI shall have the right to take title to the Property in the name of a joint venture, partnership or other legal vehicle in which CEI or an affiliate of CEI, including, without limitation, any entity in which Michael Sorochinsky and/or his family trust has a direct or indirect interest, has any direct or indirect interest.

**Brokerage:** Owner shall pay a commission equal to 1.0% of the Purchase Price to Allied Quest LLC at Closing.

CEI and Owner shall execute a reciprocal indemnity in which each party shall hold the other party harmless from and against all claims, demands, losses, liabilities, lawsuits, judgments, and costs and expenses (including reasonable attorney's fees) with respect to any alleged brokerage commissions or finder's fees to be owing on account of Owner's or CEI's dealings with any real estate broker or agent. Owner shall indemnify CEI from any claims made by any other prospective purchasers of the Property.

**Preparation of Purchase Agreement:** Owner and CEI acknowledge that this LOI sets forth only the basic terms and conditions upon which the purchase and sale of the Property would be consummated and is not a binding agreement for such purchase and sale. CEI and Owner agree to negotiate the definitive Purchase Agreement in good faith and to use their best efforts to enter into the Purchase Agreement as soon as reasonably possible. The Purchase Agreement will incorporate all of the terms set forth in this LOI and such additional terms, conditions, representations and warranties as CEI or Owner may reasonably require.  CEI will distribute a draft purchase agreement within five business days after the mutual execution of this LOI.

**Exclusivity:** CEI and Owner (and their agents and affiliates) agree to work together exclusively to consummate the Transaction described herein, to negotiate in good faith solely with each other, to cease negotiating with any and all other potential purchasers, lenders and investors for any competing proposal for the Transaction or any similar equity or debt financing until the first to occur of (i) the mutual execution and delivery of the Purchase Agreement, (ii) the date that is 45 days after Owner's acceptance of this LOI and (iii) the date on which both parties hereto agree, in each party's sole and absolute discretion, in writing to terminate this LOI.

**Confidentiality:** Each of the parties hereto will be furnishing to each other certain information, which is non-public, confidential or proprietary in nature. Each of the parties agree that all such information furnished or otherwise obtained, directly or indirectly, by such party, its directors, officers, partners, members, employees, agents or representatives, including without limitation attorneys,

3

**App. 006**

accountants, partners, experts and consultants (collectively "**Representatives**") and all reports analysis, compilations, data, studies or other documents prepared by such party or its Representatives containing or based, in whole or in part, on any such furnished information (collectively, the "**Information**") will be kept strictly confidential and will not, without the prior written consent of the other party, be disclosed to any other individual, corporation, partnership, joint venture, trust or association in any manner whatsoever, in whole or in part, and will not be used for any purpose other than evaluating the Transaction; provided that if either party receives an opinion of counsel that it is legally obligated to release the Information, such party may do so after notice to and consultation with the other party.

**General Conditions:**    The above terms are meant solely to indicate CEI's interest in the proposed Transaction. Except for the Binding Provisions, which are fully binding and enforceable, the parties hereto expressly acknowledge and agree that this LOI is intended solely to set forth the basic terms and conditions upon which the parties hereto desire to form an agreement for the sale and acquisition of the Property and does not constitute a legal binding agreement between the parties hereto and does not purport to be inclusive of all the terms and conditions (material or otherwise) relating to the transaction described herein and that nothing contained herein, whether stated or implied, shall impose any obligation of any kind upon the parties hereto. CEI shall have no legal obligation to purchase or to provide any equity or debt financing, unless and until otherwise agreed in definitive written agreements mutually executed and delivered.

4

**App. 007**

This LOI is not intended to be, and, except with respect to the Binding Provisions, is not a binding contract between CEI and Owner or an offer capable of acceptance, and CEI and Owner will be bound only in accordance with the terms and conditions contained in a mutually acceptable Purchase Agreement. We will hold this LOI open for 15 business days after which the terms of this LOI shall expire. Please be advised that if this LOI is not accepted in that time, or if it is disclosed to anyone other than as authorized in this LOI, the LOI will be withdrawn.

Very truly yours,

Cypress Equity Investments LLC

By:

Mark Lecocq, Managing Director

Accepted and Agreed:

_____,
a _____

By:    _____

       Name:
       Title:

5

**App. 008**

## Exhibit A

### Owner's Deliverables

- A copy of the existing title policy held by Owner.
- A current preliminary title report or commitment together with copies of all underlying documents of record referred therein.
- Most recent survey - certified ALTA/ACSM survey/plot plans.
- Reports regarding the presence of Hazardous Materials (including radon) in, on or about the Property.
- Copy of current rent roll, including all expiration dates, prepaid rents, delinquencies, defaults, options, deposits (and whether refundable or non-refundable), and any special concessions, and the same as of the latest month-end. All rent rolls shall be provided in Microsoft Excel format in addition to any other formats provided.
- Copies of the last two (2) years of property tax assessments and bills; or if condominiums, copy of most recent bill and a schedule of the last two (2) years of bills.
- List and copies of all management, maintenance and repair, service and supply contracts and other agreements, written or oral.
- Copies of all licenses and permits applicable to the current period.
- Insurance loss claim records for the period of Owner's ownership.
- All plans and specification in Owner's possession, including, but not limited, to any and all existing as-built constructions plans, floor plans, site plans and parking assignments.
- Monthly trailing-12 operating statements in Microsoft Excel on an accrual book basis including capital expenditures as well as year-end operating statements for the prior three years in Microsoft Excel format in addition to any other formats provided.
- Schedule of all replacements and capital improvements made of the past three years.
- Utility bills for the prior 12 months, including, but not limited to, electricity, gas, water, sewer, trash, telephone, cable and internet.
- Listing of utility vendors with all account numbers and a phone number for each utility
- General ledger detail for the prior calendar year and current year to date, if available.
- Schedule of all personal property and fixtures with a separate list indicating personal property not being conveyed, if any.
- Schedule of current lawsuits pending or threatened, summary of the action, and names of all parties and their attorneys.
- All governmental authority notices of building code, zoning, fire or health code violations.
- Any notice of an existing, proposed, or contemplated plan to widen, modify or realign any street or highway or any eminent domain proceeding that could affect the Property.
- Names, telephone numbers and addresses of architects, consultants and contractors who provided services regarding the Property, if available.
- Schedule of employees, employee salaries (or hourly wage), bonuses, employee title, hire date, and detail of any bonus, commission, or similar programs.
- Floor plans and marketing materials, including high resolution photos.
- Copies of work order history reports for the last 36 months.
- Digital copies of all lease files for current residents including original leases and all renewals.
- Resident ledgers for each current tenant for their entire tenancy.
- Aged receivables/delinquent rent and prepaid rent report.
- Any Land Use Restriction Agreements (LURAs).
- Any 8609's for the Property.
- Copies of all outstanding 8823's for the Property.

**App. 009**

INDEX NO. 452564/2022
NYSCEF DOC. NO. 183                                      RECEIVED NYSCEF: 11/03/2022

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:    HON. ARTHUR F. ENGORON                    PART            37
                                        *Justice*

----------------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK, BY LETITIA          INDEX NO.        452564/2022
JAMES, ATTORNEY GENERAL OF THE STATE OF NEW
YORK,                                                MOTION DATE      10/13/2022

                                                    MOTION SEQ. NO.      001
                        Plaintiff,

                    - v -

DONALD J. TRUMP, DONALD TRUMP JR, ERIC TRUMP,
IVANKA TRUMP, ALLEN WEISSELBERG, JEFFREY
MCCONNEY, THE DONALD J. TRUMP REVOCABLE
TRUST, THE TRUMP ORGANIZATION, INC., TRUMP           **DECISION + ORDER ON**
ORGANIZATION LLC, DJT HOLDINGS LLC, DJT                    **MOTION**
HOLDINGS MANAGING MEMBER, TRUMP ENDEAVOR
12 LLC, 401 NORTH WABASH VENTURE LLC, TRUMP
OLD POST OFFICE LLC, 40 WALL STREET LLC, SEVEN
SPRINGS LLC,

                        Defendants.

----------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 001) 37, 38, 39, 40, 41,
42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69,
70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97,
98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 119,
120, 121, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 138, 158, 159, 160, 161, 162, 163,
164, 165, 166, 167, 168, 182

                                            PRELIMINARY INJUNCTION AND
were read on this motion for a           APPOINTMENT OF AN INDEPENDENT MONITOR .

Upon the foregoing documents, and after oral argument held on November 3, 2022, it is hereby
ordered that plaintiff's motion for a preliminary injunction and appointment of an independent
monitor is granted as detailed herein.

Background

This action arises out of a three-year investigation conducted by plaintiff, the Office of the
Attorney General of the State of New York ("OAG"), into the business practices of defendants
from 2011 through 2021. OAG alleges that defendant Donald J. Trump ("Mr. Trump") and the
other named defendants engaged in ongoing and extensive acts of fraud in the preparation and

**App. 010**

INDEX NO. 452564/2022

NYSCEF DOC. NO. 183                                                    RECEIVED NYSCEF: 11/03/2022

submission of Mr. Trump's annual Statements of Financial Condition (the "SFCs"), violating New York Executive Law § 63(12) and a multitude of state criminal laws.[1]

OAG commenced this action on September 21, 2022, and service was thereafter effectuated on all parties. OAG now moves for a preliminary injunction and the appointment of an independent monitor to oversee the submission of certain financial information by defendants pending the final disposition of this case. Defendants have not yet answered the complaint, although they vigorously oppose OAG's motion.

New York Executive Law § 63(12)

New York Executive Law § 63, under which OAG brings this action, was enacted specifically to outline the "General Duties" of the New York Attorney General. Executive Law § 63(12) reads as follows:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper. The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct. The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person. Notwithstanding any law to the contrary, all monies recovered or obtained under this subdivision by a state agency or state official or employee acting in their official capacity shall be subject to subdivision eleven of section four of the state finance law.
>
> In connection with any such application, the attorney general is authorized to take proof and make a determination of the relevant

---

[1] OAG brings this action exclusively under New York Executive Law § 63(12) but alleges violations of New York Penal Law § 175.10 (Falsifying Business Records), New York Penal Law 175.45 (Issuing a False Financial Statement), and New York Penal Law § 176.05 (Insurance Fraud) to demonstrate defendants' propensity to commit fraud.

**452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL**                    **Page 2 of 11**
**Motion No. 001**

**App. 011**

INDEX NO. 452564/2022

NYSCEF DOC. NO. 183                                              RECEIVED NYSCEF: 11/03/2022

facts and to issue subpoenas in accordance with the civil practice law and rules. Such authorization shall not abate or terminate by reason of any action or proceeding brought by the attorney general under this section.

<u>Legal Standing and Capacity to Sue</u>
Defendants assert that OAG has neither standing nor legal capacity to bring this action. Defendants argue that OAG cannot demonstrate standing because it cannot establish an "injury in fact—an actual legal stake in the matter being adjudicated." Defendants further argue that OAG cannot meet the elements required to bring a *parens patriae* action to sue in the public interest. NYSCEF Doc. No. 126, pg. 9.

Defendants are mistaken. The Court of Appeals has made clear that "Executive Law § 63(12) is the procedural route by which the Attorney-General may apply to Supreme Court for an order enjoining repeated illegal or fraudulent acts." <u>State by Abrams v Ford Motor Co.</u>, 74 NY2d 495, 502 (1989).

The *parens patriae* doctrine provides a basis for a State to bring an action against a defendant whose conduct has or will impact the health or well-being of the State's citizens. <u>See e.g.</u>, <u>Alfred L. Snapp & Son, Inc. v Puerto Rico, ex rel., Barez</u>, 458 US 592, 593 (1982) (to bring *parens patriae* action, Attorney General must identify quasi-sovereign interest in public's well-being, that touches substantial segment of population, and articulate "an interest apart from the interests of particular private parties"). Although to maintain an action in Federal Court, a state Attorney General must demonstrate the prima facie requirements of the *parens patrie* doctrine, such a demonstration is unnecessary where, as here, the New York legislature has specifically empowered the Attorney General to bring such an action in a New York state court. <u>People by Schneiderman v Credit Suisse Sec. (USA) LLC</u>, 31 NY3d 622, 633 (2018) ("it is undisputed that Executive Law § 63(12) gives the Attorney General standing to redress liabilities recognized elsewhere in the law, expanding the scope of available remedies").

However, in any event, OAG satisfies the *parens patrie* doctrine by sufficiently articulating a quasi-sovereign interest that touches a substantial segment of the population and is distinct from the interests of private parties. <u>State of N.Y. by Abrams v Gen. Motors Corp.</u>, 547 F Supp 703, 705 (SDNY 1982) ("[t]he State's goal of securing an honest marketplace in which to transact a business is a quasi-sovereign interest"); <u>People ex rel. Cuomo v Coventry First LLC</u>, 52 AD3d 345, 346 (1st Dep't 2008) ("the claim pursuant to Executive Law § 63(12) constituted proper exercises of the State's regulation of businesses within its borders in the interest of securing an honest marketplace"); <u>New York by James v Amazon.com, Inc.</u>, 550 F Supp 3d 122, 130-131 (SDNY 2021) ("[T]he State's statutory interest under § 63(12) encompasses the prevention of either 'fraudulent or illegal' business activities. Misconduct that is illegal for reasons other than fraud still implicates the government's interests in guaranteeing a marketplace that adheres to standards of fairness…").

Defendants' argument that OAG's complaint is improperly lodged because it is not aimed at actions surrounding "consumer protection" is wholly without merit. <u>New York v Feldman</u>, 210 F Supp 2d 294, 299-300 (SDNY 2002) ("[D]efendants' claim that section 63(12) is limited to

452564/2022 **PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL**
Motion No. 001                                                                              Page 3 of 11

**App. 012**

INDEX NO. 452564/2022

NYSCEF DOC. NO. 183                                       RECEIVED NYSCEF: 11/03/2022

consumer protection actions is simply incorrect. The New York Attorney General has repeatedly used section 63(12) to secure relief for persons who are not consumers in cases that are not consumer protection actions") (internal citations omitted).

Similarly, defendants' contention that OAG does not have capacity to sue because "Executive Law § 63(12) does not authorize Plaintiff to commence this type of proceeding" (NYSCEF Doc. No. 126, pgs. 19-20) is belied by the plain language of the statute and by prevailing authority. Matter of People by Schneiderman v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 (1st Dep't 2016) ("[E]ven apart from prevailing authority, the language of the statute itself appears to authorize a cause of action; like similar statutes that authorize causes of action, § 63(12) defines the fraudulent conduct that it prohibits, authorizes the Attorney General to commence an action or proceeding to foreclose that conduct, and specifies the relief, including equitable relief, that the Attorney General may seek").

The Purported Disclaimers
The defendants further argue that the allegations contained in the complaint are unsustainable based on documentary evidence, citing to language that appears at the beginning of each of the SFCs. The relevant language was included by Mr. Trump's former accounting firm, Mazars[2], and states, as here pertinent:

> We have compiled the accompanying statement of financial condition of Donald J. Trump as of June 20, 2012. We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or provide any assurance about whether the financial statement is in accordance with accounting principles generally accepted in the United States of America.

> Donald J. Trump is responsible for the preparation and fair presentation of the financial statement in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statement.

NYSCEF Doc. No. 6. Contrary to defendants' assertions, the Mazars disclaimer does not avail Mr. Trump at all. First, the disclaimer was issued by Mazars, not by Mr. Trump or any of the other named defendants. Second, the Mazars disclaimer makes abundantly clear that Mr. Trump was fully responsible for the information contained within the SFCs. SFCs serve an important function in the real world; allowing blanket disclaimers to insulate liars from liability would completely undercut that function.

---

[2] Although Mazars provided the cover letter for Mr. Trump's SFCs for 2011 through 2020 (NYSCEF Doc. Nos. 5-14), accountant Whitley Penn LLP provided the cover letter for Mr. Trump's 2021 SFC, which contains similar language indicating that it "did not audit or review the financial statement" nor did it "perform any procedures to verify the accuracy or completeness of the information provided by the Trustee of Donald J. Trump Revocable Trust…" NYSCEF Doc. No. 15.

452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL                Page 4 of 11
Motion No. 001

**App. 013**

INDEX NO. 452564/2022

NYSCEF DOC. NO. 183

RECEIVED NYSCEF: 11/03/2022

Further, the case law cited by defendants arises out of causes of action for justifiable reliance, not Executive Law § 63(12). Nonetheless, "[t]he law is abundantly clear that" using a disclaimer as a defense to a justifiable reliance claim requires proof that: "(1) the disclaimer is made sufficiently specific to the particular type of fact misrepresented or undisclosed; and (2) the alleged misrepresentations or omissions did not concern facts peculiarly within the [defendant's] knowledge." Basis Yield Alpha Fund (Master) v Goldman Sachs Grp., Inc., 115 AD3d 128, 136 (1st Dep't 2014) (holding "a [plaintiff] may not be precluded from claiming reliance on misrepresentation of facts peculiarly within the [defendant's] knowledge"). As the SFCs were unquestionably based on information peculiarly within defendants' knowledge, defendants may not rely on such purported disclaimers as a defense.

Moreover, the Mazars' language to which defendants refer does nothing to alert its recipients that Mr. Trump himself cautions them not to rely on its contents. Joel v Weber, 166 AD2d 130, 137 (1st Dep't 1991) (denying motion to dismiss based on disclaimer and finding language "cannot be classified as a disclaimer, since the wording of the note does not in any manner caution [recipient] not to rely upon the financial statement of which it was a part" and "[i]n fact, rather than being a disclaimer, we further find that this note conveys the unequivocal impression that it is a good faith attempt to approximate current market value").

Preliminary Injunction
"A municipality seeking a preliminary injunction to enforce compliance with its ordinances or regulations in order to protect the public interest… need only demonstrate a likelihood of success on the merits and that the equities weigh in its favor." City of New York v Beam Bike Corp., 206 AD3d 447, 447-448 (1st Dep't 2022).

Defendants strenuously argue that OAG's motion should be denied because OAG has failed to demonstrate that "the Trump Parties have ever even been late on so much as one loan payment over the past decade" such that they could not possibly have engaged in fraud. NYSCEF Doc. No. 126, pg. 9. This argument fails, as OAG need not demonstrate irreparable harm when seeking a preliminary injunction under Executive Law § 63(12)—OAG must only demonstrate a likelihood of success on the merits and that the balance of equities weighs in its favor. Beam Bike Corp., 206 AD3d at 447-448.

Moreover, as discussed *supra*, the State's "statutory interest under § 63(12)" is to protect "the government's interests in guaranteeing a marketplace that adheres to standards of fairness." Amazon, 550 F Supp 3d at 130. Additionally:

> Where, as here, there is a claim based on fraudulent activity, disgorgement may be available as an equitable remedy, notwithstanding the absence of loss to individuals or independent claims for restitution. Disgorgement is distinct from the remedy of restitution because it focuses on the gain to the wrongdoer as opposed to the loss to the victim. Thus, disgorgement aims to deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct. Accordingly, the remedy of disgorgement does not require a showing or allegation of direct

452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No. 001

Page 5 of 11

**App. 014**

INDEX NO. 452564/2022

NYSCEF DOC. NO. 183                                    RECEIVED NYSCEF: 11/03/2022

> losses to consumers or the public; the source of the ill-gotten
> games is "immaterial."

People v Ernst & Young, LLP, 114 AD3d 569, 569-70 (1st Dep't 2014).

Likelihood of Success on the Merits
Contrary to defendants' allegations, OAG's motion is not based solely on the "verified allegations" set forth in its 222-page complaint. Rather, OAG attaches dozens of exhibits that contain documentary evidence not subject to interpretation (i.e., the SFCs speak for themselves) that support OAG's contention that it is likely to succeed on the merits. Conversely, defendants have failed to submit an iota of evidence, or an affidavit from anyone with personal knowledge, rebutting OAG's comprehensive demonstration of persistent fraud.

Although, for present purposes, the Court need not detail every instance of fraud found in the record, the following examples are particularly compelling:

Trump Tower Triplex
Mr. Trump formerly resided in a triplex apartment (the "Triplex") in Manhattan located within Trump Tower. It is undisputed that the square footage of the Triplex is 10,996 square feet. NYSCEF Doc. No. 49. However, from 2012 until at least 2016, Mr. Trump represented that the Triplex was 30,000 square feet. Mr. Trump further used this extreme exaggeration to inflate wildly the value of the Triplex on his SFCs for those years. In 2011, Mr. Trump represented that the Triplex's value was $80 million, which would have valued the apartment at more than $7,200 per square foot, when the highest price paid for an apartment in that building was $3,027 per square foot. In 2012, Mr. Trump's SFC represented the value of the same apartment as $180 million.[3]

Over the next four years, Mr. Trump reported massive increases in the value of the Triplex on his SFCs, reporting the value of the Triplex as $200 million in 2013 and 2014 and $327 million in 2015 and 2016. Defendant Allen Weisselberg ("Mr. Weisselberg"), the Trump Organization's former Chief Financial Officer, testified under oath that the valuation overstated the apartment's value by "give or take" $200 million. NYSCEF Doc. No. 53, pg. 4.

To the extent that defendants assert that the over-valuation of approximately $200 million was not intentional but an inadvertent mistake[4], such argument is irrelevant under Executive Law § 63(12).

> Good faith or lack of fraudulent intent is not an issue. The
> definition of 'fraud' as contained in Section 63, subd.12 of the

---

[3] As of 2012, the highest price ever paid for an apartment in New York City was $88 million, nearly $100 million less than Mr. Trump's valuation of his Triplex. NYSCEF Doc. No. 1, pg. 85.

[4] Although intent is not relevant under Executive Law § 63(12), it belies all common sense to assert that Mr. Trump, who resided in the Triplex for over 35 years and who purports to be "one of the top businesspeople" was not aware that he was over-representing the size of his home by nearly 200%. See Jill Colvin, Associated Press, https://apnews.com/article/north-america-donald-trump-ap-top-news-cabinets-maryland-2bb960fda0264c488d454632628cb193 [last accessed Nov. 3, 2022].

452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL                    Page 6 of 11
Motion No.  001

> Executive Law is equivalent to that contained in Section 352 of the
> General Business Law... which has been construed to include acts
> which tend to deceive or mislead the public, whether or not they
> are the product of scienter or an intent to defraud.

State by Lefkowtiz v Interstate Tractor Trailer Training, Inc., 66 Misc 2d 678, 682 (Sup Ct 1971).

### Trump Park Avenue Rent-Stabilized Apartments

Mr. Trump included Trump Park Avenue as an asset on his SFCs for the years 2011 through 2021. In 2012 the Oxford Group performed an appraisal that identified 12 rent-stabilized apartments in the building and assessed their collective value at $750,000, noting that the rent-stabilized units "cannot be marketed as individual units" for sale because the "current tenants cannot be forced to leave." NYSCEF Doc. No. 61. Notwithstanding[5], Mr. Trump's 2011 and 2012 SFCs valued the 12 unsold residential units without taking into account the rent-stabilization restrictions, reporting their collective value at a staggering $50 million. Mr. Trump's own accountant, Donald Bender, testified that he was "shocked by the size of the discrepancy" between the appraised value of $750,000 and the self-reported value of $50 million. NYSCEF Doc. No. 41, pg. 8.

### 40 Wall Street

The Trump Organization, through the entity 40 Wall Street LLC, owns a "ground lease" at 40 Wall Street. In 2010, non-party Cushman & Wakefield ("C&W") appraised the Trump Organization's interest in that ground lease at $200 million.[6] NYSCEF Doc. No. 55, pg. 3.

Notwithstanding, Mr. Trump listed the value of his interest in 40 Wall Street as $524.7 million on his 2011 SFC, $527.2 million on his 2012 SFC, and $530.7 million on his 2013 SFC, more than twice the value that C&W reached. Mr. Trump's longtime accountant, Donald Bender, testified that it was "misleading" for Mr. Trump not to provide the C&W appraisal to Mazars to consider in issuing its SFC, and that if he had been aware of it, that could have led to the SFC not being issued. NYSCEF Doc. No. 41, pg. 4.

### Donald Trump Jr.'s Disclaimer of Responsibility for SFCs' Accuracy

Defendant Donald Trump Jr. is a senior executive at the Trump Organization and a trustee of the Donald J. Trump Revocable Trust, which was responsible for certifying the SFCs accuracy to banks and other institutions. He personally signed representation letters to Mazars on each Statement Engagement while serving as a trustee, and those letters included the representation that "[w]e acknowledge our responsibility and have fulfilled our responsibilities for the preparation and fair presentation of the personal financial statement in accordance with accounting principles generally accepted in the United States of America." NYSCEF Doc. No.

---

[5] Although OAG need not prove intent, there is no doubt that defendants were aware the apartments were rent-stabilized, as defendant Donald Trump Jr. testified that the rent-stabilized tenants were "the bane of my existence for quite some time." NYSCEF Doc. No. 45, pg. 7.

[6] OAG alleges many more instances of fraud arising out of defendants' valuation of their interest in 40 Wall Street. However, for present purposes, the Court need not address each and every one.

452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL                Page 7 of 11
Motion No. 001

7 of 11

**App. 016**

INDEX NO. 452564/2022

RECEIVED NYSCEF: 11/03/2022

48. The statement further said that "[w]e have not knowingly withheld from you any financial records or related data that in our judgment would be relevant to your compilation." Id.

Notwithstanding such representations, Donald Trump Jr. testified at his deposition that he had no knowledge of Generally Accepted Accounting Principles ("GAAP") outside of "Accounting 101 at Wharton," and that he "had no knowledge as [GAAP] relates to what it was for, for the Statement of Financial Condition or not." NYSCEF Doc. No. 45, pg. 10-11. He further testified that despite personally vouching for their accuracy, he "had no real involvement in the preparation of the Statement of Financial Condition[s] and don't really remember ever working on it with anyone." Id.

Accordingly, at a minimum, Donald Trump Jr. signed off on representations to Mazars without performing the due diligence necessary to ensure their accuracy or compliance with GAAP, raising serious doubt as to the reliability of future SFCs for which Donald Trump Jr. may be responsible. Furthermore, the record is replete with evidence that Donald Trump Jr.'s statement that "we" have not knowingly withheld pertinent information is blatantly false.

### Mar-a-Lago

In 1995, Mr. Trump signed a Deed of Conservation and Preservation that gave up his rights to use the property for any purpose other than as a social club. NYSCEF Doc. No. 64. Additionally, in 2002, Mr. Trump signed a Deed of Development Rights conveying to the National Trust for Historic Preservation "any and all of [his] rights to develop the Property for any usage other than club usage." NYSCEF Doc. No. 65. Despite these prohibitive legal restrictions, Mr. Trump signed SFCs between 2011 and 2021 valuing the property at between $347 million and $739 million, based on the false premise that it was an unrestricted plot of land that could be sold and used as a private home, rather than the heavily encumbered historical landmark that it was. NSYCEF Doc. Nos. 16-26.

### Zurich Insurance Fraud

The only method by which defendants disclosed Mr. Trump's SFCs to insurance company Zurich North American ("Zurich") was to permit its underwriters to review a copy of the SFCs at the Trump Organization's offices, under the watchful gaze of Mr. Weisselberg. While a Zurich underwriter was at the Trump offices reviewing such SFCs, Mr. Weisselberg represented to the Zurich underwriter that the fair values of the properties within the SFCs were determined by outside professional firms such as C&W, when, in fact, the Trump Organization itself concocted them out of whole cloth. NYSCEF Doc. Nos. 90-92. Zurich's underwriter testified that Mr. Weisselberg's representations "weighed favorably" into her recommending that Zurich renew the Surety Program. NYSCEF Doc. No. 90, pg. 7.

### Invocation of the Fifth Amendment

Although not dispositive on any single issue, this Court is permitted, and is here persuaded, to draw a negative inference from Mr. Trump's invocation of his Fifth Amendment right against self-incrimination more than 400 times in response to questions posed to him during his deposition. See El-Dehdan v El-Dehdan, 26 NY3d 19, 37 (2015) ("a negative inference may be drawn in the civil context when a party invokes the right against self-incrimination").

**App. 017**

INDEX NO. 452564/2022

NYSCEF DOC. NO. 183                                          RECEIVED NYSCEF: 11/03/2022

For example, when asked if he knew that each SFC from 2011 through 2021 contained false and misleading valuations and statements, Mr. Trump invoked his right against self-incrimination. NYSCEF Doc. No. 42, pgs. 10-12. When asked if Mr. Weissselberg, Mr. McConney and others worked at his direction and followed his instructions to inflate the asset valuations in the SFCs between 2011 and 2021, Mr. Trump invoked his right against self-incrimination. Id.

Similarly, when Mr. Weisselberg was asked whether Mr. Trump directed him to make any changes to the SFCs between 2011 and 2015, Mr. Weisselberg invoked his right against self-incrimination. NYSCEF Doc. No. 44, pgs. 4-8.

Although the above examples are by no means exhaustive, they are more than sufficient to demonstrate OAG's likelihood of success on the merits.

Balancing of the Equities
"The balancing of the equities requires the court to determine the relative prejudice to each party accruing from a grant or denial of the requested relief." Barbes Rest. Inc. v ASRR Suzer 218, LLC, 140 AD3d 430, 432 (1st Dep't 2016).

Here, the balancing of the equities tips, strongly, if not completely, in favor of granting a preliminary injunction, particularly to ensure that defendants do not dissipate their assets or transfer them out of this jurisdiction. OAG seeks to enjoin defendants from transferring any material asset to a non-party affiliate or otherwise disposing of material assets absent approval of this Court. In the event that defendants believe they have a legitimate reason to do so, they may apply to this Court for permission.

In the absence of an injunction, and given defendants' demonstrated propensity to engage in persistent fraud, failure to grant such an injunction could result in extreme prejudice to the people of New York. Further, the relief sought is appropriately tailored to curbing unlawful conduct and ensuring that funds are available for potential disgorgement at the conclusion of this case.

Notably, New York City is the epicenter of global finance. To take an example close to home, Deutsche Bank, headquartered in Germany, lent hundreds of millions of dollars to a New York real estate conglomerate that owns properties all over the world. New Yorkers derive enormous economic and other benefits from all the money coursing through the veins of Wall Street and real estate. Our executive, legislative, and judicial institutions are obligated to ensure that financial transactions are conducted truthfully, not fraudulently.

Appointment of an Independent Monitor
Defendants' opposition conflates the appointment of an "independent monitor" with that of a "receiver," when, in fact, they perform two very different functions: the former oversees, the latter controls.

In its motion, OAG asks for the appointment of an independent monitor to oversee the: (1) submission of financial information provided to any accounting firm compiling a 2022 SFC for Mr. Trump; (2) submission of all financial disclosures to lenders and insurers; and (3) corporate

452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL                Page 9 of 11
Motion No. 001

**App. 018**

INDEX NO. 452564/2022
NYSCEF DOC. NO. 183                                        RECEIVED NYSCEF: 11/03/2022

restructuring or disposition of significant assets. This limited function is entirely different from the functions of a receiver, who would, in effect, take control of the entire organization. CPLR 5228. Accordingly, defendants' claims that this amounts to a "nationalization" of the Trump Organization are entirely without merit.

Furthermore, given the persistent misrepresentations throughout every one of Mr. Trump's SFCs between 2011 and 2021, this Court finds that the appointment of an independent monitor is the most prudent and narrowly tailored mechanism to ensure there is no further fraud or illegality that violates § 63(12) pending the final disposition of this action.

The Court has considered defendants' other arguments and finds them unavailing and/or non-dispositive.

Conclusion
Thus, for the reasons set forth herein, OAG's motion for a preliminary injunction and appointment of an independent monitor is granted; and

Defendants are hereby preliminary enjoined from selling, transferring, or otherwise disposing of any non-cash asset listed on the 2021 Statement of Financial Condition of Donald J. Trump, without first providing 14 days written notice to OAG and this Court; and

This Court will appoint an independent monitor, to be paid by defendants, for the purpose of ensuring compliance with this order. If the monitor reasonably determines that defendants have violated this order, the monitor shall immediately report that matter to OAG, defendants, and this Court; and

Defendants are hereby ordered to provide the monitor any financial statement, statement of financial condition, other asset valuation disclosure, or other financial disclosure to a lender, insurer, or other financial institution, any non-privileged document, book, record, or other information bearing on any of the foregoing or reasonably necessary to assess the accuracy of any representation, and to comply with all reasonable requests by the monitor for such information; and

Defendants are hereby ordered to provide the monitor with a full and accurate description of the structure and liquid and illiquid holdings and assets of the Trump Organization, its subsidiaries, and all other affiliates, no later than two weeks after the monitor's appointment; and

Defendants are hereby ordered to provide the monitor, at least 30 days in advance, information regarding any planned or anticipated restructuring of the Trump Organization, its subsidiaries, and all other affiliates, or of any plans for disposing or refinancing of significant Trump Organization assets, or disposing significant liquidity; and

This Court will appoint an independent monitor from names recommended by OAG and defendants, who shall have until November 10, 2022 to identify no more than three potential monitors for the Court's consideration. The parties shall have until November 15, 2022 to

452564/2022  PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL                Page 10 of 11
Motion No. 001

**App. 019**

INDEX NO. 452564/2022

NYSCEF DOC. NO. 183

RECEIVED NYSCEF: 11/03/2022

comment, if they so choose, on their adversaries' selections.  Once a monitor is appointed by this Court, the monitor shall remain in place until further order of this Court; and

This order binds defendants and all other persons or entities acting in concert with them, or under their direction or control, directly or indirectly, including defendants' officers, employees, representatives, servants, or other agents, and including the Donald J. Trump Revocable Trust through any of its trustees; and

The parties are hereby ordered to appear in person for a preliminary conference on November 22, 2022 at 10:00 am at 60 Centre Street, New York, New York, Courtroom 418.

| 11/3/2022 | | | |
|-----------|---|---|---|
| **DATE** | | **ARTHUR F. ENGORON, J.S.C.** | |

| CHECK ONE: | | CASE DISPOSED | X | NON-FINAL DISPOSITION | |
|------------|---|---------------|---|----------------------|---|
| | X | GRANTED | ☐ DENIED | GRANTED IN PART | ☐ OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | ☐ REFERENCE |

452564/2022   PEOPLE OF THE STATE OF NEW YORK vs. DONALD J. TRUMP, ET AL
Motion No.  001

Page 11 of 11

**App. 020**