**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff,* | § § § | |
| **v.** | § § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § § § § § § § § § § § § § § § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § § § | |
| *Relief Defendants.* | § § | |

**RECEIVER'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO SUPPLEMENT
ORDER APPOINTING RECEIVER *AND*
FURTHER MOTION TO SUPPLEMENT**

Respectfully submitted,

Charlene C. Koonce
 State Bar No. 11672850
 charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000

*Attorneys for Receiver Cortney C. Thomas*

# TABLE OF CONTENTS

I.    SUMMARY ........................................................................................................................ 1

II.   FACTUAL SUMMARY ...................................................................................................... 2

    A.    The Receivership Order ............................................................................................. 2

    B.    The Motion ................................................................................................................. 3

    C.    The Max Barton Objection and the Disputed Entities ............................................. 5

        1.    Gillespie Villas, LLC ..................................................................................... 7

        2.    Venus59, LLC ................................................................................................ 8

        3.    TRTX Properties, LLC ................................................................................... 8

        4.    MXBA, LLC ................................................................................................... 9

        5.    Titan Investments, LLC ............................................................................... 10

    D.    The Additional Entities ............................................................................................ 10

        1.    TC Hall, LLC ............................................................................................... 12

        2.    Titan 2022 Investment, LLC ........................................................................ 13

        3.    Marine Creek SP, LLC ................................................................................. 13

        4.    LC Aledo TX, LLC ...................................................................................... 13

III.  ARGUMENT ..................................................................................................................... 14

    A.    The Objection Ignores the Plain Text of the Receivership Order and
        Misrepresents the Purpose and Effect of the Motion ............................................. 14

    B.    Barton Comingled Assets with Impunity ................................................................ 17

    C.    Barton Refuses to Provide the Information and Evidence Required by the
        Receivership Order ................................................................................................... 19

    D.    The Objection Misstates or Misinterprets the Holding of *Adams* and Relies
        on Inapplicable Authorities ...................................................................................... 20

    E.    The Receivership Order Properly Focuses on Control ............................................ 23

IV.   CONCLUSION .................................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Cases**

*FDIC v. Faulkner*,
  991 F.2d 262 (5th Cir. 1993) ............................................................................................... 20

*Janvey v. Adams*,
  588 F.3d 831 (5th Cir. 2009) ........................................................................................ 14, 21

*Kokesh v. SEC*,
  137 S. Ct. 1635 (2017) ....................................................................................................... 14

*Liberte Capital Group, LLC v. Capwill*,
  462 F.3d 543 (6th Cir. 2006) .............................................................................................. 24

*Long Beach Mortg. Co. v. White*,
  No. 95 C 4068, 1995 WL 470234 (N.D. Ill. Aug. 7, 1995)................................................. 20

*Netsphere, Inc. v. Baron*,
  799 F.3d 327 (5th Cir. 2015) ........................................................................................ 14, 22

*SEC v. Camarco*,
  No. 19-1486, 2021 WL 5985058 (10th Cir. Dec. 16, 2021)................................................ 14

*SEC v. Champion-Cain*,
  No. 3:19-CV-1628-LAB-AHG, 2019 WL 6834661 (S.D. Cal. Dec. 13, 2019) ....................... 21

*SEC v. Colello,*
  139 F.3d 674 (9th Cir.1998) ............................................................................................... 22

*SEC v. Elmas Trading Corp.*,
  620 F. Supp. 231 (D. Nev.1985), *aff'd*, 805 F.2d 1039 (9th Cir. 1986) ...................................... 23

*SEC v. Faulkner*,
  No. 3:16-CV-1735-D, 2018 WL 4362729 (N.D. Tex. Sept. 12, 2018) ...................................... 23

*SEC v. Kaleta*,
  530 Fed. App'x. 360 (5th Cir. 2013) ...................................................................................... 21

*SEC v. Private Equity Mgmt. Group, Inc.*,
  No. CV09-2901PSG(EX), 2009 WL 1941400 (C.D. Cal. July 2, 2009)............................. 24, 25

*SEC v. Vescor Capital Corp.*,
  599 F.3d 1189 (10th Cir. 2010) ........................................................................................... 24

*Tex. Co. v. Miller,*
  165 F.2d 111 (5th Cir. 1947) ............................................................................................... 21

*US v. Durham,*
  86 F.3d 70 (5th Cir. 1996) ...................................................................................................... 20

*US v. Soloco, LLC*,
  962 F.2d 1244 (10th Cir. 2020) ............................................................................................. 14

Cort Thomas, as Receiver, provides the following arguments, authorities, and evidence in further support of his Motion to Supplement Order Appointing Receiver (the "Motion") [Dkt. 41], and also requests that the Court expressly identify four additional entities as falling within the scope of the Receivership Order.

## I.   **SUMMARY**

Based on evidence submitted by the SEC, on October 18, 2022, the Court placed in receivership certain entities specifically listed in the Receivership Order, as well as "any other entities that Barton directly or indirectly controls . . ." [Dkt. 29, ¶ 1]. In the Motion, the Receiver submitted evidence that more than 130 additional entities were included within the scope of the Receivership Order because they were controlled "directly or indirectly" by Defendant Tim Barton ("Barton") and sought an Order supplementing the Receivership Order, *nunc pro tunc*. Maximilien Barton ("Max") objected to the Motion and asserted at least five specific entities should be exempted: Gillespie Villas LLC, Venus59 LLC, TRTX Properties LLC, MXBA LLC, and Titan Investments LLC (collectively the "Disputed Entities"). [Dkt. 53, "the Objection"]. Barton, however, controls the Disputed Entities just as he controls the other Receivership Entities. As such, Barton's control— rather than tracing investor funds (particularly at this very early stage)—demonstrates that the Court placed these entities in receivership when it entered the Receivership Order.

After filing the Motion, the Receiver discovered additional evidence demonstrating at least four other entities fall within the scope of the Receivership Order, and thus also requests that the Court include TC Hall, LLC, Titan 2022 Investment, LLC,[1] Marine Creek SP, LLC, and LC Aledo TX, LLC (collectively the "Additional Entities") in any further Order clarifying the scope of the

---

[1] As demonstrated below, Titan 2022 Investment, LLC is the same entity as Titan Investments, LLC.  The former is the name under which the entity is registered to conduct business in Texas, while the latter is the entity's name based on its Delaware incorporation.

Receivership Order.

## II.    FACTUAL SUMMARY

### A.    The Receivership Order

1.    In response to the SEC's Motion for Appointment of Receiver ("Motion to Appoint") [Dkt. 6], the Court entered the Order Appointing Receiver ("Receivership Order") [Dkt. 29]. As stated in the Receivership Order, its intent is, among other things, to marshal and preserve assets for the further and eventual distribution to investors defrauded by Barton and other defendants, as well as to penalize past unlawful conduct and deter future wrongdoing. *Receivership Order,* p. 2.

2.    The factual basis for inclusion of the entities identified in the Receivership Order was Barton's misappropriation of investor funds, which the SEC's evidence demonstrated he misused to, "among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions, pay expenses associated with unrelated real estate development projects, and fund his lifestyle." [Dkt. 6, p. 1; Dkt. 7, pp. 10-15]. The SEC's investigation revealed, that "Barton, acting *through various entities he controls*, misused a significant portion of the investor funds to purchase real property interests, including several parcels of raw land in Texas." [Dkt. 7-1 at ¶¶ 26-33 & Ex. B. (pdf pgs. 10-17) (emphasis added)].

3.    The SEC relied on the Declaration of Carol Hahn, ("Hahn Dec") which provided evidence in support of the Motion to Appoint—to the extent the evidence was discoverable prior to filing—about Barton's practice of commingling investor funds and transferring those funds for his own use to the Barton-controlled entities, "***including but not limited to***" those listed in the SEC's Motion. For instance, the SEC provided evidence demonstrating that Barton used commingled investor funds to:

- "Acquire, develop, or for the benefit of different unrelated properties for *other direct or indirect Barton-controlled entities, including but not limited to*: Villita Towers LLC, Mansions Apartment Homes at Marine Creek LLC, MO 2999TC LLC, JMR 100 LLC, JMJ Acquisitions

LLC, FHC Acquisition LLC, D4DS LLC, D4FR LLC, and D4KL LLC;

- transfer funds *to other Barton-controlled entities, including but not limited to*: Lajolla Construction Management LLC, Goldmark Hospitality LLC, Enoch Investments LLC, and JMJAV;

- pay for professional services (such as engineering, surveying, land development, and consulting) related to the acquisition, development, and build out of multiple real estate;

- properties, the majority of which are believed to be for non-Wall Entity properties;

- pay other *personal expenses of Barton and his family*, including to purchase vehicles or make car payments, pay rent, make retail purchases, and purchase an airplane;

- pay principal and interest payments on multiple loans that Barton obtained, *including loans for other non-Wall Entity properties*; and

- make interest payments to investors, some of which were Ponzi payments."

[Dkt. 7-1, ¶ 27  pdf pp. 10-11 (emphasis added, footnotes omitted)].

4.    Additionally, the SEC identified several properties that Barton had purchased with investor funds, including properties he sold before the lawsuit was filed. [Dkt. 7-1, pdf pp. 14 and 17]. Thus, the evidence submitted by the SEC demonstrated that Barton used investor funds to operate the entities identified in the Motion to Appoint, and potentially others.

**B.    The Motion**

5.    In communicating with lenders, banks, vendors, creditors, counsel in cases adverse these entities, and others, as well as evaluating the debt and equity held by Receivership Entities, the Receiver needed confirmation that the entities he discovered also fell within the scope of the Receivership Order. Accordingly, the Receiver filed the Motion and sought, on an expedited basis, a supplemental order identifying more than one hundred additional entities controlled by Barton as included in the Receivership from inception. [Dkt. 41, p. 1].

6.    The Motion did not seek to add any entities controlled by non-parties or otherwise expand the scope of the receivership. On the contrary, many of the additional entities were identified in a list

3

provided by Barton to the SEC before the lawsuit was filed. [Dkt. 42, pdf pp. 39-40]. Instead, the

Motion sought clarification and a supplemental order expressly identifying the additional entities as

"***other entities that Defendant Timothy Barton directly or indirectly controls.***" [Dkt. 41].

7.     The Motion was supported by the Receiver's Declaration in which he provided testimony

about the basis for his conclusion that the additional entities were controlled by Barton. The

Receiver's conclusion was supported by, among other evidence: (a) binders with entity information

located at the Turtle Creek Property occupied by Barton and the entities; (b) tax records; (c) the

common addresses used by Barton and virtually all entities[2]; (d) additional documents reviewed at

the Turtle Creek Property, for instance real property records, contracts, bank records and bills; (e) a

spread sheet located in the Turtle Creek Property identifying virtually all entities included in the

Motion; (f) inclusion of several of the entities in a list of on-going litigation managed by counsel

who officed on-site with Barton; and (g) interviews. [Dkt. 42, pdf pgs. 5-7]. More specifically, during

two different interviews, the Receiver was informed that certain entities were created identifying

Max Barton as the manager/in control to create distance between those entities and the deals in which

they engaged, and Barton. *Thomas Dec.* ¶ 4, App. 2.

8.     Before filing the Motion, the Receiver sent a preliminary list of supplemental entities to

all counsel. Barton's counsel identified several entities that Barton claimed he did not control, or

which Barton otherwise objected to inclusion. Barton, however, did not object to the majority of the

entities included in the list as subject to his control. *Thomas Dec.* ¶¶ 8-9, App. 3-4. Indeed, during

the SEC's investigation, Barton's counsel had provided a list of 107 entities controlled by Barton.

---

[2] Most entities use a UPS store address at 13901 Midway Rd., Ste. 102-243, Dallas, TX 75244 (the "Midway address"). Notably, after the Receiver began collecting mail from the Midway address, the proprietor informed the Receiver that Tim Barton demanded the proprietor "close" that mailbox or otherwise provide all mail delivered to that address directly to Barton rather than the Receiver. *See Second Declaration of Cort Thomas*, ("Thomas Dec.") ¶ 15 included in the Appendix. App. 1-19. The Receiver demanded Barton cease and desist from this activity, which directly violates ¶¶ 30-32A of the Receivership Order, and Barton responded by denying his conduct. *Id.*

[Dkt. 7-1, p. 23; Dkt. 42, pdf p. 39]. Despite additional conferences, no agreement was reached, and because of the urgency of obtaining a supplemental order, the Receiver filed the Motion. *Thomas Dec.*, ¶ 9, App. 3-4.

### C.    The Max Barton Objection and the Disputed Entities

9.    On November 14, 2022,[3] Max Barton and the Disputed Entities filed their Objection.[4] The only "evidence" submitted in support were several unauthenticated company agreements, a trust agreement, and two "resignation" documents signed by Barton in violation of the Receivership Order. [Dkt. 53-1]. No evidence was provided regarding Barton's purported lack of control—direct or indirect—over the Disputed Entities, nor was any evidence provided of the inverse—that Max alone—controlled the Disputed Entities. Thus, assertions of Barton's purported lack of control were merely unsupported arguments.

10.    The documents submitted by Max nonetheless demonstrate (1) Barton is violating ¶ 4 Receivership Order by purporting to conduct business on behalf of Receivership Entities—by signing resignations for One SF Residential, LLC (an entity over which Barton admitted control),[5] as Manager for Venus 59, LLC (a resignation which is thus wholly void as well as contumacious) and similarly for Titan Investments, LLC;[6] and (2) admitted his control by creating documents that seek to eliminate the control he exercised over the Disputed Entities, regardless of what the Company Agreements provide. [Dkt. 53-1, pdf pp. 72, 177].

11.    Despite Max Barton's role on paper, Tim Barton is either directly or indirectly in control

---

[3] The Court ordered any response or objection to the Motion filed by November 11, 2022.  [Dkt. 43].

[4] If the Disputed Entities are Receivership Entities as alleged, their officers, managers, and all other agents are dismissed pursuant to the Receivership Order.  Receivership Order ¶ 3.

[5] Dkt. 7-1, pdf pp. 21 and 23, including One SF Residential, LLC on "Barton-controlled entities list provided by Barton's counsel in March 2021."  *See also Thomas Dec.* ¶ 18, n. 3, and Exhibit A-9, *infra*.

[6] *See* Dkt. 53, pdf p. 72.

of each of the Disputed Entities. A good example of Barton's control, regardless of who he identified in Company Agreements or elsewhere as managers, owners, or officers, is provided by Titan Investments. Although Max was purportedly the President of Titan, App. 322, on January 17, 2022 and again on February 10, 2022, Barton, as Titan Investment's President, signed Purchase Contracts. *Thomas Dec.*, Exh. A-15; App. 343, 370.

12.    Max Barton's ability to control and manage these various entities is also suspect at best. Within the first few weeks of his appointment, the Receiver, Barton's counsel, and Max Barton also met in person to discuss the entities and management of a property owned by Goldmark Hospitality, LLC, the "Amerigold Suites." *Thomas Dec.* ¶¶ 11-12, App. 4-5. The Receiver and Barton's counsel also discussed TC Hall, LLC, an entity Max contended he controlled, together with an individual who invested in TC Hall, LLC. *Id.*

13.    During the interview, Max disclosed that although he had been placed in charge of the Amerigold Suites by his father, Max had been unable to manage it profitably and had requested his father's intervention and assistance.[7]  Max also disclosed that he only recently had completed his college studies, having recently left Oklahoma State University although unable to pass a course needed for his degree. Max Barton's college expenses appear to have been funded in full or in part by the Receivership Entities. *Thomas Dec.*, ¶ 12, App. 4.

14.    Moreover, the Receiver discovered through various interviews and documents that Barton had begun structuring deals and creating or using certain entities to obscure his involvement by identifying Max as the owner or manager of the entities no later than December 2020.[8]  *Thomas Dec.* ¶ 4-5, App. 2. Documentary evidence regarding ownership and control over the Disputed

---

[7] That property is discussed at pp. 14 and 23 of the Receiver's Initial Report, [Dkt 67, pdf pp. 14, and 23].  *See also*, *Thomas Dec.*, ¶¶ 11-12, App. 4.

[8] Barton learned about the SEC's investigation not later than December 2020.  *Thomas Dec.*, ¶ 5, App. 2.

Entities confirms their control, at least on paper, resulted from these efforts. In other instances, and before the SEC's investigation, Barton also shifted purported control to Max, to obtain more favorable financing. The shift, however, was illusory. *Thomas Dec.*, ¶ 5, App. 2.

15.    Finally, as to each of the Disputed Entities listed below, the Receiver and his team discovered corporate formation binders and other documents that were housed in the office of Barton's primary administrator. There was no distinction between the Disputed Entities and the other Receivership Entities; rather, the binders for each entity were kept in alphabetical order over a series of multiple drawers. *Thomas Dec.*, ¶ 14, App. 5.

16.    The evidence, at least what the Receiver has been able to determine to date and as further detailed in the Thomas Declaration, demonstrates the following:

**1.    Gillespie Villas, LLC**

- Texas entity formed April 18, 2022; uses 2999 Turtle Creek as its address, the location from which JMJ Development operated. Real estate purchased by Gillespie Villas, LLC is only blocks away from 2999 Turtle Creek.

- MXBA, LLC is identified as the only one member in Amended Company Agreement, executed April 28, 2022. [Dkt. 53-1, pdf p. 33]; App. 116.

- ONE SF Residential, LLC, an entity Barton admits he controls. [Dkt. 7-1, pdf pg. 24; Dkt. 42, pdf pg. 39], is the current manager, [Dkt. 53-1, pdf pg. 69].

- The Certificate of Formation filed for the entity, on April 13, 2022, reflects MXBA, LLC and One SF Residential, LLC as the Governing Authority. App. 118-120.

- Property owned by Gillespie Villas is subject to a lien held by Broadview Holdings, LLC, an entity that Barton admitted he controlled. [Dkt. 7-1, pdf pg. 24]; App. 121-140.

- On September 9, 2022, Broadview Holdings paid Stone Street Development LLC $15,000 for "Gillespie."  App. 141.

- On September 15, 2022, Broadview Holdings paid Texas Brand Bank $17,100 for "Cashier CK in the name of Gillespie Villas LLC." Checks from the Broadview account at Texas Brand Bank evidence similar and additional payments made by Broadview Holdings on behalf of Gillespie Villas, as if the two entities were one and the same. App. 141-146.

- Gillespie borrowed $550,000 from a third-party lender, secured by real estate purchased

7

by Gillespie with a loan from Broadview Holdings. Broadview subordinated its own loan in favor of the third party. App. 147-156.

- Enoch Investments, LLC, an entity Barton admits controlling, [Dkt. 7-1, pdf p. 24; Dkt. 42, pdf p. 39], guaranteed the loan.

*See Thomas Dec.,* Exh. A-10; App. 83-156 as to all evidence summarized above.

### 2.    Venus59, LLC

- Texas entity formed June 1, 2020; uses Midway address.

- ONE SF Residential, LLC, an entity Barton admits he controls[9] [Dkt. 7-1, pdf p. 24; Dkt. 42, pdf p. 39], is the current manager, [Dkt. 53-1, pdf p. 69]. In an earlier Company Agreement, JMJ Residential, LLC (an entity also controlled by Barton) is identified as a Member. App. 203-204.

- The Certificate of Formation filed for the entity, on April 13, 2022, reflects MXBA, LLC and One SF Residential, LLC as the Governing Authority.

- Form SF-4 filed with the IRS on June 11, 2022 lists Tim Barton as the sole member. App. 167

- Officers identified in the Company Agreement were Max Barton as President, and Saskya Bedoya ("Bedoya") as Treasurer/Secretary. App. 261.

- On September 15, 2022, Broadview Holdings paid $23,325.62 to Venus 59, LLC in reference to a loan. App. 208.

- On August 31, 2021, Venus59 entered into a funding agreement with Daniel Crow, which provided that the funding agreement was "consented to by One SF Residential, LLC ("OSFR") (as the manager and a member of the Company) and MXBA, LLC ("MXBA") (collectively, "Members") as the members in the Company. App. 209-261.

- Despite not being identified as an officer in the Company Agreement, on October 31, 2022, after the Receivership Order was entered, Barton resigned as an officer or agent. [Dkt. 53-1, pdf p. 72].

*See Thomas Dec.,* Exh. 12; App. 164-261 as to all evidence summarized above.

### 3.    TRTX Properties, LLC

- Texas entity, formed August 20, 2010 [Dkt. 53-1, pdf p. 115] uses Midway address. App. 264.

---

[9] Although other documents also demonstrate Barton's control over One SF Resident, LLC, he also admitted his control. *See Thomas Dec.,* Exh A-11; App. 157-159.

- William Vance McMcMurry, an attorney who represented Barton and most Receivership Entities for many years and who officed at the Turtle Creek Property, was identified as the Managing Member in TRTX's Certificate of Formation. App. 266. In 2015, the members were changed to Enoch Investments, LLC and Max Barton. App. 303.  In later filings, TRWF, LLC was identified as a manager. [Dkt. 53-1, pdf p. 115] Barton admitted control over TRWF, LLC [Dkt. 7-1, pdf p. 24].

- A 2016 email from Barton to employee Bedoya instructed her to "make Max owner in TRTX and we will make him sign and then I will be added as guarantor" to follow instructions of Barton's attorney to facilitate refinancing debt owed by the entity. App. 304.

- On July 7, 2020, TRWF, LLC was deleted as a manager, pursuant to an amendment, and replaced with the MXBA Trust. [DKT 53-1, pdf page 116, 212].

- Tim Barton is the Grantor of the MXBA Trust, and his personal assistant and primary employee, Bedoya, is the Trustee. [Dkt. 53-1, pdf. p. 119]. Bedoya, through her attorney, has informed the Receiver that with respect to all entity business and transactions, she followed Barton's instructions. He was in control. Thomas Dec. ¶ 7; App. 3.

- On October 4, 2022, in *In re FM 544 Park Vista, Ltd.*, Cause No. 17-34255-SGJ-11 and Cause No. 17-34274-SGJ-11, pending in the United States Bankruptcy Court for the Northern District of Texas, TRTX Properties, LLC and JMJ Development, Inc. filed a notice of appeal in which they identified Barton and counsel, McMurry as the "principals" of those entities. App. 305-308.

- Timothy Barton signed the Statement of Change of Registered Office/Agent dated May 2, 2022, although he purportedly had no authority [on paper] over the entity on that date. App. 310-311.

*See Thomas Dec.,* Exh. 13; App. 262-312 as to all evidence summarized above.

### 4.    MXBA, LLC

- Delaware corporation formed on August 24, 2020, [DKT. 53-1, pdf p. 160-212]; uses Midway address.

- The Company Agreement identifies MXBA Trust as the only member, on behalf of which Max Barton signed as *President*. Max Barton is not the President of the MXBA Trust, however. He is the beneficiary, and as such lacks authority to sign anything on behalf of the trust. *Compare* Dkt. 53-1, pdf pgs. 169-170 (member signature for MXBA Trust is "Max Barton, President") *and* MXBA Trust, identifying Max as beneficiary and Saskya Bedoya as Trustee. [Dkt. 53-1, pdf. pg. 119].

- Tim Barton is the Grantor of the MXBA Trust, and his primary employee and administrative assistant, Bedoya, is the Trustee. [Dkt. 53-1, pdf. p. 119]. As his employee, Barton controlled Bedoya and therefore also controlled the trust. *See* Exhs. A-3, A-4, A-5 and A-13; App. 49-57; 58-62; 63-67; 304.

*See Thomas Dec.,* Exh. 14; App. 313-314 as to all evidence summarized above.

### 5.    Titan Investments, LLC

• Formed in Delaware on August 20, 2022 by Vance McMurry; uses 3600 Gillespie, property owned by Gillespie Villas, as its mailing address. App. 318; 324.

• In formative documents, Max Barton is identified as Manager and the only officer. App. 320; 324-25.

• Application of Registration filed in Texas on October 5, 2022, uses Titan Investments 2022, LLC as its name. App. 324.

• On January 17, 2022, Barton signed a contract for Titan to purchase real estate, as Titan's President, although corporate records reflect that Max held that position as of that date. App. 358-373.

• Tim Barton again signed a purchase contract on February 10, 2022 as President, although Max is listed as the only officer in the company documents. App. 326-356.

• On January 12 and 18, 2022, on behalf of Titan Investments, Barton also signed two Letters of Intent for Titan to purchase property. App. 348-356.

• Tim Barton signed resignation from role as signatory/agent *effective* October 6, 2022. [Dkt. 53-1, pdf p. 177]; App. 357.

• On February 23, 2022, Titan contracted to purchase real estate from Patricia Butler. The earnest money and extension fees were provided by Broadview Holdings, LLC. App. 374-376.

*See* Thomas Dec., ¶ 24, and Exhibit 15 included in the Appendix at pp. 317-383.

### D.    The Additional Entities

17.    The Receiver's preliminary investigation revealed that Barton used *many* additional entities—on top of those specifically listed in the Receivership Order—to spend, hide, and improperly use investor funds, the proceeds of investor funds, or funds so commingled with investor funds as to render tracing or segregation nearly impossible, particularly at this early juncture. *Thomas Dec.* at ¶ 23, App. 9.

18.    As one example only, the Receiver has discovered that in several instances in which a Receivership Entity into which the SEC had traced investor funds as identified in the Hahn Declaration, sold property and Barton, through the selling entity or another Barton-controlled entity,

10

for instance Marine Creek SP, LLC, entered into "Participation Agreements" by which he retained entitlement to future profits in the properties he purchased with commingled investor funds, and sold. *Thomas Dec*. at ¶ 24 and Exh. A-16; App. 384-413.

19.     Notably, although the Receiver has diligently sought to discover the current assets and liabilities of all Receivership Entities and uses of the funds Barton received from the investors, Barton has refused to comply with many of the Receivership Order's terms intended to allow the Receiver to discover more specific information that would inform the Court's decision here. *Thomas Dec*. 25-26; App. 10. For instance, despite numerous requests and in violation of ¶ 18 B.3, Barton, his counsel, and an IT vendor have to date refused to provide the Receiver with the access information—user-names and passwords—necessary for the Receiver to access the Receivership Entities' servers, cloud storage, emails and other electronic information. *Thomas Dec.* ¶ 25, App. 10.

20.     Neither has Barton provided the documents or information required by Paragraphs 8, 9, 10, and 18B of the Receivership Order. *Thomas Dec.* ¶¶ 25-26, App. 10.

21.     And despite repeated requests for credentials and access information to the entities' Quickbook accounts, the Receiver was forced to seek access through Intuit, the entity that owns that accounting service. *Thomas Dec. ¶* 27. Although Intuit is cooperating, due to technological issues, it has yet to provide that access and thus the Receiver's accountants have not been able to review the entities' accounting records. *Id.*

22.     Despite these limitations, the Receiver and his team identified at least four Additional Entities that are controlled "directly or indirectly" by Barton. More specifically, the Receiver now seeks inclusion of TC Hall, LLC, Titan 2022 Investment, LLC, Marine Creek SP, LLC, and LC Aledo TX, LLC as within the scope of the Receivership Order based on the following evidence that Tim Barton controls each Additional Entity:

11

**1.   TC Hall, LLC**

- Formed in Texas July 16, 2022; uses New Hampshire address. App. 415-420.

- Sole member and manager is MF Container, LLC, a Delaware company, which in turn was formed July 11, 2022. App. 418.

- In communications with a lender, Louisiana National Bank, the bank offered a loan to Enoch Investments, LLC (admittedly a Barton-controlled entity), or a TBD entity, but corresponded with Barton about the loan. App. 421-423.

- On May 6, 2022, Broadview Holdings paid Commonwealth Title $100,000 for "Earnest Money Deposit for 3407 & 3409 N. Hall St." App. 429.

- On May 25, 2022, Broadview Holdings paid Commonwealth Title $100,000 for "Earnest Money Deposit-3407 & 3409 N. Hall St." App. 429.

- On July 25, 2022, Broadview Holdings paid Commonwealth Title $40,000 for "Earnest Money Deposit-3407 & 3409 N. Hall St." App. 429-430.

- On August 9, 2022, Broadview Holdings paid Commonwealth Title $40,000 for "Extension for 3407 & 3409 N. Hall St." App. 429.

- On or about August 24, 2022, TC Hall, LLC purchased property at 3407 and 3409 N. Hall Street Dallas, Texas. The purchase was funded, at least in part, by $545,806.40 received from Gillespie Villas, LLC, which in turn had borrowed $550,000 from a third party, after obtaining Barton's Guaranty on that loan and subordinating Broadview's lien on the collateral. App. 429-430; 443; *see also* App. 147-151.

- Barton controlled the flow of money on behalf of TC Hall as evidenced by an email from Barton to his attorney Randy Marx in which Barton provided instructions about where to originate payments for the benefit of TC Hall. App. 444-445.

- However, long before TC Hall was formed, and continuing after it was formed, Broadview Holdings, LLC and JMJ Development spent over $1.4M on the same Hall Street property. App. 475-480.

As explained more fully below, an August 2022 refinance of 3600 Gillespie, owned by Gillespie Villas, LLC, was used for the TC Hall purchase of 3407 and 3409 N. Hall Street. App. 147-151; 152-156; 429-432. Additionally, the Receiver located a Confidential Offering Memorandum at the Turtle Creek location showing proposed uses of the property purchased by TC Hall which references JMJ Development as the developer and Tim Barton as the point of contact. *Thomas Dec.* ¶ 29, App.

12

11. *See also Thomas Dec.,* Exh. A-17; App. 414-444B.

### 2.    Titan 2022 Investment, LLC

- Titan 2022 Investment, LLC is the same entity as Titan Investments, LLC. The former is the name under which the entity is registered to conduct business in Texas, while the latter is the entity's name based on its Delaware incorporation.

*See Thomas Dec*., Exh. A-18; App. 445-48

### 3.    Marine Creek SP, LLC

- The date the entity was formed is unknown. Contracts, however, identify it as a Delaware entity, with Barton as President.

- Received a contractual Participation Interest when the Mansions Apartment Homes at Marine Creek LLC (admittedly a Barton-controlled entity, Dkt. 7-1, pdf p. 24), sold property into which the SEC had traced investor funds.

*See Thomas Dec.,* Exh. A-16; App. 384-413 as to all evidence summarized above; *see also,* Dkt. 7-

1 pdf pgs. 14-15, 17.

### 4.    LC Aledo TX, LLC

- Barton admits control over this entity. [Dkt. 7-1 pdf pgs. 14-15, 17].

- In February 2019 Wall10, LLC loaned Somerset-Lost Creek Golf Course $300,000 ("Somerset Loan"). As evidenced by an Affidavit signed by Barton in the case referenced below, Wall10 then conveyed the note for the Somerset Loan to LC Aledo TX, LLC, and the note is purportedly still outstanding.

- The transaction is tied up in litigation styled as *Somerset-Lost Creek Golf, LTD v. Tim Barton, LC Aledo TX, LLC, JMJ Acquisitions, LLC and Wall10, LLC.*, Cause no. 096-319595-20 in the 96th District Court for Tarrant County.

*See Thomas Dec.,* Exh. A-19; App. 449-466 as to all evidence summarized above.

 As discussed below, these facts more than demonstrate Barton's direct or indirect control over

the Disputed Entities, as well as additional factual support for including them within the scope of the

Receivership Order.

13

### III.   ARGUMENT

In a veiled collateral attack on the Receivership Order,[10] the *Objection* asserts that the Receiver seeks to expand the reach of the Receivership Order. Max also contends that a receivership may not be imposed over "non-party assets" absent evidence that the non-party "(1) received ill-gotten funds and (2) has no legitimate claim to the funds."[11]  *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009)." *Objection*, p. 2. Both assertions, which provide the theme of the Objection, ignore the predicate for inclusion of the Disputed Entities and the basis for the Motion, misstate *Adams'* holding, and misapprehends receivership law generally.

### A.   The Objection Ignores the Plain Text of the Receivership Order and Misrepresents the Purpose and Effect of the Motion

The Receivership Entities are not "non-parties," nor is the Receiver seeking to impose the receivership over them. Those entities were included in the scope of the Receivership from inception based on the SEC's Motion to Appoint and the Receivership Order's governance over all entities controlled by Tim Barton. The Motion thus seeks to clarify what the Receivership Order provided

---

[10] On November 18, 2022, Barton appealed the Receivership Order.  [Dkt. 66]. The Notice of Appeal also purports to appeal the Court's denial of Barton's Motion to Amend or Correct the Receivership Order [Dkt. 33], the Court's order granting the Motion to Supplement [Dkt. 62] and Order Granting Motion for Administrative Procedures. [Dkt. 63]. Notably, however, no appellate jurisdiction exists for an interlocutory appeal of any order except the Receivership Order.  *See US v. Soloco, LLC*, 962 F.2d 1244, 1250 (10th Cir. 2020) ("'Courts narrowly construe § 1292(a)(2) ("to permit appeals only from the three discrete categories of receivership orders specified in the statute, namely [1] orders appointing a receiver, [2] orders refusing to wind up a Texas Secretary of State, and [3] orders refusing to take steps to accomplish the purposes of winding up a receivership.'") quoting *In re Pressman-Gutman Co.*, 459 F.3d 383, 393 (3d Cir. 2006) (quotations omitted));[3] *see also Netsphere, Inc. v. Baron*, 799 F.3d 327, 331-32 (5th Cir. 2015) (every circuit to address the meaning of § 1292(a)(2)'s 'refusing orders' interprets it to "permit[ ] appeals only from orders 'refusing ... to take steps to accomplish the purposes of [winding up receiverships].'").

[11] The Objection also appends an additional requirement, that the entity continues in possession of the ill-gotten funds it received.  Dkt. 53, p. 3. That requirement is absent, however, from the authorities on which the Objection relies, and would be contrary to the SEC's authority to obtain disgorgement, the underlying purpose of the receivership, without the necessity of tracing.  *See SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *14 (10th Cir. Dec. 16, 2021) ("[N]othing in the Supreme Court's description of disgorgement [in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017)] suggests the party ordered to disgorge money must still possess the specific ill-gotten funds at the time of the disgorgement action. And imposing the strict tracing requirement . . . would not further the goals of disgorgement because a savvy embezzler could quickly spend the money on luxury vacations, secrete ill-gotten funds away in a location or foreign bank account not detectable by authorities, *or so commingle tainted funds with untainted funds as to make it impossible to trace the tainted funds to their final resting plac*e.") (emphasis added)).

from inception: the names of more of the entities controlled by Tim Barton.

Indeed, although in a few instances the Objection relies on formative documents that do not identify Barton as a manager or officer, it does not attempt to dispute Barton's control, instead offering unsupported arguments and company agreements or other documents, divorced from the reality of the web of entities through which Barton operated. The Court's common sense as well as the literal meaning of "indirect control" negates the arguments offered by Max Barton. For instance, the Objection asserts that MXBA LLC is the "sole manager, member, and owner of Gillespie Villas, LLC." [Dkt. 53, p. 3]. But MXBA LLC's sole manager is the MXBA Trust, for which Barton's trusted employee and assistant, Saskya Bedoya, is the trustee and Barton is the Grantor. Documents evidence Bedoya's faithful compliance with Barton's instructions regarding treatment of entities and bills. [Dkt. 7-1, Exhs. 10-12, 17, and *Thomas Dec.*, ¶ 7; Exhibits A-3, A-4, A-5, and A-13; App. 49-57; 58-62; 63-67 and 304.

In contrast, the evidence offered by the Receiver in support of the Motion [Dkt. 42] as well as the evidence specific to the Objection submitted in the supporting Appendix demonstrates that Barton conducted life and business through entities he controlled, whether directly as authorized through corporate documents, or indirectly through other entities, his son Max, or his employee, Bedoya.

For instance, Barton signed contracts as the President of Titan Investments, although on paper he held no such role. *Thomas Dec.* ¶ 22, Exh. 15; App. 343; 357; 370. He directed Bedoya to "make Max the owner" of TRTX to obtain more favorable terms on a refinance, [*Thomas Dec.,* ¶ 5, App. 304], which strongly implies ownership on paper was wholly irrelevant to who controlled the entity. In furtherance of his effort to support the illusion that he did not control these entities and in violation of the Receivership Order, Barton on an unknown date, signed documents with an effective date

15

immediately before and after the date of the Receivership Order, resigning from authority that did not exist on paper. [Dkt. 53-1, pdf. pp. 72, 177]. Rather than demonstrating the absence of control, Barton's efforts to eliminate his control—on paper—demonstrates instead his prior direct control, and his continuing indirect control.

Barton also used Broadview Holdings' funds, which included the proceeds of property sales funded at least in part from investor funds to pay expenses and make purchases for most of the Disputed Entities. *Thomas Dec.*, ¶ 34, Exhs. A-10, A-12, A-15, A-14, A-17, A-20; App. 13, 141-146; 208, 316, 377-383, 424-426, 467-472. Based on the use of Broadview Holdings' Texas Brand Bank account to fund and operate other entities, the Receiver presumes additional comingling occurred, but he has not received all bank records for that account or had an opportunity to fully review all that he has received. *Thomas Dec.* ¶ 35, App. 13.

The Entities use, or recently used, the same mailing or physical address, have no outside directors, manager, or officers, are undercapitalized or capitalized through loans from other Receivership Entities, and were all incorporated by either Bedoya, or one of two attorneys who worked for Barton. *Thomas Dec.* ¶¶ 41-42, App. 15-16. Documents evidencing tax information, bills, or mail for the Disputed Entities was found at the Turtle Creek location, and all are used for real estate investments. *Id.* Virtually no documents evidencing observation of any corporate formalities were found. *Id.*

Stated simply, the Court took possession of the assets of all entities that Barton "directly or directly controls." Receivership Order, [Dkt. 29 at ¶ 1]. While Barton (and now Max) have made clear that they are unhappy with that Order, their attempt to collaterally attack or seek reconsideration of the Order is improper. Instead, as demonstrated by the evidence discussed above and provided in support of this Response, Barton unequivocally controls "directly or indirectly" the Disputed Entities

16

and the Additional Entities.

## B.     Barton Comingled Assets with Impunity

While the Receiver's investigation is still in its early stages, no doubt exists that Barton often used one Receivership Entity, including the Disputed Entities, to fund others,  and used several Receivership Entities to fund his lifestyle.[12]  For instance, Barton used an account at Texas Brand Bank in the name of Broadview Holdings, LLC to pay his personal attorneys in this lawsuit, as well as making payments for the benefit of Gillespie Villas, LLC,  TC Hall, LLC, Titan Investments, LLC, MXBA, LLC and Venus 59. *Thomas Dec.* ¶¶ 34, 36, 141-146, 208, 316, 377-383, 424-426, 473-474.  Broadview Holdings in turn received the proceeds of from the sale of property owned by Mansions Apartment Homes at Marine Creek, LLC, into which the SEC traced investor funds. *Thomas Dec.*, ¶ 34; App. 13; 467-472. ; *see also* Dkt. 7-1, ¶¶ 29, 36, pdf pp. 14-15 ("36. There were also numerous other properties acquired, at least in part, with Wall sold, some within the last year, but Commission staff has not traced the disposition of the proceeds from those sales. These sold properties are also included on Exhibit B.")

Similarly, Gillespie Villas, LLC purchased 3600 Gillespie Street, using a $1.4M note (the "Broadview Loan") obtained from Broadview Holdings, LLC. *Thomas Dec.*, ¶ 37, App. 14, 121-140; 147-156. Gillespie Villas then refinanced the purchase using a $550,000 loan from a third-party in favor of whom Broadview Holdings subordinated its lien. *Id.* Through a series of bank transfers, the proceeds of the Broadview Loan were then used to purchase 3407 and 3409 N. Hall Street by TC Hall, LLC. *Id.* And a spreadsheet found in the Turtle Creek Property summarizes $1,401,914.40 in payments made from Broadview Holding's bank account at Texas Brand Bank, and on various

---

[12] The evidence supporting the SEC's Motion to Appoint reached the same conclusion, but noted the evaluation and tracing were based on "currently available information," but expressly recognized that "Barton controls multiple other entities that may have also received or benefited from investor funds, including the sales proceeds for the recent property sales."  Dkt. 7-1, ¶ 37, pdf pg. 15.

credit cards owned by JMJ Development, LLC (a Receivership Entity) for TC Hall's purchase of 3407 and 3409 Hall Street. *Thomas Dec.*, ¶ 38; App. 14, 475-480.

Although the Receiver has not yet obtained all relevant records and certainly has not had an adequate opportunity for he or his accountant to review all records, bank records demonstrate more transfers between and among Gillespie Villas, Broadview Holdings, and TC Hall, LLC. For instance, on August 22, 2022, Gillespie Villas received a $100,000 loan from a third party. On August 23, 2022, Gillespie transferred $70,000 from its new account at Vista Bank to Broadview Holdings, LLC, potentially in repayment of some of the payments Broadview made as reflected in the summary included in the Appendix at 475-480. *Thomas Dec.*, ¶ 39; App. 15, 433-442. On August 25, 2022, as part of the purchase of 3407 & 3409 N. Hall St., Commonwealth Title transferred $132,138.55 to TC Hall, LLC's newly opened bank account at Vista Bank. App. 431. On August 26, 2022, TC Hall, LLC transferred $100,000 from its Vista Bank account to Gillespie Villas, LLC, App. 433, which likely served as reimbursement for the transfer from Gillespie Villas to Broadview Holdings. On September 16, 2022, Gillespie Villas repaid the $100,000 loan to the third party. App 436. Barton's indirect control over Gillespie (through One SF Residential) and TC Hall (as evidenced by his role in obtaining the loan from Louisiana National Bank and using Broadview's funds to operate and fund TC Hall), demonstrates the shell game Barton directed in comingling funds, including funds that originated from investors, the interdependency of the Disputed Entities, and Barton's total disregard for the corporate existence of these entities. *Thomas Dec.*, ¶ 40, App. 15; *see also* [Dkt. 7-1, ¶ 16-17, 27].

Based on the Receiver's review of the bank records obtained to date, purchase agreements, communications with or documents received from lenders, settlement statements and related documents and information received from title companies, as of the date of filing, it is impossible to

18

determine whether any of the funds used to operate, fund, or purchase assets for any of the Disputed Entities or the Additional Entities originated from any untainted source, i.e., projects, accounts, or properties that were not purchased with funds comingled with investor funds or the proceeds of properties purchased with investor funds. Based on the SEC's investigation, however, investor funds or their proceeds appear to have been the primary source of cash used by Barton, other than third party loans. *Thomas Dec.*, ¶ 43; App. 16; *see also* Dkt. 7-1, pdf pgs. 14, 17.  Moreover, based on the extensive commingling of assets and interdependency between the Receivership Entities, the Disputed Entities and the Additional Entities, it is extremely likely that additional commingling occurred.  The Receiver, however, has had insufficient time to obtain and evaluate all necessary bank records. *Thomas Dec.* ¶ 35, App. 13. In sum, the evidence summarized here and included in the Appendix demonstrates the Disputed Entities' receipt and use of investor funds or the proceeds of investor funds.

## C.   Barton Refuses to Provide the Information and Evidence Required by the Receivership Order

To the extent Barton or Max contends the evidence submitted with this Response falls short of demonstrating Barton's control over each of the Disputed Entities or otherwise fails to satisfy the inaccurate standard Max contends applies, the Court must also consider Barton's failure to comply with the Receivership Order. To date, although his attorneys have provided some information verbally, Barton has failed and refused to provide most information and materials required of him by the Receivership Order. For instance, Barton has refused to provide any of the information required by paragraphs 8, 9, 10, and 18[13], and has interfered with the Receiver's efforts to obtain

---

[13] *See* Receivership Order, which requires production of information and documents identifying properties and assets, employees, agents and personnel, bank and brokerage accounts, credit cards, inter-entity and defendant transfers, tax returns, keys, codes, passwords, identification and location of safe deposit boxes, and a host of related documents and information.

access to the Receivership Entities' data. *Thomas Dec.* ¶¶ 25-26, App. 10.

Barton's own conduct thus provides an additional reason for including the Disputed Entities within the scope of the Receivership. *See, e.g., FDIC v. Faulkner*, 991 F.2d 262, 267-68 (5th Cir. 1993) (Injunction freezing assets, even if not obtained through fraud, appropriate where party refused to "aid the district court in determining which of their assets were traceable" to underlying fraud); *Long Beach Mortg. Co. v. White*, No. 95 C 4068, 1995 WL 470234, at \*2 (N.D. Ill. Aug. 7, 1995) ("[W]here the presumed wrongdoer's conduct has itself created the roadblock that prevents resort to that usual process [tracing], it is entirely appropriate for a court to freeze all of that party's assets pending the determination of just which assets may be traceable to the allegedly fraudulent activities.").

Additionally, as a court that "sits in equity" and as a 'court of conscience,'" *US v. Durham,* 86 F.3d 70, 73 (5th Cir. 1996), the Court is "enabled to frustrate fraud and work complete justice." *Tex. Co. v. Miller,* 165 F.2d 111, 116 (5th Cir. 1947). In so doing, the Court accordingly possesses "broad powers and wide discretion" in supervising a receivership created for the benefit of defrauded investors. *SEC v. Kaleta*, 530 Fed. App'x. 360, 362 (5th Cir. 2013) . The Court's conscience here must bend in favor of the investors, particularly where (1) to date, the Receiver's evaluation of Receivership Assets suggests the potential for a very large shortfall if various creditors or claimants are successful [*see* Dkt. 67]; and (2) Barton admitted under oath that his assets are far less than a $4 million judgment entered against him personally [Dkt. 42, pdf pp. 36-37].

## D.    The Objection Misstates or Misinterprets the Holding of *Adams* and Relies on Inapplicable Authorities

The circumstances presented here are starkly different from the authorities cited by Barton. For instance in *Adams*, the Fifth Circuit was not determining which entities were already included within the scope of a receivership due to control over those entities by a defendant. Instead, it was

evaluating the *Stanford* receiver's "clawback" claims against several hundred "winning" investors that the receiver designated as "relief defendants" and whose investment accounts he sought to freeze in furtherance of his claim. *Adams*, 588 F.3d at 833–34. In rejecting the Receiver's contention that the freeze was appropriate, the Fifth Circuit concluded that the investors against whom the claims were asserted fell outside the scope of "relief defendants" because they were more than passive recipients of ill-gotten gains and instead possessed ownership interests in the funds at issue.[14] *Id.* at 834. Indeed, the two-part test which the Objection frames as necessary to "establish a receivership over non-party assets" misrepresents the *Adams*' court's holding, which instead addresses the propriety of equitable relief against a "relief defendant": "A relief defendant is not accused of wrongdoing, but a federal court may order equitable relief against such a person where that person (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds." *Id.*, (citing *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir.1998)). Importantly, in *Adams*, no question existed about the independence of the investors from whom the receiver sought to recover and Allen Stanford or the entities he used in conducting that massive Ponzi scheme. By comparison, the Receiver is not seeking to recover funds from defrauded investors. Rather, by virtue of Barton's control over the Disputed Entities and the Additional Entities, he seeks an order that expressly identifies each as within the Receivership Order's definition of "Receivership Entities".

The *Adams'* holding also frames the inapplicable principle identified in the *Netsphere* case also cited in the Objection. In *Netsphere*, the Fifth Circuit considered the propriety of a receivership over an individual's assets and two corporations he controlled but which were not alleged to have committed any wrongdoing or possess any assets related to the litigation, where the receivership was

---

[14] A "relief defendant" has no ownership interest in the property that is the subject of the litigation. *Adams*, 588 F.3d at 834-35.

21

imposed to preclude the defendant's vexatious litigation tactics. *Netsphere, Inc. v. Baron*, 703 F.3d 296, 301-302, 304 (5th Cir. 2012). The case arose from a private dispute between private litigants; securities violations and preserving assets for defrauded victims was not in issue. *Id.* In concluding the district court abused its discretion in imposing the receivership, the Fifth Circuit observed that receiverships over "corporate assets," i.e., corporate entities, were appropriate where the "corporate assets are the underlying subject matter of the dispute." *Id.* at 306. The SEC's entitlement to equitable relief, including a receivership over Barton-controlled entities as necessary to recover and preserve proceeds of fraud underlies entry of the Receivership Order.

Similarly, in *Faulkner*, the Court considered a motion to *expand* the receivership by including new entities which the defendant had purportedly used in defrauding investors. *SEC v. Faulkner*, No. 3:16-CV-1735-D, 2018 WL 4362729, at *3 (N.D. Tex. Sept. 12, 2018) ("The Receiver maintains that Crude and Patriot should be included in the receivership estate because both entities were integral to the fraudulent scheme; both were subject to Faulkner's control; and both intermingled their assets with those of BECC, BOG, and BRC."). The Court also noted the defendants' and disputed entities' cooperation in providing information to the Receiver. *Id.* at * 3 (Crude "has already offered to share its financial documents with the Receiver—documents it has previously shared with the SEC."). Here, the Receiver provides evidence similar to that presented in *Faulkner* which justified adding the subject entities to the receivership estate.[15] The Receiver, however, need not demonstrate Barton's use of each of the Disputed Entities in conducting the fraud with which he is charged because the Receivership Order has already concluded that entities controlled by Barton are within the scope of the receivership.

---

[15] Faulkner's control was demonstrated through his identity as a director for the disputed entities, shared addresses, shared registered agents, paying personal expenses from the bank account for one entity, and using a false identity to open bank accounts for several entities and funneling assets through the concealed accounts. *Faulkner*, 2018 WL 4362729, at *5.

E.    **The Receivership Order Properly Focuses on Control**

The Court should reject Max's implicit request that the Court reconsider the Receivership Order's inclusion of entities controlled "directly or indirectly" by Barton. To the extent the Court is inclined to revisit its prior decision, however, it should nevertheless reject Max's arguments. By including all entities controlled directly or indirectly by Barton within the Receivership, this Court recognized fundamental principals, as well as the factual basis for the SEC's Motion. Under federal law[16] "a corporate entity may be disregarded in the interests of public convenience, fairness, and equity." *SEC v. Elmas Trading Corp.,* 620 F. Supp. 231, 234 (D. Nev.1985), *aff'd*, 805 F.2d 1039 (9th Cir. 1986) ("Just as with the alter ego doctrine, it is sufficient that if we recognized the separate corporate existence, we would bring about an inequitable result."); *SEC v. Private Equity Mgmt. Group, Inc.*, No. CV09-2901PSG(EX), 2009 WL 1941400, at *1 (C.D. Cal. July 2, 2009). In deciding whether to disregard a corporate form, courts "look closely at the purpose of the federal statute involved to determine whether it places importance on the corporate form." *Elmas Trading Corp.,* 620 F. Supp. at 234. The federal analysis "gives less respect to the corporate form than does the strict common-law alter ego doctrine." *Id.* (applying a "flexible approach in determining whether the corporate entity should be disregarded" in light of Receiver's "primary objective . . . to ensure that all available assets are brought within the Receivership and may then be properly distributed to creditors.").

The purpose of a receivership underlies this analytical framework by focusing a district court's broad discretion on safeguarding assets, administering property as suitable, and assisting the court in achieving an equitable distribution of limited assets. *SEC v. Vescor Capital Corp.*, 599 F.3d 1189,

---

[16] Federal law governs here given the securities laws that provide the Court's jurisdiction and the authority for the imposing a receivership. *Private Equity Mgmt. Group, Inc.*, 2009 WL 1941400, at *1.

1194 (10th Cir. 2010); *see also Liberte Capital Group, LLC v. Capwill,* 462 F.3d 543, 551 (6th Cir. 2006) (In creating a receivership, district court's focus is "to safeguard the assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary."). Where evidence demonstrates control by defendant and thus the authority to transfer money between or on behalf of disputed entities, an inference of intertwined operations arises justifying disregard of those entities' corporate existence. *Id.*

In *Elmas Trading* and *Private Equity Management Group*, both of which are very close factually, the courts relied on several factors that gave rise to an inference of intertwined operations between "Entities in Dispute" and the defendants, which in turn supported disregarding the corporate existence of the disputed entities in concluding each was a receivership entity. *See Elmas Trading Corp.,* 620 F. Supp. at 234; *Private Equity Mgmt. Group, Inc.*, 2009 WL 1941400, at \*1 (granting Receiver's motion for clarification regarding inclusion of six entities within the scope of the Receivership Order, which the Receiver asserted were "merely the alter egos of the entities already within the receivership estate"). Specifically, those courts relied on overlapping control persons, incomplete or improper corporate records, money transfers between and among the various entities made subject to the control of the defendants or entities already in receivership. *Elmas Trading Corp.*, 620 F. Supp. at 234-235; *Private Equity Mgmt. Group, Inc.*, 2009 WL 1941400, \*4.

Similarly here, even if the Receiver was required to justify inclusion of the Disputed Entities within the scope of the Receivership Order beyond a demonstration of control, the evidence suffices.[17]

---

[17] Indeed, Barton's own objection, Dkt. 55, demonstrates his treatment of the entities as a mere extension of himself. Barton argued that in interpreting a "single-purpose personal entity through which Mr. Barton maintains his personal residence"—an entity Barton unquestionably controls—the Receiver misinterpreted the scope of the Receivership Order. [Dkt. 55, p. 4]. Barton himself disregards the corporate existence of the entities.

24

## IV.    CONCLUSION

Liens, ownership disputes, and other facts that complicate the potential recovery of any net equity in the assets owned by the Receivership Entities, including properties owned by the Disputed and Additional Entities, could result in a far lower recovery than the $26M necessary to repay the investors. *Thomas Dec.* 45, App. 17.

Inclusion of the Disputed and Additional Entities (as well as the entities identified originally in the Motion) not only falls within the plain language of the Receivership Order, but is essential to protect potential recoveries for the investors. For example, Gillespie Villas owns 3600 Gillespie Street, but purchased that property, in part, with assets obtained from Broadview Holdings, which in turn received proceeds from the sale of property the Mansions Apartment Homes at Marine Creek, LLC purchased with investor funds. Gillespie funds in turn, funded, in part, TC Hall's purchase of property. *Id.* Marine Creek SP, LLC holds valuable contractual rights in the form of a Participation Agreement, related to the sale of real estate by the Mansions Apartment Homes at Marine Creek, LLC, which the SEC alleged was purchased with investor funds. *Id.*

The Disputed Entities and the Additional Entities, like all other Receivership Entities, are one and the same as Tim Barton and are subject to his control. They fall within the Receivership Order's definition of Receivership Entities, and are appropriately included within the receivership. The Receiver accordingly requests that the Court overrule the Objection and enter an Order supplementing the Receivership Order to clarify that each of the Disputed Entities and the Additional Entities are Receivership Entities.

Respectfully submitted,

By: */s/ Charlene C. Koonce*
    Charlene C. Koonce
     State Bar No. 11672850
     charlene@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    T: (214) 327-5000
    F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on November 29, 2022, the Receiver conferred with counsel for all parties regarding inclusion of the Additional Entities within the scope of the Receivership Order. The SEC is unopposed to the relief requested herein. Defendant Barton and Intervenor Max Barton are opposed. Defendants Fu and Wall did not respond to the conference.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

26