the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010 **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11 **Action Without Meeting.** Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such

APP000182

consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 **Broad Discretion and Authority of Managers.** Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member. Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

**ARTICLE VII**
**CONFIDENTIAL INFORMATION**

7.01 **Confidential Information.** The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information. The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

---

Company Agreement                                                                 Page 12
**Venus59, LLC**


APP000183

7.02. **Specific Performance.** The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of a Simple Majority are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not

APP000184

less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02 **Voting List.** The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Percentage Interests held by each. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03 **Proxies.** A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 **Conduct of Meetings.** All meetings of the Members shall be presided over by the

APP000185

chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05 **Action by Unanimous Written Consent Without Meeting.**

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this paragraph, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06 **Action by Telephone Conference or Other Remote Communications Technology.** Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07 **Classes of Members; Voting.** At an annual or special meeting called for that purpose,

APP000186

the Members may from time to time establish classes or groups of Members. One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

## ARTICLE IX
## OFFICERS

9.01  **Qualification.** The Managers may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Texas, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers. Any number of offices may be held by the one person.

9.02.  **Compensation.** The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03.  **Resignation.** Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04.  **Removal.** Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05  **Appointment of Officers.** The President is Tim Barton. The Secretary and Treasurer is Saskya Bedoya. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions. Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company.

## ARTICLE X
## INDEMNIFICATION

10.01  **Right to Indemnification.** Subject to the limitations and conditions as provided in

Company Agreement                                                                                   **Page 16**
**Venus59, LLC**

APP000187

this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named

---

**Company Agreement**
**Venus59, LLC**

APP000188

defendant or respondent in the Proceeding.

10.05  **Non-exclusivity of Rights.**  The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06  **Insurance.**  The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07  **Member Notification.**  To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08  **Savings Clause.**  If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01  **Tax Returns.**  The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement.  Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02  **Tax Elections.**  The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and records;

---

Company Agreement
**Venus59, LLC**

Page 18

APP000189

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."** A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

APP000190

# ARTICLE XIII
# TRANSFERS

13.01 **Limited Right to Transfer**. No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the unanimous consent of the Managers; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

13.02 **Rights of an Assignee**.

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee. If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03 **Legal Opinion**. For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations. The Managers, however, may waive the requirements of this paragraph.

13.04 **Admission as Substituted Member**. An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

APP000191

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05 **Transfer to Existing Member**. In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06 **Third Party Offer**. In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest. If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07 **Reasonable Expenses**. The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

14.01 **Termination of Marital Relationship**.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in

APP000192

the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member**. Commencing upon the death of a Member, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Company and/or the other Members in accordance with the option or obligation established by this paragraph.

14.03 **Bankruptcy of Member**. If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04 **Insufficient Surplus**. If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05 **Option by Other Members**. If the Company fails or declines to exercise an option to

---

APP000193

purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company.

14.06 **Exercise of Option.** Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07 **Determination of Fair Value.** The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08 **Fees and Expenses of Appraiser.** In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09 **Right to Withdraw Option.** In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10 **Terms of Purchase.**

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

APP000194

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows:  (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing.  Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty.   In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company.   The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.**  If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the

APP000195

Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas;

(d) reducing the Defaulting Member's Membership Interest or other interest in the Company;

(e) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member;

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV;

(g) forfeiture of the Defaulting Member's Membership Interest; or

(h) exercising any other rights and remedies available at law or in equity.

15.02 **Security.** Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under

---

APP000196

the Uniform Commercial Code of the State of Texas. It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 **Compromise or Release.** The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the unanimous consent of the Managers. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04 **Expulsion.** A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination.** The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

APP000197

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02 **Business May Be Continued.** Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation.** As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow

APP000198

fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

**ARTICLE XVII**

APP000199

## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed (a) with the unanimous consent of the Managers or (b) by a Super Majority of the Members.

17.02 **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification reducing a Member's Percentage Interest or increasing its Capital Commitment (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent.

(b) An amendment or modification reducing the required Percentage Interest or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the Percentage Interest or other measure theretofore required.

(c) An amendment to establish the relative rights and preferences of the Membership Interests of any class or series may be made by a committee of Managers, within the authority of Managers or otherwise provided in the Certificate of Formation, the TBOC, or resolutions by Members forming the committee.

(d) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01 **Construction.** Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02 **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03 **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

APP000200

13901 Midway Rd
Suite 102-243
Dallas, TX 75244

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04 **Entire Agreement; Supersedes Other Agreements.** This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05 **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06 **Binding Effect.** Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07 **Governing Law.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08 **Severability.** If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all

APP000201

losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01 **Compliance with Regulation D of the Securities Act of 1933.** THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02 **Notice to Members.** By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03 **Limitation of Liability.** Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date set forth above.

APP000202

**MANAGER:**

_____

TIM BARTON,
President of JMJ Residential, LLC


**MEMBERS:**

_____

TIM BARTON,
President of JMJ Residential, LLC

_____

TIM BARTON,
President of ONE SF Residential, LLC

APP000203

## EXHIBIT "A"
## MEMBERS OF Venus59, LLC

| Member's Name and Address | Percentage Interest |
|---|---|
| JMJ Residential, LLC<br>13901 MIDWAY RD<br>SUITE 102<br>DALLAS, TX 75244 | 99% |
| ONE SF Residential, LLC<br>13901 MIDWAY RD<br>SUITE 102<br>DALLAS, TX 75244 | 1% |

APP000204





RECEIVED
MAR 0 8 2021
BY:

## TEXAS COMPTROLLER OF PUBLIC ACCOUNTS

Comptroller.Texas.Gov

| Taxpayer number |  |
| --- | --- |
| 32074476477 | |
| File number | |
| 0803635526 | |
| WebFile number | |
| XT060235 | |
| Report year | Due date |
| 2021 | 05/17/2021 |

VENUS59, LLC
13901 MIDWAY RD STE 102
DALLAS TX 75244-4388

## Texas Franchise Taxpayers: Your Annual Report Is Due

Your annual franchise tax report is due on the date shown in the box in the upper right corner of this letter. Even if you have no tax due or no activity to report, Texas tax law requires that you file a franchise tax report and information report each year.

### Choose a Reporting Option
There are three reporting options: No Tax Due Report, E-Z Computation Report and the Long Form report. You will need to choose the best report for your situation.

Taxable entities that are part of a combined group engaged in a unitary business must file a combined group report. A passive entity or a new veteran-owned business cannot be included in a combined group report.

You can file a No Tax Due Report if your business:
- is an entity or a combined group with annualized total revenue less than or equal to the no tax due threshold;
- has zero Texas receipts; or
- meets the statutory requirements for a passive entity, a real estate investment trust or a new veteran-owned business.

You must file an original No Tax Due Report electronically. You can file free through the Comptroller's Webfile system at www.comptroller.texas.gov/taxes/file-pay/.

You can file an E-Z Computation Report if your business is an entity or a combined group with annualized total revenue of $20 million or less.
If you choose this option, your business cannot:
- take any margin deductions (including cost of goods sold or compensation),
- take any franchise tax credits, or
- carry over that report year's temporary credit for business loss carryforward to a future period.

You must file a Long Form report if you:
- are not eligible to file either the No Tax Due Report or the E-Z Computation Report, or
- will take franchise tax credits.

### Request an Extension
A $50 penalty is due on a report filed after the due date, even if no tax is due. If you need more time to file, request an extension by the due date to avoid the penalty. A combined group must include the Texas Franchise Tax Affiliate List with its first extension request.

### Save Time and File Online!
With the Comptroller's secure online system, Webfile (www.comptroller.texas.gov/taxes/file-pay/), you can file a franchise tax report, pay tax due or request an extension. First-time users will need the Webfile number in the box in the upper right corner of this letter to get started. (Note: Your tax preparer may need your Webfile number to file your report electronically.)

Form 05-285 (Rev.1-18/15)

continued on back

0298391

APP000205

# Franchise Tax

## 2021 Annual No Tax Due Report

Confirmation

## You Have Filed Successfully

### Please do NOT send a paper form

Since you are electronically reporting this tax, you will not receive a paper tax return in the mail for subsequent reports due. To keep you up-to-date and informed of due dates for this tax, we will send a courtesy e-mail reminder to you at the e-mail address on file for this account.

### Print this page for your records

**Submission ID: 56544943**
**Date and Time of Filing:** 06/14/2021 05:31:01 PM

**Taxpayer ID:** 32074476477
**Taxpayer Name:** VENUS59, LLC
**Taxpayer Address:** 13901 MIDWAY RD STE 102 DALLAS,  TX 75244 - 4388

**Entered By:** Saskya Bedoya
**Email Address:** sbedoya@jmjdevelopment.com
**Telephone Number:** (214) 641-0122
**IP Address:** 50.84.47.194

| Additional Reports | |
|---|---|
| Is this the reporting entity of a combined group? | No |
| Do any of the entities in the combined group have a temporary business loss preserved? | No |
| Will your total revenue be adjusted for the Tiered Partnership Election? | No |

| No Tax Due Report | |
|---|---|
| SIC Code: | NAICS Code: |
| Accounting Year Begin Date: 01/01/2020 | Accounting Year End Date: 12/31/2020 |
| Is this a passive entity as defined in Chapter 171 of the Texas Tax Code? | No |
| Is this entity's annualized total revenue below the no tax due threshold? | Yes |
| Does the entity have zero Texas Gross Receipts? | Yes |
| Is this entity a Real Estate Investment Trust (REIT) that meets the qualifications specified in section 171.0002(c)(4)? | No |
| Is this entity a New Veteran-Owned Business as defined in Texas Tax Code Sec. 171.0005? | No |
| Total Revenue: | $0 |

| Mailing Address |
|---|
| Street Address: 13901 MIDWAY RD STE 102 |
| City: DALLAS |
| State: TX |
| Zip Code: 75244 - 4388 |
| Country: USA |

| Public Information Report |
|---|
| **Taxpayer** |
| Taxpayer Name: VENUS59, LLC |
| Taxpayer Number: 32074476477 |
| SOS File Number or Comptroller File Number: 0803635526 |
| Mailing Address: 13901 MIDWAY RD STE 102 DALLAS, TX  75244-4388 |
| Principal Office: |
| Principal Place Of Business: |
| Changes from previous year?: Yes |
| **Officers, Directors, Managers, Member or General Partner** |

APP000206

6/14/2021                                                  Franchise Tax - You Have Filed Successfully

Name: ONE SF RESIDENTIAL

| Title: Manager | Director? No | | Term Expiration Date: |
| --- | --- | --- | --- |

Mailing Address: 13901 MIDWAY RD SUITE 102
Dallas, TX  75244

**Owned Entity(s)**

| Owned Entity(s) | State of Formation | TX SOS File # | Percentage of Ownership |
| --- | --- | --- | --- |
| | None entered. | | |

**Owners**

| Owned Entity(s) | State of Formation | TX SOS File # | Percentage of Ownership |
| --- | --- | --- | --- |
| | None entered. | | |

**Registered Agent and Office**

Agent: ONE AGENT TEXAS, LLC

Office: 13901 MIDWAY RD SUITE 102
DALLAS, TX  75244-4388

**Declaration Statement**

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the submission date, and that a copy of this information has been mailed to each person named in this section who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

Print    Return to Menu    File for Another Taxpayer

texas.gov | Texas Records and Information Locator (TRAIL) | State Link Policy | Texas Homeland Security | Texas Veterans Portal
**Glenn Hegar**, Texas Comptroller • Home • Contact Us
Privacy and Security Policy | Accessibility Policy | Link Policy | Public Information Act | Compact with Texans

APP000207

**THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS**

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1342

Date  9/15/2022

Pay To The  VENUS59 LLC

$  **23,325.62

Twenty-Three Thousand Three Hundred Twenty-Five and 62/100***

Dollars

VENUS59 LLC
13901 Midway Rd. STE 102-243
Dallas, TX 75244
(972) 385-9934



HEAT SENSITIVE
RUB AREA TO VERIFY

Memo:  Return of Loan

⑈00000 1342⑈  ⑈1119 25113⑈10 24611⑈

APP000208

**FUNDING AGREEMENT**

This Funding Agreement ("**Agreement**") is entered into on this 31st day of August 2021 ("**Effective Date**"), by and between **Daniel Crow** ("**Crow**") and/or his assigns and **Venus59, LLC** ("**Company**") (collectively, "**Parties**") as consented to by One SF Residential, LLC  ("**OSFR**") (as the manager and a member of the Company) and MXBA, LLC ("**MXBA**") (collectively, "**Members**") as the members in the Company.

**RECITALS**

WHEREAS Company is under contract ("**59 Acre Contract**") to acquire approximately 59 acres of land in Venus, Johnson County, Texas ("**59 Acres**") which is due to close ("**Closing**") on August 31, 2021 ("**Closing Date**").

WHEREAS Company is also under contract ("**3 Acre Contract**" with the 3 Acre Contract and 59 Acre Contract referred to collectively as the "**Purchase Contract**") to purchase a 3.44 acre adjacent tract of land in Venus, Johnson County, Texas ("**3 Acres**" with the 59 Acres collectively consisting of 62.4 acres being the "**Property**") which will close simultaneously with or shortly after the Closing of the 59 Acre Contract. (see <u>Exhibit "A"</u>).

WHEREAS Company intends to preliminary plat the Property into residential subdivision known as Mustang Meadows consisting of approximately 304 50 ft. single family lots or approximately 379 40 ft single family lots (or mix thereof) and associated street rights-of-way, detention areas and common area amenities which Company intends sell or otherwise perform such horizontal development as necessary to develop the Project for the purpose of selling developed lots to home builders to the extent agreed to by the Members.

WHEREAS Company seeks certain equity funding for the purchase of the Property;

WHEREAS the Parties agree that Crow shall provide certain equity funding on the terms provided herein including such supplemental terms attached as <u>Exhibit "B"</u> for the purpose of Closing the Purchase Contract and other specified costs upon which Crow shall be granted certain membership interests in the Company and admitted into the Company as defined in this Agreement upon the terms stated in the *Amended and Restated Company Agreement* ("**Company Agreement**") as attached hereto and under which Crow shall have certain consent rights to approve certain major decisions of the Company.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration the sufficiency and acceptance of which is acknowledged by the Parties, the Parties hereto agree as follows:

1. **Equity Funding by Crow.**  Crow shall contribute a total of $1,098,675.36 as follows and as further described on <u>Exhibit C</u> as attached hereto:  (i)  $744,985.56 towards the closing of the 59 Acre Contract ("**59 Acre Closing Balance**") (ii) $254,220,80 towards the closing of the 3 Acre Contract ("**3 Acre Closing Balance**"), (iii) $36,860.00 for expenses incurred but which remain unpaid related to the Property ("Unpaid Expenses" with the 59 Acre Closing Balance and 3 Acre Closing Balance being referred to collectively as, "**Initial Contribution**") and (iv) $21,924.64 ("**Additional Crow Contribution**" with the Initial Contribution collectively, "**Crow**

Funding Agreement – Crow & Venus 59, LLC                                                                1

**Contributions**"). as a required additional contribution to be used towards the $62,600.00 ("**Estimated Costs**") for estimated costs to complete the Paper Lots (defined below)

2. **Equity Funding by MXBA and OSFR.** MXBA, including through is related entities, has made certain deposits and paid certain extension fees related to the closing of the Property, paid certain fees and other costs related to the Property, and has paid invoices on behalf of the Company as related to the Property totaling $81,653.65 (as further described on Exhibit C as attached hereto), copies of which shall be made available to Crow upon request, and all of which shall be treated as the initial capital contributions of MXBA in the Company Agreement. Additionally, MXBA shall be required to make an additional capital contribution of $40,675.36 ("**MXBA Additional Contribution**") to be used to pay the remaining Estimated Costs. OSFR, which is the manager of the Company, has contributed $10.00 as its total required capital contribution to the Company in exchange for its one percent (1%) membership interest.

3. **Membership Interests.** In exchange for the Crow Contributions, Crow shall be granted sixty percent (60%) of the total outstanding membership interests in the Company with all profit and losses being allocated likewise under the terms of the Company Agreement of the Company the form attached hereto as Exhibit D. No preferred return shall be paid on any contributions by the members in the Company unless otherwise agreed to by all members.

4. **Delivery of Crow Contributions**. Crow shall deliver (i) the 59 Acre Closing Balance on August 31, 2021 to the applicable Title Company which shall be held in escrow and applied at closing of such contract, (ii) the 3 Acre Closing Balance on or before the date the 3 Acre Contract closes to the applicable Title Company which shall be held in escrow and applied at closing of such contract, (iii) the Unpaid Expenses to the Company within seven (7) days following the closing on the 59 Acre Contract, (iv) the Additional Crow Contribution to be used towards the Estimated Costs as determined by the Company prior to such costs becoming due. No part of the Initial Contribution may be refunded or returned to Crow unless either (1) Company fails to close on either the 3 Acre Contract or 59 Acre Contract including as may be extended upon the agreement of the applicable seller(s) or (2) Company's material default of this Agreement prior to closing of the Purchase Contract which is not otherwise cured as provided herein.

5. **Use of Proceeds.** The Crow Contributions and the MXBA Contributions shall be used by the Company as described in Exhibit C. Upon the Closing and the application of the Crow Contributions, Crow will be (i) deemed to have delivered his required contributions under the Company Agreement to the Company, (ii) shall be granted sixty percent (60%) of the total outstanding membership interests in the Company, and (iii) shall be admitted as a member into the Company upon terms as stated and agreed to by Crow in the Company Agreement with all rights and obligations as agreed to therein.

6. **Development of the Property**. Company shall perform all work necessary in order to create a preliminary plat of property designating single family residential subdivision and creating "paper lots" that may be sold to and/or developed by a third party land development company(ies) and/or home builder(s). OSFR as manager of the Company shall close on the sale of at least 50% of the paper lots or the total acreage of the Property within two (2) years following the closing of the entire Property as further described in the Company Agreement. Upon terms agreed to by Crow, MXBA, and OSFR, the Company may perform horizontal development on the Property in order to develop the Paper Lots into single family lots in a form ready for vertical construction and

APP000210

which may be sold to third party home builders ("Horizontal Development") as further described in the Company Agreement.

7. **Development Costs and Fees.**  No separate development fees shall be paid or earned by any member of the Company including their related persons and entities for the creation of Paper Lots.  In the event Crow, MXBA, and OSFR agree to perform the Horizontal Development, a related entity of MXBA and/or OSFR may be utilized to perform such development work and shall be paid a development fee of three percent (3%) of the total costs of development.

8. **Company Agreement.**  The execution of the Company Agreement shall not be effective or binding against the parties or the members and managers therein until the Closing of the Purchase Contract, provided that if the transaction contemplated in the 3 Acre Contract fails to close for any reason other than due to the action or inaction of Crow, the parties shall enter into the Company Agreement with the sole modification thereto being the reduction of Crow's membership interest set forth on Exhibit A thereof to 55%, together with modification of the other members' membership interests set forth thereon on a pro rata basis.

9. **Management**.  As provided in the Company Agreement, OSFR is the current manager of Company and shall continue to serve as the manager and will control the day-to-day operations of Company subject to certain consent and removal rights of Crow and subject to the consent rights of all members for certain major decisions including but not limited to approving Company budgets, spending funds in excess of such budgets, execution of contracts beyond an agreed to amount, major debt financing, admission of new members/investors not otherwise agreed to herein, sale and/or development of the Property, and other major decisions to the extent provided in the Company Agreement.

10. **Distributions**. Allocation of all profits and losses in the Company shall be made in accordance with the percentages of each member in the Company in accordance with Exhibit A as attached to and incorporated into the Company Agreement and as such, Crow shall be allocated sixty percent (60%) of all such profits and losses.

11. **Termination**.  This Agreement may be terminated only upon (1) the consent of the Parties or (2) upon a material default of this Agreement including any related agreement as attached hereto which is not cured within three (3) days (or such longer period as otherwise provided herein) following written notice from the non-breaching party (except where the default is the failure to provide the equity funding upon which Company may terminate immediately without providing any opportunity to cure.)  Otherwise, this Agreement shall terminate upon the closing of the Purchase Contract and application of the Crow Contribution to the Company upon which the Company Agreement shall survive, shall become effective, and shall govern the relationship between the Parties subject to the representations of the Parties made herein and any other provisions which expressly survive termination.  The termination of this Agreement prior to Closing of the Purchase Contract shall operate as a termination of the Company Agreement.

12. **Disclosure**.  Crow has performed all necessary due diligence in order to enter into this Agreement including but not limited to reviewing the Purchase Contract and all related documents and the Company Agreement and is entering into this Agreement on its own accord independently of and without reliance on any statements or representations made by Company or any person or entity related thereto and as such neither Company or its related entities or persons makes any representations or warranties related to the transactions described in this Agreement and as such

APP000211

expressly disclaims any and all implied warranties and representations to the maximum extent permitted by applicable law.

13. **Valid and Binding Obligation**.  This Agreement along with the Amended and Restated Company Agreement (once effective), Supplemental Terms and any related agreements or documents thereto, constitute valid and binding obligations of Company and Crow enforceable in accordance with their terms.

14. **Title to Property**.  Upon closing, Company shall own full legal and equitable title to the Property as provided in the warranty deed granted to Company at Closing only subject to the exceptions listed on the Title Commitment and/or exceptions of record as recorded in the real property records of Johnson County, Texas the rights and obligations under which shall be superior to this Agreement and shall not sell, pledge, or encumber the Property without consent of Crow as further provided in the Company Agreement.

15. **Default**.  Any material breach of the terms, covenants, representations, or warranties in this Agreement  shall constitute an "Event of Default" hereunder by either Party which, unless otherwise stated herein, is not cured within three (3) days following the receipt of written notice shall be an immediate default.

16. **Authorization**.  This Agreement shall serve as authorization to the Title Company to apply the Crow Contribution held in escrow to the Purchase Price and applicable closing costs at Closing of the Purchase Contract and to refund any amounts remaining in escrow to Crow after Closing as further described in section 3 without any other authorization.

17. **Remedy**. Upon an Event of Default a non-defaulting Party may extend the cure period as necessary for a defaulting Party to cure such default or else may terminate this Agreement and be entitled to pursue its actual damages but in no event shall it be entitled to receive any consequential damages, special damages, punitive damages, or lost profits or revenues or the like even if the party has been advised of the likelihood of the occurrence of such damages (except where such default is the result of fraud, willful misconduct, or any criminal conduct) or be entitled to specific performance.   NOTWITHSTANDING ANY TERMS HEREOF TO THE CONTRARY, NEITHER THE COMPANY NOR ANY MEMBER THEREOF SHALL HAVE ANY REMEDY AGAINST CROW, IN DAMAGES OR OTHERWISE, DUE TO THE FAILURE BY CROW TO DELIVER THE 59 ACRE CLOSING BALANCE ON OR BEFORE THE CLOSE OF BUSINESS ON AUGUST 31, 2021. UPON ANY SUCH FAILURE, THE COMPANY'S SOLE REMEDY WILL BE THE TERMINATION OF THIS CONTRACT, WITH NO FURTHER OBLIGATIONS HEREUNDER BY ANY PARTY.

18. **Supplementa**l.  This Agreement is subject to the supplemental terms attached hereto as Exhibit E which are incorporated hereto by reference and any acquisition of any membership interests in Company and the admission of Crow as a member shall be governed by the terms of the Company Agreement which shall be interpreted in conjunction with this Agreement and in the event of any conflict between this Agreement and the Company Agreement then the Company Agreement shall control unless otherwise stated herein.

19. **Broker/Referral Fees.**  No broker, agent, or similar party is entitled to any referral or broker fee as related to this Agreement.

20. **Intentionally Omitted.**

21. **Time of Essence**.  Time is of the essence in performance of this Agreement by the Parties.

APP000212

22. **APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS WITHIN SUCH STATE WITH EXCLUSIVE FORUM AND JURISDICTION BEING IN THE COURTS OF DALLAS COUNTY, TEXAS.**

23. **Notices**.  All notices by Crow to Company pursuant to any provisions of this Agreement must be in writing.  Such notices shall be given at such addresses as provided by each party to one another by personal delivery, expedited delivery service with proof of delivery, registered or certified mail, return receipt requested, or by email transmission (provided that such email transmission is confirmed by any other method of notice provided herein or delivery confirmation of such email along with a read receipt is received by the sending party)  Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery; in the case of expedited delivery service or mail, as of the date of deposit with a reputable overnight courier service or an official depository of the United States Postal Service; or in the case of an email transmission, upon receipt.

24. **Miscellaneous**.  In case any of the provisions of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein; provided, however, if the disregard of such provision would frustrate the intent and purposes of this Agreement, either Party may petition any court having jurisdiction in equity to render a judgment modifying the disregarded provision of this Agreement so as to carry out such intent and purposes.  Except as otherwise provided herein, no provision of this Agreement may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver or termination is sought to be enforced.  Except as otherwise provided herein, in the event of any conflict between this Agreement and any other documents, then this Agreement shall control except for the Company Agreement in which case the Company Agreement shall control. This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**CROW**

By: _Daniel Crow_          25 Aug 20

Name: Daniel Crow

**COMPANY**

Venus59, LLC

By: _____

Name: Maximilien Barton

Its:    President

*[Consent Pages to Follow]*

APP000214

As consented to by MXBA, LLC

By:
Name: Maximilien Barton
Its:     President


As consented to by One SF Residential, LLC

By:
Name: Maximilien Barton
Its:     President


Funding Agreement – Crow & Venus 59, LLC                                         6     D C
                                                                                              25 Aug 14

APP000215

**EXHIBIT A**
**Purchase Contract and related Documents**

[See Attached]

Funding Agreement – Crow & Venus 59, LLC                                                                    8

APP000216

**EXHIBIT B**
**Supplemental Terms**

1.      As a condition of Venus 59 LLC or any of its related entities (collectively, "Company") to accept any investment and contribution from Crow and admit Crow as a member (which shall be effective upon the Closing of the Purchase Contract) for any reason including upon the as related to the Funding Agreement, Crow shall represent and warrant to Company and its members the following which may be further amended and supplemented as agreed to by Crow and Company:

a.   Except as disclosed in writing to Company, Crow shall acquire any membership interests in Company for its own account; shall not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of Company interests; and shall not acquire Company interests with a view to or for sale in connection with any distribution.

b.   Crow or an advisor or consultant relied upon by Crow in reaching a decision to invest has such knowledge and experience in financial, tax and business matters as to enable Crow or such advisor or consultant to evaluate the merits and risks of an investment in Company interests and to make an informed investment decision with respect thereto.

c.   Crow understands that Company interests have not been and will not be registered under the Securities Act of 1933 or 1934, as amended (collectively, the "Securities Act"), or any state law, and that Company is not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Crow understands that Company has no intention to register Company or Company interests or any of its related entities with the Securities and Exchange Commission or any state and is under no obligation to assist Crow in obtaining or complying with any exemption from registration. Company may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor, at its expense, furnish a legal opinion satisfactory to Company and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws. An appropriate legend evidencing such restrictions may be placed on any certificates issued representing Company interests and appropriate stop-transfer instructions may be placed with respect to Company interests.

d.   In formulating a decision to invest in Company, Crow has not relied nor acted on the basis of any representations or other information purported to be given on behalf of Company (it being understood that no person has been authorized by Company furnish any such representations or other information) and has conducted sufficient due diligence and background investigation including into the Property and to the related persons and entities of Company including in the property and court records of Johnson County and secretary of the state of Texas.

e.   Crow recognizes that there may not be any ascertainable secondary market for Company interests. Accordingly, it may not be possible for Crow readily to liquidate Crow's investment in Company.

f.   Crow is qualified to become a member in Company and (i) has the legal capacity to execute, deliver and perform as agreed including any definitive agreement, and (ii) has all permits, licenses or approvals as may be required to make any investment to Company in US Dollars.

g.   The acquisition of Company interests contemplated hereunder and the compliance by Crow with all of the provisions herein and the Company Agreement applicable to Crow and the consummation by Crow of the transactions as contemplated will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Crow is a party or by which Crow is bound or to which any of the property or assets of Crow is subject, nor (ii) will such action result in any violation of any statute applicable to Crow or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Crow or the property of Crow.

h.   Crow has carefully reviewed and understands the various risks of an investment in Company.

Funding Agreement – Crow & Venus 59, LLC                                              9

i.    Crow is satisfied that it has received adequate disclosure from Company to enable it to enter into further negotiations towards the Company Agreement and shall be satisfied that it has received all requested due diligence materials and adequate disclosure prior to executing any definitive agreement.

j.    Crow has sufficient expertise and knowledge necessary to understand and evaluate the rights, obligations, distributions and other terms of a potential definitive agreement and the risks associated therewith.

k.    Crow agrees promptly to notify Company of any change in information affecting these representations and covenants.

l.    Crow acknowledges and agrees that any amounts paid to it will be paid to the same account from which its funds were originally remitted, unless Company agrees otherwise.

m.    Crow is purchasing Company interests for Crow's own account.

n.    Crow is an accredited investor under Rule 501 of the Securities Act and/or is outside the United States and is not a U.S. Person (i.e., is not a resident or citizen of the United States).

o.    If the managing member/manager permits a transfer of Company interests to occur, Crow will give each person to whom Crow transfers Company interests notice of any restrictions on transfer of Company interests including a copy of the Company Agreement/regulations of Company in which a transferee must agree to be bound.

p.    If Crow is not a U.S. person and is outside the United States, Crow is purchasing in accordance with Regulation S under the Securities Act and has not engaged in, and will not engage in any short selling of any interests granted by Company (including, without limitation, Company interests) or any hedging transaction with respect to any such equity security, including without limitation, put, call or other option transactions, option writing and equity swaps.

2.    Crow understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that any investment made to Company is accepted in reliance thereon.  Crow shall agree to indemnify and hold harmless Company, the managing member/manager, and their affiliates, and the partners, members, managing members/managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (the "Indemnified Persons") from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in any investment representation statement) not having been true, correct and complete when made, any misrepresentation made by Crow or any failure by Crow to fulfill any of the covenants or agreements set forth herein, in any representations or in any other document provided by Crow to Company.

3.    In the event of any breach of Crow's representations, Crow shall indemnify and hold any administrative agent, lenders, developer, and their affiliates and each of their officers, directors, employees, consultants, agents, and owners harmless, and to reimburse any administrative agent, lender, and its affiliates and each Party shall be responsible for their own costs, expenses, and fees related to the contemplated transaction including accounting and legal fees, consulting fees, costs of investigation, insurance, due diligence reports, brokers or finders fees, travel, and closing costs.  In the event of any dispute between the Parties, each Party waives any and all rights to seek or recover any consequential, punitive, or special damages.

4.    Crow's investment is subject to certain "know your customer" disclosures and requirements as promulgated by the government of the United States related to certain investments and transactions by foreign nationals within the United States.  As such, you agree to provide any and all necessary documents and information including personal and financial information regarding Crow and any entity which Crow uses to facilitate its investment.  Such information is subject to verification by Company and any required government authority.

5.    The actual terms and conditions upon which each Company is willing to accept Crow as a member are further defined in the form of the Company Agreement which shall govern the terms by which Crow is granted any membership interests in Company and admitted as a member and any other documentation reasonably requested by Company in order to close the applicable transaction which may include the following:

- Completed and signed Investment Representation Statement;

Funding Agreement – Crow & Venus 59, LLC                                                                           10

APP000218

- Completed IRS Forms W-8BEN (non US citizens) or W-9: as designated by the U.S. Department of the Treasury Internal Revenue Service;
- Payment of any designated administrative or escrow fee;
- Delivery of any signed escrow agreement; and
- Delivery of consent to be bound to the Company Agreement of Company.

6.  Crow agrees to abide by all applicable laws, rules, regulations, orders and ordinances to which Company is or may be subject including but not limited to those related to the negotiation and consummation of an investment in Company.

7.  Crow shall hold harmless Company's managing member/manager including its related persons, officers, directors, members, and employees from any liability, damages or loss that the Crow sustains from any such person's action or failure to act except to the extent such losses, liability or damages are directly caused by the fraud or willful misconduct of any such person.

APP000219

**EXHIBIT C**

# Venus59, LLC -
# Use of Proceeds from Capital Contributions of Members

## TOTAL CAPITAL CONTRIBUTIONS OF CROW

1.  **Closing of 59 Acre Contract**
    (as defined in the attached 59 Acre Purchaser's Statement)

    **"Balance Due by Purchaser"**                          **$744,985.56**

2.  **Closing of 3 Acre Contract**
    (as defined in the attached 3 Acre Purchaser's Statement)

    **"Estimated Total" due by Purchaser**                  **$254,229.80**

3.  **Invoices to be Paid on behalf of Venus59, LLC**

    Jones|Carter Invoice 00320691                          $19,440.00

    Alpha Testing, Inc., Invoice 602974                    $ 6,300.00

    CCN Settlement with Mountain Peak
    The AL Law Group (David Tuckfield) Invoice 40763       $ 1,120.00

    Barrett & Associates, PLLC Invoice 1539                <u>$10,000.00</u>

    **Total Invoices to be Paid**:                          **$36,860.00**

**Total Initial Capital Contributions of Crow          $1,036,075.36**

4.  **Estimated Cost to complete Preliminary Plat:**

    Preliminary Plat                                       $29,000.00
    Meeting and Coordination                               $ 2,000.00
    Easement Preparation                                   $ 1,000.00
    Downstream Assessment and Flood Study                  $24,225.00
    Downstream Assessment Agency Comments                  <u>$ 6,375.00</u>

    **Total Billing Remaining for Preliminary Plat:**      **$62,600.00**
    **LESS: MXBA Additional Contribution:**                **($40,675.36)**

**Estimated Costs Apportioned to the**
**Crow Additional Contribution          $21,924.64**


**TOTAL CAPITAL CONTRIBUTIONS OF CROW:          $1,058,000.00**

Funding Agreement – Crow & Venus 59, LLC                                    12

APP000220

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA

**4.  Estimated Cost to complete Preliminary Plat:**

| | |
|---|---|
| Preliminary Plat | $29,000.00 |
| Meeting and Coordination | $ 2,000.00 |
| Easement Preparation | $ 1,000.00 |
| Downstream Assessment and Flood Study | $24,225.00 |
| Downstream Assessment Agency Comments | $ 6,375.00 |
| **Total Billing Remaining for Preliminary Plat:** | **$62,600.00** |
| **LESS: Crow's Additional Contribution:** | **($21,924.64)** |

**Estimated Costs Apportioned to the
MXBA Additional Contribution**                    **$40,675.36**

**5.  Invoices and Monies Paid on behalf of Venus59, LLC**

| | |
|---|---|
| City of Venus Professional Services Agreement Fee Invoice 2021-01-112-1 | $15,000.00 |
| Retainer for Development Agreement with Miklos\|Cinclair Attorneys & Counselors | $ 5,000.00 |
| Retainer for Decertification Filing with Mountain Peak The AL Law Group (Andy Barrett) | $ 5,000.00 |
| Mountain Peak Settlement for Decertification 51-158 | $10,000.00 |
| Jones\|Carter – Services for Johnston Tract Legal Description –   Invoice 00302850-2 | $ 1,116.33 |
| Invoice 00303581-2 | $   372.11 |
| Non-Applicable Non-Refundable Deposit for Contract Extension Johnston Seventh Amendment, May 31, 2021 | $10,000.00 |
| Non-Applicable Non-Refundable Deposit for Contract Extension Johnston Eighth Amendment, July 31, 2021 | $10,000.00 |
| 59 Acres: Gross Amount Due By Purchaser Less Balance Due By Purchaser (per the Purchasers Statement including Applicable Earnest Money of $20,000.00) ($765,150.77 - $744,985.56) | $20,165.21 |
| "Earnest and Option" (per 3 Acre "Estimated Fees") | $ 5,000.00 |
| | **$81,653.65** |

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA          $122,329.01

APP000221

**APP000222**

**EXHIBIT D**
**Amended and Restated Company Agreement of Company**


[See Attached]

**AMENDED AND RESTATED
COMPANY AGREEMENT OF
VENUS59, LLC
A TEXAS LIMITED LIABILITY COMPANY**


This Amended and Restated Company Agreement of VENUS 59, LLC a Texas limited liability company is executed as of AUGUST 31, 2021 by the persons who sign and are identified as "Members" and "Managers" in this Agreement but shall not be effective unless and until the closing of the acquisition of the Property under the terms of the Purchase Contract as described herein (the "Effective Date"), or as otherwise contemplated in the Funding Agreement entered into among the Members as of the date hereof.

**ARTICLE I
DEFINITIONS**

1.01    **Definitions.**    As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent all Members consent otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which

APP000224

national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means **Venus 59, LLC,** a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) <u>plus</u> the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Good Cause" or similar language means (i) conviction of a crime of moral turpitude, (ii) action or inaction constituting willful misconduct or gross negligence, or (iii) a material breach of this Agreement which remains uncured thirty (30) days after written notice from any Member and/or Manager as applicable.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as

---

APP000225

provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" or "Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

"Unanimous Consent" including "consent of all" or similar language means consent of 100% of such persons entitled to vote or consent on such matters and in reference to the Members means 100% of all Membership Interests in the Company entitled to vote. Where consent of the Members is required such shall mean Unanimous Consent unless a Majority, Super Majority, or other specific consent is specifically stated.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01  **Formation.**  The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02  **Name.**  The name of the Company is "Venus 59, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03  **Registered Office and Registered Agent**.  The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law.  The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04  **Principal Office and Other Offices.**  The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas.  The Company may have such other offices as the Managers may designate from time to time.

2.05  **Purposes.**  The purposes of the Company shall be:

(a)  The closing of a purchase contract ("59 Acre Contract") to acquire approximately 59 acres of land in Venus, Johnson County, Texas ("Large Tract") which is due to close ("Closing") on August 31, 2021 ("Closing Date");

(b)  The closing of a purchase contract ("3 Acre Contract" with the 3 Acre Contract and 59 Acre Contract referred to collectively as the "Purchase Contract") to purchase a 3.44 acre adjacent tract of land in Venus, Johnson County, Texas ("Small Tract" with the Large Tract and Small Tract collectively consisting of 62.4 acres being the "Property") which will close simultaneously with the Closing of the 59 Acre Contract;

(c)  Create a preliminary plat of the Property to create a residential subdivision known as Mustang Meadows consisting of approximately 304 50 ft. single family lots or approximately 379 40 ft single family lots (or mix thereof) and associated street rights-of-way, detention areas and common area amenities ("Paper Lots") which Company, unless otherwise agreed to by all Members, shall sell to a third party on terms as consented to by all Members (and which shall not be unreasonably withheld so long as such are sold at fair market value under an arms length transaction)  ("Project");

(d)  Otherwise, Company may perform horizontal development on the Property in order to develop the Paper Lots into single family lots in a form ready for vertical construction and which may be sold to third party home builders ("Horizontal Development") only upon the Unanimous Consent of the Members and only upon such terms as further agreed to

APP000227

by all Members and which will include the payment of a development fee of three percent (3%) of the total development costs to be paid to a related entity of MXBA as the developer; and

(e)  No other purposes whatsoever.

2.06  **Powers.**  The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07  **Foreign Qualification.**  Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08  **Term.**  The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09  **Mergers and Exchanges.**  The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10  **No State-Law Partnership.**  The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

2.11  **Budget**.  Upon closing of the Property, the Members shall unanimously agree to a development budget for any Horizontal Development of the Property and upon approval, the Manager shall have the power to spend money or incur liabilities in the ordinary course of business in accordance with the approved budget.  Otherwise, the Manager is authorized to expend up to $100,000.00 for the purpose of creating Paper Lots including for reasonably necessary engineering costs ("Paper Lot Expenses").

**ARTICLE III**
**MEMBERSHIP**

3.01  **Initial Members, Capital Commitments, and Percentage Interests.**  The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company.  Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest.  Exhibit A may

APP000228

be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.  Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws.  The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02  **Additional Members.**  Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by Unanimous Consent of the Members.  The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto.  The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties.  The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed by all Members.

3.03  **Member Rights Specified in Agreement.**  Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04  **Representations and Warranties.**  Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity:  (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05  **No Authority.**  Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06  **Liability to Third Parties.**  No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07  **Withdrawal.**  A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

**ARTICLE IV**
**CAPITAL CONTRIBUTIONS**

APP000229

4.01  **Initial Contributions.**  Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

4.02  **Additional Contributions.** Except for the additional Capital Contribution to be made by the Members Daniel Crow and MXBA up to the amounts described as the "Crow Additional Contribution" and "MXBA Additional Contribution" set forth on the *Use of Proceeds from Capital Contributions of Members* included as part of Exhibit A as attached to this Agreement, which amounts shall be a required additional Capital Contribution of such Members, no Member shall be required to make any Capital Contributions other than those specifically described by this Agreement unless agreed to in writing by the contributing Member or required by the TBOC.

4.03  **Return of Contributions.**  No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions except as provided for in section 5.02.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.

4.04  **Loans by Members.**  If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent without further consent of the Members and may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05  **Capital Accounts.**  A Capital Account shall be established and maintained for each Member.  The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of

APP000230

Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

# ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01 **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken. If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

(e) Notwithstanding any terms of this Section 5.01 to the contrary, at the request of Daniel Crow and without the need of any further consent from any other Member, this Section shall be modified so as to allocate any losses to Daniel Crow, up to the amount of his Capital

APP000231

Contribution, before the allocation of any losses to any other Member hereunder. All of the Members hereto acknowledge that this subsequent modification is in consideration for Daniel Crow's joinder as a Member of the Company immediately prior to the close of escrow on the acquisition of the Large Tract, and that the limitations of time prior thereto made consultation with a tax lawyer impracticable. No other Member shall impose any conditions on such further modification of this Section.

5.02 **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve ("Distributable Cash"). If such an excess exists, the Managers shall cause the Company to distribute to the Members, in the following order:

(a) Reimbursement of all capital contributions of the Member, Daniel Crow

(b) Reimbursement of all capital contributions of the other Members.

(c) in accordance with their Percentage Interests, an amount in cash equal to that excess.

Notwithstanding the above, no distributions shall be paid until the Project is generating income or otherwise has closed on the sale of a sufficient number of lots sufficient to create Distributable Cash. The distributions made under this section for the purpose of paying back Capital Contributions shall not result in the reduction of any the Membership Interests of the Members. The Manager may require any and all loans to Members including any rate of return on such loans be paid prior to distributing any Distributable Cash.

## ARTICLE VI
## MANAGEMENT

6.01 **Designation of Manager and Management by Managers.** The Manager identified on Exhibit "B" are hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a)    entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in connection with the purposes of the Company at the Manager's reasonable and sole discretion (except entering into any contract with or a sale to any related entity of any Member that is not for fair value or upon terms standard for the industry that would be conducted as an arms-length transaction) and making all decisions and waivers thereunder.

(c)      opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money in accordance with the Budget or as authorized in this Agreement;

(d)      maintaining the assets of the Company in good order;

(e)      collecting sums due the Company;

(f)      to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(g)      utilizing the assets of the Company for the approved Purposes of the Company;

(i)      selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(j)      obtaining and maintaining insurance for the Company;

(l)      disposition of Company property in the ordinary course of business except for any capital assets including the Property which shall require Unanimous Consent of the Members;

(n)      designating Members or other individuals with authority to sign or give instructions with respect to those accounts and arrangements as authorized in this Agreement;

(p)      incurring any debt or liability (or agreeing to incur any debt or liability) on behalf of the Company which is consented to by all Members as part of an approved Budget or as otherwise authorized in this Agreement;

(q)      determining the amount and timing of distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(r)      appoint officers of the Company and provide such officers with authorities, powers,;

(t)      delegate any responsibilities to any Member, officer, or person retained by the Manager to perform certain tasks (except any payment or remuneration paid to such person shall require Unanimous Consent of the Members).

(u)      where the Company is a member, shareholder, partner, or joint venture in any partnership or entity, execute any necessary resolution, consent, or agreement on behalf of the Company including voting the interests of the Company in the best interests of the Company as reasonably determined by the Manager.

(v)      perform all necessary action on behalf of the Company in order to create Paper Lots as described in section 2.05(c) and expend up to $100,000.00 for the Paper Lot Expenses (as defined in section 2.11) without the necessity to obtain further consent of the Members.

6.02 **Restrictions.** Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Manager(s) may not cause the Company to do any of the following which shall require the Unanimous

APP000233

Consent of all Members and shall comply with any other applicable requirements as may be set forth in this Agreement:

    (a)  enter into a Fundamental Business Transaction

    (b)  do any act in violation of this Agreement;

    (c)  sell or issue additional Membership Interests or admit new Members of the Company;

    (d)  do any act which requires the prior consent or approval of the Members;

    (e)  possess Company property or assign rights in Company property, other than for a Company purpose;

    (f)  amend or terminate this Agreement, except as expressly permitted by this Agreement.

    (g)  sell, transfer, assign, convey, encumber the Property except as necessary to plat the Property to create Paper Lots.

    (h)  enter into any contract or expend funds which would exceed the Budget or as otherwise authorized in this Agreement.

    (i)  enter into any development agreement, perform Horizontal Development, or perform any other material work on the Property not otherwise authorized in this Agreement for the purpose of creating Paper Lots.

    (j)  borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

    (k)  agreeing to or paying any type of compensation or remuneration to any Manager, Officer, or Member or other employee of the Company which is not otherwise authorized in this Agreement

    (l)  entering into and executing agreements in the ordinary course of business and related to the capital assets of the Company including those related to construction, development, sales (including assets), management, marketing and promotion of the Company and the Project.

    6.03  **Conflicts of Interest**.  Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

    6.04  **Contracts or Transactions with Interested Directors or Officers**.  This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

    An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers, or of a committee of the Managers, Members or officers that authorizes the contract or

APP000234

transaction, or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if: the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by the Members of the Company, and the disinterested Members in good faith approve the contract or transaction by vote of the disinterested Members.

6.05 **Number and Term of Office.** The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers. If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06 **Vacancies; Removal; Resignation.** Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled upon the Unanimous Consent of the Members at an annual or special meeting of Members called for that purpose. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by Unanimous Consent of the Members and otherwise may be removed upon any material breach of this Agreement which is not cured following thirty (30) days written notice from any Member, Manager, or Officer or for Good Cause (as defined in section 15.04) by a Majority of the Members. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07 **Compensation**. For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by the Unanimous Consent of the Members.

6.08 **Reimbursement**. The Managers are not required to advance any funds to pay costs and expenses of the Company. However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities, provided that any such reimbursed amounts are promptly reported to all the Members.

6.09 **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the

APP000235

Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers.  At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members.  Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager.  Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement.  Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010  **Approval or Ratification of Acts or Contracts by Members.**  The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract.  Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11  **Action Without Meeting**.  Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be.  Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts.  An email, telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph.  Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be.  The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

APP000236

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other.  Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant.  Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 **Broad Discretion and Authority of Managers**.  Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member.  Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

6.14 **Sale of Paper Lots**.  Unless otherwise consented to by all Members including where the Members have agreed to perform Horizontal Construction, the Manager shall cause the sale and closing of the Paper Lots at fair market value on an arms-length transaction basis subject to commercial reasonable terms to a third party that is not related to any Member ("**Sale Parameters**") and shall ensure that at least fifty (50%) of the Paper Lots or total acreage of the Property is sold on or before the expiration of two (2) years following the closing of all Property ("**Sales Objective**").  Regardless of any conflict in this Agreement, in the event that Manager fails to achieve the Sales Objective, the Manager may be removed and replaced by a Majority of the Members following thirty (30) days' written notice during which period the Manager fails to cure and meet the Sales Objective.  So long as Manager enters into a purchase contract on behalf of the Company and closes on the sale of Paper Lots in accordance with the Sale Parameters, then the Members shall not unreasonably withhold or delay any required consent to the sale and otherwise, such consent shall be deemed given.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information**.  The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information.  The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business.  Each Member

shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.02.  **Specific Performance**.  The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both.  Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

**ARTICLE VIII**
**MEETING OF MEMBERS**

8.01  **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of 100% of the Membership Interests are represented at the meeting in person or by proxy.  With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting.  If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

APP000238

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02  **Intentionally Omitted.**

8.03  **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04  **Conduct of Meetings.** All meetings of the Members shall be presided over by the

chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers.  The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05  **Action by Unanimous Written Consent Without Meeting**.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of all Members or committee members, as the case may be, setting forth the action so taken which may be evidenced by the delivery of an email, fax, or similar transmission or electronic consent delivered by a Member, or any copy, facsimile or similar reproduction of a writing signed by a Member or other written consent delivered to and received by the Manager.   Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts.  The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers including by electronic transmission.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06  **Action by Telephone Conference or Other Remote Communications Technology**.  Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other.  Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant.  Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07  **Classes of Members; Voting.**  At an annual or special meeting called for that purpose, the Members may from time to time establish classes or groups of Members.  One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

**ARTICLE IX**
**OFFICERS**

APP000240

9.01  **Qualification**.  The Managers may, from time to time, designate one or more persons to be officers of the Company upon the Unanimous Consent of the Members.  No officer need be a resident of the State of Texas, a Member or a Manager.  Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them.  The Managers may assign titles to particular officers.  Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph.  Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided.  Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers.  Any number of offices may be held by the one person.

9.02.  **Compensation**.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.  However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03.  **Resignation**.  Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04.  **Removal**.  Any officer may be removed for any material breach of this Agreement which is not cured following thirty (30) days written notice from any Member, Manager, or Officer or for Good Cause (as defined in section 15.04) by a Majority of the Members provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05  **Appointment of Officers**. The initial President, Treasurer, Secretary and any other Officers, if any, are designated on Exhibit B who shall serve the Company without compensation. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis and may delegate any such rights, powers, or authorities to any other officer or an authorized representative of the Company as appointed by the President. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions.  Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company and each shall be a signatory on such accounts without the need for any further consent.

## ARTICLE X
## INDEMNIFICATION

10.01  **Right to Indemnification.**  Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director,

officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder.  The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal.  It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02  **Advance Payment.**  The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03  **Indemnification of Officers, Employees and Agents.**  The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04  **Appearance as a Witness.**  Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05  **Non-exclusivity of Rights.**  The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or

hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06  **Insurance.**  The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07  **Member Notification.**  To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08  **Savings Clause.**  If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

### ARTICLE XI
### TAXES

11.01  **Tax Returns.**  The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement.  Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02  **Tax Elections.**  The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

APP000243

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."** A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the Unanimous Consent of the Members, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

11.04 **Employment Identification Number**. A separate individual as authorized by the Company may have originally obtained an Employment Identification Number ("EIN") from the IRS on behalf of the Company which designated such person as a member or sole member of the Company on its letter issuing the EIN as a result of the limitations of the IRS's online EIN request process but such designation by the IRS is not determinative of such person's capacity or ownership interests in the Company and as such as of the Effective Date, such person has no rights or interests in the Company except to the extent specifically stated in this Agreement.


ARTICLE XII
BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company. The Members shall have full access to the Company's books of account, and any other financial or other records of the Company, upon reasonable advance notice.

APP000244

12.02  **Accounts.**  The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine.  The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01  **Limited Right to Transfer**.  No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the Unanimous Consent of the Members; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement.  Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

13.02  **Rights of an Assignee**.

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company.  The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee.  If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default.  In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03  **Legal Opinion**.  For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations.  The Managers, however, may waive the requirements of this paragraph.

APP000245

13.04  **Admission as Substituted Member**.  An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05  **Transfer to Existing Member**.  In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06  **Third Party Offer**.  In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members.  Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members.  Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer.  If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest.  If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07  **Reasonable Expenses**.  The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due.  If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

**ARTICLE XIV**

APP000246

## BUYOUT OF MEMBERSHIP INTEREST

14.01  **Termination of Marital Relationship**.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed.  Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse.  Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement.  If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust.  Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust.  Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02  **Intentionally Omitted.**

14.03  **Bankruptcy of Member.**  If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers.  In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04  **Insufficient Surplus**.  If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01 or 14.02 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05  **Option by Other Members**.  If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms

available to the Company.

14.06  **Exercise of Option**.  Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07  **Determination of Fair Value**.  The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement.  In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose.  The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08  **Fees and Expenses of Appraiser**.  In the case of a purchase and sale of Membership Interest under paragraph 14.01 of this Agreement (in the event of divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company.  In the case of a purchase and sale of Membership Interest under paragraph 14.02 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company.  Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09  **Right to Withdraw Option**.  In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.08 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee.  In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10  **Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows:  (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly

APP000248

installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.** If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

APP000249

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) proportionately reducing the Defaulting Member's Membership Interest or other interest in the Company;

(d) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member; OR

(e) exercising any other rights and remedies available at law or in equity.

15.02 **Security.** Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas. It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 **Compromise or Release.** The obligation of a Defaulting Member or its legal

representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the u Unanimous Consent of the non defaulting Members.  Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04  **Suspension**.  A Member's right to vote and otherwise exercise the rights of a Member in the Company  may be suspended upon the Unanimous Consent of all other Members (not including the Member to be suspended) for such period as determined by such other Members which may be indefinite if that Member is found to have (a) willfully and knowingly violated any material provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) knowingly engaged in wrongful conduct that such person should have known would adversely and materially affects the business or operation of the Company and which actually adversely and materially affected the business or operation of the Company (collectively, "Good Cause").  Such a Member shall be considered in breach of this Agreement, and the Company or other Members may also exercise any available remedies as provided in this Agreement or at law or in equity.  The Company may offset any damages to the Company or its Members occasioned by the misconduct of the breaching Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01  **Event Requiring Termination**.  The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02  **Business May Be Continued.**  Except as provided in paragraph 16.01(b) of this

APP000251

Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.06 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation**. As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05  **Deficit Capital Accounts.**  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06  **Certificate of Termination.**  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01  **Amendment or Modification.**  This Agreement may be amended or modified from time to time only with a written instrument executed with the Unanimous Consent of the Members.

## ARTICLE XVIII
## GENERAL PROVISIONS

APP000253

18.01  **Construction**.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02  **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03  **Notices.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person.  All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> 13901 Midway, Suite 102-243
> Farmers Branch, Texas 75244

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04  **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05  **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company.  Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06  **Binding Effect.**  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.  However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07  **Governing Law.**  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW

APP000254

OF ANOTHER JURISDICTION.

18.08  **Severability**.  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09  **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10  **Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11  **Indemnification.**  To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12  **Counterparts.**  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

**ARTICLE XIX**
**NOTICES AND DISCLOSURES**

19.01  **Compliance with Regulation D of the Securities Act of 1933**.  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.  THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS.  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02  **Notice to Members.**  By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation.  Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03  **Limitation of Liability**.  Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil

Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services.  By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

*[Signature Page to Follow]*

**IN WITNESS HEREOF,** the Managers and Members have adopted and executed this Company Agreement as of the Effective Date set forth above.

**MANAGER:**

ONE SF Residential, LLC
a Delaware limited liability company

Maximilien Barton
President

**MEMBERS:**

ONE SF Residential, LLC
a Delaware limited liability company

Maximilien Barton
President

MXBA, LLC
a Delaware limited liability company

Maximilien Barton
President

Daniel Crow, Individually

25 Aug 2a

APP000257

## EXHIBIT "A"
## MEMBERS

| Member Name & Address | Initial Capital Contributions | Membership Interest % | Profit/Loss |
|---|---|---|---|
| MXBA, LLC | $122,329.01* | 39.00% | 39.00% |
| ONE SF Residential, LLC | $10.00 | 1.00% | 1.00% |
| Daniel Crow | $1,058,000.00* | 60.0% | 60.00% |

*As itemized and detailed on the following *Use of Proceeds from Capital Contributions of Members*.

# EXHIBIT A (Continued)
## Use of Proceeds from Capital Contributions of Members

## TOTAL CAPITAL CONTRIBUTIONS OF CROW

1. **Closing of 59 Acre Contract**
   (as defined in the 59 Acre Purchaser's Statement)

   **"Balance Due by Purchaser"**                                    **$744,985.56**

2. **Closing of 3 Acre Contract**
   (as defined in the 3 Acre Purchaser's Statement)

   **"Estimated Total" due by Purchaser**                           **$254,229.80**

3. **Invoices to be Paid on behalf of Venus59, LLC**

   Jones|Carter Invoice 00320691                                     $19,440.00

   Alpha Testing, Inc., Invoice 602974                               $ 6,300.00

   CCN Settlement with Mountain Peak
   The AL Law Group (David Tuckfield) Invoice 40763                  $ 1,120.00

   Barrett & Associates, PLLC Invoice 1539                          <u>$10,000.00</u>

   **Total Invoices to be Paid**:                                   **$36,860.00**

## Total Initial Capital Contributions of Crow

4. **Estimated Cost to complete Preliminary Plat:**

   Preliminary Plat                                      $29,000.00
   Meeting and Coordination                              $ 2,000.00
   Easement Preparation                                  $ 1,000.00
   Downstream Assessment and Flood Study                 $24,225.00
   Downstream Assessment Agency Comments                 <u>$ 6,375.00</u>

   **Total Billing Remaining for Preliminary Plat:**     **$62,600.00**
   **LESS: MXBA Additional Contribution:**               **($40,675.36)**

## Estimated Costs Apportioned to the
## Crow Additional Contribution                          $21,924.64

## TOTAL CAPITAL CONTRIBUTIONS OF CROW:                  $1,058,000.00

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA

4. **Estimated Cost to complete Preliminary Plat:**

| | |
|---|---|
| Preliminary Plat | $29,000.00 |
| Meeting and Coordination | $ 2,000.00 |
| Easement Preparation | $ 1,000.00 |
| Downstream Assessment and Flood Study | $24,225.00 |
| Downstream Assessment Agency Comments | $ 6,375.00 |
| **Total Billing Remaining for Preliminary Plat:** | **$62,600.00** |
| **LESS: Crow's Additional Contribution:** | **($21,924.64)** |

## Estimated Costs Apportioned to the
##   MXBA Additional Contribution        $40,675.36

5. **Invoices and Monies Paid on behalf of Venus59, LLC**

| | |
|---|---|
| City of Venus Professional Services Agreement Fee<br>Invoice 2021-01-112-1 | $15,000.00 |
| Retainer for Development Agreement with<br>Miklos\|Cinclair Attorneys & Counselors | $ 5,000.00 |
| Retainer for Decertification Filing with Mountain Peak<br>The AL Law Group (Andy Barrett) | $ 5,000.00 |
| Mountain Peak Settlement for Decertification 51-158 | $10,000.00 |
| Jones\|Carter – Services for Johnston Tract Legal<br>Description – Invoice 00302850-2 | $ 1,116.33 |
|                 Invoice 00303581-2 | $    372.11 |
| Non-Applicable Non-Refundable Deposit for Contract Extension<br>Johnston Seventh Amendment, May 31, 2021 | $10,000.00 |
| Non-Applicable Non-Refundable Deposit for Contract Extension<br>Johnston Eighth Amendment, July 31, 2021 | $10,000.00 |
| 59 Acres: Gross Amount Due By Purchaser Less Balance Due<br>  By Purchaser (per the Purchasers Statement including<br>  Applicable Earnest Money of $20,000.00)<br>  ($765,150.77 - $744,985.56) | $20,165.21 |
| "Earnest and Option" (per 3 Acre "Estimated Fees") | $ 5,000.00 |
| | **$81,653.65** |

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA      $122,329.01

**EXHIBIT "B"**
**MANAGER AND OFFICERS**


**Manager:** ONE SF Residential, LLC

**President:** Maximilien "Max" Barton

**Treasurer**: Saskya Bedoya

**Secretary**: Saskya Bedoya

# EXHIBIT A-13

APP000262

## TEXAS SECRETARY of STATE
## JOHN B. SCOTT

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 801308593 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | August 20, 2010 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32042478134 | **FEIN:** | |
| **Duration:** | Perpetual | | |

**Name:** TRTX Properties, LLC

**Address:** 13901 MIDWAY RD STE 102-243
Farmers Branch, TX 75244 USA

| | | | | | ASSOCIATED | |
|---|---|---|---|---|---|---|
| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ENTITIES | INITIAL ADDRESS |

| Last Update | Name | Title | Address |
|---|---|---|---|
| August 4, 2020 | The MXBA Trust | Manager | 2999 Turtle Creek Blvd
Dallas, TX 75219 USA |

[Order]   [Return to Search]

---

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

APP000263

## TEXAS SECRETARY of STATE
## JOHN B. SCOTT

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 801308593 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | August 20, 2010 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32042478134 | **FEIN:** | |
| **Duration:** | Perpetual | | |

**Name:**      TRTX Properties, LLC
**Address:**   13901 MIDWAY RD STE 102-243
Farmers Branch, TX 75244 USA

REGISTERED AGENT    FILING HISTORY    NAMES    MANAGEMENT    ASSUMED NAMES    ASSOCIATED ENTITIES    INITIAL ADDRESS

| View Image | Document Number | Filing Type | Filing Date | Effective Date | Eff. Cond | Page Count |
|---|---|---|---|---|---|---|
| | 322333270002 | Certificate of Formation | August 20, 2010 | August 20, 2010 | No | 1 |
| | 457541320001 | Public Information Report (PIR) | December 31, 2012 | December 16, 2012 | No | 1 |
| | 480684010002 | Change of Registered Agent/Office | May 10, 2013 | May 10, 2013 | No | 2 |
| | 501623590001 | Public Information Report (PIR) | December 31, 2013 | September 9, 2013 | No | 1 |
| | 553630480001 | Public Information Report (PIR) | December 31, 2013 | July 17, 2014 | No | 1 |
| | 554023240001 | Public Information Report (PIR) | December 31, 2013 | July 17, 2014 | No | 1 |
| | 558842190001 | Public Information Report (PIR) | December 31, 2014 | August 5, 2014 | No | 1 |
| | 625203610001 | Public Information Report (PIR) | December 31, 2015 | August 19, 2015 | No | 1 |
| | 741246170001 | Public Information Report (PIR) | December 31, 2016 | May 31, 2017 | No | 1 |
| | 773033030001 | Public Information Report (PIR) | December 31, 2017 | November 10, 2017 | No | 1 |
| | 878197030001 | Public Information Report (PIR) | December 31, 2018 | March 29, 2019 | No | 1 |
| | 852102050001 | Public Information Report (PIR) | December 31, 2018 | November 29, 2018 | No | 1 |
| | 948780320001 | Public Information Report (PIR) | December 31, 2019 | February 20, 2020 | No | 1 |
| | 986838770003 | Certificate of Amendment | July 31, 2020 | July 31, 2020 | No | 3 |
| | 1133537920001 | Public Information Report (PIR) | December 31, 2021 | March 26, 2022 | No | 1 |
| | 1144928130003 | Change of Registered Agent/Office | May 2, 2022 | May 2, 2022 | No | 2 |
| | 1178038500001 | Public Information Report (PIR) | December 31, 2022 | September 14, 2022 | No | 1 |

[Order]  [Return to Search]

---

Instructions:
🔴 To place an order for additional information about a filing press the 'Order' button.

APP000264

# TEXAS SECRETARY of STATE
# JOHN B. SCOTT

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 801308593 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | August 20, 2010 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32042478134 | **FEIN:** | |
| **Duration:** | Perpetual | | |

**Name:** TRTX Properties, LLC

**Address:** 13901 MIDWAY RD STE 102-243
Farmers Branch, TX 75244 USA

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|
| **Name** | | **Address** | | | | **Inactive Date** |
| One Agent Texas, LLC | | 13901 Midway Rd, suite - 102, LB243 Dallas, TX 75244 USA | | | | |

Order    Return to Search

Instructions:
🔴 To place an order for additional information about a filing press the 'Order' button.

APP000265



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 801308593 08/20/2010
Document #: 322333270002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**TRTX Properties, LLC**

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

**McMurry & McMurry, LLP**

OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**2912 Whitemarsh Cir.    Richardson  TX  75080**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

OR

☑B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

| Managing Member 1: **William    McMurry** | Title:  **Managing Member** |
| --- | --- |

Address:  **2912 Whitemarsh Cir.    Richardson  TX, USA  75080**

Managing Member 2: (Business Name)  **TR CARNEGIE INVESTMENTS, LLC**

Address:  **ONE COMMERCE CENTER 1201 ORANGE ST. #600    Wilmington  DE, USA  19899**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

APP000266

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**William McMurry**          **2912 Whitemarsh Cir, Richarson, TX 75080**

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**William McMurry**

Signature of Organizer

**FILING OFFICE COPY**

APP000267

**REINSTATED**
**REGULATIONS**
**OF**
**TRTX PROPERTIES, LLC**
**A TEXAS LIMITED LIABILITY COMPANY**

**FEBRUARY 8, 2015**

THE MEMBERSHIP INTERESTS OF TRTX PROPERTIES, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR PURSUANT TO THE PROVISIONS OF ANY STATE SECURITIES ACT.

APP000268

## TABLE OF CONTENTS

ARTICLE I.  DEFINED TERMS..................................................................................... 5
ARTICLE II.  ORGANIZATION .................................................................................. 8
   1.   Articles of Organization...................................................................... 8
   2.   Term .................................................................................................... 8
   3.   No State-Law Partnership .................................................................. 8
ARTICLE III.  NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT . 8
   1.   Name................................................................................................... 8
   2.   Assumed Names.................................................................................. 8
   3.   Registered ........................................................................................... 8
ARTICLE IV.  PURPOSE ............................................................................................. 9
ARTICLE V.  MEMBERS.............................................................................................. 9
   1.   Members ............................................................................................. 9
   2.   Admission of Additional Members..................................................... 9
ARTICLE VI.  CAPITAL CONTRIBUTIONS AND INTERESTS................................ 10
   1.   Capital Contributions....................................................................... 10
   2.   Interests ............................................................................................ 11
   3.   Capital Accounts.............................................................................. 11
   4.   Return of Capital Contributions....................................................... 12
   5.   Interest.............................................................................................. 12
   6.   Loans from Members ....................................................................... 12
ARTICLE VII.  ALLOCATIONS AND DISTRIBUTIONS ......................................... 12
   1.   Allocation of Income and Loss. ....................................................... 12
   2.   Determination of Income and Loss .................................................. 13
   3.   Cash Distributions............................................................................ 13
   4.   Distributions of Other Property........................................................ 13
ARTICLE VIII.  OWNERSHIP OF COMPANY ASSETS........................................... 13
ARTICLE IX.  FISCAL MATTERS; BOOKS AND RECORDS................................... 14
   1.   Bank Accounts; Investments............................................................ 14
   2.   Records Required by Act; Right of Inspection ................................. 14
   3.   Books and Records of Account......................................................... 15
   4.   Tax Returns and Information ............................................................ 15
   5.   Delivery of Financial Statements to Members.................................. 15
   6.   Audits................................................................................................ 15
   7.   Fiscal Year ........................................................................................ 15
   8.   Tax Elections .................................................................................... 15
ARTICLE X  MANAGEMENT OF THE COMPANY .................................................. 16
   2.   Control by the Members .................................................................. 16
   3.   Management...................................................................................... 16
   4.   Powers of the Managing Members ................................................... 16
   4.   Powers of the President.................................................................... 18
   5.   Ownership of Information and Materials.......................................... 19

APP000269

6.    Licenses............................................................................................... 19
7.    Resignation and Removal ....................................................................... 19
ARTICLE X.  RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS ....................... 19
1.    Authority; Liability to Third Parties. ...................................................... 19
2.    Breach. .................................................................................................. 20
3.    Remedies. .............................................................................................. 20
4.    Transfers of Interests............................................................................. 21
5.    Effect of Transfer of Member's Interest ................................................. 21
6.    Admission of Transferee as Member ...................................................... 21
7.    Other Business ...................................................................................... 22
8.    Voting by Members ............................................................................... 22
ARTICLE XI.  MEETINGS OF MEMBERS .................................................................. 22
1.    Place of Meeting ................................................................................... 22
2.    Annual Meeting ..................................................................................... 22
3.    Special Meetings ................................................................................... 22
4.    Notice.................................................................................................... 23
5.    Waiver of Notice ................................................................................... 23
6.    Quorum and Attendance ........................................................................ 23
9.    Voting ................................................................................................... 24
10.   Adjournment .......................................................................................... 24
11.   Conduct of Meetings.............................................................................. 24
12.   Telephone Meetings............................................................................... 24
13.   Action by Written Consent .................................................................... 25
14.   Proxies .................................................................................................. 25
15.   Information............................................................................................. 25
ARTICLE XII.  MUTUAL BUY OUT PROVISIONS.................................................... 26
1.    Right of First Refusal............................................................................. 26
2.    Option ................................................................................................... 28
ARTICLE XIII.  DISSOLUTION AND WINDING UP .................................................. 28
1.    Events Causing Dissolution ................................................................... 28
2.    Winding Up............................................................................................ 29
3.    Compensation of Liquidator .................................................................. 29
4.    Distribution of Company Assets and Proceeds of Sale Thereof............... 30
5.    Final Audit ............................................................................................ 30
6.    Deficit Capital Accounts........................................................................ 30
ARTICLE XIV.  INDEMNIFICATION AND INSURANCE .......................................... 30
1.    Indemnification and Advance of Expenses.............................................. 30
2.    Insurance ............................................................................................... 31
3.    Limit on Liability of Members................................................................ 31
ARTICLE XV.  MISCELLANEOUS PROVISIONS ...................................................... 31
1.    Entire Agreement ................................................................................... 31
2.    Law Governing ...................................................................................... 31
3.    Conference Telephone Meetings ............................................................ 32
4.    Successors and Assigns.......................................................................... 32
5.    Severability ........................................................................................... 32

APP000270

6.   Headings ........................................................................................ 32
7.   Construction .................................................................................. 32
8.   Offset............................................................................................ 32
9.   Effect of Waiver or Consent ........................................................ 32
10.   Further Assurance ....................................................................... 33
11.   Waiver of Certain Rights ............................................................ 33
12.   Counterparts and Binding Effect................................................ 33
13.   Attorney's Fees........................................................................... 33
14.   Amendment of Agreement........................................................... 33
15.   Joinder of Managing Members ................................................... 33
16.   Notices ........................................................................................ 33
**SCHEDULE A**............................................................................................ **36**

APP000271

These **TEXAS REGULATIONS OF TRTX PROPERTIES, LLC**, a Texas limited liability company, are adopted effective as of the date set forth above by the undersigned Members of the Company.

## ARTICLE I.

## DEFINED TERMS

The capitalized terms used in these Regulations shall, unless the context otherwise requires, have the meanings specified in this Article I.

**Act.** The Texas Business Organization Code as it may be amended from time to time, and any successor to such Act.

**Additional Capital Contribution(s).** Any Capital Contributions in excess of the Initial Capital Contribution as may be approved in accordance with the provisions of Article VI hereof.

**Affiliate(s).** As applied to a Person, any other Person directly or indirectly controlling, controlled by, or under common control with that Person. Controlling, controlled by or under common control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or otherwise.

**Approved by the Members.** Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Members that has been determined by a Majority-in-Interest of the Members.

**Approval of the Managing Members**. Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Managing Members that has been determined by a Majority of the Managing Managers. Unless stated otherwise, as long as notice is given to all Managing Members, consent of all Managing Members shall be implied unless a Managing Member expressly dissents.

**Articles of Organization.** The Articles of Organization of the Company described in Article II, Section 1 of these Regulations.

**Assets.** All interest, assets and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

**Bankruptcy.** Bankruptcy under the federal Bankruptcy Code or insolvency under any state insolvency act.

**Business Day.** Any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. '6103 (a), as may be amended from time to time.

APP000272

**Capital Account.** The Capital Account maintained for each Member pursuant to Article VI, Section 3 of these Regulations.

**Capital Contributions.** The total amount of cash or property contributed to the Company by all the Members or any one Member, as the case may be.

**Code.** The Internal Revenue Code of 1986, as it has been and may be amended.

**Company.** TRTX Properties, LLC., as such limited liability company may from time to time be constituted.

**Initial Capital Contribution.** Such amounts designated as such on Schedule A hereof.

**Interest(s).** All rights and interests of a Member with regard to the Company, under these Regulations and the Act, including (i) the right of a Member, expressed as a percentage on Schedule A, to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under these Regulations, and (ii) all management rights, voting rights or rights to consent.

**Majority-in-Interest of the Members.** Members who are holding more than fifty percent (50%) of the total Interest who are entitled to vote hereunder at the applicable date after receipt by all Members of notice of such item requiring a vote.

**Managing Members.** At any time, the Person who is then managing the business of the Company in accordance with Article X of these Regulations. The initial Managing Members are Enoch Investments, LLC (a Delaware Limited Liability Company with Timothy Barton serving as the Managing Member).

**Member(s).** At any time, the Person(s) who then own Interests in the Company. The initial Members are listed on Schedule A.

**Notification.** A writing containing any information required by these Regulations to be communicated to any Persons which may be personally delivered, sent by registered or certified mail, postage prepaid, electronic mail with delivery confirmation to the email address specified in the Company records, or sent by facsimile transmission with delivery confirmation, to such Person, at the last known address of such Person in the Company records. Any such Notification shall be deemed to be given (i) when delivered, in the case of personal delivery, (ii) on the third business day after it is deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid, in the case of mail, and (iii) when transmitted properly (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) in the case of facsimile transmission. Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute Notification as of the date of such receipt by such person for all purposes of these Regulations.

Regulations of TRTX Properties, LLC                                                     Page 6

APP000273

**Operating Budget.** The annual budget prepared by the Managing Members and submitted to and approved by the Members. The Operating Budget shall reflect all costs and expenses projected or expected to be incurred by the Company during the Company's fiscal year.

**Operating Costs.** Any costs incurred by or on behalf of the Company or the Partnership pursuant to the Operating Budget.

**Operating Plan.** The annual business plan prepared by the Managing Members and submitted to and approved by the Members and the Company. The Operating Plan shall reflect all activities to be undertaken by the Company during each fiscal year of the Company, including, without limitation, any development work.

**Option.** The option of each Member hereto to purchase the other Member's Interest as set forth in Article XIII hereof.

**Persons.** Any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, trust, business trust, cooperative or association.

**Purpose.** The "Purpose" of the Company as set forth in Article IV hereof.

**Regulations.** These Regulations, including any Schedules, as originally executed and as they may be subsequently amended from time to time, by requisite vote of the Members.

**Representative(s).** The Representative(s) shall mean the Representative designated by or on behalf of each Sponsoring Member and authorized to act on behalf of such Sponsoring Member pursuant to the terms and provisions hereof.

**Right of First Refusal.** Right of First Refusal shall mean the right of first refusal of each Member to acquire another Members' Interests as set forth in Article XIII.

**Schedule A.** The schedule attached hereto and labeled "Schedule A", containing: (i) the identity of each initial Member, (ii) Initial Capital Contributions, (iii) each Member's Interest and (iv) profit/loss sharing ratio.

**Sponsoring Member.** Sponsoring Member shall mean a Member who designates a certain Representative to act on its behalf pursuant to the terms and provisions of this Agreement.

**Transfer.** Any assignment, hypothecation or change in the record ownership of an Interest, whether made voluntarily or involuntarily by operation of law, including, but not limited to, the following:

1.    a sale, pledge, encumbrance, assignment, gift or other transfer to any Person;

2.    a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon or execution against such Interest;

Regulations of TRTX Properties, LLC                                                    Page 7

APP000274

3.    the filing by the transferor Member of a voluntary Bankruptcy petition; or

4.    the entry of a judicial order granting the relief requested by the petitioner in an involuntary Bankruptcy proceeding filed against the transferor Member.

**Updated Business Plan.** Annual revisions to the Business Plan, or more frequently, if revisions are agreed upon, which provisions shall be prepared by the Managing Members and approved by the company.

## ARTICLE II.

## ORGANIZATION

1.    Articles of Organization. Articles of Organization for the Company were filed with, and a Certificate of Formation was issued by, the Secretary of State of the State of Texas.

2.    Term. Pursuant to the Act, the existence of the Company began upon the effective date of the Articles of Organization. The Company shall exist for the duration specified in the Articles of Organization unless sooner terminated in accordance with these Regulations.

3.    No State-Law Partnership. No provision of these Regulations (including, without limitation, the provisions of Article X) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other Member or Managing Members, for any purposes other than federal and state tax purposes.

## ARTICLE III.

## NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT

1.    Name. The name of the Company is "TRTX PROPERTIES, LLC." The name may be changed at anytime by the President without the approval of the Members as long as such name conforms with state law.

2.    Assumed Names. The Managing Members may cause the Company to do business under one or more assumed names. In connection with the use of any such assumed names, the Managing Members shall cause the Company to comply with the Act.

3.    Registered Office: Registered Agent: Principal Office in the United States: Other Offices. The registered office of the Company required by the act to be maintained in the State of Texas shall be the initial registered office named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Managing Members may designate, from time to time in the manner provided by law. The registered agent of the

Regulations of TRTX Properties, LLC                                    Page 8

APP000275

Company in the State of Texas shall be the initial registered agent named in the Articles of Organization or such other Person or Persons as the Managing Members may designate, from time to time in the manner provided by law.  The principal office of the Company in the United States shall be at such place as the Managing Members may designate, from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by the Act.  The Company may have such other offices as the Managing Members may designate from time to time.

## ARTICLE IV.

## PURPOSE

The purpose of the Company is to conduct any lawful business which includes but is not limited to the acquisition, development, holding, improvement, subdivision, maintenance, operation, and investment in real estate and to engage in any other business or activity that may be incidental, proper, advisable or convenient to accomplish the foregoing purpose that is not forbidden by the law of the jurisdiction in which the Company engages in that business.

## ARTICLE V.

## MEMBERS

1.    Members.  The names and addresses of the Members of the Company are as set forth on Schedule A of these Regulations which shall be updated as necessary.

2.    Admission of Additional Members.  Additional Members of the Company may be admitted as follows:

    (a)    If the proposed additional Member desires to purchase an Interest from the Company, such purchase may be made and the admission of the additional Member shall become effective only if the identity of the proposed additional Member and the amount of the Capital Contribution to be made by such proposed additional Member in exchange for such proposed additional Member's Interest is approved by the Managing Members.

    (b)    If the proposed additional Member desires to acquire an Interest in a Transfer from an existing Member, such Transfer may be made and the admission of the additional Member shall become effective only in accordance with Article XI, Section 2 hereof and Article XIII, Section I hereof.  All other attempted Transfers of any Interest or right, or any part thereof, in or in respect of the Company shall be null and void ab initio.

Regulations of TRTX Properties, LLC                                          Page 9

APP000276

(c)     The Managing Members may deny the membership of any proposed additional member for any reason.

## ARTICLE VI.

## CAPITAL CONTRIBUTIONS AND INTERESTS

1.     <u>Capital Contributions.</u>

(a)     Each Member shall contribute to the capital of the Company the amounts set forth as such Member's Initial Capital Contribution on Schedule A.  The Initial Capital Contribution shall be in the form of cash and shall be paid simultaneously with the execution by each respective Member of these Regulations.  Schedule A may not be amended without the written approval of all Members, unless modifications to Interests occur by virtue of other provisions of these Regulations.

(b)     In the event any Member fails to make full payment of its Initial Capital Contribution, as and when required by Article VI, Section I (a) hereof, said Member shall be deemed in default hereunder and shall automatically, and without notice or further proceeding, forfeit its full Interest in and to the Company.  Upon such default, the non-defaulting Member's shall be entitled to acquire the defaulting Member's forfeited Interest upon payment of the amount of Capital Contribution unpaid as to the defaulting Member's Interest prior to the date of Closing, as scheduled or as the same may be extended.

(c)     In the event any Member fails to make full and timely payment of the initial capital contribution or an approved Additional Capital Contribution such failure shall constitute an Event of Default hereunder and the non-defaulting Member(s) shall exercise by written notice to the defaulting Member(s) one (1) of the following rights or remedies, as its exclusive remedy available to the non-defaulting Members:

(i)     With the Managing Members' approval, upon payment of the delinquent Capital Contribution the non-defaulting Members or the Managing Members may exercise the Option, described in Article XII, Section 2 hereof, as to the Interest of the defaulting Member, or;

(ii)    With the Managing Members' approval, one or more of the non-defaulting Member or the Managing Members may elect to contribute Additional Capital Contribution to the Company in lieu of the defaulting Member's additional capital contribution requirement in such proportions as the non-defaulting Members shall have agreed upon among themselves, or if they fail to so agree, the non-defaulting Members shall contribute on a pro rata basis based upon their respective Interests in the Company.  The Members' Interests will be recalculated accordingly including the dilution of the

Regulations of TRTX Properties, LLC                                                          Page 10

**APP000277**

                  defaulting member's interest. All rights to vote and other rights available to the defaulting member shall be reduced accordingly.

        (iii)    In the event of default, the defaulting member is not entitled to notice or a cure period unless required by law. The Managing Members have the sole discretion to grant such a cure period for the length of time the Managing Members deems appropriate.

2.      Interests.

      (a)    Upon making the Capital Contribution specified on Schedule A, in a timely manner, each Member shall own the Interest set forth opposite such Member's name on Schedule A.

      (b)    The Interests may, with the approval of the Managing Members, be evidenced by certificates issued by the Company which, if issued, shall be in such form and incorporate such legends, recitals and provisions as the Managing Members shall deem necessary or advisable. If certificates are issued, the Managing Members shall establish reasonable procedures for the delivery and reissuance of certificates in connection with Transfers of Member's Interests, split-ups or combinations of certificates, loss or destruction of certificates and other eventualities. Among other matters, such procedures may set forth required fees, indemnifications, documentation and signatures (including guarantees thereof) to be obtained from parties requesting reissuance of certificates. Such procedures need not be incorporated into these Regulations, but a copy thereof shall be delivered to all Members.

      (c)    Additional Capital Contributions may be made with the express unanimous consent of all Members. Membership Interests may be adjusted accordingly to reflect such additional capital contributions upon unanimous approval of the Members.

3.      Capital Accounts. A capital account shall be established and maintained for each Member. Each Member's capital account (a) shall be increased by (i) the amount of money contributed by that Member to the Company, (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to as provided in Section 752 of the Code), and (iii) allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. § 1.704-1(b)(4)(i), and (b) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to as provided in Section 752 of the Code), (iii) allocations to that Member of expenditures of the Company described in Section 705 (a)(2)(B) of the Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. §1. 704-1 (b)(2)(iv)(g), but excluding items described in

Regulations of TRTX Properties, LLC                                 Page 11

APP000278

clause (b)(iii) above and loss or deduction described in Treas. Reg. § 1.704 (b) (4) (i) or § 1.704-1 (b) (4) (iii). The Members' capital accounts shall also be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (f) and as required by the other provisions of Treas. Reg. § 1. 704-1 (b)(2)(iv) and § 1.704-1 (b) (4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1. 704-1 (b) (2) (iv) (g). A Member that has more than one Interest shall have a single capital account that reflects all its Interests, regardless of the class of Interests owned by that Member and regardless of the time or manner in which those Interests were acquired. On the Transfer of all or part of an Interest, the capital account of the transferor that is attributable to the transferred Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (1).

4.    Return of Capital Contributions. Except with the approval of the Managing Members and as otherwise provided herein or in the Act, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution.

5.    Interest. No interest shall be paid by the Company on Capital Contributions or on balances in Members' capital accounts.

6.    Loans from Members. Loans by a Member to the Company shall not be considered Capital Contributions. Any amounts contributed to the Company which are not expressly authorized as Additional Capital Contributions shall be considered Loans by a Member to the Company. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by him to the capital of the Company, the making of such advances shall not result in any increase in the amount of the capital account of such Member. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. Loans must be approved by the Managing Members. No loans shall earn interest unless expressly agreed to in writing by all Managing Members. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in Article XIII, Section 4 hereof.

## ARTICLE VII.

## ALLOCATIONS AND DISTRIBUTIONS

1.    Allocation of Income and Loss.
      (a)    Except as may be required by Section 704(a) of the Code and Treas. Reg. § 1.704-1(b)(2)(iv)(f)(4), the income, gains, losses, deductions and credits (or items thereof) of the Company shall be shared by the Members in accordance with Schedule A. It is the intention of the Members that allocations of income, gains, losses, deductions and

Regulations of TRTX Properties, LLC                                                    Page 12

APP000279

credits (or items thereof) pursuant to this Article VII, Section 1 be in accordance with the Interests for tax purposes.

(b)    All items of income, gain, loss, deduction and credit allocable to any Interest that may have been transferred shall be allocated between the transferor and the transferee based upon an interim closing of the books as of the date of the transfer; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

2.    Determination of Income and Loss. At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members in accordance with Article VII, Section 1 hereof.

3.    Cash Distributions.  The Managing Members have the discretion to distribute to the Members, in accordance with their respective Interests, the amount by which cash on hand exceeds the amount necessary to meet the current costs, expenses, and liabilities of the Company (including, without limitation, a reasonably adequate reserve for working capital and contingencies) as determined by the Managing Members. The distribution should be, at a minimum, sufficient to allow the Members to pay the income tax allocated to the Members as a result of the income generated by the Company. The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair market value of Company Assets, except that the fair market value of Company Assets that are subject to a liability for which recourse of creditors is limited shall be included in the Company Assets only to the extent that the fair market value of the Company Assets exceeds that liability.

4.    Distributions of Other Property. From time to time, the Managing Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Interests and may be made subject to existing liabilities and obligations.  Immediately prior to such distribution, the capital accounts of the Members shall be adjusted as provided in Treas. Reg. §1.704 l(b)(2)(iv)(f).

## ARTICLE VIII.

## OWNERSHIP OF COMPANY ASSETS

Company Assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Assets or any portion thereof. Title to any or all Company Assets shall be held in the name of the Company. All Company Assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Assets are held.

APP000280

## ARTICLE IX.

## FISCAL MATTERS; BOOKS AND RECORDS

1.    Bank Accounts; Investments. Capital Contributions, revenues and any other Company funds shall be deposited by the Managing Members in a bank account established in the name of the Company, or shall be invested and/or expended by the Managing Members in furtherance of the Purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only for the purposes described herein or to be distributed to the Members pursuant to these Regulations. All such funds shall be deposited and applied in accordance with the terms of these Regulations.

2.    Records Required by Act; Right of Inspection.
   (a)    During the existence of the Company and for a period of four (4) years thereafter, unless the Managing Members approves of an alternative procedure, the Managing Members or the Manger's agent, at the expense of the Company, shall maintain all records required to be kept pursuant to the Act, including, without limitation, (i) a current list of the names, addresses and Member's Interests held by each of the Members (including, if any class or group of interest is established under the Articles of Organization or these Regulations, the names of the Members who are Members of each such class or group); (ii) copies of federal, state and local information or income tax returns for each of the Company's six (6) most recent tax years; (iii) copies of these Regulations and the Articles of Organization, including all amendments or restatements; (iv) if such information is not otherwise set forth in the Articles of Organization or these Regulations, a written statement of (A) the amount of the cash contribution and a description and statement of the agreed value of any other contribution made by each Member, and the amount of the cash contribution and a description and statement of the agreed value of any other contribution that the Member has agreed to make in the future as an Additional Contribution, (B) the times at which any Additional Contributions are to be made or events requiring contributions to be made, (C) events requiring the Company to be dissolved and its affairs wound up, and (D) the date on which each Member became a Member of the Company; (v) correct and complete books and records of account of the Company; and (vi) copies of any financial statements of the Company for the three (3) most recent years.

   (b)    On written request, an initial Member or an approved assignee of an Interest (an "Eligible Person") may examine and copy in person or by the Eligible Person's representative, at any reasonable time, for any proper purpose, and at the Eligible Person's expense, records required to be maintained under the Act and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the Eligible Person to examine and copy. Upon written

Regulations of TRTX Properties, LLC                                          Page 14

APP000281

request by any Eligible Person made to the Managing Members at the address of the Company's principal office in the United States specified in Article III, Section 3 hereof, the Company shall provide to the Eligible Person copies of (i) these Regulations and the Articles of Organization and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

3.  Books and Records of Account. The Managing Members, at the expense of the Company as set forth in the Operating Budget, shall maintain for the Company adequate books and records of account that shall be prepared in accordance with sound accounting principles.

4.  Tax Returns and Information. The Members intend for the Company to be treated as a partnership for tax purposes. The Managing Members, at the expense of the Company, shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of (i) such period as may be required by applicable law or regulation, or (ii) seventy-five (75) days after the end of each calendar year, the Managing Members shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

5.  Delivery of Financial Statements to Members. As to each calendar year, the Managing Members may send to each Member, or upon request of a member, a copy of (i) a balance sheet of the Company as of the end of the calendar year, (ii) an income statement of the Company for such calendar year, (iii) a statement of changes in Member capital accounts for such calendar year. Such financial statements shall be delivered by no later than thirty (30) days following the end of the calendar year to which the statements apply. Unless the Managing Members so elects, such statements need not be audited.

6.  Audits. The Managing Members may conduct an audit of the Company books, with respect to the annual financial statements under Article IX, Section 5 above. The cost of the audit shall be borne by the Company. The audits shall be performed by an accounting firm approved by the Managing Members. Not more than one (1) audit shall be required for any fiscal year.

7.  Fiscal Year. The Company's fiscal year shall end on December 31 of each calendar year.

8.  Tax Elections. The Company shall make the following elections on the appropriate tax returns:

    (a)  to adopt the calendar year as the Company's fiscal year;

    (b)  to adopt the appropriate method of accounting and to keep the Company's books and records in accordance with the rules and regulations regarding income tax accounting as opposed to accounting for financial reporting purposes;

Regulations of TRTX Properties, LLC                                          Page 15

APP000282

(c)    if a distribution of Company Assets as described in Section 734 of the Code occurs or if a transfer of Interest as described in Section 743 of the Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company Assets;

(d)    to elect to amortize the organizational expenses of the Company ratably over a period of sixty (60) months as permitted by Section 709(b) of the Code; and

(e)    any other election the Managing Members may reasonably deem appropriate and in the best interest of the Members.

Neither the Company nor any Managing Members may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

## ARTICLE X

## MANAGEMENT OF THE COMPANY

2.    Control by the Members. The Managing Members, shall manage and control the operation of this Company through their exercise of the decision making powers granted herein.

3.    Management.
(a)    The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managing Members with the day to day operations managed by the President. Neither the Managing Members nor President need be a resident of the State of Texas. The initial President is Timothy Barton. (hereinafter collectively referred to as "President.")

(b)    The Managing Members may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managing Members. The Managing Members shall designate the salary and/or bonuses the Officers are to receive, if any. Officers need not be Members, the Managing Members or residents of the State of Texas. Any officer may be removed by the Managing Members at any time, with or without cause. Each officer shall hold office until his or her successor shall be duly designated and take office or until the earlier of the officer's death, resignation or removal. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed by the Managing Members.

4.    Powers of the Managing Members. Subject to the foregoing powers and limitations, the Managing Members, shall have the power and authority to manage the affairs of the

Regulations of TRTX Properties, LLC                                    Page 16

**APP000283**

Company, and shall have the authority to take any action deemed to be necessary, convenient or advisable in connection with the management of the Company given such actions are approved by a majority of the Managing Members. The Managing Members shall act in place of a Board of Directors. As long as prior notice is given, any Managing Member may exercise the powers granted within this agreement as the consent of the other Managing Member(s) shall be implied unless expressly objected to by the other Managing Member(s). In the event, the Managing Members are unable to reach a consensus of a majority of the Members, then such issue shall be resolved by a vote of the majority in interest of all Members. The Managing Members shall have the power to establish and maintain accounts of the Company at financial institutions and the Managing Members shall be authorized signatories on such financial institution accounts. The Managing Members shall also have the following respective duties:

(a)    shall expend sums on behalf of the Company;

(b)    shall be responsible for the distribution of funds, including the timing of such distributions, to the Members by way of cash, income, return of capital, profits or otherwise, all in accordance with the provisions of this Agreement and perform all matters in furtherance of the objectives of the Company and this Agreement;

(c)    has the right to execute any and all agreements, contracts, documents, certifications and instruments necessary and convenient in connection with the powers described in these regulations;

(d)    Any act of the Managing Members purporting to bind the Company, shall bind the Company and the ratification or consent of the Members to any such act(s) shall not be required;

(e)    The Managing Members shall have the full right and authority to execute any and all documents and instruments relating to the business and affairs of the Company, without the joinder of the Members, or any other person or entity, and any person dealing with the Company may rely upon the Managing Members' execution of any such document or instrument as the act and deed of the Company, without the necessity for further inquiry; and

(f)    The Managing Members shall not receive compensation for management services to the Company other than the reimbursement of any and all out-of-pocket expenses reasonably incurred by the in connection with the furtherance of its duties, obligations and responsibilities hereunder or otherwise with respect to the management and operation of the business and affairs of the Company. Managing Members may contract with the Company and receive compensation for other services not related to the duties of a Managing Member.

APP000284

4.    Powers of the President. The President shall have the following rights and powers in subject to the following restrictions:

(a)    managing the daily operations of the business unless such management conflicts with the powers reserved to the Managing Members or unless the Managing Members restrict such powers.

(b)    with prior notice to the Managing Members, may contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise certain operations of Company unless the Managing Members requests to approve such decisions;

(c)    may incur reasonably, ordinary, and necessary expenses in order to manage the daily operations of the Company within the monetary limits set by the Managing Members above which will require the Managing Members' approval;

(d)    shall make any and all elections for federal, state and local tax purposes including, without limitation, any election if permitted by applicable law: (1) to adjust the basis of property owned by or for the benefit of the Company pursuant to the Internal Revenue Code of 1986, as amended, specifically including, but not limited to, Sections 734(b), 743(b) and 754 thereof, or comparable provisions of state or local law, in connection with the transfer of Percentage Interests and distributions to the Members; (2) to extend the statute of limitations for assessments of tax deficiencies against Members with respect to adjustments to the Company's federal, state and local tax returns; and (3) to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and the Members in their capacity as Members, and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company or the Members, it being specifically understood and agreed that the Managing Member is specifically authorized to act as the "Tax Matters Member" under the Internal Revenue Code of 1986, as amended, and in any similar capacity under state or local law;

(e)    shall contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise any of the assets or operations of the Company;

(f)    with prior notice to the Managing Members, may negotiate or execute any agreements, contracts, documents, certifications and instruments which may bind the company without consent of the non-managing Members;

(g)    those powers delegated to him by the Managing Members which may be ongoing or for a particular purpose and may be revoked at any time by the Managing Members;

Regulations of TRTX Properties, LLC                                             Page 18

APP000285

5.     <u>Ownership of Information and Materials.</u> The Managing Members shall, upon completion of or upon any earlier termination of its management hereunder, deliver to the Company all books and records and written financial or accounting data and information of or relating to the Company and the Property whether or not prepared by the Managing Members or supplied to the Managing Members by the Company or the Company's contractors or agents, which information shall at all time be the property of the Company.

6.     <u>Licenses.</u> The Managing Members shall, at the company's expense, qualify to do business and obtain and maintain such licenses as may be required for the performance by the Managing Members of its services hereunder.

7.     <u>Resignation and Removal</u>. Any Managing Member or the President may resign at any time after giving prior notice of such resignation to the Members at least thirty (30) days prior to the effective date of the resignation. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Members, if any. Such persons may only be removed by a unanimous vote of all Members entitled to vote and with cause which is defined as the willful and gross misconduct or gross negligence which must result in material economic damage to the company and its members.


## ARTICLE X.

## RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

1.     <u>Authority; Liability to Third Parties.</u>

    (a)     No Member (other than Managing Member or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company.

    (b)     No Member (including any Member who is Managing Member or Officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court.

    (c)     The members may amend the regulations with the approval of a majority-in-interest of the members entitled to vote and with approval of the Managing Members. Any amendments to the role of the Managing Members would also require the approval of the Managing Members.

    (d)     Except as otherwise limited by the terms and provisions contained in these regulations, the Members shall have all of the rights, and be afforded the status, of Members as set forth in these regulations and by law.

Regulations of TRTX Properties, LLC                                         Page 19

APP000286

(e)    Except as provided herein, no Member shall have any right or power to (1) take part in the management or control of the Company or its business or affairs, (2) transact any business for the Company, or (3) sign for or bind the Company in any way.

(f)    No Member shall have the right to withdraw from the Company unless approved by the Managing Members.

(g)    No Member shall have the right or power to cause the dissolution and winding up of the Company by court decree or otherwise.

(h)    All Members hereby agree to execute any and all instruments that they may be required to execute by any approved purchaser of said property in order to effect a sale of the Company Property.

2.    Breach. In addition to a member failing to adhere to these regulations, a Member will breach this Agreement if he

(a)    attempts to withdraw from the Company without approval;

(b)    interferes in the management of the Company affairs;

(c)    engages in conduct which could result in the Company losing its tax status as a Company;

(d)    engages in conduct that tends to bring the Company into disrepute;

(e)    breaches any confidentiality provisions of this Agreement;

(f)    fails to meet any commitment to the Company; or

(g)    owns a Company interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings.

3.    Remedies. A Member who is in breach of this Agreement shall be liable to the Company for damages caused by such breach. The Company may offset the damages against any distributions or return of capital to the Member who has breached this Agreement. Additionally, if a Member violates the terms of this agreement that person may be terminated as a member and their capital contributions shall be refunded without interest including any profits or losses accrued up to the date of the breach. If necessary such capital contribution may be converted to a loan to the company if the assets are not available to refund the capital contribution at the time of the breach and is subject to reasonable interest and payment terms as determined by the Managing Members. These remedies are in addition to any additional remedies that may be available under the law.

APP000287

4. <u>Transfers of Interests</u>. A Member may make a Transfer of such Member's Interest, only upon the approval of the Managing Members subject to the Managing Members' right of first refusal in this agreement:

(a) The Member or the proposed transferee must file with the Company a written and dated instrument of such Transfer, in form and substance reasonably satisfactory to the Managing Members, executed by both the transferor and the proposed transferee, which instrument shall (i) contain the acceptance by the proposed transferee of all of the terms and provisions of these Regulations, to the extent applicable to an assignee of an Interest, and identify all liabilities which the transferee shall assume upon the transfer of the Member's Interest; (ii) contain such representations as the Managing Members may deem necessary or advisable to assure that such Transfer need not be registered under any applicable federal or state securities laws; (iii) instruct the Managing Members as to the Interest to be transferred and to whom and at what address Company distributions and Notifications in respect of such Interest should henceforth be sent; and (iv) contain any information required under the Code that is reasonably requested by the Managing Members.

(b) Unless expressly waived by the Managing Members, the transferor or transferee shall deliver to the Company an opinion of counsel reasonably acceptable to the Managing Members that (i) such Transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, applicable state securities laws, and any rules or regulations promulgated thereunder, and will not otherwise cause the Company to be in violation of such laws and regulations; (ii) the Transfer will not result in the termination of the Company within the meaning of Section 708(b) of the Code; and (iii) the Transfer will not adversely affect the status of the Company as a partnership under the Code.

(c) The Transfer is approved by the Managing Members, and the transferor Member.

5. <u>Effect of Transfer of Member's Interest</u>. A Transfer of an Interest pursuant to Article XI, Section 2 above does not entitle the transferee to become, or to exercise rights or powers of, a Member. A Transfer only entitles the transferee to receive cash distributions and allocations of Company profits and losses to the extent of the Interest transferred. Until the transferee is admitted as a Member pursuant to Article XI, Section 4 below, the transferor Member shall continue to be a Member and to be entitled to exercise any rights or powers of a Member with respect to the Interest transferred.

6. <u>Admission of Transferee as Member</u>. An approved transferee of an Interest desiring to be admitted as a Member must execute a counterpart of, or an agreement adopting, these Regulations. The admission of such transferee (including, without limitation, a transferee by reason of the death of a Member) is subject to the Managing Members acting in his sole discretion. Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Interest transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Member under these Regulations, the Articles of Formation and the Act.

APP000288

The transferee shall also be liable, to the extent of the Interest transferred, for the unfulfilled obligations, if any, of the transferor Member to make Capital Contributions. Whether or not the transferee of an Interest becomes a Member, the transferor Member is not released from any liability to the Company under these Regulations, the Articles of Organization or the Act.

7.    Other Business. The Members may engage in or possess interests in other business ventures (unconnected with the Company) of every kind and description, independently or with others, except those business in direct competition with the Company upon approval of the Managing Members. Neither the Company nor the other Members shall have any rights in or to such independent ventures or the income or profits therefrom.

8.    Voting by Members. Any decisions, directions, approvals and consents required by the Members shall be made by the vote of a Majority-in-Interest (whether by actual vote or deemed vote as provided herein) of the Members, unless these Regulations expressly provide that a decision shall be made by the 2/3 or unanimous vote or consent of all of the Members, which shall mean the 2/3 of the membership interests or unanimous vote of all membership interests or consent of the Members entitled to vote hereunder at the time that the vote is taken, or deemed taken.

## ARTICLE XI.

## MEETINGS OF MEMBERS

1.    Place of Meeting. All meetings of Members shall be held at the principal office of the Company as provided in Article III above or at such other place as may be designated by the Member(s) calling the meeting.

2.    Annual Meeting. Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members may be held on any day of the year at such hour as may be designated in the notice of the meeting, if such day is a Business Day, and if not a Business Day, then on the next following day that is a Business Day. If the annual meeting is not held on the date above specified, the Managing Members shall cause a meeting in lieu thereof to be held as soon thereafter as convenient, and any business transacted or election held at that meeting shall be as valid as if held at the annual meeting. Failure to hold the annual meeting at the designated time shall not work a dissolution of the Company. This provision shall not be construed to require the holding of any annual meeting.

3.    Special Meetings. Special meetings of the Members may be called by resolution of the Members holding thirty percent (30%) or more of the Interests, for the purpose of addressing any matter upon which the Members may vote under these Regulations. Members may call a meeting by delivering to the Managing Members one or more written requests signed by the requisite number of Members, stating that the signing Members wish to call a meeting and indicating the specific purpose for which the meeting is to be held. Action at the meeting

Regulations of TRTX Properties, LLC                                    Page 22

APP000289

shall be limited to those matters specified in the call of the meeting. This provision shall not be construed to require the holding of any special meetings.

4.    Notice. A Notification of all annual and special meetings, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered by the Managing Members within a reasonable time period prior to the meaning with the presumption that reasonable notices is not less than twenty (20) nor more than sixty (60) days before the meeting to each Member. If the Managing Members fails to timely deliver such notices, then any Member may deliver such notices to the other Members. The period of prior notice for any special meeting, which the Managing Members or any Member deems to be an emergency meeting, shall be shortened to such reasonable period of time, consistent with the nature of the emergency, sufficient to give actual notice to each Member.

5.    Waiver of Notice. Attendance of a Member at a meeting or action taken by written consent shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened. Notification of a meeting may also be waived in writing. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

6.    Quorum and Attendance.

(a)    Members or Representatives (as defined herein) representing a Majority-in-Interest of the Members shall constitute a quorum at any meeting of the Members, whether present in person or by proxy.

(b)    Each Sponsoring Member may designate a Representative, who must be approved by the Managing Members, to act on its behalf with respect to all decisions reserved to the Members pursuant to this Agreement. Each Sponsoring Member may remove or place its Representative at any time upon written notification to the Managing Members. Each Representative shall have full authority to act on behalf of his Sponsoring Member on all matters reserved or presented to the Members.

(c)    The initial Representatives shall be Timothy Barton.

(d)    Upon removal or withdrawal of any Representative, the Sponsoring Member shall immediately designate a substitute to fill the vacancy caused by such removal or withdrawal. If no substitute is designated within thirty (30) days of removal or withdrawal the Sponsoring Member shall be considered its successor Representative.

(e)    If approved by the Managing Members, a Representative may give a proxy to another person, either in writing or by facsimile or email with a copy to the Managing Members, to be present and act on his behalf in his absence at meetings of the

Regulations of TRTX Properties, LLC                                    Page 23

APP000290

Members. The person having such proxy shall have the power set forth in such proxy, and his actions in exercising such power shall be deemed to be those of the Member whose Representative granted the proxy. Such Representative may, at any time at his discretion, revoke, either in writing or by facsimile or email with a copy to the Managing Members, such proxy given by him. Such person's proxy shall be deemed automatically revoked upon his death.

(f)   Any Member may designate other parties to attend Member meetings in an ex-officio capacity only upon approval of the Managing Members. Such parties may consult with and advise the Members and/or Representatives but may not vote at such meetings.

9.   Voting.
(a)   All Members who are not in default hereunder and who do not have a Default Loan outstanding shall be entitled to vote at meetings unless their membership interests are non-voting. Members may vote either in person or by proxy at any meeting. Each Member's percentage voting power at a meeting shall be in proportion to his Interest. Notwithstanding anything contained herein to the contrary, all references to approval or voting by the Members shall mean those Members who are entitled to vote hereunder at the time the vote is taken on such matter.

(b)   The Managing Members shall be elected by the Majority in Interest and may only be removed in accordance with these regulations.

10.   Adjournment. The Managing Members of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the resumption of the adjourned meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

11.   Conduct of Meetings. The Managing Members shall conduct the meetings of the Members, including, without limitation, the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article XII, the conduct of voting, the validity and effectiveness of any proxies, and the determination of any controversies, votes or challenges arising in connection with or during the meeting or voting. The Managing Members shall designate a Person to take minutes of each meeting. The minutes of each meeting of the Members shall be kept in a minute book and shall be approved by the Managing Members at the next meeting of Members.

12.   Telephone Meetings. Members, Representatives or any committee appointed by the Members, may participate in a meeting by means of telephone conference or similar communications, and participation in a meeting pursuant to this subsection shall constitute presence in person at the meeting.

Regulations of TRTX Properties, LLC                                      Page 24

APP000291

13.  <u>Action by Written Consent</u>.  Any action that may be taken at a meeting of the Members may be taken without a meeting, upon prior written notice to each Member of the proposed action, if a consent in writing, setting forth the action to be taken, shall be signed by Members who are entitled to vote hereunder and who are holding the percentage of Interests required to approve such action under these Regulations.  Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article XII.  Notification of any action taken by means of a written consent of Members shall be sent, within a reasonable time after the date of the consent, by the Managing Members, to all Members who did not sign the written consent.

14.  <u>Proxies</u>.  A Member may vote either in person or by proxy executed in writing by the Member or its Representative.  A facsimile, electronic mail, telegram, telex, cablegram or similar transmission by the Member, or a photographic, photo static, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Article.  Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managing Members, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managing Members who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the Managing Members, in which event such inspector or inspectors shall decide all such questions.  No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.  Should a proxy designate two or more Persons to act as proxies, unless such instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one, or if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Interests that are the subject of such proxy are to be voted with respect to such issue.

15.  <u>Information.</u>

(a)  In addition to the other rights specifically set forth in these Regulations, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

(b)  The Members acknowledge that, from time to time, they may receive information from or regarding the Company or each other in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or each other or Persons with which they do business.  Each Member shall hold in strict confidence any information it receives regarding the Company or each other that is identified as being

Regulations of TRTX Properties, LLC                                    Page 25

APP000292

confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or Managing Member, except for disclosures (i) compelled by law (but the Member must notify the Managing Members and the other Members promptly of any request for that information, before disclosing it if practicable), (ii) to advisors or representatives of the Member, (iii) to Persons to which that Member's Interest may be transferred as permitted by these Regulations, but only if the recipients have agreed to be bound by the provisions of this Article, (iv) of information that such Member has also received from a source independent of the Company that the Member reasonably believes obtained the information without breach of confidentiality, or (v) of matters which have become of public knowledge. The Members acknowledge that breach of the provisions of this Article may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Article may be enforced by specific performance.

## ARTICLE XII.

## MUTUAL BUY OUT PROVISIONS

1.      Right of First Refusal.

(a)     In the event a Member shall desire to transfer or sell all or part of its Interest to any third party, it must receive a bona fide written offer therefor which is acceptable to it and which offer complies with the provisions below, and such Member shall, within five (5) days of receipt of the proposed offer, give the written Notice of Sale to the Managing Members. The Notice of Sale shall state that a bona fide offer has been received by the selling Member from such third party, shall contain the price, terms and conditions of sale and the name and address of the third party to whom such interest is proposed to be sold, and shall be accompanied by a copy of the written offer from the third party and a written offer by the selling Member to sell such Member's Interest to the non-selling Members for the same consideration and upon the same terms and conditions as are set forth in the third party offer.

(b)     The Managing Members shall have the option ("Right of First Refusal"), on a pro-rata basis for a period of fifteen (15) days from the date such Notice of Sale is provided to them (the "Right of First Refusal Periods"), within which to exercise the Right of First Refusal to purchase the Interest of the selling Member by notifying such selling Member of such election in writing prior to the expiration of the Right of First Refusal Period. If the Managing Members exercise such Right of First Refusal, the proposed purchase price shall be payable at the scheduled closing date in the same manner as is set forth in the third party offer.

(c)     In the event the Managing Members rejects or does not exercise the Right of First Refusal to purchase all of the selling Member's Interest which is the subject of the third party offer on the same terms as such third party offer, the Managing Members

Regulations of TRTX Properties, LLC                                                    Page 26

APP000293

shall not have the right to purchase such portion of the selling Member's Interest, and the selling Member shall have the right to sell its Interest strictly in accordance with the terms of the Notice of Sale, provided, however, the selling Member and the third party making the third party offer must first comply with all other provisions of these Regulations as to Transfers, including the consent of the Managing Members to the sale (and admission of Transferee as a Member, if requested), the Interest sold shall continue to be subject to the terms and provisions of these Regulations and the purchasing third party shall be required, prior to closing, to acknowledge the same in writing.

(d)    If no such sale is made within one hundred twenty (120) days following expiration of the Right of First Refusal Period, the Right of First Refusal provided herein shall be reinstated with respect to such Member's Interest and a new Notice of Sale shall be required in the manner provided hereinbefore.

(e)    It is expressly agreed that the remedy at law for breach of any of the obligations set forth in these regulations is inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply fully with each of the obligations contained herein, and (ii) the uniqueness of the Interests and the development relationship created hereby. Accordingly, each of the aforesaid obligations shall be, and is hereby expressly made, enforceable by specific performance or injunction in addition to any other remedy available at law or in equity.

(f)    Any third Party Offer shall comply with the following requirements:

(i)    The proposed offer shall include an offer to buy the entire selling Member's Interest, including all of the rights of the Member, under these Regulations.

(ii)    The proposed purchase price for the Interest shall be payable solely in lawful money of the United States and shall be payable in its entirety in cash.

(iii)    The offer shall contain provisions whereby the proposed purchaser is obligated to comply with the provisions of these Regulations, at and after closing.

(iv)    The offer shall be by a principal, identified in the offer, and not an agent acting on behalf of an undisclosed principal, and such principal shall not be an Affiliate of the selling Member.

(v)    The offer shall be accompanied by a certified check of the prospective purchaser for a sum equal to at least five percent (5%) of the proposed purchase price.

(vi)    The prospective purchaser shall be of good business character and reputation and shall be financially capable of carrying out all obligations of the selling Member under these Regulations and all related agreements.

(g)    There shall be no sale concluded to a third party of less than 100% of a Member's Interest.

Regulations of TRTX Properties, LLC                                              Page 27

APP000294

2. <u>Option</u>. Each Member hereby grants the Managing Members, and no other members, the right (the "Option") to acquire such Member's entire Interest on a pro-rata basis, whenever these Regulations specifically reference the availability of the Option, as set forth in these regulations.

   (a)   The Managing Members may exercise the Option at any time by delivering written notice to the other Member(s) or its/their legal representatives setting forth the electing Member's intention to effectuate the Option. The closing of the transaction provided in this Paragraph 2 shall occur on the date which is the later of (i) ninety (90) days after delivery of the electing Member's written notice, or (ii) thirty (30) days after the determination of the purchase price.

   (b)   The Option shall be available only to the Managing Members.

   (c)   If the Managing Members elects to exercise the Option, then the Managing Members shall specify in its notice a closing date and purchase price which the Managing Members is willing to pay for the non-electing Member's Interest. The non-electing Member shall have thirty (30) days (the "Option Period") within which to elect in writing either to (i) sell its Interest to the Managing Members for the purchase price and on the closing date contained in the Managing Members' notice, or (ii) purchase the electing Member's Interest in the Company on the closing date and for the purchase price (adjusted on a pro rata basis, as applicable, to reflect the size of the electing Member's Interest) contained in the Managing Members' notice. If no election is delivered to or received by the Managing Members within the Option Period, then the non-electing Member shall be deemed to have elected to sell its Interest to the electing Member.

   (d)   At the closing, both parties shall execute and deliver all documents necessary or appropriate to effectuate and evidence the transfers described herein. Without limiting the foregoing, each Member grants to the other Members an irrevocable power of attorney, coupled with an interest, to execute and deliver such documents to consummate the transactions described herein.

## ARTICLE XIII.

## DISSOLUTION AND WINDING UP

1. <u>Events Causing Dissolution</u>. The Company shall be dissolved upon the first of the following events to occur:

   (a)   the expiration of the term of duration of the Company set forth in the Articles of Organization;

Regulations of TRTX Properties, LLC                                         Page 28

APP000295

(b)    the written consent of 2/3 (two-thirds) of the Membership interests entitled to vote hereunder at any time with approval of the Managing Members to dissolve and wind up the affairs of the Company;

(c)    the occurrence of any other event that causes the dissolution of a limited liability company under the Act.

2.    Winding Up. If the Company is dissolved pursuant to Article XIV, Section 1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    The winding up of the Company's affairs shall be supervised by a liquidator.  The liquidator shall be the Managing Members or, if the Managing Members prefers, a liquidator or liquidating committee selected by the Managing Members.

(b)    In winding up the affairs of the Company, the liquidator shall have the right and unlimited discretion, for and on behalf of the Company;

(i)    to prosecute and defend civil, criminal or administrative suits;
(ii)    to collect Company Assets, including obligations owed to the Company;
(iii)    to settle and close the Company's business;
(iv)    to dispose of and convey all Company Assets for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Assets, having due regard for the activity and condition of the relevant market and general financial and economic conditions;
(v)    to pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company Assets;
(vi)    to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;
(vii)    to distribute any remaining proceeds from the sale of Company Assets to the Members;
(viii)    to prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and
(ix)    to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managing Members under the terms of these Regulations to the extent necessary or desirable in the good faith judgment of the liquidator to perform its duties and functions.

3.    Compensation of Liquidator.  The liquidator appointed as provided herein shall not be entitled to receive any compensation for its services unless otherwise agreed upon by the liquidator and the Managing Members.

APP000296

4.    Distribution of Company Assets and Proceeds of Sale Thereof.

(a)    Upon completion of all desired sales of Company Assets, and after payment of all selling costs and expenses, the liquidator shall distribute the proceeds of such sales, and the Company Assets that are to be distributed in kind, to the following groups in the following order of priority:

(i)    to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions) of the Company, whether by payment or establishment of reserves;

(ii)    to satisfy Company obligations to Members to pay past due Company distributions;

(iii)    to the Members, in accordance with the positive balance in their respective Capital Accounts; and

(iv)    to the Members in accordance with their respective Interests.

(b)    The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective capital account balances or Interests of each Member in such group.

5.    Final Audit. Within a reasonable time following the completion of the liquidation, the liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to these regulations.

6.    Deficit Capital Accounts. Notwithstanding anything to the contrary contained in these Regulations, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to these Regulations to all Members in proportion to their respective Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE XIV.

## INDEMNIFICATION AND INSURANCE

1.    Indemnification and Advance of Expenses. The Company shall indemnify and/or advance expenses to a Person who was, is, or is threatened to be made a named defendant or

Regulations of TRTX Properties, LLC                                         Page 30

APP000297

respondent in a proceeding because the person (i) is or was a Managing Members, Member, officer, employee or agent of the Company, or (ii) is or was serving at the request of the Company as a Managing Member, Member, director, officer, partner, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, to the fullest extent provided by, and in accordance with the procedures set forth in, any applicable laws; provided, however, that in the following respects as applied to the Company, the following provisions shall apply:

(a)    Indemnification of any Person who has satisfied the standard of conduct set forth in the Act shall be mandatory rather than optional. The determination under the Act that indemnification shall be made shall also constitute authorization of indemnification under the Act.

(b)    Advancement of expenses to a Person who has satisfied the requirements of the Act shall be mandatory rather than optional.

(c)    Payment or reimbursement of expenses to a Person pursuant to the Act in connection with his appearance as a witness or other participation in a proceeding shall be mandatory rather than optional.

2.    Insurance. Subject to certain provisions in the Act, the Company may, but shall not be obligated to, purchase and maintain insurance or other arrangements on behalf of any Person who is or was a Managing Member, Officer, Member, employee, agent or other Person identified above in Article XV, Section 1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such a Person, whether or not the Company would have the power to indemnify him against that liability under Article XV, Section 1 or otherwise.

3.    Limit on Liability of Members. The indemnification set forth in this regulations shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any other liability of the Members to any third party.

## ARTICLE XV.

## MISCELLANEOUS PROVISIONS

1.    Entire Agreement. These Regulations contain the entire agreement among the Members relating to the subject matter hereof, and all prior agreements relative hereto which are not contained herein are terminated.

2.    Law Governing. These Regulations shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, these Regulations are intended to comply with the requirements of the Act and the Articles of Organization. In the event of a

APP000298

direct conflict between the provisions of these Regulations and the mandatory provisions of the Act or any provision of the Articles of Organization, the Act and the Articles of Organization, in that order of priority, will control. In the event that the Act is re-codified by the Legislature, then any such references made within this document shall refer to the newly codified Act and its corresponding sections.

3. Conference Telephone Meetings. Meetings of the Members, Managing Members or any committee may be held by means of conference telephone or similar communications equipment so long as all Persons participating in the meeting can hear each other. Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

4. Successors and Assigns. Subject to restrictions on Transfers and assignments herein, these Regulations shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

5. Severability. These Regulations are intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of these Regulations or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed herein, the remainder of these Regulations and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

6. Headings. The Article and Article headings appearing in these Regulations are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article.

7. Construction. Whenever required by the context, as used in these Regulations, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles refer to articles of these Regulations, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

8. Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

9. Effect of Waiver or Consent. A waiver or consent to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default

APP000299

with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run. No waivers shall be enforceable unless in writing and running in favor of the Person claiming the benefit of same.

10.    Further Assurance. In connection with these Regulations and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments, and perform any additional acts, that may be necessary or appropriate to effectuate and perform the provisions of these Regulations and those transactions.

11.    Waiver of Certain Rights. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the Property of the Company.

12.    Counterparts and Binding Effect. These Regulations may be executed in one or more counterparts, each of which shall be an original but all of which taken together shall constitute a single document. These Regulations shall be binding upon each Member as evidenced by their signatures below.

13.    Attorney's Fees. If any Member becomes involved in litigation or proceedings arising out of this Agreement or the performance thereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party. Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the Members to fully compensate for all the attorney's fees paid or incurred in good faith.

14.    Amendment of Agreement. These Regulations may be amended only in writing, in whole or in part, at any time only by the execution thereof by 2/3 of the Membership interests entitled to vote thereon with Managing Members' approval.

15.    Joinder of Managing Members. The Initial Managing Members have joined in these Regulations for the purposes of acknowledging his appointment and agreeing to all requirements for performance by Managing Members hereunder. A Successor Managing Member, if any, shall also be required to join in the Regulations in the same manner and for the same purpose as the Initial Managing Members.

16.    Notices. Notifications, as defined above, given under these Regulations shall be duly given to the appropriate addresses, fax number, email addresses set forth below (or to such other addresses or  numbers as a party may designate as to itself by notice to the other):

If to Enoch Investments, LLC:

Mr. Timothy Barton
Managing Member

Regulations of TRTX Properties, LLC                                                    Page 33

**APP000300**

Enoch Investments, LLC
13901 Midway Rd
Suite 102
Dallas, Texas  75244
Telephone:  (972) 385-9934
Facsimile:  (972) 241-4484
tbarton@jmjholdings.com

If to Maximilien Barton:

Mr. Maximilien Barton
1755 Wittington Place
Unit 340
Dallas, Texas 75234

*[Remaining Portion of this Page Intentionally Left  Blank]*

Regulations of TRTX Properties, LLC                                    Page 34

APP000301

IN WITNESS WHEREOF, the Members of the Company have evidenced the adoption of these Regulations in accordance with the Act by their signatures below, such adoption to be effective as of the date first above written.

**MANAGING MEMBERS:**

Timothy Barton
Managing Member
Enoch Investments, LLC

Maximilien Barton

Regulations of TRTX Properties, LLC                                                   Page 35

## SCHEDULE A

| Member Name & Address | Initial Capital Contributions | Interest | Profit/Loss |
|---|---|---|---|
| Enoch Investments, LLC<br>13901 Midway Rd<br>Suite 102<br>Dallas, Texas 75244 | $50.00 | 50% | 50% |
| Maximilien Barton<br>1755 Wittington Place<br>Unit 340<br>Dallas, Texas 75234 | $50.00 | 50% | 50% |

APP000303

**Saskya Bedoya**

| | |
|---|---|
| From: | Tim Barton |
| Sent: | Monday, May 23, 2016 6:39 PM |
| To: | Saskya Bedoya |

Saskya

Do as Robert says and make Max owner in trtx and we will make him sign and then I will be added as guarantor if needed

T:b

You could make Max a co-owner -member in TRTX properties that way when you go to refinance it in his name personally the lender treats ur as a refinance and he won't have to put any money down Plus it's easier to get a loan refinanced.

Sent from my BlackBerry 10 smartphone.

1

APP000304

Steven C. Metzger
Texas State Bar No. 139825600
Metzger Law PLLC
3626 N. Hall Street, Suite 800
Dallas, Texas 75219
Tel: 214-740-5030
Facsimile: 214-224-7555
Email: smetzger@pmklaw.com
*Attorney for JMJ Development LLC, TRTX Properties LLC,*
*And Timothy Barton*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **FM 544 PARK VISTA, LTD.; and** | § | **CASE NO. 17-34255-SGJ-11** |
| **PAVIST, LLC; and** | § | **CASE NO. 17-34274-SGJ-11** |
| | § | |
| **Debtors.** | § | |
| | § | |

## <u>NOTICE OF APPEAL</u>

TO THE UNITED STATES BANKRUPTCY COURT:

NOTICE IS GIVEN that JMJ Development, Inc. ("JMJ") and TRTX Properties, LLC

("TRTX") including their principals, Timothy Barton, and counsel, Vance McMurry (collectively,

"Appellants"), herein, appeal to the United States District Court for the Northern District of Texas,

the *Order Granting Motion for Contempt in Part* [Dkt. 390] filed on September 20, 2022 resulting

from the hearing held on September 18, 2022 on the *Motion for Order to Show Cause for Violation*

*of the Discharge Injunction, For Contempt, For Permanent Injunction, and for Sanctions* [Dkt.

356] ("Motion for Contempt") filed by FM 544 Park Vista, Ltd., Pavist, LLC (collectively,

"Debtors"), Richard Shaw, Park Vista Seniors, LLC, North/South Building, LLC, GW Equity

Capital, LLC, RP Shaw Investments, LLC, and The Trustees of the BOS Trust (collectively,

Notice of Appeal                                                                                      Page 1

APP000305

"Movants"), as joined by Roger Sefzik, Hoss Holdings LLC, Tower 98 LLC and BSPV-Plano,

LLC (collectively, "Appellees").

The Order being appealed is a final order, in order for the United States District Court for

the Northern District of Texas to have jurisdiction to hear the appeal pursuant to 28 U.S.C.

§ 158(a)(1).

1.      Name of Appellants:   JMJ Development, Inc. and TRTX Properties, LLC,

including their principals, Timothy Barton, and counsel, Vance McMurry.

2.      Position of Appellants:  The Appellants, JMJ Development, Inc. and TRTX

Properties, LLC were the respondents to the Motion for Contempt.

3.      Subject of this Appeal:  The Order being appealed is the *Order Granting*

*Motion for Contempt in Part* resulting from the hearing held on September 18, 2022, on

the *Motion for Order to Show Cause for Violation of the Discharge Injunction, For*

*Contempt, For Permanent Injunction, and for Sanctions*.

4.      Name of Appellees: FM 544 Park Vista, Ltd., Pavist, LLC, Richard Shaw,

Park Vista Seniors, LLC, North/South Building, LLC, GW Equity Capital, LLC, RP Shaw

Investments, LLC, The Trustees of the BOS Trust, Roger Sefzik, Hoss Holdings LLC,

Tower 98 LLC,  and BSPV-Plano, LLC

5.      Counsel for Appellees:

Mark Stromberg
STROMBERG STOCK, PLLC
8350 N. Central Expressway, Suite 1225
Dallas, TX  75206
Telephone: (972) 458-5353
Facsimile:  (972) 861-5339
Email: mark@strombergstock.com
*Attorneys for FM 544 Park Vista, Ltd.; Pavist, LLC; Richard Shaw; Park*
*Vista Seniors, LLC; North/South Building, LLC; GW Equity Capital, LLC;*
*RP Shaw Investments, LLC; and the Trustees of the BOS Trust*

Notice of Appeal                                                                                Page 2

Joe E. Marshall
MARSHALL LAW
2626 Cole Avenue, Suite 300
Dallas, TX  75201
Telephone: (214) 579-9173
Email:
jmarshall@marshalllaw.net
*Attorney for Roger Sefzik, Hoss Holdings and Tower 98, LLC*

Thomas D. Berghman, Esq.
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard St., Ste. 3800
Dallas, Texas 75201
Telephone: (214) 855-7500
Email: tberghman@munsch.com
*Attorney for BSVP-Plano, LLC*

Dated: October 4, 2022.

Respectfully Submitted,

/s/ Steven C. Metzger
Steven C. Metzger
Texas State Bar No. 139825600
Metzger Law PLLC
3626 N. Hall Street, Suite 800
Dallas, Texas 75219
Tel: 214-740-5030
Facsimile: 214-224-7555
Email: smetzger@pmklaw.com

*Attorney for JMJ Development LLC, TRTX
Properties LLC, and Timothy Barton*

/s/ Vance McMurry
Vance McMurry
Texas State Bar No. 24047198
McMurry Law, PLLC
508 W Lookout Dr.
Suite 14-74
Richardson, Texas 75080
Tel: 972-746-9656
Fax:888-388-0561
Email: vance@mcmurrylegal.com

APP000307

*Pro Se*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October  4, 2022, a true and correct copy of the foregoing document was served via the Court's ECF system upon the parties receiving electronic notice in this case.

Mark Stromberg
STROMBERG STOCK, PLLC
8350 N. Central Expressway, Suite 1225
Dallas, TX  75206
Telephone: (972) 458-5353
Facsimile:  (972) 861-5339
Email: mark@strombergstock.com
*Attorneys for FM 544 Park Vista, Ltd.; Pavist, LLC; Richard Shaw; Park Vista Seniors, LLC; North/South Building, LLC; GW Equity Capital, LLC; RP Shaw Investments, LLC; and the Trustees of the BOS Trust*

Joe E. Marshall
MARSHALL LAW
2626 Cole Avenue, Suite 300
Dallas, TX  75201
Telephone: (214) 579-9173
Email:
jmarshall@marshalllaw.net
*Attorney for Roger Sefzik, Hoss Holdings and Tower 98, LLC*

Thomas D. Berghman, Esq.
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard St., Ste. 3800
Dallas, Texas 75201
Telephone: (214) 855-7500
Email: tberghman@munsch.com*ttorney for BSVP-Plano, LLC*

/s/ Steven C. Metzger
Steven C. Metzger

Notice of Appeal                                                              Page 4

# Texas Franchise Tax Public Information Report

Comptroller of Public Accounts FORM 05-102 (Rev.9-11/30)

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

■ **Tcode** 13196 Franchise

■ Taxpayer number: 3 2 0 4 2 4 7 8 1 3 4

■ Report year: 2 0 2 2

*You have certain rights under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.*

| Taxpayer name | TRTX PROPERTIES, LLC |
|---|---|

| Mailing address | 13901 MIDWAY RD STE 102-243 | Secretary of State (SOS) file number or Comptroller file number |
|---|---|---|

| City | State | ZIP Code | Plus 4 | |
|---|---|---|---|---|
| FARMERS BRNCH | TX | 75244 | | 0801308593 |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office |
|---|
| Principal place of business |

*Please sign below!*

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3204247813422

**SECTION A**  Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | m m d d y y |
|---|---|---|---|
| THE MXBA TRUST | MANAGER | ○ YES | Term expiration |

| Mailing address | City | State | ZIP Code |
|---|---|---|---|
| 2999 TURTLE CREEK BLVD | DALLAS | TX | 75219 |

| Name | Title | Director | m m d d y y |
|---|---|---|---|
| | | ○ YES | Term expiration |

| Mailing address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

| Name | Title | Director | m m d d y y |
|---|---|---|---|
| | | ○ YES | Term expiration |

| Mailing address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

**SECTION B**  Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C**  Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

Registered agent and registered office currently on file. *(see instructions if you need to make changes)*

○ Blacken circle if you need forms to change the registered agent or registered office information.

Agent: **ONE AGENT TEXAS, LLC**

| Office: 13901 MIDWAY RD SUITE 102-243 | City Dallas | State TX | ZIP Code 78701 |
|---|---|---|---|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▸ Saskya Bedoya | Title Electronic | Date 05-02-2022 | Area code and phone number ( 214 ) 641 - 0122 |
|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|

APP000309

| **Form 401** |  | **Filed in the Office of the** |
| --- | --- | --- |
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: See Instructions** | **Statement of Change of<br>Registered Office/Agent** | **Secretary of State of Texas<br>Filing #: 801308593 05/02/2022<br>Document #: 1144928130003<br>Image Generated Electronically<br>for Web Filing** |

**Entity Information**

The name of the entity is :

**TRTX Properties, LLC**

The file number issued to the entity by the secretary of state is: **801308593**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**ONE Agent Texas, LLC**

**815 Brazos St, Suite 500, Austin, TX, USA 78701**

**Change to Registered Agent/Registered Office**

The following changes are made to the registered agent and/or office information of the named entity:

Registered Agent Change

☑A. The new registered agent is an organization by the name of:

**One Agent Texas, LLC**

OR

☐B. The new registered agent is an individual resident of the state whose name is:

Registered Office Change

☑C. The business address of the registered agent and the registered office address is changed to:

**13901 Midway Rd, suite - 102, LB243, Dallas, TX, USA 75244**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

☑B. The consent of the registered agent is maintained by the entity.

**Statement of Approval**

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

**Effectiveness of Filing**

☑A. This document becomes effective when the document is filed by the secretary of state.

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

**Execution**

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: **May 2, 2022**  **Timothy Barton**

Signature of authorized person(s)

**FILING OFFICE COPY**

APP000311

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK, HOLD AT ANGLE TO VIEW

No. 1053

**JMJ VC Management, LLC**
13901 Midway Road  Suite 102LB243
Dallas, TX 75244
(214) 702-8897

Texas Brand Bank
Garland, TX 75042
88-2511/1119

Date  3/1/2022

Pay To The
Order Of ___ Noah Burns

S  **95,000.00

Ninety-Five Thousand  and 00/100***

Dollars

Noah Burns
3427 Cedar Springs Road, APT 1736
Dallas, TX 75219
(210) 954-6444

Memo:  3600 Gillespie (assignment) TRTX Properties

⑈000001053⑈  ⑆111925113⑆1024637⑈

APP000312

# EXHIBIT A-14

APP000313

 DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI   OH    45999-0023

Date of this notice:  08-31-2021

Employer Identification Number:
87-2433225

Form:  SS-4

Number of this notice:  CP 575 G

MXBA
MAXIMILIEN BARTON SOLE MBR
13901 MIDWAY RD SUITE 102
DALLAS, TX  75244

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

        Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN 87-2433225.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

        When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

        A limited liability company (LLC) may file Form 8832, *Entity Classification Election*,
and elect to be classified as an association taxable as a corporation.  If the LLC is
eligible to be treated as a corporation that meets certain tests and it will be electing S
corporation status, it must timely file Form 2553, *Election by a Small Business
Corporation*.  The LLC will be treated as a corporation as of the effective date of the S
corporation election and does not need to file Form 8832.

        To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov.  If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**IMPORTANT REMINDERS:**

   *   Keep a copy of this notice in your permanent records.  **This notice is issued only
       one time and the IRS will not be able to generate a duplicate copy for you.**  You
       may give a copy of this document to anyone asking for proof of your EIN.

   *   Use this EIN and your name exactly as they appear at the top of this notice on all
       your federal tax forms.

   *   Refer to this EIN on your tax-related correspondence and documents.

        If you have questions about your EIN, you can call us at the phone number or write to
us at the address shown at the top of this notice.  If you write, please tear off the stub
at the bottom of this notice and send it along with your letter.  If you do not need to
write us, do not complete and return the stub.

        Your name control associated with this EIN is MXBA.  You will need to provide this
information, along with your EIN, if you file your returns electronically.

        Thank you for your cooperation.

APP000314

(IRS USE ONLY)    575G           08-31-2021   MXBA   O   9999999999   SS-4

Keep this part for your records.        CP 575 G (Rev. 7-2007)

------------------------------------------------------------------------------------

Return this part with any correspondence
so we may identify your account.  Please                              CP 575 G
correct any errors in your name or address.
                                                                    9999999999

Your Telephone Number   Best Time to Call   DATE OF THIS NOTICE:  08-31-2021
(     )      -                              EMPLOYER IDENTIFICATION NUMBER:  87-2433225
                                            FORM:  SS-4              NOBOD
_____   _____

INTERNAL REVENUE SERVICE                    MXBA
CINCINNATI  OH   45999-0023                 MAXIMILIEN BARTON SOLE MBR
ᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈᘈ                 13901 MIDWAY RD SUITE 102
                                            DALLAS, TX  75244

APP000315



**THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS**

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1276

Date  8/18/2022

Pay To The
Order Of  MXBA LLC                                              $ **153.00

One Hundred Fifty-Three and 00/100***                          **Dollars**

MXBA LLC
13901 Midway RD STE 102-243
Dallas, TX 75244
(972) 385-9934

HEAT SENSITIVE
RUB AREA TO VERIFY

Memo:

⑈000001276⑈ ⑆111925113⑈1024611⑈

APP000316

# EXHIBIT A-15

APP000317

## STATEMENT OF ORGANIZER

## TITAN INVESTMENT, LLC

### August 20, 2020

The Undersigned being the Organizer of Titan Investment, LLC, a Delaware limited liability company, ("Company") does hereby adopt the following resolutions and takes the following action by written consent in lieu of a meeting which is effective as of August 20, 2020.

RESOLVED, that Organizer has filed the Certificate of Formation of the Company in the office of the Secretary of State of Delaware on August 19, 2020 which was accepted and filed as document number 20206819687 / file number 3477768 a true and correct copy of which is attached as Exhibit A which shall be filed in the minute book of the Company as a part of the permanent records of such limited liability company.

RESOLVED, that the Company shall be managed by managers who need not be members of the Company and that the Company shall have a single initial manager ("Initial Manager").

RESOLVED that the Initial Manager of the Company shall be such person or entity as designated and consented to below as evidenced by their execution of this statement.

RESOLVED that the Initial Manager is authorized to draft and execute the initial company agreement of the Company as authorized under §18-204 of the of the Delaware Limited Liability Company Act ("Act") which will identify and be executed by the members of the Company and retained by the Company.

RESOLVED, that upon filing the Certificate of Formation the Organizer has fulfilled his sole duty to the Company, has resigned as Organizer, and has relinquished all further duties to the initial Manager of the Company and further confirms that he is not an officer, member, agent, or manager of the Company and has no interests in or other obligations to the Company.

Signed and executed by the Organizer and effective as of August 20, 2020.

ORGANIZER

Vance McMurry

Approved and consented to by:

INITIAL MANAGER
TITAN INVESTMENTS, LLC

By: _____
Name: Maximilian Barton
Title: _____

APP000318

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:01 AM 08/19/2020
FILED 10:01 AM 08/19/2020
20206819687 - File Number 3477768

# STATE OF DELAWARE
## CERTIFICATE OF FORMATION
## OF LIMITED LIABILITY COMPANY

The undersigned authorized person, desiring to form a limited liability company pursuant to the Limited Liability Company Act of the State of Delaware, hereby certifies as follows:

1.      The name of the limited liability company is Titan Investments, LLC

2.      The Registered Office of the limited liability company in the State of Delaware is located at 919 North Market Street, Suite 950 _____(street), in the City of Wilmington _____, Zip Code 19801 _____. The name of the Registered Agent at such address upon whom process against this limited liability company may be served is Incorp Services, Inc.

By: _____
         Authorized Person

Name: Vance McMurry _____
                  Print or Type

APP000319

**LIMITED LIABILITY COMPANY AGREEMENT
OF
TITAN INVESTMENTS, LLC**

**(Single-Member Delaware  Limited Liability Company)**

This Limited Liability Company Agreement of **TITAN INVESTMENTS, LLC** (this "Agreement" or these ``Regulations''), dated as of **August 19, 2020**, are adopted, executed and agreed to by the sole Member (as defined below).

1.     Formation. **TITAN INVESTMENTS, LLC**, a Delaware limited liability company (the ``Company'') has been organized as a Texas limited liability company under the Delaware Limited Liability Company Act, 6 *Del. C. § 18-101 et seq.*,  as amended from time to time (the "LLC Act") by filing of the Certificate of Formation for the Company in the office of the Secretary of State of Delaware, on **August 19, 2020**, file number **3477768.**

2.     Sole Member. **MAXIMILIEN BARTON,** shall be the sole member of the Company (the "Member").

3.     Contributions. The Member has made an initial contribution to the capital of the Company in the amount of $100.00. Without creating any rights in favor of any third party, the Member may, from time to time, make additional contributions of cash or property to the capital of the Company, but shall have no obligation to do so.

4.     Distributions. The Member shall be entitled (a) to receive all distributions (including, without limitation, liquidating distributions) made by the Company, and (b) to enjoy all other rights, benefits and interests in the Company.

5.     Management.  Management by Managers. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Manager(s), who shall make all decisions and take all actions for the Company. No Member (other than a Manager or an Officer) has the right, power or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. The Initial Manager(s) of the Company shall be: **MAXIMILIEN BARTON.**

Officers:

SECTION 1. NUMBER; TITLES AND TERM OF OFFICE.  The officers of the Company shall be a President, one or more Vice-Presidents and a Secretary-Treasurer, and such other officers as the Manager(s) may from time to time elect or appoint.  Each officer shall hold office until his successor shall be duly elected and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.  Any two (2) or more offices may be held by the same person.

**LIMITED LIABILITY COMPANY AGREEMENT OF
TITAN INVESTMENTS, LLC**- Page 1

APP000320

SECTION 2. SALARIES. The salaries or other compensation of the officers and agents of the Company shall be fixed from time to time by the Manager(s).

SECTION 3. REMOVAL. Any officer or agent or member of a committee elected or appointed by the Manager(s) may be removed by the Manager(s) whenever in its judgment the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

SECTION 4. VACANCIES. Any vacancy occurring in any office of the Company may be filled by the Manager(s).

SECTION 5. POWERS AND DUTIES OF THE CHIEF EXECUTIVE OFFICER. The President shall be the chief executive officer of the Company, unless the Manager(s) designates the Chairman of the Board as chief executive officer. Subject to the control of the Manager(s) and the executive committee (if any), the chief executive officer shall have general executive charge, management and control of the properties, business and operations of the Company with all such powers as may be reasonably incident to such responsibilities; he may agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Company and may sign all certificates for shares of capital stock of the Company; and shall have such other powers and duties as designated in accordance with these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 6. POWERS AND DUTIES OF THE CHAIRMAN OF THE BOARD. If elected, the Chairman of the Board shall preside at all meetings of the shareholders and of the Manager(s); and the Chairman shall have such other powers and duties as designated in these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 7. POWERS AND DUTIES OF THE PRESIDENT. The President, unless the Manager(s) otherwise determines, shall have the authority to agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Company; and, unless the Manager(s) otherwise determines, he shall, in the absence of the Chairman of the Board or if there be no Chairman of the Board, preside at all meetings of the shareholders and (should he be a director) of the Manager(s); and the President shall have such other powers and duties as designated in accordance with these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 8. VICE PRESIDENTS. In the absence of the Chairman of the Board (if any), or President, or in the event of their inability or refusal to act, a Vice President designated by the Manager(s) shall perform the duties of the Chairman of the Board (if any), or the President. In the absence of a designation by the Manager(s) of a Vice President to perform the duties of the Chairman of the Board (if any) or President, or in the event of their absence or inability or refusal to act, the Vice President who is present and who is senior in terms of time as a Vice President of the Company shall so act. The Vice

**LIMITED LIABILITY COMPANY AGREEMENT OF
TITAN INVESTMENTS, LLC**- Page 2

APP000321

Presidents shall perform such other duties and have such other powers as the Manager(s) may from time to time prescribe.

SECTION 9. TREASURER. The Treasurer shall have responsibility for the custody and control of all the funds and securities of the Company. He shall perform all acts incident to the position of Treasurer subject to the control of the chief executive officer and the Manager(s); and the Treasurer shall, if required by the Manager(s), give such bond for the faithful discharge of his duties in such form as the Manager(s) may require.

SECTION 10. ASSISTANT TREASURERS. Each Assistant Treasurer shall have the usual powers and duties pertaining to his office, together with such other powers and duties as may be assigned to him by the chief executive officer or the Manager(s). The Assistant Treasurers shall exercise the powers of the Treasurer during that officer's absence or inability or refusal to act.

SECTION 11. SECRETARY. The Secretary shall keep the minutes of all meetings of the Manager(s) and the minutes of all meetings of the shareholders, in books provided for that purpose; he shall attend to the giving and serving of all notices; he may in the name of the Company affix the seal of the Company to all contracts of the Company and attest thereto; he may sign with the other appointed officers all certificates for shares of capital stock of the Company; he shall have charge of the certificate books, transfer books and stock ledgers, and such other books and papers as the Manager(s) may direct, all of which shall at all reasonable times be open to inspection of any director upon application at the office of the Company during business hours, and he shall in general perform all duties incident to the office of Secretary, subject to the control of the chief executive officer and the Manager(s).

SECTION 12. ASSISTANT SECRETARIES. Each Assistant Secretary shall have the usual powers and duties pertaining to his office, together with such other powers and duties as may be assigned to him by the Chief Executive Officer or the Manager(s) or the Secretary. The Assistant Secretaries shall exercise the powers of the Secretary during that officer's absence or inability or refusal to act.

Officers. The initial officers of the Company shall be:
**Maximilien Barton – President, Secretary & Treasurer.**

**LIMITED LIABILITY COMPANY AGREEMENT OF
TITAN INVESTMENTS, LLC**- Page 3

APP000322

6.   Dissolution. The Company shall dissolve and its affairs shall be wound up at such time, if any, as the Member may elect.

7.   Governing Law. THIS LIMITED LIABILITY COMPANY AGREEMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (EXCLUDING ITS CONFLICT-OF-LAWS RULES).

MEMBER(S):

MAXIMILIEN BARTON

Being the sole Member of the Company

MANAGER(S):

MAXIMILIEN BARTON

Being the sole Manager(s) of the Company

LIMITED LIABILITY COMPANY AGREEMENT OF
TITAN INVESTMENTS, LLC- Page 4

APP000323

| **Form 304** | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $750 | <br>**Application for Registration of a Foreign Limited Liability Company** | **Filed in the Office of the Secretary of State of Texas Filing #: 804757546 10/05/2022 Document #: 1184202700002 Image Generated Electronically for Web Filing** |

1. The entity is a foreign limited liability company. The name of the entity is :

**TITAN INVESTMENTS, LLC**

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company" (or an abbreviation thereof). The name of the entity with the word or abbreviation which it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

**TITAN 2022 INVESTMENTS, LLC**

3. Its federal employer identification number is:
☑Federal employer identification number information is not available at this time.

4. It is organized under the laws of:  **DELAWARE, USA**
and the date of its formation in that jurisdiction is:  **8/9/2020**

5. As of the date of filing, the undersigned certifies that the foreign limited liability company currently exists as a valid limited liability company under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the limited liability company that it proposes to pursue in the transaction of business in Texas are set forth below. The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.
**For the transaction of any lawful business for which liability companies maybe organized.**

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: **10/05/2022**

8.The principal office address of the limited liability company is:
**3600 GILLESPIE ST, DALLAS, TX, USA 75219**

☐9A. The initial registered agent is an organization by the name of:

☑9B. The initial registered agent is an individual resident of the state whose name is:
**ANISH   KAREDIA**

APP000324

☑9C. The business address of the registered agent and the registered office address is:
**22415 MARY ROGERS TRAIL    RICHMOND  TX  77469**

### Consent of Registered Agent

☐A. A copy of the consent of Registered Agent is attached.

OR

☑B. The consent of the registered agent is maintained by the entity.

10. The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each governing person is:

NAME OF GOVERNING PERSON (Enter the name of either an individual or an organization, but not both:)

IF INDIVIDUAL

**MAXIMILIEN E BARTON**

OR

IF ORGANIZATION

ADDRESS OF GOVERNING PERSON :

**3600 GILLESPIE ST    DALLAS  TX, USA  75219**

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: **October 5, 2022**     **RANDY P MARX, AUTHORIZED AGENT for MAXIMILIEN E BARTON, MANAGER**

Signature and title of authorized person on behalf of the foreign entity

**FILING OFFICE COPY**

APP000325

## CONTRACT OF SALE

IN CONSIDERATION of the mutual terms, provisions, covenants and agreements contained in this Contract of Sale (the "Contract"), the parties hereto agree as follows, as of the Effective Date (as defined herein).

1.      PARTIES. **First Development Co. of Ohio, LLC, a Texas limited liability company** ( "Seller"), shall cause the sale and convey same to **Titan Investments, LLC, a Texas limited liability company** (the "Purchaser"), and Purchaser shall buy and pay for the Property (defined below).

2.      PROPERTY. Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title of an estimated **16.3 acres situated along Woodlawn Boulevard and West Coffin Street, in the City of Denison,  Grayson County, Texas**, an approximate legal description of which is set forth on Exhibit "A" attached hereto and incorporated herein by this reference for all purposes (the "Land"), together with

> (1) all rights and appurtenances pertaining to the Land, including, without limitation, (a) all roads, alleys, easements, streets and rights of ways adjacent to or serving the Land, (b) strips and gores of real property lying between the boundaries of the Land and adjoining real estate, and (c) any and all rights of ingress and egress thereto; and all of Seller's right, title and interest in any minerals, utilities, licenses and permits related to the Land,
>
> (2) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property,
>
> (3) all permits, approvals, licenses, leases, contracts, reports, water and sewer capacity commitments, all engineering and architectural plans, Declarant status under any Property Associations formed on or respecting the Land, rights to develop and rights to reimbursements from any governmental or quasi-agency for either utility impacts fees, taxing district bond sale proceeds if any, and other rights and interests owned or held by Seller, if any, in connection with the Land (collectively, "Intangible Property"), and
>
> (4) all appurtenant easements owned by Seller, if any, which are used, usable  or needed in connection with the development of the Land

(the foregoing is collectively referred to herein as the "Property"), and Purchaser agrees to purchase the Property at the Purchase Price (hereinafter defined) and upon the terms set forth herein. The metes and bounds description of the Land contained in the Survey (hereinafter defined), if different from the legal description attached hereto, shall be substituted for Exhibit "A" and shall become a part of this Contract as the description of the Land to be conveyed hereunder. Furthermore, Exhibit "A" shall be automatically updated to include the description of the tract(s) within the Property, and or easements appurtenant to the Property,  that Seller owns upon disclosure to the Purchaser by Seller which shall occur prior to the expiration of the Seller Delivery Date (as defined herein).

3.      PURCHASE PRICE. The purchase price for the Property is **Two Million, Two Hundred And Eighty-Two Thousand U. S. Dollars ($2,282,000.00)** (the "Purchase Price").

Contract of Sale –                                                                                                    1

**APP000326**

4.    EARNEST MONEY.

A.    Initial Earnest Money.    Within 5 business days of the Effective Date of this Contract, Purchaser shall deposit earnest money in the form of a check or wire transfer of funds in the amount of **FIVE THOUSAND DOLLARS ($5,000)** (the "Initial Earnest Money") with **Title Partners, LLC, attn: Judd Whiteman,** in its capacity as escrow agent, to be held in escrow pursuant to the terms of this Contract. Additional Earnest Money. Not later than ninety (90) days after the Effective Date, if this Agreement shall not have terminated prior to such time, then Purchaser shall deposit additional earnest money with the Escrow Agent in the amount of **FIFTY THOUSAND DOLLARS ($50,000.00)** by check or in cash, which sum shall be invested by the Escrow Agent in a federally-insured, interest-bearing account pending disposition thereof in accordance with this Agreement (such sum and the interest accrued thereon being hereinafter referred to collectively as the **"Additional Earnest Money", and together with the Initial Earnest Money, shall be referred to herin as the "Earnest Money").** Notwithstanding anything herein to the contrary, a portion of the Earnest Money in the amount of $100.00 shall be non-refundable and shall be distributed to Seller upon any termination of this Contract as full payment and independent consideration (the "Independent Consideration") for Seller's execution of and performance under this Contract.

B.    If Purchaser fails to timely deposit the Earnest Money, Seller may terminate this Contract at any time before Purchaser deposits the Earnest Money with the Title Company. The Earnest Money, at Purchaser's election, may be placed in an interest-bearing account by the Title Company, and any interest earned thereon shall become a part of the Earnest Money. If Purchaser terminates this Contract on or prior to the expiration of the Inspection Period, all Earnest Money, other than the Independent Consideration, shall be returned to Purchaser. If Purchaser does not terminate this Contract on or prior to the expiration of the Inspection Period, the Earnest Money **(referring to both the Iniital and Additional Earnest Money)** shall be **non-refundable** to Purchaser; unless:

(a)    Seller fails or refuses to comply in a timely manner with its obligations hereunder, or

(b)    at the Closing, any of Seller's representations, warranties or covenants contained herein is not true or has been breached or modified, or

(c)    or in the event that, at the Closing, any condition precedent to Purchaser's obligations hereunder, **as set forth in Section 14 hereof,** is not fully satisfied as herein required, or

(d)    this Contract is terminated pursuant to Sections 6 (Review of Title Documents), 10 (Casualty Loss; Condemnation) or 13(A) (Purchaser's Remedies) hereof,

(herein the **"Limited Special Circumstances"**) in which case such shall be disposed in accordance with the provisions of this Agreement relating to Earnest Money. If this Contract is terminated pursuant to either Sections 6 (Review of Title Documents), 10 (Casualty Loss; Condemnation) or 13(A) (Purchaser's Remedies) after the expiration of the Inspection Period, the Earnest Money shall be returned to Purchaser. The Earnest Money shall be paid to Seller at the Closing and shall be applicable to the Purchase Price.

Contract of Sale —                                                                                                                                    2

APP000327

C.    Disposition of Earnest Money.  If Purchaser terminates this Agreement pursuant to any right to do so as specified herein, the Earnest Money, together with any interest thereon, if applicable, shall be returned to Purchaser, without any requested or required notice to or approval of any person or party.  If Purchaser completes this Agreement and purchases the Property, such Earnest Money, including interest, shall be applied towards the Purchase Price. If Purchaser fails to perform its obligations, or otherwise terminates this Agreement, without any right to do so as specified herein, Seller shall be entitled to receive the Earnest Money as its sole damages under this Agreement.

D.    Disbursement of Earnest Money. In the event that the sale of the Property is consummated as contemplated in this Agreement, then the Earnest Money shall be applied to the Purchase Price or returned to Purchaser at Closing, as Purchaser shall direct.  In the event that this Agreement is terminated prior to consummation of the sale of the Property in accordance with this Agreement, then the Earnest Money shall be delivered as provided herein or as otherwise directed in writing by Purchaser and Seller.

E.    Authority to Disburse Earnest Money. The Escrow Agent shall be authorized to make disbursements of the Earnest Money authorized herein without any further joinder or approval of Seller or Purchaser; provided, however, that, if Purchaser does not terminate this Agreement pursuant to an express right to do so as provided herein, then the Escrow Agent shall not thereafter disburse the Earnest Money to either party hereto until and unless either (i) the Escrow Agent has received a notice signed jointly by both parties or a court order directing such disbursement or (ii) the Escrow Agent has received a request for such disbursement signed by one of the parties and has given the other party notice of such request not less than five (5) business days prior to consummating such disbursement.

5.    SURVEY AND TITLE DOCUMENTS.

A.    Survey. **Within ten (10) days after the Effective Date**, Seller, at its sole cost and expense, shall deliver to Purchaser its existing survey on the Property.  The Survey shall be in a form acceptable to the Title Company for the deletion of the standard survey exception relating to boundaries, which if applicable may require the Seller providing an affidavit to the Title Company that there have not been any changes to the condition of the Property which would render the existing survey inaccurate for any reason; which the Seller covenants to provide, if and to the extent such is factual. The Survey must: (a) Identify the Land by metes and bounds, and by platted lot description; (b) Show that the Survey was made and staked on the ground with corner permanently marked; (c) Set forth the dimensions and total area of the Land; (d) Show the location of all improvements, highways, streets, roads, railroads, rivers, creeks or other waterways, fences, easements and rights-of-way on the Land with all easements and rights-of-way referenced to their recording information; (e) Show any discrepancies or conflicts in boundaries, any visible encroachments and any portion of the Land lying in a special flood hazard area (an "A" or "V" zone as show on the current Federal Emergency Management Agency (FEMA) flood insurance rate map); and (f) Contain the surveyor certificate that the survey is true and correct. If the Survey is not acceptable to the Purchaser or the Title Company, then Purchaser may update the Survey prior to Closing at Purchaser's cost (provided however, that if and conditioned upon the Closing, then the Seller shall reimburse Purchaser for the costs of any such update of the Survey up to the

APP000328

amount of $3,000.00, but not otherwise). At Closing, the metes and bounds description of the Land reflected in the Survey (or update thereof, as the case may be), upon approval of the Purchaser and Title Company, shall be used in the warranty deed and any other closing documents requiring a legal description of the Property.

B.     Title Commitment. **Within ten (10) days after the Effective Date**, Seller shall, at Seller's sole cost and expense, deliver or cause to be delivered to Purchaser (1) a title commitment (the "Title Commitment") covering the Property binding the Title Company to issue a Texas Owner Policy of Title Insurance (the "Title Policy") on the standard form prescribed by the Texas State Board of Insurance at the Closing, in the full amount of the Purchase Price, insuring Purchaser's fee simple title to the Property to be good and indefeasible, subject only to the Permitted Exceptions as defined below, and (2) the following documents (collectively, the "Title Documents"): (a) true and legible copies of all recorded instruments affecting the Property and recited as exceptions in the Title Commitment, (b) a current tax certificate, and (c) written notices as required in Section 5(C).

C.     Special Assessment Districts. If the Property is situated within a utility district or flood control district subject to the provisions of Section 50.301, Texas Water Code, then Seller shall give to Purchaser as part of the Title Documents the required written notice and Purchaser agrees to acknowledge receipt of the notice in writing. The notice must set forth the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and must comply with all other applicable requirements of the Texas Water Code. If the Property is subject to mandatory membership in a property owner's association, Seller shall notify Purchaser of the current annual budget of the property owners' association, and the current authorized fees, dues and/or assessments relating to the Property.

6.     REVIEW OF TITLE DOCUMENTS.

A.     Review Period. Purchaser shall have Ten (10) days (the "Review Period") after Purchaser's receipt of the last of (i) the Survey (or any update thereof, as the case may be), (ii) the Title Commitment, and (iii) the Title Documents, to review them. If Purchaser has any objections to the Survey, Title Commitment or Title Documents, then Purchaser may deliver the objections to Seller prior to the expiration of the Review Period. Except as otherwise provided herein, any item to which Purchaser or its lender does not object prior to the expiration of the Inspection Period which is not otherwise required to be cured by the Title Company shall be deemed a "Permitted Exception." Any other provision herein to the contrary notwithstanding, all liquidated liens disclosed in the Title Commitment (or any subsequent commitment) and all other exceptions disclosed in the Title Commitment (or any subsequent commitment) which arise on or after the Effective Date of this Agreement and are not attributable to actions by Purchaser (collectively, the "**Mandatory Cure Items**"), shall be satisfied, cured or removed by Seller, at Seller's sole cost and expense, at or prior to the Closing. The Mandatory Cure Items and any other items that the Title Company identifies that it requires to be released at Closing will be deemed objections by Purchaser that must be cured and shall not be Permitted Exceptions. If there are objections by Purchaser, including a third party lender, Seller may, but is not obligated to attempt to satisfy such objections except as otherwise provided herein, and Seller shall respond in writing irrevocably identifying which objections it will not cure and which objects it will cure which shall occur within

Contract of Sale –

4

APP000329

ten (10) days after receipt of Purchaser's objections (the "Cure Period"). If Seller fails to respond to Purchaser's written objections, then Seller shall be deemed to be obligated to cure all such objections prior to or at Closing, by a credit toward the Purchase Price, as a condition to Purchaser's closing. Regardless of any conflict herein or Purchaser's objections or any failure to object, any blanket easements, Seller's retained rights or rights of third parties including mineral owners and lessees, restrictions, or other encumbrances which would prohibit or materially interfere with or increase the costs of Purchaser's redevelopment of the Land shall be deemed objections which must be cured by Seller at Seller's expense prior to Closing which shall be a condition to Purchaser's closing. Otherwise, Purchaser's failure to object within the time provided shall be a waiver of the right to object.

B.      Cure Period. If Seller cannot cure the objections as required above within the Cure Period, then Purchaser may terminate this Contract by delivering a written notice to Seller within ten (10) days after the expiration of the Cure Period and otherwise shall be deemed to have elected to extend the Cure Period as necessary but not later than the Closing Date in order for Seller to cure such objection which shall be a condition for Purchaser to close but which may be waived by Purchaser prior to Closing. If Purchaser terminates this Contract or elects not to close because of Seller's failure to cure any required objection, the refundable portion of the Earnest Money and any fees remitted by Purchaser shall be immediately returned to Purchaser and thereafter neither party shall have any rights or obligations under this Contract (except for those which may expressly survive the termination of this Contact). If Purchaser does not terminate this Contract and proceeds with Closing, then Purchaser shall be deemed to have waived any uncured objections and must accept such title as Seller is able to convey as of Closing, subject to the other terms and provisions of this Contract. Notwithstanding the foregoing, at or prior to Closing, Seller shall discharge or cause to be discharged all: (i) matters set forth on Schedule C of the Title Commitment; (ii) exceptions to title created after the Effective Date without the written consent of Purchaser; and (iii) judgments, liens and mortgages affecting the Property, and same shall not constitute Permitted Exceptions.

C.      Updated Commitment.     If Purchaser elects not to terminate this Agreement in accordance with Section 6A or 6B  above, Seller, upon request of Purchaser, shall cause Title Company to reissue from time to time the Commitment prior to Closing. Purchaser shall have the right to object to any new exceptions other than the Permitted Exceptions shown on any updated Commitment. If Seller fails to cure such items, Purchaser shall again have the right to terminate this Agreement and be reimbursed the Earnest Money or waive the objection. The time periods for objecting to and curing the additional exceptions and for terminating this Agreement shall be the same as those set forth in Sections 6A and 6B  above, commencing with the date Purchaser receives the updated Commitment, and, if necessary, the Closing Date shall be extended for such purposes.

7.     SELLER'S WARRANTIES AND REPRESENTATIONS.

A.      Statements. Seller represents and warrants to Purchaser as of the Effective Date and as of the Closing as follows:

Contract of Sale –                                                                                                       5

APP000330

(1)    Title.  Seller has the right to, and will, convey to Purchaser good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments, unrecorded easements, security interests and other encumbrances except only to the Permitted Exceptions.

(2)    Leases.  There are not any parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers.

(3)    Negative Covenants.  Seller shall not further encumber any of the Property or allow an encumbrance upon the title to any of the Property, or execute or modify the terms or conditions of any leases, contracts or encumbrances, if any, currently affecting the Property without the written consent of Purchaser.

(4)    Liens and Debts.  Except for the liens securing any existing mortgages which will be paid in full at Closing, there are no mechanic's liens, Uniform Commercial Code liens or unrecorded liens against the Property, and Seller shall not allow any such liens to attach to the Property prior to Closing, which will not be satisfied out of the Closing proceeds. All obligations of Seller arising from the ownership and operation of the Property and any business operated on the Property, including, but not limited to, taxes, leasing commissions, salaries, contracts, and similar agreements, have been paid or will be paid prior to Closing. Except for obligations for which provisions are made in this Contract for prorating at Closing, there will be no obligations of Seller with respect to the Property outstanding as of Closing.

(5)    Litigation.  There is no pending or, to the knowledge of Seller, threatened litigation, condemnation, or assessment affecting Seller or any of the Property, pending or being prosecuted in any court or by or before any federal, state, county or municipal department, commission, board, bureau or agency or other governmental entity.   Seller shall promptly advise Purchaser of any litigation, condemnation or assessment affecting the any of Property which is threatened or instituted after the Effective Date.

(6)    Hazardous Materials.  Except as otherwise disclosed in writing by Seller to Purchaser prior to the Effective Date, to the knowledge of Seller, the Property (including the improvements located thereon) does not contain any Hazardous Materials (defined below). For purposes of this Contract, the term "Hazardous Materials" means any pollutants, toxic substances, oils, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to the Resource Conservation and Recovery Act, as amended, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Federal Clean Watch Act, as amended, or any other Federal, State or local environmental law, regulation, ordinance, rule, or bylaw, whether existing as of the Effective Date, or subsequently enacted.

(7)    Surface Use.  No party has any right to use the surface of the Land or otherwise, Seller shall provide a surface use waiver at Closing under which any party which has any surface use rights, including any mineral owner or lessee, waives any right to use the surface of the Land.

Contract of Sale –                                                                                                6

APP000331

(8)     Operation of the Property. After the Effective Date until the Closing Date, Seller shall (a) operate the Property in the same manner as the Property has been operated, and (b) maintain the Property in the same condition and in the same manner as existed on the Effective Date, except for ordinary wear and tear and any casualty loss.

(9)     Seller's Authority. This Agreement has been duly authorized by requisite action and is enforceable against Seller in accordance with its terms; neither the execution and delivery of this Agreement nor the consummation of the sale provided for herein will constitute a violation or breach by Seller of any provision of any agreement or other instrument to which Seller is a party or to which Seller may be subject although not a party, or will result in or constitute a violation or breach of any judgment, order, writ, junction or decree issued against or binding upon Seller or the Property.

(10)     Seller Not Foreign Person. Seller is not a foreign person or entity as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and Purchaser is not obligated to withhold portions of the Purchase Price for the benefit of the Internal Revenue Service.

(11)     No Insolvency Proceedings. No attachment, execution, assignment for the benefit of creditors, receivership, conservatorship or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relief laws is contemplated or has been filed by or against Seller or the Property, nor is any such action pending by or against Seller or the Property.

(12)     No Competing Rights. No person, firm or entity, other than Purchaser, has any right to purchase, lease or otherwise acquire or possess the Property or any part thereof;

(13)     No Regulatory Violations. Seller has no knowledge that, and has not received any written or other notice that, the Property is in breach of any law, ordinance or regulation, or any order of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located, including, without limitation, those relating to environmental matters and hazardous waste, and no claim, action, suit or proceeding is pending, or, to the best of Seller's knowledge and belief and after due inquiry, threatened against or affecting Seller or affecting the Property, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or entity wherever located, with respect to the Property or the Seller's present use and operation of the Property;

B.     Definitions of "Knowledge" and "Belief." When reference is made in this Agreement to Seller's "knowledge" or "belief", such terms shall include only the actual knowledge and belief of _____ Spiro Trajcevski _____ and _____ and shall be deemed to imply that Seller and the above identified person or persons has conducted such inquiry or investigation with respect to the subject matter of any representation or warranty which is so qualified as shall have been reasonably necessary to make such representation or warranty. Seller acknowledges that Purchaser has relied and will rely on the representations and warranties of Seller in executing this Agreement and in closing the purchase and sale of the Property pursuant to this Agreement, and Seller, during the term of this Agreement, agrees to notify Purchaser in writing promptly in the event of any change affecting any of such representations and warranties,

Contract of Sale --                                                                                          7

APP000332

in which event Purchaser shall be entitled to exercise the remedies set forth in Section 13A hereof. Until and unless Seller's warranties and representations shall have been qualified and modified as appropriate by any such additional information provided by Seller to Purchaser, Purchaser shall continue to be entitled to rely on Seller's representatives and warranties set forth in this Agreement, notwithstanding any contrary information resulting from any inspection or investigation made by or on behalf of Purchaser.

     C.     Remedies. If Purchaser discovers prior to Closing that any of Seller's warranties or representations has been misrepresented or is inaccurate, Purchaser may notify Seller promptly in writing, and Seller shall correct or remedy the misrepresentation or inaccuracy at Seller's expense. If the misrepresentation or inaccuracy is not remedied prior to Closing, upon written notice to Seller, Purchaser may: (i) proceed to Closing without waiving any claim for breach of warranty or misrepresentation; or (ii) delay Closing until ten (10) days after the misrepresentation or inaccuracy is remedied or such other period necessary for Seller to cure such issue; or (iii) exercise Purchaser's remedies for default by Seller under this Contract including terminating this Contract and being refunded all Earnest Money and any other fees paid to Seller. If Purchaser discovers after Closing that any of Seller's warranties or representations has been misrepresented or is inaccurate, Purchaser may notify Seller promptly in writing, and Seller may attempt to correct or remedy the misrepresentation within thirty (30) days of such notice and to the extent Seller is unable to remedy such warranty or misrepresentation then Purchaser may pursue any remedy available at law or in equity except that Purchaser may not pursue any punitive, speculative, or consequential damages. The Parties agree that Seller will incur no liability or damages pursuant to this Section 7 for any claim or cause of action asserted more than ONE HUDNRED EIGHTY (180) DAYS after the date of the Closing.

     D.     **NO OTHER WARRANTIES AND DISCLAIMER. EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND SELLER'S WARRANTY OF TITLE SET FORTH IN THE DEED(S), PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS, AND PURCHASER IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (D) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, OR (E) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND SELLER'S WARRANTY OF TITLE SET FORTH IN THE DEED CONVEYING THE PROPERTY TO PURCHASER, PURCHASER UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS PURCHASER MIGHT HAVE (INCLUDING CONTRACTUAL AND/OR STATUTORY ACTIONS FOR CONTRIBUTION OR INDEMNITY)**

Contract of Sale –                                                                                          8

APP000333

**REGARDING THE NATURE, CONDITION OR SUITABILITY OF THE PROPERTY OR ANY FORM OF WARRANTY WITH RESPECT TO THE PROPERTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.**

8.    NONCONFORMANCE. Purchaser has or will independently investigate and verify to Purchaser's satisfaction the extent of any limitations or permitted uses of the Property. Purchaser acknowledges that the current use of the Property or any improvements located on the Property (or both) may not conform to applicable Federal, State or municipal laws, ordinances, codes or regulations. Zoning, permitted uses, height limitations, setback requirements, minimum parking requirements, limitations on coverage of improvements to total area of land, requirements of the Americans with Disabilities Act, wetlands restrictions and other matters may have a significant economic impact upon the intended use of the Property by Purchaser. However, if Seller is aware of nonconformance with any Federal, State or local laws, ordinances, codes or regulations, Seller shall disclose same to Purchaser. Purchaser is not relying upon any warranties or representations of Seller or the Broker concerning the permitted uses of the Property or with respect to any nonconformance of the Property.

9.    INSPECTION.

A.    Inspection. Purchaser shall have a period of **Ninety (90)days** after the Effective Date (the "Inspection Period"), subject to the conditions listed in Section 9(B) below, to inspect the Property and to conduct feasibility studies regarding Purchaser's intended use of the Property. Purchaser's studies may include without limitation:  (i) core borings; (ii) environmental and architectural tests and investigations; (iii) physical inspections of all improvements, fixtures, equipment, subsurface soils, structural members, and personal property; and (iv) examination of plans specifications, manuals, and other documents relating to the construction and condition of the Property. Purchaser and Purchaser's agents employees, consultants and contractors shall have the right of reasonable entry onto the Property during normal business hours, and upon reasonable advance notice to Seller and/or Seller's tenants, for purposes of the inspections, studies, tests and examinations deemed necessary by Purchaser. **Purchaser and or its agents, employees, consultants and or contractors shall have and maintain adequate liability insurance in force and effect covering the activies of such persons on the Property.**   All inspections, studies, tests and examinations performed hereunder shall be at Purchaser's expense. If Purchaser terminates this Contract, Purchaser shall reasonably restore the Property to substantially its same state or condition prior to such inspection, and shall deliver copies of third party studies it obtains on the Property to the Seller, all of which shall be delivered without representation or warranty by Purchaser. Purchaser shall not, however, be required to deliver to Seller copies of any reports or other "work product" prepared or developed by Purchaser or any of its employees or affiliates.

B.    Report. Prior to the expiration of ten (10) days following the Effective Date ("Seller Delivery Date"), Seller shall deliver or cause to be delivered to Purchaser, copies of any and all other documents, instruments and information known to Seller or in Seller's actual possession or control and/or received pursuant to or in connection with the Property including relating to the condition, status, and approvals of the Land including, without limitation, all platting and zoning

APP000334

applications and proposed zoning documents, contracts, development agreements, permits, annexation, approvals, compliance, declarations, restrictions, preliminary plans, site plans, conceptual plans, preliminary plats, final plats, topographical maps, soil tests, inspection reports, environmental reports, flood plain information and building restrictions and any and all documents creating, evidencing, governing or created by or for any property or homeowners' association affecting, governing or relating to the Land or the Lots. Seller shall use its best efforts to cause any soils tests and environmental reports, if any, to be reissued and/or updated at Purchaser's cost (subject to Purchaser's approval prior to such cost being incurred), and to have reliance letters issued on any existing soils tests and environmental reports, to Purchaser relating thereto, at no cost to Purchaser.

      C.     Termination. If Purchaser determines, in Purchaser's sole discretion, no matter how arbitrary, that the Property is not in satisfactory condition or is not suitable for Purchaser's intended use or purpose, or if Purchaser for any reason does not desire to proceed with the acquisition of the Property, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the last day of the Inspection Period, in which event, the Earnest Money, other than the Independent Consideration, shall be promptly returned by the Title Company to Purchaser and neither party shall have any further rights or obligations under this Contract (except for those which may expressly survive the termination of this Contract).

      D.     Restoration. If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to tests and inspections performed by Purchaser or on Purchaser's behalf, Purchaser must restore the Property to its original condition. Purchaser shall not permit any liens or encumbrances to arise against the Property in connection with or as a result of such inspections, studies, or investigations. **PURCHASER SHALL INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS OF AND FROM ANY AND ALL LOSSES, LIABILITIES, COSTS, EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS OF COURT), DAMAGES, LIENS, CLAIMS (INCLUDING, WITHOUT LIMITATION, MECHANICS' OR MATERIALMEN'S LIENS OR CLAIMS OF LIENS), ACTIONS AND CAUSES OF ACTION (COLLECTIVELY, "CLAIMS") ARISING FROM OR RELATING TO PURCHASER'S (OR PURCHASER'S AGENTS, EMPLOYEES, CONTRACTORS, SUBCONTRACTORS, OR REPRESENTATIVES) ENTERING UPON THE PROPERTY TO TEST, STUDY, INVESTIGATE, OR INSPECT THE PROPERTY, WHETHER PURSUANT TO THIS SECTION 9, OR OTHERWISE, UNLESS DUE TO THE NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER.** Purchaser will not be required to indemnify, defend or hold Seller harmless of or from any condition affecting any of the Property prior to Purchaser's entry thereon. This Section 9(E) shall survive termination of this Contract or a Closing of the transaction contemplated hereunder.

      E.     Extension of Inspection Period. Purchaser may extend the Inspection Period for an additional thirty (30) days upon the delivery to the Title Company of an Additional Earnest Money deposit of **TEN-THOUSAND AND 00/100 DOLLARS ($10,000.00)** (this and any other "Additional Earnest Money" together with the initial "Earnest Money" referred to collectively as "Earnest Money") prior to the expiration of the Inspection Period which shall be be treated as any other Earnest Money; BUT SHALL NOT be applicable to the Purchase Price at the Closing.

Contract of Sale –                                                                                                                    10

APP000335

10.    CASUALTY LOSS; CONDEMNATION.  All risk of loss to the Property shall remain upon Seller prior to the Closing.  If, prior to the Closing, any portion of the Property is damaged or destroyed by fire or other casualty, or subject to a condemnation or taking or the threat of a condemnation or taking, Seller shall have a duty to notify Purchaser, and Purchaser may either terminate this Contract by delivering a written termination notice to Seller or elect to close.  If the transaction is to proceed to Closing, there shall be no reduction in the Purchase Price, but Seller shall assign to Purchaser all of Seller's right and interest in any insurance proceeds and/or condemnation awards, as applicable, plus an amount equal to any insurance deductible.

11.    ASSIGNMENT.  Purchaser may assign this Contract without the prior written consent of Seller. This Contract shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devises of the parties; however, Seller may not assign this Contract without Purchaser's consent.

12.    CLOSING.

A.    Closing Date.  The closing of the transaction described in this Contract (the "Closing") shall be held on the date which is **sixty (60) days following the last day of the Inspection Period** (the "Closing Date"), at the offices of the Title Company.  Purchaser may extend the Closing Date for two (2) thirty (30) day periods upon the delivery to the Title Company of a non-refundable extension fee equal to **Twenty Thousand and 00/100 Dollars ($20,000.00)** for each extension prior to the applicable Closing Date. The extension fee shall be **non-refundable** to Purchaser unless:

(a)    Seller fails or refuses to comply in a timely manner with its obligations hereunder, or

(b)    at the Closing, any of Seller's representations, warranties or covenants contained herein is not true or has been breached or modified, or

(c)    or in the event that, at the Closing, any condition precedent to Purchaser's obligations hereunder is not fully satisfied as herein required, or

(d)    this Contract is terminated pursuant to Sections 6 (Review of Title Documents), 10 (Casualty Loss; Condemnation) or 13(A) (Purchaser's Remedies) hereof,

in which case such shall be disposed in accordance with the provisions of this Agreement relating to Earnest Money.  The extension fee shall **NOT** be applicable to Purchase Price at Closing.

B.    Seller's Closing Documents.  At the Closing, Seller shall deliver to Purchaser at Seller's expense:

(1)    A duly executed Special Warranty Deed (the "Deed"), in a form reasonably acceptable to Seller and Purchaser, conveying the Property in fee simple according to the legal description as prepared by the surveyor as shown on the Survey, subject only to the Permitted Exceptions;

(2)    The Title Policy issued by the underwriter for the Title Company pursuant to the Title Commitment, subject only to the Permitted Exceptions, in the full amount of

APP000336

the Purchase Price, dated as of the date of Closing, and with the survey exception deleted except as to "shortages in area;"

(3)    Bill of Sale conveying the personal property, if any, including all Intangible Property and other items described in section 2 which are not considered part of the Land;

(4)    Possession of the Property;

(5)    Evidence of Seller's authority and capacity to close this transaction;

(6)    Assignment of all Intangible Property; if any, relating to the Property;

(7)    Any required surface use waiver; as may be requested or required by Purchase or its lender,

(8)    All other documents reasonably required in this Contract or by the Title Company from Seller to close this transaction.

C.    Purchaser's Closing Documents. At the Closing, Purchaser shall deliver to Seller at Purchaser's expense:

(1)    The Cash Payment;

(2)    [reserved];

(3)    Evidence of Purchaser's authority and capacity to close this transaction; and

(4)    All other documents reasonably required by the Title Company from Purchaser to close this transaction.

D.    Closing Costs. The base title policy premiums shall be paid by Seller and any endorsements or extended coverage shall be paid by Purchaser. Any survey costs shall be allocated to the party listed at Section 5(A). The Seller shall pay the costs of recording any releases, and the Purchaser shall pay the cost of recording the deed and any lender costs on its side of the transaction. The escrow fees shall be equally split between the parties. All other costs shall be allocated among the Parties as is customary for a transaction of this character in the county where the Property is located, or as otherwise agreed.

E.    Real Estate Commissions. Seller shall be responsible for paying **Vanguard Real Estate Advisors** commission(s) as agreed under a separate agreement. Otherwise, each party to this Contract represents and warrants to the other party that such party has had no dealings with any person, firm, agent or finder in connection with the negotiation of this Contract and/or the consummation of the purchase and sale contemplated herein and no real estate broker, agent, attorney, person, firm or entity is entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such party. Each party hereby agrees to indemnify, defend, protect, and hold the other party harmless from and against any costs, expenses

Contract of Sale –                                                                                      12

APP000337

or liability for compensation, commission, fee, or charges which may be claimed by any agent, finder, or other similar party by reason of any dealings or acts of the indemnifying party.

      F.      <u>Prorations</u>. Prior to Closing, Seller shall pay prior to delinquency all taxes and expenses applicable to the Property. Ad valorem taxes applicable to the Property shall be prorated at the Closing effective as of the Closing date. If the Closing occurs before the tax rate is fixed for the current tax year, the apportionment of the taxes shall be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation, but any difference between estimated taxes for the current tax year and the actual taxes paid by Purchaser shall be adjusted equitably between the parties upon proof of payment of the taxes by Purchaser. This provision shall survive the Closing.

      G.      <u>Rollback Taxes</u>. Seller shall pay Purchaser any rollback taxes (i) within the three (3) year period immediately following the calendar year in which the Closing occurs; and (ii) attributable to the period that Seller owned the applicable portion of the Property. For purposes of calculating the Additional Tax, Seller shall be deemed to have owned the applicable portion of the Property for the five year period immediately preceding the Closing Date. Appropriate prorations shall be made in the calculation of any rollback taxes payable by Seller hereunder based upon the date on which the rollback taxes are actually triggered with respect to the Property. Alternatively, Purchaser may reduce the payment on the Note by the amount of Rollback Taxes assessed against the Property and owed by Seller following Closing. This provision shall survive Closing.

      H.      <u>Foreign Person Notification</u>. If Seller is a Foreign Person, as deemed by the U.S. Internal Revenue Code, or if Seller fails to deliver to Purchaser a non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code, then Purchaser may withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the withheld proceeds to the Internal Revenue Service together with appropriate tax forms. The required affidavit(s) from Seller(s) shall include (1) a statement that Seller is not a foreign person, (2) the U. S. taxpayer identification number(s) of Seller(s), and (3) other information required by Section 1445 of the Internal Revenue Code.

13.    DEFAULT.

      A.      <u>Purchaser's Remedies</u>. If Seller fails to perform its obligations under this Contract for any reason (except resulting from Purchaser's default or the termination of this Contract by Seller pursuant to a right to terminate as set forth in this Contract) which continues for more than five (5) business days following delivery of written notice of such default from Purchaser to Seller, Seller shall be in default and Purchaser may elect one of the following, as Purchaser's sole remedies: (1) enforce specific performance of this Contract; provided, however, that if Seller shall have **intentionally or wrongfully** taken or omitted to take any action which shall preclude or impair the ability of Purchaser to maintain any such action for specific performance, then Purchaser shall be entitled to seek damages for Seller's default; or (2) terminate this Contract and receive a refund of the Earnest Money along with any extension fees paid, other than the Independent Consideration, immediately. In the event of any breach of the representations or warranties in this Contract discovered after Closing or if Purchaser elects to enforce specific

APP000338

performance and such remedy is not available as a result of Seller's actions, such as conveying the Property to a third party, then Purchaser shall be entitled to seek damages.

B.    Seller's Remedies. If Purchaser fails to perform its obligations under this Contract for any reason (except resulting from Seller's default or the termination of this Contract by Purchaser pursuant to a right to terminate as set forth in this Contract) which continues for more than five (5) business days following delivery of written notice of such default from Seller to Purchaser, Purchaser shall be in default and Seller may, as Seller's sole remedy, terminate this Contract, in which event, the Earnest Money along with any extension fees paid by Purchaser shall be delivered to Seller as liquidated damages for the Purchaser's breach of this Contract, thereby releasing Purchaser from this Contract.

14.    Conditions Precedent. Purchaser's obligation to consummate the transaction contemplated herein is conditioned upon satisfaction of each of the following conditions at or prior to the Closing, any one or more of which conditions precedent may be waived by Purchaser in Purchaser's sole discretion:

(a) Representations and Warranties. None of the representations and warranties of Seller set forth in Article V hereof shall be untrue or inaccurate in any respect; and

(b) Seller's Obligations. Seller shall have performed or complied with Seller's covenants, agreements and obligations hereunder in all respects; and

(c) No Bankruptcy Proceeding. There shall not have been instituted by or against Seller or the Property any bankruptcy proceeding.

15.    MISCELLANEOUS PROVISIONS.

A.    Effective Date. The term "Effective Date" means the date the Contract is marked receipted by the Title Company (if any).

B.    Notices. All notices and other communications required or permitted under this Contract must be in writing and shall be deemed delivered on the earlier of: (i) actual receipt, if delivered in person or by messenger with evidence of delivery; or (ii) receipt of an electronic facsimile transmission ("Fax") with a transmission confirmation receipt; or email transmission, or (iii) three (3) business days after deposit in the United States Mail as required below. Notices may be transmitted by Fax to the Fax telephone numbers specified below, if any. Notices delivered by mail must be deposited with the U.S. Postal Service and sent by certified mail return receipt requested with postage prepaid, and properly addressed to the intended recipient at the address set forth below. Any party may change its address for notice purposes by delivering written notice of its new address to all other parties in the manner set forth above. For the purposes of notice, the addresses of the parties shall be as follows:

Purchaser:        Titan Invesments, LLC
                  13901 Midway Road. Ste 102.

Contract of Sale –                                                                    14

APP000339

|                    | Dallas, Texas 75244                                          |
|                    | TBarton@jmjdevelopment.com                                  |

With a Copy to:    The Marx Firm, LLC
                   Attn: Randy Marx
                   2999 Turtle Creek Blvd.
                   Dallas, Texas 75219
                   Randy@themarxfirm.com
                   214.360.9343
                   214.405.5120 cell

Seller:            First Development Company of Ohio, LLC
                   111 Lilyfield Dr.
                   Allen, Tx 75002
                   Phone: 586-709-6182
                   Email: spiro1000@gmail.com

With a Copy to:

Title Company:

                   **Title Partners, LLC**
                   **Attn: Mr. Judd Whiteman**
                   **judd.whiteman@titlepartnersllc.com**
                   **8350 N. Central Expressway, North Mezzainine Suite #M1090**
                   **Dallas, Texas 75206**
                   **Mobile:  214.649.4845**
                   **Fax:  214.987.6771**

     C.    Forms and Construction.    This Contract is the result of negotiations between the parties, neither of whom has acted under any duress or compulsion, whether legal, economic or otherwise. Accordingly, the terms and provisions hereof shall be construed in accordance with their usual and customary meanings. Seller and Purchaser hereby waive the application of any rule of law which otherwise would be applicable in connection with the construction of this Contract that ambiguous or conflicting terms or provisions should be construed against the party who (or whose attorney) prepared the executed Contract or any earlier draft of the same.

     D.    Attorneys Fees. The prevailing party in any legal proceeding brought in relation to this Contract or transaction shall be entitled to recover from the non-prevailing parties court costs, reasonable attorneys' fees and all other reasonable litigation expenses.

     E.    Integration. This Contract contains the complete agreement between the parties with respect to the Property and cannot be varied except by written agreement of the parties hereto. The parties agree that there are no oral or signed agreements, understandings, representations or warranties made by the parties which are not expressly set forth herein.

Contract of Sale –                                                                              15

APP000340

F.     Survival.    Any warranty, representation, covenant, condition or obligation contained in this Contract not otherwise consummated at the Closing along with any rights and obligations under any promissory note and deed of trust agreed to as part of any Seller financing will survive the Closing of this transaction and nothing herein shall act as an election, release, or waiver of any legal or equitable remedies related thereto.

G.     Binding Effect.  This Contract shall inure to the benefit of and be binding upon the parties to this Contract and their respective heirs, legal representatives, successors and assigns.

H.     Time for Performance.  Time is of the essence under each provision of this Contract. If any date of performance hereunder falls upon a Saturday, Sunday or recognized holiday, such date will be deemed moved forward to the next day which is not a Saturday, Sunday or recognized holiday.

I.     Right of Entry.  Subject to the requirements of Section 9, upon reasonable advance notice and during normal business hours, Purchaser, Purchaser's representatives and the Broker have the right to enter upon the Property prior to Closing for purposes of viewing, inspecting and conducting studies of the Property, so long as they do not unreasonably interfere with the use of the Property by Seller or any tenants, or cause undue damage to the Property.

J.     Business Day.  The term "business day" shall mean days elapsed exclusive of Saturday, Sunday or recognized holidays.

K.     Governing Law.  This Contract shall be construed under and governed by the laws of the State of Texas, and unless otherwise provided herein, all obligations of the parties created under this Contract are to be performed in the county where the Property is located.

L.     Severability.  If any provision of this Contract is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the invalid, illegal or unenforceable provision shall not affect any other provisions, and this Contract shall be construed as if the invalid, illegal, or unenforceable provision is severed and deleted from this Contract.

M.     Counterparts.  This Contract may be executed in a number of identical counterparts. Each counterpart is deemed an original and all counterparts shall, collectively, constitute one agreement.

N.     Gender; Number.  Unless the context requires otherwise, all pronouns used in this Contract shall be construed to include the other genders, whether used in the masculine, feminine or neuter gender. Words in the singular number shall be construed to include the plural, and words in the plural shall be construed to include the singular.

APP000341

O.    Cessation of Marketing Activities. From and after the Effective Date, Seller (i) shall suspend all activities to market the Property for sale; (ii) shall refer all persons making inquiry about the sale of the Property to Purchaser; and (iii) shall not enter into any contract to sell the Property to anyone other than Purchaser, including without limitation any contract denominated as a so-called "back-up contract".

16.    CONTRACT AS OFFER.  The execution of this Contract by the first party to do so constitutes an offer to purchase or sell the Property on the conditions contained in this Contract. Unless within ten (10) business days from the date of execution of this Contract by the first party, this Contract is accepted by the other party by signing the offer and delivering a fully executed copy to the first party, the offer of this Contract may be rescinded and the Earnest Money, if any, shall be promptly returned to Purchaser.

*[Signature Page to Follow]*

APP000342

EXECUTED on the dates stated below, to be effective on the Effective Date.

**SELLER:**

**First Development Company of Ohio, LLC**
A Texas limited liability company

By:
Name: Spiro Trajcevski
Title:   President
Date: February 10, 2022

**PURCHASER:**

**Titan Investments, LLC**
A Texas limited liability company

By:
Name: Tim Barton
Title:   President
Date:   Feb 10, 2023

Contract of Sale –                                                                                    18

APP000343

## Title Company Receipt and Acknowledgement

     The Title Company acknowledges receipt of a fully executed copoy of this Contract on February 10, 20 22 (the "Effective Date") and agrees to accept the Earnest Money, when deposited, subject to the terms and conditions set forth in this Contract and shall notify the parties once the Earnest Money is received.

TITLE COMPANY:

By: _____

Name: Jessica Puckett

Title: Commercial Escrow Officer

Contract of Sale –                                    19

APP000344

Exhibit "A"
**Property Legal Description**

As per the attached.

APP000345



APP000346

Case 3:22-cv-02118-X    Document 73-2    Filed 11/30/22    Page 166 of 308    PageID 1717

M:\JMJ 20220119 TitanFirstDevelopOhio16 3 acres\Purchase Agreement\20220208 b\PSA Titan Inv - First Development Co. of Ohio (16.3 ac Denison) v6.docx

Contract of Sale –

21

APP000347

# Titan Investments, LLC

Tuesday, January 18, 2022

Titan Investments LLC
13901 Midway Road. Ste 102
Dallas, Texas 75244
tbarton@jmjdevelopment.com

Re:    *Letter of Intent for 152+/- acres situated in Sherman, Texas.*

To Whom It May Concern:

       This letter of intent ("LOI") serves to communicate the non-binding intent of Seller (defined below) to sell and the non-binding intent of Purchaser (defined below) to purchase the real property and any improvements of the *152 +/- acres in Sherman, Texas,* generally in accordance with the terms set forth herein.  If Seller accepts the terms as set forth in this LOI, please so indicate by executing the signature block below.

| | |
|---|---|
| PURCHASER: | **Titan Investments, LLC** |
| SELLER: | **Datavault Joint Venture** |
| PURCHASE PRICE: | **$5,940,000**, Seller shall deliver the property free and clear of all encumbrances following the funding schedule below: |
| PROPERTY: | **152.187** acre lot, tract, or parcel of land east of U.S. Hwy 75 in the northeast quadrant of Sherman along Texoma Pkwy. |
| CONVEYANCE: | The Property shall be conveyed to Purchaser by Special Warranty Deed.  Any and all rights held by the Seller or affiliates that directly pertain to the Property as well as all mineral rights and any rights to development plans completed for the property shall transfer to Purchaser. |
| EARNEST MONEY: | Within **Five (5)** business days of the execution of the contract, Purchaser shall place in escrow, to be held by the title company, the "Earnest Money Deposit", to **Sendera Title** (hereinafter "Escrow" and the "Title Company"), an earnest money deposit (the "Deposit") in the amount of **Ten Thousand Dollars ($10,000)** under the terms of the Contract. The Deposit shall be refundable upon execution of |



APP000348

the Contract. The Deposit shall not be applied towards the Purchase Price.

**TITLE COMPANY:**

**Sendera Title**
1800 Valley View Ln. # 160.
Farmers Branch, Texas 75234
Attn: Jeanie Acord or Julie Lyssy

**TITLE AND SURVEY:**

Seller shall furnish to Purchaser within **Ten (10)** business days following the full execution of a Contract and the payment of the Deposit, at Seller's sole cost and expense, a Commitment for Title Insurance (the "Title Commitment") and an existing survey of the Property (the "Survey"). Purchaser shall have **Ten (10)** business days following the date of receipt of the Title Commitment and the Survey (the "Title Review Period") in which to review the state of Seller's title to the Property. If the Title Commitment and/or Survey reflect or disclose any defect, exception or other matter affecting the Property that is unacceptable to Purchaser for any reason whatsoever then, prior to the end of the Title Review Period, Purchaser shall provide Seller with written notice of its objections (the "Title Defect Notice"). Seller shall have no obligation to remove or cure such objections. If within **Ten (10)** business days following Seller's receipt of the Title Defect Notice the Seller fails to notify Purchaser in writing that it will cure all of the matters contained in the Title Defect Notice (the "Title Cure Notice"), then Purchaser may terminate the Contract at any time prior to (i) **Ten (10)** business days after the date of the Title Cure Notice, (ii) the end of the Feasibility Period and/or Extended Feasibility Period, or (iii) the end of the Entitlement Period. If any or all of the exceptions are not approved and accepted by the Purchaser, Purchaser shall be entitled to a full refund of all Deposits.

**FEASIBILITY PERIOD:**

Purchaser shall have a period of **One-Hundred Eighty (180)** business days after the date of the Escrow Deposit in which to inspect the property, perform studies and generally determine if the property is suitable for Purchaser's needs (the "Feasibility Period"). Prior to the end of the Feasibility Period, Purchaser may declare, in its sole discretion, the contract null and void, whereupon neither Seller nor Purchaser shall have any further obligations or liabilities to the other in connection with the transaction contemplated hereby. Purchaser shall have the right to extend the Feasibility Period for one **Thirty (30)** business day period by delivering to Title Company the extension fee of **$10,000.00** for the **Thirty (30)** business day



APP000349

extension **One** (**1**) business day prior to the expiration of the Feasibility Period, which shall be non-refundable. The extension fee shall be applicable to the Purchase price at closing.

CLOSING:

Closing shall occur at the offices of the Title Company on that date which is **Thirty** (**30**) business days after the expiration of the Feasibility Period, unless extended. Purchaser shall have the right to extend the closing date for **Two, Thirty** (**30**) business day periods by delivering to Title Company the extension fee of **$25,000.00** for each **Thirty** (**30**) day extension **Thirty** (**30**) business days prior to the scheduled closing date. The extension fee shall be applicable to the Purchase price at closing.

REMEDIES UPON DEFAULT:

In the event Seller defaults, Purchaser's sole remedy is to enforce specific performance of the Contract.

In the event Purchaser defaults, Seller may elect, in its sole discretion, to terminate the Contract by giving written notice thereof to Purchaser, whereupon neither party shall have any further rights or obligations under the Contract, and Seller shall retain the Earnest Money, free of any claims by Purchaser, as liquidated damages,

COUNTERPARTS:

The parties agree that this letter agreement may be executed in multiple counterparts and that facsimile transmitted copies will be acceptable as if executed as original.

REAL ESTATE COMMISSIONS:

Seller shall be responsible for paying Justin Tidwell of Vanguard Real Estate Advisors commissions as agreed under a separate agreement. Otherwise, each party to this Contract represents and warrants to the other party that such party has had no dealings with any person, firm, agent or finder in connection with the negotiation of this Contract and/or the consummation of the purchase and sale contemplated herein and no real estate broker, agent, attorney, person, firm or entity is entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such party. Each party hereby agrees to indemnify, defend, protect, and hold the other party harmless from and against any costs, expenses or liability for compensation, commission, fee, or charges which may be claimed by any agent, finder, or other similar party by reason of any dealings or acts of the indemnifying party.



APP000350

This Letter of Intent shall terminate without liability to any party upon the occurrence of any one of the following events: (a) all parties are unable to agree upon all terms, representations, covenants, warranties, conditions and provisions of the Contract, as to both form and substance, or evidenced by the execution of a definitive purchase and sale agreement (the "Contract") by the parties; or (b) either Purchaser or Seller submits, at any time prior to execution of a definite contract, written notification of its intent to abandon the proposed transaction.

The foregoing merely constitutes a possible structure for a potential transaction and does not constitute a binding agreement because it does not contain all matters upon which agreement must be reached in order for such a transaction to be consummated.  A binding commitment with respect to the potential transaction outlined herein will result only from the mutual execution of a Contract.

Upon acceptance and approval of this Letter of Intent, along with final definition of the Property, Purchaser shall cause a draft Contract to be prepared and delivered to Seller by Buyer and both parties agree to move in good faith to execute a final agreement.

Sincerely,

_Timothy Baxter_

AGREED AND ACCEPTED as of
the ___ day of _____, 2022:

_____

_____
By:

APP000351

# Titan Investments, LLC

Wednesday, January 12, 2022

Titan Investments LLC
13901 Midway Road. Ste 102
Dallas, Texas 75244
tbarton@jmjdevelopment.com

Re:    *Letter of Intent for 16.3 acres situated in Denison, Texas.*

Dear

    This letter of intent ("LOI") serves to communicate the non-binding intent of Seller (defined below) to sell and the non-binding intent of Purchaser (defined below) to purchase the real property and any improvements of the *16.3 acres in Denison, Texas,* generally in accordance with the terms set forth herein. If Seller accepts the terms as set forth in this LOI, please so indicate by executing the signature block below.

| | |
|---|---|
| PURCHASER: | **Titan Investments, LLC** |
| SELLER: | **First Development Co. of Ohio, LLC** |
| PURCHASE PRICE: | **$2,282,000,** Seller shall deliver the property free and clear of all encumbrances following the funding schedule below:<br>    • **$5,000** Earnest Money with execution of contract |
| PROPERTY: | 16.3 +/- acre lot, tract, or parcel of land along **Woodlawn Boulevard and West Coffin Street** in the **City of Denison, Grayson County, Texas.** |
| CONVEYANCE: | The Property shall be conveyed to Purchaser by Special Warranty Deed. Any and all rights held by the Seller or affiliates that directly pertain to the Property as well as all mineral rights and any rights to development plans completed for the property shall transfer to Purchaser. |
| EARNEST MONEY: | Within **Five (5)** calendar days of the execution of the contract, Purchaser shall place in escrow, to be held by the title company, the "Earnest Money Deposit", to ~~DLP Closing Services~~ (hereinafter "Escrow" and the "Title Company"), an earnest money deposit (the |

13901 Midway Road. Suite 102. Dallas, TX. US 75234
Phone (972) 385-9934 Fax (972) 241-4484
Page 1 of 5

*Fidelity natum*

APP000352

"Deposit") in the amount of **Five Thousand ($5,000)** under the terms of the Contract. The Deposit shall be refundable upon execution of the Contract. The Deposit shall be applied towards the Purchase Price.

**TITLE COMPANY:**

Josh Samuel, Fidelity National Title, jsamuel@fidelitypfg.

~~DLP Closing Services, LLC. Amanda V. Dean, amanda@dlpclosings.com. (484) 821-3341.~~

**TITLE AND SURVEY:**

Seller shall furnish to Purchaser within **Ten (10)** days following the full execution of a Contract and the payment of the Deposit, at Seller's sole cost and expense, a Commitment for Title Insurance (the "Title Commitment") and an existing survey of the Property (the "Survey"). Purchaser shall have **Ten (10)** days following the date of receipt of the Title Commitment and the Survey (the "Title Review Period") in which to review the state of Seller's title to the Property. If the Title Commitment and/or Survey reflect or disclose any defect, exception or other matter affecting the Property that is unacceptable to Purchaser for any reason whatsoever then, prior to the end of the Title Review Period, Purchaser shall provide Seller with written notice of its objections (the "Title Defect Notice"). Seller shall have no obligation to remove or cure such objections. If within **Ten (10)** days following Seller's receipt of the Title Defect Notice the Seller fails to notify Purchaser in writing that it will cure all of the matters contained in the Title Defect Notice (the "Title Cure Notice"), then Purchaser may terminate the Contract at any time prior to (i) **Ten (10)** days after the date of the Title Cure Notice, (ii) the end of the Feasibility Period and/or Extended Feasibility Period, or (iii) the end of the Entitlement Period. If any or all of the exceptions are not approved and accepted by the Purchaser, Purchaser shall be entitled to a full refund of all Deposits.

**FEASIBILITY PERIOD:**

*After 90 days, Purchaser shall deposit an additional $50,000 with Title Company which shall be non-refundable but applicable to Purchase Price at Closing.*

Purchaser shall have a period of **One-Hundred Twenty (120)** day(s) after the date of the Escrow Deposit in which to inspect the property, perform studies, rezone the property, and generally determine if the property is suitable for Purchaser's needs (the "Feasibility Period"). Prior to the end of the Feasibility Period, Purchaser may declare, in its sole discretion, the contract null and void, whereupon neither Seller nor Purchaser shall have any further obligations or liabilities to the other in connection with the transaction contemplated hereby. Purchaser shall have the right to extend the Feasibility Period for **Thirty (30)** day(s) period by delivering to Title Company the extension fee of **$10,000** for the **Thirty (30)** day extension **One (1)** days prior to the expiration of

APP000353

*which shall be non-refundable.*

*not*

the Feasibility Period. The extension fee shall ~~be~~ applicable to the Purchase price at closing.

CLOSING:
Closing shall occur at the offices of the Title Company on that date which is **Thirty (30)** days after the expiration of the Feasibility Period, unless extended. Purchaser shall have the right to extend the closing date for **Two, Thirty (30)** day periods by delivering to Title Company the extension fee of **$20,000.00** for each **Thirty (30)** day extension **Thirty (30)** days prior to the scheduled closing date. The extension fee shall ~~be~~ applicable to the Purchase price at closing.

*not*

REMEDIES UPON
DEFAULT:
In the event Seller defaults, Purchaser's sole remedy is to enforce specific performance of the Contract.

In the event Purchaser defaults, Seller may elect, in its sole discretion, to terminate the Contract by giving written notice thereof to Purchaser, whereupon neither party shall have any further rights or obligations under the Contract, and Seller shall retain the Earnest Money, free of any claims by Purchaser, as liquidated damages,

COUNTERPARTS:
The parties agree that this letter agreement may be executed in multiple counterparts and that facsimile transmitted copies will be acceptable as if executed as original.

This Letter of Intent shall terminate without liability to any party upon the occurrence of any one of the following events: (a) all parties are unable to agree upon all terms, representations, covenants, warranties, conditions and provisions of the Contract, as to both form and substance, or evidenced by the execution of a definitive purchase and sale agreement (the "Contract") by the parties; or (b) either Purchaser or Seller submits, at any time prior to execution of a definite contract, written notification of its intent to abandon the proposed transaction.

The foregoing merely constitutes a possible structure for a potential transaction and does not constitute a binding agreement because it does not contain all matters upon which agreement must be reached in order for such a transaction to be consummated. A binding commitment with respect to the potential transaction outlined herein will result only from the mutual execution of a Contract.

Upon acceptance and approval of this Letter of Intent, along with final definition of the Property, Purchaser shall cause a draft Contract to be prepared and delivered to Seller by Buyer and both parties agree to move in good faith to execute a final agreement.

APP000354

Sincerely.

TITAN INVESTMENTS LLC
TIM BARTON

AGREED AND ACCEPTED as of
the ___ day of _____, 2022:

_____

By:

APP000355

EXHIBIT A

**LEGAL TO BE ADDED**

13901 Midway Road. Suite 102. Dallas, TX. US 75234
Phone (972) 385-9934 Fax (972) 241-4484
Page 5 of 5

APP000356

## RESIGNATION
## TITAN INVESTMENTS, LLC

### (Resignation of Mr. Timothy L. Barton)

In accordance with the General Corporation Law of Delaware (the "GCL"), the undersigned, respecting **TITAN INVESTMENTS, LLC**, a Delaware limited liability company (the "Company"), hereby provides as follows:

I, the undersigned, **Timothy L. Barton,** hereby resign in all respects from any capacity as authorized signatory, or agent or agency of any kind or character whatsoever respecting the Company, if any; said resignation to become effective immediately:

_____
Timothy L. Barton

RESOLVED, that the undersigned manager(s) and or member(s) of the Company hereby acknowledge receipt and acceptance of the following resignation, effective October 6, 2022.

TITAN INVESTMENTS, LLC
A Delaware limited liability company

By: _____
Maximilien Barton, President

## RESIGNATION; AND ACCEPTANCE THEREOF
## (TITAN INVESTMENTS, LLC)- Page 1

APP000357

## CONTRACT OF SALE

IN CONSIDERATION of the mutual terms, provisions, covenants and agreements contained in this Contract of Sale (the "Contract"), the parties hereto agree as follows.

1.       PARTIES. Kingdom Road Equities, LLC ( "Seller"), shall cause the sale and convey same to Titan Investments, LLC (the "Purchaser"), and Purchaser shall buy and pay for the Property (defined below).

2.       PROPERTY.  Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title of two tracts totaling an estimated 25.958 acres situated in the City of Denison, Grayson County, Texas, an approximate legal description of which is set forth on Exhibit "A" attached hereto and incorporated herein by this reference for all purposes (the "Land"), together with (1) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, (2) all permits, approvals, licenses, leases, contracts, reports, water and sewer capacity commitments, all engineering and architectural plans, Declarant status under any Property Associations formed on the Land, rights to reimbursements from any governmental or quasi-agency for either utility impacts fees, taxing district bond sale proceeds if any, and other rights and interests owned or held by Seller, if any, in connection with the Land (collectively, "Intangible Property"), and (3) all easements owned by Seller, if any, which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "Property"), and Purchaser agrees to purchase the Property at the Purchase Price (hereinafter defined) and upon the terms set forth herein. The metes and bounds description of the Land contained in the Survey (hereinafter defined), if different from the legal description attached hereto, shall be substituted for Exhibit "A" and shall become a part of this Contract as the description of the Land to be conveyed hereunder.  Furthermore, Exhibit "A" shall be automatically updated to include the description of the tract(s) within the Property that Seller owns upon disclosure to the Purchaser by Seller which shall occur prior to the expiration of the Inspection Period.

3.       PURCHASE PRICE.  The purchase price for the Property is Three Million, Five Hundred Thousand Dollars ($3,500,000) (the "Purchase Price").

4.       EARNEST MONEY.

    A.       Within execution of this Contract, Purchaser shall deposit earnest money in the form of a check or wire transfer of funds in the amount of Ten Thousand Dollars ($10,000) (the "Earnest Money") with Chapin Title Company, Mr. Loren Siems, in its capacity as escrow agent, to be held in escrow pursuant to the terms of this Contract. Notwithstanding anything herein to the contrary, a portion of the Earnest Money in the amount of $100.00 shall be non-refundable and shall be distributed to Seller upon any termination of this Contract as full payment and independent consideration (the "Independent Consideration") for Seller's performance under this Contract.

    B.       If Purchaser fails to timely deposit the Earnest Money, Seller may terminate this Contract at any time before Purchaser deposits the Earnest Money with the Title Company. The Earnest Money, at Purchaser's election, may be placed in an interest-bearing account by the Title



Contract of Sale –

1

APP000358

Company, and any interest earned thereon shall become a part of the Earnest Money. If Purchaser terminates this Contract on or prior to the expiration of the Inspection Period, all Earnest Money, other than the Independent Consideration, shall be returned to Purchaser. If Purchaser does not terminate this Contract on or prior to the expiration of the Inspection Period, the Earnest Money shall be non-refundable to Purchaser unless this Contract is terminated pursuant to Sections 6, 10 or 13(A) hereof. If this Contract is terminated pursuant to either Sections 6, 10 or 13(A) after the expiration of the Inspection Period, the Earnest Money shall be returned to Purchaser. The Earnest Money shall be paid to Seller at the Closing and shall be applicable to the Purchase Price.

5.      SURVEY AND TITLE DOCUMENTS.

        A.      Survey. Within ten (10) days after execution of the Contract, Seller, at its sole cost and expense, shall deliver to Purchaser its existing survey on the Property. The Survey shall be in a form acceptable to the Title Company for the deletion of the standard survey exception relating to boundaries, which if applicable may require the Seller providing an affidavit to the Title Company that there have not been any changes to the condition of the Property which would render the existing survey inaccurate for any reason. If the Survey is not acceptable to the Title Company, Purchaser may update the Survey prior to Closing at Purchaser's cost. At Closing, the metes and bounds description of the Land reflected in the Survey shall be used in the warranty deed and any other closing documents requiring a legal description of the Property.

        B.      Title Commitment. Within ten (10) days after execution of the Contract, Seller shall, at Seller's expense, deliver or cause to be delivered to Purchaser (1) a title commitment (the "Title Commitment") covering the Property binding the Title Company to issue a Texas Owner Policy of Title Insurance (the "Title Policy") on the standard form prescribed by the Texas State Board of Insurance at the Closing, in the full amount of the Purchase Price, insuring Purchaser's fee simple title to the Property to be good and indefeasible, subject only to the Permitted Exceptions as defined below, and (2) the following documents (collectively, the "Title Documents"): (a) true and legible copies of all recorded instruments affecting the Property and recited as exceptions in the Title Commitment, (b) a current tax certificate, and (c) written notices as required in Section 5(C).

        C.      Special Assessment Districts. If the Property is situated within a utility district or flood control district subject to the provisions of Section 50.301, Texas Water Code, then Seller shall give to Purchaser as part of the Title Documents the required written notice and Purchaser agrees to acknowledge receipt of the notice in writing. The notice must set forth the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and must comply with all other applicable requirements of the Texas Water Code. If the Property is subject to mandatory membership in a property owner's association, Seller shall notify Purchaser of the current annual budget of the property owners' association, and the current authorized fees, dues and/or assessments relating to the Property.

6.      REVIEW OF TITLE DOCUMENTS.

        A.      Review Period. Purchaser shall have thirty (30) days (the "Review Period") after Purchaser's receipt of the last of (i) the Survey, (ii) the Title Commitment, and (iii) the Title

Contract of Sale –

2

APP000359

Documents, to review them. If Purchaser has any objections to the Survey, Title Commitment or Title Documents, Purchaser may deliver the objections to Seller prior to the expiration of the Review Period. Except as otherwise provided herein, any item to which Purchaser or lender does not object which is not otherwise required to be cured by the Title Company shall be deemed a "Permitted Exception." Items that the Title Company identifies that it requires to be released at Closing will be deemed objections by Purchaser that must be cured and shall not be Permitted Exceptions. If there are objections by Purchaser, including a third party lender, Seller may, but is not obligated to attempt to satisfy such objections except as otherwise provided herein, and Seller shall respond in writing identifying which objections it will not cure and which objects it will cure which shall occur within ten (10) days after receipt of Purchaser's objections (the "Cure Period"). If Seller fails to respond to Purchaser's written objections, then Seller shall be deemed to be obligated to cure all such objections prior to Closing as a condition to Purchaser's closing. Regardless of any conflict herein or Purchaser's objections or any failure to object, any blanket easements, Seller's retained rights or rights of third parties including mineral owners and lessees, restrictions, or other encumbrances which would prohibit or materially interfere with or increase the costs of Purchaser's redevelopment of the Land shall be deemed objections which must be cured by Seller at Seller's expense prior to Closing which shall be a condition to Purchaser's closing. Otherwise, Purchaser's failure to object within the time provided shall be a waiver of the right to object.

B.      Cure Period. If Seller cannot cure the objections as required above within the Cure Period, then Purchaser terminate this Contract by delivering a written notice to Seller within ten (10) days after the expiration of the Cure Period and otherwise shall be deemed to have elected to extend the Cure Period as necessary but not later than the Closing Date in order for Seller to cure such objection which shall be a condition for Purchaser to close but which may be waived by Purchaser prior to Closing. If Purchaser terminates this Contract or elects not to close because of Seller's failure to cure any required objection, the refundable portion of the Earnest Money and any fees remitted by Purchaser shall be immediately returned to Purchaser and thereafter neither party shall have any rights or obligations under this Contract (except for those which may expressly survive the termination of this Contact). If Purchaser does not terminate this Contract and proceeds with Closing, then Purchaser shall be deemed to have waived any uncured objections and must accept such title as Seller is able to convey as of Closing, subject to the other terms and provisions of this Contract. Notwithstanding the foregoing, at or prior to Closing, Seller shall discharge or cause to be discharged all: (i) matters set forth on Schedule C of the Title Commitment; (ii) exceptions to title created after the Effective Date without the written consent of Purchaser; and (iii) judgments, liens and mortgages affecting the Property, and same shall not constitute Permitted Exceptions.

7.      SELLER'S WARRANTIES AND REPRESENTATIONS.

A.      Statements. Seller represents and warrants to Purchaser as of the Effective Date and as of the Closing as follows:

(1)      Title. Seller has the right to, and will, convey to Purchaser good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments,

Contract of Sale –

3

APP000360

unrecorded easements, security interests and other encumbrances except only to the Permitted Exceptions.

(2)    Leases.    There are not any parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers.

(3)    Negative Covenants.    Seller shall not further encumber any of the Property or allow an encumbrance upon the title to any of the Property, or execute or modify the terms or conditions of any leases, contracts or encumbrances, if any, currently affecting the Property without the written consent of Purchaser.

(4)    Liens and Debts.    Except for the liens securing any existing mortgages which will be paid in full at Closing, there are no mechanic's liens, Uniform Commercial Code liens or unrecorded liens against the Property, and Seller shall not allow any such liens to attach to the Property prior to Closing, which will not be satisfied out of the Closing proceeds. All obligations of Seller arising from the ownership and operation of the Property and any business operated on the Property, including, but not limited to, taxes, leasing commissions, salaries, contracts, and similar agreements, have been paid or will be paid prior to Closing. Except for obligations for which provisions are made in this Contract for prorating at Closing, there will be no obligations of Seller with respect to the Property outstanding as of Closing.

(5)    Litigation.    There is no pending or, to the knowledge of Seller, threatened litigation, condemnation, or assessment affecting any of the Property. Seller shall promptly advise Purchaser of any litigation, condemnation or assessment affecting the any of Property which is threatened or instituted after the Effective Date.

(6)    Hazardous Materials.    Except as otherwise disclosed in writing by Seller to Purchaser prior to the Effective Date, to the knowledge of Seller, the Property (including the improvements located thereon) does not contain any Hazardous Materials (defined below). For purposes of this Contract, the term "Hazardous Materials" means any pollutants, toxic substances, oils, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to the Resource Conservation and Recovery Act, as amended, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Federal Clean Watch Act, as amended, or any other Federal, State or local environmental law, regulation, ordinance, rule, or bylaw, whether existing as of the Effective Date, or subsequently enacted.

(7)    Surface Use.    No party has any right to use the surface of the Land or otherwise, Seller shall provide a surface use waiver at Closing under which any party which has any surface use rights, including any mineral owner or lessee, waives any right to use the surface of the Land.

(8)    Operation of the Property.    After the Effective Date until the Closing Date, Seller shall (a) operate the Property in the same manner as the Property has been operated, and (b) maintain the Property in the same condition and in the same manner as existed on the Effective Date, except for ordinary wear and tear and any casualty loss.

Contract of Sale –                                                                                                          4

APP000361

B.      Remedies. If Purchaser discovers prior to Closing that any of Seller's warranties or representations has been misrepresented or is inaccurate, Purchaser may notify Seller promptly in writing, and Seller shall correct or remedy the misrepresentation or inaccuracy at Seller's expense. If the misrepresentation or inaccuracy is not remedied prior to Closing, upon written notice to Seller, Purchaser may: (i) proceed to Closing without waiving any claim for breach of warranty or misrepresentation; or (ii) delay Closing until ten (10) days after the misrepresentation or inaccuracy is remedied or such other period necessary for Seller to cure such issue; or (iii) exercise Purchaser's remedies for default by Seller under this Contract including terminating this Contract and being refunded all Earnest Money and any other fees paid to Seller. If Purchaser discovers after Closing that any of Seller's warranties or representations has been misrepresented or is inaccurate, Purchaser may notify Seller promptly in writing, and Seller may attempt to correct or remedy the misrepresentation within thirty (30) days of such notice and to the extent Seller is unable to remedy such warranty or misrepresentation then Purchaser may pursue any remedy available at law or in equity except that Purchaser may not pursue any punitive, speculative, or consequential damages. The Parties agree that Seller will incur no liability or damages pursuant to this Section 7 for any claim or cause of action asserted more than three hundred sixty five (365) days after the date of the Closing. The representations and warranties herein shall survive Closing.

C.      **NO OTHER WARRANTIES AND DISCLAIMER. EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND SELLER'S WARRANTY OF TITLE SET FORTH IN THE DEED(S), PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS, AND PURCHASER IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (D) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, OR (E) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND SELLER'S WARRANTY OF TITLE SET FORTH IN THE DEED CONVEYING THE PROPERTY TO PURCHASER, PURCHASER UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS PURCHASER MIGHT HAVE (INCLUDING CONTRACTUAL AND/OR STATUTORY ACTIONS FOR CONTRIBUTION OR INDEMNITY) REGARDING THE NATURE, CONDITION OR SUITABILITY OF THE PROPERTY OR ANY FORM OF WARRANTY WITH RESPECT TO THE PROPERTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.**

Contract of Sale –

5

APP000362

8.    NONCONFORMANCE.  Purchaser has or will independently investigate and verify to Purchaser's satisfaction the extent of any limitations or permitted uses of the Property.  Purchaser acknowledges that the current use of the Property or any improvements located on the Property (or both) may not conform to applicable Federal, State or municipal laws, ordinances, codes or regulations.  Zoning, permitted uses, height limitations, setback requirements, minimum parking requirements, limitations on coverage of improvements to total area of land, requirements of the Americans with Disabilities Act, wetlands restrictions and other matters may have a significant economic impact upon the intended use of the Property by Purchaser.  However, if Seller is aware of nonconformance with any Federal, State or local laws, ordinances, codes or regulations, Seller shall disclose same to Purchaser.  Purchaser is not relying upon any warranties or representations of Seller or the Broker concerning the permitted uses of the Property or with respect to any nonconformance of the Property.

9.    INSPECTION.

    A.    Inspection.  Purchaser shall have a period of sixty (60) days after the Effective Date (the "Inspection Period"), subject to the conditions listed in Section 9(B) below, to inspect the Property and to conduct feasibility studies regarding Purchaser's intended use of the Property. Purchaser's studies may include without limitation:  (i) core borings; (ii) environmental and architectural tests and investigations; (iii) physical inspections of all improvements, fixtures, equipment, subsurface soils, structural members, and personal property; and (iv) examination of plans specifications, manuals, and other documents relating to the construction and condition of the Property.  Purchaser and Purchaser's agents employees, consultants and contractors shall have the right of reasonable entry onto the Property during normal business hours, and upon reasonable advance notice to Seller and/or Seller's tenants, for purposes of the inspections, studies, tests and examinations deemed necessary by Purchaser.  All inspections, studies, tests and examinations performed hereunder shall be at Purchaser's expense. If Purchaser terminates this Contract, Purchaser shall deliver copies of third party studies it obtains on the Property to the Seller, all of which shall be delivered without representation or warranty by Purchaser. Purchaser shall not, however, be required to deliver to Seller copies of any reports or other "work product" prepared or developed by Purchaser or any of its employees or affiliates.

    B.    Report. Prior to the expiration of ten (10) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, copies of any and all other documents, instruments and information known to Seller or in Seller's actual possession or control and/or received pursuant to or in connection with the Property including relating to the condition, status, and approvals of the Land including, without limitation, all platting and zoning applications and proposed zoning documents, contracts, development agreements, permits, annexation, approvals, compliance, declarations, restrictions, preliminary plans, site plans, conceptual plans, preliminary plats, final plats, topographical maps, soil tests, inspection reports, environmental reports, flood plain information and building restrictions and any and all documents creating, evidencing, governing or created by or for any property or homeowners' association affecting, governing or relating to the Land or the Lots.  Seller shall use its best efforts to cause any soils tests and environmental reports, if any, to be reissued and/or updated at Purchaser's cost (subject to Purchaser's approval prior to such cost being incurred), and to have reliance letters issued on any existing soils tests and environmental reports, to Purchaser relating thereto, at no cost to Purchaser.

Contract of Sale –                                                                                          6

APP000363

C.      Termination. If Purchaser determines, in Purchaser's sole discretion, no matter how arbitrary, that the Property is not in satisfactory condition or is not suitable for Purchaser's intended use or purpose, or if Purchaser for any reason does not desire to proceed with the acquisition of the Property, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the last day of the Inspection Period, in which event, the Earnest Money, other than the Independent Consideration, shall be promptly returned by the Title Company to Purchaser and neither party shall have any further rights or obligations under this Contract (except for those which may expressly survive the termination of this Contract).

D.      Restoration. If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to tests and inspections performed by Purchaser or on Purchaser's behalf, Purchaser must restore the Property to its original condition. Purchaser shall not permit any liens or encumbrances to arise against the Property in connection with or as a result of such inspections, studies, or investigations. **PURCHASER SHALL INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS OF AND FROM ANY AND ALL LOSSES, LIABILITIES, COSTS, EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS OF COURT), DAMAGES, LIENS, CLAIMS (INCLUDING, WITHOUT LIMITATION, MECHANICS' OR MATERIALMEN'S LIENS OR CLAIMS OF LIENS), ACTIONS AND CAUSES OF ACTION (COLLECTIVELY, "CLAIMS") ARISING FROM OR RELATING TO PURCHASER'S (OR PURCHASER'S AGENTS, EMPLOYEES, CONTRACTORS, SUBCONTRACTORS, OR REPRESENTATIVES) ENTERING UPON THE PROPERTY TO TEST, STUDY, INVESTIGATE, OR INSPECT THE PROPERTY, WHETHER PURSUANT TO THIS SECTION 9, OR OTHERWISE, UNLESS DUE TO THE NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER.** Purchaser will not be required to indemnify, defend or hold Seller harmless of or from any condition affecting any of the Property prior to Purchaser's entry thereon. This Section 9(E) shall survive termination of this Contract or a Closing of the transaction contemplated hereunder.

E.      Extension. Purchase may extend the Inspection Period for an additional thirty (30) days upon the delivery to the Title Company of an additional Earnest Money deposit of Fice-Thousand and 00/100 Dollars ($5,000.00) ("Additional Earnest Money" together with the initial "Earnest Money" referred to collectively as "Earnest Money") prior to the expiration of the Inspection Period which shall be applicable to the Purchase Price.

10.     CASUALTY LOSS; CONDEMNATION. All risk of loss to the Property shall remain upon Seller prior to the Closing. If, prior to the Closing, any portion of the Property is damaged or destroyed by fire or other casualty, or subject to a condemnation or taking or the threat of a condemnation or taking, Seller shall have a duty to notify Purchaser, and Purchaser may either terminate this Contract by delivering a written termination notice to Seller or elect to close. If the transaction is to proceed to Closing, there shall be no reduction in the Purchase Price, but Seller shall assign to Purchaser all of Seller's right and interest in any insurance proceeds and/or condemnation awards, as applicable, plus an amount equal to any insurance deductible.

11.     ASSIGNMENT. Purchaser may assign this Contract without the prior written consent of

Contract of Sale –

7

APP000364

Seller. This Contract shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devises of the parties; however, Seller may not assign this Contract without Purchaser's consent.

12.    CLOSING.

A.    Closing Date.    The closing of the transaction described in this Contract (the "Closing") shall be held on the date which is sixty (60) days following the last day of the Inspection Period (the "Closing Date"), at the offices of the Title Company.    Purchaser may extend the Closing Date for two (2) thirty (30) day periods upon the delivery to the Title Company of a non-refundable extension fee equal to Ten Thousand and 00/100 Dollars ($10,000.00) for each extension prior to the applicable Closing Date. The extension fee shall be applicable to Purchase Price at Closing.

B.    Seller's Closing Documents.    At the Closing, Seller shall deliver to Purchaser at Seller's expense:

(1)    A duly executed Special Warranty Deed (the "Deed"), in a form reasonably acceptable to Seller and Purchaser, conveying the Property in fee simple according to the legal description as prepared by the surveyor as shown on the Survey, subject only to the Permitted Exceptions;

(2)    The Title Policy issued by the underwriter for the Title Company pursuant to the Title Commitment, subject only to the Permitted Exceptions, in the full amount of the Purchase Price, dated as of the date of Closing, and with the survey exception deleted except as to "shortages in area;"

(3)    Bill of Sale conveying the personal property, if any, including all Intangible Property and other items described in section 2 which are not considered part of the Land;

(4)    Possession of the Property;

(5)    Evidence of Seller's authority and capacity to close this transaction;

(6)    Assignment of all Intangible Property;

(7)    Any required surface use waiver;

(8)    All other documents reasonably required in this Contract or by the Title Company from Seller to close this transaction.

C.    Purchaser's Closing Documents. At the Closing, Purchaser shall deliver to Seller at Purchaser's expense:

(1)    The Cash Payment;



Contract of Sale –

8

APP000365

(2)    The Note in the principal amount of the Purchase Price less any and all Earnest Money deposits and applicable fees which have been remitted and the Deed of Trust;

(3)    Evidence of Purchaser's authority and capacity to close this transaction; and

(4)    All other documents reasonably required by the Title Company from Purchaser to close this transaction.

D.    Closing Costs. The base title policy premiums shall be paid by Seller and any endorsements or extended coverage shall be paid by Purchaser. Any survey costs shall be allocated to the party listed at Section 5(A). The Seller shall pay the costs of recording any releases, and the Purchaser shall pay the cost of recording the deed and any lender costs on its side of the transaction. The escrow fees shall be equally split between the parties. All other costs shall be allocated among the Parties as is customary for a transaction of this character in the county where the Property is located, or as otherwise agreed.

E.    Prorations. Prior to Closing, Seller shall pay prior to delinquency all taxes and expenses applicable to the Property. Ad valorem taxes applicable to the Property shall be prorated at the Closing effective as of the Closing date. If the Closing occurs before the tax rate is fixed for the current tax year, the apportionment of the taxes shall be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation, but any difference between estimated taxes for the current tax year and the actual taxes paid by Purchaser shall be adjusted equitably between the parties upon proof of payment of the taxes by Purchaser. This provision shall survive the Closing.

F.    Rollback Taxes. Seller shall pay Purchaser any rollback taxes (i) within the three (3) year period immediately following the calendar year in which the Closing occurs; and (ii) attributable to the period that Seller owned the applicable portion of the Property. For purposes of calculating the Additional Tax, Seller shall be deemed to have owned the applicable portion of the Property for the five year period immediately preceding the Closing Date. Appropriate prorations shall be made in the calculation of any rollback taxes payable by Seller hereunder based upon the date on which the rollback taxes are actually triggered with respect to the Property. Alternatively, Purchaser may reduce the payment on the Note by the amount of Rollback Taxes assessed against the Property and owed by Seller following Closing. This provision shall survive Closing.

G.    Foreign Person Notification. If Seller is a Foreign Person, as deemed by the U.S. Internal Revenue Code, or if Seller fails to deliver to Purchaser a non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code, then Purchaser may withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the withheld proceeds to the Internal Revenue Service together with appropriate tax forms. The required affidavit(s) from Seller(s) shall include (1) a statement that Seller is not a foreign person, (2) the U. S. taxpayer identification number(s) of Seller(s), and (3) other information required by Section 1445 of the Internal Revenue Code.



Contract of Sale –

9

APP000366

13.    DEFAULT.

A.    Purchaser's Remedies. If Seller fails to perform its obligations under this Contract for any reason (except resulting from Purchaser's default or the termination of this Contract by Seller pursuant to a right to terminate as set forth in this Contract) which continues for more than five (5) business days following delivery of written notice of such default from Purchaser to Seller, Seller shall be in default and Purchaser may elect one of the following, as Purchaser's sole remedies: (1) enforce specific performance of this Contract; or (2) terminate this Contract and receive a refund of the Earnest Money along with any extension fees paid, other than the Independent Consideration, immediately. In the event of any breach of the representations or warranties in this Contract discovered after Closing or if Purchaser elects to enforce specific performance and such remedy is not available as a result of Seller's actions, such as conveying the Property to a third party, then Purchaser may pursue any legal remedy available at law or in equity.

B.    Seller's Remedies. If Purchaser fails to perform its obligations under this Contract for any reason (except resulting from Seller's default or the termination of this Contract by Purchaser pursuant to a right to terminate as set forth in this Contract) which continues for more than five (5) business days following delivery of written notice of such default from Seller to Purchaser, Purchaser shall be in default and Seller may, as Seller's sole remedy, terminate this Contract, in which event, the Earnest Money along with any extension fees paid by Purchaser shall be delivered to Seller as liquidated damages for the Purchaser's breach of this Contract, thereby releasing Purchaser from this Contract.

14.    INTENTIONALLY OMITTED.

15.    MISCELLANEOUS PROVISIONS.

A.    Effective Date. The term "Effective Date" means the later of the date the Contract is marked receipted by the Title Company (if any) or date of execution of the last party executing this Contract and if not dated then the date the fully executed Contract is received by the first party which executed the Contract.

B.    Notices. All notices and other communications required or permitted under this Contract must be in writing and shall be deemed delivered on the earlier of: (i) actual receipt, if delivered in person or by messenger with evidence of delivery; or (ii) receipt of an electronic facsimile transmission ("Fax") with a transmission confirmation receipt; or (iii) three (3) business days after deposit in the United States Mail as required below. Notices may be transmitted by Fax to the Fax telephone numbers specified below, if any. Notices delivered by mail must be deposited with the U.S. Postal Service and sent by certified mail return receipt requested with postage prepaid, and properly addressed to the intended recipient at the address set forth below. Any party may change its address for notice purposes by delivering written notice of its new address to all other parties in the manner set forth above. For the purposes of notice, the addresses of the parties shall be as follows:

    Purchaser:        Titan Invesments, LLC
                      13901 Midway Road. Ste 102.

Contract of Sale –                                                10

APP000367

Dallas, Texas 75244
TBarton@jmjdevelopment.com

With a Copy to:      The Marx Firm
Attn: Randy Marx
2999 Turtle Creek Blvd.
Dallas, Texas 75244
Randy@themarxfirm.com


Seller:      Kingdom Road Equities. LLC
8650 Freeport Pkwy, Suite 100
Irving, TX 75063
Frank May
Frankmay683@gmail.com


With a Copy to:


   C.   Forms and Construction.    This Contract is the result of negotiations between the parties, neither of whom has acted under any duress or compulsion, whether legal, economic or otherwise. Accordingly, the terms and provisions hereof shall be construed in accordance with their usual and customary meanings. Seller and Purchaser hereby waive the application of any rule of law which otherwise would be applicable in connection with the construction of this Contract that ambiguous or conflicting terms or provisions should be construed against the party who (or whose attorney) prepared the executed Contract or any earlier draft of the same.

   D.   Attorneys Fees. The prevailing party in any legal proceeding brought in relation to this Contract or transaction shall be entitled to recover from the non-prevailing parties court costs, reasonable attorneys' fees and all other reasonable litigation expenses.

   E.   Integration. This Contract contains the complete agreement between the parties with respect to the Property and cannot be varied except by written agreement of the parties hereto. The parties agree that there are no oral or signed agreements, understandings, representations or warranties made by the parties which are not expressly set forth herein.

   F.   Survival.   Any warranty, representation, covenant, condition or obligation contained in this Contract not otherwise consummated at the Closing along with any rights and obligations under any promissory note and deed of trust agreed to as part of any Seller financing will survive the Closing of this transaction and nothing herein shall act as an election, release, or waiver of any legal or equitable remedies related thereto.

   G.   Binding Effect. This Contract shall inure to the benefit of and be binding upon the parties to this Contract and their respective heirs, legal representatives, successors and assigns.

Contract of Sale –                                                                                    11

APP000368

H.    Time for Performance.    Time is of the essence under each provision of this Contract. If any date of performance hereunder falls upon a Saturday, Sunday or recognized holiday, such date will be deemed moved forward to the next day which is not a Saturday, Sunday or recognized holiday.

I.    Right of Entry.    Subject to the requirements of Section 9, upon reasonable advance notice and during normal business hours, Purchaser, Purchaser's representatives and the Broker have the right to enter upon the Property prior to Closing for purposes of viewing, inspecting and conducting studies of the Property, so long as they do not unreasonably interfere with the use of the Property by Seller or any tenants, or cause undue damage to the Property.

J.    Business Day.    The term "business day" shall mean days elapsed exclusive of Saturday, Sunday or recognized holidays.

K.    Governing Law.    This Contract shall be construed under and governed by the laws of the State of Texas, and unless otherwise provided herein, all obligations of the parties created under this Contract are to be performed in the county where the Property is located.

L.    Severability.    If any provision of this Contract is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the invalid, illegal or unenforceable provision shall not affect any other provisions, and this Contract shall be construed as if the invalid, illegal, or unenforceable provision is severed and deleted from this Contract.

M.    Counterparts.    This Contract may be executed in a number of identical counterparts. Each counterpart is deemed an original and all counterparts shall, collectively, constitute one agreement.

N.    Gender; Number.    Unless the context requires otherwise, all pronouns used in this Contract shall be construed to include the other genders, whether used in the masculine, feminine or neuter gender.  Words in the singular number shall be construed to include the plural, and words in the plural shall be construed to include the singular.

17.    CONTRACT AS OFFER.    The execution of this Contract by the first party to do so constitutes an offer to purchase or sell the Property on the conditions contained in this Contract. Unless within ten (10) business days from the date of execution of this Contract by the first party, this Contract is accepted by the other party by signing the offer and delivering a fully executed copy to the first party, the offer of this Contract may be rescinded and the Earnest Money, if any, shall be promptly returned to Purchaser.

*[Signature Page to Follow]*

Contract of Sale –

12



**APP000369**

EXECUTED on the dates stated below, to be effective on the Effective Date.

**SELLER:**

Kingdom Road Equities, LLC

By: _____

Name: Frank May

Title:   Authorized Signator

1/17/2022

**PURCHASER:**

Titan Investments, LLC

By: _____

Name: Tim Barton

Title:   President

1/17/2022

Contract of Sale –

13

APP000370

## Title Company Receipt and Acknowledgement

The Title Company acknowledges receipt of the Contract on _____, 20____ and agrees to accept the Earnest Money, when deposited, subject to the terms and conditions set forth in this Contract and shall notify the parties once the Earnest Money is received.

TITLE COMPANY:

_____

By:_____

Name:_____

Title:_____

Contract of Sale –

14

APP000371

# Exhibit "A"
## Property Legal Description

### Tract 1

BEING a tract of land situated in the J. Streeper Survey, Abstract No. 1156, City of Denison, Grayson County, Texas, being part of Tract 12 – Parcel A (Main Hospital Tract) conveyed to UHS of Texoma, Inc., by deed recorded in Volume 4172, Page 482 of the Deed Records, Grayson County, Texas (DRGCT), and being all of Lots 3 and 4 of the Texoma Industrial Insulation Addition, recorded in Volume 21, Page 147, Plat Records, Grayson County, Texas (PRGCT), with the subject tract being more particularly described as follows:

BEGINNING at a 1/2" iron rod with plastic cap found on the north line of Martin Luther King Street, a variable width public right-of-way (also known as State Highway 91), for the southeast corner of Lot 1, Block 1, North Hill Plaza Addition, Phase One, recorded in Volume 21, Page 54 PRGCT;

THENCE along the common line of Lot 1, Block 1, North Hill Plaza Addition, Phase One, the following:

N 00°25'22" E, 282.60 feet;

S 89°10'11" W, 101.06 feet;

N 01°23'53" W, 40.92 feet;

A tangent curve to the left having a central angle of 28°31'45", a radius of 18.00 feet, a chord of N 15°39'46" W – 8.87 feet, an arc length of 8.96 feet;

N 89°06'54" W, 169.39 feet;

And S 00°53'06" W, 292.57 feet to the north line of Martin Luther King Street;

THENCE N 88°35'59" W, 73.20 feet along the north line thereof;

THENCE continuing along the north line thereof, around a tangent curve to the right having a central angle of 17°28'34", a radius of 807.50 feet, a chord of N 79°51'22" W – 245.36 feet, an arc length of 246.30 feet to the southeast corner of Lot 2, Texoma Industrial Insulation Addition;

THENCE N 01°08'37" E, 925.62 feet along the east line of Lot 2, and of a tract conveyed to JF-Had Denison, LLC, recorded in Volume 4849, Page 144 DRGCT, to a 1/2" iron rod with plastic cap found on the south line of Memorial Drive, a variable width public right-of-way;

THENCE S 88°51'21" E, 400.60 feet along the south line of Memorial Drive to a point for the upper southwest corner of a right-of-way conveyed by deed to the City of Denison by deed recorded in Volume 1921, Page 539 DRGCT;

THENCE along the south and west line of said dedication, the following:

N 85°08'37" E, 59.16 feet;

N 89°57'15" E, 341.13 feet;

A tangent curve to the right having a central angle of 71°57'52", a radius of 68.50 feet, a chord of S 54°03'49" E – 80.26 feet, an arc length of 85.79 feet;

And S 18°04'54" E, 517.42 feet to the north line of a tract conveyed to Steelcore, recorded in Volume 5435, Page 547 DRGCT;

THENCE S 89°14'42" W, 81.83 feet along the north line thereof;

THENCE S 01°09'35" W, 475.00 feet along the west line thereof to the north line of Martin Luther King Street;

THENCE N 88°57'54" W, 362.72 feet along the north line thereof to the POINT OF BEGINNING with the subject tract containing 853,691 square feet or 19.603 acres of land.



Contract of Sale –

15

APP000372

## Tract 2

BEING a tract of land situated in the J. Streeper Survey, Abstract No. 1156, City of Denison, Grayson County, Texas, being part of Tract 12 – Parcel A (Main Hospital Tract) conveyed to UHS of Texoma, Inc., by deed recorded in Volume 4172, Page 482 of the Deed Records, Grayson County, Texas (DRGCT), and being all of Lot 13, Memorial Medical Addition, recorded in Volume 6, Page 28 PRGCT, with the subject tract being more particularly described as follows;

BEGINNING at a 3/8" iron rod found on the north line of Memorial Drive, a variable width public right-of-way, for the southwest corner of Lot 13 and the southeast corner of Lot 12, Memorial Medical Addition;

THENCE N 00°20'42" E, 174.50 feet along the common line thereof;

THENCE S 89°46'23" E, 70.00 feet along the north line of Lot 13 to the northeast corner thereof;

THENCE S 88°45'59" E, 589.59 feet through Tract 12-Parcel A to a 1/2" iron rod found for an inset northeasterly corner thereof, being a southwesterly corner of a tract conveyed to Lifesearch Partners, recorded in Volume 2067, Page 737 DRGCT;

THENCE S 89°25'44" E, 443.65 feet along the south line thereof to the northwest corner of a tract conveyed to the First Baptist Church of Denison, Texas, recorded in Volume 4289, Page 803 DRGCT;

THENCE S 00°14'38" E, 661.40 feet along the west line thereof to the north line of Denison Medical Park Clinic on Memorial Drive, an addition recorded in Volume 17, Page 111 PRGCT;

THENCE N 88°14'58" W, 175.45 feet along the north line thereof to the east line of a right-of-way conveyed by deed to the City of Denison by deed recorded in Volume 1921, Page 539 DRGCT;

THENCE along the east and north line of said dedication, the following:

N 18°04'54" W, 424.35 feet;

A tangent curve to the left having a central angle of 71°57'52", a radius of 138.30 feet, a chord of N 54°03'49" W – 162.51 feet, an arc length of 173.71 feet;

S 89°57'15" W, 344.75 feet;

And S 84°30'47" W, 55.86 feet to the northwest corner of said dedication and the southeast corner of Lot 13;

THENCE N 88°50'46" W, 70.00 feet along the common line thereof to the POINT OF BEGINNING with the subject tract containing 276,510 square feet or 6.355 acres of land.

Contract of Sale –                                                                                                16

APP000373

# Receipts and Disbursements Ledger

### Printed at 02:20 PM, Nov 21, 2022

| | |
|---|---|
| Buyer/Borrower: | **Titan Investments, LLC, a Texas limited liability company** |
| Seller: | **Patricia Talbot Butler** |
| Lender: | |
| Closing Date: | |
| File Number: | **2201031-VVJL** |
| Property Address: | **10932 CR 506, Venus TX** |
| Closer: | |
| Primary Bank: | **Prosperity Bank - Valley View Comm#51** |

Open Date: **03/08/2022**

**Prosperity Bank - Valley View Comm#51**

### Receipts

| Trans ID: | Payor | Description: | Type of Funds | Deposit Date | Amount | |
|---|---|---|---|---|---|---|
| 2201031-VVJL-1 | Broadview Holdings | Earnest Money | Check | 03/10/2022 | 5,670.00 | C |
| | | **Total** | | | **5,670.00** | |
| 2201031-VVJL-2 | Broadview Holdings | Earnest Money | Check | 03/10/2022 | 10,000.00 | C |
| | | **Total** | | | **10,000.00** | |
| 2201031-VVJL-3 | MXBA LLC | Extension Fee | Check | 07/11/2022 | 60,000.00 | C |
| | | **Total** | | | **60,000.00** | |
| 2201031-VVJL-4 | MXBA LLC | Extension Fee check returned | NSF Check | 07/14/2022 | (60,000.00) | C |
| | | **Total** | | | **(60,000.00)** | |
| 2201031-VVJL-5 | Broadview Holdings | Extension Fee | Wire | 07/18/2022 | 60,000.00 | C |
| | | **Total** | | | **60,000.00** | |
| 2201031-VVJL-6 | Broadview Holdings | Extension Fee | Wire | 07/29/2022 | 60,000.00 | C |
| | | **Total** | | | **60,000.00** | |
| | | **Total Receipts** | | | **135,670.00** | |

### Disbursements

| Check #: | Payee | Description: | Type of Funds | Check Date | Amount | |
|---|---|---|---|---|---|---|
| Wire | Nancy Raesz | | | | | |
| | | 15% EM Release to Seller | Wire | 03/15/2022 | 1,500.00 | C |
| | | **Total** | | | **1,500.00** | |

 
APP000374

**Prosperity Bank - Valley View Comm#51**

| Check #: | Payee | Description: | Type of Funds | Check Date | Amount | |
|---|---|---|---|---|---|---|
| | | **Disbursements** | | | | |
| Wire | Patricia Butler | | | | | |
| | | 15% EM Release to Seller | Wire | 03/15/2022 | 1,500.00 | C |
| | | Total | | | **1,500.00** | |
| Wire | James Tolbert, Jr. | | | | | |
| | | 15% EM Release to Seller | Wire | 03/16/2022 | 1,500.00 | C |
| | | Total | | | **1,500.00** | |
| W-UC000478 | Broadview Holdings | | | | | |
| | | return of $60,000 extension | Wire | 07/22/2022 | 60,000.00 | C |
| | | Total | | | **60,000.00** | |
| | Patricia Butler, Melinda Barnes, Nancy R | | | | | |
| | | to be divided between heirs | Check | Not Issued | 5,670.00 | |
| | | Total | | | **5,670.00** | |
| Wire | Chase Fielder | | | | | |
| | | 2nd Amendment | Wire | 08/08/2022 | 10,950.00 | C |
| | | Total | | | **10,950.00** | |
| Wire | Nancy Raesz | | | | | |
| | | 2nd Amendment | Wire | 08/08/2022 | 9,241.00 | C |
| | | Total | | | **9,241.00** | |
| Wire | Patricia Butler | | | | | |
| | | 2nd Amendment | Wire | 08/08/2022 | 9,866.00 | C |
| | | Total | | | **9,866.00** | |
| Wire | James W. Tolbert | | | | | |
| | | 2nd Amendment | Wire | 08/08/2022 | 9,243.00 | C |
| | | Total | | | **9,243.00** | |
| Wire | Christy Idrissi Barnes | | | | | |
| | | 2nd Amendment | Wire | 08/08/2022 | 12,200.00 | C |
| | | Total | | | **12,200.00** | |
| Wire | Melinda L. Barnes | | | | | |
| | | 2nd Amendment | Wire | 08/08/2022 | 12,200.00 | C |
| | | Total | | | **12,200.00** | |
| 13706 | Rick Vehon | | | | | |
| | | Commission 2nd Amendment | Check | 08/08/2022 | 1,800.00 | C |
| | | Total | | | **1,800.00** | |
| | | **Total Disbursements** | | | **135,670.00** | |

APP000375

| | Scheduled Disbursements: | 135,670.00 |
|---|---|---|
| | Actual Disbursements: | 130,000.00 |
| | Pre-Disbursements Balance: | 0.00 |
| | Account Balance: | 5,670.00 |

 
APP000376

🔒 THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS 🔒

*220103I-VVJL*

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

**No. 1059**

**Date** 3/8/2022

**Pay To The Order Of** Sendera Title

$ **5,670.00

Five Thousand Six Hundred Seventy and 00/100*** **Dollars**

Sendera Title
1800 Valley View Ln. #160
Farmers Branch, TX 75234
(972) 428-2855

HEAT SENSITIVE
RUB AREA TO VERIFY

**Memo:** Titan Investments (62.75 Acres Johnson County)

⑆000001059⑆ ⑈111925113⑈10246⑈

APP000377

THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1139

Date  5/11/2022

Pay To The
Order Of    Title Partners LLC

$ **10,000.00

Ten Thousand  and 00/100***

Dollars

Title Partners LLC
8325 Douglas Av STE 104
Dallas, TX 75225
(214) 361-2878

HEAT SENSITIVE
RUB AREA TO VERIFY

Memo:  GF 2307948T Titan Investments LLC (E M 16.3 acres)

⑈000001139⑈ ⑆1119251130 246 11⑈

APP000378

THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1152

Date   5/19/2022

Pay To The
Order Of   Dooley & Associates                                    $  **5,000.00

Five Thousand  and 00/100***                                              Dollars

Dooley & Associates
14228 Midway Road STE 214
Dallas, TX 75244
(972) 330-4455

HEAT SENSITIVE
RUB AREA TO VERIFY

Memo:  Titan Investments-106266/40th Court, Ellis county

⑈000001152⑈  ⑆111925113⑆10246 11⑈

APP000379

THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES · SEE BACK FOR DETAILS

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1152

Date   5/19/2022

Pay To The
Order Of   Dooley & Associates                                    $  **5,000.00

Five Thousand  and 00/100***                                      Dollars

Dooley & Associates
14228 Midway Road STE 214
Dallas, TX 75244
(972) 330-4455

HEAT SENSITIVE
RUB AREA TO VERIFY

Memo:  Titan Investments-106266/40th Court, Ellis county

⑈000001152⑈  ⑆111925113⑆10 24611⑈

APP000380

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK • HOLD AT ANGLE TO VIEW

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1125

Date   4/29/2022

Pay To The
Order Of _____ Byron Walker _____   $   **15,000.00

Fifteen Thousand  and 00/100*** _____   **Dollars**

Byron Walker, TBW Land Castle
1201 Crisp Rd
ENNIS, TX 75119
(940) 626-9201

Memo:   Earnest Money- Titan Investments (Walker Ranch)

⑈000001125⑈ ⑆111925113⑈10246 11⑈

APP000381



THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK • HOLD AT ANGLE TO VIEW

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1126

Date  4/29/2022

**Pay To The Order Of**   Byron Walker

$  **30,000.00

Thirty Thousand  and 00/100***                                    **Dollars**

Byron Walker, TBW Land Castle
1201 Crisp Rd
ENNIS, TX 75119
(940) 626-9201

**Memo:**  Earnest Money- Titan Investments (Walker Ranch)

⑈000001126⑈ ⑆111925113⑆ 1024611⑈

APP000382

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

*220103I - VVJL*

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1058

**Date**  3/8/2022

**Pay To The Order Of**  Sendera Title                                                                 $  **10,000.00

Ten Thousand  and 00/100***                                                                          **Dollars**

Sendera Title
1800 Valley View Ln. #160
Farmers Branch, TX 75234
(972) 428-2855

**Memo:**  Titan Investments (62.75 Acres Johnson County)

⑈000001058⑈ ⑆111925113⑆10246⑈

APP000383

# EXHIBIT A-16

APP000384

## PARTICIPATION AGREEMENT

This Participation Agreement ("Agreement") is made this _____ day of January, 2022 between **MARINE CREEK SP LLC,** a Delaware limited liability company ("Participant"), and **MARINE CREEK VENTURES LLC,** a Delaware limited liability company ("Owner") (collectively referred to as the "Parties").

A. WHEREAS, **MANSIONS APARTMENT HOMES AT MARINE CREEK LLC,** a Texas limited liability company ("*Seller*", and related to Participant herein), and Owner (as "*Purchaser*" therein have entered into that certain Purchase and Sale Agreement dated on or about December 23, 2021 respecting that certain tract of land containing approximately **40.20 acres**, more or less, located in Tarrant County, Texas, generally located **at the intersection of Loop 820 and Huffines Boulevard, City of Fort Worth, County of Tarrant, State of Texas,** and depicted in **Exhibit A** attached hereto, and depicted in **Exhibit A** attached hereto (the "*Property*") (the "Purchase and Sale Agreement"). The Property is currently planned to be development in three (3) phases, to include one or more multifamily residential communities and related infrastructure and amenities (the foregoing and related activities upon the Land, referred to herein as the "Development Project", or at times simply, the "Project").

B.WHEREAS, Owner's acquisition and development of the Project would not be possible but for the sale of the Land and assignment of associated development rights identified in the Purchase and Sale Agreement as the Property, from Participant's related entity, as Seller, to Owner, as the Purchaser, upon the terms and provisions set forth therein. In further consideration thereof, and expressly irrespective of any "entirety" or other provision contained in the Purchase and Sale Agreement, the parties hereto, expressly covenant and agree to the terms and provisions of this Participation Agreement, to among other things, expressly provide for the Participation Fee (as defined herein) to be paid by the Owner.

C.WHEREAS, both parties are experienced real estate developers who wish to participate in the development of the Project in accordance with the provisions hereof.

D.WHEREAS, consistent therewith, Owner has agreed to grant to Participant a right to participate in the Value Created (as defined herein) during the course of the initial development of the Project, and or arising from any near term sale or condemnation of all or any portion of the Property, all as more particularly set forth herein.

THEREFORE, for and in consideration of the foregoing premises and the respective agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and stipulated, Owner and Participant hereby covenant and agree as follows:

**PARTICIPATION AGREEMENT- Page 1**

APP000385

AGREEMENTS

ARTICLE I
Assignment; Participation Fee

1.01    Assignment; Payment Following Stabilized Occupancy.    Owner agrees to pay to Participant twenty-five percent (25%) (the "**Applicable Percentage**") of the Achieved Increased Value (as defined herein) (the "**Participation Fee**") payable ninety (90) days following the date that any Phase of the Development achieves Stabilized Occupancy, or such earlier date as Participant may elect with no less than thirty (30) days prior notice to Owner ("**Payment Date**"). Stabilized Occupancy shall mean ninety (90%) percent occupancy for a trailing three-month period ("**Stabilized Occupancy**").  The amounts payable pursuant to this Agreement shall be in addition to the amounts due to Participant under the Purchase and Sale Agreement, and the amounts due to an affiliate of Participant, if any, under any development agreement respecting the Project.

1.02    Payment In The Absence of Stabilized Occupancy.  In the event that Stabilized Occupancy is not achieved within three (3) years from the date hereof (for whatever reason), and Participant has not previously set a Payment Date, then on the thirtieth (30) day following such anniversary date, Owner shall pay to Participant the Participation Fee based upon a calculation that the Property had been sold for Fair Market Value on such anniversary date.  Fair Market Value shall be as determined as such procedure is set forth in    **Exhibit "B"** attached hereto. It is understood, acknowledged and agreed by the parties hereto that the provisions of this Section shall only apply in the event that the Property is not sold or exchanged and the Participation Fee not paid until that date which is three (3) years from the date hereof.

1.03    Definitions. Unless otherwise indicated, the capitalized defined terms used in this Agreement shall have the respective means set forth for such terms on **Exhibit "B"** attached hereto and incorporated herein by reference for all purposes as if set forth herein verbatim.

ARTICLE II
Sale or Refinancing of the Property

2.01    Net Proceeds from Sale or Refinancing. **In the event of a Sale or Refinancing prior to the Stabilized Occupancy or Payment Date,** then Owner shall pay to Participant in cash an amount equal to the Applicable Percentage of the Net Proceeds (as a Participation Fee) from any Sale or Refinancing immediately following such Sale or Refinancing unless Section 2.02 is applicable.

2.02    Other Proceeds from Sale. In the event Owner shall receive a note or any other evidence of indebtedness in connection with any Sale, the Participation Fee shall be payable only on the cash portion of such Sale and Participant shall be entitled to receive an interest in Net Proceeds from such note equal to the Applicable Percentage. Owner shall execute and deliver to Participant (i) a Deed of Trust or other appropriate document covering such property in the same form as the **PARTICIPATION AGREEMENT**- Page 2

**APP000386**

documents then evidencing the liens securing Owner's obligations under this Agreement to secure Owner's obligations under the profits participation agreement delivered pursuant to subparagraph (ii) below (or such other form as Participant may reasonably require); and (ii) a participation agreement in form and content identical to this Agreement, covering such note (or such other form as Participant may reasonably require).

2.03    Notice of Sale. Owner shall give Participant at least ten (10) days advance written notice of any contemplated Sale or Refinancing, and such notice shall include an executed copy of the contract of sale or loan commitment and shall set forth in detail the terms of such Sale or Refinancing and the identity of the actual contemplated purchaser or lender, including a description of the relationship, if any, which Owner has or will have with such purchaser or lender. Participant may elect to receive the Participation Fee directly from the title company closing such Sale or Refinancing and shall receive a copy of the closing statement for such transaction.

ARTICLE III
Exchange of the Property

3.01    Net Proceeds from Exchange. **In the event of an Exchange prior to the Stabilized Occupancy Date or Payment Date,** and if the Owner shall enter into a transaction to exchange the Property for a different property without the Participant's consent, then Owner shall pay to Participant in cash an amount equal to the the Applicable Percentage of the Net Proceeds (as a Participation Fee) from any Exchange immediately following the occurrence thereof unless Section 3.02 is applicable. For purposes of determining the amount of Net Proceeds from any Exchange, the property other than cash received in connection with such Exchange (hereinafter referred to as the "Exchange Property") shall be deemed to be cash in an amount equal to the greater of the Fair Market Value of the Exchange Property or the value allocated to the Exchange Property in the exchange agreement unless Owner elects to receive an interest in the Exchange Property pursuant to Section 3.02 hereof.

3.02    Other Proceeds from Exchange. In the event Owner shall receive a note or any other evidence of indebtedness in connection with any Exchange, Owner shall pay to Participant the amount which Participant would be entitled to receive if Owner had received cash in lieu of such note in an amount equal to the principal amount due under such note plus the amount, if any, by which the interest payable over the term of such note exceeds the Market Rate in effect at the time of such Exchange or Refinancing. At Participant's option, in Participant's sole and absolute discretion, Participant shall be entitled to receive an interest in Net Proceeds from the Exchange Property equal to the Applicable Percentage in lieu of receiving payment of Net Proceeds resulting from the Exchange. If Participant elects to receive an interest in the Exchange Property, Owner shall execute and deliver to Participant (i) a Deed of Trust or other appropriate document covering such property in the same form as the documents then evidencing the liens securing Owner's obligations under this Agreement to secure Owner's obligations under the profits participation agreement delivered pursuant to subparagraph (ii) below (or such other form as Participant may reasonably require); and (ii) a profits participation agreement in form and content identical to this

**PARTICIPATION AGREEMENT- Page 3**

APP000387

Agreement, covering the Exchange Property (or such other form as Participant may reasonably require).

3.03    Notice of Exchange. Owner shall give Participant at least thirty (30) days' advance written notice of any contemplated Exchange, and such notice shall include an executed copy of the exchange agreement, and shall set forth in detail the terms of such Exchange and a description of the relationship, if any, which Owner has or will have with any other parties to such transaction. Participant may elect to receive the Participation Fee directly from the title company closing such Exchange and shall receive a copy of the closing statement for such transaction.

ARTICLE IV
Net Cash Flow from Operations

4.01    [Reserved].

ARTICLE V
Significant Events

5.01    Damage or Destruction. In the event of damage to or destruction of all or any portion of the Property, the following provisions shall apply:

(a)    So long as this Agreement remains in effect, Owner shall comply with all of the provisions of any Qualified Loan regarding insurance, repair and restoration of the Property, and in the absence thereof, shall reasonably insure, repair and restore the Property, in a manner consistent with customary standards for the management of similar projects in the market area.

(b)    All insurance proceeds, if any, paid on account of any damage or destruction to the Property, less the actual cost, fees and expenses, if any, incurred in connection with adjustment of the loss, shall be first applied in the manner set forth in any Qualified Loan, and thereafter in a manner consistent with customary standards for the management of similar projects in the market area.

5.02    Condemnation. **In the event of Condemnation of all or any portion of the Property, prior to the Stabilized Occupancy Date or Payment Date,** the following provisions shall apply:

(a)    If all of the Property shall be taken in Condemnation, the Condemnation award shall be applied and apportioned as and when received by Owner in the same manner as provided in Section 2.01 of this Agreement; and

(b)    If less than all of the Property shall be taken in Condemnation, Owner shall comply with all of the provisions of any then Qualified Loan regarding repair and restoration of the Property. Owner shall promptly pay to Participant an amount equal to the Applicable Percentage of any Condemnation proceeds not used for repair and restoration of the Property.

**PARTICIPATION AGREEMENT- Page 4**

APP000388

ARTICLE VI
General

6.01    Speculative Value.    The Parties hereto herby acknowledge that the entering into and or exercise of any rights by Participant provided under this Participation Agreement, and any payments that may be paid or payable to Participant from the Owner, as a result of such exercise, if any, are of speculative and uncertain value and are contingent upon various factors susceptible to fluctuations in market conditions. Owner and Participant acknowledge that presently it is not possible to determine either the value of the amounts, if any, Participant will receive hereunder, or subsequently, as a result thereof, and that it is possible that the rights granted Participant hereunder will be of no monetary value. Owner makes no representation or guaranty that any distributions from the Owner or proceeds from the sale or refinancing or other disposition of any of the Property, will ever occur or take place. Participant has not required that any fixed amount be paid to Participant pursuant to this Participation Agreement.

6.02    Time of Payment. Any amounts due Participant pursuant to the terms of this Agreement shall be paid to Participant immediately upon receipt by or on behalf of Owner except as otherwise specifically set forth herein.

6.03    Accounting. Immediately upon the occurrence of any Sale or Exchange as a result of which Net Proceeds are payable under this Agreement for any reason, Owner shall immediately provide Participant with a written statement, verified by Owner as to accuracy and completeness, breaking down by line item and category the calculation of Net Proceeds. Within three (3) days after receipt of Participant's written request therefor, Owner shall provide Participant with an additional verified statement setting forth the amounts attributable to such additional items based upon which Net Proceeds are calculated as are specified in Participant's request.

6.04    Books and Records. Participant shall from time to time during normal business hours have access to and may make copies of all Owner's books and records, contracts, invoices, bills pertaining to the Property, and claims for labor, materials, and services supplied for the Property. Participant shall have the right to audit such books and records, including calculations of Net Proceeds or Participation Fee. Owner shall keep full, true and accurate books and records of all revenues and expenses from the Property and permit Participant, at any time during normal business hours, to inspect, audit, review and make copies of all contracts, invoices, cancelled checks and books and records of Owner pertaining to the Property and/or the ownership and operation thereof and/or to any Sale or Exchange. This covenant contained in this paragraph shall survive payment of the Net Proceeds due Participant hereunder.

6.05    Payment of Undisputed Amounts. No matter when a final determination of the amount of Net Proceeds is made, Owner shall pay, immediately following any Sale or Exchange or other event pursuant to which Net Proceeds is due, all amounts which would be due pursuant to this Agreement if Owner's calculation of Net Proceeds were correct, based upon Owner's good faith calculations of such amount.

**PARTICIPATION AGREEMENT- Page 5**

APP000389

## ARTICLE VII
### Restricted Transactions

7.01    Restricted Transactions. Owner shall not enter into any Sale or Exchange without the prior written consent of Participant. Participant's consent shall be in Participant's sole and absolute discretion unless all of the following conditions have been satisfied:

(a)    [reserved];

(b)    The Sale or Exchange covers all of the Property;

(c)    Participant is paid the amount which Participant would receive if a Sale occurred pursuant to which Net Proceeds were received in cash in an amount equal to the Fair Market Value of the Property; and

If all of the foregoing conditions have been satisfied, Participant's consent to any Sale or Exchange shall not unreasonably be withheld, but may be conditioned upon such terms as are set forth herein.

7.02    [Reserved].

## ARTICLE VIII
### Covenants of Owner

Owner represents, warrants, covenants, agrees and undertakes that, during the term of this Agreement, Owner shall:

8.01    Performance of Obligations. Fully and timely observe and perform each and every obligation and covenant of Owner under this Agreement and the provisions of any Qualified Loan.

8.02    Notice of Other Default. Immediately notify Participant if Owner receives, from a party other than Participant, a notice of default or a notice which gives Owner an opportunity to cure a default under or pursuant to any deed of trust or other document pertaining to the Property, and allow Participant, at Participant's election and in Participant's discretion, to cure any default under any such deed of trust or other document (but Participant shall have no obligation to do so). Any advances made by Participant to cure any such default shall bear interest from the date of such advance at the same rate as the principal balance of the Note would bear in the event of an acceleration thereof, shall be secured by the Deed of Trust and shall be repayable by Owner upon demand by Participant;

8.03    No Action to Decrease Value. Not take any action that would cause the Property to decrease in value, or fail to take any reasonable action that would prevent the Property from decreasing in value;

**PARTICIPATION AGREEMENT- Page 6**

APP000390

8.04    Notice of Condemnation. Give Participant written notice that Condemnation proceedings have been asserted within five (5) days after Owner has been notified thereof;

8.05    Notice of Damage or Destruction. Give Participant written notice of any occurrence resulting in damage or destruction to the Property within five (5) days of such occurrence;

8.06    Maintain Insurance. Maintain all required Insurance Policies in full force and effect;

8.07    No Related Party Agreement(s). Not enter into any agreement with a Related Party to pay a real estate or other commission or any other fee in connection with a Sale or Exchange or any lease of the Property UNLESS SUCH IS ON FAIR MARKET TERMS;

8.08    No Further Encumbrances or Other Matters Which Affect Title. Not create or cause to be created any liens or other encumbrances or other matters which affect the Property in any manner (including but not limited to the filing of a condominium declaration covering the Property or the granting of easements or agreements pertaining to the Property) without the prior written consent of Participant **which consent shall not be unreasonably withheld, conditioned or delayed;**

8.09    No Sale or Transfer. Unless the prior written consent of Participant is first obtained, not sell, transfer, convey or otherwise dispose of the Property or any interest therein. Participant's consent shall be subject to and governed by the provisions of Article VII hereof entitled "Restricted Transactions";

8.10    No Fee. Not collect or receive any fee, commission, salary or other form of compensation in connection with the Sale or Exchange of the Property or operation of the Property UNLESS SUCH IS ON FAIR MARKET TERMS;

8.11    [Reserved];

8.12    Annual Operating Statement. If requested by Participant, furnish an annual operating statement to Participant within one hundred twenty (120) days after the close of each calendar year. Such annual operating statement shall show in detail the source and amount of income, expense and cash flow from the Property. The annual operating statements shall be in a form satisfactory to Participant and shall be certified by Owner as having been prepared in accordance with generally accepted accounting principles consistently applied on a cash basis and as being true, correct and complete; and

8.13    Further Assurances. Execute and deliver to Participant other instruments reasonably requested by Participant to secure and perfect the interests granted to Participant under this Agreement. Owner shall also execute and deliver to Participant any and all further assurances reasonably requested by Participant to evidence, perfect and protect the rights of Participant under this Agreement and shall do all other acts and things reasonably required by Participant to evidence, perfect and protect the rights of Participant under this Agreement.

**PARTICIPATION AGREEMENT- Page 7**

APP000391

## ARTICLE IX
## Representations and Warranties

Owner represents and warrants that the execution of this Agreement does not violate or conflict with any other agreements affecting Owner or the Property or, to the best of Owner's knowledge, any provision of applicable law. Further, Owner hereby represents and warrants to Participant as follows:

9.01    Organization. Owner is a **limited liability company organized and existing under the laws of the State of Delaware;**

9.02    Authorization. Owner is duly authorized to execute and deliver this Agreement and is and will continue to be authorized to perform Owner's obligations under this Agreement;

9.03    Consents. No consent, approval, authorization or order of any court or governmental authority, or third party is required in connection with the execution and delivery by Owner of this Agreement or to consummate the transactions contemplated hereby;

9.04    Enforceable Obligations. This Agreement, when duly executed, will be the legal and binding obligation of Owner and enforceable in accordance with its terms;

9.05    Title to the Property. Owner holds good and indefeasible title to the Property free and clear of all liens and encumbrances, except as previously disclosed to and approved by Participant in writing; and

9.06    Other Representations and Warranties. All of the representations and warranties contained in the Loan Documents are true and correct.

## ARTICLE X
## Default and Remedies

10.01    Owner Default. The term "Event of Default" shall include the occurrence of any one or more of the following events:

(a)    The failure by Owner to observe or perform any covenant or obligation of Owner contained in this Agreement within thirty (30) days after notice and demand to cure by the Participant;

(b)    The discovery by Participant that any representation or warranty made herein by Owner is false, misleading, erroneous or breached in any material respect; and/ or

(c)    The occurrence of an Event of Default as defined or described in any Qualified Loan.

10.02    Remedies for Owner Default. Upon the occurrence of an Event of Default, Participant may, at Participant's option, and without the requirement of demand, protest or notice of any kind

**PARTICIPATION AGREEMENT- Page 8**

APP000392

whatsoever, all of which are hereby expressly waived by Owner, do any one or more of the following:

(a)     Exercise any or all of the remedies of Participant under this Agreement; and/or

(b)     Exercise any remedies Participant may have at law or in equity including, without limitation, the right to bring a suit for specific performance of this Agreement against Owner.

10.02   [Reserved].

10.03   Waivers. No waiver by Participant of any Event of Default shall be deemed to be a waiver of any other then existing or subsequent Event of Default. No waiver by Participant of any right, remedy, power or privilege of Participant hereunder shall be considered a waiver of any subsequent right, remedy, power or privilege hereunder. No delay or omission by Participant in exercising any right, remedy, power or privilege hereunder shall impair such right, remedy, power or privilege of Participant or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such right, remedy, power or privilege of Participant exhaust the same or preclude other or further exercise thereof.

10.04   Cumulative Rights. All rights, remedies, powers and privileges available to Participant may be pursued separately, successively or concurrently at the sole and absolute discretion of Participant.

ARTICLE XI
Miscellaneous

11.01   Rights in Property. Participant does not have, and nothing contained in this Agreement shall be construed to grant or to vest in Participant the actual fee title in or to the Property; though a Memorandum of this Agreement, in the form attached hereto as **Exhibit C**, shall be filed in the real property records where the Property is located.

11.02   Transfer of Rights. Participant may assign or encumber any of Participant's rights under this Agreement without the prior written consent of Owner.

11.03   No Partnership. Nothing contained in this Agreement is intended, nor shall it be construed, to create a partnership, agency or joint venture between the parties hereto or to render either of the parties hereto liable or responsible for the debts or obligations of the other, including, but not limited to, interest, taxes, losses or any other liability. Any term or condition of this Agreement to the contrary notwithstanding, Participant shall not have, and by Participant's execution and acceptance of this Agreement hereby expressly disclaims, any obligation, liability or responsibility for the management, conduct or operation of the business and affairs of Owner. Participant shall not have, has not assumed and, by Participant's execution and acceptance of this Agreement, hereby expressly disclaims any liability or responsibility of the payment or performance of any indebtedness or obligation of Owner, and no term or condition of this Agreement shall be construed

**PARTICIPATION AGREEMENT- Page 9**

APP000393

otherwise. Owner hereby expressly acknowledges and stipulates that no term or condition of this Agreement shall be construed so as to render the relationship between Owner and Participant other than that of borrower and lender. None of the covenants or other provisions contained in this Agreement shall give Participant the right or power to exercise control over the affairs and/or management of Owner, the power of Participant being limited to the exercise of the rights, remedies, powers and privileges of Participant referred to in this Agreement. Owner hereby indemnifies and agrees to hold Participant harmless from and against any cost, expense or liability incurred or suffered by Participant as a result of any assertion or claim of any obligation or responsibility of Participant for the management, operation and conduct of the business and affairs of Owner, or as a result of any assertion or claim of any liability or responsibility of Participant for the payment or performance of any indebtedness or obligation of Owner.

11.04    Losses. In no event and under no circumstances shall Participant be responsible for any deductions or any losses incurred in connection with the ownership, operation and maintenance of the Property.

11.05    Tax Benefits. Nothing in this Agreement shall be construed to confer upon Participant any tax benefits, depreciation allowances and the like in connection with the Property.

11.06    Governing Law and Venue. The laws of the State of Texas and the applicable laws of the United States shall govern the validity, enforcement and interpretation of this Agreement. Venue for enforcement of this Agreement shall be in Tarrant County, Texas, except to the extent that the location of the Property determines venue as a matter of law.

11.07    Integration, Modification and Waiver. This Agreement constitutes the complete and final expression of the agreement of the parties relating to the subject matter hereof, and supersedes all previous contracts, agreements and understandings of the parties, either oral or written relating to such subject matter. This Agreement cannot be modified, nor any of the terms hereof waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification or waiver is sought.

11.08    Counterparts. This Agreement may be executed in several counterparts, each of which shall be fully effective as an original and all of which together shall constitute one and the same instrument.

11.09    Construction. The headings which have been used throughout this Agreement have been inserted for convenience or reference only and to not constitute matter to be construed in interpreting this Agreement. Words of any gender used in this Agreement shall be held and construed to include the other gender, and singular to include the plural, and vice versa, unless the context requires otherwise. The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not any particular provision, paragraph or article. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday, then the duration of such time period shall

**PARTICIPATION AGREEMENT- Page 10**

APP000394

be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday.

11.10    Invalid Provisions. If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision shall not be affected thereby, but rather, the same shall be enforced to the greatest extent permitted law.

11.11    Sole Benefit. This Agreement has been executed for the sole benefit of Owner and Participant and the respective heirs, successors, assigns and legal representatives of Participant and Owner. No other party will have rights thereunder nor be entitled to assume that the parties hereto will insist upon strict performance of the mutual obligations arising under this Agreement.

11.12    Time of Essence. Time is of the essence of this Agreement.

11.13    Exhibits. All references herein to "Exhibits" are references to exhibits attached hereto, all of which are made a part hereof for all purposes the same as if set forth herein verbatim, it being understood that if any exhibit attached hereto which is to be executed and delivered contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained and as contemplated herein or in said exhibit prior to or at the time of the execution and delivery thereof.

11.14    Successors and Assigns. All of the terms of this Agreement apply to, are binding upon and inure to the benefit of the parties hereto, such parties' respective successors, assigns, heirs and legal representatives, all subsequent owners of the Property, and all other persons claiming by, through or under such parties.

11.15    No Waiver. Any failure by Participant to insist, or any election by Participant not to insist, upon strict performance by Owner of any of the terms, provisions or conditions of this Agreement will not be deemed to be a waiver of the same or of any other term, provisions or condition thereof, and Participant may at any time or times thereafter insist upon strict performance by Owner of any and all of such terms, provisions and conditions.

11.16    Recording. Owner understands that Participant may elect to record this Agreement or a memorandum hereof.

11.17    Attorneys' Fees. If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement by Participant, Participant shall be entitled to recover from Owner all costs incurred by Participant in connection with such action, including, without limitation reasonable attorneys' fees, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fees shall be in addition to any other relief which may be awarded.

**PARTICIPATION AGREEMENT- Page 11**

APP000395

11.18  Confidentiality. Each Party agrees (1) to keep this Agreement and the terms herein and the contents of all related documents and correspondence strictly confidential and to require its agents, employees, and representatives to keep this Agreement strictly confidential and (2) to not make any public announcements, press releases or similar disclosures with respect to the subject matter of this Agreement at any time without the written consent of the other Party, provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by applicable law or order of any competent court or administrative agency or preclude the Parties from making disclosure to its agents, professionals, employees, attorneys, investors and prospective investors and lenders, provided each agrees to keep the information provided to them strictly confidential in accordance with the terms of this Section.  This provision does not replace or supersede any previous agreement relating to confidentiality executed between the parties and shall be interpreted in conjunction with any such agreement. This provision shall survive the termination or expiration of this Agreement for a period of 2 years except that the obligation to protect confidential information shall survive for so long as one Party retains any confidential information of the other Party.

11.19  No Interpretation Against Drafter. This Agreement has been negotiated between unrelated Parties who are sophisticated and knowledgeable in the matters contained in this Agreement and who have acted in their own self interest. In addition, each Party has been represented by legal counsel or have been advised to consult with an attorney and had the opportunity to do so. Accordingly, any rule of law, as well as any other statute, law, ordinance, or common law principles or other authority of any jurisdiction of similar effect, or legal decision that would require interpretation of any ambiguities in this Agreement against the Party who has drafted it is not applicable and is hereby waived. The provisions of this Agreement shall be interpreted pursuant to the applicable law, and this Agreement shall not be interpreted or construed against any party to this Agreement because that Party or any attorney or representative for that Party drafted this Agreement or participated in the drafting of this Agreement.

11.20    [Reserved].

11.21  Reserved.

11.22  Reserved.

11.23  Participant's Costs and Expenses. Owner shall pay to Participant the reasonable cost and expenses incurred by Participant (including, without limitation, reasonable attorneys' fees) in connection with any consent or approval required by this Agreement or requested by Owner pursuant to this Agreement and in connection with the determination of any amounts due Participant pursuant to this Agreement.

11.24  Reserved

**PARTICIPATION AGREEMENT- Page 12**

APP000396

11.25  Notices. Any notice, consent or approval required or permitted by this Agreement shall be in writing, and shall be effective and deemed to be delivered, whether actually received or not, upon the earlier to occur of(a) actual receipt by the addressee or (b) transmission by tested telex or telecopy to a receiving station located at the address set forth below, or (c) delivery to the address set forth below by courier or by overnight delivery providing for proof of delivery, addressed to the party to whom such notice is being given, or (d) deposit in the United States mail, postage prepaid, certified, return receipt requested, addressed to the party to whom such notice is being given at such party's address set forth below. Owner and Participant may change their respective addresses and the addresses of the parties to receive copies of such notices to another address within the continental United States, effective after ten (10) days' written notice to the other party in the manner hereinabove set forth, which notice shall specifically refer to this Agreement and shall state that it is being given for the purpose of changing the address for notices pursuant to this Agreement. Any notice given pursuant to this Agreement shall be effective upon delivery to Owner or Participant, as the case may be, in the manner set forth herein, and copies to the appropriate parties shall be a matter of courtesy only and shall not be a prerequisite to the effectiveness of any notice. The provisions of this section entitled "Notices" shall not be construed to require any notice or to affect or impair in any manner any waiver of notice of demand contained in this Agreement or any of the other Loan Documents.

If to Owner:
MARINE CREEK VENTURES LLC
Attn: Barry W. DeGroot
405 Golfway W Drive
St. Augustine, FL 32095
Tel: (904) 342-6880
Email: barry@dlpre.com

If to Participant:
MARINE CREEK SP LLC
13901 Midway Rd, Suite 102-243
Dallas, Texas 75244
Attn: Tim Barton, President
Email: tbarton@ jmjdevelopment.com;

With a copy to:
Vance McMurry
McMurry Law, PLLC
508 W. Lookout Suite 14-74
Richardson, Texas 75080
Email: vance@mcmurrylegal.com; and

The Marx Firm, LLC
2999 Turtle Creek Blvd.
Dallas, Texas 75219

**PARTICIPATION AGREEMENT- Page 13**

APP000397

Attention: Randy P. Marx, Esq.
Telephone No.: 214/360-9343
Telephone No.: 214/405-5120 Cell
E-Mail Address: randy@themarxfirm.com

11.26 **SPECIAL PAYMENT.** In addition to the above, and irrespective of any other provision contained in the Purchase and Sale Agreement, or this Participation Agreement respecting the Property, in further consideration thereof, the Owner hereby covenants and agrees to pay to Participant, an additional fee, in the amount of $1,781,250.00 upon the earlier of: (a) the commencement of construction upon any portion of the Land, or (b) 90 days from the date of this Agreement; which fee is fully earned in all regards.

*[Signature pages to follow]*

**PARTICIPATION AGREEMENT- Page 14**

APP000398

IN WITNESS WHEREOF, the parties hereto have fully executed this Agreement all as of the day and year first above set forth.

**OWNER**

**MARINE CREEK VENTURES LLC,**
a Delaware limited liability company

By: _____

Name:  Barry W. DeGroot
Title: Vice President
Signed the 7 day of January, 2022

**PARTICIPATION AGREEMENT- Page 15**

APP000399

**PARTICIPANT**

**MARINE CREEK SP LLC**
A Delaware limited liability company

By: _____

Name: _____

Title: _____

Signed the ___ day of December, 2021.

**PARTICIPATION AGREEMENT- Page 16**

APP000400

**EXHIBIT A**

(Legal Description/Depiction of the Land)

(as per the attached)

APP000401

## Exhibit A

Legal description of land:
(Marine Creek)

**TRACTS 1 & 2:**

Being a tract of land situated in the L.H. Brown Survey, Abstract No. 213 and the T. & P.R.R.CO. Survey, Abstract No. 1472, in the City of Fort Worth, Tarrant County, Texas, being all of Lots 2 & 3, Block 3 of MARINE CREEK APARTMENTS, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in Cabinet A, Slide 8820, Deed Records, Tarrant County, Texas, and being that same tracts of land conveyed to Marine Creek Land Partners, L.P. by Deed recorded in Instrument No. D212240140, Official Public Records, Tarrant County, Texas, and being more particularly described by metes and bounds as follows:

Beginning at a 5/8 inch iron rod found for corner in the North line of Shadydell Drive (a 60' right-of-way), said point being the Southeast corner of Lot 1R, Block 3 of Marine Creek Apartments, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in Cabinet A, Slide 8912, Map Records, Tarrant County, Texas;

Thence North 27 degrees 41 minutes 29 seconds West along the East line of said Lot 1R, Block 3, a distance of 950.88 feet to a 5/8 inch iron rod found for corner, said point being the Northeast corner of said Lot 1R, Block 3, and being in the South line of a tract of land conveyed to the City of Fort Worth by Deed recorded in Volume 7226, Page 721, Deed Records, Tarrant County, Texas;

Thence traversing along the exterior line of said City of Fort Worth tract as follows:

South 88 degrees 00 minutes 01 seconds East, a distance of 110.13 feet to a 5/8 inch iron rod found for corner;

North 86 degrees 00 minutes 56 seconds East, a distance of 866.87 feet to a 1/2 inch iron rod with a yellow cap stamped "TXHS" set for corner;

North 80 degrees 57 minutes 49 seconds East, a distance of 320.54 feet to a 5/8 inch iron rod found for corner;

South 75 degrees 41 minutes 36 seconds East, a distance of 330.06 feet to a 5/8 inch iron rod found for corner;

North 61 degrees 12 minutes 35 seconds East, a distance of 247.16 feet to a 5/8 inch iron rod found for corner;

North 73 degrees 24 minutes 41 seconds East, a distance of 149.78 feet to a 1/2 inch iron rod found for corner;

APP000402

South 32 degrees 31 minutes 58 seconds East, a distance of 210.60 feet to a 1/2 inch iron rod found for corner;

South 29 degrees 45 minutes 46 seconds West, a distance of 180.02 feet to a 1/2 inch iron rod found for corner;

South 83 degrees 07 minutes 55 seconds West, a distance of 99.67 feet to a 1/2 inch iron rod found for corner;

South 53 degrees 19 minutes 33 seconds West, a distance of 145.03 feet to a 1/2 inch iron rod found for corner;

South 38 degrees 18 minutes 42 seconds West, a distance of 364.19 feet to a 1/2 inch iron rod found for corner;

South 20 degrees 36 minutes 52 seconds West, a distance of 298.09 feet to a 1/2 inch iron rod found for corner;

North 79 degrees 37 minutes 24 seconds West, a distance of 388.02 feet to a 1/2 inch iron rod with a yellow cap stamped "TXHS" set for corner;

North 68 degrees 07 minutes 25 seconds West, a distance of 241.24 feet to a 5/8 inch iron rod found for corner, said point being in the Southeast line of aforementioned Shadydell Drive;

Thence North 49 degrees 05 minutes 44 seconds East along the Southeast line of said Shadydell Drive, a distance of 204.71 feet to a 5/8 inch iron rod found for corner, said point being in a curve to the left having a radius of 50.00 feet, a delta of 286 degrees 15 minutes 37 seconds and a chord bearing North 40 degrees 54 minutes 49 seconds West, a distance of 60.00 feet;

Thence along said curve to the left and Shadydell Drive, an arc length of 249.81 feet to a 5/8 inch iron rod found for corner;

Thence South 49 degrees 05 minutes 44 seconds West along the Northwest line of said Shadydell Drive, a distance of 412.80 feet to a 1/2 inch iron rod with a yellow cap stamped "TXHS" set for corner, said point being in a curve to the left having a radius of 425.00 feet, a delta of 31 degrees 12 minutes 25 seconds, a chord bearing South 63 degrees 52 minutes 40 seconds West, a distance of 228.63 feet;

Thence in a Southwestern direction along the Northwest line of said Shadydell Drive and curve to the left, an arc distance of 231.48 feet to the Point of Beginning and containing a total of 1,238,758 square feet or 28.4380 acres of land.

NOTE: COMPANY DOES NOT REPRESENT THAT THE ABOVE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

APP000403

TRACT 3:

Being a tract of land situated in the S.A. Hatcher Survey, Abstract No. 1792, in the City of Fort Worth, Tarrant County, Texas, being all of Lot 1, Block 2 of MARINE CREEK APARTMENTS, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in Cabinet A, Slide 8820, Deed Records, Tarrant County, Texas, and being that same tract of land conveyed to Marine Creek Land Partners, L.P. by Deed recorded in Instrument No. D212240140, Official Public Records, Tarrant County, Texas, and being more particularly described by metes and bounds as follows:

Beginning at an "X" found for corner in the intersection of the North line of Shadydell Drive (a 60' right-of-way) and the East line of Huffines Boulevard (an 84' right-of-way), said point being in a curve to the left having a radius of 1992.00 feet, a delta of 05 degrees 38 minutes 38 seconds and a chord bearing North 24 degrees 51 minutes 49 seconds West, a distance of 196.14 feet;

Thence in a Northwestern direction along the East line of said Huffines Boulevard and curve to the left, an arc distance of 196.22 feet to an "X" found for corner;

Thence North 27 degrees 41 minutes 29 seconds West continuing along the East line of said Huffines Boulevard, a distance of 359.66 feet to an "X" found for corner in the intersection of the East line of said Huffines Boulevard and the South line of Shadydell Drive (a 60' right-of-way);

Thence North 62 degrees 18 minutes 52 seconds East along the South line of said Shadydell Drive, a distance of 50.00 feet to a 1/2 inch iron rod with a yellow cap stamped "TXHS" set for corner, said point being in a curve to the right having a radius of 430.00 feet, a delta of 39 degrees 05 minutes 49 seconds and a chord bearing North 81 degrees 51 minutes 48 seconds East, a distance of 287.76 feet;

Thence in an Easterly direction along the South line of said Shadydell Drive and curve to the right, an arc distance of 293.42 feet to a 5/8 inch iron rod found for corner, said point being in a compound curve to the right having a radius of 485.00 feet, a delta of 30 degrees 28 minutes 27 seconds and a chord bearing North 85 degrees 43 minutes 27 seconds East, a distance of 254.93 feet;

Thence continuing in an Easterly direction along the South line of said Shadydell Drive and curve to the right, an arc distance of 257.96 feet to a 5/8 inch iron rod found for corner in the intersection of the South line of said Shadydell Drive and the West line of Shadydell Circle (a variable width right-of-way), said point being in a curve to the right having a radius of 425.00 feet, a delta of 89 degrees 03 minutes 04 seconds, a chord bearing South 24 degrees 04 minutes 09 seconds West, a distance of 596.04 feet;

Thence in a Southwesterly direction along the Western line of said Shadydell Circle, an arc distance of 660.55 feet to a 5/8 inch iron rod found for corner;

APP000404

Thence South 68 degrees 47 minutes 56 seconds West continuing along the North line of said Shadydell Circle, a distance of 96.50 feet to the Point of Beginning and containing 232,838 square feet or 5.3452 acres of land.

NOTE: COMPANY DOES NOT REPRESENT THAT THE ABOVE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

TRACT 4:

Being a tract of land situated in the S.A. Hatcher Survey, Abstract No. 1792, in the City of Fort Worth, Tarrant County, Texas, being all of Lot 1, Block 1 of MARINE CREEK APARTMENTS, an Addition to the City of Fort Worth, Tarrant County, Texas, according to the plat recorded in <u>Cabinet A, Slide 8820</u>, Deed Records, Tarrant County, Texas, and being that same tract of land conveyed to Marine Creek Land Partners, L.P. by Deed recorded in Instrument No. <u>D212240140,</u> Official Public Records, Tarrant County, Texas, and being more particularly described by metes and bounds as follows:

Beginning at an "X" set for corner in the East line of Huffines Boulevard (an 84' right-of-way), said point being the Northwest corner of a tract of land conveyed to H&M Mackey, LLC by Deed recorded in Volume 15932, Page 274, Deed Records, Tarrant County, Texas, and also being in a curve to the left having a radius of 1992.00 feet, a delta of 08 degrees 12 minutes 02 seconds and a chord bearing North 16 degrees 12 minutes 56 seconds West, a distance of 284.87 feet;

Thence in a Northerly direction along the East line of said Huffines Boulevard and curve to the left, an arc distance of 285.11 feet to an "X" found for corner in the intersection of the East line of said Huffines Boulevard and the South line of Shadydell Circle (a variable width right-of-way);

Thence North 68 degrees 47 minutes 56 seconds East along the South line of said Shadydell Circle, a distance of 96.63 feet to a 5/8 inch iron rod found for corner, said point being in a curve to the right having a radius of 485.00 feet, a delta of 73 degrees 41 minutes 32 seconds and a chord bearing North 31 degrees 50 minutes 59 seconds East, a distance of 581.68 feet;

Thence in a Northeasterly direction along the Southeast line of said Shadydell Circle and curve to the right, an arc distance of 623.79 feet to a 1/2 inch iron rod with a yellow cap stamped "TXHS" set for corner;

Thence North 85 degrees 39 minutes 55 seconds East, a distance of 2.75 feet to a 1/2 inch iron rod with a yellow cap stamped "TXHS" set for corner in the West line of a tract of land conveyed to the City of Fort Worth by Deed recorded in Volume 7226, Page 721, Deed Records, Tarrant County, Texas;

Thence traversing along the exterior line of said City of Fort Worth tract as follows:

South 71 degrees 17 minutes 20 seconds East, a distance of 252.71 feet to a 1/2 inch iron rod with a yellow cap stamped "TXHS" set for corner;

APP000405

South 53 degrees 55 minutes 24 seconds East, a distance of 230.95 feet to a 1/2 inch ironrod with a yellow cap stamped "TXHS" set for corner;

South 33 degrees 45 minutes 40 seconds East, a distance of 121.55 feet to a railroad spike found for corner, said point being the North corner of Lot 1, Block 1 of CrosspointChurch Addition, an Addition to the City of Fort Worth, according to map recorded in Instrument No. D214243867, Deed Records, Tarrant County, Texas;

Thence South 59 degrees 13 minutes 24 seconds West along the North line of said Lot 1, Block 1 and passing through the common Northwest corner of said Lot 1, Block 1 and theNortheast corner of aforementioned H&M Mackey, LLC, a total distance of 947.19 feet to the Point of Beginning and containing 292,114 square feet or 6.7060 acres of land.

NOTE: COMPANY DOES NOT REPRESENT THAT THE ABOVE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

APP000406

APP000407



APP000408

Page 2 of 2
FINAL PLAT
LOT 1, BLOCK 1
LOT 1, BLOCK 2
LOTS 1-3, BLOCK 3
MARINE CREEK APARTMENTS
54.166 Acre Tract fo Land
an addition to the City of Fort Worth, Texas
and being situated in the
S.A. Hatcher Survey, Abstract No. 1792,
T.&P. R.R. Co. Survey, Abstract No. 1472,
& L.H. Brown Survey, Abstract No. 213
Tarrant County, Texas
Case No. FP-003-044
August 2003
Filed in Cabinet ___A___ , Slide __8821__

**EXHIBIT "B"**
DEFINITIONS


"**Achieved Increased Value**", in connection with the determination of the Participation Fee to be paid upon a Payment Date following Stabilized Occupancy, shall mean (a) the Fair Market Value of the Project, less (b) the aggregate Capital Expenditures respecting the Project, including the total actual development costs of the Project, including all costs to acquire the Property pursuant to the Purchase and Sale Agreement, hard and soft costs to perform all horizontal and vertical development including construction of streets, utilities, lots, common areas, amenity center, homes, and other improvements, as well as interest expense on any Qualified Loan(s) (such development costs of the Project referred to herein as the "**Actual Development Costs**"), as well as the reasonable and customary transaction costs of the Sale, Exchange, or Condemnation. Actual Development Costs shall include soft costs paid to an affiliate of Owner, costs of capital, and any preferred return on capital contributions or similar preferred interest or return to Owner or any investor therein.

"**Capital Expenditure**" shall mean any reasonable replacement repair or improvement cost for any work relating to the Property, paid by Owner in cash.

"**Condemnation**" shall mean any action or proceeding brought for the purpose of any taking of the Property or any part thereof or interest therein by competent authority as a result of the exercise of the power of eminent domain, including a voluntary sale to such authority either under threat of condemnation or while such action or proceeding is pending.

"**Exchange**" shall mean the transfer of all or any portion of the Property or any interest therein in exchange for other property in addition to or in lieu of cash (or a note or other evidence of indebtedness).

"**Fair Market Value**" shall mean the greater of (a) fair market value of the Property as agreed to by Owner and Participant (or pursuant to the Appraisal Procedure described below) or (b) the Sale Price of the Property in an arms' length transaction. In the event Owner and Participant are unable to agree upon Fair Market Value within fifteen (15) days after the Stabilized Occupancy of any Phase upon the Property, or the occurrence of any other event requiring such agreement, then Fair Market Value shall be determined by appraisers in accordance with the following procedures:

(a)     The value to be determined by the appraisers hereinafter referred to shall be the fair market value of the Property, in fee simple as of the Appraisal Date (hereinafter defined) in question, unencumbered by any liens and including the value of all improvements on the Property, and the appraisal shall be made in accordance with the usual and normal appraisal methods in use at the time the appraisals hereinafter mentioned are made.

(b)     Owner shall appoint in writing an appraiser to represent Owner, and Participant shall appoint in writing an appraiser to represent Participant, and each party shall notify the other of such appointment, not later than ten (10) days after the date of expiration of the fifteen (15) day period described above (such date of expiration being referred to as the "Appraisal Date"). Any appraiser so appointed hereunder (whether by a party hereto or by an appraiser so appointed, as hereinafter provided) shall have at least five (5) years' experience as a real estate appraiser in the county in which the Property is situated and shall be a member of the American Institute of Real Estate Appraisers or a similar organization of recognized national standing, or shall be on Participant's list of approved appraisers. If either party fails to notify the other of

**Participation Agreement- Page 18**

APP000409

the appointment of an appraiser (hereinafter referred to as the "Non-Appointing Party") within such ten (10) day period, the other party (hereinafter referred to as the "Appointing Party") may appoint a second appraiser provided that the Appointing Party delivers to the Non-Appointing Party notice of the appointment of a second appraiser before the Non-Appointing Party has delivered notice of the appointment of an appraiser to the Appointing Party.

(c)     The two appraisers so appointed shall promptly meet and attempt to agree on a valuation. The determination of the value of the Property by the two appraisers shall be final and binding on both Owner and Participant. If the two appraisers fail to agree upon a valuation not later than forty-five (45) days after the Appraisal Date, they shall appoint a third appraiser not later than sixty (60) days after the Appraisal Date, but if they are unable to agree upon a third appraiser within such time, then they shall in lieu thereof each select the names of two willing persons qualified to be appraisers hereunder and from the four persons so named, one name shall be drawn by lot by a representative of Owner in the presence of a representative of Participant, and the person whose name is so drawn shall be the third appraiser. If either of the first two appraisers fails to select the names of two willing, qualified appraisers and to cooperate with the other appraiser so that a third appraiser can be selected by lot, as aforesaid, the third appraiser shall be selected by lot from the two appraisers which were selected by the other appraiser for the drawing.

(d)     The third appraiser so selected shall immediately proceed to appraise the value for the Property, and the average valuation determined by all three appraisers shall be final and binding on both Owner and Participant as the value of the Property on the Appraisal Date in question. In the event, however, that the value of the Property determined by any one or more of the three appraisers varies by more than fifteen percent (15%) from the average valuation determined by all three appraisers, then the determination of such appraiser or appraisers (whose appraisal varied by more than fifteen percent (15%) shall be discarded for all purposes hereof and the average valuation determined by the remaining appraiser(s) shall be final and binding on both Owner and Participant. If all three appraisals vary by more than fifteen percent (15%) from the average of the three (3) appraisals, then the average shall be the Fair Market Value.

(e)     The appraisers selected hereunder shall deliver a signed, detailed and complete written report on their appraisals, or the average of the three (3) appraisals, as the case may be, to Owner and Participant, which report shall be completed and delivered not later than ninety (90) days after the Appraisal Date. The fees of all appraisers shall be paid by Owner and shall not be deducted in determining the amount due Participant. Any vacancy in the office of the first appraiser shall be filled by Owner, any vacancy in the office of the second appraiser shall be filled by Participant. If either party fails to fill any vacancy within ten (10) days after such vacancy occurs, then such vacancy shall be filled by the other party, and any vacancy in the office of the third appraiser shall be filled by the first two (2) appraisers in the manner specified above for the selection of a third appraiser.

(f)     If no final determination of the Fair Market Value of the Property has been made by the appraisers within ninety (90) days after the Appraisal Date in question, Owner or Participant may file suit in any court having jurisdiction to determine the matter by declaratory judgment or otherwise, and upon the assumption of jurisdiction by the court for determination of the matter, by entry of any preliminary or other order so reciting, the authority of the appraisers shall terminate, no determination by them having been made, and they shall not have authority thereafter to make any determination, but the determination shall then be made by that court and that suit.

**Participation Agreement- Page 19**

APP000410

"**Insurance Policies**" shall mean insurance policies covering the same types of risks, in the same amounts, and otherwise containing the same provisions, obtained and maintained, in a manner consistent with customary standards for the management of similar projects in the market area
.

"**Market Rate**" shall mean the Prime Rate (herein defined) plus two percent (2%) per annum. "Prime Rate" shall mean the Prime Rate of interest quoted from time to time in the Wall Street Journal or its successors, as publicly announced or published in Dallas, Texas.

"**Net Cash Flow from Operations**" means for any fiscal period, gross receipts paid to Owner in connection with the Property, including amounts previously set aside as reserves which the Owner and Participant determine are no longer necessary for such purpose, less cash payments disbursed for operating expenses, capital expenditures and loan payments.

"**Net Proceeds**", in connection with the determination of the Participation Fee to be paid in the event of a Sale, Exchange, or Condemnation of the Property, shall mean (a) the total amount of consideration received or agreed to be received either directly or indirectly by Owner pursuant to an arms length transaction from the Sale, Exchange, or Condemnation of the Property or any part thereof, plus (b) the principal balance of any outstanding indebtedness of any nature to which any of the Property remains subject after such Sale, Exchange, or Condemnation (whether such amount is assumed by the purchaser, exchange or other party, or not) less (c) Actual Development Costs (as defined herein).

"**Property**" shall mean the real property described on **Exhibit "A"** attached hereto and incorporated herein, the improvements now or hereafter located thereon, any and all development rights and interests, any and all appurtenances, and all personal property which belongs to Owner now or hereafter located thereon or therein or used in connection therewith.

"**Qualified Loan**" shall mean any acquisition, development or construction loan and any other indebtedness of Owner , the proceeds of which were used to acquire, develop or construction the Project, which is secured by lien(s) against the Property or any part thereof.

"**Sale**" shall mean each sale, transfer, assignment, conveyance, or other disposition of, or the entering into of any contract for deed or similar agreement with respect to, all or any portion of the Property or any legal or equitable interest therein.

**Participation Agreement- Page 20**

APP000411

EXHIBIT "C"

Memorandum of Agreement

(in the form attached hereto

Participation Agreement- Page 21

APP000412

M:\JMJ 20210111 OrchardSALEtoDLP\20211129 Sale to DLP\Seller conveyance docs\20220105 compilation\20211229a barry\Marine Creek Participation Agreement v1.docx

**Participation Agreement- Page 22**

APP000413

# EXHIBIT A-17

APP000414

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## TC HALL, LLC

### (Single-Member Texas Limited Liability Company)

This Limited Liability Company Agreement of **TC HALL, LLC** (this "Agreement" or these ``Regulations"), dated as of **March 10, 2022**, are adopted, executed and agreed to by the sole Member (as defined below).

1.      Formation. **TC HALL, LLC**, a Texas limited liability company (the ``Company") has been organized as a Texas limited liability company under the Texas Limited Liability Company Act, as amended from time to time (the "LLC Act") by filing of the Certificate of Formation for the Company in the office of the Secretary of State of Texas, on **July 16th, 2022**, file number **804648526.**

2.      Sole Member. **MF CONTAINER, LLC, a Delaware Company,** shall be the sole member of the Company (the ``Member").

3.      Contributions. The Member has made an initial contribution to the capital of the Company in the amount of $100.00. Without creating any rights in favor of any third party, the Member may, from time to time, make additional contributions of cash or property to the capital of the Company, but shall have no obligation to do so.

4.      Distributions. The Member shall be entitled (a) to receive all distributions (including, without limitation, liquidating distributions) made by the Company, and (b) to enjoy all other rights, benefits and interests in the Company.

5.      Management. Management by Managers. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Manager(s), who shall make all decisions and take all actions for the Company. No Member (other than a Manager or an Officer) has the right, power or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.    The Initial Manager(s) of the Company shall be: **MF CONTAINER, LLC,** a Delaware limited liability company.

### Officers:

SECTION 1. NUMBER; TITLES AND TERM OF OFFICE. The officers of the Company shall be a President, one or more Vice-Presidents and a Secretary-Treasurer, and such other officers as the Manager(s) may from time to time elect or appoint. Each officer shall hold office until his successor shall be duly elected and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided. Any two (2) or more offices may be held by the same person.

**LIMITED LIABILITY COMPANY AGREEMENT OF**
**TC Hall, LLC**- Page 1

APP000415

SECTION 2. SALARIES. The salaries or other compensation of the officers and agents of the Company shall be fixed from time to time by the Manager(s).

SECTION 3. REMOVAL. Any officer or agent or member of a committee elected or appointed by the Manager(s) may be removed by the Manager(s) whenever in its judgment the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

SECTION 4. VACANCIES. Any vacancy occurring in any office of the Company may be filled by the Manager(s).

SECTION 5. POWERS AND DUTIES OF THE CHIEF EXECUTIVE OFFICER. The President shall be the chief executive officer of the Company, unless the Manager(s) designates the Chairman of the Board as chief executive officer. Subject to the control of the Manager(s) and the executive committee (if any), the chief executive officer shall have general executive charge, management and control of the properties, business and operations of the Company with all such powers as may be reasonably incident to such responsibilities; he may agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Company and may sign all certificates for shares of capital stock of the Company; and shall have such other powers and duties as designated in accordance with these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 6. POWERS AND DUTIES OF THE CHAIRMAN OF THE BOARD. If elected, the Chairman of the Board shall preside at all meetings of the shareholders and of the Manager(s); and the Chairman shall have such other powers and duties as designated in these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 7. POWERS AND DUTIES OF THE PRESIDENT. The President, unless the Manager(s) otherwise determines, shall have the authority to agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Company; and, unless the Manager(s) otherwise determines, he shall, in the absence of the Chairman of the Board or if there be no Chairman of the Board, preside at all meetings of the shareholders and (should he be a director) of the Manager(s); and the President shall have such other powers and duties as designated in accordance with these bylaws and as from time to time may be assigned to him by the Manager(s).

SECTION 8. VICE PRESIDENTS. In the absence of the Chairman of the Board (if any), or President, or in the event of their inability or refusal to act, a Vice President designated by the Manager(s) shall perform the duties of the Chairman of the Board (if any), or the President. In the absence of a designation by the Manager(s) of a Vice President to perform the duties of the Chairman of the Board (if any) or President, or in the event of their absence or inability or refusal to act, the Vice President who is present and

**LIMITED LIABILITY COMPANY AGREEMENT OF**
**TC Hall, LLC**- Page 2

APP000416

who is senior in terms of time as a Vice President of the Company shall so act. The Vice Presidents shall perform such other duties and have such other powers as the Manager(s) may from time to time prescribe.

SECTION 9. TREASURER. The Treasurer shall have responsibility for the custody and control of all the funds and securities of the Company. He shall perform all acts incident to the position of Treasurer subject to the control of the chief executive officer and the Manager(s); and the Treasurer shall, if required by the Manager(s), give such bond for the faithful discharge of his duties in such form as the Manager(s) may require.

SECTION 10. ASSISTANT TREASURERS. Each Assistant Treasurer shall have the usual powers and duties pertaining to his office, together with such other powers and duties as may be assigned to him by the chief executive officer or the Manager(s). The Assistant Treasurers shall exercise the powers of the Treasurer during that officer's absence or inability or refusal to act.

SECTION 11. SECRETARY. The Secretary shall keep the minutes of all meetings of the Manager(s) and the minutes of all meetings of the shareholders, in books provided for that purpose; he shall attend to the giving and serving of all notices; he may in the name of the Company affix the seal of the Company to all contracts of the Company and attest thereto; he may sign with the other appointed officers all certificates for shares of capital stock of the Company; he shall have charge of the certificate books, transfer books and stock ledgers, and such other books and papers as the Manager(s) may direct, all of which shall at all reasonable times be open to inspection of any director upon application at the office of the Company during business hours, and he shall in general perform all duties incident to the office of Secretary, subject to the control of the chief executive officer and the Manager(s).

SECTION 12. ASSISTANT SECRETARIES. Each Assistant Secretary shall have the usual powers and duties pertaining to his office, together with such other powers and duties as may be assigned to him by the Chief Executive Officer or the Manager(s) or the Secretary. The Assistant Secretaries shall exercise the powers of the Secretary during that officer's absence or inability or refusal to act.

Officers. The initial officers of the Company shall be:
**Maximilien Barton – President, Secretary & Treasurer.**

**LIMITED LIABILITY COMPANY AGREEMENT OF**
**TC Hall, LLC**- Page 3

APP000417

6.    Dissolution. The Company shall dissolve and its affairs shall be wound up at such time, if any, as the Member may elect.

7.    Governing Law. THIS LIMITED LIABILITY COMPANY AGREEMENT SHALL BE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS (EXCLUDING ITS CONFLICT-OF-LAWS RULES).

**MEMBER(S):**

**MF CONTAINER, LLC**
a Delaware limited liability company

By:    _____
       **Maximilien Barton, President**

Being the sole Member of the Company


**MANAGER(S):**

**MF CONTAINER, LLC**
a Delaware limited liability company

By:    _____
       **Maximilien Barton, President**


Being the sole Manager(s) of the Company


**LIMITED LIABILITY COMPANY AGREEMENT OF**
**TC Hall, LLC**- Page 4

APP000418

**LIMITED LIABILITY COMPANY AGREEMENT OF**
**TC Hall, LLC**- Page 5

APP000419

# TEXAS SECRETARY of STATE
## JOHN B. SCOTT

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 804648526 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | July 16, 2022 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32085467747 | **FEIN:** | |
| **Duration:** | Perpetual | | |

| | |
|---|---|
| **Name:** | TC Hall, LLC |
| **Address:** | 98 SPIT BROOK RD STE 104 |
| | NASHUA, NH 03062-5737 USA |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|

| Name | Address | Inactive Date |
|---|---|---|
| Anish Karedia | 22415 Mary Rogers Trl<br>RICHMOND, TX 77469 USA | |

[Order]  [Return to Search]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

APP000420

**Fwd: TC & Hall Update**

From: Tim Barton tbarton@jmjdevelopment.com
  To: Aria Pamenari Aria.Pamenari@jmjdevelopment.com
Date: Tue, Jul 19, 2022, 12:08 PM


TB


**From:** Max Barton <MBarton@jmjdevelopment.com>
**Sent:** Tuesday, July 19, 2022, 12:06 PM
**To:** Robert Edelman; Tim Barton
**Subject:** RE: TC & Hall Update

Great. Do we get a copy of it?

Thank You,
Maximilien Barton.
JMJ Development.
972-385-9934


**From:** Robert Edelman
**Sent:** Tuesday, July 19, 2022 12:05 PM
**To:** Tim Barton; Max Barton
**Subject:** FW: TC & Hall Update

Good news. The lender said TC & Hall appraisal came back at $5,310,000 – just over purchase price.


Robert Edelman
Stone Street Development
Phone: (214) 794-3575

1 / 1

APP000421

**LNB**

6/30/2022

Enoch Investments, LLC or an entity TBD
Attn: Mitchell Howell; Joey Howell

Dear Gentlemen,

Louisiana National Bank is pleased to offer the initial terms to Enoch Investments, LLC. The terms of this _initial_ approval are subject to change and are as follows:

BORROWER: Enoch Investments, LLC, TBD entity

PROPERTY: 0.515 Acre at SWC of Turtle Creek Blvd. and Hall Street, Dallas, Texas

AMOUNT:    75% Loan to Cost or appraised value, lesser amount applies. The maximum loan amount anticipated based on such criteria is $4,100,000, which is based on $5.470M in cost, comprised of the $5.3M purchase price and $170K in estimated finance fees and closing costs.

TERM OF LOAN: 12 months, with a one year extension option on terms specified by the Bank.

AMORTIZATION: 12 months

INTEREST RATE: 12 month interest only period- Prime plus .509%

FEES:               1.0% Origination Fee
                    $500 Doc Prep
                    Additional 3rd party fees will apply (appraisal, title)

GUARANTORS:         An insolido continuing guarantee from Enoch Investments, LLC and Tim
                    Barton

EXIT FEE:           A 2.5% fee** will be charged in the event the borrower refinances the
                    proposed credit facility with _another financial institution_ during term
                    period. There is no charge in the event the borrower sells the collateral or
                    pays off the loan using cash. **LNB will ask and seek a "right of first
                    refusal" on any proposed construction loan and will waive the exit fee
                    within the term period should the Bank decline such a request.

**Louisiana National Bank | Term Sheet**                                                    1

APP000422



Conditions:
An updated appraisal to be obtained by Louisiana National Bank
An updated and merchantable title from a title company acceptable to Louisiana National Bank
Updated Articles, Tax ID number and Operating Agreement from the To Be Formed Borrowing Entity.

Accepted: _____ 7/1/22

It is a pleasure to extend this term letter to you and we look forward to continuing our banking relationship.

Sincerely,              ,

Michael W. "Mike" McGee
SVP, Chief Lending Officer

APP000423

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1260

Date  8/9/2022

Pay To The
Order Of  Commonwealth Title of Dallas, Inc.                                    $  **40,000.00

Forty Thousand  and 00/100***                                                   **Dollars**

Commonwealth Title of Dallas, Inc.
2651 North Harwood Street Suite 260
Dallas, TX 75201
(800) 627-5652

**Memo:**  Extension for 34707 & 3409 N Hall St

⑈000001260⑈  ⑉111925113⑉⑉1024611⑈

---

1260                                  Amount: $40000.00                          Date: 8/9/2022

Pay to: Commonwealth Title of Dallas, Inc.

**Broadview Holdings**

Memo: Extension for 34707 & 3409 N Hall St

---

1260                                  Amount: $40000.00                          Date: 8/9/2022

Pay to: Commonwealth Title of Dallas, Inc.

**Broadview Holdings**

Memo: Extension for 34707 & 3409 N Hall St

APP000424



AMT: 100,000.00 SEQ: 80200040
CK:   DT: 05/10/22  ST: Paid

APP000425



AMT: 100,000.00 SEQ: 80101810
CK:   DT: 05/31/22  ST: Paid

APP000426

# Receipts and Disbursements Ledger

### Printed at 10:21 AM, Nov 22, 2022

| | |
|---|---|
| Buyer/Borrower: | **Gillespie Villas, LLC, a Texas limited liability company** |
| Seller: | |
| Lender: | **Xiao-En Fang** |
| Closing Date: | **8/24/2022** |
| File Number: | **2202692-VVJA** |
| Property Address: | **3600 Gillespie St., Dallas TX 75219** |
| Closer: | |
| Primary Bank: | **Prosperity Bank - Valley View Comm#51** |

Open Date:  **07/25/2022**

**Prosperity Bank - Valley View Comm#51**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Trans ID: | Payor | Description: | Type of Funds | Deposit Date | Amount | |
| 2202692-VVJA-1 | Xiao-En Fang | Loan Amount | Wire | 08/24/2022 | 550,000.00 | C |
| | | **Total** | | | **550,000.00** | |
| | | **Total Receipts** | | | **550,000.00** | |
| **Disbursements** | | | | | | |
| Check #: | Payee | Description: | Type of Funds | Check Date | Amount | |
| 13795 | **GRS Tax Service** | | | | | |
| | 1112 | Tax Certificate | Check | 08/24/2022 | 95.00 | C |
| | | **Total** | | | **95.00** | |
| 13799 | **Silver Star Title, LLC dba Sendera Title** | | | | | |
| | 1114 | E-Recording Fee | Check | 08/25/2022 | 6.40 | C |
| | 1204 | Recording Fee   Subordination Agreement | Check | 08/25/2022 | 38.00 | C |
| | 1201 | Recording Fees | Check | 08/25/2022 | 98.00 | C |
| | | **Total** | | | **142.40** | |
| 13796 | **Silver Star Title, LLC dba Sendera Title** | | | | | |
| | 1121 | Not yet due/payable | Check | 08/24/2022 | 5.00 | C |
| | 1120 | Tax deletion | Check | 08/24/2022 | 20.00 | C |
| | 1124 | Environmental PL T-36 | Check | 08/24/2022 | 25.00 | C |
| | 1117 | Courier/Mail/Messenger | Check | 08/24/2022 | 32.00 | C |
| | 1122 | MTP T19 Res. Endorsement | Check | 08/24/2022 | 160.20 | C |
| | 1113 | Escrow Fee | Check | 08/24/2022 | 500.00 | C |
| | 1108 | Title insurance | Check | 08/24/2022 | 3,204.00 | C |
| | | **Total** | | | **3,946.20** | |

 
APP000427

**Prosperity Bank - Valley View Comm#51**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Disbursements** | | | | | | |
| **Check #:** | **Payee** | **Description:** | **Type of Funds** | **Check Date** | **Amount** | |
| 13797 | | Silver Star Title, LLC dba Sendera Title | | | | |
| | 1111 | State of Texas Policy Guaranty Fee | Check | 08/24/2022 | 2.00 | C |
| | | **Total** | | | **2.00** | |
| Wire | | **Commonwealth Title of Dallas** | | | | |
| | | Proceeds wired for purchase | Wire | 08/24/2022 | 545,806.40 | C |
| | | **Total** | | | **545,806.40** | |
| 13800 | | Gillespie Villas, LLC, a Texas limited l | | | | |
| | | Refund of Recording Overage | Check | 08/25/2022 | 8.00 | C |
| | | **Total** | | | **8.00** | |
| | | **Total Disbursements** | | | **550,000.00** | |
| | | **Scheduled Disbursements:** | | | **550,000.00** | |
| | | **Actual Disbursements:** | | | **550,000.00** | |
| | | **Pre-Disbursements Balance:** | | | **0.00** | |
| | | **Account Balance:** | | | **0.00** | |

*Wired for TC Half Purchase*

 
APP000428



# Commonwealth Title of Dallas, Inc.
2651 North Harwood Street, Suite 260, Dallas, TX 75201
Phone: (800)627-5652 | Fax: (214)754-9066

## Single Ledger Balance
*By Trust Accounting Date, With Adjustments*

| | |
|---|---|
| **Ledger ID:** | *22011220092* |
| **Trust Account:** | ████████████████████████ |
| **Trust Accounting Date:** | *All* |
| **Format / Sort Options:** | *Sort by reference number* |

| | |
|---|---|
| **Ledger ID:** | *22011220092* |
| **Branch:** | *CWD-11C – Commonwealth Title of Dallas, Inc.* |
| **Trust Account:** | ████████████████ |
| **Settlement Date:** | *08/23/22* |
| **Responsible Party:** | *FNFGLOBAL\Stephanie.Johnson* |
| **Sales Price:** | *$5,300,000.00* |

| | |
|---|---|
| **Buyer/Borrower:** | *TC Hall, LLC, a Texas limited liability company* |
| **Seller:** | *TURTLE CREEK TOWER, LLC, a Delaware limited l* |
| **Property:** | *3407 and 3409 North Hall Street, Dallas, TX 75219* |
| **Ledger Comment:** | |
| **Loan Amount:** | *$4,063,000.00* |

| | | | | | |
|---|---|---|---|---|---|
| | | | | **Beginning balance:** | **$0.00** |

| Ref/Ck Number | Trust Date | Payee / Payor Adjustments | Medium | Cleared Date | Amount |
|---|---|---|---|---|---|
| **TRUST ACCOUNT TRANSACTIONS** | | | | | |
| **INCOMING WIRES** | | | | | |
| **POSTED** | | | | | |
| 999002318 | 08/24/22 | Silver Star Title LLC | Wire | | $545,806.40 |
| 999002318-ADJ | 08/25/22 | Silver Star Title LLC ADJ Miscellaneous: ProClear | Wire | 08/24/22 | |
| 999002318-ADJ | 08/25/22 | Silver Star Title LLC ADJ Miscellaneous: excess closing funds | Wire | 08/24/22 | |
| 999002319 | 08/24/22 | Louisiana National Bank | Wire | | $4,021,844.28 |
| 999002319-ADJ | 08/24/22 | Louisiana National Bank ADJ Miscellaneous: WMA | Wire | | |
| 999002319-ADJ | 08/25/22 | Louisiana National Bank ADJ Miscellaneous: ProClear | Wire | 08/24/22 | |
| | | | **2 INCOMING WIRES:** | | **$4,567,650.68** |
| | | | **4 Adjustments:** | | **$0.00** |
| | | | **Total:** | | **$4,567,650.68** |
| **RECEIPTS** | | | | | |
| **POSTED** | | | | | |
| 111000318 | 05/06/22 | Broadview Holdings | Check | | $100,000.00 |
| 111000318-ADJ | 05/09/22 | Broadview Holdings ADJ Miscellaneous: Added to Group Deposit | Check | | |
| 111000318-ADJ | 05/10/22 | Broadview Holdings ADJ Miscellaneous: ProClear | Check | 05/09/22 | |
| 111000318-ADJ | 07/26/22 | Broadview Holdings ADJ Miscellaneous: System Generated | Check | 05/09/22 | |
| 111000322 | 05/26/22 | Broadview Holdings | Check | | $100,000.00 |
| 111000322-ADJ | 05/27/22 | Broadview Holdings ADJ Miscellaneous: Added to Group Deposit | Check | | |
| 111000322-ADJ | 05/31/22 | Broadview Holdings ADJ Miscellaneous: ProClear | Check | 05/27/22 | |
| 111000322-ADJ | 07/26/22 | Broadview Holdings ADJ Miscellaneous: System Generated | Check | 05/27/22 | |
| 111000336 | 07/26/22 | Broadview Holdings | Check | | $40,000.00 |
| 111000336 | 07/26/22 | Broadview Holdings ADJ Miscellaneous: System Generated | Check | | |
| 111000336-ADJ | 07/26/22 | Broadview Holdings ADJ Miscellaneous: Added to Group Deposit | Check | | |

APP000429

# Single Ledger Balance

**22011220092 (continued)**

| Ref/Ck Number | Trust Date | Payee / Payor Adjustments | Medium | Cleared Date | Amount |
|---|---|---|---|---|---|
| **TRUST ACCOUNT TRANSACTIONS (continued)** | | | | | |
| **RECEIPTS (continued)** | | | | | |
| ***POSTED (continued)*** | | | | | |
| 111000336-ADJ | 07/27/22 | Broadview Holdings | Check | 07/26/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 111000343 | 08/10/22 | Broadview Holdings | Check | | $40,000.00 |
| 111000343-ADJ | 08/10/22 | Broadview Holdings | Check | | |
| | | ADJ Miscellaneous: Added to Group Deposit | | | |
| 111000343-ADJ | 08/11/22 | Broadview Holdings | Check | 08/10/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 111000343-ADJ | 08/11/22 | Broadview Holdings | Check | 08/10/22 | |
| | | ADJ Miscellaneous: send to closing statement | | | |
| 111000343-ADJ | 08/11/22 | Broadview Holdings | Check | 08/10/22 | |
| | | ADJ Miscellaneous: add memo | | | |
| 111000343-ADJ | 08/11/22 | Broadview Holdings | Check | 08/10/22 | |
| | | ADJ Miscellaneous: System Generated | | | |
| | | | | **5 RECEIPTS:** | **$280,000.00** |
| | | | | **13 Adjustments:** | **$0.00** |
| | | | | **Total:** | **$280,000.00** |
| **CHECKS** | | | | | |
| ***POSTED*** | | | | | |
| 511002181 | 08/25/22 | CSC | Check | | $90.00 |
| 511002181-ADJ | 08/31/22 | CSC | Check | 08/30/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 511002195 | 09/06/22 | Capitol Services, Inc. | Check | | $581.42 |
| 511002195-ADJ | 09/23/22 | Capitol Services, Inc. | Check | 09/22/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 511002204 | 09/22/22 | Broadview Holdings | Check | | $4,200.00 |
| 511002204-ADJ | 09/30/22 | Broadview Holdings | Check | 09/29/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 511002221 | 10/10/22 | TURTLE CREEK TOWER, LLC, a Delawa | Check | | $41.23 |
| 511002222 | 10/10/22 | TC Hall, LLC, a Texas limited liability com| | Check | | $397.30 |
| | | | | **5 CHECKS:** | **$5,309.95** |
| | | | | **3 Adjustments:** | **$0.00** |
| | | | | **Total:** | **$5,309.95** |
| **OUTGOING WIRES** | | | | | |
| ***POSTED*** | | | | | |
| 311007055 | 05/11/22 | Turtle Creek Tower LLC | Wire | | $100,000.00 |
| 311007055-ADJ | 05/11/22 | Turtle Creek Tower LLC | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007055-ADJ | 05/12/22 | Turtle Creek Tower LLC | Wire | 05/11/22 | |
| | | ADJ Miscellaneous: Cleared for Bank Statement ▮▮▮ | | | |
| 311007055-ADJ | 07/27/22 | Turtle Creek Tower LLC | Wire | | |
| | | ADJ Miscellaneous: remove date per Mary Rosas, need to change app | | | |
| 311007055-ADJ | 07/27/22 | Turtle Creek Tower LLC | Wire | | |
| | | ADJ Miscellaneous: per Stephanie Johnson change apply to closing | | | |
| 311007055-ADJ | 07/28/22 | Turtle Creek Tower LLC | Wire | 07/27/22 | |
| | | ADJ Miscellaneous: Cleared for Bank Statement ▮▮▮ | | | |
| 311007157 | 05/31/22 | TURTLE CREEK TOWER, LLC, a Delawa | Wire | | $100,000.00 |
| 311007157-ADJ | 05/31/22 | TURTLE CREEK TOWER, LLC, a Delawa | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007157-ADJ | 06/01/22 | TURTLE CREEK TOWER, LLC, a Delawa | Wire | 05/31/22 | |
| | | ADJ Miscellaneous: Cleared for Bank Statement ▮▮▮ | | | |
| 311007157-ADJ | 07/27/22 | TURTLE CREEK TOWER, LLC, a Delawa | Wire | | |
| | | ADJ Miscellaneous: remove date per Mary Rosas, need to change app | | | |

APP000430

**Single Ledger Balance**

### 22011220092 (continued)

| Ref/Ck Number | Trust Date | Payee / Payor Adjustments | Medium | Cleared Date | Amount |
|---|---|---|---|---|---|
| **TRUST ACCOUNT TRANSACTIONS (continued)** | | | | | |
| **OUTGOING WIRES (continued)** | | | | | |
| *POSTED (continued)* | | | | | |
| 311007157-ADJ | 07/27/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | | |
| | | ADJ Miscellaneous: per Stephanie Johnson apply to closing | | | |
| 311007157-ADJ | 07/28/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | 07/27/22 | |
| | | ADJ Miscellaneous: Cleared for Bank Statement | | | |
| 311007545 | 07/28/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | | $40,000.00 |
| 311007545-ADJ | 07/28/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007545-ADJ | 07/29/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | 07/28/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007629 | 08/11/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | | $40,000.00 |
| 311007629-ADJ | 08/11/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007629-ADJ | 08/12/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | 08/11/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007703 | 08/25/22 | Silverlake Capital, LLC | Wire | | $81,260.00 |
| 311007703-ADJ | 08/25/22 | Silverlake Capital, LLC | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007703-ADJ | 08/26/22 | Silverlake Capital, LLC | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007704 | 08/25/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | | $1,174,306.13 |
| 311007704-ADJ | 08/25/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007704-ADJ | 08/26/22 | TURTLE CREEK TOWER, LLC, a Delawɛ | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007705 | 08/25/22 | Sale Street Capital, LLC | Wire | | $2,960,000.00 |
| 311007705-ADJ | 08/25/22 | Sale Street Capital, LLC | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007705-ADJ | 08/26/22 | Sale Street Capital, LLC | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007706 | 08/25/22 | Lawrence D. Robinson | Wire | | $375.00 |
| 311007706-ADJ | 08/25/22 | Lawrence D. Robinson | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007706-ADJ | 08/26/22 | Lawrence D. Robinson | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007707 | 08/25/22 | RMWBH PC | Wire | | $65,000.00 |
| 311007707-ADJ | 08/25/22 | RMWBH PC | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007707-ADJ | 08/26/22 | RMWBH PC | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007708 | 08/25/22 | The Marx Firm, LLC | Wire | | $15,382.00 |
| 311007708-ADJ | 08/25/22 | The Marx Firm, LLC | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007708-ADJ | 08/26/22 | The Marx Firm, LLC | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007709 | 08/25/22 | JEH PC | Wire | | $109,000.00 |
| 311007709-ADJ | 08/25/22 | JEH PC | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007709-ADJ | 08/26/22 | JEH PC | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |
| 311007710 | 08/25/22 | TC Hall, LLC, a Texas limited liability comɪ | Wire | | $132,138.55 |
| 311007710-ADJ | 08/25/22 | TC Hall, LLC, a Texas limited liability comɪ | Wire | | |
| | | ADJ Miscellaneous: WMA | | | |
| 311007710-ADJ | 08/26/22 | TC Hall, LLC, a Texas limited liability comɪ | Wire | 08/25/22 | |
| | | ADJ Miscellaneous: ProClear | | | |

APP000431

# Single Ledger Balance

## 22011220092 (continued)

| Ref/Ck Number | Trust Date | Payee / Payor Adjustments | Medium | Cleared Date | Amount |
|---|---|---|---|---|---|
| **TRUST ACCOUNT TRANSACTIONS (continued)** | | | | | |
| **OUTGOING WIRES (continued)** | | | | | |
| | | | **12 OUTGOING WIRES:** | | $4,817,461.68 |
| | | | **30 Adjustments:** | | $0.00 |
| | | | | **Total:** | $4,817,461.68 |
| **LEDGER TRANSFERS(+)** | | | | | |
| *POSTED* | | | | | |
| 411003138 | 08/25/22 | Transfer Contact | From: 22011220092-B | | $650,000.00 |
| | | | **1 LEDGER TRANSFER(+):** | | $650,000.00 |
| **LEDGER TRANSFERS(-)** | | | | | |
| *POSTED* | | | | | |
| 411003141 | 08/25/22 | Texas Title Insurance Guaranty Associatic | To: GTF22Q3 | | $4.00 |
| 411003142 | 08/25/22 | National TaxNet | To: NTN202208 | | $51.00 |
| 411003143 | 08/25/22 | Commonwealth Title of Dallas, Inc. | To: REV202208 | | $24,686.00 |
| 411003143-ADJ | 09/02/22 | Commonwealth Title of Dallas, Inc. | To: REV202208 | | |
| | | ADJ Miscellaneous: Disburse transferred funds | | | |
| 411003278 | 09/06/22 | Commonwealth Title of Dallas, Inc. | To: REV202209 | | $138.05 |
| 411003278-ADJ | 10/07/22 | Commonwealth Title of Dallas, Inc. | To: REV202209 | | |
| | | ADJ Miscellaneous: Disburse transferred funds | | | |
| 411003137 | 08/25/22 | Transfer Contact | To: 22011220092-B | | $650,000.00 |
| 411003137 | 08/25/22 | Transfer Contact | To: 22011220092-B | | |
| | | ADJ Miscellaneous: adjusting to correct payor code | | | |
| | | | **6 LEDGER TRANSFERS(-):** | | $674,879.05 |
| | | | **2 Adjustments:** | | $0.00 |
| | | | | **Total:** | $674,879.05 |
| | | | **TRUST ACCOUNT ENDING BALANCE:** | | $0.00 |
| | | **ENDING LEDGER BALANCE IN TRUST ACCOUNT:** | ▮▮▮▮▮▮ | | $0.00 |

**COMBINED ENDING BALANCE :**          $0.00

APP000432



**Vista Bank**
*People First.*

1508 Texas Avenue
Lubbock, TX 79401

| Account Number: | *******7891 |
| Statement Date: | 08/31/2022 |
| Items Enclosed: | 1 |

Member

**Page 1 of 2**



00006915  TV11365S090122145031  1 000000000 6915  3
**TC HALL LLC**
**3600 GILLESPIE ST**
**DALLAS TX 75219**

00006915 0033255 0001-0002

---

**CUSTOMER SERVICE INFORMATION**

📞 877-888-4782 (877-88-VISTA)

📬 P.O. Box 2100 | Lubbock, TX 79401

💻 vistabank.com

---



**REMAIN VIGILANT**

*Unfortunately, combatting fraud and cyber security risks are a regular part of our everyday lives. Visit our Fraud Resource Center at vistabank.com to stay current and implement the recommended steps to protect you and yours.*

---

## VIEW BUSINESS CHECKING          ACCOUNT NUMBER:     *******7891

### Balance Summary

| | |
| --- | ---: |
| **Beginning Balance as of 08/24/22** | **$0.00** |
| + Deposits and Credits  (1) | $132,138.55 |
| - Withdrawals and Debits  (1) | $100,000.00 |
| - Account Maintenance Assessment for Statement Period | $0.00 |
| **Ending Balance as of 08/31/22** | **$32,138.55** |
| Number of Days in Statement Period | 7 |
| **Items Enclosed** | **1** |

### Transaction Detail

| Date | Description | Deposits | Withdrawals | Balance |
| --- | --- | ---: | ---: | ---: |
| Aug 25 | FED WIRE IN #202208250071587 ORIG-COMMONWEALTH TITLE OF DAL | $132,138.55 | | $132,138.55 |
| Aug 26 | CASHED CHECK/WITHDRAWAL | | -$100,000.00 | $32,138.55 |



         

APP000433

HOW TO RECONCILE YOUR CHECK BOOK
BALANCE TO THE STATEMENT BALANCE

1.  SORT YOUR CHECKS IN THE ORDER IN WHICH
    THEY WERE WRITTEN.

2.  COMPARE EACH CHECK WITH THE AMOUNTS
    WRITTEN IN YOUR CHECK RECORD, AND MARK
    OFF THOSE WHICH AGREE. THEN ENTER IN THE
    OUTSTANDING CHECK COLUMN THE AMOUNTS
    OF ALL THE CHECKS WHICH APPEAR IN YOUR
    RECORD BUT HAVE NOT BEEN RETURNED WITH
    THIS STATEMENT.

3.  ENTER IN YOUR CHECK RECORD AND SUBTRACT
    FROM THE BALANCE SHOWN ANY MISCELLANEOUS
    CHARGES OR CHECKS WHICH ARE ENCLOSED WITH
    THIS STATEMENT BUT WHICH YOU HAVE NOT
    PREVIOUSLY RECORDED.

4.  SUBTRACT ANY BANK CHARGES. (AND BE SURE TO
    SUBTRACT FROM STUB BALANCE)

WRITE THE NEW BALANCE HERE

CHECK BOOK
BALANCE

| OUTSTANDING CHECKS | |
|---|---|
| NO. OR DATE | AMOUNT |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | |

ENTER CURRENT BALANCE AS
SHOWN ON FRONT OF YOUR
STATEMENT

ADD ANY DEPOSIT YOU HAVE
MADE AFTER THE DATE SHOWN
ON FRONT OF STATEMENT

SUB TOTAL

SUBTRACT TOTAL OF
OUTSTANDING CHECKS

WRITE TOTAL HERE

ADJUSTED STATEMENT
BALANCE

THESE TWO BALANCES SHOULD AGREE

After making the above entries, your check book balance should agree with the statement balance. If you feel there are discrepancies, please report them within 14 DAYS. PREAUTHORIZED ELECTRIC TRANSFERS. Any questions you may have concerning these transfers on your account will be answered by calling the telephone number shown on the front of this statement.

## IMPORTANT INFORMATION ABOUT PREAUTHORIZED WITHDRAWALS AND DIRECT DEPOSITS

If you have arranged to have certain recurring bills deducted from your account, such as insurance premiums or mortgage payments, or to accept direct deposits of certain recurring payments, such as payroll checks or Social Security benefits, please read this notice carefully.

**About Preauthorized Withdrawals:**

**Periodic Statements.** You will receive a monthly account statement from us each month in which an electronic fund transfer from your account has occurred; in any event you will receive a quarterly statement. If the transfer varies in amount from the previous transfer, you have the right to receive from us or the third party receiving payment, at least 10 days before the scheduled transfer date, a written notice of the amount and scheduled date of the transfer.

**Preauthorized payments.**
(1) **Customer's Right to stop payment** and procedure for doing so. If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here's how:

Call us at the telephone number on the front of this statement, write us at:

PO Box 2100 Lubbock, Texas 79408 or email us at depositops@vistabank.com in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. We may charge you the published amount for each stop-payment order you give.

(2) **Notice of varying amounts.** If these regular payments may vary in amount, we or the person you are going to pay will tell you at least 10 days before each payment when it will be made and how much it will be.

(3) **Liability for failure to stop payment of preauthorized transfer.** If you order us to stop one of these payments 14 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

(4) **Customer's liability.** Most checks, and other items are processed automatically, i.e.,without individual review of each item. Therefore, unless we agree in a separate writing, in our sole discretion, upon your request and due to unique circumstances to conduct individual review of each item, you agree that we are acting within common and reasonable banking practices by automatically processing checks, and other items, i.e., without individual review of each check, or item. You agree to indemnify, defend, and hold us harmless from and against all loss, costs, damages, liability, and other injury (including

reasonable attorney fees) that you or we may suffer or incur as a result of this practice not limited to the following instances:

(1) If, through no fault of ours, you do not have enough money in your account
(2) If the transfer would go over the credit limit on your overdraft line.
(3) If the automated teller machine where you are making the transfer does not have enough cash.
(5) If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
(6) There may be other exceptions stated in our agreement with you.

**About Direct Deposits:**

**Periodic Statements.** You will get a monthly account statement from us. However, if the only electronic fund transfer is a direct deposit to your savings account your statement will be quarterly. If you need to confirm a direct deposit before you receive your statement, call the telephone number shown on the front of the statement.

**Our liability.** We are responsible for processing your Items and Transactions concerning your Account using customary banking practices. if we make a mistake in processing items or transactions and charge you more than we should have, or failed to give you credit where due, we will correct the error as long as you give us sufficient and timely notice and an opportunity to fix it. However, we will not be liable in any event for losses or damages in excess of the amount of the transaction (the "face amount").

**Error resolution notice.** In case of errors or questions about your electronic transfers, call us at the telephone number on the front of this statement or write us at PO Box 2100 Lubbock, Texas 79408 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must h e a r from you no later than 30 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us the dollar amount of the suspected error. We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error; you will have the use of the money during the time it takes us to complete our investigation.

00006915 0033256 0000-0002 TV11365S090122145031 01L

APP000434



**Account Number:** *******7891
**Statement Date:** 08/31/2022
**Page 2 of 2**

## CHECK IMAGES

**ACCOUNT NUMBER:** *******7891

| | |
|---|---|
| WE HAVE CHARGED YOUR ACCOUNT FOR THE FOLLOWING REASON(S): | (51) Force Pay Debit |
| Transfer to #8103 | (52) Closing Withdrawal |
| | (77) Wire Transfer Debit |
| | (79) Wire Transfer No Fee |
| | (80) Cashed Check/Withdrawal |

Vista Bank
www.vistabank.com

80  7097891    10 00 00 00

APPROVED _Koronary_    DATE 8/25/22

NAME  TC Hall LLC
ADDRESS
CITY, STATE, ZIP

⑆5035⑈1457⑆

per e-mail/phone approval-
max Barter

08/26/2022                                   $100,000.00



00006915 0033257 0002-0002

00006915 0033257 0002-0002 TV11365S090122145031 01L

APP000435



## Vista Bank
*People First.*

1508 Texas Avenue
Lubbock, TX 79401

00006925 TV11365S090122145031 1 000000000 6925 4
GILLESPIE VILLAS LLC
13901 MIDWAY RD STE 102-243
DALLAS TX 75244

| | |
|---|---|
| **Account Number:** | *******8103 |
| **Statement Date:** | 08/31/2022 |
| **Items Enclosed:** | 4 |
| | **Page 1 of 3** |

Member **FDIC**

**CUSTOMER SERVICE INFORMATION**

📞 877-888-4782 (877-88-VISTA)

🏢 P.O. Box 2100 | Lubbock, TX 79401

💻 vistabank.com



## REMAIN VIGILANT

*Unfortunately, combatting fraud and cyber security risks are a regular part of our everyday lives. Visit our Fraud Resource Center at vistabank.com to stay current and implement the recommended steps to protect you and yours.*

### VIEW BUSINESS CHECKING

**ACCOUNT NUMBER:**    *******8103

### Balance Summary

| | |
|---|---:|
| **Beginning Balance as of 07/31/22** | **$70.00** |
| + Deposits and Credits  (3) | $200,008.00 |
| - Withdrawals and Debits  (4) | $100,015.00 |
| - Account Maintenance Assessment for Statement Period | $5.00 |
| **Ending Balance as of 08/31/22** | **$100,058.00** |
| Number of Days in Statement Period | 31 |
| **Items Enclosed** | **4** |

### Transaction Detail

| Date | Description | Deposits | Withdrawals | Balance |
|---|---|---:|---:|---:|
| Aug 22 | FED WIRE IN #202208220088212 ORIG-CRAIG J STELTZ | $100,000.00 | | $100,070.00 |
| Aug 23 | FED WIRE OUT #202208230084810 FEE | | -$15.00 | $100,055.00 |
| Aug 23 | FED WIRE OUT #202208230084810 BENE-BROADVIEW HOLDINGS | | -$70,000.00 | $30,055.00 |
| Aug 23 | CHECK # 90 | | -$10,300.25 | $19,754.75 |
| Aug 23 | CHECK # 90 | | -$19,699.75 | $55.00 |
| Aug 26 | DEPOSIT | $100,000.00 | | $100,055.00 |
| Aug 29 | VISTA MOBILE DEPOSIT | $8.00 | | $100,063.00 |
| Aug 31 | MONTHLY SERVICE CHARGE | | -$5.00 | $100,058.00 |



         

00006925 0033288 0001-0003 TV11365S090122145031 01L

APP000436

HOW TO RECONCILE YOUR CHECK BOOK
BALANCE TO THE STATEMENT BALANCE

1. SORT YOUR CHECKS IN THE ORDER IN WHICH
THEY WERE WRITTEN.

2. COMPARE EACH CHECK WITH THE AMOUNTS
WRITTEN IN YOUR CHECK RECORD, AND MARK
OFF THOSE WHICH AGREE. THEN ENTER IN THE
OUTSTANDING CHECK COLUMN THE AMOUNTS
OF ALL THE CHECKS WHICH APPEAR IN YOUR
RECORD BUT HAVE NOT BEEN RETURNED WITH
THIS STATEMENT.

3. ENTER IN YOUR CHECK RECORD AND SUBTRACT
FROM THE BALANCE SHOWN ANY MISCELLANEOUS
CHARGES OR CHECKS WHICH ARE ENCLOSED WITH
THIS STATEMENT BUT WHICH YOU HAVE NOT
PREVIOUSLY RECORDED.

4. SUBTRACT ANY BANK CHARGES. (AND BE SURE TO
SUBTRACT FROM STUB BALANCE)

WRITE THE NEW BALANCE HERE

CHECK BOOK BALANCE

| OUTSTANDING CHECKS | |
|---|---|
| NO. OR DATE | AMOUNT |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | |

ENTER CURRENT BALANCE AS SHOWN ON FRONT OF YOUR STATEMENT

ADD ANY DEPOSIT YOU HAVE MADE AFTER THE DATE SHOWN ON FRONT OF STATEMENT

SUB TOTAL

SUBTRACT TOTAL OF OUTSTANDING CHECKS

WRITE TOTAL HERE

ADJUSTED STATEMENT BALANCE

THESE TWO BALANCES SHOULD AGREE

After making the above entries, your check book balance should agree with the statement balance. If you feel there are discrepancies, please report them within 14 DAYS. PREAUTHORIZED ELECTRIC TRANSFERS. Any questions you may have concerning these transfers on your account will be answered by calling the telephone number shown on the front of this statement.

## IMPORTANT INFORMATION ABOUT PREAUTHORIZED WITHDRAWALS AND DIRECT DEPOSITS

If you have arranged to have certain recurring bills deducted from your account, such as insurance premiums or mortgage payments, or to accept direct deposits of certain recurring payments, such as payroll checks or Social Security benefits, please read this notice carefully.

**About Preauthorized Withdrawals:**

**Periodic Statements.** You will receive a monthly account statement from us each month in which an electronic fund transfer from your account has occurred; in any event you will receive a quarterly statement. If the transfer varies in amount from the previous transfer, you have the right to receive from us or the third party receiving payment, at least 10 days before the scheduled transfer date, a written notice of the amount and scheduled date of the transfer.

**Preauthorized payments.**

(1) Customer's Right to stop payment and procedure for doing so. If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here's how:

Call us at the telephone number on the front of this statement, write us at:

PO Box 2100 Lubbock, Texas 79408 or email us at depositops@vistabank.com in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. We may charge you the published amount for each stop-payment order you give.

(2) Notice of varying amounts. If these regular payments may vary in amount, we or the person you are going to pay will tell you at least 10 days before each payment when it will be made and how much it will be.

(3) Liability for failure to stop payment of preauthorized transfer. If you order us to stop one of these payments 14 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

(4) Customer's liability. Most checks, and other items are processed automatically, i.e.,without individual review of each item. Therefore, unless we agree in a separate writing, in our sole discretion, upon your request and due to unique circumstances to conduct individual review of each item, you agree that we are acting within common and reasonable banking practices by automatically processing checks, and other items, i.e., without individual review of each check, or item. You agree to indemnify, defend, and hold us harmless from and against all loss, costs, damages, liability, and other injury (including

reasonable attorney fees) that you or we may suffer or incur as a result of this practice not limited to the following instances:

(1) If, through no fault of ours, you do not have enough money in your account
(2) If the transfer would go over the credit limit on your overdraft line.
(3) If the automated teller machine where you are making the transfer does not have enough cash.
(5) If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
(6) There may be other exceptions stated in our agreement with you.

**About Direct Deposits:**

**Periodic Statements.** You will get a monthly account statement from us. However, if the only electronic fund transfer is a direct deposit to your savings account your statement will be quarterly. If you need to confirm a direct deposit before you receive your statement, call the telephone number shown on the front of the statement.

**Our liability.** We are responsible for processing your Items and Transactions concerning your Account using customary banking practices. if we make a mistake in processing items or transactions and charge you more than we should have, or failed to give you credit where due, we will correct the error as long as you give us sufficient and timely notice and an opportunity to fix it. However, we will not be liable in any event for losses or damages in excess of the amount of the transaction (the "face amount").

**Error resolution notice.** In case of errors or questions about your electronic transfers, call us at the telephone number on the front of this statement or write us at PO Box 2100 Lubbock, Texas 79408 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must h e a r from you no later than 30 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us the dollar amount of the suspected error. We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error; you will have the use of the money during the time it takes us to complete our investigation.

00006925 0033289 0000-0003 TV11365S090122145031 01L

APP000437



**Account Number:**       \*\*\*\*\*\*8103
**Statement Date:**       08/31/2022
                          **Page 2 of 3**

**VIEW BUSINESS CHECKING**                    **ACCOUNT NUMBER:**       \*\*\*\*\*\*\*8103

## Checks Posted

\* Indicates a break in check sequence

| Date | Check# | Amount | Date | Check# | Amount |
|------|--------|--------|------|--------|--------|
| Aug 23 | 90 | $10,300.25 | Aug 23 | 90* | $19,699.75 |



00006925 0033290 0002-0003 TV11365S090122145031 01L

APP000438



**Account Number:**     *******8103
**Statement Date:**     08/31/2022
Page 3 of 3

## CHECK IMAGES

**ACCOUNT NUMBER:**     *******8103



| | |
|---|---|
| 08/26/2022 | $100,000.00 |
| 08/29/2022 | $8.00 |

**Vista Mobile Deposit**

7098103
Deposit amount: 8.00

⑈111314575⑈ 7098103⑈41 ⑈0000000800⑈

Gillespie Villas LLC
13901 Midway Road STE 102LB243
Farmers' Branch, TX 75244
(972) 385-9934

Vista Bank
5840 W. Northwest Highway
Dallas, TX 75225
(214) 416-8300

No. 1002
Date 8/22/2022

Pay To The Order Of  Broadview Holdings     $ **10,300.25
Ten Thousand Three Hundred and 25/100***     Dollars

Broadview Holdings
13901 Midway Road
Dallas, TX 75244
(214) 702-8897
Memo:

⑈000001002⑈ ⑈111314575⑈7098103⑈

| | | |
|---|---|---|
| 08/23/2022 | # 90 | $10,300.25 |

Gillespie Villas LLC
13901 Midway Road STE 102LB243
Farmers' Branch, TX 75244
(972) 385-9934

Vista Bank
5840 W. Northwest Highway
Dallas, TX 75225
(214) 416-8300

No. 1001
Date 8/22/2022

Pay To The Order Of  Texas Brand Bank     $ **19,699.75
Nineteen Thousand Six Hundred Ninety-Nine and 75/100***     Dollars

Texas Brand Bank
4161 McKinney Avenue
Dallas, TX 75204
(214) 219-0003
Memo:  Loan Account 2753178-15

⑈000001001⑈ ⑈111314575⑈7098103⑈

| | | |
|---|---|---|
| 08/23/2022 | # 90 | $19,699.75 |

00006925 0033291 0003-0003 TV11365S090122145031 01L

APP000439



# Vista Bank
*People First.*

1508 Texas Avenue
Lubbock, TX 79401

| | |
|---|---|
| **Account Number:** | *******8103 |
| **Statement Date:** | 09/30/2022 |
| **Items Enclosed:** | 1 |
| | **Page 1 of 2** |

 

00006234 TV11365S100322142322 1 000000000 6234 3
**GILLESPIE VILLAS LLC**
13901 MIDWAY RD STE 102-243
DALLAS TX 75244

**CUSTOMER SERVICE INFORMATION**

 877-888-4782 (877-88-VISTA)

 P.O. Box 2100 | Lubbock, TX 79401

vistabank.com



**REMAIN VIGILANT**

*Unfortunately, combatting fraud and cyber security risks are a regular part of our everyday lives. Visit our Fraud Resource Center at vistabank.com to stay current and implement the recommended steps to protect you and yours.*

## VIEW BUSINESS CHECKING     ACCOUNT NUMBER:     *******8103

### Balance Summary

| | |
|---|---|
| **Beginning Balance as of 08/31/22** | **$100,058.00** |
| + Deposits and Credits  (0) | $0.00 |
| - Withdrawals and Debits  (1) | $100,000.00 |
| - Account Maintenance Assessment for Statement Period | $5.00 |
| **Ending Balance as of 09/30/22** | **$53.00** |
| **Number of Days in Statement Period** | 30 |
| **Items Enclosed** | 1 |

### Transaction Detail

| Date | Description | Deposits | Withdrawals | Balance |
|---|---|---|---|---|
| Sep 16 | CHECK # 1004 | | -$100,000.00 | $58.00 |
| Sep 30 | MONTHLY SERVICE CHARGE | | -$5.00 | $53.00 |

### Checks Posted

*Indicates a break in check sequence

| Date | Check# | Amount |
|---|---|---|
| Sep 16 | 1004 | $100,000.00 |



         

00006234 0030582 0001-0002 TV11365S100322142322 01L

APP000440



HOW TO RECONCILE YOUR CHECK BOOK
BALANCE TO THE STATEMENT BALANCE

1. SORT YOUR CHECKS IN THE ORDER IN WHICH
   THEY WERE WRITTEN.

2. COMPARE EACH CHECK WITH THE AMOUNTS
   WRITTEN IN YOUR CHECK RECORD, AND MARK
   OFF THOSE WHICH AGREE. THEN ENTER IN THE
   OUTSTANDING CHECK COLUMN THE AMOUNTS
   OF ALL THE CHECKS WHICH APPEAR IN YOUR
   RECORD BUT HAVE NOT BEEN RETURNED WITH
   THIS STATEMENT.

3. ENTER IN YOUR CHECK RECORD AND SUBTRACT
   FROM THE BALANCE SHOWN ANY MISCELLANEOUS
   CHARGES OR CHECKS WHICH ARE ENCLOSED WITH
   THIS STATEMENT BUT WHICH YOU HAVE NOT
   PREVIOUSLY RECORDED.

4. SUBTRACT ANY BANK CHARGES. (AND BE SURE TO
   SUBTRACT FROM STUB BALANCE)

WRITE THE NEW BALANCE HERE

CHECK BOOK BALANCE

THESE TWO BALANCES SHOULD AGREE

**OUTSTANDING CHECKS**

| NO. OR DATE | AMOUNT |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | |

ENTER CURRENT BALANCE AS
SHOWN ON FRONT OF YOUR
STATEMENT

ADD ANY DEPOSIT YOU HAVE
MADE AFTER THE DATE SHOWN
ON FRONT OF STATEMENT

SUB TOTAL

SUBTRACT TOTAL OF
OUTSTANDING CHECKS

WRITE TOTAL HERE

ADJUSTED STATEMENT
BALANCE

After making the above entries, your check book balance should agree with the statement balance. If you feel there are discrepancies, please report them within 14 DAYS. PREAUTHORIZED ELECTRIC TRANSFERS. Any questions you may have concerning these transfers on your account will be answered by calling the telephone number shown on the front of this statement.

# IMPORTANT INFORMATION ABOUT PREAUTHORIZED WITHDRAWALS AND DIRECT DEPOSITS

If you have arranged to have certain recurring bills deducted from your account, such as insurance premiums or mortgage payments, or to accept direct deposits of certain recurring payments, such as payroll checks or Social Security benefits, please read this notice carefully.

**About Preauthorized Withdrawals:**

**Periodic Statements.** You will receive a monthly account statement from us each month in which an electronic fund transfer from your account has occurred; in any event you will receive a quarterly statement. If the transfer varies in amount from the previous transfer, you have the right to receive from us or the third party receiving payment, at least 10 days before the scheduled transfer date, a written notice of the amount and scheduled date of the transfer.

**Preauthorized payments.**

(1) **Customer's Right to stop payment** and procedure for doing so. If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here's how:

Call us at the telephone number on the front of this statement, write us at:

PO Box 2100 Lubbock, Texas 79408 or email us at depositops@vistabank.com in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call. We may charge you the published amount for each stop-payment order you give.

(2) **Notice of varying amounts.** If these regular payments may vary in amount, we or the person you are going to pay will tell you at least 10 days before each payment when it will be made and how much it will be.

(3) **Liability for failure to stop payment of preauthorized transfer.** If you order us to stop one of these payments 14 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

(4) **Customer's liability.** Most checks, and other items are processed automatically, i.e.,without individual review of each item. Therefore, unless we agree in a separate writing, in our sole discretion, upon your request and due to unique circumstances to conduct individual review of each item, you agree that we are acting within common and reasonable banking practices by automatically processing checks, and other items, i.e., without individual review of each check, or item. You agree to indemnify, defend, and hold us harmless from and against all loss, costs, damages, liability, and other injury (including

reasonable attorney fees) that you or we may suffer or incur as a result of this practice not limited to the following instances:

(1) If, through no fault of ours, you do not have enough money in your account
(2) If the transfer would go over the credit limit on your overdraft line.
(3) If the automated teller machine where you are making the transfer does not have enough cash.
(5) If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
(6) There may be other exceptions stated in our agreement with you.

**About Direct Deposits:**

**Periodic Statements.** You will get a monthly account statement from us. However, if the only electronic fund transfer is a direct deposit to your savings account your statement will be quarterly. If you need to confirm a direct deposit before you receive your statement, call the telephone number shown on the front of the statement.

**Our liability.** We are responsible for processing your Items and Transactions concerning your Account using customary banking practices. if we make a mistake in processing items or transactions and charge you more than we should have, or failed to give you credit where due, we will correct the error as long as you give us sufficient and timely notice and an opportunity to fix it. However, we will not be liable in any event for losses or damages in excess of the amount of the transaction (the "face amount").

**Error resolution notice.** In case of errors or questions about your electronic transfers, call us at the telephone number on the front of this statement or write us at PO Box 2100 Lubbock, Texas 79408 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must h e a r from you no later than 30 days after we sent you the FIRST statement on which the error or problem appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us the dollar amount of the suspected error. We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error; you will have the use of the money during the time it takes us to complete our investigation.

00006234 0030583 0000-0002 TV11365S100322142322 01L

APP000441



## CHECK IMAGES

ACCOUNT NUMBER:    ******8103



| | | |
|---|---|---|
| Gillespie Villas LLC | Vista Bank | No. 1004 |
| 13901 Midway Road STE 102LB243 | 5840 W. Northwest Highway | |
| Farmers' Branch, TX 75244 | Dallas, TX 75225 | Date 9/14/2022 |
| (972) 385-9934 | (214) 416-8300 | |

Pay To The Order Of  Craig Steltz                                         $ **100,000.00

One Hundred  Thousand  and 00/100***                                    **Dollars**

Craig Steltz
4809 Wade Dr.
Metairie, LA 7003

Memo:  Return of Loan

⑈000001004⑈ ⑆111314575⑆7098103⑈

| 09/16/2022 | # 1004 | $100,000.00 |
|---|---|---|

00006234 0030584 0002-0002 TV11365S100322142322 01L

APP000442

# Commonwealth Title of Dallas, Inc.

### Proceeds from Real Estate Transactions as required by the Internal Revenue Service

*You are required by law to provide Commonwealth Title of Dallas, Inc. with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.*

Branch Address
2651 North Harwood Street, Suite 260
Dallas, TX 75201

**Substitute Form 1099-S**
This is important tax information and is being furnished to the Internal Revenue Service, as required by section 1521 of the Tax Reform Act of 1986. If you are required to file a return, a negligence penalty or other sanction will be imposed if this income is taxable and the IRS determines that it has not been reported.

GF#: CWD-11C-22011220092

Date of closing: **8-24-2022**

**PROPERTY ADDRESS OR LEGAL DESCRIPTION**

3407 and 3409 North Hall Street, Dallas, TX 75219

Assessor's Parcel Number (APN) -

**PROCEEDS FOR THIS SALE WENT TO:** (MULTIPLE SELLERS - Use one form for each seller. Treat husband and wife as one seller (filing joint tax returns) unless requested otherwise, then separate forms must be used.)

1. **Turtle Creek Tower, LLC**
   Sellers Name (First, MI, Last or Entity Name)

   ▬▬▬▬▬▬▬
   Federal Tax ID# for this seller
   (List only the Tax ID# for the seller listed on Line 1, spouse Tax ID# not required. Executor/Trustee should not list their name as the seller unless they are going to report the proceeds on their personal income tax return. Disregarded entities should provide the name and Tax ID# of the responsible person/entity.)

2. 
   Spouse or Personal Representative

**TOTAL CONSIDERATION**

$ **5,300,000**   Total Consideration

☐ Exchange (If checked)

**100**   % Percentage of ownership for this seller

$ **5,300,000**   GROSS Allocated Proceeds
(Total consideration multiplied by percentage of ownership)

$ _____ Tax Credit to Seller (Real property tax credits to seller contained in the 400 series of the HUD-1 or comparable closing statement form.)

**MAILING ADDRESS:**

**9100 Southwest Freeway, 201**

**Houston, TX 77074**

☐ Check here if the address is outside of the U.S.A.

☐ Check here if you are a foreign person per IRS regulations (nonresident alien, foreign partnership, foreign estate, or foreign trust). Do not sign below.

Under penalties of perjury, I certify that I am a U.S. person or U.S. resident alien and the number shown on this statement is my correct taxpayer identification number.

Transferor's Signature

**8-24-2022**
Date

**Retain for 4 years**

1099-S (Substitution) (1099) (10-03) (Rev. 09-12)
TXFNFESC_SubstituteForm1099-S (11-07)

APP000443

CONFIDENTIALITY NOTICE: This email and the attachments are "privileged and confidential" and is strictly meant for the intended recipient(s). All others are requested to notify me and also to remove this email and the attachments from your computer

-----Original Message-----
From: Murugan Venkat
Sent: Thursday, August 25, 2022 11:16 AM
To: Johnson, Stephanie <Stephanie.Johnson@cltlt.com>; Tim Barton <tbarton@jmjdevelopment.com>; RANDY P. MARX <randy@themarxfirm.com>
Cc: Alan C. Marx <alan@themarxfirm.com>; Aguilar, Tonya <TonyaJAguilar@cltlt.com>
Subject: RE: Turtle Creek - Escrow Agreement (Broker and Seller)

Stephanie
Here below is the wire information:
- Bank Name        Texas Brand Bank
- Routing# for the Bank   111925113
- Account #        ███████████
- Name on the Account    Broadview Holdings
- Address for the Bank Account Holder 13901 Midway Road, STE 102LB243, Dallas, TX 752444

Thanks & regards, Murugan Venkat
CONFIDENTIALITY NOTICE: This email and the attachments are "privileged and confidential" and is strictly meant for the intended recipient(s). All others are requested to notify me and also to remove this email and the attachments from your computer

-----Original Message-----
From: Johnson, Stephanie <Stephanie.Johnson@cltlt.com>
Sent: Thursday, August 25, 2022 9:37 AM
To: Tim Barton <tbarton@jmjdevelopment.com>; RANDY P. MARX <randy@themarxfirm.com>
Cc: Murugan Venkat <MVenkat@jmjdevelopment.com>; Alan C. Marx <alan@themarxfirm.com>; Aguilar, Tonya <TonyaJAguilar@cltlt.com>
Subject: RE: Turtle Creek - Escrow Agreement (Broker and Seller)

Good morning,

Please provide wiring instructions for the funding overage iao $132,138.55. Thank you.

Stephanie Johnson
O: (214) 855-8407 | C: (214) 208-3342
Stephanie.johnson@cltlt.com

-----Original Message-----
From: Tim Barton <tbarton@jmjdevelopment.com>
Sent: Wednesday, August 24, 2022 4:18 PM
To: RANDY P. MARX <randy@themarxfirm.com>
Cc: Johnson, Stephanie <https://urldefense.proofpoint.com/v2/url?u=http-3A_·_Stephanie.Johnson-40cltlt.com&d=DwIGaQ&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=nbJhiOCFWbDfCAhPUURkZlQmVMVQGm_rUFpBYOGzsoM&m=UNT0786LycMSW9HhJtvNhm2cDsqlYoSlacIC_4qsuiM&s=qQMt8R4eS1mYw48mbeic0EZymN2ya4N5gCi8i1xt9WU&e=>; Murugan Venkat <MVenkat@jmjdevelopment.com>; Alan C. Marx <alan@themarxfirm.com>
Subject: Re: Turtle Creek - Escrow Agreement (Broker and Seller)

3

APP000444

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK. HOLD AT ANGLE TO VIEW

No. 1131

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

Date  5/6/2022

Pay To The
Order Of    James E. Langford                                              S  **3,500.00

Three Thousand Five Hundred  and 00/100***                                  **Dollars**

James E. Langford
3001 Bookhout Street
Dallas, TX 75201

Memo:   3/1/22  to 4/12/22 (Turtle Creek Hall)

⑆000000 1131 ⑆  ⑈1119 2511 3⑈ 10 2461 1⑆

APP000444A

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK HOLD AT ANGLE TO VIEW

No. 1132

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

Date  5/6/2022

Pay To The Order Of  James E. Langford

S  **6,150.00

Six Thousand One Hundred Fifty and 00/100***                    Dollars

James E. Langford
3001 Bookhout Street
Dallas, TX 75201

Memo:  3/1/22 to 4/12/22 (Turtle Creek Hall)

⑈000001132⑈ ⑆111925113⑆1024611⑈

**APP000444B**

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

Max

Do you have bank for TC hall if so send wire info so funds can be sent back to it

If not Ven will use Broadview

Sent from my iPhone

> On Aug 24, 2022, at 4:15 PM, RANDY P. MARX <RANDY@themarxfirm.com> wrote:
>
> Tim.  Ven.
>
> Please send wiring information's to the title company for her to use in returning the excess funds to you, yet today if possible or first thing in the morning. Thank you. Randy
>
> (NOTE:  The above may have been dictated, but not read, as sent via IPhone).
>
> Randy P Marx, Esq.
> The Marx Firm
> 2999 Turtle Creek Blvd.
> Dallas, Texas 75219
> 214.360.9343 office
> 214.405.5120 cell
> randy@themarxfirm.com
>
>
>> On Aug 24, 2022, at 16:14, RANDY P. MARX <RANDY@themarxfirm.com> wrote:
>>

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

------------------------------------------------------------------

This message was secured by Zix(R).

4

APP000445

## Domestic Incoming Wire Instructions

**Receiving Bank**
**Bank Name:** Vista Bank
**Bank Routing/ABA #:** 111314575
**City, State:** Dallas, TX

$132,138.55
Wire

**Beneficiary**
**Beneficiary Account Number:** ███████
**Beneficiary Name:** TC Hall LLC
**Address 1:** 3600 Gillespie St
**Address 2:** Dallas, TX 75219
**Additional Wire Info:**

## International Incoming Wire Instructions

**Receiving/Intermediary Bank** **US Dollars Only**
**Bank Name:** TIB – The Independent Bankers Bank
**Bank Routing/ABA #:** 111010170
**Address, City, State:** 11701 Luna Rd Farmers Branch, TX 75234
**Swift Code:** ███████

**Beneficiary Bank**
**Beneficiary Bank Name:** Vista Bank
**Beneficiary Bank Account Number/ABA:** ███████/111314575
**City, State:** Dallas, TX

**Beneficiary**
**Beneficiary Account Number:**
**Beneficiary Name:**
**Address 1:**
**Address 2:**
**Additional Wire Info:**

\* amount and wiring
Instructions verified
w/ Bella Khusal at
JMJ Development on
8/25/2022 at
12:04pm by
RLP
at 972-385-9934

Thanks & regards, Murugan Venkat

2

**APP000446**

# EXHIBIT A-18

APP000447

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



John B. Scott
Secretary of State

## Office of the Secretary of State

### CERTIFICATE OF FILING
### OF

### TITAN INVESTMENTS, LLC
File Number: 804757546

The undersigned, as Secretary of State of Texas, hereby certifies that an Application for Registration for the above named Foreign Limited Liability Company (LLC) to transact business in this State has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing the authority of the entity to transact business in this State from and after the effective date shown below for the purpose or purposes set forth in the application under the name of

TITAN 2022 INVESTMENTS, LLC

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 10/05/2022

Effective: 10/05/2022



John B. Scott
Secretary of State

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: Stacey Ybarra          TID: 10308          Document: 1184202700002

APP000448

# EXHIBIT A-19

APP000449

| Form 401<br><br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: See Instructions | <br><br>**Statement of Change of<br>Registered Office/Agent** | **Filed in the Office of the<br>Secretary of State of Texas**<br>Filing #: 803711606 05/19/2022<br>Document #: 1150231480028<br>Image Generated Electronically<br>for Web Filing |

**Entity Information**

The name of the entity is :

**LC Aledo TX, LLC**

The file number issued to the entity by the secretary of state is: **803711606**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**Incorp Services**

**815 Brazos St, Suite 500, Austin, TX, USA 78701**

**Change to Registered Agent/Registered Office**

The following changes are made to the registered agent and/or office information of the named entity:

Registered Agent Change

☑A. The new registered agent is an organization by the name of:

**One Agent Texas, LLC**

OR

☐B. The new registered agent is an individual resident of the state whose name is:

Registered Office Change

☑C. The business address of the registered agent and the registered office address is changed to:

**13636 GOLDMARK DR, DALLAS, TX, USA 75240**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

☑B. The consent of the registered agent is maintained by the entity.

**Statement of Approval**

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

**Effectiveness of Filing**

☑A. This document becomes effective when the document is filed by the secretary of state.

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

**Execution**

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: **May 19, 2022**                              **Tim Barton**

APP000450

|  |
|---|
| Signature of authorized person(s) |

**FILING OFFICE COPY**

APP000451

11/30/22, 10:59 AM                                         BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

# TEXAS SECRETARY of STATE
# JOHN B. SCOTT

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 803711606 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | August 5, 2020 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32075329238 | **FEIN:** | |
| **Duration:** | Perpetual | | |

**Name:** LC Aledo TX, LLC
**Address:** 13901 MIDWAY RD STE 102-243
DALLAS, TX 75244-4359 USA

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|

| Last Update | Name | Title | Address |
|---|---|---|---|
| October 15, 2022 | ONE PASS INVESTMENTS LLC | MANAGER | 13901 MIDWAY RD STE 102 DALLAS, TX 75244 USA |

[Order]  [Return to Search]

---

Instructions:
🔴 To place an order for additional information about a filing press the 'Order' button.

APP000452

| Form 401<br><br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: See Instructions | <br><br>**Statement of Change of<br>Registered Office/Agent** | **Filed in the Office of the<br>Secretary of State of Texas**<br>Filing #: 803711606 05/19/2022<br>Document #: 1150231480028<br>Image Generated Electronically<br>for Web Filing |
| --- | --- | --- |

### Entity Information

The name of the entity is :

**LC Aledo TX, LLC**

The file number issued to the entity by the secretary of state is: **803711606**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**Incorp Services**

**815 Brazos St, Suite 500, Austin, TX, USA 78701**

### Change to Registered Agent/Registered Office

The following changes are made to the registered agent and/or office information of the named entity:

Registered Agent Change

☑ A. The new registered agent is an organization by the name of:

**One Agent Texas, LLC**

OR

☐ B. The new registered agent is an individual resident of the state whose name is:

Registered Office Change

☑ C. The business address of the registered agent and the registered office address is changed to:

**13636 GOLDMARK DR, DALLAS, TX, USA 75240**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

☑ B. The consent of the registered agent is maintained by the entity.

### Statement of Approval

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: **May 19, 2022**                    **Tim Barton**

APP000453

Signature of authorized person(s)

**FILING OFFICE COPY**

APP000454

096-319595-20

FILED
TARRANT COUNTY
10/22/2021 3:41 AM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 096-319595-20

| | | |
|---|---|---|
| SOMERSET-LOST CREEK GOLF, LTD | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| | § | |
| LC ALEDO TX, LLC, | § | |
| JMJ ACQUISITIONS, LLC, AND | § | |
| WALL010, LLC | § | |
| | § | |
| Defendants / Counter-Plaintiffs, | § | 96th JUDICIAL DISTRICT |
| | § | |
| v. | § | |
| | § | |
| SOMERSET-LOST CREEK GOLF, LTD, | § | |
| | § | |
| Counter-Defendant | § | |
| | § | |
| AND | § | |
| | § | |
| SOMERSET-LOST CREEK MANAGEMENT, | § | TARRANT COUNTY, TEXAS |
| LLC., BERYL ARTZ BYPASS TRUST, | § | |
| RHONDA ARTZ AS TRUSTEE OF THE | § | |
| BERYL ARTZ BYPASS TRUST, RHONDA | § | |
| ARTZ, AND S. GARY WERLEY (AS | § | |
| SUBSTITUTE TRUSTEE) | § | |
| | § | |
| Third-Party Defendants. | § | |

**SUPPLEMENT TO DEFENDANTS' / COUNTER-PLAINTIFFS' AMENDED MOTION
TO COMPEL DISCOVERY RESPONSES; MOTION FOR CONTINUANCE;
RESPONSE TO THIRD-PARTY DEFENDANTS' AMENDED MOTION FOR
SUMMARY JUDGMENT; AND RESPONSE TO PLAINTIFF'S, COUNTER-
DEFENDANT'S AND THIRD-PARTY DEFENDANTS' NO EVIDENCE MOTION FOR
SUMMARY JUDGMENT**

1.      NOW COMES, LC Aledo TX, LLC ("LC Aledo"); JMJ Acquisitions, LLC ("JMJ")

and Wall010, LLC ("Wall") (collectively, "Counter-Plaintiffs" or "Defendants") and files this

SUPPLEMENT TO DEFENDANTS' / COUNTER-PLAINTIFFS' AMENDED MOTION TO

APP000455

LOAN ORIGINATOR'S NAME:
**TIMOTHY BARTON**
**NMLS ID#: N/A**

LOAN ORIGINATION COMPANY'S NAME:
**WALL010 LLC**
**NMLS INSTITUTION ID#: N/A**

### PROMISSORY NOTE

**$300,000.00**                                                                **JUNE 25, 2018**

FOR VALUE RECEIVED, on **February 29, 2020** ("Maturity Date"), the undersigned and if more than one, each of them, jointly and severally (hereinafter referred to as "Borrower"), promises to pay to the order of **WALL010 LLC,** ("Bank") at its offices in DALLAS County, Texas at **1755 WITTINGTON PLACE, SUITE 340 DALLAS, TEXAS 75234,** the principal amount of **THREE HUNDRED THOUSAND AND 00/100THS ($300,000.00)** ("Total Principal Amount"), or such amount, that has been advanced to Borrower, together with interest on such portion of the Total Principal Amount which has been advanced to Borrower from the date advanced until paid at the rate of **ONE AND 00/100THS PERCENT (1.000%)** per annum calculated on the basis of the actual days elapsed but computed as if each year consisted of 365 days.

The principal of and all accrued but unpaid interest on this Note shall be due and payable as follows:

**THE PRINCIPAL AMOUNT IS DUE AND PAYABLE February 29, 2020 AND THE INTEREST IS DUE AND PAYABLE AT MATURITY; and**

**THIS LOAN IS PAYABLE IN FULL ON February 29, 2020. AT MATURITY, YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE PAYEE IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

The outstanding principal balance of this Note, together with all accrued but unpaid interest, shall be due and payable on the Maturity Date.

To the extent that any interest is not paid on or before the first day after it becomes due and payable, Bank may, at its option, add such accrued interest to the principal of this Note. Notwithstanding anything herein to the contrary, upon an Event of Default (as hereinafter defined) or at maturity, whether by acceleration or otherwise, all principal of this Note shall, at the option of Bank, bear interest at the Maximum Rate until paid.

The term "Maximum Rate," as used herein, shall mean at the particular time in question the maximum rate of interest which, under applicable law, may then be charged on this Note. If such maximum rate of interest changes after the date hereof and this Note provides for a fluctuating rate of interest, the Maximum Rate shall be automatically increased or decreased, as the case may be, without notice to Borrower from time to time as of the effective date of each change in such maximum rate. If applicable law ceases to provide for such a maximum rate of interest, the Maximum Rate shall be equal to eighteen percent (18%) per annum.

Borrower may prepay the principal of this Note as set forth above without premium or penalty. All regularly scheduled payments of the indebtedness evidenced by this Note and by any of the other Loan Documents shall be applied first to any accrued but unpaid interest then due and payable hereunder or thereunder and then to the principal amount then due and payable. All non-regularly scheduled payments shall be applied to such indebtedness in such order and manner as the holder of this Note may from time to time determine in its sole discretion. All payments and prepayments of principal of or interest on this Note shall be made in lawful money of the United States of America in immediately available funds, at the address of Bank indicated above, or such other place as the holder of this Note shall designate in writing to Borrower. If any payment of principal of or interest on this Note shall become due on a day which is not a Business Day (as hereinafter defined), such payment shall be made on the next succeeding Business Day and any such extension of time shall be included in computing interest in connection with such payment. As used herein, the term "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banking associations are authorized to be closed. The books and records of Bank shall be prima facie evidence of all outstanding principal of and accrued and unpaid interest on this Note.

LOAN AGREEMENT AND/OR SECURITY DOCUMENTS

This Note has been executed and delivered pursuant to that certain Loan Agreement and/or Security Documents of even date herewith by and between Borrower and Bank ("Loan Agreement"), and is secured by, inter alia, the following:

Deed of Trust, Security Agreement and Assignment of Rents and Leases of even date herewith from

Page 1 of 3



APP000456

Borrower in favor of **TIMOTHY BARTON, Trustee(s)** for the benefit of the Bank, covering certain real property situated in Tarrant County, Texas, as more particularly described therein;

This Note, the Loan Agreement and all other documents evidencing, securing, governing, guaranteeing and/or pertaining to this Note, including but not limited to those documents described above, are hereinafter collectively referred to as the "Loan Documents." The holder of this Note is entitled to the benefits and security provided in the Loan Documents.

Borrower agrees that no advances under this Note shall be used for personal, family or household purposes, and that all advances hereunder shall be used solely for business, commercial, investment, or other similar purposes.

Borrower agrees that upon the occurrence of any one or more of the following events of default ("Event of Default"):

(a)    failure of Borrower to pay any installment of principal of or interest on this Note or on any other indebtedness of Borrower to Bank when due; or

(b)    the occurrence of any event of default specified in any of the other Loan Documents; or

(c)    the bankruptcy or insolvency of, the assignment for the benefit of creditors by, or the appointment of a receiver for any of the property of, or the liquidation, termination, dissolution or death or legal incapacity of, any party liable for the payment of this Note, whether as maker, endorser, guarantor, surety or otherwise;

the holder of this Note may, at its option, without further notice or demand, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, (ii) refuse to advance any additional amounts under this Note, (iii) foreclose all liens securing payment hereof, (iv) pursue any and all other rights, remedies and recourses available to the holder hereof, including but not limited to any such rights, remedies or recourses under the Loan Documents, at law or in equity, or (v) pursue any combination of the foregoing.

The failure to exercise the option to accelerate the maturity of this Note or any other right, remedy or recourse available to the holder hereof upon the occurrence of an Event of Default hereunder shall not constitute a waiver of the right of the holder of this Note to exercise the same at that time or at any subsequent time with respect to such Event of Default or any other Event of Default. The rights, remedies and recourses of the holder hereof, as provided in this Note and in any of the other Loan Documents, shall be cumulative and concurrent and may be pursued separately, successively or together as often as occasion therefore shall arise, at the sole discretion of the holder hereof. The acceptance by the holder hereof of any payment under this Note which is less than the payment in full of all amounts due and payable at the time of such payment shall not (i) constitute a waiver of or impair, reduce, release or extinguish any right, remedy or recourse of the holder hereof, or nullify any prior exercise of any such right, remedy or recourse, or (ii) impair, reduce, release or extinguish the obligations of any party liable under any of the Loan Documents as originally provided herein or therein.

This Note and all of the other Loan Documents are intended to be performed in accordance with, and only to the extent permitted by, all applicable usury laws. If any provision hereof or of any of the other Loan Documents or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the application of such provision to any other person or circumstance nor the remainder of the instrument in which such provision is contained shall be affected thereby and shall be enforced to the greatest extent permitted by law. It is expressly stipulated and agreed to be the intent of the holder hereof to at all times comply with the usury and other applicable laws now or hereafter governing the interest payable on the indebtedness evidenced by this Note. If the applicable law is ever revised, repealed or judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved or received with respect to the indebtedness evidenced by this Note, or if Bank's exercise of the option to accelerate the maturity of this Note, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by law, then it is the express intent of Borrower and Bank that all excess amounts theretofore collected by Bank be credited on the principal balance of this Note (or, if this Note and all other indebtedness arising under or pursuant to the other Loan Documents have been paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectable hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid, or agreed to be paid, by Borrower for the use, forbearance, detention, taking, charging, receiving or reserving of the indebtedness of Borrower to Bank under this Note or arising under or pursuant to the other Loan Documents shall, to the maximum extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the usury ceiling from time to time in effect and applicable to such indebtedness for so long as such indebtedness is outstanding. To the extent federal law permits Bank to contract for, charge or receive a greater amount of interest, Bank will rely on federal law instead of TEX. REV. CIV. STAT. ANN. art. 5069-1.04, as amended, for the purpose of determining the Maximum Rate. Additionally, to the maximum extent permitted by applicable law now or hereafter in effect, Bank may, at its option and from time to time, implement any other method of computing the Maximum Rate under such Article 5069-1.04, as amended, or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Bank to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

To the extent permitted by applicable law, lender reserves a right of setoff in all borrower's accounts with lender (whether checking, savings, or some other account). This includes all accounts borrower holds jointly with someone else and all accounts borrower may open in the future. However, this does not include any IRA or

Page 2 of 3

APP000457

KEOGH accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at lender's option, to administratively freeze all such accounts to allow lender to protect lender's charge and setoff rights provided in this paragraph.

In no event shall TEX. REV. CIV. STAT. ANN. art. 5069 Ch. 15 (which regulates certain revolving loan accounts and revolving tri-party accounts) apply to this Note. To the extent that TEX. REV. CIV. STAT. ANN. art. 5069-1.04, as amended, is applicable to this Note, the "indicated rate ceiling" specified in such article is the applicable ceiling; provided that, if any applicable law permits greater interest, the law permitting the greatest interest shall apply.

If this Note is placed in the hands of an attorney for collection, or is collected in whole or in part by suit or through probate, bankruptcy or other legal proceedings of any kind, Borrower agrees to pay, in addition to all other sums payable hereunder, all costs and expenses of collection, including but not limited to reasonable attorneys' fees.

Borrower and any and all endorsers and guarantors of this Note severally waive presentment for payment, notice of nonpayment, protest, demand, notice of protest, notice of intent to accelerate, notice of acceleration and dishonor, diligence in enforcement and indulgences of every kind and without further notice hereby agree to renewals, extensions, exchanges or releases of collateral, taking of additional collateral, indulgences or partial payments, either before or after maturity.

THIS NOTE HAS BEEN EXECUTED UNDER, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS, EXCEPT AS SUCH LAWS ARE PREEMPTED BY APPLICABLE FEDERAL LAWS.

**BORROWER:**

Somerset-Lost Creek Golf, Ltd
A Texas Limited Partnership

BY:
Printed Name: Rhonda Artz
Title: President, Member, and Manager

APP000458

CAUSE NO. 096-319595-20

| | | |
|---|---|---|
| SOMERSET-LOST CREEK GOLF, LTD | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| LC ALEDO TX, LLC, | § | |
| JMJ ACQUISITIONS, LLC, AND | § | |
| WALL010, LLC | § | |
| | § | |
| Defendants / Counter-Plaintiffs, | § | |
| | § | 96th JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| SOMERSET-LOST CREEK GOLF, LTD, | § | |
| | § | |
| Counter-Defendant | § | |
| | § | |
| AND | § | |
| | § | |
| SOMERSET-LOST CREEK MANAGEMENT, | § | |
| LLC., BERYL ARTZ BYPASS TRUST, | § | TARRANT COUNTY, TEXAS |
| RHONDA ARTZ AS TRUSTEE OF THE | § | |
| BERYL ARTZ BYPASS TRUST, RHONDA | § | |
| ARTZ, AND S. GARY WERLEY (AS | § | |
| SUBSTITUTE TRUSTEE) | § | |
| | § | |
| Third-Party Defendants. | § | |

## AFFIDAVIT OF TIMOTHY L. BARTON

1.      "My name is TIMOTHY L. BARTON. I am over the age of twenty-one years old, have never been convicted of a felony or a crime of moral turpitude, of sound mind, and fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and all such facts are true and correct in all material respects.

2.      The following terms are used herein, as indicated: LC Aledo Tx, LLC ("LC Aledo"); JMJ Acquisitions, LLC ("JMJ"); Wall0l0, LLC ("Wall"), Somerset-Lost Creek Golf, Ltd. ("Somerset", or "Borrower"), Somerset-Lost Creek Management, LLC ("Somerset Management"), Beryl Artz Bypass Trust ("Artz Trust"), Rhonda Artz, as Trustee of the Beryl Artz Bypass Trust ("Trustee"), Rhonda Artz (individually) ("Artz"), and S. Gary Werley (As Substitute Trustee) ("Werley").

3.      I have at times served as an officer or agent of LC Aledo, JMJ and Wall, as from time to time relevant herein.

---

Affidavit of Timothy L. Barton                                                                 Page 1

4.      JMJ entered into a contract to purchase real property ("Purchase Contract") consisting of 145.4999 acres located in Aledo, Tarrant County, Texas ("Property") then owned by Somerset which consists of a former golf course in July of 2017.

5.      In February 2019 during the term of the Purchase Contract, Wall **(a distinct entity from JMJ),** agreed to loan to Somerset $300,000 upon which Somerset issued a Promissory Note to Wall ("Wall Note", or simply the "Note") in the principal amount of $300,000 at 1.0% interest (collectively, "Debt") which was due and payable on February 29, 2020 including all accrued interest. The Note was secured by a Deed of Trust, Security Agreement and Assignment of Rents and Leases ("Wall Deed of Trust", or simply the "Deed of Trust") executed on April 4, 2019 by Somerset on the Property and recorded in the real property records of Tarrant County under document number D219077623 on April 15, 2019 (collectively, the Wall Note and Wall Deed of Trust, and any and all other instruments received from or executed by the Borrower, are referred to as the "Wall Loan Agreement").

6.      This Debt was issued by Wall, and those funds advanced by Wall, with the express understanding that in the event JMJ (or its assigns) did not close on the Purchase Contract then the Note would be paid back by Borrower on the maturity date agreed to therein and until such time the Deed of Trust would constitute a first lien on the Property.

7.      The maturity date has passed and except for the amount credited to the Wall Note in the amount of $65,000 upon termination of the Purchase Contract, no payment has been made towards any principal or accrued interest of 1% per year and the Note is in default and a deficiency exists.  Furthermore, a notice of default was sent to her giving her the opportunity to cure the default and pay the amounts owed as stated in such notice.  I personally left her a voicemail at approximately 11 am on June 12, 2020 regarding the notice of default that had been sent.

8.      A default under the Wall Note was also a default under the terms of the Wall Deed of Trust in addition other defaults under such deed of trust.

9.      There was never any intent or discussion that the Note would be forgiven or terminated (along with the Wall Deed of Trust) if the Purchase Contract was terminated or not closed.  In fact, the parties expressly agreed the Wall Note and Deed of Trust survived the termination of the Purchase Contract.

10.      I was unaware at the time of any issuance of a preliminary title commitment and did not receive such commitment including as allegedly issued to JMJ who was not the lender under the Note, that referenced both a prior lien in favor of Textron Financial or a prior lien in favor of the Artz Trust, which upon information and belief is wholly owned and administered by Artz, the principal of Somerset. It was anticipated and agreed as a part of the Purchase Contract, and certainly a condition to the closing of such, that any and all prior liens of any sort or nature would have to be cleared by Somerset as the seller especially considering the title company under such commitment required such liens, which would appear on schedule C of the commitment, to be cleared and released. Artz on behalf of the Borrower represented to me on a number of occasions that they owned the Property outright and that there were no validly outstanding liens.

11.      JMJ was never issued a title policy in connection with its failed attempt to purchase the Property. Wall, as a lender, did not, to my knowledge, ever receive a preliminary title commitment issued to it in connection with the Wall Loan Agreement and thus the existence of any priority liens were never disclosed to Wall including but not limited to

---

Affidavit of Timothy L. Barton                                                                    Page 2

_____ ("Artz Deed of Trust"). Wall, as a lender, did not request a title commitment nor obtain an actual title policy in connection with the Wall Loan Agreement.

12. The Wall Deed of Trust does not include an express reference to any such prior liens. And, in connection with the Wall Debt, and prior to the issuance of the Wall Debt, it was expressly represented to Wall by Somerset that they owned the Property outright and that there were no validly outstanding lien, and any such prior liens of any sort or nature would have to be cleared by Somerset as the borrower. Nonetheless and upon subsequent review, the Wall Deed of Trust excepted any permitted encumbrances which were those appearing on schedule B of a title commitment which are the permitted exceptions, however, the Artz Deed of Trust is required to be cleared under schedule C and thus is not a permitted exception or lien under the Wall Deed of Trust.

13. Somerset, as borrower, certainly did not then disclose to Wall, that it was borrower's intent **to never make a single payment toward the Wall Debt,** to fraudulently represent that there were no liens, not to disclose any prior liens to Wall, as lender, and or to not clear any prior liens (despite its representation that there were none), to default under the Wall Note, and after any foreclosure sale then naturally following such default, simply then seek to foreclose upon the previously nondisclosed, prior (and possibly fictious) lien held by the Artz or subsequently (the foregoing, and related acts in furtherance thereof, the "Artz Scheme to Defraud"); which it now appears was the case.

14. I was informed that the borrower would use the funds from the loan evidenced by the Wall Note and Wall Deed of Trust to pay off all debt and amounts owed by borrower.

15. In sum, the Debt was issued by Wall, and those funds advanced by Wall, with the express agreement that the Deed of Trust would constitute a first lien on the Property.

16. Subsequently, JMJ and Somerset agreed to terminate the Purchase Contract in June of 2019. Irrespective of the termination of the Purchase Contract, the Wall Note and Deed of Trust survived.

17. On May 29, 2020, after Somerset failed to pay the Debt when due, Wall, through separate counsel, sent a notice of default and demand letter to Somerset (including to Artz as President, Member, and Manger of Somerset Management as the general partner of Somerset) ("Wall Demand Letter(s)") which demanded payment of all remaining Debt by June 12, 2020 ("Wall Demand Date").

18. Only after Wall made numerous attempts to contact Artz on behalf of Somerset by email and phone to resolve the Debt, did Artz finally respond by phone stating that she had turned the matter over to counsel (who was not identified to Wall) who would follow up with Wall. However, Wall received no further communication.

19. Somerset still made no effort to contact Wall or make any effort thereafter. As a result, the Property was foreclosed on at the August 4, 2020 foreclosure sale ("August Foreclosure") by the substitute trustee on behalf of LC Aledo to whom Wall had conveyed the Wall Note and Deed of Trust.

20. On September 1, 2020, Somerset through its counsel, sent a "Demand for Rescission of August 4th Sale and Damages Wrongful Foreclosure" letter to Somerset including allegations that Somerset had informed Wall that it had been willing to pay the note which was not true and that it had never received the foreclosure notice. Apparently, Artz failed to forward her or Somerset's mail or change their addresses with the post office.

21. On September 9, 2020 Somerset filed its Plaintiffs Original Petition ("Plaintiffs Petition") seeking to declare the August Foreclosure void and in the alternative Plaintiff

requested monetary damages and recorded a Lis Pendens against the Property on September 11, 2020.

22.     During September and without any notice or knowledge of any of the Defendants or the court, Plaintiff in concert with the Counter-Defendants conspired to take back the Property and initiated a sham foreclosure against the Property. Apparently, Artz as the Trustee for the Artz Trust had made a loan to Somerset ( of which she was also President and either a member of or a member in the general partner) in the amount of $500,000.00 ("Artz Debt") which she agreed to on behalf of both the borrower and lender and which she executed and recorded a deed of trust on behalf of both the grantor for the benefit of the Artz Trust of which she is the Trustee on October 12, 2011 ("Artz Deed of Trust"). Upon information and belief, and with the need for additional discovery, this was essentially as sham transaction that was used by the Counter Defendants to defraud the LC Aledo of the Property. At no time did any of the Counter-Defendants disclose the existence of the Artz Deed of Trust or the debt of Somerset to the Artz Trust to any of the Defendants despite Somerset making numerous representations and warranties to Wall under the Wall Deed of Trust including that there were no other liens or debts on the Property and that it had authority to grant such security interest although the Artz Deed of Trust prohibited the granting of such a lien to Wall.[1]  On information and belief, Somerset had no intention of paying the debt to the Artz Trust- a debt which existed for about 9 years. Instead, they just used the sham foreclosure to wipe out the alleged debt and move the Property.

23.     It was only by accident that Defendants became aware of the Somerset foreclosure on January 12, 2021, for the first time when their counsel was running a search in the property records in preparation for the hearing to vacate the Default Judgment. Despite having email addresses of the Defendants and their transaction and litigation attorneys along with all of their physical addresses and phone numbers, Counter-Defendants made no effort to contact Defendants related to the Artz Foreclosure or its supposed acquired ownership of the Property. Instead Artz as the Trustee of the Artz Trust appointed Werley as the substitute trustee on September 15, 2020 (6 days after filing the Plaintiffs Petition) and had him supposedly send notice of such appointment and notice of foreclosure to be held on October 6, 2020 from herself as the Trustee of the Artz Trust to herself as the president and/or manager of Somerset on or about September 15, 2020 to the Lost Creek Address - an address she knew was on the Property and no longer occupied by Somerset or anyone else as she had vacated the building and locked it up and left it in such condition that it could not be occupied. Thus, the Counter-Defendants ensured that Defendants would have no notice of any pending or actual foreclosure of the Property and that the Artz Trust would be able to perpetrate a sham foreclosure and essentially steal the Property back.

24.     The Defendants allegedly conducted the foreclosure sale under the Artz Deed of Trust on October 6, 2020 and recorded a Substitute Trustee's Deed to convey the property to the Artz Trust on the same date ("October Foreclosure"). Then only eight days later Plaintiff filed a proposed order for Default Judgment on their Plaintiffs Petition which was signed by the Court on November 24, 2020 as further described in the Defendants' Motion to Set Aside Default Judgment and Answer although setting aside the August Foreclosure was a moot issue.

25.     Somerset breached the Wall Loan Agreement including the Wall Note and Wall Deed of Trust by failing to pay the Debt when due as demanded in the Wall Demand Letter.

---

[1] See sections 2.1 (a), (b), (c), (e), (p) (s), (y), and (z) of the Wall Deed of Trust. The Wall Deed of Trust states that it is subject to "Permitted Encumbrances" but fails to disclose any such encumbrances or attach "Exhibit B" which would supposedly list them including easements, deed restrictions, and similar encumbrances.

Affidavit of Timothy L. Barton                                                          Page 4

APP000462

26.     Somerset breached the Wall Note by failing to pay the Debt subject to any credits, payments, or offset when due and as demanded in the Wall Demand Letter.

27.     Somerset made certain representations and warranties and had certain obligations under the Wall Deed of Trust which were false or otherwise breached including but not limited to its failure to disclose the existence of the debt on the Property to the Artz Trust along with the Artz Deed of Trust which was an existing lien and debt of Somerset, its lack of authority to grant the Wall Deed of Trust given the prohibition in the Artz Deed of Trust, failure to cause "all debts and liabilities of any character" to be paid, and its obligation to "forever defend the title to the [Property] against the claims of all persons making any claims to the same or any part thereof."

28.     Artz including on behalf of herself and Somerset and as Trustee of the Artz Trust committed fraud in a real estate transaction under section 27.01 of the Texas Business Organizations Conde when she made false statements related to the Property and/or failed to disclose material items as described herein related to the existence of the Artz Debt and Artz Deed of Trust which were relied upon by Wall0I0 when it entered into the Wall Loan including the Wall Deed of Trust.

29.     Furthermore, Artz acting on behalf of Somerset had no intention of paying the Artz Debt owed by Somerset to the Artz Trust and instead intended to use the existence of the Artz Debt and Artz Deed of Trust to avoid the obligations under the Wall Deed of Trust and insulate itself against paying back the Wall Debt by using the sham foreclosure to wipe out the Wall Deed of Trust and get the Property back upon foreclosure by Wall. Additionally, Artz is in reality the alter ego of Somerset and/or the Artz Trust and essentially conducted a transaction between herself to commit the fraudulent foreclosure.

30.     Plaintiff and Artz represented to Wall that there was no debt or liens on the Property despite the existence of the Artz Debt and Artz Deed of Trust at the time of entering into the Wall Loan which they knew was false with the intention that Wall010 would enter into the Wall Loan.  As the President of Wall I relied on such statements in making the loan and otherwise if I had known that Wall was not going to get a first lien, I would not have made the loan on behalf of Wall.  Furthermore, they fraudulently conducted the October Foreclosure to acquire the Property.

31.     In the alternative, Plaintiff and Artz failed to disclose the existence of the Artz Debt or the Artz Deed of Trust at the time of entering into the Wall Loan knowing that Wall would likely not make the Wall Loan if it knew of the existence of the Artz Debt or Artz Deed of Trust. Furthermore, they failed to notify Wall of their intent to foreclose on the Artz Deed of Trust and intentionally ensured that Wall would not have notice.

32.     In the alternative, Plaintiff and Artz failed to disclose the existence of the Artz Debt or the Artz Deed of Trust at to induce Wall into Wall Loan.

33.     In the alternative to the above fraud related claims regarding the existence of the Artz Debt and Artz Deed of Trust, Plaintiff and Artz negligently misrepresented that no debt or liens existed on the Property at the time of the Wall Note.

34.     Plaintiff conducted a wrongful foreclosure at the October Foreclosure by not giving proper notice to Wall (an essentially ensuring that Wall did not have notice) and conducting a foreclosure of a debt between themselves and LC Aledo requests that the October Foreclosure be declared void along with the Substitute Trustee executed on October 6, 2020.

35.     On or about August 3, 2020, Wall010, LLC assigned the Wall Loan including Wall Note and Wall Deed of Trust to LC Aledo, LLC subject to a written assignment agreement.

36.    In the alternative to a Wrongful Foreclosure, LC Alleges LC Aledo obtained good and marketable undivided, fee simple title to the Property ( as further described in Exhibit "A" attached hereto) through the August Foreclosure to which it was legally in possession of at the time of the October Foreclosure and to which it is still in possession given lack of any notice from the Artz Trust of any claim to ownership resulting from the October Foreclosure. However, the Artz Deed of Trust was a sham transaction and not valid and the resulting October Foreclosure was an unlawful foreclosure based on the events described herein. As such, fee simple title should be granted to LC Aledo.

37.    In the event the Court rules to void the October Foreclosure or otherwise grant LC Aledo's cause of action of Trespass to Try Title, LC Aledo seeks to quiet title regarding the existence of the cloud on title created by the Artz Deed of Trust which is invalid, void, and/or unenforceable.

38.    The Counter-Defendants, including Werley as the substitute trustee who also has a duty to act impartially related to a foreclosure sale and to obtain the best price, conspired to commit the sham foreclosure which was fraudulent in order to deprive LC Aledo of the Property. Furthermore, the Counter-Defendants (excluding Werley) conspired to create the sham Artz Deed of Trust transaction to act as a block against any efforts of future lenders including Wall to pursue the debts owed to them by enforcing valid liens against the Property including the Wall Deed of Trust.

39.    The court should pierce the veil of Somerset, Somerset Management, and/or the Artz Trust to hold Artz personally accountable for the fraud and other bad acts committed against the CounterPlaintiffs as described herein under which she personally benefited, pursuant to Section 21.223 of the Texas Business Organizations Code states. Alternatively, as related to the Artz Trust, CounterPlaintiffs request that the Court determine that Artz, individually, is the alter ego of the Artz Trust.

[Signature Page to Follow]

Affiant sayeth further not.

AFFIANT:

Timothy L. Barton

**STATE OF TEXAS** §
§
**COUNTY OF DALLAS** §

SWORN TO AND SUBSCRIBED before me on the 21 day of October, 2021, to certify which witness my hand and official seal.

Notary Public in and for
The State of Texas

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

---

Affidavit of Timothy L. Barton                                    Signature Page

**APP000465**

# EXHIBIT A-20

APP000466

## FedPayments Manager℠ -- Funds

| | |
|---|---|
| Delivered to FPM: | 01/11/2022 17:50:10 |
| IMAD: | 20220111 B1QGC08C 024191 01111750 |
| OMAD: | 20220111 QMGFNP75 002005 01111750 |

Test/Prod:    Prod

BASIC INFORMATION

| | |
|---|---|
| Sender ABA {3100}: | 021000021 JPMORGAN CHASE |
| Receiver ABA {3400}: | 111925113 TEXAS BRAND BK |
| Amount {2000}: | 1,100,000.00 |
| Type/Subtype Code {1510}: | 1000 - Transfer of Funds |
| Business Function {3600}: | CTP - Customer Transfer Plus |
| Sender Reference {3320}: | 3439442011ES |
| Reference for Beneficiary {4320}: | DCD OF 22/01/11 |

ORIGINATOR INFORMATION

Originator {5000}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 789669592 |
| Name: | MANSIONS APARTMENT HOMES AT MARINE CREEK LLC |
| Address: | 1755 WITTINGTON PL STE 340 |
| | DALLAS TX 75234-1930 US |

BENEFICIARY INFORMATION

Beneficiary {4200}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 1024611 |
| Name: | BROADVIEW HOLDINGS |

CHARGES & EXCHANGE RATE INFORMATION

Instructed Amount {3710}

| | |
|---|---|
| Currency Code: | USD |
| Amount: | 1100000,00 |

PAYMENT NOTIFICATION

Payment Notification {3620}

| | |
|---|---|
| Indicator: | 4 |
| Contact Name: | 66DD8D1C-7E11-42AF-9855-BB1E93043A0E |

11/14/2022 10:33:21

Page 1 of 1

APP000467

## FedPayments Manager℠ -- Funds

| | |
|---|---|
| Delivered to FPM: | 01/20/2022 16:31:27 | Test/Prod: | Prod |
| IMAD: | 20220120 B1QGC08C 030353 01201631 |
| OMAD: | 20220120 QMGFNP65 001993 01201631 |

**BASIC INFORMATION**

| | |
|---|---|
| Sender ABA {3100}: | 021000021 JPMORGAN CHASE |
| Receiver ABA {3400}: | 111925113 TEXAS BRAND BK |
| Amount {2000}: | 500,000.00 |
| Type/Subtype Code {1510}: | 1000 - Transfer of Funds |
| Business Function {3600}: | CTP - Customer Transfer Plus |
| Sender Reference {3320}: | 3451322020ES |
| Reference for Beneficiary {4320}: | BMG OF 22/01/20 |

ORIGINATOR INFORMATION

Originator {5000}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 789669592 |
| Name: | MANSIONS APARTMENT HOMES AT MARINE |
| | CREEK LLC |
| Address: | 1755 WITTINGTON PL STE 340 |
| | DALLAS TX 75234-1930 US |

BENEFICIARY INFORMATION

Beneficiary {4200}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 1024637 |
| Name: | JMJ VC MANAGEMENT |
| Address: | 13901 MIDWAY RD SUITE 102-243 |
| | DALLAS TX 75244 US |

CHARGES & EXCHANGE RATE INFORMATION

Instructed Amount {3710}

| | |
|---|---|
| Currency Code: | USD |
| Amount: | 500000,00 |

PAYMENT NOTIFICATION

Payment Notification {3620}

| | |
|---|---|
| Indicator: | 4 |
| Contact Name: | 33872DAE-7E13-42B8-9202-82EA490CB49C |

APP000468

## FedPayments Manager℠ -- Funds

| | | | |
|---|---|---|---|
| Delivered to FPM: | 01/21/2022 17:00:57 | Test/Prod: | Prod |
| IMAD: | 20220121 B1QGC07C 019412 01211700 | | |
| OMAD: | 20220121 QMGFNP69 002249 01211700 | | |

BASIC INFORMATION

| | |
|---|---|
| Sender ABA {3100}: | 021000021 JPMORGAN CHASE |
| Receiver ABA {3400}: | 111925113 TEXAS BRAND BK |
| Amount {2000}: | 500,000.00 |
| Type/Subtype Code {1510}: | 1000 - Transfer of Funds |
| Business Function {3600}: | CTP - Customer Transfer Plus |
| Sender Reference {3320}: | 3513682021ES |
| Reference for Beneficiary {4320}: | BMG OF 22/01/21 |

ORIGINATOR INFORMATION

Originator {5000}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 790212267 |
| Name: | ORCHARD FARMS VILLAGE, LLC |
| Address: | 13901 MIDWAY RD STE 102-243 |
| | DALLAS TX 75244-4388 US |

BENEFICIARY INFORMATION

Beneficiary {4200}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 1024637 |
| Name: | JMJ VC MANAGEMENT |
| Address: | 13901 MIDWAY RD SUITE 102-243 |
| | DALLAS TX 75244 US |

CHARGES & EXCHANGE RATE INFORMATION

Instructed Amount {3710}

| | |
|---|---|
| Currency Code: | USD |
| Amount: | 500000,00 |

PAYMENT NOTIFICATION

Payment Notification {3620}

| | |
|---|---|
| Indicator: | 4 |
| Contact Name: | 681A1C7A-7E13-42B9-B2F7-C7CEFCB69C5A |

APP000469

## FedPayments Manager℠ -- Funds

```
Delivered to FPM:   01/31/2022 17:51:10              Test/Prod:       Prod
IMAD:               20220131 B1QGC05C 043733 01311751
OMAD:               20220131 QMGFNP62 002925 01311751
```

```
BASIC INFORMATION
Sender ABA {3100}:                      021000021 JPMORGAN CHASE
Receiver ABA {3400}:                    111925113 TEXAS BRAND BK
Amount {2000}:                          1,000,000.00
Type/Subtype Code {1510}:               1000 - Transfer of Funds
Business Function {3600}:               CTP - Customer Transfer Plus
Sender Reference {3320}:                3664292031ES
Reference for Beneficiary {4320}:       DCD OF 22/01/31
ORIGINATOR INFORMATION
Originator {5000}
   ID Code:                             D - DDA Account Number
   Identifier:                          790212267
   Name:                                ORCHARD FARMS VILLAGE, LLC
   Address:                             13901 MIDWAY RD STE 102-243
                                        DALLAS TX 75244-4388 US
BENEFICIARY INFORMATION
Beneficiary {4200}
   ID Code:                             D - DDA Account Number
   Identifier:                          1024637
   Name:                                JMJ VC MANAGEMENT
CHARGES & EXCHANGE RATE INFORMATION
Instructed Amount {3710}
   Currency Code:                       USD
   Amount:                              1000000,00
PAYMENT NOTIFICATION
Payment Notification {3620}
   Indicator:                           4
   Contact Name:                        6CDE82DA-7E15-42C3-99A1-57AC35D1E901
```

```
11/14/2022 10:59:33                                         Page 1 of 1
```

APP000470

## FedPayments Manager℠ -- Funds

| | | |
|---|---|---|
| Delivered to FPM: | 05/10/2022 14:43:23 | |
| IMAD: | 20220510 B1QGC08C 023480 05101443 | Test/Prod:    Prod |
| OMAD: | 20220510 QMGFNP73 001615 05101443 | |

BASIC INFORMATION

| | |
|---|---|
| Sender ABA {3100}: | 021000021 JPMORGAN CHASE |
| Receiver ABA {3400}: | 111925113 TEXAS BRAND BK |
| Amount {2000}: | 2,000,000.00 |
| Type/Subtype Code {1510}: | 1000 - Transfer of Funds |
| Business Function {3600}: | CTP - Customer Transfer Plus |
| Sender Reference {3320}: | 3353112130ES |
| Reference for Beneficiary {4320}: | DCD OF 22/05/10 |

ORIGINATOR INFORMATION

Originator {5000}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 787577698 |
| Name: | AVG WEST, LLC |
| Address: | 13901 MIDWAY RD STE 102-243 |
| | DALLAS TX 75244-4388 US |

BENEFICIARY INFORMATION

Beneficiary {4200}

| | |
|---|---|
| ID Code: | D - DDA Account Number |
| Identifier: | 1024611 |
| Name: | BROADVIEW HOLDINGS |

CHARGES & EXCHANGE RATE INFORMATION

Instructed Amount {3710}

| | |
|---|---|
| Currency Code: | USD |
| Amount: | 2000000,00 |

PAYMENT NOTIFICATION

Payment Notification {3620}

| | |
|---|---|
| Indicator: | 4 |
| Contact Name: | 4E5C22D6-7E29-4326-9063-14A4F12A97A0 |

11/14/2022 11:03:10                                                   Page 1 of 1

**APP000471**

## FedPayments Manager℠ -- Funds

| | | | |
|---|---|---|---|
| Delivered to FPM: | 09/08/2022 14:47:52 | Test/Prod: | Prod |
| IMAD: | 20220908 I1B7032R 013864 09081447 | | |
| OMAD: | 20220908 QMGFNP74 001480 09081447 | | |

**BASIC INFORMATION**

Sender ABA {3100}:  121000248 WELLS FARGO SF

Receiver ABA {3400}:  111925113 TEXAS BRAND BK

Amount {2000}:  800,000.00

Type/Subtype Code {1510}:  1000 - Transfer of Funds

Business Function {3600}:  CTP - Customer Transfer Plus

Sender Reference {3320}:  2022090800137749

Reference for Beneficiary {4320}:  121342

**ORIGINATOR INFORMATION**

Originator {5000}

   ID Code:  D - DDA Account Number

   Identifier:  000006096117517

   Name:  REPUBLIC TITLE OF TEXAS, INC.

   Address:  1002-ESCROW ACCOUNT

              2701 W PLANO PKWY STE 100

              PLANO TX US 75075-8212

Originator to Beneficiary  Information {6000}

   Text:  INVOICE #7002

       112-120 & 126 VILLITA ST

       1002-353986A RTT ME

**BENEFICIARY INFORMATION**

Beneficiary {4200}

   ID Code:  D - DDA Account Number

   Identifier:  1024611

   Name:  BROADVIEW HOLDINGS

**CHARGES & EXCHANGE RATE INFORMATION**

Charges {3700}

   Details of Charges:  S - Charges shared between the originator and beneficiary

       USD 0,00

**PAYMENT NOTIFICATION**

Payment Notification {3620}

   Indicator:  3

   Contact Name:  54744F0F-7064-4CFF-A2BF-446694D19854

11/18/2022 12:57:15

Page 1 of 1

APP000472

# EXHIBIT A-21

APP000473



# EXHIBIT A-22

APP000475

*(handwritten: 6158    Gilespe)*

**3407 and 3409 Hall Street**
**Draft List of Payments (Jan-Sep2022)**

| Date | Type | Memo | Class | Memo | Accounts | Amount |
|------|------|------|-------|------|----------|--------|
| 05/12/2022 | Check | Flowers Title Company | Hall Street | Wire Transfer To Flowers Title Companies Llc Dbaeast | TxBrand - Broadview Hold *4611 | 1,040,034.32 |
| 04/28/2022 | Check | Turtle Creek Tower | Hall Street | Earnest Money Deposit | TxBrand - Broadview Hold *4611 | 100,000.00 |
| 05/25/2022 | Check | Turtle Creek Tower | Hall Street | Addn Earnest Moneny Deposit | TxBrand - Broadview Hold *4611 | 100,000.00 |
| 08/09/2022 | Check | Turtle Creek Tower | Hall Street | Extension Money | TxBrand - Broadview Hold *4611 | 40,000.00 |
| 07/25/2022 | Check | Turtle Creek Tower | Hall Street | Extension Money | TxBrand - Broadview Hold *4611 | 40,000.00 |
| 01/24/2022 | Check | East Texas Title Co | Hall Street | East Texas Title Companies | TxBrand - Broadview Hold *4611 | 15,000.00 |
| 08/02/2022 | Check | Stone Street Dev | Hall Street | Ck # 1242 | TxBrand - Broadview Hold *4611 | 15,000.00 |
| 09/12/2022 | Check | Stone Street Dev | Hall Street | Ck # 1334 | TxBrand - Broadview Hold *4611 | 15,000.00 |
| 02/23/2022 | Check | Noah Burns | Hall Street | Noah Burns | TxBrand - JMJ VC Mgt LLC *4637 | 10,000.00 |
| 05/10/2022 | Check | James Langford | Hall Street | Ck # 1132 | TxBrand - Broadview Hold *4611 | 6,150.00 |
| 09/09/2022 | Check | James Langford | Hall Street | Ck # 1326 | TxBrand - Broadview Hold *4611 | 4,750.00 |
| 08/01/2022 | Check | James Langford | Hall Street | Ck # 1180 | TxBrand - Broadview Hold *4611 | 3,850.00 |
| 06/14/2022 | Check | James Langford | Hall Street | Ck # 1179 | TxBrand - Broadview Hold *4611 | 2,500.00 |
| 05/20/2022 | Check | Inspire Insurance | Hall Street | In *Inspire Insurance | Barclay CC-JMJ Dev *6668 | 2,346.02 |
| 08/22/2022 | Check | James Langford | Hall Street | Ck # 1279 | TxBrand - Broadview Hold *4611 | 1,750.00 |
| 08/29/2022 | Check | Robert Wilhite | Hall Street | Ck # 1295 | TxBrand - Broadview Hold *4611 | 1,500.00 |
| 07/12/2022 | Check | First Insurance | Hall Street | In *Inspire Insurance 512-8284200 Tx | Citi CC-JMJ Dev *2844 | 905.39 |
| 07/29/2022 | Check | First Insurance | Hall Street | First Insurance Fundin | Barclay CC-JMJ Dev *6668 | 879.02 |
| 08/26/2022 | Check | First Insurance | Hall Street | First Insurance Fundin | Citi CC-JMJ Dev *2844 | 879.02 |
| 08/03/2022 | Check | AppraisalWorks LLC | Hall Street | Aloha Capital 303-245-0291 CoMa | Citi CC-JMJ Dev *2844 | 792.63 |
| 05/01/2022 | Check | Delaware County | Hall Street | Texas Secretary Of Sta | Chase CC-JMJ Dev *5997 | 300.00 |
| 09/08/2022 | Check | US Trustee | Hall Street | Ck # 1299 | TxBrand - Broadview Hold *4611 | 250.00 |
| 06/06/2022 | Check | Byron Rowlett | Hall Street | On-Us Check | TxBrand - Broadview Hold *4611 | 28.00 |
| | | | | | **Total** | **1,401,914.40** |

*(handwritten notes: "Paid 85 Jog"; "Gilespe")*

APP000476



**Commonwealth Title of Dallas, Inc.**
2651 North Harwood Street, Suite 260
Dallas, TX 75201
Phone: (214)855-8400 or (800)627-5652

## Settlement Statement

**Date:** August 24, 2022

**Order Number:** 22011220092-B

**Escrow Officer:** Stephanie Johnson

**Borrower:** Enoch Investments, LLC, a Delaware limited liability company

**Lender:** TURTLE CREEK TOWER, LLC, a Delaware limited liability company
9100 Southwest Freeway, Suite 201
Houston, TX 77074

**Property:** 3407 and 3409 North Hall Street
Dallas, TX 75219
Dallas County

*Loan Agst Gilspi*

| | Borrower | |
| --- | --- | --- |
| | Debit | Credit |
| **Total Consideration** | | |
| Enoch Loan Advance | | 650,000.00 |
| **Miscellaneous Charges** | | |
| Enoch Equity Credit to File No. 22011220092 to Transfer Contact | 650,000.00 | |
| **Subtotals** | 650,000.00 | 650,000.00 |
| **Balance Due FROM Borrower** | | 0.00 |
| **Totals** | 650,000.00 | 650,000.00 |

*TC Hall*

See signature page to follow

Printed on 8/24/2022 9:57:42 AM

22011220092-B
Page 1 of 2

APP000477





**Commonwealth Title of Dallas, Inc.**
2651 North Harwood Street, Suite 260
Dallas, TX 75201
Phone: (214)855-8400 or (800)627-5652

## Buyer's Settlement Statement

| | |
|---|---|
| **Date:** | August 24, 2022 |
| **Order Number:** | 22011220092 |
| **Escrow Officer:** | Stephanie Johnson |
| **Buyer:** | TC Hall, LLC, a Texas limited liability company<br>3600 Gillespie<br>Dallas, TX 75219 |
| **Seller:** | TURTLE CREEK TOWER, LLC, a Delaware limited liability company<br>9100 Southwest Freeway, Suite 201<br>Houston, TX 77074 |
| **Lender:** | Louisiana National Bank<br>2001 North Trenton Street<br>Ruston, LA 71270 |
| **Property:** | 3407 and 3409 North Hall Street<br>Dallas, TX 75219<br>Dallas County |

| | Buyer | |
|---|---|---|
| | Debit | Credit |
| **Total Consideration** | | |
| Purchase Price | 5,300,000.00 | |
| Principal Amount of New Loan | | 4,063,000.00 |
| Initial Earnest Money Deposit | | 100,000.00 |
| Additional Earnest Money Deposit | | 100,000.00 |
| Extension Deposit | | 40,000.00 |
| Extension Deposit | | 40,000.00 |
| Equity Credit from File No. 22011220092-B | | 650,000.00 |
| **Prorations/Adjustments** | | |
| 2022 Real Property Taxes (based on 2021 amounts)<br>236 days @ 153.567233 per day at $56,052.04<br>01/01/22-08/24/22 | | 36,241.87 |
| **Loan Fees and Charges $41,155.72** | | |
| Origination Fee | 40,630.00 | |
| Flood Determination Fee (Initial Determination) | 11.00 | |
| Flood Determination (LOL) | 11.00 | |
| Credit Report Fee | 3.72 | |
| Doc Prep | 500.00 | |
| **Title Insurance to Commonwealth Title of Dallas, Inc. $102.00** | | |
| Loan Policy Premium<br>  Coverage: $4,063,000.00<br>  Version: Loan Policy of Title Insurance (T-2) - 2014 | 100.00 | |

APP000478

### Buyer's Settlement Statement

| | Buyer | |
|---|---|---|
| | Debit | Credit |
| **Title Insurance to Commonwealth Title of Dallas, Inc. (continued)** | | |
| State of Texas Policy Guaranty Fee - Loan Policy | 2.00 | |
| **Settlement Charges to Commonwealth Title of Dallas, Inc. $310.00** | | |
| Escrow Fee (split 50/50) | 300.00 | |
| Courier/ Overnight Delivery Fee (split 50/50) | 10.00 | |
| **Recording Charges to Commonwealth Title of Dallas, Inc.** | | |
| Estimated Recording Charges | 500.00 | |
| **Miscellaneous Charges** | | |
| Buyer/borrower legal fees to The Marx Firm, LLC | 15,382.00 | |
| Fee to Silverlake Capital, LLC | 81,260.00 | |
| Appraisal Reimbursement to Broadview Holdings | 4,200.00 | |
| **Subtotals** | 5,442,909.72 | 5,029,241.87 |
| **Balance Due FROM Buyer** | | 413,667.85 |
| **Totals** | 5,442,909.72 | 5,442,909.72 |

See signature page to follow

APP000479

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1260

Date  8/9/2022

Pay To The
Order Of ___ Commonwealth Title of Dallas, Inc. _____  $  **40,000.00

Forty Thousand  and 00/100***

Dollars

Commonwealth Title of Dallas, Inc.
2651 North Harwood Street Suite 260
Dallas, TX 75201
(800) 627-5652

Memo:   Extension for 34707 & 3409 N Hall St

⑈000001260⑈ ⑆111925113⑈10246 11⑈

---

1260

Amount: $40000.00

Date: 8/9/2022

Pay to: Commonwealth Title of Dallas, Inc.

Broadview Holdings

Memo: Extension for 34707 & 3409 N Hall St

---

1260

Amount: $40000.00

Date: 8/9/2022

Pay to: Commonwealth Title of Dallas, Inc.

Broadview Holdings

Memo: Extension for 34707 & 3409 N Hall St

APP000480

# EXHIBIT A-23

APP000481

| From: | Charlene Koonce |
|---|---|
| To: | Edney, Michael; Cort Thomas |
| Cc: | Richard Rooper; Huffman, Ted; Tim Wells |
| Subject: | RE: Securities and Exchange Commission v. Barton et al., No. 3:22-cv-2118-X |
| Date: | Friday, November 11, 2022 3:40:00 PM |
| Attachments: | image001.png |

Mike – Thank you for your letter providing Mr. Barton's recommendation regarding how the Receiver should proceed to perform the mandate of the Receivership Order and recommending that he sell the Forney and DeSoto properties. We will carefully consider your recommendation but want to be clear about several inaccuracies in your letter and provide additional perspective that your proposal ignores.

First, as you know, the Receiver's possession and control over all Receivership Assets is required by the Receivership Order. He cannot pick and choose which properties to potentially exclude for Mr. Barton's continued control or development.

Second, many of the properties owned by Receivership Entities have existing and urgent financial obligations tied to them. For instance, property and liability insurance coverage, long past due utility payments, and payroll obligations owed on the Amerigold extended stay property. To date, the Receiver has recovered $25,000 in cash that can be used for these continuing and substantial obligations. All other cash, which is limited, is encumbered or necessary for the continued operation of several other properties. (The dearth of cash also explains why the Receivership Entities had apparently not been paying virtually any of their debts as they become due). Thus, even if the Receiver agreed with your proposal to sell the two properties you identified, those sales would take time and he would be required to liquidate additional assets to pay for the administration of the estate.

Third, like every other receivership property, the two which are the subject of your proposal carry more than one lien or encumbrance. As to Bellwether Ridge in Desoto, the latest information we have is that $17,957,371 is still owed on the HUD loan, and at least $3.8 million is owed to Pillar Income Asset Management for a second loan on the property. As to the Parc at Windmill Farms in Forney, the latest information we have is that $35,490,553 is still owed on that property's HUD loan and at least $7.3 million is owed to Pillar Income Asset Management. Even if we assume that the appraisal you cite (which we understand was prepared by an entity and/or individual that is closely connected to Mr. Barton) is accurate and not inflated, the best-case sale scenario on Desoto prior to closing costs and any commissions and legal fees would be $4,942,629–$6,242,629, while Forney would be $10,509,447–$13,209,447. In other words, even under Mr. Barton's assumptions, successful sales of these two properties alone will still be considerably less than $27 million.

Fourth, and perhaps most importantly at this point, there is no guarantee that the sale of these properties will result in any value to the Receivership Estate. As Mr. Barton is well aware, Pillar (the second lender on the properties) contends that prior to entry of the Receivership Order it exercised a right of conversion, which operates to extinguish (in whole) *any* interest in those properties held or claimed by the Receivership Entities. While the Receiver plans on vehemently contesting that purported conversion, the outcome is far from certain, and again, will require time and expense.

APP000482

Fifth, as you note, the process of returning investor funds will be complex and therefore time-consuming and expensive.  Thus, as noted above regarding the continuing cost of administering the estate for properties that require management and have accruing expenses, the estate will incur additional and extensive expenses related to other aspects of administration.   Indeed, just selling the properties you identify will require additional cash outlays to comply with the statutory sales process that would govern the sale.  At this very early juncture we have no estimate of what those costs may be and are unwilling to commit to or limit the receiver's efforts to an uncertain recovery on properties in which the estate may or may not hold any interest as providing sufficient funds to fully reimburse all investors, pay all creditors holding claims on those properties, and pay for the accrued and expected costs of administering the estate.

Finally, without waiver of the *many* other arguments, facts, and authorities that necessitate liquidating some assets in this case as soon as possible, we also direct you to the extremely broad discretion afforded judges supervising equitable receiverships.  *See SEC v. Hardy,* 803 F.2d 1036,1037–38 (9th Cir. 1986).  Due in part to the considerations listed above, your assertion that a receiver may not liquidate assets held by the estate prior to entry of a judgment is simply incorrect.  On the contrary, in instances where the ongoing administration of the estate will drain assets otherwise available for distribution to defrauded investors, liquidation prior to entry of a judgment is *expressly* permissible.  *See S.E.C. v. TLC Investments & Trade Co.*, 147 F. Supp. 2d 1031, 1036 (C.D. Cal. 2001) ("[L]iquidation at this time, prior to entry of judgment, is appropriate because the evidence presented to the Court demonstrated that the TLC entities' liabilities were greater than their assets and because ongoing management alone will drain money out of the estate, money that otherwise could be returned to investors.").  Additionally, but not inconsequently, the Fifth Circuit does not adhere to other circuits' (particularly the Second Circuit's) preference for use of bankruptcy procedures over receiverships.  Thus, your citations to Second Circuit cases in which "reservations" are expressed about liquidation in the context of receiverships are unpersuasive and inapplicable here.  *See for example,* the dozens if not hundreds of opinions arising from the Stanford Receiver's liquidation efforts, much of which occurred for several years before any final judgment was entered against Allan Stanford.

We are in agreement that the Receiver is required to marshal and preserve Receivership Assets. To the extent he must sell some properties to preserve others, he will do so in the most expeditious manner possible and will in all instances seek to maximize the value of all properties.  We appreciate Mr. Barton's efforts to assist the Receiver and look forward to receiving the many documents and additional information that has been requested of him in that regard.



**CHARLENE KOONCE**
214.367.7503
BROWNFOXLAW.COM

**From:** Edney, Michael <MEdney@huntonak.com>
**Sent:** Wednesday, November 9, 2022 5:27 PM
**To:** Cort Thomas <cort@brownfoxlaw.com>

APP000483

**Cc:** Charlene Koonce <charlene@brownfoxlaw.com>; Richard Rooper <Richard.Roper@hklaw.com>; Huffman, Ted <THuffman@hunton.com>
**Subject:** Securities and Exchange Commission v. Barton et al., No. 3:22-cv-2118-X

Dear Mr. Thomas,

Attached please find a letter and an accompanying exhibit regarding the above entitled matter.  Please feel free to contact me with any questions.

My very best regards,

Mike


Michael J. Edney
Hunton Andews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 778-2204

APP000484



HUNTON ANDREWS KURTH LLP
2200 PENNSYLVANIA AVENUE, NW
WASHINGTON, D.C. 20037-1701

TEL   202 · 955 · 1500
FAX   202 · 778 · 2201

MICHAEL EDNEY
DIRECT DIAL: 202 · 778 · 2204
EMAIL: medney@HuntonAK.com

FILE NO:   126068.0000001

November 7, 2022

*__Via Electronic Mail__*

Cort C. Thomas, Esq.
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
Email:  cort@brownfoxlaw.com

Re:    *Securities and Exchange Commission v. Barton, et al.,* No. 3:22-cv-2118-X

Dear Mr. Thomas:

We write today about a way forward to generate the $26 million allegedly owed to the lenders that is the subject of the above-entitled action.  As we repeatedly have underscored, the receiver has taken possession of significant commercial real estate assets well in excess of $26 million. At the same time, Mr. Barton has not been convicted of any crime or adjudged liable for any violation of the securities laws.  There is no legal authority for an order permitting a receiver, prior to a judgment in the underlying proceeding against the target of the receiver, to liquidate the target's assets in an effort to prepare for punishing him.  At the very most, the receiver may secure such assets that will compensate those allegedly affected by the claimed violation of the securities laws.

We have briefed you on the ongoing, critical-path efforts in development projects that have received funds from loans to Wall entities.  While, in many cases, these projects have been delayed by government approval processes and the pandemic, they stand poised to deliver tens of millions of dollars in value that will pay back lenders and benefit the equity owners of the projects.  We will oppose premature, forced liquidation of these projects for salvage value before the development process is complete.  Such actions are inconsistent with the pre-judgment authorities of any receiver in a securities case and the property rights of private citizens against whom no charge of wrongdoing has been proven.  *See SEC v. Am. Bd. of Trade, Inc.,* 830 F.2d 431, 436 (2d Cir. 1987) ("equity receiverships should not be used to effect the liquidation of defendants in actions brought under the securities laws"); *SEC v. San Francisco Reg'l Ctr. LLC,* No. 17-CV-00223-RS, 2018 WL 11436314, at *4 (N.D. Cal. Aug. 15, 2018) ("the ordinary rule is that a receiver should *not* be authorized to liquidate assets").

APP000485

Premature liquidation of ongoing real estate development projects is all the more improper because, if managed properly, those projects will produce more than $26 million in liquidity. Herein we propose a plan to create more than that amount, which represents the outer limit of any legitimate receiver interest. Specifically, Mr. Barton would be prepared to consent, after review of terms and under appropriate circumstances, to the sale of two properties owned by Enoch Investments LLC. The properties—in Forney and DeSoto—are fully built apartment complexes whose construction was financed by the Department of Housing and Urban Development. As these projects were completed before any Wall entity was ever established, they are not the subject of lender funds. They are, however, mature and, thus, their liquidation would not significantly destroy their value.

Attached please find an independent valuation by the manager of Silverlake Capital LLC, a mortgage broker, for two the properties held by Enoch: apartment complexes at Forney (Parc @ Windmill Farms) and DeSoto (Bellwether Ridge), Texas. We have buyers prepared to purchase the properties at or near the valuations therein, creating, we project, well in excess of $27 million. Mr. Barton would consent to the sale of those two properties and to placing $27 million of the proceeds into a special fund for the repayment of lenders subject to this matter, as further described below. The balance of the net proceeds should be returned to Enoch Investments LLC. The $27 million fund should be more than enough to cover the alleged liabilities to the lenders subject to this matter and the fees associated with a short receivership.

Mr. Barton is also open to consenting to the sale of a third mature property (located at Ingleside, Texas) held by Enoch Investments LLC. While unnecessary to address the outer limits of the receiver's mandate, the time is potentially right to sell these properties as an economic matter, and the receiver's existence limits our ability to do so directly.

Once the proposed valuations are verified and the sale process of those properties is initiated, the receiver should immediately return control of all other Barton-related entities and assets to Mr. Barton. That would include control of Mr. Barton's records, electronic files, offices, and residence. Again, there is only one legitimate purpose for the receiver's continued existence: Ensuring funds are available to repay the lenders subject to this action. The proposed course of action will so ensure and should end the need for further action by the receiver.

We note that securing $26 million in funds is only part of the problem. Identifying the real lenders and obtaining their agreement to have funds returned *in a manner consistent with U.S. law* will require considerable effort. Mr. Barton assembled a team in 2019 to attempt payments to the lenders subject to this action. That team insisted that the funds be returned to the accounts that funded the loans in the first instance and that, where appropriate, U.S. taxes be withheld from certain interest payments as required by U.S. law. Michael Fu interfered with this process every step of the way by insisting that funds be repaid to accounts of his choosing and that U.S. taxes not be withheld from any repayments. Mr. Fu also interfered with efforts to contact the true lenders. One explanation for his obstruction became apparent as Barton team inquiries and civil litigation uncovered lenders that, in many cases (accounting for more than 70 percent of the loaned funds), were simply cut-outs to obscure that funding was provided by Haibo Jiang, a Chinese Communist Party officer.

APP000486

Any fund to reimburse lenders must account for these significant federal anti-money laundering and tax law issues that were an obstacle to repayment in 2019. We look forward to sharing additional information regarding these concerns at the appropriate time.

Please note that there is no legitimate reason or authority to liquidate assets owned by Mr. Barton's entities. The Receivership Order is clear that there are only two purposes of the receivership: "marshaling and preserving all assets of the Receivership Entities." *See* Receivership Order [ECF No. 29] at 2. The courts have repeatedly held that equity receiverships should not be used to liquidate defendants in actions brought under the securities laws. *See SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) (expressing being "disturbed" by attempted use of receivership to liquidate defendant entities); *SEC v. High Park Inv. Grp., Inc.*, No. SACV051090CJCMLGX, 2006 WL 8464226, at *4 (C.D. Cal. June 19, 2006) (holding that a district court's "broad discretion in determining the appropriate relief in an equity receivership" did not create rare case in which a receiver could liquidate); *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) (reiterating "strong reservations as to the propriety of allowing a receiver to liquidate [an estate]."). This is particularly so here, where a plan has been presented to secure and preserve more than enough assets to address the subject matter of the above entitled action.

Sincerely,

Michael Edney

cc: Richard Roper, Esq.
    Charlene Koonce, Esq.

APP000487