# EXHIBIT A

APP000001

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | § | |
| **COMMISSION,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON, et al.** | § | |
| | § | |
| *Defendants.* | § | |

**DECLARATION OF CORTNEY C. THOMAS**
**IN SUPPORT OF MOTION TO SUPPLEMENT RECEIVERSHIP ORDER**

1.      My name is Cortney C. Thomas.  I have personal knowledge of the matters set forth in this Declaration, I am of sound mind, and I am otherwise competent to testify to these matters.

2.      I am an attorney licensed to practice law in the State of Texas.  On October 18, 2022, I was appointed Receiver in the above-styled case and ordered to take exclusive possession and control over all assets belonging to or under the control of the Receivership Entities.  *See* Order Appointing Receiver (the "Receivership Order") ¶1.

3.      This Declaration supplements the information provided in support of the Motion (the "Original Declaration"), and is provided in support of the Motion and in response to the Objection filed by Max Barton regarding Gillespie Villas LLC, Venus 59 LLC, TRTX Properties LLC, MXBA LLC, and Titan Investments LLC (collectively the "Disputed Entities"), as well as my request to identify TC Hall, LLC, Titan 2022 Investment, LLC,[1] Marine Creek SP, LLC, and LC

---

[1] As demonstrated below, Titan 2022 Investment, LLC is the same entity as Titan Investments, LLC.  The former is the name under which the entity is registered to conduct business in Texas, while the latter is the entity's name based on its Delaware incorporation.

1

Aledo TX, LLC (collectively the "Additional Entities") as Barton-controlled entities within the scope of the Receivership Order.

4.      As explained in the Original Declaration, on October 18, 2022, and the days following, my team and I travelled to the Turtle Creek Property utilized by JMJ Development, LLC and most Receivership Entities as their office location.   While there, my counsel or I interviewed two attorneys who provided legal services to Barton and the Receivership Entities.   We also spoke to both attorneys subsequently in person, over the phone, and communicated by emails.   In those conversations, one or both of the attorneys informed me or my counsel (1) that certain entities, including but not limited to TC Hall, LLC, had been created by Barton with Max placed in charge to create distance between the deals and Barton as a result of the SEC's investigation and (2) that Receivership Entities had contributed capital and, indirectly, collateral towards the purchase of assets by TC Hall, LLC.

5.      Notably, a subpoena the SEC served on Barton in December 2020 reveals that Barton was aware of the Commission's investigation at least by that date.  A true and correct copy of a Subpoena the Commission served on Barton on December 11, 2020 is attached as Exhibit A-1. As discussed below, additional documents support the information I obtained in these interviews, that not later than December 2020, Barton began structuring deals and creating or using certain entities to obscure his involvement by identifying Max as the owner or manager of the entities.

6.      Similarly, but perhaps even more importantly, other documents demonstrate that Barton shifted ownership of entities to Max his son, at least on paper, to obtain more favorable financing.  For instance, in an email to his administrative assistant following instructions from another person regarding how to obtain favorable refinancing, Barton instructed her to "Do as Robert says and make Max owner in TRTX and we will make him sign and then I will be added

APP000003

as guarantor." A true and correct copy of this email, which was discovered in the Turtle Creek Property, is attached as Exhibit A-2. Transferring ownership for the reasons and in the manner demanded by Barton demonstrates he treated the Disputed Entities, like all Receivership Entities, as nothing more than his alter egos and that he must have known that in transferring ownership he was not giving up control.

7.     Through her attorney, Saskya Bedoya informed my counsel that she served as Barton's employee (through various entities) and followed his instructions in setting up entities, obtaining bank accounts and tax IDs for them.  True and correct copies of excerpted pages from Ms. Bedoya's testimony to the SEC, where she testified about the same practice for various Wall Entities and her role with Barton generally, are also attached as Exhibit A-3.  True and correct copies of emails the SEC submitted in support of the Motion to Appoint which demonstrate Barton's control over Bedoya regarding treatment of funds received from investors, are attached as Exhibit A-4. Similarly, in testimony before the Commission, Barton identified Bedoya as his personal assistant. True and correct copies of relevant pages from Barton's testimony regarding Bedoya's role is attached as Exhibit A-5.

8.     My team and I continued investigating the Receivership Entities, their assets and operations and determined it was necessary to obtain an order clarifying their inclusion in the Receivership Order. Before filing the Motion, my counsel sent a preliminary list of supplemental entities to all counsel.  Barton's counsel identified several entities that Barton claimed he did not control, or regarding which Barton otherwise objected to inclusion but did not object to the majority of the entities included in the list as subject to his control.

9.     Additional email conferences followed during which I or my counsel provided additional evidence and my rationale for including the Disputed Entities.  Because agreement was

not reached, and although my investigation was ongoing and suggested additional entities not included in the Motion would need to be identified on a later date, I filed the Motion.

10.     One entity that we conferred about, but did not include initially, was TC Hall, LLC. We continued investigating that entity and as described below, have now obtained sufficient information demonstrating Barton's control over it to warrant its inclusion in the Receivership Order as an entity controlled by Barton.

11.     In the initial days of the Receivership, my counsel and I also interviewed Max Barton, together with his counsel, primarily to discuss management and operations of a property owned by Goldmark Hospitality, LLC, the "Amerigold Suites."  We also discussed TC Hall, LLC, an entity Max claimed he together with an individual who invested in TC Hall, LLC, controlled.

12.     During the interview, Max disclosed that although he had been placed in charge of the Amerigold Suites by his father, he had been unable to manage it profitably and had requested his father's intervention and assistance.  An additional individual I spoke with in person also stated that Max was not capable of running any of the businesses operated by the Receivership Entities. I find it extremely unlikely that Max controls, alone, the real estate investment deals for any of the Disputed Entities.  As described below, documents and Barton's role in each of the Disputed Entities supports my conclusion in this regard.

13.     Based on the information described below and attached as exhibits, I have concluded that each of the Disputed Entities and the Additional Entities are controlled by Barton and are properly included within the Receivership Order as Receivership Entities.  My investigation has revealed that regardless of who is identified in corporate records as the "manager," or officer of any such entity, Barton controls each, either directly or indirectly.  As one example only of Barton's disregard for authority or control as reflected in corporate records relates to TRTX

4

Properties, LLC, Barton and Max were both initially designated as managers. App. 302-304.  As of July 20, 2020, MXBA Trust, however, was designated as the "Manager" for TRTX Properties, App. 71-74.  A December 17, 2020 Resolution removed Max as President and appointed Barton in that role, App. 18-70.  Copies of documents reflecting Max's title as President and the Resolution by which he was purportedly removed are attached as Exhibits A-6 and A-7; App. 68-74.  As reflected in Exhibit A-8, on May 2, 2022, Barton signed a Statement Change of Registered Officer/Agent for TRTX, thereby reflecting his continuing control, App. 75-77, despite substitution of MXBA Trust as the Manager.  Similarly, although Max was purportedly President of TRTX until December 17, 2020, on June 9, 2020, Barton signed a Warranty Deed on behalf of TRTX.  A true and correct copy of the Warranty Deed is attached as Exhibit A-9; App. 75-82.

14.    As to each of the Disputed Entities listed below, I and my team discovered corporate formation binders and other documents that were housed in the office of Barton's primary administrator, Saskya Bedoya.  There was no distinction between the Disputed Entities and the other Receivership Entities; rather, the binders for each entity were kept in alphabetical order over a series of multiple drawers.

15.    The documents in the binders, for instance correspondence with the IRS regarding EIN numbers, or mail found at the Turtle Creek Location demonstrate that most entities, including the Disputed Entities and the Additional Entities, generally use a UPS store address at 13901 Midway Rd., Ste. 102-243, Dallas, TX 75244 (the "Midway Address").  Based on notices received from banks and vendors, I believe that Gillespie Villas and perhaps one or more of the Disputed Entities changed their mailing address after entry of the Receivership Order.

16.    After I began collecting mail from the Midway Address, the proprietor of the UPS store informed me that Tim Barton had demanded the proprietor "close" that mailbox when the

5

proprietor refused to provide all mail delivered to that address directly to Barton rather than the Receiver.  Through counsel, I demanded that Barton cease and desist from this activity, which directly violates ¶¶ 30-32A of the Receivership Order.  In response, Barton denied having interfered with the mail delivery.

17.   More specifically regarding each of the Disputed Entities, I have discovered the following information and documents demonstrating Barton's control over each.

18.   **Gillespie Villas, LLC**

- Texas entity formed April 18, 2022; uses 2999 Turtle Creek as its address, the location from which JMJ Development operated.  Real estate purchased by Gillespie Villas, LLC is only blocks away from 2999 Turtle Creek.
- MXBA, LLC is identified as only member in Amended Company Agreement, executed April 28, 2022.  [Dkt. 53-1, pdf pg. 33]; App. 116.
- The Certificate of Formation filed for the entity, on April 13, 2022, however, reflects MXBA, LLC and One SF Residential, LLC, which is admittedly controlled by Barton. [Dkt. 7-1, pdf pg. 24] [2].
- Property owned by Gillespie Villas is subject to a lien held by Broadview Holdings, LLC, an entity that Barton admitted he controlled.
- On September 9, 2022, Broadview Holdings paid Stone Street Development LLC $15,000 for "Gillespie."
- On September 15, 2022, Broadview Holdings paid Texas Brand Bank $17,100 for "Cashier CK in the name of Gillespie Villas LLC." Checks from the Broadview account at Texas Brand Bank evidence similar and additional payments made by Broadview Holdings on behalf of Gillespie Villas, as if the two entities were one and the same.
- Gillespie borrowed $550,000 from a third-party lender, secured by real estate purchased by Gillespie with a loan from Broadview Holdings.
- Enoch Investments, LLC, an entity Barton admits controlling, [Dkt. 7-1, pdf pg. 24; Dkt. 42, pdf pg. 39], guaranteed the loan.

True and correct copies of documents evidencing these facts related to Gillespie Villas, LLC are attached as Exhibit A-10; App. 83-156.

19.   **Venus59, LLC**

- Texas entity formed June 1, 2020; uses Midway Address.

---

[2] For ease of reference, the list of entities over which Barton conceded control which was included in the SEC's Appendix filed in support of its Motion to Appoint is also include as an exhibit here, and is attached as Exhibit A-9.

- ONE SF Residential, LLC, an entity Barton admits he controls. [Dkt. 7-1, pdf pg. 24; Dkt. 42, pdf pg. 39], is the current manager, [Dkt. 53-1, pdf pg. 69]. In an earlier Company Agreement, JMJ Residential, LLC (an entity also controlled by Barton) is identified as a Member.
- The Certificate of Formation filed for the entity, on April 13, 2022, reflects MXBA, LLC and One SF Residential, LLC as the Governing Authority.
- Form SF-4 filed with the IRS on June 11, 2020 lists Tim Barton as the sole member.
- Officers identified in the Company Agreement were Max Barton as President, and Saskya Bedoya as Treasurer/Secretary.
- On September 15, 2022, Broadview Holdings paid $23,325.62 to Venus 59, LLC in reference to a loan.
- On August 31, 2021, Venus 59 entered into a funding agreement with Daniel Crow, which provided that the funding agreement was "consented to by One SF Residential, LLC . . . (as the manager and a member of the Company) and MXBA, LLC ("MXBA") (collectively, "Members") as the members in the Company."
- Despite not being identified as an officer or manager in the Company Agreement, on October 31, 2022, after the Receivership Order was entered, Barton resigned as an officer or agent. [Dkt. 53-1, pdf pg. 72].
- The property purchased by Venus59, LLC in Johnson County is part of (and essential to) a larger planned development by Barton. Barton controlled the development as a whole and was negotiating a development agreement on behalf of Venus59, LLC (which would then be the template for development agreements for the other properties that comprised the development) at the time of my appointment.
-

True and correct copies of documents evidencing these facts related to Venus 59, LLC are attached

as Exhibit A-12; App. 164-261.

20. **TRTX Properties, LLC**

- Texas entity formed August 20, 2010 [Dkt. 53-1, pdf pg. 115]; uses Midway Address.
- William Vance McMcMurry, an attorney who represented Barton and most Receivership Entities for many years and who officed at the Turtle Creek Property, was identified as the Managing Member in TRTX's Certificate of Formation. In 2015, the members were changed to Enoch Investments, LLC and Max Barton. In later filings, TRWF, LLC was identified as a manager. [Dkt. 53-1, pdf pg. 115]] Barton admitted control over TRWF, LLC [Dkt. 7-1, pdf pg. 24].
- A 2016 email from Barton to employee Saskya Bedoya instructed her to "make Max owner in TRTX" to follow instructions of Barton's attorney to facilitate refinancing debt owed by the entity. *See* Exhibit A-2, described above.
- Pursuant to an amendment, on July 7, 2020, TRWF, LLC was deleted as a manager and replaced with the MXBA Trust. [DKT 53-1, pdf page 116, 212].
- Tim Barton is the Grantor of the MXBA Trust, and his personal assistant and primary administrator, Saskya Bedoya, is the Trustee. [Dkt. 53-1, pdf. pg. 119]. As evidenced through Bedoya's testimony, her statements through her attorney, and Barton's own testimony, included in Exhibits A-3, A-4 and A-5 above, Barton controlled Bedoya.

- On October 4, 2022, in *In re FM 544 Park Vista, Ltd.*, Cause No. 17-34255-SGJ-11 and Cause No. 17-34274-SGJ-11, pending in the United States Bankruptcy Court for the Northern District of Texas, TRTX Properties, LLC and JMJ Development, Inc. filed a notice of appeal in which they identified Barton and counsel, McMurry as the "principals" of those entities.
- Timothy Barton signed the Statement of Change of Registered Office/Agent dated May 2, 2022, although he purportedly had no authority over the entity on that date.
- 

True and correct copies of documents evidencing these facts related to TRTX Properties, LLC are

attached as Exhibit 13; App. 262-312.

21. **MXBA, LLC**

- Delaware corporation formed on August 24, 2020, [DKT. 53-1, pdf pg. 160-212]; uses Midway Address
- The Company Agreement identifies MXBA Trust as the only member, on behalf of which Max Barton signed as *President*. Max Barton is not the President of the MXBA Trust, however.  He is the beneficiary, and as such lacks authority to sign anything on behalf of the trust.  *Compare* Dkt. 53-1, pdf pgs. 169-170 (member signature for MXBA Trust is "Max Barton, President") *and* MXBA Trust, identifying Max as beneficiary and Saskya Bedoya as Trustee.  [Dkt. 53-1, pdf. pg. 119].
- Tim Barton is the Grantor of the MXBA Trust, and his administrator, Saskya Bedoya, is the Trustee.  [Dkt. 53-1, pdf. pg. 119]. As his employee, Barton controlled Bedoya and therefore also controlled the trust.
- 

True and correct copies of documents evidencing these facts related to MXBA, LLC are attached

as Exhibit A-14; App. 313-314.

22. **Titan Investments, LLC**

- Formed in Delaware on August 20, 2022 by Vance McMurry; uses 3600 Gillespie St., owned by Gillespie Villas, as its mailing address.
- In formative documents, Max Barton is identified as Manager and the only officer.
- Filed Application of Registration in Texas on October 5, 2022, using Titan Investments 2022, LLC as its name.
- On January 17, 2022, Barton signed a contract for Titan to purchase real estate, as Titan's President, although corporate records reflect that Max held that position as of that date.
- Tim Barton again signed a purchase contract on February 10, 2022 as President, although Max is listed as the only officer in the company documents.
- On January 12 and 18, 2022, on behalf of Titan Investments, Barton also signed two Letters of Intent for Titan to purchase property.
- Tim Barton signed resignation from role as signatory/agent *effective* October 6, 2022. [Dkt. 53-1, pdf pg. 177]

APP000009

- On February 23, 2022, Titan contracted to purchase real estate from Patricia Butler. The earnest money and extension fees were provided by Broadview Holdings, LLC, which is a Receivership Entity that was controlled by Barton.

True and correct copies of documents evidencing these facts related to Titan Investments, LLC are attached as Exhibit A-15, App. 317-383.

Continuing Investigation and the Additional Entities

23.   My preliminary investigation revealed that Barton used *many* additional entities—on top of those specifically listed in the Receivership Order—to spend, hide, and improperly use investor funds, the proceeds of investor funds, or funds so commingled with investor funds—as to render tracing or segregation nearly impossible, particularly at this early juncture.

24.   For example, I discovered several instances in which a Receivership Entity sold property into which the SEC had traced investor funds and identified in Exhibit B to the Hahn Declaration, [Dkt. 7-1, pdf pg. 17] where Barton, through the selling entity or another Barton-controlled entity, for instance Marine Creek SP, LLC, entered into "Participation Agreements" by which he retained entitlement to future profits in the properties he purchased with commingled investor funds, and sold.  A true and correct copy of one such Participation Agreement is attached as Exhibit A-16; App. 384-413.

25.   Although my team and I have worked tirelessly and diligently to discover the current assets and liabilities of all Receivership Entities and uses of the funds Barton received from the investors, Barton has refused to comply with many of the Receivership Order's terms intended to provide more specific information that would inform the Court's decision here.  For instance, despite numerous requests and in violation of ¶ 18 B. 3, Barton, his counsel, and an IT vendor have to date failed to provide the Receiver with the access information—user-names and passwords—

necessary for my retained IT professional to access the Receivership Entities' servers, cloud storage, emails and other electronic information.

26.    Neither has Barton provided the documents or information required by Paragraphs 8, 9, 10, and 18B of the Receivership Order.

27.    And despite repeated requests for credentials and access information to the entities' Quickbook accounts, Defendant Barton, his children and former employees all either professed ignorance or refused to provide that information.  I was instead forced to task an attorney with communicating with Intuit, the entity that owns that accounting service, to obtain access. Although Intuit is cooperating, due to technological issues, it has yet to provide that access and thus my accountants have not been able to review the entities' accounting records at this early stage of the Receivership.

28.    Despite these limitations, I and my team have identified at least four Additional Entities that are controlled "directly or indirectly" by Barton.  More specifically and accordingly, I believe that TC Hall, LLC, Titan 2022 Investment, LLC, Marine Creek SP, LLC, and LC Aledo TX, LLC fall within the scope of the Receivership Order based on the following evidence that Tim Barton controls each Additional Entity:

29.    **TC Hall, LLC**

- Formed in Texas July 16, 2022; uses New Hampshire address.
- Sole member and manager is MF Container, LLC, a Delaware company, which in turn was formed July 11, 2022.
- In communications with a lender, Louisiana National Bank, the bank offered a loan to Enoch Investments, LLC (admittedly a Barton controlled entity), or a TBD entity, but corresponded with Barton about the loan.
- On May 6, 2022, Broadview Holdings paid Commonwealth Title $100,000 for "Earnest Money Deposit for 3407 & 3409 N. Hall St."
- On May 25, 2022, Broadview Holdings paid Commonwealth Title $100,000 for "Earnest Money Deposit-3407 & 3409 N. Hall St."
- On July 25, 2022, Broadview Holdings paid Commonwealth Title $40,000 for "Earnest Money Deposit-3407 & 3409 N. Hall St."

APP000011

- On August 9, 2022, Broadview Holdings paid Commonwealth Title $40,000 for "Extension for 3407 & 3409 N. Hall St."
- On or about August 24, 2022, TC Hall, LLC purchased property at 3407 and 3409 N. Hall Street Dallas, Texas. The purchase was funded, at least in part, by $545,806.40 received from Gillespie Villas, LLC, which in turn had borrowed $550,000 from a third party, after obtaining Barton's Guaranty on that loan and subordinating Broadview's lien on the collateral.
- Barton controlled the flow of money on behalf of TC Hall as evidenced by an email from Barton to his attorney Randy Marx in which Barton provided instructions about where to originate payments for the benefit of TC Hall.
- On May 6, May 10, 2022 and June 8, 2022, Broadview Holdings made payments to James Langford, an architect, in the amounts of $3,500, $6,150, and $3,850 for "Turtle Creek Hall."
- However, long before TC Hall was formed, and continuing after it was formed, Broadview Holdings, LLC and JMJ Development spent over $1.4M on the same Hall Street property. *See* summary attached as Exhibit 22; App. 475-480.
- As explained in more detail below, an August 24, 2022 refinance of 3600 Gillespie, owned by Gillespie Villas, LLC was used for the TC Hall purchase of 3407 & 3409 N. Hall St.
- A Confidential Offering Memorandum located at 2999 Turtle Creek shows proposed uses for the property purchased by TC Hall, LLC, and references JMJ Development as the developer of the property and Tim Barton as the point of contact.
-

True and correct copies of documents evidencing these facts related to TC Hall, LLC are attached as Exhibit A-17. App. 414-444B.

30. **Titan 2022 Investment, LLC**

- Titan 2022 Investment, LLC is the same entity as Titan Investments, LLC. The former is the name under which the entity is registered to conduct business in Texas, while the latter is the entity's name based on its Delaware incorporation.

True and correct copies of documents evidencing these facts related to Titan 2022 Investment, LLC are attached as Exhibit A-15; App. 324-325.

31. **Marine Creek SP, LLC**

- The date the entity was formed is unknown. Contracts, however, identify it as a Delaware entity, with Barton as President.
- Marine Creek SP, LLC received a contractual Participation Interest when the Mansions Apartment Homes at Marine Creek LLC (admittedly a Barton-controlled entity, Dkt. 7-1, pdf pg. 24), sold property into which the SEC had traced investor funds.

11

True and correct copies of documents evidencing these facts related to Marine Creek SP, LLC is attached as Exhibit A-16; App. 384-413;  *see also,* Dkt. 7-1 pdf pgs. 14-15, 17.

32. **LC Aledo TX, LLC**

- Barton admits control over this entity.  [Dkt. 7-1 pdf pgs. 14-15, 17].  *See also* App. 449-451.
- In February 2019 Wall10, LLC loaned Somerset-Lost Creek Golf Course $300,000 ("Somerset Loan").  As evidenced by an Affidavit signed by Barton in the case referenced below, Wall10 then conveyed the note for the Somerset Loan to LC Aledo TX, LLC, and the note is purportedly still outstanding.  App. 459-466.
- The transaction is tied up in litigation styled as *Somerset-Lost Creek Golf, LTD v. Tim Barton, LC Aledo TX, LLC, JMJ Acquisitions, LLC and Wall10, LLC.*, Cause no. 096-319595-20 in the 96th District Court for Tarrant County.
- 

True and correct copies of documents evidencing these facts related to Marine Creek SP, LLC are attached as Exhibit A-19; App. 449-466.

33.    In furtherance of his effort to support the illusion that he did not control the Disputed Entities and in violation of the Receivership Order, on an unknown date, Barton signed documents with effective dates immediately before and after the date of the Receivership Order, resigning from authority that did not exist on paper.  [Dkt. 53-1, pdf. pg. 72, 177].

34.    Barton also paid expenses and made purchases for most of the Disputed Entities using Broadview Holdings' funds, which included the proceeds of property sales funded at least in part from investor funds.  True and correct copies of wire transfers evidencing funds received from Mansions Apartment Homes at Marine Creek, LLC, Orchard Farms Village, LLC and AVG West, LLC transferred to Broadview Holdings and JMJ VC Management, LLC's[3] accounts at Texas Brand Bank are attached as Exhibit A-20; App. 467-472.  The SEC traced investor funds to

---

[3] The SEC traced investor funds to Mansions Apartment Homes at Marine Creek, LLC Orchard Farms Village, LLC, and JMJ Acquisitions LLC a/k/a AVG West LLC.  [Dkt. 7-1, pdf pg. 10, 16-17].  Barton admitted his control over JMJ VC Management LLC and the Mansions Apartment Homes and Orchard Farms entities are identified as Receivership Entities.  Receivership Order ¶ 1.  I have not yet obtained bank records for JMJ VC Management LLC's accounts.

APP000013

Mansions Apartment Homes at Marine Creek and LLC Orchard Farms Village.  Dkt. 7-1, ¶ 36, pdf pg. 14-15 ("36. There were also numerous other properties acquired, at least in part, with Wall Entity investor funds, or where investor funds used in connection with the properties, that were sold, some within the last year, but Commission staff has not traced the disposition of the proceeds from those sales. These sold properties are also included on Exhibit B.").  True and correct copies of checks issued from the Broadview Holdings account for expenses or purchases made for the benefit of Gillespie Villas, LLC, TC Hall, LLC, Titan Investments, LLC, MXBA, LLC and Venus 59, LLC are included in Exhibits A-10, A-12, A-14, A-15, A-17 at App. 141-146; 208; 316; 377-383; and 424-426.

35.   Based on the use of Broadview Holdings' Texas Brand Bank account to fund and operate the Disputed and Additional Entities as evidenced just in the last few months of statements, it is likely that substantial and additional comingling occurred.  To date, however, I have only received a few months of the statements for these accounts and have not yet had my accountant review them.

36.   The SEC alleges that Barton used comingled funds to pay his personal expenses and fund his lifestyle.  While my investigation is still in its early stages, it appears that this is correct. For instance, Barton used funds in the Broadview Holdings, LLC account to pay his personal attorneys in this lawsuit.  A true and correct copy of one such check evidencing these payments is attached as Exhibit A-21; App. 473-474.  Bank records I have reviewed also reflect continued and substantial payments for Barton's personal expenses.

37.   As reflected in the Exhibits attached above related to Barton's control over Gillespie Villas, Barton also would use one Receivership Entity, including the Disputed Entities, to fund others.  For instance, Gillespie Villas, LLC purchased 3600 Gillespie Street, using a $1.4M note

(the "Broadview Loan") obtained from Broadview Holdings, LLC. Gillespie Villas then refinanced the purchase using a $550,000 loan from a third-party in favor of whom Broadview Holdings subordinated its loan and lien. Through a series of bank transfers, the proceeds of the Broadview Loan were then used to purchase 3407 and 3409 N. Hall Street by TC Hall, LLC. *See* Exhibit A-10; App. 121-140; 147-156.

38.   Similarly, a spreadsheet found in the Turtle Creek Property attached as Exhibit A-22 summarizes $1,401,914.40 in payments made from Broadview Holding's bank account at Texas Brand Bank, and on various credit cards owned by JMJ Development, LLC (a Receivership Entity) for TC Hall's purchase of 3407 and 3409 Hall Street. App. 467-472.

39.   Although I have not yet received all relevant records (due in part to Barton's refusal to produce any and to identify the banks at which the various Receivership Entities maintained accounts) neither I nor my accountants have had an adequate opportunity to review all bank records. Nonetheless, in the short time since my appointment, I have discovered additional transfers between and among Gillespie Villas, Broadview Holdings, and TC Hall, LLC. For instance, on August 22, 2022, Gillespie Villas received a $100,000 loan from a third party. On August 23, 2022, Gillespie transferred $70,000 from its new account at Vista Bank to Broadview Holdings, LLC, potentially in repayment of some of the payments Broadview made as reflected in the summary attached as Exhibit A-22; App. 475-480. On August 25, 2022, as part of the purchase of 3407 & 3409 N. Hall St., Commonwealth Title transferred $132,138.55 to TC Hall, LLC's newly opened bank account at Vista Bank. On August 26, 2022, TC Hall, LLC transferred $100,000 from its Vista Bank account to Gillespie Villas, LLC, which likely served as reimbursement for the transfer from Gillespie Villas to Broadview Holdings. On September 16,

2022, Gillespie Villas repaid the $100,000 loan to the third party.  True and correct copies of documents evidencing these transactions are included in Exhibit A-17; App. 429-432, 433, 448.

40.  Barton's indirect control over Gillespie (through One SF Residential and use of Broadview Holdings to fund it) and TC Hall (as evidenced, among other things, by his role in obtaining the loan from Louisiana National Bank and his control over the funds TC Hall used to purchase the property), and Barton's use of JMJ Development (another Receivership Entity) to develop and solicit investors for both Gillespie and TC Hall properties, demonstrates a shell game of comingled fund, including funds that originated from investors, the interdependency of the Receivership Entities, the Disputed Entities and the Additional Entities, and Barton's disregard for the corporate existence of these entities.

41.  As reflected in the summary above for each Disputed and Additional Entity, the Disputed Entities and most of the Additional Entities use, or recently used, the same mailing or physical address as all other Receivership Entities.  None appears to have any outside directors, managers, or officers, and each is undercapitalized or capitalized through loans from other Receivership Entities (although TC Hall apparently also received investment capital from a third party). Each of the Disputed Entities and the Additional Entities appear to have all been incorporated by either Ms. Bedoya, or one of two attorneys who worked for Barton.

42.  Documents evidencing formation, tax information, bills, contracts, or mail for the Disputed Entities was found at the Turtle Creek Location, and all are used for real estate investments or activities incident to real estate investments.  *Id.*  Other than documents evidencing incorporation and tax ID numbers, very few documents suggest observation of any corporate formalities.

APP000016

43.   Based on my review of the bank records received to date, purchase agreements, communications with or documents received from lenders, settlement statements and related documents and information received from title companies, it is currently impossible to determine whether any of the funds used to operate, fund, or purchase assets for any of the Disputed Entities or the Additional Entities originated from any untainted source, i.e., projects, accounts, or properties that were not purchased with funds comingled with investor funds or the proceeds of properties purchased with investor funds. Based on the SEC's investigation, however, investor funds or their proceeds appear to have been the primary source of cash used by Barton, other than third party loans.  Dkt. 7-1, pdf pgs. 14, 17.

44.   As stated in my Initial Report, most properties owned by Receivership Entities, including some owned by the Disputed or Additional Entities, are highly leveraged.  The equity, and indeed ownership interest held by the Receivership Entities and the Disputed and Additional Entities is in many instances questionable.  Although Barton contends the sale of just two properties would provide more than enough to repay the defrauded investors, as my counsel informed him, he is ignoring the debt on those properties.  A true and correct copy of an email communication from my counsel to Barton, responding to his letter suggesting that the sale of two properties would allow a speedy end to the receivership, as well as Barton's letter, are attached as Exhibit A-23. App. 481-487.  I also explained many of these details in my Initial Status Report [Dkt. 67].

45.   Based on liens, ownership disputes, and other facts that complicate the potential recovery of any net equity in the assets owned by the Receivership Entities, including properties owned by the Disputed and Additional Entities, if third-parties are successful in defeating Receivership Entity's ownership or contractual rights, as discussed in my Initial Report, far less

16

than the $26M necessary to repay the investors will be recovered.  These estimates also do not account for the cost and expenses of administering a claims process and the receivership estate, nor the claims of a host of other creditors who have indicated that they will be submitting several million dollars in claims.

46.     Accordingly, and as outlined above, inclusion of the Disputed and Additional Entities (as well as the entities identified originally in the Motion) is not only within the plain language of the Receivership Order, but essential to protect potential recoveries for the investors.  For instance, Gillespie Villas owns 3600 Gillespie Street, but purchased that property, in part, with assets obtained from Broadview Holdings, which in turn received proceeds from the sale of property the Mansions Apartment Homes at Marine Creek, LLC purchased with investor funds.  Gillespie funds in turn, funded, in part, TC Hall's purchase of property, and I understand that Gillespie's property was used as collateral for TC Hall's loan.  Marine Creek SP, LLC holds valuable contractual rights in the form of a Participation Agreement, related to the sale of real estate by the Mansions Apartment Homes at Marine Creek, LLC, real estate which the SEC alleges was purchased with investor funds, and those rights are, unlike virtually every other property interest included in the estate, unencumbered.

47.     I declare under penalty of perjury that the foregoing is true and correct.

November 30, 2022

 _/s/ Cortney C. Thomas_____
CORTNEY C. THOMAS

17

APP000018

# EXHIBIT A-1

APP000019



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Burnett Plaza, 801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

FORT WORTH
REGIONAL OFFICE

Jason A. Braun
Attorney
(817) 978-1419

December 11, 2020

**VIA E-MAIL (smetzger@pmklaw.com)**
Timothy Barton
c/o Steven C. Metzger
Metzger Law PLLC
3626 N. Hall Street, Suite 800
Dallas, Texas 75219-5133

     Re:    *In the Matter of JMJ Holdings, LLC;* File No. FW-04420

Dear Mr. Metzger:

     The staff of the Fort Worth Regional Office of the United States Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to Timothy Barton as part of this investigation. The subpoena requires Mr. Barton to give us records. In connection with this investigation, the staff requests that Mr. Barton **provide us documents no later than Friday, January 8, 2021.**

     Please read the subpoena and this letter carefully. This letter answers some questions your client may have about the subpoena. Your client should also read the enclosed SEC Form 1662. If Mr. Barton does not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena. Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment or both.

**Producing Documents**

*What materials do I have to produce?*

     The subpoena requires Mr. Barton to provide us the documents described in the attachment to the subpoena. The attachment to the subpoena defines some terms (such as "document") before listing what must be provided.

     Mr. Barton should produce each and every document in his possession, custody, or control, including any documents that are not in his immediate possession but that he has the ability to obtain. All responsive documents shall be produced as they are kept in the usual course of business, and shall be organized and labeled to correspond with the numbered paragraphs in the subpoena attachment. In that regard, documents should be produced in a unitized manner, *i.e.*, delineated with staples or paper clips to identify the document boundaries.

APP000020

Timothy Barton
December 11, 2020
Page 2

Documents responsive to this subpoena may be in electronic or paper form.  Electronic documents such as email should be produced in accordance with the attached document entitled SEC Data Delivery Standards (the "Standards").  If Mr. Barton has any questions concerning the production of documents in an electronic format, please contact me as soon as possible but in any event before producing documents.  **All electronic documents responsive to the document subpoena, including all metadata, must also be secured and retained in their native software format and stored in a safe place.**  The staff may later request or require that Mr. Barton produce the native format.

For documents in paper format, Mr. Barton may send the originals, or, if he prefers, Mr. Barton may send copies of the originals.  The Commission cannot reimburse Mr. Barton for the copying costs.  If Mr. Barton is sending copies, the staff requests that he scan (rather than photocopy) hard copy documents and produce them in an electronic format consistent with the Standards.  Alternatively, he may send us photocopies of the documents in paper format.  **If he chooses to send copies, Mr. Barton must secure and retain the originals and store them in a safe place.**  The staff may later request or require that it produce the originals.

Whether you scan or photocopy documents, the copies must be identical to the originals, including even faint marks or print.  Also, please note that if copies of a document differ in any way, they are considered separate documents and Mr. Barton must send each one.  For example, if Mr. Barton has two copies of the same letter, but only one of them has handwritten notes on it, he must send both the clean copy and the one with notes.

If Mr. Barton does send us scanned or photocopied documents, please put an identifying notation on each page of each document to indicate that Mr. Barton produced it, and number the pages of all the documents submitted.  (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.)  Please make sure the notation and number do not conceal any writing or marking on the document.  If Mr. Barton sends us originals, please do not add any identifying notations.

In producing a photocopy of an original document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original document, photocopies of the original document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

*Do I need to send anything else?*

Mr. Barton should enclose a list briefly describing each item you send.  The list should state to which numbered paragraph(s) in the subpoena attachment each item responds.  A copy of the subpoena should be included with the documents that are produced.

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ENF-CPU@sec.gov, or in a separate cover letter mailed separately from the data. **Password correspondence should reference case number, case name and requesting SEC staff member.**

Timothy Barton
December 11, 2020
Page 3

Please include a cover letter stating whether Mr. Barton believes he has met his obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.  Please also provide a duplicate copy of any cover letters to Jason A. Braun at braunj@sec.gov and Jamie Haussecker at hausseckerj@sec.gov. **Correspondence should reference case number, case name and requesting SEC staff member.**

Please also provide a narrative description describing what Mr. Barton did to identify and collect documents responsive to the subpoena.  At a minimum, the narrative should describe:

- who searched for documents;

- who reviewed documents found to determine whether they were responsive;

- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, home office, work office, voice mails, home email, webmail, work email, backup tapes or other media);

- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and

- where the original electronic and hardcopy documents are maintained and by whom.

For any documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the document production.

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires Mr. Barton to send <u>all</u> the materials described in it.  If, for any reason – including a claim of attorney-client privilege – Mr. Barton does not produce something called for by the subpoena, he should submit a list of what he is not producing.  The list should describe each item separately, noting:

- its author(s);

- its date;

- its subject matter;

- the name of the person who has the item now, or the last person known to have it;

- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;

- the reason Mr. Barton did not produce the item; and

- the specific request in the subpoena to which the document relates.

Timothy Barton
December 11, 2020
Page 4

If Mr. Barton withheld anything on the basis of a claim of attorney-client privilege or attorney work product protection, he should identify the attorney and client involved.  If he withheld anything on the basis of the work product doctrine, he should also identify the litigation in anticipation of which the document was prepared.

If documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, Mr. Barton should identify such documents and give the date on which they were lost, discarded or destroyed.

*Where should I send the materials?*

Please send the materials to:

ENF-CPU
U.S. Securities and Exchange Commission
6315 Bren Mar Drive, Suite 175
Alexandria, VA 22312

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address:  ENF-CPU@sec.gov.

**Other Important Information**

*May I have a lawyer help me respond to the subpoena?*

Yes.  Mr. Barton has the right to consult with and be represented by his own lawyer in this matter.  We cannot give Mr. Barton legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

The enclosed SEC Form 1662 explains how we may use the information Mr. Barton provides to the Commission.  This form also has other important information for Mr. Barton.  Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry.  We are trying to determine whether there have been any violations of the federal securities laws.  The investigation and the subpoena do not mean that we have concluded that Mr. Barton or anyone else has violated the law.  Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

Timothy Barton
December 11, 2020
Page 5

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

Sincerely,

Jason A. Braun
Attorney
Division of Enforcement

Enclosures:    Subpoena and Attachment
               SEC Data Delivery Standards
               SEC Form 1662
               Business Records Certification



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In the Matter of JMJ Holdings, LLC (FW-04420)**

To:     Timothy Barton
        c/o Steven C. Metzger
        Metzger Law PLLC
        3626 N. Hall Street, Suite 800
        Dallas, Texas 75219-5133

---

☒     **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the
       Securities and Exchange Commission, at the place, date and time specified below:

       ENF-CPU, U.S. Securities and Exchange Commission, 6315 Bren Mar Drive, Suite 175,
       Alexandria, VA 22312, **no later than January 8, 2021 at 9:30 a.m.**

---

☐     **YOU MUST TESTIFY**

---

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this
subpoena. Failure to comply with a court order enforcing this subpoena may result in the court imposing a
fine, imprisonment, or both.

By: _____          Date:   <u>December 11, 2020</u>
      Jason A. Braun, Attorney
      U.S. Securities and Exchange Commission
      Fort Worth Regional Office
      Burnett Plaza, 801 Cherry Street, Suite 1900
      Fort Worth, TX 76102

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this
matter.  The Securities and Exchange Commission has issued a formal order authorizing this investigation
under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

---

NOTICE TO WITNESS:        If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

APP000025

<u>U.S. SECURITIES AND EXCHANGE COMMISSION</u>
<u>SUBPOENA ATTACHMENT</u>

**TIMOTHY BARTON**

A.    **DEFINITIONS**

1.    "Timothy Barton," "you," or "your," means Timothy Barton and anyone acting on his behalf other than a lawyer retained by Mr. Barton.

2.    "Michael Fu," means Michael Fu and anyone acting on his behalf other than a lawyer retained by Mr. Fu.

3.    "Steven Wall," means Steven Wall and anyone acting on his behalf other than a lawyer retained by Mr. Wall.

4.    "JMJ Holdings," means JMJ Holdings, LLC and its parents, managing members or members, subsidiaries, predecessors, successors, affiliates, employees, and officers.

5.    "JMJ Development," means JMJ Development, LLC and its parents, managing members or members, subsidiaries, predecessors, successors, affiliates, employees, and officers.

6.    "Wall Entities," means, both individually and collectively, Wall007, LLC; Wall009, LLC; Wall010, LLC; Wall011, LLC, Wall012, LLC; Wall016, LLC; Wall017, LLC; Wall018, LLC; Wall019, LLC; and any of their parents, managing members or members, subsidiaries, predecessors, successors, affiliates, employees, and officers.

7.    "Carnegie," means Carnegie Development, Inc., its parents, managing members or members, subsidiaries, predecessors, successors, affiliates, employees, and officers.

8.    "Platinum Investment," means Platinum Investment Corporation, its parents, managing members or members, subsidiaries, predecessors, successors, affiliates, employees, and officers

9.    "Silverland," means Silverland Finance Ltd., its parents, managing members or members, subsidiaries, predecessors, successors, affiliates, employees, and officers

10.    "TRWF Lodge," means TRWF Lodge, LLC, its parents, managing members or members, subsidiaries, predecessors, successors, affiliates, employees, and officers

11.    "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, presentations, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational

1

indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

12.   "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

13.   "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

14.   An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement.  A request for any Agreement among or between specified parties includes a request for all Documents concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

15.   The terms "Reviewed" means examined, assessed, considered, analyzed or evaluated.

16.   The term "you" and "your" means the Person or entity to whom this request was issued.

17.   To the extent necessary to bring within the scope of this request any information or Documents that might otherwise be construed to be outside its scope:

    a.   the word "or" means "and/or";
    b.   the word "and" means "and/or";
    c.   the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
    d.   the masculine gender includes the female gender and the female gender includes the masculine gender; and
    e.   the singular includes the plural and the plural includes the singular.

18.   Defined terms are to be given their meanings set forth above whether capitalized or not.

19.   "Possession, custody, or control" of documents means documents within the actual or constructive possession, custody or control or within the possession, custody or control of the

APP000027

subpoenaed entity or individual, his/her employer, or any department, officer, employee, agent or attorney thereof.

20.     "Person" refers to any natural person, company, or business.

21.     "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

22.     "Payment" or "Payments" shall mean anything of value, including money or other compensation.

**B.     Instructions**

1.      Unless otherwise specified, the subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All electronic Documents responsive to the Document subpoena, including all metadata, should also be produced in their native software format.

2.      For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.      Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.      In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.      Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e.., delineated

APP000028

with staples or paper clips to identify the Document boundaries.

6. Documents should be labeled with sequential numbering (bates-stamped).

7. You must produce all Documents created during, or Concerning, the period January 1, 2017 to the present, unless otherwise specified.

8. The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9. You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff **in connection with this matter**.  If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10. For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11. This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below.  If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing.  The list should describe each item separately, noting:

    a.    its author(s);
    b.    its date;
    c.    its subject matter;
    d.    the name of the Person who has the item now, or the last Person known to have it;
    e.    the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
    f.    the basis upon which you are not producing the responsive Document;
    g.    the specific request in the subpoena to which the Document relates;
    h.    the attorney(s) and the client(s) involved; and
    i.    in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12. If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

APP000029

**C.    Documents to be Produced**

1.    A list of all JMJ Holdings, JMJ Development, and Wall Entities' investors broken down for each investor by the following categories:

    a.    Investor name, address and telephone number;
    b.    Amount invested;
    c.    Date invested;
    d.    Repayment maturity date; and
    e.    Whether, when, and how much of each investors' principal has been returned to them.

2.    For each investor identified in response to Request No. 1 above, all Documents concerning Agreements or contracts between or involving JMJ Holdings, JMJ Development, the Wall Entities, and the investor and all Documents that reflect the terms of the investments.

3.    For each investor identified in response to Request No. 1 above, all periodic or other account statements.

4.    For each investor identified in response to Request No. 1 above, all Documents concerning the investment of (or other use of) their funds by JMJ Holdings, JMJ Development, or the Wall Entities, and the current location of investor funds.

5.    All Agreements to which JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Steven Wall, or the Wall Entities is a party and which reference or relate to investments or real estate concerning the Wall Entites.

6.    To the extent not already produced, all Agreements concerning JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Steven Wall, or the Wall Entities and which reference or relate to any investments or real estate concerning the Wall Entites.

7.    Documents sufficient to identify all offerings by JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, or the Wall Entities (including, but not limited to, private placement memorandums, executive summaries, partnership agreements, construction contracts, and all other such documents).

8.    Documents sufficient to disclose all domestic and foreign bank, brokerage, investment or other financial accounts held currently or previously in JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Steven Wall, or the Wall Entities' name, or in which any of them has or has had a beneficial interest, or over which amy of them exercises or has exercised any discretion, authority, or control, from January 1, 2017 to present.

9.    Documents sufficient to identify all entities owned or controlled by JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Steven Wall, or the Wall Entities.

5

10.     For each year from January 1, 2017 through present, Documents sufficient to disclose JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, or the Wall Entities' revenue and all sources of revenue.

11.     Documents sufficient to disclose all other assets held by or on behalf of JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, or the Wall Entities.

12.     For each year from January 1, 2017 through present, documents sufficient to disclose your annual income and all sources of income.

13.     Documents sufficient to identify all auditors or persons who performed auditing-related services and that were retained, employed, or paid by JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Streven Wall, or the Wall Entities.

14.     Documents sufficient to identify all individuals and entities for whom JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Steven Wall, or the Wall Entities performs or has performed services of any kind and the nature of the services performed.

15.     Documents sufficient to identify all individuals or entities who were solicited as potential investors but did not ultimately invest in JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, or the Wall Entities.

16.     Documents sufficient to identify all Payments concerning the Wall Entities which were received by JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Steven Wall, or the Wall Entities.

17.     All Documents concerning Communications (including the Communications) sent to, or received by, JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, Michael Fu, Timothy Barton, Steven Wall, or the Wall Entities, and which reference or relate to investments or real estate concerning the Wall Entites.

18.     Documents sufficient to identify all officers, directors, members, principals, owners, shareholders, employees, and all others acting on behalf of JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, and the Wall Entities, and Documents sufficient to disclose the following, for each individual identified in response to this Item:

    a.     title;
    b.     dates of affiliation with JMJ Holdings, JMJ Development, TRWF Lodge, Carnegie, Platinum Investment, Silverland, and the Wall Entities;
    c.     current or last known home address and telephone number;
    d.     current or last known employment address and telephone number; and
    e.     salary or other compensation for each year from January 1, 2017 through present.

APP000031



**U.S. Securities and Exchange Commission**

**<u>Data Delivery Standards</u>**

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC). ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions........................................................................................................................... 1

Delivery Formats .............................................................................................................................. 2

   I.  Imaged Productions.............................................................................................................3

      1.  Images ............................................................................................................................3

      2.  Image Cross-Reference File ...........................................................................................3

      3.  Data File .........................................................................................................................3

      4.  Text ................................................................................................................................3

      5.  Linked Native Files ........................................................................................................3

   II.  Native File Productions without Load Files ......................................................................4

   III.  Adobe PDF File Productions .............................................................................................4

   IV.  Audio Files .........................................................................................................................4

   V.  Video Files .........................................................................................................................4

   VI.  Electronic Trade and Bank Records...................................................................................4

   VII.  Electronic Phone Records .................................................................................................4

   VIII.  Audit Workpapers .............................................................................................................5

   IX. Mobile Device Data ..........................................................................................................5

**General Instructions**

<span style="color:red">Due to COVID-19 restrictions the current, temporary mailing address for all <u>physical productions</u> sent to the SEC is:</span>
**<span style="color:red">ENF-CPU, 6315 Bren Mar Drive, Suite 175, Alexandria, VA 22312</span>**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. ***(Note:  An Adobe PDF file is <u>not</u> considered a native file unless the document was initially created as a PDF.)***

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF). If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

Rev 12/2020

APP000032

General requirements for **ALL** document productions are:

1. A cover letter must be included with each production and should include the following information:
   a. Case number, case name and requesting SEC staff member name
   b. A list of each piece of media included in the production with its unique production volume number
   c. A list of custodians, identifying the Bates range for each custodian
   d. The time zone in which the emails were standardized during conversion
   e. Whether the production contains native files produced from Mac operating system environments
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range (if applicable)
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate document-level text files.
7. All load-ready collections should account for custodians in the custodian field.
8. All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9. Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. The SEC uses 7zip to access compressed files. Note that the SEC **cannot** accept files that use AES-256 Jpeg or pkAES-256-Cert Deflate compression methods, even if the files are created with 7zip. If you have any questions or need additional information, please reach out to the requesting SEC staff member.
13. Electronic productions of 20 GB or less are strongly encouraged to be submitted via Secure File Transfer. All Secure File Transfers should be sent to the SEC Centralized Production Unit (ENF-CPU@sec.gov) with a CC to the requesting SEC staff member. If you do not have your own Secure File Transfer application, you may reach out to the requesting SEC staff member for a link to the SEC system in order to upload your production. If using the SEC Secure File Transfer system, you will NOT be able to CC individuals outside the SEC on your upload transmission. Note that the SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
14. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
15. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
16. All electronic productions should be produced free of computer viruses.
17. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
18. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
19. Additional technical descriptions can be found in the addendum to this document.

**\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

Rev 12/2020

APP000033

U.S. Securities and Exchange Commission
Data Delivery Standards

**Delivery Formats**

**I.   Imaged Productions**

The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

**1.   Images**
   a.   Black and white images must be 300 DPI Group IV single-page TIFF files
   b.   Color images must be produced in JPEG format
   c.   File names cannot contain embedded spaces or special characters (including the comma)
   d.   Folder names cannot contain embedded spaces or special characters (including the comma)
   e.   All image files must have a unique file name, i.e. Bates number
   f.   Images must be endorsed with sequential Bates numbers in the lower right corner of each image
   g.   The number of image files per folder should not exceed 2,000 files
   h.   Excel spreadsheets should have a placeholder image named by the Bates number of the file
   i.   AUTOCAD/photograph files should be produced as a single page JPEG file

**2.   Image Cross-Reference File**

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

**3.   Data File**

The data file (.DAT) contains all of the fielded information that will be loaded into the database.

   a.   The first line of the .DAT file must be a header row identifying the field names
   b.   The .DAT file must use the following *Concordance®* default delimiters:
         Comma ¶ ASCII character (020)
         Quote þ ASCII character (254)
   c.   If the .DAT file is produced in Unicode format it must contain the byte order marker
   d.   Date fields should be provided in the format: mm/dd/yyyy
   e.   Date and time fields must be two separate fields
   f.   The time zone must be included in all time fields
   g.   If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments
   h.   An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
   i.   For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
   j.   BEGATTACH and ENDATTACH fields must be two separate fields
   k.   A complete list of metadata fields is available in **Addendum A** to this document

**4.   Text**

Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

**5.   Linked Native Files**

Copies of original email and native file documents/attachments must be included for all electronic productions.
   a.   Native file documents must be named per the FIRSTBATES number
   b.   The full path of the native file must be provided in the .DAT file for the LINK field
   c.   The number of native files per folder should not exceed 2,000 files

Rev 12/2020

APP000034

## II. Native File Production without Load Files

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, native email files (.PST or .MBOX) may be produced. A separate folder should be provided for each custodian.

## III. Adobe PDF File Production

With prior approval, Adobe PDF files may be produced in native file format.

1. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

## IV. Audio Files

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

1) Caller Name:            Caller's name or account/identification number
2) Originating Number:   Caller's phone number
3) Called Party Name:    Called party's name
4) Terminating Number:  Called party's phone number
5) Date:                     Date of call
6) Time:                     Time of call
7) Filename:               Filename of audio file

## V. Video Files

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

## VI. Electronic Trade and Bank Records

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2. Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

## VII. Electronic Phone Records

When producing electronic phone records, provide the files in the following format:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).
   a. The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

4

APP000035

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. The laptop must have printing capability, and when possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format.

Rev 12/2020

APP000036

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME _ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |

Rev 12/2020

APP000037

| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
|---|---|---|
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty) Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty) Native: Time the document was created including time zone **This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD/TIME ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last modified including the time zone **This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last accessed including the time zone **This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb 8306d1@MSN> | Email: Unique Message ID Native: (empty) |

Rev 12/2020

APP000038

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|--------|--------|--------|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

Rev 12/2020

APP000039

U.S. Securities and Exchange Commission
Data Delivery Standards

## **ADDENDUM B**

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable


For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable


For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Rev 12/2020

APP000040

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply
## Information Voluntarily or Directed to Supply Information
## Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record*.  Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel*.  You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability*.  Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury*.  Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--
>
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify

SEC 1662 (08-16)

truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5.  *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.  *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C.  Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D.  Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

APP000042

### E. Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1.  To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2.  To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3.  To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

APP000043

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

4

22. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

APP000045

## DECLARATION CERTIFYING RECORDS
## OF REGULARLY CONDUCTED ACTIVITY

I, _____, pursuant to 28 U.S.C. § 1746
　　(Insert the name of the company representative signing the declaration)　declare that:

    1.  I am employed by _____ (the "Company").  By
　　　　　　　　　　　　　　　(Insert the company name)

reason of my position within the Company, I am authorized and qualified to make this

declaration.

    2.  I am familiar with the recordkeeping practices and systems of the Company.

    3.  Submitted herewith are true and correct copies of records serially numbered from

_____ to _____ or otherwise described in
　　(Insert beginning Bates number)　　　　(Insert ending Bates number)

the optional attachment, Exhibit A.[1]

    4.  As to each record submitted herewith, I hereby certify that:

        a.  the record was made at or near the time of the act, event, condition, or opinion
reflected therein by—or from information transmitted by—someone with
knowledge;

        b.  the record was kept in the course of a regularly conducted activity of the Company;
and

        c.  making the record was a regular practice of that activity.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on_____.
　　　　　　　　　　(Insert date of signing in blank above)

          _____
　　　　　　　　　　　　(Sign name on blank above)

          _____
　　　　　　　　(Print name and Company position on blank above)

---

[1] If all the records are Bates numbered and the beginning and ending Bates numbers have been included, then no Exhibit A is necessary.  For records that are not Bates numbered, please include as Exhibit A a brief description of the records by kind and number.  For electronic records that are not Bates numbered, please attach as Exhibit A a list or screenshot of the file names containing the electronic records.

# EXHIBIT A-2

APP000047

**Saskya Bedoya**

| From: | Tim Barton |
|---|---|
| Sent: | Monday, May 23, 2016 6:39 PM |
| To: | Saskya Bedoya |

Saskya

Do as Robert says and make Max owner in trtx and we will make him sign and then I will be added as guarantor if needed

T:b

You could make Max a co-owner -member in TRTX properties that way when you go to refinance it in his name personally the lender treats ur as a refinance and he won't have to put any money down Plus it's easier to get a loan refinanced.

Sent from my BlackBerry 10 smartphone.

resolution

TB Guarantor
MB CO - Owner
needs to be for this
one

chart
Owners is =

1

APP000048

# EXHIBIT A-3

APP000049

1

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION:

2

3    In the Matter of:              )

4                                   )  File No.  FW-04420-A

5    JMJ HOLDINGS, LLC              )

6

7    WITNESS:  Saskya Bedoya

8    PAGES:    1 through 235

9    PLACE:    Securities and Exchange Commission

10            801 Cherry Street, Suite 1900

11            Fort Worth, Texas

12   DATE:     Thursday, March 10, 2022

13

14       The above-entitled matter came on for hearing,

15   pursuant to notice, at 10:16 a.m. Central Time.

16

17

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25            (202) 467-9200

1      Q     Same question, you weren't the

2   treasurer of Carnegie Development, LLC and you

3   weren't the treasurer of Wall 12, LLC, either one,

4   correct?

5      A     That's correct.

6      Q     I'm showing you what's been marked as

7   Exhibit 175, Resolutions of Wall 16.  Do you

8   recognize this document?

9      A     Yes, sir.

10      Q     And that's your signature, correct?

11      A     Yes, sir.

12      Q     And you, in fact, were not the

13   treasurer despite that statement; is that correct?

14      A     Yes, sir.

15      Q     Going to Exhibit 176.  So, these

16   are -- this is an actual Regulations of Wall 17.

17   October 3rd, 2008 is the date of the document.  And

18   I'm going to go to the very bottom of Exhibit 176.

19   Well, close to the bottom.

20          I'm on page 34 of Exhibit 176 and you

21   are listed here as the secretary for Wall 17, LLC.

22   That in fact is incorrect, correct?

23      A     Correct.

24      Q     I'm showing you what's been marked as

25   Exhibit 177, Resolutions of Wall 19, LLC.  Do you

1   why -- now we're creating some confusion again

2   because now -- when you say, Just initially, that

3   says that you in fact were the secretary for the

4   company.  So, were you or were you not?

5        A    Well, I think we did that just to

6   open the bank account.

7        Q    And that's what we've been talking

8   about this for all these other entities.  There's a

9   distinction between you putting down something that

10  says secretary, but not really being the secretary,

11  but just putting it down, but helping to set the

12  entity up in your capacity as this other role that

13  you served for all these different entities.

14            So far I -- I believe you've been

15  really consistent that you weren't serving as the

16  secretary for these companies and that's not what

17  you were doing.  That wasn't your role, but you were

18  helping in your capacity as this kind of a catchall,

19  Jack of all trades for all these other companies you

20  were working for.  Is that still correct?

21       A    So, I mean, in performing the tasks

22  as the -- as I was initially the secretary, isn't

23  that -- I guess my question is, if -- if I'm

24  initially the secretary to open the bank account, it

25  was for that task.

1          Q    Well, I'm trying to figure out, Ms.

2     Bedoya, for your background questionnaire in

3     particular, what your employment activities were.

4     And, you know, you don't list being a secretary or

5     having all these other roles for all of these other

6     entities.  And so, I'm trying to figure out, you

7     know, were you the secretary of all these different

8     companies and the treasurer and that was one of your

9     jobs or did you not work for those companies?

10         A    I didn't --

11         Q    So --

12         A    I didn't work for them.  I was just

13    listed as the secretary really to -- to perform that

14    task initially.

15         Q    Okay.  So, all these entities we've

16    been talking about that were -- that list you, for

17    example, as treasurer were you the treasurer for

18    those entities?

19         A    I guess that's where my confusion is

20    because, I mean, I -- I was -- to do the tasks I was

21    initially named those titles, but they weren't --

22    there wasn't much more fulfillment operationally or

23    anything other than that.

24         Q    Okay.

25              MR. BRAUN:  Let's go off the record

1    at 1:22 p.m.

2              (Brief recess taken at 1:22 p.m. Central Time.)

3              MR. BRAUN:  Let's go back on the

4    record at 1:49 p.m.

5              BY MR. BRAUN:

6         Q    Ms. Bedoya, we just took a brief

7    break.  Do you understand you're still under oath?

8         A    Yes, sir.

9         Q    We were talking off the record a

10   little bit about some of this confusion about

11   whether you actually were serving in the capacity as

12   a treasurer or as a secretary for all these various

13   companies we were talking about just before the

14   break.

15             So, were you in fact the secretary or

16   treasurer as -- you know, all these entities that we

17   went through, all these documents that said you were

18   the treasurer, you were the secretary, did you

19   actually serve in those roles for those entities?

20        A    Initially, yes.

21        Q    For how long?

22        A    Well, I'm not sure, but my role was

23   to create the entities.  And then, after that tasks

24   were completed, those tasks to create the entities

25   and create the bank account, after those tasks were

1    done then I would no longer have that role.

2        Q    Okay.  So, you -- you set the -- you

3    set the -- you set the company up.  That was one

4    thing you did.  Yes?

5        A    Yes.

6        Q    You got the EIN number.  Yes?

7        A    Yes.

8        Q    What else?

9        A    The -- first, was the state, the EIN

10   and then the bank account.

11       Q    Okay.  So, you were -- you were just

12   on -- you were -- so for one of the Wall entities,

13   for example, those were all created I think in the

14   2017, 2018 period.  Yes?

15       A    I'd have to look, but that sounds

16   about right.

17       Q    And so you would set the company up,

18   get the EIN, set up a bank account and that's all

19   you were doing.  And then you are no longer serving

20   in that capacity, correct?

21       A    Right.  That's correct.

22       Q    Okay.  So, let me show you what's

23   been marked and I -- 'cause I want to clear some of

24   this up because I want to show you one example of --

25   so, here is one of the documents we were going over,

1    Exhibit 173.  This is a Wall 10 resolution.

2         So, this is in November of 2020.  So,

3    this is, you know, a couple of years after the Wall

4    10 entity was set up.  Those Wall 10 agreements were

5    entered into and the company was set up a couple of

6    years before.  And here you are still being referred

7    to as the appointed treasurer of the company.  And

8    you're signing as the treasurer of the company a

9    couple of years after the company was formed.  So --

10        A    I see that.

11        Q    Yeah.  And so, I'm just -- I'm not

12   understanding what you're testifying to now that you

13   were the treasurer or secretary for this brief

14   moment in time to get the company set up, the

15   initial bank account and then you weren't.  You were

16   done.  Because now you're still listed here and

17   signing as treasurer in 2020 years after the Wall 10

18   entity was created.

19        And I'll represent to you, this is

20   not an anomaly.  There are other -- other documents,

21   other scenarios like this where, you know, it's not

22   -- you know, it's years later and you're still

23   listed as the treasurer or secretary.  So, I'm just

24   trying to figure out, looking at your background

25   questionnaire and trying to square that with, you

1    say you had this limited employment history, but

2    then we're seeing all those companies where you are

3    the treasurer or the secretary over and over and

4    over and over again, but they're not showing up on

5    your background questionnaire.  And I'm just trying

6    to understand why that is.

7         A    Well, I imagine -- I mean, for --

8    from my understanding was when I initially was the

9    treasurer or secretary it was to create the company.

10   And then, it was soon after I was no longer taking

11   that role.

12        Q    Did you -- did you ever handle the

13   accounting for any of the Wall entities?

14        A    No.

15        Q    You were the signer on a lot of those

16   bank accounts though, correct?

17        A    Yes.

18        Q    And you were -- you were handling

19   transfers of money from all these various accounts,

20   correct?

21        A    Yes.

22        Q    Weren't you doing that in your

23   capacity as the treasurer or secretary for all of

24   these different entities that you were serving on?

25        A    I mean, I don't know that I was doing

# EXHIBIT A-4

APP000058

# Re: :)

| | |
|---|---|
| **From:** | Tim Barton <tbarton@jmjdevelopment.com> |
| **To:** | Saskya Bedoya <sbedoya@jmjdevelopment.com> |
| **Date:** | Tue, 27 Jun 2017 17:44:59 -0500 |

009 to JMJ to villita
009 to carnigie to segoville

Sent from my BlackBerry 10 smartphone.

**From:** Saskya Bedoya
**Sent:** Tuesday, June 27, 2017 6:29 PM
**To:** Tim Barton
**Subject:** :)

Need money in Seagoville (7,500)
Need money in Villita (10,000)

Take from 007  or 009

Wall to Carnegie Development to Seagoville (or to JMJ then to Seagoville)?

Wall to Carnegie Development to JMJ to Villita

EXHIBIT
10

EXHIBIT
97
JMJ, FW-04420

SEC-FW-04420-E-0133035

APP000059

# Re: Invoice 1515 from BHEI

| | |
|---|---|
| **From:** | Tim Barton <tbarton@jmjdevelopment.com> |
| **To:** | Saskya Bedoya <sbedoya@jmjdevelopment.com> |
| **Date:** | Wed, 09 Jan 2019 15:51:43 -0600 |

Wall

Sent from my BlackBerry 10 smartphone.

**From:** Saskya Bedoya
**Sent:** Wednesday, January 9, 2019 3:46 PM
**To:** Tim Barton
**Subject:** RE: Invoice 1515 from BHEI

Use wall017 money or from lajolla ?

**From:** Tim Barton <TBarton@jmjdevelopment.net>
**Sent:** Wednesday, January 9, 2019 3:41 PM
**To:** Saskya Bedoya <SBedoya@jmjdevelopment.net>
**Subject:** Re: Invoice 1515 from BHEI

Yes

Sent from my BlackBerry 10 smartphone.

**From:** Saskya Bedoya
**Sent:** Wednesday, January 9, 2019 3:39 PM
**To:** Tim Barton
**Subject:** RE: Invoice 1515 from BHEI

Pay amex?

**From:** Tim Barton <TBarton@jmjdevelopment.net>
**Sent:** Wednesday, January 9, 2019 3:38 PM
**To:** Saskya Bedoya <SBedoya@jmjdevelopment.net>
**Subject:** Re: Invoice 1515 from BHEI

Ok

Sent from my BlackBerry 10 smartphone.

**From:** Saskya Bedoya
**Sent:** Wednesday, January 9, 2019 3:28 PM
**To:** Tim Barton
**Subject:** RE: Invoice 1515 from BHEI

23k?

I need to pay down amex 150k

**From:** Tim Barton <TBarton@jmjdevelopment.net>
**Sent:** Wednesday, January 9, 2019 3:05 PM
**To:** Saskya Bedoya <SBedoya@jmjdevelopment.net>
**Subject:** Fw: Invoice 1515 from BHEI



**EXHIBIT 12**

**EXHIBIT 101**
JMJ, FW-04420

SEC-FW-04420-E-0173736

APP000060

Pay credit card

Sent from my BlackBerry 10 smartphone.

**From:** mmatthews@cynergydev.com
**Sent:** Wednesday, January 9, 2019 2:28 PM
**To:** Beverly Roberts
**Cc:** Tim Barton
**Subject:** FW: Invoice 1515 from BHEI

This is for Rogers JMR.
Need to keep these guys working.

Michael Matthews
Cynergy Development Advisors
214.287.0090

**From:** Nichol Herron <nichol@b-hei.com>
**Sent:** Wednesday, January 9, 2019 2:09 PM
**To:** tbarton@jmjdevelopment.net
**Cc:** mmatthews@cynergydev.com
**Subject:** Invoice 1515 from BHEI

---

### BHEI

**Invoice** *Due:12/07/2018*
*1515*                                    Amount Due: **$23,176.00**

Dear Tim Barton:

Your invoice-1515 for 23,176.00 is attached. This is now 31 days past due. I was under the impression that it would be paid prior to the Holidays.  Please remit payment at your earliest convenience.

Thank you for your business - we appreciate it very much.

Sincerely,
BHEI

817-341-4242

---

SEC-FW-04420-E-0173737

APP000061

SEC-FW-04420-E-0173738

APP000062

# EXHIBIT A-5

APP000063

160

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:    )

4                          ) File No. FW-04420-A

5    JMJ HOLDINGS         )

6

7    WITNESS:  Timothy Barton

8    PAGES:    160 through 418

9    PLACE:    Securities and Exchange Commission

10              801 Cherry Street, Suite 1900, Unit 18

11              Fort Worth, Texas 76102

12    DATE:     Monday, May 24, 2021

13

14        The above-entitled matter came on for a

15    hearing via Webex, pursuant to notice, at 9:29 a.m.

16

17

18

19

20

21

22

23

24              Diversified Reporting Services, Inc.

25                    (202) 467-9200

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP000064

1    know that -- that it's not used for my personal

2    activities.  So they can certainly give you

3    that information on that account.  As I said,

4    it's on the list with the other bank accounts.

5            BY MR. BRAUN:

6        Q    So, Mr. Barton, you -- a couple of

7    times when you were talking just now about your

8    personal accounts, you made -- you had made --

9    you said a qualifier that, you know, you used

10   for your personal activities.  Getting rid of

11   any personal activities, any -- you know, I

12   don't really care about that.  I just want to

13   find out what accounts that you personally have

14   at any bank account.

15            Other than the personal checking at

16   Capital One and the Wells Fargo account you

17   just mentioned, do you have any other accounts

18   in your name at any other financial

19   institutions?

20       A    Sir, as far as I know, no, but

21   every -- I told Mr. K., and I -- and I put

22   together a list of every bank account.  So once

23   you have that list, I think that will be the

24   most accurate list, but as I said, the only --

25   the ones I use is Capital One.  So no, none

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP000065

1   that I know of.

2       Q    How did you go about gathering the

3   information to compile this list of bank

4   accounts?

5       A    I called Saskya Bedoya, and told her

6   to put the information together.

7       Q    Okay.  And for the record, could you

8   tell us the -- Ms. Saskya Bedoya, what her

9   relationship is to you?

10      A    She's been an administrative

11  assistant, and involved with me probably for

12  the last ten years.

13      Q    And it -- an administrative assistant

14  to you personally?

15      A    Yes.

16      Q    Does she also hold positions in any

17  of your companies?

18      A    I think from time-to-time, there's

19  surgery secretary, or roles such as that, yes.

20      Q    What is her role with each of the

21  Wall entities?

22      A    I have to look at the documents, but

23  it's possible she was a secretary on those

24  companies, I would -- I would surmise.  I need

25  to look at the documents, but...

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP000066

1    Q    Okay.  Does Ms. Bedoya generally

2   handle the accounting for all of the Wall

3   entities?

4    A    Correct.

5    Q    Do you have a personal relationship

6   with Ms. Bedoya?

7    A    I do not have a personal-sexual

8   relationship with Ms. Bedoya.

9    Q    What about any type of a romantic

10  relationship?

11   A    I do not have a romantic, sexual -- I

12  don't fantasize about her.  We don't have

13  interaction in a sexual way, and she's a -- you

14  know, somebody that's been working for me for a

15  long time, and has taken care of things for my

16  children so we consider her a family friend.

17   Q    Thank you.

18   A    For the record, she's a married

19  mother of three.

20   Q    And how old is Ms. Bedoya?

21   A    I don't know.  I'm not -- I'm a

22  Connecticut Yankee, but I'm a Texan now.  So

23  gentleman don't ask ages.

24   Q    So let's go to Question Number 21,

25  and I expect that we'll come back to some of

[5/24/2021 9:29 AM] Barton, Timothy - Vol. II.20210524.326740...

APP000067

# EXHIBIT A-6

APP000068

RESOLUTIONS
OF
TRTX Properties, LLC

December 17, 2020

RESOLVED, that the Manager on behalf of TRTX Properties, LLC, a Texas limited liability company (the "Company") hereby recognizes and approves that the Manager or any officer of the Company is authorized and directed to do any and all things deemed necessary or advisable in the best interest of the Company, in its or his sole discretion, in connection with the transaction(s) and to execute any and all documents necessary to complete the transaction(s) in the name of and on behalf of the Company;

Further RESOLVED, that Max Barton is removed as President and no longer carries the authority delegated to the position.

FURTHER RESOLVED, that Tim Barton is appointed as President and is authorized to (a) sign, execute, certify to, verify, acknowledge, deliver, accept, file and record any and all instruments and documents, and (b) take, or cause to be taken, any and all such action in the name and on behalf of the Company or otherwise, as in its or his judgment is necessary, desirable or appropriate in order to consummate the transaction(s), including forming special purpose entity(s) for this purpose contemplated by or otherwise to effect the purpose of the foregoing resolutions, including preparing and producing certified resolutions that conform to specific resolutions requested by a lender that do not materially or substantially differ from these resolutions, and all actions taken by the President or officers of the Company in connection with the transaction(s) referred to in the foregoing resolutions are hereby ratified and confirmed.

FURTHER RESOLVED, that in executing and delivering any and all such documents on behalf of the Company or doing any and all such things or taking any and all such actions on behalf of the Company, the President is acting on behalf of the Company and all such executions, deliveries, things and actions shall be effective on behalf of the Company regardless of the designation used by the President.

Executed as of __December 17__ 2020,

MANAGER
The MXBA Irrevocable Trust

By: _____
Name:   Saskya Bedoya
Its:    Trustee

APP000069

**MANAGER:**

SASKYA BEDOYA, TRUSTEE
THE MXBA TRUST
13901 MIDWAY RD
SUITE 102-243
DALLAS TX 75244

**MEMBERS**:

SASKYA BEDOYA, TRUSTEE
THE MXBA TRUST
13901 MIDWAY RD
SUITE 102-243
DALLAS TX 75244

APP000070

# EXHIBIT A-7

APP000071

| | |
|---|---|
| **Form 424**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | This space reserved for office use.<br><br>THE STATE OF TEXAS<br><br>**Certificate of Amendment** |

## Entity Information

The name of the filing entity is:

TRTX Properties, LLC
_____

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                    ☐ Professional Corporation

☐ Nonprofit Corporation                     ☐ Professional Limited Liability Company

☐ Cooperative Association                   ☐ Professional Association

☑ Limited Liability Company                 ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  801308593

The date of formation of the entity is:  08/20/2010

## Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

TRTX Properties, LLC
_____

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424

6

APP000072

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☑ A.  The registered agent is an organization (cannot be entity named above) by the name of:

ONE Agent Texas, LLC
_____
**OR**

☐ B.  The registered agent is an individual resident of the state whose name is:

_____
*First Name*                          *M.I.*          *Last Name*                          *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent
has consented to serve as registered agent.

C.  The business address of the registered agent and the registered office address is:

815 Brazos St., Suite 500                          Austin                          TX    78701
_____
*Street Address (No P.O. Box)*                    *City*                    *State*    *Zip Code*

### 3.  Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided
is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this
form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

---

☑ **Add** each of the following provisions to the certificate of formation.  The identification or
reference of the added provision and the full text are as follows:

The MXBA Trust
2999 Turtle Creek Blvd
Dallas TX 75219
Manager

---

☐ **Alter** each of the following provisions of the certificate of formation.  The identification or
reference of the altered provision and the full text of the provision as amended are as follows:

---

☑ **Delete** each of the provisions identified below from the certificate of formation.

TRWF LLC as Manager

---

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the
Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                                    7

APP000073

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

---

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:   07/20/2020

By: _____

Signature of authorized person

Max Barton, President

Printed or typed name of authorized person (see instructions)

Form 424                                     8

APP000074

# EXHIBIT A-8

APP000075

| **Form 401**<br><br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: See Instructions** | <br><br>**Statement of Change of<br>Registered Office/Agent** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 801308593 05/02/2022<br>Document #: 1144928130003<br>Image Generated Electronically<br>for Web Filing** |

### Entity Information

The name of the entity is :

**TRTX Properties, LLC**

The file number issued to the entity by the secretary of state is: **801308593**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**ONE Agent Texas, LLC**

**815 Brazos St, Suite 500, Austin, TX, USA 78701**

### Change to Registered Agent/Registered Office

The following changes are made to the registered agent and/or office information of the named entity:

Registered Agent Change

☑ A. The new registered agent is an organization by the name of:

**One Agent Texas, LLC**

OR

☐ B. The new registered agent is an individual resident of the state whose name is:

Registered Office Change

☑ C. The business address of the registered agent and the registered office address is changed to:

**13901 Midway Rd, suite - 102, LB243, Dallas, TX, USA 75244**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

☑ B. The consent of the registered agent is maintained by the entity.

### Statement of Approval

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: **May 2, 2022**                    **Timothy Barton**

| Signature of authorized person(s) |
| --- |

**FILING OFFICE COPY**

# EXHIBIT A-9

APP000078

**Denton County**
**Juli Luke**
**County Clerk**

---

**Instrument Number:** 74240

ERecordings-RP

WARRANTY DEED

Recorded On: June 02, 2020 11:30 AM                    Number of Pages: 4

---

**" Examined and Charged as Follows: "**

Total Recording: $38.00

---

**\*\*\*\*\*\*\*\*\*\*\* THIS PAGE IS PART OF THE INSTRUMENT \*\*\*\*\*\*\*\*\*\*\***
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**                                   **Record and Return To:**

Document Number:    74240                               Corporation Service Company
Receipt Number:     20200602000226
Recorded Date/Time: June 02, 2020 11:30 AM
User:               Debra B
Station:            Station 23

---



STATE OF TEXAS
COUNTY OF DENTON

I hereby certify that this Instrument was FILED In the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Denton County, Texas.

Juli Luke
County Clerk
Denton County, TX

APP000079

GF No.: 662000662

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM <u>ANY</u> INSTRUMENT <u>THAT TRANSFERS AN INTEREST IN REAL PROPERTY</u> BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## WARRANTY DEED WITH VENDOR'S LIEN
### (Vendor's Lien Reserved and Assigned to Third Party Lender)

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DENTON | § | |

THAT THE UNDERSIGNED, TRTX Properties, LLC, hereinafter referred to as "Grantor", whether one or more, for and in consideration of the sum of TEN DOLLARS ($10.00) cash, and other good and valuable consideration in hand paid by Maximilien Barton, a single man, hereinafter referred to as "Grantee", whether one or more, the receipt and sufficiency of which is hereby fully acknowledged, and a note of even date herewith in the principal amount Two Hundred Sixteen Thousand Two Hundred Eighteen And No/100 Dollars ($216,218.00) payable to the order of SFMC, LP, dba Service First Mortgage Company (the "Lender"). The note is secured by the vendor's lien herein retained in favor of Lender, and is additionally secured by a deed of trust of even date herewith to J. Marc Hesse (the "Trustee") for the benefit of Lender. Lender, at Grantee's request, has paid in cash to Grantor that portion of the purchase price of the property that is evidenced by the note described. It is expressly agreed that the vendor's lien, as well as superior title in and to the property is retained for the benefit of Lender and is transferred to that party without recourse on Grantor until the above described note and all interest thereon are fully paid according to the face, tenor, effect and reading thereof, when this Deed shall become absolute.

**Property (including any improvements):** The real property situated in Denton County, Texas, and being more particularly described on Exhibit "A" (Legal Description) attached hereto and made a part hereof for all purposes (the "Property").

**Reservations from and Exceptions to Conveyances and Warranty:** This conveyance, however, is made and accepted subject to any and all restrictions, encumbrances, easements, covenants and conditions, if any, relating to the hereinabove described property and/or filed for record in the County Clerk's Office of Denton County, Texas; taxes for the current year, the payment of which Grantee assumes.

TO HAVE AND TO HOLD the above described premises, together with all the rights and appurtenances lawfully accompanying it, by the Grantee, Grantee's heirs, executors, administrators, successors and/or assigns forever; and Grantor does hereby bind Grantor, Grantor's heirs, executors, administrators, successors and/or assigns to WARRANT AND FOREVER DEFEND all the said premises unto the said Grantee, Grantee's heirs, executors, administrators, successors and/or assigns, against every person whomsoever claiming or to claim the same or any part thereof.

Current ad valorem taxes on said property having been prorated, the payment thereof is assumed by Grantee.

*Remainder of page intentionally left blank; signature page to follow*

1

APP000080

EXECUTED on _____ 5-29 _____, 2020

TRTX Properties, LLC

BY:_____
   Timothy Barton
   Managing Member

## ACKNOWLEDGMENT

State of Texas

County of Denton

Signed and sworn to before me the 29 day of May _____, 2020, by Timothy Barton, the Managing Member of TRTX Properties, LLC, on behalf of the Limited Liability Company.

_____
Notary Public

Affix stamp/seal:

**AFTER RECORDING, RETURN TO:**
Maximilien Barton
3926 Vista Woods
Carrollton, TX 75007

CATHY MILLER
Notary Public, State of Texas
Comm. Expires 09-18-2020
Notary ID 7416736

2

## EXHIBIT "A"
### Legal Description

Lot 20, Block N, of The Revised Plat of Phase I, High Country No. 3, an Addition to the City of Carrollton, Denton County, Texas, according to the plat thereof recorded in Cabinet B, Page 101, Plat Records, Denton County, Texas.

3

APP000082

# EXHIBIT A-10

APP000083

## AMENDED AND RESTATED COMPANY AGREEMENT OF
## Gillespie Villas LLC,
## A TEXAS LIMITED LIABILITY COMPANY

This Company Agreement of GILLESPIE VILLAS, LLC, a Texas limited liability company is executed as of APRIL 28, 2022 (the "Effective Date") by the persons who sign and are identified as "Members" and "Managers" in this Agreement.

## ARTICLE I
## DEFINITIONS

1.01   **Definitions.**   As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Amended and Restated Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

APP000084

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means GILLESPIE VILLAS, LLC, a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including,

APP000085

without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01  **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02  **Name.** The name of the Company is "GILLESPIE VILLAS, LLC " and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03  **Registered Office and Registered Agent.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of

APP000086

business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04  **Principal Office and Other Offices.**  The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

2.05  **Purposes.**  The primary purposes of the Company shall be any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06  **Powers.**  The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07  **Foreign Qualification.**  Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08  **Term.**  The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09  **Mergers and Exchanges.**  The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10  **No State-Law Partnership.**  The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

### ARTICLE III
### MEMBERSHIP

3.01  **Initial Members, Capital Commitments, and Percentage Interests.**  The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company. Set forth opposite the name of each Member

APP000087

listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws. The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02   **Additional Members.**   Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by unanimous consent of the Managers. The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Managers.

3.03   **Member Rights Specified in Agreement.**   Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04   **Representations and Warranties.**   Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity: (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05   **No Authority.**   Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06   **Liability to Third Parties.**   No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07   **Withdrawal.**   A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

**ARTICLE IV**

APP000088

## CAPITAL CONTRIBUTIONS

**4.01  Initial Contributions.**  Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

**4.02  No Further Contributions.**  No Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by the TBOC.

**4.03  Return of Contributions.**  No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member.

**4.04  Loans by Members.**  If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent may advance all or part of the needed funds to or on behalf of the Company.  An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

**4.05  Capital Accounts.**  A Capital Account shall be established and maintained for each Member.  The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g).  A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or

APP000089

manner in which those Membership Interests were acquired.  On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01 **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken.  If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

5.02 **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve.  If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Percentage Interests, an amount in cash equal to that excess.

APP000090

(b) From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Managers take action to authorize such a distribution pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

## ARTICLE VI
## MANAGEMENT

6.01  **Designation of Manager and Management by Managers.**  MXBA, LLC is hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder, including a Fundamental Business Transaction;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c) maintaining the assets of the Company in good order;

(d) collecting sums due the Company;

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes, and disposing of any asset of the Company;

(g) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

APP000091

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(i) obtaining insurance for the Company;

(j) determining distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(k) establishing a seal for the Company; and

(l) designating one or more committees, each of which shall be comprised of one or more Managers, to exercise any authority of the Managers in the management, business and affairs of the Company.

6.02 **Restrictions.** Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) do any act which requires the prior approval of the Members;

(e) possess Company property or assign rights in Company property, other than for a Company purpose; or

(f) amend this Agreement, except as expressly permitted by this Agreement.

6.03 **Conflicts of Interest.** Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

6.04 **Contracts or Transactions with Interested Directors or Officers.** This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers, or of a committee of the Managers, Members or officers that authorizes the contract or transaction,

APP000092

or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if: (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by (a) the Managers, Members or officers or a committee of the Managers, Members or officers and the Managers, Members or officers or committee in good faith authorize the contract or transaction by the affirmative vote of the majority of the disinterested Managers, Members or officers or committee members, regardless of whether the disinterested Managers, Members or officers or committee members constitute a quorum; or (b) the Members of the Company, and the Members in good faith approve the contract or transaction by vote of the Members; or (2) the contract or transaction is fair to the Company when the contract or transaction is authorized, approved, or ratified by the Managers, Members or officers, a committee of the Managers, Members or officers, or the Members of the Company.

6.05 **Number and Term of Office.** The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers. If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06 **Vacancies; Removal; Resignation.** Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled by election at an annual or special meeting of Members called for that purpose. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by a Super Majority. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07 **Compensation.** For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by a Simple Majority of the Members.

6.08 **Reimbursement.** The Managers are not required to advance any funds to pay costs and expenses of the Company. However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities.

6.09 **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of

APP000093

business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010  **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11  **Action Without Meeting.** Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such

APP000094

APP000095

committee, as the case may be. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 **Broad Discretion and Authority of Managers.** Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member. Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information.** The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information. The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

APP000096

**7.02. Specific Performance**. The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of a Simple Majority are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by

**Company Agreement**
GILLESPIE VILLAS, LLC

Page 13

mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02  **Voting List**.  The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Percentage Interests held by each.  For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting.  The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members.  Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03  **Proxies**.  A Member may vote either in person or by proxy executed in writing by the Member.  A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph.  Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be.  All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions.  No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.  Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04  **Conduct of Meetings.**  All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority

APP000098

of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

### 8.05 Action by Unanimous Written Consent Without Meeting.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this paragraph, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

### 8.06 Action by Telephone Conference or Other Remote Communications Technology.
Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

### 8.07 Classes of Members; Voting.
At an annual or special meeting called for that purpose, the Members may from time to time establish classes or groups of Members. One or more of the

APP000099

Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

## ARTICLE IX
## OFFICERS

9.01  **Qualification**.  The Managers may, from time to time, designate one or more persons to be officers of the Company.  No officer need be a resident of the State of Texas, a Member or a Manager.  Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them.  The Managers may assign titles to particular officers.  Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph.  Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided.  Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers.  Any number of offices may be held by the one person.

9.02.  **Compensation**.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.  However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03.  **Resignation**.  Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04.  **Removal**.  Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05  **Appointment of Officers**.  The President is Maximilien Batton.  The Secretary and Treasurer is Niusha Karki. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis.  The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions.  Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company.

## ARTICLE X
## INDEMNIFICATION

10.01  **Right to Indemnification**.  Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is

APP000100

involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

     10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

     10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

     10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

APP000101

**10.05  Non-exclusivity of Rights.**  The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

**10.06  Insurance.**  The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

**10.07  Member Notification.**  To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

**10.08  Savings Clause.**  If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

**11.01  Tax Returns.**  The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

**11.02  Tax Elections.**  The Company shall make the following elections on the appropriate tax returns:

      (a) to adopt the calendar year as the Company's fiscal year;

      (b) to adopt the cash method of accounting for keeping the Company's books and records;

---

APP000102

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."** A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

## ARTICLE XII
### BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

### ARTICLE XIII

APP000103

## TRANSFERS

**13.01  Limited Right to Transfer.**  No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the unanimous consent of the Managers; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement.  Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

**13.02  Rights of an Assignee.**

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company.  The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee.  If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default.  In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

**13.03  Legal Opinion.**  For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations.  The Managers, however, may waive the requirements of this paragraph.

**13.04  Admission as Substituted Member.**  An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this

Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05  **Transfer to Existing Member**.  In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06  **Third Party Offer**.  In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members.  Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members.  Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer.  If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest.  If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07  **Reasonable Expenses**.  The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due.  If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

14.01  **Termination of Marital Relationship**.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"),

APP000105

either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member**. Commencing upon the death of a Member, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Company and/or the other Members in accordance with the option or obligation established by this paragraph.

14.03 **Bankruptcy of Member**. If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04 **Insufficient Surplus**. If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05 **Option by Other Members**. If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of

time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company.

14.06 **Exercise of Option**. Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07 **Determination of Fair Value**. The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement. In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08 **Fees and Expenses of Appraiser**. In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09 **Right to Withdraw Option**. In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10 **Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

### ARTICLE XV
### DEFAULT OF A MEMBER

15.01  **Failure to Contribute.**  If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

---

APP000108

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas;

(d) reducing the Defaulting Member's Membership Interest or other interest in the Company;

(e) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member;

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV;

(g) forfeiture of the Defaulting Member's Membership Interest; or

(h) exercising any other rights and remedies available at law or in equity.

15.02  **Security.**  Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas.  It is expressly agreed that the security interest

created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03   **Compromise or Release.**   The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the unanimous consent of the Managers. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04   **Expulsion.**   A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01   **Event Requiring Termination.**   The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02  **Business May Be Continued.**  Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03  **Purchase of Former Member's Membership Interest.**  Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company.  Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04  **Liquidation**.  As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers.  The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably

APP000111

determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

APP000112

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed (a) with the unanimous consent of the Managers or (b) by a Super Majority of the Members.

17.02 **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification reducing a Member's Percentage Interest or increasing its Capital Commitment (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent.

(b) An amendment or modification reducing the required Percentage Interest or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the Percentage Interest or other measure theretofore required.

(c) An amendment to establish the relative rights and preferences of the Membership Interests of any class or series may be made by a committee of Managers, within the authority of Managers or otherwise provided in the Certificate of Formation, the TBOC, or resolutions by Members forming the committee.

(d) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

### ARTICLE XVIII
### GENERAL PROVISIONS

18.01 **Construction.** Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02 **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03 **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

1800 Valley View Lane, Suite 300
Farmers Branch, Texas 75234

---

Company Agreement
GILLESPIE VILLAS, LLC

Page 29

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04   **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05   **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06   **Binding Effect.**  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.  However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07   **Governing Law.**  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08   **Severability.**  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09   **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10   **Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11   **Indemnification.**  To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

APP000114

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date set forth above.

**MANAGER:**

MXBA LLC
MAX BARTON, PRESIDENT

**MEMBERS:**

MXBA LLC
MAX BARTON, PRESIDENT

APP000115

EXHIBIT "A"
## MEMBERS OF GILLESPIE VILLAS, LLC

| Member's<br>Name and Address | Percentage<br>Interest |
|---|---|
| MXBA LLC<br>1755 WITTINGTON PLACE,<br>SUITE 340<br>DALLAS, TEXAS 75234 | 100% |

APP000116

18.12  **Counterparts.**  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01  **Compliance with Regulation D of the Securities Act of 1933.**  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.  THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS.  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02  **Notice to Members.**  By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation.  Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03  **Limitation of Liability.**  Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services.  By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

APP000117

Filing#:804545256  Document#:1140489300002  Filed On 4/18/2022 received by Upload

---

| **Form 205**<br>**(Revised 12/21)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br><br>**Filing Fee: $300** | **Certificate of Formation**<br>**Limited Liability Company** | This space reserved for office use |

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

Gillespie Villas, LLC
<br>*The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.*

## Article 2 — Registered Agent and Registered Office
*(See instructions. Select and complete either A or B and complete C.)*

☑ A.  The initial registered agent is an organization (cannot be entity named above) by the name of:

ONE AGENT TEXAS, LLC

OR

☐ B.  The initial registered agent is an individual resident of the state whose name is set forth below:

| *First Name* | *M.I.* | *Last Name* | *Suffix* |

C.  The business address of the registered agent and the registered office address is:

| 13901 Midway Road #102 | Dallas | TX | 75244 |
| *Street Address* | *City* | *State* | *Zip Code* |

## Article 3—Governing Authority
*(Select and complete either A or B and provide the name and address of each initial governing person.)*

☑ A.  The limited liability company initially has managers. The name and address of each initial manager are set forth below.

☐ B.  The limited liability company does not initially have managers. The name and address of each initial member are set forth below.

| **INITIAL GOVERNING PERSON 1** | | | |
|---|---|---|---|
| NAME (Enter the name of either an individual or an organization, but not both.)<br>    IF INDIVIDUAL | | | |
| *First Name* | *M.I.* | *Last Name* | *Suffix* |
| OR<br>IF ORGANIZATION | | | |
| MXBA, LLC | | | |
| *Organization Name* | | | |
| **ADDRESS** | | | |
| 13901 Midway Road #102 | Dallas | TX | 76244 |
| *Street or Mailing Address* | *City* | *State*   *Country*   *Zip Code* | |

Form 205                                                            1

APP000118

**INITIAL GOVERNING PERSON 2**

NAME (Enter the name of either an individual or an organization, but not both.)
IF INDIVIDUAL

| First Name | M.I. | Last Name | Suffix |
|---|---|---|---|

OR

IF ORGANIZATION

ONE SF Residential LLC

Organization Name

ADDRESS

| 13901 Midway Road #102 | Dallas | TX | 75244 |
|---|---|---|---|
| Street or Mailing Address | City | State   Country | Zip Code |

**INITIAL GOVERNING PERSON 3**

NAME (Enter the name of either an individual or an organization, but not both.)
IF INDIVIDUAL

| First Name | M.I. | Last Name | Suffix |
|---|---|---|---|

OR

IF ORGANIZATION

Organization Name

ADDRESS

| Street or Mailing Address | City | State   Country   Zip Code |
|---|---|---|

### Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

### Initial Mailing Address

(Provide the mailing address to which state franchise tax correspondence should be sent.)

| 13901 Midway Rd #102 | Dallas | TX | 75244 |
|---|---|---|---|
| Mailing Address | City | State   Zip Code   Country |

### Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

Form 205

2

APP000119

## Organizer

The name and address of the organizer:

Max Barton
_____
*Name*

13901 Midway Rd #102                    Dallas              TX   76244
_____
*Street or Mailing Address*              *City*             *State*  *Zip Code*

### Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, or a later date and time, not more than 90 days from the date of signing. The later effective date, or date and time is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

```
┌─────────────────────────────────────────────────────────────────┐
│                                                                   │
│                                                                   │
└─────────────────────────────────────────────────────────────────┘
```

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned also affirms that, to the best knowledge of the undersigned, the name provided as the name of the filing entity does not falsely imply an affiliation with a governmental entity. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date:   04/13/2022
       _____

       _____
       Signature of organizer

       Max Barton
       _____
       Printed or typed name of organizer

APP000120

02

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANYINSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE ITIS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITYNUMBER OR YOUR DRIVER'S LICENSE NUMBER

## DEED OF TRUST and SECURITY AGREEMENT

Date: **May 11, 2022**

Grantor: **GILLESPIE VILLAS, LLC**
**a Texas limited liability company, whose state**
**identification number is 804545256**

Grantor's Mailing Address: **2999 Turtle Creek Blvd.**
**Dallas, Texas 75219**
**(Dallas County, Texas)**

Trustee: **Randy P. Marx**

Trustee's Mailing Address: **127 Howell Street**
**Dallas, Texas 75207**

Lender: **BROADVIEW HOLDINGS, LLC**

Lender's Mailing Address: **1755 Wittington Place, Suite 340, Dallas, Texas 75324**

Obligation:

Note:

Date: even date herewith

Original stated principal amount: **$1,400,000.00**

Borrower: **GILLESPIE VILLAS, LLC**

Lender: **BROADVIEW HOLDINGS, LLC**

Maturity Date: **May 10, 2023**

APP000121

Other Debt: This conveyance is also made in trust to secure payment of all other present and future debts that Grantor may owe to Lender, regardless of how the other debt is incurred or evidenced. This conveyance is also made to secure payment of any renewal or extension of any present or future debt that Grantor owes Lender, including any loans and advancements from Lender to Grantor under the provisions of this deed of trust. When Grantor repays all debts owed to Lender, this deed of trust lien will terminate only if Lender releases this deed of trust at the request of Grantor. Until Lender releases it, this deed of trust will remain fully in effect to secure future advances and debts, regardless of any renewals, extensions, or partial releases.

Property (including any improvements), as may be more particularly described on Exhibit A hereto:

**Being a tract of land situated in the J.A. Sylvester Survey, Abstract No. 1383, City of Dallas Block 1029, Dallas County, Texas, said being that tract of land conveyed to Kay Baker and Dale Baker by Last Will and Testament recorded in Volume 134, Page 710, Deed Records, Dallas County, Texas, and being more particularly described by metes and bounds as follows:**

**BEGINNING at a 1/2 inch iron rod found at the South corner of a tract of land conveyed to Hossein G. Tabatabaie by Deed recorded in Instrument No. 200600280527, Official Public Records, Dallas County, Texas, said point being on the Northwest right-of-way line of Hood Street (40 foot right-of-way);**

**THENCE South 44 degrees 46 minutes 05 seconds West, along said Northwest right-of-way line of Hood Street, a distance of 132.07 feet to a point for corner at the intersection of said Northwest right-of- way line of Hood Street and the Northeast right-of-way line of Gillespie Street (40 foot right-of-way);**

**THENCE North 43 degrees 35 minutes 00 seconds West, along said Northeast right-of-way line of Gillespie Street, a distance of 64.05 feet to a 1/2 inch iron rod found at the South corner of Lot 2, Block A/1029 of Gillespie Tract, an Addition to the City of Dallas, Dallas County, Texas, according to the map recorded in Volume 2004110, Page 19, Map Records, Dallas County, Texas;**

**THENCE North 44 degrees 46 minutes 40 seconds East, along the Southeast line of said Lot 2, Block A/1029, passing at a distance of 111.23 feet, a 1/2 inch iron rod found at the common East corner of Lot 4 and the South corner of Lot 5 of said Block A/1029 and continuing for a total distance of 131.78 feet to a point for corner at the West corner of the aforementioned Tabatabaie tract;**

2

THENCE South 43 degrees 50 minutes 26 seconds East, along the Southwest line of said Tabatabaie tract, a distance of 64.02 feet to the POINT OF BEGINNING and containing 8,445 square feet or 0.193 of an acre of land.

Said parcel generally known as **3600 Gillespie, Dallas, Dallas County, Texas 75219**; together with: (i) all buildings, structures and other improvements now or hereafter situated on the foregoing described real property, (ii) all fixtures, equipment, apparatus, appliances, furniture, furnishings and other items now or hereafter attached to, installed in or used in connection with the foregoing described real property or improvements or buildings thereon including but not limited to any and all partitions, ducts, shafts, pipes, radiators, conduits, wiring, window screens and shades, drapes, rugs and other floor coverings, motors, engines, boilers, stockers, pumps, dynamos, transformers, generators, fans, blowers, vents, switchboards, compressors, furnaces, cleaning systems, call and sprinkler systems, fire extinguishing apparatus, water system, sewage disposal system, heating, plumbing, laundry, incinerating, air conditioning and air cooling systems, water, gas and electric equipment, and building materials, supplies and construction equipment of all of kinds, all of which property and things are hereby declared to be permanent accessions to the foregoing described real property, (iii) all rights, titles and interests now owned or hereafter acquired by Grantor in and to all easements, streets, roads, highways, and rights-of-way adjacent or contiguous to the foregoing described real property, (iv) all tracts or parcels of land and any interests therein presently owned by Grantor and contiguous to the foregoing described real property, (v) any strips or gores between the Land and abutting or adjacent properties; (vi) all water and water rights, timber, crops and mineral interests; and (vii) all rights, titles, interests, leases, privileges, hereditaments, appurtenances, estates, reversions and remainders owned or to be owned by Grantor in and to all or any portion of the foregoing described properties (all of the aforesaid being hereinafter sometimes called the "Property").

Prior Lien(s) (including recording information): None.

Other Exceptions to Conveyance and Warranty: as set forth in Lender's title policy covering the Property and the loan.

For value received and to secure payment of the Obligation, Grantor owns the Property, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

In addition to creating a deed-of-trust lien on all the real and other property described above, Grantor also grants to Lender a security interest in all of the above-described personal property pursuant to and to the extent permitted by the Texas Uniform Commercial Code.

3

APP000123

**Clauses and Covenants**

**A.      Grantor's Obligations**

Grantor agrees to—

1.      keep the Property in good repair and condition;

2.      pay all taxes and assessments on the Property before delinquency and furnish Lender paid tax receipts for all such taxes and assessment. Grantor shall not borrow money to pay ad valorem taxes without Lender's prior written consent. If all taxes are not timely paid by Grantor, Lender may, but shall not be obligated to, pay such taxes and Grantor shall, by affidavit or other instrument in form approved by Lender, authorize each tax assessor collector to transfer the lien securing payment of such taxes to Lender. In the event Grantor fails to execute such affidavit or other instrument within three (3) days from request by Lender to do so, Lender may sign the affidavit on behalf of Grantor - and for such limited purpose, Grantor appoints Lender its agent and attorney in fact coupled with the interest of this deed of trust. At Lender's request, Grantor shall pay Lender, on the same day monthly installments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth (1/12th) of the yearly taxes and assessments which may attain priority under this Deed of Trust and one-twelfth (1/12th) of the yearly premiums for insurance as reasonably estimated initially and from time to time by Lender on the basis of assessments and reasonable estimates thereof. The Funds shall be managed by Lender or its designee and shall be held in an institution, the deposits or accounts of which are insured or guaranteed by a Federal or state agency. Lender shall apply the Funds to pay said taxes, assessments, and insurance. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Grantor's interest on the Funds and applicable law permits Lender to make such a charge. Unless applicable law requires such interest to be paid, Lender shall not be required to pay Grantor any interest or earnings on the Funds. Lender shall provide Grantor, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Deed of Trust. If the initial amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, and insurance premiums shall exceed the amount required to pay same as they fall due, such excess shall be, at Grantor's' option; either promptly repaid to Grantor or credited to Grantor's monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments or insurance as they fall due, Grantor shall pay to Lender any amount necessary to make up the deficiency within thirty (30) days from the date notice is mailed by Lender to Grantor requesting payment thereof. Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Grantor any Funds held by Lender.

4

APP000124

If the Property is sold or the Property is otherwise acquired by Lender, it shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust. If Lender does not require a tax escrow and Grantor fails to pay any taxes as and when due, or if Grantor fails to make escrow payments sufficient to pay all taxes, assessments and insurance premiums timely, Lender may, but shall not be obligated to, pay same. If payment of taxes is made by Lender, Grantor shall, by affidavit or other instrument in form approved by Lender, authorize each tax assessor collector to transfer the lien securing payment of such taxes to Lender. Grantor shall, immediately upon receipt, forward to Lender copies of all notices, appraisals and valuation determination, or other information regarding ad valorem taxes applicable to the Property received by Grantor. Grantor agrees to file and prosecute in good faith a protest or appeal of valuation or status of the property if requested to do so by Lender.

3.      defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.      maintain all insurance coverage with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires including without limitation damage or loss by fire, hazards included within the meaning of the term "extended coverage," wind or windstorm, earthquakes and floods in the amounts required by Lender but no less than the amount of your indebtedness to the Lender ("Required Insurance Coverage") issued by insurers authorized to do business in Texas or an eligible surplus lines carrier and written on policy forms acceptable to Lender that includes naming Lender as the person to be paid under the policy in the event of a loss, and deliver evidence of the Required Insurance Coverage in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverage. If Grantor fails to meet these requirements, Lender may, but is not obligated to, obtain collateral protection insurance on behalf of Grantor (or for Lender's protection only) at Grantor's expense;

5.      obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.      keep any buildings occupied as required by the Required Insurance Coverages; and

7.      if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all lien instruments;

8.      notify Lender of any change of address, condemnation proceeding, or other action affecting title to the Property.

9.      furnish, from time to time, to the Lender promptly upon request, but in any event, no later than April 1 of each year during the term of the note, the personal financial statement of Grantor, sworn to by Grantor, and in such form as Lender may require. Such

5

financial statements shall include an adequately detailed current statement of assets, liabilities and net worth and current income statements in such detail as the Lender may reasonably request, all to conform to generally accepted or recognized accounting principals consistently applied.

10.     Grantor shall not commercially cut timber on the property without the prior written consent of Lender. Grantor shall not commit or permit waste, impairment, or deterioration of or to the Property. Grantor will not, without first obtaining the written consent of Lender, permit any exploration, drilling, or extraction, removal, or production of any minerals from the Property.

11.     Grantor shall promptly cure, and ratify the cure of, any defects in the creation, issuance, delivery, and recording of the Note, Deed of Trust, and any other loan document. Grantor will, at its expense, execute (or cause to be executed) and deliver to Lender upon request all such other and further documents, agreements, and instruments in compliance with or accomplishment of the covenants and agreements of Grantor in the Note, Deed of Trust or other loan document, or to evidence further and describe more fully any collateral intended as security for the loan, or to correct any omissions in the Note, Deed of Trust or other loan document, or to state more fully the obligations and agreements set out in the Note, Deed of Trust or other loan document, or to make any recordings, to file any notices, or to obtain any consents, all as may be reasonably necessary or appropriate in connection with the loan.

12.     Grantor shall <u>not</u> seek, agree to, or make any change in the use of the Property or its zoning classification without Lender's written agreement.

13.     So long as any part of the Indebtedness remains unpaid, no construction shall be commenced nor improvements made upon the Property unless the plans and specifications for such construction or improvements have been submitted to and approved in writing by Lender. Lender shall not unreasonably withhold approval; provided that Lender is entitled to receive such assurances, agreements and subordinations by Grantor and the contractor(s) involved as Lender may request to the end that the Property will not be subject to any lien claim that is superior to Lender's lien(s) on the Property.

14.     Grantor shall furnish Lender true and complete copies of any and all existing leases, extensions of existing leases, and new leases covering the Property or any part or portion thereof immediately upon the effective date thereof.

15.     If Grantor fails to perform any of Grantor's obligations, Lender may, but is not obligated to, perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including without limitation attorneys fees and interest on those amounts from the date of Lender's payment at the default rate stated in the Note; and such amounts will be secured by this Deed of Trust.

6

APP000126

2022 - 202200138717  05/17/2022  08:25 AM  Page 7 of 20

**B.    Lender's Rights**

1.     Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee. Any such appointment shall be presumed to have been executed with appropriate authority.

2.     If the proceeds of the Note are used to pay a debt or ad valorem taxes secured by superior liens, Lender is subrogated to and entitled to exercise any and all the rights, remedies and liens of the holder of the debt or the taxing units so paid.

3.     Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy.

4.     Notwithstanding note terms to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5.     If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.     If there is a default on the Obligation or if Grantor fails to perform any of Grantor's obligations, Lender may—

          a. declare the unpaid principal balance and earned interest on the Obligation immediately due;

          b. direct Trustee to foreclose this lien and security interest, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code and the Uniform Commercial Code as enacted in Texas, then in effect or institute suit to foreclose; and

          c. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

          d. Grantor acknowledges that the provisions of this Section 6 could result in foreclosure or institution of a suit to foreclose.

7

APP000127

7.     Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

8.     The term "Lender" includes the Lender named on the first page of this instrument and to its successors and assigns. The Obligation may be owned by more than one person or entity. Grantor acknowledges that Lender may assign portions of the Obligation or sell participations in the Obligation. Grantor consents to such assignments and/or participations and further consents that the owners of and/or participants in the Obligation may, by agreement or by appointment of power of attorney or both, designate a lead lender who may, on behalf of all owners and/or participants, fully administer the Obligation, including, without limitation, appointing substitute trustee(s), declaring and acting on defaults in payment or performance of the Obligation, modifying the terms of the Obligation, and directing the trustee or substitute trustee to act. Unless Grantor is otherwise informed in writing, the lead lender shall be Lender heretofore identified.

9.     Lender shall be entitled to apply for and obtain the appointment of a receiver, trustee, liquidator, or conservator of the Property, without notice to Grantor and without regard to the adequacy of any security for the Obligation and without regard for the solvency of Grantor, any guarantor or other person or entity liable for the payment of the Obligation.

10.    Grantor shall allow Lender or Lender's agents entry on the Property at reasonable times and inspect it and the personal property in which Lender has a security interest.

11.    Grantor and Lender may agree to modify, extend, and/or renew the Note and this Deed of Trust for any reason without notice to or consent by any third party and without such modification, renewal or extension being subject to any "reasonableness" standard. .

## C.    Trustee's Rights and Duties

If directed by Lender to foreclose this lien, Trustee will —

1.     either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.     sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.     from the proceeds of the sale, pay, in this order—

8

a. expenses of foreclosure, including a reasonable fee or commission to Trustee;

b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and        unpaid;

c. any amounts required by law to be paid before payment to Grantor; and

d. to Grantor, any balance; and

4.        be indemnified by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity. The Trustee shall not incur any personal liability hereunder except for his own gross negligence or willful misconduct; and the Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder, believed by him in good faith to be genuine.

## D.    General Provisions

1.        If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.        Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.        Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.        This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5.        Grantor shall send Lender any information on the Property received by Grantor from the County Appraisal District, including without limitation, all notices of appraised value of the Property. At Lender's request, Borrower shall file a notice of protest of such appraised value and diligently pursue such protest at least through the appraisal review board hearing stage. Should Grantor fail to perform the obligations herein stated, Lender may, but is not obligated to file a protest and pursue it with the proper authorities; and, Grantor shall pay Lender all costs and expenses incurred by Lender in doing so, at Lender's request.

6.        Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and

9

from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.      Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt. Borrower agrees that as a condition to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender advising Lender in reasonable detail of the nature and amount of the violation, and Lender will have sixty calendar days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Obligation, as provided above, or to any other indebtedness then owing to Lender by Borrower.

8.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

9.      When the context requires, singular nouns and pronouns include the plural.

10.     The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

11.     This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

12.     If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

13.     **Grantor and each surety, endorser, and guarantor of the Note waive the requirement of notice of default or demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.**

14.     Every party to this Deed of Trust expressly waives any right to trial by jury of any suit, action, or cause of action arising under this Deed of Trust or any other instrument,

10

document, or agreement executed or delivered in connection herewith, or in any way connected with or related or incidental to the dealings of the parties hereto with respect to this Deed of Trust. Each party consents that any such suit or cause of action shall be decided by the court without the aid of a jury and that any party to this Deed of Trust may file this Deed of Trust or a certified copy of this Deed of Trust with any court as conclusive evidence of the consent of the parties hereto to the waiver of their right to trial by jury.

15.    To the maximum extent permitted by applicable law, **Grantor waives all rights, remedies, claims and defenses based on or related to Sections 51.003, 51.004, and 51.005 of the Texas Property Code**, to the extent the same pertain or may pertain to this Deed of Trust or suit for deficiency after enforcement hereof.

16.    Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

17.    If any portion of the Note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

18.    The term Lender includes any mortgage servicer for Lender.

19. If default be made in the payment of any part of the Indebtedness, such as an installment of the Note or advancements made under the terms of this Deed of Trust, Lender shall have the option to proceed with foreclosure of the Property, or any part or portion thereof, to satisfy the payment of such installment(s) or other items only, without accelerating the maturity of the entire debt. Lender may foreclose either through the courts or by directing the Trustee or her successor or substitute in trust to proceed as authorized in this Deed of Trust conducting the sale as otherwise herein provided but without declaring the whole Indebtedness due. Any such installment foreclosure sale shall be made subject to the unmatured part of the Indebtedness and any other obligations secured by this Deed of Trust. It is agreed that any such installment foreclosure shall not in any manner affect the unmatured part of the Indebtedness secured by this Deed of Trust; but, as to such unmatured part of said indebtedness and obligations, this Deed of Trust shall thereafter remain in full force and effect as a good and valid lien on the Property just as though no sale had been made as authorized by the provisions of this section. Should Lender purchase at such a sale, the title so acquired shall not merge with the liens and security interests held by Lender except by the express written election to the contrary by Lender. It is further agreed that several sales may be made under this section of this Deed of Trust without exhausting the right or power of sale for any unmatured part of the Indebtedness.

20.    The Trustee may sell the Property in whole or in part and in such parcels and order as the Lender or Trustee may determine. The right of sale hereunder shall not be exhausted by one sale; but rather, successive sales may be made until all of the Property has been

11

sold. If any sale made hereunder is not completed or is defective in the opinion of Lender, such sale shall not exhaust the power of sale hereunder, and Lender or Trustee shall have the right to vitiate said sale and cause a subsequent sale or sales to be made by the Trustee. In the event of a foreclosure sale under this deed of trust, Grantor agrees that all of the Property may be sold as a whole at Lender's option and that the Property need not be present at the sale.

21.     Grantor further covenants and agrees (which covenants and agreements shall survive any foreclosure or deed in lieu of foreclosure, of the Property and any satisfaction of the Indebtedness) that:

a. Grantor has no knowledge of (i) the presence of any "Hazardous Substances" (as defined below) on or about the Property or (ii) any spills, releases, discharges or disposal of Hazardous Substances that have occurred or are presently occurring on or onto the Property or any "Other Property" (as defined below).

b. In connection with the construction on or operation and use of the Property, Grantor has no knowledge of any failure to comply with all applicable local, state, and federal environmental laws regulations, ordinances and administrative and judicial orders relating to the generation, recycling, return, sale, storage handling, transport and disposal of any Hazardous Substances.

c. Grantor has given no release or waiver of liability that would waive or impair any claim based on Hazardous Substances to a previous owner of the Property or to any party who may be potentially responsible for the presence of Hazardous Substances to any party.

d. Grantor agrees to immediately notify Lender if Borrower becomes aware of (i) any Hazardous Substances or other environmental problem or liability with respect to the Property or any Other Property or (ii) any lien, action or notice resulting from violation of any laws, regulations, ordinances or orders affecting the Property. At its own cost, Borrower will take all actions which are necessary or desirable to clean up any Hazardous Substances affecting the Property, including removal, containment or any other remedial action required by applicable governmental authorities.

e. Grantor will indemnify and hold Lender harmless from and against any and all claims, demands, damages, losses, liens, liabilities, penalties, fines, lawsuits and disbursements which accrue as to or are incurred by Lender on or after transfer of the Property pursuant to foreclosure proceedings or in lieu thereof and on after the indebtedness is fully paid and arises directly from or out of, or in any way in connection with (i) the inaccuracy of the certification contained herein, (ii) any activities on the Property which directly or indirectly results in the Property or any

12

Other Property becoming contaminated with Hazardous Substances, (iii) the discovery of Hazardous Substances on the Property, and (iv) the clean-up after such a transfer of Hazardous Substances from the Property or any Other Property. Grantor acknowledges that it will be solely responsible for all costs and expenses relating to the clean-up of Hazardous Substances from the Property or any Other Property.

f. As used herein, "Hazardous Substances" shall mean: any substance or material defined or designated as hazardous or toxic waste, hazardous or toxic material, a hazardous, toxic or radioactive substance, or other similar term by any federal, state, or local environmental and /or health statute, regulation or ordinance presently in effect or that may be promulgated in the future as such statutes, regulations and ordinances may be amended from time to time, including but not limited to: Federal Resources Conservation and Recovery Act of 1986, 42 U.S.C. 6901 et seq.; Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1990, 41 U.S.C. 9601 et seq.; Federal Clean Air Act, 42 U.S.C. Sections 7401-7626; Federal Water Pollution Control Act, Federal Clean Water Act of 1987, 33 U.S.C. 1257 et seq.; Federal Insecticide, Fungicide, Rodenticide Act, Federal Pesticide Act of 1988, 7 U.S.C Paragraph 13 et seq; Federal Toxic Substance Control Act, 15 U.S.C. 2601 et seq; Federal Safe Drinking Water Act, 42 U.S.C. 300(f) et seq; Federal Solid Waste Disposal Act, 42 U.S.C. 6921 et seq; Texas Water Code; Texas Clean Air Act, Texas Revised Civil Statutes Annotated Article 4477-5 (Vernon 1986 and Supp. 1989); Texas Solid Waste Disposal Act, Texas Revised Civil Statutes Annotated Article 4477-7 (Vernon 1986 and Supp. 1989); Texas Low-Level Radioactive Waste Disposal Authority Act, Texas Revised Civil Statutes f-1 (Vernon 1986 and Supp. 1989);

As used in this Deed of Trust, "Other Property" means any property which becomes contaminated with Hazardous Substances as a result of construction, operations or other activities on, or the contamination of, the Property.

22.     Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

Grantor shall not cause or permit the Property, nor any part thereof to be encumbered by any liens, security interests, or encumbrances other than the liens securing

13

the Obligation without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

In addition, if granted, consent may be conditioned upon the consented lien containing express covenants to the effect that (a) the consented lien instrument is unconditionally subordinate to this deed of trust; (b) if any action is instituted to foreclose or otherwise enforce the consented lien instrument , no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines; (c) rents, if collected by or for the holder of the consented lien instrument, will be applied first to the payment of the Obligation then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the consented lien instrument; (d) written notice of default under the consented lien instrument and written notice of the commencement of any action to foreclose or otherwise enforce the consented lien instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and (e) in the event of the bankruptcy of Grantor, all amounts due on or with respect to the Obligation and this deed of trust will be payable in full before any payments on the indebtedness secured by the consented lien instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the dissolution of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the dissolution of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the dissolution of the partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint venturer; or (d) a limited partnership, (1) the dissolution of the partnership, (2) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (3) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (4) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such

14

as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation. Failure on the part of Lender to exercise said option to accelerate shall never in any event be interpreted as a release of liability of the original Borrower of said note or any other person liable thereon.

Included in the restriction aforesaid, but not in limitation thereof, Grantor shall neither enter into any mineral lease or conveyance nor drill or explore for, or extract, removal or produce minerals from the surface or subsurface of the Property or affecting the Property or any part or portion thereof without the prior written consent of Lender. Lender's consent may be conditioned upon Grantor and any proposed mineral lessee executing, in form and content acceptable to Lender, a subordination of said lease or other conveyance or like instrument to the lien of this Deed of Trust. In addition, Grantor shall execute and deliver to Lender such other security agreements, instruments, or similar documents which, in Lender's reasonable discretion, is necessary or appropriate to secure Lender. The term "minerals" includes, without limitation, oil, gas, casing head gas, coal, lignite, hydrocarbons, methane, carbon dioxide, helium, uranium, sand and gravel and all other natural elements, compounds, and substances.

23.     No waiver by Lender of any default by Grantor or breach of any of the provisions of this Deed of Trust shall be considered a waiver of any other default or breach, and no delay or omission in exercising or enforcing the rights and powers herein granted shall be construed as a waiver of such rights and powers, and likewise no exercise or enforcement of any rights or power hereunder shall be held to exhaust such rights and powers, and every such right and power may be exercised from time to time.

24.     Neither Lender nor any other person asserting rights against the Property hereunder for the benefit of Lender shall have any obligation to marshal the rights of Lender under the Obligation or any other instruments or to marshal the assets securing the Note or to marshal any other assets.

25.     This Deed of Trust creates an assignment of rents arising from the Property pursuant to Chapter 64 of the Texas Property Code. Grantor may not lease the Property or any portion, on terms other than at market rents and utilizing lease forms approved by Grantor, thereof without Lender's prior written approval. Grantor agrees to provide Lender, upon request, copies of all leases and rent roll reports affecting the Property. Grantor may not, without Lender's written consent, request or receive rent from any tenant of the property for more than one month in advance.

26.     This instrument is intended to also function as a security agreement pursuant to and in accordance with the Uniform Commercial Code as enacted in the state of Texas.

15

APP000135

27.    This instrument is also intended to serve as a Financing Statement under the Uniform Commercial Code between the Debtor/Grantor whose address is hereinabove set out, and the Secured Party/Lender, whose address is hereinabove set out. Debtor grants permission to Lender to file other financing statements to perfect Lender's security interest.

28.    At all times throughout the term of the loan, Grantor and all of its respective Affiliates (defined below) shall (i) not be a Prohibited Person (defined below), and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of the Office of Foreign Assets Control ("OFAC") of the U. S. Department of the Treasury. The term "Prohibited Persons" shall mean any person or entity a) listed in the Annex to, or otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");b) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; c) with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order; d) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; e) that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its website, www.ustreas.gov/offices/enforcement/ofac or at any replacement website or other replacement or supplemental official publication of such list; or f) who is an Affiliate of or affiliated with a person or entity listed above. The term "Affiliate" as used herein shall mean, as to any person or entity, any other person or entity that, directly or indirectly, is in control of, is controlled by, or is under common control with such person or entity, or is a director or officer of such person or entity or of an Affiliate of such person or entity. As used herein, the term "control"-means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership or voting securities or interest, by contract or otherwise.

29.    Grantor acknowledges and agrees that Lender may collaterally assign this Deed of Trust and the Note secured hereby. Grantor shall execute and deliver to Lender and the collateral assignee its estoppel certificate certifying that copies of the executed loan documents are true and correct; that the loan documents have not been modified (or stating such modifications); that Grantor has no claims, setoffs, or defenses to payment of the Note or against Grantor (or stating any such claims); whether a default exists under the terms of the Note and Deed of Trust and the amounts due and owing on the Note and held in escrow. Failure by Grantor to deliver the signed estoppel certificate within five days from Lender's request that Grantor do so shall be a material default hereunder.

30.    Grantor shall not engage in business other than owning and operating the Property; acquire or own material assets other than the Property and such personal property as is reasonable and necessary in the management and operation of the Property; or fail to hold

16

itself out to the public as a legal entity separate from all others and its owners or conduct business in any name other than that set forth in the signature line hereof.

31.     (reserved).

32.     The Note secured hereby is given as part of the purchase price of the Property and is additionally secured by the Vendor's Lien and Superior Title retained in Warranty Deed With Vendor's Lien executed and delivered to Grantor this day by **Dale and Kay Baker.** This deed of trust does not waive the vendor's lien or superior title and the two liens and the right of superior title are cumulative. Lender may elect to foreclose under either of the liens or assert superior title without waiving the others. Foreclosure of this Deed of Trust lien shall, unless otherwise reserved, cancel the Vendor's Lien and Superior Title reserved in the Deed aforesaid. Likewise, foreclosure of the Vendor's Lien or rescission of this transaction to reinstate the Superior Title reserved in the deed aforesaid shall, unless otherwise noted, cancel this deed of trust lien.

        Signature page follows

17

APP000137

2022 - 202200138717  05/17/2022  08:25 AM  Page 18 of 20

Signature page to Deed of Trust and Security Agreement

Executed **May 10, 2022.**

**GILLESPIE VILLAS, LLC**
A Texas limited liability company

By: _____
Maximilien Barton
President

THE STATE OF TEXAS                    §

COUNTY OF DALLAS                      §

This instrument was acknowledged before me on **May 9, 2022, by Maximilien** Barton, President of **GILLESPIE VILLAS, LLC**, a Texas limited liability company, on behalf of said company.

_____
Notary Public - State of Texas

RANDY P. MARX
Notary Public, State of Texas
Comm. Expires 05-03-2023
Notary ID 132001233

After recording return to:

Lender
c/o
Emily Hutcherson
East Texas Title Companies
(903) 561-8060 ext.2426
chutcherson@etextitle.com www.etextitle.com

18

APP000138

## EXHIBIT "A" to
## Deed of Trust

### LEGAL DESCRIPTION OF LAND

Being a tract of land situated in the J.A. Sylvester Survey, Abstract No. 1383, City of Dallas Block 1029, Dallas County, Texas, said being that tract of land conveyed to Kay Baker and Dale Baker by Last Will and Testament recorded in Volume 134, Page 710, Deed Records, Dallas County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod found at the South corner of a tract of land conveyed to Hossein G. Tabatabaie by Deed recorded in Instrument No. 200600280527, Official Public Records, Dallas County, Texas, said point being on the Northwest right-of-way line of Hood Street (40 foot right-of-way);

THENCE South 44 degrees 46 minutes 05 seconds West, along said Northwest right-of-way line of Hood Street, a distance of 132.07 feet to a point for corner at the intersection of said Northwest right-of- way line of Hood Street and the Northeast right-of-way line of Gillespie Street (40 foot right-of-way);

THENCE North 43 degrees 35 minutes 00 seconds West, along said Northeast right-of-way line of Gillespie Street, a distance of 64.05 feet to a 1/2 inch iron rod found at the South corner of Lot 2, Block A/1029 of Gillespie Tract, an Addition to the City of Dallas, Dallas County, Texas, according to the map recorded in Volume 2004110, Page 19, Map Records, Dallas County, Texas;

THENCE North 44 degrees 46 minutes 40 seconds East, along the Southeast line of said Lot 2, Block A/1029, passing at a distance of 111.23 feet, a 1/2 inch iron rod found at the common East corner of Lot 4 and the South corner of Lot 5 of said Block A/1029 and continuing for a total distance of 131.78 feet to a point for corner at the West corner of the aforementioned Tabatabaie tract;

THENCE South 43 degrees 50 minutes 26 seconds East, along the Southwest line of said Tabatabaie tract, a distance of 64.02 feet to the POINT OF BEGINNING and containing 8,445 square feet or 0.193 of an acre of land.

*Memo only:*
*3600 Gillespie, Dallas, Dallas County TX 75219*
*GF No. 424803*
*Survey Date: May 9, 2004*
*(at times, Lot 10, Block 1029)*
*DCAD Account: 138-784 000 000*

19

2022-202200138717 05/17/2022 8:28 AM Page 20 of 20

## Dallas County
## John F. Warren
### Dallas County Clerk

---

**Instrument Number:**   202200138717

eRecording - Real Property

Recorded On: May 17, 2022 08:25 AM                    Number of Pages: 20

---

**" Examined and Charged as Follows: "**

Total Recording: $98.00

---

**\*\*\*\*\*\*\*\*\*\*\* THIS PAGE IS PART OF THE INSTRUMENT \*\*\*\*\*\*\*\*\*\*\***
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**                                 **Record and Return To:**
Document Number:        202200138717                 Simplifile
Receipt Number:         20220516001241
Recorded Date/Time:     May 17, 2022 08:25 AM
User:                   Kamesha W
Station:                CC33

---



**STATE OF TEXAS**
**COUNTY OF DALLAS**
I hereby certify that this Instrument was FILED In the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Dallas County, Texas.

John F. Warren
Dallas County Clerk
Dallas County, TX

APP000140

🔒 THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
1919 S. Shiloh Rd STE 100 LB 30
Garland, TX 75042
(972) 494-9800

No. 1030

Date   1/18/2022

Pay To The Order Of   East Texas Title Companies                                    $  **15,000.00

Fifteen Thousand  and 00/100***                                                      Dollars

East Texas Title Companies
102J East Loop STE 400
Tyler, TX

HEAT SENSITIVE
RUB AREA TO VERIFY

Memo:   3600 Gillespie St Dallas TX 75219 (Deposit)

GF# 424803 9

⑈"000001030"⑈  ⑆:111925113⑆:1024611"

APP000141

THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1341

**Date** 9/15/2022

**Pay To The** Texas Brand Bank                                          **$** **17,100.00

Seventeen Thousand One Hundred  and 00/100***                        **Dollars**

Texas Brand Bank
Garland, TX 75042

**Memo:** Cashier CK in the name of Gillespie Villas LLC

HEAT SENSITIVE
RUB AREA TO VERIFY

⑈00000 1341⑈ ⑆111925113⑆ 10 2461 1⑈

APP000142



THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES - SEE BACK FOR DETAILS

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1334

Date   9/9/2022

Pay To The   Stone Street Development LLC          $  **15,000.00

Fifteen Thousand  and 00/100***                          **Dollars**

Stone Street Development LLC
8215 Westchester Dr STE 301
Dallas, TX 75225-6117

HEAT SENSITIVE
RUB AREA TO VERIFY

**Memo:**   Gillespie

⑈000001334⑈ ⑆111925113⑆1024611⑈

APP000143

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK   HOLD AT ANGLE TO VIEW

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1097

Date   4/4/2022

Pay To The Order Of   Kay Baker                                    $  **10,000.00

Ten Thousand  and 00/100***                                    **Dollars**

Kay Baker
6237 Anita Street
Dallas, TX 75214
(214) 826-2607

Memo:  Gillespie Project

⑆000001097⑈ ⑉111925113⑊ 1024611⑈

THIS CHECK IS VOID WITHOUT A COLORED BACKGROUND AND SECURE DOCUMENT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1242

Date   7/29/2022

Pay To The Order Of   Stone Street Development LLC                                      $ **15,000.00

Fifteen Thousand  and 00/100***                                                            **Dollars**

Stone Street Development LLC
8215 Westchester Dr STE 301
Dallas, TX 75225-6117

Memo:  Gillespi

⑈000001242⑈ ⑆111925113⑆10246⑈11⑈



THIS CHECK HAS A COLORED BACKGROUND AND CONTAINS MULTIPLE SECURITY FEATURES • SEE BACK FOR DETAILS

**Broadview Holdings**
13901 Midway Rd STE 102LB243
Dallas, TX 75244
(972) 385-9934

Texas Brand Bank
Garland, TX 75042
88-2511/1119

No. 1279

Date   8/19/2022

Pay To The
Order Of   James E. Langford

S   **1,750.00

One Thousand Seven Hundred Fifty and 00/100***

Dollars

James E. Langford
3001 Bookhout Street
Dallas, TX 75201

Memo:   Architect (Gillespie Villas)

�串000001279�串  ⑈111925113⑈10246⑈

03

## GUARANTY

WHEREAS, **XIAO-EN FANG** (herein called "Lender"), is the owner and holder of that certain promissory note (herein called the "Note") in the original principal sum of **$550,000.00**, executed by **Gillespie Villas, LLC, a Texas limited liability company ("Borrower"), secured by a first lien deed of trust encumbering the Gillespie Property owned by Gillespie Villas, LLC, a Texas limited liability company (here "Grantor")** said promissory note of even date herewith, payable to the order of Lender; and

WHEREAS, said Note is secured by Deed of Trust of even date with the Note, executed by Grantor, as Mortgagor, in favor of a Trustee designated by Lender, covering that property more particularly described in said Deed of Trust to which reference is hereinafter made;

WHEREAS, as a condition precedent to the making of the loan, Lender has required Guarantor to guarantee the loan on the conditions hereinafter set forth; and

WHEREAS, the undersigned desires to guarantee, jointly and severally, payment of the Guaranteed Indebtedness upon and subject to the terms and conditions set forth herein,

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS:

THAT, **ENOCH INVESTMENTS, LLC, a Delaware limited liability company** (herein called the "Guarantor") for and in consideration of the premises, ten dollars, and other good and valuable consideration paid, the receipt of which is hereby acknowledged, and for the purpose of inducing Lender to make the aforesaid loan, does hereby unconditionally and irrevocably guarantee to Lender, its successors and assigns, the full, punctual and prompt payment of the Guaranteed Indebtedness and the performance and observance of all obligations under the Note and Deed of Trust.

The term "Guaranteed Indebtedness" shall mean all sums stated to be paid under the terms of the Note, and Deed of Trust, including, without limitation, each and every installment of principal and interest under said Note, and all other indebtedness of Borrower to Lender whether matured or unmatured and whether presently existing or hereafter incurred or acquired.

This is a guaranty of payment and not a guaranty of collection. This Guaranty shall terminate only upon payment to Lender of all Guaranteed Indebtedness and performance of all obligations under the Note and Deed of Trust.

This Guaranty is subject to the following terms and provisions:

1.      Guarantor absolutely and unconditionally covenants and agrees that (i) in the event that Borrower does not or is unable to pay or perform the Guaranteed Indebtedness for any reason, or (ii) if all or any part of the Guaranteed Indebtedness (or any instrument executed in connection therewith) is for any reasons found to be

1

invalid, illegal, unenforceable, uncollectible or legally impossible; then, in any such event, Guarantor shall pay and perform the Guaranteed Indebtedness as herein provided and agrees that no such occurrence shall in any way diminish or otherwise impair or Guarantor's obligations hereunder.

2.      Without notice to or the consent of Guarantor, Lender may renew, rearrange or extend the time, manner, place or terms of payment of the Guaranteed Indebtedness or any renewal or extension thereof, and/or Lender may supplement, change, amend, substitute, modify or alter the Guaranteed Indebtedness and/or any present and future security document without in any way changing, releasing or discharging Guarantor from liability and obligation hereunder;

3.      **Guarantor waives notice of the acceptance of this Guaranty and also waives notice of default, presentment, demand, protest, and notice of protest, non-payment, default or dishonor, notice of intent to accelerate and notice of acceleration of the Guaranteed Indebtedness or any renewal or extension thereof;**

4.      Lender may, at any time and from time to time, without prejudice to any claim against Guarantor hereunder, and without notice to Guarantor:  (i) exchange, release or surrender all or any part of the security which Lender may at any time hold as security for the payment of the Guaranteed Indebtedness, (ii) sell all or any part of the security in accordance with the terms and provisions of any instrument pledging the same and become the purchaser thereof at any such sale, and (iii) settle or compromise with Borrower or any other person liable on the Guaranteed Indebtedness or any renewal or extension thereof;

5.      No failure, omission or delay on the part of Lender in exercising any rights hereunder or in taking any action to collect or enforce payment of any obligation to which this Guaranty applies or in enforcing observance of performance of any agreement, covenant, term or condition to be performed or observed under the Note and/or Deed of Trust, either against Borrower or any other person thereon primarily or secondarily liable shall operate as a waiver of any such rights of Lender against the Guarantor;

6.      Guarantor waives any right to require Lender to (i) proceed against Borrower or any other person primarily or secondarily liable on the Note, (ii) proceed against or exhaust any security held by Lender for the payment of the Guaranteed Indebtedness, or (iii) pursue any remedy that Lender has or to which it may be entitled; marshal assets and liabilities or sell in inverse order of alienation.

7.      **Guarantor waives all rights or defenses given to sureties or guarantors at common law, in equity, or by statute, other than actual payment of the Guaranteed Indebtedness and expressly waives each and every right to which Guarantor may be entitled pursuant to Rule 31, Texas Rules of Civil Procedure, Section 17.001 et seq. of the Texas Civil Practice and Remedies Code. In addition, to the maximum extent permitted by applicable law, Guarantor waives all rights, remedies, claims and defenses based on or related to Sections 51.003, 51.004, and 51.005 of the Texas Property Code, to the extent the same pertain or may pertain to any enforcement of this Guaranty.**

8.      Guarantor agrees to pay a reasonable attorney's fee and all other costs and expenses which may be incurred by Lender in the enforcement of the Note, Deed of Trust or this Guaranty;

2

APP000148

9.      Guarantor's liability shall remain and continue in full force and effect notwithstanding the non-liability of the Borrower for any reason whatsoever for the payment of the Guaranteed Indebtedness or any part thereof; the voluntary or involuntary liquidation, dissolution, sale of all of the property described in the Deed of Trust, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition of readjustment of, or any similar proceeding affecting Borrower or any of its assets; the release of the Borrower from the observance of any of the agreements, covenants, terms or conditions contained in the Note and/or Deed of Trust by operation of law; any defenses or rights of set-off or counter-claims which Borrower, or any other person liable on the Note may have or assert; or any change in status, composition, structure or name of Borrower.

10.     Until the Guaranteed Indebtedness, has been paid in full to Lender, Guarantor hereby waives and releases any right of subrogation that Guarantor has or to which Guarantor may be entitled and further waives any right that Guarantor has in or to which Guarantor may be entitled in and to the benefit of any security which Lender may at any time hold in connection with the Guaranteed Indebtedness;

11.     Guarantor agrees that this contract is performable in **Dallas County, Texas;**

12.     If an event of default occurs under the terms of the Note or Deed of Trust, or (ii) if Guarantor defaults in the performance or observance of any agreement, covenant, term or condition contained herein, or (iii) if Guarantor makes a general assignment for the benefit of creditors, or (iv) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate or assets of or any substantial part of the business, estate or assets of Guarantor or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect; or (v) any such petition or application is filed or any such proceedings are commenced against Guarantor and by any act indicating approval thereof, consent thereto, or acquiescence therein, or an order is entered appointing any such trustee or receiver, or adjudicating such Guarantor bankrupt or insolvent, or approving the petition in any such proceeding and such order remains in effect for more than sixty (60) days; or (vi) Guarantor dies and his estate or a substantial part of such estate is distributed by the executor or administrator thereof to his heirs or in accordance with such Guarantor's Will prior to all the distributees of such estate or part thereof (by an instrument approved in form and substance by Lender) either jointly or severally, assuming all of such deceased Guarantor's obligation hereunder, or as additional collateral securing the payment of the Note, effectively pledging, mortgaging or otherwise creating a first lien (but without any personal liability of such distributees' part) on a portion of the assets of such estate valued by a qualified appraiser approved by Lender at not less than the principal amount of the Note then outstanding, then an event of default under this Guaranty shall have occurred and the holder of the Note may, at its option, immediately declare the Note to be due and payable, and the entire principal remaining on the Note shall thereupon be and become forthwith due and payable together with accrued, unpaid interest thereon, under the terms of and with the effect provided in the Note, Deed of Trust and this Guaranty.

13.     Guarantor hereby warrants and represents unto Lender that (i) any and all balance sheets, net worth statements and other financial data which have heretofore been given to Lender, with respect to Guarantor, fairly and accurately present the financial condition of Guarantor as of the date thereof, and since the date thereof there has been no material adverse change in the financial condition of Guarantor; and (ii) except as may be set forth in any exhibit attached hereto, (iii) there are no legal proceedings, material claims or demands pending against,

3

or to Guarantor's knowledge, threatened against Guarantor's assets, and (iv) no event (including specifically Guarantor's execution and delivery of this Guaranty) has occurred which, with the lapse of time or action by a third party, could result in Guarantor's material breach or material default under any legal requirement or agreement.

14.      In the event any payment from Borrower to Lender is held to constitute a preference under the bankruptcy laws, or if for any other reason Lender is required to refund such payment or pay the amount thereof to any other party, such payment by Borrower to Lender shall not constitute a release of Guarantor from any liability hereunder. Guarantor agrees to pay such amount to Lender upon demand and this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments.

15.      It is not the intention of the Lender to obligate the Guarantor to pay interest in excess of that legally permitted to be paid by Borrower under applicable law and should it be determined that Guarantor is required to pay usurious interest under the Note, or Deed of Trust, the obligations of the Guarantor shall be limited to paying the maximum rate permitted under said applicable law.  This provision shall not limit in any respect, other than the payment of such interest as may be usurious, the obligation of the Guarantor to pay the principal amount due plus other sums then due under the terms of the Note and Deed of Trust.

16.      Suit may be brought against Guarantor, if there be more than one guarantor of the Guaranteed Indebtedness, jointly and severally, and against any one or more of them, less than all, without impairing the rights of the Lender against Guarantor or any  other guarantor; and Lender may compromise with any other guarantor for such sum or sums as it may see fit and release such other guarantor(s) from all further liability to the Lender for the Guaranteed Indebtedness without impairing the right of the Lender to demand and collect the balance of the Guaranteed Indebtedness from Guarantor or the other guarantors not so released.  The Lender may bring suit against any Guarantor separately, without having to contemporaneously sue the other guarantors or the Borrower, or any other person liable on the Note.

17.      It is specifically understood and agreed that this Guaranty shall be in force and effect and fully enforceable according to the terms and conditions herein notwithstanding any limitations which may exist with respect to the liability of Borrower, if any.

18.      Every party to this Guaranty expressly waives any right to trial by jury of any suit, action, or cause of action arising under this Guaranty or any other instrument, document, or agreement executed or delivered in connection herewith, or in any way connected with or related or incidental to the dealings of the parties hereto with respect to this Guaranty. Each party consents that any such suit or cause of action shall be decided by the court without the aid of a jury and that any party to this Guaranty may file this Guaranty or a certified copy of this Guaranty with any court as conclusive evidence of the consent of the parties hereto to the waiver of their right to trial by jury.

19.      Wherever used in this Guaranty, the singular number shall include the plural and the singular and the use of any gender shall include all genders.

4

APP000150

20.     This Agreement shall be binding upon Guarantor and his/her executors, administrators and other personal representatives, heirs and assigns.  The transfer or assignment by Lender of the Note shall operate as a transfer or assignment to the transferee or assignee of this Guaranty and all rights and privileges hereunder.  All references herein to "Lender" shall mean the Lender named above and any subsequent owner and/or holder of the Note or any interest therein.

Signed: August 23 2022.

**GUARANTOR:**


**ENOCH INVESTMENTS, LLC**
**A Delaware limited liability company**

By: _____
Maximilien Barton
President

5

Sendera Title
GF#_ 22DD2692 - VUTA

07.

# SUBORDINATION AGREEMENT
(Fee Interest)

| THE STATE OF TEXAS | ☐ | |
| | ☐ | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DALLAS | ☐ | |

This Subordination Agreement is made and entered into to be effective **August 23, 2022,** by **BROADVIEW HOLDINGS, LLC,** a Texas limited liability company, the owner and holder of the lien or security interest hereinafter described and is given for the purposes and considerations hereinafter expressed.

RECITALS

(1) The undersigned is the owner and holder of the following described lien or security interest: (such lien or security interest being hereinafter referred to as the "Lien").

Deed of Trust from GILLESPIE VILLAS, LLC, a Texas limited liability company to Randy P. Marx, trustee, fbo Broadview Holdings, LLC, dated May 11, 2022, filed May 17, 2022, recorded in Clerk's File Instrument Number:  2022 001 387 17, Deed of Trust Records of Dallas County, Texas, securing a note in the principal sum of $1,400,000.00, payable to BROADVIEW HOLDINGS, LLC, and securing other indebtedness as described therein, if any, encumbering the Property (herein so called, as described therein, and herein, on **Exhibit A** hereto); together with:

Vendor's lien retained in Special warranty Deed With Vendor's Lien dated May 11, 2022, to Gillespie Villas, LLC, a Texas limited liability company, . dated May 11, 2022, filed May 17, 2022, recorded in Clerk's File Instrument Number: 202200138694 Deed Records of Dallas County, Texas, securing a note in the principal sum of $1,400,000.00, payable to BROADVIEW HOLDINGS, LLC, and securing other indebtedness as described therein, if any, encumbering the Property (herein so called, as described therein, and herein, on **Exhibit A** hereto); and

**UCC Financing Statement executed by Gillespie Villas, LLC, as Debtor to Broadview Holdings, LLC, as Secured Party, filed May 18, 2022, recorded under Instrument No. 202200141259, of the Official Public Records of Dallas County, Texas.**

(2) The undersigned desires to subordinate the Lien to the following described interest, security interest or lien (hereinafter referred to as the "Superior Interest"):

1

APP000152

2022 - 202200229929  08/24/2022  03:41 PM  Page 2 of 5

Deed of Trust from GILLESPIE VILLAS, LLC, a Texas limited liability company to **Xue Zhen Fang-Lu**, Trustee for the benefit of **XIAO-EN FANG**, dated August 2 4 2022, filed contemporaneously herewith the 2 4 day of August, 2022, recorded in <u>Clerk's File Instrument Number:</u> 2022 00229790, Deed of Trust Records of Dallas County, Texas, securing a note in the principal sum of $550,000.00, payable to XIAO-EN FANG, and encumbering the Property.

     **NOW, THEREFORE**, the undersigned, the present owner(s) and holder(s) of the Lien, for valuable and sufficient consideration paid this date, the receipt and adequacy of which is hereby acknowledged, do/does hereby agree that the Lien shall be and is hereby made subordinate, subject and inferior to the Superior Interest; and in the event of foreclosure (or other sale or liquidation of the Lien pursuant to judicial, non-judicial, private or other proceedings) and the sale of the collateral (whether real property, personal property or otherwise) covered by the Lien pursuant to such foreclosure, it is agreed that the Superior Interest, and any renewal, extension, amendment or alteration thereof, as the case may be, shall in no wise be effected thereby.

Except as expressly provided herein, the Lien shall not otherwise be impaired or further subordinated hereby.

EXECUTED to be effective August **2 3**, 2022.


**BROADVIEW HOLDINGS, LLC,**
a Texas limited liability company

By: _____
Timothy L. Barton, President


STATE OF TEXAS       ☐
COUNTY OF DALLAS    ☐


     THIS INSTRUMENT ACKNOWLEDGED before me, the undersigned authority, on this 23 day of August, 2022, by Timothy L. Barton, President of BROADVIEW HOLDINGS, LLC, a Texas limited liability company, on behalf of said corporation.

                              _____
Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

                              Notary Public, State of Texas
                              Printed name: Bella D Khusal
                              Commission expires: 09/24/2022

Exhibit A:  legal description

2

**AFTER RECORDING RETURN TO:**

Lender
c/o

Julie Lyssy,
Escrow Officer
**SENDERA TITLE**
**1800 Valley View Ln. # 160**
**Farmers Branch, Texas 75234**
jlyssy@senderatitle.com
Tel 972-428-2855
Fax 972-428-2901

3

APP000154

**EXHIBIT A**
**(LEGAL DESCRIPTION)**

**LEGAL DESCRIPTION OF LAND**

Being a tract of land situated in the J.A. Sylvester Survey, Abstract No. 1383, City of Dallas Block 1029, Dallas County, Texas, said being that tract of land conveyed to Kay Baker and Dale Baker by Last Will and Testament recorded in Volume 134, Page 710, Deed Records, Dallas County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod found at the South corner of a tract of land conveyed to Hossein G. Tabatabaie by Deed recorded in Instrument No. 200600280527, Official Public Records, Dallas County, Texas, said point being on the Northwest right-of-way line of Hood Street (40 foot right-of-way);

THENCE South 44 degrees 46 minutes 05 seconds West, along said Northwest right-of-way line of Hood Street, a distance of 132.07 feet to a point for corner at the intersection of said Northwest right-of- way line of Hood Street and the Northeast right-of-way line of Gillespie Street (40 foot right-of-way);

THENCE North 43 degrees 35 minutes 00 seconds West, along said Northeast right-of-way line of Gillespie Street, a distance of 64.05 feet to a 1/2 inch iron rod found at the South corner of Lot 2, Block A/1029 of Gillespie Tract, an Addition to the City of Dallas, Dallas County, Texas, according to the map recorded in Volume 2004110, Page 19, Map Records, Dallas County, Texas;

THENCE North 44 degrees 46 minutes 40 seconds East, along the Southeast line of said Lot 2, Block A/1029, passing at a distance of 111.23 feet, a 1/2 inch iron rod found at the common East corner of Lot 4 and the South corner of Lot 5 of said Block A/1029 and continuing for a total distance of 131.78 feet to a point for corner at the West corner of the aforementioned Tabatabaie tract;

THENCE South 43 degrees 50 minutes 26 seconds East, along the Southwest line of said Tabatabaie tract, a distance of 64.02 feet to the POINT OF BEGINNING and containing 8,445 square feet or 0.193 of an acre of land.

*Memo only:*
*3600 Gillespie, Dallas, Dallas County TX 75219*
*GF No. 424803*
*Survey Date: May 9, 2004*
*(at times, Lot 10, Block 1029)*
*DCAD Account: 138-784 000 000*

4

2022-202200229929 08/24/2022 3:45 PM Page 5 of 5

**Dallas County**
**John F. Warren**
**Dallas County Clerk**

**Instrument Number:**   202200229929

eRecording - Real Property

Recorded On: August 24, 2022 03:41 PM                    Number of Pages: 5

**" Examined and Charged as Follows: "**

Total Recording: $38.00

**\*\*\*\*\*\*\*\*\*\*\* THIS PAGE IS PART OF THE INSTRUMENT \*\*\*\*\*\*\*\*\*\*\***
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**                                      **Record and Return To:**
Document Number:      202200229929              Simplifile
Receipt Number:         20220824000899
Recorded Date/Time:   August 24, 2022 03:41 PM
User:                          Kevin T
Station:                      CC18



**STATE OF TEXAS**
**COUNTY OF DALLAS**
**I hereby certify that this Instrument was** FILED **In the File Number sequence on the date/time**
**printed hereon, and was duly** RECORDED **in the Official Records of Dallas County, Texas.**

John F. Warren
Dallas County Clerk
Dallas County, TX

# EXHIBIT A-11

APP000157

CORPORATE ENTITY LIST     Case 3:22-cv-02118-X   Document 7-1   Filed 09/26/22   Page 23 of 100   PageID 167          5/24/2021

| # | Corporate Entity Name |
|---|---|
| 1 | 126 VILLITA, LLC |
| 2 | 2999TC ACQUISITIONS MZ, LLC |
| 3 | 2999TC ACQUISITIONS, LLC |
| 4 | 2999TC FOUNDERS, LLC |
| 5 | 2999TC JMJ CMGR, LLC |
| 6 | 2999TC JMJ EQUITY, LLC |
| 7 | 2999TC JMJ MGR, LLC |
| 8 | 2999TC JMJ, LLC |
| 9 | 2999TC LP, LLC |
| 10 | 2999TC MM, LLC |
| 11 | 2999TC MZ, LLC |
| 12 | AVEG WW, LLC |
| 13 | BARTON TEXAS WATER DISTRICT, LLC |
| 14 | BARTON WATER DISTRICT LLC |
| 15 | BC ACQUISITIONS, LLC |
| 16 | BEE2019, LLC |
| 17 | BM318 LLC |
| 18 | BROADVIEW HOLDINGS, LLC |
| 19 | CARNEGIE DEVELOPMENT  LLC |
| 20 | CARNEGIE FINANCE, LLC |
| 21 | CYNKFP, LLC |
| 22 | D4AT LLC |
| 23 | D4AVEG LLC |
| 24 | D4BM LLC |
| 25 | D4BR, LLC |
| 26 | D4DS LLC |
| 27 | D4FR LLC |
| 28 | D4IN, LLC |
| 29 | D4KL LLC |
| 30 | D4MC LLC |
| 31 | D4OP LLC |
| 32 | D4OPM, LLC |
| 33 | D4SMC, LLC |
| 34 | D4WP LLC |
| 35 | DALLAS REAL ESTATE INVESTORS LLC |
| 36 | DALLAS REAL ESTATE LENDERS, LLC |
| 37 | DALLAS REAL ESTATE MANAGEMENT, LLC |
| 38 | DJD LAND PARTNERS, LLC |
| 39 | ENOCH INVESTMENTS, LLC |
| 40 | FHC ACQUISITION, LLC |
| 41 | FIVE STAR GM, LLC |
| 42 | FIVE STAR MM, LLC |
| 43 | FIVE STAR MM, LLC |
| 44 | FIVE STAR TC, LLC |
| 45 | GOLDMARK HOSPITALITY LLC |
| 46 | ILLUMINATE DALLAS, LLC |
| 47 | JMJ ACQUISITIONS MANAGEMENT LLC |
| 48 | JMJ ACQUISITIONS, LLC |
| 49 | JMJ CENTRE LLC |
| 50 | JMJ DEVELOPMENT FUND INC |
| 51 | JMJ DEVELOPMENT INC. (LLC) |
| 52 | JMJ HOLDING US LLC |
| 53 | JMJ HOLDINGS LLC |
| 54 | JMJ HOLDINGS USA, INC. |
| 55 | JMJ HOME BUILDING, INC. |
| 56 | JMJ HOSPITALITY, LLC |
| 57 | JMJ LAND ACQUISITIONS, INC. |
| 58 | JMJ LAND DEVELOPMENT, INC. |
| 59 | JMJ MEZZANINE, INC. |
| 60 | JMJ MF DEVELOPMENT, LLC |
| 61 | JMJ MULTIFAMILY, INC. |
| 62 | JMJ RESIDENTIAL, LLC |
| 63 | JMJ VALLEY CENTER LLC |
| 64 | JMJ VC MANAGEMENT LLC |
| 65 | JMJAV LLC |
| 66 | JMJD4 LLC |
| 67 | JMJD4ALLENSVILLE, LLC |
| 68 | JMJKH, LLC |
| 69 | JMR100, LLC |
| 70 | LAJOLLA CONSTRUCTION MANAGEMENT, LLC |
| 71 | LC ALEDO TX, LLC |

EXHIBIT
1

APP023

EXHIBIT
JH 5-24-2021
73
JMJ, FW-04420

Page 1 of 2

APP000158

CORPORATE ENTITY LIST       Case 3:22-cv-02118-X   Document 7-1   Filed 09/26/22   Page 24 of 100   PageID 168       5/24/2021

| # | Corporate Entity Name |
|---|---|
| 72 | LDG001, LLC |
| 73 | LYNN INVESTMENTS, LLC |
| 74 | MANSIONS APARTMENT HOMES AT MARINE CREEK LLC |
| 75 | MCFW, LLC |
| 76 | MCRS2019, LLC |
| 77 | MYRA PARK 635, LLC |
| 78 | NORTHSTAR PM, LLC |
| 79 | NORTHSTAR114, LLC |
| 80 | ONE AGENT TEXAS, LLC |
| 81 | ONE AGENT, LLC |
| 82 | ONE FHC, LLC |
| 83 | ONE MFD4, LLC |
| 84 | ONE PASS INVESTMENTS, LLC |
| 85 | ONE SF RESIDENTIAL, LLC |
| 86 | ORCHARD FARMS VILLAGE, LLC |
| 87 | RIDGEVIEW ADDITION, LLC |
| 88 | SEAGOVILLE FARMS, LLC |
| 89 | SF ROCK CREEK, LLC |
| 90 | SK CARNEGIE LLC |
| 91 | STL PARK, LLC |
| 92 | TRWF LLC |
| 93 | TRWF LODGE LLC |
| 94 | VENUS59, LLC |
| 95 | VENUSBK195, LLC |
| 96 | VENUSPARK201, LLC |
| 97 | VILLITA TOWERS LLC |
| 98 | WALL007 LLC |
| 99 | WALL009 LLC |
| 100 | WALL010 LLC |
| 101 | WALL011 LLC |
| 102 | WALL012 LLC |
| 103 | WALL016 LLC |
| 104 | WALL017 LLC |
| 105 | WALL018 LLC |
| 106 | WALL019, LLC |
| 107 | WRL2019, LLC |

**APP024**

APP000159

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803639280 06/04/2020
Document #: 974390580004
Image Generated Electronically
for Web Filing**

---

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**ONE SF Residential, LLC**

### Article 2 – Registered Agent and Registered Office

☑ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**ONE Agent Texas, LLC**

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**13901 Midway Rd**
**Suite 102  Dallas  TX  75244-75244**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name)  **ONE Pass Investments, LLC**

Address:  **13901 Midway Rd   Suite 102  Dallas  TX, USA  75244-75244**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Krista Vassallo**          **13901 Midway Rd Suite 102 Dallas TX 75244**

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Krista Vassallo**

Signature of Organizer

FILING OFFICE COPY

APP000162

# Texas Franchise Tax Public Information Report

Comptroller of Public Accounts FORM 05-102 (Rev.9-11/30)

**Tcode** 13196 Franchise

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

■ Taxpayer number: 3 2 0 7 4 5 2 2 1 5 5

■ Report year: 2 0 2 1

**You have certain rights** under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.

| Field | Value |
|---|---|
| Taxpayer name | **ONE SF RESIDENTIAL, LLC** |
| Mailing address | **13901 MIDWAY RD STE 102** |
| City | **DALLAS** |
| State | **TX** |
| ZIP Code | **75244** |
| Plus 4 | |
| Secretary of State (SOS) file number or Comptroller file number | **0803639280** |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office

Principal place of business

*Please sign below!* Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3207452215521

**SECTION A**   Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | Term expiration m m d d y y |
|---|---|---|---|
| **ONE PASS INVESTMENTS** | **Manager** | ○ YES | |
| Mailing address **13901 MIDWAY RD SUITE 102** | City **Dallas** | State **TX** | ZIP Code **75244** |
| Name | Title | ○ YES | Term expiration |
| Mailing address | City | State | ZIP Code |
| Name | Title | ○ YES | Term expiration |
| Mailing address | City | State | ZIP Code |

**SECTION B**   Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C**   Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(see instructions if you need to make changes)*

Agent: **ONE AGENT TEXAS, LLC**

○ Blacken circle if you need forms to change the registered agent or registered office information.

| Office: **13901 MIDWAY RD SUITE 102** | City **DALLAS** | State **TX** | ZIP Code **75244** |
|---|---|---|---|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Title | Date | Area code and phone number |
|---|---|---|---|
| **Saskya Bedoya** | **Electronic** | **06-14-2021** | **( 214 ) 641 - 0122** |

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|

APP000163

# EXHIBIT A-12

APP000164

# Venus59, LLC

# Texas

APP000165

EIN

IRS DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH 45999-0023

Date of this notice: 06-11-2020

Employer Identification Number:
85-1392580

Form: SS-4

Number of this notice: CP 575 B

VENUS59 LLC
TIM BARTON MBR
13901 MIDWAY RD STE 102
DALLAS, TX 75244

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN). We assigned you
EIN 85-1392580. This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees. Please keep this notice in your permanent
records.

When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above. Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN. If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

                    Form 1065                          03/15/2021

If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice. If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods*.

We assigned you a tax classification based on information obtained from you or your
representative. It is not a legal determination of your tax classification, and is not
binding on the IRS. If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue). Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election*. See Form 8832 and its instructions for additional information.

A limited liability company (LLC) may file Form 8832, *Entity Classification
Election*, and elect to be classified as an association taxable as a corporation. If
the LLC is eligible to be treated as a corporation that meets certain tests and it
will be electing S corporation status, it must timely file Form 2553, *Election by a
Small Business Corporation*. The LLC will be treated as a corporation as of the
effective date of the S corporation election and does not need to file Form 8832.

To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov. If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

APP000167

```
(IRS USE ONLY)    575B              06-11-2020   VENU   B   9999999999   SS-4
```

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records. **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.** You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is VENU. You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

Keep this part for your records.          CP 575 B (Rev. 7-2007)

--------------------------------------------------------------------------------

Return this part with any correspondence
so we may identify your account.  Please                        CP 575 B
correct any errors in your name or address.
                                                            9999999999

Your Telephone Number  Best Time to Call   DATE OF THIS NOTICE:  06-11-2020
(     )      -                              EMPLOYER IDENTIFICATION NUMBER:  85-1392580
_____  _____         FORM:  SS-4            NOBOD

INTERNAL REVENUE SERVICE                   VENUS59 LLC
CINCINNATI  OH   45999-0023                TIM BARTON MBR
Inlilddlildldlldlldlmmddlldldldl           13901 MIDWAY RD STE 102
                                           DALLAS, TX  75244

APP000168

6/11/2020                                                 EIN Individual Request - Online Application



**EIN Assistant**

| Your Progress: | 1. Identity | 2. Authenticate | 3. Addresses | 4. Details | **5. EIN Confirmation** |
|---|---|---|---|---|---|

**Summary of your information**

Please review the information you are about to submit. If any of the information below is incorrect, you will need to start a new application.

Click the "Submit" button at the bottom of the page to receive your EIN.

**Help Topics**

❓ What is Form 1128?

**Organization Type: LLC**

### LLC Information

| | |
|---|---|
| Legal name: | **VENUS59 LLC** |
| County: | **DALLAS** |
| State/Territory: | **TX** |
| Start date: | **JUNE 2020** |
| Closing month of accounting year: | **DECEMBER** (The closing month of the accounting year is defaulted to December due to your organization type. To change your closing month of accounting year, complete Form 1128.) |
| State/Territory where articles of organization are (or will be) filed: | **TX** |

### Addresses

| | |
|---|---|
| Physical Location: | **13901 MIDWAY RD STE 102** |
| | **DALLAS TX 75244** |
| Phone Number: | **972-385-9934** |

### Responsible Party

| | |
|---|---|
| Name: | **TIM BARTON MBR** |
| SSN/ITIN: | **XXX-XX-1728** |

### Principal Business Activity

| | |
|---|---|
| What your business/organization does: | **REAL ESTATE** |
| Principal products/services: | **REAL ESTATE PROPERTY MANAGEMENT** |

### Additional LLC Information

| | |
|---|---|
| Owns a 55,000 pounds or greater highway motor vehicle: | **NO** |
| Involves gambling/wagering: | **NO** |
| Involves alcohol, tobacco or firearms: | **NO** |
| Files Form 720 (Quarterly Federal Excise Tax Return): | **NO** |
| Has employees who receive Forms W-2: | **NO** |
| Reason for Applying: | **STARTED A NEW BUSINESS** |

We strongly recommend you print this summary page for your records as this will be your only copy of the application. You will not be able to return to this page after you click the "Submit" button.

Click "Submit" to send your request and receive your EIN.  Once you submit, please wait while your application is being processed. It can take up to two minutes for your application to be processed.

**APP000169**



## EIN Assistant

| Your Progress: | 1. Identity | 2. Authenticate | 3. Addresses | 4. Details | **5. EIN Confirmation** |

### Additional Information about your EIN

We suggest you print this page for your records.

**When Can You Use Your EIN?**

This EIN is your permanent number and can be used immediately for most of your business needs, including:

- Opening a bank account
- Applying for business licenses
- Filing a tax return by mail.

However, it will take up to two weeks before your EIN becomes part of the IRS's permanent records. You must wait until this occurs before you can:

- File an electronic return
- Make an electronic payment
- Pass an IRS Taxpayer Identification Number (TIN) matching program.

**Next Steps (for LLC)?**

If you do not wish to accept the default status of either partnership or disregarded entity, you can file:

- Form 8832 (Entity Classification Election). This form must be completed in a timely manner to receive corporation status. See the instructions for complete information.
- Form 2553 (Election by a Small Business Corporation).This form must be completed in a timely manner to receive S corporation status. See the instructions for complete information.

**Acceptance or Non-Acceptance of Election**

- The service center will notify the LLC as to the acceptance or non-acceptance of its election. The LLC should generally receive a determination on its election within 60 days after it has filed Form 8832 or Form 2553.
- Do not file Form 1120 (U.S. Corporation Income Tax Return) or Form 1120S (U.S. Income Tax Return for an S Corporation) until you receive notification of your acceptance.

You can download IRS forms, publications, and tax returns at http://www.irs.gov/formspubs

**Corrections?**

If you need to make changes to your organization's information, you must do so in writing and mail the information to the address provided at https://www.irs.gov/businesses/business-name-change.

#### Help Topics

- ❓ What is Form 8832?
- ❓ What is Form 2553?

[ << Back ]          [ Continue >> ]

APP000170

Certificate of State

APP000171

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803635526 06/01/2020
Document #: 973624300002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## <u>Venus59, LLC</u>

### Article 2 – Registered Agent and Registered Office

☑ A. The initial registered agent is an organization (cannot be company named above) by the name of:

## ONE Agent Texas, LLC

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**13901 Midway RD**
**Suite 102  Dallas TX  75244**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **JMJ Residential, LLC**

Address: **13901 Midway Rd   Suite 102  Dallas  TX, USA  75244-75244**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

**APP000171A**

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Krista LaGrange Vassallo**     <u>**1755 Wittington Place Suite 340 Dallas TX 75234**</u>

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

## OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Krista LaGrange Vassallo**

Signature of Organizer

**FILING OFFICE COPY**

**APP000171B**

### COMPANY AGREEMENT OF
### Venus59, LLC,
### A TEXAS LIMITED LIABILITY COMPANY

This Company Agreement of **Venus59, LLC**, a Texas limited liability company is executed as of JUNE 01, 2020 (the "Effective Date") by the persons who sign and are identified as "Members" and "Managers" in this Agreement.

### ARTICLE I
### DEFINITIONS

1.01 Definitions. As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property

APP000172

other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means **Venus59, LLC**, a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

APP000173

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement.  The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01  **Formation.**  The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02  **Name.**  The name of the Company is " **Venus59, LLC** " and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03  **Registered Office and Registered Agent.**  The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law.  The registered agent of the Company in the State of Texas shall be the initial registered agent

APP000174

named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

2.05 **Purposes.** The primary purposes of the Company shall be any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06 **Powers.** The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09 **Mergers and Exchanges.** The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10 **No State-Law Partnership.** The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

**ARTICLE III**
**MEMBERSHIP**

3.01 **Initial Members, Capital Commitments, and Percentage Interests.** The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company.

APP000175

Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company.  Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws.  The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02   **Additional Members.**   Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by unanimous consent of the Managers.  The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto.  The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties.  The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Managers.

3.03   **Member Rights Specified in Agreement.**   Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04   **Representations and Warranties.**   Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity:  (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05   **No Authority.**   Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06   **Liability to Third Parties.**   No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07   **Withdrawal.**   A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

APP000176

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

4.02 **No Further Contributions.** No Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Loans by Members.** If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests,

APP000177

regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired.   On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

# ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01   **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken.   If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

5.02   **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve.   If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Percentage Interests, an amount

APP000178

in cash equal to that excess.

(b) From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

(c) For the purpose of determining the Members entitled to receive a distribution as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the distribution is taken. If no record date is fixed, then the date on which the Managers take action to authorize such a distribution pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

## ARTICLE VI
## MANAGEMENT

6.01 **Designation of Manager and Management by Managers.** JMJ Residential, LLC is hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder, including a Fundamental Business Transaction;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c) maintaining the assets of the Company in good order;

(d) collecting sums due the Company;

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes, and disposing of any asset of the Company;

(g) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

APP000179

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(i) obtaining insurance for the Company;

(j) determining distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(k) establishing a seal for the Company; and

(l) designating one or more committees, each of which shall be comprised of one or more Managers, to exercise any authority of the Managers in the management, business and affairs of the Company.

6.02   **Restrictions.**  Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) do any act which requires the prior approval of the Members;

(e) possess Company property or assign rights in Company property, other than for a Company purpose; or

(f) amend this Agreement, except as expressly permitted by this Agreement.

6.03   **Conflicts of Interest.**  Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

6.04   **Contracts or Transactions with Interested Directors or Officers.**  This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers,

APP000180

or of a committee of the Managers, Members or officers that authorizes the contract or transaction, or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if: (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by (a) the Managers, Members or officers or a committee of the Managers, Members or officers and the Managers, Members or officers or committee in good faith authorize the contract or transaction by the affirmative vote of the majority of the disinterested Managers, Members or officers or committee members, regardless of whether the disinterested Managers, Members or officers or committee members constitute a quorum; or (b) the Members of the Company, and the Members in good faith approve the contract or transaction by vote of the Members; or (2) the contract or transaction is fair to the Company when the contract or transaction is authorized, approved, or ratified by the Managers, Members or officers, a committee of the Managers, Members or officers, or the Members of the Company.

6.05   **Number and Term of Office.**   The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers.  If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal.  Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06   **Vacancies; Removal; Resignation.**   Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled by election at an annual or special meeting of Members called for that purpose.  A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office.  At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by a Super Majority.  Any Manager may resign at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07   **Compensation**.   For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by a Simple Majority of the Members.

6.08   **Reimbursement**.  The Managers are not required to advance any funds to pay costs and expenses of the Company.  However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities.

6.09   **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in,

APP000181