**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff,* | § § § | |
| **v.** | § § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON,** | § § | |
| **CARNEGIE DEVELOPMENT, LLC,** | § | |
| **WALL007, LLC,** | § | |
| **WALL009, LLC,** | § | |
| **WALL010, LLC,** | § | |
| **WALL011, LLC,** | § | |
| **WALL012, LLC,** | § | |
| **WALL016, LLC,** | § | |
| **WALL017, LLC,** | § | |
| **WALL018, LLC,** | § | |
| **WALL019, LLC,** | § | |
| **HAOQIANG FU (A/K/A MICHAEL FU),** | § | |
| **STEPHEN T. WALL,** | § § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC, and** | § | |
| **LDG001, LLC,** | § § | |
| *Relief Defendants.* | § | |

### RECEIVER'S RESPONSE TO BARTON'S MOTION TO STAY PENDING APPEAL

Respectfully submitted,

Charlene C. Koonce
  State Bar No. 11672850
  charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................ 1

II.   ARGUMENT AND AUTHORITIES ................................................................................ 2

      A.     A Stay Is *Highly* Impractical and Would Result in Lost Value,
           Uncertainty, and Injury to Tenants and Creditors.................................................... 2

      B.     The Assets Are Potentially Far Short of the Investors' Loss.................................. 5

      C.     The Necessity of Sales, Including the Rock Creek Property .................................. 7

      D.     Privilege As an Excuse to Hold IT Credentials Hostage ...................................... 10

      E.     Documents Have Not and Will Not Be Shredded ................................................. 12

      F.     The Receiver's Efforts, Qualifications, and Continued Service ........................... 14

III.  CONCLUSION ................................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**

*Esbitt v. Dutch-Am. Mercantile Corp.*,
  335 F.2d 141 (2d Cir. 1964) ................................................................................. 2

*FTC v. Consumer Def., LLC*,
  No. 2:18-CV-30 JCM (PAL), 2019 WL 266287 (D. Nev. Jan. 18, 2019) ................................. 8

*FTC v. Johnson*,
  No. 2:10-CV-02203-RLH, 2011 WL 3841039 (D. Nev. Aug. 26, 2011)................................... 8

*FTC v. Nationwide Connections, Inc.*,
  No. 06-80180-CIV, 2009 WL 10669554 (S.D. Fla. Apr. 24, 2009), *report and
  recommendation adopted*, No. 06-80180-CIV, 2009 WL 10668727
  (S.D. Fla. May 19, 2009) ..................................................................................... 14

*In re Pressman-Gutman Co.*,
  459 F.3d 383 (3d Cir. 2006) ................................................................................. 1

*Netsphere, Inc. v. Baron*,
  799 F.3d 327 (5th Cir. 2015) ................................................................................. 1

*Porter v. Sabin*,
  149 U.S. 473 (1893)........................................................................................... 14

*SEC v. Bowler*,
  427 F.2d 190 (4th Cir. 1970) ................................................................................. 2

*SEC v. Elfindepan, S.A.*,
  169 F. Supp. 2d 420 (M.D.N.C. 2001) ..................................................................... 14

*SEC v. Faulkner*,
  No. 3:16-CV-1735-D, 2018 WL 4362729 (N.D. Tex. Sept. 12, 2018) ................................. 2, 3

*SEC v. TLC Investments & Trade Co.*,
  147 F. Supp. 2d 1031 (C.D. Cal. 2001) ..................................................................... 9

*Stuart v. Boulware*,
  133 U.S. 78 (1890)............................................................................................. 14

*Tanzer v. Huffines*,
  408 F.2d 42 (3d Cir. 1969) ................................................................................... 2

*US v. Solco, LLC*,
  962 F.3d 1244 (10th Cir. 2020) .............................................................................. 1

*WB Music Corp. v. Royce Int'l Broad. Corp.*,
   47 F.4th 944 (9th Cir. 2022) ............................................................................................... 13

**Codes**

TEX. BUS. & COM. CODE § 24.010 ............................................................................................... 5

Cort Thomas, as Receiver, responds to Barton's Motion to Stay Pending Appeal (the "Motion") [Dkt. 71], and in support, respectfully shows the Court as follows:

## I.    **INTRODUCTION**

In a Motion divorced from hard, but undisputable facts, Barton seeks a stay of the Order Appointing Receiver [Dkt. 29] (the "Receivership Order"), the Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62], and the Order Granting Motion for Order Governing Administration of Receivership Estate, Etc. and Approving Disposition of Certain Personal Property [Dkt. 63], premised on his appeal of all three orders.[1]  In the alternative,  Barton seeks a stay of the Receivership Order to the extent it permits "the Receiver to liquidate assets, review documents that are privileged without a protocol to ensure that this information is not shared with the Government, to destroy records and property that are essential to the preparation of a defense in the criminal prosecution pending against Mr. Barton, to seize the property of non-defendant entities, and to keep Mr. Barton out of his personal home."  Motion at 2.

On December 1, 2022, the Court entered an Order [Dkt. 75] directing the SEC to file a Response on or before December 9 and permitting the Receiver to file a response within that timeframe as well.  To the extent the motion to stay essentially asks the Court to reconsider the appointment of a Receiver in the first place, the Securities and Exchange Commission ("SEC") is the proper party to respond.  However, because a stay at this juncture would have an immense

---

[1] On November 18, 2022, Barton appealed the Receivership Order.  [Dkt. 66]. The Notice of Appeal also purports to appeal the Court's denial of Barton's Motion to Amend or Correct the Receivership Order [Dkt. 33], the Court's order granting the Motion to Supplement [Dkt. 62] and Order Granting Motion for Administrative Procedures. [Dkt. 63]. Notably, however, no appellate jurisdiction exists for an interlocutory appeal of any order except the Receivership Order.  *See US v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) ("'Courts narrowly construe § 1292(a)(2) ("to permit appeals only from the three discrete categories of receivership orders specified in the statute, namely [1] orders appointing a receiver, [2] orders refusing to wind up a receivership, and [3] orders refusing to take steps to accomplish the purposes of winding up a receivership.'") (quoting *In re Pressman-Gutman Co.*, 459 F.3d 383, 393 (3d Cir. 2006) (quotations omitted)); *see also Netsphere, Inc. v. Baron*, 799 F.3d 327, 331-32 (5th Cir. 2015)  (every circuit to address the meaning of § 1292(a)(2)'s 'refusing orders' interprets it to "permit[ ] appeals only from orders 'refusing ... to take steps to accomplish the purposes of [winding up receiverships].'").

impact on the Receiver's efforts and the preservation of the assets in the Receivership Estate, the Receiver has determined a response is necessary. Accordingly, this Response addresses the *many* factual inaccuracies in the Motion, the harm that would arise in the event of a stay, and the practical factors that militate against such a stay.

## II. ARGUMENT AND AUTHORITIES

### A. A Stay Is *Highly* Impractical and Would Result in Lost Value, Uncertainty, and Injury to Tenants and Creditors

With his Motion to Stay, it is unclear whether Barton proposes that he should resume control of the Receivership Entities or whether he simply seeks a limited stay of the Receiver's ability to sell assets or something entirely different. *See generally* Motion. As to the former, Barton cannot and should not be reinstated into his prior roles with the Receivership Entities. Barton makes no attempt to deny operating the more than 140 entities he controlled using investor assets. This implicit admission, particularly when coupled with evidence regarding the potential shortfall between Receivership Assets and the Investors' loss discussed below,[2] demonstrates the propriety of Barton's removal from continued control over the Receivership Entities and their assets. *See SEC v. Faulkner*, No. 3:16-CV-1735-D, 2018 WL 4362729, at *4 (N.D. Tex. Sept. 12, 2018) ("The court therefore finds that appointing a receiver over [defendant] is necessary to preserve assets for future disgorgement to investors—particularly given [defendant's] past pattern of substantive securities law violations—that other legal and equitable remedies are insufficient, and that the benefits of receivership outweigh the burdens.").[3] Additionally, and as discussed

---

[2] Barton's *assertions* of value, devoid of context and material facts regarding competing claims and outstanding liens, are not evidence. Nor are the assertions credible.

[3] *See also SEC v. Bowler*, 427 F.2d 190, 198 (4th Cir. 1970) ("[A] receiver is permissible and appropriate where necessary to protect the public interest and where it is obvious . . . that those who have inflicted serious detriment in the past must be ousted."); *Tanzer v. Huffines*, 408 F.2d 42, 43 (3d Cir. 1969) ("A receiver may be appointed to avert further loss of assets through waste and mismanagement."); *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F.2d 141, 142–43 (2d Cir. 1964) (explaining the "primary purpose of appointing a receiver is to conserve the existing estate" and

further below, Barton's lack of candor in the Motion and prior filings specifically surrounding the value of the Receivership properties and operational challenges facing the Receiver alone disqualifies Barton from continuing in control of any Receivership Entities from which any recovery for the investors, and the long, long line of creditors will hopefully be obtained. *See Faulkner*, No. 3:16-CV-1735-D, 2018 WL 4362729, at *4. Yet as going concerns, the Receivership Entities and the properties they own, or in which they hold ownership claims, require oversight. A stay would prohibit oversight, development, and potentially sales.

Similarly, even if Barton seeks a limited stay as to the Receiver's ability to liquidate assets, such a stay simply is not feasible, nor would it be in any of the interested parties' interest. Many of the Receivership Entities' already have continuing, urgent operational requirements that have been greatly exacerbated by the dearth of cash available to the Receivership Estate to date. By way of example only, Receivership Entity Goldmark Hospitality, LLC is the record owner of an extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites"). Ex. A, Declaration of Cortney. C. Thomas (Dec. 9, 2022) ("Thomas Decl.") ¶ 4 (APP000002). In the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, at least in part, because of a large number of vacant units, the generally poor condition of some of the units, and the general mismanagement by Barton and his son Maximilien Barton ("Max"). *Id.* ¶ 4 (APP000002). Within days of his appointment, the Receiver learned that insurance on the property was on the verge of cancellation for non-payment, shut off notices for the electricity had been received, significant water bills were owed, and at least one vendor was owed over $16,000 for months of unpaid invoices related to HVAC maintenance and repairs. *Id.* ¶ 5 (APP000003). A

---

without a receiver in place to "promptly marshal[] [assets] to provide a fund from which defrauded investors may be at least partially reimbursed, there is a strong possibility that these assets will be dissipated or wasted.").

full-time property manager and maintenance person are necessary employees, as is a contracted security officer (though to date the Receiver has been unable to afford to hire a security service for the Amerigold Suites, and the prior security service had been terminated prior to issuance of the Receivership Order).  *Id.* ¶ 6 (APP000003).  The stay of collection or foreclosure efforts by creditors in the Receivership Order has allowed the Receiver to pause payment on the mortgage, thereby freeing up sufficient funds to pay the past due electric bills and bring the account current, preventing cancellation.  *Id.* ¶ 7 (APP000003).  However, such a stay cannot continue forever, and interest on the loan continues to accrue daily.  *Id.*  The Receiver was also able to secure new, albeit expensive, insurance for the property and negotiate with the Dallas City Attorney's Office to prevent termination of water service.  *Id.* ¶ 8 (APP000003).  Oversight and management is required to ensure continued habitability for this occupied property, as well as paying the employees and attempting to increasing its occupancy to generate additional value for the Receivership Estate. *Id.* ¶ 8 (APP00003).

A second example is Receivership Entity D4OP, LLC, which owns an Alabama apartment complex that is still under construction and is financed in part by a HUD loan.[4]  HUD's involvement requires extensive regulatory approval and cost certification, absent which, the project could face default and significant penalties.   The Receiver must provide continued oversight to ensure this project does not lapse so that its value can be captured.  *Id.* ¶ 9 (APP000003-4).

Moreover, all of the Properties identified in the Receiver's Initial Status Report have extensive debt and property tax obligations that will continue to accrue during the pendency of any

---

[4] As discussed below, Pillar Asset Management claims that it owns all of the equity in this project and that the Receivership Estate holds none of the equity.

stay. *See generally* Dkt. 67. Even if the Court were willing to continue the stay on lenders' ability to foreclose on these loans indefinitely pending Barton's appeal, interest, taxes, and expenses will only continue to grow, and the Receiver must have a source of revenue to pay necessary expenses. *Id.* ¶ 10 (APP000004). Because Defendant Barton drained or otherwise appropriated all but approximately $75,000 of available cash away from the Receivership Entities' bank accounts, the Receiver has limited resources other than the liquidation of properties and contractual interests. *Id.* ¶ 10 (APP000004).

Finally, a stay would also create chaos in terms of the Receiver's ability to recover, monetize or manage non-real estate assets. For instance, the Receiver is already aware of certain transfers by the Receivership Entities that were almost certainly made without reasonably equivalent value. Yet the statute of repose for those claims is not subject to tolling. *See* TEX. BUS. & COM. CODE § 24.010. A stay would also present a host of other questions, including:

- how and from what would the Receiver pay continuing obligations, if he were in fact authorized to pay anything?

- are lawsuits involving third-parties (one of which was filed by a personal injury tort claimant arising from a fall at the Amerigold Suites) stayed indefinitely?

- would the Receiver be authorized to continue expending time responding to inquiries by the Investors, creditors, vendors, and others?

These, and a multitude of other similar issues preclude staying the Receivership.

**B.   The Assets Are Potentially Far Short of the Investors' Loss**

Perhaps the most flagrantly false assertion in the Motion is that "all parties acknowledge that there are more than enough assets in corporations associated with the defendant to cover any alleged liability associated with the loan agreements at issue in this case." Motion at 1. In support of his position, Barton attaches an unauthenticated Letter of Intent ("LOI") to purchase three Texas

5

apartment complexes—in DeSoto, Forney, and Corpus Christi—for $107 million.  Dkt. 72, pp. 4-9.  Although the Receiver agrees that selling these properties will be essential to *potentially* recovering sufficient funds to satisfy just the investor claims, what is once again notably absent from the LOI and Barton's discussion of the same is any reference to Pillar Asset Management ("Pillar").  As outlined in the Receiver's Initial Status Report, Pillar contends it provided a second loan to the Receivership Entities in connection with the development of each of the three Texas properties, in the total principal amount of $17.7 million.  Ex. A, Thomas Decl. ¶ 11 (APP000003). While the Receiver is still working to determine the current balance on the Pillar loans, Pillar asserts it exercised certain purported contractual rights to convert its loan rights in two of the Texas apartment complexes into an equity interest *such that the Receivership Entities purportedly no longer hold **any** ownership position in these properties*. *Id.* ¶ 11 (APP000004-5).  While the Receiver intends to oppose any attempt by Pillar to enforce any conversion rights, if Pillar is ultimately successful, these properties will result in a recovery of $0 to the Receivership Estate. *Id.*

Even if the Receiver succeeds in his efforts to treat Pillar's loans as loans, the Receiver still anticipates the net proceeds of any sale to amount to less than the $26 million that the SEC claims has been misappropriated.[5]  If the LOI obtained by Barton were ultimately executed, after accounting for total HUD debt (approximately $78.7 million), Pillar debt (approximately $17.7 million), and the 1% broker's commission (approximately $1.1 million), the Receiver estimates that the net benefit to the Receivership Estate would be $9.9 million before closing costs and other expenses.  *Id.* ¶ 12 (APP0000045This net benefit would only be realized after assumption of the

---

[5] The SEC claims that at least $26 million flowed into the Wall Entities from investors. *Complaint* ¶ 1.  That loss does not account for the many, many millions of dollars owed to judgement creditors, and creditors or claimants whose lawsuits are currently stayed by paragraph 34 of the Receivership Order is in place.  Thomas Decl. ¶ 12, n.1 (APP000005).

HUD loans that are currently in place, a process that is likely to take six months or more. *Id.*

Moreover, the LOI provided by Barton says nothing of the Pillar contingency, the need for Court

approval, or the process mandated by 28 U.S.C. § 2001, and it gives CEI broad assignment powers.

## C.    The Necessity of Sales, Including the Rock Creek Property

As noted in the Receiver's Initial Report, substantial disputes exist regarding the value and

ownership of other Receivership properties in addition to the three apartments discussed above,

with every property identified to date being encumbered by substantial loans and often other

competing liens and claims. The limited amount of cash available to the Receiver to manage these

properties—which have substantial worth but often equally substantial debt—only exacerbates the

issue. Extensive efforts to identify all Receivership Entity bank accounts have resulted in recovery

of less than $75,000 in cash to date, despite the fact that the Receiver is aware of several million

dollars in receipts flowing into the Receivership Entities during the last twelve months alone.

Thomas Decl. ¶ 13 (APP000005-6). Numerous and urgent bills, many long past due upon the

Receiver's appointment, compete for these extremely limited assets. *Id.* For instance, at the time

of appointment several properties, including the Amerigold Suites, had received shut off notices

from energy providers and trash collection services. *Id.* ¶ 13 (APP000005). Notices of

cancellation for property insurance on several properties were in the Receivership Entities' offices

when the Receiver entered to take possession and control. *Id.* The dearth of liquid assets has

presented and continues to present immense challenges in performing one of the Receiver's most

fundamental duties, securing and maintaining assets.[6] In short, absent an influx of cash *from the*

---

[6] In discovering, acknowledging, and reporting these difficulties the Receiver in no way agrees with Barton's
suggestions of incompetence and ineptitude. Instead, the Receiver seeks to diligently and competently inform the
Court of the challenges presented by Defendant Barton's actions that resulted in very limited funds in the Receivership
Entities' bank accounts as of October 18, 2022. In the face of these challenges, Barton continues to fail and/or refuse
to comply with virtually *any* of the Receivership Order's disclosure provisions, instead doubling down on far-fetched

*sale of something*, the value of the properties owned by the Receivership Entities are in jeopardy. *Id.* ¶ 13 (APP000006).

Barton's Motion to Stay focusses particularly on the Receiver's attempts to sell 4107 Rock Creek (the "Rock Creek Residence"). Although Barton professes harassment, the specter of irreparable harm, and an unnecessary liquidation spree based the Receiver's sale of the Rock Creek Property, he ignores the facts that (1) Barton himself had signed a listing agreement with a realtor to sell the property within the weeks prior to the commencement of the Receivership; (2) the sales price exceeds the average value of the three independent appraisals the Receiver obtained on the property, far exceeding the two-thirds threshold; (3) the property is owned by a Receivership Entity and not Barton personally; (4) notice provided to the Receiver by a person known to Barton that Barton was moving valuable art and contents out of the house *after* the Receivership Order was entered; (5) the diminishing equity in the property due to the accruing but unpaid mortgage and property taxes, the net proceeds of which are as yet unknown; and (6) the urgent need for liquid assets to fund management of other Receivership properties. Ex. A, Thomas Decl. ¶ 14 (APP000006-7).

Liquidation under these circumstances is not an abuse of discretion or inappropriate; it is expedient. *See FTC v. Consumer Def., LLC*, No. 2:18-CV-30 JCM (PAL), 2019 WL 266287, at *3 (D. Nev. Jan. 18, 2019) ("Courts regularly freeze assets with a preliminary injunction and authorize the sale of those assets prior to finding liability in order to preserve the value of the estate."); *FTC v. Johnson*, No. 2:10-CV-02203-RLH, 2011 WL 3841039, at *2 (D. Nev. Aug. 26, 2011) (granting the Receiver's motion to sell property after "the Receiver ha[d] adequately shown

---

notions that disregard fundamental realities of the situation he has created. Ex. A, Thomas Decl. ¶ 13. n.2 (APP000006).

the Court that liquidating the[] assets w[ould] limit expenses and avoid further deterioration or loss of value."); *SEC v. TLC Investments & Trade Co.*, 147 F. Supp. 2d 1031, 1036 (C.D. Cal. 2001) ("[L]iquidation at this time, prior to entry of judgment, is appropriate because the evidence presented to the Court demonstrated that the TLC entities' liabilities were greater than their assets and because ongoing management alone will drain money out of the estate, money that otherwise could be returned to investors.").

To fund the Receivership's continuing obligations and eliminate the continuing costs of maintaining them, the Receiver immediately began the process of attempting to sell the least encumbered and most easily salable properties, including the Rock Creek Residence.[7]  Ex. A, Thomas Decl. ¶ 15 (APP000007).  Although the sale of art or other moveable items theoretically might have been a quicker process, Barton to this day refuses to identify certain artwork, to disclose the location to which he has moved such items, or to confirm who owns those items.  *Id.* ¶ 15 (APP000007).  At least in 2019, Barton claimed that JMJ Holdings owned $12 million in artwork. *Id.* ¶ 15 (APP000007); *see also* Ex. A-1, Balance Sheet of JMJ Holdings at 1 (APP000015-16). Sales of the Receivership Entities' commercial properties, such as the apartment complexes discussed above, will take many months at a minimum, after a willing buyer is found, while the Rock Creek Residence is already set to close on December 28.  Ex. A, Thomas Decl. ¶ 16 (APP000007).

Relatedly, Barton and Max both complain of Receiver's purported refusal to allow them to remove "personal items" from the Rock Creek Property.  Besides the fact that these complaints ignore the Receiver's repeated requests for (1) a list of the personal items at the Rock Creek

---

[7] The Rock Creek Property is encumbered by a lien resulting from Barton's recent refinancing of the property recently. Two judgment liens filed in Dallas County against Barton individually, which should not attach to the property but which nonetheless have required time to communicate with those judgment creditors, almost certainly explain Barton's use of an entity to hold ownership of the Property.  Ex. A, Thomas Decl. ¶ 15 (APP000007).

Residence and 2999 Turtle Creek and (2) evidence showing that such items were not purchased with the Receivership Entities' funds, these complaints also ignore the fact that the majority of these furnishings appear to have been purchased within the last two years, *by a Receivership Entity.* Ex. A, Thomas Decl. ¶ 17 (APP000007-8). Nonetheless, in recognition of the limited value to the estate of clothing and similar items, the Receiver has already allowed Barton, Max, and others to remove items of minimal value from the Rock Creek Residence. *Id.* As to all other items, the Receiver offered to allow Barton and Max to retrieve them if they could demonstrate what they wanted to remove was not purchased by Receivership Entities, or to store the items (at Barton's cost) until such time as ownership is established. *Id.* Barton has ignored both of the Receiver's proposals and instead continues to insist that he be allowed to remove unspecified contents. *Id.*

Max similarly refused to provide the Receiver with a list of the property he claims as his own until December 7, when, rather than providing that information to the Receiver, he instead filed the list with his Response to a different motion. *Id.* ¶ 19 (APP000008); *see also* Dkt. 81.

In sum, Barton seeks the Court's sympathy and a carve-out from the terms of the Receivership Order with respect to items he refuses to demonstrate were purchased from his own, rather than Receivership Entity assets, while at the same time refusing to provide information about art he removed from the Rock Creek Property or provide truthful and helpful information about additional assets and properties. His complaints about and assertions of overreach by the Receiver merit no weight. Thomas Decl. ¶ 20 (APP000008).

**D.      Privilege As an Excuse to Hold IT Credentials Hostage**

Barton also claims that a stay is warranted because of the Receiver's attempts to secure the digital assets of the Receivership Entities. Barton is not only incorrect, but his actions to date have wholly disregarded the Receivership Order and needlessly increased the burden on the Receiver and his team.

10

Despite requesting passwords and other IT credentials on the day of his appointment (and multiple times since), Barton has continually failed and refused to provide the requested information to the Receiver. Ex. A, Thomas Decl. ¶ 21 (APP000009). Instead, Barton, Max, and the Receivership Entities' employees refused to identify which IT professionals controlled the Receivership Entities' email and any other cloud accounts. *Id.* ¶ 21 (APP000009). When the Receiver discovered, through independent efforts, the identity of the Receivership Entities' former IT professional, the Receiver discovered that Barton had hired a different IT professional who changed the credentials that would have allowed the Receiver access to the servers and email accounts. *Id.* ¶ 21 (APP000009).

Barton has consistently used the Receiver's purported access to privileged documents and information as an excuse for ignoring the clear mandate to turnover access to the Receivership Entities' digital assets, despite the Receiver's repeated statements that he is willing to enter into an FRE 502(b) agreement or other protocol to protect information and documents for which Barton *legitimately* holds the privilege. *See* Ex. A, Thomas Decl. ¶ 22 (APP000009). Despite the Receiver's continued request for the IT credentials and willingness to preserve Barton's privilege, the IT credentials have still not been provided, and Barton failed to provide any proposed privilege protocol for the electronic data—again, despite repeated requests—until December 7, 2022, after the Receiver's counsel threatened to take the continued delay to the Court. *Id.* The proposal that Barton has proposed is extremely overbroad and would apply to protect communications between the Receivership Entities and their prior counsel, irrespective of whether or not those communications have any ties to Barton's individual criminal investigation. *Id.*

11

Notably, in separating and sifting Barton's privilege from the Receivership Entities', which is now held by the Receiver,[8] the Court should be aware that at least 36 lawsuits involving Receivership Entities are currently stayed.  Ex. A, Thomas Decl. ¶ 23 (APP000009-10).  Indeed, the Receiver only recently discovered yet another lawsuit, filed on December 5, 2022, which Max Barton, purportedly through Titan Investments, LLC, filed in Ellis County without notice to the Receiver and despite extensive briefing on the fact that the Receiver contends Titan Investments is already a Receivership Entity.  *Id.*  The Receiver *must* have access to prior communications with counsel regarding this and the other lawsuits to evaluate how and when to potentially resolve them.

The issues surrounding Barton's refusal to comply with the Receivership Order and provide the IT credentials, including the on-going discussion of a privilege protocol neither demonstrates an abuse of discretion nor the basis for a stay.

### E.    Documents Have Not and Will Not Be Shredded

In the alternative to a stay of the entire receivership, Barton seeks a stay of the Order Governing Administration of the Receivership Estate, Dkt. 63 (the "Administrative Order") which permitted the Receiver to shred certain irrelevant and bulky documents.[9]  To be clear, none of the documents the Receiver proposed destroying (rather than incurring the cost to pack, move, and store) have *anything* to do with any party's claims in this matter or Barton's criminal defense.[10]

Instead, the Administrative Order authorized the Receiver to "store, destroy, or abandon the property identified below, in any manner provided below as he determines in his discretion is most appropriate," only very limited records.  Records that *could potentially* impact the claims and

---

[8] *See* Receivership Order ¶ 46 ("The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Entities.").

[9] As noted above, that Order is not properly the subject of Barton's appeal.

[10] *See Motion*, (Barton's contention that "no limitation [is] in place to meaningfully protect documents material to Mr. Barton's defense in parallel criminal proceedings."

defenses at issue here, were to be scanned or stored, for instance "Any Wall-related Investor Files"; "Bills and Bank statements going back to January 1, 2015"; "Litigation/discovery files from pending cases—scanned or moved to storage, depending on cost."

Only certain very old or wholly irrelevant documents were authorized for shredding:

"4. Receivership Entities' records preceding January 1, 2015—shredded and/or otherwise destroyed;

5. Litigation/discovery files from closed cases—shredded and/or otherwise destroyed;

7. Old, unopened (and some opened) mail—shredded and/or otherwise destroyed;

8. Any non-Wall Entity-related documents, other than those described above, and which in the Receiver's discretion appear to have no relevance to the claims asserted against Defendants or the assets under the control of the Receiver—destroyed. . ."

Dkt. 63, p. 8.

Barton fails to explain how, or why destruction of these materials jeopardizes his defense or suggests anything other than appropriate efforts to conserve limited receivership assets. **Nonetheless, to eliminate any further concerns regarding these documents and despite the increased storage and packing costs, the Receiver will refrain from shredding or destroying any documents until further order of the Court.** Ex. A, Thomas Decl. ¶ 24 (APP000010)

Neither the Receivership Order nor any of the Court's other orders or the actions of the Receiver demonstrate an abuse of discretion by the Court or any impropriety by the Receiver. *See, e.g., WB Music Corp. v. Royce Int'l Broad. Corp.*, 47 F.4th 944, 953 (9th Cir. 2022) (In reviewing a district court's denial of a defendant's motion to discharge a receiver, holding "a district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad.") (citation omitted).

**F.     The Receiver's Efforts, Qualifications, and Continued Service**

Finally, Barton reiterates prior attacks on the qualifications of the Receiver and his fitness to serve in a case involving numerous ongoing real estate projects. Motion at 16. As an initial matter, a receiver serves as the Court's agent, and at the Court's discretion. *Porter v. Sabin*, 149 U.S. 473, 479 (1893) ("The possession of the receiver is the possession of the court; and the court itself holds and administers the estate through the receiver, as its officer, for the benefit of those whom the court shall ultimately adjudge to be entitled to it."); *FTC v. Nationwide Connections, Inc.*, No. 06-80180-CIV, 2009 WL 10669554, at *8 (S.D. Fla. Apr. 24, 2009), *report and recommendation adopted*, No. 06-80180-CIV, 2009 WL 10668727 (S.D. Fla. May 19, 2009) ("'The receiver is an officer of the court, and subject to its directions and orders; and while, in the discharge of his official duties. . .'") (quoting *Stuart v. Boulware*, 133 U.S. 78, 81-82 (1890)); *SEC v. Elfindepan, S.A.*, 169 F. Supp. 2d 420, 424 (M.D.N.C. 2001) ("Generally, a receiver is 'viewed as an officer of the court occupying a position of a custodian of the property in receivership and owing to all persons interested in such property a discharge of h[er] duties in good faith and impartially insofar as they are concerned.'") (quoting 65 Am.Jur.2d Receivers § 135 (1972)).

Were the Court to conclude that the Receivership Estate were better served by a different individual, the Receiver will willingly and dutifully step down from his role. At the same time, the Court's decision to appoint the Receiver was wholly justified for a number of reasons, including but not limited to, the fact that (1) as to the five properties with the highest gross value in the Receivership, the Receivership Estate will recover $0 absent litigation because of the way Barton structured the deals, and thus a seasoned commercial litigation attorney is in many ways a better fit to deal with these properties regardless of whether he has commercial real estate experience; (2) by simply labeling the Receiver a "trial attorney," Barton wholly ignores the Receiver's background, which includes service as a law clerk to another federal judge in the

14

district, extensive litigation in federal and bankruptcy courts (including litigation involving commercial real estate and other receiverships involving realty), other relevant commercial real estate experience, and a prior receivership appointment that included the sale of multiple properties pursuant to 28 U.S.C. § 2001; and (3) the Receiver moved quickly and diligently to assemble a top-notch team to assist him, and in that regard has consulted with numerous leading commercial realty firms, brokers, and advisors who have to date been willing to assist the Receivership at no cost to the Receivership Estate based upon the Receiver's prior relationships with these individuals. Ex. A, Thomas Decl. ¶ 25 (APP000011).

Although Barton may dislike the effect of the Receiver's efforts and questions his qualifications, he lacks credibility in contending any other individual would or could have approached the tangled Gordian knot of encumbered property interests more effectively or efficiently. And his complaints deserve to be viewed against the backdrop of his disregard for the facts regarding the mess he created with investor funds, his unrealistic views of value, and his refusal to provide information as required by paragraphs 8, 9, 10, and 18 the Receivership Order.[11] *Id.* ¶ 25 (APP000011).

### III.    CONCLUSION

As explained above, any stay of the Receivership pending Barton's appeal of the Receivership Order would have an immensely detrimental impact on the Receiver's work and specifically the Receiver's efforts to maximize value to the Receivership Estate. Accordingly, the Receiver respectfully requests that the Court deny Barton's Motion to Stay.

---

[11] The requested but omitted information includes documents identifying properties and assets, employees, agents and personnel, bank and brokerage accounts, credit cards, inter-entity and defendant transfers, tax returns, keys, codes, passwords, identification and location of safe deposit boxes, and a host of related documents and information. Ex. A, Thomas Decl. ¶ 25 (APP000011); *see also* Dkt. 74 at 10.

Respectfully submitted,

By: /s/ Charlene C. Koonce
    Charlene C. Koonce
      State Bar No. 11672850
      charlene@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    T: (214) 327-5000
    F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

16