IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL018, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § § § | |
| *Defendants,* | § § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § § | |
| *Relief Defendants.* | § § | |

**DEFENDANT BARTON'S RESPONSE TO MOTION FOR SALE OF ROCK CREEK PROPERTY [ECF NO. 76], AND CROSS-MOTION FOR ORDER PROHIBITING SALE OF PERSONAL PROPERTY LOCATED AT ROCK CREEK HOME**

Michael J. Edney
Michael Dingman
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037

Ted A. Huffman
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202

Richard Roper
Javan Porter
HOLLAND & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.    ARGUMENT & AUTHORITIES ............................................................................ 3

    A.    The Receiver Lacks Proper Legal Authority to Sell Mr. Barton's Family Home .............. 3

    B.    Selling Mr. Barton's Personal Residence Is Unnecessary ................................... 7

    C.    The Receiver's efforts to sell the property are not done at a fair price ............................. 8

III.    CROSS-MOTION FOR ORDER PROHIBITING SALE OF PERSONAL PROPERTY LOCATED AT 4107 ROCK CREEK DRIVE ........................................................... 13

IV.    CONCLUSION & PRAYER .................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Coastal Corp. v. Tex. E. Corp.*,
   869 F.2d 817 (5th Cir. 1989) ...............................................................................5, 6

*Griggs v. Provident Consumer Disc. Co.*,
   459 U.S. 56 (1982) ..................................................................................................6

*Hinkley v. Envoy Air, Inc.*,
   968 F.3d 544 (5th Cir. 2020) ..................................................................................5

*Janvey v. Adams*,
   588 F.3d 831 (5th Cir. 2009) ..................................................................................6

*L.A. Trust Deed & Mortg. Exch. v. SEC*,
   285 F.2d 162 (9th Cir. 1960) ..................................................................................8

*Netsphere, Inc. v. Baron*,
   703 F.3d 296 (5th Cir. 2012) ..................................................................................6

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) ..................................................................................5

*SEC v. Am. Bd. of Trade, Inc.*,
   830 F.2d 431 (2d Cir. 1987)....................................................................................4

*SEC v. Current Fin. Servs., Inc.*,
   783 F. Supp. 1441 (D.D.C. 1992)...........................................................................4

*SEC v. Faulkner*,
   No. 3:16-CV-1735-D, 2018 WL 4362729 (N.D. Tex. Sept. 12, 2018)
   (Fitzwater, J.) ..........................................................................................................7

*SEC v. Hallam*,
   42 F.4th 316 (5th Cir. 2022) ...................................................................................5

*Trenolone v. Cook Expl. Co.*,
   166 S.W.3d 495 (Tex. App. 2005)........................................................................13

*Wages & White Lions Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) .................................................................................5

**Statutes**

28 U.S.C. § 2001..........................................................................................................15

Tex. Prop. Code § 72.101 .............................................................................................13

Defendant Timothy L. Barton files this Response in opposition to the Receiver's Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [ECF No. 76] ("Motion"),[1] and Cross-Motion for Order Prohibiting Sale of Personal Property Located at Rock Creek Home ("Cross-Motion"), as follows.

## I.    INTRODUCTION

The receiver has one legitimate purpose: to identify and to preserve the assets of the corporate, business-related entities under receivership. ECF No. 29 at 2. In the SEC's recent opposition to the stay of the receivership, the Commission placed great emphasis on the fact that it did not seek to put Mr. Barton into receivership in his personal capacity. ECF No. at 2, 8.

But, to date, the Receiver's efforts have been focused on property very personal to Mr. Barton. In doing so, the Receiver repeatedly has attempted to leverage one line in the Court's Receivership Order that grants the Receiver authority over all corporations under Mr. Barton's ownership or control. The Receiver has used this line in the order to justify seizing Mr. Barton's personal home because, as with many other high-income individuals, the home was held in the name of special purpose limited liability corporation. That corporation *had no other purpose than to hold title to his personal residence*. The Receiver removed Mr. Barton from his home on Day Two of his tenure, and now seeks to sell it out from under him. And, in a separate motion, the Receiver now attempts to sell all of Mr. Barton's personal belongings that remain onsite. *See* Notice of Intended Sale of Personal Property [ECF No. 89]. The Receiver's alleged justification is that those items happened to be stored in the place where Mr. Barton lives.

---

[1] For the second time in this action, the Receiver's counsel did not confer with Mr. Barton's lead counsel before filing the instant motion.

It should be made clear that the Receiver is not seeking to sell some second home in a vacation locale. Mr. Barton has none. This was Mr. Barton's sole place to live, and after the Receiver launching him from his home, he has slept on a couch in his daughter's apartment.

What a distraction from anything relevant to this case! The Receiver should be taking steps to understand a complex real estate development business with tens of millions of assets under management and the potential to make tens of millions more. But the Receiver has fixated on squeezing pennies from Mr. Barton's personal residence. One has to ask what this sale has to do with marshaling and preserving assets.

Liquidation of Mr. Barton's home before any judgment finding liability is contrary to applicable law. Even when a receiver is properly appointed, its purpose is to preserve assets prior to judgment, for potential compensation of alleged victims if the Government proves its case and obtains liability or for return to the Defendant in the event the Government does not. A prejudgment receiver's role is not to punish, it is to maintain the status quo. But the liquidation of Mr. Barton's home would irretrievably upend the status quo. It would be a bell that cannot be unrung and entirely improper at this stage of the proceedings.

In addition, the Receiver's professed reasons for seeking a sale of this property will not advance any material objective of the receivership estate. This is certainly not an effort to raise money for any allegedly wronged lenders. Rather than list the Barton home for sale at market price, the Receiver attempts to sell the home for hundreds of thousands of dollars less. In taking this fire-sale approach, the Receiver contends the residence will generate, at best, "between $100,000 and $200,000," prior to the Receiver charging his own legal fees, expert costs, and other expenses against the recovery. Receiver's Initial Status Report [ECF No. 67] at 15-16. The sale of Mr. Barton's home is thus unnecessary and unjust, and the Court should deny the

-2-

Receiver's motion in order to redirect the Receiver toward projects that will meaningfully serve the purpose of the receivership.

Mr. Barton cross-moves to prevent the Receiver from attempting to sell personal property still located at the residence. The Receiver has prevented Mr. Barton and his family from recovering many of their possessions from the home and intends to sell these belongings to the new home buyer. Neither the Receiver's real estate motion nor the current real estate sale contract details this plan. Nor does the Court's Order Appointing Receiver authorize the Receiver to possess and sell these personal items. To ensure that this property is not sold, as the Receiver threatens to do, Mr. Barton moves for an Order requiring the Receiver to return all personal property that is present in his home.

## II.    ARGUMENT & AUTHORITIES

### A. The Receiver Lacks Proper Legal Authority to Sell Mr. Barton's Family Home

At a fundamental level, the Court should deny the Receiver's Motion to sell the Barton family home because the Receiver lacks legal authority over the property, much less a right to sell it.

A receiver's only legitimate purpose is to identify and secure assets and to preserve those assets, so that they may be used to compensate any alleged victims *if and only if the Defendant is later found liable for securities fraud.* The sale of Mr. Barton's home is not aimed at this sole legitimate end. Instead, it is a measure designed to punish Mr. Barton, now, before the Government has taken even the first steps to prove its allegations, much less the Defendant been given an opportunity to respond to this proof. Consider the possibility that the SEC does not prevail in establishing liability. Will Mr. Barton be given back his house, his furniture, his personal effects accumulated over a lifetime? No.

For this reason, liquidation of a defendant's assets prior to judgment is typically not proper. *See, e.g.*, *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1445 (D.D.C. 1992) (finding liquidation neither "necessary to protect [the defendant's] investors" nor "appropriate prior to the entry of final judgment"). Liquidation is especially inappropriate when the receiver is still ascertaining the true state of affairs of the property under his remit. *See SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436-37 (2d Cir. 1987) (criticizing receivers that attempt to liquidate "effect the liquidation of defendants in actions brought under the securities law" and addressing receiver's purpose of preserving assets and ascertaining affairs).

The Court should reject any suggestion by the Receiver that the sale of Mr. Barton's personal home is somehow vital to keeping the entire receivership estate going.  This sale was Plan A, not some kind of last resort.  The house was seized on the Receiver's second day on the job and listed for sale less than two weeks later.  The net proceeds from the sale will barely pay the Receiver's legal bills for seeking this remedy.  And, in the meantime, the Receiver is bypassing commercial real estate sales—investments without the same personal importance to Mr. Barton—that would generate millions.  That is not the type of extraordinary circumstance that might warrant an exception to the general rule against prejudgment liquidation. This move is a disturbance of the status quo, not a preservation of it.  It is an assumption of an adverse outcome in this matter, inconsistent with due process and any conception of the Government's ultimate burden of proof.

The Receiver also incorrectly contends that his "underlying purpose" is to *disgorge* property and assets from Mr. Barton, before any finding of liability. *See* ECF No. 73 at 14 n.11. Disgorgement is no business of a pre-judgment receiver; it is a post-judgment remedy to potentially follow only after the Commission proving its claims and establishing liability.  And

-4-

equitable judgment may not even be a permitted remedy at all—whether pre- or post-judgment—as the Fifth Circuit recently questioned the Commission's authority to seek equitable disgorgement following Congress's 2021 amendments to the Securities Exchange Act. *See SEC v. Hallam*, 42 F.4th 316, 343 (5th Cir. 2022).

In any event, the Court lacks jurisdiction to order the sale of the house because its receivership orders are currently on appeal to the Fifth Circuit. ECF No. 66. The orders under appeal include the Court's orders establishing the receivership, extending the receivership to the special purpose entity that owns the property, and refusing to exempt that personal residence related entity from the receivership. *Id.* Whether Mr. Barton's home is rightful property of the receivership estate is, therefore, a question before the Fifth Circuit on appeal. That means this Court is divested of jurisdiction to do anything more than "maintain[] the status quo," and it may not take any action that "can divest the court of appeals from jurisdiction while the issue is before" that court. *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989). Approving the sale of Mr. Barton's home will do exactly that. Once sold, Mr. Barton would have no recourse, even if the Fifth Circuit later determined that his home should not have been in the Receiver's power, because the Receivership Order grants blanket immunity to the Receiver, ECF No. 29 at 21, and the government "enjoy[s] sovereign immunity." *Wages & White Lions Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) (holding that the loss of an interest in real property constitutes irreparable harm). If the Court were to nonetheless approve the sale of Mr. Barton's house, he would no longer "retain a legally cognizable interest in the outcome of" whether the Rock Creek property was validly encumbered by the receivership, which would deprive the Fifth Circuit of jurisdiction to decide the issue on appeal. *See Hinkley v. Envoy Air, Inc.*, 968 F.3d 544,

548 (5th Cir. 2020). Because granting the Receiver's motion would deprive the Fifth Circuit of jurisdiction to consider the orders on appeal, this Court lacks jurisdiction to approve the instant motion. It must instead "maintain[] the status quo," in which the Rock Creek property remains unsold. *Coastal Corp.*, 869 F.2d at 820. In addition, although further orders approving the sale of real property are contemplated by the court's pre-existing orders, the order sought by a receiver would clearly be an additional order on "those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). The Court is deprived of jurisdiction to enter such an order until the appeal is resolved.

In the same appeal, Mr. Barton seeks to overturn the Court's implicit determinations from prior orders that any entity directly or indirectly related to Mr. Barton can be thrown into receivership. Although Mr. Barton has previously raised this point of law, the importance of this legal matter continues to taint the issues raised in the Receiver's present Motion and now threatens to take on permanence by selling the Defendant's personal home, an event that cannot be unwound later when the Fifth Circuit enforces its prior precedents. As addressed previously, the Fifth Circuit has made clear that "equity does not allow a receivership to be imposed over property that [is] not the subject of the underlying dispute." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 306 (5th Cir. 2012). For a receivership to be expanded to include non-party assets, the movant must show that the non-party (1) received ill-gotten funds, and (2) has no legitimate claim to the funds. *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 310 (5th Cir. 2012) ("The receivership ordered in this case encompassed all of Baron's personal property [and] business entities owned or controlled by Baron, including Novo Point, LLC and Quantec, LLC . . . . We conclude the district court could not impose a receivership over Baron's personal property and the assets held by Novo Point and Quantec.");

*SEC v. Faulkner*, No. 3:16-CV-1735-D, 2018 WL 4362729, at *5 (N.D. Tex. Sept. 12, 2018) (Fitzwater, J.) (permitting non-defendant entities to be included in an SEC receivership only when shown to be both controlled by the defendant and in possession of funds traceable to alleged fraud).  Neither the SEC nor the Receiver has made a showing that Mr. Barton's home was funded with any Wall lender funds, so neither the company owning the home nor the home itself should be included in the receivership estate, and the Receiver should be divested of control to sell that property.

For these reasons, the Court should deny the Receiver's Motion in its entirety.

## B. Selling Mr. Barton's Personal Residence Is Unnecessary

The Receiver also has not advanced a legitimate reason for liquidating Mr. Barton's residence.  Notwithstanding that Mr. Barton's house has no connection to the subject matter of this lawsuit (or any Wall lender funds), the sale of the house will not materially advance any need of the receivership estate.  As the Receiver contends, the sale of the home at its current price will only net "between $100,000 and $200,000" after paying off property liens, taxes, closing costs, and broker commissions.  *See* Receiver's Initial Status Report [ECF No. 67] at 15-16.  The actual  proceeds of the sale would be even less, as the Receiver also intends to charge his legal fees, appraisal costs, and other expenses against the recovery on the sale, ultimately leaving the net benefits of the transaction at near net zero.

While the Receiver contends that creditor claims, administrative expenses, or "current economic uncertainty" justify a rapid sale of the home, those concerns are unmeritorious.  As an initial matter, the Court has stayed all creditor claims against the estate and its property.  *See, e.g.,* Receivership Order [ECF No. 29] ¶¶ 15, 32, 34-35.  Further, any complaints by the Receiver regarding his ability to maintain Mr. Barton's home are issues of his own doing.  A better alternative to selling Mr. Barton's house—one that would alleviate the Receiver's

complaints about cash flow and market uncertainty, *see* Mot. at 5—would be converting the property into an income-generating asset for the estate, such as seeking permission to rent the house back.  Doing so would address the Receiver's liquidity concerns while also avoiding any waste from a below-market sale or injustice from a sale that the Fifth Circuit later determines on appeal to be wrongful. However, far from seeking to manage and monetize the asset without selling it, the Receiver has removed the home's resident (Mr. Barton) and made no attempt to find a different tenant.

Further, this property is Mr. Barton's sole personal residence, not a business endeavor linked to his real estate businesses. Its ownership by a special-purpose corporation is a recent development, *see* App. 004 (showing 2022 taxes assessed against Timothy Barton in his personal capacity for the Rock Creek property), done for personal reasons. It does not change the inherently non-business nature of the property. The Receiver's efforts to dispose of Mr. Barton's residence for non-material gain ultimately do not advance a legitimate objective of the receivership estate and will do little more than continue to penalize Mr. Barton through an unnecessarily disposal of his family home.  *See L.A. Trust Deed & Mortg. Exch. v. SEC*, 285 F.2d 162, 182 (9th Cir. 1960) (criticizing "additional penalty" that would be effected by proposed liquidation).  The Court should deny the Receiver's Motion on these grounds to avoid such a result.

### C.  The Receiver's efforts to sell the property are not done at a fair price

Even if the Receiver had good cause to sell Mr. Barton's house, he should be ordered to do so at market price, rather than through a fire sale.  Yet, in the current Motion, the Receiver proposes to effect a sale transaction that would dispose of the approximately 3,840 square foot home for $1.4 million, or **$365 per square foot**.  Mot. at 3 (listing sale price); Compass, 4107 Rock Creek Drive, Dallas, TX 75204, https://www.compass.com/listing/4107-rock-creek-drive-

dallas-tx-75204/1176276111269130409/ (last visited Dec. 11, 2022) (listing square footage). That price per square foot is significantly lower than current listings and recent sales in the surrounding area. A sampling of nearby comparable properties is illustrative:

- 4111 Rock Creek Dr., the home *next door* to Mr. Barton's home, with 4,601 square feet, is currently listed at $2.995 million, or **$651 per square foot**, which is $286 per square foot greater than the Receiver's attempted sale price for Mr. Barton's house.[2]

- 15 Turtle Creek Bend, a nearby home with 3,900 square feet, was sold earlier this year with a listing price of $1.975 million, or **$506 per square foot**, which is $141 per square foot greater than the Receiver's attempted sale price for Mr. Barton's house.[3]

- 3832 Turtle Creek Dr., another nearby home with 3,948 square feet, is listed at $2.699 million, or **$684 per square foot**, which is $319 per square foot greater than the Receiver's attempted sale price for Mr. Barton's house.[4]

The Receiver's contracted price for the property is, therefore, much lower, in price-per-square-foot terms, than comparable properties. Moreover, the sale price is more than $600,000 shy of the $2.061 million appraisal of the property that Mr. Barton obtained in June 2022. *See* App. to Response in Opposition to Motion to Supplement Order Appointing Receiver [ECF No. 58] at 7. And this prior appraisal was rendered using a conservative estimation of the home's square footage, meaning the prior appraised value was actually understated. Had the Receiver

---

[2] Ebby Halliday, 4111 Rock Creek Dr, Dallas, TX 75204 https://www.ebby.com/ ListingDetails/4111-Rock-Creek-Drive-Dallas-TX-75204/20085701 (last visited Dec. 11, 2022).

[3] Zillow, 15 Turtle Creek Bend, Dallas, TX 75204 https://www.zillow.com/ homedetails/15-Turtle-Creek-Bnd-Dallas-TX-75204/26692855_zpid/ (last visited Dec. 8, 2022).

[4] Briggs Freeman, 3832 Turtle Creek Dr, Dallas, TX 75219, https://www. briggsfreeman.com/listing/20110818/3832-turtle-creek-drive-dallas-tx-75219/ (last visited Dec. 11, 2022).

nonetheless used the prior appraisal to price the Rock Creek property for sale, the asking price would have been approximately $536 per square foot, which is still lower than the house next door—$651 per square foot.

The Receiver's effort to sell the Barton residence for less than market value is not meaningfully supported by the documentation submitted with the Receiver's Motion. Although the Receiver submits three supposedly independent appraisal reports, the contents of these reports undermine their valuation conclusions. Among other things, the reports contain factual inaccuracies about Mr. Barton's residence. This includes each appraiser making differing assertions regarding the square footage of the property or other inaccurate descriptions of the property's features. The reports misstate basic facts such as the number of rooms in the house (sometimes 9, sometimes 11 depending on which report), inconsistent descriptions of the condition or quality of the home (sometimes good or updated, but other times just average); and even differing assertions about the types of A/C systems or other features of the residence. In one of the appraisals, the report actually states two different square footage calculations for the same house, claiming in one instance that the house is 4,057 square feet but later that the house is only 3,681 square feet. *Compare* Receiver's App. [ECF No. 77] at 26, *with id.* at 27.

Notably, each of the appraisal reports attempts to render an estimation regarding the value of each property using a sales comparison approach, but their analyses are flawed. The sales comparison approach is performed by comparing market value data from other properties in the same vicinity to the target house—here, Mr. Barton's Rock Creek Drive property. However, in performing the sales comparison methodology, each of the appraisers relies on comparable properties that do not directly compare. For example, in certain parts, the appraisers attempt to compare Mr. Barton's single-family home to different forms of residential property,

such as townhomes.   In other instances, the appraisers cite to home values in different neighborhood areas near the Tollway in an effort to support conclusions about the value of Mr. Barton's home that is located between Turtle Creek and US-75.  *See, e.g.,* Receiver's App. [ECF No. 77] at 40 (showing that at least two of the comparable properties are in a much different neighborhood area than the Rock Creek Drive residence).  Even worse, every single one of the appraisal reports attempts to use outdated sales data—even sales data from 2021—as a basis to value Mr. Barton's home as of the November 2022 contract date.  *See, e.g.,* Receiver's App. [ECF No. 77] at 26, 47, 75 (citing to 2021 residential sales data).  This is an incredible error in methodology, as Dallas home prices have risen significantly in the past year.  *See* Is the Dallas Housing Market Slowing Down?, Norada Real Estate Investments, https://www.norada realestate.com/blog/dallas-real-estate-market/#:~:text=According%20to%20Zillow%2C%20the %20typical,Sept%202022%20to%20Sept%202023 (Nov. 10, 2022) ("According to Zillow, the typical home value for the Dallas-Forth Worth-Arlington area rose by a whopping 20.4% in the past 12 months . . . ."); Here are the 50 Dallas-Fort Worth Neighborhoods where home values are the     highest,     WFAA,     https://www.wfaa.com/article/money/business/dallas-fort-worth-neighborhoods-where-home-values-are-the-highest/287-5b672914-83b7-44c7-bcd2-5b20658e3f de (Oct. 6, 2022) ("Typical home values in Highland Park and University Park have each risen 24% in the past year . . . .").

The appraisal reports also fail to make necessary adjustments in their calculations of home value based on material differences between the nearby comparison properties and the Rock Creek Drive property.  Often, the reports attempt to identify reasons for reducing their valuations of Mr. Barton's residence, for example, claiming that the comparison properties are superior to his residence. In many other instances, the appraisal reports fail or refuse to recognize

that significant aspects of Mr. Barton's house make it superior to the comparison properties. In one glaring example, one appraiser makes *no adjustment whatsoever* to account for one comparable property lot being described as *less than 25% the size* of Rock Creek Drive property. *See* Receiver's App. [ECF No. 77] at 74. In another instance, the appraiser makes no adjustment to account for one of the comparable properties being 57 years older than the Rock Creek property. These are material defects in the appraisers' analyses and render the appraisers' conclusions about property values unreliable.

Finally, the Receiver attempts to sell Mr. Barton's house "as is" without providing any of the required disclosures and statutory warranties that would normally add significant value to the property sale. *See* ECF No. 77 at 18. Thus, in addition to concerns with the listing price, there are significant concerns with the facts and circumstances leading up to the Receiver's sale offer and ultimate contract for sale. Additional time and discovery would be needed to resolve these issues and to ensure that the home is sold on more appropriate terms. At this time, however, the identified concerns raise significant questions that should stop the sale on the terms and price on which it is proposed by the Receiver.

It is no answer that the Receiver has not received any higher offers due to the listing. Receiver's Mot. [ECF No. 76] at 4. It is apparent to any buyer doing the slightest bit of research that this house is subject to an ongoing legal dispute and that the Receiver's authority to engage in prejudgment liquidation is tenuous at best. The prospect of investing time and resources in an offer that should not and very likely will not go through, including the appellate process, is no doubt going to drag on the price that the Receiver can command in these circumstances.

### III.   CROSS-MOTION FOR ORDER PROHIBITING SALE OF PERSONAL PROPERTY LOCATED AT 4107 ROCK CREEK DRIVE

Defendant Barton separately moves for a Court order prohibiting the sale of the personal property currently located in the residence at 4107 Rock Creek Drive.  Mr. Barton and his family were summarily removed from the property mere days after the receivership began. Since that time, the Receiver has prevented Mr. Barton and his children (Victoria and Max) from recovering the remainder of their personal belongings from the house.  These items have included, inter alia, sentimental items, dishes, towels, furniture, bedsheets, and other family belongings.  Indeed, in a recent filing from just today, the Receiver expressly disclosed his efforts to sell many of these very items. *See* Notice of Intended Sale of Personal Property [ECF No. 89]. Mr. Barton thus moves for relief to make clear that the Receiver has no authority or legal basis to sell this property.

Most important, the Order Appointing Receiver does not place Mr. Barton or his personal belongings into receivership. *See* Order Appointing Receiver [ECF No. 29] at 2–3 (placing only entities into receivership).   The Order only authorizes the Receiver to take possession of "personal property [belonging to] the Receivership Entities." *Id*. at 9. Thus, any of Mr. Barton's personal property—to say nothing of the property belongings of Max, Victoria, or others—is off-limits and cannot legally be sold.[5]  Nor is there any reason for the Receiver to contend that these

---

[5] To the extent the Receiver may argue that Mr. Barton has abandoned his personal property, that argument is frivolous. Affirmative abandonment requires "the relinquishment of the possession of a thing by the owner with the intention of terminating his ownership, but without vesting it in any one else." *Trenolone v. Cook Expl. Co.*, 166 S.W.3d 495, 500–01 (Tex. App. 2005) (citation omitted). Mr. Barton and his family were removed pursuant to a *court order*, and have been impeded in their efforts to obtain their personal property from the residence. But, in the meantime, they have continued to assert their ownership of the personal property remaining within the house. There has been no affirmative act of abandonment. Nor can the property be presumed abandoned, as none of the various requirements for such a presumption have been met. Tex. Prop. Code § 72.101 (detailing those requirements).

personal belongings are somehow property of a corporate receivership entity. The Receiver's only conceivable basis for this assertion is that they happened to be located in Mr. Barton's residence.  Even though his residence is owned by a special purpose corporation of which he is sole beneficiary, that provides no grounds to argue that the personal property therein is the corporation's.  The corporation's sole purpose is to hold the real property constituting Mr. Barton's sole residence.  Where else would Mr. Barton put his personal belongings?   A family's personal belongings, towels, dishes, bedsheets, and other sentimental belongings accumulated over the course of a lifetime are inherently non-corporate property.  People simply keep their personal possessions in their home.

If the Court were nonetheless to accept the Receiver's tenuous position that the Bartons' personal belongings are property of the receivership entities, the result would be the certain wrongful and punitive sale of these items with no meaningful benefit to the estate. A Court order should prevent such an outcome from occurring.

It should be made clear that the Receiver cannot backend a personal property sale into his present motion practice for the sale of the residence.  At a minimum, the contract documents attached to the Motion do not contemplate the sale of any personal assets.  The contract itself defines the property to be sold as "[t]he land, improvements and accessories."  Sale Contract (Receiver's App. at 6). This term does not mention or contemplate the inclusion of the Bartons' individual property, but rather typical real property fixtures, improvements, and accessories such as kitchen stoves, fire detectors, chandeliers, security systems, and window shades. *See* Sale Contract (Receiver's App. at 6).  Notably absent from the contract documents is a Non-Realty

-14-

Items Addendum,[6] which is the industry-standard form that the Receiver would need to add to the residential sale contract to include personal property with the sale of the residence.

Critically, the current residential sale contract cannot include personal property and still comply with 28 U.S.C. § 2001. This is because none of the Receiver's appraisal reports submitted to the Court in accordance with that statute place a value on the personal property in the home. *See also* Waldron Appraisal (Receiver's App. at 32) ("No personal property was considered . . . ."); Hagen Appraisal (Receiver's App. at 53) ("No personal property was considered."); Milliorn Appraisal (Receiver's App. at 88) ("Personal property has been excluded . . . ."). If for some reason the Receiver has given the new buyer the impression outside of the contract documents that the Bartons' personal property is part of the residential sale, there is a defect in the sale documents and appraisal materials presented to the Court. At a minimum, the purported $1,400,000 contract price is not actually the sale price for the home, but instead captures thousands of dollars in additional property that has not been addressed. And new valuations of this additional property need to be rendered and submitted to the Court before a more comprehensive sale could move forward and be approved.

### IV.    CONCLUSION & PRAYER

For the foregoing reasons, Defendant Timothy Barton respectfully requests that the Court deny the Receiver's Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [ECF

---

[6] That addendum is, as intended by the Texas Real Estate Commission and by way of common practice, attached to any contract for the sale of property "if the parties need to add additional items of personal property that are to stay with the property that are not already listed in paragraph 2B or 2C of the purchase contract." *See* Tex. Real Est. Commission, *Non-Realty Items Addendum*, https://www.trec.texas.gov/forms/non-realty-items-addendum.

No. 76], grant his Cross-Motion to Prohibit Sale of Personal Property Located at Rock Creek Home, and grant such other and further relief that may be merited.

Dated: December 13, 2022

Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
Michael Dingman
Virginia Bar No. 95762
DC Bar No. 90001474 (*admitted pro hac vice)*
mdingman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

Ted A. Huffman
State Bar No. 24089015
thuffman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Phone: (214) 979-3000
Facsimile: (214) 740-7110

Richard Roper
State Bar No. 17233700
richard.roper@hklaw.com
Javan Porter
State Bar No. 24116912
javan.porter@hklaw.com
**HOLLAND & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Phone: (214) 969-1345
Facsimile: (214) 999-9252

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## <u>CERTIFICATE OF SERVICE</u>

On December 13, 2022 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Michael J. Edney*
Michael J. Edney
