## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § § | |

## APPENDIX IN SUPPORT OF RECEIVER'S MOTION FOR APPOINTMENT OF APPRAISERS, APPROVAL OF APPRAISALS AND A HEARING <u>REGARDING APPROVAL OF SALE OF FRISCO GATE PROPERTY</u>

– 2 –

Respectfully submitted,

**RECEIVER**

By:  */s/ Cortney C. Thomas*
     Cortney C. Thomas
       Texas Bar No. 24075153
       cort@brownfoxlaw.com
     Charlene C. Koonce
       Texas Bar No. 11672850
       charlene@brownfoxlaw.com
     BROWN FOX PLLC
     8111 Preston Road, Suite 300
     Dallas, TX  75225
     Tel. 214.327.5000
     Fax. 214.327.5001


**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

– 3 –

| EXHIBIT | DESCRIPTION | APP PAGES |
|:---:|:---|:---:|
| A | Purchase and Sale Agreement between Receiver and Petra Development, dated December 13, 2022 | APP000011-36 |
| B-1 | The Broker Opinion of Value issued by Landry Burdine, dated November 15, 2022 | APP000037-59 |
| B-2 | The Broker Opinion of Value issued by JLL, dated November 2022 | APP000060-66 |
| B-3 | Appraisal issued by Charles G. Dannis, dated December 10, 2022 | APP000067-152 |

# EXHIBIT A

APP000001

PURCHASE AND SALE AGREEMENT

AMONG

Cort Thomas

As Receiver for FHC Acquisition, LLC, a Texas Limited Liability Company

AS RECEIVER,

AND

PETRA DEVELOPMENT, LLC
A Virginia Limited Liability Company

AS PURCHASER

Dated as of December 13, 2022

APP000002

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made as of the Effective Date (as defined below), by and among Petra Development, LLC, a Virginia Limited Liability Company, with its principal place of business at 1875 K Street NW, Fl 4 Suite 436, Washington, D.C. 20006 ("**Purchaser**") and Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity (the "**Receiver**") for, and on behalf of, FHC Acquisition LLC, a Texas Limited Liability Company, with its principal place of business at 8111 Preston Road, Suite 300, Dallas, Texas 75225 ("**FHC**"). Purchaser and Receiver are collectively referred to as the "**Parties**" and each individually as a "**Party**."

WHEREAS, FHC is the owner of that certain tract or parcel of land consisting of approximately 4.538 acres described as Lot 13, Block A on that certain Revised Conveyance Plat of The Gate, recorded in the Office Public Records of Collin County, Texas, on April 11, 2019, as Document No. 20190411010001690, which is further reflected in Volume 2019, Page 275, Map Records, Collin County, Texas and further described in **Exhibit A**, which is attached hereto and incorporated herein as if fully set forth (the "**Property**");

WHEREAS, pursuant to the Order Appointing Receiver, dated October 18, 2022 (the "**Receivership Order**"), entered by the United States District Court for the Northern District of Texas, Dallas Division (the "**Court**") in Case No. 3:22-cv-2118-X (the "**Receivership Action**"), the Court appointed and authorized Receiver to, among other things, (a) take possession, custody and control of all of FHC's business operations, assets, and property, and (b) market and sell FHC's business operations, assets, and property, all subject to the conditions contained in the Receivership Order;

WHEREAS, Purchaser desires to purchase the Property, and Receiver desires to sell Property to Purchaser for and on behalf of FHC, in each case for the consideration and upon the terms and subject to the conditions set forth herein; and

WHEREAS, Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement, are expressly subject to the approval of the Court and will be consummated only pursuant to orders to be entered in the Receivership Action.

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## I. CERTAIN BASIC TERMS

1.1.    Certain Basic Terms. Below is a summary of certain basic terms in this Agreement. In the event of a conflict between this Section 1.1 and remainder of this Agreement, the remainder of this Agreement shall govern and control.

| Term | Definition | Controlling Section |
|------|------------|---------------------|
| FHC | FHC Acquisition LLC, a Texas Limited Liability Company | Preamble |

APP000003

| | | |
|---|---|---|
| Receiver | Cort Thomas, solely in his capacity as Receiver, and not in his individual capacity, for, and on behalf of, FHC Acquisition LLC | Preamble |
| Purchaser | Petra Development, LLC, a Virginia Limited Liability Company | Preamble |
| Receiver's Attorney | Brown Fox PLLC<br>Attn: Adam Fox<br>6303 Cowboys Way, Suite 450<br>Frisco, Texas 75034<br>Email: adam@brownfoxlaw.com | Section 10.5 |
| Purchaser's Attorney | The Wolf Law Firm, P.C.<br>Attn: Jeffrey J. Wolf<br>1360 N. White Chapel Blvd.,<br>Southlake, Texas 76092<br>Office: (817) 552-9653<br>Email: jwolf@wolflawpc.com | Section 10.5 |
| Purchase Price | $9,000,000.00 | Section 2.3 |
| Escrow Agent | Republic Title of Texas, Inc.<br>2626 Howell Street, 10th Floor<br>Dallas, Texas 75204<br>Attn: Jeff Porter<br>Telephone: (214) 855-8820<br>Email: JPorter@republictitle.com | Section 2.5 |
| Earnest Money | $150,000.00 is to be deposited by Purchaser with the Title Company within five (5) calendar days after the Effective Date. Purchaser shall deposit an additional $100,000.00 within five (5) calendar days after the end of the Feasibility Period. | Section 2.5 |
| Title Company | Republic Title of Texas, Inc.<br>[Same Address as Escrow Agent] | Section 3.1 |
| Title Exam Deadline | 5:00 p.m., Central time, on the twentieth (20th) day after Purchaser receives the Title Commitment and the Supporting Documents, but no later than forty-five (45) days after the Effective Date. | Section 3.3 |
| Feasibility Period | Thirty (30) days after the Effective Date. | Section 4.1 |

1.2.    Closing Costs. Below is a summary of the allocation of Closing costs in this Agreement. In the event of a conflict between this Section 1.2 and remainder of this Agreement, the remainder of this Agreement shall govern and control.

| Cost | Responsible Party |
|---|---|
| Ad valorem property taxes | Prorated between Receiver and Purchaser as of the Closing Date on a calendar year basis |
| All other closing costs, expenses, charges and fees | Per Section 5.5 |
| Any endorsements, additional coverage, or changes to the Owner's Title Policy desired by Purchaser or Purchaser's lender, if any | Purchaser |
| Costs for UCC Searches, Environmental Phase I and all other inspections and reports, Site visit(s) of Purchaser and Purchaser Representatives (as defined below) | Purchaser |

APP000004

| Escrow fees | ½ Receiver<br>½ Purchaser |
|---|---|
| Purchaser's Attorney's Fees | Purchaser |
| Receiver's Attorney's Fees | Receiver |
| Settlement Costs | ½ Receiver<br>½ Purchaser |
| Survey | Purchaser |
| Title Commitment, Search and Exam Fees, Basic Premium for Owner's Title Policy promulgated by the Texas Department of Insurance | Purchaser |
| Broker Fees | Purchaser |

## II. PURCHASE AND SALE

2.1.    Agreement of Purchase and Sale. Subject to the terms and conditions hereinafter set forth, Receiver agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Receiver, the Property which consists of:

(a)    The land as depicted on **Exhibit A** ("**Land**");

(b)    The improvements to the Land, if any; and

(c)    All right, title and interest, if any, of FHC at Closing in and to any and all of the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land.

2.2.    Exceptions. The Property shall be conveyed subject to the matters which are, or are deemed to be, Exceptions (as defined below) pursuant to Section 3.3 herein.

2.3.    Purchase Price. The purchase price for the Property will be Nine Million and 00/100 Dollars ($9,000,000.00) (the "**Purchase Price**");

2.4.    Payment of Purchase Price. The Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be due and payable, by Purchaser, in full at Closing by wire transfer of immediately available federal funds to a bank account designated by Escrow Agent (as defined below) in writing to Purchaser prior to the Closing.

2.5.    Earnest Money; Independent Consideration.

(a)    *Earnest Money*. Purchaser agrees to deposit with Jeff Porter of Republic Title of Texas, Inc. ("**Escrow Agent**"): (i) an initial earnest money deposit in the amount of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) within five (5) days after the Effective Date; and (ii)

APP000005

an additional earnest money deposit in the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) within five (5) days following the conclusion of the Feasibility Period (Section 2.5(a)(i) and (ii) are collectively referred to as the "**Earnest Money**"). If Purchaser fails to timely deliver any portion of the Earnest Money, Receiver may terminate this Agreement and this Agreement shall be automatically deemed *void ab initio* and of no further force or effect, at Receiver's sole discretion upon delivery of written notice by Receiver to Purchaser. The Earnest Money shall upon receipt be placed in an interest-bearing account at a federally insured bank and shall be deemed non-refundable to Purchaser upon delivery to the Escrow Agent, unless otherwise provided under the terms of this Agreement. The Earnest Money shall be applicable to the Purchase Price at Closing. All interest on the Earnest Money shall become part of the Earnest Money and will be reported to the Internal Revenue Service as income to Purchaser.

(b)    *Additional Escrow Instructions.* The Escrow Agent shall hold and disburse the Earnest Money (including any portion thereof) in accordance with the terms and conditions of this Agreement. In connection with any termination made in accordance with this Agreement, One Hundred and 00/100 Dollars ($100.00) of the Earnest Money shall be paid to Receiver as independent consideration for Purchaser's right to purchase the Property and for Receiver's execution, delivery and performance of this Agreement (the "**Independent Consideration**"). The Independent Consideration is in addition to and independent of any other consideration or payment provided for in this Agreement, is non-refundable and shall be retained by Receiver notwithstanding any other provision of this Agreement. Receiver acknowledges and agrees that the Independent Consideration is sufficient for Receiver's covenants and obligations under this Agreement. The terms and provisions set forth in this Section 2.5(b) shall survive the termination of this Agreement.

(c)    *Purchaser Acknowledgment.* Purchaser hereby acknowledges and agrees that the Earnest Money held by Escrow Agent does not and shall not constitute property of the estate of Purchaser within the meaning of Section 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), or substantially similar provisions of state law, and Purchaser's interest in such Earnest Money Deposit is limited to the right to have the Earnest Money returned if and when the conditions for the return of the Earnest Money to Purchaser are satisfied as set forth herein. Purchaser hereby acknowledges and agrees that: (i) the proper giving of notice by Receiver to release the Earnest Money as provided hereunder; and/or (ii) the proper release of the Earnest Money to Receiver as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over any case in which Purchaser or any affiliate of Purchaser is a debtor. Purchaser hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, Sections 105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Receiver.

2.6.    Escrow Agent.

(a)    All checks, money orders or drafts received by Escrow Agent will be processed for collection in the normal course of business. Escrow Agent covenants and agrees to hold and

---

PURCHASE AND SALE AGREEMENT                                                                    PAGE 4

**APP000006**

disburse the Earnest Money in accordance with the terms and conditions of this Agreement; provided, however, in the event Escrow Agent receives an order issued by a court of competent jurisdiction instructing Escrow Agent not to release and deliver the Earnest Money to Receiver or Purchaser (as applicable), then Escrow Agent shall continue to hold such Earnest Money until after receipt of mutual agreed upon written instructions from the Parties, or otherwise instructed by court order. Other than for the performance of Escrow Agent's duties and obligations in accordance with the terms and conditions of this Agreement, Escrow Agent shall be without liability to either Receiver or Purchaser and is hereby otherwise fully and unconditionally released from any responsibility or liability related to the holding and disbursement of the Earnest Money under the terms of this Agreement.

(b)     The Escrow Agent shall not be liable for any damage, liability or loss arising out of its services pursuant to this Agreement, except for damage, liability or loss to either Receiver or Purchaser resulting from the breach of the terms of this Agreement, or the willful or negligent conduct of the Escrow Agent or any of its officers or employees. Each of Receiver and Purchaser also hereby authorize and direct Escrow Agent to accept, comply with and obey any and all writs, orders, judgments or decrees entered or issued by any court with jurisdiction with respect to either Receiver or Purchaser; and in case the Escrow Agent obeys or complies with any such writ, order, judgment or decree, it shall not be liable to any of the Parties hereto or any other person, by reason of such compliance. In case the Escrow Agent is a party to any suit or proceedings regarding the Earnest Money, Receiver and Purchaser agree to be jointly responsible for all reasonable attorney's fees and expenses incurred with respect thereto if Escrow Agent is found upon a final judgment issued by a court of competent jurisdiction to not be in breach of the terms of this Agreement, or not to have caused any damage, liability or loss to be incurred or suffered by either Receiver or Purchaser due to the willful or negligent conduct of the Escrow Agent or any of its officers or employees. If said costs, fees and expenses are not paid, then the Escrow Agent shall have the right to reimburse itself out of the Earnest Money then held by Escrow Agent (if any).

(c)     Escrow Agent shall invest the Earnest Money on behalf of the Purchaser in a federally insured, separately denominated account, and all interest earned in connection therewith (if any) shall become part of the "Earnest Money", provided that the Escrow Agent is in receipt of a fully executed W-9 containing the Purchaser's taxpayer's identification number and required investment instructions. Escrow Agent will, upon request, furnish information concerning its procedures and fee schedules for investment. In the event the Escrow Agent is requested to invest Earnest Money hereunder, Escrow Agent shall not be held responsible for any loss of principal or interest which may be incurred as a result of making the investment or redeeming said investment for the purposes of this Agreement, except to the extent arising in connection with the breach of the terms of this Agreement, or the negligence or willful misconduct of the Escrow Agent or any of its officers or employees.

(d)     The terms and provisions set forth in this Section 2.6 shall survive the termination of this Agreement.

---

APP000007

## III. TITLE AND SURVEY

3.1.    Title Examination; Commitment for Title Insurance. Within ten (10) business days after Escrow Agent's receipt of the Earnest Money, Purchaser shall cause Republic Title of Texas, Inc. (the "**Title Company**") to deliver to Receiver and Purchaser a Commitment for Title Insurance on the form promulgated by the Texas Department of Insurance for the Property (the "**Title Commitment**"), together with true, complete, and legible copies of the applicable exception documents. The Title Commitment shall be issued by Title Company or other underwriter acceptable to the Title Company.

3.2.    Survey. Within twenty (20) days following the Effective Date, Receiver shall provide Purchaser, to the extent in Receiver's possession, with the most current survey of the Property in Receiver's possession ("**Current Survey**"), if any.

3.3.    Title Objections; Cure of Title Objections.

(a)    The "**Title Exam Deadline**" shall be 5:00 p.m., Central time, on the twentieth (20th) day following the date in which Purchaser has received the Title Commitment and copies of all title exception documents referenced therein (the "**Supporting Documents**"); provided, however, in no event shall the Title Exam Deadline be later than forty-five (45) days after the Effective Date. Purchaser shall have until the Title Exam Deadline to notify Receiver, in writing, of any objection as Purchaser may have regarding the condition and status of the title to the Property and any matter contained in the Title Commitment and, if applicable, the Current Survey, excluding any Exceptions or Claims created due to the acts or omissions of Purchaser or any Purchaser Representative ("**Purchaser Objection**").

(b)    Any item contained in the Title Commitment, or any matter shown on the Current Survey (if any), which Receiver does not elect in writing to cure prior to the Title Exam Deadline, shall be deemed individually an "**Exception**", and collectively, the "**Exceptions**" and shall include any and all other Exceptions as described in this Agreement hereafter created at or prior to Closing. In the event Purchaser notifies Receiver of a Purchaser Objection, Receiver shall have the right, but not the obligation, to cure such Purchaser Objection.

(c)    Within ten (10) days after receipt of Purchaser's written notice of a Purchaser Objections, Receiver may notify Purchaser in writing of Receiver's election to cure or not cure such Purchaser Objections. If Receiver fails to give Purchaser such notice of election, then Receiver shall be deemed to have elected not to cure such Purchaser Objection. If Receiver elects to cure and this Agreement is not otherwise terminated as provided herein, Receiver shall have until Closing to remove, satisfy or cure the same. In the event that Receiver fails to do so at or prior to Closing, Purchaser shall have a right as its sole and exclusive remedy, to terminate this Agreement and receive a return of the Earnest Money, thereby waiving and releasing Receiver and the Property of and from any and all Claims, and thereafter neither Receiver nor Purchaser shall have any further

APP000008

rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.

(d)      Upon the expiration of the Title Exam Deadline, and subject to Section 3.5 herein, Purchaser shall be deemed to have accepted the form and substance of the Current Survey, all matters shown thereon, and all other then-existing Exceptions, including without limitation, all exceptions to the Title Commitment and other items shown thereon. If Receiver elects (or is deemed to have elected) not to cure any Purchaser Objection specified in Purchaser's notice, or if Receiver is unable to effect a cure of a Purchaser Objection which Receiver has elected in writing to cure prior to the Closing, Purchaser shall, as its sole and exclusive remedy (and hereby waiving and releasing Receiver and the Property of and from any and all Claims), either: (i) accept a conveyance of the Property subject to the Exceptions, specifically including any matter objected to by Purchaser which Receiver is unwilling or unable to cure; or (ii) terminate this Agreement by delivering written notice thereof to Receiver on or before the expiration of the Feasibility Period, or if the Title Commitment is thereafter updated and reflects a new Exception (other than an existing or permitted Exception), then Purchaser may terminate this Agreement by delivering written notice thereof to Receiver on or before the expiration of such date that is five (5) days after the date of such updated Title Commitment which reflects such new exception that Receiver has not agreed in writing to cure by Closing, and was not otherwise already an Exception (or deemed Exception) to title as provided under the terms of this Agreement. Upon delivery of such notice of termination, this Agreement shall terminate and thereafter neither Receiver nor Purchaser shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.

(e)      Receiver shall have no obligation to take any steps or bring any action or proceeding or otherwise to incur any effort or expense whatsoever to eliminate or modify any Exceptions or any Purchaser Objections thereto, except with respect to any items that Receiver agrees in writing to cure.

(f)      For purposes of this Agreement, in addition to the foregoing, the term "Exception" or "Exceptions" shall also specifically include: (i) any and all general real estate taxes and assessments, special taxes and assessments, franchise taxes, levies and personal property taxes imposed by any governmental or quasi-governmental authority and any assessments, dues or charges by private covenant constituting a lien or charge on the Property which are, as of the Closing, not delinquent; (ii) supplemental taxes, if any, hereinafter assessed by any governmental authority against the Property to the extent due to a change in ownership and/or use of the Property as a result of this sale; (iii) any other access, telecommunication, cabling and/or utility agreements, memorandums of agreements, licenses or rights-of-way either filed of public record against title to or otherwise effects, the Property, whether prior to or after the Effective Date; (iv) any license, contract, instrument or other agreement entered into between Receiver and/or Receiver's affiliate (on the one hand), and the City, the FEDC, the FCDC, or any other administrative body, governmental or quasi-governmental authority, or utility provider (on the other hand), which is either filed of public record against title to or otherwise effects, the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or

APP000009

occupancy of the Property, whether prior to or after the Effective Date; (v) the permits, approvals and conditions which have been or must be obtained for the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, including without limitation, and any document, instrument and/or agreement related to same (including, without limitation, any replat of the Property or any portion thereof), whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date.

3.4.    Conveyance of Title. At Closing, Receiver shall convey fee simple title to the Property, on behalf of FHC, to Purchaser, subject to the Exceptions.

3.5.    Pre-Closing "Gap" Title Matters. Provided the Agreement has not otherwise been terminated, after the expiration of the Feasibility Period, Purchaser may, prior to the Closing Date, notify Receiver in writing of any objections to title first appearing on the Title Commitment or the Current Survey after the expiration of the Feasibility Period, other than any Exceptions. Purchaser must provide Receiver written notice of any such objections within five (5) days after receipt of notice thereof (whether reflected in the updated Title Commitment or the Current Survey, receipt of a recorded copy of such instrument, or otherwise), failing which Purchaser shall be deemed to have waived its right to object and such new title exception shall be deemed an Exception under the terms of this Agreement. With respect to any objections to title set forth in such notice, Receiver shall have the same option to cure, and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser before the Title Exam Deadline.

### IV. FEASIBILITY PERIOD

4.1.    Feasibility Period.

(a)    From and after the Effective Date until the earlier of the termination of this Agreement or thirty (30) days thereafter (the "**Feasibility Period**"), Purchaser and its agents, employees, consultants, inspectors, appraisers, engineers, and contractors (collectively the "**Purchaser's Representatives**") shall have the right to make physical and environmental inspections of the Property and to examine such other information that Purchaser reasonably requests and Receiver agrees in writing to provide.

(b)    Purchaser understands and agrees that any on-site inspections of the Property shall be conducted upon reasonable advance notice to Receiver. Purchaser and Purchaser's Representatives shall have the right to perform a Phase I environmental site assessment of the Property and a geotechnical survey of the Land without Receiver's consent. Purchaser and Purchaser's Representatives shall not engage in any activities that would violate any permits, licenses, entitlements, environmental, wetlands or other regulations pertaining to the Property, or any terms or provisions set forth in any Exception documents. Following each entry by Purchaser or Purchaser's Representatives with respect to inspections and/or tests on the Property made by Purchaser or Purchaser's Representatives, Purchaser shall, to the extent of any damage caused by Purchaser's inspections or tests, restore the Property in the same condition that existed immediately

APP000010

prior to any such inspections and/or tests to Receiver's reasonable satisfaction. Such obligation to restore shall survive the termination of this Agreement.

(c)     In no event shall Purchaser be responsible to repair or cure any pre-existing conditions on the Property so long as the existing condition is not worsened by Purchaser or by any Purchaser Representative. At no third-party expense to Receiver, Receiver shall reasonably cooperate with Purchaser in its due diligence investigations conducted in accordance with this Section 4.1.

(d)     Purchaser agrees to indemnify, defend, and hold Receiver and its disclosed or undisclosed, agents, affiliates, representatives, consultants, accountants, contractors, and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Receiver, the "**Receiver Parties**") harmless from and against any and all losses, costs, damages, liens, claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) (each a "**Claim**") incurred by any Receiver Parties arising from or by reason of Purchaser's and/or Purchaser's Representatives' access to, or inspection of, the Property, or any tests, inspections, or other due diligence conducted by or on behalf of Purchaser, except to the extent such Claims are caused by the gross negligence or willful misconduct of any of the Receiver Parties. The provisions of this Section 4.1(d) shall survive the Closing or any termination of this Agreement.

4.2.     Right of Termination. Purchaser shall have the right to terminate this Agreement, in Purchaser's sole discretion, for any reason or no reason, by giving written notice thereof to Receiver prior to the expiration of the Feasibility Period. If Purchaser gives such notice of termination to Receiver prior to the expiration of the Feasibility Period, this Agreement shall terminate, the Earnest Money shall be promptly returned to Purchaser, and neither Receiver nor Purchaser shall have any further rights or obligations under this Agreement, other than those that expressly survive a termination of this Agreement. If Purchaser fails to give Receiver written notice of termination prior to the expiration of the Feasibility Period, Purchaser shall be deemed to have elected to proceed with the purchase of the Property pursuant to the terms hereof and the Earnest Money shall be non-refundable to Purchaser, absent only an uncured default by Receiver, but shall be applicable to the Purchase Price at Closing.

## V. CLOSING

5.1.     Time and Place.

(a)     The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 4:00 p.m. (Central time) on the date which is sixty (60) days after the expiration of the Feasibility Period, or earlier date as agreed in writing by the Parties, and subject to the remainder of this Article IV (the "**Closing Date**"). Closing shall not be contingent upon re-zoning of the Property.

(b)     The Closing shall occur with all deliveries required hereunder being made to Escrow Agent on or before the Closing Date, in accordance with escrow instructions consistent with the terms and conditions of this Agreement given by or on behalf of Receiver and Purchaser, respectively; whereby escrow arrangements mutually acceptable to Receiver and Purchaser shall allow Receiver, Purchaser and their respective attorneys to consummate the Closing without being physically

APP000011

present and to exchange closing documents through such escrow, via electronic means, and/or .pdf (except with regard to recordable documents or other instruments reasonably requested by the Parties to be provided in original "wet ink" form), which shall be physically delivered to the Escrow Agent on or before the Closing Date.

5.2.    <u>Receiver's Obligations at Closing</u>. At Closing, subject to Purchaser's timely and proper satisfaction of the terms and conditions set forth in Section 5.3 below and Court approval pursuant to Section 5.9 below, Receiver shall:

(a)    deliver to the Title Company for delivery to Purchaser the duly executed recordable special warranty deed for the Land, in substantially the form attached hereto as **Exhibit B** (the "**Deed**") and incorporated herein as if fully set forth;

(b)    deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Receiver;

(c)    deliver to Purchaser possession and occupancy of the Property, subject to the Exceptions;

(d)    execute a closing statement in form and content satisfactory to Receiver;

(e)    execute and deliver such documents and other information as may be reasonably required by the Title Company to issue an owner's title insurance policy in the form promulgated by the Texas Department of Insurance for the Property (the "**Title Policy**"); and

(f)    execute and deliver such additional documents as shall be reasonably required to consummate the transactions expressly contemplated by this Agreement.

5.3.    <u>Purchaser's Obligations at Closing</u>. At Closing, subject to Receiver's timely and proper satisfaction of the terms and conditions set forth in Section 5.2 above and Court approval pursuant to Section 5.9 below, Purchaser shall:

(a)    pay to Escrow Agent the full amount of the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred funds pursuant to Section 2.6 above;

(b)    execute a closing statement in form and content satisfactory to Purchaser;

(c)    deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser;

(d)    pay to Broker a commission pursuant to Section 8.1 herein; and

(e)    execute and deliver such additional documents as shall be reasonably required to consummate the transactions contemplated by this Agreement.

APP000012

5.4.    Credits and Prorations. The following shall be apportioned with respect to the Property as of 12:01 a.m. (Central time), on the Closing Date, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs which such prorations shall be final and binding with no further adjustment and shall survive Closing:

(a)    Any Assessments levied against or otherwise applicable to the Property;

(b)    If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing (the "**Rollback Taxes**"), then Purchaser shall be responsible for payment of all Rollback Taxes; and

(c)    Assessments for the calendar year in which the Closing occurs shall be prorated at the Closing based upon actual days involved. If the actual amount of such Assessments are not known as of such date, either because tax bills for the calendar year of the Closing have not been issued or because such tax bills cover real property in addition to the Property, the proration at the Closing will be based on the most current and accurate tax billing information available, subject to allocation of prorated Assessments being proportionate to the gross square feet (GSF) size of the Property compared to any other real property included in the tax bills.

5.5.    Closing Costs.

(a)    Receiver shall pay on behalf of FHC: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) one-half of State, County and City transfer taxes which become payable by reason of the transfer of the Property from Receiver to Purchaser; (iii) one-half of the Escrow Costs; and (iv) any other costs, fees or expenses approved by Receiver under the terms of this Agreement or the settlement statement delivered at Closing.

(b)    Purchaser shall pay: (i) the fee for the Title Commitment, search, exam fee and the basic premium for Title Policy; (ii) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (iii) the cost of obtaining or updating the Current Survey and other third party reports relating to the conducting its due diligence review; (iv) pay the cost for any title endorsements; (v) the recordation fee for the Deed and any other documents, instruments or agreements to be recorded at Closing; (vi) one-half of the Escrow Costs; (vii) all fees and costs associated with Purchaser's loan or otherwise incurred by Purchaser's lender; (viii) one-half of State, County and City transfer taxes which become payable by reason of the transfer of the Property from Receiver to Purchaser; and (ix) any other commissions, costs, fees or expenses approved by Purchaser under the terms of this Agreement or the settlement statement delivered at Closing. All other costs and expenses incident to this transaction and the closing thereof shall be paid in accordance with Section 1.1 of this Agreement; if not enumerated in this Section 5.5 or in Section 1.1, such costs and expenses shall be paid by the Party incurring such costs and expenses. In the event of a conflict between this Section 5.5 and Section 1.1, then this Section 5.5 shall

APP000013

control. The provisions of this Section 5.5 shall survive the Closing or any early termination of this Agreement.

5.6.    Conditions Precedent to Obligation of Purchaser.

(a)    The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion (individually, a "**Purchaser's Condition Precedent**" and collectively, the "**Purchaser's Conditions Precedent**"):

(i)    All of the representations and warranties of Receiver contained in this Agreement, if any, shall be true and correct in all material respects as of the Closing Date;

(ii)    Receiver shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Receiver as of the Closing Date; and

(iii)    The Court has approved the transactions contemplated hereby pursuant to Section 5.9 herein.

(b)    Purchaser agrees that, as soon as Purchaser has notice of the failure of a Purchaser's Condition Precedent, Purchaser shall notify Receiver thereof and Receiver shall have three (3) business days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) business day period; provided, however, in no event shall the Closing Date be further extended under the terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.2) unless Purchaser and Receiver agree in writing to such extension.

(c)    In the event (i) each and all of Receiver's Conditions Precedent are timely and completely satisfied (or, if applicable, waived in writing by Receiver), and (ii) each and all of the Purchaser's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) business day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Receiver's prior written agreement), then Purchaser shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Purchaser's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Receiver as provided for and in accordance with the terms and conditions set forth in Section 7.2. The provisions set forth in this Section 5.6(c) shall survive the termination of this Agreement.

5.7.    Conditions Precedent to Obligation of Receiver.

(a)    The obligation of Receiver to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which

APP000014

may be waived by Receiver in its sole discretion (individually, a "**Receiver's Condition Precedent**" and collectively, the "**Receiver's Conditions Precedent**"):

(i)    Purchaser shall have timely deposited with Escrow Agent on or before 1:00 p.m. (Central time) on the Closing Date, the Purchase Price as adjusted pursuant to and payable in the manner provided for in this Agreement;

(ii)    All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date;

(iii)    Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the Closing Date; and

(iv)    The Court has approved the transactions contemplated hereby pursuant to Section 5.9 herein.

(b)    Receiver agrees that, as soon as Receiver has notice of the failure of a Receiver's Condition Precedent other than Purchaser's failure to deliver the remaining portion of the Purchase Price or any other amounts required to be delivered herein by Purchaser (which event shall be deemed an automatic default by Purchaser without any notice or cure rights), Receiver shall notify Purchaser thereof and Purchaser shall have three (3) business days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) business day period; provided, however, in no event shall the Closing Date be further extended under the terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.1) unless Purchaser and Receiver agree in writing to such extension.

(c)    In the event each and all of the Receiver's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) business day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Receiver's prior written agreement), then Receiver shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Receiver's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Purchaser as provided for and in accordance with the terms and conditions set forth in Section 7.1, and, if applicable, pursue any Claim against Purchaser related to any indemnity obligations arising under the terms of this Agreement. The provisions set forth in this Section 5.7(c) shall survive the termination of this Agreement.

5.8.    <u>Obligations of Purchaser</u>. Purchaser acknowledges that conveyance of title to the Property may be subject to certain covenants, conditions, and restrictions. Purchaser covenants and agrees to continue to cooperate in good faith with Receiver to execute, deliver and record (if necessary) such documents required with respect to such covenants, conditions, and restrictions, which such obligation shall survive Closing.

APP000015

5.9.    Court Approval. Notwithstanding anything to the contrary herein, Purchaser acknowledges that the transactions contemplated by this Agreement are expressly subject in all respects to: (a) approval and confirmation by the Court; (b) any applicable order of the Court in the Receivership Action; and (c) compliance with Applicable Laws (defined below).

## VI. REPRESENTATIONS, WARRANTIES, AND COVENANTS

6.1.    Representations, Warranties and Covenants of Purchaser. Purchaser hereby makes the following representations, warranties and covenants for the benefit of Receiver as of the Effective Date and the Closing Date:

(a)    Purchaser is validly existing, in good standing under the laws of the state of its formation, and duly qualified to do business in the State of Texas. Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been, taken. Any permitted assignee of Purchaser shall be an entity which, prior to the Closing, is validly existing and in good standing under the laws of the state of its formation and, if applicable, duly qualified to do business in the State of Texas. The person signing this Agreement on behalf of Purchaser is authorized to do so. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, governmental or quasi-governmental authority or other third party is required for Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby which has not already been obtained.

(b)    There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending or, to Purchaser's knowledge, threatened against Purchaser which, if adversely determined, could materially interfere with the consummation by Purchaser of the transactions contemplated by this Agreement.

(c)    The execution and delivery of this Agreement or the consummation by Purchaser of the transactions contemplated by this Agreement will not (i) conflict with or result in a breach of or default under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, license, agreement, or other instrument or obligation to which Purchaser is a party, or (ii) violate any order, injunction, decree, statute, rule, or regulation applicable to Purchaser.

(d)    Purchaser has, or has available to it, funds adequate to pay the Purchase Price at Closing and to perform its other obligations under this Agreement.

(e)    Purchaser is not: (i) a plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as defined in Section 3(3) of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to collectively as a "Plan"); or (ii) a "governmental plan" as defined in Section 3(32) of ERISA. Purchaser is acting on its own behalf and not on account of or for the benefit of any Plan. Purchaser shall not transfer the Property to any entity, person or Plan which

APP000016

will cause a violation of ERISA. Purchaser shall not assign its interest under this Agreement to any entity, person or Plan which, if the assignee acquires the Property, will cause a violation of ERISA.

(f)    Neither Purchaser, nor to Purchaser's knowledge any individual or entity having an interest in Purchaser, is, nor will become, a person and/or entity with whom U.S. persons or entities are restricted from doing business under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq.; the Trading with the Enemy Act, 50 U.S.C. App. §5; any executive orders promulgated thereunder; any implementing regulations promulgated thereunder by OFAC (including those persons and/or entities named on the SDN List); or any other applicable law of the United States, including Executive Order 13224 or the USA Patriot Act.

(g)    Should this Agreement terminate prior to the Closing Date, Purchaser shall, at its sole cost and expense, immediately (i) return or cause to be returned to Receiver all copies of any information or documents received from Receiver and any other Receiver Parties in hard copy form, and (ii) delete from its computer and other electronic storage devices any information or documents received from Receiver and any other Receiver Parties received from Receiver electronically.

(h)    Before Closing, Purchaser agrees (whether individually or by and through an entity which is directly or indirectly owned or controlled by Purchaser) not to solicit, negotiate or enter into any document, agreement or instrument that is binding upon Receiver or Receiver's interest in the Property, or the Property, or any portion thereof.

6.2.    <u>Survival of Representations, Warranties and Covenants</u>. The representations, warranties and covenants of Purchaser set forth in Section 6.1 shall survive Closing for a period of six (6) months.

## VII. DEFAULT

7.1.    <u>Default by Purchaser</u>. In the event that Purchaser fails to perform its obligations prior to Closing pursuant to this Agreement for any reason other than a default by Receiver or the permitted termination of this Agreement by either Receiver or Purchaser as herein expressly provided, or if prior to Closing any one or more of Purchaser's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Receiver, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed five (5) days after the original date for Closing set forth in Section 5.1 hereof), unless otherwise stated in this Agreement to the contrary, Receiver shall be entitled as its sole and exclusive remedy, either to: (a) waive said failure or breach and proceed to Closing without any reduction in the Purchase Price; or (b) terminate this Agreement and receive or retain (as applicable) the Earnest Money as liquidated damages for Purchaser's breach of this Agreement, it being agreed between the Parties hereto that determining the actual damages to Receiver in the event of such breach are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate thereof. In addition to the foregoing rights of Receiver, Receiver shall retain the right to pursue against Purchaser any Claim for any indemnification obligation of Purchaser set forth in this Agreement. IN NO EVENT SHALL PURCHASER'S DIRECT OR INDIRECT PARTNERS (OTHER THAN A GENERAL PARTNER OF A PARTNERSHIP), SHAREHOLDERS, MEMBERS, OWNERS OR AFFILIATES, OR ANY OFFICER,

APP000017

DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF WHO, (WHETHER INDIVIDUALLY OR COLLECTIVELY) ARE NOT A PARTY TO ANY AGREEMENT WITH RECEIVER (OR ANY ENTITY CONSTITUTING RECEIVER, AS APPLICABLE) HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE. The provisions of this Section 7.1 shall survive Closing or the earlier termination of this Agreement.

7.2.    Default by Receiver. In the event that Receiver fails to perform prior to Closing its obligations under this Agreement for any reason other than Purchaser's default, or the permitted termination of this Agreement by either Receiver or Purchaser as herein expressly provided, or if prior to Closing any one or more of Receiver's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Purchaser, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed five (5) days after the original date for Closing set forth in Section 5.1 hereof), Purchaser shall elect, as its sole and exclusive remedy, either to: (a) waive said failure or breach and proceed to Closing without any reduction in the Purchase Price; or (b) terminate this Agreement and receive the return of the Earnest Money. The provisions of this Section 7.2 shall survive Closing or the earlier termination of this Agreement.

7.3.    Provisions Applicable to Claims. Any pre- or post-judgment claims shall bear interest at the lesser of ten percent (10%) per annum, or the highest rate of interest allowed by law. If Closing is consummated, then the Parties shall have all remedies available to each respective Party as provided under the terms of this Agreement which are applicable to the alleged default (including, without limitation, the remedies provided in Article V above) in the event either Party fails to perform any obligation under this Agreement that survives the Closing; provided, however, in no event shall either Party be liable to the other Party for any incidental, consequential or punitive damages. The provisions of this Section 7.3 shall survive Closing or the earlier termination of this Agreement.

## VIII. COMMISSIONS

8.1.    Brokerage Commissions. Upon the Closing of the transaction contemplated in this Agreement, Purchaser shall pay to Avison & Young (Attn: Michael Kennedy) ("**Broker**") a commission ("**Broker's Commission**") pursuant to the terms of a separate written agreement. If Closing does not occur for any reason, then Purchaser shall not owe or be obligated to pay Broker's Commission. Under no circumstances shall Receiver or Purchaser owe a commission or other compensation to any other broker, agent or person. Under no circumstances shall Receiver owe a commission or other compensation to any broker, agent or person. Purchaser hereby represents and warrants to Receiver that, other than Broker's Commission payable to Broker by Purchaser, no other brokers, agents, finder's fees, or commissions are due or arising in connection with Purchaser entering into this Agreement or the consummation of transactions contemplated herein, and Purchaser hereby agrees to indemnify, defend and hold Receiver harmless from and against all Claims arising from such warranties whether or not such Claim is meritorious, for any compensation with respect to the entering into of this Agreement, the sale and purchase of the Property, or the consummation

APP000018

of transactions contemplated herein. The provisions of this Section 8.1 shall survive Closing or earlier termination of this Agreement.

## IX. DISCLAIMERS AND WAIVERS

9.1.    Certain Definitions. The following terms shall have the definitions indicated below:

(a)    "**Environmental Law**" shall mean any federal, state, or local laws, ordinances, permits, or regulations, or any common law, regarding health, safety, radioactive materials, or the environment, including, but not limited to, the following federal statutes: Clean Air Act (42 U.S.C. § 7401 et seq.) ("**CAA**"), Clean Water Act (42 U.S.C. § 1251 et seq.) ("**CWA**"), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.) ("**RCRA**"), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("**CERCLA**"), Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.) ("**EPCRA**"), Safe Drinking Water Act (42 U.S.C. § 300f et seq.) ("**SDWA**"), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("**TSCA**"), Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) ("**ESA**"), Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.) ("**FIFRA**"), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) ("**OSHA**"), each as amended, and any regulations promulgated thereunder, guidance and directives issued with respect thereto, or policies adopted by authority thereunder.

(b)    "**Environmental Matter**" shall mean any of the following: (i) the Release of any Hazardous Material on or at the Property or any other property; (ii) the migration of any Hazardous Material onto or from the Property; (iii) the environmental, health, or safety aspects of the transportation, storage, treatment, handling, use, or Release, whether any of the foregoing occurs on or off the Property, of Hazardous Materials in connection with the operations or past operations of the Property; (iv) the violation, or alleged violation, of any Environmental Law, order, permit, or license of or from any governmental authority, agency, or court relating to environmental, health, or safety matters; (v) the presence of any underground storage tanks within the confines of the Property; (vi) the presence of wetlands within the confines of the Property; (vii) the presence of any endangered species on, in, or around the Property; or (viii) the characterization of the Property as historical in nature in any way.

(c)    "**Hazardous Material**" shall mean: (i) any radioactive materials; (ii) any substance or material the transportation, storage, treatment, handling, use, removal, or Release of which is subject to any Environmental Law; or (iii) any substance or material for which standards of conduct are imposed under any Environmental Law. Without limiting the generality of the foregoing, "Hazardous Materials" shall include: asbestos and asbestos-containing materials (whether or not friable); urea-formaldehyde in any of its forms; polychlorinated biphenyls; oil; used oil; petroleum products and their by-products; lead based paint; radon; and any substances defined as "hazardous waste", "hazardous substances", "pollutants or contaminants", "toxic substances", "hazardous chemical", "hazardous air pollutants", or "toxic chemical" under the CAA, CWA, RCRA, CERCLA, EPCRA, SDWA, TSCA, or OSHA, or any other Environmental Law.

APP000019

(d)    "**Release**" shall mean the discharge, disposal, deposit, injection, dumping, spilling, leaking, leaching, placing, presence, pumping, pouring, emitting, emptying, escaping, or other release of any Hazardous Material.

9.2.    Disclaimer of Warranties.

(a)    Purchaser acknowledges that Receiver has acquired the rights and obligations to sell the Property due solely to the Receivership Action, and consequently Receiver has little or no knowledge of the condition of the Property and the surrounding areas. ACCORDINGLY, PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS" AS OF THE EFFECTIVE DATE AND AS OF THE CLOSING DATE, AND PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT RECEIVER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER WILL INSPECT THE PROPERTY AND PURCHASER WILL RELY SOLELY ON ITS OWN INVESTIGATION AND INSPECTIONS OF THE PROPERTY IN ITS ACQUISITION THEREOF. RECEIVER SHALL HAVE NO OBLIGATION HEREUNDER TO ALTER, REPAIR, OR IMPROVE THE PROPERTY UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

(b)    Purchaser further agrees that Purchaser will not rely upon any: (i) representations or warranties (oral or written) made by, or purportedly on behalf of, Receiver unless expressly set forth in this Agreement, or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Receiver. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO PURCHASER BY RECEIVER, A RECEIVER PARTY, OR ON RECEIVER'S BEHALF, HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY RECEIVER, AND ARE NOT TO BE RELIED UPON BY PURCHASER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. RECEIVER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES, AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO PURCHASER BY RECEIVER, ANY RECEIVER PARTY, OR ANYONE ACTING OR PURPORTING TO ACT ON RECEIVER'S BEHALF.

(c)    EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT, RECEIVER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, RECEIVER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING ANY OF THE FOLLOWING MATTERS:

(i)    EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE PROPERTY;

APP000020

(ii)    THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS;

(iii)    THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR FUTURE DEVELOPMENT OR RENOVATION OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT PURCHASER MAY ELECT TO CONDUCT THEREON;

(iv)    THE CONDITION OF THE PROPERTY OR ANY PORTION THEREOF;

(v)    THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF ANY UTILITIES SERVING THE PROPERTY; OR

(vi)    THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR ENVIRONMENTAL MATTERS.

9.3.    Waiver and Release of Liability; Indemnification.

(a)    PURCHASER, FOR ITSELF AND ITS HEIRS, SUCCESSORS, AND ASSIGNS AND ANYONE ELSE CLAIMING BY, THROUGH, OR UNDER PURCHASER, HEREBY EXPRESSLY WAIVES THE CLAIMS DESCRIBED BELOW IN THIS SECTION 9.3 (WHETHER OR NOT SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE), AND RELEASES THE RECEIVER PARTIES FROM ANY AND ALL LIABILITY BASED IN WHOLE OR IN PART UPON ANY SUCH CLAIMS:

(i)    CLAIMS BASED UPON ANY OF THE MATTERS SET FORTH IN SECTION 9.2 ABOVE; AND

(ii)    NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS AGREEMENT, CLAIMS BASED UPON ANY ACTUAL OR ALLEGED FAILURE BY RECEIVER OR ANY RECEIVER PARTY TO SATISFY A DUTY TO DISCLOSE INFORMATION TO PURCHASER CONCERNING THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONCERNING THE PRESENCE OF ANY PATENT OR LATENT DEFECTS, DEFICIENCIES IN OR AFFECTING THE PROPERTY, OR THE PRESENCE OF ANY PATENT OR LATENT ENVIRONMENTAL MATTERS OR HAZARDOUS MATERIALS.

(b)    Notwithstanding the intent of the Parties hereto that the waiver and release provisions contained in Section 9.3(a) above bar all Claims by Purchaser and Purchaser's heirs, successors, and assigns and anyone else claiming by, through, or under Purchaser, should a court of competent jurisdiction deem otherwise, Purchaser hereby agrees that the presence of the waiver and release provisions in Section 9.3(a) should serve as the overwhelming, primary factor in any equitable apportionment of costs under applicable federal, state, or local laws, ordinances, or regulations.

(c)    Purchaser shall indemnify, defend, and hold Receiver Parties harmless from and against all Claims (including cleanup or remediation costs, deficiencies, interest, fines, penalties, court costs,

---

APP000021

and consultants' and attorneys' fees and disbursements) that Receiver Parties suffer, incur, or may potentially suffer or incur, as a result of any Claims made or brought by any party other than Purchaser (including, without limitation, any governmental or quasi-governmental agency, instrumentality, or authority, or one or more private parties) on the basis of any of the matters set forth in this Article IX.

(d)      Purchaser acknowledges and agrees that the waiver, release, and indemnification provisions contained in this Section 9.3 are each reasonable and acceptable to Purchaser and an essential component of the consideration for the sale of the Property hereunder and Receiver would not otherwise sale the Property without such provisions.

(e)      Purchaser acknowledges and agrees that Purchaser's sole recourse for Claims of the nature described in this Article IX shall be to or against parties other than Receiver Parties and that economic recovery may not be possible against some or all of such parties.

(f)      Notwithstanding anything to the contrary, each of the provisions of this Article IX shall survive Closing and the execution and delivery of the Deed by Receiver and shall not be merged therein.

## X. MISCELLANEOUS

10.1.    <u>Other Statutory Disclosure Provisions</u>. The following disclosures are made for the purpose of complying with specific statutory provisions of Texas law, and such disclosures are not intended to and do not hereby alter or affect the rights and obligations of Purchaser and Receiver:

(a)      *Notice Regarding Possible Annexation*. If the Property is located outside the limits of a municipality, the Property may now or later be included in the extra-territorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information. The complete requirements for the notice may be found at Tex. Prop. Code Ann. § 5.011.

(b)      *Notice to Purchaser Regarding Restrictive Covenants*. Pursuant to the Texas Local Government Code, if the Property is located within a municipality whose governing body has required any person who sells or conveys restricted property located within its jurisdiction to first give written notice to the Purchaser of: (i) the restrictions and (ii) the municipality's right to enforce compliance with the restrictions, written notice must be given to by Receiver to Purchaser on or before the final closing, and the notice document must be signed and acknowledged by both Receiver and Purchaser, then recorded in the real property records in the county where the real property is located. The requirements and text of the notice may be found at 30 Tex. Loc. Gov't Code Ann. § 212.155.

APP000022

(c)    *Notice to Purchaser Regarding Coastal Area Property.* Pursuant to the Texas Natural Resources Code, if the Property adjoins and abuts the tidally influenced waters of the state, this information must be disclosed by Receiver to Purchaser before the transaction closes. The requirements and text of the notice may be found at Tex. Nat. Res. Code Ann. § 33.135.

(d)    *Notice to Purchaser of Property Seaward of Gulf Intracoastal Waterway.* Pursuant to the Texas Natural Resources Code, if the Property is located seaward of the Gulf Intracoastal waterway to its southernmost point and then seaward of the longitudinal line also known as 97 degrees, 12'19" which runs southerly to the international boundary from the intersection of the centerline of the Gulf Intracoastal waterway and the Brownsville Ship Channel, then this information must be disclosed by Receiver to Purchaser before the transaction closes. The requirements and text of the notice may be found at Tex. Nat. Res. Code Ann. § 61.025.

(e)    *Storage Tanks Disclosure Provider.* If the Property contains an underground storage tank or tank system or an aboveground tank or tank system subject to regulation by the Texas Commission on Environmental Quality, statutory notice must be given by Receiver to Purchaser prior to closing pursuant to the Texas Administrative Code. The requirements and text of the notice may be found at 30 Tex. Admin. Code Ann. § 334.9.

(f)    *Utility District Notice.* If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49 of the Texas Water Code requires Receiver to deliver and Purchaser to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Agreement. The requirements and text of the notice may be found at Tex. Water Code Ann. § 49.452.

(g)    *Notice to Purchaser of Property Located in Certain Annexed Water Districts.* This form sets out the mandatory notice provisions under the Texas Water Code. If the Property is located in a water or sanitary sewer district that entered into a contract with a city, other than a city with a population of more than one million in a county of more than two million, that allows the city to set rates in the district after annexation that are different from rates charged to other residents of the city, Receiver at or before closing must deliver to Purchaser a separate written notice, executed and acknowledged by Receiver, containing the information in this notice. Purchaser must sign the notice to evidence receipt. Tex. Water Code Ann. § 49.452(g)-(p) applies to this notice provision, including Purchaser's right to seek damages if the sale or conveyance of the Property is not made in compliance with this statute. The requirements and text of the notice may be found at Tex. Water Code Ann. § 54.016(h)(4) and § 49.452(g)-(p).

(h)    *Notice to Purchaser that Property is Located within the Area of the Alignment of a Transportation Project.* Pursuant to the Texas Local Government Code, if the Property is within the area of the alignment of a transportation project, as shown on the final environmental decision document applicable to the future transportation corridor identified in an agreement between the Texas Department of Transportation and the county under Tex. Transp. Code Ann. § 201.619, Receiver must provide a conspicuous statement in the Agreement. The requirements and text of the notice may be found at Tex. Loc. Gov't Code Ann. § 232.0033.

APP000023

(i)     *Notice Required by §13.257, Texas Water Code*. Receiver hereby notifies Purchaser that the Property may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If the Property is located in a certificated area, there may be special costs or charges that Purchaser will be required to pay before Purchaser can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to the Property. Purchaser is advised to determine if the Property is in a certificated area and contact the utility service provider to determine the cost that Purchaser will be required to pay and the period, if any, that is required to provide water or sewer service to the Property. By execution of this Agreement, Purchaser acknowledges receipt of this notice. Receiver and Purchaser agree that the provisions of this 10.1 shall survive Closing.

10.2.    Public Disclosure. Subject to Section 5.9, prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement that would disclose the Purchase Price will be made only in the form approved by each of Purchaser and Receiver, except to the extent such release of information is to a party entitled to receive such information hereunder. The provisions of this Section 10.2 shall survive any early termination of this Agreement.

10.3.    Jury Waiver. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM ARISING OUT OF THIS AGREEMENT OR ANY INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO. THIS SECTION 10.3 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

10.4.    Assignment.

(a)     Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Receiver. In the event that Purchaser desires to assign its rights under this Agreement, Purchaser shall send written notice to Receiver at least five (5) business days prior to the Closing, and upon any permitted assignment of this Agreement at Closing, Purchaser shall promptly deliver to Receiver a copy of the fully executed assignment of this Agreement and the assumption by the assignee of Purchaser's obligations hereunder. Any such assignment must include the assignee's tax identification number. Any assignee of Purchaser's interest in this Agreement shall be bound by all approvals and waivers, actual and deemed, by the original Purchaser prior to the assignment. The original Purchaser shall not be released of any duties, obligations, or liability for any Claims arising under the terms of this Agreement.

(b)     Receiver (at its sole cost) may transfer and convey the Property, and otherwise assign, transfer and delegate its rights, duties and obligations under this Agreement and any post-Closing agreement to any Receiver Parties without Purchaser's consent; provided, however, Receiver shall not be released of any duties, obligations or liabilities for any Claims arising under the terms of this Agreement which are not expressly assumed by Receiver's assignee. Upon such transfer, assignment and conveyance, the original Receiver shall be immediately released of any and all duties, obligations and liability for any Claims arising under the terms of this Agreement and any

APP000024

post-Closing agreements (or otherwise) which are expressly assumed by Receiver's assignee, and all references in this Agreement and any post-Closing agreement to Receiver shall thereafter mean and refer to Receiver's assignee, to the extent the context requires. The Parties hereto agree that all representations, warranties, covenants and indemnifications shall inure to the benefit of any permitted assignee of Purchaser and Receiver, as applicable.

10.5.    Notices. Any notice, request, demand, instruction or other communication to be given to either Party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be deemed to be delivered, whether actually received or not, upon: (a) deposit with a courier service for personal delivery (whether by local or overnight courier service); or (b) deposit in a regularly maintained official depository of the United States Mail located in the continental United States, and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below; or (c) electronic transmission to the email address set forth below, so long as an original of same is sent within one (1) business day thereafter by either of the methods described in (a) or (b) above to the address as set forth below.

|  |  |
|---|---|
| If to Receiver: | c/o Cort Thomas, as receiver of FHC Acquisition LLC<br>8111 Preston Road<br>Suite 300<br>Dallas, Texas 75225<br>Email: Cort@brownfoxlaw.com |
| with a copy to: | Brown Fox PLLC<br>Attn: Adam Fox<br>6303 Cowboys Way, Suite 450<br>Frisco, Texas 75034<br>Email: adam@brownfoxlaw.com |
| If to Purchaser: | PETRA DEVELOPMENT, LLC<br>1875 K Street NW<br>Fl 4 Suite 436<br>Washington, D.C. 20006<br>Attention: Rashid Salem<br>E-mail: rashid@livepetra.com |
| with a copy to: | The Wolf Law Firm, P.C.<br>Attn: Jeffrey J. Wolf<br>1360 N. White Chapel Blvd., Suite 100<br>Southlake, Texas 76092<br>Office: (817) 552-9653<br>Email: jwolf@wolflawpc.com |
| If to Escrow Agent: | Republic Title of Texas, Inc.<br>2626 Howell Street, 10th Floor<br>Dallas, Texas 75204 |

APP000025

Attn: Jeff Porter
Telephone: (214) 855-8820
Email: JPorter@republictitle.com

Any notice hereunder sent by counsel to either Receiver or Purchaser hereunder shall be deemed transmitted by Receiver or Purchaser, respectively. Either Party may change the address for purposes of notice by giving notice of such change to the other Party and the Title Company as set forth above.

10.6.    Modifications. This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part, unless such executory agreement is in writing and is signed by the Parties against whom enforcement of any waiver, change, modification or discharge is sought.

10.7.    Calculation of Time Periods. As used herein, the term "day" means each calendar day including a Saturday, Sunday or federal holiday or those days on which national banks in the State of Texas are closed. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included. Unless otherwise set forth herein, the close of business is deemed to be 5:00 p.m. (Central time).

10.8.    Successors and Assigns. The terms and provisions of this Agreement are binding upon the Parties hereto and are to apply to and bind the permitted successors and assigns of the Parties hereto.

10.9.    Entire Agreement. This Agreement, including the Exhibits, contains the entire agreement between the Parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the Parties pertaining to such subject matter.

10.10.    Further Assurances. Each Party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other Party to consummate more effectively the purposes or subject matter of this Agreement. The provisions of this Section 10.10 shall survive Closing.

10.11.    Counterparts/Manners of Delivery. This Agreement and further documentation may be executed in counterparts, and may be delivered by first class mail, electronic conveyance and/or pdf. All such executed counterparts shall constitute the same agreement, when delivered by any of the methods described in this Section 10.11. It shall be necessary to account for only one such counterpart in proving this Agreement.

10.12.    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

10.13.    Applicable Law. This Agreement shall in all respects be solely governed by, and construed in accordance with, the substantive federal laws of the United States (expressly including 28 U.S. Code § 2001 and § 2002, as applicable) and the laws of the State of Texas (collectively the "**Applicable Laws**"). Each Party hereby irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Texas

APP000026

in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agrees that all Claims in respect of such action or proceeding shall be solely heard and determined in a state or federal court sitting in Frisco, Collin County, Texas. Purchaser and Receiver agree that the provisions of this Section shall survive the closing of the transaction contemplated by, or the early termination of, this Agreement.

10.14.  No Third-Party Beneficiary. Except as otherwise expressly provided herein, the provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Receiver and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

10.15.  Exhibits and Schedules. All schedules and exhibits attached to this Agreement shall be deemed to be an integral part of this Agreement.

Exhibit A:    Depiction of the Land
Exhibit B:    Form of Deed

10.16.  Captions. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

10.17.  Construction. Each Party acknowledges that such Party has had adequate opportunity to review this Agreement with their counsel, that their counsel has reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

10.18.  Termination of Agreement. It is understood and agreed that if either Purchaser or Receiver terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Receiver and Purchaser from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

10.19.  Litigation Expenses. In the event either Party hereto employs an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement, in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals and rehearings, the Prevailing Party in such litigation shall be entitled to recover from the other Party its reasonable attorneys' and consultants' fees and expenses incidental to such litigation (including, without limitation, service of process costs, filing fees, court reporter costs, investigative costs, expert witness fees, the cost of any bonds, and any and all other similar fees incurred in connection with the action or proceeding) and all court costs and fees through all trial and appellate levels. Attorneys' fees under this Section 10.19 shall include reasonable attorneys' fees on appeal and, in addition, a Party entitled to attorneys' fees shall be entitled to all other reasonable, out-of-pocket, third-party costs and expenses actually incurred or otherwise payable in connection with such action or proceeding. In addition to the foregoing award of attorneys' fees to the Prevailing Party, the Prevailing Party in any lawsuit shall be entitled to its reasonable attorneys' fees actually incurred or otherwise payable in any post-judgment

APP000027

proceedings to collect or enforce the judgment. The "**Prevailing Party**" means the Party determined by the final, non-appealable judgment of court of competent jurisdiction to most nearly prevail and not necessarily the one in whose favor a judgment is rendered. This provision is separate and several and shall survive the merger of this Agreement into any judgment with respect hereto.

10.20.    Time is of the Essence. Each Party acknowledges and agrees that, except as otherwise expressly provided in this Agreement, TIME IS OF THE ESSENCE for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents, and the funding of money) required or permitted to be taken under this Agreement.

10.21.    No Offer. This Agreement shall not be deemed an offer or binding upon Receiver or Purchaser until this Agreement is fully executed and delivered by Receiver and Purchaser and the Court has entered an order in the Receivership Action approving the Agreement and the transactions contemplated hereby.

10.22.    Waiver of Consumer Rights. PURCHASER WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF PURCHASER'S OWN SELECTION, PURCHASER VOLUNTARILY CONSENTS TO THIS WAIVER AS EVIDENCED BY PURCHASER'S EXECUTION OF THIS AGREEMENT.

10.23.    Incorporation of Recitals. The Recitals set forth above constitute an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the Parties.

[SIGNATURES ON NEXT PAGE]

APP000028

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Effective Date.

**RECEIVER:**

CORT THOMAS, AS RECEIVER FOR FHC ACQUISITION, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:

Printed Name:     Cort Thomas

Title:            Receiver for FHC Acquisition, LLC

Date:             12/13/22

**PURCHASER:**

PETRA DEVELOPMENT, LLC,
a Virginia limited liability company

Signature:

Printed Name:     Rashid Salem

Title:            Manager

Date:             12/15/22

---

PURCHASE AND SALE AGREEMENT                                      SIGNATURE PAGE

APP000029

**ESCROW AGENT ACCEPTANCE**

The undersigned agrees to serve as the Escrow Agent and to be bound by the provisions of Sections 2.4, 2.5, 2.6, and 10.5 of this Agreement. The Escrow Agent acknowledges receiving counterparts of this Agreement signed by both Receiver and Purchaser on the date shown below, which is the Effective Date of this Agreement and agrees to insert this date on the cover page of this Agreement.

_____, 2022 ("**Effective Date**")

REPUBLIC TITLE OF TEXAS, INC.:

Signature: _____

Printed Name: _____

Title: _____

Date: _____

---

APP000030

**EXHIBIT A**
**DEPICTION OF THE LAND**

[to be confirmed by all Parties prior to execution]

APP000031

**EXHIBIT B**
**FORM OF DEED**

AFTER RECORDING RETURN TO:

_____

_____

_____

_____

(Space Above This Line for Recorder's Use Only)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF COLLIN | § | |

THIS SPECIAL WARRANTY DEED, dated _____, 2022, by Cort Thomas, solely in his capacity as Receiver for, and on behalf of, FHC Acquisition, LLC, a Texas limited liability company, with its principal office at 8111 Preston Road, Suite 300, Dallas, Texas 75225 ("**Grantor**"), for the benefit of Petra Development, LLC, a Virginia limited liability company, with its principal office at 1875 K Street NW, Fl 4, Suite 436, Washington, District of Columbia 20006 ("**Grantee**"):

WITNESSETH, that Grantor, for good and valuable consideration, has granted bargained, sold, and conveyed and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors, and assigns, forever, all the following described lot or parcel of land, situated, lying and being in the County of Collin, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**");

TOGETHER with Grantor's rights, title and interest (if any) in and to the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively, the "**Appurtenances**" and together with the Land, the "**Property**"); AND SUBJECT TO any Exception (as such term is defined in that certain Purchase and Sale Agreement between Grantor and Grantee dated December 13, 2022) and those matters listed and described on Exhibit "B" attached hereto (collectively, the "**Exceptions**").

APP000032

TO HAVE AND TO HOLD the Property unto Grantee, its successors and assigns, subject to the Exceptions, reservations, and exclusions set forth herein, forever, and Grantor binds Grantor and Grantor's successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against all and every person or persons lawfully claiming or to claim the whole or any part thereof, when the claim is by, through or under Grantor, but not otherwise.

BY ACCEPTANCE OF THIS SPECIAL WARRANTY DEED, GRANTEE ACKNOWLEDGES THAT IT HAS INSPECTED AND ASSESSED THE PROPERTY AND HAS SATISFIED ITSELF AS TO THE CONDITION OF SAME AND IS TAKING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS", AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, IT BEING THE INTENTION OF GRANTOR AND GRANTEE TO EXPRESSLY NEGATE AND EXCLUDE ALL REPRESENTATIONS AND WARRANTIES, INCLUDING, BUT NOT LIMITED TO: (1) THE PHYSICAL CONDITION OF THE PROPERTY OR ANY ELEMENT THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES RELATED TO HABITABILITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FITNESS FOR ANY PURPOSE; (2) THE NATURE OR QUALITY OF CONSTRUCTION, STRUCTURAL DESIGN, AND ENGINEERING OF ANY IMPROVEMENTS; (3) THE QUALITY OF THE LABOR AND MATERIALS INCLUDED IN ANY IMPROVEMENTS; (4) THE SOIL CONDITIONS (BOTH SURFACE AND SUBSURFACE), DRAINAGE, OR OTHER CONDITIONS EXISTING AT THE PROPERTY WITH RESPECT TO ANY PARTICULAR PURPOSE, DEVELOPMENTAL POTENTIAL, OR OTHERWISE; (5) ALL WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE PROPERTY; AND (6) ALL OTHER WARRANTIES AND REPRESENTATIONS, WHATSOEVER, EXCEPT THE SPECIAL WARRANTY OF TITLE EXPRESSLY SET FORTH IN THIS DEED.

[Signature Page Follows]

APP000033

IN WITNESS WHEREOF, Grantor has executed this deed on the date set forth above.

**FHC ACQUISITION LLC:**

FHC ACQUISITION LLC, a Texas limited liability company

Signature: _____

Printed Name:     Cort Thomas

Title:     Receiver for, and on behalf of, FHC Acquisition, LLC

Date: _____


THE STATE OF TEXAS        §
                          §
COUNTY OF COLLIN          §

This instrument was acknowledged before me on this the _____ day of _____, 2022, by Cort Thomas, Receiver for, and on behalf of, FHC ACQUISITION LLC, a Texas limited liability company.


_____
Notary Public in and for the State of Texas

My Commission Expires:


_____

(SEAL)

---

PURCHASE AND SALE AGREEMENT          EXHIBIT B – SPECIAL WARRANTY DEED

APP000034

**Exhibit A to Special Warranty Deed**
**Legal Description**

APP000035

**Exhibit B to Special Warranty Deed**
**Exceptions**

APP000036

# EXHIBIT B-1

APP000037



Land Advisors®
ORGANIZATION

# Broker Opinion of Value

JMJ Development/Tim Barton Assets
Dallas-Fort Worth, Texas

Prepared Exclusively For:
Cort Thomas, Brown Fox Law

Prepared By:
Landry Burdine

5600 Clearfork Main, Suite 170
Fort Worth, TX 76109
214-550-1551
www.landadvisors.com

APP000038



November 15, 2022

Cort Thomas
Brown Fox, PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
cort@brownfoxlaw.com
214-367-6094

RE:    A portfolio of JMJ Development/Tim Barton controlled Assets located throughout the Dallas-Fort Worth Metroplex

Dear Mr. Thomas,

Thank you for the opportunity to provide you with our Broker Opinion of Value (BOV) for a portfolio of assets located throughout DFW currently held by Tim Barton and his related entities.

Our proposal is based on our significant involvement in numerous land transactions in the DFW marketplace, including direct involvement in the sale of multiple land assets in close proximity to the subject tracts over the years. Land Advisors Organization is highly and uniquely qualified to provide advisory and land brokerage services to you in your role as Receiver for the entities. Within this proposal you will find our qualifications, including the scope of our nationwide footprint.  Land Advisors Organization is the only commercial real estate brokerage firm with a national platform focused exclusively on land.

This proposal serves as an opinion of value. Enclosed you will find insights into the current DFW market, brief overviews of each asset along with our opinion of value of the portfolio. Although we believe our opinion and the supporting data to be accurate, this is an opinion and should not be interpreted or relied upon as an appraisal. TREC requires the following disclosure on all Broker Opinion of Value: **_"This represents an estimated sale price for this property. It is not the same as the opinion of value in an appraisal developed by a licensed appraiser under the Uniform Standards of Professional Appraisal Practice."_**

We look forward to continuing a long term and mutually beneficial relationship with Brown Fox, PLLC.  We appreciate the opportunity and are confident that we will be able to leverage our experience, resources and relationships to achieve your goals related to this portfolio.

Thank you for your consideration, and the opportunity to assist you in your role as court appointed Receiver.

Respectfully submitted,

Landry Burdine                Austin T. Reilly

Land Advisors Organization
Dallas/Fort Worth

APP000039



## Table of Contents

- DFW Market Insights
- Overview of Assets
- Broker Opinion of Value
- Corporate Background and Credentials
- Broker Bios

APP000040



Land Advisors®
ORGANIZATION

DFW Market Insights

APP000041



DALLAS/FORT WORTH MARKET REPORT

DFW

MARKET INSIGHTS · 3Q22

| 3.4% | 48,183 | 42,851 | $580,756 |
| DFW Unemployment Rate | Annual New Home Starts | Annual New Home Closings | Avg New Home Price |

Land Advisors® ORGANIZATION

LANDADVISORS.COM

APP000042



DALLAS/FT WORTH
MARKET REPORT
**3Q22**



## NEW HOUSING TRENDS[1]

### Single & Multi-Family Permits



Single Family    Multifamily                US Census

### 12 Month Homebuilder Ranking by Closings



| Builder | Closings |
|---|---|
| DR Horton | 7,814 |
| Lennar Homes | 2,332 |
| Bloomfield Homes | 1,957 |
| Highland Homes | 1,722 |
| Pulte/Centex/Del Webb | 1,600 |
| Ashton Woods | 1,337 |
| LGI Homes | 1,247 |
| Trophy Signature Home | 1,219 |
| Meritage Homes | 896 |
| History Maker Homes | 840 |

Zonda

### Vacant Developed Lot Supply



Zonda    Vacant Dev Lots    VDL Mo Supply

**ANNUALIZED NEW HOME STARTS**



Sep 2021
55,141

Sep 2022
48,183

▼ -12.6%

**ANNUALIZED NEW HOME CLOSINGS**

 

Sep 2021
44,365

Sep 2022
42,851

-3.4% ▼

**AVERAGE NEW HOME PRICE**



Sep 2021
$496,342

Sep 2022
$580,756

▲ 17.0%

### Annual Starts vs Closings



48,183

42,851

Zonda    Annual Starts    Annual Close

## MLS RESALE STATISTICS[2]

### ANNUALIZED CLOSED SALES

Sep 2021
112,550    ▼ -7.0%    Sep 2022
104,685

### MEDIAN SALE PRICE

Sep 2021
$352,000    ▲ 13.6%    Sep 2022
$400,000

### MONTHS OF INVENTORY

Sep 2021
1.3 Mo    ▲ 1.0 Mo    Sep 2022
2.3 Mo

### ANNUALIZED SALES VOLUME

Sep 2021
$46.0B    ▲ 7.5%    Sep 2022
$49.5B

Sources: (1) Zonda (2) Texas A&M Real Estate Center

APP000043



DALLAS/FT WORTH
MARKET REPORT
3Q22



## ECONOMIC TRENDS[3]

### UNEMPLOYMENT RATE (unadjusted)

| DFW | | TEXAS | |
|---|---|---|---|
| Sep 2021 | Sep 2022 | Sep 2021 | Sep 2022 |
| 4.5% | 3.4% | 5.1% | 3.8% |
| ▼ -1.1% | | ▼ -1.3% | |

### TOTAL NONFARM EMPLOYMENT (in thousands)

| DFW | | TEXAS | |
|---|---|---|---|
| Sep 2021 | Sep 2022 | Sep 2021 | Sep 2022 |
| 3,831 | 4,129 | 12,822 | 13,529 |
| ▲ 7.8% | | ▲ 5.5% | |

### EMPLOYMENT CHANGE

| DFW | TEXAS |
|---|---|
| Annualized Employment Change* | Annualized Employment Change* |
| 7.5% | 5.8% |

#### Population Growth & Total Population



Pop Growth — Total Pop — US Census

#### Change in Employment

56K 56K 64K 90K 126K 184K 130K 98K 86K 93K 110K 281K
-68K -61K -101K

2008 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019 2020 2021 12 Mo
Bureau of Labor Statistics *average YOY monthly employment change.*

#### 30 Year Fixed Mortgage Rate



7.08

Oct-19 Jan-20 Apr-20 Jul-20 Oct-20 Jan-21 Apr-21 Jul-21 Oct-21 Jan-22 Apr-22 Jul-22 Oct-22

St. Louis Fed

#### US Inflation Rate



8.2%

Sep-19 Dec-19 Mar-20 Jun-20 Sep-20 Dec-20 Mar-21 Jun-21 Sep-21 Dec-21 Mar-22 Jun-22 Sep-22

US Bureau of Labor Statistics

## MULTIFAMILY STATISTICS

#### Absorption & Deliveries



AxioMetrics ■ Absorption ■ Deliveries

#### Occupancy & Rent Growth



94.9% 94.4% 94.5% 94.9% 94.2% 97.2% 95.1%
13.7%

2016 2017 2018 2019 2020 2021 Last 12

AxioMetrics ■ Occupancy — Rent Growth

Sources: (3) Bureau of Labor Statistics
*Seasonally Adjusted

APP000044

# THE NATION'S LEADING LAND BROKERAGE & ADVISORY FIRM

## SALES · CAPITAL · CONSERVATION · ADVISORY



29 Offices Across the Nation



75+ Specialized Advisors



55+ Staff Professionals



$32+ Billion in Sales Since 1987

| | | |
|---|---|---|
| SCOTTSDALE, AZ | ORLANDO, FL | FUTURE OFFICES |
| CASA GRANDE, AZ | TAMPA, FL | CHARLESTON, SC |
| PRESCOTT, AZ | ATLANTA, GA | DENVER, CO |
| TUCSON, AZ | BOISE, ID | RALEIGH-DURHAM, NC |
| IRVINE, CA | KANSAS CITY, MO | |
| BAY AREA, CA | CHARLOTTE, NC | |
| COACHELLA VALLEY, CA | ALBUQUERQUE, NM | |
| PASADENA, CA | LAS VEGAS, NV | |
| ROSEVILLE, CA | RENO, NV | |
| SAN DIEGO, CA | NASHVILLE, TN | |
| SANTA BARBARA, CA | AUSTIN, TX | |
| VALENCIA, CA | DALLAS-FORT WORTH, TX | |
| LODI, CA | HOUSTON, TX | |
| JACKSONVILLE, FL | SALT LAKE CITY, UT | |
| | BELLEVUE, WA | |

Dallas/Fort Worth Market Team
**Landry Burdine** | lburdine@landadvisors.com
**Austin Reilly** | areilly@landadvisors.com
**Josh Watson** | jwatson@landadvisors.com
5600 Clearfork Main, Suite 170, Fort Worth, Texas 76102
Phone: 214.550.1550
**LandAdvisors.com**



The information contained herein is from sources deemed reliable. We have no reason to doubt its accuracy but do not guarantee it. It is the responsibility of the person reviewing this information to independently verify it.

APP000045



Overview of Assets

APP000046



## II.    Frisco Commercial

Frisco Commercial is a 4.6-acre tract located at the intersection of the Dallas North Tollway and John Hickman Parkway.  This location is one of the hottest, most desirable locations in the DFW metroplex and should command significant interest if taken to the marketplace.  The current plan calls for a luxury hotel/residential tower to be built.  However, given current market conditions, and the incredible visibility and access to the site, other uses should be considered including mixed use commercial/residential, and hotel uses.

*Aerial of Frisco Commercial asset*



Overview of Frisco Commercial asset:

Location…………………….… NWC DNT & John Hickman Pkwy, Frisco, Collin County, Texas

Property Size ………………… 4.6 acres (+/- 200,376 sf)

Zoning……………………….…. Mixed Use

APP000047



# Land Advisors®
### ORGANIZATION

## Broker Opinion of Value

APP000048



Based upon our analysis, it is our opinion that the valuation for the Frisco Commercial land asset has a current market value between **$9,016,920 - $10,018,800.**

The opinion of value for the Frisco Commercial land asset is as follows:

| Asset | Size (SF) | Value Range | Value Range PSF | Comments |
|---|---|---|---|---|
| Frisco Commercial | 4.6 Acres<br><br>200,376 SF | $9,016,920 - $10,018,800 | $45 - $50 PSF | Prime Commercial/Mixed Use site in one of the hottest corridors in our market. The site would command significant interest from the national marketplace and should be taken to market to maximize value |

APP000049



Corporate Background and Credentials

APP000050



Beyond Land

**24** offices across the nation
**65+** specialized brokers
**35+** staff professionals
**$20+** billion in sales since 1987

APP000051

# THE NATION'S LARGEST BROKERAGE FIRM FOCUSED EXCLUSIVELY ON LAND

Founded in 1987, **Land Advisors Organization** has expanded from its base in the Phoenix metropolitan area into growth markets across the United States. Now the largest land brokerage company in the nation, Land Advisors Organization has successfully executed thousands of land transactions, from infill building sites to large scale master-planned communities.

Our success is based on:

> The experience of highly skilled land specialists.

> Deep relationships with land owners, homebuilders, developers, and those who fund them.

> A collaborative network of land specialists in dozens of markets nationwide.

> Proprietary spatial land-data systems that our advisors utilize to distill valuable perspective.

> Engagement with industry influencers and active support of professional and community organizations.

> Additional services and affiliated companies that serve our client's needs.

APP000052

# THE BEST LAND AND MAPPING EXPERTISE IN THE BUSINESS

Advisory and brokerage services related to the acquisition and disposition of land and land-related assets is our core business. Our expert and highly specialized land professionals enable our clients to identify opportunities and navigate complex projects by analyzing comprehensive data and deploying sophisticated mapping technology.

**Data and integration.** We acquire and organize extensive information to determine trends and options to precisely market properties to the largest pool of qualified candidates.

**Proprietary mapping technology.** Our mapping system enables clients to visualize current and future development to assess and value the environment accurately. Using these tools, our advisors develop the perspective and advice that reduces risks and enhances returns.

**Local relationships and expertise.** Our advisors are specialists in their geographic areas: they maintain close relationships with local land owners, builders, and governments. As a collaborative network, they broaden the array of buyers and opportunities for clients. Land is a complex asset with many constraints and opportunities. Our advisors study the issues that relate to local land use from the macro to the micro level.

Our commitment to our clients and serving their unique requirements is unwavering, leading us to profoundly change the way land is bought and sold.

## > INSTITUTIONAL + LENDER REPRESENTATION

The firm has represented the largest financial institutions in the country, including the largest private equity firms and more than 50 chartered banking institutions. Land Advisors Organization has provided these entities a high level of expertise and service that has resulted in decades of repeat business and referrals.

## > HOMEBUILDER SERVICES

Land Advisors Organization has become a vital part of the home building land and lot supply chain. Our residential advisors are a trusted source for builders in each of the markets we serve. We are committed to understanding the unique challenges and needs of the homebuilders, including the importance of positioning residential land assets.

## > SPECIALTY SITE SELECTION

Specialty site selection advisors possess the unique knowledge required to represent clients in complex site selections. We have a track record of successfully completing site selection assignments for industrial, retail and resort uses, and have deep capabilities related to healthcare. Public-sector clients ranging from public education to large-scale utility entities are also represented.

**Land Advisors Organization** is tirelessly entrepreneurial, expanding into new geography and developing new services for clients. The firm welcomes the opportunity to explore new ideas and how we may open new markets with innovative products and services to further our mission and values as the best-known name in land.

APP000053

## A NATIONWIDE NETWORK OF SPECIALISTS

Land Advisors Organization has created a collaborative network of offices that broadens the opportunities available to our clients. Our network can accommodate everything from national land portfolios to individual owners and their unique needs and requirements. Our network, visibility and reputation empowers us to broadly expose our exclusive listings to national and international buyers.

Individuals in each office specialize in geographic or functional areas and through collaboration with their fellow advisors, they form the best possible team for each project. The result is a unified focus on the goals of our clients.

## PROFESSIONALISM YOU CAN TRUST

Our advisors and team members never compromise on integrity. Our clients' interests come first, and together we succeed.

We market properties to the largest pool of qualified buyers available, tracking and analyzing all available properties that meet their needs. We're committed to performing at the highest professional level, uncovering timely and accurate information and giving each transaction the detailed attention it requires.

APP000054



**Land Advisors®**
ORGANIZATION

CORPORATE HEADQUARTERS
4900 North Scottsdale Road, Suite 3000
Scottsdale, Arizona 85251
480.483.8100
LandAdvisors.com

SCOTTSDALE, AZ | CASA GRANDE, AZ | PRESCOTT, AZ
TUCSON, AZ | IRVINE, CA | BAY AREA, CA
COACHELLA VALLEY, CA | PASADENA, CA
ROSEVILLE, CA | SAN DIEGO, CA | SANTA BARBARA, CA
VALENCIA, CA | ORLANDO, FL | TAMPA, FL | BOISE, ID
ALBUQUERQUE, NM | LAS VEGAS, NV | RENO, NV
AUSTIN, TX | DALLAS-FORT WORTH, TX | HOUSTON, TX
SALT LAKE CITY, UT | BELLEVUE, WA

Current Offices
Future Offices

APP000055

# CURRENT LISTINGS



## DALLAS / FORT WORTH MARKET



### Marine Creek
DFW MSA | Forth Worth, Texas

- ±241 Acres
- Zoned Single-Family Residential



### River Park
DFW MSA | Forth Worth, Texas

- ±10.18 Acres in Three Parcels
- Prime Infill Locations In Mixed-Use Master-Plan



### Aledo Ranch
DFW MSA | Parker County, Texas

- ±250 Acres
- Future Mixed-Use in Aledo ISD



### Trinity Bluff
DFW MSA | Fort Worth, Texas

- ±6 Acres in Multiple Parcels
- Urban Assemblage



### Old Weatherford
DFW MSA | Parker County, Texas

- ±257Acres
- Future Single-Family in Aledo ISD



### Burleson Crossing
DFW MSA | Tarrant/Johnson Counties, Texas

- ±1,040 Acres
- Future MPC Development Tract



### Loop 820 Mixed Use
DFW MSA | Benbrook & Fort Worth, Texas

- ±174 Acres
- Future Commercial, Industrial & Multi-Family



### Alliance Tract
DFW MSA | City of Fort Worth ETJ, Texas

- ±920 Acres
- Future Land Use Plan as A-5 Residential



### Parkway Central
DFW MSA | Arlington, Texas

- ±3.22 Acres
- Frontage and Visibility on IH 30

**Landry Burdine** | lburdine@landadvisors.com   **Austin Reilly** | areilly@landadvisors.com   **Joshua Watson** | jwatson@landadvisors.com
5600 Clearfork Main Street, Suite 170, Fort Worth, Texas 76109 | Phone: 214.550.1550 | **LandAdvisors.com**

The information contained herein from sources deemed reliable. We have no reason to doubt its accuracy but do not guarantee it. It is the responsibility of the person reviewing this information to independently verify it. This package is subject to change or complete withdrawal.

# SIGNIFICANT CLOSINGS



## DALLAS / FORT WORTH MARKET



### Walsh
DFW MSA | Fort Worth, Texas

- ±1,700 Acres
- ±3,200 Residential Units
- Brokered Joint Venture for the Walsh Family



### Whitewing Trails
DFW MSA | Princeton, Texas

- ±854 Acres, 2,415 Residential Units
- Fully-Entitled MPC
- Court-Ordered Chapter 7 Liquidation



### Westchester
DFW MSA | Fort Worth, Texas

- ±4.23 Acres
- Prime Infill Location
- Gateway to the Medical District



### Birdsong
DFW MSA | Fort Worth, Texas

- ±186 Acres
- Mansfield ISD
- 540 Lots



### Estancia
DFW MSA | Irving, Texas

- Infill Residential
- ±20 Acres
- 95 Single-Family Home Community



### Kelley at Samuels Avenue
DFW MSA | Fort Worth, Texas

- Urban Assemblage
- 353 Units
- ±10.5 Total Acreage



### Trinity Falls
DFW MSA | McKinney, Texas

- ±1,761 Acres
- ±4,176 Residential Units



### Bailey Park
DFW MSA | Tarrant County, Texas

- ±167 Acres
- 450+ Residential Lots



### Wildflower
DFW MSA | Fort Worth, Texas

- ±2,400 Acres
- ±8,000 Residential Units

**Landry Burdine** | lburdine@landadvisors.com    **Austin Reilly** | areilly@landadvisors.com    **Joshua Watson** | jwatson@landadvisors.com
5600 Clearfork Main Street, Suite 170, Fort Worth, Texas 76109 | Phone: 214.550.1550 | **LandAdvisors.com**

The information contained herein from sources deemed reliable. We have no reason to doubt its accuracy but do not guarantee it. It is the responsibility of the person reviewing this information to independently verify it. This package is subject to change or complete withdrawal.

APP000057



Broker Bios

APP000058



## Landry Burdine | Designated Broker



As Designated Broker for Land Advisors Organization in Dallas-Fort Worth, Landry Burdine consistently delivers exceptional service, advisement and returns for his broad spectrum of clients including lending institutions, private equity funds, homebuilders, and master planned community developers.

In the past few years, Landry has been involved in residential and commercial land transactions in Dallas/Fort Worth over $1 billion in valuation.

Landry is an active member of the Urban Land Institute where he serves on the Community Development Council (Gold Flight). He also gives his time to several non-profit organizations including TCU's Letterman's Association (past president), Volunteers For Christ Brazil
(past president) and Hope Farm Inc.

Landry graduated from Texas Christian University in 1999 with a bachelor's in business administration in marketing. He served as team captain for the 1998 Sun Bowl Champion Football team and he currently serves as the sideline analyst for the TCU IMG Sports Network for all TCU Football Games. He has been licensed in Texas as a real estate broker since 1999.

## Austin T. Reilly | Advisor

Austin T. Reilly joined the Dallas-Fort Worth team in 2010 to assist in expanding the organization's role as the leading provider of land brokerage services to developers, homebuilders, investors and land owners in the area.

Austin has been in the industry for more than 10 years, specializing in large-scale master planned communities and infill residential and commercial property brokerage assignments.

He participates in the Urban Land Institute, as an active member on the Community Development Council (Green Flight). He is a member of the University of Richmond Spider Club, participates in the Tarrant Net Read2Win! literacy program in the Fort Worth Independent School District, and is on the board of directors for Lena Pope, which provides counseling and education services to children and families.

Austin earned a bachelor of arts in American Studies from the University of Richmond in 2008, where he played on the Richmond Spiders baseball team and has held his Texas Real Estate Broker's license since 2012.



## Joshua Watson | Advisor



Josh joined Land Advisors Organization in 2020, partnering with Landry Burdine and Austin T. Reilly to aid in the expansion of the firm's land brokerage services throughout the Dallas-Fort Worth market. Josh is responsible for a full-range of services including evaluating and analyzing market data and conditions in the Dallas-Fort Worth MSA, financial modeling and analysis, ongoing client communication, overseeing the due diligence process, and the production of marketing materials.

Josh graduated from Texas Christian University in 2019 with a Bachelor's in Business Administration and Marketing and is currently working towards his MBA at LSUS. He played on the TCU Baseball team from 2016-2019 and was a part of two College World Series appearances. He holds the record for games started/played at 253 games over his TCU Baseball career and was selected in the 15th round by the Oakland Athletics in the 2019 MLB Draft.

Josh is a member of Urban Land Institute and is a member of the Young Leader Group Partnership Forum. The forum is an educational based program that brings together young leaders in their respected fields of expertise from all facets of the real estate industry.

APP000059

# EXHIBIT B-2

APP000060

# N W C   D N T   &   J O H N   H I C K M A N
# B R O K E R   O P I N I O N   O F   V A L U E
### N o v e m b e r   2 0 2 2







This Broker Opinion of Value document ("BOV") is JLL's broker opinion of the estimated sale value for the real property identified herein. This BOV is based upon JLL's preliminary review of the property, its existing use, current zoning and other restrictions in place, the surrounding neighborhood, current economic and real estate market conditions, and, as applicable, sales of other comparable properties. It is subject to change due to changes in the local and national real property markets, changes in the credit and money markets, changes in the laws and regulations impacting the property and lawful uses thereof, and changes in any other facts regarding the property. JLL has not made a survey or analysis of the property to determine whether it complies with any law, including the Americans with Disabilities Act, Stark law or any anti-kickback laws, and this BOV renders no opinion regarding any such compliance.

This opinion is not an appraisal of the market value of the property and may not be used in lieu of an appraisal. If an appraisal is desired, the services of a licensed or certified appraiser shall be obtained. This opinion may not be used by any party as the primary basis to determine the value of a parcel of or interest in real property for a mortgage loan origination, including first and second mortgages, refinances, or equity lines of credit.

JLL expressly disclaims any liability to any party for any reliance on this BOV for any purpose unless otherwise provided in a separate written agreement between such party and JLL.

APP000061

# HIGH LEVEL VALUATION – PROPERTY



| | |
|---|---|
| Address: | Syria Gate Way<br>Frisco, TX 75034 |
| Lot Size: | 4.538  Acres (197,697 SF) |
| Zoning: | Tollway Overlay District Typical<br>PD-248 with a base zoning of O-2/R/RES |

APP000062

# HIGH LEVEL VALUATION – MARKET & PROPERTY SUMMARY



In reviewing the market, following is a summary of the market conditions used in estimating the value of the Property located at Syria Gate Way in Frisco, Texas:

**Market Summary:**
The Legacy/ Frisco area is among the fastest-growing submarkets in the country. There is over 1.5 million SF of product under construction in Legacy/Frisco. The four projects are located near the Dallas North Tollway and Hwy 121 intersection and in close proximity to Shops at Legacy West and entertainment such as the The Star and Frisco Sports Complex. TIAA's 500,000 SF, 15-story proposed project in The Star Development is expected to open in 2024, bringing over 2,000 additional jobs to the area.

**Property Summary:**
The subject property is bifurcated by Polo Gate Way into two distinct parcels with +/- 0.837 net acres to the north side of the road and +/- 3.4 net acres to the south. The site is currently zoned PD-248 with a base zoning of O-2/R/RES, falls within the Tollway Overlay District. This zoning allows for the development of Hotel, Retail, Office, and Residential uses permitted under O-2. Due to evolving market conditions, JLL would recommend marketing the property to developers/investors that are capable of delivering variety of product types including, but not limited to, hotel, for sale multifamily, office, and retail.

**Valuation Conclusion**
JLL Capital Markets We took multiple factors into consideration while coming to this conclusion. The three most important factors were the zoning, location, and comparable sales comps in the area. This research and resulting market price guidance is not to be used as a formal appraisal and our firm has not followed any specific MAI appraisal guidelines. Market conditions have fluctuated <u>greatly</u> over the past two quarters and remain <u>fluid</u> today, recent changes in interest rates and acceptable yields and exit cap rate assumptions have greatly impacted how developers/investors value development site opportunities.

**<u>Based on all factors, we would establish a market pricing guidance of $55/SF ($10,873,335)</u>**

# HIGH LEVEL VALUATION – VACANT SITE ASSUMING REDEVELOPMENT



In reviewing the subject property as a vacant site for potential redevelopment, JLL Capital Markets generated a Comparative Market Analysis ("CMA") analysis assuming the site was developed utilizing the existing zoning underlying zoning for a multifamily development. The CMA reports the performance of market transactions and current offerings. JLL Capital Markets utilized the CMA to establish a recommended asking price for the subject property.

The CMA identified three land/redevelopment properties recently sold at $60/SF and three properties available for purchase from $33/SF to $38.26/SF. Each of the sites that have been sold are generally situated in the subject properties' submarket, but they vary in size, zoning and specific block location (i.e., mid-block or hard corner). Considering only the CMA data, the estimated pricing guidance would be $55/SF ($10,873,335) with a strike range between $45/SF ($8,896,365) and $50/SF ($9,884,850).

# HIGH LEVEL VALUATION – VACANT SITE ASSUMING REDEVELOPMENT



## PROPERTY OVERVIEW

| | |
|---|---|
| **Address** | Syria Gate Way<br>Frisco, TX 75034 |
| **Product Type** | Land |
| **Land (AC)** | 4.538 |
| **Land SF** | 197,697 |

## SALE PROCESS

| | |
|---|---|
| **Timeline** | 3 – 6 Months |
| **Pricing** | Prospective Buyers would be guided towards $55/SF, with likely sale occurring in the range of $40/SF to $50/SF. |
| **JLL Feedback** | This assumes identifying a purchaser that will redevelop the site, free of encumbrances, for a use permitted under the existing zoning. Any changes to the entitlement will extend the transaction timeline. |



APP000065

# HIGH LEVEL VALUATION – VACANT SITE ASSUMING REDEVELOPMENT - CMA



## Property Overview



| Address: | Syria Gate Way |
| --- | --- |
| | Frisco, TX  75034 |
| Land Gross Acres: | 4.538 |
| Land SF: | 197,697 |
| Land Submarket: | Far North Dallas |
| Flood Plain | Minimal |
| Commercial Utilities | Yes |
| Topo | Level |
| Zoning | PD- 248: O-2/R/RES |

Notes :

## Market Data

### SELECT LAND SALE COMPARABLES

| SWC of DNT & Hwy 121 | | 8181 Communications | | SWC DNT & Headquarters | |
| --- | --- | --- | --- | --- | --- |
| Frisco, TX | | Frisco, TX | | Frisco, TX | |
| Sale Date: | 2018 | Sale Date: | 2018 | Sale Date: | 2016 |
| Size Acres: | 2 | Size Acres: | 4.00 | Size Acres: | 2 |
| Size SF: | 87,120 | Size SF: | 174,240 | Size SF: | 87,120 |
| Value: | $5,227,200 | Price: | $10,454,400 | Price: | $5,227,200 |
| Value PSF: | $60.00 | Price PSF: | $60.00 | Price PSF: | $60.00 |
| Office | | Office | | Office | |

### SELECT AVAILABLE LAND COMPARABLES

| NEC Preston & Hickory Street | | 860 Preston Circle | | 6 BLK D Frisco Soccer | |
| --- | --- | --- | --- | --- | --- |
| Frisco, TX | | Frisco, TX | | Frisco TX | |
| Status: | Active Listing | Status: | Active Listing | Status | Active Listing |
| Size Acres: | 2.15 | Size Acres: | 0.84 | Size Acres: | 1.15 |
| Size SF: | 93,654 | Size SF: | 36,590.40 | Size SF: | 50,094 |
| Price: | $3,084,807 | Price: | $1,400,000 | Price: | $1,900,000 |
| Price PSF: | $33.00 | Price PSF: | $38.26 | Price PSF: | $37.03 |
| Proposed mixed use | | Proposed mixed use | | Fully developed pad site | |

## Market Summary

### SELECT LAND SALE COMPARABLES

| Land Address | Land Size | Price/ SF |
| --- | --- | --- |
| SWC of DNT & Hwy 121 | 2 | $60.00 |
| 8181 Communications | 4.00 | $60.00 |
| SWC DNT & Headquarters | 2 | $60.00 |
| Average Comparable Land Sale Value (PSF): | | $60.00 |
| Adjustment: | | $0.00 |
| Comparable Average Land Sale Value (PSF): | | $60.00 |

### SELECT AVAILABLE LAND FOR SALE

| Land Address | Land Size | Price/ SF |
| --- | --- | --- |
| NEC Preston & Hickory Street | 2.15 | $33.00 |
| 860 Preston Circle | 0.84 | $38.26 |
| 6 BLK D Frisco Soccer | 1.15 | $37.03 |
| Average Comparable Land Sale Value (PSF): | | $36.10 |
| Adjustment: | | $0.00 |
| Comparable Average Land Sale Value (PSF): | | $36.10 |

| Approach | Value PSF | | Value | |
| --- | --- | --- | --- | --- |
| List Price: | $55 | | $10,873,335 | |
| Strike Range: | $45.00 | to    $50.00 | $8,896,365 | to    $9,884,850 |

APP000066

# EXHIBIT B-3

APP000067



# NVC
## National Valuation Consultants, Inc.

**An Appraisal Report of:**

4.54 Acres of Vacant Land
NWC of Dallas North Tollway and John Hickman Parkway
Frisco, TX 75034

**Latitude/Longitude:**
33.116721, -96.824543

**NVC File Number:**
DAL2212012

**Prepared For:**
Mr. Cort Thomas, Receiver
Partner
Brown Fox PLLC
8111 Preston Road, Ste. 300
Dallas, Texas 75225

**Effective Date(s) of Value:**
"As Is" - December 10, 2022



**Prepared By:**
**NATIONAL VALUATION CONSULTANTS, INC.**
**7807 E. PEAKVIEW AVENUE, SUITE 200**
**CENTENNIAL, COLORADO 80111**

ATLANTA • BOSTON • CHICAGO • CINCINNATI • DALLAS • DENVER • HOUSTON • NY/NJ METRO • SAN FRANCISCO • SOUTH FLORIDA

# NVC

## National Valuation Consultants, Inc.

December 16, 2022

Mr. Cort Thomas, Receiver
Partner
Brown Fox PLLC
8111 Preston Road, Ste. 300
Dallas, Texas 75225

Re:  4.54 Acres of Vacant Land
     NWC of Dallas North Tollway and John Hickman Parkway
     Frisco, TX 75034
     Latitude: 33.116721 & Longitude: -96.824543
     NVC File No.:  DAL2212012

Dear Mr. Thomas:

In compliance with your request, enclosed is an appraisal report of the above-referenced property.  The purpose of the appraisal is to provide our market value opinion under the following scenario.

| Valuation Scenario | | |
|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal |
| "As Is" | Leased Fee | December 10, 2022 |

It is our opinion that this report complies fully with (a) the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation.

Briefly described, the subject consists of 4.54 acres of vacant land located at the northwest corner of John Hickman Road and the Dallas North Tollway in Frisco, Texas.  The property has excellent visibility from the Dallas North Tollway at The Gate development, in the heart of the Frisco North Platinum Corridor.

The Gate is a more than 41-acre, $1 billion mixed-use development that includes apartments, retail, offices and sites for additional residential and commercial buildings. The Gate offers a live-work-play environment that's adjacent to The Star (Home of the Dallas Cowboys Training Facility) and Frisco Station.

Per Purchase Sales Agreement, the subject is currently under contract for a reported $9,000,000 ($45.52/SF).   Our analysis of recent transactions supports this contract price.

Mr. Cort Thomas, Receiver
December 16, 2022
Page 3

The market value opinions are subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report. There are no Extraordinary Assumptions or Hypothetical Conditions that may have affected the assignment results.

***Extraordinary Assumptions***

■   *None.*

***Hypothetical Conditions***

■   *None*

Based upon the data, analyses and reasoning contained in the attached report, and subject to the assumptions and limiting conditions set forth in this analysis, our market value opinion is set forth below.

| Summary of Value Conclusion | | | | |
|---|---|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal | **Reconciled Value** | $/SF |
| "As Is" | Leased Fee | December 10, 2022 | **$9,000,000** | $45.52 |

We appreciate the opportunity to provide appraisal services and trust you will advise us if we can be of further assistance.

Respectfully submitted,

NATIONAL VALUATION CONSULTANTS, INC.

Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

APP000070

## TABLE OF CONTENTS

Subject Photograph ..........................................................................................................5
Subject Aerial.................................................................................................................6
Executive Summary ........................................................................................................7
**PREMISES OF THE APPRAISAL**.............................................................................................**9**
Scope of Work ............................................................................................................10
Definitions of Terminology ..........................................................................................13
Identification and History of the Property ....................................................................15
Standard Assumptions and Limiting Conditions............................................................16
Extraordinary Assumptions and Hypothetical Conditions..............................................19
**PRESENTATION OF DATA**....................................................................................................**20**
U.S. Economic Indicators .............................................................................................21
Dallas-Fort Worth-Arlington, TX MSA Economic and Demographic Profile.......................26
Market Area Analysis ...................................................................................................34
Zoning Analysis ...........................................................................................................39
Tax Assessment Analysis..............................................................................................40
Site Analysis ...............................................................................................................42
Parcel Map / Site Survey..............................................................................................44
Subject Photographs....................................................................................................45
**ANALYSIS OF DATA AND CONCLUSIONS**...............................................................................**46**
Apartment Market & Apartment Submarket Cluster Analysis..........................................47
Dallas-Fort Worth Office Market & Frisco/The Colony Submarket Analysis.......................50
Dallas-Fort Worth Retail Market & Frisco Submarket Analysis .......................................53
Highest and Best Use Analysis ......................................................................................56
The Valuation Process ..................................................................................................57
Sales Comparison Approach ..........................................................................................58
Reconciliation and Final Value.......................................................................................64
Reasonable Exposure Time and Marketing Period............................................................65
Certification ................................................................................................................66

**ADDENDA**
Appraiser Qualifications
Sale Abstracts
Engagement Letter

APP000071

Subject Photograph



Subject Photograph

DAL2212012

NVC | National Valuation Consultants, Inc.

6

Subject Aerial



4.54 Acres of Vacant Land

Subject Aerial

DAL2212012

APP000073

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Executive Summary

**CLIENT**:

Mr. Cort Thomas, Receiver
Partner
Brown Fox PLLC
8111 Preston Road, Ste. 300
Dallas, Texas 75225

**PROPERTY IDENTIFICATION:**

4.54 Acres of Vacant Land

**PHYSICAL ADDRESS:**

NWC of Dallas North Tollway and John Hickman Parkway
Frisco, TX 75034

**PURPOSE OF APPRAISAL:**

The purpose of this assignment is to provide the following market value opinion.

| Valuation Scenario | | |
|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal |
| "As Is" | Leased Fee | December 10, 2022 |

**DATE OF INSPECTION**:

December 10, 2022

**DATE OF REPORT PREPARATION**:

December 16, 2022

**EXTRAORDINARY ASSUMPTIONS:**

None

**ZONING:**

Planned Development District 248 - O-2/R/RES by the City of Frisco. Retail, office and residential uses are a permitted land use under this zoning. Site plan approval required.

**SITE SIZE**:

4.54 acres (±197,697 SF) per county assessor

**TRANSFERS IN THE LAST THREE YEARS:**

The subject was acquired by FHC Acquisition LLC in January 2021 for an undisclosed amount.

Per Purchase Sales Agreement, the subject is currently under contract for a reported $9,000,000 ($45.52/SF). Our analysis of recent transactions supports this contract price.

Other than the contract discussed above, we are aware of no other sales occurring within the past three years.

DAL2212012                              Executive Summary                                        7

APP000074

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

**MARKET VALUE SUMMARY AND CONCLUSION:**

Based upon the data, analyses and reasoning contained herein, our market value opinions is summarized as follows:

| Final Value Reconciliation | |
|---|---|
| Value Premise | "As Is" |
| Date of Valuation | December 10, 2022 |
| Interest Appraised | Leased Fee |
| Land Area (SF) | 197,697 |
| Sales Comparison Approach | $9,000,000 |
| Cost Approach | NA |
| Income Capitalization Approach | NA |
| **Market Value Opinion** | **$9,000,000** |
| Market Value Opinion $/SF | $45.52 |

APP000075

4.54 Acres of Vacant Land                                        NVC | National Valuation Consultants, Inc.

# PREMISES OF THE APPRAISAL

APP000076

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Scope of Work

**SCOPE OF WORK DEFINED**

The Scope of Work requirement within the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Standards Board states that the appraiser must provide the following information within each appraisal, appraisal review, or appraisal consulting assignment:

1.    Identify the problem to be solved;

2.    Determine and perform the scope of work necessary to develop credible assignment results; and

3.    Disclose the scope of work in the report.

While the scope of work is addressed within many sections of this report, the following is a summary of the Scope of Work for this assignment.

**APPRAISAL ELEMENTS**

There are six key assignment elements that need to be addressed when identifying the appraisal problem. These include:

1.    Client and any other intended users;

2.    Intended use of the appraiser's opinions and conclusions;

3.    Type and definition of value;

4.    Effective date of the appraiser's opinions and conclusions;

5.    Subject of the assignment and its relevant characteristics (e.g. interest valued, physical and legal characteristics); and

6.    Assignment conditions (e.g. hypothetical conditions, extraordinary assumptions, supplemental standards, and jurisdictional exceptions).

**CLIENT, INTENDED USERS, AND INTENDED USE**

Client:              Brown Fox PLLC
Intended Users:      Officials with Brown Fox PLLC, and their clients
Intended Use:        Assist in the potential sale of the subject

This report has no other intended use, and National Valuation Consultants, Inc. is not responsible for the use of this report by any third parties.

APP000077

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

**PURPOSE OF APPRAISAL**

The purpose of the appraisal is to provide our market value opinion of the valuation scenario summarized below.

| Valuation Scenario | | |
|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal |
| "As Is" | Leased Fee | December 10, 2022 |

Please note that no opinion of value is provided for mineral rights, water rights or other non-realty items which may or may not be associated with the property.

**ANALYSIS PERFORMED IN THE ASSIGNMENT**

The work performed within this appraisal assignment include a number of independent investigations and analyses.  The methods and sources utilized are listed as follows.

- **Approaches to Value**: The three traditional valuation approaches – cost, income, and sales comparison – were considered in the appraisal.  Value indications were derived from those considered applicable, which is discussed later in this report.

- **Market Area Analysis:**  The appraisers inspected the subject's market area, evaluated demographic and economic statistics, reviewed city zoning maps, aerial photographs and other market data in analyzing the characteristics of the subject area.

- **Site Description and Analysis:** This description is based on an on-site inspection and review of documents provided by the property contacts.  Specific documents used in the description are cited in the Site Analysis section of this report.

- **Improvement Description and Analysis**:  This description is also based on an on-site inspection and review of building information provided by the property contacts.  Specific documents used in the description are cited in the Description of the Improvements section of this report.

- **Market Analysis**: Macro and micro market analysis sections and industry overview sections were prepared by many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC).  We have cited our sources within these sections which typically include related trade industry associations, state and local government sources, and interviews with market participants.

- **Market Data**:  All market data were derived from multiple conversations with many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC).

- **Comparable Sales:**  The appraisers assembled data on comparable improved property sales and land sales from abstracts provided by CoStar COMPS; public deed records; multiple listing service data; newspaper articles and news releases; file sources; and conversations with numerous real estate buyers, sellers, and agents active in the marketplace.

APP000078

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

**ASSIGNMENT CONDITIONS**

In two separate sections of this appraisal report, we have included the Standard Assumptions and Limiting Conditions as well as the Extraordinary Assumptions and Hypothetical Conditions used in the preparation of the appraisal assignment.

**PROPERTY CONTACTS**

In addition to public records and other sources cited in this appraisal, we have relied on the following parties for information pertaining to the property.

| Property Contacts | | | |
|---|---|---|---|
| Contact Name | Title | Company | Phone Number |
| Mr. Cort Thomas | Partner | Brown Fox PLLC | 214.367.6094 |

APP000079

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Definitions of Terminology

**APPRAISAL** — (noun) the act or process of developing an opinion of value.  (adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services.  Comment:  An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship to a previous value opinion or numerical benchmark.[1]

**ASSIGNMENT** — 1) An agreement between an appraiser and a client to provide a valuation service; 2) the valuation service that is provided as a consequence of such an agreement.[2]

**MARKET VALUE** — The most probable price which a property should bring in a competitive and open market under all condition's requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated.
2. Both parties are well informed or well advised and acting in what they consider their own best interests.
3. A reasonable time is allowed for exposure in the open market.
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto.
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[3]

**AS IS MARKET VALUE** — The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines, OCC) [4]

**FEE SIMPLE ESTATE** — Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[5]

**LEASED FEE INTEREST** — The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. .[6]

**PROJECTION** — In market analysis, a prediction of the future that is an extension of current and historical trends.[7]

**MARKETING TIME** — Opinion of the estimated amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. [8]

---

[1] USPAP 2020-2021 Edition, Page 3.
[2] USPAP 2020-2021 Edition, Page 3.
[3] Source: Code of Federal Regulations; Title 12--Banks And Banking; Chapter I--Comptroller Of The Currency, Department Of The Treasury; Part 34--Real Estate Lending And Appraisals--Subpart C—Appraisals Sec. 34.42 Definitions; Revised January 1, 2000.
[4] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[7] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[8] USPAP 2020-2021 Edition, Advisory Opinion 7, Page 74.

DAL2212012                        Definitions of Terminology                        13

APP000080

**INTENDED USE -** the use(s) of an appraiser's reported appraisal or appraisal review assignment results, as identified by the appraiser based on communication with the client at the time of the assignment. [9]

**INTENDED USER** - the client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser, based on communication with the client at the time of the assignment. [10]

**PROSPECTIVE OPINION OF VALUE** — A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.[11]

**EXTRAORDINARY ASSUMPTION** — An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis. [12]

**HYPOTHETICAL CONDITION** —1.  A condition that is presumed to be true when it is known to be false. (SVP) 2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.(USPAP)[13]

**EXPOSURE TIME** — Estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.[14]

**PERSONAL PROPERTY** — Identifiable tangible objects that are considered by the general public as being "personal," for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate.  (USPAP) Consists of every kind of property that is not real property; movable without damage to itself or the real estate; subdivided into tangible and intangible components. (IAAO)[15]

**TANGIBLE PROPERTY** - Property that can be perceived with the senses; includes land, fixed improvements, furnishings, merchandise, cash, and other items of working capital used in an enterprise. [16]

**EFFECTIVE DATE** — 1. The date on which the appraisal opinion applies. (SVP) 2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value. (USPAP)  3. The date that a lease goes into effect.[17]

---

[9] USPAP 2020-2021 Edition, Page 4.
[10] USPAP 2020-2021 Edition, Page 4.
[11] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[12] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[13] USPAP 2020-2021 Edition, Page 4.
[14] USPAP 2020-2021 Edition, Page 4.
[15] USPAP 2020-2021 Edition, Page 5.
[16] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[17] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.

APP000081

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Identification and History of the Property

**PROPERTY NAME:**              4.54 Acres of Vacant Land

**LOCATION:**                   NWC of Dallas North Tollway and John Hickman Parkway
                                Frisco, TX 75034

**COUNTY:**                     Collin

**PROPERTY I.D. NUMBER:**       2735901

**OWNER OF RECORD:**            FHC Acquisition LLC

**LEGAL DESCRIPTION:**          GATE THE, BLK A, LOT 13; (REVISED)

**LATITUDE / LONGITUDE:**       33.116721 / -96.824543

**HISTORY OF THE PROPERTY:**

The subject was acquired by FHC Acquisition LLC in January 2021 for an undisclosed amount.  The transaction is recorded in Collin County's public records in document number 20200203000144930.

Per Purchase Sales Agreement, the subject is currently under contract for a reported $9,000,000 ($45.52/SF).  Our analysis of recent transactions supports this contract price.

Other than the contract discussed above, we are aware of no other sales occurring within the past three years.

APP000082

4.54 Acres of Vacant Land                                                        NVC | National Valuation Consultants, Inc.

## Standard Assumptions and Limiting Conditions

1. Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated:  specifically, the Appraisal Institute.

2. This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment.  Furthermore, the Report is to be used in whole and not in part.  The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.  NVC shall have no accountability or responsibility to any such third party.

3. The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4. The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property.  The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5. The legal description used in this report is assumed to be correct.

6. No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7. No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered.  The title is assumed to be good and merchantable unless otherwise stated.

8. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such.

DAL2212012                        Standard Assumptions and Limiting Conditions                              16

APP000083

**4.54 Acres of Vacant Land**                                    NVC | National Valuation Consultants, Inc.

9.  All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age.  The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

10. Information furnished by others is assumed to be true, correct and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

11. The opinion of value assumes responsible ownership and competent management.

12. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the opinion of value is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them.

13. The values contained in this report are opinions.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14. The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and opinions of value if information pertinent to this assignment is made known to us after the completion of the report.

15. National Valuation Consultants, Inc., as well as any employee, agent or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject, but only if neither National Valuation Consultants, Inc. nor any other indemnified person shall have been grossly negligent or shall have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16. The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

APP000084

4.54 Acres of Vacant Land                                                    NVC | National Valuation Consultants, Inc.

17. Unless otherwise noted, all prospective values, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization. The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur and which would alter market conditions prior to the effective date of the appraisal.

APP000085

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Extraordinary Assumptions and Hypothetical Conditions

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report.  In addition, there are no Extraordinary Assumptions or Hypothetical Conditions that may have affected the assignment results.

***Extraordinary Assumptions***

- ■ *None.*

***Hypothetical Conditions***

- ■ *None.*

APP000086

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

# PRESENTATION OF DATA

APP000087

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## U.S. Economic Indicators

**Gross Domestic Product**

Real gross domestic product (GDP) increased at an annual rate of 2.6% in 3Q 2022, in contrast to a decrease of 0.6% in 2Q 2022.



**Inflation**

The Consumer Price Index for All Urban Consumers increased 7.7% from October 2021 to October 2022. The increase of 7.7% from October 2021 to October 2022 was the smallest 12-month advance since January 2022.



APP000088

4.54 Acres of Vacant Land

NVC | National Valuation Consultants, Inc.

### *U.S. 10-Year Treasury Yield*

As of late November 2022, the 10-year U.S. Treasury yield was 3.71%, as investors digested the Federal Reserve's November meeting minutes, which suggested that interest rate hikes would be slowed in the coming months.



### *Consumer Sentiment Index*

Consumer sentiment fell 5% below October, offsetting about one-third of the gains posted since the historic low in June.  Along with the ongoing impact of inflation, consumer attitudes have also been weighed down by rising borrowing costs, declining asset values, and weakening labor market expectations.  Buying conditions for durables, which had markedly improved last month, decreased most sharply in November, falling back 19% to its September level on the basis of high interest rates and continued high prices. Long-term business conditions declined a more modest 6%, while short-term business conditions and personal finances were essentially unchanged.  Inflation expectations were also little changed from October.  The median expected year-ahead inflation rate was 4.9%, down slightly from 5.0% last month.  Long run inflation expectations, currently at 3.0%, have remained in the narrow (albeit elevated) 2.9%-3.1% range for 15 of the last 16 months.  Uncertainty over these expectations remained at an elevated level, indicating that the general stability of these expectations may not necessarily endure.



APP000089

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

*Investment*

Stocks are coming off a mixed session, amid worries about protests in major Chinese cities against strict COVID-19 policies, although gains in Amazon helped limit losses as Cyber Monday sales were set for a record.



*NCREIF Property Index*

The quarterly total return was 0.57% for the third quarter which is down from 3.23% the second quarter. The quarterly return consisted of 0.93% from income and (0.37%) from appreciation, the first negative appreciation returns since the 2nd quarter of 2020. Appreciation is after the deduction of capital expenditures. Market values before considering capital expenditures decreased by (0.09%), the first decline in the index since the 3rd quarter of 2020. The decline was due in part to a significant increase in the number of properties that had their values written down this quarter versus those that were written up. More than half the properties in the index were written down which also hasn't happened since the 3rd quarter of 2020.



DAL2212012                              U.S. Economic Indicators                                      23

APP000090

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

*Capital Markets*

According to CoStar Analytics, having decreased in 2020 by 27.5%, total commercial real estate sales volume reached a new record of $583B in 2021.  Thus far in 2022, total CRE sales volume has increased 41.5%, with over 101,000 total sales and an overall asset value exceeding $13.7T.



**CONCLUSION**

As 2022 progresses, the U.S. inflation rate continues to impact markets, as strong consumer demand has collided with pandemic-related supply disruptions.  Prices are up sharply for a number of everyday household items, including food, vehicles, shelter, and energy.  Shortages of supplies and workers, heavy doses of federal aid, rising interest rate predictions, and robust consumer spending have combined to send inflation soaring.  The Fed once again made history, as it raised benchmark interest rates by another three-quarters of a percentage point and indicated it will keep hiking well above the current level.  It's the fourth straight time the Federal Reserve has raised rates 75 basis points this year, as the central bank rapidly reduces liquidity to the financial markets in an attempt to help tamp down inflation.  Fed officials signaled the intention of continuing to hike rates into 2023.  Inflation currently stands at 7.7% for the 12 months ended October 2022.

While industrial properties continue to be the magnet for investors, the retail sector remains impacted by the continuous surge of e-commerce.  Unlike retail where supply exceeds demand, all types of housing in the U.S. remains supply constrained, and the demand for apartments has been fueled by generally unaffordable housing prices.  The hospitality industry is seeing the return of business and large conference travel, but the biggest issue the sector is suffering from currently is a talent shortage and the need to pay higher wages.  The hotel industry is directly affected by the office segment, which continues to be impacted by hybrid work from home policies, resulting in the shrinking of office demand in certain U.S. markets.

Looking forward, most analysts anticipate a short and mild recession, followed by a period of slower growth with inflation remaining well above the Fed's two percent target.  When combined with higher interest rates and ongoing supply-chain issues, the commercial real estate markets will face challenges in the short term, although long term trends remain positive due to high employment and constrained supply in many markets.

APP000091

4.54 Acres of Vacant Land                                          NVC | National Valuation Consultants, Inc.

## AREA/SUBJECT MAP



APP000092

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Dallas-Fort Worth-Arlington, TX MSA Economic and Demographic Profile

### MSA Defined

According to the U.S. Office of Management and Budget, the Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area (#19100) is defined as follows.

*Principal Cities:* Dallas, Fort Worth, Arlington, Plano, Irving, Denton, Richardson, Grapevine.
*Constituent Counties:* Collin County, Dallas County, Denton County, Ellis County, Hunt County, Kaufman County, Rockwall County, Johnson County, Parker County, Tarrant County, Wise County.

### Locational and Linkages Attributes

The cities of Dallas and Fort Worth are the two central cities of the metroplex. Dallas and its suburbs have one of the highest concentrations of corporate headquarters in the United States and is the largest growing metropolitan economy in the nation. Its major industries include Information Technology and Conducting Business. Fort Worth's economy is fueled by defense and aircraft manufacturing, as well as the Texas farming and ranching industry.

The Dallas-Fort Worth Metroplex is home to over 220 publicly traded companies and roughly 700 total corporate headquarters, one of the largest concentrations in the United States. As a whole, the region has over 20 Fortune 500 companies and approximately 40 Fortune 1,000 companies. Among these companies in Dallas are AT&T, Southwest Airlines, Texas Instruments, and Exxon Mobil; Fort Worth is home to American Airlines and several major defense manufacturers including Lockheed Martin and Bell Helicopter Textron.

The Dallas-Fort Worth region's attractive quality of life, low cost of living, skilled labor force, pro-business mindset and absence of corporate and personal income taxes all contribute to a strong regional and state economy. The region's central location allows it to function as a logistics and distribution hub, giving businesses an edge by putting key markets within easy reach of both truck and rail shipping.

### Ground Transportation

*Highways*

The Dallas-Fort Worth area has multiple different freeways and interstates. Major north-south Interstates include I-35 and I-45/I-75. I-35 splits into I-35E and I-35W from Denton to Hillsboro. I-35W goes through Fort Worth while I-35E goes through Dallas. I-45 connects Dallas to Houston. I-75 connects Dallas to Durant Oklahoma. East-west routes include I-30 and I-20. The North Central Texas Council of Governments is a cooperative effort of all the counties impacted by the continued population growth and resulting traffic congestion, with the charter to help plan and coordinate future transportation needs of the region. Two major turnpikes have been opened in the last 10 years to address this growth: the Sam Rayburn Tollway, which links north Tarrant County to Collin County and the President George Bush Turnpike, which links I-20 and I-30, south of DFW Airport, to the Dallas North Tollway and I-75.

APP000093

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

*Public Transportation*

Public transit options continue to expand significantly, though in several outlying suburbs, it remains limited.  Dallas County and parts of Collin and Rockwall Counties have bus service and light rail operated by Dallas Area Rapid Transit, (DART), covering thirteen cities.  The Red Line extends north to Plano and southwest to Westmoreland Road.  The Blue Line reaches from Rowlett in the northeast to Ledbetter Road in south Dallas.  An additional three miles south to the University of North Texas near I-20 recently opened.  DART's 28-mile Green Line connects Carrollton in the northwest through Downtown Dallas to Pleasant Grove in the southeast.  The Orange Line is being extended in phases from Northwest Hwy to Las Colinas, in Irving, and finally to DFW International Airport.

*Rail*

Tarrant County has bus service operated by the Fort Worth Transportation Authority (known as 'The T'), available only in Fort Worth.  The commuter train that serves Fort Worth and its eastern suburbs is operated as the Trinity Railway Express.  It connects downtown Fort Worth to downtown Dallas, where it links to the DART light rail system.  A station near its midpoint, Centerport, serves DFW Airport via a free airport shuttle bus.

The Dallas-Fort Worth-Arlington area is served by the Burlington Northern and Santa Fe Railway's Intermodal freight transport yard, the Yellow Freight Systems' cross-docking facility and the Union Pacific intermodal facility, all located adjacent to I-45, southeast of Dallas.

**Air Transportation**

*Dallas-Fort Worth International Airport*

Commercial air transportation is handled through the Dallas-Fort Worth International Airport (DFW).  DFW, located midway between Dallas and Fort Worth, is the world's largest in terms of land area, covers in excess of 18,000 acres.  According to the airport's website, DFW Airport provides non-stop access to 150 U.S. and 51 international cities.  Within 2021 DFW had served over 62.4 million passengers and over 1.0 billion tons of cargo a significant increase over the 39.3 million passengers and 872,000 tons of cargo served by the same date in 2021.  It is the nation's fourth-busiest airport and 11th busiest in the world.  The airport also provides employment for close to 220,000 individuals.  A map of non-stop flights from DFW is presented below.



APP000094

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

### Demographic Overview

The following table provides a summary of key demographic characteristics within the Dallas-Fort Worth MSA, the State of Texas, and the nation.

| Regional Demographic Summary | | | |
|---|---|---|---|
| | Dallas-Fort Worth MSA | State of Texas | United States |
| **Population** | | | |
| 2010 Census | 6,366,542 | 25,145,561 | 308,745,538 |
| 2022 Estimate | 7,826,862 | 29,801,205 | 334,279,739 |
| 2027 Projection | 8,291,685 | 31,381,561 | 344,999,336 |
| 2010 - 2022 % Annual Change | 1.7% | 1.4% | 0.7% |
| 2022 - 2027 % Annual Change | 1.2% | 1.0% | 0.6% |
| Average Age | 37.0 | 37.2 | 40.0 |
| Median Age | 36.0 | 35.7 | 39.0 |
| **Households** | | | |
| 2010 Census | 1,879,020 | 7,393,354 | 116,716,292 |
| 2022 Estimate | 2,795,625 | 10,591,958 | 127,073,679 |
| 2027 Projection | 2,955,954 | 11,165,395 | 131,388,249 |
| 2010 - 2022 % Annual Change | 3.4% | 3.0% | 0.7% |
| 2022 - 2027 % Annual Change | 1.1% | 1.1% | 0.7% |
| 2022 Average Household Size | 2.8 | 2.8 | 2.6 |
| **Income** | | | |
| 2022 Estimated Median Household | $81,205 | $70,957 | $72,191 |
| 2022 Estimated Avg. Household | $112,828 | $100,590 | $103,625 |
| % Under $50,000 | 30.1% | 36.0% | 35.4% |
| % $50,000 - $100,000 | 30.0% | 29.3% | 28.8% |
| % Over $100,000 | 39.9% | 34.7% | 35.8% |

| Annual Growth Projections (2022 - 2027) | Household Income Comparison |
|---|---|

Environics Analytics, 2022

### Population Trends

The Dallas-Fort Worth MSA has experienced annual population growth of 1.7% since 2010, which has surpassed population growth in the State of Texas as a whole.  Over the next five years, the Dallas-Fort Worth MSA is expected to see annual growth taper off to 1.2%, which is above the projected rate of the State of Texas.

### Income Demographics

When compared to the State of Texas overall, a relatively large share of households in the Dallas-Fort Worth MSA earn more than $100,000 annually (39.9%).  Within the State of Texas, only 34.7% fall within this income bracket.

APP000095

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

### *Area Housing Stock*

The majority of housing in the Dallas-Fort Worth MSA is concentrated in single-family homes which constitute 66.4% of inventory.  Overall, a higher proportion of households in the Dallas-Fort Worth MSA rent housing compared to the State of Texas; home-ownership levels are estimated at 62.2% and 64.3% in the Dallas-Fort Worth MSA and State of Texas, respectively.  At $294,255, the estimated value of owner-occupied homes in the Dallas-Fort Worth MSA is above the State of Texas median of $237,136.

| 2022 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Dallas-Fort Worth MSA | | State of Texas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 1,997,063 | 66.4% | 7,937,288 | 67.8% |
| 2-3-4 Units | 132,421 | 4.4% | 580,360 | 5.0% |
| 5-19 Units | 418,648 | 13.9% | 1,279,202 | 10.9% |
| 20 or more Units | 346,128 | 11.5% | 1,040,191 | 8.9% |
| Mobile Home, Trailer, Other | 111,432 | 3.7% | 864,631 | 7.4% |
| TOTAL | 3,005,692 | 100.0% | 11,701,672 | 100.0% |
| Home Ownership Levels | % Owner | 62.2% | % Owner | 64.3% |
| | % Renter | 37.8% | % Renter | 35.7% |
| Median Year Structure Built | | 1992 | | 1991 |
| Median Value of Owner-Occupied Homes | | $294,255 | | $237,136 |

Environics Analytics, 2022

### *Employment by Industry Sector*

Top employment sectors in the Dallas-Fort Worth MSA include Management (11.3%), Office/Admin Support (11.3%), and Sales/Related (11.0%).  Together, these three sectors represent 33.6% of total employment.  When compared with the State of Texas, the Dallas-Fort Worth MSA has a higher share of residents in the Business/Financial Ops occupation (6.7%).



DAL2212012                    Economic and Demographic Profile                    29

APP000096

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

### Resident Employment Trends

The Dallas- Ft. Worth MSA is currently exhibiting an unemployment rate of 3.4% as of October 2022.  In 2021, the total number of employed residents in the Dallas- Ft. Worth MSA grew by 214,943.  Over the 12-month trailing period through October 2022, resident employment growth slowed as the number of employed residents grew by 189,886.

The total number of employed residents in the Dallas- Ft. Worth MSA is now 6.7% higher than the recent peak reached in 2021.  When compared to the State of Texas, the Dallas- Ft. Worth MSA's unemployment rate is lower, but unemployment in the Dallas- Ft. Worth MSA is 3.4 percentage points higher than the nation.

| Resident Employment Trends | | | | |
|---|---|---|---|---|
| | Dallas- Ft. Worth MSA | | State of Texas | United States |
| Year | Employment | Unemployment Rate | Unemployment Rate | Unemployment |
| 2011 | 3,109,349 | 7.8% | 8.0% | 8.9% |
| 2012 | 3,188,765 | 6.5% | 6.7% | 8.1% |
| 2013 | 3,253,995 | 6.2% | 6.3% | 7.4% |
| 2014 | 3,350,325 | 5.1% | 5.2% | 6.2% |
| 2015 | 3,437,008 | 4.1% | 4.5% | 5.3% |
| 2016 | 3,559,384 | 3.9% | 4.6% | 4.9% |
| 2017 | 3,637,295 | 3.7% | 4.3% | 4.4% |
| 2018 | 3,713,687 | 3.6% | 3.9% | 3.9% |
| 2019 | 3,798,180 | 3.3% | 3.5% | 3.7% |
| 2020 | 3,673,336 | 7.1% | 7.7% | 8.1% |
| 2021 | 3,888,279 | 5.1% | 5.7% | 5.3% |
| Most Current Data | | | | |
| Oct 2021 | 3,959,769 | 4.2% | 4.8% | 4.3% |
| Oct 2022* | 4,149,655 | 3.4% | 3.8% | 0.0% |



Source: U.S. Bureau of Labor Statistics, 12/2022. The preceding data reflects all BLS revisions to date.
* - Preliminary data

APP000097

***Consumer Price Index (CPI) Trends***

The Consumer Price Index (CPI) is a measure of the average change over time in the prices paid by urban consumers for consumer goods and services and serves as an economic indicator.  The CPI is the most widely used measure of inflation and provides information about price changes in the Nation's economy to government, business, and private citizens.

Price indexes are available for the U.S., the four Census regions, size of city, cross-classifications of regions and size-classes, and for 26 local areas.  Indexes are available for major groups of consumer expenditures (food and beverages, housing, apparel, transportation, medical care, recreation, education and communications, and other goods and services), for items within each group, and for special categories, such as energy.

The CPI for Dallas-Fort Worth CSA recorded an increase of 1.7% annually for "All Items" during the period 2012-2021, which is slightly below the U.S. (Class A) increase.  From September 2021 to September 2022 (most recent data available), the CPI for the Dallas-Fort Worth CSA increased by 9.2%, which was above the U.S. (Class A) CPI increase of 8.2% over the same time period.

| Comparative CPI Trends Dallas-Ft. Worth CSA and U.S. (Class A) | | |
|---|---|---|
| | All Items | |
| Year | DFW TX CSA | U.S. (Class A) |
| 2012 | 212.2 | 209.3 |
| 2013 | 216.0 | 212.6 |
| 2014 | 218.4 | 216.1 |
| 2015 | 217.5 | 217.1 |
| 2016 | 220.7 | 220.3 |
| 2017 | 226.1 | 225.4 |
| 2018 | 232.8 | 231.3 |
| 2019 | 237.7 | 235.9 |
| 2020 | 239.1 | 239.0 |
| 2021 | 251.6 | 249.1 |
| Annual Change | 1.7% | 1.8% |
| 2020-2021 | 5.2% | 4.2% |
| Partial Year Comparison | | |
| Sep-21 | 255.0 | 251.9 |
| Sep-22 | 278.3 | 272.5 |
| Annual Change | 9.2% | 8.2% |

Source: U.S. Bureau of Labor Statistics. 4Q 2022.
Not Seasonally Adjusted Data
DFW CSA Period: December 2001=100
U.S. (Class A) Base Period: December 1986=100

The BLS divides the nation into several Combined Statistical Areas (CSA's).  CSA's are larger than Metropolitan Statistical areas (MSA's) because they are intended to give a regional picture.  For markets that do not fall within these CSA's, the BLS has defined these as being Class A, Class B/C, or Class D, depending on population.  Size Class A is defined as having a population of more than 1.5 million.  Size Class B/C is defined has having a population between 50,000 and 1.5 million.  Size Class D is defined as having a population of less than 50,000.

APP000098

4.54 Acres of Vacant Land                                              NVC | National Valuation Consultants, Inc.

**CONCLUSION**

The Dallas-Fort Worth MSA encompasses 11 counties within the State of Texas. Residents of the area refer to it as the Dallas/Fort Worth Metroplex, DFW, or The Metroplex. It is the economic and cultural hub of the region commonly called North Texas or North Central Texas and is the largest land-locked metropolitan area in the United States.

Both the U.S. economy and the Dallas-Fort Worth economy have sustained exponential growth in the past decade. The Dallas-Fort Worth area has become a premier area for doing business, which has attracted many companies and people in the past 10 years. Although recent years brought many economic challenges, the jobs lost during the COVID-19 pandemic have been regained.

The Dallas-Fort Worth MSA is home to excellent higher education institutions including Southern Methodist University, Texas Christian University, the University of Texas Southwestern Medical School, the University of Texas at Dallas, and the University of North Texas. The region offers an extensive community college system as well, enrolling almost 190,000 students annually.

The Dallas-Fort Worth region's low cost of doing business and highly skilled labor force has caused companies across various sectors to relocate or expand operations within the area. After acquiring TD Ameritrade in 2019, Charles Schwab relocated its headquarters to Westlake in Tarrant County. The company's new $100 million regional campus was completed in 2021. Additionally, companies such as Uber and McKesson Corporation have relocated and expanded within the Dallas-Fort Worth area in recent years. These developments, among others, have brought thousands of jobs and will continue to grow the job market in the future as many companies are still in the process of moving to the DFW area.

The Dallas-Fort Worth metro economy continues to grow and attract more companies which has caused increased employment and demand for commercial real estate. Due to the overall, outlook for the Dallas-Fort Worth MSA is favorable.

APP000099

## MARKET AREA MAP



APP000100

4.54 Acres of Vacant Land                                           NVC | National Valuation Consultants, Inc.

## Market Area Analysis

### Description of the Market Area

The subject is located on the NWC of Dallas North tollway and John Hickman Parkway, in the City of Frisco, Collin County, Texas.  For the purposes of this analysis, the market area boundaries have been defined as a three-mile radius extending from the subject property.  The defined market area and subject property's location is presented in the map on the previous page.

Located about 25 minutes from Downtown Dallas, Frisco serves as a bedroom community for professionals who work in Dallas.  Frisco is also creating a business environment of its own, further expanding growth within the area.  Frisco was the fastest-growing city in the nation from 2000 to 2009 and has remained among the top growth locations for the past two decades.  Frisco is known for its many retail properties and sporting venues which provide residents with an attractive style of living.  Major retail properties include Stonebriar Centre, a 165-store regional mall, and a 310,000 SF IKEA.  The city has also been home to the headquarters of the Dallas Cowboys since 2017.  Furthermore, Frisco is known for its exceptional school districts and quality of life brought on by major developments, small-town feel, and ease of access to the surrounding Dallas-Fort Worth metroplex.

The subject is located near the intersection of the Dallas North Tollway and the Sam Rayburn Tollway.  The market area contains mostly retail properties.  The subject is not part of an Opportunity Zone.

### Highways and Major Arterials

The Dallas North Tollway and Sam Rayburn Tollway are the primary freeways serving the market area and provide an excellent connection to the greater Dallas highway network.  The Dallas North Tollway is a 30.2-mile controlled-access toll road operated by the North Texas Tollway Authority, which runs from Interstate 35E near downtown Dallas, Texas, to U.S. Highway 380, in Frisco, Texas.  The Sam Rayburn Tollway is a tollway operated by the North Texas Tollway Authority that runs from Grapevine to McKinney.  Its frontage road is signed State Highway 121.  Other major arterials serving the subject include Main Street, Stonebrook Parkway, Eldorado Parkway, Preston Road, and Legacy Drive.

### Public Transit

Dallas Area Rapid Transit is a transit agency serving the Dallas–Fort Worth metroplex of Texas. It operates buses, light rail, commuter rail, and high-occupancy vehicle lanes in Dallas and twelve of its suburbs. Passenger rail is provided thru the DART light rail system which operates its four lines throughout the metroplex.

### Airports

Dallas/Fort Worth International Airport (DFW) is the primary airport serving the market area, located approximately 20.2 driving miles southwest of the subject property.  DFW is located midway between Dallas and Fort Worth and provides non-stop access to 148 U.S. and 51 international cities.  Dallas Love Field also serves the area and is located 21.7 miles south of the subject.

APP000101

4.54 Acres of Vacant Land                                     NVC | National Valuation Consultants, Inc.

### Demographic Overview

The following table provides a summary of key demographic statistics for the subject's defined market area, along with comparable data for the one-, and five-mile radial areas surrounding the subject, the City of Frisco, and Collin County.

| Market Area Demographic Summary | | | | | |
|---|---|---|---|---|---|
| | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | City of Frisco | Collin County |
| **Population** | | | | | |
| 2010 Census | 5,468 | 76,501 | 215,155 | 116,989 | 782,341 |
| 2022 Estimate | 8,415 | 109,625 | 303,395 | 191,888 | 1,105,764 |
| 2027 Projection | 9,089 | 118,337 | 326,421 | 207,309 | 1,185,875 |
| 2010 - 2022 % Annual Change | 3.7% | 3.0% | 2.9% | 4.2% | 2.9% |
| 2022 - 2027 % Annual Change | 1.6% | 1.5% | 1.5% | 1.6% | 1.4% |
| Average Age | 37.3 | 36.9 | 37.0 | 34.9 | 37.7 |
| Median Age | 37.3 | 37.7 | 37.8 | 36.0 | 37.9 |
| **Households** | | | | | |
| 2010 Census | 2,773 | 29,869 | 78,981 | 39,851 | 283,759 |
| 2022 Estimate | 4,244 | 42,177 | 109,028 | 63,434 | 394,890 |
| 2027 Projection | 4,543 | 45,189 | 116,611 | 68,060 | 422,341 |
| 2010 - 2022 % Annual Change | 3.6% | 2.9% | 2.7% | 2.1% | 2.8% |
| 2022 - 2027 % Annual Change | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| 2022 Average Household Size | 2.0 | 2.6 | 2.8 | 3.0 | 2.8 |
| **Income** | | | | | |
| 2022 Estimated Median Household | $86,439 | $106,575 | $120,551 | $135,611 | $103,798 |
| 2022 Estimated Avg. Household | $113,665 | $146,453 | $165,259 | $177,845 | $138,272 |
| % Under $50,000 | 24.5% | 20.3% | 16.3% | 14.7% | 21.9% |
| % $50,000 - $100,000 | 34.9% | 26.5% | 24.2% | 20.8% | 26.3% |
| % Over $100,000 | 40.7% | 53.2% | 59.5% | 64.6% | 51.7% |

Annual Growth Projections (2022 - 2027) / Household Income Comparison

Environics Analytics, 2022

### Population Trends

The market area has registered annual population growth of 3.0% since 2010, which has lagged population growth in the City of Frisco as a whole.  Over the next five years, the market area is expected to see annual growth taper off to 1.5%, which is below the projected rate of the City of Frisco.

### Income Demographics

When compared to the City of Frisco overall, a relatively large share of households in the market area earn between $50,000 and $100,000 annually (26.5%).  Within the City of Frisco, only 20.8% fall within this income bracket.

### Area Housing Stock

DAL2212012                            Market/Trade Area Analysis                            35

APP000102

The bulk of housing in the market area is concentrated in single-family homes which constitute 58.9% of inventory.  Overall, a higher proportion of households in the market area rent housing compared to the City of Frisco; home-ownership levels are estimated at 56.8% and 76.7% in the market area and City of Frisco, respectively.  At $449,814, the estimated value of owner-occupied homes in the market area is below the City of Frisco median of $487,488.

| 2022 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | 3 Mile Radius | | City of Frisco | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 25,967 | 58.9% | 51,784 | 78.4% |
| 2-3-4 Units | 954 | 2.2% | 1,008 | 1.5% |
| 5-19 Units | 4,894 | 11.1% | 4,515 | 6.8% |
| 20 or more Units | 11,911 | 27.0% | 8,237 | 12.5% |
| Mobile Home, Trailer, Other | 366 | 0.8% | 532 | 0.8% |
| TOTAL | 44,092 | 100.0% | 66,076 | 100.0% |
| Home Ownership Levels | % Owner | 56.8% | % Owner | 76.7% |
| | % Renter | 43.2% | % Renter | 23.3% |
| Median Year Structure Built | | 2004 | | 2008 |
| Median Value of Owner-Occupied Homes | | $449,814 | | $487,488 |

Environics Analytics, 2022

### *Employment by Occupation*

Top employment sectors in the market area include Management (16.5%), Sales/Related (13.1%), and Computer/Mathematical (12.0%).  Together, these three sectors constitute 41.6% of total employment. When compared with the City of Frisco, the market area has a higher proportion of residents in the Office/Admin Support occupation (9.1%).



APP000103

4.54 Acres of Vacant Land                                                NVC | National Valuation Consultants, Inc.

### Principal Employers

The following table lists the principal employers found in the City of Frisco, according to the city's most recent *Comprehensive Annual Financial Report.*

| City of Frisco - Principal Employers | |
|---|---|
| Company | # of Employees |
| Frisco ISD | 7,048 |
| City of Frisco | 1,630 |
| Conifer | 903 |
| T-Mobile USA | 900 |
| Baylor Medical Center (Warren Pkwy) | 663 |
| Mario Sinacola & Sons Excavating | 603 |
| Oracle | 500 |
| IKEA Frisco | 423 |
| Baylor Scott White/Texas Centennial Hospital | 400 |
| UT Southwestern/Texas Health Hospital | 300 |

Source: City of Frisco CAFR, Accessed 2022.

### Market Drivers

**Corporate -** The City of Frisco is home to many companies such as Toyota, Dr Pepper, Keurig, JC Penny, PGA of America, Altair Global as well as larger office park and corporate campuses such as Legacy Business Park, Granite Park, Hall Office Park, HP Campus, JPMorgan Chase Campus, Capital One Campus.

**Stonebriar Centre -** The subject property is uniquely positioned within Stonebriar Centre, providing a significant and captive built-in demand generator. Now owned by Brookfield Properties, the 1.6-million SF Stonebriar Centre opened in 2000. The success of Stonebriar, which produces over $400 million annually in retail sales, has spawned more than 3 million SF of additional ancillary retail shopping and restaurant space in Frisco since its inception, contributing greatly to Frisco/ Plano's incredible transformation from a highly admired D/FW suburb to the growth capital of the United States.

**Sporting Venues** – Frisco is home to multiple sporting venues that host events year-round including sports and concerts. The Dr Pepper Ballpark is a 10,316-seat baseball stadium located 1.7 miles south of the subject. Toyota Stadium is a 20,500-seat stadium, primarily used as a soccer stadium by FC Dallas, but also hosts concerts and other events located 4.2 miles north of the subject. The Comerica Center is a combination hockey and basketball venue located 41.7 miles south of the subject and home to the Texas Legends of the NBA G League and a practice facility of the Dallas Stars. Finally, the Ford Center at the Star is a 12,000-seat indoor stadium serving as the Dallas Cowboys' practice facility, as well as other events located just two blocks south of the subject. In August 2022, the Professional Golfers' Association of America or (PGA of America) opened approximately 10 miles north of the subject. The new 106,600-square-foot PGA of America headquarters contains major elements of the complex include open and private workspaces accommodating 150 employees, seminar and meeting rooms, a professional development center, communal areas including a large social staircase, a fitness facility, and a top-floor event venue with access to a large outdoor terrace. Fieldhouse USA also serves the market area. Fieldhouse USA is a 144,000 square-foot, state-of-the-art sports facility devoted to providing excellence in competitive and recreational sports. It features 12 full-sized hardwood basketball and volleyball courts, indoor soccer/football turf and approximately 13,200 square feet of retail space, as well as a food court, onsite trainer, team store and corporate conference rooms.

APP000104

4.54 Acres of Vacant Land

NVC | National Valuation Consultants, Inc.

### *Resident Employment Trends*

The City of Frisco is currently exhibiting an unemployment rate of 2.8% as of October 2022. In 2021, the total number of employed residents in the City of Frisco grew by 6,516. Over the 12-month trailing period through October 2022, resident employment growth slowed as the number of employed residents increased by 5,847. The total number of employed residents in the City of Frisco is now 7.1% above the recent peak reached in 2021. When compared to Collin County, the City of Frisco's unemployment rate is lower, but unemployment in the City of Frisco is 2.8 percentage points above the nation.

| Resident Employment Trends | | | | | |
|---|---|---|---|---|---|
| | City of Frisco | | Collin County | | Dallas Fort-Worth MSA |
| Year | Employment | Unemployment Rate | Employment | Unemployment Rate | Unemployment Rate |
| 2011 | 61,821 | 6.0% | 407,778 | 7.0% | 7.8% |
| 2012 | 64,438 | 4.9% | 419,576 | 5.9% | 6.5% |
| 2013 | 68,889 | 4.5% | 431,462 | 5.6% | 6.2% |
| 2014 | 73,829 | 3.8% | 451,569 | 4.6% | 5.1% |
| 2015 | 79,367 | 2.9% | 470,919 | 3.7% | 4.1% |
| 2016 | 86,012 | 3.3% | 495,061 | 3.5% | 3.9% |
| 2017 | 92,966 | 3.3% | 509,750 | 3.5% | 3.7% |
| 2018 | 98,572 | 3.1% | 527,817 | 3.4% | 3.6% |
| 2019 | 105,831 | 2.8% | 547,629 | 3.1% | 3.3% |
| 2020 | 105,454 | 5.5% | 539,871 | 6.3% | 7.1% |
| 2021 | 111,970 | 3.7% | 573,302 | 4.3% | 5.1% |
| Most Current Data | | | | | |
| Oct 2021 | 114,119 | 3.1% | 584,318 | 3.6% | 4.2% |
| Oct 2022* | 119,966 | 2.8% | 614,202 | 3.0% | 3.4% |

Source: U.S. Bureau of Labor Statistics, 12/2022. The preceding data reflects all BLS revisions to date.
* - Preliminary data

### CONCLUSION

The City of Frisco is a community that offers exceptional housing, award-winning schools, and a dynamic business climate, all of which are strong factors in the success of the city's economy. The City of Frisco continues to benefit from other favorable conditions associated with the area, including a stable, diverse economic base, and a desirable location for work and living. The market area has posted annual population growth of 3.0%. Population growth in the market area is projected to continue at a slowed, but solid annual rate of 1.5% over the next five years. The market area is dominated by high-income households, with 53.2% of households earning more than $100,000 each year, and a median household income of $106,575. Overall, the market area's convenient location and relatively healthy fundamentals provide a positive outlook for the future.

APP000105

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Zoning Analysis

The property is zoned  Planned Development District 248 - O-2/R/RES under the authority of City of Frisco. Retail, office and residential uses are a permitted land use under this zoning. Site plan approval required. The subject's zoning requirements are summarized below.

| Zoning Requirements | |
|---|---|
| Zoning Jurisdiction | City of Frisco |
| Zoning Designation | Planned Development District 248 - O-2/R/RES |
| Description | Office-2/Retail/Residential (Village Center District) |
| Legally Conforming? | N/A - Vacant |
| Zoning Change Likely? | No |
| **Lot** | |
| Permitted Uses | Retail, office and residential uses are a permitted land use under this zoning. Site plan approval required. |
| Minimum Lot Size (SF) | 2,500 SF |
| Maximum Lot Size (SF) | None |
| Minimum Lot Width (Feet) | 80 feet |
| Maximum Coverage Ratio | 100% |
| Minimum Open Space | None |
| **Setbacks** | |
| Front (Feet) | 15 feet |
| Side (Feet) | 15 feet |
| Rear (Feet) | 25 feet |
| **Building** | |
| Maximum Building Height (feet) | None; restricted to 30 stories office and 25 stories condo/hotel |
| Maximum Floor Area Ratio | None |
| **Parking Requirement** | |
| Parking Requirement | Varies accrording to use |

Source: City of Frisco Municipal Code

According to the local planning department, there are no pending or prospective zoning changes.

DAL2212012                                    Zoning Analysis                                    39

APP000106

4.54 Acres of Vacant Land                                            NVC | National Valuation Consultants, Inc.

## Tax Assessment Analysis

*Property Tax Administration*

According to the State of Texas, administration of the property tax system in Texas involves both state and local entities and officials.  State law governs how the process works.

1. The *Comptroller of Public Accounts of the State of Texas* adopts rules establishing minimum standards for the administration and operation of an appraisal district.  The minimum standards may vary according to the number of parcels and the kinds of property the district is responsible for appraising.

2. The *Board of Tax Professional Examiners* is responsible for certifying tax professionals in Texas and  in setting standards for and approving curricula and materials for use in training and educating appraisers and assessor-collectors.

3. An *appraisal district* is established in each county.  The district is responsible for appraising property in the district for ad valorem tax purposes of each taxing unit that imposes ad valorem taxes on property in the district.  An appraisal district is a political subdivision of the state.  With exceptions, the appraisal district's boundaries are the same as the county's boundaries.  The appraisal district is governed by a *board of directors*.  A *chief appraiser* is the chief administrator.

4. *An appraisal review board* settles any disagreements between the property owner and the appraisal district about the value of a property.  The appraisal review board is established for each appraisal district.

*Local taxing units*, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The county assessor-collector shall assess and collect taxes on property in the county.
The county attorney or, if there is no county attorney, the district attorney shall represent the county to enforce the collection of delinquent taxes if the commissioners court does not contract with a private attorney.

*Assessment*

The assessment of property for taxation on the basis of a percentage of its appraised value is prohibited.  All property shall be assessed on the basis of 100% of its appraised value.  The market value of property shall be determined by the application of generally accepted appraisal methods and techniques.  If the appraisal district determines the appraised value of a property using mass appraisal standards, the mass appraisal standards must comply with the Uniform Standards of Professional Appraisal Practice.  The same or similar appraisal methods and techniques shall be used in appraising the same or similar kinds of property.  However, each property shall be appraised based upon the individual characteristics that affect the property's market value.  In determining the market value of property, the chief appraiser shall consider the cost, income, and market data comparison methods of appraisal and use the most appropriate method.

APP000107

### Reassessment Cycle

The appraisal district must repeat the appraisal process for property in the county at least once every three years.

### Tax Rates

Local taxing units, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The governing body of each taxing unit, before the later of September 30 or the 60th day after the date the certified appraisal roll is received by the taxing unit, shall adopt a tax rate for the current tax year and shall notify the assessor for the unit of the rate adopted.

State "truth-in-taxation" laws give taxpayers a voice in decisions that affect their property tax rates. Beginning in early August, taxing units take the first step toward adopting a tax rate by calculating and publishing the effective and rollback tax rates.

The *effective tax* rate would provide the taxing unit with approximately the same amount of revenue it had the year before on properties taxed in both years.

The *rollback* rate provides the taxing unit approximately the same amount of tax revenue it spent the previous year for day-to-day operations plus an extra 8-percent cushion, and sufficient funds to pay its debts in the coming year.  For school districts, the cushion is six cents per $100 of property value, not 8%.

### Assessment and Real Estate Taxes

Current year assessments and real estate taxes for the subject are summarized as follows.

| 2022 Assessment and Taxes | | | | | | |
|---|---|---|---|---|---|---|
| Tax ID | Land Value | Improvements Value | Assessed Value | Mill Levy Per $1,000 | Subtotal | Taxes |
| 2735901 | $6,425,154 | $0 | $6,425,154 | 1.893163 | $12,164 | $12,164 |
| $/SF - ( SF) | | | $0.00 | | | $0.00 |
| Grand Total | | | $6,425,154 | | | $12,164 |
| $/SF - ( SF) | | | $0.00 | | | $0.00 |

APP000108

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Site Analysis

In analyzing and describing the subject site, we have relied on our personal inspection of the property and surrounding area on December 10, 2022; information provided by ownership; and records on file with the county.

| | |
|---|---|
| **SIZE:** | 4.54 acres (±197,697SF) per county assessor. |
| **LOCATION:** | NWC of Dallas North Tollway and John Hickman Parkway<br>Frisco, TX 75034 |
| **TOPOGRAPHY:** | Generally level and near grade with surrounding streets and properties. |
| **SHAPE / UTILITY:** | Rectangular shape with no unusual features limiting utility. The tract is bisected on its northeast corner by Polo Gate Road. |
| **ACCESS:** | The site is accessible via John Hickman Road and the Dallas North Tollway (DNT). Polo Gate Road bisects the northeast corner of the tract. |
| **VISIBILITY/EXPOSURE:** | The site is visible from all surrounding roadways. |
| **FRONTAGE:** | The site has frontage along John Hickman Road and DNT. |
| **UTILITIES:** | All public utilities are available and in adequate supply. |
| **EASEMENT / ENCUMBRANCES:** | A title policy and ALTA Survey were not provided. As is the case with most major commercial sites, easements and encumbrances are common place and predominately utility-related. This appraisal is based on the standard assumption that no title exceptions, recorded or unrecorded, are present that would have a negative impact on the subject site. |
| **HAZARDOUS SUBSTANCES:** | The appraisers were not provided with a Phase I Environmental Site Assessment. This appraisal specifically assumes that the property is not affected by environmental conditions that would significantly impact the usability, or marketability of the site. |
| **ZONING:** | The property is zoned Planned Development District 248 - O-2/R/RES under the authority of City of Frisco. Retail, office and residential uses are a permitted land use under this zoning. Site plan approval required. |

APP000109

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

**FLOODPLAIN:**              According to Site To Do Business (STDB), the subject property is located within FEMA Flood Insurance Rate Map Community Panel Number 48085C0355K, dated, June 7, 2017. The subject is situated in Zone X. First American Flood Data Services defines Zone X as an area that is determined to be outside the 100- and 500-year floodplains.

**DRAINAGE:**               Based on our inspection of the site, drainage appears adequate.

**SURROUNDING LAND USES:**   Located at The Gate master-planned development, in the heart of the "Frisco North Platinum Corridor."

Hall Office Park: Total 2.5 million SF Office Space.

The Star: 91 Acres of Retail, Restaurant and Office; Total 510,000 SF Indoor Athletic Facility.

Frisco Station: The Towers: 3 million SF Office Space; The Campus: 1 million SF Corporate HQ; The Offices: 1.5 million SF Office Space; Urban Living: 2400+ Residences.

**CONCLUSION:**             As previously discussed, the subject tract is bisected near the northeast corner by Polo Gate Road; thus the tract is effectively two tracts, with the northern portion's size limiting development potential. However, given its location and its status as an easement at this point, it has no material effect on value. We are unaware of any other unusual or detrimental site characteristics that adversely affect site utility or potential development. The site, located at one of the primary entrances off the Dallas North Tollway in The Gate master-planned development, is one of the higher profile, undeveloped commercial sites on this side of the tollway, in this submarket.

APP000110

NVC | National Valuation Consultants, Inc.

44

## Parcel Map / Site S`urvey



Parcel Map / Site Survey

4.54 Acres of Vacant Land

DAL2212012

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Subject Photographs



Subject Tract



Frontage on John Hickman Road

APP000112

4.54 Acres of Vacant Land                                           NVC | National Valuation Consultants, Inc.

## ANALYSIS OF DATA AND CONCLUSIONS

APP000113

4.54 Acres of Vacant Land

NVC | National Valuation Consultants, Inc.

Based upon zoning and surrounding land usages, subject's legally permitted usages include office, apartment and retail markets. Accordingly, each of these market segments are analyzed in the following.

## Apartment Market & Apartment Submarket Cluster Analysis
### Dallas-Fort Worth & Frisco/Prosper

A proper analysis and understanding of the market factors which influence the apartment submarket is necessary as a precursor to the appraisal process.  We have relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in the Dallas-Fort Worth apartment market and the Frisco/Prosper apartment submarket cluster.  ***All data is specific to "market rate" units (i.e., effective rent per unit, after concessions).***  Based upon data sources available, the following is an analysis of the factors which impact demand for apartment units.

| Dallas-Fort Worth Apartment Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2022 Q3 | 2021 Q3 | YoY Change | Trend |
| Overall Vacancy | 7.7% | 6.1% | 160 bps | ⬆ |
| Market Rate Per Unit | $1,531 | $1,427 | 7.3% | ⬆ |
| Absorbed Units | 757 | 13,396 | (12,639) | ⬇ |
| New Unit Deliveries | 8,809 | 5,494 | 3,315 | ⬆ |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Dallas-Fort Worth Apartment Market Snapshot | | | | | | |
|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 836 | 258,366 | 31.9% | 22,219 | 8.6% | 5,518 | $1,825 |
| Class B | 1,815 | 357,273 | 44.1% | 31,083 | 8.7% | 3,881 | $1,453 |
| Class C | 2,574 | 194,146 | 24.0% | 12,425 | 6.4% | (3,460) | $1,169 |
| Total | 5,225 | 809,785 | 100.0% | 65,728 | 8.1% | 5,940 | $1,508 |

Source: CoStar Properties Analytical Search, 12/12/2022. RBA = Rentable Building Area

| Frisco/Prosper Apartment Submarket Cluster Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2022 Q3 | 2021 Q3 | YoY Change | Trend |
| Overall Vacancy | 10.2% | 7.2% | 300 bps | ⬆ |
| Market Rate Per Unit | $1,867 | $1,766 | 5.7% | ⬆ |
| Absorbed Units | 1,053 | 628 | 425 | ➡ |
| New Unit Deliveries | 1,842 | 772 | 1,070 | ⬆ |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Frisco/Prosper Apartment Submarket Cluster Snapshot | | | | | | |
|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 58 | 20,970 | 66.1% | 1,887 | 9.0% | 586 | $1,811 |
| Class B | 37 | 10,639 | 33.6% | 1,181 | 11.1% | 2,355 | $1,820 |
| Class C | 3 | 98 | 0.3% | 2 | 2.1% | 0 | $890 |
| Total | 98 | 31,707 | 100.0% | 3,070 | 9.7% | 2,942 | $1,814 |

Source: CoStar Properties Analytical Search, 12/12/2022. RBA = Rentable Building Area

APP000114

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

***New Development – Dallas-Fort Worth Apartment Market***

According to CoStar, there are 151 apartment properties currently under construction within the Dallas-Fort Worth apartment market.  Once completed, these 151 apartment properties will add 39,565 new apartment units to the market.  There are also 70 apartment properties currently proposed for construction with the potential to add 26,581 new units, if completed.  Additionally, there are four apartment properties currently in the final planning phase with the potential to add 4,207 new units.

***New Development – Frisco/Prosper Apartment Submarket Cluster***

According to CoStar, there are 10 apartment properties currently under construction within the submarket cluster.  Once completed, these 10 apartment properties will add 2,971 new units.  There are also nine apartment properties currently proposed for construction with the potential to add 6,036 new units, if completed.  Additionally, there is one apartment property currently in the final planning phase with the potential to add 3,400 apartment units to the submarket cluster.

| Frisco/Prosper Apartment  Submarket Cluster - Under Construction | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 4250 Gridiron Rd | The Casey | Frisco | 300 |
| 634 N Teel Pky | Prosper Elms Apartments | Prosper | 196 |
| 408 W 5th St | Prosper Lofts | Prosper | 319 |
| 5775 Blairview St | The Remy | Frisco | 357 |
| 5750 Cotton Gin Rd | Presidium Frisco Square | Frisco | 338 |
| 16720 Doe Creek Rd | The Tyler | Little Elm | 283 |
| 9444 Frisco St | Frisco Fish Market | Frisco | 315 |
| Gordon and Church Street | Remy | Frisco | 357 |
| 1111 S Oklahoma Dr | One Preston Station | Celina | 240 |
| Prosper Rd | The Artesia | Prosper | 266 |
| | | **TOTALS** | **2,971** |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Frisco/Prosper Apartment  Submarket Cluster - Proposed | | | |
|---|---|---|---|
| Address | Name | City | Units |
| NW Corner Of S. Preston Rd. & Richland Blvd | Gates of Prosper | Prosper | 350 |
| Dallas North Tollway & Avon Ln | Railhead Residential | Frisco | 1,200 |
| Gaylord Pky | Hall Park Apartments | Frisco | 2,000 |
| 3033 Ohio Dr | Echelon at the Summit Phase II | Frisco | 373 |
| 7334 Coit Rd | Ten Mile Creek | Frisco | 481 |
| Country Road 87 | Cross Creek Meadows Community | Celina | 264 |
| County Road 87 | Christopher Todd - Cross Creek Meadows | Celina | 264 |
| Lake Forest Dr & Wilmeth Rd | Cyrene at Painted Tree | McKinney | 304 |
| 6500 W University Dr | The Chase at Wilson Creek | McKinney | 800 |
| | | **TOTALS** | **6,036** |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Frisco/Prosper Apartment  Submarket Cluster - Final Planning | | | |
|---|---|---|---|
| Address | Name | City | Units |
| US Highway 380 & Lake Forest Blvd | Painted Tree | McKinney | 3,400 |
| | | **TOTALS** | **3,400** |

Source: CoStar Properties Analytical Search, 12/12/2022.

APP000115

**CONCLUSION**

The Dallas-Fort Worth multifamily market remains on stable ground even as performances are softening from their record-setting pace last year. The region is seeing weaker demand for multifamily units as elevated economic uncertainty and stubborn inflation weigh on households' decision to sign new leases. In turn, the pace of rent growth is slowing, trending closer to precrisis norms through the end of the year. Ranking among the top spots for apartment construction, overall development levels remain stable in Dallas-Fort Worth. The trend is counter to several other major Sun Belt markets whose pipelines have swelled over the past two years. Most construction is concentrated in Collin and Denton counties, tracing robust population growth in the region

Robust economic underpinnings have fostered a healthy apartment market. Dallas-Fort Worth leads the country to recover from the pandemic and resulting recession, up 346,000 jobs from pre-pandemic levels. Healthy job growth and continuous in-migration are two primary drivers of apartment demand in the metroplex. In terms of demographic growth, the metroplex led the country in nominal population growth, adding 97,000 new residents from 2020 to 2021. Even with a continuous flow of new properties coming to the market, the renter pool continues to absorb new units at a steady pace. Since 2010, the market has added about 200,000 new multifamily units, growing its inventory by 33%, the most among major markets in the country. Continuous supply and leading absorption levels make Dallas-Fort Worth one of the country's fastest-growing and balanced multifamily markets.

Located in the far north section of the Dallas-Fort Worth metroplex, Frisco/Prosper is among the fastest-growing submarkets in the country. The submarket's magnetism is driven by more accessible housing than Dallas proper, excellent public schools, and proximity to major employers in neighboring Plano. Toyota, Liberty Mutual, and JPMorgan Chase moved to nearby Legacy West, and Keurig Dr. Pepper is moving from Plano to The Star in Frisco. Development here has transformed empty pastures into a thriving community, shifting Dallas-Fort Worth's center of gravity north. Frisco/Prosper remains a leader in construction in Dallas-Fort Worth. Thanks to demographic tailwinds, the area ranks among the top spots for demand in the market. The pace of rent growth is cooling after setting a scorching pace in 2021. Meanwhile, more development is coming in 2022, placing pressure on vacancy rates in the near term. New communities, like those along the Platinum Corridor, should continue to benefit from a continuous flow of renters, and apartment builders and corporations alike are attracted to Frisco for its business-friendly environment. Likewise, renters are drawn to new retail destinations and entertainment venues such as the new Cowboys practice facility and Toyota Stadium.  As a result, the overall outlook for both the Dallas-Fort Worth apartment market and Frisco/Prosper submarket cluster appear to be one of optimism, citing current trends and a continued interest in multifamily development within the region.

APP000116

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Dallas-Fort Worth Office Market & Frisco/The Colony Submarket Analysis

Office market data provided by the CoStar Group is used in this analysis to support our commentary on the metropolitan office market and submarket trends. This section provides an analysis of trends observed in the Dallas-Fort Worth office market and Frisco/The Colony office submarket. *NVC has excluded owner-occupied product in this analysis.* All rental rates reported by CoStar are Full Service (F/S) rental rates.

| Dallas-Fort Worth Office Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2022 Q3 | 2021 Q3 | YoY Change | Trend |
| Overall Vacancy | 20.8% | 20.8% | 0 bps | |
| (FS) Avg. Rate | $28.86 | $27.78 | 3.9% | |
| Net Absorption (in SF) | 1,238,052 | 29,695 | 1,208,357 | |
| Completions (in SF) | 445,241 | 54,740 | 390,501 | |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Dallas-Fort Worth Office Market Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | YTD Net Absorption | (FS) Avg. Rate |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | | |
| Class A | 646 | 150,625,993 | 47.5% | 39,313,384 | 26.1% | (249,684) | $32.85 |
| Class B | 5,061 | 135,994,489 | 42.8% | 26,110,942 | 19.2% | 332,762 | $23.84 |
| Class C | 4,447 | 30,789,859 | 9.7% | 2,062,921 | 6.7% | 47,929 | $21.24 |
| Total | 10,154 | 317,410,341 | 100.0% | 67,487,247 | 21.3% | 131,007 | $29.11 |

Source: CoStar Properties Analytical Search, 12/12/2022. RBA = Rentable Building Area

| Frisco/The Colony Office Submarket Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2022 Q3 | 2021 Q3 | YoY Change | Trend |
| Overall Vacancy | 13.4% | 15.4% | (200) bps | |
| (FS) Avg. Rate | $35.77 | $35.21 | 1.6% | |
| Net Absorption (in SF) | (14,019) | 25,838 | (39,857) | |
| Completions (in SF) | 10,853 | 0 | 10,853 | |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Frisco/The Colony Office Submarket Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | YTD Net Absorption | (FS) Avg. Rate |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | | |
| Class A | 31 | 4,021,751 | 58.6% | 631,415 | 15.7% | 15,757 | $37.14 |
| Class B | 210 | 2,686,748 | 39.1% | 228,374 | 8.5% | 146,750 | $31.96 |
| Class C | 27 | 181,348 | 2.6% | 15,415 | 8.5% | 1,006 | $29.31 |
| Total | 266 | 6,863,813 | 100.0% | 875,203 | 12.7% | 163,513 | $35.93 |

Source: CoStar Properties Analytical Search, 12/12/2022. RBA = Rentable Building Area

APP000117

4.54 Acres of Vacant Land                                      NVC | National Valuation Consultants, Inc.

### New Development – Dallas-Fort Worth Office Market

According to CoStar, there are 154 office properties currently under construction within the Dallas-Fort Worth office market.  Once completed, these 154 office properties will add over 8.0 million SF of new office space to the market.  There are also 387 office properties currently proposed for construction with the potential to add over 60.5 million SF of new office space, if completed.  Additionally, there are no office properties currently in the final planning phase.

### New Development – Frisco/The Colony Office Submarket

According to CoStar, there are 12 office properties currently under construction within the Frisco/The Colony submarket.  Once completed, these 12 office properties will add over 1.1 million SF of new office space.  There are also 28 office properties currently proposed for construction with the potential to add over 5.0 million SF of new space, if completed.  Additionally, there are no office properties currently in the final planning phase.

| Frisco/The Colony Office Submarket - Under Construction | | | | | |
|---|---|---|---|---|---|
| Address | Name | Class | City | RBA | % Leased |
| 17 Cowboys Way | The Star - Phase IV | A | Frisco | 299,970 | 0.0% |
| 8275 Judges Way Way | --- | A | Frisco | 24,450 | 0.0% |
| 615 Main St | PCR Crossing Medical Offices | B | Frisco | 15,040 | 0.0% |
| 25663 Smotherman Rd | D | B | Frisco | 10,000 | 0.0% |
| 400 Stonebrook Parkway | --- | B | Frisco | 5,750 | 0.0% |
| NEC Spring Creek Pky & State Highway 121 | Southstone Yards | A | Frisco | 241,443 | 0.0% |
| Dallas Pky | Medical Clinic/Office Space | B | Frisco | 40,000 | 0.0% |
| Dallas Pky | --- | B | Frisco | 84,000 | 0.0% |
| John Hickman Parkway | --- | B | Frisco | 12,720 | 0.0% |
| SWC Hwy 380 & Coit Rd | Building 7 | B | Frisco | 5,100 | 0.0% |
| SWC Hwy 380 & Coit Rd | Building 8 | B | Frisco | 5,100 | 0.0% |
| 6605 Warren Pky | The Tower at Hall Park | A | Frisco | 386,946 | 0.0% |
| | | | TOTALS | 1,130,519 | 0.0% |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Frisco/The Colony Office Submarket - Proposed | | | | | |
|---|---|---|---|---|---|
| Address | Name | Class | City | RBA | % Leased |
| 12801 Dallas Pky | --- | B | Frisco | 33,000 | 0.0% |
| 4950 Wade Blvd | A | B | Frisco | 9,000 | 0.0% |
| 9450 Wade Blvd | B | B | Frisco | 9,000 | 0.0% |
| Legacy Dr & PGA Pky | The Link at Fields Frisco Building 2 | A | Frisco | 2,000,000 | 0.0% |
| Legacy Dr & PGA Pky | The Link at Fields Frisco | A | Frisco | 250,000 | 0.0% |
| Panther Creek | Building 1 | B | Frisco | 6,120 | 0.0% |
| SEC Of Warren Pkwy & Dallas N Tollway | Tate + Toll | A | Frisco | 305,919 | 0.0% |
| E US 380 | Fairways Office Park | A | Frisco | 50,000 | 0.0% |
| Panther Creek & Fm 423 | --- | B | Little Elm | 19,000 | 0.0% |
| North Dallas Parkway and McCandless Way | --- | A | Frisco | 150,000 | 0.0% |
| 5445 Town And Country Blvd | Stonebriar Commons Legacy | B | Frisco | 104,115 | 0.0% |
| 6600 TX-121 | The Enclave in Frisco | B | Frisco | 120,000 | 0.0% |
| 10551 N County Rd | Cobb Office Condos | B | Frisco | 30,756 | 0.0% |
| Dallas Pky | Stonebrook Building IV | A | Frisco | 150,000 | 0.0% |
| 4205 Dallas Pky | Offices at The Gate - Phase III | A | Frisco | 315,000 | 0.0% |
| 2055 Farm To Market Rd | --- | B | Little Elm | 9,000 | 0.0% |
| John Hickman Pky | --- | A | Frisco | 300,000 | 0.0% |
| 830 John Hickman Pky | Prestonways Commons Office Park | B | Frisco | 20,000 | 0.0% |
| 6700 John Hickman Pky | Frisco Medical Research Center | A | Frisco | 543,268 | 0.0% |
| NEC of Cobb Hill & Dallas Parkway | Victory at Cobb Hill Medical | A | Frisco | 80,000 | 0.0% |
| NWC John Hickman Pkwy | Auspire at The Gate- Phase 2 | A | Frisco | 200,000 | 0.0% |
| NEQ Panther Creek | --- | B | Frisco | 18,000 | 0.0% |
| Panther Creek Pky | Pad Site | C | Frisco | 16,800 | 0.0% |
| Preston Rd & Meadow Hill Dr | Preston Plaza at North Frisco West Building | B | Frisco | 10,758 | 0.0% |
| 6765 Salt Cedar Way | Stonebrook Building II | A | Frisco | 120,000 | 0.0% |
| SW Quadrant Of Main St & Majestic Gardens Drive | --- | B | Frisco | 44,060 | 0.0% |
| US 380 Hwy | --- | B | Little Elm | 50,000 | 0.0% |
| 8130 Dallas Pky | --- | B | Frisco | 61,302 | 0.0% |
| | | | TOTALS | 5,025,098 | 0.0% |

Source: CoStar Properties Analytical Search, 12/12/2022.

APP000118

4.54 Acres of Vacant Land                                          NVC | National Valuation Consultants, Inc.

**CONCLUSION**

While there are signs of a recovery in the office market, headwinds still remain. As a result of the pressures of increased work-from-home policies and the amount of sublease space available remains stubbornly high. With workplace occupancy still trending at around 45% per Kastle occupancy data, many occupiers expect to reevaluate their space needs. A long-time real estate professional described the state of the office market as follows, "The office will never return to pre-pandemic normals. Anyone still expounding that nonsense is kidding themselves. No office manager or human resources person has come up with a compelling enough reason to return to the office every day."

Several large build-to-suits were completed, providing absorption a much-needed boost. Charles Schwab moved into its 580,000 SF Westlake Campus. Additionally, Paycom moved into its 150,000 SF facility. Meanwhile, JPMorgan Chase moved into its 540,000 SF space in Legacy West. In addition to the activity in the build-to-suit environment, high-quality, recently renovated product in downtown Dallas is drawing interest from office occupiers. For example, Integrity Marketing Group moved into its 100,000-SF space in the iconic Fountain Place. In addition, Galderma moved into the 15th and 16th floors of the Trammell Crow Center, occupying 51,900 SF.

Frisco/The Colony is a rapidly growing suburban submarket in the metroplex. In 2000, the submarket's office inventory was less than 700,000 SF, but today it's 6.8 million SF. Office inventory isn't the only thing that has seen rapid growth. Frisco is consistently ranked as one of the most desirable cities to live in by various publications and is one of the fastest-growing areas in the country. The submarket also features several retail and entertainment amenities: Stonebriar Centre is a 1.6 million-SF regional mall; Dr. Pepper Ballpark is the home of the Frisco RoughRiders, the Texas Rangers' Class AA minor league affiliate; and Toyota Stadium is home to FC Dallas of Major League Soccer. In addition, Frisco hosts a Division I college bowl game, the Frisco Bowl. With the abundance of sports facilities and events, the city is branding itself as Sports City USA. In keeping with its sports theme, the PGA recently completed its new headquarters, moving from Florida. Along with the 106,000 SF headquarters, a significant amount of mixed use development is planned around the headquarters. The Dallas Cowboys star is one of the most recognized logos. The Star at Frisco, "The Star," has redefined the area's office market. The Star is a 91-acre campus of the Dallas Cowboys headquarters and practice facility. The project was developed as a first-of-its-kind partnership between Blue Star, the City of Frisco, and Frisco ISD. Along with the Cowboys, there is an Omni Hotel, Baylor Scott & White Sports Therapy & Research Center, and numerous retail and restaurant options. In addition, Keurig Dr. Pepper has moved its headquarters from West Plano to a new facility at The Star.  Overall, the outlook for the Dallas-Fort Worth office market and the Frisco/The Colony office submarket is one of optimism.

APP000119

4.54 Acres of Vacant Land                                NVC | National Valuation Consultants, Inc.

## Dallas-Fort Worth Retail Market & Frisco Submarket Analysis

Retail market data provided by the CoStar Group is used within this analysis to support our commentary on metropolitan retail market trends.  This section provides an analysis of retail market trends for the Dallas-Fort Worth market and its Frisco submarket.  NVC has gathered current market data furnished by CoStar's Online Properties Database. *For the purposes of this analysis, owner-occupied properties were excluded.*  All rental rates reported by CoStar are Triple Net (NNN) quoted rental rates.

| Dallas-Fort Worth Retail Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2022 Q3 | 2021 Q3 | YoY Change | Trend |
| Overall Vacancy | 5.8% | 6.7% | (90) bps | ⬇ |
| (NNN) Avg. Rate | $17.05 | $16.49 | 3.4% | ⬆ |
| Net Absorption (in SF) | (28,927) | 1,592,181 | (1,621,108) | ⬇ |
| Completions (in SF) | 153,946 | 221,026 | (67,080) | ⬇ |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Dallas-Fort Worth Retail Market Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | YTD Net Absorption | (NNN) Avg. Rate |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | | |
| Shopping Centers | 7,305 | 195,893,855 | 60.7% | 14,496,145 | 7.4% | 2,219,645 | $17.05 |
| General Retail | 16,659 | 126,711,844 | 39.3% | 4,054,779 | 3.2% | 806,804 | $18.78 |
| Total | 23,964 | 322,605,699 | 100.0% | 18,550,924 | 5.7% | 3,026,449 | $17.46 |

Source: CoStar Properties Analytical Search, 12/12/2022. RBA = Rentable Building Area

| Frisco Retail Submarket Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2022 Q3 | 2021 Q3 | YoY Change | Trend |
| Overall Vacancy | 5.5% | 5.7% | (20) bps | ⬇ |
| (NNN) Avg. Rate | $32.71 | $31.54 | 3.7% | ⬆ |
| Net Absorption (in SF) | (26,063) | 40,099 | (66,162) | ⬇ |
| Completions (in SF) | 9,317 | 42,925 | (33,608) | ⬇ |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Frisco Retail Submarket Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | YTD Net Absorption | (NNN) Avg. Rate |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | | |
| Shopping Centers | 198 | 5,585,687 | 78.5% | 318,384 | 5.7% | 8,473 | $34.44 |
| General Retail | 169 | 1,526,731 | 21.5% | 82,443 | 5.4% | 64,606 | $28.28 |
| Total | 367 | 7,112,418 | 100.0% | 400,828 | 5.6% | 73,079 | $32.99 |

Source: CoStar Properties Analytical Search, 12/12/2022. RBA = Rentable Building Area

APP000120

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

### New Development – Dallas-Fort Worth Retail Market

According to CoStar, there are 252 retail properties currently under construction within the Dallas-Fort Worth retail market. Once completed, these 252 retail properties will add over 3.6 million SF of new retail space to the market. There are also 497 retail properties currently proposed for construction with the potential to add over 10.2 million SF of new retail space, if completed. Additionally, there are four retail properties currently in the final planning phase with the potential to add 56,000 SF of new retail space.

### New Development – Frisco Retail Submarket

According to CoStar, there are 17 retail properties currently under construction within the Frisco submarket. Once completed, these 17 retail properties will add 278,776 SF of new office space. There are also 26 retail properties currently proposed for construction with the potential to add nearly 343,560 SF of new space, if completed. Additionally, there are no retail properties currently in the final planning phase.

| Frisco Retail  Submarket - Under Construction | | | | | |
|---|---|---|---|---|---|
| Address | Name | Type | City | RBA | % Leased |
| Swq Custer Rd & Rolater Rd | Phase 1 | Storefront Retail/Office | Frisco | 9,320 | 0.0% |
| SWC Hwy 380 & Coit Rd | Building 4 | --- | Frisco | 15,074 | 0.0% |
| SWC Hwy 380 & Coit Rd | Building 9 | Storefront | Frisco | 13,200 | 0.0% |
| 204 Coit Rd | Wendy's | Fast Food | McKinney | 1,822 | 0.0% |
| 1230 S Coit Rd | --- | Storefront | Prosper | 5,200 | 0.0% |
| 16945 Country 80 Rd | --- | Storefront | Frisco | 5,200 | 0.0% |
| El Dorado Pky | North Frisco Village | --- | Frisco | 103,000 | 0.0% |
| John Hickman Parkway | --- | --- | Frisco | 12,720 | 0.0% |
| NEQ Gaylord & John Hickman | South Building | Storefront Retail/Office | Frisco | 13,491 | 0.0% |
| NEQ Gaylord & John Hickman Rd | North Building | --- | Frisco | 15,575 | 0.0% |
| NEQ Panther Creek & Hillcrest Pky | --- | --- | Frisco | 9,808 | 0.0% |
| 2401 Preston Rd | --- | Retail Building | Frisco | 11,000 | 0.0% |
| 7218 Rolater | --- | Storefront Retail/Office | Frisco | 5,016 | 0.0% |
| 7030 Stonebrook Pky | --- | --- | Frisco | 10,500 | 0.0% |
| SWQ Hwy 380 & Coit Rd | Building 6 | Health Club | Frisco | 24,800 | 0.0% |
| 8700 Eldorado Pky | --- | --- | Frisco | 11,800 | 0.0% |
| 7101 Warren Pky | --- | --- | Frisco | 11,250 | 0.0% |
| | | | TOTALS | 278,776 | 0.0% |

Source: CoStar Properties Analytical Search, 12/12/2022.

| Frisco Retail  Submarket - Proposed | | | | | |
|---|---|---|---|---|---|
| Address | Name | Type | City | RBA | % Leased |
| 0 Custer Rd | --- | Restaurant | Frisco | 20,362 | 0.0% |
| Panther Creek Pkwy | Building 2 | --- | Frisco | 14,400 | 0.0% |
| Panther Creek Pkwy | Building 1 | --- | Frisco | 9,800 | 0.0% |
| 3900 Preston Rd | Preston Road Retail & Pad | Restaurant | Frisco | 8,000 | 0.0% |
| 1531 N Custer Rd | --- | Storefront | McKinney | 4,500 | 0.0% |
| S Custer Rd | Retail F | --- | Frisco | 4,000 | 0.0% |
| 13355 Dallas | Panther Creek Crossing | --- | Frisco | 12,625 | 0.0% |
| 6765 Dallas Pky | Building B | --- | Frisco | 13,798 | 0.0% |
| 6765 Dallas Pky | Building A | --- | Frisco | 22,372 | 0.0% |
| Eldorado Pky | --- | --- | Frisco | 7,600 | 0.0% |
| 820 John Hickman Pky | --- | --- | Frisco | 6,000 | 0.0% |
| 13405 Main St | --- | Storefront Retail/Office | Frisco | 7,340 | 0.0% |
| 13415 Main St | --- | Storefront Retail/Office | Frisco | 7,300 | 0.0% |
| 13495 Main St | --- | --- | Frisco | 16,138 | 0.0% |
| NEQ Dallas North Tollway & Stonebrook Pky | The Heights at Frisco | --- | Frisco | 11,000 | 0.0% |
| NWC Dallas North Tollway & Panther Creek Crossing | Building 1 | --- | Frisco | 5,898 | 0.0% |
| NWQ Preston Rd & Meadow Hill Dr | --- | --- | Frisco | 25,000 | 0.0% |
| 4041 Preston Rd | --- | Restaurant | Frisco | 5,208 | 0.0% |
| 6950 Preston Rd | Preston Stonebrook Center | Storefront | Frisco | 33,000 | 0.0% |
| SWQ Preston Rd & Fisher Dr | Preston Fisher Court II | --- | Frisco | 10,000 | 0.0% |
| SWQ Preston Rd & Fisher Dr | Preston Fisher Court I | --- | Frisco | 9,360 | 0.0% |
| U.S. 380 & Preston Rd | Home Design Experience at Frisco | Restaurant | Frisco | 11,389 | 0.0% |
| Warren Pky | --- | Freestanding | Frisco | 23,412 | 0.0% |
| Coit Rd & Eldorado Pky | Lot 2 | --- | Frisco | 13,200 | 0.0% |
| SEQ Coit Rd. & Main St. | --- | --- | Frisco | 15,250 | 0.0% |
| 6020 State Highway 121 | Crest Volvo | Auto Dealership | Frisco | 26,608 | 0.0% |
| | | | TOTALS | 343,560 | 0.0% |

Source: CoStar Properties Analytical Search, 12/12/2022.

APP000121

4.54 Acres of Vacant Land                                              NVC | National Valuation Consultants, Inc.

**CONCLUSION**

Dallas-Fort Worth's retail market has been marked by resurgent demand over the past year. By many measures, foot traffic and in-person shopping have rebounded, returning to pre-pandemic norms. Confident, retailers are committing to more space, driving net absorption. The metroplex has regained its place on the national leaderboard for net absorption, and vacancy rates are trending below 5%, closer to pre-pandemic norms. Due to rising demand, annual rent growth is surpassing the national average and is establishing a new record through 22Q3.

Leasing activity rebounded last year, leading to net absorption levels consistent with pre-pandemic averages. Meanwhile, over 1.0 million SF of new space hit the market YTD 2022, putting the metroplex among the top markets for deliveries. Most growth is concentrated in fast-growing suburban areas and is tied directly with robust demographic and economic anchors found in Collin and Denton counties. The good news is developers have not over-extended themselves with new projects as they have during previous building cycles, further insulating vacancy rates during the latest downturn.

Frisco is the economic and demographic growth engine in Collin County. Corporate expansions, growing population, and rising incomes are lifting the retail sector in this area. The area is a common destination for families, given more relatively affordable homes and highly rated school districts. As a result, the retail segment in Frisco has flourished to become a destination for shopping in the northern suburbs. The area is tied to growth along the Dallas North Tollway, near 121, and runs parallel to Preston Road. Most retail construction is located along 380, chasing new home building. Look for developers to push north towards Celina, tracing single family development.

The Dallas-Fort Worth economy has proven durable in other economic downturns. The metro is typically among the first to show signs of recovery, and the long-term structural advantages in terms of economic development and demographics in north Texas remain intact. These factors have enabled the retail sector to recover relatively quickly compared to other parts of the country.

APP000122

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Highest and Best Use Analysis

The fundamental concept of highest and best use may be defined as:

"The reasonably probable use of property that results in the highest value."[18]

To test for highest and best use, all logical and feasible alternatives must be analyzed.  The appraiser should determine whether the proposed usage of the land is:

1. Legally permissible
2. Physically possible
3. Economically feasible
4. Maximally productive

If an affirmative answer may be given to these basic questions, it is determined that the highest and best use test has been satisfied.

The appraiser must recognize that land is generally appraised as if vacant and available for development to its highest and best use and that the appraisal of improvements is based on their actual contribution to the site.  Thus, the highest and best use of a site must be determined both 1) as vacant and 2) as improved.  Highest and best use as vacant will be addressed first.

**HIGHEST AND BEST USE AS VACANT**

■  *Legally Permissible Uses*

The property is zoned  Planned Development District 248 - O-2/R/RES under the authority of City of Frisco. Retail, office and residential uses are a permitted land use under this zoning. Site plan approval required. The purpose of the PD is to permit flexibility in the application of zoning standards and requirements where it can be demonstrated that the proposed development provides equivalent or superior standards in a creative way to meet the intent of the underlaying zoning district and general plan. There are no reasonable probable modifications of existing land use regulations to occur in the near future.

■  *Physically Possible Uses*

The land area is 4.54 acres or 197,697 SF.  It has very good access, is mostly level in topography, has adequate soil conditions, is not located within the flood plain, and has no apparent environmental contamination.  Thus, the subject site has adequate utility to accommodate a variety of uses.

■  *Economically Feasible and Maximally Productive Use*

Of the legally permitted uses office appears the most logical considering the subject's location and immediately surrounding land uses.  Thus, mixed-use type development that includes office is considered the most economically feasible use of the subject as vacant.  Our survey of market participants indicated there is increased tenant demand for the subject's market area.  The highest and best use, as vacant, is office development dictated by market conditions.

---

[18] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 305.

APP000123

4.54 Acres of Vacant Land                                        NVC | National Valuation Consultants, Inc.

## The Valuation Process

The estimation of a real property's market value involves a systematic process in which the problem is defined; the work necessary to solve the problem is planned; and the data required are acquired, classified, analyzed and interpreted as an opinion of value.  In this process, three basic approaches, when applicable, are used by the appraiser: the sales comparison approach, the income capitalization approach and the cost approach.  When one or more of these approaches is not applicable in the appraisal process, full justification must be presented.  An explanation of each approach follows.

**COST APPROACH**

In the Cost Approach, the appraiser first values of the fee simple interest in the site.  The replacement or reproduction cost new of the improvements is then estimated. Next, depreciation from all sources is determined and subtracted from the replacement or reproduction cost new of the improvements to arrive at their present value.  The present value of all improvements is added to the market value of the site, resulting in an indicated value by the Cost Approach.

**SALES COMPARISON APPROACH**

The sales comparison approach involves the comparison of the subject property to similar properties that have recently sold or that are currently offered for sale.  The sales prices of these properties are then adjusted to reflect the respective differences of each from the subject to indicate a value range.  This value range, as indicated by the adjusted comparable properties, is then used to establish an indicated value for the subject property.

**INCOME CAPITALIZATION APPROACH**

The income capitalization approach is a process in which the anticipated future benefits (actual dollar income or amenities) are reduced to a present value figure.  The appraiser is primarily concerned with the future benefits resulting from net income and reversionary proceeds.  This approach involves estimating potential gross income by comparison with competing properties and estimating expenses (derived from historical and/or market experience) to determine a projected net income stream.  The income stream is then capitalized into an indication of value by using capitalization rates extracted from competitive properties in the market or by using other techniques when applicable.  Alternatively, the income stream as well as the reversion of the property is converted into value by use of a discounted cash flow (DCF) analysis.  If both techniques are used, the resultant value indications must be reconciled.

**RECONCILIATION**

The final analytical step in the valuation process is reconciliation of the value indications obtained from the different approaches to value. The appraisers must consider the relative dependability and applicability of each approach as dictated by the individual characteristics of the subject. The final opinion of value reflects the results of such deliberation.

APP000124

## Sales Comparison Approach

The sales comparison approach, also termed the market approach, involves the comparison of the subject property to similar properties which have already sold, or which are currently offered for sale, with consideration given to their respective differences from the subject.  This process tends to form a pattern of indicators from which the appraiser can estimate the value of the subject property.  The principle of substitution is an integral part of this approach since a purchaser will typically not pay more for a property than would be required to purchase an equally desirable substitute property.

The following procedures are used to apply the sales comparison approach.

1.  "Research the competitive market for information on properties that are similar to the subject property and that have recently sold, are listed for sale, or are under contract.  Information on agreements of sale, options, listings, and bona fide offers may also be collected.  The characteristics of the properties such as property type, date of sale, size, physical condition, location, and land use constraints should be considered.  The goal is to find a set of comparable sales or other evidence such as property listings or contracts as similar as possible to the subject property to ensure they reflect the actions of similar buyers.  Market analysis and highest and best use analysis set the stage for the selection of appropriate comparable sales.

2.  Verify the information by confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations.  Verification should elicit additional information about the property such as buyer motivation, economic characteristics (if the property is income-producing), value component allocations, and other significant factors as well as information about the market to ensure that comparisons are credible.

3.  Select the most relevant units of comparison used by participants in the market (e.g., price per acre, price per square foot, price per front foot, price per dwelling unit) and develop a comparative analysis for each unit.  The appraiser's goal is to define and identify a unit of comparison that explains market behavior.

4.  Look for differences between the comparable sale properties and the subject property using all appropriate elements of comparison.  Then adjust the price of each sale property, reflecting how it differs, to equate it to the subject property or eliminate that property as a comparable.  This step typically involves using the most similar sale properties and then adjusting for any remaining differences.  If a transaction does not reflect the actions of a buyer who would also be attracted to the subject property, the appraiser should be concerned about comparability and the wisdom of relying on that comparable as a basis for comparison.

5.  Reconcile the various value indications produced from the analysis of comparables into a value conclusion.  A value opinion can be expressed as a single point estimate, as a range of values, or in terms of a relationship (e.g., more or less than a given amount)."[19]

Each of the preceding steps will be explained as they are utilized.  First, we consider the applicability of the sales comparison approach.

---

[19] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 355.

APP000125

4.54 Acres of Vacant Land                                          NVC | National Valuation Consultants, Inc.

**APPLICABILITY OF SALES COMPARISON APPROACH**

Given the status of the subject land as well as the availability of land sales comparable enough in nature to the subject, we value the subject using available sales.

**SALES COMPARISON APPROACH DATA**

All available data sources were researched to identify sales and offerings of sites which are similar to the subject's site.  Market participants were also surveyed regarding available offerings and general market activity.

Below, we have provided a summary of the sales selected for this analysis.  A map of the sales relative to the subject location follows the summary table below. Note that complete abstracts and plat maps for each sale may be found in the Addenda.

Units of comparison vary in the valuation of land and can be based on price per acre, per square foot, or per lot.  ***We choose the price per square foot indication to value the subject.***

**Site Summary**

The subject site is 4.54 acres, zoned Planned Development-29 (Office 2/Retail/Residential) and located at the prestigious northwest quadrant of the Dallas North Tollway and Sam Rayburn Tollway (121) in Frisco, Texas within the Gate master-planned development.

The table below summarizes the comparables.

| Land Sale Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comp No. | Name/Location | Date of Sale | Sale Price | Acreage | Site Area SF | $/SF | Zoning Code |
| 1 | Southwest Corner of Ikea Drive and Parkwood Blvd | Contract | $13,782,384 | 11.30 | 492,228 | $28.00 | PD 25 (BC) and within the Network Node Overlay District |
| 2 | Northwest Quadrant of North Dallas Parkway and John Hickman Parkway | 12/21 | $4,172,885 | 3.42 | 148,892 | $28.03 | PD-248 (O2-R-Res) within the Tollway Overlay District and the Network Node Overlay District |
| 3 | Northeast Corner Dallas North Tollway and Ikea Dr. | Contract | $19,058,370 | 14.58 | 635,279 | $30.00 | PD 169 (O-2/R/RES) within the Tollway Overlay District and the Network Node Overlay District. |
| 4 | North Side of John Hickman Parkway; West of Dallas North Tollway | 12/21 | $5,109,366 | 3.09 | 134,457 | $38.00 | PD 248 - O-2/R/RES |
| 5 | West side of Dallas North Tollway; South of Dubai | Contract | $10,583,038 | 6.39 | 278,501 | $38.00 | PD 248 - O-2/R/RES |
| | Subject | | | 4.54 | 197,697 | | |

APP000126

NVC | National Valuation Consultants, Inc.

60

4.54 Acres of Vacant Land

## Land Sale Map



Sales Comparison Approach

DAL2212012

APP000127

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

**DISCUSSION OF ADJUSTMENTS**

The comparables summarized in the preceding table are used to value the subject land.  Adjustments are made to the sale prices of the comparables to compensate for differences between them and the subject.  A discussion of the adjustments, and their impact on the comparables, follows.

- **REAL PROPERTY RIGHTS CONVEYED -** The subject site is being valued in fee simple.  Each of the comparables were sold conveying fee simple ownership.  Thus, no adjustment is required for real property rights conveyed.

- **FINANCING TERMS** account for the impact on value that is produced by favorable financing.  Adjustments are not required since all sales are based on cash or a cash equivalency basis.

- **CONDITION OF SALE** adjustments reflect the motivations of the buyer and the seller.  All sales are considered "arm's length".  The buyers and sellers appeared to be free of duress with adequate exposure to the market for the property to sell at its fair value.  No adjustments are made.

- **MARKET CONDITIONS (TIME)** account for value changes in properties between the date of the comparable sale and the effective date of this appraisal report.  The real estate prices have rallied in recent years, especially in the industrial sector.  Prices peaked earlier in 2022 and have started to fall since the Federal Reserve has raised the federal funds rate. Therefore, the sales that occurred in 2020 and 2021 are adjusted upward to account for the overall increase in prices over the past several years.  Comparable Nos. 1 and 3, both currently under contract, were negotiated in early 2022; therefore, a slight downward adjustment is made to these two transactions.  Comparable No. 5, also under contract, was negotiated more recently and no adjustment is warranted.  The remaining two sales were sold in late 2021 and therefore was adjusted slightly downward to account for the changing market conditions in the past several months.

- **LOCATION** adjustments account for superiority/inferiority in terms of the impact on value of aesthetic appeal and time-distance relationships between a site and common origins/destinations as compared to the subject.  Within this category we also consider the micro and macro location of the subject and the comparable sales. Comparable No. 1 and 3 are located just south of the subject at the northeast quadrant of DNT and SH-121, which has appreciated at a slower pace the last several years and is considered inferior compared to the subject's immediate neighborhood.  The remaining comparables are located proximate to the subject within The Gate master-planned development. Slight variations in location are accounted for within street frontage adjustments (Functional Utility) next.

- **FUNCTIONAL (SITE) UTILITY -** adjustments may account for differences in a site's shape, dimensions, street frontage, width and corner influence as well as site preparation. The subject is located at the northwest corner of DNT and John Hickman Road with hard corner influence and direct frontage on highway access road.  Comparable No. 1 and 4 lack frontage on highway. Comparable Nos. 2, 3, 4 and 5 lack true hard corner influence on major roadways.  We note that Comparable Nos. 1 and 3 are located on the corner of a roadway that terminates just west of the two comparable tracts at Parkwood Boulevard.  All five comparable sales are adjusted upward for inferior utility.  Notably, Comparable No. 2 has a long narrow shape that impacts development potential; thus, this comparable is adjusted greater than the other sales.

APP000128

4.54 Acres of Vacant Land                                       NVC | National Valuation Consultants, Inc.

- **SIZE** adjustments account for differences in a site's size.  Typically, market data suggest that the size of a tract (all other factors being equal) is inversely proportional to the price per acre of comparison (i.e., the larger the tract, the lower the sale price per unit of comparison, and vice versa).  Comparable Nos. 1 and 3 are much larger (inferior) sized sites and are adjusted accordingly.  No further adjustment for size is made.

- **ZONING / LAND USE** adjustments account for the intensity and flexibility of uses and allowed development with those projects providing for higher densities and greater uses being superior to those with less.  The subject project allows for commercial uses including office, retail, and other uses.  All of the comparables allow for relatively high-density, mixed-use commercial development similar to the subject.  No adjustments are necessary.  All sales allow for 25-30 stories; this includes No.1 with unlimited height restrictions.

Based on the preceding discussion, we have prepared the adjustment grid on the following page.

| Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| Comp No. | Subject | 1 | 2 | 3 | 4 | 5 |
| Sale Price | | $13,782,384 | $4,172,885 | $19,058,370 | $5,109,366 | $10,583,038 |
| Date of Sale | | Contract | 12/21 | Contract | 12/21 | Contract |
| Acreage | 4.54 | 11.30 | 3.42 | 14.58 | 3.09 | 6.39 |
| Site Area (SF) | 5 | 492,228 | 148,892 | 635,279 | 134,457 | 278,501 |
| $/SF | | $28.00 | $28.03 | $30.00 | $38.00 | $38.00 |
| Property Rights | | - | - | - | - | - |
| Financing | | - | - | - | - | - |
| Condition of Sale | | - | - | - | - | - |
| Market Conditions | | -5.0% | -5.0% | - | -5.0% | -5.0% |
| Subtotal price/unit | | $26.60 | $26.63 | $30.00 | $36.10 | $36.10 |
| Location | | 5.0% | - | 5.0% | - | - |
| Development Status | | - | - | - | - | - |
| Site Utility | | 25.0% | 35.0% | 25.0% | 25.0% | 25.0% |
| Size | | 10.0% | - | 10.0% | - | - |
| Zoning | | - | - | - | - | - |
| Subtotal Property Adjust. | | 40.0% | 35.0% | 40.0% | 25.0% | 25.0% |
| Final Adjusted Price/SF | | $37.24 | $35.95 | $42.00 | $45.13 | $45.13 |
| Total Net Adjustment | | 33% | 28% | 40% | 19% | 19% |

The sales indicate an unadjusted range in prices from $28.00/SF to $38.00/SF.  The range narrows to about $35- $45/SF after quantitative adjustments.  Most weight is accorded to Comparable Nos. 4 and 5, each located adjacent to the subject within The Gate master-planned development.  These sales indicated an adjusted value/SF of $45.00.  We are also aware of confidential land price/value negotiations in The Star would readily support this value/SF.

As noted, the subject is one of the last remaining vacant tracts located on the Tollway within The Gate master-planned development; it is the hard corner at The Gates main entryway.  We note that investment sales volume (includes land) in the first half of the year were higher than same time last year.  But the Federal Reserve started to rapidly raise interest rates in April, including 50 bps on December 14th.

APP000129

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

**MARKET VALUE CONCLUSION**

In light of the preceding changing market conditions, but also considering the accelerating development in this immediate market area wherein subject is located at the entrance of, we conclude to an estimated market value shown below.

| Land Value Conclusion | |
|---|---|
| SF of Land | 197,697 |
| Indicated Value Per SF | $45.00 |
| Indicated Value | $8,896,365 |
| **Land Value** | **$9,000,000** |
| Value / SF | $45.52 |

Per PSA, the subject is currently under contract for a reported $9,000,000 ($45.52/SF). Our analysis of recent transactions readily supports this contract price upon adjustment.

APP000130

4.54 Acres of Vacant Land                                    NVC | National Valuation Consultants, Inc.

## Reconciliation and Final Value

In estimating the market value of the subject, we utilized only the Sales Comparison Approach. Thus, reconciliation is not necessary. The indicated market value is summarized in the following table.

| Final Value Reconciliation | |
|---|---|
| Value Premise | "As Is" |
| Date of Valuation | December 10, 2022 |
| Interest Appraised | Leased Fee |
| Land Area (SF) | 197,697 |
| Sales Comparison Approach | $9,000,000 |
| Cost Approach | NA |
| Income Capitalization Approach | NA |
| **Market Value Opinion** | **$9,000,000** |
| Market Value Opinion $/SF | $45.52 |

***Sales Comparison Approach***

NVC conducted an extensive search for land sales within the subject submarket. There are sufficient sales to analyze and compare to the subject property and to derive market values of the subject property.

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report. In addition, there no Extraordinary Assumptions or Hypothetical Conditions that may have affected the assignment results.

***EXTRAORDINARY ASSUMPTIONS***

*None*

***HYPOTHETICAL CONDITIONS***

*None*

APP000131

4.54 Acres of Vacant Land                                         NVC | National Valuation Consultants, Inc.

## Reasonable Exposure Time and Marketing Period

Advisory Opinion G-7 of the USPAP defines reasonable exposure time as follows:

"The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market."

In contrast, the same Advisory Opinion defines marketing time as follows:

"An estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value level during the period immediately after the effective date of an appraisal."

The key difference is that exposure time is inherent in the market value and is always presumed to precede the effective date of value, whereas the marketing period is the estimated length of time immediately after the effective date of value that will be necessary to sell the property.

In level markets, the exposure time and marketing time should be identical. In improving markets, the marketing period will probably be shorter than the exposure period, whereas in declining markets, the marketing period will probably be longer than the exposure period.

### Conclusion

Considering both the macro context of the institutional real estate market in general, as well as the micro aspects of the subject property in particular including recent sales and listings, it is our opinion that the reasonable exposure period inherent in the market value estimate is six months.

With higher interest rates, the number of transactions in many markets around the country is slowing. Our projected exposure and marketing period for the property are as follows. Thus, we estimate that the forward-looking marketing period is nine months. This is the length of time that we estimate it will take to sell the subject property at the appraised value.

Our projected exposure and marketing period for the property are as follows.

| Exposure and Marketing Period Conclusions | |
|---|---|
| Exposure Period Implicit in Market Value Estimate | 6 Months |
| Forecasted Marketing Period | 9 Months |

APP000132

4.54 Acres of Vacant Land                                                    NVC | National Valuation Consultants, Inc.

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

8.  Charles G. Dannis, MAI, SRA made a personal inspection of the property that is the subject of this report from a public roadway.

9.  Additional employees of National Valuation Consultants, Inc. provided assistance with the preparation of this report. Specifically, Brad Kilgore provided significant real property appraisal assistance under the direction and supervision of the persons signing this report. This included property inspection & description, comparable data research, market analysis, highest & best use, application of valuation approaches and reconciliation.  Otherwise, no one provided significant real property appraisal assistance to the persons signing this certification.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Charles G. Dannis, MAI, SRA has completed the continuing education program for Designated Members of the Appraisal Institute.

12. We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

APP000133

Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

APP000134

**ADDENDA**

APP000135

CHARLES GLENN DANNIS
6060 N CENTRAL EXPY STE 860
DALLAS, TX 75206



# Certified General
# Real Estate Appraiser

Appraiser: **Charles Glenn Dannis**

License #: **TX 1321531 G**        License Expires: **01/31/2024**

Having provided satisfactory evidence of the qualifications required
by the Texas Appraiser Licensing and Certification Act, Occupations
Code, Chapter 1103, authorization is granted to use this title:
Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB
at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

APP000136

# Charles (Chuck) G. Dannis, MAI, SRA
## Senior Managing Director



### National Valuation Consultants, Inc.

Chuck has been a real estate appraiser and consultant since 1972. In 1976, he co-founded the Dallas-based appraisal firm Crosson Dannis, Inc., which provided real estate appraisal and consultation services throughout the U.S. for more than 35 years. In 2015, Crosson Dannis merged with National Valuation Consultants to create one of the largest privately held commercial real estate valuation and advisory firms in the United States.

Chuck currently serves as the Senior Managing Director of NVC's Dallas office, overseeing all aspects of its day-to-day operations including bidding, structuring and engaging appraisal assignments and managing the office's valuation team.

## PROFESSIONAL EXPERIENCE

NATIONAL VALUATION CONSULTANTS, INC.                    JANUARY 2015 - PRESENT

*One of the largest, privately held commercial real estate valuation and advisory companies in the United States with a focus on institutional real estate clients*

CROSSON DANNIS, INC.                    1977 – DECEMBER 2014

Served as co-founder and President of this full-service real estate appraisal and consulting firm operating throughout the United States.

FIRST TEXAS FINANCIAL CORPORATION AND MUTUAL SAVINGS                    1974 - 1976

Initially employed as Regional Supervisor, subsequently promoted to Assistant Vice President. Responsible for management and marketing of all company-owned real estate developments with concurrent responsibilities of all appraisal work on income-producing property loans. Residential developments included several single-family subdivisions and a large, planned unit development.

OAK CLIFF SAVINGS AND FIRST TEXAS FINANCIAL CORPORATION                    1972 - 1974

Employed as a Staff Appraiser for a statewide savings and loan holding company, involving real estate appraisal and consulting work on all types of properties.

## EDUCATION

SOUTHERN METHODIST UNIVERSITY                    B.B.A. – MANAGEMENT
GRADUATE STUDIES IN FINANCE AND REAL ESTATE

## CERTIFICATIONS AND LICENSES

Certified General Appraiser in the State of Texas

## PROFESSIONAL AFFILIATIONS

- Member of the Appraisal Institute (MAI and SRA)
- Chairman – Ethics Committee, Appraisal Institute[1]
- Chairman – Candidate Guidance, Appraisal Institute[1]
- Chairman – Public Relations, Appraisal Institute[1]
- Chairman – Symposium Committee, Appraisal Institute[2]
- Vice Chairman – Research Committee, Appraisal Institute[2]
- Member – Appraisal Standards Council, Appraisal Institute[2]

[1]Local Chapter
[2]National Appointment

**PHONE:**
Direct:  214.932.1818
Mobile: 214.707.1851

**EMAIL:**
cdannis@nvcinc.com

**WEBSITE:**
www.nvcinc.com

**NVC - DALLAS**
6060 North Central Expressway
Suite 740
Dallas, TX 75206

APP000137

# Charles (Chuck) G. Dannis, MAI, SRA
Senior Managing Director                                                                 Page 2

## PROFESSIONAL AFFILIATIONS (CONT.)

- Chairman – Valuation Committee, National Council of Real Estate Investment Fiduciaries
- Chairman, Education Committee, National Council of Real Estate Investment Fiduciaries
- Board of Directors, National Council of Real Estate Investment Fiduciaries (1997-2001;2015-); Chairman of the Board (2020 - 2022)
- Lecturer – Nuts & Bolts of Institutional Real Estate, National Council of Real Estate Investment Fiduciaries, 2001-
- Adjunct Professor of Practice in Real Estate, Edwin L. Cox School of Business, SMU, 1988-
- Chairman - City of Dallas, Economic Review Panel for the Landmark Commission, 2002, 2008
- Mayor's Real Estate Task Force for the City of Dallas, 2003-2006

## PUBLICATIONS, SPEECHES AND LECTURES

- Articles contributed to the following publications:

  *Appraisal Journal*                          *Real Estate Finance*
  *Real Estate Review*                         *D Magazine (blog)*
  *Institutional Real Estate Letter*           *Dallas Business Journal*

- Participation in various Educational Symposiums/Conferences including MBA (Texas, Louisiana and National Conferences), IPT, NCREIF, SMU, Appraisal Institute

## BOARDS, CIVIC AND PROFESSIONAL SERVICE

- Guest Lecturer at graduate business schools of: UT Austin, UT Arlington, Texas A&M, Harvard, DePaul, and UT Dallas
- Board of Trustees – The Dallas Marathon, benefiting The Texas Scottish Rite Hospital for Children (President/Chairman, 2005-2008; Chairman Emeritus, 2009-)
- Board of Directors – Folsom Institute for Real Estate, SMU/Cox, Vice Chair Education (2014 -)
- Host of "The Real Estate Hour", 1992 – 2008; 2020 - (CBS Radio Network, Dallas affiliate)
- Founder, SMU Real Estate Society at the SMU Cox School of Business
- Board of Governors, Chartered Realty Investor Society
- Board of Directors – Friends of The Katy Trail (2011 - 2016)
- Board of Trustees – The Shelton School (2013 -), an Internationally known school for children that learn differently
- Independent Director, TIER REIT (2003 - 2017); Chairman of the Board (2013 - 2015)
- Qualified as an expert witness in several states and courts throughout the U.S.

## AWARDS AND HONORS

- The Dallas Marathon's Victory Award for Excellence and Community Service, 2011
- First recipient of the Eugene T. Byrne Endowed Faculty Innovation Award, SMU Cox School of Business, 2006
- HOPE Professor, SMU Cox School of Business, 2008, 2009 and 2021
- Mortgage Bankers Association, Faculty Fellow Award, 1996-1997
- First Recipient of the Folsom Institute for Real Estate/SMU Real Estate Society's Distinguished Real Estate Alumni Award – 2015
- Appraisal Institute Education Trust's Dr. William N. Kinnard, Jr. Award in recognition of his professionalism and commitment to real estate appraisal education, 2016
- Commandant of the U.S. Marine Corps Quality Citizen Award, 2008
- North Texas Commercial Association of Realtors "Michael F. McAuley Lifetime Achievement Award" for his personal efforts to the community, to professional organizations committed to the real estate industry and to charitable pursuits, 2019



NVC
**National Valuation Consultants, Inc.**

APP000138

## Comparable Contract 1
### Land Other and Special Purpose
NVC #258701

Southwest Corner of Ikea Drive and Parkwood Blvd • 0001 Parkwood Blvd, Frisco, Texas




## PROPERTY DATA

| | |
|---|---|
| Size | 11.30 Acres / 492,228 SF |
| Land Use Type | Other and Special Purpose |
| Status at Sale | Raw/Unfinished |
| Entitlement Status | No Entitlements/Approvals |
| Improvements | None |
| Utilities | All available |
| Zoning | PD 25 (BC) and within the Network Node Overlay District - City of Frisco |
| Site Utility Issues | None |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $1,219,680 |
| Sale Price Per SF | $28.00 |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Southwest Corner of Ikea Drive and Parkwood Blvd |
| Address / Location | 0001 Parkwood Blvd |
| City, County, State | Frisco, Collin, Texas |
| Legal Description | Land situated in the J Abez Degman Survey, Abstract Number 0279 and being all of Tract 30. |
| Assessor ID | 2780836 - 11.30 Acres |

## CONTRACT DATA

| | |
|---|---|
| Sale Price | $13,782,384 |
| Date of Sale | 04/19/2022 |
| Grantor | JDHG Land Holding LLC |
| Grantee | Confidential |
| Document # | N/A |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

**Comparable 1 Cont...**

## CONTRACT COMMENTS

This rectangular-shaped commercial property is located at the hard corner of Ikea Drive and Parkwood Boulevard.

The site has immediate access to both State Highway 121 (Sam Rayburn Tollway) and the Dallas North Tollway.

The property is currently under contract to sell for $13,782,384 or $28.00/SF; the site has been under contract since early 2022.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 04/19/2022 |
| Reviewed By | Bradley Kilgore |

APP000140

## Comparable Sale 2
### Land Other and Special Purpose
NVC #258696

Northwest Quadrant of North Dallas Parkway and John Hickman Parkway • 0000 Frisco Gate Way, Frisco, Texas





## PROPERTY DATA

| | |
|---|---|
| Size | 3.42 Acres / 148,892 SF |
| Land Use Type | Other and Special Purpose |
| Status at Sale | Raw/Unfinished |
| Entitlement Status | No Entitlements/Approvals |
| Improvements | None |
| Utilities | All available |
| Zoning | PD-248 (O2-R-Res) within the Tollway Overlay District and the Network Node Overlay District - City of Frisco |
| Site Utility Issues | None |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $1,220,820 |
| Sale Price Per SF | $28.03 |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Northwest Quadrant of North Dallas Parkway and John Hickman Parkway |
| Address / Location | 0000 Frisco Gate Way |
| City, County, State | Frisco, Collin, Texas |
| Legal Description | Lots 4, 7, and 14, Block A, The Gate |
| Assessor ID | 2735892 - 1.39 Acres<br>2735895 - 0.77 Acres<br>2735902 - 1.26 Acres |

## SALE DATA

| | |
|---|---|
| Sale Price | $4,172,885 |
| Date of Sale | 12/27/2021 |
| Grantor | IGO-USA, LP, IGO-USA, and/or IGO USA 1 LLC |
| Grantee | Frisco Gate Offices, LLC and Polo Gate Offices, LLC |
| Document # | 20211229002615950, 20211229002616010, and 20211229002616020. |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

APP000141

**Comparable 2 Cont...**

## SALE COMMENTS

This sale represents three tracts of land within The Gates commercial park which are being acquired for future office use development.

Lot 4 - 60,339 SF - NEC Polo Gate Way and Frisco Gate Way.
Lot 7 - 33,635 SF -NWC Frisco Gate Way and Polo Gate Way.
Lot 14 - 54,916 SF - NEC Dubai Way and Frisco Gate Way.

The site is bisected by a Polo Gate Road.

The site has a long narrow shape.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 04/19/2022 |
| Reviewed By | Bradley Kilgore |

APP000142

# Comparable Contract 3
## Land Mixed Use
NVC #258700

---

### Northeast Corner Dallas North Tollway and Ikea Dr. • 0000 Ikea Dr, Frisco, Texas




## PROPERTY DATA

| | |
|---|---|
| Size | 14.58 Acres / 635,279 SF |
| Land Use Type | Mixed Use |
| Status at Sale | Raw/Unfinished |
| Entitlement Status | No Entitlements/Approvals |
| Improvements | Parking Lot |
| Utilities | All available |
| Zoning | PD 169 (O-2/R/RES) within the Tollway Overlay District and the Network Node Overlay District. - City of Frisco |
| Site Utility Issues | None |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $1,306,800 |
| Sale Price Per SF | $30.00 |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Northeast Corner Dallas North Tollway and Ikea Dr. |
| Address / Location | 0000 Ikea Dr |
| City, County, State | Frisco, Collin, Texas |
| Legal Description | Lots 1 and 2, block E, Frisco Sports Complex. |
| Assessor ID | 2837726 - 10.25 Acres<br>2837725 - 4.34 Acres |

## CONTRACT DATA

| | |
|---|---|
| Sale Price | $19,058,370 |
| Date of Sale | 04/19/2022 |
| Grantor | Frisco Community Development Corporation |
| Grantee | Confidential |
| Document # | N/A |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

---

APP000143

**Comparable 3 Cont...**

## CONTRACT COMMENTS

This rectangular-shaped commercial property is located at the hard corner and fronts the Dallas North Tollway.

We are unable to confirm buyer's plans for the site.

The property is currently under contract to sell for $19,058,370 or $30.00/SF

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 04/19/2022 |
| Reviewed By | Bradley Kilgore |

APP000144

# Comparable Sale 4

## Land Office

NVC #263833

North Side of John Hickman Parkway; West of Dallas North Tollway • 0000 John Hickman Prwy., Frisco, Texas




## PROPERTY DATA

| | |
|---|---|
| Size | 3.09 Acres / 134,457 SF |
| Land Use Type | Office |
| Status at Sale | Raw/Unfinished |
| Entitlement Status | No Entitlements/Approvals |
| Improvements | None |
| Utilities | All Available |
| Zoning | PD 248 - O-2/R/RES - City of Frisco |
| Site Utility Issues | None |
| Frontage (Ft) | 458 |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $1,655,284 |
| Sale Price Per SF | $38.00 |
| Intended Use | Mixed Use |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | North Side of John Hickman Parkway; West of Dallas North Tollway |
| Address / Location | 0000 John Hickman Prwy. |
| City, County, State | Frisco, Collin, Texas |
| Legal Description | Lot 17 Block A, The Gate (Revised) |
| Assessor ID | 2735905 - 3.09 Acres |

## SALE DATA

| | |
|---|---|
| Sale Price | $5,109,366 |
| Date of Sale | 12/28/2021 |
| Grantor | IGO-USA LP |
| Grantee | MPC Frisco Gate LP |
| Document # | 20220105000026560 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

## SALE COMMENTS

According to confidential source the property sold for $38/SF.

**Comparable 4 Cont...**

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 12/15/2022 |
| Reviewed By | Bradley Kilgore |



## Comparable Contract 5

### Land Mixed Use
NVC #263834

West side of Dallas North Tollway; South of Dubai • 0000 Dallas Parkway, Frisco, Texas





## PROPERTY DATA

| | |
|---|---|
| Size | 6.39 Acres / 278,501 SF |
| Land Use Type | Mixed Use |
| Status at Sale | Raw/Unfinished |
| Entitlement Status | No Entitlements/Approvals |
| Improvements | None |
| Utilities | All available |
| Zoning | PD 248 - O-2/R/RES - City of Frisco |
| Site Utility Issues | None |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $1,655,281 |
| Sale Price Per SF | $38.00 |
| Intended Use | Mixed Use |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | West side of Dallas North Tollway; South of Dubai |
| Address / Location | 0000 Dallas Parkway |
| City, County, State | Frisco, Collin, Texas |
| Legal Description | Lots 1, 2, and 3; Block A of The gate (Revised) |
| Assessor ID | 2735889 - 1.50 Acres<br>2735890 - 2.43 Acres<br>2735891 - 2.47 Acres |

## CONTRACT DATA

| | |
|---|---|
| Sale Price | $10,583,038 |
| Date of Sale | 12/15/2022 |
| Grantor | IGO-Frisco 1 LLC |
| Grantee | N/A |
| Document # | N/A |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

## CONTRACT COMMENTS

According to the broker, the three parcels are under contract for $38/SF +/- and are currently set to close in January 2023.

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

APP000147

**Comparable 5 Cont...**

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | (214) 269-3142 |
| Surveyed By | Dennis Young |
| Surveyed Date | 12/15/2022 |
| Reviewed By | Bradley Kilgore |



APP000148

# NVC

## National Valuation Consultants, Inc.

**Via email:** cort@brownfoxlaw.com

December 2, 2022

Cort Thomas , Receiver
Partner
Brown Fox PLLC
8111 Preston Road, Ste. 300
Dallas, TX  75225
Phone No.: 214-367-6094

**Re:    An Appraisal of 4.54 acres of vacant land located at the NWC of Dallas North Tollway and John Hickman Parkway, Frisco, Texas**

Dear Mr. Thomas:

This letter will confirm your request that National Valuation Consultants, Inc. prepare an appraisal of the above referenced property. The purpose of the assignment will be to estimate the fee simple market value of the subject property as of the date of our inspection.

We understand that the intended use is to assist in the potential sale of the subject.

The appraisal report will be prepared in conformance with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; and with the written appraisal requirements and guidelines established by the Appraisal Institute for an appraisal.

The requested appraisal will be delivered within **two weeks from receipt of the retainer**, provided all requested information is received in a timely manner.  Please understand that this is our best estimate of the delivery date and may be subject to change because of conditions beyond our control.  The fee is also subject to modification and/or change, by mutual agreement, should you require changes to the assignment described herein.

***The fee for our services will be $4,000. NVC will require a 100% retainer.*** The retainer ($4,000) is due and payable at our offices in Centennial, Colorado before work will begin. In the event of cancellation of the assignment, or if the assignment is placed on hold for more than thirty (30) days, all applicable charges for services rendered by NVC to the date of such cancellation will be due within thirty (30) days from the date of invoice.

The fee quoted above is for the reports only and does not include court preparation or post-appraisal consultation, if any.  Court preparation and consultation time are billed at the rate of $450 per hour for senior staff and $250 per hour for other staff.  These fees are subject to increase after six months from the date of this agreement. It is also corporate policy that prior to any deposition or court testimony, we must be paid in full not only for current billings, but any outstanding past accounts as well.

It is mutually agreed that our acceptance of this assignment is not contingent upon any predetermined conclusions to value, marketability, or feasibility.  Should the assignment be terminated, you agree to pay for our time and costs incurred prior to receipt of written notice of cancelation.

APP000149

Cort Thomas
December 2, 2022
Page Two

If this agreement is given to an attorney for collection or enforcement, the prevailing party shall be entitled to recover all costs, expenses and reasonable attorney's fees incurred because of the legal action.

Our report will contain numerous assumptions and limiting conditions which are requisite to the conclusions reached therein.  The standard assumptions and limiting conditions are set forth in Exhibit "A" attached hereto and made a part hereof for all purposes.  Your signature below acknowledges that you have read, understood, and agreed to these assumptions.  In addition to these standard assumptions, there may be assumptions contained in our report which are specific to your property. Regarding these latter assumptions, your signature below acknowledges that, unless we have been notified in writing by you within twenty days of receipt of our report, you accept these assumptions as stated therein.



We will deliver the report in PDF format. If requested, we will also deliver a hard copy at the cost of $250.00 per copy.

If the foregoing is agreeable, please sign where indicated on the enclosed copy of this letter and return to me along with the requested data. Please keep a copy for your files. We look forward to working with you on this assignment.  Please feel free to contact me if you have any questions.

By:

/s/ Cort Thomas, Receiver
_____
Cort Thomas
Partner
Brown Fox PLLC

December 2, 2022
_____
Date

_____
Charles G. Dannis, MAI, SRA
Senior Managing Director
National Valuation Consultants, Inc.

December 2, 2022
_____
Date

APP000150

Exhibit "A"

# ASSUMPTIONS AND LIMITING CONDITIONS

1.  Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated:  specifically, the Appraisal Institute.

2.  This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment.  Furthermore, the Report is to be used in whole and not in part.  The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.  NVC shall have no accountability or responsibility to any such third party.

3.  The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4.  The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property.  The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5.  The legal description used in this report is assumed to be correct.

6.  No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7.  No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered.  The title is assumed to be good and merchantable unless otherwise stated.

8.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9.  All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age.  The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

10.  Information furnished by others is assumed to be true, correct and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

APP000151

11. The value estimate assumes responsible ownership and competent management.

12. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

13. Opinions of value contained in this report are estimates.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14. The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and value estimates if information pertinent to this assignment is made known to us after the completion of the report.

15. By signing hereafter, the client hereby acknowledges and agrees that National Valuation Consultants, Inc., as well as any employee, agent, or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject but only if National Valuation Consultants, Inc. or any other indemnified person shall not have been negligent or shall not have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16. The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17. Unless otherwise noted, all prospective value estimates, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization.  The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur, and which would alter market conditions prior to the effective date of the appraisal.

APP000152