**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff*, | § § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, et al.** | § § § | |
| *Defendants*. | § § § | |

**RECEIVER'S VERIFIED RESPONSE TO BARTON'S**
**MOTION TO STAY PENDING APPEAL OF ORDER GRANTING RECEIVER'S**
**MOTION TO RATIFY AGREEMENT WITH DLP CAPITAL ETC.**

Respectfully submitted,

Charlene C. Koonce
  State Bar No. 11672850
  charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

**TABLE OF CONTENTS**

I.   FACTS ............................................................................................................... 2

    A.   SALE OF THE FRISCO PROPERTY ................................................... 3

    B.   The DLP Settlement ............................................................................... 6

    C.   Sale of the Rock Creek Property .......................................................... 10

II.   ARGUMENT ................................................................................................... 11

    A.   Barton Will Not Prevail on the Merits ................................................. 12

        1.   No Jurisdiction Exists for Barton's Appeal of the DLP Order ................. 12

        2.   The Court Did Not Err in Ratifying the DLP Settlement ......................... 13

    B.   Barton Does Not Demonstrate Irreparable Injury .................................. 14

    C.   Barton Ignores the Injury to the Receivership Estate and Thus the Injury to the Public that Would Arise from a Stay ................................................. 15

III.   CONCLUSION ................................................................................................ 16

## TABLE OF AUTHORITIES

**Cases**

*Berne v. Keith,*
  361 S.W.2d 592 (Tex. Civ. App.—Houston 1962, writ ref'd n.r.e.) ........................................ 12

*Conocophillips Co. v. Dahlberg*,
  No. CIV.A. C-10-285, 2011 WL 710604 (S.D. Tex. Feb. 22, 2011) ...................................... 12

*Exxon Corp. v. Breezevale, Ltd.*,
  82 S.W.3d 429 (Tex. App.—Dallas 2002, pet. denied). ........................................................... 12

*In re Primera Energy, LLC*,
  560 B.R. 448 (Bankr. W.D. Tex. 2016) .................................................................................... 12

*Netsphere, Inc. v. Baron*,
  799 F.3d 327 (5th Cir. 2015) ................................................................................................... 11

*SEC v. Complete Bus. Sols. Group, Inc.*,
  44 F.4th 1326 (11th Cir. 2022) ................................................................................................ 11

*Sewing v. Bowman*,
  371 S.W.3d 321 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) ..................................... 12

*U.S. v. Solco I, LLC*,
  962 F.3d 1244 (10th Cir. 2020) ............................................................................................... 11

**Statutes**

28 U.S.C. § 1292(a)(2) ................................................................................................................. 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | §<br>§<br>§ | |
| *Plaintiff*, | §<br>§<br>§ | |
| v. | §<br>§ | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, et al. | §<br>§<br>§ | |
| *Defendants*. | § | |

**RECEIVER'S VERIFIED RESPONSE TO BARTON'S**
**MOTION TO STAY PENDING APPEAL OF ORDER GRANTING RECEIVER'S**
**MOTION TO RATIFY AGREEMENT WITH DLP CAPITAL ETC.**

Cort Thomas, the Court-appointed Receiver, responds to Barton's Motion to Stay Pending Appeal of Order Granting Receiver's Motion to Ratify Agreement with DLP Capital, etc., [Dkt. 114] (the "Motion") and in support respectfully shows the Court as follows.

**SUMMARY**

Barton's Motion to stay the Receivers' settlement agreement with DLP Capital [Dkt. 109, 114] ignores most facts and significant aspects of the law. It also lacks any supporting evidence. The Motion relies primarily on the argument that sale of the "Frisco" property will provide adequate funds for the continued maintenance of other Receivership Properties during the pendency of Barton's interlocutory appeal of the Order Appointing Receiver (the "Receivership Order"), [Dkt. 29] and the Order by which the Court ratified the DLP settlement (the "Order"). [Dkt. 109]. But the Frisco transaction will not close and fund for almost three months (at the earliest), and the Fifth Circuit lacks jurisdiction to consider Barton's appeal of the Order. And perhaps most importantly, the Motion seeks to stay a contractual settlement that has already funded and which is fully performed. Thus, any "stay" would merely preserve the already accomplished

1

settlement, a settlement that the Court correctly found did not even need to be judicially approved by the Receivership Court in the first place. The Court should deny the motion.

## I.    FACTS

1.    Because Barton's Motion depends in part on other sales transactions and grossly misrepresents or omits key facts regarding those transactions as well as the DLP Settlement, the Receiver provides a more accurate record for the Court's consideration.

2.    First, and foremost, the Receiver did not seek the sales and settlement listed below to punish Barton, or because of an ill-advised liquidation strategy.  On the contrary, as discussed in his Initial Status Report, [Dkt. 67], after consulting with experienced and respected real estate professionals (who did not charge the estate for their services as a result of their respect and relationship with the Receiver) he determined that attempting to sell certain real estate assets as soon as possible would likely result in greater values than waiting several months to begin a sales process.  [Dkt. 67, pp. 14-15].

3.    Nor do the two sales and settlement represent a race to liquidate all Receivership Properties.  As explained in prior reports, motions, and responses, the Receiver sought to sell the Rock Creek Property because it provided the most likely avenue for an immediate influx of cash needed to continue operating the estate, and because Barton had listed the property for sale before the Receiver's appointment.  He negotiated the DLP Settlement because the Receivership Entities' default was brought to his attention on the second day of his appointment, and the settlement served to both mitigate damages that would and could have been assessed against Receivership Entities and compensate the estate for the participation interest.  And the Frisco Property sale was pursued because again, Barton had listed that property for sale before the Receiver was appointed, Barton promoted the sale to the Receiver, and, if approved and closed, the sale will allow the Receiver to continue operating and preserving the value of other properties.

2

4.      The influx of cash was necessary, because despite Barton's receipt of cash from real estate sales of properties to DLP (including the Marine Creek and Orchard Farms properties) of not less than $2M within the year before the Receivership Order was entered, Barton had either spent, secreted, or otherwise transferred those funds away.  Notably, the SEC had traced investor funds into Barton's purchase of the properties that he in turn sold through the Mansions Apartment Homes at Marine Creek LLC.

**A.      Sale Of The Frisco Property**

5.      As reflected in the Receiver's Motion to Appoint Appraisers, etc. regarding the Frisco Property ("Motion to Sell Frisco Property") [Dkt. 110], in the initial days of his appointment, the Receiver learned that prior to his appointment, the Frisco Property had been listed for sale by Defendant for many months. However, no buyers had been identified at the approximately $10 million list price, and Defendant's broker's listing agreement had either terminated or expired.

6.      After receiving a Letter of Intent (the "LOI") in late October 2022 from a prospective purchaser of the Frisco Property offering $9M for its purchase, the Receiver solicited information regarding entitlements, other obligations, and financial information related to the property.  Despite specific and direct provisions of the Receivership Order compelling Barton's assistance and cooperation, Barton provided no assistance on this issue.

7.      The Receiver also sought information from lenders with liens on the Frisco Property to evaluate the current debt and thus the likelihood of any net recovery on the sale of the Frisco Property.  He received no assistance in this regard from Barton.  Notably, the Receiver was particularly concerned about whether a sale would ultimately result in any net recovery for the estate, given the discovery of significant debt and legal issues impeding virtually every other Receivership Property and Barton's failure to disclose or indeed even acknowledge that debt.  *See*

3

*Appendix ISO Barton's Response to Motion for Order Governing Estate,* Dkt. 57, App. p. 4-6; *Receiver's Initial Report*, Dkt. 67; *Receiver's Response to Motion to Stay*, Dkt. 84, pp. 6-8; *Appendix ISO Response to Motion to Stay*, Dkt. 85, App. pp. 28-29.

8.      The Receiver's investigation regarding the Frisco Property occurred while he was also gathering information about multiple other Receivership Properties, including four apartment complexes that Barton inexplicably continues to argue will make the investors whole and negate the need for any continuation of the receivership from their sale alone.  Investigation of those properties has revealed that one of the lenders on the property contends that it has converted its debt position to one of equity and eliminated any ownership or entitlement interest previously held by any Receivership Entity.  *See* Dkt. 67, pp.19-22.  While the Receiver is hopeful that he will be able to defeat these arguments, Barton, again, provided no information regarding these issues and instead has continued to ignore them in his unrealistic assertions about how the estate should be managed and which properties can and should be sold to satisfy the unrebutted debt owed to the investors and dozens if not hundreds of creditors.

9.      The Receiver and his team also spent considerable time investigating and evaluating the more than one hundred and thirty additional entities operated by Barton and the properties or assets each controlled; communicating with banks, investors, creditors, angry lawyers whose lawsuits against Barton and Receivership Entities were stayed by the Receivership and the creditor who claims the Receivership Entities' interest in the Turtle Creek Property was extinguished prior to issuance of the Receivership Order; and negotiating with utility providers, literally, to keep the lights on and the water flowing at the Amerigold Suites.  And, considerable time has been necessary to address Barton's many instances of contempt and interference with the Receiver's management of the estate, as well as Barton's opposition to all but one motion filed by

4

the Receiver. All of these activities occurred concurrently with the Receiver's efforts to identify, evaluate, and control more than a dozen real properties, and many more contractual rights and obligations.

10.    With respect to the Frisco Property and indeed all other real estate properties, the Receiver has expended considerable time meeting and conferring with expert brokers, developers, appraisers, and others to determine realistic sales prices, sales horizons, development plans and obligations. The Receiver's efforts regarding these Properties could have been minimized if Barton had complied with the Receivership Order, and if the limited information Barton has provided (almost exclusively via filings in this case) was trustworthy or credible. Those predicates, however, were glaringly absent.

11.    After performing due diligence related to the likelihood of a net recovery for the estate resulting from the proposed sale of the Frisco Property, including obtaining and evaluating broker's opinions of value and a Title Commitment, the Receiver spent several weeks negotiating a purchase and sale agreement ("PSA") with the potential purchaser and its attorneys. While negotiations were delayed, in part, because of the Thanksgiving holiday and multiple rounds of revisions to the agreement, the Receiver and his team worked diligently to finalize the PSA, which was ultimately executed by the purchaser on December 15, 2022. Per the terms of the PSA, a thirty-day due diligence period commenced on December 15 and lasts until January 14. If the buyer does not execute its right to terminate the contract during this period, closing will then occur within sixty (60) days thereafter—*i.e.*, March 15, 2023. The Receiver was unwilling to expend time seeking confirmation of the sale until and unless the buyer signed the PSA, which did not occur until December 15. Additionally, to comply with 28 U.S.C. § 2001, the Receiver obtained an appraisal and an additional opinion of value.

12.     Thus, the Frisco Property sale was not "on the shelf ready to go" when the Receiver was appointed.  A willing buyer, who made an offer below the prior list price, was identified by a broker that represented Defendants months prior to the Receiver's appointment, but as in any sale of commercial real estate, a lengthy diligence, negotiation, and sale process remained.

13.     Although the Receiver conferred with Barton prior to filing his Motion to Appoint Appraisers, etc., regarding approval of the Frisco Property sale, Barton did not respond.  His opposition is thus presumed.

14.     If the Court approves the sale of the Frisco Property, and if the Fifth Circuit does not stay the sale of the Property in connection with Barton's pending appeal, the sale will not close or fund until mid-March at the earliest. Based on the two liens on the Frisco Property and after closing costs, the Receiver expects the sale to net approximately $2M.

**B.     The DLP Settlement**

15.     As reflected in his Verified Motion to Ratify Agreement with DLP Capital and Other DLP Entities, [Dkt. 95] (the "DLP Motion"), on December 15, 2022, following negotiations with DLP's counsel,[1] the Receiver sought the Court's approval of a settlement agreement between various Receivership Entities and DLP Capital and related entities (the "DLP Settlement").  As reflected in the Motion, the DLP Settlement compromised the respective Receivership Entities' obligation to provide development and construction management services—regarding which the Receivership Entities had defaulted prior to the Receiver's Appointment—and by separate agreement, entitled one Receivership Entity to a "participation fee" payable upon substantial completion with respect to specific real estate developments. [Dkt. 95, pp. 2-4.]

---

[1] On October 19, 2022, DLP sent Notices of Default dated October 18, 2022, regarding the Receivership Entities' development and construction services obligations.  True and correct copies of each Notice of Default are included in the supporting Appendix.

16.     The DLP Settlement did not include the sale of an interest in any real estate. *Id.*[2] Instead, the Settlement compromised only contractual rights related to the participation fee and the development and construction services at issue, none of which qualified as a "lien, claim, easement, servitude or encumbrance" burdening the real estate that had been sold prior to entry of the Receivership.

17.     As reflected in the DLP Motion, the settlement was in the Receivership Estate's best interest because:

(a) it brought much needed capital into the Receivership Estate, enabling the Receiver to continue managing the Receivership Assets in accordance with the Receivership Order;

(b) minimized the amount of monetary damages owed to the DLP Entities as a result of the Receivership Entities' pre- and post-receivership breaches of the Orchard Farms Development Agreement, Marine Creek Development Agreement, and the Marine Creek Construction Management Agreement, which damages continued to accrue on a daily basis;

(c) similarly minimized the attorneys' fees and expenses that would otherwise be incurred by the Receiver in pursuit or defense of any claims surrounding the DLP Transactions;

---

[2] *See also*, discussion below at pp. 12-13.  While the Settlement Agreement required the Receiver to file in the real property records instruments quit-claiming participation interests in the real estate developments at issue, that requirement was necessary because Barton filed a "Memorandum of Contract" in the real property records evidencing the terms of the Participation Agreement. Dkt. 107, pp. 4-24. Filing notice of the Participation Agreement in real property records did not create any interest in the land that was not provided in the Participation Agreement, and the Memorandum expressly states that the parties' agreement was governed by the Participation Agreement, not the "Memorandum." Dkt. 107, p. 6. Thus, releasing a contractual right to participate in the "Achieved Increased Value" of a development, even if the release is also reflected in real property records, does not convert the contractual rights at issue into a conveyance of an interest in the real estate.

(d) avoided the uncertainty surrounding the value of the Receivership Entities' participation in the properties given:

(i) the current instability in the market and the economy at large,

(ii) the delays in construction on the properties, and

(iii) the varying amounts of debt on the properties;

(e) maximized the value received by the Receivership because:

(i) the Participation Agreements only entitle the Receivership Entities to a percentage of the "Achieved Increased Value" after the sale of the properties,

(ii) limited construction has occurred on the properties to date, and thus substantial increases in value have not yet occurred,

(iii) nevertheless, the DLP Entities have agreed to apply a valuation methodology that estimates what the value of the project will be upon stabilization and then discounts that value to present value,

(iv) one real estate consultant who advised the Receiver has indicated that the valuation methodology and execution of that methodology by DLP Capital were both reasonable, and yet

(v) the Settlement Payment still greatly exceeds this discounted income capitalization approach; and

(f) reviewing the totality of the situation from a position of equity, the Participation Agreements appeared to have been designed to reward Defendant Barton and the Receivership Entities for their efforts in developing and managing construction of

the properties; however, such work had not occurred at the time of the Receiver's appointment and cannot occur moving forward.

18.    In contrast, Barton's claims that the Receiver is engaged in a "continued effort to fire sale and liquidate assets" and the DLP payment of $750,000 amounts to "less than 5% of their value" are misplaced, unsupported by credible evidence, and part of a pattern of bold, unsupportable assertions.    As an initial matter, Barton's position wholly ignores his pre-receivership obligations under the development and construction agreements.    Indeed, DLP sent default notices to Defendants on the same day the Receiver was appointed, and representatives for DLP have informed the Receiver that Barton did not fulfill any of his obligations under those agreements.    While the Participation Agreement is arguably independent of the Development and Construction Agreements (and the Receiver argued as much in negotiating with DLP), the intent of the documents is clear that the purpose of the participation interest was to incentivize Barton's continued participation in the development and construction of the properties.

19.    Putting the defaults and the equities to the side however, under the DLP Participation Agreements, the Receivership Estate is only entitled to 25% of the "Achieved Increased Value" on each project, meaning the Fair Market Value of the Project less capital expenditures (including property acquisition costs and total development costs).    In negotiating with DLP, the first point of contention was whether a valuation today would be dependent upon increased value as of today or as of a future date when a point of stabilized occupancy had been reached, discounted to present value.    DLP initially insisted on the former but eventually agreed to give the Receiver the benefit of the future anticipated increases in value, minus capital expenditures, discounted to present value.    DLP agreed to share its own detailed opinions of value for each project based upon an income capitalization approach, comparing anticipated value to

9

anticipated costs.   The Receiver took this approach, analyzed its various assumptions, solicited feedback from multiple respected participants in the real estate industry (and specifically multifamily) and determined that DLP's projections were both credible and likely accurate.  Even if certain assumptions were incorrect and the model was updated, however, the overall value of the Receivership Estate's participation interest would still be **below** the $750,000 settlement that was reached, and all without any account for the setoffs created by Barton's breaches of the development and construction agreements.

20.   Barton nonetheless appears to contend, based upon his son's "recollection" of the transactional documents, that the value of the Marine Creek property was estimated to be "approximately $187 million," with the increased value for Phase One of the project alone to be "approximately $23 million."  Barton's numbers, while inflated, also wholly ignore the necessary capital expenditures for the project.  The present estimated step-up in value for Phase One of the Marine Creek project is closer to $500,000 to $1 million.  It is nowhere near the $23 million Max Barton vaguely recalls being referenced in transactional documents.

21.   Following the Court's ratification of the sale on December 22, 2022 (the "DLP Order"), on December 28, 2022, DLP funded the settlement payment.  All incidental requirements have also been satisfied or performed. Thus, any "stay" would merely preserve the completed DLP Settlement.

**C.   Sale of the Rock Creek Property**

22.   Through the sale of property owned by SF Rock Creek, LLC, the Receiver had hoped to fund some of the expenses required for continued administration of the estate.  *See* Dkts. 76, 77, 84, 93.  Although the Court approved that sale, (which was on an "AS IS" basis) at a hearing on December 19, 2022, the sale did not close.

23.    As will be disclosed more fully in a forthcoming Motion to Show Cause, in the afternoon following the hearing and in direct violation of the Receivership Order, Barton contacted the purchaser and informed him, the Receiver believes falsely, that the property was subject to flooding and had foundation problems.  The buyer was unwilling to close on December 28 as scheduled because of Barton's direct communications to the buyer.  Although the Receiver entered into a short-term lease to mitigate losses and will seek sanctions against Mr. Barton as compensation for the lost sale, the estate will not receive any proceeds from the sale of the Rock Creek Property in the immediate future.

24.    Although Barton points to the sale of the Frisco Property as an excuse for the Court to stay the DLP Settlement, when the Receiver conferred about his motion to approve that sale, Barton has not agreed to that sale.  That sale is accordingly still contingent, not only on the Court's approval, but on closing and the absence of additional interference by Barton.  In addition to Barton's motion to stay the Receivership filed in this Court [Dkt. 71], he has also filed a motion to stay in the Fifth Circuit, which would also stay the sale of the Frisco Property. In other words, other than the DLP Settlement, the Receivership Estate has no other source of cash on the immediate horizon.  Combined with the dearth of Defendants' available cash on hand on the date of his appointment, particularly in light of the twenty-days' notice Barton had before the Court entered the Receivership Order, Barton's continued litigation tactics appear designed to starve the Receivership of resources necessary to administer its ongoing needs.  The Court should reject these improper efforts.

## II.    <u>ARGUMENT</u>

Barton contends the Court should "stay the impending sale" he contends was involved in the DLP Settlement and argues the four familiar factors governing stays warrant the relief he seeks. But not one of those factors supports a stay, including, but not limited to the fact that the settlement

11

was not a sale, and it has funded and closed.  Thus, any stay would preserve the consummated transaction rather than unraveling it as Barton intends.

## A.    Barton Will Not Prevail on the Merits

Barton justifies his request for a stay based on his interlocutory appeal of the Receivership Order and the DLP Order.  The SEC has responded to the legal merits of Barton's appeal of the Receivership Order, [Dkt. 83], and, for purposes of efficiency and economy, the Receiver incorporates those arguments here.

### 1.    No Jurisdiction Exists for Barton's Appeal of the DLP Order

With respect to any order save the Receivership Order, including the DLP Order, the Fifth Circuit lacks appellate jurisdiction.  28 U.S.C. § 1292(a)(2); *Netsphere, Inc. v. Baron*, 799 F.3d 327, 331-32 (5th Cir. 2015) (every circuit to address the meaning of § 1292(a)(2)'s 'refusing orders' interprets it to "permit[ ] appeals only from orders 'refusing . . . to take steps to accomplish the purposes of [winding up receiverships].'"); *see also U.S. v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020).   In addressing the different scope of an interlocutory appeal of an injunction as compared with orders issued in receiverships, the Eleventh Circuit aptly explained:

> "That provision [1292(a)(1)] more broadly confers jurisdiction over orders 'granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.' 28 U.S.C. § 1292(a)(1). It thereby expressly authorizes immediate appeals not only of front- and back-end orders 'granting,' 'refusing,' or 'dissolving' injunctions, but also of mid-stream orders 'continuing,' 'modifying,' or 'refusing to dissolve or modify' them. The contrast is unmistakable. Had Congress wanted to authorize the same robust interlocutory appellate review of interim receivership-related orders, it could have included similar language in § 1292(a)(2). It didn't, and its decision in that respect is 'telling.'"

*SEC v. Complete Bus. Sols. Group, Inc.*, 44 F.4th 1326, 1331–32 (11th Cir. 2022).  Thus, Barton's appeal of the DLP Order provides no basis for a stay of the DLP Order.

2.      **The Court Did Not Err in Ratifying the DLP Settlement**

Barton contends the stay is also warranted because the Court erred in approving the DLP Settlement, contending the Receiver failed to comply with the sales process governing sales of realty by Receivers and settled for a fraction of the value held by Receivership Entities. Both contentions are incorrect.

As discussed above and in the DLP Motion, the DLP Settlement represented a compromise of contractual participation interests in the potential appreciation of real estate based on its development, and the concurrent termination of development and construction management obligations. The "participation interest," however, was not premised on any Receivership Entity's ownership interest in the land or minerals located therein, but rather on contractual obligations to develop the land. Indeed, the real estate was fully conveyed to DLP by certain Receivership Entities in late 2021. As such, no realty was conveyed in the settlement of those obligations. *Sewing v. Bowman*, 371 S.W.3d 321, 330 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) ("[A]n agreement to share in the profits of contemplated speculative deals in real estate simply does not involve the transfer of real estate, or an interest in real estate . . .") (quoting *Berne v. Keith,* 361 S.W.2d 592, 597 (Tex. Civ. App.—Houston 1962, writ ref'd n.r.e.)). In contrast, the authorities Barton relied upon for contending participation agreements convey an interest in realty rely on participation agreements related to production of oil and gas still in the ground.[3] *See Conocophillips Co. v. Dahlberg*, No. CIV.A. C-10-285, 2011 WL 710604, at *1 (S.D. Tex. Feb. 22, 2011) (discussing conveyance of working mineral interest rights); and *compare In re Primera Energy, LLC*, 560 B.R. 448, 463 (Bankr. W.D. Tex. 2016) ("As such . . . 'a conveyance of an interest in the minerals that are produced from land, such as a working interest or a royalty interest,

---

[3] *See* Dkt. 106, pp. 8-9.

passes a right to the land itself.'") (quoting *Exxon Corp. v. Breezevale, Ltd.*, 82 S.W.3d 429, 437 (Tex. App.—Dallas 2002, pet. denied).    Nor does Barton's contention that "liens, claims, easements, [] servitudes" or other "encumbrance[s]" are "interest[s] in realty,"[4] provide any support for his contention that the DLP Settlement included a conveyance of an interest in real estate, since no evidence whatsoever demonstrates that the contractual rights and obligations at issue were a "lien, claim, easement, servitude or encumbrance."

Likewise, Barton's wholly unsupported contention that the Settlement represented a mere fraction of the value of the Receivership Entities' contractual expectation is grossly inaccurate.    In fact, the $750,000 payment not only exceeds the Receiver's estimate of the Receivership Estate's 25% of the Achieved Increased Value for the project, but also included releases related to Barton's pre-Receivership breaches of the construction and development agreements.

Finally, when considering the merits of the Barton's arguments regarding the propriety of the Receivership Order, the continuing absence of *any* denial of liability to the Investors or indeed any evidence supporting *any* argument made to date by Barton speaks loudly. On the contrary, in "instructing" the Receiver regarding which properties to sell, Barton implicitly concedes the $26M liability owed to the Investors.    He also fails to challenge the Receiver's evidence regarding millions owed to creditors.    The need for a receivership to marshal, preserve, and maintain Receivership Assets, even if preservation of the majority of the properties requires liquidation of others, is thus undisputed.

## B.    Barton Does Not Demonstrate Irreparable Injury

Barton's sole argument regarding irreparable injury is his purported loss of an interest in real estate.    Dkt. 114, p. 4.    On the contrary, however, as demonstrated by the DLP Motion, the

---

[4] *Id.*

Receiver's verified testimony herein and Barton's failure to appreciate the difference between participation interests in mineral interests and the participation interest at issue here, the DLP Settlement did not involve any interest in realty.  Barton fails to demonstrate irreparable injury.

**C.     Barton Ignores the Injury to the Receivership Estate and Thus the Injury to the Public that Would Arise from a Stay**

Barton wholly ignores the prejudice and injury to the Receivership Estate—and thus the already injured Investors for whose benefit the Estate exists—in asserting the balance of prejudice weighs in his favor.  First and foremost, the Receivership Estate cannot continue operating without cash.[5] Within the first thirty-days of his appointment, the Receiver recovered less than $75,000 in cash.  Property insurance, fees to pay costs necessary to comply with HUD regulations and protect the value in several other developments, utilities and services necessary to operate the Amerigold Suites, among other things, require the Estate to liquidate some assets to protect others.[6]  Nor is the Estate in any position to expend assets to develop properties, for instance by providing construction management services that Barton himself had defaulted on prior to entry of the Receivership Order.

Barton interfered with sale of the Rock Creek Property thereby eliminating that source of cash.  Sale of the Frisco Property will not close, even if approved, until mid-March 2023, at the earliest.  In the interim, the DLP Settlement provides the only realistic avenue of recoverable cash.  Unwinding or otherwise "staying" the DLP Settlement could be catastrophic to the Receivership Estate.  Barton's conduct created the need for a receivership, and his continuing unwillingness to comply with the Receivership Order compels a continuing, active Receiver.

---

[5] The same would be true of a monitorship, a remedy that is also extremely unrealistic.  Barton has demonstrated time and again that he lacks credibility and cannot be trusted. *See for example*, Dkts. 73, 74, 84. Returning him to control over these properties would be putting the fox in charge of the henhouse.

[6] The arguments and evidence submitted in the Receiver's Response to Barton's Motion to Stay, Dkts. 84 & 85, are incorporated by reference.

### III.    CONCLUSION

The DLP Settlement is complete.  There is nothing to stay.  But even if there was, Barton

failed to demonstrate entitlement to a stay. The Court should deny Barton's Motion.

Respectfully submitted,

By: */s/ Charlene C. Koonce*
    Charlene C. Koonce
     State Bar No. 11672850
     charlene@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    T: (214) 327-5000
    F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

### VERIFICATION

My name is Cortney C. Thomas.  I am over the age of 18 and am fully competent to make this verification. I declare under penalty of perjury that the facts stated above are within my personal knowledge and are true and correct.

    */s/ Cortney C. Thomas*
    Cortney C. Thomas

### CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.