UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

CASE NO. 3:22-cv-2118-X

-----------------------------------------x

SECURITIES & EXCHANGE COMMISSION,

Plaintiffs,

v.

THOMAS LYNCH BARTON, et al.,

Defendants.

-----------------------------------------x

TRANSCRIPT OF THE HEARING

BEFORE THE HONORABLE BRANTLEY STARR

UNITED STATES DISTRICT JUDGE

Dallas, Texas

December 19, 2022

10:03 a.m.

A P P E A R A N C E S:

FOR  THE  PLAINTIFF:

    SECURITIES & EXCHANGE COMMISSION
       801 Cherry Street
       Suite 1900
       Fort Worth, Texas 76102
  BY:  KEEFE M. BERNSTEIN, ESQ.
       bernsteink@sec.gov
       (817) 900-2607

FOR  THE  DEFENDANT  BARTON:

    HUNTON ANDREWS KURTH, LLP
       2200 Pennsylvania Avenue NW
       Suite 905
       Washington, DC  20037
  BY:  MICHAEL J. EDNEY, ESQ.
       TED HUFFMAN, ESQ.
       medney@HuntonAK.com
       (202) 778-2204

FOR  THE  RECEIVER:

    BROWN FOX, LLP
       8111 Preston Road
       Suite 300
       Dallas, Texas  75225
  BY:  CHARLENE KOONCE, ESQ.
       charlene@brownfoxlaw.com
       (214) 327-5000

COURT REPORTER:   MS. KELLI ANN WILLIS, RPR, CRR, CSR
                  United States Court Reporter
                  1100 Commerce Street
                  Room 1528
                  Dallas, Texas  75242
                  livenotecrr@gmail.com


       Proceedings reported by mechanical

stenography and transcript produced by computer.


                   * * * *

- P R O C E E D I N G S -

-o-

THE COURT SECURITY OFFICER:  All rise.

THE COURT:  Thank you.

You can be seated.

Okay.  We are on the record in Case No. 3:22-cv-2118.  That is SEC versus Barton, et al.

Let's do appearances first, for the SEC.

MR. BERNSTEIN:  Your Honor, Keefe Bernstein here on behalf of the SEC.

THE COURT:  Thank you.  Thanks for speaking up since we don't have a microphone for you.

Okay.  Who is here for Barton?

MR. EDNEY:  Good morning, your Honor.

Michael Edney and Ted Huffman from the Hunton Andrews Kurth law firm for Mr. Barton.

THE COURT:  All right.  Thank you, Mr. Edney.

And who is here -- so I understand, do we anyone here for Wall?

No one here today for Wall.

Okay.  How about for the Receiver?

MS. KOONCE:  Good morning, your Honor.

Charlene Koonce on behalf of Cort Thomas,

the Receiver.

THE COURT:  Okay.  Thank you, Ms. Koonce.

All righty.  So we are here on the pending motion for the sale of property.  So what I need to do is talk through with Receiver's counsel if we've got any other competing offers.  I see that you filed your notice yesterday of no further competing offers.

But tell me the update on that.  Any new ones in, and then talk me through best interests, and why you think it is in the best interest of the estate.

MS. KOONCE:  Thank you, Judge.

Would you prefer that I approach at the lecturn or stand here?

THE COURT:  So you can go either place.

I will say for everybody who's speaking, if you are going to sit at counsel table, just stay seated because once you stand up, you are far away from the microphone.

So wherever you want to go is fine by me, sitting at counsel table or standing at the podium.

MS. KOONCE:  I'm actually just more comfortable standing, if it's okay.  So I'll --

THE COURT:  Fine by me.  Go for it.

MS. KOONCE:  As you are aware, by your reference to the Receiver's notice, that we did publish notice of the sale and notice of the hearing, which is required by the statute that governs this sale.  We did not receive any competing offers.

As we stated in the motion to approve the sale, the motion to appoint the appraisers, there were negotiations on the contract that is before the Court.  This was the highest offer received out of four offers.

As the Court is aware, this sale does comply and exceed what the statute requires.  It is more than the two-thirds minimum.  In fact, it is higher than the appraised value that was submitted.

As the Court requested, I would like to provide some information about why this is in the best interest of the estate.

As the Court is aware, from numerous filings, we have very limited cash and at the same time, we have competing requirements for the cash on hand.  For instance, we need to pay insurance on this property and multiple other properties.

We have one property that is subject to HUD loans and those HUD loans require continuing

certifications from accountants.  Those are very expensive.  And if we don't pay those certifications, the HUD loan could go into default and it could then forfeit the interest, the receivership estate's interest in that property.

Those are just some of the competing obligations that we have for very limited cash.

I know there is a motion to stay the sale.  There is a motion that is -- there's an objection to this sale that contends that this sale should not go forward now, that there could be the possibility of irreparable harm.  And Judge, the sale has to go forward immediately.

This sale, this property, like every other receivership property that we have encountered so far is heavily encumbered.  And it is not encumbered by a traditional loan.  It's encumbered by a loan that's incurring interest at 9.9 percent.  It's interest only.  The lender claims that there is default interest accruing at 18 percent.

We also have to continue to pay taxes.  We have to pay the utilities, so that the pipes don't freeze during this weather.

If we don't sell the property very quickly, that interest that is accruing and not

being paid, because we don't have access to pay it, will erode all equity in the property.

THE COURT:  When are property taxes due? January 31st?

MS. KOONCE:  I'm not confident that is correct but I think so.

THE COURT:  Okay.  Generally speaking, all property taxes are due January 31st.

MS. KOONCE:  I believe that's correct.

THE COURT:  Some people pay them the year of --

MS. KOONCE:  Yes.

THE COURT:  -- December 31st, so that they get the tax deduction for them but --

MS. KOONCE:  That is correct.  And there's a -- there's a higher assessment -- yes, if you pay late, it increases.  That's absolutely true.

THE COURT:  Understood.

Okay.  So I understand from Barton's filings that Barton would like to rent the house.

Talk me through that scenario and why -- I know you have already talked me through, you need the cash in order to maintain the other properties. Talk me through why it's not --

MS. KOONCE:  Right.  That would have been

an excellent offer, possibly.

First of all, it was never made.  It was suggested in a filing as an alternative as opposed to any communication in response to any conference.  It was never offered.

Additionally, the monthly interest on this loan is about $11,000.

We did a little bit of research.  The highest monthly rental for any property in the location is about $9,000.

So if Mr. Barton would like to offer and put in place today -- we've had a lot of delay in our communications -- but a contract in which he rents the property, pays all of the accruing mortgage expenses, the insurance, the property taxes, and he's going to warrant that he's not going to remove any more of the property from the premises.

We took possession of it on a day after we had received notice that he was moving art, not just personal belongings, but art and valuable items out of the house.

If that was something that could be put in place immediately, we would consider it.  The offer was never made.  It was an argument raised in a

motion.  There was no conference, there was no request that that happen.  So our contention, Judge, is that the time to consider that offer has long since passed.

In addition, as you have observed, paying the expenses to maintain the equity in this property would not help the receivership with our cash issues.

Now, I know the Court is aware, we've also filed a motion to ratify approval of a settlement with another entity.  And that potentially could bring in sufficient assets to maintain some of these other properties for some limited period of time.

We didn't receive a conference as to what -- there was no response to our conference as to whether that is going to be opposed.  We don't know if the Court is going to approve it.  We don't know when that will happen, if it will happen at all.

But the receivership cannot maintain the other properties that we have an obligation to manage without cash.  It is just not possible.

With respect to the contents -- I don't know if you want to take that up now.

THE COURT:  Sure.  I would like to hear

from you.

MS. KOONCE:  So there is a motion, as you know, to sell the contents of the property as well. Mr. Barton has also objected to that proposal.

As you are aware from multiple filings and email communications between counsel, we offered to store and hold that -- those contents, at Mr. Barton's cost because, again, the receivership does not have the funds to pay to move those contents out and store them.  And we got no response.

In addition, we have asked for confirmation that the furnishings in this property were actually purchased by Mr. Barton.  We have received no response to that either.

The response has been, Mr. Barton lived in this property, it was owned by a single purpose entity, therefore, it is his.

Well, the receivership order says that all of the assets of all of these entities now are in the Court's possession and, therefore, the Receiver's possession.

We know, from looking at the bank records, that there was extensive commingling.  The Receiver, also, in his investigation, learned that most of the contents of this property were purchased within the

last two years by receivership entities.

We have had absolutely no response to that, that, hey, we need some time to look at credit card statements, we need some time to gather information to demonstrate that these assets were actually purchased by Mr. Barton, none of that.

Instead, Judge, what we have is a continuing disregard for the Court's authority and the receivership order.

For instance, in filing a lis pendens that we discovered was filed the day we conferred on the motion to sell the property.  It was filed on December 1st.

Now, the response to that was filed very early this morning was that the Court does not have the authority to declare that lis pendens void.  I think that is absolutely incorrect, your Honor.

We relied on Property Code Section 12.008, not 12.007.  It is a different procedure.  I think the bankruptcy cases that we cited absolutely provide the Court authority.

The Duval case was an instance in which the debtor filed a lis pendens on property that he did not want to be transferred subject to a planned confirmation.  The bankruptcy judge said, you cannot

accomplish a stay through a lis pendens which has already been denied in the litigation.

But if the Court is uncomfortable with that procedure, you have a much more simple and direct route as well.

Because the Defendant here has violated your receivership order, you can compel him to sign a release of lien, which we brought with us today. That's absolutely permissible, Judge, that you require the obedience and observance of your court order to allow the sale to proceed in the manner that is contemplated by the receivership order.

In short, the sale is in the best -- in the best interest of the receivership estate. It is absolutely essential to maintaining the value of the other properties that are in the Receiver's possession and control.

We have had no other competing offers. We have satisfied the statute. Everything that is necessary for the Court to consider the sale, I think, has been presented today. But we are, of course, happy to provide any additional information that you need.

THE COURT: Thank you, Ms. Koonce.

MS. KOONCE: Thank you.

THE COURT:  All righty.

And let's hear from counsel for Barton, Mr. Edney.

MR. EDNEY:  Thank you, your Honor.

Before the Court today is a request to authorize the sale of Mr. Barton's only home.

Since the Receiver kicked Mr. Barton out of his home on October 20th, he's been sleeping on his daughter's couch.

At this stage of the case, the Government has alleged violations of the securities laws but the Government has not produced the documents underlying those claims to us; the Government has not attempted to prove those allegations before a trier of fact.

At the same time, we are challenging the existence of this Receiver and certainly his authority to undertake liquidation.

This sale, your Honor, is permanent.  It is a permanent action that would cause irreparable harm and be almost impossible to reverse.

The Court should deny this request to undertake the Receiver's action at this time.

Your Honor, respectfully, selling the -- selling Mr. Barton's home is beyond any legitimate

purpose for this Receiver at this point of the proceedings, prior to any proof, much less finding of liability on the underlying charges.

THE COURT:  So receivers can't sell any property until there's a liability finding, in your view?

MR. EDNEY:  No, no.  I think a receiver could sell property under certain circumstances before there is a liability finding, but that is the extraordinary circumstance.

Then in the general course of events, a receiver is supposed to conserve and identify assets for use, if there is an ultimate finding of liability, or for return to the Defendant in the event that there is not a finding of liability.  It is to conserve the status quo.  And this sale would alter the statute quo in a way that is almost impossible to reverse, not conserve it.

There are cases that find an extraordinary need to sell certain forms of property to raise cash to keep operations going.  But that showing hasn't been made here, your Honor.

And your Honor, I think it is important to note that the Receiver's first order of business, the day 2 action here was to kick Mr. Barton out of

his home.

It was listed for sale roughly two weeks earlier, and not after some kind of sober appraisal of the financial condition of these entities.  And it's not a matter of last resort; it is a matter of first resort.

In our view, respectfully, the Receiver's focus needs to be on the management of the high value commercial real estate assets that are under the control of the business entities, the business entities.

And for cash needs, for some of those assets, Mr. Barton has facilitated offers for those assets from third parties and will consent to their sale pursuant to a well thought out process.  And there is many examples of that in the record before the Court at this point.

And let me just mention just a few.

Right now, there is a -- there is a pending, before the receivership order sale, 54 lots at the Venus complex for $3 million that is designed to net $600,000 in net equity.

At the Frisco complex, there is a proposed sale of $9 million in property that would net $3 million in net equity.

With regard to the big apartment portfolio, these are the HUD-backed properties in Fort Worth and elsewhere, at three locations, offers have been raised for $110 million to sell those.

There is a dispute with the Receiver about how much in net equity that would raise, but -- but, in no case is that number less than 7 figures.  In fact, in the high 7 figures, into the 8 figures.

So focusing on the business operations of the legacy Barton entities themselves, the focusing on the commercial aspects, there are ways to raise cash that we would consent to, frankly, that are less drastic than selling something so personal to him as his house.

THE COURT:  Have you consented to them?

MR. EDNEY:  Your Honor, we have -- we have teed them up for the Receiver.  We have said that we would consent to them, if they went down the process of getting serious about it and lining it up.

And on that, we have received no meaningful response.  We have seen in some of the filings -- these have been in the course of arguments -- that, well, there is a complication here, there is a complication there.  But it has not received serious treatment.

And I think that those commercial avenues need to be explored before we go down such a low value proposition of selling this house and something that is so personal to Mr. Barton.  And -- and --

THE COURT:  Are those properties under 11 percent interest-only loans?

I mean, I get your point.  But I'm trying to figure out, it seems to me that this home is in dire straits of because of how it was financed.

MR. EDNEY:  But --

THE COURT:  And I don't know if the commercial properties were under the same dire straits.

Can you talk me through that?  I mean, you are telling me that they would be more profitable to sell.

But if there needs to be a quick sale, it is probably because of the dire nature of the financing of this.  So what's the dire nature of the financing of those commercial properties?

MR. EDNEY:  Well, I'm not sure that there is a dire nature of financing for those properties, but they would raise cash for the -- for the Receiver's operations.

When the Receiver came and proposed the sale, the purpose of the sale was to raise cash for the Receiver to keep going and doing its work, presumably to pay its fees, presumably to pay other ongoing expenses.

These commercial avenues provide a mechanism for doing that.  I mean, frankly, we don't think the house should be in the receivership at all.  You know, we have urged that upon this Court. We think under the -- under the Fifth Circuit's Janvey case, there needs to be some effort to trace assets related to these lender loans that are the subject to the SEC's complaints into the purchase of that house.  That hasn't been done.

The only reason it is here is because it has been -- because it was held by a special purpose corporation.  It had no other business than holding this house.  Other net worth -- high net individuals do this.

And I would direct the Court to the SEC's opposition to our motion to stay this receivership or aspects of it.

And this can be found at Docket No. 83 in this case.

Judge, the whole first two pages of that

submission from the Securities & Exchange Commission focuses on the decision that the SEC made not to put Mr. Barton personally in the receivership.  And that was an option the SEC believed that it could have, generally speaking, in cases of this nature to choose to put the Defendant himself, in his individual capacity in the receivership.

The SEC chose not to do that.  Instead, it focused, you know, just on his business and commercial interests.

And your Honor, I would submit to you that this particular piece of property -- I mean, it is unique in this regard, the house and the property inside of it, his personal belongings, is not just business.  It doesn't have to do with his real estate operation.  It just happened to be held by a special purpose corporation that did nothing else than hold this property.

And unlike for the 26 companies that the SEC originally thought -- sought to put in the receivership, there was an effort, through the Carol Hahn declaration, which we have some issues with, but there was an effort in that declaration to trace the -- the funds from the -- from the lenders that are subject to the SEC action into those

corporations, right?

Under Janvey versus Adams, the 2009 Fifth Circuit case. And they said, look, some of the -- some of the funds that were received from the lenders from China, they went into those corporations and they were plowed into real estate projects, into this real estate -- commercial real estate development business.

But there was no effort to do so here with regard to this particular entity whose only purpose was to hold Mr. Barton's residence.

And frankly, your Honor, if this corporation were not inside the receivership, and we don't think it should be, the mortgage, no matter its terms, and I -- you know, listen, I get the fact that the interest rate is probably not the one that you are getting or I'm getting. You know, it's higher than that.

But that interest rate and the carry and the maintenance of this house would be Mr. Barton's problem. You know, he would either have to live up to it or the house would be foreclosed upon.

It wouldn't be the Receiver's problem, and I think this is an example why this shouldn't be in the receivership to begin with.

And that is for two reasons, your Honor. First, we haven't seen that tracing of assets into this.

Second, it was a uniquely personal exercise. I'm not going to come up to your Honor with regard to other corporate entities, other of the 155 entities that have now been placed in the receivership and say that that it is uniquely personal. It doesn't have to do with the commercial real estate development business that Mr. Barton was undertaking.

But this particular property, your Honor, this is -- this is very, very personal indeed. And it doesn't need to be in the receivership. It should be taken out of it. And should be made Mr. Barton's problem, not the Receiver's problem.

If that's the justification for selling this house, and it's a shifting justification, your Honor. That it is just too hard to deal with this place. It's not -- it is not worth the candle power. Then give it back to Mr. Barton and have him deal with the problem, right?

But instead, where this started was, we are going to pick out this one, this one to keep the lights on, to get our cash flow issues straight for

all the other business entities.

Your Honor, first of all, I don't think that is necessary given the other commercial properties that can be used for that purpose.

But second, your Honor, you know, it is -- it is an extremely personal invasion into Mr. Barton's property rights before he's been adjudicated to have been responsible for any wrongdoing of any kind.

Your Honor, in that regard -- in that regard, turning back to the -- to the -- to the alternatives to this, focusing where the SEC has claimed all wrong, the focus of this receivership should be on the commercial real estate development business.

There are those three other options that I talked about, you know, with regard to servicing the HUD loans, the cost of servicing those loans has been prefunded by independent lending and is on autopilot.

Now, you have not seen the sustained showing from the Receiver that this type of drastic action, taking a man's home before any adjudication of liability is necessary to prevent the loss of crucial assets that are needed to reimburse

potentially the alleged victims of these events. And we will contest that liability. We do not think that he is responsible for it.

But just assuming for sake of argument that he may be in the future, that showing of necessity has not been made.

On top of that, your Honor, we do have a pending appeal on this. And what the Receiver is asking for is liquidation authority that is not currently entailed by the Court's order under appeal.

It is an expansion of the Court's order. And under Fifth Circuit precedents, we don't think the Court has jurisdiction to take this extra step to expand the authority of the Receiver to sell this house.

Your Honor, on the personal property, I want to correct the record a little bit on this personal property issue.

We have had to drag out of the Receiver what he plans to do with this personal property. We want that personal property back. We have been willing to come by, on an hour's notice, with movers to take it out of the house. This is -- this is not receivership entity property. It is property that

happened to be in a man's house.  And -- and you know, with regard to this exercise, without access to our business records, without access to the materials in his home, without access to the materials at his office, to go back and prove the financial provenance of every couch and chair, every dish and glass, every piece of clothing in that house is unreasonable.

Where else does one keep one's personal property than in the house in which he lives?

I mean, this is man is 60 years old.  He's accumulated some stuff.  Apparently, not a lot of it.  It is proposed to be sold for $20,000.  So -- so not too much.

But he's accumulated some stuff over his life and it is very harmful for that to just be taken away.

And the apparent basis for that, your Honor, is the Receiver's assertion that, well, listen, this -- this house that was owned by a corporation, we haven't traced any lender assets in it, but it was owned by a corporation, so the things in it belong to us.

I don't think there is any basis for that proposition in the Court's order.  I don't think

there is any basis for that proposition in law.  And whatever your Honor does with the house, I believe the Court should order the Receiver to make that personal property available to us for pickup and return to Mr. Barton's possession.

This $20,000 issue is not worth it, and is more in the manner of a personal attack than in the administration of receivership property.

THE COURT:  All right.

Talk to me about their proposed alternative to where they would store it but at Barton's expense on the continued storage cost until a later adjudication can be made on tracing.

MR. EDNEY:  Well, your Honor, I am personally not familiar with that proposal.  But if it -- but if that is -- you know, I think the right thing to do at this point is to return the property to Barton.  But absolutely, it should not be sold.

So if that is -- if that is the halfway house, that it is moved out and moved into a storage locker, where it can be kept safe, pending the resolution of the appeal, that that absolutely should be the alternative that the Court takes instead of approving the sale of this property for

$20,000 to a stranger.

THE COURT:  Understood.

MR. EDNEY:  Okay.  Your Honor, the -- you know, the SEC-sought receivers are not unprecedented but this one, in our view, is extraordinary and contrary to precedent.

SEC-appointed receivers are for Ponzi schemes and emergencies of eminent asset flight. They are for the Stanfords and the Madoffs of the world.

And Mr. Barton is not alleged to have been running a Ponzi scheme.  Is not, your Honor.  I mean, there is -- there is a flake of that allegation in the SEC's papers, but it is not sustained, and there -- there is barely a sentence behind it.

And he's not dealing in portable assets, at risk of imminent flight to Switzerland, or some other far stretch of the earth.

He has run a prominent real estate development business in Dallas/Fort Worth for the last 30 years.  And because of that, the assets of that business and their associated entities, they are stationary, they are stationary commercial real estate projects that aren't going anywhere and that

can have an eye kept on them.

Moreover, the value of those assets, according to the SEC's initial filing, exceeds $70 million, well more than the $26 million that the SEC is allegedly at issue with regard to these lenders.

The value of those assets, your Honor, however, depend entirely on managing them competently to their development maturity. And the way to destroy that value is to hand them over to a receiver that does not intend to manage them, does not intend to keep going as David Wallace would have, the SEC's requested Receiver, but instead -- but instead to liquidate them now in premature sales.

Now, this is incredibly harmful to Mr. Barton, but it's also particularly harmful to the unsecured lenders, the Chinese lenders, who are the subject of the SEC's claims.

In this case, the situation explains why the Fifth Circuit, in its 2012 Netsphere versus Baron decision, set down rules for when a prejudgment receiver could be ordered. Allegations of fraud are not enough. That is what the Fifth Circuit said.

Instead, the SEC must show that the receivership is necessary to prevent the flight of assets subject to the SEC's claims.

And again, there has been no evidence of a flight risk. And it is inconsistent with the nature of the assets that the SEC has long said they are subject here.

I mean, these are assets planted in the ground, recorded on public records and very difficult to sell without making, you know, a lot of -- a lot of ruckus with everyone else.

THE COURT: You can sell a company more quickly, though, right?

I mean, it was titled in the name of a sole purpose company. I'm sure it takes time to sell real property, but you sell a company that holds real property and that can be done in 24 hours or less.

MR. EDNEY: You can certainly try to do that, right. You can try to sell the company.

THE COURT: I have seen it done.

MR. EDNEY: Oh, I understand. I understand, your Honor.

But -- you know, again, when we -- look, what the Netsphere case says, right? Is it needs to

be necessary to prevent asset flight.  So you can't just say, I think it is going to happen.  There needs to be proof that is happening.

We didn't see that in the SEC's submission.  And this is not a case that the SEC just dipped its toe into yesterday.  They have been investigating Mr. Barton for two years.

And we will have many things to say about the SEC's substantive allegations when the time comes.

But there is no evidence in the record that this was some kind of emergency where -- where the assets were about to fly away.  There is no showing of that in the record.

On top of that, your Honor, what Netsphere says -- and I think this is important, not just for the existence of the receivership, but how the receivership is administered, is there a less drastic, a less burdensome on the Defendant alternative to achieve the goals of conserving assets and making sure that they are around in the event of an eventual finding of liability.

And this is -- this is -- this is absolutely applicable to the SEC cases.  And you need to look no further than -- than a decision

authored by the judge, who is peering over us today, Judge Fitzwater, the SEC versus Faulkner decision in 2018, where he applied these standards and made sure that they were satisfied.

With regard to that less burdensome alternative is the proposal that we put before your Honor in opposing the imposition of this receivership. And that is, a monitorship, under the SEC's selection of David Wallace, a man very experienced in running a real estate business, that would have achieved this end, it would have prohibited any sales of the corporations or the real estate that you are talking about, but it would have permitted the management of those projects so they could continue to create value.

And Mr. Barton certainly has an incentive to make sure that they're as valuable as possible, not only to pay back the unsecured lenders that are the subject of the SEC's case, but to make sure that they create as much value as possible to be left over for other investors in the project.

That -- that alternative navigates through the -- through the problems that are presented here. We don't have -- we don't have evidence of imminent asset flight.

We do have evidence that if we -- if we bring in somebody to run this business that cannot move these projects to development maturity value is going to be destroyed.

The solution is to put orders in place that prevents their sale, put a monitor in place that is sophisticated in terms of making sure that the projects move forward, that transactions that need to be done to move those projects forward are done, but those that present any risk of asset flight or loss to the assets are not done, and to continue to report to this Court and to the SEC about it.

That -- that alternative was presented in our papers, but I think recent events show how important that alternative is, how important it is for the lenders that are the subject of the SEC's complaint, how important it is under the Baron -- Netsphere versus Baron standards.

Because these projects can't just be sold right now.  They are going to be left with a massive loss if they are; they're not ready yet.

That's what real estate projects are. They have a cycle.  And for many of these that you are going to hear about over the next couple weeks

where they -- where the Receiver comes to you for permission to sell these properties, they are not ready to be sold.  If they are sold now, they are going to be sold for pennies on the dollar.

But instead, we need a system where these things are managed to their maturity.  And that's -- and that's very possible here.  And look, I understand the real estate development business is complicated.  I wouldn't be very good at it.  But we need somebody in place who is good at it.  And we need -- and we need a system where they can be managed and we are not just fire-selling for pennies on the dollar because that is not good for any of the entities that are involved here.

Also, your Honor, we have to be mindful of the situation we find ourselves in.

This is a situation where the Government chose to launch a parallel criminal prosecution on the same day as this SEC case.  And this SEC case was always meant to achieve this receivership and be stayed and turn the criminal case into the main event.

In light of that, this is also not an emergency.  The SEC has been investigating this for two years.

In light of that, we need to be mindful of whether the receivership and the steps the Receiver is taking are truly necessary or whether they involve an effort to increase the pressure on a criminal defendant by taking his property without any proof of wrongdoing -- before any proof of wrongdoing is made and by hampering his ability to defend himself, to forfeit is right, to put the United States to its burden of proof in the criminal case.

And with so many questions surrounding the propriety of this receivership, we believe that your Honor should not approve the irreversible permanent sale of Mr. Barton's only home.

And if your Honor is inclined to grant the Receiver's motion, we ask that your Honor stay it with immediate affect pending appeal to the Fifth Circuit.

Thank you, your Honor.

THE COURT:  Thank you.  I appreciate that, Mr. Edney.

Okay.  Let me ask, then, SEC, does the SEC have anything to say at this point?  I should probably give final word to Receiver's counsel.

You can say anything you want to; I just

didn't know if you want to talk today.

MR. BERNSTEIN:  Your Honor, I don't think we have anything to add on the issue of the sale of the home.  I think it's in our view --

THE COURT:  I'm sorry.  Do you mind hitting that mic just for us to hear what you do want to say.

MR. BERNSTEIN:  The Receiver has put forth a compelling case for why the home needs to be sold. The Receiver has put forth competent evidence that they will be achieving fair value, and nothing that we saw in the papers or that was argued today led us to believe that there would be any reason to second guess the Receiver's judgment in this situation.

And that is our position on the sale of the home.

We obviously reserve our rights to make arguments and have been making arguments in the papers about all the different issues that Mr. Barton's counsel attempted to raise here at argument today about the receivership itself and the scope of the receivership.  But I'm also happy to answer any questions the Court may have on those issues as well.

THE COURT:  I really only have one

question for you today.

And that is, I know there were allegations made that because there is a prosecution going on, this may -- them acting on the home first may seem to be leverage on the prosecution.

I'm going to try to tell you a disclaimer and then ask you a question.

The disclaimer is, in cases like this, I usually don't pick the SEC's recommended receiver. And it's not because I think you are bad people.  I think you are lovely people and your proposer picks would be lovely.

But I like separation when it comes to the receiver in cases where there is also a criminal prosecution, so that we can't have the type of collusion that he's suggesting might be occurring in this case.

So my question is this:  Has the SEC been suggesting to the Receiver that they go after the home first to apply more pressure on Barton as a result of the criminal proceeding?

MR. BERNSTEIN:  Absolutely not, your Honor.

THE COURT:  Okay.

Have they suggested that to you -- that if

they go after the home first, that might help your case on the criminal side?

MR. BERNSTEIN:  They have not.

THE COURT:  Okay.  Got it.  That is my only question for you.

MR. BERNSTEIN:  Thank you, your Honor.

THE COURT:  You bet.

Okay.  Final word.  And I would like to hear your thoughts.  I know their suggestion of David Wallace as the Court-appointed monitor will conserve resources for the receivership estate.

I know, in my mind, that is an argument more largely directed to future discussions rather than today's discussions.

We are not talking about a real estate project that is 80 percent developed with regard to this home.

But that is a key question in my mind.

And then the other question I would have is, talk to me about offers on other properties, like the Frisco property, how quickly you think they could bring cash in to the receivership that would keep the lights on at the other properties.

MS. KOONCE:  So you do want me to address the monitorship?  I want to be clear.

THE COURT:  I would like to hear but not in full depth because I think it is largely a question for another day, if that makes sense.

MS. KOONCE:  Yes.

THE COURT:  But when the other day comes, you will be a hundred percent down the track you want to.  And I know y'all are thinking of which track to take at this point.

So my question is largely one of this 30,000-foot discussion on the monitorship.

MS. KOONCE:  Let me step back from that just for a second because I would like to address the contention that receiverships are only for Ponzi schemes and the suggestion here is that a receivership or a monitorship would simply hold assets until the end of the day following a judgment.

Your Honor, that's a post-judgment remedy, right?  If you're not going to sell anything, we can't do anything, that is a post-judgment remedy.

If you want a receivership or a monitorship, you have to have assets to manage what you have.  Whether or not those assets are necessary to continue paying for appraisals on a property or development to see it to fruition, you have to have

assets.  And if that occurs in the context of a monitorship, the Receiver is still going to have -- needs cash.  It is going to have to raise money somehow.

There is no cash here.  So whether you had a monitorship or a receivership is irrelevant to that particular issue.

I have been involved in many monitorships. I've been a monitor for the FTC in cases.  It is far more expensive than a receivership, to be perfectly honest.  And if the goal here is to preserve assets for the victims of the fraud that is alleged by the SEC, then the goal here is to be expedient with the money that we have.

A monitorship requires extra layers of supervision and it is very difficult to supervise, for the Court to supervise, for the monitor to supervise.

It is very difficult for banks and third parties to comply with, because you have to look at every single thing that comes through as opposed to appointing one person who is the receiver, who is the Court's agent, who is complying with the Court's order.  It is much more expedient.

So my suggestion with respect to a

monitorship is that you would be undermining the goal of the remedy that is here. Even if you wanted to have a monitorship, however, as I said, you have to have assets. You have to have cash in order to protect the value of what is at stake.

My understanding with many of these developments is that, for instance, the properties that should be sold quickly, but at the same time they are going to take years to develop -- that is what we just heard, right? The Receiver should be accomplishing these sales very quickly but we're not going to see the value until many, many years down the road. That is a contradiction, your Honor.

If we have to develop these properties by putting in roads or obtaining entitlements from the government, somebody has to supervise that process and we have to pay vendors and other people to accomplish that.

That has to happen in a monitorship or a receivership, either way. So the problem here is, the way these businesses were structured, at least from our perspective is, they are all highly leveraged. There is almost no cash.

Mr. Barton, himself, was struggling to pay for the development of these. We know that is true,

because when we stepped in, we stayed four foreclosures, four of them.

So if the issue here is preserving assets and you want to have a monitorship, are you going to still stay foreclosures so that we can preserve these other assets?

We have -- the problem here, your Honor, is a failure to be in touch with reality.  These properties -- the property at issue here was on the market.  There was a listing agreement signed that we found in the office when we came in.

So while it may be Mr. Barton's personal residence, and we are not unsympathetic to that issue, he was preparing to sell it when the receivership -- when the receiver order was entered.

I don't know what was behind that.  I also am frankly shocked that Mr. Barton would come to the Court and make arguments that the SEC or the Receiver, for instance, has not been able to trace assets into this property.

While at the same time, he has failed and in fact refused to comply with the Court's order to provide bank records and accountings and information and indeed an inventory of the assets that he removed from that property.  Items that could have

been sold that would have been less dear and personal to Mr. Barton.

Additionally, we know, just from the information that we saw in the Turtle Creek office, that Mr. Barton has treated these entities as his personal wallet, if you will.

We have assets that were listed on an accounting statement for JMJ Holdings, which reflected $12 million in art.  $12 million in 2019.  And yet Mr. Barton has given us an inventory of art worth, I think, $80,000 and said it was all his, purchased with his own money.

Where did that $12 million in art go, your Honor?  We don't know.  Because Defendant Barton will not comply with the Court's order.

For him to come to the Court today and complain that the Receiver or the SEC, for that matter, has been unable to trace assets into -- trace the investor funds into these assets is very disingenuous.

With respect to the personal belongings -- I don't know if you want to get into any of that.  I can address those issues, but I know you wanted me to speak to the monitorship.

THE COURT:  Yes.  I think you already

have.

MS. KOONCE:  Okay.

And what was the other issue that you wanted me to address specifically?

THE COURT:  If sale of other properties, like the Frisco property, could be accomplished in time to generate cash for the receivership.

MS. KOONCE:  Yes.

And thank you.  I'm sorry I had to ask you to repeat the question.

Absolutely not.  These are, as Mr. Barton has alluded, these are complex properties.  Every single one of them is subject to extensive liens or competing claims in equity.  Some of them, those competing claims, potentially extinguish any value held by the receivership estate.

But even if you assume that is not the case, if you just look at one property that is not subject to a competing claim of ownership, as opposed to a lien, it will take months.  And we do have, I think, letters of intent on several of them. We have one that is potentially subject to a contract; Mr. Thomas could speak to that more clearly.

But even those contracts contemplate

months and months and months to get to a potential sale.

And as Mr. Barton also has stated, while he might agree to the sale of those properties, he's alluded that the Receiver has not given full attention or full effort to the sales that he would prefer that we -- that we focus on, and that is because what we have said in emails that are part of the Court's record, I think they were submitted with the Receiver's response to the motion to stay, the properties at issue there are subject to huge liens.

So while we would prefer to sell those properties as well, we would have been happy to proceed immediately to that.

It still would not have satisfied our immediate need for cash to preserve the other assets and, frankly, to sell those additional properties.

We can't sell them without paying for appraisals.  We can't sell them without accommodating the requirements of the statute.

So our hands are tied.  And Mr. Barton has tied them in the way that he has managed these properties, drained all the cash out of the bank accounts, at least the bank accounts we have been able to find to date.  There may be more, we don't

know.  He won't tell us.

With respect to Mr. Barton and his counsel's familiarity with our request or offer to store the contents of these properties, with all due respect, Mr. Edney is aware of that offer.  It was sent to him in an email, very, very specific.  We would be happy to do this.  And that email is in the Court's record, in the appendix, in support of the Receiver's response to the motion to stay.

I highlighted that.  It is in the docket. We sent, I think it was two weeks ago that we would be happy to do that.  We got no response.

So respectfully, your Honor, we are stuck. The Court has appointed Mr. Thomas to oversee these properties, to manage them, and to preserve their value.  We cannot preserve the value in the more larger properties, the properties that will take months to years to either bring to fruition or to sell.

We are not receiving cooperation from the Defendant.  We are not receiving the materials that the Court ordered him to provide.

And yet, we are being told to sit and wait while these properties potentially dissipate in value and we are not able to accomplish the mandate

of the order.

THE COURT:  Thank you.

Can I ask you one final, quick question?

Can you flush out your tracing argument a little more?  Because I know he made a lot of that, in not following Janvey and having an exact tracing of the funds used to pay for this home, tracing back to the original alleged unlawful conduct.

MS. KOONCE:  Yes, your Honor.  So let me start also with the Janvey versus Adams.  There's a million Janvey cases.

Janvey versus Adams, first of all, was not a tracing case.  It was a -- an issue as to whether or not certain investors were properly named as relief defendants.  And a relief defendant is completely different context than what is going on here.

But with respect to tracing, I think this is Mr. Barton's argument that the Court reconsider entry of the receivership order from its inception.

The Receiver, as you know, we didn't have anything to do with the SEC filing its case, didn't have anything to do with the Court's decision as to whether to appoint a receiver but the -- in seeking a receiver and filing that motion to appoint a

receiver, the SEC engaged in some tracing and what the evidence in support of that said was, to the best of their ability at that time to trace, they had discovered commingling, I think the Hahn declaration said from the very beginning of the investments.

And what the Receiver has discovered, obviously, we were able to go in and obtain additional information that the SEC did not have at the time it filed that motion, we have discovered additional commingling.

We filed, as you know, a massive appendix in support of the Receiver's motion to demonstrate that the additional entities that were operated by Mr. Barton were properly within the scope of the receivership order as entities controlled by him.

But in addition to that, we have seen extensive commingling, that one entity takes out a loan to purchase property for another entity and that same entity pays off another loan.

We have also seen evidence that we believe suggests -- and I'm not going to testify that it does or provide testimony -- but it suggests that there were some efforts here to put intercompany loans in place after this happened in order to

justify the banking transactions that we've seen.

Now, we have sent the receivership order out to dozens of banks, and we have received some banking records back.

We do not have access yet to all the QuickBooks accounts. Our understanding is there are 26, I think -- QuickBooks accounts. We tried to get access to that. It was denied. We were not given those credentials.

We still do not have credentials to the websites. We don't have credentials to the cloud data that would allow us to find information about what was happening with these assets. It's not been provided. Even though the receivership order compels it, we specifically asked for it over and over again.

And we have conferred about a motion to show cause and -- because of the violations of the receivership order.

If we had that information, it might have allowed us to provide more detail in terms of the potential commingling of investor assets that we have seen.

But what we have seen to date says, we haven't seen any evidence that any money was not

commingled; it was all commingled. We haven't seen any segregation of assets between specific entities. It just -- there is no evidence that that actually happened.

So it is not possible for us at this -- I think we are 60 days in, to tell the Court, absolutely, we saw money coming, you know, from one investor into this entity to purchase the house. We have seen no other explanation, however, for how these businesses were operated.

So we -- while I believe down the road is it possible that we may be able to provide that information? Very likely. I think it is probably going to be the SEC's burden.

But at this point, it is not possible for Mr. Thomas to perform the Court's mandate to protect these additional assets without cash. We just can't do it.

THE COURT: Understood. Thank you.

Okay. So what I need to do is make some findings and rulings now that I have heard the parties out.

What I'm going to do is talk first about the sale of the home, second about personal property, and then third about the stay.

On the sale of the home, here are my findings:

First, just mechanically from a numbers standpoint, I think the sale price being above the appraised value, obviously meets the two-thirds test in the law.  So I think it meets the legal test for sufficiency, and I find that there are no competing offers that meet the threshold of being 10 percent higher than that offer.

Is it in the best interest of the receivership?  I think it is, notwithstanding the personal connection of the home.

On the personal connection of the home, I do note the listing agreement that they found when -- when they took possession of the property.

I have had another situation like this where someone argued it was intrinsically personal to them.  I went with them on that and then they put the home up for rent.

So I have been burned by that before and the listing agreement tells me that perhaps the personal nature of the home isn't as strong as it otherwise would be.

But here is my analysis on the rest of it.

First, it is an interest-only loan, right?

9 percent is the floor and then foreclosure rates go up from there.

Interest rates are still increasing. And then we had the Federal Reserve in Dallas say that residential properties could diminish in value by 20 percent, given the economic forecast that they are seeing. Could; doesn't mean it will. And so that is the backdrop I'm looking at this in. And I will take judicial notice of that because it is the kind of the thing I can take judicial notice of.

Property taxes are due January 31st. There is cash needed to keep the receivership going to maintain the other properties that are in the receivership estate.

The sale of other properties are not as efficient from a timeline standpoint as the sale of this property because they are not properties in development or have other encumbrances on them, like the other commercial properties would.

On commingling and tracing, it seems like commingling was the rule of the day for how Barton ran his different entities. And so I think I have seen enough to know that it was funds that were at issue in the SEC allegations that were used for the home.

And then seventh is, while this property isn't necessarily mobile and subject to offshore dissipation, I do think the asset value of the property is dissipating, right?  When we look at the potential 20 percent drop in the value of all homes in the coming year, when we look at the interest-only nature of the loan, the property taxes that are due, this property is unlike the other properties, in that it is a quickly depreciating asset, given the current nature of its financing and property taxes that are coming due.

So I will say that the sale of the home is in the best interest of the receivership, and I will approve that sale for -- for completion on the 28th of the month.

I will get to the stay just in a moment.

Personal property.

I view personal property a little bit differently than I view the home itself.

I don't see the personal property as rapidly dissipating in value.  And so I don't think I can sign off on the sale of it, because it is not under interest-only financing and property taxes due on it.

I will say that I'm fine moving it into

storage, right?  I don't think you need to return it to Barton because I do still think the receivership has a valid claim to it and then we need to adjudicate that at the right point in this case.

I'm not going to order the storage be at Barton's expense yet, but I don't know the cost of the storage and y'all don't either yet.  And so that is an issue that we need to keep thinking through.

If we are storing property that's worth $20,000 total and it is cost him $3,000 a month, we need to make a quick determination on that.  And then I need Barton to be ready to decide if he wants to shoulder the cost of that.  If that property is uniquely personal enough to him to where he would rather pay the storage costs until we can reach a determination, then that needs to be a decision he can make.

Which takes us to a stay.  I know there's a request for me to stay my ruling if I grant the motion.  I'm granting it, certainly in part, as it relates to the home, not as it relates to the personal property.

I'm going to deny that request.  The reason being, I think time is of the essence on this.  I think it is -- the closing date is on the

28th.  And I think if we push off beyond that, I think we can see an increase in interest rates that's drives an increase in mortgage rates, that drives an increase in the student loan -- student loan -- this mortgage interest-only rate.

So students loans are all the rage of court challenges these days.

So I don't think it's -- I don't think I can grant the motion and also grant the stay.  I think it's illogical for me to do that.  I can't split the baby like that.  I'll ruin the whole thing if I do that.

But I recognize the Fifth Circuit might disagree with me and stay this and shut it down.  In which case, we will all abide by whatever they say.  So I don't plan on going with your stay.  I will deny that request.

Okay.  That is all I'm prepared to rule on at this hearing.

Other questions or issues that --

MS. KOONCE:  Yes.  Your Honor, we have the issue of the lis pendens.  That while Mr. Barton contends it is not -- we can still close the sale with lis pendens, our title company begs to differ. So we either need the Court to declare that void or

compel Mr. Barton to sign a release of lien.  The release lis pendens.  He will have to sign it in front of Notary, but I have a copy here.  I can provide it to Mr. Barton's counsel, but we would request that you compel him to sign this by the close of the day and provide it to the Receiver.

THE COURT:  Understood.

Okay.  We have got the choose-your-own-adventure now.

What I will say is, I do think the lis pendens is void.  The question is, will Barton sign it or do I need to declare it void?

Do you need to confer with your client on that basis?  We can take a five-minute recess and you talk.

MR. EDNEY:  I don't need to confer, your Honor.  If you are going to declare it void, we would disagree with that decision, and -- but, you know, obviously, your Honor is set on that path.

So we think the lis pendens is perfectly valid.  We are -- we have a pending proceeding before your Honor contesting the Receiver's authority to sell it.  This issue is under appeal. It hasn't been resolved by the Fifth Circuit yet.

It won't block the sale.  It is not a

lien.  It is constructive notice to the buyer that in the event that this proceeding goes in the other direction, either here or in front of the Court of Appeals, that we are going to be coming back for this property.

So it is the buyer's choice.  It is not a lien.  It is not a legal impediment to sale and it was properly filed.

THE COURT:  Understood.

Have you've gotten me a proposed order or can you get me one?

MS. KOONCE:  I believe we submitted a proposed order on Friday.  I'm happy to submit it again.  We have to have something to give to the title company, so that they show it is clear.

THE COURT:  Understood.

Okay.  And then the last thing I will ask is, can the Receiver order a copy of this, just so I have my findings on the record.

It doesn't have to be expedited, a copy of the transcript of this proceeding.

And then we will find your proposed order from Friday.  If we have any trouble locating it, we'll email all counsel and ask for you to reply all to that email.

All right.  Anything further for this proceeding?

MR. EDNEY:  Yes, your Honor.

Earlier in these proceedings we had a discussion.

THE COURT:  Y'all can stay seated, just so I can hear you better.

MR. EDNEY:  Okay.  Sure.  You bet.

Your Honor, earlier in these proceedings, we had a discussion about alternatives to this receivership and the necessity to continue to manage these real estate projects to create value as opposed to liquidating them and the potential for doing that through a monitorship.

And just for a small digression, your Honor, the value in a monitorship here that leaves management in control of these projects, experienced management, driving the projects forward but while preventing sales and other dissipation is that these projects can come to their full fruition for investors and for the lenders that are subject of the SEC complaint.

As your Honor pointed out earlier in this hearing, there will come a point where the Receiver is 100 percent down the road of selling things

because it cannot manage them.

And I would like a hearing before your Honor, sooner rather than later, in the early part of next year, that discusses that fork in the road. Because, you know, I understand your Honor put in the receivership order on the 19th of October. We did not have a hearing then.

You know, this is a pretty focused issue now about -- about whether -- whether -- what the time horizon is on these projects and what is going to be required to maximize their value versus what is appearing to become a liquidation strategy at the receiver level.

And I would just ask your Honor to consider putting a hearing on the schedule to consider that issue.

THE COURT: Understood.

I have hearings on motions, and what I have heard from you is not enough to convince me yet. I would say file a motion with an accompanying request for a hearing, right?

The person in the best position right now to make that argument is Barton. And so make the argument, tell me how much cash it would take. They think it would take a lot more cash than you are

suggesting it would, right?  But I need something more concrete and more convincing from you.

But I don't have hearings to have chit-chats.  I have hearings on motions, but very specific and concrete, which is why I don't really like motions coming up in responses to replies, right?  Don't embed a motion in a response to a reply.  File a motion, right?  And if I need to get an expedited response, I can get that.

But file your motion, if you want a hearing on it.  And we can talk more fully through it.  But in your motion, lay out how much cash you think it would take to accomplish the objectives of a monitorship and then we will see what their position is.

MR. EDNEY:  Yes, your Honor.  We are happy to do that.

We do have a fully briefed motion for stay of the receivership pending appeal that deals with broader issues but -- including this.  But if it would help the Court, we would be more than happy to put a targeted motion on file to address this particular issue.

THE COURT:  Understood.  I will look forward to it.

Okay.  Not having anything further, I will go into recess, and I will see y'all at the point we have a hearing on that motion.

MR. EDNEY:  Thank you, your Honor.

THE COURT:  Thank you.

THE COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 11:03 a.m.)

**C E R T I F I C A T E**

I, Kelli Ann Willis, RPR, CRR, CSR certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This 30th day of December, 2022.

s/ Kelli Ann Willis
Official Court Reporter
The Northern District of Texas
Dallas Division

**$**

**$11,000** 9:7

**$110** 17:4

**$12** 42:9,13

**$20,000** 25:13 26:6 27:1 53:10

**$26** 28:4

**$3** 16:21,25

**$3,000** 53:10

**$600,000** 16:22

**$70** 28:4

**$80,000** 42:11

**$9** 16:24

**$9,000** 9:10

**-**

**-o-** 4:2

**1**

**10** 50:8

**100** 57:25

**11** 18:7

**11:03** 60:7

**12.007** 12:19

**12.008** 12:18

**155** 22:7

**18** 7:20

**19th** 58:6

**1st** 12:13

**2**

**2** 15:25

**20** 51:6 52:5

**2009** 21:2

**2012** 28:21

**2018** 31:3

**2019** 42:9

**20th** 14:8

**24** 29:17

**26** 20:19 48:7

**28th** 52:14 54:1

**3**

**30** 27:22

**30,000-foot** 38:10

**31st** 8:4,8,13 51:11

**3:22-cv-2118** 4:7

**5**

**54** 16:20

**6**

**60** 25:11 49:6

**7**

**7** 17:7,8

**8**

**8** 17:8

**80** 37:16

**83** 19:23

**9**

**9** 51:1

**9.9** 7:18

**A**

**a.m.** 60:7

**abide** 54:15

**ability** 34:7 47:3

**absolutely** 8:17 12:2,

17,20 13:9,15 26:18,23 30:24 36:22 43:11 49:7

**access** 8:1 25:2,3,4 48:5,8

**accommodating** 44:20

**accompanying** 58:20

**accomplish** 13:1 40:18 45:25 59:13

**accomplished** 43:6

**accomplishing** 40:11

**accountants** 7:1

**accounting** 42:8

**accountings** 41:23

**accounts** 44:24 48:6,7

**accruing** 7:20,25 9:14

**accumulated** 25:12,15

**achieve** 30:20 33:20

**achieved** 31:11

**achieving** 35:11

**acting** 36:4

**action** 14:20,23 15:25 20:25 23:23

**Adams** 21:2 46:10,12

**add** 35:3

**addition** 10:5 11:11 47:17

**additional** 13:22 44:17 47:9,11,14 49:17

**Additionally** 9:6 42:3

**address** 37:24 38:12 42:23 43:4 59:22

**adjudicate** 53:4

**adjudicated** 23:8

**adjudication** 23:23 26:13

**administered** 30:18

**administration** 26:8

**affect** 34:17

**agent** 39:23

**agree** 44:4

**agreement** 41:10 50:14,21

**allegation** 27:14

**allegations** 14:14 28:23 30:9 36:2 51:24

**alleged** 14:11 24:1 27:11 39:12 46:8

**allegedly** 28:5

**allowed** 48:21

**alluded** 43:12 44:5

**alter** 15:17

**alternative** 9:3 26:11, 24 30:20 31:6,22 32:14, 16

**alternatives** 23:12 57:10

**analysis** 50:24

**Andrews** 4:17

**apartment** 17:1

**apparent** 25:18

**Apparently** 25:12

**appeal** 24:8,11 26:23 34:17 55:23 59:19

**Appeals** 56:4

**appearances** 4:8

**appearing** 58:12

**appendix** 45:8 47:12

**applicable** 30:24

**applied** 31:3

**apply** 36:20

**appoint** 6:8 46:24,25

**appointed** 45:14

**appointing** 39:22

**appraisal** 16:3

**appraisals** 38:24 44:19

**appraised** 6:15 50:5

**appraisers** 6:8

**approach** 5:14

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON

**approval** 10:10

**approve** 6:7 10:17 34:13 52:14

**approving** 26:25

**argued** 35:12 50:17

**argument** 9:25 24:4 35:20 37:12 46:4,19 58:23,24

**arguments** 17:23 35:18 41:18

**art** 9:20,21 42:9,10,13

**aspects** 17:11 19:22

**assertion** 25:19

**assessment** 8:16

**asset** 27:8 30:1 31:25 32:10 52:3,10

**assets** 10:12 11:19 12:5 15:12 16:9,13,14 19:12 22:2 23:25 25:21 27:17,22 28:2,7 29:3,6,8 30:13,21 32:11 38:16,22,23 39:1,11 40:4 41:3,6,20,24 42:7,18,19 44:16 48:13,22 49:2,17

**assume** 43:17

**assuming** 24:4

**attack** 26:7

**attempted** 14:14 35:20

**attention** 44:6

**authored** 31:1

**authority** 12:8,16,21 14:18 24:9,15 55:23

**authorize** 14:6

**autopilot** 23:20

**avenues** 18:1 19:6

**aware** 6:1,12,19 10:9 11:5 45:5

────────────

**B**

────────────

**baby** 54:11

**back** 22:21 23:11 24:22 25:5 31:18 38:11 46:7

48:4 56:4

**backdrop** 51:8

**bad** 36:10

**bank** 11:22 41:23 44:23,24

**banking** 48:1,4

**bankruptcy** 12:20,25

**banks** 39:19 48:3

**barely** 27:15

**Baron** 28:22 32:18,19

**Barton** 4:7,14,17 8:20 9:11 11:4,13,15 12:6 14:2,7 15:25 16:13 17:10 18:4 20:3 22:10,21 26:18 27:11 28:17 30:7 31:16 36:20 40:24 41:17 42:2,5,10,14 43:11 44:3,21 45:2 47:15 51:21 53:2,12 54:22 55:1,11 58:23

**Barton's** 8:19 11:8 14:6,25 21:11,20 22:16 23:7 26:5,12 34:14 35:20 41:12 46:19 53:6 55:4

**basis** 25:18,24 26:1 55:14

**begin** 21:25

**beginning** 47:5

**begs** 54:24

**behalf** 4:10,25

**believed** 20:4

**belong** 25:23

**belongings** 9:21 20:14 42:21

**Bernstein** 4:9,10 35:2,8 36:22 37:3,6

**bet** 37:7 57:8

**big** 17:1

**bit** 9:8 24:18 52:18

**block** 55:25

**briefed** 59:18

**bring** 10:12 32:2 37:22 45:18

**broader** 59:20

**brought** 13:8

**burden** 34:9 49:14

**burdensome** 30:19 31:5

**burned** 50:20

**business** 15:24 16:10 17:9 19:17 20:9,15 21:8 22:10 23:1,15 25:3 27:21,23 31:10 32:2 33:8

**businesses** 40:21 49:10

**buyer** 56:1

**buyer's** 56:6

────────────

**C**

────────────

**candle** 22:20

**capacity** 20:7

**card** 12:4

**Carol** 20:21

**carry** 21:19

**case** 4:6 12:22 14:10 17:7 19:11,24 21:3 28:20 29:25 30:5 31:19 33:19,21 34:10 35:9 36:17 37:2 43:18 46:13,22 53:4 54:15

**cases** 12:20 15:19 20:5 30:24 36:8,14 39:9 46:11

**cash** 6:20,21 7:7 8:23 10:7,22 15:20 16:12 17:12 18:24 19:2 22:25 37:22 39:3,5 40:4,23 43:7 44:16,23 49:17 51:12 58:24,25 59:12

**certifications** 7:1,3

**chair** 25:6

**challenges** 54:7

**challenging** 14:16

**charges** 15:3

**Charlene** 4:25

**China** 21:5

**Chinese** 28:18

**chit-chats** 59:4

**choice** 56:6

**choose** 20:6

**choose-your-own-adventure** 55:9

**chose** 20:8 33:18

**Circuit** 21:3 24:13 28:21,25 34:18 54:13 55:24

**Circuit's** 19:10

**circumstance** 15:10

**circumstances** 15:8

**cited** 12:20

**claim** 43:19 53:3

**claimed** 23:13

**claims** 7:19 14:13 28:19 29:3 43:14,15

**clear** 37:25 56:15

**client** 55:13

**close** 54:23 55:6

**closing** 53:25

**clothing** 25:7

**cloud** 48:11

**Code** 12:18

**collusion** 36:16

**comfortable** 5:24

**commercial** 16:9 17:11 18:1,13,21 19:6 20:10 21:7 22:9 23:3,14 27:24 51:19

**commingled** 49:1

**commingling** 11:23 47:4,11,18 48:22 51:20,21

**Commission** 20:1

**communication** 9:4

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                    December 19, 2022        Index: communications..developed

**communications** 9:13 11:6

**companies** 20:19

**company** 29:12,15,16, 20 54:24 56:15

**compel** 13:7 55:1,5

**compelling** 35:9

**compels** 48:15

**competent** 35:10

**competently** 28:9

**competing** 5:6,7 6:5, 21 7:6 13:18 43:14,15, 19 50:7

**complain** 42:17

**complaint** 32:18 57:22

**complaints** 19:13

**completely** 46:16

**completion** 52:14

**complex** 16:21,23 43:12

**complicated** 33:9

**complication** 17:23,24

**comply** 6:13 39:20 41:22 42:15

**complying** 39:23

**concluded** 60:7

**concrete** 59:2,5

**condition** 16:4

**conduct** 46:8

**confer** 55:13,16

**conference** 9:4 10:1, 14,15

**conferred** 12:11 48:17

**confident** 8:5

**confirmation** 11:12 12:25

**connection** 50:12,13

**consent** 16:14 17:12, 18

**consented** 17:15

**conserve** 15:12,16,18 37:11

**conserving** 30:20

**constructive** 56:1

**contemplate** 43:25

**contemplated** 13:12

**contends** 7:10 54:23

**contention** 10:2 38:13

**contents** 10:23 11:3,7, 9,25 45:4

**contest** 24:2

**contesting** 55:22

**context** 39:1 46:16

**continue** 7:21 31:15 32:12 38:24 57:11

**continued** 26:12

**continuing** 6:25 12:8

**contract** 6:9 9:13 43:23

**contracts** 43:25

**contradiction** 40:13

**contrary** 27:6

**control** 13:17 16:10 57:17

**controlled** 47:16

**convince** 58:19

**convincing** 59:2

**cooperation** 45:20

**copy** 55:3 56:18,20

**corporate** 22:6

**corporation** 19:17 20:17 21:13 25:21,22

**corporations** 21:1,6 31:12

**correct** 8:6,9,15 24:18

**Cort** 4:25

**cost** 11:8 23:18 26:12 53:6,10,13

**costs** 53:15

**couch** 14:9 25:6

**counsel** 5:5,18,22 11:6 14:2 34:24 35:20 55:4 56:24

**counsel's** 45:3

**couple** 32:25

**court** 4:3,4,11,18 5:2, 16,25 6:10,12,16,19 8:3,7,10,13,18 10:9,17, 25 12:15,21 13:3,10,20, 24 14:1,5,22 15:4 16:17 17:15 18:6,12 19:9,20 24:14 26:3,9,24 27:2 29:12,21 32:12 34:20 35:5,23,25 36:24 37:4,7 38:1,5 39:17 41:18 42:16,25 43:5 45:14,22 46:2,19 49:6,19 54:7,25 55:7 56:3,9,16 57:6 58:17 59:21,24 60:5,6

**Court's** 11:20 12:8 24:10,12 25:25 39:23 41:22 42:15 44:9 45:8 46:23 49:16

**Court-appointed** 37:10

**create** 31:15,20 57:12

**credentials** 48:9,10,11

**credit** 12:3

**Creek** 42:4

**criminal** 33:18,21 34:5, 9 36:14,21 37:2

**crucial** 23:25

**current** 52:10

**cycle** 32:24

**D**

**Dallas** 51:4

**Dallas/fort** 27:21

**data** 48:12

**date** 44:25 48:24 53:25

**daughter's** 14:9

**David** 28:12 31:9 37:10

**day** 9:19 12:11 15:25 33:19 38:3,5,16 51:21

55:6

**days** 49:6 54:7

**deal** 22:19,22

**dealing** 27:17

**deals** 59:19

**dear** 42:1

**debtor** 12:23

**December** 8:13 12:13

**decide** 53:12

**decision** 20:2 28:22 30:25 31:2 46:23 53:16 55:18

**declaration** 20:22,23 47:5

**declare** 12:16 54:25 55:12,17

**deduction** 8:14

**default** 7:3,20

**defend** 34:8

**defendant** 13:6 15:14 20:6 30:19 34:5 42:14 45:21 46:15

**defendants** 46:15

**delay** 9:12

**demonstrate** 12:5 47:13

**denied** 13:2 48:8

**deny** 14:22 53:23 54:17

**depend** 28:8

**depreciating** 52:9

**depth** 38:2

**designed** 16:21

**destroy** 28:10

**destroyed** 32:4

**detail** 48:21

**determination** 53:11, 16

**develop** 40:9,14

**developed** 37:16

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON

development 21:8
22:10 23:14 27:21 28:9
32:3 33:8 38:25 40:25
51:18

developments 40:7

differ 54:24

differently 52:19

difficult 29:10 39:16,19

digression 57:15

diminish 51:5

dipped 30:6

dire 18:10,13,19,20,23

direct 13:5 19:20

directed 37:13

direction 56:3

disagree 54:14 55:18

disclaimer 36:6,8

discovered 12:11
47:4,7,10

discusses 58:4

discussion 38:10 57:5,
10

discussions 37:13,14

dish 25:7

disingenuous 42:20

dispute 17:5

disregard 12:8

dissipate 45:24

dissipating 52:4,21

dissipation 52:3 57:19

docket 19:23 45:10

documents 14:12

dollar 33:4,13

dozens 48:3

drag 24:20

drained 44:23

drastic 17:13 23:22
30:19

drives 54:3,4

driving 57:18

drop 52:5

due 8:3,8 45:4 51:11
52:8,11,23

Duval 12:22

---

**E**

earlier 16:3 57:4,9,23

early 12:15 58:3

earth 27:19

economic 51:6

Edney 4:15,16,19 14:3,
4 15:7 17:16 18:11,22
26:14 27:3 29:19,22
34:21 45:5 55:16 57:3,8
59:16 60:4

efficient 51:16

effort 19:11 20:21,23
21:9 34:4 44:6

efforts 47:24

email 11:6 45:6,7
56:24,25

emails 44:8

embed 59:7

emergencies 27:8

emergency 30:12
33:24

eminent 27:8

encountered 7:15

encumbered 7:16,17

encumbrances 51:18

end 31:11 38:16

engaged 47:1

entailed 24:10

entered 41:15

entities 11:19 12:1
16:4,10,11 17:10 22:6,7
23:1 27:23 33:14 42:5
47:14,16 49:2 51:22

entitlements 40:15

entity 10:11 11:17
21:10 24:25 47:18,19,
20 49:8

entry 46:20

equity 8:2 10:6 16:22,
25 17:6 43:14

erode 8:2

essence 53:24

essential 13:15

estate 5:12 6:18 13:14
16:9 20:16 21:6,7,8
22:10 23:14 27:20,25
31:10,13 32:23 33:8
37:11,15 43:16 51:14
57:12

estate's 7:5

et al 4:7

event 15:15 30:22
33:22 56:2

events 15:11 24:1
32:15

eventual 30:22

evidence 29:4 30:11
31:24 32:1 35:10 47:2,
21 48:25 49:3

exact 46:6

examples 16:16

exceed 6:13

exceeds 28:3

excellent 9:1

Exchange 20:1

exercise 22:5 25:2

existence 14:17 30:17

expand 24:15

expansion 24:12

expedient 39:13,24

expedited 56:20 59:9

expense 26:12 53:6

expenses 9:15 10:6
19:5

expensive 7:2 39:10

experienced 31:10
57:17

explains 28:20

explanation 49:9

explored 18:2

extensive 11:23 43:13
47:18

extinguish 43:15

extra 24:14 39:15

extraordinary 15:10,
19 27:5

extremely 23:6

eye 28:1

---

**F**

facilitated 16:13

fact 6:14 14:15 17:8
21:15 41:22

failed 41:21

failure 41:8

fair 35:11

familiar 26:15

familiarity 45:3

Faulkner 31:2

Federal 51:4

fees 19:4

figure 18:9

figures 17:7,8

file 58:20 59:8,10,22

filed 5:7 10:10 12:11,
12,14,23 47:10,12 56:8

filing 9:3 12:10 28:3
46:22,25

filings 6:20 8:20 11:5
17:22

final 34:24 37:8 46:3

financed 18:10

financial 16:4 25:6

financing 18:20,21,23
52:10,23

**find**  15:19 33:16 44:25 48:12 50:7 56:22

**finding**  15:2,5,9,13,15 30:22

**findings**  49:21 50:2 56:19

**fine**  5:21,25 52:25

**fire-selling**  33:12

**firm**  4:17

**Fitzwater**  31:2

**five-minute**  55:14

**flake**  27:13

**flight**  27:8,18 29:2,5 30:1 31:25 32:11

**floor**  51:1

**flow**  22:25

**flush**  46:4

**fly**  30:13

**focus**  16:8 23:13 44:7

**focused**  20:9 58:8

**focuses**  20:2

**focusing**  17:9,10 23:12

**forecast**  51:6

**foreclosed**  21:22

**foreclosure**  51:1

**foreclosures**  41:2,5

**forfeit**  7:4 34:8

**fork**  58:4

**forms**  15:20

**Fort**  17:3

**forward**  7:11,13 32:8,9 57:18 59:25

**found**  19:23 41:11 50:14

**frankly**  17:12 19:7 21:12 41:17 44:17

**fraud**  28:24 39:12

**freeze**  7:23

**Friday**  56:13,23

**Frisco**  16:23 37:21 43:6

**front**  55:3 56:3

**fruition**  38:25 45:18 57:20

**FTC**  39:9

**full**  38:2 44:5,6 57:20

**fully**  59:11,18

**funds**  11:9 20:24 21:4 42:19 46:7 51:23

**furnishings**  11:12

**future**  24:5 37:13

**G**

**gather**  12:4

**general**  15:11

**generally**  8:7 20:5

**generate**  43:7

**give**  22:21 34:24 56:14

**glass**  25:7

**goal**  39:11,13 40:2

**goals**  30:20

**good**  4:15,24 33:9,10, 13

**government**  14:10,12, 13 33:17 40:16

**governs**  6:5

**grant**  34:15 53:19 54:9

**granting**  53:20

**ground**  29:9

**guess**  35:14

**H**

**Hahn**  20:22 47:4

**halfway**  26:20

**hampering**  34:7

**hand**  6:22 28:10

**hands**  44:21

**happen**  10:2,18 30:2 40:19

**happened**  20:16 25:1 47:25 49:4

**happening**  30:3 48:13

**happy**  13:22 35:22 44:13 45:7,12 56:13 59:16,21

**hard**  22:19

**harm**  7:12 14:21

**harmful**  25:16 28:16,17

**hear**  10:25 14:2 32:25 35:6 37:9 38:1 57:7

**heard**  40:10 49:21 58:19

**hearing**  6:4 54:19 57:24 58:2,7,15,21 59:11 60:3

**hearings**  58:18 59:3,4

**heavily**  7:16

**held**  19:16 20:16 43:16

**hey**  12:3

**high**  16:8 17:8 19:18

**higher**  6:15 8:16 21:18 50:9

**highest**  6:10 9:9

**highlighted**  45:10

**highly**  40:22

**hitting**  35:6

**hold**  11:7 20:18 21:11 38:15

**holding**  19:17

**Holdings**  42:8

**holds**  29:17

**home**  14:6,8,25 16:1 18:9 23:23 25:4 34:14 35:4,9,16 36:4,20 37:1, 17 46:7 49:24 50:1,12, 13,19,22 51:25 52:12, 19 53:21

**homes**  52:5

**honest**  39:11

**Honor**  4:9,15,24 12:17 14:4,19,24 15:22,23 17:16 20:11 21:12 22:1, 5,12,19 23:2,5,10 24:7, 17 25:19 26:2,14 27:3, 12 28:7 29:23 30:15 31:7 33:15 34:13,15,16, 19 35:2 36:23 37:6 38:18 40:13 41:7 42:14 45:13 46:9 54:21 55:17, 19,22 57:3,9,16,23 58:3,5,14 59:16 60:4

**horizon**  58:10

**hour's**  24:23

**hours**  29:17

**house**  8:20 9:22 17:14 18:3 19:8,14,18 20:13 21:20,22 22:18 24:16, 24 25:1,8,10,20 26:2,21 49:8

**HUD**  6:25 7:3 23:18

**HUD-BACKED**  17:2

**Huffman**  4:16

**huge**  44:11

**hundred**  38:6

**Hunton**  4:17

**I**

**identify**  15:12

**illogical**  54:10

**immediately**  7:13 9:24 44:14

**imminent**  27:18 31:24

**impediment**  56:7

**important**  15:23 30:16 32:16,18

**imposition**  31:7

**impossible**  14:21 15:18

**incentive**  31:16

**inception**  46:20

**inclined**  34:15

**including**  59:20

Case 3:22-cv-02118-X    Document 121    Filed 01/06/23    Page 67 of 72    PageID 3154

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                    December 19, 2022              Index: inconsistent..maintenance

**inconsistent** 29:5

**incorrect** 12:17

**increase** 34:4 54:2,3,4

**increases** 8:17

**increasing** 51:3

**incredibly** 28:16

**incurring** 7:18

**independent** 23:19

**individual** 20:7

**individuals** 19:18

**information** 6:17 12:5 13:22 41:23 42:4 47:9 48:12,20 49:13

**initial** 28:3

**inside** 20:14 21:13

**instance** 6:22 12:10,22 40:7 41:19

**insurance** 6:22 9:15

**intend** 28:11,12

**intent** 43:21

**intercompany** 47:24

**interest** 5:11 6:18 7:4, 5,18,19,20,25 9:6 13:14 21:16,19 50:10 51:3 52:13 54:2

**interest-only** 18:7 50:25 52:7,23 54:5

**interests** 5:10 20:10

**intrinsically** 50:17

**invasion** 23:6

**inventory** 41:24 42:10

**investigating** 30:7 33:24

**investigation** 11:24

**investments** 47:6

**investor** 42:19 48:22 49:8

**investors** 31:21 46:14 57:21

**involve** 34:4

**involved** 33:14 39:8

**irrelevant** 39:6

**irreparable** 7:12 14:20

**irreversible** 34:13

**issue** 24:19 26:6 28:5 35:3 39:7 41:3,9,14 43:3 44:11 46:13 51:24 53:8 54:22 55:23 58:8, 16 59:23

**issues** 10:8 20:22 22:25 35:19,23 42:23 54:20 59:20

**items** 9:21 41:25

**J**

**January** 8:4,8 51:11

**Janvey** 19:11 21:2 46:6,10,11,12

**JMJ** 42:8

**judge** 5:13 7:12 10:2 12:7,25 13:9 19:25 31:1,2

**judgment** 35:14 38:17

**judicial** 51:9,10

**jurisdiction** 24:14

**justification** 22:17,18

**justify** 48:1

**K**

**Keefe** 4:9

**key** 37:18

**kick** 15:25

**kicked** 14:7

**kind** 16:3 23:9 30:12 51:10

**Koonce** 4:24,25 5:2,13, 23 6:1 8:5,9,12,15,25 11:2 13:24,25 37:24 38:4,11 43:2,8 46:9 54:21 56:12

**Kurth** 4:17

**L**

**largely** 37:13 38:2,9

**larger** 45:17

**late** 8:17

**launch** 33:18

**law** 4:17 26:1 50:6

**laws** 14:11

**lay** 59:12

**layers** 39:15

**learned** 11:24

**leaves** 57:16

**lecturn** 5:15

**led** 35:12

**left** 31:20 32:21

**legacy** 17:10

**legal** 50:6 56:7

**legitimate** 14:25

**lender** 7:19 19:12 25:21

**lenders** 20:24 21:5 28:6,18 31:18 32:17 57:21

**lending** 23:19

**letters** 43:21

**level** 58:13

**leverage** 36:5

**leveraged** 40:23

**liability** 15:3,5,9,14,15 23:24 24:2 30:22

**lien** 13:8 43:20 55:1 56:1,7

**liens** 43:13 44:11

**life** 25:16

**light** 33:23 34:1

**lights** 22:25 37:23

**limited** 6:20 7:7 10:13

**lining** 17:19

**liquidate** 28:14

**liquidating** 57:13

**liquidation** 14:18 24:9 58:12

**lis** 12:10,16,23 13:1 54:22,24 55:2,10,20

**listed** 16:2 42:7

**listen** 21:15 25:20

**listing** 41:10 50:14,21

**litigation** 13:2

**live** 21:21

**lived** 11:15

**lives** 25:10

**loan** 7:3,17 9:7 47:19, 20 50:25 52:7 54:4,5

**loans** 6:25 18:7 19:12 23:18 47:25 54:6

**locating** 56:23

**location** 9:10

**locations** 17:3

**locker** 26:22

**long** 10:3 29:6

**loss** 23:24 32:11,22

**lot** 9:12 25:12 29:10,11 46:5 58:25

**lots** 16:20

**lovely** 36:11,12

**low** 18:2

**M**

**made** 9:2,25 15:22 20:2 22:15 24:6 26:13 31:3 34:7 36:3 46:5

**Madoffs** 27:9

**main** 33:21

**maintain** 8:23 10:6,12, 20 51:13

**maintaining** 13:15

**maintenance** 21:20

**make** 26:3 31:17,19 35:17 41:18 49:20 53:11,17 58:23

**makes** 38:3

**making** 29:10 30:21 32:7 35:18

**man** 25:11 31:9

**man's** 23:23 25:1

**manage** 10:22 28:11 38:22 45:15 57:11 58:1

**managed** 33:6,12 44:22

**management** 16:8 31:14 57:17,18

**managing** 28:8

**mandate** 45:25 49:16

**manner** 13:11 26:7

**market** 41:10

**massive** 32:21 47:12

**materials** 25:4,5 45:21

**matter** 16:5 21:14 42:18

**maturity** 28:9 32:3 33:6

**maximize** 58:11

**meaningful** 17:21

**meant** 33:20

**mechanically** 50:3

**mechanism** 19:7

**meet** 50:8

**meets** 50:5,6

**mention** 16:18

**mic** 35:6

**Michael** 4:16

**microphone** 4:12 5:20

**million** 16:21,24,25 17:4 28:4 42:9,13 46:11

**mind** 35:5 37:12,18

**mindful** 33:15 34:1

**minimum** 6:14

**mobile** 52:2

**moment** 52:16

**money** 39:3,14 42:12 48:25 49:7

**monitor** 32:6 37:10 39:9,17

**monitorship** 31:8 37:25 38:10,15,22 39:2, 6,15 40:1,3,19 41:4 42:24 57:14,16 59:14

**monitorships** 39:8

**month** 52:15 53:10

**monthly** 9:6,9

**months** 43:20 44:1 45:18

**morning** 4:15,24 12:15

**mortgage** 9:15 21:14 54:3,5

**motion** 5:4 6:7,8 7:8,9 10:1,10 11:2 12:12 19:21 34:16 44:10 45:9 46:25 47:10,13 48:17 53:20 54:9 58:20 59:7, 8,10,12,18,22 60:3

**motions** 58:18 59:4,6

**move** 11:9 32:3,8,9

**moved** 26:21

**movers** 24:23

**moving** 9:20 52:25

**multiple** 6:23 11:5

---

**N**

**named** 46:14

**nature** 18:19,20,23 20:5 29:5 50:22 52:7,10

**navigates** 31:22

**necessarily** 52:2

**necessity** 24:6 57:11

**needed** 23:25 51:12

**negotiations** 6:9

**net** 16:22,24,25 17:6 19:18

**Netsphere** 28:21 29:25 30:15 32:19

**Notary** 55:3

**note** 15:24 50:14

**notice** 5:7 6:2,3 9:20 24:23 51:9,10 56:1

**notwithstanding** 50:11

**number** 17:7

**numbers** 50:3

**numerous** 6:19

---

**O**

**obedience** 13:10

**objected** 11:4

**objection** 7:9

**objectives** 59:13

**obligation** 10:21

**obligations** 7:7

**observance** 13:10

**observed** 10:5

**obtain** 47:8

**obtaining** 40:15

**occurring** 36:16

**occurs** 39:1

**October** 14:8 58:6

**offer** 6:10 9:1,11,24 10:3 45:3,5 50:9

**offered** 9:5 11:6

**offers** 5:6,8 6:6,11 13:18 16:13 17:3 37:20 50:8

**office** 25:5 41:11 42:4

**OFFICER** 4:3 60:6

**offshore** 52:2

**one's** 25:9

**ongoing** 19:5

**operated** 47:14 49:10

**operation** 20:16

**operations** 15:21 17:9 18:25

**opposed** 9:3 10:16 39:21 43:20 57:13

**opposing** 31:7

**opposition** 19:21

**option** 20:4

**options** 23:16

**order** 8:23 11:18 12:9 13:7,11,12 15:24 16:20 24:10,12 25:25 26:3 39:24 40:4 41:15,22 42:15 46:1,20 47:16,25 48:2,14,19 53:5 56:10, 13,18,22 58:6

**ordered** 28:23 45:22

**orders** 32:5

**original** 46:8

**originally** 20:20

**oversee** 45:14

**owned** 11:16 25:20,22

**ownership** 43:19

---

**P**

**pages** 19:25

**paid** 8:1

**papers** 27:14 32:15 35:12,19

**parallel** 33:18

**part** 44:8 53:20 58:3

**parties** 16:14 39:20 49:22

**passed** 10:4

**path** 55:19

**pay** 6:22 7:2,21,22 8:1, 10,16 11:9 19:4 31:18 40:17,24 46:7 53:15

**paying** 10:5 38:24 44:18

**pays** 9:14 47:20

**peering** 31:1

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                    December 19, 2022                    Index: pendens..question

**pendens** 12:10,16,23 13:1 54:22,24 55:2,11, 20

**pending** 5:3 16:20 24:8 26:22 34:17 55:21 59:19

**pennies** 33:4,12

**people** 8:10 36:10,11 40:17

**percent** 7:18,20 18:7 37:16 38:6 50:8 51:1,6 52:5 57:25

**perfectly** 39:10 55:20

**perform** 49:16

**period** 10:13

**permanent** 14:19,20 34:13

**permissible** 13:9

**permission** 33:2

**permitted** 31:14

**person** 39:22 58:22

**personal** 9:21 17:13 18:4 20:14 22:4,9,13 23:6 24:17,19,21,22 25:9 26:4,7 41:12 42:2, 6,21 49:24 50:12,13,17, 22 52:17,18,20 53:14, 22

**personally** 20:3 26:15

**perspective** 40:22

**pick** 22:24 36:9

**picks** 36:11

**pickup** 26:4

**piece** 20:12 25:7

**pipes** 7:22

**place** 5:16 9:12,24 22:20 32:5,6 33:10 47:25

**plan** 54:16

**planned** 12:24

**plans** 24:21

**planted** 29:8

**plowed** 21:6

**podium** 5:22

**point** 15:1 16:17 18:8 26:17 34:23 38:8 49:15 53:4 57:24 60:2

**pointed** 57:23

**Ponzi** 27:7,12 38:13

**portable** 27:17

**portfolio** 17:2

**position** 35:15 58:22 59:15

**possession** 9:19 11:20,21 13:17 26:5 50:15

**possibility** 7:11

**possibly** 9:1

**post-judgment** 38:18, 20

**potential** 44:1 48:22 52:5 57:13

**potentially** 10:11 24:1 43:15,22 45:24

**power** 22:21

**precedent** 27:6

**precedents** 24:13

**prefer** 5:14 44:7,12

**prefunded** 23:19

**prejudgment** 28:23

**premature** 28:14

**premises** 9:18

**prepared** 54:18

**preparing** 41:14

**present** 32:10

**presented** 13:21 31:23 32:14

**preserve** 39:11 41:5 44:16 45:15,16

**preserving** 41:3

**pressure** 34:4 36:20

**pretty** 58:8

**prevent** 23:24 29:2 30:1

**preventing** 57:19

**prevents** 32:6

**price** 50:4

**prior** 15:2

**problem** 21:21,23 22:16,22 40:20 41:7

**problems** 31:23

**procedure** 12:19 13:4

**proceed** 13:11 44:14

**proceeding** 36:21 55:21 56:2,21 57:2

**proceedings** 15:2 57:4,9 60:7

**process** 16:15 17:18 40:16

**produced** 14:12

**profitable** 18:16

**prohibited** 31:12

**project** 31:21 37:16

**projects** 21:7 27:25 31:14 32:3,8,9,20,23 57:12,17,18,20 58:10

**prominent** 27:20

**proof** 15:2 30:3 34:6,9

**properly** 46:14 47:15 56:8

**properties** 6:23 8:23 10:13,21 13:16 17:2 18:6,13,21,23 23:4 33:2 37:20,23 40:7,14 41:9 43:5,12 44:4,11,13,17, 23 45:4,15,17,24 51:5, 13,15,17,19 52:9

**property** 5:4 6:23,24 7:5,14,15,24 8:2,3,8 9:9,14,15,17 10:6 11:3, 12,16,25 12:12,18,23 15:5,8,20 16:24 20:12, 13,18 22:12 23:7 24:17, 19,21,22,25 25:10 26:4, 8,18,25 29:16,17 34:5 37:21 38:24 41:9,20,25 43:6,18 47:19 49:25

**pretty** 58:8

50:15 51:11,17 52:1,4, 7,8,11,17,18,20,23 53:9,13,22 56:5

**proposal** 11:4 26:15 31:6

**proposed** 16:23 19:1 25:13 26:10 56:10,13, 22

**proposer** 36:11

**proposition** 18:3 25:25 26:1

**propriety** 34:12

**prosecution** 33:18 36:3,5,15

**protect** 40:5 49:16

**prove** 14:14 25:5

**provenance** 25:6

**provide** 6:17 12:21 13:22 19:6 41:23 45:22 47:23 48:21 49:12 55:4, 6

**provided** 48:14

**public** 29:9

**publish** 6:3

**purchase** 19:13 47:19 49:8

**purchased** 11:13,25 12:6 42:12

**purpose** 11:16 15:1 19:2,16 20:17 21:10 23:4 29:15

**pursuant** 16:15

**push** 54:1

**put** 9:12,23 20:2,6,20 31:6 32:5,6 34:8 35:8, 10 47:24 50:18 58:5 59:22

**putting** 40:15 58:15

---

**Q**

---

**question** 36:1,7,18 37:5,18,19 38:3,9 43:10 46:3 55:11

**questions** 34:11 35:23 54:20

**quick** 18:18 46:3 53:11

**Quickbooks** 48:6,7

**quickly** 7:25 29:13 37:21 40:8,11 52:9

**quo** 15:16,17

### R

**rage** 54:6

**raise** 15:20 17:6,11 18:24 19:2 35:20 39:3

**raised** 9:25 17:4

**ran** 51:22

**rapidly** 52:21

**rate** 21:16,19 54:5

**rates** 51:1,3 54:2,3

**ratify** 10:10

**reach** 53:15

**ready** 32:22 33:3 53:12

**real** 16:9 20:15 21:6,7 22:10 23:14 27:20,24 29:16,17 31:10,12 32:23 33:8 37:15 57:12

**reality** 41:8

**reason** 19:15 35:13 53:24

**reasons** 22:1

**receive** 6:5 10:14

**received** 6:10 9:20 11:14 17:20,25 21:4 48:3

**receiver** 4:23 5:1 11:23 14:7,17 15:1,7,12 17:5, 17 19:1,3 23:22 24:8, 15,20 26:3 28:11,13,23 33:1 34:2 35:8,10 36:9, 14,19 39:2,22 40:10 41:15,19 42:17 44:5 46:21,24,25 47:1,7 55:6 56:18 57:24 58:13

**Receiver's** 5:5 6:2 11:21 13:16 14:23

15:24 16:7 18:25 21:23 22:16 25:19 34:16,24 35:14 44:10 45:9 47:13 55:22

**receivers** 15:4 27:4,7

**receivership** 7:5,15 10:7,20 11:8,18 12:1,9 13:7,12,14 16:20 19:8, 21 20:3,7,21 21:13,25 22:8,14 23:13 24:25 26:8 29:2 30:17,18 31:8 33:20 34:2,12 35:21,22 37:11,22 38:15,21 39:6, 10 40:20 41:15 43:7,16 46:20 47:16 48:2,14,19 50:11 51:12,14 52:13 53:2 57:11 58:6 59:19

**receiverships** 38:13

**receiving** 45:20,21

**recent** 32:15

**recess** 55:14 60:2

**recognize** 54:13

**recommended** 36:9

**reconsider** 46:19

**record** 4:6 16:16 24:18 30:11,14 44:9 45:8 56:19

**recorded** 29:9

**records** 11:22 25:3 29:9 41:23 48:4

**reference** 6:2

**reflected** 42:9

**refused** 41:22

**regard** 17:1 20:13 21:10 22:6 23:10,11,17 25:2 28:5 31:5 37:16

**reimburse** 23:25

**related** 19:12

**relates** 53:21

**release** 13:8 55:1,2

**relied** 12:18

**relief** 46:15

**remedy** 38:18,20 40:2

**remove** 9:17

**removed** 41:25

**rent** 8:20 50:19

**rental** 9:9

**rents** 9:14

**repeat** 43:10

**replies** 59:6

**reply** 56:24 59:8

**report** 32:12

**request** 10:2 14:5,22 45:3 53:19,23 54:17 55:5 58:21

**requested** 6:16 28:13

**require** 6:25 13:10

**required** 6:4 58:11

**requirements** 6:21 44:20

**requires** 6:13 39:15

**research** 9:8

**reserve** 35:17 51:4

**residence** 21:11 41:13

**residential** 51:5

**resolution** 26:23

**resolved** 55:24

**resort** 16:5,6

**resources** 37:11

**respect** 10:23 39:25 42:21 45:2,5 46:18

**respectfully** 14:24 16:7 45:13

**response** 9:4 10:15 11:10,14,15 12:2,14 17:21 44:10 45:9,12 59:7,9

**responses** 59:6

**responsible** 23:8 24:3

**rest** 50:24

**result** 36:21

**return** 15:14 26:5,17 53:1

**reverse** 14:21 15:18

**rights** 23:7 35:17

**righty** 5:3 14:1

**rise** 4:3 60:6

**risk** 27:18 29:5 32:10

**road** 40:13 49:11 57:25 58:4

**roads** 40:15

**roughly** 16:2

**route** 13:5

**ruckus** 29:11

**ruin** 54:11

**rule** 51:21 54:18

**rules** 28:22

**ruling** 53:19

**rulings** 49:21

**run** 27:20 32:2

**running** 27:12 31:10

### S

**safe** 26:22

**sake** 24:4

**sale** 5:4 6:3,5,8,12 7:8, 10,12,14 13:11,13,20 14:6,19 15:16 16:2,15, 20,24 18:18 19:2 26:25 32:6 34:14 35:3,15 43:5 44:2,4 49:24 50:1,4 51:15,16 52:12,14,22 54:23 55:25 56:7

**sales** 28:15 31:12 40:11 44:6 57:19

**satisfied** 13:19 31:4 44:15

**scenario** 8:21

**schedule** 58:15

**scheme** 27:12

**schemes** 27:8 38:14

**scope** 35:21 47:15

**seated** 4:5 5:19 57:6

**SEC** 4:7,8,10 20:2,4,8, 20,25 23:12 28:5 29:1,6 30:5,24 31:2 32:12 33:19,24 34:22 36:18 39:13 41:18 42:17 46:22 47:1,9 51:24 57:22

**SEC's** 19:13,20 27:14 28:3,13,19 29:3 30:4,9 31:9,19 32:17 36:9 49:14

**SEC-APPOINTED** 27:7

**SEC-SOUGHT** 27:4

**Section** 12:18

**securities** 14:11 20:1

**SECURITY** 4:3 60:6

**seeking** 46:24

**segregation** 49:2

**selection** 31:9

**sell** 7:24 11:3 12:12 15:4,8,20 17:4 18:17 24:15 29:10,12,16,20 33:2 38:19 41:14 44:12, 17,18,19 45:19 55:23

**selling** 14:24,25 17:13 18:3 22:17 57:25

**sense** 38:3

**sentence** 27:15

**separation** 36:13

**servicing** 23:17,18

**set** 28:22 55:19

**settlement** 10:10

**seventh** 52:1

**shifting** 22:18

**shocked** 41:17

**short** 13:13

**shoulder** 53:13

**show** 29:1 32:15 48:18 56:15

**showing** 15:21 23:22 24:5 30:14

**shut** 54:14

**side** 37:2

**sign** 13:7 52:22 55:1,2, 5,11

**signed** 41:10

**simple** 13:4

**simply** 38:15

**single** 11:16 39:21 43:13

**sit** 5:18 45:23

**sitting** 5:22

**situation** 28:20 33:16, 17 35:14 50:16

**sleeping** 14:8

**small** 57:15

**sober** 16:3

**sold** 25:13 26:19 32:20 33:3,4 35:9 40:8 42:1

**sole** 29:15

**solution** 32:5

**sooner** 58:3

**sophisticated** 32:7

**sought** 20:20

**speak** 42:24 43:23

**speaking** 4:12 5:17 8:7 20:5

**special** 19:16 20:17

**specific** 45:6 49:2 59:5

**specifically** 43:4 48:15

**split** 54:11

**stage** 14:10

**stake** 40:5

**stand** 5:15,19

**standards** 31:3 32:19

**standing** 5:22,24

**standpoint** 50:4 51:16

**Stanfords** 27:9

**start** 46:10

**started** 22:23

**stated** 6:7 44:3

**statement** 42:8

**statements** 12:4

**States** 34:9

**stationary** 27:24

**status** 15:16

**statute** 6:4,13 13:19 15:17 44:20

**stay** 5:18 7:8 13:1 19:21 34:16 41:5 44:10 45:9 49:25 52:16 53:18, 19 54:9,14,16 57:6 59:18

**stayed** 33:21 41:1

**step** 24:14 38:11

**stepped** 41:1

**steps** 34:2

**storage** 26:12,21 53:1, 5,7,15

**store** 11:7,10 26:11 45:4

**storing** 53:9

**straight** 22:25

**straits** 18:10,14

**stranger** 27:1

**strategy** 58:12

**stretch** 27:19

**strong** 50:22

**structured** 40:21

**struggling** 40:24

**stuck** 45:13

**student** 54:4

**students** 54:6

**stuff** 25:12,15

**subject** 6:24 12:24 19:13 20:25 28:19 29:3, 7 31:19 32:17 43:13,19, 22 44:11 52:2 57:21

**submission** 20:1 30:5

**submit** 20:11 56:13

**submitted** 6:15 44:9 56:12

**substantive** 30:9

**sufficiency** 50:7

**sufficient** 10:12

**suggested** 9:3 36:25

**suggesting** 36:16,19 59:1

**suggestion** 37:9 38:14 39:25

**suggests** 47:22,23

**supervise** 39:16,17,18 40:16

**supervision** 39:16

**support** 45:8 47:2,13

**supposed** 15:12

**surrounding** 34:11

**sustained** 23:21 27:15

**Switzerland** 27:18

**system** 33:5,11

---

**T**

**table** 5:18,22

**takes** 26:24 29:15 47:18 53:18

**taking** 23:23 34:3,5

**talk** 5:5,10 8:21,24 18:15 26:10 35:1 37:20 49:23 55:15 59:11

**talked** 8:22 23:17

**talking** 31:13 37:15

**targeted** 59:22

**tax** 8:14

**taxes** 7:21 8:3,8 9:16 51:11 52:7,11,23

**Ted** 4:16

**teed** 17:17

**telling** 18:16

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          December 19, 2022                          Index: tells..yesterday

tells 50:21

terms 21:15 32:7 48:21

test 50:5,6

testify 47:22

testimony 47:23

thing 26:17 39:21 51:10 54:11 56:17

things 25:22 30:8 33:6 57:25

thinking 38:7 53:8

Thomas 4:25 43:23 45:14 49:16

thought 16:15 20:20

thoughts 37:9

threshold 50:8

tied 44:21,22

time 6:21 10:3,13 12:3, 4 14:16,23 29:15 30:9 40:8 41:21 43:7 47:3,10 53:24 58:10

timeline 51:16

title 54:24 56:15

titled 29:14

today 4:22 9:12 13:8,21 14:5 31:1 35:1,12,21 36:1 42:16

today's 37:14

toe 30:6

told 45:23

top 24:7 30:15

total 53:10

touch 41:8

trace 19:11 20:23 41:19 42:18,19 47:3

traced 25:21

tracing 22:2 26:13 46:4,6,7,13,18 47:1 51:20

track 38:6,8

traditional 7:17

transactions 32:8 48:1

transcript 56:21

transferred 12:24

treated 42:5

treatment 17:25

trier 14:15

trouble 56:23

true 8:17 40:25

turn 33:21

turning 23:11

Turtle 42:4

two-thirds 6:14 50:5

type 23:22 36:15

U

ultimate 15:13

unable 42:18

uncomfortable 13:3

underlying 14:13 15:3

undermining 40:1

understand 4:20 8:19 29:22,23 33:8 58:5

understanding 40:6 48:6

Understood 8:18 27:2 49:19 55:7 56:9,16 58:17 59:24

undertake 14:18,23

undertaking 22:11

unique 20:13

uniquely 22:4,8 53:14

United 34:9

unlawful 46:8

unlike 20:19 52:8

unprecedented 27:4

unreasonable 25:8

unsecured 28:18 31:18

unsympathetic 41:13

update 5:9

urged 19:9

utilities 7:22

V

valid 53:3 55:21

valuable 9:21 31:17

vendors 40:17

Venus 16:21

versus 4:7 21:2 28:21 31:2 32:19 46:10,12 58:11

victims 24:1 39:12

view 15:6 16:7 27:5 35:4 52:18,19

violated 13:6

violations 14:11 48:18

void 12:16 54:25 55:11, 12,17

W

wait 45:23

Wall 4:21,22

Wallace 28:12 31:9 37:10

wallet 42:6

wanted 40:2 42:23 43:4

warrant 9:16

ways 17:11

weather 7:23

websites 48:11

weeks 16:2 32:25 45:11

word 34:24 37:8

work 19:3

world 27:10

worth 17:3 19:18 22:20 26:6 27:21 42:11 53:9

wrong 23:13

wrongdoing 23:9 34:6, 7

Y

y'all 38:7 53:7 57:6 60:2

year 8:10 52:6 58:4

years 12:1 25:11 27:22 30:7 33:25 40:9,12 45:18

yesterday 5:7 30:6