UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>TIMOTHY BARTON, et al.,<br><br>*Defendants,*<br><br>DJD LAND PARTNERS, LLC, and LDG001, LLC,<br><br>*Relief Defendants.* | §§§§§§§§§§§§§§§§<br><br>Civil Action No. 3:22-CV-2118-X |

### ORDER DENYING MOTION TO STAY PENDING APPEAL

Three days after the Securities and Exchange Commission ("SEC") filed this action against Timothy Barton and other Defendants, alleging violations of various federal securities laws, the SEC asked the Court to appoint a receiver to steward the vast array of Barton-controlled entities. After considering Barton's objections, the Court granted the request and issued an Order Appointing Receiver ("Receivership Order"), which it later supplemented with two further orders.[1]

Barton appealed to the Fifth Circuit, challenging all three of these orders. Now before the Court is Barton's Motion for Stay Pending Appeal, which asks the Court to stay all three of these orders pending the outcome of his appeal, or, in the

---
[1] Doc. Nos. 29 (Receivership Order), 62 (Order Granting Receiver's Motion to Supplement Order Appointing Receiver), and 63 (Order Granting the Receiver's Motion for Order Governing Administration of Receivership Estate).

1

alternative, to stay several components of the orders. [Doc. No. 71]. Barton requested the same relief from the Fifth Circuit pending his appeal, which the Fifth Circuit denied the day after receiving the SEC's response, without waiting for Barton's reply.[2]

In his motion to stay, Barton weaves a web of unsupported assertions and outright misrepresentations, conjuring up a vindictive Receiver who is mismanaging Barton's tidy family of entities that would otherwise be flush with unencumbered and lawfully obtained cash. But Barton's thriving network of wealthy business entities exists only in his mind and on the papers he writes. The evidence tells a far bleaker story: the truth. Barton's money is melting away. The Receiver is fighting to hold Barton's crumbling empire together with minimal resources and rising expenses. And Barton's hapless investors are wondering whether they'll ever be repaid.

Having carefully investigated the parties' arguments, the applicable caselaw, and the underlying facts, the Court finds that staying the Receivership would prevent justice under these circumstances. The Court accordingly **DENIES** Barton's motion to stay in its entirety.

### I. Factual Background

In late September 2022, the U.S. Attorney's Office for the Northern District of Texas indicted Barton on several criminal counts related to his real estate and business dealings. Three days later, the SEC, which had been investigating Barton

---

[2] *See* Doc. No. 122.

since October 2020,³ filed this action against Barton, alleging violations of federal securities laws and seeking injunctive and monetary relief.⁴

Three days after filing suit, the SEC moved for appointment of a receiver "to determine the value of the property interests (and any other assets) and to secure, preserve, and potentially monetize that value for the benefit of defrauded investors."⁵ The SEC's motion recounted in detail Barton's multi-year efforts to raise approximately $26 million from over 100 investors, supposedly to support real estate investments in Texas.⁶  The motion then detailed the precise representations, agreements, and investments through which the SEC alleges Barton "misappropriated and misused" the vast majority of investor funds.⁷ Specifically, and according to expansive documentation in the SEC's motion, Barton and his collaborators used "commingled funds," "[i]nflation of property purchase prices," "[w]orthless . . . purported corporate guarantee[s]," and "progress reports that misrepresented the actual status of the projects" to investors in order to "pay personal expenses of Barton and his family, including exorbitant credit card bills, rent, and to buy a plane," "make Ponzi payments to earlier investors," "make political

---

³ *See* Doc. No. 25 at 5–6.

⁴ Doc. No. 1 at 23–28 (alleging that Barton violated 15 U.S.C. §§ 78j(b) and 77q, as well as 17 C.F.R. § 240.10b-5, and seeking both monetary and equitable relief).

⁵ Doc. No. 6 at 7.

⁶ *Id.* at 9–11.

⁷ *Id.* at 11–16.

3

contributions," and "acquire properties not related to the [investment] offerings in the names of other Barton companies," among other activities.[8]

The Court allowed Barton a full twenty-one days to respond despite the SEC's request for expedited consideration. After thoroughly reviewing Barton's arguments against imposing the receivership, the Court granted the motion and issued the Receivership Order, which appointed Cortney C. Thomas ("Receiver") to serve as Receiver over "any . . . entities that Defendant Timothy Barton directly or indirectly controls" ("Receivership Entities").[9] The Court found that "the appointment of a receiver in this action [was] necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities" and ordered the Receiver to "assume and control the operations of the Receivership Entities and . . . pursue and preserve all of their claims."[10]

Soon thereafter, the Receiver asked the Court to supplement the Receivership Order by expressly naming 139 additional entities as Receivership Entities, in addition to the 29 Receivership Entities initially listed in the Receivership Order.[11] The Court granted the motion in part, naming 126 entities as Receivership Entities and ordering the Receiver "to provide supplemental briefing . . . regarding whether [the remaining 13 entities were] 'entities that Defendant Timothy Barton directly or

---

[8] *Id.* (emphases omitted).

[9] Doc. No. 29 at 2–3.

[10] *Id.* at 2, 4.

[11] Doc. No. 41 at 1.

indirectly controls.'"[12]  This order was necessary because Barton's control over an entity "is the measure for inclusion in the Receivership."[13]  In a later order, the Court clarified that, in asking the Court to "supplement" the Receivership Order, "the Receiver d[id] not ask the Court to add new entities to the Receivership; rather, he ask[ed] the Court to *recognize entities the Receivership already contain[ed]*."[14]

The Court also considered and granted the Receiver's Motion for Order Governing Administration of Receivership Estate, which introduced "procedures with respect to notices and disposition of any tangible or intangible personal property" in the Receivership.[15]

Barton filed a notice of interlocutory appeal of: (1) the Receivership Order, (2) the order supplementing the Receivership Order, and (3) the Order Governing Administration of Receivership Estate.[16]  Shortly thereafter, Barton filed this motion to stay all three of these orders pending the outcome of his appeal.

## II.  Legal Standard

The Supreme Court has made clear that "[a] stay is not a matter of right, even if irreparable injury might otherwise result."[17]  Instead, a stay is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances

---

[12] Doc. No. 62 at 2 (quoting Doc. No. 29 at 2).

[13] Doc. No. 88 at 2; *see* Doc. No. 7-1 at 3 (declaration from an SEC Certified Fraud Examiner alleging that "Barton received investor funds directly into . . . bank accounts held in the name of entities controlled (directly or indirectly) by Barton").

[14] Doc. No. 88 at 5.

[15] Doc. No. 63 at 2.

[16] Doc. No. 66 at 1.

[17] *Nken v. Holder*, 556 U.S. 418, 433 (2009) (cleaned up).

of the particular case."[18]  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."[19]

When deciding whether to grant a stay pending appeal, courts consider four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.[20]

"The first two factors . . . are the most critical," and, generally, the final two "factors merge when the Government is the opposing party."[21]

### III. Analysis

The Court will examine each of the four factors in turn.  But practically, the Court notes at the outset that granting a stay the Fifth Circuit already denied would give an appearance that this doubly inferior Court disagreed with its bosses on the Fifth Circuit.  This Court will do no such thing, and the below analysis confirms why this Court believes the Fifth Circuit to be entirely correct.

### A.  Likelihood of Success on the Merits

As to the first factor, Barton argues that he will likely prevail at the Fifth Circuit for several reasons, all of which misinterpret the Court's orders, obscure controlling precedent, or misrepresent the facts of the case.

---

[18] *Id.* (cleaned up).

[19] *Id.* at 433–34.

[20] *Id.* at 434 (cleaned up).

[21] *Id.* at 434–35.

6

Barton claims that the SEC used "the wrong legal standard" and "inapposite caselaw" when seeking the Receiver's appointment.[22] But Barton acknowledges the Exchange Act's broad and clear language describing the standard for equitable relief, such as a receivership: In any SEC action brought "under any provision of the securities laws, the [SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."[23] Barton also acknowledges three factors provided by the Fifth Circuit to help determine whether a receivership is justified: (1) "there is a clear necessity to protect a party's interest in property," (2) "legal and less drastic equitable remedies are inadequate," and (3) "the benefits of receivership outweigh the burdens on the affected parties."[24]

Barton initially tries to heighten these standards, indicating that the SEC must, or at least should, obtain preliminary injunctive relief before seeking a receivership.[25] But the SEC is seeking, among other things, injunctive relief,[26] and "[t]he appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief."[27] Because Barton offers no source to support his alternative vision of the law, the Court will not stray

---

[22] Doc. No. 71 at 10 (emphasis omitted).

[23] 15 U.S.C. § 78u(d)(5).

[24] *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).

[25] Doc. No. 71 at 11.  The only authority Barton cites to support his heightened standard is a fabricated quotation from the SEC's motion requesting a receiver: He claims the SEC sought a receiver as "an ancillary to preliminary injunctive relief."  Doc. No. 71 at 10 (purporting to quote Doc. No. 6 at 11–14) (emphasis omitted).  But this quote never appears in the SEC's motion.

[26] Doc. No. 1 at 27–28.

[27] *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981).

7

from the Fifth Circuit's well-established method for determining whether a receivership was properly sought and obtained.

Turning to the first of the three factors, Barton argues that the SEC failed to show "a clear necessity" for the receivership because "it submitted no evidence of an imminent asset flight or dissipation risk" and investigated Barton for two years before requesting a receivership.[28] Barton's logic is bemusing: He claims that the filing of an SEC investigation into the entirety of his business empire, supported by as-yet unrefuted evidence demonstrating extensive commingling and misuse of investor funds, and asking the Court to order Barton "to disgorge all ill-gotten gains,"[29] gives the Court no reason to find a risk of dissipation or asset flight; rather, he argues, it is evidence of the opposite.

The Court disagrees. Barton does not explain why the length of the SEC's investigation before filing suit has any bearing on whether a risk of asset flight or dissipation existed *after* the SEC filed suit. And in direct contradiction of Barton's narrative, the Receiver notes that his "[e]xtensive efforts to identify all Receivership Entity bank accounts have resulted in recovery of less than $75,000 in cash to date, despite the fact that the Receiver is aware of several million dollars in receipts flowing into the Receivership Entities during the last twelve months alone."[30] Clearly, imposing a receivership to prevent dissipation and asset flight was, and continues to be, a clear necessity.

---

[28] Doc. No. 71 at 11 (cleaned up).

[29] Doc. No. 1 at 28.

[30] Doc. No. 84 at 11.

Barton next challenges the Receivership's necessity on the ground that his "myriad real estate projects include substantial assets that far exceed the $26 million at issue in this litigation."[31] As an example, Barton points the Court to an unauthenticated "hard offer[]" to purchase three of his apartment complexes for $107 million.[32] But as the Receiver notes, Barton's ownership of these properties is disputed, loans are outstanding, contractual rights remain uncertain, and any eventual sale price would be decimated by repayment of loans alone.[33] The Receiver provides numerous examples of properties that, regardless of their theoretical face value, remain burdened by unpaid taxes and bills, encumbered by ownership disputes or pending foreclosures, and entangled in ongoing lawsuits.[34] Barton's sunny assessment of his own financial situation may have fooled his business associates in the past, but the Court, looking to the evidence, remains convinced that the Receivership is necessary because the $26 million at issue is far from guaranteed at this early stage.

Finally, as to the first factor, Barton argues that the Court improperly expanded the Receivership to include entities that are not the subject of the underlying dispute. But the Court has never expanded the Receivership's scope. The Receivership has always encompassed "entities that Defendant Timothy Barton

---

[31] Doc. No. 71 at 13.

[32] *Id.* at 13; *see* Doc. No. 72 at 4–9.

[33] Doc. No. 84 at 9–10.

[34] *E.g.*, *id.* at 7–9.

directly or indirectly controls."[35]  Though the Court expressly identified certain entities that fit this category after reviewing evidence demonstrating Barton's control over them, it never constrained the Receivership to just those entities.  And Barton's control is an appropriate standard for inclusion in the Receivership because the SEC has ably alleged that Barton used his intricate web of entities to commingle and misuse investor funds.[36]  The Receivership's scope is a clear necessity given Barton's demonstrated history of using entities he controls to move, exploit, and conceal his likely ill-gotten gains.[37]

Turning to the second factor, Barton argues, with no evidence, that the Court failed to consider other, potentially "less drastic," equitable remedies, such as a monitorship.[38]  This is untrue.  The Court fully considered the possibility of a monitorship before granting the request for a receiver, as evidenced by the Court's lengthy discussion at an in-person hearing with the parties about the merits of a monitorship.[39]  While Barton's myopic assertion that a monitorship would be "less burdensome" may be true when it comes to the burden on Barton himself,[40] the

---

[35] Doc. No. 29 at 2–3.

[36] *See, e.g.*, Doc. No. 7-1 at 7–10, 14–18.

[37] Barton again attempts to obscure the law, asserting that the Fifth Circuit has listed factors that "the movant must show" in order "to justify an expansion of a receivership to include non-party assets." Doc. No. 71 at 13.  But the Fifth Circuit states that "a federal court *may* order equitable relief" when those factors are present, belying Barton's invented "must." *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009) (emphasis added); Doc. No. 71 at 13.  The Fifth Circuit's "may" is appropriate given the federal statute's broad discretionary allowance.  *See* 15 U.S.C. § 78u(d)(5).

[38] Doc. No. 71 at 15 (cleaned up).

[39] *See* Doc. No. 121 at 37–43.

[40] Doc. No. 71 at 15.

10

Receivership remains the most effective and least drastic measure to preserve assets at this point in the case.

As to the third and final factor, Barton claims that the harm to his business entities will outweigh the benefit of placing them in the Receivership. The harm Barton envisions stems from fees incidental to all receiverships and damage to his companies from the Receiver's alleged lack of personal experience managing real estate projects.[41] But the Court has never seen any persuasive reason—and Barton provides none—to doubt the Receiver's qualifications. The Receiver cited extensive evidence of his personal competence to manage this Receivership[42] and has confirmed his credentials by performing his duties efficiently and without incident since his appointment.

Far from inheriting a healthy business empire replete with ready cash, the Receiver began his work under pressure from "[n]umerous and urgent bills, many long past due," "shut off notices from energy providers and trash collection services," "[n]otices of cancellation for property insurance on several properties," and "at least 36 lawsuits involving Receivership Entities."[43] Barton alleges the Receiver's incompetence, but the evidence only demonstrates his incompetence to perform miracles. And given Barton's own belligerence and noncooperation—ranging from

---

[41] *Id.* at 14.

[42] *See, e.g.*, Doc. No. 84 at 18–19 (noting the Receiver's history of "extensive litigation in federal and bankruptcy courts (including litigation involving commercial real estate and other receiverships involving realty), other relevant commercial real estate experience, and a prior receivership appointment that included the sale of multiple properties").

[43] *Id.* at 11, 16. This situation, coupled with the Receivership's inadequate funding, thoroughly refutes Barton's unsupported assertion that "no special circumstances . . . justify a prejudgment liquidation of assets under receivership." Doc. No. 71 at 19.

his "refusal to comply with the Receivership Order and provide [his] IT credentials" to his refusal to identify or turn over $12 million in artwork one of his entities claimed to own—any harm Barton's companies might suffer under the Receiver's management is likely due to Barton's recalcitrance, not the Receiver's qualifications.[44] Weighing this harm against the Receivership's vast benefit to Barton's potentially defrauded investors (a benefit Barton does not contest), the Court continues to believe the Receivership satisfies the third factor.

Turning from the Fifth Circuit's three factors, Barton next argues that he is likely to succeed on appeal because the Court's orders regarding the Receiver were inequitable.

First, Barton claims that the SEC sought a receivership "for inequitable reasons and under inequitable circumstances" because it filed suit against Barton only days after the U.S. Attorney for the Northern District of Texas filed separate criminal charges against Barton.[45] He claims the SEC's two-year investigation was an unnecessary and coordinated delay, but he cites no facts to support that claim. Mere proximity between the filing of criminal and civil charges against Barton is insufficient reason to find the entire Receivership inequitable.

Nor is the Court persuaded by Barton's conjecture that the Receiver might disclose alleged privileged documents he might obtain at Barton's properties. Assured by the Receiver's promise to refrain from shredding or destroying any

---

[44] *Id.* at 13, 16.

[45] Doc. No. 71 at 16.

12

documents without permission, and presented with absolutely no evidence indicating that the Receiver might handle any documents unethically, the Court refuses to credit Barton's self-serving speculation in the face of contradictory facts. The Receivership is not a subterfuge or a conspiracy to aid the government in its criminal prosecution. All of the evidence before the Court indicates that it is exactly what it purports to be: a method of assessing and preserving assets for potentially defrauded investors.

Next, Barton claims the Receivership is inequitable because it is merely a vehicle to penalize him personally. Barton presents zero evidence to indicate why the Court, the Receiver, or the SEC would go to such lengths to persecute him in this way. To support his claim that the Receivership "is being used as a sword rather than a shield," Barton starts by yanking the word "penalizing" out of context from the Receivership Order and claiming it describes the Court's attitude toward him.[46] In context, the preamble to the Receivership Order states the Court's finding that the Receivership "is in the public interest by . . . penalizing past unlawful conduct and deterring future wrongdoing."[47] It simply acknowledges that one characteristic of the public interest is penalizing past unlawful conduct, which is a basic tenet of justice rather than a description of the Court's attitude toward Barton himself.[48] The Court

---

[46] Doc. No. 71 at 18.

[47] Doc. No. 29 at 2.

[48] To the extent the Receivership Order penalizes Barton, the Court notes that while defendants generally should not be penalized before a finding of liability, the Receivership's primary intended effects are restoring potentially defrauded investors, vindicating the law, and promoting justice. Penalizing Barton is not the Receivership's principal or exclusive purpose. *See SEC v. Philip A. Michael Securities, Inc.*, No. 74 Civ. 2158, 1974 WL 416, at *2 (S.D.N.Y. June 26, 1974) ("[T]he

did not grant a remedy to penalize Barton; it granted a remedy, at least in part, to vindicate the public interest.

Determined to paint himself as a victim, Barton turns to the Receiver, alleging "a liquidation spree" in which "[t]he Receiver seems especially fixated on selling items that are particularly dear to" Barton, including his "personal home."[49] Yet again, the facts tell a completely different story. Far from enabling a malicious "spree," the Court conducted an in-person hearing solely to determine whether to approve the sale of Barton's home.[50] Far from considering the home "particularly dear," the evidence reveals that Barton signed a listing agreement with a realtor to sell the home mere weeks before the Receivership commenced.[51] And far from a cavalier "liquidation," the sale was lucrative and by-the-books, as demonstrated by the Receiver's copious evidence showing that the home was rapidly losing value, that it was among "the least encumbered and most easily salable properties" in a Receivership starved for cash because of Barton's management, and that the Receiver ultimately secured a sales price that exceeded the average estimate of his three independent appraisals.[52] Under these circumstances, liquidation was expedient, not extravagant; it was vital, not vindictive.

---

extraordinary remed[y] of . . . receivership should not be invoked when the *only* effect would be punitive, not remedial." (emphasis added)).

[49] Doc. No. 71 at 18.

[50] *See* Doc. No. 104.

[51] Doc. No. 85 at 8.

[52] *Id.* at 8–9.

The Receivership continues to be the most appropriate and necessary equitable relief given the circumstances of this case. It remains clearly necessary to protect the interests at stake, no less drastic remedy would be adequate, and its benefits far outweigh its burdens. Considering the Fifth Circuit's abuse-of-discretion standard when reviewing a district court's appointment of a receiver, the Court finds that Barton's likelihood of success on the merits of his appeal is extremely low, which weighs heavily against granting a stay.[53]

### B. Irreparable Injury

Barton argues that he will suffer irreparable injury unless the Court grants a stay because the Receivership Order permits the sale of his real property, which is "irreparable harm per se."[54]

Barton is correct that "[t]he deprivation of an interest in real property constitutes irreparable harm,"[55] but he does not provide any examples of real property in the Receivership that he owns personally.[56] And the Court will not rely on hypothetical future harm that might be inflicted should the Receiver opt to sell property Barton prefers not to sell. The Receiver will probably operate Barton's business entities differently than Barton himself would, but that hardly amounts to

---

[53] *Netsphere*, 703 F.3d at 305.

[54] Doc. No. 71 at 20. Barton also argues again that the Receiver is, in his view, incompetent to manage the Receivership, but the Court has already addressed and affirmed the Receiver's ample qualifications.

[55] *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) (cleaned up).

[56] Barton's "personal home," for example, is only part of the Receivership because it was wholly owned by SF Rock Creek, LLC—an entity that was, in turn, controlled by Barton. *See* Doc. No. 76 at 2.

15

the irreparable injury Barton claims. And again, Barton raises fears that the Receiver might share or destroy privileged documents, but he offers no evidence showing that that has actually happened or might happen in the future.

Ultimately, though Barton will likely suffer at least minor inconvenience, frustration, or financial difficulty due to the imposition of the Receivership, the Court intends to fulfill its duty to closely supervise the Receiver's administration of Barton's property as required by law. On the balance, the Court therefore finds that this factor weighs against granting a stay.

### C. Other Parties' Interests and the Public Interest

The third and fourth factors—whether a stay would "substantially injure the other parties interested in the proceeding" and "where the public interest lies"— "merge when the Government is the opposing party."[57] Barton argues that a stay would not harm other interested parties and is in the public's best interest because the SEC spent two years investigating Barton before seeking a receivership, and because "the public interest is best served when the government complies with the law."[58]

Barton does not disclose exactly how the government is breaking the law, so the Court turns to his argument that the length of the SEC's investigation shows that imposing a stay would serve the public interest. Barton fails to connect the dots. Why would a two-year investigation prior to filing suit indicate that nothing could be

---

[57] *Nken*, 556 U.S. at 434, 435 (cleaned up).

[58] Doc. No. 71 at 24.

16

urgent after filing suit? Barton does not explain his thinking, but the SEC offers a compelling counterpoint as to why the opposite is true: "Barton's fraud has now been exposed" and his "house of cards . . . is toppling."[59] Once again, Barton's version fails to account for the fact that time is of the essence.

The Receiver's detailed reports make clear that the Receivership is in dire need of cash. Barton's empire is crumbling; the real estate market is trending downward; ownership disputes are percolating; and bills, taxes, and loans continue to compete for the Receivership's scant assets.[60] Barton continues to obstruct the Receivership at every opportunity, further diverting time and money.[61] All of these factors increasingly jeopardize the ultimate goal of the Receivership: protecting assets to repay investors. Staying the Receivership would grievously harm the public interest because it would unnecessarily and significantly imperil this goal. As the Receiver sums it up, a stay "would result in lost value, uncertainty, and injury to tenants and creditors," and "would have an immensely detrimental impact on the Receiver's work and specifically the Receiver's efforts to maximize value to the Receivership Estate."[62] Barton offers no plausible argument to refute this prediction.

Staying the Receivership is not in the interest of the Receivership, the SEC, the allegedly defrauded investors, or the public. The Court finds that this combined factor weighs heavily against granting a stay.

---

[59] Doc. No. 83 at 14.

[60] *See* Doc. No. 67 at 14–26.

[61] *See, e.g.*, Doc. No. 84 at 14–16.

[62] Doc. No. 84 at 6, 19 (emphasis omitted) (cleaned up).

## IV. Conclusion

The Court continues to believe that the Receivership is equitable, necessary, and just under the circumstances. Having weighed the Fifth Circuit's factors and considered the equities at stake, the Court **DENIES** Barton's motion to stay.

**IT IS SO ORDERED** this 17th day of January, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE