## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (A/K/A MICHAEL FU),<br>STEPHEN T. WALL, | § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and<br>LDG001, LLC, | § § § | |
| *Relief Defendants*. | § | |

### RECEIVER'S SECOND STATUS REPORT (4Q22)

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits the following quarterly status report for the Fourth Quarter of 2022 pursuant to this Court's Order Appointing Receiver [Dkt. 29] (the "Receivership Order" or "RO").

The Receiver previously filed his Initial Status Report [Dkt. 67], covering the period October 18, 2022, through November 17, 2022. This Second Status Report provides an updated summary of the Receivership for the period spanning November 18, 2022, through December 31, 2022. In accordance with the Receivership Order, this Second Status Report also updates and

supplements the summary of Receivership property and initial plan for liquidation of Receivership property contained in the Initial Status Report. As such, the Receiver anticipates that this Report will be longer than most, if not all, subsequent quarterly reports.

Pursuant to the Receivership Order, the Receiver is directed to submit quarterly reports that contain the following information:

A.    A summary of the operations of the Receiver;

B.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

C.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

D.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations."

RO at ¶ 59.

# I.
## SUMMARY OF THE OPERATIONS OF THE RECEIVER AND DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY

As outlined below, substantial work was performed by the Receiver and his team during the Fourth Quarter of 2022. This Section of the Quarterly Status Report includes (A) a summary of the SEC's Allegations and the procedural posture of the case; (B) a summary of the Receiver's

efforts to identify, sell, develop, hold, or otherwise dispose of real estate assets; (C) a summary of the Receiver's efforts to identify, sell, hold, or otherwise dispose of other property; (D) a summary of the Receiver's accountants' efforts, including an update on their forensic accounting; and (E) a summary of other Receivership Activities from the Quarter.  To date, the Receiver's efforts have been more laborious than anticipated in large part because of Defendant Barton's decisions to challenge the Receiver's decisions at virtually every turn (many of these challenges are outlined below).

**A.      Summary of SEC Allegations and Status of Proceedings**

**1.      The SEC's Lawsuit**

On September 23, 2022, the SEC filed its Complaint [Dkt. 1] against Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC (collectively, the "Wall Entities"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall" and together with Barton, Carnegie Development, the Wall Entities, and Fu, the "Defendants").

Among other things, the SEC alleges that between March 2017 and June 2019, Barton "raised approximately $26 million from over 100 investors . . . in unregistered, fraudulent securities offerings related to real-estate investments in Texas."  Compl. ¶ 1.  The SEC further alleges that Barton "partnered with Wall . . . and Fu . . . to offer and sell investment loans issued by" the Wall Entities.  *Id.* ¶ 2.  More specifically, the SEC alleges that Defendants promised that funds raised by the Wall Entities would be used to purchase specific parcels of land at specific prices set forth in the offering materials, those parcels would then be developed by Barton into residential lots, and then Wall would build homes on the lots and sell them.  *Id.* ¶ 3.

While the Wall Entities purportedly promised investors that they would receive their principal back in two years along with annual interest payments, the SEC contends that Defendants misappropriated nearly all of the investor funds and misused them to, among other things:

- pay personal expenses of Barton and his family, including credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies and using funds from a different Wall Entity;

- pay professional fees (such as engineering, surveying, and land development) related to, in most cases, properties unrelated to the offerings; and

- make payments to Wall.

*Id.* ¶¶ 3-5, 35.  In the end, the SEC alleges that the Wall Entities "were left with little or no assets, the projects were not developed, and the investors were never paid back."  *Id.* ¶ 5.

### 2.    The Appointment of the Receiver

On September 26, 2022, the SEC filed a Motion for Appointment of Receiver [Dkt. 6], requesting that United States District Judge Brantley Starr appoint a federal equity receiver over the Wall Entities, Carnegie Development, certain Relief Defendants (DJD Land Partners, LLC and LDG001, LLC) and "[a]ny other entities that Barton directly or indirectly controls, including but not limited to "BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment

Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, the "Receivership Entities"). On October 17, 2022, Barton filed a Response [Dkt. 24] in opposition to the appointment of a Receiver.

On October 18, 2022, the Court entered the Receivership Order [Dkt. 29], which appointed the undersigned, Cortney C. Thomas, to serve as Receiver over the Receivership Entities. On November 17, 2022, Defendant Barton filed a Notice of Appeal [Dkt. 66] concerning the Receivership Order and other orders entered by the Court. As of the date of this filing, that appeal is pending before the Fifth Circuit.

### 3.       Supplementation of the Receivership Order

The Receivership Order states that the Court assumed "exclusive jurisdiction and possession of the assets . . . of . . . "any other entities that Defendant Timothy Barton directly or indirectly controls . . . ." RO ¶ 1. While several entities controlled by Defendant Barton are included in the Receivership Order, the Receiver quickly discovered from a review of formation binders in the Turtle Creek Office that over 100 entities controlled by Defendant Barton had not been specifically listed in the Receivership Order. Because certain banks and lenders had refused to follow the Receivership Order's mandates absent specific identification of certain companies as "Receivership Entities," on November 1, 2022, the Receiver filed a Motion to Supplement Order Appointing Receiver [Dkt. 41], asking the Court to supplement its Order to specifically list each of these entities. Defendant Barton opposed the motion [Dkt. 55], as did his son Maximilien Baron ("Max Barton") [Dkt. 53]. On November 16, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62] (the "First Supplemental Order") as to the vast majority of these entities and directed the Receiver to file supplemental briefing addressing certain Max Barton-related entities.

On November 30, 2023, the Receiver filed his Supplemental Brief in Support of the Motion to Supplement [Dkt. 73], asking the Court to specifically identify the following entities as Receivership Entities because they were controlled by Defendant Barton: Gillespie Villas, LLC; Venus 59, LLC; TRTX Properties, LLC; MXBA, LLC; Titan Investments, LLC; TC Hall, LLC; and Titan 2022 Investment, LLC.  Defendant Barton filed a Response [Dkt. 81] opposed to the requests contained in the supplemental brief.  Max Barton similarly filed a Response [Dkt. 82] the same day opposed to the requested relief.  On December 13, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 88] (the "Second Supplemental Order").

On November 17, 2022, Defendant Barton filed a Notice of Appeal of the First Supplemental Order.  On January 12, 2023, Max Barton filed a Notice of Appeal of the Second Supplemental Order.

### 4. Stay of the SEC Case and Barton's Attempts to Stay the Receivership.

On November 2, 2022, the United States Department of Justice filed an Unopposed Motion to Intervene and to Stay Proceedings, whereby it sought to stay the SEC's civil enforcement lawsuit pending resolution of certain Defendants' criminal proceedings.  On November 16, 2022, the Court entered an Order Granting Motion to Intervene and Stay Proceedings [Dkt. 64], but ordered that "[n]othing in this Order shall preclude the Court-appointed Receiver from performing the duties and obligations, and from exercising the powers and rights, set forth in the Court's Order Appointing Receiver."

On November 28, 2022, Defendant Barton filed a Motion for Stay Pending Appeal [Dkt. 71], asking the Court to stay the Receivership Order and other orders pending resolution of his appeal to the Fifth Circuit.  On December 9, 2022, the Receiver filed a Response [Dkt. 84] in opposition to Barton's motion to stay the receivership, arguing, among other things, that "a stay at

this juncture would have an immense impact on the Receiver's efforts and the preservation of the assets in the Receivership Estate."

On December 28, 2022, Defendant Barton also filed a Motion for Stay Pending Appeal with the Fifth Circuit Court of Appeals, asking the appellate court to stay the Receivership pending resolution of his appeal of the Receivership Order.   The Receiver filed a response opposed to the requested stay on January 5, 2022.

On January 6, 2022, the Fifth Circuit summarily denied Barton's Motion to Stay.   On January 17, 2023, this Court likewise denied Barton's Motion to Stay.

### 5.      Status of Defendants Barton and Fu's Criminal Trial

On September 20, 2022, at the United States Department of Justice's request, a grand jury indicted Defendant Barton for wire fraud, conspiracy to commit wire fraud, and securities fraud. On October 13, 2022, Defendant Fu waived indictment for the sale of unregistered securities and pleaded guilty.

As of the date of this Report, Defendant Barton's criminal trial is set for May 8, 2023. Defendant Fu has requested that his sentencing hearing occur after his potential testimony at Defendant Barton's criminal trial.   While trial is currently set for May 2023, a possibility exists that it will be continued to a later date.   The Receiver will update the status of the criminal proceedings in his next quarterly report, which will be filed on or before April 30, 2023.

### B.      Status of Receiver's Efforts to Sell, Develop, Hold or Otherwise Dispose of Real Estate.

The overwhelming majority of the Receiver's time during the Fourth Quarter of 2022 was dedicated, when not responding to Defendant Barton's filings, to identifying real estate-related assets of the Receivership Entities, reaching out to lenders and other interested parties on each property, determining insurance, utility, tax, and other payments coming due on each of the

properties, identifying and communicating with a host of potential purchasers of each of the properties, identifying brokers and other professionals willing to assist in the initial valuation and eventual sale of these properties, identifying appraisers who will be able to help carry out the mandates of 28 U.S.C. § 2001, and reviewing lien reports and title commitments on the properties.

As originally outlined in the Receiver's Initial Report, without exception the real estate assets held by the Receivership Entities face significant challenges. For one, the vast majority of the assets are heavily leveraged, with some having favorable interest rates and others having abnormally high rates. Additionally, as to the most valuable assets owned by the Receivership Entities (2999 Turtle Creek and the HUD apartments described below), significant legal challenges complicate potential dispositions of such properties and make any recovery uncertain. Finally, given the continued uncertainty of the current economic environment and interest rates moving forward, the overwhelming majority of industry participants with whom the Receiver has spoken continue to advise that attempting to sell certain of the assets described below will likely result in greater values than holding those properties for three or six months or longer.[1]

Based on the information now known by the Receiver, the Receiver believes the following real estate assets may result in a net recovery for the receivership and provides his proposed plan for the fair, reasonable, and efficient disposition of the properties:

**1.      4107 Rock Creek Drive**

As detailed in the Initial Status Report, while reviewing documents at the Turtle Creek Office, the Receiver's team discovered documents indicating loans and insurance payments on a

---

[1] As detailed in prior briefing, while the Receiver has extensive experience litigating commercial real estate transactions, as well as negotiating large commercial and raw land purchase and sale transactions, he has thus far relied heavily upon the advice of a variety of well-respected industry professionals who have been willing to assist the Receiver at no charge to the Receivership Estate. If the Court prefers that the Receiver formally retain and pay these professionals, the Receiver will file a motion seeking approval of engagement agreements for their services.

property located at 4107 Rock Creek Drive in Dallas (the "Rock Creek Property"). Upon further examination, the Receiver determined that this property was owned by SF Rock Creek, LLC, a Receivership Entity controlled by Defendant Barton. *See* Dkt. 41 ¶¶ 6-7. Accordingly, the Rock Creek Property is a Receivership Asset.

The Receiver obtained an initial opinion of value that the property is worth approximately $1.45 million. Because (1) the property was financed with a "house flipping loan" that included a high interest rate (9.99%) and was saddled with continuing obligations to pay utilities, insurance, and taxes, (2) the Receivership faced a general dearth of liquid assets with which to administer its ongoing needs, and (3) the relative ease and efficiency in selling residential properties versus commercial properties, the Receiver listed this property for sale as expeditiously as possible through a respected, independent broker.

After receiving several offers on the property, the Receiver ultimately agreed, subject to Court approval, to sell the Rock Creek Property "AS IS" to the potential purchaser with the highest offer for a total payment price of $1.4 million. In accordance with 28 U.S.C. § 2001 and the Court's Administration Order [Dkt. 63], the Receiver obtained three separate appraisals that resulted in an average appraised value of $1,393,333. The contracted sales price not only exceeded two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b), but exceeded the average appraised value.

On December 2, 2022, the Receiver filed a Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [Dkt. 76], contending that the sale of the Rock Creek Property for $1.4 million was in the best interest of the Receivership. The Court set a hearing to consider approval

of the sale for December 19, 2022. Barton filed a Response in opposition to the Receiver's proposed sale [Dkt. 91].

Shortly before the December 19 hearing, the title company assisting the Receiver with the sale of the Rock Creek Property notified the Receiver that on December 1, 2022—after the Receiver had discussed his efforts to sell the Rock Creek Property in his Initial Status Report and the same day that the Receiver's counsel conferred on the sale of the property—Defendant Barton recorded a lis pendens on the property. Because the title company was unwilling to issue a title policy with the existence of the lis pendens, the Receiver was forced to file an Emergency Motion to Declare Lis Pendens Void [Dkt. 96] on December 16, 2022.

At the December 19 hearing, which started at 10 am and concluded shortly before lunch, the Court found that the sale was in the best interest of the Receivership, giving the Receiver authority to complete the sale at the scheduled December 28 closing. The Court also ordered Barton to pay for the Receiver's fees (totaling $1,200) in seeking to have the lis pendens declared invalid.

However, just hours after the conclusion of the hearing, Defendant Barton reached out to the purchaser (unsolicited and without permission from the Court or the Receiver) to notify the purchaser of past foundation and flooding issues Barton claims to have had with the property. In light of Barton's communication, the purchaser requested an extension of the closing date. On December 21, 2023, Barton also filed an interlocutory appeal of the Order approving the sale. While the Receiver is confident that the Court of Appeals does not have jurisdiction over this appeal and it will be dismissed (the Receiver filed a motion to intervene and motion to dismiss at the Fifth Circuit during the First Quarter of 2023), the title company has been unwilling to issue a title policy until the appeal is concluded.

In the interim, the financial problems that plagued the Rock Creek Property from the outset persist.  Since the initial status report, the Receiver has confirmed that the loan on the Rock Creek Property was not a traditional homeowner's loan.  To the contrary, Defendant Barton agreed that during the term of the Loan, SF Rock Creek would "not occupy any portion of the Mortgaged Property in any manner" and that "persons with a direct or indirect ownership interest in [SF Rock Creek] shall not occupy any portion of the Mortgaged Property in any manner throughout the term of the loan."  Because the sale did not close on December 28, interest continues to accrue daily. While the Receiver has leased the Rock Creek Property to the approved purchaser to salvage (hopefully) the sale when the Fifth Circuit dismisses Barton's appeal of the Rock Creek Order, under the loan documents all rent payments go to the lender.  Finally, while the Receiver negotiated favorable terms regarding penalty interest and a pre-payment penalty that would otherwise be due based upon a December 28 closing, and while the Receiver is optimistic he will be able to reach a similar agreement if he is able to close the approved sale, no guarantees exist that these favorable terms will be part of a delayed closing or subsequent sale.

After payment of the existing loan, associated fees, taxes, closing costs, and broker commissions, the Receiver still anticipates net proceeds flowing into the Receivership Estate. However, given the uncertainty surrounding the closing date, it is impossible for the Receiver to accurately predict the amount of funds that will flow into the Receivership Estate.

### 2. Frisco Gate Property

Receivership Entity FHC Acquisitions, LLC owns approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate Property").  The Receiver has obtained multiple broker's opinions of value for this property that generally estimate the property's value to fall between $8.9MM and $10.8MM.  Through a broker previously retained by Barton, and with Barton's cooperation, a potential purchaser of the Frisco Gate Property

approached the Receiver about selling the Frisco Gate Property for $9,000,000. The parties entered a Letter of Intent on October 31, 2022. Between October 31 and December 13, 2022, the parties negotiated a purchase and sale agreement.

Pursuant to 28 U.S.C. § 2001, the Receiver sought three appraisals on the property—two broker opinions of value and one formal appraisal. The three appraisals value the Property at $9,016,920 - $10,018,800, $8,896,365 - $9,884,850, and $9,000,000, respectively. After receiving the formal appraisal on December 16, 2022, the Receiver and his team prepared a Motion for Appointment of Appraisers, Approval of Appraisals, and a Hearing Regarding Approval of Sale of Frisco Gate Property [Dkt. 110] on December 22, 2022. Barton has since filed a Notice of Non-Opposition [Dkt. 123], and a hearing to approve the sale has been set for January 31, 2023.

Because of certain unanswered questions regarding potential parking commitments on the property, the Receiver and purchaser entered an Addendum to the purchase and sale agreement on January 24, 2023. The Addendum did not materially alter the agreement, but simply (1) extended the Feasibility Period defined in the Agreement by an additional 30 days, (2) extended the closing date in proportion to the Feasibility Period, and (3) made certain Earnest Money nonrefundable if specified conditions are met. Pursuant to the Addendum, the Feasibility Period ends on February 13, 2023, and Closing is set to occur on or before April 14, 2023.

The Receiver continues to believe that this sale is in the best interest of the Receivership because, among other things, it allows the Receiver to accomplish a sale of the property (a) quickly and without a listing process and (b) without having to pay any broker fees (the potential purchaser of the property has agreed to pay its broker separately and outside of the sale proceeds).

After payment of the existing loan (which appears to exceed $3 million), a second investment/loan of approximately $3.5 million, taxes, and closing costs, the Receiver currently

anticipates this sale resulting in net proceeds of approximately $2 million into the Receivership Estate. However, such closing will not occur until mid-April at the earliest, and the parking issue remains unresolved.

### 3.   2999 Turtle Creek

Receivership Entity 2999TC Acquisitions, LLC is or was the owner of the Turtle Creek Office, having purchased the property in or around September of 2019. In connection with this purchase, 2999TC Acquisitions, LLC or its predecessor secured a loan in the amount of $32,500,000. Through protracted litigation in the bankruptcy court—and millions of dollars in payments from the Receivership Entities to the lender, HNGH Turtle Creek, LLC ("HNGH")— the Bankruptcy Court eventually entered an Order on September 28, 2022 that finds, among other things, that HNGH now "owns" the Turtle Creek Office, not 2999TC Acquisitions, LLC. That Order was appealed shortly after it was entered, and the appeal, which is also with this Court, was automatically stayed upon the Receiver's October 18, 2022 appointment.

On November 25, 2022, HNGH filed a Motion to Intervene and to Confirm Ownership of Property Located at 2999 Turtle Creek Boulevard [Dkt. 69]. Among other things, HNGH claims that the Bankruptcy Court's September 28 order confirms that as of May 2022, HNGH owned the Turtle Creek Office. The Receiver filed a Response [Dkt. 94] on December 15, 2022, in which he indicated that he is not opposed to HNGH's request to intervene as a party in interest but is opposed to HNGH's requested confirmation of any ownership interest in 2999 Turtle Creek and HNGH's implicit request to lift the stay of litigation imposed by the Receivership Order to permit resolution of the pending bankruptcy appeal. Defendant Barton also filed a Response [Dkt. 97] opposed to HNGH's request. As of the date of this Report, the motion remains pending.

The Receiver continues to investigate HNGH's claims and to analyze how the Receivership potentially impacts prior agreements, actions, and decisions in the Bankruptcy Court. While the

Receiver's investigation is ongoing, it appears that (1) the Receivership Entities have previously claimed that they paid $43,049,926.00 for the Property ($46,410,625.00 inclusive of closing costs), with the $32,500,000 loan later acquired by HNGH funding a portion of the transaction (meaning an initial outlay of <u>between $10.5 and $13.9 million</u> in capital going into the property from the Receivership Entities); (2) the Receivership Entities have also previously claimed that they paid HNGH "over $8.5 million" in loan paymetns from 2021 onward (the Receiver has seen records that this number may be as low as $6,263,496 in payments); and (3) the Property likely increased in value between September 2019 and October 2022 by approximately $3 million.[2]

Thus, at a minimum, the Receivership Entities, including entities into which investor funds have already been traced, have invested at least $16 million into 2999 Turtle Creek at Barton's direction and perhaps as much as $25 million. If the prior Bankruptcy Orders are allowed to stand, HNGH will receive a windfall at the expense of potentially impacted investors. At the same time, even if the Receiver is ultimately successful in unwinding the determination that HNGH is the owner of the property, substantial amounts will still be due and owing to HNGH under the loan, with interest continuing to accrue daily. Stated differently, if the Property is worth $50 million, but close to $50 million were owed by the Receivership Entities under HNGH's loan, then a sale of the property would still result in limited benefit to the Receivership. The Receiver continues to seek additional opinions of value and appraisals of this property. He also continues to analyze the potential value and cost of pursuing various legal options. In the interim, the Receiver is also communicating with counsel to HNGH to discuss potential paths forward, including a possible

---

[2] The Receiver has seen many appraisals for 2999 Turtle Creek ranging between $35 million and $71.5 million, but it appears the most accurate view of the current value of the property is approximately $50 million.

settlement.  As of the date of this Report, the Receiver is still unable to predict with any degree of certainty what value—if any—will ultimately be recoverable by the Receivership.

### 4.      HUD Apartments

Receivership Entities D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC, are the record owners and HUD borrowers on four separate apartment complexes in Texas and Alabama (collectively, the "HUD Apartments").  Each of these properties is currently encumbered by a HUD loan through Greystone.  Third-Party Pillar Asset Management ("Pillar") contends that for each of these properties, it provided a second loan.  Pillar contends that all four of these loans are convertible loans and that as to the DeSoto, Forney, and Ingleside properties discussed below, it exercised its option to convert the loans from debt to equity prior to the institution of the Receivership, thereby eliminating any ownership position held by the Receivership Entities in those properties.  While the Receiver intends to contest this position and maintain, preserve, and maximize the Receivership Entities' interest in these properties, if Pillar is successful in its challenge, the possibility exists that the Receivership Entities will not obtain any recovery on these properties.

To date, Defendant Barton has suggested in various filings that the sale of one, two, or three of these properties will result in the recovery of sufficient funds to pay a 100% recovery to the Wall investors.  However, as the Receiver has detailed in prior filings and outlines further below, this position not only ignores Pillar's arguments regarding its equity position in the properties, but, even assuming that Pillar's loans are treated as debt, ignores the existing HUD and Pillar debt on the properties.  Barton also ignores the non-Wall creditors who will participate in the Receivership's eventual claims process.  Each of the HUD Apartments is discussed in turn.

### a.      Bellwether Ridge (DeSoto)

Receivership Entity D4DS, LLC is the record owner and HUD borrower on a certain apartment complex located at 841 S. Polk Street in DeSoto, Texas ("Bellwether Ridge").  The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports.  To date, he has received opinions of value ranging between $27.75 million and $29.75 million.  On November 14, 2022, Defendant Barton filed an opinion of value—from an individual who is connected to Barton on other transaction—that estimates the value of Bellwether Ridge to be between $26.7 million and $28.0 million.  [Dkt. 57 at 7].  As of January 13, 2023, the balance on the HUD loan for this property was $17,823,548.47.  As of January 17, 2023, Pillar claims that the balance of its second loan for this property was $3,797,758.95.

Assuming (1) that Pillar will be treated as a lender and not an equity holder and (2) that, for purposes of calculation only, Pillar's claimed second loan amount is accurate, the best-case sale scenario on DeSoto prior to closing costs, broker commissions, and attorneys' fees using Barton's opinion of value would be approximately $5.1 million to $6.4 million.  And, as detailed in prior filings, to maximize this value, a potential purchaser of this asset will desire to assume the current HUD loan and its favorable interest rate.  This assumption process alone is likely to take four months at minimum and very possibly somewhere between six and twelve months.  Because Defendant Barton is designated on the Regulatory Agreement for this property, disposition of this asset will require Defendant Barton's continued cooperation with HUD.

### b.      Parc at Windmill Farms (Forney)

Receivership Entity D4FR, LLC is the record owner and HUD borrower on a certain apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126. The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those

in future status reports.  To date, he has received opinions of value ranging between $52 million and $56 million.  On November 14, 2022, Defendant Barton filed an opinion of value prepared by the same individual as DeSoto that estimates the value of Bellwether Ridge to be between $53.3 million and $56.0 million. [Dkt. 57 at 7].  As of January 13, 2023, the balance on the HUD loan for this property was $35,076,762.98. As of January 17, 2023, Pillar claims that the balance of its second loan for this property was $7,885,547.12.

Assuming once again (1) that Pillar will be treated as a lender and not an equity holder and (2) that, for purposes of calculation only, Pillar's claimed second loan amount is accurate, the best-case sale scenario on Forney prior to closing costs, broker commissions, and attorneys' fees using Barton's opinion of value would be approximately $10.3 million to $13.0 million.  And, again, a potential purchaser will likely want to go through the longer process of assuming the current HUD loan and its favorable interest rate.

### c.      Parc at Ingleside (Corpus Christi area)

Receivership Entity D4IN, LLC is the record owner and HUD borrower on a certain apartment complex located at 2850 Ave. J, Ingleside, TX, 78362.  The property is still in the process of rent stabilization.  The Receiver is gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports.  To date, he has received opinions of value ranging between $28 million and $31.1 million.  As of January 13, 2023, the balance on the HUD loan for this property was $24,790,081.91.  As of January 17, 2023, Pillar claims that the balance of its second loan for this property was $3,759,163.65.

The Receiver has been advised by multiple real estate professionals that the Ingleside property needs additional time for rent stabilization to maximize any value.  While the Receiver believes that Ingleside presents value to the Receivership Estate, at this time it is impossible to predict what that value will be.

### d.   Parc at Opelika (Alabama)

Receivership Entity D4OP, LLC is the record owner and HUD borrower on a certain apartment complex located at 1375 McCoy Street, Opelika, AL 36801.  Construction on Opelika is nearing completion and the rental process has begun.  Endorsement of the HUD loan on the Opelika is not yet complete and cost certification is currently in process.  The Receiver has encountered multiple challenges in this respect, including construction liens that had to be cleared, interest payments that had to be made when draw requests were delayed, and ongoing challenges surrounding the Receiver's lack of access to QuickBooks and the Receivership Entities' digital files (as outlined below).  At this time, there is no guarantee that certification will occur, but the Receiver is still optimistic that it will occur, albeit with potential loan penalty payments.

Similar to Bellwether Ridge, Windmill Farms, and Ingleside, Opelika has both a HUD loan as well as additional funding from Pillar.  As of January 13, 2023, the balance on the HUD loan for this property was $21,878,710.41.  As of January 17, 2023, Pillar claims that the balance of its second loan for this property was $3,189,659.90.  Pillar claims that while it has not yet converted its debt to equity, its convertible loan will allow it to do so in the future.  While the Receiver believes that Opelika presents value to the Receivership Estate, at this time it is impossible to predict what that value will be.

### 5.   Amerigold Suites

Receivership Entity Goldmark Hospitality, LLC is the record owner of an extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites").  While the four apartment complexes discussed above have third-party property managers, the Receivership Entities themselves coordinated with contractors to manage the Amerigold Suites.  As discussed in the initial report, in the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a large number of vacant units and the generally poor

condition of several units.  Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off, and that significant water bills were long overdue, even under a prior negotiated settlement.  The Receiver was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued.  Moreover, but–for the Receivership Order's automatic stay on foreclosure and other lender remedies, the Receiver would have faced considerable challenges from the lender, Texas Brand Bank.

During the Fourth Quarter of 2022, the Receiver and his team were forced to expend considerable effort (1) convincing electrical and water utility companies not to shut off services to the property; (2) securing property and liability insurance despite the history of the property and the Receivership; (3) meeting with the property manager to discuss the ongoing maintenance and repair needs of the property; and (4) analyzing various options to maximize the value of the Amerigold Suites to the Receivership.  In the meantime, interest on the property continues to accrue, significant repairs continue to be needed, property tax and insurance bills remain high, and the Receiver and his team continue to be forced to devote significant attention to this property.

In December 2022, the lender (Texas Brand Bank) sold the note on the Amerigold Suites to a third party.  As of January 30, 2022, the note holder claims that the outstanding balance on the primary loan on Amerigold Suites is $2,543,820.04.  The Receiver is aware of at least one other smaller loan on the property, as well as a few other smaller liabilities.  As discussed below, there is also a personal injury lawsuit involving Amerigold that is currently stayed.  The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports.  To date, he has received opinions of value ranging between $3.5 million and $5.5 million.

The Receiver is currently analyzing the best path towards preserving and maximizing the value of this property, particularly in light of its considerable liabilities.  Significant debt on the property is owed to at least two lenders, but the Receiver anticipates value to the Receivership even after loan payoffs based upon initial estimates of value that he has received.  The Receiver anticipates having additional updates on this property by the time of his next report.

**6.    Venus Development**

Prior to the Receiver's appointment, the Receivership Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development agreement with the City of Venus.  The properties included in this potential development, including the Receivership Entity currently owning the properties is detailed below:

| Project Name | Current Owning Entity | Approximate Address | CAD Geographic ID | Acres |
|---|---|---|---|---|
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00050 | 1 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00051 | 110.9 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00052 | 14.25 |
| Northstar | DJD Land Partners, LLC | 1025 N FM 157, Venus, TX | 126.0857.00030 | 1 |
| Northstar | Lynco Ventures, LLC | 1209 Cr 501, Venus, TX | 126.0358.00070 | 62.8 |
| Northstar | Lynco Ventures, LLC | 11209 Cr 501, Venus TX | 126.0358.00060 | 1 |
| Griffin I | LDG001, LLC | 980 CR 110, Venus, TX | 126.0093.00010 | 150.9 |
| Griffin II | LDG001, LLC | 324 W CR 109, Venus, TX | 126.0758.00100 | 46.9 |

| Griffin House | LDG001, LLC | 940 CR 110 Venus, TX | 126.0093.00009 | 1 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00044 | 17.6 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00039 | 86.9 |
| Berkowitz | Carnegie Development, LLC | 11129 CR 506, Venus, TX | 126.0261.00040 | 1 |
| Berkowitz | Carnegie Development, LLC | 11101 CR 506, Venus, TX | 126.0261.00041 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00042 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00043 | 30 |
| Johnston | Venus 59, LLC | 916 S Fm 157, Venus, TX | 126.0379.00110 | 3.4 |
| Johnston | Venus 59, LLC | 817 CR 214, Venus, TX | 126.0379.00040 | 59 |

At the time of the Receiver's appointment in October 2022, multiple of these properties were in the process of being foreclosed upon by secured lenders. Such efforts were automatically stayed upon entry of the Receivership Order, although the Receiver and his team did have to expend some time avoiding scheduled foreclosure sales post-appointment. Another property (Venus Farms) was intended to be included in the development, but closing on the property never occurred.

During the Fourth Quarter of 2022, the Receiver and his team spent considerable time discussing the Venus Project with the representatives from the City of Venus, consultants who assisted the Receivership Entities with the entitlements process, lenders and secured creditors, and multiple developers who are potentially interested in developing the project. If the development

agreements with the City are finalized, the value of the properties could increase significantly. However, as of the date of this Report, the Receiver is still unable to predict (1) whether the development agreements will ultimately be finalized with the City of Venus and (2) if the development agreements are finalized, what value will ultimately be realized by the Receivership Estate. Each of the properties associated with this development have significant debt (which debt collectively exceeds $11 million). At this time, it is still too early to determine whether the Receiver will be able to recover any value to the Receivership Estate from the Venus Development or, if there is value, what that value will ultimately be.

### 7.      Ridgeview Addition

Receivership Entity Ridgeview Addition, LLC owns approximately 54 platted lots near Bulldog Road in Venus, Texas. The Receiver understands in or around July 2021, Ridgeview Addition entered into a Lot Take-Down Contract whereby it would sell 54 developed lots to an affiliate of Lillian Homes at a price of $61,000 per lot (for a total purchase price of $3,294,000). All lots were not to convey at one time, rather twelve lots would be conveyed at closing, an additional twelve lots would be conveyed 120 days, later, and then three successive transfers of ten lots each would occur at 90 day intervals thereafter. All told, the contract contemplates that the take down of the lots will occur over a thirteen-month period.

The Receiver is aware of one loan on the property (to a Pillar-related entity) and a second loan upon which the Ridgeview Addition is cross-collateralized (to separate Pillar-related entity). Collectively, these loans exceed the value to be realized by the Receivership from any sale. Moreover, the Receiver has learned of significant additional liens on the property that will require release prior to any transfer of the lots. And finally, the City of Venus insists that Defendant Barton agreed to construct a playground at the development as part of the platting promise, but the playground has not yet been constructed. Thus, despite Defendant Barton's prior claim that the

sale of this property will bring in "approximately $265,000 in immediate cash equity into the Receivership," significant challenges and uncertainties with the property make it impossible to predict what amount of funds, if any, will be received by the Receivership and when such transfer will occur.

### 8.    Gillespie Property

Receivership Entity Gillespie Villas, LLC owns a residential property located at 3600 Gillespie Dr. in Dallas, Texas (the "Gillespie Property").   On December 13, 2022, the Court entered its Second Supplemental Order, which, among other things, confirmed that Gillespie Villas LLC is a Receivership Entity.  Max Barton's appeal of the Second Supplemental Order is still pending.  The Receiver is currently in the process of securing opinions of value and eventually appraisal(s) on this property and anticipates providing further updates on the property, including debt owed on the property, in his next status report.

### 9.    Hall Property

Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property").  The Court's December 13, 2022, Second Supplemental Order also clarified that TC Hall, LLC is a Receivership Entity controlled by Defendant Barton.  The Receiver is currently in the process of securing opinions of value and eventually appraisal(s) on this property and anticipates providing further updates on the property, including debt owed on the property, in his next status report.

### 10.    Other Potential Real Estate Assets

As outlined further below and in the Receiver's Motion to Compel (which was filed in January 2023), Defendant Barton has not provided the overwhelming majority of the information required by the Receivership Order.  This includes a list of properties owned by the Receivership Entities.  While the Receiver believes that he has separately identified all properties owned by the

Receivership Entities, it remains possible that (and the Receiver has reason to believe) other properties exist that are owned, either directly or indirectly, by Defendant Barton. The Receiver's investigation is ongoing.

### C.  Other Identified Assets of the Receivership.

Based on the information now known by the Receiver, the Receiver believes the following assets may be additional sources of recovery for the receivership:

Artwork and other Contents of Turtle Creek Office. The Turtle Creek office contains a large bronze casting of Michelangelo's Bacchus. During the early days of the Receivership, the Receiver was told by multiple individuals associated with Barton that more than $100,000 was paid for this sculpture and that an appraisal exists that indicates the sculpture is worth well in excess of that amount. At one point, Defendant Barton and his lawyers suggested that the Receiver should liquidate this sculpture to help pay for administration of the Receivership. However, Heritage Auctions has declined to assist the Receiver in selling this piece of art. A professional art appraiser researched the bronze and estimates that its value at auction would likely be between $2,500 and $3,500.

The Receiver continues to believe that an auction of the contents of the Turtle Creek office will maximize the value of the sales in the most efficient and economical manner. The Receiver and his team have asked (repeatedly) for multiple individuals, including Defendant Barton, his children, and others associated with Barton to provide a list of any personal effects they claim remain housed at the Turtle Creek office. However, to date, the Receiver has received limited responses. It remains impossible to predict the total value that may inure to the Receivership from the sale of the art, furniture, and other contents of the Turtle Creek Office.

Artwork at Rock Creek Residence. As discussed in the Initial Report, upon securing possession of the Rock Creek Residence, the Receiver noticed that there were several holes in the

wall confirming, as he had been told, that artwork had been removed prior to his visit to the residence.  Despite multiple oral and written requests, to date the Receiver still has not received a list of the artwork from the house, nor pictures of the artwork.  However, on November 15, Defendant Barton disclosed, perhaps inadvertently, pictures of some of the artwork that was removed from the walls.  *See* Dkt. 58 at 29, 30, 33, 35.  Additionally, the Receiver has located financial statements indicating that Barton believed the Receivership Entities owned artwork worth approximately $12 million.  As will be detailed in future reports, in January 2023 the Receiver filed a motion to compel Barton to disclose this and other information in accordance with the Receivership Order.  Without additional information regarding these pieces of art and their current location, it is impossible to ascertain the amount of any value to the Receivership Estate.

Contents of Rock Creek Property.  In connection with approving the sale of the Rock Creek Property, the Court ordered that the Receiver move and store personal items belonging to Defendant Barton "before the Property is sold."  Because closing has yet to occur pending Barton's appeal of the sale order, contents of the Rock Creek Property remain on site.  The Receiver is still analyzing whether storage expenses will "cause the personal items to rapidly deteriorate in value when compared to the cost of the storage" and whether to ask the Court for approval to sell these items if Barton is unwilling to pay storage costs to avoid the sale.

Vehicles.  The Receiver has identified multiple vehicles that may have been purchased in whole or in part with money from the Receivership Entities. The Receiver is still determining what ownership interest the Receivership Entities have in these vehicles.

Airplane.  One of the Receivership Entities owns an airplane that is located in Arlington, Texas.  The Receiver has received information indicating a significant loan burdens the plane, as

well as a mechanic's lien and unpaid maintenance bills.  The Receiver has also been told that the plane is not functional and needs extensive work.  The Receiver's investigation of value is ongoing.

Participation Interests.  During the twelve months prior to the appointment of the Receiver (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida. In connection with these sales, the Receivership Entities often (though not always) received millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms, and Winter Haven:

- $800,000 on March 14, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $500,000 on March 14, 2022 to Orchard Farms Village, LLC

- $200,000 on May 6, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $2,000,000 on May 9, 2022 to AVG West, LLC (Winter Haven)

Although the Receiver has not yet obtained all bank accounts and his accountants have not yet performed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC.  A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms.  These few examples alone demonstrate the necessity for the forensic accounting described below.

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC).   The Receiver is currently investigating and analyzing potential value of participation interests related to Killeen and San Antonio properties.   While it is impossible to predict the amount of value these contractual interests will ultimately bring to the Receivership, the Receiver is optimistic that some value will be realized.  The Participation Agreements related to DLP Capital are discussed below.

Ratification of DLP Settlement.  As detailed more fully in the Receiver's Verified Motion to Ratify Agreement with DLP Capital and Other Entities [Dkt. 95], the Receivership Entities sold certain properties in Fort Worth (Orchard Farms and the Mansions at Marine Creek) and Florida (Winter Haven) to DLP Capital in late 2021.   As part of these transactions, the Receivership Entities (1) received several million dollars over a period of months, (2) transferred title to the properties, and (3) as to each of the Fort Worth properties, entered into a Construction Agreement, a Development Agreement, and a Participation Agreement.  On October 18, 2022, the same day that the Receiver was appointed, DLP Capital sent default notices to the Receivership Entities regarding their obligations under the Construction Agreement and Development Agreement.  After a meeting between counsel and protracted settlement negotiations, the Receiver and DLP Capital eventually agreed to a mutual release of claims and a payment of $750,000 from DLP Capital to the Receivership. Although the Receivership Order specifies that the Receiver does not need Court approval for such agreements, the Receiver nevertheless filed the Motion to Ratify the agreement. The Court entered an Order ratifying the DLP agreement [Dkt. 109] over Barton's objection. Barton has filed an interlocutory appeal of this Order.  He has also filed a motion to stay the Court's Order.  As outlined below, the settlement payment has already been received.

Walker Ranch.  On December 8, 2022, the Receiver was notified—for the first time and despite the Receiver's pending Motion to Supplement the Receivership Order and Supplemental Brief setting forth specific evidence that Defendant Barton controlled Titan Investments, LLC—of a contract between Titan Investments, LLC and Byron Walker to purchase the Walker Ranch. The communication did not come from Defendant Barton, any of his attorneys, or any of the Receivership Entities host of former layers and employees.  Instead, it came from Mr. Walker himself, who was attempting to sell the property in order to avoid foreclosure on his property. However, shortly before closing on the sale, Mr. Walker was notified of a lis pendens and lawsuit filed by Max Barton—in violation of the Receivership Order—against Mr. Walker and an affiliated entity to recover certain payments made by Titan Investments and other to Walker during the life of the terminated purchase contract.  Over a period of weeks, the Receiver learned, among other things, that one of the Receivership Entities' former lawyers held the note on the property and was trying to foreclose and that many of the payments included in Titan Investments' lawsuit against Walker were not recoverable.  In order to allow Mr. Walker to close the sale, the Receiver agreed to hold virtually all of Mr. Walker' equity in the sale ($120,000) pending reaching a court-approved settlement with Mr. Walker.   The Receiver is currently awaiting additional documentation from Walker and is optimistic that they will be able to reach agreement.  Any settlement with Walker will be brought to the Court for approval.  The $120,000 in escrowed funds were deposited in the Receivership bank accounts in January of 2023.

Fraudulent Transfer Claims.  Based upon the forensic accounting to be conducted by the Receiver's accountant, the Receiver will evaluate the disposition of investor funds to determine whether he has a valid fraudulent conveyance claim against the recipient of the funds.  The Receiver will also evaluate the potential defenses, whether each transfer of funds was exchanged

in good faith and for reasonably equivalent value, in advance of pursuing these claims. From a cursory review of the Broadview Holdings bank statements, it appears that hundreds of thousands of dollars may have been fraudulently transferred from that account between July and October 2022 alone.

Potential Damages Claims. The Receiver is investigating the role of other persons and entities associated with the Defendants and the Receivership Entities.

Recovery of False Profits. To the extent any investors received monies in excess of their principal investment, the Receiver may seek the return of those "false profits."

**D.    Status of Forensic Accounting and Other Accounting Work.**

The Receiver has taken possession of all documents and computers belonging to the Receivership Entities that are housed in the Turtle Creek office. The Receiver is hopeful that the Quickbooks account will enable his accounting team to avoid the time and expense associated with manually entering transactions from bank statements. However, as of the date of this Report, the Receiver still does not have access to the vast majority of the Receivership Entities' Quickbooks accounts or their Microsoft365 accounts. It is anticipated that the Receiver's accounting firm will begin the forensic accounting during the First Quarter of 2023, depending upon the Receiver's continued efforts to obtain access to the Receivership Entities' accounting files.

The Receiver has retained Ahuja & Clark to prepare the forensic accounting, which when complete should enable the Receiver to trace (1) the amount of funds flowing from each Wall-entity investor into the Receivership Entities and (2) where those investor funds ultimately ended up (*i.e.*, whether they were saved, spent, or transferred to someone else). This forensic accounting is of paramount importance to the Receiver's duties in analyzing claims received from investors, identifying potential targets of fraudulent transfer claims, and determining the amounts owing to the Receivership on account of such claims.

**E.      Other Fourth Quarter 2022 Activities of the Receiver.**

Between November 17, 2022 and December 31, 2022, the Receiver and his attorneys also engaged in the following:

<u>Maintenance of Receivership Website.</u>      During the Fourth Quarter of 2022, the Receiver created a website for the receivership: www.bartonreceivership.com (the "Receivership Website").  The Receivership Website enables the Receiver to quickly, inexpensively, and broadly convey information regarding the Receivership, particularly to potentially impacted investors who live overseas.  The Receiver continues to update the website periodically as the Receivership progresses.  The Receiver will post a copy of this Report on the website and intends to continue posting periodic updates and information and links to any potential sales or auctions of real estate or other property on the Receivership Website.

<u>Attempts to Obtain Information from Defendant Barton.</u>  Pursuant to ¶¶ 8-10 and 18 of the Receivership Order (among other paragraphs), the Receiver continued to insist that Defendant Barton various information for Receivership Entities that had been under his control, including "the identity, location, and estimated value of all Receivership Property," identification of every bank account held by the Receivership Entities, and identification of all Receivership Property. To date, the information provided has been incomplete and sporadic at best.  These delays have in turn severely hampered the speed and efficiency with which the Receiver has been able to identify and secure bank accounts and Receivership assets.  In many instances, requests for information, have simply been ignored.  As will be detailed in the next Quarterly Report, the Receiver filed a Motion to Compel and for sanctions against Defendant Barton during January 2023.

<u>Freeze Letters and Requests for Information.</u>  The Receiver and his attorneys continued to send freeze letters and requests for information to banks, creditors, and others as they became aware of additional persons who conducted business with the Receivership Entities.

Mail.  The Receiver and his team have continued to review the substantial amounts of mail received by the Receivership Entities, both at a UPS Store and from other forwarded addresses.

Other Miscellaneous Activities.  Among other things, the Receiver and his team have also continued (1) securing access to the Receivership Entities' bank records, (2) communicating with interested parties, potential purchasers of assets, litigation counter-parties, former employees, attorneys, creditors, and others and (3) identifying potential third-party claims and other sources of recovery.

## II. AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES, INCLUDING SECOND QUARTER RECEIPTS AND DISBURSEMENTS.

To date, Defendant Barton still has yet to provide a list of the Receivership Entities' bank accounts.  The Receiver and his team have spent considerable effort attempting to identify these accounts, sending letters and copies of the Receivership Order to any banks that the Receiver believes may have ties to the Receivership Entities, and tracking the financial institution's frequently incomplete and inadequate responses.  The challenges of this process have been particularly compounded by the number of entities controlled by Barton.  As of the date of this report, the Receiver's team is still tracking down bank statements and records from banks with whom the Receivership Entities had a relationship.

As first discussed in the Receiver's Initial Report [Dkt. 67], despite (1) the significant properties and ongoing obligations outlined above, (2) the $26 million the SEC alleges were received from the Wall investors between 2017 and 2019, and (3) the sheer volume of payments to Receivership Entities in 2021 and 2022 from certain property sales, very limited funds were found in the Receivership Entities' bank accounts when the Receiver was appointed.  During the initial days of the Receivership, the Receiver opened bank accounts for the Receivership Estate at Veritex Bank in order to administer the receipt and disposition of monies in the receivership.

Additionally, because of the continued operations of the Amerigold Suites, the Receiver continues to maintain accounts at Vista Bank for the sole purpose of that property.

As reflected more fully in the schedule of the Receiver's receipts and disbursements that is attached hereto as Exhibit A,[3] during the Fourth Quarter of 2022, the Receiver deposited $819,171.90 into the Receivership Estate and also received rental income from the Amerigold Suites totaling $108,460.28. Total expenses during the Fourth Quarter of 2022 were $110,594.98.

As of December 31, 2022, the balance held in the receivership bank accounts is $856,537.35.

The beginning balance in the Receivership as of October 18, 2022 was $39,500.15. While frozen funds in certain accounts have since been turned over to the Receivership, as of the date of this Report, certain frozen funds at other banks remain frozen and have not yet been transferred to the Receivership bank accounts at Veritex or Vista for a variety of reasons. These frozen funds include:

| | |
|---|---|
| First Guaranty Bank | $673.96 |
| JP Morgan Chase | $5,773.26[4] |
| Regions Bank | $11.00[5] |

As of December 31, 2022, the only accrued and unpaid administrative expenses are fees and expenses incurred by the Receiver and his professionals for work performed during the Fourth

---

[3] Included in Exhibit A are (1) the Standardized Fund Accounting Report ("SFAR") required by the Court, (2) an itemized list of receipts and disbursements to date in the Receivership accounts at Veritex Bank, and (3) an itemized list of receipts and disbursements to date in the Amerigold Suites accounts at Vista Bank.

[4] Certain other accounts at JP Morgan Chase are in the name of the Receivership Entities but are used by third-party property management companies to manage the multifamily properties discussed below or are used to pay loans on these properties. Certain of these funds may eventually be transferred to the Receivership.

[5] The majority of these funds are attributable to the Amerigold Suites (as that term is defined below) and are needed to continue paying utilities and contractors managing the property.

Quarter.  The Receiver will be filing his fee application for this work on or before February 14, 2023.  As will be detailed in the next Quarterly Report, substantial tax, insurance, and utility payments accrued during the Fourth Quarter of 2022 but were paid in January 2023, after receipt of the DLP settlement funds.

## A.       DESCIPTION OF RECOVERIES FROM FOURTH QUARTER

### 1.       Deposits into Veritex Accounts

The Receiver's deposits between October 18, 2022, and December 31, 2022, were comprised of the following:

<u>Sendera Title</u>.  On October 21, 2022, Sendera Title returned <u>$25,000</u> that had been stored in "an older file" that "never closed and cancelled" related to a potential sale from DJD Land Partners to Wall011.  The Title Company returned the funds.

<u>State Farm</u>.  On November 28, 2022, the Receiver deposited a <u>$4,215.68</u> check from State Farm to Receivership Entity JMJ Development.

<u>Broadview Holdings Account</u>.  On December 7, 2022, Texas Brand Bank transferred the balance of $33,072.22 that had been in the Receivership Account at the time of the Receiver's appointment.[6]

<u>Sanction Award.</u>  On December 22, 2022, Defendant Barton paid the <u>$1,200</u> sanction regarding the invalid lis pendens filed on the Rock Creek Property (discussed above).

<u>DLP Settlement</u>.  As discussed above, on December 28, 2022, DLP made the settlement payment of <u>$750,000.00</u>.

---

[6] Texas Brand Bank insisted on holding these funds until the Receiver agreed to release certain CDs that the bank held as collateral on approximately $4 million worth of loans.  The Receiver is still investigating these loans and the use of the Receivership Entities' use of the loan proceeds.

Rock Creek Rent.  On December 29, 2022, the purchaser of the Rock Creek Property purchaser paid $5,684.00 in rent under the Lease Agreement he signed pending resolution of Defendant Barton's appeal of the Rock Creek sale.  As outlined above, these funds must be delivered to the lender under the applicable loan documents.

### 2.  Deposits into Vista Accounts (Amerigold Suites)

Between October 18, 2022 and December 31, 2022, the Amerigold Suites generated $108,460.28 in rental income.

## B.  DESCIPTION OF DISBURSEMENTS FROM FOURTH QUARTER

Generally speaking, the Receiver attempted to limit disbursements as much as possible during the Fourth Quarter of 2022 in light of the fact that there was limited cash available for operations until the funding of the DLP settlement.  Several deferred payments (*e.g.*, utility payments) will be reflected in the next Quarterly Report.

### 1.  Disbursements from Veritex Accounts

Between October 18, 2022, and December 31, 2022, the Receivership spent $10,764.09 on general Receivership (*i.e.*, non-Amerigold) expenses, comprised of the following:

Rock Creek Property Appraisals. In connection with the sale of the Rock Creek Property, the Receiver obtained three separate appraisals.  During the Fourth Quarter, two of these checks were deposited, costing $850.00 each.

Frisco Property Appraisal.  In connection with the sale of the Frisco Gate Property, the Receiver paid $4,000.00 for a commercial appraisal.

Facilities Audit of 2999 Turtle Creek.  The Receiver spent $700.00 on a facilities audit of the 2999 Turtle Creek to ensure continued operation and winterizing of systems at the Turtle Creek Office.

Artwork and Antiques Appraisal.  While the Receiver obtained multiple informal opinions of value of the contents of the Turtle Creek Office and the Rock Creek Property, he also retained an expert to provide an unbiased opinion of the artwork, antiques, and other furnishings located at the properties at a cost of $375.00.

Insurance Charges.  The Receiver spent a total of $3,834.98 on insurance for the Rock Creek and Gillespie properties during the Quarter.

Utility Fees.  The Receiver paid $133.65 to TXU related to electricity at Rock Creek during the Quarter.

Bank Fees.  The Receiver spent $20.46 collectively on wire transfer fees and account analysis charges during the Quarter.

### 2.     Disbursements from Vista Accounts (Amerigold Suites)

Between October 18, 2022, and December 31, 2022, the Receivership spent $99,830.15 on Amerigold Suites, comprised of the following:

Payments to Property Manager.  During this Quarter, the Receiver paid the property manager at Amerigold a total of $8,221.05.

Maintenance and Cleaning Payments.  During this Quarter, the Receiver paid maintenance, cleaning, and landscape contractors a total of $6,935.00.

Repair Costs.  During this Quarter, the Receiver paid $16,170.00 in repairs.

Utility Payments.  During this Quarter, the Receiver paid $31,991.58 in utility payments for electricity, water, trash, and internet.

Insurance Payments.  During this Quarter, the Receivers paid $33,374.42 in insurance premium payments.

Bank Fees.  During this quarter, the Receiver paid $25.85 in check fees, wire fees, and other miscellaneous bank fees.

Pre-Receivership Expenses.  Expenses incurred prior to October 18 but posting to the Amerigold account after the Receiver's appointment and before the freeze took place include: (1) an unknown mobile transfer of $800.00, (2) another unknown withdrawal transfer of $1,700, (3) a payment to Lowe's of $200.00, and (4) a payment of $200.00 to Home Depot.

Other Miscellaneous Expenses.  During this Quarter, the Receiver also expended $212.25 on PropertyWare software at Amerigold

### III. DEVELOPMENT OF CLAIMS HELD BY
### RECEIVERHSIP ESTATE AND OTHER PENDING LITIGATION.

During the first day of the Receivership, the Receiver and his team interviewed multiple lawyers who officed in the Turtle Creek office who were aware of (and in many respects involved in) dozens of active and closed litigation matters involving the Receivership Entities.  As the Fourth Quarter of 2022 progressed, the Receiver and his team became aware of several additional active litigation matters involving the Receivership Entities and began speaking to counsel for counter-parties.  Pursuant to ¶¶ 34-36 of the Receivership Order, all civil legal proceedings of any nature are stayed until further order of the Receivership Court.

Included below is a list of the active (but stayed) litigation matters of which the Receiver is currently aware.  Given the size of this list, the Receiver anticipates making recommendations on each of these cases on a rolling basis in future reports.

**Wall-Related Litigation**

1.      *Wall Entity Bankruptcies*[7] (Bankr. E.D. Tex.)

---

[7] These cases are styled In re: *WALL007, LLC*, No. 22-41049; *In re: WALL009, LLC*, No. 22-41113; *In re: WALL011, LLC*, No. 22-41114; *In re: WALL010, LLC*, No. 22-41125; *In re: WALL012, LLC*, No. 22-41135; *In re: WALL016, LLC*, No. 22-41136; *In re: WALL017, LLC*, No. 22-41137; *In re: WALL018, LLC*, No. 22-41176; *In re: WALL019, LLC*, No. 22-41177; *In re: Seagoville Farms, LLC*, No. 22-41181.

On August 19, 2022, the Wall Entities and Seagoville Farms, LLC filed voluntary Chapter 11 bankruptcy petitions in the Eastern District of Texas.  Prior to the Receiver's appointment, counsel for the Debtors and the US Trustee's office agreed that the bankruptcy filings should be dismissed.  The Receiver has been told by counsel to the debtors that the purpose of these bankruptcy filings was to identify all investors in the Wall Entities.  Assuming this to be the case, these bankruptcy filings are unnecessary because one of the central purposes of the claims process in the Receivership is to identify investors in the Wall entities.  Moreover, it does not appear that there is any monetary value to be gained by proceeding with those cases.

Accordingly, in the near future, the Receiver will likely concede to the lifting of the stay in the Wall Entities' bankruptcy cases to permit their agreed dismissal.

2. *Sun Yun, Qu Yi, Ma Jinghui, Gao Huaizen v. WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, Platinum Investment Corporation (PIC), JMJ Holdings, LLC*, No. DC-20-04575 (44th District Court, Dallas County, Texas)

Plaintiffs assert they loaned the various Wall Entities a total of $700,000 and claim Defendants defaulted on the loans. The Wall Defendants filed a third-party petition against Haoqiang Fu a/k/a Michael Fu his spouse, Jin Wang, and Silverland Finance, Ltd, and asserted cross claims against Platinum Investment Corporation. On September 13, 2022, the Wall Defendants filed Chapter 11 Bankruptcy.

3. *Rone Engineering Services, Ltd. v. JMJ Development, LLC, WALL017, LLC, WALL009, LLC, and Seagoville Farms, LLC*, No. DC-19-20384 (116th District Court, Dallas County, Texas)

Rone initiated this lawsuit for breach of contract for unpaid services related to engineering work performed on properties owned by Wall007, Wall009, and Seagoville Farms. Rone asserts the work was contracted by JMJ. Wall007 filed bankruptcy in 2020 and on August 6, 2020, the Court administratively closed the case. The case remains inactive.

4.     *JMJAV, LLC v. Michael Fu, Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, Shirley Qing, and Michele Guo*, No. 2020-00720 (281st District Court, Harris County, Texas)

Plaintiff initiated this lawsuit to recover funds in excess of $1 million paid to defendants based on defendants' allegedly fraudulent representations they were Texas realtors. Defendant Shirley Quing was dismissed, and Plaintiff nonsuited claims against defendants Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, and Michele Guo. Case has been abated.

**HNGH Bankruptcy Cases (2999 Turtle Creek)**

5.     *2999TC Acquisitions, LLC*, Chap. 11 Bk, No. 3:21-bk-31954 (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

Receivership Entity 2999TC Acquisitions borrowed $ 32.5M from HNGH to acquire property at 2999 Turtle Creek Blvd for the eventual construction of hotel but was unable to repay the loan. Facing a deed in lieu of foreclosure, 2999TC Acquisitions filed chapter 11 bankruptcy. See discussion above.

6.     *2999TC Acquisitions, LLC v. HNGH*, No. 22-03061-swe (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

Related to 3:21-bk-31954, Plaintiff filed the adversarial proceeding based on breach of contract and a request for declaratory judgment that they are the rightful owner of the disputed property at 2999 Turtle Creek.

7.     *2999 Turtle Creek, LLC v. Timothy Lynch Barton*, No. DC-20-12133 (192nd District Court Dallas County, Texas)

Plaintiff sued Defendant claiming he guaranteed $32.5M loan on 2999 Turtle Creek property and when borrower defaulted, Defendant refused to pay. The parties filed an agreed motion to abate the case based on an order entered in the related bankruptcy case. The court granted

an abatement until March 15, 2022. Shortly after March 15, 2022, Defendant filed a motion to dismiss which is still pending.

## Palisades Litigation (2999 Turtle Creek and Frisco Gate Property)

8.   *In Re: Dallas Real Estate Investors*, No. 21-41488 (US Bk Ct, ND Fort Worth Division)

9.   *In Re: Dallas Real Estate Investors Palisades TC, LLC, Individually and on behalf of Five Star GM, LLC v. Dallas Real Estate Investors, LLC et al.*, Nos. 21-04061, 21-04073 (United States District Court for the Northern District of Texas, Fort Worth Division)

Cases 21-04061 and 21-04073 were adversary proceedings that were consolidated in October 2022 under 21-04061. Palisades invested approximately $4M in 2999 Turtle Creek Acquisition through Five Star MM, and approximately $3.5M in Frisco Gate property through FHC Acquisitions. Palisades alleges the money was a loan intended to be repaid and Defendants defaulted by not repaying. Defendants allege the money was a capital contribution. Parties engaged in settlement talks but could not come to an agreement.

## Hodges Litigation (2999 Turtle Creek)

10.   *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLC, JMJ Development, LLC and Timothy Barton* No. 141-316567-20, (141st District Court Tarrant County, Texas)

In September 2019, Defendant 2999 TC LP, LLC borrowed $4,000,000 from Plaintiffs in connection with property at 2999 Turtle Creek. Timothy Barton, individually, and JMJ Development, LLC guaranteed the loan. According to Plaintiffs, 2999 TC defaulted, and Plaintiffs accelerated the note. Defendants counterclaimed asserting Plaintiffs slip sheeted the loan documents and changed terms. The Court granted Plaintiff's motion for summary judgment and

awarded actual damages of $4.25M, pre and post judgment interest, costs of court, and $111,962 in attorney's fees. The Court also entered an order severing claims not covered by the summary judgment. Defendants appealed, and the case is pending in the Court of Appeals

11.   *In re 2999TC LP, LLC*, Chap. 11 BK , No. 4:20-BK-43204 (US Bk Ct, ND Fort Worth Division)

Related to 141-316567-20. A few months after the related case was filed, 2999 TC, the debtor, filed for Chapter 11 bankruptcy. In September 2022, the bankruptcy trustee filed a motion to dismiss or in the alternative convert to chapter 7, stating that the debtor was not likely to successfully reorganize. Debtor objected and a hearing on the matter was postponed due to the Receiver's stay.

12.   *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLP, JMJ Development, LLC and Timothy Barton*, No. 141-328490-21 (141st District Court, Tarrant County, Texas)

Related to 141-316567-20. This case originated when the Court in the related case entered an order severing claims not covered by the Order granting MSJ in the related case. Defendants appealed, and the case is pending in the Court of Appeals.

13.   *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al*., No. 02-21-00414-CV (Second Court of Appeals, Fort Worth Division)

Appeal from 141-328490-21. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

14.   *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-22-00288-CV (2nd COA, Fort Worth)

Appeal from 141-316567-20. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

**Kirby Litigation (2999 Turtle Creek)**

15.     *Pamela Kirby v. Timothy L. Barton, John McElwee, JMJ Development, LLC, 2999TC Acquisitions, LLC, 2999TC Founders, LLC, 2999TC JMJ, LLC, 2999TC JMJ GM, LLC, 2999 Five Star GM, LLC, Five Star GM, LLC, Five Star MM, LLC, Five Star TC, LLC*, No. 3:22-CV-01447-M (United States District Court for the Northern District of Texas, Dallas Division)

Pursuant to a subscription agreement, in 2019 Ms. Kirby invested $1M with 2999TC Founders, LLC for the purchase and development of 2999 Turtle Creek.  She contends her investment was fraudulently induced, that Barton failed to disclose foreclosure proceedings, and misappropriated her funds which were comingled with the Chinese investor funds.  She contends she is a victim of the crimes Barton has been charged with and requests a judicial determination of that fact so she can claim a tax credit for her loss. For any distributions, she also seeks treatment as an investor rather than a creditor.   The Receiver's counsel has had several lengthy communications with Ms. Kirby's counsel and will continue to seek a fair resolution.

16.     *In Re: 2999FC Finders, LLC* (Bk.), No. 22-40911 (United States Bankruptcy Court for the Eastern District of Texas)

On July 21, 2022, 2999TC Founders filed for voluntary Chapter 11 bankruptcy. On October 7, 2022, debtor Pamela Kirby filed a Motion to Dismiss the Chapter 11 case. In light of the receivership, the Court entered an order Staying Debtor's Pending Motion to Dismiss and All Other Matters.

**Nitya Capital Litigation (2999 Turtle Creek)**

17.     *Nitya Capital, LLC v. 2999TC Acquisitions MZ, LLC*, No. DC-22-09841 (14th District Court, Dallas County, Texas)

Plaintiff made loan to Defendant for approximately $1.5M related to the development of 2999 Turtle Creek. When 2999TC Acquisitions filed for bankruptcy in 3:21-bk-31954, Nitya

asserts this caused an event of default without opportunity to cure and called the loan. Defendant did not pay the loan balance and Nitya filed suit. Defendant has not filed an answer.

## Dowdall Litigation (2999 Turtle Creek)

18.  *John Dowdall v. 2999TC JMJ MGR, LLC and Timothy Barton*, No. DC-22-14770 (193rd District Court, Dallas County, Texas)

Plaintiff initiated suit against the Defendants to recover $2M loaned to JMJ MGR which Barton guaranteed. Plaintiff alleges Defendants failed to make any payments and defaulted on the note. This case was filed October 21, 2022, after the Receiver was appointed, and no answer has been filed.

## Amerigold-Related Litigation

19.  *Serena Badgley, As Next Friend of Bryson Badgley, Minor v. Goldmark Hospitality, LLC*, No. CC-21-02991-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiffs are mother and son who lived at Amerigold Suites owned by Defendant. Son fell from a second story window and was injured when a closed window gave way.

20.  *Stream SPE LTD. v. Goldmark Hospitality by and through its General Partner, TRTX Properties, LLC*, No. 2021-81644 (80th District Court, Harris County, Texas

Plaintiff initiated suit against Defendant based on Defendant's failure to pay for contracted electrical service. Defendant has answered.

## Ridgeview-Related Litigation

21.  *Circle H Contractors, LP, v. La Jolla Construction Management, LLC, and Ridgeview Addition, LLC*, No. DC-C202200522 (18th Dist. Ct. Johnson Cnty., Tex.)

Plaintiff initiated this lawsuit to recover approximately $64,000 in fees owed for work done installing a PVC water main system and fire hydrant assemblies, with related testing, connection of manholes, and sewer services and installation of storm drain system for the Ridgeview Addition project. This lawsuit was filed after the Receiver was appointed, and no answer has been entered.

**Windmill Farms-Related Litigation**

22.  *BGE, Inc. v. JMJ Development, LLC*, No. 471-03497-2020 (471st District Court, Collin County, Texas)

Plaintiff initiated suit against defendant to recover fees owed for surveying and engineering services provided for Windmill Farms Development in Kaufman County, Texas. Defendant contracted with Plaintiff to provide the services and allegedly refused to pay invoices sent by the Plaintiff. An order compelling discovery responses from Defendant was entered August 8, 2022.

**Ramolia Litigation**

23.  *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. DC-19-11030 (191st District Court, Dallas County, Texas)

24.  *JMJ Development, LLC and Timothy Barton v. "David" Dhiraj Ramolia*, No. 05-21-01100-CV (From DC-19-11030, 5th Court of Appeals)

25.  *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. 02-0922 (Appellate Case (to Sup. Ct.) Supreme Court from 5th Court of Appeals)

Defendants each executed a $3M note payable to the Plaintiff in connection with the sale of real property and a settlement agreement in Bankruptcy Case Nos. 17-34255-SGJ-11 and 17-34274-SGJ-11. Defendants counterclaimed asserting that conditions to the note were not completed by the Plaintiff and that the notes were not valid. After considering Plaintiff's motion for summary judgment, the court entered a judgment against each Defendant for $3M plus pre-judgment interest.

Defendants appealed the final judgment entered in DC-19-11030. The Fifth Court of Appeals dismissed the case on the grounds that the appeal was not timely filed. Defendants then appealed to the Texas Supreme Court on October 13, 2022.

26.   *Timothy Barton and JMJ Development, LLC v. A.J. Babaria, Bilal Khaleeq and Dan Morenof*, No. DC-20-17086, (Related case DC-19-11030) (191st District Court, Dallas County, Texas)

Plaintiffs in this case, (defendants in DC-19-11030) severed claims related to defendants from DC-19-11030. Among the claims are violations of ethical obligations related to Khaleeq's role as a former attorney for JMJ, and legal malpractice claims against Morenoff as attorney for JMJ and Barton in the bankruptcy proceeding underlying this case and the related case.

27.   *TRTX Properties, LLC and JMJ Development v. Dhirah "David" Ramolia*, No. 471-00033-2022 (471st District Court, Collin County, Texas)

Tim Barton and JMJ Development allege they entered into an agreement with Defendant and a third party to purchase a piece of land involved in a dispute between the third party and the Defendant. As part of the agreement Defendant was supposed to release his ownership claims to the property, but failed to do so, resulting in Barton and JMJ losing the property. Barton assigned his claims to TRTX, making it a party.

**Lost Creek-Related Litigation**

28.   *The Somerset-Lost Creek Golf Ltd.v. Timothy Barton, LC Aledo TX LLC, WALL010, LLC, JMJ Acquisitions*, No. 096-319595-20 (96th District Court, Tarrant County, Texas)

Defendants hold a $300,000 note secured by a Deed of Trust on a golf course. Plaintiffs initiated the lawsuit to set aside a prior foreclosure by the Wall Defendants while Plaintiff/a Third Party Trust also contemporaneously foreclosed their own senior lien. Plaintiff/Third Party Plaintiff contends they can sell the property free and clear of the Wall Note based on that

foreclosure. Defendants' counterclaims for breach of contract and fraud in connection with real estate are pending. Plaintiffs have made an informal settlement offer and negotiations are proceeding.

## BM318-Related Litigation

29. *BM318, LLC v. Dixon Water Foundation*, No. 4:20-BK-42789 (US Bk Ct, ND Dallas Division)

BM318 purchased a tract of land from Dixon with $2M down and a seller financed note of $33 million held by Dixon. BM318 defaulted on the note, and Dixon recorded a special warranty deed transferring most of the property back to Dixon. BM318 then filed Chapter 11 bankruptcy and the Bankruptcy court confirmed the plan on August 2, 2021.

30. *BM318, LLC v. Dixon Water Foundation*, Adversary No. 4:21-AP-4051, Related to 4:20-BK-42789 (United States Bankruptcy Court, Northern District of Texas, Dallas Division)

After the Court approved the Chapter 11 plan in the related case, Plaintiff filed an adversarial proceeding against Dixon alleging the special warranty deed was a preferential or fraudulent transfer. Plaintiff also filed a lis pendens. Dixon filed a counterclaim requesting that if the Court determines the transfer was void to find that Dixon still has a lien on the property.

31. *BM318, LLC v. Lumar Land Cattle, et al.*, WF AP: 4:21-AP-4051 (United States Bankruptcy Court, Northern District of Texas, Dallas Division, Related to 4:20-BK-42789)

During the pending bankruptcy in the related case, but several months before the adversarial proceeding was filed, Lumar bought a 204 acre tract of land from Dixon. The land later became part of the adversarial proceeding between BM318 and Dixon. Lumar then contracted to sell part of the land and the lis pendens was discovered causing the sale to fall through. After discovering the lis pendens, Lumar sought, and was granted, permission to intervene in the

adversarial proceeding and asserts it was a good faith purchaser and that the lis pendens is an incorrect cloud on its title. Lumar and the Receiver are currently in negotiations regarding a settlement.

**3820 Illinois-Related Litigation**

32.    *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County)

Plaintiff obtained a $500,000 loan from Tamamoi to purchase land located at 3820 E. Illinois Ave. After repeated missed payments and several extensions to the loan, Tamamoi foreclosed on the property. Tamamoi then conveyed the property to 3820 Illinois, LLC. Plaintiff asserts it was a wrongful foreclosure and initiated this lawsuit seeking to set aside the foreclosure. Defendants filed an MSJ shortly before the receivership. The Receiver's counsel have had several conversations with Defendants' counsel and will continue to seek a fair resolution.

33.    *Deshazo Group v. Timothy Barton, JMJ Development*, No. CC-22-04381-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiff sued Defendants in JP court on an unpaid invoice related to a traffic study that was performed for property owned by JMJ Development on Illinois Ave in Dallas. A default was granted. Defendants assert the JP suit was not properly served and appealed the judgment to the county court.

**Other Pending Litigation Matters**

34.    *JMJAV v. Elite Jet*, No. 017-333443-22 (17th District Court, Tarrant County)

Plaintiff initiated this lawsuit asserting that defendants failed to provide reasonable estimates and overcharged Plaintiffs for work done to Plaintiff's Learjet 55. Plaintiff refused to pay for the excess charges and in return defendant refused to release the aircraft, associated log

books, and other documentation pertaining to the aircraft. Defendant filed counterclaims against Plaintiff and Tim Barton, as a third party, based on suit on a sworn account, breach of contract, and unjust enrichment.

35.     *In Re: FM 544 Park Vista, Ltd. and Pavist, LLC*, No. 17-34255-SGJ-11/17-34274-SJG-11 (US Bk Ct, ND Dallas Division); *on appeal*, *JMJ Development, LLC, et al. v. Roger Sefzik, et al.*, No. 3:22-cv-02254-L (N.D. Tex.)

Dispute arose between Tim Barton, JMJ and TRTX, and Debtor FM 544, Debtor Pavist in connection with the ownership and development of certain real property, consisting of approximately 31.159 acres located in Plano, Collin County, Texas. The Court entered a Chapter 11 reorganization plan which became final in September 2018. As part of the plan, the parties agreed to release certain claims and not sue based on those claims. JMJ and TRTX filed a lawsuit against debtors in this case, and others, in violation of the Court's order. In response, the Court entered an injunction and contempt order against JMJ, TRTX, Tim Barton and the responsible attorneys (the "contemnors"). On October 4, 2022 the contemnors filed an appeal, which has been docketed but no other action has been taken.

36.     *Cardno, Inc. v. JMJ Development, LLC, Villita Towers, LLC and Tim Barton*, No. DC-22-10928 (160th District Court Dallas County)

Plaintiff initiated this suit to recover approximately $84,000 in unpaid fees from Defendant related to Plaintiff's work as a structural engineer on the Villita Towers project. Defendants have yet to file an answer.

## IV.  STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process.

## A.   INVESTORS

On November 7, 2022, the Receiver sent letters to approximately 100 investors who had previously been identified as potential investors in Wall Entities.  The letters also included a request for information.  This letter and request for information were also posted to the Receivership Website.  Dozens of the investors have completed the information forms, which the Receiver continues to receive on a daily basis.  Once the Receiver begins the claims process, he anticipates receiving additional information from these investors, other Wall investors, and other creditors.  Through the forensic accounting process, the Receiver will continue to identify and cross-reference potential investors in the Wall Entities.

## B.   OTHER INVESTORS AND CREDITORS

In addition to investors in the Wall Entities, the Receiver has continued the process of identifying other lenders, equity investors, and creditors (both secured and unsecured) of the Receivership Entities.  While the Receiver's efforts to date have focused primarily upon identifying investors and assets, several creditors have already been identified, and the Receiver anticipates receiving creditor claims once a claims process begins.  The Receiver's eventual distribution plan will address the proposed treatment of the various categories of creditors.

## IV.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership remain (1) continuing to secure and maintain the assets of the Receivership, including liquidating assets of the Receivership where necessary to preserve their value; (2) performing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered. Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting very likely will be the best means of determining where investor monies flowed.

**V.**

**<u>RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP</u>**

This is the second report from the Receiver and extensive work still remains. More specifically, the Receiver intends to (1) continue securing, maintaining, and selling assets; recovering fraudulent conveyances; (2) investigate damages claims against third parties; (3) petition the Court to establish an investor and creditor claims process; and, (4) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.

Dated: January 30, 2023

Respectfully submitted,

**RECEIVER CORTNEY C. THOMAS**

By: */s/ Cortney C. Thomas*
      Cortney C. Thomas
       State Bar No. 24075153
       cort@brownfoxlaw.com
      BROWN FOX PLLC
      8111 Preston Road, Suite 300
      Dallas, Texas 75225
      T: (214) 327-5000
      F: (214) 327-5001

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.