# Exhibit A



APPRAISAL REPORT

# VACANT LAND

**TBD Bear Creek Road**
**Parker County, Texas**



Client





**LPA**

December 18, 2020

Angie Peebles
**AgAmerica Lending**
4030 South Pipkin Road
Lakeland, FL 33811



**VACANT LAND**
TBD Bear Creek Road
Parker County, Texas

In accordance with your request and authorization, we have completed an Appraisal Report of the captioned property for the purpose of developing an opinion of the market value of the subject property. It is our intent to comply with 12 CFR, Subpart C - Subsection 34.42(g), Department of the Treasury, Office of the Comptroller of the Currency, as well as the Uniform Standards of Professional Appraisal Practice (USPAP) and FIRREA.

It should be noted that the undersigned have experience in appraising properties considered similar to the subject, in the subject market area, and therefore comply with the Competency Rule as outlined in USPAP.

The following report, plus the Addenda, sets forth our findings and conclusions. Maps, plats and photographs that are considered essential to explain the reasoning followed in making the appraisal have been included and the conclusions are expressed therein. Also, no hazardous materials or waste were noted upon inspection of the subject property. Please refer to the Basic Assumptions and Limiting Conditions section of this report.

USPAP Standards Rule 1-2(h) states that an appraiser must identify the scope of work necessary to complete an assignment. The scope of work is acceptable when it is consistent with: (1) the expectations of participants in the market for the same or similar appraisal services; and (2) what the appraiser's peers' actions would be in performing the same or similar assignment in compliance with USPAP. In the case of the subject property, both of these USPAP criteria have been met.

NOTEWORTHY POINTS

- Subject is a 1,531.75-acre tract of vacant land that is currently under contract, *below market*, for $27,500,658 ($17,954/acre).

- Subject site was recently improved with a Multiple Utility District for a total reported cost of $191,785.

- The Sales Approach was fully developed herein. The omission of the Income Approach and Cost Approach to value is not considered to, in any way, reduce the reliability of the value conclusions herein. The Cost Approach was not considered to be applicable due to the lack of improvements located on the subject site. The Income Approach was not considered to be applicable due to the subject as a non-income producing piece of land.

- **COVID-19 continues to impact the economy and commercial real estate. LPA is working diligently to capture and analyze current market data to reliably quantify impacts on real property values. We are conducting interviews with market participants, as well as relying on available survey data in order to support our conclusions regarding COVID-19.**

The appraisal, subject to the assumptions and limiting conditions as expressed herein and conducted according to the Uniform Standards of Professional Appraisal Practice, led us to develop an opinion of market value as follows:

| VALUE CONCLUSIONS | | | |
|---|---|---|---|
| Status | Interest | Date | Value |
| As Is | Fee Simple | October 30, 2020 | $35,250,000 |

Support and explanation for our value conclusion is explained in detail in the contents of the attached report. It has been a pleasure to assist you, and if we can be of service to you in the future, please let us know.

Lowery Property Advisors, LLC

**MARK LOWERY, MAI, CCIM, MRICS**
*Texas State Certified General Real Estate Appraiser*
Certificate No. TX1334103-G
**mark@lowerypa.com**

**LAUREN BOBALIK**
*Texas State Certified General Real Estate Appraiser*
Certificate No. TX1380865-G
**lauren@lowerypa.com**

**MITCHELL AUSTIN, MAI**
*Texas State Certified General Real Estate Appraiser*
Certificate No. TX1380788-G
**mitchell@lowerypa.com**

**ELLEN HEVENOR**
*Texas State Certified General Real Estate Appraiser*
Certificate No. TX1381048-G
**ellen@lowerypa.com**

# CONTENTS

SALIENT DATA ................................................................................................................................ 1

SUBJECT PHOTOS ......................................................................................................................... 2

INTRODUCTION ............................................................................................................................ 5

SCOPE OF WORK .......................................................................................................................... 6

REGIONAL....................................................................................................................................... 7

NEIGHBORHOOD ....................................................................................................................... 12

DEMOGRAPHICS.......................................................................................................................... 15

COVID-19 ..................................................................................................................................... 18

SITE DESCRIPTION ....................................................................................................................... 28

PROPERTY HISTORY ..................................................................................................................... 36

REAL ESTATE TAXES...................................................................................................................... 39

HIGHEST & BEST USE ................................................................................................................... 40

LAND VALUATION ........................................................................................................................ 42

MARKETING / EXPOSURE TIME .................................................................................................... 52

ASSUMPTIONS & LIMITING CONDITIONS.................................................................................. 53

CERTIFICATION ............................................................................................................................. 55

ADDENDUM................................................................................................................................. 56



# SALIENT DATA

## GENERAL

| | |
|---|---|
| Dates of Valuation | October 30, 2020 "As Is" |
| Date of Inspection | October 30, 2020 |
| Property Rights Appraised | Fee Simple |

## SITE DESCRIPTION

Location: The subject site is located on the south side of Bear Creek Road, just east of Cleburne Highway and west of US Highway 377. There is no physical address associated with the subject property.

Site Description: The overall subject site is comprised of **five (5) adjacent parcels** totaling 1,531.75-acres (66,723,240 SF). Site is irregular in shape with generally level topography. Minimal flood plain is noted. Reader is referred to the *Site Description* for further details.

Legal Description: 1,531.75-acres of James Bradley Survey, Abstract No. 119, J.H. Rean Survey, Abstract No. 1106, -and- T.J. Benderman Survey, Abstract No. 2519, Parker County, Texas.

Zoning: None

## IMPROVEMENTS

General Description: The subject site displays entitlements for a Multiple Utility District.

## HIGHEST & BEST USE

As Vacant: Future residential development



PARKER COUNTY ▪ TEXAS
VACANT LAND

# SUBJECT PHOTOS










PARKER COUNTY ▪ TEXAS
VACANT LAND









## AERIAL



# INTRODUCTION

This is an Appraisal Report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for an Appraisal Report. Supporting documentation concerning the data, reasoning and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated below. The appraiser is not responsible for unauthorized use of this report. Furthermore, as agreed upon with the client prior to the preparation of this appraisal, this is an appraisal as set forth by USPAP.

## TYPE OF VALUE

The value definition employed in this report is *Market Value* as defined in 12 CFR - Part 34.44 (FIRREA), Department of the Treasury, Office of the Comptroller of the Currency.

*Market value* means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in US dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

| | |
|---|---|
| **Intended Use** | The Intended Use of the appraisal report is for a Farmer Mac related loan transaction or servicing action, or in a similar lending-related transaction. |
| **Intended User** | The Intended Users of the appraisal report are **AgAmerica Lending LLC and Farmer Mac** and/or its successors and assigns. |
| **Client** | AgAmerica Lending, LLC |
| **Interest Valued** | Fee Simple |
| **Dates of Valuation** | October 30, 2020 "As Is" |
| **Date of Inspection** | October 30, 2020 |
| **Date of Report** | December 18, 2020 |

# SCOPE OF WORK

The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered and analysis is applied. In preparing this appraisal, the appraisers did the following:

- Inspected the subject property;

- Search the applicable market area for comparable market data. We utilized multiple sources including but not limited to: *Costar, Loopnet*, area brokers, local MLS, as well as our proprietary database.

- Interviewed landowners and local brokers familiar with the subject area and considered their insight of the current market and transactions;

- Obtained information from surrounding counties and area jurisdictions regarding zoning, taxes, property history, flood plain, utilities, etc.

- Developed an opinion of the market value via the Sales Approach. The omission of the Income Approach and Cost Approach to value is not considered to, in any way, reduce the reliability of the value conclusions herein. The Cost Approach was not considered to be applicable due to the lack of improvements located on the subject site. The Income Approach was not considered to be applicable due to the subject as a non-income producing piece of land. The inclusion or exclusion of approaches to value was determined by LPA and not our client.

- To develop the opinion of value, the appraiser performed an appraisal process, as defined by the Uniform Standards of Professional Appraisal Practices.

## Extraordinary Assumptions & Hypothetical Conditions

It is emphasized that per USPAP, "*the use of extraordinary assumptions and or hypothetical conditions may have affected assignment results." These terms are defined as follows:*

**Extraordinary Assumption**, "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." This report is made with the following extraordinary assumption(s):

- **None.**

**Hypothetical Condition**, "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis." This report is made with the following hypothetical condition(s):

- **None**

# REGIONAL

The subject is located within the Dallas/Fort Worth Consolidated Metropolitan Statistical Area (CMSA), otherwise more commonly referred to as the Metroplex. The CMSA is made up of twelve contiguous counties in North Central Texas.



## DEMOGRAPHICS

Based on estimates from Moody's Analytics, the current population of the DFW area is 7,771,100, making it the largest metropolitan area in the South. Based on this estimate, the Dallas–Fort Worth–Arlington metropolitan area gained approximately 223,000 new residents between 2019 and 2020. The Dallas–Fort Worth–Arlington MSA is, by population, the largest metropolitan area in Texas, the largest in the South, the fourth largest in the United States, and the tenth largest in the Americas. The NCTCOG considers 16 counites to be part of the DFW Metroplex. Most of the total growth of the area occurred in the four largest counties, including Dallas, Tarrant, Collin, and Denton. For 2020, the Metroplex is projected to have fourth largest gross metropolitan product (GMP) in the United States with a projected total of $620.6 Billion and is approximately the tenth largest by GMP in the world. For 2019, the median income for a household in the MSA was $68,838 and the average was $95,458. The per capita income for the MSA was $34,068.

## ECONOMICS

### Dallas – Plano – Irving MSA

Dallas-Plano-Irving has up until now been the best performing metro division in terms of job growth among the largest ones in the country. However, it has by no means escaped the coronavirus crisis. Jobless claims, which had averaged less than 3,000 a week in January and February, rose to approximately 49,000 in the last week of March as stay-at-home orders resulted in the closing of most retail businesses. The number of hourly workers currently employed is down by more than one-third. Dallas-Plano-Irving will feel the effects of the crisis but will fare somewhat better than average because of its business service industries. Longer term, the concentration of corporate headquarters, technology businesses and financial services and above-average population growth will contribute to well above-average performance.

### Strengths

- Stable demand for professional services because of many corporate headquarters.
- Well-positioned distribution center for Southwest as international trade grows.
- Favorable migration trends, age structure.

### Weaknesses

- Exposure to volatile high tech, which is sensitive to the business cycle.
- Diminished housing affordability as metro division matures.

| 2015 | 2016 | 2017 | 2018 | 2019 | INDICATORS | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| 310.8 | 325.3 | 337.6 | 356.8 | 377.2 | Gross Metro product (C09$ bil) | 357.4 | 371.3 | 404.7 | 429.9 | 446.0 |
| 5.4 | 4.7 | 3.8 | 5.7 | 5.7 | % change | -5.3 | 3.9 | 9.0 | 6.2 | 3.8 |
| 2,405.1 | 2,495.1 | 2,562.2 | 2,620.2 | 2,693.9 | Total employment (ths) | 2,597.7 | 2,628.0 | 2,761.2 | 2,873.3 | 2,939.5 |
| 4.2 | 3.7 | 2.7 | 2.3 | 2.8 | % change | -3.6 | 1.2 | 5.1 | 4.1 | 2.3 |
| 4.0 | 3.8 | 3.7 | 3.5 | 3.3 | Unemployment rate (%) | 8.0 | 8.4 | 6.3 | 4.7 | 4.3 |
| 5.0 | 4.5 | 6.0 | 6.6 | 5.3 | Personal income growth (%) | 0.7 | 3.7 | 8.3 | 8.2 | 6.6 |
| 62.7 | 65.5 | 68.5 | 71.2 | 72.8 | Median household income ($ ths) | 73.3 | 75.2 | 79.1 | 82.8 | 86.1 |
| 4,709.8 | 4,815.0 | 4,914.3 | 4,996.8 | 5,081.9 | Population (ths) | 5,166.4 | 5,249.6 | 5,330.8 | 5,408.4 | 5,487.3 |
| 2.3 | 2.2 | 2.1 | 1.7 | 1.7 | % change | 1.7 | 1.6 | 1.5 | 1.5 | 1.5 |
| 66.4 | 64.7 | 60.4 | 46.1 | 49.3 | Net Migration (ths) | 45.7 | 41.7 | 39.3 | 35.6 | 36.8 |
| 22,018 | 22,735 | 25,628 | 26,707 | 25,644 | Single-family permits | 22,160 | 26,454 | 29,993 | 29,745 | 28,598 |
| 24,767 | 19,089 | 22,273 | 20,975 | 17,328 | Multifamily permits | 14,809 | 18,246 | 21,064 | 17,813 | 15,342 |
| 202.8 | 223.4 | 247.1 | 265.4 | 277.5 | FHFA house price (1995Q1=100) | 280.4 | 266.0 | 269.4 | 282.2 | 287.7 |

*Moody's Analytics*

PARKER COUNTY • TEXAS
VACANT LAND

## Fort Worth – Arlington MSA

Before the onset of the coronavirus crisis, revised data showed that Fort Worth-Arlington was outperforming the national average in terms of employment growth. Now, however, jobless claims, which had averaged no more than 1,500 a week in January and February, rose to more than 24,000 in the last week of March. The temporary shuttering of retail, transportation, hospitality and other businesses reduced the number of hourly workers currently employed by approximately 40%. The coronavirus crisis will hit the Fort Worth-Arlington air travel and hospitality industries hard, but the metro area will continue to derive support from military aircraft manufacturing. Longer term, after the crisis ends, above-average population growth, a diversified manufacturing base, and lower business costs and costs of living relative to Dallas will help support above-average gains.

### Strengths

- Central Southwest location near Latin America supports distribution industry.
- Low costs of doing business and high housing affordability attract companies from Dallas and elsewhere.

### Weaknesses

- Large military procurement industry makes metro division sensitive to political winds.
- Exposure to motor vehicle and energy industries adds to cyclical volatility.

| 2015 | 2016 | 2017 | 2018 | 2019 | INDICATORS | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| 122.4 | 123.4 | 127.6 | 134.1 | 141.0 | Gross Metro product (C09$ bil) | 133.7 | 138.9 | 151.1 | 160.3 | 166.2 |
| 1.6 | 0.8 | 3.4 | 5.1 | 5.1 | % change | -5.2 | 3.9 | 8.8 | 6.1 | 3.7 |
| 994.5 | 1,008.5 | 1,033.6 | 1,063.2 | 1,090.7 | Total employment (ths) | 1,045.1 | 1,054.0 | 1,098.5 | 1,141.3 | 1,166.8 |
| 1.9 | 1.4 | 2.5 | 2.9 | 2.6 | % change | -4.2 | 0.9 | 4.2 | 3.9 | 2.2 |
| 4.2 | 4.1 | 3.7 | 3.5 | 3.3 | Unemployment rate (%) | 7.9 | 8.3 | 6.3 | 4.8 | 4.4 |
| 1.9 | 0.3 | 6.9 | 6.3 | 5.8 | Personal income growth (%) | 1.6 | 3.5 | 7.0 | 7.1 | 5.9 |
| 60.0 | 62.4 | 64.2 | 65.9 | 66.9 | Median household income ($ ths) | 67.7 | 69.4 | 72.1 | 74.8 | 77.3 |
| 2,396.6 | 2,445.0 | 2,489.6 | 2,528.1 | 2,562.0 | Population (ths) | 2,604.7 | 2,646.8 | 2,688.0 | 2,727.2 | 2,767.2 |
| 2.0 | 2.0 | 1.8 | 1.5 | 1.3 | % change | 1.7 | 1.6 | 1.6 | 1.5 | 1.5 |
| 30.0 | 30.8 | 28.3 | 23.6 | 19.0 | Net Migration (ths) | 26.2 | 24.3 | 23.2 | 21.3 | 22.0 |
| 7,020 | 2,968 | 8,976 | 10,125 | 9,841 | Single-family permits | 8,240 | 10,185 | 11,887 | 11,815 | 11,311 |
| 3,341 | 7,008 | 5,647 | 6,086 | 9,187 | Multifamily permits | 3,608 | 3,560 | 4,357 | 3,899 | 3,472 |
| 185.5 | 202.3 | 223.6 | 243.7 | 257.8 | FHFA house price (1995Q1=100) | 261.4 | 249.2 | 253.3 | 265.9 | 271.3 |

*Moody's Analytics*

## TRANSPORTATION

### Dallas / Fort Worth International Airport



The Dallas/Fort Worth International Airport, located between the cities of Dallas and Fort Worth, is the largest and busiest airport in the state of Texas. DFW is the second largest airport in the country and sixth largest in the world. It is the fourth busiest airport in the world in terms of aircraft movements and the fifteenth busiest airport in the world in terms of passenger traffic. Every major city in the continental U.S. can be reached within four hours. American Airlines, based in Fort Worth, has its headquarters adjacent to DFW Airport. As of January 2020, DFW Airport has service to a total of 260 destinations, including 67 international and 193 domestic destinations with the U.S. In surpassing 200+ total destinations, DFW joined a select group of airports worldwide with that distinction. As of January 2020, the airport has more non-stop domestic destinations than any other airport in the U.S. *In March 2020,* DFW earned the title of Best Large Airport by *Airports Council International,* for the second year in a row.

### Dallas Love Field Airport



Love Field Airport (IATA airport code: DAL) is a city-owned public airport six (6) miles northwest of downtown Dallas, Texas. It was Dallas' main airport until 1974 when Dallas/Fort Worth International Airport (DFW) opened. All Southwest Airlines' flights to and from Dallas go through Love Field, with the airline's corporate headquarters being located close by the airport. Southwest Airlines is the largest carrier in the world in terms of passengers carried. Seven full service fixed base operators (FBOs) provide general aviation service: fuel, maintenance, hangar rentals, and charters. Some also provide meeting rooms, car rentals, limousine service and restaurants. The Love Field Modernization Program (LFMP), a $519 million modernization project, began in early 2009 to construct a new building that would house 20 gates at DAL, as well as a remodeled lobby, an expanded baggage claim area and a new ticketing wing. The newly renovated Love Field Airport re-opened in the Fall of 2014. A new seven story parking garage connected to the existing terminal opened in November 2018. Its capacity is 5,300 cars and cost $208 million to construct.

## The Texas Department of Transportation

 The Dallas-Fort Worth area has thousands of lane-miles of freeways and interstates. The Metroplex has the second largest number of freeway-miles per capita in the nation, behind only the Kansas City Metropolitan Area. Like most major metropolitan areas in Texas, most interstates and freeways have frontage roads where most of the city's businesses are located. these access roads have slip ramps that merge onto the freeways and interstates. North-south Interstates include I-35, which stretches all the way to Minnesota and I-45, which provides easy access to Houston. East-west routes include I-30, which connects DFW to Little Rock, Arkansas, and I-20, which stretches all the way to South Carolina. I-35 splits into I-35E and I-35W from Denton to Hillsboro: I-35W goes through Fort Worth while I-35E goes through Dallas. HOV lanes currently exist along I-35E, I-30, I-635, US 67, and US 75. I-20 bypasses both Dallas and Fort Worth to the south while its loop, I-820, loops around Fort Worth. I-635 splits to the north of I-20 and loops around east and north Dallas, ending at SH 121 north of DFW Airport. I-35E, Loop 12, and Spur 408 ultimately connect to I-20 southwest of Dallas, completing the west bypass loop around Dallas.

## Dallas Area Rapid Transit (DART)

 Dallas Area Rapid Transit (DART), which includes light rail and bus service, features the nation's longest light-rail network and enables easy access to key job centers in Dallas and its suburbs. DART also provides convenient light-rail access to Dallas Fort Worth International Airport and interfaces with the Texas Railway Express (TRE). The TRE is an intercity commuter train that transports passengers between downtown Dallas and Fort Worth, with stops at several "mid-cities" suburbs in between. Fort Worth residents are served by the T, which also connects to the TRE. The Denton County Transportation Authority (DCTA) operates its A-Train, which connects DART riders in Carrollton to five stations ending in Denton. Additional public transportation options in the area include the TEXRail commuter rail line extending from downtown Fort Worth into Terminal B at the Dallas Fort Worth International Airport, which opened in January 2019, and an on-demand ridesharing provided by a partnership between Arlington and Via that launched in December 2017. Via is an on-demand transit system that services the city of Arlington which takes multiple passengers heading in the same direction and books them into a shared vehicle.

## CONCLUSION

While Dallas/Fort Worth Metroplex is being hit hard by the coronavirus crisis, the region is positioned to perform at an above-average performance relative to similar metros in the country. In Dallas, the concentration of corporate headquarters, technology businesses and financial services is projected to keep demand for most types of real estate stable. In Fort Worth, a lower cost of doing business with a diversified manufacturing base will help with recovery after the crisis is over.

# NEIGHBORHOOD

A neighborhood is typically a segment of a community, city or town which is a homogeneous grouping of individuals, buildings or business enterprises within the larger community. A neighborhood has three stages of life and possibly a fourth. They are (1) integration (the development stage), (2) equilibrium (the static stage), (3) disintegration (the declining or decaying stage), and possibly (4) a redevelopment or rejuvenation state or period and continuance of the neighborhood life cycle.



SUBJECT



## LOCATION

Parker County is a county located in the state of Texas. As of the 2010 census, its population was 116,927.  The county seat is Weatherford. The county was created in 1855 and organized the following year. It is named for Isaac Parker, a state legislator who introduced the bill that established the county in 1855.

## ACCESS

Access to the subject neighborhood is considered average due to the presence of the Dallas/Fort Worth freeway system.  The subject is located north of Farm to Market Road 1886.  Farm to Market Road 1886 provides transportation to State Highway 199 to the east which provides excellent transportation east-west to Dallas/Fort Worth. Other primary thoroughfares in the area include Church Road, Flat Rock Road, Silver Creek Road, and Azle Highway.

## UTILITIES

The subject neighborhood is adequately served by all the typical utilities, including water, sewer, electric service, natural gas, private well and septic and public telephone. No shortages of utility service in the developed portions of the neighborhood were reported and lack of utilities has not been detrimental in the development of the area. Major utility companies servicing the neighborhood include the Parker County Special Utility District, and Tri-County Electric.

## NUISANCES & HAZARDS

Nuisances and hazards are limited in the subject neighborhood. Vibration, smoke, smog, odors and intense noise are basically related to vehicular traffic along the major thoroughfares. As in any area, traffic density poses problems ranging from congestion to noise. These problems are not severe and are a natural part of most communities.

PARKER COUNTY ▪ TEXAS
VACANT LAND

## LIFE CYCLE

Each neighborhood has a unique and dynamic quality all its own, given mans' unique imagination, design and development of an area. This quality is described as a "life cycle," which is identified in *The Appraisal of Real Estate* as evolving through the following four stages.

|  |  |
|---|---|
| ***Growth*** | Neighborhood gains public favor and acceptance |
| ***Stability*** | Equilibrium without marked gains or losses |
| ***Decline*** | Diminishing demand |
| ***Revitalization*** | Renewal, modernization and increasing demand |

The subject neighborhood appears to be in the **growth** period of its life cycle. The immediate area is a well-established area within Parker County and is considered to be approximately 40% developed. Properties appear to range in age from new to over 30 years.

## CONCLUSION

The subject neighborhood is located in Parker County, Texas. Demand for virtually all types of real estate in this area has been mostly stable in recent years. The future growth of the neighborhood relies heavily upon the overall strength of the real estate market within the entire North Texas area. The subject property displays good locational attributes in the defined neighborhood and should benefit from any positive economic conditions experienced by the immediate area.

PARKER COUNTY · TEXAS
VACANT LAND



# DEMOGRAPHICS

The following pages summarize data generated by the STDB.

 **Site Map**

TBD Bear Creek Road
76035, Cresson, Texas
Rings: 1, 3, 5 mile radii

Prepared by Esri
Latitude: 32.61814
Longitude: -97.62609







DEMOGRAPHICS

PARKER COUNTY ▪ TEXAS
VACANT LAND



## Demographic and Income Profile

TBD Bear Creek Road
76035, Cresson, Texas
Ring: 3 mile radius

Prepared by Esri
Latitude: 32.61814
Longitude: -97.62609

| Summary | Census 2010 | 2020 | 2025 |
|---|---|---|---|
| Population | 380 | 517 | 569 |
| Households | 133 | 181 | 199 |
| Families | 114 | 154 | 169 |
| Average Household Size | 2.86 | 2.86 | 2.86 |
| Owner Occupied Housing Units | 122 | 170 | 187 |
| Renter Occupied Housing Units | 11 | 11 | 13 |
| Median Age | 40.3 | 40.6 | 42.3 |
| Trends: 2020-2025 Annual Rate | Area | State | National |
| Population | 1.94% | 1.54% | 0.72% |
| Households | 1.91% | 1.51% | 0.72% |
| Families | 1.88% | 1.47% | 0.64% |
| Owner HHs | 1.92% | 1.53% | 0.72% |
| Median Household Income | 0.84% | 1.43% | 1.60% |

| | | 2020 | | 2025 | |
|---|---|---|---|---|---|
| Households by Income | | Number | Percent | Number | Percent |
| <$15,000 | | 9 | 5.0% | 13 | 6.5% |
| $15,000 - $24,999 | | 3 | 1.7% | 3 | 1.5% |
| $25,000 - $34,999 | | 0 | 0.0% | 0 | 0.0% |
| $35,000 - $49,999 | | 2 | 1.1% | 2 | 1.0% |
| $50,000 - $74,999 | | 25 | 13.8% | 26 | 13.1% |
| $75,000 - $99,999 | | 9 | 5.0% | 10 | 5.0% |
| $100,000 - $149,999 | | 39 | 21.5% | 36 | 18.1% |
| $150,000 - $199,999 | | 35 | 19.3% | 36 | 18.1% |
| $200,000+ | | 59 | 32.6% | 73 | 36.7% |
| | | | | | |
| Median Household Income | | $153,557 | | $160,144 | |
| Average Household Income | | $183,962 | | $198,783 | |
| Per Capita Income | | $62,126 | | $67,062 | |

| | Census 2010 | | 2020 | | 2025 | |
|---|---|---|---|---|---|---|
| Population by Age | Number | Percent | Number | Percent | Number | Percent |
| 0 - 4 | 24 | 6.3% | 28 | 5.4% | 30 | 5.3% |
| 5 - 9 | 33 | 8.7% | 35 | 6.8% | 35 | 6.2% |
| 10 - 14 | 37 | 9.7% | 44 | 8.6% | 43 | 7.6% |
| 15 - 19 | 29 | 7.6% | 40 | 7.8% | 41 | 7.2% |
| 20 - 24 | 12 | 3.2% | 25 | 4.9% | 22 | 3.9% |
| 25 - 34 | 27 | 7.1% | 55 | 10.7% | 58 | 10.2% |
| 35 - 44 | 59 | 15.5% | 57 | 11.1% | 73 | 12.9% |
| 45 - 54 | 78 | 20.5% | 77 | 15.0% | 79 | 13.9% |
| 55 - 64 | 48 | 12.6% | 85 | 16.5% | 91 | 16.0% |
| 65 - 74 | 20 | 5.3% | 46 | 8.9% | 62 | 10.9% |
| 75 - 84 | 10 | 2.6% | 16 | 3.1% | 27 | 4.8% |
| 85+ | 3 | 0.8% | 6 | 1.2% | 7 | 1.2% |



LPA 2020.10.146

DEMOGRAPHICS

PARKER COUNTY • TEXAS
VACANT LAND





## Demographic and Income Profile

TBD Bear Creek Road
76035, Cresson, Texas
Ring: 3 mile radius

Prepared by Esri
Latitude: 32.61814
Longitude: -97.62609

### Trends 2020-2025



### Population by Age



### 2020 Household Income







# COVID-19

The COVID-19 pandemic continues to impact the economy and commercial real estate. LPA is working diligently to capture and analyze current market data to reliably quantify impacts on real property values. Outlined below is a timeline of important events in the history of the pandemic, as well as sentiment from leading experts regarding the current condition of commercial real estate and the economy. As the situation evolves, LPA is committed to monitoring current events and how they affect the commercial real estate market.

| | |
|---|---|
| Jan 21 | The first instance of the coronavirus is seen in the U.S. |
| Feb 24 | Dow Jones Industrial Average down 1,031 points, the lowest in 2 years due to concerns about the virus. |
| Mar 11 | The World Health Organization declares COVID-19 a worldwide pandemic. |
| Mar 27 | President Trump signs a $2 trillion economic stimulus bill. |
| Apr 30 | National jobless total reaches around 30 million people, or 18% of the workforce. |
| May 26 | All 50 states have begun some form of reopening procedure. |
| Jun 2 | The Texas Workforce Commission extends its unemployment benefits for an additional 13 weeks. |
| Jun 26 | Gov. Abbott announces a pause in reopening procedures as Texas sees record cases. |
| Jul 1 | State of New Mexico requires all visitors to quarantine for 14 days upon arrival. |
| Jul 30 | The U.S. Department of Commerce announces that the U.S. GDP declined by 33% from the prior year in Q2 2020. |
| Aug 8 | President Trump authorizes an additional $400 in weekly unemployment insurance benefits. |
| Oct 15 | The US sees cases begin to rise again towards a third peak, now concentrated in the Midwest and Mountain West. |
| Oct 20 | New Mexico tightens lockdown regulations after increased hospitalizations, including limiting restaurant capacity to 25%. |
| Nov 4 | The U.S. reports 100,000 new cases, the most since the pandemic began. |
| Dec 2 | A bipartisan group in congress proposes another stimulus bill totaling $908 Billion. |
| Dec 4 | Bureau of Labor Statistics reports a 6.7% unemployment rate in November, only a 0.2% decrease from October |
| Dec 9 | U.S. reports 3,100 deaths from the virus, a new record for a single day. |

## UNEMPLOYMENT

With regards to commercial real estate, employment figures are paramount in predicting trends in the market. The COVID-19 pandemic is strongly affecting the employment status in numerous non-essential and essential industries. As stay-at-home orders began, employment in sectors such as retail and food service sharply declined. The graphs to the right show the weekly number of jobless claims on the national and state level. The number of jobless claims skyrocketed the week of March 21 as the pandemic began. *Christine Cooper*, Managing Director and Senior Economist of the *CoStar Group,* estimated that, at the week of May 3, 2020, "27 million people are out of work today, giving us an unemployment rate of around 17%." At the end of May, the official unemployment rate sat at around 15%. In early June, the Federal Reserve projected that the unemployment rate would likely be elevated for years, reaching normal levels after 2022. As shown in the above graphs, initial unemployment claims have been steadily decreasing since the beginning of July. While the unemployment rate is still very high, it has been decreasing. As of September 4, the Bureau of Labor Statistics report that the U.S. unemployment rate sits at 8.4% after adding 1.4 million jobs in August. The September report reported an overall unemployment rate of 7.9%, while the October report reported a 6.9% rate.  The November report shows a 6.7% unemployment rate, showing slowing job growth.



*Source: Texas Workforce Commission*



*Source: Federal Reserve Bank of St. Louis*

PARKER COUNTY ▪ TEXAS

VACANT LAND

COVID-19 has affected virtually all industries in a negative way. Of the 31 major employment sectors as defined by the *Bureau of Labor Statistics*, 27 set a single-month record for job loss at the onset of the pandemic. Only utilities, telecom, other information sectors and federal government did not shed jobs at a record pace. The only sector that saw an increase was the federal government, as central banks were seeing heightened activity. As mentioned previously, the food service and retail sectors have borne the brunt of the negative effects, but essentially all other sectors have seen significant job loss. The graph below shows the employment change for each of these industries from April-October 2020.

As the months have gone by and the economy has begun to open, virtually all industries have seen job growth since record losses from April. However, per the United States Labor Department, non-farm employment has only increased to about 50% of February levels. While employment reports from May and June indicated a quick national recovery, job growth has been slowing significantly as the end of the year approaches and the cases of the virus continue to rise.



*Source: BLS, Haver Analytics, CoStar Group*

## POLICY RESPONSE

While the foremost consideration is of public health policy, virtually all local, state, and federal governments have enacted some sort of monetary and fiscal policy to ease the burden the virus is putting on economies at all levels.

**Monetary Policy**

The U.S. Federal Reserve has initiated a 'whatever it takes' approach to monetary and banking policy. While many actions have been taken, the most substantial steps have been to decrease interest rates and begin measures of quantitative easing. The Fed has decreased the federal funds rate by 1.5% since March 3. This rate serves as a benchmark for other short- and long-term rates, and is aimed at lowering rates on mortgages, auto and home equity loans. Quantitative Easing refers to the Fed purchasing trillions of dollars in securities in order to restore smooth market functioning so that credit can continue to flow. The Fed initially indicated that it would purchase $500 billion in Treasury Securities as well as $200 billion in mortgage-backed securities, but on March 23, made the purchases open ended. It has also expanded purchasing to include commercial mortgage-backed securities.



**EFFECTIVE FEDERAL FUNDS RATE**

*Source: Federal Reserve Bank of St. Louis*

COVID-19

PARKER COUNTY ▪ TEXAS
VACANT LAND

## Fiscal Policy

The table below shows the extent of stimulus the federal government has enacted thus far, with the most significant being the CARES Act. On March 26, the U.S. Senate passed this approximately $2 trillion coronavirus response bill, which included an estimated $560 billion to individuals by way of stimulus checks and extra unemployment benefits, $377 billion in emergency grants and loan relief for small businesses, $500 billion in employment relief for large corporations, including airlines, and $150 billion to state and local governments in the form of direct aid.

| COVID-19 LEGISLATION | Coronavirus Preparedness and Response Supplemental Appropriations Act *March 4, 2020* | Families First Coronavirus Response Act *March 18, 2020* | Coronavirus Aid, Relief, and Economic Security Act (CARES Act) *March 27, 2020* | Paycheck Protection Program and Health Care Enhancement Act *April 24, 2020* | Health and Economic Omnibus Emergency Solutions Act *Pending in Senate* | Health, Economic Assistance, Liability Protection, Schools Act *Pending in Congress* |
|---|---|---|---|---|---|---|
| Economic Support for Small Businesses | X | X | $377 Billion | $383 Billion | X | $158 Billion |
| Financial Assistance to Large Companies | X | X | $500 Billion* | X | X | X |
| Tax Incentives | X | $105 Billion | $263 Billion | X | X | $200 Billion |
| Health Aid Spending | $8 Billion | $59 Billion | $145 Billion | $100 Billion | X | $111 Billion |
| Payments to Taxpayers | X | X | $292 Billion | X | X | $300 Billion |
| Unemployment Insurance | X | $5 Billion | $268 Billion | X | X | $110 Billion |
| Aid to State, Local, and Terriotorial Governments | X | X | $150 Billion | X | X | X |
| Other | X | $24 Billion | $228 Billion | X | X | $207 Billion |
| **Total Cost** | $8 Billion | $192 Billion | $1,721 Billion | $483 Billion | 2,200 Billion | $1,086 Billion |

*Source: Peter G. Peterson Foundation, Committee for a Responsible Federal Budget*
*\*Reflects authorized spending; deficit impact, and therefore the contribution to the $2,404 billion total cost, is $1 billion.*

As of November 2020, no additional federal stimulus acts have passed since the end of April. While economic recovery looked promising in May, and even into June, rising cases brought the need for more action, especially as the CARES Act expired early August. More proposals have been brought to Congress, including the HEROES Act, which if passed, could add another $2.2 trillion to the economy in the form of another round of stimulus checks to taxpayers, added unemployment benefits, loan forbearance and forgiveness, aid to state and local governments, and aid to essential workers who have continued working during the pandemic. This would be the largest relief package to date. It is noted that this act was written in May and was amended in September from an original $3.4 trillion in total cost. The current exact cost breakdown is currently unknown. Another proposal, the HEALS Act, would total around $1 Trillion in the form of more stimulus checks to taxpayers, extended unemployment benefits, stimulus for schools, liability protection for businesses, and added virus testing. Both acts are awaiting debate and approval in Congress.

## PROPERTY TYPES

The overwhelming consensus in the commercial real estate industry is that different property types have been affected in varying degrees of severity. Below are descriptions of the major property types and how they are specifically feeling the effects of the virus.

### Multi Family

Although the multifamily sector is traditionally seen as a resilient property type, unprecedented levels of unemployment could severely effect rent collection and new leasing. Commercial markets that are tied to heavily affected industries such as tourism and energy are at enhanced risk. Markets with more diversified industry should recover more quickly. It is noted that federal stimulus and increased personal savings have kept vacancy and rent loss minimal. However, as additional unemployment benefits begin to expire, vacancies may increase. As of July 27, national rent collection had slipped to 93%, a 1.7% decrease from the previous month.

As the effects of the virus become clearer, trends in multifamily are starting to be seen. According to John Affleck of CoStar Group, demand for multifamily was higher in Q3 than any time on record. This is likely due to movers wanting to delay moves until after lockdown measures ended. Demand has been focused on suburban markets, as they offer more space at a lower price. Inversely, urban multi-family markets have seen a substantial drop in demand.

### Industrial

The general consensus is that the industrial sector will be one of the least affected property types through the pandemic. While activity and leasing may slow given national and local stay-at-home orders, increased space needs from the e-commerce sector is projected to place upward pressure on the demand for quality industrial space. Exceptions to this will likely include markets dependent on energy, buildings leased to small/non-credit tenants, and buildings located in secondary markets.

## Retail

The retail sector is among the hardest hit property types. While the emergence of e-commerce was already shifting the space needs for producers, the pandemic will likely cause this shift to accelerate even further. While retail centers anchored by grocery stores are the best position to remain afloat, general retail and restaurant tenants are hindered by stay-at-home orders and social distancing guidelines, leaving them unable to pay rent. Regional Malls are seeing the harshest effects, as many have added significant restaurant and entertainment components to drive traffic. Even as reopening procedures began, occupancy restrictions still altered business. However, it had been reported by analysts at the CoStar Group that retail sales had begun to sharply increase in June and July, matching the numbers from the same time in 2017, which was cause for optimism. However, CoStar reports that overall retail sales increased by only 0.6% in August. This is likely because supplemental income from the Cares Act expired at the end of July and consumers decreased spending. Furthermore, retail tenants and restaurant tenants could be in more danger as the winter approaches, as outdoor shopping and dining becomes less feasible.

## Office

Many office landlords and tenants are feeling the effects of COVID-19. As unemployment has increased and economic activity has dropped, demand for office space in the short term has decreased. This weak demand has increased vacancies, put downward pressure on rents, increased concessions, and slowed lease-up of vacant space. While demand will likely increase as the economy recovers, a byproduct of the pandemic may be that if current work-from-home policies prove efficient and productive, a more permanent decrease is likely. This trend continued in Q2 and through Q3, as national leasing velocity totaled less than 80 million SF, which is near the levels experienced in 2009 during the great recession. According to Mike Roessle of the CoStar group, office vacancy totals 11%, the highest rate in 5 years. Another trend is the increase in available sublet space, as many tenants are wanting to downsize. The total space available has increased around $40 million square feet since Q419.

## Hospitality

Hotels remain the hardest-hit property type to date. As travel restrictions have been placed, hotel rooms have been empty. Overall RevPAR was down over 80% from March through April. While the impacts have shown heavily in all classes of lodging, the damage is proportionate. Most current hotel occupancy is coming from the economy class, as those who are travelling are opting to stay at less expensive, limited service hotels. Luxury hotels that rely on group and convention demand have been the most-heavily affected. According to *STR and Tourism Economics*, the U.S. Hotel Industry is projected to report a 50.5% decline in RevPAR in 2020.

## OUTLOOK

As this pandemic is a public health challenge, the recovery of the economy depends heavily on the extent and duration of isolation and social distancing guidelines. In most parts of the country, these guidelines have been eased, but if cases continue to rise, stricter standards may be reinstated. Below are various recovery scenarios for the overall economy.



Source: JLL

The V-Shaped recovery is considered the ideal scenario, with a short period of containment measures and a sharp return to economic growth. However, the more time the virus continues to spread, this scenario seems less likely. The U, W, and L shapes all predict some lasting impacts with slower periods to recovery. As the exact time frame of the virus is unknown, it is impossible to predict how quickly the economy will recover and its more permanent effects. As mentioned previously, real estate is extremely segmented, in both geography and property type, so the shape of recovery will be different across place and type. As mentioned previously, on July 23, the U.S. Bureau of Labor Statistics reported a rise in initial unemployment claims for the first time since reopening began, signaling that an overall V-Shaped recovery of the economy is unlikely.

As the pandemic has continued into the second half of 2020, views on the outlook of the economy and by extension commercial real estate remain unclear. It has proved difficult to have a short-term view when new cases have risen and fallen unpredictably. However, it has been long enough to observe behavior of owners and investors. As Jim Costello, SVP of Real Capital Analytics says "Weirdly, the uncertainty in the economy and outcomes for public health can also move owners to ask for higher prices. Better the devil you know after all, and if you are going to ask me to part with a property where I know the challenges, you will need to pay dearly. As a result of this impasse, U.S. deal activity was down 68% from a year earlier in Q2'20." Decline in deal volume was certainly expected, but the divide between investors wanting lower prices due to uncertainty and property owners raising their prices given their knowledge of the asset is interesting.  While this observation is certainly valuable to decision-makers and analysts, the overall outlook of the economy is still unknown, as measures designed to contain losses at some point have to end.

RECOVERY

As the pandemic progressed through Q2 and Q3, more data was beginning to be available to see the progress of recovery. According to economists at the CoStar group, the U.S. GDP declined 34% in Q2 but rebounded 35% in Q3. While this signifies a strong recovery, this does not tell the whole story. As mentioned previously, the U.S. has only recovered about half (11.5 million) of the jobs lost after the initial 22 million loss suffered at the initial onset of the pandemic. While most saw these job losses as temporary, permanent job losses are now outpacing furloughs. Additionally, permanent job losses are now rising faster than either of the past two recessions. At this rate, employment is not expected to return to pre-pandemic levels until the end of 2022. The biggest threats to overall recovery are surging cases and lack of additional  fiscal support from governments. While the economy is growing, the pace of recovery is likely to be slow and protracted like that of the Great Recession.



Source: Esri ArcGis, Texas Department of State Health Services, New Mexico Dept. of Health

The chart above shows the mortality rate as percentage of the total cases while comparing Texas, New Mexico and the United States as a whole. While cases had been rising since early June, the death rate had been steadily decreasing. Some attribute this to cases being concentrated in younger age groups, while others say an increase in testing is finding mild cases earlier.  After a period of steady to declining cases in August and September, new cases have started rising towards a third peak. Even so, as of the middle of September and into December, mortality rates in the U.S., Texas and New Mexico have been steady to decreasing, signaling that the current version of the virus may be less severe and/or that care is improving.

## CONCLUSION

The COVID-19 pandemic is unprecedented, and therefore ever changing. The commercial real estate industry has responded in various ways. In many of the heavily affected sectors, rent relief has requested and deals are being put on hold. The overwhelming sentiment is that market participants are taking a 'wait and see' approach regarding their next steps. As mentioned previously, LPA is working diligently to capture and analyze current market data to reliably quantify impacts on real property values, national as well as regional. As the situation evolves, LPA is committed to monitoring current events and how they affect the commercial real estate market.

# SITE DESCRIPTION

## PHYSICAL CHARACTERISTICS

### Location

The subject site is located on the south side of Bear Creek Road, just east of Cleburne Highway and west of US Highway 377. There is no physical address associated with the subject property.

### Legal Description

1,531.75-acres of James Bradley Survey, Abstract No. 119, J.H. Rean Survey, Abstract No. 1106, -and- T.J. Benderman Survey, Abstract No. 2519, Parker County, Texas.

### Size / Configuration / Flood Zone

The overall subject site is comprised of **five (5) adjacent parcels** totaling 1,531.75-acres (66,723,240 SF). Site is irregular in shape with generally level topography**.** According to the immediate flood map, some flood plain is noted on the northwest corner and southern side of the subject site.

### Frontage / Accessibility

The subject's site displays adequate frontage to support the subject improvements. The subject site is considered to possess ample access to the subject's traffic carrier which is a secondary traffic carrier for the area and is in good overall condition.

### Utilities

Water service and sewer are provided by the local municipalities. According to city officials, these utilities are sufficient for development in the area. In addition, the city provides fire and police protection along with garbage pick-up. Electrical and natural gas are provided by the region's typical providers. At the present time, all utilities appear to be sufficient for area development patterns.

### Soils

The site's soil appears such that its load-bearing capacity does not restrict the construction of ordinary structural improvements. No evidence to the contrary was noted during our physical inspection of the site.

## LEGAL CHARACTERISTICS

### Zoning / Restrictions

As mentioned previously, the subject site is not situated within the city limits and does not have a zoning designation.

### Easements / Encroachments

The subject site is encumbered by typical utility easements. Due to the general location of these easements, they are not considered detrimental toward development and/or the site's overall marketability. No other detrimental easements and/or encroachments were noted upon physical inspection of the subject tract. It should be noted, however, that if a current survey map, or a registered surveyor determines that adverse easements exist, these factors might impact the market value and/or the marketability of the subject property. Therefore, it is assumed that no easements and/or encroachments exist, which would adversely affect the marketability or desirability of the site. *It is specifically noted that the subject site displays a right-of-way agreement on the western side of the tract, a pipeline easement agreement running north to south through the middle of the tract, and surface site and access easements on the north and south sides of the tract.*

## CONCLUSION

Given the physical characteristics, the subject site is capable of being developed with numerous residential uses.

SITE DESCRIPTION

PARKER COUNTY ▪ TEXAS
VACANT LAND

## AERIAL



SUBJECT

SITE DESCRIPTION

## PLAT MAP



PARKER COUNTY • TEXAS
VACANT LAND

SURVEY



SITE DESCRIPTION

InterFlood by a la mode

Prepared for: Lowery Property Advisors, LLC

**MAP DATA**

FEMA Special Flood Hazard Area: **No**
Map Number: **48367C0450E**
Zone: **X**
Map Date: **September 26, 2008**
FIPS: **48367**

**MAP LEGEND**

Powered by CoreLogic®

Areas inundated by 500-year flooding    Protected Areas

Areas inundated by 100-year flooding    Floodway

Velocity Hazard    Subject Area

*Northern side of subject site.*



SITE DESCRIPTION

PARKER COUNTY ▪ TEXAS
VACANT LAND



**InterFlood** by a la mode

Prepared for: Lowery Property Advisors, LLC
**TBD Bear Creek Road**

300 yards

Google                  Map data ©2020 Imagery ©2020 Maxar Technologies, U.S. Geological Survey, USDA Farm Service Agency

Powered by CoreLogic®

**MAP DATA**

FEMA Special Flood Hazard Area: **No**
Map Number: **48367C0575E**
Zone: **X**
Map Date: **September 26, 2008**
FIPS: **48367**

**MAP LEGEND**

| | | |
|---|---|---|
| 🟨 | Areas inundated by 500-year flooding | 🟥 Protected Areas |
| 🟦 | Areas inundated by 100-year flooding | ▨ Floodway |
| 🟩 | Velocity Hazard | ⭕ Subject Area |

*Middle of subject site.*

InterFlood by a la mode

Prepared for: Lowery Property Advisors, LLC

300 yards

Google

Map data ©2020 Imagery ©2020 Maxar Technologies, USDA Farm Service Agency

**MAP DATA**

FEMA Special Flood Hazard Area: **No**
Map Number: **48367C0550F**
Zone: **X**
Map Date: **April 05, 2019**
FIPS: **48367**

**MAP LEGEND**

Powered by CoreLogic®

Areas inundated by 500-year flooding

Areas inundated by 100-year flooding

Velocity Hazard

Protected Areas

Floodway

Subject Area

*Southern side of subject site.*



# PROPERTY HISTORY

The subject site is currently vested in *The Dixon Water Foundation,* as evidenced by county records. The subject site was acquired on July 2, 2020 from *BM318, LLC* for no monetary consideration. *BM318, LLC* acquired the subject site from *Dixon Foundation* on November 28, 2018 as part of a larger overall acquisition for an overall purchase price of $34,946,900 ($17,000/acre). This purchase price was generally in-line with market at the time of sale. It is further noted that the transaction was financed by the seller. After *BM318, LLC* acquired the subject property, they reportedly invested $3,297,016 in various hard and soft costs, inclusive of development fees, engineering and survey costs, and costs to develop a Multiple Utility District on the subject property. Reader is referred to the *Addendum* for further detail. No other real property sales transactions related to the subject have occurred in the three years prior to the date of this report.

The subject site is currently under contract to *JMJ Development, LLC* for $27,500,658 ($17,954/acre). This purchase price is considered to be *below market* as the purchase price is not inclusive of any of the previously mentioned costs invested to date by the pending buyer. It is noted that *JMJ Development, LLC* and *BM318, LLC* are related entities. Per conversation with the pending buyer, the purchase price was based on the original loan principal amount from the seller, as well as accrued interest from the November 2018 transaction.

Per conversation with the pending buyer, the subject site will reportedly be developed into an outdoor recreation area.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Property Year 2020** Tax Summary Map/Gis | | | | | | | Information Updated 11/16/2020 |
| Property ID: R000036340  Geo ID: 20119.002.000.00 | | | | | | < Previous Property | 1 / 5  Next Property > |

**Property Details**

| Ownership | Available Actions |
|---|---|
| THE DIXON WATER FOUNDATION | |
| P O BOX 177 MARFA, TX 79843 | |
| Ownership Interest: 1.0000000 | |
| Map Number: L-20 | |

Qualified Exemptions
Not Applicable

Legal Information
Legal: Acres: 83.505, Abst: 119, Survey: BRADLEY JAMES
Situs: Not Applicable

**Property Valuation History**

| Values by Year | | 2020 | 2019 | 2018 | 2017 | 2016 | n/a |
|---|---|---|---|---|---|---|---|
| Improvements | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Land | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Production Market | + | $1,419,590 | $1,419,590 | $584,540 | $584,540 | $584,540 | $0 |
| Personal | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Mineral | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Market | = | $1,419,590 | $1,419,590 | $584,540 | $584,540 | $584,540 | $0 |
| Agricultural Loss | - | $1,415,750 | $1,415,750 | $580,280 | $580,280 | $580,110 | $0 |
| Homestead Cap Loss | - | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Assessed | = | $3,840 | $3,840 | $4,260 | $4,260 | $4,430 | $0 |

PROPERTY HISTORY



**Property Year 2020**    Tax Summary    Map/Gis                                    Information Updated 11/16/2020
Property ID:  R000036342   Geo ID:  20119.003.001.00                             < Previous Property   2 / 5   Next Property >

### Property Details

**Ownership**                                                    **Available Actions**

THE DIXON WATER FOUNDATION

P O BOX 177
MARFA, TX 79843

Ownership Interest: 1.0000000

Map Number: L-20

**Qualified Exemptions**

Not Applicable

**Legal Information**

Legal: Acres: 26.050, Abst: 119, Survey: BRADLEY JAMES

Situs: Not Applicable

### Property Valuation History

| Values by Year | | 2020 | 2019 | 2018 | 2017 | 2016 | n/a |
|---|---|---|---|---|---|---|---|
| Improvements | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Land | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Production Market | + | $442,850 | $850,000 | $350,000 | $350,000 | $350,000 | $0 |
| Personal | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Mineral | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Market | = | $442,850 | $850,000 | $350,000 | $350,000 | $350,000 | $0 |
| Agricultural Loss | - | $441,650 | $847,700 | $347,450 | $347,450 | $347,350 | $0 |
| Homestead Cap Loss | - | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Assessed | = | $1,200 | $2,300 | $2,550 | $2,550 | $2,650 | $0 |

**Property Year 2020**    Tax Summary    Map/Gis                                    Information Updated 11/16/2020
Property ID:  R000050460   Geo ID:  21106.001.000.00                             < Previous Property   3 / 5   Next Property >

### Property Details

**Ownership**                                                    **Available Actions**

THE DIXON WATER FOUNDATION

P O BOX 177
MARFA, TX 79843

Ownership Interest: 1.0000000

Map Number: L-21

**Qualified Exemptions**

Not Applicable

**Legal Information**

Legal: Acres: 449.915, Abst: 1106, Survey: REAN J H

Situs: Not Applicable

### Property Valuation History

| Values by Year | | 2020 | 2019 | 2018 | 2017 | 2016 | n/a |
|---|---|---|---|---|---|---|---|
| Improvements | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Land | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Production Market | + | $7,648,560 | $7,648,560 | $4,745,000 | $4,745,000 | $4,816,700 | $0 |
| Personal | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Mineral | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Market | = | $7,648,560 | $7,648,560 | $4,745,000 | $4,745,000 | $4,816,700 | $0 |
| Agricultural Loss | - | $7,627,860 | $7,627,860 | $4,710,430 | $4,710,430 | $4,780,230 | $0 |
| Homestead Cap Loss | - | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Assessed | = | $20,700 | $20,700 | $34,570 | $34,570 | $36,470 | $0 |

LPA 2020.10.146

PROPERTY HISTORY

PARKER COUNTY • TEXAS
VACANT LAND



| Property Year 2020    Tax Summary    Map/Gis | | | | | | Information Updated 11/16/2020 |
| --- | --- | --- | --- | --- | --- | --- |
| Property ID: R000050462   Geo ID: 21106.002.000.50 | | | | | | < Previous Property  4 / 5  Next Property > |

**Property Details**

Ownership

Available Actions

THE DIXON WATER FOUNDATION

P O BOX 177
MARFA, TX 79843

Ownership Interest: 1.0000000

Map Number: L-21

Qualified Exemptions

Not Applicable

Legal Information

Legal: Acres: 757.000, Abst: 1106, Survey: REAN J H, TR:, BLK:, SURV: J. H. REAN

Situs: Not Applicable

**Property Valuation History**

| Values by Year | | 2020 | 2019 | 2018 | 2017 | 2016 | n/a |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Improvements | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Land | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Production Market | + | $12,869,000 | $12,869,000 | $5,299,000 | $5,299,000 | $5,299,000 | $0 |
| Personal | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Mineral | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Market | = | $12,869,000 | $12,869,000 | $5,299,000 | $5,299,000 | $5,299,000 | $0 |
| Agricultural Loss | - | $12,834,180 | $12,834,180 | $5,260,390 | $5,260,390 | $5,258,880 | $0 |
| Homestead Cap Loss | - | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Assessed | = | $34,820 | $34,820 | $38,610 | $38,610 | $40,120 | $0 |

| Property Year 2020    Tax Summary    Map/Gis | | | | | | Information Updated 11/16/2020 |
| --- | --- | --- | --- | --- | --- | --- |
| Property ID: R000067097   Geo ID: 22519.001.000.00 | | | | | | < Previous Property  5 / 5  Next Property > |

**Property Details**

Ownership

Available Actions

THE DIXON WATER FOUNDATION

P O BOX 177
MARFA, TX 79843

Ownership Interest: 1.0000000

Map Number: L-22

Qualified Exemptions

Not Applicable

Legal Information

Legal: Acres: 215.280, Abst: 2519, Survey: BENDERMAN T J, TR:, BLK:, SURV: T J BENDERMAN

Situs: Not Applicable

**Property Valuation History**

| Values by Year | | 2020 | 2019 | 2018 | 2017 | 2016 | n/a |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Improvements | + | $68,940 | $68,940 | $0 | $0 | $0 | $0 |
| Land | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Production Market | + | $3,659,760 | $3,659,760 | $1,506,960 | $1,506,960 | $1,506,960 | $0 |
| Personal | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Mineral | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Market | = | $3,728,700 | $3,728,700 | $1,506,960 | $1,506,960 | $1,506,960 | $0 |
| Agricultural Loss | - | $3,649,860 | $3,649,860 | $1,495,980 | $1,495,980 | $1,495,550 | $0 |
| Homestead Cap Loss | - | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Assessed | = | $78,840 | $78,840 | $10,980 | $10,980 | $11,410 | $0 |

# REAL ESTATE TAXES

The subject property is located in Parker County, Texas and is taxed based on values established by the county tax assessors. The tax rates are applied to the assessed value of the subject property, and the taxes for the subject property are then estimated. The taxes are estimated per $100 of assessed value. This property is subject to taxes for Aledo Independent School District and Parker County.

The subject displays an assessment of $26,108,700. It is noted the tract displays a $25,969,300 agricultural exemption, as well as a $68,940 assessment for the existing improvements, bringing the assessment down to $70,460. It is noted the agricultural exemption will be removed going forward given the development of the lots. *It is further noted that 109.555-acres are subject to taxes for Emergency Services D, 1,206.915-acres are subject to taxes for Emergency Services D and Emergency Services #6, and 215.280-acres are subject to taxes for Emergency Services #6. The pro-rated taxable amounts are indicated below.*

| PROPERTY TAX CALCULATION - Emergency Services D | | | |
|---|---|---|---|
| Account #: R000036340 & R000036342 | | | |
| Authority | Assessed Value | Rate / $100 | Tax Liability |
| City | $5,040 | $0.0000000 | $0 |
| County | $5,040 | $0.6913771 | $35 |
| School | $5,040 | $1.4797000 | $75 |
| | | $2.1710771 | $110 |

| PROPERTY TAX CALCULATION - Emergency Services D & #6 | | | |
|---|---|---|---|
| Account #: R000050460 & R000050462 | | | |
| Authority | Assessed Value | Rate / $100 | Tax Liability |
| City | $55,520 | $0.0000000 | $0 |
| County | $55,520 | $0.7863771 | $437 |
| School | $55,520 | $1.4797000 | $822 |
| | | $2.2660771 | $1,259 |

| PROPERTY TAX CALCULATION - Emergency Services #6 | | | |
|---|---|---|---|
| Account #: R000067097 | | | |
| Authority | Assessed Value | Rate / $100 | Tax Liability |
| City | $9,900 | $0.0000000 | $0 |
| County | $9,900 | $0.6863771 | $68 |
| School | $9,900 | $1.4797000 | $146 |
| | | $2.1660771 | $214 |

# HIGHEST & BEST USE

The Appraisal Institute defines highest and best use as follows: "The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."

The four criteria the highest and best use must meet are:

| PHYSICALLY POSSIBLE | LEGALLY PERMISSIBLE |
|---|---|
| 1 — What uses of the site in question are physically possible? | 2 — What uses are permitted by zoning and deed restrictions? |
| **FINANCIALLY FEASIBLE** | **MAXIMALLY PRODUCTIVE** |
| 3 — Which possible and permissible uses will produce a net return to the owner of the site? | 4 — Among the financially feasible uses that are physically possible and legally permissible, which use will produce the highest net return or the highest present worth? |

There are two types of highest and best use studies. The first is the highest and best use of the land or site as though vacant. The second is the highest and best use of the property as improved. The highest and best use of land or a site as though vacant assumes that the parcel is vacant or can be made vacant by demolishing any improvements. The question to be answered in this analysis is: If the land is, or were vacant, what use should be made of it?

The highest and best use of a property as improved pertains to the use that should be made of an improved property in light of its improvements. Should it be maintained as it is, or be renovated, expanded, demolished, or partly demolished? Should it be replaced with a different type or intensity of use, or should it be held as an interim use? The improvements should be retained as long as they have some value and the return from the property exceeds the return that would be realized by a new use, after deducting the costs of demolishing the old building and constructing a new one.

## HIGHEST & BEST USE - AS VACANT

### Physically Possible

The overall subject site is 1,531.75-acres (66,723,240 SF). There is no physical address associated with the subject site. Accessibility to the site is via curb cuts along the traffic carrier. Overall, access is considered average. The property will have necessary utilities installed and is relatively level in regards to topography. The site is primarily surrounded by residential uses. Access to the subject's neighborhood is considered good due to its location near area primary traffic carriers.

The principle of conformity is an important consideration in determining the physically possible uses of a site. Conformity is the appraisal principle that holds that real property value is created and sustained when the characteristics of a property conform to the demands of its market. The styles and uses of the properties in an area may conform for several reasons, including economic pressures; the shared preferences of owners for certain types of structures, amenities, services; and the enforcement of uniform standards by zoning ordinances.

Based on the subject's physical characteristics and the principle of conformity, the subject site would most likely be developed with a residential type use.

### Legally Permissible

As mentioned previously, the subject is located outside city limits. Other than zoning, no private deed restrictions were uncovered during a normal investigation, which would further limit the potential uses of the subject site. Nonetheless, a title policy is strongly suggested in order to guarantee the absence of adverse restrictions. No other legal restrictions or covenants were found to be imposed on the subject property at the time of the appraisal, which would further restrict its development. The research supports the physical indication that the site's most probable use, as if vacant, would be for some form of residential use.

### Financially Feasible and Maximally Productive

The prior consideration of physically possible uses and legally permissible does not significantly narrow the use of the subject property. Based on market data presented in this report, it appears that development of a residential subdivision is likely feasible.

After considering legal, physical and financial alternatives, it is our opinion that the highest and best use of the subject site, as if vacant, is for a residential development.

# LAND VALUATION

The principles of real estate appraisal are basic to the sales comparison approach; however, one of the most important is the principle of substitution. "As applied to the sales comparison approach, the principle of substitution holds that the value of a property tends to be set by the price that would be paid to acquire a substitute property of similar utility and desirability."

The sales comparison approach is a method of estimating market value whereby a subject property is compared with comparable properties that have sold recently. One premise of the sales comparison approach is that the market will determine a price for the property being appraised in the same manner that it determines the prices of comparable, competitive properties. Essentially, the sales comparison approach is a systematic procedure for carrying out comparative shopping. As applied to real estate, the comparison is applied to the unique characteristics of the economic good that cause real estate prices to vary.

LAND VALUATION

PARKER COUNTY ▪ TEXAS
VACANT LAND



COMP MAP

LAND VALUATION

PARKER COUNTY ▪ TEXAS
VACANT LAND

## COMPARABLE 1



| LOCATION | | SALES DATA | |
|---|---|---|---|
| **Address /** | TBD Kelly Road, | **Date of Sale** | Listing |
| **Location** | Parker County, Texas | **Sale Price** | $34,680,000 |
| | | **Price Per Acre** | **$30,000** |
| | | **Price Per SF** | **$0.69** |

| PHYSICAL DATA | | | |
|---|---|---|---|
| **Size (acres)** | 1156.00 | | |
| **Size (SF)** | 50,355,360 | **Grantor** | Listing |
| **Zoning** | None | **Grantee** | Listing |
| **Shape** | Irregular | **Recording** | Listing |
| **Topography** | Generally level | **Confirmation** | MLS #14428426 |

### COMMENTS

Property is located on the northwest corner of Bear Creek Road and Kelly Road. Minimal flood plain is noted on the southern edge of the tract. Property does not display a MUD. Broker: Kelly Nelson (817) 271.3207

LAND VALUATION

PARKER COUNTY • TEXAS
VACANT LAND

## COMPARABLE 2



| LOCATION | |
|---|---|
| **Address** | 2290 North Cardinal Road, Reno, Texas |

| PHYSICAL DESCRIPTION | |
|---|---|
| Size (acres) | 131.150 |
| Size (SF) | 5,712,894 |
| Zoning | SF-1 |
| Shape | Irregular |
| Utilities | Available |

| SALES DATA | |
|---|---|
| **Date of Sale** | October 26, 2020 |
| **Sales Price** | $1,984,000 |
| **Price Per Acre** | **$15,128** |
| **Price Per SF** | **$0.35** |

| | |
|---|---|
| **Grantor:** | Arnold & Joyce Wilson, Gladys Harris |
| **Grantee:** | Beaten Path Development, LLC |
| **Recording:** | Pending |
| **Confirmation:** | Closing Statement |

## COMMENTS

Property is located on the west side of North Cardinal Road, just south of Scenic Wood Drive. No flood plain is noted. Property was purchased for single-family residential development. It is noted the property displays a MUD.

LAND VALUATION

PARKER COUNTY ▪ TEXAS
VACANT LAND

## COMPARABLE 3



### LOCATION

| | |
|---|---|
| **Address** | 300 Coder Drive, Parker County, Texas |

### PHYSICAL DESCRIPTION

| | |
|---|---|
| Size (acres) | 199.000 |
| Size (SF) | 8,668,440 |
| Zoning | None |
| Shape | Irregular |
| Utilities | Available |

### SALES DATA

| | |
|---|---|
| **Date of Sale** | December 5, 2019 |
| **Sales Price** | $5,325,000 |
| **Price Per Acre** | **$26,759** |
| **Price Per SF** | **$0.61** |

| | |
|---|---|
| **Grantor:** | Onken Family Trust |
| **Grantee:** | Moncrief Properties, LLC |
| **Recording:** | December 5, 2019 |
| **Confirmation:** | MLS #14240884 |

### COMMENTS

Property is located on the west side of Coder Drive, just north of Old Weatherford Road. Minimal flood plain is noted along the southern edge of the tract. It is noted the property does not display a MUD. Broker: Becky Hanley (817) 613.7020

LAND VALUATION

PARKER COUNTY · TEXAS
VACANT LAND

## COMPARABLE 4



### LOCATION

**Address**    2701 Hideaway Bay,
Granbury, Texas

### PHYSICAL DATA

| | |
|---|---|
| **Size (acres)** | 140.78 |
| **Size (SF)** | 6,132,159 |
| **Zoning** | None |
| **Shape** | Irregular |
| **Topography** | Generally Level |
| **Utilities** | Available |

### SALES DATA

| | |
|---|---|
| **Date of Sale** | August 28, 2019 |
| **Sales Price** | $3,000,000 |
| **Price Per Acre** | **$21,311** |
| **Price Per SF** | **$0.49** |

| | |
|---|---|
| **Grantor:** | TexAg Construction, LLC |
| **Grantee:** | CRV Investments, LLC |
| **Recording** | D2019-0011298 |
| **Confirmation** | Broker |

### COMMENTS

The subject property is located on the north side of Old Granbury Road, just south of Hideaway Bay Court and east of Mallard Pointe Drive. Some flood plain is noted on the southeast and southwest corners of the tract. Property displays a MUD. Broker: Diane Wallace (817) 360.3116.

LAND VALUATION

PARKER COUNTY ▪ TEXAS
VACANT LAND

## COMPARABLE 5



### LOCATION

| | |
|---|---|
| **Address** | TBD Bear Creek Road, Parker County, Texas |

### PHYSICAL DATA

| | |
|---|---|
| **Size (acres)** | 2055.70 |
| **Size (SF)** | 89,546,292 |
| **Zoning** | None |
| **Shape** | Irregular |
| **Topography** | Generally Level |
| **Utilities** | Available |

### SALES DATA

| | |
|---|---|
| **Date of Sale** | November 28, 2018 |
| **Sales Price** | $34,946,900 |
| **Price Per Acre** | **$17,000** |
| **Price Per SF** | **$0.39** |

| | |
|---|---|
| **Grantor:** | Dixon Water Foundation |
| **Grantee:** | BM318, LLC |
| **Recording** | D201829926 |
| **Confirmation** | Closing Statement |

### COMMENTS

Property is located on the south side of Bear Creek Road, just east of Cleburne Highway and west of US Highway 377. Property was purchased for future outdoor recreational development. Some flood plain is noted on the northwest corner and southern side of the subject. It is noted the sale was financed by the seller. At the time of sale, the property did not display a MUD.



## LAND SALES SUMMARY

The market data utilized for the basis of this analysis is considered the best available and indicative of current market trends for undeveloped land in the subject market area. Components that affect the sale price of vacant land are numerous, but the most prominent are property rights conveyed, terms, conditions of sale, market conditions, size, location, physical features, zoning and public utility availability.

### Property Rights

The adjustment for property rights conveyed recognizes that differences in legal interest or estate between the subject and the comparable properties may occur. In this analysis, all the sales occurred in fee simple title and therefore, no adjustments were made.

### Financing Terms

The adjustment for cash equivalency takes into account the fact that the transaction price of the comparable property may not be equal to its cash equivalent price. All the sales utilized in this analysis were cash to seller transactions or transactions involving market financing, and no adjustment for cash equivalency was necessary.

### Conditions of Sale

Adjustments for conditions of sale are intended to recognize motivations of the buyer and the seller that are unique to ordinary market conditions. All of the comparable market data utilized herein were arm's length transactions. With respect to this factor, Comparable 1 indicates a downward adjustment to allow for price negotiations.

### Market Conditions

Each of the previous sales have been given consideration for the lapse of time between the date of sale and the effective date of this appraisal. The available market data was analyzed in an attempt to extract an adjustment for this factor. ***It should be noted that recent market conditions related to COVID-19 are having a significant impact on real estate values. Comparable 2 traded during the COVID-19 pandemic, and it appeared to trade generally in-line with market. The below table illustrates survey results provided by market participants across the region and their perceived impacts on real estate values:***

| COVID-19 IMPACT ON MARKET VALUES | | | | |
|---|---|---|---|---|
| Date Surveyed | Company | Market Area | Property Type | % Impact |
| October 6, 2020 | Frost Bank | DFW | Land | -2.50% |
| October 6, 2020 | JLL | DFW | Land | 2.50% |
| October 6, 2020 | O'Brien Realty Advisors | DFW | Land | 0.00% |
| October 7, 2020 | Skanska USA Building Inc. | DFW | Land | -2.50% |
| | | | **Average** | **-0.63%** |

*Based on the provided survey results, given the nominal average decrease to values, no adjustments related to COVID-19 are indicated. Comparables 4 and 5 indicate upward adjustments as market conditions have improved.*

## Location

Differences in value occur due to varying degrees of accessibility, exposure and surrounding development to a site. Access is often determined by corner locations, natural barriers, ease of entrance on and off of major thoroughfares, etc. Surrounding development also plays an important part of locational influences for a property. With respect to this factor, Comparable 1 indicates a downward adjustment as it displays superior frontage. Comparables 2 and 4 indicate upward adjustments as they are located within inferior submarkets. Comparable 3 indicates a downward adjustment as it displays proximity to Interstate 20.

## Size

Size is a factor that must be considered when comparing vacant land sales. Typically, but not always, larger tracts sell for a lower unit value. Therefore, when making comparisons on a per unit basis, such as price per unit, the larger tracts tend to be adjusted upward and the smaller tracts tend to be adjusted downward to accurately reflect the differences. With respect to this factor, materially larger tracts of land were adjusted upward accordingly, and materially smaller tracts of land were adjusted downward accordingly.

## Physical Features

The overall site characteristics of each sale have been compared to the subject site. These include traits such as drainage, site preparation expense, topography, and configuration. Configuration, if irregular, may limit development. With respect to this factor, no adjustments are indicated.

## Utilities

The availability of public utilities such as water, electric power and sanitary sewer service have an impact on property values since the non-availability of such utilities could restrict the overall development and/or potential use of an individual site. Therefore, when analyzing vacant land, it is important to determine whether or not public utilities are available. If they are not available, the appraiser must examine to what extreme a potential developer would have to go in gaining access to such services. With respect to this factor, Comparables 1, 3, and 5 indicate upward adjustments as they did not display a Multiple Utility District at the time of sale.

## Zoning

Adjustments for zoning typically recognize the different densities and restrictions of different zoning classifications, as well as use potential, and directly relates these differences between the comparable sales and the subject property. The zoning classifications and/or use potential for the sales utilized are deemed similar to that of the subject. With respect to this factor, no adjustments were indicated.

LAND VALUATION

PARKER COUNTY • TEXAS
VACANT LAND

## CONCLUSION

In the final analysis of the subject property, similar weight was given to all of the sales. The following is the adjustment table with the concluded value of the Sales Approach.

| | SUBJECT | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Date | **Current** | Listing | Oct-20 | Dec-19 | Aug-19 | Nov-18 |
| Sale Price | | $34,680,000 | $1,984,000 | $5,325,000 | $3,000,000 | $34,946,900 |
| SIZE - Acre | **1,531.75** | 1,156.00 | 131.15 | 199.00 | 140.78 | 2,055.70 |
| Unit Price ($ / Acre) | | **$30,000** | **$15,128** | **$26,759** | **$21,311** | **$17,000** |

### TRANSACTION ADJUSTMENTS

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Property Rights | | Similar | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% | 0% |
| | | $30,000 | $15,128 | $26,759 | $21,311 | $17,000 |
| Financing Terms | **Cash** | Similar | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% | 0% |
| | | $30,000 | $15,128 | $26,759 | $21,311 | $17,000 |
| Conditions of Sale | **Arm's Length** | Listing | Normal | Normal | Normal | Normal |
| | | -20% | 0% | 0% | 0% | 0% |
| | | $24,000 | $15,128 | $26,759 | $21,311 | $17,000 |
| Market Conditions | **Current** | Listing | Oct-20 | Dec-19 | Aug-19 | Nov-18 |
| | | 0% | 0% | 0% | 3% | 10% |
| | | $24,000 | $15,128 | $26,759 | $21,950 | $18,700 |

### PROPERTY ADJUSTMENTS

| | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Location | **Average** | Superior | Inferior | Superior | Inferior | Similar |
| | | -5% | 30% | -10% | 10% | 0% |
| Size - Acre | **1,531.75** | 1,156.00 | 131.15 | 199.00 | 140.78 | 2,055.70 |
| | | 0% | -5% | -5% | -5% | 3% |
| Physical Features | **Average** | Similar | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% | 0% |
| Utilities | **Available** | Inferior | Similar | Inferior | Similar | Inferior |
| | | 10% | 0% | 10% | 0% | 10% |
| Zoning | **None** | Similar | Similar | Similar | Similar | Similar |
| | | 0% | 0% | 0% | 0% | 0% |
| *Total Adjustment* | | 5% | 25% | -5% | 5% | 13% |
| **Adjusted $ / Acre** | | **$25,200** | **$18,910** | **$25,421** | **$23,047** | **$21,131** |
| **Adjusted Mean $ / Acre** | | | | | | **$22,742** |

A value generally in-line with the mean is well supported.       Unit Value   **$23,000**

| | |
|---|---|
| Land Size (Acres) | **1,531.75** |
| Value Indication | **$35,230,250** |
| **Concluded Value** | **$35,250,000** |

# MARKETING / EXPOSURE TIME

Consideration has been given to a reasonable estimated exposure and marketing period estimate for the subject property.

*Exposure Time* as it relates to the subject is utilized in establishing market value. The Comment to Standards Rule 1-2 (c) of USPAP states that when estimating market value, the appraiser should be specific as to the estimate of exposure time linked to the value estimate.

Reasonable exposure time is one of a series of conditions in most market value definitions. Exposure time is always presumed to precede the effective date of the appraisal. Exposure time may be defined as follows: the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

*Marketing Time* is a function of various factors including, prevailing market conditions, the price of the product being marketed, the competitive position of the property in the market, and the amount and quality of marketing effort allocated to the property. It is strongly emphasized that the appraisers have no control of the aforementioned factors, nor can the appraisers anticipate or predict any of them. Therefore, it assumed that the property will receive an adequate marketing effort.

Therefore, an estimated marketing period/exposure time of 12 months or less is considered reasonable.

# ASSUMPTIONS & LIMITING CONDITIONS

"Report" signifies the appraisal or consulting report and its conclusions, to which these Assumptions and Limiting Conditions are annexed. "Property" signifies the subject of the Report.

"LPA" means Lowery Property Advisors, LLC, or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of LPA who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

- Unless otherwise specifically noted in the body of the report, it is assumed that the title to the property or properties appraised is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. LPA is not aware of any title defects nor has it been advised of any representations relative to the condition of the title. LPA has not reviewed any documents dealing with liens, encumbrances, easements, deed restrictions, clouds and other conditions that may affect the quality of the title. Insurance against financial loss resulting in claims that may arise out of defects in the subject's title should be sought from a reputable title company which specializes in real property.

- Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property was not observed by the appraisers. LPA has no knowledge of the existence of such materials on or in the property. LPA, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would constitute a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired. LPA has inspected as thoroughly as possible by observation. However, it was impossible to personally inspect conditions beneath the soil. Therefore, no representation is made as to these matters unless specially considered in the appraisal.

- The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

- Responsible ownership and competent property management are assumed.

- The information furnished by others is believed to be reliable. However, LPA gives no warranty for its accuracy.

- LPA assumes that all engineering is correct. The plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

- If provided, the estimated insurable value is included at the request of the client and has not been performed by a qualified insurance agent or risk management underwriter. The cost estimate should not be solely relied upon for insurable value purposes. The appraisers are not familiar with the definition of insurable value from the actual insurance provider, the local government underwriting regulations, or the types of insurance coverage available. LPA has followed traditional appraisal standards to develop a reasonable calculation based upon industry practices and industry accepted publications such as the Marshall Valuation Service handbook. Actual construction costs can vary greatly from this estimate. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The appraisers are not cost experts in cost estimating for insurance purposes.

- LPA assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

- It is assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the Appraisal Report.

- All applicable zoning and use regulations and restrictions are assumed to have been complied with, unless a nonconformity has been stated, defined, and considered in the Appraisal Report.

- Required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization are assumed to have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

- The utilization of the land and improvements is assumed to be within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

- All information, comments and conclusions pertaining to subject and other properties described represent the opinion of the appraiser formed after a personal examination of each.

- The appraiser has no interest, present or prospective, in the subject property.

- Sketches in this report are included to assist the reader in visualizing the property.

- LPA assumes that there are no hidden or unapparent conditions of the appraised property, which would render it more or less valuable. Furthermore, the appraisers assume that there are no potentially harmful asbestos or other materials and/or site contaminants in, on, or near soil, subsoil, or structure of the appraised property and that there has been no disposal, discharge, leakage, or spillage of pollutants or contaminant which would render it more or less valuable, whether or not these materials or contaminants are apparent or hidden and unapparent.

- No responsibility is assumed by the appraisers for these conditions. In addition, no responsibility is assumed by LPA for the cost of engineering and/or laboratory studies which might be required to discover such materials or contaminants. And no such engineering or laboratory studies have been ordered for the appraised property.

- Disclosure by the appraiser of the contents of this Appraisal Report is subject to review in accordance with the by-laws and regulations of The Appraisal Institute.

- The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

- Possession of this report, or a copy thereof, does not carry with it the right of publication, unless prior arrangements have been made.

- The appraiser, by reason of this appraisal, is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.

- Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval of the appraiser.

- This appraisal was made in accordance with the Code of Professional Ethics and Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Foundation and the Appraisal Institute.

- Acceptance of and/or use of this report constitutes acceptance of all assumptions and limiting conditions stipulated.

- The *Americans with Disabilities Act* ("ADA") became effective January 26, 1992. LPA has not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible non-compliance with the requirements of ADA in estimating the value of the property.

- Unless otherwise noted in the body of the report, it is assumed that there are no mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered unless otherwise stated in this Appraisal Report. Unless otherwise stated, it is also assumed that there are no air or developments rights of value that may be transferred.

By use of this Appraisal Report, each party that uses this Appraisal Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

# CERTIFICATION

We certify to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is our personal, impartial and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- Our analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal practice, as well as the State of Texas.

- Lauren Bobalik made a personal inspection of the property that is the subject of this report. Mark Lowery, MAI, AI-GRS, CCIM, MRICS, Mitchell Austin, MAI, and Ellen Hevenor did not make a personal inspection of the property that is the subject of this report.

- This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

- As of the date of this report, Mark Lowery, MAI, AI-GRS, CCIM, MRICS and Mitchell Austin, MAI have completed the continuing education program for Designated Members of the Appraisal Institute. Moreover, the reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

- As of the date of this report, Lauren Bobalik has completed the Standards and Ethics Education Requirements for Candidates of the Appraisal Institute.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

**MARK LOWERY, MAI, AI-GRS, CCIM, MRICS**
Certificate No. TX1334103-G

**LAUREN BOBALIK**
Certificate No. TX1380865-G

**MITCHELL AUSTIN, MAI**
Certificate No. TX1380788-G

**ELLEN HEVENOR**
Certificate No. TX1381048-G

PARKER COUNTY • TEXAS
VACANT LAND

# ADDENDUM



# Appraisal Letter of Engagement

**Appraiser:**                                                October 27, 2020
**Mark Lowery**
**Lowery Property Advisors**
**105 Decker Court Suite 1000**
**Irving, TX 75062**

Borrower Contact Info:
Larry Martin
914-671-5007

**Subject: JMJ Development Bear Creek Property, Parker County, TX**

Dear Mark,

Please consider this engagement letter as our request for your appraisal services. Please review this document and ensure that it describes the Scope of Work we discussed previously and that you agree to the terms outlined here. Upon your acceptance of these terms, please sign this letter and return a copy to me within three (3) business days. Upon my receipt, I will consider you engaged to perform this work and look forward to reading the finished product.

**Introduction**
The goal of the appraisal report is to facilitate our understanding of all aspects of the subject property that affect its value and income stream. To that end it is necessary that the report explain in detail characteristics of the subject property, of the subject's real estate market and a thorough analysis of the local and regional forces that affect value.

**Business Relationship**
Upon your acceptance of this assignment, *AgAmerica Lending LLC* is your Client. Your work in this assignment is as an independent contractor and not as an employee / partner, principal, or agent of AgAmerica Lending LLC. Information relating to the collateral property, borrower and loan are to be considered ***confidential***.

**Collateral**
The information below is identified as the collateral to be appraised. Additionally, refer to the Appraisal Order Request previously submitted to you. If any questions or discrepancies arise, please contact AgAmerica's Appraisal Department immediately for clarification.

Parker County, TX PID#s: R000067097; R000036342; R000036340; R000050460; R000050462

**General Assignment Conditions**

***Confidentiality:*** The results of your assignment are to be communicated only in writing and only to us. All documents and information furnished to you by this company in connection with this assignment are confidential information.

***Delivery:*** Your Appraisal Report shall be delivered to us at ***appraisal@agamerica.com*** on or before ***Tuesday, November 17, 2020***. One electronic (Adobe PDF, via email) file containing your Appraisal Report is required. If your completed report is too large to email, please contact us immediately for a secure file upload link. Please contact us immediately if you encounter unforeseen problems, such as difficulty in making access arrangements or obtaining necessary property information.

**Fee:** The fee for appraisal services rendered, payable upon our acceptance of your report, shall be **$4,250**. Please include your tax identification number on your invoice. *In the event that your report is not delivered in a timely manner, and without adequate notification, AgAmerica Lending, LLC reserves the right to assess a penalty of 2% per day for each day beyond the agreed upon due date.*

**Competency:** Your engagement in this assignment is predicated on you being able to personally complete this assignment in compliance with the assignment requirements. If at any time during this assignment you find that you will not be able to comply with the Competency Rule in USPAP, please contact us immediately.

**Scope of Work and Minimum Requirements**

To clarify the goals of the assignment the following items must be considered in the appraisal as part of the Scope of Work decision discussed between us as the client and you as the appraiser.

1. <u>USPAP Compliance:</u> The appraisal report submitted to our office must be compliant with the most current version of USPAP including standards for development, reporting, competency and ethics.
2. <u>Extraordinary Assumptions/Hypothetical Conditions:</u> Any extraordinary assumptions or hypothetical conditions included in the analysis of the subject or comparable sales <u>must</u> be approved by our office prior to use in the report. The Client will only accept those assumptions or conditions that have been discussed prior to delivery of the report.
3. <u>Intended Users:</u> The Intended Users of the appraisal report are **AgAmerica Lending LLC and Farmer Mac** and/ or its successors and assigns. Language for this item is specific and must be verbatim.
4. <u>Intended Use:</u> The Intended Use of the appraisal report is for a Farmer Mac-related loan transaction or servicing action, or in a similar lending-related transaction. Language for this item is specific and must be verbatim.
5. <u>Purpose of Appraisal:</u> The purpose of the appraisal is to develop an "As Is" opinion of Market Value of the subject property that is to be used as an aid in credit decisions and/or portfolio management decisions regarding the subject property.
6. <u>Effective Date:</u> The Effective Date of the appraisal should be the last day of the appraiser's physical inspection of the subject property.
7. <u>Report Date:</u> The Report Date should not be more than thirty (30) days after the Effective Date.
8. <u>Format:</u> The prepared report should be written in either a narrative format or a format consistent with the Uniform Agricultural Appraisal Report (UAAR).  Form FSA-2161, available in many appraisal software packages is also acceptable. Fannie Mae URAR and Land forms can be used, but typically require significant additions to meet AgAmerica Lending's report requirements. UAD standards should not be incorporated.
9. <u>Interest Appraised (Fee Simple/Leased Fee/Lease Hold):</u> The intention of this appraisal report should be to arrive at the Market Value of the subject property.  It is the appraiser's responsibility in this assignment to verify the borrower's interest in the property and properly identify and describe.  A discussion of the relationship of the values of the Fee Simple and Leased Fee estates is required for all leased properties.
10. <u>Highest and Best Use Analysis:</u> The analysis of Highest and Best use should be completed in accordance with USPAP standards. A Highest and Best Use analysis as "vacant" must be performed including analysis of the four tests of Highest and Best Use in that scenario. If the subject is improved the appraisal must include an analysis of Highest and Best Use "as is" and comment on the consistency of use between the "as is" conclusion and the subject improvements. Particular attention must be paid to the legal use of the subject in terms of zoning, irrigation, water rights and special permitted uses.
11. <u>Approaches Utilized:</u> The appraisal report must contain an analysis of the subject using the three standard approaches to value (Cost, Sales Comparison and Income). In some instances, it will be impossible to develop one or more of these approaches and in these instances the appraiser is to discuss the limitations of the approach and the reason for its omission.  For properties where an Income Approach is not developed, the appraiser *must* report the Net Property Income for the subject property.
12. <u>Subject Property Description:</u> The report should describe the subject property in detail. At a minimum these descriptions must include (exceptions to be noted in the report for non-disclosure states, when applicable):
    a. Ownership and vesting information
    b. Addresses, County and State in which the property is located
    c. Full legal description (legal description from a title search for subject will be provided to the appraiser when available)
    d. *Physical and legal access must be discussed in detail, as well as its effect on value*
    e. Plat maps
    f. *County parcel/ID numbers must be identified in the Tax Section of the appraisal report.*
    g. Total acreage and acreage by land use
    h. Address (if no physical address exists then note nearest roads and towns)
    i. General description of the subject location noting proximity to surrounding communities, municipalities, etc.
    j. Current zoning/land use designation
    k. Aerial photo of subject indicating property boundaries

l.  Soils map of the subject indicating property boundaries and soils descriptions

m.  *Improvements* – AgAmerica Improvement Schedule (available in the *Document Library*) is required to be included in the report addendum for all improved properties.  Effective Age and Remaining Economic Life must be included in the report.

n.  Photographs showing all improvements (including irrigation equipment) and land with captions noting the location of the photographer relative to property boundaries and the direction of view

o.  Flood maps if the subject is improved

p.  Marketing period

q.  Market conditions and trends

13.  <u>Comparable Sale/Lease Descriptions:</u> The report should describe the comparable properties in detail. At a minimum these descriptions must include (exceptions to be noted in the report for non-disclosure states, when applicable):

a.  Names of buyer and seller

b.  Addresses, County and State in which the property is located

c.  Sales price and date, with pertinent recording information when available

d.  Legal description/ County parcel/ID numbers

e.  Land mix allocation

f.  Description of the characteristics of the sale and its use

g.  Aerial photo indicating property boundaries

h.  Report income and expenses used in the calculation of the cap rate

14.  <u>Irrigation Analysis:</u> For subjects that rely on irrigation the appraisal must include an analysis of the legality and sufficiency of water rights associated with the subject property. Factors such as water quality, reliability, quantity, ownership and delivery methods are to be included. The appraiser must also include data demonstrating ownership of irrigation water rights in the report.

15.  <u>Irrigation and Drainage Supplement:</u> The appraiser must ensure that an Irrigation and Drainage Supplement is completed and included in the report. Farmer Mac Form 1020 has been provided to the borrower for this purpose and will be forwarded to the appraiser when completed.

16.  <u>Environmental Survey:</u> The appraiser must ensure that a signed Environmental Survey is included in the report. Farmer Mac Form 1010A has been provided to the borrower for this purpose and will be forwarded to the appraiser when completed.

17.  <u>Livestock and Special Use Facilities:</u> Facilities that are unique in nature or that may require special permitting to operate legally must be described in detail. The description should include, at a minimum, a discussion of the legality of use, documentation of appropriate permits and a thorough discussion of the operation of the facility. Further emphasis should be given to the requirement and/or need for a Manure Easement. The value of these types of properties often largely depends on the legality of the operation as of the Effective Date. The valuation of the property must be done with a view toward the legal operation of the subject and the likelihood of legal use in the future.

18.  <u>Allocation of Components:</u>  The appraiser must allocate the land, building and agricultural use components after reconciliation of the final value for all improved properties.  Farmer Mac Form 1027B (available in the *Document Library*) is the preferred format, however allocation tables available in Form software packages are acceptable as well.  ***The AgAmerica Improvement Schedule must be completed and must reconcile with the Farmer Mac Form 1027B.***

19.  <u>Non-Realty Rights:</u> An analysis of the impact on the use and marketability of the subject property of permits, agreements, leases, etc. that may affect the overall value and/or marketability of the subject. The appraiser should report such agreements as well as note the ultimate owners of the rights conveyed through any permits, agreements, leases, etc.

20.  <u>Letter of Engagement:</u> The appraisal report must include a signed copy of the engagement letter in the report.

21.  <u>Appraiser Licenses:</u> The appraisal report must include copies of the current appraisal license held by the appraiser for the state in which the subject is located.

**<u>Special Scope of Work Requests</u>:**

- *Due to the threat of Covid-19, we are requiring only an exterior inspection of the residential improvements, and interior viewings of accessory structures at your discretion.  Please ask the borrower to supply interior photos of the residence as you deem necessary for the purpose of establishing quality and condition.  An extraordinary assumption to this effect will be required.*

**Additional Resources**

Farmer Mac Collateral Valuation Standards and Guidelines, Chapters CV 101.4, 101.5 and 101.6, provide additional guidance for the valuation of Land, Improved and Agricultural Facility properties, respectively, and should be consulted if clarification is needed.  We have made this, and other documents, available in the *Document Library*.



## Certification

This assignment is placed with you on the express condition that your certification constitutes your representation that the assignment was accepted and performed by you with knowledge of and in compliance with AgAmerica Lending's scope of work, report content, and disclosure requirements applicable in the assignment.

Your Appraisal Report must include your personally signed and dated certification. Your signature must include your state licensing and certification information as well as any professional accreditation, and the following USPAP-related statements:

- "Unless otherwise disclosed in this report, I have provided no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year (36-months) period immediately preceding acceptance of the assignment that resulted in this report."
- "I am aware of the requirements stated in the Farmer Mac Seller/Servicer Guide and have completed this assignment in accordance with those requirements as they applied in this assignment."
- "My analyses, opinions, and conclusions were developed, and the appraisal and this report has been prepared for use in a lending transaction that may include Farmer Mac as an intended user."

## Assumptions and Limiting Conditions

This assignment will require the use of Farmer Mac's Assumptions and Limiting Conditions (Form 1037 – available in the *Document Library*).  If you decide that you cannot agree to these conditions, or wish to supplement them, we **must** approve the change prior to delivery of the appraisal report.  Please contact is immediately to address your change request.

## Appraisal Review Process

Acceptance Audit and Appraisal Review: To ensure that the appraisal product we receive meets our Appraisal Requirements, and those set forth by USPAP, the appraisal that your office generates will be reviewed by our staff and/or participating partners. The review process will include an examination of the appraisal to ensure compliance with our Appraisal Requirements as well as compliance with USPAP. The review will conform to Standard 3 of USPAP. The reviewer will also read the report for consistent logic and treatment of sales and subject as well as review any mathematical calculations for accuracy and will also ensure that a credible assignment result has been achieved. The review may be either an administrative or technical review.

Subsequent Requests: You may be contacted to provide responses to questions resulting from our reading or review of your report. By accepting this assignment, you agree to respond promptly to our subsequent requests. When the cause of our subsequent request is a deficiency in your appraisal or report that was under your control, you agree to cure that deficiency promptly without cost to us.  If a title commitment is not available to you prior to the delivery of your report, you will be required to verify that the collateral appraised is the same as that described in the title commitment once it becomes available.

Supplemental Assignments: If, during or following completion of your work, we determine a need for additional research, analysis, or supplemental appraisal information, that need may be addressed as a supplemental assignment.

## Signatures

By signing this Letter of Engagement, I agree to the terms and conditions set forth and will provide an appraisal report that address the purpose of the appraisal in a manner consistent with your appraisal standards and those set forth in USPAP.

Lowery Property Advisors

By:    Mark Lowery

Signature of Appraiser _____    Date __10/28/2020__

**AgAmerica Lending LLC**

By:  Jim Pruitt, Chief Appraiser                     10/27/2020

Signature of Representative _____    Date

## Assumptions and Limiting Conditions

(Singular includes plural)

The certification of the Appraiser appearing in the Appraisal Report is subject to the following assumptions and limiting conditions and to such other specific and limiting conditions as are set forth in Item No. 18 of this statement in accordance with Farmer Mac Collateral Valuation Standards and Guidelines.

1.  The Appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or the title thereto, nor does the Appraiser render any opinion as to title, which is assumed to be good and marketable. The property is appraised as though under responsible ownership.

2.  Sketches in the report may show approximate dimensions and are included only to assist the reader in visualizing the property. The Appraiser has made no survey of the property. Drawings and/or plats are not represented as an engineer's work product, nor are they provided for legal reference.

3.  The Appraiser is not required to give testimony or appear in court because of having made the appraisal with reference to the property in question unless arrangements have been previously made.

4.  Any distribution of the valuation in the report applies only under the existing program of utilization. Contributory value indications are only allocations and are not represented as separate valuations. The intended use of those contributory value indications is only in underwriting. Any other use is without obligation to the Appraiser.

5.  The Appraiser has, in the process of exercising due diligence, requested, reviewed, and considered information provided by the ownership of the property and client, and the Appraiser has relied on such information being candid and complete, and assumes there are no hidden or unapparent conditions of the property, subsoil or structures, which would render it more or less valuable. The Appraiser assumes no responsibility for such conditions, for engineering that might be required to discover such factors, or the cost of discovery or correction.

6.  In an assignment where the Appraiser has not inspected the subject property, due to lack of peaceful access or client approved assignment limitations, as described and documented in the report, the appraiser has used subject property information developed in the course of public and/or private record research. If public record information is subsequently found to have been in error, responsibility for the impact of the error rests with its source, not the appraiser.

7.  The Appraiser is not qualified to verify or detect the presence of hazardous substances by visual inspection or otherwise, and is not qualified to determine the effect, if any, of known or unknown substances present. Unless otherwise stated, the final value conclusion is based on the subject property being free of hazardous waste contaminations, and it is specifically assumed that present and subsequent ownerships will exercise due care to ensure that the property does not become otherwise contaminated. (See Farmer Mac Form 1010A)

8.  Information, estimates, and opinions furnished to the Appraiser and contained in the report were obtained from sources considered reliable and believed to be true and correct. The Appraiser assumes no responsibility for accuracy of such items furnished the Appraiser.

9.  Unless specifically cited, no value has been allocated to mineral rights or deposits.

10. Acreage of land types and measurements of improvements are based on physical inspection of the subject property unless otherwise noted in this Appraisal Report.

11. Water requirements and information provided has been relied on and, unless otherwise stated, it is assumed that:

    a.  All water rights to the property have been secured or perfected, there are no adverse easements or encumbrances, and the property complies with the rules and regulations of local, state, or federal agencies, including Bureau of Reclamation rules, as they apply to the subject;

    b.  Irrigation and domestic water and drainage system components, including fixed or hard-mounted distribution equipment and piping, are real estate fixtures;

    c.  Any mobile surface piping or equipment essential for water distribution, recovery, or drainage, if included in the subject property of this appraisal (e.g., pivot systems), is secured with the title to real estate; and

    d.  Title to all such property conveys with the land.

12. Disclosure of the contents of this report is governed by applicable law and/or by the Bylaws and Regulations of the professional appraisal organization(s) with which the Appraiser is affiliated.

Page 5

13. Neither all nor any part of the report, or copy thereof, shall be used for any purposes by anyone but the client and intended users specified in the report without the written consent of the Appraiser.

14. Where the appraisal conclusions are subject to satisfactory completion, repairs, or alterations, the Appraisal Report and value conclusion are contingent upon completion of the improvements in a workmanlike manner consistent with the plans, specifications and/or scope of work relied upon in the appraisal.

15. EXCLUSIONS. In analyzing the subject property and its market the Appraiser considered and, as applicable, used the cost, income, and direct market sales comparison approaches to develop value indications and reconciled the results of the approaches completed to develop a final value conclusion. The explanation for excluding any of the three approaches in developing the final value conclusion is provided in this report.

16. SCOPE OF WORK RULE. The appraisal reflects a scope of work that is based on information from the client and this appraisal and report was prepared for the client's use and for use by Farmer Mac at their sole discretion within the framework of the intended use stated in the report. The use of this appraisal or report for any other purpose or use by any party not identified as an intended user of this report is beyond the scope of work contemplated in the appraisal, and without creating an obligation of the Appraiser.

17. Acceptance of the report by the client constitutes acceptance of all assumptions and limiting conditions contained in the report.

18. Other Assumptions and Limiting Conditions, including any extraordinary assumptions or hypothetical conditions (each applied on the basis of the client's written prior approval, a copy of which is contained in the Addenda to this report).

Farmer Mac Form 1037 Version 3.5 (Rev 08-2015)
Based on text in the "Assumptions and Limiting Conditions" page of the UAAR form set by AgWare, Inc. 1- 605-787-7871
©2000 AgWare, Inc. All Rights Reserved, Farmer Mac use by permission

Page 6



# BM 318, LLC
## Costs to Date

| | |
|---|---:|
| **Closing Cost** | 66,411.25 |
| **Consulting and Professional Fees** | 15,435.73 |
| **Development Fee** | 310,000.00 |
| **Engineering & Survey** | 316,582.83 |
| **Insurance.** | 12,621.90 |
| **Interest** | 2,050,007.60 |
| **Legal** | 28,588.57 |
| **Real Estate Taxes** | 4,988.89 |
| **Lender Fees** | 73,250.00 |
| **Miscellaneous** | 2,343.75 |
| **Construction Costs** | 225,000.00 |
| **MUD Costs** | 191,785.37 |
| | 3,297,015.89 |

ADDENDUM

PARKER COUNTY • TEXAS
VACANT LAND

## Reunion Title

**REUNION** TITLE

5060 E. I-20 South •Willow Park, TX 76087

Office Phone:(817)441-6321 Office Fax:(817)441-8892

### Buyer's Final Settlement Statement

| | | | |
|---|---|---|---|
| **Property Address:** | Bear Creek Ranch, Aledo, TX 76008 | **File No:** | 2025-262749-RU |
| | | **Officer:** | Rakisha Chenault/RC |
| | | **Settlement Date:** | 11/27/2018 |
| | | **Disbursement Date:** | 11/27/2018 |
| | | **Print Date:** | 11/27/2018, 2:16 PM |

| | |
|---|---|
| **Buyer:** | BM318, LLC |
| **Address:** | 1755 Wittington PL. , Suite 340, Dallas , TX 75234 |
| **Seller:** | The Dixon Water Foundation |
| **Address:** | P.O. Box 177, Marfa , TX 79843 |
| **Lender:** | The Dixon Water Foundation |
| **Address:** | P.O. Box 177, Marfa, TX, 79843 |
| **Loan No.:** | |

| Charge Description | Buyer Charge | Buyer Credit |
|---|---|---|
| **Consideration:** | | |
| Total Consideration | 34,946,900.00 | |
| | | |
| **Deposits in Escrow:** | | |
| Receipt No. 20258189 on 10/03/2018 by Carnegie Development LLC | | 100,000.00 |
| | | |
| **Prorations:** | | |
| County Taxes  11/27/18 to 12/31/18  @$3,565.82/yr | 332.16 | |
| | | |
| **New Loan(s):** | | |
| Lender: The Dixon Water Foundation | | |
| Loan Amount  - The Dixon Water Foundation | | 32,946,900.00 |
| | | |
| **Title/Escrow Charges to:** | | |
| Title - Settlement Charge  to Adams, Bennett & Duncan, PC | 325.00 | |
| Title - Guaranty Assessment Recoupment Charge-LTP | 4.50 | |
|   Guaranty Assessment Recoupment Charge-LTP  to TX Title Insurance Guaranty Association | | |
| Title - e-Recording Fee (TRecS) | 4.50 | |
|   e-Recording Fee (TRecS)  to TRecS | | |
| Title - 3210 T-2/T-2R LTP Sml w/OTP (R-5a) | 100.00 | |
|   3210 T-2/T-2R LTP Sml w/OTP (R-5a)  to Reunion Title | | |
| Title - [0810 TX] T-36 EPL End (R-11g) | 25.00 | |
|   [0810 TX] T-36 EPL End (R-11g)  to Reunion Title | | |
| Title - [0500 TX] T-3 Survey Amendment OTP Non-Resi (R-16) | 15,647.40 | |
|   [0500 TX] T-3 Survey Amendment OTP Non-Resi (R-16)  to Reunion Title | | |
| Title - [0710 TX] T-3 Tax Amend End-NYD&P (R24) | 5.00 | |
|   [0710 TX] T-3 Tax Amend End-NYD&P (R24)  to Reunion Title | | |
| Recording Fee - Deed  to Parker County Clerk | 74.00 | |
| Recording Fee - Mortgage  to Parker County Clerk | 114.00 | |
| | | |
| **Disbursements Paid:** | | |
| JMJ Dev. Bear Creek Ranch Acct: 6915.0041  to Bennett, Weston, LaJone & Turner, PC | 11,000.00 | |
| Survey Invoice 10536  to Barron-Stark-Swift Consulting Engineers | 8,118.75 | |
| Survey Invoice 10576  to Barron-Stark-Swift Consulting Engineers | 14,452.36 | |
| | | |
| Cash (X From) ( To) Buyer | | 1,950,202.67 |
| | | |
| **Totals** | 34,997,102.67 | 34,997,102.67 |

## REAL ESTATE SALE AGREEMENT

This Real Estate Sale Agreement (this "**Agreement**") is entered into between THE DIXON WATER FOUNDATION F/K/A THE DIXON FOUNDATION, a Texas non-profit corporation ("**Seller**"), and JMJ DEVELOPMENT, LLC, a Texas limited liability company ("**Purchaser**"), and is effective June 2**C**, 2020 (the "**Effective Date**").

1.  **Sale and Purchase; Property and Minerals.** Seller shall sell and Purchaser shall purchase, subject to the terms and conditions herein, (a) that certain real property (the "**Land**") located in Parker County, Texas, described on Exhibit A which is attached hereto and made a part hereof for all purposes, and (b) all of Seller's right, title and interest in and to any and all appurtenant easements for ingress and egress, and utilities, and other appurtenances thereto. All of the above-described properties are hereinafter collectively referred to as the "**Property**". The "Property" shall also include any and all mineral rights, and royalties, delayed rents, bonus or other mineral interest payments of any kind or character respecting the Property received by and or accruals thereof in favor of Seller during the period from the Effective Date to the Closing Date. Seller and Purchaser acknowledge and agree that Seller previously conveyed the Property to BM 318, LLC, a Texas limited liability company, an affiliate of Purchaser ("**BM 318**") (the "**First Transaction**"). BM 318 will convey the Property back to Seller (the "**Second Transaction**") prior to the Closing Date. Notwithstanding the conveyance of the Property back to Seller, Seller has agreed if and to the extent any such royalties, delayed rents, bonus or other mineral interest payments are actually received by Seller or accrue in favor of Seller during the period from the Effective Date to the Closing Date, then Seller shall provide to Purchaser, a credit in the amount of such funds toward the Purchase Price.

2.  **Deposit and Independent Consideration.** Within 3 days of the Effective Date, Purchaser shall deliver via wire transfer an amount equal to $1,000.00 ("**Deposit**"), into escrow with Reunion Title, Attn: Rakisha Chenault, 5060 E. Interstate 20, S. Service Road, Willow Park, Texas 76087, rchenault@reuniontitle.com, Phone: 817-441-6321, Fax: 817-441-8892 (the "**Title Company**"). Failure to timely deliver the Deposit shall be an immediate default by Purchaser under this Agreement. If requested by Purchaser, the Deposit shall be placed in an interest bearing account and the interest earned on such account shall be added to and made part of the Deposit. If this Agreement is consummated, the Deposit shall be applied against the total Purchase Price (as hereinafter defined) to be paid by Purchaser at Closing. If this Agreement is terminated, then the Deposit, less $100 that Seller will retain as independent consideration for entering into this Agreement ("**Independent Consideration**"), shall be returned to the party indicated under the terms of this Agreement. The Deposit shall become non-refundable if Purchaser fails to terminate this Agreement before expiration of the Inspection Period (as hereinafter defined) except as otherwise expressly set forth in this Agreement.

3.  **Purchase Price.** The total purchase price for the Property is $27,500,658.00 (the "**Purchase Price**"). The Purchase Price, less the Deposit and credits, if any, set forth on Purchaser's closing settlement statement, shall be payable on the date of the closing of this sale ("**Closing**") by wire transfer.

4.  **Defined Terms.** As used in this Agreement, the following terms shall have the following meanings:

"**Permitted Exceptions**" means only the following interests, liens and encumbrances:

    (a)    Liens for ad valorem taxes not payable at or before Closing;

    (b)    Covenants, restrictions, easements and other matters of record as of the expiration of the Inspection Period (it being understood and acknowledged by Purchaser that it shall have the Inspection Period within which to determine whether any such items will materially and adversely affect Purchaser's contemplated use of the Property).

"**Survey**" means the existing survey of the Property in Seller's possession.

Real Estate Sale Agreement - Page 1

4849-0017-9392v.4

# MARK LOWERY, MAI, AI-GRS, CCIM, MRICS

## DFW OFFICE

105 Decker Court #1000
Irving, Texas 75062

cell 214.300.8466
ofc 214.347.8558 x 301
mark@lowerypa.com

## EXPERIENCE

Mark is the owner and founder of LPA and serves as President and CEO. LPA is a commercial appraisal and consulting firm completing a wide range of projects throughout the southwest. Property types include, but are not limited to office, retail, industrial, multi-family, retail, self-storage, hotel / motel, carwashes, vacant land, daycare, subdivisions, etc.

Mark began his appraisal career in with Wells Fargo Bank focusing primarily on residential appraisal review. In 2002, he moved to BRG, Inc. as a Senior Appraiser recruiting and training multiple appraisers. In 2010, Mark founded LPA which has grown to include four fully staffed offices and a satellite office.

Mark has experience with litigation support for legal matters in both federal and state courts. Numerous clients, including attorneys, insurance companies, and lenders nationwide have relied on his expertise in a review appraiser capacity. Mark has been called upon as guest lecturer at his beloved alma mater, Texas A&M.

## PROFESSIONAL ASSOCIATIONS

- Appraisal Institute
  - MAI and AI-GRS designations
  - Govt Relations Chair Region VIII
  - President North Texas 2020
  - Vice President North Texas 2019
  - Secretary North Texas 2018
  - Treasurer North Texas 2017
  - President Central Texas 2016
- Member Royal Institute of Chartered Surveyors – (MRICS)
- CCIM Institute – Designated Member

- North Texas Association of Government Guaranteed Lenders
- Urban Land Institute
- Society of Texas A&M Real Estate Professionals
- Aggie100 List – 2013, 2014, 2015
- American Society of Appraisers – Designated (ASA)
- Appraisal Foundation (IAC Member)

## LICENSES

Texas General Appr.
1334103

Texas Broker License
0515247

Oklahoma General Appr.
13395CGA

Louisiana General Appr.
G4147

New Mexico General Appr.
03688-G

## EDUCATION

BBA – Texas A&M University – Finance, Real Estate Emphasis

Coursework for MAI designation

Coursework for CCIM designation

Coursework for AI-GRS designation



**Certified General Real Estate Appraiser**

Appraiser: **Mark Rayburn Lowery**
License #: **TX 1334103 G**    License Expires: **09/30/2022**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

Chelsea Buchholtz
Commissioner



# MITCHELL AUSTIN, MAI

## DFW OFFICE

105 Decker Court #1000
Irving, Texas 75062

direct 214.919.7402
cell 817.705.5641
ofc 214.347.8558 x 308
mitchell@lowerypa.com

## EXPERIENCE

December 2013 to Present; Manager at LPA

Types of properties appraised include: multifamily, subdivision, office, retail, industrial, mixed-use, restaurants, hotels, self-storage, car washes, land, and other types of commercial properties.



## EDUCATION

BBA Finance – Texas Tech University

Successfully completed all requirements for designation including the General Comprehensive Examination, Demonstration of Knowledge, Specialized Experience Review, and all required general and advanced courses offered by the Appraisal Institute:

- Basic Appraisal Principles
- Basic Appraisal Procedures
- Uniform Standards of Professional Appraisal Practice
- Business Practices and Ethics
- Real Estate Finance, Statistics, and Valuation Modeling
- General Appraiser Income Capitalization Approach - I
- General Appraiser Income Capitalization Approach – II
- General Appraiser Sales Comparison Approach
- General Appraiser Cost Approach & Site Analysis
- General Appraiser Report Writing and Case Studies
- General Appraiser Market Analysis and Highest and Best Use
- Expert Witness: Preparation & Testimony
- Quantitative Analysis
- Advanced Income Capitalization
- Advanced Concepts and Case Studies
- Advanced Market Analysis and Highest & Best Use
- General Demonstration Report Writing

## LICENSES

Texas General Appraiser
1380788-G

Oklahoma General Appraiser
13394CGA

Arkansas General Appraiser
CG-4600

Texas Real Estate Sales Agent
0618925

Property Tax Consultant

11442



**Certified General
Real Estate Appraiser**

Appraiser: **Mitchell Ryan Austin**
License #: **TX 1380788 G**          License Expires: **05/31/2022**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.



Chelsea Buchholtz
Commissioner



# ELLEN HEVENOR

## DFW OFFICE

105 Decker Court #1000
Irving, Texas 75062

cell 214.919.7573
ofc 214.347.8558 x 319
ellen@lowerypa.com

## APPRAISAL / REAL ESTATE EXPERIENCE

November 2020 to Present: Director at Lowery Property Advisors, LLC

Types of properties appraised include: office, retail, industrial, multi-family, self-storage, auto service, subdivisions, raw land, proposed construction, and other types of commercial properties.

January 2019 to November 2020: Associate at Lowery Property Advisors, LLC

May 2018 to December 2018: Summer Associate at Lowery Property Advisors, LLC

## EDUCATION

MS Real Estate – Texas A&M University
BBA Finance & Business Honors – Texas A&M University

Successfully completed the following courses administered by *McKissock Appraisal Education* and *Appraisal Institute*:

- Basic Appraisal Principles
- Basic Appraisal Procedures
- Texas Supervisor-Trainee Course
- 15-hour National USPAP Course
- General Appraiser Sales Comparison Approach
- General Appraiser Site Valuation and Cost Approach
- General Appraiser Report Writing and Case Studies

Successfully completed the following applicable courses at *Texas A&M University*:

- Real Estate Investment Analysis
- Real Property Analysis
- Real Property Valuation
- Commercial Real Estate Law
- Market Analysis for Real Estate Development
- Real Estate Analytics
- Land Economics
- Real Property Finance
- Analysis of Real Estate Decisions
- Real Estate Development Analysis

## LICENSES

Texas General Appraiser
1381048 G

Louisiana General Appraiser
G-4472



**TALCB**
TEXAS APPRAISER LICENSING & CERTIFICATION BOARD

**Certified General Real Estate Appraiser**

Appraiser: **Ellen Hevenor**
License #: **TX 1381048 G**        License Expires: **11/30/2022**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

Chelsea Buchholtz
Commissioner

 **LPA**

# LAUREN BOBALIK

## DFW OFFICE

105 Decker Court #1000
Irving, Texas 75062

cell 214.300.8466
ofc 214.347.8558 x 309
lauren@lowerypa.com

## APPRAISAL / REAL ESTATE EXPERIENCE

March 2011 to March 2016; Staff Appraiser at C. L. McDade & Company

Duties include research and valuation of all types of hotels, retail, office, restaurants, industrial, multi-family and special use properties.

March 2016 to Present; Senior Associate at Lowery Property Advisors, LLC

Types of properties appraised include: office, retail, industrial, restaurants, hotels, special use, multi-family, and other types of commercial properties.

## EDUCATION

BBA Marketing – Texas Tech University

Successfully completed the following all requirements for designation including the General Comprehensive Examination, the Demonstration of Knowledge, the Specialized Experience Review, and all required general and advanced courses offered by the Appraisal Institute:

- Basic Appraisal Principles
- Basic Appraisal Procedures
- Uniform Standards of Professional Appraisal Practice
- Statistics, Modeling and Finance
- Business Practices and Ethics
- General Appraiser Income Capitalization Approach - I
- General Appraiser Income Capitalization Approach – II
- General Appraiser Sales Comparison Approach
- General Appraiser Cost Approach & Site Analysis
- General Appraiser Report Writing and Case Studies
- General Appraiser Market Analysis and Highest and Best Use
- Quantitative Analysis
- Advanced Income Capitalization
- Advanced Concepts and Case Studies
- Small Hotel/Motel Valuation

## LICENSES

Texas General Appraiser
1380865-G

Oklahoma General Appraiser
13500CGA

Louisiana General Appraiser
G4430

**Texas Appraiser Licensing and Certification Board**
P.O. Box 12188 Austin, Texas 78711-2188
**Certified General Real Estate Appraiser**

Number:     **TX 1380865 G**
Issued:      **01/29/2019**          Expires:     **01/31/2021**
Appraiser:   **LAUREN JOY ALLEN BOBALIK**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Texas Occupations Code, Chapter 1103, is authorized to use this title, Certified General Real Estate Appraiser.

Douglas E. Oldmixon
Commissioner


LPA