# EXHIBIT A

APP000001

**PURCHASE AND SALE AGREEMENT**

between

**CORT THOMAS, AS RECEIVER FOR D4FR LLC**
a Texas limited liability company
("Receiver")

and

**WINDMILL FARMS 2023, LLC**
a Texas limited liability company
("Buyer")

DATED: February 21, 2023

For property generally located at:

**1003 Windmill Farms Boulevard, Forney, Texas**
(Parc at Windmill Farms Apartments)

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is made as of the Effective Date (as defined below), by and among Windmill Farms 2023, LLC, a Texas limited liability company ("**Buyer**") and Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity (the "**Receiver**") for, and on behalf of, D4FR LLC, a Texas limited liability company, ("**D4FR**"). Buyer and Receiver are collectively referred to as the "**Parties**" and each individually as a "**Party**."

**WHEREAS**, D4FR is the owner of the Property (defined below) and pursuant to the Order Appointing Receiver, dated October 18, 2022 (the "**Receivership Order**"), entered by the United States District Court for the Northern District of Texas, Dallas Division (the "**Court**") in Case No. 3:22-cv-2118-X (the "**Receivership Action**"), the Court appointed and authorized Receiver to, among other things, (a) take possession, custody and control of all of D4FR's business operations, assets, and property, and (b) market and sell D4FR's business operations, assets, and property, all subject to the conditions contained in the Receivership Order;

**WHEREAS**, Buyer desires to purchase the Property, and Receiver desires to sell the Property to Buyer for and on behalf of D4FR, in each case for the consideration and upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement, are expressly subject to the approval of the Court and will be consummated only pursuant to orders to be entered in the Receivership Action.

**NOW THEREFORE**, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### Article I
### PROPERTY/PURCHASE PRICE

1.1.    *Certain Basic Terms*. Below is a summary of certain basic terms in this Agreement which shall have the meanings as set forth below. In the event of a conflict between this **Section 1.1** and remainder of this Agreement, the remainder of this Agreement shall govern and control.

    (a)    Buyer and Notice Address:
Windmill Farms 2023, LLC
c/o Palmetto Capital Partners, LLC
Attention: Collin Cooper
4849 Greenville Ave, Suite 100-146
Dallas, TX, 75206
Telephone: 214-934-4416
Email: collin@palmetto.capital

With a copy to:
White & Starling, PLLC
Attn: Lauren Osterman
700 N. Pearl Street #1610
Dallas, TX 75201
Telephone: 214-215-1119
Email: losterman@whiteandstarling.com

    (b)    Receiver and Notice Address:
c/o Cort Thomas, as receiver of D4FR, LLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
cort@brownfoxlaw.com

With a copy to: Brown Fox PLLC
6303 Cowboys Way, Suite 450
Frisco, Texas 75034
Attn: Adam Fox
adam@brownfoxlaw.com

31994070v.2

**APP000003**

(c)    Title Company:
Republic Title of Texas, Inc.
2626 Howell Street, 10th Floor
Dallas, Texas 75204
Attn: Jeff Porter
Telephone: (214) 855-8820
Email: Jporter@republictitle.com

(d)    Escrow Agent:
Republic Title of Texas, Inc.
2626 Howell Street, 10th Floor
Dallas, Texas 75204
Attn: Jeff Porter
Telephone: (214) 855-8820
Email: Jporter@republictitle.com

(e)    Effective Date: February 21, 2023.

(f)    Purchase Price: $51,000,000, of which a portion shall be paid by assumption of the Loan, and the balance paid in cash at Closing.

(g)    Initial Earnest Money Deposit: $500,000 is to be deposited with the Escrow Agent within five (5) Business Days following the commencement of the Due Diligence Period.

(h)    Additional Earnest Money Deposits:

(i)    $100,000 is to be deposited with the Escrow Agent within five (5) Business Days of the expiration of the Due Diligence Period.

(ii)    $100,000 is to be deposited with the Escrow Agent on the ninety-first (91st) day following the expiration of the Due Diligence Period if Closing is not yet completed.

(iii)    $100,000 is to be deposited with the Escrow Agent within five (5) Business Days upon request by Buyer to extend the Closing Date by up to thirty (30) days as set forth in **Section 5.1**.

(i)    Due Diligence Period: The period commencing on the fifth (5th) Business Day following the Contingency Clearance Date and ending on the thirty-fifth (35th) day thereafter (for a 30-day Due Diligence Period).

(j)    Closing Date: The latter to occur of the following two dates: (i) a mutually agreed date no later than sixty (60) days following the expiration of the Due Diligence Period or (ii) a mutually agreed date no more than thirty (30) days following receipt of HUD Approval (defined below). Buyer shall have the right to extend the Closing Date as set forth in **Section 5.1**, subject to the terms and conditions contained elsewhere in this Agreement.

(k)    Broker: The "Broker" identified in Section 6.6 is Site Selection Group, LLC, a Texas limited liability company.

2

APP000004

(l)      Contingency Clearance Date. The date that Buyer is reasonably satisfied with all of the following (the "**Contingency Clearance Date**"): (i) the Loan is capable of assumption by Buyer without material modification; (ii) Receiver has demonstrated that Receiver is able to convey at Closing title to the Property free and clear of any claims to the Property (including purchase offers received by Receiver prior to the Court hearing to approve this Agreement, if any) or any liens or encumbrances of any party other than parties to the Loan, including Pillar Asset Management (or affiliates thereof) and Tim Barton; and (iii) the Court has authorized Receiver to sell the Property substantially on the terms and conditions contained in this Agreement (such authorization, "**Court Approval**"). Buyer agrees to notify Receiver in writing of the Contingency Clearance Date as soon as is reasonably practicable following Buyer's reasonable satisfaction of **Sections 1.1(l)(i) through (iii)**. For avoidance of doubt, notwithstanding the occurrence of the Contingency Clearance Date, Closing shall remain subject to the satisfaction of all conditions to Closing set forth elsewhere in this Agreement, including as set forth in **Section 5.9**. If the Contingency Clearance Date does not occur by or on the date that is sixty (60) days following the Effective Date of this Agreement, this Agreement may be terminated by either Party and, in the event of such termination, the Earnest Money shall be returned to the Buyer less the Independent Consideration.

1.2.      *Property*. Subject to the terms of this Agreement, Receiver agrees to sell to Buyer, and Buyer agrees to purchase from Receiver, the following property (collectively the "**Property**"):

(a)      All of D4FR's right, title, and interest, in and to the real property described in **Exhibit A** (the "**Land**"), together with all of D4FR's right title and interest in: (i) the buildings and improvements thereon (the "**Improvements**"); (ii) all appurtenances of the Land, including easements and/or rights-of-way relating thereto; and (iii) any land lying in the bed of any street, road or access way, opened or proposed, on the Land; (collectively, with the Land, the "**Real Property**"). The Real Property shall be conveyed subject to the matters which are, or are deemed to be, Exceptions (defined below).

(b)      All of D4FR's right, title, and interest, in and to all fixtures, furniture, equipment, inventory, and other tangible personal property, if any, located on the Real Property and used in connection with the operation of same, in each case to the extent assignable, and without warranty, but expressly excluding any items of personal property owned by each tenant, any managing agent, or any other party (the "**Tangible Personal Property**").

(c)      All of D4FR's rights or interest, as landlord, in the "**Leases**," being defined as all those certain leases regarding the Improvements, and all amendments thereto, and including all leases which may be made by Receiver after the Effective Date and before Closing as permitted by this Agreement; in each case of the foregoing, to the extent assignable and without warranty.

(d)      All of D4FR's right, title, and interest, if any, in and to all of the following items, in each case to the extent assignable or transferrable, and without warranty (the "**Intangible Personal Property**"): (i) licenses and permits relating to the operation of the Real Property; (ii) the right to use the name "Parc at Windmill Farms" in connection with the Real Property; and (iii) if still in effect, each guaranty and warranty from any general contractor, subcontractor, or manufacturer in connection with the construction or maintenance of the Real Property or associated with the Tangible Personal Property, provided, however, if there is any cost or fee to transfer any such guaranty and warranty to Buyer, Buyer must pay the same as a condition precedent to any such assignment by Receiver. The Tangible Personal Property and the Intangible Personal Property are collectively referred to herein as the "**Personal Property**."

3

APP000005

1.3.    ***Purchase Price***. The purchase price for the Property will be fifty-one million and no/100 Dollars ($51,000,000.00) (the "**Purchase Price**") of which: (a) a portion shall be paid by assumption of the Loan; and (b) the balance of the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be due and payable by Buyer in full at Closing by wire transfer of immediately available federal funds to a bank account designated by Escrow Agent (defined below) in writing to Buyer prior to Closing.

1.4.    ***Earnest Money***.

(a)    Deposit of Initial Earnest Money. Within five (5) Business Days following the commencement of the Due Diligence Period, Buyer shall deposit five hundred thousand and no/100 dollars ($500,000.00) (the "**Initial Earnest Money**") with the Escrow Agent in immediately available federal funds.

(b)    Deposits of Additional Earnest Money. Deposits of additional earnest money shall be made upon the occurrence of each of the following events, in the following amounts and within the timelines specified (each a deposit of "**Additional Earnest Money**" and all actual deposits of Additional Earnest Money together with the Initial Earnest Money, the "**Earnest Money**"):

(i)    One hundred thousand and no/100 dollars ($100,000.00) is to be deposited with the Escrow Agent within five (5) Business Days following the expiration of the Due Diligence Period;

(ii)    One hundred thousand and no/100 dollars ($100,000.00) is to be deposited with the Escrow Agent within five (5) Business Days following the ninetieth (90th) day following the expiration of the Due Diligence Period if Closing is not yet completed; and

(iii)    One hundred thousand and no/100 dollars ($100,000.00) is to be deposited with the Escrow Agent within five (5) Business Days upon request by Buyer to extend the Closing Date by up to thirty (30) days as more fully set forth in **Section 5.1** as the Closing Extension Fee.

If Buyer fails to timely deliver any portion of the Earnest Money and such failure is not remedied within three (3) business days following written notice thereof from Receiver to Buyer, Receiver may declare this Agreement to be terminated, in which case this Agreement shall be terminated and of no force and effect (except for sections hereof described to survive such termination) and the Earnest Money shall be (a) refunded to Buyer, if the Due Diligence Period has not yet expired or (b) retained by Receiver if the Due Diligence Period has then expired. The Earnest Money shall, upon receipt, be placed in an interest-bearing account at a federally insured bank and shall be deemed non-refundable to Buyer upon delivery to Escrow Agent, unless otherwise provided under the terms of this Agreement. The Earnest Money shall be applicable to the Purchase Price at Closing, unless otherwise forfeited within the terms herein. All interest on the Earnest Money shall become part of the Earnest Money and will be reported to the Internal Revenue Service as income to Buyer.

(c)    Independent Consideration. The Escrow Agent shall hold and disburse the Earnest Money (including any portion thereof) in accordance with the terms and conditions of this Agreement. In connection with any termination made in accordance with this Agreement, One Hundred and 00/100 Dollars ($100.00) of the Earnest Money shall be paid to Receiver as independent consideration for Buyer's right to purchase the Property and for Receiver's execution, delivery and performance of this Agreement (the "**Independent Consideration**"). The Independent

4

APP000006

Consideration is in addition to and independent of any other consideration or payment provided for in this Agreement, is non-refundable and shall be retained by Receiver notwithstanding any other provision of this Agreement. Receiver acknowledges and agrees that the Independent Consideration is sufficient for Receiver's covenants and obligations under this Agreement. The terms and provisions set forth in this Section shall survive the termination of this Agreement. Independent Consideration is applicable toward the Purchase Price at Closing.

(d)      Disposition of Earnest Money. Except as otherwise provided to the contrary in **Sections 4.5** (i.e., damage/condemnation), **5.2(b)** (i.e., inability to satisfy Buyer's closing conditions, which includes the inability to obtain unconditional HUD Approval as contemplated in and further subject to the remaining terms of Section 2.8), **and 8.2** (i.e., a Receiver default) providing for the refundability of the Earnest Money upon certain events following the Due Diligence Period, the Initial Earnest Money shall be fully refundable until the expiration of the Due Diligence Period, at which point the Initial Earnest Money shall become non-refundable to Buyer. Except as otherwise provided to the contrary in **Sections 4.5** (i.e., damage/condemnation), **5.2(b)** (i.e., inability to satisfy Buyer's closing conditions), **and 8.2** (i.e., a Receiver default) providing for the refundability of the Earnest Money upon certain events following the Due Diligence Period, each Additional Earnest Money shall become non-refundable upon deposit by Buyer with Escrow Agent. In each of the foregoing cases, once the Initial Earnest Money or Additional Earnest Money become non-refundable to Buyer, each such deposit shall be considered consideration for Buyer's exclusive right to inspect and purchase the Property under this Agreement. The Earnest Money shall be held and disbursed by the Escrow Agent pursuant to **Article IX** of this Agreement.

(e)      Buyer Acknowledgement. Buyer hereby acknowledges and agrees that the Earnest Money held by Escrow Agent does not and shall not constitute property of the estate of Buyer within the meaning of Section 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), or substantially similar provisions of state law, and Buyer's interest in such Earnest Money Deposit is limited to the right to have the Earnest Money returned if and when the conditions for the return of the Earnest Money to Buyer are satisfied as set forth herein. Buyer hereby acknowledges and agrees that: (i) the proper giving of notice by Receiver to release the Earnest Money as provided hereunder; and/or (ii) the proper release of the Earnest Money to Receiver as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over any case in which Buyer or any affiliate of Buyer is a debtor. Buyer hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, Sections 105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Receiver.

## Article II
### INSPECTIONS AND TPA/LOAN ASSUMPTION

2.1.    *Property Information*. Not later than ten (10) Business Days after the Effective Date, Receiver will use Commercially Reasonable Efforts to make available to Buyer, to the extent in Receiver's possession or readily obtainable or ascertainable from the Property's property management company, copies of, or Receiver's permission to access with the right to copy, the following information with respect to the Property (collectively the "**Property Information**"):

(a)      any standard form of apartment lease used for the Real Property and the right to inspect and copy the existing Leases in the possession of the property manager;

5

APP000007

(b) any current rent roll for the Real Property, indicating rents collected, scheduled rents and concessions, delinquencies, and security deposits, sure deposits, pet, and other deposits held (the "**Rent Roll**");

(c) any operating statements for the three (3) previous fiscal years and year to date (the "**Operating Statements**");

(d) a list of Tangible Personal Property, if any, and a list and copies of any service or maintenance agreements, if any (the "**Service Contracts**");

(e) any existing land title survey (the "**Existing Survey**");

(f) any digital and hard copy "as built" plans for the Improvements;

(g) any engineering, geotechnical, no further action letters and environmental reports prepared for Receiver and relating solely to the Property;

(h) any certificates of occupancy;

(i) any ad valorem (both real property and personal property) tax bills and assessments for the last two (3) years;

(j) any currently-effective warranties and guaranties;

(k) any inspection reports such as, but not limited to, swimming pool, fire, backflow, inspection reports within the last twelve (12) months;

(l) any permits such as, but not limited to, fire alarm, pool, spa, parking, burglar, sign, and elevator permits issued by governmental authorities;

(m) any pending applications for licenses, permits or other governmental approvals for the Property;

(n) any business and other licenses required by any governmental authority to operate the Property;

(o) any insurance reports such as, but not limited to, prior claims, insurance certificates, evidence that insurance premiums have been paid as well as evidence of policies currently in effect, loss reports listing any loses over the last twelve (12) months; and any insurance bills for the last (3) years;

(p) any documentation relating to any outstanding deposits, bonds, or letters of credit relating to the Property, including, but not limited to, any of the foregoing for road paving, road construction, storm water basins, erosion control, and utility systems;

(q) any construction documents such as, but not limited to, construction specifications, warranty manuals, close out documents, soils reports and sprinkler plans;

(r) any existing title policy (lender and owner), Existing Survey and copies of exception documents;

(s) any code compliance documents such as fire department inspection reports, building code inspection reports, zoning, certificate of occupancy, utility availability, termite inspection certificate and PZR zoning report;

(t) any appraisals of the property;

(u) any aged receivable and delinquency reports;

(v) any current occupancy reports and for the last (2) years;

(w) any lease expiration reports and schedules;

6

APP000008

(x)    any operating and capital budgets;

(y)    any competitive market surveys;

(z)    any utility bills and fees or charges with utility reimbursement programs for the last (2) years;

(aa)    any major additions or renovations report;

(bb)    any list of current litigation;

(cc)    any crime incident reports for the last (2) years;

(dd)    any Service Contracts including a vendor list with contact information such as, but not limited to company name, contact name, phone numbers, email;

(ee)    any marketing material such as leasing brochure, floor plans, site plans, property photos or videography;

(ff)    the documents and instruments governing the Loan;

(gg)    Copies of all Assumed Service Contracts (below defined); and

(hh)    any list of current employees including salaries, benefits, tenure and employee units and specific employee discounts.

2.2.    *Confidentiality*. The Property Information and all other information (other than matters of public record or matters generally known to the public) furnished to, or obtained through inspection of the Property by Buyer, its affiliates, lenders, employees, attorneys, accountants and other professionals or agents ("**Buyer's Representatives**") relating to the Property, will be treated by Buyer and Buyer's Representatives as confidential, and will not be disclosed to anyone other than on a need-to-know basis who agree to maintain the confidentiality of such information pursuant to this **Section 2.2**, and all originals and copies will be returned to Receiver by Buyer if the Closing does not occur, or will be otherwise destroyed and confirmed by Buyer as destroyed in writing. Buyer at all times agrees to remain responsible for itself and the Buyer's Representatives, as well as any third parties that access Property Information as a result of Buyer's disclosure. Without limiting the foregoing, Buyer acknowledges that the Leases and the Rent Roll may contain personal information relating to the respective tenants thereto (including, names, postal addresses, phone numbers, etc.), and Buyer agrees that all such personal information shall be treated as confidential information by Buyer. Buyer further agrees to implement and maintain adequate and appropriate administrative, physical, and technical safeguards to ensure the confidentiality and security of such confidential information and to protect against any threats, hazards and unauthorized access or use of such confidential information. Buyer agrees to promptly notify Receiver of any requested disclosure or known or suspected unauthorized access to or loss, breach, damage, or theft of any confidential information and, in such event, take such additional measures to mitigate the loss, breach, damage, or theft and indemnify, defend, and hold harmless Receiver in such event. The confidentiality provisions of this **Section 2.2** shall not apply to any disclosures made by Buyer as required by law, by court order, or in connection with any subpoena served upon Buyer; provided Buyer shall provide Receiver with written notice before making any such disclosure to enable Receiver to seek an appropriate protective order. The provisions of this paragraph shall survive the termination of this Agreement.

2.3.    *Inspections in General*. During the Due Diligence Period, Buyer and Buyer's Representatives shall have the right to enter upon the Property for the purpose of making non-invasive inspections at Buyer's sole risk, cost and expense. All of such entries upon the Property shall be at reasonable times during normal business hours with prior written notice to Receiver or Receiver's agent (which notice shall describe the scope of the inspections Buyer intends to conduct during Buyer's inspection), and Receiver or Receiver's agent shall have the right, but not the obligation, to accompany Buyer during any activities performed by

7

APP000009

Buyer on the Property, but the unavailability of Receiver's representatives shall not be a basis for denying Buyer's representatives access to the Property. Buyer shall not contact any tenant of the Property, any employee of Receiver or the property management company, any governmental agency or instrumentality (except to obtain a zoning compliance letter or in connection with Buyer's zoning report), or any other third person regarding the Property without the prior written consent of Receiver. Following each entry by Buyer or Buyer's Representatives with respect to inspections and/or tests on the Property made by Buyer or Buyer's Representatives, Buyer shall, to the extent of any damage caused by Buyer's inspections or tests, restore the Property in the same condition that existed immediately prior to any such inspections and/or tests to Receiver's reasonable satisfaction. Such obligation to restore shall survive the termination of this Agreement.

2.4.    ***Environmental Inspections and Release***. The inspections under **Section 2.3** may include a non-invasive Phase I environmental inspection of the Property, but no Phase II environmental inspection or other invasive inspection or sampling of soils, water, air or other materials (other than standard radon testing), including without limitation construction materials, for analytical testing, either as part of the Phase I inspection or any other inspection, shall be performed without the prior written consent of Receiver not to be unreasonably withheld, conditioned or delayed; and, if consented to by Receiver, the proposed scope of work and the party who will perform the work shall be subject to Receiver's review and approval. Buyer agrees, for itself and for Buyer's Representatives, not to engage in any activities that would violate any permits, licenses, entitlements, environmental, wetlands or other regulations pertaining to the Property, or any terms or provisions set forth in any Exception documents.

2.5.    ***Termination Prior to Expiration of Due Diligence Period***. If prior to the expiration of the Due Diligence Period (even if the Due Diligence Period has yet to commence) Buyer determines, in its sole discretion, that the Property is unacceptable for Buyer's purposes, Buyer shall have the right to terminate this Agreement by giving to Receiver written notice of termination before the expiration of the Due Diligence Period, in which case the Earnest Money shall be refunded to Buyer pursuant to the terms of this Agreement, and neither Receiver nor Buyer shall have any further rights or obligations under this Agreement, other than those that expressly survive a termination of this Agreement. If Buyer does not give written notice of termination prior to the expiration of the Due Diligence Period, this Agreement shall continue in full force and effect subject to the provisions of this Agreement.

2.6.    ***Receiver Expense***. At no third-party expense to Receiver, Receiver shall reasonably cooperate with Buyer in its due diligence investigations conducted in accordance with this Article II.

2.7.    ***Indemnification***. Buyer agrees to indemnify, defend, and hold Receiver and its disclosed or undisclosed, agents, affiliates, representatives, consultants, accountants, contractors, and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Receiver, the "**Receiver Parties**") harmless from and against any and all losses, costs, damages, liens, claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) (each a "**Claim**") incurred by any Receiver Parties arising from or by reason of Buyer's and/or Buyer's Representatives' access to, or inspection of, the Property, or any tests, inspections, or other due diligence conducted by or on behalf of Buyer; provided, however, that Buyer shall not hereunder be obligated to indemnify, defend or hold harmless for any Claims resulting from the mere discovery of matters that are not exacerbated by any Buyer Representatives or Claims are caused by the gross negligence or willful misconduct of any of the Receiver Parties. The provisions of this **Section 2.7** shall survive the Closing or any termination of this Agreement.

2.8.    ***Transfer of Physical Assets; Loan Assumption***.

8

APP000010

(a)    Generally. The Property is currently subject to a loan in the approximate amount of $35,076,762.98 made by Greystone Servicing Corporation, Inc. ("**Lender**") (the "**Loan**"). The Loan is insured by the U.S. Department of Housing and Urban Development's Federal Housing Administration ("**HUD**"). Buyer's obligations hereunder are expressly contingent upon receipt of unconditional, final approval of both HUD and, if required, Lender, for the assumption of the Loan by Borrower at Closing without any material modifications thereto (such approvals herein referred to as "**HUD Approval**"), which assumption shall constitute a dollar-for-dollar credit against the Purchase Price. Buyer agrees to use Commercially Reasonable Efforts to obtain HUD Approval, which expressly includes providing HUD with all documents, applications, information, and materials regarding Buyer or the Project (to the extent available to Buyer) as necessary to obtain HUD Approval. Failure to obtain HUD Approval for any reason outside Buyer's reasonable control shall permit Buyer to terminate this Agreement and receive a refund of the Earnest Money less the Independent Consideration.

(b)    Transfer of Physical Assets. As soon as commercially practicable following the Effective Date, Buyer shall, with reasonable cooperation and assistance from Receiver, prepare and submit an application for a Transfer of Physical Assets (the "**TPA**") to seek HUD approval for the assumption of the Loan, and to provide any materials that Lender may reasonably require in connection with the assumption of the Loan. Receiver shall use Commercially Reasonable Efforts (defined below) to cause the Property's property management agent to provide materials necessary to prepare the TPA. The TPA application fee, the cost for any assumption-related inspections and/or reports required by HUD and/or Lender (including any remediation or repair costs or expenses as noted in said reports and/or inspections), and any costs and expenses of a similar nature shall be borne by Buyer. Receiver shall use Commercially Reasonable Efforts to (and shall use Commercially Reasonable Efforts to cause its property manager to) (i) make available the Property for inspections during normal business hours, upon advance notice, and without material interruption to the operations on the Property, and (ii) respond to any inquiries as needed in connection with the assumption of the Loan. "*Commercially Reasonable Efforts*" means with respect to a given commercial objective, the efforts that a reasonable person in the position of the promising Party would use so as to achieve that goal as expeditiously as is reasonably possible.

(c)    Approval Conditions.    In the event HUD Approval is conditioned upon certain undertakings that the Receiver is unable or unwilling to satisfy or perform within thirty (30) days following receipt of written notice thereof, Buyer shall have the option, exercisable in Buyer's discretion, to terminate this Agreement and receive a refund of the Earnest Money, or to undertake (or commit to undertake after Closing) the same on Receiver's behalf without any reduction in Purchase Price.

(d)    Reserves. Unless otherwise agreed by the Parties, any mandatory reserves funded by Receiver or D4FR that are required by the terms of the Loan to be deposited with Lender and/or HUD may remain in said reserve accounts with Lender and/or HUD, and a corresponding amount shall be paid by Buyer to Receiver at Closing in cash. An approximation of the remaining reserve balances on deposit with Lender as of the Effective Date is $244,951.44.

(e)    Assumption Fee. Buyer shall pay any assumption fee(s) associated with the Loan assumption that are due to HUD or Lender at or prior to Closing.

**Article III**
**TITLE AND SURVEY REVIEW**

9

APP000011

3.1.    ***Delivery of Title Commitment***. Within ten (10) days following the commencement of the Due Diligence Period, Buyer shall cause to be delivered to Buyer and Receiver a preliminary report or title commitment issued by the Title Company on the form promulgated by the Texas Department of Insurance (the "**Title Commitment**") covering the Real Property, together with true, complete, and legible copies of all applicable exception documents referenced in the Title Commitment. The Title Commitment shall be issued by the Title Company or other underwriter acceptable to the Title Company.

3.2.    ***Title Review and Cure***.

(a)    On or before the date that is ten (10) Business Days after the delivery to Buyer of the Title Commitment and, if in possession of Receiver, the Existing Survey (the "**Objection Deadline**"), Buyer shall give written notice (the "**Objection Notice**") to Receiver of any matter set forth in the Title Commitment (and, if obtained, the Existing Survey) to which Buyer objects (the "**Objections**"), which shall specifically exclude any Exceptions or Claims created due to the acts or omissions of Buyer or Buyer's Representatives. In the event the Existing Survey is not provided or omits any item identified on the Title Commitment, such "Objection Deadline" shall be extended until the tenth (10th) Business Day following receipt by Buyer of a new survey, which shall be obtained at Buyer's sole cost and expense. Notwithstanding anything to the contrary herein, in no event shall the Objection Deadline be later than forty-five (45) days after the Effective Date.

(b)    Any item contained in the Title Commitment, or any matter shown on the Existing Survey (if any), which Receiver does not elect in writing to cure prior to the Objection Deadline, shall be deemed individually an "**Exception**", and collectively, the "**Exceptions**" and shall include any and all other Exceptions as described in this Agreement hereafter created at or prior to Closing. In the event Buyer notifies Receiver of an Objection, Receiver shall have the right, but not the obligation, to cure such Objection.

(c)    If Buyer fails to tender an Objection Notice on or before the Objection Deadline, Buyer shall be deemed to have approved and waived any objections to any matters covered by the Title Commitment and the Existing Survey (and, if obtained, a new survey). On or before five (5) Business Days after receipt of the Objections (the "**Response Deadline**") in writing, Receiver may give Buyer notice (the "**Response Notice**") of those Objections that Receiver is willing to cure, if any. Receiver further agrees to use Commercially Reasonable Efforts to remove (or use Commercially Reasonable Efforts to cause the Title Company to affirmatively insure over) any exceptions or encumbrances to title which are created by Receiver after the Effective Date without Buyer's consent.

(d)    If Receiver fails to deliver a Response Notice by the Response Deadline, Receiver shall be deemed to have elected not to cure or otherwise resolve any matter set forth in the Objection Notice. Receiver shall have no obligation to take any steps or bring any action or proceeding or otherwise to incur any effort or expense whatsoever to eliminate or modify any Exceptions or any Objections thereto, except with respect to any items that Receiver agrees in writing to cure. If Receiver elects to cure any of the foregoing items and this Agreement is not otherwise terminated as provided herein, Receiver shall have until Closing to remove, satisfy, or cure the same.

(e)    If Buyer is dissatisfied with the Response Notice or the lack of Response Notice or Receiver's failure to cure any Exception or Objection, then, in each case, Buyer may, as its exclusive remedies, accept a conveyance of the Property subject to the Exceptions, specifically including any matter objected to by Buyer which Receiver is unwilling or unable to cure, or exercise its right to terminate this Agreement on or before five (5) Business Days after receipt of the Response Notice or, if no Response Notice is given prior to the Response Deadline, on or before

10

APP000012

five (5) Business Days after the Response Deadline. If Buyer provides such notice, this Agreement shall terminate and be of no further force and effect, except for the matters that expressly survive the termination of this Agreement, the Escrow Agent shall refund the Earnest Money to Buyer pursuant to the terms of this Agreement, and Buyer shall be deemed to have waived and released Receiver and Property from any and all Claims. If Buyer fails to timely exercise such right, Buyer shall be deemed to accept the Title Commitment and Existing Survey (and, if obtained, a new survey) with resolution, if any, of the Objections set forth in the Response Notice (or if no Response Notice is tendered, without any resolution of the Objections) and without any reduction or abatement of the Purchase Price.

(f)    The term "**Permitted Exceptions**" shall mean: the Exceptions (exceptions that are not part of the promulgated title insurance form) in the Title Commitment that the Title Company has not agreed to insure over or remove from the Title Commitment prior to Closing and that Receiver is not required to, or has not agreed to, remove as provided above; all items shown on the Existing Survey, or if obtained, a new survey. Permitted Exceptions shall also specifically include: (i) any and all general real estate taxes and assessments, special taxes and assessments, franchise taxes, levies and personal property taxes imposed by any governmental or quasi-governmental authority and any assessments, dues or charges by private covenant constituting a lien or charge on the Property which are, as of the Closing, not delinquent; (ii) supplemental taxes, if any, hereinafter assessed by any governmental authority against the Property to the extent due to a change in ownership and/or use of the Property as a result of this sale; (iii) any other access, telecommunication, cabling and/or utility agreements, memorandums of agreements, licenses or rights-of-way either filed of public record against title to or otherwise effects, the Property, whether prior to or after the Effective Date; (iv) any license, contract, instrument or other agreement entered into between Receiver and/or Receiver's affiliate and any municipality or administrative body, governmental or quasi-governmental authority, or utility provider (on the other hand), which is either filed of public record against title to or otherwise effects, the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, whether prior to or after the Effective Date; (v) the permits, approvals and conditions which have been or must be obtained for the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, including without limitation, and any document, instrument and/or agreement related to same (including, without limitation, any replat of the Property or any portion thereof), whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date.

3.3.    ***Conveyance of Title at Closing***. At Closing, Receiver shall convey fee simple title to the Property, on behalf of D4FR, to Buyer, subject to the Permitted Exceptions. Subject to Receiver's Knowledge (defined herein) and the truth of any matter, Receiver shall execute Title Company's customary affidavit of debt, liens and parties in possession at Closing.

**Article IV**
**OPERATIONS AND RISK OF LOSS**

4.1.    ***Ongoing Operations***. During the pendency of this Agreement, Receiver shall use Commercially Reasonable Efforts to, and shall use Commercially Reasonable Efforts to cause the property manager to, carry on its business and activities relating to the Property, including leasing of the Property and payment of the Loan, in substantially the same manner as it did before the Effective Date.

4.2.    ***Performance under Leases and Service Contracts***. During the pendency of this Agreement, Receiver shall use Commercially Reasonable Efforts to, and shall use Commercially Reasonable Efforts to

11

APP000013

cause the property manager to, perform its material obligations under the Leases, the Loan, and Service Contracts relating to the Property in substantially the same manner as it did before the Effective Date.

4.3.    *New Contracts*. During the pendency of this Agreement, Receiver shall use Commercially Reasonable Efforts to cause the property manager to not enter into any contract that will be an obligation affecting the Property subsequent to the Closing, except (a) Leases and (b) freely assignable contracts entered into in the ordinary course of business, without the prior consent of Buyer, which shall not be unreasonably withheld, conditioned, or delayed.

4.4.    *Service Contracts*. Buyer agrees to assume at Closing the Service Contracts serving the Property (the "**Assumed Service Contracts**"), to the extent assignable and/or transferrable and to the extent there are, at Closing, no unresolved defaults thereunder. Notwithstanding the foregoing, Buyer shall not have the right to assume any Service Contract that is pursuant to a master contract with Receiver's property manager unless Buyer retains the current property manager and obtains such property manager's written approval. Buyer shall pay any transfer or assignment charges due in connection with its assumption of any Assumed Service Contracts.

4.5.    *Damage or Condemnation*. Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced before the Closing, and risk of loss to the Property due to fire, flood, or any other cause before the Closing, shall remain with Receiver. If before the Closing the Property or any portion thereof shall be materially damaged, or if the Property or any material portion thereof shall be subjected to a bona fide threat of condemnation or shall become the subject of any proceedings, judicial, administrative or otherwise, with respect to the taking by eminent domain or condemnation, then Buyer may terminate this Agreement by providing proof thereof and written notice to Receiver given within five (5) days after Buyer learns of the damage or taking, in which event the Earnest Money, less the Independent Consideration, shall be returned to Buyer. If the Closing Date is within the aforesaid five (5) day period, then Closing shall be extended to the next Business Day following the end of said five (5) day period. If no such election is made, and in any event if the damage is not material, this Agreement shall remain in full force and effect and the purchase contemplated hereby, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, and upon the Closing of this purchase, Receiver shall assign, transfer, and set over to Buyer all of the right, title, and interest of Receiver in and to any awards that have been or that may thereafter be made for such taking, and Receiver shall assign, transfer and set over to Buyer any insurance proceeds that may thereafter be made for such damage or destruction giving Buyer a credit at Closing for any deductible under such policies. For the purposes of this paragraph, the phrases "**material damage**" and "**materially damaged**" means damage reasonably estimated by Receiver to have a cost exceeding ten percent (10%) of the Purchase Price to repair.

**Article V**
**CLOSING**

5.1.    *Closing*. The closing, funding, and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on the Closing Date at the offices of the Title Company; provided, however, Buyer shall have the option to extend the Closing Date for a thirty (30) day period (the "**Closing Extension**") by giving written notice of the Closing Extension to Receiver at least five (5) Business Days prior to the originally scheduled Closing Date and by depositing with the Escrow Agent, on or by such fifth (5th) Business Day prior, Additional Earnest Money of $100,000 (as referenced in **Section 1.4(b)(iii)** herein). Such $100,000 of Additional Earnest Money shall be non-refundable to Buyer except as otherwise provided to the contrary in **Sections 4.5** (i.e., casualty/condemnation), **5.2(b)** (i.e., inability to satisfy Buyer's closing conditions, which includes the inability to obtain unconditional HUD Approval as contemplated in and further subject to the remaining terms of Section 2.8)**, and 8.2** (i.e., a Receiver default).

12

APP000014

The Closing shall occur with all deliveries required hereunder being made to Escrow Agent on or before the Closing Date, in accordance with the escrow instructions consistent with the terms and conditions of this Agreement given by or on behalf of Receiver and Buyer, respectively; whereby escrow arrangements mutually acceptable to Receiver and Buyer shall al low Receiver, Buyer and their respective attorneys to consummate the Closing without being physically present and to exchange closing documents through such escrow, via electronic means, and/or .pdf (except with regard to recordable documents or other instruments reasonably requested by the Parties to be provided in original "wet ink" form), which shall be physically delivered to the Escrow Agent on or before the Closing Date.

5.2.    ***Conditions to Closing.***

(a)    Receiver's Closing Conditions. The obligation of Receiver to consummate the transactions contemplated hereby is contingent upon the following, any or all of which may be waived by Receiver in its sole discretion (each a **"Receiver's Condition Precedent"**):

(i)    Buyer's representations and warranties expressly set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date;

(ii)    As of the Closing Date, Buyer shall have performed and observed, in all material respects, all material obligations, agreements, and covenants expressly set forth in this Agreement and all deliveries to be made at Closing as expressly set forth in this Agreement have been tendered;

(iii)    Buyer shall have timely deposited with Escrow Agent on the Closing Date, the Purchase Price, as adjusted pursuant to and payable in the manner provided for in this Agreement; and

(iv)    The Court has approved the transactions contemplated hereby pursuant to **Section 5.9** herein.

(b)    Buyer's Closing Conditions. The obligation of Buyer to consummate the transactions contemplated hereby is contingent upon the following, any or all of which may be waived by Buyer in its sole discretion (each a **"Buyer's Condition Precedent"**):

(i)    Receiver's representations and warranties expressly set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date;

(ii)    As of the Closing Date, Receiver shall have performed its material obligations expressly set forth in this Agreement and all deliveries to be made at Closing as expressly set forth in this Agreement have been tendered;

(iii)    Buyer shall have received HUD Approval for the assumption of the Loan on terms and conditions reasonably acceptable to Buyer, and Receiver has executed all documents required by HUD and Lender to effectuate the assumption of the Loan, unless such HUD Approval was withheld for reasons within Buyer's reasonable control, in which case this Section 5.2(b)(iii) shall be deemed waived;

(iv)    There have been no material developments involving matters described in **Sections 1.1(l)(i) through (iii)** that (A) remain uncured beyond thirty (30) days following Receiver's receipt of written notice from Buyer, (B) are materially adverse to Buyer's interest in the

13

APP000015

Property or the Property itself, and (C) have caused any of the criteria described in **Sections 1.1(l)(i) through (iii)** to no longer be satisfied as of the Closing Date; and

(v)        Title Company is prepared to issue, upon the condition and payment of its scheduled premium, a standard form of Texas Land Title Association owner's policy (the "**Title Policy**") as of the date and time of the recording of the Deed, in the amount of the Purchase Price, insuring Buyer as owner of good and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions.

So long as a Party is not in default hereunder pursuant to **Article VIII**, if any condition to such Party's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date, such Party shall give the other Party written notice of same with at least three (3) Business Days to cure such condition and the Closing Date shall be extended until the next business day following the three (3) business day cure period provided herein. Thereafter, if any condition to such Party's obligation to proceed with the Closing has not been satisfied, such Party may, in its sole discretion, either (i) terminate this Agreement by delivering written notice to the other Party on or before the Closing Date, in which event the Earnest Money less the Independent Consideration shall be paid as follows: (1) to Buyer if Buyer terminates pursuant to Section 5.2(b) herein or 2) to Receiver if Receiver terminates pursuant to Section 5.2(a) herein, or (ii) elect to close without alteration of the Purchase Price, notwithstanding the non-satisfaction of such condition, in which event such Party shall be deemed to have waived any such condition. If such Party elects to close, notwithstanding the nonsatisfaction of such condition, there shall be no liability on the part of the other Party for nonsatisfaction of such condition or for breaches of representations and warranties of which the Party electing to close had knowledge as of the Closing.

5.3.    ***Receiver's Deliveries in Escrow***. Not later than the Closing Date, subject to Buyer's timely and proper satisfaction of the terms and conditions set forth in **Section 5.4** and **Section 5.9** below, Receiver shall use Commercially Reasonable Efforts to deliver in escrow to the Title Company the following:

(a)        Deed. A special warranty deed in the form of **Exhibit B** attached hereto (the "**Deed**"), executed and acknowledged by Receiver, conveying Receiver's title to the Real Property, subject to the Permitted Exceptions.

(b)        Bill of Sale and Assignment of Leases and Contracts. A Bill of Sale and Assignment of Leases and Assumed Service Contracts in the form of **Exhibit C** attached hereto (the "**Assignment**"), executed by Receiver.

(c)        State Law Disclosures. Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property.

(d)        Loan Assumption Documents. All documents and instruments reasonably required by HUD and/or Lender to be delivered by Receiver in connection with the Loan assumption.

(e)        Additional Documents. Any additional documents that Escrow Agent or Title Company may reasonably require for the proper consummation of the transactions contemplated by this Agreement.

(f)        FIRPTA. An affidavit compliant with the Foreign Investment in Real Property Tax Act, executed by Receiver.

14

APP000016

(g)　　Rent Roll. An updated Rent Roll, dated within five (5) Business Days prior to the Closing Date and certified by either Receiver or the property manager, to the best of its knowledge, to be true and correct in all material respects.

5.4.　　***Buyer's Deliveries in Escrow***. Not later than the Closing Date, subject to Receiver's timely and proper satisfaction of the terms and conditions set forth in **Section 5.3** above and **Section 5.9** below, Buyer shall deliver in escrow to the Title Company the following:

(a)　　Purchase Price. The Purchase Price, less the Earnest Money deposited by Buyer, plus or minus applicable prorations, deposited by Buyer with the Escrow Agent in immediate, same day federal funds wired for credit into the Title Company's escrow account at a bank satisfactory to Receiver.

(b)　　Bill of Sale and Assignment of Leases and Contracts. The Assignment, duly executed by Buyer.

(c)　　State Law Disclosures. Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property.

(d)　　Additional Documents. Any additional documents that the Title Company may reasonably require for the proper consummation of the transactions contemplated by this Agreement.

(e)　　Loan Assumption Documents. All documents and instruments reasonably required by HUD and/or Lender to be delivered by Buyer in connection with the Loan assumption.

5.5.　　***Possession, Lease Files and Assumed Contracts***. Receiver shall deliver possession of the Property to Buyer at the Closing, subject to the Permitted Exceptions. To the extent reasonably available to Receiver, Receiver agrees to use Commercially Reasonable Efforts to deliver, or cause to be delivered, originals or copies of the Leases, Assumed Service Contracts, lease files, warranties, guaranties, operating manuals, keys to the Property, and books and records regarding the Property at Closing or, if delivery is not possible at Closing, within a reasonable period of time after Closing.

5.6.　　***Notice to Residents***. Receiver and Buyer agree to work together in good faith to deliver to each tenant within a commercially practicable timeframe following Closing, a notice regarding the sale in substantially the form of **Exhibit D** attached hereto, or such other form as may be required by applicable state law.

5.7.　　***Closing Costs***.

a.　　Receiver shall pay on behalf of D4FR at Closing: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) reserved; (iii) one-half of the Escrow Costs; (iv) prorated Ad Valorem Property taxes; (v) the fee for the Title Commitment, search, exam fee, and the basic premium for Title Policy; (vi) all Broker Commission pursuant to Section 6.6 and (vii) any other costs, fees, or expenses approved by Receiver under the terms of this Agreement or the settlement statement delivered at Closing.

b.　　Buyer shall pay: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) the cost of obtaining a new survey or updating the Existing Survey and other third party reports relating to the conducting its due diligence review; (iii) the

15

APP000017

cost for any title endorsements; (iv) the recordation fee for the Deed and any other documents, instruments or agreements to be recorded at Closing (other than curative matters); (v) one-half of the Escrow Costs; (vi) all fees and costs associated with Buyer's loan or otherwise incurred by Buyer's lender; (vii) reserved; (viii) prorated Ad Valorem Property taxes; and (ix) any other commissions, costs, fees or expenses approved by Buyer under the terms of this Agreement or the settlement statement delivered at Closing.

c.        Below is a summary of the allocation of Closing costs in this Agreement. In the event of a conflict between this **Section 5.7(c)** and the remainder of this Agreement, the remainder of this Agreement shall control. Any other costs not outlined below shall be the responsibility of the Party as expressly outlined in this Agreement, or if not outlined in the Agreement, of Buyer.

| Cost | Responsible Party |
|---|---|
| Title Commitment, search, and exam fee for Title Policy | Receiver |
| Premium for standard/basic form of Title Policy | Receiver |
| Premium for any upgrade of Title Policy for extended or additional coverage and any endorsements desired by Buyer, any inspection fee charged by the Title Company, tax certificates, municipal and utility lien certificates, and any other Title Company charges | Buyer |
| Costs of any update to the Existing Survey commissioned by Buyer, or any new survey obtained by Buyer | Buyer |
| Costs for UCC searches, Environmental Phase I and all other inspections and reports, site visit(s) of Buyer and Buyer Representatives | Buyer |
| Recording fees for the Deed and any other documents, instruments, or agreements to be recorded at Closing | Buyer |
| Ad Valorem Property Taxes | Prorated as of Closing Date on a calendar year basis |
| All fees and costs associated with Buyer's loan or otherwise incurred by Buyer's lender | Buyer |
| Any escrow fee charged by the Escrow Agent for holding the Earnest Money and Additional Earnest Money or conducting the Closing | ½ Buyer ½ Receiver |
| Broker Commission to Broker | Receiver |
| Buyer's Attorney Fees | Buyer |
| Receiver's Attorney Fees | Receiver |

5.8.    **Close of Escrow.** The Title Company shall agree in writing with Receiver and Buyer that (a) recordation of the Deed constitutes its representation that it is holding the closing documents, closing funds, and closing statement and is prepared and irrevocably committed to disburse the closing funds in accordance with the closing statements and (b) release of funds to Receiver shall irrevocably commit it to issue the Title Policy in accordance with this Agreement. Upon satisfaction or completion of the foregoing conditions and deliveries, the Parties shall direct the Title Company to immediately record and deliver the documents described above to the appropriate parties and make disbursements according to the closing statements executed by Receiver and Buyer and in accordance with escrow instructions by each Party consistent with this Agreement.

5.9.    **Court Approval.** Notwithstanding anything to the contrary herein, Buyer acknowledges that the transactions contemplated by this Agreement are expressly subject in all respects to: (a) Court Approval;

APP000018

(b) any applicable order of the Court in the Receivership Action; and (c) compliance with Applicable Laws (defined below).

5.10.    ***Obligations of Buyer.*** Buyer acknowledges that conveyance of title to the Property may be subject to certain covenants, conditions, and restrictions. Buyer covenants and agrees to continue to cooperate in good faith with Receiver to execute, deliver, and record (if necessary) such documents required with respect to such covenants, conditions, and restrictions, which such obligation shall survive Closing.

**Article VI**
**PRORATIONS; PAYMENTS AT CLOSING**

6.1.    ***Prorations***. The day of Closing shall belong to Buyer and all prorations hereinafter provided to be made as of the Closing shall each be made as of the end of the day before the Closing. In each such proration set forth below, the portion thereof applicable to periods beginning as of Closing shall be credited or charged to Buyer and the portion thereof applicable to periods ending as of Closing shall be credited or charged to Receiver.

(a)    <u>Taxes and Assessments</u>.

(i)    General real estate taxes and assessments imposed by governmental authority and any assessments imposed by private covenant constituting a lien or charge on the Property for the then current calendar year or other current tax period (collectively, "**Taxes**") not yet due and payable shall be prorated. If the Closing occurs prior to the receipt by Receiver of the tax bill for the calendar year or other applicable tax period in which the Closing occurs, Buyer and Receiver shall prorate Taxes for such calendar year or other applicable tax period based upon the most recent ascertainable assessed values and tax rates.

(ii)    Any refund or rebate of Taxes resulting from a tax protest, challenge, or appeal (an "**Appeal**") for a tax year ending prior to the Closing Date shall belong to Receiver, whether received before or after Closing, and Receiver shall have the sole authority to prosecute such Appeals. Any refund or rebate of Taxes resulting from an Appeal for the tax year in which the Closing Date occurs shall belong to Buyer, and Buyer shall have the sole authority to prosecute such appeals.

(iii)    If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing (the "**Rollback Taxes**"), then Buyer shall be responsible for payment of all Rollback Taxes.

(b)    <u>Collected Rent; Tenant Receivables</u>. All collected rent and other collected income (and any applicable state or local tax on rent) under Leases in effect on the Closing Date shall be prorated. Receiver agrees to deliver to Buyer at Closing any rent and other income collected by Receiver before Closing, but applicable to any period of time after Closing. Any rents from tenants received by Buyer after the Closing Date that are in excess of amounts then outstanding to Buyer shall be delivered to Receiver by Buyer. For a period of ninety (90) days following Closing, Buyer will use Commercially Reasonable Efforts, but without suit, to collect any unpaid rents applicable to the period before Closing and pay amounts received from such Tenants that are in excess of what they owe Buyer and promptly pay such amounts to Receiver. Receiver may pursue the collection of the same, provided that Receiver shall have no right to terminate any Lease or any tenant's occupancy under any Lease in connection therewith.

17

APP000019

(c)  Utilities. Utilities, including water, sewer, electric, and gas, based upon the last reading of meters prior to the Closing shall be prorated. Receiver shall use Commercially Reasonable Efforts to obtain meter readings within the five (5) Business Day period before the Closing Date, and if such readings are obtained, there shall be no proration of such items. Receiver shall pay at Closing the bills therefore for the period preceding the Closing, and Buyer shall pay the bills therefore for the period subsequent thereto. If the utility company will not issue separate bills, or Receiver is unable to obtain same, Buyer will receive a credit against the Purchase Price for Receiver's portion and will pay the entire bill prior to delinquency after Closing. If Receiver has paid any utilities no more than thirty (30) days in advance in the ordinary course of business, then Buyer shall be charged its portion of such payment at Closing. Recoveries from the reimbursement of utility expenses collected by Buyer or Receiver (or a third-party service provider) shall be prorated based upon, and shall relate back to, the months in which the billed expenses were incurred. Buyer shall be responsible for the payment of all deposits necessary to continue utility services for the period beginning on the Closing Date, and Receiver shall be entitled to apply for return of any deposits that Receiver had paid to such utility companies.

(d)  Fees and Charges under Assumed Service Contracts, Licenses and Permits. Fees and charges under the Assumed Service Contracts, licenses, and permits as are being assigned to and assumed by Buyer at the Closing shall be prorated on the basis of the periods to which such Assumed Service Contracts, licenses and permits relate.

(e)  Nonrefundable Deposits, Fees, Upfront Payments, and Prepaid Amounts. Nonrefundable deposits, fees and upfront payments, bonuses, door fees, and prepaid amounts received by Receiver under laundry, telecommunications, cable, internet and other similar leases and concessions shall not be prorated at Closing, it being the agreement of Receiver and Buyer that Receiver shall have the right to keep all of the same.

6.2.  *Final Adjustments*. The Parties agree to use good faith efforts to make final prorations as of the Closing Date. The Parties agree there will be no final adjustments after the Closing except as specifically set forth in Section 6.1.

6.3.  *Service Contracts*. Buyer will assume the obligations arising from and after the Closing Date under the Assumed Service Contracts.

6.4.  *Tenant Deposits*. All refundable tenant security deposits, pet deposits and similar deposits from tenants that are in Receiver's possession (which are to be reflected on a final Rent Roll delivered to Buyer), together with interest thereon if required by law or contract to be earned thereon, and not theretofore applied to tenant obligations under the Leases, shall be transferred or credited to Buyer at Closing or placed in escrow. As of the Closing, Buyer shall assume Receiver's obligations related to tenant security deposits under the applicable lease agreements and applicable law, and to the extent such deposits were accounted in this proration between the Parties at Closing.

6.5.  *Utility Deposits*. Buyer shall be responsible for making any deposits required with utility companies or, if elected by Receiver, crediting to Receiver at Closing the amount of such deposits in which case Receiver shall assign to Buyer at Closing its rights to same.

6.6.  *Broker Commissions*. Upon the Closing of the transaction contemplated in this Agreement, Receiver shall pay to Site Selection Group, LLC, a Texas limited liability company (Attn: Lee Wagner) ("**Broker**") a commission ("**Broker's Commission**") in the amount of one percent (1%) of the Purchase Price pursuant to the terms of a separate written agreement between Buyer and Broker. If Closing does not occur for any reason, then Receiver shall not owe or be obligated to pay Broker's Commission. Under no

18

APP000020

circumstances shall Receiver or Buyer owe a commission, fee, or other compensation to any other broker, agent, finder, or person. Buyer and Receiver each hereby represents and warrants to the other that, other than Broker's Commission payable to Broker by Receiver, no other brokers, agents, finder's fees, or commissions are due or arising in connection with Buyer entering into this Agreement or the consummation of transactions contemplated herein, and each Party hereby agrees to indemnify, defend and hold the other harmless from and against all Claims arising from such warranties whether or not such Claim is meritorious, for any compensation with respect to the entering into of this Agreement, the sale and purchase of the Property, or the consummation of transactions contemplated herein. The provisions of this Section 6.6 shall survive Closing or earlier termination of this Agreement.

6.7    *Final Inspection*. Purchaser shall have the right to inspect the Property, including, but not limited to, all vacant units within five (5) Business Days of the scheduled Closing Date. Buyer shall receive a credit at Closing toward the Purchase Price of $750 per unit for each vacant unit, if any, that is not in a rent-ready condition as determined by Buyer in its commercially reasonable discretion. Buyer agrees to provide written notice to Receiver not later than two (2) Business Days prior to Closing of any such credit with sufficient detail to both document and itemize the defective vacant units.

## Article VII
### REPRESENTATIONS AND WARRANTIES

7.1.    *Receiver's Representations and Warranties.* As a material inducement to Buyer to enter into this Agreement and consummate this transaction, Receiver represents and warrants to Buyer the following shall be materially true and correct as of Closing:

(a)    Authority. As of the Closing Date and subject to the conditions described in **Section 5.9**, (i) Receiver shall have the full right and authority, and shall have received all consents required, to consummate the transactions herein described and (ii) this Agreement shall be a valid and binding obligation of Receiver, enforceable in accordance with its terms.

(b)    Pending Action. To Receiver's Knowledge (below defined), other than matters before the Court in this receivership, there is no action, investigation or similar proceeding materially affecting the Property.

(c)    Property Materials. Receiver has no Knowledge that the Property Information provided to Buyer is materially inaccurate or materially misleading.

(d)    Defaults or Non-Compliance. To Receiver's Knowledge, there is no default or unresolved material matter of non-compliance arising under any Assumed Service Contract or the Loan.

(e)    Environmental. Receiver has no Knowledge of any actual or threatened Environmental Matter affecting the Property.

As used in this **Section 7.1**, the phrases "**to Receiver's Knowledge**" and "**Knowledge**" shall mean the current, actual knowledge of Receiver gained through his receivership of the Property.

Buyer acknowledges that, by virtue of Receiver's limited knowledge and involvement in managing the Property, Receiver's Knowledge is limited. Receiver shall have no duty to make an independent investigation or inquiry as to the truthfulness of his representations and warranties. Upon request of Buyer following the Contingency Clearance Date, Receiver shall make a reasonable inquiry of the Property's property manager and/or Lender as to the truthfulness of the above representations and warranties, without incurring an additional obligation to investigate same, and shall promptly

19

APP000021

notify Buyer of any response from Property's property manager or Lender that would make them no longer truthful.

Unless otherwise stated to the contrary, each of Receiver's representations and warranties in this Agreement shall be true and correct in all material respects as of the date of Closing and shall survive Closing for a period of at least six (6) months.

7.2.   ***Buyer's Representations and Warranties***. As a material inducement to Receiver to execute this Agreement and consummate this transaction, Buyer represents and warrants to Receiver that the following shall be materially true and correct as of Closing:

(a)     Organization and Authority. Buyer has been duly organized and is validly existing as a limited liability company in good standing in the State of Texas and is qualified to do business in the state in which the Property is located. Buyer has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Buyer at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Buyer, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action. There is no agreement to which Buyer is a party or to Buyer's knowledge binding on Buyer which is in conflict with this Agreement. There is no action or proceeding pending or, to Buyer's knowledge, threatened against Buyer which challenges or impairs Buyer's ability to execute or perform its obligations under this Agreement. The execution and delivery of this Agreement or the consummation by Buyer of the transactions contemplated by this Agreement will not (i) conflict with or result in a breach of or default under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, license, agreement, or other instrument or obligation to which Buyer is a party, or (ii) violate any order, injunction, decree, statute, rule, or regulation applicable to Buyer.

(c)     Adequate Funds. Buyer will have at Closing funds adequate to pay the cash portion of the Purchase Price at Closing and to perform its other obligations under this Agreement.

(d)     ERISA. Buyer is not: (i) a plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as defined in Section 3(3) of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to collectively as a "Plan"); or (ii) a "governmental plan" as defined in Section 3(32) of ERISA. Buyer is acting on its own behalf and not on account of or for the benefit of any Plan. Buyer shall not transfer the Property to any entity, person or Plan which will cause a violation of ERISA. Buyer shall not assign its interest under this Agreement to any entity, person, or Plan which, if the assignee acquires the Property, will cause a violation of ERISA

(e)     Bankruptcy. Buyer has not (i) commenced a voluntary case, or had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its property, or (iii) made an assignment for the benefit of creditors.

20

APP000022

(f)    Patriot Act. Buyer is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, including the reporting, record keeping and compliance requirements of the Patriot Act and other authorizing statutes, executive orders and regulations administered by OFAC, and related Securities and Exchange Commission, SRO or other agency rules and regulations, and has policies, procedures, internal controls and systems that are reasonably designed to ensure such compliance.

(g)    OFAC. Neither (i) Buyer, any Affiliate of Buyer nor any Person controlled by Buyer; nor (ii) to the best of Buyer's knowledge, after making due inquiry, any Person who owns a controlling interest in or otherwise controls Buyer; nor (iii) to the best of Buyer's knowledge, after making due inquiry, if Buyer is a privately held entity, any Person otherwise having a direct or indirect beneficial interest (other than with respect to an interest in a publicly traded entity) in Buyer; nor (iv) any Person for whom Buyer is acting as agent or nominee in connection with this investment, is a country, territory, Person, organization, or entity named on an OFAC List, nor is a prohibited country, territory, Person, organization, or entity under any economic sanctions program administered or maintained by OFAC.

(h)    Return of Information. Should this Agreement terminate prior to the Closing Date, Buyer shall, at its sole cost and expense, immediately (i) return or cause to be returned to Receiver all copies of any information or documents received from Receiver and any other Receiver Parties in hard copy form, and (ii) delete from its computer and other electronic storage devices any information or documents received from Receiver and any other Receiver Parties received from Receiver electronically.

(i)    No Agency. Before Closing, Buyer agrees not to solicit, negotiate, or enter into any document, agreement or instrument that is binding upon Receiver or Receiver's interest in the Property, or the Property, or any portion thereof.

(j)    ADA/FHA Disclosure. Buyer acknowledges that the Property may be subject to the federal Americans With Disabilities Act (the "ADA") and the federal Fair Housing Act (the "FHA"). The ADA requires, among other matters, that tenants and/or owners of "public accommodations" remove barriers in order to make the Property accessible to disabled persons and provide auxiliary aids and services for hearing, vision or speech impaired persons. Receiver makes no warranty, representation or guarantee of any type or kind with respect to the Property's compliance with the ADA or the FHA (or any similar state or local law), and Receiver expressly disclaims any such representation. Buyer acknowledges that it is solely responsible for determining whether the Property complies with the ADA and the FHA. The provisions of this Section shall survive indefinitely the Closing or earlier termination of this Agreement and shall not be merged into the Deed or other closing documents.

(k)    Sophisticated Buyer. Buyer is and will at Closing be comprised of principals who are sophisticated and experienced buyers of commercial properties including without limitation, apartment projects and real property subject to HUD restrictions, qualifications, and obligations, and has participated in and is familiar with the acquisition, development, redevelopment, ownership, management, and operation of real estate projects similar to the Property.

Unless otherwise stated to the contrary, each of Buyer's representations and warranties in this Agreement shall be true and correct in all material respects as of the date of Closing and shall survive Closing for a period of at least six (6) months.

21

APP000023

**Article VIII**
**DEFAULT AND DAMAGES**

8.1.    ***Default by Buyer***. If Buyer shall default in its obligation to close or any other material pre-Closing obligation hereunder (for the avoidance of doubt, Buyer's failure to satisfy a condition to close in **Section 5.2(b)** shall not be deemed a Buyer default), or if at Closing any one or more of Buyer's representations or warranties are not materially correct, and such default was not caused by a prior default by Receiver hereunder, Buyer agrees that Receiver shall have the right to (a) waive such failure or breach and proceed to Closing without reduction in Purchase Price; or (b) terminate this Agreement and to have the Escrow Agent deliver the Earnest Money deposited by Buyer, to Receiver as liquidated damages to recompense Receiver for time spent, labor and services performed, and the loss of Receiver's bargain. Buyer and Receiver agree that it would be impracticable or extremely difficult to affix damages if Buyer so defaults and that the disbursement to Receiver of the Earnest Money deposited by Buyer represents a reasonable estimate of Receiver's damages. Receiver agrees to accept such deposits and fees as Receiver's total damages and relief hereunder if Buyer defaults in its obligation to close or any other material pre-Closing obligation hereunder, Receiver waiving all other rights and remedies for a default set forth in this **Section 8.1**. In addition to the foregoing rights of Receiver, Receiver shall retain the right to pursue against Buyer any Claim for any indemnification obligation of Buyer set forth in this Agreement.

8.2.    ***Default by Receiver***. If Receiver defaults in its obligation to sell and convey the Property to Buyer pursuant to this Agreement or in any other material pre-Closing obligation hereunder, or if at Closing any one or more of Receiver's representations or warranties are not materially correct, and such default was not caused by a prior default by Buyer hereunder or not a permitted termination of this Agreement, Buyer's sole and exclusive remedy shall be to elect one of the following:

(a)    to terminate this Agreement, in which event Buyer shall be entitled to the return by the Escrow Agent to Buyer of the Earnest Money deposited by Buyer, less the Independent Consideration;

(b)    to waive such failure or breach and proceed to Closing without any reduction in the Purchase Price; or

(c)    to bring a suit for specific performance of Receiver's obligations in compliance with the following procedure: (a) no later than ninety-one (91) days following receiver's default or breach, Buyer shall petition the Court to bring such suit seeking specific performance and (b) such suit shall only proceed only if such suit has received approval from the Court, and only as authorized by the terms and provisions of the order authorizing the same.

8.3.    ***Notice of Default***. Except for a Party's failure to close on the Closing Date, neither Party shall have the right to declare a default by the other Party or terminate this Agreement because of a failure by such other Party to perform under the terms of this Agreement, unless the other Party shall fail to cure such failure to perform within five (5) Business Days after its receipt of written notice of such failure to perform.

**Article IX**
**EARNEST MONEY PROVISIONS**

9.1.    ***Investment and Use of Funds***. The Escrow Agent shall invest the Earnest Money in government insured interest-bearing accounts satisfactory to Buyer, shall not commingle the Earnest Money deposited by Buyer with any funds of the Escrow Agent or others, and shall, upon request, promptly provide Buyer and Receiver with confirmation of the investments made, information concerning its procedures, and fee schedules for investments. In the event the Escrow Agent is requested to invest Earnest Money hereunder,

22

APP000024

Escrow Agent shall not be held responsible for any loss of principal or interest which may be incurred as a result of making the investment or redeeming said investment for the purposes of this Agreement, except to the extent arising in connection with the breach of the terms of this Agreement, or the negligence or willful misconduct of the Escrow Agent or any of its officers or employees.

9.2.    *Contract Terminations*. Upon a termination of this Agreement pursuant to the terms of the Agreement, either Party (the "**Terminating Party**") may give written notice to the Escrow Agent and the other Party (the "**Non-Terminating Party**") of such termination and the reason for such termination. Such request shall also designate who the Terminating Party believes is entitled to the Earnest Money deposited by Buyer. The Non-Terminating Party shall then have five (5) Business Days within which to object in writing to the release of the Earnest Money deposited by Buyer to the Terminating Party, if applicable. If the non-Terminating Party provides such an objection, then the Escrow Agent shall retain the Earnest Money deposited by Buyer until it receives written instructions executed by both Receiver and Buyer as to the disposition and disbursement of the Earnest Money deposited by Buyer, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money deposited by Buyer to a particular party, in which event the Earnest Money deposited by Buyer shall be delivered in accordance with such instructions, order, decree or judgment.

9.3.    *Interpleader.* Receiver and Buyer mutually agree that if any controversy regarding the Earnest Money deposited by Buyer, unless mutual written instructions are received by the Escrow Agent directing the disposition of the Earnest Money deposited by Buyer, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money deposited by Buyer or, at the Escrow Agent's option, the Escrow Agent may interplead all Parties and deposit the Earnest Money deposited by Buyer with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable attorneys' fees. Receiver or Buyer, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing Party in accordance with the other provisions of this Agreement.

9.4.    *Liability of Escrow Agent*. The Parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the Parties, and that the Escrow Agent shall not be liable to either of the Parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Receiver or Buyer resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties. Receiver and Buyer shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.

9.5.    *Failure to Satisfy Closing Conditions*. Notwithstanding anything contained herein to the contrary, if this Agreement fails to close under this Agreement due to the failure of a Party to satisfy its respective conditions to Closing described in **Section 5.2(a)** or **(b)**, as applicable, then the remaining provisions of **Section 5.2** shall apply in full for resolution of such Party's failure to satisfy conditions to Closing, which shall specifically include distribution of Earnest Money.

**Article X**
**DISCLAIMERS AND WAIVERS**

10.1.    *Certain Definitions*. The following terms shall have the definitions indicated below:

23

APP000025

(a)    "**Environmental Law**" shall mean any federal, state, or local laws, ordinances, permits, or regulations, or any common law, regarding health, safety, radioactive materials, or the environment, including, but not limited to, the following federal statutes: Clean Air Act (42 U.S.C. § 7401 et seq.) ("**CAA**"), Clean Water Act (42 U.S.C. § 1251 et seq.) ("**CWA**"), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.) ("**RCRA**"), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("**CERCLA**"), Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.) ("**EPCRA**"), Safe Drinking Water Act (42 U.S.C. § 300f et seq.) ("**SDWA**"), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("**TSCA**"), Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) ("**ESA**"), Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.) ("**FIFRA**"), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) ("**OSHA**"), each as amended, and any regulations promulgated thereunder, guidance and directives issued with respect thereto, or policies adopted by authority thereunder.

(b)    "**Environmental Matter**" shall mean any of the following: (i) the Release of any Hazardous Material on or at the Property or any other property; (ii) the migration of any Hazardous Material onto or from the Property; (iii) the environmental, health, or safety aspects of the transportation, storage, treatment, handling, use, or Release, whether any of the foregoing occurs on or off the Property, of Hazardous Materials in connection with the operations or past operations of the Property; (iv) the violation, or alleged violation, of any Environmental Law, order, permit, or license of or from any governmental authority, agency, or court relating to environmental, health, or safety matters; (v) the presence of any underground storage tanks within the confines of the Property; (vi) the presence of wetlands within the confines of the Property; (vii) the presence of any endangered species on, in, or around the Property; or (viii) the characterization of the Property as historical in nature in any way.

(c)    "**Hazardous Material**" shall mean: (i) any radioactive materials; (ii) any substance or material the transportation, storage, treatment, handling, use, removal, or Release of which is subject to any Environmental Law; or (iii) any substance or material for which standards of conduct are imposed under any Environmental Law. Without limiting the generality of the foregoing, "Hazardous Materials" shall include: asbestos and asbestos-containing materials (whether or not friable); urea-formaldehyde in any of its forms; polychlorinated biphenyls; oil; used oil; petroleum products and their by-products; lead based paint; radon; and any substances defined as "hazardous waste", "hazardous substances", "pollutants or contaminants", "toxic substances", "hazardous chemical", "hazardous air pollutants", or "toxic chemical" under the CAA, CWA, RCRA, CERCLA, EPCRA, SDWA, TSCA, or OSHA, or any other Environmental Law.

(d)    "**Release**" shall mean the discharge, disposal, deposit, injection, dumping, spilling, leaking, leaching, placing, presence, pumping, pouring, emitting, emptying, escaping, or other release of any Hazardous Material.

10.2.    *Disclaimer of Warranties*.

(a)    Buyer acknowledges that Receiver has acquired the rights and obligations to sell the Property due solely to the Receivership Action, and consequently Receiver has little or no knowledge of the condition of the Property and the surrounding areas. ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS" AS OF THE EFFECTIVE DATE AND AS OF THE CLOSING DATE, BASED EXCLUSIVELY ON ITS OWN EXPERTISE AND THAT OF ITS CONSULTANTS AND OR ITS OWN INVESTIGATIONS AND EXAMINATIONS, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT RECEIVER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES

24

APP000026

CONCERNING THE CONDITION OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT BUYER WILL INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS OWN INVESTIGATION AND INSPECTIONS OF THE PROPERTY IN ITS ACQUISITION THEREOF. RECEIVER SHALL HAVE NO OBLIGATION HEREUNDER TO ALTER, REPAIR, OR IMPROVE THE PROPERTY UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

(b)     Buyer further agrees that Buyer will not rely upon any: (i) representations or warranties (oral or written) made by, or purportedly on behalf of, Receiver unless expressly set forth in this Agreement, or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Receiver. BUYER ACKNOWLEDGES THAT, EXCEPT CONTAINED HEREIN, RECEIVER HAS NOT MADE AND HEREBY SPECIFICALLY NEGATES AND DISCLAIMS ANY WARRANTY, REPRESENTATION, COVENANT, AGREEMENT, OR GUARANTEE OF ANY KIND OR CHARACTER, WHETHER EXPRESS, IMPLIED, STATUTORY, WRITTEN, ORAL, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING, OR WITH RESPECT TO ANY MATTER PERTAINING TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE VALUE OF THE PROPERTY, INCOME TO BE DERIVED FROM THE PROPERTY, SUITABILITY OF THE PROPERTY, HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, THE MANNER, STATE OF REPAIR, OR LACK OF REPAIR OF THE PROPERTY, THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY (INCLUDING WATER, WATER RIGHTS, SOIL, OR GEOLOGICAL), COMPLIANCE OF THE PROPERTY OR THE OPERATION ON THE PROPERTY WITH ANY CODES, LAWS, RULES, ORDINANCES, OR REGULATIONS, THE NATURE, MANNER, OR QUALITY OF CONSTRUCTION OR MATERIALS INCORPORATED INTO THE PROPERTY, THE DESIGN OF THE PROPERTY, AND COMPLIANCE WITH APPLICABLE LAWS, INCLUDING HEALTH, SAFETY, AND LAND USE LAWS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY RECEIVER, A RECEIVER PARTY, ON RECEIVER'S BEHALF, OR PURPORTEDLY ON BEHALF OF RECEIVER, HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY RECEIVER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. OTHER THAN AS CONTAINED HEREIN, RECEIVER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES, AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY RECEIVER, ANY RECEIVER PARTY, OR ANYONE ACTING OR PURPORTING TO ACT ON RECEIVER'S BEHALF.

(c)     EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT, RECEIVER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, RECEIVER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING ANY OF THE FOLLOWING MATTERS:

(i)     EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE PROPERTY;

(ii)     THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS;

25

APP000027

(iii)    THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR FUTURE DEVELOPMENT OR RENOVATION OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY ELECT TO CONDUCT THEREON;

(iv)    THE CONDITION OF THE PROPERTY OR ANY PORTION THEREOF;

(v)    THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF ANY UTILITIES SERVING THE PROPERTY; OR

(vi)    THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR ENVIRONMENTAL MATTERS.

10.3.    *Waiver and Release of Liability;.*

(a)    BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS, AND ASSIGNS AND ANYONE ELSE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY WAIVES THE CLAIMS DESCRIBED BELOW IN THIS SECTION 10.3 (WHETHER OR NOT SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE), AND RELEASES THE RECEIVER PARTIES FROM ANY AND ALL LIABILITY BASED IN WHOLE OR IN PART UPON ANY SUCH CLAIMS BASED UPON ANY OF THE MATTERS SET FORTH IN SECTION 10.2 ABOVE.

(b)    Notwithstanding the intent of the Parties hereto that the waiver and release provisions contained in **Section 10.3(a)** above bar all Claims by Buyer and Buyer's heirs, successors, and assigns and anyone else claiming by, through, or under Buyer, should a court of competent jurisdiction deem otherwise, Buyer hereby agrees that the presence of the waiver and release provisions in **Section 10.3(a)** should serve as the overwhelming, primary factor in any equitable apportionment of costs under applicable federal, state, or local laws, ordinances, or regulations.

(c)    Reserved.

(d)    Buyer acknowledges and agrees that the waiver and release provisions contained in this **Section 10.3** are each reasonable and acceptable to Buyer and an essential component of the consideration for the sale of the Property hereunder and Receiver would not otherwise sell the Property without such provisions.

(e)    Buyer acknowledges and agrees that Buyer's sole recourse for Claims of the nature described in this Article X shall be to or against parties other than Receiver Parties and that economic recovery may not be possible against some or all of such parties.

(f)    Notwithstanding anything to the contrary, each of the provisions of this Article X shall survive Closing and the execution and delivery of the Deed by Receiver and shall not be merged therein.

### Article XI
### MISCELLANEOUS

11.1.    *Parties Bound*. Except for an assignment pursuant to **Section 11.2**, neither Party may assign this Agreement without the prior written consent of the other Party, and any such prohibited assignment shall be void. No assignment permitted under this Agreement shall relieve the assigning Party of any liability hereunder, whether arising before or after the date of such assignment, unless expressly agreed upon herein.

26

APP000028

Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the Parties.

11.2.    *Assignment*.

(a)      At any time prior to Closing, Buyer shall be permitted to assign this Agreement and the Earnest Money deposited by Buyer, and the rights of "Buyer" in connection therewith, to a Buyer's Affiliate upon receiving the prior written consent of Receiver, which such consent shall not be unreasonably withheld, conditioned, or delayed. "**Buyer's Affiliate**" means (a) any entity that directly or indirectly controls, is controlled by or is under common control with Buyer (being a joint venture of Palmetto Capital Partners, LLC, and i3i Ventures, LP), or (b) any entity at least a majority of whose economic interest is owned by Buyer (being a joint venture of Palmetto Capital Partners, LLC, and i3i Ventures, LP); and the term "control" means the power to direct the management of such entity through voting rights, ownership, or contractual obligations. If Buyer assigns this Agreement with Receiver's prior written consent, Buyer agrees to deliver a fully executed assignment of this Agreement and assumption by the assignee of Buyer's obligations hereunder. Any such assignment must include the assignee's tax identification number. Any assignee of Buyer's interest in this Agreement shall be bound by all approvals and waivers, actual and deemed, by the original Buyer prior to the assignment. The original Buyer shall not be released of any duties, obligations, or liability for any Claims arising under the terms of this Agreement.

(b)      Receiver (at its sole cost) may transfer and convey the Property, and otherwise assign, transfer and delegate its rights, duties and obligations under this Agreement and any post-Closing agreement to any Receiver Parties without Buyer's consent; provided, however, Receiver shall not be released of any duties, obligations or liabilities for any Claims arising under the terms of this Agreement which are not expressly assumed by Receiver's assignee. Upon such transfer, assignment and conveyance, the original Receiver shall be immediately released of any and all duties, obligations, and liability for any Claims arising under the terms of this Agreement and any post-Closing agreements (or otherwise) which are expressly assumed by Receiver's assignee, and all references in this Agreement and any post-Closing agreement to Receiver shall thereafter mean and refer to Receiver's assignee, to the extent the context requires. The Parties hereto agree that all representations, warranties, covenants, and indemnifications shall inure to the benefit of any permitted assignee of Buyer and Receiver, as applicable.

11.3.    *Intentionally Reserved.*

11.4.    *Headings*. The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

11.5.    *Exhibits and Schedules*. All exhibits and schedules annexed hereto are a part of this Agreement for all purposes.

11.6.    *Invalidity and Waiver*. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either Party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such Party's right to enforce against the other Party the same or any other such term or provision in the future.

11.7.    *Jurisdiction and Venue*. **BUYER AND RECEIVER AGREE THAT ANY SUIT, ACTION, COUNTERACTION OR PROCEEDING ARISING OUT OF THE SUBJECT MATTER HEREOF**

APP000029

(EACH, A "**PROCEEDING**"), SHALL BE INSTITUTED IN THE United States District Court for the Northern District of Texas, Dallas Division (THE "**ACCEPTABLE FORUM**"). BUYER AND RECEIVER AGREE THAT THE ACCEPTABLE FORUM IS CONVENIENT TO THEM; IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE ACCEPTABLE FORUM; AND WAIVE ANY AND ALL OBJECTIONS TO JURISDICTION OR VENUE THAT THEY MAY HAVE UNDER THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED OR OTHERWISE IN THOSE COURTS IN ANY PROCEEDING. SHOULD ANY PROCEEDING BE INITIATED IN ANY OTHER FORUM BY RECEIVER OR BUYER, THE INITIATING PARTY WAIVES ANY RIGHT TO OPPOSE ANY MOTION OR APPLICATION MADE BY THE OTHER PARTY TO TRANSFER VENUE, DISMISS OR SEEK OTHER APPROPRIATE RELIEF AS A CONSEQUENCE OF SUCH PROCEEDING HAVING BEEN COMMENCED IN A FORUM OTHER THAN AN ACCEPTABLE FORUM.

11.8.    *Governing Law*. This Agreement shall in all respects be solely governed by, and construed in accordance with, the substantive federal laws of the United States (expressly including 28 U.S. Code § 2001 and § 2002, as applicable) and the laws of the State of Texas (collectively the "**Applicable Laws**").

11.9.    *No Third-Party Beneficiary*. This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third-party beneficiary, whether by decree or otherwise.

11.10.    *Entirety and Amendments*. This Agreement embodies the entire agreement between the Parties and supersedes all prior agreements and understandings, oral or written, relating to the Property. This Agreement may be amended or supplemented only by an instrument in writing executed by the Party against whom enforcement is sought.

11.11.    *Time*. Time is of the essence in the performance of this Agreement.

11.12.    *Attorneys' Fees*. In the event either Party hereto employs an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement, in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals and rehearings, the Prevailing Party in such litigation shall be entitled to recover from the other Party its reasonable attorneys' and consultants' fees and expenses incidental to such litigation (including, without limitation, service of process costs, filing fees, court reporter costs, investigative costs, expert witness fees, the cost of any bonds, and any and all other similar fees incurred in connection with the action or proceeding) and all court costs and fees through all trial and appellate levels. Attorneys' fees under this **Section 11.12** shall include reasonable attorneys' fees on appeal and, in addition, a Party entitled to attorneys' fees shall be entitled to all other reasonable, out-of-pocket, third-party costs and expenses actually incurred or otherwise payable in connection with such action or proceeding. In addition to the foregoing award of attorneys' fees to the Prevailing Party, the Prevailing Party in any lawsuit shall be entitled to its reasonable attorneys' fees actually incurred or otherwise payable in any post-judgment proceedings to collect or enforce the judgment. The "**Prevailing Party**" means the Party determined by the final, non-appealable judgment of court of competent jurisdiction to most nearly prevail and not necessarily the one in whose favor a judgment is rendered. This provision is separate and several and shall survive the merger of this Agreement into any judgment with respect hereto.

11.13.    *Notices and Deliveries*. All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the addresses set forth in **Section 1.1**. Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one (1) Business Day after deposit with such courier, (b) sent by facsimile or e-mail, with written confirmation or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt.

APP000030

Any notice sent by facsimile, e-mail or personal delivery and delivered after 5:00 p.m. local time where the Property is located shall be deemed received on the next Business Day. A Party's address may be changed by written notice to the other Party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given by counsel to Buyer shall be deemed given by Buyer; notices given by counsel to Receiver shall be deemed given by Receiver; and notices given to a Party's counsel shall be deemed given to the Party.

11.14. *Construction*. The Parties acknowledge that the Parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction – to the effect that any ambiguities are to be resolved against the drafting Party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

11.15. *Business Days; Calculation of Time Periods*. "**Business Day**" (or "**business day**") means, as to any Party, any day that is not a Saturday, Sunday, or legal holiday for national banks in the location where the Property is located. If the last day of any time period hereunder, or the last day of performance of any obligation, or for the giving of notice, or for taking any other action falls on a day that is not a Business Day, then such last day shall be extended to the first day thereafter that is a Business Day, and any such day shall be deemed to end at 5:00 p.m. local time where the Property is located. Subject to the foregoing, in computing any time period described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included.

11.16. *Execution in Counterparts*. This Agreement may be executed in one or more counterparts, each of which is an original, and all of which together constitute only one agreement between the parties. The signatures of all the parties do not need to be on the same counterpart for it to be effective. Delivery of an executed counterpart of this Agreement by facsimile, electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.

11.17. *Waiver of Jury Trial*. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.18. *Limitation of Liability*. No partner, member, manager, officer, director, shareholder, beneficial owner, agent, or employee of either Buyer or Receiver or any affiliate thereof shall be personally liable for any obligation of Buyer or Receiver, as applicable, hereunder. Buyer agrees Receiver's liability arising hereunder or related hereto shall at all times be strictly limited to Receiver's interest in the Property, or proceeds from the sale thereof. No liability shall accrue to Receiver for breach of the covenants, indemnification, warranties, or representations in this Agreement or any document executed by Receiver hereunder pursuant to this Agreement unless such liability accrues, in the aggregate, in excess of $50,000.00. Receiver's aggregate liability for all claims arising out of such covenants, indemnities, representations, and warranties with respect to the Property shall not exceed an amount equal to $450,000.00 once the initial $50,000 aggregate limit has been reached. Notwithstanding anything to the contrary in this Agreement, neither Party shall be liable to the other Party for consequential, punitive, and/or exemplary damages of any nature whatsoever. Buyer agrees to provide written notice of such breach to Receiver and allow Receiver thirty (30) days to cure the same. If Receiver fails to cure such breach after written notice and after such cure period, Buyer's sole remedy shall be an action at law for actual damages as a consequence thereof, provided, however, that any action at law shall only be enforceable and actionable if and only if written notice of such claim is delivered to Receiver within six (6) months after the Closing Date (the "**Notice Period**"), Buyer hereby waiving the right to file any such claim, suit, proceeding,

29

APP000031

litigation, or action at law at any later date. The Notice Period applies to known and unknown breaches of covenants, indemnities, warranties, or representations. This **Section 11.18** shall survive indefinitely the termination of this Agreement or Closing and shall not be merged into the Deed or other closing documents.

11.19. ***Termination of Agreement***. It is understood and agreed that if either Buyer or Receiver terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Receiver and Buyer from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

11.20. ***No Recording***. Neither this Agreement nor any memorandum or short form thereof may be recorded by either Party.

11.21. ***No Partnership***. The relationship of the Parties hereto is solely that of a seller and buyer with respect to the Property and no joint venture or other partnership exists between the Parties hereto. Neither Party has any fiduciary relationship hereunder to the other.

11.22. ***Further Assurances.*** Each Party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other Party to consummate more effectively the purposes or subject matter of this Agreement. The provisions of this **Section 11.22** shall survive Closing.

11.23. ***Waiver of Consumer Rights.*** BUYER WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BUYER'S OWN SELECTION, BUYER VOLUNTARILY CONSENTS TO THIS WAIVER AS EVIDENCED BY BUYER'S EXECUTION OF THIS AGREEMENT.

11.24. ***Incorporation of Recitals***. The Recitals set forth above constitute an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the Parties.

11.25. ***No Offer.*** This Agreement shall not be deemed an offer or binding upon Receiver or Buyer until this Agreement is fully executed and delivered by Receiver and Buyer and the Court has entered an order in the Receivership Action approving the Agreement and the transactions contemplated hereby. However, following the Contingency Clearance Date through the Closing (unless this Agreement is terminated prior to Closing pursuant to a right herein), Receiver shall not enter into any binding contracts regarding the sale of the Property with any other potential buyers.

11.26. ***Certain Disclosures.*** The following disclosures are made for the purpose of complying with specific statutory provisions of Texas law, and such disclosures are not intended to and do not hereby alter or affect the rights and obligations of Buyer and Receiver:

(b)     Statutory Tax Districts. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Receiver to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Agreement.

(c)     Tide Waters. If the Property abuts the tidally influenced waters of the State of Texas, Section 33.135 of the Texas Natural Resources Code requires a notice regarding coastal area property to be included in this Agreement.

30

APP000032

(d)     Annexation. If the Property is located outside the limits of a municipality, Receiver notifies Buyer under Section 5.011 of the Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(e)     Property Located in a Certified Service Area of a Utility Service Provider. The Property may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If the Property is located in a certificated area there may be special costs or charges the Buyer will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to the Property. The Buyer is advised to determine if the Property is in a certificated area and contact the utility service provider to determine the cost that Buyer will be required to pay and the period, if any, that is required to provide water or sewer service to the Property. Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the Property or at the Closing.

(f)     Public Improvement District. If the Property is in a public improvement district, Section 5.014 of the Property Code requires Receiver to notify Buyer as follows: As a Buyer of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372 Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property.

(g)     Notice of Water Level Fluctuations. If the Property adjoins an impoundment of water, including a reservoir or lake, constructed under Chapter 11 of the Texas Water Code, that has a storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, Receiver hereby notifies Buyer: "The water level of the impoundment of water adjoining the Property fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions."

(h)     Transfer Fees. If the Property is subject to a private transfer fee obligation, Section 5.205 of the Texas Property Code requires Receiver to notify Buyer as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

(i)     Notice to Buyer Regarding Restrictive Covenants. Pursuant to the Texas Local Government Code, if the Property is located within a municipality whose governing body has required any person who sells or conveys restricted property located within its jurisdiction to first give written notice to the Buyer of: (i) the restrictions and (ii) the municipality's right to enforce compliance with the restrictions, written notice must be given to by Receiver to Buyer on or before the final closing, and the notice document must be signed and acknowledged by both Receiver and Buyer, then recorded in the real property records in the county where the real property is located. The requirements and text of the notice may be found at 30 Tex. Loc. Gov't Code Ann. § 212.155.

31

APP000033

(j)    Notice to Buyer of Property Seaward of Gulf Intracoastal Waterway. Pursuant to the Texas Natural Resources Code, if the Property is located seaward of the Gulf Intracoastal waterway to its southernmost point and then seaward of the longitudinal line also known as 97 degrees, 12'19" which runs southerly to the international boundary from the intersection of the centerline of the Gulf Intracoastal waterway and the Brownsville Ship Channel, then this information must be disclosed by Receiver to Buyer before the transaction closes. The requirements and text of the notice may be found at Tex. Nat. Res. Code Ann. § 61.025.

(k)    Storage Tanks Disclosure Provider. If the Property contains an underground storage tank or tank system or an aboveground tank or tank system subject to regulation by the Texas Commission on Environmental Quality, statutory notice must be given by Receiver to Buyer prior to closing pursuant to the Texas Administrative Code. The requirements and text of the notice may be found at 30 Tex. Admin. Code Ann. § 334.9.

(l)    Notice to Buyer of Property Located in Certain Annexed Water Districts. This form sets out the mandatory notice provisions under the Texas Water Code. If the Property is located in a water or sanitary sewer district that entered into a contract with a city, other than a city with a population of more than one million in a county of more than two million, that allows the city to set rates in the district after annexation that are different from rates charged to other residents of the city, Receiver at or before closing must deliver to Buyer a separate written notice, executed and acknowledged by Receiver, containing the information in this notice. Buyer must sign the notice to evidence receipt. Tex. Water Code Ann. § 49.452(g)-(p) applies to this notice provision, including Buyer's right to seek damages if the sale or conveyance of the Property is not made in compliance with this statute. The requirements and text of the notice may be found at Tex. Water Code Ann. § 54.016(h)(4) and § 49.452(g)-(p).

(m)    Notice to Buyer that Property is Located within the Area of the Alignment of a Transportation Project. Pursuant to the Texas Local Government Code, if the Property is within the area of the alignment of a transportation project, as shown on the final environmental decision document applicable to the future transportation corridor identified in an agreement between the Texas Department of Transportation and the county under Tex. Transp. Code Ann. § 201.619, Receiver must provide a conspicuous statement in the Agreement. The requirements and text of the notice may be found at Tex. Loc. Gov't Code Ann. § 232.0033.

*[Signature Page Follows]*

32

APP000034

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**RECEIVER**:

CORT THOMAS, AS RECEIVER FOR D4FR, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:          _Cort Thomas, Receiver_
Printed Name:    Cort Thomas
Title:                 Receiver for D4FR, LLC
Date:                 _February 21, 2023_

**BUYER**:

**WINDMILL FARMS 2023, LLC,**
a Texas limited liability company

By:      Palmetto Capital Partners, LLC,
         a Texas limited liability company,
         its Manager

Signature:  _Collin Cooper_
Printed Name: Collin Cooper
Title: Manager
Date: 2/21/2023

Signature Page 1

APP000035

**ESCROW AGENT ACCEPTANCE**

Escrow Agent has executed this Agreement in order to confirm that the Escrow Agent has received executed counterparts of the Agreement and the Earnest Money and shall hold the Earnest Money deposited by Buyer, and any interest earned thereon, in escrow, and shall disburse the Earnest Money and the interest earned thereon, pursuant to the provisions of the Agreement.

_____ ("**Effective Date**")


REPUBLIC TITLE OF TEXAS, INC.:

Signature:          _____
Printed Name:       _____
Title:              _____
Date:               _____

Signature Page 2

APP000036

<u>**EXHIBIT A**</u>

**LEGAL DESCRIPTION**

[Attached]

A - 1

APP000037

EXHIBIT B
FORM OF DEED

AFTER RECORDING RETURN TO:

_____

(Space Above This Line for Recorder's Use Only)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF KAUFMAN | § | |

THIS SPECIAL WARRANTY DEED, dated _____, 2023, by Cort Thomas, solely in his capacity as Receiver for, and on behalf of, D4FR, LLC, a Texas limited liability company, with its principal office at 8111 Preston Road, Suite 300, Dallas, Texas 75225 ("**Grantor**"), for the benefit of _____, a _____ ("**Grantee**"), whose mailing address is _____:

WITNESSETH, that Grantor, for good and valuable consideration, has granted bargained, sold, and conveyed and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors, and assigns, forever, all the following described lot or parcel of land, situated, lying and being in the County of Kaufman, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**");

TOGETHER with Grantor's rights, title and interest (if any) in and to the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively, the "**Appurtenances**" and together with the Land, the "**Property**"); AND SUBJECT TO any Permitted Exception (as such term is defined in that certain Purchase and Sale Agreement between Grantor and Grantee dated [●]) and those matters listed and described on Exhibit "B" attached hereto (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property unto Grantee, its successors and assigns, subject to the Permitted Exceptions, reservations, and exclusions set forth herein, forever, and Grantor binds Grantor and Grantor's successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against all and every person or persons lawfully claiming or to claim the whole or any part thereof, when the claim is by, through or under Grantor, but not otherwise.

B - 1

APP000038

BY ACCEPTANCE OF THIS SPECIAL WARRANTY DEED, GRANTEE ACKNOWLEDGES THAT IT HAS INSPECTED AND ASSESSED THE PROPERTY AND HAS SATISFIED ITSELF AS TO THE CONDITION OF SAME AND IS TAKING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS", AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, OTHER THAN THE WARRANTY OF TITLE HEREIN CONTAINED AND/OR IN THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED ___, 2023, BETWEEN GRANTOR AND GRANTEE (THE "PURCHASE AGREEMENT"). IT BEING THE INTENTION OF GRANTOR AND GRANTEE TO EXPRESSLY NEGATE AND EXCLUDE ALL REPRESENTATIONS AND WARRANTIES, INCLUDING, BUT NOT LIMITED TO: (1) THE PHYSICAL CONDITION OF THE PROPERTY OR ANY ELEMENT THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES RELATED TO HABITABILITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FITNESS FOR ANY PURPOSE; (2) THE NATURE OR QUALITY OF CONSTRUCTION, STRUCTURAL DESIGN, AND ENGINEERING OF ANY IMPROVEMENTS; (3) THE QUALITY OF THE LABOR AND MATERIALS INCLUDED IN ANY IMPROVEMENTS; (4) THE SOIL CONDITIONS (BOTH SURFACE AND SUBSURFACE), DRAINAGE, OR OTHER CONDITIONS EXISTING AT THE PROPERTY WITH RESPECT TO ANY PARTICULAR PURPOSE, DEVELOPMENTAL POTENTIAL, OR OTHERWISE; (5) ALL WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE PROPERTY; AND (6) ALL OTHER WARRANTIES AND REPRESENTATIONS, WHATSOEVER, EXCEPT THE SPECIAL WARRANTY OF TITLE EXPRESSLY SET FORTH IN THIS DEED AND/OR REPRESENTATIONS AND WARRANTIES CONTAINED IN THE PURCHASE AGREEMENT.

[Signature Page Follows]

B - 2

APP000039

IN WITNESS WHEREOF, Grantor has executed this deed on the date set forth above.

**D4FR LLC:**

D4FR LLC, a Texas limited liability company

Signature:      _____
Printed Name:   Cort Thomas
Title:          Receiver for, and on behalf of, D4FR, LLC
Date:           _____


THE STATE OF TEXAS        §
                          §
COUNTY OF DALLAS          §

This instrument was acknowledged before me on this the _____ day of _____, 2023, by Cort Thomas, Receiver for, and on behalf of, D4FR LLC, a Texas limited liability company.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

(SEAL)

B - 3

APP000040

Exhibit A

Legal Description

B - 1

APP000041

Exhibit B

Permitted Exceptions

B - 2

APP000042

<u>**EXHIBIT C**</u>

**BILL OF SALE AND ASSIGNMENT OF LEASES AND CONTRACTS**

This instrument is executed and delivered as of the _____ day of _____, 20___ pursuant to that certain Purchase and Sale Agreement (the "**Agreement**"), dated _____, 2023, by and between Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity ("**Receiver**") for, and on behalf of, D4FR LLC, a Texas limited liability company, ("**D4FR**"), and _____, a _____ ("**Buyer**"), covering the real property described in <u>**Exhibit A**</u> attached hereto (the "<u>**Real Property**</u>").

1.    <u>Sale of Personalty</u>. For good and valuable consideration, Receiver hereby sells, transfers, sets over and conveys to Buyer the following (the "<u>**Personal Property**</u>"):

    (a)    *Tangible Personalty*. All of D4FR's right, title and interest in and to all fixtures, furniture, equipment, and other tangible personal property, if any, presently located on the Real Property and used in connection with the operation of same, in each case to the extent assignable and without warranty (the "<u>**Tangible Personal Property**</u>") but excluding any items of personal property owned by tenants, any managing agent or any other party.

    (b)    *Intangible Personalty*. All of D4FR's right, title, and interest, if any, in and to all of the following items, in each case to the extent assignable or transferrable, and without warranty (the "<u>**Intangible Personal Property**</u>"): (i) licenses and permits relating to the operation of the Real Property; (ii) the right to use the name "Parc at Windmill Farms" in connection with the Real Property; and (iii) if still in effect, each guaranty and warranty received by Receiver from any general contractor, subcontractor, or manufacturer in connection with the construction or maintenance of the Real Property or associated with the Tangible Personal Property, provided, however, if there is any cost or fee to transfer any such guaranty and warranty to Buyer, Buyer must pay the same as a condition precedent to any such assignment by Receiver.

Notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall the Personal Property include (i) any marketing information, market and other analyses, reports, investigations or other documents which constitute proprietary information of Receiver or Receiver's affiliates, including, without limitation any architectural plans, designs or other plans and designs for any houses, townhomes, apartments, casitas and other buildings, or any other vertical improvements of any type, (ii) any information which is privileged or confidential pursuant to a recognized legal privilege (such as attorney-client communication and/or attorney work product) and (iii) any property management software and related hardware, and the data contained therein.

2.    <u>Assignment of Leases and Contracts</u>. For good and valuable consideration, Receiver hereby assigns, transfers, sets over and conveys to Buyer, and Buyer hereby accepts such assignment of, the following (the "<u>**Assigned Property**</u>"):

    (a)    *Leases*. All of the D4FR's right, title and interest, as landlord, in and to the tenant leases (the "<u>**Leases**</u>") covering the Real Property, to the extent assignable and without warranty, and Buyer hereby assumes all of the landlord's obligations under the Leases arising from and after the Closing Date (as defined in the Agreement); and

    (b)    *Service Contracts*. All of D4FR's rights, title and interest in and to the service contracts described in <u>**Exhibit B**</u> attached hereto (the "<u>**Service Contracts**</u>"), to the extent assignable and without warranty.

APP000043

3.      Assumption. Buyer hereby assumes the obligations of Receiver under the Leases and Service Contracts arising from and after the Closing Date and shall defend, indemnify and hold harmless Receiver from and against any liability, damages, causes of action, expenses, and attorneys' fees incurred by Receiver by reason of the failure of Buyer to fulfill, perform, discharge, and observe its obligations with respect to the Leases or the Service Contracts arising on and after the Closing Date.

4.      Agreement Applies. The covenants, agreements, representations, warranties, indemnities and limitations provided in the Agreement with respect to the property conveyed hereunder (including, without limitation, the limitations of liability provided in the Agreement), are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Buyer and Receiver and their respective successors and assigns.

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale and Assignment of Leases and Contracts to be executed as of the date written above.

**RECEIVER:**

CORT THOMAS, AS RECEIVER FOR D4FR, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:
Printed Name:      Cort Thomas
Title:             Receiver for D4FR, LLC
Date:

**BUYER:**

**WINDMILL FARMS 2023, LLC,**
a Texas limited liability company

By:     Palmetto Capital Partners, LLC,
        a Texas limited liability company,
        its Manager

Signature: _____
Printed Name: Collin Cooper
Title: Manager
Date: _____

C - 2

APP000044

Exhibit A

Legal Description

C - 3

APP000045

Exhibit B

List of Service Contracts Being Assumed

C - 4

APP000046

**EXHIBIT D**

**NOTICE TO RESIDENTS**

_____, 2023

*Re:*    *Unit No.* _____

Dear Residents:

Notice is hereby given to the tenants of Parc at Windmill Farms (the "**Property**") that D4FR, LLC, the current owner of the Property, has sold the Property to _____ ("**Buyer**") effective as of this date. Buyer has assumed all of the obligations of landlord under your lease, and Buyer acknowledges that it has received and is responsible for your security deposit in the amount of $_____. You will be receiving a separate letter from Buyer's management company providing, among other things, their contact information and to whom and where your rent should be paid. The privacy policy and practices of Buyer will apply to the collection, use and sharing of your personal information on a going-forward basis.

Sincerely,

**RECEIVER:**
CORT THOMAS, AS RECEIVER FOR D4FR, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:        _____
Printed Name:    Cort Thomas
Title:               Receiver for D4FR, LLC
Date:              _____

**BUYER:**
**WINDMILL FARMS 2023, LLC,**
a Texas limited liability company

By:    Palmetto Capital Partners, LLC,
        a Texas limited liability company,
        its Manager

Signature: _____
Printed Name: Collin Cooper
Title: Manager
Date: _____

D - 1

APP000047

# EXHIBIT B-1

# NVC
## National Valuation Consultants, Inc.

### An Appraisal Report of:
Parc at Windmill Farms
1003 Windmill Farms Blvd
Forney**,** Texas 75126

**Latitude/Longitude:**
32.74128,  -96.39680

**NVC File Number:**
DAL2212075



**Prepared For:**
Cort Thomas
Partner
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX, 75225
Cort@brownfoxlaw.com

**Effective Date(s) of Value:**
"As Is" - January 23, 2023

**Prepared By:**
**NATIONAL VALUATION CONSULTANTS, INC.**
**7807 E. PEAKVIEW AVENUE, SUITE 200**
**CENTENNIAL, COLORADO 80111**

ATLANTA • BOSTON • CHICAGO • CINCINNATI • DALLAS • DENVER • HOUSTON • NY/NJ METRO • SAN FRANCISCO • SOCAL • SOUTH FLORIDA

APP000049



February 7, 2023

Cort Thomas
Partner
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX, 75225
Cort@brownfoxlaw.com

Re:  Parc at Windmill Farms
     1003 Windmill Farms Blvd
     Forney, Texas 75126
     Latitude  32.74128 & Longitude  -96.39680
     NVC File No.:  DAL2212075

Dear Mr. Thomas:

In compliance with your request, enclosed is an appraisal report of the above-referenced property.  The purpose of the appraisal is to provide our market value opinion of the valuation scenario summarized below.

| Valuation Scenario | | |
|---|---|---|
| Scenario | Interest Appraised | Effective Date of Appraisal |
| "As Is" Market Value | Fee Simple | January 23, 2023 |

Briefly described, the subject is a Class B, Garden/Low Rise, apartment community with 17 residential buildings and two clubhouses. The improvements include 272 units with a total rentable area of 279,648 SF for an average unit size of 1,028 SF. The subject was approximately 91.5% occupied at the time of this appraisal, per the rent roll provided.  There are  557 total parking spaces, for a parking ratio of 2.1 spaces per unit.   The subject was built in 2019.

As an apartment complex, the subject is encumbered with tenant leases. Thus, the official property rights under appraisal are those of a leased fee estate.  However, it is commonplace in the industry to refer to the property rights as those of a fee simple interest, because of the short duration of apartment leases (6 to 12 months) and since we are assuming that all of the tenant leases are at market levels.  In this assignment the "leased fee" and "fee simple" property rights are synonymous.

APP000050

Cort Thomas
February 7, 2023
Page 3

It is our opinion that this report complies fully with (a) the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation, (b) and the client's appraisal reporting guidelines. A copy of the engagement letter can be found in the Addenda.

It must be noted that our opinion of value is subject to other standard and typical assumptions and limiting conditions which are referenced in the accompanying appraisal report. There are no **extraordinary assumptions** or **hypothetical conditions**.

**Extraordinary Assumptions:**

  1.  **None**

**Hypothetical Conditions:**

  1.  **None**

Based upon the data, analyses and reasoning contained in the attached report, and subject to the assumptions and limiting conditions set forth in this analysis, our market value opinions are set forth below:

| Summary of Value Conclusion | | | |
| --- | --- | --- | --- |
| Scenario | Interest Appraised | Effective Date of Appraisal | Reconciled Value |
| "As Is" Market Value | Fee Simple | January 23, 2023 | $50,000,000 |

In an effort to curb inflation, the Federal Reserve raised the federal funds rate seven times in 2022 and has signaled rate hikes will continue into 2023. A 25 bps increase was the latest on February 1st. While spreads between interest rates and investment rates are not static, market participants indicate that today's higher interest rates have had an upward impact on investment rates, as compared to a year ago. We have reflected this trend in the appraisal.

Please note that our value opinions include personal property such as appliances, office furniture, and other personal property. We have included all personal property in the appraised value of the subject property since we have determined from our analysis that it is typically traded with apartments in the market area.

APP000051

Cort Thomas
February 7, 2023
Page 4

We appreciate the opportunity to serve you, and trust you will advise us if we can be of further assistance.

Respectfully submitted,

NATIONAL VALUATION CONSULTANTS, INC.


Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

## TABLE OF CONTENTS

**SUBJECT PHOTOGRAPHS** ...............................................................................................................**6**
    Subject Photograph ...............................................................................................................7
    Property Aerial...........................................................................................................................8
    Executive Summary ...............................................................................................................9
**PREMISES OF THE APPRAISAL** ...............................................................................................**12**
    Scope of Work ........................................................................................................................13
    Definitions of Terminology ..............................................................................................16
    Identification and History of the Property ...............................................................18
    Standard Assumptions and Limiting Conditions...................................................19
    Extraordinary Assumptions and Hypothetical Conditions................................22
**PRESENTATION OF DATA**............................................................................................................**23**
    U.S. Economic Indicators ..................................................................................................24
    Area / Subject Map ..............................................................................................................28
    Dallas-Fort Worth-Arlington, TX MSA Economic and Demographic Profile ..........................29
    Market Area Map ..................................................................................................................37
    Market Area Analysis ..........................................................................................................38
    State of Texas Tax and Assessment Analysis ...........................................................45
    Site Analysis ............................................................................................................................49
    Description of the Improvements ..................................................................................51
    Subject Photographs............................................................................................................54
**ANALYSIS OF DATA AND CONCLUSIONS**............................................................................**56**
    Dallas-Fort Worth Apartment Market Analysis:.....................................................57
    Mesquite Apartment Submarket Cluster Analysis ................................................66
    Highest and Best Use Analysis .......................................................................................72
    The Valuation Process ........................................................................................................74
    Cost Approach .......................................................................................................................75
    Sales Comparison Approach ............................................................................................77
    Income Capitalization Approach....................................................................................85
    Reconciliation and Final Value........................................................................................109
    Reasonable Exposure Time and Marketing Period.................................................110
    Certification ............................................................................................................................112

**ADDENDA**

Appraiser Qualifications
Improved Sale Abstracts
Lease Comparable Abstracts
Legal Description
Site Plan / Floor Plans
Rent Roll
Operating Statements
Engagement Letter

APP000053

SUBJECT PHOTOGRAPHS

NVC | National Valuation Consultants, Inc.

APP000054

## Subject Photograph



APP000055

NVC | National Valuation Consultants, Inc.

Parc at Windmill Farms

Property Aerial



Subject Photographs

DAL2212075

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

## Executive Summary

**CLIENT**:                              Cort Thomas
                                        Partner
                                        Brown Fox PLLC
                                        8111 Preston Road, Suite 300
                                        Dallas, TX, 75225
                                        Cort@brownfoxlaw.com

**PROPERTY IDENTIFICATION:**             Parc at Windmill Farms located at 1003 Windmill Farms
                                        Blvd  in Forney**,** Texas 75126

**PURPOSE OF APPRAISAL**:                The purpose of this assignment is to provide the
                                        following market value opinion(s):

| Valuation Scenario | | |
| --- | --- | --- |
| Scenario | Interest Appraised | Effective Date of Appraisal |
| "As Is" Market Value | Fee Simple | January 23, 2023 |

**DATE OF INSPECTION**:                  January 23, 2023

**DATE OF REPORT PREPARATION**:          February 7, 2023

**EXTRAORDINARY ASSUMPTIONS**:           This report is subject to the extraordinary assumptions
                                        mentioned in the letter of transmittal and in the attached
                                        report.

**ZONING**:                              The property is zoned  B-1 (Neighborhood Commercial)
                                        under the authority of City of Forney. Multifamily is a
                                        permitted land use under this zoning.

**SITE SIZE**:                           18.45 acres (±803,726 SF) per county assessor

**IMPROVEMENTS DESCRIPTION:**

| | |
| --- | --- |
| Year of Construction: | 2019 |
| Number of Buildings: | 17 residential buildings and two clubhouses |
| Net Rentable Area: | 279,648 SF |
| Average Unit Size: | 1,028 SF |
| Current Occupancy: | 91.5% |
| Parking: | 557 total parking spaces, for a parking ratio of 2.1 spaces per unit. |

APP000057

Parc at Windmill Farms                                        NVC | National Valuation Consultants, Inc.

**UNIT MIX**:

| Unit Mix Summary | | | |
|---|---|---|---|
| Unit Type | Size (SF) | No. of Units | % of Total | Rentable Area (SF) |
| A1 | 832 | 65 | 23.9% | 54,080 |
| A1 -HC | 832 | 3 | 1.1% | 2,496 |
| A2A | 798 | 48 | 17.6% | 38,304 |
| B1 | 1,059 | 28 | 10.3% | 29,652 |
| B2 | 1,145 | 77 | 28.3% | 88,165 |
| B2 -HC | 1,125 | 3 | 1.1% | 3,375 |
| B3 | 1,203 | 12 | 4.4% | 14,436 |
| C1 | 1,365 | 35 | 12.9% | 47,775 |
| C1 -HC | 1,365 | 1 | 0.4% | 1,365 |
| Total | 1,028 | 272 | 100.0% | 279,648 |

**PROPERTY STRENGTHS AND WEAKNESSES**

| Strengths And Weaknesses |
|---|
| **Strengths** |
| • Location offers good access and visibility |
| • Proximity to open space |
| • Top rated school district |
| • Large-sized units |
| • Efficient floorplan design with balconies/patios |
| • Adequate parking at 2.1 spaces per bedroom |
| • Above-average project amenities |
| • New construction |
| • Good condition / well maintained |
| • Rental rates have trended upward in recent years |
| • Stabilized occupancy |
| • Strong employment growth in submarket / metropolitan area |
| **Weaknesses** |
| • Located in a tertiary market |
| • Rising interest rates causing downward pressures on values |
| • Significant new supply brought to market |
| • Ample land supply in area allows for potential new construction |
| • Limited availability of debt capital |

**HIGHEST AND BEST USE:**

As Vacant:     Multi-family development
As Improved:   Continued operation as a for-rent apartment project.

APP000058

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

**MARKET VALUE OPINION SUMMARY:**

| Final Value Reconciliation | |
|---|---|
| Value Scenario | "As Is" Market Value |
| | |
| Date of Valuation | January 23, 2023 |
| Interest Appraised | Fee Simple |
| | |
| Sales Comparison Approach | $49,000,000 |
| | |
| Income Capitalization Approach | |
| Direct Capitalization | $51,600,000 |
| DCFA | $49,700,000 |
| Reconciled | $50,000,000 |
| | |
| Market Value Opinion | $50,000,000 |
| Market Value Opinion /Unit | $183,824 |

**KEY UNITS OF COMPARISON:**

| Key Units of Comparison | |
|---|---|
| Valuation Premise | "As Is" |
| Effective Date | January 23, 2023 |
| Indicated Value | $50,000,000 |
| Indicated Value - $/SF (279,648) | $178.80 |
| Indicated Value - $/Unit (272) | $183,824 |
| Vacancy/Credit Loss | 8.0% |
| Concessions | 0.0% |
| Average Rent/ Unit / Month | $1,560 |
| Annual Expense / Unit (including reserves) | $8,057 |
| Operating Expenses Ratio | 44.71% |
| Direct Capitalization Rate (Going In Rate) | 5.25% |

| Summary of DCF Assumptions | |
|---|---|
| Scenario | "As Is" |
| Date of Value | January 23, 2023 |
| Average Market Rent | $1,560 |
| Rent Escalation | 0%, 2%, 3% … |
| Holding Period | 10 years |
| Vacancy & Credit Loss | 8.00% |
| Long Term Concessions | 0.00% |
| Expense Escalation | 3.00% |
| Terminal Cap Rate | 5.75% |
| Discount Rate | 7.00% |
| Selling Expenses | 1.50% |
| DCF Value Indication (Rounded) | $49,700,000 |
| DCF Value Indication $/Unit | $182,721 |

APP000059

PREMISES OF THE APPRAISAL

APP000060

## Scope of Work

**SCOPE OF WORK DEFINED**

The Scope of Work requirement within the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Standards Board states that the appraiser must provide the following information within each appraisal, appraisal review, or appraisal consulting assignment:

1.      Identify the problem to be solved;

2.      Determine and perform the scope of work necessary to develop credible assignment results; and

3.      Disclose the scope of work in the report.

While the scope of work is addressed within many sections of this report, the following is a summary of the Scope of Work for this assignment.

**APPRAISAL ELEMENTS**

There are six key assignment elements that need to be addressed when identifying the appraisal problem. These include:

1.      Client and any other intended users;

2.      Intended use of the appraiser's opinions and conclusions;

3.      Type and definition of value;

4.      Effective date of the appraiser's opinions and conclusions;

5.      Subject of the assignment and its relevant characteristics (e.g. interest valued, physical and legal characteristics); and

6.      Assignment conditions (e.g. hypothetical conditions, extraordinary assumptions, supplemental standards, and jurisdictional exceptions).

**CLIENT, INTENDED USERS AND INTENDED USE**

According to USPAP, the credibility of an appraisal must be evaluated within the context of the intended use. To that end, this appraisal is prepared at the request of Brown Fox PLLC, for the purpose of assisting in the potential sale of the subject.. The intended users of this appraisal are officials with Brown Fox PLLC. This report has no other intended use, and National Valuation Consultants, Inc. is not responsible for the use of this report by any third parties.

APP000061

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

**PURPOSE OF APPRAISAL**

The purpose of the appraisal is to provide our market value opinion of the valuation scenario summarized below.

| Valuation Scenario | | |
|---|---|---|
| Scenario | Interest Appraised | Effective Date of Appraisal |
| "As Is" Market Value | Fee Simple | January 23, 2023 |

**PROPERTY RIGHTS APPRAISED**

The property rights appraised are those of a fee simple interest in the subject real property.  No opinion of value is provided for mineral rights, water rights or other non-realty items which may or may not be associated with the property.

**ANALYSIS PERFORMED IN THE ASSIGNMENT**

The engagement letter, included at the end of the addenda of this report, requests that the appraisers perform a comprehensive appraisal that includes a detailed explanation of all material factors that relate to the valuation of the subject property.  This type of analysis was formerly referred to as a "self-contained" report format by many clients.

The work performed within this appraisal assignment includes a number of independent investigations and analyses.  The methods and sources utilized are listed as follows:

> **Approaches to Value**: The three traditional valuation approaches – cost, income, and sales comparison – were considered in the appraisal along with the subdivision development approach. Value indications were derived from those considered applicable, which is discussed later in this report.

> **Market Area Analysis**:   The appraisers inspected the subject's market area, evaluated demographic and economic statistics, reviewed city zoning maps, aerial photographs and other market data in analyzing the characteristics of the subject area.

> **Site Description and Analysis**: This description is based on an on-site inspection and review of documents provided by the property contacts.  Specific documents used in the description are cited in the Site Analysis section of this report.

> **Improvement Description and Analysis**:  This description is also based on an on-site inspection and review of building information provided by the property contacts.  Specific documents used in the description are cited in the Description of the Improvements section of this report.

APP000062

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

**Market Analysis**: Macro and micro market analysis sections and industry overview sections were prepared by many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC). We have cited our sources within these sections which typically include related trade industry associations, state and local government sources, and interviews with market participants.

**Market Data**: All market data were derived from multiple conversations with many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC).

**Comparable Sales**: The appraisers assembled data on comparable improved property sales and land sales from abstracts provided by CoStar COMPS; Real Capital Analytics; public deed records; multiple listing service data; newspaper articles and news releases; file sources; and conversations with numerous real estate buyers, sellers, and agents active in the marketplace.

## ASSIGNMENT CONDITIONS

In two separate sections of this appraisal report, we have included the Standard Assumptions and Limiting Conditions used in the preparation of the appraisal assignment.

## PROPERTY CONTACTS

In addition to public records and other sources cited in this appraisal, we have relied on the following parties for information pertaining to the subject:

| Property Contacts | | | | |
|---|---|---|---|---|
| Contact Name | Title | Company | Email | Phone Number |
| Larina Friend | Mgt. Co. Rep | Sun Chase American | lfriend@sunchaseamerican.com | 336-545-1291 |
| Kayla Martin | Site Manager | Parc at Windmill Farms | manager@parcatwindmillfarms.com | 972-552-5500 |

APP000063

Parc at Windmill Farms                                                  NVC | National Valuation Consultants, Inc.

## Definitions of Terminology

**APPRAISAL** — (noun) the act or process of developing an opinion of value.  (adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services.  Comment:  An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship to a previous value opinion or numerical benchmark.[1]

**ASSIGNMENT** — 1) An agreement between an appraiser and a client to provide a valuation service; 2) the valuation service that is provided as a consequence of such an agreement.[2]

**MARKET VALUE** — The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated.
2. Both parties are well informed or well advised, and acting in what they consider their own best interests.
3. A reasonable time is allowed for exposure in the open market.
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto.
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[3]

**AS IS MARKET VALUE** — The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines, OCC) [4]

**FEE SIMPLE ESTATE** — Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[5]

**LEASED FEE INTEREST** — The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. .[6]

**PROJECTION** — In market analysis, a prediction of the future that is an extension of current and historical trends.[7]

**EFFECTIVE DATE** — 1. The date on which the appraisal opinion applies. (SVP) 2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value. (USPAP)  3. The date that a lease goes into effect.[8]

---

[1] USPAP 2020-2021 Edition, Page 3.
[2] USPAP 2020-2021 Edition, Page 3.
[3] Source: Code of Federal Regulations; Title 12--Banks And Banking; Chapter I--Comptroller Of The Currency, Department Of The Treasury; Part 34--Real Estate Lending And Appraisals--Subpart C—Appraisals Sec. 34.42 Definitions; Revised January 1, 2000.
[4] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[7] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[8] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.

APP000064

**PROSPECTIVE OPINION OF VALUE** — A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.[9]

**EXTRAORDINARY ASSUMPTION** — An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis. [10]

**HYPOTHETICAL CONDITION** —1.  A condition that is presumed to be true when it is known to be false. (SVP) 2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.(USPAP)[11]

**EXPOSURE TIME** — Estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.[12]

**MARKETING TIME** — Opinion of the estimated amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. [13]

**INTENDED USE -** the use(s) of an appraiser's reported appraisal or appraisal review assignment results, as identified by the appraiser based on communication with the client at the time of the assignment. [14]

**INTENDED USER** - the client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser, based on communication with the client at the time of the assignment. [15]

**PERSONAL PROPERTY** — Identifiable tangible objects that are considered by the general public as being "personal," for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate.  (USPAP) Consists of every kind of property that is not real property; movable without damage to itself or the real estate; subdivided into tangible and intangible components. (IAAO)[16]

---

[9] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[10] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[11] USPAP 2020-2021 Edition, Page 4.
[12] USPAP 2020-2021 Edition, Page 4.
[13] USPAP 2020-2021 Edition, Advisory Opinion 7, Page 74.
[14] USPAP 2020-2021 Edition, Page 4.
[15] USPAP 2020-2021 Edition, Page 4.
[16] USPAP 2020-2021 Edition, Page 5.

APP000065

Parc at Windmill Farms                                         NVC | National Valuation Consultants, Inc.

## Identification and History of the Property

| | |
|---|---|
| **PROPERTY NAME:** | Parc at Windmill Farms |
| **LOCATION:** | The property is just north of W US Hwy 80 and in between Forney and Terrell, TX. |
| **ADDRESS:** | 1003 Windmill Farms Blvd, Forney, Texas 75126 |
| **COUNTY:** | Kaufman |
| **PROPERTY I.D. NUMBER:** | 8214 |
| **OWNER OF RECORD:** | D4FR  LLC |
| **LEGAL DESCRIPTION:** | Please refer to the *Addenda.* |
| **LATITUDE / LONGITUDE:** | 32.74128 / -96.39680 |

**HISTORY OF THE PROPERTY:**

The improvements of the Parc at Windmill Farms were constructed in 2019.  Since then, there have been no significant upgrades to the units or common areas.  The property currently has a letter of intent ("LOI") from DLP Capital Holdings, LLC to purchase the property for $47,328,000 or $174,000/unit.  The subject was not widely marketed nor was it listed with a brokerage firm.  The subject is part of ongoing legal proceedings to where the LOI has been taken by a receiver, Brown Fox LLC, to make financial decisions.

Other than the current LOI in place, we are aware of no other sales since the property was built.

APP000066

## Standard Assumptions and Limiting Conditions

1.  Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated:  specifically, the Appraisal Institute.

2.  This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment.  Furthermore, the Report is to be used in whole and not in part.  The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.  NVC shall have no accountability or responsibility to any such third party.

3.  The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4.  The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property.  The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5.  The legal description used in this report is assumed to be correct.

6.  No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7.  No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered.  The title is assumed to be good and merchantable unless otherwise stated.

8.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such.

APP000067

9.  All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age.  The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

10. Information furnished by others is assumed to be true, correct and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

11. The opinion of value assumes responsible ownership and competent management.

12. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the opinion of value is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them.

13. The values contained in this report are opinions.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14. The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and opinions of value if information pertinent to this assignment is made known to us after the completion of the report.

15. National Valuation Consultants, Inc., as well as any employee, agent or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject, but only if neither National Valuation Consultants, Inc. nor any other indemnified person shall have been grossly negligent or shall have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16. The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

APP000068

17. Unless otherwise noted, all prospective values, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization.  The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur and which would alter market conditions prior to the effective date of the appraisal.

APP000069

NVC | National Valuation Consultants, Inc.

## Extraordinary Assumptions and Hypothetical Conditions

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report.  There are no Extraordinary Assumptions and Hypothetical Conditions that may have affected the assignment results.

**EXTRAORDINARY ASSUMPTIONS**

None

**HYPOTHETICAL CONDITIONS**

None

APP000070

PRESENTATION OF DATA

APP000071

Parc at Windmill Farms                          NVC | National Valuation Consultants, Inc.

## U.S. Economic Indicators

### *Gross Domestic Product*

Real gross domestic product (GDP) increased at an annual rate of 2.6% in 3Q 2022, in contrast to a decrease of 0.6% in 2Q 2022.



### *Inflation*

The Consumer Price Index for All Urban Consumers rose just 0.1% from the previous month, and increased 7.1% from a year ago, compared with respective estimates of 0.3% and 7.3%.  Inflation-adjusted average hourly earnings for workers rose 0.5% for the month, though they were still down 1.9% from a year ago.



DAL2212075                          U.S. Economic Indicators                                    24

APP000072

Parc at Windmill Farms                                      NVC | National Valuation Consultants, Inc.

### U.S. 10-Year Treasury Yield

As of late-December 2022, the 10-year U.S. Treasury yield dropped below 3.6%, after inflation reading comes in lighter than expected.  The data no doubt cemented the 50 basis point rate hike.



### Consumer Sentiment Index

Consumer sentiment confirmed the preliminary reading earlier this month, rising 5% above November. Sentiment remains relatively downbeat at 15% below a year ago, but consumers' extremely negative attitudes have softened this month on the basis of easing pressures from inflation.  One-year business conditions surged 25%, and the long-term outlook improved a more modest but still sizable 9%. Still, both measures are well below 2021 readings.  Assessments of personal finances, both current and future, are essentially unchanged from November.  Year-ahead inflation expectations improved considerably but remained elevated, falling from 4.9% in November to 4.4% in December, the lowest reading in 18 months but still well above two years ago.  Declines in short-run inflation expectations were visible across the distribution of age, income, education, as well as political party identification.  While the sizable decline in short-run inflation expectations may be welcome news, consumers continued to exhibit substantial uncertainty over the future path of prices.



APP000073

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

***Investment***

Stocks waver as holidays approach and investors look to 2023.  The S&P 500 is down 4.73% for the month.



***NCREIF Property Index***

The quarterly total return was 0.57% for the third quarter which is down from 3.23% the second quarter. The quarterly return consisted of 0.93% from income and (0.37%) from appreciation, the first negative appreciation returns since the 2nd quarter of 2020.  Appreciation is after the deduction of capital expenditures.  Market values before considering capital expenditures decreased by (0.09%), the first decline in the index since the 3rd quarter of 2020.  The decline was due in part to a significant increase in the number of properties that had their values written down this quarter versus those that were written up.  More than half the properties in the index were written down which also hasn't happened since the 3rd quarter of 2020.



APP000074

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

*Capital Markets*

According to CoStar Analytics, having decreased in 2020 by 27.5%, total commercial real estate sales volume reached a new record of $583B in 2021.  Thus far in 2022, total CRE sales volume has increased 41.5%, with over 101,000 total sales and an overall asset value exceeding $13.7T.



**CONCLUSION**

As 2022 progresses, the U.S. inflation rate continues to impact markets, as strong consumer demand has collided with pandemic-related supply disruptions.  Prices are up sharply for a number of everyday household items, including food, vehicles, shelter, and energy.  Shortages of supplies and workers, heavy doses of federal aid, rising interest rate predictions, and robust consumer spending have combined to send inflation soaring.  The Federal Reserve reinforced its inflation fight by raising its key interest rate for the seventh time this year and signaling more hikes to come.  The central bank boosted its benchmark rate a half-point to a range of 4.25% to 4.5%, its highest level in 15 years.  Though lower than its previous three-quarter-point hikes, the latest move will further increase the costs of many consumer and business loans and the risk of a recession.

While industrial properties continue to be the magnet for investors, the retail sector remains impacted by the continuous surge of e-commerce.  Unlike retail where supply exceeds demand, all types of housing in the U.S. remains supply constrained, and the demand for apartments has been fueled by generally unaffordable housing prices.  The hospitality industry is seeing the return of business and large conference travel, but the biggest issue the sector is suffering from currently is a talent shortage and the need to pay higher wages.  The hotel industry is directly affected by the office segment, which continues to be impacted by hybrid work from home policies, resulting in the shrinking of office demand in certain U.S. markets.

Looking forward, most analysts anticipate a short and mild recession, followed by a period of slower growth with inflation remaining well above the Fed's two percent target.  When combined with higher interest rates and ongoing supply-chain issues, the commercial real estate markets will face challenges in the short term, although long term trends remain positive due to high employment and constrained supply in many markets.

APP000075

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

## Area / Subject Map



APP000076

Parc at Windmill Farms                                                NVC | National Valuation Consultants, Inc.

## Dallas-Fort Worth-Arlington, TX MSA Economic and Demographic Profile

### MSA Defined

According to the U.S. Office of Management and Budget, the Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area (#19100) is defined as follows.

*Principal Cities:*  Dallas, Fort Worth, Arlington, Plano, Irving, Denton, Richardson, Grapevine.
*Constituent Counties:* Collin County, Dallas County, Denton County, Ellis County, Hunt County, Kaufman County, Rockwall County, Johnson County, Parker County, Tarrant County, Wise County.

### Locational and Linkages Attributes

The cities of Dallas and Fort Worth are the two central cities of the metroplex.  Dallas and its suburbs have one of the highest concentrations of corporate headquarters in the United States and is the largest growing metropolitan economy in the nation.  Its major industries include Information Technology and Conducting Business.  Fort Worth's economy is fueled by defense and aircraft manufacturing, as well as the Texas farming and ranching industry.

The Dallas-Fort Worth Metroplex is home to over 220 publicly traded companies and roughly 700 total corporate headquarters, one of the largest concentrations in the United States.  As a whole, the region has over 20 Fortune 500 companies and approximately 40 Fortune 1,000 companies.  Among these companies in Dallas are AT&T, Southwest Airlines, Texas Instruments, and Exxon Mobil; Fort Worth is home to American Airlines and several major defense manufacturers including Lockheed Martin and Bell Helicopter Textron.

The Dallas-Fort Worth region's attractive quality of life, low cost of living, skilled labor force, pro-business mindset and absence of corporate and personal income taxes all contribute to a strong regional and state economy.  The region's central location allows it to function as a logistics and distribution hub, giving businesses an edge by putting key markets within easy reach of both truck and rail shipping.

### Ground Transportation

*Highways*

The Dallas-Fort Worth area has multiple different freeways and interstates.  Major north-south Interstates include I-35 and I-45/I-75.  I-35 splits into I-35E and I-35W from Denton to Hillsboro.  I-35W goes through Fort Worth while I-35E goes through Dallas.  I-45 connects Dallas to Houston.  I-75 connects Dallas to Durant Oklahoma.   East-west routes include I-30 and I-20.   The North Central Texas Council of Governments is a cooperative effort of all the counties impacted by the continued population growth and resulting traffic congestion, with the charter to help plan and coordinate future transportation needs of the region.  Two major turnpikes have been opened in the last 10 years to address this growth: the Sam Rayburn Tollway, which links north Tarrant County to Collin County and the President George Bush Turnpike, which links I-20 and I-30, south of DFW Airport, to the Dallas North Tollway and I-75.

APP000077

*Public Transportation*

Public transit options continue to expand significantly, though in several outlying suburbs, it remains limited. Dallas County and parts of Collin and Rockwall Counties have bus service and light rail operated by Dallas Area Rapid Transit, (DART), covering thirteen cities. The Red Line extends north to Plano and southwest to Westmoreland Road. The Blue Line reaches from Rowlett in the northeast to Ledbetter Road in south Dallas. An additional three miles south to the University of North Texas near I-20 recently opened. DART's 28-mile Green Line connects Carrollton in the northwest through Downtown Dallas to Pleasant Grove in the southeast. The Orange Line is being extended in phases from Northwest Hwy to Las Colinas, in Irving, and finally to DFW International Airport.

*Rail*

Tarrant County has bus service operated by the Fort Worth Transportation Authority (known as 'The T'), available only in Fort Worth. The commuter train that serves Fort Worth and its eastern suburbs is operated as the Trinity Railway Express. It connects downtown Fort Worth to downtown Dallas, where it links to the DART light rail system. A station near its midpoint, Centerport, serves DFW Airport via a free airport shuttle bus.

The Dallas-Fort Worth-Arlington area is served by the Burlington Northern and Santa Fe Railway's Intermodal freight transport yard, the Yellow Freight Systems' cross-docking facility and the Union Pacific intermodal facility, all located adjacent to I-45, southeast of Dallas.

**Air Transportation**

*Dallas-Fort Worth International Airport*

Commercial air transportation is handled through the Dallas-Fort Worth International Airport (DFW). DFW, located midway between Dallas and Fort Worth, is the world's largest in terms of land area, covers in excess of 18,000 acres. According to the airport's website, DFW Airport provides non-stop access to 193 U.S. and 67 international cities. During 2021 DFW served over 62.5 million passengers and over 1.8 billion tons of cargo a significant increase over the 39.3 million passengers and 872,000 tons of cargo served by the same date in 2020. DFW currently ranks 3rd in the world in terms of operations, and 2nd in terms of passengers. The airport also provides employment for close to 228,000 individuals. A map of non-stop flights from DFW is presented below.



APP000078

Parc at Windmill Farms                                        NVC | National Valuation Consultants, Inc.

### Demographic Overview

The following table provides a summary of key demographic characteristics within the Dallas-Fort Worth MSA, the State of Texas, and the nation.

| Regional Demographic Summary | | | |
|---|---|---|---|
| | Dalla-Fort Worth MSA | State of Texas | United States |
| **Population** | | | |
| 2020 Census | 7,637,387 | 29,145,505 | 331,449,281 |
| 2023 Estimate | 7,933,171 | 30,065,904 | 334,500,069 |
| 2028 Projection | 8,329,332 | 31,310,079 | 341,662,969 |
| 2020 - 2023 % Annual Change | 1.3% | 1.0% | 0.3% |
| 2023 - 2028 % Annual Change | 1.0% | 0.8% | 0.4% |
| Average Age | 37.2 | 37.4 | 40.2 |
| Median Age | 36.2 | 35.9 | 39.2 |
| **Households** | | | |
| 2020 Census | 2,760,991 | 10,491,147 | 126,817,580 |
| 2023 Estimate | 2,867,378 | 10,848,636 | 128,298,155 |
| 2028 Projection | 3,013,369 | 11,325,374 | 131,437,810 |
| 2020 - 2023 % Annual Change | 1.3% | 1.1% | 0.4% |
| 2023 - 2028 % Annual Change | 1.0% | 0.9% | 0.5% |
| 2023 Average Household Size | 2.7 | 2.7 | 2.5 |
| **Income** | | | |
| 2023 Estimated Median Household | $81,625 | $71,347 | $73,336 |
| 2023 Estimated Avg. Household | $113,629 | $101,151 | $104,972 |
| % Under $50,000 | 29.9% | 35.7% | 34.8% |
| % $50,000 - $100,000 | 29.8% | 29.3% | 28.7% |
| % Over $100,000 | 40.2% | 35.0% | 36.4% |

| Annual Growth Projections (2023 - 2028) | Household Income Comparison |
|---|---|

Environics Analytics, 2023

### Population Trends

The Dalla-Fort Worth MSA has recorded annual population growth of 1.3% since 2020, which has outpaced population growth in the State of Texas as a whole.  Over the next five years, the Dalla-Fort Worth MSA is expected to see annual growth taper off to 1.0%, which is above the projected rate of the State of Texas.

### Income Demographics

When compared to the State of Texas overall, a relatively large percentage of households in the Dalla-Fort Worth MSA earn more than $100,000 annually (40.2%).  Within the State of Texas, only 35.0% fall within this income bracket.

APP000079

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

### *Area Housing Stock*

The bulk of housing in the Dalla-Fort Worth MSA is concentrated in single-family homes which make up 65.9% of inventory.  Overall, a higher percentage of households in the Dalla-Fort Worth MSA rent housing compared to the State of Texas; home-ownership levels are estimated at 60.0% and 62.3% in the Dalla-Fort Worth MSA and State of Texas, respectively.  At $320,741, the estimated value of owner-occupied homes in the Dalla-Fort Worth MSA is higher than the State of Texas median of $254,801.

| 2023 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Dalla-Fort Worth MSA | | State of Texas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 2,017,735 | 65.9% | 8,108,184 | 67.7% |
| 2-3-4 Units | 134,266 | 4.4% | 592,901 | 4.9% |
| 5-19 Units | 399,050 | 13.0% | 1,249,613 | 10.4% |
| 20 or more Units | 403,418 | 13.2% | 1,174,138 | 9.8% |
| Mobile Home, Trailer, Other | 108,172 | 3.5% | 853,180 | 7.1% |
| TOTAL | 3,062,641 | 100.0% | 11,978,016 | 100.0% |
| Home Ownership Levels | % Owner | 60.0% | % Owner | 62.3% |
| | % Renter | 40.0% | % Renter | 37.7% |
| Median Year Structure Built | | 1991 | | 1990 |
| Median Value of Owner-Occupied Homes | | $320,741 | | $254,801 |

Environics Analytics, 2023

### *Employment by Industry Sector*

Top employment sectors in the Dalla-Fort Worth MSA include Management (11.6%), Office/Admin Support (11.3%), and Sales/Related (10.8%).  Together, these three sectors comprise 33.7% of total employment.  When compared with the State of Texas, the Dalla-Fort Worth MSA has a higher portion of residents in the Business/Financial Ops occupation (6.8%).



APP000080

Parc at Windmill Farms                                                      NVC | National Valuation Consultants, Inc.

### *Resident Employment Trends*

The Dalla-Fort Worth MSA is currently exhibiting an unemployment rate of 3.3% as of November 2022. In 2021, the total number of employed residents in the Dalla-Fort Worth MSA increased by 214,943. Over the 12-month trailing period through November 2022, resident employment growth slowed as the number of employed residents increased by 173,645.

The total number of employed residents in the Dalla-Fort Worth MSA is now 7.7% higher than the recent peak reached in 2021. When compared to the State of Texas, the Dalla-Fort Worth MSA's unemployment rate is lower, and unemployment in the Dalla-Fort Worth MSA is 0.1 percentage points lower than the nation.

| Resident Employment Trends | | | | |
|---|---|---|---|---|
| | Dalla-Fort Worth MSA | | State of Texas | United States |
| Year | Employment | Unemployment Rate | Unemployment Rate | Unemployment Rate |
| 2011 | 3,109,349 | 7.8% | 8.0% | 8.9% |
| 2012 | 3,188,765 | 6.5% | 6.7% | 8.1% |
| 2013 | 3,253,995 | 6.2% | 6.3% | 7.4% |
| 2014 | 3,350,325 | 5.1% | 5.2% | 6.2% |
| 2015 | 3,437,008 | 4.1% | 4.5% | 5.3% |
| 2016 | 3,559,384 | 3.9% | 4.6% | 4.9% |
| 2017 | 3,637,295 | 3.7% | 4.3% | 4.4% |
| 2018 | 3,713,687 | 3.6% | 3.9% | 3.9% |
| 2019 | 3,798,180 | 3.3% | 3.5% | 3.7% |
| 2020 | 3,673,336 | 7.1% | 7.7% | 8.1% |
| 2021 | 3,888,279 | 5.1% | 5.7% | 5.3% |
| Most Current Data | | | | |
| Nov 2021 | 4,015,523 | 3.9% | 4.5% | 3.9% |
| Nov 2022* | 4,189,168 | 3.3% | 3.7% | 3.4% |



Source: U.S. Bureau of Labor Statistics, 01/2023. The preceding data reflects all BLS revisions to date.
* - Preliminary data

---

DAL2212075                              Economic and Demographic Profile                              33

APP000081

### Consumer Price Index (CPI) Trends

The Consumer Price Index (CPI) is a measure of the average change over time in the prices paid by urban consumers for consumer goods and services and serves as an economic indicator. The CPI is the most widely used measure of inflation and provides information about price changes in the Nation's economy to government, business, and private citizens.

Price indexes are available for the U.S., the four Census regions, size of city, cross-classifications of regions and size-classes, and for 26 local areas. Indexes are available for major groups of consumer expenditures (food and beverages, housing, apparel, transportation, medical care, recreation, education and communications, and other goods and services), for items within each group, and for special categories, such as energy.

The CPI for Dallas-Fort Worth CSA recorded an increase of 1.7% annually for "All Items" during the period 2012-2021, which is slightly below the U.S. (Class A) increase. From November 2021 November 2022 (most recent data available), the CPI for the Dallas-Fort Worth CSA increased by 8.4%, which was above the U.S. (Class A) CPI increase of 7.1% over the same time period.

| Comparative CPI Trends Dallas-FT Worth CSA and U.S. (Class A) | | |
|---|---|---|
| | All Items | |
| Year | DFW CSA | U.S. (Class A) |
| 2012 | 212.2 | 209.3 |
| 2013 | 216.0 | 212.6 |
| 2014 | 218.4 | 216.1 |
| 2015 | 217.5 | 217.1 |
| 2016 | 220.7 | 220.3 |
| 2017 | 226.1 | 225.4 |
| 2018 | 232.8 | 231.3 |
| 2019 | 237.7 | 235.9 |
| 2020 | 239.1 | 239.0 |
| 2021 | 251.6 | 249.1 |
| Annual Change | 1.7% | 1.8% |
| 2020-2021 | 5.2% | 4.2% |
| Partial Year Comparison | | |
| Nov-21 | 257.4 | 255.1 |
| Nov-22 | 279.0 | 273.2 |
| Annual Change | 8.4% | 7.1% |

Source: U.S. Bureau of Labor Statistics. 1Q 2023
DFW CSA Base Period: December 1982-84 = 100
U.S. Class Base Period: December 1986 = 100

The BLS divides the nation into several Combined Statistical Areas (CSA's). CSA's are larger than Metropolitan Statistical areas (MSA's) because they are intended to give a regional picture. For markets that do not fall within these CSA's, the BLS has defined these as being Class A, Class B/C, or Class D, depending on population. Size Class A is defined as having a population of more than 1.5 million. Size Class B/C is defined has having a population between 50,000 and 1.5 million. Size Class D is defined as having a population of less than 50,000.

APP000082

***Market News***

*Goldman Sachs*

New York-based financial firm Goldman Sachs announced a truly transformative project.  The $480 million, 950,000 SF regional campus will be adjacent to the Perot Museum of Nature and Science.  When completed, it will house nearly 5,000 employees a redefine the Dallas skyline.  The campus will anchor an 11-acre mixed-use development being built by Dallas based Hunt Realty Investments on what are now low-rise apartments.  The city of Dallas approved an economic incentive package valued at about $18 million.  As part of the deal, the company signed a lease with a minimum term of 15 years for the new project.  Construction is expected to begin in early 2023, with an anticipated delivery of 2026.

*Texas Live!*

Texas Live!, a partnership between The Cordish Companies and the Texas Rangers, is a dynamic $250 million world-class dining, entertainment and hospitality district nestled between the Texas Rangers' Globe Life Park and the Dallas Cowboys AT&T Stadium in the heart of Arlington, TX.  The now completed project is part of a greater $1.25 billion vision for the Arlington stadium district that features a new Rangers ballpark; 200,000 square feet of best-in-class restaurants, retail and entertainment venues; a full-service 300-room convention hotel; 35,000 square feet of meeting/convention space; and a 5,000-capacity outdoor event pavilion.  The Rangers previous stadium, Globe Life Park, will remain open near Texas Live!, where it will be used for soccer games, football games, as well as some concerts.

*High-Speed Dallas-to-Houston Train*

A project to construct a high-speed train in-between Dallas and Houston is in the works as a $16 billion contract was enacted in June 2021.  Texas Central and Milan-based Webuild will work together to construct the rail line, which will allow passengers to travel between Dallas and Houston in 90 minutes.  This will be the single biggest infrastructure investment of its kind in the United States by value and will be the first true high-speed rail service in the county.  The project has seen multiple setbacks and delays, primarily due to political and community opposition, however in June 2022, the Texas Supreme Court handed the company what could be a watershed victory, ruling that Texas Central can use eminent domain for this project.

*Walmart Fulfillment Center*

Plans are currently in the works for Walmart to build two new high-tech facilities in the Dallas-Fort Worth area in order to support its rapidly developing supply chain network.  The facilities include a 1.5 million SF automated fulfillment center set to open in 2023 and a 730,000 SF automated grocery distribution center slated to open in 2024.  The facilities will play a critical role in Walmart's supply chain to deliver on the retailer's promise to get customers the items they want when they want them.  Through the combination of Walmart associates and automation technology, the high-tech facilities will move more than two times the volume of a traditional fulfillment and grocery distribution center, all while improving the accuracy, quality and speed of the fulfillment and distribution of products.

APP000083

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

**CONCLUSION**

The Dallas-Fort Worth MSA encompasses 11 counties within the State of Texas.  Residents of the area refer to it as the Dallas/Fort Worth Metroplex, DFW, or The Metroplex.  It is the economic and cultural hub of the region commonly called North Texas or North Central Texas and is the largest land-locked metropolitan area in the United States.

Dallas-Fort Worth's economy is expanding, adding 214,943 jobs in 2021, and has fully recovered from the recession, up 173,645 jobs since November 2021.  As of the latest report in November 2021, the economy has reached over 4.1 million jobs and is reporting an unemployment rate of 3.3%.

The Dallas-Fort Worth MSA is home to excellent higher education institutions including Southern Methodist University, Texas Christian University, the University of Texas Southwestern Medical School, the University of Texas at Dallas, and the University of North Texas.  The region offers an extensive community college system as well, enrolling almost 190,000 students annually.

The Dallas-Fort Worth region's low cost of doing business and highly skilled labor force has caused companies across various sectors to relocate or expand operations within the area.  The financial services sector is expected to have an outsized impact soon, with Goldman Sachs and Wells Fargo announcing the construction of regional campuses employing a combined 9,000 employees.  The latest example is Caterpillar, relocating to Irving from Peoria, Illinois; the heavy equipment manufacturer moved its electric power division to the area earlier.  Engineering giant AECOM announced relocating its global headquarters from Los Angeles to Dallas.  Another California transplant was MD7 LLC, a mobile infrastructure consultancy firm.  The company is relocating from San Diego to Allen.  The move is anticipated to create 218 jobs and bring $6.8 billion in capital investment.

In late 2019, Charles Schwab announced acquiring TD Ameritrade in a $26 billion transaction, moving its headquarters to Tarrant County from San Francisco. Charles Schwab completed a new regional office, and TD Ameritrade completed a large project nearby.  Combined the two companies will bring thousands of jobs to the region.  TripActions, a Palo Alto based company specializing in corporate travel, expanded its presence in Downtown Dallas. McKesson Corp, the nation's largest pharmaceutical distributor, relocated its headquarters to Irving. USAA added a 150,000-SF office building adjacent to its existing Plano location to bring the total headcount to 2,000 in north Texas, up by 800 employees.

The Dallas-Fort Worth metro economy continues to grow and attract more companies which has caused increased employment and demand for commercial real estate.  Due to this, the overall outlook for the Dallas-Fort Worth MSA is favorable.

APP000084

Parc at Windmill Farms                                              NVC | National Valuation Consultants, Inc.

## Market Area Map



APP000085

## Market Area Analysis

### Description of Market Area

The subject property is located at 1003 Windmill Farms Boulevard, in the City of Forney, Kaufman County, Texas.  For the purposes of this analysis, the market area is defined as the area generally bound by I-20 to the south, the county line to the north and the west, and the unincorporated community of Lawrence to the east.  A map of the market area is provided on the preceding page.

Forney is a city in northwest Kaufman County, and has been named by the Texas Legislature as the "Antique Capital of Texas".  The city, which is about four miles southeast of Lake Ray Hubbard, has the second fastest growing school district in the state.

The subject is located directly off U.S. 80.  The area immediately surrounding the subject is largely comprised of residential neighborhoods and undeveloped land.  Retail centers flank U.S. 80.  Additionally, the subject property is not located in an Opportunity Zone.

### Linkages and Locational Attributes

U.S. Route 80 passes through the city as a four-lane limited-access highway, leading west 20 miles to the center of Dallas and east 11 miles to Terrell.  I-20 is south of U.S. 80, running parallel to it in this part of the market area.  Both connect to I-635, which forms a partial loop around the east side of the metro area.

*Public Transportation*

Forney is a member of the STAR public bus transit service for area residents in Kaufman County, Rockwall County, Mesquite, Balch Springs, Seagoville, Hutchins, and DeSoto. Named Outstanding Rural Transit System by the Texas Transit Association in 2019, STAR provides scheduled and concierge transportation for over 235,000 riders per year utilizing a fleet of ADA-compliant vehicles.

*Air Transportation*

Dallas-Fort Worth International Airport (DFW), home of American Airlines, is the fourth largest airport in the U.S. and offers passenger and commercial services to over 250 destinations throughout the United States and the world.  Plus, DFW has the added advantage of offering Foreign Trade Zone "Subzone" status for businesses locating in Forney.  It is located 42 miles northwest of Forney via I-635 N.

Dallas Love Field, home of Southwest Airlines, carries over 17 million passengers a year to over 60 nonstop destinations throughout the United States and is also available for commercial cargo and freight transportation.  It is located 29 miles northwest of Forney via US-80 W.

*Rail*

Union Pacific has an intermodal facility in Mesquite (12 miles) and an intermodal hub south of Dallas in Wilmer (22 miles southwest).  Union Pacific Railroad covers 23 states across the western two-thirds of the United States.

APP000086

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

### *Demographic Overview*

The following table provides a summary of key demographic statistics for the defined market area, as well as comparable data for the three- and five-mile radial areas surrounding the subject, the City of Forney, and Kaufman County.

| Market Area Demographic Summary | | | | | |
|---|---|---|---|---|---|
| | 3 Mile Radius | 5 Mile Radius | Market Area | City of Forney | Kaufman County |
| **Population** | | | | | |
| 2020 Census | 19,791 | 53,001 | 54,890 | 23,455 | 145,310 |
| 2023 Estimate | 22,828 | 61,415 | 64,520 | 27,743 | 164,505 |
| 2028 Projection | 25,994 | 69,823 | 74,426 | 31,707 | 183,288 |
| 2020 - 2023 % Annual Change | 4.9% | 5.0% | 5.5% | 5.8% | 4.2% |
| 2023 - 2028 % Annual Change | 2.6% | 2.6% | 2.9% | 2.7% | 2.2% |
| Average Age | 32.8 | 34.1 | 34.1 | 34.1 | 36.5 |
| Median Age | 31.9 | 33.5 | 33.7 | 33.5 | 35.6 |
| **Households** | | | | | |
| 2020 Census | 6,247 | 16,714 | 17,346 | 7,580 | 47,673 |
| 2023 Estimate | 7,175 | 19,250 | 20,283 | 8,927 | 53,691 |
| 2028 Projection | 8,137 | 21,768 | 23,311 | 10,138 | 59,515 |
| 2020 - 2023 % Annual Change | 4.7% | 4.8% | 5.4% | 0.7% | 4.0% |
| 2023 - 2028 % Annual Change | 2.5% | 2.5% | 2.8% | 2.6% | 2.1% |
| 2023 Average Household Size | 3.2 | 3.2 | 3.2 | 3.1 | 3.0 |
| **Income** | | | | | |
| 2023 Estimated Median Household | $106,696 | $103,960 | $105,468 | $101,554 | $84,884 |
| 2023 Estimated Avg. Household | $129,219 | $123,503 | $123,249 | $112,834 | $105,370 |
| % Under $50,000 | 16.6% | 18.0% | 17.6% | 19.0% | 27.8% |
| % $50,000 - $100,000 | 29.9% | 29.8% | 29.4% | 30.1% | 30.5% |
| % Over $100,000 | 53.5% | 52.2% | 53.0% | 50.9% | 41.7% |



Environics Analytics, 2023

### *Population Trends*

The market area has seen annual population growth of 5.5% since 2020, which has outpaced population growth in Kaufman County as a whole. Over the next five years, the market area is expected to see annual growth slow down to 2.9%, which remains higher than the projected rate of the county.

### *Income Demographics*

When compared to Kaufman County overall, a relatively large portion of households in the market area earn more than $100,000 annually (53.0%). Within Kaufman County, only 41.7% fall within this income bracket.

APP000087

### Area Housing Stock

The majority of housing in the market area is concentrated in single-family homes which represent 89.3% of inventory. Overall, a lower proportion of households in the market area rent housing compared to Kaufman County; home-ownership levels are estimated at 81.6% and 76.5% in the market area and Kaufman County, respectively. At $300,950, the estimated value of owner-occupied homes in the market area is above the Kaufman County median of $262,561.

| 2023 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Market Area | | Kaufman County | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 19,167 | 89.3% | 44,600 | 77.8% |
| 2-3-4 Units | 443 | 2.1% | 2,021 | 3.5% |
| 5-19 Units | 386 | 1.8% | 1,442 | 2.5% |
| 20 or more Units | 1,153 | 5.4% | 1,752 | 3.1% |
| Mobile Home, Trailer, Other | 304 | 1.4% | 7,492 | 13.1% |
| TOTAL | 21,453 | 100.0% | 57,307 | 100.0% |
| Home Ownership Levels | % Owner | 81.6% | % Owner | 76.5% |
| | % Renter | 18.4% | % Renter | 23.5% |
| Median Year Structure Built | | 2008 | | 2002 |
| Median Value of Owner-Occupied Homes | | $300,950 | | $262,561 |

Environics Analytics, 2023

### Resident Employment by Occupation

Top employment sectors in the market area include Office/Admin Support (13.6%), Management (13.2%), and Sales/Related (10.9%). Together, these three sectors account for 37.8% of total employment. When compared with Kaufman County, the market area has a higher proportion of residents in the Management occupation.



APP000088

Parc at Windmill Farms                                        NVC | National Valuation Consultants, Inc.

*Principal Employers*

A list of the principal employers in the City of Forney, according to the city's most recently published *Comprehensive Annual Financial Report*, is presented below.

| Principal Employers - City of Forney | |
|---|---|
| Employers | Employees |
| Forney Independent School District | 1,390 |
| WalMart | 398 |
| Smurfit Kappa | 260 |
| Intex Electric | 250 |
| Kroger Marketplace | 222 |
| Steve Silver Company | 200 |
| Lowe's Home Improvement | 165 |
| City of Forney | 160 |
| Goodyear Tire & Rubber | 160 |
| Ridgecrest Healthcare & Rehap | 160 |

Source: City of Forney 2021 CAFR, 2023.

*Market Drivers*

**Advanced Manufacturing:** The advanced manufacturing industry is well represented in Forney by a diversity of both small and large companies utilizing high-precision production methods and technology. A few advanced manufacturers in Forney include ABOX Packaging, Aircraft Ducting Repair, Classic Industries, Dal-Bac, and Smurfit Kappa.

**Data Centers & Technology:** One of the key reasons, Forney is a prime destination for data storage, transmission, and high-tech manufacturing operations is our strategic proximity to the 1.5 million-square-foot Dallas Infomart interconnect hub, the largest facility in the south-central United States, making maximum roundtrip latency virtually instantaneous. Gateway, a master-planned 2,000-acre mixed-use development, offers critical access to several major fiber optics providers for comprehensive connectivity, along with dual-feed electrical service availability by Oncor, access to a large supply of water, natural gas, and related services.

**Healthcare:** The 80,000-square-foot Forney Medical Plaza features a 24/7 Baylor Scott & White ER facility and helipad, with medical offices/suites and clinic space for lease. Current tenants include pediatrics, family medicine, women's health, cardiology, dermatology, ENT, podiatry, and imaging services. Forney also offers available land throughout the community well-suited for healthcare office development.

**Logistics***:* In February 2020, the City of Forney was selected by Amazon for the construction of their new 200,000-square-foot distribution center, and just four months later, the company announced it would also be placing a 1.08 million-square-foot fulfillment center in Forney. Other key companies in Forney include Goodyear Tire & Rubber Co., and Steve Silver Furniture Company.

APP000089

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

### *Resident Employment Trends*

The City of Forney is currently exhibiting an unemployment rate of 4.4% as of November 2022. In 2021, the total number of employed residents in the City of Forney grew by 876. Over the 12-month trailing period through November 2022, resident employment growth slowed as the number of employed residents increased by 780.

The total number of employed residents in the City of Forney is now 8.5% above the recent peak reached in 2021. When compared to Kaufman County, the city's unemployment rate is higher, and unemployment in the City of Forney is 1.0 percentage point above the nation.

| | Resident Employment Trends | | | | |
|---|---|---|---|---|---|
| | City of Forney | | Kaufman County | | Dallas-Ft Worth MSA |
| Year | Employment | Unemployment Rate | Employment | Unemployment Rate | Unemployment Rate |
| 2011 | 7,469 | 6.1% | 47,242 | 8.3% | 7.8% |
| 2012 | 7,753 | 5.3% | 47,941 | 6.9% | 6.5% |
| 2013 | 8,140 | 4.7% | 48,995 | 6.4% | 6.2% |
| 2014 | 8,665 | 3.7% | 50,740 | 5.2% | 5.1% |
| 2015 | 9,189 | 3.0% | 52,824 | 4.1% | 4.1% |
| 2016 | 9,757 | 3.5% | 55,742 | 3.8% | 3.9% |
| 2017 | 10,352 | 3.5% | 57,740 | 3.6% | 3.7% |
| 2018 | 12,060 | 3.5% | 60,348 | 3.5% | 3.6% |
| 2019 | 13,957 | 3.2% | 64,407 | 3.2% | 3.3% |
| 2020 | 14,263 | 7.1% | 64,465 | 6.4% | 7.1% |
| 2021 | 15,139 | 5.6% | 68,423 | 4.9% | 5.1% |
| Most Current Data | | | | | |
| Nov 2021 | 15,643 | 4.6% | 70,701 | 3.9% | 3.9% |
| Nov 2022* | 16,423 | 4.4% | 74,225 | 3.5% | 3.3% |



Source: U.S. Bureau of Labor Statistics, 01/2023. The preceding data reflects all BLS revisions to date.
* - Preliminary data

APP000090

Parc at Windmill Farms                                                NVC | National Valuation Consultants, Inc.

### Forney School District

Forney ISD is a school district in Forney, TX.  As of the 2020-2021 school year, it had 12,724 students (most recent data presented).  According to the district website, the state waived accountability ratings for the 2020-2021 school year because of the coronavirus pandemic.  The school received an accountability rating of A for the 2018-2019 school year.

In the Class of 2020, 97.2% of students received their high school diplomas on time or earlier.  The average SAT score at Forney ISD was 1060 for 2019-2020 graduates.  The average ACT score was 21.0.

As of the 2020-2021 school year, on average, teachers had 9.4 years of experience.

### District News

"Forney ISD's Opportunity Central opening in 2023", September 21, 2021

On Tuesday, Sept. 21, the District presented a site plan to the Forney City Council for "The OC" set to open in 2023.

> The Keith Bell Opportunity Central (OC) is a state-of-the-art college and career center designed to create a collaborative space for the Forney community to engage in learning at all levels. The estimated 350,000 square foot, three-tier learning facility will be built across from the new Jackson Middle School and Rhodes Intermediate campus on Innovation Blvd. and will serve as a national model for education.

> This one-of-a-kind facility will serve as a career and college center, multi-purpose complex, student-run business hub, fine arts events, and more. Students will take career classes, complete college courses and learn skills in entrepreneurship. Local businesses can partner with Forney ISD to educate the future workforce and build community connections. Members of the community can attend fine arts events, take college classes, join recreation leagues, and shop from a variety of stores.  The OC is scheduled to open in 2023.

*"Forney ISD Board Calls for May 2022 Bond",* Forney School District

> At a special called board meeting on Feb. 17, the Forney ISD Board of Trustees voted unanimously to approve a May bond referendum proposed by the Facilities Planning Committee. The bond package to go before voters in May will not increase the district's tax rate. The district tax rate is currently $1.37 and has lowered 17 cents over the last 3 years. ***Unprecedented enrollment growth is expected in the next few years as housing demands have increased across Forney. The latest quarterly enrollment report forecasts a staggering 25,000 students in five years, and 35,000 students by 2031.*** The report is based on the latest data of housing starts, inventory, land use and enrollment trends presented by leading demographer Zonda Education.

APP000091

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

**CONCLUSION**

The subject property is located in the eastern corridor of the Dallas-Fort Worth Metroplex along US Highway 80, featuring the sites, land, and infrastructure needed for strong growth and development. Forney is one of the few remaining cities in the Dallas-Fort Worth Metroplex with available sites and hundreds of acres of land to build and grow.  Top Fortune 500 companies, including Amazon, Goodyear Tire & Rubber, and Vistra Energy, along with other statewide, national and international businesses, such as Ireland-based corrugated manufacturer Smurfit Kappa, are found in Forney.

The market area has enjoyed very strong annual population growth since 2020 at 5.5%.  Population growth is expected to continue over the next five years; however, it will be at a slower pace of 2.9%.  This pace is above growth in Kaufman County.  The City of Forney's strong and diverse range of industries has bolstered job growth, with the number of employed residents now 8.5% above the recent peak reached in 2021.  As of November 2022, the unemployment rate has fallen to 4.4%, which is the lowest rate recorded since the pandemic began. Overall, the outlook for the market area is favorable as the market area looks to continue to improve.

APP000092

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

## State of Texas Tax and Assessment Analysis

### Property Tax Administration

According to the State of Texas, administration of the property tax system in Texas involves both state and local entities and officials.  State law governs how the process works.

1.      The **Comptroller of Public Accounts of the State of Texas** adopts rules establishing minimum standards for the administration and operation of an appraisal district.  The minimum standards may vary according to the number of parcels and the kinds of property the district is responsible for appraising.

2.      The **Board of Tax Professional Examiners** is responsible for certifying tax professionals in Texas and  in setting standards for and approving curricula and materials for use in training and educating appraisers and assessor-collectors.

3.      An **appraisal district** is established in each county.  The district is responsible for appraising property in the district for ad valorem tax purposes of each taxing unit that imposes ad valorem taxes on property in the district.  An appraisal district is a political subdivision of the state.  With exceptions, the appraisal district's boundaries are the same as the county's boundaries.  The appraisal district is governed by a **board of directors**.  A **chief appraiser** is the chief administrator.

4.      **An appraisal review board** settles any disagreements between the property owner and the appraisal district about the value of a property.  The appraisal review board is established for each appraisal district.

**Local taxing units**, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The county assessor-collector shall assess and collect taxes on property in the county.

The county attorney or, if there is no county attorney, the district attorney shall represent the county to enforce the collection of delinquent taxes if the commissioners court does not contract with a private attorney.

### Assessment

The assessment of property for taxation on the basis of a percentage of its appraised value is prohibited.  All property shall be assessed on the basis of 100% of its appraised value.  The market value of property shall be determined by the application of generally accepted appraisal methods and techniques.  If the appraisal district determines the appraised value of a property using mass appraisal standards, the mass appraisal standards must comply with the Uniform Standards of Professional Appraisal Practice.  The same or similar appraisal methods and techniques shall be used in appraising the same or similar kinds of property.  However, each property shall be appraised based upon the individual characteristics that affect the property's market value.  In determining the market value of property, the chief appraiser shall consider the cost, income, and market data comparison methods of appraisal and use the most appropriate method.

APP000093

Parc at Windmill Farms                                          NVC | National Valuation Consultants, Inc.

*Reassessment Cycle*

The appraisal district must repeat the appraisal process for property in the county at least once every three years.

*Tax Rates*

Local taxing units, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The governing body of each taxing unit, before the later of September 30 or the 60th day after the date the certified appraisal roll is received by the taxing unit, shall adopt a tax rate for the current tax year and shall notify the assessor for the unit of the rate adopted.

State "truth-in-taxation" laws give taxpayers a voice in decisions that affect their property tax rates. Beginning in early August, taxing units take the first step toward adopting a tax rate by calculating and publishing the effective and rollback tax rates.

> The *effective tax* rate would provide the taxing unit with approximately the same amount of revenue it had the year before on properties taxed in both years.
>
> The *rollback* rate provides the taxing unit approximately the same amount of tax revenue it spent the previous year for day-to-day operations plus an extra 8-percent cushion, and sufficient funds to pay its debts in the coming year.  For school districts, the cushion is six cents per $100 of property value, not 8%.

*Current Assessment*

Below is a summary of the subject's current assessment for Parcel 8214 in the Kaufman County Tax District.  We note this assessment is based on the subject as improved and have current tax rates of 2.6346% and a total assessed value of $35,000,000.  Kaufman County has five different tax units to comprise the total tax paid, which is shown below.  This equates to a total tax amount of $922,107 or $3,390/unit.

| Calculation of 2022 Assessment and Taxes | | | | | |
|---|---|---|---|---|---|
| Parcel Number | Land Value | Improvement Value | Assessed Value | Mill Levy Per $100 of Value | Total Taxes |
| 8214 | $3,214,902 | $31,785,098 | $35,000,000 | 2.63 | $922,107 |
| Subtotal Real Estate | | | $35,000,000 | | $922,107 |
| $/Unit | | | $128,676 | | $3,390 |
| $/SF | | | $125.16 | | $3.30 |
| **Total Real Estate Taxes** | | | | | **$922,107** |

Source: Kaufman County Assessor's Office

APP000094

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

*Tax Rate*

The tax rate is comprised of five taxing units that are shown below.

| Taxable Values | | | |
|---|---|---|---|
| Taxing Unit | Assessed Value | Tax Rate | Total Tax |
| Kaufman County | $  35,000,000 | 0.345850% | $121,048 |
| Road & Bridge | $  35,000,000 | 0.070412% | $24,644 |
| Forney ISD | $  35,000,000 | 1.354600% | $474,110 |
| KC ESD #6 (Forney) | $  35,000,000 | 0.034830% | $12,191 |
| Kaufman CO FWSD 1C | $  35,000,000 | 0.828900% | $290,115 |
| **Total** | | 2.634592% | **$922,107** |

*Projection of Future Taxes*

Going forward, the assessor will base future taxable value on comparable projects. In the table below, we have summarized the 2022 assessed values on several comparable projects in Kaufman County.

| Tax Comparable Summary | | | | | | |
|---|---|---|---|---|---|---|
| Property | County | Year Built | Avg. SF | # of Units | Assessed Value | Value Per Unit |
| Avilla Oakridge 1405 N Gateway Blvd | Kaufman | 2021 | 956 | 209 | $39,100,000 | $187,081 |
| Gateway Pines 1200 N Gateway Blvd | Kaufman | 2018 | 810 | 337 | $40,824,114 | $121,140 |
| Magnolia Grove 551 Crossroads Pkwy | Kaufman | 2020 | 910 | 270 | $31,414,244 | $116,349 |
| Emerson at Forney 300 Trailhouse Ln | Kaufman | 2019 | 894 | 320 | $33,524,957 | $104,765 |
| Gateway Oaks 1105 Gateway Blvd | Kaufman | 2016 | 860 | 313 | $37,832,752 | $120,871 |
| Gateway Cedars 1100 N Gateway Blvd | Kaufman | 2014 | 791 | 334 | $37,510,624 | $112,307 |
| Comps Averages | | 2018 | 870 | 297 | $36,701,115 | $127,086 |

Source: Kaufman County Assessor's Office

The subject's 2022 value/unit is $128,676 /unit. The tax comparables above are quite similar overall and indicate an average assessed value of $127,086/unit. The proposed sale of the subject property may cause the taxable value to be higher. The current assessment is roughly 74% of the proposed sale price ($47,328,000 or $174,000/unit). ***Based on conversations with local brokers, buyers are often underwriting tax values at 80% to 100% of the sale price with the expectation that tax values will tend to lag market value.*** The subject's 2022 taxable value slightly falls below this range.

APP000095

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

Given the nature of this market underwriting, we have based taxes on 80% of the current contract price. The contract price is $47,328,000; hence, using an 80% of value factor to determine our estimated market assessment, an assessed value of $37,862,400 is indicated and this value equates to a per unit amount of $139,200.  This is well supported by market data given the subject's newer construction and relatively larger average unit size (in this market).  In the following table, we have estimated stabilized taxes for the subject property.  A potential investor would likely use similar assumptions.

| NVC Property Tax Projection | |
|---|---|
| Scenario | Stabilized Proforma (Un-Trended) |
| No. of Units | 272 |
| Assessor's Value ($/Unit) | $139,200 |
| Assessor's Value | $37,862,400 |
| Assessment Ratio | 100.00% |
| Total Assessed Value | $37,862,400 |
| Mill Levy (2022) | 2.6346 |
| Real Estate Taxes | $997,520 |
| Subtotal Taxes | $997,520 |
| Total Taxes (Rounded) | $1,000,000 |
| $/Unit | $3,676 |

*NVC Projection*

***Gross Receipts Tax (Franchise or Margin Tax)***

In Article 2 of the Texas Tax Code, the Gross Receipt Tax (GRT), aka Franchise Tax or Margin Tax, was reformed by broadening the tax base, lowering the tax rate, and extending coverage to all active businesses receiving state law liability protection. A taxable entity, under the new franchise tax, is defined as, "those with state law liability protection." Such entities include corporations, limited liability companies, partnerships, limited partnerships, limited-liability partnerships, professional and business associations, joint ventures, joint stock companies, and holding companies. There are some entities that will not be held responsible for the tax; those taxable entities that are excluded from the franchise tax include sole proprietorships, general partnerships owned entirely by natural persons, certain unincorporated passive entities, and non-profit and other organizations currently exempt from the franchise tax.  As the subject is not one of these tax-exempt entities, the franchise tax must be applied as an additional tax.  The computation franchise tax rate is estimated at 0.331% as of 2022 and 2023.  This will be discussed more in the income approach.

APP000096

Parc at Windmill Farms                                          NVC | National Valuation Consultants, Inc.

## Site Analysis

In analyzing and describing the subject site, we have relied on our personal inspection of the property and surrounding area on January 23, 2023; information provided by ownership; and records on file with the county.

**SIZE:**                          18.45 acres (±803,726SF) per county assessor.

**ADDRESS:**                       1003 Windmill Farms Blvd, Forney, Texas

**LOCATION:**                      The property is just north of W US Hwy 80 and in between Forney and Terrell, TX.

**SHAPE:**                         The site is generally irregular in shape but functional.

**TOPOGRAPHY:**                    Generally level

**FRONTAGE:**                      The site has frontage on Windmill Farms Blvd and W US Hwy 80.

**VISIBILITY:**                    Good

**ACCESS:**                        Good

**VIEWS:**                         Average - Neighborhood - Housing and U.S. 80

**SOIL CONDITIONS:**               The appraisers were not provided a soils report. This appraisal specifically assumes that there are no adverse soil conditions that would prevent development on this site.  If more information is required, the client is advised to seek the counsel of a qualified professional.

**EASEMENT / ENCUMBRANCES:**       A title policy and ALTA Survey were not provided. As is the case with most major commercial sites, easements and encumbrances are common place and predominately utility-related.  This appraisal is based on the standard assumption that no title exceptions, recorded or unrecorded, are present that would have a negative impact on the subject site.

**HAZARDOUS SUBSTANCES:**          The appraisers were not provided with a Phase I Environmental Site Assessment.  This appraisal specifically assumes that the property is not affected by environmental conditions that would significantly impact the usability, or marketability of the site.

APP000097

Parc at Windmill Farms                                             NVC | National Valuation Consultants, Inc.

**FLOODPLAIN:** According to Site To Do Business (STDB), the subject property is located within FEMA Flood Insurance Rate Map Community Panel Number 0175D, dated, July 3, 2012. The subject is situated in Zone X. First American Flood Data Services defines Zone X as an area that is determined to be outside the 100- and 500-year floodplains.



**DRAINAGE:** Based on our inspection of the site, drainage appears adequate.

**ZONING:** The property is zoned B-1 (Neighborhood Commercial) under the authority of City of Forney. Multifamily is a permitted land use under this zoning.

**REAL ESTATE TAXES:** Please refer to the Tax and Assessment Analysis section of this report for detailed tax information.

**SITE IMPROVEMENTS:** Sidewalks, curb and gutter on frontage streets.

**UTILITIES:** All utilities are available to the site.

**SURROUNDING LAND USES:** Current surrounding land uses are as follows:

North: Single Family (SF) homes
East: Day Care Center and High Point Creek
South: Industrial, Multifamily, Vacant Land, and Railroad Tracks (across U.S. 80)
West: Downtown Forney - Multifamily and Retail

**CONCLUSION:**

The site is well suited for multi-family development having good access and visibility.

APP000098

## Description of the Improvements

In describing and analyzing the improvements, we have relied on the following sources of information:

1. Personal inspection on January 23, 2023, and
2. Various exhibits and written information provided to us by the owner.

According to Costar, the subject is a Class B, Garden/Low Rise, apartment community with 17 residential buildings and two clubhouses. The improvements include 272 units with a total rentable area of 279,648 SF for an average unit size of 1,028 SF. There are 557 total parking spaces, for a parking ratio of 2.1 spaces per unit. The subject was built in 2019.

**IMPROVEMENT SUMMARY**

| | |
|---|---|
| Year of Construction: | 2019 |
| Total Units: | 272 |
| Density: | 14.74 units/acre |
| No. of Buildings: | 17 residential buildings and two clubhouses |
| Net Rentable Area: | 279,648 SF  per rent roll |
| Average Unit Size: | 1,028 SF |

**PARKING**

| | |
|---|---|
| No. of Spaces: | 557 – Per Rental Information Survey |
| Spaces per unit: | 2.05 |
| Description: | 544 surface spaces and 13 ADA Parking |

**BUILDING STRUCTURE**

| | |
|---|---|
| No. of Floors: | 2 |
| Design: | Walk-up exterior |
| Foundation: | Likely a shallow foundation system such as slab, spread footings or pad foundation |
| Construction type: | Wood frame |
| Exterior Finish: | Mix of masonry veneer and fiber cement siding |
| Roofing: | Pitched roof with composite shingles |
| General Comments: | Architectural plans were not available. Our assumptions regarding the structural elements summarized above are based on common building practices observed in improvements of similar design and function. |

APP000099

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

**UNIT MIX:**

| Unit Mix Summary | | | | |
|---|---|---|---|---|
| Unit Type | Size (SF) | No. of Units | % of Total | Rentable Area (SF) |
| A1 | 832 | 65 | 23.9% | 54,080 |
| A1 -HC | 832 | 3 | 1.1% | 2,496 |
| A2A | 798 | 48 | 17.6% | 38,304 |
| B1 | 1,059 | 28 | 10.3% | 29,652 |
| B2 | 1,145 | 77 | 28.3% | 88,165 |
| B2 -HC | 1,125 | 3 | 1.1% | 3,375 |
| B3 | 1,203 | 12 | 4.4% | 14,436 |
| C1 | 1,365 | 35 | 12.9% | 47,775 |
| C1 -HC | 1,365 | 1 | 0.4% | 1,365 |
| Total | 1,028 | 272 | 100.0% | 279,648 |

**HVAC/MECHANICAL**
  Heat:                    Hydronic (Aquatherm type) systems
  AC:                      Ground Mounted AC Condensers
  Hot Water:               Individual gas water heaters

**UTILITIES METERING**
  Electric:                Individually metered, direct billed
  Gas:                     Individually metered, direct billed
  Water:                   Reimbursed via RUBS
  Trash:                   Reimbursed at a flat monthly rate
  Sewer:                   Reimbursed via RUBS

**DOORS AND WINDOWS**
  Entry Doors:             Raised-panel, metal clad
  Interior Doors:          Raised-panel, wood
  Windows:                 Double-pane, vinyl frames
  Window coverings:        Mini-blinds provided

**FLOORING**
  Entry:                   Vinyl
  Kitchen:                 Vinyl
  Bathrooms:               Vinyl
  Living Area:             Vinyl
  Bedrooms:                Carpet

**KITCHENS**
  Counter Tops:            Granite/quartz or similar
  Cabinets:                Laminated composition board cabinetry
  Appliance Color:         A mix of black and stainless
  Appliances:              Oven/range, hood vent, refrigerator with ice maker.  All units
                           have a full-size washer and dryer.

APP000100

Parc at Windmill Farms                                      NVC | National Valuation Consultants, Inc.

**PROJECT AMENITIES:**       Clubhouse, Dog/Pet Park, Fitness Center, Playground, Pool and Lounge

**UNIT AMENITIES:**       W/D appliances, 9' Ceilings, Vaulted Ceilings (select units), AC, Balcony/Patio, Fireplace (select units), Crown molding and Walk-in closets

**CEILING HEIGHT:**       9-foot ceilings

**LIFE SAFTEY / SPRINKLERS:**       Sprinklers and smoke detectors in units, fire extinguishers located in hallways

**SITE IMPROVEMENTS:**       Concrete-paved parking lot and driveways with concrete curbs and sidewalks, project signage and landscaping.

**ADA COMPLIANCE:**       An ADA compliance audit is beyond the scope of this report. However, the PCA provided to the appraisers indicates the subject appears to generally conform to ADA requirements. For purposes of this appraisal, it is assumed that the subject is in compliance with the Americans With Disabilities Act (ADA).

**OVERALL CONDITION:**       Overall, the property is in good condition for its age and any immediate repairs are negligible

**PERSONAL PROPERTY:**       The subject includes personal property, which is typical for an apartment project. This includes all appliances within the units, as well as management office furniture and equipment along with two central clubhouses.

Note that our market value allocation to the personal property summarized above reflects depreciation and is lower than the replacement cost new estimated in the Cost Approach.

**AGE AND ECONOMIC LIFE**

| | |
|---|---|
| Actual Age: | 4 years (Built in 2019) |
| Effective Age: | 4 years (Appraiser Estimate) |
| Life Expectancy: | 55 years (per MVS) |
| Remaining Economic Life: | 51 years |

**CONCLUSION:**

The subject is a 272-unit, Class B, apartment complex. The subject's unit finish is similar - if not superior to - other apartments of this vintage and class in the submarket.

APP000101

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

## Subject Photographs



**Project Signage**



**Exterior**



**Exterior**



**Exterior**



**Leasing Center**



**Fitness Center**

APP000102

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.





**Pool Area**                                              **Pool Area**





**Kitchen**                                                **Living Room**





**Bedroom**                                                **Washer/Dryer**

APP000103

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

# ANALYSIS OF DATA AND CONCLUSIONS

APP000104

## Dallas-Fort Worth Apartment Market Analysis:

A proper analysis and understanding of the market factors which influence the apartment market is necessary as a precursor to the appraisal process. We have relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in the Dallas-Fort Worth market and *data is specific to "market rate" units (i.e., effective rent per unit, after concessions)*. Based upon data sources available, the following is an analysis of the factors which impact demand for apartment units.

### Dallas-Fort Worth Apartment Market Overview

Like many markets, Dallas-Fort Worth is reporting softer demand for multifamily units compared to the surge in 2021 and pre-crisis levels. The surge of inflation and souring consumer sentiment are freezing household formation, a key ingredient for multifamily demand. Both vacancy and availability rates are trending higher, closer to pre-pandemic norms.

Even so, submarkets with healthy demographic tailwinds continue to drive demand in the market. Frisco/Prosper and Denton have been leading the market in net absorption, reflecting the continuous population growth in these areas. Meanwhile, submarkets with a greater concentration of renters by necessity are reporting weaker demand. For example, Mesquite, Garland/Rowlett, and Arlington reported stagnant demand in the past year, pushing vacancy rates higher to pre-crisis norms.

The metroplex remains a target for corporate relocations and expansions, and steady in-migration is another driver for apartment demand. Dallas-Fort Worth ranks as one of the top metros for nominal employment growth in the past decade. New residents are less likely to purchase a home until they identify neighborhoods they prefer, leading many to rent initially.

Demand has outstripped the supply of for-sale housing over the past expansion, leading to a competitive housing market. As a result of the pandemic, surging demand for single-family homes has created a hyper-competitive environment, particularly among renters seeking to enter homeownership. As a result, some households are left renting for longer until additional supply hits the market. More recently, a rising interest rate environment is expected to keep renter retention renewals elevated.

As vacancy and availability rates trend higher, closer to pre-pandemic norms, the pace of rent growth is softening, also coming closer to pre-crisis performances. Class A rents are declining fastest, while Class B rents are proving more resilient.

In the meantime, the pace of multifamily construction in Dallas-Fort Worth has remained relatively flat. Permitting activity is rebounding, after slipping during the pandemic, leading to leaner construction starts. While rising permitting activity is an encouraging sign for future construction, developers continue to struggle with supply chain bottlenecks, inflationary pressures, and availability of construction materials. In a rising interest rate environment, the cost to finance new projects is a barrier to kicking off construction. All these forces have weighed on developers' ability to get projects off the ground quickly.

APP000105

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

*Dallas-Fort Worth Apartment Market Year-Over-Year Trend Summary*

From 4Q 2021 to 4Q 2022, vacancy within the market increased by 220 bps to a rate of 8.4%.  Over the same time, rental rates increased by 3.9% to an average rate of $1,508/unit.  In 4Q 2022, 1,488 apartment units were returned to the market while 4,453 new units were added.  Both metrics fell substantially from 4Q 2021.

| Dallas-Fort Worth Apartment Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2022 Q4 | 2021 Q4 | YoY Change | Trend |
| Overall Vacancy | 8.4% | 6.2% | 220  bps | ⬆ |
| Market Rate Per Unit | $1,508 | $1,452 | 3.9% | ⬆ |
| Absorbed Units | (1,488) | 5,447 | (6,935) | ⬇ |
| New Unit Deliveries | 4,453 | 6,053 | (1,600) | ⬇ |

Source: CoStar Properties Analytical Search, 01/09/2023.

*Dallas-Fort Worth Apartment Market Snapshot*

The following table provides an overview of apartment market statistics by property subtype for the metropolitan Dallas-Fort Worth market.  As shown, vacancy is currently higher in the Class B segment at 9.1%.  By number of units, the Dallas-Fort Worth apartment market exhibits the following composition: Class A-31.9%, Class B-44.2%, and Class C-23.9%.

| Dallas-Fort Worth Apartment Market Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 838 | 258,815 | 31.9% | 22,517 | 8.7% | 623 | $1,822 |
| Class B | 1,822 | 358,608 | 44.2% | 32,633 | 9.1% | 90 | $1,458 |
| Class C | 2,573 | 193,827 | 23.9% | 12,986 | 6.7% | (100) | $1,170 |
| Total | 5,233 | 811,250 | 100.0% | 68,137 | 8.4% | 613 | $1,510 |

Source: CoStar Properties Analytical Search, 01/09/2023. RBA = Rentable Building Area

*Product Class Definitions*

Each class of apartment building is defined below, using parameters established by BOMA International. Please note that these are primarily market classifications, not construction classifications:

*Class A*: Generally, garden product built within the last 10 years.  Properties with a physical age greater than 10 years but have been substantially renovated.  Commands rents within the range of Class "A" rents in the submarket.  Well merchandised with landscaping, attractive rental office and/or club building.  High-end exterior and interior amenities as dictated by other Class "A" products in the market.

*Class B*: Generally, product built within the last 20 years.  Exterior and interior amenity package is dated and less than what is offered by properties in the high end of the market.  Good quality construction with little deferred maintenance.  Commands rents within the range of Class "B" rents in the submarket.

*Class C*:  Generally, product built within the last 30 years.  Limited, dated exterior and interior amenity package.  Improvements show some age and deferred maintenance.  Commands rents below Class "B" rents in submarket.  Majority of appliances are "original".

APP000106

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

***Dallas-Fort Worth Apartment Market Map***

The following map shows apartment properties within the Dallas-Fort Worth metro.  The blue markers are properties that are currently available: these properties are for sale, for lease, or both.  The gray markers are properties that are not currently available.  Please note that some markers overlap.



APP000107

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Apartment Market – Total Trends*

Apartment expansion in the Dallas-Fort Worth market has been robust over the past 10 years, peaking in 2021, but remaining substantial through 1Q 2023. Steady deliveries resulted in elevated vacancy, despite record demand in the market through 2021. Vacancy rose to 9.0% in 2020, fell to 6.2% in 2021, but jumped back up to 8.4% in 2022, with only 4,112 units of positive net absorption by the year's end. When vacancy was at its lowest in 2021, rent growth surged by 16.0%. However, rent growth is now moderating, as demand contracts. The 10-year average vacancy rate for the market is 7.8%, and as of YTD 2023, vacancy has risen above that mark to 8.4%. Rental rates are up by only 0.1% since year-end 2022.

| Dallas-Fort Worth Apartment Market Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 4,366 | 603,279 | 12,616 | 12,534 | 7.1% | $1,020 | N/A |
| 2014 | 4,419 | 617,481 | 14,202 | 12,538 | 7.2% | $1,052 | 3.1% |
| 2015 | 4,477 | 633,554 | 16,073 | 18,753 | 6.6% | $1,114 | 5.9% |
| 2016 | 4,567 | 655,801 | 22,247 | 16,225 | 7.3% | $1,149 | 3.1% |
| 2017 | 4,681 | 685,298 | 29,497 | 16,284 | 8.9% | $1,172 | 2.0% |
| 2018 | 4,788 | 708,609 | 23,311 | 21,529 | 8.9% | $1,202 | 2.6% |
| 2019 | 4,899 | 733,614 | 25,005 | 23,818 | 8.7% | $1,245 | 3.6% |
| 2020 | 5,015 | 759,661 | 26,047 | 21,218 | 9.0% | $1,252 | 0.6% |
| 2021 | 5,127 | 786,769 | 27,108 | 47,340 | 6.2% | $1,452 | 16.0% |
| 2022 | 5,230 | 810,306 | 23,537 | 4,112 | 8.4% | $1,508 | 3.9% |
| CAGR/Averages | | 3.3% | 21,964 | 19,435 | 7.8% | $1,217 | 4.4% |
| Current Year Data | | | | | | | |
| YTD | 5,233 | 811,250 | 944 | 613 | 8.4% | $1,510 | 0.1% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends |
|---|---|---|---|
| | YoY | Prev. Quarter | |
| Vacancy (bps) | ⬆ 220 | ⬆ 70 | |
| Rents | ⬆ 3.9% | ⬇ (1.6%) | |
| Absorption (SF) | ⬇ (6,935) | ⬇ (2,262) | |
| Completions (SF) | ⬇ (1,600) | ⬇ (4,574) | |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

APP000108

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

### Dallas-Fort Worth Apartment Market – Class A Trends

Class A units have experienced the most significant growth in the Dallas-Fort Worth market.  Demand for Class A units remained robust from 2015 through 2021, but saw a steep drop-off in 2022.  In 2021, vacancy fell to 7.1%, but turned back upward in 2022.  Rent growth has followed suite, with growth of 18.0% in 2021, backing off to growth of just 2.2% in 2021.  At the start of 2023, vacancy remains at 8.7%, with rents rising by 0.2%.

| Dallas-Fort Worth Apartment Market Trends - Class A | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 344 | 111,329 | 8,428 | 5,791 | 8.9% | $1,328 | N/A |
| 2014 | 374 | 121,441 | 10,112 | 7,207 | 10.6% | $1,360 | 2.4% |
| 2015 | 415 | 134,190 | 12,749 | 12,187 | 10.0% | $1,419 | 4.3% |
| 2016 | 469 | 149,879 | 15,689 | 12,667 | 11.0% | $1,442 | 1.6% |
| 2017 | 538 | 171,007 | 21,128 | 13,581 | 14.0% | $1,455 | 0.9% |
| 2018 | 604 | 191,441 | 20,434 | 18,094 | 13.8% | $1,477 | 1.5% |
| 2019 | 674 | 211,803 | 20,362 | 20,054 | 12.6% | $1,525 | 3.2% |
| 2020 | 751 | 232,557 | 20,754 | 17,569 | 12.8% | $1,508 | (1.1%) |
| 2021 | 800 | 247,724 | 15,167 | 27,393 | 7.1% | $1,780 | 18.0% |
| 2022 | 837 | 258,345 | 10,621 | 5,582 | 8.7% | $1,819 | 2.2% |
| CAGR/Averages | | 9.8% | 15,544 | 14,013 | 11.0% | $1,511 | 3.6% |
| Current Year Data | | | | | | | |
| YTD | 838 | 258,815 | 470 | 623 | 8.7% | $1,822 | 0.2% |

| Q4 2022 Recent Trends | | | | Historical Supply and Demand Trends |
|---|---|---|---|---|
| | YoY | | Prev. Quarter | |
| Vacancy (bps) | ⬆ | 160 | ⬆ | 60 |
| Rents | ⬆ | 2.2% | ⬇ | (2.7%) |
| Absorption (SF) | ⬇ | (2,356) | ➡ | (574) |
| Completions (SF) | ⬇ | (1,220) | ⬇ | (1,555) |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

APP000109

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Apartment Market – Class B Trends*

The majority of apartment units in the Dallas-Fort Worth market are Class B unit, which comprise 44.2% of total units here.  In 2021, net absorption outpaced new supply allowing vacancy to contract to 6.4%.  As a result, rents rose by 15.8%.  The following year, a record number of new units delivered, while demand slowed significantly, causing vacancy to spike to a 10-year high of 9.0%.  Rent growth continued in 2022, but at a below-average pace.  As of YTD, vacancy has continued to tick upward, with rent growth of 0.1%.

| Dallas-Fort Worth Apartment Market Trends - Class B | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 1,480 | 298,918 | 4,183 | 4,914 | 6.5% | $956 | N/A |
| 2014 | 1,503 | 303,008 | 4,090 | 4,541 | 6.3% | $990 | 3.6% |
| 2015 | 1,520 | 306,332 | 3,324 | 4,716 | 5.7% | $1,055 | 6.6% |
| 2016 | 1,551 | 312,572 | 6,240 | 3,306 | 6.6% | $1,092 | 3.5% |
| 2017 | 1,594 | 320,917 | 8,345 | 3,600 | 7.9% | $1,115 | 2.1% |
| 2018 | 1,629 | 323,711 | 2,794 | 3,939 | 7.4% | $1,148 | 3.0% |
| 2019 | 1,663 | 328,123 | 4,412 | 4,137 | 7.4% | $1,191 | 3.7% |
| 2020 | 1,696 | 333,393 | 5,270 | 3,675 | 7.8% | $1,206 | 1.3% |
| 2021 | 1,754 | 345,218 | 11,825 | 15,757 | 6.4% | $1,397 | 15.8% |
| 2022 | 1,820 | 358,134 | 12,916 | 2,565 | 9.0% | $1,457 | 4.3% |
| CAGR/Averages | | 2.0% | 6,340 | 5,115 | 7.1% | $1,161 | 4.8% |
| Current Year Data | | | | | | | |
| YTD | 1,822 | 358,608 | 474 | 90 | 9.1% | $1,458 | 0.1% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | ⬆ 260 | ⬆ 70 | | |
| Rents | ⬆ 4.3% | ⬇ (1.4%) | | |
| Absorption (SF) | ⬇ (2,975) | ⬇ (1,624) | | |
| Completions (SF) | ➡ (380) | ⬇ (3,019) | | |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

APP000110

Parc at Windmill Farms                                   NVC | National Valuation Consultants, Inc.

### Dallas-Fort Worth Apartment Market – Class C Trends

In the Class C segment, new deliveries have been muted, which has helped maintain relatively healthy vacancy despite weak demand.  Net absorption has fallen negative for Class C units in five out of the past six years.  Despite weak demand, rent growth has continued each year.  Strong demand was experienced in 2021, allowing vacancy to fall to a 10-year low, and rents to rise by 11.6%.  In 2022, net absorption fell back into negative territory, although rent growth remained above average.  At the start of 2023, 100 Class C units have returned to market, and rents have been reduced by 0.2%.

| Dallas-Fort Worth Apartment Market Trends - Class C | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 2,542 | 193,032 | 5 | 1,829 | 6.9% | $708 | N/A |
| 2014 | 2,542 | 193,032 | 0 | 788 | 6.5% | $737 | 4.1% |
| 2015 | 2,542 | 193,032 | 0 | 1,852 | 5.6% | $795 | 7.9% |
| 2016 | 2,547 | 193,350 | 318 | 253 | 5.6% | $845 | 6.3% |
| 2017 | 2,549 | 193,374 | 24 | (896) | 6.1% | $883 | 4.5% |
| 2018 | 2,555 | 193,457 | 83 | (504) | 6.4% | $917 | 3.9% |
| 2019 | 2,562 | 193,688 | 231 | (373) | 6.7% | $954 | 4.0% |
| 2020 | 2,568 | 193,711 | 23 | (25) | 6.7% | $979 | 2.6% |
| 2021 | 2,573 | 193,827 | 116 | 4,192 | 4.6% | $1,093 | 11.6% |
| 2022 | 2,573 | 193,827 | 0 | (4,037) | 6.7% | $1,172 | 7.2% |
| CAGR/Averages | | 0.0% | 80 | 308 | 6.2% | $908 | 5.8% |
| Current Year Data | | | | | | | |
| YTD | 2,573 | 193,827 | 0 | (100) | 6.7% | $1,170 | (0.2%) |



| Q4 2022 Recent Trends | | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|---|
| | YoY | | Prev. Quarter | | |
| Vacancy (bps) | ⬆ | 210 | ⬆ | 70 | |
| Rents | ⬆ | 7.2% | ➡ | 0.4% | |
| Absorption (SF) | ⬇ | (1,606) | ➡ | (65) | |
| Completions (SF) | ➡ | 0 | ➡ | 0 | |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

APP000111

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

### New Development

According to CoStar, there are currently 146 apartment properties under construction within the Dallas-Fort Worth apartment market that will add 37,951 new units to the market upon completion.  The properties are well dispersed throughout the market; however, a large concentration of this new supply can be found in the Plano, Northwest Fort Worth, and Frisco/Prosper submarket clusters.  There are another 72 apartment properties that are currently proposed for development within the market, with the potential to add 27,311 new apartment units, if completed, and three in final planning with 807 units.

| **Dallas-Fort Worth Apartment Market - New Development by Submarket Cluster** | | | | | | |
|---|---|---|---|---|---|---|
| | Under Construction | | | Proposed | | |
| Submarket | # of Properties | # of Units | % of Units | # of Properties | # of Units | % of Units |
| Plano | 6 | 3,867 | 10.2% | 1 | 379 | 1.4% |
| Northwest Fort Worth | 13 | 3,450 | 9.1% | 6 | 2,014 | 7.3% |
| Frisco/Prosper | 8 | 2,509 | 6.6% | 9 | 6,036 | 21.8% |
| Allen/McKinney | 10 | 2,387 | 6.3% | 3 | 1,850 | 6.7% |
| Arlington | 8 | 2,063 | 5.4% | 2 | 578 | 2.1% |
| Southwest Fort Worth | 8 | 1,652 | 4.4% | 4 | 1,425 | 5.1% |
| North Fort Worth | 5 | 1,637 | 4.3% | 3 | 1,005 | 3.6% |
| Southeast Fort Worth | 6 | 1,591 | 4.2% | 3 | 1,128 | 4.1% |
| Oak Cliff | 6 | 1,429 | 3.8% | 0 | 0 | 0.0% |
| Garland/Rowlett | 4 | 1,338 | 3.5% | 3 | 700 | 2.5% |
| Lewisville/Flower Mound | 5 | 1,317 | 3.5% | 0 | 0 | 0.0% |
| Far North Dallas | 5 | 1,186 | 3.1% | 1 | 1,114 | 4.0% |
| Richardson | 3 | 1,175 | 3.1% | 2 | 457 | 1.6% |
| Rockwall/Wylie | 4 | 1,110 | 2.9% | 2 | 612 | 2.2% |
| Denton | 5 | 1,103 | 2.9% | 4 | 1,352 | 4.9% |
| Farmers Branch/Carrollton | 4 | 1,087 | 2.9% | 1 | 264 | 1.0% |
| East Dallas | 10 | 1,075 | 2.8% | 6 | 1,426 | 5.1% |
| West Dallas | 4 | 924 | 2.4% | 6 | 2,444 | 8.8% |
| Southeast Dallas | 3 | 798 | 2.1% | 2 | 477 | 1.7% |
| Ellis County | 4 | 762 | 2.0% | 0 | 0 | 0.0% |
| Grand Prairie | 3 | 705 | 1.9% | 0 | 0 | 0.0% |
| Downtown Dallas | 3 | 648 | 1.7% | 2 | 733 | 2.6% |
| Las Colinas | 2 | 574 | 1.5% | 1 | 275 | 1.0% |
| Johnson County | 2 | 378 | 1.0% | 1 | 604 | 2.2% |
| South Dallas County | 2 | 356 | 0.9% | 0 | 0 | 0.0% |
| Uptown/Park Cities | 1 | 345 | 0.9% | 4 | 1,388 | 5.0% |
| Parker County | 1 | 332 | 0.9% | 0 | 0 | 0.0% |
| Southeast Outlying | 2 | 326 | 0.9% | 0 | 0 | 0.0% |
| Mesquite | 1 | 325 | 0.9% | 0 | 0 | 0.0% |
| Grapevine | 1 | 324 | 0.9% | 1 | 200 | 0.7% |
| North Richland Hills/Haltom City | 1 | 291 | 0.8% | 0 | 0 | 0.0% |
| Downtown Fort Worth | 1 | 283 | 0.7% | 1 | 202 | 0.7% |
| Northeast Outlying | 1 | 216 | 0.6% | 0 | 0 | 0.0% |
| Hood County | 1 | 145 | 0.4% | 0 | 0 | 0.0% |
| Henderson County | 1 | 122 | 0.3% | 0 | 0 | 0.0% |
| Northwest Dallas | 2 | 121 | 0.3% | 1 | 300 | 1.1% |
| East Fort Worth | 0 | 0 | 0.0% | 1 | 268 | 1.0% |
| Irving | 0 | 0 | 0.0% | 1 | 220 | 0.8% |
| Wise County | 0 | 0 | 0.0% | 1 | 282 | 1.0% |
| **TOTALS** | **146** | **37,951** | **100.0%** | **72** | **27,733** | **100.0%** |

| **Dallas-Fort Worth Apartment Market - New Development by Submarket Cluster** | | | |
|---|---|---|---|
| | Final Planning | | |
| Submarket | # of Properties | # of Units | % of Units |
| Southeast Dallas | 1 | 285 | 35.3% |
| Grand Prairie | 1 | 272 | 33.7% |
| Uptown/Park Cities | 1 | 250 | 31.0% |
| **TOTALS** | **3** | **807** | **100.0%** |

Source: CoStar Properties Analytical Search, 01/09/2023.

APP000112

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

**CONCLUSIONS**

The Dallas-Fort Worth multifamily market remains on stable ground even as performances are softening from their record-setting pace last year.  The region is seeing weaker demand for multifamily units as elevated economic uncertainty and stubborn inflation weigh on households' decision to sign new leases. In turn, the pace of rent growth is slowing, trending closer to precrisis norms through the end of the year.

Ranking among the top spots for apartment construction, overall development levels remain stable in Dallas-Fort Worth.  The trend is counter to several other major Sun Belt markets whose pipelines have swelled over the past two years.

Robust economic underpinnings have fostered a healthy apartment market.  Healthy job growth and continuous in-migration are two primary drivers of apartment demand in the metroplex.  Even with a flow of new properties coming to the market, the renter pool continues to absorb new units at a steady pace. Continuous supply and leading absorption levels make Dallas-Fort Worth one of the country's fastest-growing and balanced multifamily markets.

The multifamily market has been an example of resilience across asset classes, and investors remain bullish on the Dallas-Fort Worth apartment market.  According to CoStar, the metroplex remains a leader for sales volume in the country over the past two years, following a broader trend of investors descending on sunbelt markets amid economic uncertainty.  Most deals are found in value-add opportunities, with the Mid-Cities and older sections of the metroplex such as East Dallas as active areas for investment. Meanwhile, core investors often target areas with amenity-rich assets within urban areas like Uptown.

APP000113

## Mesquite Apartment Submarket Cluster Analysis

A proper analysis and understanding of the market factors which influence the apartment submarket is necessary as a precursor to the appraisal process. We have relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in Dallas-Fort Worth's Mesquite apartment submarket cluster, and ***data is specific to "market rate" units (i.e., effective rent per unit, after concessions.*** Based upon data sources available, the following is an analysis of the factors which impact demand for apartment units. A map of the Mesquite apartment submarket cluster is provided below.

The blue markers are properties that are currently available: these properties are for sale, for lease, or both. The gray markers are properties that are not currently available. Please note that several markers overlap.



***Mesquite Apartment Submarket Cluster Snapshot***

The table below provides a breakdown of apartment market statistics by property class for the Mesquite submarket cluster. As shown, vacancy is currently higher in the Class B segment at 9.8%. By number of units, the Mesquite submarket cluster displays the following composition: Class A-8.2%, Class B-50.7%, and Class C-41.1%.

| | Mesquite Apartment Submarket Cluster Snapshot | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 9 | 2,215 | 8.2% | 140 | 6.3% | 1 | $1,414 |
| Class B | 65 | 13,724 | 50.7% | 1,345 | 9.8% | (9) | $1,186 |
| Class C | 86 | 11,128 | 41.1% | 835 | 7.5% | (5) | $1,074 |
| Total | 160 | 27,067 | 100.0% | 2,319 | 8.5% | (13) | $1,159 |

Source: CoStar Properties Analytical Search, 01/09/2023. RBA = Rentable Building Area

APP000114

Parc at Windmill Farms                                              NVC | National Valuation Consultants, Inc.

### *Mesquite Apartment Submarket Cluster – Total Trends*

The Mesquite apartment submarket cluster has expanded at an average annual rate of 1.2% since 2013, and new supply has generally been well received.  The 10-year average vacancy rate is 7.0%, but vacancy has risen above that average since 2022.  Despite weak demand in 2022, rents grew by 6.3% last year.  This was slower than the 10.0% growth in 2021, but still above average.  Net absorption remains in negative territory at the start of 2023, but vacancy has held 8.5%.  YTD 2023's average rent has increased from year-end 2022 by 0.2% to $1,159/unit, which is 23.2% lower than the metro market.

| Mesquite Apartment Submarket Cluster Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 146 | 24,296 | 0 | 480 | 6.5% | $726 | N/A |
| 2014 | 147 | 24,630 | 334 | 197 | 7.0% | $749 | 3.2% |
| 2015 | 147 | 24,630 | 0 | 383 | 5.4% | $809 | 8.0% |
| 2016 | 149 | 25,122 | 492 | 226 | 6.4% | $851 | 5.2% |
| 2017 | 149 | 25,122 | 0 | 235 | 5.4% | $889 | 4.5% |
| 2018 | 152 | 25,503 | 381 | (279) | 7.9% | $920 | 3.5% |
| 2019 | 154 | 26,096 | 593 | 127 | 9.6% | $959 | 4.2% |
| 2020 | 157 | 26,653 | 557 | 1,293 | 6.6% | $989 | 3.1% |
| 2021 | 159 | 27,065 | 412 | 440 | 6.4% | $1,088 | 10.0% |
| 2022 | 160 | 27,067 | 2 | (567) | 8.5% | $1,157 | 6.3% |
| CAGR/Averages | | 1.2% | 277 | 254 | 7.0% | $914 | 5.3% |
| Current Year Data | | | | | | | |
| YTD | 160 | 27,067 | 0 | (13) | 8.5% | $1,159 | 0.2% |

| Q4 2022 Recent Trends | | | | Historical Supply and Demand Trends |
|---|---|---|---|---|
| | YoY | | Prev. Quarter | |
| Vacancy (bps) | ⬆ | 210 | ⬆ 70 | |
| Rents | ⬆ | 6.3% | ➡ (0.3%) | |
| Absorption (SF) | ➡ | (177) | ➡ (114) | |
| Completions (SF) | ➡ | (412) | ➡ 0 | |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

APP000115

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

### *Mesquite Apartment Submarket Cluster– Class A Trends*

The Class A segment is the smallest segment in the Mesquite apartment submarket cluster, comprising only 8.2% of units here.  However, this is the fastest-growing apartment segment, expanding at an average annual rate of 12.1% since 2013.  Class A units have been well received here, with positive demand each year through 2021.  However, net absorption turned negative in 2022.  Due to supply-side pressure over the past 10 years, the average vacancy rate is elevated at 10.4%.  However, vacancy has remained below that average since 2020.  In turn, this has encouraged strong rent growth in the past two years. YTD 2023's average rent has increased from year-end 2022 by 0.6% to $1,414/unit, which remains 22.4% lower than the metro market.

| | Inventory | | Supply & Demand | | | Rents | |
|---|---|---|---|---|---|---|---|
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 4 | 791 | 0 | 14 | 3.5% | $1,012 | N/A |
| 2014 | 5 | 1,125 | 334 | 131 | 20.5% | $1,009 | (0.3%) |
| 2015 | 5 | 1,125 | 0 | 202 | 2.6% | $1,084 | 7.4% |
| 2016 | 6 | 1,438 | 313 | 109 | 16.2% | $1,100 | 1.5% |
| 2017 | 6 | 1,438 | 0 | 154 | 5.5% | $1,140 | 3.6% |
| 2018 | 7 | 1,775 | 337 | 89 | 18.4% | $1,157 | 1.5% |
| 2019 | 8 | 2,095 | 320 | 277 | 17.7% | $1,167 | 0.9% |
| 2020 | 9 | 2,215 | 120 | 306 | 8.3% | $1,188 | 1.8% |
| 2021 | 9 | 2,215 | 0 | 68 | 5.2% | $1,278 | 7.6% |
| 2022 | 9 | 2,215 | 0 | (24) | 6.4% | $1,405 | 9.9% |
| CAGR/Averages | | 12.1% | 142 | 133 | 10.4% | $1,154 | 3.7% |
| Current Year Data | | | | | | | |
| YTD | 9 | 2,215 | 0 | 1 | 6.3% | $1,414 | 0.6% |

*Mesquite Apartment Submarket Cluster Trends - Class A*



| Q4 2022 Recent Trends | | | | Historical Supply and Demand Trends |
|---|---|---|---|---|
| | YoY | | Prev. Quarter | |
| Vacancy (bps) | ⬆ 120 | ⬇ | (140) | |
| Rents | ⬆ 9.9% | ➡ | (0.5%) | |
| Absorption (SF) | ➡ 24 | ➡ | 62 | |
| Completions (SF) | ➡ 0 | ➡ | 0 | |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

APP000116

Parc at Windmill Farms                                          NVC | National Valuation Consultants, Inc.

### *Mesquite Apartment Submarket Cluster – Class B Trends*

The Class B segment experienced its strongest expansion from 2019 through 2021.  During this time frame, net absorption remained mostly positive, which helped maintain moderately healthy vacancy levels.  In 2022, however, demand weakened, pushing vacancy to a 10-year high of 9.7%.  In the meantime, rent growth surged in 2021, and continued to see healthy growth in 2021.  As of YTD 2023, vacancy has already started to tick upward to a current rate of 9.8%, but YTD 2023's average rent has increased from year-end 2022 by 0.3% to $1,186/unit, which is 18.7% lower than the metro market.

| Mesquite Apartment Submarket Cluster Trends - Class B | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 58 | 12,421 | 0 | 169 | 5.7% | $746 | N/A |
| 2014 | 58 | 12,421 | 0 | (14) | 5.8% | $767 | 2.8% |
| 2015 | 58 | 12,421 | 0 | 49 | 5.4% | $834 | 8.7% |
| 2016 | 59 | 12,600 | 179 | 196 | 5.2% | $872 | 4.6% |
| 2017 | 59 | 12,600 | 0 | (34) | 5.5% | $904 | 3.7% |
| 2018 | 59 | 12,600 | 0 | (242) | 7.4% | $934 | 3.3% |
| 2019 | 60 | 12,873 | 273 | (19) | 9.5% | $977 | 4.6% |
| 2020 | 62 | 13,310 | 437 | 701 | 7.2% | $1,008 | 3.2% |
| 2021 | 64 | 13,722 | 412 | 356 | 7.4% | $1,125 | 11.6% |
| 2022 | 65 | 13,724 | 2 | (314) | 9.7% | $1,183 | 5.2% |
| CAGR/Averages | | 1.1% | 130 | 85 | 6.9% | $935 | 5.3% |
| Current Year Data | | | | | | | |
| YTD | 65 | 13,724 | 0 | (9) | 9.8% | $1,186 | 0.3% |
| Q4 2022 Recent Trends | | | | Historical Supply and Demand Trends | | | |
| | YoY | | Prev. Quarter | | | | |
| Vacancy (bps) | ⬆ | 230 | ⬆ | 120 | | | |
| Rents | ⬆ | 5.2% | ➡ | (0.3%) | | | |
| Absorption (SF) | ➡ | (209) | ➡ | (236) | | | |
| Completions (SF) | ➡ | (412) | ➡ | 0 | | | |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

APP000117

Parc at Windmill Farms                                        NVC | National Valuation Consultants, Inc.

### *Mesquite Apartment Submarket – Class C Trends*

Minimal Class C deliveries has helped to maintain healthy vacancy in this segment, despite periods of weak demand.  In 2021, 16 units were absorbed, allowing the vacancy rate to decline to 5.4%.  As vacancy decreased, 2021's average rent increased by 8.3% to $1,001/unit.  In 2022, 226 units were returned, causing the vacancy rate to increase to 7.4%.  Even though vacancy increased, 2022's average rent increased by 7.3% to $1,074/unit.  YTD metrics show that no units have been delivered, while five units have been returned, increasing the vacancy rate to 7.5%.  YTD 2023's average rent has remained unchanged from year-end 2022, which is 8.2% lower than the metro market.

| Mesquite Apartment Submarket Cluster Trends - Class C | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 84 | 11,084 | 0 | 296 | 7.7% | $641 | N/A |
| 2014 | 84 | 11,084 | 0 | 81 | 6.9% | $673 | 5.0% |
| 2015 | 84 | 11,084 | 0 | 132 | 5.7% | $720 | 7.0% |
| 2016 | 84 | 11,084 | 0 | (76) | 6.4% | $772 | 7.2% |
| 2017 | 84 | 11,084 | 0 | 115 | 5.4% | $817 | 5.8% |
| 2018 | 86 | 11,128 | 44 | (125) | 6.9% | $854 | 4.5% |
| 2019 | 86 | 11,128 | 0 | (132) | 8.1% | $892 | 4.4% |
| 2020 | 86 | 11,128 | 0 | 285 | 5.5% | $924 | 3.6% |
| 2021 | 86 | 11,128 | 0 | 16 | 5.4% | $1,001 | 8.3% |
| 2022 | 86 | 11,128 | 0 | (226) | 7.4% | $1,074 | 7.3% |
| CAGR/Averages | | 0.0% | 4 | 37 | 6.5% | $837 | 5.9% |
| Current Year Data | | | | | | | |
| YTD | 86 | 11,128 | 0 | (5) | 7.5% | $1,074 | (0.0%) |



| Q4 2022 Recent Trends | | |
|---|---|---|
| | YoY | Prev. Quarter |
| Vacancy (bps) | ⬆ 200 | ⬆ 40 |
| Rents | ⬆ 7.3% | ➡ (0.3%) |
| Absorption (SF) | ➡ 9 | ➡ 60 |
| Completions (SF) | ➡ 0 | ➡ 0 |

Source: CoStar Properties Analytical Search, 01/09/2023. Annual numbers represent year-end statistics.

---

DAL2212075                    Apartment Market & Submarket Analysis                    70

*New Development*

According to CoStar, there is currently one apartment development under construction within the Mesquite submarket cluster.  Once completed this development will deliver 325 units to the submarket cluster.

| Mesquite Apartment  Submarket Cluster - Under Construction | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 502 E US Highway 80 | Wildwood Luxury Urban Homes | Forney | 325 |
| | | TOTALS | 325 |

Source: CoStar Properties Analytical Search, 01/09/2023.

**CONCLUSION**

The Mesquite submarket cluster consists of vintage garden-style properties.  Some sections of the submarket cluster lack the local employment opportunities and neighborhood amenities of neighboring Garland, let alone cities like Richardson and Plano.  Employment growth is most robust in the retail and trade/distribution sectors, and those jobs contribute to the demand for workforce housing in the area.  Leasing activity performed well in 2020 and 2021, thanks to a surge of pent-up demand from the pandemic.  Renters have demonstrated interest in the area's budget-friendly communities and new properties recently hitting the market.

Both demand as well as rent growth cooled in 2022, coming in closer to precrisis performances, and little has changed at the start of 2023.

According to CoStar, investors remain keen to deploy capital in Mesquite.  Like other submarkets with primarily Class B stock, Mesquite has seen several value-add trades recently, and pricing has about doubled in the past decade.

APP000119

## Highest and Best Use Analysis

The fundamental concept of highest and best use may be defined as:

"The reasonably probable use of property that results in the highest value."[17]

To test for highest and best use, all logical and feasible alternatives must be analyzed. The appraiser should determine whether the proposed usage of the land is:

1. physically possible
2. legally permissible
3. economically feasible
4. maximally productive

If an affirmative answer may be given to these basic questions, it is determined that the highest and best use test has been satisfied.

The appraiser must recognize that land is generally appraised as if vacant and available for development to its highest and best use and that the appraisal of improvements is based on their actual contribution to the site. Thus, the highest and best use of a site must be determined both 1) as vacant and 2) as improved. Highest and best use as vacant will be addressed first.

### HIGHEST AND BEST USE AS VACANT

*Physically Possible Uses*

The subject site is of sufficient size to accommodate various types of development. It has good exposure and visibility along surrounding roadways. It is convenient to residential and commercial development. All relevant municipal utilities are available in adequate supply to service a variety of development.

*Legally Permissible Uses*

The property is zoned B-1 (Neighborhood Commercial) under the authority of City of Forney. Multifamily is a permitted land use under this zoning. There are no reasonable probable modifications of existing land use regulations to occur in the near future. Subject to the current zoning, the legally permissible uses include multi-family residential.

*Economically Feasible Uses*

A multifamily residential use is physically possible and legally permissible for the subject, and we believe a change from this basic usage would probably be unlikely. We have discussed apartment market conditions at length in the preceding market analysis. The metro apartment market is strong with substantial new development in the pipeline; thus, multi-family development is considered feasible at this time.

---

[17] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 305.

APP000120

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

*Maximally Productive Use*

Based on our analysis, the maximally productive and highest and best use of the subject site, as if vacant, is development of a multi-family project.

**HIGHEST AND BEST USE AS IMPROVED**

The highest and best use *as improved* is also analyzed using the four previously indicated criteria.

1).    A physically possible utilization as evidenced by the current development of the site;

2).    A legally permissible use under requirements set by zoning authority;

3).    Economically feasible and maximally productive, based on the property's ability to produce a positive net operating income, which, when capitalized, significantly exceeds the underlying land value; and,

4).    ***Considering the above, the maximally productive or highest and best use of the site, as improved, is for continued operation, management, and maintenance of the existing apartment complex.***

*Most Likely Buyer*

In analyzing the subject and supported by market evidence, the most likely buyer of the apartment community would be an institutional buyer such as a Life company, REIT, or national or regional apartment investor.

APP000121

Case 3:22-cv-02118-X    Document 162-1    Filed 02/22/23    Page 122 of 310    PageID 3923

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

## The Valuation Process

The estimation of a real property's market value involves a systematic process in which the problem is defined; the work necessary to solve the problem is planned; and the data required are acquired, classified, analyzed and interpreted as an opinion of value. In this process, three basic approaches, when applicable, are used by the appraiser: the sales comparison approach, the income capitalization approach and the cost approach. When one or more of these approaches is not applicable in the appraisal process, full justification must be presented. An explanation of each approach follows:

**COST APPROACH**

In the cost approach, the appraiser first values of the fee simple interest in the site. The replacement or reproduction cost new of the improvements is then estimated. Next, depreciation from all sources is determined and subtracted from the replacement or reproduction cost new of the improvements to arrive at their present value. The present value of all improvements is added to the market value of the site, resulting in an indicated value by the cost approach.

**SALES COMPARISON APPROACH**

The sales comparison approach involves the comparison of the subject property to similar properties that have recently sold or that are currently offered for sale. The sales prices of these properties are then adjusted to reflect the respective differences of each from the subject to indicate a value range. This value range, as indicated by the adjusted comparable properties, is then used to establish an indicated value for the subject property.

**INCOME CAPITALIZATION APPROACH**

The income capitalization approach is a process in which the anticipated future benefits (actual dollar income or amenities) are reduced to a present value figure. The appraiser is primarily concerned with the future benefits resulting from net income and reversionary proceeds. This approach involves estimating potential gross income by comparison with competing properties and estimating expenses (derived from historical and/or market experience) to determine a projected net income stream. The income stream is then capitalized into an indication of value by using capitalization rates extracted from competitive properties in the market or by using other techniques when applicable. Alternatively, the income stream as well as the reversion of the property is converted into value by use of a discounted cash flow (DCF) analysis. If both techniques are used, the resultant value indications must be reconciled.

**RECONCILIATION**

The final analytical step in the valuation process is reconciliation of the value indications obtained from the different approaches to value. The appraisers must consider the relative dependability and applicability of each approach as dictated by the individual characteristics of the subject. The final opinion of value reflects the results of such deliberation.

DAL2212075                                    The Valuation Process                                    74

APP000122

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

## Cost Approach

The cost approach is based on the principle of substitution, which "affirms that a knowledgeable buyer would pay no more for a property than the cost to acquire a similar site and construct improvements of equivalent desirability and utility without undue delay."[18] This approach often represents "market thinking" since buyers and sellers frequently relate value to cost.

The cost approach to value typically involves the following steps:

1. "Estimate the value of the site as though vacant and available to be developed to its highest and best use.
2. Determine which cost basis is most applicable to the assignment: reproduction cost or replacement cost.
3. Estimate the direct (hard) and indirect (soft) costs of the improvements as of the effective appraisal date.
4. Estimate an appropriate entrepreneurial incentive or profit from analysis of the market.
5. Add the estimated direct costs, indirect costs, and entrepreneurial incentive or profit to arrive at the total cost of the improvements.
6. Estimate the amount of accrued depreciation in the structure and, if necessary, allocate it among the three major categories:  physical deterioration, functional obsolescence, and external obsolescence.
7. Deduct the estimated depreciation from the total cost of the improvements to derive an estimate of their depreciated cost.
8. Estimate the contributory value of any site improvements that have not already been considered.  (Site improvements are often appraised at their contributory value, i.e., directly on a depreciated-cost basis – but may be included in the overall cost calculated in Step 3 and depreciated if necessary.)
9. Add land value to the total depreciated cost of all the improvements to arrive at the indicated value of the property.
10. If appropriate, adjust for the property interest being appraised to derive the indicated value of the specified interest in the property.
11. If the property will experience net income shortfalls during a lease-up period, then calculate a rent-up adjustment to account for the cost of leasing (distinct from leasing commissions.)
12. Adjust for personal property (e.g., furniture, fixtures, and equipment) or intangible assets that are included in the appraisal."[19]

---

[18]  Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 528.
[19]  Ibid, page 532-533.

APP000123

NVC | National Valuation Consultants, Inc.

**RELEVANCE OF COST APPROACH**

The objective of the cost approach is to examine the replacement costs of an alternative building of like utility, less all depreciation.  This recognizes that there is an underlying connection between cost and value.  Sometimes the connection is obscured by factors such as depreciation or excess profits, but the relationship still exists.  The cost approach reflects market thinking because market participants relate value to cost.  Buyers tend to judge the value of an existing structure not only by prices and rents of similar buildings, but also by comparing the costs to create a new building with optimal physical condition and functional utility.  Moreover, buyers will sometimes consider the potential costs of rehabilitating an older structure up to the physical condition and functional utility that they desire.

We have found that the cost approach can be very meaningful in some appraisals and have little or no meaning in others. Specifically, the cost approach is useful for newer, functional buildings in stable markets. However, as buildings age over time, and as functional flaws in the design and layout are exposed by a changing market, the replacement cost method takes on less relevance.  This is a subjective process which can have a large impact on the resulting value, thereby diminishing its reliability.

The first step of the Cost Approach involves estimating the value of the site as though vacant and available to be developed to its highest and best use.  In order to estimate the value of the land as vacant, we gather recent land sales similar in zoning, intended use, location, size, and site utility.  After substantial market research and speaking with multiple brokers, we did not find any recent or relevant land sales to compare with subject property.  Therefore, it is unlikely the Cost Approach would be relied upon in underwriting by the most probable buyer (investor) and we have omitted the Cost Approach herein; this approach Is not considered necessary to produce a credible opinion.

APP000124

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

## Sales Comparison Approach

The sales comparison approach, also termed the market approach, involves the comparison of the subject property to similar properties which have already sold, or which are currently offered for sale, with consideration given to their respective differences from the subject.  This process tends to form a pattern of indicators from which the appraiser can estimate the value of the subject property.  The principle of substitution is an integral part of this approach since a purchaser will typically not pay more for a property than would be required to purchase an equally desirable substitute property.

The following procedures are used to apply the sales comparison approach.

1.  "Research the competitive market for information on properties that are similar to the subject property and that have recently sold, are listed for sale, or are under contract.  Information on agreements of sale, options, listings, and bona fide offers may also be collected.  The characteristics of the properties such as property type, date of sale, size, physical condition, location, and land use constraints should be considered.  The goal is to find a set of comparable sales or other evidence such as property listings or contracts as similar as possible to the subject property to ensure they reflect the actions of similar buyers.  Market analysis and highest and best use analysis set the stage for the selection of appropriate comparable sales.

2.  Verify the information by confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations.  Verification should elicit additional information about the property such as buyer motivation, economic characteristics (if the property is income-producing), value component allocations, and other significant factors as well as information about the market to ensure that comparisons are credible.

3.  Select the most relevant units of comparison used by participants in the market (e.g., price per acre, price per square foot, price per front foot, price per dwelling unit) and develop a comparative analysis for each unit.  The appraiser's goal is to define and identify a unit of comparison that explains market behavior.

4.  Look for differences between the comparable sale properties and the subject property using all appropriate elements of comparison.  Then adjust the price of each sale property, reflecting how it differs, to equate it to the subject property or eliminate that property as a comparable.  This step typically involves using the most similar sale properties and then adjusting for any remaining differences.  If a transaction does not reflect the actions of a buyer who would also be attracted to the subject property, the appraiser should be concerned about comparability and the wisdom of relying on that comparable as a basis for comparison.

5.  Reconcile the various value indications produced from the analysis of comparables into a value conclusion.  A value opinion can be expressed as a single point estimate, as a range of values, or in terms of a relationship (e.g., more or less than a given amount)."[20]

---

[20]  Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 355.

APP000125

Each of the preceding steps will be further explained in detail as they are utilized.  Several units of comparison are typically developed in the valuation of income-producing properties.  Those units of comparison appropriate for this analysis are detailed as follows:

### Sales Price per Unit

The sales price per unit is a unit of comparison which expresses the relationship between price/value and the size of a structure. This is a reliable indicator of value assuming a high degree of comparability among properties available for comparison.  The weakness of this unit of comparison is that it does not directly differentiate between the respective income-generating capabilities of somewhat dissimilar properties. For apartments, the price per apartment unit is the frequently utilized unit of comparison.  We will use price per unit as our unit of comparison.

### Price per Square Foot

The sales price per square foot is a unit of comparison which expresses the relationship between price/value and the size of a structure. This is a reliable indicator of value assuming a high degree of comparability among properties available for comparison.  The weakness of this unit of comparison is that it does not directly differentiate between the respective income-generating capabilities of somewhat dissimilar properties.  Rentable area is the preferred unit of comparison for office buildings while the gross area is preferred for retail properties.  For apartments, both the price per apartment unit and the price per square foot of rentable area are the preferred units of comparison.  Because of the unreliability of the area estimates of the comparable sales, a comparative analysis based on price per square foot is considered unreliable.  Therefore, we will use the price per square foot unit of comparison as a check against the value reached by price per unit.

### Effective Gross Income Multiplier

The effective gross income multiplier (EGIM) is obtained by dividing sales price by effective potential gross annual income.  This unit of comparison tends to be self-adjusting, since the relationship between income and price/value tends to be similar among reasonably comparable properties.  It is this characteristic of the EGIM that makes it a relatively reliable valuation tool.  The weakness of this unit of comparison is that reliable effective gross income data are not always available.  Also, the EGIM process is, in effect, the inverse of the capitalization process used in the income approach.  In this sense, the EGIM is really not an "independent" method of valuation.

Based on our conversations with brokers and investors around the U.S., these valuation tools are not considered ideal in valuing a property with the unique characteristics of the subject.  Quite simply, these techniques are considered somewhat crude, which is why the greatest weight is usually placed on the income capitalization approach in valuing these types of properties.  Nonetheless, we will utilize the SP/Unit technique, as a test of reasonableness.

APP000126

Parc at Windmill Farms                                          NVC | National Valuation Consultants, Inc.

**SEARCH FOR COMPARABLE SALES**

The subject is a 272-unit, Class B,  Garden/Low Rise apartment complex.  We searched for sales of similar properties occurring within the past 12 months within the subject's market area.  Leading up to the coronavirus pandemic, the apartment market was strong and active with rising rents, and declining vacancies.  There has been minimal sales activity since, due in part to increased uncertainty, higher interest rates, and a wider gap between buyer and seller expectations.

We considered many of the recent sales comparables and narrowed the data down to the sales which we considered to be the most relevant.  Each of the sales were inspected by the appraiser, and then confirmed with buyer, seller, or broker, together with supplemental data from public records.   Although there may be additional sales available, it is our opinion that this represents an adequate sample from which an estimate of fair market value can be derived.

***Complete sale abstracts are contained in the Addenda.***  The sales are summarized in the table below, with a location map following.  Please note that all represent arm's length transactions, and all are cash or cash equivalent transactions.

| Sale Comparable Summary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Comp No. | Name/Location | Date of Sale | Year Built | Average Unit Size | Occupancy At Sale | Sale Price | Total Units | Sale Price/Unit |
| 1 | The Borough 5700 Boca Raton Blvd Fort Worth | 9/22 | 1981/2018 | 779 | 90.0% | $27,350,000 | 208 | $131,490 |
| 2 | Bridgewood Ranch Apartments 4100 Vista Ln Kaufman | 9/22 | 2006 | 831 | 89.6% | $16,044,405 | 106 | $151,362 |
| 3 | Greens of Hickory Trail 8613 Old Hickory Trail Dallas | 2/22 | 1999 | 1,090 | 98.0% | $45,000,000 | 300 | $180,000 |
| 4 | Magnolia Grove 551 Crossroads Pky Terrell | 1/22 | 2021 | 910 | 97.8% | $57,400,000 | 270 | $212,593 |
| 5 | Harmony Hill Apartments 11010 Harmony Hill Ln Rowlett | 5/22 | 2017 | 818 | 92.5% | $165,000,000 | 644 | $256,211 |
| | Comparable Avg. | | 2011 | 886 | 93.6% | $62,158,881 | 306 | $186,331 |
| | Subject | Contract | 2019 | 1,028 | 91.5% | | 272 | $0 |

Please refer to the following page for a map of the comparables.

APP000127

NVC | National Valuation Consultants, Inc.

Parc at Windmill Farms

*Sale Comparables Map*

Sales Comparison Approach

80

DAL2212075

Parc at Windmill Farms                                              NVC | National Valuation Consultants, Inc.

**ADJUSTMENTS & ANALYSIS**

The objective of this section is to adjust the comparables for their key differences with the subject so that we can make an informed estimate of fair market value of the subject. This can be accomplished via either a qualitative or quantitative process. Both are legitimate appraisal techniques. We have opted to utilize the quantitative adjustment process within this appraisal.

Adjustments are made to the sale prices of the comparables to compensate for differences between each sale and the subject. Due to differences among the comparables and limited availability of comparable market data, matched pairs comparison (paired sales analysis) was unreliable. While this type of analysis and adjustment method is considered ideal, it is often not realistic. However, we have attempted, to the best extent possible, to quantify the individual adjustments to each sale comparable. Unlike other investment products, no two commercial-grade real estate products are exactly alike. There are multiple differences between properties, and this creates differences in value. Further, the market for investment-grade real estate in general is thinly traded relative to non-real estate investments. As a result, the adjustment process is still somewhat subjective.

According to the 15th edition of The Appraisal of Real Estate, published in 2020 by the Appraisal Institute, the use of the sales comparison approach in valuation involves the estimation of the degree of similarity or difference between the subject property and a comparable by considering various elements of comparison. Adjustments are then made to the prices of the comparables to compensate for differences between each sale and the subject. These elements of comparison are discussed as follows.

1. **PROPERTY RIGHTS CONVEYED:** The subject is being valued in fee simple/leased fee. All of the comparables were also sold conveying fee simple/leased fee ownership. Thus, no adjustments are required for real property rights conveyed.

2. **FINANCING TERMS** account for the impact on value that is produced by favorable or unfavorable financing. No adjustments are necessary for financing terms.

3. **CONDITION OF SALE** adjustments reflect the motivations of the buyer and the seller. All sales are considered "arm's length." All of the buyers and sellers appeared to be free of duress with adequate exposure to the market for the property to sell at its market value. No adjustments are necessary in this category.

4. **MARKET CONDITIONS (TIME)** account for value changes in properties between the date of the comparable sale and the effective date of this appraisal report. The sales occurred between January 2022 and September 2022. Slight downward adjustments have been made to all Comparables as recent interest rates have caused downward pressures on values.

5. **LOCATION** adjustments account for superiority/inferiority in terms of access, road frontage, surrounding land uses, the character of the neighborhood, micro-area trends in rents and occupancy rates, and other factors. This is a subjective process, although it is based on real differences in rents. Comparable Nos. 1 and 5 received a slight downward adjustment as they are located in faster growing areas of the DFW market. Comparable No. 2 received a slight upward adjustment for being located farther outside the fast-growing City of Forney, TX.

APP000129

6.  **OCCUPANCY** accounts for the impact of occupancy level on sales price.  Occupancy at the time of sale for the comparables ranged from 89.6% to 98.0%.  Comparable Nos. 3 and 4 received a slight downward adjustment as both properties had 98.0% and 97.8% occupancy at sale.  The subject's current occupancy is within the range of the comparables.

.

7.  **PROPERTY AGE/CONDITION** adjustments are required when the subject and the comparables vary in terms of age and/or the general level of maintenance evident in the units and common areas. The subject was built in 2019. The comparable properties were built between 1999 and 2021. An upward adjustment is made to Comparable Nos. 1 and 3 which were built in 1981 and 1999, while a slight upward adjustment was given to Comparable No. 2 for being built in 2006. No other adjustments were made to location.

8.  **DESIGN/QUALITY/APPEAL** adjustments account for such items as architectural appeal, construction quality, and project and unit amenities.  By nature, this is a subjective adjustment, based primarily on the judgment of the appraisers.  We have made an upward adjustment to comparable No. 1 due to an inferior quality and a slight downward adjustment to Comparable No. 5 for having a superior design.

9.  **AVERAGE UNIT SIZE** adjustments address the significant impact on value of this one factor unique to apartment properties. As we are using a "per unit" method of comparison, we adjust for the different sizes of the units. All else being equal, a project with an abundance of smaller one-bedroom units will sell at a lower price per unit than a project with a greater share of larger two-bedroom units. The average unit sizes among comparable properties range from 779  SF to 1,090 SF. The subject's average unit size is 1,028 SF which is within the range of comparable properties. An upward adjustment has been applied to Comparable Nos. 1 and 5 since both properties have a much smaller average unit size.

10. **PROJECT DENSITY** adjustments account for the relationship between the number of units and the total site area of a property. Typically, properties with lower densities sell for higher prices/unit since the property is more appealing to tenants.  There were no adjustments to project density.

Please refer to the adjustment grid provided on the following page.

APP000130

NVC | National Valuation Consultants, Inc.

APP000131

| Comparable Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| Comp No. | Subject | 1 | 2 | 3 | 4 | 5 |
| Asset Name | Parc at Windmill Farms | The Borough | Bridgewood Ranch Apartments | Greens of Hickory Trail | Magnolia Grove | Harmony Hill Apartments |
| Address | 1003 Windmill Farms Blvd | 5700 Boca Raton Blvd | 4100 Vista Ln | 8613 Old Hickory Trail | 551 Crossroads Pky | 11010 Harmony Hill Ln |
| City | Forney | Fort Worth | Kaufman | Dallas | Terrell | Rowlett |
| State | Texas | Texas | Texas | Texas | Texas | Texas |
| Sale Price | | $27,350,000 | $16,044,405 | $45,000,000 | $57,400,000 | $165,000,000 |
| Date of Sale | | 9/22 | 9/22 | 2/22 | 1/22 | 5/22 |
| Year Built | 2019 | 1981/2018 | 2006 | 1999 | 2021 | 2017 |
| Average Unit Size | 1,028 | 779 | 831 | 1,090 | 910 | 818 |
| Total Units | 272 | 208 | 106 | 300 | 270 | 644 |
| Unit Mix Density | 14.7 | 20.8 | 17.8 | 10.0 | 24.9 | 29.1 |
| Occupancy At Sale | | 90.0% | 89.6% | 98.0% | 97.8% | 92.5% |
| Cap Rate | | 4.65% | NAV | NAV | 3.63% | 2.80% |
| Sale Price/SF | | $168.78 | $182.14 | $165.15 | $159.02 | $313.22 |
| Sale Price/Unit | | $131,490 | $151,362 | $180,000 | $212,593 | $256,211 |
| Property Rights | | - | - | - | - | - |
| Financing | | - | - | - | - | - |
| Condition of Sale | | - | - | - | - | - |
| Market Conditions | | Slight Downward | Slight Downward | Slight Downward | Slight Downward | Slight Downward |
| Location | | Slight Downward | Slight Upward | - | - | Slight Downward |
| Occupancy | | - | - | Slight Downward | Slight Downward | - |
| Age/Condition | | Upward | Slight Upward | Upward | - | - |
| Design/Appeal | | Upward | - | - | - | Slight Downward |
| Average Unit Size | | Upward | - | - | - | Upward |
| Density | | - | - | - | - | - |
| **Overall Adjustment** | | Upward | Slight Upward | - | Slight Downward | Downward |

**CONCLUSION OF PRICE PER UNIT ANALYSIS**

The sales indicate an unadjusted range in prices from $131,490/unit to $256,211/unit. Based off the adjustments, we have concluded to a range in prices from $151,362/unit to $212,593/unit. Due to their recency of sale, average unit size, and the similarity in total units, we have placed a stronger weight on Comparable Nos. 3 and 4, pointing to the middle of adjusted values. With consideration given to the unique characteristics of the subject and to the range of values indicated by adjustments to the comparable sales, we have concluded the following value:

| "As Is" Value Via Sales Comparison, As of January 23, 2023 | |
|---|---|
| Value Indication | Price / Unit |
| NVC Conclusion/Unit | $180,000 |
| No. of Units | 272 |
| Total | $48,960,000 |
| **Value Indication (Rounded)** | **$49,000,000** |
| $/Unit | $180,147 |
| $/SF | $175.22 |

APP000132

## Income Capitalization Approach

The income capitalization approach requires the appraiser to formulate a market value for the subject by converting projected net income into a single present value.  This process is known as capitalization.  The approach to value requires the following steps:

1. "Research the income and expense data for the subject property and comparable.

2. Estimate the potential gross income of the property by adding the rental income and any other potential income.

3. Estimate the vacancy and collection loss.

4. Subtract vacancy and collection loss from total potential gross income to arrive at the effective gross income of the subject property.

5. Estimate the total operating expenses for the subject by adding fixed expenses, variable expenses, and a replacement allowance (where applicable).

6. Subtract the estimate of total operating expenses from the estimate of effective gross income to arrive at net operating income.  (Deductions for capital items may also be necessary at various points in time through the projection period to calculate the cash flow used in discounted cash flow analysis.)

7. Apply one of the direct or yield capitalization techniques to this data to generate an estimate of value via the income capitalization approach.

8. If necessary, calculate a rent-up adjustment for the value indication that accounts for the cost of leasing up the property or for needed capital improvements (including an appropriate estimate of entrepreneurial incentive)."[21]

The preceding steps are discussed in detail below and in the following pages.  The preceding steps are discussed in detail below and in the following pages.

**POTENTIAL GROSS INCOME ESTIMATE**

The first step is to estimate market rent attainable for the subject.  This is accomplished via an analysis of competing properties in the market area.  It should be noted that the following comparables may not represent all competing properties within the submarket, but they are considered to form a reliable and representative data base from which we can obtain a reasonable estimate of market rent for the subject.

We have prepared detailed abstracts on each rent comparable, and this information is presented in the Addenda.  A summary table of the data and location map is presented on the following page.  All units are rented on an unfurnished basis.

---

[21] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 432.

APP000133

Parc at Windmill Farms                                           NVC | National Valuation Consultants, Inc.

### *Rent per Square Foot and Gross Rent per Unit*

The rent per square foot is a unit of comparison which expresses the relationship between rent and the size of a unit. This is a reliable indicator of market rent assuming a high degree of comparability among properties available for comparison.

Overall, we believe that the square footage figures from the comparables are representative of livable area. While this issue may be of concern, we note that the typical apartment renter does not analyze rent on a per square foot basis. Rather, it is the gross monthly rent that is of primary concern. Minor differences in square footage tend to have little or no impact on the achievable rent for similar types of units. Therefore, within our analysis, we will place emphasis on both rent per livable square foot and gross monthly rent per unit.

| | Lease Comparable Summary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No. | Name/ Street Address | Year Built | Total Units | Average Unit Size | $/SF Range | Avg. $/SF | $/Unit Range | Average Unit Rent | Occupancy |
| 1 | Gateway Pines 1200 Gateway Blvd N | 2018 | 337 | 810 | $1.31 - $2.15 | $1.75 | $1,075 - $2,100 | $1,418 | 92.8% |
| 2 | Gateway Oaks 1105 Gateway Blvd N | 2016 | 313 | 860 | $1.33 - $1.95 | $1.66 | $1,090 - $2,150 | $1,424 | 96.4% |
| 3 | Gateway Cedars 1100 Gateway Blvd N | 2014 | 334 | 791 | $1.39 - $1.89 | $1.67 | $1,059 - $1,704 | $1,318 | 98.7% |
| 4 | Emerson at Forney Marketplace 300 Trailhouse Ln | 2019 | 320 | 894 | $1.39 - $2.11 | $1.74 | $1,258 - $1,891 | $1,558 | 94.3% |
| 5 | Magnolia Grove 551 Crossroads Pkwy | 2020 | 270 | 910 | $1.42 - $2.12 | $1.77 | $1,224 - $2,010 | $1,613 | 93.0% |
| Average | | 2017 | 315 | 853 | $1.31 - $2.15 | $1.72 | $1,059 - $2,150 | $1,466 | 95.0% |
| Subject Contract Rent | | 2019 | 272 | 1,028 | $1.30 - $1.71 | $1.51 | $1,323 - $1,838 | $1,552 | 91.5% |

Apartment rents in this market are typically quoted on a monthly basis with lease terms averaging around twelve months. Quoted rent typically includes any premiums for location, floor-level, and views. Tenants are typically responsible for the cost of most utilities.

A map showing the location of each of the comparables may be found on the following page.

DAL2212075                                  Income Capitalization Approach                                  86

APP000134

Parc at Windmill Farms                                                      NVC | National Valuation Consultants, Inc.



### Market Rent Analysis

The subject includes 9 primary unit types with multiple floor plan variations.  Thus, we have prepared individual adjustment grids for the representative unit types.  In each case, we have attempted to analyze the comparable unit type which most closely resembles the subject unit for which we are estimating market rent.  In making adjustments, we have focused on the following key differences between the subject and the comparables, including:

- Location
- Quality/Condition
- Project Amenities
- Average Unit Size
- Parking
- Layout
- Unit Amenities

APP000135

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

***Observations Regarding Comparables' Rental Rates***

Rents for any individual floor plan may vary substantially with exposure. This is especially valid for properties that use rent optimization software such as "LRO" or Yieldstar. Even at properties that are more "human managed," exposure in a specific floor plan (or similarly, an unusually small or large number of the floor plans to begin with) can still influence the rent upward or downward over a short time frame. It is this factor that explains why some of the rents at comparable floor plans at the comparables may appear relatively high or low compared with the balance of the data set. For this reason, our concluded market rents for the subject may not always perfectly conform to the average indicated by the comparables.

***Conclusions of Market Rent***

We have estimated market rent for each of the subject's major unit types as shown on the preceding grids. While we have attempted to be as quantitative as possible, it is important to note that, in the end, the final conclusion of market rent is still somewhat subjective due to the myriad of differences. Still, we are confident that the rental estimates are supported by the comparable data.

| | | | | | NVC | NVC | Total |
|---|---|---|---|---|---|---|---|
| | | No. of | Contract | Contract | Current | Current | Current |
| Unit Type | Size (SF) | Units | Rent | Rent/SF | Market Rent | Rent/SF | Market Rent |
| A1 | 832 | 65 | $1,421 | $1.71 | $1,425 | $1.71 | $92,625 |
| A1 -HC | 832 | 3 | $1,368 | $1.64 | $1,375 | $1.65 | $4,125 |
| A2A | 798 | 48 | $1,323 | $1.66 | $1,340 | $1.68 | $64,320 |
| B1 | 1,059 | 28 | $1,605 | $1.52 | $1,610 | $1.52 | $45,080 |
| B2 | 1,145 | 77 | $1,631 | $1.42 | $1,640 | $1.43 | $126,280 |
| B2 -HC | 1,125 | 3 | $1,710 | $1.52 | $1,723 | $1.53 | $5,169 |
| B3 | 1,203 | 12 | $1,667 | $1.39 | $1,676 | $1.39 | $20,112 |
| C1 | 1,365 | 35 | $1,838 | $1.35 | $1,849 | $1.35 | $64,715 |
| C1 -HC | 1,365 | 1 | $1,770 | $1.30 | $1,783 | $1.31 | $1,783 |
| Total | 1,028 | 272 | $1,552 | $1.51 | $1,560 | $1.52 | $424,209 |
| Annual Base Rental Income | | | | | | | $5,090,508 |

**NVC Market Rent Conclusion**

These are estimated market rents for a twelve-month lease term. The lease comparables indicate a range of average monthly rent from $1,318/unit to $1,613/unit and from $1.66/SF to $1.77/SF. With the Class B vacancy rate in the submarket now at its highest in over 10 years, there is no material immediate increase in current contract rents and levels are supported. Our average monthly market rent conclusion is $1,560 /unit or $1.52/SF, which is within the indicated range for total average monthly rent per unit, but below the range for average monthly rent per SF. Our market rent estimate is only 18% of the estimated median household income in Forney – well below the typical qualifying ratio of 30%.

Properties with larger units tend to rent for more per unit, but less per square foot. The comparables average unit size ranges from 791 SF to 910 SF. The subject's average unit size is 1,028 SF, which is outside of the comparable range. Because the subject has larger units than the comparables, it has a higher average rent per unit, but is below the range of average rent per SF.

APP000136

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

*Loss To Lease*

Loss to lease is the difference between a unit's current market rent and the actual contract rent. Typically, in a market with moderately increasing rental rates, older leases would be slightly below market rent. However, the loss to lease exposure for an apartment is limited by the short-term nature of the lease. We have taken these factors into consideration within our projection of market rents, which are net of loss to lease.  Thus, we have not projected loss to lease as a separate line item within our analysis.

*Concessions*

Some properties use concessions periodically as a means to stay competitive and manage occupancy.  This is less common with properties utilizing revenue optimizing software such as LRO or Yield Star where asking rents are adjusted more frequently. In our market rent analysis, we have made adjustments for any incentives where applicable. Therefore, our market rent conclusions are net of concessions and no further deduction for concessions is necessary.

*Other Income*

Other income at the subject includes parking revenue, utility reimbursements and income from other sources.

*Parking Income*

There are no charges for parking at the subject property.

*Utility Reimbursement*

Utility reimbursements vary from property to property based on several factors including age, building efficiency, which utilities are direct billed to the tenants, and whether the utilities are sub-metered, allocated, or collected based on a fixed amount per unit. However, most property managers in this area attempt to recover between 80% and 100% of their utility expenses.  Based off the properties 2023 budget, we see that they are reporting utilities net of reimbursements.  Therefore, we will not project out any utility reimbursements for the subject.

*Other Income*

Other income includes items such as pet rent, trash and pest control income, damage and cleaning fees, application fees, late charges, forfeiture of security deposits, non-sufficient funds charges, interest on deposits and other miscellaneous items.  Placing emphasis on the 2023 budget, we have projected other income at $800/unit; the last two years' actuals averaged $869/year ad the last three years' actuals average $726/year.

APP000137

Parc at Windmill Farms                                                                      NVC | National Valuation Consultants, Inc.

**ABSORPTION, VACANCY AND COLLECTION LOSS**

*Absorption*

Absorption pertains to the period that would be required to lease vacant units at the subject property. The subject is currently 91.5% occupied, and is considered at or near stabilized under current market conditions.

*Vacancy and Credit Loss*

Vacancy in the overall Mesquite apartment submarket cluster has a 10-year average of 7.0% with current vacancies at 8.5% YTD 2023 according to Costar. This is just 0.1 percentage points higher than the vacancy in the metropolitan area overall. Over the last decade, the subject's Class B submarket averaged 6.9%, but in 2023, vacancy has jumped to a decade high of 9.8% as a result of negative absorption that began in 2022.

The stabilized lease comparables indicate a range in occupancy from 92.8% to 98.7%. As discussed in the Apartment Market Analysis section, there is substantial new apartment inventory planned and under construction which is expected to ease the tight rental market. Based on these factors, it is our opinion that a 8.0% long-term stabilized vacancy and credit loss factor is a reasonable assumption for the subject; we allocate 7% to vacancy and 1% to credit loss. It is likely that this would match the assumptions of a typical purchaser for this property in the current market conditions.

**OPERATING EXPENSES**

Operating expenses are the annual direct expenses or annual cash outflows borne by the owner/ investor of income producing properties as the necessary cost of generating gross income. The expense figures used are typical of stabilized annual cash expenses to be paid by the owner of the property over the income projection period. Before net operating income can be calculated, operating expenses are estimated and deducted from effective gross income.

To estimate the appropriate expenses for the subject property, we have examined several sources of information, including:

1. Aggregated expense data from the most recent NCREIF survey for similar properties in the subject's region.

2. Analysis of actual expense data from several comparable multifamily projects, from which we have actual operating data. Please note that it was necessary to screen these projects to protect client confidentiality.

3. An analysis of the 2023 budget.

A summary of the subject's historical operating statements is provided immediately following the summary of comparable expense data on the following pages.

APP000138

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

**NCREIF Expense Data**

| Expense Details: Trailing 12 Months (per unit) | | | | | |
|---|---|---|---|---|---|
| | <200 | 200-300 | 300-500 | 500-700 | >700 | Total |
| **Southwest** | | | | | | |
| Administrative | $ 1,049 | $ 614 | $ 279 | n/a | n/a | $ 800 |
| Marketing | 401 | 333 | 158 | n/a | n/a | 1,166 |
| Utilities | 725 | 242 | 217 | n/a | n/a | 642 |
| Maintenance | 2,121 | 502 | 417 | n/a | n/a | 1,072 |
| Insurance | 397 | 186 | 86 | n/a | n/a | 341 |
| Management Fee | 1,235 | 273 | 174 | n/a | n/a | 423 |
| Real Estate Tax | 3,060 | 1,333 | 1,026 | n/a | n/a | 1,960 |
| Other | 1,076 | 955 | 49 | n/a | n/a | 408 |
| Total | $ 10,063 | $ 4,438 | $ 2,406 | n/a | n/a | $ 6,813 |
| Average No. Units | 160 | 253 | 355 | n/a | n/a | 435 |
| Count | 7 | 4 | 6 | < 3 | < 3 | 58 |

DAL2212075                        Income Capitalization Approach                        91

APP000139

Case 3:22-cv-02118-X   Document 162-1   Filed 02/22/23   Page 140 of 310   PageID 3941

APP000140

| Expense Comparables | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| State | TX | | TX | | TX | | TX | | |
| County | Denton | | Johnson | | Collin | | Dallas | | Averages |
| Reporting Year | 2021 | | 2021 | | 2022 | | 2019 | | |
| Year of Construction | 2002 | | 2013 | | 2014 | | 2011 | | |
| Number of Units | 300 | | 240 | | 279 | | 300 | | 280 |
| Avg Unit Size | 990 | | 997 | | 868 | | 844 | | 925 |
| | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF |
| Effective Gross Income | $13,242 | $13.38 | $16,553 | $16.60 | $17,470 | $20.13 | $17,004 | $20.15 | $16,067 | $17.56 |
| Operating Expenses | | | | | | | | | | |
| Payroll | $1,093 | $1.10 | $1,367 | $1.37 | $1,788 | $2.06 | $1,715 | $2.03 | $1,491 | $1.64 |
| Management Fees | $372 | $0.38 | $494 | $0.50 | $485 | $0.56 | $595 | $0.71 | $486 | $0.53 |
| Administrative Expense | $225 | $0.23 | $282 | $0.28 | $473 | $0.55 | $172 | $0.20 | $288 | $0.31 |
| Advertising and Promotion | $105 | $0.11 | $131 | $0.13 | $373 | $0.43 | $365 | $0.43 | $243 | $0.27 |
| Maintenance/Building/Grounds | $631 | $0.64 | $788 | $0.79 | $1,174 | $1.35 | $1,061 | $1.26 | $913 | $1.01 |
| Utilities | $552 | $0.56 | $690 | $0.69 | $490 | $0.56 | $548 | $0.65 | $570 | $0.62 |
| Insurance | $362 | $0.37 | $452 | $0.45 | $292 | $0.34 | $165 | $0.20 | $318 | $0.34 |
| Other Expenses | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 |
| Subtotal Controllable Operating Expenses | $3,339 | $3.37 | $4,203 | $4.22 | $5,076 | $5.85 | $4,620 | $5.47 | $4,310 | $4.73 |
| Property Taxes | $1,746 | $1.76 | $2,182 | $2.19 | $3,542 | $4.08 | $4,200 | $4.98 | $2,917 | $3.25 |
| Total Operating Expenses | $5,085 | $5.14 | $6,386 | $6.40 | $8,618 | $9.93 | $8,820 | $10.45 | $7,227 | $7.98 |
| | | | | | | | | | | |
| NET OPERATING INCOME | $8,158 | $8.24 | $10,167 | $10.20 | $8,852 | $10.20 | $8,184 | $9.70 | $8,840 | $9.58 |
| | | | | | | | | | | |
| Expense Ratio | | 38.4% | | 38.6% | | 49.3% | | 51.9% | | 45.0% |
| Management Fee as % of EGI | | 2.8% | | 3.0% | | 2.8% | | 3.5% | | 3.0% |
| Vacancy | | 6.2% | | 6.2% | | 7.5% | | 5.7% | | 6.4% |

Source: NVC Internal Database

Income Capitalization Approach

**Subject Operating History and NVC Proforma**

Total No. of Units: 272

Total Rentable Square Footage: 279,648

| Income/Expense Category | YTD 12/15/2020 Amount | $/Unit | YTD 12/15/2021 Amount | $/Unit | YTD 12/15/2022 Amount | $/Unit | 2023 Budget Amount | $/Unit | NVC Proforma Amount | $/Unit |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Potential Rental Revenue | $4,234,077 | $15,566 | $4,407,001 | $16,202 | $4,826,724 | $17,745 | $5,300,117 | $19,486 | $5,090,508 | $18,715 |
| Vacancy / Collection Loss | ($2,305,733) | ($8,477) | ($142,433) | ($524) | ($259,432) | ($954) | ($273,507) | ($1,006) | ($407,241) | ($1,497) |
| Other Income | $119,499 | $439 | $262,300 | $964 | $210,392 | $774 | $223,470 | $822 | $217,600 | $800 |
| Effective Gross Income | $2,047,843 | $7,529 | $4,526,868 | $16,643 | $4,777,684 | $17,565 | $5,250,080 | $19,302 | $4,900,867 | $18,018 |
| **Operating Expenses** | | | | | | | | | | |
| Personnel | $233,182 | $857 | $284,920 | $1,048 | $308,503 | $1,134 | $347,025 | $1,276 | $383,520 | $1,410 |
| Management Fees | $62,150 | $228 | $125,577 | $462 | $135,221 | $497 | $147,287 | $541 | $147,026 | $541 |
| Administrative Expense | $52,902 | $194 | $51,243 | $188 | $51,353 | $189 | $53,286 | $196 | $57,120 | $210 |
| Leasing | $68,247 | $251 | $54,082 | $199 | $51,518 | $189 | $53,445 | $196 | $54,400 | $200 |
| Utilities | $79,903 | $294 | $50,481 | $186 | $61,028 | $224 | $62,011 | $228 | $62,560 | $230 |
| Services | $61,838 | $227 | $54,816 | $202 | $63,496 | $233 | $58,290 | $214 | $68,000 | $250 |
| Repairs & Maintenance/Cleaning & Decorating | $23,440 | $86 | $45,402 | $167 | $86,560 | $318 | $84,187 | $310 | $204,000 | $750 |
| Property Insurance | $39,678 | $146 | $106,295 | $391 | $111,232 | $409 | $116,886 | $430 | $116,960 | $430 |
| Franchise Tax | | $0 | | $0 | | $0 | $0 | $0 | $16,222 | $60 |
| Property Taxes | $444,711 | $1,635 | $896,285 | $3,295 | $922,107 | $3,390 | $949,770 | $3,492 | $1,000,000 | $3,676 |
| Replacement Reserves | | $0 | | $0 | | $0 | $0 | $0 | $81,600 | $300 |
| Total Operating Expenses | $1,066,051 | $3,919 | $1,669,101 | $6,136 | $1,791,018 | $6,585 | $1,872,187 | $6,883 | $2,191,408 | $8,057 |
| Net Operating Income (NOI) | $981,792 | $3,610 | $2,857,767 | $10,506 | $2,986,666 | $10,980 | $3,377,893 | $12,419 | $2,709,459 | $9,961 |
| Expense Ratio | | 52.1% | | 36.9% | | 37.5% | | 35.7% | | 44.7% |
| Vacancy/Collection loss | | 54.5% | | 3.2% | | 5.4% | | 5.2% | | 8.0% |
| Concessions | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% |
| Management Fee % of EGI | | 3.0% | | 2.8% | | 2.8% | | 2.8% | | 3.0% |

ï    NVC's estimate of Texas Franchise taxes is estimated at 0.331% of effective income.

Case 3:22-cv-02118-X    Document 162-1    Filed 02/22/23    Page 141 of 310    PageID 3942

APP000141

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

Our estimation of operating expenses for the subject as of January 23, 2023 follows in the ensuing narrative discussion.

**NVC Expenses Estimates**

*Employee Compensation (Payroll/Personnel)*

This category, for a property like the subject, includes salaries for any on-site personnel.  This might include a full-time manager, leasing agents, and all maintenance personnel.  It also includes all employee benefits such as health insurance, payroll taxes, and workman's compensation.

- Ï    Expense comparables range from $1,400 to $2,008/unit with an average of $1,715/unit.
- Ï    2023 Budget expenses average $1,276/unit which is slightly below the range of comparables.
- Ï    Our projection is $1,410/unit which is within the range of the comparables.

*Professional Services (Management Fee)*

This category includes items such as management fees, legal fees and other professional services. Property management fees are often treated as a separate expense category for apartments and are typically charged as a percentage of effective gross income.  Fees tend to vary depending on a variety of factors including the market position and rent levels of a particular property.  Generally, higher quality properties with higher unit rents have lower management fees (as a percentage) because they produce more income yet require the same amount of time and effort to manage as a property with average rents.

- Ï    Expense comparables range from 2.28% to 3.00% of EGI with an average of 2.76%.
- Ï    2023 Budget expenses average 2.81% of EGI which is within the range of comparables.
- Ï    Our projection is 3.0% of EGI which is within the range of the comparables.

*General/Administrative Expense*

General and administrative expenses include items such as phone service, postage, and office supplies.

- Ï    Expense comparables range from $241 to $360/unit with an average of $301/unit.
- Ï    2023 Budget expenses average $196/unit which is below the range of comparables.
- Ï    Our projection is $210/unit which is below the range of the comparables, but consistent with the overall budget.

*Utilities*

The expense category includes all utility expense not paid directly by the tenant and net of reimbursements.  As previously mentioned, tenants at the subject are billed directly for electricity and gas.  Water, trash and sewer will be recovered by the landlord.

- Ï    Expense comparables range from $256 to $1,394/unit with an average of $811/unit.
- Ï    2023 Budget expenses average $214/unit which is below the range of comparables.
- Ï    With heavy emphasis on budgeted and historical operations, our projection is $230 /unit which is slightly below the range of the comparables, but near the budget.

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

*Repairs & Maintenance/Cleaning & Decorating*

This category includes painting, cleaning, landscaping, plumbing, electrical, landscaping, unit make-ready, security, and general maintenance.

- Ï  Expense comparables range from $787 to $1,067/unit with an average of $939/unit.
- Ï  2023 Budget expenses average $310 /unit which is far below the range of comparables.
- Ï  We placed heavy emphasis on expense comparables for this category as the subject ages.  Our projection is $750 /unit which is within the range of the comparables and considers the subject's larger average unit size.

*Insurance*

This category includes all insurance premiums and deductibles paid by the landlord. Landlords typically carry both property and liability insurance.

- Ï  Expense comparables range from $366 to $700 /unit with an average of /unit
- Ï  2023 Budget expenses average $430 /unit which is above the range of comparables
- Ï  Our projection is $430 /unit which is equivalent to the budget and within range of the expense comparables.

*Leasing*

Leasing costs include all expenses incurred for capital improvements and equipment to satisfy the initial construction obligations of the landlord.  With a heavy emphasis on budgeted operations, we project a lease expense of $200 /unit, or $54,400 .

*Services*

Service costs include expenses associated with building, supporting, and delivering the properties overall services.  These include software, equipment, staffing, and fees.  With heavy emphasis on budgeted operations, we project a service expense of $250/unit or $68,000.

*Property Taxes*

Taxes are based on the estimated amount to be collected by the various taxing entities with jurisdiction over the subject. Please refer the *Tax Assessment and Analysis* section for a detailed stabilized tax projection.  Our tax projection equates to $3,676/unit.

We have also included an estimated franchise tax of 0.331%, which equates to $60 /unit or $16,222.

APP000143

Parc at Windmill Farms                                          NVC | National Valuation Consultants, Inc.

*Replacement Reserves*

Replacement Reserves is an allowance that provides for expenditures of short-lived items or recurring expenses.  The deterioration of capital items occurs over a period of time, but are viewed as an annual expense to ownership.  This requires an annual deduction be made from income to reflect the statistical probability of their occurrence time.

For apartment buildings, short-lived items such as appliances, carpeting, window coverings, and HVAC units are typically considered in replacement reserves.   Generally, apartment investors will select a reserve amount between $150 to $350 per unit depending upon the age/condition of the property and the amount estimated for general maintenance expense.  The subject is in good condition for it's age.  It will not need to "catch up" with its reserves, as is the case for many existing properties. As noted previously, the property condition assessment provided to the appraisers estimated reserves would average $310 (uninflated) over the next 12 years.   We note that most buyer underwrite slightly lower reserves between $200 and $250 for properties of this vintage and condition.  We have projected reserves at $300/unit as the subject is larger in average unit size than typical apartments in the market.

**Total Operating Expenses Conclusion**

NVC's projection of operating expenses for the subject as of January 23, 2023, is shown in the following table.

| NVC Expense Projection as of January 23, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total No. of Units: 272 Total SF (NRA): 279,648 | | | | | | | |
| | NVC Projection | | | Expense Comps (Per Unit) | | | 2023 |
| Expense Category | Amount | $/Unit | $/SF | Low | High | Avg. | Budget |
| Personnel | $383,520 | $1,410 | $1.37 | $1,400 | $2,008 | $1,715 | $1,276 |
| Management Fees | $147,026 | $541 | $0.53 | $360 | $528 | $466 | $541 |
| Administrative Expense | $57,120 | $210 | $0.20 | $241 | $360 | $301 | $196 |
| Leasing | $54,400 | $200 | $0.19 | $110 | $446 | $238 | $196 |
| Utilities | $62,560 | $230 | $0.22 | $787 | $1,067 | $939 | $228 |
| Services | $68,000 | $250 | $0.24 | $256 | $1,394 | $811 | $214 |
| Repairs & Maintenance/Cleaning & Dec | $204,000 | $750 | $0.73 | $631 | $1,174 | $913 | $310 |
| Property Insurance | $116,960 | $430 | $0.42 | $165 | $452 | $318 | $430 |
| Franchise Tax | $16,222 | $60 | $0.06 | N/A | N/A | N/A | $0 |
| Property Taxes | $1,000,000 | $3,676 | $3.58 | $2,656 | $3,961 | $3,373 | $3,492 |
| Subtotal-Variable Expenses | $2,109,808 | $7,757 | $7.54 | $4,503 | $5,668 | $5,011 | $6,883 |
| Property Taxes | $1,000,000 | $3,676 | $3.58 | $2,656 | $3,961 | $3,373 | $3,492 |
| Replacement Reserves | $81,600 | $300 | $0.29 | - | - | - | $0 |
| Total Operating Expenses | $3,191,408 | $11,733 | $11.41 | $8,043 | $8,875 | $8,384 | $6,883 |

Overall our projections are within the range of comparable market data and similar to historical operations.

DAL2212075                        Income Capitalization Approach                        96

APP000144

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

**NET OPERATING INCOME**

The stabilized income and expense projection is summarized in the following table.

| Income/Expense Category | Annual | Percent of EGI | $/SF | $/Unit |
|---|---|---|---|---|
| **Income and Expense Projection - As of January 23, 2023** | | | | |
| Total No. of Units: 272 | | | | |
| Total SF (NRA): 279,648 | | | | |
| | "As Is" | | | |
| Operating Income: | | | | |
| Gross Base Rental Income | $5,090,508 | 103.9% | $18.20 | $18,715 |
| Vacancy/Credit Loss (8.0%) | -$407,241 | -8.3% | ($1.46) | -$1,497 |
| Other Income | $217,600 | 4.4% | $0.78 | $800 |
| Effective Gross Income | $4,900,867 | 100.0% | $17.53 | $18,018 |
| Operating Expenses: | | | | |
| Personnel | $383,520 | 7.8% | $1.37 | $1,410 |
| Management Fees | $147,026 | 3.0% | $0.53 | $541 |
| Administrative Expense | $57,120 | 1.2% | $0.20 | $210 |
| Leasing | $54,400 | 1.1% | $0.19 | $200 |
| Utilities | $62,560 | 1.3% | $0.22 | $230 |
| Services | $68,000 | 1.4% | $0.24 | $250 |
| Repairs & Maintenance/Cleaning & Dec | $204,000 | 4.2% | $0.73 | $750 |
| Property Insurance | $116,960 | 2.4% | $0.42 | $430 |
| Franchise Tax | $16,222 | 0.3% | $0.06 | $60 |
| Property Taxes | $1,000,000 | 20.4% | $3.58 | $3,676 |
| Replacement Reserves | $81,600 | 1.7% | $0.29 | $300 |
| Total Operating Expenses | $2,191,408 | 44.7% | $7.84 | $8,057 |
| Net Operating Income | $2,709,459 | 55.3% | $9.69 | $9,961 |
| Per Unit Indicators: | | | | |
| Effective Gross Income/Unit | | | | $18,018 |
| Operating Expenses/Unit | | | | $8,057 |
| Operating Expenses/EGI (%) | | | | 44.7% |

Source: NVC

***NOI Comparison***

Our year 1 NOI projection is way below the 2023 budget. This is primarily due to an increased projection in vacancy/credit loss, increases in expenses such as repairs & maintenance/cleaning & decorating to meet market comparable ranges, a 3.0% management fee, and $300/SF in replacement reserves.

APP000145

## CAPITALIZATION

Capitalization is a process in which projected net income is converted into a single value estimate. The two primary methods of capitalizing income are 1) direct capitalization and 2) yield capitalization.

## DIRECT CAPITALIZATION

There are several methods of deriving an appropriate overall rate to use to capitalize NOI. In determining the appropriate rate for the subject, we have utilized the following methods: A) market extraction, B) investor survey, and C) Debt Coverage Ratio

### A) Market Extraction

A market-extracted capitalization rate (overall rate) is market-oriented and can be determined by dividing the NOI of a comparable sale by its selling price. If comparables are truly similar to the subject, they will produce a narrow range from which an appropriate rate can be selected and applied to the subject's NOI.

As a basis for comparison, the strengths and weaknesses of the subject are summarized below.

| Strengths And Weaknesses |
|---|
| **Strengths** |
| • Location offers good access and visibility |
| • Proximity to open space |
| • Top rated school district |
| • Large-sized units |
| • Efficient floorplan design with balconies/patios |
| • Adequate parking at 2.1 spaces per bedroom |
| • Above-average project amenities |
| • New construction |
| • Good condition / well maintained |
| • Rental rates have trended upward in recent years |
| • Stabilized occupancy |
| • Strong employment growth in submarket / metropolitan area |
| **Weaknesses** |
| • Located in a tertiary market |
| • Rising interest rates causing downward pressures on values |
| • Significant new supply brought to market |
| • Ample land supply in area allows for potential new construction |
| • Limited availability of debt capital |

APP000146

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

In an effort to curb inflation, the Federal reserve raised the federal funds rate seven times in 2022 and has signaled rate hikes will continue into 2023.  While spreads between interest rates and investment rates are not static, market participants indicate that today's higher interest rates have had an upward impact on investment rates, as compared to a year ago.  We have reflected this trend in the appraisal.

Within the Sales Comparison Approach of this report, we confirmed and analyzed several recent sales of apartment complexes the subject's market.  The capitalization rates derived from these recent sales are summarized in the table below.  Please see the Sales Comparison Approach section of this report for other details about the sales comparables.

| Summary of Sales for Capitalization Rate Extraction | | | | | | |
|---|---|---|---|---|---|---|
| Comp No. | Name/Location | Date of Sale | Year Built | Occupancy At Sale | Total Units | Cap Rate |
| 1 | The Borough 5700 Boca Raton Blvd Fort Worth | 9/22 | 1981/2018 | 90.0% | 208 | 4.65% |
| 2 | Bridgewood Ranch Apartments 4100 Vista Ln Kaufman | 9/22 | 2006 | 89.6% | 106 | NAV |
| 3 | Greens of Hickory Trail 8613 Old Hickory Trail Dallas | 2/22 | 1999 | 98.0% | 300 | NAV |
| 4 | Magnolia Grove 551 Crossroads Pky Terrell | 1/22 | 2021 | 97.8% | 270 | 3.63% |
| 5 | Harmony Hill Apartments 11010 Harmony Hill Ln Rowlett | 5/22 | 2017 | 92.5% | 644 | 2.80% |

These comparable sales indicate a range of capitalization rates of 2.80% to 4.65% on in-place income. Because of the on-going and anticipated interest rate hikes in the market, we estimate a higher capitalization rate due to the resulting downward pressures on value.  Based on the market data summarized above, we conclude to a range in capitalization rates from 4.75% to 5.25% via market extraction.

APP000147

***B) Investor Survey***

In preparation for this assignment we spoke with several brokers active in the subject's market area who specialize in institutional grade, Class A and B multi-family projects.  We have recently also interviewed other multi-family market participants in other primary markets though out the region and nationally. The brokers active in the subject's market indicated a capitalization rate range of 5.00% to 5.50% for institutional grade multifamily properties.

The table below provides current and historical OAR trends (from the PwC Real Estate Investor Survey) that are relevant to the subject property.

| Overall Capitalization Rate (OAR) | | | |
|---|---|---|---|
| | National Apartment Market | | |
| Reporting Period | Low | High | Average |
| 2 Years Ago      4Q20 | 3.50% | 8.00% | 5.22% |
| 1Q21 | 3.50% | 7.00% | 5.04% |
| 2Q21 | 3.50% | 7.00% | 4.96% |
| 3Q21 | 3.00% | 7.00% | 4.59% |
| Year Ago         4Q21 | 3.00% | 7.00% | 4.42% |
| 1Q22 | 3.00% | 7.00% | 4.40% |
| 2Q22 | 3.00% | 7.00% | 4.45% |
| Last Quarter     3Q22 | 3.00% | 8.00% | 4.75% |
| Current          4Q22 | 3.25% | 8.00% | 4.89% |



PwC Real Estate Investor Survey 4Q22

In the latest survey, overall capitalization rates for institutional-grade apartment complexes averaged 4.89%. This is  up 47 basis points  from one year ago.  This data should reflect the on-going effects of the interest rate hikes that began in the first quarter of 2022.

In addition to the national PwC data, we have spoken to Brian O'Boyle, Jr, the Vice Chairman of Capital Markets at Newmark, who is very active in the multifamily market within the Dallas-Fort Worth metroplex. He discussed the increase of capitalization rates throughout the apartment market in general due to rising interest rates and inflation.  Based off his information, we concluded to a capitalization range of 5.00% to 5.50% via the investor survey technique.

APP000148

**C) Debt Coverage Ratio (DCR) Method**

Due to the current state of the economy and overall trends in the real estate industry, more investors are looking at the relationship between debt and overall cap rates. Thus, we have included the following DCR analysis.

A debt coverage ratio is the ratio of NOI to annual debt service. The DCR method of deriving an overall rate involves factoring the debt coverage ratio that is typically required by a lender during the underwriting of the loan request. The estimated overall rate is derived by multiplying the debt coverage ratio, the loan-to-value ratio, and the mortgage constant.

To estimate an overall rate, the debt coverage ratio is multiplied by the mortgage constant and the loan-to-value ratio. The formula is as follows:

$$
\begin{aligned}
Ro &= DCR \times Rm \times M \\
Ro &= \text{overall rate} \\
DCR &= \text{debt coverage ratio} \\
Rm &= \text{mortgage constant} \\
M &= \text{loan-to-value ratio}
\end{aligned}
$$

In order to gather the necessary information to calculate the OAR for a property similar to the subject, we have reviewed financing information from RealtyRates.com - Investor Survey. According to the most recent survey, current investment parameters applicable are as follows:

| RealtyRates.com Investor Survey - 1st Quarter 2023* Permanent Financing - Apartment | | | |
|---|---|---|---|
| Component | Minimum | Maximum | Average |
| Interest Rate | 3.62% | 7.88% | 5.78% |
| Amortization Period (years) | 15 | 40 | 26 |
| Mortgage Constant | 0.0865 | 0.0824 | 0.0744 |
| Loan to Value | 55.00% | 90.00% | 73.00% |
| Debt Coverage Ratio | 1.00 | 1.86 | 1.43 |

*4th Quarter 2022 - Realty Rates

Parc at Windmill Farms

NVC | National Valuation Consultants, Inc.

As indicated, even though the survey is from 1st Quarter 2023, the data is from 4th Quarter 2022. Interest rates on loans for properties like the subject generally track the 10-year treasury with an approximate 200 to 300 basis point risk premium. The 10-year treasury yield has trended upward significantly over the past 12 months which translates to rising interest rates for commercial loans.

| Summary of DCR Method | |
|---|---|
| Loan Terms Selected | |
| Interest Rate | 5.75% |
| Amortization Period  (years) | 30 |
| Mortgage Constant (Rm) | 0.0700 |
| Loan to Value (M) | 60% |
| Debt Coverage Ratio (DCR) | 1.25 |
| DCR Method OAR Indication | |
| DCR  x  Rm  x  M  =  Ro | **5.25%** |

Due to rising interest rates, investors are likely to contribute greater equity to reduce the impact of higher interest rates and to ensure acceptable coverage ratios, resulting in a lower LTV. The DCR method further indicates a current cap rate of 5.11%.

**Conclusion of Capitalization Rate**

| Conclusion of Capitalization Rates | | | |
|---|---|---|---|
| Method | Indication | | |
| Market Extraction | 4.75% | - | 5.25% |
| Investor Survey | 5.00% | - | 5.50% |
| Debt Coverage Ratio | 5.25% | | |

Of the two methods used in deriving a capitalization rate, market extraction is the most heavily weighted. Based on the varied data, we conclude a range of proforma capitalization rates of 4.75% to 5.25% for the subject. This range takes into consideration that the subject has value-add potential for unit renovation.

Based on the preceding and given the future date of value, an overall rate of 5.25% is selected for the subject property. The indicated value for the subject is shown in the following table:

| Direct Capitalization - "As Is" As of January 23, 2023 | |
|---|---|
| NOI | $2,709,459 |
| Capitalization Rate | 5.25% |
| Indicated Value By Direct Capitalization | $51,608,752 |
| Rounded | $51,600,000 |
| Value Per $/Unit (272) | $189,706 |

APP000150

## 2. YIELD CAPITALIZATION (DCF ANALYSIS)

Yield capitalization is utilized as an additional means of estimating the subject's market value by the income capitalization approach.   This method utilizes a DCF analysis and is currently in wide use by most sophisticated investors and purchasers of income-producing properties.   This method utilizes a DCF analysis that allows for year-to-year variations of projected income and expenses while reflecting all actual contractual income expected to accrue to the property.

Properly utilized, the DCF analysis should mirror the expectations and requirements of typical investors and purchasers of real estate at the time of the appraisal.  The criteria used in this analysis are based on the best available data in the marketplace.  Documentation and logic supporting the estimates of gross and net income have been previously discussed.  Other important elements of the DCF analysis are described in the following sections.

### Inflation

To some degree, rental rates and expenses follow inflation.  When real estate market conditions are stable, one can expect rental rates will advance no faster than the cost of constructing a new property to serve as a suitable substitute for the subject property.  CPI trends in the subject's market were discussed in the Economic and Demographic Profile section. We project CPI to increase at approximately 3.0% over the holding period.  Accordingly, we will use an average general inflation factor of 3.00% throughout the holding period.  We note that this is consistent with typical investor underwriting in the subject's market.

### Rent Escalation

Trends in supply and demand have the greatest effect on changes in market rental rates.  In periods where demand exceeds supply, rents tend to increase at a rate faster than that of inflation.  When supply exceeds demand, rents may grow at a much slower rate or experience real declines.

We addressed historic rental rates and other apartment market conditions in depth in our preceding market analysis.  The most recent quarterly data indicates a trend of stable vacancies and rents after a time period of declining vacancies and high rent growth.  It is anticipated that effective rents will continue to rise over the next year.  We note that some investors had been underwriting rent spikes within their DCF acquisition analyses, but the number of apartment development projects in the pipeline in many major metro areas has recently tempered these expectations.  Furthermore, the subject's submarket cluster had its highest vacancy rate in over a decade. In conclusion, we have estimated escalated rents at 0% in year one, 2% in year two, and 3% throughout the rest of the holding period.

### Expense Escalation

The subject's stabilized expenses previously discussed are applied in the DCF analysis.  Expenses are increased by the previously concluded annual inflation rate.  The management fee is projected as a percentage of EGI and will fluctuate accordingly.

### Holding Period

A 10-year holding period has been selected for use in each respective DCF analysis, which is supported by our in-house survey of institutional investors and the results of the PwC investor survey.  An 11th year is calculated for reversionary purposes.

APP000151

Parc at Windmill Farms                                              NVC | National Valuation Consultants, Inc.

***Discount (Yield) Rate Selection***

The proper selection of a yield rate is critical to the DCF analysis.  In order to translate the forecasted income stream into an estimate of value, the NOI for each year, as well as the value of the reversion upon termination of the investment, is discounted to the present utilizing a selected discount rate, which for the purposes of this report is interchangeable with the internal rate of return (IRR).

Yield rates are partially a function of perceived risks.  Real estate must compete with other investment instruments in the capital markets.  Because real estate is immobile and illiquid, it is generally regarded as higher risk than fixed-rate investments with a stated yield. In addition, yields on commercial real estate are far more difficult to quantify as real estate is traded less frequently than other types of investments.

The PwC survey reported an average discount rate of 6.86% as of the most recent survey.  This is  up 23 basis points  from one year ago.  Please refer to the following table.

| Discount Rate (IRR) | | | | |
|---|---|---|---|---|
| | | National Apartment Market | | |
| Reporting Period | | Low | High | Avg. |
| 2 Years Ago | 4Q20 | 5.00% | 10.00% | 6.83% |
| | 1Q21 | 5.00% | 10.00% | 6.73% |
| | 2Q21 | 5.00% | 10.00% | 6.69% |
| | 3Q21 | 5.00% | 10.00% | 6.74% |
| Year Ago | 4Q21 | 5.00% | 10.00% | 6.63% |
| | 1Q22 | 5.00% | 10.00% | 6.62% |
| | 2Q22 | 4.75% | 10.00% | 6.72% |
| Last Quarter | 3Q22 | 4.75% | 10.00% | 6.79% |
| Current | 4Q22 | 4.75% | 10.00% | 6.86% |




PwC Real Estate Investor Survey 4Q22

Given this data, as well as the previous discussion of direct capitalization rates, including the subject's location, we will use a discount rate of 7.00%.  This is 175 basis points above our estimated going-in cap rate and just slightly below the survey spread of 197 bps.

DAL2212075                            Income Capitalization Approach                            104

APP000152

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

*Exit Capitalization Rate Selection*

Most investors typically add 50 to 100 basis points to the stabilized rate to reflect the increased risk of a property at the end of the assumed holding period.  The holding period in this analysis is 10 years.  A higher terminal capitalization rate is justified by the fact the property will be 10 years older at the end of the holding period, and there is uncertainty of how market conditions will be at this time.  According to the latest PwC survey, the average exit cap rate was 39 points above the going-in rate.  This is  essentially flat from a year ago, as indicated in the table below.

| Going-in/Exit Capitalization Rates | | | |
|---|---|---|---|
| | National Apartment Market | | |
| Reporting Period | Going-In Cap Rate | Exit Cap Rate | Spread (BPS) |
| 2 Years Ago | 4Q20 | 5.22% | 5.60% | 38.00 |
| | 1Q21 | 5.04% | 5.42% | 38.00 |
| | 2Q21 | 4.96% | 5.31% | 35.00 |
| | 3Q21 | 4.59% | 5.25% | 66.00 |
| Year Ago | 4Q21 | 4.42% | 4.79% | 37.00 |
| | 1Q22 | 4.40% | 4.81% | 41.00 |
| | 2Q22 | 4.45% | 4.76% | 31.00 |
| Last Quarter | 3Q22 | 4.75% | 5.14% | 39.00 |
| Current | 4Q22 | 4.89% | 5.28% | 39.00 |



PwC Real Estate Investor Survey 4Q22

Overall, we conclude with an increase of 50 basis points above the concluded stabilized going-in rate of 5.25%, indicating a terminal capitalization rate of 5.75%.

*Selling Costs*

Respondents in the PwC survey reported anticipated selling costs to be 0.5% to 3.0% of proceeds from resale.  Considering the size of the subject asset, we will deduct 1.50% in selling costs to calculate the reversion at the end of the holding period in our stabilized DCF.

APP000153

Parc at Windmill Farms                                                        NVC | National Valuation Consultants, Inc.

*Present Value Calculation*

| Present Value Calculation "As Is" - January 23, 2023 | | | |
|---|---|---|---|
| Analysis Period | For the Year Ending | Annual Cash Flow | P.V. of Cash Flow 7.00% Discount Rate |
| Year 1 | Jan-2024 | $2,709,459 | $2,532,205 |
| Year 2 | Jan-2025 | $2,643,717 | $2,309,125 |
| Year 3 | Jan-2026 | $2,674,020 | $2,182,797 |
| Year 4 | Jan-2027 | $2,754,241 | $2,101,197 |
| Year 5 | Jan-2028 | $2,836,868 | $2,022,648 |
| Year 6 | Jan-2029 | $2,921,974 | $1,947,035 |
| Year 7 | Jan-2030 | $3,009,633 | $1,874,248 |
| Year 8 | Jan-2031 | $3,099,922 | $1,804,183 |
| Year 9 | Jan-2032 | $3,192,920 | $1,736,737 |
| Year 10 | Jan-2033 | $3,288,707 | $1,671,812 |
| Total Cash Flow | | $29,131,462 | $20,181,986 |
| Property Resale | | $58,027,097 | $29,498,034 |
| Total Property Present Value | | | $49,680,020 |
| Rounded to Thousands | | | $49,700,000 |
| $/Unit | | | $182,721 |
| Percentage Value Distribution | | | |
| Prospective Income | | | 40.62% |
| Prospective Property Resale | | | 59.38% |
| Total | | | 100.00% |

APP000154

*Yield Capitalization Conclusions*

With each of the required elements now identified, we are able to analyze the results of our DCF analysis. A summary of the cash flow and the present value calculation is provided at the end of this section, with additional supporting reports and assumptions included in the Addenda. A summary of assumptions is provided in the following table.

| Summary of DCF Assumptions | |
|---|---|
| Scenario | "As Is" |
| Date of Value | January 23, 2023 |
| Average Market Rent | $1,560 |
| Rent Escalation | 0%, 2%, 3% … |
| Holding Period | 10 years |
| Vacancy & Credit Loss | 8.00% |
| Long Term Concessions | 0.00% |
| Expense Escalation | 3.00% |
| Terminal Cap Rate | 5.75% |
| Discount Rate | 7.00% |
| Selling Expenses | 1.50% |
| DCF Value Indication (Rounded) | $49,700,000 |
| DCF Value Indication $/Unit | $182,721 |

*Income Capitalization Approach Reconciliation*

The value indications by both direct capitalization and yield capitalization were employed in order to develop opinions of the value "as is" via the income capitalization approach. The value derived from the direct capitalization method is similar to that derived from the yield capitalization method. Direct capitalization is most useful where lease terms are of shorter duration or where the future change in income is not erratic. Direct capitalization is frequently considered by today's institutional investor. Yield capitalization is typically given greater weight where existing leases have a significant impact on the income stream. We have placed greater weight on the yield capitalization method, rounding to an appropriate level of confidence.

| Income Approach Reconciliation | |
|---|---|
| Valuation Premise | "As Is" |
| Date of Valuation | January 23, 2023 |
| Direct Capitalization | $51,600,000 |
| Yield Capitalization | $49,700,000 |
| Reconciled To | $50,000,000 |

APP000155

*Cash Flow Projection*

| Stabilized Cash Flow Projection -"As Is" | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
| For the Years Ending | Jan-2024 | Jan-2025 | Jan-2026 | Jan-2027 | Jan-2028 | Jan-2029 | Jan-2030 | Jan-2031 | Jan-2032 | Jan-2033 | Jan-2034 |
| **Potential Gross Revenue** | | | | | | | | | | | |
| Potential Market Rent | $5,090,508 | 5,090,508 | 5,192,318 | 5,348,088 | 5,508,530 | 5,673,786 | 5,844,000 | 6,019,320 | 6,199,899 | 6,385,896 | 6,577,473 |
| Vacancy/Credit Loss | ($407,241) | (407,241) | (415,385) | (427,847) | (440,682) | (453,903) | (467,520) | (481,546) | (495,992) | (510,872) | (526,198) |
| Concessions | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking Income | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utility Reimbursements | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Income | $217,600 | 217,600 | 221,952 | 228,611 | 235,469 | 242,533 | 249,809 | 257,303 | 265,022 | 272,973 | 281,162 |
| Effective Gross Revenue | 4,900,867 | 4,900,867 | 4,998,885 | 5,148,851 | 5,303,317 | 5,462,416 | 5,626,289 | 5,795,077 | 5,968,930 | 6,147,998 | 6,332,438 |
| **Operating Expenses** | | | | | | | | | | | |
| Personnel | $383,520 | 395,026 | 406,876 | 419,083 | 431,655 | 444,605 | 457,943 | 471,681 | 485,832 | 500,407 | 515,419 |
| Management Fees | $147,026 | 151,437 | 155,980 | 160,659 | 165,479 | 170,443 | 175,557 | 180,823 | 186,248 | 191,836 | 197,591 |
| Administrative Expense | $57,120 | 58,834 | 60,599 | 62,417 | 64,289 | 66,218 | 68,204 | 70,250 | 72,358 | 74,529 | 76,765 |
| Leasing | $54,400 | 56,032 | 57,713 | 59,444 | 61,228 | 63,065 | 64,956 | 66,905 | 68,912 | 70,980 | 73,109 |
| Utilities | $62,560 | 64,437 | 66,370 | 68,361 | 70,412 | 72,524 | 74,700 | 76,941 | 79,249 | 81,627 | 84,075 |
| Services | $68,000 | 70,040 | 72,141 | 74,305 | 76,535 | 78,831 | 81,196 | 83,631 | 86,140 | 88,725 | 91,386 |
| Repairs & Maintenance/Cleaning & Dec | $204,000 | 210,120 | 216,424 | 222,916 | 229,604 | 236,492 | 243,587 | 250,894 | 258,421 | 266,174 | 274,159 |
| Property Insurance | $116,960 | 120,469 | 124,083 | 127,805 | 131,640 | 135,589 | 139,656 | 143,846 | 148,161 | 152,606 | 157,184 |
| Franchise Tax | $16,222 | 16,709 | 17,210 | 17,726 | 18,258 | 18,806 | 19,370 | 19,951 | 20,549 | 21,166 | 21,801 |
| Property Taxes | $1,000,000 | 1,030,000 | 1,060,900 | 1,092,727 | 1,125,509 | 1,159,274 | 1,194,052 | 1,229,874 | 1,266,770 | 1,304,773 | 1,343,916 |
| Replacement Reserves | $81,600 | 84,048 | 86,569 | 89,167 | 91,842 | 94,597 | 97,435 | 100,358 | 103,368 | 106,469 | 109,664 |
| Total Operating Expenses | 2,191,408 | 2,257,150 | 2,324,865 | 2,394,611 | 2,466,449 | 2,540,442 | 2,616,656 | 2,695,155 | 2,776,010 | 2,859,290 | 2,945,069 |
| Net Operating Income | 2,709,459 | 2,643,717 | 2,674,020 | 2,754,241 | 2,836,868 | 2,921,974 | 3,009,633 | 3,099,922 | 3,192,920 | 3,288,707 | 3,387,369 |

APP000156

Parc at Windmill Farms                                          NVC | National Valuation Consultants, Inc.

## Reconciliation and Final Value

In this valuation, the Sales Comparison and Income Capitalization Approach were used.  The resultant values are provided in the following table.

| Final Value Reconciliation | |
| --- | --- |
| Value Scenario | "As Is" Market Value |
| | |
| Date of Valuation | January 23, 2023 |
| Interest Appraised | Fee Simple |
| | |
| Sales Comparison Approach | $49,000,000 |
| | |
| Income Capitalization Approach | |
| Direct Capitalization | $51,600,000 |
| DCFA | $49,700,000 |
| Reconciled | $50,000,000 |
| | |
| Market Value Opinion | $50,000,000 |
| Market Value Opinion /Unit | $183,824 |

### *Sales Comparison Approach*

The strength of this approach is that it is based entirely upon the actions of market participants.  The sales were analyzed using a price per unit analysis.  The weakness of this approach is that there has been limited market activity of truly comparable properties in the subject's area and it is difficult to quantify adjustments for each sale. Furthermore, most investors do not rely on this technique in making their purchase decisions, although it is considered as a test of reasonableness. Overall, minimal weight is accorded to the sales comparison approach.

### *Income Capitalization Approach*

The income capitalization approach to value is predicated on the assumption that a strong relationship exists between the net income a property produces and its market value.  For this reason, the income capitalization approach focuses on the most important feature to an investor in an income-producing property, the potential net operating income.  The direct capitalization technique and the yield capitalization technique were utilized in this approach.  The quantity and quality of data available for this approach were considered good, thus we have a high level of confidence in the resulting value indication. We have placed most weight on the income approach for our final value conclusion.

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report.  There are no Extraordinary Assumptions and Hypothetical Conditions that may have affected the assignment results.

### EXTRAORDINARY ASSUMPTIONS

**None**

### HYPOTHETICAL CONDITIONS

**None**

APP000157

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

## Reasonable Exposure Time and Marketing Period

The Statement on Appraisal Standards No. 6 (SMT-6) define reasonable exposure time as follows:

> "The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal."

In contrast, Advisory Opinion 7 (AO-7) marketing time as follows:

> "an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal."

The key difference between the two is that exposure time is inherent in the market value and is always presumed to precede the effective date of value, whereas the marketing period is the estimated length of time immediately after the effective date of value that will be necessary to sell the property.

### *Market Context*

In level markets, the exposure time and marketing time should be identical.  In improving markets, the marketing period will probably be shorter than the exposure period, whereas in declining markets, the marketing period will probably be longer than the exposure period.  In the following table, we have considered average marketing times indicated in a national real estate investor survey conducted by PwC Real Estate.

| Average Marketing Times | | | | |
|---|---|---|---|---|
| National Apartment Market | | | | |
| Reporting Period | | Low | High | Avg. Months |
| 2 Years Ago | 4Q20 | 1.0 | 12.0 | 5.3 |
| | 1Q21 | 1.0 | 12.0 | 5.3 |
| | 2Q21 | 1.0 | 12.0 | 4.4 |
| | 3Q21 | 1.0 | 12.0 | 4.6 |
| Year Ago | 4Q21 | 1.0 | 12.0 | 4.2 |
| | 1Q22 | 1.0 | 12.0 | 4.3 |
| | 2Q22 | 1.0 | 12.0 | 4.3 |
| Last Quarter | 3Q22 | 1.0 | 12.0 | 4.3 |
| Current | 4Q22 | 1.0 | 12.0 | 4.6 |



PwC Real Estate Investor Survey 4Q22

APP000158

Parc at Windmill Farms                                                    NVC | National Valuation Consultants, Inc.

*Conclusion*

Considering both the macro context of the institutional real estate market in general, as well as the micro aspects of the subject property in particular, it is our opinion that the reasonable exposure period inherent in the market value estimate four months.

The multifamily market has improved, and investment interest has increased for apartment properties. Thus, we estimate that the forward-looking marketing period is also at four months.  This is the length of time that we estimate it will take to sell the subject property at the appraised value.

| Exposure and Marketing Period Conclusions | |
| --- | --- |
| Exposure Period Implicit in Market Value Estimate | 4 Months |
| Forecasted Marketing Period | 4 Months |

APP000159

## Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

8. Charles G. Dannis, MAI, SRA made a personal inspection of the property that is the subject of this report.

9. Additional employees of National Valuation Consultants, Inc. provided assistance with the preparation of this report. Specifically, Andrew Teichner provided significant real property appraisal assistance under the direction and supervision of the person signing this report. This included comparable data research, market analysis, highest & best use, application of valuation approaches and reconciliation. Cherylee Beller provided assistance with research, data gathering and confirmation of public records. Otherwise, no one provided significant real property appraisal assistance to the persons signing this certification.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Charles G. Dannis, MAI, SRA has completed the continuing education program for Designated Members of the Appraisal Institute.

APP000160

Parc at Windmill Farms                                    NVC | National Valuation Consultants, Inc.

12. We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.


Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

APP000161

**ADDENDA**

**APPRAISER QUALIFICATIONS**

NVC | National Valuation Consultants, Inc.

APP000163

# Charles (Chuck) G. Dannis, MAI, SRA
## Senior Managing Director

**NVC**
National Valuation Consultants, Inc.

Chuck has been a real estate appraiser and consultant since 1972. In 1976, he co-founded the Dallas-based appraisal firm Crosson Dannis, Inc., which provided real estate appraisal and consultation services throughout the U.S. for more than 35 years. In 2015, Crosson Dannis merged with National Valuation Consultants to create one of the largest privately held commercial real estate valuation and advisory firms in the United States.

Chuck currently serves as the Senior Managing Director of NVC's Dallas office, overseeing all aspects of its day-to-day operations including bidding, structuring and engaging appraisal assignments and managing the office's valuation team.

## PROFESSIONAL EXPERIENCE

NATIONAL VALUATION CONSULTANTS, INC.                    JANUARY 2015 - PRESENT

*One of the largest, privately held commercial real estate valuation and advisory companies in the United States with a focus on institutional real estate clients*

CROSSON DANNIS, INC.                    1977 – DECEMBER 2014

Served as co-founder and President of this full-service real estate appraisal and consulting firm operating throughout the United States.

FIRST TEXAS FINANCIAL CORPORATION AND MUTUAL SAVINGS            1974 - 1976

Initially employed as Regional Supervisor, subsequently promoted to Assistant Vice President. Responsible for management and marketing of all company-owned real estate developments with concurrent responsibilities of all appraisal work on income-producing property loans. Residential developments included several single-family subdivisions and a large, planned unit development.

OAK CLIFF SAVINGS AND FIRST TEXAS FINANCIAL CORPORATION            1972 - 1974

Employed as a Staff Appraiser for a statewide savings and loan holding company, involving real estate appraisal and consulting work on all types of properties.

## EDUCATION

SOUTHERN METHODIST UNIVERSITY                    B.B.A. – MANAGEMENT
GRADUATE STUDIES IN FINANCE AND REAL ESTATE

## CERTIFICATIONS AND LICENSES

Certified General Appraiser in the State of Texas

## PROFESSIONAL AFFILIATIONS

- Member of the Appraisal Institute (MAI and SRA)
- Chairman – Ethics Committee, Appraisal Institute[1]
- Chairman – Candidate Guidance, Appraisal Institute[1]
- Chairman – Public Relations, Appraisal Institute[1]
- Chairman – Symposium Committee, Appraisal Institute[2]
- Vice Chairman – Research Committee, Appraisal Institute[2]
- Member – Appraisal Standards Council, Appraisal Institute[2]

[1]Local Chapter
[2]National Appointment

**PHONE:**
Direct:  214.932.1818
Mobile: 214.707.1851

**EMAIL:**
cdannis@nvcinc.com

**WEBSITE:**
www.nvcinc.com

**NVC - DALLAS**
6060 North Central Expressway
Suite 740
Dallas, TX 75206

APP000164

# Charles (Chuck) G. Dannis, MAI, SRA
Senior Managing Director                                                                                     Page 2

## PROFESSIONAL AFFILIATIONS (CONT.)

- Chairman – Valuation Committee, National Council of Real Estate Investment Fiduciaries
- Chairman, Education Committee, National Council of Real Estate Investment Fiduciaries
- Board of Directors, National Council of Real Estate Investment Fiduciaries (1997-2001;2015-2023); Chairman of the Board (2020 -2022)
- Lecturer – Nuts & Bolts (Essentials) of Institutional Real Estate, National Council of Real Estate Investment Fiduciaries, 2001-
- Adjunct Professor of Practice in Real Estate, Edwin L. Cox School of Business, SMU, 1988-
- Chairman - City of Dallas, Economic Review Panel for the Landmark Commission, 2002, 2008
- Mayor's Real Estate Task Force for the City of Dallas, 2003-2006

## PUBLICATIONS, SPEECHES AND LECTURES

- Articles contributed to the following publications:

| | |
|---|---|
| *Appraisal Journal* | *Real Estate Finance* |
| *Real Estate Review* | *D Magazine (blog)* |
| *Institutional Real Estate Letter* | *Dallas Business Journal* |

- Participation in various Educational Symposiums/Conferences including MBA (Texas, Louisiana and National Conferences), IPT, NCREIF, SMU, Appraisal Institute

## BOARDS, CIVIC AND PROFESSIONAL SERVICE (PAST AND PRESENT)

- Guest Lecturer at graduate business schools of: UT Austin, UT Arlington, Texas A&M, Harvard, DePaul, and UT Dallas
- Board of Trustees – The Dallas Marathon, benefiting The Texas Scottish Rite Hospital for Children (President/Chairman, 2005-2008; Chairman Emeritus, 2009-)
- Board of Directors – Folsom Institute for Real Estate, SMU/Cox, Vice Chair Education (2014 -)
- Host of "The Real Estate Hour", 1992 – 2008; 2020 - 2022 (CBS Radio Network, Dallas affiliate)
- Founder, SMU Real Estate Society at the SMU Cox School of Business
- Board of Governors, Chartered Realty Investor Society
- Board of Directors – Friends of The Katy Trail (2011 - 2016)
- Board of Trustees – The Shelton School (2013 -), an Internationally known school for children that learn differently
- Independent Director, TIER REIT (2003 - 2017); Chairman of the Board (2013 - 2015)
- Qualified as an expert witness in several states and courts throughout the U.S.

## AWARDS AND HONORS

- The Dallas Marathon's Victory Award for Excellence and Community Service, 2011
- First recipient of the Eugene T. Byrne Endowed Faculty Innovation Award, SMU Cox School of Business, 2006
- HOPE Professor Nominee, SMU Cox School of Business, 2008, 2009 and 2021
- Mortgage Bankers Association, Faculty Fellow Award, 1996-1997
- First Recipient of the Folsom Institute for Real Estate/SMU Real Estate Society's Distinguished Real Estate Alumni Award – 2015
- Appraisal Institute Education Trust's Dr. William N. Kinnard, Jr. Award in recognition of his professionalism and commitment to real estate appraisal education, 2016
- Commandant of the U.S. Marine Corps Quality Citizen Award, 2008
- North Texas Commercial Association of Realtors "Michael F. McAuley Lifetime Achievement Award" for his personal efforts to the community, to professional organizations committed to the real estate industry and to charitable pursuits, 2019
- Included in the 2023 DCEO Dallas 500



National Valuation Consultants, Inc.

APP000165

CHARLES GLENN DANNIS
6060 N CENTRAL EXPY STE 860
DALLAS, TX 75206



## Certified General Real Estate Appraiser

Appraiser:  **Charles Glenn Dannis**

License #:  **TX 1321531 G**      License Expires: **01/31/2024**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

APP000166

**IMPROVED SALE ABSTRACTS**

NVC | National Valuation Consultants, Inc.

APP000167

## Comparable Sale 1

**Apartment Garden/Low Rise**

NVC # 263863

The Borough • 5700 Boca Raton Blvd, Fort Worth, Texas



### PROPERTY DATA

| | |
|---|---|
| Description | Two-Story, Class C, Garden Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1981 |
| Year Renovated | 2020 |
| Total Units | 208 |
| Total SF | 162,048 |
| Average Unit Size | 779 SF |
| Land Size | 435,600 SF |
| Density | 20.80 |
| Project Amenities | BBQ Grills, Clubhouse, Computer Lab/Business Center, Fitness Center, Laundry Facility, On-site Leasing Office, Pool |
| Unit Amenities | AC, Balcony/Patio, Fireplace, Stainless Steel Appliances, Storage, W/D Hookups |
| Parking | Open |
| Parking Ratio | 1.99    Per 1,000 SF NRA |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | The Borough |
| Address / Location | 5700 Boca Raton Blvd |
| City, County, State | Fort Worth, Tarrant County, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $27,350,000 |
| Sale Price/Unit | $131,490 |
| Sale Price/RSF | $168.78 |
| Cap Rate | 4.65% |
| Date of Sale | 09/22/2022 |
| Grantor | S2 Magnolia LLC |
| Grantee | 5700 Borough , LLC (89.25%); Yates Borough, LLC (5.0%);  Lambiris Borough, LLC (3.25%); and Stosich Borough, LLC (2.5%. |
| Document # | D222232720 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 90.0% |

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/ 1 BA | 32 | 502 | | | 16,064 | |
| 1 BD/ 1 BA | 56 | 615 | | | 34,440 | |
| 1 BD/ 1 BA | 16 | 674 | | | 10,784 | |
| 1 BD/ 1 BA | 24 | 820 | | | 19,680 | |
| 1 BD/ 1 BA Fireplace | 20 | 674 | | | 13,480 | |
| 2 BD/ 2 BA | 40 | 1,050 | | | 42,000 | |
| 2 BD/ 2 BA | 20 | 1,280 | | | 25,600 | |

**Total Monthly Rent:**     **$0**

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | 4.65% |
| Other Income | | | | **EGIM** | .00 |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $131,490 |
| Expenses | | | | **Sale Price Per SF** | $168.78 |
| Reserves | | | | **Source:** | In Place |
| **Net Operating Income** | **$1,271,775** | **$6,114** | **$7.85** | **Comments:** | See comments |

## SALE COMMENTS

According to confidential source the property sold for $27.35 million with an actual cap rate based on in place income and adjusted for taxes was 4.75%.

2022 Demographics within one Mile:

Households: 6,945
Median Household Income: $44,109
Median Home Value: $152,050

CoStar " Star" rating: 2 star Garden Apartment Community
Walk Score: 51 (Somewhat Walkable)
Transit Score:27 (Some Transit)

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 12/15/2022 |
| Reviewed By | Bradley Kilgore |

## Comparable Sale 2

### Apartment Garden/Low Rise

NVC # 264583

Bridgewood Ranch Apartments • 4100 Vista Ln, Kaufman, Texas





### PROPERTY DATA

| | |
|---|---|
| No. of Buildings | 5 |
| Year Built | 2006 |
| Total Units | 106 |
| Total SF | 88,088 |
| Average Unit Size | 831 SF |
| Land Size | 259,587 SF |
| Density | 17.79 |
| Project Amenities | BBQ Grills, Clubhouse, Fitness Center, Pool |
| Unit Amenities | Balcony/Patio, W/D Hookups |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Bridgewood Ranch Apartments |
| Address / Location | 4100 Vista Ln |
| City, County, State | Kaufman, Kaufman County, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $16,044,405 |
| Sale Price/Unit | $151,362 |
| Sale Price/RSF | $182.14 |
| Date of Sale | 09/01/2022 |
| Occupancy at Sale | 89.6% |

**Comparable 2 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|-----------|----------|-----------|--------------|---------|----------|------------|
| 1 | 66 | 716 | | | 47,256 | |
| 2 | 32 | 976 | | | 31,232 | |
| 3 | 08 | 1,200 | | | 9,600 | |

**Total Monthly Rent:**     **$0**

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | |
| Other Income | | | | **EGIM** | |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $151,362 |
| Expenses | | | | **Sale Price Per SF** | $182.14 |
| Reserves | | | | **Source:** | |
| **Net Operating Income** | **$0** | **$0** | **$0.00** | **Comments:** | |

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential User |
| Telephone | N/A |
| Surveyed By | Andrew Teichner |
| Surveyed Date | 01/23/2023 |



## Comparable Sale 3
### Apartment Garden/Low Rise
NVC # 264372

Greens of Hickory Trail • 8613 Old Hickory Trail, Dallas, Texas



## PROPERTY DATA

| | |
|---|---|
| Description | Two-Story, Class B, Garden Apartment Community. |
| No. of Buildings | 40 |
| Year Built | 1999 |
| Year Renovated | 2019 |
| Total Units | 250 |
| Total SF | 272,475 |
| Average Unit Size | 1,090 SF |
| Land Size | 1,089,871 SF |
| Density | 9.99 |
| Project Amenities | BBQ Grills, Clubhouse, Computer Lab/Business Center, Fitness Center, On-site Leasing Office, Playground, Pool |
| Unit Amenities | AC, Balcony/Patio, Storage, W/D Hookups |
| Parking | Open and carports |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Greens of Hickory Trail |
| Address / Location | 8613 Old Hickory Trail |
| City, County, State | Dallas, Dallas County, Texas |

## SALE DATA

| | |
|---|---|
| Sale Price | $45,000,000 |
| Sale Price/Unit | $180,000 |
| Sale Price/RSF | $165.15 |
| Date of Sale | 02/24/2022 |
| Grantor | Greens Of Hickory LLC |
| Grantee | Hickory Trails DE Holdings, LLC |
| Property Interest | Fee Simple |
| Document # | 202200052778 |
| Occupancy at Sale | 98.0% |

**Comparable 3 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 2 BD/ 2 BA Flat | 75 | 911 | | | 68,325 | |
| 2 BD/ 2 BA Townhome | 50 | 1,110 | | | 55,500 | |
| 3 BD/ 2 BA Flat | 75 | 1,094 | | | 82,050 | |
| 3 BD/ 2 BA Townhome | 50 | 1,332 | | | 66,600 | |

**Total Monthly Rent:**     $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | |
| Other Income | | | | **EGIM** | |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $180,000 |
| Expenses | | | | **Sale Price Per SF** | $165.15 |
| Reserves | | | | **Source:** | |
| **Net Operating Income** | **$0** | **$0** | **$0.00** | **Comments:** | |

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Rylie Hardman |
| Surveyed Date | 01/17/2023 |

## Comparable Sale 4
**Apartment**
NVC # 264756

Magnolia Grove • 551 Crossroads Pky, Terrell, Texas





### PROPERTY DATA

| | |
|---|---|
| No. of Buildings | 1 |
| Year Built | 2021 |
| Total Units | 270 |
| Total SF | 360,972 |
| Land Size | 472,626 SF |
| Project Amenities | Fitness Center, Playground, Pool, Study Rooms |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Magnolia Grove |
| Address / Location | 551 Crossroads Pky |
| City, County, State | Terrell, Kaufman, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $57,400,000 |
| Sale Price/Unit | $212,593 |
| Sale Price/RSF | $159.02 |
| Cap Rate | 3.63% |
| Date of Sale | 01/25/2022 |
| Grantor | Ventures Development Group |
| Grantee | Railfield Partners |
| Document # | 2022-0003538 |
| Occupancy at Sale | 97.8% |

**Comparable 4 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| | | | | | | |

**Total Monthly Rent:** 

**Average Rent Per Unit:** 

**Average Rent Per SF:**     **$1.51**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF |
|---|---|---|---|
| Rental Income | | | |
| Other Income | | | |
| Vacancy (0.0%) | $0 | $0 | $0.00 |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** |
| Expenses | | | |
| Reserves | | | |
| **Net Operating Income** | **$0** | **$0** | **$0.00** |

| | |
|---|---|
| **Overall Cap Rate** | 3.63% |
| **EGIM** | .00 |
| **Expense Ratio** | |
| **Sale Price Per Unit** | $212,593 |
| **Sale Price Per SF** | $159.02 |

**Source:**

**Comments:**

## SALE COMMENTS

Magnolia Grove, a recently constructed 270-unit multifamily property sold January 2022.

The property delivered in the first half of 2021 and was reported to be 97.8% occupied by the end of December.

## VERIFICATION

| | |
|---|---|
| Verified By | Confirmed by Confidential Broker |
| Surveyed By | Andrew Teichner |
| Surveyed Date | 02/06/2023 |

## Comparable Sale 5
### Apartment Mid/High Rise
NVC # 260980

Harmony Hill Apartments • 11010 Harmony Hill Ln, Rowlett, Texas





### PROPERTY DATA

| | |
|---|---|
| Description | Four-Story, Class A, Mid-Rise Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 2017 |
| Year Renovated | 2019 |
| Total Units | 644 |
| Total SF | 526,781 |
| Average Unit Size | 818 SF |
| Land Size | 962,937 SF |
| Density | 29.13 |
| Project Amenities | BBQ Grills, Clubhouse, Computer Lab/Business Center, Dog/Pet Park, Fitness Center, Jogging Trail, On-site Leasing Office, Pool, Valet Trash |
| Unit Amenities | AC, Balcony/Patio, Granite Counters, Stainless Steel Appliances, Storage, W/D, W/D Hookups |
| Parking | Open, Carports, and Detached Garages. |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Harmony Hill Apartments |
| Address / Location | 11010 Harmony Hill Ln |
| City, County, State | Rowlett, Dallas County, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $165,000,000 |
| Sale Price/Unit | $256,211 |
| Sale Price/RSF | $313.22 |
| Cap Rate | 2.80% |
| Date of Sale | 05/12/2022 |
| Grantor | HC Harmony Hill, LLC |
| Grantee | TX Harmony Apartments LLC |
| Document # | 2022001/35546 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 92.5% |

**Comparable 5 Cont...**

| APARTMENT UNIT MIX | | | | | | |
|---|---|---|---|---|---|---|
| **Unit Type** | **Quantity** | **Size (SF)** | **Monthly Rent** | **Rent/SF** | **Total SF** | **Total Rent** |
| 1 BD/ 1 BA | 102 | 560 | | | 57,120 | |
| 1 BD/ 1 BA | 80 | 561 | | | 44,880 | |
| 1 BD/ 1 BA | 77 | 642 | | | 49,434 | |
| 1 BD/ 1 BA | 27 | 647 | | | 17,469 | |
| 1 BD/ 1 BA | 50 | 759 | | | 37,950 | |
| 1 BD/ 1 BA | 22 | 794 | | | 17,468 | |
| 1 BD/ 1 BA | 20 | 816 | | | 16,320 | |
| 1 BD/ 1 BA | 13 | 836 | | | 10,868 | |
| 1 BD/ 1 BA | 46 | 845 | | | 38,870 | |
| 1 BD/ 1 BA | 15 | 959 | | | 14,385 | |
| 2 BD/ 2 BA | 20 | 888 | | | 17,760 | |
| 2 BD/ 2 BA | 12 | 1,006 | | | 12,072 | |
| 2 BD/ 2 BA | 20 | 1,026 | | | 20,520 | |
| 2 BD/ 2 BA | 14 | 1,081 | | | 15,134 | |
| 2 BD/ 2 BA | 20 | 1,108 | | | 22,160 | |
| 2 BD/ 2 BA | 15 | 1,149 | | | 17,235 | |
| 2 BD/ 2 BA | 16 | 1,201 | | | 19,216 | |
| 2 BD/ 2 BA | 20 | 1,246 | | | 24,920 | |
| 2 BD/ 2 BA | 20 | 1,253 | | | 25,060 | |
| 2 BD/ 2 BA | 15 | 1,276 | | | 19,140 | |
| 3 BD/ 2 BA | 20 | 1,440 | | | 28,800 | |

**Total Monthly Rent:**     $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

| INCOME & EXPENSE DATA | | | | | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Per Unit | Per SF | **Overall Cap Rate** | 2.80% | |
| Rental Income | | | | **EGIM** | .00 | |
| Other Income | | | | **Expense Ratio** | | |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Sale Price Per Unit** | $256,211 | |
| **Effective Gross Income** | **$0** | **$0** | **$8.77** | **Sale Price Per SF** | $313.22 | |
| Expenses | | | | | | |
| Reserves | | | | **Source:** | In Place | |
| **Net Operating Income** | **$4,620,000** | **$7,174** | **$8.77** | **Comments:** | See comments | |

APP000177

## SALE COMMENTS

According to confidential source the property sold for $165 million and the Actual cap rate was 2.80%.

The property was renamed Harmony Luxury Apartments after the sale.

2022 Demographics within one Mile:

Households: 717
Median Household Income: $121,481
Median Home Value: $301,892

CoStar " Star" rating: 4 star Mid-Rise apartment community
Walk Score: None available at time survey.
Transit Score: None available at time of survey.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 07/25/2022 |
| Reviewed By | Bradley Kilgore |

**LEASE COMPARABLE ABSTRACTS**

NVC | National Valuation Consultants, Inc.

APP000179

## Comparable Lease 1

### Apartment Garden/Low Rise

NVC # 516676U

Gateway Pines • 1200 Gateway Blvd N, Forney, Texas





## PROPERTY DATA

| | |
|---|---|
| Description | Three-Story, Class A, Garden Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 2018 |
| Total Units | 337 |
| Total SF | 272,856 |
| Average Unit Size | 810 SF |
| Project Amenities | BBQ Grills, Clubhouse, Dog/Pet Park, Fitness Center, On-site Leasing Office, Pool |
| Unit Amenities | 9' Ceilings, AC, Balcony/Patio, Stainless Steel Appliances, Storage, W/D |
| Additional Amenities | Concierge Package Center, Poolside Grilling Stations, Courtyard & Pergola Recreation Areas, 2 Inch Wood Style Window Coverings, and Hardwood-Style Flooring. |
| Parking | Open, Carports, and Attached and Detached Garages. |
| Parking Ratio | 1.40      Per 1,000 SF NRA |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Gateway Pines |
| Address / Location | 1200 Gateway Blvd N |
| City, County, State | Forney, Kaufman, Texas |

## LEASE DATA

| | |
|---|---|
| Current Occupany | 92.8% |
| Typical Lease Term | Will do any lease between 6 and 12 months |
| Current Concessions | None |
| Premiums | None |
| Parking Charges | Carports: $35/MonthDetached Garages: $100/Month. |
| HVAC | Individual |
| Tenant Expenses | Electric: Yes |
| | Water: Yes |
| | Sewer: Yes |
| | Trash: Yes |

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

APP000180

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| Studio | 12 | 499 | $1,075 | $2.15 | 5,988 | $12,900 |
| 1 BD/ 1 BA | 78 | 587 | $1,100 | $1.87 | 45,786 | $85,800 |
| 1 BD/ 1 BA | 60 | 712 | $1,375 | $1.93 | 42,720 | $82,500 |
| 1 BD/ 1 BA | 2 | 713 | $1,350 | $1.89 | 1,426 | $2,700 |
| 1 BD/ 1 BA | 54 | 763 | $1,410 | $1.85 | 41,202 | $76,140 |
| 1 BD/ 1 BA | 42 | 816 | $1,485 | $1.82 | 34,272 | $62,370 |
| 2 BD/ 2 BA | 18 | 825 | $1,515 | $1.84 | 14,850 | $27,270 |
| 2 BD/ 2 BA | 27 | 1,038 | $1,700 | $1.64 | 28,026 | $45,900 |
| 2 BD/ 2 BA | 18 | 1,197 | $1,755 | $1.47 | 21,546 | $31,590 |
| 2 BD/ 2 BA | 12 | 1,213 | $1,770 | $1.46 | 14,556 | $21,240 |
| 2 BD/ 2 BA Townhome | 14 | 1,606 | $2,100 | $1.31 | 22,484 | $29,400 |

**Total Monthly Rent:** $477,810

**Average Rent Per Unit:** $1,418

**Average Rent Per SF:** $1.75

*The data shown in this section reflects the current unit mix and base rates at the comparable property. These figures may differ from the actual contract rent due to tenant incentives and premiums on some units.*

## LEASE COMMENTS

Rents and occupancy from ALN Apartment Data and Phone is number of the apartment community.

2022 Demographics within one Mile:
Households: 2,208
Median Household Income: $96,260
Median Home Value: $240,746

CoStar " Star" rating: 4 star Garden apartment community
Walk Score: 5 (Car-Dependent)
Transit Score: None available at time of survey.

## VERIFICATION

| | |
|---|---|
| Verified By | ALN Apartment Data, Inc. |
| Telephone | (972) 357-7892 |
| Surveyed By | Dennis Young |
| Surveyed Date | 01/10/2023 |
| Reviewed By | Andrew Teichner |

## Comparable Lease 2
### Apartment Garden/Low Rise
NVC # 516677U

Gateway Oaks • 1105 Gateway Blvd N, Forney, Texas





## PROPERTY DATA

| | |
|---|---|
| Description | Three-Story, Class A, Garden Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 2016 |
| Total Units | 313 |
| Total SF | 269,086 |
| Average Unit Size | 860 SF |
| Project Amenities | BBQ Grills, Clubhouse, Dog/Pet Park, Fitness Center, On-site Leasing Office, Pool, Sports Courts |
| Unit Amenities | 9' Ceilings, AC, Balcony/Patio, Granite Counters, Stainless Steel Appliances, Storage, W/D Hookups |
| Additional Amenities | Breezeway Storage Units, Sand Volleyball court, Stainless-Steel Appliances(Select units), Granite Counters(Select Units), Artistek Walnut Flooring, 2" Faux-Wood Blinds, and Programmable Thermostats. |
| Parking | Open, Carports, and Detached Garages |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Gateway Oaks |
| Address / Location | 1105 Gateway Blvd N |
| City, County, State | Forney, Kaufman, Texas |

## LEASE DATA

| | |
|---|---|
| Current Occupany | 96.4% |
| Typical Lease Term | Do 6 and 12 month leases. |
| Current Concessions | None |
| Premiums | None with Storage Closets: $20/Month to $75/Month |
| Parking Charges | Carports: $30/MonthDetached Garages: $100/Month |
| HVAC | Individual |
| Tenant Expenses | Electric: Yes |
| | Water: Yes |
| | Sewer: Yes |
| | Trash: Yes |

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

APP000182

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/ 1 BA | 22 | 564 | $1,100 | $1.95 | 12,408 | $24,200 |
| 1 BD/ 1 BA | 44 | 575 | $1,090 | $1.90 | 25,300 | $47,960 |
| 1 BD/ 1 BA | 78 | 716 | $1,325 | $1.85 | 55,848 | $103,350 |
| 1 BD/ 1 BA | 6 | 716 | $1,210 | $1.69 | 4,296 | $7,260 |
| 1 BD/ 1 BA | 17 | 817 | $1,400 | $1.71 | 13,889 | $23,800 |
| 1 BD/ 1 BA | 3 | 817 | $1,440 | $1.76 | 2,451 | $4,320 |
| 1 BD/ 1 BA | 39 | 828 | $1,375 | $1.66 | 32,292 | $53,625 |
| 1 BD/ 1 BA | 3 | 828 | $1,450 | $1.75 | 2,484 | $4,350 |
| 1 BD/ 1 BA | 2 | 839 | $1,450 | $1.73 | 1,678 | $2,900 |
| 2 BD/ 2 BA | 9 | 1,076 | $1,685 | $1.57 | 9,684 | $15,165 |
| 2 BD/ 2 BA | 27 | 1,076 | $1,685 | $1.57 | 29,052 | $45,495 |
| 2 BD/ 2 BA | 10 | 1,133 | $1,685 | $1.49 | 11,330 | $16,850 |
| 2 BD/ 2 BA | 2 | 1,133 | $1,575 | $1.39 | 2,266 | $3,150 |
| 2 BD/ 2 BA | 17 | 1,238 | $1,742 | $1.41 | 21,046 | $29,614 |
| 2 BD/ 2 BA | 7 | 1,238 | $1,785 | $1.44 | 8,666 | $12,495 |
| 2 BD/ 2 BA | 10 | 1,317 | $1,750 | $1.33 | 13,170 | $17,500 |
| 2 BD/ 2 BA | 8 | 1,317 | $1,800 | $1.37 | 10,536 | $14,400 |
| 3 BD/ 2 BA | 3 | 1,410 | $2,100 | $1.49 | 4,230 | $6,300 |
| 3 BD/ 2 BA | 6 | 1,410 | $2,150 | $1.52 | 8,460 | $12,900 |

| | | |
|---|---|---|
| **Total Monthly Rent:** | **$445,634** | *The data shown in this section reflects the current unit mix and base rates* |
| **Average Rent Per Unit:** | **$1,424** | *at the comparable property. These figures may differ from the actual* |
| **Average Rent Per SF:** | **$1.66** | *contract rent due to tenant incentives and premiums on some units.* |

## LEASE COMMENTS

Rents and occupancy from ALN Apartment Data and Phone is number of the apartment community.

2022 Demographics within one Mile:
Households: 8,940
Median Household Income: $98,945
Median Home Value: $243,363

CoStar " Star" rating: 4 star Garden apartment community
Walk Score: 1 (Car-Dependent)
Transit Score: None available at time of survey.

## VERIFICATION

| | |
|---|---|
| Verified By | ALN Apartment Data, Inc. |
| Telephone | (972) 552-9441 |
| Surveyed By | Dennis Young |
| Surveyed Date | 12/16/2022 |
| Reviewed By | Andrew Teichner |

APP000183

## Comparable Lease 3
### Apartment Garden/Low Rise
NVC # 516678U

Gateway Cedars • 1100 Gateway Blvd N, Forney, Texas





## PROPERTY DATA

| | |
|---|---|
| Description | Three-Story, Class A, Garden Apartment Community |
| No. of Buildings | 1 |
| Year Built | 2014 |
| Total Units | 334 |
| Total SF | 264,260 |
| Average Unit Size | 791 SF |
| Project Amenities | BBQ Grills, Clubhouse, Common area Wi-Fi, Computer Lab/Business Center, Dog/Pet Park, Fitness Center, On-site Leasing Office, Pool |
| Unit Amenities | 9' Ceilings, AC, Balcony/Patio, Granite Counters, Stainless Steel Appliances, Storage, W/D Hookups |
| Additional Amenities | Pergola Recreation Area, Breezeway Storage Units, Resident Lounge, Pendant Lighting, and Vinyl Wood Plank Flooring. |
| Parking | Open, Carports, and Detached Garages |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Gateway Cedars |
| Address / Location | 1100 Gateway Blvd N |
| City, County, State | Forney, Kaufman, Texas |

## LEASE DATA

| | |
|---|---|
| Current Occupany | 98.7% |
| Typical Lease Term | Will do any lease between 6 and 12 months. |
| Current Concessions | None |
| Premiums | None |
| Parking Charges | Carports: $25/MonthDetached Garages: $75/Month |
| HVAC | Individual |
| Tenant Expenses | Electric: Yes |
| | Water: Yes |
| | Sewer: Yes |
| | Trash: Yes |

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

APP000184

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/ 1 BA | 78 | 560 | $1,059 | $1.89 | 43,680 | $82,602 |
| 1 BD/ 1 BA | 84 | 700 | $1,229 | $1.76 | 58,800 | $103,236 |
| 1 BD/ 1 BA | 66 | 775 | $1,279 | $1.65 | 51,150 | $84,414 |
| 1 BD/ 1 BA | 18 | 850 | $1,379 | $1.62 | 15,300 | $24,822 |
| 2 BD/ 2 BA | 58 | 1,010 | $1,619 | $1.60 | 58,580 | $93,902 |
| 2 BD/ 2 BA | 30 | 1,225 | $1,704 | $1.39 | 36,750 | $51,120 |

| | | |
|---|---|---|
| **Total Monthly Rent:** | **$440,096** | *The data shown in this section reflects the current unit mix and base rates* |
| **Average Rent Per Unit:** | **$1,318** | *at the comparable property. These figures may differ from the actual* |
| **Average Rent Per SF:** | **$1.67** | *contract rent due to tenant incentives and premiums on some units.* |

## LEASE COMMENTS

Rents and occupancy from ALN Apartment Data and Phone is number of the apartment community.

2022 Demographics within one Mile:
Households: 9,516
Median Household Income: $98,938
Median Home Value: $242,764

CoStar " Star" rating: 4 star Garden apartment community
Walk Score: 9 (Car-Dependent)
Transit Score: None available at time of survey.

## VERIFICATION

| | |
|---|---|
| Verified By | ALN Apartment Data, Inc. |
| Telephone | (972) 564-9292 |
| Surveyed By | Dennis Young |
| Surveyed Date | 11/18/2022 |
| Reviewed By | Andrew Teichner |

## Comparable Lease 4
### Apartment Garden/Low Rise
NVC # 516679U

Emerson at Forney Marketplace • 300 Trailhouse Ln, Forney, Texas




### PROPERTY DATA

| | |
|---|---|
| Description | Two-Story, Class A Garden Apartment Community |
| No. of Buildings | 1 |
| Year Built | 2019 |
| Total Units | 320 |
| Total SF | 286,013 |
| Average Unit Size | 894 SF |
| Project Amenities | BBQ Grills, Clubhouse, Computer Lab/Business Center, Dog/Pet Park, Fitness Center, Game Room, On-site Leasing Office, Pool, Sports Courts, Valet Trash |
| Unit Amenities | AC, Granite Counters, Stainless Steel Appliances, W/D |
| Additional Amenities | Outdoor Grilling Pavilion, Community Garden, Sand Volleyball Court, Pendant Lighting, Wood Vinyl Plank Flooring, and Private Pet Yards (select units) |
| Parking | Open, Carports, and Detached Garages |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Emerson at Forney Marketplace |
| Address / Location | 300 Trailhouse Ln |
| City, County, State | Forney, Kaufman, Texas |

### LEASE DATA

| | |
|---|---|
| Current Occupany | 94.3% |
| Typical Lease Term | Will do any lease between 6 and 13 months. |
| Current Concessions | None |
| Premiums | None |
| Parking Charges | Carports: $45/MonthDetached Garages: $125/Month |
| HVAC | Individual |
| Tenant Expenses | Electric: Yes |
| | Water: Yes |
| | Sewer: Yes |
| | Trash: Yes |

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/1 BA Yard | 59 | 725 | $1,532 | $2.11 | 42,775 | $90,388 |
| 1 BD/1 BA | 54 | 750 | $1,258 | $1.68 | 40,500 | $67,932 |
| 1 BD/1 BA | 40 | 779 | $1,547 | $1.99 | 31,160 | $61,880 |
| 1 BD/1 BA | 2 | 833 | $1,422 | $1.71 | 1,666 | $2,844 |
| 1 BD/1 BA | 37 | 887 | $1,260 | $1.42 | 32,819 | $46,620 |
| 2 BD/ 2 BA | 35 | 966 | $1,686 | $1.75 | 33,810 | $59,010 |
| 2 BD/ 2 BA | 32 | 1,000 | $1,861 | $1.86 | 32,000 | $59,552 |
| 2 BD/ 2 BA | 20 | 1,018 | $1,710 | $1.68 | 20,360 | $34,200 |
| 2 BD/ 2 BA | 14 | 1,148 | $1,848 | $1.61 | 16,072 | $25,872 |
| 3 BD/ 2 BA | 15 | 1,237 | $1,840 | $1.49 | 18,555 | $27,600 |
| 3 BD/ 2 BA | 12 | 1,358 | $1,891 | $1.39 | 16,296 | $22,692 |

| | | |
|---|---|---|
| **Total Monthly Rent:** | **$498,590** | *The data shown in this section reflects the current unit mix and base rates* |
| **Average Rent Per Unit:** | **$1,558** | *at the comparable property. These figures may differ from the actual* |
| **Average Rent Per SF:** | **$1.74** | *contract rent due to tenant incentives and premiums on some units.* |

## LEASE COMMENTS

Rents and occupancy from ALN Apartment Data and Phone is number of the apartment community.

Valet Trash: $35/Month

2022 Demographics within one Mile:
Households: 3,788
Median Household Income: $102,555
Median Home Value: $243.457

CoStar " Star" rating: 4 star Garden Apartment Community
Walk Score: 34 (Car-Dependent)
Transit Score: None Available at time of survey.

## VERIFICATION

| | |
|---|---|
| Verified By | ALN Apartment Data,  Inc. |
| Telephone | (972) 552-5584 |
| Surveyed By | Dennis Young |
| Surveyed Date | 01/03/2023 |
| Reviewed By | Andrew Teichner |

# Comparable Lease 5
## Apartment Garden/Low Rise
NVC # 516680U

Magnolia Grove • 551 Crossroads Pkwy, Terrell, Texas




## PROPERTY DATA

| | |
|---|---|
| Description | Three-Story, Class A, Garden Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 2020 |
| Total Units | 270 |
| Total SF | 245,718 |
| Average Unit Size | 910 SF |
| Project Amenities | BBQ Grills, Clubhouse, Computer Lab/Business Center, Dog Wash, Dog/Pet Park, Fitness Center, Game Room, Media Room/Movie Theater, On-site Leasing Office, Playground, Pool, Sports Courts, Valet Trash |
| Unit Amenities | 9' Ceilings, AC, Balcony/Patio, Granite Counters, Stainless Steel Appliances, Storage, W/D |
| Additional Amenities | Indoor/Outdoor Recreation Room, Outdoor Kitchen, Firepits, Nitro Cold Brew Coffee Station, and Sand Volleyball Court. |
| Parking | Open, Carports, and detached Garages. |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Magnolia Grove |
| Address / Location | 551 Crossroads Pkwy |
| City, County, State | Terrell, Kaufman, Texas |

## LEASE DATA

| | |
|---|---|
| Current Occupany | 93.0% |
| Typical Lease Term | 12 month leases only. |
| Current Concessions | None |
| Premiums | None |
| Parking Charges | Carports: $50/MonthDetached Garages: $150/Month |
| HVAC | Individual |
| Tenant Expenses | Electric: Yes |
| | Water: Yes |
| | Sewer: Yes |
| | Trash: Yes |

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| Studio | 12 | 578 | $1,224 | $2.12 | 6,936 | $14,688 |
| 1 BD/ 1 BA | 78 | 704 | $1,470 | $2.09 | 54,912 | $114,660 |
| 1 BD/ 1 BA | 72 | 789 | $1,510 | $1.91 | 56,808 | $108,720 |
| 2 BD/ 2 BA | 6 | 1,059 | $1,685 | $1.59 | 6,354 | $10,110 |
| 2 BD/ 2 BA | 30 | 1,106 | $1,765 | $1.60 | 33,180 | $52,950 |
| 2 BD/ 2 BA | 36 | 1,156 | $1,865 | $1.61 | 41,616 | $67,140 |
| 2 BD/ 2 BA | 12 | 1,223 | $1,850 | $1.51 | 14,676 | $22,200 |
| 2 BD/ 2 BA | 18 | 1,292 | $1,830 | $1.42 | 23,256 | $32,940 |
| 3 BD/ 2 BA | 6 | 1,330 | $2,010 | $1.51 | 7,980 | $12,060 |

| | | |
|---|---|---|
| **Total Monthly Rent:** | **$435,468** | *The data shown in this section reflects the current unit mix and base rates* |
| **Average Rent Per Unit:** | **$1,613** | *at the comparable property. These figures may differ from the actual* |
| **Average Rent Per SF:** | **$1.77** | *contract rent due to tenant incentives and premiums on some units.* |

## LEASE COMMENTS

Rents and occupancy from ALN Apartment Data and Phone is number of the apartment community.

Valet Trash: $25/Month

2022 Demographics within one Mile:
Households: 231
Median Household Income: $46,465
Median Home Value: $269,999

CoStar " Star" rating: 4 star Garden Apartment Community
Walk Score: 18 (Car-Dependent)
Transit Score: None Available at time of survey.

## VERIFICATION

| | |
|---|---|
| Verified By | ALN Apartment Data, Inc |
| Telephone | (469) 410-6104 |
| Surveyed By | Dennis Young |
| Surveyed Date | 11/23/2022 |
| Reviewed By | Andrew Teichner |

**SITE PLAN / FLOOR PLANS**

NVC | National Valuation Consultants, Inc.

APP000190

BEDROOM
11'6"X13'2"

CLOSET

LINEN

BATH

PATIO
12'8"X8'2"

DINING
10'4"X5'5"

UTILITY

MECH.

D

W

WH

DW

KITCHEN

LIVING ROOM
12'10"X17'2"

ENTRY

PANTRY

CLOSET

A1 | One Bedroom | One Bath
832 Sq Ft

APP000191



A2 | One Bedroom | One Bath
798 Sq Ft

APP000192



B1 | Two Bedroom | Two Bath
1,059 Sq Ft

APP000193



B2 | Two Bedroom | Two Bath
1,145 Sq Ft

APP000194



CLOSET

LINEN

BATH

BEDROOM
11'6"X11'9"

ENTRY

LIVING ROOM
15'4"X13'

PATIO
16'10"X5'6"

CLOSET

BATH

LINEN

UTILITY

W    D

MECH
WH

PANTRY

KITCHEN

DINING ROOM
11'10"X5'11"

BEDROOM
12'8"X12'8 15/16"

CLOSET

DW

B3  |  Two Bedroom | Two Bath
1,203 Sq Ft

APP000195



C1 | Three Bedroom | Two Bath
1,365 Sq Ft

APP000196

**RENT ROLL**

APP000197

OneSite Rents v3.0

01/10/2023  1:03:57PM

OneSite Reports - Parc at Windmill Farms

RENT ROLL DETAIL

As of 01/10/2023

Page 1 of 15

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111 | B1 | N/A | 1059 | Occupied | Alvarado, Wilfredo | 08/09/2022 | 08/09/2022 | 08/06/2023 | 1,715.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 0.00 | 0.00 |
| 112 | C1-HC | N/A | 1365 | Occupied | Guerra, Vanesa | 05/04/2022 | 05/04/2022 | 05/07/2023 | 1,999.00 | RENT | 1,770.00 | 0.00 | 1,770.00 | 0.00 | 0.70 |
| 113 | A2 | N/A | 798 | Occupied | Kinyanjui, Duncan | 01/29/2022 | 11/28/2022 | 12/03/2023 | 1,468.00 | RENT | 1,468.00 | 0.00 | 1,468.00 | 200.00 | 0.00 |
| 114 | A1 | N/A | 832 | Occupied | Allison, LeAndrea | 09/14/2021 | 09/13/2022 | 09/10/2023 | 1,558.00 | RENT | 1,450.00 | 0.00 | 1,450.00 | 200.00 | 0.00 |
| 115 | A2 | N/A | 798 | Occupied | Jones, Jaylen | 11/14/2022 | 11/14/2022 | 11/12/2023 | 1,468.00 | RENT | 1,279.00 | 0.00 | 1,279.00 | 500.00 | 0.00 |
| 116 | A1 | N/A | 832 | Admin/Down | VACANT | | | | 1,558.00 | | 0.00 * | 0.00 * | | | |
| 117 | B1 | N/A | 1059 | Occupied | Davis, Jimmy | 08/05/2021 | 08/02/2022 | 09/03/2023 | 1,715.00 | PETRENT | 0.00 | 15.00 | 1,605.00 | 550.00 | 0.00 |
| | | | | | | | | | | RENT | 1,590.00 | 0.00 | | | |
| 118 | C1 | N/A | 1365 | Vacant-Leased | VACANT | | | | 2,039.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Pedro Torres, Pedro | 01/14/2023 | 01/14/2023 | 02/11/2024 | | RENT | 1,850.00 * | 0.00 * | 1,850.00 * | 1,500.00 | 0.00 |
| 121 | B1 | N/A | 1059 | Occupied | Burrell III, Warren | 11/02/2021 | 11/01/2022 | 12/03/2023 | 1,675.00 | RENT | 1,650.00 | 0.00 | 1,650.00 | 300.00 | 0.00 |
| 122 | C1 | N/A | 1365 | Occupied | Parenteau, Miranda | 06/23/2020 | 07/26/2022 | 07/30/2023 | 1,999.00 | PETRENT | 0.00 | 15.00 | 1,785.00 | 650.00 | 0.00 |
| | | | | | | | | | | RENT | 1,770.00 | 0.00 | | | |
| 123 | A2 | N/A | 798 | Vacant | VACANT | | | | 1,428.00 | | 0.00 * | 0.00 * | | | |
| 124 | A1 | N/A | 832 | Occupied | Fouret, Ashlyn | 01/04/2020 | 03/08/2022 | 04/09/2023 | 1,518.00 | PETRENT | 0.00 | 15.00 | 1,360.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,345.00 | 0.00 | | | |
| 125 | A2 | N/A | 798 | Occupied | Bryant, Allegra | 08/22/2020 | 09/13/2022 | 10/15/2023 | 1,428.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 1,290.00 | 0.00 |
| 126 | A1 | N/A | 832 | Occupied | Moore, Connie | 09/09/2021 | 09/13/2022 | 10/15/2023 | 1,518.00 | RENT | 1,410.00 | 0.00 | 1,410.00 | 200.00 | 0.00 |
| 127 | B1 | N/A | 1059 | Occupied | WANAN, RODOLPHINE | 06/04/2022 | 06/04/2022 | 06/04/2023 | 1,675.00 | RENT | 1,530.00 | 0.00 | 1,530.00 | 0.00 | 0.00 |
| 128 | C1 | N/A | 1365 | Occupied | Castro, Jonathan | 02/11/2022 | 02/11/2022 | 02/05/2023 | 1,999.00 | PETRENT | 0.00 | 15.00 | 1,760.00 | 650.00 | 0.00 |
| | | | | | | | | | | RENT | 1,745.00 | 0.00 | | | |
| 211 | C1 | N/A | 1365 | Vacant | VACANT | | | | 2,019.00 | | 0.00 * | 0.00 * | | | |
| 212 | B2 | N/A | 1145 | Occupied | Evers, Kyle | 05/05/2022 | 05/05/2022 | 05/07/2023 | 1,892.00 | PETRENT | 0.00 | 15.00 | 1,645.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,630.00 | 0.00 | | | |
| 213 | A1 | N/A | 832 | Occupied-NTV | Sayyeau, Brian | 02/09/2021 02/12/2023 | 02/08/2022 | 02/12/2023 | 1,538.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 200.00 | 0.00 |
| 214 | B2 | N/A | 1145 | Occupied | Walker, Darrell | 01/22/2020 | 03/01/2022 | 04/02/2023 | 1,892.00 | PETRENT | 0.00 | 15.00 | 1,585.00 | 550.00 | 0.00 |

Case 3:22-cv-02118-X  Document 162-1  Filed 02/22/23  Page 198 of 310  PageID 3999

APP000198

Case 3:22-cv-02118-X   Document 162-1   Filed 02/22/23   Page 199 of 310   PageID 4000

APP000199

| | | | | RENT | | | | | | 1,570.00 | 0.00 | | | |

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 215 | A1 | N/A | 832 | Occupied | Metz, Victoria | 05/28/2022 | 05/28/2022 | 05/28/2023 | 1,538.00 | PETRENT | 0.00 | 30.00 | 1,420.00 | 500.00 | 0.00 |
| | | | | | | | | | | RENT | 1,390.00 | 0.00 | | | |
| 216 | B2 | N/A | 1145 | Occupied | Bland, Kiel | 11/25/2019 | 06/28/2022 | 07/02/2023 | 1,892.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 550.00 | 0.00 |
| 217 | C1 | N/A | 1365 | Occupied | DAVIS, ARIES | 08/19/2022 | 08/19/2022 | 09/17/2023 | 2,019.00 | RENT | 1,930.00 | 0.00 | 1,930.00 | 0.00 | 0.00 |
| 218 | B2 | N/A | 1145 | Occupied | Neault, Patrick | 06/23/2021 | 06/28/2022 | 07/30/2023 | 1,892.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 300.00 | 0.00 |
| 221 | C1 | N/A | 1365 | Occupied | Holloway, Amanda | 02/01/2021 | 08/22/2022 | 09/24/2023 | 1,979.00 | RENT | 1,770.00 | 0.00 | 1,770.00 | 650.00 | (1.27) |
| 222 | B2 | N/A | 1145 | Occupied | Cooper, Bodey | 09/16/2022 | 09/16/2022 | 09/17/2023 | 1,852.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 2,000.00 | 0.00 |
| 223 | A1 | N/A | 832 | Occupied | Viator, Nichole | 08/31/2022 | 08/31/2022 | 10/01/2023 | 1,498.00 | RENT | 1,390.00 | 0.00 | 1,390.00 | 0.00 | 0.00 |
| 224 | B2 | N/A | 1145 | Vacant | VACANT | | | | 1,852.00 | | 0.00 * | 0.00 * | | | |
| 225 | A1 | N/A | 832 | Occupied | Aydelotte, Jessica | 04/10/2021 | 03/08/2022 | 03/05/2023 | 1,498.00 | PETRENT | 0.00 | 15.00 | 1,340.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,325.00 | 0.00 | | | |
| 226 | B2 | N/A | 1145 | Occupied | Henderson, Sacha | 06/14/2021 | 07/12/2022 | 07/16/2023 | 1,852.00 | RENT | 1,590.00 | 0.00 | 1,590.00 | 300.00 | 0.00 |
| 227 | C1 | N/A | 1365 | Occupied | Cabrera, Kevin | 08/31/2022 | 08/31/2022 | 08/30/2023 | 1,979.00 | RENT | 1,890.00 | 0.00 | 1,890.00 | 0.00 | 0.00 |
| 228 | B2 | N/A | 1145 | Occupied | Silva, Marco | 06/29/2021 | 07/04/2022 | 07/09/2023 | 1,852.00 | RENT | 1,590.00 | 0.00 | 1,590.00 | 300.00 | 0.00 |
| 311 | B1 | N/A | 1059 | Occupied | Hendershott, Christopher | 11/04/2022 | 11/04/2022 | 04/30/2023 | 1,715.00 | RENT | 1,815.00 | 0.00 | 1,815.00 | 750.00 | 0.00 |
| 312 | C1 | N/A | 1365 | Occupied | Thornblom, Stewart | 01/15/2022 | 01/15/2022 | 01/16/2023 | 2,039.00 | RENT | 1,750.00 | 0.00 | 1,750.00 | 650.00 | 0.00 |
| | | N/A | | Pending renewal | Thornblom, Stewart | 01/15/2022 | 01/17/2023 | 02/18/2024 | | RENT | 1,950.00 * | 0.00 * | 1,950.00 * | 0.00 | 0.00 |
| 313 | A2 | N/A | 798 | Occupied | Battles, Charles | 08/23/2021 | 03/01/2022 | 02/26/2023 | 1,468.00 | RENT | 1,270.00 | 0.00 | 1,270.00 | 1,450.00 | 0.00 |
| | | N/A | | Pending renewal | Battles, Charles | 08/23/2021 | 02/27/2023 | 03/24/2024 | | RENT | 1,468.00 * | 0.00 * | 1,468.00 * | 0.00 | 0.00 |
| 314 | A1 | N/A | 832 | Occupied | Thrash, Michael | 12/14/2019 | 05/24/2022 | 05/21/2023 | 1,558.00 | RENT | 1,425.00 | 0.00 | 1,425.00 | 200.00 | 0.00 |
| 315 | A2 | N/A | 798 | Occupied | Sterling, Mike | 03/09/2022 | 09/12/2022 | 03/12/2023 | 1,468.00 | RENT | 1,470.00 | 0.00 | 1,470.00 | 200.00 | 0.00 |
| 316 | A1 | N/A | 832 | Occupied | Lyles, Cody | 08/31/2022 | 08/31/2022 | 04/02/2023 | 1,558.00 | PETRENT | 0.00 | 15.00 | 1,673.00 | 2,250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,658.00 | 0.00 | | | |
| 317 | B1 | N/A | 1059 | Occupied | Battle, Lloidea | 01/16/2020 | 02/15/2022 | 02/12/2023 | 1,715.00 | RENT | 1,510.00 | 0.00 | 1,510.00 | 800.00 | (9.00) |
| 318 | C1 | N/A | 1365 | Occupied | Brown, Jenna | 12/01/2022 | 12/01/2022 | 11/26/2023 | 2,019.00 | PETRENT | 0.00 | 15.00 | 2,034.00 | 2,100.00 | 0.00 |
| | | | | | | | | | | RENT | 2,019.00 | 0.00 | | | |
| 321 | B1 | N/A | 1059 | Occupied | Holton, Nancy | 07/08/2020 | 04/05/2022 | 04/02/2023 | 1,675.00 | PETRENT | 0.00 | 15.00 | 1,520.00 | 1,850.00 | 0.00 |

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,505.00 | 0.00 | | | |
| 322 | C1 | N/A | 1365 | Occupied | Flores, Pete | 08/03/2021 | 09/06/2022 | 10/08/2023 | 1,999.00 | PETRENT | 0.00 | 15.00 | 1,925.00 | 650.00 | (55.65) |
| | | | | | | | | | | RENT | 1,910.00 | 0.00 | | | |
| 323 | A2 | N/A | 798 | Occupied | Henry, Tierra | 04/09/2022 | 04/09/2022 | 05/07/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 0.00 | 0.00 |
| 324 | A1 | N/A | 832 | Occupied-NTV | Cooper, Delaney | 02/09/2022 02/09/2023 | 02/09/2022 | 02/05/2023 | 1,518.00 | PETRENT | 0.00 | 15.00 | 1,360.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,345.00 | 0.00 | | | |
| 325 | A2 | N/A | 798 | Occupied | Crum, Charles Jakob | 06/13/2020 | 07/19/2022 | 08/20/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 450.00 | 0.00 |
| 326 | A1 | N/A | 832 | Occupied | Furnace, Keyoni | 04/12/2022 | 04/12/2022 | 04/09/2023 | 1,518.00 | PETRENT | 0.00 | 15.00 | 1,385.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,370.00 | 0.00 | | | |
| 327 | B1 | N/A | 1059 | Occupied | Roeske, Davis | 01/08/2022 | 01/10/2023 | 01/07/2024 | 1,675.00 | RENT | 1,670.00 | 0.00 | 1,670.00 | 300.00 | 0.00 |
| 328 | C1 | N/A | 1365 | Occupied | Eaton, Valecia | 08/29/2020 | 08/31/2021 | 08/29/2022 | 1,999.00 | MTOM | 0.00 | 500.00 | 2,410.00 | 1,930.00 | (18.26) |
| | | | | | | | | | | RENT | 1,910.00 | 0.00 | | | |
| 411 | B1 | N/A | 1059 | Occupied | Guggenheim, Melissa | 09/13/2022 | 09/13/2022 | 09/17/2023 | 1,715.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 0.00 | 0.00 |
| 412 | C1 | N/A | 1365 | Occupied | Montague, Michelle | 08/08/2020 | 08/30/2022 | 09/24/2023 | 2,019.00 | RENT | 1,810.00 | 0.00 | 1,810.00 | 650.00 | 0.00 |
| 413 | A2 | N/A | 798 | Occupied | Wade, Caitlin | 08/09/2022 | 08/09/2022 | 08/13/2023 | 1,468.00 | RENT | 1,370.00 | 0.00 | 1,370.00 | 1,000.00 | 0.00 |
| 414 | A1 | N/A | 832 | Vacant | VACANT | | | | 1,538.00 | | 0.00 * | 0.00 * | | | |
| 415 | A2 | N/A | 798 | Occupied | Couch, Shelley | 06/01/2022 | 06/01/2022 | 05/31/2023 | 1,468.00 | PETRENT | 0.00 | 15.00 | 1,345.00 | 250.00 | (0.65) |
| | | | | | | | | | | RENT | 1,330.00 | 0.00 | | | |
| 416 | A1 | N/A | 832 | Occupied | Davis, Christina | 12/13/2021 | 12/19/2022 | 01/14/2024 | 1,538.00 | PETRENT | 0.00 | 15.00 | 1,525.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,510.00 | 0.00 | | | |
| 417 | B1 | N/A | 1059 | Occupied | Hagad, Jeremy | 12/31/2022 | 12/31/2022 | 12/31/2023 | 1,715.00 | CONC/SPECL | 0.00 | ###### | 0.00 | 750.00 | 0.00 |
| | | | | | | | | | | RENT | 1,715.00 | 0.00 | | | |
| 418 | C1 | N/A | 1365 | Occupied | Holzkamp, Barbara | 10/11/2022 | 10/11/2022 | 11/10/2023 | 2,019.00 | PETRENT | 0.00 | 30.00 | 2,049.00 | 2,000.00 | 0.00 |
| | | | | | | | | | | RENT | 2,019.00 | 0.00 | | | |
| 421 | B1 | N/A | 1059 | Occupied | Lowe, Coreisha | 12/07/2022 | 12/07/2022 | 12/03/2023 | 1,675.00 | RENT | 1,675.00 | 0.00 | 1,675.00 | 750.00 | 0.00 |
| 422 | C1 | N/A | 1365 | Occupied | Niragira, Jeanine | 03/12/2022 | 03/12/2022 | 04/16/2023 | 1,979.00 | RENT | 1,725.00 | 0.00 | 1,725.00 | 400.00 | (80.43) |
| 423 | A2 | N/A | 798 | Occupied | Juarez, Francisco | 09/17/2021 | 04/05/2022 | 04/02/2023 | 1,428.00 | RENT | 1,265.00 | 0.00 | 1,265.00 | 200.00 | 0.00 |
| 424 | A1 | N/A | 832 | Occupied | Smith, Felicia | 06/29/2022 | 06/29/2022 | 06/25/2023 | 1,498.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 0.00 | 0.00 |
| 425 | A2 | N/A | 798 | Occupied | Snapp, Lucas | 03/17/2021 | 10/24/2022 | 10/22/2023 | 1,428.00 | RENT | 1,428.00 | 0.00 | 1,428.00 | 200.00 | 0.00 |
| 426 | A1 | N/A | 832 | Occupied | Settles, Terry | 12/02/2021 | 10/03/2022 | 11/05/2023 | 1,498.00 | RENT | 1,490.00 | 0.00 | 1,490.00 | 400.00 | 0.00 |

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 427 | B1 | N/A | 1059 | Occupied | Green, Brionna | 03/19/2022 | 03/19/2022 | 04/23/2023 | 1,675.00 | PETRENT | 0.00 | 15.00 | 1,520.00 | 550.00 | 0.00 |
| | | | | | | | | | | RENT | 1,505.00 | 0.00 | | | |
| 428 | C1 | N/A | 1365 | Occupied | Tuzzolo, Kristina | 08/23/2020 | 08/08/2022 | 08/13/2023 | 1,979.00 | RENT | 1,770.00 | 0.00 | 1,770.00 | 1,910.00 | 0.00 |
| 511 | C1 | N/A | 1365 | Occupied | OWENS, SANDRA | 07/25/2022 | 07/25/2022 | 07/23/2023 | 2,019.00 | RENT | 1,930.00 | 0.00 | 1,930.00 | 0.00 | 0.00 |
| 512 | B2 | N/A | 1145 | Vacant | VACANT | | | | 1,872.00 | | 0.00 * | 0.00 * | | | |
| 513 | A1-HC | N/A | 832 | Occupied | Wilson, BreAnna | 04/01/2021 | 03/29/2022 | 03/26/2023 | 1,390.00 | RENT | 1,325.00 | 0.00 | 1,325.00 | 200.00 | 0.00 |
| 514 | B2 | N/A | 1145 | Occupied | Wickersham, Candace | 05/25/2022 | 05/25/2022 | 05/21/2023 | 1,872.00 | PETRENT | 0.00 | 30.00 | 1,640.00 | 500.00 | 1,786.48 |
| | | | | | | | | | | RENT | 1,610.00 | 0.00 | | | |
| 515 | A1 | N/A | 832 | Occupied | Rodriguez, Daniel | 09/01/2020 | 10/18/2022 | 10/22/2023 | 1,538.00 | RENT | 1,470.00 | 0.00 | 1,470.00 | 700.00 | 0.00 |
| 516 | B2 | N/A | 1145 | Occupied | Sotelo, Jose | 09/14/2021 | 07/12/2022 | 08/20/2023 | 1,872.00 | PETRENT | 0.00 | 15.00 | 1,625.00 | 550.00 | 0.00 |
| | | | | | | | | | | RENT | 1,610.00 | 0.00 | | | |
| 517 | C1 | N/A | 1365 | Occupied | Hendrickson, Jared | 05/02/2022 | 05/02/2022 | 04/30/2023 | 2,019.00 | RENT | 1,790.00 | 0.00 | 1,790.00 | 0.00 | 0.00 |
| 518 | B2-HC | N/A | 1125 | Vacant | VACANT | | | | 1,840.00 | | 0.00 * | 0.00 * | | | |
| 521 | C1 | N/A | 1365 | Occupied | Lamichhane, Sanam | 07/01/2022 | 07/01/2022 | 07/30/2023 | 1,979.00 | PETRENT | 0.00 | 15.00 | 1,805.00 | 250.00 | (1.70) |
| | | | | | | | | | | RENT | 1,790.00 | 0.00 | | | |
| 522 | B2 | N/A | 1145 | Occupied | Sipes, Brookelyn | 03/20/2020 | 03/22/2022 | 03/19/2023 | 1,832.00 | RENT | 1,545.00 | 0.00 | 1,545.00 | 300.00 | 0.00 |
| 523 | A1 | N/A | 832 | Occupied | Jones, Darren | 09/01/2020 | 08/30/2022 | 10/01/2023 | 1,498.00 | RENT | 1,370.00 | 0.00 | 1,370.00 | 200.00 | 0.00 |
| 524 | B2 | N/A | 1145 | Occupied | Hernandez, Michael | 09/16/2022 | 09/16/2022 | 09/10/2023 | 1,832.00 | RENT | 1,699.00 | 0.00 | 1,699.00 | 0.00 | 0.00 |
| 525 | A1 | N/A | 832 | Occupied | Caudill, Mark | 01/13/2022 | 01/13/2022 | 02/19/2023 | 1,498.00 | PETRENT | 0.00 | 30.00 | 1,355.00 | 1,200.00 | 0.00 |
| | | | | | | | | | | RENT | 1,325.00 | 0.00 | | | |
| 526 | B2 | N/A | 1145 | Occupied | Hill, Joshua | 11/12/2022 | 11/12/2022 | 12/10/2023 | 1,832.00 | RENT | 1,832.00 | 0.00 | 1,832.00 | 750.00 | (6.50) |
| 527 | C1 | N/A | 1365 | Occupied | Richardson, Kenneth | 03/06/2020 | 04/26/2022 | 05/28/2023 | 1,979.00 | RENT | 1,725.00 | 0.00 | 1,725.00 | 1,910.00 | 0.00 |
| 528 | B2 | N/A | 1145 | Occupied | Truesdale, Jasmine | 07/27/2022 | 07/27/2022 | 07/23/2023 | 1,832.00 | RENT | 1,699.00 | 0.00 | 1,699.00 | 0.00 | 0.00 |
| 611 | A1 | N/A | 832 | Occupied | Trotter, Nathaniel | 12/01/2022 | 12/01/2022 | 04/02/2023 | 1,538.00 | RENT | 1,649.00 | 0.00 | 1,649.00 | 500.00 | 0.00 |

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 612 | B2 | N/A | 1145 | Occupied | JAMES, LABRITTANI | 05/02/2022 | 08/08/2022 | 09/10/2023 | 1,872.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 2,000.00 | 0.00 |
| 613 | A2 | N/A | 798 | Occupied | Hearn, Darrell | 11/11/2020 | 05/17/2022 | 05/14/2023 | 1,468.00 | RENT | 1,345.00 | 0.00 | 1,345.00 | 200.00 | 0.00 |
| 614 | B2 | N/A | 1145 | Occupied | Demus, LaConstance | 12/09/2020 | 06/14/2022 | 06/18/2023 | 1,872.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 300.00 | 0.00 |
| 615 | A2 | N/A | 798 | Occupied | Schneider, Patrick | 08/10/2021 | 08/23/2022 | 09/24/2023 | 1,468.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 200.00 | 0.00 |
| 616 | B2 | N/A | 1145 | Occupied | Navar, Gyonna | 02/13/2021 | 02/15/2022 | 02/19/2023 | 1,872.00 | RENT | 1,550.00 | 0.00 | 1,550.00 | 300.00 | 0.00 |
| 617 | A1 | N/A | 832 | Occupied | Wallace, Christi | 10/09/2020 | 11/15/2022 | 12/17/2023 | 1,538.00 | RENT | 1,538.00 | 0.00 | 1,538.00 | 450.00 | 0.00 |

APP000201

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 618 | B2 | N/A | 1145 | Occupied | Bradley, | 03/09/2021 | 04/12/2022 | 05/14/2023 | 1,872.00 | PETRENT / RENT | 0.00 / 1,585.00 | 30.00 / 0.00 | 1,615.00 | 800.00 | 1,772.45 |
| 621 | A1 | N/A | 832 | Occupied | Tuggle, Savannah | 03/09/2022 | 03/09/2022 | 03/05/2023 | 1,498.00 | RENT | 1,325.00 | 0.00 | 1,325.00 | 200.00 | 0.00 |
| 622 | B2 | N/A | 1145 | Occupied | Taylor, Matthew | 11/07/2020 | 12/13/2022 | 01/14/2024 | 1,832.00 | RENT | 1,690.00 | 0.00 | 1,690.00 | 300.00 | 0.00 |
| 623 | A2 | N/A | 798 | Occupied | Thomas, Macy | 07/16/2021 | 07/19/2022 | 07/23/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 450.00 | 0.00 |
| 624 | B2 | N/A | 1145 | Occupied | Guerrero, Starr | 01/06/2021 | 01/04/2022 | 02/05/2023 | 1,832.00 | PETRENT / RENT | 0.00 / 1,510.00 | 15.00 / 0.00 | 1,525.00 | 1,050.00 | (0.53) |
| 625 | A2 | N/A | 798 | Occupied | Ledford, Christopher | 05/01/2020 | 05/10/2022 | 05/07/2023 | 1,428.00 | RENT | 1,305.00 | 0.00 | 1,305.00 | 200.00 | 0.00 |
| 626 | B2 | N/A | 1145 | Occupied | Falcon, Jesus | 04/20/2022 | 04/20/2022 | 04/16/2023 | 1,832.00 | RENT | 1,585.00 | 0.00 | 1,585.00 | 0.00 | 0.00 |
| 627 | A1 | N/A | 832 | Occupied | Cozby, Bryan | 08/31/2021 | 08/30/2022 | 10/01/2023 | 1,498.00 | PETRENT / RENT | 0.00 / 1,370.00 | 15.00 / 0.00 | 1,385.00 | 450.00 | 0.00 |
| 628 | B2 | N/A | 1145 | Occupied | Elliott, Kimberly | 02/20/2020 | 09/27/2022 | 09/24/2023 | 1,832.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 300.00 | 0.00 |
| 711 | A1 | N/A | 832 | Occupied | Durbin, Bree | 08/03/2022 | 08/03/2022 | 08/06/2023 | 1,538.00 | RENT | 1,430.00 | 0.00 | 1,430.00 | 1,000.00 | 0.00 |
| 712 | B2 | N/A | 1145 | Occupied | Clifton, Teresa | 02/25/2022 | 02/25/2022 | 02/26/2023 | 1,872.00 | RENT | 1,550.00 | 0.00 | 1,550.00 | 650.00 | 0.00 |
| 713 | A2 | N/A | 798 | Occupied | Stephenson, | 02/05/2021 | 02/08/2022 | 02/05/2023 | 1,468.00 | RENT | 1,270.00 | 0.00 | 1,270.00 | 200.00 | 0.00 |
| 714 | B2 | N/A | 1145 | Vacant | VACANT | | | | 1,872.00 | | 0.00 * | 0.00 * | | | 0.00 |
| 715 | A2 | N/A | 798 | Occupied | Payne Jr, | 02/24/2020 | 02/22/2022 | 03/26/2023 | 1,468.00 | RENT | 1,270.00 | 0.00 | 1,270.00 | 200.00 | 0.00 |
| 716 | B2 | N/A | 1145 | Occupied | Hernandez gomez, Wenceslao | 08/09/2022 | 08/09/2022 | 08/06/2023 | 1,872.00 | RENT | 1,650.00 | 0.00 | 1,650.00 | 0.00 | 0.00 |
| 717 | A1 | N/A | 832 | Occupied | Taylor, Leah | 11/12/2021 | 11/08/2022 | 07/09/2023 | 1,538.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 450.00 | 0.00 |
| 718 | B2 | N/A | 1145 | Occupied | Godfrey, Rachel | 07/16/2022 | 07/16/2022 | 07/16/2023 | 1,872.00 | PETRENT / RENT | 0.00 / 1,650.00 | 30.00 / 0.00 | 1,680.00 | 500.00 | 0.00 |
| 721 | A1 | N/A | 832 | Vacant | VACANT | | | | 1,498.00 | | 0.00 * | 0.00 * | | | 0.00 |
| 722 | B2 | N/A | 1145 | Occupied | Chase, Raziya | 06/08/2021 | 03/08/2022 | 04/09/2023 | 1,832.00 | RENT | 1,545.00 | 0.00 | 1,545.00 | 300.00 | 1,716.16 |
| 723 | A2 | N/A | 798 | Occupied | Warren, Krystal | 09/01/2021 | 08/30/2022 | 10/01/2023 | 1,428.00 | RENT | 1,310.00 | 0.00 | 1,310.00 | 200.00 | 0.00 |
| 724 | B2 | N/A | 1145 | Occupied | Seguinot Dominguez, Albamar | 06/16/2022 | 06/16/2022 | 06/18/2023 | 1,832.00 | PETRENT / RENT | 0.00 / 1,570.00 | 15.00 / 0.00 | 1,585.00 | 250.00 | 0.00 |
| 725 | A2 | N/A | 798 | Occupied | Corker, Brandyn | 07/09/2021 | 07/19/2022 | 07/23/2023 | 1,428.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 200.00 | (99.62) |
| 726 | B2 | N/A | 1145 | Occupied | Adeyanju, Saheed | 03/28/2022 | 03/28/2022 | 03/26/2023 | 1,832.00 | RENT | 1,585.00 | 0.00 | 1,585.00 | 300.00 | 0.00 |
| 727 | A1 | N/A | 832 | Occupied | Kempf Cantrell, Rachel | 03/08/2021 | 03/08/2022 | 03/05/2023 | 1,498.00 | PETRENT | 0.00 | 15.00 | 1,340.00 | 450.00 | 0.00 |

APP000202

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,325.00 | 0.00 | | | |
| 728 | B2 | N/A | 1145 | Occupied | Christensen, Kelse | 09/01/2022 | 09/01/2022 | 08/27/2023 | 1,832.00 | PETRENT | 0.00 | 30.00 | 1,640.00 | 2,500.00 | 0.00 |
| | | | | | | | | | | RENT | 1,610.00 | 0.00 | | | |
| 811 | C1 | N/A | 1365 | Occupied | Bibins, Christopher | 10/07/2022 | 10/07/2022 | 11/05/2023 | 2,019.00 | RENT | 2,019.00 | 0.00 | 2,019.00 | 1,500.00 | 2,206.38 |
| 812 | B2 | N/A | 1145 | Occupied | Garza, Juan | 07/06/2021 | 07/05/2022 | 08/06/2023 | 1,892.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 550.00 | 0.00 |
| 813 | A1 | N/A | 832 | Occupied-NTV | Jackson, | 10/31/2020 01/30/2023 | 12/21/2021 | 01/30/2023 | 1,538.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 200.00 | 0.00 |
| 814 | B2 | N/A | 1145 | Occupied | Young, LaToya | 04/16/2021 | 04/19/2022 | 04/23/2023 | 1,892.00 | RENT | 1,605.00 | 0.00 | 1,605.00 | 550.00 | 3,848.64 |
| 815 | A1 | N/A | 832 | Occupied | Peters, Jared | 09/12/2020 | 10/11/2022 | 11/12/2023 | 1,538.00 | PETRENT | 0.00 | 15.00 | 1,485.00 | 700.00 | 0.00 |
| | | | | | | | | | | RENT | 1,470.00 | 0.00 | | | |
| 816 | B2 | N/A | 1145 | Occupied | Salters, Patsy | 03/28/2022 | 03/28/2022 | 03/26/2023 | 1,892.00 | RENT | 1,605.00 | 0.00 | 1,605.00 | 300.00 | 0.00 |
| 817 | C1 | N/A | 1365 | Occupied | Manor, Robert | 04/18/2022 | 04/18/2022 | 04/16/2023 | 2,019.00 | OFCRCRED | 0.00 | (882.50) | 882.50 | 650.00 | 0.00 |
| | | | | | | | | | | RENT | 1,765.00 | 0.00 | | | |
| 818 | B2 | N/A | 1145 | Occupied | Bell, Titiana | 11/03/2022 | 11/03/2022 | 05/07/2023 | 1,892.00 | RENT | 1,899.00 | 0.00 | 1,899.00 | 750.00 | 0.00 |
| 821 | C1 | N/A | 1365 | Occupied | Matara, Druscilla | 02/25/2020 | 03/01/2022 | 02/26/2023 | 1,979.00 | RENT | 1,690.00 | 0.00 | 1,690.00 | 1,910.00 | 0.00 |
| 822 | B2 | N/A | 1145 | Occupied | Moore, Rebecca | 04/01/2020 | 04/12/2022 | 05/14/2023 | 1,852.00 | RENT | 1,565.00 | 0.00 | 1,565.00 | 650.00 | 0.00 |
| 823 | A1 | N/A | 832 | Occupied | Stafford Hubbard, Mariah | 06/08/2022 | 06/08/2022 | 06/04/2023 | 1,498.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 0.00 | (0.37) |
| 824 | B2 | N/A | 1145 | Occupied | Jeffrey, Ricky | 09/14/2021 | 09/13/2022 | 10/08/2023 | 1,852.00 | PETRENT | 0.00 | 15.00 | 1,645.00 | 550.00 | 0.00 |
| | | | | | | | | | | RENT | 1,630.00 | 0.00 | | | |

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 825 | A1 | N/A | 832 | Occupied | Jones, Sarah | 06/19/2021 | 06/21/2022 | 07/23/2023 | 1,498.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 200.00 | 0.00 |
| 826 | B2 | N/A | 1145 | Occupied | Ventura, Veronica | 06/01/2022 | 06/01/2022 | 06/04/2023 | 1,852.00 | PESTCONTROLREIMB | 0.00 | 378.88 | 2,003.88 | 2,250.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,610.00 | 0.00 | | | |
| 827 | C1 | N/A | 1365 | Occupied | Gonzalez, Karina | 10/15/2021 | 10/18/2022 | 10/22/2023 | 1,979.00 | RENT | 1,890.00 | 0.00 | 1,890.00 | 0.00 | 0.00 |
| 828 | B2 | N/A | 1145 | Occupied | Burnett, Pamey | 04/14/2022 | 04/14/2022 | 04/16/2023 | 1,852.00 | RENT | 1,585.00 | 0.00 | 1,585.00 | 0.00 | 0.00 |
| 911 | A1 | N/A | 832 | Occupied | Vasquez, Brock | 11/03/2022 | 11/03/2022 | 12/03/2023 | 1,538.00 | RENT | 1,538.00 | 0.00 | 1,538.00 | 500.00 | 0.00 |
| 912 | B2 | N/A | 1145 | Occupied | Turner, Darra | 08/27/2022 | 08/27/2022 | 09/24/2023 | 1,892.00 | RENT | 1,759.00 | 0.00 | 1,759.00 | 0.00 | 0.00 |
| 913 | A2 | N/A | 798 | Occupied | Zuniga, Roger | 09/29/2020 | 03/08/2022 | 03/05/2023 | 1,468.00 | RENT | 1,305.00 | 0.00 | 1,305.00 | 200.00 | 0.00 |
| 914 | B2 | N/A | 1145 | Occupied | Kitchen, Nancy J | 06/07/2022 | 06/07/2022 | 06/04/2023 | 1,892.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 2,000.00 | 0.00 |
| 915 | A2 | N/A | 798 | Occupied | Lee, Shelby | 05/08/2021 | 05/10/2022 | 05/07/2023 | 1,468.00 | PETRENT | 0.00 | 30.00 | 1,375.00 | 700.00 | (0.81) |
| | | | | | | | | | | RENT | 1,345.00 | 0.00 | | | |
| 916 | B2 | N/A | 1145 | Occupied | Evans, Misty | 07/13/2021 | 07/12/2022 | 07/16/2023 | 1,892.00 | PETRENT | 0.00 | 30.00 | 1,660.00 | 800.00 | 0.00 |

APP000203

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|----------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,630.00 | 0.00 | | | |
| 917 | A1 | N/A | 832 | Occupied | Chambers, Sharday | 05/05/2022 | 05/05/2022 | 05/07/2023 | 1,538.00 | PETRENT | 0.00 | 15.00 | 1,405.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,390.00 | 0.00 | | | |
| 918 | B2 | N/A | 1145 | Occupied | York, Keighly | 06/10/2022 | 06/10/2022 | 06/11/2023 | 1,892.00 | PETRENT | 0.00 | 30.00 | 1,680.00 | 500.00 | 0.00 |
| | | | | | | | | | | RENT | 1,650.00 | 0.00 | | | |
| 921 | A1 | N/A | 832 | Occupied | Mendez, Javier | 08/08/2022 | 08/08/2022 | 03/05/2023 | 1,498.00 | RENT | 1,598.00 | 0.00 | 1,598.00 | 1,000.00 | 0.00 |
| 922 | B2 | N/A | 1145 | Occupied | Kim, Ji | 08/01/2020 | 09/06/2022 | 10/08/2023 | 1,852.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 300.00 | 0.00 |
| 923 | A2 | N/A | 798 | Occupied | Byrd, Araiya | 05/24/2022 | 05/24/2022 | 06/25/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 0.00 | 85.00 |
| 924 | B2 | N/A | 1145 | Vacant | VACANT | | | | 1,852.00 | | 0.00 * | 0.00 * | | | |
| 925 | A2 | N/A | 798 | Occupied | Harris, Amyriah | 04/07/2022 | 04/07/2022 | 04/02/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 0.00 | (0.17) |
| 926 | B2 | N/A | 1145 | Occupied | Perkins, Mazaratee | 08/22/2020 | 10/04/2022 | 11/05/2023 | 1,852.00 | RENT | 1,670.00 | 0.00 | 1,670.00 | 1,670.00 | 0.00 |
| 927 | A1 | N/A | 832 | Occupied | Webb, Jeremy | 01/07/2023 | 01/07/2023 | 01/07/2024 | 1,498.00 | RENT | 1,405.00 | 0.00 | 1,405.00 | 750.00 | (250.00) |
| 928 | B2 | N/A | 1145 | Vacant | VACANT | | | | 1,852.00 | | 0.00 * | 0.00 * | | | |
| 1011 | C1 | N/A | 1365 | Occupied | Salas, Rosalinda | 04/01/2020 | 05/10/2022 | 06/11/2023 | 2,019.00 | RENT | 1,805.00 | 0.00 | 1,805.00 | 750.00 | 0.00 |
| 1012 | B2 | N/A | 1145 | Occupied | Mack, Nickolas | 08/03/2022 | 08/03/2022 | 08/06/2023 | 1,892.00 | RENT | 1,670.00 | 0.00 | 1,670.00 | 0.00 | 0.00 |
| 1013 | A1-HC | N/A | 832 | Occupied | Bollin, Kendra | 11/30/2021 | 11/29/2022 | 11/26/2023 | 1,390.00 | PETRENT | 0.00 | 15.00 | 1,405.00 | 450.00 | 0.00 |

**details**

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|----------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,390.00 | 0.00 | | | |
| 1014 | B2 | N/A | 1145 | Occupied | Rodriguez, Cesar | 11/12/2022 | 11/12/2022 | 11/12/2023 | 1,892.00 | EMPCONC | 0.00 | (378.40) | 1,513.60 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,892.00 | 0.00 | | | |
| 1015 | A1 | N/A | 832 | Occupied | Fernandez, John | 12/28/2021 | 09/26/2022 | 10/22/2023 | 1,538.00 | RENT | 1,430.00 | 0.00 | 1,430.00 | 200.00 | 0.00 |
| 1016 | B2 | N/A | 1145 | Vacant | VACANT | | | | 1,892.00 | | 0.00 * | 0.00 * | | | |
| 1017 | C1 | N/A | 1365 | Occupied-NTV | Nelson, Jennifer | 11/12/2022 02/12/2023 | 11/12/2022 | 02/12/2023 | 2,019.00 | RENT | 2,319.00 | 0.00 | 2,319.00 | 1,500.00 | 0.00 |
| 1018 | B2-HC | N/A | 1125 | Occupied | Velasco, Octavio | 06/01/2022 | 06/01/2022 | 05/28/2023 | 1,820.00 | RENT | 1,660.00 | 0.00 | 1,660.00 | 0.00 | 0.00 |
| 1021 | C1 | N/A | 1365 | Occupied | Nethery, Eric | 08/01/2020 | 08/09/2022 | 08/13/2023 | 1,979.00 | RENT | 1,770.00 | 0.00 | 1,770.00 | 650.00 | 0.00 |
| 1022 | B2 | N/A | 1145 | Occupied | Boone, Blake | 08/07/2021 | 07/26/2022 | 07/30/2023 | 1,852.00 | RENT | 1,590.00 | 0.00 | 1,590.00 | 300.00 | 0.00 |
| 1023 | A1 | N/A | 832 | Occupied | Turner III, Cesar | 12/21/2020 | 06/28/2022 | 07/02/2023 | 1,498.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 200.00 | 0.00 |
| 1024 | B2 | N/A | 1145 | Occupied | Holguin, Stephanie | 06/11/2022 | 06/11/2022 | 07/09/2023 | 1,852.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 0.00 | 0.00 |
| 1025 | A1 | N/A | 832 | Occupied | Bonham, Tammy | 01/08/2022 | 01/08/2022 | 02/12/2023 | 1,498.00 | RENT | 1,325.00 | 0.00 | 1,325.00 | 200.00 | 0.00 |
| | | N/A | | Pending renewal | Bonham, | 01/08/2022 | 02/13/2023 | 03/17/2024 | | RENT | 1,498.00 * | 0.00 * | 1,498.00 * | 0.00 | 0.00 |
| 1026 | B2 | N/A | 1145 | Occupied | Whittaker, Donna | 09/26/2022 | 09/26/2022 | 11/05/2023 | 1,852.00 | RENT | 1,719.00 | 0.00 | 1,719.00 | 0.00 | 0.00 |
| 1027 | C1 | N/A | 1365 | Occupied | McBay, Markie | 01/15/2022 | 01/15/2022 | 02/19/2023 | 1,979.00 | RENT | 1,690.00 | 0.00 | 1,690.00 | 400.00 | (0.08) |

APP000204

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 1028 | B2 | N/A | 1145 | Occupied | Godoy, Betsy | 08/17/2021 | 09/20/2022 | 10/22/2023 | 1,852.00 | RENT | 1,630.00 | 0.00 | 1,630.00 | 300.00 | 0.00 |
| 1111 | B1 | N/A | 1059 | Occupied | Escudero, Adolfo | 10/01/2022 | 10/01/2022 | 09/24/2023 | 1,715.00 | RENT | 1,715.00 | 0.00 | 1,715.00 | 0.00 | 0.00 |
| 1112 | B3 | N/A | 1203 | Occupied | Wilson Kindred, Damali | 08/26/2021 | 08/23/2022 | 08/27/2023 | 1,984.00 | RENT | 1,670.00 | 0.00 | 1,670.00 | 300.00 | (17.11) |
| 1113 | A2 | N/A | 798 | Occupied | Johnson, Krista | 06/03/2022 | 06/03/2022 | 05/14/2023 | 1,468.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 0.00 | 0.00 |
| 1114 | A1 | N/A | 832 | Occupied | Williams, Kenedria | 06/03/2022 | 06/03/2022 | 03/05/2023 | 1,558.00 | RENT | 1,550.00 | 0.00 | 1,550.00 | 0.00 | 0.00 |
| 1115 | A2 | N/A | 798 | Occupied | Oas, Heather | 12/20/2022 | 12/20/2022 | 01/14/2024 | 1,468.00 | CONC/SPECL | 0.00 | ###### | 0.00 | 1,000.00 | 0.00 |
|      |    |     |     |          |              |            |            |            |          | RENT | 1,375.00 | 0.00 |  |  |  |
| 1116 | A1 | N/A | 832 | Occupied | Solis, Johnny | 02/06/2021 | 05/17/2022 | 05/14/2023 | 1,558.00 | RENT | 1,425.00 | 0.00 | 1,425.00 | 450.00 | 0.00 |
| 1117 | B1 | N/A | 1059 | Occupied | Watts, Joseph | 06/09/2022 | 06/09/2022 | 06/11/2023 | 1,715.00 | PETRENT | 0.00 | 15.00 | 1,625.00 | 250.00 | 0.00 |
|      |    |     |     |          |              |            |            |            |          | RENT | 1,610.00 | 0.00 |  |  |  |
| 1118 | B3 | N/A | 1203 | Occupied | Regenye, Samantha | 04/21/2020 | 05/24/2022 | 06/25/2023 | 1,984.00 | PETRENT | 0.00 | 15.00 | 1,670.00 | 550.00 | 0.00 |
|      |    |     |     |          |              |            |            |            |          | RENT | 1,655.00 | 0.00 |  |  |  |

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 1121 | B1 | N/A | 1059 | Occupied | Christopher, Alesia | 06/04/2020 | 06/29/2022 | 07/02/2023 | 1,675.00 | RENT | 1,530.00 | 0.00 | 1,530.00 | 550.00 | 0.00 |
| 1122 | B3 | N/A | 1203 | Occupied | Smith, JonMichael | 06/08/2022 | 06/08/2022 | 06/11/2023 | 1,944.00 | RENT | 1,615.00 | 0.00 | 1,615.00 | 0.00 | 0.00 |
| 1123 | A2 | N/A | 798 | Occupied | Bragg, Jerry | 04/01/2020 | 05/31/2022 | 06/25/2023 | 1,428.00 | RENT | 1,305.00 | 0.00 | 1,305.00 | 200.00 | 0.00 |
| 1124 | A1 | N/A | 832 | Occupied | Clendening, Joey | 09/03/2022 | 09/03/2022 | 09/24/2023 | 1,518.00 | PETRENT | 0.00 | 15.00 | 1,533.00 | 1,250.00 | 0.00 |
|      |    |     |     |          |              |            |            |            |          | RENT | 1,518.00 | 0.00 |  |  |  |
| 1125 | A2 | N/A | 798 | Vacant | VACANT |  |  |  | 1,428.00 |  | 0.00 * | 0.00 * |  |  |  |
| 1126 | A1 | N/A | 832 | Vacant | VACANT |  |  |  | 1,518.00 |  | 0.00 * | 0.00 * |  |  |  |
| 1127 | B1 | N/A | 1059 | Occupied | McGraw, James | 05/25/2022 | 05/25/2022 | 08/27/2023 | 1,675.00 | PETRENT | 0.00 | 15.00 | 1,545.00 | 250.00 | 0.00 |
|      |    |     |     |          |              |            |            |            |          | RENT | 1,530.00 | 0.00 |  |  |  |
| 1128 | B3 | N/A | 1203 | Occupied | Khampa, Cindy | 11/06/2021 | 12/06/2022 | 12/10/2023 | 1,944.00 | RENT | 1,735.00 | 0.00 | 1,735.00 | 300.00 | 0.00 |
| 1211 | B1 | N/A | 1059 | Occupied | Thomas, Kaitlyn | 04/12/2022 | 04/12/2022 | 04/16/2023 | 1,715.00 | RENT | 1,570.00 | 0.00 | 1,570.00 | 2,000.00 | 0.00 |
| 1212 | B3 | N/A | 1203 | Occupied | Morgan, Porscha | 06/15/2022 | 06/15/2022 | 06/11/2023 | 1,984.00 | RENT | 1,655.00 | 0.00 | 1,655.00 | 0.00 | 0.00 |
| 1213 | A2 | N/A | 798 | Vacant | VACANT |  |  |  | 1,468.00 |  | 0.00 * | 0.00 * |  |  |  |
| 1214 | A1 | N/A | 832 | Vacant | VACANT |  |  |  | 1,558.00 |  | 0.00 * | 0.00 * |  |  |  |
| 1215 | A2 | N/A | 798 | Occupied | Meza, Leticia | 07/26/2021 | 07/26/2022 | 08/27/2023 | 1,468.00 | PETRENT | 0.00 | 15.00 | 1,345.00 | 450.00 | 0.00 |
|      |    |     |     |          |              |            |            |            |          | RENT | 1,330.00 | 0.00 |  |  |  |
| 1216 | A1 | N/A | 832 | Occupied | Boroughs, Janice | 12/19/2020 | 01/11/2022 | 02/12/2023 | 1,558.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 200.00 | 0.00 |
|      |    | N/A |     | Pending renewal | Boroughs, | 12/19/2020 | 02/13/2023 | 03/17/2024 |  | RENT | 1,550.00 * | 0.00 * | 1,550.00 * | 0.00 | 0.00 |
| 1217 | B1 | N/A | 1059 | Occupied | Deen Cole, Nafisatu | 03/12/2022 | 03/12/2022 | 03/12/2023 | 1,715.00 | RENT | 1,570.00 | 0.00 | 1,570.00 | 300.00 | 0.00 |

APP000205

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 1218 | B3 | N/A | 1203 | Occupied | Stickle, Tracy | 09/24/2021 | 04/26/2022 | 04/30/2023 | 1,984.00 | PETRENT | 0.00 | 15.00 | 1,787.95 | 550.00 | 132.75 |
|      |    |     |      |          |                |            |            |            |          | RENT | 1,630.00 | 0.00 |  |  |  |
|      |    |     |      |          |                |            |            |            |          | SODA- DAMAGES | 0.00 | 142.95 |  |  |  |
| 1221 | B1 | N/A | 1059 | Occupied | Contreras Giron, Alexandra | 05/09/2020 | 05/17/2022 | 05/14/2023 | 1,675.00 | RENT | 1,545.00 | 0.00 | 1,545.00 | 300.00 | (0.90) |
| 1222 | B3 | N/A | 1203 | Occupied | Armendariz, Cynthia | 07/15/2020 | 08/16/2022 | 08/20/2023 | 1,944.00 | PETRENT | 0.00 | 15.00 | 1,645.00 | 1,945.00 | 1,801.84 |
|      |    |     |      |          |                |            |            |            |          | RENT | 1,630.00 | 0.00 |  |  |  |
| 1223 | A2 | N/A | 798 | Occupied | Filomio, Michael | 12/15/2021 | 07/18/2022 | 04/23/2023 | 1,428.00 | RENT | 1,390.00 | 0.00 | 1,390.00 | 200.00 | 0.00 |
| 1224 | A1 | N/A | 832 | Occupied | Freed, Keaton | 12/02/2022 | 12/02/2022 | 11/26/2023 | 1,518.00 | RENT | 1,329.00 | 0.00 | 1,329.00 | 500.00 | 0.00 |
| 1225 | A2 | N/A | 798 | Occupied | Buford, Micaylah | 06/14/2022 | 06/14/2022 | 06/11/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 0.00 | 0.00 |

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 1226 | A1 | N/A | 832 | Occupied | Hanks, Jasmine | 06/21/2022 | 06/21/2022 | 06/18/2023 | 1,518.00 | RENT | 1,370.00 | 0.00 | 1,370.00 | 1,000.00 | 0.00 |
| 1227 | B1 | N/A | 1059 | Occupied | Walton, Shanice | 05/01/2020 | 05/10/2022 | 06/11/2023 | 1,675.00 | RENT | 1,545.00 | 0.00 | 1,545.00 | 300.00 | 0.00 |
| 1228 | B3 | N/A | 1203 | Occupied | Taylor, Joshua | 06/25/2021 | 06/21/2022 | 07/23/2023 | 1,944.00 | RENT | 1,615.00 | 0.00 | 1,615.00 | 550.00 | 0.00 |
| 1311 | B1 | N/A | 1059 | Occupied | McDonald, Emily | 05/21/2021 | 05/24/2022 | 05/28/2023 | 1,715.00 | RENT | 1,585.00 | 0.00 | 1,585.00 | 300.00 | 0.00 |
| 1312 | B3 | N/A | 1203 | Occupied | Smith, Sonya | 04/26/2022 | 04/26/2022 | 04/23/2023 | 1,984.00 | RENT | 1,655.00 | 0.00 | 1,655.00 | 0.00 | 0.00 |
| 1313 | A2 | N/A | 798 | Occupied | Williams, Jomarcus | 01/16/2021 | 07/26/2022 | 08/27/2023 | 1,468.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 200.00 | (34.43) |
| 1314 | A1 | N/A | 832 | Occupied | Collier, Kameron | 06/25/2022 | 06/25/2022 | 06/18/2023 | 1,558.00 | PETRENT | 0.00 | 15.00 | 1,465.00 | 1,250.00 | 0.00 |
|      |    |     |      |          |                |            |            |            |          | RENT | 1,450.00 | 0.00 |  |  |  |
| 1315 | A2 | N/A | 798 | Occupied | Bailey, Madison | 05/04/2022 | 05/04/2022 | 05/07/2023 | 1,468.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 2,000.00 | 0.00 |
| 1316 | A1 | N/A | 832 | Occupied | Castanedo, Donna | 01/09/2021 | 04/26/2022 | 05/28/2023 | 1,558.00 | RENT | 1,385.00 | 0.00 | 1,385.00 | 200.00 | 3,143.89 |
| 1317 | B1 | N/A | 1059 | Occupied | Ureta Leyva, Gilberto | 12/03/2022 | 12/03/2022 | 06/04/2023 | 1,715.00 | RENT | 1,815.00 | 0.00 | 1,815.00 | 1,500.00 | 0.00 |
| 1318 | B3 | N/A | 1203 | Occupied-NTV | Cruz, Jesus | 08/01/2022 01/31/2023 | 08/01/2022 | 07/30/2023 | 1,984.00 | EMPCONC | 0.00 | (331.00) | 1,324.00 | 0.00 | 0.00 |
|      |    |     |      |          |                |            |            |            |          | RENT | 1,655.00 | 0.00 |  |  |  |
| 1321 | B1 | N/A | 1059 | Occupied | Bradley, Eric | 10/29/2022 | 10/29/2022 | 11/26/2023 | 1,675.00 | RENT | 1,675.00 | 0.00 | 1,675.00 | 750.00 | 0.00 |
| 1322 | B3 | N/A | 1203 | Occupied | Gitahi, Ayub | 01/04/2022 | 01/02/2023 | 07/02/2023 | 1,944.00 | RENT | 1,855.00 | 0.00 | 1,855.00 | 300.00 | 0.00 |
| 1323 | A2 | N/A | 798 | Vacant | VACANT |  |  |  | 1,428.00 |  | 0.00 * | 0.00 * |  |  |  |
| 1324 | A1 | N/A | 832 | Occupied | Dockery, Michelle | 09/10/2021 | 09/13/2022 | 10/15/2023 | 1,518.00 | RENT | 1,410.00 | 0.00 | 1,410.00 | 1,450.00 | 0.00 |
| 1325 | A2 | N/A | 798 | Occupied | Fink, Thomas | 09/03/2022 | 09/03/2022 | 09/24/2023 | 1,428.00 | RENT | 1,428.00 | 0.00 | 1,428.00 | 1,000.00 | 0.00 |
| 1326 | A1 | N/A | 832 | Occupied | Robbins, Tammy | 12/31/2022 | 12/31/2022 | 07/30/2023 | 1,518.00 | CONC/SPECL | 0.00 | ###### | 0.00 | 500.00 | (86.03) |
|      |    |     |      |          |                |            |            |            |          | RENT | 1,518.00 | 0.00 |  |  |  |
| 1327 | B1 | N/A | 1059 | Occupied | Moore, Chante | 06/01/2020 | 05/31/2022 | 07/02/2023 | 1,675.00 | RENT | 1,545.00 | 0.00 | 1,545.00 | 1,600.00 | 0.00 |

APP000206

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1328 | B3 | N/A | 1203 | Occupied | North, Donovan | 07/01/2020 | 08/30/2022 | 10/01/2023 | 1,944.00 | PETRENT / RENT | 0.00 / 1,630.00 | 15.00 / 0.00 | 1,645.00 | 800.00 | 0.00 / 0.00 |
| 1411 | B1 | N/A | 1059 | Occupied | Little, Grant | 07/05/2022 | 07/05/2022 | 07/09/2023 | 1,715.00 | PETRENT / RENT | 0.00 / 1,590.00 | 15.00 / 0.00 | 1,605.00 | 2,500.00 | 0.00 / 0.00 |
| 1412 | C1 | N/A | 1365 | Vacant-Leased | VACANT | | | | 2,039.00 | | 0.00 * | 0.00 * | 1,970.00 * | 0.00 | |
| 1413 | A2 | N/A | 798 | Applicant / Vacant | Esworthy, .. / VACANT | 01/12/2023 | 01/12/2023 | 02/11/2024 | 1,468.00 | RENT | 1,970.00 * / 0.00 * | 0.00 * | | 0.00 | |
| details | | | | | | | | | | | | | | | |
| 1414 | A1 | N/A | 832 | Occupied | Michaelkovich, Colby | 07/01/2022 | 07/01/2022 | 07/30/2023 | 1,558.00 | RENT | 1,410.00 | 0.00 | 1,410.00 | 0.00 | 0.00 |
| 1415 | A2 | N/A | 798 | Occupied | Hackler, .. | 02/09/2022 | 02/09/2022 | 02/05/2023 | 1,468.00 | RENT | 1,270.00 | 0.00 | 1,270.00 | 400.00 | 0.00 |
| 1416 | A1 | N/A | 832 | Occupied | Guerrera, Jennifer | 12/19/2020 | 10/25/2022 | 10/22/2023 | 1,558.00 | PETRENT / RENT | 0.00 / 1,558.00 | 30.00 / 0.00 | 1,588.00 | 700.00 | 0.00 |
| 1417 | B1 | N/A | 1059 | Occupied | Lopez, Diana | 05/29/2021 | 05/31/2022 | 06/04/2023 | 1,715.00 | RENT | 1,585.00 | 0.00 | 1,585.00 | 550.00 | 0.00 |
| 1418 | C1 | N/A | 1365 | Occupied | Duffield, Brene | 08/31/2021 | 08/30/2022 | 10/01/2023 | 2,039.00 | RENT | 1,830.00 | 0.00 | 1,830.00 | 400.00 | 0.00 |
| 1421 | B1 | N/A | 1059 | Occupied | Rivera, Israel | 08/01/2022 | 08/01/2022 | 07/23/2023 | 1,675.00 | RENT | 1,675.00 | 0.00 | 1,675.00 | 0.00 | 0.00 |
| 1422 | C1 | N/A | 1365 | Occupied | Beddingfield, Allison | 06/16/2021 | 06/14/2022 | 07/16/2023 | 1,999.00 | PETRENT / RENT | 0.00 / 1,770.00 | 15.00 / 0.00 | 1,785.00 | 650.00 | (0.17) |
| 1423 | A2 | N/A | 798 | Occupied | Resendiz, Lisa | 04/14/2022 | 04/14/2022 | 05/14/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 0.00 | (0.65) |
| 1424 | A1 | N/A | 832 | Occupied | Grate, Lateja | 05/09/2020 | 07/19/2022 | 08/20/2023 | 1,518.00 | RENT | 1,370.00 | 0.00 | 1,370.00 | 200.00 | 0.00 |
| 1425 | A2 | N/A | 798 | Occupied | Garza, Linda | 06/08/2021 | 04/05/2022 | 04/09/2023 | 1,428.00 | PETRENT / RENT | 0.00 / 1,265.00 | 15.00 / 0.00 | 1,280.00 | 450.00 | 0.00 |
| 1426 | A1 | N/A | 832 | Occupied | Nyakemwa, Evans | 01/08/2022 | 01/10/2023 | 01/07/2024 | 1,518.00 | RENT | 1,510.00 | 0.00 | 1,510.00 | 200.00 | (0.99) |
| 1427 | B1 | N/A | 1059 | Occupied-NTVL | WILLIAMS, Tomeka | 01/29/2022 01/29/2023 | 01/29/2022 | 01/29/2023 | 1,675.00 | RENT | 1,470.00 | 0.00 | 1,470.00 | 300.00 | 0.00 |
| | | N/A | | Applicant | Walton, Brittany | 02/08/2023 | 02/08/2023 | 02/07/2024 | | RENT | 1,675.00 * | 0.00 * | 1,675.00 * | 0.00 | |
| 1428 | C1 | N/A | 1365 | Occupied | KOENIG, CHELSEA | 07/18/2022 | 07/18/2022 | 07/16/2023 | 1,999.00 | PETRENT / RENT | 0.00 / 1,790.00 | 15.00 / 0.00 | 1,805.00 | 250.00 | 0.00 |
| 1511 | C1 | N/A | 1365 | Occupied | Jimenez, Sergio | 07/29/2022 | 07/29/2022 | 07/30/2023 | 2,019.00 | PETRENT / RENT | 0.00 / 1,930.00 | 15.00 / 0.00 | 1,945.00 | 250.00 | 0.00 |
| 1512 | B2-HC | N/A | 1125 | Occupied | Limonge Duri, Diego | 12/01/2021 | 10/24/2022 | 04/23/2023 | 1,820.00 | RENT | 1,760.00 | 0.00 | 1,760.00 | 600.00 | 0.00 |
| 1513 | A1 | N/A | 832 | Vacant | VACANT | | | | 1,538.00 | | 0.00 * | 0.00 * | | 0.00 | |
| 1514 | B2 | N/A | 1145 | Occupied | Turbert, Kenneth | 08/01/2020 | 08/30/2022 | 10/01/2023 | 1,892.00 | PETRENT / RENT | 0.00 / 1,650.00 | 30.00 / 0.00 | 1,680.00 | 1,150.00 | 0.00 |

APP000207

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1515 | A1-HC | N/A | 832 | Occupied | Erwin, Thomas | 10/05/2021 | 10/04/2022 | 10/08/2023 | 1,390.00 | PETRENT / RENT | 0.00 / 1,390.00 | 15.00 / 0.00 | 1,405.00 | 450.00 | 0.00 / 0.00 |
| 1516 details | B2 | N/A | 1145 | Occupied | Uribe, Gerardo | 07/09/2022 | 07/09/2022 | 07/09/2023 | 1,892.00 | RENT | 1,650.00 | 0.00 | 1,650.00 | 3,650.00 | 0.00 |
| 1517 | C1 | N/A | 1365 | Occupied | Orr, Preston | 04/16/2022 | 04/16/2022 | 05/21/2023 | 2,019.00 | RENT | 1,765.00 | 0.00 | 1,765.00 | 400.00 | (0.05) |
| 1518 | B2 | N/A | 1145 | Occupied | Lynn, Ninia | 10/10/2022 | 10/10/2022 | 10/09/2023 | 1,872.00 | RENT | 1,739.00 | 0.00 | 1,739.00 | 1,500.00 | 0.00 |
| 1521 | C1 | N/A | 1365 | Occupied | Danovsky, ... | 07/01/2022 | 07/01/2022 | 07/02/2023 | 1,979.00 | RENT | 1,750.00 | 0.00 | 1,750.00 | 0.00 | 0.00 |
| 1522 | B2 | N/A | 1145 | Occupied | Rabenhorst, Nicholas | 07/06/2022 | 07/06/2022 | 08/06/2023 | 1,852.00 | PETRENT / RENT | 0.00 / 1,590.00 | 15.00 / 0.00 | 1,605.00 | 250.00 | 0.00 |
| 1523 | A1 | N/A | 832 | Occupied | Jackson, ... | 07/26/2021 | 07/26/2022 | 08/27/2023 | 1,498.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 200.00 | 0.00 |
| 1524 | B2 | N/A | 1145 | Occupied | Vargas, Oscar | 04/15/2022 | 04/15/2022 | 04/16/2023 | 1,852.00 | PETRENT / RENT | 0.00 / 1,605.00 | 15.00 / 0.00 | 1,620.00 | 250.00 | 0.00 |
| 1525 | A1 | N/A | 832 | Occupied | Fortoul, Toni | 06/15/2021 | 06/14/2022 | 06/18/2023 | 1,498.00 | PETRENT / RENT | 0.00 / 1,350.00 | 15.00 / 0.00 | 1,365.00 | 450.00 | 0.00 |
| 1526 | B2 | N/A | 1145 | Occupied | Wright, Marina | 08/15/2020 | 08/30/2022 | 09/24/2023 | 1,852.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 300.00 | 1,710.00 |
| 1527 | C1 | N/A | 1365 | Occupied | Williams, Sharon | 05/29/2020 | 05/03/2022 | 05/07/2023 | 1,979.00 | RENT | 1,765.00 | 0.00 | 1,765.00 | 400.00 | 0.00 |
| 1528 | B2 | N/A | 1145 | Occupied | Brannon, ... | 06/09/2022 | 06/09/2022 | 06/11/2023 | 1,832.00 | RENT | 1,570.00 | 0.00 | 1,570.00 | 0.00 | 0.00 |
| 1611 | A1 | N/A | 832 | Occupied | Daniels, Catherine | 05/16/2022 | 05/16/2022 | 05/07/2023 | 1,538.00 | RENT | 1,390.00 | 0.00 | 1,390.00 | 0.00 | 0.00 |
| 1612 | B2 | N/A | 1145 | Occupied | Hawkins, Marcel | 12/15/2022 | 12/15/2022 | 01/21/2024 | 1,872.00 | RENT | 1,683.00 | 0.00 | 1,683.00 | 1,250.00 | 0.00 |
| 1613 | A2 | N/A | 798 | Occupied | Patrick, Akia | 12/30/2021 | 09/26/2022 | 09/24/2023 | 1,468.00 | RENT | 1,370.00 | 0.00 | 1,370.00 | 400.00 | 0.00 |
| 1614 | B2 | N/A | 1145 | Occupied | Obisike, Mikola | 08/15/2022 | 08/15/2022 | 08/13/2023 | 1,872.00 | PETRENT / RENT | 0.00 / 1,650.00 | 15.00 / 0.00 | 1,665.00 | 250.00 | 0.00 |
| 1615 | A2 | N/A | 798 | Occupied | Morris, Zackary | 02/12/2021 | 03/15/2022 | 03/12/2023 | 1,468.00 | RENT | 1,265.00 | 0.00 | 1,265.00 | 200.00 | 0.00 |
| 1616 | B2 | N/A | 1145 | Occupied | Cornett, ... | 04/08/2022 | 04/08/2022 | 05/07/2023 | 1,872.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 0.00 | (0.15) |
| 1617 | A1 | N/A | 832 | Occupied | Sandidge, Tanisha | 10/31/2020 | 05/31/2022 | 04/02/2023 | 1,538.00 | RENT | 1,505.00 | 0.00 | 1,505.00 | 200.00 | 0.00 |
| 1618 | B2 | N/A | 1145 | Occupied | Lester, Edward | 09/01/2022 | 09/01/2022 | 09/03/2023 | 1,872.00 | PETRENT / RENT | 0.00 / 1,630.00 | 15.00 / 0.00 | 1,645.00 | 4,160.00 | (1,748.58) |
| 1621 | A1 | N/A | 832 | Occupied | Ibarra Torres, Karla | 08/30/2020 | 07/26/2022 | 08/27/2023 | 1,498.00 | RENT | 1,350.00 | 0.00 | 1,350.00 | 200.00 | 0.00 |
| 1622 | B2 | N/A | 1145 | Occupied | Susunaga, ... | 07/06/2022 | 07/06/2022 | 07/09/2023 | 1,832.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 0.00 | 0.00 |
| 1623 | A2 | N/A | 798 | Occupied | Lazuka, Donald | 07/11/2020 | 07/19/2022 | 07/23/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 200.00 | 0.00 |
| 1624 | B2 | N/A | 1145 | Occupied | Stevens, Denisia | 05/28/2022 | 05/28/2022 | 06/25/2023 | 1,832.00 | RENT | 1,610.00 | 0.00 | 1,610.00 | 0.00 | 0.00 |
| 1625 | A2 | N/A | 798 | Occupied | Khamis, Reem | 08/24/2021 | 08/23/2022 | 08/27/2023 | 1,428.00 | RENT | 1,310.00 | 0.00 | 1,310.00 | 200.00 | 0.00 |

APP000208

details

| Unit | Floorplan | unit designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 1626 | B2 | N/A | 1145 | Vacant | VACANT | | | | 1,832.00 | | 0.00 * | 0.00 * | | | |
| 1627 | A1 | N/A | 832 | Vacant | VACANT | | | | 1,498.00 | | 0.00 * | 0.00 * | | | |
| 1628 | B2 | N/A | 1145 | Occupied | Chambers, Deterick | 04/06/2022 | 04/06/2022 | 07/02/2023 | 1,832.00 | RENT | 1,570.00 | 0.00 | 1,570.00 | 0.00 | (0.02) |
| 1711 | A1 | N/A | 832 | Occupied | Gomez, Christina | 03/21/2022 | 03/21/2022 | 04/16/2023 | 1,538.00 | PETRENT | 0.00 | 15.00 | 1,400.00 | 2,250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,385.00 | 0.00 | | | |
| 1712 | B2 | N/A | 1145 | Occupied | Osorio, Mercedes | 06/30/2020 | 07/26/2022 | 07/30/2023 | 1,887.00 | RENT | 1,625.00 | 0.00 | 1,625.00 | 300.00 | 0.00 |
| 1713 | A2 | N/A | 798 | Occupied | Cowing, Mason | 04/16/2022 | 04/16/2022 | 04/09/2023 | 1,468.00 | RENT | 1,330.00 | 0.00 | 1,330.00 | 0.00 | 0.00 |
| 1714 | B2 | N/A | 1145 | Occupied | Sumlin, Demetria | 08/25/2022 | 08/25/2022 | 09/24/2023 | 1,887.00 | RENT | 1,754.00 | 0.00 | 1,754.00 | 0.00 | 0.00 |
| 1715 | A2 | N/A | 798 | Occupied | Avila, Bryan | 05/03/2022 | 05/03/2022 | 08/02/2023 | 1,468.00 | RENT | 1,325.00 | 0.00 | 1,325.00 | 0.00 | (85.37) |
| 1716 | B2 | N/A | 1145 | Occupied | Williams, MaRonda | 06/16/2022 | 06/16/2022 | 06/18/2023 | 1,887.00 | RENT | 1,645.00 | 0.00 | 1,645.00 | 0.00 | (0.41) |
| 1717 | A1 | N/A | 832 | Occupied | Ringo, Terrance | 10/01/2020 | 10/04/2022 | 10/08/2023 | 1,538.00 | RENT | 1,470.00 | 0.00 | 1,470.00 | 1,200.00 | 0.00 |
| 1718 | B2 | N/A | 1145 | Occupied | Aguirre, Eduardo | 06/28/2022 | 06/28/2022 | 06/25/2023 | 1,887.00 | RENT | 1,645.00 | 0.00 | 1,645.00 | 0.00 | 0.00 |
| 1721 | A1 | N/A | 832 | Occupied | Sherrod, Holly | 06/29/2020 | 08/02/2022 | 08/06/2023 | 1,498.00 | RENT | 1,370.00 | 0.00 | 1,370.00 | 200.00 | 0.00 |
| 1722 | B2 | N/A | 1145 | Occupied | Ward, Taniesha | 12/17/2021 | 12/17/2021 | 01/15/2023 | 1,847.00 | RENT | 1,525.00 | 0.00 | 1,525.00 | 300.00 | 0.00 |
| | | N/A | | Pending renewal | Ward, Taniesha | 12/17/2021 | 01/16/2023 | 02/18/2024 | | RENT | 1,725.00 * | 0.00 * | 1,725.00 * | 0.00 | 0.00 |
| 1723 | A2 | N/A | 798 | Occupied | Stafford, Lauren | 07/20/2021 | 07/19/2022 | 07/23/2023 | 1,428.00 | PETRENT | 0.00 | 15.00 | 1,305.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,290.00 | 0.00 | | | |
| 1724 | B2 | N/A | 1145 | Occupied | Bronson, Sherry | 09/10/2021 | 09/13/2022 | 10/15/2023 | 1,847.00 | RENT | 1,625.00 | 0.00 | 1,625.00 | 300.00 | 0.00 |
| 1725 | A2 | N/A | 798 | Occupied | Bauman, Sarah | 06/21/2021 | 07/05/2022 | 08/06/2023 | 1,428.00 | RENT | 1,290.00 | 0.00 | 1,290.00 | 200.00 | 0.00 |
| 1726 | B2 | N/A | 1145 | Occupied | Daniel, Dustin | 08/01/2020 | 04/05/2022 | 04/09/2023 | 1,847.00 | RENT | 1,560.00 | 0.00 | 1,560.00 | 300.00 | 0.00 |
| 1727 | A1 | N/A | 832 | Occupied | Borders, Raegan | 06/10/2022 | 06/10/2022 | 07/09/2023 | 1,498.00 | PETRENT | 0.00 | 15.00 | 1,365.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,350.00 | 0.00 | | | |
| 1728 | B2 | N/A | 1145 | Occupied | Bryant, Terrence | 07/24/2020 | 09/27/2022 | 10/29/2023 | 1,847.00 | RENT | 1,625.00 | 0.00 | 1,625.00 | 300.00 | 0.00 |
| totals: | | | | | | | | | 464,800.00 | | 386,543.00 | (4,068.07) | 382,474.93 | 136,975.00 | |

Amt / SQFT: Market = 279,648 SQFT; Leased = 256,599 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market + Addl. | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|-----------|---------|--------------|------------------------|----------------|----------------|-------------------|----------------|-------------|-----------------|
| A1 | 65 | 832 | 1,524.46 | 1.83 | 1,421.19 | 1.71 | 58 | 89.23 | 9 |
| A1-HC | 3 | 832 | 1,390.00 | 1.67 | 1,368.33 | 1.64 | 3 | 100.00 | 0 |
| A2 | 48 | 798 | 1,448.00 | 1.81 | 1,323.09 | 1.66 | 43 | 89.58 | 5 |
| B1 | 28 | 1,059 | 1,695.00 | 1.60 | 1,605.00 | 1.52 | 28 | 100.00 | 0 |
| B2 | 77 | 1,145 | 1,862.13 | 1.63 | 1,631.21 | 1.42 | 70 | 90.91 | 7 |
| B2-HC | 3 | 1,125 | 1,826.67 | 1.62 | 1,710.00 | 1.52 | 2 | 66.67 | 1 |

APP000209

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B3 | 12 | 1,203 | 1,964.00 | 1.63 | 1,666.67 | 1.39 | 12 | 100.00 | 1 |
| C1 | 35 | 1,365 | 2,004.14 | 1.47 | 1,837.53 | 1.35 | 32 | 91.43 | 2 |
| C1-HC | 1 | 1,365 | 1,999.00 | 1.46 | 1,770.00 | 1.30 | 1 | 100.00 | 0 |
| **totals /** | **272** | **1,028** | **1,708.82** | **1.66** | **1,552.38** | **1.51** | **249** | **91.54** | **25** |

**occupancy and rents summary for current date**

| unit status | Market + Addl. | # units | potential rent |
|---|---|---|---|
| Occupied, no NTV | 415,641.00 | 243 | 377,094.00 |
| Occupied, NTV | 8,597.00 | 5 | 7,979.00 |
| Occupied NTV | 1,675.00 | 1 | 1,470.00 |
| Vacant Leased | 4,078.00 | 2 | 4,078.00 |
| Admin/Down | 1,558.00 | 1 | 1,558.00 |
| Vacant Not Leased | 33,251.00 | 20 | 33,251.00 |
| **totals:** | **464,800.00** | **272** | **425,430.00** |

**summary billing by transaction code for current date**

| code | amount |
|---|---|
| CONC/SPECL | (4,608.00) |
| EMPCONC | (709.40) |
| MTOM | 500.00 |
| OFCRCRED | (882.50) |
| PESTCONTROLREIM | 378.88 |
| PETRENT | 1,110.00 |
| RENT | 386,543.00 |
| SODA- DAMAGES | 142.95 |
| **total:** | **382,474.93** |

APP000210

**OPERATING STATEMENTS**

NVC | National Valuation Consultants, Inc.

APP000211

---

Sunchase American, Ltd.

---

**Parc at Windmill Farms**
**FINANCIAL STATEMENTS FOR THE MONTH OF**
December, 2022

---

Number of Units          272
Number of Sq Feet     279,648

Parc at Windmill Farms
Forney, TX 76126

APP000212

# Parc at Windmill Farms
## Summary Income Statement
### December 15, 2022

| | Month Ending 12/15/2022 | | | | Year to Date 12/15/2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Revenue** | | | | | | | | |
| Possible Rent Per Leases | | | | | | | | |
| Rent Per Schedule | 464,074 | 109.38 % | 427,730 | 36,344 | 5,235,716 | 108.47 % | 4,969,563 | 266,153 |
| Leases Under Schedule | (39,796) | (9.38) % | (25,278) | (14,518) | (408,992) | (8.47) % | (251,497) | (157,494) |
| Total Possible Rent Per Leases | 424,278 | 100.00 % | 402,452 | 21,826 | 4,826,724 | 100.00 % | 4,718,066 | 108,659 |
| | | | | | | | | |
| Vacancy Losses | (38,842) | (9.15) % | (19,248) | (19,594) | (177,826) | (3.68) % | (223,630) | 45,804 |
| Other Rental Losses | (3,038) | (0.72) % | (4,290) | 1,252 | (81,606) | (1.69) % | (50,296) | (31,311) |
| Total Rental Losses | (41,880) | (9.87) % | (23,538) | (18,342) | (259,432) | (5.37) % | (273,926) | 14,493 |
| Total Net Rental Revenue | 382,398 | 90.13 % | 378,914 | 3,484 | 4,567,292 | 94.63 % | 4,444,140 | 123,152 |
| | | | | | | | | |
| Other Revenue | 11,104 | 2.62 % | 12,383 | (1,279) | 210,392 | 4.36 % | 177,581 | 32,811 |
| | | | | | | | | |
| Total Revenue | 393,502 | 92.75 % | 391,297 | 2,205 | 4,777,684 | 98.98 % | 4,621,721 | 155,963 |
| | | | | | | | | |
| **Operating Expenses** | | | | | | | | |
| Personnel Expenses | 20,506 | 4.83 % | 27,363 | 6,857 | 308,503 | 6.39 % | 325,461 | 16,957 |
| Management Fees | 10,981 | 2.59 % | 11,001 | 20 | 135,221 | 2.80 % | 129,976 | (5,245) |
| Administrative Expenses | 4,280 | 1.01 % | 4,605 | 325 | 51,353 | 1.06 % | 52,397 | 1,045 |
| Leasing Expenses | 3,154 | 0.74 % | 4,140 | 986 | 51,518 | 1.07 % | 55,082 | 3,564 |
| Utility Expenses | 7,527 | 1.77 % | 7,077 | (450) | 61,028 | 1.26 % | 63,352 | 2,324 |
| Service Expenses | 10,845 | 2.56 % | 4,838 | (6,006) | 63,496 | 1.32 % | 58,806 | (4,690) |
| Cleaning & Decorating Expenses | 6,684 | 1.58 % | 1,320 | (5,365) | 54,310 | 1.13 % | 35,330 | (18,981) |
| Repair & Maintenance Expenses | 3,768 | 0.89 % | 860 | (2,908) | 32,250 | 0.67 % | 14,835 | (17,414) |
| Property Taxes | 75,866 | 17.88 % | 76,931 | 1,065 | 922,107 | 19.10 % | 923,173 | 1,066 |
| Property Insurance | 9,741 | 2.30 % | 8,327 | (1,414) | 111,232 | 2.30 % | 99,924 | (11,308) |
| | | | | | | | | |
| Total Operating Expenses | 153,352 | 36.14 % | 146,462 | (6,890) | 1,791,018 | 37.11 % | 1,758,336 | (32,682) |
| | | | | | | | | |
| Total Net Operating Income | 240,150 | 56.60 % | 244,835 | (4,685) | 2,986,666 | 61.88 % | 2,863,385 | 123,281 |
| | | | | | | | | |
| **Property Replacements** | | | | | | | | |
| Recurring Replacements | 3,048 | 0.72 % | 954 | (2,095) | 43,453 | 0.90 % | 15,313 | (28,140) |
| Non-Recurring Replacements | 3,139 | 0.74 % | 0 | (3,138) | 247,033 | 5.12 % | 191,321 | (55,711) |
| Total Property Replacements | 6,187 | 1.46 % | 954 | (5,233) | 290,486 | 6.02 % | 206,634 | (83,851) |
| | | | | | | | | |
| Reserve Activity | 6,800 | 1.60 % | 6,800 | 0 | 81,600 | 1.69 % | 81,600 | 0 |
| | | | | | | | | |
| **Total Available for Debt Service** | **227,163** | **53.54 %** | **237,081** | **(9,918)** | **2,614,580** | **54.17 %** | **2,575,151** | **39,429** |
| | | | | | | | | |
| Debt Service | 149,256 | 35.18 % | 156,640 | 7,384 | 1,835,376 | 38.03 % | 1,879,680 | 44,305 |
| | | | | | | | | |
| **Total Cash Flow/(Deficit)** | **77,907** | **18.36 %** | **80,441** | **(2,534)** | **779,205** | **16.14 %** | **695,471** | **83,734** |

APP000213

# Parc at Windmill Farms
# Summary Income Statement
December 15, 2022

| | Current Month Per Unit | Annualized Per Unit | Current Month / SQ Ft | Annualized / SQ FT | Current Month % of Gross | YTD % of Gross |
|---|---|---|---|---|---|---|
| | Current | Annualized | Current Month/SQ FT | Annualized / SQ FT | Current % of Gross | YTD % of Gross |
| **Revenue** | | | | | | |
| Possible Rent Per Leases | | | | | | |
| Rent Per Schedule | 1,706.15 | 19,248.96 | 1.659 | 18.723 | 109.380 % | 108.473 % |
| Leases Under Schedule | (146.31) | (1,503.65) | (0.142) | (1.463) | (9.380) % | (8.473) % |
| Total Possible Rent Per Leases | 1,559.84 | 17,745.31 | 1.517 | 17.260 | 100.000 % | 100.000 % |
| Vacancy Losses | (142.80) | (653.77) | (0.139) | (0.636) | (9.155) % | (3.684) % |
| Other Rental Losses | (11.17) | (300.02) | (0.011) | (0.292) | (0.716) % | (1.691) % |
| Total Rental Losses | (153.97) | (953.80) | (0.150) | (0.928) | (9.871) % | (5.375) % |
| Total Net Rental Revenue | 1,405.87 | 16,791.51 | 1.367 | 16.332 | 90.129 % | 94.625 % |
| Other Revenue | 40.82 | 773.50 | 0.040 | 0.752 | 2.617 % | 4.359 % |
| Total Revenue | 1,446.70 | 17,565.02 | 1.407 | 17.085 | 92.746 % | 98.984 % |
| **Operating Expenses** | | | | | | |
| Personnel Expenses | 75.39 | 1,134.20 | 0.073 | 1.103 | 4.833 % | 6.392 % |
| Management Fees | 40.37 | 497.14 | 0.039 | 0.484 | 2.588 % | 2.802 % |
| Administrative Expenses | 15.73 | 188.80 | 0.015 | 0.184 | 1.009 % | 1.064 % |
| Leasing Expenses | 11.60 | 189.40 | 0.011 | 0.184 | 0.743 % | 1.067 % |
| Utility Expenses | 27.67 | 224.37 | 0.027 | 0.218 | 1.774 % | 1.264 % |
| Service Expenses | 39.87 | 233.44 | 0.039 | 0.227 | 2.556 % | 1.316 % |
| Cleaning & Decorating Expenses | 24.57 | 199.67 | 0.024 | 0.194 | 1.575 % | 1.125 % |
| Repair & Maintenance Expenses | 13.85 | 118.57 | 0.013 | 0.115 | 0.888 % | 0.668 % |
| Property Taxes | 278.92 | 3,390.10 | 0.271 | 3.297 | 17.881 % | 19.104 % |
| Property Insurance | 35.81 | 408.94 | 0.035 | 0.398 | 2.296 % | 2.304 % |
| Total Operating Expenses | 563.79 | 6,584.63 | 0.548 | 6.405 | 36.144 % | 37.106 % |
| Total Net Operating Income | 882.90 | 10,980.39 | 0.859 | 10.680 | 56.602 % | 61.878 % |
| **Property Replacements** | | | | | | |
| Recurring Replacements | 11.21 | 159.75 | 0.011 | 0.155 | 0.718 % | 0.900 % |
| Non-Recurring Replacements | 11.54 | 908.21 | 0.011 | 0.883 | 0.740 % | 5.118 % |
| Total Property Replacements | 22.75 | 1,067.96 | 0.022 | 1.039 | 1.458 % | 6.018 % |
| Reserve Activity | 25.00 | 300.00 | 0.024 | 0.292 | 1.603 % | 1.691 % |
| Total Available for Debt Service | 835.16 | 9,612.43 | 0.812 | 9.350 | 53.541 % | 54.169 % |
| Debt Service | 548.74 | 6,747.71 | 0.534 | 6.563 | 35.179 % | 38.025 % |
| Total Cash Flow/(Deficit) | 286.42 | 2,864.72 | 0.279 | 2.786 | 18.362 % | 16.144 % |

APP000214

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
As of December 15, 2022

| | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| Possible Rent Per Leases | | | | | | | | | | | | | | |
| Rent Per Schedule | 395,090 | 404,610 | 404,610 | 411,410 | 411,410 | 422,230 | 425,830 | 448,571 | 448,571 | 464,800 | 464,800 | 464,800 | 464,074 | 5,235,716 |
| Leases Under Schedule | (13,941) | (22,723) | (22,234) | (27,187) | (21,520) | (25,180) | (24,879) | (43,716) | (39,941) | (50,901) | (46,558) | (44,354) | (39,796) | (408,992) |
| Total Possible Rent Per Leases | 381,149 | 381,887 | 382,376 | 384,223 | 389,890 | 397,050 | 400,951 | 404,855 | 408,630 | 413,899 | 418,242 | 420,446 | 424,278 | 4,826,724 |
| Vacancy Losses | (9,565) | (4,774) | (4,804) | (11,546) | (12,299) | (11,455) | (12,322) | (10,815) | (14,248) | (13,465) | (14,674) | (28,586) | (38,842) | (177,826) |
| Other Rental Losses | (4,406) | (9,998) | (6,965) | (12,434) | (8,358) | (6,790) | (6,359) | (5,772) | (5,504) | (2,753) | (5,892) | (7,742) | (3,038) | (81,606) |
| Total Rental Losses | (13,971) | (14,772) | (11,769) | (23,980) | (20,657) | (18,245) | (18,681) | (16,587) | (19,752) | (16,218) | (20,566) | (36,328) | (41,880) | (259,432) |
| Total Net Rental Revenue | 367,178 | 367,115 | 370,607 | 360,243 | 369,233 | 378,805 | 382,270 | 388,268 | 388,878 | 397,681 | 397,676 | 384,118 | 382,398 | 4,567,292 |
| Other Revenue | 16,392 | 19,014 | 12,138 | 19,827 | 16,801 | 17,933 | 21,672 | 26,595 | 16,707 | 14,171 | 20,028 | 14,403 | 11,104 | 210,392 |
| Total Revenue | 383,570 | 386,129 | 382,745 | 380,070 | 386,034 | 396,738 | 403,942 | 414,863 | 405,585 | 411,852 | 417,704 | 398,521 | 393,502 | 4,777,684 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Personnel Expenses | 24,411 | 25,775 | 24,993 | 24,125 | 30,213 | 24,806 | 27,245 | 29,515 | 26,146 | 26,645 | 25,358 | 23,178 | 20,506 | 308,504 |
| Management Fees | 10,759 | 10,754 | 11,386 | 11,059 | 10,993 | 10,876 | 11,351 | 11,760 | 11,494 | 11,606 | 11,689 | 11,272 | 10,981 | 135,221 |
| Administrative Expenses | 4,897 | 5,320 | 5,030 | 3,905 | 3,007 | 4,465 | 3,711 | 4,436 | 4,846 | 5,258 | 2,345 | 4,749 | 4,280 | 51,352 |
| Leasing Expenses | 3,727 | 3,843 | 4,447 | 3,557 | 4,337 | 4,581 | 4,448 | 5,428 | 4,588 | 4,776 | 3,983 | 4,375 | 3,154 | 51,518 |
| Utility Expenses | 3,565 | 3,155 | 5,983 | 2,147 | 4,936 | 4,458 | 4,960 | 5,597 | 6,068 | 6,024 | 4,521 | 5,654 | 7,527 | 61,028 |
| Service Expenses | 4,310 | 4,762 | 4,382 | 4,705 | 2,514 | 4,207 | 4,855 | 5,811 | 4,736 | 5,746 | 5,575 | 5,358 | 10,845 | 63,497 |
| Cleaning & Decorating Expenses | 4,522 | 3,601 | 2,585 | 2,749 | 2,789 | 7,196 | 7,775 | 5,096 | 5,106 | 4,108 | 2,825 | 3,794 | 6,684 | 54,309 |
| Repair & Maintenance Expenses | 1,669 | 3,098 | 1,380 | 1,456 | 1,791 | 2,562 | 5,206 | 1,145 | 2,375 | 4,599 | 2,462 | 2,408 | 3,768 | 32,250 |
| Property Taxes | 399,393 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 75,866 | 922,108 |
| Property Insurance | 8,327 | 8,327 | 8,327 | 8,326 | 8,327 | 9,741 | 9,741 | 9,740 | 9,741 | 9,740 | 9,741 | 9,741 | 9,741 | 111,231 |
| Total Operating Expenses | 465,580 | 145,566 | 145,444 | 138,960 | 145,838 | 149,823 | 156,223 | 155,459 | 152,031 | 155,433 | 145,430 | 147,460 | 153,352 | 1,791,018 |
| Total Net Operating Income | (82,010) | 240,563 | 237,301 | 241,110 | 240,196 | 246,915 | 247,719 | 259,404 | 253,554 | 256,419 | 272,274 | 251,061 | 240,150 | 2,986,666 |
| **Property Replacements** | | | | | | | | | | | | | | |
| Recurring Replacements | 3,921 | 3,623 | 3,173 | 4,267 | 5,551 | 6,602 | 1,562 | 2,196 | 3,123 | 6,838 | 534 | 2,937 | 3,048 | 43,453 |
| Non-Recurring Replacements | 3,364 | 18,846 | 30,395 | 68,016 | 7,100 | 14,236 | 52,774 | 15,609 | 5,209 | 18,263 | 2,960 | 10,484 | 3,139 | 247,033 |
| Total Property Replacements | 7,285 | 22,469 | 33,568 | 72,283 | 12,651 | 20,838 | 54,336 | 17,805 | 8,332 | 25,101 | 3,494 | 13,421 | 6,187 | 290,486 |
| Reserve Activity | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 81,600 |
| Total Available for Debt Service | (96,095) | 211,294 | 196,933 | 162,026 | 220,745 | 219,277 | 186,583 | 234,799 | 238,422 | 224,518 | 261,981 | 230,841 | 227,163 | 2,614,582 |
| Debt Service | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 149,256 | 149,256 | 149,256 | 149,256 | 149,256 | 149,256 | 1,835,376 |
| Total Cash Flow/(Deficit) | (252,735) | 54,654 | 40,293 | 5,386 | 64,105 | 62,637 | 29,943 | 85,543 | 89,166 | 75,262 | 112,725 | 81,585 | 77,907 | 779,206 |

APP000215

# Parc at Windmill Farms
## Income Statement Prior Year Comparison
December 15, 2022

| | Month Ending 12/15/2022 Actual | Month Ending 12/15/2021 Actual | Month Ending 12/15/2022 Period Diff | Period % Var | Year to Date 12/15/2022 Actual | Year to Date 12/15/2021 Actual | Year to Date 12/15/2022 Period Diff | Period % Var |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Possible Rent Per Leases | | | | | | | | |
| Rent Per Schedule | 464,074 | 395,090 | 68,984 | 17.5 % | 5,235,716 | 4,587,880 | 647,836 | 14.1 % |
| Leases Under Schedule | (39,796) | (13,941) | (25,856) | 185.5 % | (408,992) | (180,879) | (228,113) | 126.1 % |
| Total Possible Rent Per Leases | 424,278 | 381,149 | 43,128 | 11.3 % | 4,826,724 | 4,407,001 | 419,723 | 9.5 % |
| | | | | | | | | |
| Vacancy Losses | (38,842) | (9,565) | (29,277) | 306.1 % | (177,826) | (89,886) | (87,939) | 97.8 % |
| Other Rental Losses | (3,038) | (4,406) | 1,369 | (31.1) % | (81,606) | (52,547) | (29,061) | 55.3 % |
| Total Rental Losses | (41,880) | (13,971) | (27,908) | 199.8 % | (259,432) | (142,433) | (117,000) | 82.1 % |
| Total Net Rental Revenue | 382,398 | 367,178 | 15,220 | 4.1 % | 4,567,292 | 4,264,568 | 302,723 | 7.1 % |
| | | | | | | | | |
| Other Revenue | 11,104 | 16,392 | (5,288) | (32.3) % | 210,392 | 262,300 | (51,907) | (19.8) % |
| Total Revenue | 393,502 | 383,570 | 9,932 | 2.6 % | 4,777,684 | 4,526,868 | 250,816 | 5.5 % |
| **Operating Expenses** | | | | | | | | |
| Personnel Expenses | 20,506 | 24,411 | (3,905) | (16.0) % | 308,503 | 284,920 | 23,583 | 8.3 % |
| Management Fees | 10,981 | 10,759 | 222 | 2.1 % | 135,221 | 125,577 | 9,644 | 7.7 % |
| Administrative Expenses | 4,280 | 4,897 | (617) | (12.6) % | 51,353 | 51,243 | 110 | 0.2 % |
| Leasing Expenses | 3,154 | 3,727 | (573) | (15.4) % | 51,518 | 54,082 | (2,564) | (4.7) % |
| Utility Expenses | 7,527 | 3,565 | 3,962 | 111.1 % | 61,028 | 50,481 | 10,547 | 20.9 % |
| Service Expenses | 10,845 | 4,310 | 6,535 | 151.6 % | 63,496 | 54,816 | 8,680 | 15.8 % |
| Cleaning & Decorating Expenses | 6,684 | 4,522 | 2,161 | 47.8 % | 54,310 | 29,497 | 24,813 | 84.1 % |
| Repair & Maintenance Expenses | 3,768 | 1,669 | 2,100 | 125.8 % | 32,250 | 15,905 | 16,345 | 102.8 % |
| Property Taxes | 75,866 | 399,393 | (323,527) | (81.0) % | 922,107 | 896,285 | 25,822 | 2.9 % |
| Property Insurance | 9,741 | 8,327 | 1,414 | 17.0 % | 111,232 | 106,295 | 4,937 | 4.6 % |
| | | | | | | | | |
| Total Operating Expenses | 153,352 | 465,580 | (312,228) | (67.1) % | 1,791,018 | 1,669,101 | 121,917 | 7.3 % |
| | | | | | | | | |
| Total Net Operating Income | 240,150 | (82,010) | 322,160 | (392.8) % | 2,986,666 | 2,857,767 | 128,899 | 4.5 % |
| **Property Replacements** | | | | | | | | |
| Recurring Replacements | 3,048 | 3,921 | (873) | (22.3) % | 43,453 | 23,100 | 20,353 | 88.1 % |
| Non-Recurring Replacements | 3,139 | 3,364 | (225) | (6.7) % | 247,033 | 122,141 | 124,891 | 102.3 % |
| Total Property Replacements | 6,187 | 7,285 | (1,098) | (15.1) % | 290,486 | 145,241 | 145,244 | 100.0 % |
| | | | | | | | | |
| Reserve Activity | 6,800 | 6,800 | 0 | 0.0 % | 81,600 | 81,600 | 0 | 0.0 % |
| | | | | | | | | |
| Total Available for Debt Service | 227,163 | (96,095) | 323,258 | (336.4) % | 2,614,580 | 2,630,926 | (16,346) | (0.6) % |
| | | | | | | | | |
| Debt Service | 149,256 | 156,640 | (7,384) | (4.7) % | 1,835,376 | 1,879,888 | (44,513) | (2.4) % |
| | | | | | | | | |
| Total Cash Flow/(Deficit) | 77,907 | (252,735) | 330,642 | (130.8) % | 779,205 | 751,038 | 28,167 | 3.8 % |

APP000216

## Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2022

| | Month Ending 12/15/2022 | | | | Year to Date 12/15/2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Revenue** | | | | | | | | |
| Total Potential Per Schedule | 464,074 | 109.38 % | 427,730 | 36,344 | 5,235,716 | 108.47 % | 4,969,563 | 266,153 |
| Leases Under/Over Schedule | (39,796) | (9.38) % | (25,278) | (14,518) | (408,992) | (8.47) % | (251,497) | (157,494) |
| **Total Possible Rent Per Leases** | **424,278** | **100.00 %** | **402,452** | **21,826** | **4,826,724** | **100.00 %** | **4,718,066** | **108,659** |
| | | | | | | | | |
| Vacancy Loss | (38,842) | (9.15) % | (19,248) | (19,594) | (177,826) | (3.68) % | (223,630) | 45,804 |
| Model | (1,558) | (0.37) % | (1,470) | (88) | (17,710) | (0.37) % | (17,010) | (700) |
| Bad Debt Loss | (771) | (0.18) % | (2,012) | 1,241 | (52,770) | (1.09) % | (23,590) | (29,180) |
| Discounts & Concessions | (709) | (0.17) % | (808) | 99 | (11,126) | (0.23) % | (9,696) | (1,431) |
| **Total Rental Losses** | **(41,880)** | **(9.87) %** | **(23,538)** | **(18,342)** | **(259,432)** | **(5.37) %** | **(273,926)** | **14,493** |
| **Total Net Rental Revenue** | **382,398** | **90.13 %** | **378,914** | **3,484** | **4,567,292** | **94.63 %** | **4,444,140** | **123,152** |
| | | | | | | | | |
| Deposit Forfeitures | 3,504 | 0.83 % | 1,475 | 2,029 | 52,466 | 1.09 % | 39,235 | 13,231 |
| Non-Refundable Pet Fees | 1,372 | 0.32 % | 2,300 | (928) | 24,515 | 0.51 % | 27,600 | (3,085) |
| Application Fees | 650 | 0.15 % | 1,500 | (850) | 17,450 | 0.36 % | 18,000 | (550) |
| NSF & Late Fees | 2,755 | 0.65 % | 2,850 | (95) | 30,915 | 0.64 % | 34,450 | (3,535) |
| Television Cable Revenue | 0 | 0.00 % | 1,700 | (1,700) | 15,523 | 0.32 % | 20,400 | (4,877) |
| Vending Revenue | 0 | 0.00 % | 0 | 0 | 1,428 | 0.03 % | 0 | 1,428 |
| Miscellaneous Revenue | 2,758 | 0.65 % | 2,500 | 258 | 67,481 | 1.40 % | 37,200 | 30,281 |
| Interest Income | 65 | 0.02 % | 58 | 7 | 614 | 0.01 % | 696 | (82) |
| **Total Other Revenue** | **11,104** | **2.62 %** | **12,383** | **(1,279)** | **210,392** | **4.36 %** | **177,581** | **32,811** |
| **Total Revenue** | **393,502** | **92.75 %** | **391,297** | **2,205** | **4,777,684** | **98.98 %** | **4,621,721** | **155,963** |
| | | | | | | | | |
| **Operating Expenses** | | | | | | | | |
| **Personnel Expenses** | | | | | | | | |
| Office Salaries | 7,653 | 1.80 % | 11,075 | 3,422 | 120,718 | 2.50 % | 129,693 | 8,976 |
| Maintenance | 4,948 | 1.17 % | 8,111 | 3,163 | 91,947 | 1.90 % | 95,874 | 3,926 |
| Porters/Housekeepers | 2,843 | 0.67 % | 2,704 | (139) | 24,128 | 0.50 % | 31,928 | 7,800 |
| Bonuses | 0 | 0.00 % | 0 | 0 | 8,000 | 0.17 % | 2,000 | (6,000) |
| Employers FICA | 1,237 | 0.29 % | 1,769 | 532 | 20,100 | 0.42 % | 21,347 | 1,247 |
| Other Payroll Taxes | 1,454 | 0.34 % | 2,082 | 628 | 23,643 | 0.49 % | 25,114 | 1,471 |
| Payroll Administrative | 146 | 0.03 % | 208 | 62 | 2,365 | 0.05 % | 2,496 | 131 |
| Workers Compensation | 464 | 0.11 % | 664 | 200 | 7,541 | 0.16 % | 8,009 | 468 |
| Group Insurance | 750 | 0.18 % | 750 | 0 | 9,000 | 0.19 % | 9,000 | 0 |
| Employee Recruitment | 157 | 0.04 % | 0 | (157) | 207 | 0.00 % | 0 | (208) |
| Contract Office Help | 854 | 0.20 % | 0 | (854) | 854 | 0.02 % | 0 | (854) |
| **Total Personnel Expenses** | **20,506** | **4.83 %** | **27,363** | **6,857** | **308,503** | **6.39 %** | **325,461** | **16,957** |
| | | | | | | | | |
| **Management Fees** | | | | | | | | |
| Management Fee | 10,981 | 2.59 % | 11,001 | 20 | 135,221 | 2.80 % | 129,976 | (5,245) |
| **Total Management Fees** | **10,981** | **2.59 %** | **11,001** | **20** | **135,221** | **2.80 %** | **129,976** | **(5,245)** |

APP000217

## Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2022

| | Month Ending 12/15/2022 | | | | Year to Date 12/15/2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Administrative Expenses** | | | | | | | | |
| Office Supplies | 0 | 0.00 % | 75 | 75 | 667 | 0.01 % | 900 | 234 |
| Professional Services | 0 | 0.00 % | 0 | 0 | 750 | 0.02 % | 750 | 0 |
| Site Travel | 0 | 0.00 % | 0 | 0 | 255 | 0.01 % | 0 | (255) |
| Postage & Freight | 368 | 0.09 % | 250 | (119) | 3,494 | 0.07 % | 3,000 | (495) |
| Employee Relations | 915 | 0.22 % | 640 | (275) | 985 | 0.02 % | 1,080 | 95 |
| License, Permits & Fees | 818 | 0.19 % | 680 | (137) | 12,110 | 0.25 % | 9,905 | (2,205) |
| Credit/Collection/Eviction Cost | 556 | 0.13 % | 878 | 322 | 13,439 | 0.28 % | 10,540 | (2,898) |
| Dues & Subscriptions | 0 | 0.00 % | 0 | 0 | 463 | 0.01 % | 450 | (14) |
| Copier, Forms & Printing | 220 | 0.05 % | 250 | 30 | 2,911 | 0.06 % | 3,000 | 90 |
| Training & Seminars | 289 | 0.07 % | 135 | (154) | 1,675 | 0.03 % | 1,620 | (56) |
| Computer Supplies | 0 | 0.00 % | 40 | 40 | 947 | 0.02 % | 1,268 | 322 |
| Telephone & Answering | 666 | 0.16 % | 1,107 | 441 | 8,317 | 0.17 % | 13,284 | 4,967 |
| Miscellaneous Administrative | 448 | 0.11 % | 550 | 102 | 5,340 | 0.11 % | 6,600 | 1,260 |
| **Total Administrative Expenses** | **4,280** | **1.01 %** | **4,605** | **325** | **51,353** | **1.06 %** | **52,397** | **1,045** |
| | | | | | | | | |
| **Leasing Expenses** | | | | | | | | |
| Advertising | 2,298 | 0.54 % | 2,201 | (97) | 28,463 | 0.59 % | 26,632 | (1,831) |
| Locator Commissions | 0 | 0.00 % | 250 | 250 | 250 | 0.01 % | 3,000 | 2,750 |
| Referral Fees | 0 | 0.00 % | 0 | 0 | 250 | 0.01 % | 1,000 | 750 |
| Brochures & Related | 0 | 0.00 % | 0 | 0 | 811 | 0.02 % | 700 | (111) |
| Project & Promotions | 141 | 0.03 % | 450 | 309 | 3,819 | 0.08 % | 4,200 | 381 |
| Leasing Commissions | 715 | 0.17 % | 1,239 | 524 | 17,925 | 0.37 % | 19,550 | 1,625 |
| **Total Leasing Expenses** | **3,154** | **0.74 %** | **4,140** | **986** | **51,518** | **1.07 %** | **55,082** | **3,564** |
| | | | | | | | | |
| **Utility Expenses** | | | | | | | | |
| Electricity - House Meters | 2,005 | 0.47 % | 1,827 | (177) | 22,722 | 0.47 % | 26,632 | 3,909 |
| Electricity - Vacant & Model | 456 | 0.11 % | 480 | 23 | 2,295 | 0.05 % | 5,760 | 3,466 |
| Water Expense | 4,881 | 1.15 % | 4,548 | (333) | 38,516 | 0.80 % | 37,038 | (1,477) |
| Sewer Expense | 4,407 | 1.04 % | 4,630 | 223 | 49,279 | 1.02 % | 45,299 | (3,981) |
| Resident Billing | 900 | 0.21 % | 840 | (61) | 10,965 | 0.23 % | 10,078 | (888) |
| Water Irrigation | 1,372 | 0.32 % | 1,545 | 174 | 15,974 | 0.33 % | 20,085 | 4,112 |
| Water & Sewer Reimbursements | (6,494) | (1.53) % | (6,793) | (299) | (78,723) | (1.63) % | (81,540) | (2,817) |
| **Total Utility Expenses** | **7,527** | **1.77 %** | **7,077** | **(450)** | **61,028** | **1.26 %** | **63,352** | **2,324** |
| | | | | | | | | |
| **Service Expenses** | | | | | | | | |
| Grounds Maintenance Contract | 4,716 | 1.11 % | 4,720 | 4 | 56,598 | 1.17 % | 56,640 | 43 |
| Exterminating Services/Supplies | 624 | 0.15 % | 325 | (299) | 5,140 | 0.11 % | 3,900 | (1,241) |
| Exterminating Reimbursements | (1,428) | (0.34) % | (1,452) | (24) | (17,541) | (0.36) % | (17,424) | 117 |
| Garbage & Trash Removal | 7,177 | 1.69 % | 2,050 | (5,127) | 30,586 | 0.63 % | 24,600 | (5,986) |
| Garbage & Trash Reimbursements | (1,933) | (0.46) % | (1,930) | 3 | (23,470) | (0.49) % | (23,160) | 310 |
| Security Services | 882 | 0.21 % | 600 | (282) | 7,442 | 0.15 % | 7,200 | (242) |
| Uniform Services and Cleaning | 332 | 0.08 % | 0 | (332) | 645 | 0.01 % | 750 | 106 |
| Hallway Cleaning | 360 | 0.08 % | 450 | 90 | 3,314 | 0.07 % | 5,400 | 2,086 |
| Fire Protection | 115 | 0.03 % | 75 | (39) | 782 | 0.02 % | 900 | 117 |
| **Total Service Expenses** | **10,845** | **2.56 %** | **4,838** | **(6,006)** | **63,496** | **1.32 %** | **58,806** | **(4,690)** |

APP000218

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2022

| | Month Ending 12/15/2022 | | | | Year to Date 12/15/2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Cleaning & Decorating Expenses** | | | | | | | | |
| Contract Paint Labor | 3,366 | 0.79 % | 206 | (3,161) | 13,685 | 0.28 % | 8,841 | (4,844) |
| Paint Supplies | 207 | 0.05 % | 319 | 112 | 5,319 | 0.11 % | 8,489 | 3,170 |
| Contract Cleaning & Supplies | 2,024 | 0.48 % | 345 | (1,679) | 20,080 | 0.42 % | 8,520 | (11,560) |
| Carpet Cleaning | 1,077 | 0.25 % | 240 | (837) | 13,325 | 0.28 % | 6,960 | (6,365) |
| Carpet Dyeing & Repairs | 0 | 0.00 % | 90 | 90 | 325 | 0.01 % | 1,080 | 755 |
| Sheetrock Repairs | 10 | 0.00 % | 120 | 110 | 1,576 | 0.03 % | 1,440 | (137) |
| **Total Cleaning & Decorating Expenses** | **6,684** | **1.58 %** | **1,320** | **(5,365)** | **54,310** | **1.13 %** | **35,330** | **(18,981)** |
| | | | | | | | | |
| **Repair & Maintenance Expenses** | | | | | | | | |
| Roof Supplies & Repairs | 0 | 0.00 % | 0 | 0 | 250 | 0.01 % | 0 | (250) |
| Grounds Maintenance Supplies | 247 | 0.06 % | 40 | (207) | 1,614 | 0.03 % | 480 | (1,133) |
| Pool Supplies & Repair | 482 | 0.11 % | 450 | (32) | 7,353 | 0.15 % | 6,940 | (413) |
| Clubhouse & Amenity Repairs | 134 | 0.03 % | 0 | (134) | 134 | 0.00 % | 0 | (134) |
| Parking Lot/Sidewalks | 0 | 0.00 % | 0 | 0 | 62 | 0.00 % | 0 | (62) |
| Electrical Supplies & Repairs | 754 | 0.18 % | 25 | (729) | 1,195 | 0.02 % | 450 | (745) |
| Plumbing Supplies & Repairs | 409 | 0.10 % | 35 | (374) | 2,540 | 0.05 % | 420 | (2,121) |
| HVAC Supplies & Repairs | 176 | 0.04 % | 100 | (77) | 5,573 | 0.12 % | 2,600 | (2,972) |
| Appliance Supplies & Repairs | 833 | 0.20 % | 90 | (742) | 9,875 | 0.20 % | 1,255 | (8,620) |
| Carpentry Supplies | 0 | 0.00 % | 0 | 0 | 15 | 0.00 % | 0 | (15) |
| Hardware Supplies | 210 | 0.05 % | 45 | (165) | 848 | 0.02 % | 590 | (258) |
| Locks & Keys | 105 | 0.02 % | 25 | (80) | 395 | 0.01 % | 600 | 204 |
| Light Bulbs & Fixtures | 418 | 0.10 % | 50 | (368) | 2,396 | 0.05 % | 1,500 | (895) |
| **Total Repair & Maintenance Expenses** | **3,768** | **0.89 %** | **860** | **(2,908)** | **32,250** | **0.67 %** | **14,835** | **(17,414)** |
| | | | | | | | | |
| **Property Taxes** | | | | | | | | |
| Property Tax Expense | 75,866 | 17.88 % | 76,931 | 1,065 | 922,107 | 19.10 % | 923,173 | 1,066 |
| **Total Property Taxes** | **75,866** | **17.88 %** | **76,931** | **1,065** | **922,107** | **19.10 %** | **923,173** | **1,066** |
| | | | | | | | | |
| **Property Insurance** | | | | | | | | |
| Hazard Insurance Expense | 9,741 | 2.30 % | 8,327 | (1,414) | 111,232 | 2.30 % | 99,924 | (11,308) |
| **Total Property Insurance** | **9,741** | **2.30 %** | **8,327** | **(1,414)** | **111,232** | **2.30 %** | **99,924** | **(11,308)** |
| **Total Operating Expenses** | **153,352** | **36.14 %** | **146,462** | **(6,890)** | **1,791,018** | **37.11 %** | **1,758,336** | **(32,682)** |
| | | | | | | | | |
| **Total Net Operating Income** | **240,150** | **56.60 %** | **244,835** | **(4,685)** | **2,986,666** | **61.88 %** | **2,863,385** | **123,281** |

APP000219

## Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2022

| | Month Ending 12/15/2022 | | | | Year to Date 12/15/2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Property Replacements** | | | | | | | | |
| **Recurring Replacements** | | | | | | | | |
| Carpet Replacement | 1,331 | 0.31 % | 604 | (727) | 24,794 | 0.51 % | 10,268 | (14,526) |
| Drapery/Mini-Blind Replacements | 0 | 0.00 % | 85 | 85 | 3,485 | 0.07 % | 1,870 | (1,615) |
| Apppliance Replacements | 1,717 | 0.40 % | 265 | (1,453) | 15,174 | 0.31 % | 3,175 | (11,999) |
| **Total Recurring Replacements** | **3,048** | **0.72 %** | **954** | **(2,095)** | **43,453** | **0.90 %** | **15,313** | **(28,140)** |
| | | | | | | | | |
| **Non-Recurring Replacements** | | | | | | | | |
| Pool Furniture | 0 | 0.00 % | 0 | 0 | 2,279 | 0.05 % | 3,500 | 1,221 |
| Playground/Recreational Equipment | 0 | 0.00 % | 0 | 0 | 108 | 0.00 % | 0 | (108) |
| Lawns, Trees & Shrubs | 1,949 | 0.46 % | 0 | (1,948) | 129,661 | 2.69 % | 126,843 | (2,818) |
| Paving & Parking Lots | 0 | 0.00 % | 0 | 0 | (3,815) | (0.08) % | 9,100 | 12,915 |
| Roof Replacments | 0 | 0.00 % | 0 | 0 | 5,225 | 0.11 % | 0 | (5,225) |
| Exterior Carpentry/Siding | 0 | 0.00 % | 0 | 0 | 1,289 | 0.03 % | 0 | (1,289) |
| Concrete Repairs | 0 | 0.00 % | 0 | 0 | 3,789 | 0.08 % | 0 | (3,789) |
| HVAC Replacments | 0 | 0.00 % | 0 | 0 | 6,066 | 0.13 % | 2,500 | (3,566) |
| Plumbing Replacements | 0 | 0.00 % | 0 | 0 | 5,140 | 0.11 % | 0 | (5,140) |
| Electrical Replacement | 0 | 0.00 % | 0 | 0 | 1,419 | 0.03 % | 0 | (1,419) |
| Pool & Equipment | 0 | 0.00 % | 0 | 0 | 489 | 0.01 % | 0 | (488) |
| Gate Repairs & Supplies | 500 | 0.12 % | 0 | (500) | 4,695 | 0.10 % | 800 | (3,896) |
| City Inspection/Multifamily Fee | 0 | 0.00 % | 0 | 0 | 26,928 | 0.56 % | 26,928 | 0 |
| Major Pest Control | 379 | 0.09 % | 0 | (379) | 1,326 | 0.03 % | 800 | (526) |
| Other Non-Recurring Replacements | 111 | 0.03 % | 0 | (111) | 14,193 | 0.29 % | 5,500 | (8,692) |
| Unit Upgrades | 0 | 0.00 % | 0 | 0 | 9,000 | 0.19 % | 0 | (9,001) |
| Audit Expense | 0 | 0.00 % | 0 | 0 | 7,800 | 0.16 % | 7,700 | (100) |
| Fire Alarm System Repairs | 200 | 0.05 % | 0 | (200) | 31,311 | 0.65 % | 7,650 | (23,661) |
| Ownership Level Expenses | 0 | 0.00 % | 0 | 0 | 130 | 0.00 % | 0 | (129) |
| **Total Non-Recurring Replacements** | **3,139** | **0.74 %** | **0** | **(3,138)** | **247,033** | **5.12 %** | **191,321** | **(55,711)** |
| **Total Property Replacements** | **6,187** | **1.46 %** | **954** | **(5,233)** | **290,486** | **6.02 %** | **206,634** | **(83,851)** |

APP000220

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2022

| | Month Ending 12/15/2022 | | | | Year to Date 12/15/2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Reserve Activity** | | | | | | | | |
| Recurring Reserve Expense | 6,800 | 1.60 % | 6,800 | 0 | 81,600 | 1.69 % | 81,600 | 0 |
| **Total Reserve Activity** | **6,800** | **1.60 %** | **6,800** | **0** | **81,600** | **1.69 %** | **81,600** | **0** |
| | | | | | | | | |
| **Total Available for Debt Service** | **227,163** | **53.54 %** | **237,081** | **(9,918)** | **2,614,580** | **54.17 %** | **2,575,151** | **39,429** |
| **Debt Service** | | | | | | | | |
| Interest Expense | 114,114 | 26.90 % | 156,640 | 42,526 | 1,376,787 | 28.52 % | 1,879,680 | 502,893 |
| Principal - First to Fourth | 35,101 | 8.27 % | 0 | (35,101) | 413,791 | 8.57 % | 0 | (413,791) |
| HUD MIP (PMI) Insurance | 41 | 0.01 % | 0 | (41) | 44,798 | 0.93 % | 0 | (44,797) |
| **Total Debt Service** | **149,256** | **35.18 %** | **156,640** | **7,384** | **1,835,376** | **38.03 %** | **1,879,680** | **44,305** |
| | | | | | | | | |
| **Total Cash Flow/(Deficit)** | **77,907** | **18.36 %** | **80,441** | **(2,534)** | **779,205** | **16.14 %** | **695,471** | **83,734** |

APP000221

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2022

| | Month Ending 12/15/2022 | | | | Year to Date 12/15/2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | **Actual** | **Ratio** | **Budget** | **Variance** | **Actual** | **Ratio** | **Budget** | **Variance** |
| **Syndication / Non-Operating Expenses** | | | | | | | | |
| Debt Service Principal Credit | (35,101) | (8.27) % | 0 | (35,101) | (413,791) | (8.57) % | 0 | (413,791) |
| Replacement Reserve Credit | (6,800) | (1.60) % | 0 | (6,800) | (81,600) | (1.69) % | 0 | (81,600) |
| Deferred Interest - HUD | 7,299 | 1.72 % | 0 | 7,299 | 43,455 | 0.90 % | 0 | 43,455 |
| **Total Syndication / Non-Operating Expenses** | **(34,602)** | **(8.16) %** | **0** | **(34,602)** | **(451,936)** | **(9.36) %** | **0** | **(451,936)** |
| | | | | | | | | |
| **Net Income / (Loss)** | **112,509** | **26.52 %** | **80,441** | **32,068** | **1,231,141** | **25.51 %** | **695,471** | **535,670** |

APP000222

## Parc at Windmill Farms
## Trailing 12 Month Income Statement
### As of December 15, 2022

| | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| **Possible Rent Per Leases** | | | | | | | | | | | | | | |
| Rent Per Schedule | | | | | | | | | | | | | | |
| Total Potential Per Schedule | 395,090 | 404,610 | 404,610 | 411,410 | 411,410 | 422,230 | 425,830 | 448,571 | 448,571 | 464,800 | 464,800 | 464,800 | 464,074 | 5,235,716 |
| Total Rent Per Schedule | 395,090 | 404,610 | 404,610 | 411,410 | 411,410 | 422,230 | 425,830 | 448,571 | 448,571 | 464,800 | 464,800 | 464,800 | 464,074 | 5,235,716 |
| **Leases Under Schedule** | | | | | | | | | | | | | | |
| Leases Under/Over Schedule | (13,941) | (22,723) | (22,234) | (27,187) | (21,520) | (25,180) | (24,879) | (43,716) | (39,941) | (50,901) | (46,558) | (44,354) | (39,796) | (408,992) |
| Total Leases Under Schedule | (13,941) | (22,723) | (22,234) | (27,187) | (21,520) | (25,180) | (24,879) | (43,716) | (39,941) | (50,901) | (46,558) | (44,354) | (39,796) | (408,992) |
| Total Possible Rent Per Leases | 381,149 | 381,887 | 382,376 | 384,223 | 389,890 | 397,050 | 400,951 | 404,855 | 408,630 | 413,899 | 418,242 | 420,446 | 424,278 | 4,826,724 |
| **Vacancy Losses** | | | | | | | | | | | | | | |
| Vacancy Loss | (9,565) | (4,774) | (4,804) | (11,546) | (12,299) | (11,455) | (12,322) | (10,815) | (14,248) | (13,465) | (14,674) | (28,586) | (38,842) | (177,826) |
| Total Vacancy Losses | (9,565) | (4,774) | (4,804) | (11,546) | (12,299) | (11,455) | (12,322) | (10,815) | (14,248) | (13,465) | (14,674) | (28,586) | (38,842) | (177,826) |
| **Other Rental Losses** | | | | | | | | | | | | | | |
| Model | (1,350) | (1,385) | (1,385) | (1,410) | (1,410) | (1,430) | (1,450) | (1,450) | (1,558) | (1,558) | (1,558) | (1,558) | (1,558) | (17,710) |
| Bad Debt Loss | (1,139) | (7,317) | (4,245) | (9,574) | (5,477) | (4,291) | (4,025) | (4,594) | (2,731) | (280) | (4,150) | (5,314) | (771) | (52,770) |
| Discounts & Concessions | (1,917) | (1,296) | (1,335) | (1,450) | (1,471) | (1,069) | (884) | 272 | (1,215) | (915) | (184) | (870) | (709) | (11,126) |
| Total Other Rental Losses | (4,406) | (9,998) | (6,965) | (12,434) | (8,358) | (6,790) | (6,359) | (5,772) | (5,504) | (2,753) | (5,892) | (7,742) | (3,038) | (81,606) |
| Total Rental Losses | (13,971) | (14,772) | (11,769) | (23,980) | (20,657) | (18,245) | (18,681) | (16,587) | (19,752) | (16,218) | (20,566) | (36,328) | (41,880) | (259,432) |
| Total Net Rental Revenue | 367,178 | 367,115 | 370,607 | 360,243 | 369,233 | 378,805 | 382,270 | 388,268 | 388,878 | 397,681 | 397,676 | 384,118 | 382,398 | 4,567,292 |
| **Other Revenue** | | | | | | | | | | | | | | |
| Deposit Forfeitures | 74 | 6,044 | 297 | 4,472 | 2,672 | 6,182 | 7,549 | 5,065 | 5,803 | 3,385 | 3,625 | 3,868 | 3,504 | 52,466 |
| Non-Refundable Pet Fees | 2,609 | 1,759 | 1,511 | 951 | 2,254 | 2,036 | 3,686 | 2,723 | 2,521 | 2,764 | 1,765 | 1,174 | 1,372 | 24,515 |
| Application Fees | 1,450 | 800 | 1,350 | 1,900 | 2,550 | 2,700 | 1,450 | 2,200 | 1,700 | 800 | 600 | 750 | 650 | 17,450 |
| NSF & Late Fees | 4,955 | 4,230 | 1,985 | 1,347 | 1,823 | 2,685 | 1,955 | 2,875 | 2,985 | 2,560 | 2,655 | 3,060 | 2,755 | 30,915 |
| Television Cable Revenue | 1,024 | 0 | 1,712 | 2,641 | 0 | 0 | 0 | 5,330 | 0 | 262 | 3,638 | 1,939 | 0 | 15,523 |
| Vending Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 476 | 0 | 476 | 0 | 0 | 476 | 0 | 1,428 |
| Miscellaneous Revenue | 6,233 | 6,132 | 5,234 | 8,472 | 7,453 | 4,282 | 6,506 | 8,354 | 3,173 | 4,350 | 7,696 | 3,069 | 2,758 | 67,481 |
| Interest Income | 47 | 49 | 49 | 44 | 49 | 48 | 50 | 48 | 49 | 50 | 49 | 67 | 65 | 614 |
| Total Other Revenue | 16,392 | 19,014 | 12,138 | 19,827 | 16,801 | 17,933 | 21,672 | 26,595 | 16,707 | 14,171 | 20,028 | 14,403 | 11,104 | 210,392 |

APP000223

## Parc at Windmill Farms
## Trailing 12 Month Income Statement
### As of December 15, 2022

| | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Revenue** | 383,570 | 386,129 | 382,745 | 380,070 | 386,034 | 396,738 | 403,942 | 414,863 | 405,585 | 411,852 | 417,704 | 398,521 | 393,502 | 4,777,684 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Office Salaries | 9,569 | 10,319 | 9,740 | 9,936 | 10,531 | 10,083 | 10,621 | 10,330 | 10,327 | 10,698 | 9,951 | 10,530 | 7,653 | 120,718 |
| Maintenance | 7,778 | 7,949 | 7,884 | 7,172 | 8,522 | 7,394 | 8,562 | 8,091 | 8,128 | 8,540 | 8,242 | 6,514 | 4,948 | 91,947 |
| Porters/Housekeepers | 2,284 | 2,294 | 2,290 | 2,149 | 2,452 | 2,202 | 2,477 | 2,402 | 2,270 | 1,336 | 0 | 1,415 | 2,843 | 24,128 |
| Bonuses | 0 | 0 | 0 | 0 | 2,700 | 0 | 0 | 2,700 | 0 | 600 | 2,000 | 0 | 0 | 8,000 |
| Employers FICA | 1,603 | 1,672 | 1,603 | 1,543 | 1,970 | 1,640 | 1,811 | 1,964 | 1,750 | 1,769 | 1,654 | 1,487 | 1,237 | 20,100 |
| Other Payroll Taxes | 1,886 | 1,967 | 1,886 | 1,815 | 2,317 | 1,929 | 2,131 | 2,310 | 2,058 | 2,081 | 1,946 | 1,749 | 1,454 | 23,643 |
| Payroll Administrative | 189 | 197 | 188 | 182 | 232 | 193 | 213 | 231 | 206 | 208 | 194 | 175 | 146 | 2,365 |
| Workers Compensation | 602 | 627 | 602 | 578 | 739 | 615 | 680 | 737 | 657 | 663 | 621 | 558 | 464 | 7,541 |
| Group Insurance | 500 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 9,000 |
| Employee Recruitment | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 157 | 208 |
| Contract Office Help | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 854 | 854 |
| **Total Personnel Expenses** | 24,411 | 25,775 | 24,993 | 24,125 | 30,213 | 24,806 | 27,245 | 29,515 | 26,146 | 26,645 | 25,358 | 23,178 | 20,506 | 308,504 |
| **Management Fees** | | | | | | | | | | | | | | |
| Management Fee | 10,759 | 10,754 | 11,386 | 11,059 | 10,993 | 10,876 | 11,351 | 11,760 | 11,494 | 11,606 | 11,689 | 11,272 | 10,981 | 135,221 |
| **Total Management Fees** | 10,759 | 10,754 | 11,386 | 11,059 | 10,993 | 10,876 | 11,351 | 11,760 | 11,494 | 11,606 | 11,689 | 11,272 | 10,981 | 135,221 |
| **Administrative Expenses** | | | | | | | | | | | | | | |
| Office Supplies | 30 | 0 | 82 | 35 | 23 | 111 | 193 | 88 | 0 | 135 | 0 | 0 | 0 | 666 |
| Professional Services | 0 | 0 | 0 | 750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 750 |
| Site Travel | 0 | 0 | 0 | 0 | 0 | 0 | 193 | 0 | 0 | 0 | 0 | 62 | 0 | 255 |
| Postage & Freight | 244 | 262 | 281 | 277 | 272 | 253 | 304 | 269 | 277 | 294 | 233 | 404 | 368 | 3,495 |
| Employee Relations | 874 | (117) | 87 | 0 | 0 | 45 | 0 | 0 | 55 | 0 | 0 | 0 | 915 | 985 |
| License, Permits & Fees | 875 | 2,569 | 1,579 | 907 | 850 | 872 | 866 | 866 | 874 | 810 | 232 | 866 | 818 | 12,110 |
| Credit/Collection/Eviction Cost | 1,404 | 412 | 1,436 | 412 | 412 | 1,327 | 556 | 1,573 | 2,172 | 2,357 | 556 | 1,669 | 556 | 13,438 |
| Dues & Subscriptions | 0 | 464 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 464 |
| Copier, Forms & Printing | 260 | 219 | 329 | 271 | 220 | 334 | 220 | 219 | 219 | 220 | 220 | 220 | 220 | 2,910 |
| Training & Seminars | 115 | 114 | 115 | 114 | 114 | 115 | 114 | 114 | 115 | 114 | 150 | 208 | 289 | 1,676 |
| Computer Supplies | 0 | 237 | 0 | 0 | 0 | 236 | 0 | 237 | 0 | 0 | 0 | 236 | 0 | 946 |
| Telephone & Answering | 671 | 688 | 679 | 668 | 667 | 671 | 689 | 678 | 698 | 882 | 666 | 666 | 666 | 8,317 |
| Miscellaneous Administrative | 424 | 472 | 442 | 471 | 449 | 501 | 576 | 392 | 491 | 391 | 288 | 418 | 448 | 5,340 |
| **Total Administrative Expenses** | 4,897 | 5,320 | 5,030 | 3,905 | 3,007 | 4,465 | 3,711 | 4,436 | 4,846 | 5,258 | 2,345 | 4,749 | 4,280 | 51,352 |

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
As of December 15, 2022

| | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leasing Expenses** | | | | | | | | | | | | | | |
| Advertising | 2,201 | 2,408 | 2,409 | 2,407 | 2,407 | 2,299 | 2,298 | 2,299 | 2,298 | 2,365 | 2,232 | 2,743 | 2,298 | 28,463 |
| Locator Commissions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 250 | 0 | 0 | 0 | 250 |
| Referral Fees | 0 | 0 | 0 | 0 | 250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 250 |
| Brochures & Related | 50 | 0 | 700 | 52 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 60 | 0 | 811 |
| Project & Promotions | 151 | 135 | 298 | 188 | 135 | 527 | 135 | 984 | 145 | 211 | 321 | 597 | 141 | 3,819 |
| Leasing Commissions | 1,325 | 1,300 | 1,040 | 910 | 1,545 | 1,755 | 2,015 | 2,145 | 2,145 | 1,950 | 1,430 | 975 | 715 | 17,925 |
| Total Leasing Expenses | 3,727 | 3,843 | 4,447 | 3,557 | 4,337 | 4,581 | 4,448 | 5,428 | 4,588 | 4,776 | 3,983 | 4,375 | 3,154 | 51,518 |
| | | | | | | | | | | | | | | |
| **Utility Expenses** | | | | | | | | | | | | | | |
| Electricity - House Meters | 1,972 | 1,807 | 2,261 | 2,250 | 2,393 | 2,120 | 2,100 | 1,877 | 2,028 | 1,794 | 90 | 1,999 | 2,005 | 22,723 |
| Electricity - Vacant & Model | 242 | 209 | (157) | 0 | 475 | 223 | 344 | 91 | 338 | (3) | 266 | 52 | 456 | 2,294 |
| Water Expense | 2,693 | 2,722 | 3,846 | 2,676 | 3,117 | 2,775 | 2,956 | 3,642 | 2,893 | 2,826 | 3,097 | 3,086 | 4,881 | 38,516 |
| Sewer Expense | 3,764 | 3,792 | 4,857 | 3,745 | 4,191 | 3,845 | 4,029 | 4,290 | 3,964 | 3,827 | 4,170 | 4,160 | 4,407 | 49,279 |
| Resident Billing | 925 | 905 | 925 | 925 | 932 | 911 | 925 | 904 | 918 | 897 | 911 | 911 | 900 | 10,965 |
| Water Irrigation | 400 | 303 | 469 | 340 | 540 | 592 | 822 | 498 | 2,230 | 3,475 | 3,576 | 1,760 | 1,372 | 15,974 |
| Water & Sewer Reimbursements | (6,431) | (6,583) | (6,218) | (7,789) | (6,712) | (6,008) | (6,216) | (5,705) | (6,303) | (6,792) | (7,589) | (6,314) | (6,494) | (78,723) |
| Total Utility Expenses | 3,565 | 3,155 | 5,983 | 2,147 | 4,936 | 4,458 | 4,960 | 5,597 | 6,068 | 6,024 | 4,521 | 5,654 | 7,527 | 61,028 |
| | | | | | | | | | | | | | | |
| **Service Expenses** | | | | | | | | | | | | | | |
| Grounds Maintenance Contract | 4,716 | 4,717 | 4,716 | 4,716 | 4,717 | 4,716 | 4,716 | 4,717 | 4,717 | 4,716 | 4,716 | 4,717 | 4,716 | 56,598 |
| Exterminating Services/Supplies | 286 | 286 | 287 | 316 | 386 | 158 | 163 | 440 | 526 | 1,067 | 440 | 448 | 624 | 5,140 |
| Exterminating Reimbursements | (1,482) | (1,452) | (1,524) | (1,506) | (1,593) | (1,434) | (1,404) | (1,344) | (1,458) | (1,458) | (1,470) | (1,470) | (1,428) | (17,541) |
| Garbage & Trash Removal | 2,655 | 2,655 | 2,656 | 2,655 | 885 | 885 | 1,991 | 2,655 | 1,759 | 2,156 | 2,656 | 2,455 | 7,177 | 30,586 |
| Garbage & Trash Reimbursements | (2,038) | (1,921) | (2,023) | (2,076) | (2,031) | (1,953) | (1,876) | (1,839) | (1,960) | (1,944) | (1,940) | (1,975) | (1,933) | (23,470) |
| Security Services | 0 | 0 | 0 | 0 | 0 | 1,265 | 883 | 882 | 882 | 883 | 883 | 883 | 882 | 7,443 |
| Uniform Services and Cleaning | 0 | 13 | 0 | 300 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 332 | 644 |
| Hallway Cleaning | 0 | 464 | 150 | 300 | 150 | 450 | 300 | 300 | 150 | 300 | 210 | 180 | 360 | 3,314 |
| Fire Protection | 173 | 0 | 120 | 0 | 0 | 120 | 82 | 0 | 120 | 26 | 80 | 120 | 115 | 783 |
| Total Service Expenses | 4,310 | 4,762 | 4,382 | 4,705 | 2,514 | 4,207 | 4,855 | 5,811 | 4,736 | 5,746 | 5,575 | 5,358 | 10,845 | 63,497 |

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
### As of December 15, 2022

| | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cleaning & Decorating Expenses** | | | | | | | | | | | | | | |
| Contract Paint Labor | 0 | 0 | 0 | 740 | 546 | 3,150 | 1,377 | 1,031 | 2,521 | 0 | 0 | 952 | 3,366 | 13,684 |
| Paint Supplies | 434 | 0 | 391 | 564 | 436 | 1,182 | 228 | 354 | 264 | 1,039 | 197 | 458 | 207 | 5,319 |
| Contract Cleaning & Supplies | 2,453 | 1,262 | 1,522 | 905 | 1,040 | 1,940 | 3,087 | 2,210 | 1,804 | 1,221 | 1,726 | 1,339 | 2,024 | 20,080 |
| Carpet Cleaning | 1,635 | 1,725 | 672 | 296 | 713 | 924 | 2,445 | 1,501 | 517 | 1,508 | 902 | 1,045 | 1,077 | 13,325 |
| Carpet Dyeing & Repairs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 325 | 0 | 0 | 0 | 325 |
| Sheetrock Repairs | 0 | 614 | 0 | 244 | 54 | 0 | 638 | 0 | 0 | 15 | 0 | 0 | 10 | 1,576 |
| Total Cleaning & Decorating Expenses | 4,522 | 3,601 | 2,585 | 2,749 | 2,789 | 7,196 | 7,775 | 5,096 | 5,106 | 4,108 | 2,825 | 3,794 | 6,684 | 54,309 |
| | | | | | | | | | | | | | | |
| **Repair & Maintenance Expenses** | | | | | | | | | | | | | | |
| Roof Supplies & Repairs | 0 | 0 | 0 | 0 | 0 | 0 | 250 | 0 | 0 | 0 | 0 | 0 | 0 | 250 |
| Grounds Maintenance Supplies | 0 | 215 | 0 | 0 | 0 | 132 | 272 | 0 | 197 | 373 | 216 | (37) | 247 | 1,614 |
| Pool Supplies & Repair | 436 | 435 | 436 | 435 | 727 | 726 | 1,195 | 884 | 290 | 777 | 482 | 483 | 482 | 7,353 |
| Clubhouse & Amenity Repairs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 134 | 134 |
| Parking Lot/Sidewalks | 0 | 0 | 0 | 62 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 62 |
| Electrical Supplies & Repairs | 4 | 0 | 0 | 0 | 0 | 89 | 100 | 0 | 107 | 12 | 0 | 133 | 754 | 1,195 |
| Plumbing Supplies & Repairs | 189 | 123 | 139 | 0 | 101 | 84 | 128 | 133 | 394 | 368 | 176 | 486 | 409 | 2,541 |
| HVAC Supplies & Repairs | 292 | 869 | 232 | 76 | 0 | 355 | 520 | 60 | 1,098 | 1,577 | 398 | 210 | 176 | 5,572 |
| Appliance Supplies & Repairs | 270 | 1,230 | 553 | 657 | 899 | 1,140 | 2,223 | 0 | 188 | 634 | 1,050 | 468 | 833 | 9,875 |
| Carpentry Supplies | 4 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| Hardware Supplies | 47 | 42 | 20 | 152 | 48 | 0 | 104 | 68 | 0 | 52 | 0 | 153 | 210 | 848 |
| Locks & Keys | 207 | 0 | 0 | 74 | 0 | 36 | 0 | 0 | 0 | 101 | 26 | 54 | 105 | 396 |
| Light Bulbs & Fixtures | 220 | 184 | 0 | 0 | 0 | 0 | 414 | 0 | 101 | 705 | 114 | 458 | 418 | 2,395 |
| Total Repair & Maintenance Expenses | 1,669 | 3,098 | 1,380 | 1,456 | 1,791 | 2,562 | 5,206 | 1,145 | 2,375 | 4,599 | 2,462 | 2,408 | 3,768 | 32,250 |
| | | | | | | | | | | | | | | |
| **Property Taxes** | | | | | | | | | | | | | | |
| Property Tax Expense | 399,393 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 75,866 | 922,108 |
| Total Property Taxes | 399,393 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 76,931 | 75,866 | 922,108 |
| | | | | | | | | | | | | | | |
| **Property Insurance** | | | | | | | | | | | | | | |
| Hazard Insurance Expense | 8,327 | 8,327 | 8,327 | 8,326 | 8,327 | 9,741 | 9,741 | 9,740 | 9,741 | 9,740 | 9,741 | 9,741 | 9,741 | 111,231 |
| Total Property Insurance | 8,327 | 8,327 | 8,327 | 8,326 | 8,327 | 9,741 | 9,741 | 9,740 | 9,741 | 9,740 | 9,741 | 9,741 | 9,741 | 111,231 |

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
As of December 15, 2022

Case 3:22-cv-02118-X   Document 162-1   Filed 02/22/23   Page 227 of 310   PageID 4028

APP000227

| | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Operating Expenses | 465,580 | 145,566 | 145,444 | 138,960 | 145,838 | 149,823 | 156,223 | 155,459 | 152,031 | 155,433 | 145,430 | 147,460 | 153,352 | 1,791,018 |
| Total Net Operating Income | (82,010) | 240,563 | 237,301 | 241,110 | 240,196 | 246,915 | 247,719 | 259,404 | 253,554 | 256,419 | 272,274 | 251,061 | 240,150 | 2,986,666 |
| **Property Replacements** | | | | | | | | | | | | | | |
| Recurring Replacements | | | | | | | | | | | | | | |
| Carpet Replacement | 1,388 | 3,623 | 614 | 1,746 | 4,219 | 3,765 | 743 | 1,406 | 3,123 | 3,085 | 534 | 605 | 1,331 | 24,794 |
| Drapery/Mini-Blind Replacements | 640 | 0 | 0 | 0 | 0 | 817 | 0 | 0 | 0 | 2,048 | 0 | 620 | 0 | 3,485 |
| Apppliance Replacements | 1,893 | 0 | 2,559 | 2,521 | 1,332 | 2,020 | 819 | 790 | 0 | 1,705 | 0 | 1,712 | 1,717 | 15,174 |
| Total Recurring Replacements | 3,921 | 3,623 | 3,173 | 4,267 | 5,551 | 6,602 | 1,562 | 2,196 | 3,123 | 6,838 | 534 | 2,937 | 3,048 | 43,453 |
| Non-Recurring Replacements | | | | | | | | | | | | | | |
| Pool Furniture | 0 | 0 | 0 | 0 | 1,959 | 0 | 0 | 0 | 0 | 0 | 0 | 320 | 0 | 2,279 |
| Playground/Recreational Equipment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 108 | 0 | 0 | 0 | 0 | 108 |
| Lawns, Trees & Shrubs | 0 | 5,470 | 20,001 | 34,040 | 0 | 15,887 | 50,857 | 958 | 0 | 0 | 499 | 0 | 1,949 | 129,661 |
| Paving & Parking Lots | 0 | 0 | 0 | 0 | 0 | (3,815) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (3,815) |
| Roof Replacments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,415 | 0 | 810 | 0 | 5,225 |
| Exterior Carpentry/Siding | 0 | 0 | 0 | 406 | 0 | 0 | 0 | 883 | 0 | 0 | 0 | 0 | 0 | 1,289 |
| Concrete Repairs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,789 | 0 | 0 | 0 | 0 | 0 | 3,789 |
| HVAC Replacments | 0 | 0 | 1,374 | 1,925 | 530 | 1,129 | 410 | 0 | 0 | 0 | 0 | 696 | 0 | 6,066 |
| Plumbing Replacements | 2,206 | 0 | 1,508 | 0 | 2,485 | 0 | 0 | 279 | 0 | 0 | 0 | 868 | 0 | 5,140 |
| Electrical Replacement | 0 | 0 | 0 | 0 | 210 | 0 | 748 | 0 | 0 | 400 | 62 | 0 | 0 | 1,419 |
| Pool & Equipment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 488 | 0 | 0 | 489 |
| Gate Repairs & Supplies | 928 | 300 | 0 | 300 | 0 | 399 | 300 | 2,687 | 0 | 0 | 0 | 210 | 500 | 4,695 |
| City Inspection/Multifamily Fee | 0 | 0 | 0 | 26,928 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,928 |
| Major Pest Control | 0 | 800 | 0 | 66 | 0 | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 379 | 1,326 |
| Other Non-Recurring Replacements | 0 | 5,859 | 0 | 0 | 0 | 348 | 0 | 6,840 | 1,033 | 0 | 0 | 0 | 111 | 14,193 |
| Unit Upgrades | 0 | 994 | 0 | 301 | 1,601 | 165 | 0 | 173 | 4,068 | 66 | 1,511 | 123 | 0 | 9,000 |
| Audit Expense | 0 | 3,750 | 0 | 4,050 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,800 |
| Fire Alarm System Repairs | 230 | 1,630 | 7,512 | 0 | 270 | 0 | 459 | 0 | 0 | 13,382 | 400 | 7,457 | 200 | 31,311 |
| Ownership Level Expenses | 0 | 43 | 0 | 0 | 45 | 42 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 130 |
| Total Non-Recurring Replacements | 3,364 | 18,846 | 30,395 | 68,016 | 7,100 | 14,236 | 52,774 | 15,609 | 5,209 | 18,263 | 2,960 | 10,484 | 3,139 | 247,033 |

Case 3:22-cv-02118-X    Document 162-1    Filed 02/22/23    Page 228 of 310    PageID 4029

APP000228

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
As of December 15, 2022

|  | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Property Replacements | 7,285 | 22,469 | 33,568 | 72,283 | 12,651 | 20,838 | 54,336 | 17,805 | 8,332 | 25,101 | 3,494 | 13,421 | 6,187 | 290,486 |

Case 3:22-cv-02118-X   Document 162-1   Filed 02/22/23   Page 229 of 310   PageID 4030

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
### As of December 15, 2022

| | Month Ending 12/15/2021 Actual | Month Ending 01/15/2022 Actual | Month Ending 02/15/2022 Actual | Month Ending 03/15/2022 Actual | Month Ending 04/15/2022 Actual | Month Ending 05/15/2022 Actual | Month Ending 06/15/2022 Actual | Month Ending 07/15/2022 Actual | Month Ending 08/15/2022 Actual | Month Ending 09/15/2022 Actual | Month Ending 10/15/2022 Actual | Month Ending 11/15/2022 Actual | Month Ending 12/15/2022 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reserve Activity | | | | | | | | | | | | | | |
| Recurring Reserve Expense | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 81,600 |
| Total Reserve Activity | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 81,600 |
| | | | | | | | | | | | | | | |
| Total Available for Debt Service | (96,095) | 211,294 | 196,933 | 162,026 | 220,745 | 219,277 | 186,583 | 234,799 | 238,422 | 224,518 | 261,981 | 230,841 | 227,163 | 2,614,582 |
| Debt Service | | | | | | | | | | | | | | |
| Interest Expense | 115,454 | 115,344 | 115,234 | 115,124 | 115,013 | 114,902 | 114,790 | 114,678 | 114,566 | 114,454 | 114,341 | 114,227 | 114,114 | 1,376,787 |
| Principal - First to Fourth | 33,761 | 33,871 | 33,981 | 34,091 | 34,202 | 34,313 | 34,425 | 34,537 | 34,649 | 34,761 | 34,874 | 34,988 | 35,101 | 413,791 |
| HUD MIP (PMI) Insurance | 7,425 | 7,425 | 7,425 | 7,425 | 7,425 | 7,425 | 7,425 | 41 | 41 | 41 | 41 | 41 | 41 | 44,798 |
| Total Debt Service | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 149,256 | 149,256 | 149,256 | 149,256 | 149,256 | 149,256 | 1,835,376 |
| | | | | | | | | | | | | | | |
| Total Cash Flow/(Deficit) | (252,735) | 54,654 | 40,293 | 5,386 | 64,105 | 62,637 | 29,943 | 85,543 | 89,166 | 75,262 | 112,725 | 81,585 | 77,907 | 779,206 |

APP000229

_____

Sunchase American, Ltd.

_____

**Parc at Windmill Farms**
**FINANCIAL STATEMENTS FOR THE MONTH OF**
December, 2021

_____

Number of Units                272
Number of Sq Feet        279,648

Parc at Windmill Farms
Forney, TX 76126

APP000230

# Parc at Windmill Farms
## Summary Income Statement
### December 15, 2021

| | Month Ending 12/15/2021 | | | | Year to Date 12/15/2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Revenue** | | | | | | | | |
| Possible Rent Per Leases | | | | | | | | |
| Rent Per Schedule | 395,090 | 103.66 % | 366,930 | 28,160 | 4,587,880 | 104.10 % | 4,370,520 | 217,360 |
| Leases Under Schedule | (13,941) | (3.66) % | (6,468) | (7,473) | (180,879) | (4.10) % | (88,041) | (92,837) |
| Total Possible Rent Per Leases | 381,149 | 100.00 % | 360,462 | 20,687 | 4,407,001 | 100.00 % | 4,282,479 | 124,523 |
| | | | | | | | | |
| Vacancy Losses | (9,565) | (2.51) % | (18,347) | 8,782 | (89,886) | (2.04) % | (250,982) | 161,095 |
| Other Rental Losses | (4,406) | (1.16) % | (2,136) | (2,270) | (52,547) | (1.19) % | (61,444) | 8,898 |
| Total Rental Losses | (13,971) | (3.67) % | (20,483) | 6,512 | (142,433) | (3.23) % | (312,426) | 169,993 |
| Total Net Rental Revenue | 367,178 | 96.33 % | 339,979 | 27,199 | 4,264,568 | 96.77 % | 3,970,053 | 294,516 |
| | | | | | | | | |
| Other Revenue | 16,392 | 4.30 % | 5,855 | 10,537 | 262,300 | 5.95 % | 92,460 | 169,840 |
| | | | | | | | | |
| Total Revenue | 383,570 | 100.64 % | 345,834 | 37,736 | 4,526,868 | 102.72 % | 4,062,513 | 464,356 |
| | | | | | | | | |
| **Operating Expenses** | | | | | | | | |
| Personnel Expenses | 24,411 | 6.40 % | 23,385 | (1,026) | 284,920 | 6.47 % | 283,584 | (1,338) |
| Management Fees | 10,759 | 2.82 % | 9,736 | (1,023) | 125,577 | 2.85 % | 114,396 | (11,181) |
| Administrative Expenses | 4,897 | 1.28 % | 3,600 | (1,297) | 51,243 | 1.16 % | 43,473 | (7,769) |
| Leasing Expenses | 3,727 | 0.98 % | 4,882 | 1,155 | 54,082 | 1.23 % | 63,490 | 9,409 |
| Utility Expenses | 3,565 | 0.94 % | 7,485 | 3,921 | 50,481 | 1.15 % | 89,203 | 38,721 |
| Service Expenses | 4,310 | 1.13 % | 4,604 | 294 | 54,816 | 1.24 % | 56,170 | 1,354 |
| Cleaning & Decorating Expenses | 4,522 | 1.19 % | 703 | (3,821) | 29,497 | 0.67 % | 20,665 | (8,832) |
| Repair & Maintenance Expenses | 1,669 | 0.44 % | 765 | (903) | 15,905 | 0.36 % | 11,040 | (4,865) |
| Property Taxes | 399,393 | 104.79 % | 45,171 | (354,222) | 896,285 | 20.34 % | 542,058 | (354,227) |
| Property Insurance | 8,327 | 2.18 % | 2,952 | (5,375) | 106,295 | 2.41 % | 35,425 | (70,869) |
| | | | | | | | | |
| Total Operating Expenses | 465,580 | 122.15 % | 103,283 | (362,297) | 1,669,101 | 37.87 % | 1,259,504 | (409,597) |
| | | | | | | | | |
| Total Net Operating Income | (82,010) | (21.52) % | 242,551 | (324,561) | 2,857,767 | 64.85 % | 2,803,009 | 54,759 |
| | | | | | | | | |
| **Property Replacements** | | | | | | | | |
| Recurring Replacements | 3,921 | 1.03 % | 223 | (3,698) | 23,100 | 0.52 % | 2,310 | (20,790) |
| Non-Recurring Replacements | 3,364 | 0.88 % | 0 | (3,364) | 122,141 | 2.77 % | 63,361 | (58,780) |
| Total Property Replacements | 7,285 | 1.91 % | 223 | (7,062) | 145,241 | 3.30 % | 65,671 | (79,570) |
| | | | | | | | | |
| Reserve Activity | 6,800 | 1.78 % | 6,800 | 0 | 81,600 | 1.85 % | 81,600 | 0 |
| | | | | | | | | |
| **Total Available for Debt Service** | (96,095) | (25.21) % | 235,528 | (331,623) | 2,630,926 | 59.70 % | 2,655,738 | (24,812) |
| | | | | | | | | |
| Debt Service | 156,640 | 41.10 % | 159,223 | 2,583 | 1,879,888 | 42.66 % | 1,910,674 | 30,786 |
| | | | | | | | | |
| **Total Cash Flow/(Deficit)** | (252,735) | (66.31) % | 76,305 | (329,040) | 751,038 | 17.04 % | 745,064 | 5,974 |

APP000231

# Parc at Windmill Farms
## Summary Income Statement
December 15, 2021

| | Current Month Per Unit | Annualized Per Unit | Current Month / SQ Ft | Annualized / SQ FT | Current Month % of Gross | YTD % of Gross |
|---|---|---|---|---|---|---|
| | Current | Annualized | Current Month/SQ FT | Annualized / SQ FT | Current % of Gross | YTD % of Gross |
| **Revenue** | | | | | | |
| Possible Rent Per Leases | | | | | | |
| Rent Per Schedule | 1,452.54 | 16,867.21 | 1.413 | 16.406 | 103.658 % | 104.104 % |
| Leases Under Schedule | (51.25) | (665.00) | (0.050) | (0.647) | (3.658) % | (4.104) % |
| Total Possible Rent Per Leases | 1,401.28 | 16,202.21 | 1.363 | 15.759 | 100.000 % | 100.000 % |
| | | | | | | |
| Vacancy Losses | (35.17) | (330.47) | (0.034) | (0.321) | (2.510) % | (2.040) % |
| Other Rental Losses | (16.20) | (193.18) | (0.016) | (0.188) | (1.156) % | (1.192) % |
| Total Rental Losses | (51.36) | (523.65) | (0.050) | (0.509) | (3.666) % | (3.232) % |
| | | | | | | |
| Total Net Rental Revenue | 1,349.92 | 15,678.56 | 1.313 | 15.250 | 96.334 % | 96.768 % |
| | | | | | | |
| Other Revenue | 60.26 | 964.34 | 0.059 | 0.938 | 4.301 % | 5.952 % |
| | | | | | | |
| Total Revenue | 1,410.18 | 16,642.90 | 1.372 | 16.188 | 100.635 % | 102.720 % |
| | | | | | | |
| **Operating Expenses** | | | | | | |
| Personnel Expenses | 89.75 | 1,047.50 | 0.087 | 1.019 | 6.405 % | 6.465 % |
| Management Fees | 39.56 | 461.68 | 0.038 | 0.449 | 2.823 % | 2.849 % |
| Administrative Expenses | 18.00 | 188.39 | 0.018 | 0.183 | 1.285 % | 1.163 % |
| Leasing Expenses | 13.70 | 198.83 | 0.013 | 0.193 | 0.978 % | 1.227 % |
| Utility Expenses | 13.11 | 185.59 | 0.013 | 0.181 | 0.935 % | 1.145 % |
| Service Expenses | 15.85 | 201.53 | 0.015 | 0.196 | 1.131 % | 1.244 % |
| Cleaning & Decorating Expenses | 16.63 | 108.44 | 0.016 | 0.105 | 1.187 % | 0.669 % |
| Repair & Maintenance Expenses | 6.14 | 58.48 | 0.006 | 0.057 | 0.438 % | 0.361 % |
| Property Taxes | 1,468.36 | 3,295.17 | 1.428 | 3.205 | 104.786 % | 20.338 % |
| Property Insurance | 30.61 | 390.79 | 0.030 | 0.380 | 2.185 % | 2.412 % |
| | | | | | | |
| Total Operating Expenses | 1,711.69 | 6,136.40 | 1.665 | 5.969 | 122.152 % | 37.874 % |
| | | | | | | |
| Total Net Operating Income | (301.51) | 10,506.50 | (0.293) | 10.219 | (21.517) % | 64.846 % |
| | | | | | | |
| **Property Replacements** | | | | | | |
| Recurring Replacements | 14.42 | 84.93 | 0.014 | 0.083 | 1.029 % | 0.524 % |
| Non-Recurring Replacements | 12.37 | 449.05 | 0.012 | 0.437 | 0.882 % | 2.772 % |
| Total Property Replacements | 26.78 | 533.97 | 0.026 | 0.519 | 1.911 % | 3.296 % |
| Reserve Activity | 25.00 | 300.00 | 0.024 | 0.292 | 1.784 % | 1.852 % |
| | | | | | | |
| Total Available for Debt Service | (353.29) | 9,672.52 | (0.344) | 9.408 | (25.212) % | 59.699 % |
| Debt Service | 575.88 | 6,911.35 | 0.560 | 6.722 | 41.097 % | 42.657 % |
| | | | | | | |
| Total Cash Flow/(Deficit) | (929.17) | 2,761.17 | (0.904) | 2.686 | (66.309) % | 17.042 % |

APP000232

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
### As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| Possible Rent Per Leases | | | | | | | | | | | | | | |
| Rent Per Schedule | 356,050 | 361,490 | 361,490 | 372,610 | 379,850 | 379,850 | 380,930 | 380,930 | 390,370 | 395,090 | 395,090 | 395,090 | 395,090 | 4,587,880 |
| Leases Under Schedule | (4,139) | (4,275) | (5,140) | (16,948) | (20,727) | (21,495) | (16,285) | (12,985) | (17,890) | (20,989) | (15,176) | (15,028) | (13,941) | (180,879) |
| Total Possible Rent Per Leases | 351,911 | 357,215 | 356,350 | 355,662 | 359,123 | 358,356 | 364,645 | 367,945 | 372,480 | 374,101 | 379,914 | 380,062 | 381,149 | 4,407,001 |
| Vacancy Losses | (22,911) | (11,444) | (2,905) | (4,223) | (3,139) | (4,604) | (11,609) | (7,879) | (13,212) | (4,766) | (6,468) | (10,073) | (9,565) | (89,886) |
| Other Rental Losses | (17,215) | (16,173) | (4,096) | (2,627) | (1,480) | (1,721) | (3,514) | (3,839) | (6,198) | (1,308) | (4,901) | (2,284) | (4,406) | (52,547) |
| Total Rental Losses | (40,126) | (27,617) | (7,001) | (6,850) | (4,619) | (6,325) | (15,123) | (11,718) | (19,410) | (6,074) | (11,369) | (12,357) | (13,971) | (142,433) |
| Total Net Rental Revenue | 311,785 | 329,598 | 349,349 | 348,812 | 354,504 | 352,031 | 349,522 | 356,227 | 353,070 | 368,027 | 368,545 | 367,705 | 367,178 | 4,264,568 |
| Other Revenue | 13,742 | 13,807 | 85,435 | 9,803 | 15,272 | 11,510 | 12,229 | 20,118 | 19,355 | 20,592 | 15,376 | 22,412 | 16,392 | 262,300 |
| **Total Revenue** | 325,527 | 343,405 | 434,784 | 358,615 | 369,776 | 363,541 | 361,751 | 376,345 | 372,425 | 388,619 | 383,921 | 390,117 | 383,570 | 4,526,868 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Personnel Expenses | 23,825 | 21,655 | 20,576 | 22,589 | 26,718 | 23,380 | 23,045 | 27,100 | 21,964 | 25,053 | 22,892 | 25,540 | 24,411 | 284,921 |
| Management Fees | 10,075 | 9,727 | 10,259 | 9,725 | 10,946 | 10,533 | 10,262 | 10,343 | 10,525 | 10,948 | 10,752 | 10,798 | 10,759 | 125,577 |
| Administrative Expenses | 5,075 | 3,539 | 3,365 | 3,986 | 3,906 | 3,622 | 4,935 | 3,873 | 5,641 | 4,070 | 4,982 | 4,425 | 4,897 | 51,243 |
| Leasing Expenses | 5,544 | 5,418 | 3,849 | 4,827 | 4,010 | 4,316 | 3,965 | 5,923 | 5,177 | 4,610 | 4,424 | 3,836 | 3,727 | 54,081 |
| Utility Expenses | 8,348 | (58) | 4,720 | 5,674 | 2,463 | 4,836 | 3,203 | 5,367 | 5,721 | 5,340 | 7,914 | 1,735 | 3,565 | 50,481 |
| Service Expenses | 10,215 | 4,973 | 5,106 | 4,237 | 4,479 | 4,502 | 4,629 | 4,067 | 4,218 | 4,250 | 4,361 | 5,685 | 4,310 | 54,817 |
| Cleaning & Decorating Expenses | 2,310 | 3,128 | 1,477 | 616 | 1,809 | 1,385 | 1,779 | 5,864 | 1,220 | 1,151 | 2,874 | 3,671 | 4,522 | 29,497 |
| Repair & Maintenance Expenses | 382 | 1,062 | 686 | 755 | 1,234 | 1,033 | 1,828 | 1,312 | 1,782 | 1,777 | 1,091 | 1,676 | 1,669 | 15,905 |
| Property Taxes | (204,289) | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 399,393 | 896,285 |
| Property Insurance | 9,920 | 9,920 | 9,920 | 9,920 | 9,920 | 8,327 | 8,327 | 8,327 | 8,327 | 8,326 | 8,327 | 8,327 | 8,327 | 106,294 |
| Total Operating Expenses | (128,595) | 104,536 | 105,130 | 107,501 | 110,657 | 107,106 | 107,145 | 117,348 | 109,747 | 110,697 | 112,789 | 110,865 | 465,580 | 1,669,101 |
| **Total Net Operating Income** | 454,122 | 238,869 | 329,654 | 251,114 | 259,119 | 256,435 | 254,606 | 258,997 | 262,678 | 277,922 | 271,132 | 279,252 | (82,010) | 2,857,767 |
| **Property Replacements** | | | | | | | | | | | | | | |
| Recurring Replacements | 718 | 1,324 | 708 | 1,139 | 1,154 | 2,531 | 1,463 | 4,533 | 457 | 513 | 2,079 | 3,279 | 3,921 | 23,100 |
| Non-Recurring Replacements | 24,115 | 35,330 | 7,350 | 15,305 | 17,690 | 7,464 | 1,842 | 2,175 | 1,541 | 11,813 | 8,562 | 9,705 | 3,364 | 122,141 |
| Total Property Replacements | 24,833 | 36,654 | 8,058 | 16,444 | 18,844 | 9,995 | 3,305 | 6,708 | 1,998 | 12,326 | 10,641 | 12,984 | 7,285 | 145,241 |
| Reserve Activity | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 81,600 |
| Total Available for Debt Service | 422,490 | 195,415 | 314,796 | 227,870 | 233,475 | 239,640 | 244,501 | 245,489 | 253,880 | 258,795 | 253,691 | 259,468 | (96,095) | 2,630,925 |
| Debt Service | 149,610 | 156,765 | 156,765 | 156,765 | 156,765 | 156,494 | 156,494 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 1,879,888 |
| **Total Cash Flow/(Deficit)** | 272,880 | 38,651 | 158,031 | 71,105 | 76,710 | 83,146 | 88,006 | 88,849 | 97,240 | 102,155 | 97,051 | 102,828 | (252,735) | 751,037 |

APP000233

# Parc at Windmill Farms
## Income Statement Prior Year Comparison
December 15, 2021

| | Month Ending 12/15/2021 | Month Ending 12/15/2020 | Month Ending 12/15/2021 | | Year to Date 12/15/2021 | Year to Date 12/15/2020 | Year to Date 12/15/2021 | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Actual | Period Diff | Period % Var - CALC | Actual | Actual | Period Diff | Period % Var |
| **Revenue** | | | | | | | | |
| Possible Rent Per Leases | | | | | | | | |
| Rent Per Schedule | 395,090 | 356,050 | 39,040 | 11.0 % | 4,587,880 | 4,251,440 | 336,440 | 7.9 % |
| Leases Under Schedule | (13,941) | (4,139) | (9,802) | (236.8) % | (180,879) | (17,363) | (163,516) | (941.8) % |
| Total Possible Rent Per Leases | 381,149 | 351,911 | 29,238 | 8.3 % | 4,407,001 | 4,234,077 | 172,924 | 4.1 % |
| Vacancy Losses | (9,565) | (22,911) | 13,346 | 58.3 % | (89,886) | (1,826,233) | 1,736,346 | 95.1 % |
| Other Rental Losses | (4,406) | (17,215) | 12,809 | 74.4 % | (52,547) | (479,500) | 426,954 | 89.0 % |
| Total Rental Losses | (13,971) | (40,126) | 26,155 | 65.2 % | (142,433) | (2,305,733) | 2,163,300 | 93.8 % |
| Total Net Rental Revenue | 367,178 | 311,785 | 55,394 | 17.8 % | 4,264,568 | 1,928,344 | 2,336,224 | 121.2 % |
| Other Revenue | 16,392 | 13,742 | 2,649 | 19.3 % | 262,300 | 119,499 | 142,801 | 119.5 % |
| Total Revenue | 383,570 | 325,527 | 58,043 | 17.8 % | 4,526,868 | 2,047,843 | 2,479,025 | 121.1 % |
| **Operating Expenses** | | | | | | | | |
| Personnel Expenses | 24,411 | 23,825 | (586) | (2.5) % | 284,920 | 233,182 | (51,739) | (22.2) % |
| Management Fees | 10,759 | 10,075 | (684) | (6.8) % | 125,577 | 62,150 | (63,427) | (102.1) % |
| Administrative Expenses | 4,897 | 5,075 | 178 | 3.5 % | 51,243 | 52,902 | 1,660 | 3.1 % |
| Leasing Expenses | 3,727 | 5,544 | 1,817 | 32.8 % | 54,082 | 68,247 | 14,166 | 20.8 % |
| Utility Expenses | 3,565 | 8,348 | 4,783 | 57.3 % | 50,481 | 79,903 | 29,422 | 36.8 % |
| Service Expenses | 4,310 | 10,215 | 5,905 | 57.8 % | 54,816 | 61,838 | 7,021 | 11.4 % |
| Cleaning & Decorating Expenses | 4,522 | 2,310 | (2,213) | (95.8) % | 29,497 | 10,960 | (18,537) | (169.1) % |
| Repair & Maintenance Expenses | 1,669 | 382 | (1,287) | (336.6) % | 15,905 | 12,480 | (3,425) | (27.4) % |
| Property Taxes | 399,393 | (204,289) | (603,682) | 295.5 % | 896,285 | 444,711 | (451,574) | (101.5) % |
| Property Insurance | 8,327 | 9,920 | 1,593 | 16.1 % | 106,295 | 39,678 | (66,616) | (167.9) % |
| Total Operating Expenses | 465,580 | (128,595) | (594,175) | 462.1 % | 1,669,101 | 1,066,051 | (603,050) | (56.6) % |
| Total Net Operating Income | (82,010) | 454,122 | (536,132) | (118.1) % | 2,857,767 | 981,792 | 1,875,976 | 191.1 % |
| **Property Replacements** | | | | | | | | |
| Recurring Replacements | 3,921 | 718 | (3,204) | (446.4) % | 23,100 | 1,425 | (21,675) | (1,520.9) % |
| Non-Recurring Replacements | 3,364 | 24,115 | 20,751 | 86.1 % | 122,141 | 60,312 | (61,829) | (102.5) % |
| Total Property Replacements | 7,285 | 24,833 | 17,548 | 70.7 % | 145,241 | 61,737 | (83,504) | (135.3) % |
| Reserve Activity | 6,800 | 6,800 | 0 | 0.0 % | 81,600 | 54,400 | (27,200) | (50.0) % |
| Total Available for Debt Service | (96,095) | 422,490 | (518,585) | (122.7) % | 2,630,926 | 865,654 | 1,765,272 | 203.9 % |
| Debt Service | 156,640 | 149,610 | (7,030) | (4.7) % | 1,879,888 | 848,467 | (1,031,422) | (121.6) % |
| Total Cash Flow/(Deficit) | (252,735) | 272,880 | (525,615) | (192.6) % | 751,038 | 17,187 | 733,851 | 4,269.8 % |

APP000234

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2021

| | Month Ending 12/15/2021 | | | | Year to Date 12/15/2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Revenue** | | | | | | | | |
| Total Potential Per Schedule | 395,090 | 103.66 % | 366,930 | 28,160 | 4,587,880 | 104.10 % | 4,370,520 | 217,360 |
| Leases Under/Over Schedule | (13,941) | (3.66) % | (6,468) | (7,473) | (180,879) | (4.10) % | (88,041) | (92,837) |
| **Total Possible Rent Per Leases** | **381,149** | **100.00 %** | **360,462** | **20,687** | **4,407,001** | **100.00 %** | **4,282,479** | **124,523** |
| | | | | | | | | |
| Vacancy Loss | (9,565) | (2.51) % | (18,347) | 8,782 | (89,886) | (2.04) % | (250,982) | 161,095 |
| Model | (1,350) | (0.35) % | (1,240) | (110) | (15,600) | (0.35) % | (14,730) | (870) |
| Bad Debt Loss | (1,139) | (0.30) % | (360) | (780) | (21,900) | (0.50) % | (4,282) | (17,617) |
| Discounts & Concessions | (1,917) | (0.50) % | (536) | (1,380) | (15,047) | (0.34) % | (42,432) | 27,385 |
| **Total Rental Losses** | **(13,971)** | **(3.67) %** | **(20,483)** | **6,512** | **(142,433)** | **(3.23) %** | **(312,426)** | **169,993** |
| **Total Net Rental Revenue** | **367,178** | **96.33 %** | **339,979** | **27,199** | **4,264,568** | **96.77 %** | **3,970,053** | **294,516** |
| | | | | | | | | |
| Deposit Forfeitures | 74 | 0.02 % | 600 | (526) | 40,712 | 0.92 % | 20,800 | 19,912 |
| Non-Refundable Pet Fees | 2,609 | 0.68 % | 1,200 | 1,409 | 30,968 | 0.70 % | 14,400 | 16,568 |
| Application Fees | 1,450 | 0.38 % | 500 | 950 | 17,700 | 0.40 % | 8,750 | 8,950 |
| NSF & Late Fees | 4,955 | 1.30 % | 1,200 | 3,755 | 40,931 | 0.93 % | 14,400 | 26,531 |
| Television Cable Revenue | 1,024 | 0.27 % | 0 | 1,023 | 88,418 | 2.01 % | 0 | 88,418 |
| Miscellaneous Revenue | 6,233 | 1.64 % | 2,355 | 3,879 | 42,897 | 0.97 % | 34,110 | 8,787 |
| Interest Income | 47 | 0.01 % | 0 | 47 | 674 | 0.02 % | 0 | 674 |
| **Total Other Revenue** | **16,392** | **4.30 %** | **5,855** | **10,537** | **262,300** | **5.95 %** | **92,460** | **169,840** |
| **Total Revenue** | **383,570** | **100.64 %** | **345,834** | **37,736** | **4,526,868** | **102.72 %** | **4,062,513** | **464,356** |
| | | | | | | | | |
| **Operating Expenses** | | | | | | | | |
| **Personnel Expenses** | | | | | | | | |
| Office Salaries | 9,569 | 2.51 % | 10,345 | 776 | 115,465 | 2.62 % | 121,339 | 5,874 |
| Maintenance | 7,778 | 2.04 % | 6,249 | (1,529) | 77,717 | 1.76 % | 74,312 | (3,406) |
| Porters/Housekeepers | 2,284 | 0.60 % | 2,253 | (31) | 24,113 | 0.55 % | 27,036 | 2,924 |
| Bonuses | 0 | 0.00 % | 0 | 0 | 6,130 | 0.14 % | 5,000 | (1,130) |
| Employee Apartments | 0 | 0.00 % | 0 | 0 | 3,703 | 0.08 % | 0 | (3,704) |
| Employers FICA | 1,603 | 0.42 % | 1,521 | (82) | 18,960 | 0.43 % | 18,826 | (134) |
| Other Payroll Taxes | 1,886 | 0.49 % | 1,791 | (95) | 22,304 | 0.51 % | 22,148 | (156) |
| Payroll Administrative | 189 | 0.05 % | 155 | (34) | 2,229 | 0.05 % | 1,860 | (369) |
| Workers Compensation | 602 | 0.16 % | 571 | (31) | 7,110 | 0.16 % | 7,063 | (48) |
| Group Insurance | 500 | 0.13 % | 500 | 0 | 6,000 | 0.14 % | 6,000 | 0 |
| Employee Recruitment | 0 | 0.00 % | 0 | 0 | 550 | 0.01 % | 0 | (549) |
| Contract Office Help | 0 | 0.00 % | 0 | 0 | 639 | 0.01 % | 0 | (640) |
| **Total Personnel Expenses** | **24,411** | **6.40 %** | **23,385** | **(1,026)** | **284,920** | **6.47 %** | **283,584** | **(1,338)** |
| | | | | | | | | |
| **Management Fees** | | | | | | | | |
| Management Fee | 10,759 | 2.82 % | 9,736 | (1,023) | 125,577 | 2.85 % | 114,396 | (11,181) |
| **Total Management Fees** | **10,759** | **2.82 %** | **9,736** | **(1,023)** | **125,577** | **2.85 %** | **114,396** | **(11,181)** |

APP000235

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2021

| | Month Ending 12/15/2021 | | | | Year to Date 12/15/2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Administrative Expenses** | | | | | | | | |
| Office Supplies | 30 | 0.01 % | 85 | 55 | 965 | 0.02 % | 1,020 | 56 |
| Professional Services | 0 | 0.00 % | 155 | 155 | 1,717 | 0.04 % | 2,610 | 893 |
| Site Travel | 0 | 0.00 % | 25 | 25 | 0 | 0.00 % | 300 | 300 |
| Postage & Freight | 244 | 0.06 % | 300 | 56 | 2,917 | 0.07 % | 3,600 | 683 |
| Employee Relations | 874 | 0.23 % | 500 | (375) | 1,546 | 0.04 % | 775 | (771) |
| License, Permits & Fees | 875 | 0.23 % | 198 | (676) | 8,696 | 0.20 % | 6,527 | (2,169) |
| Credit/Collection/Eviction Cost | 1,404 | 0.37 % | 517 | (887) | 12,557 | 0.28 % | 6,201 | (6,356) |
| Dues & Subscriptions | 0 | 0.00 % | 0 | 0 | 448 | 0.01 % | 200 | (248) |
| Copier, Forms & Printing | 260 | 0.07 % | 150 | (110) | 3,115 | 0.07 % | 1,800 | (1,315) |
| Training & Seminars | 115 | 0.03 % | 115 | 1 | 1,590 | 0.04 % | 1,380 | (210) |
| Computer Supplies | 0 | 0.00 % | 0 | 0 | 660 | 0.01 % | 400 | (260) |
| Telephone & Answering | 671 | 0.18 % | 955 | 283 | 10,837 | 0.25 % | 11,460 | 624 |
| Miscellaneous Administrative | 424 | 0.11 % | 600 | 176 | 6,195 | 0.14 % | 7,200 | 1,004 |
| **Total Administrative Expenses** | **4,897** | **1.28 %** | **3,600** | **(1,297)** | **51,243** | **1.16 %** | **43,473** | **(7,769)** |
| **Leasing Expenses** | | | | | | | | |
| Advertising | 2,201 | 0.58 % | 2,886 | 685 | 27,341 | 0.62 % | 34,890 | 7,549 |
| Locator Commissions | 0 | 0.00 % | 500 | 500 | 1,400 | 0.03 % | 3,000 | 1,600 |
| Referral Fees | 0 | 0.00 % | 0 | 0 | 1,250 | 0.03 % | 500 | (750) |
| Brochures & Related | 50 | 0.01 % | 0 | (49) | 539 | 0.01 % | 700 | 161 |
| Project & Promotions | 151 | 0.04 % | 450 | 298 | 4,622 | 0.10 % | 6,000 | 1,379 |
| Leasing Commissions | 1,325 | 0.35 % | 1,046 | (279) | 18,930 | 0.43 % | 18,400 | (530) |
| **Total Leasing Expenses** | **3,727** | **0.98 %** | **4,882** | **1,155** | **54,082** | **1.23 %** | **63,490** | **9,409** |
| **Utility Expenses** | | | | | | | | |
| Electricity - House Meters | 1,972 | 0.52 % | 3,500 | 1,528 | 26,064 | 0.59 % | 36,700 | 10,635 |
| Electricity - Vacant & Model | 242 | 0.06 % | 560 | 318 | 1,899 | 0.04 % | 7,640 | 5,741 |
| Water Expense | 2,693 | 0.71 % | 3,402 | 709 | 35,047 | 0.80 % | 40,822 | 5,776 |
| Sewer Expense | 3,764 | 0.99 % | 3,863 | 100 | 45,830 | 1.04 % | 46,363 | 532 |
| Resident Billing | 925 | 0.24 % | 988 | 62 | 12,036 | 0.27 % | 11,849 | (187) |
| Water Irrigation | 400 | 0.11 % | 1,300 | 899 | 9,011 | 0.20 % | 18,564 | 9,553 |
| Water & Sewer Reimbursements | (6,431) | (1.69) % | (6,128) | 305 | (79,406) | (1.80) % | (72,735) | 6,671 |
| **Total Utility Expenses** | **3,565** | **0.94 %** | **7,485** | **3,921** | **50,481** | **1.15 %** | **89,203** | **38,721** |
| **Service Expenses** | | | | | | | | |
| Grounds Maintenance Contract | 4,716 | 1.24 % | 4,999 | 282 | 56,597 | 1.28 % | 59,988 | 3,391 |
| Exterminating Services/Supplies | 286 | 0.07 % | 272 | (14) | 3,923 | 0.09 % | 3,264 | (660) |
| Exterminating Reimbursements | (1,482) | (0.39) % | (1,548) | (66) | (17,753) | (0.40) % | (18,438) | (684) |
| Garbage & Trash Removal | 2,655 | 0.70 % | 2,000 | (655) | 27,035 | 0.61 % | 24,000 | (3,036) |
| Garbage & Trash Reimbursements | (2,038) | (0.53) % | (2,064) | (26) | (23,741) | (0.54) % | (24,584) | (842) |
| Security Services | 0 | 0.00 % | 545 | 545 | 3,405 | 0.08 % | 6,540 | 3,135 |
| Uniform Services and Cleaning | 0 | 0.00 % | 0 | 0 | 1,133 | 0.03 % | 600 | (533) |
| Hallway Cleaning | 0 | 0.00 % | 400 | 400 | 3,230 | 0.07 % | 4,800 | 1,570 |
| Fire Protection | 173 | 0.05 % | 0 | (172) | 987 | 0.02 % | 0 | (987) |
| **Total Service Expenses** | **4,310** | **1.13 %** | **4,604** | **294** | **54,816** | **1.24 %** | **56,170** | **1,354** |

APP000236

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2021

| | Month Ending 12/15/2021 | | | | Year to Date 12/15/2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Cleaning & Decorating Expenses** | | | | | | | | |
| Contract Paint Labor | 0 | 0.00 % | 0 | 0 | 6,661 | 0.15 % | 0 | (6,661) |
| Paint Supplies | 434 | 0.11 % | 178 | (257) | 2,380 | 0.05 % | 6,155 | 3,775 |
| Contract Cleaning & Supplies | 2,453 | 0.64 % | 425 | (2,029) | 11,325 | 0.26 % | 11,560 | 235 |
| Carpet Cleaning | 1,635 | 0.43 % | 100 | (1,535) | 6,990 | 0.16 % | 2,950 | (4,040) |
| Carpet Dyeing & Repairs | 0 | 0.00 % | 0 | 0 | 672 | 0.02 % | 0 | (672) |
| Sheetrock Repairs | 0 | 0.00 % | 0 | 0 | 1,469 | 0.03 % | 0 | (1,469) |
| **Total Cleaning & Decorating Expenses** | **4,522** | **1.19 %** | **703** | **(3,821)** | **29,497** | **0.67 %** | **20,665** | **(8,832)** |
| | | | | | | | | |
| **Repair & Maintenance Expenses** | | | | | | | | |
| Grounds Maintenance Supplies | 0 | 0.00 % | 100 | 100 | 318 | 0.01 % | 1,200 | 882 |
| Pool Supplies & Repair | 436 | 0.11 % | 375 | (60) | 7,270 | 0.16 % | 6,210 | (1,060) |
| Parking Lot/Sidewalks | 0 | 0.00 % | 25 | 25 | 81 | 0.00 % | 300 | 219 |
| Electrical Supplies & Repairs | 4 | 0.00 % | 20 | 16 | 108 | 0.00 % | 240 | 132 |
| Plumbing Supplies & Repairs | 189 | 0.05 % | 30 | (159) | 745 | 0.02 % | 360 | (384) |
| HVAC Supplies & Repairs | 292 | 0.08 % | 50 | (242) | 2,786 | 0.06 % | 750 | (2,037) |
| Appliance Supplies & Repairs | 270 | 0.07 % | 0 | (270) | 2,132 | 0.05 % | 0 | (2,132) |
| Carpentry Supplies | 4 | 0.00 % | 10 | 6 | 190 | 0.00 % | 120 | (70) |
| Hardware Supplies | 47 | 0.01 % | 30 | (17) | 474 | 0.01 % | 360 | (114) |
| Locks & Keys | 207 | 0.05 % | 100 | (108) | 676 | 0.02 % | 1,200 | 524 |
| Light Bulbs & Fixtures | 220 | 0.06 % | 25 | (194) | 1,125 | 0.03 % | 300 | (825) |
| **Total Repair & Maintenance Expenses** | **1,669** | **0.44 %** | **765** | **(903)** | **15,905** | **0.36 %** | **11,040** | **(4,865)** |
| | | | | | | | | |
| **Property Taxes** | | | | | | | | |
| Property Tax Expense | 399,393 | 104.79 % | 45,171 | (354,222) | 896,285 | 20.34 % | 542,058 | (354,227) |
| **Total Property Taxes** | **399,393** | **104.79 %** | **45,171** | **(354,222)** | **896,285** | **20.34 %** | **542,058** | **(354,227)** |
| | | | | | | | | |
| **Property Insurance** | | | | | | | | |
| Hazard Insurance Expense | 8,327 | 2.18 % | 2,952 | (5,375) | 106,295 | 2.41 % | 35,425 | (70,869) |
| **Total Property Insurance** | **8,327** | **2.18 %** | **2,952** | **(5,375)** | **106,295** | **2.41 %** | **35,425** | **(70,869)** |
| **Total Operating Expenses** | **465,580** | **122.15 %** | **103,283** | **(362,297)** | **1,669,101** | **37.87 %** | **1,259,504** | **(409,597)** |
| | | | | | | | | |
| **Total Net Operating Income** | **(82,010)** | **(21.52) %** | **242,551** | **(324,561)** | **2,857,767** | **64.85 %** | **2,803,009** | **54,759** |

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2021

| | Month Ending 12/15/2021 | | | | Year to Date 12/15/2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Property Replacements** | | | | | | | | |
| **Recurring Replacements** | | | | | | | | |
| Carpet Replacement | 1,388 | 0.36 % | 183 | (1,205) | 15,899 | 0.36 % | 1,830 | (14,069) |
| Drapery/Mini-Blind Replacements | 640 | 0.17 % | 40 | (600) | 2,332 | 0.05 % | 480 | (1,852) |
| Apppliance Replacements | 1,893 | 0.50 % | 0 | (1,893) | 4,869 | 0.11 % | 0 | (4,869) |
| **Total Recurring Replacements** | **3,921** | **1.03 %** | **223** | **(3,698)** | **23,100** | **0.52 %** | **2,310** | **(20,790)** |
| **Non-Recurring Replacements** | | | | | | | | |
| Lawns, Trees & Shrubs | 0 | 0.00 % | 0 | 0 | 17,304 | 0.39 % | 13,183 | (4,121) |
| Paving & Parking Lots | 0 | 0.00 % | 0 | 0 | 11,048 | 0.25 % | 9,100 | (1,948) |
| Exterior Carpentry/Siding | 0 | 0.00 % | 0 | 0 | 1,564 | 0.04 % | 0 | (1,564) |
| Concrete Repairs | 0 | 0.00 % | 0 | 0 | 427 | 0.01 % | 0 | (427) |
| HVAC Replacments | 0 | 0.00 % | 0 | 0 | 3,039 | 0.07 % | 2,750 | (289) |
| Plumbing Replacements | 2,206 | 0.58 % | 0 | (2,206) | 6,195 | 0.14 % | 0 | (6,195) |
| Electrical Replacement | 0 | 0.00 % | 0 | 0 | 2,381 | 0.05 % | 0 | (2,381) |
| Gate Repairs & Supplies | 928 | 0.24 % | 0 | (928) | 3,229 | 0.07 % | 300 | (2,929) |
| City Inspection/Multifamily Fee | 0 | 0.00 % | 0 | 0 | 26,928 | 0.61 % | 26,928 | 0 |
| Other Non-Recurring Replacements | 0 | 0.00 % | 0 | 0 | 1,837 | 0.04 % | 0 | (1,837) |
| Unit Upgrades | 0 | 0.00 % | 0 | 0 | 4,159 | 0.09 % | 0 | (4,159) |
| Audit Expense | 0 | 0.00 % | 0 | 0 | 7,500 | 0.17 % | 7,200 | (300) |
| Fire Alarm System Repairs | 230 | 0.06 % | 0 | (230) | 8,355 | 0.19 % | 3,900 | (4,455) |
| Clubhouse/Office Upgrade | 0 | 0.00 % | 0 | 0 | 260 | 0.01 % | 0 | (260) |
| Fire & Storm Damage Repairs | 0 | 0.00 % | 0 | 0 | 27,915 | 0.63 % | 0 | (27,915) |
| **Total Non-Recurring Replacements** | **3,364** | **0.88 %** | **0** | **(3,364)** | **122,141** | **2.77 %** | **63,361** | **(58,780)** |
| **Total Property Replacements** | **7,285** | **1.91 %** | **223** | **(7,062)** | **145,241** | **3.30 %** | **65,671** | **(79,570)** |

Created on: 12/30/2021, 2:52 PM EST

APP000238

# Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2021

| | Month Ending 12/15/2021 | | | | Year to Date 12/15/2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Reserve Activity** | | | | | | | | |
| Recurring Reserve Expense | 6,800 | 1.78 % | 6,800 | 0 | 81,600 | 1.85 % | 81,600 | 0 |
| **Total Reserve Activity** | **6,800** | **1.78 %** | **6,800** | **0** | **81,600** | **1.85 %** | **81,600** | **0** |
| | | | | | | | | |
| **Total Available for Debt Service** | **(96,095)** | **(25.21) %** | **235,528** | **(331,623)** | **2,630,926** | **59.70 %** | **2,655,738** | **(24,812)** |
| **Debt Service** | | | | | | | | |
| Interest Expense | 115,454 | 30.29 % | 159,223 | 43,769 | 1,392,589 | 31.60 % | 1,910,674 | 518,085 |
| Principal - First to Fourth | 33,761 | 8.86 % | 0 | (33,761) | 397,989 | 9.03 % | 0 | (397,989) |
| HUD MIP (PMI) Insurance | 7,425 | 1.95 % | 0 | (7,425) | 89,310 | 2.03 % | 0 | (89,310) |
| **Total Debt Service** | **156,640** | **41.10 %** | **159,223** | **2,583** | **1,879,888** | **42.66 %** | **1,910,674** | **30,786** |
| | | | | | | | | |
| **Total Cash Flow/(Deficit)** | **(252,735)** | **(66.31) %** | **76,305** | **(329,040)** | **751,038** | **17.04 %** | **745,064** | **5,974** |

APP000239

## Parc at Windmill Farms
## Detailed Income Statement
### December 15, 2021

| | Month Ending 12/15/2021 | | | | Year to Date 12/15/2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Ratio | Budget | Variance | Actual | Ratio | Budget | Variance |
| **Syndication / Non-Operating Expenses** | | | | | | | | |
| Debt Service Principal Credit | (33,761) | (8.86) % | 0 | (33,761) | (397,989) | (9.03) % | 0 | (397,989) |
| Prior Period Adjustment | 0 | 0.00 % | 0 | 0 | 39,679 | 0.90 % | 0 | 39,679 |
| Replacement Reserve Credit | (6,800) | (1.78) % | 0 | (6,800) | (81,600) | (1.85) % | 0 | (81,600) |
| Deferred Interest - HUD | 0 | 0.00 % | 0 | 0 | (154,833) | (3.51) % | 0 | (154,833) |
| **Total Syndication / Non-Operating Expenses** | **(40,561)** | **(10.64) %** | **0** | **(40,561)** | **(594,743)** | **(13.50) %** | **0** | **(594,743)** |
| **Net Income / (Loss)** | **(212,174)** | **(55.67) %** | **76,305** | **(288,479)** | **1,345,781** | **30.54 %** | **745,064** | **600,717** |

# Parc at Windmill Farms
# Trailing 12 Month Income Statement
### As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Possible Rent Per Leases** | | | | | | | | | | | | | | |
| Rent Per Schedule | | | | | | | | | | | | | | |
| Total Potential Per Schedule | 356,050 | 361,490 | 361,490 | 372,610 | 379,850 | 379,850 | 380,930 | 380,930 | 390,370 | 395,090 | 395,090 | 395,090 | 395,090 | 4,587,880 |
| Total Rent Per Schedule | 356,050 | 361,490 | 361,490 | 372,610 | 379,850 | 379,850 | 380,930 | 380,930 | 390,370 | 395,090 | 395,090 | 395,090 | 395,090 | 4,587,880 |
| | | | | | | | | | | | | | | |
| Leases Under Schedule | | | | | | | | | | | | | | |
| Leases Under/Over Schedule | (4,139) | (4,275) | (5,140) | (16,948) | (20,727) | (21,495) | (16,285) | (12,985) | (17,890) | (20,989) | (15,176) | (15,028) | (13,941) | (180,879) |
| Total Leases Under Schedule | (4,139) | (4,275) | (5,140) | (16,948) | (20,727) | (21,495) | (16,285) | (12,985) | (17,890) | (20,989) | (15,176) | (15,028) | (13,941) | (180,879) |
| Total Possible Rent Per Leases | 351,911 | 357,215 | 356,350 | 355,662 | 359,123 | 358,356 | 364,645 | 367,945 | 372,480 | 374,101 | 379,914 | 380,062 | 381,149 | 4,407,001 |
| | | | | | | | | | | | | | | |
| **Vacancy Losses** | | | | | | | | | | | | | | |
| Vacancy Loss | (22,911) | (11,444) | (2,905) | (4,223) | (3,139) | (4,604) | (11,609) | (7,879) | (13,212) | (4,766) | (6,468) | (10,073) | (9,565) | (89,886) |
| | | | | | | | | | | | | | | |
| Total Vacancy Losses | (22,911) | (11,444) | (2,905) | (4,223) | (3,139) | (4,604) | (11,609) | (7,879) | (13,212) | (4,766) | (6,468) | (10,073) | (9,565) | (89,886) |
| | | | | | | | | | | | | | | |
| **Other Rental Losses** | | | | | | | | | | | | | | |
| Model | (1,210) | (1,230) | (1,230) | (1,270) | (1,290) | (1,290) | (1,290) | (1,290) | (1,330) | (1,330) | (1,350) | (1,350) | (1,350) | (15,600) |
| Bad Debt Loss | (1,503) | (5,392) | 67 | (839) | (3,886) | 615 | (1,566) | (1,968) | (4,304) | (570) | (3,129) | 212 | (1,139) | (21,900) |
| Discounts & Concessions | (14,502) | (9,551) | (2,933) | (518) | 3,696 | (1,046) | (658) | (581) | (564) | 592 | (422) | (1,146) | (1,917) | (15,047) |
| Total Other Rental Losses | (17,215) | (16,173) | (4,096) | (2,627) | (1,480) | (1,721) | (3,514) | (3,839) | (6,198) | (1,308) | (4,901) | (2,284) | (4,406) | (52,547) |
| Total Rental Losses | (40,126) | (27,617) | (7,001) | (6,850) | (4,619) | (6,325) | (15,123) | (11,718) | (19,410) | (6,074) | (11,369) | (12,357) | (13,971) | (142,433) |
| | | | | | | | | | | | | | | |
| Total Net Rental Revenue | 311,785 | 329,598 | 349,349 | 348,812 | 354,504 | 352,031 | 349,522 | 356,227 | 353,070 | 368,027 | 368,545 | 367,705 | 367,178 | 4,264,568 |
| | | | | | | | | | | | | | | |
| **Other Revenue** | | | | | | | | | | | | | | |
| Deposit Forfeitures | 3,895 | 3,675 | 2,723 | 1,668 | 2,057 | 1,925 | 2,152 | 6,078 | 6,470 | 4,796 | 5,047 | 4,048 | 74 | 40,712 |
| Non-Refundable Pet Fees | 954 | 1,955 | 1,956 | 2,202 | 3,809 | 1,956 | 1,858 | 3,081 | 2,847 | 2,409 | 2,442 | 3,844 | 2,609 | 30,968 |
| Application Fees | 1,150 | 1,350 | 1,450 | 600 | 1,400 | 1,550 | 2,250 | 1,900 | 1,900 | 1,500 | 850 | 1,500 | 1,450 | 17,700 |
| NSF & Late Fees | 3,680 | 2,695 | 2,760 | 3,150 | 1,730 | 3,060 | 2,915 | 4,680 | 3,970 | 3,745 | 2,965 | 4,306 | 4,955 | 40,931 |
| Television Cable Revenue | 0 | 0 | 74,189 | 1,086 | 1,641 | 1,693 | 1,004 | 1,653 | 1,723 | 958 | 1,662 | 1,785 | 1,024 | 88,418 |
| Miscellaneous Revenue | 4,063 | 4,124 | 2,280 | 1,028 | 4,559 | 1,270 | 1,992 | 2,670 | 2,387 | 7,126 | 2,346 | 6,881 | 6,233 | 42,897 |
| Interest Income | 0 | 8 | 77 | 69 | 76 | 56 | 58 | 56 | 58 | 58 | 64 | 48 | 47 | 674 |
| | | | | | | | | | | | | | | |
| Total Other Revenue | 13,742 | 13,807 | 85,435 | 9,803 | 15,272 | 11,510 | 12,229 | 20,118 | 19,355 | 20,592 | 15,376 | 22,412 | 16,392 | 262,300 |

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Revenue** | 325,527 | 343,405 | 434,784 | 358,615 | 369,776 | 363,541 | 361,751 | 376,345 | 372,425 | 388,619 | 383,921 | 390,117 | 383,570 | 4,526,868 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Office Salaries | 10,188 | 10,578 | 8,305 | 8,849 | 10,433 | 10,652 | 9,751 | 9,765 | 9,675 | 10,362 | 7,842 | 9,685 | 9,569 | 115,465 |
| Maintenance | 6,194 | 6,192 | 5,900 | 5,600 | 6,554 | 5,956 | 6,213 | 6,017 | 5,276 | 6,823 | 7,886 | 7,524 | 7,778 | 77,718 |
| Porters/Housekeepers | 0 | 0 | 1,618 | 2,124 | 2,347 | 2,142 | 2,359 | 2,254 | 2,224 | 2,388 | 2,178 | 2,193 | 2,284 | 24,112 |
| Bonuses | 1,500 | 0 | 0 | 0 | 2,000 | 0 | 0 | 3,000 | 0 | 0 | 0 | 1,130 | 0 | 6,130 |
| Employee Apartments | 766 | 498 | 301 | 268 | 268 | 87 | 210 | 794 | 242 | 518 | 518 | 0 | 0 | 3,704 |
| Employers FICA | 1,486 | 1,413 | 1,327 | 1,799 | 1,726 | 1,515 | 1,503 | 1,768 | 1,476 | 1,672 | 1,487 | 1,671 | 1,603 | 18,960 |
| Other Payroll Taxes | 1,748 | 1,663 | 1,561 | 2,116 | 2,030 | 1,782 | 1,768 | 2,080 | 1,737 | 1,967 | 1,749 | 1,965 | 1,886 | 22,304 |
| Payroll Administrative | 175 | 166 | 156 | 212 | 203 | 178 | 177 | 208 | 173 | 196 | 175 | 196 | 189 | 2,229 |
| Workers Compensation | 558 | 530 | 498 | 674 | 647 | 568 | 564 | 664 | 553 | 627 | 557 | 626 | 602 | 7,110 |
| Group Insurance | 250 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Employee Recruitment | 0 | 0 | 110 | 222 | 10 | 0 | 0 | 50 | 108 | 0 | 0 | 50 | 0 | 549 |
| Contract Office Help | 960 | 115 | 300 | 225 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 640 |
| **Total Personnel Expenses** | 23,825 | 21,655 | 20,576 | 22,589 | 26,718 | 23,380 | 23,045 | 27,100 | 21,964 | 25,053 | 22,892 | 25,540 | 24,411 | 284,921 |
| **Management Fees** | | | | | | | | | | | | | | |
| Management Fee | 10,075 | 9,727 | 10,259 | 9,725 | 10,946 | 10,533 | 10,262 | 10,343 | 10,525 | 10,948 | 10,752 | 10,798 | 10,759 | 125,577 |
| **Total Management Fees** | 10,075 | 9,727 | 10,259 | 9,725 | 10,946 | 10,533 | 10,262 | 10,343 | 10,525 | 10,948 | 10,752 | 10,798 | 10,759 | 125,577 |
| **Administrative Expenses** | | | | | | | | | | | | | | |
| Office Supplies | 0 | 0 | 0 | 38 | 32 | 183 | 196 | 55 | 45 | 117 | 186 | 81 | 30 | 964 |
| Professional Services | 162 | 162 | 161 | 912 | 161 | 161 | 161 | 0 | 0 | 0 | 0 | 0 | 0 | 1,718 |
| Postage & Freight | 266 | 274 | 274 | 253 | 293 | 309 | 256 | 78 | 229 | 232 | 235 | 238 | 244 | 2,916 |
| Employee Relations | 837 | 0 | 96 | 0 | 115 | 41 | 84 | 44 | 95 | 53 | 32 | 111 | 874 | 1,546 |
| License, Permits & Fees | 337 | 1,425 | 354 | 289 | 337 | 288 | 361 | (173) | 997 | 1,070 | 2,008 | 867 | 875 | 8,696 |
| Credit/Collection/Eviction Cost | 547 | 548 | 547 | 547 | 547 | 793 | 1,947 | 1,498 | 1,819 | 799 | 512 | 1,596 | 1,404 | 12,558 |
| Dues & Subscriptions | 0 | 447 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 448 |
| Copier, Forms & Printing | 219 | 323 | 263 | 260 | 179 | 220 | 322 | 220 | 374 | 219 | 257 | 220 | 260 | 3,115 |
| Training & Seminars | 115 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 274 | 174 | 114 | 115 | 1,590 |
| Computer Supplies | 267 | 0 | 0 | 0 | 230 | 0 | 0 | 193 | 0 | 0 | 237 | 0 | 0 | 659 |
| Telephone & Answering | 1,830 | (236) | 1,058 | 1,022 | 1,082 | 1,071 | 1,040 | 1,327 | 1,459 | 771 | 865 | 707 | 671 | 10,837 |
| Miscellaneous Administrative | 495 | 482 | 498 | 551 | 816 | 442 | 454 | 517 | 509 | 535 | 476 | 491 | 424 | 6,196 |
| **Total Administrative Expenses** | 5,075 | 3,539 | 3,365 | 3,986 | 3,906 | 3,622 | 4,935 | 3,873 | 5,641 | 4,070 | 4,982 | 4,425 | 4,897 | 51,243 |

APP000242

# Parc at Windmill Farms
# Trailing 12 Month Income Statement
As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leasing Expenses** | | | | | | | | | | | | | | |
| Advertising | 2,775 | 2,170 | 2,128 | 2,124 | 2,124 | 2,752 | 2,451 | 2,395 | 2,335 | 2,335 | 2,090 | 2,236 | 2,201 | 27,341 |
| Locator Commissions | 0 | 1,400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,400 |
| Referral Fees | 0 | 0 | 0 | 0 | 250 | 250 | 0 | 500 | 0 | 0 | 250 | 0 | 0 | 1,250 |
| Brochures & Related | 0 | 0 | 49 | 222 | 0 | 50 | 0 | 0 | 178 | (108) | 99 | 0 | 50 | 539 |
| Project & Promotions | 1,234 | 143 | 147 | 1,006 | 411 | 214 | 189 | 953 | 539 | 108 | 460 | 300 | 151 | 4,621 |
| Leasing Commissions | 1,535 | 1,705 | 1,525 | 1,475 | 1,225 | 1,050 | 1,325 | 2,075 | 2,125 | 2,275 | 1,525 | 1,300 | 1,325 | 18,930 |
| Total Leasing Expenses | 5,544 | 5,418 | 3,849 | 4,827 | 4,010 | 4,316 | 3,965 | 5,923 | 5,177 | 4,610 | 4,424 | 3,836 | 3,727 | 54,081 |
| | | | | | | | | | | | | | | |
| **Utility Expenses** | | | | | | | | | | | | | | |
| Electricity - House Meters | 1,827 | 1,954 | 1,995 | 1,975 | 3,108 | 2,200 | 2,156 | 2,043 | 2,175 | 2,161 | 2,064 | 2,261 | 1,972 | 26,065 |
| Electricity - Vacant & Model | 498 | 512 | 23 | 350 | 190 | (425) | 0 | 138 | 490 | 0 | 829 | (450) | 242 | 1,899 |
| Water Expense | 4,415 | 2,725 | 2,786 | 3,798 | 2,141 | 3,208 | 3,343 | 3,338 | 2,862 | 2,180 | 3,596 | 2,376 | 2,693 | 35,046 |
| Sewer Expense | 4,495 | 2,884 | 4,133 | 4,808 | 3,134 | 4,143 | 3,842 | 4,286 | 3,800 | 3,116 | 4,547 | 3,374 | 3,764 | 45,830 |
| Resident Billing | 1,090 | 1,090 | 1,090 | 1,090 | 1,026 | 1,011 | 1,021 | 1,008 | 1,005 | 1,012 | 835 | 925 | 925 | 12,037 |
| Water Irrigation | 2,089 | 5 | 26 | 71 | 196 | 272 | 271 | 307 | 2,553 | 3,018 | 1,578 | 311 | 400 | 9,010 |
| Water & Sewer Reimbursements | (6,066) | (9,228) | (5,333) | (6,418) | (7,332) | (5,573) | (7,430) | (5,753) | (7,164) | (6,147) | (5,535) | (7,062) | (6,431) | (79,406) |
| Total Utility Expenses | 8,348 | (58) | 4,720 | 5,674 | 2,463 | 4,836 | 3,203 | 5,367 | 5,721 | 5,340 | 7,914 | 1,735 | 3,565 | 50,481 |
| | | | | | | | | | | | | | | |
| **Service Expenses** | | | | | | | | | | | | | | |
| Grounds Maintenance Contract | 9,998 | 4,717 | 4,717 | 4,716 | 4,717 | 4,716 | 4,717 | 4,717 | 4,716 | 4,717 | 4,716 | 4,716 | 4,716 | 56,598 |
| Exterminating Services/Supplies | 286 | 473 | 396 | 286 | 300 | 301 | 301 | 286 | 300 | 320 | 286 | 389 | 286 | 3,923 |
| Exterminating Reimbursements | (1,362) | (1,410) | (1,440) | (1,536) | (1,530) | (1,530) | (1,554) | (1,422) | (1,440) | (1,452) | (1,434) | (1,524) | (1,482) | (17,754) |
| Garbage & Trash Removal | 1,991 | 1,991 | 1,991 | 1,991 | 1,991 | 1,991 | 2,397 | 1,991 | 1,991 | 2,338 | 2,276 | 3,429 | 2,655 | 27,036 |
| Garbage & Trash Reimbursements | (1,787) | (1,858) | (1,901) | (2,005) | (2,058) | (2,043) | (2,124) | (1,885) | (1,944) | (1,931) | (1,898) | (2,052) | (2,038) | (23,741) |
| Security Services | 545 | 680 | 545 | 545 | 545 | 545 | 545 | 0 | 0 | 0 | 0 | 0 | 0 | 3,405 |
| Uniform Services and Cleaning | 259 | 0 | 298 | 0 | 0 | 0 | 0 | 0 | 0 | 108 | 300 | 427 | 0 | 1,132 |
| Hallway Cleaning | 285 | 380 | 380 | 240 | 380 | 380 | 285 | 380 | 475 | 150 | 0 | 180 | 0 | 3,230 |
| Fire Protection | 0 | 0 | 120 | 0 | 134 | 142 | 62 | 0 | 120 | 0 | 115 | 120 | 173 | 988 |
| Total Service Expenses | 10,215 | 4,973 | 5,106 | 4,237 | 4,479 | 4,502 | 4,629 | 4,067 | 4,218 | 4,250 | 4,361 | 5,685 | 4,310 | 54,817 |

APP000243

# Parc at Windmill Farms
# Trailing 12 Month Income Statement
As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cleaning & Decorating Expenses** | | | | | | | | | | | | | | |
| Contract Paint Labor | 295 | 935 | 0 | 0 | 0 | 661 | 344 | 1,605 | 0 | 0 | 0 | 3,117 | 0 | 6,660 |
| Paint Supplies | 283 | 291 | 110 | 0 | 193 | 0 | 84 | 419 | 232 | 111 | 196 | 309 | 434 | 2,381 |
| Contract Cleaning & Supplies | 864 | 822 | 610 | 394 | 887 | 297 | 690 | 1,226 | 596 | 475 | 2,678 | 196 | 2,453 | 11,325 |
| Carpet Cleaning | 270 | 539 | 611 | 222 | 649 | 282 | 661 | 1,298 | 480 | 565 | 0 | 49 | 1,635 | 6,989 |
| Carpet Dyeing & Repairs | 103 | 116 | 146 | 0 | 80 | 145 | 0 | 184 | 0 | 0 | 0 | 0 | 0 | 673 |
| Drapes/Blinds Cleaning & Repair | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 88 | (88) | 0 | 0 | 0 | 0 | 0 |
| Sheetrock Repairs | 495 | 425 | 0 | 0 | 0 | 0 | 0 | 1,044 | 0 | 0 | 0 | 0 | 0 | 1,469 |
| Total Cleaning & Decorating Expenses | 2,310 | 3,128 | 1,477 | 616 | 1,809 | 1,385 | 1,779 | 5,864 | 1,220 | 1,151 | 2,874 | 3,671 | 4,522 | 29,497 |
| | | | | | | | | | | | | | | |
| **Repair & Maintenance Expenses** | | | | | | | | | | | | | | |
| Grounds Maintenance Supplies | 0 | 0 | 53 | 0 | 114 | 33 | 0 | 0 | 114 | 0 | 0 | 5 | 0 | 317 |
| Pool Supplies & Repair | 396 | 396 | 397 | 396 | 660 | 724 | 1,064 | 713 | 689 | 875 | 396 | 523 | 436 | 7,270 |
| Parking Lot/Sidewalks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 62 | 20 | 0 | 82 |
| Electrical Supplies & Repairs | 0 | 53 | 0 | 0 | 0 | 0 | 0 | 0 | 35 | 17 | 0 | 0 | 4 | 108 |
| Plumbing Supplies & Repairs | 0 | 55 | 0 | 10 | 0 | 24 | 0 | 116 | 156 | 96 | 98 | 0 | 189 | 744 |
| HVAC Supplies & Repairs | 0 | 173 | 65 | 118 | 177 | 60 | 519 | 216 | 354 | 494 | 139 | 179 | 292 | 2,787 |
| Appliance Supplies & Repairs | 0 | 86 | 60 | 90 | 173 | 63 | 8 | 94 | 232 | 141 | 137 | 777 | 270 | 2,132 |
| Carpentry Supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 186 | 0 | 4 | 190 |
| Hardware Supplies | 47 | 86 | 55 | 0 | 11 | 16 | 98 | 0 | 53 | 0 | 0 | 108 | 47 | 474 |
| Locks & Keys | (61) | 131 | 40 | 0 | 0 | 0 | 139 | 61 | 25 | 0 | 73 | 0 | 207 | 675 |
| Light Bulbs & Fixtures | 0 | 82 | 16 | 141 | 99 | 113 | 0 | 112 | 124 | 154 | 0 | 64 | 220 | 1,126 |
| Total Repair & Maintenance Expenses | 382 | 1,062 | 686 | 755 | 1,234 | 1,033 | 1,828 | 1,312 | 1,782 | 1,777 | 1,091 | 1,676 | 1,669 | 15,905 |
| | | | | | | | | | | | | | | |
| **Property Taxes** | | | | | | | | | | | | | | |
| Property Tax Expense | (204,289) | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 399,393 | 896,285 |
| Total Property Taxes | (204,289) | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 45,172 | 399,393 | 896,285 |
| | | | | | | | | | | | | | | |
| **Property Insurance** | | | | | | | | | | | | | | |
| Hazard Insurance Expense | 9,920 | 9,920 | 9,920 | 9,920 | 9,920 | 8,327 | 8,327 | 8,327 | 8,327 | 8,326 | 8,327 | 8,327 | 8,327 | 106,294 |
| Total Property Insurance | 9,920 | 9,920 | 9,920 | 9,920 | 9,920 | 8,327 | 8,327 | 8,327 | 8,327 | 8,326 | 8,327 | 8,327 | 8,327 | 106,294 |

APP000244

# Parc at Windmill Farms
# Trailing 12 Month Income Statement
As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Operating Expenses | (128,595) | 104,536 | 105,130 | 107,501 | 110,657 | 107,106 | 107,145 | 117,348 | 109,747 | 110,697 | 112,789 | 110,865 | 465,580 | 1,669,101 |
| Total Net Operating Income | 454,122 | 238,869 | 329,654 | 251,114 | 259,119 | 256,435 | 254,606 | 258,997 | 262,678 | 277,922 | 271,132 | 279,252 | (82,010) | 2,857,767 |
| **Property Replacements** | | | | | | | | | | | | | | |
| **Recurring Replacements** | | | | | | | | | | | | | | |
| Carpet Replacement | 474 | 708 | 708 | 214 | 1,154 | 596 | 1,463 | 3,430 | 370 | 513 | 2,079 | 3,279 | 1,388 | 15,899 |
| Drapery/Mini-Blind Replacements | 0 | 0 | 0 | 501 | 0 | 0 | 0 | 1,103 | 87 | 0 | 0 | 0 | 640 | 2,332 |
| Apppliance Replacements | 244 | 616 | 0 | 424 | 0 | 1,935 | 0 | 0 | 0 | 0 | 0 | 0 | 1,893 | 4,869 |
| Total Recurring Replacements | 718 | 1,324 | 708 | 1,139 | 1,154 | 2,531 | 1,463 | 4,533 | 457 | 513 | 2,079 | 3,279 | 3,921 | 23,100 |
| **Non-Recurring Replacements** | | | | | | | | | | | | | | |
| Lawns, Trees & Shrubs | 0 | 0 | 6,273 | 3,453 | 1,152 | 2,896 | 0 | 1,152 | 0 | 0 | 354 | 2,024 | 0 | 17,304 |
| Paving & Parking Lots | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11,048 | 0 | 0 | 0 | 11,048 |
| Exterior Carpentry/Siding | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 793 | 771 | 0 | 1,564 |
| Concrete Repairs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 428 | 0 | 0 | 0 | 0 | 0 | 427 |
| HVAC Replacments | 0 | 2,712 | 0 | 0 | 0 | 0 | 326 | 0 | 0 | 0 | 0 | 0 | 0 | 3,039 |
| Plumbing Replacements | 2,797 | 1,690 | 0 | 0 | 1,295 | 0 | 0 | 0 | 1,004 | 0 | 0 | 0 | 2,206 | 6,195 |
| Electrical Replacement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 920 | 1,462 | 0 | 2,381 |
| Gate Repairs & Supplies | 0 | 400 | 0 | 0 | 200 | 0 | 0 | 0 | 300 | 765 | 300 | 336 | 928 | 3,229 |
| City Inspection/Multifamily Fee | 10,920 | 26,928 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,928 |
| Other Non-Recurring Replacements | 5,988 | 0 | 457 | 221 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 1,125 | 0 | 1,837 |
| Unit Upgrades | 0 | 0 | 620 | 0 | 987 | 140 | 253 | 125 | 237 | 0 | 0 | 1,797 | 0 | 4,159 |
| Audit Expense | 0 | 3,600 | 0 | 3,900 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,500 |
| Fire Alarm System Repairs | 4,410 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,195 | 1,930 | 230 | 8,355 |
| Clubhouse/Office Upgrade | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 260 | 0 | 260 |
| Fire & Storm Damage Repairs | 0 | 0 | 0 | 7,731 | 14,024 | 4,428 | 1,263 | 470 | 0 | 0 | 0 | 0 | 0 | 27,915 |
| Total Non-Recurring Replacements | 24,115 | 35,330 | 7,350 | 15,305 | 17,690 | 7,464 | 1,842 | 2,175 | 1,541 | 11,813 | 8,562 | 9,705 | 3,364 | 122,141 |

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Property Replacements | 24,833 | 36,654 | 8,058 | 16,444 | 18,844 | 9,995 | 3,305 | 6,708 | 1,998 | 12,326 | 10,641 | 12,984 | 7,285 | 145,241 |

# Parc at Windmill Farms
## Trailing 12 Month Income Statement
As of December 15, 2021

| | Month Ending 12/15/2020 Actual | Month Ending 01/15/2021 Actual | Month Ending 02/15/2021 Actual | Month Ending 03/15/2021 Actual | Month Ending 04/15/2021 Actual | Month Ending 05/15/2021 Actual | Month Ending 06/15/2021 Actual | Month Ending 07/15/2021 Actual | Month Ending 08/15/2021 Actual | Month Ending 09/15/2021 Actual | Month Ending 10/15/2021 Actual | Month Ending 11/15/2021 Actual | Month Ending 12/15/2021 Actual | 12 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reserve Activity | | | | | | | | | | | | | | |
| Recurring Reserve Expense | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 81,600 |
| Total Reserve Activity | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 81,600 |
| | | | | | | | | | | | | | | |
| Total Available for Debt Service | 422,490 | 195,415 | 314,796 | 227,870 | 233,475 | 239,640 | 244,501 | 245,489 | 253,880 | 258,795 | 253,691 | 259,468 | (96,095) | 2,630,925 |
| Debt Service | | | | | | | | | | | | | | |
| Interest Expense | 228,895 | 116,638 | 116,532 | 116,426 | 116,319 | 116,212 | 116,105 | 115,997 | 115,889 | 115,781 | 115,672 | 115,563 | 115,454 | 1,392,589 |
| Principal - First to Fourth | (86,835) | 32,577 | 32,683 | 32,789 | 32,896 | 33,003 | 33,110 | 33,218 | 33,326 | 33,434 | 33,543 | 33,652 | 33,761 | 397,989 |
| HUD MIP (PMI) Insurance | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,279 | 7,279 | 7,425 | 7,425 | 7,425 | 7,425 | 7,425 | 7,425 | 89,310 |
| Total Debt Service | 149,610 | 156,765 | 156,765 | 156,765 | 156,765 | 156,494 | 156,494 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 156,640 | 1,879,888 |
| | | | | | | | | | | | | | | |
| Total Cash Flow/(Deficit) | 272,880 | 38,651 | 158,031 | 71,105 | 76,710 | 83,146 | 88,006 | 88,849 | 97,240 | 102,155 | 97,051 | 102,828 | (252,735) | 751,037 |

APP000247

**ENGAGEMENT LETTER**

NVC | National Valuation Consultants, Inc.

APP000248

# NVC

## National Valuation Consultants, Inc.

**Via email:** cort@brownfoxlaw.com

December 16, 2022

Cort Thomas, Receiver
Partner
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225
Phone No.: 214.367.6094

Re:    **Three Appraisals of the following properties:**
   1. **Amerigold Suites – 13636 Goldmark Dr., Dallas, Texas**
   2. **Bellwether Ridge Apartments – 841 S. Polk St., DeSoto, Texas**
   3. **Parc at Windmill Farms Apartments – 1003 Windmill Farms Blvd., Forney, Texas**

Dear Mr. Thomas:

This letter will confirm your request that National Valuation Consultants, Inc. prepare separate appraisals of the above referenced properties. The purpose of the assignment will be to estimate the fee simple market value of each subject property as of the date of our inspection.

We understand that the intended use is to assist in the potential sale of the subjects.

The appraisal reports will be prepared in conformance with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; and with the written appraisal requirements and guidelines established by the Appraisal Institute for an appraisal.

The requested appraisals will be delivered in approximately *four to five weeks from receipt of the retainer*, provided all requested information is received in a timely manner. Please understand that this is our best estimate of the delivery date and may be subject to change because of conditions beyond our control. The fee is also subject to modification and/or change, by mutual agreement, should you require changes to the assignment described herein.

*The fee for our services will be $6,700 for Amerigold, $4,800 for Bellwether, and $4,800 for Parc, totaling $16,300. NVC will require a 100% retainer.* The retainer ($16,300) is due and payable at our offices in Centennial, Colorado before work will begin. In the event of cancellation of the assignment, or if the assignment is placed on hold for more than thirty (30) days, all applicable charges for services rendered by NVC to the date of such cancellation will be due within thirty (30) days from the date of invoice.

The fee quoted above is for the reports only and does not include court preparation or post-appraisal consultation, if any. Court preparation and consultation time are billed at the rate of $450 per hour for senior staff and $250 per hour for other staff. These fees are subject to increase after six months from the date of this agreement. It is also corporate policy that prior to any deposition or court testimony, we must be paid in full not only for current billings, but any outstanding past accounts as well.

ATLANTA · BOSTON · CHICAGO · CINCINNATI · DALLAS · DENVER · HOUSTON · NY/NJ METRO · SAN FRANCISCO · SOUTH FLORIDA

Corporate Headquarters: 7807 East Peakview Ave., Suite 200, Centennial, CO 80111 | 303.753.6900 | www.nvcinc.com

APP000249

Cort Thomas, Receiver
December 16, 2022
Page Two

It is mutually agreed that our acceptance of this assignment is not contingent upon any predetermined conclusions to value, marketability, or feasibility. Should the assignment be terminated, you agree to pay for our time and costs incurred prior to receipt of written notice of cancelation.

If this agreement is given to an attorney for collection or enforcement, the prevailing party shall be entitled to recover all costs, expenses and reasonable attorney's fees incurred because of the legal action.

Our report will contain numerous assumptions and limiting conditions which are requisite to the conclusions reached therein. The standard assumptions and limiting conditions are set forth in Exhibit "A" attached hereto and made a part hereof for all purposes. Your signature below acknowledges that you have read, understood, and agreed to these assumptions. In addition to these standard assumptions, there may be assumptions contained in our report which are specific to your property. Regarding these latter assumptions, your signature below acknowledges that, unless we have been notified in writing by you within twenty days of receipt of our report, you accept these assumptions as stated therein.

We will deliver the report in PDF format. If requested, we will also deliver a hard copy at the cost of $250.00 per copy.

If the foregoing is agreeable, please sign where indicated on the enclosed copy of this letter and return to me along with the requested data. Please keep a copy for your files. We look forward to working with you on this assignment. Please feel free to contact me if you have any questions.

By:

_____
Cort Thomas, Receiver
Partner
Brown Fox PLLC

_____
Date

_____
Charles G. Dannis, MAI, SRA
Senior Managing Director
National Valuation Consultants, Inc.

December 16, 2022
_____
Date

APP000250

Exhibit "A"

## ASSUMPTIONS AND LIMITING CONDITIONS

1. Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated: specifically, the Appraisal Institute.

2. This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment. Furthermore, the Report is to be used in whole and not in part. The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media. Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property. NVC shall have no accountability or responsibility to any such third party.

3. The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4. The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property. The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5. The legal description used in this report is assumed to be correct.

6. No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7. No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered. The title is assumed to be good and merchantable unless otherwise stated.

8. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9. All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age. The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

APP000251

10. Information furnished by others is assumed to be true, correct and reliable. A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

11. The value estimate assumes responsible ownership and competent management.

12. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

13. Opinions of value contained in this report are estimates. There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14. The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and value estimates if information pertinent to this assignment is made known to us after the completion of the report.

15. By signing hereafter, the client hereby acknowledges and agrees that National Valuation Consultants, Inc., as well as any employee, agent, or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject but only if National Valuation Consultants, Inc. or any other indemnified person shall not have been negligent or shall not have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16. The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17. Unless otherwise noted, all prospective value estimates, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization. The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur, and which would alter market conditions prior to the effective date of the appraisal.

APP000252

# EXHIBIT B-2

APP000253



*Parc at Windmill Farms - Existing Debt*
*Executive Summary*

## Property Description

| | | | | | |
|---|---|---|---|---|---|
| Location: | Forney, TX | Current Occupancy: | 96.0% | Loan Balance: | $35,111,864 |
| Year Built: | 2021 | Avg. Market Rent/Month: | $1,709 | Interest Rate: | 3.90% |
| Number of Units: | 272 | Avg. Market Rent/PSF: | $1.66 | Loan Constant: | 5.10% |
| Rentable SF: | 279,648 | Avg. Effective Rent/Month: | $1,521 | LTV: | 65% |
| Average Unit Size: | 1,028 | Avg. Effective Rent/PSF: | $1.48 | | |
| Product Type: | Garden | Last 20 Move-Ins Average/Month: | $1,623 | | |
| Acreage: | 18.45 Acres | Last 20 Move-Ins Average/SF: | $1.55 | | |
| Density: | 15 Units / Acre | Last 20 Move-Ins Avg. Unit Size: | 1,045 | | |
| | | T-12 Effective Rent Growth: | 8.83% | | |

## Pricing Matrix

| Current Value<br>Value Per Unit<br>Value PSF | Cap Rate [1]<br>In Place<br>T-3 | Cap Rate [1]<br>In Place<br>T-1 | Cap Rate<br>Yr 1<br>Pro Forma | Levered Indices [2] | | | Unlevered<br><br>IRR | Reversion Price<br>5.00%<br>Cap Rate [3] |
|---|---|---|---|---|---|---|---|---|
| | | | | IRR | 7 YR Avg<br>Cash Yield | Yr 1<br>Cash Yield | | |
| **$56,000,000**<br>$205,882<br>$200.25 | 4.41% | 4.54% | 5.07% | 13.40% | 5.59% | 3.96% | 8.58% | $71,780,882<br>$263,900<br>$256.68 |
| **$54,000,000**<br>$198,529<br>$193.10 | 4.66% | 4.80% | 5.35% | 15.79% | 6.43% | 4.60% | 9.51% | $72,882,556<br>$267,951<br>$260.62 |
| **$52,000,000**<br>$191,176<br>$185.95 | 4.92% | 5.07% | 5.64% | 18.45% | 7.46% | 5.40% | 10.47% | $73,991,522<br>$272,028<br>$264.59 |

**Pricing Matrix Footnotes:**

(1) In place cap rates are calculated on the T-3 and T-1 numbers adjusted for pro forma other income, broker's projected expenses, 85% taxes, $650 per unit for insurance, and $250 per unit in replacement reserves. T-3 & T-1 cap rate adjusted for 5% vacancy.

(2) Analysis assumes an existing loan with an outstanding balance of $35,111,864, an interest rate of 3.90%, no interest only followed by 40-year amortization, and a maturity date of January 2060.

(3) Sale price is derived by capitalizing the new Owner's 8th year NOI at 5.00%.

This is an opinion of value or comparative market analysis and should not be considered an appraisal.

In making any decision that relies upon our work, you should know that we have not followed the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.



*Parc at Windmill Farms*
*Rent Roll Summary*

## Unit Mix

| Units | % | Unit Description | Type | SF | Total SF | Status Occ | Status Vac | Market Rent | Market PSF | Lease Rent | Lease LTL | Effective Rent | Effective Conc % | Effective PSF | Market Monthly | Market Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 65 | 24% | 1 BR - 1 BA | A1 | 832 | 54,080 | 61 | 4 | $1,524 | $1.83 | $1,384 | -9.2% | $1,384 | 0.0% | $1.66 | $99,090 | $1,189,080 |
| 3 | 1% | 1 BR - 1 BA | A1-HC | 832 | 2,496 | 3 | 0 | $1,390 | $1.67 | $1,335 | -4.0% | $1,335 | 0.0% | $1.60 | $4,170 | $50,040 |
| 48 | 18% | 1 BR - 1 BA | A2 | 798 | 38,304 | 46 | 2 | $1,448 | $1.81 | $1,311 | -9.5% | $1,305 | -0.4% | $1.63 | $69,504 | $834,048 |
| 28 | 10% | 2 BR - 2 BA | B1 | 1,059 | 29,652 | 27 | 1 | $1,695 | $1.60 | $1,564 | -7.7% | $1,564 | 0.0% | $1.48 | $47,460 | $569,520 |
| 77 | 28% | 2 BR - 2 BA | B2 | 1,145 | 88,165 | 73 | 4 | $1,862 | $1.63 | $1,618 | -13.1% | $1,618 | 0.0% | $1.41 | $143,384 | $1,720,608 |
| 3 | 1% | 2 BR - 2 BA | B2-HC | 1,125 | 3,375 | 3 | 0 | $1,827 | $1.62 | $1,620 | -11.3% | $1,620 | 0.0% | $1.44 | $5,480 | $65,760 |
| 12 | 4% | 2 BR - 2 BA | B3 | 1,203 | 14,436 | 12 | 0 | $1,964 | $1.63 | $1,625 | -17.3% | $1,597 | -1.7% | $1.33 | $23,568 | $282,816 |
| 35 | 13% | 3 BR - 3 BA | C1 | 1,365 | 47,775 | 34 | 1 | $2,004 | $1.47 | $1,817 | -9.4% | $1,791 | -1.4% | $1.31 | $70,145 | $841,740 |
| 1 | 0% | 3 BR - 3 BA | C1-HC | 1,365 | 1,365 | 1 | 0 | $1,999 | $1.46 | $1,770 | -11.5% | $1,770 | 0.0% | $1.30 | $1,999 | $23,988 |
| **272** | **100%** | | | **1,028** | **279,648** | **260** | **12** | **$1,709** | **$1.66** | **$1,527** | **-10.6%** | **$1,521** | **-0.4%** | **$1.48** | **$464,800** | **$5,577,600** |
| 116 | 43% | One Bedroom | | 818 | 94,880 | 110 | 6 | $1,489 | $1.82 | $1,352 | -9.20% | $1,349 | -0.2% | $1.65 | $172,764 | $2,073,168 |
| 120 | 44% | Two Bedroom | | 1,130 | 135,628 | 115 | 5 | $1,832 | $1.62 | $1,606 | -12.34% | $1,604 | -0.2% | $1.42 | $219,892 | $2,638,704 |
| 36 | 13% | Three Bedroom | | 1,365 | 49,140 | 35 | 1 | $2,004 | $1.47 | $1,815 | -9.42% | $1,790 | -1.4% | $1.31 | $72,144 | $865,728 |

## Unit Status

| Units | Unit Status | % of Total | Market Rent | Lease Rent | LTL |
|---|---|---|---|---|---|
| 258 | Occupied with Lease Units | 94.9% | $441,098 | $393,977 | -10.7% |
| 2 | Employee Units | 0.7% | $3,452 | $3,000 | -13.1% |
| 1 | Model Units | 0.4% | $1,558 | $0 | 0.0% |
| 11 | Vacant Units | 4.0% | $18,692 | $0 | -100.0% |
| **272** | | **100%** | **$464,800** | **$396,977** | **-14.6%** |



- Occupied
- Vacant



- One Bedroom
- Two Bedroom
- Three Bedroom



**Lease Expiration Trend**



### Parc at Windmill Farms
*Last 20 Move-Ins*

| Unit Number | Unit Type | Unit SF | Lease Start | Lease Expiration | Market Rent/Month | Market Rent/PSF | Lease Rent/Month | Loss to Lease | Lease Rent/PSF | Prorated Conc. | Upfront Conc. | Effective Rent/Month | Effective Rent/PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 827 | C1 | 1,365 | 10/18/22 | 10/22/23 | $1,979 | $1.45 | $1,890 | -$89 | $1.38 | $0 | $0 | **$1,890** | **$1.38** |
| 515 | A1 | 832 | 10/18/22 | 10/22/23 | $1,538 | $1.85 | $1,470 | -$68 | $1.77 | $0 | $0 | **$1,470** | **$1.77** |
| 418 | C1 | 1,365 | 10/11/22 | 11/10/23 | $2,019 | $1.48 | $2,019 | $0 | $1.48 | $0 | $0 | **$2,019** | **$1.48** |
| 815 | A1 | 832 | 10/11/22 | 11/12/23 | $1,538 | $1.85 | $1,470 | -$68 | $1.77 | $0 | $0 | **$1,470** | **$1.77** |
| 1115 | A2 | 798 | 10/11/22 | 10/15/23 | $1,468 | $1.84 | $1,410 | -$58 | $1.77 | $0 | $0 | **$1,410** | **$1.77** |
| 1518 | B2 | 1,145 | 10/10/22 | 10/09/23 | $1,872 | $1.63 | $1,739 | -$133 | $1.52 | $0 | $0 | **$1,739** | **$1.52** |
| 811 | C1 | 1,365 | 10/07/22 | 11/05/23 | $2,019 | $1.48 | $2,019 | $0 | $1.48 | $0 | $0 | **$2,019** | **$1.48** |
| 926 | B2 | 1,145 | 10/04/22 | 11/05/23 | $1,852 | $1.62 | $1,670 | -$182 | $1.46 | $0 | $0 | **$1,670** | **$1.46** |
| 1717 | A1 | 832 | 10/04/22 | 10/08/23 | $1,538 | $1.85 | $1,470 | -$68 | $1.77 | $0 | $0 | **$1,470** | **$1.77** |
| 1515 | A1-HC | 832 | 10/04/22 | 10/08/23 | $1,390 | $1.67 | $1,390 | $0 | $1.67 | $0 | $0 | **$1,390** | **$1.67** |
| 426 | A1 | 832 | 10/03/22 | 11/05/23 | $1,498 | $1.80 | $1,490 | -$8 | $1.79 | $0 | $0 | **$1,490** | **$1.79** |
| 1111 | B1 | 1,059 | 10/01/22 | 09/24/23 | $1,715 | $1.62 | $1,715 | $0 | $1.62 | $0 | $0 | **$1,715** | **$1.62** |
| 1728 | B2 | 1,145 | 09/27/22 | 10/29/23 | $1,847 | $1.61 | $1,625 | -$222 | $1.42 | $0 | $0 | **$1,625** | **$1.42** |
| 628 | B2 | 1,145 | 09/27/22 | 09/24/23 | $1,832 | $1.60 | $1,610 | -$222 | $1.41 | $0 | $0 | **$1,610** | **$1.41** |
| 1026 | B2 | 1,145 | 09/26/22 | 11/05/23 | $1,852 | $1.62 | $1,719 | -$133 | $1.50 | $0 | $0 | **$1,719** | **$1.50** |
| 1015 | A1 | 832 | 09/26/22 | 10/22/23 | $1,538 | $1.85 | $1,430 | -$108 | $1.72 | $0 | $0 | **$1,430** | **$1.72** |
| 1613 | A2 | 798 | 09/26/22 | 09/24/23 | $1,468 | $1.84 | $1,370 | -$98 | $1.72 | $0 | $0 | **$1,370** | **$1.72** |
| 1028 | B2 | 1,145 | 09/20/22 | 10/22/23 | $1,852 | $1.62 | $1,630 | -$222 | $1.42 | $0 | $0 | **$1,630** | **$1.42** |
| 524 | B2 | 1,145 | 09/16/22 | 09/10/23 | $1,832 | $1.60 | $1,699 | -$133 | $1.48 | $0 | $0 | **$1,699** | **$1.48** |
| 222 | B2 | 1,145 | 09/16/22 | 09/17/23 | $1,852 | $1.62 | $1,630 | -$222 | $1.42 | $0 | $0 | **$1,630** | **$1.42** |
| **20** | **1,045** | **20,902** | | | **$1,725** | **$1.65** | **$1,623** | | **$1.55** | **$0** | **$0** | **$1,623** | **$1.55** |

| | Avg. Unit Size | Effective Rent | Effective Rent PSF | Conc. % |
|---|---|---|---|---|
| **Overall Rent Roll Average** | **1,028** | **$1,521** | **$1.48** | **0.37%** |
| **Average per Last 20 Leases** | **1,045** | **$1,623** | **$1.55** | **0.00%** |
| Average per Last 40 Leases | 1,042 | $1,609 | $1.54 | 0.00% |
| Average per Last 60 Leases | 1,059 | $1,604 | $1.52 | 0.00% |
| Average per Last 80 Leases | 1,051 | $1,589 | $1.51 | 0.26% |
| Average per Last 100 Leases | 1,055 | $1,584 | $1.50 | 0.21% |

APP000256



**Parc at Windmill Farms**
*Rent Growth Analysis*

### MARKET RENTAL RATES

| Period | Market Rent/Month | Market Rent PSF | Market Monthly Rent Growth | Market PSF Rent Growth | Cumulative Monthly Growth | Market Rent Growth | Loss to Lease | Concessions |
|---|---|---|---|---|---|---|---|---|
| Current Rent Roll | $1,709 | $1.66 | | | | | | |
| Year 1 Pro Forma | $1,709 | $1.66 | $0 | $0.00 | $0 | 0.0% | -5.0% | 0.0% |
| Year 2 Pro Forma | $1,760 | $1.71 | $51 | $0.05 | $51 | 3.0% | -4.0% | 0.0% |
| Year 3 Pro Forma | $1,813 | $1.76 | $53 | $0.05 | $104 | 3.0% | -3.5% | 0.0% |
| Year 4 Pro Forma | $1,867 | $1.82 | $54 | $0.05 | $158 | 3.0% | -3.5% | 0.0% |
| Year 5 Pro Forma | $1,923 | $1.87 | $56 | $0.05 | $214 | 3.0% | -3.5% | 0.0% |
| Year 6 Pro Forma | $1,981 | $1.93 | $58 | $0.06 | $272 | 3.0% | -3.5% | 0.0% |
| Year 7 Pro Forma | $2,040 | $1.98 | $59 | $0.06 | $332 | 3.0% | -3.5% | 0.0% |

| 7-Year Average Market Rent Growth | | 7-Year Cumulative Market Rent Growth | |
|---|---|---|---|
| Monthly Growth | $47 | Monthly Growth | $332 |
| PSF Growth | $0.05 | PSF Growth | $0.32 |
| Percentage Growth | 2.6% | Percentage Growth | 19.4% |

### EFFECTIVE RENTAL RATES

| Period | Effective Rent/Month | Effective Rent PSF | Effective Monthly Rent Growth | Effective PSF Rent Growth | Cumulative Monthly Growth | Net Effective Rent Growth |
|---|---|---|---|---|---|---|
| Current Rent Roll | $1,521 | $1.48 | | | | |
| Year 1 Pro Forma | $1,623 | $1.58 | $102 | $0.10 | $102 | 6.7% |
| Year 2 Pro Forma | $1,690 | $1.64 | $66 | $0.06 | $169 | 4.1% |
| Year 3 Pro Forma | $1,749 | $1.70 | $60 | $0.06 | $228 | 3.5% |
| Year 4 Pro Forma | $1,802 | $1.75 | $52 | $0.05 | $281 | 3.0% |
| Year 5 Pro Forma | $1,856 | $1.81 | $54 | $0.05 | $335 | 3.0% |
| Year 6 Pro Forma | $1,912 | $1.86 | $56 | $0.05 | $391 | 3.0% |
| Year 7 Pro Forma | $1,969 | $1.92 | $57 | $0.06 | $448 | 3.0% |

| 7-Year Average Effective Rent Growth | | 7-Year Cumulative Effective Rent Growth | |
|---|---|---|---|
| Monthly Growth | $64 | Monthly Growth | $448 |
| PSF Growth | $0.06 | PSF Growth | $0.44 |
| Percentage Growth | 3.8% | Percentage Growth | 29.4% |

APP000257

## JLL — Achieve Ambitions

### Parc at Windmill Farms - New Debt
*Operating Statement Comparative Analysis*

| | | Trailing 12 Actual Oct '21 - Sep '22 | | Trailing 9 Annualized Jan '22 - Sep '22 | | Trailing 6 Annualized Apr '22 - Sep '22 | | Trailing 3 Annualized Jul '22 - Sep '22 | | Trailing 1 Annualized Sep '22 | | Year 1 Pro Forma | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **INCOME** | Total | Per Unit | Total | Per Unit | Total | Per Unit | Total | Per Unit | Total | Per Unit | Total | Per Unit |
| | **Effective Rental Income** | | | | | | | | | | | | |
| [1] | Current Market Rents | $5,027,312 | $18,483 | $5,122,723 | $18,834 | $5,242,824 | $19,275 | $5,447,768 | $20,029 | $5,577,600 | $20,506 | $5,577,600 | $20,506 |
| | Potential Rent Growth | | | | | | | | | | | $0 | 0.0% |
| [2] | Gain / Loss to Lease | -$322,426 | -6.4% | -$371,041 | -7.2% | -$412,274 | -7.9% | -$538,232 | -9.9% | -$610,812 | -11.0% | -$278,880 | -5.0% |
| | **Gross Potential Income** | $4,704,886 | $17,297 | $4,751,681 | $17,469 | $4,830,550 | $17,759 | $4,909,536 | $18,050 | $4,966,788 | $18,260 | $5,298,720 | $19,481 |
| [3] | Vacancy | -$121,834 | -2.6% | -$127,637 | -2.7% | -$149,208 | -3.1% | -$154,112 | -3.1% | -$161,580 | -3.3% | -$264,936 | -5.0% |
| [4] | Non Revenue / Employee Units | -$17,086 | -0.4% | -$17,381 | -0.4% | -$17,712 | -0.4% | -$18,264 | -0.4% | -$18,696 | -0.4% | -$26,494 | -0.5% |
| [5] | Concessions / Discounts | -$12,848 | -0.3% | -$12,484 | -0.3% | -$10,564 | -0.2% | -$7,432 | -0.2% | -$10,980 | -0.2% | $0 | 0.0% |
| [6] | Bad Debt | -$46,590 | -1.0% | -$56,712 | -1.2% | -$42,796 | -0.9% | -$30,420 | -0.6% | -$3,360 | -0.1% | -$15,896 | -0.3% |
| | **Effective Rental Income** | $4,506,528 | $16,568 | $4,537,467 | $16,682 | $4,610,270 | $16,950 | $4,699,308 | $17,277 | $4,772,172 | $17,545 | $4,991,394 | $18,351 |
| | **Effective Rent** | $1,438 | $1.40 | $1,452 | $1.41 | $1,477 | $1.44 | $1,502 | $1.46 | $1,518 | $1.48 | **$1,623** | **$1.58** |
| | per month | | $375,544 | | $378,122 | | $384,189 | | $391,609 | | $397,681 | 6.2% | $415,950 |
| [7] | **Other Income** | | | | | | | | | | | % over T-3 | |
| | Deposit Forfeitures | $50,638 | $186 | $55,292 | $203 | $61,312 | $225 | $57,012 | $210 | $40,620 | $149 | $47,600 | $175 |
| | Late & NSF Fees | $34,671 | $127 | $29,927 | $110 | $29,766 | $109 | $33,680 | $124 | $30,720 | $113 | $31,280 | $115 |
| | Cable/Internet Income | $14,416 | $53 | $13,260 | $49 | $11,184 | $41 | $22,368 | $82 | $3,144 | $12 | $13,600 | $50 |
| | Leasing Fees | $19,250 | $71 | $20,600 | $76 | $22,800 | $84 | $18,800 | $69 | $9,600 | $35 | $20,400 | $75 |
| | Pet Fees | $29,100 | $107 | $26,940 | $99 | $31,968 | $118 | $32,032 | $118 | $33,168 | $122 | $29,920 | $110 |
| | Miscellaneous Income | $70,368 | $259 | $73,211 | $269 | $70,140 | $258 | $65,412 | $240 | $52,200 | $192 | $72,080 | $265 |
| | Trash Reimbursement | $23,611 | $87 | $23,497 | $86 | $23,206 | $85 | $22,972 | $84 | $23,328 | $86 | $23,120 | $85 |
| | Water/Sewer Reimbursement | $77,354 | $284 | $77,768 | $286 | $75,472 | $277 | $75,200 | $276 | $81,504 | $300 | $81,600 | $300 |
| | **Total Other Income** | $319,408 | $1,174 | $320,495 | $1,178 | $325,848 | $1,198 | $327,476 | $1,204 | $274,284 | $1,008 | $319,600 | $1,175 |
| | **EFFECTIVE GROSS INCOME** | **$4,825,936** | **$17,742** | **$4,857,961** | **$17,860** | **$4,936,118** | **$18,147** | **$5,026,784** | **$18,481** | **$5,046,456** | **$18,553** | **$5,310,994** | **$19,526** |
| | % change over previous period | | | | | | | | | | | % over T-3 | 5.7% |
| [8] | **EXPENSES** | Total | Per Unit | Total | Per Unit | Total | Per Unit | Total | Per Unit | Total | Per Unit | Total | Per Unit |
| | **Controllable Expenses** | | | | | | | | | | | | |
| [9] | Payroll | $312,306 | $1,148 | $319,284 | $1,174 | $329,140 | $1,210 | $329,224 | $1,210 | $319,740 | $1,176 | $362,750 | $1,334 |
| | Contract/Landscape | $53,028 | $195 | $54,725 | $201 | $58,282 | $214 | $61,864 | $227 | $66,408 | $244 | $61,200 | $225 |
| | Electricity | $27,068 | $100 | $26,867 | $99 | $27,560 | $101 | $24,500 | $90 | $21,492 | $79 | $27,880 | $103 |
| | Water/Sewer | $95,901 | $353 | $97,683 | $359 | $101,024 | $371 | $110,580 | $407 | $121,536 | $447 | $98,778 | $363 |
| | Other Utility Expense | $10,927 | $40 | $10,989 | $40 | $10,974 | $40 | $10,876 | $40 | $10,764 | $40 | $11,255 | $41 |
| | Trash | $26,657 | $98 | $24,396 | $90 | $20,662 | $76 | $26,280 | $97 | $25,872 | $95 | $27,457 | $101 |
| | Turnover | $52,072 | $191 | $54,673 | $201 | $64,140 | $236 | $57,240 | $210 | $49,296 | $181 | $54,400 | $200 |
| | R&M | $28,048 | $103 | $31,483 | $116 | $35,356 | $130 | $32,476 | $119 | $55,188 | $203 | $47,600 | $175 |
| | Advertising | $51,992 | $191 | $53,340 | $196 | $56,316 | $207 | $59,168 | $218 | $57,312 | $211 | $54,400 | $200 |
| | Administrative | $54,282 | $200 | $53,304 | $196 | $51,446 | $189 | $58,160 | $214 | $63,096 | $232 | $61,200 | $225 |
| | **Total Controllable Expenses** | $712,281 | $2,619 | $726,744 | $2,672 | $754,900 | $2,775 | $770,368 | $2,832 | $790,704 | $2,907 | $806,920 | $2,967 |
| | **Non-Controllable Expenses** | | | | | | | | | | | | |
| [10] | Management Fees | $133,588 | 2.8% | $135,039 | 2.8% | $136,160 | 2.8% | $139,440 | 2.8% | $139,272 | 2.8% | $146,052 | 2.8% |
| [11] | Real Estate Taxes | $1,182,116 | $4,346 | $923,172 | $3,394 | $923,172 | $3,394 | $923,172 | $3,394 | $923,172 | $3,394 | $1,130,899 | $4,158 |
| [12] | Property Liability/Insurance | $106,991 | $393 | $109,347 | $402 | $114,060 | $419 | $116,884 | $430 | $116,880 | $430 | $176,800 | $650 |
| [13] | Franchise Tax | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% | $17,579 | 0.3% |
| | **Total Non-Controllable Expenses** | $1,422,695 | $5,230 | $1,167,557 | $4,292 | $1,173,392 | $4,314 | $1,179,496 | $4,336 | $1,179,324 | $4,336 | $1,471,330 | $5,409 |
| | **TOTAL EXPENSES** | $2,134,976 | $7,849 | $1,894,301 | $6,964 | $1,928,292 | $7,089 | $1,949,864 | $7,169 | $1,970,028 | $7,243 | $2,278,250 | $8,376 |
| | *Expense Ratio* | | 44.2% | | 39.0% | | 39.1% | | 38.8% | | 39.0% | | 42.9% |
| | **NET OPERATING INCOME** | **$2,690,960** | **$9,893** | **$2,963,660** | **$10,896** | **$3,007,826** | **$11,058** | **$3,076,920** | **$11,312** | **$3,076,428** | **$11,310** | **$3,032,744** | **$11,150** |
| | **CAPITAL EXPENDITURES** | | | | | | | | | | | | |
| [14] | Capital Replacement/Capital Reserves | $68,000 | $250 | $68,000 | $250 | $68,000 | $250 | $68,000 | $250 | $68,000 | $250 | $68,000 | $250 |
| | **CASH FLOW FROM OPERATIONS** | **$2,622,960** | **$9,643** | **$2,895,660** | **$10,646** | **$2,939,826** | **$10,808** | **$3,008,920** | **$11,062** | **$3,008,428** | **$11,060** | **$2,964,744** | **$10,900** |

### Footnotes

[1]    Current Market Rents:  Are based on the rent roll dated October 21, 2022.

[2]    Pro Forma Gain / Loss to Lease:  Is based on historical operations of the Property, Broker's projections and market underwriting standards.

[3]    Pro Forma Vacancy:  Is based on the historical operations of the Property, current market conditions, and the Broker's projections.

[4]    Non Revenue / Employee Units:  Is based on historical operations of the Property and Broker's projections.

[5]    Concessions / Discounts:  Is based on historical operations, current market conditions, and the Broker's projections.

[6]    Bad Debt:  Is based on historical operations of the Property and Broker's projections.

[7]    Other Income:  Unless otherwise noted, other income is based on the historical operations of the Property and the Broker's projections.

[8]    Expenses:  Unless otherwise noted, expenses are based on the historical operations of the Property and the Broker's projections.

[9]    Payroll expense in the Year 1 Pro Forma was estimated by the following calculations.

| Inside | Salary |
|---|---|
| Manager | $75,000 |
| Leasing | $30,000 |
| Part-Time Leasing | $15,000 |
| Total Inside: | $120,000 |

| Outside | Salary |
|---|---|
| Lead Maintenance | $55,000 |
| Asst. Maintenance | $40,000 |
| Cleaning / Porter | $28,000 |
| Total Outside: | $123,000 |

| | |
|---|---|
| Leasing Bonus ($100 per unit) | $27,200 |
| General Bonus | $20,000 |
| Total Bonus | $47,200 |
| Payroll | $290,200 |
| + | |
| Load at 25% | $72,550 |
| Total Payroll: | $362,750 |

[10]    Pro Forma Management Fee:  Is based on market standards of 2.75% of Effective Gross Income.

[11]    Real Estate Taxes:  Pro Forma taxes are based on 85% of the purchase price, multiplied by the current millage rate of 2.634592%.

[12]    Property/Liability Insurance:  Is based on market standards of $650 per unit.

[13]    Franchise Tax:  As of the year 2018, the Texas Comptroller's Office is subjecting properties with less than $1,130,000 of gross income to no Franchise Tax and properties exceeding $1,130,000 of gross income to a tax of 0.331% of gross income. This analysis assumes Texas Franchise Tax of 0.331% times Effective Gross Income.

[14]    Capital Reserves:  Is based on market standards of $250 per unit.

APP000258



*Parc at Windmill Farms - Existing Debt*
*Cash Flow Projections*

| Pricing | Total | Unit | PSF |
|---|---|---|---|
| Purchase Price | $54,000,000 | $198,529 | $193.10 |
| Acquisitions Reserves | $0 | $0 | $0.00 |
| Outstanding Balance | ($35,111,864) | ($129,088) | ($125.56) |
| Loan Assumption Fee (1%) | $351,119 | $1,291 | $1.26 |
| **Total Equity Required** | **$19,239,254** | **$70,733** | **$68.80** |

| Existing Loan | |
|---|---|
| Original Loan Amount | $36,240,000 |
| Outstanding Balance | $35,111,864 |
| LTV | 65% |
| Interest Rate | 3.90% |
| Start Date | Feb-20 |
| Maturity | Jan-60 |
| Term | 40 Years |
| Amortization | 40 Years |
| Years of Interest Only | 0 Years |
| Interest Only Remaining | None |
| Amortization Period | Years 1-40 |
| Annual Payment | $1,790,578 |
| MIP | 0.60% |
| MIP Payment | $210,249 |
| Loan Constant | 5.10% |

| Calculation of Residual | | Per Unit |
|---|---|---|
| Holding Period | 7 Years | |
| Residual Cap Rate | 5.00% | |
| Gross Residual | $72,882,556 | $267,951 |
| Cost of Sale  1.00% | ($728,826) | ($2,680) |
| **Net Residual Value** | **$72,153,730** | **$265,271** |
| Outstanding Loan Balance | ($31,773,849) | ($116,816) |
| **Net Residual After OLB** | **$40,379,881** | **$148,455** |

| | Year 1 2023 | Year 2 2024 | Year 3 2025 | Year 4 2026 | Year 5 2027 | Year 6 2028 | Year 7 2029 | Year 8 2030 | Year 9 2031 | Year 10 2032 | Year 11 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | |
| **Effective Rental Income** | | | | | | | | | | | |
| Current Market Rents | $5,577,600 | $5,744,928 | $5,917,276 | $6,094,794 | $6,277,638 | $6,465,967 | $6,659,946 | $6,859,744 | $7,065,537 | $7,277,503 | $7,495,828 |
| Loss to Lease | -$278,880 | -$229,797 | -$207,105 | -$213,318 | -$219,717 | -$226,309 | -$233,098 | -$240,091 | -$247,294 | -$254,713 | -$262,354 |
| **Gross Potential Income** | $5,298,720 | $5,515,131 | $5,710,171 | $5,881,476 | $6,057,921 | $6,239,658 | $6,426,848 | $6,619,653 | $6,818,243 | $7,022,790 | $7,233,474 |
| Vacancy | -$264,936 | -$275,757 | -$285,509 | -$294,074 | -$302,896 | -$311,983 | -$321,342 | -$330,983 | -$340,912 | -$351,140 | -$361,674 |
| Non Revenue / Employee Units | -$26,494 | -$27,576 | -$28,551 | -$29,407 | -$30,290 | -$31,198 | -$32,134 | -$33,098 | -$34,091 | -$35,114 | -$36,167 |
| Concessions / Discounts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Bad Debt | -$15,896 | -$16,545 | -$17,131 | -$17,644 | -$18,174 | -$18,719 | -$19,281 | -$19,859 | -$20,455 | -$21,068 | -$21,700 |
| **Effective Rental Income** | $4,991,394 | $5,195,253 | $5,378,981 | $5,540,351 | $5,706,561 | $5,877,758 | $6,054,091 | $6,235,714 | $6,422,785 | $6,615,468 | $6,813,933 |
| **Other Income** | $319,600 | $329,188 | $339,064 | $349,236 | $359,713 | $370,504 | $381,619 | $393,068 | $404,860 | $417,006 | $429,516 |
| **EFFECTIVE GROSS INCOME** | **$5,310,994** | **$5,524,441** | **$5,718,045** | **$5,889,586** | **$6,066,274** | **$6,248,262** | **$6,435,710** | **$6,628,781** | **$6,827,645** | **$7,032,474** | **$7,243,448** |
| *% change from previous period* | | *4.0%* | *3.5%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* |
| **EXPENSES** | | | | | | | | | | | |
| **Controllable Expenses** | $806,920 | $831,127 | $856,061 | $881,743 | $908,195 | $935,441 | $963,504 | $992,409 | $1,022,182 | $1,052,847 | $1,084,432 |
| Management Fee | $146,052 | $151,922 | $157,246 | $161,964 | $166,823 | $171,827 | $176,982 | $182,291 | $187,760 | $193,393 | $199,195 |
| Real Estate Taxes | $1,209,278 | $1,245,556 | $1,282,923 | $1,321,410 | $1,361,053 | $1,401,884 | $1,443,941 | $1,487,259 | $1,531,877 | $1,577,833 | $1,625,168 |
| Property/Liability Insurance | $176,800 | $182,104 | $187,567 | $193,194 | $198,990 | $204,960 | $211,108 | $217,442 | $223,965 | $230,684 | $237,604 |
| Franchise Tax | $17,579 | $18,107 | $18,650 | $19,209 | $19,786 | $20,379 | $20,991 | $21,620 | $22,269 | $22,937 | $23,625 |
| **Non-Controllable Expenses** | $1,549,709 | $1,597,689 | $1,646,386 | $1,695,778 | $1,746,651 | $1,799,051 | $1,853,022 | $1,908,613 | $1,965,871 | $2,024,847 | $2,085,593 |
| **TOTAL EXPENSES** | $2,356,629 | $2,428,816 | $2,502,447 | $2,577,520 | $2,654,846 | $2,734,491 | $2,816,526 | $2,901,022 | $2,988,053 | $3,077,694 | $3,170,025 |
| *Expense Ratio* | *44.4%* | *44.0%* | *43.8%* | *43.8%* | *43.8%* | *43.8%* | *43.8%* | *43.8%* | *43.8%* | *43.8%* | *43.8%* |
| **NET OPERATING INCOME** | **$2,954,365** | **$3,095,625** | **$3,215,598** | **$3,312,066** | **$3,411,428** | **$3,513,771** | **$3,619,184** | **$3,727,759** | **$3,839,592** | **$3,954,780** | **$4,073,423** |
| **CAPITAL EXPENDITURES** | | | | | | | | | | | |
| Capital Reserves | $68,000 | $70,040 | $72,141 | $74,305 | $76,535 | $78,831 | $81,196 | $83,631 | $86,140 | $88,725 | $91,386 |
| **CASH FLOW FROM OPERATIONS** | **$2,886,365** | **$3,025,585** | **$3,143,457** | **$3,237,760** | **$3,334,893** | **$3,434,940** | **$3,537,988** | **$3,644,128** | **$3,753,452** | **$3,866,055** | **$3,982,037** |
| **DEBT FINANCING** | | | | | | | | | | | |
| Debt Service | $2,000,827 | $1,998,238 | $1,995,545 | $1,992,746 | $1,989,835 | $1,986,809 | $1,983,663 | $1,980,391 | $1,976,990 | $1,973,454 | $1,969,777 |
| **CASH FLOW AFTER DEBT FINANCING** | **$885,538** | **$1,027,348** | **$1,147,912** | **$1,245,015** | **$1,345,058** | **$1,448,131** | **$1,554,326** | **$1,663,736** | **$1,776,461** | **$1,892,601** | **$2,012,259** |
| DSCR (Based on 40 YR AMO) | 1.61 | 1.69 | 1.76 | 1.81 | 1.86 | 1.92 | 1.98 | 2.04 | 2.10 | 2.16 | 2.22 |
| | | | | | | | | | | | |
| **ASSUMPTIONS** | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Year 6** | **Year 7** | **Year 8** | **Year 9** | **Year 10** | **Year 11** |
| Market Rent Growth | 0.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| Loss to Lease | -5.0% | -4.0% | -3.5% | -3.5% | -3.5% | -3.5% | -3.5% | -3.5% | -3.5% | -3.5% | -3.5% |
| Vacancy | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% | -5.0% |
| Non Revenue / Employee Units | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% |
| Concessions / Discounts | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Bad Debt | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% | -0.3% |
| Inflation Factor | 0.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| Management Fee | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% |
| | | | | | | | | | | | |
| **Returns** | | | | | | | | | | | |
| Unleveraged 7 YR IRR | 9.51% | | | | | | | | | | |
| Leveraged 7 YR IRR | 15.79% | | | | | | | | | | |
| Capitalization Rate | 5.35% | 5.60% | 5.82% | 6.00% | 6.18% | 6.36% | 6.55% | 6.75% | 6.95% | 7.16% | 7.37% |
| Leveraged Cash Return | 4.60% | 5.34% | 5.97% | 6.47% | 6.99% | 7.53% | 8.08% | 8.65% | 9.23% | 9.84% | 10.46% |
| 7 YR AVG Cash Return | 6.43% | | | | | | | | | | |

# EXHIBIT B-3

APP000260

# PARC AT WINDMILL FARMS

APP000261

# FORNEY

## AREA HIGHLIGHTS

**POPULATION**
23,046

**PROJECTED GROWTH**
5 year: 7.63%

**MEDIAN AGE**
33

**MEDIAN HOUSEHOLD INCOME**
$110,818

**LIMITED SUPPLY**
~8 Communities

**FORNEY SCHOOLS**
A- (niche.com)

**LOGISTICS HUB**
- Home to logistics hubs such as Goodyear and Amazon
- USAA filed plans for a three building warehouse addition to East Gate Logistics Center
- More than 10m SF of warehouse space is planned



PARC AT WINDMILL FARMS



2

APP000262

# PARC AT WINDMILL FARMS

## VALUATION SUMMARY

For Parc at Windmill Farms, our team solved for a Year 1 Cash on Cash of 5.0% and 7.0% in the Premium and Market Scenarios, respectively.

| UNITS: 272 AVG UNIT SIZE: 1,028 | | |
|---|---|---|
| | Premium Price | Market Price |
| Multifamily Sales Price | $58,000,000 | $53,000,000 |
| Per Unit | $213,200 | $194,900 |
| Per Square Foot | $207 | $190 |
| **Cap Rate** | | |
| Cap Rate (Year 1) | 5.19% | 5.88% |
| Cap Rate (T3/T12) | 4.77% | 5.42% |
| **Multifamily Return Metrics** | | |
| Loan To Value | 60.81% | 66.54% |
| Levered IRR | 13.64% | 16.97% |
| Unlevered IRR | 8.72% | 9.72% |
| Year 1 Cash-On-Cash | 5.00% | 7.00% |
| Average Cash-on-Cash | 8.38% | 11.41% |
| Year 1 Cash-On-Cash (No Amort.) | 6.85% | 9.37% |
| Average Cash-on-Cash (No Amort.) | 10.62% | 14.28% |
| **Multifamily Terminal Value** | | |
| Terminal Cap Rate | 5.75% | 6.25% |
| Terminal Value | $80,100,000 | $75,900,000 |
| Per Unit | $294,485 | $279,044 |
| **Operations** | | |
| Year 1 Market Rent | $1,709 | |
| Year 1 Market Rent PSF | $1.66 | |
| Collection Growth (Over T3) | 6.0% | |
| Year 1 NRI Growth | 6.1% | |
| 10 Yr CAGR (Revenue) | 3.7% | |
| Year 1 RE Taxes, per unit | $4,496 | |
| Controllable Expenses Per Unit | $2,764 | |
| 10 Yr CAGR (NOI) | 4.3% | |

## ASSUMPTIONS

WDIS' valuation analysis is comprised of two scenarios. The Premium Proforma and Market Proforma assumptions are outlined below. Please note, for the purpose of our valuation, the buyer's first year begins 6.1.23.

| | |
|---|---|
| **Year 1 Cap Rate** | The WDIS Proforma contemplates respective Year 1 Cap Rates of 5.25% and 5.75% in the Premium and Market scenarios. |
| **Year 1 Cap Rate** | The WDIS Proforma contemplates a respective exit cap of 5.75% and 6.25% in the Premium and Market scenarios. |
| **Market Rent** | The property has experienced impressive Market Rent growth of 17.6% over the past 12 months. On a per month basis, asking rents are at the top of the market. Our analysis assumes no market rent growth in Year 1 with a focus on loss to lease burn off. |
| **Loss to Lease (LTL)** | Loss to Lease on the RR dated 10.22.22 is 10.6%. Assuming new leases are signed at Market, renewals are signed at the lower of Market and a 3.0% increase, and a 50% retention ratio, the WDIS Proforma calculates Year 1 Loss to Lease of 4.64%. |
| **Effective Rent Growth** | The WDIS Rollover Model forecasts Year 1 Effective Rents of $1,629. This represents a 6.72%, or $103 increase over the most recent rent roll. |
| **Vacancy** | The WDIS Proforma assumes a 5% vacancy for the duration of the hold period. |
| **Concessions** | Due to limited new supply in the near future and strong pricing power that Parc at Windmill Farms has, the WDIS proforma assumes no concessions in Year 1. |
| **Non-Revenue Units** | The WDIS Proforma assumes 1 model unit, 1 courtesy officer unit with a 50% discount, and 2 employee units with 25% discounts. |
| **Bad Debt** | The WDIS Proforma assumes bad debt of 0.5%. |
| **Other Income** | Other income is assumed as the trailing 3 months grown at 3%. |
| **Utility Reimbursements** | Utility Reimbursements are assumed as the trailing 12 months grown at 3%. |
| **Controllable Expenses** | Controllable Expenses are based upon the trailing 12 months and grown at 3%. |
| **Management Fee** | The WDIS Proforma assumes a management fee of 2.75% of total income. |
| **Property Insurance** | Property Insurance are assumed as the trailing 12 months grown at 3%. |
| **Replacement Reserves** | The WDIS Proforma assumes replacement reserves of $200/unit. |
| **Property Taxes** | Property Taxes are based upon 80% of our conclusion to value in both scenarios. This assumption is based upon current buyer underwriting of similar assets and conversations with Alliance Tax Advisors. |

3

APP000263

# UNDERWRITING

| | TRAILING 12 | | | T3 REV/T12 EXP | | | PROFORMA | | | PROFORMA V. T-12 | PROFORMA V. T-3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | % of Income | Per Unit | Amount | % of Income | PerUnit | Amount | % of Income | Per Unit | | |
| **INCOME:** | | | | | | | | | | | |
| Gross Scheduled Market Rent | $5,027,312 | 107% | $18,483 | $5,447,768 | 111% | $20,029 | $5,577,600 | 105% | $20,506 | | |
| Plus: Renovated Unit Premiums | | | | | | | $0 | 0% | $0 | | |
| Gain / Loss to Lease | ($322,426) | -6.9% | (1,185) | ($538,232) | -11.0% | (1,979) | ($258,937) | -4.9% | (952) | | |
| **Gross Potential Rent** | **$4,704,886** | **100.0%** | **17,297** | **$4,909,536** | **100.0%** | **18,050** | **$5,318,663** | **100.0%** | **19,554** | **13.0%** | **8.3%** |
| | | | | | | | | | | | |
| Less: Vacancy | ($121,834) | -2.6% | (448) | ($154,112) | -3.1% | (567) | ($265,933) | -5.0% | (978) | | |
| Less: Concessions | ($12,848) | -0.3% | (47) | ($7,432) | -0.2% | (27) | $0 | 0.0% | 0 | | |
| Less: Non-Revenue Units | ($17,086) | -0.4% | (63) | ($18,264) | -0.4% | (67) | ($39,108) | -0.7% | (144) | | |
| Less: Bad Debt | ($46,590) | -1.0% | (171) | ($30,420) | -0.6% | (112) | ($26,593) | -0.5% | (98) | | |
| **Net Rental Income** | **$4,506,528** | **95.8%** | **16,568** | **$4,699,308** | **95.7%** | **17,277** | **$4,987,029** | **93.8%** | **18,335** | **10.7%** | **6.1%** |
| | | | | | | | | | | | |
| Plus: Utility Reimbursements | $77,354 | 1.6% | 284 | $75,200 | 1.5% | 276 | $79,675 | 1.5% | 293 | | |
| Plus: Parking/Storage Income | $0 | 0.0% | 0 | $0 | 0.0% | 0 | $0 | 0.0% | 0 | | |
| Plus: Other Income | $260,262 | 5.5% | 957 | $269,904 | 5.5% | 992 | $278,001 | 5.2% | 1,022 | | |
| **Total Income** | **$4,844,144** | **103.0%** | **17,809** | **$5,044,412** | **102.7%** | **18,546** | **$5,344,705** | **100.5%** | **19,650** | **10.3%** | **6.0%** |
| Monthly Collections | $403,679 | | | $420,368 | | | $445,392 | | | | |
| | | | | | | | | | | | |
| **EXPENSES:** | | | | | | | | | | | |
| Utilities | $133,896 | 2.8% | 492 | $133,896 | 2.7% | 492 | $137,913 | 2.6% | 507 | | |
| Repairs and Maintenance | $28,048 | 0.6% | 103 | $28,048 | 0.6% | 103 | $28,889 | 0.5% | 106 | | |
| Apartment Make Ready | $52,072 | 1.1% | 191 | $52,072 | 1.1% | 191 | $53,634 | 1.0% | 197 | | |
| Contract Services | $97,298 | 2.1% | 358 | $97,298 | 2.0% | 358 | $100,217 | 1.9% | 368 | | |
| Marketing | $33,037 | 0.7% | 121 | $33,037 | 0.7% | 121 | $34,028 | 0.6% | 125 | | |
| Payroll Expenses | $331,261 | 7.0% | 1,218 | $331,261 | 6.7% | 1,218 | $341,199 | 6.4% | 1,254 | | |
| General and Administrative | $54,282 | 1.2% | 200 | $54,282 | 1.1% | 200 | $55,910 | 1.1% | 206 | | |
| Property Taxes | $1,182,116 | 25.1% | 4,346 | $1,182,116 | 24.1% | 4,346 | $1,222,943 | 23.0% | 4,496 | | |
| Franchise Tax | $0 | 0.0% | 0 | $0 | 0.0% | 0 | $17,691 | 0.3% | 65 | | |
| Insurance | $106,991 | 2.3% | 393 | $106,991 | 2.2% | 393 | $110,201 | 2.1% | 405 | | |
| Management Fees | $133,588 | 2.8% | 491 | $133,588 | 2.7% | 491 | $146,979 | 2.8% | 540 | | |
| **Total Expenses** | **$2,152,589** | **45.8%** | **7,914** | **$2,152,589** | **43.8%** | **7,914** | **$2,249,604** | **42.3%** | **8,271** | **4.5%** | **4.5%** |
| | | | | | | | | | | | |
| **Net Operating Income** | **$2,691,555** | **57.2%** | **9,895** | **$2,891,823** | **58.9%** | **10,632** | **$3,095,100** | **58.2%** | **11,379** | **15.0%** | **7.0%** |
| Replacement Reserves | | 0.0% | 0 | | 0.0% | 0 | ($81,600) | -1.5% | (300) | | |
| **NET CASH FLOW** | **$2,691,555** | **57.2%** | **9,895** | **$2,891,823** | **58.9%** | **10,632** | **$3,013,500** | **56.7%** | **11,079** | **12.0%** | **4.2%** |

4

# CASH FLOW ANALYSIS

| | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | YEAR 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Potential Rent, Net | $5,318,663 | $5,531,410 | $5,780,323 | $6,069,339 | $6,372,806 | $6,627,718 | $6,826,550 | $7,031,347 | $7,242,287 | $7,459,556 | $7,683,342 |
| Plus: Renovation Unit Premiums | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Gross Potential Rental Income** | **$5,318,663** | **$5,531,410** | **$5,780,323** | **$6,069,339** | **$6,372,806** | **$6,627,718** | **$6,826,550** | **$7,031,347** | **$7,242,287** | **$7,459,556** | **$7,683,342** |
| Less: Vacancy | $265,933 | $276,570 | $289,016 | $303,467 | $318,640 | $331,386 | $341,328 | $351,567 | $362,114 | $372,978 | $384,167 |
| Less: Concession | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Less: Credit Loss | $26,593 | $27,657 | $28,902 | $30,347 | $31,864 | $33,139 | $34,133 | $35,157 | $36,211 | $37,298 | $38,417 |
| Less: Non-Revenue Units | $39,108 | $40,672 | $42,502 | $44,627 | $46,859 | $48,733 | $50,195 | $51,701 | $53,252 | $54,850 | $56,495 |
| **Net Rental Income** | **$4,987,029** | **$5,186,510** | **$5,419,903** | **$5,690,898** | **$5,975,443** | **$6,214,461** | **$6,400,895** | **$6,592,921** | **$6,790,709** | **$6,994,430** | **$7,204,263** |
| Plus: Utility Reimbursements | $79,675 | $82,065 | $84,527 | $87,063 | $89,674 | $92,365 | $95,136 | $97,990 | $100,929 | $103,957 | $107,076 |
| Plus: Parking and Storage Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Plus: Other Income | $278,001 | $286,341 | $294,931 | $303,779 | $312,893 | $322,279 | $331,948 | $341,906 | $352,164 | $362,728 | $373,610 |
| **Total Operating Income** | **$5,344,705** | **$5,554,916** | **$5,799,361** | **$6,081,740** | **$6,378,010** | **$6,629,105** | **$6,827,978** | **$7,032,817** | **$7,243,802** | **$7,461,116** | **$7,684,949** |
| *Revenue Growth Rate (Over Y1)* | | *3.9%* | *8.5%* | *13.8%* | *19.3%* | *24.0%* | *27.8%* | *31.6%* | *35.5%* | *39.6%* | *43.8%* |
| *Effective Rent* | *$1,629* | *$1,695* | *$1,771* | *$1,859* | *$1,952* | *$2,031* | *$2,091* | *$2,154* | *$2,219* | *$2,285* | *$2,354* |
| **11 YR CAGR** | **3.7%** | | | | | | | | | | |
| Expenses: | | | | | | | | | | | |
| Management Fee | $146,979 | $152,760 | $159,482 | $167,248 | $175,395 | $182,300 | $187,769 | $193,402 | $199,205 | $205,181 | $211,336 |
| Property taxes | $1,240,634 | $1,274,960 | $1,310,325 | $1,346,766 | $1,384,229 | $1,422,546 | $1,461,721 | $1,501,975 | $1,543,337 | $1,585,839 | $1,604,074 |
| Operating Expenses | $861,992 | $885,696 | $910,053 | $935,079 | $960,794 | $987,216 | $1,014,364 | $1,042,259 | $1,070,922 | $1,100,372 | $1,156,069 |
| **Total Expenses** | **$2,249,604** | **$2,313,417** | **$2,379,861** | **$2,449,093** | **$2,520,418** | **$2,592,062** | **$2,663,855** | **$2,737,636** | **$2,813,463** | **$2,891,391** | **$2,971,479** |
| | | | | | | | | | | | |
| **Net Operating Income** | **$3,095,100** | **$3,241,499** | **$3,419,501** | **$3,632,647** | **$3,857,592** | **$4,037,043** | **$4,164,124** | **$4,295,181** | **$4,430,339** | **$4,569,725** | **$4,713,470** |
| Capital Reserves | $81,600 | $83,844 | $86,150 | $88,519 | $90,953 | $93,454 | $96,024 | $98,665 | $101,378 | $104,166 | $107,031 |
| **Net Operating Income After Capital** | **$3,013,500** | **$3,157,655** | **$3,333,351** | **$3,544,128** | **$3,766,639** | **$3,943,588** | **$4,068,099** | **$4,196,516** | **$4,328,961** | **$4,465,559** | **$4,606,439** |
| *NOI Growth Rate* | | *4.8%* | *10.6%* | *17.6%* | *25.0%* | *30.9%* | *35.0%* | *39.3%* | *43.7%* | *48.2%* | *52.9%* |
| **11 YR CAGR** | **4.3%** | | | | | | | | | | |
| **Total Debt Service Amount** | **$1,876,606** | **$1,876,606** | **$1,876,606** | **$1,876,606** | **$1,876,606** | **$1,876,606** | **$1,876,606** | **$1,876,606** | **$1,876,606** | **$1,876,606** | |
| **Net Cash Flow** | **$1,136,894** | **$1,281,049** | **$1,456,745** | **$1,667,522** | **$1,890,033** | **$2,066,983** | **$2,191,493** | **$2,319,910** | **$2,452,355** | **$2,588,953** | |
| Cash on Cash | 5.00% | 5.63% | 6.41% | 7.33% | 8.31% | 9.09% | 9.64% | 10.20% | 10.79% | 11.39% | |
| Debt Service Coverage | 1.61x | 1.68x | 1.78x | 1.89x | 2.01x | 2.10x | 2.17x | 2.24x | 2.31x | 2.38x | |

| ASSUMPTIONS | | CLOSING ASSUMPTIONS | | REVERSION | |
|---|---|---|---|---|---|
| Total Capital Budget | $58,023,000 | Estimated Closing Date | June 2023 | Gross Selling Price | $80,112,000 |
| Total Units | 272 | Loan Amount at Closing | $35,286,000 | Less: Sales Expenses (1.50%) | ($1,201,680) |
| Stabilized Cap Rate | 5.19% | Loan To Value At Closing | 61% | Less: Principal Outstanding | ($30,186,812) |
| Terminal Cap Rate | 5.75% | Term remaining on loan (Mos) | 439 | Net Proceeds | $48,723,508 |
| **FINANCING PARAMETERS** | | Amortization | 37 | LEVERAGED IRR | 13.64% |
| Loan Amount | $35,286,000 | IO Periods Remaining | 0 | UNLEVERAGED IRR | 8.72% |
| Date of Origination | June 2023 | Loan Constant | 5.32% | AVERAGE CASH ON CASH | 8.38% |
| Interest Rate | 4.15% | Equity Requirement | $22,737,000 | % OF IRR FROM CASHFLOW | 53.54% |
| Debt Service Coverage Limit | 1.25x | Equity Multiple During Term | 2.98x | % OF IRR FROM RESIDUAL | 46.46% |

| GROWTH ASSUMPTIONS | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 | Y11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rental Inflation | | 4.00% | 4.50% | 5.00% | 5.00% | 4.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Vacancy Loss | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | -5.00% |
| Concession Loss | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Other Income Inflation | | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Management Fee | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% |
| Expenses Inflation | | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 5.06% |
| Real Estate Tax Inflation | | 2.77% | 2.77% | 2.78% | 2.78% | 2.77% | 2.75% | 2.75% | 2.75% | 2.75% | 2.77% |

5

APP000265

## SALES COMPARABLES

Due to the run up in interest rates, the below sales would not sell at the same price today. These sale comps are presented as a point of reference and to show support for the basis people are willing to accept in Dallas' southern suburbs.

| PROPERTY NAME | PARC AT WINDMILL FARMS | MAGNOLIA GROVE | THE JANE AT PRESTON TRAILS | EMERSON AT FORNEY MARKETPLACE | BEACON AT WESTMORELAND | CREEKSIDE AT HUDSON OAKS |
|---|---|---|---|---|---|---|
| City: | Forney | Terrell | Cedar Hill | Forney | Desoto | Weatherford |
| Address: | 1003 Windmill Farms Blvd | 551 Crossroads Pkwy | 320 W Pleasant Run | 300 Trailhouse Lane | 120 S Westmoreland Rd | 900 Cinema Dr |
| Year Built/ Renovated: | 2020 | 2020 | 2020 | 2020 | 2022 | 2022 |
| Number of Units: | 272 | 270 | 300 | 320 | 194 | 338 |
| Square Feet/Unit: | 1028 | 754 | 930 | 894 | 837 | 1060 |
| Sale Date: | TBD | Jan-22 | Feb-22 | Aug-21 | Jun-22 | Jun-22 |
| Buyer: | TBD | Stoneriver Company | PEM Real Estate Group | CAF Capital Partners | - | Olympus |
| Seller: | JMJ Development | Venture Development Group | ALK Realty | CESM Real Estate | Private Seller | Private Owner |
| | Market Price | | | | | |
| Price: | $53,000,000 | $57,600,000 | $75,000,000 | $68,000,000 | $40,880,000 | $90,000,000 |
| Price/Unit: | $194,900 | $213,333 | $250,000 | $212,500 | $210,722 | $266,272 |
| Price/SF: | $190 | $283 | $269 | $238 | $252 | $251 |
| Cap Rate: | 5.42% | 4.32% | 3.50% | 3.75% | 4.42% | 3.39% |
| Effective Rent/SF: | $1.49 | $1.73 | $1.81 | $1.54 | $2.04 | $1.55 |
| Effective Rent Multiplier: | 10.6 | 13.6 | 12.4 | 12.9 | 10.3 | 13.5 |

## RENT COMPARABLES

| PROPERTY NAME | YEAR BUILT | # UNITS | AVG. SQ. FT. | % OCC. | MAR. PER UNIT | MAR. PER SF |
|---|---|---|---|---|---|---|
| Parc at Windmill Farms | 2020 | 272 | 1028 | 96% | $1,709 | $1.66 |
| The Emerson at Forney Marketplace | 2020 | 320 | 894 | 97% | $1,574 | $1.76 |
| Gateway Oaks | 2017 | 313 | 860 | 100% | $1,434 | $1.67 |
| Gateway Cedars | 2014 | 334 | 786 | 99% | $1,320 | $1.68 |
| Magnolia Grove | 2021 | 270 | 910 | 93% | $1,524 | $1.67 |
| Comp Averages | 2018 | 309 | 860 | 97% | $1,459 | $1.70 |

6

APP000266

# EXHIBIT C

APP000267

Preparing receipt data...

| **Kaufman, TX RECORDER**<br>**RECEIPT** |
| --- |
| Date:12/13/2017<br>For:**Lawyers Title Insurance Company - DFW**<br>Total: $190<br>Entry #:**2017-0028853**<br>Receipt #:**2017-0028853**<br>County Recorder: == Laura Hughes == |

APP000268

1

OMB Approval No.2502-0598
(Exp. 06/30/2017)

> **Public Reporting Burden** for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

*2228005339*

Prepared by and
Recording Requested by:
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

After Recording return to:
Department of Housing and Urban Development
Attn: Legal Department
801 Cherry Street, Unit #45, Suite 2500
Ft. Worth, TX 76102

## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
## REGULATORY AGREEMENT FOR MULTIFAMILY PROJECTS

### UNDER SECTIONS 207, 220, 221(d)(3), 221(d)(4), 223(a)(7), 223(f) and 231 OF THE NATIONAL HOUSING ACT, AS AMENDED

### Replaces HUD- 92465, 92466, FHA-1730, and 1733

**Project Name:** Parc at Windmill Farms Apartments
**HUD Project No.** 113-35682
**HAP Contract No.:** N/A
**Project Location:** Forney, County of Kaufman, Texas
**Lender:** Greystone Servicing Corporation, Inc.          **Processed under:**          [ X ]MAP    [ ]TAP
**Original Principal Amount of Multifamily Note:** $36,240,000.00
**Originally endorsed for insurance under §221(d)(4).**
                                                      **Date of Note: as of December 1, 2017**

**Residual Receipts Rider:** _____Yes __X__No
*If "yes" is checked, the Surplus Cash provisions of this Agreement are modified by an attached Rider relating to residual receipts account requirements.*

---

| Previous editions are obsolete; Replaces form HUD-92466 (11/02) | Regulatory Agreement | HUD-92466M (06/14) |
|---|---|---|

2

This Agreement is entered into this 1st day of December, 2017, between D4FR LLC, a limited liability company, organized and existing under the laws of State of Texas, whose address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, its successors, heirs, and assigns (jointly and severally) (Borrower) and the United States Department of Housing and Urban Development, acting by and through the Secretary, his or her successors, assigns or designates (HUD).

In consideration of, and in exchange for an action by HUD, HUD and Borrower agree to the terms of this Agreement. The HUD action may be one of the following: HUD's endorsement for insurance of the Note, HUD's consent to the transfer of the Mortgaged Property, HUD's sale and conveyance of the Mortgaged Property, or HUD's consent to other actions related to Borrower or to the Mortgaged Property.

Further, Borrower and HUD execute this Agreement in order to comply with the requirements of the National Housing Act, as amended, and the regulations adopted by HUD pursuant thereto. This Agreement shall continue during such period of time as HUD shall be the owner, holder, or insurer of the Note. Upon satisfaction of such Note, this Agreement shall automatically terminate. However, Borrower shall be responsible for any Violations of this Agreement which occurred prior to termination.

Violation of this Agreement may subject Borrower and other signatories hereto to adverse actions. Refer to Article VII below.

**AGREEMENTS**: Borrower and HUD covenant and agree as follows:

## I. DEFINITIONS

1. **DEFINITIONS.** Any capitalized term or word used herein but not defined shall have the meaning given to such term in the Security Instrument between Borrower and Lender or the Note. The following terms, when used in this Agreement (including when used in the above recitals), shall have the following meanings, whether capitalized or not and whether singular or plural, unless, in the context, an incongruity results:

a. **"Affiliate"** is defined in 24 C.F.R. 200.215, or any successor regulation.

b. **"Borrower"** means all entities identified as "Borrower" in the first paragraph of the Security Instrument, together with any successors, heirs, and assigns (jointly and severally). "Borrower" shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note. Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument and shall also be deemed to be the mortgagor as defined by Program Obligations.

c. **"Business Day"** is defined in Section 46.

---

3

d. **"Construction Contract"** means the construction contract, approved by HUD, between Borrower and the contractor contracting to perform construction or substantial rehabilitation on the Project.

e. **"Declaration of Default"** is defined in Section 37.

f. **"Displaced Persons or Families"** means a person, family or families, displaced from (i) an urban renewal area, (ii) as a result of government action, or (iii) as a result of a major disaster determined by the President pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

g. **"Distribution"** means any disbursal, conveyance or transfer of any portion of the Mortgaged Property, including the segregation of cash or assets for subsequent withdrawal as Surplus Cash, other than in payment of Reasonable Operating Expenses, or any other disbursement, conveyance, or transfer provided for in this Agreement.

h. **"Elderly Person"** means any person, married or single, who is 62 years of age or older.

i. **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods and property, and including but not limited to: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

APP000271

4

j.  **"Goods and Services"** is defined in Section 22.

k.  **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in his capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

l.  **"Impositions"** and **"Imposition Deposits"** are defined in the Security Instrument.

m.  **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

n.  **"Indebtedness"** means the principal, interest on, and all other amounts due at any time under the Note or the Security Instrument, including prepayment premiums, late charges, default interest, and advances to protect the security as provided in the Security Instrument.

o.  **"Land"** means the estate in realty described in Exhibit A.

p.  **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals. (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

q.  **"Lender"** means the entity identified as "Lender" in the first paragraph of the Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the Obligee, or the Trustee(s) and the Beneficiary of the Security Instrument and shall also be deemed to be the Mortgagee as defined by Program Obligations.

r.  **"Loan"** means the loan initially made by Lender to Borrower, as defined in the Security Instrument.

APP000272

5

s. **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

(1)     the Land;

(2)     the Improvements;

(3)     the Fixtures;

(4)     the Personalty;

(5)     all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads that may have been or may in the future be vacated;

(6)     all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)     all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)     all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)     all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged

APP000273

6

Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)   all Rents and Leases;

(11)   all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)   all Imposition Deposits;

(13)   all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which the Security Instrument is dated);

(14)   all forfeited tenant security deposits under any Lease;

(15)   all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)   all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)   all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property. These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Distributions of Surplus Cash, if allowed).

t. **"Note"** means the Note executed by Borrower described in the Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

| Previous editions are obsolete; Replaces form HUD-92466 (11/02) | Regulatory Agreement | HUD-92466M (06/14) |

APP000274

7

u. **"Notice"** is defined in Section 46.

v. **"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to: Reserve for Replacement accounts, bank accounts, residual receipt accounts, and investments.

w. **"Principal"** is defined in 24 C.F.R. 200.215, or any successor regulation.

x. **"Project"** and **"Project Assets"** mean the Mortgaged Property.

y. **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site).

z. **"Property Jurisdiction"** is (are) the jurisdiction(s) in which the Land is located.

APP000275

8

aa. **"Reasonable Operating Expenses"** means the reasonable expenses and payments that arise from the purchase of goods or services which are exclusively used for the operation, maintenance, and routine repair of the Project (including all payments and deposits required under this Agreement, the Note, or the Security Instrument), or as otherwise permitted by Program Obligations.

bb. **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past due, or to become due, residual receipts, and escrow accounts, however and whenever funded and wherever held.

cc. **"Reserve for Replacement"** is defined in Section 10.

dd. **"Security Instrument"** means the MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT (HUD-94000M), and any other security for the Indebtedness between Borrower and Lender, and shall be deemed to be the "mortgage" as defined by Program Obligations.

ee. **"Surplus Cash"** means certain Project cash pursuant to the calculation set forth in Section 13.

ff. **"State"** includes the several states comprising the United States of America, and Puerto Rico, the District of Columbia, Guam, the Commonwealth of the Northern Marianas, American Samoa, and the U.S. Virgin Islands.

gg. **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, that are levied, assessed or imposed by any public authority or quasi-public authority, and that, if not paid, could become a lien on the Land or the Improvements.

hh. **"Undocumented Expense"** is defined in Section 16.

ii. **"Violation"** is defined in Section 36.

jj. **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair.  During any period in which HUD insures the

APP000276

9

Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

    (1)    physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

    (2)    fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

    (3)    fails to pay before delinquency any Taxes secured by a lien having priority over the Security Instrument;

    (4)    materially fails to comply with covenants in the Note, the Security Instrument or this Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

    (5)    retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents;

## II. CONSTRUCTION; REFINANCING

2. [*Check the applicable box(es):*]
    ☒a. **CONSTRUCTION FUNDS**. Borrower shall keep funds of the Mortgaged Property to be used for construction or substantial rehabilitation separate and apart from operating funds of the Mortgaged Property. Funds for construction or substantial rehabilitation are identified in the Building Loan Agreement and/or Construction Contract.

    ☐b. **NON-CRITICAL, DEFERRED REPAIR FUNDS.** Borrower shall keep funds of the Mortgaged Property to be used for non-critical repairs separate and apart from operating funds of the Mortgaged Property. Funds for non-critical repairs are identified in the Escrow Agreement for Non-Critical, Deferred Repairs, if applicable.

3. **UNPAID OR OUTSTANDING OBLIGATIONS**. Borrower certifies, upon final or initial/final endorsement of the Note by HUD, Borrower shall have no unpaid obligations in connection with the purchase of the Mortgaged Property, the construction or repair of the Mortgaged Property, or with respect to the Security Instrument, except such unpaid obligations as have the written approval of HUD as to terms, form and amount; and, except for those obligations approved by HUD in writing, the Land shall be paid for in full and is free from any liens or purchase money obligations, or if the Land is subject to a leasehold interest, it must be subject to a HUD approved lease, and it shall be free

---

APP000277

10

from any lien.  As of the date hereof, Borrower has no knowledge of any liens or encumbrances against the Mortgaged Property that are not reflected as exceptions to coverage in the lender's title policy insuring the Security Instrument accepted by HUD or that are not shown on the UCC search.  All contractual obligations of Borrower or on behalf of Borrower with any party shall be fully disclosed to HUD.

4.  **LENDER'S CERTIFICATE**.  Borrower acknowledges receipt of the Lender's Certificate or the Request for Endorsement of Credit Instrument & Certificate of Lender, Borrower & General Contractor, as applicable.  To the extent such document establishes or reflects obligations of Borrower, such provisions are incorporated herein by this reference.  Borrower agrees that the fees and expenses enumerated in the applicable document have been fully paid or payment has been provided for as set forth in such document and that all funds deposited with Lender shall be used for the purposes set forth in such document insofar as Borrower has rights and obligations in respect thereto.

5.  **CONSTRUCTION COMMENCEMENT/REPAIRS**.

☒a.  [*Check the box to the left for Construction/Substantial Rehabilitation transactions.*]  Borrower certifies that it has not commenced construction or substantial rehabilitation of the Mortgaged Property prior to HUD's initial endorsement of the Note, except that this Section 5a is not applicable if HUD has given prior written approval to an early start of construction, or if this Project is an Insurance Upon Completion or if such work has been disclosed to and approved in writing by HUD.  If Borrower has received prior written approval for early start, Borrower shall perform, observe and comply with all Program Obligations for early start prior to initial endorsement, which includes but is not limited to the release of liens in association with the Project, the funding of escrows for change orders, and the payment of an inspection fee.

☐b.  [*Check the box to the left for Refinance/Purchase transactions.*]  Borrower shall complete any non-critical repairs in accordance with the terms of the Firm Commitment.   Borrower is in receipt of HUD's written acknowledgment of the satisfactory completion of any non-critical repairs for the Mortgaged Property to the extent such non-critical repairs have been completed.  Borrower has provided funds to complete any remaining repairs, as evidenced by the Escrow Agreement for Non-critical, Deferred Repairs, in accordance with Program Obligations, if applicable.

6.  **DRAWINGS AND SPECIFICATIONS**.  The Mortgaged Property shall be constructed in accordance with the terms of the Construction Contract as approved by HUD, if any, and with the Drawings and Specifications that have been approved by HUD and deemed attached to the Construction Contract.

APP000278

11

## 7. REQUIRED PERMITS

☒a. [*Check the box to the left for Construction/Substantial Rehabilitation transactions.*] The Borrower has obtained, or caused to be obtained, all necessary certificates, permits, licenses, qualifications, authorizations, consents and approvals from all necessary Governmental Authorities to own and operate the Project and to carry out all of the transactions required by the Loan Documents and to comply with all applicable federal statutes and regulations of HUD in effect on the date of the Firm Commitment, except for those, if any, which customarily would be obtained at a later date, at an appropriate stage of construction or completion thereof, and which the Borrower shall obtain, or cause to be obtained, in the future. As the construction of the Project progresses, the Borrower will obtain or cause to be obtained, and submit to HUD and Lender all necessary building and other permits required by Governmental Authorities. The Mortgaged Property shall not be available for occupancy by any tenant without the prior written approval of HUD and of all other legal authorities having jurisdiction of the Mortgaged Property.

☐b. [*Check the box to the left for Refinancing/Acquisition transactions.*] Borrower has obtained, or cause to be obtained, all necessary certificates, permits, licenses, qualifications, authorizations, consents and approvals from all necessary Governmental Authorities to own and operate the Project, to carry out all of the transactions required by the Loan Documents and to comply with all applicable federal statutes and regulations of HUD in effect on the date of the Firm Commitment. If HUD requires that Borrower execute an Escrow Agreement for Non-Critical, Deferred Repairs in connection with HUD's endorsement for insurance of the Note, the licenses and permits that are in effect as of the date hereof are sufficient to allow any repair of the improvements required pursuant to the terms of the Escrow Agreement for Non-Critical, Deferred Repairs to proceed to completion in the ordinary course.

## 8. ACCOUNTING REQUIREMENTS.

☒a. [*Check the box to the left for Construction/Substantial Rehabilitation transactions.*] Borrower shall submit a cost certification to HUD, if and as required by Program Obligations, for all receipts and disbursements during the period set forth therein. The excess of project income over property disbursements, as determined by HUD, shall be treated as a recovery of construction cost, except as otherwise allowed in Program Obligations.

☐b. [*Check the box to the left for Refinancing/Acquisition transactions.*] Borrower shall submit a cost certification to HUD, if and as required by Program Obligations, including all receipts and disbursements relating to repairs required pursuant to the Building Loan Agreement and/or the Escrow Agreement for Non-Critical, Deferred

| Previous editions are obsolete; Replaces form HUD-92466 (11/02) | Regulatory Agreement | HUD-92466M (06/14) |
|---|---|---|

APP000279

12

Repairs.  Any funds remaining after completion of the repairs shall be treated in accordance with Program Obligations, and pursuant to the Escrow Agreement for Non-Critical Deferred Repairs, if applicable.

## III.  FINANCIAL MANAGEMENT

9.  **PAYMENTS**.  Borrower shall make promptly all payments due under the Note, Security Instrument, and this Agreement.

10. **RESERVE FOR REPLACEMENT**.  Borrower shall establish and maintain a Reserve for Replacement account for defraying certain costs of replacing major structural elements and mechanical equipment of the Project or for any other purpose.

a.     The Reserve for Replacement shall be deposited with Lender or in a safe and responsible depository designated by Lender in accordance with Program Obligations. Such funds shall at all times remain under the control of Lender or Lender's designee and shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations.

b.  Borrower shall deposit a monthly amount of $**6,800.00,** concurrently with the beginning of payments towards amortization of the Note unless a different date or amount is established by HUD.  At least every ten years, starting from the date of initial or initial/final endorsement of the Note, and more frequently at HUD's sole discretion, Borrower shall submit to HUD a written analysis of its use of the Reserve for Replacement during the prior ten years and the projected use of the Reserve for Replacement in accordance with Program Obligations.  The amount of the monthly deposit may be increased or decreased from time to time at the written direction of HUD without a recorded amendment to this Agreement.

c.  Borrower shall carry the balance in this account on the financial records as a restricted asset.  The Reserve for Replacement shall be invested in accordance with Program Obligations, and any interest earned on the investment shall be deposited in the Reserve for Replacement for use by the Project in accordance with this Section 10.

d.  Disbursements from the Reserve for Replacement shall only be made after consent, in writing, of HUD, in its sole discretion, or as otherwise approved by HUD pursuant to Program Obligations.  In the event of a Declaration of Default under the terms of the Security Instrument, pursuant to which the Indebtedness has been accelerated, a written notification by HUD to Borrower of a violation of this Agreement or at such other times as determined solely by HUD, HUD may direct the application of the balance in

---

Previous editions are obsolete;         Regulatory Agreement         HUD-92466M (06/14)
Replaces form HUD-92466 (11/02)

APP000280

13

such account to the amount due on the Indebtedness as accelerated or for such other purposes as may be determined solely by HUD.

e.  In the case of a transfer of the Mortgaged Property where the Project is already subject to a Security Instrument insured or held by HUD as of the date hereof, and this Agreement is now being executed by Borrower as of the date hereof, the Reserve for Replacement now to be established shall be equal to the amount due to be in such account under this Agreement, and payments hereunder shall begin with the first payment due on the Security Instrument after acquisition, unless some other method of establishing and maintaining the account is approved in writing by HUD.

f.  Upon Borrower's full satisfaction of all HUD obligations, including but not limited to those imposed under this Agreement, Borrower shall receive any monies remaining in the Reserve for Replacement.

## 11. PROPERTY AND OPERATION; ENCUMBRANCES.

a.  Borrower shall deposit all Rents and other receipts of the Project in connection with the financing of the Project, including equity or capital contributions required under the Firm Commitment or otherwise advanced for the purpose and as part of the Mortgaged Property, in the name of the Project in a federally insured depository or depositories and in accordance with Program Obligations.  (Such required equity or capital contributions shall not include certain syndication proceeds, such as proceeds from Low Income Housing Tax Credit transactions used to repay bridge loans, all as more fully set forth in Program Obligations.)  Such funds shall be withdrawn only in accordance with the provisions of this Agreement for Reasonable Operating Expenses of the Project or for Distribution of Surplus Cash or as reimbursement of advances as permitted by Sections 14 and 15 below; or for permitted deposits authorized by this Agreement or for any other reason authorized under this Agreement.  Any person or entity receiving Mortgaged Property other than for payment of Reasonable Operating Expenses, authorized Distributions of Surplus Cash, or for any reason authorized under Section 34 of this Agreement, shall immediately deliver such Mortgaged Property to the Project and failing so to do shall hold such Mortgaged Property in trust.

b.  Borrower shall not engage in any business or activity, including the operation of any other project, or incur any liability or obligation not in connection with the Project, nor acquire an Affiliate or contract to enter into any affiliation with any party except as otherwise approved by HUD.

c.  Borrower shall satisfy or obtain a release of any mechanic's lien, attachment, judgment lien, or any other lien that attaches to the Mortgaged Property or any part

| Previous editions are obsolete;<br>Replaces form HUD-92466 (11/02) | Regulatory Agreement | HUD-92466M (06/14) |

APP000281

14

thereof.

d. Penalties, including but not limited to delinquent tax penalties and civil money penalties, shall not be paid from the Project.

e. Borrower shall promptly notify HUD of the appointment of any receiver for the Project, the filing of a petition in bankruptcy or insolvency or for reorganization.

f. Borrower shall keep the Mortgaged Property insured at all times in accordance with the Security Instrument and Program Obligations, and Borrower shall notify HUD of all payments received from an insurer.

g. Borrower shall notify HUD of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.

h. Borrower shall notify HUD of any litigation proceeding filed against Borrower or the Project, or any litigation proceeding filed by Borrower.

12. **SECURITY DEPOSITS**. Any funds collected as security deposits shall be kept (a) separate and apart from all other funds of the Project; (b) in interest bearing trust accounts, to the extent required by State or local law; and (c) in an amount which shall at all times equal or exceed the aggregate of all outstanding obligations under said account. Security deposit account interest shall be paid on a pro rata basis to tenants or applied to sums due under their leases upon the termination of their tenancy in the Project. The use of tenant security deposits for Project operations is prohibited unless the tenant has forfeited the deposit.

13. **Surplus Cash**.

    a. Borrower must calculate Surplus Cash as of the last day of its fiscal year. Borrower may also, at its election, and if permitted pursuant to Program Obligations, calculate Surplus Cash as of the last day of the sixth month of its fiscal year. Borrower shall submit a report of its Surplus Cash calculations to HUD with its required annual financial reports, pursuant to Program Obligations.

    b. Surplus Cash shall equal the sum of:

        (i)     Project cash and cash equivalents (excluding the Reserve for Replacement account and other HUD-required reserves);

        (ii)    short-term investments;

APP000282

15

(iii)    project-based Section 8 Housing Assistance Payments earned but not yet received by Borrower; and

(iv)    any amounts approved for withdrawal but not yet withdrawn from the Reserve for Replacements or any other reserves or escrow accounts;

after deducting:

(v)    all sums due or required to be paid within the calendar month following the date as of which Surplus Cash is calculated under the terms of the Note and Security Instrument (including without limitation principal, interest, mortgage insurance premium deposits, deposits to the Reserve for Replacements and other reserves as may be required by HUD, and tax and insurance escrow deposits);

(vi)    all special funds required to be segregated by this Agreement, the Note, the Security Instrument, or Program Obligations, including tenant security deposits and any other amounts held in trust for tenants; and

(vii)    all other obligations of the Project payable within the next thirty days, unless the obligation is paid subject to available Surplus Cash or subject funds for payment of the obligation are set aside or HUD has approved deferment of payment.

14.    **DISTRIBUTIONS**.  Borrower shall not make or take, or receive and retain, nor allow any Affiliate or Principal to receive or retain any Distribution of assets or any income of any kind of the Project, except from Surplus Cash or in accordance with Program Obligations.  Distributions are governed by the following conditions:

a.  No Distribution shall be made or taken from borrowed funds.  Distributions shall not be taken prior to the completion of the Project.  Distributions shall not be taken after HUD has given Notice to Borrower of a Violation under this Agreement or an Event of Default occurs under the Note or Security Instrument. Distributions shall not be taken when a Project is under a forbearance agreement.

b.  No Distribution shall be made or taken when either (i) necessary services (utilities, trash removal, security, lawn service or any other services that Borrower is required to provide) are not being provided on a regular basis, which failure Borrower should have known about in the exercise of due care; (ii) notices of physical repairs or deficiencies (including, but not limited to, building code violations) by Governmental Authorities and/or by HUD have been issued and

---

16

remain unresolved to the satisfaction of the issuing public body; or (iii) Borrower has been notified by HUD, Lender or a Governmental Authority that physical repairs and/or deficiencies exist and Borrower has not corrected or cured the identified items to HUD's satisfaction.  Upon completion of the repairs, HUD may permit a Distribution to be placed in an escrow account until a subsequent inspection has been completed by HUD.  If the Project passes a subsequent inspection, HUD may then authorize release of the funds in the escrow account to Borrower.  HUD may also permit Distributions when there are minor or contested local code violations on a case-by-case basis.

c.  Any Distribution of any funds of the Project not permitted by this Agreement or Program Obligations shall be returned to the appropriate Project account as specified by HUD immediately.

d.  Any Distributions shall be made or taken only as permitted by the law of the applicable jurisdiction.  Distributions, if taken, must be taken out of the appropriate Project account as specified by HUD within the accounting period immediately following the computation of Surplus Cash, and prior to the Borrower's next calculation of Surplus Cash, pursuant to Section 13 above, and if not taken within the identified period, these funds remain as Mortgaged Property and may only be used as permitted by this Agreement.

e.  Equity or capital contributions shall not be reimbursed from Project accounts without the prior written approval of HUD.  Borrower advances for Reasonable Operating Expenses shall not be deemed to fall under this subsection but rather shall be treated under Section 15 below.

15. **BORROWER ADVANCES**.

a.  "**Borrower Advances**" means any advance of funds or loan to the Project made by Borrower or any Affiliate for whatever reason.  Borrower Advances do not include equity or capital contributions whether required in conjunction with the financing of the Project or otherwise.  Borrower Advances may only be repaid from Project funds pursuant to this Section 15.

b.  Any Borrower Advances must be deposited into the Project's operating account as required by Program Obligations.  Interest may accrue on Borrower Advances pursuant to Program Obligations and may only be paid in accordance with this Section 15.

c.  Borrower Advances may only be repaid, and interest on Borrower Advances may only be paid:

---

Previous editions are obsolete;               Regulatory Agreement               HUD-92466M (06/14)
Replaces form HUD-92466 (11/02)

APP000284

17

(i)     with prior written approval from HUD, or

(ii)    if and to the extent that Borrower is permitted to take Distributions, from funds allowable for Distributions, and only at times when Distributions are permitted pursuant to Sections 13 and 14 of this Agreement.

d.  Repayments of Borrower Advances, and payments of interest on Borrower Advances, approved by HUD and made pursuant to Section 15(c)(i) shall be considered Reasonable Operating Expenses.

e.  Borrower shall require, as a condition of any agreement to repay Borrower Advances, or to pay interest thereon, with any party making such Borrower Advances, that such agreement shall recognize the limitations of this Section 15 and, if all of the conditions of this Section 15 are not met, shall hold the Borrower and the Mortgaged Property harmless for failure to pay.

16. **FINANCIAL ACCOUNTING.**  Borrower shall keep the books and accounts of the operation of the Mortgaged Property in accordance with Program Obligations.  The books and accounts must be complete, accurate and current at all times.  Posting must be made at least monthly to the ledger accounts, and year-end adjusting entries must be posted promptly in accordance with sound accounting principles. Any Undocumented Expense or Distribution shall be an ineligible Project expense, unless otherwise determined in writing by HUD.  An **"Undocumented Expense"** is an expense without sufficient documentation that provides reasonable identification of the basis of the expense.  Books, accounts and records shall be open and available for inspection by HUD, after reasonable prior notice, during normal office hours, at the Project or another mutually agreeable location.

17. **BOOKS MAINTAINED BY MANAGEMENT AGENTS.** The books and records of the Project maintained by management agents and Affiliates shall be maintained in accordance with Program Obligations and shall be open and available to inspection by HUD, after reasonable prior notice, during normal office hours, at the Project or another mutually agreeable location.  Every agreement executed on behalf of the Project with any management agent or Affiliate shall include the provision that the books and records of the Project shall be properly maintained and open to inspection during normal business hours by HUD at the Project or another mutually agreeable location and that upon the termination of an agreement with management agent and/or Affiliates, the books and records of the Project maintained by the management agent and/or Affiliates shall remain with Borrower.

18. **ANNUAL FINANCIAL REPORTS.**

APP000285

18

a. Within ninety (90) days, or such period established in writing by HUD, following the end of each fiscal year, Borrower shall prepare a financial report for the Borrower's fiscal year, or the portion thereof that started with the Borrower's assumption of financial responsibility (or the portion thereof that ended with Borrower's permitted transfer pursuant to a HUD-approved transfer of the Project), based on an examination of the books and records of the Borrower in accordance with generally accepted accounting principles (GAAP) and in such other form and substance as specified by HUD in supplemental guidance, and provide such report to HUD in such form and substance as specified by HUD under the Uniform Financial Reporting Standards at 24 C.F.R. 5.801 (UFRS), or any successor regulations, and Program Obligations.

b. Unless specifically waived or modified by HUD or through Government notice (OMB Circular A-133 or any equally applicable notice), Borrower shall: (i) engage an independent, licensed Certified Public Accountant (CPA) to audit the Borrower's annual financial report and to produce an audit report in accordance with both Generally Accepted Government Auditing Standards (GAGAS) and Generally Accepted Auditing Standards (GAAS); (ii) engage an independent, licensed CPA to perform an agreed-upon procedure, in accordance with the American Institute of Certified Public Accountants (AICPA) Statement on Standards for Attestation Engagements (SSAE) Number 4, to compare the financial data template information submitted electronically by the Borrower to HUD against the annual financial report examined by, and the audit report prepared by, the independent, licensed CPA; and (iii) furnish to HUD the audit report, and any other reports relating to the annual financial report or the audit report as required by Program Obligations, by such means and in such form and substance as specified by HUD under UFRS, or any successor regulations, and Program Obligations.

c. To the extent certain non-profit Borrowers' requirement to submit audited annual financial reports may be waived or modified pursuant to OMB Circular A-133 or any successor notice, no provisions of such notice shall be construed to relieve Borrower of any requirements of this Section 18, except for those requirements specifically waived or modified by such notice.

d. If Borrower fails to perform as required pursuant to this Section 18, HUD may, at its sole election, and in a manner determined by HUD, and without affecting any other provisions of this Agreement, and without first providing notice of violation of this Agreement pursuant to Section 36 of this Agreement, initiate a forensic audit of the Borrower's books, records, and accounts in such a manner as to provide to HUD with as much of the same information that would have been

APP000286

19

provided had the Borrower not failed to perform as required. Any such audit initiated by HUD does not relieve Borrower of the requirement to submit to HUD an annual audited financial report as required pursuant to this Agreement.

## IV.  PROJECT MANAGEMENT

19. **PRESERVATION, MANAGEMENT AND MAINTENANCE OF THE MORTGAGED PROPERTY**.  Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as HUD may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, and (d) shall keep the Mortgaged Property in decent, safe, sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations.  By executing this Agreement, Borrower agrees and understands that obligations (a) through (d) of this Section 19 are absolute and unconditional and are not limited by any conditions precedent and are not contingent on HUD's performance of any administrative or contractual obligations.  Furthermore, HUD is in no way obligated to provide funding or any financial assistance of any kind to Borrower to repair, rehabilitate, maintain, or make improvements to the Mortgaged Property.  The Mortgaged Property must also be maintained in reasonable condition for proper audit and subject to examination by HUD at the Project or another mutually agreeable location.  In the event all or any of the Improvements shall be destroyed or damaged by fire, by failure of warranty, or other casualty, the money derived from any settlement, judgment, or insurance on the Mortgaged Property shall be applied in accordance with the terms of the Security Instrument.  In the event all or any of the Improvements shall be taken by an exercise of the power of eminent domain, all awards of compensation in connection with condemnation for public use of or a taking of any of the Improvements shall be paid in accordance with the Security Instrument.

20. **FLOOD HAZARDS**.  Borrower shall maintain flood insurance if required by the Security Instrument.

21. **MANAGEMENT**.  Borrower shall provide management of the Mortgaged Property in a manner deemed to be acceptable to HUD.  At HUD's sole discretion, HUD may require replacement of the management under any circumstances set forth in clause d. of this Section 21 pursuant to Program Obligations, in which case Borrower shall immediately make arrangements for providing management satisfactory to HUD. Borrower shall execute a management agreement or other document outlining procedures for managing or operating the Mortgaged Property.  Such agreement or

APP000287

20

document must comply with Program Obligations.  Borrower and management agent (if applicable) shall submit and maintain a current management certification in accordance with Program Obligations.  In addition to the requirements of Section 17 above, all management agreements must contain the following provisions:

   a.  HUD's rights and requirements prevail in the event of any conflict with the terms of the management agreement.

   b.  The management agreement shall not be assigned without the prior written approval of HUD.

   c.  Management fees will be computed and paid in accordance with HUD requirements.

   d.  HUD may require Borrower to terminate the management agreement:

     (1)  immediately without penalty if an Event of Default occurs under the Security Instrument, Note, or Regulatory Agreement-;

     (2)  upon thirty (30) days written notice to Borrower and management agent, for failure to comply with the provisions of the Management Certification, or for other good cause; or

     (3)  immediately without penalty when HUD takes control of the Mortgaged Property pursuant to its rights under the loan documents as mortgagee in possession.

   e.  If Borrower terminates the management agreement pursuant to a request from HUD, the management agent must immediately turn over to Borrower all of the cash, accounts, deposits, investments, and records pertaining to the Mortgaged Property.

   f.  Borrower may terminate the management agreement for cause with no more than a thirty (30) day notice period.

   g.  The management agreement shall not exempt the management agent from liability for damages, injuries or losses, resulting from the management agent's gross negligence or willful misconduct.

22. **CONTRACTS FOR GOODS AND SERVICES**.  Consistent with Program Obligations, Borrower shall obtain contracts for goods, materials, supplies, and services (**Goods and Services**) at costs, amounts, and terms that do not exceed reasonable and necessary levels and those customarily paid in the vicinity of the Land for Goods

APP000288

21

and Services received.  The purchase price of Goods and Services shall be based on quality, durability and scope of work and shall be made upon the most advantageous terms for the Project operation.  Reasonable Operating Expenses do not include amounts paid for Improvements and/or betterments, unless approved in writing by HUD.   Borrower shall keep copies of all written contracts or other instruments that affect the Mortgaged Property, all or any of which may be subject to inspection and examination by HUD at the Project or another mutually agreeable location.

23. **RESPONSIVENESS TO INQUIRIES**.  At the request of HUD, Borrower shall promptly furnish operating budgets and occupancy, accounting and other reports (including credit reports) and give specific answers to questions relative to income, assets, liabilities, contracts, operation, and conditions of the Mortgaged Property and the status of the Security Instrument.

24. **TENANT ORGANIZATIONS**.  If the Project is subject to 24 C.F.R. 245 Subpart B or any successor regulation covering the rights of tenants to organize, Borrower shall comply with this Section 24.  Borrower shall not (a) impede the reasonable efforts of resident tenant organizations to represent their members or the reasonable efforts of tenants to organize, or (b) unreasonably withhold the use of any community room or other available space appropriate for meetings that is part of the Mortgaged Property when requested by: (i) a resident tenant organization in connection with the representational purposes of the organization; or (ii) tenants seeking to organize or to consider collectively any matter pertaining to their living environment, which includes the terms and conditions of their tenancy as well as activities related to housing and community development.  Borrower may charge for the use of the Mortgaged Property any fees or costs approved by HUD as may normally be imposed for the use of such facilities or may waive any such fees or costs.

## V.  ADMISSIONS AND OCCUPANCY

25. **RESIDENTIAL UNITS AND SERVICES**.  If the Project is subject to regulation of rent by HUD, Borrower shall make residential units and services of the Project available to eligible tenants at charges not exceeding those established in accordance with a rental schedule approved in writing by HUD.

26. **LEASE TERMS FOR RESIDENTIAL UNITS**.  Residential units shall not be rented for a period of less than thirty (30) days or for more than 3 years and shall not be used for transient or hotel purposes.  Rental for transient or hotel purposes shall mean:  (a) rental for a period of less than thirty (30) days or (b) any rental, if the occupants of the residential units are provided customary hotel services such as room service for food and beverages, maid service, furnishings or laundering of linens, and bellhop service.  Residential units in projects with Security Instruments initially endorsed for insurance

APP000289

22

pursuant to Section 231 of the National Housing Act, as amended, may be rented for a period of more than 3 years.

27. **COMMERCIAL (NON-RESIDENTIAL) LEASES**. No portion of the Mortgaged Property shall be leased for any commercial purpose or use without receiving HUD's prior written approval as to terms, form and amount, except that for lease renewals or extensions or amendments involving no change in terms or use, rent increases are permitted without HUD approval. Borrower must deliver an executed copy of the commercial Lease to HUD.

28. **SUBLEASES**. All Leases of residential units by Borrower to tenants must also prohibit assignment of the leasehold interest by the tenant without the prior written approval of Borrower. All Leases of residential units by Borrower to tenants must prohibit tenants from entering into any subleases that do not run for at least thirty (30) days and must require that all subleases be approved in advance in writing by Borrower. Leases of residential units must prohibit the tenant from granting the right to occupy the premises for a period of less than thirty (30) days or from furnishing hotel services, as defined in Section 26. Assignment and subleasing of units by other than the tenant thereof without the prior written approval of Borrower shall be prohibited in the Lease. Upon discovery of any unapproved assignment, sublease or occupancy, Borrower shall, to the extent permitted by law, immediately demand cancellation and/or vacation of the premises, as appropriate, and notify HUD thereof.

29. **TENANT SELECTION/OCCUPANCY.**

   a. If the Security Instrument is originally a HUD-held purchase money mortgage, or is originally endorsed for insurance under any Section of the National Housing Act, as amended, other than Section 231 units specially designed for use and occupancy of Elderly Persons exclusively, Borrower shall not, in selecting tenants, discriminate against any person or persons by reason of the fact that there are children in the family, unless in accordance with the Fair Housing Act and otherwise approved in writing by HUD.

   b. If the Security Instrument is originally endorsed for insurance under Section 221, Borrower shall, in selecting tenants, give to Displaced Persons or Families an absolute preference or priority of occupancy that shall be accomplished as follows: (1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by HUD, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants; (2) thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by Borrower; and

---

APP000290

23

(3) through such further provisions agreed to in writing by the parties to this Agreement.

c. At least 75% of the units in a Project insured under Section 231 shall be designed for the use and occupancy of Elderly Persons unless prior written approval is given by HUD for a lesser number of units.

d. All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of Borrower to obtain occupancy by Elderly Persons.

## 30. ADDITIONAL OCCUPANCY RESTRICTIONS AND POLICIES

NONE

31. **RENTS**.  If the Project is subject to regulation of rent by HUD, HUD will at any time entertain a written request for a rent increase that is properly supported by substantiating evidence and HUD will, within a reasonable time:  (a) approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance costs over which Borrower has no effective control; or (b) deny the increase and state the reasons for its decision.

32. **CHARGES FOR SERVICES AND FACILITIES**.  If the Project is subject to regulation of rent by HUD, Borrower shall only charge to and receive from any tenant such amounts as have the prior written approval of HUD and are mutually agreed upon between Borrower and the tenant for any facilities and/or services not included in the HUD approved rent schedule that may be furnished by, or on behalf of, Borrower to such tenant upon request.

APP000291

24

33. **PROHIBITION OF CERTAIN FEES**.  Borrower shall not charge any Project tenant or prospective Project tenant any fees prohibited under Program Obligations; such prohibited fees may include an admission fee, a key fee, or similar payment pursuant to any agreement to furnish residential units or services to persons making such payments.

34. **SECURITY DEPOSITS AND OTHER FEES**.  Borrower shall not require as a condition of occupancy or leasing of any unit in the Project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the lease terms.  Borrower may charge certain application processing fees such as credit check or criminal background fees or pet deposits.

## VI.  ACTIONS REQUIRING THE PRIOR WRITTEN APPROVAL OF HUD

35. **ACTIONS REQUIRING THE PRIOR WRITTEN APPROVAL OF HUD.**  Borrower shall not without the prior written approval of HUD:

a.  Convey, assign, transfer, pledge, hypothecate, encumber, or otherwise dispose of the Mortgaged Property or any interest therein, or permit the conveyance, assignment, or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal) unless permitted by Program Obligations.  Borrower need not obtain the prior written approval of HUD:  (i) for a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under the Security Instrument; (ii) for inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code; (iii) for acquisition of an interest by inheritance or by Court decree; or (iv) for actions permitted under subsection (g) below.

b.  Enter into any contract, agreement or arrangement to borrow funds or finance any purchase or incur any liability, direct or contingent other than for Reasonable Operating Expenses.

c.  Pay out any funds of the Mortgaged Property except as provided in this Agreement and Program Obligations.

d.  Except from permissible withdrawals of Surplus Cash, pay any compensation, including wages or salaries, or incur any obligation to do so, to any officer, director, stockholder, trustee, beneficiary, partner, member, manager (in the case of a Borrower formed as a Limited Liability Company or Limited Liability Corporation), or Principal of Borrower, or to any nominee thereof.

| Previous editions are obsolete; Replaces form HUD-92466 (11/02) | Regulatory Agreement | HUD-92466M (06/14) |

25

e.  Enter into or change any contract, agreement or arrangement for supervisory or managerial services or Leases for operation of the Project in whole or in part except as permitted under Program Obligations.

f.  Convey, assign or transfer any right to receive the Rents of the Mortgaged Property, except as provided in the Security Instrument.

g.  Remodel, add to, subtract from, construct, reconstruct or demolish any part of the Mortgaged Property, except as required by HUD under Section 19(c) and except that Borrower may, without the prior written approval of HUD, dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value and make minor alterations that do not impair the security.

h.  Permit the use of the Mortgaged Property for any other purpose except the use for which it was originally intended, or permit commercial use greater than that originally approved by HUD.

i.  Amend the organizational documents of Borrower in a way that materially modifies the terms of the organization, including, but not limited to:  any amendment that activates the requirement that a HUD previous participation certification be obtained from any additional partner or member; any amendment that would authorize any officer, partner or member other than the officer(s), general partner(s) or the managing member(s) of the corporation, partnership or company or pre-approved successor officer(s), general partner(s) or managing member(s) to bind the corporation, partnership or company for any matters concerning the Project which requires HUD's consent or approval; a change in the officer(s), general partner(s) or managing member(s) or pre-approved successor officer(s), general partner(s) or managing member(s) of the corporation, partnership or company and any proposed changes to the HUD-required provisions included in the organizational documents. Copies of all fully executed amendments to the organizational documents must be provided to HUD within ten (10) days of the effective date of the amendment.  If the amendments to the organizational documents are recorded or filed, copies of the recorded or filed documents must be provided to HUD within ten (10) days of receipt by Borrower.

j.  Reimburse any party from Mortgaged Property for payment of expenses or costs of the Project or for any purpose except for Reasonable Operating Expenses and in a manner consistent with Section 15.

k.  Receive any fee or payment of any kind from any managing agent, employee of the Project or of the managing agent, or other provider of Goods or Services of the Project, except for warranty claims from providers of Goods and Services.

APP000293

26

l.  Initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement.

m.  Establish any condominium or cooperative regime with respect to the Mortgaged Property.

n.  Materially change any unit configurations or change the number of units in the Mortgaged Property.

## VII.  ENFORCEMENT

36. **VIOLATION OF AGREEMENT.**  The occurrence of any one or more of the following shall constitute a **"Violation"** under this Agreement:

a.  Any failure by Borrower to comply with any of the provisions of this Agreement;

b.  Any fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or managing agent in connection with (1) any financial statement, rent roll or other report or information provided to HUD or (2) any request for HUD's consent to any proposed action, including a request for disbursement of funds from any restricted account for which HUD's prior written approval is required; and/or

c.  The commencement of a forfeiture action or proceeding, whether civil or criminal, which, in HUD's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the value of the Mortgaged Property.

37. **DECLARATION OF DEFAULT.**

a.  Upon a Violation, HUD may give written Notice, pursuant to Section 46, of the Violation to Borrower, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written Notice to HUD, be designated by Borrower as its legal business address.  If, after receiving written Notice of a Violation, that Violation is not corrected to the satisfaction of HUD either within thirty (30) days after the date Notice is mailed, or within such shorter or longer time set forth in said Notice, HUD may declare a default (Declaration of Default) under this Agreement without further Notice.  Alternatively, in order to protect the health and safety of the tenants, HUD may declare a default at any time during the existence of a Violation without providing prior written Notice of the Violation.

27

b. Upon any **Declaration of Default** HUD may:

    (i) If HUD holds the Note, declare the whole of said Indebtedness immediately due and payable and then proceed with the foreclosure of the Security Instrument;

    (ii) If said Note is not held by HUD, notify the holder of the Note of such default and require the holder to declare a default under the Note and Security Instrument, and the holder, after receiving such Notice and demand, may declare the whole Indebtedness due and payable and thereupon proceed with foreclosure of the Security Instrument or assignment of the Note and Security Instrument to HUD as provided in Program Obligations.  Upon assignment of the Note and Security Instrument to HUD, HUD may then proceed with the foreclosure of the Security Instrument;

    (iii) Collect all Rents and charges in connection with the operation of the Project and use such collections to pay Borrower's obligations under this Agreement and under the Note and Security Instrument and the necessary expenses of preserving and operating the Mortgaged Property;

    (iv) Take possession of the Mortgaged Property, bring any action necessary to enforce any rights of Borrower growing out of the Mortgaged Property's operation, and maintain the Mortgaged Property in decent, safe, and sanitary condition and good repair;

    (v) Apply to any court, state or federal, for specific performance of this Agreement, for an injunction against any Violations of this Agreement, for the appointment of a receiver to take over and operate the Project in accordance with this terms of the Agreement, or for such other relief as may be appropriate, as the injury to HUD arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain; and,

    (vi) Collect reasonable attorney fees related to enforcing Borrower's compliance with this Agreement.

38. **FORBEARANCE NO WAIVER**.  Any forbearance by HUD in exercising any right or remedy under this Agreement or otherwise afforded by applicable law shall not be a waiver of or preclude the exercise of any right or remedy.

39. **MEASURE OF DAMAGES**.  The damage to HUD as a result of Borrower's breach of duties and obligations under this Agreement shall be, in the case of failure to maintain the Mortgaged Property as required by this Agreement, the cost of the repairs

APP000295

28

required to return the Project to decent, safe and sanitary condition and good repair. This contractual provision shall not abrogate or limit any other remedy or measure of damages available to HUD under any civil, criminal or common law.

## VIII.  MISCELLANEOUS

### 40.  COMPLIANCE WITH LAWS.

a.  Borrower shall comply with all applicable:  laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements (including the Security Instrument) recorded against the Mortgaged Property; and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, subpart G, and any successor regulations; including but not limited to those of the foregoing pertaining to: health and safety; construction of improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments. Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 40.  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by the Security Instrument or Lender's interest in the Mortgaged Property.  Borrower represents and warrants to HUD that no portion of the Mortgaged Property has been or shall be purchased with the proceeds of any illegal activity.

b.  HUD shall be entitled to invoke any remedies available by law to redress any breach or to compel compliance by Borrower with these requirements, including any remedies available hereunder.

41. BINDING EFFECT.  This Agreement shall bind, and the benefits shall inure to, Borrower, its heirs, legal representative, executors, administrators, successors in office or interest, and assigns, and to HUD and HUD's successors, so long as the Contract of Insurance continues in effect, and during such further time as HUD shall be the Lender, holder, coinsurer, or reinsurer of the Security Instrument, or obligated to reinsure the Security Instrument.

42. PARAMOUNT RIGHTS AND OBLIGATIONS.  Borrower warrants that it has not, and shall not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this

APP000296

29

Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

43. **SEVERABILITY.**  The invalidity of any clause, part, or provision of this Agreement shall not affect the validity of the remaining portions hereof.

44. **RULES OF CONSTRUCTION.**  The captions and headings of the Sections of this Regulatory Agreement are for convenience only and shall be disregarded in construing this Regulatory Agreement.  Any reference in this Regulatory Agreement to an **"Exhibit"** or a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Regulatory Agreement or to a Section of this Regulatory Agreement.  All Exhibits attached to or referred to in this Regulatory Agreement are incorporated by reference into this Regulatory Agreement. Use of the singular in this Regulatory Agreement includes the plural and use of the plural includes the singular.  As used in this Regulatory Agreement, the term, "including" means "including, but not limited to."  In this Regulatory Agreement, where the context may so require, feminine or masculine pronouns or adjectives shall be substituted for those of the neuter gender, and vice versa.

45. **PRESENT ASSIGNMENT.**  Borrower irrevocably and unconditionally assigns, pledges, mortgages and transfers to HUD its rights to the Rents, charges, fees, carrying charges, Project accounts, security deposits, and other revenues and receipts of whatsoever sort that it may receive or be entitled to receive from the operation of the Mortgaged Property, subject to the assignment of Rents in the Security Instrument. Until a default is declared under this Agreement, a revocable license is granted to Borrower to collect and retain such Rents, charges, fees, carrying charges, Project accounts, security deposits, and other revenues and receipts, but upon a Declaration of Default under this Agreement or under the Security Instrument, this revocable license is automatically terminated.

46. **NOTICE.**

a.  All notices, demands and other communications ("**Notice**") under or concerning this Agreement shall be in writing.  A courtesy copy of any Notice given by Borrower or HUD shall be sent simultaneously to Lender.  Each Notice shall be addressed to the intended recipients at their respective addresses set forth below, and shall be deemed given on the earliest to occur of (i) the date when the Notice is received by the addressee; (ii) the first or second Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next or second Business Day delivery, respectively; or (iii) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 46, the term

| Previous editions are obsolete; Replaces form HUD-92466 (11/02) | Regulatory Agreement | HUD-92466M (06/14) |
|---|---|---|

30

"**Business Day**" means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business. When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day.

b. Any party to this Agreement and Lender may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 46. Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 46, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 46 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

**BORROWER:**
D4FR LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Dallas, TX 75234

**HUD:**
Department of Housing and Urban Development
Attn: Legal Department
801 Cherry Street, Unit #45, Suite 2500
Ft. Worth, TX 76102

**LENDER:**
Greystone Servicing Corporation, Inc.
Attn: General Counsel
419 Belle Air Lane
Warrenton, VA 20186

47. **CONFLICTS PROVISION.** Borrower shall comply with the requirements set forth in this Agreement as well as any other agreement Borrower enters into with HUD. However, if a conflict exists between this Agreement and any other HUD agreement executed by Borrower, the agreement which imposes the more restrictive requirements on Borrower shall control.

48. **THIRD PARTY BENEFICIARY.** Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

APP000298

31

49. **EXPLANATION OF ROLES.** HUD is not providing a loan to the Borrower. HUD operates insurance programs under the provisions of the National Housing Act. HUD, through the Federal Housing Administration (FHA) provides insurance to private and public lenders which it has approved as financially responsible against loss on mortgages financing multifamily projects. The mortgage insurance is a contract between the approved lender and HUD. These are the only two parties to the FHA insurance contract, the approved mortgage lender and HUD. The approved lender is the only party that is intended to benefit from the contract of mortgage insurance. While borrowers and other program participants may incidentally benefit in some manner from the insured mortgage financing that the approved lender provides, all other program participants are deemed not to be third party beneficiaries of the insurance contract. Thus, program participants have no rights and should not have any expectations in regard to decisions made or actions taken by HUD under the mortgage lender's contract of mortgage insurance, including but not limited to accepting a loan as eligible for insurance or paying a claim.

## SECTION IX.  NON RECOURSE

50. **NONRECOURSE DEBT**. The addendum ("Section 50 Addendum") attached hereto is incorporated herein by this reference.

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Regulatory Agreement:

      [X]    <u>Exhibit A</u>    Description of the Land

      [X]    <u>Exhibit B</u>    Rider

      [X]    <u>Section 50 Addendum</u>

APP000299

32

**IN WITNESS WHEREOF**, the parties hereto have set their hands and seals on the date first herein above written.

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete and that each signatory has read and understands the terms of this Agreement. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

STATE OF TEXAS            §
                          §
COUNTY OF Dallas          §

The foregoing instrument was acknowledged before me on this _5_ day of December, 20 17, by Timothy Barton, President of D4FR LLC, a Texas limited liability company.

[seal]

_____
Notary Public
Printed Name of Notary: _Saskya Bedoya_

My Commission Expires: _July 21, 2018_

SASKYA BEDOYA
Notary Public, State of Texas
My Commission Expires
July 21, 2018

---

Previous editions are obsolete;          Regulatory Agreement          HUD-92466M (06/14)
Replaces form HUD-92466 (11/02)

APP000300

33

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

HUD-92466M – Regulatory Agreement
HUD Signature Page

US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ACTING
By and through the Secretary of Housing and Urban Development

By: _____ Acting
    Authorized Agent
    Kenneth L. Cooper

STATE OF Texas
COUNTY OF Tarrant

     Before me the undersigned authority, a notary public, of the state and county aforesaid, personally appeared Lisa L. Farmer for Kenneth L. Cooper to me personally known and known to be the duly appointed authorized agent of the Secretary of the United States Department of Housing and Urban Development, who executed the foregoing instrument by virtue of the authority vested in him/her and acknowledged to me that he/she executed it voluntarily for the purposes stated therein on behalf of the Secretary of Housing and Urban Development this the _8_ day of December, 2017.

    Witness my hand and official seal or stamp.



Notary Public
Print Name: Leslie Elaine Johnson

My commission expires: 1 March 2018

[Affix Notarial Seal]

LESLIE ELAINE JOHNSON
Notary Public, State of Texas
My Commission Expires
March 01, 2018

| Previous editions are obsolete; Replaces form HUD-92466 (11/02) | Regulatory Agreement | HUD-92466M (06/14) |

APP000301

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

## Warning

Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.

**NOTICE:  THIS DOCUMENT MUST HAVE A LEGAL DESCRIPTION ATTACHED AND BOTH THIS DOCUMENT AND THE SECTION 50 ADDENDUM MUST BE EXECUTED WITH ALL FORMALITIES REQUIRED FOR RECORDING A DEED TO REAL ESTATE (*i.e.*, NOTARY/ACKNOWLEDGEMENT, SEAL, WITNESS OR OTHER APPROPRIATE FORMALITIES).**

HUD-92466M (Rev. 06/14)                                                         Legal Description

APP000302

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

## EXHIBIT A
## DESCRIPTION OF THE LAND

BEING AN 18.451 ACRE TRACT OF LAND SITUATED IN THE J. HEATH SURVEY, ABSTRACT NO. 227, KAUFMAN COUNTY, TEXAS, AND BEING PART OF THAT TRACT OF LAND CONVEYED TO LEMAN DEVELOPMENT, LTD., PER DEED RECORDED IN VOLUME 1323, PAGE 281 OF THE DEED RECORDS OF KAUFMAN COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1" IRON ROD FOUND FOR CORNER IN THE NORTH RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO. 80 (300' RIGHT-OF-WAY), SAID POINT BEING THE MOST SOUTHERLY SOUTHWEST COMER OF THE ABOVE CITED LEMAN TRACT, SAID POINT ALSO BEING THE SOUTHEAST CORNER OF A TRACT OF LAND CONVEYED TO PROSPER CAPITAL MANAGEMENT, L.P., PER DEED RECORDED IN VOLUME 1994, PAGE 16 OF THE DEED RECORDS OF KAUFMAN COUNTY, TEXAS;

THENCE N. 45 DEG. 08 MIN. 31 SEC. W. ALONG THE MOST SOUTHERLY SOUTHWEST LINE OF SAID LEMAN TRACT, AND ALONG THE NORTHEAST LINE OF SAID PROSPER CAPITAL TRACT, A DISTANCE OF 582.59 FEET TO A 1/2" IRON ROD FOUND FOR CORNER, SAID POINT BEING THE MOST WESTERLY SOUTHWEST CORNER OF PHASE 1A PER THE RECORDED PLAT OF WINDMILL FARMS, PHASE 1A, 1B & 1C, AS RECORDED IN CABINET 2, PAGE 213 OF THE PLAT RECORDS OF KAUFMAN COUNTY, TEXAS;

THENCE S. 88 DEG. 30 MIN. 09 SEC. E. ALONG THE SOUTH LINE OF SAID WINDMILL FARMS, A DISTANCE OF 1635.57 FEET TO A 1/2" IRON ROD WITH CAP STAMPED "USA INC PROP. COR." FOUND (HEREINAFTER CALLED 1/2" IRON ROD FOUND) FOR CORNER AT THE MOST SOUTHERLY SOUTHEAST CORNER OF SAID WINDMILL FARMS;

THENCE N. 01 DEG. 29 MIN. 51 SEC. E ALONG THE EAST LINE OF SAID WINDMILL FARMS, A DISTANCE OF 349.33 FEET TO A 1/2" IRON ROD FOUND FOR CORNER IN THE SOUTH LINE OF CONCORD DRIVE (85' RIGHT-OF-WAY);

THENCE S. 87 DEG. 47 MIN. 14 SEC. E. ALONG THE SOUTH LINE OF SAID CONCORD DRIVE, A DISTANCE OF 335.85 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE INTERSECTION OF THE SOUTH LINE OF SAID CONCORD DRIVE WITH THE WEST LINE OF WINDMILL FARMS BOULEVARD (120' RIGHT-OF-WAY);

THENCE S. 06 DEG. 11 MIN. 24 SEC. E. ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, A DISTANCE OF 28.75 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE BEGINNING OF A CURVE TO THE RIGHT;

THENCE IN A SOUTHERLY DIRECTION, ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, AND ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 23 DEG. 53 MIN. 42 SEC., A RADIUS OF 940.00 FEET, A CHORD BEARING OF

APP000303

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

S. 05 DEG. 45 MIN. 27 SEC. W., A CHORD LENGTH OF 389.19 FEET AND AN ARC LENGTH OF 392.02 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE BEGINNING OF A REVERSE CURVE TO THE LEFT;

THENCE IN A SOUTHERLY DIRECTION, ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, AND ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 16 DEG. 36 MIN. 42 SEC., A RADIUS OF 1,060.00 FEET, A CHORD BEARING OF S. 09 DEG. 23 MIN. 57 SEC. W., A CHORD LENGTH OF 306.25 FEET AND AN ARC LENGTH OF 307.32 FEET TO A 1 /2" IRON ROD FOUND FOR CORNER;

THENCE S. 01 DEG. 05 MIN. 36 SEC. W. ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, A DISTANCE OF 25.19 FEET TO A 1" IRON ROD FOUND FOR CORNER IN THE NORTH LINE OF SAID U.S. HIGHWAY NO. 80;

THENCE N. 88 DEG. 30 MIN. 09 SEC. W. ALONG THE NORTH LINE OF SAID HIGHWAY, A DISTANCE OF 1480.84 FEET TO THE POINT OF BEGINNING, AND CONTAINING 18.451 ACRES OF LAND.

HUD-92466M (Rev. 06/14)                                              Legal Description

## EXHIBIT B

## RIDER TO REGULATORY AGREEMENT
### Borrower's Obligation to Maintain Project's Energy Performance as Consideration for MIP Reduction

This Rider ("Rider") is attached to and amends the Regulatory Agreement entered into between D4FR LLC, a Texas limited liability company ("Borrower") and the United States Department of Housing and Urban Development, acting by and through the Secretary, his or her successors, assigns or designates ("HUD"), dated as of <u>December 1, 2017</u> ("Regulatory Agreement") concerning a Project known as Parc at Windmill Farms Apartments located at:

Windmill Farms Blvd., Forney, TX

For and in consideration of the reduction in mortgage insurance premiums and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and HUD agree as follows:
To the extent that any provisions of the Rider conflict with any provisions of the Regulatory Agreement, the provisions of this Rider shall prevail. Any terms in the Regulatory Agreement not in conflict with this Rider remain in full force and effect. Notwithstanding anything else in the Regulatory Agreement to which this Rider is attached:

1. <u>Definitions</u>

The following terms shall be added to Section 1 (Definitions) of the Regulatory Agreement

    (a) Any capitalized terms not defined in this Rider shall have the meaning given in the Regulatory Agreement.

    (b) "**Green Standard**" means an industry recognized standard of building design, construction, renovation and/or maintenance that results in minimized consumption of non-renewable energy sources and optimum use of sustainable materials, resources and methods and is acceptable to HUD.

    (c) "**Portfolio Manager®**" means the free software tool provided by the US Environmental Protection Agency (EPA) for the purpose of reporting and scoring utility consumption for common types of facilities in the built environment including multifamily properties, and any successor or amended tool as EPA may from time to time provide.

    (d) "**Statement of Energy Performance (SEP)**" means a particular report produced by Portfolio Manager® available in various formats providing utility

APP000305

consumption data for 12 month periods with stabilized operations and comparing the energy consumption per square foot of a subject property to a fixed sample of similar properties by means of an index score, and any successor or amended report providing an index score for multifamily properties.

(e) "**ENERGY STAR® Score**" means the 1 to 100 index score produced by Portfolio Manager and reported on the SEP comparing the energy performance of the subject property to a sample of other similar properties.

(f) "**HUD Custom SEP**" is a machine readable format of the SEP which may be a required format for an SEP when HUD enables electronic or automated reporting.

(g) "**Qualified Energy Professional**" is a person or firm qualified by education and experience as described in the Multifamily Accelerated Processing Guide, Chapter 5, or amended Program Obligations.

2. Borrower's Election to Achieve a Green Standard for the Project

Borrower has elected and hereby agrees to diligently pursue and achieve a Green Standard in accordance with HUD's Announcement and waiver published on March 31, 2016 (81 FR 18473) and entitled "Changes in Certain Multifamily Mortgage Insurance Premiums and Regulatory Waiver for the 542(c) Risk-Sharing Program".

The selected Green Standard is: (choose one, X)

| X | Choose One: |
|---|---|
| | Enterprise Green Communities Criteria |
| | U.S. Green Building Council's LEED-H |
| | U.S. Green Building Council's LEED-H Midrise |
| | U.S. Green Building Council's LEED-NC |
| | LEED for Existing Buildings: Operations & Maintenance |
| | ENERGY STAR Certification |
| | EarthCraft House |
| | EarthCraft Multifamily |
| | Earth Advantage New Homes |
| | Greenpoint Rated New Home |
| | Greenpoint Rated Existing Home (Whole House or Whole Building label) |
| X | National Green Building Standard (NGBS) |
| | Passive Building Certification or EnerPHit Retrofits certification from the Passive House Institute US (PHIUS), International Passive House Association, or the Passive House Institute |
| | Living Building Challenge Certification from the International Living Future Institute |
| | Other (Specify): |

APP000306

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

Each Green Standard establishes milestones and/or performance levels to be met and procedures to evidence successful completion or achievement of the milestones or levels of performance.  Lender or HUD may request from time to time and Borrower shall provide status reports of the completion or achievement of the milestones or levels of performance.  When all requirements are met the Borrower shall provide the Lender and ensure that HUD receives evidence satisfactory to HUD of the achievement of the selected Green Standard.  When such achievement is contingent on completion of construction, repairs or alterations, then evidence, as defined by the Green Standard, that the completion of work is consistent with the Green Standard must be provided to Lender and HUD within three months of the completion of work.

3. <u>1-100 ENERGY STAR® Score</u>

After, and in addition to, meeting the selected Green Standard, Borrower agrees to pursue, achieve and maintain a minimum score of 75 or better on the 1-100 ENERGY STAR® score, using a Statement of Energy Performance from EPA's Portfolio Manager®.  Borrower agrees that each score shall be verified in writing by the independent conclusion of a Qualified Energy Professional and promptly provided to Lender and HUD.  When achievement of the Green Standard is contingent on completion of construction, the time when the first SEP must be delivered varies as follows:
    (a) For new construction or substantial rehabilitation projects, the required ENERGY STAR® score shall be provided to HUD not later than 15 months following the achievement of sustaining occupancy.
    (b) For projects acquired or refinanced under Section 223(f) of the National Housing Act with repairs and alterations, the required ENERGY STAR® score shall be provided to HUD not later than 15 months following completion of the repairs and alterations.

4. <u>Borrower's Obligation to Maintain Energy Performance after Initial Achievement</u>

After meeting the requirements of Sections 2 and 3 above, evidencing the achievement of the selected Green Standard and the first SEP, Borrower agrees to provide to HUD annually on the anniversary date of the first SEP, without request, evidence of the continuing energy performance of the property by submitting an SEP, each prepared or verified by a Qualified Energy Professional.  Borrower covenants and agrees to achieve a score of 75 or better on each SEP.  If and when HUD enables submission of machine readable SEPs then the HUD Custom SEP shall be provided.  If and when the utility provider(s) for the Project deliver whole building utility consumption data directly to Portfolio Manager® by means of automatic electronic data transfer protocols, then

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

resulting SEP for the Project does not require verification by a Qualified Energy Professional.

5. Projects of Less than 20 Units

For Projects of less than 20 units, the Borrower has elected and hereby agrees to diligently pursue and achieve the Green Standard indicated above, but the Borrower is exempt from requirements to provide an SEP and to evidence an ENERGY STAR® Score of 75 or more.

**BORROWER**

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

## SECTION 50 ADDENDUM

The Loan is nonrecourse. Each individual/entity (each, a **"Section 50 party"**) as identified below and in the **"Firm Commitment"** (which means the commitment for insurance of advances or commitment for insurance upon completion issued to Lender by HUD under which the debt evidenced by the Note is to be insured pursuant to a Section of the Act, dated <u>August 25, 2017</u>, and any amendments thereto): <u>Timothy Barton and TLB 2012 Irrevocable Trust</u> does not assume personal liability for payments due under the Note and Security Instrument, or for the payments to the Reserve for Replacements, or for matters not under its control, provided that each Section 50 Party shall be personally liable under this Agreement only with respect to the matters hereinafter stated; namely: (a) for funds or property of the Project coming into its hands which, by the provisions hereof, it is not entitled to retain; (b) for authorizing the conveyance, assignment, transfer, pledge, encumbrance, or other disposition of the Mortgaged Property or any interest therein in violation of Section 35(a) of the Regulatory Agreement to which this addendum is attached **("Regulatory Agreement")** without the prior written approval of HUD; and (c) for its own acts and deeds, or acts and deeds of others, which it has authorized in violation of the provisions of this Section 50 Addendum. The obligations of each Section 50 Party shall survive any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, any termination of the Regulatory Agreement, or any release of record of the Security Instrument.

_____

Timothy Barton


The TLB 2012 Irrevocable Trust dated March 16, 2012

_____
By: Saskya Bedoya, Trustee for the TLB 2012 Irrevocable Trust dated March 16, 2012

HUD-92466M (Rev. 06/14)                                    Section 50 - Addendum

APP000309

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

### *ACKNOWLEDGEMENT PAGE TO SECTION 50 ADDENDUM*

STATE OF TEXAS          §
                        §
COUNTY OF Dallas        §

      The foregoing instrument was acknowledged before me on this  5  day of December, 20 17, by Saskya Bedoya, Trustee for the TLB 2012 Irrevocable Trust dated March 16, 2012.

Deanna Di Bella
My Commission Expires
11/14/2021
ID No  131350688          [seal]

Notary Public
Printed Name of Notary: Deanna DiBella
My Commission Expires:  11 14 21


STATE OF TEXAS          §
                        §
COUNTY OF Dallas        §

      The foregoing instrument was acknowledged before me on this  5  day of December, 2017, by Timothy Barton.

SASKYA BEDOYA
Notary Public, State of Texas
My Commission Expires
July 21, 2018          [seal]

Notary Public
Printed Name of Notary: Saskya Bedoya
My Commission Expires: July 21, 2018


HUD-92466M (Rev. 06/14)                    Section 50 - Addendum

APP000310