**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff*, | § § § | |
| **v.** | § § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON,** | § | |
| **CARNEGIE DEVELOPMENT, LLC,** | § | |
| **WALL007, LLC,** | § | |
| **WALL009, LLC,** | § | |
| **WALL010, LLC,** | § | |
| **WALL011, LLC,** | § | |
| **WALL012, LLC,** | § | |
| **WALL016, LLC,** | § | |
| **WALL017, LLC,** | § | |
| **WALL018, LLC,** | § | |
| **WALL019, LLC,** | § | |
| **HAOQIANG FU (A/K/A MICHAEL FU),** | § | |
| **STEPHEN T. WALL,** | § § | |
| *Defendants*, | § § | |
| **DJD LAND PARTNERS, LLC, and** | § | |
| **LDG001, LLC,** | § § | |
| *Relief Defendants*. | § | |

**RECEIVER'S VERIFIED MOTION FOR APPOINTMENT OF APPRAISERS,
APPROVAL OF APPRAISALS, APPROVAL HEARING, AND
APPROVAL OF SALE OF BELLWETHER RIDGE**

Cort Thomas, as the court appointed Receiver, respectfully moves the Court as follows:

## I.    SUMMARY

In compliance with the Court's Order Appointing Receiver (the "Receivership Order") and

28 U.S.C. § 2001 (the "Statute"), the Receiver requests appointment of three appraisers, approval

of the appraisals, a hearing regarding approval of the sale of certain property, and, ultimately, the

approval of the sale discussed below.

– 1 –

## II.    FACTUAL BACKGROUND

### A.    The Receivership Order and the Property.

On October 18, 2022, the Court entered an Order Appointing Receiver (the "Receivership Order") by which Cortney C. Thomas was appointed as Receiver for certain entities (the "Receivership Entities"). The Court directed the Receiver to take possession and control of all Receivership Assets, "[t]he assets of the[] Receivership Entities," and Receivership Records. Receivership Order ¶¶ 6, 16, 17.

D4DS, LLC ("D4DS") is identified in the Receivership Order as a Receivership Entity that was controlled "directly or indirectly" by Defendant Barton and that "received investor funds, real property interests purchased with investor funds, or own[ed] property interests that were improved with or otherwise have benefitted from the use of investor funds." *Id*. ¶ 1.

On November 16, 2022, the Court entered the Order Governing the Administration of the Receivership ("Administrative Order") which also established procedures for sales of real property in conformity with the Statute.

D4DS is the owner of the Bellwether Ridge—a 150 unit apartment complex located at 841 S. Polk Street, DeSoto, Texas (the "Property").

D4DS is also the borrower on a HUD loan (the "HUD Loan") serviced by Greystone Servicing Corporation, Inc. ("Greystone"). The HUD Loan matures on June 1, 2059 and accrues interest at 3.7% annually. As of January 13, 2023, the balance on the HUD Loan was $17,823,548.47. Defendant Timothy Barton is listed as the "Section 50 party" to the HUD Loan and associated Regulatory Agreement, and signed the promissory note for the HUD Loan and all associated contract documents as the President of D4DS.

**B.      The Southern Properties Loan.**

Separately, Receivership Entity JMJ Development, LLC ("JMJ") executed a promissory note (the "Note") for $3,800,000 with Southern Properties Capital, LTD ("Southern Properties"). The debt created by the Note is referenced below as the "JMJ Debt."  Southern Properties has represented that the purpose of this loan was to provide additional capital to D4DS in connection with the construction of the Property.  As of January 17, 2023, an affiliate of Southern Properties claims that the balance of the Note is $3,797,758.95.

Southern Properties and its affiliates also contend that through a series of different agreements with Barton and various Receivership Entities, Southern Properties was granted the ability to convert its loan, as evidenced by the Note, to equity in D4DS.  More specifically, Southern Properties contends that it exercised its option to convert the JMJ Debt into equity in D4DS on or about October 3, 2022,[1] when it sent JMJ a conversion option purchase contract for the Property.

The validity of Southern Properties' claims is doubtful.  For one, to date, no evidence has been discovered demonstrating that the contract documents' 30-day notice provisions were satisfied prior to October 3 or the Receiver's appointment on October 18.  Irrespective of notice, the conversion agreement proposed by Southern Properties was never signed by Defendant Barton, and if it had been, it would have been invalid without prior HUD approval.  *See, e.g.*, Regulatory Agreement ¶¶ 11(b), 35(a), 35(b), 35(i). A true and correct copy of the Regulatory Agreement is included in the Appendix submitted with this Motion at App. 220-265.

---

[1] The timing of Southern Properties' attempt to convert its debt to equity is suspicious.  The instant case was filed by the Securities and Exchange Commission on September 23, 2022.  The Receiver was appointed on October 18, 2022.

Most importantly however, separate and apart from the validity of Southern Properties' attempted conversion, as of both October 3, 2022, and October 18, 2022, no dispute exists that Defendant Barton directly controlled D4DS, a Receivership Entity, and that HUD had not approved any conversion or transfer. Accordingly, the Property is a Receivership Asset, and the Receiver is entitled to sell it in accordance with the Court's orders.

**C.    The Proposed Sale of the Property.**

After the Receiver's appointment, he consulted multiple industry professionals and brokers regarding the potential value of the Property and three other similar projects (Parc at Windmill Farms in Forney, the Parc at Ingleside outside of Corpus Christi, and the Parc at Opelika in Alabama) that involve both HUD loans serviced by Greystone and additional loans from Southern Properties to JMJ. Due to the uncertainty surrounding the outstanding dispute with Southern Properties, the Receiver ultimately was unable to reach agreement to engage the brokers, who expressed unease in marketing the properties due to Southern Properties' ownership claims.[2]

Despite difficulties listing the Property with a broker, the Receiver communicated with dozens of potential interested purchasers. Pursuant to the Receivership Order and in accordance with the Administrative Order, the Receiver negotiated with these potential buyers. While most of the potential purchasers ultimately were unwilling to submit offers on the Property, the Receiver obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Palmetto Capital Partners, LLC—on behalf of a joint venture (Polk Street 2023, LLC) between

---

[2] If, as detailed below, Southern Properties' interest is ultimately treated as a loan position and not an ownership position, the Receiver is optimistic he will be able to engage brokers and go through a more formal sales process for the two remaining HUD properties—the Parc at Ingleside and the Parc at Opelika.

Palmetto and i3 Interests LLC (collectively, "Palmetto/i3")—on November 30, 2023 at a purchase price of $27,000,000.

During the following months, the Receiver and Palmetto/i3 engaged in protracted negotiations regarding the purchase and sale agreements for the Property and one other related property. During this time, the Receiver continued to communicate with other potential interested purchasers, none of whom provided higher offers than that received from Palmetto/i3. Finally, on February 21, 2023 the Receiver and Palmetto/i3 entered into a Purchase and Sale Agreement, whereby the Receiver agreed, subject to Court approval and certain other contingencies outlined below, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $27,000,000. Moreover, Palmetto/i3 and its equity partner, i3 Interests, have represented that they have a history of multifamily development and ownership and will not have difficulty receiving HUD's approval in assuming the HUD Loan.[3]

Largely because of Southern Properties' claims, the Receivers' agreement with Palmetto/i3 is premised upon three contingencies: (i) the HUD loan is capable of assumption by Palmetto/i3 without material modification; (ii) the Receiver has demonstrated he can convey free and clear title to the Property; and (iii) the Receiver obtains Court approval. Upon the satisfaction of these contingencies, Palmetto/i3 will have a thirty-day due diligence period. An initial earnest money payment of $500,000 will be deposited within five days of commencement of the diligence period, with additional amounts deposited thereafter at various times. Provided certain conditions are met, the earnest money becomes non-refundable, at the end of the due diligence period. Closing is to occur the latter of 60 days after due diligence or within thirty days following receipt of HUD

---

[3] Because of the low interest rate and pre-payment penalties on the HUD loan, the value to be realized by the Receivership is much higher for the purchaser to assume the existing HUD loan.

approval of Palmetto/i3's assumption of the loan.  The Receiver expects the assumption process to take four to six months.

The Receiver believes that the above-described sale is in the best interest of the Receivership and accordingly seeks permission to sell the Property pursuant to the Purchase and Sale Agreement between the Receiver and Palmetto/i3 (the "Contract")[4] and in accordance with the Administration Order and 28 U.S.C. § 2001.  Further, the Receiver requests authorization to sell and to convey title to the Property free and clear of mortgages, liens, claims and encumbrances, save and except the HUD Loan, which will be assumed by Palmetto/i3.  Southern Properties' entitlement to payment on the Note, or other claim, should not cloud title or delay the sale and may be dealt with as further discussed below.

### III.    ARGUMENT AND AUTHORITIES

**A.    Legal Standard**

Pursuant to the Statute, the Court may order the sale of real property via private sale "if it finds that the best interests of the estate will be conserved thereby."  Before the confirmation of any private sale, (1) "the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities[, and] [n]o private sale shall be confirmed at a price less than two-thirds of the appraised value;" (2) "the terms [of the sale] shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation" and a hearing held, "of which notice to all interested parties shall be given by publication or otherwise as the court directs;" and (3) "[t]he private sale shall not be confirmed if a bona fide offer is made, under

---

[4] A true and correct copy of the Contract is included in the Appendix submitted with this Motion as Exhibit A, App. 1-47.

conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale."  28 U.S.C. § 2001(b).

**B.    The Court Should Appoint The Identified Appraisers and Accept Their Appraisals.**

In accordance with this Court's Orders and the Statute, the Receiver obtained three independent appraisals of the Property. One is a certified appraisal, and two are informal broker opinions of value (collectively, the "Appraisals").[5] True and correct copies of the three appraisals are included in the Appendix as Exhibits B-1, B-2, and B-3 (APP000048-207, APP000208-219, and APP000215-219). The Receiver requests that the Court appoint the appraisers for the purpose of providing the attached Appraisals and accept these three appraisals as required by the Statute.

The three appraisals value the Property at $28,000,000,[6] $27,750,000 - $29,750,000,[7] and $28,800,000 - $31,900,000[8] resulting in an average appraised value of $29,033,333.[9] Thus, the contracted sales price, $27,000,000, exceeds two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b).  As outlined below, the Receiver contends the proposed sale of the Property both satisfies the two-thirds threshold and is in the best interest of the receivership.

---

[5] In accordance with the Court's Administration Order, the Receiver is using two informal opinions of value as appraisals due to the cost of a certified appraisal on commercial property. Dkt. 63 at 9 ("Similarly, the Receiver may in his discretion utilize informal "opinions of value" received from respected brokers in the respective industries related to the subject property, as one or more of the "appraisals" required by § 2001(b).")

[6] The appraisal was issued by Charles G. Dannis of National Valuation Consultants, Inc. and is dated as of January 26, 2023. *App.* pp. 48-207.

[7] The Broker Opinion of Value was issued by JLL on or around November 17, 2022. *App.* pp. 208-214.

[8] The Broker Opinion of Value was issued by WDIS on or around December 8, 2022. *App.* pp. 215-219.

[9] The average appraised value was calculated using the average price of each of Broker Opinion of Value $28,750,000 and $30,350,000, respectively.

**C.      The Court Should Set a Hearing on the Proposed Sale**

The Statute also requires that the Court conduct a hearing to consider the proposed sale. At least ten days before the hearing, the Statute further requires publication of the terms of the proposed sale so that bona fide interested purchasers can submit competing bids of not less than 10% more than the Contract price. Any competing offers should be accompanied by proof of funds for a cash sale, or confirmation of approved financing to allow an immediate closing on the same basis provided in the Contract.

The Receiver requests that the Court schedule a hearing on or before March 31, 2023, to consider the sale. The Receiver will publish notice of the hearing at least ten (10) days prior to the hearing as required by 28 U.S.C. § 2001(b) and provide notice of the hearing through the receivership website. Additionally, the Receiver requests that the Court require that any objections to the proposed sale be filed no later than ten days after the date of an order setting the hearing, or fourteen days before such hearing, whichever date is earlier.

The Receiver requests that any bona fide offers for purchase of the Property which exceed by ten percent (10%) the Contract sales price of $27,000,000 be served on the Receiver and filed with the Court not later than two days before the hearing scheduled to consider the sale.

**D.      After the Hearing, the Court Should Approve the Sale, or Any Bona Fide Offers Exceeding 10% of the Sales Price, as in the Best Interest of the Receivership.**

The disposition of the Property outlined above is in the best interest of the Receivership. While the Receiver anticipates that he might have received a higher purchase price if he had been able to retain a broker and list the Property, the claims asserted by Southern Properties precluded that process. Nonetheless, the Receiver found a purchaser willing to acquire the Property despite these issues and at a purchase price that exceeds the two-thirds appraised value.

As outlined above, there can be no dispute that D4DS is a Receivership Entity and that the Receiver has the authority to sell the Property pursuant to the Receivership Order, irrespective of Southern Properties' claims. The Receiver is hopeful that he will be able to reach agreement with Southern Properties to treat their loan as just that—a loan that will be paid at closing. Indeed, Southern Properties' parent's SEC filings support such a treatment, and the equities, on balance support this approach. However, even assuming no agreement will be reached, those claims need not be resolved at this juncture. Instead, Southern Properties' claims to the proceeds from the sale of the Property can be administered through the forthcoming claims process, where the adjudication of their claim to the proceeds could range from treatment as an unsecured creditor generally, to the Court's determination that Southern Properties is entitled to 100% of the sale proceeds.

Assuming that Southern Properties is ultimately treated as a lender, and if the Court approves the sale, after discounting the Greystone loan balance ($17,823,548.47), the Southern Properties loan balance ($3,797,758.95), and the fee to buyer's broker ($270,000), the sale will result in a net benefit of approximately $5.1 million to the Receivership Estate.

Finally, the Receiver further requests that in the event the Court approves the sale contemplated in this Motion but Palmetto/i3 ultimately terminates the Contract in accordance with its terms, the Court authorize the Receiver to sell the Property on substantially similar terms and at a price at or above the sales price of the Contract.

### IV.    CONCLUSION AND PRAYER

As set forth above, the Receiver requests that the Court (1) appoint the three appraisers identified above and in the Appraisals included in the Appendix; (2) approve and accept the Appraisals provided by each appraiser; (3) set this matter for hearing to consider approval of the sale on the terms provided by the Contract or as offered in any bona fide competing offer received

after the date of this Motion; and, (4) provided no timely bona fide offers exceeding the Contract price by 10% are received at least two days before the date of the hearing, enter an order authorizing the Receiver to sell the Property pursuant to the terms of the Contract (or upon substantially similar terms in the event the Contract is terminated).  The Receiver also requests such other and further relief to which he is justly entitled.

Respectfully submitted,

By: */s/ Charlene C. Koonce*
   Charlene C. Koonce
    Texas Bar No. 11672850
    charlene@brownfoxlaw.com
   Timothy B. Wells
    Texas Bar No. 24131941
    tim@brownfoxlaw.com
   BROWN FOX PLLC
   8111 Preston Road, Suite 300
   Dallas, TX  75225
   Tel. 214.327.5000
   Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## **VERIFICATION**

My name is Cortney C. Thomas.  I am over the age of 18 and am fully competent to make this verification. I declare under penalty of perjury that the facts stated above are within my personal knowledge and are true and correct.

*/s/ Cortney C. Thomas*
Cortney C. Thomas

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on February 21, 2023 and February 22, 2023, counsel for the Receiver conferred with counsel for Defendant Barton. Counsel for Defendant Barton responded but did not indicate whether they are opposed or unopposed. As such, Defendant Barton is deemed to be opposed to the relief requested herein.  On February 22, 2023, counsel also attempted to confer with the Plaintiff Securities and Exchange Commission.  As of this filing, the SEC has not responded whether they are opposed or unopposed to the relief requested herein.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.  While, as detailed above, the Receiver does not believe that non-party Southern Properties is entitled to be heard on this Motion, as a profession courtesy the Receiver will separately send a copy of this Motion and the accompanying appendix, via Certified Mail, Return Receipt Requested, regular U.S. Mail, and email, to non-party Southern Properties as follows:

Southern Properties Capital, LTD
Attn: Messrs. Mark Cooper, Bradley Muth, and Steven Shelley
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Mark.Cooper@pillarincome.com

*/s/ Charlene C. Koonce*
Charlene C. Koonce

– **11** –