IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § § | |

**RECEIVER'S VERIFIED MOTION FOR APPOINTMENT OF APPRAISERS,
APPROVAL OF APPRAISALS, APPROVAL HEARING, AND
APPROVAL OF SALE OF AMERIGOLD SUITES**

Cort Thomas, as the court-appointed Receiver, respectfully moves the Court as follows:

## I.     SUMMARY

In compliance with the Court's Order Appointing Receiver (the "Receivership Order") and

28 U.S.C. § 2001 (the "Statute"), the Receiver requests appointment of three appraisers, approval

of the appraisals, a hearing regarding approval of the sale of certain property, and, ultimately, the

approval of the sale discussed below.

– 1 –

## II.    FACTUAL BACKGROUND

**A.    The Receivership Order and the Property.**

1.    On October 18, 2022, the Court entered an Order Appointing Receiver (the "Receivership Order") by which Cortney C. Thomas was appointed as Receiver for certain entities (the "Receivership Entities").  The Court directed the Receiver to take possession and control of all Receivership Assets, "[t]he assets of the[] Receivership Entities," and Receivership Records. Receivership Order ¶¶ 6, 16, 17.

2.    Goldmark Hospitality, LLC ("Goldmark") is identified in the Receivership Order as a Receivership Entity that was controlled "directly or indirectly" by Defendant Barton and that "received investor funds, real property interests purchased with investor funds, or own[ed] property interests that were improved with or otherwise have benefitted from the use of investor funds." *Id*. ¶ 1.

3.    On November 16, 2022, the Court entered the Order Governing the Administration of the Receivership ("Administrative Order") which also established procedures for sales of real property in conformity with the Statute. [Dkt. 63].

4.    Goldmark owns the Amerigold Suites—a 70 unit extended stay hotel located at 13636 Goldmark Drive, Dallas, Texas (the "Property")

**B.    The Proposed Sale of the Property.**

5.    Within days of his appointment, the Receiver discovered that the Property was in a perilous state. The Receiver provided notice of the Receivership Order to the lender,[1] including notice of the provision that stays collection and foreclosure activities, (*see* ¶ 32), which also allowed him to pause payments on the loan encumbering the Property. The electricity was

_____

[1] The Note on the Property was conveyed from Texas Brand Bank to McCormick 101, LLC, and the current amount owed is approximately $2.5 million.

scheduled for disconnection, significant water bills were due, the insurance policy was on the verge of cancellation, and a personal injury lawsuit involving a young child who fell through a window was pending.  After negotiating payment extensions to prevent the utilities from being interrupted, the Receiver attempted to renew the previous insurance policy, but the prior insurer was unwilling to provide renewal for a one-year term.  It agreed instead to a 30-day extension which allowed the Receiver and his team time to locate a new insurance carrier. On behalf of the Receiver, an insurance broker contacted several insurance carriers before finding one who agreed to insure the Property, but at a considerably increased premium. Once sufficient funds were available, the Receiver paid the past due utility bills, and with the assistance of the property manager, has continued operating the Property as efficiently as possible.  However, even with the loan payments paused, the Property continues losing money every month.

6.      In light of these challenges, and to avoid using limited receivership assets to continue operating the Property, at a loss, the Receiver determined selling the Property was in the best interest of the Receivership Estate if a sale would generate a net return for the Estate.  After consulting multiple industry professionals and brokers regarding the Property's potential value, the Receiver engaged a broker to market the Property.

7.      The broker obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Matthew Flume ("Buyer") on January 25, 2023 at a purchase price of $5,500,000.[2]  Mr. Flume (and his affiliated entities) have extensive experience rehabilitating distressed multifamily assets.

---

[2] The Buyer is not related to, nor controlled by any of the parties to this lawsuit, and is not related to, nor controlled by the Receiver, or any of his agents, employees, or attorneys.

8.      The Receiver and the Buyer engaged in negotiations regarding a purchase and sale agreement for the Property, and on March 1, 2023, the Receiver and the Buyer entered into a Purchase and Sale Agreement (the "Contract"),[3] pursuant to which the Receiver agreed, subject to Court approval, to sell the Property to the Buyer for $5,500,000.

9.      The Contract requires deposit of an initial earnest money payment of $100,000 within three days after receiving court approval to sell the Property, with subsequent deposits required at various times.  Provided certain conditions are met, the earnest money becomes non-refundable at the end of the due diligence period.  The Contract requires closing no later than 30 days after the expiration of the due diligence period, subject to a 30-day extension based on additional events.

10.      The Receiver believes that this sale is in the best interest of the Receivership Estate and accordingly seeks permission to sell the Property pursuant to the Contract and in accordance with the Administration Order and the Statute.  Further, the Receiver requests authorization to sell and to convey title to the Property free and clear of mortgages, liens, claims and encumbrances, save and except those secured liens discussed in this Motion.

## III.      ARGUMENT AND AUTHORITIES

### A.      Legal Standard

Pursuant to the Statute, the Court may order the sale of real property by private sale "if it finds that the best interests of the estate will be conserved thereby."  Before the confirmation of any private sale, (1) "the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities[, and] [n]o private sale shall be confirmed at a price less than two-thirds of the

---

[3] A true and correct copy of the Contract is included in the Appendix submitted with this Motion as Exhibit A, App. 1-44.

appraised value;" (2) "the terms [of the sale] shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation" and a hearing held, "of which notice to all interested parties shall be given by publication or otherwise as the court directs;" and (3) "[t]he private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale."  28 U.S.C. § 2001(b).

**B.      The Court Should Appoint the Identified Appraisers and Accept Their Appraisals.**

In accordance with this Court's Orders and the Statute, the Receiver obtained three independent appraisals of the Property. Two are informal broker opinions of value, and one is a certified appraisal (collectively, the "Appraisals").[4]  True and correct copies of the three Appraisals are included in the Appendix as Exhibits B-1, B-2, and B-3 (APP000045-189, APP000190-191, and APP000192-201).  The Receiver requests that the Court appoint the appraisers for the purpose of providing the attached Appraisals and accept these three Appraisals as required by the Statute.

The three Appraisals value the Property at $4,400,000,[5] $3,500,000,[6] and $4,900,000 - $5,500,000,[7] resulting in an average appraised value of $4,366,667.[8] Thus, the contracted sales price, $5,500,000, not only greatly exceeds two-thirds of the average appraised value of the Property ($2.9 million) as required, but also exceeds the certified appraised value by over $1

---

[4] In accordance with the Court's Administration Order, the Receiver is using two informal opinions of value as appraisals due to the cost of a certified appraisal on commercial property. Dkt. 63 at 9 ("Similarly, the Receiver may in his discretion utilize informal "opinions of value" received from respected brokers in the respective industries related to the subject property, as one or more of the "appraisals" required by § 2001(b).")

[5] The appraisal was issued by Charles G. Dannis of National Valuation Consultants, Inc. and is dated as of January 19, 2023.  *App.* pp. 45-189.

[6] The Broker Opinion of Value was issued by JLL on or around November 9, 2022.  *App.* pp. 190-191.

[7] The Broker Opinion of Value was issued by WDIS and is dated as of November 30, 2022.  *App.* pp. 192-201.

[8] The averaged appraised value was calculated using the average of the WDIS Broker Opinion of Value, $5,200,00.

million.  The Receiver contends the proposed sale satisfies the two-thirds threshold and is in the best interest of the Receivership Estate.

**C.    The Court Should Set a Hearing on the Proposed Sale**

The Statute also requires that the Court conduct a hearing to consider the proposed sale. At least ten days before the hearing, the Statute further requires publication of the terms of the proposed sale so that bona fide interested purchasers can submit competing bids of not less than 10% more than the Contract price.  Any competing offers should be accompanied by proof of funds for a cash sale, or confirmation of approved financing to allow an immediate closing on the same basis provided in the Contract.

The Receiver requests that the Court schedule a hearing on or before March 31, 2023, to consider the sale.  The Receiver will publish notice of the hearing at least ten (10) days prior to the hearing as required by the Statute and provide notice of the hearing through the receivership website.  Additionally, the Receiver requests that the Court require that any objections to the proposed sale be filed no later than ten days after the date of an order setting the hearing, or fourteen days before such hearing, whichever date is earlier.

The Receiver requests that any bona fide offers for purchase of the Property which exceed by ten percent (10%) the Contract sales price of $5,500,000 be served on the Receiver and filed with the Court not later than two days before the hearing scheduled to consider the sale.

**D.    After the Hearing, the Court Should Approve the Sale, or Any Bona Fide Offers Exceeding 10% of the Sales Price, as in the Best Interest of the Receivership.**

The disposition of the Property outlined above is in the best interest of the Receivership Estate.  As discussed previously, numerous issues plagued the Property before the Receiver was appointed, and several issues continue.  Based on a market survey conducted as part of the sales process, the current occupancy rate lags behind similarly situated properties.  The Property needs

substantial renovations and requires monthly repairs but does not generate sufficient income to make those repairs. Most notably, in its current state, the Property is losing money. Monthly premiums for insurance exceed $14,000. And while payments on the mortgage are paused, interest at 6.5% annually continues to accrue. All of these factors demonstrate that selling the Property now, rather than continuing to spend Receivership resources on management and maintenance will maximize the value of the Property, as well as preserving the value of the entire Estate. Moreover, as discussed in the Receiver's Second Status Report [Dkt. 139], other property sales previously approved by the Court have not closed. While the Receiver is optimistic these sales eventually will close, additional funds are needed for continued administration of the Receivership Estate, particularly to prepare a forensic accounting.[9]

If the Court approves the sale, after discounting the loan balance (approximately $2,543,820 as of January 30, 2023), liens on the Property (totaling approximately $6,298.59), and the fee to seller's broker ($192,500), the sale will result in a net benefit of approximately $2.7 million to the Receivership Estate.[10]

Finally, the Receiver further requests that in the event the Court approves the sale contemplated in this Motion but the Buyer ultimately terminates the Contract in accordance with its terms, the Court authorize the Receiver to sell the Property on substantially similar terms and at a price at or above the sales price of the Contract.

---

[9] As detailed in the Receiver's Motion to Compel [Dkt. 133] and supporting Reply [Dkt. 166], the Receiver has been unable to secure access to the Receivership Entities' electronic accounting records. While the Receiver is still hopeful such access will be granted eventually, because of the likely October 2023 deadline governing certain fraudulent transfer claims, the accountants' work must start now, using the far more cumbersome and limited bank records that are available.

[10] Although not reflected in the title commitment or an independent review of the Dallas County property records, the Receiver has discovered a second lien for several hundred thousand dollars may encumber the Property. The Receiver will verify the status of the purported loan before closing. Even if the loan exists, the net to the Receivership Estate will likely be more than $2 million.

## IV.    CONCLUSION AND PRAYER

As set forth above, the Receiver requests that the Court (1) appoint the three appraisers identified above and in the Appraisals included in the Appendix; (2) approve and accept the Appraisals provided by each appraiser; (3) set this matter for hearing to consider approval of the sale on the terms provided by the Contract or as offered in any bona fide competing offer received after the date of this Motion; and, (4) provided no timely bona fide offers exceeding the Contract price by 10% are received at least two days before the date of the hearing, enter an order authorizing the Receiver to sell the Property pursuant to the terms of the Contract (or upon substantially similar terms in the event the Contract is terminated).  The Receiver also requests such other and further relief to which he is justly entitled.

Respectfully submitted,

**RECEIVER**

By: */s/ Charlene C. Koonce*
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## VERIFICATION

My name is Cortney C. Thomas.  I am over the age of 18 and am fully competent to make this verification. I declare under penalty of perjury that the facts stated above are within my personal knowledge and are true and correct.

 */s/ Cortney C. Thomas*
Cortney C. Thomas

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on March 1, 2022, the Receiver conferred with counsel for all parties.  The SEC is unopposed.  No other counsel has responded.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

*/s/ Charlene C. Koonce*
Charlene C. Koonce