**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff,* | § § § | |
| **v.** | § § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON,** | § § | |
| **CARNEGIE DEVELOPMENT, LLC,** | § | |
| **WALL007, LLC,** | § | |
| **WALL009, LLC,** | § | |
| **WALL010, LLC,** | § | |
| **WALL011, LLC,** | § | |
| **WALL012, LLC,** | § | |
| **WALL016, LLC,** | § | |
| **WALL017, LLC,** | § | |
| **WALL018, LLC,** | § | |
| **WALL019, LLC,** | § | |
| **HAOQIANG FU (A/K/A MICHAEL FU),** | § | |
| **STEPHEN T. WALL,** | § § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC, and** | § | |
| **LDG001, LLC,** | § § | |
| *Relief Defendants.* | § | |

**APPENDIX IN SUPPORT OF RECEIVER'S MOTION FOR APPOINTMENT OF
APPRAISERS, APPROVAL OF APPRAISALS AND A HEARING
<u>REGARDING APPROVAL OF SALE OF AMERIGOLD SUITES</u>**

– 2 –

Respectfully submitted,

**RECEIVER**

By: /s/ Charlene C. Koonce
    Cortney C. Thomas
     Texas Bar No. 24075153
     cort@brownfoxlaw.com
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

/s/ Charlene C. Koonce
Charlene C. Koonce

–**3**–

| EXHIBIT | DESCRIPTION | APP PAGES |
|:---:|:---|:---|
| A | Purchase and Sale Agreement between Cort Thomas, as Receiver for Goldmark Hospitality, LLC and Matthew Flume, dated March 1, 2023 | APP000001-000044 |
| B-1 | National Valuation Consultants Appraisal Report for Amerigold Suites | APP000045-000189 |
| B-2 | JLL Broker Opinion of Value for Amerigold Suites | APP000190-000191 |
| B-3 | Walker & Dunlop Valuation for Amerigold Suites | APP000192-000201 |

# EXHIBIT A

APP000001

# PURCHASE AND SALE AGREEMENT

between

## CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC
a Texas limited liability company
("Receiver")

and

## MATTHEW FLUME
and/or his permitted assigns
("Buyer")

DATED: March 14, 2023

For property generally located at:

13636 Goldmark Drive, Dallas, Texas 75240
(Amerigold Suites)

APP000002

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made as of March 1, 2023 (the "**Effective Date**"), by and between Matthew Flume, an individual Texas resident and/or his permitted assigns ("**Buyer**") and Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity (the "**Receiver**") for, and on behalf of, Goldmark Hospitality LLC, a Texas limited liability company, ("**Goldmark**"). Buyer and Receiver are collectively referred to as the "**Parties**" and each individually as a "**Party**."

WHEREAS, Goldmark is the owner of the Property (defined below) and pursuant to the Order Appointing Receiver, dated October 18, 2022 (the "**Receivership Order**"), entered by the United States District Court for the Northern District of Texas, Dallas Division (the "**Court**") in Case No. 3:22-cv-2118-X (the "**Receivership Action**"), the Court appointed and authorized Receiver to, among other things, (a) take possession, custody and control of all of Goldmark's business operations, assets, and property, and (b) market and sell Goldmark's business operations, assets, and property, all subject to the conditions contained in the Receivership Order;

WHEREAS, Buyer desires to purchase the Property, and Receiver desires to sell the Property to Buyer for and on behalf of Goldmark, in each case for the consideration and upon the terms and subject to the conditions set forth herein; and

WHEREAS, Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement, are expressly subject to the approval of the Court and will be consummated only pursuant to orders to be entered in the Receivership Action.

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### Article I
### PROPERTY/PURCHASE PRICE

1.1.    *Parties*. Below is a summary of the Parties to, or involved in, this Agreement:

(a)    Buyer and Notice Address:
Matthew Flume                          With a copy to:
8303 Chadbourne Road                   White & Starling, PLLC
Dallas, Texas 75205                    Attn: Lauren Osterman
Telephone: 214-675-2454                700 N. Pearl Street #1610
Email: matthew@worthst.com and        Dallas, TX 75201
cole@neuma.capital                     Telephone: 214-215-1119
                                       Email: losterman@whiteandstarling.com

(b)    Receiver and Notice Address:
c/o Cort Thomas, as receiver of        With a copy to: Brown Fox PLLC
Goldmark Hospitality, LLC              6303 Cowboys Way, Suite 450
8111 Preston Road, Suite 300           Frisco, Texas 75034
Dallas, Texas 75225                    Attn: Adam Fox
cort@brownfoxlaw.com                   adam@brownfoxlaw.com

(c)    Title Company:

31994070v.2

APP000003

Chicago Title of Texas
14801 Quorum Drive, Suite 110
Dallas, Texas 75254
Attn: Todd Phillips
Telephone: (972-419-7153
Email: todd.phillips@tdptitle.com

(d)    Escrow Agent:
Chicago Title of Texas
14801 Quorum Drive, Suite 110
Dallas, Texas 75254
Attn: Todd Phillips
Telephone: (972-419-7153
Email: todd.phillips@tdptitle.com

1.2.    *Property*. Subject to the terms of this Agreement, Receiver agrees to sell to Buyer, and Buyer agrees to purchase from Receiver, the following property (collectively the "**Property**"):

(a)    All of Goldmark's right, title, and interest, in and to the real property described in **Exhibit A** (the "**Land**"), together with all of Goldmark's right title and interest in: (i) the buildings and improvements thereon (the "**Improvements**"); (ii) all appurtenances of the Land, including easements and/or rights-of-way relating thereto; and (iii) any land lying in the bed of any street, road or access way, opened or proposed, on the Land; (collectively, with the Land, the "**Real Property**"). The Real Property shall be conveyed subject to the matters which are, or are deemed to be, Exceptions (defined below).

(b)    All of Goldmark's right, title, and interest, in and to all fixtures, furniture, equipment, inventory, and other tangible personal property, if any, located on the Real Property and used in connection with the operation of same, in each case to the extent assignable, and without warranty, but expressly excluding any items of personal property owned by each tenant, any managing agent, or any other party (the "**Tangible Personal Property**").

(c)    All of Goldmark's rights or interest, as landlord, in the "**Leases**," being defined as all those certain leases regarding the Improvements, and all amendments thereto, and including all leases which may be made by Receiver after the Effective Date and before Closing as permitted by this Agreement; in each case of the foregoing, to the extent assignable and without warranty.

(d)    All of Goldmark's right, title, and interest, if any, in and to all of the following items, in each case to the extent assignable or transferrable, and without warranty (the "**Intangible Personal Property**"): (i) licenses and permits relating to the operation of the Real Property; (ii) the right to use the name "Amerigold Suites" in connection with the Real Property; and (iii) if still in effect, each guaranty and warranty from any general contractor, subcontractor, or manufacturer in connection with the construction or maintenance of the Real Property or associated with the Tangible Personal Property, provided, however, if there is any cost or fee to transfer any such guaranty and warranty to Buyer, Buyer must pay the same as a condition precedent to any such assignment by Receiver. The Tangible Personal Property and the Intangible Personal Property are collectively referred to herein as the "**Personal Property**."

1.3.    *Purchase Price*. The purchase price for the Property will be Five Million, Five Hundred Thousand and no/100 Dollars ($5,500,000.00) (the "**Purchase Price**"), which shall be due and payable by Buyer in

2

APP000004

full at Closing by wire transfer of immediately available federal funds to a bank account designated by Escrow Agent in writing to Buyer prior to Closing.

1.4.    ***Earnest Money.***

(a)    Deposit of Earnest Money. Within three (3) Business Days following receipt of Court Approval, Buyer shall deposit one hundred thousand and no/100 dollars ($100,000.00) (the "**Initial Earnest Money**") with the Escrow Agent in immediately available federal funds, it being understood that twenty-five thousand and no/100 dollars ($25,000.00) of the Initial Earnest Money shall be non-refundable after deposit and the remainder becomes non-refundable following expiration of the Due Diligence Period, in each case subject to the terms and conditions contained herein. Deposits of additional earnest money shall be made upon the occurrence of each of the following events, in the following amounts, and within the timelines specified (each a deposit of "**Additional Earnest Money**" and all actual deposits of Additional Earnest Money together with the Initial Earnest Money, the "**Earnest Money**"):

(i)    Fifty thousand and no/100 dollars ($50,000.00) is to be deposited with the Escrow Agent within three (3) business days following the expiration of the Due Diligence Period;

(ii)    Twenty-five thousand and no/100 dollars ($25,000.00) is to be deposited with the Escrow Agent within fifteen days prior to the Closing Date if Buyer desires to extend the initial Closing Date for an additional fifteen-day period ("**First Closing Extension**");

(iii)    Twenty-five thousand and no/100 dollars ($25,000.00) is to be deposited with the Escrow Agent within fifteen days prior to the expiration of the First Closing Extension if Buyer desires to extend Closing Date for an additional fifteen-day period beyond the expiration of the First Closing Extension ("**Second Closing Extension**" and together with the First Closing Extension, the "**Closing Extensions**");

(iv)    If Buyer fails to timely deliver any portion of the Earnest Money and such failure is not remedied within three (3) business days following Buyer's receipt of written notice thereof from Receiver to Buyer, Receiver may declare this Agreement to be terminated, in which case this Agreement shall be terminated and of no force and effect (except for sections hereof described to survive such termination) and the refundable portion of the Earnest Money, if any, shall be refunded to Buyer and the non-refundable portion shall be retained by Receiver. The Earnest Money shall be applicable to the Purchase Price at Closing, unless otherwise forfeited within the terms herein.

(b)    Independent Consideration. The Escrow Agent shall hold and disburse the Earnest Money (including any portion thereof) in accordance with the terms and conditions of this Agreement. In connection with any termination made in accordance with this Agreement, One Hundred and 00/100 Dollars ($100.00) of the Earnest Money shall be paid to Receiver as independent consideration for Buyer's right to purchase the Property and for Receiver's execution, delivery and performance of this Agreement (the "**Independent Consideration**"). The Independent Consideration is in addition to and independent of any other consideration or payment provided for in this Agreement, is non-refundable and shall be retained by Receiver notwithstanding any other provision of this Agreement. Receiver acknowledges and agrees that the Independent Consideration is sufficient for Receiver's covenants and obligations under this Agreement. The terms and provisions set forth in this Section shall survive the termination of this Agreement. Independent Consideration is applicable toward the Purchase Price at Closing.

3

APP000005

(c)    Disposition of Earnest Money. Except as otherwise provided to the contrary in **Sections 4.5** (i.e., damage/condemnation), **5.2(b)** (i.e., inability to satisfy Buyer's closing conditions), and **8.2** (i.e., a Receiver default) providing for the refundability of the Earnest Money upon certain events following the Due Diligence Period, the refundable portion of the Earnest Money shall be fully refundable until the expiration of the Due Diligence Period, at which point the Earnest Money shall become non-refundable to Buyer. In each of the foregoing cases, once the Earnest Money becomes non-refundable to Buyer, each such deposit shall be considered consideration for Buyer's exclusive right to inspect and purchase the Property under this Agreement. The Earnest Money shall be held and disbursed by the Escrow Agent pursuant to **Article IX** of this Agreement.

(d)    Buyer Acknowledgement. Buyer hereby acknowledges and agrees that the Earnest Money held by Escrow Agent does not and shall not constitute property of the estate of Buyer within the meaning of Section 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), or substantially similar provisions of state law, and Buyer's interest in such Earnest Money is limited to the right to have the Earnest Money returned if and when the conditions for the return of the Earnest Money to Buyer are satisfied as set forth herein. Buyer hereby acknowledges and agrees that: (i) the proper giving of notice by Receiver to release the Earnest Money as provided hereunder; and/or (ii) the proper release of the Earnest Money to Receiver as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over any case in which Buyer or any affiliate of Buyer is a debtor. Buyer hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, Sections 105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Receiver.

1.5.    ***Court Approval and Due Diligence Period***:

(a)    Court Approval. This Agreement shall not be deemed an offer or binding upon Receiver or Buyer until this Agreement is fully executed and delivered by Receiver and Buyer and the Court has entered an order in the Receivership Action authorizing Receiver to sell the Property on the terms and conditions herein ("**Court Approval**"). For avoidance of doubt, notwithstanding the receipt of Court Approval, Closing shall remain subject to the satisfaction of all conditions to Closing set forth elsewhere in this Agreement, including as set forth in **Section 5.9**. If the Court Approval does not occur by or on the date that is sixty (60) days following the Effective Date of this Agreement, this Agreement may be terminated by either Party and, in the event of such termination, the Earnest Money shall be returned to the Buyer less the Independent Consideration.

(b)    Due Diligence Period. The "**Due Diligence Period**" shall be the period commencing on the Effective Date and ending on the thirtieth (30th) day after receipt of Court Approval.

### Article II
#### INSPECTIONS

2.1.    ***Property Information***. Not later than two (2) days after the Effective Date, Receiver will use commercially reasonable efforts to make available to Buyer, to the extent in Receiver's possession, to the extent Receiver is able to locate such documents following a reasonable search, or to the extent readily obtainable or ascertainable from the Property's property management company, copies of, or Receiver's permission to access with the right to copy, the following information with respect to the Property (collectively the "**Property Information**"):

4

APP000006

(a)    Unaudited financial statements for the last two (2) calendar years of the Property's operation, along with a year-to-date financial statement.

(b)    All third-party due diligence including appraisals, PCA and Phase 1.

(c)    Most recent capital and operating budget.

(d)    Copies of all leases now in effect and all related correspondence and a copy of the standard lease.

(e)    Copies of all LIHTC and LURA documentation, compliance, and correspondence (If Applicable)

(f)    Current rent roll, delinquency report and general ledger for the past and current month., and billing register. All service agreements, easements, CCRs (or similar), permits, licenses, contracts, or other agreements with respect to the ownership, operation and maintenance of the Property, and all maintenance records, to the extent reasonably available.

(g)    Copies of all reports, inspections and correspondence with the City of Dallas including but not limited to: Crime, Code and Fire Compliance department.

(h)    All environmental studies.

(i)    All fire inspection reports.

(j)    A schedule of Personal Property.

(k)    As-built plans, if available

(l)    Any zoning ordinances, variances or special approvals relating to the site.

(m)    Most recent title policy.

(n)    Most recent survey along with any soil tests, topographical maps, etc.

(o)    A current list of security deposits and accounts receivable schedule.

(p)    Tax bills, value renditions and assessment statements for the last two (2) years.

(q)    Utility invoices, including electric, gas and water for the last two (2) years.

(r)    Historical capital improvements during ownership period.

(s)    List of personnel and wages and benefit information, if applicable.

(t)    All Certificates of Occupancy, if available.

(u)    Any guaranties and warranties.

(v)    Existing insurance coverage and list of claims. Claim Loss Runs for the last five years.

(w)    Copies of all Assumed Service Contracts (below defined).

APP000007

2.2. *Confidentiality*. The Property Information and all other information (other than matters of public record or matters generally known to the public) furnished to, or obtained through inspection of the Property by Buyer, its affiliates, lenders, employees, attorneys, accountants and other professionals or agents ("**Buyer's Representatives**") relating to the Property, will be treated by Buyer and Buyer's Representatives as confidential, and will not be disclosed to anyone other than on a need-to-know basis who agree to maintain the confidentiality of such information pursuant to this **Section 2.2**, and all originals and copies will be returned to Receiver by Buyer if the Closing does not occur, or will be otherwise destroyed and confirmed by Buyer as destroyed in writing. Buyer at all times agrees to remain responsible for itself and the Buyer's Representatives, as well as any third parties that access Property Information as a result of Buyer's disclosure. Without limiting the foregoing, Buyer acknowledges that the Leases and the Rent Roll may contain personal information relating to the respective tenants thereto (including, names, postal addresses, phone numbers, etc.), and Buyer agrees that all such personal information shall be treated as confidential information by Buyer. Buyer further agrees to implement and maintain adequate and appropriate administrative, physical, and technical safeguards to ensure the confidentiality and security of such confidential information and to protect against any threats, hazards and unauthorized access or use of such confidential information. Buyer agrees to promptly notify Receiver of any requested disclosure or known or suspected unauthorized access to or loss, breach, damage, or theft of any confidential information and, in such event, take such additional measures to mitigate the loss, breach, damage, or theft and indemnify, defend, and hold harmless Receiver in such event. The confidentiality provisions of this **Section 2.2** shall not apply to any disclosures made by Buyer as required by law, by court order, or in connection with any subpoena served upon Buyer; provided Buyer shall provide Receiver with written notice before making any such disclosure to enable Receiver to seek an appropriate protective order. The provisions of this paragraph shall survive the termination of this Agreement.

2.3. *Inspections in General*. During the Due Diligence Period, Buyer and Buyer's Representatives shall have the right to enter upon the Property for the purpose of making non-invasive inspections at Buyer's sole risk, cost and expense. Further, Buyer shall have the right to inspect all units at the Property, whether vacant or occupied, during the Due Diligence Period and Receiver shall (or shall cause the property manager to) facilitate such inspections. All of such entries upon the Property shall be at reasonable times during normal business hours with prior written notice to Receiver or Receiver's agent (which notice shall describe the scope of the inspections Buyer intends to conduct during Buyer's inspection), and Receiver or Receiver's agent shall have the right, but not the obligation, to accompany Buyer during any activities performed by Buyer on the Property, but the unavailability of Receiver's representatives shall not be a basis for denying Buyer's representatives access to the Property. Buyer shall not contact any tenant of the Property, any employee of Receiver or the property management company, any governmental agency or instrumentality (except (a) to obtain a zoning compliance letter or in connection with Buyer's zoning report, (b) to obtain information on code compliance, and (c) to obtain information on criminal and/or nuisance matters), or any other third person regarding the Property without the prior written consent of Receiver. Following each entry by Buyer or Buyer's Representatives with respect to inspections and/or tests on the Property made by Buyer or Buyer's Representatives, Buyer shall, to the extent of any damage caused by Buyer's inspections or tests, restore the Property in the same condition that existed immediately prior to any such inspections and/or tests to Receiver's reasonable satisfaction. Such obligation to restore shall survive the termination of this Agreement.

2.4. *Environmental Inspections*. The inspections under **Section 2.3** may include a non-invasive Phase I environmental inspection of the Property, but no Phase II environmental inspection or other invasive inspection or sampling of soils, water, air or other materials (other than standard radon testing), including without limitation construction materials, for analytical testing, either as part of the Phase I inspection or any other inspection, shall be performed without the prior written consent of Receiver not to be unreasonably withheld, conditioned or delayed; and, if consented to by Receiver, the proposed scope of

6

APP000008

work and the party who will perform the work shall be subject to Receiver's review and approval. Buyer agrees, for itself and for Buyer's Representatives, not to engage in any activities that would violate any permits, licenses, entitlements, environmental, wetlands or other regulations pertaining to the Property, or any terms or provisions set forth in any Exception documents.

2.5.    ***Termination Prior to Expiration of Due Diligence Period.*** If prior to the expiration of the Due Diligence Period Buyer determines, in its sole discretion, that the Property is unacceptable for Buyer's purposes, Buyer shall have the right to terminate this Agreement by giving to Receiver written notice of termination before the expiration of the Due Diligence Period, in which case the Earnest Money shall be refunded to Buyer pursuant to the terms of this Agreement, and neither Receiver nor Buyer shall have any further rights or obligations under this Agreement, other than those that expressly survive a termination of this Agreement.  If Buyer does not give written notice of termination prior to the expiration of the Due Diligence Period, this Agreement shall continue in full force and effect subject to the provisions of this Agreement.

2.6.    ***Receiver Expense.*** At no third-party expense to Receiver, Receiver shall reasonably cooperate with Buyer in its due diligence investigations conducted in accordance with this Article II.

2.7.    ***Indemnification.*** Buyer agrees to indemnify, defend, and hold Receiver and its disclosed or undisclosed, agents, affiliates, representatives, consultants, accountants, contractors, and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Receiver, the "**Receiver Parties**") harmless from and against any and all losses, costs, damages, liens, claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) (each a "**Claim**") incurred by any Receiver Parties arising from or by reason of Buyer's and/or Buyer's Representatives' access to, or inspection of, the Property, or any tests, inspections, or other due diligence conducted by or on behalf of Buyer; provided, however, that Buyer shall not hereunder be obligated to indemnify, defend or hold harmless for any Claims resulting from the mere discovery of matters that are not exacerbated by any Buyer Representatives or Claims are caused by the gross negligence or willful misconduct of any of the Receiver Parties. The provisions of this **Section 2.7** shall survive the Closing or any termination of this Agreement.

### Article III
### TITLE AND SURVEY REVIEW

3.1.    ***Delivery of Title Commitment.*** Within ten (10) days following the commencement of the Due Diligence Period, Buyer shall cause to be delivered to Buyer and Receiver a preliminary report or title commitment issued by the Title Company on the form promulgated by the Texas Department of Insurance (the "**Title Commitment**") covering the Real Property, together with true, complete, and legible copies of all applicable exception documents referenced in the Title Commitment. The Title Commitment shall be issued by the Title Company or other underwriter acceptable to the Title Company.

3.2. ***Title Review and Cure.***

(a)    On or before the date that is ten (10) Business Days after the delivery to Buyer of the Title Commitment and receipt by Buyer of a new Survey ("**Survey**") of the Property (the "**Objection Deadline**"), Buyer shall give written notice (the "**Objection Notice**") to Receiver of any matter set forth in the Title Commitment (and, if obtained, the Existing Survey) to which Buyer objects (the "**Objections**"), which shall specifically exclude any Exceptions or Claims created due to the acts or omissions of Buyer or Buyer's Representatives. Notwithstanding anything to the contrary herein, in no event shall the Objection Deadline be later than the end of the Due Diligence Period.

APP000009

(b)  Any item contained in the Title Commitment, or any matter shown on the Survey (if any), which Receiver does not elect in writing to cure prior to the Objection Deadline, shall be deemed individually an "**Exception**", and collectively, the "**Exceptions**" and shall include any and all other Exceptions as described in this Agreement hereafter created at or prior to Closing. In the event Buyer notifies Receiver of an Objection, Receiver shall have the right, but not the obligation, to cure such Objection.

(c)  If Buyer fails to tender an Objection Notice on or before the Objection Deadline, Buyer shall be deemed to have approved and waived any objections to any matters covered by the Title Commitment and the Survey. On or before five (5) Business Days after receipt of the Objections (the "**Response Deadline**") in writing, Receiver may give Buyer notice (the "**Response Notice**") of those Objections that Receiver is willing to cure, if any. Receiver further agrees to use commercially reasonable efforts to remove (or use commercially reasonable efforts to cause the Title Company to affirmatively insure over) any exceptions or encumbrances to title which are created by Receiver after the Effective Date without Buyer's consent.

(d)  If Receiver fails to deliver a Response Notice by the Response Deadline, Receiver shall be deemed to have elected not to cure or otherwise resolve any matter set forth in the Objection Notice. Receiver shall have no obligation to take any steps or bring any action or proceeding or otherwise to incur any effort or expense whatsoever to eliminate or modify any Exceptions or any Objections thereto, except with respect to any items that Receiver agrees in writing to cure. If Receiver elects to cure any of the foregoing items and this Agreement is not otherwise terminated as provided herein, Receiver shall have until Closing to remove, satisfy, or cure the same.

(e)  If Buyer is dissatisfied with the Response Notice or the lack of Response Notice or Receiver's failure to cure any Exception or Objection, then, in each case, Buyer may, as its exclusive remedies, accept a conveyance of the Property subject to the Exceptions, specifically including any matter objected to by Buyer which Receiver is unwilling or unable to cure, or exercise its right to terminate this Agreement on or before five (5) Business Days after receipt of the Response Notice or, if no Response Notice is given prior to the Response Deadline, on or before five (5) Business Days after the Response Deadline. If Buyer provides such notice, this Agreement shall terminate and be of no further force and effect, except for the matters that expressly survive the termination of this Agreement, the Escrow Agent shall refund the Earnest Money to Buyer pursuant to the terms of this Agreement, and Buyer shall be deemed to have waived and released Receiver and Property from any and all Claims. If Buyer fails to timely exercise such right, Buyer shall be deemed to accept the Title Commitment and Survey (and, if obtained, a new survey) with resolution, if any, of the Objections set forth in the Response Notice (or if no Response Notice is tendered, without any resolution of the Objections) and without any reduction or abatement of the Purchase Price.

(f)  The term "**Permitted Exceptions**" shall mean: the Exceptions (exceptions that are not part of the promulgated title insurance form) in the Title Commitment that the Title Company has not agreed to insure over or remove from the Title Commitment prior to Closing and that Receiver is not required to, or has not agreed to, remove as provided above; all items shown on the Existing Survey, or if obtained, a new survey. Permitted Exceptions shall also specifically include: (i) any and all general real estate taxes and assessments, special taxes and assessments, franchise taxes, levies and personal property taxes imposed by any governmental or quasi-governmental authority and any assessments, dues or charges by private covenant constituting a lien or charge on the Property which are, as of the Closing, not delinquent; (ii) supplemental taxes, if any, hereinafter assessed by any governmental authority against the Property to the extent due to a change in ownership and/or use of the Property as a result of this sale; (iii) any other access,

8

APP000010

telecommunication, cabling and/or utility agreements, memorandums of agreements, licenses or rights-of-way either filed of public record against title to or otherwise effects, the Property, whether prior to or after the Effective Date; (iv) any license, contract, instrument or other agreement entered into between Receiver and/or Receiver's affiliate and any municipality or administrative body, governmental or quasi-governmental authority, or utility provider (on the other hand), which is either filed of public record against title to or otherwise effects, the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, whether prior to or after the Effective Date; (v) the permits, approvals and conditions which have been or must be obtained for the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, including without limitation, and any document, instrument and/or agreement related to same (including, without limitation, any replat of the Property or any portion thereof), whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date.

3.3.    *Conveyance of Title at Closing.* At Closing, Receiver shall convey fee simple title to the Property, on behalf of Goldmark, to Buyer, subject to the Permitted Exceptions. Subject to Receiver's Knowledge (defined herein) and the truth of any matter, Receiver shall execute Title Company's customary affidavit of debt, liens and parties in possession at Closing.

**Article IV**
**OPERATIONS AND RISK OF LOSS**

4.1.    *Ongoing Operations.* During the pendency of this Agreement, Receiver shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause the property manager to, carry on its business and activities relating to the Property, including leasing of the Property and payment of all indebtedness secured by the Property, in substantially the same manner as it did before the Effective Date; provided, however, that Receiver shall (and shall cause the property manager to) not, following Court Approval, either (a) enter into any new tenant leases with tenants not currently residing at the Property or (b) extend any existing tenant Leases beyond a month-to-month term (i.e., terminable by the landlord on 30 days' notice), in each case Receiver understands Buyer intends to upgrade units after the Closing.

4.2.    *Performance under Leases and Service Contracts.* During the pendency of this Agreement, Receiver shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause the property manager to, perform its material obligations under the Leases and Service Contracts relating to the Property in substantially the same manner as it did before the Effective Date.

4.3.    *New Contracts.* During the pendency of this Agreement, Receiver shall use commercially reasonable efforts to cause the property manager to not enter into any contract that will be an obligation affecting the Property subsequent to the Closing, except (a) month-to-month Lease extensions and (b) freely assignable contracts entered into in the ordinary course of business, without the prior consent of Buyer, which shall not be unreasonably withheld, conditioned, or delayed.

4.4.    *Service Contracts.* Buyer agrees to assume at Closing the Service Contracts serving the Property (the "**Assumed Service Contracts**"), to the extent assignable and/or transferrable and to the extent there are, at Closing, no unresolved defaults thereunder. Notwithstanding the foregoing, Buyer shall not have the right to assume any Service Contract that is pursuant to a master contract with Receiver's property manager unless Buyer retains the current property manager and obtains such property manager's written approval. Buyer shall pay any transfer or assignment charges due in connection with its assumption of any Assumed Service Contracts.

9

**APP000011**

4.5.    ***Damage or Condemnation***. Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced before the Closing, and risk of loss to the Property due to fire, flood, or any other cause before the Closing, shall remain with Receiver. If before the Closing the Property or any portion thereof shall be materially damaged, or if the Property or any material portion thereof shall be subjected to a bona fide threat of condemnation or shall become the subject of any proceedings, judicial, administrative or otherwise, with respect to the taking by eminent domain or condemnation, then Buyer may terminate this Agreement by providing proof thereof and written notice to Receiver given within five (5) days after Buyer learns of the damage or taking, in which event the Earnest Money, less the Independent Consideration, shall be returned to Buyer. If the Closing Date is within the aforesaid five (5) day period, then Closing shall be extended to the next Business Day following the end of said five (5) day period. If no such election is made, and in any event if the damage is not material, this Agreement shall remain in full force and effect and the purchase contemplated hereby, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, and upon the Closing of this purchase, Receiver shall assign, transfer, and set over to Buyer all of the right, title, and interest of Receiver in and to any awards that have been or that may thereafter be made for such taking, and Receiver shall assign, transfer and set over to Buyer any insurance proceeds that may thereafter be made for such damage or destruction giving Buyer a credit at Closing for any deductible under such policies. For the purposes of this paragraph, the phrases "**material damage**" and "**materially damaged**" means damage reasonably estimated by Receiver to have a cost exceeding ten percent (10%) of the Purchase Price to repair.

**Article V**
**CLOSING**

5.1.    ***Closing***. The closing, funding, and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall, subject to the Closing Extensions, occur on a mutually agreed date no later than thirty (30) days following the expiration of the Due Diligence Period (the "**Closing Date**"), at the offices of the Title Company. Notwithstanding anything to the contrary herein, both Parties agree each deposit of Additional Earnest Money for Closing Extensions shall be non-refundable to Buyer except as otherwise provided to the contrary in **Sections 4.5** (i.e., casualty/condemnation), **5.2(b)** (i.e., inability to satisfy Buyer's closing conditions), **and 8.2** (i.e., a Receiver default). The Closing shall occur with all deliveries required hereunder being made to Escrow Agent on or before the Closing Date, in accordance with the escrow instructions consistent with the terms and conditions of this Agreement given by or on behalf of Receiver and Buyer, respectively; whereby escrow arrangements mutually acceptable to Receiver and Buyer shall allow Receiver, Buyer and their respective attorneys to consummate the Closing without being physically present and to exchange closing documents through such escrow, via electronic means, and/or .pdf (except with regard to recordable documents or other instruments reasonably requested by the Parties to be provided in original "wet ink" form), which shall be physically delivered to the Escrow Agent on or before the Closing Date.

5.2.    ***Conditions to Closing***.

(a)    Receiver's Closing Conditions. The obligation of Receiver to consummate the transactions contemplated hereby is contingent upon the following, any or all of which may be waived by Receiver in its sole discretion:

(i)    Buyer's representations and warranties expressly set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date;

(ii)    As of the Closing Date, Buyer shall have performed and observed, in all material respects, all material obligations, agreements, and covenants expressly set forth in this

10

APP000012

Agreement and all deliveries to be made at Closing as expressly set forth in this Agreement have been tendered;

(iii)    Buyer shall have timely deposited with Escrow Agent on the Closing Date, the Purchase Price, as adjusted pursuant to and payable in the manner provided for in this Agreement; and

(iv)    Closing can occur hereunder in a manner compliant with orders of the Court, as contemplated in **Section 5.9**.

(b)    Buyer's Closing Conditions. The obligation of Buyer to consummate the transactions contemplated hereby is contingent upon the following, any or all of which may be waived by Buyer in its sole discretion:

(i)    Receiver's representations and warranties expressly set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date;

(ii)    As of the Closing Date, Receiver shall have performed its material obligations expressly set forth in this Agreement and all deliveries to be made at Closing as expressly set forth in this Agreement have been tendered;

(iii)    There have been no material developments involving the Receivership Action or Court Approval that would adversely impact the transaction contemplated hereby;

(iv)    Title Company is prepared to issue, upon the condition and payment of its scheduled premium, a standard form of Texas Land Title Association owner's policy (the "**Title Policy**") as of the date and time of the recording of the Deed, in the amount of the Purchase Price, insuring Buyer as owner of good and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions.

So long as a Party is not in default hereunder pursuant to **Article VIII**, if any condition to such Party's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date, such Party shall give the other Party written notice of same with at least three (3) Business Days to cure such condition and the Closing Date shall be extended until the next business day following the three (3) business day cure period provided herein. Thereafter, if any condition to such Party's obligation to proceed with the Closing has not been satisfied, such Party may, in its sole discretion, either (i) terminate this Agreement by delivering written notice to the other Party on or before the Closing Date, in which event the Earnest Money less the Independent Consideration shall be paid as follows: (1) to Buyer if Buyer terminates pursuant to Section 5.2(b) herein or 2) to Receiver if Receiver terminates pursuant to Section 5.2(a) herein, or (ii) elect to close without alteration of the Purchase Price, notwithstanding the non-satisfaction of such condition, in which event such Party shall be deemed to have waived any such condition. If such Party elects to close, notwithstanding the nonsatisfaction of such condition, there shall be no liability on the part of the other Party for nonsatisfaction of such condition or for breaches of representations and warranties of which the Party electing to close had knowledge as of the Closing.

5.3.    ***Receiver's Deliveries in Escrow.*** Not later than the Closing Date, subject to Buyer's timely and proper satisfaction of the terms and conditions set forth in **Section 5.4** and **Section 5.9** below, Receiver shall use commercially reasonable efforts to deliver in escrow to the Title Company the following:

11

APP000013

(a)     Deed. A special warranty deed in the form of **Exhibit B** attached hereto (the "**Deed**"), executed and acknowledged by Receiver, conveying Receiver's title to the Real Property, subject to the Permitted Exceptions.

(b)     Bill of Sale and Assignment of Leases and Contracts. A Bill of Sale and Assignment of Leases and Assumed Service Contracts in the form of **Exhibit C** attached hereto (the "**Assignment**"), executed by Receiver.

(c)     State Law Disclosures. Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property.

(d)     Additional Documents. Any additional documents that Escrow Agent or Title Company may reasonably require for the proper consummation of the transactions contemplated by this Agreement.

(e)     FIRPTA.  An affidavit compliant with the Foreign Investment in Real Property Tax Act, executed by Receiver.

(f)     Rent Roll. An updated Rent Roll, dated within five (5) Business Days prior to the Closing Date and certified by either Receiver or the property manager, to the best of its knowledge, to be true and correct in all material respects.

5.4.    **Buyer's Deliveries in Escrow.** Not later than the Closing Date, subject to Receiver's timely and proper satisfaction of the terms and conditions set forth in **Section 5.3** above and **Section 5.9** below, Buyer shall deliver in escrow to the Title Company the following:

(a)     Purchase Price. The Purchase Price, less the Earnest Money deposited by Buyer, plus or minus applicable prorations, deposited by Buyer with the Escrow Agent in immediate, same day federal funds wired for credit into the Title Company's escrow account at a bank satisfactory to Receiver.

(b)     Bill of Sale and Assignment of Leases and Contracts. The Assignment, duly executed by Buyer.

(c)     State Law Disclosures. Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property.

(d)     Additional Documents. Any additional documents that the Title Company may reasonably require for the proper consummation of the transactions contemplated by this Agreement.

5.5.    **Possession, Lease Files and Assumed Contracts.** Receiver shall deliver possession of the Property to Buyer at the Closing, subject to the Permitted Exceptions. To the extent reasonably available to Receiver, Receiver agrees to use commercially reasonable efforts to deliver, or cause to be delivered, originals or copies of the Leases, Assumed Service Contracts, lease files, warranties, guaranties, operating manuals, keys to the Property, and books and records regarding the Property at Closing or, if delivery is not possible at Closing, within a reasonable period of time after Closing.

5.6.    **Notice to Residents.** Receiver and Buyer agree to work together in good faith to deliver to each tenant within a commercially practicable timeframe following Closing, a notice regarding the sale in substantially the form of **Exhibit D** attached hereto, or such other form as may be required by applicable state law.

12

**APP000014**

5.7.    ***Closing Costs.***

a.    Receiver shall pay on behalf of Goldmark at Closing: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) reserved; (iii) one-half of the Escrow Costs; (iv) prorated Ad Valorem Property taxes; (v) all Broker Commission pursuant to **Section 6.6** and (vi) any other costs, fees, or expenses approved by Receiver under the terms of this Agreement or the settlement statement delivered at Closing.

b.    Buyer shall pay: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) the cost of obtaining a new survey or updating the Existing Survey and other third party reports relating to the conducting its due diligence review; (iii) the basic premium for the Title Policy and any title endorsements; (iv) the recordation fee for the Deed and any other documents, instruments or agreements to be recorded at Closing (other than curative matters); (v) one-half of the Escrow Costs; (vi) all fees and costs incurred by Buyer's lender; (vii) reserved; (viii) prorated Ad Valorem Property taxes; and (ix) any other commissions, costs, fees or expenses approved by Buyer under the terms of this Agreement or the settlement statement delivered at Closing.

c.    Below is a summary of the allocation of Closing costs in this Agreement. In the event of a conflict between this **Section 5.7(c)** and the remainder of this Agreement, the remainder of this Agreement shall control. Any other costs not outlined below shall be the responsibility of the Party as expressly outlined in this Agreement, or if not outlined in the Agreement, of Buyer.

| Cost | Responsible Party |
|---|---|
| Title Commitment, search, and exam fee for Title Policy | Buyer |
| Premium for standard/basic form of Title Policy | Buyer |
| Premium for any upgrade of Title Policy for extended or additional coverage and any endorsements desired by Buyer, any inspection fee charged by the Title Company, tax certificates, municipal and utility lien certificates, and any other Title Company charges | Buyer |
| Costs of any update to the Existing Survey commissioned by Buyer, or any new survey obtained by Buyer | Buyer |
| Costs for UCC searches, Environmental Phase I and all other inspections and reports, site visit(s) of Buyer and Buyer Representatives | Buyer |
| Recording fees for the Deed and any other documents, instruments, or agreements to be recorded at Closing | Buyer |
| Ad Valorem Property Taxes | Prorated as of Closing Date on a calendar year basis |
| Any escrow fee charged by the Escrow Agent for holding the Earnest Money and Additional Earnest Money or conducting the Closing | ½ Buyer ½ Receiver |
| Broker Commission to Broker | Receiver |
| Buyer's Attorney Fees | Buyer |
| Receiver's Attorney Fees | Receiver |
| Survey | Buyer |

13

APP000015

5.8.    *Close of Escrow.* The Title Company shall agree in writing with Receiver and Buyer that (a) recordation of the Deed constitutes its representation that it is holding the closing documents, closing funds, and closing statement and is prepared and irrevocably committed to disburse the closing funds in accordance with the closing statements and (b) release of funds to Receiver shall irrevocably commit it to issue the Title Policy in accordance with this Agreement. Upon satisfaction or completion of the foregoing conditions and deliveries, the Parties shall direct the Title Company to immediately record and deliver the documents described above to the appropriate parties and make disbursements according to the closing statements executed by Receiver and Buyer and in accordance with escrow instructions by each Party consistent with this Agreement.

5.9.    *Court Approval.* Notwithstanding anything to the contrary herein, Buyer acknowledges that the transactions contemplated by this Agreement are expressly subject in all respects to: (a) Court Approval; (b) any applicable order of the Court in the Receivership Action; and (c) compliance with Applicable Laws (defined below).

5.10.    *Obligations of Buyer.* Buyer acknowledges that conveyance of title to the Property may be subject to certain covenants, conditions, and restrictions. Buyer covenants and agrees to continue to cooperate in good faith with Receiver to execute, deliver, and record (if necessary) such documents required with respect to such covenants, conditions, and restrictions, which such obligation shall survive Closing.

**Article VI**
**PRORATIONS; PAYMENTS AT CLOSING**

6.1.    *Prorations.* The day of Closing shall belong to Buyer and all prorations hereinafter provided to be made as of the Closing shall each be made as of the end of the day before the Closing. In each such proration set forth below, the portion thereof applicable to periods beginning as of Closing shall be credited or charged to Buyer and the portion thereof applicable to periods ending as of Closing shall be credited or charged to Receiver.

(a)    Taxes and Assessments.

(i)    General real estate taxes and assessments imposed by governmental authority and any assessments imposed by private covenant constituting a lien or charge on the Property for the then current calendar year or other current tax period (collectively, "**Taxes**") not yet due and payable shall be prorated. If the Closing occurs prior to the receipt by Receiver of the tax bill for the calendar year or other applicable tax period in which the Closing occurs, Buyer and Receiver shall prorate Taxes for such calendar year or other applicable tax period based upon one hundred twenty percent (120%) of the most recent ascertainable assessed values and tax rates.

(ii)    Any refund or rebate of Taxes resulting from a tax protest, challenge, or appeal (an "**Appeal**") for a tax year ending prior to the Closing Date shall belong to Receiver, whether received before or after Closing, and Receiver shall have the sole authority to prosecute such Appeals. Any refund or rebate of Taxes resulting from an Appeal for the tax year in which the Closing Date occurs shall belong to Buyer, and Buyer shall have the sole authority to prosecute such appeals.

(iii)    If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing (the "**Rollback Taxes**"), then Buyer shall be responsible for payment of all Rollback Taxes.

14

APP000016

(b)    <u>Collected Rent; Tenant Receivables</u>. All collected rent and other collected income (and any applicable state or local tax on rent) under Leases in effect on the Closing Date shall be prorated. Receiver agrees to deliver to Buyer at Closing any rent and other income collected by Receiver before Closing, but applicable to any period of time after Closing. Any rents from tenants received by Buyer after the Closing Date that are in excess of amounts then outstanding to Buyer shall be delivered to Receiver by Buyer. For a period of ninety (90) days following Closing, Buyer will use commercially reasonable efforts, but without suit, to collect any unpaid rents applicable to the period before Closing and pay amounts received from such Tenants that are in excess of what they owe Buyer and promptly pay such amounts to Receiver. Receiver may pursue the collection of the same, provided that Receiver shall have no right to terminate any Lease or any tenant's occupancy under any Lease in connection therewith.

(c)    <u>Utilities</u>. Utilities, including water, sewer, electric, and gas, based upon the last reading of meters prior to the Closing shall be prorated. Receiver shall use commercially reasonable efforts to obtain meter readings within the five (5) Business Day period before the Closing Date, and if such readings are obtained, there shall be no proration of such items. Receiver shall pay at Closing the bills therefore for the period preceding the Closing, and Buyer shall pay the bills therefore for the period subsequent thereto. If the utility company will not issue separate bills, or Receiver is unable to obtain same, Buyer will receive a credit against the Purchase Price for Receiver's portion and will pay the entire bill prior to delinquency after Closing. If Receiver has paid any utilities no more than thirty (30) days in advance in the ordinary course of business, then Buyer shall be charged its portion of such payment at Closing. Recoveries from the reimbursement of utility expenses collected by Buyer or Receiver (or a third-party service provider) shall be prorated based upon, and shall relate back to, the months in which the billed expenses were incurred. Buyer shall be responsible for the payment of all deposits necessary to continue utility services for the period beginning on the Closing Date, and Receiver shall be entitled to apply for return of any deposits that Receiver had paid to such utility companies.

(d)    <u>Fees and Charges under Assumed Service Contracts, Licenses and Permits</u>. Fees and charges under the Assumed Service Contracts, licenses, and permits as are being assigned to and assumed by Buyer at the Closing shall be prorated on the basis of the periods to which such Assumed Service Contracts, licenses and permits relate.

(e)    <u>Nonrefundable Deposits, Fees, Upfront Payments, and Prepaid Amounts</u>. Nonrefundable deposits, fees and upfront payments, bonuses, door fees, and prepaid amounts received by Receiver under laundry, telecommunications, cable, internet and other similar leases and concessions shall not be prorated at Closing, it being the agreement of Receiver and Buyer that Receiver shall have the right to keep all of the same.

6.2.    ***Final Adjustments***. The Parties agree to use good faith efforts to make final prorations as of the Closing Date. The Parties agree there will be no final adjustments after the Closing except as specifically set forth in **Section 6.1**.

6.3.    ***Service Contracts***. Buyer will assume the obligations arising from and after the Closing Date under the Assumed Service Contracts.

6.4.    ***Tenant Deposits***. All refundable tenant security deposits, pet deposits and similar deposits from tenants that are in Receiver's possession (which are to be reflected on a final Rent Roll delivered to Buyer), together with interest thereon if required by law or contract to be earned thereon, and not theretofore applied to tenant obligations under the Leases, shall be transferred or credited to Buyer at Closing or placed in escrow. As of the Closing, Buyer shall assume Receiver's obligations related to tenant security deposits

15

APP000017

under the applicable lease agreements and applicable law, and to the extent such deposits were accounted in this proration between the Parties at Closing.

6.5.    *Utility Deposits.* Buyer shall be responsible for making any deposits required with utility companies or, if elected by Receiver, crediting to Receiver at Closing the amount of such deposits in which case Receiver shall assign to Buyer at Closing its rights to same.

6.6.    *Broker Commissions.* Upon the Closing of the transaction contemplated in this Agreement, Receiver shall pay to Walker & Dunlop a Texas limited liability company (Attn: Lee Wagner) ("**Broker**") a commission ("**Broker's Commission**") pursuant to the terms of a separate written agreement between Receiver and Broker. If Closing does not occur for any reason, then Receiver shall not owe or be obligated to pay Broker's Commission. Under no circumstances shall Receiver or Buyer owe a commission, fee, or other compensation to any other broker, agent, finder, or person. Buyer and Receiver each hereby represent and warrant to the other that, other than Broker's Commission payable to Broker by Receiver, no other brokers, agents, finder's fees, or commissions are due or arising in connection with Buyer or Receiver entering into this Agreement or the consummation of transactions contemplated herein, and each Party hereby agrees to indemnify, defend and hold the other harmless from and against all Claims arising from such warranties whether or not such Claim is meritorious, for any compensation with respect to the entering into of this Agreement, the sale and purchase of the Property, or the consummation of transactions contemplated herein. The provisions of this Section shall survive Closing or earlier termination of this Agreement.

6.7.    *Final Inspection.* Purchaser shall have the right to inspect the Property, including, but not limited to, all vacant units within five (5) Business Days of the scheduled Closing Date.

## Article VII
### REPRESENTATIONS AND WARRANTIES

7.1.    *Receiver's Representations and Warranties.* As a material inducement to Buyer to enter into this Agreement and consummate this transaction, Receiver represents and warrants to Buyer the following shall be materially true and correct as of Closing:

(a)    Authority. As of the Closing Date and subject to the conditions described in **Section 5.9**, (i) Receiver shall have the full right and authority, and shall have received all consents required, to consummate the transactions herein described and (ii) this Agreement shall be a valid and binding obligation of Receiver, enforceable in accordance with its terms.

(b)    Pending Action. To Receiver's Knowledge (below defined), other than matters before the Court in this receivership, there is no action, investigation or similar proceeding materially affecting the Property.

(c)    Property Materials. Receiver has no Knowledge that the Property Information provided to Buyer is materially inaccurate or materially misleading.

(d)    Defaults or Non-Compliance. To Receiver's Knowledge, there is no default or unresolved material matter of non-compliance arising under any Assumed Service Contract.

(e)    Environmental. Receiver has no Knowledge of any actual or threatened Environmental Matter affecting the Property.

16

APP000018

As used in this **Section 7.1**, the phrases "**to Receiver's Knowledge**" and "**Knowledge**" shall mean the current, actual knowledge of Receiver gained through his receivership of the Property.

Buyer acknowledges that, by virtue of Receiver's limited knowledge and involvement in managing the Property, Receiver's Knowledge is limited. Receiver shall have no duty to make an independent investigation or inquiry as to the truthfulness of his representations and warranties. Upon request of Buyer, Receiver shall make a reasonable inquiry of the Property's property manager as to the truthfulness of the above representations and warranties, without incurring an additional obligation to investigate same, and shall promptly notify Buyer of any response from Property's property manager that would make them no longer truthful.

Unless otherwise stated to the contrary, each of Receiver's representations and warranties in this Agreement shall be true and correct in all material respects as of the date of Closing and shall survive Closing for a period of at least six (6) months.

7.2.    ***Buyer's Representations and Warranties***. As a material inducement to Receiver to execute this Agreement and consummate this transaction, Buyer represents and warrants to Receiver that the following shall be materially true and correct as of Closing:

(a)    <u>Organization and Authority</u>. Buyer has been duly organized and is validly existing as a limited liability company in good standing in the State of Texas and is qualified to do business in the state in which the Property is located. Buyer has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Buyer at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Buyer, enforceable in accordance with their terms.

(b)    <u>Conflicts and Pending Action</u>. There is no agreement to which Buyer is a party or to Buyer's knowledge binding on Buyer which is in conflict with this Agreement. There is no action or proceeding pending or, to Buyer's knowledge, threatened against Buyer which challenges or impairs Buyer's ability to execute or perform its obligations under this Agreement. The execution and delivery of this Agreement or the consummation by Buyer of the transactions contemplated by this Agreement will not (i) conflict with or result in a breach of or default under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, license, agreement, or other instrument or obligation to which Buyer is a party, or (ii) violate any order, injunction, decree, statute, rule, or regulation applicable to Buyer.

(c)    <u>Adequate Funds</u>. Buyer's assignee (which will be comprised of Buyer and at least one other partner) has adequate funding sources enabling it to pay the Purchase Price at Closing and to perform its other obligations under this Agreement.

(d)    <u>ERISA</u>. Buyer is not: (i) a plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), as defined in Section 3(3) of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to collectively as a "**Plan**"); or (ii) a "governmental plan" as defined in Section 3(32) of ERISA. Buyer is acting on its own behalf and not on account of or for the benefit of any Plan. Buyer shall not transfer the Property to any entity, person or Plan which will cause a violation of ERISA. Buyer shall not assign its interest under this Agreement to any entity, person, or Plan which, if the assignee acquires the Property, will cause a violation of ERISA

17

APP000019

(e)    Bankruptcy. Buyer has not (i) commenced a voluntary case, or had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its property, or (iii) made an assignment for the benefit of creditors.

(f)    Patriot Act. Buyer is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, including the reporting, record keeping and compliance requirements of the Patriot Act and other authorizing statutes, executive orders and regulations administered by OFAC, and related Securities and Exchange Commission, SRO or other agency rules and regulations, and has policies, procedures, internal controls and systems that are reasonably designed to ensure such compliance.

(g)    OFAC. Neither (i) Buyer, any Affiliate of Buyer nor any Person controlled by Buyer; nor (ii) to the best of Buyer's knowledge, after making due inquiry, any Person who owns a controlling interest in or otherwise controls Buyer; nor (iii) to the best of Buyer's knowledge, after making due inquiry, if Buyer is a privately held entity, any Person otherwise having a direct or indirect beneficial interest (other than with respect to an interest in a publicly traded entity) in Buyer; nor (iv) any Person for whom Buyer is acting as agent or nominee in connection with this investment, is a country, territory, Person, organization, or entity named on an OFAC List, nor is a prohibited country, territory, Person, organization, or entity under any economic sanctions program administered or maintained by OFAC.

(h)    Return of Information. Should this Agreement terminate prior to the Closing Date, Buyer shall, at its sole cost and expense, immediately (i) return or cause to be returned to Receiver all copies of any information or documents received from Receiver and any other Receiver Parties in hard copy form, and (ii) delete from its computer and other electronic storage devices any information or documents received from Receiver and any other Receiver Parties received from Receiver electronically.

(i)    No Agency. Before Closing, Buyer agrees not to solicit, negotiate, or enter into any document, agreement or instrument that is binding upon Receiver or Receiver's interest in the Property, or the Property, or any portion thereof.

(j)    ADA/FHA Disclosure. Buyer acknowledges that the Property may be subject to the federal Americans With Disabilities Act (the "**ADA**") and the federal Fair Housing Act (the "**FHA**"). The ADA requires, among other matters, that tenants and/or owners of "public accommodations" remove barriers in order to make the Property accessible to disabled persons and provide auxiliary aids and services for hearing, vision or speech impaired persons. Receiver makes no warranty, representation or guarantee of any type or kind with respect to the Property's compliance with the ADA or the FHA (or any similar state or local law), and Receiver expressly disclaims any such representation. Buyer acknowledges that it is solely responsible for determining whether the Property complies with the ADA and the FHA. The provisions of this Section shall survive indefinitely the Closing or earlier termination of this Agreement and shall not be merged into the Deed or other closing documents.

(k)    Sophisticated Buyer. Buyer is and will at Closing be comprised of principals who are sophisticated and experienced buyers of commercial properties and have participated in and are

18

APP000020

familiar with the acquisition, development, redevelopment, ownership, management, and operation of real estate projects similar to the Property.

Unless otherwise stated to the contrary, each of Buyer's representations and warranties in this Agreement shall be true and correct in all material respects as of the date of Closing and shall survive Closing for a period of at least six (6) months.

## Article VIII
## DEFAULT AND DAMAGES

8.1.    ***Default by Buyer.*** If Buyer shall default in its obligation to close or any other material pre-Closing obligation hereunder (for the avoidance of doubt, Buyer's failure to satisfy a condition to close in **Section 5.2(b)** shall not be deemed a Buyer default), or if at Closing any one or more of Buyer's representations or warranties are not materially correct, and such default was not caused by a prior default by Receiver hereunder, Buyer agrees that Receiver shall have the right to (a) waive such failure or breach and proceed to Closing without reduction in Purchase Price; or (b) terminate this Agreement and to have the Escrow Agent deliver the Earnest Money deposited by Buyer, to Receiver as liquidated damages to recompense Receiver for time spent, labor and services performed, and the loss of Receiver's bargain. Buyer and Receiver agree that it would be impracticable or extremely difficult to affix damages if Buyer so defaults and that the disbursement to Receiver of the Earnest Money deposited by Buyer represents a reasonable estimate of Receiver's damages. Receiver agrees to accept such deposits and fees as Receiver's total damages and relief hereunder if Buyer defaults in its obligation to close or any other material pre-Closing obligation hereunder, Receiver waiving all other rights and remedies for a default set forth in this **Section 8.1**. In addition to the foregoing rights of Receiver, Receiver shall retain the right to pursue against Buyer any Claim for any indemnification obligation of Buyer set forth in this Agreement.

8.2.    ***Default by Receiver.*** If Receiver defaults in its obligation to sell and convey the Property to Buyer pursuant to this Agreement or in any other material pre-Closing obligation hereunder, or if at Closing any one or more of Receiver's representations or warranties are not materially correct, and such default was not caused by a prior default by Buyer hereunder or not a permitted termination of this Agreement, Buyer's sole and exclusive remedy shall be to elect one of the following:

(a)    to terminate this Agreement, in which event Buyer shall be entitled to the return by the Escrow Agent to Buyer of the Earnest Money deposited by Buyer, less the Independent Consideration;

(b)    to waive such failure or breach and proceed to Closing without any reduction in the Purchase Price; or

(c)    to bring a suit for specific performance of Receiver's obligations in compliance with the following procedure: (a) no later than ninety-one (91) days following receiver's default or breach, Buyer shall petition the Court to bring such suit seeking specific performance and (b) such suit shall only proceed only if such suit has received approval from the Court, and only as authorized by the terms and provisions of the order authorizing the same.

8.3.    ***Notice of Default.*** Except for a Party's failure to close on the Closing Date, neither Party shall have the right to declare a default by the other Party or terminate this Agreement because of a failure by such other Party to perform under the terms of this Agreement, unless the other Party shall fail to cure such failure to perform within five (5) Business Days after its receipt of written notice of such failure to perform.

19

APP000021

## Article IX
### EARNEST MONEY PROVISIONS

9.1.    *Earnest Money account.* The Escrow Agent shall deposit the Earnest Money in government insured account(s).

9.2.    *Contract Terminations.* Upon a termination of this Agreement pursuant to the terms of the Agreement, either Party (the "**Terminating Party**") may give written notice to the Escrow Agent and the other Party (the "**Non-Terminating Party**") of such termination and the reason for such termination. Such request shall also designate who the Terminating Party believes is entitled to the Earnest Money deposited by Buyer. The Non-Terminating Party shall then have five (5) Business Days within which to object in writing to the release of the Earnest Money deposited by Buyer to the Terminating Party, if applicable. If the non-Terminating Party provides such an objection, then the Escrow Agent shall retain the Earnest Money deposited by Buyer until it receives written instructions executed by both Receiver and Buyer as to the disposition and disbursement of the Earnest Money deposited by Buyer, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money deposited by Buyer to a particular party, in which event the Earnest Money deposited by Buyer shall be delivered in accordance with such instructions, order, decree or judgment.

9.3.    *Interpleader.* Receiver and Buyer mutually agree that if any controversy regarding the Earnest Money deposited by Buyer, unless mutual written instructions are received by the Escrow Agent directing the disposition of the Earnest Money deposited by Buyer, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money deposited by Buyer or, at the Escrow Agent's option, the Escrow Agent may interplead all Parties and deposit the Earnest Money deposited by Buyer with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable attorneys' fees. Receiver or Buyer, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing Party in accordance with the other provisions of this Agreement.

9.4.    *Liability of Escrow Agent.* The Parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the Parties, and that the Escrow Agent shall not be liable to either of the Parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Receiver or Buyer resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties. Receiver and Buyer shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.

9.5.    *Failure to Satisfy Closing Conditions.* Notwithstanding anything contained herein to the contrary, if this Agreement fails to close under this Agreement due to the failure of a Party to satisfy its respective conditions to Closing described in **Section 5.2(a)** or **(b)**, as applicable, then the remaining provisions of **Section 5.2** shall apply in full for resolution of such Party's failure to satisfy conditions to Closing, which shall specifically include distribution of Earnest Money.

## Article X
### DISCLAIMERS AND WAIVERS

10.1.    *Certain Definitions.* The following terms shall have the definitions indicated below:

20

APP000022

(a)    "**Environmental Law**" shall mean any federal, state, or local laws, ordinances, permits, or regulations, or any common law, regarding health, safety, radioactive materials, or the environment, including, but not limited to, the following federal statutes: Clean Air Act (42 U.S.C. § 7401 et seq.) ("**CAA**"), Clean Water Act (42 U.S.C. § 1251 et seq.) ("**CWA**"), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.) ("**RCRA**"), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("**CERCLA**"), Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.) ("**EPCRA**"), Safe Drinking Water Act (42 U.S.C. § 300f et seq.) ("**SDWA**"), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("**TSCA**"), Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) ("**ESA**"), Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.) ("**FIFRA**"), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) ("**OSHA**"), each as amended, and any regulations promulgated thereunder, guidance and directives issued with respect thereto, or policies adopted by authority thereunder.

(b)    "**Environmental Matter**" shall mean any of the following: (i) the Release of any Hazardous Material on or at the Property or any other property; (ii) the migration of any Hazardous Material onto or from the Property; (iii) the environmental, health, or safety aspects of the transportation, storage, treatment, handling, use, or Release, whether any of the foregoing occurs on or off the Property, of Hazardous Materials in connection with the operations or past operations of the Property; (iv) the violation, or alleged violation, of any Environmental Law, order, permit, or license of or from any governmental authority, agency, or court relating to environmental, health, or safety matters; (v) the presence of any underground storage tanks within the confines of the Property; (vi) the presence of wetlands within the confines of the Property; (vii) the presence of any endangered species on, in, or around the Property; or (viii) the characterization of the Property as historical in nature in any way.

(c)    "**Hazardous Material**" shall mean: (i) any radioactive materials; (ii) any substance or material the transportation, storage, treatment, handling, use, removal, or Release of which is subject to any Environmental Law; or (iii) any substance or material for which standards of conduct are imposed under any Environmental Law. Without limiting the generality of the foregoing, "Hazardous Materials" shall include: asbestos and asbestos-containing materials (whether or not friable); urea-formaldehyde in any of its forms; polychlorinated biphenyls; oil; used oil; petroleum products and their by-products; lead based paint; radon; and any substances defined as "hazardous waste", "hazardous substances", "pollutants or contaminants", "toxic substances", "hazardous chemical", "hazardous air pollutants", or "toxic chemical" under the CAA, CWA, RCRA, CERCLA, EPCRA, SDWA, TSCA, or OSHA, or any other Environmental Law.

(d)    "**Release**" shall mean the discharge, disposal, deposit, injection, dumping, spilling, leaking, leaching, placing, presence, pumping, pouring, emitting, emptying, escaping, or other release of any Hazardous Material.

10.2.    *Disclaimer of Warranties*.

(a)    Buyer acknowledges that Receiver has acquired the rights and obligations to sell the Property due solely to the Receivership Action, and consequently Receiver has little or no knowledge of the condition of the Property and the surrounding areas. ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS" AS OF THE EFFECTIVE DATE AND AS OF THE CLOSING DATE, BASED EXCLUSIVELY ON ITS OWN EXPERTISE AND THAT OF ITS CONSULTANTS AND OR ITS OWN INVESTIGATIONS AND EXAMINATIONS, AND BUYER FURTHER ACKNOWLEDGES AND AGREES

21

APP000023

THAT RECEIVER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT BUYER WILL INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS OWN INVESTIGATION AND INSPECTIONS OF THE PROPERTY IN ITS ACQUISITION THEREOF. RECEIVER SHALL HAVE NO OBLIGATION HEREUNDER TO ALTER, REPAIR, OR IMPROVE THE PROPERTY UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

(b)    Buyer further agrees that Buyer will not rely upon any: (i) representations or warranties (oral or written) made by, or purportedly on behalf of, Receiver unless expressly set forth in this Agreement, or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Receiver. BUYER ACKNOWLEDGES THAT, EXCEPT CONTAINED HEREIN, RECEIVER HAS NOT MADE AND HEREBY SPECIFICALLY NEGATES AND DISCLAIMS ANY WARRANTY, REPRESENTATION, COVENANT, AGREEMENT, OR GUARANTEE OF ANY KIND OR CHARACTER, WHETHER EXPRESS, IMPLIED, STATUTORY, WRITTEN, ORAL, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING, OR WITH RESPECT TO ANY MATTER PERTAINING TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE VALUE OF THE PROPERTY, INCOME TO BE DERIVED FROM THE PROPERTY, SUITABILITY OF THE PROPERTY, HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, THE MANNER, STATE OF REPAIR, OR LACK OF REPAIR OF THE PROPERTY, THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY (INCLUDING WATER, WATER RIGHTS, SOIL, OR GEOLOGICAL), COMPLIANCE OF THE PROPERTY OR THE OPERATION ON THE PROPERTY WITH ANY CODES, LAWS, RULES, ORDINANCES, OR REGULATIONS, THE NATURE, MANNER, OR QUALITY OF CONSTRUCTION OR MATERIALS INCORPORATED INTO THE PROPERTY, THE DESIGN OF THE PROPERTY, AND COMPLIANCE WITH APPLICABLE LAWS, INCLUDING HEALTH, SAFETY, AND LAND USE LAWS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY RECEIVER, A RECEIVER PARTY, ON RECEIVER'S BEHALF, OR PURPORTEDLY ON BEHALF OF RECEIVER, HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY RECEIVER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. OTHER THAN AS CONTAINED HEREIN, RECEIVER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES, AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY RECEIVER, ANY RECEIVER PARTY, OR ANYONE ACTING OR PURPORTING TO ACT ON RECEIVER'S BEHALF.

(c)    EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT, RECEIVER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, RECEIVER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING ANY OF THE FOLLOWING MATTERS:

(i)    EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE PROPERTY;

(ii)    THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS;

22

APP000024

(iii)    THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR FUTURE DEVELOPMENT OR RENOVATION OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY ELECT TO CONDUCT THEREON;

(iv)    THE CONDITION OF THE PROPERTY OR ANY PORTION THEREOF;

(v)    THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF ANY UTILITIES SERVING THE PROPERTY; OR

(vi)    THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR ENVIRONMENTAL MATTERS.

10.3.    *Waiver and Release of Liability;.*

(a)    BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS, AND ASSIGNS AND ANYONE ELSE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY WAIVES THE CLAIMS DESCRIBED BELOW IN THIS SECTION 10.3 (WHETHER OR NOT SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE), AND RELEASES THE RECEIVER PARTIES FROM ANY AND ALL LIABILITY BASED IN WHOLE OR IN PART UPON ANY SUCH CLAIMS BASED UPON ANY OF THE MATTERS SET FORTH IN SECTION 10.2 ABOVE.

(b)    Notwithstanding the intent of the Parties hereto that the waiver and release provisions contained in **Section 10.3(a)** above bar all Claims by Buyer and Buyer's heirs, successors, and assigns and anyone else claiming by, through, or under Buyer, should a court of competent jurisdiction deem otherwise, Buyer hereby agrees that the presence of the waiver and release provisions in **Section 10.3(a)** should serve as the overwhelming, primary factor in any equitable apportionment of costs under applicable federal, state, or local laws, ordinances, or regulations.

(c)    Buyer acknowledges and agrees that the waiver and release provisions contained in this **Section 10.3** are each reasonable and acceptable to Buyer and an essential component of the consideration for the sale of the Property hereunder and Receiver would not otherwise sell the Property without such provisions.

(d)    Buyer acknowledges and agrees that Buyer's sole recourse for Claims of the nature described in this Article X shall be to or against parties other than Receiver Parties and that economic recovery may not be possible against some or all of such parties.

(e)    Notwithstanding anything to the contrary, each of the provisions of this Article X shall survive Closing and the execution and delivery of the Deed by Receiver and shall not be merged therein.

## Article XI
### MISCELLANEOUS

11.1.    *Parties Bound.* Except for an assignment pursuant to **Section 11.2**, neither Party may assign this Agreement without the prior written consent of the other Party, and any such prohibited assignment shall be void. No assignment permitted under this Agreement shall relieve the assigning Party of any liability hereunder, whether arising before or after the date of such assignment, unless expressly agreed upon herein. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the Parties.

23

APP000025

11.2.  *Assignment.*

a.    At any time prior to Closing, Buyer shall be permitted to assign this Agreement and the Earnest Money deposited by Buyer, and the rights of Buyer in connection therewith, to a Buyer's Affiliate upon receiving the prior written consent of Receiver, which such consent shall not be unreasonably withheld, conditioned, or delayed. "**Buyer's Affiliate**" means (a) any entity that directly or indirectly controls, is controlled by or is under common control with Buyer, or (b) any entity at least a majority of whose economic interest is owned by Buyer; and the term "control" means the power to direct the management of such entity through voting rights, ownership, or contractual obligations. If Buyer assigns this Agreement with Receiver's prior written consent, Buyer agrees to deliver a fully executed assignment of this Agreement and assumption by the assignee of Buyer's obligations hereunder. Any such assignment must include the assignee's tax identification number. Any assignee of Buyer's interest in this Agreement shall be bound by all approvals and waivers, actual and deemed, by the original Buyer prior to the assignment. The original Buyer shall not be released of any duties, obligations, or liability for any Claims arising under the terms of this Agreement.

a.    Receiver (at its sole cost) may transfer and convey the Property, and otherwise assign, transfer and delegate its rights, duties and obligations under this Agreement and any post-Closing agreement to any Receiver Parties without Buyer's consent; provided, however, Receiver shall not be released of any duties, obligations or liabilities for any Claims arising under the terms of this Agreement which are not expressly assumed by Receiver's assignee. Upon such transfer, assignment and conveyance, the original Receiver shall be immediately released of any and all duties, obligations, and liability for any Claims arising under the terms of this Agreement and any post-Closing agreements (or otherwise) which are expressly assumed by Receiver's assignee, and all references in this Agreement and any post-Closing agreement to Receiver shall thereafter mean and refer to Receiver's assignee, to the extent the context requires. The Parties hereto agree that all representations, warranties, covenants, and indemnifications shall inure to the benefit of any permitted assignee of Buyer and Receiver, as applicable.

11.3.  *Headings.* The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

11.4.  *Exhibits and Schedules.* All exhibits and schedules annexed hereto are a part of this Agreement for all purposes.

11.5.  *Invalidity and Waiver.* If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either Party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such Party's right to enforce against the other Party the same or any other such term or provision in the future.

11.6.  *Jurisdiction and Venue.* BUYER AND RECEIVER AGREE THAT ANY SUIT, ACTION, COUNTERACTION OR PROCEEDING ARISING OUT OF THE SUBJECT MATTER HEREOF (EACH, A "PROCEEDING"), SHALL BE INSTITUTED IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION (THE "ACCEPTABLE FORUM"). BUYER AND RECEIVER AGREE THAT THE ACCEPTABLE FORUM IS CONVENIENT TO THEM; IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE ACCEPTABLE FORUM; AND WAIVE ANY AND ALL OBJECTIONS TO JURISDICTION OR VENUE THAT THEY MAY HAVE UNDER THE LAWS OF THE STATE WHERE THE

24

APP000026

PROPERTY IS LOCATED OR OTHERWISE IN THOSE COURTS IN ANY PROCEEDING. SHOULD ANY PROCEEDING BE INITIATED IN ANY OTHER FORUM BY RECEIVER OR BUYER, THE INITIATING PARTY WAIVES ANY RIGHT TO OPPOSE ANY MOTION OR APPLICATION MADE BY THE OTHER PARTY TO TRANSFER VENUE, DISMISS OR SEEK OTHER APPROPRIATE RELIEF AS A CONSEQUENCE OF SUCH PROCEEDING HAVING BEEN COMMENCED IN A FORUM OTHER THAN AN ACCEPTABLE FORUM.

11.7.    *Governing Law.* This Agreement shall in all respects be solely governed by, and construed in accordance with, the substantive federal laws of the United States (expressly including 28 U.S. Code § 2001 and § 2002, as applicable) and the laws of the State of Texas (collectively the "**Applicable Laws**").

11.8.    *No Third-Party Beneficiary.* This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third-party beneficiary, whether by decree or otherwise.

11.9.    *Entirety and Amendments.* This Agreement embodies the entire agreement between the Parties and supersedes all prior agreements and understandings, oral or written, relating to the Property. This Agreement may be amended or supplemented only by an instrument in writing executed by the Party against whom enforcement is sought.

11.10.   *Time.* Time is of the essence in the performance of this Agreement.

11.11.   *Attorneys' Fees.* In the event either Party hereto employs an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement, in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals and rehearings, the Prevailing Party in such litigation shall be entitled to recover from the other Party its reasonable attorneys' and consultants' fees and expenses incidental to such litigation (including, without limitation, service of process costs, filing fees, court reporter costs, investigative costs, expert witness fees, the cost of any bonds, and any and all other similar fees incurred in connection with the action or proceeding) and all court costs and fees through all trial and appellate levels. Attorneys' fees under this **Section 11.11** shall include reasonable attorneys' fees on appeal and, in addition, a Party entitled to attorneys' fees shall be entitled to all other reasonable, out-of-pocket, third-party costs and expenses actually incurred or otherwise payable in connection with such action or proceeding. In addition to the foregoing award of attorneys' fees to the Prevailing Party, the Prevailing Party in any lawsuit shall be entitled to its reasonable attorneys' fees actually incurred or otherwise payable in any post-judgment proceedings to collect or enforce the judgment. The "**Prevailing Party**" means the Party determined by the final, non-appealable judgment of court of competent jurisdiction to most nearly prevail and not necessarily the one in whose favor a judgment is rendered. This provision is separate and several and shall survive the merger of this Agreement into any judgment with respect hereto.

11.12.   *Notices and Deliveries.* All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the addresses set forth in **Section 1.1**. Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one (1) Business Day after deposit with such courier, (b) sent by facsimile or e-mail, with written confirmation or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt. Any notice sent by facsimile, e-mail or personal delivery and delivered after 5:00 p.m. local time where the Property is located shall be deemed received on the next Business Day. A Party's address may be changed by written notice to the other Party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given by

25

APP000027

counsel to Buyer shall be deemed given by Buyer; notices given by counsel to Receiver shall be deemed given by Receiver; and notices given to a Party's counsel shall be deemed given to the Party.

11.13. *Construction*. The Parties acknowledge that the Parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction – to the effect that any ambiguities are to be resolved against the drafting Party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

11.14. *Business Days; Calculation of Time Periods*. "**Business Day**" (or "**business day**") means, as to any Party, any day that is not a Saturday, Sunday, or legal holiday for national banks in the location where the Property is located. If the last day of any time period hereunder, or the last day of performance of any obligation, or for the giving of notice, or for taking any other action falls on a day that is not a Business Day, then such last day shall be extended to the first day thereafter that is a Business Day, and any such day shall be deemed to end at 5:00 p.m. local time where the Property is located. Subject to the foregoing, in computing any time period described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included.

11.15. *Execution in Counterparts*. This Agreement may be executed in one or more counterparts, each of which is an original, and all of which together constitute only one agreement between the parties. The signatures of all the parties do not need to be on the same counterpart for it to be effective. Delivery of an executed counterpart of this Agreement by facsimile, electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.

11.16. *Waiver of Jury Trial*. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.17. *Limitation of Liability*. No partner, member, manager, officer, director, shareholder, beneficial owner, agent, or employee of either Buyer or Receiver or any affiliate thereof shall be personally liable for any obligation of Buyer or Receiver, as applicable, hereunder. Buyer agrees Receiver's liability arising hereunder or related hereto shall at all times be strictly limited to Receiver's interest in the Property, or proceeds from the sale thereof. No liability shall accrue to Receiver for breach of the covenants, indemnification, warranties, or representations in this Agreement or any document executed by Receiver hereunder pursuant to this Agreement unless such liability accrues, in the aggregate, in excess of $50,000.00. Receiver's aggregate liability for all claims arising out of such covenants, indemnities, representations, and warranties with respect to the Property shall not exceed an amount equal to $450,000.00 once the initial $50,000 aggregate limit has been reached. Notwithstanding anything to the contrary in this Agreement, neither Party shall be liable to the other Party for consequential, punitive, and/or exemplary damages of any nature whatsoever. Buyer agrees to provide written notice of such breach to Receiver and allow Receiver thirty (30) days to cure the same. If Receiver fails to cure such breach after written notice and after such cure period, Buyer's sole remedy shall be an action at law for actual damages as a consequence thereof, provided, however, that any action at law shall only be enforceable and actionable if and only if written notice of such claim is delivered to Receiver within six (6) months after the Closing Date (the "**Notice Period**"), Buyer hereby waiving the right to file any such claim, suit, proceeding, litigation, or action at law at any later date. The Notice Period applies to known and unknown breaches of covenants, indemnities, warranties, or representations. This Section shall survive indefinitely the termination of this Agreement or Closing and shall not be merged into the Deed or other closing documents.

26

APP000028

11.18. **Termination of Agreement.** It is understood and agreed that if either Buyer or Receiver terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Receiver and Buyer from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

11.19. **No Recording.** Neither this Agreement nor any memorandum or short form thereof may be recorded by either Party.

11.20. **No Partnership.** The relationship of the Parties hereto is solely that of a seller and buyer with respect to the Property and no joint venture or other partnership exists between the Parties hereto. Neither Party has any fiduciary relationship hereunder to the other.

11.21. **Further Assurances.** Each Party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other Party to consummate more effectively the purposes or subject matter of this Agreement. The provisions of this Section shall survive Closing.

11.22. **Waiver of Consumer Rights.** BUYER WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BUYER'S OWN SELECTION, BUYER VOLUNTARILY CONSENTS TO THIS WAIVER AS EVIDENCED BY BUYER'S EXECUTION OF THIS AGREEMENT.

11.23. **Incorporation of Recitals.** The Recitals set forth above constitute an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the Parties.

11.24. **Certain Disclosures.** The following disclosures are made for the purpose of complying with specific statutory provisions of Texas law, and such disclosures are not intended to and do not hereby alter or affect the rights and obligations of Buyer and Receiver:

    (a)    Statutory Tax Districts. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Receiver to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Agreement.

    (b)    Tide Waters. If the Property abuts the tidally influenced waters of the State of Texas, Section 33.135 of the Texas Natural Resources Code requires a notice regarding coastal area property to be included in this Agreement.

    (c)    Annexation. If the Property is located outside the limits of a municipality, Receiver notifies Buyer under Section 5.011 of the Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

    (d)    Property Located in a Certified Service Area of a Utility Service Provider. The Property may be located in a certificated water or sewer service area, which is authorized by law to provide

27

APP000029

water or sewer service to the properties in the certificated area. If the Property is located in a certificated area there may be special costs or charges the Buyer will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to the Property. The Buyer is advised to determine if the Property is in a certificated area and contact the utility service provider to determine the cost that Buyer will be required to pay and the period, if any, that is required to provide water or sewer service to the Property. Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the Property or at the Closing.

(e)     Public Improvement District. If the Property is in a public improvement district, Section 5.014 of the Property Code requires Receiver to notify Buyer as follows: As a Buyer of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372 Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property.

(f)     Notice of Water Level Fluctuations. If the Property adjoins an impoundment of water, including a reservoir or lake, constructed under Chapter 11 of the Texas Water Code, that has a storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, Receiver hereby notifies Buyer: "The water level of the impoundment of water adjoining the Property fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions."

(g)     Transfer Fees. If the Property is subject to a private transfer fee obligation, Section 5.205 of the Texas Property Code requires Receiver to notify Buyer as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

(h)     Notice to Buyer Regarding Restrictive Covenants. Pursuant to the Texas Local Government Code, if the Property is located within a municipality whose governing body has required any person who sells or conveys restricted property located within its jurisdiction to first give written notice to the Buyer of: (i) the restrictions and (ii) the municipality's right to enforce compliance with the restrictions, written notice must be given to by Receiver to Buyer on or before the final closing, and the notice document must be signed and acknowledged by both Receiver and Buyer, then recorded in the real property records in the county where the real property is located. The requirements and text of the notice may be found at 30 Tex. Loc. Gov't Code Ann. § 212.155.

(i)     Notice to Buyer of Property Seaward of Gulf Intracoastal Waterway. Pursuant to the Texas Natural Resources Code, if the Property is located seaward of the Gulf Intracoastal waterway to its southernmost point and then seaward of the longitudinal line also known as 97 degrees, 12'19" which runs southerly to the international boundary from the intersection of the centerline of the Gulf Intracoastal waterway and the Brownsville Ship Channel, then this information must be disclosed by Receiver to Buyer before the transaction closes. The requirements and text of the notice may be found at Tex. Nat. Res. Code Ann. § 61.025.

(j)     Storage Tanks Disclosure Provider. If the Property contains an underground storage tank or tank system or an aboveground tank or tank system subject to regulation by the Texas Commission on Environmental Quality, statutory notice must be given by Receiver to Buyer prior

28

APP000030

to closing pursuant to the Texas Administrative Code. The requirements and text of the notice may be found at 30 Tex. Admin. Code Ann. § 334.9.

(k)    Notice to Buyer of Property Located in Certain Annexed Water Districts. This form sets out the mandatory notice provisions under the Texas Water Code. If the Property is located in a water or sanitary sewer district that entered into a contract with a city, other than a city with a population of more than one million in a county of more than two million, that allows the city to set rates in the district after annexation that are different from rates charged to other residents of the city, Receiver at or before closing must deliver to Buyer a separate written notice, executed and acknowledged by Receiver, containing the information in this notice. Buyer must sign the notice to evidence receipt. Tex. Water Code Ann. § 49.452(g)-(p) applies to this notice provision, including Buyer's right to seek damages if the sale or conveyance of the Property is not made in compliance with this statute. The requirements and text of the notice may be found at Tex. Water Code Ann. § 54.016(h)(4) and § 49.452(g)-(p).

(l)    Notice to Buyer that Property is Located within the Area of the Alignment of a Transportation Project. Pursuant to the Texas Local Government Code, if the Property is within the area of the alignment of a transportation project, as shown on the final environmental decision document applicable to the future transportation corridor identified in an agreement between the Texas Department of Transportation and the county under Tex. Transp. Code Ann. § 201.619, Receiver must provide a conspicuous statement in the Agreement. The requirements and text of the notice may be found at Tex. Loc. Gov't Code Ann. § 232.0033.

*[Signature Page Follows]*

29

APP000031

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**RECEIVER:**

CORT THOMAS, AS RECEIVER FOR GOLDMARK, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:
Printed Name:       Cort Thomas
Title:              Receiver for GOLDMARK, LLC
Date:               March 1, 2023

**BUYER:**

MATTHEW FLUME
Date: 03/01/2023, 2023

Signature Page 1

**APP000032**

**ESCROW AGENT ACCEPTANCE**

Escrow Agent has executed this Agreement in order to confirm that the Escrow Agent has received executed counterparts of the Agreement and the Earnest Money and shall hold the Earnest Money deposited by Buyer, and any interest earned thereon, in escrow, and shall disburse the Earnest Money and the interest earned thereon, pursuant to the provisions of the Agreement.

_3 -1 - 2 ° 23_  ("**Effective Date**")

CHICAGO TITLE OF TEXAS

Signature: _Todd Phillips_
Printed Name: _Todd Phillips_
Title: _3-1-23_
Date: _Escrow Officer_

Chicago Title Texas
14801 Quorum Drive Suite 110
Dallas, Texas 75254
Phone- (972)419-7153  Fax- (972)239-4322
todd.phillips@tdptitle.com

Signature Page 2

**APP000033**

## EXHIBIT A

### LEGAL DESCRIPTION

[Attached]

A - 1

APP000034

EXHIBIT B
FORM OF DEED

AFTER RECORDING RETURN TO:

_____

_____

(Space Above This Line for Recorder's Use Only)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DALLAS | § | |

THIS SPECIAL WARRANTY DEED, dated _____, 2023, by Cort Thomas, solely in his capacity as Receiver for, and on behalf of, Goldmark Hospitality, LLC, a Texas limited liability company, with its principal office at 8111 Preston Road, Suite 300, Dallas, Texas 75225 ("**Grantor**"), for the benefit of _____, a _____ ("**Grantee**"), whose mailing address is _____;

WITNESSETH, that Grantor, for good and valuable consideration, has granted bargained, sold, and conveyed and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors, and assigns, forever, all the following described lot or parcel of land, situated, lying and being in the County of Dallas, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**");

TOGETHER with Grantor's rights, title and interest (if any) in and to the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively, the "**Appurtenances**" and together with the Land, the "**Property**"); AND SUBJECT TO any Permitted Exception (as such term is defined in that certain Purchase and Sale Agreement between Grantor and Grantee dated [●]) and those matters listed and described on Exhibit "B" attached hereto (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property unto Grantee, its successors and assigns, subject to the Permitted Exceptions, reservations, and exclusions set forth herein, forever, and Grantor binds Grantor and Grantor's successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against all and every person or persons lawfully claiming or to claim the whole or any part thereof, when the claim is by, through or under Grantor, but not otherwise.

B - 1

APP000035

BY ACCEPTANCE OF THIS SPECIAL WARRANTY DEED, GRANTEE ACKNOWLEDGES THAT IT HAS INSPECTED AND ASSESSED THE PROPERTY AND HAS SATISFIED ITSELF AS TO THE CONDITION OF SAME AND IS TAKING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS", AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, OTHER THAN THE WARRANTY OF TITLE HEREIN CONTAINED AND/OR IN THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED ____, 2023, BETWEEN GRANTOR AND GRANTEE (THE "PURCHASE AGREEMENT"). IT BEING THE INTENTION OF GRANTOR AND GRANTEE TO EXPRESSLY NEGATE AND EXCLUDE ALL REPRESENTATIONS AND WARRANTIES, INCLUDING, BUT NOT LIMITED TO: (1) THE PHYSICAL CONDITION OF THE PROPERTY OR ANY ELEMENT THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES RELATED TO HABITABILITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FITNESS FOR ANY PURPOSE; (2) THE NATURE OR QUALITY OF CONSTRUCTION, STRUCTURAL DESIGN, AND ENGINEERING OF ANY IMPROVEMENTS; (3) THE QUALITY OF THE LABOR AND MATERIALS INCLUDED IN ANY IMPROVEMENTS; (4) THE SOIL CONDITIONS (BOTH SURFACE AND SUBSURFACE), DRAINAGE, OR OTHER CONDITIONS EXISTING AT THE PROPERTY WITH RESPECT TO ANY PARTICULAR PURPOSE, DEVELOPMENTAL POTENTIAL, OR OTHERWISE; (5) ALL WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE PROPERTY; AND (6) ALL OTHER WARRANTIES AND REPRESENTATIONS, WHATSOEVER, EXCEPT THE SPECIAL WARRANTY OF TITLE EXPRESSLY SET FORTH IN THIS DEED AND/OR REPRESENTATIONS AND WARRANTIES CONTAINED IN THE PURCHASE AGREEMENT.

[Signature Page Follows]

B - 2

APP000036

IN WITNESS WHEREOF, Grantor has executed this deed on the date set forth above.

**GOLDMARK HOSPITALITY, LLC:**

GOLDMARK HOSPITALITY, LLC, a Texas limited liability company

| | |
|---|---|
| Signature: | _____ |
| Printed Name: | Cort Thomas |
| Title: | Receiver for, and on behalf of, Goldmark Hospitality, LLC |
| Date: | _____ |

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

This instrument was acknowledged before me on this the _____ day of _____, 2023, by Cort Thomas, Receiver for, and on behalf of, Goldmark Hospitality, LLC, a Texas limited liability company.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

(SEAL)

B - 3

APP000037

Exhibit A

Legal Description

B - 1

APP000038

Exhibit B

Permitted Exceptions

B - 2

APP000039

## EXHIBIT C

### BILL OF SALE AND ASSIGNMENT OF LEASES AND CONTRACTS

This instrument is executed and delivered as of the ____ day of _____, 20___ pursuant to that certain Purchase and Sale Agreement (the "**Agreement**"), dated _____, 2023, by and between Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity ("**Receiver**") for, and on behalf of, GOLDMARK HOSPITALITY, LLC, a Texas limited liability company, ("**Goldmark**"), and _____, a _____ ("**Buyer**"), covering the real property described in **Exhibit A** attached hereto (the "**Real Property**").

1.    <u>Sale of Personalty</u>. For good and valuable consideration, Receiver hereby sells, transfers, sets over and conveys to Buyer the following (the "**Personal Property**"):

(a)    *Tangible Personalty*. All of Goldmark's right, title and interest in and to all fixtures, furniture, equipment, and other tangible personal property, if any, presently located on the Real Property and used in connection with the operation of same, in each case to the extent assignable and without warranty (the "**Tangible Personal Property**") but excluding any items of personal property owned by tenants, any managing agent or any other party.

(b)    *Intangible Personalty*. All of Goldmark's right, title, and interest, if any, in and to all of the following items, in each case to the extent assignable or transferrable, and without warranty (the "**Intangible Personal Property**"): (i) licenses and permits relating to the operation of the Real Property; (ii) the right to use the name "Amerigold Suites" in connection with the Real Property; and (iii) if still in effect, each guaranty and warranty received by Receiver from any general contractor, subcontractor, or manufacturer in connection with the construction or maintenance of the Real Property or associated with the Tangible Personal Property, provided, however, if there is any cost or fee to transfer any such guaranty and warranty to Buyer, Buyer must pay the same as a condition precedent to any such assignment by Receiver.

Notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall the Personal Property include (i) any marketing information, market and other analyses, reports, investigations or other documents which constitute proprietary information of Receiver or Receiver's affiliates, including, without limitation any architectural plans, designs or other plans and designs for any houses, townhomes, apartments, casitas and other buildings, or any other vertical improvements of any type, (ii) any information which is privileged or confidential pursuant to a recognized legal privilege (such as attorney-client communication and/or attorney work product) and (iii) any property management software and related hardware, and the data contained therein.

2.    <u>Assignment of Leases and Contracts</u>. For good and valuable consideration, Receiver hereby assigns, transfers, sets over and conveys to Buyer, and Buyer hereby accepts such assignment of, the following (the "**Assigned Property**"):

(a)    *Leases*. All of the Goldmark's right, title and interest, as landlord, in and to the tenant leases (the "**Leases**") covering the Real Property, to the extent assignable and without warranty, and Buyer hereby assumes all of the landlord's obligations under the Leases arising from and after the Closing Date (as defined in the Agreement); and

(b)    *Service Contracts*. All of Goldmark's rights, title and interest in and to the service contracts described in **Exhibit B** attached hereto (the "**Service Contracts**"), to the extent assignable and without warranty.

C - 1

**APP000040**

3.      Assumption. Buyer hereby assumes the obligations of Receiver under the Leases and Service Contracts arising from and after the Closing Date and shall defend, indemnify and hold harmless Receiver from and against any liability, damages, causes of action, expenses, and attorneys' fees incurred by Receiver by reason of the failure of Buyer to fulfill, perform, discharge, and observe its obligations with respect to the Leases or the Service Contracts arising on and after the Closing Date.

4.      Agreement Applies. The covenants, agreements, representations, warranties, indemnities and limitations provided in the Agreement with respect to the property conveyed hereunder (including, without limitation, the limitations of liability provided in the Agreement), are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Buyer and Receiver and their respective successors and assigns.

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale and Assignment of Leases and Contracts to be executed as of the date written above.

**RECEIVER:**

CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC, A TEXAS LIMITED LIABILITY COMPANY

| | |
|---|---|
| Signature: | _____ |
| Printed Name: | Cort Thomas |
| Title: | Receiver for Goldmark Hospitality, LLC |
| Date: | _____ |

**BUYER:**

_____
a Texas limited liability company

Signature: _____

Printed Name: ___
Title: ___
Date: _____

C - 2

APP000041

Exhibit A

Legal Description

C - 3

APP000042

Exhibit B

List of Service Contracts Being Assumed

C - 4

APP000043

## EXHIBIT D

## NOTICE TO RESIDENTS

_____, 2023

*Re:     Unit No.* _____

Dear Residents:

Notice is hereby given to the tenants of Amerigold Suites (the "**Property**") that Goldmark Hospitality, LLC, the current owner of the Property, has sold the Property to _____ ("**Buyer**") effective as of this date. Buyer has assumed all of the obligations of landlord under your lease, and Buyer acknowledges that it has received and is responsible for your security deposit in the amount of $_____. You will be receiving a separate letter from Buyer's management company providing, among other things, their contact information and to whom and where your rent should be paid. The privacy policy and practices of Buyer will apply to the collection, use and sharing of your personal information on a going-forward basis.

Sincerely,

**RECEIVER:**
CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:          _____
Printed Name:       Cort Thomas
Title:              Receiver for GOLDMARK HOSPITALITY, LLC
Date:               _____

**BUYER:**
[_____]
a Texas limited liability company

Signature: _____

Date: _____

D - 1

APP000044

# EXHIBIT B-1

APP000045

# NVC

## National Valuation Consultants, Inc.

**An Appraisal Report of:**

# AMERIGOLD SUITES

**LOCATED AT:**

**13636 Goldmark Drive
Irving, Texas 75038**

**Latitude: 32.883968 N
Longitude: 96.956886 W**

**NVC File No.  DAL2212073**

**PREPARED FOR:**

**Mr. Cort Thomas, Receiver
Partner
Brown Fox, PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225**

**EFFECTIVE DATE OF APPRAISAL:**

**"As Is" - January 19, 2023**

**PREPARED BY:**

**NATIONAL VALUATION CONSULTANTS, INC.
7807 EAST PEAKVIEW AVENUE, SUITE 200
CENTENNIAL, COLORADO  80111**

Atlanta ▪ Boston ▪ Chicago ▪ Cincinnati ▪ Dallas ▪ Denver ▪ Houston ▪ NY/NJ Metro ▪ San Francisco ▪ SoCal ▪ South Florida

Corporate Headquarters: 7807 E. Peakview Ave., Suite 200, Centennial, CO 80111  ▪  303.753.6900  ▪  nvcinc.com

APP000046

# NVC

## National Valuation Consultants, Inc.

February 9, 2023

Mr. Cort Thomas, Receiver
Partner
Brown Fox, PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225

**Re:      Amerigold Suites - 13636 Goldmark Drive, Irving, Texas, 75240**
**NVC File No.: DAL2212073**
**Latitude: 32.560732 N, Longitude: 96.451664 W**

Dear Mr. Thomas:

In compliance with your request, enclosed is an appraisal report of the above-referenced property. The purpose of the appraisal is to provide our "as is" market value opinion of the fee simple interest in the subject property.  The date of property inspection was January 19, 2023 and the effective date of value is the same date.

Briefly described, the subject is a 70-unit apartment facility built in 1981 on a 3.56 acre site located in North Dallas, just west of US-75 freeway and north of IH-635 freeway, surrounded by other lodging and apartment communities and close to various retail, restaurant, office, and other commercial facilities.

The property is operated as a hybrid between an apartment and an extended stay lodging facility, but as the suites are not furnished and it leases by the month, it is more comparable to an apartment complex.

The property contains 11, two-story garden-style buildings with two unit types, built in 1981.   Per management, there are 60 single-story one bedroom units at 660 SF, and 10 two-story, two bedroom units at 1,200 SF for a total size of 51,600 SF. In addition, there is a leasing center with restrooms, kitchen area and community room, and a separate maintenance building with garage and workshop is located at the rear of the property.

All units are carpeted in the bedroom areas, with tile in the entries, bathrooms and kitchens, the latter being equipped with electric range, fridge/freezer and dishwasher.  Project amenities include landscaped grounds, community pool, and a small on-site fitness center, although this was closed at the time of inspection as it recently suffered flood damage due to a frozen pipe burst.  All units have a small patio area or balcony.

Rates are quoted on a monthly basis and are all-inclusive of utilities (except electricity and cable). On the date of inspection, average base rates were quoted at $1,200 per month  for the one bedroom suites and $1,800 per month for the two-bedroom.  The minimum rental period is one month, but some agreements are for several months or more, and most tenants have been in place much longer. Rents are due in full in advance and there are no leases signed and no credit checks taken, although criminal background checks are conducted.

There are a variety of customers at this facility, including monthly residents and long-time residents, with some reportedly having been in occupancy for over nine years.  Per the manager, occupancy had generally been around 100% until Covid-19 became rampant in March 2020.  Since then, occupancy has varied as a number of residents have been evicted and damaged units have had to be repaired.  Nevertheless, all of the habitable units are advised to be occupied with a waiting list.

Atlanta • Boston • Chicago • Cincinnati • Dallas • Denver • Houston • NY/NJ Metro • San Francisco • SoCal • South Florida

Corporate Headquarters: 7807 E. Peakview Ave., Suite 200, Centennial, CO 80111  •  303.753.6900  •  nvcinc.com

APP000047

Mr. Cort Thomas
February 9, 2023
Page 2

As of our inspection date, 11 units were in need of repair and were out of commission so that occupancy was around 84.3% and repairs are needed to make these units habitable again.

The property is currently the subject of a signed LOI for a sale to Worth Street Partners, a local real estate investor, for a price of $5,500,000. The buyer intends to spend approximately $1,380,000 on renovating the interiors and $1,660,000 on exterior renovations for a total investment of around $8,540,000, or $122,000 per unit.

Additional offers have also been received from two other potential purchasers at figures of $4.0 million and $4.2 million.

It is our opinion that this report complies fully with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation.

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report. In addition, there is one ***Extraordinary Assumption*** that may have affected the assignment results, as follows.

### *EXTRAORDINARY ASSUMPTION*

>***During our inspection of the property, a random sampling of the subject's units were inspected. For the purposes of this appraisal, we have assumed that the condition and decor of the remaining units (those not inspected) is similar to those inspected and described within this report. If it is determined that the condition and/or decor of the remaining units is significantly different than described herein, a re-valuation of the subject could be required.***

Based upon the data, analyses and reasoning contained in the attached report, and subject to the assumptions and limiting conditions set forth in this analysis, the "as is" market value of the ***fee simple*** interest in the subject property as of January 19, 2023, is set forth below:

**$4,400,000**

**FOUR MILLION FOUR HUNDRED THOUSAND DOLLARS**

Please note that our value opinion includes personal property such as appliances, pool and fitness equipment, and office equipment. We have included all personal property in the appraised value of the subject property since we have determined from our analysis that it is typically traded with both hotels and apartments in the market area. Also, our value reflects our opinion of the market value of the subject that does not distinguish any allocation or contribution from the business operation. Therefore, in accordance with appraisal requirements, the value is allocated between real estate and personal property as follows:

| Allocation of Value | |
|---|---|
| Valuation Premise | "As Is" Market Value |
| Date of Valuation | January 19, 2023 |
| Total Market Value | $4,400,000 |
| Allocation of Real Property | $4,350,000 |
| Allocation of Personal Property | $50,000 |

APP000048

Mr. Cort Thomas
February 9, 2023
Page 3


We appreciate the opportunity to serve you, and trust you will advise us if we can be of further assistance.

Respectfully submitted,

NATIONAL VALUATION CONSULTANTS, INC.


_____

Charles G. Dannis, MAI, SRA (Appraisal Institute)
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G

Phone:     214-932-1818
E-mail:     cdannis@nvcinc.com


_____

Simon D. Neame, MRICS
Senior Vice President
Texas Certified General Appraiser
License No.: TX 1330329 G

Phone:     214-932-1821
E-mail:     sneame@nvcinc.com


APP000049

**TABLE OF CONTENTS**

Page

Subject Photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**PREMISES OF THE APPRAISAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Scope of Work. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Definitions of Terminology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Identification of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
History of the Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Standard Assumptions and Limiting Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Extraordinary Assumptions and Hypothetical Conditions . . . . . . . . . . . . . . . . . . . . . . . . 13

**PRESENTATION OF DATA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. Economic Indicators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Area / Subject Map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Economic and Demographic Profile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Market Area Map. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Market Area Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Zoning Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Tax and Assessment Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Site Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Description of the Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**ANALYSIS OF DATA AND CONCLUSIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

DFW Apartment Market Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Las Colinas Apartment Submarket Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Competitive Market Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
Highest and Best Use Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
The Valuation Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
Cost Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
Sales Comparison Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
Income Capitalization Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
Reconciliation and Final Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
Allocation of Non-Realty Components . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
Reasonable Exposure Time & Marketing Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

**ADDENDA**

Appraiser Qualifications
Subject Photos
Flood Plain Map
Improved Sale Abstracts
Rent Roll
Historical Operating Results
Engagement Letter

APP000050

**SUBJECT PHOTOGRAPHS**





## EXECUTIVE SUMMARY

| | |
|---|---|
| **CLIENT:** | Mr. Cort Thomas, Receiver<br>Partner<br>Brown Fox, PLLC<br>8111 Preston Road, Suite 300<br>Dallas, Texas 75225 |
| **PROPERTY IDENTIFICATION:** | Amerigold Suites<br>13636 Goldmark Drive<br>Dallas, Texas 75240 |
| **PURPOSE OF REPORT:** | As requested, the purpose of this appraisal assignment is to estimate the market value of the fee simple interest in the subject, including the contributory value of the fixtures and equipment, as of our date of inspection, January 19, 2023. |
| **DATE OF INSPECTION:** | January 19, 2023 |
| **DATE OF REPORT PREPARATION:** | Late December 2022 to early February 2023 |
| **EXTRAORDINARY ASSUMPTIONS:** | This report is subject to one Extraordinary Assumption mentioned in the *Letter of Transmittal* and in the attached report. |
| **SITE DESCRIPTION:** | 3.56 acres (155,074 square feet) located on the south corner of Goldmark Drive and Midpark Road. |
| **ZONING:** | MU-3 - Mixed Use 3 District within the City of Dallas. |
| **IMPROVEMENTS:** | 70-unit two-story apartment/hotel facility built in 1981. |
| **IMPROVEMENT SUMMARY:** | Details of the subject property are summarized below for informational purposes. |

|  |  |
|---|---|
| Total Units: | 70 |
| Total Number of Buildings: | 11 (nine residential, one leasing office/community room, and one maintenance shop/garage. |
| Net Rentable Area: | 51,600 SF (per property manager) |
| Average Unit Size: | 737 SF |
| Total Number of Parking Spaces | 90 parking spaces |

**UNIT MIX:**

| Unit Mix | | | | |
|---|---|---|---|---|
| Unit Type | Avg Size (SF) | No. of Units | % of Total | Rentable Area (SF) |
| 1 BR 1 BA | 660 | 60 | 85.7% | 39,600 |
| 2 BR 2 BA | 1,200 | 10 | 14.3% | 12,000 |
| **Totals** | **737** | **70** | **100.0%** | **51,600** |

APP000052

**HIGHEST AND BEST USE:**

As if Vacant:                            Multi-family development.

As Improved:                           Continued operation as a hybrid between an apartment and an extended stay lodging facility.

**MARKET VALUE OPINION SUMMARY:**

| Summary of Market Value Indications | |
|---|---|
| Approach/Technique | Indicated Value |
| Cost Approach | Not Utilized |
| Sales Comparison Approach | $4,200,000 |
| Income Capitalization Approach | $4,400,000 |
| ***Reconciled*** | ***$4,400,000*** |

| Resulting Key Units of Comparison | |
|---|---|
| Indicated Value/SF(NRA) | $85.27 |
| Indicated Value/Unit | $62,857 |
| Forecast Stabilized Occupancy | 92.5% |
| Forecast Loss to Lease | 0.0% |
| Market Rent/Unit | $1,350/Month |
| Projected Expense/Unit (including reserves) per Year | $8,736 |
| Projected Operating Expenses/EGI% | 55.6% |
| Direct Capitalization Rate | 6.50% |

**PREMISES OF THE APPRAISAL**

APP000054

## SCOPE OF WORK

**SCOPE OF WORK DEFINED**

The Scope of Work requirement within the *Uniform Standards of Professional Appraisal Practice* (USPAP) of the Appraisal Standards Board states that the appraiser must provide the following information within each appraisal, appraisal review, or appraisal consulting assignment:

1. Identify the problem to be solved;

2. Determine and perform the scope of work necessary to develop credible assignment results; and

3. Disclose the scope of work in the report.[1]

While the scope of work is addressed within many sections of this report, the following is a summary of the Scope of Work for this assignment.

**APPRAISAL ELEMENTS**

There are seven key assignment elements that need to be addressed when identifying the appraisal problem.  These include:

1. Client;

2. Intended users in addition to the client;

3. Intended use;

4. Objective, or type of value scenario(s) in an appraisal assignment;

5. Effective date(s);

6. Property characteristics that are relevant to the assignment (e.g. interest valued, physical and legal characteristics); and

7. Assignment conditions (e.g. hypothetical conditions, extraordinary assumptions, supplemental standards, and jurisdictional exceptions).[2]

**CLIENT, INTENDED USERS AND INTENDED USE**

This appraisal is prepared at the request of Mr. Cort Thomas, Receiver, to assist with decision making regarding a potential sale of the property.  The intended user of this appraisal is our client. This report has no other intended use, and National Valuation Consultants, Inc. is not responsible for the use of this report by any third parties.

---

[1] Uniform Standards of Professional Appraisal Practice, 2020-2021 Edition, Effective January 1, 2020 through December 31, 2023, Advisory Opinion 28 (AO-28).

[2] Ibid, page A-92.

*Scope of Work - continued*

**VALUATION SCENARIOS AND EFFECTIVE DATES**

After consideration of these assignment elements, the following market value scenarios and effective dates are used to solve the appraisal problem, as defined by the client:

"As Is"market value of the fee simple interest in the subject property, including the contributory value of the, fixtures and equipment, as of our date of inspection, January 19, 2023.

**PROPERTY RIGHTS APPRAISED**

The property rights appraised are those of a ***fee simple*** interest in the subject real property. No opinion of value is provided for mineral rights, water rights or other non-realty items which may or may not be associated with the property.

**ANALYSIS PERFORMED IN THE ASSIGNMENT**

The work performed within this appraisal assignment includes a number of independent investigations and analyses. The methods and sources utilized are listed as follows:

**Approaches to Value:** The three traditional valuation approaches – cost, income, and sales comparison – were considered in the appraisal along with the subdivision development approach. Value indications were derived from those considered applicable, which is discussed later in this report.

**Market Area Analysis:** Mr. Simon D. Neame, MRICS, inspected the subject's market area, evaluated demographic and economic statistics, reviewed city zoning maps, aerial photographs and other market data in analyzing the characteristics of the subject area.

**Site Description and Analysis:** This description is based on an on-site inspection and review of documents provided by the owner. Specific documents used in the description are cited in the *Site Analysis* section of this report.

**Improvement Description and Analysis:** This description is also based on an on-site inspection and other information provided by the owner. Specific documents used in the description are cited in the *Description of the Improvements* section of this report.

**Market Data:** All market data were derived from multiple conversations with many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC). All rent comparables were confirmed by NVC staff and personally viewed by the appraiser. The confirmation source is listed along with each comparable located within the following *Competitive Market Analysis* section.

**Comparable Sales:** The appraisers assembled data on comparable improved property sales from abstracts provided by CoStar COMPS; Reis Inc.; public deed records; newspaper articles and news releases; and conversations with numerous real estate buyers, sellers, and agents active in the marketplace. Each sale comparable was confirmed by NVC staff and the confirmation source is detailed within each sale comparable abstract, which is located in the *Addenda*.

**CONTACTS**

In addition to public records and other sources cited in this appraisal, we have relied on the following parties for information pertaining to the subject:

| Subject Property Contacts | | |
|---|---|---|
| Contact | Company | Phone Number |
| Mr. Tim Wells | Brown Fox, PLLC | 214-367-6091 |
| Ms. Joanna Roberts, Property Manager | Amerigold Suites | 214-575-9044 |

**DEFINITIONS OF TERMINOLOGY**

**APPRAISAL** - (noun) the act or process of developing an opinion of value. (adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services. <u>Comment:</u> An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship to a previous value opinion or numerical benchmark.[3]

**ASSIGNMENT** - An valuation service that is provided by an appraiser as a consequence of an agreement with a client.[4]

**MARKET VALUE** - The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motived;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[5]

**AS IS MARKET VALUE** - The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date, Interagency Appraisal and Evaluation Guidelines, OCC.

**FEE SIMPLE ESTATE** - Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[6]

**FORECASTING**- To estimate, calculate, or indicate in advance. Forecasts made by appraisers are based on past trends and the perceptions of market participants concerning their continuation or alteration.[7]

**PROJECTION** - A process in which past and contemporaneous experience is extrapolated into the future using a mechanical formula; may be a simple, straight-line projection or one based on a complex formula; presumes that the conditions and rates of change of the past and present will continue in the future.[8]

**EXTRAORDINARY ASSUMPTION** - An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis.[9]

---

[3] USPAP 2020-2021 Edition, Page 3

[4] USPAP 2020-2021 Edition, Page 3

[5] Code of Federal Regulations; Title 12--Banks And Banking; Chapter I--Comptroller Of The Currency, Department Of The Treasury; Part 34--Real Estate Lending And Appraisals--Subpart C—Appraisals Sec. 34.42 Definitions; Revised as of January 1, 2000

[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th edition

[7] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th edition

[8] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th edition

[9] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th edition

---

APP000058

**HYPOTHETICAL CONDITION -** A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but which is used for the purposes of the analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis.[10]

**EXPOSURE TIME** - Estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.[11]

**MARKETING TIME** - Opinion of the estimated amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal.[12]

**INTENDED USE** - the use(s) of an appraiser's reported appraisal or appraisal review assignment results, as identified by the appraiser based on communication with the client at the time of the assignment.[13]

**INTENDED USER** - the client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser, based on communication with the client at the time of the assignment.[14]

**PERSONAL PROPERTY** - Identifiable tangible objects that are considered by the general public as being "personal" - for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate.[15]

**TANGIBLE PROPERTY** - Property that can be perceived with the senses; includes land, fixed improvements, furnishings, merchandise, cash, and other items of working capital used in an enterprise.[16]

**INTANGIBLE PROPERTY** - Nonphysical assets, including but not limited to franchises, trademarks, patents, copyrights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment.[17]

**EFFECTIVE DATE -** 1) The date on which the analyses, opinions, and advice in an appraisal review, or consulting service apply. 2) In a lease document, the date upon which the lease goes into effect.[18]

---

[10] Appraisal Institute, The Dictionary of Real Estate Appraisal, 6th edition

[11] USPAP 2020-2021 Edition, Page 4

[12] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th edition

[13] USPAP 2020-2021 Edition, Page 5.

[14] USPAP 2020-2021 Edition, Page 5.

[15] USPAP 2020-2021 Edition, Page 5.

[16] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th edition.

[17] USPAP 2020-2021 Edition, Page 5

[18] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th edition.

APP000059

# IDENTIFICATION AND HISTORY OF THE PROPERTY

**PROPERTY NAME:**           Amerigold Suites

**LOCATION:**                Dallas, Texas

**ADDRESS:**                 13636 Goldmark Drive, Dallas, Texas 75240

**COUNTY:**                  Dallas

**PROPERTY I.D./ACCOUNT #:** 00000769000800000

**OWNER OF RECORD:**         Goldmark Hospitality, LLC
                            13901 Midway Road, # 102, Farmers Branch, Texas 75244

**LEGAL DESCRIPTION:**       Carleton House Garden Hotel, Block A/7761, Lot 3, Acres 3.56, Dallas County, Texas, per tax records.  A full legal description was not provided the appraisers.

**HISTORY OF THE PROPERTY:** The subject improvements were constructed in 1981 and the property was acquired by existing ownership in 2007 for an unknown price.

There have been no property transfers in the past three years according to public record.  However, per a signed letter of intent provided by our client, the property is to be sold to Worth Street Partners, a local investor, for a figure of $5,500,000. The buyer reportedly intends to spend just over $3.0 million on renovations and repairs to enhance its appeal.

Two other proposals have been received, also from local investor/developers, at figures of $4,000,000 and $4,200,000.

APP000060

# STANDARD ASSUMPTIONS AND LIMITING CONDITIONS

1. Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated: specifically, the Appraisal Institute.

2. When the signatory of this appraisal report is a candidate or a member of the Appraisal Institute, its bylaws and regulations require the member or candidate to control the use and distribution of the report. Therefore, except as hereinafter provided, the party for whom this appraisal report was prepared may distribute copies of the report, in its entirety, to such third parties as may be selected by the party for whom this appraisal report was prepared. However, selected portions of this appraisal report shall not be given to third parties without the prior written consent of the signatory of the report. Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations media, news media, sales media or other media for public communication without the prior written consent of the signatory of the report. Nor shall the appraiser, firm, or professional organization of which the appraiser is a member be identified without written consent of the appraiser.

3. The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4. The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property. The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5. The legal description used in this report is assumed to be correct.

6. No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7. No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered. The title is assumed to be good and merchantable unless otherwise stated.

8. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9. All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age. The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

10. Information furnished by others is assumed to be true, correct and reliable. A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

11. The opinion of value assumes responsible ownership and competent management.

*Standard Assumptions and Limiting Conditions - continued*

12.  Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the opinion of value is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them.

13.  The values contained in this report are opinions.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14.  The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and opinions of value if information pertinent to this assignment is made known to us after the completion of the report.

15.  National Valuation Consultants, Inc., as well as any employee, agent or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject, but only if neither National Valuation Consultants, Inc. nor any other indemnified person shall have been grossly negligent or shall have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16.  The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17.  Unless otherwise noted, all prospective values, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization.  The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur and which would alter market conditions prior to the effective date of the appraisal.

APP000062

# EXTRAORDINARY ASSUMPTIONS AND HYPOTHETICAL CONDITIONS

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report. In addition, there is one ***Extraordinary Assumption*** (but no ***Hypothetical Conditions)*** that may have affected the assignment results, as follows.

### *EXTRAORDINARY ASSUMPTION*

*During our inspection of the property, a random sampling of the subject's units were inspected. For the purposes of this appraisal, we have assumed that the condition and decor of the remaining units (those not inspected) is similar to those inspected and described within this report. If it is determined that the condition and/or decor of the remaining units is significantly different than described herein, a re-valuation of the subject could be required.*

# PRESENTATION OF DATA

APP000064

**AREA/SUBJECT MAP**



**APP000065**

**DALLAS-FORT WORTH-ARLINGTON, TX MSA**
**ECONOMIC AND DEMOGRAPHIC INTRODUCTION**

### MSA Defined

According to the U.S. Office of Management and Budget, the Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area (19100) is defined as follows.

*Principal Cities*: Dallas, Fort Worth, Arlington, Plano, Irving, Denton, Richardson, Grapevine.
*Constituent Counties:* Collin County, Dallas County, Denton County, Ellis County, Hunt County, Kaufman County, Rockwall County, Johnson County, Parker County, Tarrant County, Wise County.

### Linkages and Locational Attributes

The cities of Dallas and Fort Worth are the two central cities of the Metroplex. Dallas and its suburbs have one of the highest concentrations of corporate headquarters in the United States and is the largest growing metropolitan economy in the nation. Its major industries include Information Technology and Conducting Business. Fort Worth's economy is fueled by defense and aircraft manufacturing, as well as the Texas farming and ranching industry.

The Dallas-Fort Worth Metroplex is home to over 220 publicly traded companies and roughly 700 total corporate headquarters, one of the largest concentrations in the United States. As a whole, the region has over 20 Fortune 500 companies and approximately 40 Fortune 1,000 companies. Among these companies in Dallas are AT&T, Southwest Airlines, Texas Instruments, and Exxon Mobil; Fort Worth is home to American Airlines and several major defense manufacturers including Lockheed Martin and Bell Helicopter Textron.

The Dallas-Fort Worth region's attractive quality of life, low cost of living, skilled labor force, pro-business mindset and absence of corporate and personal income taxes all contribute to a strong regional and state economy. The region's central location allows it to function as a logistics and distribution hub, giving businesses an edge by putting key markets within easy reach of both truck and rail shipping.

### Transportation

*Highways*

The Dallas-Fort Worth area has multiple different freeways and interstates. Major north-south Interstates include I-35 and I-45/I-75. I-35 splits into I-35E and I-35W from Denton to Hillsboro. I-35W goes through Fort Worth while I-35E goes through Dallas. I-45 connects Dallas to Houston. I-75 connects Dallas to Durant Oklahoma. East-west routes include I-30 and I-20. The North Central Texas Council of Governments is a cooperative effort of all the counties impacted by the continued population growth and resulting traffic congestion, with the charter to help plan and coordinate future transportation needs of the region. Two major turnpikes have been opened in the last 10 years to address this growth: the Sam Rayburn Tollway, which links north Tarrant County to Collin County and the President George Bush Turnpike, which links I-20 and I-30, south of DFW Airport, to the Dallas North Tollway and I-75.

*Regional Outer Loop Project*

The Dallas-Fort Worth Regional Outer Loop is a proposed future bypass route around the DFW metroplex. The purpose of the DFW Regional Outer Loop project is to improve regional mobility and system connectivity with the I-35 corridor. The Outer Loop project seeks to reduce traffic congestion through the DFW metroplex urban core by directing it around the metroplex. As much of the traffic that flows through the metroplex does not terminate in the metroplex, it was envisioned that a bypass route would be beneficial to traffic, particularly truck traffic, that has no need to go through the metroplex core. The Outer Loop project will include improvements to I-35, I-35W, SH-170, SH 360, and also includes the associated Loop 9 project.

APP000066

*Regional Outer Loop Project (continued)*

A map of the proposed Regional Outer Loop project development site is provided below.



*Public Transportation*

Public transit options continue to expand significantly, though in several outlying suburbs, it remains limited. Dallas County and parts of Collin and Rockwall Counties have bus service and light rail operated by Dallas Area Rapid Transit, (DART), covering thirteen cities. The Red Line extends north to Plano and southwest to Westmoreland Road. The Blue Line reaches from Rowlett in the northeast to Ledbetter Road in south Dallas. An additional three miles south to the University of North Texas near I-20 recently opened. DART's 28-mile Green Line connects Carrollton in the northwest through Downtown Dallas to Pleasant Grove in the southeast. The Orange Line is being extended in phases from Northwest Hwy to Las Colinas, in Irving, and finally to DFW International Airport.

*Rail*

Tarrant County has bus service operated by the Fort Worth Transportation Authority (known as 'The T'), available only in Fort Worth. The commuter train that serves Fort Worth and its eastern suburbs is operated as the Trinity Railway Express. It connects downtown Fort Worth to downtown Dallas, where it links to the DART light rail system. A station near its midpoint, Centerport, serves DFW Airport via a free airport shuttle bus.

The Dallas-Fort Worth-Arlington area is served by the Burlington Northern and Santa Fe Railway's Intermodal freight transport yard, the Yellow Freight Systems' cross-docking facility and the Union Pacific intermodal facility, all located adjacent to I-45, southeast of Dallas.

### *Air Transportation*

*Dallas-Fort Worth International Airport*

Commercial air transportation is handled through the Dallas-Fort Worth International Airport (DFW). DFW, located midway between Dallas and Fort Worth, is the world's largest in terms of land area, covers in excess of 18,000 acres. According to the airport's website, DFW Airport provides non-stop access to 193 U.S. and 67 international cities. During 2021 DFW served over 62.5 million passengers and over 1.8 billion tons of cargo a significant increase over the 39.3 million passengers and 872,000 tons of cargo served by the same date in 2020. DFW currently ranks 3rd in the world in terms of operations, and 2nd in terms of passengers. The airport also provides employment for close to 228,000 individuals. A map of non-stop flights from DFW is presented below.



*Dallas Love Field Airport*

Dallas Love Field is a City of Dallas owned and operated general-purpose airport located approximately five driving miles northwest of downtown. Love Field serves both commercial airline and corporate user needs. Southwest Airlines corporate headquarters are located at the airport. Love Field recently held its 100-year anniversary in 2017 and now operates seven FBO's and general aviation facilities, including charter flights. A recent $519 million modernization of Love Field's terminals replaced the original terminal buildings with a single 20-gate concourse. With travelers now flying to over 42 major U.S. cities, Love Field serves as the front door to Dallas for over seven million passengers a year, providing a vital link in the City of Dallas economy.

APP000068

*Economic and Demographic Profile - continued*

### Demographic Overview

The following table provides a summary of key demographic characteristics within the Dallas-Fort Worth MSA, the State of Texas, and the nation.

### Population Trends

| Regional Demographic Summary | | | |
|---|---|---|---|
| | Dalla-Fort Worth MSA | State of Texas | United States |
| **Population** | | | |
| 2020 Census | 7,637,387 | 29,145,505 | 331,449,281 |
| 2023 Estimate | 7,933,171 | 30,065,904 | 334,500,069 |
| 2028 Projection | 8,329,332 | 31,310,079 | 341,662,969 |
| 2020 - 2023 % Annual Change | 1.3% | 1.0% | 0.3% |
| 2023 - 2028 % Annual Change | 1.0% | 0.8% | 0.4% |
| Average Age | 37.2 | 37.4 | 40.2 |
| Median Age | 36.2 | 35.9 | 39.2 |
| **Households** | | | |
| 2020 Census | 2,760,991 | 10,491,147 | 126,817,580 |
| 2023 Estimate | 2,867,378 | 10,848,636 | 128,298,155 |
| 2028 Projection | 3,013,369 | 11,325,374 | 131,437,810 |
| 2020 - 2023 % Annual Change | 1.3% | 1.1% | 0.4% |
| 2023 - 2028 % Annual Change | 1.0% | 0.9% | 0.5% |
| 2023 Average Household Size | 2.7 | 2.7 | 2.5 |
| **Income** | | | |
| 2023 Estimated Median Household | $81,625 | $71,347 | $73,336 |
| 2023 Estimated Avg. Household | $113,629 | $101,151 | $104,972 |
| % Under $50,000 | 29.9% | 35.7% | 34.8% |
| % $50,000 - $100,000 | 29.8% | 29.3% | 28.7% |
| % Over $100,000 | 40.2% | 35.0% | 36.4% |

| Annual Growth Projections (2023 - 2028) | Household Income Comparison |
|---|---|

Environics Analytics, 2023

### Population Trends

The Dalla-Fort Worth MSA has recorded annual population growth of 1.3% since 2020, which has outpaced population growth in the State of Texas as a whole.  Over the next five years, the Dalla-Fort Worth MSA is expected to see annual growth taper off to 1.0%, which is above the projected rate of the State of Texas.

### Income Demographics

When compared to the State of Texas overall, a relatively large percentage of households in the Dalla-Fort Worth MSA earn more than $100,000 annually (40.2%).  Within the State of Texas, only 35.0% fall within this income bracket.

APP000069

### *Area Housing Stock*

The bulk of housing in the Dalla-Fort Worth MSA is concentrated in single-family homes which make up 65.9% of inventory.  Overall, a higher percentage of households in the Dalla-Fort Worth MSA rent housing compared to the State of Texas; home-ownership levels are estimated at 60.0% and 62.3% in the Dalla-Fort Worth MSA and State of Texas, respectively.  At $320,741, the estimated value of owner-occupied homes in the Dalla-Fort Worth MSA is higher than the State of Texas median of $254,801.

| 2023 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Dalla-Fort Worth MSA | | State of Texas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 2,017,735 | 65.9% | 8,108,184 | 67.7% |
| 2-3-4 Units | 134,266 | 4.4% | 592,901 | 4.9% |
| 5-19 Units | 399,050 | 13.0% | 1,249,613 | 10.4% |
| 20 or more Units | 403,418 | 13.2% | 1,174,138 | 9.8% |
| Mobile Home, Trailer, Other | 108,172 | 3.5% | 853,180 | 7.1% |
| TOTAL | 3,062,641 | 100.0% | 11,978,016 | 100.0% |
| Home Ownership Levels | % Owner | 60.0% | % Owner | 62.3% |
| | % Renter | 40.0% | % Renter | 37.7% |
| Median Year Structure Built | 1991 | | | 1990 |
| Median Value of Owner-Occupied Homes | $320,741 | | | $254,801 |

Environics Analytics, 2023

### *Employment by Industry Sector*

Top employment sectors in the Dalla-Fort Worth MSA include Management (11.6%), Office/Admin Support (11.3%), and Sales/Related (10.8%).  Together, these three sectors comprise 33.7% of total employment.  When compared with the State of Texas, the Dallas-Fort Worth MSA has a higher portion of residents in the Business/Financial Ops occupation (6.8%).



APP000070

*Economic and Demographic Profile - continued*

### *Resident Employment Trends*

The Dallas-Fort Worth MSA is currently exhibiting an unemployment rate of 3.3% as of November 2022. In 2021, the total number of employed residents in the Dalla-Fort Worth MSA increased by 214,943. Over the 12-month trailing period through November 2022, resident employment growth slowed as the number of employed residents increased by 173,645.

The total number of employed residents in the Dalla-Fort Worth MSA is now 7.7% higher than the recent peak reached in 2021. When compared to the State of Texas, the Dalla-Fort Worth MSA's unemployment rate is lower, and unemployment in the Dalla-Fort Worth MSA is 0.1 percentage points lower than the nation.

| Resident Employment Trends | | | | |
|---|---|---|---|---|
| | Dalla-Fort Worth MSA | | State of Texas | United States |
| Year | Employment | Unemployment Rate | Unemployment Rate | Unemployment Rate |
| 2011 | 3,109,349 | 7.8% | 8.0% | 8.9% |
| 2012 | 3,188,765 | 6.5% | 6.7% | 8.1% |
| 2013 | 3,253,995 | 6.2% | 6.3% | 7.4% |
| 2014 | 3,350,325 | 5.1% | 5.2% | 6.2% |
| 2015 | 3,437,008 | 4.1% | 4.5% | 5.3% |
| 2016 | 3,559,384 | 3.9% | 4.6% | 4.9% |
| 2017 | 3,637,295 | 3.7% | 4.3% | 4.4% |
| 2018 | 3,713,687 | 3.6% | 3.9% | 3.9% |
| 2019 | 3,798,180 | 3.3% | 3.5% | 3.7% |
| 2020 | 3,673,336 | 7.1% | 7.7% | 8.1% |
| 2021 | 3,888,279 | 5.1% | 5.7% | 5.3% |
| Most Current Data | | | | |
| Nov 2021 | 4,015,523 | 3.9% | 4.5% | 3.9% |
| Nov 2022* | 4,189,168 | 3.3% | 3.7% | 3.4% |

Source: U.S. Bureau of Labor Statistics, 01/2023. The preceding data reflects all BLS revisions to date.

* - Preliminary data

APP000071

### *Consumer Price Index (CPI) Trends*

The Consumer Price Index (CPI) is a measure of the average change over time in the prices paid by urban consumers for consumer goods and services and serves as an economic indicator.  The CPI is the most widely used measure of inflation and provides information about price changes in the Nation's economy to government, business, and private citizens.

Price indexes are available for the U.S., the four Census regions, size of city, cross-classifications of regions and size-classes, and for 26 local areas.  Indexes are available for major groups of consumer expenditures (food and beverages, housing, apparel, transportation, medical care, recreation, education and communications, and other goods and services), for items within each group, and for special categories, such as energy.

The CPI for Dallas-Fort Worth CSA recorded an increase of 1.7% annually for "All Items" during the period 2012-2021, which is slightly below the U.S. (Class A) increase.  From November 2021 November 2022 (most recent data available), the CPI for the Dallas-Fort Worth CSA increased by 8.4%, which was above the U.S. (Class A) CPI increase of 7.1% over the same time period.

| Comparative CPI Trends Dallas-Ft. Worth CSA and U.S. (Class A) | | |
|---|---|---|
| | All Items | |
| Year | DFW TX CSA | U.S. (Class A) |
| 2012 | 212.2 | 209.3 |
| 2013 | 216.0 | 212.6 |
| 2014 | 218.4 | 216.1 |
| 2015 | 217.5 | 217.1 |
| 2016 | 220.7 | 220.3 |
| 2017 | 226.1 | 225.4 |
| 2018 | 232.8 | 231.3 |
| 2019 | 237.7 | 235.9 |
| 2020 | 239.1 | 239.0 |
| 2021 | 251.6 | 249.1 |
| Annual Change | 1.7% | 1.8% |
| 2020-2021 | 5.2% | 4.2% |
| Partial Year Comparison | | |
| Nov-21 | 257.4 | 255.1 |
| Nov-22 | 279.0 | 273.2 |
| Annual Change | 8.4% | 7.1% |

Source: U.S. Bureau of Labor Statistics. 1Q 2023.
Not Seasonally Adjusted Data
DFW CSA Period: December 2001=100
U.S. (Class A) Base Period: December 1986=100

The BLS divides the nation into several Combined Statistical Areas (CSA's).  CSA's are larger than Metropolitan Statistical areas (MSA's) because they are intended to give a regional picture.  For markets that do not fall within these CSA's, the BLS has defined these as being Class A, Class B/C, or Class D, depending on population.  Size Class A is defined as having a population of more than 1.5 million.  Size Class B/C is defined has having a population between 50,000 and 1.5 million.  Size Class D is defined as having a population of less than 50,000.

APP000072

**CONCLUSION**

The Dallas-Fort Worth MSA encompasses 11 counties within the State of Texas.  Residents of the area refer to it as the Dallas/Fort Worth Metroplex, DFW, or The Metroplex.  It is the economic and cultural hub of the region commonly called North Texas or North Central Texas and is the largest land-locked metropolitan area in the United States.

Over time, Dallas-Fort Worth's economic fabric has become more diversified, with a global reach that resembles the broader U.S. economy.  Abundant job opportunities have spurred significant population growth, adding 1.2 million residents from 2010 to 2020.  This momentum has continued into 2021 and 2022, with the region averaging 103,000 residents annually.  Employment growth is expected to outperform the national benchmark over the next five years.  Meanwhile, household incomes continue to rise for north Texans.  Over recent years, median household incomes have grown about 4% annually and are now tracking near $80,000.

The Dallas-Fort Worth MSA is home to excellent higher education institutions including Southern Methodist University, Texas Christian University, the University of Texas Southwestern Medical School, the University of Texas at Dallas, and the University of North Texas.  The region offers an extensive community college system as well, enrolling almost 190,000 students annually.

Due to the region's low cost of doing business and highly skilled labor force, companies have relocated or expanded operations across various sectors.  The financial services sector is expected to have an outsized impact soon, with Goldman Sachs and Wells Fargo announcing the construction of regional campuses employing a combined 9,000 employees.  The latest example is Caterpillar, relocating to Irving from Peoria, Illinois; the heavy equipment manufacturer moved its electric power division to the area earlier. Engineering giant AECOM announced relocating its global headquarters from Los Angeles to Dallas. Another California transplant was MD7 LLC, a mobile infrastructure consultancy firm.  The company is relocating from San Diego to Allen.  The move is anticipated to create 218 jobs and bring $6.8 billion in capital investment.  In late 2019, Charles Schwab announced acquiring TD Ameritrade in a $26 billion transaction, moving its headquarters to Tarrant County from San Francisco.  Charles Schwab completed a new regional office, and TD Ameritrade completed a large project nearby.  The two companies combined are bringing thousands of jobs to the region. TripActions, a Palo Altobased company specializing in corporate travel, expanded its presence in Downtown Dallas. McKesson Corp, the nation's largest pharmaceutical distributor, relocated its headquarters to Irving. USAA added a 150,000-SF office building adjacent to its existing Plano location to bring the total headcount to 2,000 in north Texas, up by 800 employees.

A flurry of economic development wins has defined growth in the region over the last decade. North Texas has attracted over 150 new corporate headquarters during this period.  In 2017, Toyota moved into its 2.0 million SF North American headquarters at the Legacy West development in Plano.  The company relocated its sales, engineering, and financial services operations from California, bringing about 4,000 jobs. It has plans to add thousands more.  State Farm finished its regional expansion in 2016 and occupied 2.0 million SF in Richardson's CityLine development.  Another major headliner is Liberty Mutual Insurance, which has added around 5,000 jobs in Legacy West.  Existing employers like AT&T, 7-Eleven, JPMorgan Chase, USAA, and Fannie Mae are also expanding their local footprints.

The Dallas-Fort Worth metro economy continues to grow and attract more companies which has caused increased employment and demand for commercial real estate.  Due to the overall, outlook for the Dallas-Fort Worth MSA is favorable.

APP000073

**MARKET AREA MAP**



APP000074

**MARKET AREA ANALYSIS**

*Description of Market Area*

The subject is located at 13636 Goldmark Drive, in the City of Dallas, Dallas County, Texas.  The market area's boundaries have been defined as a rough polygon bounded by U.S. 75 to the east, Belt Line Road to the north, Coit Road to the west and Interstate 635 to the south.  A map of the market area is provided on the preceding page.

Dallas is the largest urban center of the Dallas-Fort Worth MSA, which is the fourth-most populous metropolitan area in the United States.  Dallas has developed into a strong industrial and financial center, as well as a major inland port, due to the convergence of railroad lines, interstate highways, and the construction of the Dallas/Fort Worth International Airport, one of the largest and busiest airports in the world.  Additionally, Dallas has one of the largest concentrations of corporate headquarters for publicly traded companies in the United States.

Retail use is fairly prevalent surrounding the outskirts of the subject, as a number of restaurants and shopping centers can be found directly north and east of the subject property.  Most of the market area covers residential neighborhoods to its immediate west and north.  The Dallas College Richland Campus.  The subject is not located within an Opportunity Zone.

*Linkages and Locational Attributes*

Interstate 635, U.S. Highway 75, and the Dallas North Tollway are the primary highways serving the market area.  The Dallas North Tollway runs north-south from Interstate 35E near downtown Dallas to U.S. Highway 380 in Frisco.  Interstate 635 forms a half loop around the City of Dallas, connecting to Dallas/Fort Worth International Airport in the west and Balch Springs in the southwestern portion of the metro area.  Furthermore, U.S. 75 runs north to south and stretches from Downtown Dallas, north through Plano, connecting suburban markets to the market area.  The market area is also well-served by a number of regional roads, including Forest Lane, Royal Lane, Preston Road, Hillcrest Rd, and Greenville Avenue.

*Air Transportation* - Commercial air transportation is handled through two major facilities.  DFW International Airport, located midway between Dallas and Fort Worth approximately 20 driving miles east of the subject, is the world's largest in terms of land area, covers in excess of 18,000 acres.  DFW Airport provides non-stop access to 148 U.S. and 51 international cities.  It's the U.S.'s third busiest airport and eighth busiest in the world.  The airport also provides employment for 217,000 individuals.

Dallas Love Field, located about seven miles southwest of the subject market area, is a second option for air travelers.  Love Field is home to Southwest Airlines.  Delta Airlines and Virgin America also have service at Love Field at this time.  Recent renovations to Love Field include a new centralized concourse with 20 gates, a remodeled lobby, baggage claim area and ticketing wing.

*Public Transit* - Dallas Area Rapid Transit (DART) is the public transportation provider for Dallas and 12 surrounding cities.  The extensive network of DART Rail and bus services moves more than 220,000 passengers per day across the service area.  DART operates local and express bus routes serving University Park and 11 other cities.  The DART Rail System provides service in Dallas, Carrollton, Farmers Branch, Garland, Irving, Plano, and Richardson.  The subject is five miles east of the Royal Lane DART rail and bus station.

APP000075

### Demographic Overview

The following table provides a summary of key demographic statistics for the subject's market area as well as data for the corresponding, one- and five-mile radial areas, the City of Dallas, and Dallas County.

| Market Area Demographic Summary | | | | | |
|---|---|---|---|---|---|
| | Market Area | 1 Mile Radius | 3 Mile Radius | City of Dallas | Dallas County |
| **Population** | | | | | |
| 2020 Census | 12,208 | 24,181 | 148,897 | 1,304,379 | 2,613,539 |
| 2023 Estimate | 12,057 | 24,011 | 148,736 | 1,306,486 | 2,612,622 |
| 2028 Projection | 12,012 | 24,074 | 150,446 | 1,326,059 | 2,646,900 |
| 2020 - 2023 % Annual Change | (0.4%) | (0.2%) | (0.0%) | 0.1% | (0.0%) |
| 2023 - 2028 % Annual Change | (0.1%) | 0.1% | 0.2% | 0.3% | 0.3% |
| Average Age | 32.4 | 33.0 | 38.2 | 36.4 | 36.4 |
| Median Age | 31.1 | 31.7 | 36.4 | 34.6 | 34.6 |
| **Households** | | | | | |
| 2020 Census | 4,502 | 8,494 | 60,261 | 523,798 | 965,537 |
| 2023 Estimate | 4,461 | 8,453 | 60,273 | 527,613 | 968,801 |
| 2028 Projection | 4,459 | 8,497 | 61,125 | 539,439 | 986,837 |
| 2020 - 2023 % Annual Change | (0.3%) | (0.2%) | 0.0% | 0.0% | 0.1% |
| 2023 - 2028 % Annual Change | (0.0%) | 0.1% | 0.3% | 0.4% | 0.4% |
| 2023 Average Household Size | 2.7 | 2.8 | 2.5 | 2.5 | 2.7 |
| **Income** | | | | | |
| 2023 Estimated Median Household | $42,841 | $50,756 | $66,316 | $61,602 | $68,008 |
| 2023 Estimated Avg. Household | $55,387 | $67,811 | $103,823 | $95,899 | $98,452 |
| % Under $50,000 | 59.0% | 49.2% | 37.6% | 41.6% | 36.7% |
| % $50,000 - $100,000 | 28.6% | 30.6% | 29.1% | 29.7% | 31.3% |
| % Over $100,000 | 12.3% | 20.2% | 33.3% | 28.7% | 32.0% |



Environics Analytics, 2023

### Population Trends

The market area has experienced an annual decline of 0.4% since 2020, while the City of Dallas has seen population grow by 0.1% annually over the same time period.  Over the next five years, the market area is expected to see population decline at a slower annual rate of 0.1%, while the City of Dallas is forecasted to see population grow by 0.3% annually.

### Income Demographics

When compared to the City of Dallas overall, a relatively large proportion of households in the market area earn less than $50,000 annually (59.0%).  Within the City of Dallas, only 41.6% fall within this income bracket.

APP000076

### Area Housing Stock

The bulk of housing in the market area is concentrated in multi-family homes which make up 84.6% of inventory. Overall, a higher proportion of households in the market area rent housing compared to the City of Dallas; home-ownership levels are estimated at 17.8% and 41.1% in the market area and City of Dallas, respectively. At $232,896, the estimated value of owner-occupied homes in the market area is below the City of Dallas median of $307,271.

| 2023 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Market Area | | City of Dallas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 748 | 15.2% | 261,093 | 45.0% |
| 2-3-4 Units | 513 | 10.4% | 35,365 | 6.1% |
| 5-19 Units | 1,864 | 37.9% | 119,196 | 20.6% |
| 20 or more Units | 1,783 | 36.3% | 157,337 | 27.1% |
| Mobile Home, Trailer, Other | 8 | 0.2% | 6,726 | 1.2% |
| TOTAL | 4,916 | 100.0% | 579,717 | 100.0% |
| Home Ownership Levels | % Owner | 17.8% | % Owner | 41.1% |
| | % Renter | 82.2% | % Renter | 58.9% |
| Median Year Structure Built | | 1975 | | 1979 |
| Median Value of Owner-Occupied Homes | | $232,896 | | $307,271 |

Environics Analytics, 2023

### Resident Employment by Occupation

Top employment sectors in the market area include Construction/Extraction (18.0%), Food Prep/Serving (17.5%), and Building Grounds Maint (13.7%). Together, these three sectors make up 49.2% of total employment. When compared with the City of Dallas, the market area has a higher proportion of residents in the Food Prep/Serving occupation (17.5%).



### *Major Employers*

A list of principal employers in City of Dallas provided below.

| City of Dallas - Principal Employers | |
|---|---|
| Company | # of Employees |
| Dallas Independent School District | 22,671 |
| City of Dallas | 13,000 |
| AT&T Inc. | 10,990 |
| Medical City Dallas | 10,800 |
| Parkland Health and Hospital Systems | 10,577 |
| Taxas Instruments | 9,800 |
| Dallas County Community College | 8,230 |
| Methodist Dallas Medical Center | 7,114 |
| Dallas County | 6,500 |
| Children's Health | 6,355 |

Source: City of Dallas CAFR.  Acessed in 2023.

### *Market Drivers*

**Information Technology:**  According to the Dallas Chamber of Commerce, Dallas holds about 43% of the state's high-tech occupations.  Dallas is among the country's largest employment leaders for cutting-edge technology as the industry has evolved from telecom in the 1990's to enterprise technology, applications software engineering, and computer systems design and IT services.  The average wage for a Texas tech industry worker is estimated to exceed $102,000.

**Art & Media:**  The Dallas Arts District is home to the AT&T Performing Arts Center, the development that completed the vision of an arts and cultural center in downtown.  Dallas Museum of Art, Morton H. Meyerson Symphony Center, Nasher Sculpture Center and Klyde Warren Park are all located in this area as well.  Kay Bailey Hutchinson Convention Center is over 2.0 million SF in size and contains over 1.0 million SF of exhibit space, making it the largest center of its kind in the United states.  The Dallas Morning News, D Magazine, KDFW and WFAA have offices in the market area.

**Business & Financial Services:**  The City of Dallas is home to 21 Fortune 500 companies.  Due to the city's thriving business environment, the areas in and around Dallas are prime locations for investors.  Home to top financial institutions JP Morgan Chase, Bank of America, Citigroup, and Wells Fargo, business services make up about 20.0% of Dallas' workforce

**Medical City Hospital:**  Medical City Hospital is located a few blocks to the west of the subject. Medical City Dallas Hospital is a full-service, 876-bed tertiary care center consisting of more than 1,150 physicians and offering nearly 100 specialties.  Patients travel to Medical City from all over the United States and more than 75 other countries for the treatment offered by the 400+ in-house physician specialists.

**Texas Health Presbyterian Hospital:**  About 3.0 miles to the south of the subject, Texas Health Presbyterian Hospital Dallas provides heart health, oncology, neurosurgery and women's health/infant care.  The hospital is designated as a Level II Trauma Center and Comprehensive Stroke Center.

APP000078

### *Resident Employment Trends*

The City of Dallas is currently exhibiting an unemployment rate of 3.3% as of September 2022. In 2021, the total number of employed residents in the City of Dallas increased by 7,435. Over the 12-month trailing period through September 2022, resident employment growth slowed as the number of employed residents grew by 6,397.

The total number of employed residents in the City of Dallas is now 6.1% higher than the recent peak reached in 2021. When compared to Dallas County, the City of Dallas's unemployment rate is lower, but unemployment in the City of Dallas is 0 percentage points above the nation.

| Resident Employment Trends | | | | | |
|---|---|---|---|---|---|
| | City of Dallas | | Dallas County | | Dallas-Fort Worth MSA |
| Year | Employment | Unemployment Rate | Employment | Unemployment Rate | Unemployment Rate |
| 2011 | 558,597 | 8.3% | 1,110,079 | 8.4% | 7.8% |
| 2012 | 570,666 | 7.0% | 1,133,951 | 7.1% | 6.5% |
| 2013 | 580,276 | 6.5% | 1,150,663 | 6.6% | 6.2% |
| 2014 | 597,306 | 5.3% | 1,180,636 | 5.5% | 5.1% |
| 2015 | 612,229 | 4.2% | 1,208,806 | 4.3% | 4.1% |
| 2016 | 634,785 | 4.0% | 1,246,814 | 4.0% | 3.9% |
| 2017 | 644,448 | 3.9% | 1,264,990 | 4.0% | 3.7% |
| 2018 | 645,789 | 3.8% | 1,273,283 | 3.8% | 3.6% |
| 2019 | 649,989 | 3.5% | 1,281,824 | 3.5% | 3.3% |
| 2020 | 618,428 | 8.0% | 1,219,627 | 7.8% | 7.1% |
| 2021 | 656,970 | 5.7% | 1,295,698 | 5.6% | 5.1% |
| Most Current Data | | | | | |
| Nov 2021 | 679,127 | 4.4% | 1,339,408 | 4.4% | 3.9% |
| Nov 2022* | 712,428 | 3.5% | 1,405,016 | 3.5% | 3.3% |



Source: U.S. Bureau of Labor Statistics, 01/2023. The preceding data reflects all BLS revisions to date.

* - Preliminary data

**CONCLUSION**

The City of Dallas lies in the heart of one of the fastest growing regions in the United States.  With the subject market's central location within the Dallas-Fort Worth metroplex, and its easy access to both DFW International Airport and Dallas Love Field Airport, Dallas offers an ideal location for businesses and travelers in the North Texas region.  As the city grows and is notable for its prosperous atmosphere, unemployment in the City of Dallas is at a new decade low rate of 3.5%, which is on par with Dallas County but higher than the Dallas-Fort Worth MSA.

Despite a projected population decline, the market area holds several positive attributes.  This includes an advanced highway infrastructure, public transportation options, and a highly suburban location within Dallas' north suburbs.

It must be noted that because of its positive attributes, the market area is aiming to enhance its status as a desirable, attractive, safe, healthy and fiscally-sound community with quality neighborhoods, while maintaining a high standard of living, learning, shopping, working, recreation, and open spaces. The neighborhoods surrounding the market area are notorious for being of the highest quality, as evident by the massive income that these households take home.  As a result, the market area and the City of Dallas appears well poised for continuous growth.

APP000080

**ZONING ANALYSIS**

The subject site currently has a zoning of MU-3, Mixed Use 3, as designated by the City of Dallas. The purpose of the MU-3 district is to provide for the development of high density retail, office, hotel, and/or multifamily residential uses in combination on single or contiguous building sites; to encourage innovative and energy conscious design, efficient circulation systems, the conservation of land, and the minimization of vehicular travel. A copy of the zoning map is displayed subsequently.

A brief synopsis of pertinent data for the subject's zoning is as follows:

| | |
|---|---|
| **Maximum Lot Coverage:** | 80% |
| **Maximum Density:** | 4.0 FAR |
| **Maximum Building Height:** | 270 feet or 20 stories |
| **Minimum Front Yard:** | 15 feet |
| **Minimum Side Yard:** | 0 feet |
| **Minimum Rear Yard:** | 0 feet |
| **Parking Requirements:** | Varies according to use. |
| **Permitted Uses:** | High density retail, office, hotel and/or multifamily residential uses in combination on single or contiguous building sites. |

The subject improvements appear to be in compliance with the requirements and standards of existing zoning regulations.  An extract from the relevant zoning map is below.



APP000081

## TAX AND ASSESSMENT ANALYSIS

*Property Tax Administration*

The administration of the property tax system in Texas involves both state and local entities and officials.  State law governs how the process works.

*Stages of the Texas Property Tax System*

The system has four stages: 1) valuing the taxable property, 2) protesting the values, 3) adopting the tax rates, and 4) collecting the taxes.

January 1 marks the beginning of property appraisal.  What a property is used for on January 1, market conditions at that time, and who owns the property on that date determine whether the property is taxed, its value, and who is responsible for paying the tax.

Between January 1 and April 30, the appraisal district processes applications for tax exemptions, agricultural appraisals, and other tax relief.

Around May 15, the appraisal review board (ARB) begins hearing protests from property owners who believe their property values are incorrect or who did not get exemptions or agricultural appraisal. The ARB is an independent panel of citizens responsible for handling protests about the appraisal district's work.  When the ARB finishes its work, the appraisal district gives each taxing unit a list of taxable property.

In August or September, the elected officials of each taxing unit adopt tax rates for their operations and debt payments.  Several taxing units tax your property. Every property is taxed by the county and the local school district. You also may pay taxes to a city and to special districts such as hospital, junior college, water, fire, and others.

Tax collection starts around October 1 as tax bills go out. Taxpayers have until January 31 of the following year to pay their taxes. On February 1, penalty and interest charges begin accumulating on unpaid tax bills. Tax collectors may start legal action to collect unpaid taxes on February 1.

*Assessment*

The assessment of property for taxation on the basis of a percentage of its appraised value is prohibited.  All property shall be assessed on the basis of 100% of its appraised value.

The market value of property shall be determined by the application of generally accepted appraisal methods and techniques.  If the appraisal district determines the appraised value of a property using mass appraisal standards, the mass appraisal standards must comply with the Uniform Standards of Professional Appraisal Practice.  The same or similar appraisal methods and techniques shall be used in appraising the same or similar kinds of property.  However, each property shall be appraised based upon the individual characteristics that affect the property's market value.  In determining the market value of property, the chief appraiser shall consider the cost, income, and market data comparison methods of appraisal and use the most appropriate method.

*Reassessment Cycle*

The appraisal district must repeat the appraisal process for property in the county at least once every three years.

APP000082

*Collection/Penalties/Interest*

*Deadline*

The assessor shall mail tax bills by October 1 each year, or as soon thereafter as practicable. The deadline to pay is January 31. The tax collector will add penalty and interest charges to taxes that are unpaid on February 1.

## SUBJECT PROPERTY TAXES

The State of Texas has provided for a unified system of taxation for the assessment of real estate property taxes. An appraisal district is established on a county basis for assessing real estate within the county. The individual taxing authorities within the county set their own tax rates.

According to the Dallas Central Appraisal District, the subject property falls under the taxing jurisdiction of numerous taxing entities, detailed below. Because assessed value is typically the result of a mass appraisal process based more on statistical probability than individual property characteristics, it should be noted that there is frequently a difference between assessed value and market value for an individual property. Tax rates for 2022, which are the basis for taxes payable in 2023 for each taxing entity, are as follows.

| 2022 Tax Rate Composition | |
|---|---|
| City of Dallas | $0.745800 |
| Richardson ISD | $1.314600 |
| Dallas County | $0.227946 |
| Dallas County Community College | $0.115899 |
| Parkland Hospital | $0.235800 |
| *Total Tax Rate* | *$2.640045* |

*2022 Assessments and Taxes*

The property's 2022 assessments and taxes, are summarized in the following table. According to the Dallas Central Appraisal District, business personal property is included in the assessed value for hotels, motels, and apartments.

| 2022 Tax and Assessment Information | |
|---|---|
| Account Number | 00000769000800000 |
| Total Assessed Value | $1,445,000 |
| Total Assessed Value per Unit | $20,643 |
| Tax Rate | $2.640045 |
| **Taxes** | **$38,149** |
| **Taxes per Unit** | **$544.99** |
| Note: Assessment includes business personal property | |

*Tax Comparables*

In order to determine the validity of the subject's assessed value and real estate taxes, we have compiled the following taxes for three nearby apartment projects similar to the subject.  This information is summarized in the following table.

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Summary of Tax Comparables** | | | | | |
| *No.* | *Project Name Location* | *Total Assessed Value* | *Units* | *Tax Valuation Per Unit* | *Total 2022 Taxes* | *Taxes Per Unit* |
| 1 | 13259 Emily Road, Dallas | $4,575,000 | 60 | $76,250 | $163,396 | $2,723 |
| 2 | 13330 Emily Road, Dallas | $1,867,420 | 32 | $58,357 | $155,226 | $4,851 |
| 3 | 8444 Spring Valley Road, Richardson | $4,405,310 | 54 | $81,580 | $246,636 | $4,567 |
| *Source: Dallas Central Appraisal District* | | | | | | |

The subject property has an assessed value of $20,643 per unit in 2022 with annual taxes of $545 per unit.  The comparables indicate a higher range of taxes per unit of $2,723 to $4,851, mainly higher than subject, likely due to subject's poor condition and lack of amenities.  It is also noted that the subject has a higher unit count compared to the other apartment properties.

*Estimate of Proforma Taxes*

Based on our knowledge of the property tax market in North Texas and given that our market value opinion is significantly higher than the 2022 assessed value, a prudent investor would base its proforma taxes on a higher assessed value, particularly as the property is under an LOI of sale.

Considering the preceding, we estimate an assessed value for subject of $3,575,000 ($51,071/Unit), for our estimate of proforma taxes, based upon 65% of the projected sale price.  Using this assessed value, subject's proforma taxes are estimated to be **$95,000,** rounded.

## SITE ANALYSIS

The following description and analysis is based on our inspection of the site and project description provided to the appraisers by management and obtained from public records.  An aerial layout photograph is provided at the end of this section.

| | |
|---|---|
| **Size:** | 3.56 acres (155,074 square feet) per Dallas County. |
| **Shape/Site Utility:** | The site is approximately rectangular in shape, and there are no unusual features which limit its utility. |
| **Improvements:** | The subject currently consists of the improved 70-units of the Amerigold Suites.  The property is understood to have been operated as a furnished lodging facility in the past but has transferred to a non-furnished apartment format, although without many of the amenities that apartment communities now enjoy.  As such, it is operated as a hybrid between an apartment community and an extended stay hotel.  For a detailed summary of the  improvements, please refer to the *Description of the Improvements* section. |
| **Density:** | 19.7 units per acre. |
| **Street Frontage:** | The site has frontage along the southeast side of Goldmark Drive with frontage also along the southwest line of Midpark Road. |
| **Access:** | Access to and from the subject is provided by Goldmark Drive, within a block of North Central Expressway.  Thus, overall, access is considered good for its use. |
| **Visibility/Exposure:** | The property has good visibility and exposure along both carriers to which it fronts. |
| **Topography:** | The site is generally level and at grade with surrounding streets, but with a slight downward slope from east to west. No drainage problems were noted upon site inspection. |
| **Hazardous Substances:** | We were not provided any reports pertaining to hazardous substances or environmental conditions for this assignment. During  the site inspection, we noticed no material signs of environmental  contamination. ***This appraisal specifically assumes that there are no hazardous materials affecting the subject site.***  NVC does not profess to be qualified in assessing environmental conditions of any site and the appraisers recommend that a qualified environmental engineer be retained to investigate the subject site in order to conclude whether any environmental liabilities exist. |
| **Soils:** | Although no soil analysis has been obtained, an inspection of the subject did not reveal any significant evidence of structural damage  caused  by  unstable soil.   However, such a determination lies outside  the  scope  of  this  appraisal assignment.  Such a determination should be made by a qualified professional. It is specifically assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such. |

APP000085

*Site Analysis - continued*

**Easements/Encumbrances:** As is the case with most major commercial sites, it is assumed there are numerous easements and encumbrances which affect the subject. Various electric, sewer, natural gas, and telephone easements are assumed to run throughout the property, but the appraisers are not aware of any easements or encumbrances that are estimated to be detrimental to the value of the site. ***It is specifically assumed that the aforementioned easements and encumbrances, or any unknown easements or encumbrances, do not adversely affect the subject's value or utility.***

**Flood Plain Status:** According to flood insurance rate map, community panel number 48113C0195K, dated July 7, 2014, published by the Federal Emergency Management Agency, the subject site is not located within a 100-year flood zone. A copy of the flood map is included in the *Addenda*.

**Zoning:** Please refer to the *Zoning Analysis* section in this report.

**Real Estate Taxes:** Please refer to the *Tax and Assessment Analysis* section of this report for tax information.

**Utilities:** All utilities, including water, sewer, gas, electricity, telephone, and cable TV are available adjacent to the site.

**Surrounding Land Uses:** Surrounding land uses are as follows:

North: Apartments
South: U-Haul Self Storage Facility
East: Red Roof Inn (lodging)
West: Apartments

**Comments:** Overall, the site appears well suited for a variety of uses including its current use. There are no detrimental factors inherent in the site which appear to limit development with its highest and best use.

***Please refer to the following page for an aerial photograph.***

APP000086

**Amerigold Suites - Aerial Photograph**



# DESCRIPTION OF THE IMPROVEMENTS

The subject property includes a total of 70 units in 11, two-story buildings, together with a leasing/community building and a small maintenenace shop, all situated on a 3.56-acre site. Per management, there are two basic floor plans ranging from 660 SF to 1,200 SF. The buildings are of wood frame construction with stucco and wood siding. Please refer to the photos in the Addenda.

During our inspection of the property, a random sampling of each of the subject's unit types were inspected. For the purposes of this appraisal, we have assumed that the condition and decor of the remaining units (those not inspected) is similar to those inspected and described within this report. If it is determined that the condition and/or decor of the remaining units is significantly different that described herein, a re-evaluation of the subject could be required.

The following description is taken from information provided by the owner/management of the subject property. Additional photographs of the subject and unit floor plans are provided in the Addenda.

**YEAR OF CONSTRUCTION:**       1981

**TOTAL UNITS:**       70

**NET RENTABLE AREA:**       51,600 SF

**AVERAGE UNIT SIZE:**       737 SF

**UNIT MIX (per Management):**

| Unit Mix | | | | |
|---|---|---|---|---|
| Unit Type | Avg. Size (SF) | No. of Units | % of Total | Rentable Area (SF) |
| 1 BR 1 BA | 660 | 60 | 85.7% | 39,600 |
| 2 BR 2 BA | 1,200 | 10 | 14.3% | 12,000 |
| | 400 | 70 | 100.0% | 51,600 |

**DENSITY:**       19.7 units per gross acre.

**PARKING:**       90+ surface parking spaces. Parking ratio of 1.29 spaces per unit.

**STRUCTURE:**       Assumed to be wood frame on concrete slab.

**EXTERIOR FINISH:**       Painted stucco with wood siding and trim.

**ROOFING:**       Pitched roofs with composition tiles. Solar panels have been installed on the roofs of nine of the buildings, which produce electricity.

**CEILINGS:**       Painted drywall.

**DOORS:**       Exterior doors are hollow core metal entry doors, interior doors consist of hollow core wood with painted wood frames.

**WINDOWS:**       Double pane with wood or metal frames.

**FLOOR COVERINGS:**       Carpet in the living and bedroom areas; ceramic tile flooring in the entryways, some living areas, bathrooms and kitchens.

APP000088

*Description of the Improvements - continued*

**KITCHENS:**

Open style kitchens with wood cabinetry. Kitchens include double sink, electric range/oven, dishwasher, microwave, and refrigerator with freezer.

**BATHROOMS:**

All bathrooms have a fiberglass shower or tub/shower, toilet and singular vanity with granite or simulated granite vanities and backsplashes. .

**HVAC/MECHANICAL:**

Each unit has a roof-mounted A/C unit.

**AMERICAN WITH DISABILITIES ACT:**

We were not provided an ADA assessment of the subject, nor are we experts in this area. It is assumed that the subject is in full compliance with the Americans With Disabilities Act (ADA).

**UNIT AMENITIES:**

Full size refrigerator, range/oven, dishwasher, microwave, fireplace, patio or balcony, and available cable and internet. The units are rented unfurnished.

**PROJECT AMENITIES:**

Pool and small fitness center, which was closed due to flooding at the time of inspection. In addition, the leasing center/clubhouse has a renovated community room, but this was not being utilized at the time of inspection.

**SITE IMPROVEMENTS:**

Asphalt and concrete paved parking areas and driveways with concrete curbs and sidewalks, trash enclosures, and perimeter fencing, project signage and landscaping (unsprinklered).

**CONDITION:**

The improvements are considered to be below-average condition. Various deferred maintenance was observed at the time of inspection, including damage due to flooding from broken pipes, peeling paintwork, deteriorated siding, craked and broken concrete paving, damaged unit interiors. These would likely be dealt with in the purchaser's proposed renovations.

**EFFECTIVE AGE:**

35 years

**REMAINING ECONOMIC LIFE:**

According to the Marshall & Swift Valuation service, the average life of an apartment complex similar to the subject is approximately 55 years. Thus, the remaining life is estimated at 20 years, but this would likely be extended by a renovation..

**PERSONAL PROPERTY:**

The project includes personal property typical for an apartment project, in addition to the kitchen appliances for each of the 70 units. Also included is management office furniture and equipment, community room kitchen appliances, and pool equipment and furniture.

APP000089

**CONCLUSION:**

The subject is a 70-unit extended stay property modeled after a garden-style apartment complex and is comprised of 11, 2-story buildings in addition to a single-story leasing and community center building, and a small maintenance shop/garage building.

The unit mix consists of one- and two-bedroom units that are generally similar in size to apartment units, but far larger than traditional extended stay rooms.

Based on our observations during the inspection, the improvements appear to be of average quality, but in well below-average condition. Renovations proposed by the prospective purchaser would likely improve the appeal of the property and enable it to regain occupancy closer to 100%.

**AMERIGOLD SUITES _ AERIAL PHOTOGRAPH**



**ANALYSIS OF DATA AND CONCLUSIONS**

APP000092

# DALLAS-FORT WORTH APARTMENT MARKET ANALYSIS

A proper analysis and understanding of the market factors which influence the apartment market (subject's most likely long-term usage) is necessary as a precursor to the appraisal process. We have relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in the Dallas-Fort Worth market and *data is specific to "market rate" units (i.e., effective rent per unit, after concessions)*. Based upon data sources available, the following is an analysis of the factors which impact demand for apartment units.

### Dallas-Fort Worth Apartment Market Overview

Like many markets, Dallas-Fort Worth is reporting softer demand for multifamily units compared to the surge in 2021 and pre-crisis levels. The surge of inflation and souring consumer sentiment are freezing household formation, a key ingredient for multifamily demand. Both vacancy and availability rates are trending higher, closer to pre-pandemic norms.

Even so, submarkets with healthy demographic tailwinds continue to drive demand in the market. Frisco/Prosper and Denton have been leading the market in net absorption, reflecting the continuous population growth in these areas. Meanwhile, submarkets with a greater concentration of renters by necessity are reporting weaker demand. For example, Mesquite, Garland/Rowlett, and Arlington reported stagnant demand in the past year, pushing vacancy rates higher to pre-crisis norms.

The metroplex remains a target for corporate relocations and expansions, and steady in-migration is another driver for apartment demand. Dallas-Fort Worth ranks as one of the top metros for nominal employment growth in the past decade. New residents are less likely to purchase a home until they identify neighborhoods they prefer, leading many to rent initially.

Demand has outstripped the supply of for-sale housing over the past expansion, leading to a competitive housing market. As a result of the pandemic, surging demand for single-family homes has created a hyper-competitive environment, particularly among renters seeking to enter homeownership. As a result, some households are left renting for longer until additional supply hits the market. More recently, rising interest rates are expected to keep renter retention elevated.

As vacancy and availability rates trend higher, closer to pre-pandemic norms, the pace of rent growth is softening, also coming closer to pre-crisis performances. Class A rents are declining fastest, while Class B rents are proving more resilient.

In the meantime, the pace of multifamily construction in Dallas-Fort Worth has remained relatively flat. Permitting activity is rebounding, after slipping during the pandemic, leading to leaner construction starts. While rising permitting activity is an encouraging sign for future construction, developers continue to struggle with supply chain bottlenecks, inflationary pressures, and availability of construction materials. In a rising interest rate environment, the cost to finance new projects is a barrier to kicking off construction. All these forces have weighed on developers' ability to get projects off the ground quickly.

### Dallas-Fort Worth Apartment Market Year-Over-Year Trend Summary

From 4Q 2021 to 4Q 2022, vacancy within the market increased by 220 bps to a rate of 8.4%. Over the same time, rental rates increased by 3.9% to an average rate of $1,509/unit. In 4Q 2022, 1,755 apartment units were returned to the market while 4,023 new units were added. Both metrics fell substantially from 4Q 2021.

APP000093

### Dallas-Fort Worth Apartment Market Snapshot

The following table provides an overview of apartment market statistics by property subtype for the metropolitan Dallas-Fort Worth market. As shown, vacancy is currently higher in the Class B segment at 9.3%. By number of units, the Dallas-Fort Worth apartment market exhibits the following composition: Class A-31.9%, Class B-44.2%, and Class C-23.9%.

| | Existing Inventory | | | Vacancy Rate | | | |
|---|---|---|---|---|---|---|---|
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 836 | 258,307 | 31.9% | 22,731 | 8.8% | 417 | $1,828 |
| Class B | 1,822 | 358,406 | 44.2% | 33,332 | 9.3% | (150) | $1,459 |
| Class C | 2,573 | 193,877 | 23.9% | 13,184 | 6.8% | (203) | $1,175 |
| Total | 5,231 | 810,590 | 100.0% | 69,246 | 8.5% | 64 | $1,513 |

Source: CoStar Properties Analytical Search, 01/17/2023. RBA = Rentable Building Area

### Product Class Definitions

Each class of apartment building is defined below, using parameters established by BOMA International. Please note that these are primarily market classifications, not construction classifications:

**Class A**: Generally, garden product built within the last 10 years. Properties with a physical age greater than 10 years but have been substantially renovated. Commands rents within the range of Class "A" rents in the submarket. Well merchandised with landscaping, attractive rental office and/or club building. High-end exterior and interior amenities as dictated by other Class "A" products in the market.

**Class B**: Generally, product built within the last 20 years. Exterior and interior amenity package is dated and less than what is offered by properties in the high end of the market. Good quality construction with little deferred maintenance. Commands rents within the range of Class "B" rents in the submarket.

**Class C**: Generally, product built within the last 30 years. Limited, dated exterior and interior amenity package. Improvements show some age and deferred maintenance. Commands rents below Class "B" rents in submarket. Majority of appliances are "original".

APP000094

### *Dallas-Ft. Worth Apartment Market Map*

The following map shows apartment properties within the Dallas-Ft. Worth metro.  The blue markers are properties that are currently available: these properties are for sale, for lease, or both.  The gray markers are properties that are not currently available.  Please note that several markers overlap.



APP000095

### Dallas-Ft. Worth Apartment Market Trends - Total

Apartment expansion in the Dallas-Fort Worth market has been robust over the past 10 years, peaking in 2021, but remaining substantial through 1Q 2023. Steady deliveries resulted in elevated vacancy, despite record demand in the market through 2021. Vacancy rose to 9.1% in 2020, fell to 6.2% in 2021, but jumped back up to 8.4% in 2022, with only 3,523 units of positive net absorption by the year's end. When vacancy was at its lowest in 2021, rent growth surged by 16.1%. However, rent growth is now moderating, as demand contracts. The 10-year average vacancy rate for the market is 7.8%, and as of YTD 2023, vacancy has risen above that mark to 8.5%. Rental rates are up by only 0.3% since year-end 2022.

| Dallas-Fort Worth Apartment Market Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 4,366 | 603,050 | 12,616 | 12,539 | 7.1% | $1,020 | N/A |
| 2014 | 4,419 | 617,251 | 14,201 | 12,536 | 7.2% | $1,052 | 3.1% |
| 2015 | 4,478 | 633,509 | 16,258 | 18,788 | 6.6% | $1,113 | 5.8% |
| 2016 | 4,567 | 655,571 | 22,062 | 16,167 | 7.3% | $1,149 | 3.2% |
| 2017 | 4,681 | 685,068 | 29,497 | 16,277 | 8.9% | $1,172 | 2.0% |
| 2018 | 4,788 | 708,650 | 23,582 | 21,639 | 8.9% | $1,202 | 2.6% |
| 2019 | 4,899 | 733,655 | 25,005 | 23,960 | 8.7% | $1,245 | 3.6% |
| 2020 | 5,015 | 759,702 | 26,047 | 21,226 | 9.1% | $1,251 | 0.5% |
| 2021 | 5,126 | 786,539 | 26,837 | 47,155 | 6.2% | $1,452 | 16.1% |
| 2022 | 5,228 | 809,646 | 23,107 | 3,523 | 8.4% | $1,509 | 3.9% |
| CAGR/Averages | | 3.3% | 21,921 | 19,381 | 7.8% | $1,217 | 4.4% |
| Current Year Data | | | | | | | |
| YTD | 5,231 | 810,590 | 944 | 64 | 8.5% | $1,513 | 0.3% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | 220 | 70 | | |
| Rents | 3.9% | (1.6%) | | |
| Absorption (SF) | (7,066) | (2,278) | | |
| Completions (SF) | (2,030) | (5,004) | | |

Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

### *Dallas-Ft. Worth Apartment Market Trends - Class A*

Class A units have experienced the most significant growth in the Dallas-Fort Worth market. Demand for Class A units remained robust from 2015 through 2021 but saw a steep drop-off in 2022. In 2021, vacancy fell to 7.1%, but turned back upward in 2022. Rent growth has followed suite, with growth of 18.1% in 2021, backing off to growth of just 2.2% in 2021. At the start of 2023, vacancy remains at 8.8%, with rents rising by 0.5%.

| Dallas-Fort Worth Apartment Market Trends - Class A | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 344 | 111,329 | 8,428 | 5,791 | 8.9% | $1,327 | N/A |
| 2014 | 373 | 121,092 | 9,763 | 7,169 | 10.4% | $1,359 | 2.4% |
| 2015 | 415 | 134,026 | 12,934 | 11,990 | 10.1% | $1,418 | 4.3% |
| 2016 | 468 | 149,530 | 15,504 | 12,575 | 11.0% | $1,442 | 1.7% |
| 2017 | 537 | 170,658 | 21,128 | 13,613 | 14.0% | $1,455 | 0.9% |
| 2018 | 603 | 191,363 | 20,705 | 18,160 | 13.8% | $1,476 | 1.4% |
| 2019 | 673 | 211,725 | 20,362 | 20,222 | 12.6% | $1,525 | 3.3% |
| 2020 | 750 | 232,479 | 20,754 | 17,554 | 12.8% | $1,507 | (1.2%) |
| 2021 | 799 | 247,646 | 15,167 | 27,386 | 7.1% | $1,780 | 18.1% |
| 2022 | 835 | 257,837 | 10,191 | 5,184 | 8.8% | $1,819 | 2.2% |
| CAGR/Averages | | 9.8% | 15,494 | 13,964 | 11.0% | $1,511 | 3.6% |
| Current Year Data | | | | | | | |
| YTD | 836 | 258,307 | 470 | 417 | 8.8% | $1,828 | 0.5% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | 170 | 70 | | |
| Rents | 2.2% | (2.7%) |  | |
| Absorption (SF) | (2,774) | (1,035) | | |
| Completions (SF) | (1,650) | (1,985) | | |

Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

APP000097

### *Dallas-Ft. Worth Apartment Market Trends - Class B*

The majority of apartment units in the Dallas-Fort Worth market are Class B unit, which comprise 44.2% of total units here.  In 2021, net absorption outpaced new supply allowing vacancy to contract to 6.4%.  As a result, rents rose by 15.8%.  The following year, a record number of new units delivered, while demand slowed significantly, causing vacancy to spike to a 10-year high of 9.1%. Rent growth continued in 2022, but at a below-average pace.  As of YTD, vacancy has continued to tick upward, with rent growth of 0.1%.

| Dallas-Fort Worth Apartment Market Trends - Class B | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 1,480 | 298,639 | 4,183 | 4,920 | 6.5% | $956 | N/A |
| 2014 | 1,504 | 303,077 | 4,438 | 4,578 | 6.3% | $990 | 3.6% |
| 2015 | 1,521 | 306,401 | 3,324 | 4,949 | 5.8% | $1,056 | 6.7% |
| 2016 | 1,552 | 312,641 | 6,240 | 3,349 | 6.6% | $1,092 | 3.4% |
| 2017 | 1,595 | 320,986 | 8,345 | 3,560 | 7.9% | $1,115 | 2.1% |
| 2018 | 1,630 | 323,780 | 2,794 | 3,982 | 7.4% | $1,148 | 3.0% |
| 2019 | 1,664 | 328,192 | 4,412 | 4,110 | 7.4% | $1,191 | 3.7% |
| 2020 | 1,697 | 333,462 | 5,270 | 3,689 | 7.8% | $1,206 | 1.3% |
| 2021 | 1,754 | 345,016 | 11,554 | 15,587 | 6.4% | $1,397 | 15.8% |
| 2022 | 1,820 | 357,932 | 12,916 | 2,342 | 9.1% | $1,457 | 4.3% |
| CAGR/Averages | | 2.0% | 6,348 | 5,107 | 7.1% | $1,161 | 4.8% |
| Current Year Data | | | | | | | |
| YTD | 1,822 | 358,406 | 474 | (150) | 9.3% | $1,459 | 0.1% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | 270 | 70 | | |
| Rents | 4.3% | (1.4%) | | |
| Absorption (SF) | (2,728) | (1,194) | | |
| Completions (SF) | (380) | (3,019) | | |

Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

APP000098

### *Dallas-Ft. Worth Apartment Market Trends - Class C*

In the Class C segment, new deliveries have been muted, which has helped maintain relatively healthy vacancy despite weak demand. Net absorption has fallen negative for Class C units in five out of the past six years. Despite weak demand, rent growth has continued each year. Strong demand was experienced in 2021, allowing vacancy to fall to a 10-year low, and rents to rise by 11.7%. In 2022, net absorption fell back into negative territory, although rent growth remained above average. At the start of 2023, 203 Class C units have returned to market, and rents have increased by 0.1%.

| Dallas-Fort Worth Apartment Market Trends - Class C | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 2,542 | 193,082 | 5 | 1,828 | 6.9% | $709 | N/A |
| 2014 | 2,542 | 193,082 | 0 | 788 | 6.5% | $738 | 4.1% |
| 2015 | 2,542 | 193,082 | 0 | 1,850 | 5.6% | $796 | 7.9% |
| 2016 | 2,547 | 193,400 | 318 | 245 | 5.6% | $846 | 6.3% |
| 2017 | 2,549 | 193,424 | 24 | (898) | 6.1% | $884 | 4.5% |
| 2018 | 2,555 | 193,507 | 83 | (502) | 6.4% | $918 | 3.8% |
| 2019 | 2,562 | 193,738 | 231 | (371) | 6.7% | $955 | 4.0% |
| 2020 | 2,568 | 193,761 | 23 | (19) | 6.7% | $980 | 2.6% |
| 2021 | 2,573 | 193,877 | 116 | 4,182 | 4.6% | $1,095 | 11.7% |
| 2022 | 2,573 | 193,877 | 0 | (4,004) | 6.7% | $1,174 | 7.2% |
| CAGR/Averages | | 0.0% | 80 | 310 | 6.2% | $910 | 5.8% |
| Current Year Data | | | | | | | |
| YTD | 2,573 | 193,877 | 0 | (203) | 6.8% | $1,175 | 0.1% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | 210 | 70 | | |
| Rents | 7.2% | 0.4% | | |
| Absorption (SF) | (1,565) | (50) | | |
| Completions (SF) | 0 | 0 | | |

Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

APP000099

### New Development

According to CoStar, there are currently 151 apartment properties under construction within the Dallas-Fort Worth apartment market that will add 39,600 new units to the market upon completion. The properties are well dispersed throughout the market; however, a large concentration of this new supply can be found in the Plano, Northwest Fort Worth, and Frisco/Prosper submarket clusters. There are another 71 apartment properties that are currently proposed for development within the market, with the potential to add 26,996 new apartment units, if completed, and two in final planning with 535 units.

| | Dallas-Fort Worth Apartment Market - New Development by Submarket Cluster | | | | | |
|---|---|---|---|---|---|---|
| | Under Construction | | | Proposed | | |
| Submarket | # of Properties | # of Units | % of Units | # of Properties | # of Units | % of Units |
| Plano | 7 | 4,246 | 10.7% | 0 | 0 | 0.0% |
| Northwest Fort Worth | 13 | 3,450 | 8.7% | 6 | 2,014 | 7.5% |
| Frisco/Prosper | 8 | 2,509 | 6.3% | 9 | 6,036 | 22.4% |
| Allen/McKinney | 10 | 2,387 | 6.0% | 3 | 1,850 | 6.9% |
| Arlington | 8 | 2,063 | 5.2% | 2 | 578 | 2.1% |
| Southwest Fort Worth | 9 | 1,971 | 5.0% | 3 | 1,106 | 4.1% |
| North Fort Worth | 5 | 1,637 | 4.1% | 3 | 1,005 | 3.7% |
| Southeast Fort Worth | 6 | 1,591 | 4.0% | 3 | 1,128 | 4.2% |
| West Dallas | 5 | 1,459 | 3.7% | 5 | 1,909 | 7.1% |
| Denton | 7 | 1,447 | 3.7% | 5 | 1,671 | 6.2% |
| Oak Cliff | 6 | 1,429 | 3.6% | 0 | 0 | 0.0% |
| Garland/Rowlett | 4 | 1,338 | 3.4% | 3 | 700 | 2.6% |
| Lewisville/Flower Mound | 5 | 1,317 | 3.3% | 0 | 0 | 0.0% |
| Far North Dallas | 5 | 1,186 | 3.0% | 2 | 1,291 | 4.8% |
| Richardson | 3 | 1,175 | 3.0% | 2 | 457 | 1.7% |
| Rockwall/Wylie | 4 | 1,110 | 2.8% | 2 | 612 | 2.3% |
| East Dallas | 10 | 1,075 | 2.7% | 6 | 1,426 | 5.3% |
| Grand Prairie | 4 | 977 | 2.5% | 0 | 0 | 0.0% |
| Farmers Branch/Carrollton | 3 | 887 | 2.2% | 1 | 264 | 1.0% |
| Southeast Dallas | 3 | 798 | 2.0% | 2 | 477 | 1.8% |
| Ellis County | 4 | 762 | 1.9% | 0 | 0 | 0.0% |
| Downtown Dallas | 3 | 648 | 1.6% | 2 | 733 | 2.7% |
| Las Colinas | 2 | 574 | 1.4% | 1 | 275 | 1.0% |
| Johnson County | 2 | 378 | 1.0% | 1 | 604 | 2.2% |
| South Dallas County | 2 | 356 | 0.9% | 0 | 0 | 0.0% |
| Uptown/Park Cities | 1 | 345 | 0.9% | 4 | 1,388 | 5.1% |
| Parker County | 1 | 332 | 0.8% | 0 | 0 | 0.0% |
| Southeast Outlying | 2 | 326 | 0.8% | 0 | 0 | 0.0% |
| Mesquite | 1 | 325 | 0.8% | 0 | 0 | 0.0% |
| Grapevine | 1 | 324 | 0.8% | 1 | 200 | 0.7% |
| North Richland Hills/Haltom City | 1 | 291 | 0.7% | 0 | 0 | 0.0% |
| Downtown Fort Worth | 1 | 283 | 0.7% | 1 | 202 | 0.7% |
| Northeast Outlying | 1 | 216 | 0.5% | 0 | 0 | 0.0% |
| Hood County | 1 | 145 | 0.4% | 0 | 0 | 0.0% |
| Henderson County | 1 | 122 | 0.3% | 0 | 0 | 0.0% |
| Northwest Dallas | 2 | 121 | 0.3% | 1 | 300 | 1.1% |
| East Fort Worth | 0 | 0 | 0.0% | 1 | 268 | 1.0% |
| Irving | 0 | 0 | 0.0% | 1 | 220 | 0.8% |
| Wise County | 0 | 0 | 0.0% | 1 | 282 | 1.0% |
| **TOTALS** | **151** | **39,600** | **100.0%** | **71** | **26,996** | **100.0%** |

Source: CoStar Properties Analytical Search, 01/17/2023.

| Dallas-Fort Worth Apartment Market - New Development by Submarket Cluster | | | |
|---|---|---|---|
| | Final Planning | | |
| Submarket | # of Properties | # of Units | % of Units |
| Southeast Dallas | 1 | 285 | 53.3% |
| Uptown/Park Cities | 1 | 250 | 46.7% |
| **TOTALS** | **2** | **535** | **100.0%** |

Source: CoStar Properties Analytical Search, 01/17/2023.

**CONCLUSION**

The Dallas-Fort Worth multifamily market remains on stable ground even as performances are softening from their record-setting pace last year. The region is seeing weaker demand for multifamily units as elevated economic uncertainty and stubborn inflation weigh on households' decision to sign new leases. In turn, the pace of rent growth is slowing, trending closer to precrisis norms through the end of the year.

Ranking among the top spots for apartment construction, overall development levels remain stable in Dallas-Fort Worth. The trend is counter to several other major Sun Belt markets whose pipelines have swelled over the past two years.

Robust economic underpinnings have fostered a healthy apartment market. Healthy job growth and continuous in-migration are two primary drivers of apartment demand in the metroplex. Even with a flow of new properties coming to the market, the renter pool continues to absorb new units at a steady pace. Continuous supply and leading absorption levels make Dallas-Fort Worth one of the country's fastest-growing and balanced multifamily markets.

The multifamily market has been an example of resilience across asset classes, and investors remain bullish on the Dallas-Fort Worth apartment market. According to CoStar, the metroplex remains a leader for sales volume in the country over the past two years, following a broader trend of investors descending on sunbelt markets amid economic uncertainty. Most deals are found in value-add opportunities, with the Mid-Cities and older sections of the metroplex such as East Dallas as active areas for investment. Meanwhile, core investors often target areas with amenity-rich assets within urban areas like Uptown.

A proper analysis and understanding of the market factors which influence the apartment submarket are necessary as a precursor to the appraisal process.  We have relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in Dallas-Fort Worth's Richardson submarket cluster.  ***Please note that data is specific to "market rate" units (i.e., effective rent per unit, after concessions).***

The map below shows the location of apartment properties within the Richardson submarket cluster.  The blue markers are properties that are currently available: these properties are for sale, for lease, or both.  The gray markers are properties that are not currently available.  Please note that some markers overlap.



***Richardson Apartment Submarket Cluster Snapshot***

The table below provides a breakdown of apartment market statistics by property class for the Richardson submarket cluster.  As shown, vacancy is currently higher in the Class B segment at 7.5%.  By number of units, the Richardson submarket cluster displays the following composition: Class A-12.7%, Class B-59.6%, and Class C-27.6%.

| | Existing Inventory | | | Vacancy Rate | | | |
|---|---|---|---|---|---|---|---|
| **Richardson Apartment Submarket Cluster Snapshot** | | | | | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 11 | 3,145 | 12.7% | 189 | 6.0% | (3) | $1,745 |
| Class B | 62 | 14,715 | 59.6% | 1,104 | 7.5% | (10) | $1,264 |
| Class C | 55 | 6,823 | 27.6% | 464 | 6.8% | (18) | $1,205 |
| Total | 128 | 24,683 | 100.0% | 1,756 | 7.1% | (31) | $1,309 |

Source: CoStar Properties Analytical Search, 01/17/2023. RBA = Rentable Building Area

APP000102

### *Richardson Apartment Submarket Cluster – Total Trends*

Over the past several years, the Richardson submarket cluster has been in a phase of expansion, fueled by strong population gains and growing suburbs outside of the Dallas area.  The vacancy rate for the Richardson apartment submarket cluster currently sits at 7.1%, which is 1.4 percentage points lower than vacancy in the metropolitan area overall.  The submarket cluster's vacancy rate reached a recent high of 9.9% in year-end 2020, but the submarket cluster's vacancy rate has declined significantly since that point.  At $1,309/unit, effective rental rates in the submarket cluster are 13.5% lower than those in the metropolitan market.  Additionally, the submarket cluster has received new apartment space in seven of the previous 10 years.

| Richardson Apartment Submarket Cluster Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 120 | 22,904 | 0 | 292 | 6.9% | $808 | N/A |
| 2014 | 121 | 23,039 | 135 | 311 | 6.1% | $837 | 3.6% |
| 2015 | 122 | 23,447 | 408 | 410 | 5.9% | $904 | 8.0% |
| 2016 | 123 | 23,529 | 82 | 33 | 6.1% | $956 | 5.8% |
| 2017 | 125 | 24,189 | 660 | (85) | 9.1% | $983 | 2.8% |
| 2018 | 125 | 24,189 | 0 | 256 | 8.0% | $1,017 | 3.5% |
| 2019 | 126 | 24,262 | 73 | (81) | 8.3% | $1,059 | 4.1% |
| 2020 | 127 | 24,634 | 372 | (54) | 9.9% | $1,066 | 0.7% |
| 2021 | 128 | 24,683 | 49 | 911 | 6.4% | $1,194 | 12.0% |
| 2022 | 128 | 24,683 | 0 | (143) | 7.0% | $1,297 | 8.6% |
| CAGR/Averages | | 0.8% | 178 | 185 | 7.4% | $1,012 | 5.4% |
| Current Year Data | | | | | | | |
| YTD | 128 | 24,683 | 0 | (31) | 7.1% | $1,309 | 0.9% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | 60 | 40 | | |
| Rents | 8.6% | 2.0% | | |
| Absorption (SF) | (313) | (88) | | |
| Completions (SF) | 0 | 0 | | |



Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

APP000103

### *Richardson Apartment Submarket Cluster – Class A Trends*

A majority of new development within the submarket cluster have been concentrated within the Class A segment.  As such, new Class A supply has often outpaced demand, resulting in small spikes in vacancy.  In 2021, the Class A apartment segment had no new units delivered, while 337 units were absorbed, causing the vacancy rate to decline to 4.4%.  As vacancy decreased, 2021's average rent increased by 18.5% to $1,617/unit.  In 2022, there were no new units delivered, while 45 units were returned, causing the vacancy rate to increase to 5.9%.  As vacancy increased, 2022's average rent increased by 10.0% to $1,779/unit.  YTD metrics show that no units have been delivered, while three units have been returned, increasing the vacancy rate to 6.0%.  YTD 2023's average rent has decreased from year-end 2022 by 1.9% to $1,745/unit, which is 4.5% lower than the metro market.  Additionally, the submarket cluster has received new Class A apartment space in six of the previous 10 years.

| Richardson Apartment Submarket Cluster Trends - Class A | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 5 | 1,696 | 0 | 8 | 5.4% | $1,229 | N/A |
| 2014 | 6 | 1,831 | 135 | 156 | 3.8% | $1,248 | 1.5% |
| 2015 | 7 | 2,239 | 408 | 199 | 12.4% | $1,308 | 4.8% |
| 2016 | 8 | 2,321 | 82 | 89 | 11.7% | $1,351 | 3.3% |
| 2017 | 9 | 2,700 | 379 | 187 | 17.1% | $1,316 | (2.6%) |
| 2018 | 9 | 2,700 | 0 | 291 | 6.3% | $1,331 | 1.1% |
| 2019 | 10 | 2,773 | 73 | 28 | 5.2% | $1,380 | 3.7% |
| 2020 | 11 | 3,145 | 372 | 42 | 15.4% | $1,365 | (1.1%) |
| 2021 | 11 | 3,145 | 0 | 337 | 4.4% | $1,617 | 18.5% |
| 2022 | 11 | 3,145 | 0 | (45) | 5.9% | $1,779 | 10.0% |
| CAGR/Averages | | 7.1% | 145 | 129 | 8.8% | $1,392 | 4.2% |
| Current Year Data | | | | | | | |
| YTD | 11 | 3,145 | 0 | (3) | 6.0% | $1,745 | (1.9%) |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | 150 | 60 | | |
| Rents | 10.0% | 2.6% | | |
| Absorption (SF) | (64) | (18) | | |
| Completions (SF) | 0 | 0 | | |



Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

### *Richardson Apartment Submarket Cluster – Class B Trends*

The Class B segment has also received a fair share of new development, albeit, at a more moderate pace compared to the Class A segment. In 2021, the Class B apartment segment had 49 new units delivered, while 521 units were absorbed, causing the vacancy rate to decline to 7.5%. As vacancy decreased, 2021's average rent increased by 11.6% to $1,155/unit. In 2022, there were no new units delivered, while seven units were absorbed, causing the vacancy rate to drop to 7.4%. As vacancy decreased, 2022's average rent increased by 7.4% to $1,240/unit. YTD metrics show that no units have been delivered, while 10 units have been returned, increasing the vacancy rate to 7.5%. YTD 2023's average rent has increased from year-end 2022 by 1.9% to $1,264/unit, which is 13.4% lower than the metro market.

| Richardson Apartment Submarket Cluster Trends - Class B | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 60 | 14,385 | 0 | 292 | 7.6% | $766 | N/A |
| 2014 | 60 | 14,385 | 0 | 70 | 7.1% | $794 | 3.7% |
| 2015 | 60 | 14,385 | 0 | 223 | 5.6% | $869 | 9.4% |
| 2016 | 60 | 14,385 | 0 | (63) | 6.0% | $921 | 6.0% |
| 2017 | 61 | 14,666 | 281 | (219) | 9.3% | $951 | 3.3% |
| 2018 | 61 | 14,666 | 0 | 43 | 9.0% | $989 | 4.0% |
| 2019 | 61 | 14,666 | 0 | (82) | 9.6% | $1,025 | 3.6% |
| 2020 | 61 | 14,666 | 0 | (167) | 10.7% | $1,035 | 1.0% |
| 2021 | 62 | 14,715 | 49 | 521 | 7.5% | $1,155 | 11.6% |
| 2022 | 62 | 14,715 | 0 | 7 | 7.4% | $1,240 | 7.4% |
| CAGR/Averages | | 0.3% | 33 | 63 | 8.0% | $975 | 5.5% |
| Current Year Data | | | | | | | |
| YTD | 62 | 14,715 | 0 | (10) | 7.5% | $1,264 | 1.9% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | (10) | 20 | | |
| Rents | 7.4% | 1.9% | | |
| Absorption (SF) | (214) | (67) | | |
| Completions (SF) | 0 | 0 | | |



Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

APP000105

***Richardson Apartment Submarket Cluster – Class C Trends***

New development within the Class C segment has been nonexistent, due to the submarket cluster's preference for higher class, amenity rich properties in the Class A and Class B segments. In 2021, the Class C apartment segment had no new units delivered, while 55 units were absorbed, causing the vacancy rate to decline to 5.0%. As vacancy decreased, 2021's average rent increased by 8.6% to $1,083/unit. In 2022, there were no new units delivered, while 103 units were returned, causing the vacancy rate to increase to 6.5%. As vacancy increased, 2022's average rent increased by 10.7% to $1,199/unit. YTD metrics show that no units have been delivered, while 18 units have been returned, increasing the vacancy rate to 6.8%. YTD 2023's average rent has increased from year-end 2022 by 0.5% to $1,205/unit, which is 2.6% higher than the metro market.



| Richardson Apartment Submarket Cluster Trends - Class C | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2013 | 55 | 6,823 | 0 | (9) | 5.6% | $707 | N/A |
| 2014 | 55 | 6,823 | 0 | 85 | 4.4% | $739 | 4.5% |
| 2015 | 55 | 6,823 | 0 | (13) | 4.6% | $793 | 7.3% |
| 2016 | 55 | 6,823 | 0 | 6 | 4.5% | $849 | 7.1% |
| 2017 | 55 | 6,823 | 0 | (55) | 5.3% | $897 | 5.7% |
| 2018 | 55 | 6,823 | 0 | (79) | 6.4% | $935 | 4.2% |
| 2019 | 55 | 6,823 | 0 | (29) | 6.9% | $983 | 5.1% |
| 2020 | 55 | 6,823 | 0 | 71 | 5.8% | $997 | 1.4% |
| 2021 | 55 | 6,823 | 0 | 55 | 5.0% | $1,083 | 8.6% |
| 2022 | 55 | 6,823 | 0 | (103) | 6.5% | $1,199 | 10.7% |
| CAGR/Averages | | (0.0%) | 0 | (7) | 5.5% | $918 | 6.0% |
| Current Year Data | | | | | | | |
| YTD | 55 | 6,823 | 0 | (18) | 6.8% | $1,205 | 0.5% |

| Q4 2022 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | 150 | 40 | | |
| Rents | 10.7% | 2.0% | | |
| Absorption (SF) | (36) | (4) | | |
| Completions (SF) | 0 | 0 | | |

Source: CoStar Properties Analytical Search, 01/17/2023. Annual numbers represent year-end statistics.

APP000106

***New Development***

According to CoStar, there are three properties currently under construction within the Richardson submarket cluster. Once completed, these three properties will add 1,175 new apartment units. There are also two properties currently proposed for construction with the potential to add 457 new apartment units, if completed. Additionally, there are no properties within the final planning phase.

| Richardson Apartment Submarket Cluster - Under Construction | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 1735 N Greenville Ave | Mallory Eastside- Phase II | Richardson | 384 |
| 200 E Main St | Richardson Gateway | Richardson | 430 |
| 2323 Plaza Blvd | Ovation at Galatyn Park | Richardson | 361 |
| | | **TOTALS** | **1,175** |

Source: CoStar Properties Analytical Search, 01/17/2023.

| Richardson Apartment Submarket Cluster - Proposed | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 811 South Central Expy | Serene Plaza Apartments | Richardson | 160 |
| 111 W Spring Valley Rd | --- | Richardson | 297 |
| | | **TOTALS** | **457** |

Source: CoStar Properties Analytical Search, 01/17/2023.

## CONCLUSIONS

Richardson is the home of the Telecom Corridor, which has attracted major national firms in the telecommunications and insurance industries for decades. Several technology-focused employers are also concentrated in the southeastern part of the submarket cluster, most notably the Texas Instruments corporate campus. A fast-growing neighbor immediately to the north, the Plano submarket bodes well for apartment demand in Richardson. In recent years, Richardson has benefitted from companies like State Farm and Raytheon, which have moved to the CityLine mixed-use development at the intersection of the North Central Expressway and President George Bush Turnpike.

Rent growth is softening from double digit performances in 2021, but remain above pre-pandemic norms. Construction activity has ticked higher over the past year, defying the trend at the metro level. Meanwhile, the submarket cluster remains liquid, with investors pursuing both older, mid-tier assets and newer communities.

While much of the focus in Richardson has been on the northern part of the submarket cluster closest to CityLine, most of the submarket's stock is older. Most inventory consists of Class B inventory that serves as housing for middle- to lower-income renters. Occupancies on those assets have remained high. Due to the strong demand for workforce housing in northern Dallas and a string of value-add renovations, rent growth for these properties has outpaced the submarket cluster average. Overall, the outlook for the Richardson submarket cluster is favorable.

## COMPETITIVE MARKET ANALYSIS

The subject property is somewhat unique in its operation. It shares similarities to extended stay hotels, corporate housing and apartments, but given its design, unit sizes and lack of furnishings, is considered most similar to an apartment community. We have researched the market extensively to determine the subject property's direct competitors, or the competitive market.

An analysis of the competitive market provides a historical perspective of the interaction of supply and demand. Each competitive property is analyzed for strengths and weaknesses within the competitive market and its ability to capture existing and future demand. In addition, prospective known and unknown additions to demand are researched and quantified, and factored into the forecast of future occupancy levels. This section is an analysis of the competitive market historical performance and sets the foundation for the forecast of the competitive market future performance.

### APARTMENT MARKET ANALYSIS

The most significant data set in the competitive market analysis are the properties that are directly competitive with the subject property. Based on our inspection and analysis of the market area, interviews with management at the subject property as well as nearby apartments, we have identified four properties considered competitive as summarized below.

| No. | Project Name | Year Built | Total Units | Monthly Rates | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Unit Size (sf) | Type | Avg Monthly Rates | Utilities | Furnish-ings | Adjusted Full Service Rates |
| 1 | Autumn Brook Apartments | 1980 | 60 | 625 | 1 BR | $540 | $0 | $0 | $540 |
| | | | | 975 | 2 BR | $837 | $0 | $0 | $837 |
| 2 | Hillsdale Garden Apartments | 1969 / 1999 | 72 | 705 | 1 BR | $1,070 | $200 | $0 | $1,270 |
| | | | | 920 | 2 BR | $1,212 | $250 | $0 | $1,462 |
| | | | | 1,095 | 2 BR | $1,375 | $250 | $0 | $1,625 |
| 3 | Oak Hollow 1 Apartments | 1980 / 2004 | 55 | 400 | EFF | $650 | $150 | $0 | $800 |
| | | | | 528 | 1 BR | $725 | $175 | $0 | $900 |
| | | | | 625 | 1 BR | $800 | $175 | $0 | $975 |
| | | | | 750 | 2 BR | $1,050 | $200 | $0 | $1,250 |
| | | | | 930 | 2 BR | $1,200 | $250 | $0 | $1,450 |
| | | | | 1,000 | 2 BR | $1,350 | $250 | $0 | $1,600 |
| 4 | West Creek Villas Apartments | 1980 | 54 | 675 | 1 BR | $1,050 | $200 | $0 | $1,250 |
| | | | | 972 | 2 BR | $1,300 | $250 | $0 | $1,550 |
| | | | | 1,069 | 2 BR | $1,400 | $250 | $0 | $1,650 |
| | **Subject Property** | **1981** | **70** | **660** | **1 BR** | **$1,200** | **incl** | **$0** | **$1,200** |
| | | | | **1,200** | **2 BR** | **$1,800** | **incl** | **$0** | **$1,800** |

*Summary of Competitive Rate Survey - January 2023*

Note: Adjustments for utilities & furnishings are estimated when not available at the comparable

APP000108

As mentioned previously, per the Property Manager, current quoted average monthly base rates at the subject property are $1,200 for one bedroom units and $1,800 for two bedroom units. However, apart from the 11 units which are under renovation, there are no vacancies, so it is possible that rents could be increased slightly given the strength of demand in the market.

The following map illustrates the location of each competitive property.



In the following pages we have provided a description of each of the competitive properties as well as important operating characteristics. This information was compiled from personal interviews and inspections.

APP000109

**COMPETITIVE PROPERTY NO. 1**



Property Name:        Autumn Brook Apartments
Address:              13259 Emily Road
City, State:          Dallas, TX
Parcel ID:            00000767846000000
Owner:                The Egyptian Boys, LLC
Year of Construction: 1980
Stories:              2

| Autumn Brook - Unit Mix | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unit Type | Unit Mix | Size | Base Rent /Month | Monthly Rent/SF | % Units | Total SF | Total Annual Potential Rent |
| 1 BR | 44 | 625 | $540 | $0.86 | 73.3% | 27,500 | $285,120 |
| 2 BR | 16 | 975 | $837 | $0.86 | 26.7% | 15,600 | $160,704 |
| Totals/Avg. | 60 | 718 | $619 | $0.86 | 100.0% | 43,100 | $445,824 |

**PHYSICAL CHARACTERISTICS**

Average Unit Size:    718 SF
Project Amenities:    Laundry facility, pool
Unit Amenities:       A/C, satellite TV, dishwashers, patio/balcony, washer/dryer connections.
Unit Type:            Walk-up breezeways

APP000110

**OPERATING PERFORMANCE**

|                        |                                              |
|------------------------|----------------------------------------------|
| Occupancy:             | 100%                                         |
| Average Length of Stay:| Over a year                                  |
| Tenant Expenses:       | Tenants pay electricity; other utilities included. |

**TENANT REQUIREMENTS**

|                |                               |
|----------------|-------------------------------|
| Tenant checks: | Credit and background checks. |
| Lease Term:    | 6 or 12 months                |

**COMPETITIVE POSITION AS COMPARED TO SUBJECT**

|                    |                                  |
|--------------------|----------------------------------|
| Location:          | Similar                          |
| Quality/Condition: | Similar                          |
| Utilities:         | Similar - tenant pays electricity|
| Unit Size:         | Slightly inferior                |
| Project Amenities: | Similar                          |
| Unit Amenities     | Similar                          |

**COMMENTS**

The primary differences between this property and subject property is the background and credit check required upon application at this property and the slightly smaller unit sizes at this property. The current occupancy is approximately 100%. The property was built in 1980, but has not been renovated. It is of slightly superior quality to the subject. Leasing is on a similar basis to subject. The property does not offer furnished units.

## COMPETITIVE PROPERTY NO. 2



| | |
|---|---|
| Property Name: | Hillsdale Garden Apartments |
| Address: | 800 W. Spring Valley Road |
| City, State: | Richardson, TX |
| Parcel ID: | 42233500010010000 |
| Owner: | Hillsdale Capital Group, LLC |
| Year of Construction: | 1969 (renovated 1999) |
| Stories: | 2 |

| Unit Mix | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unit Type | Unit Mix | Size | Base Rent /Month | Monthly Rent/SF | % Units | Total SF | Total Annual Potential Rent |
| 1 BR FP | 26 | 705 | $1,070 | $1.52 | 36.1% | 18,330 | $1,446,640 |
| 2 BR FP | 28 | 920 | $1,212 | $1.32 | 38.9% | 25,760 | $1,764,672 |
| 2 BR TH | 18 | 1,095 | $1,375 | $1.26 | 25.0% | 19,710 | $1,287,000 |
| Totals/Avg. | 72 | 886 | $1,202 | $1.36 | 100.0% | 63,800 | $4,498,312 |

APP000112

**PHYSICAL CHARACTERISTICS**

| | |
|---|---|
| Average Unit Size: | 886 SF (comparable units only) |
| Project Amenities: | Laundry room, pool |
| Unit Amenities: | A/C, satellite TV, dishwashers, patio/balcony |
| Unit Type: | Walk-up exterior |

**OPERATING PERFORMANCE**

| | |
|---|---|
| Occupancy: | 100% |
| Average Length of Stay: | 1-2 years |
| Tenant Expenses: | Tenant pays for water, electric, and cable |

**TENANT REQUIREMENTS**

| | |
|---|---|
| Tenant checks: | Background and credit checks |
| Lease term: | 12 months |

**COMPETITIVE POSITION AS COMPARED TO SUBJECT**

| | |
|---|---|
| Location: | Similar |
| Quality/Condition: | Similar |
| Utilities: | Inferior - tenant pays water, electric, and cable |
| Unit Size: | Slightly inferior |
| Project Amenities: | Similar |
| Unit Amenities | Similar |

**COMMENTS**

The primary differences between this property and subject property is the background and credit check required upon application at this property and the larger unit sizes at this property. The current occupancy is approximately 100%. The property was built in 1969 and was renovated in 1999. It is of slightly inferior quality to the subject. The property does not offer furnished units or "bills paid" options.

**COMPETITIVE PROPERTY NO. 3**



Property Name:      Oak Hollow Apartments
Address:            13330 Emily Road
City, State:        Dallas, TX
Parcel ID:          000000767923000000
Owner:              Sedig Properties, LP
Stories:            2

| Unit Mix | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unit Type | Unit Mix | Size | Base Rent /Month | Monthly Rent/SF | % Units | Total SF | Total Annual Potential Rent |
| Eff. | 9 | 400 | $650 | $1.63 | 16.4% | 3,600 | $304,200 |
| 1 BR | 9 | 528 | $725 | $1.37 | 16.4% | 4,752 | $339,300 |
| 1 BR | 9 | 625 | $800 | $1.28 | 16.4% | 5,625 | $374,400 |
| 2 BR | 9 | 750 | $1,050 | $1.40 | 16.4% | 6,750 | $491,400 |
| 2 BR | 9 | 930 | $1,200 | $1.29 | 16.4% | 8,370 | $561,600 |
| 3 BR | 10 | 1,000 | $1,350 | $1.35 | 18.2% | 10,000 | $702,000 |
| Totals/Avg. | 55 | 711 | $970 | $1.36 | 100.0% | 39,097 | $2,772,900 |

APP000114

**PHYSICAL CHARACTERISTICS**

| | |
|---|---|
| Average Unit Size: | 711 SF |
| Project Amenities: | Two swimming pools, laundry room |
| Unit Amenities: | Dishwasher, pantry, balcony/patio |
| Unit Type: | Walk-up exterior |

**OPERATING PERFORMANCE**

| | |
|---|---|
| Occupancy | 100% |
| Average Length of Stay | 6 - 12 months |
| Tenant Expenses | Tenants pay for electric |

**TENANT REQUIREMENTS**

| | |
|---|---|
| Tenant checks: | Background and credit checks are made upon application. |
| Lease term: | 6-12 months |

**COMPETITIVE POSITION AS COMPARED TO SUBJECT**

| | |
|---|---|
| Location: | Slightly inferior |
| Quality/Condition: | Similar |
| Utilities: | Tenants pay for electric |
| Unit Size: | Slightly inferior |
| Project Amenities: | Superior |
| Unit Amenities: | Similar |

**COMMENTS**

The primary differences between this property and subject property is the background and credit check required upon application at this property and the larger unit sizes at this property. The current occupancy is approximately 100%. The property was built in 1980 and was renovated in 2004. It is of inferior quality to the subject. The property does not offer furnished units or "bills paid" options.

**COMPETITIVE PROPERTY NO. 4**



PropertyName:     West Creek Villas Apartments
Address:          8444 Spring Valley Road
City, State:      Dallas, TX
Parcel ID:        00000768982000000
Owner:            Nortex Security Investment, Inc.
Stories:          2

| Unit Mix | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unit Type | Unit Mix | Size | Base Rent /Month | Monthly Rent/SF | % Units | Total SF | Total Annual Potential Rent |
| 1 BR | 39 | 675 | $1,050 | $1.56 | 72.2% | 26,325 | $2,129,400 |
| 2 BR | 9 | 972 | $1,300 | $1.34 | 16.7% | 8,748 | $608,400 |
| 2 BR | 6 | 1,069 | $1,400 | $1.31 | 11.1% | 6,414 | $436,800 |
| Totals/Avg. | 54 | 768 | $1,131 | $1.47 | 100.0% | 41,487 | $3,174,600 |

**PHYSICAL CHARACTERISTICS**

| | |
|---|---|
| Average Unit Size: | 768 SF |
| Project Amenities: | Laundry room |
| Unit Amenities: | Fireplace, dishwasher, patio/balcony |
| Unit Type: | Walk-up exterior |

**OPERATING PERFORMANCE**

| | |
|---|---|
| Occupancy | 99% |
| Average Length of Stay | Mainly over 12 months |
| Tenant Expenses | Tenant pays for water, electric, and cable |

**TENANT REQUIREMENTS**

| | |
|---|---|
| Tenant checks: | A background and credit check is done upon application. |
| Lease terms: | 6 or 12 months |

**COMPETITIVE POSITION AS COMPARED TO SUBJECT**

| | |
|---|---|
| Location: | Slightly inferior |
| Quality/Condition: | Similar |
| Utilities: | Inferior - tenant pays for water, electric, and cable |
| Unit Size: | Similar |
| Project Amenities: | Slightly inferior |
| Unit Amenities | Similar |

**COMMENTS**

The primary differences between this property and subject property is the background and credit check required upon application at this property and the larger unit sizes at this property. The current occupancy is 99%. The property was built in 1980, but appears not to have been renovated. It is of fairly similar quality to the subject and does not offer furnished units or "bills paid" options.

***Competitive Market Conclusion***

Overall, the properties we have analyzed in this section are not intended to be a comprehensive list of potentially competitive properties to the subject, but are frequently mentioned, nearby properties that may compete with the subject and give a good indication of demand for short or long term unfurnished units in the immediate area.

The occupancy for the competitive apartments is between 99% and 100%, similar to subject's, which, due to its operational characteristics, is most similar to an apartment. Additionally, the rates at the competitive properties support the rates currently charged at the subject, but the proposed renovations should enhance the unit interiors, as well as overall appeal, thereby driving higher rents. Given this and the historical occupancy at the subject property, there appears to be strong demand in the market area and for the units at the subject, so slightly higher rents will be assumed to reflect this.

# HIGHEST AND BEST USE ANALYSIS

The fundamental concept of highest and best use may be defined as:

"The reasonably probable use of property that results in the highest value."[19]

To test for highest and best use, all logical and feasible alternatives must be analyzed. The appraiser should determine whether the proposed usage of the land is:

1) physically possible
2) legally permissible
3) economically feasible
4) maximally productive

If an affirmative answer may be given to these basic questions, it is determined that the highest and best use test has been satisfied.

The appraiser must recognize that land is generally appraised as if vacant and available for development to its highest and best use and that the appraisal of improvements is based on their actual contribution to the site. Thus, the highest and best use of a site must be determined both 1) *as vacant* and 2) *as improved.* Highest and best use as vacant will be addressed first.

## HIGHEST AND BEST USE AS VACANT

### Physically Possible Uses

The subject site is of sufficient size to accommodate a number of potential uses, including multi-family residential development. The site has good exposure and visibility along Goldmark Drive to the northwest and Midpark Road to the northeast. The site is proximate to retail and commercial development and nearby US-75. All relevant municipal utilities are available in adequate supply to service a variety of development uses.

### Legally Permissible Uses

The subject site is zoned MU-3, Mixed Use 3, per the City of Dallas, which allows a variety of high-density commercial and residential uses. Retail is unlikely due to the lack of frontage to a busy carrier, but multi-family, hotel, office, or industrial would be compatible with surrounding uses, if demand existed.

### Economically Feasible Uses

Both multifamily residential and hospitality uses are physically possible and legally permissible for the subject, and we believe a change from one of these uses would probably be unlikely. We have discussed both apartment market and extended stay conditions in the preceding market analyses. Market conditions are good for both uses in Dallas and in the subject property's immediate area. This is a result of increasing population and continued job growth in the region. Thus, both uses are considered feasible at this time.

### Maximally Productive Use

Based on our analysis, the most likely use of the site is development of either a multi-family or hospitality development, or a hybrid of the two such as the current use of the subject. Therefore, the maximally productive and highest and best use of the subject site as if vacant, is for the development of a multi-family and/or hospitality project similar to the existing subject.

---

[19] Appraisal Institute, *The Appraisal of Real Estate,* Fifteenth Edition, (Chicago: Appraisal Institute, 2020).

---

APP000118

**HIGHEST AND BEST USE AS IMPROVED**

The highest and best use *as improved* is also analyzed with regard to the four previously indicated criteria.  The physical property is somewhat unique in its construction and operation as hybrid between an extended stay lodging facility and an apartment.  It was constructed for this specific purpose almost 40 years ago and has been operated in this manner since.  The units include a living area, bedroom(s), a fully-equipped kitchen, and one or more bathrooms; however, they are generally leased unfurnished.

A typical one-bedroom unit is 660 SF, making it much larger than a typical extended stay hotel suite and most comparable to apartment units.  The two-bedroom units are reported at 1,200 SF, again much larger than typical suites.  Further, the units are not furnished.  Unlike a hotel, the project generally caters to residents who hold a job in the local area, as opposed to transient business.

Further, the property has been able to achieve occupancy levels which are higher than those of an extended stay hotel and similar to those of an apartment.  Like apartments, the units rent on a monthly basis, but there are no leases signed, although many tenants have been in occupation for many years.  Most utilities, including basic cable TV are included, but tenants do pay electricity and upgraded cable fees.  Also a tenant will need to provide furniture.  As there are no credit checks, all customers must pay in advance on a monthly basis using cash or credit cards.

Unlike a hotel, there are no linens or housekeeping service, and unit turnover is much lower than at a hotel.  At a typical lodging facility, pproximately one-quarter to one-third of the units will turnover in a typical month, but some customers will stay for more than a year, and ownership reports that some tenants at subject have been in occupation for almost 10 years.  For the most part, occupancy levels are reported to have been at, or very close to 100%, prior to the onset of Covid-19 in early 2000.

For these reasons, it is our opinion that the maximally productive and highest and best use for the property, *as improved*, is for continued operation under its current format as a hybrid between an apartment and an extended stay lodging facility, but most similar to an apartment.

# THE VALUATION PROCESS

The estimation of a real property's market value involves a systematic process in which the problem is defined; the work necessary to solve the problem is planned; and the data required are acquired, classified, analyzed and interpreted as an opinion of value. In this process, we recognize three primary approaches to value: the cost approach, sales comparison approach, and the income capitalization approach. When land development is imminent or proposed, the subdivision development approach is also used. When one or more of these approaches is not applicable in the appraisal process, full justification must be presented. An explanation of each approach follows:

## COST APPROACH

In the cost approach, the appraiser first values of the fee simple interest in the site. The replacement or reproduction cost new of the improvements is then estimated. Next, depreciation from all sources is determined and subtracted from the replacement or reproduction cost new of the improvements to arrive at their present value. The present value of all improvements is added to the market value of the site, resulting in an indicated value by the cost approach.

## SALES COMPARISON APPROACH

The sales comparison approach involves the comparison of the subject property to similar properties that have recently sold or that are currently offered for sale. The sales prices of these properties are then adjusted to reflect the respective differences of each from the subject to indicate a value range. This value range, as indicated by the adjusted comparable properties, is then used to establish an indicated value for the subject property.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach is a process in which the anticipated future benefits (actual dollar income or amenities) are reduced to a present value figure. The appraiser is primarily concerned with the future benefits resulting from net income and reversionary proceeds. This approach involves estimating potential gross income by comparison with competing properties and estimating expenses (derived from historical and/or market experience) to determine a projected net income stream. The income stream is then capitalized into an indication of value by using capitalization rates extracted from competitive properties in the market or by using other techniques when applicable. Alternatively, the income stream as well as the reversion of the property is converted into value by use of a discounted cash flow (DCF) analysis. If both techniques are used, the resultant value indications must be reconciled.

## VALUATION APPROACHES UTILIZED

In this valuation, the sales and income capitalization approaches to value will be used.

## RECONCILIATION

The final analytical step in the valuation process is reconciliation of the value indications obtained from the different approaches to value. The appraisers must consider the relative dependability and applicability of each approach as dictated by the individual characteristics of the subject. The final opinion of value reflects the results of such deliberation.

APP000120

**COST APPROACH**

The Cost Approach is based on the principle of substitution, which "affirms that a knowledgeable buyer would pay no more for a property than the cost to acquire a similar site and construct improvements of equivalent desirability and utility without undue delay."[20]  This approach often represents "market thinking" since buyers and sellers frequently relate value to cost.

The Cost Approach to value typically involves the following steps:

1.  "Estimate the value of the site as though vacant and available to be developed to its highest and best use.

2.  Determine which cost basis is most applicable to the assignment: reproduction cost or replacement cost.

3.  Estimate the direct (hard) and indirect (soft) costs of the improvements as of the effective appraisal date.

4.  Estimate an appropriate entrepreneurial incentive or profit from analysis of the market.

5.  Add the estimated direct costs, indirect costs, and entrepreneurial incentive or profit to arrive at the total cost of the improvements.

6.  Estimate the amount of accrued depreciation in the structure and, if necessary, allocate it among the three major categories:  physical deterioration, functional obsolescence, and external obsolescence.

7.  Deduct the estimated depreciation from the total cost of the improvements to derive an estimate of their depreciated cost.

8.  Estimate the contributory value of any site improvements that have not already been considered.  (Site improvements are often appraised at their contributory value, i.e., directly on a depreciated-cost basis – but may be included in the overall cost calculated in Step 3 and depreciated if necessary.)

9.  Add land value to the total depreciated cost of all the improvements to arrive at the indicated value of the property.

10.  Adjust for personal property (e.g., furniture, fixtures, and equipment) or intangible assets that are included in the appraisal

11.  Adjust the value conclusion, which reflects the value of the fee simple estate, for the property interest being appraised to arrive at the indicated value of the specified interest in the property."[21]

Each of the preceding steps will be further explained in detail as they are utilized.  First we will address the applicability of the Cost Approach.

---

[20] Appraisal Institute, *The Appraisal of Real Estate,* Fifteenth Edition, (Chicago: Appraisal Institute, 2020).

[21] Ibid.

---

APP000121

**RELEVANCE OF COST APPROACH**

The objective of the Cost Approach is to examine the replacement costs of an alternative building of like utility, less all depreciation.  This recognizes that there is an underlying connection between cost and value.  Sometimes the connection is obscured by factors such as depreciation or excess profits, but the relationship still exists.  The Cost Approach reflects market thinking because market participants relate value to cost.  Buyers tend to  judge the value of an existing structure not only by prices and rents of similar buildings, but also by comparing the costs to create a new building with optimal physical condition and functional utility.  Moreover, buyers will sometimes consider the potential costs of rehabilitating an older structure up to the physical condition and functional utility that they desire.

We have found that the Cost Approach is very useful for newer, functional buildings in stable markets.  However, as buildings age and depreciation accrues, the replacement cost method often becomes less of a factor in the decisions of buyers and sellers, and thus is less applicable in some assignments.

Considering the age and nature of the subject and its market, we have not utilized the Cost Approach in this appraisal, as it is not deemed necessary to produce a credible value opinion.

## SALES COMPARISON APPROACH

The sales comparison approach, also termed the market approach, involves the comparison of the subject property to similar properties which have already sold, or which are currently offered for sale, with consideration given to their respective differences from the subject. This process tends to form a pattern of indicators from which the appraiser can estimate the value of the subject property. The principle of substitution is an integral part of this approach since a purchaser will typically not pay more for a property than would be required to purchase an equally desirable substitute property.

The following procedures are used to apply the sales comparison approach.

1. "Research the competitive market for information on sale transactions, listings, and offers to purchase or sell involving properties that are similar to the subject property in terms of characteristics such as property type, date of sale, size, physical condition, location, and land use constraints. The goal is to find a set of comparable sales as similar as possible to the subject property.

2. Verify the information by confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations. Verification may elicit additional information about the market.

3. Select relevant units of comparison (e.g., price per acre, price per square foot, price per front foot) and develop a comparative analysis for each unit. The goal here is to define and identify a unit of comparison that explains market behavior.

4. Look for differences between the comparable sale properties and the subject property using the elements of comparison. Then adjust the price of each sale property to reflect how it differs from the subject property or eliminate that property as a comparable. This step typically involves using the most comparable sale properties and then adjusting for any remaining differences.

5. Reconcile the various value indications produced from the analysis of comparables into a single value indication or a range of values."[22]

Each of the preceding steps will be further explained in detail as they are utilized. First we will address the applicability of the sales comparison approach.

**APPLICABILITY OF THE SALES COMPARISON APPROACH**

The Sales Comparison Approach is most relevant in markets with homogeneous properties (such as single family homes, apartments and warehouses), where there is substantial sales activity, and where the adjustments to the comparables are few and relatively simple to compute. When appraising more complex properties, such as hotels, office buildings and shopping centers, the sales comparison approach is less useful.

Large commercial properties tend to have multiple variables that set them apart from other properties in the same class. For example, two nearby hotel properties that might at first appear similar could differ in the following areas: number of rooms, age of facility, franchise affiliation, parking availability, room layout, condition of furnishings, configuration of restaurants, amount of meeting space, status of mechanicals, influence of other amenities, timing of transaction, management effectiveness, buyer motivations, capital sources, and numerous other factors. Given these multiple differences, the proper analysis of a sale comparable in a complex property appraisal frequently requires a substantial number of adjustments which, when taken together, dilutes the applicability of the comparable in the first place. At the same time, as properties become more complex, the transaction market gets thinner, meaning that more weight must be placed on fewer sales.

---

[22] Appraisal Institute, *The Appraisal of Real Estate,* Fifteenth Edition, (Chicago: Appraisal Institute, 2020).

APP000123

In reality, most buyers of apartments are focused on the quality, quantity and durability of the income stream. This starts with a careful review of rates, occupancies and margins, an analysis of the subject relative to its competition, consideration of new construction in the market, and a review of macro and micro trends within the industry. These factors are best addressed in the Income Capitalization Approach. In fact, the Income Capitalization Approach, together with a detailed market analysis, best emulates the process that a buyer goes through to establish a purchase price. Consequently, the Sales Comparison Approach is seldom given much weight in the final value conclusion for complex properties.

Given the multitude of adjustment factors, the practical reality is that a value estimate derived solely from sales comparison, even after adjustments, can often be materially different (either higher or lower) than the price that an income-based investor would be willing to pay. Yet despite these limitations, the Sales Comparison Approach is still useful in establishing a check on the value reached by the Income Capitalization Approach.

Recent sales of apartment properties can provide a range of data which can be used to evaluate the appropriateness of the value reached via an income method. In situations where the Income Capitalization Approach suggests a market value outside the range as suggested by the Sales Comparison Approach, it may cause the appraiser to revisit the assumptions used in deriving the income-based value. We will utilize the Sales Comparison Approach in a similar manner. In essence, the Sales Comparison Approach is used as a test of the Income Capitalization Approach.

The following section details individual sales used in our sales comparison approach.

***The sales deemed most relevant for use in this analysis are presented in summary on the following page. We have discussed in a narrative format within this approach the details of each sale and provided photographs and abstracts of each comparable in the Addenda.***

## Sale Summary

| | | | | | |
|---|---|---|---|---|---|
| **Apartment Comparable #1** | McCallum Communities | Year Built: | 1984 | **Price:** | $52,000,000 |
| | 7740 McCallum Blvd | Total Units: | 419 | Sale Date: | 11/04/2022 |
| | | Total SF: | 249,426 | Price/SF: | $208.48 |
| | Dallas, Dallas County, Texas | Average Unit Size: | 595 SF | Price/Unit: | $124,105 |
| | | Occupancy at Sale: | 92.3% | Cap Rate: | 4.42% |
| **SALE** | Seller: McCallum Multifamily Dallas DE LLC | | | | |
| ID# 263859 | Buyer: HC McCallum LLC | | | | |
| **Apartment Comparable #2** | Clover on Park Lane | Year Built: | 1975 | **Price:** | $38,500,000 |
| | 8780 Park Ln | Total Units: | 343 | Sale Date: | 01/04/2022 |
| | | Total SF: | 209,172 | Price/SF: | $184.06 |
| | Dallas, Dallas, Texas | Average Unit Size: | 610 SF | Price/Unit: | $112,245 |
| | | Occupancy at Sale: | 95.0% | Cap Rate: | 3.50% |
| **SALE** | Seller: Travertine North Park Investors, LLC | | | | |
| ID# 261611 | Buyer: Tides on Park Lane Owner, LLC | | | | |
| **Apartment Comparable #3** | The Colony House | Year Built: | 1961 | **Price:** | $2,952,380 |
| | 6235 Oram St | Total Units: | 21 | Sale Date: | 12/13/2021 |
| | | Total SF: | 19,170 | Price/SF: | $154.01 |
| | Dallas, Dallas, Texas | Average Unit Size: | 913 SF | Price/Unit: | $140,590 |
| | | Occupancy at Sale: | 91.3% | Cap Rate: | 3.55% |
| **SALE** | Seller: SMG Carriage, LP | | | | |
| ID# 257180 | Buyer: Wedgewood Commercial Holdings, LLC | | | | |
| **Apartment Comparable #4** | Estara, The | Year Built: | 1971 | **Price:** | $25,620,000 |
| | 11321 Woodmeadow Pkwy | Total Units: | 216 | Sale Date: | 11/16/2021 |
| | | Total SF: | 217,620 | Price/SF: | $117.73 |
| | Dallas, Dallas, Texas | Average Unit Size: | 1,008 SF | Price/Unit: | $118,611 |
| | | Occupancy at Sale: | 92.0% | Cap Rate: | 3.95% |
| **SALE** | Seller: Ascendant RE 1, LLC | | | | |
| ID# 256091 | Buyer: 11321 Woodmeadow, LLC | | | | |
| **Apartment Comparable #5** | 1500 N Carroll Apartments | Year Built: | 1986 | **Price:** | $3,000,000 |
| | 1500 N Carroll Ave | Total Units: | 26 | Sale Date: | 11/12/2021 |
| | | Total SF: | 14,206 | Price/SF: | $211.18 |
| | Dallas, Dallas, Texas | Average Unit Size: | 546 SF | Price/Unit: | $115,385 |
| | | Occupancy at Sale: | 100.0% | | |
| **SALE** | Seller: jWang Investments II, LLC | | | | |
| ID# 257121 | Buyer: Ratsiu Family Trust | | | | |

APP000125

**MAP OF SALE COMPARABLES**



APP000126

**ANALYSIS OF DATA**

The objective of the Sales Comparison Approach is to test the value reached by the Income Capitalization Approach against the comparable data. This is done using several key units of comparison, together with the operating ratios and statistics available from the comparable sales. Given the lack of information available from this limited set of comparable sales, we will primarily focus only on the sale price per room/unit.

The sale price per unit is a unit of comparison which expresses the relationship between price/value and the size of the structure (number of units). This is a reliable indicator of value assuming a high degree of comparability. The weakness of this unit of comparison is that it does not directly differentiate between the respective income-generating capacities of somewhat dissimilar properties. It is noted that the comparisons will be made assuming that subject has been renovated per the buyer's proposals; adjustments will then be made to estimate the subject's "as is" value.

A brief discussion of each sale comparable follows:

***Sale No. 1 - McCallum Communities, 7740 McCallum Blvd., Dallas, TX***

Located in Far North Dallas, off Coit Road, this property sold in November 2022 for $52,000,000 or $124,105 per unit. This much larger, 419-unit property was built in 1984 and has a smaller average unit size of 595 SF. The units are rented unfurnished and the tenant pays for electric and cable. The pro forma cap rate was projected to be 4.45%, reflecting almost $4.0 million in renovations which the buyer proposes. ***Overall, this property is superior in comparison to the subject.***

***Sale No. 2 - Clover on Park Lane, 8780 Park Lane, Dallas, TX***

Located around five miles south of subject, to the east of US-75, this property sold in January 2022 for $38,500,000 or $112,245 per unit. The 343-unit apartment property was built in 1975 and was renovated in 2007, and has an average unit size of 610 SF, smaller than subject. The cap rate was reported to be 3.50%. The units are rented unfurnished and the tenants pay for all utilities. ***Overall, this property is fairly similar in comparison to the subject.***

***Sale No. 3 - The Colony House, 6235 Oram Street, Dallas, TX***

Located just a couple of miles northeast of Central Dallas, this property sold in December 2021 for $2,952,380 or $140,590 per unit. The 21-apartment community is smaller than subject and was built in 1961 and has an average unit size of 913 SF. The units are rented unfurnished and the tenant pays for all utilities. The cap rate was reported to be 3.55%. ***Overall, this property is significantly superior in comparison to the subject.***

***Sale No. 4 - The Estara - 11321 Woodmeadow Pkwy., Dallas, TX***

Located in Northeast Dallas, just inside IH-635, this community sold in November 2021 for $25,620,000 or $118,611 per unit. The 216-unit apartment property was built in 1971 and renovated in 2017. It has an average unit size of 1,008 SF, much larger than subject. The cap rate was reported to be 3.95%. The units are rented unfurnished and the tenant pays for electric and cable. ***Overall, this property is slightly superior in comparison to the subject.***

***Sale No. 5 - 1500 North Carroll - 1500 N. Carroll Avenue, Dallas, TX***

Located in Northeast Dallas, within two miles of the CBD, this property sold in November 2021 for $3,000,000 or $115,385 per unit. The 26-unit property was built in 1986, but appears to have been renovated fairly recently. All units are rented unfurnished and tenants pay utilities. The average unit size is smaller than subject's at 546 SF. ***Overall, this property is slightly superior in comparison to the subject.***

**Adjustments**

In addition to the primary adjustments (location, age/condition, design/appeal, average unit size, etc.), adjustments for other intangibles are analyzed. As mentioned previously, the subject property is relatively unique, with an operation similar to an extended stay hotel and other characteristics more similar to an apartment complex. There are other intangibles that the subject property and the extended stay hotel offer that the apartment comparables do not. Other intangible items are primarily unfurnished units, no credit checks, low or zero deposits, and term flexibility.

At the subject property, the residents are not given credit checks, nor are lease agreements entered into like an apartment complex. This allows for a broader tenant base that may not be able to secure a lease at an apartment property due to credit issues. In addition, weekly payments allows for greater flexibility than a long-term apartment lease. Based upon the preceding, most of the apartments sales are adjusted upward for other intangibles.

| # | Sale Date | Sale Price/Unit | Market Conditions | Occupancy at Sale | Location | Age/ Condition | Design/ Appeal | Average Unit Size | Other Intangibles | *Overall Adjustment* |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11/22 | $124,105 | - | Slt. Upward | Slt. Downward | Downward | Downward | Upward | Slight Upward | *Slight Downward* |
| 2 | 01/22 | $112,245 | Slt. Downward | - | Slt. Downward | - | Downward | Upward | Upward | *-* |
| 3 | 12/21 | $140,590 | Slt. Downward | Slt. Upward | Slt. Downward | Slight Downward | - | Slt. Downward | Slight Upward | *Sig. Downward* |
| 4 | 11/21 | $118,611 | Slt. Downward | Slt. Upward | Upward | Slt. Downward | Downward | Slight Downward | Slight Upward | *Slt. Downpward* |
| 5 | 11/21 | $115,385 | Slt. Downward | - | Slt. Downward | - | Downward | Upward | Slt. Upward | *Slt. Downward* |

**Amerigold Suites - Adjustment Grid**

### *Value Opinion*

Given all the factors, it is our opinion that the sales indicate the subject, as if stabilized, would sell, in today's dollars, for a price between $100,000 and $110,000 per unit. The following table summarizes our opinion of the "as is" market value of the subject property, after deductions for the costs of the proposed renovations and resulting lease-up lost income.

| **Fee Simple Market Value of Amerigold Suites via the Sales Comparison Approach - As Is, As Of January 19, 2023** | | |
|---|---|---|
| Method | Low Indicator | High Indicator |
| Estimated Sale Price Per Unit January 19, 2023 | $100,000 | $110,000 |
| Number of Units | 70 | |
| Indicated Value | $7,000,000 | $7,700,000 |
| **RECONCILED VALUE (Rd.)** | **$7,350,000** | |
| **Less: Renovation Costs** | **($3,040,000)** | |
| **Less: Lost Income During Renovation** | **($115,000)** | |
| **Final Value by Sales Comparison** | **$4,200,000** | |

## INCOME CAPITALIZATION APPROACH

The income capitalization approach requires the appraiser to formulate a market value for the subject by converting projected net income into a single present value. This process is known as capitalization. The approach to value requires four basic steps:

1. Estimate gross income for the subject space on a stabilized basis and/or over the term of the holding period according to the anticipated timing of the leases.

2. Using available market data, estimate a proper allowance for vacancy and credit loss forecast to occur during the projected period of ownership.

3. Estimate and project anticipated fixed and variable operating expenses to be incurred. Also estimate anticipated leasing commissions and refurbishment costs, as well as a reasonable allowance for replacements which the owner of the subject should expect during ownership.

4. Convert the resulting income stream into an estimate of value using a market-derived capitalization rate in the case of direct capitalization, and/or a discount rate in the discounted cash flow (DCF) analysis (yield capitalization).

The preceding steps are discussed in detail below and in the following pages.

### PROJECTIONS OF REVENUES AND EXPENSES

To forecast future operations for the subject, we have first examined its historical operating experience. However, although historical income statements were provided, very limited cost data was received, and only for the period since the property went into receivership last October. To the extent possible, we have conducted an analysis of the property's financial history. The historical statements do not provide any detail of expenses; further, they do not include a base management fee, since the property is currently managed by ownership, nor do they include a reserve for replacement. ***In our projection, we have included both a management fee and reserve for replacement based on what is typical in the market.***

Based on the operating model of the subject with a minimum length of stay of one month, but with an average length of stay of nine to twelve months (without a written lease), the subject property has operations most similar to an apartment complex and other operations similar to an extended-stay hotel. The historical financials as provided by property management, present income and expenses in a manner more similar to that of an apartment complex.

*Please note the following with regard to the historical operating statement recast:*

• **Deposit Fee Income** represents the non-refundable deposit fees charged to guests/residences at the time rent is paid. The surcharge is considered a protection to the owner against damage or vacancy.

• **Other Income** includes revenue from the sale of convenience items (vending, etc.), application fees, late fees, pet fees, damage fees, and any other fee income, as well as any other revenues.

The recast statement is presented on the following page and the actual statements received from management are provided in the *Addenda*.

According to the property manager, occupancy has been virtually 100% since around 2012, but fell when Covid-19 took hold in early 2020. A number of tenants reportedly could not pay rent and remained in occupancy in the expectation of Government assistance, but when this was not forthcoming ownership had to issue eviction orders in order to gain possession. As a result of some of the tenants cuasing damage to the units prior to their eviction, 17 units had been incapable of being leased until repairs were made and 11 of these remain vacant as of our inspection.

APP000129

Our stabilized pro forma assumes that the property has been renovated, per the specifications provided by one of the prospective purchasers (Worth Street Properties) and that all of the units are renovated and available to be leased at market rents.

Throughout this analysis, we will compare the subject's reported actual operating history with other financial data. Specifically, we will use the following:

- Analysis of average data reported by the National Council of Real Estate Investment Fiduciaries (NCREIF) for investment grade low-rise apartments for 4Q 2022 (Southwest Region); this survey data represents far superior product.

- We have also compared the subject property's expenses to other comparable lodging suites and Class C apartment properties in the DFW area.

Actual detailed operating statements and budgets were requested, but not provided.



**POTENTIAL GROSS INCOME (PGI) ESTIMATE**

The first step in estimating PGI is to estimate the market rent attainable for the subject. This is accomplished via an analysis of the competing properties in the market area. Because the subject property is reported to have had a good history of occupancy, the following analysis is more of a check of reasonableness of the subject's current rates.

We have previously analyzed the subject's comparable properties in detail in the *Competitive Market Analysis*. The subject property as well as properties with similar operations typically do not allow nightly or weekly guests and the rates are quoted on a monthly basis. Therefore, the most applicable unit of comparison is the monthly rate, in common with other nearby apartment properties.

Rates at the subject are similar to those charged by the other comparable properties (presented earlier) as shown in the following table.

| Summary of Competitive Rate Survey - January 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| No. | Project Name | Year Built | Total Units | Weekly Rates | | | |
| | | | | Unit Size (SF) | Type | Quoted Monthly Rents | Quoted Monthly Rent/SF |
| 1 | Autumn Brook Apartments | 1980 | 60 | 625 | 1 BR | $540 | $0.86 |
| | | | | 975 | 2 BR | $837 | $0.86 |
| 2 | Hillsdale Garden Apartments | 1969 / 1999 | 72 | 705 | 1 BR | $1,070 | $1.52 |
| | | | | 920 | 2 BR | $1,212 | $1.32 |
| | | | | 1,095 | 2 BR | $1,375 | $1.26 |
| 3 | Oak Hollow Apartments | 1980 / 2004 | 55 | 400 | EFF. | $650 | $1.63 |
| | | | | 528 | 1 BR | $725 | $1.37 |
| | | | | 625 | 1 BR | $800 | $1.28 |
| | | | | 750 | 2 BR | $1,050 | $1.40 |
| | | | | 930 | 2 BR | $1,200 | $1.29 |
| | | | | 1,000 | 3 BR | $1,350 | $1.35 |
| 4 | West Creek Villas Apartments | 1980 | 54 | 675 | 1 BR | $1,050 | $1.56 |
| | | | | 972 | 2 BR | $1,300 | $1.34 |
| | | | | 1,069 | 2 BR | $1,400 | $1.31 |
| **Subject Property** | | **1986 / 2023** | **70** | **660** | **1 BR** | **$1,200** | **$1.82** |
| | | | | **1,200** | **2 BR** | **$1,800** | **$1.50** |
| Note: As each of the comparables is also rented unfurnished, no adjustments are necessary. | | | | | | | |

APP000132

### Market Rent Analysis

Although the properties summarized above are competitive, the subject property is unique and therefore each property has characteristics that are different from the subject which affect rates. Therefore, we have analyzed differences in location, quality and condition, unit size, available project amenities, and unit amenities in comparison to the subject. The following are brief descriptions of each of the properties.

### Competitive Property 1

**Autumn Brook Apartments** is located close to the subject property to the west, a slightly inferior location. It is inferior to the subject in quality and condition as, to our knowledge, it has not been renovated. As an apartment complex, the units are slightly smaller and a credit and background check is made for each application. The property offers similar amenities, having a pool and laundry facility.

Adjustments to this comparable are summarized below.

Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Upward
Quality and Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Upward
Unit Size  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar
Project Amenities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar
Unit Amenities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar

### The overall adjustment is upward.

### Competitive Property 2

**Hillsdale Garden** apartment community is located north of the subject property, a slightly inferior location to subject. It is similar to the subject in quality and condition. As an apartment complex, the units are  larger overall and a credit and background check are made for each application. Unit sizes average 886 square feet, compared to 737 square feet at the subject. The property has a pool and a laundry, but no fitness center. It is older than subject, but has been renovated, albeit 23 years ago.

Adjustments to this comparable are summarized below.

Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Upward
Quality and Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar
Unit Size  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Downward
Project Amenities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar
Unit Amenities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Upward

### The overall adjustment is slightly upward.

### Competitive Property 3

**Oak Hollow 1** apartments are located west of the subject property, close to No. 1 and is a slightly smaller project which is fully leased.  The property is slightly older, but was renovated in 2004, so is slightly inferior in condition to the subject. The units are slightly smaller in average size and a credit and background check are made for each application.  The property has two swimming pools, and a laundry room.  Units are similar in amenities to the subject units.

Adjustments to this comparable are summarized below.

Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slightly Upward
Quality and Condition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Upward
Unit Size  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slightly Upward
Project Amenities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar
Unit Amenities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar

*The overall adjustment is upward.*

### Competitive Property 4

**West Creek Villas** are located northwest of the subject property along Spring Valley Road, a slightly inferior location.  The property is slightly older, but appears to have been renovated and is assumed in similar condition to the subject, as if renovated.  In this complex, the units are slightly larger and credit and background checks are made for each application.  The property has a  laundry room, but no swimming pool or  fitness center.  Units appear to have a  similar level of finish and interior amenities to the subject units.

Adjustments to this comparable are summarized below.

Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Upward
Quality and Condition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Upward
Unit Size  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Downward
Project Amenities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Slight Upward
Unit Amenities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Similar

*The overall adjustment is upward.*

### Conclusions of Market Rent

The subject's current asking rents are above the range of comparables, which is reasonable, given their respective characteristics. Taking into consideration the previous adjustment grids, the subject's historical and current occupancy, and assumed renovation and stabilized occupancy, we adopt the current rates as representative of market at present.  However, given the high occupancy, good demand, and proposed renovations, we will inflate the rents by 5.0% to reflect the cumulative effect of all these factors.

The following table summarizes the estimated rental income for the subject property based on our conclusions of market rent.

| NVC Estimated Stabilized Rental Income Amerigold Suites - Dallas | | | | |
|---|---|---|---|---|
| Unit Type | Size (SF) | No. of Units | Estimated *Stabilized* Monthly  Rent | Estimated *Stabilized* Annual Rent |
| 1 BR 1 BA | 660 | 60 | $1,260 | $907,200 |
| 2 BR 1 BA | 1,200 | 10 | $1,890 | $226,800 |
| Totals/Averages | 737 | 70 | $1,350 | $1,134,000 |

*Concessions*

Demand for apartments in this market remains generally strong, with submarket vacancy currently at 7.1%, slightly lower than the overall market's 8.5%.   Income statements received indicate concessions as follows:

| Amerigold Suites - Concessions | | | | | |
|---|---|---|---|---|---|
| Category | 2019 | 2020 | 2021 | 2022 | NVC Projection |
| **Concessions** | **$0** | **$2,030** | **$2,047** | **$3,100** | **$3,500** |
| Amount/Unit | $0.00 | $29.00 | $29.24 | $44.29 | $50.00 |

As can be seen, there were no concessions at subject in 2019, but likely due to Covid, concessions have been evident subsequently, as there were up to 17 vacancies, although this has now dropped to 11 units, all of which are under renovation.  Indeed, subject's property manager reports no available units at present.  As a result, and assuming the proposed renovation, nominal concessions of ***$3,500*** per annum are included.

## OTHER INCOME ITEMS

As noted earlier, other income is generated from various fees, including application fees, administration feees, late fees, pet fees, damage fees, utility reimbursements, and vending income. The historical data for subject for 2019, 2020, 2021, and 2022, are shown below, together with our stabilized projection:

| Amerigold Suites - Surcharge Income | | | | | |
|---|---|---|---|---|---|
| Category | 2019 | 2020 | 2021 | 2022 | NVC Projection |
| Application Fee | $1,440 | $1,160 | $880 | $1,265 | $1,200 |
| Administration Fee | $150 | $0 | $0 | $138 | $150 |
| Late Fees | $0 | $0 | $350 | $970 | $500 |
| Pet Fees | $3,151 | $1,740 | $2,550 | $1,450 | $2,000 |
| Damage Fees | $0 | $4,276 | $1,932 | $6,208 | $2,000 |
| N/R Deposits | $13,582 | $12,475 | $8,100 | $11,000 | $10,000 |
| Utility Recoveries | $0 | $0 | $0 | $28,022 | $35,000 |
| **Totals** | **$18,323** | **$19,651** | **$13,812** | **$49,053** | **$51,000** |
| Amount/Unit | $261.76 | $280.73 | $197.31 | $700.76 | $728.57 |

Taking historical operations into account, ***we have projected stabilized other income of $728.57 per unit, or $51,000*** (rounded).

The National Council of Real Estate Investment Fiduciaries (NCREIF) indicates that other income for garden apartment projects in the Southwest averaged $1,111 per unit per year as of 4Q 2022, with expense recoveries of $285/unit per annum.  These data are based upon a property count of 289 communities with an average occupancy of 94.25%.  However, these data relate to higher quality, newer properties with higher rents and expenses.

*Room Tax*

The income and expense statements do not show any room tax amounts.  These typically apply to a hotel, and thus, these are excluded any Room Tax income or Room Tax Refund expense items in our projection as subject is considered most similar to an apartment community.

**ABSORPTION, VACANCY AND CREDIT LOSS**

*Absorption*

Absorption pertains to income loss due to the time required to lease vacant units at the subject to stabilization.  According to management, the subject was at or close to full occupancy in the years preceding 2020, but Covid-19 caused a drop in occupancy to around 76%, although this has recovered to around 84% as of the date of inspection.

The vacant units are either under repair/renovation or are unleasable due to damge, and will likely not be leased until a new owner has finished renovations to the entire property.  Consequently, an absorption loss is applicable and is estimated at the existing vacancy level until January of 2024, allowing approximately one year for the work to be completed and the units re-leased.

*Vacancy and Credit Loss*

Occupancy fluctuates over time but is generally high in this apartment market, although it has been reduced recently, due to the construction of new communities.  However, most of the new construction is Class A product and therefore doesn't impact subject.

Further, as it is operated effectively as an apartment project, it does not have the high level of turover that an extended stay hotel might have.and lower than a garden apartment property. A typical "suites" may have up to a quarter of its units turnover in a typical month which affords the opportunity for more frequent changes in occupancy in any given period.

There is limited credit loss since all customers are required to pay in cash or by credit card.  If a customer does not pay when rent is due, then the owner changes the lock and classifies that unit as vacant.  In this way, credit loss is incorporated within the vacancy figure.

Given subject's historically high occupancy and proposed renovation, we consider stabilized occupancy at subject to be 92.5%. This equates to a ***7.5% vacancy/credit loss*** deduction. Although higher  than recent figures, this is what an investor might underwrite at present.

The subject submarket has averaged 5.5% vacancy over the last 10 years and is currently at 6.8%. Thus, at a total of 7.5%, vacancy is 5.50% to 6.00%, and 1.5% - 2.0% is allocated to credit loss.

### Loss to Lease

The "quoted" rates  are typically slightly higher than the actual income received.  On-site managers have incentives to maintain both occupancy and rent, so they are frequently tweaking rental rates to manipulate occupancy levels in an attempt to maximize income.  A customer will typically have a set rent for roughly a year and then management will make a change in the summer, often adjusting weekly rents by some ten dollars per unit.

There are also periods of high and low demand where the manager will adjust its quoted rates upward or downward to meet the market. Tenants who sign in this period are normally charged that same rent for the duration of the year. The impact of loss-to-lease is shown in the following table.

APP000136

| Amerigold Suites - Loss to Lease | | |
|---|---|---|
| 70 Units | December 2022 Annualized | |
| | Amount | Per Unit Per Month |
| Current Gross Income At Market Rates | $1,080,000 | $1,286 |
| Actual Gross Income Reported | $666,965 | |
| Actual Occupancy Indicated | 61.4% | |
| Implied Potential Gross Income | $1,086,262 | $1,293 |
| Loss to Lease | ($6,262) | ($7) |
| Percentage of Gross Potential | -0.6% | -0.6% |

As can be seen, the recent numbers (annualized) indicate a very nominal gain to lease. Again, given the incompleteness of the operating information, over the course of a year, we estimate a zero "loss to lease".

### Combined Vacancy and Loss to Lease

The combination of 7.5% vacancy/credit loss and 0.0% loss to lease indicates a total 7.5% deduction from gross potential stabilized income.

## OPERATING EXPENSES

Operating expenses are the annual direct expenses or annual cash outflows borne by the owner/ investor of income producing properties as the necessary cost of generating gross income. The expense figures used are typical of stabilized annual cash expenses to be paid by the owner of the property over the income projection period. Before net operating income can be calculated, operating expenses are estimated and deducted from effective gross income.

To estimate the appropriate expenses for the subject property, we have examined several sources of information, including:

1) Analysis of apartment expense data reported by the National Council of Real Estate Investment Fiduciaries (NCREIF) for investment grade apartments for 4Q 2022 (Southwest Region).

2) An analysis (as far as was possible)of the subject's very limited expense data provided the appraisers.

3) Average operating expenses for several limited stay suites in the DFW area.

### Apartment Expense Data - NCREIF 4Q22

| Comparable Income and Expense Data NCREIF - Southwest Region Apartments (<200 Units) | | |
|---|---|---|
| Number of Multifamily Complexes | 7 | |
| Average Number of Units | 158 | |
| | $/Unit | % of EGI |
| | Average | Average |
| Base Rent | $18,038 | 90.9% |
| Expense Reimbursement | $178 | 0.9% |
| Other Income | $1,620 | 8.2% |
| **TOTAL INCOME (EGI)** | **$19,836** | **100.0%** |

| | | |
|---|---|---|
| Administrative | $3,159 | 15.9% |
| Marketing | $292 | 1.5% |
| Utilities | $1,277 | 6.4% |
| Maintenance | $1,276 | 6.4% |
| Insurance | $539 | 2.7% |
| Management Fee | $694 | 3.5% |
| Real Estate Taxes | $3,934 | 19.8% |
| Other | $454 | 2.3% |
| TOTAL OPERATING EXPENSES | $11,625 | 58.6% |
| NET OPERATING INCOME (NOI) | $8,211 | 41.4% |
| Source: NCREIF and NVC Keystone Database - 4Q 2022 Data | | |

### Subject Expense Data

Although requested, very limited expense data for subject was provided the appraisers, likely due both to it being managed in-house, and the current receivership status.

The following table shows expenses for subject during the last two months of 2022, just after the property went into receivership. As best as possible, we have annualized those expenses and added taxes based upon the current assessed value and tax rate.

| Amerigold Suites - 2022 Annualized Expenses | | | |
|---|---|---|---|
| Expense | 2 Month Expense | Annualized | Annualized/Unit |
| Management | $8,221 | $49,326 | $705 |
| Utilities | $28,151 | $168,904 | $2,413 |
| Repairs/Maintenance | $18,317 | $109,904 | $1,570 |
| Insurance | $26,463 | $26,463 | $378 |
| Administration | $2 | $5,160 | $74 |
| Taxes | $0 | $79,000 | $1,129 |
| Margin Tax | $0 | $0 | $0 |
| **Total** | **$81,154** | **$486,925** | **$6,956** |

### Comparable Expense Data

In the following tables, are expenses of comparable apartment projects and comparable hotel or "suites" units.   All of the apartment data is for periods in 2022.

| Apartment Expense Comparables | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State | TX | | TX | | TX | | TX | | TX | | |
| County | Denton | | Denton | | Tarrant | | Denton | | Denton | | Avera |
| Year of Construction | 1982 | | 1983 | | 1985 | | 1985 | | 2002 | | |
| Number of Units | 244 | | 252 | | 216 | | 180 | | 300 | | 238 |
| Avg Unit Size | 880 | | 866 | | 933 | | 801 | | 990 | | 894 |
| | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF | $/Unit |
| Effective Gross Income | $14,698 | $16.70 | $15,277 | $17.64 | $15,819 | $16.96 | $14,619 | $18.25 | $17,611 | $17.79 | $15,605 |
| Operating Expenses | | | | | | | | | | | |
| Payroll | $1,537 | $1.75 | $1,610 | $1.86 | $1,827 | $1.96 | $1,623 | $2.03 | $1,717 | $1.73 | $1,663 |
| Management Fees | $335 | $0.38 | $347 | $0.40 | $360 | $0.39 | $334 | $0.42 | $401 | $0.40 | $355 |
| Administrative Expense | $241 | $0.27 | $259 | $0.30 | $360 | $0.39 | $368 | $0.46 | $248 | $0.25 | $295 |
| Advertising and Promotion | $142 | $0.16 | $266 | $0.31 | $222 | $0.24 | $183 | $0.23 | $172 | $0.17 | $197 |
| Maintenance/Building/Grounds | $653 | $0.74 | $618 | $0.71 | $1,001 | $1.07 | $450 | $0.56 | $876 | $0.89 | $720 |
| Utilities | $1,088 | $1.24 | $800 | $0.92 | $1,394 | $1.49 | $825 | $1.03 | $910 | $0.92 | $1,003 |
| Insurance | $504 | $0.57 | $479 | $0.55 | $504 | $0.54 | $462 | $0.58 | $514 | $0.52 | $493 |
| Other Expenses | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 |
| Subtotal Controllable Operating Expenses | $4,499 | $5.11 | $4,379 | $5.06 | $5,668 | $6.08 | $4,246 | $5.30 | $4,838 | $4.89 | $4,726 |
| Property Taxes | $2,602 | $2.96 | $2,269 | $2.62 | $2,656 | $2.85 | $1,916 | $2.39 | $2,653 | $2.68 | $2,419 |
| Total Operating Expenses | $7,101 | $8.07 | $6,648 | $7.68 | $8,325 | $8.92 | $6,162 | $7.69 | $7,491 | $7.57 | $7,145 |
| NET OPERATING INCOME | $7,596 | $8.63 | $8,629 | $9.96 | $7,495 | $8.03 | $8,456 | $10.56 | $10,120 | $10.22 | $8,459 |
| Expense Ratio | | 48.3% | | 43.5% | | 52.6% | | 42.2% | | 42.5% | |
| Management Fee as % of EGI | | 2.3% | | 2.3% | | 2.3% | | 2.3% | | 2.3% | |
| Vacancy | | 7.1% | | 6.2% | | 9.2% | | 7.4% | | 8.5% | |

Source: NVC Internal Database

**Expense Comps**

The table below provides a summary of operations at three larger lodging suites projects located in the North Dallas area, and these are used to assist in our projection of operating expenses at the subject.

| Summary of Trailing 12 Months 2022 Comparable Operating Statements | | | | | | |
|---|---|---|---|---|---|---|
| Property City/Location | Addison | | NW Dallas | | NE Dallas | |
| Units | 344 | | 282 | | 348 | |
| Income/ Expense Category | T12 10/2022 | | T12 10/2022 | | T12 10/2022 | |
| | Amount | $/Unit | Amount | $/Unit | Amount | $/Unit |
| **Effective Rental Income** | **$5,033,452** | **$14,632** | **$4,080,797** | **$14,471** | **$4,910,037** | **$14,109** |
| Surcharge Income | **$220,384** | $641 | $207,218 | $735 | $240,961 | $692 |
| Room Tax | **$83,899** | $244 | $99,021 | $351 | $139,617 | $401 |
| Other Income | **$461,649** | $1,342 | $543,976 | $1,929 | $592,834 | $1,704 |
| **Effective Gross Income** | **$5,799,384** | **$16,859** | **$4,931,012** | **$17,486** | **$5,883,449** | **$16,906** |
| **Operating Expenses** | | | | | | |
| Advertising & Promotion | $11,828 | $34 | $13,310 | $47 | $15,044 | $43 |
| General & Administrative | $95,326 | $277 | $105,316 | $373 | $125,420 | $360 |
| Repairs & Maintenance | $175,817 | $511 | $146,267 | $519 | $237,057 | $681 |
| Personnel (Payroll) | $1,033,543 | $3,004 | $920,906 | $3,266 | $1,052,225 | $3,024 |
| Utilities | $829,904 | $2,413 | $524,393 | $1,860 | $619,600 | $1,780 |
| Management Fees | $0 | $0 | $0 | $0 | $0 | $0 |
| Insurance | $63,650 | $185 | $57,531 | $204 | $62,000 | $178 |
| Real Estate Taxes | $252,500 | $734 | $216,400 | $767 | $294,000 | $845 |
| TX Margin Tax | $27,600 | $80 | $22,800 | $81 | $28,200 | $81 |
| Refunds | $24,504 | $71 | $74,441 | $264 | $83,574 | $240 |
| Room Tax | $77,439 | $225 | $44,917 | $159 | $76,021 | $218 |
| Replacement Reserve | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Operating Expenses** | **$2,592,111** | **$7,535** | **$2,126,281** | **$7,540** | **$2,593,141** | **$7,452** |
| **Net Operating Income (NOI)** | **$3,207,273** | **$9,323** | **$2,804,731** | **$9,946** | **$3,290,308** | **$9,455** |
| Effective Gross Income/Unit | $16,859 | | $17,486 | | $16,906 | |
| Operating Expenses/Unit | $7,535 | | $7,540 | | $7,452 | |
| Operating Expense Ratio (% of EGI) | 44.70% | | 43.12% | | 44.08% | |

***NVC Expenses Estimates***

*Advertising and Promotion*

Subject's annual cost for advertising and promotion is not known.  The suites expense comparables indicate a range in advertising and promotion from $34 to $47 per unit but the apartment expenses show a range from  $142 - 266/unit, and NCREIF shows an average of $292.  Most emphasis is placed upon the NCREIF and apartment comps which indicate a range of $142-292.  We have estimated ***$175 per unit***, or $12,250 for advertising and promotion.

| Advertising and Promotion | | | | | |
|---|---|---|---|---|---|
| | Suites Expenses | NCREIF 4Q 2022 | Apartment Comps | Subject 2022 2M Ann. | NVC Projection |
| Amount/Unit | $34-47 | $292 | $142-266 | $0 | $175 |
| Amount | - | - | - | - | $12,250 |

*General and Administrative*

General and administrative expenses include items such as phone service, postage and office supplies. At the subject property, the only costs for general and administrative are minimal. The suites expense comparables indicate a range in administrative expenses from $277 to $373 per unit, with NCREIF indicating a much higher average amount of $3,159. The apartment comps showing a range of $241-368/unit . Placing most emphasis on the comparable property figures, we have estimated *$350 per unit*, or $24,500 for general and administrative costs.

| General and Administrative | | | | | |
|---|---|---|---|---|---|
| | Suites Expenses | NCREIF 4Q 2022 | Apartment Comps | Subject 2022 2M Ann. | NVC Projection |
| Amount/Unit | $277-373 | $3,159 | $242-368 | $0 | $350 |
| Amount | - | - | - | - | $24,500 |

*Repairs and Maintenance*

This category includes painting, cleaning, plumbing, electrical, and general maintenance associated with the buildings and common areas including the majority of turnover expenses. We note that this category also includes landscaping and pest control. At the subject property, the annualized cost per unit for repairs and maintenance was $1,570, and the suites expenses range between $511-681/unit. The apartment comparables show a range of $450-1,001/unit, with NCREIF indicating $1,276.

Placing most emphasis on the recent historical figures, we have estimated *$1,200 per unit*, or $84,000 for repairs and maintenance.

| Repairs and Maintenance | | | | | |
|---|---|---|---|---|---|
| | Suites Expenses | NCREIF 4Q 2022 | Apartment Comps | Subject 2022 2M Ann. | NVC Projection |
| Amount/Unit | $511-681 | $1,276 | $450-1,001 | $1,570 | $1,200 |
| Amount | - | - | - | - | $84,000 |

*Personnel Costs (Payroll)*

This category, for a property like the subject, includes salaries for any on-site personnel. This might be full or a part-time managers and all maintenance personnel. The property also employs several people, mainly for maintenance and security. It also includes all employee benefits such as health insurance, payroll taxes, and workman's compensation.

Personnel costs were not itemized for the subject. However, the suites expense comparables indicate a range in payroll expenses from $3,004 to $3,266 per unit, the apartment comparables show a range of $1,537-1,837. but NCREIF does not break out this category. With most emphasis placed on the apartment data and increasing wage costs, we have estimated *$2,000 per unit*, or $140,000 for personnel costs.

| Payroll (Personnel) | | | | | |
|---|---|---|---|---|---|
| | Suites Expenses | NCREIF 4Q 2022 | Apartment Comps | Subject 2022 2M Ann. | NVC Projection |
| Amount/Unit | $3,000-3,266 | $0 | $1,537-1,827 | $0 | $2,000 |
| Amount | - | - | - | - | $140,000 |

APP000141

*Utilities*

The utilities category includes gas, electricity, water/sewer and trash expenses paid for by the landlord. At the subject property, the annualized cost for utilities in the last two months of 2022 was $2,413. The suites comparables indicated a range of between $1,780 and $2,413 per unit for utilities, and the apartment comparables show a range of $800-1,088/unit, likely lower as most newer apartment units are directly metered so that the owner's direct expenses are reduced. The NCREIF survey shows a cost of $1,277/unit and again likely reflects the owners' lower direct costs. Placing most emphasis on the subject annualized and suites data, we have estimated ***$2,400 per unit***, or $168,000 for utilities.

| Utilities | | | | | |
|---|---|---|---|---|---|
| | Suites Expenses | NCREIF 4Q 2022 | Apartment Comps | Subject 2022 2M Ann. | NVC Projection |
| Amount/Unit | $1,718-2,413 | $0 | $800-1,088 | $2,413 | $2,400 |
| Amount | - | - | - | - | $168,000 |

*Management Fees*

This category includes items such as management fees, legal fees and other professional services. Property management fees are often treated as a separate expense category for apartments and are typically charged as a percentage of effective gross income. Fees tend to vary depending on a variety of factors including the market position and rent levels of a particular property. Generally, higher quality properties with higher unit rents have lower management fees (as a percentage) because they produce more income yet require the same amount of time and effort to manage as a property with average rents.

The subject is an individual property which is reportedly self-managed and has an on-site manger. It does not use a third-party management company so there has not historically been a management fee. This is atypical in the market for both apartments and hotels. Should the subject property sell, a new operator would likely contract a management company for management services, so we have included this as an expense. However, we don't want to double-count any of the management services that are already accounted for in the payroll expense category.

NCREIF data indicates an average management fee of 3.5% of EGI for investment grade garden style apartments in the Southwest region. Typical management fees for good quality apartment complexes range between 2.5% and 3.5% of EGI. Considering that the subject is more management intensive than a typical apartment due to its weekly rent collection and frequent unit turnover, but that we already have accounted for certain management expenses in the payroll category, we adopt an additional management fee at ***3.0% of effective gross income***. This is designed to account for the added management services that corporate office currently provides.

*Insurance*

From the recent expenses provided (since the receivership), the annualized cost for insurance appears to have been $26,463 ($378/unit) in 2022.  Insurance costs for the suites comparables ranged from $178 to $204 per unit, and for the apartments $462 to $514 per unit.  The NCREIF insurance expense averages $539 for 4Q 2022.  Placing most emphasis on the recent apartment comparables, we have estimated ***$400 per unit***, or $28,000 for insurance.

| Insurance | | | | | |
|---|---|---|---|---|---|
| | Suites Expenses | NCREIF 4Q 2022 | Apartment Comps | Subject 2022 2M Ann. | NVC Projection |
| Amount/Unit | $178-204 | $539 | $462 - 514 | $539 | $400 |
| Amount | - | - | - | - | $28,000 |

*Property Taxes*

As discussed in detail in the *Tax and Assessment Analysis* presented previously in this report, based upon the current assessed value and current tax rate, the subject's property taxes are ***$38,150***, or $545 per unit. However, if the property was sold (and it is the subject of an LOI at $5,500,000) the assessed value would likely be increased closer to the sale price.  As a typical investor would probably assume an assessed value of around 65-75% of market value, we have utilized an assumed assessed value of $3,575,000 which produces a tax burden of **$95,000**.

*Room Tax*

As noted previously, we have excluded any Room Tax income and Room Tax & Refund expense line items in our projection as room tax revenues collected are generally offset by room tax obligations to be paid.

*Replacement Reserves*

Replacement Reserves is an allowance that provides for expenditures of short-lived items or recurring expenses.  The deterioration of capital items occurs over a period of time, but are viewed as an annual expense to ownership.  This requires an annual deduction be made from income to reflect the statistical probability of their occurrence time.

The owner currently expenses all replacements of stoves/ovens, refrigerators, microwaves, heating/cooling units, carpet, furniture, etc. within the repairs and maintenance category.   Many times they will attempt to repair rather than replace.  As such, they employ three full time maintenance workers and have a storage unit on site with tools and replacement units.  While we don't want to double-count what is already being expensed in these two categories, we do want to properly allow for replacement reserves.

Short-lived items such as appliances, carpeting, window coverings, and HVAC units are typically considered in replacement reserves.  Generally, for apartments, investors will select a reserve amount between $250 to $700 per unit depending upon the age/condition of the property and the amount estimated for general maintenance expense.  However, the subject has been maintained at a below-average level and now exhibits deferred maintenance.

Given the age of the propety and the projected renovation, we will conclude with an additional reserve estimate of ***$300 per unit***, or ***$21,000*** for annual replacement reserves (post renovation).

### *Total Operating Expenses Conclusion*

NVC's estimation of operating expenses for the subject as of January 19, 2023, is shown in the following table.

| Summary of Operating Expense Estimates | | | |
|---|---|---|---|
| Total No. of Units: 70 | | | |
| Total Square Footage: 51,600 | | | |
| | As of 1/19/2023 | | |
| Expense Category | Amount | $/Unit | $/SF |
| Advertising & Promotion | $12,250 | $175 | $0.24 |
| General & Administrative | $24,500 | $350 | $0.47 |
| Repairs & Maintenance | $84,000 | $1,200 | $1.63 |
| Personnel (Payroll) | $140,000 | $2,000 | $2.71 |
| Utilities | $168,000 | $2,400 | $3.26 |
| Management Fees | $32,634 | $466 | $0.63 |
| Insurance | $28,000 | $400 | $0.54 |
| Real Estate Taxes | $95,000 | $1,357 | $1.84 |
| Texas Franchise Tax | $5,711 | $82 | $0.11 |
| Replacement Reserves | $21,000 | $300 | $0.41 |
| TOTAL | $611,095 | $8,730 | $11.84 |

Our post-renovation NOI is shown in the proforma on the following page.

APP000144

**NET OPERATING INCOME**

The net operating income for the subject "as is", is shown in the following table.

| **Amerigold Suites** **Projected Income and Expenses As of January 19, 2023** **For Use in Direct Capitalization Calculation** | | | | | |
|---|---|---|---|---|---|
| Total No. of Units:  70 | | | | | |
| Total Square Feet  51,600 | | | | | |
| | | "As Is" | | | |
| Income/Expense Category | | Annual | Percent of EGI | Per SF (Rentable) | Per Unit |
| Operating Income: | | | | | |
| Potential Rental Revenue | | $1,134,000 | 103.1% | $21.98 | $16,200 |
| Vacancy and Credit Loss | 7.5% | ($85,050) | (7.7)% | ($1.65) | ($1,215) |
| Loss to Lease | 0.0% | $0 | 0.0% | $0.00 | $0 |
| Concessions | | ($3,500) | (0.3)% | ($0.07) | ($50) |
| Effective Rental Income | | $1,048,950 | 95.4% | $20.33 | $14,985 |
| Other Income | | $51,000 | 4.6% | $0.99 | $729 |
| Effective Gross Income (EGI) | | $1,099,950 | 100.0% | $21.32 | $15,714 |
| Operating Expenses: | | | | | |
| Advertising & Promotion | | $12,250 | 1.1% | $0.24 | $175 |
| General & Administrative | | $24,500 | 2.2% | $0.47 | $350 |
| Repairs & Maintenance | | $84,000 | 7.6% | $1.63 | $1,200 |
| Personnel (Payroll) | | $140,000 | 12.7% | $2.71 | $2,000 |
| Utilities | | $168,000 | 15.3% | $0.00 | $2,400 |
| Management Fees | 3.0% | $32,999 | 3.0% | $0.64 | $471 |
| Insurance | | $28,000 | 2.5% | $0.54 | $400 |
| Real Estate Taxes | | $95,000 | 8.6% | $1.84 | $1,357 |
| Texas Franchise Tax | 0.525% | $5,775 | 0.5% | $0.11 | $82 |
| Replacement Reserves | | $21,000 | 1.9% | $0.41 | $300 |
| Total Operating Expenses | | $611,523 | 55.6% | $11.85 | $8,736 |
| ***Net Operating Income (NOI)*** | | ***$488,427*** | ***44.4%*** | ***$9.47*** | ***$6,978*** |
| Per Unit Indications: | | | | | |
| Effective Gross Income/Unit | | | | | $15,714 |
| Operating Expenses/Unit | | | | | $8,736 |
| Operating Expenses/EGI (%) | | | | | 55.6% |
| *Source: NVC Inc.* | | | | | |

As only very limited data was provided, an analysis and comparison of subject's estimated expenses with projected figures, was not possible.

**CAPITALIZATION**

Capitalization is a process in which projected net income is converted into a single value estimate. The two primary methods of capitalizing income are 1) ***direct capitalization*** and 2) ***yield capitalization***.   Buyers of properties such as this do not typically utilize discounted cash flows or yield capitalization, so we have only utilized direct capitalization.

**DIRECT CAPITALIZATION**

Capitalization rates are typically tied to a particular asset class.  Although the subject property shares some characteristics of both apartment and hotel asset classes, its unit sizes and operation are most akin to an apartment property.  The subsequent table summarizes characteristics that typically affect capitalization rates and how the subject property compares with these different asset classes.

Given its existing and proposed continued use as an apartment property,  we have appraised the property as such.  Apartments typically have a lower capitalization rate than extended stay hotels due to their superior income stability, typically higher occupancy, and more stable market conditions as well as less risk of mismanagement and competition with product affiliated properties. When the risk characteristics of the subject property are compared with apartment and hotel asset classes, we would expect a capitalization rate much closer to the former.

Considering this, there are several methods of deriving an appropriate overall rate to use to capitalize NOI.  In determining the appropriate rate for the subject, we have utilized two methods, A) ***market extraction***, and B) ***investor survey***.   Each of these methods are considered in the following analysis.

*A) Market Extraction Method*

A market-extracted capitalization rate (overall rate) is market-oriented and can be determined by dividing the NOI of a comparable sale by its selling price.  If comparables are truly similar to the subject, they will produce a narrow range from which an appropriate rate can be selected and applied to the subject's NOI.

Within the *Sales Comparison Approach*, we confirmed several sales of recently sold apartment complexes in the Dallas metro area.  The capitalization rates derived from these recent sales, as well as other pertinent details regarding these properties, were described in the *Sales Comparison Approach* section of this report, but are re-summarized for convenience in the chart on the following page.

APP000146

## Sale Summary

| Apartment Comparable #1 | McCallum Communities | Year Built: | 1984 | Price: | $52,000,000 |
|---|---|---|---|---|---|
| | 7740 McCallum Blvd | Total Units: | 419 | Sale Date: | 11/04/2022 |
| | | Total SF: | 249,426 | Price/SF: | $208.48 |
| | Dallas, Dallas County, Texas | Average Unit Size: | 595 SF | Price/Unit: | $124,105 |
| | | Occupancy at Sale: | 92.3% | Cap Rate: | 4.42% |
| SALE ID# 263859 | Seller: McCallum Multifamily Dallas DE LLC <br> Buyer: HC McCallum LLC | | | | |
| Apartment Comparable #2 | Clover on Park Lane | Year Built: | 1975 | Price: | $38,500,000 |
| | 8780 Park Ln | Total Units: | 343 | Sale Date: | 01/04/2022 |
| | | Total SF: | 209,172 | Price/SF: | $184.06 |
| | Dallas, Dallas, Texas | Average Unit Size: | 610 SF | Price/Unit: | $112,245 |
| | | Occupancy at Sale: | 95.0% | Cap Rate: | 3.50% |
| SALE ID# 261611 | Seller: Travertine North Park Investors, LLC <br> Buyer: Tides on Park Lane Owner, LLC | | | | |
| Apartment Comparable #3 | The Colony House | Year Built: | 1961 | Price: | $2,952,380 |
| | 6235 Oram St | Total Units: | 21 | Sale Date: | 12/13/2021 |
| | | Total SF: | 19,170 | Price/SF: | $154.01 |
| | Dallas, Dallas, Texas | Average Unit Size: | 913 SF | Price/Unit: | $140,590 |
| | | Occupancy at Sale: | 91.3% | Cap Rate: | 3.55% |
| SALE ID# 257180 | Seller: SMG Carriage, LP <br> Buyer: Wedgewood Commercial Holdings, LLC | | | | |
| Apartment Comparable #4 | Estara, The | Year Built: | 1971 | Price: | $25,620,000 |
| | 11321 Woodmeadow Pkwy | Total Units: | 216 | Sale Date: | 11/16/2021 |
| | | Total SF: | 217,620 | Price/SF: | $117.73 |
| | Dallas, Dallas, Texas | Average Unit Size: | 1,008 SF | Price/Unit: | $118,611 |
| | | Occupancy at Sale: | 92.0% | Cap Rate: | 3.95% |
| SALE ID# 256091 | Seller: Ascendant RE 1, LLC <br> Buyer: 11321 Woodmeadow, LLC | | | | |
| Apartment Comparable #5 | 1500 N Carroll Apartments | Year Built: | 1986 | Price: | $3,000,000 |
| | 1500 N Carroll Ave | Total Units: | 26 | Sale Date: | 11/12/2021 |
| | | Total SF: | 14,206 | Price/SF: | $211.18 |
| | Dallas, Dallas, Texas | Average Unit Size: | 546 SF | Price/Unit: | $115,385 |
| | | Occupancy at Sale: | 100.0% | | |
| SALE ID# 257121 | Seller: jWang Investments II, LLC <br> Buyer: Ratsiu Family Trust | | | | |

The comparables indicate a capitalization rate range of 3.50% to 4.42%. However, all but one of these sales occurred before the rapid increase in interest rates, which has resulted in uncertainty in the capital markets, but has also caused a downward pricing shift, moreso for secondary properties like subject. None of the sales occurred after the most recent interest rate increases in December 2022, and then on February 1 this year. The 10-year U.S. Treasury Yield was under 2.0% when Nos. 2-5 transacted; it is currently just under 3.2%.

Overall, considering the characteristics of the comparable properties relative to the subject and the current environment in the capital markets, we would expect an overall rate for subject, as if stabilized, to fall higher than this range of say, 6.00% to 6.50%. ***We have concluded with a market extracted capitalization rate of 6.25%.***

### B) Investor Survey Method

The following sections highlight key sections from the *PwC Real Estate Investor Survey - Fourth Quarter 2022.*

### National Highlights - Apartments

- *"The year-one market rent change rate is the trickiest assumption to estimate now, according to investors.  This key indicator declines to 3.83% from 4.10% last quarter but remains above the ten-year average of 2.56% for this market.*

- *At the same time, this market's average overall cap rate rises from 4.45% last quarter to 4.75% this quarter; in response to the rising cost of capital, investors are slowing their pace of acquisitions, pausing to assess the market, or pivoting toward debt-structured deals.*

- *A widening bid-ask pricing gap between buyers and sellers is a major impediment to deal flow in this market, followed by increased caution being shown by investors."*

With the preceding in mind, the table on the following page provides current and historical OAR trends (from the PwC Real Estate Investor Survey) that are relevant to the subject property.

| Overall Capitalization Rate (OAR) National Apartment Market | | | |
|---|---|---|---|
| Year (4ᵗʰ Qtr.) | Low | High | Average |
| 2011 | 3.75% | 10.00% | 5.80% |
| 2012 | 3.75% | 10.00% | 5.72% |
| 2013 | 3.50% | 10.00% | 5.80% |
| 2014 | 3.50% | 8.00% | 5.36% |
| 2015 | 3.50% | 8.00% | 5.35% |
| 2016 | 3.50% | 7.50% | 5.26% |
| 2017 | 3.50% | 7.50% | 5.32% |
| 2018 | 3.50% | 8.50% | 5.16% |
| 2019 | 3.50% | 7.00% | 5.15% |
| 2020 | 3.50% | 8.00% | 5.22% |
| 2021 | 3.00% | 7.00% | 4.42% |
| 1Q 2022 | 3.00% | 7.00% | 4.40% |
| 2Q 2022 | 3.00% | 7.00% | 4.45% |
| 3Q 2022 | 3.00% | 8.00% | 4.75% |
| 4Q 2022 | 3.25% | 8.00% | 4.89% |

Source: *PwC Real Estate Investor Survey* published by PricewaterhouseCoopers, LLP

In the 4th quarter 2022 issue (which does not reflect the most recent increase in interest rates), overall capitalization rates for *institutional-grade* apartment complexes were reported to range from 3.25% to 8.00%, with an average of 4.89%, up 11 bps from the previous quarter.  The subject property, however, is not considered investment grade given its age, condition, lack of amenities, etc. **Non-institutional-grade OARs** in the 4Q22 survey range from ***4.00% to 5.00%*** in the Southwest US, averaging ***5.50%***. Again, this latest survey likely does not reflect the Fed's latest interest rate increase.

APP000148

Given the foregoing and the operating characteristics of the subject, ***we conclude with a 6.50% capitalization rate via the investor survey technique assuming a stabilized cash flow, as if renovated.***

### Conclusion of Capitalization Rate

To summarize, the two methods suggest the following indications of capitalization rate for the subject.

| Summary of Capitalization Rate Estimates Budget Suites | |
|---|---|
| Method | Reconciled |
| Market Extraction | 6.25% |
| Investor Survey | 6.50% |

While both methods are considered, we place more weight on investor survey for the subject property - although they are similar.

Considering current market conditions, subject's location in the Dallas/Fort Worth metropolitan area and our forecast NOI in comparison to historical results, we conclude with an overall rate of ***6.50%*** for the subject property.

As noted, the property exhibits significant deferred maintenance, with the highest bidder to date indicating some $3,040,000 of proposed renovations, $1,660,000 of which is for the exterior, and $1,380,000 of which is for the interiors. Consequently, in order to achieve the projected rents, the cost of these works must be deducted from our indicated value, as if stabilized, to arrive at our "as is" value.

Also deducted is the lost rent while the property is renovated and units are unleasable. This is estimated by assuming that each month, 6 units are "down" while renovations are completed, reducing the potential current income by around 8.6%. Costs are also adjusted slightly, and the resulting loss of just over $125,000 is discounted at 9.0% for a present value of $115,000 (rounded). Thus, our final value, as of January 19, 2023, is projected as follows:

| Direct Capitalization "As Is" As Of January 19, 2023 | | |
|---|---|---|
| Stabilized Net Operating Income | | $488,427 |
| Capitalization Rate | | 6.50% |
| Indicated Value, As If Renovated and Stabilized | | $7,514,258 |
| Less: Proposed Cost of Renovations | | ($3,040,000) |
| **Less: Lost Rent During Renovations** | | ($115,000) |
| **Final Value, As Is, by Direct Capitalization** | | **$4,359,258** |
| **Rounded to:** | | **$4,400,000** |
| Value Per Unit | 70 | $62,857 |

# RECONCILIATION AND FINAL VALUE

In estimating the market value of the subject, the *Sales Comparison* and *Income Capitalization* approaches were used.  The indicated market value from each approach is summarized in the following table.

| Summary of Market Value Indications | |
|---|---|
| Approach/Technique | Indicated Value |
| Sales Comparison Approach | $4,200,000 |
| Income Capitalization Approach | $4,400,000 |
| *Reconciled* | *$4,400,000* |

The following is a brief discussion of the methodologies used to arrive at each value indication.

### *Sales Comparison Approach*

As mentioned within the body of the *Sales Comparison Approach*, the subject property is somewhat unique and sales were not found that are directly comparable to the property. Although no weight is given to the *Sales Comparison Approach*, we did analyze apartment and hotel sales as a means to test the reasonableness of the *Income Capitalization Approach*.  The sales were analyzed using a price/unit, analysis.  **Overall, the sales comparison approach is used as a test of reasonableness of the Income Capitalization Approach.**

### *Income Capitalization Approach*

The income capitalization approach to value is predicated on the assumption that a strong relationship exists between the net income a property produces and its market value.  For this reason, the income capitalization approach focuses on the most important feature to an investor in an income-producing property, the potential net operating income.  Inasmuch as the amount and quality of data used in this approach are considered good, we have a high level of confidence in the value indication in this approach.  **Therefore, most weight will be placed on the income capitalization method in the final reconciliation of value.**

It must be noted that our opinion of value is subject to other standard and typical assumptions and limiting conditions which are referenced in the accompanying appraisal report.  Those assumptions that are **extraordinary** in nature are summarized as follows:

1. **During our inspection of the property, a random sampling of the subject's units were inspected.  For the purposes of this appraisal, we have assumed that the condition and decor of the remaining units (those not inspected) is similar to those inspected and described within this report.  If it is determined that the condition and/or decor of the remaining units is significantly different than described herein, a re-valuation of the subject could be required.**

After careful consideration of all pertinent, available information, the market value of the **fee simple** interest in the subject property as of January 19, 2023, subject to the assumptions and limiting conditions set forth in this analysis, is reconciled below:

**$4,400,000**

**FOUR MILLION FOUR HUNDRED THOUSAND DOLLARS**

APP000150

**ALLOCATION OF NON-REALTY COMPONENTS**

USPAP Standards Rule 1-4(g) specifies that when an appraisal includes personal property, trade fixtures, or intangible items, the appraiser must analyze the effect on value of such non-real property items.

In December 2010, the Department of the Treasure issued new Interagency Appraisal and Evaluation Guidelines for the Agencies of the Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision and National Credit Union Administration. These guidelines set forth a number of minimum appraisal standards. Included in these base requirements is the following requirement:

> Be based upon the definition of market value set forth in the appraisal regulation. Each appraisal must contain an estimate of market value, as defined by the Agencies' appraisal regulations. The definition of market value assumes that the price is not affected by undue stimulus, which would allow the value of the real property to be increased by favorable financing or seller concessions. Value opinions such as ***going concern value***, value in use, or a special value to a specific property user may not be used as market value for federally related transactions. An appraisal may contain separate opinions of such values so long as they are clearly identified and disclosed.

There is spirited debate within the appraisal community regarding the degree to which non-realty components comprise the market value of certain properties, and how such components can best be measured. Some question whether there is any business element to real estate, some say it applies to all types of real estate, and is significant. In the case of hotels and restaurants, most valuation professionals acknowledge the existence of non-realty items, but the interpretation and measurement of such is open for discussion.

However, when discussing the concept of business and going-concern value with investors, they often state there is one market value as any allocation to a business is theoretical and academic. Moreover, investors quite often state any business value is removed by deductions for franchise fees and management fees. Likewise, when adjustments are made in the Income Approach to reflect market, any business value associated with superior performance of management is eliminated. While a property may have superior or inferior revenue or profit, this can often be traced back to superior real estate attributes such as location, visibility, exposures, condition and deferred maintenance.

To assist appraisers with this issue, the Appraisal Institute commenced with a new course in 2012 titled Fundamentals of Separating Real Property, Personal Property and Intangible Business Assets. This course allocates the components of a Going concern or Business to Tangible Property (real property and personal property), Intangible Personal Property and Monetary Assets. These three components include the following:

- Tangible Property includes real property and personal property;
- Intangible Personal Property includes an assembled workforce, contracts, name, patents and copyrights and capitalized economic profit;
- Monetary Assets include cash and equivalent, accounts receivable and supplies and inventory.

Since our appraisal is based on market conditions and we have deducted applicable management fees, there is a strong argument that any intangible personal property has been removed. Given the entry level work force of hotels as well as abundance of competent managerial staff, there is little value to an assembled work force. In fact, standard operating procedures and training manuals are a component of managing entity and reflected in the management fee deduction. Monetary Assets are commonly adjustments on the settlement sheet at closing.

In the final analysis, we have concluded that the highest and best use of the subject is for continued operation as a hybrid apartment and extended stay lodging facility. In either side of this market, whether it be apartments or extended stay hotels, buyers and sellers do not normally distinguish between tangible and intangible components.

This is evidenced in the fact that buyers and sellers rarely make adjustments or allocations on a settlement sheet for intangibles.  Moreover, when reviewing financial reports of publically traded companies, individual property acquisitions reflect the real estate and personal property, with no allocation for goodwill or other intangibles.  ***We believe this also holds true at the subject.  Thus, while the market value estimated herein is reflective of the subject operating as a going-concern, there is no measurable contribution from intangible items.  The only allocation is between real estate and FF&E.***

### *Furnishings, Fixtures and Equipment*

Furnishings, Fixtures and Equipment (FF&E) are essential to the operation of a hotel facility.  Their quality often influences a property's class.  These items are exposed to heavy use and must be replaced regularly for the property to maintain its market position.  This includes carpet and furnishings, guest room carpet and furnishings, wall coverings, restaurant decor, and other equipment.  In the past decade, guests have demanded newer properties, and more frequently-updated furnishings and decor.

| Typical Useful Lives of Various FF&E Items | |
| --- | --- |
| Item | Useful Life in Years |
| Furnishings - Lobby | 5 - 12 |
| Kitchen Equipment - Lobby Area | 5 - 12 |
| Pool Furniture | 5 - 8 |
| Kitchen Equipment | 8 - 25 |
| Source: Hotels and Motels: Valuations and Market Studies, Steven Rushmore, MAI and Eric Baum, Appraisal Institute, Chicago 2001, page 360 | |

High quality properties may require more frequent updating than suggested above.  Guest rooms probably need to be completely revamped every 10-20 years for an older property such as the subject.  The condition of guest rooms can change relatively quickly, with on-going wear and tear, plus changing trends in tastes and styles contributing to relatively short useful lives.

We have estimated the cost new of the subject FF&E to be $3,500 per unit x 70 units, or $245,000 (rounded.) Other FF&E items associated with the common area (office equipment, maintenance equipment, pool furniture, etc. are estimated to add another $20,000, for a total of $265,000.  However, the FF&E varies in age and must be depreciated.  Since the items are used, any buyer would deeply discount these items, often at a rate beyond standard accounting depreciation estimates and useful life.  Accordingly, we have applied a discount factor of 75%, which results in an estimated depreciated value of $65,000 (rounded).

Please note that this figure is intended as a general estimate only for allocation purposes.  It is not intended to represent an appraisal of the personal property, which the appraisers are not qualified to provide.

## REASONABLE EXPOSURE TIME & MARKETING PERIOD

Advisory Opinion G-7 of the USPAP defines *reasonable exposure time* as follows:

"The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market."

In contrast, the same Advisory Opinion defines *marketing time* as follows:

"An estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value level during the period immediately after the effective date of an appraisal."

The key difference between the two is that exposure time is inherent in the market value and is always presumed to precede the effective date of value, whereas the marketing period is the estimated length of time immediately after the effective date of value that will be necessary to sell the property.

### Market Context

PWC provides apartment investment data twice a year, with the last update as of the fourth quarter of 2022.  The average marketing time for apartments (most applicable to subject) ranged from 1.0 to 12.0 months, with an average of 4.6 months.

| Average Marketing Times - Apartments Fourth Quarter 2022 | | | | | |
|---|---|---|---|---|---|
| | Current Quarter | Last Quarter | | Year Ago | |
| Market | Average | Average | Change | Average | Change |
| National Apartment | 4.6 | 4.3 | 7.0% | 4.2 | 9.5% |
| Source: *PwC Real Estate Investor Survey* published by PricewaterhouseCoopers, LLP | | | | | |

### Conclusion

Considering both the macro context of the institutional real estate market in general, as well as the micro aspects of the subject in particular, it is our opinion that the reasonable exposure period inherent in the market value estimate is *3 to 6 months.*

The investment market for apartment projects remains active. The near-term outlook is similar and there should not be a perceptible difference between exposure time and marketing time. Thus, exposure time is estimated to be the same as marketing time. This is the length of time that we estimate it will take to sell the subject property at the appraised value.

| Exposure and Marketing Period Conclusions | |
|---|---|
| Exposure Period Implicit in Market Value Estimate | 3 to 6 months |
| Forecasted Marketing Period | 3 to 6 months |

**CERTIFICATION**

We certify that, to the best of our knowledge and belief. . .

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial and unbiased professional analyses, opinions and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.  Further, the appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

7.  Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*,  the requirements of the *Code of Professional Ethics and the Standards of Professional Appraisal Practice* of the Appraisal Institute.

8.  Simon D. Neame, MRICS made a personal inspection of the property that is the subject of this report.  Charles G. Dannis, MAI, SRA did not inspect the subject.

9.  Additional employees of National Valuation Consultants, Inc., provided assistance with research, data gathering and confirmation of public records.  Scott Martin and Dennis Young provided research and data-gathering assistance to the persons signing this certification.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Charles G. Dannis, MAI, SRA has completed the requirements under the continuing education program for Designated Members of the Appraisal Institute. Simon D. Neame, MRICS, is current with the continuing professional development program of the Royal Institution of Chartered Surveyors, and has completed the Standards and Ethics Education Requirements for Practicing Affiliates of the Appraisal Institute.

12. The appraiser(s) and/or NVC, Inc. have not provided professional services on the subject property in the three years immediately preceding acceptance of this assignment.



Charles G. Dannis, MAI, SRA (Appraisal Institute)
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G

Phone: 214-932-1818
E-mail: cdannis@nvcinc.com

Simon D. Neame, MRICS
Senior Vice President
Texas Certified General Appraiser
License No.: TX 1330329 G

Phone:  214-932-1821
E-mail:  sneame@nvcinc.com

APP000155

**ADDENDA**

**APPRAISER QUALIFICATIONS**

APP000157

# Charles (Chuck) G. Dannis, MAI, SRA
## Senior Managing Director

**National Valuation Consultants, Inc.**



Chuck has been a real estate appraiser and consultant since 1972.  In 1976, he co-founded the Dallas-based appraisal firm Crosson Dannis, Inc., which provided real estate appraisal and consultation services throughout the U.S. for more than 35 years.  In 2015, Crosson Dannis merged with National Valuation Consultants to create one of the largest privately held commercial real estate valuation and advisory firms in the United States.

Chuck currently serves as the Senior Managing Director of NVC's Dallas office, overseeing all aspects of its day-to-day operations including bidding, structuring and engaging appraisal assignments and managing the office's valuation team.

## PROFESSIONAL EXPERIENCE

**NATIONAL VALUATION CONSULTANTS, INC.**                    JANUARY 2015 - PRESENT

*One of the largest, privately held commercial real estate valuation and advisory companies in the United States with a focus on institutional real estate clients*

**CROSSON DANNIS, INC.**                    1977 – DECEMBER 2014

Served as co-founder and President of this full-service real estate appraisal and consulting firm operating throughout the United States.

**FIRST TEXAS FINANCIAL CORPORATION AND MUTUAL SAVINGS**                    1974 - 1976

Initially employed as Regional Supervisor, subsequently promoted to Assistant Vice President. Responsible for management and marketing of all company-owned real estate developments with concurrent responsibilities of all appraisal work on income-producing property loans. Residential developments included several single-family subdivisions and a large, planned unit development.

**OAK CLIFF SAVINGS AND FIRST TEXAS FINANCIAL CORPORATION**                    1972 - 1974

Employed as a Staff Appraiser for a statewide savings and loan holding company, involving real estate appraisal and consulting work on all types of properties.

## EDUCATION

**SOUTHERN METHODIST UNIVERSITY**                    B.B.A. – MANAGEMENT
**GRADUATE STUDIES IN FINANCE AND REAL ESTATE**

## CERTIFICATIONS AND LICENSES

Certified General Appraiser in the State of Texas

## PROFESSIONAL AFFILIATIONS

- Member of the Appraisal Institute (MAI and SRA)
- Chairman – Ethics Committee, Appraisal Institute[1]
- Chairman – Candidate Guidance, Appraisal Institute[1]
- Chairman – Public Relations, Appraisal Institute[1]
- Chairman – Symposium Committee, Appraisal Institute[2]
- Vice Chairman – Research Committee, Appraisal Institute[2]
- Member – Appraisal Standards Council, Appraisal Institute[2]

[1]Local Chapter
[2]National Appointment

**PHONE:**
Direct:   214.932.1818
Mobile: 214.707.1851

**EMAIL:**
cdannis@nvcinc.com

**WEBSITE:**
www.nvcinc.com

**NVC - DALLAS**
6060 North Central Expressway
Suite 860
Dallas, TX 75206

APP000158

# Charles (Chuck) G. Dannis, MAI, SRA
**Senior Managing Director** Page 2

## PROFESSIONAL AFFILIATIONS (CONT.)

- Chairman – Valuation Committee, National Council of Real Estate Investment Fiduciaries
- Chairman, Education Committee, National Council of Real Estate Investment Fiduciaries
- Board of Directors, National Council of Real Estate Investment Fiduciaries (1997-2001;2015-); Chairman of the Board (2020 - 2022)
- Lecturer – Nuts & Bolts of Institutional Real Estate, National Council of Real Estate Investment Fiduciaries, 2001-
- Adjunct Professor of Practice in Real Estate, Edwin L. Cox School of Business, SMU, 1988-
- Chairman - City of Dallas, Economic Review Panel for the Landmark Commission, 2002, 2008
- Mayor's Real Estate Task Force for the City of Dallas, 2003-2006

## PUBLICATIONS, SPEECHES AND LECTURES

- Articles contributed to the following publications:

  *Appraisal Journal*                *Real Estate Finance*
  *Real Estate Review*               *D Magazine (blog)*
  *Institutional Real Estate Letter* *Dallas Business Journal*

- Participation in various Educational Symposiums/Conferences including MBA (Texas, Louisiana and National Conferences), IPT, NCREIF, SMU, Appraisal Institute

## BOARDS, CIVIC AND PROFESSIONAL SERVICE

- Guest Lecturer at graduate business schools of: UT Austin, UT Arlington, Texas A&M, Harvard, DePaul, and UT Dallas
- Board of Trustees – The Dallas Marathon, benefiting The Texas Scottish Rite Hospital for Children (President/Chairman, 2005-2008; Chairman Emeritus, 2009-)
- Board of Directors – Folsom Institute for Real Estate, SMU/Cox, Vice Chair Education (2014 - )
- Host of "The Real Estate Hour", 1992 – 2008; 2020 - (CBS Radio Network, Dallas affiliate)
- Founder, SMU Real Estate Society at the SMU Cox School of Business
- Board of Governors, Chartered Realty Investor Society
- Board of Directors – Friends of The Katy Trail (2011- 2016)
- Board of Trustees – The Shelton School (2013 -), an Internationally known school for children that learn differently
- Independent Director, TIER REIT (2003 - 2017); Chairman of the Board (2013- 2015)
- Qualified as an expert witness in several states and courts throughout the U.S.

## AWARDS AND HONORS

- The Dallas Marathon's Victory Award for Excellence and Community Service (2011)
- First recipient of the Eugene T. Byrne Endowed Faculty Innovation Award, SMU Cox School of Business, 2006
- HOPE Professor, SMU Cox School of Business, 2008 - 2009
- Mortgage Bankers Association, Faculty Fellow Award, 1996-1997
- First Recipient of the Folsom Institute for Real Estate/SMU Real Estate Society's Distinguished Real Estate Alumni Award – 2015
- Appraisal Institute Education Trust's Dr. William N. Kinnard, Jr. Award in recognition of his professionalism and commitment to real estate appraisal education- 2016
- Commandant of the U.S. Marine Corps Quality Citizen Award, 2008
- North Texas Commercial Association of Realtors "Michael F. McAuley Lifetime Achievement Award" for community service, 2019


**NVC**
National Valuation Consultants, Inc.

APP000159

CHARLES GLENN DANNIS
6060 N CENTRAL EXPY STE 860
DALLAS, TX 75206



# Certified General Real Estate Appraiser

Appraiser: **Charles Glenn Dannis**

License #: **TX 1321531 G**          License Expires: **01/31/2024**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

APP000160

# Simon D. Neame, MRICS

Senior Vice President

Valuation and consultation of all types of commercial properties including retail, office, industrial, apartment, other commercial, special-use, and land/planned developments.

## EXPERIENCE

**NATIONAL VALUATION CONSULTANTS, INC.**                                         **2015 - PRESENT**

*One of the largest, privately-held commercial real estate valuation and advisory companies in the United States, with focus on institutional real estate clients.*

**CROSSON DANNIS, INC.**                                         **1997 - 2014**

Valuation and consultation of all types of commercial properties including retail, office, industrial, apartment, other commercial, special-use, and land/planned developments.  Worked on portfolio and individual valuations, advising institutional, lending and private clients, as well as providing litigation support, on properties throughout the United States.

**CHURSTON HEARD & CO.**                                         **1988 - 1997**

Employed as Associate Director/Head of Valuation, located in London, England.  Appraisal of all types of commercial, leasehold and freehold, vacant and income-producing property throughout the United Kingdom.  Portfolio appraisal and analysis, management reporting and preparation of submissions for lease, rent review and licensing disputes.  Promoted to Head of Valuation in October 1992.  In change of all valuation issues including appraisal policy and education.  Advised and reported to major lending institutions, banks, property companies, investors and retailers in respect of funding and leasing of new projects, lending on all forms of commercial property and portfolio management.  Prepared and presented evidence in property litigation.

**CHURSTON HEARD & CO.**                                         **1975 - 1988**

Retail and commercial brokerage for leading London-based national real estate consulting firm.  Responsible for acquisition, marketing, disposal and appraisal of London retail real estate for institutional investors and major retail companies.  Also handled lease renewal and rent review negotiations.  Appointed head of section in 1983.

## FORMAL EDUCATION

**DULWICH COLLEGE, LONDON, ENGLAND**           **COLLEGE OF ESTATE  MANAGEMENT, READING, ENGLAND**

## REAL ESTATE APPRAISAL EDUCATION

Royal Institution of Chartered Surveyors: Parts 1, 2 and 3 - Valuation, Building Construction, Law of Property, Estate Agency – Marketing & Management and Urban Land Development.

R.I.C.S. Test of Professional Competence.

Current compliance with R.I.C.S. Continuing Professional Development and State Appraiser Continuing Education requirements.

Appraisal Institute Business Practices and Ethics Course 12/30/2009.

## PROFESSIONAL AFFILIATIONS

Professional Member of the Royal Institution of Chartered Surveyors

Texas State Certified General Real Estate Appraiser           Associate Member of the Appraisal Institute

Georgia State Certified General Real Estate Appraiser           Michigan State Certified General Appraiser

APP000161

SIMON DAVID NEAME
8621 OLD OAK DR
IRVING, TX 75063



# Certified General Real Estate Appraiser

Appraiser: **SIMON DAVID NEAME**

License #: **TX 1330329 G**   License Expires: **08/31/2023**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

APP000162

**SUBJECT PHOTOS**

APP000163

*Subject Photographs*



Main Entrance



Leasing/Community Building



Typical Building



Close-Up of Elevation



Courtyard Area Between Buildings



Pool Area

APP000164

*Subject Photographs*



Community Area



Fitness Center (Under Renovation)



Typical Living Area with Fireplace



Typical Bedroom with Closet



Typical Kitchen Area



Typical Bathroom

APP000165



Typical Bathtub



Typical Entry Area (Two Bedroom Unit)



Building Rear Showing Needed Repairs



Rear Area Showing Parking



Goldmark Drive – View North



Goldmark Drive – View South

APP000166

**IMPROVED SALE ABSTRACTS**

APP000167

## Comparable Sale 1
### Apartment Garden/Low Rise
NVC # 263859

McCallum Communities • 7740 McCallum Blvd, Dallas, Texas



| PROPERTY DATA | |
|---|---|
| Description | Apartments - Far North Dallas Submarket |
| No. of Buildings | 14 |
| Year Built | 1984 |
| Total Units | 419 |
| Total SF | 249,426 |
| Average Unit Size | 595 SF |
| Land Size | 244,981 SF |
| Density | 74.50 |

| PROPERTY IDENTIFICATION | |
|---|---|
| Property Name | McCallum Communities |
| Address / Location | 7740 McCallum Blvd |
| City, County, State | Dallas, Dallas County, Texas |

| SALE DATA | |
|---|---|
| Sale Price | $52,000,000 |
| Sale Price/Unit | $124,105 |
| Sale Price/RSF | $208.48 |
| Cap Rate | 4.42% |
| Date of Sale | 11/04/2022 |
| Grantor | McCallum Multifamily Dallas DE LLC |
| Grantee | HC McCallum LLC |
| Document # | 0163066 |
| Occupancy at Sale | 92.3% |

APP000168

**Comparable 1 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|-----------|----------|-----------|--------------|---------|----------|------------|
| 1 BR | 390 | 577 | | | 225,030 | |
| 2 BR | 28 | 857 | | | 23,996 | |
| Studio | 01 | 400 | | | 400 | |

**Total Monthly Rent:**        $0           *The data shown in this section reflects the unit mix and advertised rental rates as*

**Average Rent Per Unit:**                *of the date of sale. These figures may differ from the actual contract rent shown*

**Average Rent Per SF:**                 *in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | 4.42% |
| Other Income | | | | **EGIM** | .00 |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $124,105 |
| Expenses | | | | **Sale Price Per SF** | $208.48 |
| Reserves | | | | **Source:** | |
| **Net Operating Income** | **$0** | **$0** | **$0.00** | **Comments:** | Actual Cap Rate - 4.42%Pro Forma Cap - 4.45% |

## SALE COMMENTS

Year 1 projects for NOI are $2,314,563 or a 4.45% CAP rate with year 5 projections of $4,088,820.

The new owner was attracted to the yield and stability that the property offers and plans to renovate 402 of the units at $7,700 per unit including new appliances, paint and updated lighting. $815,000 will go to exterior renovations to address deferred maintenance and improve amenities for a total of $3,895,080 in Capex.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Bradley Kilgore |
| Surveyed Date | 12/15/2022 |

APP000169

## Comparable Sale 2

**Apartment Garden/Low Rise**

NVC # 261611

Clover on Park Lane • 8780 Park Ln, Dallas, Texas





### PROPERTY DATA

| | |
|---|---|
| Description | Three-Story, Class B, Garden Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1975 |
| Total Units | 343 |
| Total SF | 209,172 |
| Average Unit Size | 610 SF |
| Land Size | 305,468 SF |
| Density | 48.91 |
| Project Amenities | BBQ Grills, Clubhouse, Computer Lab/Business Center, Dog/Pet Park, Fitness Center, Hot Tub/Jacuzzi, Laundry Facility, Media Room/Movie Theater, On-site Leasing Office, Playground, Pool, Sauna |
| Unit Amenities | 9' Ceilings, AC, Balcony/Patio, Stainless Steel Appliances, W/D |
| Additional Amenities | Resort Style Infinity Pool and Hot Tub, Wood-style Flooring, and Quartz Countertops. |
| Parking | Open |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Clover on Park Lane |
| Address / Location | 8780 Park Ln |
| City, County, State | Dallas, Dallas, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $38,500,000 |
| Sale Price/Unit | $112,245 |
| Sale Price/RSF | $184.06 |
| Cap Rate | 3.50% |
| Date of Sale | 01/04/2022 |
| Grantor | Travertine North Park Investors, LLC |
| Grantee | Tides on Park Lane Owner, LLC |
| Document # | 2022000/07419 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 95.0% |

**Comparable 2 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/1 BA | 62 | 486 | | | 30,132 | |
| 1 BD/1 BA | 12 | 525 | | | 6,300 | |
| 1 BD/1 BA | 17 | 528 | | | 8,976 | |
| 1 BD/1 BA | 31 | 544 | | | 16,864 | |
| 1 BD/1 BA | 78 | 558 | | | 43,524 | |
| 1 BD/1 BA | 22 | 640 | | | 14,080 | |
| 1 BD/1 BA | 24 | 654 | | | 15,696 | |
| 2 BD/1 BA | 27 | 720 | | | 19,440 | |
| 2 BD/1 BA | 06 | 784 | | | 4,704 | |
| 2 BD/2 BA | 25 | 900 | | | 22,500 | |
| 2 BD/2 BA | 23 | 916 | | | 21,068 | |
| Studio | 16 | 368 | | | 5,888 | |

**Total Monthly Rent:**     $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF |
|---|---|---|---|
| Rental Income | | | |
| Other Income | | | |
| Vacancy (0.0%) | $0 | $0 | $0.00 |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** |
| Expenses | | | |
| Reserves | | | |
| **Net Operating Income** | **$1,347,500** | **$3,929** | **$6.44** |

| | |
|---|---|
| **Overall Cap Rate** | 3.50% |
| **EGIM** | .00 |
| **Expense Ratio** | |
| **Sale Price Per Unit** | $112,245 |
| **Sale Price Per SF** | $184.06 |

**Source:**     In Place

**Comments:**    See comments

## SALE COMMENTS

According to confidential source the property sold for a sale price of $38.5 million and the cap rate reported as being approximately   3.50%.

The property was renamed Tides on Park Lane after the sale.

2022 Demographics within one Mile:

Households: 14,141
Median Household Income: $41,929
Median Home Value: $283,450

CoStar " Star" rating: 3 star Garden Apartment Community
Walk Score: 61 (Somewhat Walkable)
Transit Score: 41(Some Transit)

**VERIFICATION**

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 08/29/2022 |
| Reviewed By | Bradley Kilgore |

## Comparable Sale 3

### Apartment Garden/Low Rise

NVC # 257180

The Colony House • 6235 Oram St, Dallas, Texas



### PROPERTY DATA

| | |
|---|---|
| Description | Two-Story, Class B, Low-Rise Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1961 |
| Total Units | 21 |
| Total SF | 19,170 |
| Average Unit Size | 913 SF |
| Land Size | 30,456 SF |
| Density | 30.03 |
| Project Amenities | Laundry Facility, Pool |
| Unit Amenities | AC, Granite Counters, W/D |
| Parking | Open |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | The Colony House |
| Address / Location | 6235 Oram St |
| City, County, State | Dallas, Dallas, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $2,952,380 |
| Sale Price/Unit | $140,590 |
| Sale Price/RSF | $154.01 |
| Cap Rate | 3.55% |
| Date of Sale | 12/13/2021 |
| Grantor | SMG Carriage, LP |
| Grantee | Wedgewood Commercial Holdings, LLC |
| Property Interest | Fee Simple |
| Document # | 2021003/71050 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 91.3% |

**Comparable 3 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/ 1 BA | 06 | 675 | | | 4,050 | |
| 2 BD/2 BA | 15 | 1,008 | | | 15,120 | |

**Total Monthly Rent:**  $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | 3.55% |
| Other Income | | | | **EGIM** | .00 |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $140,590 |
| Expenses | | | | **Sale Price Per SF** | $154.01 |
| Reserves | | | | **Source:** | In Place |
| **Net Operating Income** | **$104,810** | **$4,991** | **$5.47** | **Comments:** | See comments |

## SALE COMMENTS

According to confidential source the sale price was $2,952,380 and the cap rate was reported as being 3.55%.

2021 Demographics within one Mile:

Households: 8,901
Median Household Income: $87,378
Median Home Value: $511,778

CoStar " Star" rating: 3 star Low-Rise apartment community
Walk Score: 80 (Very Walkable)
Transit Score: 41 (Some Transit)

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 02/04/2022 |
| Reviewed By | Bradley Kilgore |

## Comparable Sale 4
### Apartment Garden/Low Rise
NVC # 256091

Estara, The • 11321 Woodmeadow Pkwy, Dallas, Texas





## PROPERTY DATA

| | |
|---|---|
| Description | Two-Story, Class B, Garden Apartment Community |
| No. of Buildings | 1 |
| Year Built | 1971 |
| Year Renovated | 2017 |
| Total Units | 216 |
| Total SF | 217,620 |
| Average Unit Size | 1,008 SF |
| Land Size | 496,114 SF |
| Density | 18.97 |
| Project Amenities | BBQ Grills, Clubhouse, Dog/Pet Park, Fitness Center, Game Room, Laundry Facility, On-site Leasing Office, Playground, Pool |
| Unit Amenities | AC, Balcony/Patio, Fireplace, Storage, W/D Hookups |
| Additional Amenities | Free After-School Tutoring Programs and Summer Camps, Free Bicycle Rental, Outdoor Kitchen with Gas, Outdoor Life size Chess/Checkers Set, 2-inch Faux Wood Blinds, Faux Wood Flooring (select units), and Private Fenced Backyard (select units). |
| Parking | Open and Carports |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Estara, The |
| Address / Location | 11321 Woodmeadow Pkwy |
| City, County, State | Dallas, Dallas, Texas |

## SALE DATA

| | |
|---|---|
| Sale Price | $25,620,000 |
| Sale Price/Unit | $118,611 |
| Sale Price/RSF | $117.73 |
| Cap Rate | 3.95% |
| Date of Sale | 11/16/2021 |
| Grantor | Ascendant RE 1, LLC |
| Grantee | 11321 Woodmeadow, LLC |
| Document # | 2021003/44373 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 92.0% |

APP000175

**Comparable 4 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/ 1 BA | 36 | 741 | | | 26,676 | |
| 1 BD/1 BA | 32 | 701 | | | 22,432 | |
| 2 BA/ 1.5 BA Townhome | 32 | 1,164 | | | 37,248 | |
| 2 BD/ 2 BA | 32 | 1,081 | | | 34,592 | |
| 2 BD/1.5 BA | 40 | 955 | | | 38,200 | |
| 3 BD/ 2 BA | 20 | 1,300 | | | 26,000 | |
| 3 BD/ 2 BA | 24 | 1,353 | | | 32,472 | |

**Total Monthly Rent:**    $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF |
|---|---|---|---|
| Rental Income | | | |
| Other Income | | | |
| Vacancy (0.0%) | $0 | $0 | $0.00 |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** |
| Expenses | | | |
| Reserves | | | |
| **Net Operating Income** | **$1,011,990** | **$4,685** | **$4.65** |

| | |
|---|---|
| **Overall Cap Rate** | 3.95% |
| **EGIM** | .00 |
| **Expense Ratio** | |
| **Sale Price Per Unit** | $118,611 |
| **Sale Price Per SF** | $117.73 |
| **Source:** | Historical T12 |
| **Comments:** | See Comments |

## SALE COMMENTS

According to confidential source the sale price was $25.620 million and the cap rate was reported as being 3.95%.

2021 Demographics within one Mile:

Households: 6,879
Median Household Income: $47,329
Median Home Value: $161,318

CoStar " Star" rating: 3 star Garden Apartment Community.
Walk Score: 32 (Car-Dependent)
Transit Score: 37 (Some Transit)

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 12/14/2021 |
| Reviewed By | Bradley Kilgore |

## Comparable Sale 5
### Apartment Garden/Low Rise
NVC # 257121

1500 N Carroll Apartments • 1500 N Carroll Ave, Dallas, Texas





### PROPERTY DATA

| | |
|---|---|
| Description | Two-Story, Class C, Low-Rise Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1986 |
| Total Units | 26 |
| Total SF | 14,206 |
| Average Unit Size | 546 SF |
| Land Size | 26,760 SF |
| Density | 42.32 |
| Project Amenities | Dog/Pet Park |
| Unit Amenities | AC, Balcony/Patio, Granite Counters, Stainless Steel Appliances, Storage, W/D |
| Parking | Open |
| Parking Ratio | 1.97     Per 1,000 SF NRA |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | 1500 N Carroll Apartments |
| Address / Location | 1500 N Carroll Ave |
| City, County, State | Dallas, Dallas, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $3,000,000 |
| Sale Price/Unit | $115,385 |
| Sale Price/RSF | $211.18 |
| Date of Sale | 11/12/2021 |
| Grantor | jWang Investments II, LLC |
| Grantee | Ratsiu Family Trust |
| Document # | 2021003/40761 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 100.0% |

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/1 BA | 20 | 575 | | | 11,500 | |
| Studio | 06 | 451 | | | 2,706 | |

**Total Monthly Rent:**　　$0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | |
| Other Income | | | | **EGIM** | |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $115,385 |
| Expenses | | | | **Sale Price Per SF** | $211.18 |
| Reserves | | | | **Source:** | |
| **Net Operating Income** | **$0** | **$0** | **$0.00** | **Comments:** | |

## SALE COMMENTS

According to confidential source the sale price was $3.0 million but no cap rate was reported.

2021 Demographics within one Mile:

Households: 16,907
Median Household Income: $53,979
Median Home Value: $377,142

CoStar " Star" rating: 2 star Low-Rise apartment community
Walk Score: (Very Walkable)
Transit Score: 48 (Some Transit)

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 01/27/2022 |
| Reviewed By | Bradley Kilgore |

**FLOOD PLAIN MAP**

APP000179

 RiskMeter

## Overview Map



Flood Zones: ☐ X500 or B Zone ☐ A Zone ☐ V Zone ☐ D Zone ▨ Floodway ▨ CBRA

© 2023 CoreLogic, Inc. All rights reserved. CORELOGIC, RISKMETER, PXPOINT and the CoreLogic logo are trademarks of CoreLogic, Inc. and/or its subsidiaries. All other trademarks are the property of their respective holders.

APP000180

 **RiskMeter**

## 13636 GOLDMARK DR DALLAS, TX 75240-4246

LOCATION ACCURACY:  ⬤ Excellent

### Flood Zone Determination Report

**Flood Zone Determination: OUT**

| | | | |
|---|---|---|---|
| COMMUNITY | 480171 | PANEL | 0195K |
| PANEL DATE | July 07, 2014 | MAP NUMBER | 48113C0195K |



© 2023 CoreLogic, Inc. All rights reserved. CORELOGIC, RISKMETER, PXPOINT and the CoreLogic logo are trademarks of CoreLogic, Inc. and/or its subsidiaries. All other trademarks are the property of their respective holders.

APP000181

**RENT ROLL**

APP000182

# Amerigold Rent Roll Report - Enhanced

**Run Date**

12/01/2022

APP000183

Portfolio:Amerigold Suites - Building: Amerigold

| Unit | Lease Name | Lease Status | Rent | Total Recurring Charges | Last Payment Date | Move In Date | Lease Start Date | Lease End Date | Security Deposit Held |
|---|---|---|---|---|---|---|---|---|---|
| 1100 | Vacant | | $1,675.00 | $0.00 | | | | | $0.00 |
| 1101 | Jefferson, B. | Active | $1,150.00 | $1,150.00 | 11/17/2022 | 03/24/2022 | 03/25/2022 | 04/24/2022 | $0.00 |
| 1102 | Abelardo, L. | Active | $1,100.00 | $1,100.00 | 11/15/2022 | 11/01/2018 | 11/01/2018 | 11/30/2018 | $0.00 |
| 1103 | Dunlap, D. | Active | $1,150.00 | $1,150.00 | 10/15/2022 | 05/22/2020 | 05/22/2020 | 06/21/2020 | $0.00 |
| 1104 | Cross-Dog, C. | Active | $1,050.00 | $1,050.00 | 11/29/2022 | 09/05/2015 | 09/05/2015 | 01/31/2021 | $0.00 |
| 1105 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1106 | Baldwin, M. | Active | $1,150.00 | $1,150.00 | 11/30/2022 | 04/01/2021 | 04/01/2021 | 04/30/2021 | $0.00 |
| 1200 | Vacant | | $1,675.00 | $0.00 | | | | | $0.00 |
| 1201 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1202 | Schenk, C._1 | Active | $1,050.00 | $1,050.00 | 11/15/2022 | 08/01/2014 | 08/01/2014 | 08/31/2014 | $0.00 |
| 1203 | Yancy - Walker | Active | $1,050.00 | $1,050.00 | 11/28/2022 | 12/27/2017 | 12/28/2017 | 01/27/2018 | $0.00 |
| 1204 | Lee, C. | Active | $1,200.00 | $1,200.00 | 11/15/2022 | 07/01/2022 | 07/01/2022 | 07/31/2022 | $0.00 |
| 1205 | Graham, R._1 | Active | $1,150.00 | $1,150.00 | 11/10/2022 | 11/25/2019 | 11/23/2019 | 06/30/2021 | $0.00 |
| 1206 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1300 | Maddox, C. | Active | $1,675.00 | $1,675.00 | 11/29/2022 | 02/27/2018 | 03/01/2018 | 12/31/2020 | $0.00 |
| 1301 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1302 | Yates, P. | Eviction | $1,150.00 | $1,150.00 | 08/18/2022 | 06/17/2021 | 06/15/2021 | 07/14/2021 | $0.00 |
| 1303 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1304 | Trivedi, G. | Active | $1,100.00 | $1,100.00 | 12/01/2022 | 06/15/2018 | 06/15/2018 | 12/31/2020 | $0.00 |
| 1400 | Vacant | | $1,675.00 | $0.00 | | | | | $0.00 |
| 1401 | Sinclair, J. | Active | $1,150.00 | $1,150.00 | 11/07/2022 | 08/12/2022 | 08/09/2022 | 09/08/2022 | $0.00 |
| 1402 | Greer, C. | Active | $1,150.00 | $1,150.00 | 11/16/2022 | 07/15/2021 | 07/15/2021 | 08/14/2021 | $0.00 |
| 1403 | Abron, K. | Active | $1,050.00 | $1,050.00 | 11/28/2022 | 08/15/2017 | 08/15/2017 | 03/31/2021 | $0.00 |
| 1404 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1405 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1406 | Vacant | | $1,100.00 | $0.00 | | | | | $0.00 |
| 1500 | Vacant | | $1,000.00 | $0.00 | | | | | $0.00 |
| 1501 | Jones, T. | Active | $1,200.00 | $1,200.00 | 11/10/2022 | 11/15/2022 | 11/15/2022 | 12/14/2022 | $0.00 |
| 1502 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |
| 1503 | Garrison, S. | Active | $1,150.00 | $1,150.00 | 11/30/2022 | 05/20/2021 | 05/15/2021 | 06/14/2021 | $0.00 |
| 1504 | Grant, S. | Active | $1,200.00 | $1,200.00 | 11/29/2022 | 10/01/2022 | 10/01/2022 | 10/31/2022 | $0.00 |
| 1505 | Gallegos, J. | Active | $1,150.00 | $1,150.00 | 11/25/2022 | 07/22/2021 | 07/22/2021 | 08/21/2021 | $0.00 |
| 1506 | Owen, M. | Active | $1,150.00 | $1,150.00 | 11/18/2022 | 05/19/2022 | 05/19/2022 | 06/18/2022 | $0.00 |
| 1600 | Vacant | | $1,600.00 | $0.00 | | | | | $0.00 |
| 1601 | Goolsby, S. | Active | $1,050.00 | $1,050.00 | 12/01/2022 | 10/01/2012 | 10/01/2012 | 10/31/2012 | $0.00 |
| 1602 | Clark, A. | Active | $1,050.00 | $1,050.00 | 11/09/2022 | 04/15/2016 | 04/08/2016 | 05/07/2016 | $0.00 |
| 1603 | Mcdaniel, J. | Active | $1,150.00 | $1,150.00 | 11/04/2022 | 11/04/2022 | 11/05/2022 | 12/04/2022 | $0.00 |
| 1604 | Vacant | | $1,150.00 | $0.00 | | | | | $0.00 |

| Unit | Tenant | Status | Market Rent | Date 1 | Date 2 | Date 3 | Date 4 | Rent | Security Deposit |
|---|---|---|---|---|---|---|---|---|---|
| 1700 | Vacant | | $1,675.00 | | | | | $0.00 | $0.00 |
| 1701 | Vacant | | $1,050.00 | | | | | $0.00 | $0.00 |
| 1702 | Bickley, J. | Active | $1,048.00 | 06/18/2022 | 05/19/2022 | 12/01/2022 | | $1,048.00 | $0.00 |
| 1703 | Vacant | | $1,050.00 | | | | | $0.00 | $0.00 |
| 1704 | Johanson, C. | Active | $1,150.00 | 06/30/2021 | 09/09/2017 | 11/03/2022 | | $1,025.00 | $0.00 |
| 1705 | Vacant | | $1,150.00 | | | | | $0.00 | $0.00 |
| 1706 | Vacant | | $1,675.00 | | | | | $0.00 | $0.00 |
| 1800 | Vacant | | $1,675.00 | | | | | $0.00 | $0.00 |
| 1801 | Tylor, A. | Active | $1,050.00 | 06/30/2021 | 09/01/2019 | 08/30/2019 | 11/10/2022 | $1,050.00 | $0.00 |
| 1802 | Davis, D._1 | Active | $1,000.00 | 07/31/2016 | 07/01/2016 | 07/01/2016 | 11/03/2022 | $1,000.00 | $0.00 |
| 1803 | Vacant | | $1,050.00 | | | | | $0.00 | $0.00 |
| 1804 | Grffin, L. | Active | $1,200.00 | 07/14/2022 | 06/15/2022 | 06/20/2022 | 11/11/2022 | $1,200.00 | $0.00 |
| 1805 | Haney, R. | Active | $1,200.00 | 09/14/2022 | 07/07/2022 | 07/15/2022 | 11/15/2022 | $1,200.00 | $0.00 |
| 1806 | Brumfield, L. | Active | $1,200.00 | 05/14/2022 | 04/15/2022 | 04/15/2022 | 11/09/2022 | $1,200.00 | $0.00 |
| 1900 | Marshall, D. | Active | $1,800.00 | 07/02/2022 | 06/03/2022 | 06/03/2022 | 11/15/2022 | $1,800.00 | $0.00 |
| 1901 | Vacant | | $1,150.00 | | | | | $0.00 | $0.00 |
| 1902 | Dworkin - Dworkin | Active | $1,050.00 | 06/30/2021 | 11/10/2014 | 11/07/2014 | 12/01/2022 | $1,050.00 | $0.00 |
| 1903 | Vacant | | $1,150.00 | | | | | $0.00 | $0.00 |
| 1904 | Foster, T. | Active | $1,150.00 | 03/06/2022 | 02/07/2022 | 02/10/2022 | 11/21/2022 | $1,150.00 | $0.00 |
| 2000 | Shumate, R. | Eviction | $1,675.00 | 01/09/2020 | 12/10/2019 | 12/09/2019 | 11/04/2022 | $1,675.00 | $0.00 |
| 2001 | Wallpool, A. | Active | $1,150.00 | 12/31/2020 | 07/24/2020 | 07/27/2020 | 11/28/2022 | $1,150.00 | $0.00 |
| 2002 | Baker - Dwyer | Active | $1,100.00 | 10/31/2012 | 10/01/2012 | 10/01/2012 | 11/04/2022 | $1,100.00 | $0.00 |
| 2003 | Moore, J. | Active | $1,150.00 | 02/28/2021 | 11/15/2020 | 11/15/2020 | 11/23/2022 | $1,150.00 | $0.00 |
| 2004 | Butler, P._2 | Active | $1,150.00 | 11/30/2022 | 11/01/2022 | 11/01/2022 | 11/29/2022 | $1,150.00 | $0.00 |
| 2005 | Lockhart, N. | Active | $1,150.00 | 03/31/2021 | 03/01/2021 | 03/01/2021 | 11/15/2022 | $1,150.00 | $0.00 |
| 2006 | Silvasan-Roberts, J. | Active | - | 11/14/2017 | 10/15/2017 | 10/15/2017 | 11/03/2022 | $0.00 | $0.00 |
| 2101 | Carter, J. | Active | $1,150.00 | 07/02/2022 | 06/03/2022 | 06/03/2022 | 11/23/2022 | $1,150.00 | $0.00 |
| 2102 | Roberts, L. | Active | $700.00 | 02/07/2018 | 01/08/2018 | 01/08/2018 | 12/01/2022 | $700.00 | $0.00 |
| 2103 | Contreras, M. | Active | $1,200.00 | 12/14/2022 | 11/15/2022 | 11/10/2022 | 11/10/2022 | $1,200.00 | $0.00 |
| 2104 | Lopez, M. | Active | $1,150.00 | 02/28/2021 | 11/15/2020 | 11/15/2020 | 11/11/2022 | $1,150.00 | $0.00 |
| 2105 | Tran - Hilburn | Active | $1,150.00 | 05/14/2022 | 04/15/2022 | 04/15/2022 | 11/15/2022 | $1,150.00 | $0.00 |
| 2106 | Alexander, S. | Active | $1,000.00 | 06/30/2021 | 10/01/2012 | 10/01/2012 | 11/30/2022 | $1,000.00 | $0.00 |
| Totals | | | $82,048 | | | | | $51,873.00 | |

**Summary - Amerigold**

| | | | |
|---|---|---|---|
| Total Units | 70 | Security Deposit | $0.00 |
| Occupied | 46 | Rent | $51,873.00 |
| Vacant | 24 | Active Leases | 46 |
| Occupancy Percent | 65% | MTM Leases | 43 |
| Gross Potential Rent | $81,825.00 | Eviction | 2 |
| Vacancy Loss | $30,175.00 | | |

APP000184

**ENGAGEMENT LETTER**

APP000185

# NVC

## National Valuation Consultants, Inc.

<u>Via email:</u> cort@brownfoxlaw.com

December 16, 2022

Cort Thomas, Receiver
Partner
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225
Phone No.: 214.367.6094

Re:     **Three Appraisals of the following properties:**
   1.  **Amerigold Suites – 13636 Goldmark Dr., Dallas, Texas**
   2.  **Bellwether Ridge Apartments – 841 S. Polk St., DeSoto, Texas**
   3.  **Parc at Windmill Farms Apartments – 1003 Windmill Farms Blvd., Forney, Texas**

Dear Mr. Thomas:

This letter will confirm your request that National Valuation Consultants, Inc. prepare separate appraisals of the above referenced properties. The purpose of the assignment will be to estimate the fee simple market value of each subject property as of the date of our inspection.

We understand that the intended use is to assist in the potential sale of the subjects.

The appraisal reports will be prepared in conformance with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; and with the written appraisal requirements and guidelines established by the Appraisal Institute for an appraisal.

The requested appraisals will be delivered in approximately *four to five weeks from receipt of the retainer*, provided all requested information is received in a timely manner. Please understand that this is our best estimate of the delivery date and may be subject to change because of conditions beyond our control. The fee is also subject to modification and/or change, by mutual agreement, should you require changes to the assignment described herein.

*The fee for our services will be $6,700 for Amerigold, $4,800 for Bellwether, and $4,800 for Parc, totaling $16,300. NVC will require a 100% retainer.* The retainer ($16,300) is due and payable at our offices in Centennial, Colorado before work will begin. In the event of cancellation of the assignment, or if the assignment is placed on hold for more than thirty (30) days, all applicable charges for services rendered by NVC to the date of such cancellation will be due within thirty (30) days from the date of invoice.

The fee quoted above is for the reports only and does not include court preparation or post-appraisal consultation, if any. Court preparation and consultation time are billed at the rate of $450 per hour for senior staff and $250 per hour for other staff. These fees are subject to increase after six months from the date of this agreement. It is also corporate policy that prior to any deposition or court testimony, we must be paid in full not only for current billings, but any outstanding past accounts as well.

ATLANTA · BOSTON · CHICAGO · CINCINNATI · DALLAS · DENVER · HOUSTON · NY/NJ METRO · SAN FRANCISCO · SOUTH FLORIDA
Corporate Headquarters: 7807 East Peakview Ave., Suite 200, Centennial, CO 80111 | 303.753.6900 | www.nvcinc.com

APP000186

Cort Thomas, Receiver
December 16, 2022
Page Two

It is mutually agreed that our acceptance of this assignment is not contingent upon any predetermined conclusions to value, marketability, or feasibility. Should the assignment be terminated, you agree to pay for our time and costs incurred prior to receipt of written notice of cancelation.

If this agreement is given to an attorney for collection or enforcement, the prevailing party shall be entitled to recover all costs, expenses and reasonable attorney's fees incurred because of the legal action.

Our report will contain numerous assumptions and limiting conditions which are requisite to the conclusions reached therein. The standard assumptions and limiting conditions are set forth in Exhibit "A" attached hereto and made a part hereof for all purposes. Your signature below acknowledges that you have read, understood, and agreed to these assumptions. In addition to these standard assumptions, there may be assumptions contained in our report which are specific to your property. Regarding these latter assumptions, your signature below acknowledges that, unless we have been notified in writing by you within twenty days of receipt of our report, you accept these assumptions as stated therein.

We will deliver the report in PDF format. If requested, we will also deliver a hard copy at the cost of $250.00 per copy.

If the foregoing is agreeable, please sign where indicated on the enclosed copy of this letter and return to me along with the requested data. Please keep a copy for your files. We look forward to working with you on this assignment. Please feel free to contact me if you have any questions.

By:

_____
Cort Thomas, Receiver
Partner
Brown Fox PLLC

_____
Date

_____
Charles G. Dannis, MAI, SRA
Senior Managing Director
National Valuation Consultants, Inc.

December 16, 2022
Date

APP000187

Exhibit "A"

## ASSUMPTIONS AND LIMITING CONDITIONS

1.  Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated: specifically, the Appraisal Institute.

2.  This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment. Furthermore, the Report is to be used in whole and not in part. The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media. Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property. NVC shall have no accountability or responsibility to any such third party.

3.  The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4.  The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property. The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5.  The legal description used in this report is assumed to be correct.

6.  No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7.  No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered. The title is assumed to be good and merchantable unless otherwise stated.

8.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9.  All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age. The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

APP000188

10. Information furnished by others is assumed to be true, correct and reliable. A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

11. The value estimate assumes responsible ownership and competent management.

12. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

13. Opinions of value contained in this report are estimates. There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14. The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and value estimates if information pertinent to this assignment is made known to us after the completion of the report.

15. By signing hereafter, the client hereby acknowledges and agrees that National Valuation Consultants, Inc., as well as any employee, agent, or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject but only if National Valuation Consultants, Inc. or any other indemnified person shall not have been negligent or shall not have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16. The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17. Unless otherwise noted, all prospective value estimates, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization. The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur, and which would alter market conditions prior to the effective date of the appraisal.

APP000189

# EXHIBIT B-2

APP000190

**AmeriGold Suites**
**Return on Cost Analysis**
Valuation As Fully Improved

| Property Summary | |
|---|---|
| Property Name | AmeriGold Suites |
| Address | 13636 Goldmark Dr, Dallas, TX |
| Year Built/Renovated | 1981 |
| Number of Rooms | 70 |
| Average Square Footage | 732 |
| Total Rentable SF | 51,240 |
| Total Land SF | 155,074 |
| Proposed Resi Units | 70 |
| Surface Parking | 86 Parking Spaces |

| Debt Summary | |
|---|---|
| L.T.C. | 65.00% |
| Loan Amount | $3,430,000 |
| Rate | 6.75% |
| Interest | $150,491 |
| Stabilized DY | 11.56% |

### Income & Expense Summary

| Revenue | # of Units | SF/Unit | Per SF | Annual Total | | Per Unit |
|---|---|---|---|---|---|---|
| Studio | 1 | 300 | $2.30 | $8,280 | | $690 |
| 1 Bedroom Suite | 59 | 660 | $1.60 | $747,648 | | $1,056 |
| 2 Bedroom Suite | 10 | 1,200 | $1.25 | $180,000 | | $1,500 |
| | 70 | 732 | | $935,928 | | $1,114 |
| | | | | | | |
| Economic Loss | 10% | | | ($93,593) | ($0.60) | ($1,337) |
| | | | | | | |
| Other Income | 12% | | | $112,311 | $0.72 | $1,604 |
| **Effective Gross Revenue** | | | | **$954,647** | **$6.16** | **$13,638** |

| Expenses | | | | Total | Per RSF | Per Unit |
|---|---|---|---|---|---|---|
| Operating Exp + RE Taxes | 55.00% | | of E.G.R. | $525,056 | $3.39 | $7,501 |
| | | | | | | |
| **Total Operating Expenses** | | | | **$525,056** | **$3.39** | **$7,501** |
| | | | | | | |
| **Capital Replacement/Capital Reserves** | | | | **$33,000** | **$0.21** | **$250** |
| | | | | | | |
| **Stabilized Net Operating Income** | | | | **$396,591** | **$2.56** | **$5,666** |

### Project Cost Summary

| Item | | | Total | Per RSF | Per Unit |
|---|---|---|---|---|---|
| Base Building Work (estimated) | | | $0 | $0.00 | $0.00 |
| Hard Conversion Costs | $25 | PSF | $1,281,000 | $25.00 | $18,300 |
| Interest Reserve | | | $150,491 | $2.94 | $2,150 |
| Financing Costs | 1.00% | of Loan | $34,300 | $0.67 | $490 |
| Closing Costs | 1.50% | of Loan | $51,450 | $1.00 | $735 |
| **Total Project Cost** | | | **$1,773,241** | **$34.61** | **$25,332** |

| | | Total | Per RSF | Per Unit |
|---|---|---|---|---|
| **GROSS PURCHASE PRICE** | | **$3,500,000** | **$68.31** | **$50,000** |
| **TOTAL COST** | | **$5,300,000** | **$103.43** | **$75,714** |
| *Unlevered Return on Cost* | | *7.52%* | | *7.52%* |

### EXIT ANALYSIS

| | | |
|---|---|---|
| Stabilized NOI | | $396,591 |
| Exit Valuation | 6.00% | $6,600,000 |
| Net Sale Value | 2.00% | $6,468,000 |
| Per Unit | | $94,286 |
| Whole Dollar Profit | | $1,168,000 |
| Levered EM | | 1.62x |

APP000191

# EXHIBIT B-3

APP000192

# WALKER & DUNLOP
## INVESTMENT SALES

Date:    November 30, 2022

To:    Cort Thomas

From:  WDIS Dallas Team

RE:    **Broker Opinion of Value (BOV) – AmeriGold Suites**

WDIS is greatly appreciative of the opportunity to present the following short-form BOV for **AmeriGold Suites**. The WDIS Team collectively has a tremendous amount of experience in the disposition of value-add assets, including the sale of thousands of units over nearly four decades and several RE cycles.

We believe that the appetite for value-add properties such as **AmeriGold Suites** is still considerably strong. We anticipate demand to further increase moving into 2023 with fresh allocations, new entrants to the market, etc. The scale/size and profile of **AmeriGold Suites** in particular ($5M-$10M deals) is conducive to a much larger buyer pool (more buyers with the ability to execute) that will consist predominantly of private buyers, many of whom are the sole decision makers when considering potential acquisitions. The capital markets will have an impact on the breadth of the buyer pool and the ultimate sale price.

We prepared the BOV in accordance with customary valuation methodologies and market metrics employed by a wide array of buyers, along with our recent value-add sales experience in the DFW market.

We elected to develop a valuation for **AmeriGold Suites** by employing the following methodologies:

- **Value-Add (Multifamily Conversion)** – WDIS utilized our internal model to project **AmeriGold Suites Value-Add conversion from hospitality to Multifamily.** Our valuation is based upon our estimate of a buyers first stabilized year. Based upon our knowledge and conversations with value-add owners, we estimate that new ownership will spend about $30K/unit renovating the property.
  - Please note, based on our understanding, the current zoning of Mixed Use 3 allows for multifamily. If awarded the listing, our team will investigate further to confirm that there would be no issues faced in a conversion to multifamily.

1

APP000193

- **Return Methodology – Direct Capitalization Analysis** – With the current environment of increasing interest rates, many buyers are focused on their first-year cap rate. Based upon this, our team determined it best to value this property using a direct capitalization analysis. Our cap rate assumptions are based upon recent sales and current investor appetite for properties such as **Amerigold Suites**.

- **Levered & Unlevered IRR** – After valuing the property using a direct capitalization analysis, our team used the levered and unlevered IRR's as a reference point to validate our value. Value-add buyers today are commonly looking for levered returns in the high teens and unlevered returns in the low teens.

- **Capital Markets Supporting Buyer Returns** – To further support the capitalization rates and return metrics we have utilized to derive our suggested pricing, WDIS has obtained feedback from several lenders and how much loan proceeds they would provide. With the feedback outlined below (please note that we are in a highly fluid capital market environment, and these fluctuate on a weekly if not daily basis) – understanding what returns buyers need to achieve based on the debt available furthers WDIS' conviction in obtaining the suggested pricing herein:

  - Bank Debt Interest Rate (Range): 7%-8%
    - Prime + 100-150 bps
    - 5-Year Note w/2 Years of I/O
    - LTV: 65%-70%
    - Full recourse
  - Non-Recourse (if available) Debt Interest Rate: ±10%

- **Comparable Sales** - We prepared a schedule of comparable sales (age, location, size, renovation status, etc.) to **AmeriGold Suites.**

  - Please note, while these comps can be viewed as "guideposts," the market has experienced a dramatic change and continues to experience fluidity; mainly driven by the Fed.
    - To further support our valuation in considering sales comparables, we have employed an additional methodology that backs out the renovation/conversion costs from the higher sales.

<u>WDIS Conclusion to Value – AmeriGold Suites</u>

To reflect the returns of a value-add asset such as **AmeriGold Suites**, WDIS solved to a 6.40%-7.15% Year 1 Cap Rate, along with a 5-Year unlevered IRR of 10.00%-12.00% over the hold period. This range, and growth metrics, is supported by buyer underwriting in Dallas-Fort Worth,

2

APP000194

as well as a recent value add portfolio B&F offer in Old East Dallas (Private Buyer assumed ~$34k per unit in renovations for a 61 Unit value add portfolio; solving to a ~12% UL IRR/High teens levered IRR over a 5-year hold period).

- The Market Price represents a value at which we believe there is strong pricing support
- The Premium Price is the number our team would attempt to push buyers toward and we believe that we can achieve

| VALUATION SUMMARY | Premium Price | Market Price |
|---|---|---|
| **Units: 70** <br> **Avg Unit Size: 732** | | |
| Multifamily Stabilized Value | $7,600,000 | $7,000,000 |
| Per Unit | $108,600 | $100,000 |
| Per Square Foot | $148 | $137 |
| Less: Renovations (30K/Unit) | -$2,100,000 | -$2,100,000 |
| **Multifamily Sales Price** | **$5,500,000** | **$4,900,000** |
| **Per Unit** | **$78,571** | **$70,000** |
| **Per Square Foot** | **$107** | **$96** |
| **Cap Rate** | | |
| Cap Rate (Year 1) | 6.40% | 7.15% |
| **Multifamily Return Metrics** | | |
| Loan To Value | 65.00% | 65.00% |
| Levered IRR | 15.74% | 17.82% |
| Unlevered IRR | 10.61% | 11.46% |
| Year 1 Cash-On-Cash (I/O) | 5.29% | 7.43% |
| Average Cash-on-Cash | 7.94% | 10.49% |
| **Multifamily Terminal Value** | | |
| Terminal Cap Rate | 6.90% | 7.65% |
| Terminal Value | $10,000,000 | $9,100,000 |
| Per Unit | $142,857 | $130,000 |
| **Operations** | | |
| Year 1 Market Rent | $1,172 | |
| Year 1 Market Rent PSF | $1.60 | |
| 7 Yr CAGR (Revenue) | 3.9% | |
| Year 1 RE Taxes, per unit | $1,523 | |
| Controllable Expenses Per Unit | $4,440 | |
| 7 Yr CAGR (NOI) | 5.0% | |

3

APP000195

**Summary of Exhibits:**

**Exhibit A –** Underwriting Assumptions
**Exhibit B** – Year 1 Proforma
**Exhibit C** – Premium Scenario Cash Flows
**Exhibit D –** Comparable Sales Analysis
**Exhibit E –** Rent Comparables

4

APP000196

**Exhibit A**                                                                                                    **Underwriting Assumptions**

WDIS' valuation analysis is comprised of two scenarios. The Premium Proforma and
Market Proforma assumptions are outlined below.

| | |
|---|---|
| **Terminal Cap Rate** | The WDIS Proforma contemplates a respective exit cap of 6.90% and 7.65% in the Premium and Market scenarios. |
| **Year 1 Cap Rate** | The WDIS Proforma contemplates respective Year 1 Cap Rates of 6.40% and 7.15% in the Premium and Market scenarios. |
| **Market Rent** | Year 1 Market rent is assumed at $1,172/unit. This assumption is based upon market comparables and current asking rates on the property. |
| **Loss to Lease (LTL)** | Year 1 Loss to Lease is assumed at 2.0% |
| **Vacancy** | The WDIS Proforma assumes a 5% vacancy for the duration of the hold period. |
| **Concessions** | The WDIS Proforma assumes 1 month free on new leases and no concessions on renewals. |
| **Non-Revenue Units** | The WDIS Proforma assumes no model or admin units. |
| **Bad Debt** | The WDIS Proforma assumes bad debt of 0.5%. |
| **Other Income** | Other income is broken out within Other Income Detail. |
| **Utility Reimbursements** | Utility Reimbursements are assumed at 50% of Utility Expenses. |
| **Controllable Expenses** | Controllable Expenses are based upon expense comps from similar stabilized properties. |
| **Management Fee** | The WDIS Proforma assumes a management fee of 3.50% of total income. |
| **Property Insurance** | The WDIS Proforma assumes Property Insurance of $500/unit predicated upon buyer underwriting and expense comps for similar properties. |
| **Replacement Reserves** | The WDIS Proforma assumes replacement reserves of $250/unit. |
| **Property Taxes** | Property Taxes are based upon 85% of our conclusion to value in both scenarios. |

5

APP000197

**Exhibit B**                                                                                                    **Year 1 Proforma**

| | Proforma | | |
| --- | --- | --- | --- |
| | | % of | Per |
| INCOME: | Amount | Income | Unit |
| Gross Scheduled Market Rent | $984,720 | 102% | $14,067 |
| Plus: Renovated Unit Premiums | $0 | 0% | $0 |
| Gain / Loss to Lease | ($19,694) | -2.0% | (281) |
| **Gross Potential Rent** | **$965,026** | **100.0%** | **13,786** |
| | | | |
| Less: Vacancy | ($48,251) | -5.0% | (689) |
| Less: Concessions | ($38,601) | -4.0% | (551) |
| Less: Non-Revenue Units | $0 | 0.0% | 0 |
| Less: Bad Debt | ($4,825) | -0.5% | (69) |
| **Net Rental Income** | **$873,348** | **90.5%** | **12,476** |
| | | | |
| Plus: Utility Reimbursements | $52,500 | 5.4% | 750 |
| Plus: Parking/Storage Income | $0 | 0.0% | 0 |
| Plus: Other Income | $67,289 | 7.0% | 961 |
| **Total Income** | **$993,137** | **102.9%** | **14,188** |
| *Monthly Collections* | *$82,761* | | |
| | | | |
| **EXPENSES:** | | | |
| Utilities | $105,000 | 10.9% | 1,500 |
| Repairs and Maintenance | $31,500 | 3.3% | 450 |
| Apartment Make Ready | $17,500 | 1.8% | 250 |
| Contract Services | $14,000 | 1.5% | 200 |
| Marketing | $9,800 | 1.0% | 140 |
| Payroll Expenses | $98,000 | 10.2% | 1,400 |
| General and Administrative | $35,000 | 3.6% | 500 |
| Property Taxes | $106,616 | 11.0% | 1,523 |
| Insurance | $35,000 | 3.6% | 500 |
| Management Fees | $34,760 | 3.6% | 497 |
| **Total Expenses** | **$487,176** | **50.5%** | **6,960** |
| | | | |
| **Net Operating Income** | **$505,961** | **52.4%** | **7,228** |
| Replacement Reserves | ($17,500) | -1.8% | (250) |
| **Net Cash Flow** | **$488,461** | **50.6%** | **6,978** |

6

APP000198

**Exhibit C**                                                                 **Premium Scenario Cash Flows**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|
| Gross Potential Rent, Net | $965,026 | $1,003,627 | $1,043,772 | $1,080,304 | $1,118,114 | $1,151,658 | $1,186,207 | $1,221,794 |
| Plus: Renovation Unit Premiums | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Gross Potential Rental Income** | **$965,026** | **$1,003,627** | **$1,043,772** | **$1,080,304** | **$1,118,114** | **$1,151,658** | **$1,186,207** | **$1,221,794** |
| Less: Vacancy | $48,251 | $50,181 | $52,189 | $54,015 | $55,906 | $57,583 | $59,310 | $61,090 |
| Less: Concession | $38,601 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Less: Credit Loss | $4,825 | $5,018 | $5,219 | $5,402 | $5,591 | $5,758 | $5,931 | $6,109 |
| Less: Non-Revenue Units | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Net Rental Income** | **$873,348** | **$948,427** | **$986,364** | **$1,020,887** | **$1,056,618** | **$1,088,317** | **$1,120,966** | **$1,154,595** |
| Plus: Utility Reimbursements | $52,500 | $54,075 | $55,697 | $57,368 | $59,089 | $60,862 | $62,688 | $64,568 |
| Plus: Parking and Storage Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Plus: Other Income | $67,289 | $69,307 | $71,386 | $73,528 | $75,734 | $78,006 | $80,346 | $82,756 |
| **Total Operating Income** | **$993,137** | **$1,071,809** | **$1,113,448** | **$1,151,783** | **$1,191,441** | **$1,227,184** | **$1,264,000** | **$1,301,920** |
| *Revenue Growth Rate (Over Y1)* | | *7.9%* | *12.1%* | *16.0%* | *20.0%* | *23.6%* | *27.3%* | *31.1%* |
| *Effective Rent* | *$1,103* | *$1,195* | *$1,243* | *$1,286* | *$1,331* | *$1,371* | *$1,412* | *$1,455* |
| *8 YR CAGR* | *3.9%* | | | | | | | |
| Expenses: | | | | | | | | |
| Management Fee | $34,760 | $37,513 | $38,971 | $40,312 | $41,700 | $42,951 | $44,240 | $45,567 |
| Property taxes | $106,616 | $109,548 | $112,561 | $115,656 | $118,837 | $122,105 | $125,463 | $128,913 |
| Operating Expenses | $345,800 | $355,310 | $365,081 | $375,120 | $385,436 | $396,036 | $406,926 | $418,117 |
| **Total Expenses** | **$487,176** | **$502,371** | **$516,612** | **$531,089** | **$545,973** | **$561,092** | **$576,629** | **$592,597** |
| **Net Operating Income** | **$505,961** | **$569,438** | **$596,836** | **$620,694** | **$645,468** | **$666,093** | **$687,371** | **$709,323** |
| Capital Reserves | $17,500 | $17,981 | $18,476 | $18,984 | $19,506 | $20,042 | $20,593 | $21,160 |
| **Net Operating Income After Capital** | **$488,461** | **$551,457** | **$578,360** | **$601,711** | **$625,962** | **$646,050** | **$666,777** | **$688,163** |
| *NOI Growth Rate* | | *12.9%* | *18.4%* | *23.2%* | *28.1%* | *32.3%* | *36.5%* | *40.9%* |
| *8 YR CAGR* | *5.0%* | | | | | | | |
| **Total Debt Service Amount** | **$347,265** | **$347,265** | **$396,062** | **$396,062** | **$396,062** | **$396,062** | **$396,062** | |
| **Net Cash Flow** | **$141,196** | **$204,192** | **$182,298** | **$205,648** | **$229,900** | **$249,988** | **$270,715** | |
| Cash on Cash | 5.29% | 7.64% | 6.83% | 7.70% | 8.61% | 9.36% | 10.14% | |
| Debt Service Coverage | 1.41x | 1.59x | 1.46x | 1.52x | 1.58x | 1.63x | 1.68x | |
| **GROWTH ASSUMPTIONS** | **Y1** | **Y2** | **Y3** | **Y4** | **Y5** | **Y6** | **Y7** | **Y8** |
| Rental Inflation | | 4.00% | 4.00% | 3.50% | 3.50% | 3.00% | 3.00% | 3.00% |
| Vacancy Loss | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| Concession Loss | 4.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Other Income Inflation | | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Management Fee | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |
| Expenses Inflation | | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% |
| Real Estate Tax Inflation | | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% | 2.75% |

APP000199

**Exhibit D**                                                                                    **Comparable Sales Analysis**

### Amerigold Suites
### COMPARABLE SALES ANALYSIS

| Property Name: | Amerigold Suites | Esperanza Apartments | Villa D'Este | Shadowood Apartments | Oaks at Spring Valley |
|---|---|---|---|---|---|
| City: | Dallas | Dallas | Richardson | Garland | Richardson |
| Address: | 13636 Goldmark Dr | 14000 Esperanza Rd | 117 S Bowser Rd | 120 S Jupiter Rd | 740 West Spring Valley Rd |
| Year Built/ Renovated: | 1981 | 1964 | 1963 | 1965 | 1965 |
| Number of Units: | 70 | 71 | 59 | 60 | 56 |
| Square Feet/Unit: | 732 | 844 | 565 | 799 | 961 |
| Sale Date: | TBD | Apr-21 | Nov-21 | Nov-21 | May-22 |
| Buyer: | TBD | Private Buyer | North Texas Family Properties | Private Buyer | Brazos Residential |
| Seller: | JMJ Development | Private Seller | Private Seller | Private Seller | Pardue Companies |
| **Market Price** | | | | | |
| Price: | $4,900,000 | $5,700,000 | $5,100,000 | $6,000,000 | $6,700,000 |
| Price/Unit: | $70,000 | $80,282 | $86,441 | $100,000 | $119,643 |
| Price/SF: | $96 | $95 | $153 | $125 | $124 |
| Cap Rate: | - | 5.00% | 5.20% | 5.30% | 4.50% |
| Effective Rent/SF: | - | $1.20 | $1.25 | $1.30 | $1.22 |
| Effective Rent Multiplier: | - | 6.6 | 10.2 | 8.0 | 8.5 |

8

APP000200

**Exhibit E**                                                                                                                                        **Rent Comparables**

| Property Name | Year Built | # Units | Avg. Sq. Ft. | % Occ. | Mar. per Unit | Mar. per SF | Concessions/Comments |
|---|---|---|---|---|---|---|---|
| **Cottonwood Dallas** | 1985 | 270 | 833 | 96% | $1,282 | $1.54 | Renovated |
| **La Fortuna** | 1968 | 230 | 742 | 97% | $1,182 | $1.59 | Renovated |
| **Tides on Esperanza** | 1980 | 370 | 667 | 92% | $1,137 | $1.70 | Renovated |
| **Tides at North Dallas** | 1980 | 232 | 587 | 93% | $1,121 | $1.91 | Renovated |
| **Comp Averages** | **1978** | **276** | **707** | **95%** | **$1,179** | **$1.67** | |

9

APP000201