# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | § § § | |
| Plaintiff, | § § | |
| v. | § § | **CASE NO. 3:22-cv-2118-X** |
| **TIMOTHY BARTON** ET AL., | § § | |
| Defendants, | § § | |

### SOUTHERN PROPERTIES CAPITAL, LTD.'S MOTION FOR INTERVENTION, OPPOSITION TO RECEIVER'S VERIFIED MOTIONS FOR APPOINTMENT OF APPRAISER, APPROVAL OF APPRAISERS, APPROVAL OF HEARINGS AND APPROVAL OF SALES AND BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY RELIEF WITH RESPECT TO PARC AT WINDMILL FARMS AND BELLWETHER RIDGE

TO THE HONORABLE UNITED STATES DISTRICT JUDGE BRANTLEY STARR:

Southern Properties Capital, Ltd. ("SPC") files this Motion for Intervention, Response to Receiver's Verified Motions for Appointment of Appraisers, Approval of Appraisers, Approval of Hearings and Approval of Sales and Brief in Support of Complaint for Declaratory Relief with Respect to Parc at Windmill Farms and Bellwether Ridge ("Opposition") and for its Opposition states as follows:

**Table of Contents**

I.   INTRODUCTION ................................................................................................ 1

II.   FACTS ............................................................................................................... 3

    A.   TCI and SPC Business Model.................................................................... 3

    B.   Windmill Farms and Bellwether Developments and Barton ................................. 4

    C.   Barton Obtains the HUD Loan for Windmill Farms ................................... 6

    D.   SPC's Mezzanine Loan on Windmill Farms with Right to Conversion ............................. 6

    E.   SPC Exercises the Option to Convert its Loan to Equity in Windmill Farms................... 7

    F.   Barton Obtains HUD Loan for Bellwether Development.................................... 9

    G.   SPC's Mezzanine Loan on Bellwether with Right to Conversion....................................... 9

    H.   SPC Exercises Its Option to Convert Loan to Equity in the Bellwether Development ..... 10

    I.   General Information Concerning Convertible Debt ................................... 11

    J.   Windmill Farms was SPC's Investment, Not Merely a Loan........................................... 12

    K.   Bellwether was SPC's Investment, Not Merely a Loan .................................... 13

    L.   TCI's Financials Verify that SPC Treated Windmill Farms and Bellwether as ...................
       Investments ................................................................................................ 14

    M.   Investor Funds Were Not Expended on Windmill Farms or Bellwether......................... 16

III.   ARGUMENTS AND AUTHORITIES................................................................ 17

    A.   SPC Should Be Permitted to Intervene ................................................... 17

      1.   SPC Should be Permitted to Intervene as of Right ........................................ 17

      2.   Alternatively, the Court Should Grant Permissive Intervention ................................... 19

    B.   HUD Regulations Do Not Vitiate SPC's Option to Convert to Equity ............................ 20

    C.   SPC's Exercise of the Options was Clearly Timely ....................................... 22

    D.   Depriving SPC of its Equity Interests in Windmill Farms and Bellwether Would
       Constitute a Grave Injustice.............................................................................. 23

IV.   CONCLUSION................................................................................................ 25

## Table of Authorities

**Cases**

*Hancock v. Chicago Title Ins. Co.*, 2008 WL 4344620 (N.D. Tex. Sept. 23, 2008). ............. 19, 20

*Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012) .................... 23

*San Antonio Sav. Ass'n v. C.I.R.*, 887 F.2d 577 (5th Cir. 1989) .................................................. 23

*Texas v. U.S.*, 803 F.3d 653 (5th Cir. 2015) ................................................................... 17, 19

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n.*, 834 F.3d 562 ....................................

    (5th Cir. 2016) ............................................................................................ 17, 18, 19

**Rules**

Fed. R. Civ. P. 24(a) ........................................................................................................ 16, 18

Fed. R. Civ. P. 24(b)(1) ............................................................................................................ 19

## I.    <u>INTRODUCTION</u>

At issue are two motions filed by Receiver Cortney Thomas (the "Receiver") to sell real estate developments located in the greater Dallas area.  On February 22, 2023, the Receiver filed: (1) Receiver's Verified Motion for Appointment of Appraiser, Approval of Appraisals, Approval of Hearing, and Approval of Sale of Bellwether Ridge (the "Bellwether Motion") [ECF 164 and 165]; and (2) Receiver's Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval of Hearing, and Approval of Sale of Parc at Windmill Farms (the "Windmill Farms Motion") [ECF 161 and 162] (collectively referred to as the "Motions").  The Receiver admits that these developments have a collective value of at least $78 million.  Yet, the Receiver's request to sell these developments is supported by sparse, if any, law or evidence.

In fact, the Bellwether and Windmill Farms real estate developments are owned by Southern Properties Capital, Ltd. ("SPC"), a wholly owned subsidiary of Transcontinental Investors, Inc. ("TCI"), a publicly traded company whose shares are listed on the New York Stock Exchange ("NYSE").[1] [App. at 2].  SPC is not a defendant or relief defendant in the Securities & Exchange Commission's underlying case.[2]  SPC is not a Receivership Entity.  Moreover, neither the Commission nor the Receiver alleges that SPC received any funds collected from defrauded investors.

The Receiver's Motions seek to characterize SPC as merely a lender.  The Receiver's unsupported representations to the Court are incorrect.  SPC did, in fact, make loans in connection with the Bellwether and Windmill Farms project.  This, however, does not represent the entire story.  SPC was not merely a lender in these projects; it was an investor.  SPC made

---

[1] Non-convertible bonds issued by SPC are listed and traded on the Tel-Aviv Stock Exchange in Israel. [App. at 15, 19].

[2] *SEC v. Timothy Barton*, et al., Case No. 3:22-cv-2118-X (N.D. Tex.)

loans at interest rates well below market rates with the expectation and right to acquire an equity interest in the projects when it elected to do so.

Moreover, the Receiver's characterization of SPC as a passive lender is, at best, uninformed. In anticipation of exercising its right to convert its debt into equity interest, SPC invested significant amounts of money in these projects and oversaw nearly every aspect of their development, from site selection and acquisition, to construction of the apartment complexes, to lease arrangements and more. In other words, SPC earned the equity interests that it is now asserting.

The Receiver refers to SPC's exercise of its conversion right as providing SPC with a "windfall." This is patently false. In fact, as explained in detail below, depriving SPC of the benefit of conversion would deprive SPC not only of the benefit it bargained for, but also of the benefit it earned and paid for. The right to convert the SPC loan to an equity interest in the entities that own the complexes was a right that SPC paid for through the terms and development of the complexes. Far from providing SPC with a windfall, the conversion right is a feature SPC earned during the conception and construction of the developments.

On the other hand, Barton and his related-entities did not contribute financially to the real estate projects. In fact, Barton and his companies received a development fee from SPC and were otherwise reimbursed by SPC for any expenses they incurred. These projects, in other words, were not paid for with investor funds.

In October 2022, before the appointment of the Receiver in this Commission injunctive action, SPC elected to exercise its option to convert its debt interest to an equity interest. [App. at 9, 13]. Accordingly, SPC obtained the right to obtain a one hundred percent (100%) membership

interest in both Bellwether and Windmill Farms. Neither Barton nor the Receiver have any remaining right to an ownership interest in the entities that own these developments.[3]

SPC appreciates and supports the mission of the Commission to protect investors, as well as the role of the Receiver in attempting to marshal and conserve assets for the benefit of the victims of fraudulent conduct. Nonetheless, not every proposal that might mitigate the losses of investors is fair or just. This is a case in which the proposal evidenced by the Receiver's Motions is neither.

In order to protect the property rights that SPC has acquired and earned, SPC seeks to intervene in this matter to oppose the Receiver's Motions. Moreover, SPC seeks to intervene to file a complaint for a declaratory judgment that SPC, not Barton or the Receiver, is the owner of the Bellwether and Windmill Farms developments.[4]

## II.    FACTS

### A.    TCI and SPC Business Model

As describe above, SPC is a wholly-owned subsidiary of TCI, a corporation whose shares are traded on the NYSE. [App. at 2]. SPC is only one of many subsidiaries affiliated with TCI. TCI and its affiliates include national real estate companies that specialize in the acquisition, development, ownership, and management of multifamily and commercial real estate. The companies also develop raw land for single family home communities. [App. at 2-3]. The companies, including SPC, operate a portfolio of hundreds of properties, tens of thousands of multifamily units, and hundreds of parcels of raw land. [App. at 3].

---

[3] SPC's equity interests in the developments is subject to the subsequent approval of the U.S. Department of Housing and Urban Development. As explained in this brief, however, such approval is a ministerial hurdle.

[4] In the Court's Order Granting Receiver's Motion to Supplement Order Appoint Receiver [ECF 62], the Court stated that "going forward, all interested non-parties are directed to intervene to the extent they wish to participate in the proceedings." p. 2, note 1.

One of the business models that TCI and its affiliates use when building and managing properties is to outsource the developer role to an unaffiliated party. [App. at 3].  There are many business advantages to outsourcing the developer role.  For example, by outsourcing the developer role, TCI operates a leaner corporate structure by reducing personnel and associated expenses, such as payroll and benefits. [App. at 3].  Another advantage is that TCI delegates to the outside developer certain responsibilities rather than performing them internally. [App. at 3]. Such delegated responsibilities include negotiating acquisition of the real property, obtaining mortgage financing, and developing and implementing processes. [App. at 3].  Under the business model followed by TCI and its affiliates, such as SPC, TCI pays the developer a developer's fee for these services.  The developer does not invest its own money in the project. [App. at 3].  Once the project is complete and ready for sale or leasing, the developer transfers the project to TCI or an affiliate. [App. at 3-4].   Under this business model, TCI and the developer intend that TCI or the affiliate will subsequently own and manage the project. [App. at 4].  This was the case with the relationship between Barton and SPC. [App. at 4].

**B.**    **Windmill Farms and Bellwether Developments and Barton**

TCI has used the business model of outsourcing the developer role on a number of projects, including projects involving SPC and Timothy Barton.  SPC outsourced the developer role to Barton in the projects known as Windmill Farms and Bellwether. [App. at 4, 5, 10].  As discussed in more detail below, SPC projects followed the similar business model, which was that SPC outsourced the developer role to Barton.  SPC paid Barton a developer fee. [App. at 4, 17].  Barton obtained HUD mortgage financing and provided other developer services, while SPC provided equity and management for the projects, and once the development stage was

complete, Barton was to transfer ownership to SPC, which would continue with management of the properties. [App. at 4].

It is important to note that SPC was not merely a passive lender. Rather, SPC:

- identified building sites;

- oversaw and managed entitlement efforts;

- controlled and funded planning and design efforts;

- assembled and maintained required documents for the land development projects;

- managed and approved the construction process;

- provided certificates of deposit and cash collateral to obtain letters of credit and funded change orders and cost overruns; and

- managed the operation and leasing of properties.

[App. at 4].

Contrary to the assertion in the Receiver's Motions, both TCI's and SPC's financial statements issued during the development of the Windmill Farms and Bellwether projects evidence that the loans issued by SPC involved an expectation of its future ownership interest from both an accounting and operational prospective. [App. at 16-21]. The equity financing mechanism that SPC used on the projects was a mezzanine loan in the form of a convertible loan, pursuant to which SPC could exercise the option of converting the loan to a 100% equity interest in the project. [App. at 4-5]. The low interest rates of 5% evidence that the conversion feature was part of the consideration for which SPC bargained. [App. at 5].

C.    **Barton Obtains the HUD Loan for Windmill Farms**

As mentioned above, SPC outsourced the developer role to Barton on Windmill Farms. Windmill Farms is located in Forney, Texas. [App. at 5].  It consists of 17 residential buildings and two clubhouses.  The residential buildings total 272 units and have total rentable area of approximately 280,000 square feet. [App. at 5].

Barton used one of his companies, JMJ Development, LLC ("JMJ") for the purposes of performing his role as developer. [App. at 5].  To obtain a mortgage loan for Windmill Farms, Barton used as the borrower another company, D4FR, LLC ("D4FR"), a Texas limited liability company. [App. at 5].  D4FR obtained a loan from the United States Department of Housing and Urban Development ("HUD").  Procurement of the HUD loan occurred in the following sequence of events.  On or about August 25, 2017, D4FR applied for the HUD loan.  HUD approved D4FR's application and issued to D4FR a "Firm Commitment."  Pursuant to the Firm Commitment, HUD agreed to provide the loan to Greystone Servicing Corporation, Inc. ("Greystone"), to administer to D4FR. [App. at 5-6].

Following the Firm Commitment, D4FR executed additional HUD documents on or about December 1, 2017, including a Promissory Note and Deed of Trust. [App. at 6].

D.    **SPC's Mezzanine Loan on Windmill Farms with Right to Conversion**

SPC provided equity financing to assist with construction of the Project. [App. at 6]. SPC made a convertible loan to JMJ through a Letter Agreement ('Windmill Letter Loan Agreement") entered into on December 14, 2017. [App. at 6].  The Windmill Letter Loan Agreement provided that JMJ shall execute and deliver a promissory note. [App. at 6].  JMJ, as borrower, executed a promissory note in favor of SPC, as lender, in the principal amount of $7,300,000.00 ("Windmill Note") [App. at 6].

JMJ provided to SPC security for the Windmill Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4FR's parent company, JMJD4, LLC ("JMJD4"). [App. at 6].   JMJ signed the Assignment of Pledge and Security Agreement ("Windmill Assignment"). [App. at 7].   As a result, all of the equity interest in D4FR's parent company, JMJD4, was pledged to SPC. [App. at 7].   Importantly, the JMJ Windmill Assignment granted SPC the right to convert the loan to equity, as discussed immediately below. [App. at 7].

Each of the Windmill Amended and Restated Pledge and Security Agreements included Section 7.15, titled "Conversion Option." [App. at 7].   Section 7.15 provides a mechanism for SPC to exercise an option to acquire the Windmill Pledged Equity for consideration of $100.00. [App. at 7].   Section 7.15 states in relevant part:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

[App. at 7, 126-27, 156-57, 186-87].

The Windmill Letter Loan Agreement and Windmill Note were amended several times, but SPC's right to convert its loan to an equity interest in the entire Windmill Farms project remained in effect. [App. at 7-8].   In addition, on May 13 and 14, 2020, multiple UCC financing statements were filed securing SPC's right to obtain the membership interest. [App. at 7-8].

**E.    SPC Exercises the Option to Convert its Loan to Equity in Windmill Farms**

SPC exercised its option set forth in the Windmill Amended Pledge and Security Agreements. [App. at 9, 246-275].   The option allowed SPC, the lender, to acquire the Windmill Project from D4FR for the consideration of $100.00. [App. at 9, 126-27, 156-57, 186-87].   SPC exercised its option, thereby converting the Loan to an ownership interest to acquire the Windmill Project. [App. at 9].

On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TWRF, JMJAV, D4FR, and JMJ ("Windmill Exercise Letter").  The Windmill Exercise letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Windmill Farms, Forney, Texas." [App. at 9, 246].  SPC attached to the Windmill Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Windmill Farms project from D4FR to SPC, once HUD consents to the transfer. [App. at 248-275].  SPC also attached a check for $100.00 as the required consideration. [App. at 247].  The letter was delivered on October 4, 2022 at 8:16 a.m. [App. at 277-279].

After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Windmill Farms. [App. at 9-10].  On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (1) the Windmill Exercise Letter; (2) the Windmill Amended and Restated Pledge and Security Agreements; (3) the Windmill Assignment; (4) the Windmill Note; and (5) the Windmill Letter Loan Agreement and amendments. [App. at 9-10, 281-282].

Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so. [App. at 10, 281-282].  SPC wrote:

> The terms of the [HUD] Mortgage Documents allow for an assumption of the loan, subject to the approval of Greystone and HUD.  Section 7.15 of the [Windmill Amended and Restatement Pledge Agreements] provides the mechanism under with the Mezzanine Loan can be converted to an ownership interest.  Upon Lender's exercise, the Pledges contemplate that the Parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA").  To initiate this process, a signed agreement for such a purchase must be submitted with the signed application.

[App. at 10, 281-282].

**F.      Barton Obtains HUD Loan for Bellwether Development**

Similar to his role in the Windmill Farms project, SPC outsourced the developer role to Barton for the Bellwether project. [App. at 10].  Barton's role included obtaining the initial loan from HUD for the property identified by SPC. [App. at 10].

To obtain a mortgage loan for Bellwether, Barton used as the borrower his company D4DS, LLC ("D4DS"), a Texas limited liability company. [App. at 10].  D4DS obtained a HUD loan. [App. at 10].  HUD approved D4DS' application and agreed to provide the loan to Greystone, to administer to D4DS. [App. at 10].  The loan was for the principal amount of $19,021,200.00. [App. at 10].

To finalize the loan, D4DS executed additional HUD loan documents on or about October 1, 2017, including a Promissory Note, and Deed of Trust. [App. at 11].  The loan was eventually modified to reduce the principal amount to $18,608,100.00. [App. at 11].

**G.      SPC's Mezzanine Loan on Bellwether with Right to Conversion**

SPC provided the Bellwether project with equity financing to assist with construction in the form of a convertible loan. [App. at 11].  JMJ, as borrower, executed a note in favor of SPC, as lender, in the principal amount of $3,800,000.00 ("Bellwether Note"). [App. at 11].  JMJ provided SPC security for the Bellwether Note by assigning SPC all of JMJ's rights, title, and interest in D4DS's parent company, JMJD4. [App. at 11].  JMJ signed an Assignment of Pledge and Security Agreement ("Bellwether Assignment"). [App. at 11].  As a result of this transaction, all of the equity interest in D4DS's parent company, JMJD4, was pledged to SPC. [App. at 11-12].  Importantly, the Bellwether Assignment granted SPC the right to convert the loan to equity, as discussed immediately below. [App. at 12].

Each of the Bellwether Amended and Restated Pledge and Security Agreements includes Section 7.15, titled "Conversion Option." [App. at 11].   Section 7.15 provides a mechanism for SPC to exercise an option to acquire the Bellwether Pledged Equity for consideration of $100.00. [App. at 12].  Section 7.15 states in relevant part:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

 [App. at 12, 380-81, 410-11, 440-41].

On May 13 and 14, 2020, multiple UCC financing statements were filed.  These secured SPC's convertible interest in the Bellwether project. [App. at 12].

The following year, on July 6, 2021, D4DS agreed to sell Bellwether to SPC affiliate APTS at Bellwether Ridge, LLC ("APTS"). [App. at 12, 471-509].  Additionally, the Agreement states that if SPC decided to exercise the conversion option, APTS will now be the entity that receives the $100.00 consideration. [App. at 12, 473-479].

## H.    SPC Exercises Its Option to Convert Loan to Equity in the Bellwether Development

SPC exercised its option set forth in the Bellwether Amended Pledge and Security Agreements. [App. at 13, 511-514].   The option allowed SPC, the lender, to acquire the Bellwether Project from APTS for consideration of $100.00. [App. at 13, 511].  SPC exercised this option, thereby converting the Loan to an ownership interest to acquire the entire Bellwether project. [App. at 13, 511-514].

On October 3, 2022, SPC sent a letter exercising it conversion option to Enoch, TWRF, JMJAV, JMJD4, D4DS, and JMJ ("Bellwether Exercise Letter"). The Bellwether Exercise Letter states that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Bellwether Ridge, DeSoto, Texas." [App. at 3, 516].  SPC attached to the

Bellwether Exercise Letter a "First Amendment to the Purchase and Sale Agreement" to complete transfer of the Bellwether project from APTS to SPC, once HUD consented to the transfer. [App. at 13].  The First Amendment extended the Financing Contingency Period to March 31, 2023, due to HUD taking longer than expected to approve. [App. at 13, 512-578]. SPC also attached a check for $100.00 as required consideration. [App. at 13].  The letter was delivered at 8:16 a.m. on October 4, 2022. [App. at 13, 516-578].

After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Bellwether. [App. at 13, 520-521].  On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (1) the Bellwether Exercise Letter; (2) the Bellwether Amended and Restated Pledge and Security Agreements; (3) the Bellwether Assignment; (4) the Bellwether Note; and (5) the Bellwether Letter Loan Agreement.  SPC also provided the Receiver with a description of the HUD loan documents. [App. at 13, 520-521].

## I.    <u>General Information Concerning Convertible Debt</u>

It may be useful to explain generally the concept of convertible debt.  With convertible debt, an entity borrows money from a lender, like a typical loan.  Unlike a typical loan, however, convertible debt allows the debt to be converted to equity at a later date.  This is because the lender will typically offer the loan at a lower rate and higher loan-to-value ratio, as the lender can later obtain equity in the company.  It is also because the lender, as described below, is more than merely a lender and provides additional investment of money, resources and effort into the subject of the loan. [App. at 14].

For example, Company A borrows money from Bank B.  Under the agreement, Bank B obtains the right to convert the debt into 100% company equity.  Subsequently, Bank B exercises

its right.  Because of Bank B's exercise, Bank B now owns 100% of Company A.  Conversely, Company A no longer owes money to Bank B. [App. at 14].

In the case of SPC and the Windmill Farms and Bellwether projects, SPC extended convertible debt.  This meant that SPC had the right to convert the debt into 100% equity ownership in the projects. [App. at 14].  SPC converted the debt and is now the 100% owner of the Windmill Farms and Bellwether developments. [App. at 14-15].  Functionally, this is different from traditional loans.  The convertible loans carried an interest rate of 5%, which was much lower than the market capped rate of upwards to at least 10% or 15% or more one would expect at the time of the loans, taking into account the nature of the risk of a mezzanine loan of all equity. [App. at 15].  The lower interest rate was part of the consideration that SPC provided for the right to obtain equity. [App. at 18-19].

Classifying SPC's interest in the Bellwether and Windmill Farms projects as solely "loans," as the Receiver urges the Court to do, is inaccurate because it does not provide full context.  As shown by the TCI and SPC accounting records, discussed below, SPC considered the properties as investments and intended, from the beginning, to exercise its exclusive right to convert its debt to 100% equity.

## J.      Windmill Farms was SPC's Investment, Not Merely a Loan

The SPC accounting records show that SPC considered Parc at Windmill Farms to be an investment, not merely a loan. [App. at 15, 523-572, 574-595].  There is significant value in the conversion option.  Note 10 in the SPC 2021 Financial Statements is "Notes Receivable." [App. at 15, 552-53].  It includes a table of projects in which SPC had notes receivable as of December 31, 2021. [App. at 15, 553].  The table includes Parc at Windmill Farms. [App. at 16, 553].

Below the table, the financial statements explain that SPC owns convertible debt in all of the properties listed in the table.  The SPC 2021 Financial Statements state the following:

> "The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property."

[App. at 16, 553].

The SPC 2021 Financial Statements show that SPC's note related to Parc at Windmill Farms was "convertible, at [SPC's] option, into a 100% ownership interest in" Parc at Windmill Farms. [App at 16, 553].  As explained above, SPC also expended additional funds and made various improvements on the Windmill Farms development. [App. at 17].  SPC did not treat Windmill Farms as a mere loan because it was not; it was an SPC investment. [App. at 17-18].

## K.      Bellwether was SPC's Investment, Not Merely a Loan

The Bellwether development is subject to the same analysis as the Windmill Farms project.  As shown above, SPC 2021 Financial Statements include a table listing all of SPC's notes receivable. [App. at 15-16, 552-53].  The 2021 Financial Statements explain that SPC has convertible debt in all of the properties listed in the table.  Bellwether is listed in the table. [App. at 7, 15-16, 553].  The SPC 2021 Financial Statements state that "[t]he note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property." [App. at 16, 553].  This statement applies as well to the Bellwether project.

Bellwether, similar to Windmill Farms, is an investment property that has significant conversion value for SPC.  SPC issued convertible debt and later transformed that debt into equity. [App. at 16-17].  Moreover, similar to Windmill Farms, SPC expended additional funds,

resources and efforts to construct numerous improvements on Bellwether. [App. at 17].

Accordingly, SPC *owns* Bellwether subject to HUD's ministerial approval.

L.      **TCI's Financials Verify that SPC Treated Windmill Farms and Bellwether as Investments**

TCI is SPC's parent company. [App. at 18].  TCI files consolidated financials on behalf of itself and its subsidiaries. [App. at 18].  As stated above, TCI is a real estate company that specializes in the acquisition, development, ownership and management of multifamily and commercial real estate. [App. at 18].  TCI is a publicly traded corporation whose shares are listed on the NYSE. [App. at 18].  It has many public shareholders and the Receivership should not prejudice the rights of TCI shareholders in favor of Barton investors.

TCI's financials confirm that SPC planned, from the inception, to convert its interests in the Windmill Farms and Bellwether projects into equity.  TCI's 10Ks show that TCI reserved interest income recognition. [App. at 20-21, 633-34].  This is important because the mezzanine loans provide that interest income would be forgiven once TCI exercises its conversion rights. [*Id.*].  TCI, therefore, reserved interest income recognition in its 10Ks because such income would have been forgiven anyway once TCI exercised its conversion right, which it always planned to do. [*Id.*].

TCI reserved interest income under SPC's mezzanine loans because of the view that *TCI would exercise its right of conversion for ownership.* [App. at 18].  TCI's financial statements are completed in accordance with Generally Accepted Accounting Principles ("GAAP") and U.S. Securities and Exchange Commission regulations. [App. at 18].  According to the SEC, per Staff Accounting Bulletin No. 104, revenue can only be recognized when collectability is reasonably assured. [App. at 18].

Because of GAAP rules, TCI's 10Ks list the actual value of the loans. Because of IFRS rules, SPC's financial statements list the fair market value of the loans. The difference is stark. In one instance, for example, SPC lists in its financial statements  the fair market value of the loan being *three times higher* than the actual value of the loan [App. at 18-19]. This demonstrates that SPC was treating and reporting the convertible loans as equity, because that is what SPC intended them to be.

In its financial statements, TCI accrued, but fully reserved, interest income recognition on the convertible loans. [App. at 18].  Under the SPC mezzanine loans, any uncollected interest income is forgiven in the event of conversion. [App. at 18].  TCI had the ability and the intent to convert the SPC mezzanine loans into 100% equity interests in Bellwether and Windmill Farms. TCI, through SPC, exercised its conversion rights. [App. at 18].  Any interest was forgiven once TCI exercised its conversion rights. [App. at 18-19].  Accordingly, as TCI (through SPC) planned to exercise its right from the inception of the projects, it did not recognize interest income on the convertible loans. [App. at 19].

SPC, on the other hand, is listed on the Tel Aviv Stock Exchange. [App. at 15, 19].  This means that SPC reports its financial statements in accordance with International Financial Reporting Standards. ("IFRS"). [App. at 15].  IFRS bases financials on fair market value, not historical cost. [App. at 15].  In the SPC 2021 Financial Statements and the SPC 2022 Financial Statements, the convertible loans for Windmill Farms and Bellwether "are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued." [App. at 16, 553, 583].  These experts are not mere "real estate appraisers."  The fact that SPC appraised Windmill Farms and Bellwether demonstrates

that SPC viewed the properties as investments, not loans. [App. at 17-18].  Otherwise, if they were simply loans, SPC would not have addressed the properties' fair market value.  This resulted in SPC presenting the Windmill Farms and Bellwether developments at full property value on its Balance Sheets for these respective periods because of the contractual right and intent of SPC to exercise and rightfully own the properties. [App. At 16-19].

**M.**      **Investor Funds Were Not Expended on Windmill Farms or Bellwether**

Neither the SEC nor the Receiver allege that Barton investor funds were expended on the development of Windmill Farms or Bellwether. That is because they were not.  In fact, SPC paid for the expenses of the development and even paid Barton or his entities developer fees.

SPC has expended tremendous resources and effort to construct and maintain the Windmill Farms and Bellwether developments. [App. at 4, 17].  SPC paid Barton a developers fees and reimbursed him for his expenses. [App. 17].  SPC did not use outside investor money in connection with Windmill Farms or Bellwether. [App. at 931-932, 941-942, 946-947].  As mentioned, SPC constructed improvement for the projects. [App. at 4, 17].  Accordingly, SPC did not receive Barton investor funds; SPC spent considerable money and resources to construct and market the projects.

Even today, SPC continues to pay for the expenses related to the maintenance and management of Windmill Farms and Bellwether. [App. at 931-32, 941-42, 946-47].  Indeed, SPC controls both developments. [App. at 946-47].  Barton pays no expenses and has no role in the management of the developments. [App. at 931-932, 941-942, 946-947].

III.   **ARGUMENTS AND AUTHORITIES**

A.   **SPC Should Be Permitted to Intervene**

    1.   **SPC Should be Permitted to Intervene as of Right**

Rule 24(a) confers a right to intervene on "anyone" who meets four criteria:  "(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest, [and] (4) the applicant's interest must be inadequately represented by the existing parties to the suit." *Texas v. U.S.*, 803 F.3d 653, 657 (5th Cir. 2015).  Courts should "liberally construe[]" this test to "allow intervention where no one would be hurt and the greater justice could be attained." *Id.* at 656-67 (quotation omitted).  SPC easily satisfies this standard.

First, SPC's motion is clearly timely.  The Receiver's Motions to sell developments owned by SPC were not filed until February 22, 2023.  The Court issued an order, on March 2, 2023 for the Receiver to notify SPC [ECF 171] and setting an expedited briefing schedule and hearing, requiring SPC to respond by March 10, 2023 and setting the hearing on the proposed sales of Windmill Farms and Bellwether on March 20, 2023 [ECF 169-170].  SPC is requesting intervention shortly after discovering that the Receiver proposes to sell property belonging to SPC.  Under "all the circumstances," there is no question that SPC promptly moved to protect its rights. *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n.*, 834 F.3d 562, 565-66 (5th Cir. 2016) (quotation omitted) (granting intervention three months after prospective intervenor discovered his interest was in jeopardy).

Second, SPC has "an interest relating to property or transaction which is the subject of the action" given the pending Motions by the Receiver.  All that is required is "a stake in the

matter that goes beyond a generalized preference that the case come out a certain way"—for example when "a potential decree threatens a prospective interference with [the movant's interest]," even if the court is presently "uncertain whether the [movant's interests w[ill] be affected at all." *Id.* at 657, 660 (ellipses and quotation omitted).  In light of this low threshold, movants who assert that their "property interest . . . are threatened by the litigation" are "almost always" entitled to intervene because a property right is "the most elementary type of right that Rule 24(a) is designed to protect." *Id.* at 658 (brackets and quotations omitted).

There can be no doubt that SPC has a sufficient interest to protect through intervention. There is no uncertainty concerning the threat to SPC's fundamental rights, in particular its property rights.  As set forth at length above, SPC asserts—and can establish—that it owns the Windmill Farms and Bellwether projects, subject only to the ministerial formality of HUD approval.  The Receiver asserts that the value of these SPC properties total at least $78 million. There can be no question that this litigation poses an imminent threat to SPC's valuable property rights.

Third, and for similar reasons, "the disposition of the action may, as a practical matter, impair or impede [SPC's] ability to protect [its] interest." *Id.* at 657.  Again, the Receiver seeks authority to sell unique real property that is owned by SPC.  Moreover, the Receiver clearly seeks to relegate SPC's interests in Windmill Farms and Bellwether and use the proceeds principally to distribute to Barton's investors.  Certainly, the Receiver's Motions, if granted, will not only "impair or impede" SPC's ability to protect its interest, they will obliterate SPC's prospective ownership interests.  Moreover, courts have recognized that real property interests, such as the Windmill Farms and Bellwether developments, represent unique interests.  Even if the Court were to permit the sale of these interests and require the Receiver to retain the

proceedings pending further litigation of this issue, SPC would suffer from a deprivation of its likely ownership interest in a unique and irreplaceable asset.

Fourth, the existing parties "inadequately" represent SPC's interest.  Both the Commission and the Receiver are myopically focused on obtaining funds to reimburse defrauded investors.  As SPC has already pointed out, this is a noble endeavor.  Neither the Commission nor the Receiver, however, can be expected to focus on, much less champion, a superior property right asserted by SPC.  Nor are the interests of SPC protected by Defendants or Relief Defendants.  Again, Barton and his entities would like nothing better than to sacrifice SPC's property interests on the altar of reducing their own liability to investors.  They also have no concern for the countervailing interests and assertions of SPC.  Accordingly, SPC's interests will only be protected if SPC is permitted to intervene to assert those interests.  SPC is the only entity interested in SPC being the owner of Windmill Farms and Bellwether.  This clearly satisfies the "minimal burden" of showing that "the representation [provided by existing parties] *may* be inadequate." *Wal-Mart*, 834 F.3d at 569 (quotation omitted); *see also, e.g.*, *Texas,* 805 F.3d at 663 (granting intervention when movants' interest merely "diverge[d]" from the Government's largely-aligned "institutional interest").

### 2.      Alternatively, the Court Should Grant Permissive Intervention

Permissive intervention is open to "anyone" possessing "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1).  The Court has "broad discretion in granting" intervention if "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the right of

the original parties." *Hancock v. Chicago Title Ins. Co.*, 2008 WL 4344620, at *2 (N.D. Tex. Sept. 23, 2008).

First, for the reasons set forth above, SPC's motion to intervene is timely.

Second, SPC's "claim or defense" (specifically that SPC should be recognized as the rightful owner of Windmill Farms and Bellwether) present "common questions" with the Receiver's opposing views, as expressed in his pending Motions.  The Receiver's efforts to sell these developments for the benefit of other parties clearly raises a common question that requires the attention of the Court. *Hancock*, 2008 WL 4344620, at *2.

Third, "intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *Hancock*, 2008 WL 4344620, at *2.  SPC believes that it has presented the Court with the evidence necessary to resolve this matter promptly.  Moreover, even if this question requires further litigation, the rights at issue certainly justify the Court's further consideration.

This Court has recently allowed other non-Defendant entities to intervene and assert their rights. *See* ECF 62 at 2.  There is no reason to treat SPC less favorably.  For any and all of the above reasons, the Court should allow SPC to intervene to protect its property rights.

**B.** **HUD Regulations Do Not Vitiate SPC's Option to Convert to Equity**

The Receiver's Motions argue that SPC's options to convert its debt interest into equity in the Windmill Farms and Bellwether projects are invalid because SPC did not obtain prior approval from HUD to exercise the options.  Not surprisingly, the Motions contain no detailed discussion of this assertion and cite no authority to support this position.

SPC does not quibble with the proposition that HUD approval will be required to complete the process of SPC assuming ownership of the developments.  None of the provisions

cited by the Receiver, however, establish that HUD approval is a condition precedent to exercising the type of conversion option at issue here.  By exercising the option, SPC established its right to ownership of Windmill Farms and Bellwether, subject only to the formality of HUD approval.

Based on the agreements entered into between SPC and the entities described above, SPC's exercise of the option effectively converted its interest to an ownership interest and eliminated the interest that Barton entities had in the projects.

There is, in fact, no HUD rule that prohibits the use of convertible loans on HUD-financed projects. [App. at 937-938].  Moreover, even though the transfer of equity may be subject to HUD approval, there is no HUD rule that prohibits a developer from agreeing to the sale of a HUD-financed project. [App. at 937-938].  Nor is there any rule that stays or invalidates SPC's exercise of its option to convert its mezzanine loans to equity without HUD approval. [App. at 937-938].

SPC's exercise of its options to obtain a 100% equity interest in the developments, subject only to the formality of HUD approval, should be recognized by the Court as a fact that prohibits the Receiver from selling the Windmill Farms and Bellwether projects.  Indeed, such approval is, in many cases, ministerial and TCI and SPC have obtained such HUD approval for many projects. [App. at 938].  Approval is likely and permitting the Receiver to sell the Windmill Farms and Bellwether projects "out from under" SPC would constitute a grave injustice.

The Receiver also drops a footnote suggesting, without explanation or evidence, that SPC's timing in exercising the options is "suspicious."  Ironically, SPC exercised the options on October 3, 2022 precisely in order to remain in compliance with HUD rules. [App. at 21-22].

Far from being suspicious, SPC exercised the conversions shortly after SPC's first opportunity to do so since November 2018. [App. at 21, 22].

Moreover, an absence of HUD approval would not vitiate state law ownership. At best, it would affect financing features or ultimately make the projects not HUD projects.

## C.   SPC's Exercise of the Options was Clearly Timely

Again, without explanation or citation to authority, the Receiver questions whether SPC's exercise of its convertibility options was "timely." There can be no question that the exercise of the options was timely.

None of the documents entered into between SPC and the developers placed a deadline on the exercise of the option. SPC exercised the option to convert its interest in Windmill Farms to an equity interest via a letter delivered on October 4, 2022. [App. at 9, 246-275]. Similarly, SPC exercised the option to convert its interest in Bellwether to an equity interest via a letter delivered on October 4, 2022. [App. at 13, 511-514]. Nothing in the parties' agreements make this exercise untimely.

If the Receiver is implying that the exercise was untimely because thirty (30) days did not pass between SPC's exercise of its option and the Court's granting of the Receivership Order, the Receiver provides no support for this proposition. There is no reason given why the 30 day period stopped running when the Receivership Order went into effect. This is particularly true because, once the option was exercised, SPC owned the projects, subject only to the ministerial approval of HUD.

In fact, with respect to Bellwether, SPC exercised its option on July 6, 2021. [App. at 12, 471-509]. On that date, APTS at Bellwether Ridge, LLC and D4DS, LLC entered into an Agreement for Purchase and Sale of the Bellwether complex. [App. at 12, 471-509]. This

agreement was tantamount to an exercise of the option granted to SPC.  Accordingly, the option on Bellwether was more than a year before the Receivership came into being.

**D.**     **Depriving SPC of its Equity Interests in Windmill Farms and Bellwether Would Constitute a Grave Injustice**

Contrary to the Receiver's assertion, "the equities, on balance" do ***not*** support treating the SPC interest in Windmill Farms and Bellwether as loans.  Quite the opposite.  As established by the evidence presented in this Opposition, the history of the development—as well as principles of fairness and justice—support a ruling by the Court that recognizes the equity interests that SPC not only bargained for, but earned through its participation in the developments.

As SPC stated in the Introduction to this Motion and Opposition, it respects the role of the Receiver and believes that the Receiver's mission to "marshal and conserve" assets for the benefit of defrauded investors is a matter of great importance.  Neither the SEC nor the Receiver, however, should be entitled to deprive American citizens of property rights that they have earned through honest labor and entrepreneurial risk.  If the Receiver is permitted to vitiate SPC's equity interests in these developments, then the Receiver becomes the moral equivalent of Timothy Barton.

It is clear from the Receiver's requests and the arguments that purportedly support them that the Receiver does not appreciate the real estate development process and the facts surrounding SPC's role in that process, a role through which SPC clearly earned the equity interest that it bargained for and which it now seeks to defend.

Such a stance is in defiance of even the most basic principles of real property law.  That is, "[i]t is elementary in the law that real property…is unique." *San Antonio Sav. Ass'n v. C.I.R.*,

887 F.2d 577, 591 (5th Cir. 1989). SPC has expended tremendous effort and resources toward Windmill Farms and Bellwether, both inherently "unique." The Receiver, however, seeks to erase these efforts, causing irreparable harm to SPC. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012) (finding that depriving one of an interest in real property constitutes irreparable harm). Regardless of the Receiver's perceptions and opinions, however, SPC is confident that the Court, acting in equity, will deny the Receiver's Motions seeking to nullify SPC's property rights.

SPC is also astonished by the Receiver's unwillingness to provide SPC with a few more days to establish its position in this Motion and Opposition.  In the Receiver's Verified Response to HNGH Turtle Creek, LLC's Motion to Intervene and Confirm Ownership of Certain Property [ECF 94], the Receiver repeatedly emphasized that the Receivership was in its "early stages" and that the Court should abjure from drawing hasty conclusions about the ownership of property. [ECF 94, pp. 4 and 5].  Apparently, however, when the Receiver seeks to sell property that is claimed by an innocent party, such appeals to judicial restraint and patience are no longer relevant.

At the end of the day, it is no fairer to take and sell SPC's equity in these developments to serve the interest of Barton's defrauded investors than it would be to take and sell the Receiver's house for the same purpose.  All well-meaning people would prefer to rectify the harm done by Barton and his related entities.  To do so, however, by a judicial taking of the property of an innocent party is simply not acceptable in this Court or in this country, under the federal securities laws or any other laws of the United States.

In this case, such an outcome would be particularly unseemly.  SPC is the wholly-owned subsidiary of a publicly traded company with public shareholders.  Robbing SPC of its property

interests harms the interests of the investing public.  That is an outcome that neither the SEC nor the Receiver should pursue.  And it is a course of action that the Court should reject out of hand.

## IV.    CONCLUSION

For the reason set forth herein, Southern Properties Capital, Ltd. respectfully requests that the Court grant SPC's Motion to Intervene and deny the Receiver's Verified Motions for Appointment of Appraisers, Approval of Appraisals, Approval of Hearing and Approval of Sale of Windmill Farms and Bellwether Ridge.

RESPECTFULLY SUBMITTED BY:

/s/ *C. Gregory Shamoun*
**C. GREGORY SHAMOUN**
Co-Lead Counsel State
Bar No. 18089650
g@snlegal.com
**BRIAN K. NORMAN**
Co-Lead Counsel State
Bar No. 00797161
bkn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033
**ATTORNEYS      FOR      SOUTHERN
PROPERTIES CAPITAL, LTD**

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2023, I filed the foregoing document with the clerk for the U.S. District Court, Northern District of Texas, Dallas Division using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record, who have consented in writing to accept this Notice as service of the document by electronic means.

/s/ *J. Blair Norris*
**J. BLAIR NORRIS**