IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | CASE NO. 3:22-cv-2118-X |
| TIMOTHY BARTON ET AL., | § § § | |
| Defendants, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| Relief Defendants. | § § § | |

**APPENDIX VOLUME I**

**APPS. 2-107**

**IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S MOTION FOR INTERVENTION, OPPOSITION TO RECEIVER'S VERIFIED MOTIONS FOR APPOINTMENT OF APPRAISER, APPROVAL OF APPRAISERS, APPROVAL OF HEARINGS AND APPROVAL OF SALES AND BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY RELIEF WITH RESPECT TO PARC AT WINDMILL FARMS AND BELLWETHER RIDGE**

| Ex. No. | Title | App. No. |
|---------|-------|----------|
| Ex. A | Declaration of Bradley Muth | App. 2-22 |

| Ex. No. | Title | App. No. |
|---------|-------|----------|
| Ex. 1 | Promissory Note | App. 24-36 |
| Ex. 2 | Deed of Trust | App. 38-90 |
| Ex. 3 | Windmill Letter Loan Agreement | App. 92-94 |
| Ex. 4 | Windmill Note | App. 96-107 |

RESPECTFULLY SUBMITTED BY:

/s/ *C. Gregory Shamoun*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on March 10, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

| | |
|---|---|
| **C. Gregory Shamoun**<br>State Bar No. 18089650<br>Email: g@snlegal.com<br>**Brian K. Norman**<br>State Bar No. 00797161<br>Email: bkn@snlegal.com<br>**J. BLAIR NORRIS**<br>State Bar No. 24014515<br>Email: bn@snlegal.com<br>**SHAMOUN & NORMAN, LLP**<br>1800 Valley View Lane, Ste 200<br>Farmers Branch, TX 75234 | _____ FACSIMILE<br>_____ CERTIFIED MAIL, RRR<br>_____ U.S. FIRST CLASS MAIL<br>_____ HAND DELIVERY<br>_X__ ELECTRONIC TRANSMISSION |

/s/ *C. Gregory Shamoun*
**C. GREGORY SHAMOUN**

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CASE NO. 3:22-cv-2118-X |
| TIMOTHY BARTON ET AL., | § § § | |
| Defendants, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| Relief Defendants. | § § | |

**DECLARATION OF BRADLEY MUTH
IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S MOTION
FOR INTERVENTION, OPPOSITION TO RECEIVER'S VERIFIED
MOTIONS FOR APPOINTMENT OF APPRAISER, APPROVAL OF
APPRAISERS, APPROVAL OF HEARINGS AND APPROVAL OF SALES
AND BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY
RELIEF WITH RESPECT TO PARC AT WINDMILL FARMS AND
BELLWETHER RIDGE**

"My name is Bradley Muth, I am over the age of twenty-one (21), have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein.

1.     I am a real estate executive with over 30 years of experience in development, acquisitions, finance, asset management, and portfolio management. I am the President and Chief Executive Officer of Pillar Income Asset Management ("Pillar"), Transcontinental Realty Investors, Inc. ("TCI"), and American Realty Investors, Inc. ("ARI"). Pillar, TCI, and ARI are national real estate companies publicly traded on the New York Stock Exchange that specialize in the acquisition, development, and management of multifamily and commercial real estate. The

companies also develop raw land for single family home communities. The companies operate a portfolio of hundreds of properties, tens of thousands of multifamily units, and thousands of raw land holdings. I oversee all aspects of investment and operations for the above companies, including Southern Properties Capital, Ltd. ("SPC"). TCI is the 100% passive owner of SPC. When TCI and SPC are stated to perform functions, in certain situations its affiliate Pillar is the effective manager carrying out the functions.

2.    Prior to joining Pillar, TCI, and ARI, I served as Senior Managing Director at ValueRock Realty Partners in California, where I was a member of the firm's Executive and Investment Committees with execution oversight of all development, including ground up and redevelopment activities. Prior to ValueRock, I spent the majority of my career with ING Realty Partners as partner and Managing Principal. In my career, I have overseen the acquisition, development, and portfolio management of over $8 billion in real estate investments, including over 20,000 apartment units across the United States.

**Summary of Business Model**

3.    To provide context, TCI and its affiliates, such as SPC, are in the business of building and managing properties, including multifamily residential projects. One of the business models TCI uses when building properties is to outsource the developer role. There are many business advantages to outsourcing the developer role. For example, by outsourcing the developer role, TCI can operate a leaner corporate structure by reducing personnel and associated expenses, such as payroll and benefits. Another advantage is that TCI can delegate to the outside developer certain responsibilities rather than performing them internally. Responsibilities that TCI can delegate to the developer include negotiating the acquisition of the real property, pursuing zoning, obtaining mortgage financing, and setting up processes. Under TCI's business model, TCI pays

the developer a developer's fee for these services. The developer does not invest or contribute its own money in the project. Once the project is complete and ready for use, the developer transfers the project to TCI or an affiliate. Under this business model, TCI and the developer intend that TCI or an affiliate will subsequently own and manage the project.

4.     TCI has used this business model of outsourcing the developer on a number of projects. TCI has outsourced the developer role to a number of developers, including Timothy Barton ("Barton"). SPC outsourced the developer role to Barton on projects known as Parc at Windmill Farms (Forney) ("Parc at Windmill Farms" or "Parc at Windmill Project") and Bellwether Ridge (DeSoto) ("Bellwether" or "Bellwether Project") (collectively, the "SPC Projects").

5.     As discussed in more detail below, the SPC Projects followed the similar business model, which was that SPC was effectively the primary responsible party and simply outsourced the developer role to Barton, SPC paid Barton a developer fee, Barton obtained HUD mortgage financing, pursued zoning, and provided other developer services. SPC provided the land, funded all of the equity, and managed the construction and operations of the projects. At all times, it was contemplated that after the development stage, Barton would transfer ownership to SPC, who would continue with ownership and management of the properties.

6.     It is important that for the SPC Projects SPC was not merely a passive lender. Rather, SPC identified land sites; oversaw and managed entitlement efforts; controlled and funded planning and design efforts; assembled and maintained required documents for the land development projects; managed and approved the construction process; provided certificates of deposit and cash collateral to obtain Letters of Credit; Funded change orders and costs overruns; and managed the operations and leasing of properties.

7.     As I describe below, TCI's and SPC's financial statements issued during development of the projects evidence the indicia of future ownership from an accounting perspective. The equity financing mechanism that SPC used on the projects was a mezzanine loan in the form of a convertible loan, pursuant to which SPC could, and expected to exercise the option of converting the loan to 100% equity in the project. The low interest rate, 5%, evidences that the conversion feature was part of the consideration SPC bargained for, especially since this capital was contributed to the highest risk tranche of the project's capitalization. This rate is below typical construction loans with a 60% to 70% loan-to-value (LTV) and far below the market required return-on-investment (ROI) on equity funding. Importantly, the mezzanine loans are secured by a pledge of stock, as described below, and perfected by the filing of UCC financing statements.

8.     On October 3, 2022, SPC sent letters exercising its option to convert its loan to equity with respect to Parc at Windmill Farms and Bellwether. Although SPC's exercise remains subject to certain, what I believe to be ministerial, conditions, SPC exercised its option for its ownership right in the SPC Projects.

**Parc at Windmill Farms**

9.     SPC exercised its option to own the apartment complex property known as Parc at Windmill Farms. Parc at Windmill Farms is located in Forney, Texas. It consists of 17 residential buildings and two clubhouses. The residential buildings total 272 units and have total rentable area of approximately 280,000 square feet.

### A. HUD holds the Mortgage Loan on Parc at Windmill Farms

10.     As mentioned, on Parc at Windmill Farms, SPC outsourced the developer role to Barton. Barton used as developer one of his companies, JMJ Development, LLC ("JMJ"). To

Declaration of Bradley Muth

obtain a mortgage loan for Parc at Windmill Farms, Barton used as borrower his company D4FR, LLC, a Texas limited liability company ("D4FR"). D4FR obtained the mortgage loan from the United States Department of Housing and Urban Development ("HUD"). On or about August 25, 2017, D4FR applied for the HUD loan. HUD approved D4FR's application. HUD agreed to provide for Greystone Servicing Corporation, Inc. ("Greystone"), to make the loan and administer to D4FR. The loan was for the principal amount of $36,540,600.00.

11.     Following the commitment from HUD, D4FR executed additional HUD loan documents on or about December 1, 2017, including a Borrower's Oath, Promissory Note, and Deed of Trust. True and correct copies of the Promissory Note and Deed of Trust are attached as **Exhibit 1** and **Exhibit 2.**

### B.  SPC's Mezzanine Loan on Parc at Windmill Farms

12.     SPC provided the equity capital to fund the remaining amount necessary for the construction of Parc at Windmill Farms. SPC made a convertible loan to JMJ. SPC and JMJ entered into a Letter Loan Agreement dated December 14, 2017 (the "Windmill Letter Loan Agreement"). A copy of the Windmill Letter Loan Agreement is attached as **Exhibit 3.** It provided that JMJ shall execute and deliver a Promissory Note. JMJ, as borrower, executed a promissory note in favor of SPC, as lender, in the principal amount of $7,300,000.00 (the "Windmill Note"). A copy of the Windmill Note is attached as **Exhibit 4.**

13.     JMJ provided to SPC security for the Windmill Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4FR's parent company, JMJD4, LLC ("JMJD4"). Specifically: TWRF, LLC ("TWRF") holds a 100% membership interest in JMJAV, LLC ("JMJAV"). In turn, JMJAV holds a 1% membership interest in JMJD4, and Enoch Investments, LLC ("Enoch") holds the remaining 99% membership interest in JMJD4. TWRF,

JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4 (collectively, "Windmill Amended and Restated Pledge and Security Agreements"). Copies of the Windmill Amended and Restated Pledge and Security Agreements are attached as **Exhibit 5, Exhibit 6** and **Exhibit 7.** As a result, TRWF, JMJAV and Enoch pledged to JMJ 100%of the member interests in JMJAV and JMJD4, which JMJ assigned to SPC.

14.   JMJ signed the Assignment of Pledge and Security Agreement ("Windmill Assignment"). A copy of the Windmill Assignment is attached as **Exhibit 8.** As a result, all of the equity interest in D4FR's parent company, JMJD4, was pledged to SPC (the "Windmill Collateral" or "Windmill Pledged Equity"). Importantly, the Windmill Assignment granted SPC the right to convert the loan to equity, discussed immediately below.

15.   Each of the Windmill Amended and Restated Pledge and Security Agreements includes Section 7.15, titled "Conversion Option." Section 7.15 provides a mechanism for SPC to exercise an option to acquire the Windmill Pledged Equity. Section 7.15 states in relevant part:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

16.   The Windmill Letter Loan Agreement and Windmill Promissory Note were amended several times as follows:

a.   On October 1, 2019, JMJ and SPC signed the First Amendment to Promissory Note adding new requirements for asset management and fees. However, on the same day, JMJ and SPC rescinded this amendment in its entirety. Copies of the Amendment and Rescission are attached as **Exhibit 9** and **Exhibit 10.**

b.      On October 25, 2019, JMJ and SPC signed a First Amendment to the Letter Loan Agreement increasing the prior loan of $7,300,000.00 to $8,300,000.00. A copy of the First Amendment is attached as **Exhibit 11.** They executed a Second Amendment to Promissory Note, to update the loan amount. A copy of the Second Amendment is attached as **Exhibit 12.** They executed a First Amendment to each Pledge and Security Agreement to amend the term "Loan" to refer to increased amount. Copies of the First Amendments are attached as **Exhibit 13.**

c.      On May 1, 2020, JMJ and SPC executed the Third Amendment to Promissory Note to extend the maturity date of the loan to November 1, 2020. A copy of the Third Amendment is attached as **Exhibit 14.**

d.      On November 1, 2020, JMJ and SPC executed the Fourth Amendment to Promissory Note to extend the maturity date to November 1, 2022. A copy of the Fourth Amendment is attached as **Exhibit 15.**

e.      On May 31, 2021, JMJ and SPC signed the Second Amendment to Letter Loan Agreement changing the default provision to provide that an "Event of Default" includes any default under the development agreement. A copy of the Second Amendment is attached as **Exhibit 16.**

17.     On May 13 and 14, 2020, multiple UCC financing statements were filed securing SPC's interest in the membership interests. They were as follows:

- Texas UCC Financing Statement, Filing # 20-0017679567 (Enoch)

- Delaware UCC Financing Statement, Filing # 20203378223 (TRWF)

- Texas UCC Financing Statement, Filing # 20-0017975172 (JMJAV)

- Texas UCC Financing Statement, Filing # 20-0017974808 (JMJAV)

- Delaware UCC Financing Statement, Filing # 20203407113 (JMJD4)

Copies of the Financing Statements are attached as **Exhibit 17**, **Exhibit 18**, **Exhibit 19**, **Exhibit 20** and **Exhibit 21**.

### C. SPC Exercises its Option to Convert its Loan to Equity

18.    SPC exercised its option set forth in the Windmill Amended Pledge and Security Agreements. The option allowed SPC to acquire the equity from D4FR for the consideration of $100.00. SPC exercised its option, thereby converting the loan to an ownership interest to acquire the equity.

19.    On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TRWF, JMJAV, D4FR, and JMJ ("Windmill Exercise Letter"). A copy of the Exercise Letter is attached as **Exhibit 22.** The Windmill Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Windmill Farms, Forney, Texas." SPC attached to the Windmill Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Parc at Windmill Project from D4FR to SPC, once HUD consented to the transfer. A copy of the form of Agreement is attached to **Exhibit 22.** SPC also attached a check for $100.00 as required consideration. A copy of the check is attached to **Exhibit 22.** The letter was delivered on October 4, 2022 at 8:16 am. A copy of the confirmation of receipt is attached as **Exhibit 23.**

20.    After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Parc at Windmill Farms. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (i) the Windmill Exercise

Declaration of Bradley Muth

Page 8 of 21

Letter; (ii) the Windmill Amended and Restated Pledge and Security Agreements; (iii) the Windmill Assignment; (iv) the Windmill Note; and (v) the Windmill Letter Loan Agreement and amendments. SPC also provided the Receiver with a description of the HUD loan documents. A copy of the November 3, 2022 letter is attached as **Exhibit 24.**

21.    Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so. SPC wrote:

> The terms of the [HUD] Mortgage Documents allow for an assumption of the loan, subject to the approval of Greystone and HUD. Section 7.15 of the [Windmill Amended and Restatement Pledge Agreements] provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the Parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such a purchase must be submitted with the signed TPA application.

**Bellwether Ridge Project**

22.    SPC exercised its option to own the apartment complex property known as the Bellwether Ridge Apartments ("Bellwether" or "Bellwether Project"). Bellwether is located in Desoto, Texas. It consists of nine residential buildings and one clubhouse. The residential buildings total 150 units with a total rentable area of 140,511 square feet.

**A. HUD holds the Mortgage Loan on Bellwether**

23.    Similar to Parc at Windmill Farms, SPC outsourced the developer role to Barton for the Bellwether Project. Barton used JMJ as developer. To obtain a mortgage loan for Bellwether, Barton used as the borrower his company, D4DS, LLC, a Texas limited liability company ("D4DS"). D4DS obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4DS. The loan was for the principal amount of $19,021,200.00.

24.     To finalize the loan, D4DS executed HUD loan documents on or about October 1, 2017, including a Promissory Note and Deed of Trust. Copies of the Promissory Note and Deed of Trust are attached as **Exhibit 25** and **Exhibit 26.** The Loan was modified to reduce the principal amount to $18,608,100.00.

**B.  SPC's Mezzanine Loan on Bellwether**

25.     SPC provided the Bellwether Project with equity financing to fund the construction of the Bellwether Project in the form of a convertible loan. JMJ, as borrower, executed a note in favor of SPC, as lender, in the principal amount of $3,800,000.00 (the "Bellwether Note"). A copy of the Bellwether Note is attached as **Exhibit 27.**

26.     Similar to Parc at Windmill Farms, JMJ provided to SPC security for the Bellwether Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4DS's parent company, JMJD4. Specifically: TWRF holds a 100% membership interest in JMJAV. In turn, JMJAV holds a 1% membership interest in JMJD4, and Enoch holds the remaining 99% membership interest in JMJD4. TWRF, JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4 (collectively, "Bellwether Amended and Restated Pledge and Security Agreements"). Copies of the Bellwether Amended and Restated Pledge and Security Agreements are attached as **Exhibits 28**, **Exhibit 29** and **Exhibit 30.** As a result, TRWF, JMJAV and Enoch pledged to JMJ 100% of the member interests in JMJAV and JMJD4, which JMJ assigned to SPC.

27.     JMJ signed an Assignment of Pledge and Security Agreement ("Bellwether Assignment"). A copy of the Bellwether Assignment is attached as **Exhibit 31.** As a result, all of the equity interest in D4DS's parent company, JMJD4, was pledged to SPC (the "Bellwether

Declaration of Bradley Muth                                                                 Page 10 of 21

Collateral" or "Bellwether Pledged Equity"). Importantly, the Bellwether Assignment granted SPC the right to convert the loan to equity, discussed immediately below.

28.    Each of the Bellwether Amended and Restated Pledge and Security Agreements also included Section 7.15's "Conversion Option," granting SPC an option to acquire either the Bellwether Pledged Equity or the Bellwether Project for consideration of $100.00.

29.    On May 13 and 14, 2020, multiple UCC financing statements were filed. They were as follows:

- Texas UCC Financing Statement, Filing # 20-0017679567 (Enoch)

- Delaware UCC Financing Statement, Filing # 20203378223 (TRWF)

- Texas UCC Financing Statement, Filing # 20-0017975172 (JMJAV)

- Texas UCC Financing Statement, Filing # 20-0017192082 (JMJAV)

- Delaware UCC Financing Statement, Filing # 20203275759 (JMJD4)

True and correct copies of the Financing Statements are attached as **Exhibit 32**, **Exhibit 33**, **Exhibit 34**, **Exhibit 35** and **Exhibit 36**.

30.    The following year, on July 6, 2021, pursuant to the Agreement for Purchase and Sale, D4DS agreed to sell Bellwether to SPC affiliate APTS at Bellwether Ridge, LLC ("APTS"). Additionally, the agreement stated that if SPC decided to exercise the Conversion Option, APTS will now be the entity that receives the $100.00 consideration. A copy of the Agreement for Purchase and Sale is attached as **Exhibit 37.**

**C. SPC Exercises its Option to Convert its Loan to Equity.**

31.     SPC exercised its option set forth in the Bellwether Amended Pledge and Security Agreements. The option allowed SPC to acquire the equity for the consideration of $100.00. SPC exercised its option, thereby converting the loan to an ownership interest to acquire the equity.

32.     On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TRWF, JMJAV, JMJD4, D4DS, and JMJ ("Bellwether Exercise Letter"). A copy of the Bellwether Exercise Letter is attached as **Exhibit 38.** The Bellwether Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Bellwether Ridge, DeSoto, Texas." SPC attached to the Bellwether Exercise Letter a "First Amendment to the Purchase and Sale Agreement" to complete the transfer of the Bellwether Project from APTS to SPC, once HUD consented to the transfer. The First Amendment extended the Financing Contingency Period to March 31, 2023, due to HUD taking longer than expected to approve. A copy of the amendment is attached to **Exhibit 38.** SPC also attached a check for $100.00 as required consideration, which is also attached to **Exhibit 38**. The letter was delivered at 8:16 a.m. on October 4, 2022. A copy of the receipt of confirmation is attached as **Exhibit 39.**

33.     After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Bellwether. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (i) the Bellwether Exercise Letter; (ii) the Bellwether Amended and Restated Pledge and Security Agreements; (iii) the Bellwether Assignment; (iv) the Bellwether Note; and (v) the Bellwether Letter Loan Agreement. SPC also provided the Receiver with a description of the HUD loan documents. A copy of the November 3, 2022 Letter is attached as **Exhibit 40.**

34.    Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so. SPC wrote:

> The terms of the [HUD] Mortgage Documents allow for an assumption of the loan, subject to the approval of Greystone and HUD. Section 7.15 of the [Bellwether Amended and Restatement Pledge Agreements] provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the Parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such a purchase must be submitted with the signed TPA application.

**Convertible Debt**

35.    It is helpful to explain convertible debt. With convertible debt, an entity borrows money from a lender, like a typical loan. Unlike a typical loan, however, convertible debt allows the debt to be converted to equity at a later date. This is because the lender will typically offer the loan at a lower rate since the lender can later obtain equity in the company. A debtor sometimes agrees to take on convertible debt if the debtor planned to only temporarily hold the asset, which is what happened here.

36.    For example, Company A borrows money from Bank B. Under the agreement, Bank B obtains the right to convert the debt into 100% company equity. Subsequently, Bank B exercises its right. Because of Bank's B exercise, Bank B now owns 100% of Company A. Company A, conversely, no longer owes money to Bank B.

37.    In this case, SPC extended convertible debt relating to the SPC Projects. This meant that SPC had the right to convert the debt into 100% equity ownership of the SPC Projects. This right was an integral part of the bargain at the time the convertible loans were made (and long before the Receiver was appointed). SPC converted the debt into equity and is now the 100%

equity owner of Bellwether and Parc at Windmill Farms. Functionally, this is different from a traditional loan. The convertible loan carried an interest rate of 5%, which was much lower than the market capped rate of upwards to at least 10% to 15% or more one would expect at the time of the loans, taking into account the nature of the risk of a mezzanine loan of all equity)..

38.    Classifying SPC's interests in the SPC Projects as solely "loans" is inaccurate because it does not provide full context. As shown by the TCI and SPC accounting records, discussed below, SPC effectively treated the properties as investments because it intended on exercising its exclusive right to convert its debt to 100% equity.

**Parc at Windmill Farms and Bellwether were SPC's Investments, not Loans**

39.    Attached to my Declaration as **Exhibit 41** is a copy of SPC's "Audited Consolidated Financial Statements" as of December 31, 2021 ("SPC 2021 Financial Statements"). Attached to my Declaration as **Exhibit 42** is a copy of SPC's "Interim Unaudited Consolidated Financial Statements" as of September 30, 2022 ("SPC Interim 2022 Financial Statements"). These financial statements address Parc at Windmill Farms and Bellwether. The SPC financial statements show that SPC considered Parc at Windmill Farms and Bellwether to effectively be ownership investments, not merely loans.

40.    Before explaining further, some context is crucial. SPC is listed on the Tel Aviv Stock Exchange, not the New York Stock Exchange. Because of this, SPC's financial statements are based on International Financial Reporting Standards ("IFRS"). IFRS uses fair market value instead of historical cost, which is used in the United States. With this in mind, an analysis of SPC's financial statements can be better understood.

41.    To start, Note 10 in the SPC 2021 Financial Statements is titled, "Notes Receivable." Ex. 41 at p. 30. The table, shown below, includes Parc at Windmill Farms and

Declaration of Bradley Muth                                                    Page 14 of 21

Bellwether:

| Borrower / Project | Carrying Value | | Interest Rate | Maturity Date |
|---|---|---|---|---|
| | 2021 | 2020 | | |
| Autumn Breeze(1) | $    10,365 | $    4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $    79,507 | $   47,850 | | |

42.    Below the table, the 2021 Financial Statements explain that SPC owns convertible debt in the properties listed in the table, including Parc at Windmill Farms and Bellwether. It states the following:

> "The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property." *Id.*

The 2021 Financial Statements add further explanation, stating:

> "The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued." *Id.*

The 2022 Financial Statements mirror this point, adding:

> "The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals." Ex. 42 at p. 9.

43.    Combining the above statements, and the table, make clear that SPC carried the notes receivable for these convertible loans, not at the loan amounts, but at the value of equity based primarily on the appraised value of the properties, as prescribed by IFRS rules, showing that SPC treated the properties in the way SPC would as owner of the properties.

Declaration of Bradley Muth

44.    First, SPC owned convertible debt "into a 100% ownership interest" in both properties. Ex. 41 at p. 30. This is different from a typical loan because SPC could, "at its option," obtain 100% ownership interest in both properties. *Id.* SPC did just that on October 3, 2022 when it exercised its option to acquire 100% equity interest in Parc at Windmill Farms and Bellwether.

45.    Second, SPC explains that it had the properties valued by "independent external valuation experts" or "third-party appraisals." *Id.;* Ex. 42 at p. 9. If these were simply loans, SPC would not have gone through the process of having the properties appraised for the purpose of determining their carrying values. Such an action is consistent with ownership because SPC was expending resources to ascertain the properties' values, as opposed to simply waiting for a return on its loan.

46.    Importantly, SPC expended resources on the properties in many ways other than paying Barton a developer's fee and reimbursing his expenses. SPC utilized in-house staff and resources to participate in the development of both properties. SPC also performed many services for both properties, including, among others, identifying land sites; overseeing and managing entitlement efforts; controlling and funding planning and design efforts; assembling and maintaining required documents for the land development projects; managing and approving the construction process; providing certificates of deposit and cash collateral to obtain Letters of Credit; funding change orders and costs overruns; and managing the operations and leasing of properties.

47.    If these were merely loans, then SPC would not have expended extensive resources into completing the above services for both properties. This is shown in SPC's financial statements, which show that SPC carried the notes receivable for the convertible value of the loans, not at the

stated loan amounts, but at the value of equity based on the appraised value of the properties. This demonstrates that SPC treated the properties as it would if it owned the properties.

**Comparing SPC's Financial Statements with TCI 10Ks**

48.     TCI is SPC's parent company. TCI's 10Ks encompass SPC's financial statements. As stated above, TCI is a real estate company that specializes in the acquisition, development, ownership, and management of multifamily and commercial real estate. TCI is a publicly traded company that is listed on the New York Stock Exchange and has public shareholders.

49.     Unlike SPC's financial statements, which are based on international standards, TCI's 10Ks are completed in accordance with Generally Accepted Accounting Principles ("GAAP") and U.S. Securities and Exchange Commission ("SEC") regulations. According to the SEC, per Staff Accounting Bulletin No. 104, revenue can only be recognized when collectability is reasonably assured.

50.     It is important that TCI did not recognize interest income under SPC's mezzanine loans because of the view that TCI, through SPC, would exercise its right of conversion for ownership. TCI would not be expected to recognize the interest income because when it chose to exercise its conversion rights, as it planned, such interest income would have been forgiven, per the mezzanine loans.

51.     This is shown in TCI's 10Ks. In its 10Ks, TCI accrued, but fully reserved, interest income recognition on the convertible loans. Under the SPC mezzanine loans, any uncollected interest income is forgiven in the event of conversion. TCI had the ability and the intent to convert the SPC mezzanine loans into 100% equity interest in Bellwether and Parc at Windmill Farms. TCI, through SPC, exercised its rights. Any interest was forgiven once TCI exercised its

convertible rights. Since TCI planned to exercise its right, it did not recognize interest income on the convertible loans.

52.    As mentioned, TCI 10Ks and SPC's financial statements differ due to TCI being listed on the New York Stock Exchange and SPC being listed on the Tel Aviv Stock Exchange. SPC's financial statements are based on fair market value, whereas TCI's are based on historical cost. The difference between these values is shown in the tables below. Compare the difference in value for the properties between SPC's 2021 financial statements (the first table) and TCI's 2021 10Ks (the second table) for each document's "Notes Receivable" section:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $ 10,365 | $ 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $ 79,507 | $ 47,850 | | |

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| ABC Land and Development, Inc. | $ 4,408 | $ 4,408 | 9.50 % | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50 % | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00 % | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00 % | 11/1/2026 |
| Forest Pines(1) | 6,472 | 2,869 | 5.00 % | 11/1/2022 |
| Lake Wales | 3,000 | 3,000 | 9.50 % | 6/30/2026 |
| Legacy Pleasant Grove | 496 | 496 | 12.00 % | 10/23/2022 |
| McKinney Ranch | 4,554 | 4,554 | 6.00 % | 9/15/2022 |
| One Realco Land Holding, Inc. | 1,728 | 1,728 | 9.50 % | 6/30/2026 |
| Parc at Ingleside(1) | 3,700 | 2,523 | 5.00 % | 11/1/2026 |
| Parc at Opelika(1) | 2,305 | — | 10.00 % | 1/13/2023 |
| Parc at Windmill Farms(1) | 7,830 | 7,803 | 5.00 % | 11/1/2022 |

53.    If SPC viewed the properties as mere loans, then it would have listed the properties in accordance with the cost of the loan, not the properties' market value. In other words, if SPC viewed the properties as loans, then the carrying value listed in its financial statements would match the carrying value listed in TCI's 10Ks. Instead, SPC had the properties appraised by independent valuators, an act consistent with ownership of the real estate.

**TCI's 10Ks Also Show that Parc at Windmill Farms is not a Mere Loan**

54.    I am aware that the SEC refers to TCI's 10Ks to assert that SPC's interests in Bellwether and Parc at Windmill Farms amounted to loans. This is not accurate when one considers the comprehensive picture. TCI's 10Ks, as far back as 2018, are attached as exhibits to my Declaration. Attached to my Declaration as **Exhibit 43** is the TCI Form 10-K for fiscal year ended December 31, 2021 ("2021 10K"), as **Exhibit 44** is the TCI Form 10-K for fiscal year ended December 31, 2020 ("2020 10K"), as **Exhibit 45** is the TCI Form 10-K for fiscal year ended December 31, 2019 ("2019 10K"), as **Exhibit 46** is the TCI Form 10-K for fiscal year ended December 31, 2018_ ("2018 10K") and as **Exhibit 47** is the TCI Form 10-K for fiscal year ended December 31, 2017_ ("2017 10K").

55.    In the attached 2020 10K and 2021 10K, TCI describes its interest in Parc at Windmill Farms not as a loan, but as a "note . . . convertible, at our option, into a 100% ownership interest." Ex 43 at p. 42; Ex. 44 at p. 41. The 2018 10K and 2019 10K provide that TCI "intends to service and hold for investment the mortgage notes in [TCI's] portfolio." Ex. 45 at p. 57; Ex. 46 at p. 48. "Servic[ing] and hold[ing] for investment" a convertible loan is not consistent with a mere loan; it is consistent with property ownership.

56.    SPC, which TCI owns, exercised its option on October 3, 2022, when it converted its note for Parc at Windmill Farms into a 100% ownership interest. SPC is now the sole owner of Parc at Windmill Farms.

**TCI's 10Ks also Show that Bellwether is not a Mere Loan**

57.    In its 10Ks, TCI always included Bellwether as a "Notes Receivable" or a "Mortgage Loan." In the 10Ks, there is a table listing all notes receivable TCI owns. TCI had

convertible debt into 100% ownership interest for all entities included in the table. Bellwether was included in each table. An example of such a table is included below. Ex. 43 at p. 42.

**9. Notes Receivable**

The following table summarizes our notes receivables at December 31, 2021 and 2020:

| Borrower / Project | Carrying Value | | Interest Rate | Maturity Date |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | | |
| ABC Land and Development, Inc. | $ 4,408 | $ 4,408 | 9.50 % | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50 % | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00 % | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00 % | 11/1/2026 |

Under the table, the 2020 10K and the 2021 10K state, "[t]he note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property." Ex. 43 at p. 42; Ex. 44 at p. 41.

58.     SPC had the right to convert its loan regarding Bellwether into 100% equity. TCI withheld recognizing interest income concerning Bellwether because it intended to exercise its right to conversion for Bellwether. SPC did not view Bellwether as a mere loan; it viewed Bellwether as an investment property it intended to, and did, fully acquire.

**VAA Joint Venture.**

59.     SPC commenced development of Parc at Windmill Farms and Bellwether in 2017. Thereafter, more than a year later, in November 2018, TCI formed a joint venture with Macquarie Group, Ltd. The joint venture was Victory Abode Apartments, LLC ("VAA"). VAA held a large portfolio of real estate properties, including properties financed by HUD. The VAA portfolio resulted in TCI reaching its limitation on HUD financing. On or about September 16, 2022, VAA completed the closing on a sale of substantially all of its real estate properties. The VAA sale resulted in bringing TCI back down under HUD limitations and allowed for SPC to proceed to hold additional HUD-financed properties. It is important that until September 16, 2022, SPC was not able to hold additional HUD-financed properties, and that to comply with HUD regulations,

App. 21

SPC had to wait until after September 16, 2022 to exercise its option to convert Parc at Windmill Farms and Bellwether to equity and keep the existing HUD debt in place.

**Business Records**

60.    I am a custodian of records for SPC, responsible for ensuring that SPC maintains accurate and complete records of its regularly conducted activities. Attached to my Declaration are Exhibits 1 through 47 from SPC. These exhibits were made at or near the time of the events referenced in each exhibit by, or from information transmitted by, someone with knowledge of the facts; were kept by SPC in the course of regularly conducted activity; and were made as part of the regular practice of that activity.

I declare under penalty of perjury that the foregoing is true and correct."

Executed in Dallas County, State of Texas, on the 10th of March 2023.

_____
BRADLEY MUTH

App. 23

# EXHIBIT 1

OMB Approval No.2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

# NOTE
## (MULTISTATE)

### HUD Project No. *113-35682*
### HUD Project Name: *Parc at Windmill Farms Apartments*

US $36,240,000.00                     As of December 1, 2017

FOR VALUE RECEIVED, the undersigned, D4FR LLC, a Texas limited liability company (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Servicing Corporation, Inc., a Georgia corporation, the principal sum of Thirty Six Million Two Hundred Forty Thousand and 00/100 Dollars (US $36,240,000.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of Three and 90/100 per centum (3.90%).*

1.      **Defined Terms.**  As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances under Section 13 of the Security Instrument to protect the security of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only

to the extent that they interpret, clarify and implement terms in this Note rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site).

The definition of any capitalized term or word used herein can be found in this Note and, if not found in this Note, then found in the Regulatory Agreement between Borrower and HUD and/or the Security Instrument.

2.    **Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at <u>419 Belle Air Lane, Warrenton, VA 20186</u>, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

3.    **Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

(a)  Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on <u>January 1, 2018</u> and on the first day of each month thereafter up to and including <u>February 1, 2020</u> (**"Last Interest Only Payment Date"**). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of <u>One Hundred Forty Nine Thousand Two Hundred Fourteen and 83/100 Dollars (US $149,214.83)</u>, shall be payable on the first day of each month beginning on <u>March 1, 2020</u> (**"Amortization Commencement Date"**), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on February 1, 2060 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (**"Maturity Date"**).

(b)    Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

4.    **Security.**  The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note

---

("**Security Instrument**"), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

5.  **Application of Payments.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument.  Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

6.  **Acceleration.**  If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower.  If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable.  Lender may exercise this option to accelerate regardless of any prior forbearance.  Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

7.  **Late Charge.**  If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to two percent of the unpaid principal and interest due in such month.  Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses.  Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

8.  **Exculpation; Remedies.**

(a)  Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced

App. 26

thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)    Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c)  Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

## 9.    Voluntary and Involuntary Prepayments.

(a)    This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1.  In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

(b)      Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)      Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, or (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)      Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)      Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)      If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)      All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

**10.      Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

App. 28

**11.    Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**12.    Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

**13.    Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

**14.    Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

**15.    Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

**16.    Governing Law; Consent to Jurisdiction and Venue.**
(a)    This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

App. 29

(b)    Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**17.    Rules of Construction.**  The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

**18.    Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

**19.    Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. § 3701, *et seq.*, as amended, when HUD is the holder of the Note.

**20.    Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

App. 30

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

**21.  WAIVER OF TRIAL BY JURY.  BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**See Rider 1 to Note containing modifications to the Note, attached hereto and incorporated herein by this reference.**

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

App. 32

NOTE (Multistate)

State of Texas

<u>D4FR LLC</u>

To

<u>Greystone Servicing Corporation, Inc.</u>

Project No.:  <u>113-35682</u>

Initially endorsed for insurance under <u>§221(d)(4)</u> of the National Housing Act, as amended, and regulations published thereunder in effect on <u>August 25, 2017</u> to the extent of advances approved by HUD.

By: _____ Date: <u>December 14</u>, 20<u>17</u>

Print Name: <u>Lisa Farmer (Acting)</u>
Title:  <u>Authorized Representative</u>

At final endorsement, a total sum of $_____has been approved for insurance hereunder by HUD.

By: _____ Date: _____ , 20___

Print Name: _____
Title:  <u>Authorized Representative</u>

**RIDER 1 TO NOTE**
**From**
**D4FR LLC**
**TO**
**GREYSTONE SERVICING CORPORATION, INC.**
**In the original principal sum of $36,240,000.00**

1.    This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4FR LLC, a Texas limited liability company (the "Borrower"), to Greystone Servicing Corporation, Inc., a Georgia corporation (the "Lender") dated as of December 1, 2017 (the "Note").

2.    Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to March 1, 2020.  Borrower shall have the right, on or after March 1, 2020, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  In the event of any prepayment of principal at any time on or after March 1, 2020, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from March 1, 2020 through February 28, 2021 | 10% |
| from March 1, 2021 through February 28, 2022 | 10% |
| from March 1, 2022 through February 28, 2023 | 8% |
| from March 1, 2023 through February 29, 2024 | 7% |
| from March 1, 2024 through February 28, 2025 | 6% |
| from March 1, 2025 through February 28, 2026 | 5% |
| from March 1, 2026 through February 28, 2027 | 4% |
| from March 1, 2027 through February 29, 2028 | 3% |
| from March 1, 2028 through February 28, 2029 | 2% |
| from March 1, 2029 through February 28, 2030 | 1% |
| from March 1, 2030 and thereafter | None |

App. 34

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Borrower shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

3.      Notwithstanding the provisions of Paragraph 2 above, the provisions of Paragraph 2 shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms of the Deed of Trust of even date given by Maker to the holder of this Note to secure said indebtedness.  Any prepayment made pursuant to this Paragraph 3 shall be deemed to have been made on the last day of the month in which such payment is received by holder.

[signatures appear on subsequent page]

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**END OF RIDER 1**

# EXHIBIT 2

**Kaufman County**
**Laura Hughes**
**County Clerk**

## Instrument Number: 2017-0028852

### DEED OF TRUST

Party: _____ D4FR LLC _____

Billable Pages: 52
Number of Pages: 53

| FILED AND RECORDED – REAL RECORDS | CLERKS COMMENTS |
|---|---|
| **On:** 12/13/2017 at 03:29 PM | E-RECORDING |
| **Document Number:** 2017-0028852 | |
| **Receipt No:** 17-28243 | |
| **Amount:** $ 230.00 | |
| **Vol/Pg:** V:5534 P:167 | |



STATE OF TEXAS
COUNTY OF KAUFMAN
I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded in the Official Public Records of Kaufman County, Texas.

*Laura A. Hughes*

Laura Hughes, County Clerk

Recorded By: _____ Kylie Doss _____ , Deputy

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

**Record and Return To:**
LAWYERS TITLE INSURANCE COMPANY - DFW
16479 DALLAS PKWY STE 390
ADDISON, TX   75001



App. 38

OMB Approval No.2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

*222 8005339*

**Recording Requested by:**
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

**After Recording return to:**
Leslie F. Dominy
Greystone Servicing Corporation, Inc.
419 Belle Air Lane
Warrenton, VA 20186

## MULTIFAMILY DEED OF TRUST
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

## (Texas)

**HUD Project Number: 113-35682**
**Project Name: Parc at Windmill Farms Apartments**

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

---

Previous editions are obsolete                    HUD MF Security Instrument                    HUD-94000M (06/14)

2

## MULTIFAMILY DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS AND
## SECURITY AGREEMENT

THIS MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS (**"Security Instrument"**), is made as of this 1st day of December, 2017 among D4FR LLC, a limited liability company organized and existing under the laws of the State of Texas, whose address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, as grantor, trustor and borrower (**Borrower**), to Thomas Kelly Derryberry, as trustee (**Trustee**), a person whose address is 504 Autumn Springs Ct, Suite 26, Franklin, TN 37067, for the benefit of Greystone Servicing Corporation, Inc., as beneficiary and as Lender (**Lender**), a corporation organized and existing under the laws of State of Georgia, whose address is 419 Belle Air Lane, Warrenton, VA 20186.

Borrower, in consideration of the Indebtedness and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee and Trustee's successors and assigns, in trust, with power of sale, the Mortgaged Property, including the Land located in Kaufman County, State of Texas and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Trustee and Trustee's successors and assigns.

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on February 1, 2060, in the principal amount of Thirty Six Million Two Hundred Forty Thousand and 00/100 Dollars (US $36,240,000.00) (**"Loan"**), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property. Borrower covenants that Borrower shall warrant and defend generally such title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

3

**Covenants.**  Borrower and Lender covenant and agree as follows:

**1. DEFINITIONS.**  The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a)    **"Borrower"** means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally).  Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note.  Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b)    **"Building Loan Agreement"** means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c)    **"Business Day"** is defined in Section 31.

(d)    **"Claim"** is defined in Section 48(m).

(e)    **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f)  **"Contract of Insurance"** is defined in 24 C.F.R. Part 207, Subpart B.

(g) **"Environmental Inspections"** is defined in Section 48(h).

(h) **"Event of Default"** means the occurrence of any event listed in Section 22.

---

App. 41

4

(i) **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods and property, and including but not limited to: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

(j) **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

(k) **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

(l) **"Impositions"** and **"Imposition Deposits"** are defined in Section 8(a).

(m) **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(n) **"Indebtedness"** means the principal, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document including prepayment premiums, late charges, default interest, and advances as provided in Section 13 to protect the security of this Security Instrument.

(o) **"Indemnitees"** is defined in Section 48(k).

---

Previous editions are obsolete                    HUD MF Security Instrument                    HUD-94000M (06/14)

App. 42

5

(p)    **"Land"** means the estate in realty described in <u>Exhibit A</u>.

(q)    **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.  (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)    **"Lender"** means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)    **"Lien"** is defined in Section 17.

(t)    **"Loan"** is defined in the opening paragraphs of this Security Instrument.

(u)    **"Loan Application"** is defined in Section 41.

(v)    **"Loan Documents"** means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)    **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

(1)    the Land;

(2)    the Improvements;

(3)    the Fixtures;

(4)    the Personalty;

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (06/14)

App. 43

6

(5)  all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)  all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)  all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)  all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)  all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)  all Rents and Leases;

(11)  all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative

---

Previous editions are obsolete  HUD MF Security Instrument  HUD-94000M (06/14)

App. 44

7

housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)  all Imposition Deposits;

(13)  all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)  all forfeited tenant security deposits under any Lease;

(15)  all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)  all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)  all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property. These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Surplus Cash and loan repayments).

(x)  **"Note"** means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

(y)  **"Notice"** is defined in Section 31.

(z)  **"O&M Program"** is defined in Section 48(b).

(aa)  **"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building

App. 45

8

materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to: Reserve for Replacement accounts, bank accounts, residual receipts accounts, and investments.

(bb) **"Principal"** is defined in 24 C.F.R. 200.215, or any successor regulation.

(cc) **"Project"** and **"Project Assets"** mean the Mortgaged Property.

(dd) **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm, or a successor location to that site).

(ee) **"Property Jurisdiction"** is defined in Section 30(a).

(ff) **"Regulatory Agreement"** means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

---

Previous editions are obsolete     HUD MF Security Instrument     HUD-94000M (06/14)

(gg)    **"Remedial Work"** is defined in Section 48(i).

(hh)    **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past due, or to become due, residual receipts, and escrow accounts, however and whenever funded and wherever held.

(ii)    **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

(jj)    **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair.  During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

(1)    physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

(2)    fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

(3)    fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

(4)    materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

(5)    retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

10

## 2. UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.

This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, "UCC Collateral"), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD. Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral. Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

App. 48

11

### 3. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.

(a) As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b) After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically

App. 49

12

terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice. Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution

App. 50

of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

14

## 4. ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.

(a) As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b) Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c) Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession. Prior to Lender's actual

---

App. 52

15

entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)     Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)     Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect. All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

(f)     Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations. Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender. Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed.

All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

App. 53

16

(g)   Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

5.     **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.**  Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument.  Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

6.     **EXCULPATION.**   Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

7.     **DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.**

(a)     Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums:

(1)     an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i) If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to

---

App. 54

17

accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii) If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)     a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)     all payments and deposits mentioned in the two preceding subsections of this Section and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i) mortgage insurance premium charges under the Contract of Insurance;

(ii) ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii) interest on the Note; and

(iv) amortization of the principal of the Note.

18

(b)     Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)     Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.  Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

## 8.  IMPOSITION DEPOSITS.

(a)     In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same.  Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same.  All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand.  In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums  due under Section 7(a)(3) shall be credited to Borrower.  If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3).  The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the **"Imposition Deposits"**.  The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as **"Impositions"**.  The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added.  Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower

App. 56

19

for which Imposition Deposits are required.  Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)     Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations.  Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing.  Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or residual receipts account (if any).  Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note.  Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)     If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender.  Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender.  Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)     If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or residual receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits.  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

9.     **REGULATORY AGREEMENT.**  Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument.  Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

10.     **APPLICATION OF PAYMENTS.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3).

App. 57

20

Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

11. **COMPLIANCE WITH LAWS.** Borrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, subpart G, and any successor regulations; including but not limited to those of the foregoing pertaining to: health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments. Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11. Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property. Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

12. **USE OF PROPERTY.** Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

App. 58

21

### 13.  PROTECTION OF LENDER'S SECURITY.

(a)  If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)  Any amounts advanced by Lender for taxes, special assessments, water rates, which are liens prior to the Security Instrument, insuring the Project and mortgage insurance premiums, paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note.  So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)  Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

### 14.  INSPECTION.
Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

### 15.  BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)  Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the

App. 59

22

operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property.  The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)     If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)     Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time.

(d)     Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year.  If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year.  Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender.  If Borrower fails to provide in a timely manner the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness.  Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)     Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

App. 60

23

## 16.   TAXES; OPERATING EXPENSES.

(a)    Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition.  If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits.  Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

(d)    Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)    Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (06/14) |
|---|---|---|

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM   Page 25 of 53    B: OPR V: 5534 P: 191

24

**17. LIENS; ENCUMBRANCES.** (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("**Lien**") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument. (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or residual receipts, except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

**18. PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.** Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

App. 62

25

## 19.    PROPERTY AND LIABILITY INSURANCE.

(a)    Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage. If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note. If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance. If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)    All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

App. 63

26

(c)      Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)      All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations.  Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)      Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)      In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender.  Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable.  Borrower shall notify Lender of any payment received from any insurer.  Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due.  No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

27

(g)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.  Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD.  In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable.  If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)     If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

## 20.   CONDEMNATION.

(a)     Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.  Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action.  Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1)

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (06/14)

28

any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b)     All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note.  After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration.  No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award.  Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

21.     TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.

(a)     So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations.  Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21.  Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)     If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (06/14)

29

Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

    **22.**    **EVENTS OF DEFAULT.**  The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

    (a)    Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) or (b) of this Security Instrument.

    (b)    Covenant Events of Default shall include:

        (1)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

        (2)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

        (3)    any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

        (4)    so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required

30

under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)     Lender shall deliver to the Principal(s) of Borrower, Notice, as provided in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide the Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

**23.     REMEDIES CUMULATIVE.**  Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**24.     FORBEARANCE.**

(a)     So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note.  However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)     Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other

31

payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

**25.    LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

**26.    WAIVER OF STATUTE OF LIMITATIONS.** To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

**27.    WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

32

28. **FURTHER ASSURANCES.** Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

29. **ESTOPPEL CERTIFICATE.** Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are unmodified and in full force and effect  (or, if there have been modifications, that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Security Instrument, and the Note and (so long as the Loan is insured or held by HUD, the Regulatory Agreement) (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, (so long as the Loan is insured or held by HUD, the Regulatory Agreement) and this Security Instrument; and (f) any additional facts requested by Lender.

30. **GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)     This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD as such local or state laws may be preempted by federal law.

(b)     Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any

---

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM   Page 34 of 53    B: OPR V: 5534 P: 200

33

security for the Indebtedness, or this Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

### 31.    NOTICE.

(a)     All notices, demands and other communications (**"Notice"**) under or concerning this Security Instrument shall be in writing.  Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument , and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 31, the term (**"Business Day"**) means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business.  When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day.  Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)     Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31.  Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

34

(c)     Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.

**BORROWER:**
> D4FR LLC
> Attn: Timothy Barton
> 1755 Wittington Place, Suite 340
> Dallas, TX 75234

**PRINCIPAL(S):**
| Timothy Barton | TLB 2012 Irrevocable Trust |
| 1755 Wittington Place, Suite 340 | Attn: Saskya Bedoya |
| Dallas, TX  75234 | 1755 Wittington Place, Suite 340 |
| | Dallas, TX  75234 |

**LENDER:**
> Greystone Servicing Corporation, Inc.
> Attn: General Counsel
> 419 Belle Air Lane
> Warrenton, VA 20186

32.     **SALE OF NOTE; CHANGE IN SERVICER.**  The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower.  A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note.  If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

33.     **SINGLE ASSET BORROWER.**  Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the management and operation of the Mortgaged Property, and so long as the Loan is

35

insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

        34.     **SUCCESSORS AND ASSIGNS BOUND.**  This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

        35.     **JOINT AND SEVERAL LIABILITY.**  If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

        36.     **RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

        (a)     The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower.  Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

        (b)     No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement.  Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

        37.     **SEVERABILITY; AMENDMENTS.**  The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect.  This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument.  This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

        38.     **RULES OF CONSTRUCTION.**  The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.  Any reference in this Security Instrument to an

---

36

"**Exhibit**" or a "**Section**" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term "**including**" means "including, but not limited to."

39.     **LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern; provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

40.     **DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

41.     **NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the "**Loan Application**") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of *Default*.

42.     **ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

---

37

**43.    ACCELERATION; REMEDIES.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note. Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note. Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**[INSERT PROVISIONS PERTAINING TO SALE AS APPROPRIATE UNDER STATE LAW]**

**44. FEDERAL REMEDIES.** In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. 3701 *et seq.*, as amended, when HUD is the holder of the Note.

**45.    REMEDIES FOR WASTE.** In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

(a)    the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

(b)    an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

(c)    recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security. So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole

App. 75

38

discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

46.    **TERMINATION OF HUD RIGHTS AND REFERENCES.** At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance. The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

47.    **CONSTRUCTION FINANCING.** The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern). If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof. The

39

Indebtedness shall, at the option of Lender or holder of this Security Instrument and the Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement. This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

### 48. ENVIRONMENTAL HAZARDS.

(a)   Definitions:

(1)   **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (**"PCBs"**) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)   **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

40

(3)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)    Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender (**"O&M Program"**); (2) matters described in paragraph (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

(i)    any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(ii)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

(c)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(d)    Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the

App. 78

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM  Page 42 of 53   B: OPR V: 5534 P: 208

41

Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(e)    If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program. All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender. Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)    Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)    to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)    the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)    Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits

42

required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)     to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)     Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g)     Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Borrower's discovery of any Prohibited Activity or Condition;

(2)     Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (06/14) |

App. 80

43

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h)     Borrower shall pay promptly the costs of any environmental inspections, tests or audits (**"Environmental Inspections"**) required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist.  Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances.  The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections.  Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property.  Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections.  Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale.  Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work (**"Remedial Work"**) is necessary to comply with any Hazardous Materials Law that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials

---

44

Law, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so.  So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(j)     Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)     Borrower shall indemnify and if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender, hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, **"Indemnitees"**) from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise, arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions:

(i)     any breach of any representation or warranty of Borrower in this Section 48;

(ii)     any failure by Borrower to perform or comply with any of its obligations under this Section 48;

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

45

(iii)   the existence or alleged existence of any Prohibited Activity or Condition;

(iv)    the actual or alleged violation of any Hazardous Materials Law.

(l)     Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (**"Claim"**), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)     Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)     any amendment or modification of any Loan Document;

(2)     any extensions of time for performance required by any Loan Document;

(3)     the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)     the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)     the release or substitution in whole or in part of any security for the Indebtedness; and

(6)     Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)     Borrower shall, at its own cost and expense, do all of the following:

---

Previous editions are obsolete                HUD MF Security Instrument                    HUD-94000M (06/14)

46

(1)  pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48;

(2)  reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)  reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

(p)  In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)  The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument. Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the

47

available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)    So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)    To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

**49.**    (See Exhibit B)

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Security Instrument:

|X|    Exhibit A        Description of the Land (required).

|X|    Exhibit B        Modifications to Security Instrument

48

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed instrument.

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

STATE OF TEXAS        §
                      §
COUNTY OF Dallas      §

The foregoing instrument was acknowledged before me on this __5__ day of December, 20_17_by Timothy Barton, President of D4FR LLC, a Texas limited liability company.

[seal]

_____
Notary Public
Printed Name of Notary: Saskya Bedoya

My Commission Expires: July 21, 2018

> SASKYA BEDOYA
> Notary Public, State of Texas
> My Commission Expires
> July 21, 2018

App. 86

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

## EXHIBIT A
### DESCRIPTION OF THE LAND

BEING AN 18.451 ACRE TRACT OF LAND SITUATED IN THE J. HEATH SURVEY, ABSTRACT NO. 227, KAUFMAN COUNTY, TEXAS, AND BEING PART OF THAT TRACT OF LAND CONVEYED TO LEMAN DEVELOPMENT, LTD., PER DEED RECORDED IN VOLUME 1323, PAGE 281 OF THE DEED RECORDS OF KAUFMAN COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1" IRON ROD FOUND FOR CORNER IN THE NORTH RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO. 80 (300' RIGHT-OF-WAY), SAID POINT BEING THE MOST SOUTHERLY SOUTHWEST COMER OF THE ABOVE CITED LEMAN TRACT, SAID POINT ALSO BEING THE SOUTHEAST CORNER OF A TRACT OF LAND CONVEYED TO PROSPER CAPITAL MANAGEMENT, L.P., PER DEED RECORDED IN VOLUME 1994, PAGE 16 OF THE DEED RECORDS OF KAUFMAN COUNTY, TEXAS;

THENCE N. 45 DEG. 08 MIN. 31 SEC. W. ALONG THE MOST SOUTHERLY SOUTHWEST LINE OF SAID LEMAN TRACT, AND ALONG THE NORTHEAST LINE OF SAID PROSPER CAPITAL TRACT, A DISTANCE OF 582.59 FEET TO A 1/2" IRON ROD FOUND FOR CORNER, SAID POINT BEING THE MOST WESTERLY SOUTHWEST CORNER OF PHASE 1A PER THE RECORDED PLAT OF WINDMILL FARMS, PHASE 1A, 1B & 1C, AS RECORDED IN CABINET 2, PAGE 213 OF THE PLAT RECORDS OF KAUFMAN COUNTY, TEXAS;

THENCE S. 88 DEG. 30 MIN. 09 SEC. E. ALONG THE SOUTH LINE OF SAID WINDMILL FARMS, A DISTANCE OF 1635.57 FEET TO A 1/2" IRON ROD WITH CAP STAMPED "USA INC PROP. COR." FOUND (HEREINAFTER CALLED 1/2" IRON ROD FOUND) FOR CORNER AT THE MOST SOUTHERLY SOUTHEAST CORNER OF SAID WINDMILL FARMS;

THENCE N. 01 DEG. 29 MIN. 51 SEC. E ALONG THE EAST LINE OF SAID WINDMILL FARMS, A DISTANCE OF 349.33 FEET TO A 1/2" IRON ROD FOUND FOR CORNER IN THE SOUTH LINE OF CONCORD DRIVE (85' RIGHT-OF-WAY);

THENCE S. 87 DEG. 47 MIN. 14 SEC. E. ALONG THE SOUTH LINE OF SAID CONCORD DRIVE, A DISTANCE OF 335.85 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE INTERSECTION OF THE SOUTH LINE OF SAID CONCORD DRIVE WITH THE WEST LINE OF WINDMILL FARMS BOULEVARD (120' RIGHT-OF-WAY);

THENCE S. 06 DEG. 11 MIN. 24 SEC. E. ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, A DISTANCE OF 28.75 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE BEGINNING OF A CURVE TO THE RIGHT;

HUD-94000M (06/14)                                                    Legal Description

App. 87

App. 88

THENCE IN A SOUTHERLY DIRECTION, ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, AND ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 23 DEG. 53 MIN. 42 SEC., A RADIUS OF 940.00 FEET, A CHORD BEARING OF S. 05 DEG. 45 MIN. 27 SEC. W., A CHORD LENGTH OF 389.19 FEET AND AN ARC LENGTH OF 392.02 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE BEGINNING OF A REVERSE CURVE TO THE LEFT;

THENCE IN A SOUTHERLY DIRECTION, ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, AND ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 16 DEG. 36 MIN. 42 SEC., A RADIUS OF 1,060.00 FEET, A CHORD BEARING OF S. 09 DEG. 23 MIN. 57 SEC. W., A CHORD LENGTH OF 306.25 FEET AND AN ARC LENGTH OF 307.32 FEET TO A 1 /2" IRON ROD FOUND FOR CORNER;

THENCE S. 01 DEG. 05 MIN. 36 SEC. W. ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, A DISTANCE OF 25.19 FEET TO A 1" IRON ROD FOUND FOR CORNER IN THE NORTH LINE OF SAID U.S. HIGHWAY NO. 80;

THENCE N. 88 DEG. 30 MIN. 09 SEC. W. ALONG THE NORTH LINE OF SAID HIGHWAY, A DISTANCE OF 1480.84 FEET TO THE POINT OF BEGINNING, AND CONTAINING 18.451 ACRES OF LAND.

## EXHIBIT B
### MODIFICATIONS TO SECURITY INSTRUMENT

The following modifications are made to the text of the Security Instrument of which this Exhibit is a part:

### ADDENDUM
Texas

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

The following sections are inserted into the Security Instrument and made a part thereof:

43. Accelerations/ Remedies:

If Lender invokes the power of sale, Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction. Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

49. Trustee:

(a)    Trustee may resign by giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Instrument or shall fail or refuse to act in accordance with this Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Instrument. Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or

HUD-94000M-ADD
Security Instrument - Addendum

App. 89

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM   Page 53 of 53   B: OPR V: 5534 P: 219

otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)     Any successor Trustee appointed pursuant to this Section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)     Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Instrument, including the transmittal and posting of any notices.

THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE DOCUMENT IS TO BE RECORDED AND FILED.

HUD-94000M-ADD
Security Instrument - Addendum
#2017-0028852
Filed for Record in Kaufman County TX
12/13/2017 03:29:14 PM

# EXHIBIT 3

**SOUTHERN PROPERTIES CAPITAL, LTD**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

December ___, 2017

JMJ Development, LLC
1755 Wittington Place, Suite 340
Farmers Branch, Texas 75234

Re: Southern Properties Capital, LTD ("Lender") $7,300,000.00 loan
(the "Loan") to JMJ Development, LLC ("Borrower")

Gentlemen:

This letter loan agreement (the "Letter Loan Agreement") is executed by Lender and Borrower and will evidence and govern certain terms and provisions of the Loan. As a condition to closing of the Loan, Borrower shall deliver to Lender or perform the following:

1. Borrower shall execute and deliver to Lender a counterpart of this Letter Loan Agreement, the Promissory Note and the Assignment of Pledge and Security Agreement pledging the interest in JMJAV LLC and JMJD4, LLC.
2. All of the member interest in JMJAV LLC and in JMJD4 LLC have been pledged to Borrower by the owners of such member interests, TRWF LLC, JMJAV LLC and Enoch Investments, LLC. Borrower shall execute an Assignment of Pledge and Security Agreement which will assign such pledged member interests to Lender. Borrower shall cause the Agreement and Acknowledgment attached to the Pledge and Security Agreement which has been assigned to Lender to be executed by JMJAV LLC and JMJD4 LLC (the "Pledged Entities").
3. Lender shall have received a closing statement setting forth the source and uses of all funds related to the Loan.
4. Lender shall have received the following documents with respect to each of the Pledged Entities:
   a. Certificate of formation
   b. Operating agreement
   c. Organizational meeting minutes
   d. Certificate of existence from Secretary of State of formation
   e. Certificate of good standing or account status from state of formation
   f. Certificate of qualification to do business in Texas for any foreign entity, along with certificate of account status
   g. All certificates of member interest issued to Guarantor
5. Lender shall have received the following documents with respect to Borrower:
   a. Certificate of formation
   b. Operating agreement

App. 92

    c. Certified copy of resolutions authorizing the borrowing
    d. Certificate of existence
    e. Certificate of good standing

6. Borrower shall have paid all attorneys' fees and other costs incurred by Lender in connection with the Loan.

7. Borrower shall have delivered to Lender such additional documents as Lender may have reasonably requested in connection with the closing of the Loan, including, but not limited to the organizational documents of Borrower and resolutions authorizing the Loan.

8. Lender and Borrower anticipate that the Loan will not be fully funded at closing. From time to time thereafter, Lender may advance additional funds under the Promissory Note in order to provide the Borrower with funds for its ongoing operations. Any such advances shall bear interest and be repayable as set forth in the Promissory Note. Upon request, Borrower shall execute such additional documents or new notes as Lender may reasonably request in order to evidence any such additional advances.

9. "Event of Default", shall mean any event of default under the Promissory Note, Pledge and Security Agreement, Guaranty and under this Letter Loan Agreement and shall also include any event of default related to any financing (the "D4FR Loan") provided to D4FR, LLC in connection with the construction and operation of its real property and which is secured by such real property. Upon the occurrence of any default under the D4FR Loan, regardless of whether any party is or may be entitled to cure such default and regardless of whether the holder of such loan has commenced the exercise of remedies, Lender shall be entitled to exercise any and all remedies available under any of the documents evidencing, securing or governing the loan or at law or in equity.

LENDER:

Southern Properties Capital, LTD

By: _____
Name:_____
Title: _____

BORROWER:

JMJ Development, LLC

By: _____
Timothy Barton, President

App. 94

# EXHIBIT 4

## PROMISSORY NOTE

**$7,300,000.00**                                              **December __, 2017**

FOR VALUE RECEIVED, **JMJ DEVELOPMENT, LLC,** a Texas limited liability company ("Borrower"), having an address of 1755 Wittington Place, Suite 340, Farmers Branch, Texas 75234, hereby promises to pay to the order of **SOUTHERN PROPERTIES CAPITAL, LTD,** a British Virgin Islands corporation (together with its successors and assigns and any subsequent holders of this Promissory Note, the "Lender"), as hereinafter provided, the principal sum of **SEVEN MILLION THREE HUNDRED THOUSAND AND NO/100THS DOLLARS ($7,300,000.00)** or so much thereof as may be advanced or readvanced by Lender from time to time hereunder to or for the benefit or account of Borrower, together with interest thereon at the Note Rate (as hereinafter defined), and otherwise in strict accordance with the terms and provisions hereof.

### ARTICLE ONE
### DEFINITIONS

1.1    *Defined Terms.*  Any capitalized terms used in this Promissory Note ("Note") are defined as they are introduced or in Section 4.22 hereof.  All terms used herein, whether or not defined hereof, and whether used in singular or plural form, shall be deemed to refer to the object of such term whether such is singular or plural in nature, as the context may suggest or require.

### ARTICLE II
### PAYMENT TERMS

2.1    *Payment of Principal and Interest.*  Prior to any Event of Default, as defined in Section 2.8 hereof, interest on the principal balance of this Note shall accrue at the rate of **five percent (5.0%)** per annum ("Applicable Rate").  No payments shall be due hereunder until **May 1, 2020** ("Maturity Date"), when the entire remaining unpaid principal balance of this Note and any and all accrued but unpaid interest herein shall be due and payable in full.

2.2    *Application.*  Except as expressly provided herein to the contrary, all payments on this Note shall be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon), including, without limitation, any and all fees owed to Lender, for which either Borrower shall be obligated or Lender shall be entitled pursuant to the provisions of this Note or the other Loan Documents, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the direct order of maturity. If an Event of Default exists under this Note or under any of the other Loan Documents, then Lender may, at the sole option of Lender, apply any such payments, at any time and from time to time, to any of the items specified in clauses (i), (ii) or (iii) above without regard to the order of priority otherwise specified in this Section and any application to the outstanding principal balance hereof may be made in either direct or inverse order of maturity.

Promissory Note
Southern Properties-JMJ Development, LLC                    1

App. 96

2.3    *Payments.*  All payments under this Note made to Lender shall be made on the first (1st) day of each month, without offset, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private.  Payments by check or draft shall not constitute payment in immediately available funds until the required amount is actually received by Lender in full.  Payments in immediately available funds received by Lender in the place designated for payment on a Business Day prior to 12:00 noon Central time at said place of payment shall be credited prior to the close of business on the Business Day received, while payments received by Lender on a day other than a Business Day or after 12:00 noon Central time on a Business Day shall not be credited until the next succeeding Business Day.  If any payment of principal or interest on this Note shall become due and payable on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.  Any such extension of time for payment shall be included in computing interest which has accrued and shall be payable in connection with such payment.

2.4    *Computation Period.*  Interest on the indebtedness evidenced by this Note shall be computed on the basis of a three hundred sixty (360) day year and shall accrue at the Applicable Rate on the actual number of days elapsed for any whole month in which interest is being calculated, but on the actual number of days for any partial month in which interest is being calculated.  In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to the close of business on the Business Day received.

2.5    *Prepayment.*  This Note may not be prepaid in part or in full.

2.6    *Unconditional Payment.*  Borrower is and shall be obligated to pay all principal, interest and any and all other amounts which become payable under this Note or under any of the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction whatsoever and without any reduction for counterclaim or setoff whatsoever.  If at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any Debtor Relief Law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

2.7    *Partial or Incomplete Payments.*  Remittances in payment of any part of this Note other than in the required amount in immediately available funds at the place where this Note is payable shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in full in accordance herewith and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.  Acceptance by Lender of any payment in an amount less than the full amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default in the payment of this Note.

Promissory Note
Southern Properties-JMJ Development, LLC                    2

2.8    *Interest on Unpaid Interest, Late Payment Charges; Default Interest Rate, Etc.* In the event any payment of interest is not paid on the date when due, interest shall accrue thereon as set forth herein on a compounded basis until paid in full. Further, in the event any Monthly Payment is not paid within **ten (10) days** of the date when due, Borrower shall pay a late payment charge in an amount equal to **five percent (5%)** of the late payment in order to offset Lender's increased administrative costs resulting from such late payment. For so long as any Event of Default exists under this Note or under any of the other Loan Documents, and in addition to all other rights and remedies of Lender hereunder, interest shall accrue on the outstanding principal balance hereof at the Default Interest Rate, and such accrued interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or Event of Default, and such late charges and accrued interest are reasonable estimates of those damages and do not constitute a penalty. Borrower shall also pay an additional $35.00 fee for any check which is not honored.

## ARTICLE III
## EVENT OF DEFAULT AND REMEDIES

3.1    *Event of Default.* The occurrence or happening, at any time and from time to time, of any one or more of the following shall immediately constitute an "Event of Default" under this Note:

(a)    Prior to the Maturity Date, by acceleration or otherwise, Borrower shall fail, refuse or neglect to pay and satisfy, in full and in the applicable method and manner required, any required payment of principal or interest or any other portion of the indebtedness evidenced by this Note as and when the same shall become due and payable or within five (5) days of such date, whether at the stipulated due date thereof, at a date fixed for payment, or *immediately* on the Maturity Date, by acceleration or otherwise Borrower shall fail, refuse or neglect to pay and satisfy in full and in the applicable method and manner required, the indebtedness evidenced by this Note; or

(b)    The occurrence of any other default, breach or event of default as defined in or under this Note or any other Loan Document that remains uncured under and pursuant to the provisions of this Note or any other Loan Document.

3.2    *Remedies.* Upon the occurrence of an Event of Default, Lender shall have the immediate right, at the sole discretion of Lender and without notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action **(ALL OF WHICH BORROWER HEREBY EXPRESSLY WAIVES AND RELINQUISHES)** (i) to declare the entire unpaid balance of the indebtedness evidenced by this Note (including, without limitation, the outstanding principal balance hereof, including all sums advanced or accrued hereunder or under any other Loan Document, and all accrued but unpaid interest thereon) at once immediately due and payable (and upon such declaration, the same shall be at once immediately due and payable) and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity, (ii) to foreclose any liens and security interests

Promissory Note
Southern Properties-JMJ Development, LLC                    3

securing payment hereof or thereof (including, without limitation, any liens and security interests covering any portion of the mortgaged Property), and (iii) to exercise any of Lender's other rights, powers, recourses and remedies under this Note, under any other Loan Document, or at law or in equity, and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, singly, successively, or concurrently against Borrower or others obligated for the repayment of this Note or any part hereof, or against any one or more of them, or against the mortgaged Property, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, it being agreed by Borrower that the exercise, discontinuance of the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse, and (d) are intended to be, and shall be, nonexclusive. All rights and remedies of Lender hereunder and under the other Loan Documents shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the mortgaged Property or any portion thereof. Without limiting the provisions of Section 4.18 hereof, if this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs and expenses of collection, including, but not limited to, Lender's attorneys' fees, whether or not any legal action shall be instituted to enforce this Note and whether or not such attorneys' fees shall be related to any bankruptcy proceeding of Borrower.

## ARTICLE IV
## GENERAL PROVISIONS

4.1    *No Waiver; Amendment.*  No failure to accelerate the indebtedness evidenced by this Note by reason of an Event of Default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced by this Note or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted under this Note, under any of the other Loan Documents or by any applicable laws. Borrower hereby expressly waives and relinquishes the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. The failure to exercise any remedy available to Lender shall not be deemed to be a waiver of any rights or remedies of Lender under this Note or under any of the other Loan Documents, or at law or in equity. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender specifically, unequivocally and expressly agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, or modification is sought.

4.2    *Waivers.*  EXCEPT AS SPECIFICALLY PROVIDED IN THE LOAN DOCUMENTS TO THE CONTRARY, BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION OR ANY OTHER NOTICES OR ANY OTHER ACTION. BORROWER

Promissory Note
Southern Properties-JMJ Development, LLC                    4

App. 99

AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO THE BENEFITS OF ANY MORATORIUM, REINSTATEMENT, MARSHALING, FORBEARANCE, VALUATION, STAY, EXTENSION, REDEMPTION, APPRAISEMENT, EXEMPTION AND HOMESTEAD NOW OR HEREAFTER PROVIDED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA AND OF EACH STATE THEREOF, BOTH AS TO ITSELF AND IN AND TO ALL OF ITS PROPERTY, REAL AND PERSONAL, AGAINST THE ENFORCEMENT AND COLLECTION OF THE OBLIGATIONS EVIDENCED BY THIS NOTE OR BY THE OTHER LOAN DOCUMENTS.

4.3    *Interest Provisions.*

(a)    *Savings Clause.* It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note then owing by Borrower to Lender. All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the

rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

4.4    *Use of Funds*. Borrower hereby warrants, represents and covenants that (i) the loan evidenced by this Note is made to Borrower solely for the purpose of acquiring real property for commercial purposes or carrying on a business or commercial enterprise, (ii) all proceeds of this Note shall be used only for business and commercial purposes, and (iii) no funds disbursed hereunder shall be used for personal, family, agricultural or household purposes.

4.5    *Further Assurances and Corrections*. From time to time, at the request of Lender, Borrower will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Note or in any other Loan Document or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver, record and/or file (or cause to be executed, acknowledged, delivered, recorded and/or filed) such further documents and instruments (including, without limitation, further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents) and perform such further acts and provide such further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Note and the Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Note and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Note and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

4.6    *Waiver of Jury Trial*. BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

4.7    *Governing Law; Submission to Jurisdiction*. This Note is executed and delivered as an incident to a lending transaction negotiated and consummated in **Dallas County, Texas**, and shall be governed by and construed in accordance with the laws of the **State of Texas**. Borrower, for itself and its successors and assigns, hereby irrevocably (i) submits to the nonexclusive jurisdiction of the state and federal courts in **Texas**, (ii) waives, to the fullest extent permitted by law, any objection that it may now or in the future have to the laying of venue of any litigation arising out of or in connection with this Note or any Loan Document brought in the

Promissory Note
Southern Properties-JMJ Development, LLC                    6

App. 101

appropriate state or federal court located in **Dallas County, Texas,** (iii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum, and (iv) agrees that any legal proceeding against any party to any of the Loan Documents arising out of or in connection with any of the Loan Documents may be brought in one of the foregoing courts. Borrower hereby agrees that service of process upon Borrower may be made by certified or registered mail, return receipt requested, at its address specified herein. Nothing herein shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrower or with respect to any of Borrower's property in courts in other jurisdictions.    The scope of each of the foregoing waivers is intended to be all encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Borrower acknowledges that these waivers are a material inducement to Lender's agreement to enter into the agreements and obligations evidenced by the Loan Documents that Lender has already relied on these waivers and will continue to rely on each of these waivers in related future dealings. The waivers in this Section are irrevocable, meaning that they may not be modified either orally or in writing, and these waivers apply to any future renewals, extensions, amendments, modifications, or replacements in respect of any and all of the applicable Loan Documents. In connection with any litigation, this Note may be filed as a written consent to a trial by the court.

4.8    *Counting of Days*. If any time period referenced hereunder ends on a day other than a Business Day, such time period shall be deemed to end on the next succeeding Business Day.

4.9    *Relationship of the Parties*. Notwithstanding any prior business or personal relationship between Borrower and Lender, or any officer, director or employee of Lender, that may exist or have existed, the relationship between Borrower and Lender is solely that of debtor and creditor, Lender has no fiduciary or other special relationship with Borrower, Borrower and Lender are not partners or joint venturers, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

4.10    *Successors and Assigns*. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them. The terms "Borrower" and "Lender" as used hereunder shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them.

4.11    *Joint and Several Liability*. If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.

Promissory Note
Southern Properties-JMJ Development, LLC                7

4.12    *Time is of the Essence*. Time is of the essence with respect to all provisions of this Note and the other Loan Documents.

4.13    *Headings*. The Article, Section, and Subsection entitlements hereof are inserted for convenience of reference only and shall in no way alter, modify, define, limit, amplify or be used in construing the text, scope or intent of such Articles, Sections, or Subsections or any provisions hereof.

4.14    *Controlling Agreement*. In the event of any conflict between the provisions of this Note and any of the other Loan Documents, it is the intent of the parties hereto that the provisions of this Note shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note and the other Loan Documents and that this Note and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

4.15    *Notices*. Unless otherwise expressly provided herein, all notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the intended addressee, (iii) by delivery to a reputable independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee, or (iv) by prepaid telegram, telex, telecopier or telefacsimile transmission to the addressee, so long as the same is immediately followed by delivery pursuant to one of the methods under (i) through (iii) above. Notice so mailed shall be effective two (2) days after its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective one (1) day after delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the office or designated place or machine of the intended addressee. For purposes of notice, the addresses of the parties shall be as set forth below; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' prior notice to the other party in the manner set forth herein. Electronic mail and internet websites may be used only to distribute only routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

If to Borrower:    JMJ Development, LLC
1755 Wittington Place, Suite 340
Farmers Branch, Texas  75234
Attention:    Timothy Barton

If to Lender:    Southern Properties Capital, LTD
1603 LBJ Freeway, Suite 800
Dallas, Texas  75234
Attention:    Mr. Steven Shelley

Promissory Note
Southern Properties-JMJ Development, LLC                8

4.16    *Severability.*  If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

4.17    *Right of Setoff.*  In addition to all liens upon and rights of setoff against the money, securities, or other property of Borrower given to Lender that may exist under applicable law, Lender shall have and Borrower hereby grants to Lender a lien upon and a right of setoff against all money, securities, and other property of Borrower, now or hereafter in possession of or on deposit with Lender, whether held in a general or special account or deposit, for safe-keeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Borrower.  No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by an instrument in writing executed by Lender.

4.18    *Costs of Collection.*  If any holder of this Note retains an attorney-at-law in connection with any Event of Default or at maturity or to collect, enforce, or defend this Note or any part hereof, or any other Loan Document in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to the principal balance hereof and all interest hereon, all costs and expenses of collection or incurred by such holder or in any such suit or proceeding, including, but not limited to, reasonable attorneys' fees.

4.19    *Gender.*  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.

4.20    *Statement of Unpaid Balance.*  At any time and from time to time, Borrower will furnish promptly, upon the request of Lender, a written statement or affidavit, in form satisfactory to Lender, stating the unpaid balance of the indebtedness evidenced by this Note and that there are no offsets or defenses against full payment of the indebtedness evidenced by this Note and the terms hereof, or if there are any such offsets or defenses, specifying them.

4.21    *Entire Agreement.*  THIS NOTE AND THE OTHER LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE HERETO AND THERETO WHICH ARE NOT CONTAINED HEREIN OR THEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE AND THE OTHER LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF

THE PARTIES HERETO.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

4.22    *Definitions*.  As used in this Promissory Note, the following terms shall have the following meanings:

Business Day:  A weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in **Dallas, Texas**, are authorized or required by law to be closed. Unless otherwise provided, the term "days" when used herein shall mean calendar days.

Charges:  All fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law.

Debtor Relief Laws:  Title 11 of the United States Code, as now or hereafter in effect, or any other applicable law, domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

Default Interest Rate: A rate per annum equal to the lesser of eighteen percent (18%) or the Maximum Lawful Rate. .

Loan Documents:  This Note, the Security Instrument, any guaranty agreement, any pledge, profit participation agreement, any financing statements, and such other agreements, documents and instruments now or hereafter governing, securing or guaranteeing any portion of the indebtedness evidenced by this Note or executed by Borrower or any guarantor or indemnitor or any other person or entity in connection with the loan evidenced by this Note or in connection with the payment of the indebtedness evidenced by this Note or the performance and discharge of the obligations related hereto or thereto, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, extensions and supplements hereof or thereof.

Promissory Note
Southern Properties-JMJ Development, LLC                    10

Maximum Lawful Rate:  The maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction evidenced by this Note and the other Loan Documents.

PE Accounts:  All bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited.

Pledged Entities:  Each of JMJAV, LLC and JMJD4, LLC.

Property:  The member interests in certain limited liability companies owned by TRWF, LLC and by JMJAV, LLC, as more particularly described in the Security Instrument, together with certain other rights, estates, interests, collateral and benefits now or at any time hereafter securing the payment of the indebtedness evidenced by this Note, whether by virtue of the Loan Documents or otherwise.

Security Instrument:  The **Security Agreement** dated as of the date hereof, executed by JMJAV, LLC for the benefit of JMJ Development, LLC, as beneficiary, relating to and granting a security interest in,  the Property, which security interest has been assigned to Lender.  The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, the Security Instrument and the other Loan Documents.

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note as of the day and year first written above.

## BORROWER:

**JMJ DEVELOPMENT, LLC**
a Texas limited liability company

By: _____
Timothy Barton, President

App. 107