**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | **CASE NO. 3:22-cv-2118-X** |
| **TIMOTHY BARTON ET AL.,** | § § § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § § § | |
| *Relief Defendants.* | § § | |

**APPENDIX VOLUME III**

**App. Nos. 393-595**

**IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S MOTION FOR INTERVENTION, OPPOSITION TO RECEIVER'S VERIFIED MOTIONS FOR APPOINTMENT OF APPRAISER, APPROVAL OF APPRAISERS, APPROVAL OF HEARINGS AND APPROVAL OF SALES AND BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY RELIEF WITH RESPECT TO PARC AT WINDMILL FARMS AND BELLWETHER RIDGE**

| Ex. No. | Title | App. No. |
|---|---|---|
| Ex. 29 | Bellwether Amended and Restated Pledge and Security Agreement (JMJAV) | App. 393-421 |
| Ex. 30 | Bellwether Amended and Restated Pledge and Security Agreement (Enoch) | App. 423-451 |
| Ex. 31 | Bellwether Assignment | App. 453-454 |
| Ex. 32 | UCC Financing Statement (Enoch) | App. 456-458 |
| Ex. 33 | UCC Financing Statement (TWRF) | App. 460-461 |
| Ex. 34 | UCC Financing Statement (JMJAV) | App. 463 |
| Ex. 35 | UCC Financing Statement (JMJAV) | App. 465-466 |
| Ex. 36 | UCC Financing Statement (JMJD4) | App. 468-469 |

| Ex. 37 | Agreement for Purchase and Sale | App. 471-509 |
|--------|--------------------------------|--------------|
| Ex. 38 | Bellwether Exercise Letter and First Amendment to Purchase Agreement | App. 511-514 |
| Ex. 39 | Confirmation of Receipt | App. 516-518 |
| Ex. 40 | Letter to Receiver | App. 520-521 |
| Ex. 41 | SPC 2021 Financial Statements | App. 523-572 |
| Ex. 42 | SPC Interim 2022 Financial Statements | App. 574-595 |

**RESPECTFULLY SUBMITTED BY:**

/s/ *C. Gregory Shamoun*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on March 10, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

| | |
|---|---|
| **C. Gregory Shamoun** | _____ FACSIMILE |
| State Bar No. 18089650 | _____ CERTIFIED MAIL, RRR |
| Email: g@snlegal.com | _____ U.S. FIRST CLASS MAIL |
| **Brian K. Norman** | _____ HAND DELIVERY |
| State Bar No. 00797161 | _X__ ELECTRONIC TRANSMISSION |
| Email: bkn@snlegal.com | |
| **J. BLAIR NORRIS** | |
| State Bar No. 24014515 | |
| Email: bn@snlegal.com | |
| **SHAMOUN & NORMAN, LLP** | |
| 1800 Valley View Lane, Ste 200 | |
| Farmers Branch, TX 75234 | |

*/s/ J. Blair Norris*
**J. BLAIR NORRIS**

# EXHIBIT 29

**AMENDED AND RESTATED**

**PLEDGE AND SECURITY AGREEMENT**

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of October ___, 2017, is from **JMJAV LLC**, a Texas limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns, "**Lender**").

RECITALS:

A.      Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $3,800,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.      To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated October ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1     Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-JMJAV LLC
Page 1

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)    the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)    all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)    Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)    to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)    all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)    all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Security Agreement
JMJ Development, LLC-JMJAV LLC                2

(i)     all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)     (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2     Definitions. As used herein, the following terms shall have the following respective meanings:

(a)     "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)     "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Security Agreement
JMJ Development, LLC-JMJAV LLC                    3

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)    "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest.    On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.    It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.    All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.    Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.    Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.    Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.    Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Security Agreement
JMJ Development, LLC-JMJAV LLC                4

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

ARTICLE III - REPRESENTATIONS, WARRANTIES AND
COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership. Pledgor owns 100% of the member interests in JMJD4 LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Section 3.6    No Financing Statements. Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    Certificated Securities. Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender. Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities. Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3. Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS. THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE. PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

Security Agreement
JMJ Development, LLC-JMJAV LLC                    6

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Security Agreement
JMJ Development, LLC-JMJAV LLC                7

Section 3.10    Authority, Enforceability, Etc.  The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

## ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    Transfer Rights.  Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights.  Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

Security Agreement
JMJ Development, LLC-JMJAV LLC            8

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

Security Agreement
JMJ Development, LLC-JMJAV LLC                    9

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights. Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)    Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this

Security Agreement
JMJ Development, LLC-JMJAV LLC                10

App.402

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative.  The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.  Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies.  Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

## ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral.  In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only.  If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral.  It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times.  Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures.  No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable.  All other demands, advertisements and notices are hereby irrevocably waived by Pledgor.  The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

Security Agreement
JMJ Development, LLC-JMJAV LLC                    11

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "**SEC**") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "**Securities Act**"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Security Agreement
JMJ Development, LLC-JMJAV LLC                12

App.404

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

Security Agreement
JMJ Development, LLC-JMJAV LLC                    13

App.405

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.    If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.  Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances.    Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.  Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc.    No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.  Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Security Agreement
JMJ Development, LLC-JMJAV LLC                    14

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices. All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Security Agreement
JMJ Development, LLC-JMJAV LLC                15

**JMJAV LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

Security Agreement
JMJ Development, LLC-JMJAV LLC                    16

App.408

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc.  The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor.  If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement.  This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof.  This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement.  There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury.  PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns.  This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14    Termination. Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15    Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)    As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4DS LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4DS LLC. Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)    In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4DS Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4DS Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4DS Property to Lender or Lender's assignee, and (iv) Each of Enoch Investments, LLC and TRWF LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4DS LLC, shall also have elected to transfer the D4DS Property to Pledgor. Upon receipt of such notice, Pledgor

Security Agreement
JMJ Development, LLC-JMJAV LLC          18

shall assemble all documents related to the D4DS Property and other information related to the D4DS Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4DS Property to Lender, and Pledgor shall cause D4DS to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4DS Property to Lender.

(c)    Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of Enoch Investments, LLC, and TRWF LLC, by and through D4DS LLC, as the owner of the D4DS Property, shall have the right to transfer and convey the D4DS Property to Lender in lieu of any transfer of the Collateral.

Section 7.16    Liability of Pledgor.    Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

Security Agreement
JMJ Development, LLC-JMJAV LLC                    19

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4DS Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4DS Loan;

material physical waste of the Collateral or the D4DS Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4DS Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4DS Property, (B) any awards received in connection with a condemnation of all or a portion of the D4DS Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4DS Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4DS Property which are not delivered to Lender upon a foreclosure of the D4DS Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4DS Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)     if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

Security Agreement
JMJ Development, LLC-JMJAV LLC                    20

App.412

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4DS Loan" shall mean any loan made to D4DS LLC, and secured by any real property owned by D4DS LLC.

"D4DS Property" means the real property and improvements owned by D4DS LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17     Budget Approval.  Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4DS Property to Lender for Lender's prior written approval (the "Approved Budget").  Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval.  If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR:**

JMJAV LLC

Security Agreement
JMJ Development, LLC-JMJAV LLC                    21

a Texas limited liability company

By: _____
      Timothy Barton

App.415

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---------|----------------|-----------------|
| JMJAV LLC | JMJD4 LLC | 1% of the member interests in JMJD4 LLC |

**Exhibit A**

**AGREEMENT AND ACKNOWLEDGMENT**

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by JMJAV LLC, a Texas limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.     Representations and Warranties. The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.     Covenants and Agreements.

(a)     Books and Records. The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4DS LLC, containing such detail and information as Lender may request.

(b)     UCC Matters. The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-JMJAV LLC                    1

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)    Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)    Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)    Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)    Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

Security Agreement
JMJ Development, LLC-JMJAV LLC                2

App.417

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)    The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.    Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.    No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-JMJAV LLC                3

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.      Transfers.  The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender.  In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender.  The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.      Further Assurances.  The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.      Reliance.  This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.      Counterparts.   This Agreement and Acknowledgment may be executed in counterparts.

9.      Miscellaneous.  The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

Security Agreement
JMJ Development, LLC-JMJAV LLC                    4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of October __, 2017.

**Pledged Entity:**

**JMJD4 LLC**

By: _____
Timothy Barton, President

Security Agreement
JMJ Development, LLC-JMJAV LLC                    5

App.420

## **Exhibit B**

### **Organizational Agreements**

# EXHIBIT 30

## AMENDED AND RESTATED

## PLEDGE AND SECURITY AGREEMENT

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of October ___, 2017, is from **ENOCH INVESTMENTS, LLC,** a Delaware limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC,** a Texas limited liability company (together with its successors and assigns, "**Lender**").

### RECITALS:

A.      Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $3,800,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.      To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated October ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1      Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC
Page 1

App.423

(a)     The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)     all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)     the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)     all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)     Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)     to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)     all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)     all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        2

(i)    all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)    (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral.  The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions.  As used herein, the following terms shall have the following respective meanings:

(a)    "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)    "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        3

App.425

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)    "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest.  On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.  It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.  All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.  Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.  Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        4

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

ARTICLE III - REPRESENTATIONS, WARRANTIES AND
COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership. Pledgor owns 100% of the member interests in JMJD4 LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        5

Section 3.6   No Financing Statements. Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7   Certificated Securities. Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender. Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities. Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3. Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS. THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE. PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          7

Section 3.10    Authority, Enforceability, Etc.  The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

## ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    Transfer Rights.  Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights.  Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        9

App.431

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights.  Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution.  Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights.  Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)    Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        10

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative. The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion. Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies. Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral. In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only. If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral. It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times. Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures. No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable. All other demands, advertisements and notices are hereby irrevocably waived by Pledgor. The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        11

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "SEC") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "Securities Act"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        12

App.434

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.   If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.   Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.   In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances.   Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.   Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc.   No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.   A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.   Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        14

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices.  All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        15

App.437

**ENOCH INVESTMENTS, LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.**

Section 7.5     Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6     Modification; Waiver in Writing.     No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7     Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

App.438

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        17

App.439

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14    Termination. Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15    Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)    As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4DS LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4DS LLC. Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)    In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4DS Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4DS Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4DS Property to Lender or Lender's assignee, and (iv) Each of JMJAV LLC and TRWF LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4DS LLC, shall also have elected to transfer the D4DS Property to Pledgor. Upon receipt of such notice, Pledgor shall assemble all

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        18

documents related to the D4DS Property and other information related to the D4DS Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4DS Property to Lender, and Pledgor shall cause D4DS to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4DS Property to Lender.

(c)    Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of JMJAV LLC, and TRWF LLC, by and through D4DS LLC, as the owner of the D4DS Property, shall have the right to transfer and convey the D4DS Property to Lender in lieu of any transfer of the Collateral.

Section 7.16    Liability of Pledgor.    Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4DS Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4DS Loan;

material physical waste of the Collateral or the D4DS Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4DS Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4DS Property, (B) any awards received in connection with a condemnation of all or a portion of the D4DS Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments  that can create liens on any portion of the D4DS Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4DS Property which are not delivered to Lender upon a foreclosure of the D4DS Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4DS Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4DS Loan" shall mean any loan made to D4DS LLC, and secured by any real property owned by D4DS LLC.

"D4DS Property" means the real property and improvements owned by D4DS LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17    Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4DS Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR:**

ENOCH INVESTMENTS, LLC

a Delaware limited liability company

By: _____

Timothy Barton

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC    22

App.444

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---|---|---|
| ENOCH INVESTMENTS, LLC | JMJD4 LLC | 99% of the member interests in JMJD4 LLC |

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        23

App.445

## Exhibit A

## AGREEMENT AND ACKNOWLEDGMENT

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by Enoch Investments, LLC, a Delaware limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.    Representations and Warranties.  The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.    Covenants and Agreements.

(a)    Books and Records.  The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4DS LLC, containing such detail and information as Lender may request.

(b)    UCC Matters.  The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          1

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)     Organizational Agreements.  The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender.  The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)     Notices; Defaults.   The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be.  The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default.  Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)     Proxy.  The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)     Restrictive Legend.  The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          2

App.447

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)    The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.    Events of Default; Sales of Collateral.  The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.    No Liability.  Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC         3

App.448

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.　　Transfers.　The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender.　In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender.　The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.　　Further Assurances.　The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.　　Reliance.　This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.　　Counterparts.　This Agreement and Acknowledgment may be executed in counterparts.

9.　　Miscellaneous.　The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of October __, 2017.

**Pledged Entity:**

**JMJD4 LLC**

By: _____
    Timothy Barton, President

App.450

App.451

## Exhibit B

### Organizational Agreements

# EXHIBIT 31

## ASSIGNMENT OF PLEDGE AND SECURITY AGREEMENT

THAT JMJ DEVELOPMENT, LLC, a Texas limited liability company,   ("Assignor"), for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, hereby transfers, assigns and sets over unto Southern Properties Capital, LLC , a British Virgin Islands corporation ("Assignee"), all of the right, title and interest of the Assignor in and to the security interests granted pursuant to the following:

(a) Pledge and Security Agreement dated October ___, 2017, executed by JMJAV LLC to JMJ Development, LLC, granting a security interest in one percent (1%) of the member interests in JMJD4 LLC;

(b) Pledge and Security Agreement dated October ___, 2017, executed by TRWF LLC to JMJ Development, LLC, granting a security interest in one percent (100%) of the member interests in JMJAV LLC;

(c) Pledge and Security Agreement dated October ___, 2017, executed by Enoch Investments, LLC to JMJ Development, LLC, granting a security interest in ninety-nine percent (99%) of the member interests in JMJAV LLC;

(d) Amended and Restated Pledge and Security Agreement dated October ___, 2017, executed by JMJAV, LLC to JMJ Development, LLC, granting a security interest in one percent (1%) of the member interests in JMJD4 LLC;

(e) Amended and Restated Pledge and Security Agreement dated October ___, 2017, executed by TRWF, LLC to JMJ Development, LLC, granting a security interest in one percent (100%) of the member interests in JMJAV LLC; and

(f) Amended and Restated Pledge and Security Agreement dated October ___, 2017, executed by Enoch Investments, LLC to JMJ Development, LLC, granting a security interest in ninety-nine percent (99%) of the member interests in JMJAV, LLC.

The above and foregoing Pledge and Security Agreements and the security interests and pledges granted therein are collectively referred to as the "Pledges."

TO HAVE AND TO HOLD the Pledges and above described security deposits and prepaid rents, together with any and all the rights and appurtenances thereto in anywise belonging to Assignor, unto Assignee, its successors, legal representatives and assigns FOREVER and Assignor does hereby bind itself and its legal representatives and successors to WARRANT AND FOREVER DEFEND all and singular the Pledges unto Assignee, its successors, legal representatives and assigns, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof.

1

Assignment of Pledge and Security Agreement
JMJ Development to Southern Properties

App.453

This is an absolute and present assignment of the Pledges by Assignor to Assignee. In the event that there is any default under that certain Promissory Note from Assignor to Assignee, then Assignee shall be entitled to all rights as secured party under the Pledges.

Assignor hereby agrees to indemnify and hold harmless Assignee from and against any and all losses incurred by Assignee as a result of claims brought against Assignee, as Assignor's successor in interest in the Pledges hereby assigned, relating to causes of action arising from any actions or omissions of the landlord under the Pledges occurring prior to the date hereof.

EXECUTED this _____ day of October, 2017

> JMJ DEVELOPMENT, LLC
> a Texas limited liability company
>
> By: _____
> Timothy Barton, President

2

Assignment of Pledge and Security Agreement
JMJ Development to Southern Properties

App.454

# EXHIBIT 32

Uniform Commercial Code
P.O. Box 13193
Austin,Texas 78711-3193

Ruth R. Hughs
Secretary of State

## Office of the Secretary of State

May 13, 2020

Page 1 of 1

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767 -

|  | |
|---|---|
| Filing Fee: | $30.00 |
| **Total Filing Fee:** | **$30.00** |

Re: **Texas UCC Initial Filing Acknowledgment**

The Texas Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed into our system.

Initial Filing Type: **Financing Statement**

Initial Filing Number: **20-0017679567**        Filing Date: **05/13/2020**        Filing Time: **11:56 a.m.**

Lapse Date: **05/13/2025**

Document Number: **970068230002**

| Party Type | Party Name and Address |
|---|---|
| Debtor | **ENOCH INVESTMENTS LLC** |
| | **1755 WITTINGTON PLACE SUITE 340, FARMERS BRANCH, TX, USA, 75234** |
| Secured Party | **SOUTHERN PROPERTIES CAPITAL LTD** |
| | **1603 LBJ FREEWAY, SUITE 280, FARMERS BRANCH, TX, USA, 75234** |

Please feel free to contact us at 512-475-2703 if you have any questions regarding the above information.

User ID: JHUNT

FILING NUMBER: 20-0017679567
FILING DATE: 5/13/2020 11:56 AM
DOCUMENT NUMBER: 970068230002
FILED: Texas Secretary of State
Received by Fax

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchin@bennettweston.com

**C. S**

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ENOCH INVESTMENTS LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1755 Wittington Place Suite 340 | Farmers Branch | TX / 75234 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX / 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - ENOCH INVESTMENTS Secured Interest - DOT UCC - TX SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## EXHIBIT "A"

100% of its interest in JMJD4 LLC which consist of 99% of the membership interest in JMJD4 LLC.

# EXHIBIT 33

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Date Chin, 214-350-3667

B. E-MAIL CONTACT AT FILER (optional)
dchin@bennettweston.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Bennett, Weston, Lajone & Turner P.C.
Attn:  Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234

Delaware Department of State
U.C.C. Filing Section
Filed: 12:46 PM 05/13/2020
U.C.C. Initial Filing No: 2020 3378223

Service Request No:  20203837199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME TRWF LLC | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 1755 Wittington Place Suite 340 | CITY Farmers Branch | STATE TX | POSTAL CODE 75234 | COUNTRY USA |

2 DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ Freeway, Suite 280 | CITY Farmers Branch | STATE TX | POSTAL CODE 75234 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable)   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - TRWF Secured Interest - DOT UCC - DE SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App.460

## EXHIBIT "A"

100% of its interest in JMJAV LLC which consist of 100% of the membership interest in JMJAV LLC.

App.462

# EXHIBIT 34

FILING NUMBER: 20-0017975172
FILING DATE: 5/14/2020 12:15 PM
DOCUMENT NUMBER: 970482800002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. S

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJAV LLC | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |
|---|---|---|---|---|

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |
|---|---|---|---|---|

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN JMJD4 LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN JMJD4 LLC.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative | | |
|---|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer | | ☐ Bailee/Bailor ☐ Licensee/Licensor | |

8. OPTIONAL FILER REFERENCE DATA:
JMJAV - JMJD4 - TX - STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App.463

# EXHIBIT 35

RECEIVED
MAY - 8 2020

20-0017192082
05/08/2020 04:34 PM
FILED
TEXAS SECRETARY OF STATE
SOS
969280960003

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchin@_____

**C. SEND**

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| JMJAV LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 13901 Midway Road Suite 102-LB 243 | Farmers Branch | TX / 75244 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX / 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Bellwether Ridge - JMJAV Secured Interest - DOT UCC - TX SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App.465

## EXHIBIT "A"

100% of its interest in D4DS LLC which consist of 1% of the membership interest in D4DS LLC.

# EXHIBIT 36

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Date Chin, 214-350-3667 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| dchin@bennettweston.com |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
Bennett, Weston, Lajone & Turner P.C.
Attn:  Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234
```

Delaware Department of State
U.C.C. Filing Section
Filed: 03:07 PM 05/08/2020
U.C.C. Initial Filing No: 2020 3275759

Service Request No:   20203644567

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| JMJD4 LLC |  |  |  |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|  |  |  |  |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 13901 Midway Road Suite 102-LB 243 | Farmers Branch | TX | 75244 | USA |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
|  |  |  |  |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|  |  |  |  |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD |  |  |  |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|  |  |  |  |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

4. COLLATERAL:  This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Bellwether Ridge - JMJD4 Secured Interest - DOT UCC - DE SOS Filing

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App.468

## EXHIBIT "A"

100% of its interest in D4DS LLC which consist of 98.5% of the membership interest in D4DS LLC.

# EXHIBIT 37

## AGREEMENT FOR PURCHASE AND SALE

This **AGREEMENT FOR PURCHASE AND SALE** (this "**Agreement**"), is made and entered into as of <u>July 6, 2021</u> (the "Effective Date"), by and between APTS AT BELLWETHER RIDGE, LLC, a Delaware limited liability company ("**Purchaser**"), and D4DS LLC, a Texas limited liability company ("**Seller**").

### WITNESSETH:

### ARTICLE 1: AGREEMENT FOR PURCHASE AND SALE

1.1    Seller agrees to sell and cause to be conveyed to Purchaser, and Purchaser agrees to purchase, the following real and personal property (collectively, the "**Project**") on the terms and conditions contained herein:

(a)    The real property located in the City of DeSoto, Dallas County, State of Texas, described with particularity on Exhibit "A" (the "**Land**") together with all existing buildings, structures, fixtures, amenities and improvements thereon situated including apartment units known as the Bellwether Ridge Apartments, and together with all easements and other rights appurtenant to such Land, as well as Seller's rights, titles and interests in and to the mineral rights for the Land, if any (together, the "**Property**");

(b)    Seller's interest as landlord in all leases and occupancy agreements affecting the Property reflected in the current rent roll attached hereto as Exhibit "C" (the "**Current Rent Roll**"), as updated by the certified Closing Rent Roll to be delivered by Seller to Purchaser at Closing (the "**Leases**") or any space therein and any prepaid rent and Seller's interest in all security deposits and guaranties;

(c)    Seller's right, if any, to the use of the name "Bellwether Ridge Apartments" in connection with the Property and any other trademarks, copyrights, trade names or other intangible rights associated with the Property in which Seller has a transferable right including any telephone numbers associated with on-site management and leasing operations, and website(s) and internet address(es) which relate to the Property (the "**Intangible Property**");

(d)    All of Seller's right, title and interest in and to all items of personal property owned by Seller and located at the Property and used in the operation thereof including, without limitation, plans, specifications, building supplies, marketing materials, boilers, HVAC equipment, alarms, signage, fittings, appliances, shades, wall-to-wall carpet, draperies, screens and screening, awnings, plants, shrubbery, landscaping, furniture, furnishings, office equipment, lawn care and building maintenance equipment, and other furnishings or items of personal property used in connection with the ownership and operation of the Land (the "**Personal Property**");

(e)    All of Seller's right, title and interest in and to all service contracts and agreements relating to the Property, to the extent such agreements are permitted under this Agreement (the "**Contracts**") (but specifically excluding management and leasing agreements ("**Management and Leasing Agreements**"), which will be terminated by Seller on or before

App.471

Closing), all rights of actions against previous owners of the Land and Improvements, and any unexpired warranties and guarantees relating to the Personal Property;

(f)     All of Seller's right, title and interest in and to any permits, certificates of occupancy or other licenses and governmental approvals held by Seller in connection with the ownership or operation of the Project (the "**Permits**"), to the extent that the same are assignable; and

(g) All escrows and reserves associated with the First Lien (hereinafter defined) for the Project, including, without limitation, the tax and insurance reserves, the MIP reserve and the replacement and repair reserve.

## ARTICLE 2:  PURCHASE PRICE

2.1     The purchase price (the "**Purchase Price**") for the Project shall be an amount equal to the First Lien Amount as hereinafter defined, payable as follows:

Assumption by Purchaser of the unpaid balance of the existing HUD-insured note and first lien mortgage, dated October 1, 2017, encumbering the Property in the original principal amount of $19,021,200.00, which amount was reduced to $18,608,100.00 by Modification Agreement, dated October 1, 2020 ("**First Lien**"). The amount to be assumed will be the outstanding principal balance, plus accrued but unpaid interest, as of Closing ("**First Lien Amount**").

2.2     (a)     Not later than three (3) business days after the Effective Date of this Agreement, Purchaser shall deliver a check in the amount of $1,000.00 ("**Earnest Money Deposit**") to Commonwealth Land Title Insurance Company (the "**Title Company**"), 5949 Sherry Lane, Suite 111, Dallas, Texas 75225, Attn: James P. Lazar ("**Escrow Agent**") to be held in escrow in an interest-bearing account pursuant to the terms of this Agreement pending the Closing.

(b)     As used in this Agreement, the term "Deposit" shall mean any sums, including the Earnest Money Deposit, and, if applicable, the Closing Extension Deposit, and instruments and accrued interest thereon, if any, held by Escrow Agent hereunder. The Deposit shall be applied to the Purchase Price at the Closing. If Purchaser desires to terminate this Agreement pursuant to a right granted to Purchaser in any section of this Agreement, Purchaser shall effect such termination by giving written notice thereof to Seller and Escrow Agent within any applicable time period provided therefor in this Agreement. Upon receipt of such notice, unless otherwise provided herein, Escrow Agent shall return the Deposit to Purchaser without the requirement of any further notice or instruction, this Agreement shall wholly cease and terminate, and no party to this Agreement shall have any further claim against, or obligation to, any other party to this Agreement except as expressly provided herein, and the lien, if any, of Purchaser against the Project shall automatically cease and terminate. In the event that notice shall not have been given or be deemed to have been given prior to the last day of the Inspection Period (as hereinafter defined) and Seller shall object to the disbursal of the Deposit, the Escrow Agent shall hold the Deposit pending a non-appealable adjudication by a court of competent jurisdiction or by joint written instructions of Seller and Purchaser.

## ARTICLE 3:  PHYSICAL CONDITION OF PROJECT, INSPECTION PERIOD

3.1    Purchaser will inspect the Project during the hereinafter described Inspection Period.  Purchaser acknowledges that Seller has not made and does not make and is unwilling to make any express or implied representations or warranties as to the present, past or future physical condition, income, expenses, operation, legality of occupancy or any other matter affecting or related to the Project except as specifically set forth in this Agreement.  No representation, warranty or covenant made by Seller in this Agreement or any document delivered pursuant hereto shall survive the Closing except as expressly provided in this Agreement.  Purchaser agrees to purchase the Project in its "AS IS" condition (but subject only to the express representations and warranties herein) with a complete waiver of any and all warranties as to the condition of the Project or its fitness for any purpose, other than as expressly provided herein, all in accordance with the waiver language to be included in the Special Warranty Deed conveying the Property to Purchaser (the "**Deed**").

3.2    Any documents, records or information provided to Purchaser in connection with Purchaser's inspection of the Project shall be kept in strictest confidence (but may be disclosed to Purchaser's agents, brokers, accountants, advisors, consultants, attorneys and prospective lenders or investors) and shall be returned to Seller in the event that this Agreement is canceled for any reason.  In the event that Purchaser elects not to proceed with this transaction, Purchaser shall deliver to Seller copies of all reports prepared for Purchaser by third-parties in connection with its inspection, without any representation as to the accuracy thereof, upon receipt of payment from Seller of the actual costs for such reports incurred by Purchaser.

3.3    Seller represents and warrants to Purchaser as of the date of this Agreement as follows:

(a)    Seller is a Texas limited liability company, duly formed, validly existing and in good standing in the state of its formation and is qualified to do business in Texas.

(b)    Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained.

(c)    All Due Diligence Materials delivered in furtherance of Purchaser's inspection of the Project, including all leases, lease correspondence, and rent rolls have been prepared and assembled in the ordinary course of business by Seller's fee manager, are believed to be true, complete and accurate and have been relied upon by Seller.

(d)    The Rent Roll is a true, correct and complete list of all of the Leases and rent roll for the Property.  The rents and other sums due or to become due under each Lease have not been assigned, encumbered or subjected to any lien by Seller.  Seller has provided Purchaser with true, correct and complete copies of all the Leases, including all amendments thereto.  To Seller's actual knowledge, which has not been contradicted by any written notice; (i) the Leases have been duly authorized and executed by the landlord, and, by the tenant thereunder, (ii) the Leases are in full force and effect according to the terms set forth therein, (iii) the Leases set

forth the entire agreement between landlord and tenant with respect to the premises affected thereby; (iv) there are no uncured defaults under the Leases; and (v) the Rent Roll and other financial information prepared by Seller as part of the Seller Deliveries are true and complete in all material respects. Seller has not (i) made any representations to any tenant regarding the condition of the premises covered by any Lease or the compliance of the premises with any applicable governmental regulations, except as expressly set forth in the Leases, (ii) granted any concessions to any tenant not disclosed in such Lease; or (iii) received any written notice of any defaults under the Leases. There are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property other than any agreements explicitly contained in the Leases. The Leases set forth all Tenant inducement costs and commissions that are currently due and payable or which have otherwise accrued with respect to any Lease. Other than as provided for in the Leases, there are no other agreements, oral or written, in connection with any Tenant inducement costs or leasing commissions that may become due and payable in the future in connection with any Lease.

(e)    The operating statements of the Project to be delivered by Seller to Purchaser during the Inspection Period were prepared in the ordinary course of business by Seller's fee manager, are believed to be accurate, and have been relied upon by Seller.

(f)    To the best knowledge of Seller, the Permits have been duly and validly issued, are in full force and effect.

(g)    To the best knowledge of Seller, there is no litigation or arbitration or other legal or administrative suit, action, proceeding of any kind pending against or involving Seller relating to Seller's ownership of the Property or any part thereof which would prevent Seller from conveying the Project in accordance with this Agreement. Except as may be described in the Due Diligence Materials, Seller has not received any notice from any Governmental Authority with respect to any violation of any applicable zoning ordinances and building codes, flood disaster laws and health and environmental laws, rules and regulations (hereinafter collectively called the "Applicable Laws").

(h)    Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

(i)    Seller owns fee simple title to the Property, subject to the exceptions of record.

(j)    Except for the Contracts, there will be no contracts or other agreements which affect or will affect or which are or will be obligations of the Purchaser or the Property after the Close of Escrow. All of the service contracts currently effecting the Property ("Service Contracts") may be terminated without penalty or other payment upon no more than thirty (30) days' notice except for the contract for electrical service.

(k)    To Seller's knowledge, the Property is not in violation of any recorded covenants, conditions, restrictions or other agreements recorded in the Real Property Records of Dallas County, Texas ("Recorded CC&Rs").

(l)    To the best of Seller's knowledge or as described in the Due Diligence Materials (i) the Property is free of hazardous wastes, materials, substances, urea formaldehyde, PCB's and all other toxic, radioactive or hazardous wastes, materials, substances or contaminations in excess of amounts permitted under applicable federal, state and local regulations (collectively, "Hazardous Materials"); and (ii) no Hazardous Materials have been stored, disposed or located upon the Property except in the ordinary course of business for a multi-family residential community.   Without in any way limiting the generality of above, neither the Property nor the Seller are the subject of any pending or, to the best of Seller's knowledge or as described in the Due Diligence Materials or the Violation, threatened investigation or inquiry by any Governmental Authority, or are subject to any remedial obligations under any Applicable Laws pertaining to health or the environment ("Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1987, as amended ("RCRA"), and this representation and warranty would continue to be true and correct following disclosure to any applicable Governmental Authority of all relevant facts, conditions and circumstances pertaining to the Property and/or the Seller.  Seller has taken all steps necessary to determine and has determined that no hazardous substances, solid wastes, or other substances known or suspected to pose a threat to health or the environment ("Hazards") have been disposed of or otherwise released on or to the Property or exist on or within any portion of the Property.  To the knowledge of Seller, or as otherwise disclosed in the Due Diligence Materials, no prior use, either by Seller or the prior owners of the Property, has occurred, which violates any Applicable Environmental Laws. The use which Seller makes of the Property will not result in the disposal or release of any hazardous substance, solid waste or Hazard on, in or to the Property.  The terms "hazardous substance" and "release" shall each have the meanings specified in CERCLA, and the terms "solid waste" and disposal" (or "disposed") shall each have the meanings specified in RCRA; provided, however, that in the event either that CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided further that, to the extent that the laws of the State of Texas establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader definition shall apply.  To the best of Seller's knowledge and belief, there has been no litigation brought or threatened nor any settlement reached by or with any parties alleging the presence, disposal, release, or threatened release, of any hazard substance, solid wastes or Hazards from the use or operation of the Property.  To the best of Seller's knowledge and belief after diligent investigation and inquiry, the Property is not on any federal or state "Superfund" list, nor subject to any environmentally related liens.

(m)    Except as set forth in the Title Commitment or Due Diligence Materials, there are no unpaid assessments (governmental or otherwise) for sewers, water, paving, electrical power or otherwise affecting the Property (matured or unmatured) and, to the best of Seller's knowledge, no such assessments are threatened.  There are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(n)    At the Closing there will be no unpaid bills or claims in connection with any repair of the Property or other work performed or materials purchased in connection with the

Property, or sufficient funds in the reasonable judgment of Purchaser shall be escrowed for such purpose.

(o)    Seller has not received any written notice from any governmental entity of any violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Seller.

(p)    There are no persons employed by Seller in connection with the operation of the Property, and there are no maintenance, advertising, management, leasing, employment, or service contracts affecting the Property that will be in effect at Closing except for the Contracts unless expressly assumed in writing by Purchaser. Otherwise, Seller shall terminate any such employee and any such contracts (not expressly assumed by Purchaser) other than the Contracts at or prior to the Closing.

If, at any time prior to Closing, Seller shall discover that any representation or warranty contained in this Article 3.3 is, or has become, inaccurate in any material respect, Seller shall so notify Purchaser in writing (the "Correction Notice"), and Purchaser shall have the right by notice given in writing not more than five (5) business days after receipt of the Correction Notice to terminate this Agreement and receive a refund of the Deposit. The representations and warranties contained in this Agreement shall survive one (1) year from the Closing Date.

3.4    Purchaser intends to conduct its physical inspection of the Project beginning on the Effective Date of this Agreement and ending at 5:00 p.m. Dallas, Texas time, thirty (30) days after the Effective Date ("**Inspection Period**"). The Purchaser's inspection shall be at the sole cost and expense of Purchaser and at times approved in advance by Seller's manager (not to be unreasonably withheld) so as to minimize disturbance to the operations of the Project, its employees, and guests. Seller shall reasonably assist with such inspection and shall provide Purchaser with access to the Project, but shall not be obligated to incur any material cost or expense in connection therewith or to furnish any information other than at the place where same is maintained. During the Inspection Period, Seller shall provide Purchaser with accurate and complete copies of, or permit Purchaser to review at the Property, all books and records in the possession of Seller or its agents relating to the Project, including, without limitation, all of the Leases, Contracts and Permits, all lease files and correspondence, all property tax bills in Seller's possession, utility bills, and repair and maintenance records with respect to the Property and Personal Property. All information received by Purchaser relating to the Project, Seller or its affiliates shall be kept in strict confidence (subject to the terms above) and used solely for the purpose of determining the advisability of proceeding with the transaction described in this Agreement. On or before five (5) days after the Title Company's receipt of the Deposit, Seller shall deliver to Purchaser or make the items described on Exhibit "D" (collectively, the "**Due Diligence Materials**") available to Purchaser for Purchaser's review:

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS INSPECTED AND INVESTIGATED THE PROPERTY (OR PRIOR TO THE CLOSING WILL HAVE INSPECTED AND INVESTIGATED THE PROPERTY) AND HAS ENTERED INTO THIS AGREEMENT BASED UPON SUCH INVESTIGATION AND INSPECTION AND

App.476

PURCHASER'S RIGHT TO CONDUCT THE INSPECTION AND INVESTIGATION PURSUANT TO THIS ARTICLE 3. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE ACT OF SALE, PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED FOR OR ON BEHALF OF SELLER.   EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF THE SELLER AND EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, SELLER HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF SUITABILITY, HABITABILITY, CONDITION, ELIGIBILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF AND SELLER HAS NO LIABILITY OF ANY KIND TO PURCHASER ON ACCOUNT OF THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

3.5     In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "**Option**"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties.  Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the Deposit is returned to Purchaser.

3.6     If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent at any time during the Inspection Period and have the Deposit, less the Option fee described in Section 3.5, above, returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement. If Purchaser does not give Seller and Escrow Agent written notice on or before 7 p.m. Central Time on the last day of the Inspection Period that Purchaser waives its right to terminate this Agreement pursuant to this Section 3.6, then Purchaser shall be deemed to have terminated this Agreement.

3.7     Purchaser shall have (10) ten days after the Inspection Period ("**Board Approval Period**") to obtain the approval of its Board of Managers to the transaction contemplated hereby. If Purchaser's Board of Managers approves this transaction, it shall give notice of such approval to Purchaser ("**Board Approval Notice**"). If Purchaser does not notify Seller within said period that such approval has been obtained, then this Agreement shall be deemed void ab initio and the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other.

3.8    Covenants.

(a)    Between the date of this Agreement and the Closing Seller shall continue to maintain the Property in accordance with Seller's prior practices, ordinary wear and tear, casualty losses and condemnation excepted.  During the term of this Agreement, Seller shall not take any action which would materially adversely affect the title to the Property.

(b)    Seller will cause fire and extended coverage insurance relating to the Property to be maintained in full force and effect at an amount no less than the full replacement cost of the Property.

(c)    Seller shall continue to operate the Property in accordance with its normal and customary practice after the Effective Date and prior to Closing, so that the Property will be in substantially the same condition on the Closing Date as on the Effective Date, reasonable wear and tear excepted.  After the Effective Date, Seller shall not, without approval of Purchaser enter into any new Service Contracts that are not cancelable without any penalty or fee on thirty (30) days' or less notice by Seller.  Seller shall terminate all Service Contracts related to the Property prior to Closing, unless Purchaser elects (prior to expiration of the Inspection Period) to assume such Service Contracts.  From and after the Effective Date through the Closing, Seller, at its sole cost and expense, shall   (i) not voluntarily subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters,  (ii) not make any alterations to the Property, except in the ordinary course of business, all of which Seller shall complete at its sole cost and expense prior to Closing,   (iii) pay for all capital and other improvements which are performed or contracted for by Seller at or prior to Closing, and   (iv) not accept from any tenant payment of rent more than one (1) month in advance, or apply any security deposit to rent or any other default by any tenant.  Seller shall continue to lease residential units in accordance with Seller's prior practices and market conditions.

(d)    Seller shall not remove any personal property from the Property without the consent of Seller unless the same is replaced by property of equal or greater value, and will make all necessary repairs and replacements during such time.

3.9    Conditions to Purchaser's Obligations.  Purchaser's obligation to purchase the Property shall be conditioned upon the satisfaction of each of the following conditions prior to or simultaneously with the Closing any of which may be waived by written notice from Purchaser to Seller:

(a)    Seller has complied with and otherwise performed the obligations of Seller set forth in this Agreement.

(b)    All representations and warranties of Seller as set forth in this Agreement shall be in all material respects substantively true and correct as of the date hereof and on the date of Closing (except for representations which by their terms are made as of a specific date or refer to a specific date).

(c)    Financing

(1)    Seller is the borrower under the First Lien in the original principal amount of $19,021,200.00. The First Lien is secured by a first mortgage lien on the Property. As provided in Section 2 herein, Seller and Purchaser have agreed that the Purchase Price in the amount of the outstanding principal balance thereof shall be paid via Purchaser's assumption of the First Lien. Because the Project will be encumbered by financing insured by HUD, closing of this transaction shall be subject to the approval by HUD and the lender under the First Lien ("Lender") of a Transfer of Physical Assets ("TPA") of the Project. Any and all documents to be executed by Seller in connection with the TPA shall be subject to Purchaser's approval, not to be unreasonably withheld, conditioned or delayed. From and after the consummation by Seller of the HUD Final Endorsement Closing with respect to the First Lien until the Closing or earlier termination of this Agreement, Seller authorizes Purchaser to contact Lender with respect to facilitating the TPA and assumption of the First Lien ("Loan Assumption"). The "**Financing Contingency**" shall be deemed satisfied when the parties have obtained conditional Lender and HUD approval to the TPA with conditions, including the form of the Loan Assumption documents, approved by Purchaser in its reasonable discretion. Provided Seller has provided Purchaser with all documents necessary including the Due Diligence Documents, Purchaser agrees to file the application for TPA with the Lender by the date that is fourteen (14) days after the Board Approval Period. If Lender requires additional information from Seller or Purchaser, Purchaser shall have a reasonable amount of time after receipt of such information required to make a filing or supplemental filing. In the event that on or before the 120th day following the Board Approval Period (the "**Financing Contingency Deadline**"), the Financing Contingency has not been satisfied, this Agreement will terminate, the Deposit shall be returned to Purchaser, and the parties shall have no further obligations hereunder (except for obligations that are expressly intended to survive termination of this Agreement). At all times prior to satisfaction of the Financing Contingency, whether by the Financing Contingency Deadline or the Extended Financing Contingency Deadline, Seller shall reasonably cooperate with Purchaser in such efforts, including without limitation the execution of any applications which are required to be executed by the existing owner of the Project and the furnishing of any and all information in its possession which is reasonably required by Purchaser in its efforts to obtain approval of the TPA and satisfy the Financing Contingency. Purchaser shall be required to pay all costs, fees, assumption fees, or other charges imposed or incurred by the Lender, HUD or Seller in connection with the TPA and the Loan Assumption, other than Seller's legal fees incurred therewith.

(d)    Purchaser shall at all times have the right to waive any conditions (other than those given under Section 3.9(c) above), provided that no such waiver shall be effective unless such waiver or waivers are in writing; provided that if Closing occurs and Purchaser has actual knowledge of the non-fulfillment of any such condition, such act of consummating Closing shall be deemed a waiver of such known, unfulfilled condition. Any such waiver shall be deemed a release of Seller and any liability of Seller, if any, as a result of the failure of such condition.

## ARTICLE 4:  PERMITTED ENCUMBRANCES TO TITLE

4.1    Purchaser agrees to accept title to the Property subject to the following matters (collectively, the "Permitted Encumbrances"):

(a)    Leases and tenancies reflected on the Rent Roll and such further Leases as may be entered into in accordance with this Agreement.

(b)    Liens securing payment of all ad valorem, intangible and other real and personal property taxes, special and general assessments, school taxes, and water and sewer charges against the Property or the Personal Property covered by this Agreement for the tax year in which the Closing Date occurs and subsequent years to the extent such items are properly apportioned under this Agreement, and the lien of any special taxes not entered of record against the Property on the Closing Date.

(c)    Servitudes, easements and restrictive covenants, if any, which are recorded in the land records of the County Clerk of Dallas County, Texas, as of the date hereof and which do not materially affect the marketability of the Property.

(d)    Matters approved or deemed approved pursuant to the terms of this Agreement.

(e)    Zoning ordinances and regulations and building restrictions and regulations affecting the Property on the Closing Date.

(f)    The First Lien.

(g)    All building, subdivision, land sales, securities, ecology, environmental protection and like laws, ordinances, rules and regulations of governmental authorities, including those of any and all regulatory agencies and administrative officials having or asserting jurisdiction over the Property.

## ARTICLE 5:  CONDITION OF TITLE, TITLE INSURANCE

5.1    Seller shall promptly obtain from the Title Company through Escrow Agent, and deliver to Purchaser, a title commitment or a preliminary report (the "Title Commitment") to issue a TLTA Owner's Policy of Title Insurance (the "Title Policy") insuring Purchaser's title to the Property to be good and indefeasible in the amount of the Purchase Price, containing coverage over all general exceptions subject to only the Permitted Encumbrances. A copy of the Title Commitment and legible copies of each of the documents of record reflected therein shall be furnished to the attorneys for Purchaser and Seller. Seller shall also deliver to Purchaser a copy of the Existing Survey. Within ten (10) days of receipt of the title materials described above, together with the Existing Survey, Purchaser shall give written notice (the "Objection Notice") to the attorney for Seller identifying with particularity any defect of title to which Purchaser objects (the "Objections") separately specifying and setting forth each such Objection. Seller shall be entitled to reasonable adjournments of the Closing Date not exceeding thirty (30) days in the aggregate, to cure the Objections, unless waived by Purchaser. If Purchaser gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the

App.480

Title Commitment which are not objected to in such Objection Notice shall be deemed to be Permitted Encumbrances.

5.2     Seller shall not be required to expend any money or bring any action or proceeding or do any other thing in order to deliver the Project or convey title to the Property as required by this Agreement or the Objection Notice.   If Seller gives Purchaser notice (the "Response Notice") that Seller is unable or unwilling to convey the Project or title to the Project as required by this Agreement or the Objection Notice, Purchaser may, as its exclusive remedy, elect by written notice given to Seller within five (5) days after the Response Notice is given, either (a) to accept such title as Seller is able to convey without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement, in which event the Deposit and Financing Period Extension Fee shall be returned to Purchaser.

5.3     If Purchaser shall fail to give timely notice of its election to terminate this Agreement, Purchaser shall be deemed to have accepted all matters reflected on the Title Commitment as Permitted Encumbrances.

5.4     Unpaid liens for real estate and personal property taxes for years prior to the fiscal year in which the Closing Date occurs and any other matters which Seller is obligated to pay and discharge at the Closing shall not be deemed objections to title, but the amount thereof chargeable to Seller, plus interest and penalties thereon charged by the taxing authority, if any, shall be deducted from the Purchase Price on the Closing Date and paid to the Title Company with instructions to pay and discharge such matters.

5.5     Closing costs associated with the Closing and typically paid by a seller including, but not limited to, deed stamps, transfer taxes, and Seller's attorneys' fees shall be paid by Seller. Seller shall pay all premiums and other fees associated with the Title Policy and survey to be delivered at Closing.  The cost of physical inspection, accounting, audit, and other investigations made in connection with Purchaser's due diligence, Purchaser's attorneys' fees and all other costs associated with the Closing shall be paid by Purchaser.

5.6     Time is of the essence with respect to the provisions of this Section 5.

## ARTICLE 6: CLOSING

6.1     Provided that all of the conditions of this Agreement shall have theretofore been satisfied, the closing (the "Closing") of the purchase and sale of the Property shall be conducted at the offices of the Escrow Agent (or at such other location as shall be mutually agreeable to Seller and Purchaser) on the date ("Closing Date") that is on or before ten (10) days after the Financing Contingency Deadline.

6.2     Upon Seller's and Purchaser's delivery of all required documents and instruments and payment of the Purchase Price and other amounts required herein, Purchaser and Seller shall prepare and sign a closing statement reflecting the adjustments and payments made and agreements in connection therewith.  Seller and Purchaser shall jointly deliver a copy of the closing statement and all of the aforesaid documents to the Title Company which shall do the following:

AGREEMENT FOR PURCHASE AND SALE   Page 11
1180677_1   Bellwether Ridge - D4DS to Apts at Bellwether Ridge - Agreement for Purchase and Sale6   8025.0024

App.481

(a)    Record the Deed and loan documents, if any, associated with this transaction.

(b)    Deliver to Seller and Purchaser or other appropriate party the documents and payments delivered to it as escrow holder for delivery to such party.

(c)    Pay all recording taxes and transfer fees and all filing fees reflected on the closing statement.

(d)    Issue the Title Policy and, if applicable, an endorsement to the existing Lender's Policy of Title Insurance.

(e)    File the reports required by Section 6045 of the Internal Revenue Code and regulations promulgated thereunder.

## ARTICLE 7: DOCUMENTS REQUIRED ON CLOSING DATE

7.1    At or prior to the Closing, Seller shall execute and/or deliver the following to Purchaser through Escrow Agent:

(a)    A Deed in a form reasonably acceptable to Seller and Purchaser and approved by HUD.

(b)    A Blanket Conveyance, Bill of Sale and Assignment, in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Bill of Sale**").

(c)    An Assignment and Assumption of Leases in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Assignment of Leases**"), as well as the hereinafter described Tenant Notification Letter.

(d)    A pro forma of the Title Policy, as described in Section 5.1 of this Agreement.

(e)    Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Purchaser's representative at the Property.

(f)    A rent roll for the Property (the "**Closing Rent Roll**") dated and certified as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of closing.

(g)    The originals or certified copies of the leases and other occupancy agreements described in the Closing Rent Roll.

(h)    All transfer documents (the "**Transfer Documentation**") necessary to assume the First Lien executed by Seller and the Existing Lender and to release Seller and current guarantors.

(i)    Organizational and authority documents satisfactory to the Title Company.

(j)    All costs and fees required to be paid by Seller pursuant to Article 8.

(k)    Such other documents and instruments as may be required by this Agreement or by the Title Company in order to consummate the transactions described in this Agreement and to issue the Title Policy to Purchaser.

(l)    A non-foreign (FIRPTA) affidavit for Seller complying with the requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

(m)    Evidence of termination of those Contracts that are terminable pursuant to Section 3.7(b)(vi).

(n)    An affidavit acceptable to the Title Company reflecting that there are no changes to the Survey except those approved by the Purchaser.

(o)    Such other instruments and affidavits as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

7.2    At or prior to the Closing, Purchaser shall execute and/or deliver the following to Escrow Agent:

(a)    The Purchase Price.

(b)    The Deed.

(c)    The Bill of Sale.

(d)    The Assignment of Leases.

(e)    The Transfer Documentation executed by Purchaser.

(f)    Organizational and authority documents satisfactory to the Title Company.

(g)    A written notice of the acquisition of the Property by Purchaser, originally executed by Seller and Purchaser, which shall be transmitted to all tenants and to other parties affected by the sale and purchase of the Property (the "**Tenant Notification Letter**"). Such notice (in the form of Exhibit "B" hereto) shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices. The said notices shall specify that unapplied security deposits under the tenant leases have been delivered to the Purchaser and that the Purchaser is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits.

(h)    All costs and fees required to be paid by Purchaser pursuant to Article 8.

(i)     Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

(j)     Such other instrument, affidavits, and tax returns as are customarily executed by the purchaser of an interest in real property in connection with the recording of the deed.

## ARTICLE 8:  APPORTIONMENTS AND ADJUSTMENTS

8.1     Seller shall be responsible for and pay all accrued expenses with respect to the Project accruing up to 11:59 P.M. on the day prior to the Closing Date (the "Adjustment Date") and shall be entitled to receive and retain all revenue from the Project accruing up to the Adjustment Date; provided, however, that if the Closing Date occurs on the last day of the month, the Adjustment Date shall be the Closing Date.

8.2     On the Closing Date, the following adjustments and apportionments shall be made by authorized representatives of the parties in cash as of the Adjustment Date:

(a) Rent payable and paid for the month of Closing shall be prorated as of the Adjustment Date.  There shall be no proration of delinquent rentals.  After the Closing, Purchaser shall continue to bill tenants for sums reflected on the Closing Rent Roll as past due, shall receive such rents as trustee for Seller, and shall deliver such sums to Seller if, as and when received. Such rents shall be applied first to costs of collection, second to rents due for the Closing Month, third to rents due to Purchaser at the time of receipt, and last to rents due Seller for periods prior to Closing.  After the Closing, if Seller receives rents for periods after the Closing Date, it shall remit such sums to Purchaser within two (2) business days of receipt.

(b)     Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any.  In the event that either the tax assessment or the tax rate for the current year is not known at Closing, the parties shall prorate at Closing on the basis of the last known values and rates and adjust the prorations once such values or rates become known for the current year.  Seller shall pay installments of confirmed assessments that have been levied against the Property and are due and payable as of the Closing.  Purchaser shall pay all installments of any special assessments due after Closing.

(c)     Charges under Contracts affecting the Project on the Adjustment Date, and utility charges and relating to the Project, including any payments made to Seller prior to the Closing Date in respect of Contracts, laundry lease or information services, whether characterized as "decorating fees", "sign-up bonuses", "additional rents" or the like.

(d)     Utilities, water and sewer charges on the basis of the period for which assessed.

(e)     Income from vending machines and tenant services, if any.

8.3     At the Closing, Purchaser will receive a credit against the Purchase Price in an amount equal to all unapplied security deposits held under Leases in effect on the Adjustment

AGREEMENT FOR PURCHASE AND SALE - Page 14
1180677_1   Bellwether Ridge   D4DS to Apts at Bellwether Ridge - Agreement for Purchase and Sale6   8025.0024

App.484

Date, against Purchaser's receipt and indemnification therefor. Upon making such credit, Purchaser will be deemed to have received all such security deposits and shall be fully responsible for the same as if a cash amount equal to such security deposits were actually delivered to Purchaser. Prior to the Closing, Seller reserves the right to apply security deposits as provided under the respective leases and permitted by applicable law; provided however, Seller shall not apply security deposits for any rentals due for the month in which the Closing Date occurs.

8.4     All other income of the Property, accruing or relating to the period through the Adjustment Date shall be paid to Seller. All other income of the Property, accruing or relating to the period commencing on the Adjustment Date and thereafter shall be paid to Purchaser.

8.5     All other expenses, such as utilities, maintenance and other operating expenses, incurred in connection with the Property and accruing or relating to the period through the Adjustment Date shall be the responsibility of and paid by Seller. Seller shall pay the existing amounts due under Construction Contracts. All other expenses, such as utilities, maintenance and other operating expenses incurred in connection with the Property and accruing or relating to the period commencing on the date of Closing and thereafter shall be the responsibility of and paid by Purchaser.

8.6     At the Closing and subject to the prorations herein provided, Seller shall receive a cash credit in an amount equal to the sum of all amounts held in escrow by holder of the First Lien, including, without limitation, hazard insurance premiums, taxes and MIP reserve or repair and replacement reserve. All escrows associated with the First Lien shall be assigned to Purchaser.

8.7     Walk-Through. Seven (7) days prior to Closing, Seller and Purchaser will perform a walk-through of all vacant units to determine which ones are not made-ready for rental.

8.8     To the extent that any amount of any of the above items shall not be available for exact proration as of the Closing, the proration at Closing will be based on the best available information and Seller or its representative and Purchaser or its representative shall meet as soon after the Closing as possible, but in no event later than thirty (30) days after Closing, and compute and settle and adjust or readjust the Closing prorations between the parties as of the date of Closing. Rents, if any, collected by Purchaser after the Closing shall be applied first to any amounts due Purchaser and then to the extent such rents relate to the period through and including the day before the day of the Closing shall be paid to Seller. Purchaser agrees to use good faith collection procedures with respect to the collection of any delinquent rentals, but will have no liability for the failure to collect any such amounts and will not be required to incur any material cost, conduct lock-outs or take any other legal action to enforce collection of any such amounts owed to Seller by tenants of the Property. The provisions of this Section 8.6 shall survive Closing.

The provisions of this **ARTICLE 8** shall survive the Closing.

## ARTICLE 9: REMEDIES

9.1    If Purchaser breaches its obligation to purchase the Project pursuant to this Agreement, and after receipt of any applicable notice and a five (5) day opportunity to cure, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Purchaser and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the Deposit to Seller which shall retain the same as liquidated damages. Seller shall not be required to give Purchaser notice of failure to close, on the date provided in this Agreement and Purchaser shall not have any five (5) day grace period therefor. Seller and Purchaser acknowledge that the amount of damages resulting from a breach of this Agreement by Purchaser would be difficult or impossible to accurately ascertain and that Seller's damages would, in any event, be substantial and would exceed the Deposit. Upon Seller's receipt of the Deposit, this Agreement shall wholly cease and terminate, no party to this Agreement shall have any further claim, agreement, or obligation to any other party to this Agreement, and any lien of Purchaser against the Project shall automatically cease, terminate and be released.

9.2    If the sale contemplated by this Agreement is not consummated because of Seller's failure to perform its obligations hereunder, Purchaser shall be entitled, as its exclusive remedy, to elect after notice to Seller and a five (5) day opportunity to cure either (a) to terminate this Agreement and have the Deposit returned to it or (b) to enforce specific performance of Seller's obligations under this Agreement. Purchaser shall not be required to give Seller notice of failure to close, on the date provided in this Agreement and Seller shall not have any five (5) day grace period therefor.

9.3    The non-breaching party shall also be entitled to recover against the breaching party its costs and expenses, including reasonable attorneys' fees and court costs, incurred by such non-breaching party in enforcing any of the remedies hereunder, as determined by a court of competent jurisdiction in Texas.

## ARTICLE 10: DAMAGE, DESTRUCTION OR CONDEMNATION

10.1    Seller agrees to maintain its present policies of casualty insurance covering the Project in full force and effect from the date of this Agreement through and including the Closing Date.

10.2    If either a substantial part of the improvements on the Land is damaged or destroyed or any part of the Property is taken by condemnation or other power of eminent domain then Purchaser shall have the right to terminate this Agreement based upon such damage, destruction or taking. If Purchaser does not terminate this Agreement as aforesaid, then on the Closing Date:

(i)    The Purchase Price shall not be reduced, but Seller shall credit the Purchase Price with an amount equal to any sums of money collected by Seller under its policies of casualty insurance or renewals thereof insuring against the loss in question (after deducting any reasonable expenses incurred by Seller in collecting such insurance and any amount that Seller shall have paid or shall be obligated to pay for repairs or restoration of the damage), and

Seller shall assign, transfer and set over to Purchaser at Closing all of Seller's right, title and interest in and to its casualty insurance policy or policies with respect to the Property and any further sums payable under said policies, plus the amount of any deductibles; provided that in no event shall the credits and insurance assigned to Purchaser exceed the cost of the unrepaired damage; and

(ii)    Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any awards that may be made for any taking by condemnation or other power of eminent domain.

10.3    For the purposes of this Article, a substantial part of the Improvements on the Land shall be deemed to mean a portion having a value of $100,000 or more or which would require expenditure of $100,000 or more for repair or restoration.

## ARTICLE 11: BROKER

11.1    Purchaser represents and warrants to Seller that neither Purchaser nor any entity related to Purchaser has dealt with any broker or other person or entity who would be entitled to a commission, consulting fee or other brokerage fee in connection with the transactions described in this Agreement.

11.2    Seller represents and warrants to Purchaser that neither Seller nor any entity related to Seller has dealt with any broker or other person or entity that would be entitled to a commission, consulting fee, or other brokerage fee in connection with the transactions described in this Agreement.

11.3    Each party agrees to indemnify, defend and hold the other harmless of and from any loss, cost, damage or expense (including reasonable attorneys' fees and court costs) arising out of any inaccuracy in the representation or warranty made by such party in Sections 11.1 and 11.2 above.

11.4    Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article shall survive the Closing and any prior termination of this Agreement for any reason whatsoever.

## ARTICLE 12: NOTICES

12.1    Any notice given or required to be given pursuant to any provision of this Agreement shall be in writing and shall be personally delivered or sent by facsimile, certified U.S. mail, with return receipt requested, or a reputable commercial courier service guaranteeing overnight delivery, and shall be deemed to have been given upon receipt if personally delivered, or, as the case may be, upon transmittal by facsimile with electronic confirmation of receipt, upon deposit in U.S. mail or upon delivery to such commercial courier, with delivery charges prepaid, if sent by such a courier, in either case addressed as follows:

Seller:                 D4DS LLC
                        1755 Wittington Place, Suite 340
                        Dallas, Texas 75234
                        Attention:    Timothy Barton
                        Telephone:    972-385-9934
                        E-mail:        TBarton@jmjdevelopment.net

Purchaser:              Apts at Bellwether Ridge, LLC
                        1603 LBJ Freeway, Suite 800
                        Dallas, Texas 75234
                        Attn:   Erik L. Johnson
                        Phone: 469-522-4413
                        E-mail:erik.johnson@pillarincome.com

with a copy to:         Bennett, Weston, LaJone & Turner, P.C.
                        1603 LBJ Freeway, Suite 280
                        Dallas, Texas 75234
                        Attn:   Jay A. LaJone
                        Phone: 214-373-2556
                        E-mail:jlajone@bennettweston.com

12.2    (a)    Either party may, by giving notice to the other in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change or address shall be effective three (3) days after it is given.

(b)    The attorney for each party to this Agreement identified in Article 12.1 may give notices on behalf of his client with the same force and effect as if such notice were given directly by such party.

## ARTICLE 13:  ASSIGNMENT

13.1    Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to a third party.

## ARTICLE 14:  MISCELLANEOUS

14.1    The following matters of general application shall apply to this Agreement and control interpretation notwithstanding any provision apparently to the contrary:

(a)    This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective heirs, successors, legal representatives and permitted assigns.

(b)    Wherever under the terms and provisions of this Agreement the time for performance falls upon a Saturday, Sunday or legal holiday in the state where Seller or Purchaser maintains the office reflected in Article 12 hereof, such time for performance shall be extended to the next business day thereafter.

AGREEMENT FOR PURCHASE AND SALE   Page 18
1180677 1   Bellwether Ridge   D4DS to Apts at Bellwether Ridge  - Agreement for Purchase and Sale6   8025.0024

(c)    This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one and the same agreement. Escrow Agent is authorized to attach multiple signature pages to a single conformed original.

(d)    The captions at the beginning of the several paragraphs, Sections and Articles are for convenience in locating the context, but are not part of the context. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Exhibits contained in this Agreement refer to the Exhibits which are attached to this Agreement, all of which Exhibits are incorporated in, and made a part of, this Agreement by reference. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Articles, Sections, paragraphs and clauses refer to portions of this Agreement.

(e)    If any term or provision of this Agreement shall be held to be illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this Agreement shall not be affected thereby, but each such remaining term and provision shall be valid and shall remain in full force and effect.

(f)    This Agreement and the other writings referred to in, or delivered pursuant to, this Agreement, embody the entire understanding and contract between the parties hereto with respect to the Project and supersede any and all prior agreements and understandings between the parties hereto, whether written or oral, formal or informal, with respect to the subject matter of this Agreement. This Agreement has been entered into after full investigation by each party and its professional advisors, and neither party is relying upon any statement, representation or warranty made by or on behalf of the other which is not expressly set forth in this Agreement.

(g)    No extensions, changes, waivers, modifications or amendments to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, waiver, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever, unless the same is contained in writing and is fully executed by the party against whom such matter is asserted.

(h)    This Agreement shall be governed and interpreted in accordance with the laws of the State where the Property is located.

(i)    Each party hereto shall pay all charges specified to be paid by them pursuant to the provisions of this Agreement and their own attorney's fees in connection with the negotiation, drafting and closing of this Agreement.

(j)    Purchaser and Seller agree that this Agreement has been entered into solely for the benefit of Purchaser and Seller and no other person or entity, it being the intention of Purchaser and Seller that no person or entity not a party to this Agreement shall have any right or standing to (a) bring any action against Purchaser or Seller based on this Agreement, or (b) assume that any provision of this Agreement will be enforced or remain unmodified or unwaived, or (c) assert that it or he is or should be or was intended to be a beneficiary or any provision of this Agreement.

(k)    The parties agree that any actions taken or documents (including this Agreement) signed by any trustee, officer, or director of Seller or Purchaser are undertaken in

AGREEMENT FOR PURCHASE AND SALE - Page 19
1180677 1 - Bellwether Ridge - D4DS to Apts at Bellwether Ridge - Agreement for Purchase and Sale6 - 8025.0024

App.489

their fiduciary capacity and no recourse shall be had to the personal assets of any such trustee, officer, or director for enforcement of this Agreement.

(l)      Wherever a time is set forth for performance or notice in this Agreement, time shall be of the essence unless explicitly stated to be otherwise.

(m)      Purchaser and Seller agree that the Property will not be actively marketed and the Seller will not enter into negotiations with any other prospective purchasers while this Agreement is in effect or any contract negotiations are pending.

*[Signature page to follow]*

AGREEMENT FOR PURCHASE AND SALE    Page 20
1180677 1 - Bellwether Ridge - D4DS to Apts at Bellwether Ridge - Agreement for Purchase and Sale6 - 8025.0024

App.490

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in their names by their respective duly authorized representatives as of the day and year first above written.

Seller:

**D4DS LLC,**
a Texas limited liability company

By:  _____
Timothy Barton, President

Purchaser:

**APTS AT BELLWETHER RIDGE, LLC,**
a Delaware limited liability company

By:  _____
Erik L. Johnson, President

App.491

## ACKNOWLEDGEMENT OF RECEIPT BY TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of the Agreement on this, the _6th_ day of _July_____, 20_21_, and agrees to accept, hold and disburse the Earnest Money Deposit in accordance with the provisions of the Contract. The undersigned acknowledges that it is not a party to this Agreement and that it is executing below solely for the purpose of the foregoing acknowledgment and agreement.

TITLE COMPANY:

Commonwealth Land Title Insurance Company

By: _____

Name:  James P. Lazar

Title:  Escrow Agent

## EXHIBITS:

A -  Legal Property Description
B -  Tenant Notification Letter
C -  Current Rent Roll
D -  Due Diligence Materials

App.492

# EXHIBIT "A"

## LEGAL PROPERTY DESCRIPTION

TRACT 1:

Being all of LOTS 1A1 AND 3A1, BLOCK A, HUNTINGTON RIDGE, an Addition to the City of DeSoto, Dallas County, Texas, according to the Plat thereof recorded in Instrument Number 201700293233, Official Public Records, Dallas County, Texas.

TRACT 2:

Non-exclusive easement right as created and described in Easement Grant executed by Desoto Ridge Apartments, Ltd., as Grantor, to Branch Banking and Trust Company, as Grantee, dated December 27, 2013, filed December 31, 2013, under Clerk's File No. 201300390459. Real Property Records, Dallas County, Texas, over the following described tract of land:

Lot 2, Block A, Huntington Ridge, an Addition to the City of DeSoto, Dallas County, Texas, according to the Map or Plat thereof recorded under Clerk's File No 200600427008, Map Records, Dallas County, Texas.

AGREEMENT FOR PURCHASE AND SALE  Page 23
1180677_1  Bellwether Ridge  D4DS to Apts at Bellwether Ridge - Agreement for Purchase and Sale6   8025.0024

App.493

## EXHIBIT "B"

## TENANT NOTIFICATION LETTER

Dated: _____, 20____

_____
_____
_____
_____

Re:    _____ ("Property")

Dear _____:

As of the date of this letter, _____, a _____ and the former owner of the Property ("Seller"), transferred title and possession of the Property to _____ ("Purchaser").

Pursuant to the provisions of Section _____ of the Texas _____, you are hereby notified that Purchaser is responsible for all of the obligations of the landlord under your lease first arising from and after the date hereof. Seller is joining in the execution of this letter to acknowledge the fact that title and possession to the Property and all future responsibilities of the landlord under your lease have been transferred to Purchaser.

From and after the date of this letter, please make all rental checks payable to _____ _____, and deliver same to _____, until otherwise notified in writing.

Sincerely,

**PURCHASER:**

_____,
a _____

By:    _____
Name:    _____
Title:    _____

**AGREEMENT FOR PURCHASE AND SALE**   Page 24
1180677 1   Bellwether Ridge – DADS to Apts at Bellwether Ridge - Agreement for Purchase and Sale6   8025.0024

App.494

**ACKNOWLEDGED:**

**SELLER:**

_____,

a _____

By: _____

Name: _____

Title: _____

AGREEMENT FOR PURCHASE AND SALE   Page 25
1180677 1   Bellwether Ridge   D4DS to Apts at Bellwether Ridge  - Agreement for Purchase and Sale6   8025.0024

App.495

App.495

EXHIBIT "C"

CURRENT RENT ROLL

(see attached)

App.496

OneSite Rents v3.0

08/24/2021  3:42:08PM

**RENT ROLL DETAIL**

As of 08/23/2021

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1101 | B2 | N/A | 1157 | Occupied | Wilder, Tiffany | 06/01/2019 06/01/2020 | | 08/31/2021 | 1,759.00 | RENT | 1,439.00 | 0.00 | 1,439.00 | 600.00 | (3.63) |
| | | N/A | | Pending renewal | Wilder, Tiffany | 06/01/2019 09/01/2021 | | 08/31/2022 | | RENT | 1,589.00 * | 0.00 * | 1,589.00 * | 0.00 | 0.00 |
| 1103 | B1 | N/A | 1067 | Occupied | Jackson, Doris | 07/02/2021 07/02/2021 | | 07/31/2022 | 1,689.00 | RENT | 1,654.00 | 0.00 | 1,654.00 | 250.00 | 36.23 |
| 1105 | B1 | N/A | 1067 | Occupied | Perryman, David | 06/13/2020 07/01/2021 | | 06/30/2022 | 1,539.00 | RENT | 1,504.00 | 0.00 | 1,504.00 | 250.00 | (0.63) |
| 1106 | A2 | N/A | 868 | Occupied | Black, Sharon | 03/27/2020 04/01/2021 | | 02/28/2022 | 1,444.00 | RENT | 1,399.00 | 0.00 | 1,399.00 | 400.00 | 1,693.27 |
| 1107 | B2 | N/A | 1157 | Occupied | Jones, Danitra | 07/23/2020 08/01/2021 | | 07/31/2022 | 1,759.00 | RENT | 1,724.00 | 0.00 | 1,724.00 | 250.00 | 0.00 |
| 1201 | B3 | N/A | 1276 | Occupied | Barker, Cheryl | 06/01/2019 06/01/2021 | | 05/31/2022 | 1,879.00 | RENT | 1,659.00 | 0.00 | 1,659.00 | 250.00 | 0.00 |
| 1202 | A2 | N/A | 868 | Occupied | Daniels, Rodney | 06/08/2019 08/01/2020 | | 10/31/2021 | 1,594.00 | RENT | 1,324.00 | 0.00 | 1,324.00 | 150.00 | 0.00 |
| 1203 | B1 | N/A | 1067 | Occupied | Lang, Taniesha | 06/01/2019 06/01/2021 | | 05/31/2022 | 1,539.00 | RENT | 1,469.00 | 0.00 | 1,469.00 | 600.00 | 0.00 |
| 1204 | A2 | N/A | 868 | Occupied | Hill, Virlitra | 05/28/2021 05/28/2021 | | 05/31/2022 | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 0.00 |
| 1205 | B1 | N/A | 1067 | Occupied | Leftridge, Latonya | 06/01/2019 08/01/2021 | | 07/31/2022 | 1,539.00 | RENT | 1,454.00 | 0.00 | 1,454.00 | 600.00 | 0.00 |
| 1206 | A2 | N/A | 868 | Occupied | Smith, Latonia | 05/25/2021 05/25/2021 | | 05/31/2022 | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 0.00 |
| 1207 | B3 | N/A | 1276 | Occupied | Johnson, Kirk | 06/01/2019 06/01/2020 | | 08/31/2021 | 1,879.00 | RENT | 1,559.00 | 0.00 | 1,559.00 | 350.00 | 0.00 |
| | | N/A | | Pending renewal | Johnson, Kirk | 06/01/2019 09/01/2021 | | 08/31/2022 | | RENT | 1,709.00 * | 0.00 * | 1,709.00 * | 0.00 | 0.00 |
| 1208 | A2 | N/A | 868 | Occupied | Ross, Bryant | 06/01/2019 06/01/2021 | | 05/31/2022 | 1,594.00 | RENT | 1,399.00 | 0.00 | 1,399.00 | 250.00 | 0.00 |
| 2102 | B2 | N/A | 1157 | Occupied-NTVL | Larkin, Lisa | 06/01/2019 07/01/2020 | | 09/30/2021 | 1,759.00 | RENT | 1,439.00 | 0.00 | 1,439.00 | 819.00 | 0.00 |
| | | N/A | | Applicant | Gee, Tandria | 10/11/2021 10/11/2021 | | 04/30/2022 | | RENT | 1,759.00 * | 0.00 * | 1,759.00 * | 250.00 | 0.00 |
| 2104 | B1 | N/A | 1067 | Occupied | McMurray, Vinita | 01/29/2021 01/29/2021 | | 02/28/2022 | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,644.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,494.00 | 0.00 | | | |
| 2105 | A1 | N/A | 699 | Occupied | Ashley, Savannah | 05/07/2021 05/07/2021 | | 05/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 2106 | B1 | N/A | 1067 | Occupied | Jackson, Patrick | 07/07/2020 08/01/2021 | | 07/31/2022 | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,629.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,504.00 | 0.00 | | | |
| 2108 | B2 | N/A | 1157 | Occupied | Alridge, Felicia | 04/08/2021 04/08/2021 | | 02/28/2022 | 1,759.00 | RENT | 1,724.00 | 0.00 | 1,724.00 | 250.00 | 0.00 |
| 2201 | A2 | N/A | 868 | Occupied | Rather, Jashida | 07/01/2019 07/01/2021 | | 06/30/2022 | 1,594.00 | RENT | 1,449.00 | 0.00 | 1,449.00 | 250.00 | 0.00 |
| 2202 | B3 | N/A | 1276 | Occupied | Jackson, Jean | 06/15/2021 06/15/2021 | | 06/30/2022 | 1,879.00 | RENT | 1,844.00 | 0.00 | 1,844.00 | 250.00 | 0.00 |
| 2203 | A1 | N/A | 699 | Occupied | Scott, Tammy | 06/01/2019 07/01/2021 | | 06/30/2022 | 1,194.00 | GARAGE | 0.00 | 125.00 | 1,234.00 | 250.00 | (0.41) |
| | | | | | | | | | | RENT | 1,109.00 | 0.00 | | | |
| 2204 | B1 | N/A | 1067 | Occupied-NTVL | Pitterson, Angelique | 08/14/2020 08/14/2020 | | 08/31/2021 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | 0.00 |

* indicates amounts not included in detail totals

App.497

OneSite Rents v3.0  
08/24/2021  3:42:08PM

**RENT ROLL DETAIL**

As of 08/23/2021

Page 2 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

<u>details</u>

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|-------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | N/A | | Applicant | Richardson, Torkorein | 09/15/2021 | 09/15/2021 | 09/30/2022 | | RENT | 1,539.00 * | 0.00 * | 1,539.00 * | 250.00 | 0.00 |
| 2205 | A1 | N/A | 699 | Occupied | Spearman, Tammarin | 06/01/2019 | 07/01/2021 | 06/30/2022 | 1,194.00 | RENT | 1,124.00 | 0.00 | 1,124.00 | 150.00 | 0.00 |
| 2206 | B1 | N/A | 1067 | Occupied | Kelly, Amanda | 06/01/2019 | 07/01/2020 | 09/30/2021 | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,494.00 | 350.00 | 0.00 |
| | | | | | | | | | | RENT | 1,369.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Kelly, Amanda | 06/01/2019 | 10/01/2021 | 09/30/2022 | | GARAGE | 0.00 * | 125.00 * | 1,619.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,494.00 * | 0.00 * | | | |
| 2207 | A2 | N/A | 868 | Occupied-NTV | Banks, Richard | 01/23/2021 | 01/23/2021 | 07/31/2021 | 1,594.00 | MTOM | 0.00 | 250.00 | 1,844.00 | 150.00 | 0.00 |
| | | | | | | | | | | RENT | 1,594.00 | 0.00 | | | |
| 2208 | B3 | N/A | 1276 | Occupied | Wallace, Jacqueline | 08/14/2020 | 08/14/2020 | 08/31/2021 | 1,879.00 | RENT | 1,824.00 | 0.00 | 1,824.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Wallace, Jacqueline | 08/14/2020 | 09/01/2021 | 06/30/2022 | | RENT | 1,849.00 * | 0.00 * | 1,849.00 * | 0.00 | 0.00 |
| 3101 | B1 | N/A | 1067 | Occupied | Boston, Erica | 11/11/2019 | 03/09/2021 | 02/28/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 1,469.00 | 1,788.27 |
| 3102 | A3 | N/A | 878 | Occupied | Curtis, Geoffrey | 06/01/2020 | 06/01/2020 | 05/31/2022 | 1,394.00 | RENT | 1,334.00 | 0.00 | 1,334.00 | 300.00 | 0.00 |
| 3103 | A1 | N/A | 699 | Occupied | Thomas, Lindsey | 07/07/2020 | 08/01/2020 | 05/31/2022 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 300.00 | (0.68) |
| 3104 | A1 | N/A | 699 | Occupied | Harrison, Brandon | 08/05/2020 | 08/05/2020 | 11/30/2021 | 1,194.00 | RENT | 1,124.00 | 0.00 | 1,124.00 | 300.00 | 0.00 |
| 3105 | A1 | N/A | 699 | Occupied | Cooks, Antinee | 04/01/2021 | 04/01/2021 | 03/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 3106 | A1 | N/A | 699 | Occupied | Caulk, Robert | 07/09/2021 | 07/09/2021 | 07/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 450.00 | 0.00 |
| 3107 | B1 | N/A | 1067 | Occupied | Clarke, Shawn | 07/06/2019 | 06/01/2021 | 02/28/2022 | 1,539.00 | RENT | 1,479.00 | 0.00 | 1,479.00 | 835.00 | 223.91 |
| 3108 | A3 | N/A | 878 | Occupied-NTVL | Teer, Robert | 08/27/2019 | 10/01/2020 | 05/31/2021 | 1,394.00 | MTOM | 0.00 | 250.00 | 1,629.00 | 150.00 | 0.00 |
| | | | | | | | | | | RENT | 1,379.00 | 0.00 | | | |
| | | N/A | | Applicant | Sullivan, Bianca | 09/16/2021 | 09/16/2021 | 09/30/2022 | | RENT | 1,394.00 * | 0.00 * | 1,394.00 * | 150.00 | 0.00 |
| 3201 | B1 | N/A | 1067 | Occupied | Walker, Latoyia | 09/08/2020 | 09/08/2020 | 09/30/2021 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | (5,858.22) |
| | | N/A | | Pending renewal | Walker, Latoyia | 09/08/2020 | 10/01/2021 | 08/31/2022 | | RENT | 1,519.00 * | 0.00 * | 1,519.00 * | 0.00 | 0.00 |
| 3202 | A3 | N/A | 878 | Occupied-NTV | Jacobs, Thomas | 08/09/2020 | 08/09/2020 | 08/31/2021 | 1,394.00 | RENT | 1,324.00 | 0.00 | 1,324.00 | 150.00 | 0.00 |
| 3203 | A1 | N/A | 699 | Occupied | Davis, Tiffany | 02/29/2020 | 12/01/2020 | 09/30/2021 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 150.00 | (618.27) |
| | | N/A | | Pending renewal | Davis, Tiffany | 02/29/2020 | 10/01/2021 | 07/31/2022 | | RENT | 1,179.00 * | 0.00 * | 1,179.00 * | 0.00 | 0.00 |
| 3204 | A1 | N/A | 699 | Occupied | Tolliver, Kimberlee | 08/01/2019 | 08/01/2021 | 05/31/2022 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 150.00 | 0.00 |
| 3205 | A1 | N/A | 699 | Occupied | Edwards, Lindell | 10/01/2020 | 04/01/2021 | 03/31/2022 | 1,194.00 | RENT | 1,169.00 | 0.00 | 1,169.00 | 350.00 | (0.73) |

* indicates amounts not included in detail totals

App.498

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

As of 08/23/2021

Page 3 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 3206 | A1 | N/A | 699 | Occupied | Sanders-Seawood, Troie | 07/15/2021 07/15/2021 | | 07/31/2022 | 1,194.00 | PETFEE | 0.00 | 25.00 | 1,204.00 | 650.00 | (36.00) |
| | | | | | | | | | | RENT | 1,179.00 | 0.00 | | | |
| 3207 | B1 | N/A | 1067 | Occupied | Magsby, Katosha | 07/12/2019 07/01/2021 | | 06/30/2022 | 1,539.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 250.00 | 0.00 |
| 3208 | A3 | N/A | 878 | Occupied | Johnson, Dorothy | 11/13/2019 01/01/2021 | | 10/31/2021 | 1,394.00 | GARAGE | 0.00 | 125.00 | 1,484.00 | 662.00 | 0.00 |
| | | | | | | | | | | RENT | 1,359.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Johnson, Dorothy | 11/13/2019 11/01/2021 | | 10/31/2022 | | GARAGE | 0.00 * | 125.00 * | 1,519.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,394.00 * | 0.00 * | | | |
| 3301 | B1 | N/A | 1067 | Occupied | Clark, Holly | 03/20/2020 07/01/2021 | | 04/30/2022 | 1,539.00 | RENT | 1,489.00 | 0.00 | 1,489.00 | 500.00 | 0.00 |
| 3302 | A3 | N/A | 878 | Occupied | Murrell, David | 12/10/2020 12/10/2020 | | 10/31/2021 | 1,394.00 | RENT | 1,339.00 | 0.00 | 1,339.00 | 650.00 | 383.27 |
| 3303 | A1 | N/A | 699 | Occupied | Johnson, Kaleigh | 06/08/2021 06/08/2021 | | 06/30/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 350.00 | 0.00 |
| 3304 | A1 | N/A | 699 | Occupied | Moore, Kristen | 10/08/2020 10/08/2020 | | 10/31/2021 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 350.00 | 0.00 |
| | | N/A | | Pending renewal | Moore, Kristen | 10/08/2020 11/01/2021 | | 10/31/2022 | | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 0.00 | 0.00 |
| 3305 | A1 | N/A | 699 | Occupied | Bailey, Serena | 06/21/2019 08/01/2020 | | 10/31/2021 | 1,194.00 | RENT | 1,024.00 | 0.00 | 1,024.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Bailey, Serena | 06/21/2019 11/01/2021 | | 10/31/2022 | | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 0.00 | 0.00 |
| 3306 | A1 | N/A | 699 | Occupied | Jones, Deirdre | 07/31/2019 09/01/2020 | | 08/31/2021 | 1,194.00 | RENT | 1,124.00 | 0.00 | 1,124.00 | 500.00 | 0.00 |
| | | N/A | | Pending renewal | Jones, Deirdre | 07/31/2019 09/01/2021 | | 08/31/2022 | | RENT | 1,179.00 * | 0.00 * | 1,179.00 * | 0.00 | 0.00 |
| 3307 | B1 | N/A | 1067 | Occupied | Holloway, Parker | 03/26/2020 03/01/2021 | | 02/28/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 250.00 | 0.00 |
| 3308 | A3 | N/A | 878 | Occupied | Matthews, Cedrick | 05/29/2021 05/29/2021 | | 05/31/2022 | 1,394.00 | RENT | 1,379.00 | 0.00 | 1,379.00 | 150.00 | (0.10) |
| 4101 | B1 | N/A | 1067 | Occupied | Krekel, Patrick | 03/19/2021 03/19/2021 | | 03/31/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 300.00 | 0.00 |
| 4102 | A3 | N/A | 878 | Occupied | Rogers, Damisha | 03/12/2021 03/12/2021 | | 03/31/2022 | 1,394.00 | GARAGE | 0.00 | 150.00 | 1,499.00 | 150.00 | (11.73) |
| | | | | | | | | | | RENT | 1,349.00 | 0.00 | | | |
| 4103 | A1 | N/A | 699 | Occupied | McDaniel, Marsh | 09/07/2019 09/07/2019 | | 09/30/2020 | 1,194.00 | MTOM | 0.00 | 250.00 | 1,389.00 | 562.00 | 19,130.56 |
| | | | | | | | | | | RENT | 1,139.00 | 0.00 | | | |
| 4104 | A1 | N/A | 699 | Occupied | Haskins, Emeta | 06/30/2021 06/30/2021 | | 06/30/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 4105 | A1 | N/A | 699 | Occupied | Moore, Rhonda | 09/07/2019 10/01/2020 | | 09/30/2021 | 1,194.00 | RENT | 1,169.00 | 0.00 | 1,169.00 | 250.00 | (0.89) |
| | | N/A | | Pending renewal | Moore, Rhonda | 09/07/2019 10/01/2021 | | 07/31/2022 | | RENT | 1,184.00 * | 0.00 * | 1,184.00 * | 0.00 | 0.00 |
| 4106 | A1 | N/A | 699 | Occupied | Smith, Beverly | 09/11/2020 09/11/2020 | | 08/31/2021 | 1,194.00 | GARAGE | 0.00 | 150.00 | 1,289.00 | 350.00 | (2,394.36) |
| | | | | | | | | | | RENT | 1,139.00 | 0.00 | | | |

* indicates amounts not included in detail totals

App.499

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

RENT ROLL DETAIL

As of 08/23/2021

Page 4 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N/A | | Pending renewal | Smith, Beverly | 09/11/2020 | 09/01/2021 | 08/31/2022 | | GARAGE | 0.00 * | 150.00 * | 1,324.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,174.00 * | 0.00 * | | | |
| 4107 | B1 | N/A | 1067 | Occupied | Jones, Chafine | 08/13/2021 | 08/13/2021 | 08/31/2022 | 1,539.00 | RENT | 1,524.00 | 0.00 | 1,524.00 | 250.00 | 0.00 |
| 4108 | A3 | N/A | 878 | Occupied | Carter, Tara | 10/07/2019 | 07/01/2020 | 09/30/2021 | 1,394.00 | RENT | 1,324.00 | 0.00 | 1,324.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Carter, Tara | 10/07/2019 | 10/01/2021 | 09/30/2022 | | RENT | 1,374.00 * | 0.00 * | 1,374.00 * | 0.00 | 0.00 |
| 4201 | B1 | N/A | 1067 | Occupied | Walker, Margaret | 04/09/2020 | 05/01/2021 | 04/30/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 400.00 | (0.91) |
| 4202 | A3 | N/A | 878 | Occupied | Tucker, Charletta | 11/01/2019 | 12/01/2020 | 09/30/2021 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 300.00 | (0.26) |
| 4203 | A1 | N/A | 699 | Occupied | Barron, Areyon | 09/28/2019 | 10/01/2020 | 09/30/2021 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 662.00 | 0.00 |
| | | N/A | | Pending renewal | Barron, Areyon | 09/28/2019 | 10/01/2021 | 09/30/2022 | | RENT | 1,189.00 * | 0.00 * | 1,189.00 * | 0.00 | 0.00 |
| 4204 | A1 | N/A | 699 | Occupied | Harris, Allan | 10/25/2019 | 11/01/2020 | 10/31/2021 | 1,194.00 | GARAGE | 0.00 | 125.00 | 1,284.00 | 500.00 | (6.73) |
| | | | | | | | | | | RENT | 1,159.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Harris, Allan | 10/25/2019 | 11/01/2021 | 09/30/2022 | | GARAGE | 0.00 * | 125.00 * | 1,309.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,184.00 * | 0.00 * | | | |
| 4205 | A1 | N/A | 699 | Occupied | Williams, Ashley | 07/23/2021 | 07/23/2021 | 07/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 150.00 | (1,179.00) |
| 4206 | A1 | N/A | 699 | Occupied | Vega, Esequiel | 10/17/2020 | 05/01/2021 | 04/30/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | (0.01) |
| 4207 | B1 | N/A | 1067 | Occupied | Gordon, Andrew | 10/12/2020 | 10/12/2020 | 06/30/2021 | 1,539.00 | MTOM | 0.00 | 250.00 | 1,774.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,524.00 | 0.00 | | | |
| 4208 | A3 | N/A | 878 | Occupied | Brown, Christopher | 12/19/2019 | 04/01/2021 | 02/28/2022 | 1,394.00 | GARAGE | 0.00 | 125.00 | 1,474.00 | 150.00 | 0.00 |
| | | | | | | | | | | RENT | 1,349.00 | 0.00 | | | |
| 4301 | B1 | N/A | 1067 | Occupied | Willis, Pamela | 09/07/2019 | 10/01/2020 | 09/30/2021 | 1,539.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 600.00 | (0.18) |
| 4302 | A3 | N/A | 878 | Occupied | Rivas, Mariah | 02/01/2021 | 02/01/2021 | 02/28/2022 | 1,394.00 | RENT | 1,349.00 | 0.00 | 1,349.00 | 300.00 | 9.48 |
| 4303 | A1 | N/A | 699 | Occupied | Brewer, Martin | 08/11/2021 | 08/11/2021 | 08/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 150.00 | (1.00) |
| 4304 | A1 | N/A | 699 | Occupied | Griffin, Tanesha | 07/21/2021 | 07/21/2021 | 08/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 4305 | A1 | N/A | 699 | Occupied | McGrew, Darrell | 08/19/2021 | 08/19/2021 | 07/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 150.00 | 0.00 |
| 4306 | A1 | N/A | 699 | Occupied | Cobb, Brittany | 06/17/2021 | 06/17/2021 | 06/30/2022 | 1,194.00 | PETFEE | 0.00 | 25.00 | 1,184.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,159.00 | 0.00 | | | |
| 4307 | B1 | N/A | 1067 | Occupied | Murchison, Johnathan | 10/07/2020 | 10/07/2020 | 10/31/2021 | 1,539.00 | EMPCONC | 0.00 | (297.00) | 1,187.00 | 0.00 | (1,875.76) |
| | | | | | | | | | | RENT | 1,484.00 | 0.00 | | | |

App.500

* indicates amounts not included in detail totals

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

As of 08/23/2021

Page 5 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 4308 | A3 | N/A | 878 | Occupied | Henderson, Anquaneshia | 05/01/2021 | 05/01/2021 | 04/30/2022 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 450.00 | 0.00 |
| 5101 | A3 | N/A | 878 | Occupied | Richardson, Martha | 05/07/2021 | 05/07/2021 | 05/31/2022 | 1,394.00 | PETFEE | 0.00 | 25.00 | 1,384.00 | 450.00 | 0.30 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,359.00 | 0.00 |  |  |  |
| 5102 | B1 | N/A | 1067 | Occupied | Hunter, Krystal | 05/08/2020 | 06/01/2021 | 05/31/2022 | 1,539.00 | RENT | 1,479.00 | 0.00 | 1,479.00 | 500.00 | (0.63) |
| 5103 | A1 | N/A | 699 | Occupied | Barrett, Katrina | 01/31/2020 | 02/01/2021 | 02/28/2022 | 1,194.00 | RENT | 1,144.00 | 0.00 | 1,144.00 | 500.00 | 0.00 |
| 5104 | A1 | N/A | 699 | Occupied | Emanuel, Cecily | 06/05/2021 | 06/05/2021 | 06/30/2022 | 1,194.00 | GARAGE | 0.00 | 150.00 | 1,309.00 | 150.00 | (1,378.28) |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,159.00 | 0.00 |  |  |  |
| 5105 | A1 | N/A | 699 | Occupied | James, Keith | 01/01/2020 | 08/01/2021 | 07/31/2022 | 1,194.00 | RENT | 1,164.00 | 0.00 | 1,164.00 | 1,124.00 | 0.00 |
| 5106 | A1 | N/A | 699 | Occupied-NTVL | Gray, Kendall | 11/29/2019 | 11/01/2020 | 08/31/2021 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 150.00 | 0.00 |
|  |  | N/A |  | Applicant | Moore, Jayla | 09/16/2021 | 09/16/2021 | 09/30/2022 |  | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 150.00 | 0.00 |
| 5107 | A3 | N/A | 878 | Occupied | Wyatt, Monique | 12/31/2019 | 05/01/2021 | 03/31/2022 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 300.00 | 0.00 |
| 5108 | B1 | N/A | 1067 | Occupied | Warren, Dundria | 11/30/2019 | 03/01/2021 | 10/31/2021 | 1,539.00 | RENT | 1,489.00 | 0.00 | 1,489.00 | 250.00 | 0.00 |
|  |  | N/A |  | Pending renewal | Warren, Dundria | 11/30/2019 | 11/01/2021 | 08/31/2022 |  | RENT | 1,524.00 * | 0.00 * | 1,524.00 * | 0.00 | 0.00 |
| 5201 | A3 | N/A | 878 | Occupied | Gaston, Etta | 04/03/2021 | 04/03/2021 | 04/30/2022 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 150.00 | 0.00 |
| 5202 | B1 | N/A | 1067 | Occupied | Bailey, Jasmin | 11/25/2019 | 05/11/2021 | 02/28/2022 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | (81.63) |
| 5203 | A1 | N/A | 699 | Occupied-NTVL | Richardson, Torkorein | 11/15/2019 | 05/01/2021 | 04/30/2022 | 1,194.00 | RENT | 1,174.00 | 0.00 | 1,174.00 | 1,124.00 | 0.00 |
|  |  | N/A |  | Applicant | Stolden, Milihka | 10/01/2021 | 10/01/2021 | 09/30/2022 |  | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 450.00 | 0.00 |
| 5204 | A1 | N/A | 699 | Occupied-NTVL | Robinson, Jaylyn | 12/01/2019 | 11/01/2020 | 08/31/2021 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 1,124.00 | 2,874.74 |
|  |  | N/A |  | Applicant | Hollinger, Chanica | 09/15/2021 | 09/15/2021 | 09/30/2022 |  | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 75.00 | 0.00 |
| 5205 | A1 | N/A | 699 | Occupied | Woods, Johnny | 11/27/2019 | 12/01/2020 | 09/30/2021 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 1,124.00 | 0.00 |
| 5206 | A1 | N/A | 699 | Occupied | Miller, Xavier | 04/09/2021 | 04/09/2021 | 04/30/2022 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 150.00 | 0.00 |
| 5207 | A3 | N/A | 878 | Occupied | Bailey, Stephiane | 08/03/2021 | 08/03/2021 | 08/31/2022 | 1,394.00 | RENT | 1,379.00 | 0.00 | 1,379.00 | 150.00 | 0.00 |
| 5208 | B1 | N/A | 1067 | Occupied | Tubbs, Latasha | 05/22/2020 | 06/01/2021 | 05/31/2022 | 1,539.00 | RENT | 1,479.00 | 0.00 | 1,479.00 | 250.00 | 0.00 |
| 5301 | A3 | N/A | 878 | Occupied | Griffin, Rachel | 05/14/2021 | 06/01/2021 | 05/31/2022 | 1,394.00 | RENT | 1,334.00 | 0.00 | 1,334.00 | 150.00 | 0.00 |
| 5302 | B1 | N/A | 1067 | Occupied | Morton, Katerria | 11/15/2019 | 11/01/2020 | 08/31/2021 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 735.00 | 0.00 |
|  |  | N/A |  | Pending renewal | Morton, Katerria | 11/15/2019 | 09/01/2021 | 06/30/2022 |  | RENT | 1,519.00 * | 0.00 * | 1,519.00 * | 0.00 | 0.00 |
| 5303 | A1 | N/A | 699 | Occupied | Whitaker, Christopher | 03/16/2021 | 03/16/2021 | 03/31/2022 | 1,194.00 | GARAGE | 0.00 | 150.00 | 1,299.00 | 500.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,149.00 | 0.00 |  |  |  |

* indicates amounts not included in detail totals

App.501

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

As of 08/23/2021

Page 6 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|-------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 5304 | A1 | N/A | 699 | Occupied | Starks, Jonathan | 06/22/2021 | 06/22/2021 | 03/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 1,329.00 | (39.00) |
| 5305 | A1 | N/A | 699 | Occupied | Cyrus, Gorgeous | 03/09/2021 | 03/09/2021 | 03/31/2022 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 300.00 | 0.00 |
| 5306 | A1 | N/A | 699 | Occupied | Green, Desiree | 04/01/2021 | 04/01/2021 | 03/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 300.00 | 0.00 |
| 5307 | A3 | N/A | 878 | Occupied | Allen, Dennis | 12/01/2019 | 03/01/2021 | 02/28/2022 | 1,394.00 | GARAGE | 0.00 | 125.00 | 1,474.00 | 1,324.00 | 0.00 |
| | | | | | | | | | | RENT | 1,349.00 | 0.00 | | | |
| 5308 | B1 | N/A | 1067 | Occupied | Mills, Sunnhee | 08/13/2021 | 08/13/2021 | 08/31/2022 | 1,539.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 250.00 | 0.00 |
| 6102 | B2 | N/A | 1157 | Occupied | Harris, Ernestine | 11/01/2019 | 08/03/2021 | 07/31/2022 | 1,759.00 | RENT | 1,664.00 | 0.00 | 1,664.00 | 770.00 | (75.00) |
| 6104 | B1 | N/A | 1067 | Occupied | Brewster, Heather | 10/04/2019 | 11/01/2020 | 10/31/2021 | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,654.00 | 1,469.00 | 0.00 |
| | | | | | | | | | | RENT | 1,504.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Brewster, Heather | 10/04/2019 | 11/01/2021 | 10/31/2022 | | GARAGE | 0.00 * | 150.00 * | 1,689.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,539.00 * | 0.00 * | | | |
| 6105 | A2 | N/A | 868 | Occupied | Sims, Lenora | 07/01/2020 | 07/01/2021 | 06/30/2022 | 1,444.00 | RENT | 1,409.00 | 0.00 | 1,409.00 | 300.00 | 0.00 |
| 6106 | B1 | N/A | 1067 | Occupied | Daniels, Tommie | 10/09/2020 | 10/09/2020 | 10/31/2021 | 1,689.00 | GARAGE | 0.00 | 125.00 | 1,759.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,634.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Daniels, Tommie | 10/09/2020 | 11/01/2021 | 10/31/2022 | | GARAGE | 0.00 * | 125.00 * | 1,664.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,539.00 * | 0.00 * | | | |
| 6108 | B2 | N/A | 1157 | Occupied | Aycock, Amber | 10/04/2019 | 11/01/2020 | 10/31/2021 | 1,759.00 | RENT | 1,474.00 | 0.00 | 1,474.00 | 250.00 | (2.79) |
| 6201 | A2 | N/A | 868 | Occupied | Armstead, Sheniqua | 12/05/2020 | 12/05/2020 | 10/31/2021 | 1,594.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 1,689.00 | 0.00 |
| | | N/A | | Pending renewal | Armstead, Sheniqua | 12/05/2020 | 11/01/2021 | 08/31/2022 | | RENT | 1,574.00 * | 0.00 * | 1,574.00 * | 0.00 | 0.00 |
| 6202 | B3 | N/A | 1276 | Occupied | Morrison, Brandi | 05/20/2020 | 06/01/2021 | 05/31/2022 | 1,879.00 | RENT | 1,819.00 | 0.00 | 1,819.00 | 250.00 | 0.00 |
| 6203 | A2 | N/A | 868 | Occupied | Hendrix, Dora | 03/29/2021 | 03/29/2021 | 03/31/2022 | 1,444.00 | RENT | 1,409.00 | 0.00 | 1,409.00 | 150.00 | 0.00 |
| 6204 | B1 | N/A | 1067 | Occupied | Bush, Anthony | 10/19/2019 | 10/13/2020 | 10/31/2021 | 1,539.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 500.00 | 0.00 |
| 6205 | A2 | N/A | 868 | Occupied | Bennett, Kirk | 03/13/2020 | 01/01/2021 | 09/30/2021 | 1,444.00 | GARAGE | 0.00 | 250.00 | 1,639.00 | 150.00 | 1,933.27 |
| | | | | | | | | | | RENT | 1,389.00 | 0.00 | | | |
| 6206 | B1 | N/A | 1067 | Occupied | Neal, Patrice | 10/03/2019 | 11/01/2020 | 07/31/2021 | 1,539.00 | MTOM | 0.00 | 250.00 | 1,789.00 | 500.00 | (1,530.15) |
| | | | | | | | | | | RENT | 1,539.00 | 0.00 | | | |
| 6207 | A2 | N/A | 868 | Occupied | Jackson, Joshua | 10/05/2019 | 04/01/2021 | 09/30/2021 | 1,594.00 | GARAGE | 0.00 | 150.00 | 1,699.00 | 600.00 | 0.00 |
| | | | | | | | | | | RENT | 1,549.00 | 0.00 | | | |

App.502

* indicates amounts not included in detail totals

OneSite Rents v3.0       OneSite Reports - Bellwether Ridge       Page 7 of 10

08/24/2021  3:42:08PM       **RENT ROLL DETAIL**       mgt-521-003

As of 08/23/2021

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6208 | B3 | N/A | 1276 | Occupied | Shehedeh, Motasem | 02/26/2021 | 02/26/2021 | 03/31/2022 | 1,879.00 | RENT | 1,834.00 | 0.00 | 1,834.00 | 250.00 | 0.00 |
| 7101 | B2 | N/A | 1157 | Occupied | Umstead, Cheryl | 07/15/2019 | 08/01/2021 | 07/31/2022 | 1,759.00 | RENT | 1,644.00 | 0.00 | 1,644.00 | 770.00 | 0.00 |
| 7103 | A2 | N/A | 868 | Occupied | Johnson, Karen | 05/27/2021 | 05/27/2021 | 05/31/2022 | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 0.00 |
| 7104 | B1 | N/A | 1067 | Occupied | Paulo, Gabrielle | 09/30/2020 | 09/30/2020 | 09/30/2021 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Paulo, Gabrielle | 09/30/2020 | 10/01/2021 | 09/30/2022 | | RENT | 1,524.00 * | 0.00 * | 1,524.00 * | 0.00 | 0.00 |
| 7106 | B1 | N/A | 1067 | Occupied | Harris, Erica | 08/01/2019 | 09/01/2021 | 08/31/2022 | 1,689.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 350.00 | 0.00 |
| | | N/A | | Pending renewal | Harris, Erica | 08/01/2019 | 09/01/2021 | 08/31/2022 | | RENT | 1,614.00 * | 0.00 * | 1,614.00 * | 0.00 | 0.00 |
| 7108 | B2 | N/A | 1157 | Occupied | Dugay, Letitia | 08/01/2019 | 07/01/2021 | 04/30/2022 | 1,759.00 | RENT | 1,614.00 | 0.00 | 1,614.00 | 250.00 | 0.00 |
| 7201 | A2 | N/A | 868 | Occupied-NTVL | Wright, Quinn | 08/14/2020 | 08/14/2020 | 08/31/2021 | 1,594.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 300.00 | 0.00 |
| | | N/A | | Applicant | Taylor, Andrew | 09/15/2021 | 09/15/2021 | 09/30/2022 | | PETFEE | 0.00 * | 25.00 * | 1,619.00 * | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,594.00 * | 0.00 * | | | |
| 7202 | B3 | N/A | 1276 | Occupied | Hamilton, Shontae | 07/18/2019 | 07/01/2021 | 04/30/2022 | 1,879.00 | RENT | 1,709.00 | 0.00 | 1,709.00 | 350.00 | 0.00 |
| 7203 | A2 | N/A | 868 | Occupied-NTV | Fuentes, Roberto | 10/31/2020 | 10/31/2020 | 10/31/2021 | 1,444.00 | PETFEE | 0.00 | 25.00 | 1,414.00 | 450.00 | (1,497.34) |
| | | | | | | | | | | RENT | 1,389.00 | 0.00 | | | |
| 7204 | B1 | N/A | 1067 | Occupied | Robertson, Demerian | 05/23/2020 | 06/01/2021 | 05/31/2022 | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,604.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,479.00 | 0.00 | | | |
| 7205 | A2 | N/A | 868 | Occupied | Moore, Gregory | 02/29/2020 | 03/01/2021 | 02/28/2022 | 1,444.00 | RENT | 1,399.00 | 0.00 | 1,399.00 | 150.00 | 0.00 |
| 7206 | B1 | N/A | 1067 | Occupied | A Voice LLC, * | 11/14/2020 | 11/14/2020 | 10/31/2021 | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,634.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,484.00 | 0.00 | | | |
| 7207 | A2 | N/A | 868 | Occupied | Turner, Diane | 09/05/2019 | 08/01/2021 | 07/31/2022 | 1,594.00 | RENT | 1,469.00 | 0.00 | 1,469.00 | 150.00 | 0.00 |
| 7208 | B3 | N/A | 1276 | Occupied | Neal, Terri | 07/15/2019 | 11/01/2020 | 08/31/2021 | 1,879.00 | RENT | 1,704.00 | 0.00 | 1,704.00 | 500.00 | 0.00 |
| | | N/A | | Pending renewal | Neal, Terri | 07/15/2019 | 09/01/2021 | 08/31/2022 | | RENT | 1,789.00 * | 0.00 * | 1,789.00 * | 0.00 | 0.00 |
| 8102 | B2 | N/A | 1157 | Occupied-NTVL | Price, Valen | 11/01/2019 | 03/01/2021 | 09/30/2021 | 1,759.00 | RENT | 1,704.00 | 0.00 | 1,704.00 | 350.00 | 0.00 |
| | | N/A | | Applicant | Gray, Christopher | 10/11/2021 | 10/11/2021 | 10/31/2022 | | RENT | 1,759.00 * | 0.00 * | 1,759.00 * | 550.00 | 0.00 |
| 8104 | B1 | N/A | 1067 | Occupied-NTVL | Howard, Rhonda | 11/23/2020 | 06/01/2021 | 02/28/2022 | 1,689.00 | RENT | 1,644.00 | 0.00 | 1,644.00 | 550.00 | 1,938.27 |
| | | N/A | | Applicant | White, James | 09/17/2021 | 09/17/2021 | 09/30/2022 | | RENT | 1,689.00 * | 0.00 * | 1,689.00 * | 250.00 | 0.00 |
| 8105 | A2 | N/A | 868 | Occupied | Griffin, Lisa | 05/19/2021 | 05/19/2021 | 05/31/2022 | 1,444.00 | RENT | 1,409.00 | 0.00 | 1,409.00 | 350.00 | 265.64 |
| 8106 | B1 | N/A | 1067 | Occupied | DONAHUE, ASYA | 10/12/2020 | 10/12/2020 | 10/31/2021 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 500.00 | 0.00 |

App.503

* indicates amounts not included in detail totals

OneSite Rents v3.0

08/24/2021  3:42:08PM

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | N/A | | Pending renewal | DONAHUE, ASYA | 10/12/2020 | 11/01/2021 | 10/31/2022 | | RENT | 1,539.00 * | 0.00 * | 1,539.00 * | 0.00 | 0.00 |
| 8108 | B2 | N/A | 1157 | Occupied | Bolton, Sedrick | 03/05/2021 | 03/05/2021 | 03/31/2022 | 1,759.00 | RENT | 1,714.00 | 0.00 | 1,714.00 | 250.00 | 0.00 |
| 8201 | A2 | N/A | 868 | Occupied | Halley, Phyllis | 03/06/2021 | 03/06/2021 | 03/31/2022 | 1,594.00 | PETFEE | 0.00 | 25.00 | 1,574.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,549.00 | 0.00 | | | |
| 8202 | B3 | N/A | 1276 | Occupied | Lilly, Earnest | 10/13/2019 | 08/01/2020 | 10/31/2021 | 1,879.00 | PETFEE | 0.00 | 25.00 | 1,834.00 | 500.00 | 0.05 |
| | | | | | | | | | | RENT | 1,809.00 | 0.00 | | | |
| 8203 | A2 | N/A | 868 | Occupied | Roy, Princess | 08/19/2021 | 08/19/2021 | 08/31/2022 | 1,444.00 | RENT | 1,444.00 | 0.00 | 1,444.00 | 150.00 | (46.00) |
| 8204 | B1 | N/A | 1067 | Occupied | Davis, Horace | 08/21/2021 | 08/21/2021 | 08/31/2022 | 1,539.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 250.00 | (1,539.00) |
| 8205 | A2 | N/A | 868 | Occupied | Murray, Latasha | 05/14/2020 | 05/14/2020 | 08/31/2021 | 1,444.00 | RENT | 1,374.00 | 0.00 | 1,374.00 | 150.00 | 0.00 |
| | | N/A | | Pending renewal | Murray, Latasha | 05/14/2020 | 09/01/2021 | 08/31/2022 | | RENT | 1,429.00 * | 0.00 * | 1,429.00 * | 0.00 | 0.00 |
| 8206 | B1 | N/A | 1067 | Occupied | Whitaker, Desmond | 06/18/2021 | 06/18/2021 | 06/30/2022 | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,654.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,504.00 | 0.00 | | | |
| 8207 | A2 | N/A | 868 | Occupied | Tucker, Randy | 03/15/2021 | 03/15/2021 | 03/31/2022 | 1,594.00 | RENT | 1,549.00 | 0.00 | 1,549.00 | 400.00 | 0.00 |
| 8208 | B3 | N/A | 1276 | Occupied | Burton, Riana | 02/20/2021 | 02/20/2021 | 02/28/2022 | 1,879.00 | RENT | 1,834.00 | 0.00 | 1,834.00 | 250.00 | 0.00 |
| 9102 | B2 | N/A | 1157 | Occupied | Sowells, LaClent | 04/01/2021 | 04/01/2021 | 03/31/2022 | 1,759.00 | RENT | 1,714.00 | 0.00 | 1,714.00 | 750.00 | 2,008.27 |
| 9103 | A2 | N/A | 868 | Occupied | Young, Kevin | 04/13/2020 | 08/01/2021 | 05/31/2022 | 1,444.00 | GARAGE | 0.00 | 125.00 | 1,514.00 | 400.00 | 0.00 |
| | | | | | | | | | | RENT | 1,389.00 | 0.00 | | | |
| 9104 | B1 | N/A | 1067 | Occupied-NTVL | Davis, Felicia | 01/20/2021 | 01/20/2021 | 07/31/2021 | 1,539.00 | MTOM | 0.00 | 250.00 | 1,789.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,539.00 | 0.00 | | | |
| | | N/A | | Applicant | Sowells, Patrick | 09/10/2021 | 09/10/2021 | 09/30/2022 | | RENT | 1,539.00 * | 0.00 * | 1,539.00 * | 250.00 | 0.00 |
| 9106 | B1 | N/A | 1067 | Occupied | Yearwood, Natasha | 01/09/2021 | 01/09/2021 | 02/28/2022 | 1,689.00 | RENT | 1,644.00 | 0.00 | 1,644.00 | 250.00 | 0.00 |
| 9108 | B2 | N/A | 1157 | Occupied | McCoy, Jasmine | 11/01/2019 | 12/01/2020 | 11/30/2021 | 1,759.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 500.00 | 0.00 |
| 9201 | A2 | N/A | 868 | Occupied | Branch, Darrin | 07/09/2021 | 07/09/2021 | 07/31/2022 | 1,594.00 | RENT | 1,579.00 | 0.00 | 1,579.00 | 150.00 | 0.00 |
| 9202 | B3 | N/A | 1276 | Occupied | Richardson, Eileen | 12/07/2019 | 04/01/2021 | 03/31/2022 | 1,879.00 | RENT | 1,734.00 | 0.00 | 1,734.00 | 750.00 | 0.00 |
| 9203 | A2 | N/A | 868 | Occupied | Starling, Kiara | 07/30/2021 | 07/30/2021 | 07/31/2022 | 1,444.00 | RENT | 1,444.00 | 0.00 | 1,444.00 | 150.00 | 0.00 |
| 9204 | B1 | N/A | 1067 | Occupied | Smith, Anthony | 11/09/2019 | 03/01/2021 | 02/28/2022 | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,619.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,494.00 | 0.00 | | | |
| 9205 | A2 | N/A | 868 | Occupied | Irabor, Emmanuel | 06/25/2021 | 06/25/2021 | 03/31/2022 | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 1.96 |

App.504

* indicates amounts not included in detail totals

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

As of 08/23/2021

Page 9 of 10

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 9206 | B1 | N/A | 1067 | Occupied | Herbert, Ashley | 11/08/2019 11/01/2020 | 08/31/2021 | | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,619.00 | 750.00 | 1.27 |
| | | | | | | | | | | RENT | 1,494.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Herbert, Ashley | 11/08/2019 09/01/2021 | 07/31/2022 | | | GARAGE | 0.00 * | 125.00 * | 1,644.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,519.00 * | 0.00 * | | | |
| 9207 | A2 | N/A | 868 | Occupied | Smith, Jessica | 05/29/2021 05/29/2021 | 06/30/2022 | | 1,594.00 | RENT | 1,579.00 | 0.00 | 1,579.00 | 150.00 | 0.90 |
| 9208 | B3 | N/A | 1276 | Occupied | Davis, Laquecia | 06/24/2020 06/11/2021 | 02/28/2022 | | 1,879.00 | RENT | 1,819.00 | 0.00 | 1,819.00 | 2,059.00 | (4,139.06) |
| totals: | | | | | | | | | 221,490.00 | | 212,380.00 | 4,453.00 | 216,833.00 | 62,225.00 | |

App.505

* indicates amounts not included in detail totals

OneSite Rents v3.0

08/24/2021  3:42:08PM

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

Amt / SQFT: Market = 140,511 SQFT; Leased =  140,511 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market + Addl. | | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|---|---|---|---|---|---|---|---|---|---|---|
| A1 | 39 | 699 | 1,194.00 | 1.71 | | 1,150.67 | 1.65 | 39 | 100.00 | 0 |
| A2 | 27 | 868 | 1,510.67 | 1.74 | | 1,455.11 | 1.68 | 27 | 100.00 | 2 |
| A3 | 18 | 878 | 1,394.00 | 1.59 | | 1,352.33 | 1.54 | 18 | 100.00 | 1 |
| B1 | 42 | 1,067 | 1,556.86 | 1.46 | | 1,509.00 | 1.41 | 42 | 100.00 | 0 |
| B2 | 12 | 1,157 | 1,759.00 | 1.52 | | 1,612.33 | 1.39 | 12 | 100.00 | 0 |
| B3 | 12 | 1,276 | 1,879.00 | 1.47 | | 1,762.33 | 1.38 | 12 | 100.00 | 0 |
| totals / averages: | 150 | 937 | 1,476.60 | 1.58 | | 1,415.87 | 1.51 | 150 | 100.00 | 3 |

occupancy and rents summary for current date

| unit status | Market + Addl. | # units | potential rent |
|---|---|---|---|
| Occupied, no NTV | 202,203.00 | 137 | 193,873.00 |
| Occupied, NTV | 4,432.00 | 3 | 4,307.00 |
| Occupied NTV Leased | 14,855.00 | 10 | 14,200.00 |
| Vacant Leased | | 0 | - |
| Admin/Down | | 0 | - |
| Vacant Not Leased | | 0 | - |
| totals: | 221,490.00 | 150 | 212,380.00 |

summary billing by transaction code for current date

| code | amount |
|---|---|
| EMPCONC | (297.00) |
| GARAGE | 3,100.00 |
| MTOM | 1,500.00 |
| PETFEE | 150.00 |
| RENT | 212,380.00 |
| total: | 216,833.00 |

# EXHIBIT "D"

## DUE DILIGENCE MATERIALS

**(see attached)**

| Item | Received | Comments |
|------|----------|----------|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable) | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

App.508

| Item | Received | Comments |
|------|----------|----------|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

App.509

# EXHIBIT 38

**SOUTHERN PROPERTIES CAPITAL LTD.**
1603 LBJ Freeway, Suite 800
Dallas, Texas  75234

October 3, 2022

**VIA HAND DELIVERY**
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
JMJD4, LLC
D4DS, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas  75244
Attn: Timothy Barton

   Re: Conversion option for Bellwether Ridge Project; **EXERCISE NOTICE**

Dear Mr. Barton:

   Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Bellwether Ridge, DeSoto, Texas ("Project").

   As you know, the Apartments at Bellwether Ridge, LLC and D4DS, LLC have previously executed a purchase contract to effect such transfer through a deed, once the lender on the Project and HUD have consented to the transfer.  Attached is a proposed First Amendment to such contract together with a check for $100.00 made out to Enoch Investments, LLC, TRWF LLC and JMJAV, LLC.

   Please return the signed amendment so we can continue to process the TPA approval.  If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

         Sincerely,

       By: _____
        Bradley J. Muth, President

15519290v1

App.511

Enoch Investments/TRWF/JMJAV
JMJ01

| CHECK PAYMENT NBR | 311667 | DATE | 10/03/2022 |

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION_NOTE_] SPC Conversion Notice | | $ 100.00 |

| | TOTALS: | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234



THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

Southern Properties Capital Ltd
1603 LBJ Freeway, Suite 800
Dallas, TX 75234        (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS        311667

DATE    10/03/2022        1-279/260

PAY TO THE
ORDER OF    Enoch Investments/TRWF/JMJAV

AMOUNT
$ 100.00

One Hundred Dollars and 00 Cents

Enoch Investments/TRWF/JMJAV
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
Dallas, TX 75234

Alla Dzyuba

⑈311667⑈ ⑆026002794⑆ 4104294800⑈

App.512

## FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

This First Amendment to Agreement of Purchase and Sale ("Amendment") is made and entered into this ___ day of October, 2022, by and between **APTS AT BELLWETHER RIDGE, LLC**, a Delaware limited liability company ("Purchaser") and **D4DS LLC**, a Texas limited liability company ("Seller"):

### RECITALS

A.      Pursuant to an Agreement for Purchase and Sale ("Contract") dated July 6, 2021, Seller agreed to sell, and purchaser agreed to buy improved real property located in the City of Desoto, County of Dallas, State of Texas, known as Bellwether Ridge Apartments ("Property").

B.      The parties desire to amend the Contract under the terms and conditions set forth below.

### AGREEMENTS

NOW, THEREFORE, in consideration of ten and no/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Financing.  The Financing Contingency Period, as such term is defined in the Contract, is hereby amended to expire on March 31, 2023.

2.      Counterparts/Delivery:  This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement.  The parties hereto may execute and deliver this Amendment by forwarding facsimile, telefax, email or other means of copies of this instrument showing execute by the partis sending the same, and the parties agree and intend that such signature shall have the same

1

15515400v1

effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waiver any defense to validity based on any such copies or signatures.

3. _Continued Validity_. Except as amended hereby, the Agreement is and shall remain in full force and effect as originally written and executed.

4. _Captions_. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

EXECUTED as of the date first written above.

**PURCHASER:**

**APTS AT BELLWETHER RIDGE, LLC,**
a Delaware limited liability company

**By:** _____
**Name:** _____
**Title:** _____
**Date:** _____

**SELLER:**

**D4DS LLC,**
a Texas limited liability company

**By:** _____
**Name:** _____
**Title:** _____
**Date:** _____

2

15515400v1

# EXHIBIT 39

Case 3:22-cv-02118-X     Document 181     Filed 03/10/23     Page 128 of 207     PageID 5206

FedEx® Tracking         ⋮

**DELIVERED**

# Tuesday

10/4/2022 at 8:16 am

Signed for by: S.PATEL

⤓ Obtain Proof of delivery

How was your delivery?

☆   ☆   ☆   ☆   ☆

**DELIVERY STATUS**

Delivered ✓

✉ Get Status Updates

**TRACKING ID**

770101862781 ✎ ☆

> **FROM**
> Dallas, TX US
>
> *Label Created*
> 10/3/2022 3:45 PM
>
> **PACKAGE RECEIVED BY FEDEX**
> ADDISON, TX
> 10/3/2022 7:02 PM
>
> **IN TRANSIT**
> ADDISON, TX
> 10/4/2022 7:07 AM
>
> **OUT FOR DELIVERY**
> ADDISON, TX
> 10/4/2022 7:07 AM
>
> **DELIVERED**
> Dallas, TX US
>
> *DELIVERED*
> 10/4/2022 at 8:16 AM
>
> ↓ View travel history

Manage Delivery          ⌄

App.516

Case 3:22-cv-02118-X          Document 181        Filed 03/10/23        Page 129 of 207        PageID 5207

## Travel history ⌄

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)

Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)

Investor Relations(https://investors.fedex.com/home/default.aspx)

Careers(https://careers.fedex.com/fedex/)

FedEx Blog(https://www.fedex.com/en-us/blog.html)

Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)

Newsroom(https://newsroom.fedex.com/)

Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)

FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)

FedEx Logistics(https://www.fedex.com/en-us/logistics.html)

FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)

ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX** ✉ (https://www.fedex.com/en-us/email.html)    f (Https://www.facebook.com/FedEx/)

🐦 (Https://twitter.com/fedex)    📷 (https://www.instagram.com/fedex/)    in (https://www.linkedin.com/company/fedex)

▶ (https://www.youtube.com/fedex)    𝓟 (https://www.pinterest.com/FedEx/)

© FedEx 1995-2022

Site Map (https://www.fedex.com/en-us/sitemap.html)    Terms of Use (https://www.fedex.com/en-us/terms-of-use.html)    Privacy & Security (https://www.fedex.com/en-us/trust-center.html)

App.517

Case 3:22-cv-02118-X    Document 181    Filed 03/10/23    Page 130 of 207    PageID 5208



ORIGIN ID:PNXA    (214) 373-2579
MARTHA SELLWOOD
STEPTOE & JOHNSON PLLC
1603 LBJ FREEWAY
#750
DALLAS, TX 75234
UNITED STATES US

TO TIMOTHY BARTON
ENOCH INVESTMENTS C/O JMJ DEVELOPME
13901 MIDWAY ROAD
SUITE 102
DALLAS TX 75244
(214) 456-8900

SHIP DATE: 03OCT22
ACTWGT: 1.00 LB
CAD: 254212929/INET4530

BILL SENDER

REF: 110596 00003 - SPI-BELLWETHER
DEPT:

TRK# 7701 0186 2781
0201

A1 PNXA

TUE - 04 OCT 8:00A
FIRST OVERNIGHT

TX-US
75244
ASR
DFW

581 J1/AC5F/FE2D

FedEx Express

After printing this label:

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

App.518

# EXHIBIT 40



SOUTHERN
PROPERTIES CAPITAL
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

November 3, 2022

Mr. Courtney C. Thomas
Brown Fox     LLC
8111 Preston Road
Suite 300
Dallas, Texas 75225

Re:    SEC v. Timothy Barton, et al; Civil Action No. 3:22-CV-2118X (Bellwether Ridge)

Dear Mr. Thomas:

This letter is written to you in your capacity as Receiver in the referenced case. Southern Properties Company Ltd. ("Lender") is the lender to JMJ Development, LLC ("Pledgor") in connection with the Bellwether Ridge Apartments, an apartment complex in DeSoto, Texas ("Bellwether Ridge"). By letter dated October 3, 2022 ("Exercise Letter"), a copy of which is attached, Lender exercised its right to acquire ownership of Bellwether Ridge.

Lender's right arises under the (i) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by JMJAV, LLC, to Pledgor, pledging one percent (1%) of the membership interests in JMJD4 LLC, (ii) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by TRWF, LLC to Pledgor, pledging one hundred percent (100%) of the membership interests in JMJAV, LLC, and (iii) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by Enoch Investments, LLC to Pledgor, pledging ninety-nine percent (99%) of the membership interests in JMJAV, LLC (collectively, "Pledges"). The Pledges were assigned to Lender by an Assignment of Pledge and Security Agreement, dated October 2017, executed by Pledgor to Lender ("Assignment"). Copies are attached. The Assignment secured a loan ("Mezzanine Loan") in the amount of $3,800,000.00, evidenced by the attached Promissory Note from Pledgor to Lender, as amended. The security interests granted under the Pledge were perfected by the attached UCC-1s. By letter agreement dated May 5, 2017 (copy attached), JMJAV, JMJD4, LLC, D4DS, LLC and Timothy Barton also agreed to the assignment of ownership interests in D4DS, LLC, the owner of Bellwether Ridge.

Bellwether Ridge is subject to a first mortgage loan ("Mortgage Loan") in the amount of

App.520

Mr. Courtney C. Thomas
October 28, 2022
Page 2

$19,021,200.00 in favor of Greystone Funding Company LLC ("Greystone"), which loan is insured by the US Department of Housing and Urban Development ("HUD"). The Mortgage Loan, as evidenced by a U.S. Department of Housing and Urban Development Regulatory Agreement for Multifamily Projects ("Regulatory Agreement") and a Note ("Note"), both dated October 1, 2017, is secured by a Multifamily Deed of Trust, Assignment of Leases and Rents and Security Agreement ("Deed of Trust," collectively with the Regulatory Agreement and Note referred to as the "Mortgage Documents"). The terms of the Mortgage Documents allow for an assumption of the loan, subject to the approval of both Greystone and HUD. Section 7.15 of the Pledges provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such purchase must be submitted with the signed TPA application.

In the Exercise Letter, Lender included a proposed amendment ("Amendment"), which amended the attached Purchase and Sale Agreement that that had been previously signed by D4DS, LLC and Bellwether Ridge, LLC, a wholly owned subsidiary of Lender. The only reason for the Amendment is that HUD took longer to approve the structure than contemplated. Please review the Amendment and let us know any comments.

While we understand that you have been required to review much information in a short time, it is important that this transfer be submitted to Greystone and HUD as soon as possible. The current proceedings and your appointment as Receiver violate the Mortgage Documents, and we believe proceeding with the transfer can resolve this default.

Please contact Mark Cooper (469) 522-4390 at your earliest convenience. Thank you for your help.

Very truly yours,

**SOUTHERN PROPERTIES CAPITAL LTD.**

By: _____
Name: _____
Title: _____

cc:    Enoch Investments, LLC
       TRWF LLC
       JMJAV, LLC
       JMJD4, LLC
       D4DS, LLC
       JMJ Development, LLC

App.521

# EXHIBIT 41

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Audited Consolidated Financial Statements**

**As of December 31, 2021**

**U.S. Dollars in Thousands**

**INDEX**

|  | PAGE |
|---|---|
| Auditors Report | 1 |
| Consolidated Financial Position | 2 |
| Consolidated Statements of Comprehensive Income | 3 |
| Consolidated Statements of Changes in Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 |
| Appendix | |

App.523



**EY**
Building a better
working world

**Kost Forer Gabbay & Kasierer**
144 Menachem Begin Road, Building A,
Tel-Aviv 6492102, Israel

Tel: +972-3-6232525
Fax: +972-3-5622555
ey.com

## AUDITORS' REPORT
### To the Shareholders of
### Southern Properties Capital LTD

We have audited the accompanying consolidated statements of financial position of Southern Properties Capital Ltd. as of December 31, 2021 and 2020 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2021. These financial statements are the responsibility of the Company's board of directors and management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in Israel, including standards prescribed by the Auditor's Regulations (Auditor's Mode of Performance), 1973. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by the board of directors and management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, based on our audits, the financial statements referred to above present fairly, in all material respects, the financial position of the Company and its subsidiaries as of December 31, 2021 and 2020, and the results of their operations, changes in equity and their cash flows for each of the three years in the period ended December 31, 2021, in conformity with International Financial Reporting Standards (IFRS) and with the provision of the Israeli Securities Regulations (Annual Financial Statements), 2010.

Tel-Aviv, Israel
March 29, 2022

KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

App.524

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Financial Position**
**(dollars in thousands)**

| | Note | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| **Assets** | | | |
| Current Assets | | | |
| Cash and cash equivalents | | $ 50,739 | $ 33,871 |
| Short-term investments | 5 | 16,002 | — |
| Restricted and designated cash | 6 | 8,572 | 35,071 |
| Receivables and other assets | | 6,761 | 3,828 |
| Due from joint venture | | — | 2,356 |
| | | 82,074 | 75,126 |
| Property held for sale | 21 | 26,750 | — |
| | | 108,824 | 75,126 |
| Non-Current Assets | | | |
| Investment properties | 7 | 387,925 | 513,779 |
| Investment in joint venture | 8 | 352,673 | 289,725 |
| Loan receivable | 9 | 7,472 | 14,117 |
| Notes receivable | 10 | 79,507 | 47,850 |
| Advances for acquisition of real estate | 11 | 13,878 | 11,548 |
| Accounts receivable | 12 | 38,095 | 30,742 |
| Restricted and designated cash | 13 | 11,678 | 16,484 |
| | | 891,228 | 924,245 |
| Total assets | | $ 1,000,052 | $ 999,371 |

The accompanying notes are an integral part of these consolidated financial statements.

2

App.525

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Financial Position**
**(dollars in thousands)**

| | Note | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| **Liabilities and Equity** | | | |
| Current Liabilities | | | |
| Current portion of mortgages notes payable | 14 | $ 43,854 | $ 14,979 |
| Current portion of bonds payable | 15 | 46,286 | 44,775 |
| Accounts payable | 16 | 14,640 | 29,459 |
| Tenant deposits | | 878 | 1,414 |
| Related party payable | | — | 2,356 |
| | | 105,658 | 92,983 |
| Liabilities attributed to property held for sale | 21 | 13,697 | — |
| | | 119,355 | 92,983 |
| Non-Current Liabilities | | | |
| Mortgages notes payable | 14 | 118,416 | 207,269 |
| Bonds payable | 15 | 143,166 | 193,113 |
| Other long-term liabilities | | — | 2,813 |
| | | 261,582 | 403,195 |
| Total liabilities | | 380,937 | 496,178 |
| Equity | | | |
| Share and additional paid-in capital | 19 | 165,544 | 165,544 |
| Reserve for transactions with controlling shareholder | | 138,664 | 138,664 |
| Retained earnings | | 314,907 | 198,985 |
| Total equity | | 619,115 | 503,193 |
| Total equity and liabilities | | $ 1,000,052 | $ 999,371 |

Date of approval of the financial statements: March 29, 2022

*Brad Muth*
———————————————
Bradley J. Muth
President and Chairman of the Board

*Erik Johnson*
———————————————
Erik L. Johnson
Executive Vice President and Chief Financial
Officer

3

App.526

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Operations**
**(dollars in thousands)**

| | Note | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2021 | 2020 | 2019 |
| Rental revenues | 4,7(b)(2) | $ 40,012 | $ 52,191 | $ 44,935 |
| Property operating expenses | 18(a) | 19,135 | 22,659 | 21,203 |
| Gross profit | | 20,877 | 29,532 | 23,732 |
| General and administrative expense | 18(b) | (6,505) | (5,057) | (5,154) |
| Other income (expense) | 8(d) | (29,600) | — | (10,557) |
| Revaluation of investments | 7 | 22,273 | 1,489 | 11,845 |
| Share of income (loss) from joint venture | 8 | 100,399 | (472) | 38,993 |
| Operating income | | 107,444 | 25,492 | 58,859 |
| Finance income | 18(c) | 37,020 | 11,711 | 8,802 |
| Finance income from Mezz Loan | 8 | 10,153 | 10,538 | 12,396 |
| Finance expense | 18(d) | (32,520) | (28,571) | (35,754) |
| Foreign currency loss | | (6,175) | (13,378) | (15,108) |
| Net income | | $ 115,922 | $ 5,792 | $ 29,195 |
| Comprehensive income | | $ 115,922 | $ 5,792 | $ 29,195 |

The accompanying notes are an integral part of these consolidated financial statements.

4

App.527

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Changes in Members' Capital**
**(dollars in thousands)**

| | Share and additional paid-in capital | Reserve for transactions with controlling | Retained Earnings | Total equity |
|---|---|---|---|---|
| Balance at January 1, 2019 | $ 165,544 | $ 138,664 | $ 167,956 | $ 472,164 |
| Comprehensive income | — | — | 29,195 | 29,195 |
| Non-cash dividend | — | — | (3,958) | (3,958) |
| Balance at December 31, 2019 | 165,544 | 138,664 | 193,193 | 497,401 |
| Comprehensive income | — | — | 5,792 | 5,792 |
| Balance at December 31, 2020 | 165,544 | 138,664 | 198,985 | 503,193 |
| Comprehensive income | — | — | 115,922 | 115,922 |
| Balance at December 31, 2021 | $ 165,544 | $ 138,664 | $ 314,907 | $ 619,115 |

The accompanying notes are an integral part of these consolidated financial statements.

5

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Cash Flows**
**(dollars in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020 *** | **2019 *** |
| **Operating activities** | | | |
| Net income | $  115,922 | $     5,792 | $    29,195 |
| Adjustments to reconcile net  income to cash provided by operating activities: | | | |
| Revaluation of investment properties | (22,273) | (1,489) | (11,845) |
| Earn Out Obligation Adjustment | 29,600 | — | — |
| Share of (income) loss from joint venture | (100,399) | 472 | (37,434) |
| Overlook allowance | — | — | 1,538 |
| Distributions from joint venture | 10,588 | 10,643 | 5,085 |
| Finance income from Mezz loan | (10,153) | (10,538) | (12,396) |
| Finance expenses, net | 1,675 | 30,238 | 42,060 |
| Changes in operating assets and liabilities | | | |
| Receivables, prepaid expenses and other assets | 5,221 | (889) | 5,445 |
| Accounts payable and accrued expenses | (7,233) | 2,067 | 13,654 |
| Other long-term liabilities | — | 2,813 | — |
| Related party payable | — | (135) | (56) |
| Net cash provided by operating activities | 22,948 | 38,974 | 35,246 |
| **Investing activities** | | | |
| Advances on options to purchase real estate | (2,330) | (1,900) | (3,340) |
| Origination and advances on notes receivable | (6,188) | (16,752) | (38,845) |
| Collections from notes and loan receivable | 19,410 | 15,293 | 16,234 |
| Proceeds from sale of receivables | 5,000 | — | — |
| Proceeds from sale of land | 20,366 | 12,854 | 4,218 |
| Proceeds from sale of investment properties | 77,340 | — | — |
| Investment in joint venture | — | (118) | — |
| Additions to investments in real estate | (19,355) | (24,972) | (39,280) |
| Investment in short-term securities | (16,000) | — | — |
| Change in restricted cash | 31,305 | (8,187) | 21,379 |
| Net cash provided by (used in) investing activities | 109,548 | (23,782) | (39,634) |

**Year Ended December 31,**

6

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Cash Flows**
**(dollars in thousands)**

| | 2021 | 2020 * | 2019 * |
|---|---|---|---|
| **Financing activities** | | | |
| Proceeds from issuance of bonds payable | — | 19,060 | 73,884 |
| Payments on bonds payable | (56,512) | (23,263) | (22,044) |
| Proceeds from mortgages and notes payable | 20,015 | 14,092 | 23,973 |
| Payments on mortgages and notes payable | (51,671) | (6,130) | (45,240) |
| Payments of interest | (28,317) | (24,348) | (24,253) |
| Foreign exchange of cash on hand | 857 | 1,453 | — |
| Net cash used in financing activities | (115,628) | (19,136) | 6,320 |
| Net increase (decrease) in cash and cash equivalents | 16,868 | (3,944) | 1,932 |
| Cash and cash equivalents at beginning of period | 33,871 | 37,815 | 35,883 |
| Cash and cash equivalents at end of period | $ 50,739 | $ 33,871 | $ 37,815 |
| Significant non-cash transactions: | | | |
| Non-cash dividend | $ — | $ — | $ 3,958 |
| Payable for assets under construction | $ — | $ — | $ 305 |
| Receivable from joint venture offset against related party payable | $ 2,356 | $ — | $ — |
| Distribution from joint venture applied to earn-out obligation | $ 5,441 | $ — | $ — |

• The amounts have been reclassified.

The accompanying notes are an integral part of these consolidated financial statements.

7

App.530

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 1. General**

a.   A general description of the Company and its activity:

Southern Properties Capital Ltd. (the Company) was incorporated on August 16, 2016, as a private company limited by shares, in conformity with provisions of the BVI Business Companies Act, 2004. The Company was incorporated for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange (the "TASE"). Upon incorporation, the Company issued one certificate containing 100 common shares with no par value.

The Company and its subsidiaries (the "Company"), operate in the United States and are primarily involved in (i) investing in, developing, constructing and operating income-producing properties of multifamily residential real estate assets and commercial real estate assets, and (ii) investing in land held for capital appreciation.

The Company is a wholly-owned subsidiary of Abode Multi Property, LP, a limited partnership incorporated in the State of Delaware, which is a wholly-owned subsidiary of Transcontinental Realty Investors, Inc. ("TCI"), a company incorporated in the State of Nevada, whose shares are listed for trading on the New York Stock Exchange ("NYSE") under ticker symbol TCI, in conformity with the US Securities Act and with the Security Exchange Commission ("SEC").

b.   As of December 31, 2021, the Company has a consolidated working capital deficiency of approximately $10,531. The deficiency is derived from the non-recourse loan on Stanford Center of $39,331 that matures on February 26, 2022. On March 3, 2022, the lender extended the maturity of the loan to February 26, 2023 (See Note 14).

The Company is also obligated to make bond principal and interest payments of approximately $29,256,  $26,969 and $97,947 on January 31, 2022, July 31, 2022 and January 31, 2023, respectively. The Company expects to fund these payments from cash on hand and short-term investments, which was approximately $42,685 as of the reporting date, cash from operations, and proceeds  from sale or refinance of properties, bond offerings and sale of joint venture properties.

Management and the board of directors have concluded that the Company has the ability to repay its obligations as they become due during the foreseeable future.

c.   Consequences of coronavirus ("COVID-19"):

The Company continues to closely monitor the impact of the COVID-19 pandemic on all aspects of its business and its property portfolio. While COVID-19 has not caused a significant disruptions to the Company's residential real estate operations, it has resulted in a decrease in occupancy and fair value of some of its commercial properties. The future impact of COVID-19 on our business and financial activities will depend on future developments, which at this stage are unpredictable considering the fluctuations of COVID-19 outbreaks and the resulting changes in the markets.

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 2. Significant Accounting Policies**

The following accounting policies have been consistently applied in the financial statements for all periods presented, unless otherwise stated.

*Basis of preparation*

The consolidated financial statements are prepared in accordance with International Financial Reporting Standards ("IFRS"). Furthermore, the consolidated financial statements have been prepared in conformity with the provisions of the Israeli Securities Regulations (Annual Financial Statements), 2010.

The consolidated financial statements have been prepared on a cost basis, except for investment properties.

*The operating cycle*

The operating cycle of the Company is one calendar year.

*Consolidated financial statements*

The consolidated financial statements comprise the financial statements of companies that are controlled by the Company (subsidiaries). Control is achieved when the Company is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Potential voting rights are considered when assessing whether an entity has control. The consolidation of the financial statements commences on the date on which control is obtained and ends when such control ceases.

The financial statements of the Company and its subsidiaries are prepared on the same dates and periods. The accounting policies applied in the financial statements of the subsidiaries are uniform and consistent with the policies applied in the consolidated financial statements of the Company. Significant intercompany balances and transactions and gains or losses resulting from intercompany transactions are fully eliminated in the consolidated financial statements.

*Business combinations*

Business combinations are accounted for by applying the acquisition method. The cost of the acquisition is measured at the fair value of the consideration transferred on the acquisition date. Direct acquisition costs are reported on consolidated statement of comprehensive income as they are incurred.

Regarding business combination under common control – see Note 1 above.

*Investments in joint ventures.*

Joint ventures in which the Company has significant influence over the financial and operating policies without having control. The investment in joint ventures is accounted for using the equity method.

Under the equity method, the investment in the joint venture is presented at cost with the addition of post-acquisition changes in the Company share of net assets, including other comprehensive income of the joint venture. Profits and losses resulting from transactions between the Company and the joint venture are eliminated to the extent of the interest in the joint venture.

The financial statements of the Company and of the joint ventures are prepared as of the same dates and periods. The financial statements of the joint venture Victory Abode Apartments, LLC are prepared under accounting principles

9

App.532

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

generally accepted in the United States of America ("U.S. GAAP"). The Company adjusted the financial statements of Victory Abode Apartments, LLC in accordance with the Company accounting policy.

The equity method is applied until the loss of significant influence in the joint venture or loss of joint control in the joint venture or classification as held-for-sale.

*Functional currency, presentation currency and foreign currency*

The functional and presentation currency of the financial statements is the USD unless otherwise stated.

The Company determines the functional currency of each Company entity, including companies accounted for at equity method.

Transactions denominated in foreign currency are recorded upon initial recognition of the exchange rate at the date of the transaction. After initial recognition, monetary assets and liabilities denominated in foreign currency are translated at each reporting date into the functional currency based on the exchange rate at that date. Exchange rate differences, other than those capitalized to qualifying assets or accounted for as hedging transactions in equity, are recognized as unrealized profit or loss.

*Cash equivalents:*

Cash equivalents are considered as highly liquid investments, including unrestricted short-term bank deposits with an original maturity of three months or less from the date of investment.

*Short-term deposits and restricted cash*

Short-term deposits and restricted cash are classified as deposits with an original maturity date of more than three months from the date of investment and when the Company places restrictions on the uses. They can also be classified as deposits which do not meet the definition of cash equivalents. The deposits are presented according to their terms of deposit.

*Revenue recognition*

Revenue from contracts with customers is recognized in profit or loss when control over the asset or service is transferred to the customer. The transaction price is the amount of the consideration expected to be received in accordance with the terms of the contract, less the amounts collected in favor of third parties (such as taxes).

In determining the amount of income from customer contracts, the Company examines whether it operates as a principal supplier or as a contract agent. The Company is a major supplier when it controls the goods or services that have not yet been promised and transfer it to the customer. In such cases, the Company recognizes revenue in the gross amount of the consideration.

*Leases*

The criteria for classifying leases as finance or operating leases depend on the substance of the agreements and are made at the inception of the lease in accordance with the following principles as set out in IAS 17.

The Company as lessee:

Finance leases transfer to the Company substantially all the risks and benefits incidental to ownership of the leased asset. The Company did not have any finance leases during the three years ended December 31, 2021.

App.533

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

The Company as lessor:

Lease agreements are classified as an operating lease if they do not transfer substantially all the risks and benefits incidental to ownership of the leased asset. Lease payments or lease receipts are recognized as a revenue in profit or loss on a straight-line basis over the lease term.

Minimum rental revenues arising from operating leases on investment properties are accounted for on a straight-line basis over the lease term. Operating lease terms for the Company's investment properties for residential purposes are generally one year or less. Rental revenues attributable to residential leases are recorded when due from tenants and are recognized monthly as they are earned, which is not materially different than on a straight-line basis. Certain lease agreements provide for fixed rental increases which are recognized on a straight-line basis. Certain lease agreements also provide for the reimbursement of certain operating expenses such as real estate taxes, water, electricity and common area maintenance costs by the tenants. The reimbursements are recorded as recoveries revenue.

*Borrowing costs:*

The Company capitalizes borrowing costs that are attributable to the acquisition, construction or restructuring qualifying assets which necessarily take a substantial period of time to get ready for their intended use.

The capitalization of borrowing costs commences when expenditures for the asset as well as the borrowing costs are incurred and the activities to prepare the asset are in progress. It ceases when substantially all the activities to prepare the qualifying asset for its intended use or sale are complete and general borrowing costs based on a weighted capitalization rate.

*Investment properties*

An investment property is an asset (land or a building or both) held by the owner (lessor under an operating lease) or by the lessee under a finance lease to earn rentals or for capital appreciation or both rather than for use in the production or supply of goods or services, for administrative purposes or for sale in the ordinary course of business.

Investment property is derecognized on disposal or when the investment property ceases to be used and no future economic benefits are expected from its disposal. The difference between the net disposal proceeds and the carrying amount of the asset is recognized in profit or loss in the period of the disposal.

Investment property is measured initially at cost, including costs directly attributable to the acquisition. After initial recognition, investment property is measured at fair value which reflects market conditions at the reporting date. Gains or losses arising from changes in the fair value of investment property are included in profit or loss when they arise. Investment property is not systematically amortized.

Investment property under construction for future use as investment property is also measured at fair value, as above, if fair value can be reliably measured. If fair value cannot be reliably measured, due to the nature and risks of the project, then it is measured at cost less impairment losses, if any, until the earlier of the date when the fair value can be reliably measured or the date when construction is complete. The cost basis of investment property under construction includes cost of land; costs of borrowings that are used to finance construction; directly attributable planning and development incremental costs and brokerage fees relating to agreements to lease the property.

11

App.534

# SOUTHERN PROPERTIES CAPITAL LTD.

## Notes to Consolidated Financial Statements
### (dollars in thousands)

In determining the fair value of investment property, the Company relies periodically on valuations performed by external independent valuation specialists who are experts in real estate valuations and who have the necessary knowledge and experience.

*Financial instruments*

As detailed in Note 2Q2 regarding IFRS No. 9 - "Instruments" (Hereinafter - "the Standard"), the Company elected to apply the provisions of the standard retroactively without restatement comparison numbers. New IFRS standards in place during the year.

1. Financial assets

   Financial assets are measured at the date of initial recognition at their fair value plus transaction costs which can be directly attributed to the acquisition of the financial asset, except in the case of a financial asset is measured at fair value through profit or loss, in respect of which transaction costs are charged to profit or loss. The Company classifies and measures the debt instruments in its financial statements on the basis of the criteria

   below:

   (A) the business model of the company for the management of financial assets, and

   (B) the contractual cash flow characteristics of the financial asset.

   Financial assets within the scope of the standard are measured at the date of initial recognition at their fair value, plus transaction costs that can be directly attributed to the acquisition of the financial asset, except in the case of a financial asset measured at fair value through profit or loss in respect of which transaction costs are charged to profit or loss.

   (C) The Company measures debt instruments at amortized cost when:

   The Company's business model is the holding of financial assets in order to collect contractual cash flows; and the contractual terms of the financial asset provide entitlement on defined dates to cash flows that are only principal and interest payments in respect of the amount of the principal that has not yet been repaid.

   Subsequent to initial recognition, instruments in this group shall be presented at their cost at cost plus transaction costs directly using the amortized cost method.

2. Impairment of financial instruments

   The Company examines at each reporting date the provision for loss in respect of financial debt instruments that are not measured at fair value through profit or loss.

   The impairment in respect of debt instruments measured at amortized cost will be charged to profit or loss against provision. The Company has financial assets with short credit periods such as customers, for which it is entitled to implement the relief prescribed in the model, ie., the Company will measure the provision for loss in an amount equal to expected credit losses throughout the life of the instrument. The Company chose to apply the relief regarding these financial assets.

3. Withdrawal of financial assets

   A financial asset is derecognized only when the contractual rights to the cash flows from the financial asset expire.

12

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

4.  Financial liabilities

On the initial recognition date, the Company measures the financial liabilities within the scope of the Standard at fair value net of transaction costs directly attributable to the issue of the financial liability, except in the case of a financial liability measured at fair value through profit or loss for which transaction costs are charged to profit or loss.

After initial recognition, the Company measures all financial liabilities according to the amortized cost method.

A financial liability is derecognized when and only when it is extinguished - that is, when the obligation specified in the contract is discharged or canceled or expires.

5.  Offsetting financial instruments

Financial assets and financial liabilities are offset and the net amount is presented in the statement of financial position if there is a legally enforceable right to offset the recognized amounts and there is an intention to settle the asset and liability on a net basis or to realize the asset and eliminate the liability simultaneously.

6.  Transactions with controlling shareholders

Assets in respect of which a transaction was executed between the Company and its controlling shareholder or between companies under the same control are recognized on the transaction date at fair value. The difference between the fair value and the consideration determined in the transaction is charged to a separate item in the capital "Fund in respect of transactions with controlling shareholders".

*Fair value measurements:*

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Fair value measurement is based on the assumption that the transaction will take place in the asset's or the liability's principal market, or in the absence of a principal market, in the most advantageous market.

The fair value of an asset or a liability is measured using the assumptions that market participants would use when pricing the asset or liability, assuming that market participants act in their economic best interest.

The Company uses valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximizing the use of relevant observable inputs and minimizing the use of unobservable inputs.

All assets and liabilities measured at fair value or for which fair value is disclosed are categorized into levels within the fair value hierarchy based on the lowest level input that is significant to the entire fair value measurement:

Level 1    -   quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2    -   inputs other than quoted prices included within Level 1 that are observable either directly or indirectly.

Level 3    -   inputs that are not based on observable market data (valuation techniques which use inputs that are not based on observable market data).

13

App.536

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Provisions*

A provision in accordance with IAS 37 is recognized when the Company has a present obligation (legal or constructive) as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

The financial statements include a provision for legal claims. A provision for claims is recognized when the Company has a present legal or constructive obligation as a result of a past event. It is more likely than not that an outflow of resources embodying economic benefits will be required by the Company to settle the obligation and a reliable estimate of the obligation amount can be made.

*Taxes*

According to the relevant tax laws in the British Virgin Islands and in the United States of America, the companies in the consolidated group are considered as "pass through" entities. Accordingly, no provision has been made for federal and state income taxes or other income tax benefits in the accompanying financial statements as taxable income and losses are reported in the tax returns of the shareholders.

*Contributions and distributions*

Contributions and distributions consist of amounts due to/from related parties and cash and cash equivalents that did not transfer to the Company from the transferring entities upon the acquisition of properties at the time of the initial public offering (IPO).

14

App.537

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 3. Significant Estimates**

Significant accounting judgments, estimates, and assumptions used in the preparation of the financial statements:

In the process of applying the significant accounting policies, the Company has made the following judgments which have the most significant effect on the amounts recognized in the financial statements:

a.    Judgments:

*Classification of leases:*

For the purpose of examining whether a lease should be classified as finance or operating, the Company examines whether the lease essentially transfers all the risks and benefits accompanying the ownership of the asset. The Company examines, inter alia, the existence of an option-purchase option, the lease period relative to the economic life of the asset and the present value of the minimum lease payments in relation to the fair value of the asset.

*Rental revenues:*

Certain lease agreements provide for the reimbursement of certain operating expenses such as real estate taxes, water, electricity and common area maintenance costs by tenants. If the Company acts as an agent and not as a principal, the Company accounts for such leases on the gross basis.

*Transactions with controlling shareholders:*

Assets in respect of which a transaction was executed between the Company and its controlling shareholder or between companies under the same control are recognized on the transaction date at fair value. The difference between the fair value and the consideration determined in the transaction is charged to a separate item in the capital "Reserve in respect of transactions with controlling shareholders".

b.    Estimates and assumptions:

The preparation of the financial statements requires management to make estimates and assumptions that have an effect on the application of the accounting policies and on the reported amounts of assets, liabilities, revenues and expenses. Changes in accounting estimates are recorded in the period in which the estimate is changed.

The key assumptions made in the financial statements concerning uncertainties at the reporting date and the critical estimates computed by the Company that may result in a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

*Investment property:*

Investment property that can be reliably measured is presented at fair value at the reporting date. Changes in its fair value are recognized in profit or loss. Fair value is determined generally by external independent valuation specialists using valuation techniques and assumptions as to estimates of projected future cash flows from the property and estimate of the suitable discount rate for these cash flows. When possible, fair value is determined based on recent real estate transactions with similar characteristics and location of the valued property.

In determining the fair value of investment property, valuation specialists and the Company's management are required to use certain assumptions in order to estimate the future cash flows from the properties regarding the required yield rates on the Group's properties, the future rental rates, occupancy rates, lease renewals, the

15

App.538

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

probability of leasing vacant spaces, property operating expenses, the financial strength of tenants and the implications of any investments for future development. Changes in the assumptions that are used to measure investment property may lead to a change in fair value.

16

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Reliable measurement of fair value of investment property under construction:*

In evaluating whether the fair value of investment property under construction can be reliably measured, the Group considers, among others, the following relevant indicators:

1. Is the property being constructed in active market;

2. Are there any price quotations from recent transactions or prior valuations from acquisitions or sales of properties with similar characteristics and geographical location;

3. Has a construction contract been signed with the developer;

4. Have the required building permits been obtained;

5. What percentage of rentable area has been pre-leased to tenants;

6. Are construction costs reliably determinable;

7. Is the value of the completed property reliably determinable.

If after evaluating the above indicators it is determined that the fair value of investment property under construction can be reliably measured, the property is measured at fair value in accordance with the Group's policy for investment property. If fair value cannot be reliably measured, then investment property under construction is measured at cost less, if appropriate, any impairment loss.

c.    Disclosure of new standards in the period prior to their adoption:

*IFRS 3 Business Combinations*

In October 2018, the IASB issued an amendment to the definition of a "business" in IFRS 3, "Business Combinations" ("the Amendment"), in an aim to assist entities in determining whether an acquisition transaction should be accounted for as a business combination or as an acquisition of an asset.

The Amendment consists of the following:

1. Clarification that to meet the definition of a business, an integrated set of activities and assets must include, as a minimum, an input and a substantive process that together significantly contribute to the ability to create output.

2. Removal of the reference to the assessment whether market participants are capable of acquiring the business and continuing to operate it and produce outputs by integrating the business with their own inputs and processes.

3. Introduction of additional guidance and examples to assist entities in assessing whether the acquired processes are substantive.

4. Narrowing the definitions of "outputs" and "business" by focusing on goods and services provided to customers.

5. Introducing an optional concentration test that permits a simplified assessment of whether an acquired set of activities and assets is not a business.

6. The Amendment is to be applied prospectively to all business combinations and asset acquisitions for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after January 1, 2020, with earlier application permitted.

The Company's estimation, implementation of the standard did have a material impact on its financial statements.

17

App.540

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

App.541

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Amendments to IAS 1, "Presentation of Financial Statements":*

In January 2020, the IASB issued several amendments to IAS 1, "Presentation of Financial Statements" ("the Amendments") in an aim to clarify the criteria for determining the classification of liabilities as current or non-current.

The Amendments consist of the following clarifications:
1. Clarification of the definition of the right to defer settlement of a liability.
2. Clarification that only the rights an entity has at the end of the reporting period can determine whether it has the right to defer settlement of the liability.
3. Clarification of the means that can be used to settle a liability other than by transfer of cash (such as by transfer of equity instruments).

The Amendments are to be applied retrospectively effective for annual periods beginning on or after January 1, 2020, with earlier application permitted.

The Company's implementation of the standard did not have a material impact on its financial statements.

**Note 4. Operating Segments**

Operating segments are reported in a manner consistent with the internal reporting provided to the Company's chief executive officer or chief operating decision maker ("CODM"). The CODM, is responsible for allocating resources and assessing the performance of the operating segments, and makes strategic decisions.

During 2020, the Company replaced its chief executive officer, and as a result, changed its CODM. The Company has updated its operating segments in accordance with how its new CODM assesses Company performance and allocates resources. The prior CODM had management oversight over the Company and VAA, and therefore included the VAA portfolio in the multifamily operating segment at 100%. The Company's current CODM has limited influence on VAA, and therefore, includes VAA at the Company's 50% pro rata share. In addition, the new CODM does not consider the Company's land sales transaction as an operating segment, and has included its operations in unallocated expenses. The Company has revised prior year amounts to conform with the current presentation.

Management has determined the operating segments based on the reports reviewed by the senior management team in making strategic decisions. For management purposes, the Company considers the business based on the following operating segments:

- Multifamily real estate - purchases and develops investment properties primarily consisting of multifamily apartment complexes or buildings in order to produce rental income or for capital appreciation or both. The segment include the financial information of VAA on a 50% proportion share (See Note 8).

- Commercial real estate - purchases and develops investment properties primarily consisting of offices in order to produce rental income or for capital appreciation or both.

Unallocated represents expenses general and administrative expenses of the Company's corporate office, land sale transactions, finance income from the notes receivable and bank accounts, interest expense from the Series A and Series B bonds and gain (loss) from foreign currency transactions in connection with the bonds.

No reportable operating segments have been aggregated. There are no intercompany transactions between the different segments. Management reviews the operating results of its business units separately for the purpose of making

19

App.542

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

decisions about resource allocation and performance assessment. Segment performance is evaluated based on net operating income, which is calculated as rental revenues less property operating expenses.

| | Year Ended December 31, 2021 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Residential | Commercial | Unallocated | Adjustment | Total |
| Rental revenues | $ 85,961 | $ 23,632 | $ — | $ (69,581) | $ 40,012 |
| Property operating expenses | 42,063 | 11,276 | — | (34,204) | 19,135 |
| Gross profit | 43,898 | 12,356 | — | (35,377) | 20,877 |
| General and administrative expenses | (1,100) | (480) | (4,925) | — | (6,505) |
| Other expense | (29,600) | — | — | — | (29,600) |
| Revaluation of investments | 119,658 | (18,226) | 14,046 | (93,205) | 22,273 |
| Income from joint venture | — | — | — | 100,399 | 100,399 |
| Operating income (loss) | 132,856 | (6,350) | 9,121 | (28,183) | 107,444 |
| Finance income | — | — | 37,020 | — | 37,020 |
| Finance income from Mezz Loan | — | — | — | 10,153 | 10,153 |
| Finance expense | (25,090) | (9,125) | (16,335) | 18,030 | (32,520) |
| Gain on foreign currency transactions | — | — | (6,175) | — | (6,175) |
| Net income (loss) | $ 107,766 | $ (15,475) | $ 23,631 | $ — | $ 115,922 |

| | Year Ended December 31, 2020 * | | | | |
| --- | --- | --- | --- | --- | --- |
| | Residential | Commercial | Unallocated | Adjustment | Total |
| Rental revenues | $ 77,172 | $ 36,807 | $ — | $ (61,788) | $ 52,191 |
| Property operating expenses | 37,095 | 15,245 | — | (29,681) | 22,659 |
| Gross profit | 40,077 | 21,562 | — | (32,107) | 29,532 |
| General and administrative expenses | (1,942) | (118) | (4,756) | 1,759 | (5,057) |
| Revaluation of investments | 175 | (18,421) | 17,386 | 2,349 | 1,489 |
| Loss from joint venture | — | — | — | (472) | (472) |
| Operating income | 38,310 | 3,023 | 12,630 | (28,471) | 25,492 |
| Finance income | — | — | 11,711 | — | 11,711 |
| Finance income from Mezz Loan | — | — | — | 10,538 | 10,538 |
| Finance expense | (22,576) | (10,624) | (13,304) | 17,933 | (28,571) |
| Gain on foreign currency transactions | — | — | (13,378) | — | (13,378) |
| Net income (loss) | $ 15,734 | $ (7,601) | $ (2,341) | $ — | $ 5,792 |

- The amounts have been revised to conform to the current presentation

20

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

| | Residential | Commercial | Unallocated | Adjustment | Total |
|---|---|---|---|---|---|
| | | | Year Ended December 31, 2019 * | | |
| Rental revenues | $ 70,670 | $ 31,952 | $ — | $ (57,687) | $ 44,935 |
| Property operating expenses | 35,098 | 14,826 | — | (28,721) | 21,203 |
| Gross profit | 35,572 | 17,126 | — | (28,966) | 23,732 |
| General and administrative expenses | (1,692) | (19) | (4,976) | 1,533 | (5,154) |
| Other income | — | — | (10,557) | — | (10,557) |
| Revaluation of investments | 48,674 | (1,775) | 7,179 | (42,233) | 11,845 |
| Loss from joint venture | — | — | — | 38,993 | 38,993 |
| Operating income | 82,554 | 15,332 | (8,354) | (30,673) | 58,859 |
| Finance income | 86 | — | 12,493 | (3,777) | 8,802 |
| Finance income from Mezz Loan | — | — | — | 12,396 | 12,396 |
| Finance expense | (21,879) | (12,198) | (23,731) | 22,054 | (35,754) |
| Loss on foreign currency transactions | — | — | (15,108) | — | (15,108) |
| Net income | $ 60,761 | $ 3,134 | $ (34,700) | $ — | $ 29,195 |

- The amounts have been revised to conform to the current presentation

| | Residential | Commercial | Unallocated | Adjustment | Total |
|---|---|---|---|---|---|
| **December 31, 2021** | | | | | |
| Segment assets | 1,023,705 | 173,890 | 632,198 | (829,741) | 1,000,052 |
| Segment liabilities | 682,990 | 54,358 | 212,222 | (568,633) | 380,937 |
| Capital expenditures | 1,694 | 2,117 | 2,809 | — | 6,620 |
| **December 31, 2020 *** | | | | | |
| Segment assets | 897,177 | 268,851 | 553,503 | (720,160) | 999,371 |
| Segment liabilities | 673,722 | 96,190 | 280,881 | (554,615) | 496,178 |
| Capital expenditures | 13,431 | 4,507 | 1,554 | — | 19,492 |

- The amounts have been revised to conform to the current presentation

**Note 5. Short-term Investments**

The Company has an investment in variable denominated floating rate notes with Toyota Motor Credit Corporation. The notes are have no stated maturity and are subject to immediate repayment at the Company's option. At December 31, 2021, the interest rate on the notes was 1.15%.

21

App.544

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 6. Restricted Cash - Current**

Current restricted and designated cash consists of the following:

| | December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| Designated Cash - Lender Escrow(1) | $ | 8,572 | $ | 12,597 |
| Restricted Cash - Trustee Reserve(2) | | — | | 19,743 |
| Restricted Cash - Other Deposits(3) | | — | | 2,731 |
| | $ | 8,572 | $ | 35,071 |

1. Pursuant to loan agreements, the Company is required to establish escrows for the payment of insurance, real estate taxes and tenant improvements. Funds are released from the escrow accounts in accordance with the terms of the applicable loan agreements.

2. The Company retained $19,700 from Series A expansion proceeds for its January 2021 bonds principal and interest payment.

3. Letters of credit with Truist Bank for working capital and initial deficit reserves related to two properties that were transferred to VAA in 2019. These letters of credit expired in 2021.

**Note 7. Investment Properties**

a.  Composition:

| | December 31, | | | |
|---|---|---|---|---|
| | 2021 | | 2020 | |
| Residential | $ | 154,096 | $ | 197,779 |
| Commercial | | 162,800 | | 253,000 |
| Land held for appreciation or development | | 71,029 | | 63,000 |
| | $ | 387,925 | $ | 513,779 |

Residential real estate consists of multifamily properties that are either stabilized or in lease-up.

22

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

b.   Movement

| | Residential | Commercial | Investment Land | Total |
|---|---|---|---|---|
| Balance at January 1, 2019 | $ 176,349 | $ 267,500 | $ 56,915 | $ 500,764 |
| Acquisitions(1) | 5,475 | — | — | 5,475 |
| Improvement | 13,431 | 4,507 | 1,554 | 19,492 |
| Disposal(5) | — | — | (12,854) | (12,854) |
| Straight-line rents | — | (587) | — | (587) |
| Revaluation adjustment | 2,524 | (18,420) | 17,385 | 1,489 |
| Balance at December 31, 2020 | 197,779 | 253,000 | 63,000 | 513,779 |
| Acquisitions | — | — | — | — |
| Improvement | 882 | 2,117 | 2,810 | 5,809 |
| Damages from hurricane(8) | (6,129) | — | — | (6,129) |
| Disposal(3,4,5) | (26,600) | (74,750) | (20,366) | (121,716) |
| Straight-line rents | — | 659 | — | 659 |
| Transfer among segments(6) | (11,539) | — | 11,539 | — |
| Property held for sale(7) | (26,750) | — | — | (26,750) |
| Revaluation adjustment | 26,453 | (18,226) | 14,046 | 22,273 |
| Balance at December 31, 2021 | $ 154,096 | $ 162,800 | $ 71,029 | $ 387,925 |

(1) On March 5, 2020, the Company purchased EKQ Portage LLC, which owns approximately 49.2 acres of land in Kent, Ohio, from an unrelated third party for $5,350. The purchase price was funded by a $2,000 cash payment and the issuance of a $3,350 note payable that bears interest at 10.0% and matures on November 13, 2024.

(2) On October 6, 2020, the Company entered into lease termination agreement with 7-Eleven, Inc. ("7-Eleven"), which occupied 23.7% of the rental areas of Browning Place, a pledged property for Series C debentures. The termination agreement provided for an early lease termination on December 31, 2020 in exchange for a termination fee of approximately $5,900, which was included in rental income for 2020.

Concurrently, the Company entered into a new lease with Southwestern Health Clinically Integrated Network for the spaced that was formerly occupied by 7-Eleven. The new lease provides for a 10-year term with a four month rent concession with rents that are approximately $300 more per year that what was paid by 7-Eleven. The Company incurred broker commissions of $824 in 2020 and expects to pay up to $3,711 in tenant improvement expenditures in 2022.

(3) On March 30, 2021, the Company sold a 50% ownership interest in the special purpose entity that owned Overlook at Allensville Phase II, a 144 unit multifamily property in Sevierville, Tennessee to Macquarie for $2,551. Concurrent with the sale, the Company and Macquarie, each contributed their 50% ownership interests in the entity into VAA.

(4) On August 26, 2021, the Company sold 600 Las Colinas, a 512,173 square foot office building in Irving, Texas for $74,750. The Company used the proceeds from the sale to pay off the $35,946 mortgage note payable on the property, pay debt extinguishment costs of $3,903 and for general corporate purposes.

(5) During 2021 and 2020, the Company sold 436 and 253 lots of Windmill Farms for a sales price of $20,184 and $12,854, respectively.

(6) Land for developments was transferred from residential to land held for investment.

(7) Toulon was classified as held for sale at December 31, 2021 (See note 21).

23

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

(8) In 2021, the Company's Landing Bayou property suffered significant damage from Hurricane Ida. As a result, the Company estimates that it will cost approximately $6,129 to repair the damage. The claim is covered by the Company's property insurance policy, which after deduction of $1,036, has been included in receivables and other assets.

(9) On March 24, 2021, the Company entered into an agreement with a third party to sell portion of undeveloped land in Windmill Farms, Forney Texas, for the total consideration of $10,000 and transaction is expected to close in 2022

c.  The investment property has been pledged to secure mortgages received for financing the investment property's acquisition.

d.  The Company's real estate is stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the location and category of the property being valued. The fair value was determined with reference to recent real estate transactions for similar properties in the same location as the property owned by the Company and based on the expected future cash flows from the property, if applicable. In assessing cash flows, risk is taken into account by using an investment yield that reflects the property's underlying risks supported by the standard yield in the real estate market and by including adjustments for the specific characteristics of the property and the level of future income therefrom. Land held for capital appreciation and certain investment properties under construction (those for which development activities are underway but construction has not commenced) are generally valued based on comparable sales transactions.

The valuation of real estate under construction using the comparison method or the cash flow discounting method, as it deems appropriate. The determination of fair value is based on the estimated future income from the finished project, using adjusted yields for the significant risks associated with the purchase process. Which are higher than the current returns on similar investment property when finished. The remaining expected costs to be completed, plus entrepreneurial profit, are deducted from the estimated future revenue as stated above.

e.  The following main inputs have been used:

Significant assumptions (on the basis of weighted averages) used in the valuations are presented below:

|  | December 31, | |
| --- | --- | --- |
|  | **2021** | **2020** |
| *Residential* | | |
| Average rent per square foot | $ 13.40 | $ 12.38 |
| Capitalization Rate | 5.52 % | 5.94 % |
| Vacancy | 8.59 % | 4.84 % |
| *Commercial* | | |
| Average rent per square foot | $ 21.31 | $ 24.12 |
| Capitalization Rate | 7.19 % | 7.12 % |
| Vacancy | 30.08 % | 16.14 % |

The table below presents the sensitivity of the valuation to changes in the most significant assumptions underlying the valuation of investment properties based on an increase in capitalization rate of 25 basis points:

24

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

|  | December 31, | |
|  | **2021** | **2020** |
|---|---|---|
| Residential | $ (7,858) | $ (6,620) |
| Commercial | $ (3,332) | $ (5,570) |

The fair value measurement is classified as Level 3 in the fair value hierarchy.

The future aggregate minimum rentals receivable under non-cancellable commercial operating leases are as follows:

|  | December 31, | |
|  | **2021** | **2020** |
|---|---|---|
| Less than one year | $ 13,314 | $ 23,419 |
| One to five years | 24,664 | 48,256 |
| More than 5 years | 20,008 | 32,505 |
|  | $ 57,986 | $ 104,180 |

25

App.548

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 8. Investment in Joint Venture**

The following table summarizes the Company's investment in joint ventures at December 31, 2021 and 2020:

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| Share capital and additional paid-in capital | $ 123,899 | $ 130,241 |
| Retained earnings | 137,549 | 35,654 |
| Mezz Loan | 125,384 | 123,830 |
| Earn-Out obligation | (34,159) | — |
| | $ 352,673 | $ 289,725 |

(a)  On November 16, 2018, the Company formed Victory Abode Apartments, LLC ("VAA"), a joint venture with the Summerset Intermediate Holdings 2, a wholly owned subsidiary of Macquarie Group ("Macquarie"). VAA was formed as a result of a sale of the 50% ownership interest in 51 multifamily properties owned by the Company in exchange for a 50% voting interest / 49% profit participation interest ("Class A interest") in VAA and a note payable ("Mezzanine Loan"). Concurrent with the contribution, VAA issued Class B interests with a 2% profits participation interest and no voting rights to Daniel J. Moos ("Class B Member"), the former President and Chief Executive Officer of TCI and Pillar. The Class B Member serves as the Manager of VAA.

The Mezz Loans mature on November 19, 2023 and bear interest-only at LIBOR plus 8.25%. Interest payments are due on February 15 and August 15 of each year. Unpaid accrued interest is capitalized into the Mezz Loans balance. The Mezz Loans are secured by a first lien on 100% of the rights in the entities that hold the properties were contributed to VAA.

In connection with the formation of VAA, ten out of the initial properties were subject to an earn-out provision ("Earn Out") that provides for a remeasurement of value after a two-year period following the completion of construction. Upon the formation of VAA, the Company recorded a liability ("Earn Out Obligation") for the $10,000 advance on the Earn Out that it received from Macquarie.

b.   On February 6, 2019, the Company received $7,400 proration settlement from  VAA that was transferred to TCI.

c.   On May 15 2019, the Company recorded an additional $1,100 proration adjustment, resulting in a proration payable of $13,900 to the Company and TCI. VAA settled the payable with a payment of $8,100 to TCI and $5,800 to the Company.

d.   On July 13, 2021, the Company received an arbitration result of its dispute with Macquarie regarding the measurement of the Earn Out. As a result, the Company is required to pay approximately $39,600 to Macquarie to satisfy the Earn Out Obligation, which was recorded as a charge to other expenses of $29,600 during 2021. During the  2021, a $5,441 distribution from VAA was paid directly to Macquarie as a reduction of the Earn Out Obligation.

e.   On November 17, 2021, the Company and Macquarie agreed to pursue a sale of the properties of VAA in accordance with the provisions of the joint venture agreement. The parties have engaged a broker to market the properties  and  expect to complete the sale in 2022. The parties further agreed that the Company would be able to purchase seven  of the properties from the joint venture at an agreed upon market price.

f.   The Company received $13,177 and $10,652 in distributions from the Joint Venture during 2021 and 2020, respectively. The 2021 amount include $3,157 of interest in connection with the Mezz Loan, $2,590 of proceeds from the sale of Overlook at Allensville Phase II and a $7,430 equity distribution.  The 2020 amount includes $8,915 of interest in connection with the Mezz loan, a $1,441 equity distribution and $296 of property tax refunds.  In addition, $5,441 of interest payments related to the Mezz Loan was paid directly to Macquarie as payment of earn out obligation.

26

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

g.  During the period between December 31, 2021 and the report issuance date, a $7,012 distribution from VAA was paid directly to Macquarie as a further reduction of the Earn Out Obligation.

Below is summarized information about the statement of financial position and the statement of income of VAA (100%) in accordance with GAAP:

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
| Investment property | $ 1,208,716 | $ 1,217,725 |
| Other assets | 72,151 | 61,472 |
| Total assets | 1,280,867 | 1,279,197 |
| Mortgage notes payable | 854,015 | 830,721 |
| Loans from members (Mezz Loan) | 242,942 | 239,877 |
| Other liabilities | 40,316 | 35,633 |
| Total liabilities | 1,137,273 | 1,106,231 |
| Equity | $ 143,594 | $ 172,966 |

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| Revenues | $ 139,161 | $ 123,576 | $ 115,376 |
| Operating income | $ 73,959 | $ 63,030 | $ 57,932 |
| Net loss | $ (16,686) | $ (26,702) | $ (50,396) |

The following is a reconciliation of the total equity in VAA per United States generally accepted accounting principles ("GAAP") basis to the Company's share of VAA per IFRS.

27

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
| Total equity of joint venture per GAAP | $ 143,594 | $ 172,966 |
| Company's shares of equity | 71,798 | 86,484 |
| IFRS adjustment | 189,305 | 79,063 |
| Equity per IFRS | 261,103 | 165,547 |
| IFRS investment property adjustment | 345 | 348 |
| Mezz Loan and accrued interest | 125,384 | 123,830 |
| Earn out obligation | (34,159) | — |
| Investment in joint venture per IFRS | $ 352,673 | $ 289,725 |

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| Net loss of joint per GAAP (a) | $ (16,686) | $ (26,702) | $ (50,396) |
| Company's share of net loss | (8,343) | (13,351) | (25,198) |
| IFRS investment property adjustment | 108,742 | 12,879 | 64,191 |
| Share of income (loss) per IFRS | $ 100,399 | $ (472) | $ 38,993 |

The financial statements of VAA, prepared in accordance with US GAAP, are attached to the annual financial statements of December 31, 2021.

Pursuant to the joint venture agreement, the Manager will notify the Class A Members of additional capital contributions required to fund the operations of VAA. Additional capital contributions are allocated according to the Class A Members' respective capital ratios, and are included in their ownership basis of the Company.

Distributions of the net cash flow ("Net Cash Flow") from VAA are to be paid at least twice per year according to the following order:

i.  A payment to TCI and the Company in payment of $15,000 (the "Cash Credit") which relates to the estimated balances in the operating bank accounts of the properties at closing. The Cash Credit was settled in 2019 (see c above).

ii. A one-time payment of $1,900 to the Class B Member;

iii. To the Class A Members in proportion to, and to the extent of, any preferred return on accrued but unpaid amounts paid by any Class A Member in connection with cost overruns for development properties ("Cost Overrun Contributions") funded by them, at a cumulative monthly compounded return of 18% ("Cost Overrun Preferred Return");

iv. To the Class A Members in proportion to, and to the extent of, any unreturned Cost Overrun Contributions;

28

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

v.    To establish and replenish an agreed-upon operating reserve of $8,000 (the "Operating Reserve") as needed to fund operating deficits or in any other manner as agreed to by the Class A Members; and

vi.    The balance among the Class A Members and the Class B Member pro rata in proportion to their capital and profit and loss percentages.

In addition, the joint venture agreement provides for the distributions of proceeds from capital events, including the sale of one or more of the multifamily apartment properties, as follows:

i.    To the Company, in payment of a lease guarantee in connection with two specific properties owned by the Joint Venture;

ii.    To the Class A Members in proportion to, and to the extent of, any accrued but unpaid Cost Overrun Preferred Return;

iii.    To the Class A Members in proportion to, and to the extent of, any unreturned Cost Overrun Contribution;

iv.    To the Class A Members in proportion to their ownership percentages, until their capital contributions less prior distributions have been fully returned;

v.    To the extent that any portion of the Notes remain outstanding, an amount sufficient to repay those loans; and

vi.    The balance among the Class A Members, the Class B Member, and other Members who may be designated in the course of the Company's operations ("Class C Members") in proportion to their ownership and profit and loss percentages.

**Note 9. Loan Receivable**

On February 13, 2017, TCI assigned its rights under the Mercer Loan and The Mercer Profit Participation Agreement to the Company. The profits participation agreement was cancelled in 2018, and as a result, the Company obtained full ownership of the single family lots and commercial land referred as Mercer Crossing.

On June 5, 2019, the Company distributed non-cash dividend to TCI by transferring two commercial lots of Mercer Crossing that totaled 9.92 acres and a book value is $3,958. The Company's Board of Directors approved the distribution based on meeting of the distribution requirements.

The Company sold 58, 134 and 161 lots for $8,980, $16,346 and $16,200, resulting in gains on sale of $6,429, $5,700 and $5,100 for the years ended December 31, 2021, 2020 and 2019, respectively. The gains on sale were included in finance income. As of December 31, 2021, the loan receivable balance represents the value of two single family lots that are under contract and 19 acres of commercial land that are available for sale.

**Note 10. Notes Receivable**

The following table summarizes the Company's notes receivable at December 31, 2021 and 2020:

29

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $ 10,365 | $ 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $ 79,507 | $ 47,850 | | |

(1) The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property.

(2) The loan agreement is with HGH Residential, LLC and the borrower is making semi-annual distributions of interest as approved by HUD.

(3) On January 13, 2021, the Company issued a note receivable that is secured by a project to build a 168 unit residential property in Opelika, Alabama. The note provides for borrowings of up to $5,126.

(4) On December 13, 2021, the note was collected in full.

(5) Maturity date is thirty months from the date that the senior loan was provided or seven years from the loan provision date whichever is earlier.

The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued. The fair value measurement is classified as Level 3 in the fair value hierarchy.

**Note 11. Advances for Acquisition of Real Estate**

Below is summarized information about the statement of financial position and the statement

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| ABC Land and Development | $ 2,000 | $ 2,000 |
| Tower Bay Lofts | 11,878 | 9,548 |
| | $ 13,878 | $ 11,548 |

30

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

The Company has an option agreement to acquire the ownership of the Tower Bay Lofts, a 308 unit multi-family project located in Lewisville, Texas.

On June 2018, the option agreement was amended and the option price was revised to approximately $5,800 (instead of $10,100, as in the original option agreement), and the balance of $4,086 which was transferred by the Company and was deposited in a restricted escrow account. An additional advance of up to $7,000 may be obtained with the Company's written permission. Upon exercise of the option, the Company is required to pay $50 and final payment which equals to the total equity in the project (estimated to be $12,742) less any advances and the exercise payments. In addition, the Company will assume all liabilities and obligations for the loan on the project held by Berkley Point Capital, LLC in the amount of up to $47,200. The Company may exercise the option at any time, and upon receiving regulatory approval, the title of the property will convey to the Company. In addition, upon exercise of the option, the Company will be entitled to all excess cash flow, if any, from the project until the closing. The Company is entitled to cancel the option agreement at any time and receive the full amount that was paid for the option, plus 10% annual interest.

On March 11, 2019, the Company entered into a purchase option agreement with ABC Land Development, a non-related third party. The price of the purchase option is $2,000. The purchase option entitles the Company to purchase one 6.26 acre parcel of land located in Dallas, Texas and four parcels of land located in Clark County, Nevada totaling 31.53 acres. The future separate agreement will determine the price for each property acquired.

On April 17, 2019, after approval by the Company's Board of Directors, the Company entered into an option agreement with TCI for option to acquire 256 unit multifamily project, Dominion located in Farmers Branch, Texas. In exchange for the option, the Company provided guarantee through $2,000 letter of credit. HGH Residential, LLC is constructing the project with HUD insured financing. For additional information (see Note 13(1)).

**Note 12. Accounts Receivable**

The Company investment in Windmills Farm ("WMF") consists of approximately 1,663 acres of land in Forney, Texas. WMF is being held for capital appreciation. The Company constructs roads, sewage and power and water lines (collectively referred to as "Infrastructure Costs") of WMF in connection with the development of the land for sale to single family home builders.

In accordance with the Texas Water district code and reimbursement agreements, the districts of WMF will reimburse the Company for Infrastructure Costs. According to the agreements, the Districts are required to raise funds until the Company has been fully reimbursed for the costs mentioned above.

The Company expects that the reimbursement of all Infrastructure Costs will be completed by 2025, based on an estimate of 250 houses sold per year at an average selling price of $250. A 10% reduction in the number of houses sold by 2025 or a decline of 10% in the average home price would result in a delay in the full collection of the receivables by approximately one year. The fair value of the receivables approximates its carrying amount and it is classified as Level 3 in the fair value hierarchy.

On October 12, 2020, the Company sold $5,000 of WMF receivables to a third party. The transaction was completed on March 4, 2021.

**Note 13. Restricted Cash - Non-Current**

Non-current restricted and designated cash consists of the following:

31

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

|  | December 31, | | |
|---|---|---|---|
|  | **2021** | | **2020** |
| Designated Cash - Lender Escrow(1) | $ 5,781 | $ | 6,922 |
| Restricted Cash - Trustee Reserve(2) | 5,033 | | 6,914 |
| Restricted Cash - Other Deposits(3) | 864 | | 2,648 |
|  | $ 11,678 | $ | 16,484 |

1. The account serves as cash collateral to support to the Company's letter of credit facility with Bank Leumi.

2. Restricted deposit with Trustee for interest reserve and expense cushion for Series A, B, and C Bonds.

3. As part of an option agreement and as an advance payment of the option, as detailed in Note 11, the Company deposited a designated deposit for securing working capital at Tower Bay Lofts. These funds will be released on the date of completion of the construction of the property and repayment of construction loans. Advances from the escrow account were $1,787 and $1,409 in 2021 and 2020, respectively.

32

App.555

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 14. Mortgages Notes Payable**

Below is a summary of our notes and interest payable as of December 31, 2021 and 2020:

| Property/ Entity | Carrying Value 2021 | Carrying Value 2019 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 600 Las Colinas(1) | $ — | $ 35,589 | 5.30 % | 11/1/2023 |
| 770 South Post Oak | 11,635 | 11,871 | 4.40 % | 6/1/2025 |
| Athens(2)(5) | 1,155 | 1,155 | 4.00 % | 8/28/2022 |
| Chelsea(3) | 8,460 | 8,630 | 3.40 % | 12/1/2050 |
| EQK Portage - Land | 3,350 | 3,350 | 10.00 % | 11/13/2024 |
| Forest Grove(4)(5) | 7,263 | 7,333 | 3.75 % | 5/5/2024 |
| Landing Bayou(3) | 14,989 | 15,241 | 3.50 % | 9/1/2053 |
| Legacy at Pleasant Grove(3) | 13,352 | 13,653 | 3.60 % | 4/1/2048 |
| Overlook at Allensville Phase II(3)(6) | — | 15,621 | 3.80 % | 5/1/2059 |
| Parc at Denham Springs Phase II(3) | 15,962 | 16,128 | 4.10 % | 2/1/2060 |
| Stanford Center(5)(7) | 38,979 | 39,226 | 6.00 % | 2/26/2022 |
| Sugar Mill Phase III(3) | 9,216 | 9,297 | 4.50 % | 2/1/2060 |
| Toulon(3)(8) | — | 13,974 | 3.20 % | 12/1/2051 |
| Villas at Bon Secour(5)(9) | 19,690 | 10,803 | 3.08 % | 9/1/2031 |
| Vista Ridge(3) | 9,830 | 9,979 | 4.00 % | 8/1/2053 |
| Windmill Farms(10) | 8,389 | 10,398 | 5.00 % | 2/28/2023 |
| | 162,270 | 222,248 | | |
| Less current portion | (43,854) | (14,979) | | |
| | $ 118,416 | $ 207,269 | | |

(1) On August 26, 2021, the loan was paid off in connection with the sale of the underlying property (See Note 7).

(2) On March 2, 2021, the loan was extended to August 28, 2022.

(3) The loans are backed by HUD and include mortgage insurance of 0.25% - 0.5% in addition to the nominal interest rate.

(4) The loan bears interest at prime rate plus 0.5%. The Prime interest rate was 3.25% and 3.25% at December 31, 2021 and 2020, respectively.

(5) The loan is guaranteed by TCI.

(6) On March 30, 2021, the loan was assumed by VAA in connection with our contribution of of the underlying property to the joint venture (See Note 8).

(7) On March 3, 2022 the lender extended the maturity of the loan to February 26, 2023.

(8) On January 14, 2022, we paid off the loan in connection with the sale of the underlying property (See Note 21). The loan was classified as mortgage on property held for sale at December 31, 2021.

(9) On August 25, 2021, the Company replaced the existing loan on the property with a new $20,015 loan that bears interest at 3.08% and matures on September 1, 2031. The loan is insured by Fannie Mae.

(10) On March 4, 2021, the loan was extended to February 28, 2023 at an interest of 5%. The loan is guaranteed by American Realty Investors, Inc. ("ARL"), the controlling shareholder of TCI.

33

App.556

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

The carrying value of the mortgage notes payable is net of unamortized borrowing costs of $1,425 and $3,449 at December 31, 2021 and 2020, respectively.

Future maturities on our mortgage notes payable at December 31, 2021 and 2020 are as follows:

| Year Ending December 31 | Principal Payments | | Principal and Interest Payments | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| 2022 | $ 43,854 | $ 14,979 | $ 49,403 | $ 25,026 |
| 2023 | 8,455 | 52,732 | 12,971 | 60,073 |
| 2024 | 12,458 | 37,095 | 13,284 | 43,314 |
| 2025 | 12,693 | 1,943 | 16,131 | 6,226 |
| Thereafter | 86,235 | 118,948 | 137,845 | 185,767 |
| | $ 163,695 | $ 225,697 | $ 229,634 | $ 320,406 |

The fair value of current borrowings approximates their carrying amount, as the impact of discounting is not significant. The fair value of the non-current variable borrowings approximates their carrying value. The carrying value of the non-current fixed borrowings was $126,703 and $195,962 as of December 31, 2021 and 2020, respectively.

The fair value measurement is classified as Level 3 in the fair value hierarchy.

Certain of the Company's borrowings require the maintenance of certain ratios, including debt service coverage. During 2021 and 2020, the Company exceeded the debt service credit requirement ratio for 770 South Post Oak. As a result, the cash receipts from the property will go through a cash trap to secure one month of debt service payment prior to being distributed to the Company. As of the reporting date, the Company is in compliance with all of its other debt covenants.

**Note 15. Bonds Payable**

The outstanding balance of our Bonds at December 31, 2021 and 2020 is as follows:

| Bond Issuance | December 31, | | Rate | Maturity |
|---|---|---|---|---|
| | **2021** | **2020** | | |
| Series A Bonds(1) | $ 65,563 | $ 95,133 | 7.30 % | 7/31/23 |
| Series B Bonds(1) | 54,019 | 65,318 | 6.80 % | 7/31/25 |
| Series C Bonds(2) | 75,298 | 85,537 | 4.65 % | 1/31/23 |
| | 194,880 | 245,988 | | |
| Less unamortized deferred issuance costs | (5,428) | (8,100) | | |
| | 189,452 | 237,888 | | |
| Less current portion | (46,286) | (44,775) | | |
| Non-current portion | $ 143,166 | $ 193,113 | | |

34

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

(1)  On November 30, 2020, we issued $19,693 in additional bonds for $18,822 in net proceeds.

(2)  The bonds are collateralized by a trust deed in Browning Place, a 625,297 square foot office building in Farmers Branch, Texas.

Future maturities on our bonds payable at December 31, 2021 and 2020 are as follows:

| Year Ending December 31 | Principal Payments 2021 | 2020 | Principal and Interest Payments 2021 | 2020 |
|---|---|---|---|---|
| 2022 | $   46,286 | $   44,775 | $   57,468 | $   59,344 |
| 2023 | 121,584 | 44,775 | 127,662 | 56,141 |
| 2024 | 13,505 | 130,310 | 15,118 | 136,486 |
| 2025 | 13,505 | 13,064 | 14,194 | 14,624 |
| 2026 | — | 13,064 | — | 13,732 |
| | $   194,880 | $   245,988 | $   214,442 | $   280,327 |

**Series A Bonds**

*Financial covenants:*

Until the date of the full payment of bonds and compliance with all other undertaking of the Company toward the holders of bonds according to the deed of trust and the terms of bonds, the Company shall comply at any time with the financial covenants set forth below:

1.  The consolidated equity of the Company (excluding minority interests) shall not be less than $150,000.

2.  The net adjusted financial debt ratio to the net CAP shall not exceed 75%.

3.  From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.

4.  The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 25%.

5.  The scope of the Company's imitated projects in the assets shall not exceed 30% of total assets.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

*The right to immediate repayment:*

There were obligations and immediate repayment grounds set in the deed of trust of the bonds such as violation of the Company's financial covenants for two consecutive quarters (as mentioned above), rating of the bonds, which falls

35

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

below BB (the bonds were rated BBB+ on the day of issuance), an ongoing entity note in the Company's financial statements for two consecutive quarters and failure in complying with other obligations as specified in the deed of trust.

36

App.559

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1.  The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $200,000.

2.  The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's last consolidated financial statements (quarterly or annually, as applicable) as of January 1, 2017, with the neutralization of the net revaluation gains/losses (which have not yet been realized) deriving from a change in the fair value of the Company's assets compared to their fair value on September 30, 2016 or to the date on which the assets were acquired, whichever is later. Notwithstanding the foregoing, as of the date of publication of the Company's financial statements as of December 31, 2018, the Company will be permitted to distribute 50% of the attributable income. Provided that in distribution exceeding 30% of the attributable income, the consolidated total cash of the Company, after the dividend distribution, will not be less than the total payments required for fulfillment of the principal payments of the bonds in the 12 months following the distribution date.

3.  Net Adjusted Financial Debt to Adjusted NOI shall not exceed 15.5.

**Series B Bonds**

*Financial covenants:*

The terms of the covenant are identical to the ones of Series A bonds (discussed above) except the following:

1.  The consolidated equity of the Company (excluding minority interests) shall not be less than $165,000.

2.  From the date of issue until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018 - the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.5.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

37

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

1.  The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $210,000.

2.  From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 15.5. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 16.

3.  The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 30%.

4.  There is no cause for immediate repayment of the debentures.

5.  On the date of the distribution decision by the board, and according to the last Financial Statements of the Company, annual or quarterly, there are no "warning signs" as defined in regulation 10(b)(14) of the Securities Regulations (Periodic and Immediate Reports), 1970.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds (Series B). The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (BBB+). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1.  The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $180,000.

2.  The Net Adjusted Financial Debt to net CAP shall not exceed a rate of 70%;

3.  The Net Adjusted Financial Debt to Adjusted shall not exceed a rate of 16%;

4.  The Consolidated Equity Capital of the Company (including minority rights) to the Consolidated Total Assets shall not be less than 30%.

If the Company breaches any of the financial covenants pursuant to the financial reports of the Company, the annual interest on the outstanding principal amount of the Debentures will increase by the Additional Interest Rate in respect of the Breach, above the interest rate in effect at the time, prior to the change, in respect of the period from the Date of the Breach until the date of repayment of the outstanding principal amount of the Debentures or until the date of publication of the Company's financial statements pursuant to which the Company is in compliance with that financial covenant, whichever is earlier, provided the interest rate was not increased before that due to the breach of a different financial covenant and/or to a rating downgrade.  If the interest rate was increased before that due to the

38

App.561

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

breach of a different financial covenant and/or due to a rating downgrade, if the interest rate increased due to the breach of a financial covenant, the increase will be limited so that the annual interest rate increase will not exceed 1.5%.

39

App.562

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Series C Bonds**

*Financial covenants:*

1.  The Consolidated Equity Capital of the Company (excluding minority interests) will not be less than $250,000.

2.  The Net Adjusted Financial Debt ratio to the net CAP shall not exceed 75%.

3.  The Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined below) shall not exceed 17.5.

4.  The volume of the development projects of the Company in the adjusted balance sheet (including the share of the Company in affiliated and jointly controlled companies) shall not exceed 30% of the total adjusted balance sheet.

5.  Beginning on the examination date regarding the 2nd quarter of 2021 (i.e. beginning on the publication date of the second quarter reports for 2021) the Loan/Collateral Ratio, as defined in Section 10 of Appendix 6.1 of the Trust Deed, shall not exceed 80%.

The Company made partial repayments of $9,776 and $2,854 in June 2021 and November 2021, respectively.

*The right to immediate repayment:*

Failure to comply with the Equity Covenant for two consecutive quarters and/or failure to comply with the debt to CAP ratio covenant for two consecutive quarters and/or failure to comply with the Ratio of Financial Debt to NOI Covenant for two consecutive quarters and/or failure to comply with Ratio of Development Projects to Total Balance Sheet Covenant for two consecutive quarters (namely, in respect of all the covenants on two consecutive examination dates), shall constitute grounds for declaring the outstanding balance of the Debentures due and payable.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1.  The Consolidated Equity Capital of the Company (as this term is defined in Section 6.3(1) below) excluding minority interests, according to the Company's consolidated financial statements, which were published prior to the distribution date, less the distributed divided, shall not be less than $350,000.

2.  Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined in Section 6.3(3) below), according to the Company's consolidated financial statements, which were published prior to the distribution date, shall not exceed 16.

40

App.563

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

3.  The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's latest Consolidated Financial Statements.

4.  On the date of the Board of Directors decision on the distribution there are no "Warning Signs" as so defined in article 10(b) (14) to the Reports Regulations.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds. The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (A-). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1.5%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1.  The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $300,000

2.  The Net Adjusted Financial Debt to net CAP (shall not exceed 70%).

3.  The Net Adjusted Financial Debt to Adjusted NOI shall not exceed 17.

4.  The ratio of the NOI of the pledged property to the principal balance of bonds shall not be lesser than 5.5% (or 4.5%).

**Note 16. Accounts Payable**

Non-current restricted and designated cash consists of the following:

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| Interest Payable | $ 6,334 | $ 7,544 |
| Accrued Real Estate taxes | 2,788 | 5,910 |
| Accrued Other Expenses | 5,518 | 16,005 |
| | $ 14,640 | $ 29,459 |

**Note 17. Related Party Transactions**

a.  General:

The Company has entered into various agreements with Regis Realty Prime, LLC ("Regis"), a related party, to manage, develop and lease its commercial properties. For these services, the Company pays to the related parties the following charges:

*Property Management Fee*

41

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

Monthly management fee of 3% of monthly rent collected for on the properties and to expense reimbursement with respect to providing the management services.

*Leasing Commissions*

In consideration for the property leasing services, Regis is entitled to a fee with respect to any lease signed on the properties, as follows:

1.  A fee of 3.5%-4.5% of rent with respect to the initial lease term and for each expansion of the leased space, as well as a fee of 2%-3% of rent with respect to any lease renewal, for as long as the management company continues to provide Property Leasing Services;

2.  If another broker is party to any specific lease (hereinafter in this sub-section: "the Broker"), the management company's fee would be 2%-2.25% of rent with respect to the initial lease term, for any expansion of the leased space and for any lease renewal; the Broker's fee would be as agreed with the Broker or 4%-4.5% of rent with respect to the initial lease term and any expansion of the leased space, as well as a fee of 2%-4.5% of rent for any lease renewal.

b.  Management services and headquarters agreement after issuance

As a result of a Series A bond issuance, the Company entered into a management and headquarter service agreement ("HQ Agreement") with the Pillar Income Asset Management, Inc. ("Pillar"), a company controlled by TCI, for office services and services for senior management such as Chairman, directors, CEO and CFO and headquarter services that include, among others, bookkeeping and financial services. In return for the services noted above, the Company will pay from January 2019, 0.5% annual of the value of the investment properties in the Company. In addition, after the issuance of the Series A bonds, a one time management fee payment of $500 was made. This agreement replaced previous agreements in which fees were paid for the purchase/sale and refinancing of properties.

In 2019, the company awarded bonuses to eleven employees of the headquarters management company with a total and maximum of $25 for their strenuous work in connection with the issuance of the Company's debentures (Series C).

The Company paid fees in connection with the HQ Agreement of $2,569, $2,504 and $2,200 to Pillar the years ended 2021, 2020 and 2019.

c.  Below is a summary of the related party transactions during 2021, 2020 and 2019:

42

App.565

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| **Revenue** | | | | | | |
| Lease Revenue | $ | 944 | $ | 1,102 | $ | 952 |
| **Expenses** | | | | | | |
| Management fees | $ | 887 | $ | 974 | $ | 966 |
| Management personnel | | 1,003 | | 1,119 | | 1,088 |
| Insurance expense | | 1,580 | | 1,774 | | 1,529 |
| | $ | 3,470 | $ | 3,867 | $ | 3,583 |

43

App.566

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

d.      Benefit to key management personnel (including directors):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| **Director compensation** | | | |
| Number of directors | 3 | 3 | 4 |
| Compensation for directors | $ 161 | $ 175 | $ 196 |

e.   Guarantees Granted and transactions

1.   As of December 31, 2021, TCI is a guarantor on the mortgage notes payable on Oceanaire and Tattersall Village, which are owned by VAA.

2.   TCI is a guarantor on the mortgage notes payable on Athens, Forest Grove, Stanford Center and Villas at Bon Secour (See Note 14).  ARL is a guarantor on the mortgage notes payable on Windmill Farms.

3.   On November 12, 2019, TCI entered into an agreement with Bank Leumi USA ("Bank Leumi"). Under the agreement, the Bank Leumi will issue irrevocable standby letters of credit, up to a maximum of $16,000. The letters of credit are intended for the purposes of providing to HUD approved mortgage lenders, in lieu of required escrows, initial operating deficit and working capital, of which the Company has various interest in multi-family construction projects. The Credit Agreement is secured by deposits on account (Note 13) and a land parcel in Kent, Ohio.

4.   On February 8, 2019, the Company canceled the letter of credit that was established on August 2018, in amount of $1,000 to Unified Housing Foundation, Inc. ("UHF"), a non-profit entity that holds Multifamily residential complexes for affordable housing, in return for the Company's option to provide in the future loans bearing interest at the rate of 12% or more to UHF. UHF is classified as a related party with TCI.

5.   During 2019, VAA received refunds of real estate taxes resulting from appeals to various jurisdictions. The outstanding balance at December 31, 2020 is $300.

6.   Regis leased three suites at 770 South Post Oak with total leasable area 13,174 square feet for approximately $9 for the period of November 1, 2019 to December 31, 2020. Regis also leased a suite at Browning Place for $348 for each of 2021, 2020 and 2019.

44

App.567

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 18. Supplemental Info Comp Income**

a.    Property operating expense:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| Management personnel | $    2,631 | $    3,599 | $    3,591 |
| Management Fees | 1,345 | 1,439 | 1,380 |
| Utilities | 2,263 | 2,720 | 2,928 |
| Property Taxes | 4,644 | 7,356 | 6,126 |
| Other | 8,252 | 7,545 | 7,178 |
|  | $    19,135 | $    22,659 | $    21,203 |

b.    General and administrative expenses:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| Management Fees | $    2,730 | $    2,504 | $    2,250 |
| Legal Fees | 701 | 816 | 835 |
| Professional Fees | 1,551 | 987 | 1,344 |
| Other | 1,523 | 750 | 725 |
|  | $    6,505 | $    5,057 | $    5,154 |

45

App.568

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

c.   Finance income:

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | **2021** | | **2020** | **2019** |
| Income - Loans Receivable | $ | 2,333 | $    6,097 | $ | 5,864 |
| Income - Convertible Loans | | 32,471 | 4,605 | | 2,317 |
| Other | | 2,216 | 1,009 | | 621 |
| | $ | 37,020 | $   11,711 | $ | 8,802 |

d.   Finance expenses:

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | **2021** | | **2020** | **2019** |
| Interest - Mortgages | $ | 9,706 | $   10,188 | $ | 11,065 |
| Interest - Bonds | | 13,365 | 13,671 | | 12,659 |
| Refinance costs | | 5,188 | — | | 3,799 |
| Amortization - Mortgages | | 262 | 278 | | 1,390 |
| Amortization - Bonds | | 2,672 | 2,835 | | 2,714 |
| Finance expense from receivables | | 605 | 997 | | 3,240 |
| Other | | 722 | 1,461 | | 1,488 |
| | | 32,520 | 29,430 | | 36,355 |
| Capitalized Interest | | — | (859) | | (601) |
| | $ | 32,520 | $   28,571 | $ | 35,754 |

**Note 19. Share and Additional Paid-in Capital**

As described in Note 1, the Company was incorporated on August 16, 2016. At the establishment date, the Company has registered 50,000 common shares with no par value and issued one certificate including 100 common shares with no par value. On February 15, 2017, the Company issued 5,000 shares with no par value to Abode Multi-Property, L.P. in connection with the transfer of rights.

On May 31, 2019, the Company issued a dividend in kind to TCI in exchange for two commercial lots Mercer Crossing land, approximately 9.92 acres and valued at $3,900, in lieu of attributable profits. The Board of Directors approved the distribution based on the Company's compliance with the distribution test.

46

App.569

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 20. Financial Instruments**

The fair value of cash, deposits, accounts payable and accrued liabilities approximates their carrying amounts due to their short-term nature.

Credit quality of financial assets:

a.      The carrying amount of accounts receivable represents the maximum credit exposure.

a.      The credit worthiness of tenants is established prior to execution of the signed lease agreements.

a.      Accounts receivable do not have a significant concentration risk.

a.      Credit risk from balances with banks and financial institutions is immaterial.

The Company's activities expose it to various financial risks such as market risk (interest rate risk and price risk), credit risk and liquidity risk. The Company's comprehensive risk plan focuses on activities that reduce to a minimum any possible adverse effects on the Company's financial performance. The accounting policy with respect to these financial instruments is described in Note 2 above. The Company's senior management team oversees the management of these risks.

*Interest rate risk:*

Interest risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates.

The Company's exposure to the risk of changes in market interest rates relates primarily to the Company's long-term liabilities with floating interest. The Company manages its interest rate risk by having a balanced portfolio of fixed and variable rate loans.

*Credit risk:*

Credit risk is the risk that a counterparty will not meet its obligations as a customer or under a financial instrument leading to a loss to the Company. The Company is exposed to credit risk from its operating activities, primarily trade receivables, and from its financing activities, including deposits with banks and other financial institutions, foreign currency transactions and other financial instruments.

The Company maintains cash and cash equivalents, short-term and long-term investments and other financial instruments in various financial institutions located in the United States. The Company diversifies its investments among the financial institutions and the relative credit stability of the financial institutions is evaluated on a regular basis.

As of December 31, 2021 and 2020, cash and cash equivalents consisted solely of cash. All deposits are invested with high quality financial institutions in the United States. See Note 5 for discussion of short-term investments at December 31, 2021.

*Liquidity risk:*

The Company monitors its risk to a shortage of funds using monthly and daily budget tools.

The Company's objective is to maintain a balance between continuity of funding and flexibility through the use of loans from financial institutions and others. The Company monitors the maturity of borrowings closely in order to

47

App.570

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

ensure that all borrowings due within the next 12 months will either be refinanced, as is customary in the real estate industry, or repaid of the debt will mature in less than one year.

48

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Price risk:*

The Company is exposed to property price and property rentals risk. The Company is not exposed to the market risk with respect to financial instruments as it does not hold any equity securities. However, the Company does have an investment in convertible notes receivable that Level 3 measurements (see Note 10).

*Cash flow and fair value interest risk:*

As the Company has no significant variable rate interest-bearing assets, its income and operating cash flows are substantially independent of changes in market interest rates.

The Company's interest rate risk primarily arises from long-term borrowings (see Note 14). Borrowings issued at variable rates expose the Company to cash flow interest rate risk.

The Company's cash flow and fair value interest risk are periodically monitored by the

Company's management. The Company analyses the effects of fluctuations in the prevailing levels of market

interest rates on its financial position and cash flows. Interest costs may increase as a result of such changes. They may reduce or create losses in the event that unexpected movements arise. Various scenarios are simulated taking into consideration refinancing, renewal of existing positions, alternative financing and hedging. Based on these scenarios, the Company calculates the impact on profit and loss of a defined interest rate shift. The scenarios are run only for liabilities that represent the major interest-bearing positions.

Tenant accounts receivable and accounts payable and accrued liabilities are interest-free and have settlement dates within one year.

The sensitivity analyses below are based on a change in an assumption while holding all other assumptions constant. In practice, this is unlikely to occur, and changes in some of the assumptions may be correlated – for example, change in interest rate and change in market values.

*Capital risk management:*

The Company's capital consists of borrowings and shareholder's equity. The Company manages capital to ensure it remains within its debt covenants. The Company monitors capital primarily using both (i) a loan to value ratio, which is calculated as the amount of borrowings, gross of deferred financing cost, divided by the book value of the investment properties, and (ii) a debt service coverage ratio, which is calculated as the amount of net operating income divided by the payments on borrowings.

**Note 21. Events After Reporting Period**

On January 14, 2022, we sold Toulon, a 240 unit multifamily property in Gautier, Mississippi for $26,750. The proceeds were used to pay off the mortgage note payable (Note 14) on the property and for general corporate purposes. The property was classified as held for sale on the consolidated statement of position at December 31, 2021.

The Company has evaluated subsequent events through March 29, 2022, the date at which the financial statements were available to be issued.

App.573

# EXHIBIT 42

# SOUTHERN PROPERTIES CAPITAL LTD.

## Interim Unaudited Consolidated Financial Statements

### As of September 30, 2022

### U.S. Dollars in Thousands

## INDEX

| | PAGE |
|---|---|
| Review of Interim Consolidated Financial Statements | 1 |
| Consolidated Financial Position | 3 |
| Consolidated Statements of Comprehensive Income | 4 |
| Consolidated Statements of Changes in Equity | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Interim Consolidated Financial Statements | 8 |

App.574

## Auditors' report on review to the shareholders of SOUTHERN PROPERTIES CAPITAL LTD.

### Introduction

We have reviewed the accompanying financial information of Southern Properties Capital Ltd. ("the Company"), which comprises of the condensed consolidated statements of financial position as of September 30, 2022 and the related condensed consolidated statements of comprehensive income, changes in equity and cash flows for the three and nine months ended September 30, 2022. The Company's board of directors and management are responsible for the preparation and presentation of interim financial information for these interim periods in accordance with IAS 34, "Interim Financial Reporting" and are responsible for the preparation of this interim financial information in accordance with Chapter D of the Securities Regulations (Periodic and Immediate Reports), 1970. Our responsibility is to express a conclusion on this interim financial information based on our review.

### Scope of review

We conducted our review in accordance with Review Standard 2410 of the Institute of Certified Public Accountants in Israel, "Review of Interim Financial Information Performed by the Independent Auditor of the Entity." A review of interim financial information consists of making inquiries, primarily of persons responsible for financial and accounting matters, and applying analytical and other review procedures. A review is substantially less in scope than an audit conducted in accordance with generally accepted auditing standards in Israel and consequently does not enable us to obtain assurance that we would become aware of all significant matters that might be identified in an audit. Accordingly, we do not express an audit opinion.

### Conclusion

Based on our review, nothing has come to our attention that causes us to believe that the accompanying interim financial information is not prepared, in all material respects, in accordance with IAS 34.

In addition to the above mentioned, based on our review, nothing has come to our attention that causes us to believe that the accompanying interim financial information does not comply, in all material respects, with the disclosure requirements of Chapter D of the Securities Regulations (Periodic and Immediate Reports), 1970.

Tel-Aviv, Israel                                          KOST FORER GABBAY & KASIERER
November 30, 2022                                    A Member of Ernst & Young Global

1

App.575

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Financial Position
### (dollars in thousands)

|  | September 30, | | December 31, |
|  | 2022 | 2021 | 2021 |
|  | (Unaudited) | | (Audited) |
| --- | ---: | ---: | ---: |
| **Assets** | | | |
| **Current Assets** | | | |
| Cash and cash equivalents | $ 128,275 | $ 62,018 | $ 50,739 |
| Short-term investments | 75,330 | — | 16,002 |
| Restricted and designated cash | 10,973 | 9,294 | 8,572 |
| Receivables and other assets | 7,372 | 3,014 | 6,761 |
|  | 221,950 | 74,326 | 82,074 |
| Property held for sale | — | — | 26,750 |
|  | 221,950 | 74,326 | 108,824 |
| **Non-Current Assets** | | | |
| Investment in real estate | 377,026 | 393,800 | 387,925 |
| Investment in joint venture | 372,108 | 291,481 | 352,673 |
| Loan receivable | 6,998 | 8,658 | 7,472 |
| Notes receivable | 80,160 | 52,116 | 79,507 |
| Advances for acquisition of real estate | 13,241 | 13,875 | 13,878 |
| Accounts receivable | 40,347 | 36,159 | 38,095 |
| Restricted and designated cash | 9,244 | 11,907 | 11,678 |
|  | 899,124 | 807,996 | 891,228 |
| **Total assets** | $ 1,121,074 | $ 882,322 | $ 1,000,052 |

The accompanying notes are an integral part of these consolidated financial statements.

2

App.576

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Financial Position
(dollars in thousands)

| | September 30, | | December 31, |
| | 2022 | 2021 | 2021 |
| | (Unaudited) | | (Audited) |
|---|---|---|---|
| **Liabilities and Equity** | | | |
| **Current Liabilities** | | | |
| Current portion of mortgages and notes payable | $ 49,494 | $ 42,481 | $ 43,854 |
| Current portion of bonds payable | 106,725 | 44,581 | 46,286 |
| Accounts payable | 7,890 | 12,778 | 14,640 |
| Tenant deposits | 781 | 965 | 878 |
| | 164,890 | 100,805 | 105,658 |
| Liabilities attributed to property held for sale | — | — | 13,697 |
| | 164,890 | 100,805 | 119,355 |
| **Non-Current Liabilities** | | | |
| Mortgages and notes payable | 101,556 | 134,436 | 118,416 |
| Bonds payable | 20,772 | 139,617 | 143,166 |
| | 122,328 | 274,053 | 261,582 |
| Total liabilities | 287,218 | 374,858 | 380,937 |
| **Equity** | | | |
| Share and additional paid-in capital | 165,544 | 165,544 | 165,544 |
| Reserve for transactions with controlling shareholder | 138,664 | 138,664 | 138,664 |
| Retained earnings | 529,648 | 203,256 | 314,907 |
| Total equity | 833,856 | 507,464 | 619,115 |
| Total liabilities and equity | $ 1,121,074 | $ 882,322 | $ 1,000,052 |

Date of approval of the financial statements: November 30, 2022

Bradley J. Muth
President and Chairman of the Board

Erik L. Johnson
Executive Vice President and Chief Financial
Officer

3

App.577

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Operations
### (dollars in thousands)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | 2021 |
| | (Unaudited) | | | | (Audited) |
| Rental revenues | $ 7,980 | $ 10,070 | $ 23,553 | $ 31,900 | $ 40,012 |
| Property operating expenses | 4,090 | 5,353 | 11,758 | 15,716 | 19,135 |
| Gross profit | 3,890 | 4,717 | 11,795 | 16,184 | 20,877 |
| General and administrative expense | (1,266) | (1,398) | (4,068) | (4,901) | (6,505) |
| Other expense | — | — | — | (29,600) | (29,600) |
| Revaluation of investments | 4,659 | 7,952 | 72 | (6,351) | 22,273 |
| Share of income from joint venture | 1,479 | 30,986 | 194,878 | 41,793 | 100,399 |
| Operating income | 8,762 | 42,257 | 202,677 | 17,125 | 107,444 |
| Finance income | 2,366 | 1,101 | 3,986 | 4,539 | 37,020 |
| Finance income from Mezz Loan | 2,266 | 2,594 | 7,406 | 7,739 | 10,153 |
| Finance expense | (6,304) | (13,184) | (18,765) | (26,317) | (32,520) |
| Foreign currency gain (loss) | 1,533 | (1,639) | 19,437 | 1,185 | (6,175) |
| Net income | $ 8,623 | $ 31,129 | $ 214,741 | $ 4,271 | $ 115,922 |
| Comprehensive income | $ 8,623 | $ 31,129 | $ 214,741 | $ 4,271 | $ 115,922 |

The accompanying notes are an integral part of these consolidated financial statements.

4

App.578

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Changes in Members' Capital
### (dollars in thousands)

| | Share and additional paid-in capital | | Reserve for transactions with controlling shareholder | | Retained Earnings | | Total equity | |
|---|---|---|---|---|---|---|---|---|
| **Three Months Ended September 30, 2022 (unaudited)** | | | | | | | | |
| Balance at July 1, 2022 | $ | 165,544 | $ | 138,664 | $ | 521,025 | $ | 825,233 |
| Comprehensive income | | — | | — | | 8,623 | | 8,623 |
| Balance at September 30, 2022 | $ | 165,544 | $ | 138,664 | $ | 529,648 | $ | 833,856 |
| **Three Months Ended September 30, 2021 (unaudited)** | | | | | | | | |
| Balance at July 1, 2021 | $ | 165,544 | $ | 138,664 | $ | 172,127 | $ | 476,335 |
| Comprehensive income | | — | | — | | 31,129 | | 31,129 |
| Balance at September 30, 2021 | $ | 165,544 | $ | 138,664 | $ | 203,256 | $ | 507,464 |
| **Nine Months Ended September 30, 2022 (unaudited)** | | | | | | | | |
| Balance at January 1, 2022 (Audited) | $ | 165,544 | $ | 138,664 | $ | 314,907 | $ | 619,115 |
| Comprehensive income | | — | | — | | 214,741 | | 214,741 |
| Balance at September 30, 2022 | $ | 165,544 | $ | 138,664 | $ | 529,648 | $ | 833,856 |
| **Nine Months Ended September 30, 2021 (unaudited)** | | | | | | | | |
| Balance at January 1, 2021 (Audited) | $ | 165,544 | $ | 138,664 | $ | 198,985 | $ | 503,193 |
| Comprehensive income | | — | | — | | 4,271 | | 4,271 |
| Balance at September 30, 2021 | $ | 165,544 | $ | 138,664 | $ | 203,256 | $ | 507,464 |
| **Year Ended December 31, 2021 (audited)** | | | | | | | | |
| Balance at January 1, 2021 | $ | 165,544 | $ | 138,664 | $ | 198,985 | $ | 503,193 |
| Comprehensive income | | — | | — | | 115,922 | | 115,922 |
| Balance at December 31, 2021 | $ | 165,544 | $ | 138,664 | $ | 314,907 | $ | 619,115 |

The accompanying notes are an integral part of these consolidated financial statements.

5

App.579

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Cash Flows
### (dollars in thousands)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, 2021 |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | |
| | (Unaudited) | | | | (Audited) |
| **Operating activities** | | | | | |
| Net income | $ 8,623 | $ 31,129 | $ 214,741 | $ 4,271 | $ 115,922 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | | |
| Revaluation of investments | (4,659) | (7,952) | (72) | 6,351 | (22,273) |
| Earn Out Obligation adjustment | — | — | — | 29,600 | 29,600 |
| Share of income from joint venture | (1,479) | (30,986) | (194,878) | (41,793) | (100,399) |
| Distributions from joint venture | 104,008 | — | 104,008 | 10,588 | 10,588 |
| Finance income from Mezz loan | (2,266) | (2,594) | (7,406) | (7,739) | (10,153) |
| Finance expenses, net | 2,405 | 13,722 | (4,658) | 20,593 | 1,675 |
| Changes in operating assets and liabilities | | | | | |
| Receivables, prepaid expenses and other assets | 1,249 | 3,847 | 5,978 | 2,787 | 5,221 |
| Accounts payable and accrued expenses | 86 | (3,352) | (6,508) | (5,532) | (7,233) |
| Net cash provided by operating activities | 107,967 | 3,814 | 111,205 | 19,126 | 22,948 |
| **Investing activities** | | | | | |
| Advances on options to purchase real estate | 570 | (265) | 637 | (2,327) | (2,330) |
| Origination and advances on notes receivable | 302 | (2,463) | (653) | (15,293) | (6,188) |
| Collections from notes and loan receivable | 78,841 | 1,973 | 79,315 | 8,961 | 19,410 |
| Proceeds from sale of receivables | — | — | — | 5,000 | 5,000 |
| Proceeds from sale of land | — | 3,720 | 5.110 | 19,170 | 20,366 |
| Proceeds from sale of investment properties | 11,800 | 74,750 | 38,550 | 77,340 | 77,340 |
| Additions to investments in real estate | (3,393) | (3,323) | (11,022) | (4,407) | (19,355) |
| Investment in short-term securities | (67,850) | — | (99,350) | — | (16,000) |
| Redemption of investment in short-term securities | 500 | — | 40,250 | — | — |
| Change in restricted cash | 1,930 | 3,830 | 33 | 30,354 | 31,305 |
| Net cash provided by investing activities | 22,700 | 78,222 | 52,870 | 118,798 | 109,548 |

6

App.580

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Cash Flows
### (dollars in thousands)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, 2021 |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | |
| | (Unaudited) | | | | (Audited) |
| **Financing activities** | | | | | |
| Payments on bonds payable | (20,838) | (21,938) | (43,760) | (53,658) | (56,512) |
| Proceeds from mortgages and notes payable | — | 20,015 | — | 20,015 | 20,015 |
| Payments on mortgages and notes payable | (10,085) | (47,479) | (26,411) | (50,668) | (51,671) |
| Payments of interest | (6,379) | (13,145) | (16,368) | (26,323) | (28,317) |
| Foreign exchange of cash on hand | — | (36) | — | 857 | 857 |
| Net cash used in financing activities | (37,302) | (62,583) | (86,539) | (109,777) | (115,628) |
| Net increase in cash and cash equivalents | 93,365 | 19,453 | 77,536 | 28,147 | 16,868 |
| Cash and cash equivalents at beginning of period | 34,910 | 42,565 | 50,739 | 33,871 | 33,871 |
| Cash and cash equivalents at end of period | $ 128,275 | $ 62,018 | $ 128,275 | $ 62,018 | $ 50,739 |
| Significant non-cash transactions: | | | | | |
| Receivable from joint venture offset against related party payable | $ — | $ — | $ — | $ 2,356 | $ 2,356 |

The accompanying notes are an integral part of these consolidated financial statements.

7

App.581

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 1. General**

a.  A general description of the Company and its activity:

Southern Properties Capital Ltd. (the Company) was incorporated on August 16, 2016, as a private company limited by shares, in conformity with provisions of the BVI Business Companies Act, 2004. The Company was incorporated for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange (the "TASE"). Upon incorporation, the Company issued one certificate containing 100 common shares with no par value.

The Company and its subsidiaries (the "Company"), operate in the United States and are primarily involved in (i) investing in, developing, constructing and operating income-producing properties of multifamily residential real estate assets and commercial real estate assets, and (ii) investing in land held for capital appreciation.

The Company is a wholly-owned subsidiary of Abode Multi Property, LP, a limited partnership incorporated in the State of Delaware, which is a wholly-owned subsidiary of Transcontinental Realty Investors, Inc. ("TCI"), a company incorporated in the State of Nevada, whose shares are listed for trading on the New York Stock Exchange ("NYSE") under ticker symbol TCI, in conformity with the US Securities Act and with the Security Exchange Commission ("SEC").

These financial statements have been prepared in a condensed format as of September 30, 2022 and for the three and nine months ended September 30, 2022 ("interim consolidated financial statements"), and should be read in conjunction with the Company's annual financial statements as of December 31, 2021 and for the year then ended and the accompanying notes ("annual consolidated financial statements").

b.  Consequences of coronavirus ("COVID-19"):

The Company continues to closely monitor the impact of the COVID-19 pandemic on all aspects of its business and its property portfolio. While COVID-19 has not caused a significant disruptions to the Company's residential real estate operations, it has resulted in a decrease in occupancy and fair value of some of its commercial properties. The future impact of COVID-19 on our business and financial activities will depend on future developments, which at this stage are unpredictable considering the fluctuations of COVID-19 outbreaks and the resulting changes in the markets.

App.582

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 2. Significant Accounting Policies**

The interim consolidated financial statements have been prepared in accordance with IAS 34, "Interim Financial Reporting" and in accordance with the disclosure requirements of Chapter D of the Securities Regulations (Periodic and Immediate Reports), 1970.

The accounting policies adopted in the preparation of the interim consolidated financial statements are consistent with those followed in the preparation of the consolidated financial statements. However, the Company has changed the current presentation of its financial statement to conform with how it presents financial information in the United States for internal and external purposes. The Company believes that these changes will improve the usefulness of the financial statements by investors in the United States and an internationally. As a result, the Company now presents current assets before non-current assets, and current liabilities before non-current liabilities and equity on its consolidated statements of financial position. Certain reclassifications of prior year amounts have been made to conform with the current presentation.

*Windmill Farms*

The Company accounts for its investment in Windmill Farms as investment property held for capital appreciation. The property is not used in the production or supply of goods or services or for administrative purposes; or sold in the ordinary course of business. From time-to-time the Company may sell portions of the Windmill Farms to third-party home builders, which may require the division of the sold pieces into individual lots and the the preparation of the lots for home construction use.

*Convertible Notes*

The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals. The appraisers determined the fair values of note loans using the income approach, specifically a discounted cash flow analysis. The cash flows were based upon the values provided in the appraisal reports of the underlying properties, net of transaction costs and the senior debt service payments, discounted to the value date. The convertible loan advances were then subtracted from the present value of the remaining equity

**Note 3. Operating Segments**

Operating segments are reported in a manner consistent with the internal reporting provided to the Company's chief executive officer or chief operating decision maker ("CODM"). The CODM, is responsible for allocating resources and assessing the performance of the operating segments, and strategic decisions.

Management has determined the operating segments based on the reports reviewed by the senior management team in making strategic decisions. For management purposes, the Company considers the business based on the following operating segments:

- Multifamily real estate - purchases and develops investment properties primarily consisting of multifamily apartment complexes or buildings in order to produce rental income or for capital appreciation or both. The segment includes the financial information of Victory Abode Apartments, LLC on a 50% proportion share (See Note 4).

- Commercial real estate - purchases and develops investment properties primarily consisting of offices in order to produce rental income or for capital appreciation or both.

9

App.583

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

Unallocated items in the tables below represent the cost of the Company's corporate office, land sale transactions (including Windmill farms), the income from its notes receivable and bank accounts, the expense from the bonds and gain (loss) from foreign currency transactions in connection with the bonds. The CODM does not considers its investment in Windmill Farms or its investment in convertible notes to be segment, as the CODM views these investments to be passive investments that are not actively monitored other than periodic valuations.

No reportable operating segments have been aggregated. There are no intercompany transactions between the different segments. Management reviews the operating results of its business units separately for the purpose of making decisions about resource allocation and performance assessment. Segment performance is evaluated based on net operating income, which is calculated as rental revenues less property operating expenses.

| | Three Months Ended September 30, 2022 | | | | |
|---|---|---|---|---|---|
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 19,863 | $ 4,267 | $ — | $ (16,150) | $ 7,980 |
| Property operating expenses | 10,970 | 2,239 | — | (9,119) | 4,090 |
| Gross profit | 8,893 | 2,028 | — | (7,031) | 3,890 |
| General and administrative expenses | (4,505) | (29) | (1,115) | 4,383 | (1,266) |
| Revaluation of investments | 11,040 | (782) | — | (5,599) | 4,659 |
| Income from joint venture | — | — | — | 1,479 | 1,479 |
| Operating income | 15,428 | 1,217 | (1,115) | (6,768) | 8,762 |
| Finance income | — | — | 2,366 | — | 2,366 |
| Finance income from Mezz Loan | 2,266 | — | — | — | 2,266 |
| Finance expense | (8,832) | (712) | (3,528) | 6,768 | (6,304) |
| Gain on foreign currency transactions | — | — | 1,533 | — | 1,533 |
| Net income | $ 8,862 | $ 505 | $ (744) | $ — | $ 8,623 |

10

App.584

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
(dollars in thousands)

|  | Three Months Ended September 30, 2021 | | | | |
|---|---|---|---|---|---|
|  | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 21,946 | $ 5,910 | $ — | $ (17,786) | $ 10,070 |
| Property operating expenses | 10,743 | 3,411 | — | (8,801) | 5,353 |
| Gross profit | 11,203 | 2,499 | — | (8,985) | 4,717 |
| General and administrative expenses | (464) | (4) | (1,284) | 354 | (1,398) |
| Revaluation of investments | 44,531 | (7,245) | (90) | (29,244) | 7,952 |
| Income from joint venture | — | — | — | 30,986 | 30,986 |
| Operating income (loss) | 55,270 | (4,750) | (1,374) | (6,889) | 42,257 |
| Finance income | — | — | 1,101 | — | 1,101 |
| Finance income from Mezz Loan | — | — | — | 2,594 | 2,594 |
| Finance expense | (5,864) | (5,683) | (5,932) | 4,295 | (13,184) |
| Loss on foreign currency transactions | — | — | (1,639) | — | (1,639) |
| Net income (loss) | $ 49,406 | $ (10,433) | $ (7,844) | $ — | $ 31,129 |

|  | Nine Months Ended September 30, 2022 | | | | |
|---|---|---|---|---|---|
|  | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 64,141 | $ 12,686 | $ — | $ (53,274) | $ 23,553 |
| Property operating expenses | 29,753 | 6,640 | — | (24,635) | 11,758 |
| Gross profit | 34,388 | 6,046 | — | (28,639) | 11,795 |
| General and administrative expenses | (10,010) | (40) | (3,605) | 9,587 | (4,068) |
| Revaluation of investments | 202,934 | (7,755) | 1,267 | (196,374) | 72 |
| Income from joint venture | — | — | — | 194,878 | 194,878 |
| Operating income (loss) | 227,312 | (1,749) | (2,338) | (20,548) | 202,677 |
| Finance income | — | — | 3,986 | — | 3,986 |
| Finance income from Mezz Loan | 7,406 | — | — | — | 7,406 |
| Finance expense | (26,281) | (2,142) | (10,890) | 20,548 | (18,765) |
| Gain on foreign currency transactions | — | — | 19,437 | — | 19,437 |
| Net income (loss) | $ 208,437 | $ (3,891) | $ 10,195 | $ — | $ 214,741 |

11

App.585

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
(dollars in thousands)

| | Nine Months Ended September 30, 2021 | | | | |
|---|---|---|---|---|---|
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 63,729 | $ 19,373 | $ — | $ (51,202) | $ 31,900 |
| Property operating expenses | 30,238 | 9,741 | — | (24,263) | 15,716 |
| Gross profit | 33,491 | 9,632 | — | (26,939) | 16,184 |
| General and administrative expenses | (628) | (367) | (4,159) | 253 | (4,901) |
| Other expense | (29,600) | — | — | — | (29,600) |
| Revaluation of investments | 49,588 | (18,197) | (1,845) | (35,897) | (6,351) |
| Income from joint venture | — | — | — | 41,793 | 41,793 |
| Operating income (loss) | 52,851 | (8,932) | (6,004) | (20,790) | 17,125 |
| Finance income | — | — | 4,539 | — | 4,539 |
| Finance income from Mezz Loan | — | — | — | 7,739 | 7,739 |
| Finance expense | (17,112) | (8,369) | (13,887) | 13,051 | (26,317) |
| Gain on foreign currency transactions | — | — | 1,185 | — | 1,185 |
| Net income (loss) | $ 35,739 | $ (17,301) | $ (14,167) | $ — | $ 4,271 |

| | Year Ended December 31, 2021 | | | | |
|---|---|---|---|---|---|
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 85,961 | $ 23,632 | $ — | $ (69,581) | $ 40,012 |
| Property operating expenses | 42,063 | 11,276 | — | (34,204) | 19,135 |
| Gross profit | 43,898 | 12,356 | — | (35,377) | 20,877 |
| General and administrative expenses | (1,100) | (480) | (4,925) | — | (6,505) |
| Other expense | (29,600) | — | — | — | (29,600) |
| Revaluation of investments | 119,658 | (18,226) | 14,046 | (93,205) | 22,273 |
| Income from joint venture | — | — | — | 100,399 | 100,399 |
| Operating income (loss) | 132,856 | (6,350) | 9,121 | (28,183) | 107,444 |
| Finance income | — | — | 37,020 | — | 37,020 |
| Finance income from Mezz Loan | — | — | — | 10,153 | 10,153 |
| Finance expense | (25,090) | (9,125) | (16,335) | 18,030 | (32,520) |
| Loss on foreign currency transactions | — | — | (6,175) | — | (6,175) |
| Net income (loss) | $ 107,766 | $ (15,475) | $ 23,631 | $ — | $ 115,922 |

\* General and administrative expenses represents expenses of the Company's corporate office. Revaluation of investments represents the revaluation of its land held for capital appreciation. Finance income represents revaluation of investments in notes receivable and interest income from its notes receivables, investments in short-term investments and bank accounts. Finance expense represents interest expense from the bonds and other unsecured notes payable.

App.586

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 4. Investment in Joint Venture**

The Company accounts for its investment in Victory Abode Apartments, LLC ("VAA") using the equity method of accounting.

In connection with the formation of VAA, ten out of the 51 properties acquired were subject to an earn-out provision that provides for a remeasurement of value ("Earn Out") after a two-year period following the completion of construction. Upon the formation of VAA, the Company recorded a liability for the $10,000 advance on the Earn Out that the Company received from Macquarie (see note 18b in the annual financial statements). On July 13, 2021, the Company received an arbitration result of its dispute with Macquarie regarding the measurement of the Earn Out. Following presentation by both parties, the Company's position and claims were declined, and the position of Macquarie was fully accepted. The Company is required to pay approximately $39,600 to Macquarie to satisfy the Earn Out Obligation, which was recorded as a charge to other expenses of $29,600 during the year ended December 31, 2021. In accordance with the VAA agreement, the Company will pay the Earn Out Obligation through its future distributions from VAA. During the nine months ended September 30, 2022, the Company's $34,159 distribution from VAA was paid directly to Macquarie as a reduction of the Earn Out Obligation.

On November 17, 2021, the Company and Macquarie agreed to pursue a sale of the properties of VAA in accordance with the provisions of the joint venture agreement.

On June 17, 2022, the Company, Macquarie and VAA entered into an agreement with the buyer to sell 45 properties ("VAA Sale Portfolio") held by VAA and one property held by the Company.

On September 15, 2022, the Company, VAA, Macquarie and Pillar entered a Distribution and Holdback Property Agreement ("Distribution Agreement"), which provides the timing and ordering of the distribution of the net proceeds from the sale of the VAA Sale Portfolio, the repayment of the Mezzanine Loans, and the distribution of the remaining seven properties of VAA ("Holdback Portfolio").

On September 16, 2022, the Company completed the sale of the VAA Sale Portfolio for $1,810,700, resulting in gain on sale of $738,665 to the joint venture. In connection with sale, we received $182,848 ("First Distribution"). The Distribution Agreement also provides for a distribution of the Holdback Portfolio and an additional cash distribution in the fourth quarter of 2022 ("Second Distribution"), see note 6(c).

13

App.587

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

Below is summarized information about the statement of financial position and the statement of income of VAA (100%) in accordance with United States generally accepted accounting principles ("GAAP"):

| | September 30, | | December 31, |
|---|---|---|---|
| | 2022 | 2021 | 2021 |
| | | (Unaudited) | |
| **Assets** | | | |
| Assets held for sale | $ — | $ 1,132,146 | $ 1,135,769 |
| Investment property | 128,530 | 131,709 | 130,954 |
| Other assets | 629,736 | 13,214 | 14,144 |
| Total assets | $ 758,266 | $ 1,277,069 | $ 1,280,867 |
| Liabilities and equity | | | |
| Liabilities on assets held for sale | $ 7,326 | $ 806,064 | $ 807,382 |
| Mortgage notes payable | 69,558 | 70,862 | 70,540 |
| Loans from members (Mezz Loan) | — | 242,942 | 242,942 |
| Other liabilities | 17,521 | 8,403 | 16,409 |
| Total liabilities | 94,405 | 1,128,271 | 1,137,273 |
| Equity | 663,861 | 148,798 | 143,594 |
| Total liabilities and equity | $ 758,266 | $ 1,277,069 | $ 1,280,867 |

14

App.588

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

Below is summarized information about the statement of financial position and the statement of income of VAA (100%) in accordance with GAAP:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | 2021 |
| | (Unaudited) | | | | |
| Revenues | $ 3,591 | $ 3,862 | $ 11,932 | $ 11,343 | $ 15,336 |
| Operating income | $ 1,897 | $ 2,218 | $ 7,052 | $ 6,761 | $ 8,592 |
| Net income (loss) | $ 699,288 | $ (4,308) | $ 688,912 | $ (11,482) | $ (16,686) |

The following is a reconciliation of the total equity in VAA per GAAP to the Company's share of VAA per IFRS.

| | September 30, | | December 31, |
|---|---|---|---|
| | 2022 | 2021 | 2021 |
| | (Unaudited) | | |
| Total equity of joint venture per GAAP | $ 663,861 | $ 148,798 | $ 143,594 |
| Company's shares of equity | 332,039 | 74,402 | 71,798 |
| IFRS adjustment | 39,720 | 128,096 | 189,305 |
| Equity per IFRS | 371,759 | 202,498 | 261,103 |
| IFRS investment property adjustment | 349 | 348 | 345 |
| Mezz Loan and accrued interest | — | 122,794 | 125,384 |
| Earn out obligation | — | (34,159) | (34,159) |
| Investment in joint venture per IFRS | $ 372,108 | $ 291,481 | $ 352,673 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, 2021 |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | |
| | (Unaudited) | | | | |
| Net loss of joint per GAAP (a) | $ 699,288 | $ (4,308) | $ 688,912 | $ (11,482) | $ (16,686) |
| Company's share of net loss | 349,644 | (2,154) | 344,456 | (5,741) | (8,343) |
| IFRS investment property adjustment | (348,165) | 33,140 | (149,578) | 47,534 | 108,742 |
| Share of income per IFRS | $ 1,479 | $ 30,986 | $ 194,878 | $ 41,793 | $ 100,399 |

a. Includes interest expense on Joint Venture Mezz Loan of $5,128 and $5,186 for the three months ended September 30, 2022 and 2021, respectively, and $15,620 and $15,476 for the nine months ended September 30, 2022 and 2021, respectively, and $20,500 for the year ended December 31, 2021.

15

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 5. Bonds Payable**

The outstanding balance of our Bonds at September 30, 2022 and 2021, and December 31, 2021 is as follows:

| Bond Issuance | September 30, 2022 | September 30, 2021 | December 31, 2021 | Rate | Maturity |
|---|---|---|---|---|---|
| Series A Bonds | $ 28,776 | $ 63,147 | $ 65,563 | 7.30 % | 7/31/23 |
| Series B Bonds | 35,563 | 52,029 | 54,019 | 6.80 % | 7/31/25 |
| Series C Bonds(1) | 66,095 | 75,281 | 75,298 | 4.65 % | 1/31/23 |
| | 130,434 | 190,457 | 194,880 | | |
| Less unamortized deferred issuance costs | (2,937) | (6,259) | (5,428) | | |
| | $ 127,497 | $ 184,198 | $ 189,452 | | |

(1)  The bonds are collateralized by a trust deed in Browning Place, a 625,297 square foot office building in Farmers Branch, Texas.

**Series A Bonds**

*Financial covenants:*

Until the date of the full payment of bonds and compliance with all other undertaking of the Company toward the holders of bonds according to the deed of trust and the terms of bonds, the Company shall comply at any time with the financial covenants set forth below:

1. The consolidated equity of the Company (excluding minority interests) shall not be less than $150,000.

2. The net adjusted financial debt ratio to the net CAP shall not exceed 75%.

3. From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.

4. The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 25%.

5. The scope of the Company's imitated projects in the assets shall not exceed 30% of total assets.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

16

App.590

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

*The right to immediate repayment:*

There were obligations and immediate repayment grounds set in the deed of trust of the bonds such as violation of the Company's financial covenants for two consecutive quarters (as mentioned above), rating of the bonds, which falls below BB (the bonds were rated BBB+ on the day of issuance), an ongoing entity note in the Company's financial statements for two consecutive quarters and failure in complying with other obligations as specified in the deed of trust.

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1.  The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $200,000.

2.  The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's last consolidated financial statements (quarterly or annually, as applicable) as of January 1, 2017, with the neutralization of the net revaluation gains/losses (which have not yet been realized) deriving from a change in the fair value of the Company's assets compared to their fair value on September 30, 2016 or to the date on which the assets were acquired, whichever is later. Notwithstanding the foregoing, as of the date of publication of the Company's financial statements as of December 31, 2018, the Company will be permitted to distribute 50% of the distributable income. Provided that in distribution exceeding 30% of the distributable income, the consolidated total cash of the Company, after the dividend distribution, will not be less than the total payments required for fulfillment of the principal payments of the bonds in the 12 months following the distribution date.

3.  Net Adjusted Financial Debt to Adjusted NOI shall not exceed 15.5.

**Series B Bonds**

*Financial covenants:*

The terms of the covenant are identical to the ones of Series A bonds (discussed above) except the following:

1.  The consolidated equity of the Company (excluding minority interests) shall not be less than $165,000.

2.  From the date of issue until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018 - the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.5.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

17

App.591

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1. The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $210,000.

2. From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 15.5. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 16.

3. The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 30%.

4. There is no cause for immediate repayment of the debentures.

5. On the date of the distribution decision by the board, and according to the last Financial Statements of the Company, annual or quarterly, there are no "warning signs" as defined in regulation 10(b)(14) of the Securities Regulations (Periodic and Immediate Reports), 1970.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds (Series B). The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (BBB+). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1. The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $180,000.

2. The Net Adjusted Financial Debt to net CAP shall not exceed a rate of 70%;

3. The Net Adjusted Financial Debt to Adjusted shall not exceed a rate of 16%;

4. The Consolidated Equity Capital of the Company (including minority rights) to the Consolidated Total Assets shall not be less than 30%.

18

App.592

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

If the Company breaches any of the financial covenants pursuant to the financial reports of the Company, the annual interest on the outstanding principal amount of the Debentures will increase by the Additional Interest Rate in respect of the Breach, above the interest rate in effect at the time, prior to the change, in respect of the period from the Date of the Breach until the date of repayment of the outstanding principal amount of the Debentures or until the date of publication of the Company's financial statements pursuant to which the Company is in compliance with that financial covenant, whichever is earlier, provided the interest rate was not increased before that due to the breach of a different financial covenant and/or to a rating downgrade. If the interest rate was increased before that due to the breach of a different financial covenant and/or due to a rating downgrade, if the interest rate increased due to the breach of a financial covenant, the increase will be limited so that the annual interest rate increase will not exceed 1.5%.

**Series C Bonds**

*Financial covenants:*

1.  The Consolidated Equity Capital of the Company (excluding minority interests) will not be less than $250,000.

2.  The Net Adjusted Financial Debt ratio to the net CAP shall not exceed 75%.

3.  The Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined below) shall not exceed 17.5.

4.  The volume of the development projects of the Company in the adjusted balance sheet (including the share of the Company in affiliated and jointly controlled companies) shall not exceed 30% of the total adjusted balance sheet.

5.  Beginning on the examination date regarding the 2nd quarter of 2021 (i.e. beginning on the publication date of the second quarter reports for 2021) the Loan/Collateral Ratio, as defined in Section 10 of Appendix 6.1 of the Trust Deed, shall not exceed 80%.

*The right to immediate repayment:*

Failure to comply with the Equity Covenant for two consecutive quarters and/or failure to comply with the debt to CAP ratio covenant for two consecutive quarters and/or failure to comply with the Ratio of Financial Debt to NOI Covenant for two consecutive quarters and/or failure to comply with Ratio of Development Projects to Total Balance Sheet Covenant for two consecutive quarters (namely, in respect of all the covenants on two consecutive examination dates), shall constitute grounds for declaring the outstanding balance of the Debentures due and payable.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

19

App.593

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1. The Consolidated Equity Capital of the Company (as this term is defined in Section 6.3(1) below) excluding minority interests, according to the Company's consolidated financial statements, which were published prior to the distribution date, less the distributed divided, shall not be less than $350,000.

2. Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined in Section 6.3(3) below), according to the Company's consolidated financial statements, which were published prior to the distribution date, shall not exceed 16.

3. The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's latest Consolidated Financial Statements.

4. On the date of the Board of Directors decision on the distribution there are no "Warning Signs" as so defined in article 10(b) (14) to the Reports Regulations.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds. The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (A-). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1.5%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1. The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $300,000

2. The Net Adjusted Financial Debt to net CAP (shall not exceed 70%).

3. The Net Adjusted Financial Debt to Adjusted NOI shall not exceed 17.

4. The ratio of the NOI of the pledged property to the principal balance of bonds shall not be lesser than 5.5% (or 4.5%).

### Note 6. Events During Reporting Period

1. On January 14, 2022, the Company sold Toulon, a 240 unit multifamily property in Gautier, Mississippi for $26,750. The Company used the proceeds from the sale to pay off the $14,740 mortgage note payable on the property, pay debt extinguishment costs of $590 and for general corporate purposes. The property was classified as held for sale on the consolidated statement of position at December 31, 2021.

2. On March 3, 2022, the lender extended the loan on Stanford Center to February 26, 2023.

3. On September 16, 2022, in connection with a sale of properties by VAA (See Note 4 - Investment in Unconsolidated Joint Ventures), the Company sold Sugar Mill Phase III, a 72 unit multifamily property in Baton Rouge, Louisiana for $11,800, resulting in a gain on sale of $1,871. The Company used the proceeds to pay off the $9,551 mortgage note payable on the property, pay debt extinguishment costs of $764 and for general corporate purposes.

20

App.594

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 7. Events After Reporting Period**

The Company has evaluated subsequent events through November 30, 2022, the date at which the financial statements were available to be issued.

1. On March 3, 2022, the lender extended the loan on Stanford Center to February 26, 2023 and was subsequently paid off on October 21, 2022.

2. On November 1, 2022, subsequent to the date of the financial position, approximately $203.9 million were distributed to the Company and the full control and economical rights to the seven remaining properties of VAA. The Company estimates that the transfer of the formal title in those properties will be completed second quarter of 2023 upon receipt of HUD approval with regard to the existing mortgage loans.

**Note 8. Management Fees**

The Company made payments to the controlling shareholder for services in amount of $485 and $658 for the three months ended September 30, 2022 and 2021, respectively, and $1,455 and $1,927 for the nine months ended September 30, 2022 and 2021, respectively, and $2,730 for the year ended December 31, 2021. For more details regarding the management fee see Note 18 (B) of the Company's Consolidated Financial Statements as of December 31, 2021.

App.595