**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL018, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § § § | **Evidentiary Hearing Requested** |
| *Defendants,* | § § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § § | |
| *Relief Defendants.* | § | |

**DEFENDANT'S RESPONSE TO RECEIVER'S THREE MOTIONS
TO SELL REALTY AND REQUEST FOR EVIDENTIARY HEARING**

Defendant Timothy L. Barton files this Response to: (1) Receiver's Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Parc at Windmill Farms [ECF No. 161]; (2) Receiver's Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Bellwether Ridge [ECF No. 164]; and (3) Receiver's Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [ECF No. 167].

First, the proposed sales are not in the best interest of the Estate because the Receiver failed to market the properties in a manner that a real estate development professional would to maximize value.  Specifically, the Receiver engaged in private sales and *did not even market two of these properties through a broker to achieve the highest bidder*.  A snap bidding process before this Court, under 28 U.S.C. § 2001, is no substitute for the value created through a proper marketing process.  And the Receiver can no longer, if he ever legitimately could, claim some cash crisis to justify skipping this commercially reasonable step, with completed sales having addressed any such claims. The Receiver's process is costing the estate's beneficiaries, including the Defendant or the alleged victims in this case, *millions of dollars*.  This Court should reject the sales for that reason and, if they are to go forward, instruct the Receiver to run an appropriate process.

Second, the Court should reject the sale of the properties for the purpose of using their proceeds to provide cash to the receivership estate. As detailed below, these properties in particular were not purchased or financed with any of the loan proceeds at issue in this case.  The apartment complexes in DeSoto and Forney, for example, were purchased in 2017—prior to the receipt of any significant amount of the alleged lender funds at issue.  The purchase of land and construction of improvements at these properties were wholly funded by Department of Housing and Urban Development guaranteed loans and a third-party bridge loan.  The entirety of these projects was audited annually.  These projects had no need for and did not receive an injection of funds from any other source, whether from Mr. Barton's main development company, or any lender funds at issue in this case.  If these properties are sold, the sale proceeds should go to their owners prior to the intervention of the Receiver.  Before the Section 2001 hearing on the properties, this Court should hold an evidentiary hearing wherein the Government must present

-1-

any evidence supporting the inclusion of these particular properties in the estate and the Defendant given an opportunity to cross-examine that evidence and to present rebuttal evidence.

In any event, the broad scope of the receivership is starving Mr. Barton of the resources necessary to defend himself against the Government's charges, including in a criminal proceeding threatening his liberty. Because lender funds have not been traced to these properties and evidence before the Court shows these were projects not even within the risk profile of having received subject loan proceeds, the Court should not permit the Receiver or his counsel to reserve these funds for themselves. As these assets should not be in the estate in the first place, the Court should at a minimum make them securely available for Mr. Barton to apply to his legal defense.

## I.    BACKGROUND

On October 18, 2022, the Receiver was imposed over 164 different entities. Most of the entities are not named as defendants (or even relief defendants) in this lawsuit, and the SEC has not shown that they received any of the lender funds that are subject to this suit. After making several attempts at the district court level to have these entities removed from the receivership, Mr. Barton filed an appeal in the Fifth Circuit.

In the interim, the Receiver has moved to try to quickly sell numerous properties of the non-defendant receivership entities while they are still under this control. In the past month, the Receiver has attempted to fast track the sale of three multi-million dollar apartment complexes and hotel properties.

On February 22, 2022, the Receiver filed a motion seeking approval to sell D4FR's 272-unit HUD-financed apartment complex in Forney, Texas (the "Forney Property"), ECF No. 161,

and a separate HUD-financed apartment complex owned by D4DS in DeSoto, Texas (the "DeSoto Property"), ECF No. 164.

The following week, the Receiver filed a third motion to sell an Amerigold Suites 70-unit extended stay hotel (the "Amerigold Property") owned by Goldmark Hospitality, LLC ("Goldmark"). *See* ECF No. 167.

Prior to these sales, the Receiver did not engage in a meaningful effort to market the properties. For two of them, the Receiver did not even hire a broker. And in rushing the proposed sales, the Receiver failed to contact two prospective buyers that Mr. Barton had directed to the estate.

Since the Receiver filed his three property sale motions this past month, other third-party investment companies have appeared and expressed an interest in the properties. Mr. Barton seeks to have due consideration given to such issues prior to the confirmation of any sale, and to consider the prospective buyers that would have and still may present higher competing offers.

## II.    ARGUMENT & AUTHORITIES

**A.    The Proposed Sales Will Not Serve the Best Interests of the Estate as Other Qualified Buyers, if Marketed to, Would Have Submitted Higher, Competing Offers**

The Court should deny the Receiver's motions because of the procedural impropriety in how the properties were marketed, and the ultimate sales prices that the Receiver seeks to have confirmed.

The Receiver admittedly neither "listed nor widely marketed" these properties before putting them under contract. ECF No. 165-1 at 67. The Receiver acknowledges it did not engage a broker to market the DeSoto and Forney Properties, but rather only "communicated with dozens of potential interested purchasers." *See* ECF No. 161 at 4; ECF No. 164 at 4. Even then, we know nothing about these "potential interested purchasers," including how they were

located, their potential relationships with the Receiver, or the Receiver's reasons for selectively targeting only these persons.  Not included on the list of entities that the Receiver contacted were two prospective buyers that Mr. Barton directed to estate.  Both of these parties were interested in purchasing the DeSoto and Forney Properties, and a third property, for at least $107 million, and willing to negotiate.  *See, e.g.,* ECF No. 72 at APP004 (example of one such offer filed in the court record).   These parties would have been prime candidates for the ultimate sale transactions that the Receiver now seeks to pass through.

The buyers that the Receiver did choose for the sale of the properties raise a number of questions, especially for the Forney and DeSoto Properties. *See* Exs. A–D, Texas Secretary of State filings.  One of these buyers (Palmetto) is an entity that was formed just the past year, with no real operational experience, and the other (i3) does not appear to have any sufficient prior real estate development and management experience that would qualify it for HUD approval and to take over projects of this magnitude.  *See* Exs. C, D.

Had the properties been fully and adequately marketed, the Receiver would certainly have obtained better offers than it did.  Even a small and achievable movement on the purchase price, say 10 percent, would raise over $23 million. *See also* 28 U.S.C. § 2001(b) (prohibiting confirmation of sale if another offer exceeds the Receiver's contract price by 10%).  Even a small and achievable movement on the purchase price would raise the total proceeds of the Receiver's proposed three sales to over $23 million—just $3 million short of the Receiver's entire goal for seeking the appointment of a receiver in the first place.  Proper marketing to HUD-qualified buyers would potentially bring an even greater bump.

Presently, there is no reason to jam through inferior offers on the properties through an expedient court approval process in light of this background.  If there is a real chance that other

qualified buyers will be able to present an offer to the estate that will bring in additional cash, the Court should allow that to happen and give full consideration to those prospects.

At the present, however, Mr. Barton opposes confirmation of the Receiver's three proposed sales under the circumstances and on the terms proposed, where the properties were not marketed properly, and a number of qualified, prospective buyers wholly ignored.

**B.    The Three Properties Should Not Be Sold Because They Are Not Part of the Receivership Estate**

All three property sales should be denied for jurisdictional reasons, as none of the subject properties are validly part of the receivership estate.  In this Circuit, a district court only has jurisdiction to impose a receivership over a party's property that is "the subject of the underlying dispute." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 306, 310 (5th Cir. 2012).  If the defendant has illegitimately transferred that property to a non-defendant, then, in some instances, a receiver may be appointed over assets under that non-defendant's control. *See Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009).  To do so, some form of tracing analysis is generally required. *See, e.g., Netsphere,* 703 F.3d at 310 (holding that the district court could not impose a receivership over "personal property and assets" not traceable to the underlying subject matter of the dispute); *SEC v. Faulkner*, No. 3:16-CV-1735-D, 2018 WL 4362729, at *5 (N.D. Tex. Sept. 12, 2018) (requiring the movant to show that the non-party entity is both controlled by the defendant and in possession of funds traceable to the alleged fraud).  But these Fifth Circuit requirements have not been satisfied with respect to any of the three entities or the assets of those entities that the Receiver now attempts to sell.

As an initial matter, the three entities owning the properties are not alleged to have committed securities violations of any kind.  None of them is named as a defendant in the lawsuit or even relief defendants.  Nor does the SEC otherwise allege that any of these entities' acquired

properties that were purchased with the Wall lender funds. *Compare* ECF No. 7-1 at ¶ 33, *with* ¶ 34 (asserting that other entities purchased properties with Wall lender funds, but not D4FR, D4DS, or Goldmark). At most, the SEC alluded in passing in its opening papers to D4FR, D4DS, and Goldmark, but, even then, nothing more than conclusory assertions—such as that the SEC "believed" these entities were beneficiaries of Wall funds. *See, e.g.,* ECF No. 7-1 at APP014; *see also id.* APP010 & APP015. That is not enough. The SEC submitted no background work papers to support such assertions. The SEC did not provide bank statements, wire transfer records, or other evidence in support. The Hahn declaration, submitted by the SEC with its motion papers seeking a receivership, also did not identify a single Wall entity transfer directed to D4FR, D4DS, or Goldmark, or use of such funds by those entities.

Other facts show that these entities acquired and financed their properties through entirely other means. For example, the DeSoto and Forney Properties were acquired in October and December 2017, respectively—prior to the receipt of any significant amount of lender funds, much less on the later projects with which the SEC takes particular issue. The purchase of land and construction of improvements at these properties were also wholly funded by multi-million dollar loans guaranteed through HUD, and a third-party bridge from Southern Properties Capital, LTD ("Southern") that year. *See* ECF No. 179 at APP006, APP023-90. There would have been, and was not, any reason why Chinese lender funds would have been needed to provide additional funding for projects that were was already 100% financed that year. The DeSoto and Forney projects have since been audited annually, and have no need for an injection of funds since from any other source. As Southern acknowledges, there was no other funding made from Barton or his entities: "Barton and his related-entities did not contribute financially to the real estate projects. [They] were not paid for with investor funds." ECF No. 178 at 2.

The Amerigold Property was purchased in 2007, ECF No. 168 at APP060, **ten years before** any Chinese lender loaned money to a Wall entities. *See* ECF No. 7-1 at APP006. This property could not be farther removed.

Such facts underscore the point made by multiple parties throughout these proceedings that most of the entities held in receivership are improperly so held. The SEC's targeting of longstanding and well-financed entities with no need or interest for Wall lender funding—such as D4FR, D4DS, or Goldmark—is particularly problematic. It is the SEC's burden to show that these entities "ha[d] received ill-gotten funds," *Janvey*, 588 F.3d at 834. Because it never made that showing, the court lacks jurisdiction to hold and dispose of their property. *See Netsphere*, 703 F.3d at 306, 310 ("A court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy.").[1]

In light of the importance of these issues, the SEC's evidentiary failures in tracing any Wall lender funds to D4FR, D4DS, or Goldmark should be addressed at an evidentiary hearing immediately, prior to any Section 2001 confirmation hearing. The Government should be required to present actual evidence supporting the inclusion of these particular properties in the receivership estate and the Defendant allowed to cross-examine that evidence and present rebuttal evidence, before such a serious deprivation of property were to be sanctioned by the Court. *See also Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) (loss of real property interest is irreparable).

---

[1] Any disposal of these properties should especially be avoided at this time while the receiver's and the Court's jurisdiction over these matters is pending appeal at the Fifth Circuit. *See SEC v. Barton,* Case No. 22-1132 (5th Cir. 2022); *see also Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) (loss of real property interest is irreparable).

**C.**      **If a Sale Occurs, the Proceeds Should Be Returned to The Rightful Owners**

The procedural and jurisdictional issues that the three sales face should be enough to stop those transactions altogether. In the event those sales are confirmed, the last thing that should occur is that the proceeds be earmarked for further use and waste by the Receiver. The receivership has long been starving Mr. Barton and his entities of the resources necessary to mount a defense to the Government's charges in this civil suit and the parallel criminal proceedings. If the SEC will not substantiate its contentions that the properties in question are repositories for Chinese lender funds—and thus not properly in the estate in the first place—the proceeds of any sales of those properties, at a minimum, should be preserved to secure Mr. Barton's legal defense.

### III.      CONCLUSION & PRAYER

For the foregoing reasons, Defendant Timothy Barton respectfully requests that the Court deny (1) Receiver's Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Parc at Windmill Farms [ECF No. 161]; (2) Receiver's Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Bellwether Ridge [ECF No. 164]; and (3) Receiver's Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [ECF No. 167].

Dated: March 10, 2023

Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
Michael Dingman
Virginia Bar No. 95762
DC Bar No. 90001474 (*admitted pro hac vice)*
mdingman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

Ted A. Huffman
State Bar No. 24089015
thuffman@huntonak.com
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Phone: (214) 979-3000
Facsimile: (214) 740-7110

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## CERTIFICATE OF SERVICE

On March 10, 2023, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Michael J. Edney*
Michael J. Edney

-9-