# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| | § | |
| TIMOTHY BARTON, | § | |
| CARNEGIE DEVELOPMENT, LLC, | § | |
| WALL007, LLC, | § | |
| WALL009, LLC, | § | |
| WALL010, LLC, | § | |
| WALL011, LLC, | § | |
| WALL012, LLC, | § | |
| WALL016, LLC, | § | |
| WALL017, LLC, | § | |
| WALL018, LLC, | § | |
| WALL019, LLC, | § | |
| HAOQIANG FU (A/K/A MICHAEL FU), | § | |
| STEPHEN T. WALL, | § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and | § § | |
| LDG001, LLC, | § § | |
| *Relief Defendants*. | § § | |

**RECEIVER'S REPLY TO BARTON'S OBJECTION REGARDING MOTION FOR APPOINTMENT OF APPRAISERS, APPROVAL OF APPRAISALS, APPROVAL HEARING, AND APPROVAL OF SALE OF PARC AT WINDMILL FARMS, BELLWETHER RIDGE, AND AMERIGOLD SUITES**

In support of three pending motions (Dkts.161, 162, 164, 165, 167, and 168, the "Motions"),[1] Cort Thomas, as the court appointed Receiver, files this Reply to the Response filed by Timothy Barton (Dkt. 185), and in support, respectfully shows the Court as follows:

Barton asserts the Court should not approve the requested sales, primarily for three reasons: (1) the sales are not in the best interest of the Receivership Estate, because Barton contends they were not "marketed properly" and thus the contract price is low; (2) the Receivership Entities that own the properties at issue should not be included within the Receivership Order; and, (3) if sold, the proceeds should be preserved for Barton's defense. The Receiver addresses each argument in turn.

## I.    ARGUMENT AND AUTHORITIES

### A.    The Sales are in the Best Interest of the Receivership Estate

Three different Barton entities own three properties which the Receiver has requested the Court's approval to sell:

- Receivership Entity D4FR, LLC owns the Parc at Windmill Farms in Forney, TX ("Windmill Farms");
- Receivership Entity D4DS, LLC owns Bellwether Ridge in DeSoto, TX ("Bellwether Ridge," and collectively with Windmill Farms, the "Apartment Developments")
- Receivership Entity Goldmark Hospitality, LLC owns the Amerigold Suites in Dallas, TX ("Amerigold").

In earlier filings, Barton argued sales of the Apartment Developments would generate far more than Barton's liability, and once the "sales process of those properties is initiated, the receiver should immediately return control of all other Barton-related entities and assets to Mr. Barton."[2] Thus, Baton *promoted* the Receiver's sale of those properties and asserted the Receiver's failure

---

[1] The Court continued the hearing with respect to the sale the Parc at Windmill Farms and Bellwether Ridge properties. Dkt. 190.

[2] *See* Dkt. 57, pp. 4-6.

to focus on selling the Apartment Developments evidenced incompetence or worse.[3]  Now that

Southern Properties has formally asserted its argument while continuing to *wholly ignore Southern*

*Properties' claim*, Barton contradicts his earlier complaints and argues instead that D4FR and

D4DS are not proper Receivership Entities.[4]  The argument is thus that the Court erred in granting

the SEC's Motion for Appointment of a Receiver, which this Court has repeatedly rejected.[5]

### 1.    Each Sale Satisfies the Statute, Which Ensures Maximum Value.

As required by the Statute, the Receiver published notice of the proposed sales and the

hearing to consider them in the *Dallas Morning News*.  The notice ran on March 8 and March 12

in the *Dallas Morning News*.[6]

Barton raises no arguments related to the price, marketing, or statutory sufficiency of the

sale regarding the Amerigold Suites.  The assistance of a broker in obtaining the Contract for the

Amerigold Suites negates any "improper marketing" argument for that property, and the National

Valuation Consultants' Appraisal reflects two other offers, both of which were approximately a

million dollars less than the sale before the Court.[7] As of the filing of this Reply, no additional

offers have been received for the Amerigold Suites.

Regarding the Apartment Developments, Barton does not contend the Receiver failed to

comply with 28 U.S.C. § 2001; each Motion demonstrates the contrary.  Nor does he demonstrate

that use of a broker ("proper marketing"), which was not possible for the Apartment

Developments[8] would have resulted in a higher price, or more importantly, a *higher net* recovery

---

[3] Dkt. 56, 71.

[4] *Response*, p.5–7.

[5] The Court has also expressly rejected Barton's continued requests for hearings raised in Responses to other party's motions.

[6] *See* **Exhibit A**, included in the appendix submitted with this Reply.

[7] Dkt. 168, p. 60.

[8] *See Windmill Farms Motion,* Dkt. 161, p. 4; *Bellwether Motion*, Dkt. 164, p. 4.

for the Receivership Estate. Indeed, a standard broker's commission (an expense that ignores numerous broker's unwillingness to market the properties because of SPC's competing claim) would have cost several hundred thousand dollars on each property.

Nor does the November 2022 opinion of value provided to Barton by Silverlake Capital LLC[9] demonstrate a deficient sales price for the proposed sale of the Apartment Developments. That opinion was from a mortgage broker rather than a real estate broker and did not account for the impact of Southern Properties' claim on the sales price for the Apartment Developments. Nonetheless, the sales price of Bellwether Ridge is within the opinion of value, and the Parc at Windmill Farms is within ten percent of the highest value given.

Barton also references prospective buyers interested in purchasing the Apartment Developments, one of whom previously submitted a Letter of Intent, that Barton filed with the Court. [10] The LOI included a third property (the Parc at Ingleside) for which the Receiver has not yet requested the Court's approval of a sale, and wholly ignores SPC's competing claim. In speaking with representatives for CEI this week, the Receiver and his team learned that after the Receivership Order was entered, Mr. Barton continued holding himself out as the owner of the Apartment Developments and solicited—indeed negotiated—an offer on the Apartment Developments from CEI. Barton purportedly informed CEI that the Court had rejected their initial offer as too low, that the offer needed to net at least $26M to satisfy his obligation in this case, and that any offer had to include three apartment developments.

Because the Receiver fully complied with the Statute and has presented the Court with contracts for each of the three Properties that greatly exceed the statutory minimum, with respect

---

[9] *See* Dkt. 57, p.7.
[10] *See* Dkt. 72, p. 4–8.. Indeed, Barton admits his interference in the sales process, *Response* p. 4, although not the degree of his interference, as further discussed below.

to the Apartment Developments Barton instead complains, essentially, that the Receiver did not contract with CEI. The Contracts for which the Court's approval is sought, however, are the highest offers received from qualified buyers.[11] As Barton has clearly communicated with *many* potentially interested buyers,[12] he could have directed CEI to submit a proposed sales agreement to the Receiver, but apparently chose not to.

Similarly, rather than supporting a contention that the Contracts for the Apartment Developments should be rejected, Barton's contention that "other third-party investment companies have appeared and expressed an interest in the properties" reveal his continuing violations of the Receivership Order. (Dkt. 29, ¶¶ 32, 33). Contrary to Barton's obligation to cooperate with the Receiver and refrain from interfering, Barton did not forward any such inquires to the Receiver or direct those interested persons to contact the Receiver. Instead, Barton as "CEO of JMJ Development" solicited offers to sell these and other Properties and instructed interested buyers to communicate directly with him.[13] Further, the Receiver discovered that Barton forwarded documents related to the Apartment Development to prospective buyers, without the NDA that the Receiver typically requires before discussing potential sales. Thus, Barton directly and intentionally violated, again, [14] the Receivership Order.

Nonetheless, the Statute accounts for additional interested parties by allowing such persons to make competing bids, so long as they exceed the proposed sales price by at least 10% and include proof of good funds. 28 U.S.C. § 2001(b). In the event higher offers are received from qualified buyers, the properties would be sold to those higher bidders.

---

[11]Several potentially interested parties contacted the Receiver after the Motion was filed. Competing offers will be addressed before the hearing, which has been continued.

[12] *See* discussion below.

[13]*See* **Exhibit B**, included in the appendix submitted with this Reply.

[14] *See* Dkt. 133 for additional discussion of Barton's contempt. The Receiver requests that the Court instruct Barton to immediately cease and desist from interfering with the Receiver's efforts to sell the Properties, efforts to sell other properties, and the Receiver's management of the Receivership Estate.

**2.    Selling Each Property Now Rather than At the Conclusion of Barton's Meritless Appeals Is In the Best Interest of the Estate**

The Receiver is not engaged in a liquidation spree.  He seeks to recover the maximum value of the Properties owned by Receivership Entities, while minimizing the liabilities and expenses necessary to otherwise continue ownership, maintenance, and development of the Properties at issue.  Further, as discussed in prior Reports [Dkt. 139], or other filings [Dkt. 167] neither Rock Creek [Dkt. 104] nor the Frisco Gate Property [Dkt. 140] sales have closed.  Nor will the sale of any of the three properties at issue close for several months.

Additional funds are required to perform the continuing mandate of the Receivership Order.  For instance, a forensic accounting is necessary to fully trace, to the extent possible, Barton's use of investor funds, identify fraudulent transfers. Tax returns for the Receivership Entities are due as are tax payments, and additional costs and expenses are incurred every month. To accomplish these essential tasks, cash is necessary.

**i.    The Apartment Developments**

Southern Properties has presented a competing claim to the Apartment Developments based upon its purported entitlement to convert its debt to equity.  At the conclusion of the summary proceeding between Southern Properties and the Receiver, the Court will determine what, if any, rights Southern Properties holds in the Apartment Developments.  Resolving Southern Properties' claim—with outcomes ranging from entitlement to repayment of its debt, to entitlement to ownership of the realty based on its purported right to convert debt to equity, or to treatment as a wholly unsecured creditor that participates in a claims process—will provide clarity regarding the value of the entire Receivership Estate portfolio, and potentially, the scope and direction of the Receiver's continued efforts.   Utilizing a summary to obtain that clarity now serves the Estate's best interests in several ways, including informing whether and when additional

sales will be necessary.  Given Barton's demonstrated pattern of objecting to and interfering with potential sales, obtaining this clarity now is very much in the best interest of the Receivership.

### ii.      The Amerigold Suites

Amerigold Suites loses money every month and will not generate a net profit for the Estate without a significant capital investment.  The Amerigold Suites was built in 1981 and needs many improvements and updates, including new plumbing fixtures, flooring, appliances, and interior and exterior paint.  Additionally, just since the Receiver's appointment, the property has experienced numerous HVAC and electrical issues necessitating repairs on a near monthly basis.

Because of the poor condition of the Property, occupancy is far lower than market average for comparable properties, which in turn generates less income than is necessary to operate the Property.  Monthly premiums for insurance exceed $14,000.  Although payments on the mortgage are paused, interest at 6.5% annually continues to accrue and erode equity.[15]  While a property manager is employed to manage the day-to-day issues related to tenants, oversee work performed on the Property, and manage the financial records and collection of rent, the Property also consumes an disproportionate amount of time by the Receiver's team, particularly in light of the drain in Receivership Assets caused by its continued ownership. The Receiver's team spent many hours working with an insurance broker to find property and liability insurance and communicating with creditors to prevent the utilities from being shut off.  Significant time continues in paying bills, approving repairs, and communicating with various parties regarding a multitude of issues.

---

[15] The lender conferred with the Receiver's counsel about a motion to intervene, a request to lift the litigation stay, and a motion to foreclose on the property.  When the Receiver informed the lender that (1) he would requests sanctions for such an unnecessary and improperly timed motion; and (2) a proposed sale would be presented to the Court in due course, the lender paused its intention to file the motions about which it had conferred.  Those motions and the expense inherent in fighting them, nonetheless remain on the horizon if the Court does not approve the proposed sale of the Amerigold Suites.

All of these factors demonstrate that selling the Property now, rather than continuing to spend Receivership resources on management and maintenance will maximize the value of the Property, as well as preserving the value of the entire Estate. The Amerigold Suites is not burdened by any competing ownership claims and following the statutorily required hearing, the Court should approve sale of the Amerigold Suites.

**B.     The Court Has Already Rejected Barton's Efforts to Reconsider or Vacate the Receivership Order**

Barton contends the Court should not approve these sales until it forces the SEC to provide additional evidence further supporting the Hahn Declaration, pursuant to which the SEC demonstrated that Wall Investor funds were used to purchase, develop, maintain, or otherwise for the benefit of the properties owned D4FR, LLC, D4DS, LLC and Goldmark Hospitality, LLC. Without providing any evidence, including any evidence that rebuts or challenges the SEC's evidence that Barton transferred investor funds to Goldmark Hospitality and the entities that own the Apartment Developments, Barton contends "none of the subject properties are validly part of the receivership estate." The Court has repeatedly rejected these arguments, and they present no basis to deny approval of the sales presented in the Motions. Likewise, this Court and the Fifth Circuit rejected Barton's motions to stay the receivership.[16]

Moreover, Barton's selective arguments regarding the funding with which the Amerigold Suites was purchased[17] hardly addresses the basis for the property's inclusion in the Receivership Estate. As the SEC demonstrated, Barton comingled investor funds haphazardly and used such comingled funds to *operate*, maintain, *or* purchase properties, including the Amerigold Suites.[18] Moreover, as explained in detail in the Receiver's pending Motion to Compel and supporting

---

[16] Dkt. 122, 132.
[17] *Response* p. 7.
[18] *Response* p. 8.

Reply, [Dkt Nos. 133, 134, 166], Barton continues to withhold the access credentials for the Receivership Entities' accounting records despite a clear directive in the Receivership Order and instructions from the Receiver to do so. Rather than justified by any privilege whatsoever, his conduct is calculated and his complaints about any lack of tracing are accordingly, at this juncture, disingenuous at best.

As discussed in prior filings, the Receiver's access to the Receivership Entities' accounting and bank records has been laborious and slow. Nevertheless, as the Receiver's team has begun to gain access to this information in recent weeks, they have discovered that Wall investor funds certainly flowed into the Amerigold Suites.  For example, the Receiver recently discovered that no less than $250,000 of Wall Investor money flowed into the Amerigold Suites. The SEC traced over $13 million flowing into Wall012, LLC, Wall016, LLC, Wall017, LLC between April 2018 and February 2019.[19] According to the SEC, a Wall012 account ending 0510, a Wall016 account ending 1761, and a Wall017 account ending 2529, all at J.P. Morgan Chase Bank, received investor funds.[20] Based on this information, the Receiver's team reviewed bank records for the Wall012 account ending 0510 and discovered that over $2.2 million was sent to a Carnegie Development LLC account ending 7036 in August of 2018. That same month the Carnegie Development account sent $600,000 to a JMJ Development account ending 5193. On September 29, 2018, $200,000 was wired to a Goldmark Hospitality account ending 6928. That same day a $200,000 check was written from the Goldmark Hospitality account to a solar energy company—presumably for the solar panels currently on the Amerigold Suites.

A similar series of transactions occurred in December 2018 when over $1 million was sent from the Wall012, Wall016, and Wall017 accounts to the Carnegie Development account ending

---

[19] Dkt. 7, *Hahn Decl.*, p.6.
[20] *Id.* at 5.

7036. In the same month, Carnegie Development sent over $600,000 to the JMJ Development account ending 5193. On December 31, 2018 the JMJ Development account sent $50,000 to the Goldmark Hospitality account ending 6928, and on the same day Goldmark wrote a $50,000 check to the same solar energy company.

## C.    The Receivership Order Governs Use of the Sales Proceeds

Finally, without evidence or authority, Barton argues the proceeds of any sales should be "preserved to secure Mr. Barton's legal defense," because the "receivership has long been starving Mr. Barton and his entities of the resources necessary to mount a defense to the Government's charges in this civil suit and the parallel criminal proceedings."[21]  Notably, Mr. Barton's personal assets are not included in the Receivership Estate. Further, the lengthy and dense docket in this case and in the multiple appeals in the Fifth Circuit belie any argument that Barton has been starved of funds to pay his counsel, although the origin of the funds used for that purpose is a question that will be presented to the Court shortly.

Even if imposition of the receivership deprived Barton of funds he would prefer to spend defending the criminal and civil charges against him, that collateral consequence does not inform or support Barton's entitlement to the sales proceeds. *See SEC v. Cherif*, 933 F.2d 403, 417 (7th Cir. 1991) (civil litigants, like criminal defendants have "no Sixth Amendment right to spend another person's money for services rendered by an attorney.") (internal quotation omitted)); *SEC v. Dobbins*, No. CIV.3:04-CV-0605-H, 2004 WL 957715, at *2 (N.D. Tex. Apr. 14, 2004) ("Because the use of frozen assets to pay attorney fees can be disallowed even in criminal cases, a civil litigant has no greater right to counsel than one who stands accused of a crime."); *FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, at *4 (M.D. Fla. December 31, 2008) (when frozen

---

[21] *Response* p. 8.

– 9 –

assets are less than the amount needed to compensate consumers for their losses, a district court can properly refuse to unfreeze assets). Only if Barton demonstrates through a full financial disclosure that he is unable to pay any attorney without funds released from the Receivership Estate should the Court begin the analysis of whether to exercise its discretion in balancing Barton's need against the investors' injury resulting from releasing funds to Barton. *See FSLIC v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987); *FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 WL 4182726, at *3 (E.D. Tex. Aug. 8, 2016) (defendant bears burden of demonstrating inability to secure legal services without frozen funds). Barton has not acknowledged his burden, let alone attempted to meet it. Instead, as will be discussed in a soon-to-be filed motion for show cause hearing, his attorneys refuse to disclose the source of funds already used to pay for their services. *See FTC v. Assail, Inc.*, 410 F.3d 256 (5th Cir. 2005) ("[A]n attorney must 'audit' a client sufficiently so as to avoid becoming part of a criminal scheme that includes disposing of ill-gotten gains.").

The Receivership Order and additional orders govern disposition of all Receivership Assets. *See* Dkt. 29, ¶¶ 6, 61, 63. At this juncture, nothing more is required.

None of Barton's arguments warrant denying approval of any of the sales pending before the Court and the Receiver requests that the Court overrule Barton's objections.

## II.     CONCLUSION AND PRAYER

As set forth above, the Receiver requests that the Court enter an order authorizing the Receiver to sell the Amerigold Suites pursuant to the terms of the Contract (or upon substantially similar terms in the event the Contract is terminated), and requests such other and further relief to which he is justly entitled.

Respectfully submitted,

By: /s/ Charlene C. Koonce
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX 75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

/s/ Charlene C. Koonce
Charlene C. Koonce

– **11** –