**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff*, | § § § | |
| **v.** | § § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § § § | |
| *Relief Defendants.* | § | |

**RECEIVER'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
REGARDING SOUTHERN PROPERTIES CAPITAL, LTD.'S CLAIMED OWNERSHIP
<u>INTEREST IN CERTAIN RECEIVERSHIP PROPERTIES</u>**

**TABLE OF CONTENTS**

I.    SUMMARY.................................................................................................................. 1

II.   SUMMARY JUDGMENT EVIDENCE ................................................................... 3

III.  UNDISPUTED FACTS ............................................................................................. 4

     A.    The Receivership and Receivership Entities............................................................ 4

     B.    The D4 and Parent Entities are Receivership Entities ........................................... 7

     C.    The Apartment Developments (Windmill Farms, Bellwether Ridge, Parc at Ingleside, and Parc at Opelika) ...................................................................... 7

     D.    The HUD Loans .................................................................................................. 10

     E.    SPC's Loans and Purported "Conversion Rights" Regarding D4DS and D4FR (Windmill Farms and Bellwether Ridge)................................................. 12

     F.    The Pledge and Security Agreement Regarding D4IN (Ingleside) ...................... 17

     G.    The D4OP (Opelika) Transaction ........................................................................ 18

     H.    JMJ Development and the D4 Entities Controlled Development and Management of the Properties. ........................................................................... 19

     I.    SPC's Attempted Exercise of Conversion Rights Related to the Bellwether Ridge, Windmill Farms, and Ingleside Pledge and Security Agreements ............ 21

     J.    The Receivership Estate........................................................................................ 24

     K.    This Summary Proceeding .................................................................................... 26

IV.   ARGUMENT............................................................................................................. 27

     A.    Legal Standards.................................................................................................... 27

        1.    Summary Proceedings in Receiverships................................................. 27

        2.    Summary Judgment Standards................................................................ 29

        3.    Standards Governing Creditor Claims in Receiverships ......................... 30

     B.    The D4 Entities and The Parent Entities are Receivership Entities...................... 31

     C.    SPC Did Not Effectively Exercise Conversion Rights By Which It Could Acquire Control Over the D4 Entities or the Parent Entities................................ 33

1.     The Plain Language of the Relevant Agreements Demonstrates SPC Did Not Convert Its Debt to Equity Regarding D4FR, D4DS, or D4IN ................................................................................ 34

    (i)    SPC Identified No Default Entitling "SPC LLC" to Exercise the Conversion Rights for D4DS or D4FR .................... 34

    (ii)   SPC Failed to Satisfy the Conditions Precedent Required for Exercise of the Conversion Rights Related to D4DS, D4FR and D4IN ................................................................... 35

    (iii)  SPC Failed to Satisfy the Conditions Precedent Required for Exercise of the Assignment Rights Related to D4OP ............. 37

2.     Even if SPC Had Converted its Debt to Equity or Otherwise Owned the Equity in the Parent Entities, SPC Has Not Demonstrated Ownership of the D4 Entities or the Apartment Developments ............................................................................ 38

D.    Equitable Considerations Preclude SPC From Exercising, Now or in the Future, Conversion Rights or Performance of an Executory Assignment ............ 39

1.     SPC's Conversion and Assignment Rights are Appropriately Prohibited by the Receivership Order ......................................... 39

2.     SPC's Conversion and Assignment Rights Violate the HUD Loans and HUD Regulations and Should Not Be Enforced ............................... 40

3.     SPC's Conversion and Assignment Rights Are Executory and Rejected ................................................................................ 42

E.    The Receiver Is Entitled to Sell Each of the Apartment Developments Free and Clear of Any Claim by SPC ......................................................... 44

F.    Fairness Mandates Treating SPC Like Other Investors ....................................... 44

1.     If Treated as an Investor, SPC Has No Entitlement to Recover Ahead of all Others ..................................................................... 46

2.     Alternatively, SPC Is an Unsecured Creditor ........................................... 47

V.  CONCLUSION ............................................................................................. 48

# TABLE OF AUTHORITIES

## Cases

*1701 Commerce Acquisition, LLC v. Macquarie US Trading, LLC*,
  No. 02-21-00333-CV, 2022 WL 3904976 (Tex. App.—Fort Worth Aug. 31, 2022, no
  pet.) .......................................................................................................................... 42

*Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*,
  556 F.3d 282 (5th Cir. 2009) .................................................................................. 42

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................. 29

*Broadbent v. Advantage Software, Inc.*,
  415 Fed. Appx. 73 (10th Cir. 2011)........................................................................ 45

*Cedyco Corp. v. PetroQuest Energy, LLC*,
  497 F.3d 485 (5th Cir. 2007) .................................................................................. 36

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................. 29

*Cent. Trust Co. v. Chi. Auditorium Ass'n*,
  240 U.S. 581 (1916)................................................................................................. 43

*Central Republic Bank & Trust Co. v. Caldwell*,
  58 F.2d 721 (8th Cir.1932) ..................................................................................... 28

*CFTC v. RFF GP, LLC*,
  No. 4:13-CV-382, 2014 WL 491639 (E.D. Tex. Feb. 4, 2014), *report and
  recommendation adopted*, No. 4:13-CV-382, 2014 WL 994928 (E.D. Tex. Mar. 10,
  2014) ........................................................................................................................ 45

*CFTC v. Topworth Intern., Ltd.*,
  205 F.3d 1107 (9th Cir. 1999), *as amended* (Mar. 23, 2000) ................................. 28

*Crawford v. Silette*,
  608 F.3d 275 (5th Cir. 2010) .................................................................................. 28

*Ellison v. Software Spectrum, Inc.*,
  85 F.3d 187 (5th Cir. 1996) .................................................................................... 29

*Envtl. Conservation Org. v. City of Dallas,*
  529 F.3d 519 (5th Cir. 2008) .................................................................................. 30

*Fiess v. State Farm Lloyds,*
   202 S.W.3d 744 (Tex.2006)....................................................................................... 34

*FTC v. Johnson*,
   567 Fed. Appx. 512 (9th Cir. 2014)......................................................................... 32

*FTC v. Noland*,
   No. CV-20-00047-PHX-DWL, 2020 WL 4530459 (D. Ariz. Aug. 6, 2020).......................... 32

*Galindo v. Precision Amer. Corp.,*
   754 F.2d 1212 (5th Cir.1985) ................................................................................... 30

*Giant Eagle Inc. v. Excentus Corp.*,
   No. 3:14-CV-1195-B, 2014 WL 12531173 (N.D. Tex. Aug. 2, 2014) .................................. 34

*Gossett v. Du–Ra–Kel Corp.,*
   569 F.2d 869 (5th Cir. 1978) .................................................................................... 30

*Hamilton v. Segue Software, Inc.*,
   232 F.3d 473 (5th Cir. 2000) .................................................................................... 29

*Horn v. State Farm Lloyds*,
   703 F.3d 735 (5th Cir. 2012) .................................................................................... 34

*In re Dillard Dep't Stores, Inc.*,
   186 S.W.3d 514 (Tex. 2006)....................................................................................... 34

*In re Landgraf*,
   19-41155-ELM, 2021 WL 126000 (Bankr. N.D. Tex. Jan. 13, 2021) ................................... 29

*In re Real Prop. Located at Redacted Jupiter Drive, Salt Lake City, Utah*,
   No. 2:05-CV-1013, 2007 WL 7652297 (D. Utah Sept. 4, 2007)..................................... 33, 38

*Janvey v. Alguire*,
   No. 3:09-CV-0724-N, 2014 WL 12654910 (N.D. Tex. July 30, 2014), *aff'd on other
   grounds*, 847 F.3d 231 (5th Cir. 2017) ..................................................................... 43

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
   712 F.3d 185 (5th Cir. 2013) .................................................................................... 39

*Liberte Capital Group, LLC v. Capwill*,
   148 Fed. Appx. 426 (6th Cir. 2005)....................................................................... 40, 45

*Little v. Liquid Air Corp.,*
   37 F.3d 1069 (5th Cir.1994) ..................................................................................... 30

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)................................................................................................. 30

*Moran v. City of Cent. Falls*,
    475 B.R. 323 (D.R.I. 2012)..................................................................................... 43

*Pa. Steel Co. v. N.Y.C. Ry. Co.*,
    198 F. 721 (2d Cir. 1912) ...................................................................................... 43

*Pre-War Art, Inc. v. Stanford Coins & Bullion, Inc.*,
    No. 3:09-CV-00559-N, 2021 WL 424283 (N.D. Tex. Feb. 8, 2021) ................................. 31, 45

*RLI Ins. Co. v. Caliente Oil, Inc.*,
    469 F. Supp. 3d 729 (W.D. Tex. 2020) .................................................................... 38

*SEC v. Bjork*,
    No. H-11-2830, 2012 WL 1392082 (S.D. Tex. Apr. 19, 2012)................................................. 27

*SEC v. Byers,*
    609 F.3d 87 (2d Cir.2010) ....................................................................................... 40

*SEC v. Camarco*,
    No. 19-1486, 2021 WL 5985058 (10th Cir. Dec. 16, 2021)....................................................... 32

*SEC v. Champion-Cain*,
    No. 3:19-CV-1628-LAB-AHG, 2019 WL 6834661 (S.D. Cal. Dec. 13, 2019)....................... 41

*SEC v. Credit Bancorp, Ltd.*,
    No. 99 CIV. 11395 RWS, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290
    F.3d 80 (2d Cir. 2002) ............................................................................ 31, 47, 48

*SEC v. Detroit Mem'l Partners, LLC*,
    No. 1:13-CV-1817-WSD, 2016 WL 6595942 (N.D. Ga. Nov. 8, 2016)................................. 33

*SEC v. Elliott*,
    953 F.2d 1560 (11th Cir. 1992) ................................................................. 27, 28, 30

*SEC v. Faulkner*,
    No. 3:16-CV-1735-D, 2020 WL 2042339 (N.D. Tex. Apr. 28, 2020)............................... 31, 45

*SEC v. Hardy*,
    803 F.2d 1034 (9th Cir. 1986) ................................................................... 27, 44

*SEC v. Huber*,
    702 F.3d 903 (7th Cir. 2012) ...................................................................... 40, 46

*SEC v. Safety Fin. Service, Inc.*,
    674 F.2d 368 (5th Cir. 1982) .......................................................................... 30

*SEC v. Sharp Capital, Inc.,*
    315 F.3d 541 (5th Cir. 2003) ...................................................................... 27, 28

*SEC v. Stanford Intern. Bank Ltd.*,
    465 Fed. Appx. 316 (5th Cir. 2012)...................................................................... 44, 47

*SEC v. Vescor Capital Corp.*,
    599 F.3d 1189 (10th Cir. 2010) ............................................................................... 47

*SEC v. Wencke*,
    622 F.2d 1363 (9th Cir. 1980) ................................................................................. 40

*Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*,
    327 S.W.3d 104 (Tex. 2010)..................................................................................... 36

*Sossamon v. Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) ................................................................................... 29

*Stephens Cnty. Museum, Inc. v. Swenson*,
    517 S.W.2d 257 (Tex. 1974)..................................................................................... 33

*TIG Ins. Co. v. Sedgwick James of Wash.*,
    276 F.3d 754 (5th Cir. 2002) ................................................................................... 30

*Transamerica Ins. Co. v. Avenell*,
    66 F.3d 715 (5th Cir.1995) ...................................................................................... 29

*United States v. Durham*,
    86 F.3d 70 (5th Cir. 1996) ....................................................................................... 31

*United States v. Fairway Capital Corp.*,
    433 F. Supp. 2d 226 (D.R.I. 2006), *aff'd,* 483 F.3d 34 (1st Cir. 2007)............................... 28, 29

*United States v. RaPower-3, LLC*,
    No. 2:15-CV-00828-DN, 2020 WL 5531563 (D. Utah Sept. 15, 2020) .................................. 28

*United States v. Vanguard Inv. Co., Inc.*,
    6 F.3d 222 (4th Cir. 1993) ....................................................................................... 40

*Vanston Bondholders Protective Comm. v. Green*,
    329 U.S. 156 (1946).................................................................................................. 41

*Westport Ins. Corp. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*,
    No. 4:16-CV-01947, 2023 WL 2574982 (S.D. Tex. Mar. 17, 2023) ........................................ 41

*Zacarias v. Stanford Int'l Bank, Ltd.*,
    945 F.3d 883 (5th Cir. 2019) ................................................................................... 39

## **Rules**

FED. R. CIV .P. 56(e) ............................................................................................... 30

FED. R. CIV. P. 56(a) ............................................................................................................ 29

**Codes**

TEX. BUS. ORGS. CODE § 101.106(b) ................................................................................. 38

Cort Thomas, as the court-appointed Receiver, moves the Court for summary judgment regarding Southern Properties Capital, Ltd.'s ("SPC") purported entitlement to real properties described below (collectively, the "Apartment Developments" or the "Properties").  According to SPC, it is an investor in certain Receivership Entities.  As such, it should be entitled to participate in a claims process if and when one is established, to the same extent as all other similarly situated investors.  It is not, however, entitled to extract the Apartment Developments or the Receivership Entities that own them from the Receivership Estate. Instead, the Court should authorize the Receiver to sell the Apartment Developments free and clear of any claim by SPC. In support, the Receiver respectfully shows the Court as follows:

## I.    SUMMARY

"Oh what a tangled web we weave…" Apparently at SPC's behest, Barton created separate "D4" entities (the "D4 Entities" further defined below) through which he borrowed funds from the United States Department of Housing and Urban Development ("HUD") to purchase realty and build the Apartment Developments.[1] In connection with each transaction, Barton also executed promissory notes by which JMJ Development, LLC ("JMJ  Development") borrowed additional funds from SPC (the "Notes" as further defined below). The Notes, which represented mezzanine loans, were unsecured.[2]  The respective parent entities of each D4 Entity (the "Parent Entities" further defined below) pledged to JMJ their respective membership interest in each D4 Entity in

---

[1] This Motion encompasses SPC's claimed interest in four Apartment Developments—the two presented in the Receiver's "Motions to Sell," (Dkts. 161, 162, 164, 165) the Parc at Windmill Farms and Bellwether Ridge, and the Parc at Ingleside and the Parc at Opelika, further identified below.  Because contract documents related to each Apartment Development include some purported "conversion right," or assignment of interest in certain Receivership Entities that indirectly own or control the Apartment Developments, the Receiver requests that the Court determine SPC's interest in each, although, currently, he seeks to sell only Windmill Farms and Bellwether Ridge.

[2] As discussed below, the complex structure and lack of direct security for SPC's loans was likely intended to circumvent HUD regulations that prohibit mezzanine lending on new developments, and to side-step terms of the HUD Loan documents that prohibit granting a security interest in the borrowing entity or its parent entities, to any lender other than HUD.

– 1 –

exchange for JMJ's loan of the proceeds of SPC's loans to each Parent Entity.  In certain Pledge and Security Agreements,[3] the Parent Entities agreed JMJ could convert the debt owed by each Parent Entity into equity upon SPC's satisfaction of certain conditions precedent.  JMJ then assigned the Pledge and Security Agreements to Southern Properties Capital, LLC ("SPC LLC"), but SPC LLC was only entitled to exercise the assigned rights in the event of a default under the Notes.  Although it sought to exercise the conversion rights prior to the Receiver's appointment, SPC has not identified a default or satisfied the conditions precedent and has no entitlement to exercise the conversion rights in the future.

Thus, notwithstanding its "business model" and parole expectations that contradict HUD regulations and the relevant agreements, SPC has not demonstrated entitlement to convert any rights, let alone a fully performed or executed conversion of the equity necessary for SPC to exempt the D4 Entities and the Apartment Developments from the scope of the receivership. Based on defects in the relevant agreements, SPC's failure to satisfy numerous conditions precedent, SPC's unclean hands, and other fairness considerations, the Court can and should determine SPC is either a creditor to the extent of its loans, or, as it contends, an investor on par with other investors, entitled to participate in a claims process when and if one is established.

In this summary proceeding, the Receiver accordingly seeks declarations that:

(1)    Prior to the Receiver's appointment, Barton controlled each of the Receivership Entities at issue here;

(2)    SPC did not effectively exercise any conversion or assignment rights provided in the Pledge and Security Agreements, Assignment of Pledge and Security Agreements, or Pledge

---

[3] As discussed below, differences exist between the transactions.  This outline summarizes, generally, the transactions.

and Security Agreement with Assignment of Rights, such that any debt owed to it was converted to equity or control over the D4 Entities;

(3)    Following entry of the Receivership Order, SPC is not presently permitted to exercise any conversion or assignment rights to alter the ownership or control structure of any Receivership Entities;

(4)    The Receiver is entitled to sell each of the Apartment Developments free and clear of any claim by SPC;

(5)    If a claims process is established for distribution of Receivership Assets, SPC may participate as an investor, treated equally with all other investors, or, perhaps as a creditor to the extent of any unpaid loans or other fees owed to it by any Receivership Entities.[4]

## II.    SUMMARY JUDGMENT EVIDENCE

In support of this Motion, the Receiver submits the following evidence:

(1)    Declaration of Cort Thomas ("Thomas Dec.") and its exhibits;

(2)    The Receiver also incorporates by reference the evidence submitted in support of the SEC's Motion for Appointment of Receiver, Dkts. 7, 8, 9; the evidence submitted in support of the Receiver's Motion to Supplement Order Appointing Receiver, Dkts. 41, 42; and the evidence submitted in support of his Supplemental Brief In Support of Motion to Supplement Order Appointing Receiver, Dkts. 73, 74, as well as any other Declaration or verified Motion referenced below.

---

[4] The Receiver is not requesting that the Court declare at this early juncture that any claim SPC might submit is an approved claim, but rather that SPC is entitled to submit such claims for approval. If SPC establishes entitlement to treatment as a secured creditor, the Receiver agrees to satisfy the amounts due on its Loans from the proceeds of the sales of the Apartment Developments.

### III.    UNDISPUTED FACTS

**A.    The Receivership and Receivership Entities**

1.    On October 18, 2022, the Court entered an Order Appointing Receiver (the "Receivership Order") by which Cortney C. Thomas was appointed as Receiver for certain entities (the "Receivership Entities").  The Court directed the Receiver to take possession and control of all Receivership Assets, "[t]he assets of the[] Receivership Entities," and Receivership Records.[5]

2.    The Receivership Order enjoins any actions that would interfere with the "Receiver's efforts to take control, possession, or management of any Receivership Property; . . . includ[ing] but  . . . not limited to . . . [any action in] taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;  . . . dissipate or otherwise diminish the value of any Receivership Property; . . . include[ing] but . . .  not limited to . . .  exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property."[6]

3.    The Order also stays all litigation against the Receiver, Receivership Entities, and Receivership Assets.[7]

4.    Pursuant to the Receivership Order, the Court assumed exclusive possession and control over the assets of all "Receivership Entities," which were defined as certain listed entities

---

[5] Dkt. 29, the "Receivership Order" ¶¶ 6, 16, 17.

[6] Dkt. 29, ¶ 32A, D.

[7] Dkt. 29, ¶ 34–36.

– 4 –

together with "*any other entities that Defendant Timothy Barton directly or indirectly controls, including, but not limited to . . .*"[8]

5.      JMJ Development, LLC ("JMJ Development"), JMJAV, LLC ("JMJAV"), D4FR, LLC ("D4FR"), D4DS, LLC ("D4DS"), and Enoch Investments, LLC ("Enoch") are identified in the Receivership Order as Receivership Entities that are controlled "directly or indirectly" by Defendant Barton and which "received investor funds, real property interests purchased with investor funds, or own[ed] property interests that were improved with or otherwise have benefitted from the use of investor funds."[9]

6.      Based on the Receiver's Motions and extensive evidence supporting Barton's control over a vast web of additional entities,[10] the Court supplemented the Receivership Order by identifying D4IN, LLC, ("D4IN"), D4OP, LLC ("D4OP"), JMJD4, LLC ("JMJD4"), TRWF, LLC, ("TRWF) One MF D4, LLC, ("One MF D4") and D4OPM, LLC ("D4OPM"), among others, as additional Receivership Entities (the "Supplemental Receivership Orders").[11]

7.      The factual basis for the Receivership Order was Barton's securities fraud and misappropriation of investor funds, which the SEC's evidence demonstrated he misused to, "among other things, purchase properties in the name of other entities Barton controlled, pay undisclosed fees and commissions, pay expenses associated with unrelated real estate development projects, and fund his lifestyle."[12]  The SEC's investigation revealed, that "Barton, acting *through various entities*

---

[8] Dkt. 29, ¶ 1 (emphasis added).

[9] *Id*. ¶ 1.

[10] The Receiver incorporates by reference the evidence submitted in support of his Motion to Supplement Order Appointing Receiver, and his Supplemental Brief ISO Motion to Supplement Order Appointing Receiver.  Dkts 41, 42, 73, 74,

[11] Dkt. 63 and 88.

[12] Dkt. 6, p. 1; Dkt. 7, pp. 10-15.

*he controls*, misused a significant portion of the investor funds to purchase real property interests, including several parcels of raw land in Texas."[13]

8.    The SEC relied on the Declaration of Carol Hahn, ("Hahn Dec.") which provided evidence in support of the Motion to Appoint—to the extent the evidence was discoverable prior to filing—about Barton's practice of commingling investor funds and transferring those funds for his own use to the Barton-controlled entities, "*including but not limited to*" those listed in the SEC's Motion. For instance, the SEC provided evidence demonstrating that Barton used commingled investor funds to:

- "Acquire, develop, or for the benefit of different unrelated properties for *other direct or indirect Barton-controlled entities, including but not limited to*: Villita Towers LLC, Mansions Apartment Homes at Marine Creek LLC, MO 2999TC LLC, JMR 100 LLC, JMJ Acquisitions LLC, FHC Acquisition LLC, **D4DS LLC, D4FR LLC**, and D4KL LLC;
- Transfer funds *to other Barton-controlled entities, including but not limited to*: Lajolla Construction Management LLC, Goldmark Hospitality LLC, **Enoch Investments LLC, and JMJAV**;
- Pay for professional services (such as engineering, surveying, land development, and consulting) related to the acquisition, development, and build out of multiple real estate properties, the majority of which are believed to be for non-Wall Entity properties;
- pay principal and interest payments on multiple loans that Barton obtained, *including loans for other non-Wall Entity properties.*"[14]

9.    Likewise, in seeking to identify the additional entities controlled by Barton as Receivership Entities, the Receiver discovered Barton's extensive commingling in and between the entities he controlled to spend, hide, and improperly use investor funds, the proceeds of investor funds, or funds so commingled with investor funds as to render tracing or segregation nearly impossible.[15]

---

[13] Dkt. 7-1 at ¶¶ 26-33 & Ex. B. (pdf pgs. 10-17) (emphasis added).

[14] Dkt. 7-1, ¶ 27 pdf pp. 10-11 (emphasis added, footnotes omitted).

[15] Dkt. 74; *see also* Dkts. 85 and 200.

**B.     The D4 and Parent Entities are Receivership Entities**

10.     Tim Barton held himself out as the President or Manager of TRWF, LLC, JMJ Development, D4FR, D4DS, D4IN, D4OP, JMJAV, LLC, JMJD4, and Enoch Investments, LLC.[16] In a list of entities submitted by Barton to the SEC before the case was filed, Barton also admitted control over D4DS, D4FR, D4IN, D4OP, Enoch Investments, JMJ Development, JMJAV, JMJD4, and TRWF, LLC.[17]

11.     The Court has already determined that Barton controlled each of the entities involved in the transactions described below, and thus, that each is a Receivership Entity.[18]  That conclusion is supported by Barton's title, his role in each of the transactions with SPC[19] and HUD, the evidence submitted in support of the Receiver's Motion to Supplement the Receivership Order,[20] as well as the evidence submitted by the SEC in support of its Motion for Appointment of a Receiver.[21]

**C.     The Apartment Developments (Windmill Farms, Bellwether Ridge, Parc at Ingleside, and Parc at Opelika)**

12.     D4FR is the recorded owner of the Parc at Windmill Farms—a 272-unit apartment complex located at 1003 Windmill Farms Boulevard, Forney, Texas ("Windmill Farms").[22]

---

[16] *Thomas Dec.*, Exhibits A-1–A-18; A-26–A-27; A-29; A-31–A-35; A-46; A-47–A-48; A-50–A-53; A-61; A-62; A-63–A-68; A-71; A-73; *see also* Dkts. 42 and 74.

[17] Dkt. 7 p. 19–24; Dkt. 42, pdf. p. 39.

[18] Dkts. 29, 62, 88.

[19] Indeed, SPC admits Barton's control over all Receivership Entities involved in these transactions.  Dkt. 179, pp. 7-8 ("Barton used as borrower his company D4FR. . ."); Dkt. 179, p. 12.

[20] Dkts. 73 and 74.

[21] Dkts. 7, 8, 9.

[22] *Thomas Dec.*, ¶ 9; Exhibit A-3.

13.    D4FR is also the borrower on a December 1, 2017 HUD-insured loan (the "D4FR HUD Loan") serviced by Greystone Servicing Corporation, Inc. ("Greystone").[23]    Defendant Barton is listed as the "Section 50 party"[24] in the HUD Loan and associated Regulatory Agreement and signed the promissory note for the HUD Loan and all associated contract documents as the President of D4FR.[25]    Barton, together with the TLB 2012 Irrevocable Trust, is also identified in the HUD Regulatory Agreement as the Principal of D4FR.[26]

14.    The proceeds of the D4FR HUD Loan were used to build the Windmill Farms complex, as supervised by the lender, Greystone.[27]

15.    D4DS is the recorded owner of the Bellwether Ridge—a 150-unit apartment complex located at 841 S. Polk Street, DeSoto, Texas ("Bellwether Ridge").[28]

16.    D4DS is also the borrower on an October 1, 2017 HUD-insured loan (the "D4DS HUD Loan") serviced by Greystone.[29]    Defendant Barton is listed as the "Section 50 party" to the HUD Loan and associated Regulatory Agreement and signed the promissory note for the HUD Loan and all associated contract documents as the President of D4DS.[30]

---

[23] The D4FR HUD Loan matures on February 1, 2060 and accrues interest at 3.9% annually.  As of January 13, 2023, the balance on the HUD Loan was $35,076,762.98.  *Thomas Dec.* ¶ 10.

[24] The "Section 50 party" is the individual who assumes personal liability for the otherwise non-recourse HUD loans, in the event of certain violations of the Loan document or the Regulatory Agreement, including by "authorizing the conveyance, assignment, transfer, pledge, encumbrance, or other disposition of the Mortgaged Property or interest therein in violation of Section 35(a) of the Regulatory Agreement…" *Thomas Dec.*, Exhibit A-27, APP000350.

[25] *Thomas Dec.*, Exhibits A-1; A-2; A-27.

[26] *Thomas Dec.*, Exhibits A-27; APP000349-350.

[27] *Thomas Dec.* ¶ 12.

[28] *Thomas Dec.*, Exhibits A-30.

[29] The D4DS HUD Loan matures on June 1, 2059 and accrues interest at 3.7% annually.  As of January 13, 2023, the balance on the HUD Loan was $17,823,548.47.  *Thomas Dec.* ¶ 11.

[30] *Thomas Dec.*, Exhibits A-29; A-46; A-71.

17.     The proceeds of the D4DS HUD Loan were used to build the Bellwether Ridge complex, as supervised and administered by Greystone.[31]

18.     D4IN is the recorded owner of the Parc at Ingleside—a 192-unit apartment complex located at 2850 Avenue J, Ingleside, Texas ("Ingleside").[32]

19.     D4IN is also the borrower on a November 1, 2019 HUD-insured loan (the "D4IN HUD Loan") serviced by Greystone.[33]  Defendant  Barton is listed as the "Section 50 party" to the HUD Loan and associated Regulatory Agreement and signed the promissory note for the HUD Loan and all associated contract documents as the Manager of D4IN.[34]

20.     The proceeds of the D4IN HUD Loan were used to build the Ingleside complex, as supervised and administered by Greystone.[35]

21.     D4OP is the recorded owner of the Parc at Opelika—a 168-unit apartment complex located at 1375 McCoy St. Opelika, Alabama ("Opelika").[36]

22.     D4OP is also the borrower on a January 1, 2021 HUD-insured loan (the "D4OP HUD Loan," and together with the D4DS, D4FR, and D4IN HUD Loans, the "HUD Loans") serviced by Greystone.[37]  Defendant  Barton is listed as the "Section 50 party" to the HUD Loan and associated Regulatory Agreement and signed the promissory note for the HUD Loan and all associated contract documents as the President of D4OP.[38]

---

[31] *Thomas Dec.* ¶ 15.

[32] *Thomas Dec.*, ¶ 9; Exhibit A-49.

[33] The D4IN HUD Loan matures on August 1, 2061 and accrues interest at 3.59% annually.  As of January 13, 2023, the balance on the HUD Loan was $ 24,790,081.91. *Thomas Dec.* ¶ 17.

[34] Exhibits A-47, A-48, A-56.

[35] *Thomas Dec.* ¶ 18.

[36] Exhibit A-64.

[37] The D4OP HUD Loan matures on November 1, 2062 and accrues interest at 2.99% annually.  As of January 13, 2023, the balance on the HUD Loan was $17,823,548.47. *Thomas Dec.* ¶ 20.

[38] Exhibits A-63, A-65, A-68.

23.     The proceeds of the D4OP HUD Loan were used to build the Opelika complex, as supervised and administered by Greystone.[39]

### D.    The HUD Loans

24.     Each HUD Loan prohibits a security interest by any party other than HUD,[40] and also prohibits transfer of any interest in the mortgaged property or any interest in the borrower:

> **21. TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.**
>
> (a) So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations. Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21.[41]

25.     The HUD Loans also prohibit any UCC filings against the Borrower, the Project, or Project Assets:

> Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD. Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral.[42]

---

[39] *Thomas Dec.* ¶ 21.

[40] Exhibit A-3, APP000060; APP000078; A-30; A-49; A-77.

[41] *Id.* at APP000078; A-30; A-49; A-77.

[42] Exhibit A-3, APP000060; A-30; A-49; A-77.

26.     In the "Borrower's Oath" for each HUD Loan, Barton warranted he "ha[d] not and will not enter into any agreement with any party other than Lender in connection with the Loan transaction that allows for perfection of any portion of the UCC Collateral through control under the UCC."[43]

27.     The Regulatory Agreement signed by Barton in connection with each HUD Loan similarly included extensive restrictions regarding any transactions that affected the ownership or control structure for the respective borrowers, required that the borrower manage the property, and required prior HUD approval for any loan or contract intended even indirectly, to finance the property, other than for reasonable operating expenses.[44]

28.     HUD regulations also include extensive restrictions for secondary debt.  For instance, with respect to new construction like the Apartment Developments, HUD regulations provide: "[p]rivate secondary financing is not permitted under Section 221(d)(4) or other new

---

[43]Exhibits A-2, A-48, A-65, A-71.

[44] Exhibits A-27, A-46, A-56, A-58.  For instance, ¶ 11b provides: " Borrower shall not engage in any business or activity, including the operation of any other project, or incur any liability or obligation not in connection with the Project, nor acquire an Affiliate or contract to enter into any affiliation with any party except as otherwise approved by HUD.") [Exhibit A-9]; ¶ 35 provides: "ACTIONS REQUIRING THE PRIOR WRITTEN APPROVAL OF HUD, Borrower shall not without the prior written approval of HUD: a. Convey, assign, transfer, pledge, hypothecate, encumber, or otherwise dispose of the Mortgaged Property or any interest therein, or permit the conveyance, assignment, or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal) unless permitted by Program Obligations. Borrower need not obtain the prior written approval of HUD: (i) for a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under the Security Instrument; (ii) for inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code; (iii) for acquisition of an interest by inheritance or by Court decree; or (iv) for actions permitted under subsection (g) below. b. Enter into any contract, agreement or arrangement to borrow funds or finance any purchase or incur any liability, direct or contingent other than for Reasonable Operating Expenses. . . i. Amend the organizational documents of Borrower in a way that materially modifies the terms of the organization, including, but not limited to: any amendment that activates the requirement that a HUD previous participation certification be obtained from any additional partner or member; any amendment that would authorize any officer, partner or member other than the officer(s), general partner(s) or the managing member(s) of the corporation, partnership or company or pre-approved successor officer(s), general partner(s) or managing member(s) to bind the corporation, partnership or company for any matters concerning the Project which requires HUD's consent or approval; a change in the officer(s), general partner(s) or managing member(s) or pre-approved successor officer(s), general partner(s) or managing member(s) of the corporation, partnership or company and any proposed changes to the HUD-required provisions included in the organizational documents. . ." Exhibit A-27, APP000333-334.

construction/substantial first mortgage programs."[45]  Although mezzanine loans[46] are permitted on *refinance* programs, even then, the loans are subject to notable restrictions, including, only "where there is no identity of interest between the principals and the Mezzanine Lender or any affiliates of either party . . ."; "payments on mezzanine financing may be made only from surplus cash, and the debt may not mature before the FHA insured loan. . . Interest due or accruing on the mezzanine loan must be approved as reasonable by HUD."[47]

**E.    SPC's Loans and Purported "Conversion Rights" Regarding D4DS and D4FR (Windmill Farms and Bellwether Ridge)**

29.    SPC contends it and its parent entity, Transcontinental Realty Investors, Inc. ("TCI"), "specialize in the acquisition, development, ownership and management of multifamily and commercial real estate."[48]  As demonstrated by the terms of the agreements described above that required HUD approval for certain contemplated transactions, as admitted in correspondence to the Receiver,[49] and as a logical inference based on its extensive experience in developing and operating multi-family properties, SPC was aware of the terms of the HUD Loans and relevant HUD regulations governing the HUD Loans.

30.    Separately, for each of the Properties, Receivership Entity JMJ Development, JMJAV, D4OPM, and/or One MF D4 executed promissory notes, due and payable to SPC (collectively, the "Notes" or the "SPC Loans"). SPC contends the funds loaned pursuant to the

---

[45] Exhibit A-29, (APP000333-334); A-46; A-56; A-68; *see also* https://www.hud.gov/program_offices/housing/mfh/map/maphome and, https://www.hud.gov/sites/dfiles/OCHCO/documents/4430GHSGG.pdf.

[46] HUD regulations define "Mezzanine financing" as "a loan usually secured by a pledge of ownership interests, rather than by a lien on the real estate or an obligation of the Single Asset Mortgagor Entity."  Exhibit 70, APP001024.

[47] Exhibit A-70 APP001024; *see also* A-27, APP000322; 333.

[48] Dkt. 178 pp. 3-4.

[49] Exhibits A-28, A-57, A-69, A-74.

Notes were provided to JMJ Development to "fund the remaining amount necessary for the construction of" each of the Properties.[50]

    31.    The key terms of each Note[51] are as follows:

- Following the October 1, 2017 HUD Loan, on October 19, 2017, JMJ Development borrowed $3,800,000.00 (the "JMJ/D4DS Bellwether Note") from SPC. The JMJ/D4DS Note accrues interest at the rate of 5% and was scheduled to mature, initially, on May 1, 2020.[52] As a result of timely payments on this Note, as of January 17, 2023, an approximate balance of $3,797,758.95 is due;[53]

- Immediately after the December 1, 2017 HUD Loan, on December 14, 2017, JMJ Development borrowed $7,300,000.00 (the "JMJ/D4FR Windmills Farms Note") from SPC.[54] The JMJ/D4FR Note accrues interest at the rate of 5% and matured on November 1, 2022.[55] As a result of timely payments on this Note, as of January 17, 2023, an approximate balance of $7,885,547.12 is due;[56]

- Prior to the November 1, 2019 HUD Loan, on June 13, 2019, JMJAV borrowed $6,634,490.00 (the "JMJAV/D4IN Ingleside Note") from SPC. The JMJAV/D4IN Note accrues interest at the rate of 5% and matures (pursuant to a Modification Agreement) on November 1, 2026.[57] As a result of timely payments on this Note, as of January 17, 2023, an approximate balance of $3,759,163.65 is due;[58]

- Following the January 1, 2019 HUD Loan, on June 13, 2021, D4OPM, LLC and One MF D4, LLC borrowed $5,129,000.00 (the "D4OPM/Opelika Note") from SPC. The Opelika Note accrues interest at the rate of 10% and matures on January 13, 2023.[59]

---

[50] Dkt. 179, pp. 6, 11.

[51] Most Notes were subject to various amendments, for instance, the JMJ/D4FR Note was subject to an amendment, later rescinded, by which JMJ agreed to pay SPC the "Net Income of the Property, as defined by the Semi-Annual HUD approved Excess Cash Release. *Thomas Dec.* Exhibit A-8, A-9. That Amendment directly contravened other terms of the HUD Loans. Exhibit A-3, APP000062. Similarly, the Ingleside Note was preceded by a "VOD Note," dated June 4, 2019, which included "Acquisition Rights" to the Property in violation of HUD Loans, but which was superseded by the subsequent Note dated June 13, 2019. Exhibit 62. All known amendments for each Note are included in the Appendix.

[52] Exhibit A-31. The term of the JMJ/D4DS Note was extended to November 1, 2026. *Thomas Dec.* ¶ 29.

[53] *Thomas Dec.* ¶ 29.

[54] Exhibit A-4, A-7. Pursuant to certain amendments, the Windmill Farms Loan was increased to $8,300,000. Exhibit A-10.

[55] Exhibit A-4.

[56] *Thomas Dec.* ¶ 29.

[57] Exhibit A-50.

[58] *Thomas Dec.* ¶ 29.

[59] Exhibit A-66.

As a result of timely payments on this Note, as of January 17, 2023, an approximate balance of $3,189,595.90 is due.[60]

32.    Although each Note was issued in connection with the HUD Loans and for use in constructing the Apartment Developments,[61] the D4 Entities were not the borrowers on any of the SPC Notes.  Nor, except as discussed below regarding Opelika, did equity in any of the D4 Entities, or the Apartment Developments themselves, secure the SPC Loans.

33.    Instead, with respect to D4DS and D4FR, through a series of Amended and Restated Pledge and Security Agreements (collectively, the "Bellwether Ridge and Windmill Farms Pledge and Security Agreements"), Receivership Entities that held the majority of equity in each respective D4 Entity pledged to JMJ Development their right, title and interest in the membership interests of the respective parent entities for D4FR and D4DS in exchange for the loan proceeds JMJ Development had received from SPC. These Pledge and Security Agreements—by and between Receivership Entities only—included the following pledges of equity:

- For the JMJ/D4DS Pledge and Security Agreement (Bellwether Ridge), the pledge and collateral was as follows: TWRF, holds a 100% membership interest in JMJAV; JMJAV holds a 1% membership interest in JMJD4, and Enoch holds the remaining 99% membership interest in JMJD4. TWRF, JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4.[62]

- For the JMJ/D4FR Pledge and Security Agreement (Windmill Farms), the pledge and collateral was as follows:  TWRF holds a 100% membership interest in JMJAV; JMJAV holds a 1% membership interest in JMJD4; and Enoch holds the remaining 99% membership interest in JMJD4.  TWRF, JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4.[63]

---

[60] *Thomas Dec.* ¶ 29.

[61] Dkt. 179.

[62] Exhibits A-32, A-33, A-34.

[63] Exhibits A-13, A-14, A-15, A-16, A-17.

34.    These pledges, as well as SPC's contention about the ownership structure of these entities, are also reflected in the UCC statements filed by SPC:

- The UCC Financing Statement related to the Pledge & Security Agreement relevant to D4DS states that JMJAV owns 1% of D4FR and JMJD4 owns 98.5% of D4FR;[64]

- The UCC Financing Statement related to the Pledge & Security Agreement relevant to D4DS states that JMJAV owns 1% of D4DS and JMJD4 owns 98.5% of D4DS.[65]

35.    The "Collateral" for the D4DS and D4FR Pledge and Security Agreements was each Parent Entities' equity interest in the D4 Entities, and the related rights and privileges related to the equity held by the Parent Entities over the D4 Entities and their assets (the "Collateral"). [66]

36.    The Pledge and Secuity Agreements related to D4FR and D4DS (Windmill Farms and Bellwether Ridge) included Section 7.15, titled "Conversion Option," (the "Conversion Option" or "Conversion Rights") which provided:

"Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a) As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4FR LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4FR, LLC. . . . Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. . . . At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan

---

[64] Exhibit A-20, A-21, A-22, A-23.

[65] Exhibit A-36, A-37, A-38, A-39, A-40.

[66] Exhibits A-13, APP000145-147; A-32, APP000439-441; A-33, A-34.

– 15 –

shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b) In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4FR Property instead of and in place of the Collateral (the "Project Transfer"). . . ."[67]

37.    SPC was not a party to the D4FR (Windmill Farms) or D4DS (Bellwether Ridge) Pledge and Security Agreements. Instead, those pledges were between JMJ Development (defined as "Lender" in each Pledge), which received the pledged security, and the respective Parent Entities[68] instead held the "Conversion Rights" by which it could convert JMJ's debt into equity in the Parent Entities.

38.    JMJ Development nonetheless assigned to Southern Properties, LLC ("SPC LLC") the Pledge and Security Agreements for D4DS and D4FR (the "Assignment of Pledge and Security Agreements").  SPC, LLC's rights to exercise any of the assigned rights, however was contingent on default of a "Promissory Note" between JMJ Development and SPC LLC. The Assignment of Pledge and Security Agreement provided as follows:

"This is an absolute and present assignment of the Pledges by Assignor [JMJ Development, LLC] to Assignee [Southern Properties Capital, LLC]. *In the event that there is any default under that certain Promissory Note from Assignor to Assignee*, then Assignee shall be entitled to all rights as secured party under the Pledges."[69]

39.    The Receiver is unaware of, and SPC has not demonstrated the existence of any Promissory Note between JMJ Development or SPC LLC, nor has SPC demonstrated or even

---

[67] Exhibit A-13, APP000162-163; A-32, APP000456-457.

[68] Exhibits A-13; A-32.  At least according to the terms of the Pledge and Security Agreements, JMJ Development loaned the proceeds of SPC's Notes to each respective Parent Entity, thereby becoming a "lender."  No promissory notes or other written agreement reflecting these loans was discovered, however. *Thomas Dec.* ¶ 36.

[69] Exhibit A-35 (emphasis added).

alleged that JMJ Development or any other Receivership Entity defaulted under any such promissory note.[70]

**F.      The Pledge and Security Agreement Regarding D4IN (Ingleside)**

40.      In connection with the JMJAV/D4IN Ingleside Note, on June 13, 2019, JMJAV LLC pledged to SPC JMJD4's 98.75% managing member interest in D4IN, LLC and JMJAV, LLC's 1% membership interest in D4IN, LLC.[71]

41.      The Pledge and Security Agreement between JMJAV LLC and SPC related to the JMJAV/D4IN Ingleside Note (the "Ingleside Pledge Agreement") provided a security interest in the pledged Collateral.[72]  The Ingleside Pledge Agreement also included the same Section 7.15 Conversion Option that was in the D4DS and D4FR Pledge Agreements, and which imposed a 30-day advance notice and HUD approval as conditions precedent to exercising the Conversion Option.[73]

42.      The UCC Financing Statement related to the Pledge & Security Agreement relevant to D4IN states that JMJD4 collateralized its 98.75% interest in D4IN; Enoch Investments collateralized its 99% interest in JMJD4; TRWF collateralized its 100% interest in JMJAV and JMJAV collateralized its 1% interest in JMJD4.[74]

43.      Notably, the "Amended Regulations of D4IN, LLC as of June 4, 2019," (the "Company Agreement") provide that "Company Assets" were deemed owned by "the Company

---

[70] *Thomas Dec.* ¶ 37.

[71] Exhibit A-35.  By an amendment, Enoch also pledged its interest in  JMJD4. Exhibit A-73.

[72] Exhibit A-53. The collateral was defined as the legal and beneficial ownership interests in and to the equity pledged by each company, essentially the same definition used in the Pledge and Security Agreements governing D4DS and D4FR's Parent Entities.

[73] Exhibit A-53.

[74] ExhibitsA-75, A-76.

as an entity, and no Member, individually, or collectively, shall have any ownership interest in such Company Assets or any portion thereof."[75]

44.      In a separate June 13, 2019 Letter Agreement, JMJD4, JMJAV, LLC and Enoch Investments agreed that, "provided the developer's fee for the Property has been paid, that upon 10 days written notice . . . Enoch and JMJAV will assign 100% of the membership interests in JMJD4 to [SPC] . . . and that upon such assignment and the assignment of JMJAV's interest in the Company, once HUD has approved the transfer, the Promissory Note . . . in the amount of $6,634,490 will be cancelled." (the "Ingleside Assignment Agreement").[76]

### G.      The D4OP (Opelika) Transaction

45.      The transaction was different for D4OP (Opelika).  In a January 13, 2021 Pledge Agreement that served as security for the "D4OPM/Opelika Note," D4OP's Parent Entities or "Pledgors," D4OPM, LLC and ONE MF D4, LLC, pledged all of their right title and interest in the Collateral, to SPC (the "Opelika Pledge Agreement").[77]

46.      No Conversion Option was included in the Opelika Pledge Agreement.  Instead, in a January 22, 2021 Letter Agreement (the "Opelika Pledge Assignment"), D4OP LLC and/or D4OPM, LLC and ONE MF D4, LLC agreed they would own and develop "the Property," but also agreed that in consideration of SPC's Loan, upon written notice, D4OP and its Parent Entities would assign ninety-nine and seventy-five one-hundredths percent (99.75%) of the membership interests in the "record owner of the Property," D4OP, to "Southern Properties" or its designee, and that, upon such assignment, provided the Property was subject to no lien other than a first lien

---

[75] Exhibit A-72.

[76] Exhibit A-60.

[77] Exhibit A-67.

approved by Southern Properties, the Loan would be cancelled.[78]  As of the date of this Motion, to the Receiver's knowledge SPC has not provided notice of any such request for D4OP.[79]

**H.      JMJ Development and the D4 Entities Controlled Development and Management of the Properties.**

47.      In connection with the development of each Property, the D4 Entities, not SPC, contracted with general contractors and other construction professionals to design and build each respective development.[80]  Construction was predominantly funded by the HUD Loan for each Property via the submission of periodic loan draw requests.[81]  Once again, each D4 Entity, and not SPC, signed these draw requests prior to their submission to Greystone and HUD.[82]  For construction or development expenses over-and-above the HUD loan amounts, the D4 Entities drew on the respective SPC unsecured loans for each property.[83]

48.      To coordinate the complex HUD process, JMJ and/or other Barton-related Receivership Entities employed an individual whose primary responsibility was interfacing with the lenders and managing each development as construction progressed.[84]

49.      The bank accounts and accounting records for the D4 Entities show a tangled web of commingling with other Receivership Entities.  As detailed in the Receiver's Motion to Compel and supporting Reply,[85] access to the Receivership Entities' accounting records and bank records has been slow and tedious, with information from Quickbooks and the banks still trickling in on a

---

[78] Exhibit A-67.

[79] *Thomas Dec.* ¶ 58.

[80] *Thomas Dec.* ¶ 46.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Thomas Dec.* ¶ 47.

[85] Dkt. 133 and 166.

sporadic basis. Nevertheless, the Receiver and his accounting team have traced (a) hundreds of thousands of dollars in intercompany transfers between D4DS and Receivership Entities JMJ Development, JMJD4, and Carnegie Development; (b) over a million dollars in intercompany transactions between D4FR and JMJ Development, JMJD4, and Enoch Investments; (c) hundreds of thousands of dollars in intercompany transfers between D4IN and JMJ Development, and (d) in connection with the more extensive work necessary for completing the cost certification for Opelika, hundreds of thousands of dollars in intercompany transfers between D4OP and Receivership Entities JMJ Development, JMJD4, Carnegie Development, Enoch Investments, JMJ Management LLC, Broadview Holdings, Goldmark Hospitality LLC, and even SF Rock Creek LLC.[86]

50.     Loan payments have been made on the HUD Loans for each of the four Properties. These payments have either been made from revenue generated by the Properties, or they have been drawn on the SPC Notes.[87] Where excess cash has been available for the Properties, these funds have been used to pay down the SPC Notes.[88]

51.     On July 26, 2017, D4DS, as the owner of Bellwether Ridge, entered into a management agreement with Sunridge Management Group, Inc ("Sunridge").[89] Similarly, on January 20, 2017, D4FR, as the owner of Windmill Farms contracted with Sunridge Management Group, though Windmill Farms is now managed by Sunchase American ("Sunchase").[90] Barton,

---

[86] *Thomas Dec.*¶ 49.

[87] *Thmas Dec.,* ¶ 50

[88] *Id.* The Receiver is still investigating whether all funds distributed to SPC by the management companies were used to pay down the SPC Notes or whether certain funds were used for other purposes. *Id.*

[89] Exhibit A-45.

[90] Exhibit A- 26.

as the Managing Member for each D4 Entity, signed both agreements.[91]   D4IN, as owner of

Ingleside, has similarly entered into a management agreement with Sunridge, while Opelika is

managed by Sunchase.[92]

**I.      SPC's Attempted Exercise of Conversion Rights Related to the Bellwether Ridge, Windmill Farms, and Ingleside Pledge and Security Agreements**

52.      The SEC filed this lawsuit on September 23, 2022 and on September 26, 2022 filed

its Motion for Appointment of a Receiver.[93]   On the same date, Barton was indicted.[94]   The case

against Tim Barton was well-publicized.[95]

53.      On October 3, 2022, SPC purported to exercise its Conversion Rights for D4FR

(Windmill Farms) by sending correspondence to D4FR through Enoch, TRWF, and JMJAV (the

"Exercise Notice") in which it enclosed a "proposed purchase contract to effect a transfer from the

Project owner, D4FR LLC to SPC through a deed, once the lender on the Project and HUD have

consented to the transfer."[96]

54.      SPC did not identify any default by JMJ Development or any fees owed to Timothy

Barton or his affiliates that had been paid in full, or indeed were still owed.[97]

---

[91] Exhibit A- 45, A-26.

[92] *Thomas Dec.* ¶ 51.

[93] Dkt. 1; Dkt. 6.

[94] *See United States v. Timothy Barton*, Case No. 3:22-cr-00352-K, in the United States District Court for the Northern District of Texas.

[95] *See for example* https://www.wfaa.com/article/news/local/dallas-developer-tim-barton-loses-ownership-of-turtle-creek-site-once-anticipated-to-house-mandarin-oriental-hotel-condo-tower/287-66c6aeac-6af1-443d-b96d-327430585649; https://www.dallasnews.com/business/real-estate/2022/09/26/dallas-developer-faces-charges-of-scamming-chinese-investors-out-of-26-million.

[96] *Thomas Dec.* Exhibits A-24, A-25. Dkt. 180, pp. 246-275;

[97] *Id.*

– 21 –

55.    Similarly, SPC did not provide, or contend that prior to October 3, 2022 it had provided, the 30-day notice required by the Conversion Option.[98]    Irrespective of notice, the proposed purchase contract was never signed by Defendant Barton, but if executed, would have been invalid without prior HUD approval.[99]

56.    SPC's purported conversion of its equity interest in the D4DS (Bellwether Ridge) Parent Entities is equally executory.  On July 6, 2021, the APTS at Bellwether Ridge, LLC (the "purchaser," presumably an SPC affiliate but nonetheless an entity that held no conversion rights pursuant to any Loan or contract with D4DS), and D4DS entered into an Agreement for Purchase and Sale of the Bellwether complex (the "Bellwether PSA").[100] The Bellwether PSA included numerous contingencies,[101] but as evidenced by SPC's effort to revive and the Bellwether PSA through a "First Amendment to Agreement of Purchase and Sale,"[102] (the "Amended PSA") no evidence exists that any of the contingencies were ever satisfied.[103]   Nonetheless, pursuant to an October 3, 2022 "Exercise Notice," sent to D4DS, JMJAV, TRWF, JMJD4 and Enoch, SPC purported to exercise its Conversion Rights.[104]

57.    No evidence suggests SPC satisfied the 30-day notice requirement in the Bellwether Ridge Pledge and Security Agreement.[105]   Irrespective of notice, the Amended PSA was never

---

[98] *Id.*; *Thomas Dec.* ¶ 53.

[99] Exhibit A-27, APP000060-61; APP000078; APP000322; Exhibit A-70, APP001024.

[100]Exhibit A-43.

[101] For instance, the PSA required the Purchaser to obtain Board Approval for the purchase and notify the seller within ten days of obtaining such approval.  Absent such approval and notice, the PSA was "deemed void ab initio".  Exhibit A-43.  The PSA also required the purchaser to obtain HUD approval within 120 days after Board Approval, absent which, the Agreement terminated.  *Id.*  No evidence exists that either of these conditions were satisfied. *Thomas Dec.* ¶ 54.

[102] Exhibit A-44; *see also* Exhibit A-73.

[103] *Thomas Dec.* ¶ 54.

[104] Exhibit A-42.

[105] *Thomas Dec.* ¶ 55.

– 22 –

signed by Defendant Barton, but if executed, would have been invalid without prior HUD approval.[106]

58.      Accordingly, at most, SPC gave notice of an intent to convert its debt to equity for the Parent Entities of D4DS and D4FR, which in turn own Bellwether Ridge and Windmill Farms. The respective Exercise Notices, however, did not accomplish that transition.

59.      Likewise, although SPC sent an "Exercise Notice" on October 3, 2022 regarding the "Conversion Option" for Ingleside, the Exercise Notice acknowledged the conversion was not permissible absent conditions that were not yet satisfied.[107]  SPC enclosed a proposed purchase contract to "effect a transfer from "the Project owner, D4IN" to SPC, "once the lender on the Project and HUD have consented to the transfer."[108]  The proposed purchase contract was not signed, nor was any evidence of consent by HUD ever provided.[109]

60.      SPC has not attempted to exercise or force assignment of the ownership interests in D4OP.[110]

61.      Subsequently, on November 3, 2022, SPC wrote separate letters to the Receiver regarding each of the Apartment Developments.[111] In each letter, SPC set out the general terms of the transactions described above—although it omitted any mention of the conditions precedent and the necessity of a default with respect to the Assignment of Pledge—and vaguely referenced the parties' "contemplation" regarding transfer of the Apartment Developments and conversion of

---

[106] Exhibits A-30; A-46; A-70.

[107] Exhibit A-54.

[108] Exhibit A-55.

[109] *Thomas Dec.* ¶ 57; Exhibit A-55.

[110] *Thomas Dec.* ¶ 58.

[111] Exhibits A-28; Exhibit A-74.

the mezzanine debt into equity.[112]  Nonetheless each letter acknowledged HUD had not approved any TPA for any property, and the Purchase Agreements proposed by SPC for each respective Apartment Development are unexecuted.[113]

### J.    The Receivership Estate

62.    Although Barton has largely barred the Receiver's access to the Receivership Entities' accounting records and bank records, the limited accounting records obtained to date demonstrate *extensive* commingling of assets by and between the Receivership Entities.  For instance, Barton used Investor funds to pay personal expenses (including his attorneys), to purchase properties owned by entities unrelated to the properties the Investors were promised their funds would be used for, and to make "forbearance" or related payments forestalling cancellation of purchase contracts on still different properties.[114]  As outlined above, the four D4 Entities themselves participated in extensive commingling with their purported parent entities, JMJ Development, and a host of other Receivership Entities.

63.    In addition to the approximately $26 million in investor claims identified by the SEC in its Complaint, to date the Receiver has identified at least $7 million owed to judgment debtors, and at least $16 million owed to unsecured general creditors, excluding SPC, and likely much more.[115]

64.    The Wall investors whose claims underlie the SEC's Complaint transferred funds to certain Receivership Entities for the purchase of specific properties.[116] Similarly, other investors

---

[112] *Id.*

[113] *Id.*

[114] *Thomas Dec.* ¶ 60

[115] *Thomas Dec.* ¶ 61.

[116] Dkt. 1; *Thomas Dec.* ¶ 62.

also transferred funds to Barton-controlled Receivership Entities for use in the purchase and/or development of other properties. For instance, creditor Palisades TC, LLC ("Palisades") loaned/invested $3.5 million to become a co-managing member of Dallas Real Estate Lenders LLC, which owns 100% of the membership units of FHC Acquisition, LLC, a Receivership Entity that owns the Frisco Gate Property previously addressed by the Court.[117] Similarly, Palisades, Pamela Kirby, John Dowdall, Allen Hodges, Nitya Capital and potentially others loaned/invested over $12 million in the 2999 Turtle Creek Property alone.[118] These creditors, like SPC, loaned/invested money for the development of real estate owned by Receivership Entities and expected to participate in the appreciation of the properties for which the creditors loaned money.[119]

65.    Collectively, the value of the Apartment Developments represents the largest asset of the Receivership Estate.[120] For instance, the proposed sale of Bellwether Ridge should result in a net recovery for the Estate of approximately $5.1M, even assuming full payment of the SPC Note. The proposed sale of Windmill Farms should result in a net recovery for the Estate of approximately $7.5M after payment of the SPC Note. Without inclusion of the Apartment Developments in the Receivership Estate, satisfying even a portion of the creditor claims, let alone all investor claims (without regard to creditor claims) will not be possible.[121]

---

[117] *See* Dkt. 142; *Thomas Dec.* ¶ 62

[118] *See* Dkts. 69, 94, 116, 117, and 154; *Thomas Dec.* ¶ 62.

[119] *Thomas Dec.* ¶ 62.

[120] *Thomas Dec.* ¶ 63.

[121] *See generally* Receiver's Second Status Report [Dkt. 139].

66. In comparison, the Receivership Estate's expenses are significant. Insurance, taxes, appraisals, and related operating costs continue. The costs of preparing a forensic accounting,[122] administering a claims process involving Wall investors and dozens if not hundreds of other claimants, as well as litigation expenses necessitated by Barton's opposition to virtually every motion or notice filed by the Receiver, continue to accrue. Thus, without the net proceeds recovered from sale of the Apartment Developments, the Investors and other creditors are likely to suffer a significant shortfall.[123]

**K.      This Summary Proceeding**

67. On February 22, 2023, the Receiver filed Motions seeking the Court's approval of the sale of Bellwether Ridge and Windmill Farms.[124] In those Motions, the Receiver provided notice of SPC's competing claims as explained in its correspondence, and once the Court set a hearing to consider the proposed sales, provided a copy of the Order to SPC. The Receiver hoped that SPC would agree to treatment as a secured creditor in each Property and that the parties would thereby save considerable resources and effort litigating their potential dispute.[125]

68. SPC filed a Motion to Intervene, Response and Objection,[126] and Complaint in Intervention.[127] The Receiver moved the Court to continue the hearing regarding the proposed

---

[122] A forensic accounting is necessary for many reasons, including but not limited tracking to the greatest extent possible, the sources and uses of Investor funds, recipients of fraudulent transfers, and prepare tax returns and other related documents. *Thomas Dec.* ¶ 64.

[123] *Thomas Dec.* ¶ 64.

[124] Dkts. 161, 162, 164-165.

[125] *Id.*

[126] The Receiver reserves the right to object to SPC's evidence, including evidence submitted in Dkts. 179-183, once SPC responds to this Motion and its intent to use the previously filed evidence or something different is clear.

[127] Dkts. 177, 178 and 184.

sales, stay the Complaint in Intervention, and establish a summary judgment briefing schedule,[128] which the Receiver believes will provide the most efficient resolution of this contested dispute.

69.     The Court granted the Receiver's Motion to Stay, and ordered the Receiver to file a summary judgment motion no later than April 13, 2023, and directed SPC to respond no later than May 4, 2023.[129]

70.     SPC's claim to the D4 Entities and Apartment Developments and its entitlement to treatment as an investor rather than a creditor is thus ripe for disposition.

## IV.    ARGUMENT

### A.    Legal Standards

#### 1.    Summary Proceedings in Receiverships

Courts supervising equitable receiverships frequently employ summary proceedings to adjudicate claims related to the receivership. *See SEC v. Sharp Capital, Inc.,* 315 F.3d 541, 545 (5th Cir. 2003); *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) ("A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets."); *SEC v. Bjork*, H-11-2830, 2012 WL 1392082, at *2 (S.D. Tex. Apr. 19, 2012) ("[S]ummary proceedings are proper to determine third parties' rights to assets that appear to belong to the Receivership Entities."). Utilizing such procedures avoids "formalities that would slow down the resolution of disputes, . . . thereby promot[ing] judicial efficiency and reduc[ing] litigation costs to the receivership." *SEC v. Hardy*, 803 F.2d 1034, 1040 (9th Cir. 1986) (internal quotation omitted)).  So long as the person against whom the claims are asserted has notice of the proceedings and an opportunity to present evidence, such proceedings afford all

---

[128] Dkt. 203.  Subsequently, the Receiver renewed his motion to stay the Complaint in Intervention. Dkt. 203.

[129] Dkt. 190.

required due process. *CFTC v. Topworth Intern., Ltd.*, 205 F.3d 1107, 1113 (9th Cir. 1999), *as amended* (Mar. 23, 2000) (no abuse of discretion in resolving non-party creditor's claim through summary proceeding); *Elliott*, 953 F.2d at 1567 ("[A] district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts.").

No specific process or procedure is required but the summary process supplants the necessity of a trial or more formal proceedings.[130]    For instance, the Fifth Circuit affirmed summary proceedings in which the parties were directed to provide, "in writing, the facts and legal authorities upon which they rely, supported by affidavits, declarations or other competent evidentiary-type materials, to establish the basis and nature of any 'direct' claims asserted against . . . [the nonparty]." *Sharp Capital, Inc.*, 315 F.3d at 546; *see also Crawford v. Silette*, 608 F.3d 275, 277 (5th Cir. 2010) (affirming order entered through summary proceedings compelling recipient of fraudulent transfers to turnover deed to condominium purchased with estate assets, despite assertion of Florida homestead exemption); *see also United States v. RaPower-3, LLC*, No. 2:15-CV-00828-DN, 2020 WL 5531563, at *14 (D. Utah Sept. 15, 2020) (approving summary proceedings to determine Receiver's entitlement to certain property regarding which he sought

---

[130] An old case, more recently cited by the District Court for the District of Rhode Island, discusses the differences between summary proceedings and plenary proceedings:

"The main characteristic differences between a summary proceeding and a plenary suit are: The former is based upon petition, and proceeds without formal pleadings; the latter proceeds upon formal pleadings. In the former, the necessary parties are cited in by order to show cause; in the latter, formal summons brings in the parties other than the plaintiff. In the former, short time notice of hearing is fixed by the court; in the latter, time for pleading and hearing is fixed by statute or by rule of court. In the former, the hearing is quite generally upon affidavits; in the latter, examination of witnesses is the usual method. In the former, the hearing is sometimes ex parte; in the latter, a full hearing is had."

*United States v. Fairway Capital Corp.*, 433 F. Supp. 2d 226, 241 (D.R.I. 2006), *aff'd,* 483 F.3d 34 (1st Cir. 2007) (quoting *Central Republic Bank & Trust Co. v. Caldwell,* 58 F.2d 721 (8th Cir.1932)).

– **28** –

turnover relief from non-party).  The same procedure suffices to determine SPC's rights, if any, to the D4 Entities and the Apartment Developments.

### 2.    Summary Judgment Standards[131]

A movant who demonstrates the absence of a genuine issue of material fact demonstrates entitlement to summary judgment.  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)); *In re Landgraf*, 19-41155-ELM, 2021 WL 126000, at *4 (Bankr. N.D. Tex. Jan. 13, 2021) (factual disputes that are irrelevant or unnecessary have no impact on summary judgment).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  "For any matter on which the non-movant would bear the burden of proof at trial . . . the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward

---

[131] To the extent the Court utilizes summary judgment as the procedure to resolve SPC's disputed claims, summary judgment standards apply.  In the event the Court finds a question of fact exists however, and particularly sitting in equity, factual findings and conclusions of law, rather than a trial, are appropriate.  *See Fairway Capital Corp.*, 433 F. Supp. 2d at 247 (utilizing summary proceeding to resolve questions of law and singular question of fact regarding Receiver's disputed entitlement to certain property).

– 29 –

with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting FED. R. CIV .P. 56(e)).

The court views evidence in the light most favorable to the non-movant and draws all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas,* 529 F.3d 519, 524 (5th Cir. 2008). The party requesting summary judgment cannot satisfy its burden with "bald assertions of ultimate facts." *Gossett v. Du–Ra–Kel Corp.,* 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.,* 754 F.2d 1212, 1221 (5th Cir.1985). Nor will "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" satisfy the non-movant's burden. *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc)).

### 3.    Standards Governing Creditor Claims in Receiverships

Based on tracing, the various contracts and agreements described above, and "fairness," SPC seeks a determination, essentially, that the D4 Entities are not Receivership Entities, the Apartment Developments are not Receivership Assets, and that these Entities and Assets should be immediately distributed to SPC. In seeking to recover more than repayment of its loans, SPC thus seeks recoupment of *an investment*, at the expense of other investors and creditors.[132]

The Court possesses extremely broad discretion to make the determinations at issue. *SEC v. Safety Fin. Service, Inc*., 674 F.2d 368, 372 (5th Cir. 1982) ("Any action by a trial court supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse"); *see also Elliott*, 953 F.2d at 1566. Fairness and consistent treatment of similarly situated creditors provide the fundamental principles governing

---

[132] SPC contends it is an investor. Dkt. 178 p. 1.

treatment of creditors and assets in a federal equity receivership. *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996) (evaluating competing claims against receivership assets to determine "most equitable" plan, and denying recovery based on tracing which would result in elevating "the position of [two claimants] on the basis of the actions of the defrauders."); *SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *13 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002) (denying recovery based on tracing, where allowing one creditor to recover traced assets was inequitable because the fraudster spent other victim's assets first); *see also SEC v. Faulkner*, No. 3:16-CV-1735-D, 2020 WL 2042339, at *6 (N.D. Tex. Apr. 28, 2020) (denying two investor groups' request for distribution based on tracing, because the availability of tracing depended wholly on how the defendants "spent the money of the different classes of victims. To allow one class of investors to elevate its position over that of other investors similarly 'victimized' would create inequitable results, in that certain investors might recoup a substantially greater percentage than other investors who would receive substantially less."); *Pre-War Art, Inc. v. Stanford Coins & Bullion, Inc.*, No. 3:09-CV-00559-N, 2021 WL 424283, at *5 (N.D. Tex. Feb. 8, 2021) (based on fairness, allowing distribution of one-half of disputed assets to individual creditor, but subordinating the remainder of the claim to general claims process).

The Court's discretion, the contract documents, and fairness all mandate denying SPC's request to recover, for its sole benefit, the D4 Entities and the Apartment Developments.

**B.    The D4 Entities and The Parent Entities are Receivership Entities**

Pursuant to the Receivership Order, this Court assumed exclusive jurisdiction and control over the "assets, of whatever kind and wherever situated, including all tangible and intangible property of . . . entities that Defendant Timothy Barton directly or indirectly controls."[133]   The

---

[133] Dkt. 29, ¶ 1.

Receivership Order expressly identified JMJ Development, D4DS, D4FR, Enoch Investments, and JMJAV as Receivership Entities.[134]  Based on *extensive* evidence regarding Barton's control over a vast web of entities,[135] the Court later also identified D4IN, D4OP, D4OPM, LLC, JMJD4, LLC, One MF D4, LLC, and TRWF, LLC, among others, as Receivership Entities.[136]  Barton's control over each is also demonstrated by his execution of each agreement related to these transactions.[137] SPC does not, and cannot demonstrate control by any other person or entity. As entities controlled by Defendant Barton, each of the D4 Entities and the Parent Entities are thus Receivership Entities.[138]  Although SPC claims to have dispossessed Barton of control over each,[139] as demonstrated below, it failed to accomplish the Conversion of Rights such that SPC, rather than Barton controlled any of these entities.

---

[134] *Id.*

[135] Dkts. 73, 74.

[136] Dkts. 62, 88.

[137] Exhibits A-1–A-18; A-26–A-27; A-29; A-31–A-35; A-46; A-47–A-48; A-50–A-53; A-61; A-62; A-63–A-68; A-71; A-73; *see also* Dkts. 42 and 74.

[138] *Id.*; Dkt. 29.  Moreover, SPC's argument that Investor Funds were not used to develop the Apartment Developments is neither accurate nor relevant.  Investor funds were used to operate and maintain JMJ Development and its employees, one of whom was dedicated solely to Receivership Entities' development of multi-family properties. *Thomas Dec.* ¶¶ 47, 49. And the income from Bellwether Ridge and Windmill Farms was used to pay the HUD Loans on these Properties, as well as other expenses. *Id.*  Any remaining excess cash was used to pay down the SPC Note. *Id.*  Even if *no other receivership assets* had been used to in the Apartment Developments or the D4 Entities, however, each is nonetheless appropriately included in the scope of the Receivership Estate. *See SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *14 (10th Cir. Dec. 16, 2021) (emphasis added)) (rejecting strict tracing requirement because a savvy embezzler could quickly spend the money on luxury vacations, secrete ill-gotten funds away in a location or foreign bank account not detectable by authorities, or *so commingle tainted funds with untainted funds as to make it impossible to trace the tainted funds to their final resting place.*"); *see also FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 4530459, at *6 (D. Ariz. Aug. 6, 2020) (district court's authority to freeze assets in government enforcement action, as necessary to preserve the possibility of full relief "extends to assets held by non-parties, at least where the non-parties are 'controlled partially or entirely by receivership defendants.'") (quoting *FTC v. Johnson*, 567 Fed. Appx. 512, 514 (9th Cir. 2014)).

[139] Indeed, SPC admits the entities with which it dealt were controlled by Barton.  Dkt. 179, pp. 7-8; 12.

Likewise, the deeds for each of the Apartment Developments reflect ownership of those properties by the D4 Entities, as do the HUD loans.[140] They are accordingly, by definition, Receivership Assets.[141]

## C.    SPC Did Not Effectively Exercise Conversion Rights By Which It Could Acquire Control Over the D4 Entities or the Parent Entities

SPC's competing claim of ownership depends on the contracts by which it asserts it received ownership and control over the Parent Entities for the D4 Entities and its entitlement to remedies necessary to achieve the ownership it claims. Thus, the Court must evaluate the "specific property right" SPC claims it acquired through these transactions. *See SEC v. Detroit Mem'l Partners, LLC*, No. 1:13-CV-1817-WSD, 2016 WL 6595942, at *9 (N.D. Ga. Nov. 8, 2016) (Cases evaluating creditor claims "focus on identifying the specific property interest held by the creditor and the date on which it attached."); *see also In re Real Prop. Located at Redacted Jupiter Drive, Salt Lake City, Utah*, No. 2:05-CV-1013, 2007 WL 7652297, at *6 (D. Utah Sept. 4, 2007) (evaluating "notices of interest" and determining none qualified under the governing state law to create an interest in real property).

SPC did not effectively exercise the Conversion Rights on October 3, 2022, such that Barton no longer controlled the D4 Entities or their Parent Entities or consummate any transaction by which the Apartment Developments were conveyed to SPC. Instead, to the extent the Pledge and Security Agreements, Assignment of Pledge and Security Agreements, or Assignment Agreement are enforceable, the rights conveyed to SPC are inchoate and executory.

---

[140] Exhibits A-3; A-30; A-49; A-64.

[141] *See* Dkt. 29, ¶ 1 (The assets of these Receivership Entities are "Receivership Assets."); *see also Stephens Cnty. Museum, Inc. v. Swenson*, 517 S.W.2d 257 (Tex. 1974) (highlighting that deeds reflect ownership of real property).

1.    **The Plain Language of the Relevant Agreements Demonstrates SPC Did Not Convert Its Debt to Equity Regarding D4FR, D4DS, or D4IN**

Courts interpret unambiguous contracts by enforcing the plain language as written. *Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012). Even where the parties' expectations differ from the terms of the written agreement, the contract language controls. "Under Texas law, 'the parties' intent is governed by what they said, not by what they *intended* to say but did not.'" *Id.* (quoting *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 747 (Tex.2006)); *Giant Eagle Inc. v. Excentus Corp.*, No. 3:14-CV-1195-B, 2014 WL 12531173, at *4 (N.D. Tex. Aug. 2, 2014) ("The Court looks to the objective intent of the parties as it is expressed in the contract, and not the parties' 'after-the-fact conduct.'") (quoting *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006)). Thus, the court determines not whether the parties intended to provide certain rights, or whether they anticipated the contract would do so, but instead, whether the contract as written, provided the disputed rights. *Horn*, 703 F.3d at 741. The plain language of the Pledge and Security Agreements, the Assignment of the Pledge and Security Agreements, and the Opelika Pledge Assignment demonstrates SPC does not own or control the D4 Entities or their Parent Entities, or the Apartment Developments.

(i)    **SPC Identified No Default Entitling "SPC LLC" to Exercise the Conversion Rights for D4DS or D4FR**

The timing of SPC's notices suggest an effort to accomplish the exercise of its Conversion Rights before the Court entered the Receivership Order. The timing also likely explains SPC's failure to satisfy the conditions precedent required for an effective exercise. "SPC LLC" (*not* SPC, Ltd., the entity that purported to exercise the Conversion Rights and the entity from which JMJ obtained loans) holds an executory assignment of JMJ's Conversion Rights in D4DS and D4FR's

– 34 –

Parent Entities.[142]   No evidence suggests that SPC has any entitlement to exercise even the contingent rights granted to SPC LLC.

Even if SPC were able to exercise the purported rights of "SPC LLC," the notices are still ineffectual.  SPC LLC is only permitted to exercise JMJ's assigned rights, *i.e.*, the Conversion Rights, upon default of an unspecified and undisclosed promissory note.[143]  No evidence exists that JMJ is obligated by any Promissory Note held by SPC LLC.[144]  In the Exercise Notices sent immediately before the Receiver's appointment, SPC did not identify any purported default or allege that any such default occurred, nor could they because no default existed.[145]  Thus, based on the plain language of the Assignment of Pledge and Security Agreement, SPC was not entitled to exercise JMJ's Conversion Rights for D4DS and D4FR and did not accomplish any conversion.

### (ii)      SPC Failed to Satisfy the Conditions Precedent Required for Exercise of the Conversion Rights Related to D4DS, D4FR and D4IN

Even if the Conversion Option in Pledge and Security Agreements, regarding the Parent Entities' equity in D4DS, D4FR, or D4IN, without regard to the default required by the Assignments, governed SPC's entitlement to convert debt into equity for D4DS and D4FR's Parent Entities, SPC did not satisfy the conditions precedent imposed of the Pledge and Security Agreements.  First, the Conversion Option governing D4DS, D4FR, and D4IN required thirty-days' notice in advance of any Exercise Notice.[146] SPC has not provided any evidence that it

---

[142] Exhibit A.35.

[143] *Id.* ("In the event that there is a default under that certain Promissory Note from *Assignor to Assignee*…").

[144] Thomas Dec. ¶ 37.

[145] Exhibits A-24, A-42.

[146] Exhibits A-13, A-32, A-53.

satisfied this requirement.  On the contrary, the "Exercise Notices" sent by SPC do not reference any notice prior to October 3, and the Receivership Order was entered October 18.[147]

Second, but perhaps more importantly, the Conversion Rights which governed D4DS, D4FR, and D4IN were expressly dependent on satisfaction of several conditions precedent, including but not limited to the requirement that "Lender [SPC] *shall have* obtained approval for "a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4FR LLC."[148] The requirement of HUD approval for a TPA is accordingly a condition precedent to SPC's Conversion Right.  *See Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007) ("A condition precedent is an act or event that must take place before performance of a contractual obligation is due."); *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.").

SPC failed to demonstrate that it had obtained HUD's written approval for the conversion and resulting TPA.  With respect to the requirement that it obtain HUD's approval before exercising any Conversion Rights, SPC asserted HUD's "subsequent approval" was a "ministerial hurdle."[149]  On the contrary, HUD regulations governing each HUD Loan emphasize the importance of HUD's prior approval for any transfer of ownership or control in any of the Parent Entities or the Apartment Developments.[150]  Each HUD Loan also prohibits "any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the

---

[147] *Id.*

[148] Exhibits A-13, A-32, A-53.

[149] Dkt. 178, n.3.

[150] Exhibits A-27; A-45; A-56; A-68.

perfection of a security interest in any portion of the UCC Collateral;[151] and also prohibits each D4 Entity, without HUD's prior written approval, from "convey[ing], assign[ing], transferr[ing], pledg[ing], hypothecat[ing], encumber[ing] or otherwise disposing of the Mortgaged Property or any interest therein or permitting the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations."[152]  Regardless of whether HUD approval was "ministerial" or something more, SPC did not obtain it prior to attempting to exercise its Conversion Rights.  Thus, SPC did not convert any debt to equity because SPC failed to satisfy the conditions precedent to such exercise.

### (iii)    SPC Failed to Satisfy the Conditions Precedent Required for Exercise of the Assignment Rights Related to D4OP

Similarly with respect to D4OP, the Opelika Pledge Agreement provided a security interest in the Parent Entities' ownership interests in D4OP (the "Collateral"), that SPC was entitled to recover only upon a default.[153]  No evidence exists of any such default.[154] The Opelika Pledge Agreement included no "Conversion Option," and instead was accompanied by the Opelika Pledge Assignment, which was executory such that *upon written notice* SPC was entitled to assignment of 99.75% of the membership interests in D4OP ("the Ownership Entities will assign. . ."), and "provided the Property is subject to no lien other than a first lien approved by Southern Properties,

---

[151] A Security Agreement that was part of each HUD Loan [transaction] defined the "UCC Collateral" as inclusive of the Security Agreement for the Mortgaged Property, and all products and cash proceeds and non-cash proceeds thereof."  Exhibit A-3, APP000060; A-30; A-49; A-70.

[152]. Exhibit A-70, APP001024-25.

[153] "2. As collateral security for the prompt and complete payment and performance when due of the Secured Indebtedness, Pledgor hereby grants to Secured Party, a continuing security interest in [the Collateral]." . . . "12. Remedies of Secured Party. Upon the occurrence of a Default: . . . a. Secured Party may [take possession and control of the Collateral]." Exhibit A-67.

[154] *Thomas Dec.* ¶ 58.

the Loan *will be* cancelled."[155]   SPC has not provided written notice that the Parent Entities committed any default under the Opelika Pledge Agreement, or that it sought to exercise the assigned rights provided by the Opelika Pledge Agreement.   Just as importantly, the Opelika Pledge Agreement and the Assignment directly violated terms of the HUD Loans, which prohibited "the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations."[156]   As discussed below, SPC is not now entitled to exercise its assignment rights.

### 2. Even if SPC Had Converted its Debt to Equity or Otherwise Owned the Equity in the Parent Entities, SPC Has Not Demonstrated Ownership of the D4 Entities or the Apartment Developments

Conversion Rights in the Parent Entities, even if fully exercised, are not the equivalent of a present ownership of the D4 Entities, nor is ownership of an interest in an entity the equivalent of ownership of realty owned by the entity.   Instead, "[a] member of a limited liability company or an assignee of a membership interest in a limited liability company does not have an interest in any specific property of the company."[157]   TEX. BUS. ORGS. CODE § 101.106(b); *see also RLI Ins. Co. v. Caliente Oil, Inc.*, 469 F. Supp. 3d 729, 739–40 (W.D. Tex. 2020) (rejecting argument that ownership interest in LLC entity also conveyed an ownership interest in equipment owned by the LLC); *see also In re Real Prop. Located at Redacted Jupiter Drive, Salt Lake City, Utah*, 2007 WL 7652297, at \*6 (rejecting investors' argument that they qualified as secured creditors where

---

[155] Exhibit A-67.

[156] Exhibit A-3; A-30; A-49; A-77.

[157] The Member Agreements for the entities require the same conclusion: "Company Assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Assets or any portion thereof.  Title to any or all Company Assets shall be held in the name of the Company.  All Company Assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Assets are held."  Exhibit 72, APP001044.

"[n]one of these documents suffice under Utah or federal law to make the Investors secured creditors," which required instead, with respect to an interest in real property, "a pledge by a borrower (trustor) of his interest in real property as security for an obligation owed to the lender (beneficiary).").  Thus, even if it had converted its debt to equity, SPC has not demonstrated ownership of the D4 Entities or the Apartment Developments.

**D.      Equitable Considerations Preclude SPC From Exercising, Now or in the Future, Conversion Rights or Performance of an Executory Assignment**

As demonstrated above, SPC did not effectively exercise any Conversion Rights regarding D4DS, D4FR, or D4IN.   Likewise, SPC has not yet attempted to exercise its claimed contractual right to compel D4OP's Parent Entities to transfer those Receivership Entities' equity in D4OP. For the reasons discussed below, the Court should not permit SPC, at this juncture, to take those actions now and convert its debt or otherwise foreclose the D4 Entities' ownership and interest in the Apartment Developments, so as to benefit SPC at the expense of every other injured investor and creditor.[158]

**1.      SPC's Conversion and Assignment Rights are Appropriately Prohibited by the Receivership Order**

The Receivership Order prohibits any one creditor from exercising rights to create, perfect, or enforce liens or other rights against Receivership Entities or Receivership Property, as well as any action "exchanging, assigning, or in any way conveying" Receivership Property.[159]  These provisions, together with the Court's discretion, serve to prohibit one creditor from obtaining an unfair advantage over any other creditor, including defrauded investors.  *See Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 896–97 (5th Cir. 2019) ("The receivership's role is undermined

---

[158] Because the Receiver's appointment removed Barton from control over the Receivership Entities, their role in any deception, an in pari delicto argument, has no application. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 191 (5th Cir. 2013).

[159] Dkt. 29, ¶¶ 32 A, D.

if investor-claimants jump the queue, circumventing the receivership in an attempt to recover beyond their pro rata share."); *see also SEC v. Huber*, 702 F.3d 903, 908 (7th Cir. 2012) ("'receivership protects the assets of the estate, just as a stay would in bankruptcy.'") (quoting *SEC v. Byers,* 609 F.3d 87, 92 (2d Cir.2010)); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) (district court possesses authority to enjoin nonparties from taking any action against the entities in receivership or receivership assets to further the receivership's purpose—"protection of innocent shareholders" and marshalling and preserving against further misappropriation and dissipation the assets available to pay investor claims).

Here, through inadequate, defective, or executory assignments and pledges, SPC seeks to wholly eliminate the Receivership Estate's interest in the D4 Entities and by that process, the Receivership Estate's ownership of the Apartment Developments.   Under these circumstances, where SPC seeks, solely for itself, recovery of all value in the Apartment Developments which would otherwise be available for satisfaction of all investor and creditor claims, equitable considerations underlying the receivership weigh heavily against SPC.

### 2.   SPC's Conversion and Assignment Rights Violate the HUD Loans and HUD Regulations and Should Not Be Enforced

This Court has broad discretion to reject SPC's request to convert inchoate contractual rights into ownership and control over Receivership Entities and their assets. *See Liberte Capital Group, LLC v. Capwill*, 148 Fed. Appx. 426, 434 (6th Cir. 2005) ("[A] court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership"); *United States v. Vanguard Inv. Co., Inc.*, 6 F.3d 222, 227 (4th Cir. 1993) ("[A] district court in its discretionary supervision of an equitable receivership may deny remedies like rescission and restitution where the equities of the situation suggest such a denial would be appropriate."). Indeed, "the moment an equity receivership intervened, the obligations under the pre-existing contract

– 40 –

'were drastically changed.'" *SEC v. Champion-Cain*, No. 3:19-CV-1628-LAB-AHG, 2019 WL 6834661, at *7 (S.D. Cal. Dec. 13, 2019) (authorizing receiver to sell real property free and clear of liens, based on equitable considerations inherent in equitable receivership) (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 166 (1946)).

Sitting in equity, the Court should also consider SPC's unclean hands. *See Westport Ins. Corp. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, No. 4:16-CV-01947, 2023 WL 2574982, at *5 (S.D. Tex. Mar. 17, 2023) (Court sitting in equity may refuse to grant relief to a party guilty of "inequitable or unlawful conduct with regard to the issue in dispute."). As an experienced developer operating for many years in the multi-family housing market which has contracted with HUD many, many times,[160] SPC was unquestionably aware of the terms of the HUD Loans that prohibited exactly what it sought to do here: use Barton and Receivership Entities to avoid HUD's debt ceiling, while seeking to obtain control and ownership of a HUD financed development through mezzanine lending.[161] Indeed, in early meetings with the Receiver, SPC's representatives stated that they structured the transactions regarding the Apartment Developments with Receivership Entities as the borrowers and developers intentionally because SPC had reached its maximum lending amount, $500,000,000 with HUD.[162]

Finally, SPC's contention that it "earned" the equity it seeks should not change the outcome. As a matter of interpretation regarding the relevant contracts, SPC's purported conduct in "earning" ownership in the Parent Entities or even its contact with the respective property managers for the Apartment Developments (which were contracted by JMJ rather than SPC) has no role in the Court's interpretation of the contracts that determines the present ownership of the

---

[160] Dkt. 178 pp. 3-4; 179 pdf pp. 6-7.

[161] Exhibits A-28; A-49, A-69, A-74.

[162] *Thomas Dec.* ¶ 70.

– 41 –

Entities or the Apartment Developments. *Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 288 (5th Cir. 2009) (rejecting parol evidence by which movant asserted "parties had a broader-than-usual meaning in mind" for certain terms, because "[e]xtrinsic evidence is inadmissible either to explain or to contradict [an] instrument's [clear] terms") (internal quotation omitted)); *see also 1701 Commerce Acquisition, LLC v. Macquarie US Trading, LLC*, No. 02-21-00333-CV, 2022 WL 3904976, at *11 (Tex. App.—Fort Worth Aug. 31, 2022, no pet.) ("At bottom, the 'understanding or belief' that Appellant offers to recharacterize the nature of the payment made to discharge the Mezzanine Loan is unavailing when it stands in contradiction to the terms of the document that conveyed and characterized that payment."). Neither SPC's expectations nor its efforts to "earn" equity that it does not currently control entitles it to exercise any remedies by which it would extract the most valuable assets in the Receivership Estate[163] for its sole benefit.

### 3. SPC's Conversion and Assignment Rights Are Executory and Rejected

In the alternative, even if SPC LLC assigned to SPC the Assignment of Pledge and Security Agreement, and even if SPC demonstrated a default of a Promissory Note owed by JMJ Development to SPC LLC, SPC's entitlement to exercise its Conversion Rights regarding D4DS, D4FR, and D4IN is executory. Similarly, SPC holds an executory contractual right to assignment of the ownership interest in D4OP's Parent Entities. The Receiver is entitled to and has rejected these contracts.

"[R]eceivers like bankruptcy trustees are permitted to reject executory contracts."[164] *Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910, at *9–10 (N.D. Tex. July 30, 2014),

---

[163] *Thomas Dec*. ¶ 63.

[164] Although no comprehensive definition of an "executory contract" exists, generally, courts deem agreements "for which performance is due to some extent on both sides" as executory. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523, 104 S. Ct. 1188, 1194, 79 L. Ed. 2d 482 (1984) (under labor contract, both parties owed "reciprocal obligations,

*aff'd on other grounds*, 847 F.3d 231 (5th Cir. 2017) (A "receiver is not bound to adopt the contracts, accept the leases, or otherwise step into the shoes of his assignor, if in his opinion it would be unprofitable or undesirable to do so; and he is entitled to a reasonable time to elect whether to adopt or repudiate such contracts.") (internal quotation omitted)); *see also Pa. Steel Co. v. N.Y.C. Ry. Co.*, 198 F. 721, 744 (2d Cir. 1912), *cited with approval by Cent. Trust Co. v. Chi. Auditorium Ass'n*, 240 U.S. 581, 589 (1916).  Receivers are presumed to reject executory contracts even if they do not specifically renounce such contracts.  *Samuels v. E.F. Drew & Co.*, 292 F. 734, 739 (2d Cir. 1923) ("The receiver is under no obligation to renounce an executory contract. The contract is terminated, even though the receiver never renounces."). The business-judgment rule governs a receiver's decision to reject an executory contract and turns on whether rejection is "in the best interest of the estate."  *Moran v. City of Cent. Falls*, 475 B.R. 323, 332 (D.R.I. 2012) (internal quotation omitted)).

In each of the Pledge and Security Agreements, SPC was obligated to perform certain conditions precedent before it was entitled to exercise any Conversion Rights.  If SPC performed those conditions and provided notice of its intent to exercise the Conversion Rights, the pledging Parent Entities were then obligated to gather documents related to the pledged entities, and "execute and deliver" assignments for the "absolute transfer and conveyance of the Collateral."[165] Similarly, with respect to the Opelika Assignment Agreement, performance was due on each side. There, following written notice, the D4OP Parent Entities *would* assign their membership interests in the record owner of the Property to SPC, and subject to certain conditions, SPC *would* cancel

---

and at any point during the life of the contract, performance was due by both parties"); *see also Fed.'s, Inc. v. Edmonton Inv. Co.*, 404 F. Supp. 68, 71 (E.D. Mich. 1975), *aff'd,* 555 F.2d 577 (6th Cir. 1977) (An 'executory' contract is one in which, by the terms of the contract and with the support of consideration, something remains to be done before the contract is fully performed.").

[165] Exhibits Exhibit A-13, APP000162-163; A-32, APP000456-457.

the Loan.[166]  Because performance was due with respect to the Pledge and Security Agreements and the Opelika Assignment Agreement, each was executory.

Additionally, because the rejection of these executory contracts is in the best interest of the Receivership Estate, the Receiver has rejected them.[167]  SPC has no present right to convert any debt into equity or assert ownership or control over the D4 Entities or the Apartment Developments.

## E.    The Receiver Is Entitled to Sell Each of the Apartment Developments Free and Clear of Any Claim by SPC

As demonstrated above, the D4 Entities are Receivership Entities and the Apartment Developments are Receiverhip Assets.  SPC holds unsecured loans, the proceeds of which it claims were investments in each of the D4 Entities.  Thus, as discussed below, payment to SPC,  whether as an unsecured creditor, a secured creditor,[168] or an investor, should be dealt with in a claims process. *See SEC v. Stanford Intern. Bank Ltd.*, 465 Fed. Appx. 316, 320 (5th Cir. 2012). Regardless of the manner in which it receives payment, if any, SPC's claim provides no basis to deny the Receiver's request for the Court's approval to sell the Apartment Developments, free and clear of any claim by SPC.

## F.    Fairness Mandates Treating SPC Like Other Investors

"The   basis   for   broad   deference   to   the   district   court's   supervisory   role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions."  *Hardy*, 803 F.2d at 1037.  Accordingly, in determining appropriate relief in the context of administering a receivership, "a district court has discretion to summarily reject

---

[166] *Id.*

[167] *Thomas Dec.* ¶ 45.

[168] If treated as a secured creditor, SPC would receive repayment of its loans at the time each Apartment Development is sold.

formalistic arguments that would otherwise be available in a traditional lawsuit." *Broadbent v. Advantage Software, Inc.*, 415 Fed. Appx. 73, 78 (10th Cir. 2011); *see also Liberte Capital Grp.*, 148 Fed. Appx. at 434 ("[A] court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership.").

The Court's discretion assumes particular importance in evaluating competing claims to limited assets. In receivership proceedings "courts regularly grant defrauded investors a higher priority than defrauded creditors." *CFTC v. RFF GP, LLC*, No. 4:13-CV-382, 2014 WL 491639, at *2 (E.D. Tex. Feb. 4, 2014), *report and recommendation adopted*, No. 4:13-CV-382, 2014 WL 994928 (E.D. Tex. Mar. 10, 2014). Indeed, where a creditor fails to connect any fraudulent conduct by the receivership defendant to its losses, equity permits subordinating the creditor's claims to those of the defrauded investors. *Id.* Although a party that can trace its assets is often entitled to seek the return of whatever portion of its assets remain, no such entitlement exists where the relief sought "may frustrate equity." *Pre-War Art, Inc.*, 2021 WL 424283, at *2; *RFF GP, LLC*, 2014 WL 491639, at *2 ("When a portion of funds to be distributed from the assets of a receivership estate can be traced, it is permissible to apply tracing; however, it is also permissible to allow a pro-rata distribution."); *Faulkner*, 2020 WL 2042339, at *6 (denying distribution based on tracing, where extensive commingling occurred, tracing-based distribution methodology would be "exceedingly difficult to administer" and availability of traced assets depends wholly on how the defendants "spent the money of different classes of victims."). Fairness precludes allowing SPC to extract the D4 Entities and the Apartment Developments for the Receivership Estate.

### 1.      If Treated as an Investor, SPC Has No Entitlement to Recover Ahead of all Others

SPC contends it is an investor.  If treated as such,[169] fairness dictates treating it in the same manner as other investors, entitled to a pro-rata or similar distribution of the assets recovered in the receivership.[170] *See Zacarias,* 945 F.3d at 896 ("The receivership's role is undermined if investor-claimants jump the queue, circumventing the receivership in an attempt to recover beyond their pro rata share.").  Unlike the Wall investors, however, the facts suggest that at a minimum, SPC participated in a contractual structure intended to circumvent HUD regulations, which govern the ownership and disposition of the D4 Entities and the Apartment Developments.[171] The Court's discretion and common-sense mandates consideration of SPC's role in structing these transactions to seek indirectly, what it was not entitled to obtain directly, and to frustrate recovery premised on that inequitable conduct.  *See Stanford Intern. Bank Ltd.*, 465 Fed. Appx. at 320; *Westport Ins. Corp.*, 2023 WL 2574982 at \*5.

Further, based on the structure SPC chose for these transactions and the records the Receiver has reviewed to date, it appears that SPC applied its own expenses to the D4 Entities' loans for every single "service" SPC purportedly provided, including reimbursement of SPC's travel costs and attorneys' fees.[172]  SPC has additionally received pre-payment on portions of its Notes through the rental income or other proceeds of the Apartment Developments, and thus has been adequately compensated to date, for those loans.[173]  Thus, SPC has already received priority

---

[169] The Receiver does not oppose treating SPC as an investor, and contends such treatment would be equitable if SPC's claim is treated similarly to other similarly situated investors. *Thomas Dec* ¶ 70.

[170] The Receiver is not proposing a pro rata distribution at this time, but simply identifies pro rata as one of many distribution options. *See Huber*, 702 F.3d at 908.

[171] *See Thomas Dec.* ¶¶ 53-56.

[172] *Thomas Dec.* ¶ 69.

[173] *Id.*

treatment over other investors.  Equitable considerations and the governing documents do not require any further priority.

### 2.    Alternatively, SPC Is an Unsecured Creditor

SPC essentially seeks priority treatment as an investor in specific Receivership Entities based on unrealized equity and inchoate control over the D4 Entities and the Apartment Developments.  The relevant agreements, however, demonstrate that SPC is, absent an effective conversion of its debt, an unsecured creditor.  As evidenced by its Notes, it loaned money in exchange for pledged equity in the Parent Entities, or D4OP.  At present, however, although the Notes evidence a debt owed by JMJ Development or other Receivership Entities, SPC has only an executory entitlement to equity in the Parent Entities or the D4 Entities.  As such, fairness dictates recognizing SPC as a creditor and allowing repayment of its loans through a claims process.[174] *See Stanford Intern. Bank Ltd.*, 465 Fed. Appx. at 320 (affirming district court's order that bank honor letters of credit, where letter of credit funds were not receivership assets, while denying bank's claim for reimbursement from the receivership estate rather than participation in claims process, since bank could not avoid the position it chose by issuing the letters of credit simply because "its means of recovery from Stanford may be frustrated by the Receivership Order."); *see also Credit Bancorp Ltd.*, 2000 WL 1752979, at \*19 (denying intervenor/creditor's request for declaration that it was the sole and equitable owner of certain shares of stock deposited with the receivership entity by the creditor, because in part, the requested relief would "come at the direct expense of the other Credit Bancorp victims"); *SEC v. Vescor Capital Corp.*, 599 F.3d 1189 (10th Cir. 2010) (affirming district court's refusal to provide preferential treatment to one large creditor).

---

[174] Because the equity in Bellwether Ridge and Windmill Farms exceeds both the HUD Loan and the SPC Note on each Property, the Receiver has previously offered to treat SPC as a secured creditor to the extent of its loans, like Pallisades with the Frisco Gate Property.  As discussed above, however, SPC contends it is an investor.

Outside of a claims process in which it should be treated equally with other investors or creditors, equitable considerations prohibit SPC from obtaining priority treatment at the expense of all other creditors and investors. *Credit Bancorp, Ltd.*, 2000 WL 1752979, at \*13 (In evaluating competing claims to receivership assets, "the fundamental principle which emerges from case law is that any distribution should be done equitably and fairly, with similarly-situated investors or customers treated alike."). SPC has no entitlement to extract the D4 Entities and the Apartment Developments from the Receivership to obtain repayment of its loans, and far more, at the expense of all other investors and creditors. The Court should deny any request for relief by SPC that would result in such a windfall.

## V. CONCLUSION

SPC, like dozens of other creditors and indeed investors, holds Notes which entitle it to repayment of principal and interest. The various Pledge and Security Agreements, Assignment of Pledge and Security Agreements, and Opelika Assignment Agreement provided inchoate and executory, but now stayed, rights to convert the debt owed by certain Receivership Entities to equity in the D4 Entities or their Parent Entities. Governed at this juncture by the Court's broad discretion and the various equitable considerations informing SPC's entitlement to recover anything from the Receivership Estate, the Court should prohibit SPC from exercising its Conversion Rights or Assignment Rights. Instead, SPC should be authorized to submit a claim in a claims process if and when one is established, or alternatively, seek reimbursement as a secured creditor directly from the proceeds of the sale of each respective Apartment Development. The Court should deny, however, SPC's request for anything more.

WHEREFORE, PREMISES CONSIDERED, the Receiver prays that the Court enter judgment in his favor declaring as follows:

– 48 –

1. Prior to the Receiver's appointment, Barton controlled each of the Receivership Entities at issue here;

2. SPC did not effectively exercise any conversion or assignment rights provided in the Pledge and Security Agreements, Assignment of Pledge and Security Agreements, or Pledge and Security Agreement with Assignment of Rights, such that any debt owed to it was converted to equity or control over the D4 Entities;

3. Following entry of the Receivership Order, SPC is not presently permitted to exercise any conversion or assignment rights to alter the ownership or control structure of any Receivership Entities;

4. The Receiver is entitled to sell each of the Apartment Developments free and clear of any claim by SPC;

5. If a claims process is established for distribution of Receivership Assets, SPC may participate as an investor, treated equally with all other investors, or, perhaps as a creditor to the extent of any unpaid loans or other fees owed to it by any Receivership Entities.

The Receiver requests such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

By: */s/ Charlene C. Koonce*
    Charlene C. Koonce
     State Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     State Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    T: (214) 327-5000
    F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.