# EXHIBIT A-63

APP000909

1

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived.  This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

## NOTE
## (MULTISTATE)

*HUD Project No. 062-35778*
*HUD Project Name: Parc at Opelika*

US $23,661,300.00                                As of January 1, 2021

FOR VALUE RECEIVED, the undersigned, D4OP LLC, a limited liability company organized and existing under the laws of the State of Texas (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Funding Company LLC, a limited liability company organized and existing under the laws of the State of Delaware, the principal sum of Twenty Three Million Six Hundred Sixty OneThousand Three Hundred and 00/100 Dollars ($23,661,300.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of Two and 99/100 per centum (2.99%).*

1.      **Defined Terms.**  As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of the Security Instrument under Section 13 of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

APP000910

2

become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Note rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

Any capitalized term or word used herein but not defined shall have the meaning given to such term or word in the Regulatory Agreement between Borrower and HUD or the Security Instrument.

2.      **Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at 419 Belle Air Lane, Warrenton, VA 20186, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

3.      **Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

(a)      Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on February 1, 2021, and on the first day of each month thereafter up to and including November 1, 2022  ("**Last Interest Only Payment Date**"). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of Eighty Four Thousand Five Hundred Sixty Seven and 46/100 Dollars (US $84,567.46), shall be payable on the first day of each month beginning on December 1, 2022, ("**Amortization Commencement Date**"), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on November 1, 2062 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise ("**Maturity Date**").

(b)      Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

APP000911

**4.     Security.**  The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note (**"Security Instrument"**), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

**5.     Application of Payments.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument.  Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

**6.     Acceleration.**  If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower.  If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable.  Lender may exercise this option to accelerate regardless of any prior forbearance.  Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

**7.     Late Charge.**  If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to two percent (2%) of the unpaid principal and interest due in such month.  Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses.  Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

**8.     Exculpation; Remedies.**

(a)     Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50

---

APP000912

Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)    Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c)    Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

9.    **Voluntary and Involuntary Prepayments.**

(a)    This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1.  In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

APP000913

(b)    Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)    Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, and (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)    Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)    Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)    If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)    All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

10.    **Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

APP000914

6

**11.    Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**12.    Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

**13.    Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

**14.    Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

**15.    Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

**16.    Governing Law; Consent to Jurisdiction and Venue.**
(a)    This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

APP000915

(b)    Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

17.    **Rules of Construction.**   The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

18.    **Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

19.    **Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. Section 3701, *et seq.*, as amended, when HUD is the holder of the Note.

20.    **Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

APP000916

8

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

**21.  WAIVER OF TRIAL BY JURY.  BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

[Signature page follows]

APP000917

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

D4OP LLC,
a Texas limited liability company

By: _____
　　　Timothy Barton, President

APP000918

10

NOTE (Multistate)

State of Alabama

D4OP LLC, a Texas limited liability company

To

Greystone Funding Company LLC, a Delaware limited liability company

Project No.: 062-35778

Initially endorsed for insurance under § 221(d)(4) of the National Housing Act, as amended, and regulations published thereunder in effect on July 30, 2020 to the extent of advances approved by HUD.

By: _____  Date: Jan 26 , 2021

Print Name: Donald A. Billingsley

Title:    Authorized Representative

At final endorsement, a total sum of $_____ has been approved for insurance hereunder by HUD.

By: _____  Date: _____ , 20___

Print Name: _____

Title:    Authorized Representative

---

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

APP000919

**RIDER 1 TO NOTE**
**FROM**
**D4OP LLC, a Texas limited liability company**
**TO**
**Greystone Funding Company LLC, a Delaware limited liability company**
**In the original principal sum of $23,661,300.00**

1.      This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4OP LLC, a Texas limited liability company (the "Borrower"), to Greystone Funding Company LLC, a Delaware limited liability company (the "Lender") dated as of January 1, 2021 (the "Note").

2.      Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to December 1, 2022.  Borrower shall have the right, on or after December 1, 2022, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  In the event of any prepayment of principal at any time on or after December 1, 2022, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from December 1, 2022 through November 30, 2023 | 10% |
| from December 1, 2023 through November 30, 2024 | 9% |
| from December 1, 2024 through November 30, 2025 | 8% |
| from December 1, 2025 through November 30, 2026 | 7% |
| from December 1, 2026 through November 30, 2027 | 6% |
| from December 1, 2027 through November 30, 2028 | 5% |
| from December 1, 2028 through November 30, 2029 | 4% |
| from December 1, 2029 through November 30, 2030 | 3% |
| from December 1, 2030 through November 30, 2031 | 2% |
| from December 1, 2031 through November 30, 2032 | 1% |
| from December 1, 2032 and thereafter | None |

FHA# 062-35778                          Rider 1 to Note                          Parc at Opelika

APP000920

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Borrower shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4OP LLC,
a Texas limited liability company

By: _____
    Timothy Barton, President

**END OF RIDER 1**

FHA# 062-35778                    Rider 1 to Note                    Parc at Opelika

APP000921

**ALLONGE BY
GREYSTONE FUNDING COMPANY LLC
OF THE
NOTE DATED
JANUARY 1, 2021
IN THE PRINCIPAL SUM OF $23,661,300.00
FROM
D4OP LLC,
a Texas limited liability company
to
GREYSTONE FUNDING COMPANY LLC,
a Delaware limited liability company**

**PAY TO THE ORDER OF:**

_____

**WITHOUT RECOURSE:**

**GREYSTONE FUNDING COMPANY LLC**

BY:_____

Sharon Briskman
Executive Vice President

APP000922

# EXHIBIT A-64

APP000923

2619 939

Recorded in the Above
DEEDS Book & Page
01-25-2021 01:30:06 PM
Bill English - Probate Judge
Lee County, AL
Book/Pg: 2619/939
Term/Cashier: CHPJDSK02 / CO
Tran: 24314.359970.479309
Recorded: 01-25-2021 13:30:19
NTX NO TAX COLLECTED          1.00
REC Recording Fee            17.00
Total Fees:  $ 18.00

SEND TAX NOTICE TO:
D4OP LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244

This Instrument was prepared by:
LD AL Opelika McCoy Street, LLC
2313 Penrose Avenue
Mesquite, Texas 75150

## STATUTORY WARRANTY DEED

STATE OF ALABAMA

COUNTY OF LEE

KNOW ALL MEN BY THESE PRESENTS, that in consideration of TEN AND NO/100THS DOLLARS ($10.00) and other good and valuable consideration to the undersigned Grantor in hand paid by the Grantee herein, the receipt whereof is acknowledged, LD AL OPELIKA McCOY STREET, LLC, a Delaware limited liability company, whose address is 2313 Penrose Avenue, Mesquite, Texas 75150 (herein referred to as grantor) does grant, bargain, sell and convey unto D4OP LLC, a Texas limited liability company, whose address is 13901 Midway Road, Suite 102, Dallas, Texas 75244 (herein referred to as grantee) the following described real estate situated in Lee County, Alabama, to wit:

Tract "A-3-A" of the Fox Run Development, LLC Subdivision, City of Opelika, Lee County, Alabama being more and particularly described in Exhibit "A" attached hereto and incorporated as if set forth fully herein.

TO HAVE AND TO HOLD unto the said Grantee, or its, successors and assigns forever in fee simple.

By the delivery and the acceptance of this Statuory Warranty Deed, Grantor and Grantee hereby agree that Grantor's covenants of title contaited herein by virrtue of the provisions of Alabama Code Section 35-4-271 (1975) shall be limited to acts done or suffered to come into existence by Grantor and those claiming under Grantor.

IN WITNESS WHEREOF, we have hereunto set our hands and seals, this ___22nd___ day of January, 2021.

LD AL OPELIKA McCOY STREET, LLC,
a Delaware limited liability company

BY: _____
Craig E. Landess, Vice President

Page 1 of 3

APP000924

2619   940
Recorded in the Above
DEEDS Book & Page
01-25-2021 01:30:06 PM

**STATE OF TEXAS**      )
**COUNTY OF DALLAS**    )

I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that Craig E. Landess, as Vice President of LD AL OPELIKA McCOY STREET, LLC, whose name is signed to the foregoing conveyance and who is know to me, acknowledged before me this date that, being informed of the contents of the conveyance, he, in his official capacity as such Vice President, executed the same voluntarily on the date the same bears dates.

Given under my hand this 22nd day of January, 2021.

_____
Notary Public, State of Texas
My Commission Expires: 11/12/24

DONNA SIVLEY
Notary ID #6113298
My Commission Expires
November 12, 2024

Page 2 of 3

APP000925

DEEDS  Book & Page

# EXHIBIT A

**LEGAL DESCRIPTION**: Tract "A-3-A" of the Fox Run Parkway Development, LLC Subdivision, Opelika, Lee County, Alabama

All that certain tract or parcel of land containing 11.95 acres being shown as Tract "A-3-A" on the plat titled A Re-Subdivision of Tracts "A-3", "A-4" & "A-5" of the Re-Subdivision of Tract "A" of the Fox Run Parkway Development, LLC Subdivision as recorded in Plat Book 42 at Page 104 in the Office of the Judge of Probate of Lee County, Alabama, being located in Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama and being more particularly described a follows:

Starting at the locally accepted Southeast corner of the North Half of Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama go Westerly a distance of 4106 feet, more or less, to an iron pin on the Northwesterly right of way of South Fox Run Parkway; thence South 89 degrees 24 minutes 20 seconds West a distance of 494.29 feet to an iron pin on the present North right of way of Tree Avenue; thence North 58 degrees 38 minutes 34 seconds East a distance of 39.10 feet to an iron pin at the Northeast corner of Tract "A-6" of the Fox Run Parkway Development, LLC Subdivision as shown on the plat recorded in Plat Book 41 at Page 176, also being the POINT of BEGINNING of hereinabove described Tract "A-3-A"; thence along the North line of said Tract "A-6" South 89 degrees 24 minutes 20 seconds West a distance of 597.10 feet to an iron pin; thence continue along the North line of said Tract "A-6" North 45 degrees 27 minutes 20 seconds West a distance of 35.44 feet to an iron pin on the East right of way of McCoy Street; thence along the East right of way of McCoy Street North 00 degrees 19 minutes 01 seconds West a distance of 246.57 feet to a concrete monument; thence continue along the East right of way of McCoy Street North 04 degrees 05 minutes 58 seconds West a distance of 498.14 feet to an iron pin; thence continue along the East right of McCoy Street North 00 degrees 23 minutes 36 seconds West a distance of 68.49 feet to an iron pin; thence South 45 degrees 11 minutes 48 seconds East a distance of 70.95 feet to an iron pin; thence North 90 degrees 00 minutes 00 seconds East a distance of 58.71 feet to an iron pin; thence along a curve, concave Southerly, having a radius of 245.00 feet, an arc distance of 89.89 feet, a chord direction of South 79 degrees 29 minutes 20 seconds East and a chord distance of 89.39 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 15.00 feet to an iron pin; thence South 21 degrees 01 minutes 21 seconds West a distance of 60.00 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 174.69 feet to an iron pin; thence along a curve, concave Northerly, having a radius of 220.00 feet; an arc distance of 200.89 feet, a chord direction of North 84 degrees 51 minutes 48 seconds East, and a chord distance of 193.98 feet to an iron pin; thence South 43 degrees 53 minutes 10 seconds East a distance of 636.06 feet to an iron pin; thence South 58 degrees 38 minutes 34 seconds West a distance of 382.74 feet to the POINT of BEGINNING.

Page 3 of 3

APP000926

2619  942

**Real Estate Sales Validation Form**

*This Document must be filed in accordance with Code of Alabama 1975, Section 40-22-1*

**Grantor's Name:** LD AL Opelika McCoy Street, LLC
**Mailing Address:**
2313 Penrose Avenue
Mesquite, Texas 75150
**Property Address:**
Tract A-3-A, McCoy Street
Opelika, AL 36801

**Grantee's Name:** D4OP LLC
**Mailing Address:**
13901 Midway Road, Suite 102
Dallas, Texas 75244
**Date of Sale:**
January 26, 2021

| | |
|---|---|
| **Total Purchase Price:** | $1,500,000.00 |
| or | |
| **Actual Value** | $_____ |
| or | |
| **Assessor's Market Value** | $_____ |

The purchase price or actual value claimed on this form can be verified in the following documentary evidence: (check one) (Recordation of documentary evidence is not required)

| | |
|---|---|
| ___ Bill of Sale | ___ Appraisal |
| _X_ Sales Contract | ___ Other |
| ___ Closing Statement | |

If the conveyance document presented for recordation contains all of the required information referenced above, the filing of this form is not required.

**Instructions**

Grantor's name and mailing address – provide the name of the person or persons conveying interest to property and their current mailing address.

Grantee's name and mailing address – provide the name of the person or persons to whom interest to property is being conveyed. Property address – the physical address of the property being conveyed, if available. Date of Sale – the date on which interest to the property was conveyed.

Total purchase price – the total amount paid for the purchase of the property, both real and personal, being conveyed by the instrument offered for record.

Actual value – if the property is not being sold, the true value of the property, both real and personal, being conveyed by the instrument offered for record. This may be evidenced by an appraisal conducted by a licensed appraiser or the assessor's current market value.

If no proof is provided and the value must be determined, the current estimate of fair market value, excluding current use valuation, of the property as determined by the local official charged with the responsibility of valuing property for property tax purposes will be used and the taxpayer will be penalized pursuant to Code of Alabama 1975 § 40-22-1 (h).

I attest, to the best of my knowledge and belief that the information contained in this document is true and accurate. I further understand that any false statements claimed on this form may result in the imposition of the penalty indicated in Code of Alabama 1975 § 40-22-1 (h).

Date:    January 22, 2021

Unattested

Print: LD AL Opelika McCoy Street, LLC

Sign:_____
Craig E. Landess, Vice President
Grantor

APP000927

# EXHIBIT A-65

APP000928

1

**Borrower's Oath**
(For Residential Housing
but not Section 232 Projects)

**U.S. Department of Housing
and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

**Public Reporting Burden** for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

Date: as of January 1, 2021                                    Project No. 062-35778

To the U.S. Department of Housing and Urban Development ("HUD"):
(The definition of any capitalized term or word used herein can be found in this Borrower's Oath, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument.)

In accordance with the stated intent of Congress, HUD's regulations implementing the National Housing Act, as amended ("NHA"), and the Regulatory Agreement between Borrower and HUD, the undersigned hereby certifies under oath that so long as the Loan made pursuant to the Security Instrument is insured or held by HUD:

(1) That, to carry out the intent of Section 513 of the NHA, no part of the Mortgaged Property will be rented for a period of less than thirty days or used for transient or hotel purposes, and said Mortgaged Property shall be used principally for residential use;

(2) The Mortgaged Property will not be sold while the Loan insurance is in effect or the Security Instrument is held by HUD unless the purchaser files with HUD a like certification executed by such purchaser under oath;

(3) Borrower has not and will not enter into any agreement with any party other than Lender in conjunction with the Loan transaction that allows for perfection of any portion of the UCC Collateral through control under the UCC;

(4) That to Borrower's knowledge, there are no proposed change(s) of law, ordinance, or governmental regulation (proposed in a formal manner by elected or appointed officials) that, if enacted or promulgated after the commencement of construction/rehabilitation, would require a modification to the Project, and/or prevent the Project from being completed in accordance with the Drawings dated August 29, 2019 last revised October 16, 2020 and Specifications dated January 8, 2021 executed by Borrower and Bakken Contracting Co., L.L.C., a North Dakota limited liability company DBA BC Contracting Co. and referred to in the Construction Contract.

Previous editions are obsolete                    Borrower's Oath                    HUD-92478M (6/18)

APP000929

Each signatory below hereby certifies under oath that each of their statements and representations contained in this Borrower's Oath and all their supporting documentation thereto are true, accurate, and complete. This Borrower's Oath has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

D4OP LLC,
a Texas limited liability company

By: _____
    Timothy Barton, President

Dated: Effective as of _January 1, 2021_ , Executed on January _14_, 2021

**NOTE:  THE FOREGOING CERTIFICATION MUST BE GIVEN UNDER OATH IN ACCORDANCE WITH STATE LAW REQUIREMENTS FOR TAKING AN OATH.**

Previous editions are obsolete                     Borrower's Oath                     HUD-92478M (6/18)

APP000930

### *Notary Jurat for Borrower*

County of ___Dallas___ )

State of ___Texas___ )                    )ss.

   Personally appeared before me this ___14___ day of ___January___, 2020, Timothy Barton who, **after being duly sworn**, says that he is the President of D4OP LLC, a limited liability company organized and existing under the laws of the Texas and that he/she has authority to execute **under oath** and has so executed the above certification for and on behalf of such , and for himself.

_____
Notary Public

My commission expires: ___09/24/2022___

[SEAL]



Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

NOTARY PUBLIC STATE OF TEXAS

APP000931

# EXHIBIT A-66

APP000932

## PROMISSORY NOTE

**$5,129,000.00**                                                    **January 13, 2021**

FOR VALUE RECEIVED, **D4OPM, LLC,** a Texas limited liability company, and **ONE MF D4, LLC,** a Texas limited liability company (collectively "Maker"), do hereby promise to pay to the order of **SOUTHERN PROPERTIES CAPITAL LTD,** a British Virgin Islands company ("Payee"), at such place as the holder hereof may from time to time designate in writing, in lawful money of the United States, the principal sum of FIVE MILLION ONE HUNDRED TWENTY-NINE THOUSAND AND NO/100 DOLLARS ($5,129,000.00) or so much of such sum as may be advanced from Payee in its sole discretion from time to time, with interest thereon as provided in this Note.

1.  Certain Definitions. For the purposes hereof, the terms set forth below shall have the following meanings:

    a.  "Affiliate" shall mean with respect to any person or entity, any other person or entity who, or which, controls, is controlled or under common control with such person or entity.

    b.  "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of Texas, now or at any time hereafter prescribing maximum rates of interest or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of Texas, as the same may be amended from time to time, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of Texas which permit a higher interest rate ceiling hereunder.

    c.  "Base Rate" shall mean ten percent (10%) per annum.

    d.  "Maturity Date" shall mean January 13, 2023.

    e.  "Highest Lawful Rate" shall mean at the particular time in question the lesser of (i) eighteen percent (18%) per annum or, (ii) the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker.

    f.  "Loan Documents" shall mean this Note, the Pledge and Security Agreement with Assignment of Rights and all other documents given to evidence or secure the Note.

    g.  "Security Agreement" shall mean that certain Pledge and Security Agreement with Assignment of Rights dated of even date herewith given to secure the Note.

APP000933

2.     Calculation and Payment of Principal and Interest.

a.     Principal and interest of this Note shall be payable as follows: all accrued but unpaid interest, together with the outstanding principal balance, shall be due and payable in full on the Maturity Date.

b.     Interest on this Note shall be calculated at the Base Rate on the number of days actually elapsed, but computed as though each year consisted of 360 days.

c.     If the date for any payment or prepayment hereunder falls on a day which is a Saturday, Sunday or other legal holiday in the State of Texas, then for all purposes of this Note, the same shall be deemed to have fallen on the next following day which is not a Saturday, Sunday or other legal holiday, and such extension of time shall in such case be included in the calculation of interest.

d.     All payments on this Note pursuant to this paragraph 2 shall be applied first to the payment of any accrued and unpaid Late Charge, as hereinafter defined, then to accrued and unpaid interest and then to the payment of principal; provided, however, if an Event of Default, as hereinafter defined, has occurred and is continuing, payments on this Note shall be applied as Payee shall elect, in Payee's sole discretion.

3.     Prepayment. Maker may prepay all or any part of the principal balance of this Note.

4.     Waiver.  Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (i) except as otherwise specifically set forth in this Note, waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (ii) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any party primarily or secondarily liable for the payment of this Note; (iii) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (iv) consent to any extension of time for the payment of this Note, or any installment hereof, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.     Events of Default

a.     Upon the happening of any of the following events (each an "Event of Default"), Payee may, at its option, by written notice thereof to Maker, declare immediately due and payable the entire principal balance of this Note together with all interest accrued and owing hereon, plus any other sums payable at the time of such declaration

APP000934

pursuant to this Note, or any instrument securing this Note, including, without limitation, the Security Agreement. Events of Default include the following:

i.      If Maker shall fail to pay any installment of principal and/or interest under this Note as and when same becomes due and payable in accordance with the terms hereof; or

ii.      The occurrence of any Event of Default, as defined in the Security Agreement, or the occurrence of a default under any other document or instrument evidencing, securing or pertaining to the indebtedness evidenced hereby, which remains uncured upon the expiration of any cure period applicable thereto as set forth in the document under which such default occurred; or

iii.      Any default by Maker or any Affiliate of Maker under any loan, advance or other obligation now or hereafter owed or owing to Payee or any Affiliate of Payee.

b.      The failure to exercise the foregoing option upon the happening of one or more Events of Default shall not constitute a waiver of the right to exercise the same or any other option at any subsequent time, and no such failure shall nullify any prior exercise of any such option without the express written consent of Payee.

6.      <u>Collateral</u>. This Note is secured by, among other things, the Pledge and Security Agreement with Assignment of Rights which contains provisions for the acceleration of the maturity hereof upon the happening of certain events.

7.      <u>Default Interest; Late Charge</u>. If any installment of principal and/or interest is not paid on or before the due date thereof or if the entire unpaid principal balance and accrued but unpaid interest is not paid on or before the earlier to occur of the (i) Maturity Date, or, (ii) any accelerated maturity date as permitted hereby, all unpaid amounts of this Note, including principal and interest, shall thereafter bear interest at a rate of interest (the "Default Rate") equal to the Highest Lawful Rate; provided, however, that the obligation to pay such interest is subject to the limitation contained in the following paragraph.

8.      <u>Compliance with Law</u>. All agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date, or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the unpaid

APP000935

balance of principal hereof, such excess shall be refunded to Maker. All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law. This paragraph shall control all agreements between Maker and Payee.

9.    Attorneys' Fees and Costs. If an Event of Default shall occur, and in the event that thereafter this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay, and there shall be added to the unpaid principal balance hereof, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees incurred by the holder hereof, on account of such collection, whether or not suit is filed.

10.    Cumulative Rights. No delay on the part of the holder of this Note in the exercise of any power or right under this Note or under any other instrument executed pursuant hereto shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. Enforcement by the holder of this Note of any security for the payment hereof shall not constitute any election by it of remedies so as to preclude the exercise of any other remedy available to it.

11.    Headings. The paragraph headings used in this Note are for convenience of reference only, and shall not affect the meaning or interpretation of this Note.

APP000936

12. <u>Notices and Demands</u>. Any notice or demand to be given or to be served upon Maker in connection with this Note must be in writing and may be given by facsimile, overnight delivery service, hand delivery, or certified or registered mail, return receipt requested, properly addressed, with postage prepaid, addressed to Maker as follows:

> D4OPM, LLC
> 13901 Midway Road
> Suite 102
> Farmers Branch, Texas 75244
> Attention: Timothy Barton
>
> ONE MF D4, LLC
> 13901 Midway Road
> Suite 102
> Farmers Branch, Texas 75244
> Attention: Timothy Barton

or at such other address as Maker may designate from time to time by written notice (specifically notifying of a change of address) given to and received by the holder hereof. Any notice or demand will be deemed given on the day the notice or demand given by Payee, if given by facsimile or hand delivery, the following day is given by overnight delivery service, (which receipt may be evidenced by a delivery service receipt) or two (2) days following the day such notice is deposited in an authorized depository under the care and custody of the United States Postal Service if given by registered or certified mail.

13. <u>Governing Law</u>. This Note shall be deemed to have been executed and shall be performed in the State of Texas and this Note and the Loan Documents shall be governed by its laws. Maker irrevocably agrees that subject to Payee's sole and absolute election, Payee may bring suit, action, or other legal proceedings arising out of the Loan Documents in a court located in Texas, whether local, state, or federal. Maker hereby submits to the jurisdiction of such court(s) and waives any right maker may have to request a change of venue or a removal to another court.

14. <u>Successors and Assigns</u>. The term "Payee" shall include all of Payee's successors and assigns to whom the benefits of this Note shall inure.

*[Signature page to follow]*

APP000937

**MAKER:**

**D4OPM, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

**ONE MF D4, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

APP000938

# EXHIBIT A-67

APP000939

## PLEDGE AND SECURITY AGREEMENT
## WITH ASSIGNMENT OF RIGHTS

**THIS PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS** (the "Pledge Agreement") is entered into effective as of the 13th day of January, 2021, from **D4OPM, LLC,** a Texas limited liability company ("D4OPM") and **ONE MF D4, LLC**, a Texas limited liability company ("OMD4"and D4OPM and OMD4 are collectively referred to as "Pledgor") to **SOUTHERN PROPERTIES CAPITAL LTD**, a British Virgin Islands company ("Secured Party").

### Recitals

A.    Secured Party has agreed to make a loan to Pledgor in the amount of $5,129,000.00, to be evidenced by a Promissory Note of even date herewith ("Loan").

B.    A condition of the Loan is that Pledgor delivers this Pledge Agreement to secure the Note.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Secured Party as follows:

1.    Certain Defined Terms.

    a.    Affiliate – shall mean with respect to any person or entity, any other person or entity who, or which, controls, is controlled by or under common control with, such person or entity.

    b.    Code – the Uniform Commercial Code as adopted and in force in the State of Texas, as from time to time in effect.

    c.    Collateral – all of the property and interests in property described in Section 2 hereof, and all other property that now or hereafter secures the payment and performance of any of the Secured Indebtedness (as defined herein below).

    d.    Company – D4OP LLC, a Texas limited Liability Company.

    e.    Note – as defined above.

    f.    Membership Interest – the interest of Pledgor in the Company, consisting of 100% of the Membership Interest in the Company.

    g.    Secured Indebtedness – the debt of Pledgor to Secured Party evidenced by the Note, as the same may be renewed, extended or modified from time to time.

2.    Pledge and Security Interest. As collateral security for the prompt and complete payment and performance when due of the Secured Indebtedness, Pledgor hereby grants to Secured Party, a continuing security interest in all of Pledgor's right, title, and interest in the

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 1
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

APP000940

following property, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence (the "Collateral"):

a.  The Membership Interest and all certificates, if any, representing same, and all rights, benefits, and privileges of Pledgor as a member in the Companies, and all rights, benefits, and privileges associated with the Membership Interest, including rights to profits, conversions distributions, return of capital, and voting rights;

b.  All accounts and rights now or hereafter attributable to the Membership Interest and operating agreements for the Companies, all rights, benefits, and privileges of Pledgor attributable thereto, including, without limitation, all distributions (whether in the nature of securities, monies, or other property), profits, return of capital, increases, proceeds, fees, preferences, payments, distributions or payments in partial or complete liquidation or redemption, and other rights or benefits of whatever nature made with respect to or attributable to the Membership Interest or which Pledgor is now or may hereafter become entitled to receive or exercise with respect to the Membership Interest;

c.  All subscriptions, warrants, options, and any other rights issued by the Companies or any other person whatsoever upon or in connection with the Membership Interest or any part of the collateral described in this Section 2;

d.  All cash, securities, dividends, increases, distributions and profits received as a result of reclassifications, readjustments, reorganizations, mergers, consolidations, combinations, or changes in the capital structure of the Companies and any other collateral at any time and from time to time received, receivable or otherwise distributed or delivered to Secured Party, and all rights and privileges pertaining thereto;

e.  All securities hereafter delivered to Secured Party in substitution for, or in addition to any of the foregoing, or certificates representing or evidencing such securities, and all cash, securities, instruments, documents, dividends, increases, distributions and profits received therefrom, and any other collateral at any time and from time to time received by, receivable by or otherwise distributed or delivered to Secured Party in respect of or in exchange for any of the collateral described herein;

f.  All substitutes and replacements for the collateral described in this Section 2, and all proceeds (cash and non-cash) arising out of the sale, assignment, exchange, liquidation, collection or other disposition of all or any portion of the Membership Interest, or the assets of the Companies, or the other collateral described in this Section 2, and further including, without limitation, proceeds in the form of accounts, chattel paper, instruments, documents, consumer goods, inventory and equipment; and

g.  All books and records of Pledgor pertaining to any of the above.

Coverage of proceeds, however, does not authorize the sale, assignment, exchange, liquidation or other disposition of any Collateral without the prior written consent of Secured

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 2
1162875_1 – Parc at Opelika – D4OPM. LLC. and OMD4. LLC (7516.0045)

APP000941

Party, which consent shall not be unreasonably withheld or delayed. The security interest contained herein is granted to secure the payment and performance of the Secured Indebtedness.

3.  Secured Party as Custodian. If requested by Secured Party, Pledgor agrees that it will deposit with Secured Party, duly executed transfer powers in favor of Secured Party or its nominee and will make such arrangements with a transfer agent, satisfactory to Secured Party, as will require such transfer agent, solely upon Secured Party's written request, following any Default (defined below) to register the Membership Interest in the name of the Secured Party or its nominee as provided above and as may otherwise be satisfactory to Secured Party. In addition, Secured Party shall at all times have the right to exchange certificates or instruments representing or evidencing the Membership Interest for certificates or instruments of smaller or larger denominations for any purpose consistent with its performance of this Pledge Agreement.

4.  Assignment of Companies' Distributions. In addition to the security interest granted in Section 2 above, Pledgor hereby assigns and transfers to Secured Party from and after a Default all distributions and payments of whatever kind or character Pledgor may be then or thereafter entitled to receive from the Companies (collectively, all such distributions and payments are hereinafter referred to as "Distributions or Payments"), including without limitation, any distributions of escrows or other funds from lenders secured by property owned by the Company, and Pledgor hereby authorizes and directs the Companies to pay such Distributions or Payments directly to Secured Party from and after a Default. Upon receipt of each such Distributions or Payments, Secured Party shall apply such Distributions or Payments as follows: (i) first to the payment of all costs and expenses incurred by Secured Party under this Pledge Agreement or under the Note, (ii) second to reimbursement of Secured Party of any other disbursements made by Secured Party in accordance with this Pledge Agreement, (iii) third to the payment of all accrued and unpaid interest, if any, on the Secured Indebtedness, (iv) fourth, the payment of all other amounts then owing to Secured Party by Pledgor under the Note, and (v) fifth, the remainder of such Distributions or Payments, if any, to be paid to Pledgor. Such distributions shall include, without limitation, any proceeds to which Pledgor is entitled as a result of the sale or other disposition of any assets or collateral of the Companies or of any entity in which the Companies owns an interest or as a result of any financing or refinancing of any indebtedness of the Companies or of any entity in which the Companies owns an interest. Secured Party shall not, by virtue of this assignment, be deemed a member in the Companies.

5.  Pledgor's Representations and Warranties. Pledgor represents and warrants to Secured Party as follows:

    a.  Pledgor has good right and lawful authority to execute, deliver and perform this Pledge Agreement and to pledge the Collateral under this Pledge Agreement and the execution and performance hereof has been authorized or deemed authorized by all necessary action of Pledgor and the Companies.

    b.  No consent or approval of any governmental body or regulatory authority, or of any securities exchange or of any other person is necessary to effect the validity of the rights created hereunder which have not been obtained.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 3
1162875_1 – Parc at Opelika – D4OPM. LLC. and OMD4. LLC (7516.0045)

APP000942

c.    There is no financing statement or other document creating or evidencing a lien now on file in any public office covering any of the Collateral nor is there any lien or encumbrance on any of the Collateral.    Until the termination of this Pledge Agreement, Pledgor will not execute any such financing statement or statements on any of the Collateral, except as may have been or may hereafter be granted to Secured Party.

d.    No security agreement covering the Collateral, or any part thereof, has been made and no security interest, other than the one created under this Pledge Agreement, has been granted, or to the best knowledge of Grantor has attached or been perfected in the Collateral or any part thereof.

e.    Pledgor's principal place of business is at the address of Pledgor set forth herein.

f.    No bankruptcy or insolvency proceedings are pending by or against Pledgor and there are no outstanding judgments against Pledgor.

h.    Pledgor is the legal and equitable owner of, and has good and indefeasible title to, the Membership Interest free and clear of all liens, security interests, pledges, charges and encumbrances except for the secured interest created by this Pledge Agreement.

i.    This Pledge Agreement, together with all filings and other actions necessary or desirable to perfect and protect such security interest, create a valid and perfected first priority security interest in the Collateral securing the payment and performance of the Secured Indebtedness.

j.    There are no judicial or administrative actions, suits or proceedings pending or threatened against or affecting Pledgor or the Collateral.

k.    This Pledge Agreement constitutes the legal, valid and binding obligation of Pledgor, enforceable in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

6.    Covenants. Pledgor hereby covenants and agrees with Secured Party that, except as may be provided in or with respect to the documents evidencing and/or securing any loan to the Companies from American Bank of Commerce in connection with the acquisition and development of real property by the Companies, as follows:

a.    In the event, for any reason, that the law of any jurisdiction other than the State of Texas becomes or is applicable to the Collateral, or any part thereof, or to any of the Secured Indebtedness, Pledgor agrees to execute and deliver all such instruments and to do all such other things as may be reasonably necessary or reasonably appropriate to preserve, protect and enforce Secured Party's security interest or lien under the law of such other jurisdiction, at least to the same extent as such security interest would be protected under the Code.

APP000943

b.   If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, security, or other instrument, such promissory note, security or instrument shall be immediately pledged to Secured Party under this Pledge Agreement and Pledgor shall deliver to Secured Party such promissory note, security, or instrument, duly endorsed, without recourse, in a manner satisfactory to Secured Party and Pledgor.

c.   Pledgor shall keep the Collateral free from, and will not create, grant, permit, or suffer to exist, any lien, attachment, security interest, sequestration, encumbrance or any other legal or equitable process, or any encumbrance of any kind or character other than the lien and security interest granted in this Pledge Agreement.

d.   Pledgor shall perform in all material respects all obligations, covenants and duties imposed upon Pledgor by the material agreements and instruments constituting part of the Collateral, including all of the material terms, provisions and conditions of the Companies in effect as of the date hereof, as amended, modified, or supplemented from time to time (but without affecting Pledgor's obligations prohibiting such action under this Pledge Agreement), and maintain in full force and effect all such agreements and instruments, and shall not cause, vote to consent to, vote in favor of, take any actions or fail to take any action that results in any amendment, modification, cancellation or limitation of such agreements or instruments.

e.   Pledgor shall not change its name, identity, or corporate structure in any manner which might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of the then applicable provision of the Code unless Pledgor shall have given Secured Party at least 30 days prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by Secured Party to amend such financing statement or continuation statement so that it is not seriously misleading.

f.   Pledgor will not change its principal place of business from the address set forth herein, change the location of any Collateral, or remove the records concerning the Collateral, unless it has given Secured Party at least 30 days prior written notice of its intent to do so and has taken such action as is necessary or advisable in the opinion of Secured Party to cause Secured Party's security interest in the Collateral to continue to be a first priority perfected security interest.

g.   Pledgor shall promptly execute and deliver from time to time to Secured Party all such assignments, certificates, passbooks, stock powers, supplemental writings, notices, financing statements and other items and do all other acts or things as Secured Party may reasonably request in order to comply with the Code and more fully preserve, evidence and perfect the interest herein of Secured Party in the Collateral or in order to enable Secured Party to exercise and enforce its rights hereunder with respect to the pledge and security interests granted herein, including, without limitation, causing, after Default, any or all of the Collateral to be transferred

APP000944

of record into the name of Secured Party or its nominee (and Secured Party agrees that if any Collateral is transferred into its name or the name of its nominee, Secured Party will thereafter promptly give to Pledgor copies of any notices and communications received by Secured Party or its nominee with respect to the Collateral).

h.   Pledgor shall notify Secured Party in writing, promptly upon Pledgor's learning thereof, of any litigation, proceeding or claim affecting Pledgor, the Companies or the Collateral, and, at Secured Party's request and expense, Pledgor shall appear in and defend such action or proceeding other than an action or proceeding against the Companies.

i.   Pledgor shall promptly pay or cause to be paid when due, all lawful taxes, assessments, levies, contributions, charges, fines and penalties, of every description, attributable to the Collateral or any distribution in respect of any of the Collateral (and, in connection therewith, Pledgor shall be entitled to receive from Secured Party or retain such amount of any distribution from the Companies as Pledgor shall deem reasonably necessary to satisfy any tax obligations), and shall furnish to Secured Party, upon request, evidence of the payment thereof. If any Collateral is levied upon, or taken into custody, or detained by any person whatsoever, Pledgor agrees to immediately notify Secured Party. If Pledgor should, for any reason, fail to pay and discharge promptly any such taxes, assessments, levies, contributions, charges, fines, or penalties, when due, Secured Party shall be authorized to pay the same, with full subrogation by reason of such payment, and the amount so paid, together with interest thereon as provided herein, shall be secured by the security interest herein granted, and Pledgor covenants and agrees, on demand, to repay the amount so paid by Secured Party in payment of such items, together with interest thereon at the applicable rate of interest set forth in the Note, from the date of such payment by Secured Party until said amounts are repaid. Secured Party shall have no liability for any loss, damage or injury resulting from the non-payment of any of such taxes, assessments, levies, contributions, charges, fines, or penalties.

j.   Pledgor will not sell, assign, or transfer any Collateral in any manner or any of Pledgor's rights in the Collateral, or any part thereof, except as expressly permitted in this Pledge Agreement.

k.   If this Pledge Agreement or any provision hereof shall be deemed invalid, in whole or in part, by reason of any present or future law or governmental regulation, or any decision of authoritative court, or shall be deemed by Secured Party, for any reason, ineffective to create or evidence the security interest herein granted, then from time to time, Pledgor shall execute and deliver such other and further instruments, documents or assurances, as in the reasonable judgment of Secured Party and Pledgor may be required to more effectively subject the Collateral to the payment of the Secured Indebtedness and the performance of the terms and provisions of this Pledge Agreement or to effectuate any sale of any Collateral as hereinafter provided.

l.   Pledgor shall promptly furnish Secured Party with any information or writings which Secured Party may reasonably request concerning the Collateral.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 6
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

APP000945

m.   Pledgor shall allow Secured Party, or cause to be allowed to Secured Party, to inspect all records of Pledgor relating to the Collateral, to the Companies, or to the Secured Indebtedness and to make and take away copies of such records for any proper purpose.

n.   If following any Default the Collateral, or any part thereof, is ever converted by its issuer or maker into another type of collateral or if any of the items required to be pledged by Pledgor under Section 2 above, including any money or other proceeds, is ever paid or delivered to or received by Pledgor, then, in any such event, all such collateral, items, money and other proceeds and shall be transferred and delivered to Secured Party by Pledgor (together with, if appropriate, the certificates for any shares or securities duly endorsed in blank or accompanied by undated stock powers duly executed in blank) all of which thereafter shall be held by Secured Party, pursuant to the terms of this Pledge Agreement, as part of the Collateral and Pledgor shall take such other action as Secured Party shall deem necessary or appropriate to duly record the security interests created hereunder in such collateral, items, money, or other proceeds.

o.   Pledgor will not further encumber the Collateral without the consent of Secured Party.

7.   Voting Rights.

a.   Pledgor shall not be entitled to exercise any and all voting and/or consensual rights and powers relating or pertaining to the Collateral or any part thereof for any purpose, without the consent of Secured Party.

b.   Upon the occurrence after the date hereof and during the continuance of a Default, all rights of Pledgor to exercise the voting and/or consensual rights and powers which Pledgor is entitled to exercise pursuant to subsection (a) above shall cease, at the option of Secured Party, and all such rights shall thereupon become vested in Secured Party who shall have the sole and exclusive right and authority to exercise such voting and/or consensual rights and powers. In addition and except as otherwise provided in Section 4 above, Secured Party shall have the right upon occurrence of a Default to notify and direct the issuer of, or obligor under, any of the Collateral to thereafter make all payments, distributions, dividends and any other distributions payable in respect thereof directly to Secured Party. The issuer of, or obligor under, any of the Collateral making such payment or distribution to Secured Party shall be fully protected in relying on a written statement of Secured Party that Secured Party then holds a security interest which entitles Secured Party to receive such payments and distributions. Except as otherwise provided in Section 4 above, any and all money and other collateral paid over to or received by Secured Party pursuant to the provisions of this subsection (d) shall be retained by Secured Party as additional collateral hereunder and may be applied (and upon Pledgor's written request all cash shall permanently be applied) in accordance with the provisions hereof.

APP000946

8.     Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" or a "Default":

a.     The occurrence of any default which is not cured following any applicable notice and opportunity to cure by Pledgor under the Note, or the occurrence of any Event of Default or Default under this Pledge Agreement.

b.     Pledgor shall fail to pay when due any of the Secured Indebtedness which is owed to Secured Party by Pledgor, or the failure of Pledgor to pay when due, any indebtedness, obligations or liabilities now or hereafter due under this Pledge Agreement;

c.     The discovery by Secured Party that any statement, representation, warranty, or covenant of Pledgor in this Pledge Agreement is false, misleading or erroneous in any material respect when made, if Secured Party relied thereon to its detriment;

d.     The occurrence of a levy against any of the Collateral under any execution, attachment, sequestration or other writ, or the appointment of a receiver for the Collateral or any part thereof;

e.     Pledgor shall fail promptly to perform, observe, and keep any of its obligations, covenants or agreements contained in this Pledge Agreement and such failure is not cured before expiration of any applicable cure periods.

9.     Notice required or desired to be given under the terms of this Pledge Agreement shall be in writing, and sent by hand delivery, or overnight receipted courier service, or U.S. certified or registered mail, postage prepaid, return receipt requested, and shall be given to the parties at the following address:

If to Pledgor:                D4OPM, LLC, and OMD4, LLC
                                13901 Midway Road
                                Suite 102
                                Farmers Branch, Texas 75244
                                Attention:     Timothy Barton
                                Telephone:     972-385-9934

If to Secured Party:      Southern Properties Capital LTD
                                  1603 LBJ Freeway
                                  Suite 800
                                  Dallas, Texas 75234

Notice given under this provision by hand delivery or overnight receipted courier service shall be effective as of the date of delivery or first attempted delivery; notice given by U.S. mail as aforesaid shall be deemed effective on the earlier of actual receipt by Pledgor or three (3) business days after deposit in a regularly maintained receptacle of the U.S. Postal Service.

10.     Notwithstanding anything to the contrary contained in this Pledge Agreement or the Note:

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 8
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

APP000947

a. Pledgor shall not be in default under this Pledge Agreement for the failure to pay any sum due thereunder or hereunder, unless and until Pledgor has received a written notice of non-payment from Secured Party and has failed to cure, fully and unqualifiedly, such non-payment within five (5) days after the effective date of such notice (as hereinbelow provided); and

b. Pledgor shall not be in default under the Note or this Pledge Agreement for the failure to perform or comply with any non-monetary covenant or agreement contained therein or herein, unless and until Pledgor has received written notice of such default from Secured Party and has failed to cure, fully and unqualifiedly, such non-monetary default within thirty (30) days after the effective date of such notice (as hereinbelow provided).

11. <u>Acceleration of the Secured Indebtedness</u>. Without in any way limiting the right of Secured Party to demand payment of any portion of the Secured Indebtedness payable on demand, upon or at any time after the occurrence of a Default, all or any portion of the Secured Indebtedness due or to become due shall, at the option of Secured Party and without notice or demand by Secured Party, become at once due and payable and Pledgor shall forthwith pay to Secured Party, in addition to any and all sums and charges due, the entire unpaid balance of the Secured Indebtedness owed by Pledgor to Secured Party.

12. <u>Remedies of Secured Party</u>. Upon the occurrence of a Default:

a. Secured Party may, at Secured Party's option and at Pledgor's expense, either in Secured Party's own right or in the name of Pledgor and in the same manner and to the same extent that any Pledgor might reasonably so act if this Pledge Agreement had not been made:

b. demand, sue for, collect, recover, receive and otherwise enforce payment of all proceeds and other sums due and payable in respect of the Collateral, Pledgor hereby requesting and instructing all parties liable to Pledgor in connection with the Collateral to make all payments then due or which may thereafter become due thereunder or thereby to Secured Party, and Pledgor further agreeing that the receipt by Secured Party of any such payments shall be a complete release and discharge of the obligor or obligors thereof to the extent of the payment or payments so made;

i. do all things requisite, convenient, or necessary to enforce the performance and observance of all rights, remedies and privileges of Pledgor arising from the Collateral, or any part thereof, including, but not limited to, compromising, waiving, excusing, or in any manner releasing or discharging any obligation of any party to or arising from the Collateral;

ii. take possession of the books, papers, chattel paper, documents of title and accounts of Pledgor, wherever located, relating to the Collateral;

iii. receive, and Pledgor will forthwith surrender to Secured Party, the possession of the Collateral, and, to the extent permitted by law, Secured Party may

APP000948

itself or by such officers or agents as it may appoint, (a) exercise any voting rights and/or consensual rights and powers relating or pertaining to the Collateral or any part thereof (and Pledgor agrees to take all actions as may be appropriate to give effect thereto), (b) exclude Pledgor, his/its agents and servants from such activities, and (c) do all acts, including the making of contracts, which Secured Party deems necessary for the care or management of the Collateral;

iv.    sue or otherwise collect and receive money with respect to the Collateral; and

v.    exercise any other lawfully available powers or remedies, and do all other things which Secured Party reasonably deems requisite, convenient or necessary or which Secured Party reasonably deems proper to protect the security interest herein granted.

c.    Secured Party may reduce its claim to judgment.

d.    Secured Party may foreclose or otherwise enforce its security interests in all or any part of the Collateral by any available judicial procedure.

e.    At its discretion, Secured Party may retain all or any portion of the Collateral in satisfaction of the Secured Indebtedness whenever the circumstances are such that Secured Party is entitled to do so under the Code.

f.    Secured Party may apply by appropriate judicial proceedings for appointment of a receiver for the Collateral, or any part thereof, and Pledgor hereby consents to any appointment.

g.    After giving Pledgor written notice ten (10) days in advance of the time and place, Secured Party may sell, lease, assign, transfer or otherwise dispose of all or any part of the Collateral at public or private sale, at such place or places as Secured Party deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), without demand of performance or notice of intention to effect any such disposition or (except such notice as is required above or by applicable statute and cannot be waived), and Secured Party or anyone else may be the purchaser, lessee, assignee, or recipient of any or all of the Collateral so disposed of at any public sale (or to the extent permitted by law, at any private sale), and Secured Party may, in its own name or as the irrevocably appointed attorney-in-fact of Pledgor, effectively sell, lease, assign or transfer the Collateral, or any part thereof, absolutely free from any claims or right of whatsoever kind, including any right or equity of redemption of Pledgor, and execute and deliver all necessary assignments, conveyances, bills of sale and other instruments with power to substitute one or more persons or corporations with like power. Any such foreclosure sale, assignment, or transfer shall, to the extent permitted by law, be a perpetual bar, both at law and in equity, against Pledgor and all persons and corporations lawfully claiming by or through or under Pledgor. Any public or private sale may, without notice or publication, be adjourned or caused to be adjourned by Secured Party from time to time by announcement at the time and place

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 10
1162875_1 – Parc at Opelika – D4OPM. LLC. and OMD4. LLC (7516.0045)

APP000949

fixed for the sale, and such sale may be made at any time or place to which the same may be adjourned. Upon any sale, Secured Party may bid for and purchase the Collateral, or any part thereof, and upon compliance with the terms of sale may hold, retain, possess and dispose of the Collateral, in its absolute right without further accountability. Secured Party shall have the right, at its option, to have any or all of the Secured Indebtedness as of the date of such sale credited against the amount of its bid. At any such sale it is not necessary to exhibit the Collateral. If any notice, exemption, filing, consent, approval or authorization of any federal, state, municipal or other governmental department, agency or authority should be necessary to effectuate any sale or other disposition of all or any of the Collateral, Pledgor will execute all such applications and other instruments as may be required in connection with applying for, obtaining, and securing any such notice, exemption, filing, consent, approval or authorization and will use its best efforts in connection therewith. Secured Party is authorized at any sale of the Collateral, if Secured Party deems it advisable, to restrict the prospective bidders or purchasers to those persons who will represent and agree that they are purchasing for their own account, for investment, and not with a view to distribution or resale of any of the Collateral. Any sale of the Collateral may be sold in one lot as an entirety or in separate parcels, as Secured Party may determine. The sale of any part of the Collateral will not exhaust Secured Party's power of sale, it being agreed that sales may be made from time to time until all of the Collateral has been sold or until the Secured Indebtedness has been paid in full. Secured Party shall not be obligated to make any sale pursuant to any notice.

h.    Secured Party shall have all of the rights and remedies of a secured party under the Code or under other applicable law, and all other legal and equitable rights to which Secured Party may be entitled, all of which rights and remedies shall be cumulative, and none of which shall be exclusive, and shall be in addition to any other rights or remedies contained in this Pledge Agreement or any other document or instrument.

13.    <u>Restrictions on Sale</u>. Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any private sales to such purchasers may be made at prices and on terms less favorable than those obtainable through public sale without such restrictions, and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale. Pledgor further agrees that Secured Party shall have the right to rely upon the advice and opinion of any member of the National Securities Exchange as to the best price reasonably obtainable upon such private sale and that such reliance shall be conclusive evidence that Secured Party handled such matter in a commercially reasonable manner under the Code.

APP000950

14.    Private Sale. Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Pledge Agreement conducted in a commercially reasonable manner. Pledgor waives any claims against Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Indebtedness, even if Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

15.    Notification. Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Pledgor and to any other person entitled under the Code to notice; provided, that if the Collateral threatens to decline quickly in value or is of a type customarily sold on a recognized market, Secured Party may sell or otherwise dispose of the Collateral without notification, advertisement or other notice of any kind. It is agreed that notice sent or given not less than ten (10) calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purpose of this Pledge Agreement.

16.    Waivers of Appraisement. In case of the occurrence of any Default, neither Pledgor nor anyone claiming by, through or under Pledgor, to the extent Pledgor may lawfully so agree, shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or redemption law now or hereafter in force in any locality where any of the Collateral is situated for purposes of applicable law, in order to prevent or hinder the enforcement of this Pledge Agreement, or the absolute sale of the Collateral, or the final and absolute putting into possession thereof, immediately after such sale, of the purchaser thereof; and Pledgor in Pledgor's own right and for all who may claim under Pledgor, hereby waives, to the full extent that Pledgor may lawfully do so, the benefit of all such laws and any and all right to have the Collateral marshaled upon any enforcement of the security interest herein granted, and Pledgor agrees that Secured Party or any court having jurisdiction to enforce such security interest may sell the Collateral in parts or as an entirety.

17.    Waiver of Notice. Pledgor waives notice of the creation, advance, increase, existence, extension, or renewal of, and of any indulgence with respect to, the Secured Indebtedness, waives presentment, demand, notice of dishonor, and protest, waives notice of the amount of the Secured Indebtedness outstanding at any time, notice of any change in financial condition of any person liable for the Secured Indebtedness or any part thereof, notice of any Default or Event of Default, and all other notices respecting the Secured Indebtedness, except as otherwise expressly provided in this Pledge Agreement.

18.    Application of Proceeds. Except as provided in Section 4 above, Secured Party shall apply the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Secured Party under this Pledge Agreement, as follows:

   a.    First, to the payment of all costs and expenses of any foreclosure and collection hereunder and all proceedings in connection therewith, including reasonable attorneys' fees;

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 12
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

APP000951

b.    Then, to the reimbursement of Secured Party for all disbursements made by Secured Party for taxes, assessments or liens superior to the security interest hereof and which Secured Party shall reasonably deem expedient to pay;

c.    Then, to the reimbursement of Secured Party of any other disbursements made by Secured Party in accordance with the terms hereof;

d.    Then, to the amounts then owing and unpaid in respect of the Secured Indebtedness, in such priority as Secured Party may determine in Secured Party's discretion;

e.    The remainder of such proceeds, if any, shall be paid to Pledgor or as otherwise required by a court of competent jurisdiction.

If such proceeds shall be insufficient to discharge the entire Secured Indebtedness owing by Pledgor, Secured Party may have any other available legal recourse against Pledgor for the deficiency under the Secured Indebtedness.

19.    Enforcement of Secured Indebtedness. Nothing in this Pledge Agreement shall affect or impair the unconditional and absolute right of Secured Party to enforce the Secured Indebtedness as and when the same shall become due in accordance with the terms of the Note.

20.    Right of Secured Party to Prevent or Remedy Default. If Pledgor shall fail to perform any of the covenants, conditions and agreements required to be performed and observed by Pledgor under this Pledge Agreement or under the Loan Documents, or in respect of the Collateral, as the case may be, Secured Party (i) may, but shall not be obligated to, take any action Secured Party reasonably deems necessary or desirable to prevent or remedy any such Default by Pledgor or otherwise to protect the security interest of Secured Party under this Pledge Agreement, and (ii) after a Default, shall have the absolute and immediate right to take possession of the Collateral or any part thereof to such extent and as often as Secured Party, in Secured Party's sole discretion, deems necessary or desirable in order to prevent or to cure any such Default by Pledgor, or otherwise to protect the security of this Pledge Agreement. Secured Party may advance or expend such sums of money for the account of Pledgor as Secured Party, in Secured Party's discretion, deems necessary for any such purpose. In no event, however, shall Secured Party have any obligation or duties whatsoever to perform any covenant or agreement of Pledgor contained herein, and any such performance by Secured Party shall be wholly discretionary with Secured Party.

21.    Duties of Secured Party. The powers conferred upon Secured Party hereunder are solely to protect Secured Party's interest in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Except for the safe custody of any Collateral in Secured Party's possession and the accounting for money actually received by Secured Party hereunder, Secured Party shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

22.    No Liability of Secured Party. Neither the acceptance of this Pledge Agreement by Secured Party, nor the exercise of any rights hereunder by Secured Party, shall be construed in any

APP000952

way as an assumption by Secured Party of any covenants, representations, warranties, obligations, responsibilities, liabilities, or duties of Pledgor arising in connection with the Collateral assigned hereunder or otherwise bind Secured Party to the performance of any obligations respecting the Collateral, it being expressly understood that Secured Party shall not be obligated to perform, observe or discharge any covenant, warranty, representation, obligation, responsibility, duty, or liability of Pledgor in respect of any of the Collateral, including, but not limited to, appearing in or defending any action, expending any money or incurring any expense in connection therewith.

23.   Right of Secured Party to Defend Action Affecting Security. Secured Party may, at its expense, appear in and defend any action or proceeding at law or in equity purporting to affect Secured Party's security interest under this Pledge Agreement.

24.   Secured Party's Expenses. All reasonable advances, costs, expenses, charges and attorneys' fees which Secured Party may make, pay or incur under any provision of this Pledge Agreement for the protection of Secured Party's security or for the enforcement of any of Secured Party's rights hereunder, or in foreclosure proceedings commenced and subsequently abandoned, or in any dispute or litigation in which Secured Party may become involved by reason of or arising out of this Pledge Agreement or the Loan Documents, or the Collateral, shall be a part of the Secured Indebtedness and shall be paid by Pledgor to Secured Party, upon demand, and shall bear interest until paid at the applicable rate of interest set forth in the Note, from the date of such payment until repaid by Pledgor.

25.   Secured Party's Right of Set-Off. Upon the happening of any event entitling Secured Party to pursue any remedy provided herein or if Secured Party shall be served with garnishment process in which Pledgor shall be named as defendant, whether or not Pledgor shall be in Default hereunder at the time, Secured Party may, but shall not be required to, set-off any indebtedness owing by Secured Party to Pledgor against any of the Secured Indebtedness without first resorting to the security hereunder and without prejudice to any other rights or remedies of Secured Party or Secured Party's security interest herein.

26.   No Waiver. In case Secured Party shall have proceeded to enforce any right or remedy hereunder and such proceedings shall have been discontinued or abandoned for any reason, then in every such case, Pledgor and Secured Party shall be restored to their former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of Secured Party shall continue as if no such proceeding had been taken. The failure or delay on the part of Secured Party in exercising any right, remedy or power under this Pledge Agreement or in giving or insisting upon strict performance by Pledgor hereunder or in giving notice hereunder shall not operate as a waiver of the same or any other power or right, and no single or partial exercise of any such power or right shall preclude any other or further exercise thereof or the exercise of any other such power or right. Secured Party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Pledgor of any and all of the terms and provisions of this Pledge Agreement to be performed by Pledgor. The collection and application of proceeds, the entering and taking possession of the Collateral, and the exercise of the rights of Secured Party contained in the Loan Documents, including this Pledge Agreement, shall not cure or waive any default, or affect any notice of default, or invalidate any acts done pursuant to such notice. No waiver by Secured Party of any breach or default of or by any party hereunder shall be

APP000953

deemed to alter or affect Secured Party's rights hereunder with respect to any prior to subsequent default.

27.    Remedies. No right or remedy herein reserved to Secured Party is intended to be exclusive of any other right or remedy, but each and every such remedy shall be cumulative, not in lieu of, but in addition to, any other rights or remedies given under this Pledge Agreement and all other Loan Documents and at law or in equity. Any and all of Secured Party's rights and remedies may be exercised from time to time and as often as such exercise is deemed necessary or desirable by Secured Party.

28.    Right of Secured Party to Extend Time of Payment, Substitute, Release Security, etc. Without affecting the liability of any person, including Pledgor, for the payment or performance of any of the Secured Indebtedness or the lien of this Pledge Agreement on the Collateral, or the remainder thereof, for the full amount of any indebtedness unpaid, Secured Party may from time to time, without notice or without affecting or impairing any of Secured Party's rights under this Pledge Agreement: (a) release any person liable for the payment or performance of any of the Secured Indebtedness, (b) extend the time or otherwise alter the terms of payment or performance of any of the Secured Indebtedness, (c) accept additional security therefor of any kind, including, without limitation, deeds of trust or mortgages, (d) alter, substitute or release any collateral securing the Secured Indebtedness, (e) resort for the payment or performance of all or any portion of the Secured Indebtedness to its several securities therefor in such order and manner as Secured Party may deem fit, or (f) join in any subordination or other agreement affecting this Pledge Agreement or the lien or charge thereof.

29.    Termination. When all Secured Indebtedness shall have been paid in full, this Pledge Agreement shall terminate and Secured Party shall forthwith cause to be assigned, transferred and delivered, against receipt, but without any recourse, warranty or representation whatsoever by Secured Party (other than such representations and warranties as to ownership and absence of encumbrances as Pledgor may reasonably require), all rights assigned to Secured Party under Section 4 above, and any remaining Collateral and money received in respect thereof, to or on the order of Pledgor.

30.    Miscellaneous.

    a.    This Pledge Agreement may be presented to filing officers for recordation as a financing statement or other document evidencing the security interest created hereunder.

    b.    Regardless of any provision contained in any document or instrument evidencing or securing any Secured Indebtedness, Secured Party shall not be entitled to receive, collect or apply as interest on the Secured Indebtedness an amount which would be usurious and, to this end, in the event of the acceleration of the maturity of the Secured Indebtedness, or any item hereof, a proper credit shall be given for unearned interest and such unearned interest shall be immediately refunded to Pledgor.

    c.    It is agreed that any custom or usage to the contrary notwithstanding, Secured Party shall have the right at all times to enforce the covenants and provisions of this Pledge

APP000954

Agreement in strict accordance with its terms, notwithstanding any conduct or custom by Secured Party in refraining from so doing at any time, or any acceptance by Secured Party of partial performance by Pledgor.

d.    Secured Party's rights, titles, interests, liens and securities under this Pledge Agreement are cumulative of all other rights, titles, interests, liens and securities which Secured Party may now or at any time hereafter hold securing payment of the Secured Indebtedness, or any part thereof.

e.    This Pledge Agreement is binding upon Pledgor and Pledgor's successors and permitted assigns, and shall inure to the benefit of and be enforceable by Secured Party and its respective successors and assigns. Secured Party may assign this Pledge Agreement or any of its rights and powers hereunder, with the Secured Indebtedness, and may assign and/or deliver to any such assignee any of the Collateral therefor and, in the event of such assignment, the assignee shall have all rights and remedies as if originally named in this Pledge Agreement in place of Secured Party and Secured Party shall be thereafter fully discharged from all responsibility hereunder. Pledgor may not assign or transfer Pledgor's rights hereunder without the prior written consent of Secured Party, which consent may be granted or withheld in the sole discretion of Secured Party.

f.    Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in Secured Party's possession if Secured Party takes such action for that purpose as Pledgor requests in writing, but Secured Party shall not be bound to follow such requests.

g.    Pledgor agrees that from time to time upon written request of Secured Party, Pledgor will execute and deliver such further documents and do such other acts and things as Secured Party may reasonably request in order fully to effect the purposes of this Pledge Agreement.

h.    Any notice of sale, disposition or other action by Secured Party required by the Code and sent to Pledgor at Pledgor's address set forth in this preamble of this Pledge Agreement, or at such other address for Pledgor as may from time to time be shown on Secured Party's records, at least ten days prior to such action, shall constitute reasonable notice to Pledgor. Any such notice shall be deemed to have been given on the day it is mailed to such address and shall be sent by certified mail, return receipt requested.

i.    Secured Party shall not be liable for any loss of interest on or any penalty or charge assessed by any depository institution against funds in, payable on or credited to a bank account as a result of Secured Party's exercising any of Secured Party's rights or remedies under this Pledge Agreement.

j.    All representations, warranties and covenants contained in this Pledge Agreement shall survive the execution of this Pledge Agreement and shall terminate upon termination of this Pledge Agreement under Section 29 above, except all

APP000955

indemnification obligations of Pledgor under this Pledge Agreement shall survive the termination of this Pledge Agreement.

k.    Any provision of this Pledge Agreement found to be prohibited by law shall be ineffective to the extent of such prohibition without invalidating the rest of this Pledge Agreement.

l.    If all or part of the Secured Indebtedness is given in renewal or extension of or applied toward the payment of indebtedness secured by any mortgage, deed of trust, deed to secure debt, pledge, security agreement or other lien, Secured Party shall be, and hereby is, subrogated to all of the rights, titles, security interests and other liens securing the indebtedness so renewed, extended or paid.

m.    After Pledgor executes this Pledge Agreement, it shall be a valid and binding obligation of Pledgor, whether or not Secured Party executes this Pledge Agreement.

n.    No change, amendment, modification, cancellation, or discharge of any provision of this Pledge Agreement shall be valid unless consented to in writing by Secured Party.

o.    Secured Party shall have and be entitled to exercise all such powers hereunder as are delegated to Secured Party hereunder by the terms hereof, together with such powers as are incidental thereto. Secured Party may execute any of Secured Party's rights and duties hereunder by or through sub-agents or employees and shall be entitled to retain counsel and to act in reliance upon the advice of such counsel concerning all matters pertaining to such rights and duties.

p.    Unless the context indicates otherwise, definitions in the Code apply to words and phrases in this Pledge Agreement; if Code definitions conflict, Chapter 9 definitions apply.

31.    Release of Secured Party. Secured Party shall not be liable for any action taken or omitted to be taken by Secured Party hereunder or in connection herewith, except for Secured Party's own gross negligence or willful misconduct. Secured Party shall not be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto in connection herewith. Secured Party shall be entitled to rely on any communication, instrument or document believed by Secured Party to be genuine and correct and to have been signed or sent by the proper person or persons. Pledgor agrees to indemnify and hold harmless Secured Party from and against any and all liability incurred by Secured Party hereunder or in connection herewith, unless such liability shall be due to willful misconduct or gross negligence on the part of the Secured Party.

32.    Governing Law. This Pledge Agreement and all of the Loan Documents shall be governed by, and shall be construed and enforced in accordance with the laws (other than its choice of law rules) of the State of Texas, except to the extent required to comply with the requirements of laws of states in which collateral pledged to secure the Note is located which are applicable to some of the liens, pledges and security interest which secure the Note.

APP000956

33.    Oral Agreements Ineffective. **THIS PLEDGE AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PLEDGOR AND SECURED PARTY WITH REGARD TO THE SUBJECT MATTER HEREOF, AND THIS PLEDGE AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signature page to follow]*

APP000957

EXECUTED effective as of the day and year first set forth above.

**PLEDGOR:**

**D4OPM, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

**ONE MF D4, LLC.**
a Texas limited liability company

By: _____
Name: _____
Title: _____

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 19
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

APP000958

## CONSENT OF COMPANY

Company hereby consents to the foregoing, and agrees that it will pay all proceeds it receives, including without limitation, any returns of escrows from any lender on Property owned by Company to Secured Party.

**D4OPM, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

APP000959