# EXHIBIT A-72

APP001031

# AMENDED REGULATIONS
## OF
## D4IN, LLC
# A TEXAS LIMITED LIABILITY COMPANY

## JUNE 04, 2019

THE MEMBERSHIP INTERESTS OF D4IN, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, NOR PURSUANT TO THE PROVISIONS OF ANY STATE SECURITIES ACT.

APP001032

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS ................................................................5
ARTICLE II. ORGANIZATION................................................................8
  1.  Certificate of Formation................................................8
  2.  Term ..............................................................................8
  3.  No State-Law Partnership.............................................8
ARTICLE III. NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT .8
  1.  Name ............................................................................8
  2.  Assumed Names............................................................8
  3.  Registered ....................................................................8
ARTICLE IV. PURPOSE ........................................................................9
ARTICLE V. MEMBERS .........................................................................9
  1.  Members .......................................................................9
  2.  Admission of Additional Members................................9
ARTICLE VI. CAPITAL CONTRIBUTIONS AND INTERESTS.....................9
  1.  Capital Contributions ...................................................9
  2.  Interests ......................................................................10
  3.  Capital Accounts.........................................................11
  4.  Return of Capital Contributions..................................12
  5.  Interest........................................................................12
  6.  Loans from Members ..................................................12
ARTICLE VII. ALLOCATIONS AND DISTRIBUTIONS..............................12
  1.  Allocation of Income and Loss....................................12
  2.  Determination of Income and Loss..............................12
  3.  Cash Distributions.......................................................12
  4.  Distributions of Other Property ...................................13
ARTICLE VIII. OWNERSHIP OF COMPANY ASSETS................................13
ARTICLE IX. FISCAL MATTERS; BOOKS AND RECORDS .......................13
  1.  Bank Accounts; Investments .......................................13
  2.  Records Required by Act; Right of Inspection...............13
  3.  Books and Records of Account ....................................14
  4.  Tax Returns and Information........................................14
  5.  Delivery of Financial Statements to Members ..............15
  6.  Audits .........................................................................15
  7.  Fiscal Year..................................................................15
  8.  Tax Elections..............................................................15
ARTICLE X MANAGEMENT OF THE COMPANY ..................................15
  2.  Control by the Members...............................................15
  3.  Management ................................................................16
  4.  Powers of the Managing Members ...............................16
  4.  Powers of the President................................................17
  5.  Ownership of Information and Materials.......................18
  6.  Licenses. .....................................................................18
  7.  Resignation and Removal.............................................18

APP001033

**ARTICLE X.  RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS**......................... **18**
   1.   Authority; Liability to Third Parties. ............................................................... 18
   2.   Breach................................................................................................................. 19
   3.   Remedies. ........................................................................................................... 20
   4.   Transfers of Interests........................................................................................ 20
   5.   Effect of Transfer of Member's Interest........................................................... 20
   6.   Admission of Transferee as Member ................................................................ 21
   7.   Other Business .................................................................................................. 21
   8.   Voting by Members .......................................................................................... 21

**ARTICLE XI.  MEETINGS OF MEMBERS**............................................................... **21**
   1.   Place of Meeting ............................................................................................... 21
   2.   Annual Meeting ................................................................................................ 21
   3.   Special Meetings............................................................................................... 22
   4.   Notice ................................................................................................................ 22
   5.   Waiver of Notice............................................................................................... 22
   6.   Quorum and Attendance.................................................................................... 22
   9.   Voting................................................................................................................ 23
   10.   Adjournment .................................................................................................... 23
   11.   Conduct of Meetings ....................................................................................... 23
   12.   Telephone Meetings ........................................................................................ 23
   13.   Action by Written Consent .............................................................................. 24
   14.   Proxies ............................................................................................................. 24
   15.   Information ....................................................................................................... 24

**ARTICLE XII.  MUTUAL BUY OUT PROVISIONS**.................................................. **25**
   1.   Right of First Refusal........................................................................................ 25
   2.   Option................................................................................................................ 26

**ARTICLE XIII.  DISSOLUTION AND WINDING UP** ............................................... **27**
   1.   Events Causing Dissolution............................................................................... 27
   2.   Winding Up ....................................................................................................... 28
   3.   Compensation of Liquidator.............................................................................. 28
   4.   Distribution of Company Assets and Proceeds of Sale Thereof ....................... 28
   5.   Final Audit......................................................................................................... 29
   6.   Deficit Capital Accounts ................................................................................... 29

**ARTICLE XIV.  INDEMNIFICATION AND INSURANCE** ....................................... **29**
   1.   Indemnification and Advance of Expenses....................................................... 29
   2.   Insurance............................................................................................................ 30
   3.   Limit on Liability of Members .......................................................................... 30

**ARTICLE XV.  MISCELLANEOUS PROVISIONS**.................................................... **30**
   1.   Entire Agreement.............................................................................................. 30
   2.   Law Governing ................................................................................................. 30
   3.   Conference Telephone Meetings ...................................................................... 30
   4.   Successors and Assigns ..................................................................................... 31
   5.   bility.................................................................................................................. 31
   6.   Headings............................................................................................................ 31
   7.   Construction...................................................................................................... 31
   8.   Offset................................................................................................................. 31
   9.   Effect of Waiver or Consent............................................................................. 31

APP001034

10.    Further Assurance ................................................................. 31
11.    Waiver of Certain Rights ..................................................... 32
12.    Counterparts and Binding Effect ......................................... 32
13.    Attorney's Fees .................................................................... 32
14.    Amendment of Agreement .................................................. 32
15.    Joinder of Managing Members ........................................... 32
16.    Notices ................................................................................ 32
SCHEDULE A ................................................................................. 36

Regulations of D4IN, LLC                                              Page 4

APP001035

These **AMENDED REGULATIONS OF D4IN, LLC**, a Texas limited liability company, are adopted effective as of the date set forth above by the undersigned Members of the Company.

## ARTICLE I.

## DEFINED TERMS

The capitalized terms used in these Regulations shall, unless the context otherwise requires, have the meanings specified in this Article I.

**Act.** The Texas Business Organization Code as it may be amended from time to time, and any successor to such Act.

**Additional Capital Contribution(s).** Any Capital Contributions in excess of the Initial Capital Contribution as may be approved in accordance with the provisions of Article VI hereof.

**Affiliate(s).** As applied to a Person, any other Person directly or indirectly controlling, controlled by, or under common control with that Person. Controlling, controlled by or under common control means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through ownership of voting securities or otherwise.

**Approved by the Members.** Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Members that has been determined by a Majority-in-Interest of the Members.

**Approval of the Managing Members.** Unless otherwise stated, shall mean a decision, direction, approval and/or consent of the Managing Members that has been determined by a Majority of the Managing Managers. Unless stated otherwise, as long as notice is given to all Managing Members, consent of all Managing Members shall be implied unless a Managing Member expressly dissents.

**Assets.** All interest, assets and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

**Bankruptcy.** Bankruptcy under the federal Bankruptcy Code or insolvency under any state insolvency act.

**Business Day.** Any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. '6103 (a), as may be amended from time to time.

**Capital Account.** The Capital Account maintained for each Member pursuant to Article VI, Section 3 of these Regulations.

**Capital Contributions.** The total amount of cash or property contributed to the Company by all the Members or any one Member, as the case may be.

APP001036

**Certificate of Formation.** The Certificate of Formation of the Company described in Article II, Section 1 of these Regulations.

**Code.** The Internal Revenue Code of 1986, as it has been and may be amended.

**Company.** D4IN, LLC, as such limited liability company may from time to time be constituted.

**Initial Capital Contribution.** Such amounts designated as such on Schedule A hereof.

**Interest(s).** All rights and interests of a Member with regard to the Company, under these Regulations and the Act, including (i) the right of a Member, expressed as a percentage on Schedule A, to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under these Regulations, and (ii) all management rights, voting rights or rights to consent.

**Majority-in-Interest of the Members.** Members who are holding more than fifty percent (50%) of the total Interest who are entitled to vote hereunder at the applicable date after receipt by all Members of notice of such item requiring a vote.

**Managing Members.** At any time, the Person who is then managing the business of the Company in accordance with Article X of these Regulations. The initial Managing Member is JMJD4, LLC (a Delaware Limited Liability Company with Timothy Barton serving as the Managing Member).

**Member(s).** At any time, the Person(s) who then own Interests in the Company. The initial Members are listed on Schedule A.

**Notification.** A writing containing any information required by these Regulations to be communicated to any Persons which may be personally delivered, sent by registered or certified mail, postage prepaid, electronic mail with delivery confirmation to the email address specified in the Company records, or sent by facsimile transmission with delivery confirmation, to such Person, at the last known address of such Person in the Company records. Any such Notification shall be deemed to be given (i) when delivered, in the case of personal delivery, (ii) on the third business day after it is deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid, in the case of mail, and (iii) when transmitted properly (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) in the case of facsimile transmission. Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute Notification as of the date of such receipt by such person for all purposes of these Regulations.

**Operating Budget.** The annual budget prepared by the Managing Members and submitted to and approved by the Members. The Operating Budget shall reflect all costs and expenses projected or expected to be incurred by the Company during the Company's fiscal year.

**Operating Costs.** Any costs incurred by or on behalf of the Company or the Partnership pursuant to the Operating Budget.

APP001037

**Operating Plan.** The annual business plan prepared by the Managing Members and submitted to and approved by the Members and the Company. The Operating Plan shall reflect all activities to be undertaken by the Company during each fiscal year of the Company, including, without limitation, any development work.

**Option.** The option of each Member hereto to purchase the other Member's Interest as set forth in Article XIII hereof.

**Persons.** Any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, trust, business trust, cooperative or association.

**Purpose.** The "Purpose" of the Company as set forth in Article IV hereof.

**Regulations.** These Regulations, including any Schedules, as originally executed and as they may be subsequently amended from time to time, by requisite vote of the Members.

**Representative(s).** The Representative(s) shall mean the Representative designated by or on behalf of each Sponsoring Member and authorized to act on behalf of such Sponsoring Member pursuant to the terms and provisions hereof.

**Right of First Refusal.** Right of First Refusal shall mean the right of first refusal of each Member to acquire another Members' Interests as set forth in Article XIII.

**Schedule A.** The schedule attached hereto and labeled "Schedule A", containing: (i) the identity of each initial Member, (ii) Initial Capital Contributions, (iii) each Member's Interest and (iv) profit/loss sharing ratio.

**Sponsoring Member.** Sponsoring Member shall mean a Member who designates a certain Representative to act on its behalf pursuant to the terms and provisions of this Agreement.

**Transfer.** Any assignment, hypothecation or change in the record ownership of an Interest, whether made voluntarily or involuntarily by operation of law, including, but not limited to, the following:

1. a sale, pledge, encumbrance, assignment, gift or other transfer to any Person;

2. a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon or execution against such Interest;

3. the filing by the transferor Member of a voluntary Bankruptcy petition; or

4. the entry of a judicial order granting the relief requested by the petitioner in an involuntary Bankruptcy proceeding filed against the transferor Member.

**Updated Business Plan.** Annual revisions to the Business Plan, or more frequently, if revisions are agreed upon, which provisions shall be prepared by the Managing Members and approved by the company.

APP001038

## ARTICLE II.

## ORGANIZATION

1.    Certificate of Formation. The Certificate of Formation for the Company were filed with, and a Certificate of Formation was issued by, the Secretary of State of the State of Texas.

2.    Term. Pursuant to the Act, the existence of the Company began upon the effective date of the Certificate of Formation. The Company shall exist for the duration specified in the Certificate of Formation unless sooner terminated in accordance with these Regulations.

3.    No State-Law Partnership. No provision of these Regulations (including, without limitation, the provisions of Article X) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venture of any other Member or Managing Members, for any purposes other than federal and state tax purposes.

## ARTICLE III.

## NAME; PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT

1.    Name. The name of the Company is "D4IN, LLC." The name may not be changed at any time by the President without the approval of the Members as long as such name conforms with state law.

2.    Assumed Names. The Managing Members may cause the Company to do business under one or more assumed names. In connection with the use of any such assumed names, the Managing Members shall cause the Company to comply with the Act.

3.    Registered Office; Registered Agent; Principal Office in the United States; Other Offices. The registered office of the Company required by the act to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managing Members may designate, from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managing Members may designate, from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Managing Members may designate, from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by the Act. The Company may have such other offices as the Managing Members may designate from time to time.

APP001039

## ARTICLE IV.

### PURPOSE

The purpose of the Company is to conduct any lawful business which includes but is not limited to the acquisition, development, holding, improvement, subdivision, maintenance, operation, and investment in real estate and to engage in any other business or activity that may be incidental, proper, advisable or convenient to accomplish the foregoing purpose that is not forbidden by the law of the jurisdiction in which the Company engages in that business.

## ARTICLE V.

### MEMBERS

1.  <u>Members</u>.  The names and addresses of the Members of the Company are as set forth on Schedule A of these Regulations which shall be updated as necessary.

2.  <u>Admission of Additional Members.</u>  Additional Members of the Company may be admitted as follows:

    (a)  If the proposed additional Member desires to purchase an Interest from the Company, such purchase may be made and the admission of the additional Member shall become effective only if the identity of the proposed additional Member and the amount of the Capital Contribution to be made by such proposed additional Member in exchange for such proposed additional Member's Interest is approved by the Managing Members.

    (b)  If the proposed additional Member desires to acquire an Interest in a Transfer from an existing Member, such Transfer may be made and the admission of the additional Member shall become effective only in accordance with Article XI, Section 2 hereof and Article XIII, Section I hereof.  All other attempted Transfers of any Interest or right, or any part thereof, in or in respect of the Company shall be null and void <u>ab initio</u>.

    (c)  The Managing Members may deny the membership of any proposed additional member for any reason.

## ARTICLE VI.

### CAPITAL CONTRIBUTIONS AND INTERESTS

1.  <u>Capital Contributions</u>.

    (a)  Each Member shall contribute to the capital of the Company the amounts set forth as such Member's Initial Capital Contribution on Schedule A.  The Initial Capital

APP001040

Contribution shall be in the form of cash and shall be paid simultaneously with the execution by each respective Member of these Regulations. Schedule A may not be amended without the written approval of all Members, unless modifications to Interests occur by virtue of other provisions of these Regulations.

(b)    In the event any Member fails to make full payment of its Initial Capital Contribution, as and when required by Article VI, Section I (a) hereof, said Member shall be deemed in default hereunder and shall automatically, and without notice or further proceeding, forfeit its full Interest in and to the Company. Upon such default, the non-defaulting Member's shall be entitled to acquire the defaulting Member's forfeited Interest upon payment of the amount of Capital Contribution unpaid as to the defaulting Member's Interest prior to the date of Closing, as scheduled or as the same may be extended.

(c)    In the event any Member fails to make full and timely payment of the initial capital contribution or an approved Additional Capital Contribution such failure shall constitute an Event of Default hereunder and the non-defaulting Member(s) shall exercise by written notice to the defaulting Member(s) one (1) of the following rights or remedies, as its exclusive remedy available to the non-defaulting Members:

    (i)    With the Managing Members' approval, upon payment of the delinquent Capital Contribution the non-defaulting Members or the Managing Members may exercise the Option, described in Article XII, Section 2 hereof, as to the Interest of the defaulting Member, or;

    (ii)    With the Managing Members' approval, one or more of the non-defaulting Member or the Managing Members may elect to contribute Additional Capital Contribution to the Company in lieu of the defaulting Member's additional capital contribution requirement in such proportions as the non-defaulting Members shall have agreed upon among themselves, or if they fail to so agree, the non-defaulting Members shall contribute on a pro rata basis based upon their respective Interests in the Company. The Members' Interests will be recalculated accordingly including the dilution of the defaulting member's interest. All rights to vote and other rights available to the defaulting member shall be reduced accordingly.

    (iii)    In the event of default, the defaulting member is not entitled to notice or a cure period unless required by law. The Managing Members have the sole discretion to grant such a cure period for the length of time the Managing Members deems appropriate.

2.    Interests.

(a)    Upon making the Capital Contribution specified on Schedule A, in a timely manner, each Member shall own the Interest set forth opposite such Member's name on Schedule A.

Regulations of D4IN, LLC                                                                 Page 10

APP001041

(b)    The Interests may, with the approval of the Managing Members, be evidenced by certificates issued by the Company which, if issued, shall be in such form and incorporate such legends, recitals and provisions as the Managing Members shall deem necessary or advisable. If certificates are issued, the Managing Members shall establish reasonable procedures for the delivery and reissuance of certificates in connection with Transfers of Member's Interests, split-ups or combinations of certificates, loss or destruction of certificates and other eventualities. Among other matters, such procedures may set forth required fees, indemnifications, documentation and signatures (including guarantees thereof) to be obtained from parties requesting reissuance of certificates. Such procedures need not be incorporated into these Regulations, but a copy thereof shall be delivered to all Members.

(c)    Additional Capital Contributions may be made with the consent of no less than 50% of all Members. Membership Interests may be adjusted accordingly to reflect such additional capital contributions upon approval of the Majority In-Interest of the Members.

3.    Capital Accounts. A capital account shall be established and maintained for each Member. Each Member's capital account (a) shall be increased by (i) the amount of money contributed by that Member to the Company, (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to as provided in Section 752 of the Code), and (iii) allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treas. Reg. §1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. § 1.704-1(b)(4)(i), and (b) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to as provided in Section 752 of the Code), (iii) allocations to that Member of expenditures of the Company described in Section 705 (a)(2)(B) of the Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. §1. 704-1 (b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and loss or deduction described in Treas. Reg. § 1.704 (b) (4) (i) or § 1.704-1 (b) (4) (iii). The Members' capital accounts shall also be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (f) and as required by the other provisions of Treas. Reg. § 1. 704-1 (b)(2)(iv) and § 1.704-1 (b) (4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treas. Reg. § 1. 704-1 (b) (2) (iv) (g). A Member that has more than one Interest shall have a single capital account that reflects all its Interests, regardless of the class of Interests owned by that Member and regardless of the time or manner in which those Interests were acquired. On the Transfer of all or part of an Interest, the capital account of the transferor that is attributable to the transferred Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1 (b) (2) (iv) (1).

APP001042

4.  Return of Capital Contributions. Except with the approval of the Managing Members and as otherwise provided herein or in the Act, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution.

5.  Interest. No interest shall be paid by the Company on Capital Contributions or on balances in Members' capital accounts.

6.  Loans from Members. Loans by a Member to the Company shall not be considered Capital Contributions. Any amounts contributed to the Company which are not expressly authorized as Additional Capital Contributions shall be considered Loans by a Member to the Company. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by him to the capital of the Company, the making of such advances shall not result in any increase in the amount of the capital account of such Member. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. Loans must be approved by the Managing Members. No loans shall earn interest unless expressly agreed to in writing by all Managing Members. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in Article XIII, Section 4 hereof.

## ARTICLE VII.

## ALLOCATIONS AND DISTRIBUTIONS

1.  Allocation of Income and Loss.
    (a)  Except as may be required by Section 704(a) of the Code and Treas. Reg. § 1.704-1(b)(2)(iv)(f)(4), the income, gains, losses, deductions and credits (or items thereof) of the Company shall be shared by the Members in accordance with Schedule A. It is the intention of the Members that allocations of income, gains, losses, deductions and credits (or items thereof) pursuant to this Article VII, Section 1 be in accordance with the Interests for tax purposes.

    (b)  All items of income, gain, loss, deduction and credit allocable to any Interest that may have been transferred shall be allocated between the transferor and the transferee based upon an interim closing of the books as of the date of the transfer; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

2.  Determination of Income and Loss. At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members in accordance with Article VII, Section 1 hereof.

3.  Cash Distributions. The Managing Members have the discretion to distribute to the Members, in accordance with their respective Interests, the amount by which cash on hand exceeds the amount necessary to meet the current costs, expenses, and liabilities of the

APP001043

Company (including, without limitation, a reasonably adequate reserve for working capital and contingencies) as determined by the Managing Members. The distribution should be, at a minimum, sufficient to allow the Members to pay the income tax allocated to the Members as a result of the income generated by the Company. The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair market value of Company Assets, except that the fair market value of Company Assets that are subject to a liability for which recourse of creditors is limited shall be included in the Company Assets only to the extent that the fair market value of the Company Assets exceeds that liability.

4.  Distributions of Other Property. From time to time, the Managing Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Interests and may be made subject to existing liabilities and obligations. Immediately prior to such distribution, the capital accounts of the Members shall be adjusted as provided in Treas. Reg. §1.704 l(b)(2)(iv)(f).

## ARTICLE VIII.

### OWNERSHIP OF COMPANY ASSETS

Company Assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Assets or any portion thereof. Title to any or all Company Assets shall be held in the name of the Company. All Company Assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Assets are held.

## ARTICLE IX.

### FISCAL MATTERS; BOOKS AND RECORDS

1.  Bank Accounts; Investments. Capital Contributions, revenues and any other Company funds shall be deposited by the Managing Members in a bank account established in the name of the Company, or shall be invested and/or expended by the Managing Members in furtherance of the Purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only for the purposes described herein or to be distributed to the Members pursuant to these Regulations. All such funds shall be deposited and applied in accordance with the terms of these Regulations.

2.  Records Required by Act; Right of Inspection.
    (a)  During the existence of the Company and for a period of four (4) years thereafter, unless the Managing Members approves of an alternative procedure, the Managing

Regulations of D4IN, LLC                                          Page 13

APP001044

Members or the Manger's agent, at the expense of the Company, shall maintain all records required to be kept pursuant to the Act, including, without limitation, (i) a current list of the names, addresses and Member's Interests held by each of the Members (including, if any class or group of interest is established under the Certificate of Formation or these Regulations, the names of the Members who are Members of each such class or group); (ii) copies of federal, state and local information or income tax returns for each of the Company's six (6) most recent tax years; (iii) copies of these Regulations and the Certificate of Formation, including all amendments or restatements; (iv) if such information is not otherwise set forth in the Certificate of Formation or these Regulations, a written statement of (A) the amount of the cash contribution and a description and statement of the agreed value of any other contribution made by each Member, and the amount of the cash contribution and a description and statement of the agreed value of any other contribution that the Member has agreed to make in the future as an Additional Contribution, (B) the times at which any Additional Contributions are to be made or events requiring contributions to be made, (C) events requiring the Company to be dissolved and its affairs wound up, and (D) the date on which each Member became a Member of the Company; (v) correct and complete books and records of account of the Company; and (vi) copies of any financial statements of the Company for the three (3) most recent years.

(b)     On written request, an initial Member or an approved assignee of an Interest (an "Eligible Person") may examine and copy in person or by the Eligible Person's representative, at any reasonable time, for any proper purpose, and at the Eligible Person's expense, records required to be maintained under the Act and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the Eligible Person to examine and copy. Upon written request by any Eligible Person made to the Managing Members at the address of the Company's principal office in the United States specified in Article III, Section 3 hereof, the Company shall provide to the Eligible Person copies of (i) these Regulations and the Certificate of Formation and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

3.    Books and Records of Account. The Managing Members, at the expense of the Company as set forth in the Operating Budget, shall maintain for the Company adequate books and records of account that shall be prepared in accordance with sound accounting principles.

4.    Tax Returns and Information. The Members intend for the Company to be treated as a partnership for tax purposes. The Managing Members, at the expense of the Company, shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of (i) such period as may be required by applicable law or regulation, or (ii) seventy-five (75) days after the end of each calendar year, the Managing Members shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

Regulations of D4IN, LLC                                                                Page 14

APP001045

5.  Delivery of Financial Statements to Members. As to each calendar year, the Managing Members may send to each Member, or upon request of a member, a copy of (i) a balance sheet of the Company as of the end of the calendar year, (ii) an income statement of the Company for such calendar year, (iii) a statement of changes in Member capital accounts for such calendar year. Such financial statements shall be delivered by no later than thirty (30) days following the end of the calendar year to which the statements apply. Unless the Managing Members so elects, such statements need not be audited.

6.  Audits. The Managing Members may conduct an audit of the Company books, with respect to the annual financial statements under Article IX, Section 5 above. The cost of the audit shall be borne by the Company. The audits shall be performed by an accounting firm approved by the Managing Members. Not more than one (1) audit shall be required for any fiscal year.

7.  Fiscal Year. The Company's fiscal year shall end on December 31 of each calendar year.

8.  Tax Elections. The Company shall make the following elections on the appropriate tax returns:

    (a)  to adopt the calendar year as the Company's fiscal year;

    (b)  to adopt the appropriate method of accounting and to keep the Company's books and records in accordance with the rules and regulations regarding income tax accounting as opposed to accounting for financial reporting purposes;

    (c)  if a distribution of Company Assets as described in Section 734 of the Code occurs or if a transfer of Interest as described in Section 743 of the Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company Assets;

    (d)  to elect to amortize the organizational expenses of the Company ratably over a period of sixty (60) months as permitted by Section 709(b) of the Code; and

    (e)  any other election the Managing Members may reasonably deem appropriate and in the best interest of the Members.

    Neither the Company nor any Managing Members may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

## ARTICLE X

## MANAGEMENT OF THE COMPANY

2.  Control by the Members. The Managing Members, shall manage and control the operation of this Company through their exercise of the decision making powers granted herein.

Regulations of D4IN, LLC                                                        Page 15

APP001046

3.   Management.

    (a)    The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managing Members with the day to day operations managed by the President. Neither the Managing Members nor President need be a resident of the State of Texas. The initial President is Timothy Barton. (hereinafter collectively referred to as "President.")

    (b)    The Managing Members may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managing Members. The Managing Members shall designate the salary and/or bonuses the Officers are to receive, if any. Officers need not be Members, the Managing Members or residents of the State of Texas. Any officer may be removed by the Managing Members at any time, with or without cause. Each officer shall hold office until his or her successor shall be duly designated and take office or until the earlier of the officer's death, resignation or removal. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed by the Managing Members.

4.   Powers of the Managing Members. Subject to the foregoing powers and limitations, the Managing Members, shall have the power and authority to manage the affairs of the Company, and shall have the authority to take any action deemed to be necessary, convenient or advisable in connection with the management of the Company given such actions are approved by a majority of the Managing Members. The Managing Members shall act in place of a Board of Directors. As long as prior notice is given, any Managing Member may exercise the powers granted within this agreement as the consent of the other Managing Member(s) shall be implied unless expressly objected to by the other Managing Member(s). In the event, the Managing Members are unable to reach a consensus of a majority of the Members, then such issue shall be resolved by a vote of the majority in interest of all Members. The Managing Members shall have the power to establish and maintain accounts of the Company at financial institutions and the Managing Members shall be authorized signatories on such financial institution accounts. The Managing Members shall also have the following respective duties:

    (a)    shall expend sums on behalf of the Company;

    (b)    shall be responsible for the distribution of funds, including the timing of such distributions, to the Members by way of cash, income, return of capital, profits or otherwise, all in accordance with the provisions of this Agreement and perform all matters in furtherance of the objectives of the Company and this Agreement;

    (c)    has the right to execute any and all agreements, contracts, documents, certifications and instruments necessary and convenient in connection with the powers described in these regulations;

APP001047

(d)     Any act of the Managing Members purporting to bind the Company, shall bind the Company and the ratification or consent of the Members to any such act(s) shall not be required;

(e)     The Managing Members shall have the full right and authority to execute any and all documents and instruments relating to the business and affairs of the Company, without the joinder of the Members, or any other person or entity, and any person dealing with the Company may rely upon the Managing Members' execution of any such document or instrument as the act and deed of the Company, without the necessity for further inquiry; and

(f)     The Managing Members shall not receive compensation for management services to the Company other than the reimbursement of any and all out-of-pocket expenses reasonably incurred by the in connection with the furtherance of its duties, obligations and responsibilities hereunder or otherwise with respect to the management and operation of the business and affairs of the Company.  Managing Members may contract with the Company and receive compensation for other services not related to the duties of a Managing Member.

4.   Powers of the President.  The President, who shall be Timothy Barton, shall have the following rights and powers in subject to the following restrictions:

(a)     managing the daily operations of the business unless such management conflicts with the powers reserved to the Managing Members or unless the Managing Members restrict such powers.

(b)     with prior notice to the Managing Members, may contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise certain operations of Company unless the Managing Members requests to approve such decisions;

(c)     may incur reasonably, ordinary, and necessary expenses in order to manage the daily operations of the Company within the monetary limits set by the Managing Members above which will require the Managing Members' approval;

(d)     shall make any and all elections for federal, state and local tax purposes including, without limitation, any election if permitted by applicable law: (1) to adjust the basis of property owned by or for the benefit of the Company pursuant to the Internal Revenue Code of 1986, as amended, specifically including, but not limited to, Sections 734(b), 743(b) and 754 thereof, or comparable provisions of state or local law, in connection with the transfer of Percentage Interests and distributions to the Members; (2) to extend the statute of limitations for assessments of tax deficiencies against Members with respect to adjustments to the Company's federal, state and local tax returns; and (3) to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and the Members in their capacity as Members, and to execute any agreements or

APP001048

other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company or the Members, it being specifically understood and agreed that the Managing Member is specifically authorized to act as the "Tax Matters Member" under the Internal Revenue Code of 1986, as amended, and in any similar capacity under state or local law;

(e)     shall contract on behalf of the Company for the employment and services of employees and/or independent contractors and delegate to such persons the duty to manage and supervise any of the assets or operations of the Company;

(f)     with prior notice to the Managing Members, may negotiate or execute any agreements, contracts, documents, certifications and instruments which may bind the company without consent of the non-managing Members;

(g)     those powers delegated to him by the Managing Members which may be ongoing or for a particular purpose and may be revoked at any time by the Managing Members;

5.    <u>Ownership of Information and Materials</u>. The Managing Members shall, upon completion of or upon any earlier termination of its management hereunder, deliver to the Company all books and records and written financial or accounting data and information of or relating to the Company and the Property whether or not prepared by the Managing Members or supplied to the Managing Members by the Company or the Company's contractors or agents, which information shall at all time be the property of the Company.

6.    <u>Licenses.</u> The Managing Members shall, at the company's expense, qualify to do business and obtain and maintain such licenses as may be required for the performance by the Managing Members of its services hereunder.

7.    <u>Resignation and Removal</u>. Any Managing Member or the President may resign at any time after giving prior notice of such resignation to the Members at least thirty (30) days prior to the effective date of the resignation. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Members, if any. Such persons may only be removed by a unanimous vote of all Members entitled to vote and with cause which is defined as the willful and gross misconduct or gross negligence which must result in material economic damage to the company and its members.

## ARTICLE X.

## RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

1.    <u>Authority; Liability to Third Parties.</u>
       (a)     No Member (other than Managing Member or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company.

Regulations of D4IN, LLC                                                          Page 18

APP001049

(b)    No Member (including any Member who is Managing Member or Officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court.

(c)    The members may amend the regulations with the approval of a majority-in-interest of the members entitled to vote and with approval of the Managing Members. Any amendments to the role of the Managing Members would also require the approval of the Managing Members.

(d)    Except as otherwise limited by the terms and provisions contained in these regulations, the Members shall have all of the rights, and be afforded the status, of Members as set forth in these regulations and by law.

(e)    Except as provided herein, no Member shall have any right or power to (1) take part in the management or control of the Company or its business or affairs, (2) transact any business for the Company, or (3) sign for or bind the Company in any way.

(f)    No Member shall have the right to withdraw from the Company unless approved by the Managing Members.

(g)    No Member shall have the right or power to cause the dissolution and winding up of the Company by court decree or otherwise.

(h)    All Members hereby agree to execute any and all instruments that they may be required to execute by any approved purchaser of said property in order to effect a sale of the Company Property.

2.    Breach.  In addition to a member failing to adhere to these regulations, a Member will breach this Agreement if he

(a)    attempts to withdraw from the Company without approval;

(b)    interferes in the management of the Company affairs;

(c)    engages in conduct which could result in the Company losing its tax status as a Company;

(d)    engages in conduct that tends to bring the Company into disrepute;

(e)    breaches any confidentiality provisions of this Agreement;

(f)    fails to meet any commitment to the Company; or

(g)    owns a Company interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings.

APP001050

3. <u>Remedies</u>. A Member who is in breach of this Agreement shall be liable to the Company for damages caused by such breach. The Company may offset the damages against any distributions or return of capital to the Member who has breached this Agreement. Additionally, if a Member violates the terms of this agreement that person may be terminated as a member and their capital contributions shall be refunded without interest including any profits or losses accrued up to the date of the breach. If necessary such capital contribution may be converted to a loan to the company if the assets are not available to refund the capital contribution at the time of the breach and is subject to reasonable interest and payment terms as determined by the Managing Members. These remedies are in addition to any additional remedies that may be available under the law.

4. <u>Transfers of Interests</u>. A Member may make a Transfer of such Member's Interest, only upon the approval of the Managing Members subject to the Managing Members' right of first refusal in this agreement:

    (a) The Member or the proposed transferee must file with the Company a written and dated instrument of such Transfer, in form and substance reasonably satisfactory to the Managing Members, executed by both the transferor and the proposed transferee, which instrument shall (i) contain the acceptance by the proposed transferee of all of the terms and provisions of these Regulations, to the extent applicable to an assignee of an Interest, and identify all liabilities which the transferee shall assume upon the transfer of the Member's Interest; (ii) contain such representations as the Managing Members may deem necessary or advisable to assure that such Transfer need not be registered under any applicable federal or state securities laws; (iii) instruct the Managing Members as to the Interest to be transferred and to whom and at what address Company distributions and Notifications in respect of such Interest should henceforth be sent; and (iv) contain any information required under the Code that is reasonably requested by the Managing Members.

    (b) Unless expressly waived by the Managing Members, the transferor or transferee shall deliver to the Company an opinion of counsel reasonably acceptable to the Managing Members that (i) such Transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, applicable state securities laws, and any rules or regulations promulgated thereunder, and will not otherwise cause the Company to be in violation of such laws and regulations; (ii) the Transfer will not result in the termination of the Company within the meaning of Section 708(b) of the Code; and (iii) the Transfer will not adversely affect the status of the Company as a partnership under the Code.

    (c) The Transfer is approved by the Managing Members, and the transferor Member.

5. <u>Effect of Transfer of Member's Interest</u>. A Transfer of an Interest pursuant to Article XI, Section 2 above does not entitle the transferee to become, or to exercise rights or powers of, a Member. A Transfer only entitles the transferee to receive cash distributions and allocations of Company profits and losses to the extent of the Interest transferred. Until the transferee is admitted as a Member pursuant to Article XI, Section 4 below, the transferor

Regulations of D4IN, LLC                                                                 Page 20

APP001051

Member shall continue to be a Member and to be entitled to exercise any rights or powers of a Member with respect to the Interest transferred.

6.    Admission of Transferee as Member. An approved transferee of an Interest desiring to be admitted as a Member must execute a counterpart of, or an agreement adopting, these Regulations. The admission of such transferee (including, without limitation, a transferee by reason of the death of a Member) is subject to the Managing Members acting in his sole discretion. Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Interest transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Member under these Regulations, the Articles of Formation and the Act. The transferee shall also be liable, to the extent of the Interest transferred, for the unfulfilled obligations, if any, of the transferor Member to make Capital Contributions. Whether or not the transferee of an Interest becomes a Member, the transferor Member is not released from any liability to the Company under these Regulations, the Certificate of Formation or the Act.

7.    Other Business. The Members may engage in or possess interests in other business ventures (unconnected with the Company) of every kind and description, independently or with others, except those business in direct competition with the Company upon approval of the Managing Members. Neither the Company nor the other Members shall have any rights in or to such independent ventures or the income or profits therefrom.

8.    Voting by Members. Any decisions, directions, approvals and consents required by the Members shall be made by the vote of a Majority-in-Interest (whether by actual vote or deemed vote as provided herein) of the Members, unless these Regulations expressly provide that a decision shall be made by the 2/3 or unanimous vote or consent of all of the Members, which shall mean the 2/3 of the membership interests or unanimous vote of all membership interests or consent of the Members entitled to vote hereunder at the time that the vote is taken, or deemed taken.

## ARTICLE XI.

## MEETINGS OF MEMBERS

1.    Place of Meeting. All meetings of Members shall be held at the principal office of the Company as provided in Article III above or at such other place as may be designated by the Member(s) calling the meeting.

2.    Annual Meeting. Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members may be held on any day of the year at such hour as may be designated in the notice of the meeting, if such day is a Business Day, and if not a Business Day, then on the next following day that is a Business Day. If the annual meeting is not held on the date above specified, the Managing Members shall cause a meeting in lieu thereof to be held as soon thereafter as convenient, and any business transacted or election held at that meeting shall be as valid as if held at the annual meeting. Failure to hold the annual meeting at the designated time shall not work a

APP001052

dissolution of the Company. This provision shall not be construed to require the holding of any annual meeting.

3.    Special Meetings. Special meetings of the Members may be called by resolution of the Members holding thirty percent (30%) or more of the Interests, for the purpose of addressing any matter upon which the Members may vote under these Regulations. Members may call a meeting by delivering to the Managing Members one or more written requests signed by the requisite number of Members, stating that the signing Members wish to call a meeting and indicating the specific purpose for which the meeting is to be held. Action at the meeting shall be limited to those matters specified in the call of the meeting. This provision shall not be construed to require the holding of any special meetings.

4.    Notice. A Notification of all annual and special meetings, stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered by the Managing Members within a reasonable time period prior to the meaning with the presumption that reasonable notices is not less than twenty (20) nor more than sixty (60) days before the meeting to each Member. If the Managing Members fails to timely deliver such notices, then any Member may deliver such notices to the other Members. The period of prior notice for any special meeting, which the Managing Members or any Member deems to be an emergency meeting, shall be shortened to such reasonable period of time, consistent with the nature of the emergency, sufficient to give actual notice to each Member.

5.    Waiver of Notice. Attendance of a Member at a meeting or action taken by written consent shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened. Notification of a meeting may also be waived in writing. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

6.    Quorum and Attendance.

   (a)    Members or Representatives (as defined herein) representing a Majority-in-Interest of the Members shall constitute a quorum at any meeting of the Members, whether present in person or by proxy.

   (b)    Each Sponsoring Member may designate a Representative, who must be approved by the Managing Members, to act on its behalf with respect to all decisions reserved to the Members pursuant to this Agreement. Each Sponsoring Member may remove or place its Representative at any time upon written notification to the Managing Members. Each Representative shall have full authority to act on behalf of his Sponsoring Member on all matters reserved or presented to the Members.

   (c)    Upon removal or withdrawal of any Representative, the Sponsoring Member shall immediately designate a substitute to fill the vacancy caused by such removal or

APP001053

withdrawal. If no substitute is designated within thirty (30) days of removal or withdrawal the Sponsoring Member shall be considered its successor Representative.

(d)    If approved by the Managing Members, a Representative may give a proxy to another person, either in writing or by facsimile or email with a copy to the Managing Members, to be present and act on his behalf in his absence at meetings of the Members. The person having such proxy shall have the power set forth in such proxy, and his actions in exercising such power shall be deemed to be those of the Member whose Representative granted the proxy. Such Representative may, at any time at his discretion, revoke, either in writing or by facsimile or email with a copy to the Managing Members, such proxy given by him. Such person's proxy shall be deemed automatically revoked upon his death.

(e)    Any Member may designate other parties to attend Member meetings in an ex-officio capacity only upon approval of the Managing Members. Such parties may consult with and advise the Members and/or Representatives but may not vote at such meetings.

9.    Voting.

(a)    All Members who are not in default hereunder and who do not have a Default Loan outstanding shall be entitled to vote at meetings unless their membership interests are non-voting. Members may vote either in person or by proxy at any meeting. Each Member's percentage voting power at a meeting shall be in proportion to his Interest. Notwithstanding anything contained herein to the contrary, all references to approval or voting by the Members shall mean those Members who are entitled to vote hereunder at the time the vote is taken on such matter.

(b)    The Managing Members shall be elected by the Majority in Interest and may only be removed in accordance with these regulations.

10.    Adjournment. The Managing Members of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the resumption of the adjourned meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

11.    Conduct of Meetings. The Managing Members shall conduct the meetings of the Members, including, without limitation, the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article XII, the conduct of voting, the validity and effectiveness of any proxies, and the determination of any controversies, votes or challenges arising in connection with or during the meeting or voting. The Managing Members shall designate a Person to take minutes of each meeting. The minutes of each meeting of the Members shall be kept in a minute book and shall be approved by the Managing Members at the next meeting of Members.

12.    Telephone Meetings. Members, Representatives or any committee appointed by the Members, may participate in a meeting by means of telephone conference or similar

APP001054

communications, and participation in a meeting pursuant to this subsection shall constitute presence in person at the meeting.

13. Action by Written Consent. Any action that may be taken at a meeting of the Members may be taken without a meeting, upon prior written notice to each Member of the proposed action, if a consent in writing, setting forth the action to be taken, shall be signed by Members who are entitled to vote hereunder and who are holding the percentage of Interests required to approve such action under these Regulations. Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article XII. Notification of any action taken by means of a written consent of Members shall be sent, within a reasonable time after the date of the consent, by the Managing Members, to all Members who did not sign the written consent.

14. Proxies. A Member may vote either in person or by proxy executed in writing by the Member or its Representative. A facsimile, electronic mail, telegram, telex, cablegram or similar transmission by the Member, or a photographic, photo static, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Article. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managing Members, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managing Members who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the Managing Members, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless such instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one, or if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Interests that are the subject of such proxy are to be voted with respect to such issue.

15. Information.

(a) In addition to the other rights specifically set forth in these Regulations, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

(b) The Members acknowledge that, from time to time, they may receive information from or regarding the Company or each other in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or each other or Persons with which they do business. Each Member shall hold in strict confidence any

APP001055

information it receives regarding the Company or each other that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or Managing Member, except for disclosures (i) compelled by law (but the Member must notify the Managing Members and the other Members promptly of any request for that information, before disclosing it if practicable), (ii) to advisors or representatives of the Member, (iii) to Persons to which that Member's Interest may be transferred as permitted by these Regulations, but only if the recipients have agreed to be bound by the provisions of this Article, (iv) of information that such Member has also received from a source independent of the Company that the Member reasonably believes obtained the information without breach of confidentiality, or (v) of matters which have become of public knowledge.  The Members acknowledge that breach of the provisions of this Article may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both.  Accordingly, the Members agree that the provisions of this Article may be enforced by specific performance.

## ARTICLE XII.

## MUTUAL BUY OUT PROVISIONS

1.   Right of First Refusal.

(a)     In the event a Member shall desire to transfer or sell all or part of its Interest to any third party, it must receive a bona fide written offer therefor which is acceptable to it and which offer complies with the provisions below, and such Member shall, within five (5) days of receipt of the proposed offer, give the written Notice of Sale to the Managing Members.  The Notice of Sale shall state that a bona fide offer has been received by the selling Member from such third party, shall contain the price, terms and conditions of sale and the name and address of the third party to whom such interest is proposed to be sold, and shall be accompanied by a copy of the written offer from the third party and a written offer by the selling Member to sell such Member's Interest to the non-selling Members for the same consideration and upon the same terms and conditions as are set forth in the third party offer.

(b)     The Managing Members shall have the option ("Right of First Refusal"), on a pro-rata basis for a period of fifteen (15) days from the date such Notice of Sale is provided to them (the "Right of First Refusal Periods"), within which to exercise the Right of First Refusal to purchase the Interest of the selling Member by notifying such selling Member of such election in writing prior to the expiration of the Right of First Refusal Period.  If the Managing Members exercise such Right of First Refusal, the proposed purchase price shall be payable at the scheduled closing date in the same manner as is set forth in the third party offer.

(c)     In the event the Managing Members rejects or does not exercise the Right of First Refusal to purchase all of the selling Member's Interest which is the subject of the third party offer on the same terms as such third party offer, the Managing Members shall not have the right to purchase such portion of the selling Member's Interest, and

APP001056

the selling Member shall have the right to sell its Interest strictly in accordance with the terms of the Notice of Sale, provided, however, the selling Member and the third party making the third party offer must first comply with all other provisions of these Regulations as to Transfers, including the consent of the Managing Members to the sale (and admission of Transferee as a Member, if requested), the Interest sold shall continue to be subject to the terms and provisions of these Regulations and the purchasing third party shall be required, prior to closing, to acknowledge the same in writing.

(d)     If no such sale is made within one hundred twenty (120) days following expiration of the Right of First Refusal Period, the Right of First Refusal provided herein shall be reinstated with respect to such Member's Interest and a new Notice of Sale shall be required in the manner provided hereinbefore.

(e)     It is expressly agreed that the remedy at law for breach of any of the obligations set forth in these regulations is inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply fully with each of the obligations contained herein, and (ii) the uniqueness of the Interests and the development relationship created hereby. Accordingly, each of the aforesaid obligations shall be, and is hereby expressly made, enforceable by specific performance or injunction in addition to any other remedy available at law or in equity.

(f)     Any third Party Offer shall comply with the following requirements:

(i)     The proposed offer shall include an offer to buy the entire selling Member's Interest, including all of the rights of the Member, under these Regulations.

(ii)     The proposed purchase price for the Interest shall be payable solely in lawful money of the United States and shall be payable in its entirety in cash.

(iii)     The offer shall contain provisions whereby the proposed purchaser is obligated to comply with the provisions of these Regulations, at and after closing.

(iv)     The offer shall be by a principal, identified in the offer, and not an agent acting on behalf of an undisclosed principal, and such principal shall not be an Affiliate of the selling Member.

(v)     The offer shall be accompanied by a certified check of the prospective purchaser for a sum equal to at least five percent (5%) of the proposed purchase price.

(vi)     The prospective purchaser shall be of good business character and reputation and shall be financially capable of carrying out all obligations of the selling Member under these Regulations and all related agreements.

(g)     There shall be no sale concluded to a third party of less than 100% of a Member's Interest.

2.     Option. Each Member hereby grants the Managing Members, and no other members, the right (the "Option") to acquire such Member's entire Interest on a pro-rata basis, whenever

APP001057

these Regulations specifically reference the availability of the Option, as set forth in these regulations.

(a)     The Managing Members may exercise the Option at any time by delivering written notice to the other Member(s) or its/their legal representatives setting forth the electing Member's intention to effectuate the Option. The closing of the transaction provided in this Paragraph 2 shall occur on the date which is the later of (i) ninety (90) days after delivery of the electing Member's written notice, or (ii) thirty (30) days after the determination of the purchase price.

(b)     The Option shall be available only to the Managing Members.

(c)     If the Managing Members elects to exercise the Option, then the Managing Members shall specify in its notice a closing date and purchase price which the Managing Members is willing to pay for the non-electing Member's Interest. The non-electing Member shall have thirty (30) days (the "Option Period") within which to elect in writing either to (i) sell its Interest to the Managing Members for the purchase price and on the closing date contained in the Managing Members' notice, or (ii) purchase the electing Member's Interest in the Company on the closing date and for the purchase price (adjusted on a pro rata basis, as applicable, to reflect the size of the electing Member's Interest) contained in the Managing Members' notice. If no election is delivered to or received by the Managing Members within the Option Period, then the non-electing Member shall be deemed to have elected to sell its Interest to the electing Member.

(d)     At the closing, both parties shall execute and deliver all documents necessary or appropriate to effectuate and evidence the transfers described herein. Without limiting the foregoing, each Member grants to the other Members an irrevocable power of attorney, coupled with an interest, to execute and deliver such documents to consummate the transactions described herein.

## ARTICLE XIII.

## DISSOLUTION AND WINDING UP

1.    Events Causing Dissolution. The Company shall be dissolved upon the first of the following events to occur:

(a)     the expiration of the term of duration of the Company set forth in the Certificate of Formation;

(b)     the written consent of 2/3 (two-thirds) of the Membership interests entitled to vote hereunder at any time with approval of the Managing Members to dissolve and wind up the affairs of the Company;

APP001058

(c)    the occurrence of any other event that causes the dissolution of a limited liability company under the Act.

2.    <u>Winding Up</u>. If the Company is dissolved pursuant to Article XIV, Section 1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    The winding up of the Company's affairs shall be supervised by a liquidator. The liquidator shall be the Managing Members or, if the Managing Members prefers, a liquidator or liquidating committee selected by the Managing Members.

(b)    In winding up the affairs of the Company, the liquidator shall have the right and unlimited discretion, for and on behalf of the Company;

    (i)    to prosecute and defend civil, criminal or administrative suits;

    (ii)    to collect Company Assets, including obligations owed to the Company;

    (iii)    to settle and close the Company's business;

    (iv)    to dispose of and convey all Company Assets for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Assets, having due regard for the activity and condition of the relevant market and general financial and economic conditions;

    (v)    to pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company Assets;

    (vi)    to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

    (vii)    to distribute any remaining proceeds from the sale of Company Assets to the Members;

    (viii)    to prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

    (ix)    to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managing Members under the terms of these Regulations to the extent necessary or desirable in the good faith judgment of the liquidator to perform its duties and functions.

3.    <u>Compensation of Liquidator</u>. The liquidator appointed as provided herein shall not be entitled to receive any compensation for its services unless otherwise agreed upon by the liquidator and the Managing Members.

4.    <u>Distribution of Company Assets and Proceeds of Sale Thereof</u>.

(a)    Upon completion of all desired sales of Company Assets, and after payment of all selling costs and expenses, the liquidator shall distribute the proceeds of such sales,

Regulations of D4IN, LLC                Page 28

APP001059

and the Company Assets that are to be distributed in kind, to the following groups in the following order of priority:

    (i)     to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions) of the Company, whether by payment or establishment of reserves;

    (ii)    to satisfy Company obligations to Members to pay past due Company distributions;

    (iii)   to the Members, in accordance with the positive balance in their respective Capital Accounts; and

    (iv)   to the Members in accordance with their respective Interests.

(b)    The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective capital account balances or Interests of each Member in such group.

5.    <u>Final Audit</u>. Within a reasonable time following the completion of the liquidation, the liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to these regulations.

6.    <u>Deficit Capital Accounts</u>. Notwithstanding anything to the contrary contained in these Regulations, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to these Regulations to all Members in proportion to their respective Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

**ARTICLE XIV.**

**INDEMNIFICATION AND INSURANCE**

1.    <u>Indemnification and Advance of Expenses</u>. The Company shall indemnify and/or advance expenses to a Person who was, is, or is threatened to be made a named defendant or respondent in a proceeding because the person (i) is or was a Managing Members, Member, officer, employee or agent of the Company, or (ii) is or was serving at the request of the Company as a Managing Member, Member, director, officer, partner, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, to the fullest extent provided by, and in accordance with the

Regulations of D4IN, LLC                            Page 29

APP001060

procedures set forth in, any applicable laws; provided, however, that in the following respects as applied to the Company, the following provisions shall apply:

(a)    Indemnification of any Person who has satisfied the standard of conduct set forth in the Act shall be mandatory rather than optional. The determination under the Act that indemnification shall be made shall also constitute authorization of indemnification under the Act.

(b)    Advancement of expenses to a Person who has satisfied the requirements of the Act shall be mandatory rather than optional.

(c)    Payment or reimbursement of expenses to a Person pursuant to the Act in connection with his appearance as a witness or other participation in a proceeding shall be mandatory rather than optional.

2.    Insurance. Subject to certain provisions in the Act, the Company may, but shall not be obligated to, purchase and maintain insurance or other arrangements on behalf of any Person who is or was a Managing Member, Officer, Member, employee, agent or other Person identified above in Article XV, Section 1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such a Person, whether or not the Company would have the power to indemnify him against that liability under Article XV, Section 1 or otherwise.

3.    Limit on Liability of Members. The indemnification set forth in this regulations shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any other liability of the Members to any third party.

## ARTICLE XV.

## MISCELLANEOUS PROVISIONS

1.    Entire Agreement. These Regulations contain the entire agreement among the Members relating to the subject matter hereof, and all prior agreements relative hereto which are not contained herein are terminated.

2.    Law Governing. These Regulations shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, these Regulations are intended to comply with the requirements of the Act and the Certificate of Formation. In the event of a direct conflict between the provisions of these Regulations and the mandatory provisions of the Act or any provision of the Certificate of Formation, the Act and the Certificate of Formation, in that order of priority, will control. In the event that the Act is re-codified by the Legislature, then any such references made within this document shall refer to the newly codified Act and its corresponding sections.

3.    Conference Telephone Meetings. Meetings of the Members, Managing Members or any committee may be held by means of conference telephone or similar communications

APP001061

equipment so long as all Persons participating in the meeting can hear each other. Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

4.    Successors and Assigns. Subject to restrictions on Transfers and assignments herein, these Regulations shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

5.    Severability. These Regulations are intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of these Regulations or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed herein, the remainder of these Regulations and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

6.    Headings. The Article and Article headings appearing in these Regulations are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article.

7.    Construction. Whenever required by the context, as used in these Regulations, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles refer to articles of these Regulations, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

8.    Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

9.    Effect of Waiver or Consent. A waiver or consent to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run. No waivers shall be enforceable unless in writing and running in favor of the Person claiming the benefit of same.

10.    Further Assurance. In connection with these Regulations and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments, and perform any additional acts, that may be necessary or appropriate to effectuate and perform the provisions of these Regulations and those transactions.

Regulations of D4IN, LLC                                                                      Page 31

APP001062

11. **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the Property of the Company.

12. **Counterparts and Binding Effect.** These Regulations may be executed in one or more counterparts, each of which shall be an original but all of which taken together shall constitute a single document. These Regulations shall be binding upon each Member as evidenced by their signatures below.

13. **Attorney's Fees.** If any Member becomes involved in litigation or proceedings arising out of this Agreement or the performance thereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party. Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the Members to fully compensate for all the attorney's fees paid or incurred in good faith.

14. **Amendment of Agreement.** These Regulations may be amended only in writing, in whole or in part, at any time only by the execution thereof by 2/3 of the Membership interests entitled to vote thereon with Managing Members' approval.

15. **Joinder of Managing Members.** The Initial Managing Members have joined in these Regulations for the purposes of acknowledging his appointment and agreeing to all requirements for performance by Managing Members hereunder. A Successor Managing Member, if any, shall also be required to join in the Regulations in the same manner and for the same purpose as the Initial Managing Members.

16. **Notices.** Notifications, as defined above, given under these Regulations shall be duly given to the appropriate addresses, fax number, email addresses set forth below (or to such other addresses or numbers as a party may designate as to itself by notice to the other):

   If to JMJD4, LLC:

   Saskya Bedoya
   Secretary for JMJD4, LLC,
   1755 Wittington Place, Suite 340
   Farmers Branch, TX 75234
   Telephone: (972) 385-9934

## ARTICLE XVI

## HUD PROVISIONS

16.1    Notwithstanding any clause or provision in this Agreement to the contrary and so long as

Regulations of D4IN, LLC                                            Page 32

APP001063

the United States Department of Housing and Urban Development ("HUD") or a successor or assign of HUD is the insurer or holder of a loan to D4IN LLC ("the HUD-insured Loan") secured by the mortgage on Parc at Ingleside, HUD Project No. 113-35787 in Ingleside, San Patricio County, Texas (the "Project") the following provisions shall apply:

1. If any of the provisions of the organizational documents conflict with the terms of the HUD-insured Note, Security Instrument, or HUD Regulatory Agreement ("HUD Loan Documents"), the provisions of the HUD Loan Documents shall control.

2. No provision required by HUD to be inserted into the organizational documents may be amended without HUD's prior written approval. Additionally, if there is a conflict between any HUD-required provisions inserted into this Agreement and any other provision of this Agreement, the terms of the HUD-required provisions will govern; and if there is a conflict between any of the provisions in this Agreement and any HUD-required provisions of this Agreement, the HUD-required provisions will govern.

3. Unless otherwise approved in writing by HUD, the Borrower entity's business and purpose shall consist solely of the acquisition, ownership, operation and maintenance of the Project and activities incidental thereto. Borrower shall not engage in any other business or activity. The Project shall be the sole asset of the Borrower entity, which shall not own any other real estate other than the aforesaid Project.

4. None of the following will have any force or effect without the prior written consent of HUD:

   a. Any amendment that modifies the term of Borrower's existence;

   b. Any amendment that triggers application of the HUD previous participation certification requirements (as set forth in Form HUD-2530, Previous Participation Certification, or 24 CFR § 200.210, et seq.);

   c. Any amendment that in any way affects the HUD Loan Documents;

   d. Any amendment that would authorize any member, partner, owner, officer or director, other than the one previously authorized by HUD, to bind the Borrower entity for all matters concerning the Project which require HUD's consent or approval;

   e. A change that is subject to the HUD TPA requirements contained in Chapter 13 of HUD Handbook 4350.1 REV-1; or

   f. Any change in a guarantor of any obligation to HUD (including those obligations arising from violations of the Regulatory Agreement).

5. The Borrower entity is authorized to execute a Note and Security Instrument in order to secure a loan to be insured by HUD and to execute the Regulatory Agreement and other documents required by the Secretary in connection with the HUD-insured loan.

6. Any incoming member of Borrower must as a condition of receiving an interest in the Borrower entity agree to be bound by the HUD Loan Documents and all other documents required in connection with the HUD-insured loan to the same extent and on the same

Regulations of D4IN, LLC                                                                 Page 33

APP001064

terms as the other members/partners/owners.

7. Upon any dissolution, no title or right to possession and control of the Project, and no right to collect the rents from the Project, shall pass to any person or entity that is not bound by the Regulatory Agreement in a manner satisfactory to HUD.

8. The key principals of the Borrower being those individuals/entities identified in Section 50 of the Regulatory Agreement are liable in their individual capacities to HUD to the extent set forth in the Regulatory Agreement.

9. The approved Borrower entity shall not voluntarily be dissolved or converted to another form of entity without the prior written approval of HUD.

10. The Borrower entity has designated Timothy Barton as its official representative for all matters concerning the Project that require HUD consent or approval. The signature of this representative will bind the Borrower entity in all such matters. The Borrower entity may from time to time appoint a new representative to perform this function, but within three business days of doing so, will provide HUD with written notification of the name, address, and telephone number of its new representative. When a person other than the person identified above has full or partial authority with respect to management of the Project, the Borrower entity will promptly provide HUD with the name of that person and the nature of that person's management authority.

11. Notwithstanding any provision in this Agreement to the contrary, any obligation of the Company to provide indemnification under this Agreement shall be limited to (i) amounts mandated by state law, if any, (ii) coverage afforded under any liability insurance carried by the Company and (iii) available "surplus cash" of the Borrower as defined in the Regulatory Agreement. Until funds from a permitted source for payment of indemnification costs are available for payment, the Company shall not (a) pay funds to any members, partners, officers and directors, or (b) pay the deductible on an indemnification policy for any members, partners, officers and directors.

12. The Term of the Company is perpetual.

11.02   The following provisions are added to this Agreement:

(a)   So long as the Note is insured or held by the Secretary:

i. The Borrower shall not make, nor shall any partner receive and retain, any distribution of assets or income of any kind from the Project or Project funds, except in accordance with the Regulatory Agreement; and

ii. The HUD financial requirements as to cash controls and distributions as set forth in the Regulatory Agreement (including requirements which prohibit distributions more often than annually or semi-annually) shall supersede to the extent they are in conflict with any of the financial provisions of this Partnership Agreement.

iii. Neither Borrower, nor its members, managers, partners, officers or directors, shall without HUD's prior written approval, grant a security interest in any of Borrower's or Project's assets (See Regulatory Agreement §36).

Regulations of D4IN, LLC                                    Page 34

APP001065

IN WITNESS WHEREOF, the Members of the Company have evidenced the adoption of these Regulations in accordance with the Act by their signatures below, such adoption to be effective as of the date first above written.

**MANAGING MEMBERS:**

Timothy Barton
President
JMJD4, LLC

**MEMBERS:**

Timothy Barton
Managing Member
JMJAV, LLC

Jeff Schaumann
President
Axia Contracting, LLC

APP001066

**SCHEDULE A**

| Member Name & Address | Initial Capital Contributions | Interest | Profit/Loss |
|---|---|---|---|
| JMJAV, LLC<br>As Member<br>13901 Midway Road<br>Suite 102-LB 243<br>Farmers Branch, TX 75244 | $1.00 | 1% | 1% |
| JMJD4, LLC<br>As Managing Member<br>1755 Wittington Place, Suite 340<br>Dallas, Texas, 75234 | $98.75 | 98.75% | 98.75% |
| AXIA Contracting, LLC<br>As Member<br>51 Broadway, Suite 111<br>Fargo, ND 58102 | $.25 | 0.25% | 0.25% |

APP001067

# EXHIBIT A-73

APP001068

## AMENDMENT TO PLEDGE AND SECURITY AGREEMENT

THIS Amendment to Pledge and Security Agreement is executed effective June 13, 2019 among JMJAV, LLC, a Texas limited liability company ("JMJAV"), Enoch Investments, LLC, a Delaware limited liability company ("Enoch") and Southern Properties Capital, Ltd. ("Lender").

      A.     Lender is making a loan to JMJAV in the amount of $6,634,490 pursuant to a Promissory Note of even date herewith.

      B.     In connection with the Loan, JMJAV, LLC is executing a Pledge and Security Agreement ("Pledge Agreement") dated June 13, 2019 pledging certain interests described therein.

      C.     It is a condition of Lender's funding the Loan that Enoch also pledge certain interests described below.

NOW THEREFORE, for and consideration of the foregoing, ten dollars ($10.00) and other good and valuable consideration, the parties agree as follows:

      1.     The Pledge is amended to make Enoch a party to the Pledge. Each of Enoch and JMJAV pledge its interest in the Collateral as defined in the Pledge Agreement, as amended hereunder. The term "Pledgor" as defined in the Pledge shall mean collectively Enoch and JMJAV.

      2.     Schedule 1 of the Pledge is replaced by Schedule 1 attached hereto.

      3.     All the terms and conditions of the Pledge Agreement shall remain in full force and effect.

[Signatures on next page]

1

AMENDMENT TO PLEDGE AND SECURITY AGREEMENT
1100270

APP001069

**PLEDGORS:**

**JMJAV LLC,**
a Texas limited liability company

By: _____
Timothy Barton, President

**ENOCH INVESTMENTS, LLC**
a Delaware limited liability company

By: _____
Timothy Barton, President

**LENDER:**

**SOUTHERN PROPERTIES CAPITAL, LTD.**
a British Virgin Islands corporation

By: _____
Daniel J. Moos, President and CEO

2

AMENDMENT TO PLEDGE AND SECURITY AGREEMENT
1100270

APP001070

## SCHEDULE 1

| Pledgor | Pledged Entity | Entity Interest |
| --- | --- | --- |
| JMJAV LLV | JMJD4, LLC | 1% membership interest in JMJD4, LLC |
| ENOCH INVESTMENTS, LLC | JMJD4, LLC | 99% membership interest in JMJD4, LLC |

3

AMENDMENT TO PLEDGE AND SECURITY AGREEMENT
1100270

APP001071

# EXHIBIT A-74

APP001072



# SOUTHERN
## PROPERTIES CAPITAL
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

November 3, 2022

Mr. Courtney C. Thomas
Brown Fox    LLC
8111 Preston Road
Suite 300
Dallas, Texas 75225

   Re: SEC v. Timothy Barton, et al; Civil Action No. 3:22-CV-2118X (Bellwether Ridge)

Dear Mr. Thomas:

   This letter is written to you in your capacity as Receiver in the referenced case. Southern Properties Company Ltd. ("Lender") is the lender to JMJ Development, LLC ("Pledgor") in connection with the Bellwether Ridge Apartments, an apartment complex in DeSoto, Texas ("Bellwether Ridge"). By letter dated October 3, 2022 ("Exercise Letter"), a copy of which is attached, Lender exercised its right to acquire ownership of Bellwether Ridge.

   Lender's right arises under the (i) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by JMJAV, LLC, to Pledgor, pledging one percent (1%) of the membership interests in JMJD4 LLC, (ii) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by TRWF, LLC to Pledgor, pledging one hundred percent (100%) of the membership interests in JMJAV, LLC, and (iii) Amended and Restated  Pledge and Security Agreement dated October, 2017, executed by Enoch Investments, LLC to Pledgor, pledging ninety-nine percent (99%) of the membership interests in JMJAV, LLC (collectively, "Pledges"). The Pledges were assigned to Lender by an Assignment of Pledge and Security Agreement, dated October 2017, executed by Pledgor to Lender ("Assignment"). Copies are attached. The Assignment secured a loan ("Mezzanine Loan") in the amount of $3,800,000.00, evidenced by the attached Promissory Note from Pledgor to Lender, as amended. The security interests granted under the Pledge were perfected by the attached UCC-1s. By letter agreement dated May 5, 2017 (copy attached), JMJAV, JMJD4, LLC, D4DS, LLC and Timothy Barton also agreed to the assignment of ownership interests in D4DS, LLC, the owner of Bellwether Ridge.

   Bellwether Ridge is subject to a first mortgage loan ("Mortgage Loan") in the amount of

APP001073

Mr. Courtney C. Thomas
October 28, 2022
Page 2

$19,021,200.00 in favor of Greystone Funding Company LLC ("Greystone"), which loan is insured by the US Department of Housing and Urban Development ("HUD"). The Mortgage Loan, as evidenced by a U.S. Department of Housing and Urban Development Regulatory Agreement for Multifamily Projects ("Regulatory Agreement") and a Note ("Note"), both dated October 1, 2017, is secured by a Multifamily Deed of Trust, Assignment of Leases and Rents and Security Agreement ("Deed of Trust," collectively with the Regulatory Agreement and Note referred to as the "Mortgage Documents"). The terms of the Mortgage Documents allow for an assumption of the loan, subject to the approval of both Greystone and HUD. Section 7.15 of the Pledges provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such purchase must be submitted with the signed TPA application.

In the Exercise Letter, Lender included a proposed amendment ("Amendment"), which amended the attached Purchase and Sale Agreement that that had been previously signed by D4DS, LLC and Bellwether Ridge, LLC, a wholly owned subsidiary of Lender. The only reason for the Amendment is that HUD took longer to approve the structure than contemplated. Please review the Amendment and let us know any comments.

While we understand that you have been required to review much information in a short time, it is important that this transfer be submitted to Greystone and HUD as soon as possible. The current proceedings and your appointment as Receiver violate the Mortgage Documents, and we believe proceeding with the transfer can resolve this default.

Please contact Mark Cooper (469) 522-4390 at your earliest convenience. Thank you for your help.

Very truly yours,

**SOUTHERN PROPERTIES CAPITAL LTD.**

By: _____
Name: _____
Title: _____

cc:    Enoch Investments, LLC
       TRWF LLC
       JMJAV, LLC
       JMJD4, LLC
       D4DS, LLC
       JMJ Development, LLC

APP001074

# EXHIBIT A-75

APP001075

Kelsey Hjornevik 8004323622                    (03/03) 05/14/2020 12:26:06 PM

FILING NUMBER: 20-0017975435
FILING DATE: 5/14/2020 12:26 PM
DOCUMENT NUMBER: 970482870002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGEMENT TO:

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647
CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJAV LLC | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN D4IN LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN D4IN LLC.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJAV — D4IN — TX — STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

APP001076

# EXHIBIT A-76

APP001077

## UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS**

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CAPITOL SERVICES, INC.

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 11:58 AM 05/14/2020**
**U.C.C. Initial Filing No: 2020 3407071**

**Service Request No:  20203897451**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | JMJD4 LLC | | | | |
|---|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | SOUTHERN PROPERTIES CAPITAL LTD | | | | |
|---|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |

4. **COLLATERAL:** This financing statement covers the following collateral:
100% OF ITS INTEREST IN D4IN LLC WHICH CONSISTS OF 98.75% OF THE MEMBERSHIP INTEREST IN D4IN LLC

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJD4 - D4IN - DE - STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

APP001078

# EXHIBIT A-77

APP001079

数电字0　　合码码
Recorded in the Above
XXXXXXX　Bank & Page
01-29-2021　(1:45)1:46 PM
Bill English~ Probate Judge
Lee County, AL

Book/PG: 4X10/589
Type/Counter: DEED/REAS / cadiver
Span: 2021A-00000475716
Recorded: 01-29-2021 11:21COT
MTG Mortgage Tax　　　　　　35791.XX
REC Recording Fee　　　　　　155.00
Total Fees:　$ 2554.XX

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 2729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

**Prepared by and Recording Requested by:**
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
604 Autumn Springs Ct, Suite 28
Franklin, TN 37067

**After Recording return to:**
Leslie F. Dominy
Greystone Funding Company LLC
419 Belle Air Lane
Warrenton, VA 20186

## MULTIFAMILY MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

### (Alabama)

**HUD Project Number:** 062-35778
**Project Name:** Parc at Opelika

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (8/18)

APP001080

## MULTIFAMILY MORTGAGE,
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

THIS MULTIFAMILY MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS ("Security Instrument"), is made as of this 1st day of January, 2021 between D4OP LLC, a limited liability company organized and existing under the laws of the State of Texas, whose address is 13901 Midway Rd, Suite 102, Dallas, TX 75244-4388, as grantor, trustor and borrower (**Borrower**), to Greystone Funding Company LLC, a limited liability company organized and existing under the laws of State of Delaware, whose address is 419 Belle Air Lane, Warrenton, VA 20186 as Lender (**Lender**).

Borrower, in consideration of the Indebtedness and the security interest created by this Security Instrument, irrevocably mortgages, grants, conveys and assigns to Lender and Lender's successors and assigns, with power of sale, the Mortgaged Property, including the Land located in Lee County, State of Alabama and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Lender and Lender's successors and assigns

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on November 1, 2062, in the principal amount of Twenty Three Million Six Hundred Sixty One Thousand Three Hundred and 00/100 Dollars (US $23,661,300.00) ("**Loan**"), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property; and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property. Borrower covenants that Borrower shall warrant and defend generally such title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

Previous editions are obsolete          HUD MF Security Instrument                    HUD-94000M (07/18)

APP001081

3

**Covenants.** Borrower and Lender covenant and agree as follows:

1.    **DEFINITIONS.** The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a)    "**Borrower**" means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally). Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note. Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b)    "**Building Loan Agreement**" means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c)    "**Business Day**" is defined in Section 31.

(d)    "**Claim**" is defined in Section 48(m).

(e)    "**Collateral Agreement**" means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f)    "**Contract of Insurance**" is defined in 24 C.F.R. Part 207, Subpart B.

(g)    "**Environmental Inspections**" is defined in Section 48(h).

(h)    "**Event of Default**" means the occurrence of any event listed in Section 22.

(i)    "**Fixtures**" means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (B/...)

APP001082

4

and property, and including but not limited to: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

(j)      "**Governmental Authority**" means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

(k)      "**HUD**" means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

(l)      "**Impositions**" and "**Imposition Deposits**" are defined in Section 8(a).

(m)      "**Improvements**" means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(n)      "**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of this Security Instrument as provided in Section 13.

(o)      "**Indemnitees**" is defined in Section 48(k).

(p)      "**Land**" means the estate in realty described in Exhibit A.

APP001083

5

(q)    "**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals. (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)    "**Lender**" means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)    "**Lien**" is defined in Section 17.

(t)    "**Loan**" is defined in the opening paragraphs of this Security Instrument.

(u)    "**Loan Application**" is defined in Section 41.

(v)    "**Loan Documents**" means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)    "**Mortgaged Property**" means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

(1)    the Land;

(2)    the Improvements;

(3)    the Fixtures;

(4)    the Personalty;

(5)    all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances

APP001084

6

related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)     all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)     all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)     all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)     all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)    all Rents and Leases;

(11)    all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)    all Imposition Deposits;

APP001085

(13)   all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)   all forfeited tenant security deposits under any Lease;

(15)   all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)   all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)   all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above or Section 33 below, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property. These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Distributions of Surplus Cash and loan repayments, if allowed).

(x)    "**Note**" means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

(y)    "**Notice**" is defined in Section 31.

(z)    "**O&M Program**" is defined in Section 48(b).

(aa)   "**Personalty**" means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the

APP001086



Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to: Reserve for Replacement accounts, bank accounts, Residual Receipts accounts, and investments.

(bb)    "**Principal**" is defined in the Regulatory Agreement.

(cc)    "**Project**" and "**Project Assets**" mean the Mortgaged Property.

(dd)    "**Program Obligations**" means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

(ee)    "**Property Jurisdiction**" is defined in Section 30(a).

(ff)    "**Regulatory Agreement**" means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

(gg)    "**Remedial Work**" is defined in Section 48(i).

(hh)    "**Rents**" means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past

Previous editions are obsolete.          HUD MF Security Instrument          HUD-94000M (7/98)

APP001087

9

due, or to become due, Residual Receipts, and escrow accounts, however and whenever funded and wherever held.

    (ii)    **"Residual Receipts"** is defined in the Regulatory Agreement.

    (jj)    **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

    (kk)    **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair. During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

    (1)    physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

    (2)    fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

    (3)    fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

    (4)    materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

    (5)    retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

    2.    **UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.**

    This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as

Previous editions are obsolete.    HUD MF Security Instrument    HUD-94000M (5/18)

APP001088

Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD. Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral. Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

3.    **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be

APP001089

immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)    After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice. Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

APP001090

(c)     Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver ex parte if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property. Borrower acknowledges and agrees that

APP001091

the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

4.     ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention

APP001092

of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)     Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)     Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession. Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)     Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including

APP001093



the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect. All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

(f)    Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations. Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender. Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed. All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

(g)    Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

5.    **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

6.    **EXCULPATION.** Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the

APP001094

16

Indebtedness, provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

### 7.    DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.

(a)    Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the Terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums.

(1)    an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i)  If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii)  If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)    a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility

APP001095

charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)    all payments and deposits mentioned in the two preceding paragraphs of this subsection and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i)    mortgage insurance premium charges under the Contract of Insurance;

(ii)   ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii)  interest on the Note, and

(iv)   amortization of the principal of the Note.

(b)    Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)    Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement. Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

B.    IMPOSITION DEPOSITS.

(a)    In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same. Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same. All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay

APP001096

mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand. In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums due under Section 7(a)(3) shall be credited to Borrower. If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3). The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the "**Imposition Deposits**". The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as "**Impositions**". The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added. Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower for which Imposition Deposits are required. Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)　Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations. Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing. Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or Residual Receipts account (if any). Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note. Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)　If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender. Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender. Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

APP001097

19

(c)    If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or Residual Receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits. If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

9.    **REGULATORY AGREEMENT.** Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument. Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

10.    **APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3). Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

11.    **COMPLIANCE WITH LAWS.** Borrower shall comply with all applicable laws, ordinances, regulations, requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, Subpart G and any successor regulations; including but not limited to those of the foregoing pertaining to: health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments. Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11. Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property. Borrower

APP001098

represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity;

12.    USE OF PROPERTY. Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

13.    PROTECTION OF LENDER'S SECURITY

(a)    If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)    Any amounts advanced by Lender for taxes, special assessments, or water rates (which are liens prior to the Security Instrument), for insuring the Project, or for mortgage insurance premiums, which amounts are paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note. So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (6/18)

APP001099

Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)    Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

14.    INSPECTION.  Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

15.    BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments that affect the Mortgaged Property.  The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)    Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time

(d)    Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year.  If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year.  Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender.  If Borrower fails to provide in a timely manner

APP001100

the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness. Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)      Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

### 16.    TAXES; OPERATING EXPENSES.

(a)      Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)      Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)      As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition. If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

APP001101

(d)    Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)    Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

17.    LIENS; ENCUMBRANCES.  (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("Lien") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument.  (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or Residual Receipts except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

18.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.  Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or

APP001102

other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

### 19. PROPERTY AND LIABILITY INSURANCE.

(a)    Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance; and, if the Mortgaged Property does not conform to applicable zoning or land use laws building ordinance or law coverage. If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note. If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance. If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)    All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. All policies of property damage insurance shall include a non-contributing, non-

APP001103

25

reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

(c)    Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)    All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations. Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)    Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)    In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. Borrower shall notify Lender of any payment received from any insurer. Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured

APP001104

26

hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

(g)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty. Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD. In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable. If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)    If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

20.    CONDEMNATION.

(a)    Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation. Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing. Borrower authorizes and

APP001105

appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1) any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b) All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note. After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration. No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award. Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

21. **TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.**

(a) So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations. Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21. Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-

APP001106

78

judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)     If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

22.     EVENTS OF DEFAULT.  The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

(a)     Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) of this Security Instrument.

(b)     Covenant Events of Default shall include:

(1)     fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

(2)     the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

(3)     any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right

Previous editions are obsolete                    HUD MF Security Instrument                    HUD-94000M (6/18)

APP001107

or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

(4)      so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)      Lender shall deliver Notice to any Principal(s) of Borrower identified in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide such Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

23.      **REMEDIES CUMULATIVE.** Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

24.      **FORBEARANCE.**

(a)      So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note. However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)      Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by

APP001108



applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

25.     **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

26.     **WAIVER OF STATUTE OF LIMITATIONS.** To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

27.     **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation

APP001109

or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

28.    **FURTHER ASSURANCES.** Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

29.    **ESTOPPEL CERTIFICATE.** Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are unmodified and in full force and effect (or, if there have been modifications, that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are in full force and effect as modified and setting forth such modifications), (b) the unpaid principal balance of the Note, (c) the date to which interest under the Note has been paid, (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument; and (f) any additional facts requested by Lender.

30.    **GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, and solely as to rights and remedies of HUD, as such local or state laws may be preempted by federal law.

(b)    Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal

APP001110

courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or this Security Instrument. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

### 31.    NOTICE.

(a)    All notices, demands and other communications ("**Notice**") under or concerning this Security Instrument shall be in writing. Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument, and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail return receipt requested. As used in this Section 31, the term ("**Business Day**") means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business. When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day. Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)    Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31. Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)    Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.

APP001111

**BORROWER:**
D4OF LLC
Attn: Timothy Barton
13901 Midway Rd, Suite 102
Dallas, TX 75244-4388

**PRINCIPAL(S)/RELATED PARTIES:**

Timothy Barton
13901 Midway Rd, Suite 102
Dallas, TX 75244-4388

JMJD4, LLC
Attn: Timothy Barton
13901 Midway Rd, Suite 102
Dallas, TX 75244-4388

**LENDER:**
Greystone Funding Company LLC
Attn: General Counsel
419 Belle Air Lane
Warrenton, VA 20186

32.    **SALE OF NOTE; CHANGE IN SERVICER.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower. A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note. If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

33.    **SINGLE ASSET BORROWER.** Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the management and operation of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

34.    **SUCCESSORS AND ASSIGNS BOUND.** This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

Previous editions are obsolete              HUD MF Security Instrument              HUD-94000M (9/18)

APP001112

14

35.    **JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

36.    **RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

(b)    No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement. Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

37.    **SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

38.    **RULES OF CONSTRUCTION.** The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument. Any reference in this Security Instrument to an "**Exhibit**" or a "**Section**" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term "**including**" means "including, but not limited to."

APP001113

39.    **LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern, provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

40.    **DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

41.    **NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the "**Loan Application**") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of Default.

42.    **ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

43.    **ACCELERATION; REMEDIES.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note. Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to

APP001114

be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note. Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**[INSERT PROVISIONS PERTAINING TO SALE AS APPROPRIATE UNDER STATE LAW IF NOT OTHERWISE ADDRESSED BY AN ATTACHED FORM STATE ADDENDUM]**

44.    **FEDERAL REMEDIES.** In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. Section 3701, *et seq.*, as amended, when HUD is the holder of the Note.

45.    **REMEDIES FOR WASTE.** In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

(a)    the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

(b)    an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

(c)    recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security. So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

46.    **TERMINATION OF HUD RIGHTS AND REFERENCES.** At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions

APP001115

57

shall cease, and all rights and obligations of HUD shall terminate, (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate, and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance. The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

47.    CONSTRUCTION FINANCING. The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern). If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof. The Indebtedness shall, at the option of Lender or holder of this Security Instrument and the Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement. This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

48.    ENVIRONMENTAL HAZARDS.

APP001116

(a)    Definitions.

(1)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("**PCBs**") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

(3)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)    Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender ("**O&M Program**"); (2) matters described in subsection (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with

APP001117

respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

(i)    any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(ii)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

(c)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(d)    Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(e)    If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program. All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the

APP001118

monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender. Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)    Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)    in the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)    the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)    Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)    no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)    to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending

APP001119

44

or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7) Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g) Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1) Borrower's discovery of any Prohibited Activity or Condition;

(2) Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3) any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h) Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly

APP001120



shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)    If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law applicable to the Mortgaged Property or to its use, operation or improvement, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law. If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so. So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

APP001121

(j)     Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)     Borrower shall indemnify [if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender], hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, "**Indemnitees**") from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions.

(i)     any breach of any representation or warranty of Borrower in this Section 48;

(ii)    any failure by Borrower to perform or comply with any of its obligations under this Section 48;

(iii)   the existence or alleged existence of any Prohibited Activity or Condition;

(iv)    the actual or alleged violation of any Hazardous Materials Law

(l)     Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees. However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding ("**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to

APP001122

44

Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)    Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)    any amendment or modification of any Loan Document;

(2)    any extensions of time for performance required by any Loan Document;

(3)    the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)    the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)    the release or substitution in whole or in part of any security for the Indebtedness; and

(6)    Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)    Borrower shall, at its own cost and expense, do all of the following:

(1)    pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48,

(2)    reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)    reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

APP001123

(p)     In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)     The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument. Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)     So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)     To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

---

Previous editions are obsolete                HUD MF Security Instrument                         HUD-90000M (2/18)

APP001124

4606  633
PERTINENT Book & Page

46

49.    State requirements for future advances, credit line or open-end mortgages, if any, are addressed in State Addendum attach hereto.

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Security Instrument:

|X|    Alabama State Addendum

|X|    Exhibit A              Description of the Land (required).

APP001125

47

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed Instrument.

D4OP LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

I, _____ the undersigned, a Notary Public in and for said County in said State hereby certify that on this the ____ day of _____, 202_ before me personally appeared Timothy Barton to me personally known (or proved to me on the basis of satisfactory evidence), and who, after being duly sworn, acknowledged himself to be the President of D4OP LLC, a Texas limited liability company, and that being informed of the contents of the instrument, he as such President and with full authority to so do, did execute the foregoing instrument voluntarily for and as the act of said limited liability company.
Witness my hand and official seal or stamp.

_____
Notary Public
My commission expires: _____

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (6/18)

APP001126



## ADDENDUM
(Alabama

The following sections are inserted into the Security Instrument and made a part thereof:

43. ACCELERATION; REMEDIES. The following additional Alabama provisions pertain to the power of sale granted in the Security Instrument:

Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender pursuant to Ala. Code § 35-10-1 to -71(1975). Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including but not limited to attorney's fees, costs of documentary evidence, abstracts and title reports. Pursuant to the provisions of Ala. Code § 35-10-1 to -71 (1975) if Lender invokes the power of sale: (a) Lender shall mail a copy of a notice of sale to Borrower in the manner provided in Section 31. Whether or not possession of the Mortgaged Property is taken, Lender may sell the Mortgaged Property or any part thereof pursuant to the power of sale which is hereby given to Lender, at public outcry, to the highest bidder for cash, at the front or main door of the courthouse of the county in which the Mortgaged Property to be sold is located, either in person or by auctioneer, after first giving notice by publication once a week for three (3) successive weeks of the time, place and terms of such sale, together with a description of the property to be sold, in a newspaper published in said county. If there is property to be sold in more than one (1) county, publication shall be made in all counties where the land to be sold is located, but if no newspaper is published in any such county, the notice shall be published in a newspaper published in an adjoining county for three (3) successive weeks. The sale shall be held between the hours of 11:00 a.m. and 4:00 p.m. on the day designated in the notice for the exercise of the power of sale hereunder. Lender may postpone sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale and by re-publication in the same manner provided above of notice announcing the new sale date. (Ala. Code § 6-8-69 (1975)) Lender may bid at any sale held under this Security Instrument and may purchase the Mortgaged Property, or any part thereof, if Lender is the highest bidder therefore; (b) Except as set forth above, Lender shall have the authority to determine the terms of the sale. Borrower hereby waives any requirements of a separate sale, and all or any part of the Mortgaged Property may be offered for sale, at one (1) or more sales, in lots or in parcels or "en masse" and in such order as Lender may determine; (c) Lender or any person conducting the sale for Lender is authorized to execute to the purchaser at said sale a deed or such other appropriate conveyance document to the Mortgaged Property so purchased conveying the Mortgaged Property so sold without any covenant or warranty, express or implied, and shall deliver the same to said

purchaser within a reasonable time after the sale. The recitals in such deed or document shall be prima facie evidence of the truth of the statements made in those recitals; and

(d) Borrower covenants and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.

49. FUTURE ADVANCES. This Security Instrument creates and provides for a security interest in after-acquired collateral and future advances within the meaning of Ala. Code § 7-9A-204 (1975).

50. WAIVER OF EXEMPTIONS. Borrower waives all rights of exemptions as to personal property and all rights of exemptions under the Constitution and Laws of Alabama.

51. DEFEASANCE. If the Borrower shall well and truly pay and discharge the indebtedness hereby secured as it shall become due and payable and shall do and perform all acts and agreements to be done and performed by the Borrower under the terms and provisions of this Mortgage, then this conveyance shall be and become null and void. (Ala. Code § 35-10-26 (1975))

52. CONSTRUCTION MORTGAGE. This Security Instrument is a construction mortgage within the meaning of Ala. Code § 7-9A-334(h) (1975), and secures an obligation incurred for the construction of an improvement on land.

53. WAIVER OF TRIAL BY JURY. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF TRIAL BY JURY IS SEPARATELY GIVE BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE D DOCUMENT IS TO BE RECORDED AND FILE

APP001128

**EXHIBIT A**

**(DESCRIPTION OF THE LAND)**

Tract "A-3-A" of the Fox Run Parkway Development, LLC Subdivision Opelika, Lee County, Alabama

All that certain tract or parcel of land containing 11.95 acres being shown as Tract "A-3-A" on the plat titled A Re-Subdivision of Tracts "A-3", "A-4" & "A-5" of the Re-Subdivision of Tract "A" of the Fox Run Parkway Development, LLC Subdivision as recorded in Plat Book 42 at Page 104 in the Office of the Judge of Probate of Lee County, Alabama, being located in Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama and being more particularly described a follows:

Starting at the locally accepted Southeast corner of the North Half of Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama go Westerly a distance of 4106 feet, more or less, to an iron pin on the Northwesterly right of way of South Fox Run Parkway; thence South 89 degrees 24 minutes 20 seconds West a distance of 494.29 feet to an iron pin on the present North right of way of Tree Avenue; thence North 58 degrees 38 minutes 34 seconds East a distance of 39.10 feet to an iron pin at the Northeast corner of Tract "A-8" of the Fox Run Parkway Development, LLC Subdivision as shown on the plat recorded in Plat Book 41 at Page 176, also being the POINT of BEGINNING of hereinabove described Tract "A-3-A"; thence along the North line of said Tract "A-4" South 89 degrees 24 minutes 20 seconds West a distance of 597.10 feet to an iron pin; thence continue along the North line of said Tract "A-6" North 45 degrees 27 minutes 20 seconds West a distance of 35.44 feet to an iron pin on the East right of way of McCoy Street; thence along the East right of way of McCoy Street North 00 degrees 19 minutes 01 seconds West a distance of 246.57 feet to a concrete monument; thence continue along the East right of way of McCoy Street North 04 degrees 05 minutes 50 seconds West a distance of 498.14 feet to an iron pin; thence continue along the East right of McCoy Street North 00 degrees 23 minutes 36 seconds West a distance of 68.49 feet to an iron pin; thence South 45 degrees 11 minutes 48 seconds East a distance of 70.55 feet to an iron pin; thence North 90 degrees 00 minutes 00 seconds East a distance of 58.71 feet to an iron pin; thence along a curve, concave Southerly, having a radius of 245.00 feet, an arc distance of 89.89 feet, a chord direction of South 79 degrees 25 minutes 20 seconds East and a chord distance of 89.39 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 15.00 feet to an iron pin; thence South 21 degrees 01 minutes 21 seconds West a distance of 60.00 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 174.69 feet to an iron pin; thence along a curve, concave Northerly, having a radius of 220.00 feet, an arc distance of 200.89 feet, a chord direction of North 84 degrees 51 minutes 48 seconds East, and a chord distance of 193.98 feet to an iron pin; thence South 43 degrees 53 minutes 10 seconds East a distance of 536.06 feet to an iron pin, thence South 58 degrees 38 minutes 34 seconds West a distance of 382.74 feet to the POINT of BEGINNING.  Subject to all easements and restrictions of record.

APP001129

## ASSIGNMENT OF MULTIFAMILY MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

**FOR VALUE RECEIVED,** GREYSTONE FUNDING COMPANY LLC, ("Assignor"), a Delaware limited liability company, having an office at 419 Belle Air Lane, Warrenton, VA 20186 hereby assigns and transfers to the GOVERNMENT NATIONAL MORTGAGE ASSOCIATION ("Assignee"), having its address at 451 Seventh Street, S.W., Washington, D. C. 20410, a corporation organized and existing under the laws of the United States, all its right, title and interest in, to and under that certain Multifamily Mortgage, Assignment of Leases and Rents and Security Agreement dated January 1, 2021 and recorded January 25, 2021 in the Land Records of Lee County, Alabama in Book 4680, Page 588 by and between D4OP LLC, a Texas limited liability company and GREYSTONE FUNDING COMPANY LLC, a Delaware limited liability company, covering certain real property as described in Exhibit A attached hereto and further described as Federal Housing Administration Project No. 062-35778, Government National Mortgage Association Pool No. CB0947-CL.

**TO HAVE AND TO HOLD** the same unto the Assignee, its successors and assigns, forever.

**EXECUTED THIS** 28th day of January, 2021

**GREYSTONE FUNDING COMPANY LLC**

Sharon Briskman
Executive Vice President

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAUQUIER**

On this 28th day of January, 2021, before me, a Notary Public in and for said County and State, personally appeared Sharon Briskman who acknowledged herself to be the Executive Vice President of GREYSTONE FUNDING COMPANY LLC, a Delaware limited liability company, and that as such Sharon Briskman authorized to do so, executed the foregoing instrument in the capacity and for the purposes therein stated.

WITNESS my hand and official seal the day and year aforesaid.

Notary Public, Commonwealth of Virginia

> LAURA HAILEY MCCAULEY
> NOTARY PUBLIC
> REGISTRATION # 7882930
> COMMONWEALTH OF VIRGINIA
> MY COMMISSION EXPIRES JUNE 30, 2024

APP001130