**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § § | |

## RECEIVER'S THIRD STATUS REPORT (1Q23)

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits

the following quarterly status report for the First Quarter of 2023 pursuant to this Court's Order

Appointing Receiver [Dkt. 29] (the "Receivership Order" or "RO").

The Receiver previously filed his Initial Status Report [Dkt. 67], covering the period

October 18, 2022, through November 17, 2022; and his Second Status Report [Dkt. 139], covering

the period November 18, 2022 through December 31, 2022. This Third Status Report provides an

updated summary of the Receivership for the period spanning January 1, 2023, through March 31,

**RECEIVER'S THIRD STATUS REPORT – PAGE 1**

2023. Where possible, the Receiver has incorporated background and other information from prior status reports and previous briefing from this case in order to most cost-effectively summarize the activities of the Receivership from the prior Quarter.

Pursuant to the Receivership Order, the Receiver is directed to submit quarterly reports that contain the following information:

A.    A summary of the operations of the Receiver;

B.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

C.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

D.    A schedule of all the Receiver's receipts and disbursements (attached as **Exhibit A** to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations."

RO at ¶ 59.

## I.
## SUMMARY OF THE OPERATIONS OF THE RECEIVER AND DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY

As outlined below, substantial work was performed by the Receiver and his team during the First Quarter of 2023. This Section of the Quarterly Status Report includes (A) a summary of the SEC's Allegations and the procedural posture of the case; (B) a summary of the Receiver's

efforts to identify, sell, develop, hold, or otherwise dispose of real estate assets; (C) a summary of the Receiver's efforts to identify, sell, hold, or otherwise dispose of other property; (D) a summary of the Receiver's accountants' efforts, including an update on their forensic accounting; and (E) a summary of other Receivership Activities from the Quarter.  To date, the Receiver's efforts have continued to be more laborious than anticipated in large part because of Defendant Barton's repeated challenges to the Receiver's actions (many of which are discussed below).

A.    **Summary of SEC Allegations and Status of Proceedings**

1.    **The SEC's Lawsuit**

On September 23, 2022, the SEC filed its Complaint [Dkt. 1] against Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC (collectively, the "Wall Entities"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall" and together with Barton, Carnegie Development, the Wall Entities, and Fu, the "Defendants").

Among other things, the SEC alleges that between March 2017 and June 2019, Barton "raised approximately $26 million from over 100 investors . . . in unregistered, fraudulent securities offerings related to real-estate investments in Texas."  Compl. ¶ 1.  The SEC further alleges that Barton "partnered with Wall . . . and Fu . . . to offer and sell investment loans issued by" the Wall Entities.  *Id.* ¶ 2.  More specifically, the SEC alleges that Defendants promised that funds raised by the Wall Entities would be used to purchase specific parcels of land at specific prices set forth in the offering materials, those parcels would then be developed by Barton into residential lots, and then Wall would build homes on the lots and sell them.  *Id.* ¶ 3.

While the Wall Entities purportedly promised investors that they would receive their principal back in two years along with annual interest payments, the SEC contends that Defendants misappropriated nearly all of the investor funds and misused them to, among other things:

- pay personal expenses of Barton and his family, including credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies and using funds from a different Wall Entity;

- pay professional fees (such as engineering, surveying, and land development) related to, in most cases, properties unrelated to the offerings; and

- make payments to Wall.

*Id.* ¶¶ 3-5, 35. In the end, the SEC alleges that the Wall Entities "were left with little or no assets, the projects were not developed, and the investors were never paid back." *Id.* ¶ 5.

## 2.    The Appointment of the Receiver

On September 26, 2022, the SEC filed a Motion for Appointment of Receiver [Dkt. 6], requesting that United States District Judge Brantley Starr appoint a federal equity receiver over the Wall Entities, Carnegie Development, certain Relief Defendants (DJD Land Partners, LLC and LDG001, LLC) and "[a]ny other entities that Barton directly or indirectly controls, including but not limited to "BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment

Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, the "Receivership Entities"). On October 17, 2022, Barton filed a Response [Dkt. 24] in opposition to the appointment of a Receiver.

On October 18, 2022, the Court entered the Receivership Order [Dkt. 29], which appointed the undersigned, Cortney C. Thomas, to serve as Receiver over the Receivership Entities. On November 17, 2022, Defendant Barton filed a Notice of Appeal [Dkt. 66] concerning the Receivership Order and other orders entered by the Court. As of the date of this filing, that appeal remains pending before the Fifth Circuit. *See* Case No. 22-11132. Briefing is fully ripe, and the Court is set to hear oral argument on May 1, 2023

### 3.      Supplementation of the Receivership Order

The Receivership Order states that the Court assumed "exclusive jurisdiction and possession of the assets . . . of . . . "any other entities that Defendant Timothy Barton directly or indirectly controls . . . ." RO ¶ 1. While several entities controlled by Defendant Barton are included in the Receivership Order, the Receiver quickly discovered from a review of formation binders in the Turtle Creek Office that over 100 entities controlled by Defendant Barton had not been specifically listed in the Receivership Order. Because certain banks and lenders had refused to follow the Receivership Order's mandates absent specific identification of certain companies as "Receivership Entities," on November 1, 2022, the Receiver filed a Motion to Supplement Order Appointing Receiver [Dkt. 41], asking the Court to supplement its Order to specifically list each of these entities. Defendant Barton opposed the motion [Dkt. 55], as did his son Maximilien Baron ("Max Barton") [Dkt. 53]. On November 16, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62] (the "First Supplemental Order") as to the vast majority of these entities and directed the Receiver to file supplemental briefing addressing certain Max Barton-related entities.

RECEIVER'S THIRD STATUS REPORT – PAGE 5

On November 30, 2023, the Receiver filed his Supplemental Brief in Support of the Motion to Supplement [Dkt. 73], asking the Court to specifically identify the following entities as Receivership Entities because they were controlled by Defendant Barton: Gillespie Villas, LLC; Venus 59, LLC; TRTX Properties, LLC; MXBA, LLC; Titan Investments, LLC; TC Hall, LLC; and Titan 2022 Investment, LLC.  Defendant Barton filed a Response [Dkt. 81] opposed to the requests contained in the supplemental brief.  Max Barton similarly filed a Response [Dkt. 82] the same day opposed to the requested relief.  On December 13, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 88] (the "Second Supplemental Order").

On November 17, 2022, in conjunction with his appeal of the Receivership Order, Defendant Barton also appealed the First Supplemental Order.  Case No. 22-11132.  Briefing in that appeal is fully ripe, with oral argument set for May 1, 2023.

On January 12, 2023, Max Barton filed a Notice of Appeal of the Second Supplemental Order. Case No. 23-10046.  As of the filing of this Report, Max Barton and the SEC have filed their opening briefs, and oral argument has not yet been granted or set.

**4.    Stay of the SEC Case and Barton's Attempts to Stay the Receivership.**

On November 2, 2022, the United States Department of Justice filed an Unopposed Motion to Intervene and to Stay Proceedings, whereby it sought to stay the SEC's civil enforcement lawsuit pending resolution of certain Defendants' criminal proceedings.  On November 16, 2022, the Court entered an Order Granting Motion to Intervene and Stay Proceedings [Dkt. 64], but ordered that "[n]othing in this Order shall preclude the Court-appointed Receiver from performing the duties and obligations, and from exercising the powers and rights, set forth in the Court's Order Appointing Receiver."

As detailed in the Receiver's Second Quarterly Report, Defendant Barton filed motions to stay the Receivership Order pending his appeal with both the District Court and the Fifth Circuit. These motions were both denied during the First Quarter of 2023.

### 5.     Status of Defendants Barton and Fu's Criminal Trial

On September 20, 2022, at the United States Department of Justice's request, a grand jury indicted Defendant Barton for wire fraud, conspiracy to commit wire fraud, and securities fraud. *See United States v. Barton, et al.*, No. 3:22-cr-352-K (N.D. Tex.).   On October 13, 2022, Defendant Fu waived indictment for the sale of unregistered securities and pleaded guilty.

During the First Quarter of 2023, Defendant Barton sought and received a continuance of his criminal trial from May 8, 2023 to February 5, 2024.   Defendant Fu has requested (and received) leave to have his sentencing hearing occur after his potential testimony at Defendant Barton's criminal trial.

### B.     Status of Receiver's Efforts to Sell, Develop, Hold or Otherwise Dispose of Real Estate.

The overwhelming majority of the Receiver's time during the Fourth Quarter of 2022 and the First Quarter of 2023 has been dedicated, when not responding to Defendant Barton's filings, to identifying real estate-related assets of the Receivership Entities, reaching out to lenders and other interested parties on each property, determining insurance, utility, tax, and other payments coming due on each of the properties, identifying and communicating with a host of potential purchasers of each of the properties, identifying brokers and other professionals willing to assist in the initial valuation and eventual sale of these properties, identifying appraisers who will be able to help carry out the mandates of 28 U.S.C. § 2001, and reviewing lien reports and title commitments on the properties.

As originally outlined in the Receiver's Initial Report and then further illuminated in the Second Status Report, without exception the real estate assets held by the Receivership Entities face significant challenges.  For one, the vast majority of the assets are heavily leveraged, with some having favorable interest rates and others having abnormally high rates.  Additionally, as to the most valuable assets at one time owned by the Receivership Entities (2999 Turtle Creek and the HUD apartments described below), significant legal challenges have complicated potential dispositions of such properties, making recovery uncertain.  Finally, the economic environment remains uncertain and interest rates have continued to rise.

Based on the information now known by the Receiver, the Receiver believes the following real estate assets may result in a net recovery for the receivership and provides an update to his proposed plan for the fair, reasonable, and efficient disposition of the properties:

### 1.      4107 Rock Creek Drive

As detailed in the Initial Status Report, while reviewing documents at the Turtle Creek Office, the Receiver's team discovered documents indicating loans and insurance payments on a property located at 4107 Rock Creek Drive in Dallas (the "Rock Creek Property").  Upon further examination, the Receiver determined that this property was owned by SF Rock Creek, LLC, a Receivership Entity controlled by Defendant Barton.  *See* Dkt. 41 ¶¶ 6-7.  Accordingly, the Rock Creek Property is a Receivership Asset.

The Receiver obtained an initial opinion of value that the property is worth approximately $1.45 million.  Because (1) the property was financed with a "house flipping loan" that included a high interest rate (9.99%), in addition to being saddled with continuing obligations to pay utilities, insurance, and taxes; (2) the Receivership faced a general dearth of liquid assets with which to administer its ongoing needs; and (3) the relative ease and efficiency in selling residential

properties versus commercial properties, the Receiver listed this property for sale as expeditiously as possible through a respected, independent broker.

After receiving several offers on the property, the Receiver ultimately agreed, subject to Court approval, to sell the Rock Creek Property "AS IS" to the potential purchaser with the highest offer for a total payment price of $1.4 million. In accordance with 28 U.S.C. § 2001 and the Court's Administration Order [Dkt. 63], the Receiver obtained three separate appraisals that resulted in an average appraised value of $1,393,333. The contracted sales price not only exceeded two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b), but exceeded the average appraised value.

On December 2, 2022, the Receiver filed a Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [Dkt. 76], contending that the sale of the Rock Creek Property for $1.4 million was in the best interest of the Receivership. The Court set a hearing to consider approval of the sale for December 19, 2022. Barton filed a Response in opposition to the Receiver's proposed sale [Dkt. 91].

Shortly before the December 19 hearing, the title company assisting the Receiver with the sale of the Rock Creek Property notified the Receiver that on December 1, 2022—after the Receiver had discussed his efforts to sell the Rock Creek Property in his Initial Status Report and the same day that the Receiver's counsel conferred on the sale of the property—Defendant Barton recorded a lis pendens on the property. Because the title company was unwilling to issue a title policy with the existence of the lis pendens, the Receiver was forced to file an Emergency Motion to Declare Lis Pendens Void [Dkt. 96] on December 16, 2022.

At the December 19 hearing, which started at 10 am and concluded shortly before lunch, the Court found that the sale was in the best interest of the Receivership, giving the Receiver authority to complete the sale at the scheduled December 28 closing. The Court also ordered Barton to pay for the Receiver's fees (totaling $1,200) in seeking to have the lis pendens declared invalid.

However, just hours after the conclusion of the hearing, Defendant Barton reached out to the purchaser (unsolicited and without permission from the Court or the Receiver) to notify the purchaser of past foundation and flooding issues Barton claims to have had with the property. In light of Barton's communication, the purchaser requested an extension of the closing date.

Since the original extension, the purchaser and Receiver have entered into several additional extensions of the closing date. On December 21, 2023, Barton also filed an interlocutory appeal of the Order approving the sale. Case No. 22-11226. As of the filing of this Report, briefing is fully ripe, but oral argument has not yet been granted or set. During the First Quarter of 2023, the Receiver filed a motion to intervene and motion to dismiss at the Fifth Circuit (the motion to intervene was denied, but the Receiver was granted leave to file his motion to dismiss as an amicus). While the Receiver remains optimistic that the Court of Appeals will ultimately decide the interlocutory appeal of the Rock Creek Sale Order is improper, no ruling has been received as of the date of this Quarterly Report, and the title company has remained unwilling to issue a title policy until the appeal is concluded.

In the interim, the financial problems that plagued the Rock Creek Property from the outset persist. Since the initial status report, the Receiver has confirmed that the loan on the Rock Creek Property was not a traditional homeowner's loan. To the contrary, Defendant Barton agreed that during the term of the Loan, SF Rock Creek would "not occupy any portion of the Mortgaged

Property in any manner" and that "persons with a direct or indirect ownership interest in [SF Rock Creek] shall not occupy any portion of the Mortgaged Property in any manner throughout the term of the loan." Because the sale did not close on December 28, interest continues to accrue daily. While the Receiver has leased the Rock Creek Property to the approved purchaser to salvage (hopefully) the sale when the Fifth Circuit dismisses Barton's appeal of the Rock Creek Order, under the loan documents all rent payments go to the lender. Finally, while the Receiver negotiated favorable terms regarding penalty interest and a pre-payment penalty that would otherwise be due based upon a December 28 closing, and while the Receiver is optimistic he will be able to reach a similar agreement if he is able to close the approved sale, no guarantees exist that these favorable terms will be part of a delayed closing or subsequent sale.

After payment of the existing loan, associated fees, taxes, closing costs, and broker commissions, the Receiver still anticipates net proceeds flowing into the Receivership Estate. However, given the uncertainty surrounding the closing date, it is still impossible for the Receiver to accurately predict the amount of funds that will flow into the Receivership Estate.

### 2. Frisco Gate Property

Receivership Entity FHC Acquisitions, LLC owns approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate Property"). The Receiver has obtained multiple broker's opinions of value for this property that generally estimate the property's value to fall between $8.9MM and $10.8MM. Through a broker previously retained by Barton, and with Barton's cooperation, a potential purchaser of the Frisco Gate Property approached the Receiver about selling the Frisco Gate Property for $9,000,000. The parties entered a Letter of Intent on October 31, 2022. Between October 31 and December 13, 2022, the parties negotiated a purchase and sale agreement.

Pursuant to 28 U.S.C. § 2001, the Receiver sought three appraisals on the property—two broker opinions of value and one formal appraisal. The three appraisals value the Property at $9,016,920 - $10,018,800, $8,896,365 - $9,884,850, and $9,000,000, respectively. After receiving the formal appraisal on December 16, 2022, the Receiver and his team prepared a Motion for Appointment of Appraisers, Approval of Appraisals, and a Hearing Regarding Approval of Sale of Frisco Gate Property [Dkt. 110] on December 22, 2022. Barton filed a Notice of Non-Opposition [Dkt. 123]. On January 31, 2023, the Court held a hearing to approve the sale of the Frisco Gate Property and entered an Order [Dkt. 142] approving the sale the same day.

Because of certain unanswered questions regarding potential parking commitments on the property and obligations under certain master development agreements, the Receiver and purchaser entered an Addendum to the purchase and sale agreement on January 24, 2023. The Addendum did not materially alter the agreement, but simply (1) extended the Feasibility Period defined in the Agreement by an additional 30 days, (2) extended the closing date in proportion to the Feasibility Period, and (3) made certain Earnest Money nonrefundable if specified conditions are met. Pursuant to the Addendum, the Feasibility Period would end on February 13, 2023, with Closing set to occur on or before April 14, 2023. The Receiver and purchaser ultimately entered similar Second and Third Amendments that extended the Feasibility Period and Closing Date because the parking issues remained outstanding. By way of a Fourth Amendment, the purchaser has agreed to take the risk of resolving the parking issues, with the Feasibility Period ending, but with closing set to occur on September 22, 2023.

The Receiver continues to believe that this sale is in the best interest of the Receivership because, among other things, it allows the Receiver to accomplish a sale of the property (a) quickly and without a listing process, (b) without having to pay any broker fees (the potential purchaser of

the property has agreed to pay its broker separately and outside of the sale proceeds), and (c) with a purchaser who is willing to work through and take the risk of the various parking and master development issues.

After payment of the existing loan (which appears to exceed $3 million), a second investment/loan of approximately $3.5 million, taxes, and closing costs, the Receiver currently anticipates this sale resulting in net proceeds of approximately $2 million into the Receivership Estate.

### 3.  2999 Turtle Creek

Receivership Entity 2999TC Acquisitions, LLC is or was the owner of the Turtle Creek Property, having purchased the property in or around September of 2019.  In connection with this purchase, 2999TC Acquisitions, LLC or its predecessor secured a loan in the amount of $32,500,000.  Through protracted litigation in the bankruptcy court—and millions of dollars in payments from the Receivership Entities to the lender, HNGH Turtle Creek, LLC ("HNGH")— the Bankruptcy Court eventually entered an Order (the "Order Enforcing Agreed Orders") on September 28, 2022 that finds, among other things, that HNGH now "owns" the Turtle Creek Office, not 2999TC Acquisitions, LLC.  That Order was appealed shortly after it was entered, and the appeal, which is also with this Court, was automatically stayed upon the Receiver's October 18, 2022 appointment.

On November 25, 2022, HNGH filed a Motion to Intervene and to Confirm Ownership of Property Located at 2999 Turtle Creek Boulevard [Dkt. 69].  Among other things, HNGH claims that the Bankruptcy Court's September 28 order confirms that as of May 2022, HNGH owned the Turtle Creek Office.  The Receiver filed a Response [Dkt. 94] on December 15, 2022, in which he indicated that he is not opposed to HNGH's request to intervene as a party in interest but is opposed to HNGH's requested confirmation of any ownership interest in 2999 Turtle Creek and HNGH's

implicit request to lift the stay of litigation imposed by the Receivership Order to permit resolution of the pending bankruptcy appeal.  Defendant Barton also filed a Response [Dkt. 97] opposed to HNGH's request.

During the First Quarter of 2023, the Court granted [Dkt. 154] HNGH's motion to intervene but denied HNGH's request that the Court confirm ownership of the property.  Instead, the Court ordered the parties to mediate the dispute and appointed Retired Bankruptcy Judge Harlin Hale to mediate the dispute.  Mediation occurred on March 10, 2023.

As detailed more fully in the Receiver's Verified Motion to Approve Settlement Agreement with HNGH [Dkt. 210], which is pending as of the date of this Report, the Receiver and HNGH have settled their dispute, subject to Court approval.  Pursuant to the terms of the Settlement Agreement, HNGH will pay the Receiver a total of $2.5 million in the following intervals after the Court's approval of the Settlement Agreement: (i) $500,000 paid within seven days; (ii) $500,000 paid within one year; (iii) $750,000 paid within eighteen months; and (iv) $750,000 paid within two years (collectively, the "Settlement Payments").

The Receiver believes the settlement with HNGH is in the best interest of the Receivership for a number of reasons.  First, after an extensive investigation, the Receiver has determined that there are significant, potentially impossible hurdles to unwinding the bankruptcy court's prior Agreed Orders, the confirmed and effective Plan, and the Order Enforcing Agreed Orders.  The Appeal would likely be unsuccessful, given the bankruptcy court's thoroughly examined factual record "in a hearing that lasted over fifty hours, stretched out over two months" and the requisite "clear error" standard of review for a bankruptcy court's findings of fact.

Second, even if the Receiver were to succeed on the Appeal—after an indefinite amount of time for this Court's decision and then HNGH's inevitable appeal to the Fifth Circuit—the likely

amount due under the Loan Documents would far exceed the value of the Property and the likely selling price of the Property.

Third, the Receiver contends that $3.95 million of the $4.735 million that Receivership Entities paid to HNGH under the Loan Documents are arguably fraudulent transfers, although $3.8 million of that was paid in accordance with obligations incurred by 2999TC under the Agreed Orders, which were incorporated into the confirmed and now-effective Plan, approved in the Bankruptcy Case. Even if the payments were made with actual or constructive fraudulent intent, the Receiver faces the significant hurdle of overcoming HNGH's good-faith defense because these payments were made by Receivership Entities pursuant to court orders. The substantial financial costs and delay of litigating these fraudulent transfer claims would only deplete the Receivership Estate with no guarantee of success. Consequently, the Receivership Estate's receipt of $2.5 million of potentially $3.95 million in fraudulent transfer amounts is a fair and equitable result.

As of the date of this Report, the HNGH Settlement Approval Motion remains pending. Defendant Barton has indicated that he is opposed to the settlement.

### 4.    HUD Apartments

Receivership Entities D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC, are the record owners and HUD borrowers on four separate apartment complexes in Texas and Alabama (collectively, the "HUD Apartments"). These properties include Bellwether Ridge in DeSoto, Texas (owned by D4DS, LLC), the Parc at Windmill Farms in Forney, Texas (owned by D4FR, LLC), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN, LLC), and the Parc at Opelika in Alabama (owned by D4OP, LLC).

Each of these properties was developed under (and is currently encumbered by) separate sizeable HUD loans through Greystone. Third-Party Southern Properties Capital, Ltd.'s ("SPC") provided a smaller second loan for each of the properties. SPC claims that these mezzanine loans

were "convertible" in nature, whereby it had the option to convert its debt position into equity ownership of certain affiliated Receivership Entities and, indirectly, ownership of the HUD Apartments. SPC further claims that as to the DeSoto, Forney, and Ingleside HUD Apartments, it exercised conversion options prior to the appointment of the Receiver.

As discussed further below, during the First Quarter of 2023, the Receiver entered contracts to sell the DeSoto and Forney HUD Apartments owned by D4DS and D4FR, respectively, and filed motions to approve these sales free and clear of SPC's purported conversion [Dkts. 161 & 164]. SPC responded that the Receiver had no right to sell the DeSoto and Forney HUD Apartments [Dkt. 178]. The Court ultimately continued the hearing on the Receiver's motions to sell these properties and ordered the Receiver and SPC to file summary judgment briefing on the issue of ownership of the HUD Apartments. As will be detailed more fully in the Receiver's next Quarterly Report, the Receiver filed his motion for summary judgment on April 13, 2023 [Dkt. 207]. While the Receiver is optimistic that he will ultimately succeed on the question of ownership of the HUD Apartments, if SPC is successful in its challenge, the possibility exists that the Receivership Entities will not obtain any recovery on these properties.

As noted in prior reports, Defendant Barton has suggested in various filings that the sale of one, two, or three of these properties will result in the recovery of sufficient funds to pay a 100% recovery to the Wall investors. However, as the Receiver has detailed in prior filings, this position not only ignores SPC's arguments regarding its equity position in the properties, but, even assuming that SPC's loans are treated as debt, ignores the existing HUD and SPC debt on the properties. Barton also ignores the non-Wall creditors who will participate in the Receivership's eventual claims process. Finally, at the hearing on the Motion to Approve the sale of the

Amerigold Suites (discussed below), Barton indicated (through counsel) that he believes proceeds from the sale of any HUD Apartments should go to Barton and not the Receivership.

Similar to prior Quarterly Reports, each of the HUD Apartments is dealt with in turn:

### a.    Bellwether Ridge (DeSoto)

Receivership Entity D4DS, LLC is the record owner and HUD borrower on a certain apartment complex located at 841 S. Polk Street in DeSoto, Texas ("Bellwether Ridge"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. One is a certified appraisal, and two are informal broker opinions of value.  The three appraisals value Bellwether Ridge at $28,000,000, $27,750,000 - $29,750,000, and $28,800,000 - $31,900,000 resulting in an average appraised value of $29,033,333.[1]

After the Receiver's appointment, he consulted multiple industry professionals and brokers regarding the potential value of the Property and three other similar projects (Parc at Windmill Farms in Forney, the Parc at Ingleside outside of Corpus Christi, and the Parc at Opelika in Alabama) that involve both HUD loans serviced by Greystone and additional loans from SPC to JMJ.  Due to the uncertainty surrounding the outstanding dispute with SPC, the Receiver ultimately was unable to reach agreement to engage the brokers, who expressed unease in marketing the properties due to SPC's ownership claims.

Despite difficulties listing the Property with a broker, the Receiver communicated with dozens of potential interested purchasers.  While most of the potential purchasers ultimately were

---

[1] On November 14, 2022, Defendant Barton filed an opinion of value—from an individual who is connected to Barton on at least one other transaction—that estimates the value of Bellwether Ridge to be between $26.7 million and $28.0 million.  [Dkt. 57 at 7].  As of January 13, 2023, the balance on the HUD loan for this property was $17,823,548.47.  As of January 17, 2023, Pillar claims that the balance of its second loan for this property was $3,797,758.95.

unwilling to submit offers on the Property, the Receiver obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Palmetto Capital Partners, LLC—on behalf of a joint venture (Polk Street 2023, LLC) between Palmetto and i3 Interests LLC (collectively, "Palmetto/i3")—on November 30, 2023 at a purchase price of $27,000,000.

During the following months, the Receiver and Palmetto/i3 engaged in protracted negotiations regarding the purchase and sale agreements for the Property and one other related property.  During this time, the Receiver continued to communicate with other potential interested purchasers, none of whom provided higher offers than that received from Palmetto/i3.  Finally, on February 21, 2023 the Receiver and Palmetto/i3 entered into a Purchase and Sale Agreement, whereby the Receiver agreed, subject to Court approval and certain other contingencies, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $27,000,000.

The Receiver remains hopeful, albeit pessimistic, that he will be able to reach agreement with SPC to treat its loan as just that—a loan that will be paid at closing.  Regardless of any ultimate agreement, SPC's claims to the proceeds from the sale of Bellwether Ridge can be administered through the forthcoming claims process, where the adjudication of its claim to the proceeds could range from treatment as an unsecured creditor generally, to the Court's determination that SPC is entitled to 100% of the sale proceeds.

Assuming that SPC is ultimately treated as a lender, and if the Court approves the sale, after discounting the Greystone loan balance ($17,823,548.47), the SPC loan balance ($3,797,758.95), and the fee to buyer's broker ($270,000), the sale would result in a net benefit of approximately $5.1 million to the Receivership Estate prior to other closing costs.

### b.    Parc at Windmill Farms (Forney)

Receivership Entity D4FR, LLC is the record owner and HUD borrower on a certain apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126 ("Windmill

Farms"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of Windmill Farms. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Windmill Farms at $50,000,000, $52,000,000 - $56,000,000, $53,000,000 - $58,000,000 resulting in an average appraised value of $53,166,666.

Despite difficulties listing the Property with a broker (as outlined above), after communicating with dozens of potential interested purchasers, he ultimately entered into a Purchase and Sale Agreement with Palmetto/i3 whereby the Receiver agreed, subject to Court approval, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $51,000,000.

Assuming that SPC is ultimately treated as a lender, and if the Court approves the sale, after discounting the Greystone loan balance ($35,076,762.98), the SPC loan balance ($7,885,547.12), and the fee to buyer's broker ($510,000), the sale will result in a net benefit of approximately $7.5 million to the Receivership Estate prior to other closing costs.

### c.       Parc at Ingleside (Corpus Christi area)

Receivership Entity D4IN, LLC is the record owner and HUD borrower on a certain apartment complex located at 2850 Ave. J, Ingleside, TX, 78362 ("Parc at Ingleside"). The property is still in the process of rent stabilization. The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports. To date, he has received opinions of value ranging between $28 million and $31.1 million. As of January 13, 2023, the balance on the HUD loan for this property was $24,790,081.91. As of January 17, 2023, SPC claims that the balance of its second loan for this property was $3,759,163.65.

The Receiver has been advised by multiple real estate professionals that the Ingleside property needs additional time for rent stabilization to maximize any value. While the Receiver

believes that Ingleside presents value to the Receivership Estate, at this time it remains impossible to predict what that value will be.

### d.    Parc at Opelika (Alabama)

Receivership Entity D4OP, LLC is the record owner and HUD borrower on a certain apartment complex located at 1375 McCoy Street, Opelika, AL 36801 (the "Parc at Opelika). Construction on Opelika is complete and the rental process has begun.  Endorsement of the HUD loan on the Opelika is not yet complete and cost certification remains in process.  The Receiver has encountered multiple challenges in this respect, including construction liens, interest payments that had to be made when draw requests were delayed, and ongoing challenges surrounding the Receiver's lack of access to QuickBooks and the Receivership Entities' digital files (as outlined below).  At this time, there is no guarantee that certification will occur, but the Receiver is still optimistic that it will occur, albeit with potential loan penalty payments.

Similar to Bellwether Ridge, Windmill Farms, and Ingleside, Opelika has both a HUD loan as well as additional funding from SPC.  As of January 13, 2023, the balance on the HUD loan for this property was $21,878,710.41.  As of January 17, 2023, SPC claims that the balance of its second loan for this property was $3,189,659.90.  SPC claims that while it has not yet converted its debt to equity, its convertible loan will allow it to do so in the future.  While the Receiver believes that Opelika presents value to the Receivership Estate, at this time it is impossible to predict what that value will be.

### 5.    Amerigold Suites

Receivership Entity Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites").  While the four apartment complexes discussed above have third-party property managers, the Receivership Entities themselves coordinated with contractors to manage the Amerigold Suites.  As discussed

in the initial report, in the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a large number of vacant units and the generally poor condition of several units. Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off, and that significant water bills were long overdue, even under a prior negotiated settlement. The Receiver was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued. Moreover, but–for the Receivership Order's automatic stay on foreclosure and other lender remedies, the Receiver would have faced considerable challenges from the lender, Texas Brand Bank.

During the Fourth Quarter of 2022 and continuing into the First Quarter of 2023, the Receiver and his team were forced to expend considerable effort (1) convincing electrical and water utility companies not to shut off services to the property; (2) securing property and liability insurance despite the history of the property and the Receivership; (3) meeting with the property manager to discuss the ongoing maintenance and repair needs of the property; and (4) analyzing various options to maximize the value of the Amerigold Suites to the Receivership. In the meantime, interest on the property has continued to accrue, significant repairs have continued to be needed, property tax and insurance bills remain high, and the Receiver and his team continue to be forced to devote significant attention to this property.

In December 2022, the lender (Texas Brand Bank) sold the note on the Amerigold Suites to a third party. As of January 30, 2022, the note holder claims that the outstanding balance on the primary loan on Amerigold Suites is $2,543,820.04. The Receiver is aware of at least one other smaller loan on the property, as well as a few other smaller liabilities.

As discussed below, there is also a personal injury lawsuit involving Amerigold that is currently stayed. During the First Quarter of 2023, the Receiver was notified of a second potential personal injury claim related to a recent storm. The insurance carrier has been notified of this incident, and the Receiver's investigation of the incident is ongoing.

In light of these challenges, and to avoid using limited receivership assets to continue operating the Property at a loss the Receiver determined selling the Property was in the best interest of the Receivership Estate if a sale would generate a net return for the Estate. After consulting multiple industry professionals and brokers regarding the Property's potential value, the Receiver engaged a broker to market the Property.

The broker obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Matthew Flume (the "Amerigold Purchaser") on January 25, 2023 at a purchase price of $5,500,000. The Amerigold Purchaser (and his affiliated entities) have extensive experience rehabilitating distressed multifamily assets.

The Receiver and the Amerigold Purchasers engaged in negotiations regarding a purchase and sale agreement for the Property, and on March 1, 2023, the Receiver and the Buyer entered into a Purchase and Sale Agreement (the "Amerigold Contract"), pursuant to which the Receiver agreed, subject to Court approval, to sell the Property to the Amerigold Purchaser for $5,500,000.

In connection with the sale and pursuant to 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. Two are informal broker opinions of value, and one is a certified appraisal (collectively, the "Appraisals"). The three Appraisals valued the Property at $4,400,000, $3,500,000, and $4,900,000 -$5,500,000, resulting in an average appraised value of $4,366,667.[2] Thus, the contracted sales price, $5,500,000, not only greatly exceeded two-thirds

---

[2] The averaged appraised value was calculated using the average of the WDIS Broker Opinion of Value, $5,200,00.

of the average appraised value of the Property ($2.9 million) as required by 28 U.S.C. § 2001, but also exceeds the certified appraised value by over $1 million.

On March 2, 2023, the Receiver filed his Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [Dkt. 167] (the "Amerigold Sale Motion").  Barton objected to the sale [Dkt. 185].  On March 20, 2023, the Court held a hearing on the Amerigold Sale Motion, and, on March 29, 2023, entered an Order approving the sale [Dkt. 202].

The Contract required deposit of an initial earnest money payment of $100,000 within three days after receiving court approval to sell the Property, with subsequent deposits required at various times.  The Due Diligence Period under the Agreement has been extended to May 12, 2023.  Provided certain conditions are met, the earnest money becomes non-refundable at the end of the due diligence period.  The Contract requires closing no later than 30 days after the expiration of the due diligence period, subject to a 30-day extension based on additional events.  As of the date of this Report, the Receiver is working through certain title and other issues on the property.

If the sale ultimately closes, after discounting the loan balance (approximately $2,543,820 as of January 30, 2023), liens on the Property (totaling approximately $6,298.59), and the fee to seller's broker ($192,500), the sale will result in a net benefit of over $2.5 million to the Receivership Estate prior to other closing costs.[3]

### 6.    Venus Development

Prior to the Receiver's appointment, the Receivership Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development

---

[3] Although not reflected in the title commitment or an independent review of the Dallas County property records, the Receiver has discovered a second lien for several hundred thousand dollars may encumber the Property.  The Receiver will verify the status of the purported loan before closing.  Even if the loan exists, the net to the Receivership Estate will likely be more than $2 million.

agreement with the City of Venus.  The properties included in this potential development, including the Receivership Entity currently owning the properties is detailed below:

| Project Name | Current Owning Entity | Approximate Address | CAD Geographic ID | Acres |
|---|---|---|---|---|
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00050 | 1 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00051 | 110.9 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00052 | 14.25 |
| Northstar | DJD Land Partners, LLC | 1025 N FM 157, Venus, TX | 126.0857.00030 | 1 |
| Northstar | Lynco Ventures, LLC | 1209 Cr 501, Venus, TX | 126.0358.00070 | 62.8 |
| Northstar | Lynco Ventures, LLC | 11209 Cr 501, Venus TX | 126.0358.00060 | 1 |
| Griffin I | LDG001, LLC | 980 CR 110, Venus, TX | 126.0093.00010 | 150.9 |
| Griffin II | LDG001, LLC | 324 W CR 109, Venus, TX | 126.0758.00100 | 46.9 |
| Griffin House | LDG001, LLC | 940 CR 110 Venus, TX | 126.0093.00009 | 1 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00044 | 17.6 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00039 | 86.9 |
| Berkowitz | Carnegie Development, LLC | 11129 CR 506, Venus, TX | 126.0261.00040 | 1 |
| Berkowitz | Carnegie Development, LLC | 11101 CR 506, Venus, TX | 126.0261.00041 | 30 |

| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00042 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00043 | 30 |
| Johnston | Venus 59, LLC | 916 S Fm 157, Venus, TX | 126.0379.00110 | 3.4 |
| Johnston | Venus 59, LLC | 817 CR 214, Venus, TX | 126.0379.00040 | 59 |

At the time of the Receiver's appointment in October 2022, multiple of these properties were in the process of being foreclosed upon by secured lenders. Such efforts were automatically stayed upon entry of the Receivership Order, although the Receiver and his team did have to expend some effort avoiding scheduled foreclosure sales post-appointment. Another property (Venus Farms) was intended to be included in the development, but closing on the property never occurred.

During the First Quarter of 2023, the Receiver and his team continued spending considerable time discussing the Venus Project with the representatives from the City of Venus, consultants who assisted the Receivership Entities with the entitlements process, lenders and secured creditors, multiple developers who are potentially interested in developing the project, and other potential interested purchasers of the land. If the development agreements with the City are finalized, the value of the properties could increase significantly. However, as of the date of this Report, the Receiver is still unable to predict (1) whether the development agreements will ultimately be finalized with the City of Venus and (2) if the development agreements are finalized, what value will ultimately be realized by the Receivership Estate. Each of the properties associated with this development have significant debt (which debt collectively exceeds at least $11 million). At this time, it is still too early to determine whether the Receiver will be able to recover any value

to the Receivership Estate from the Venus Development or, if there is value, what that value will ultimately be.

### 7.     Ridgeview Addition

Receivership Entity Ridgeview Addition, LLC owns approximately 54 platted lots near Bulldog Road in Venus, Texas.  The Receiver understands in or around July 2021, Ridgeview Addition entered into a Lot Take-Down Contract whereby it would sell 54 developed lots to an affiliate of Lillian Homes at a price of $61,000 per lot (for a total purchase price of $3,294,000).  All lots were not to convey at one time, rather twelve lots would be conveyed at closing, an additional twelve lots would be conveyed 120 days, later, and then three successive transfers of ten lots each would occur at 90 day intervals thereafter.  All told, the contract contemplates that the take down of the lots will occur over a thirteen-month period.

The Receiver is aware of one loan on the property (to a separate Pillar-related entity) and a second loan upon which the Ridgeview Addition is cross-collateralized (to separate Pillar-related entity).  Collectively, these loans exceed the value to be realized by the Receivership from any sale.  Moreover, the Receiver has learned of significant additional liens on the property that will require release prior to any transfer of the lots.  And finally, the City of Venus insists that Defendant Barton agreed to construct a playground at the development as part of the platting promise, but the playground has not yet been constructed. Thus, despite Defendant Barton's prior claim that the sale of this property will bring in "approximately $265,000 in immediate cash equity into the Receivership," significant challenges and uncertainties with the property make it impossible to predict what amount of funds, if any, will be received by the Receivership and when such transfer will occur.  During the First Quarter of 2023, the Receiver had extensive conversations with Lillian Homes, the lenders, and the City of Venus.  The Receiver also ordered multiple appraisals on the property.

### 8. Gillespie Property

Receivership Entity Gillespie Villas, LLC owns a residential property located at 3600 Gillespie Dr. in Dallas, Texas (the "Gillespie Property"). On December 13, 2022, the Court entered its Second Supplemental Order, which, among other things, confirmed that Gillespie Villas LLC is a Receivership Entity. Max Barton's appeal of the Second Supplemental Order is still pending. During the First Quarter of 2023, the Receiver took possession of the Gillespie Property, which is in poor physical condition, and communicated with potential brokers and purchasers of the Property. The Receiver is still in the process of securing appraisals and opinions of value on the Gillespie Property. Substantial funds were provided by Receivership Entity Broadview Holdings to purchase this property.

### 9. Hall Property

Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property"). The Court's December 13, 2022, Second Supplemental Order also clarified that TC Hall, LLC is a Receivership Entity controlled by Defendant Barton. During the First Quarter of 2023, the Receiver ordered appraisals on the Hall Property and communicated with potential brokers and purchasers on the property. Substantial debt exists on this property.

### 10. Other Potential Real Estate Assets

As outlined further below and in the Receiver's Motion to Compel (which was filed in January 2023), Defendant Barton still has not provided the overwhelming majority of the information required by the Receivership Order. This includes a list of properties owned by the Receivership Entities. While the Receiver believes that he has separately identified all properties owned by the Receivership Entities, it remains possible that (and the Receiver has reason to

believe) other properties exist that are owned, either directly or indirectly, by Defendant Barton. The Receiver's investigation is ongoing.

**C.    Other Identified Assets of the Receivership.**

Based on the information now known by the Receiver, the Receiver believes the following assets may be additional sources of recovery for the receivership:

Artwork and other Contents of Turtle Creek Office.  The Turtle Creek office contains a large bronze casting of Michelangelo's Bacchus.  During the early days of the Receivership, the Receiver was told by multiple individuals associated with Barton that more than $100,000 was paid for this sculpture and that an appraisal exists that indicates the sculpture is worth well in excess of that amount.  At one point, Defendant Barton and his lawyers suggested that the Receiver should liquidate this sculpture to help pay for administration of the Receivership. However, Heritage Auctions has declined to assist the Receiver in selling this piece of art.  A professional art appraiser researched the bronze and estimates that its value at auction would likely be between $2,500 and $3,500.  The Receiver has contracted with a professional art and antiques auctioneer to sell this and certain other items from the Turtle Creek Office.  The Receiver has separately contracted with another auctioneer to sell the remaining contents of the Turtle Creek Office (furniture, electronics, building supplies, etc.).  As to the latter, the Receiver has already filed a Notice [Dkt. 213] of the intended auction of over 1,000 items from the Turtle Creek Property.  As to the auction of select artwork and antiques, that auction is expected to occur sometime in the Fall of 2023, with a separate notice to be filed with the Court at a later date.

The Receiver continues to believe that an auction of the contents of the Turtle Creek office will maximize the value of the sales in the most efficient and economical manner.  His contracts with the auctioneers are industry standard and include a commission payment—*i.e.*, the Receiver will only pay the auctioneers tied to their successful sale of items.  The Receiver and his team have

continued to ask (repeatedly) for multiple individuals, including Defendant Barton, his children, and others associated with Barton to provide a list of any personal effects they claim remain housed at the Turtle Creek Office. Indeed, the Receiver has turned over a vast array of inherently personal items to several individuals, mainly Defendant Barton and his children. The remaining items are currently being addressed between the various parties, and the Receiver is hopeful that the auction of the majority of the contents of the Turtle Creek Office will occur during the Second Quarter of 2023.

Artwork at Rock Creek Property. As discussed in the Initial Report, upon securing possession of the Rock Creek Property, the Receiver noticed that there were several holes in the wall confirming, as he had been told, that artwork had been removed prior to his visit to the residence. Despite multiple oral and written requests, the Receiver did not receive any list of artwork from Defendant Barton for several weeks. However, on November 15, Defendant Barton disclosed, perhaps inadvertently, pictures of some of the artwork that was removed from the walls. *See* Dkt. 58 at 29, 30, 33, 35. Additionally, the Receiver has located financial statements indicating that Barton believed the Receivership Entities owned artwork worth approximately $12 million. In January 2023, the Receiver filed a Motion to Compel [Dkt. 133] Barton to disclose this and other information in accordance with the Receivership Order. Barton has claimed that very little artwork was in either the Rock Creek Property or the Turtle Creek Property. *See* Dkt. 160-1 at 23. Without additional information regarding these pieces of art and their current location, it is impossible to ascertain the amount of any value to the Receivership Estate.

Contents of Rock Creek Property. In connection with approving the sale of the Rock Creek Property, the Court ordered that the Receiver move and store personal items belonging to Defendant Barton "before the Property is sold." Because closing has yet to occur pending Barton's

appeal of the sale order, contents of the Rock Creek Property remain on site.  The Receiver is still analyzing whether storage expenses will "cause the personal items to rapidly deteriorate in value when compared to the cost of the storage" and whether to ask the Court for approval to sell these items if Barton is unwilling to pay storage costs to avoid the sale.

Vehicles.  The Receiver has identified multiple vehicles that may have been purchased in whole or in part with money from the Receivership Entities. The Receiver is still determining what ownership interest the Receivership Entities have in these vehicles.

Airplane. Receivership Entity JMJAV, LLC is the registered owner of a 1982 Learjet 55 located in Arlington, Texas. The Receiver has received information indicating Third Coast Bank, SSB holds an approximately $350,000 note on the plane, and Elite Jet Solutions, LLC holds a $143,576.63 mechanic's lien. The Receiver was told that the aircraft has been parked at Elite Jet Solutions since 2019. The Receiver has also been told that the plane is not currently airworthy and needs extensive work. Based on information provided to the Receiver, the plane is worth approximately $65,000 in its current condition, and if the airplane is taken apart and selectively sold for parts, it might be worth about $200,000. Elite Jet Solutions estimates the plane needs approximately $355,000 in parts and repairs to make it airworthy. The Receiver has been told that if the plane is operational, it may be worth approximately $900,000 - $1 million. The Receiver's investigation of value and discussions with Elite Jet and Third Coast Bank are ongoing.

Participation Interests.  During the twelve months prior to the appointment of the Receiver (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida. In connection with these sales, the Receivership Entities often (though not always) received

millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms, and Winter Haven:

- $800,000 on March 14, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $500,000 on March 14, 2022 to Orchard Farms Village, LLC

- $200,000 on May 6, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $2,000,000 on May 9, 2022 to AVG West, LLC (Winter Haven)

Although the Receiver still has not yet obtained all bank records and his accountants still have not completed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC.[4]

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC). The Receiver is still investigating and analyzing potential value of participation interests related to Killeen and San Antonio properties. While it is impossible to predict the amount of value these contractual interests will ultimately bring to the Receivership, the Receiver is optimistic that some value will be realized. The Participation Agreements related to DLP Capital are discussed below.

Ratification of DLP Settlement. As detailed more fully in the Receiver's Verified Motion to Ratify Agreement with DLP Capital and Other Entities [Dkt. 95], the Receivership Entities sold

---

[4] A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms. These few examples alone demonstrate the necessity for the forensic accounting described below.

certain properties in Fort Worth (Orchard Farms and the Mansions at Marine Creek) and Florida (Winter Haven) to DLP Capital in late 2021.  As part of these transactions, the Receivership Entities (1) received several million dollars over a period of months, (2) transferred title to the properties, and (3) as to each of the Fort Worth properties, entered into a Construction Agreement, a Development Agreement, and a Participation Agreement.  On October 18, 2022, the same day that the Receiver was appointed, DLP Capital sent default notices to the Receivership Entities regarding their obligations under the Construction Agreement and Development Agreement.  After a meeting between counsel and protracted settlement negotiations, the Receiver and DLP Capital eventually agreed to a mutual release of claims and a payment of $750,000 from DLP Capital to the Receivership.  Although the Receivership Order specifies that the Receiver does not need Court approval for such agreements, the Receiver nevertheless filed the Motion to Ratify the agreement. The Court entered an Order ratifying the DLP agreement [Dkt. 109] over Barton's objection. Barton has filed an interlocutory appeal of this Order.  Case No. 22-11242.  As of the filing of this Report, Barton has filed his opening brief, but oral argument has not yet been granted or set.  The Receiver attempted to intervene and file a motion to dismiss in the appeal.  The Fifth Circuit denied the motion to intervene but allowed the Receiver to file his motion to dismiss for lack of jurisdiction as an amicus.  Barton filed a motion to stay the District Court's Order, but the motion was denied.

Walker Ranch.  On December 8, 2022, the Receiver was notified—for the first time and despite the Receiver's pending Motion to Supplement the Receivership Order and Supplemental Brief setting forth specific evidence that Defendant Barton controlled Titan Investments, LLC— of a contract between Titan Investments, LLC and Byron Walker to purchase the Walker Ranch. The communication did not come from Defendant Barton, any of his attorneys, or any of the

RECEIVER'S THIRD STATUS REPORT – PAGE 32

Receivership Entities host of former layers and employees. Instead, it came from Mr. Walker himself, who was attempting to sell the property in order to avoid foreclosure on his property. However, shortly before closing on the sale, Mr. Walker was notified of a lis pendens and lawsuit filed by Max Barton—in violation of the Receivership Order—against Mr. Walker and an affiliated entity to recover certain payments made by Broadview Holdings and other Receivership Entities to Walker during the life of the terminated purchase contract. Over a period of weeks, the Receiver learned, among other things, that one of the Receivership Entities' former lawyers held the note on the property and was trying to foreclose and that many of the payments included in Titan Investments' lawsuit against Walker were not recoverable. In order to allow Mr. Walker to close the sale, the Receiver agreed to hold virtually all of Mr. Walker' equity in the sale ($120,000) pending reaching a court-approved settlement with Mr. Walker.

During the First Quarter of 2023, the Receiver had extensive discussions with Mr. Walker regarding potential settlement options and additional supporting information needed for certain transfers received by Walker. As of the date of this report, the Receiver is currently awaiting additional documentation from Walker and is optimistic that they will be able to reach agreement. Any settlement with Walker will be brought to the Court for approval. The $120,000 in equity was deposited in the Receivership bank accounts in January of 2023, pending ultimate allocation through settlement.

Fraudulent Transfer Claims. Based upon the forensic accounting to be conducted by the Receiver's accountant, the Receiver will evaluate the disposition of investor funds to determine whether he has a valid fraudulent conveyance claim against the recipient of the funds. The Receiver will also evaluate the potential defenses, whether each transfer of funds was exchanged in good faith and for reasonably equivalent value, in advance of pursuing these claims. From a

cursory review of the Broadview Holdings bank statements, it appears that hundreds of thousands of dollars may have been fraudulently transferred from that account between July and October 2022 alone.

Potential Damages Claims. The Receiver is investigating the role of other persons and entities associated with the Defendants and the Receivership Entities.

Recovery of False Profits. To the extent any investors received monies in excess of their principal investment, the Receiver may seek the return of those "false profits."

**D.      Status of Forensic Accounting and Other Accounting Work.**

The Receiver has taken possession of all documents and computers belonging to the Receivership Entities that were housed in the Turtle Creek Property at the time the Receiver took possession of the property. The Receiver's efforts to complete the forensic accounting have been delayed for a variety of reasons, including (1) Barton's refusal to assist in the identification of the location of or responsible persons for the Receivership Entities' QuickBooks accounts; (2) Intuit's delays in providing the Receiver access to the Receivership Entities' online QuickBooks accounts (these were finally made available during the Second Quarter of 2023); (3) the Receivership Entities' banks providing bank statements and debit and credit information inconsistently and slowly; and (4) the general lack of operating cash during the first months of the Receivership, among other things.

The Receiver remains hopeful that the online QuickBooks accounts, as well as certain Enterprise versions of QuickBooks, will enable his accounting team to avoid some of the time and expense associated with manually entering transactions from bank statements. However, as the Receiver's accountants have slowly gained access to the Receivership Entities' various QuickBooks accounts, they have determined that the most accurate means of confirming the data

in QuickBooks will be from electronic scanning of bank records and comparing against whatever QuickBooks accounts have been located.

The Receiver has retained Ahuja & Clark to prepare the forensic accounting, which when complete should enable the Receiver to trace (1) the amount of funds flowing from each Wall-entity investor into the Receivership Entities and (2) where those investor funds ultimately ended up (*i.e.*, whether they were saved, spent, or transferred to someone else). This forensic accounting is of paramount importance to the Receiver's duties in analyzing claims received from investors, identifying potential targets of fraudulent transfer claims, and determining the amounts owing to the Receivership on account of such claims. During the First Quarter of 2023, the Receiver's accountants began formulating a plan for the forensic accounting, which the Receiver anticipates kicking off in earnest during the Second Quarter of 2023.

Separately, during the First Quarter of 2023, the Receiver's accountants also prepared various tax filings associated with the Receivership and the host of Receivership Entities. The Receiver and his accountants also spent considerable time trying to track down prior tax returns for the Receivership entities. If the Receiver is unable to locate these tax returns, he will have to prepare tax returns for the Receivership Entities for years prior to the Receivership at considerable cost to the Receivership Estate. To date, Defendant Barton has neither identified the tax accountants who prepared the Receivership Entities, nor provided with sufficient specificity where prior tax returns were saved. The Receiver has sent letters to a variety of accountants across the country who appear to have received funds from the Receivership Entities, but to date these accountants largely have not responded. As will be reported in the next Quarterly Report, the Receiver separately travelled to one accountant's offices and is optimistic that these efforts will result in at least some prior tax returns being provided to the Receiver.

**E.      Other First Quarter 2023 Activities of the Receiver.**

Between January 1, 2023 and March 31, 2023, the Receiver and his attorneys also engaged in the following:

Maintenance of Receivership Website.      During the First Quarter of 2023, the Receiver maintained www.bartonreceivership.com (the "Receivership Website").      The Receivership Website enables the Receiver to quickly, inexpensively, and broadly convey information regarding the Receivership, particularly to potentially impacted investors who live overseas.   The Receiver continues to update the website periodically as the Receivership progresses.  The Receiver will post a copy of this Report on the website and intends to continue posting periodic updates and information and links to any potential sales or auctions of real estate or other property on the Receivership Website.

Attempts to Obtain Information from Defendant Barton.  As detailed in prior Quarterly Reports, pursuant to ¶¶ 8-10 and 18 of the Receivership Order (among other paragraphs), the Receiver has continued to insist that Defendant Barton provide various information for Receivership Entities that had been under his control, including "the identity, location, and estimated value of all Receivership Property," identification of every bank account held by the Receivership Entities, and identification of all Receivership Property.  To date, the information provided has remained incomplete and sporadic at best.  These delays have in turn severely hampered the speed and efficiency with which the Receiver has been able to identify and secure bank accounts and Receivership assets.  In many instances, requests for information, have simply been ignored.

On January 19, 2023, the Receiver filed his Motion to Compel Documents and Information, Request for Sanctions, or Alternatively, Motion for Show Cause Hearing [Dkt. 133], seeking an order compelling Barton to produce "all information and materials required by

paragraphs 8-10[5] and paragraph 18 of the Receivership Order, including specifically the credentials and information necessary to access the Receivership Entities' servers, email accounts, Quickbooks accounts and the identity, location, and appraisal information for all art owned by any Receivership Entity, including art that was sold, transferred or otherwise disposed of since 2019," among a host of other requests.  As of the date of this Quarterly Report, the Motion to Compel remains pending.

To date, Defendant Barton still has yet to provide access to the Receivership Entities' email accounts or to even allow the Receiver to make a forensic image of the emails accounts.  Similarly, Barton has made no attempt to provide a list of the Receivership Entities' bank accounts.  The Receiver and his team have spent considerable effort attempting to identify these accounts, sending letters and copies of the Receivership Order to any banks that the Receiver believes may have ties to the Receivership Entities, and tracking the financial institution's frequently incomplete and inadequate responses.  The challenges of this process have been particularly compounded by the number of entities controlled by Barton.  As of the date of this report, the Receiver's team still continues to down bank statements and other records from banks with whom the Receivership Entities had a relationship.

Freeze Letters and Requests for Information.  The Receiver and his attorneys continued to send freeze letters and requests for information to banks, creditors, and others as they became aware of additional persons who conducted business with the Receivership Entities.

---

[5] Although these paragraphs require the Receivership Entities to provide the specified information, paragraphs 11, 14,  and 33 require the Entities' past officers and any person who receives a copy of the Receivership Order to provide information and documents requested by the Receiver, and fully cooperate with the Receiver in providing information and documents.  Although the Receivership Order requires that much of this information be provided through sworn statements, for purposes of this motion, the Receiver agrees to accept the information requested, without any verification or attestation.  Notably, Barton has not attempted to provide even unsworn information to date.

Mail.  The Receiver and his team have continued to review the substantial amounts of mail received by the Receivership Entities, both at a UPS Store and from other forwarded addresses.

Motion to Compel Information on Fees.  On March 21, 2023, the Receiver filed his Motion to Compel Documents and Information from Attorneys, Request for Sanctions, and Brief in Support [Dkt.199], seeking an order compelling attorneys representing Defendant Barton, Hunton Andrews Kurth LLP, to disclose the source of any retainer or security interest and related information received in connection with their representation of Defendant Timothy Barton, so the Receiver can verify that counsel complied with their duty to ensure that the funds or security interest received were not paid with Receivership Assets.  As will be detailed in the Receiver's next Quarterly Report, requested information was provided to the Receiver during the Second Quarter of 2023, and the Receiver withdrew the Motion.

Other Miscellaneous Activities.  Among other things, the Receiver and his team have also continued (1) securing access to the Receivership Entities' bank records, (2) communicating with interested parties, potential purchasers of assets, litigation counter-parties, former employees, attorneys, creditors, and others and (3) identifying potential third-party claims and other sources of recovery.

## II. AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES, INCLUDING SECOND QUARTER RECEIPTS AND DISBURSEMENTS.

During the initial 30 days of the Receivership, the Receiver opened bank accounts for the Receivership Estate at Veritex Bank in order to administer the receipt and disposition of monies in the Receivership.  Additionally, because of the continued operations of the Amerigold Suites, the Receiver continues to maintain accounts at Vista Bank for the sole purpose of managing that property.

As reflected more fully in the schedule of the Receiver's receipts and disbursements that is attached hereto as Exhibit A,[6] during the First Quarter of 2023, the Receiver deposited $129,887.29[7] into the Receivership Estate and also received rental income from the Amerigold Suites totaling $206,811.44. Total expenses during the First Quarter of 2023 were $706,504.75.

As of the end of the First Quarter of 2023, the balance held in the receivership bank accounts is $478,598.36.

As of March 31, 2023, the only accrued and unpaid administrative expenses are fees and expenses incurred by the Receiver and his professionals for work performed during the First Quarter of 2023. The Receiver will be filing his fee application for this work on or before May 14, 2023.

A.    DESCIPTION OF RECOVERIES FROM FIRST QUARTER 2023

1.    Deposits into Veritex Accounts

The Receiver's deposits between January 1, 2023, and March 31, 2023, were comprised of the following:

Town Square Title Company. On January 10, 2023, Town Square Title sent $120,000 to the Receiver in connection with the Walker Ranch discussion referenced above. The Receiver and B. Walker are still engaged in negotiations regarding allocations of these funds.

Interest Deposits. During the First Quarter of 2023, the Receiver received a total of $4,814 in interest payments.

---

[6] Included in Exhibit A are (1) the Standardized Fund Accounting Report ("SFAR") required by the Court, (2) an itemized list of receipts and disbursements to date in the Receivership accounts at Veritex Bank, and (3) an itemized list of receipts and disbursements to date in the Amerigold Suites accounts at Vista Bank.

[7] Of the total deposits into the main Receivership bank account, $120,000 are funds related to the Walker Ranch transaction discussed above.

Other Miscellaneous Receipts. During the First Quarter of 2023, the Receiver also received funds from (1) Cable One ($978.95, related to the return of certain deposits), (2) Wells Fargo ($166.01, relating to the closing of accounts held at Wells Fargo), (3) First Insurance Funding ($2,450.36, relating to the return of insurance payments), and (4) Chubb Insurance ($525.97, relating to insurance on the Turtle Creek Property).

### 2.    Deposits into Vista Accounts (Amerigold Suites)

Between January 1, 2023 and March 31, 2023, the Amerigold Suites generated $206,811.44 in rental income.

### B.    DESCIPTION OF DISBURSEMENTS FROM FIRST QUARTER 2023

Generally speaking, the Receiver limited disbursements as much as possible during the Fourth Quarter of 2022 in light of the limited cash on hand until the funding of the DLP settlement. As reflected below, several payments from the Fourth Quarter of 2022 were accordingly deferred until the First Quarter of 2023.

### 1.    Disbursements from Veritex Accounts

Between January 1, 2023, and March 31, 2023, the Receivership spent $504,163.52 on general Receivership (*i.e.*, non-Amerigold) expenses, comprised of the following:

Property Appraisals. In connection with the various property sales and asset valuations performed during the First Quarter of 2023, the Receiver spent a total of $49,150.

Taxes. In connection with the various properties owned by Receivership Entities, the Receiver prioritized the payment of certain taxes, totaling $41,439.33. These do not represent all of the outstanding property tax liability owed by the Receivership Entities. The Receiver anticipates paying all outstanding taxes as additional funds come into the Receivership or at closing.

Payments to Professionals. In accordance with the Court's approval of the Receiver's first fee application [Dkt. 156], the Receiver paid a total of $349,869.42 relating to professional fees and expenses incurred during the Fourth Quarter of 2022 (the first quarter of the Receivership).

Insurance Charges. The Receiver spent a total of $8,675.65 on insurance for the Rock Creek and Gillespie properties during the Quarter.

Utility Fees. The Receiver paid $29,392.60 to TXU and Dallas Water Utilities related to electricity and water at Rock Creek, Turtle Creek, and Gillespie during the Quarter.

Bank Fees. The Receiver spent $1.47 in account analysis charges during the Quarter.

Maintenance Fees. The Receiver spent $1,226.05 in maintenance fees related to the Rock Creek and Gillespie properties during the Quarter.

Amerigold Insurance. Because of the negative cash flow of the Amerigold Suites, the Receiver transferred $14,400 from the main Receivership account to the Amerigold account at Vista to cover one of the Amerigold insurance payments (totaling $14,400.00) during the Quarter.

Mediation Fees. As discussed above, the Court ordered the Receiver to mediate HNGH's claimed ownership of the Turtle Creek Property with Retired Chief Bankruptcy Judge Harlin Hale. The total mediation deposit was $4,325.00.

## 2.     Disbursements from Vista Account (Amerigold Suites)

Between January 1, 2023, and March 31, 2023, the Receivership spent $202,341.23 on the Amerigold Suites, comprised of the following:

Payments to Property Manager. During this Quarter, the Receiver paid the property manager at Amerigold a total of $10,167.32.

Maintenance and Cleaning Payments. During this Quarter, the Receiver paid maintenance, cleaning, and landscape contractors a total of $14,855.00.

Repair Costs. During this Quarter, the Receiver paid $3,636.07 in repairs.

Utility Payments.  During this Quarter, the Receiver paid $84,201.50 in utility payments for electricity, water, and internet.

Trash Payments.  During this Quarter, the Receiver paid $2,560.99 for trash collection at the property.

Pest Control.  During this Quarter, the Receiver paid $1,590.98 relating to pest control at the property.

Insurance Payments.  During this Quarter, the Receiver paid $66,121.26 in insurance premium payments.

Taxes.  The Receiver made certain tax payments totaling $19,152.68 relating to the property during this Quarter.  This payment did not represent all of the outstanding property tax liability owed on the property.

Bank Fees.  During this quarter, the Receiver paid $36.00 in check fees, wire fees, and other miscellaneous bank fees.

Other Miscellaneous Expenses.  During this Quarter, the Receiver also expended $19.43 on PropertyWare software at Amerigold.

### III. DEVELOPMENT OF CLAIMS HELD BY RECEIVERSHIP ESTATE AND OTHER PENDING LITIGATION.

During the first day of the Receivership, the Receiver and his team interviewed multiple lawyers who officed in the Turtle Creek office who were aware of (and in many respects involved in) dozens of active and closed litigation matters involving the Receivership Entities.  As the Fourth Quarter of 2022 progressed, the Receiver and his team became aware of several additional active litigation matters involving the Receivership Entities and began speaking to counsel for counter-parties.  These conversations continued during the First Quarter of 2023.  Pursuant to

¶¶ 34-36 of the Receivership Order, all civil legal proceedings of any nature are stayed until further order of the Receivership Court.

Included below is a list of the active (but stayed) litigation matters of which the Receiver is currently aware, as well as developments (in any) from the First Quarter of 2023 (*in italics*). Given the size of this list, the Receiver anticipates continuing to make recommendations on each of these cases on a rolling basis in future reports.

**Wall-Related Litigation**

1.    *Wall Entity Bankruptcies*[8] (Bankr. E.D. Tex.)

On August 19, 2022, the Wall Entities and Seagoville Farms, LLC filed voluntary Chapter 11 bankruptcy petitions in the Eastern District of Texas.  Prior to the Receiver's appointment, counsel for the Debtors and the US Trustee's office agreed that the bankruptcy filings should be dismissed.  The Receiver has been told by counsel to the debtors that the purpose of these bankruptcy filings was to identify all investors in the Wall Entities.  Assuming this to be the case, these bankruptcy filings are unnecessary because one of the central purposes of the claims process in the Receivership is to identify investors in the Wall entities.  Moreover, it does not appear that there is any monetary value to be gained by proceeding with those cases.

Accordingly, in the near future, the Receiver will likely concede to the lifting of the stay in the Wall Entities' bankruptcy cases to permit their agreed dismissal.

2.    *Sun Yun, Qu Yi, Ma Jinghui, Gao Huaizen v. WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, Platinum Investment Corporation (PIC), JMJ Holdings, LLC*, No. DC-20-04575 (44th District Court, Dallas County, Texas)

---

[8] These cases are styled In re: *WALL007, LLC*, No. 22-41049; *In re: WALL009, LLC*, No. 22-41113; *In re: WALL011, LLC*, No. 22-41114; *In re: WALL010, LLC*, No. 22-41125; *In re: WALL012, LLC*, No. 22-41135; *In re: WALL016, LLC*, No. 22-41136; *In re: WALL017, LLC*, No. 22-41137; *In re: WALL018, LLC*, No. 22-41176; *In re: WALL019, LLC*, No. 22-41177; *In re: Seagoville Farms, LLC*, No. 22-41181.

Plaintiffs assert they loaned the various Wall Entities a total of $700,000 and claim Defendants defaulted on the loans. The Wall Defendants filed a third-party petition against Haoqiang Fu a/k/a Michael Fu his spouse, Jin Wang, and Silverland Finance, Ltd, and asserted cross claims against Platinum Investment Corporation. On September 13, 2022, the Wall Defendants filed Chapter 11 Bankruptcy.

3.    *Rone Engineering Services, Ltd. v. JMJ Development, LLC, WALL017, LLC, WALL009, LLC, and Seagoville Farms, LLC*, No. DC-19-20384 (116th District Court, Dallas County, Texas)

Rone initiated this lawsuit for breach of contract for unpaid services related to engineering work performed on properties owned by Wall007, Wall009, and Seagoville Farms. Rone asserts the work was contracted by JMJ. Wall007 filed bankruptcy in 2020 and on August 6, 2020, the Court administratively closed the case. The case remains inactive.

4.    *JMJAV, LLC v. Michael Fu, Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, Shirley Qing, and Michele Guo*, No. 2020-00720 (281st District Court, Harris County, Texas)

Plaintiff initiated this lawsuit to recover funds in excess of $1 million paid to defendants based on defendants' allegedly fraudulent representations they were Texas realtors. Defendant Shirley Quing was dismissed, and Plaintiff nonsuited claims against defendants Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, and Michele Guo. Case has been abated.

**HNGH Bankruptcy Cases (2999 Turtle Creek)**

5.    *2999TC Acquisitions, LLC*, Chap. 11 Bk, No. 3:21-bk-31954 (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

Receivership Entity 2999TC Acquisitions borrowed $ 32.5M from HNGH to acquire property at 2999 Turtle Creek Blvd for the eventual construction of hotel but was unable to repay the loan. Facing a deed in lieu of foreclosure, 2999TC Acquisitions filed chapter 11 bankruptcy.

*See discussion above regarding motion to approve settlement agreement with HNGH.  This bankruptcy case will be dismissed if the settlement agreement is approved.*

6.    *2999TC Acquisitions, LLC v. HNGH*, No. 22-03061-swe (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

Related to 3:21-bk-31954, Plaintiff filed the adversarial proceeding based on breach of contract and a request for declaratory judgment that they are the rightful owner of the disputed property at 2999 Turtle Creek.

*See discussion above regarding motion to approve settlement agreement with HNGH.  This adversary proceeding will be dismissed if the settlement agreement is approved*

7.    *2999 Turtle Creek, LLC v. Timothy Lynch Barton*, No. DC-20-12133 (192nd District Court Dallas County, Texas)

Plaintiff sued Defendant claiming he guaranteed $32.5M loan on 2999 Turtle Creek property and when borrower defaulted, Defendant refused to pay. The parties filed an agreed motion to abate the case based on an order entered in the related bankruptcy case. The court granted an abatement until March 15, 2022. Shortly after March 15, 2022, Defendant filed a motion to dismiss which is still pending.

*See discussion above regarding motion to approve settlement agreement.  Pursuant to the settlement agreement, Defendant Barton's obligations under the guarantee will be released under certain circumstances.*

**Palisades Litigation (2999 Turtle Creek and Frisco Gate Property)**

8.    *In Re: Dallas Real Estate Investors*, No. 21-41488 (US Bk Ct, ND Fort Worth Division)

9.    *In Re: Dallas Real Estate Investors Palisades TC, LLC, Individually and on behalf of Five Star GM, LLC v. Dallas Real Estate Investors, LLC et al.*, Nos. 21-04061, 21-04073 (United States District Court for the Northern District of Texas, Fort Worth Division)

Cases 21-04061 and 21-04073 were adversary proceedings that were consolidated in October 2022 under 21-04061. Palisades invested approximately $4M in 2999 Turtle Creek Acquisition through Five Star MM, and approximately $3.5M in Frisco Gate property through FHC Acquisitions. Palisades alleges the money was a loan intended to be repaid and Defendants defaulted by not repaying. Defendants allege the money was a capital contribution. Parties engaged in settlement talks but could not come to an agreement.

**Hodges Litigation (2999 Turtle Creek)**

10. *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLC, JMJ Development, LLC and Timothy Barton* No. 141-316567-20, (141st District Court Tarrant County, Texas)

In September 2019, Defendant 2999 TC LP, LLC borrowed $4,000,000 from Plaintiffs in connection with property at 2999 Turtle Creek. Timothy Barton, individually, and JMJ Development, LLC guaranteed the loan. According to Plaintiffs, 2999 TC defaulted, and Plaintiffs accelerated the note. Defendants counterclaimed asserting Plaintiffs slip sheeted the loan documents and changed terms. The Court granted Plaintiff's motion for summary judgment and awarded actual damages of $4.25M, pre and post judgment interest, costs of court, and $111,962 in attorney's fees. The Court also entered an order severing claims not covered by the summary judgment. Defendants appealed, and the case is pending in the Court of Appeals

11. *In re 2999TC LP, LLC*, Chap. 11 BK , No. 4:20-BK-43204 (US Bk Ct, ND Fort Worth Division)

Related to 141-316567-20. A few months after the related case was filed, 2999 TC, the debtor, filed for Chapter 11 bankruptcy. In September 2022, the bankruptcy trustee filed a motion to dismiss or in the alternative convert to chapter 7, stating that the debtor was not likely to

successfully reorganize. Debtor objected and a hearing on the matter was postponed due to the Receiver's stay.

12. *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLP, JMJ Development, LLC and Timothy Barton*, No. 141-328490-21 (141st District Court, Tarrant County, Texas)

Related to 141-316567-20. This case originated when the Court in the related case entered an order severing claims not covered by the Order granting MSJ in the related case. Defendants appealed, and the case is pending in the Court of Appeals.

13. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-21-00414-CV (Second Court of Appeals, Fort Worth Division)

Appeal from 141-328490-21. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

14. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-22-00288-CV (2nd COA, Fort Worth)

Appeal from 141-316567-20. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

**Kirby Litigation (2999 Turtle Creek)**

15. *Pamela Kirby v. Timothy L. Barton, John McElwee, JMJ Development, LLC, 2999TC Acquisitions, LLC, 2999TC Founders, LLC, 2999TC JMJ, LLC, 2999TC JMJ GM, LLC, 2999 Five Star GM, LLC, Five Star GM, LLC, Five Star MM, LLC, Five Star TC, LLC*, No. 3:22-CV-01447-M (United States District Court for the Northern District of Texas, Dallas Division)

Pursuant to a subscription agreement, in 2019 Ms. Kirby invested $1M with 2999TC Founders, LLC for the purchase and development of 2999 Turtle Creek. She contends her investment was fraudulently induced, that Barton failed to disclose foreclosure proceedings, and misappropriated her funds which were comingled with the Chinese investor funds. She contends

she is a victim of the crimes Barton has been charged with and requests a judicial determination of that fact so she can claim a tax credit for her loss. For any distributions, she also seeks treatment as an investor rather than a creditor.   The Receiver's counsel has had several lengthy communications with Ms. Kirby's counsel and will continue to seek a fair resolution.

16.    *In Re: 2999FC Finders, LLC* (Bk.), No. 22-40911 (United States Bankruptcy Court for the Eastern District of Texas)

On July 21, 2022, 2999TC Founders filed for voluntary Chapter 11 bankruptcy. On October 7, 2022, debtor Pamela Kirby filed a Motion to Dismiss the Chapter 11 case. In light of the receivership, the Court entered an order Staying Debtor's Pending Motion to Dismiss and All Other Matters.

**Nitya Capital Litigation (2999 Turtle Creek)**

17.    *Nitya Capital, LLC v. 2999TC Acquisitions MZ, LLC*, No. DC-22-09841 (14th District Court, Dallas County, Texas)

Plaintiff made loan to Defendant for approximately $1.5M related to the development of 2999 Turtle Creek. When 2999TC Acquisitions filed for bankruptcy in 3:21-bk-31954, Nitya asserts this caused an event of default without opportunity to cure and called the loan. Defendant did not pay the loan balance and Nitya filed suit. Defendant has not filed an answer.

**Dowdall Litigation (2999 Turtle Creek)**

18.    *John Dowdall v. 2999TC JMJ MGR, LLC and Timothy Barton*, No. DC-22-14770 (193rd District Court, Dallas County, Texas)

Plaintiff initiated suit against the Defendants to recover $2M loaned to JMJ MGR which Barton guaranteed. Plaintiff alleges Defendants failed to make any payments and defaulted on the

note. This case was filed October 21, 2022, after the Receiver was appointed, and no answer has been filed.

**Amerigold-Related Litigation**

19. *Serena Badgley, As Next Friend of Bryson Badgley, Minor v. Goldmark Hospitality, LLC*, No. CC-21-02991-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiffs are mother and son who lived at Amerigold Suites owned by Defendant. Son fell from a second story window and was injured when a closed window gave way.

20. *Stream SPE LTD. v. Goldmark Hospitality by and through its General Partner, TRTX Properties, LLC*, No. 2021-81644 (80th District Court, Harris County, Texas

Plaintiff initiated suit against Defendant based on Defendant's failure to pay for contracted electrical service. Defendant has answered.

**Ridgeview-Related Litigation**

21. *Circle H Contractors, LP, v. La Jolla Construction Management, LLC, and Ridgeview Addition, LLC*, No. DC-C202200522 (18th Dist. Ct. Johnson Cnty., Tex.)

Plaintiff initiated this lawsuit to recover approximately $64,000 in fees owed for work done installing a PVC water main system and fire hydrant assemblies, with related testing, connection of manholes, and sewer services and installation of storm drain system for the Ridgeview Addition project. This lawsuit was filed after the Receiver was appointed, and no answer has been entered.

*See discussion above regarding Ridgeview Addition. This case has been stayed.*

**Windmill Farms-Related Litigation**

22. *BGE, Inc. v. JMJ Development, LLC*, No. 471-03497-2020 (471st District Court, Collin County, Texas)

Plaintiff initiated suit against defendant to recover fees owed for surveying and engineering services provided for Windmill Farms Development in Kaufman County, Texas. Defendant contracted with Plaintiff to provide the services and allegedly refused to pay invoices sent by the Plaintiff. An order compelling discovery responses from Defendant was entered August 8, 2022.

**Ramolia Litigation**

23. *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. DC-19-11030 (191st District Court, Dallas County, Texas)

24. *JMJ Development, LLC and Timothy Barton v. "David" Dhiraj Ramolia*, No. 05-21-01100-CV (From DC-19-11030, 5th Court of Appeals)

25. *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. 02-0922 (Appellate Case (to Sup. Ct.) Supreme Court from 5th Court of Appeals)

Defendants each executed a $3M note payable to the Plaintiff in connection with the sale of real property and a settlement agreement in Bankruptcy Case Nos. 17-34255-SGJ-11 and 17-34274-SGJ-11. Defendants counterclaimed asserting that conditions to the note were not completed by the Plaintiff and that the notes were not valid. After considering Plaintiff's motion for summary judgment, the court entered a judgment against each Defendant for $3M plus pre-judgment interest.

Defendants appealed the final judgment entered in DC-19-11030. The Fifth Court of Appeals dismissed the case on the grounds that the appeal was not timely filed. Defendants then appealed to the Texas Supreme Court on October 13, 2022.

26. *Timothy Barton and JMJ Development, LLC v. A.J. Babaria, Bilal Khaleeq and Dan Morenof*, No. DC-20-17086, (Related case DC-19-11030) (191st District Court, Dallas County, Texas)

RECEIVER'S THIRD STATUS REPORT – PAGE 50

Plaintiffs in this case, (defendants in DC-19-11030) severed claims related to defendants from DC-19-11030. Among the claims are violations of ethical obligations related to Khaleeq's role as a former attorney for JMJ, and legal malpractice claims against Morenoff as attorney for JMJ and Barton in the bankruptcy proceeding underlying this case and the related case.

27.   *TRTX Properties, LLC and JMJ Development v. Dhirah "David" Ramolia*, No. 471-00033-2022 (471st District Court, Collin County, Texas)

Tim Barton and JMJ Development allege they entered into an agreement with Defendant and a third party to purchase a piece of land involved in a dispute between the third party and the Defendant. As part of the agreement Defendant was supposed to release his ownership claims to the property, but failed to do so, resulting in Barton and JMJ losing the property. Barton assigned his claims to TRTX, making it a party.

**Lost Creek-Related Litigation**

28.   *The Somerset-Lost Creek Golf Ltd.v. Timothy Barton, LC Aledo TX LLC, WALL010, LLC, JMJ Acquisitions*, No. 096-319595-20 (96th District Court, Tarrant County, Texas)

Defendants hold a $300,000 note secured by a Deed of Trust on a golf course. Plaintiffs initiated the lawsuit to set aside a prior foreclosure by the Wall Defendants while Plaintiff/a Third Party Trust also contemporaneously foreclosed their own senior lien. Plaintiff/Third Party Plaintiff contends they can sell the property free and clear of the Wall Note based on that foreclosure. Defendants' counterclaims for breach of contract and fraud in connection with real estate are pending. The case has been stayed.

**BM318-Related Litigation**

29.   *BM318, LLC v. Dixon Water Foundation*, No. 4:20-BK-42789 (US Bk Ct, ND Dallas Division)

BM318 purchased a tract of land from Dixon with $2M down and a seller financed note of $33 million held by Dixon. BM318 defaulted on the note, and Dixon recorded a special warranty deed transferring most of the property back to Dixon. BM318 then filed Chapter 11 bankruptcy and the Bankruptcy court confirmed the plan on August 2, 2021.

*During the First Quarter of 2023, the Receiver met with representatives for Dixon and Lumar Land relating to this stayed bankruptcy case. The Receiver also filed a motion to ratify his agreement with Lumar to allow Lumar to sell certain parcels of land to service bank debt and taxes. [Dkt. 143]. The Court entered an Order [Dkt. 163] granting the Motion on February 22, 2023. Negotiations with Dixon and Lumar are ongoing.*

30. *BM318, LLC v. Dixon Water Foundation*, Adversary No. 4:21-AP-4051, Related to 4:20-BK-42789 (United States Bankruptcy Court, Northern District of Texas, Dallas Division)

After the Court approved the Chapter 11 plan in the related case, Plaintiff filed an adversarial proceeding against Dixon alleging the special warranty deed was a preferential or fraudulent transfer. Plaintiff also filed a lis pendens. Dixon filed a counterclaim requesting that if the Court determines the transfer was void to find that Dixon still has a lien on the property.

*See above.*

31. *BM318, LLC v. Lumar Land Cattle, et al*., WF AP: 4:21-AP-4051 (United States Bankruptcy Court, Northern District of Texas, Dallas Division, Related to 4:20-BK-42789)

During the pending bankruptcy in the related case, but several months before the adversarial proceeding was filed, Lumar bought a 204 acre tract of land from Dixon. The land later became part of the adversarial proceeding between BM318 and Dixon. Lumar then contracted to sell part of the land and the lis pendens was discovered causing the sale to fall through. After discovering the lis pendens, Lumar sought, and was granted, permission to intervene in the adversarial proceeding and asserts it was a good faith purchaser and that the lis pendens is an

incorrect cloud on its title. Lumar and the Receiver are currently in negotiations regarding a settlement.

*See above.*

**3820 Illinois-Related Litigation**

32. *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County)

Plaintiff obtained a $500,000 loan from Tamamoi to purchase land located at 3820 E. Illinois Ave. After repeated missed payments and several extensions to the loan, Tamamoi foreclosed on the property. Tamamoi then conveyed the property to 3820 Illinois, LLC. Plaintiff asserts it was a wrongful foreclosure and initiated this lawsuit seeking to set aside the foreclosure. Defendants filed an MSJ shortly before the receivership. The Receiver's counsel have had several conversations with Defendants' counsel and will continue to seek a fair resolution.

33. *Deshazo Group v. Timothy Barton, JMJ Development*, No. CC-22-04381-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiff sued Defendants in JP court on an unpaid invoice related to a traffic study that was performed for property owned by JMJ Development on Illinois Ave in Dallas. A default was granted. Defendants assert the JP suit was not properly served and appealed the judgment to the county court.

**Other Pending Litigation Matters**

34. *JMJAV v. Elite Jet*, No. 017-333443-22 (17th District Court, Tarrant County)

Plaintiff initiated this lawsuit asserting that defendants failed to provide reasonable estimates and overcharged Plaintiffs for work done to Plaintiff's Learjet 55. Plaintiff refused to pay for the excess charges and in return defendant refused to release the aircraft, associated log

books, and other documentation pertaining to the aircraft. Defendant filed counterclaims against Plaintiff and Tim Barton, as a third party, based on suit on a sworn account, breach of contract, and unjust enrichment.

35.    *In Re: FM 544 Park Vista, Ltd. and Pavist, LLC*, No. 17-34255-SGJ-11/17-34274-SJG-11 (US Bk Ct, ND Dallas Division); *on appeal*, *JMJ Development, LLC, et al. v. Roger Sefzik, et al.*, No. 3:22-cv-02254-L (N.D. Tex.)

Dispute arose between Tim Barton, JMJ and TRTX, and Debtor FM 544, Debtor Pavist in connection with the ownership and development of certain real property, consisting of approximately 31.159 acres located in Plano, Collin County, Texas. The Court entered a Chapter 11 reorganization plan which became final in September 2018. As part of the plan, the parties agreed to release certain claims and not sue based on those claims. JMJ and TRTX filed a lawsuit against debtors in this case, and others, in violation of the Court's order. In response, the Court entered an injunction and contempt order against JMJ, TRTX, Tim Barton and the responsible attorneys (the "contemnors"). On October 4, 2022 the contemnors filed an appeal, which has been docketed but no other action has been taken.

36.    *Cardno, Inc. v. JMJ Development, LLC, Villita Towers, LLC and Tim Barton*, No. DC-22-10928 (160th District Court Dallas County)

Plaintiff initiated this suit to recover approximately $84,000 in unpaid fees from Defendant related to Plaintiff's work as a structural engineer on the Villita Towers project. Defendants have yet to file an answer.

## IV.  STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process.

A.     INVESTORS

On November 7, 2022, the Receiver sent letters to approximately 100 investors who had previously been identified as potential investors in Wall Entities.  The letters also included a request for information.   This letter and request for information were also posted to the Receivership Website.  Dozens of the investors have completed the information forms, which the Receiver continues to receive on a daily basis.  Once the Receiver begins the claims process, he anticipates receiving additional information from these investors, other Wall investors, and other creditors.  Through the forensic accounting process, the Receiver will continue to identify and cross-reference potential investors in the Wall Entities.

B.     OTHER INVESTORS AND CREDITORS

In addition to investors in the Wall Entities, the Receiver has continued the process of identifying other lenders, equity investors, and creditors (both secured and unsecured) of the Receivership Entities.   While the Receiver's efforts to date have focused primarily upon identifying investors and assets, several creditors have already been identified, and the Receiver anticipates receiving creditor claims once a claims process begins.  The Receiver's eventual distribution plan will address the proposed treatment of the various categories of creditors.

**IV.**
**PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP**

The next immediate steps for administration of the Receivership remain (1) continuing to secure and maintain the assets of the Receivership, including liquidating assets of the Receivership where necessary to preserve and maximize their value; (2) performing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential

fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered.  Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting very likely will be the best means of determining where investor monies flowed.

## V.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the third report from the Receiver and extensive work still remains.  More specifically, the Receiver intends to (1) continue securing, maintaining, and selling assets; (2) continue pursuing potential fraudulent conveyances; (3) continue investigating potential damages claims against third parties; (4) petition the Court to establish an investor and creditor claims process; and, (4) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.


Dated: April 30, 2023

Respectfully submitted,

**RECEIVER CORTNEY C. THOMAS**

By: */s/ Cortney C. Thomas*
 Cortney C. Thomas
  State Bar No. 24075153
  cort@brownfoxlaw.com
 BROWN FOX PLLC
 8111 Preston Road, Suite 300
 Dallas, Texas 75225
 T: (214) 327-5000
 F: (214) 327-5001

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.