## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | **CASE NO. 3:22-cv-2118-X** |
| TIMOTHY BARTON ET AL., | § § § | |
| Defendants, | § § | |

## SOUTHERN PROPERTIES CAPITAL, LTD.'S BRIEF IN SUPPORT OF RESPONSE TO RECEIVER'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE BRANTLEY STARR:

Southern Properties Capital, Ltd. ("SPC"), Respondent at risk of suffering imminent and irreparable harm, files this Brief in Support of Response to Receiver's Motion for Summary Judgment ("Response"), responding to Receiver's Motion for Summary Judgment [Doc. 207] ("Motion" or "Receiver's Motion") and states as follows:

**i**

**Southern Properties Capital, Ltd.'s Brief in Support of Response To Receiver's Motion for Summary Judgment**

## TABLE OF CONTENTS

I.    SUMMARY OF RESPONSE ........................................................................................ 1

II.   DISPUTED FACTS................................................................................................... 5

  A.   SPC disputes the Receiver's "Undisputed Facts" that he makes as arguments......................... 5

  B.   The Receiver's "Undisputed Facts" make an improper "Guilt by Association" argument..... 5

  C.   The Receiver's "Undisputed Facts" make an improper "Collect at all Costs" argument. ...... 7

III.  STANDARD OF REVIEW.......................................................................................... 7

  A.   This summary proceeding should include live witnesses testimony and a right to discovery..7

    1.   Live Witness Testimony....................................................................................... 7

    2.   Discovery ...................................................................................................... 9

  B.   Summary judgment standards. ............................................................................... 10

IV.   SPC'S SUMMARY JUDGMENT EVIDENCE.................................................... 10

V.    ARGUMENTS AND AUTHORITIES ................................................................ 11

  A.   In the absence of commingling of funds, the Complexes should not be included in the Receivership Estate............................................................................................... 11

  B.   SPC demonstrates fact issues regarding ownership of the D4 Entities and the Complexes... 14

    1.   Summary of SPC Business Model ........................................................................ 16

    2.   The Complexes and Barton ............................................................................... 17

    3.   SPC financial statements show ownership investments of the Complexes, not merely loans. 20

    4.   SPC's business structure is entirely legitimate. ...................................................... 25

    5.   SPC Did Effectively Exercise Conversion Rights by Which It Could Acquire Control Over the Complexes................................................................................................... 28

    6.   The reference to SPC LLC versus SPC Ltd. was merely a typographical error and does not deny SPC its conversion rights. ......................................................................... 36

    7.   SPC's notice of conversion was valid because it was timely, and HUD approval is merely ministerial............................................................................................... 36

    8.   The contracts are not executory. ....................................................................... 40

  C.   Equitable considerations, as well as the evidence, require that SPC be permitted to exercise conversion right and complete the TPAs. ..................................................................... 42

    1.   The Receivership Order does not prohibit SPC from taking actions now to convert its debt. 42

    2.   The Court should reject the Receiver's unfounded allegations that SPC has unclean hands and violates HUD regulations. ........................................................................... 43

    3.   SPC should be granted the rights in the Properties that it earned. ........................... 44

Southern Properties Capital, Ltd.'s Brief in Support of Response
To Receiver's Motion for Summary Judgment

4.    *Fairness does not mandate treating SPC like other investors, and depriving SPC of its equity interests in the SPC Projects would constitute a grave injustice.* .......................................................45

5.    *Investor Funds Were Not Expended on the Projects.* ...............................................................46

D.    **The pending sales of Windmill Farms and Bellwether Ridge will damage SPC, even if distributions of proceeds are not determined.** .................................................................................47

VI.  **CONCLUSION** ..................................................................................................... 49

Southern Properties Capital, Ltd.'s Brief in Support of Response
To Receiver's Motion for Summary Judgment

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 435 ................................................................. 25

*Addison Express, L.L.C. v. Medway Air Ambulance, Inc.*, 2006 WL 1489385 (N.D. Tex. May 19, 2006) 42

*Am. 10–Minute Oil Change v. Metro. Nat'l Bank*, 783 S.W.2d 598 (Tex. App.—Dallas 1989, no writ) .. 36

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................ 10

*Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131 (Tex. App.—Houston [14th Dist.] 2015, pet. denied)............................................................................................................. 37, 38

*Banco Popular v. Kanning*, 638 F. App'x 328 (5th Cir. 2016)................................................. 41

*Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)................................................................... 23

*Bean v. Indep. Am. Sav. Ass'n,* 838 F.2d 739, 743 (5th Cir. 1988)........................................... 2

*Centex Corp. v. Dalton*, 840 S.W.2d 952 (Tex. 1992)............................................................. 36

*Comm. Structures & Interiors, Inc. v. Liberty Educ. Ministries, Inc.*, 192 S.W.3d 827 (Tex. App.—Fort Worth 2006, no pet.) ............................................................................................... 40

*Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945 (Tex. 1990)........................ 37, 38

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006) ...................................................... 10

*Dillon v. Lintz*, 582 S.W.2d 394 (Tex. 1979)......................................................................... 37

*Eastland v. Camp Mystic, Inc.*, 2009 WL 260523 (Tex. App.—San Antonio Feb. 4, 2009)............... 45, 48

*Great W. Drilling, Ltd. v. Pathfinder Oil & Gas, Inc.*, 2020 WL 373096 (Tex. App.—Eastland Jan. 23, 2020, pet. dism'd) ............................................................................................................. 39

*Hasty v. Keller HCP Partners, L.P.*, 260 S.W.3d 666 (Tex. App.—Dallas 2008, no pet.) ........................ 36

*In re 72 Townsend, LLC*, 2010 WL 1689564 (Bankr. N.D. Cal. Apr. 22, 2010)....................... 42

*In re Digicon, Inc.*, 71 F. App'x 442 (5th Cir. 2003)............................................................. 42

*In re Swiftco, Inc.*, 1988 WL 143714 (Bankr. S.D. Tex. Oct. 5, 1988)..................................... 45

*In re Texstone Venture, Ltd.*, 54 B.R. 54 (Bankr. S.D. Tex. 1985)........................................... 41

*Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009)..................................................................... 11

*Lucas v. Coomer*, 2010 WL 5118023 (Tex. App.—Fort Worth Dec. 16, 2010, no pet.)................ 37

*Matter of Bumstead Fam. Irrevocable Tr.*, 2022 WL 710159 (Tex. App.—Corpus Christi Mar. 10, 2022) ................................................................................................................................ 45

*Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012)........................................................... 11

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012) ............................. 45

*Parkview Gen. Hosp., Inc. v. Eppes*, 447 S.W.2d 487 (Tex. App.—Corpus Christi 1969, writ ref'd n.r.e.). ................................................................................................................................ 37

*San Antonio Sav. Ass'n v. C.I.R.*, 887 F.2d 577 (5th Cir. 1989) ............................................. 44

*Sanders v. Monsanto Co.*, 574 F.2d 198 (5th Cir. 1978) ........................................................... 8

*Schwarz-Jordan, Inc. v. Delisle Constr. Co.*, 569 S.W.2d 878 (Tex. 1978)............................... 38

*SEC v. Bjork*, 2012 WL 1392082 (S.D. Tex. Apr. 19, 2012)................................................. 8, 9

*SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000) ........................... 47

*SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 2019)........................................................... 8, 9, 47

*SEC v. Faulkner*, 2018 WL 432729 (N.D. Tex. Sept. 12, 2018) ............................................ 11

*SEC v. Millennium Bank*, 2009 WL 10689053 (N.D. Tex. July 21, 2009)................................. 8

*SEC v. Torchia*, 922 F.2d 1307 (9th Cir. 2019) .................................................................... 8

*SEC v. Universal Financial*, 760 F.2d 1034 (9th Cir. 1985) ................................................... 9

**Southern Properties Capital, Ltd.'s Brief in Support of Response
To Receiver's Motion for Summary Judgment**

*SEC v. Vassallo*, 2010 WL 3835729 (E.D. Cal. Sept. 29, 2010) ....................................................................... 8

*SEC v. Wenke*, 783 F.2d 829 (9th Cir. 1986) ................................................................................................... 8

*Solar Apps. Eng'g v. T.A. Operating Corp.*, 327 S.W.3d 104 (Tex. 2010). ........................................... 37, 38

*United States v. Durham*, 686 F.3d 70 (5th Cir. 1996) ................................................................................. 47

*United States v. Vanguard Inv. Co, Inc.*, 6 F.3d 222 (4th Cir. 1993) ........................................................... 47

## Statutes

FED. R. CIV. P. 43 ........................................................................................................................................ 7, 9

## Other Authorities

Audit Comm. Disclosure, Release No. 41987 (S.E.C. Release No. Oct. 7, 1999) ..................................... 25

**Southern Properties Capital, Ltd.'s Brief in Support of Response**
**To Receiver's Motion for Summary Judgment**

I.    SUMMARY OF RESPONSE

The Receiver focuses narrowly on moving the Court to quickly liquidate four multifamily, residential apartment complexes (the "Complexes") subject to SPC's superior rights in equity on the sole bases that they (a) have a tangential connection to Barton, (b) have substantial value, and (c) could raise significant funds for the Receivership.

Not one dollar of investors' funds has been traced to the Complexes. To the contrary, the construction, development, and operation of the Complexes were funded by a third-party loan guaranteed under a program of the U.S. Department of Housing and Urban Development, or "HUD," and by SPC, a subsidiary of Transcontinental Realty Investors, Inc. ("TCI"). The Complexes should not be part of the Receivership Estate and should not be pooled therein. Granting the Motion would work a grave injustice on a new set of victims: TCI shareholders. The Court should deny the Receiver's Motion for eight principal reasons.

**First, the Complexes should not be a part of the Receivership Estate.** In this case, the SEC alleges a scheme by Barton and others to induce foreign investors to invest money ("Foreign Investment") in certain single family subdivision assets known as the "Wall Entities." Further, the SEC alleges Barton and others used the Foreign Investment in the "Wall Entities" to acquire various other assets that were not "Wall Entities" ("Non-Wall Assets"). All Non-Wall Assets are wholly and conclusively unaffiliated with the Complexes and SPC. The SEC and Receiver, after extensive investigation, have not offered, and cannot offer, competent summary judgment evidence of any Foreign Investment paid by any person for the benefit of the Complexes.[1]

---

[1] To use the Receiver's words, SPC is not attempting to "jump the queue." [Doc. 207, 39-40]. SPC is not in the queue and never has been.

**Southern Properties Capital, Ltd.'s Brief in Response**                                           Page 1 of 50
**To Receiver's Motion for Summary Judgment**

**Second, SPC would be irreparably harmed if the Court allows the Complexes to be sold.** The Receiver's Motion fails to recognize the unique interests of real property owners. Years before the Receivership, SPC structured its ownership of the Complexes to be funded with convertible debt with a vested right to convert its equitable ownership to legal ownership. SPC already exercised its unqualified and absolute right to convert to equity as to three of the four Complexes.[2] The final step, assuming SPC's continued desire to participate in the HUD program, rather than pay the loan or refinance, will be to comply with HUD guidelines and seek the formality of approval for the Transfer of Physical Assets ("TPA") to assume the underlying HUD guaranteed obligation and nominal ownership of the property. The Court should permit SPC to exercise this right. By proposing to treat SPC as a mere investor or even a secured creditor, the Receiver disregards SPC's ownership right altogether.

**Third, SPC cannot be adequately compensated with monetary damages.** Courts regularly and routinely find that real property is unique and therefore the loss of real property rights inherently results in irreparable harm. *See e.g. Bean v. Indep. Am. Sav. Ass'n,* 838 F.2d 739, 743 (5th Cir. 1988) and cases cited *infra*. Courts routinely enjoin the sale of real property because real property is unique. SPC would be irreparably harmed if the Receiver's Motion is granted because any proposed monetary relief fails to provide SPC with adequate compensation for the loss of its real property interests.

**Fourth, SPC is an innocent third party.** SPC was not involved in Barton's alleged fraudulent scheme and has received no payments from Barton. SPC has received payments from the Complexes, due under convertible loan documents, generated solely from operating cash flow resulting from payment of tenants' rent. The Receiver has not alleged that SPC has received

---

[2] SPC retains the absolute right to convert to equity the fourth apartment complex (Opelika).

any tainted funds. SPC is also not similarly situated with the other investors. In its Complaint, the SEC alleges that Barton misappropriated approximately $26 million from 100 investors, most of whom are Chinese nationals. According to the SEC, on the one hand, "[t]hese were entirely passive investments: the investors had no role or say in the operations or management of the Wall Entities or the underlying real-estate projects." [Doc. 6, p. 5-6]. SPC, on the other hand, exercised active supervision of the construction of all of the Complexes and at all times acted in furtherance of its equity rights to acquire the Complexes and to protect its active investment in the projects.

**Fifth, SPC is the equitable owner of the Complexes and has at all times acted as the owner of the Complexes.** SPC purchased the raw land, funded the escrow agreements and letters of credit for working capital, provided construction management during development, provided property management once leased, and provided substantially all equity funding. On its financial statements, SPC and TCI consistently reported the convertible loans as having a value consistent with SPC's ownership interest in the Complexes, as required by applicable accounting principles and practices. In other words, SPC's actions since day one evidence and are consistent with an ownership interest in the Complexes, not an interest as mere passive lender or investor.

**Sixth, the Receiver seeks to sell two of the Complexes at a fire-sale price.** The Receiver alleges the Barton investors are owed $26 million. The Receiver seeks to sell Windmill Farms for $51 million, and seeks to sell Bellwether for $27 million. SPC's current appraisal of Windmill Farms is at least $57.8 million ($6.8 million higher than the Receiver's sale price). SPC's current appraisal of Bellwether is at least $31.2 million ($4.2 million higher than the Receiver's sale price). Marshalling assets does not mean conducting a fire-sale. Disparate values

in the competent summary judgment evidence conclusively demonstrate genuine issues of material fact such that the Receiver's Motion must be denied.

**Seventh, granting the Motion would replace one set of victims with another**. The SEC's Enforcement Division may be charged with marshalling all (properly available) assets to return funds to allegedly defrauded investors. Other divisions, including the Corporate Finance Division, are charged with rules and regulations that assure purchasers and sellers of stock may rely on contents on forms (like Form 10-K) in making investment decisions. TCI's shareholders relied on, or are considered to have relied on, TCI's reporting related to the Complexes. What the Receiver proposes to do in the Receiver's Motion would, if allowed by the Court, create a new class of victims: TCI shareholders. TCI shareholders relied on the reports of the value as equity, not debt. The Receiver's actions create *more* victims of Barton's alleged fraud. Put simply, the SEC is functionally estopped, by its own accounting rules (including those found, among other places, in Regulation S-K) from taking the equity in the Complexes.

**Eighth is simply equity.** The Receivership is an action in equity. Weighing the absolute certainty of irreparable harm to SPC and TCI's investors and shareholders, the persons the SEC is likewise charged with protecting, considering no wrongdoing by SPC, and the fact that no investor funds have been (and cannot ever be) traced to the Complexes, the Court should deny the Receiver's Motion.

The Court should order an equitable remedy whereby SPC may proceed with the final step of obtaining the HUD TPAs, a step that TCI has taken countless times before and has never been, to its institutional memory, denied by applicable regulatory authorities.

SPC also, in the alternative, objects to the Receiver's Motion and shows below there are genuine issues of material fact whether SPC is owner and entitled to protection of the property

rights that SPC has acquired and earned. Because there are fact issues whether SPC, not Barton nor the Receiver, is the owner of the Complexes, the Court should deny the Receiver's Motion.

SPC appreciates and supports the mission of the SEC to protect investors, as well as the role of the Receiver in attempting to marshal and conserve assets for the benefit of the victims of alleged fraudulent conduct. Nonetheless, not every proposal that might return funds to investors is fair or just. The relief sought by the Receiver's Motion is neither fair nor just.

## II.    DISPUTED FACTS

### A.    SPC disputes the Receiver's "Undisputed Facts" that he makes as arguments.

The Receiver refers to "Undisputed Facts." Sometimes the "Undisputed Facts" are true and authentic excerpts from Court Orders or loan documents, without (mis)characterization and without argument, which SPC does not dispute. Any "Undisputed Facts," infected by interpretation, (mis)characterization, or argument, are not "Undisputed Facts." They are very much disputed. Several examples are discussed, categorically, below.

### B.    The Receiver's "Undisputed Facts" make an improper "Guilt by Association" argument.

The Receiver alleges as "Undisputed Facts" allegations that Barton has comingled funds and defrauded investors. [Doc. 207, 19, 21-25]. These are not "Undisputed Facts." They are the SEC's report of what it says is undisputed. Much ink is spilled arguing Barton's bad acts. This proceeding is not about Barton's conduct. This proceeding is about SPC's ownership of four (4) Complexes for which Barton performed certain developer services that had absolutely NO relationship to the Foreign Investment. SPC had no involvement in anything the SEC alleges, whether it ultimately prevails or not, and SPC is only aware of the facts in the record related to

SPC's rights. The SEC's allegations and Barton's alleged criminal behavior bear no relationship to the law or equities that govern the ownership of the Complexes.

How Barton used the Foreign Investment has nothing to do with SPC because the Foreign Investment in no way touched the Complexes. The Receiver repeatedly returns to the non-sequitur that Barton used investor funds to purchase properties, pay undisclosed fees, commissions and other expenses, and to fund his lifestyle. From the perspective of SPC and its parent, TCI (and, therefore, TCI's shareholders), what Barton did with the Foreign Investment (while (if proven) regrettable), and with all due respect, has nothing to do with SPC and, therefore, TCI and its shareholders. SPC has performed the only competent tracing of funds in this proceeding. SPC knows, and has proven, through competent evidence, that the Foreign Investment was not used to develop, construct, and operate the Complexes.

Because the Receiver has no evidence, the Receiver makes numerous comments intended to smear SPC and suggest an association with Barton other than SPC's simple retention of Barton as a fee developer and sponsor of certain projects, which SPC has done with other fee developers. [App. 695, 1171]. Whether Barton raised funds for Wall Entities and then used the Foreign Investment for other Barton properties, or not, has no relation to services rendered by Barton on the Complexes. The use or misuse of the Foreign Investment involves Barton paying someone or something. Here, Barton very narrowly performed services under the auspices, direction, and control of a holder of equitable title with the unfettered, and very much reported, right to convert its equitable title to legal title.

For example, the Receiver's "Summary" argues that Barton entities were created "at SPC's behest . . . ." [Doc. 207, 9]. No evidence is cited to support this claim and none exists.

Any attempt to impute certain alleged conduct by Barton is specifically denied by SPC and does not assist the Court in establishing the equities in this matter.

###### C.    The Receiver's "Undisputed Facts" make an improper "Collect at all Costs" argument.

A consistent theme of the Receiver's Motion is that the ends justify the means. The Receiver alleges as "Undisputed Facts" that SPC's Complexes are the largest asset of the Receivership Estate, and that the Receiver cannot satisfy creditor or investor claims without including the Complexes in the Estate. [Doc. 207, 25]. The Receiver further writes that the Receivership Estate's expenses are significant. The Receiver advocates: "Thus, without the net proceeds recovered from the sale of the Apartment Developments, the Investors and other creditors are likely to suffer a significant shortfall." [Doc. 207, 26]. Net proceeds from the Complexes are simply not properly available to pay the "significant expenses" of the Receiver and they are clearly not properly available to repay Investors. They are the property of SPC. Simply because an asset has value does not mean it is properly subject to governmental seizure to repay the Investors the Foreign Investment.

### III.    STANDARD OF REVIEW

#### A. This summary proceeding should include live witnesses testimony and a right to discovery.

##### 1.    *Live Witness Testimony*

In this matter, a summary proceeding requires live witnesses. "When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." FED. R. CIV. P. 43(c). Whether to allow live witness testimony rests in this Court's discretion because a "court may decide a motion on affidavits

or…direct that the matter be heard on oral testimony." *Sanders v. Monsanto Co.*, 574 F.2d 198, 199–200 (5th Cir. 1978).

A summary proceeding is appropriate only when it comports with a claimant's due process rights. Summary proceedings are "inappropriate when parties would be deprived of a full and fair opportunity to present their claims and defenses." *SEC v. Elliott*, 953 F.2d 1560, 1567 (11th Cir. 2019)"[T]he need for expediency and a district court's authority to utilize summary proceedings in a receivership do not outweigh an investor's right to due process." *SEC v. Torchia*, 922 F.2d 1307, 1319 (9th Cir. 2019). A court "should ensure that the third parties are given due process, and thus have adequate notice and an opportunity to be heard." *SEC v. Bjork*, 2012 WL 1392082, at *2 (S.D. Tex. Apr. 19, 2012).

Courts will sometimes determine that a summary proceeding without live testimony does not comport with a claimant's due process rights. *Elliott*, 953 F.2d at 1572 (due process was denied to claimant where claim required evidentiary hearing). Many courts have indicated that allowing live witness testimony is an important component of a claimant's due process rights in a summary proceeding. *See, e.g.*, *SEC v. Millennium Bank*, 2009 WL 10689053, at *4 (N.D. Tex. July 21, 2009) (summary proceeding provided due process where claimant was given opportunity to put on and cross-examine witnesses); *SEC v. Wenke*, 783 F.2d 829, 834-35, 838 (9th Cir. 1986) (district court afforded claimant due process in permitting him opportunity to present witness testimony and cross-examine witnesses); *SEC v. Vassallo*, 2010 WL 3835729, at *3 (E.D. Cal. Sept. 29, 2010) (due process afforded where claimant was provided opportunity to present evidence and witnesses on his behalf).

SPC supports its Response with an extensive appendix featuring numerous complex financial documents. While the declarations SPC submits explain some of these documents, they

**Southern Properties Capital, Ltd.'s Brief in Response**                                          Page 8 of 50
**To Receiver's Motion for Summary Judgment**

are, of course, a fixed medium and cannot capture the full context and detail inherent in the complex financial documents. Live witness testimony, in contrast, is not fixed and allows for both parties to question witnesses and inquire into the complexities of SPC's documentary evidence. Put simply, there is detail in SPC's Appendix that cannot be fully captured through declarations. This Court should hear this matter "wholly or partly on oral testimony." FED. R. CIV. P. 43(c).

### 2. Discovery

This proceeding involves the Receiver's claim to real estate developments with a value of tens of millions of dollars. Under these circumstance, courts generally hold that the claimant has a right to conduct discovery before it is deprived of its property. *See, e.g.*, *SEC v. Universal Financial*, 760 F.2d 1034, 1037 (9th Cir. 1985) (due process provided where claimant afforded opportunity to conduct extensive discovery, including taking depositions); *Elliott*, 953 F.2d at 1572 ) (due process denied where claimant not provided the opportunity to conduct discovery); *Bjork*, 2012 WL 1392082, at *3 (claimant denied due process where it was not permitted to conduct discovery).

Here, SPC cannot receive a fair hearing without an opportunity to conduct discovery. The only witness offered in support of the Receiver's Motion for Summary Judgment is the Receiver, Courtney Thomas. Mr. Thomas's declaration includes numerous factual assertions that are not supported by documents or references to specific evidence. SPC should have the opportunity to depose Mr. Thomas concerning the source of his factual assertions. Additionally, one of the crucial issues in determining whether the Complexes are Receivership Assets is whether investor funds have been used in development of the Complexes. SPC should be afforded the opportunity to seek documents related to this issue and have the opportunity to depose Carol Hahn, the

assigned accountant for the SEC, and any other accountants retained by the Receiver who may have attempted to trace investor funds into the Complexes.

### B. Summary judgment standards.

The moving party bears the burden of establishing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The Fifth Circuit makes clear that courts must "resolve doubts in favor of the nonmoving party and make all reasonable inferences in favor of that party." *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). To this point, SPC reiterates and incorporates the factual disputes it raised in SPC's Motion for Intervention and Opposition to Motion for Appointment of Appraiser. [Doc. 161, 164]. These disputes, and additional details, are addressed below.

## IV.    SPC'S SUMMARY JUDGMENT EVIDENCE

In support of its Response, SPC submits the following declarations with exhibits:

- Declaration of Al Crozier [App. 2-6];

- Declaration of Robert Canham [App. 8-10];

- Declaration of Doug Graham [App. 12-14];

- Declaration of Brad Kyles [App. 16-18];

- Declaration of Mark Shayne [App. 20-21]; Exhibits [App. 23-55];

- Declaration of Don Phillips [App. 57-60]; Exhibits [App. 62-86];

- Declaration of John Jordan [App. 88-89]; Exhibits [App. 91-578];

- Declaration of Scott Hakala [App. 580-615]; Exhibits [App. 617-692];

- Declaration of Erik Johnson [App. 694-710]; Exhibits [App. 712-1167]; and

- Declaration of Bradley Muth [App. 1169-1189]; Exhibits [App. 1191-2095].

## V.    ARGUMENTS AND AUTHORITIES

### A.    In the absence of commingling of funds, the Complexes should not be included in the Receivership Estate.

Pursuant to Fifth Circuit case law relating to receiverships, the Court should exclude the Complexes from the Receivership Estate. In the Fifth Circuit, a district court only has jurisdiction to impose a receivership over a party's property that is "the subject of the underlying dispute." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 306, 310 (5th Cir. 2012). If the defendant has illegitimately transferred that property to a non-defendant, then, in some instances, a receiver may be appointed over assets under the non-defendant's control. *See Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009). To determine whether Barton "illegitimately transferred" the Foreign Investment to the Complexes, tracing analysis is required. *Netsphere*, 703 F.3d at 310 (holding that the district court could not impose a receivership over "personal property and assets" not traceable to the underlying subject matter of the dispute); *SEC v. Faulkner*, 2018 WL 432729, at *5 (N.D. Tex. Sept. 12, 2018) (requiring the movant to show that the non-party entity is both controlled by the defendant and in possession of funds traceable to the alleged fraud). The Receiver has the clear burden as Movant. The Receiver has not satisfied, and cannot satisfy, his burden.

In this case, the Complexes are not the subject of the underlying dispute. Barton did not illegitimately transfer the Foreign Investment to the Complexes or to SPC. The Receiver has not submitted any competent evidence of, and has not otherwise demonstrated, tracing. The Receiver repeatedly argues that Barton misappropriated investor funds and commingled them between Barton-related entities. The Receiver submits no evidence that SPC was aware of, involved in, or received funds from the Foreign Investment. The Receiver submits no evidence that Barton paid

any of the Foreign Investment to the Complexes. He, of course, would not because Barton did not own them because of SPC's rights to them. Rather, the evidence shows that it was SPC, not Barton, who was primarily responsible for sponsoring, constructing and managing the Complexes. [App. 9-10, 13-14, 17-18, 696-697, 1171-1172, 1184]. Under these circumstances, the Complexes constitute an entirely separate *res* that should not be included in the Receivership Estate. The Complexes should not be sold by the Receiver for the benefit of victims who have no involvement with them to the detriment of a newly created set of victims: TCI shareholders.

The best that the Receiver can muster is an allegation (not evidence) of commingling. For example, in a footnote, the Receiver writes, "[i]nvestor funds were used to operate and maintain JMJ Development and its employees, one of whom was dedicated solely to Receivership Entities' development of multi-family properties." [Doc. 207, 32, n.138]. The Receiver's allegation that JMJ Development, LLC ("JMJ") compensated an employee who worked on "multi-family" projects proves nothing. The Receiver fails to: (i) identify the purported employee, (ii) provide documentary evidence of JMJ's payment, (iii) show that this employee specifically worked on the Complexes, and likewise had no other duties beyond the Complexes or (iv) identify (much less prove) the source of funds that JMJ used to pay the purported employee. The Receiver provides no evidence that any employee "dedicated solely to . . . development of multi-family properties" meant that the multi-family properties were these specific Complexes.

The Receiver appears to allege that the Foreign Investment was used to fund the Complexes because "[a]ny remaining excess cash was used to pay down the SPC note." [Doc. 207, 32, n.138]. The Receiver fails to explain or show how this constitutes a transfer of the Foreign Investment from defrauded investors to the Complexes. The evidence shows that the

borrower under the convertible notes only made payments under the notes from free cash flow **from** the operation of the Complexes. [App. 9-10, 13-14, 17-18]. The source of the funds was the payment of rent by tenants. There is no evidence that any of the Investors lived at the Complexes (because they did not) or that the Foreign Investment was the payment of rent (because it was not). At no time did Barton look to any other source of payments under the convertible notes. He had no reason nor duty to look for funds elsewhere.

The Receiver makes an unsupported extrapolation by alleging that, "[e]ven if *no other receivership assets* had been used to in [sic] the Apartment Developments or the D4 entities, however, each is nonetheless appropriately included in the scope of the Receivership Estate." [Doc. 201, 32, n.138]. That proposition is absurd. The Receiver submits no evidence that the Foreign Investment was ever paid to the Complexes. The Receiver submits no evidence that Barton used the Foreign Investment in the construction or management of the Complexes (because he did not). The sole sources of project funds for the Complexes were from (i) the primary loan on each property, (ii) the SPC convertible loan on each property, and (iii) cash flow from operations (payment of rent) of the Complexes. [App. 10, 14, 17-18]. Even the availability of cash flow (rent payments less operating expenses) from the Complexes was further limited by HUD regulation limiting cash disbursements of "excess cash" as defined by HUD and the duty to pay excess funds to the convertible loan holder SPC. If any party is "short" of funds, then it is the first lien lender or SPC. The Receiver purports to cite cases for his conclusions, none of which is supported by evidence. These cases are distinguishable.[3]

The Receiver's effort to include the Complexes in the Receivership Estate and, what's more, sell them for the benefit of victims of an unrelated fraudulent scheme, are contrary to the

---

[3] *See* Section V.C.5, *infra.*

**Southern Properties Capital, Ltd.'s Brief in Response**    Page 13 of 50
**To Receiver's Motion for Summary Judgment**

basic equitable principles of restitution and Fifth Circuit precedent relating to receiverships and the application of the law to separate property. Based on the absence of evidence that Barton used the Foreign Investment in the Complexes, the Court should exclude SPC's separate property from the Receivership Estate and deny the Receiver's Motion.

> **B.    SPC demonstrates fact issues regarding ownership of the D4 Entities and the Complexes.**

SPC asserts its rights as _owner_. It is not merely an unsecured creditor, nor is it merely an investor. It has operated since Day 1 as the beneficial and equitable owner. [App. 696-97, 704-09, 1171-72, 1182-89]. The Receiver requests declaratory judgment that SPC does not have any ownership interests or other rights in the Complexes, and the Receiver seeks to sell Bellwether and Windmill Farms free and clear of claims. In doing so, the Receiver seeks to deprive SPC of its ownership interest and its contractual rights, and the Court should reject this effort.

SPC is not a defendant or relief defendant in the SEC's underlying case. SPC is not a Receivership Entity. Moreover, neither the SEC nor the Receiver alleges that SPC received any of the Foreign Investment.

At times, the Receiver's Motion seeks to characterize SPC as merely a lender. SPC is not a mere lender but was active in the construction and operation of the Complexes and has other legal rights in addition to its position as a lender. [App. 696-97, 1171-72, 1184]. SPC's debt financing has never stood independently and cannot be considered or assessed without its absolute right to convert its equitable title into equitable and legal title. SPC made loans at interest rates well below market rates with the expectation and right to acquire an equity interest in the Complexes when it elected to do so. [App. 697, 704-705, 709, 1772, 1181-1182, 1188]. The Receiver's characterization of SPC as a passive lender is simply wrong.

At times, the Receiver's Motion seeks to characterize SPC as merely an investor. SPC is not a mere investor. SPC invested in the Complexes, but in anticipation of exercising its right to convert its debt into equity interest. [App. 696-697, 704-705, 1171, 1184]. SPC invested significant amounts of money in the Complexes and oversaw nearly every aspect of their development, from site selection and acquisition, to their construction, to lease arrangements and more. *Id.* SPC made these investments as the equitable owner and the intended legal owner. In other words, SPC behaved as the owner of membership interests or the underlying assets at all times.

The Receiver refers to SPC's exercise of its conversion right as providing SPC with a "windfall." This is patently false. In fact, depriving SPC of the benefit of conversion would deprive SPC not only of the benefit it bargained for, but also of the benefit it earned and paid for. The right to convert the SPC loan to an equity interest in the Complexes was a right that SPC paid for through the terms and development of the projects. [App. 696-697, 704-705, 1171, 1184]. Far from providing SPC with a windfall, the conversion right is a feature SPC earned during the conception and construction of the developments, and the Receiver completely ignores the time, talent, labor and costs of capital of SPC. The terms of the loans extended were not available in the market or from SPC without the underlying conversion rights. [App. 697, 705, 1172, 1182].

Conversely, Barton and his related entities did not contribute financially to the Complexes. In fact, Barton and his companies received a development fee from SPC and were otherwise reimbursed by SPC for any expenses they incurred. [App. 696, 1171]. The Receivership will receive the last payment under the Opelika contract once a cost certification of

the project is obtained by HUD. [App. 703]. The Complexes, in other words, were not paid for with the Foreign Investment.

Before the appointment of the Receiver in this SEC injunctive action, SPC elected to exercise its options to convert its debt interest to an equity interest. [App. 701, 1176-1177, 1179-1180]. Accordingly, other than with respect to Opelika, SPC perfected and is now the 100% member of the owners of the Complexes.[4] Make no mistake, SPC is the legal owner. In the highly unlikely event HUD does not approve the TPA, then HUD could exercise remedies available to HUD. Nonetheless, SPC would remain the equitable and legal owner. Neither Barton nor the Receiver has any remaining right to an ownership interest in the entities that own these developments.[5]

### 1. Summary of SPC Business Model

To provide context, TCI and its affiliates, such as SPC, are in the business of building and managing properties, including multifamily residential projects. [App. 695, 1170]. At any given time, TCI/SPC has a number of ongoing development projects funded by a variety of financing sources. [App. 695]. In certain instances, TCI outsources to a third party the initial developer role. [App. 695, 1170]. With outsourced functions, TCI can operate a leaner corporate structure by reducing the necessity of additional personnel and associated expenses. [App. 1170]. Responsibilities that TCI can delegate to the developer, under strict TCI (in this case SPC) supervision, include negotiating the acquisition of the real property, pursuing zoning, obtaining mortgage financing, and setting up loan funding processes. [App. 696, 1170]. TCI pays the developer a substantial developer's fee for these services. [App. 696, 1170-71]. The developer

---

[4] Except with respect to Opelika for which it remains a simple owner with equitable, rather than legal, title.

[5] SPC's equity interests in the developments are subject to the subsequent approval of HUD but SPC could simply refinance the projects or retire the HUD loan. [App. 703, 709]. As explained in this brief, however, such approval for TCI is a formality. [App. 709].

does not invest or contribute its own money in the project. [App. 696, 1171]. As planned, once the project is complete and stabilized, the developer takes the formality of causing ownership and equitable title to become both legal and equitable. [App. 696, 709-10, 1171]. Again, TCI (in this case, through SPC) PAYS money to the project developer. The project developer does NOT PAY money to TCI (through SPC in this case).

### 2. *The Complexes and Barton*

TCI has used the fee developer model for many projects. Barton acted as the developer on four projects. [App. 696, 1171]. The developer obtained financing for the projects with TCI/SPC planning on acquiring the projects after stabilization and securing their right by loaning funds at favorable market rates in exchange for execution and delivery of a convertible note. SPC paid Barton a developer fee for each project. [App. 696, 1171]. Barton, under the direct supervision and with substantial input by SPC, as project owner, obtained HUD mortgage financing, pursued proper zoning, and provided other developer services. *Id.* SPC provided the raw land, funded all the equity, and managed the construction and operations of the Complexes. [App. 1171]. At all times, it was contemplated that after the initial development stage, Barton would transfer legal ownership to SPC (merging SPC's equitable title with legal title), who would continue with ownership and management of the Complexes. [App. 696, 1171]. SPC was not merely a passive lender or investor. Rather, SPC identified building sites and purchased the land (wiring almost $9.5 million for the raw land), oversaw and managed entitlement efforts; controlled and funded planning and design efforts; assembled and maintained required documents; managed and approved the construction process; provided certificates of deposit and cash collateral to obtain letters of credit and funded change orders and cost overruns; and managed the operation and leasing of properties. [App. 696-97, 1171].

SPC funded multiple escrow agreements to secure construction and operations for each of the Complexes. [App. 704]. Two of the projects, Windmill Farms and Bellwether, had Escrow Agreements for both Operating Deficits and Working Capital. [App. 704]. SPC provided the $3.4 million cash for the escrow funding for these projects. *Id*. SPC provided $2.3 million escrow funding by letters of credit for the other two projects, Ingleside and Opelika. *Id*. SPC provided the letters of credit by executing on the Barton entities' behalf and providing the security for the letters of credit. *Id*.

TCI/SPC also provided construction supervision services for each of the projects as evidenced by the Construction Project Progress Meeting Minutes ("Minutes"). [App. 58-59]. The Minutes list the attendees and their role for each meeting that occurred over the multi-year development process for the Complexes. *Id.* At each meeting, Don Phillips ("Phillips"), as representative of Pillar, SPC's contractual advisor and management company, appeared as Owner or Owner's Representative, and was listed as "owner." *Id*. The attendance list below is one such example:

| ATTENDEES: | Company: |
|---|---|
| • Gerald Hines | HUD Inspector |
| • Jaron Daily | BGO Architects |
| • Kristofer Spurgin | BGO Architects |
| • Sarah Franco | Owner's rep |
| • Don Phillips | Owner |
| • Timothy Barton | Developer |
| • Ron Wood | Developer Rep. |
| • Andre Nicholas | NE Construction, LLP. |
| • Michael White | NE Construction, LLP. |
| • JR Carey | NE Construction, LLP. |

The Minutes often list attendance. *Id*. Barton is rarely named as appearing. [App. 59]. Phillips attended the vast majority of the meetings. *Id.*

Additionally, Phillips corresponded with Barton and the contractors, acting on the behalf of SPC, as owner. [App. 59]. Phillips received requests for update and had authority to initiate

and manage change orders. *Id*. Lender representatives and HUD representatives participated in these draw and update meetings and in cost administration of the loan. *Id*.

Phillips approved invoices to be paid throughout the development of the Complexes. [App. 59]. Phillips received multiple change orders and invoices for approval from Barton. Barton sent to Phillips funding requests for review and approval, "Don can you approve the attached to be funded from the lender to the GC?" [App. 80]. Where invoices were not paid directly by SPC, they were typically followed by SPC reimbursing the actual payor. [App. 59].

Furthermore, Barton, as developer, signed contracts with Sunridge Management and Sunchase Management, two property managers ("Managers"). TCI/SPC designated the Managers and interacted with the Managers on a daily basis. [App. 9, 13, 17-18]. TCI maintains a regular relationship with the Managers. *Id.* The Managers often manage TCI properties. *Id.* As the property managers, the Managers collect and deposit rental payments, show and lease vacant units, handle maintenance requests, and perform other duties related to operating and maintaining the Complexes. [App. 9, 13]. The Managers communicate with Brad Kyles, an asset manager at Pillar *who provides guidance to the Managers.* [App. 9, 13, 17-18]. *Cash shortfalls were and, if necessary, still are, funded by Pillar under the convertible loan.*

In fact, the evidence shows the Managers have not received any funds from Barton related to the Complexes. [App. 10, 14, 17-18]. All funds received by the Managers on account of the Complexes come from one of three different sources: (1) SPC, through Pillar, (2) cash flow from the Complexes, or (3) while being constructed and during lease-up, from construction loan proceeds. [App. 10, 14, 17-18].

### 3. SPC financial statements show ownership investments of the Complexes, not merely loans.

a. **Convertible Debt**

With convertible debt, an entity borrows money from a lender, like a typical loan. [App. 1181]. Unlike a typical loan, however, convertible debt allows the lender to convert to legal title to the equity (e.g. stock or membership interests) in the owner. *Id.* The lender will typically offer the loan at a much lower interest rate and other terms not generally available in the marketplace since the lender will or could later obtain equity in the company. *Id.* A number of financial instruments contain convertibility features and are commonly used for lenders to obtain equity after an initial holding period. *Id.* Lenders bargain for, and obtain, a right of choice and reserve a time at which they may make that choice. Like one's ability to choose different paths in life, that right of choice SPC bargained-for has substantial value. If SPC's sponsorship and management activities in connection with development of the Complexes suggested greater value than the return on investment available from the debt at lower-than-market interest rates and other terms, then SPC would convert its equitable title to legal and equitable title. If market conditions suggested potential operating issues based on ordinary cyclical economic downturns, SPC could simply wait and receive a lower return-on-investment associated with payments of interest and later principal until market conditions suggested a greater return-on-investment, over time, available by exercise of its conversion rights. Finally, SPC bargained-for the option that it would never exercise its conversion rights and lock in its return-on-investment based only on the repayment of principal and interest. In any event, that is what SPC bargained-for. It did not bargain for any one. It bargained for all three (3).

In this case, SPC loaned funds as convertible debt for use at the Complexes. [App. 704, 1181]. The terms of the convertible loan provide that SPC had the right to convert the debt into 100% equity ownership of the Complexes. *Id.* This right was an integral part of the bargain at the time the convertible loans were made (and long before the Receiver was appointed). [App. 704-05, 1181]. SPC converted the debt into equity and is now the 100% equity owner of the Complexes (excluding Opelika, which it intends to convert at a later date). [App. 705, 1181-82].

Classifying SPC's interests in the Complexes solely as "loans" is inaccurate because it does not provide context or describe SPC's equity rights. [App. 705, 1182]. As shown by the TCI and SPC accounting records, discussed below, SPC effectively treated the properties as investments because it always intended to exercise its exclusive right to convert its debt to 100% equity.

### b. SPC's "Audited Consolidated Financial Statements" show the Complexes Have Significant Equity Rights, not Mere Loans.

TCI files financial reports under GAAP for compliance with its public reporting requirements through the SEC as a corporation listed on the New York Stock Exchange. [App. 707, 1185]. SPC issued bonds on the Israeli Bond Exchange, those bonds being a primary source of financing for TCI during the late 2010s and early 2020s. [App. 705, 1182]. SPC files financial and other reports in Israel, as required by applicable Israeli law. Assets in Israel are reported pursuant to International Financial Reporting Standards ("IFRS") which account for assets at "fair value." [App. 705, 1182]. SPC's financial statements evidence the fair value of the convertible loan portfolio by providing the loan balance and <u>an appraised value for the conversion rights in each note</u>. [App. 1182-85]. SPC's publicly filed financial statements state as

follows: Note 10 in the SPC 2021 Financial Statements is titled, "Notes Receivable." [App. 706, 1182-83]. The table, shown below, includes the Complexes:

| Borrower / Project | | Carrying Value 2021 | | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|---|---|
| Autumn Breeze(1) | $ | 10,365 | $ | 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | | 12,308 | | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | | 9,404 | | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | | 2,426 | | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | | 1,363 | | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | | 18,819 | | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | | 1,979 | | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | | — | | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | | 9,488 | | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | | 13,355 | | 6,389 | 5.00 % | 8/1/26 |
| | $ | 79,507 | $ | 47,850 | | |

Below the table, the 2021 Financial Statements explain that SPC owns convertible debt in the properties listed in the table, including the Complexes. It states the following:

> "The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property." [App. 706, 1183].

The 2021 Financial Statements add further explanation, stating:

> "The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued." *Id.*

The 2022 Financial Statements mirror this point, adding:

> "The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals." *Id*.

SPC carried the notes receivable for these convertible loans, not at the loan value but with an additional factor of an appraised value for the conversion right as provided by a competent outside third party appraiser, assessing a value for the equity right. [App. 706-07, 1183]. These financial statements were filed with relevant regulatory authorities and received wide publication

in the Israeli business press. Bond purchasers relied on these expanded disclosure rules and the statement of future equity in purchasing these bond obligations. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (adopting the fraud on the market presumption of investor reliance).

In summary, SPC owned convertible debt that could be converted at SPC's option. [App. 707, 1184]. SPC did just that on October 3, 2022, when it exercised its option to acquire 100% equity interest in the Complexes (excluding Opelika, which it intends to convert at a later date). [App. 701, 703, 1176-77. 1179-80].

To comply with IFRS, SPC had to receive a third party valuation for these valuable conversion rights and carry that valuation on its publicly filed financial statements. [App. 707, 1184].

Also, as a practical matter, SPC expended significant financial and company resources in connection with the Complexes. SPC utilized in-house staff and resources to participate in the development of the projects. SPC also performed many services for the projects, including, among others, identifying land sites; purchasing raw land, overseeing and managing entitlement efforts; controlling and funding planning and design efforts; assembling and maintaining required documents for the land development projects; managing and approving the construction process; providing certificates of deposit and cash collateral to obtain Letters of Credit; funding change orders and costs overruns; and managing the operations and leasing of properties. [App. 696-97, 704, 1184].

At all times, SPC had an enforceable equity right under the convertible loan structure and publicly disclosed that equity value in regulatory required filings.

### c.  TCI's 10-Ks Also Show that the Complexes are More Than Mere Loans.

Because TCI is SPC's parent company, substantial information regarding SPC is contained in TCI's reports on Form 10-Ks ("TCI's 10-K"). Because TCI is listed on the NYSE, its 10-Ks are completed in accordance with Generally Accepted Accounting Principles ("GAAP") and SEC regulations. [App. 707, 1185]. According to the SEC, per Staff Accounting Bulletin No. 104, revenue can only be recognized when collectability is reasonably assured. [App. 1185].

TCI's 10-Ks show SPC's interests in the Complexes as ownership investments, when one considers the comprehensive picture. [App. 707-09, 1182, 1185]. TCI did not recognize interest income under SPC's convertible notes because at all times SPC intended to exercise its right of conversion for ownership. [App. 708-09, 1185-88]. In TCI's 10-Ks, TCI accrued, but fully reserved, interest income recognition on the convertible loans. [App. 1185]. Under the SPC Convertible Loans, any uncollected interest income is forgiven in the event of conversion. [App. 709]. TCI had the ability and the intent to convert the SPC Convertible Loans into 100% equity interest in the Complexes. [App. 1185-86].

In the 2020 and 2021 10-Ks, TCI describes its interest in the Complexes as a "note . . . convertible, at our option, into a 100% ownership interest." [App. 707, 1187-88]. The 2018 and 2019 10-Ks provide that TCI "intends to service and hold for investment the mortgage notes in [TCI's] portfolio." [App. 707-08, 1187].

SPC exercised its option on October 3, 2022, when it converted its notes for Windmill Farms, Bellwether, and Ingleside into 100% ownership interests, which it also intends to do for Opelika. [App. 701, 703, 1176-77, 1179-80]. SPC is now the sole owner of Windmill Farms, Bellwether, and Ingleside. Purchasers and sellers of TCI stock relied on, or are deemed to have

relied on, these reports on Form 10-K in making their investment decisions. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 435 (J. Parker concurring) (warning that because public filings are the medium through which stockholders monitor corporations, the consequences of financial statements not reflecting reality form the very basis of securities law). *See also* Audit Comm. Disclosure, Release No. 41987 (S.E.C. Release No. Oct. 7, 1999) (Recognizing that investors rely on and react to mandatory corporate financial disclosures).

### 4. SPC's business structure is entirely legitimate.

The Receiver argues as one of his themes that SPC's business model violates HUD regulations, and that SPC has "unclean hands." This is entirely the wrong conclusion. SPC is cognizant of HUD compliance and has not tried to hide the transactions.

As shown in this Brief, the transactions, their nature, the equity aspects of the structure, the right to convert debt to equity and SPC's intent to convert the debt to equity and acquire the Complexes has never been a secret and has been disclosed widely to the public. The disclosures in the SPC filings to comply with Israeli law are direct, specific, and detailed. [App. 705-07, 1182-85]. The convertible loan portfolio is disclosed in TCI 10-K filings clearly supporting the reserving of all accrued interest on the convertible loans by unambiguously describing the convertibility rights and SPC's intent to exercise those rights. [App. 707-09, 1185-89].

Neither SPC nor TCI has taken a security interest in the real property that secures the HUD guaranteed loans. There is no second or junior lien filed against any of the properties. Any security interest is in the equity of the equity holders of the Complexes. [App. 698-701, 702-703, 1173-76, 1178-79]. SPC has publicly filed UCC-1s in the public records of the various states showing the security interest in those equity interests. [App. 700-01, 1175-76, 1179].

The Receiver has made conclusory statements about HUD policies which do not fit the facts and circumstances surrounding the Complexes. The Receiver says exercise of the option to convert equity without HUD approval violates HUD Regulations. HUD Regulation do not prohibit a sale, but they do provide for an application process if the buyer in a sale seeks to assume the HUD loan. Specifically, a buyer could complete a purchase even if HUD did not approve the assumption of its loan. A buyer could pay off the HUD loan and obtain conventional financing. [App. 703, 709].

SPC has always acknowledged that if it wanted to assume the loan, HUD would have to approve. Amazingly, the Receiver states that this fact makes the exercise of SPC's proposed purchase less desirable, when the Contracts it proposes to enter into for the sale of Windmill Farms and Bellwether Ridge also contain an express contingency that the obligations of the buyers thereunder are subject to HUD approval of the buyers' assumption of the loan. [App. 1176, 1180]. The Court should not allow the fact that SPC intends to apply for loan assumption to allow the Receiver to breach its contractual obligation to convey equity interests in the Complexes to SPC. *The proposed buyers have to go through the same process*.

Moreover, even though the transfer of equity from the developer to the owner may be subject to HUD approval, there is no HUD rule that prohibits a developer from agreeing to the sale of a HUD-financed project. [App. 6]. Nor is there any rule that stays or invalidates SPC's exercise of its option to convert its Convertible Loans to equity without HUD approval. *Id*. Nor is there any reason to conclude that SPC's application for assumption will not be approved. TCI and SPC have previously obtained HUD approval for assumption a significant number of times. [App. 709]. TCI is not aware of any instance in which HUD denied a request by TCI or one of its affiliates such as SPC, for a TPA. [App. 709].  In fact, Bellwether was an approved transfer to

the VAA joint venture under the HUD large borrower approval (but the Bellwether transfer was not completed). [App. 710].

But for the Receivership stay, SPC would have already submitted the TPA applications for assumption of existing loans for the Complexes. [App. 710]. Since the VAA sale, which closed September 16, 2022 [App. 710, 1188], SPC currently is involved at various stages of the TPA process with 4 other projects with two other similar situated developers not subject to this proceeding. [App. 710].

HUD policy, in fact encourages both a developer and a general contractor to take equity interests in a project to assure participants have "some skin in the game." TCI and SPC have engaged in a number of other similar projects where third-party initial developers and general contractors have received fraction interests. [App. 1171].

As stated above, SPC's exercise of its options, subject only to the formality of HUD approval, should be recognized by the Court as prohibiting the Receiver from selling Windmill Farms and Bellwether. Indeed, such approval is, for TCI, a formality, and TCI and SPC have obtained such HUD approval for a significant number of other projects. [App. 709]. It would constitute a grave injustice to deny SPC the ability to submit and obtain the HUD TPA, so that the Receiver can sell the Complexes "out from under" SPC.

These Complexes are unique in this Receivership. The structure delivered four fully performing loans to the primary lenders that are being paid and are not in default. The Complexes are operating and cash flowing due to tenant rent payments (not the Foreign Investment). [App. 9-10, 14, 17-18].

Any failure of HUD to approve a transfer would not vitiate state law ownership. At best, it would affect financing features and make the properties subject to conventional financing.

**5.  *SPC Did Effectively Exercise Conversion Rights by Which It Could Acquire Control Over the Complexes.***

    a.  <u>**Windmill Farms.**</u>

        i.  **SPC's Convertible Loan on Windmill Farms with Right to Conversion.**

Barton used one of his companies, JMJ for the purposes of performing his role as developer for Windmill Farms. [App.1172]. Barton's D4FR, LLC ("D4FR") applied for the HUD loan, and HUD approved D4FR's application and issued to D4FR a "Firm Commitment," and pursuant to the Firm Commitment, HUD agreed to provide the loan to Greystone Servicing Corporation, Inc. ("Greystone"), to administer to D4FR. [App. 1172-73]. D4FR executed additional HUD documents, including Borrower's Oath, Promissory Note, and Deed of Trust. [App. 1173].

SPC provided financing to assist with construction of Windmill Farms. [App. 1173]. SPC made a convertible loan to JMJ through a Letter Agreement ("Windmill Letter Loan Agreement"). *Id.* The Windmill Letter Loan Agreement provided that JMJ shall execute and deliver a promissory note. *Id.*  JMJ, as borrower, executed a promissory note in favor of SPC, as lender, in the principal amount of $7,300,000.00 ("Windmill Note"). *Id.*

JMJ provided to SPC security for the Windmill Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4FR's parent company, JMJD4, LLC ("JMJD4"). [App. 1173]. JMJ signed an Assignment of Pledge and Security Agreement ("Windmill Assignment"). [App. 1174]. As a result, all of the equity interest in D4FR's parent company, JMJD4, was pledged to SPC. *Id.*  Importantly, the JMJ Windmill Assignment granted SPC the right to convert the loan to equity, as discussed immediately below. *Id.*

Each of the Windmill Amended and Restated Pledge and Security Agreements included Section 7.15, titled "Conversion Option." [App. 1174]. Section 7.15 provides a mechanism for SPC to exercise an option to acquire either the Windmill Pledged Equity or the Windmill Project for consideration of $100.00. *Id.* Section 7.15 states in relevant part:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

*Id.* UCC financing statements were filed securing SPC's right to obtain the membership interest. [App. 1175-76].

### b. Bellwether

#### i. SPC's Convertible Loan on Bellwether with Right to Conversion.

To obtain a mortgage loan for Bellwether, Barton used as borrower D4DS, LLC ("D4DS"). [App. 1177]. D4DS obtained a HUD loan. *Id.* HUD approved D4DS's application and agreed to provide the loan to Greystone, to administer to D4DS. *Id.* The loan was for the principal amount of $19,021,200.00. *Id.* D4DS executed additional HUD loan documents, including a Promissory Note and Deed of Trust. [App. 1178]. The loan was eventually modified to reduce the principal amount to $18,608,100.00. *Id.*

SPC provided the Bellwether project with financing to assist with construction in the form of a convertible loan. [App. 1178]. JMJ, as borrower, executed a note in favor of SPC, as lender, in the principal amount of $3,800,000.00 ("Bellwether Note"). *Id.* JMJ provided SPC security for the Bellwether Note by assigning SPC all of JMJ's rights, title, and interest in D4DS's parent company, JMJD4. *Id.* JMJ signed an Assignment of Pledge and Security Agreement ("Bellwether Assignment"). *Id.* As a result of this transaction, all of the equity

interest in D4DS's parent company, JMJD4, was pledged to SPC. [App. 1178-79]. Importantly, the Bellwether Assignment granted SPC the right to convert the loan to equity, as discussed immediately below. [App. 1179].

Each of the Bellwether Amended and Restated Pledge and Security Agreements includes the same Section 7.15, titled "Conversion Option." [App. 1179]. UCC financing statements were filed securing SPC's right to obtain the membership interest. *Id*.

The following year, D4DS agreed to sell Bellwether to SPC affiliate APTS at Bellwether Ridge, LLC ("APTS"). [App. 1179]. Additionally, the agreement states that if SPC decided to exercise the conversion option, APTS will now be the entity that receives the $100.00 consideration. *Id*.

### c. Ingleside

#### i. SPC's Convertible Loan on Ingleside with Right to Conversion.

For Ingleside, Barton used JMJD4 for the purposes of performing his role as developer. [App. 697]. To obtain a mortgage loan for Ingleside, Barton used as borrower D4IN, LLC ("D4IN"). [App. 697-98]. D4IN applied for the HUD loan, HUD approved D4IN's application, and Greystone made the loan. *Id*. The loan was for the principal amount of $25,201,000. [App. 698]. D4IN executed additional HUD loan documents, including a Borrower's Oath, Promissory Note, and Deed of Trust. *Id*.

TCI provided financing to assist with construction of Ingleside. [App. 698]. TCI made a convertible loan to JMJ through a Letter Agreement ("Ingleside Letter Loan Agreement"). *Id*. The Ingleside Letter Loan Agreement provided that JMJ shall execute and deliver a promissory note. *Id*. JMJ, as borrower, executed a promissory note in favor of TCI, as lender, in the principal

amount of $5,900,000.00 ("Ingleside Note"). *Id.*  JMJ, in turn, loaned the amount to a third entity, TWRF, LLC ("TWRF"). *Id.*

JMJ and TWRF entered into a Letter Loan Agreement dated June 4, 2019 (the "TWRF Letter Loan Agreement"). [App. 698]. It provided that TWRF shall execute and deliver a Promissory Note. TWRF, as borrower, executed a promissory note in favor of JMJ, as lender, in the principal amount of $5,900,000.00 (the "TWRF Note"). *Id.*  TWRF and JMJAV executed a Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4 (collectively, "Ingleside Pledge and Security Agreements"). [App. 699]. As a result, TRWF and JMJAV pledged to JMJ 100% of the member interests in JMJAV, which JMJ assigned to TCI. *Id.*

JMJ signed the Assignment of Pledge and Security Agreement ("Ingleside Assignment"). [App. 699]. As a result, all of the equity interest in D4IN's parent company, JMJAV, was pledged to TCI (the "Ingleside Collateral" or "Ingleside Pledged Equity"). *Id.* Each of the Ingleside Amended and Restated Pledge and Security Agreements included the same Section 7.15, titled "Conversion Option." *Id.*

The TCI Note was replaced with a Note to SPC. JMJAV, as borrower, executed a promissory note in favor of SPC, as lender, in the principal amount of $6,634,490.00 (the "JMJAV Note"). [App. 699]. Following, SPC entered into a Letter Agreement with JMJD4 and JMJAV (the "Letter Agreement") *Id.*  It provided that SPC will be assigned 100% of the membership interests in JMJD4 and, in return, SPC will cancel the JMJAV Note. [App. 699-700].

Following, JMJAV assigned to SPC 98.75% of the managing member interests in D4IN and 1% of the membership interest in D4IN (the "JMJAV Pledge and Security Agreement").

**Southern Properties Capital, Ltd.'s Brief in Response**                                                                 Page 31 of 50
**To Receiver's Motion for Summary Judgment**

[App.700]. The JMJAV Pledge and Security Agreement was subsequently amended to include Enoch Investments, LLC ("Enoch"), as a party (the "Amended JMJAV Pledge and Security Agreement"). *Id.* The Amended JMJAV Pledge and Security Agreement had JMJAV pledge to SPC its 1% membership interest in JMJD4 and Enoch pledge its 99% membership interest. *Id.* As a result, SPC was assigned 100% of the membership interest in JMJD4. *Id.*

Importantly, the JMJAV Pledge and Security Agreement, as well as its Amendment, contained the same Section 7.15 Conversion Option. UCC financing statements were filed securing SPC's right to obtain the membership interest. [App. 700].

### d.  Opelika

#### i.  SPC's Convertible Loan on Opelika with Right to Conversion.

To obtain a mortgage loan for Opelika, Barton used as borrower D4OP, LLC ("D4OP"). [App. 702]. HUD approved D4OP's application and agreed to provide the loan to Greystone, to administer to D4OP. *Id.* The loan was for the principal amount of $23,789,100.00. *Id.* D4OP executed HUD loan documents, including a Promissory Note and HUD Loan Agreement. *Id.*

SPC provided the Opelika project with financing to assist with construction in the form of a convertible loan. [App. 702]. D4OPM, LLC ("D4OPM") and One MFD4, LLC ("MFD4," together, "Borrowers"), as borrowers, executed a note in favor of SPC, as lender, in the principal amount of $5,129,000.00 (the "Opelika Note"). [App. 702-03]. Borrowers provided SPC security for the Opelika Note by assigning to SPC all of Borrower's right, title and interest in the membership interests of Borrower's parent company, D4OP. [App.703]. Specifically: Borrowers together hold 100% of the membership interest in D4OP. *Id.* Borrowers executed a Pledge and

Security Agreement with Assignment of Rights, pledging to SPC all of the member interests in D4OP ("Opelika Pledge and Security Agreement"). *Id*.

D4OP and MFD4 entered into a Letter Loan Agreement with SPC for consideration of $5,129,000.00 (the "Letter Loan Agreement"). [App. 703]. The Letter Loan Agreement states that SPC is entitled to acquire 99.75% of the membership interest in D4OP in return for cancellation of the loan. *Id*. The other 0.25% is owned by the general contractor, which is to be conveyed back to D4OPM at final endorsement. When SPC made the loan, it received the executed Opelika Pledge and Security Agreement. *Id*.

### e.   SPC Exercises its Options to Convert.

SPC's exercise of its options was delayed, in part, because TCI's HUD loans were subject to a cap. In November 2018, TCI formed a joint venture with Macquarie Group, Ltd. [App. 1188]. The joint venture was Victory Abode Apartments, LLC ("VAA"). *Id*. VAA held a large portfolio of real estate properties, encumbered by a significant HUD guaranteed debt. *Id*. The VAA portfolio resulted in, for a time, TCI reaching its limitation on aggregated HUD financing. *Id*. But that limit did not prohibit SPC's use of a third-party initial developer. [App. 710, 1188-89]. On or about September 16, 2022, VAA completed the closing on a sale of substantially all of the JV real estate properties, causing the payment of the HUD guaranteed debt and allowing for SPC to proceed to hold additional HUD-financed properties. [App. 1188]. SPC waited until after September 16, 2022 to exercise its options to convert to equity and keep the existing HUD debt in place. [App. 1188-89]. SPC did so soon after, on October 3, 2022. The Receiver alleges that SPC seeks to circumvent HUD regulations, but in fact, SPC timed its exercise of its options *to comply with HUD regulations*.

**Southern Properties Capital, Ltd.'s Brief in Response**                    Page 33 of 50
**To Receiver's Motion for Summary Judgment**

i.   **SPC Exercises the Option to Convert on Windmill Farms.**

SPC exercised its option set forth in the Windmill Amended Pledge and Security Agreements. [App. 1176]. On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TWRF, JMJAV, D4FR, and JMJ ("Windmill Exercise Letter"). *Id*. The Windmill Exercise letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Windmill Farms, Forney, Texas." *Id*. SPC attached to the Windmill Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Windmill Farms project from D4FR to SPC, once HUD consents to the transfer. *Id*. SPC also attached a check for $100.00 as the required consideration. *Id*.  The letter was confirmed delivered on October 4, 2022. *Id*.

ii.   **SPC Exercises Its Option to Convert Loan to Equity on Bellwether.**

SPC exercised its option set forth in the Bellwether Amended Pledge and Security Agreements. [App. 1179-80]. On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TWRF, JMJAV, JMJD4, D4DS, and JMJ ("Bellwether Exercise Letter"). [App. 1180]. The Bellwether Exercise Letter states that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Bellwether Ridge, DeSoto, Texas." *Id*. SPC attached to the Bellwether Exercise Letter a "First Amendment to the Purchase and Sale Agreement" to complete transfer of the Bellwether project from APTS to SPC, once HUD consented to the transfer. *Id*.  The First Amendment extended the Financing Contingency Period to March 31, 2023, due to HUD taking longer than expected to approve. *Id*.  SPC also attached a check for $100.00 as required consideration. *Id*.  The letter was confirmed on October 4, 2022. *Id*.

### iii.    SPC Exercises the Option to Convert on Ingleside.

SPC exercised its option set forth in the Ingleside Pledge and Security Agreements. [App. 701]. On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, JMJAV, JMJD4, D4IN, and JMJ ("Ingleside Exercise Letter"). *Id*. The Ingleside Exercise letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Ingleside Apartments, Ingleside, Texas." *Id*.  SPC attached to the Ingleside Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Ingleside project from D4IN to SPC, once HUD consents to the transfer. *Id*.  SPC also attached a check for $100.00 as the required consideration. *Id*. The letter was confirmed delivered on October 4, 2022. *Id*.

### iv.    SPC's November 3, 2022 letter to the Receiver.

After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Windmill Farms, Bellwether and Ingleside. [App. 701-02, 1176-77, 1180-81]. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of the various Exercise Letters, Amended and Restated Pledge and Security Agreements, Assignments, Notes, and Letter Loan Agreements and amendments. *Id*. SPC also provided the Receiver with a description of the HUD loan documents and an explanation of the option to convert that SPC exercised. *Id*.

### v.    SPC Retains Its Option to Convert Loan to Equity in Opelika

SPC has not yet, but retains the right to exercise its option set forth in the Opelika Letter Loan Agreement. [App. 703]. The reason SPC has not yet converted its option in Opelika is due to pending cost certification. *Id*. A cost certification is required at the end of the construction of

any HUD project. *Id*. Only now is a cost certification being completed for Opelika. *Id*. HUD will not approve a TPA for a property for which a cost certification is not available. *Id*. The only reason that SPC has not attempted any further action on this property is the completion of a cost certification. *Id*.

### 6. The reference to SPC LLC versus SPC Ltd. was merely a typographical error and does not deny SPC its conversion rights.

The Receiver argues the Exercise Notices were not effective because they were made by SPC (which is Southern Properties Capital, Ltd.) and one of the documents (the Assignment of Pledge and Security Agreement) refers to Southern Properties Capital *LLC*. The reference to the LLC in the assignment was clearly a typographical error, as every other document identifies and refers to Southern Properties Capital *Ltd*., including the promissory notes, the UCC filings, the sale agreements, and the pledge agreements. *See Am. 10–Minute Oil Change v. Metro. Nat'l Bank*, 783 S.W.2d 598, 600 (Tex. App.—Dallas 1989, no writ) (written contracts must be construed according to the intention of the parties notwithstanding errors and omissions); *Hasty v. Keller HCP Partners, L.P.*, 260 S.W.3d 666, 670 (Tex. App.—Dallas 2008, no pet.) (guaranty construed according to the intention of the parties, notwithstanding difference in landlord named in lease and guaranty).

### 7. SPC's notice of conversion was valid because it was timely, and HUD approval is merely ministerial.

#### a. 30-days' notice and HUD approval are not conditions precedent.

The Receiver's contention that HUD approval and 30-days' notice are conditions precedent is at odds with both the language of the conversion option and applicable law. "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). It may be

either a condition to the formation of a contract or to an obligation to perform an existing agreement. *Dillon v. Lintz*, 582 S.W.2d 394, 395 (Tex. 1979). For there to be a condition precedent to contract formation, the parties must have agreed that a contract will not be effective or binding until certain conditions occur. *Parkview Gen. Hosp., Inc. v. Eppes*, 447 S.W.2d 487, 490–91 (Tex. App.—Corpus Christi 1969, writ ref'd n.r.e.).

In contrast, a covenant is "an agreement to act or refrain from acting in a certain way." *Solar Apps. Eng'g v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010). "Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach." *Id.*

Courts determine whether a contractual provision is a condition precedent or a covenant through an examination of the entire contract to determine the parties' intent. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). "Our goal is to determine whether the parties intended that the right or responsibility at issue be conditional." *Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 136 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

"Because of their harshness in operation, conditions are not favorites of the law." *Criswell*, 792 S.W.2d at 948. Therefore, "[i]n construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible." *Id.*; *Lucas v. Coomer*, 2010 WL 5118023, at *5 (Tex. App.—Fort Worth Dec. 16, 2010, no pet.) (noting that, because forfeitures are not favored, a court should avoid finding a condition precedent to contract formation if another reasonable reading of the contract is possible). "Thus, if the language of the contract is susceptible to a non-condition precedent

**Southern Properties Capital, Ltd.'s Brief in Response**                                  Page 37 of 50
**To Receiver's Motion for Summary Judgment**

interpretation, we accept that construction and construe the language as a mere covenant." *Arbor Windsor Court*, 463 S.W.3d at 136–37.

Contract terms that use conditional language such as "if," "provided that," "on condition that," or similar conditional phrases reflect the parties' intent to create a condition precedent. *Criswell*, 792 S.W.2d at 948. The absence of such language is at least some indication that a provision should be construed as a covenant. *Id.* ("While there is no requirement that such phrases be utilized, their absence is probative of the parties['] intention that a promise be made, rather than a condition imposed.").

The Receiver urges the Court to find a condition precedent because the conversion option uses the word "shall." But the Texas Supreme Court has held that the terms "shall" and "upon approval" are "not those usually associated with a condition precedent." *Schwarz-Jordan, Inc. v. Delisle Constr. Co.*, 569 S.W.2d 878, 881 (Tex. 1978). Thus, use of the term "shall" does not indicate that the parties intended to create a condition precedent.

In addition, the Receiver takes the phrase out of context. The option granted to SPC is absolute. The Pledge Agreements, at Section 7.15(b), state:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender **shall be entitled to exercise an option** to acquire the Collateral from Pledgor for the consideration of $100.00.

Subsections (i) and (ii) thereafter set forth the mechanics to follow once the option has been exercised. Both subsections expressly state that HUD approval and preparation of the applicable documents are conditions to closing, not exercise of the option. *See Solar Applications*, 327 S.W.3d at 110 (rejecting proposition that conditioning some obligations necessarily operates to condition others); *Arbor Windsor Cour*t, 463 S.W.3d at 137; *Great W.*

*Drilling, Ltd. v. Pathfinder Oil & Gas, Inc.*, 2020 WL 373096, at *8–9 (Tex. App.—Eastland Jan. 23, 2020, pet. dism'd).

### b. **SPC's Exercise of the Options was clearly timely.**

Again, without explanation or citation to authority, the Receiver questions whether SPC's exercise of its convertibility options was "timely." There can be no question that the exercise of the options was timely.

None of the documents entered into between SPC and the developers placed a deadline on the exercise of the option. SPC exercised the options to convert its interests in Windmill Farms, Bellwether, and Ingleside to equity interests via letters delivered on October 4, 2022. Nothing in the parties' agreements makes this exercise untimely.

If the Receiver is implying that the exercise was untimely because thirty (30) days did not pass between SPC's exercise of its option and the Court's granting of the Receivership Order, the Receiver provides no support for this proposition. There is no reason given why the 30 day period stopped running when the Receivership Order went into effect. This is particularly true because, once the option was exercised, SPC owned the projects, subject only to the ministerial approval of HUD.

In fact, with respect to Bellwether, SPC exercised its option on July 6, 2021. [App. at 12, 471-509]. On that date, APTS and D4DS entered into an Agreement for Purchase and Sale of the Bellwether complex. [App. at 12, 471-509]. This agreement was tantamount to an exercise of the option granted to SPC. Accordingly, the option on Bellwether was more than a year before the Receivership came into being.

    **c.**  **The timing of SPC's exercise of the conversion rights is not "suspicious."**

The Receiver suggests, without explanation or evidence that SPC's timing in exercising the options is "suspicious." As mentioned above, SPC exercised the options on October 3, 2022 precisely in order to remain in compliance with HUD rules. [App. at 21-22]. Far from being suspicious, as shown above, SPC exercised the conversions shortly after the VAA sale, which was SPC's first opportunity to do so since November 2018. [App. at 710, 1188-89].

    **d.**  **HUD approval is merely a pro forma.**

SPC does not quibble with the proposition that HUD approval will be required to complete the process of SPC assuming ownership of the Complexes unless SPC pays off the HUD loan. None of the provisions cited by the Receiver, however, establish that HUD approval is a condition precedent to exercising the type of conversion option at issue here. By exercising the option, SPC established its right to ownership of Windmill Farms, Bellwether and Ingleside, subject only to HUD approval if SPC wants an assumption of the HUD loan (but subject to nothing should SPC elect to repay the loan or refinance the loan out of the HUD program) which, as shown above, for TCI is a formality.

    **8.**  *The contracts are not executory.*

The Receiver takes the position that the Assignment of Pledge and Security Agreement is not an effective assignment; he contends it is executory. He is wrong on both counts.

An assignment is made when an owner of a right manifests his present intent to transfer that right to another. *Comm. Structures & Interiors, Inc. v. Liberty Educ. Ministries, Inc.*, 192 S.W.3d 827, 833–34 (Tex. App.—Fort Worth 2006, no pet.). The Fifth Circuit has held that phrases such as the assignor "hereby assign[ed], transfer[red], and set over" evidence a clear

present intent and represent an unambiguous transfer. *Banco Popular v. Kanning*, 638 F. App'x 328, 335 (5th Cir. 2016). That is precisely what the Assignment of Pledge and Security Agreement says here. Specifically, that for good and valuable consideration, JMJ "hereby transfers, assigns and sets over unto Southern Properties Capital, LLC, a British Virgin Islands corporation ('Assignee'), all of the right, title and interest of the Assignor in and to the security interests granted pursuant to the following . . . ."

The Receiver points to additional language in the Assignment that states: "In the event that there is any default under that certain Promissory Note from Assignor to Assignee, then Assignee shall be entitled to all rights as secured party under the Pledges." The quoted language does not create a condition precedent to any assignment. It has nothing to do with the effectiveness of the assignment. The quoted language merely reaffirms the nature of the rights being assigned. To be sure, the assignment further states that it "is **an absolute and present assignment** of the Pledges by Assignor to Assignee." Therefore, SPC was not required to allege in the Exercise Notice that a default had occurred, nor was it required to identify any default,[6] as the Receiver contends. And the conversion option is not conditioned on the existence of a default, as the Receiver also contends.[7]

The conversion option is also not executory and it is not subject to rejection by the Receiver. The conversion option is not a separate contract or agreement. The conversion option is an integral part of the loan transaction and merely grants an alternative method of principal repayment. *In re Texstone Venture, Ltd.*, 54 B.R. 54, 56 (Bankr. S.D. Tex. 1985) (finding that an option for the lender to receive an equity participation in lieu of a monetary payment was an

---

[6] The notice requirements are set forth in Section 7.3 of the Pledge and Security Agreement.
[7] The Receiver further contends there was no default but the evidence he cites (the Exercise Notices) does not support his assertion. Moreover, As Dr. Hakala states in his declaration, a condition of default in a convertible loan would defy logic.

alternative to principal repayment that did not make the loan executory). The contracts as a whole are not executory because SPC has already performed and thus the debtor's reciprocal obligations cannot be discharged by the Receiver's attempted repudiation. *Addison Express, L.L.C. v. Medway Air Ambulance, Inc.*, 2006 WL 1489385, at \*9 (N.D. Tex. May 19, 2006); *see also In re Digicon, Inc.*, 71 F. App'x 442 (5th Cir. 2003) (A contract is not executory if the only performance required by one side is the payment of money).

Therefore, neither the conversion option nor the contracts as a whole are executory. The only remaining acts to be performed are ministerial. The Receiver disputes that and points out that there are acts remaining to be performed as part of the closing, such as execution of the sale agreements and deeds. Courts that have considered the issue have found acts to effectuate the closing are ministerial only and do not affect the exercise of the option. *See In re 72 Townsend, LLC*, 2010 WL 1689564, at \*3 (Bankr. N.D. Cal. Apr. 22, 2010). Likewise, here, SPC has fully performed all of its material obligations under the agreements and the only remaining acts to be performed are ministerial acts relating to the closing. That JMJ had not executed the documents sent to it with the Exercise Notices does not mean that SPC failed to perform a material obligation.

### C. Equitable considerations, as well as the evidence, require that SPC be permitted to exercise conversion right and complete the TPAs.

#### 1. The Receivership Order does not prohibit SPC from taking actions now to convert its debt.

The Receiver asserts that the Receivership Order prohibits SPC's conversion. The Receiver's cite to the Receivership Order is without full context. The Receiver claims that the Receivership Order "prohibits…any action 'exchanging, assigning, or in any way conveying'

Receivership Property." A closer look at the Receivership Order reveals it does not apply as the

Receiver suggests.

The exact provision cited by the Receivership is provided, in full, below:

"32. The Receivership Entities and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:
A. Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property[.]"

This section in the Receivership Order clearly prohibits a person or entity taking

unilateral legal action, like filing a lien or court attachment, to essentially lock up a Receivership

Property. That is not what is happening here. SPC, instead, is responding to the Receiver's

efforts to sell properties that SPC owns. It is the Receiver, not SPC, who initiated these

proceedings. SPC is simply protecting its interests. To hold the Receivership Order prevents SPC

from opposing the Receiver's attempt to sell SPC's properties would be to expect property

owners to sit idly whenever a receiver moves to sell their property. That cannot stand.

## 2. The Court should reject the Receiver's unfounded allegations that SPC has unclean hands and violates HUD regulations.

As shown above, SPC's business model does not violate HUD regulations, SPC does not

seek to circumvent HUD regulations, and SPC has used its business model on a number of HUD

developments. The Court should reject the Receiver's unfounded allegations that SPC has

unclean hands.

### 3. *SPC should be granted the rights in the Properties that it earned.*

Contrary to the Receiver's assertion, the fact that SPC has always had and earned the equity in the Properties *should* affect the outcome of this matter. As established by the evidence presented in this Response, the history of the Complexes supports a ruling by the Court that recognizes the equity interests that SPC bargained for first and then certainly earned through its participation in the Complexes.

Despite his attempts to do so, the Receiver should not be entitled to deprive American citizens of property rights that they have earned through honest labor and entrepreneurial risk. It appears the Receiver does not appreciate the real estate development process and the facts surrounding SPC's role in that process, a role through which SPC clearly earned the equity interest that it bargained for and which it now defends.

The Receiver contends that SPC's conduct "has no role in the Court's interpretation of the contracts that determine the present ownership of the [Properties]." [Doc. 207, 41]. He supports this claim by citing case law which stands for the proposition that extrinsic and parol evidence should not be used to characterize a contract. *Id.* This is a complete obfuscation of the points SPC is making. SPC seeks to show the Court that it has treated the Properties as its own from their beginning, not that that its claim is a matter of contract interpretation.

Further, the Receiver's stance is in defiance of even the most basic principles of real property law. That is, "[i]t is elementary in the law that real property . . . is unique." *San Antonio Sav. Ass'n v. C.I.R.*, 887 F.2d 577, 591 (5th Cir. 1989). SPC has expended tremendous effort and resources toward the Properties, each inherently unique. The Receiver, however, seeks to erase these efforts, causing irreparable harm to SPC. *See Opulent Life Church v. City of Holly Springs*,

697 F.3d 279, 297 (5th Cir. 2012) (finding that depriving one of an interest in real property constitutes irreparable harm).

The harm SPC and investors in TCI and SPC would face if the Receiver were to be granted the Complexes is unquantifiable. Each piece of real property is inherently unique because the valuation of real property is nearly impossible to pin down. *In re Swiftco, Inc*., 1988 WL 143714, at *12 (Bankr. S.D. Tex. Oct. 5, 1988) ("[T]he value of land is difficult (some say 'impossible') to fix."). There are many factors that are involved in the valuation of real estate, such as size and location. *Matter of Bumstead Fam. Irrevocable Tr*., 2022 WL 710159, at *25 (Tex. App.—Corpus Christi Mar. 10, 2022), reh'g denied (July 5, 2022), review denied (Jan. 27, 2023). A piece of real estate located in the right area may lead to appreciation in value, so what it may be worth in fair market value at a given time, might not be what it will end up being. *Id.*

It is not possible to forecast the potential value of the Projects. SPC's individual appraisals shed some light but, as Texas law holds, there is no real way to make an individual whole after the loss of their real property. *Eastland v. Camp Mystic, Inc*., 2009 WL 260523, at *4 (Tex. App.—San Antonio Feb. 4, 2009) ("The 'replacement cost' of [] real estate is not ascertainable because 'replacement cost' cannot be assigned to real property since real property is individually unique and is not replaceable.").

### 4. *Fairness does not mandate treating SPC like other investors, and depriving SPC of its equity interests in the SPC Projects would constitute a grave injustice.*

Contrary to the Receiver's assertion, "the equities, on balance" do *not* support treating the SPC interest as loans. Quite the opposite. As established by the evidence presented in this Response, the history of the developments—as well as principles of fairness and justice—

support a ruling by the Court that recognizes the equity interests that SPC not only bargained for, but earned through its participation in the developments.

As SPC stated in the Introduction to this Response, it respects the role of the Receiver and believes that the Receiver's mission to "marshal and conserve" assets for the benefit of defrauded investors is a matter of great importance. Neither the SEC nor the Receiver, however, should be entitled to deprive American citizens of property rights that they have earned through honest labor and entrepreneurial risk. If the Receiver is permitted to vitiate SPC's equity interests in these developments, then the Receiver becomes the moral equivalent of Barton (assuming the SEC proves its case).

All well-meaning people would prefer to rectify the alleged harm done by Barton and his related entities. To do so, however, by a judicial taking of the property of an innocent party is simply not acceptable in this Court or in this country, under the federal securities laws or any other laws of the United States. In this case, such an outcome would be particularly unseemly. SPC is the wholly-owned subsidiary of a publicly traded company with public shareholders. Robbing SPC of its property interests harms the interests of the investing public. That is an outcome that neither the SEC nor the Receiver should pursue. And it is a course of action that the Court should reject out of hand.

### 5. *Investor Funds Were Not Expended on the Projects.*

As set forth above, the Receiver has failed to present a scintilla of evidence that Foreign Investment collected by Barton from victims of the purported fraud have been used in the Complexes. Rather, the undisputed evidence supports the conclusion that the real estate developments were funded entirely by the HUD loans and SPC convertible loans. [App. 10, 14, 17-18]. This fact alone is sufficient to defeat the Receiver's repeated assertion that equity

supports the confiscation and sale of the Complexes. This fact also distinguishes the circumstances here from the facts of every case relied on by the Receiver to support his claim that the proceeds from the sale of the Complexes must be distributed to Barton investors and creditors on a pro rata basis.

The Receiver's equity argument relies entirely on cases, primarily in the context of Ponzi schemes, in which the claimant's funds or property has been commingled with the funds and property of other investors and creditors. Only based on such commingling (which requires a tracing the Receiver has not performed), courts have denied tracing and approved the Receiver's recommendation to make a pro rata distribution. *See, e.g*., *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979, at *15 (S.D.N.Y. Nov. 29, 2000); *Elliott*, 953 F.2d at 1569 ); *United States v. Durham*, 686 F.3d 70, 73 (5th Cir. 1996); *United States v. Vanguard Inv. Co, Inc.*, 6 F.3d 222, 227 (4th Cir. 1993).

In the present case, the authorities cited by the Receiver are entirely inapposite. Because SPC received no part of the Foreign Investment, equity does not support the sale of SPC's real estate developments or the distribution of proceeds to victims of Barton's alleged fraud on a pro rata basis. Rather, equity supports permitting SPC to complete the TPAs and confirm ownership of its property.

**D. The pending sales of Windmill Farms and Bellwether Ridge will damage SPC, even if distributions of proceeds are not determined.**

The Receiver argues that the Court should permit the pending sales of Windmill Farms and Bellwether Ridge to proceed even if the Court does not make a current determination about the distribution of the proceeds between the Receivership, on the one hand, and SPC, on the other hand. This contention is profoundly in error. The Receiver, under pressure to obtain

**Southern Properties Capital, Ltd.'s Brief in Response**
**To Receiver's Motion for Summary Judgment**

liquidity for the Estate, is proposing a fire sale of Windmill Farms and Bellwether Ridge. Accordingly, if the Court later determines—as it should—that SPC is the rightful owner of these Projects, a current sale at the prices proposed by the Receiver will cause SPC to suffer significant harm. *See Eastland*, 2009 WL 260523, at *4.

Apart from robbing SPC of the value of controlling the disposition of the Projects, the Receiver is selling the Complexes prematurely at prices that are substantially below the fair market value that the Complexes will likely attain in the future. As Hakala explains in his report, "continued ownership and operation of the subject properties with the existing HUD loans pursuant to a TPA results in an increase in realized equity value relative to the current sale prices proposed." [App. at 598]. Windmill Farms and Bellwether Ridge have only been operating for two and a half to three years, which is the time commercial real estate just begins to reach more stabilized values. [App. at 599].

Appraisals conducted on the Windmill Farms and Bellwether Ridge corroborate the SPC's expert conclusions. The Receiver's Motion proposes a sale of Windmill Farms for a contracted price of $51 million. This is a liquidation price. [App. 592-594].

Similarly, the Receiver seeks Court approval of a current sale of Bellwether Ridge for a contracted price of $27 million. This is also a liquidation price. *Id.*

Based on three Appraisals conducted on behalf of SPC, the true market value of Windmill Farms is between $57.8 million and $62.1 million. [App. 20, 29, 88-89, 92, 353]. Based on the same Appraisals, the fair market value of Bellwether Ridge is between $31.2 million and $32.8 million. [App. 20, 29, 88-89, 204 461]. As Dr. Hakala explains in his declaration, these SPC valuations are based on extremely conservative assumptions and likely under value the real estate developments. [App. 594-596].

The Receiver's proposal to sell Windmill Farms for a contracted price of $51 million will conservatively impose on SPC damages in the amount of $6.8 million to $11.1 million. The Receiver's proposal to sell Bellwether Ridge for a contracted price of $27 million will conservatively impose on SPC damages in an amount between $4.2 million and $5.8 million. The Receiver's proposed sales of Windmill Farms and Bellwether Ridge will, therefore, likely damage SPC in a total amount of $16.9 million.

Should the Court decide to allow the Receiver to proceed, SPC's losses associated with any future proposed sales of Opelika and Ingleside may be even greater. The Receiver is likely to propose to sell these Projects at liquidation prices as well. As the Opelika and Ingleside projects have not been operating for periods of time similar to Windmill Farms and Bellwether, and as these other projects have not achieved their stabilized values, fire sales will be even less reflective of the their true potential value. [App. 599-600].

As SPC has stated previously, these losses are not merely being imposed on impersonal, faceless corporations. In making investment decisions, TCI and SPC investors both relied on the expected profits from SPC's conversion and ownership of the Complexes. The harm from the Receiver's proposal will be visited on public investors in TCI and SPC securities.

## VI.    CONCLUSION

For the reasons set forth herein, Southern Properties Capital, Ltd. respectfully requests that the Court deny the Receiver's Motion for Summary Judgment Regarding Southern Properties Capital, LTD.' Claimed Ownership Interest in Certain Receivership Properties and for any additional and further relief to which SPC may be justly entitled.

**RESPECTFULLY SUBMITTED BY:**

*/s/ Brian K. Norman*
**C. GREGORY SHAMOUN**
Co-Lead Counsel
State Bar No. 18089650
g@snlegal.com
**BRIAN K. NORMAN**
Co-Lead Counsel
State Bar No. 00797161
bkn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2023, I filed the foregoing document with the clerk for the U.S. District Court, Northern District of Texas, Dallas Division, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record, who have consented in writing to accept this Notice as service of the document by electronic means.

*/s/ J. Blair Norris*
**J. BLAIR NORRIS**