**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | **CASE NO. 3:22-cv-2118-X** |
| **TIMOTHY BARTON ET AL.,** | § § § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § § § | |
| *Relief Defendants.* | § § | |

**APPENDIX VOLUME IV**

**APP. 694-1055**

**IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S BRIEF IN SUPPORT OF RESPONSE TO RECEIVER'S MOTION FOR SUMMARY JUDGMENT**

| Ex. No. | Title | App. No. |
|---------|-------|----------|
| Ex. I | Declaration of Erik Johnson | App. 694-710 |

| Ex. No. | Title | App. No. |
|---------|-------|----------|
| Ex. I-1 | Wire for Purchase of Windmill Farms Raw Land | App. 712-714 |
| Ex. I-2 | Wire for Purchase of Bellwether Raw Land | App. 716-717 |
| Ex. I-3 | Wire for Purchase of Ingleside Raw Land | App. 719-721 |
| Ex. I-4 | Wire for Purchase of Opelika Raw Land | App. 724-726 |
| Ex. I-5 | Borrower's Oath | App. 728-730 |
| Ex. I-6 | Promissory Note | App. 732-743 |
| Ex. I-7 | Deed of Trust | App. 745-796 |
| Ex. I-8 | Ingleside Letter Loan Agreement | App. 798-799 |
| Ex. I-9 | Ingleside Note | App. 801-811 |
| Ex. I-10 | TWRF Letter Loan Agreement | App. 813-814 |
| Ex. I-11 | TWRF Note | App. 816-826 |
| Ex. I-12 | Pledge and Security Agreement | App. 828-855 |
| Ex. I-13 | Pledge and Security Agreement | App. 857-884 |
| Ex. I-14 | Assignment and Security Agreement | App. 886 |

| Ex. I-15 | JMJAV Note | App. 888-898 |
| Ex. I-16 | Letter Agreement | App. 900-901 |
| Ex. I-17 | JMJAV Pledge and Security Agreement | App. 903-936 |
| Ex. I-18 | Amended JMJAV Pledge and Security Agreement | App. 938-940 |
| Ex. I-19 | Enoch UCC | App. 942-944 |
| Ex. I-20 | TWRF UCC | App. 946-947 |
| Ex. I-21 | JMJAV UCC 1 | App. 949 |
| Ex. I-22 | JMJAV UCC 2 | App. 951 |
| Ex. I-23 | JMJD4 UCC | App. 953 |
| Ex. I-24 | Modification Agreement | App. 955-957 |
| Ex. I-25 | Exercise Letter | App. 959 |
| Ex. I-26 | Form of Agreement | App. 961-988 |
| Ex. I-27 | Check for Consideration | App. 990 |
| Ex. I-28 | Receipt | App 992-994 |
| Ex. I-29 | Letter to Receiver | App. 996-997 |
| Ex. I-30 | Promissory Note | App. 999-1010 |
| Ex. I-31 | HUD Loan Agreement | App. 1012-1048 |
| Ex. I-32 | Opelika Note | App. 1050-1055 |

**RESPECTFULLY SUBMITTED BY:**

/s/ *Brian K. Norman*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on May 30, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

/s/ *J. Blair Norris*
**J. BLAIR NORRIS**

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § § | |
| *Plaintiff,* | § § | |
| v. | § | **CASE NO. 3:22-cv-2118-X** |
| TIMOTHY BARTON ET AL., | § § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants.* | § § | |

## DECLARATION OF ERIK JOHNSON

"My name is Erik Johnson, I am over the age of twenty-one (21), have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein.

1.      I am a real estate executive with over 16 years of experience in development, acquisitions, finance, asset management, and portfolio management. On April 18, 2023, I became the Interim President of Pillar Income Asset Management, Inc. ("Pillar"), Transcontinental Realty Investors, Inc. ("TCI"), and American Realty Investors, Inc. ("ARI"). TCI, and ARI are national real estate companies publicly traded on the New York Stock Exchange that specialize in the acquisition, development, and management of multifamily and commercial real estate. The companies also develop raw land for single family home communities. The companies operate a portfolio that has included hundreds of properties, tens of thousands of multifamily units, and thousands of raw land holdings. I oversee all aspects of investment and operations for the above

companies, including Southern Properties Capital, Ltd. ("SPC"). TCI is the 100% owner of SPC. Pillar is contractual advisor and management company for TCI and ARI. When TCI and SPC are stated to perform functions, in most situations Pillar is the manager carrying out the functions pursuant to a publicly filed and disclosed Advisory and Cash Management Agreement.

2.      Prior to my current position, I joined Pillar, TCI and ARI in 2020 as Chief Financial Officer. Before that, from 2005 to 2020, I served as Vice President of Financial Reporting at Macerich (NYSE: MAC), the third-largest retail REIT in the United States with over $9.2 billion in assets. I spent 15 years ensuring the quality, accuracy, and timely consolidation of financial data from 100 subsidiaries, drafting SEC reports, and structuring transactions such as acquisitions, dispositions, and joint ventures. Prior to that, I worked for North American Scientific, Inc. as Chief Accounting Officer, and before that, as an auditor with PricewaterhouseCoopers.

**Summary of Business Model**

3.      To provide context, TCI and its affiliates, such as SPC, are in the business of developing, constructing and managing properties, including multifamily residential projects. TCI develops projects through conventional lending and loans guaranteed through government programs. TCI has outsourced the initial developer role using convertible loans.

4.      TCI outsourced the initial developer using convertible loans on a number of projects involving a number of developers. TCI/SPC has outsourced the initial developer role to Timothy Barton ("Barton") on projects known as Parc at Ingleside ("Parc at Ingleside" or "Ingleside Project") and Parc at Opelika ("Opelika" or "Opelika Project") (collectively, the "SPC Projects").

5.    As discussed in more detail below, the SPC Projects followed the business model, of SPC as effectively the primary responsible party and simply outsourcing the initial developer role to Barton, using convertible loans. Barton was paid a developer fee, and Barton obtained HUD mortgage financing, pursued zoning, and provided other developer services. SPC provided the raw land, funded the equity, and managed the construction, design and development, and operations of the SPC Projects. Through the use of convertible loans, it was contemplated that, after the development stage and stabilization, Barton would transfer title to SPC in exchange for the convertible loan and any accrued interest, and SPC would continue with ownership and management of the SPC Projects.

6.    It is important that for the SPC Projects, SPC was not merely a passive lender. Rather, SPC identified land sites; oversaw and managed entitlement efforts; controlled and funded planning and design efforts; assembled and maintained required documents for the land development projects; managed and approved the construction process; provided certificates of deposit and cash collateral to obtain Letters of Credit; funded change orders and costs overruns; and supervised the operations and leasing of properties. If these were merely loans, then SPC would not have expended extensive resources into completing the above services for the SPC Properties.

7.    When initiating the development, SPC selected and funded the actual raw land upon which Parc at Ingleside and Opelika (as well as Windmill Farms and Bellwether) were to be developed. TCI affiliates held raw land for developments in areas SPC considered prime development opportunities and those affiliates sold the land to Barton entities which were financed as the part of the convertible loan. SPC wire transferred to Commonwealth Land Title Insurance: (a) $5,605,100.96 to purchase the Windmill Farms raw land; (b) $1,770,979.91 to

purchase the Bellwether raw land; and (c) $1,240,702.49 to purchase the Opelika raw land. SPC also transferred to Capital Title of Texas, LLC, $797,729.63 to purchase the Parc at Ingleside raw land. Copies of the SPC wire transfers are attached to this Declaration as **Exhibit 1** (Windmill Farms); **Exhibit 2** (Bellwether); **Exhibit 3** (Ingleside); and **Exhibit 4** (Opelika). The reasons SPC wire transferred almost $9,500,000.00 in funds to purchase the raw land for these projects is because it was intended that Barton would transfer ownership to SPC, who would continue with ownership and management of the projects.

8.   TCI's and SPC's financial statements issued during development of the SPC Projects evidence the indicia of future ownership from an accounting and reporting perspective. The equity financing mechanism that SPC used on the SPC Projects was a convertible loan, pursuant to which SPC could, and expected to, exercise its option of converting its loan to 100% equity in the SPC Projects. Relatively low interest rates evidence that the conversion feature was part of the consideration SPC bargained for, especially since this capital was contributed to the highest risk tranche of the project's capitalization. This rate is below typical construction loans with a 60% to 70% loan-to-value (LTV) and far below the market required return-on-investment (ROI) on equity funding. Importantly, the Convertible Loans are secured by a pledge of stock, as described below, and perfected by the filing of UCC financing statements.

**Parc at Ingleside**

9.   SPC exercised its option to own the apartment complex property known as Parc at Ingleside, located in Ingleside, Texas.

### A. HUD holds the Mortgage Loan on Parc at Ingleside

10.   Barton used as developer one of his companies, JMJD4, LLC ("JMJD4"). To obtain a mortgage loan for Ingleside, Barton used as borrower his company D4IN, LLC

("D4IN"). D4IN obtained the mortgage loan from HUD. On or about August 29, 2019, D4IN applied for the HUD loan. HUD approved D4IN's application. HUD agreed for Greystone Funding Company, LLC ("Greystone"), to make the loan and administer it to D4IN. The loan was for the principal amount of $25,201,000.

11.    Following the commitment from HUD, D4IN executed additional HUD loan documents on or about November 1, 2019, including a Borrower's Oath, Promissory Note, and Deed of Trust. True and correct copies of the Borrower's Oath, Promissory Note, and Deed of Trust are attached to my Declaration as **Exhibit 5**, **Exhibit 6**, and **Exhibit 7**.

**B.  SPC's Convertible Loan on Parc at Ingleside**

12.    TCI provided the equity capital to fund the remaining amount necessary for the construction of Ingleside. TCI made a convertible loan to JMJ Development, LLC ("JMJ"). TCI and JMJ entered into a Letter Loan Agreement dated June 4, 2019 ("Ingleside Letter Loan Agreement"). A copy of the Ingleside Letter Loan Agreement is attached as **Exhibit 8**. It provided that JMJ shall execute and deliver a Promissory Note. JMJ, as borrower, executed a promissory note in favor of TCI, as lender, in the principal amount of $5,900,000.00 ("Ingleside Note"). A copy of the Ingleside Note is attached as **Exhibit 9**.

13.    JMJ, in turn, loaned the amount to a third entity, TWRF, LLC ("TWRF"). JMJ and TWRF entered into a Letter Loan Agreement dated June 4, 2019 ("TWRF Letter Loan Agreement"). A copy of the TWRF Letter Loan Agreement is attached as **Exhibit 10**. It provided that TWRF shall execute and deliver a Promissory Note. TWRF, as borrower, executed a promissory note in favor of JMJ, as lender, in the principal amount of $5,900,000.00 ("TWRF Note"). A copy of the TWRF Note is attached as **Exhibit 11**.

14.    TWRF assigned to SPC all of TWRF's right, title and interest in the membership interests of D4IN's parent company, JMJAV, LLC ("JMJAV"). Specifically: TWRF holds a 100% membership interest in JMJAV. In turn, JMJAV holds a 100% membership interest in JMJD4. TWRF executed a Pledge and Security Agreement pledging to JMJ all of the member interests in JMJAV, and, subsequently, JMJAV executed a Pledge and Security Agreement pledging to JMJ all of the member interests in JMJD4 (collectively, "Ingleside Pledge and Security Agreements"). Copies of the Ingleside Pledge and Security Agreements are attached as **Exhibit 12**, and **Exhibit 13**. As a result, TRWF and JMJAV pledged to JMJ 100% of the member interests in JMJAV.

15.    JMJ executed an Assignment of Pledge and Security Agreement ("Ingleside Assignment"). A copy of the Ingleside Assignment is attached as **Exhibit 14**. As a result, all of the equity interest in D4IN's parent company, JMJAV, was pledged to TCI ("Ingleside Collateral" or "Ingleside Pledged Equity"). Importantly, the Ingleside Assignment granted the right to convert the loan to equity, discussed immediately below.

16.    Each of the Ingleside Restated Pledge and Security Agreements includes Section 7.15, titled "Conversion Option." Section 7.15 provides a mechanism to exercise an option to acquire the Ingleside Pledged Equity. Section 7.15 states in relevant part:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

17.    JMJAV, as borrower, executed a promissory note in favor of SPC, as lender, in the principal amount of $6,634,490.00 ("JMJAV Note"). A copy of the JMJAV Note is attached as **Exhibit 15**. Thereafter, SPC entered into a Letter Agreement with JMJD4 and JMJAV dated June 13, 2019 ("Letter Agreement"). A copy of the Letter Agreement is attached as **Exhibit 16**. It

provided that SPC will be assigned 100% of the membership interests in JMJD4 and, in return, SPC will cancel the JMJAV Note.

18.    Following, JMJAV assigned to SPC 98.75% of the managing member interests in D4IN and 1% of the membership interest in D4IN ("JMJAV Pledge and Security Agreement"). A copy of the JMJAV Pledge and Security Agreement is attached as **Exhibit 17**. The JMJAV Pledge and Security Agreement was subsequently amended to include Enoch Investments, LLC ("Enoch") as a party (the "Amended JMJAV Pledge and Security Agreement"). A copy of the Amended JMJAV Pledge and Security Agreement is attached as **Exhibit 18**. Pursuant to the Amended JMJAV Pledge and Security Agreement, JMJAV pledged to SPC its 1% membership interest in JMJD4 and Enoch pledged its 99% membership interest. As a result, SPC was assigned 100% of the membership interest in JMJD4. Importantly, both the JMJAV Pledge and Security Agreement and Amendment (by way of incorporation) contained the Section 7.15 Conversion Option.

19.    On May 13, 2020 and May 14, 2020, UCC financing statements were filed securing SPC's interest in the membership interests, as follows:

- Texas UCC Financing Statement, Filing # 20-0017679567 (Enoch)
- Delaware UCC Financing Statement, Filing #2020 3378223 (TRWF)
- Texas UCC Financing Statement, Filing #20-0017975435 (JMJAV)
- Texas UCC Financing Statement, Filing #20-0017975172 (JMJAV)
- Delaware UCC Financing Statement, Filing #2020 3407071 (JMJD4)

Copies of the Financing Statements are attached as **Exhibit 19**, **Exhibit 20**, **Exhibit 21**, **Exhibit 22**, and **Exhibit 23**.

20.    On June 30, 2021, JMJAV and SPC entered into a Modification Agreement regarding the JMJAV Note to extend its maturity date to November 1, 2026 ("Modification Agreement"). A copy of the Modification Agreement is attached as **Exhibit 24**.

**C. SPC Exercises its Option to Convert its Loan to Equity in Parc at Ingleside**

21.    SPC exercised its option set forth in the Ingleside Pledge and Security Agreements. The option allowed SPC to acquire the equity from D4IN for the consideration of $100.00. SPC exercised its option and paid the $100.00, thereby converting the loan to an ownership interest to acquire the equity.

22.    On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, JMJAV, JMJD4, D4IN, and JMJ ("Ingleside Exercise Letter"). A copy of the Ingleside Exercise Letter is attached as **Exhibit 25**. The Ingleside Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Ingleside Apartments, Ingleside, Texas." SPC attached to the Ingleside Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Ingleside Project from D4IN to SPC, once HUD consented to the transfer. A copy of the form of Agreement is attached to **Exhibit 26**. SPC also attached a check for $100.00 as required consideration. A copy of the check is attached to **Exhibit 27**. The letter was delivered on October 4, 2022 at 8:16 am. A copy of the confirmation of receipt is attached as **Exhibit 28**.

23.    After learning of the Receiver's appointment, SPC notified the Receiver of SPC's ownership rights with respect to Ingleside. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (i) the Ingleside Exercise Letter; (ii) the

Ingleside Pledge and Security Agreements; (iii) the Ingleside Note; (iv) the Financing Statements; and (v) the Letter Agreement. SPC also provided the Receiver with a description of the HUD loan documents. A copy of the November 3, 2022 letter is attached as **Exhibit 29**.

24.    Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so.

**Parc at Opelika Project**

25.    Opelika is located in Opelika, Alabama. SPC has not yet exercised its option regarding the apartment complex property known as the Parc at Opelika ("Opelika" or "Opelika Project"). However, it retains the right to do so. The reason SPC has not yet converted its option in Opelika is discussed below.

### A. HUD holds the Mortgage Loan on Opelika

26.    Barton used JMJ as initial developer. To obtain a mortgage loan for Opelika, Barton used as the borrower his company, D4OP, LLC ("D4OP"). D4OP obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4OP. The loan was for the principal amount of $23,789,100.00.

27.    To finalize the loan, D4OP executed HUD loan documents on or about January 1, 2021, including a Promissory and HUD Loan Agreement. A copy of the Promissory Note and HUD Loan Agreement are attached as **Exhibit 30** and **Exhibit 31**.

### B. SPC's Convertible Loan on Opelika

28.    SPC provided the Opelika Project with equity financing to fund the construction of the Opelika Project in the form of a convertible loan. D4OPM, LLC ("D4OPM") and One MFD4, LLC ("MFD4," together, "Borrowers"), as borrowers, executed a note in favor of SPC,

as lender, in the principal amount of $5,129,000.00 (the "Opelika Note"). A copy of the Opelika Note is attached as **Exhibit 32.**

29.    Borrowers provided to SPC security for the Opelika Note by assigning to SPC all of Borrowers' right, title and interest in the membership interests of Borrowers' parent company, D4OP. Specifically: Borrowers together hold 100% of the membership interest in D4OP. Borrowers executed a Pledge and Security Agreement with Assignment of Rights, pledging to SPC all of the member interests in D4OP ("Opelika Pledge and Security Agreement"). A copy of the Opelika Pledge and Security Agreement is attached as **Exhibit 33**.

30.    D4OP and MFD4 entered into a Letter Loan Agreement with SPC for consideration of $5,129,000.00 ("Letter Loan Agreement"). A copy of the Letter Loan Agreement is attached as **Exhibit 34**. The Letter Loan Agreement states that SPC is has the option to acquire 99.75% of the membership interest in D4OP in return for cancellation of the loan. The other 0.25% is owned by the general contractor, which is to be conveyed back to D4OPM at final endorsement. When SPC made the loan, it received the executed Opelika Pledge and Security Agreement.

**C. SPC Retains the Right to Exercise its Option to Convert its Loan to Equity.**

31.    SPC has not yet, but retains the right to exercise its option set forth in the Letter Loan Agreement to convert the loan to an ownership interest to acquire the equity. SPC expects to obtain a TPA from HUD to assume the undelaying debt. Construction loans are not assumable under HUD rules until a cost certification is completed on the project. Only now is a cost certification being completed on Opelika. HUD approval is only needed to assume the HUD insured mortgage, it is not necessary to the exercise of the conversion right, however. Absent HUD approval, the mortgage can be refinanced by another lender or paid off by SPC.

**SPC Conduct Evidences its Equity Ownership Interest in the SPC Projects**

32.    SPC treated Ingleside and Opelika, as well as Windmill Farms and Bellwether (all four projects together, the "Projects"), as projects it owned.

**A.    SPC funds Escrows and Letters of Credits.**

33.    SPC funded escrow agreements for Windmill Farms and Bellwether. The Escrow Agreements are attached to this Declaration as **Exhibit 35** and **Exhibit 36.** Each project utilized funds from an Escrow Agreement for both Operating Deficits and Working Capital.

34.    Each Escrow took the form of cash provided by SPC. Attached to this Declaration as **Exhibit 37** and **Exhibit 38** are Settlement Statements from SPC. The Settlement Statements evidence the money SPC provided to pay the escrow for both Windmill Farms ($2,480,383.78) and Bellwether ($996,006.05), respectively.

35.    TCI funded Letters of Credit for Ingleside and Opelika. The Letters of Credit were used, like the Escrows, to fund Operating Deficits and Working Capital for the Projects. The Ingleside Letter of Credit is attached to this Declaration as **Exhibit 39**, and the Opelika Letter of Credit is attached as **Exhibit 40**. TCI signed the Ingleside and Opelika Letter of Credit Applications, on behalf of, among others, TCI. The Ingleside Letter of Credit Application is attached to this Declaration as **Exhibit 41** (for $1,250,898.00) and the Opelika Letter of Credit Application is attached as **Exhibit 42** (for $1,073,963.00). The Applications evidence SPC as providing collateral security for the Ingleside and Opelika projects and was the responsible party.

**B.    Convertible Debt**

36.    As with Windmill Farms and Bellwether, SPC extended convertible debt relating to Parc at Ingleside and Opelika. SPC had the right to convert the debt into 100% equity ownership of Ingleside and maintains this right for Opelika. This right was an integral and

primary part of the bargain at the time the convertible loans were made (and long before the Receiver was appointed). SPC has converted the debt into equity and is now the 100% equity owner of Ingleside and maintains the right to exercise its equity in Opelika. Functionally, the convertible loan is different from a traditional loan. The convertible loan carried various interest rates usually lower than the market rate of upwards of at least 10% to 15%.

37.     Classifying SPC's interests in the SPC Projects as solely "loans" is inaccurate because it does not provide full context. As shown by the TCI and SPC accounting records, discussed below, SPC effectively treated the properties as investments because it intended on exercising its exclusive right to convert its debt to 100% equity.

### C.     SPC financial statements evidence that Ingleside and Opelika are Not Mere Loans.

38.     SPC issued bonds on the Israeli Bond Exchange, those bonds being a primary source of financing for SPC during the late 2010s and early 2020s. SPC files financial and other reports in Israel, as required by applicable Israeli law. Assets in Israel are reported pursuant to International Financial Reporting Standards ("IFRS") which account for assets at "fair value." SPC's financial statements evidence the fair value of the convertible loan portfolio by providing the loan balance and an appraised value for the conversion rights in each note.

39.     Attached to the Declaration of Bradley Muth dated March 10, 2023 ("Muth Declaration") as Exhibit 41 is a copy of SPC's "Audited Consolidated Financial Statements" as of December 31, 2021 ("SPC 2021 Financial Statements"). [ECF 181, App. at 523-572]. Attached to the Muth Declaration as Exhibit 42 is a copy of SPC's "Interim Unaudited Consolidated Financial Statements" as of September 30, 2022 ("SPC Interim 2022 Financial Statements"). [ECF 181, App. at 574-595]. These SPC financial statements also address

Declaration of Erik Johnson
453622v5

Ingleside and Opelika and show that SPC considered Ingleside and Opelika to effectively be ownership investments, not merely loans.

40.   Note 10 in the SPC 2021 Financial Statements is titled, "Notes Receivable." [ECF 181, App. at 553]. The table, shown below, includes Ingleside and Opelika:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $  10,365 | $  4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $  79,507 | $  47,850 | | |

41.   Below the table, the 2021 Financial Statements explain that SPC owns convertible debt in the properties listed in the table, including Ingleside and Opelika. It states the following:

> "The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property." *Id.*

The 2021 Financial Statements add further explanation, stating:

> "The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued." *Id.*

The 2022 Interim Financial Statements mirror this point, adding:

> "The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals." [ECF 181, App. at 583].

42.   Combining the above statements, and the table, make clear that SPC carried the Ingleside and Opelika notes receivable for these convertible loans, not at the loan amounts, but at

an enhanced value accounting for the value of the equity conversion right as established by a third-party appraiser.

43.     First, SPC owned convertible debt "into a 100% ownership interest" in both properties. [ECF 181, App. at 553]. This is different from a typical loan because SPC could, "at its option," obtain 100% ownership interest in both properties. *Id.* SPC did just that on October 3, 2022 when it exercised its option to acquire 100% equity interest in Ingleside. SPC similarly retains the same option for Opelika.

44.     Second, SPC explains that it had the properties valued by "independent external valuation experts" or "third-party appraisals." *Id.;* [ECF 181, App. at 583]. If these were simply loans, SPC would not have gone through the process of having the properties appraised for the purpose of determining their carrying values. Such an action is consistent with equity value because SPC was expending resources to ascertain the properties' values, as opposed to simply waiting for a return on its loan.

**D.     TCI's SEC Filings Show that Ingleside and Opelika are Not Mere Loans**

45.     TCI files financial reports under Generally Acceptable Accounting Procedures, or GAAP, for compliance with its public reporting requirements through the SEC as a corporation listed on the New York Stock Exchange. TCI's SEC filings, as far back as 2018, evidence that Ingleside and Opelika are Not Mere Loans. Attached to the Muth Declaration as Exhibits 43 through Exhibit 47 are the TCI Form 10-K for fiscal year ended December 31, 2017  through December 31, 2021 [ECF. 182, Apps. at 597-724]; [ECF 183, Apps. at 725-928].

46.     In the 2020 10K and 2021 10K, TCI describes its interest in Ingleside and Opelika not as a loan, but as a "note . . . convertible, at our option, into a 100% ownership interest." [ECF 182, App. at 600, 698]. The 2018 10K and 2019 10K provide that TCI "intends to service and

hold for investment the mortgage notes in [TCI's] portfolio." [ECF 184, Apps. at 845, 905]. "Servic[ing] and hold[ing] for investment" a convertible loan is not consistent with a mere loan; it is consistent with property ownership. *Id.*

47.    Further, in its 10Ks, TCI consistently included Ingleside and Opelika as "Notes Receivable" or "Mortgage Loans." In the 10Ks, there is a table listing all notes receivable TCI owns. TCI had convertible debt into 100% ownership interest for all entities included in the table. Ingleside and Opelika were included in each table. An example of such a table is included below. [ECF 182, App. at 633-634].

**9. Notes Receivable**

The following table summarizes our notes receivables at December 31, 2021 and 2020:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| ABC Land and Development, Inc. | $ 4,408 | $ 4,408 | 9.50% | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50% | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00% | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00% | 11/1/2026 |
| Forest Pines(1) | 6,472 | 2,869 | 5.00% | 11/1/2022 |
| Lake Wales | 3,000 | 3,000 | 9.50% | 6/30/2026 |
| Legacy Pleasant Grove | 496 | 496 | 12.00% | 10/23/2022 |
| McKinney Ranch | 4,554 | 4,554 | 6.00% | 9/15/2022 |
| One Realco Land Holding, Inc. | 1,728 | 1,728 | 9.50% | 6/30/2026 |
| Parc at Ingleside(1) | 3,700 | 2,523 | 5.00% | 11/1/2026 |
| Parc at Opelika(1) | 2,305 | — | 10.00% | 1/15/2025 |

Under the table, the 2020 10K and the 2021 10K state, "[t]he note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property." [ECF 182, App. at 600, 698].

**E.    TCI did not accrue interest on the convertible notes.**

48.    TCI did not recognize interest income under SPC's Convertible Loans because of the view that TCI, through SPC, would exercise its right of conversion for ownership. TCI would not be expected to recognize the interest income because when it chose to exercise its conversion rights, as it planned, such interest income would have been forgiven, per the Convertible Loans.

49.    This is shown in TCI's 10Ks. In its 10Ks, TCI accrued, but fully reserved, interest income recognition on the Convertible Loans. Any uncollected interest income is forgiven in the

event of conversion. TCI had the ability and the intent to convert the SPC Convertible Loans into 100% equity interest. TCI, through SPC, exercised its rights. Any interest was forgiven once TCI exercised its convertible rights. Since TCI planned to exercise its right, it did not recognize interest income on the convertible loans.

50.    SPC has the right to convert its loan regarding Ingleside and Opelika into 100% equity. TCI withheld recognizing interest income concerning Ingleside and Opelika, because it intended to exercise its right to conversion for Ingleside (similar to Windmill Farms and Bellwether) and still intends the same for Opelika. SPC does not view the SPC Projects as mere loans; it views them as owner investment properties it intends to fully acquire.

**F.    HUD approval of TPA.**

51.    I have TCI corporate representative knowledge that TCI has outsourced the initial developer role to a number of developers, including to Barton, and that TCI has used such business model on a number of development projects in which HUD provided financing.

52.    It is important that during the time SPC was using the business model of an initial developer using a convertible loan, TCI was simultaneously developing its largest projects through conventional lending. Contrary to the Receiver's allegations, TCI was not relying solely on HUD to finance its pipeline of projects.

53.    I have TCI corporate representative knowledge that TCI is one of HUD's largest borrowers, that TCI, or one of its affiliates such as SPC, has requested HUD approve a TPA a significant number of times, that TCI is experienced in requesting HUD approval for TPAs, and that I am not aware of any instance in which HUD denied a request by TCI or one of its affiliates such as SPC, for a TPA.  As discussed above, in any event, if HUD did not approve the TPA, SPC could pay off loan.

54.    But for the Barton Receivership, SPC would have already commenced the process of requesting HUD approval for TPAs with respect to Windmill Farms, Bellwether and Parc at Ingleside. Since the VAA sale, which closed September 16, 2022, TCI (or SPC) has commenced and is in the process of completing the HUD TPA process with respect to at least four (4) other development projects similar to Windmill Farms, Bellwether and Ingleside involving third-party initial developers using convertible loans. Note Bellwether was an approved transfer to the VAA joint venture under the HUD large borrower approval (but the Bellwether transfer was not completed).

**Business Records**

55.    I am a custodian of records for TCI/SPC, responsible for ensuring that SPC maintains accurate and complete records of its regularly conducted activities. Attached to my Declaration are Exhibits 1 through 42 from TCI/SPC. These exhibits were made at or near the time of the events referenced in each exhibit by, or from information transmitted by, someone with knowledge of the facts; were kept by TCI/SPC in the course of regularly conducted activity; and were made as part of the regular practice of that activity.

I declare under penalty of perjury that the foregoing is true and correct."

Executed in Dallas County, State of Texas, on the 30th of May, 2023.

ERIK JOHNSON

Declaration of Erik Johnson                                                                                    Page 17 of 17
453622v5                                                                                                          App. 710

# EXHIBIT I-1



Last statement: February 28, 2018
This statement: March 31, 2018
Total days in statement period: 31

SOUTHERN PROPERTIES CAPITAL, LTD
BROWNING PLACE
1603 LBJ FWY SUITE 800
DALLAS TX 75234

Page 1
4104294800
( 22)

Direct inquiries to:
800-892-5430

*EFFECTIVE JANUARY 18, 2017, OUR ACCOUNT TERMS AND CONDITIONS WILL
CHANGE. TO VIEW SUMMARY OF CHANGES AND REVISED CLIENT MANUAL, GO
TO WWW.LEUMIUSA.COM/CLIENT-MANUAL*

## Commercial Checking

| | | | | |
|---|---|---|---|---|
| Account number | 4104294800 | Beginning balance | $23,438,125.71 |
| Enclosures | 22 | Total additions | 6,421,453.08 |
| Low balance | $713,287.07 | Total subtractions | 26,315,015.74 |
| Average balance | $11,817,749.80 | Ending balance | $3,544,563.05 |
| Avg collected balance | $11,817,749 | | |

### CHECKS

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 303194 | 03-07 | 34,308.64 | 303405 | 03-13 | 243.43 |
| 303227 * | 03-01 | 4,000.00 | 303420 * | 03-09 | 1,246.04 |
| 303228 | 03-02 | 2,200.00 | 303421 | 03-19 | 1,500.00 |
| 303282 * | 03-09 | 540.00 | 303444 * | 03-13 | 17,738.39 |
| 303320 * | 03-01 | 25,039.41 | 303448 * | 03-15 | 40,075.77 |
| 303358 * | 03-07 | 57,383.00 | 303464 * | 03-19 | 2,150.08 |
| 303402 * | 03-20 | 375.00 | 303602 * | 03-30 | 18,724.02 |
| 303403 | 03-13 | 960.00 | * Skip in check sequence | | |
| 303404 | 03-08 | 1,893.89 | | | |

### DEBITS

| Date | Description | Subtractions |
|---|---|---|
| 03-07 | Wire Out Intl | 995.00 |
| | 201803070002775 COLLAS CRILL FARARA KERINS | |
| | INVOICE BNB1 0001256 | |

App. 712

SOUTHERN PROPERTIES CAPITAL, LTD                                    Page 2
March 31, 2018                                                      4104294800

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 03-07 | Wire Out Intl<br>201803070002776 THE TEL AVIV STOCK EXCHANGE LTD<br>ACCOUNT 214604 | 20,789.00 |
| 03-07 | ' Wire Out<br>201803070002774 EQK BRIDGEVIEW PLAZA<br>TRANSFER OF FUNDS | 100,000.00 |
| 03-09 | ' Wire Out<br>201803090000650 JMJ DEVELOPMENT INC.<br>PARC AT WINDMILL FARMS | 3,100,365.47 |
| 03-15 | ' Analysis Results Chg<br>ANALYSIS ACTIVITY FOR 02/18 | 924.60 |
| 03-16 | ' Transfer Debit<br>TRANSFER TO DEPOSIT ACCOUNT 6611861170 | 20,000,000.00 |
| 03-26 | ' Wire Out<br>201803260001410 HERITAGE GUARANTY HOLDINGS<br>MCKINNEY POINTE APTS | 2,883,564.00 |

**CREDITS**

| Date | Description | Additions |
|------|-------------|----------:|
| 03-02 | Wire IN<br>201803020003944 DEMAND DEPOSITS-MCCRACKEN CASH OUT<br>E OFFSITE ESC25809 | 588.45 |
| 03-13 | Wire IN<br>201803130001650 WHITNEY BANK TRUST DEPOSITS<br>DISTRIBUTION PER ESCROWAGREEMENT | 1,070,864.63 |
| 03-14 | Wire IN<br>201803140001463 REGIS REALTY PRIME LLC<br>600 LAS COLINAS EXCESS CASH | 500,000.00 |
| 03-23 | ' Cash Mgmt Trsfr Cr<br>REF 0821040L FUNDS TRANSFER FRMDEP 6611861170<br>FROM | 2,000,000.00 |
| 03-29 | Wire IN<br>201803290000999 HERITAGE GUARANTY HOLDINGS INC<br>TION FUNDS | 2,850,000.00 |

**DAILY BALANCES**

| Date | Amount | Date | Amount | Date | Amount |
|------|-------:|------|-------:|------|-------:|
| 02-28 | 23,438,125.71 | 03-13 | 21,141,876.52 | 03-23 | 3,596,851.07 |
| 03-01 | 23,409,086.30 | 03-14 | 21,641,876.52 | 03-26 | 713,287.07 |
| 03-02 | 23,407,474.75 | 03-15 | 21,600,876.15 | 03-29 | 3,563,287.07 |
| 03-07 | 23,193,999.11 | 03-16 | 1,600,876.15 | 03-30 | 3,544,563.05 |
| 03-08 | 23,192,105.22 | 03-19 | 1,597,226.07 | | |
| 03-09 | 20,089,953.71 | 03-20 | 1,596,851.07 | | |

*Thank you for banking with Bank Leuml USA*

App. 713

**SOUTHERN PROPERTIES CAPITAL, LTD**
December 31, 2017

Page 2
4104294800

| Date | Description | Subtractions | |
|------|-------------|-------------|---|
| 12-13 | Wire Out | 2,480,383.78 | BTL 368 |
| | 201712130004505 COMMONWEALTH LAND TITLE | | |
| | 2228005339 WINDMILL FARMS | | |
| 12-14 | Wire Out | 24,351.71 | BTL 368 |
| | 201712140002546 COMMONWEALTH LAND TITLE | | |
| | 2228005339WINDMILL FARMS | | |
| 12-15 | Wire Out | 180.00 | BTL 388 |
| | 201712150004394 MANPOWER GROUP SOLUTIONS | | |
| | INVOICE A 410080 INVOICE A 411018 | | |
| 12-15 | Wire Out Intl | 18,000.00 | BTL 540 |
| | 201712150004393 GUEST KRIEGER LIMITED | | |
| 12-15 | Wire Out | 8,349.35 | BTL 390 |
| | 201712150004392 ARCHITECTS COLLABORATIVE | | |
| | LAKESIDE LOFTS | | |
| 12-15 | Wire Out | 707,474.15 | BTL 390 |
| | 201712150004391 N. E. CONSTRUCTION, LLP | | |
| | AW 2 | | |
| 12-15 | Analysis Results Chg | 570.10 | BTL 538 |
| | ANALYSIS ACTIVITY FOR 11/17 | | |
| 12-20 | Wire Out | 45,000.00 | BTL 540 |
| | 201712200003819 REGIS REALTY PRIME | | |
| 12-20 | Wire Out | 168,000.00 | BTL 386 |
| | 201712200003820 T RESIDENTIAL HOLDINGS LLC | | |
| | MEDLEY INTEREST REIMBURSEMENT FEB 20 | | |
| 12-20 | Wire Out | 500,000.00 | Transfer Between Banks |
| | 201712200003818 EQK BRIDGEVIEW PLAZA | | |
| | TRANSFER OF FUNDS | | |

**CREDITS**

| Date | Description | Additions | |
|------|-------------|-----------|---|
| 12-14 | Wire IN | 511,243.49 | BTL 340 |
| | 201712140004897 COMMONWEALTH TITLE OF DALLAS INC | | |
| | TATTERSALL VILLAGE APARTMENTS | | |
| 12-14 | Wire IN | 1,187,905.50 | BTL 340 |
| | 201712140004873 COMMONWEALTH TITLE OF DALLAS INC | | |
| | OCEANAIRE APARTMENTS | | |

**DAILY BALANCES**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 11-30 | 5,470,931.62 | 12-07 | 5,193,624.72 | 12-19 | 3,618,187.58 |
| 12-01 | 5,303,431.62 | 12-08 | 5,159,316.08 | 12-20 | 2,865,111.81 |
| 12-04 | 5,259,533.62 | 12-13 | 2,678,434.90 | 12-26 | 2,862,742.19 |
| 12-05 | 5,217,457.85 | 12-14 | 4,353,232.18 | 12-27 | 2,855,425.75 |
| 12-06 | 5,193,999.72 | 12-15 | 3,618,658.58 | | |

*Thank you for banking with Bank Leumi USA*

App. 714

# EXHIBIT I-2

# PURCHASER'S STATEMENT

**DATE:** October 20, 2017

**GF NO.:** 2228005530a

**SALE FROM:** DeSoto Development, LLC
1603 LBJ Freeway, Suite 300
Dallas, TX 75234

**TO:** D4DS LLC
1755 Wittington Place, Suite 340
Dallas, TX 75234

**PROPERTY:** Bellwether Ridge Apartments Land
South Polk Street and East Parkerville Road
DeSoto, TX 75115

**PURCHASE PRICE** ........................................................................................................ **$1,200,000.00**

**PLUS: CHARGES**

PRECLOSING EXPENSES ......................................................................................... $326.19

    UCC/Tax/Judgment/Litigation Searches (Overage) to Capitol ............ $58.89
    Services, Inc.

    Title Insurance Overage For Loan Closing to Commonwealth ............ $267.30
    Title of Dallas, Inc.

ADJUSTMENTS / PRORATIONS ............................................................................ $566,988.20

    Reimburse Pre-Development Expenses ............................................ $566,988.20

2017 Ad Valorem Property Taxes ............ From 10/21/2017 thru 12/31/2017 ............ $3,665.52

               **TOTAL CHARGES** ................................................................. **$570,979.91**

               **GROSS AMOUNT DUE BY PURCHASER** ............................ **$1,770,979.91**

|  |
|---|
| 1,770,980 |
| (566,988) |
| 1,203,992 |

**LESS: CREDITS**

               **TOTAL CREDITS** ................................................................. **$0.00**

               **BALANCE DUE BY PURCHASER** ...................................... **$1,770,979.91**

Purchaser understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. Any real estate agent or lender involved may be furnished a copy of this Statement.

Purchaser understands that tax and insurance prorations and reserves were based on figures for the preceding year or supplied by others, or estimates for current year, and in the event of any change for current year, all necessary adjustments must be made between Purchaser and Seller direct.

The undersigned hereby authorizes Commonwealth Title of Dallas, Inc. to make expenditures and disbursements as shown and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement.

D4DS LLC, a Texas
limited liability company

_____
Closing or Escrow Agent
James P. Lazar

By:_____
     Timothy Barton, President

Commonwealth Title of Dallas, Inc.
5949 Sherry Lane, Suite 111
Dallas, TX 75225

Printed at: 10/20/2017 (02:02 pm)

App. 716

SOUTHERN PROPERTIES CAPITAL, LTD                                    Page 2
October 31, 2017                                                    4104294800

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 10-02 | ' Wire Out | 678,250.00 |
|  | 201710020005895 U.S. BANK AS PAYING AGENT FOR | |
|  | T RESIDENTIAL 1837TERM LOAN 1500 | |
| 10-03 | ' Wire Out | 1,803,765.00 |
|  | 201710030003379 BERKADIA | |
|  | PAG APARTMENTS LP OPTION ADVANCE | |
| 10-03 | ' Wire Out | 1,969,729.00 |
|  | 201710030003377 BERKADIA | |
|  | WYLIE APARTMENTS LP OPTION ADVANCE | |
| 10-03 | ' Wire Out | 2,514,270.00 |
|  | 201710030003378 BERKADIA | |
|  | MCKINNEY POINTE APTS LP OPTION ADVAN | |
| 10-17 | ' Analysis Results Chg | 539.10 |
|  | ANALYSIS ACTIVITY FOR 09/17 | |
| 10-19 | ' Wire Out | 20,067.63 |
|  | 201710190003844 SHIMONOV AND CO. | |
|  | 540192622 | |
| 10-19 | Wire Out Intl | 8,086.92 |
|  | 201710190003848 AVITAL BAR-DAYAN | |
|  | DIRECTOR FEE | |
| 10-19 | Wire Out Intl | 8,086.92 |
|  | 201710190003849 YOGI CONSULTING AND INVESTMENTS LTD | |
| 10-19 | Wire Out Intl | 8,086.92 |
|  | 201710190003850 HARVEST CAPITAL MARKETS LTD | |
| 10-19 | Wire Out Intl | 25,000.00 |
|  | 201710190003845 KOST FORER GABBAY AND KASIERER | |
| 10-19 | ' Wire Out | 151,267.08 |
|  | 201710190003846 SUNCHASE AMERICAN LTD | |
|  | LOFTS AT REYNOLDS VILLAGE | |
| 10-23 | ' Wire Out | 996,006.05 |
|  | 201710230003584 COMMONWEALTH LAND TITLE INSURANCE | |
|  | GF 2228005530B | |
| 10-23 | ' Wire Out | 1,770,979.91 |
|  | 201710230003585 COMMONWEALTH LAND TITLE INSURANCE | |
|  | GF 2228005530A | |
| 10-24 | ' Wire Out | 5,000.00 |
|  | 201710240003621 ORI GROSSMAN | |
|  | ACCOUNT 67810691695 | |
| 10-26 | ' Wire Out | 60,000.00 |
|  | 201710260003231 CMBS PORTFOLIO | |
|  | TATTERSALL APTS | |
| 10-26 | ' Wire Out | 60,000.00 |
|  | 201710260003232 CMBS PORTFOLIO | |
|  | OCEANAIRE APTS | |
| 10-30 | ' Wire Out | 1,099,535.49 |
|  | 201710300003553 N. E. CONSTRUCTION, LLP | |
|  | AW 1 | |

App. 717

# EXHIBIT I-3

# BORROWER'S STATEMENT

**Date:** November 15, 2019

GFNo: 19-444119-DB

**Loan From:** Greystone Funding Company LLC
152 West 57th Street
60th Floor
New York, NY 10019

**To:** D4IN LLC, a Texas limited liability company
1755 Wittington Place
Suite 340
Dallas, TX 75234

**Property:** HARGUS BLK 1 W/2 OF LOT 2 & LOT 3 - 6
1st Street
Ingleside, TX 78362

**Credits/Funds Received**

| | |
|---|---|
| Loan Amount from Greystone Funding Company LLC | $25,201,000.00 |
| Lender Credit of Good Faith Deposit | $125,293.00 |
| **Total** | **$25,326,293.00** |

**Less: Charges/Disbursements**

| | | |
|---|---|---|
| Title Insurance to Capital Title of Texas | | $108,625.35 |
| Simultaneous, w/credit for pri to Capital Title of Texas | $78,279.00 | |
| Simultaneous w/OP 1st to Capital Title of Texas | $100.00 | |
| Survey Amend Non Residential to Capital Title of Texas | $13,032.75 | |
| Tax deletion (MTP & Binder On) to Capital Title of Texas | $20.00 | |
| T-36 Environmental Protection to Capital Title of Texas | $25.00 | |
| T19 Non-Res. Endorsement to Capital Title of Texas | $8,430.10 | |
| REM OTP T-19.1 Non-Res w/Amend to Capital Title of Texas | $8,688.50 | |
| Down Date - Mortgagee to Capital Title of Texas | $50.00 | |
| Other Title Company Charges | | $1,096.30 |
| Tax Certificate to United Tax Service, Inc. | $59.80 | |
| Texas Title Insurance Guaranty Fees to Texas Title Insurance Guaranty Association | $4.00 | |
| UCC-1 (State) to Capital Title of Texas | $30.00 | |
| Cost for Certified Copies of Probate Matters | $199.45 | |
| Down Date Endorsemens to Capital Title of Texas | $803.05 | |
| Recording Fees to Capital Title of Texas | | $1,012.00 |
| Deed of Trust | $234.00 | |
| UCC-1 (County) | $54.00 | |
| Regulatory Agreement | $190.00 | |
| Warranty Deed | $46.00 | |
| Payment and Performace Bonds | $108.00 | |
| Affidavit of Commencement | $54.00 | |
| Recording Probate Matters | $326.00 | |

Loan Charges

App. 719

GFNo: 19-444119-DB                                                    Page 2

Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The lender involved may be furnished a copy of this statement.

The undersigned hereby authorizes Capital Title of Texas, LLC to make expenditure and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement.

Capital Title of Texas, LLC

                                                    D4IN LLC, a Texas limited liability company

                                                    By:  JMJD4, LLC, a Delaware limited liability company, its
                                                         Managing Member

By: _____
      Robert A. Blanshard


                                                    By:_____
                                                         Timothy Barton, Manager


*Note: Interest on existing liens is figured to the date indicated. If not paid by then, additional interest will have to be collected and your statement will be adjusted to have sufficient funds to secure release from the lienholder.

App. 720

# BORROWER'S STATEMENT

**Date:** November 15, 2019

**GFNo: 19-444119A-DB**

**Loan From:** Greystone Funding Company LLC
152 West 57th Street
60th Floor
New York, NY 10019

**To:** D4IN LLC, a Texas limited liability company
1755 Wittington Place
Suite 340
Dallas, TX 75234

**Property:** HARGUS BLK 1 W/2 OF LOT 2 & LOT 3 - 6
1st Street
Ingleside, TX 78362

**Credits/Funds Received**

Total ..................................................................................................................................$0.00

**Less: Charges/Disbursements**

Other Charges & Fees ...................................................................................................$1,703.54
    Additional Costs for Land Acquisition to Commonwealth Title ..................$1,703.54
    of Dallas...................................................................................................

        **Total Charges/Disbursements**...........................................................$1,703.54
        **Net Amount Due by Borrower**...........................................................$1,703.54

Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The lender involved may be furnished a copy of this statement.

The undersigned hereby authorizes Capital Title of Texas, LLC to make expenditure and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement.

Capital Title of Texas, LLC

By: _____
    Robert A. Blanshard

D4IN LLC, a Texas limited liability company

By: JMJD4, LLC, a Delaware limited liability company, its
    Managing Member

By:_____
    Timothy Barton, Manager

*Note: Interest on existing liens is figured to the date indicated. If not paid by then, additional interest will have to be collected and your statement will be adjusted to have sufficient funds to secure release from the lienholder.

*Compliments of* **Capital Title of Texas, LLC- Blanshard**

App. 721

# Check Remittance

**Page:** 1/1

## Southern Properties Capital
1603 LBJ Freeway
Suite 800
Dallas 75234752347523475234TX  75234

| Vendor ID | Vendor Name | Check Name | | Payment Number | Check Date | Check Number | |
|---|---|---|---|---|---|---|---|
| C1730 | CAPITAL TITLE OF TEXAS, LLC | CAPITAL TITLE OF TEXAS, LLC | | 054127 | 11/14/2019 | EFT000000000534 | |
| Our Voucher Number | Your Voucher Number | Date | Amount | Amount Paid | Discount | Writeoff | Net |
| 040092 | 19-444119-DB | 11/14/2019 | $ 797,729.63 | $ 797,729.63 | $ 0.00 | $ 0.00 | $ 797,729.63 |
| | | **Totals** | $ 797,729.63 | $ 797,729.63 | $ 0.00 | $ 0.00 | $ 797,729.63 |

# EXHIBIT I-4

Case 3:22-cv-02118-X    Document 251    Filed 05/30/23    Page 35 of 366    PageID 8572



Correct amount

# Wire Approval Confirmation

**The requests below have been transmitted successfully.**

Transmitted:       01/25/2021 09:49:50 AM (ET)
Transmitted By:   ADZYUBA

## Approved Wires

The requests below have been approved by you.

| Account | Template | Recipient | Amount | Currency | Effective | Confirmation Number | Approval Status |
|---|---|---|---|---|---|---|---|
| Southern Properties Capital Ltd - CommCk - *4800 | Commonwealth Title | Commonwealth Land Title Insurance | 1,240,702.49 | USD | 01/25/2021 | 1267024018 | 2 of 2 received |
| Additional information for recipient: REF 2200282000311 Parc at Opelika | | | | | | | |
| | | Total: 1 items for | 1,240,702.49 | USD | | | |

**Buyer's Settlement Statement**

| | Buyer | |
| --- | --- | --- |
| | Debit | Credit |
| **PRECLOSING EXPENSES (continued)** | | |
| Borrower's Attorneys Fee to The Marx Firm | 9,500.00 | |
| Soil Gas Control Systems Fee to DFW Radon/Voc | 2,600.00 | |
| Company Search Fees to Capitol Services, Inc. | 1,559.38 | |
| **TITLE/ESCROW CHARGES: COMMONWEALTH LAND TITLE INSURANCE COMPANY** | | |
| Recording Fees | 650.00 | |
| Owner's & Loan Title Policies and Endorsements | 81,257.40 | |
| Mortgage Tax to Lee County Recorder | 35,491.95 | |
| **Subtotals** | 2,642,105.48 | 1,401,402.99 |
| **Balance Due FROM Buyer** | | 1,240,702.49 |
| **Totals** | 2,642,105.48 | 2,642,105.48 |

**See signature page to follow**

2200282000311

App. 725

Page 2 of 3



SOUTHERN PROPERTIES CAPITAL, LTD                                      Page 2
January 31, 2021                                                      4104294800

| Date | Description | Subtractions |
|---|---|---|
| 01-05 | ' Cash Mgmt Trsfr Db<br>REF 0051211L FUNDS TRANSFER TO DEP 6999187100<br>FROM LOC FEES | 6,805.56 |
| 01-05 | ' Cash Mgmt Trsfr Db<br>REF 0051301L FUNDS TRANSFER TO DEP 6611861170<br>FROM XFER FROM OPERATING TO MM | 1,500,000.00 |
| 01-07 | ' Cash Mgmt Trsfr Db<br>REF 0071610L FUNDS TRANSFER TO DEP 6611861170<br>FROM XFER FROM OPERATING TO MM | 600,000.00 |
| 01-08 | ' Wire Out<br>202101080003171 MANPOWER GROUP SOLUTIONS<br>INVOICE A 419447 | 407.92 |
| 01-08 | Wire Out Intl<br>202101080003169 C. C. R. MANAGEMENT 1998 LTD<br>INVOICE NO 40044 | 8,100.00 |
| 01-08 | Wire Out Intl<br>202101080003168 EREZ DINA AND OR EREZ<br>RECTOR FEES | 18,571.75 |
| 01-08 | Wire Out Intl<br>202101080003170 YOGI CONSULTING AND INVESTMENTS LTD<br>2020 | 18,571.75 |
| 01-08 | Wire Out Intl<br>202101080003172 LEAD N.A. LTD<br>4Q20 DIRECTOR FEES ROTEM POUGACH | 18,571.75 |
| 01-12 | Wire Out Intl<br>202101120002948 HAUTEVILLE TRUST BVI LTD<br>INVOICE 78103 | 705.00 |
| 01-15 | ' Fx Contract Db<br>DEAL# 1359794 | 9,921,826.43 |
| 01-15 | ' Analysis Results Chg<br>ANALYSIS ACTIVITY FOR 12/20 | 699.78 |
| 01-20 | ' Wire Out<br>202101200003623 HAUTEVILLE TRUST BVI LTD<br>INVOICE 78236 | 105.00 |
| 01-20 | ' Wire Out<br>202101200003625 PARC AT WINDMILL FARMS APTS<br>DEFICIT | 135,000.00 |
| 01-20 | ' Wire Out<br>202101200003624 D4DS LLC DBA<br>DEFICIT | 200,000.00 |
| 01-21 | ' Cash Mgmt Trsfr Db<br>REF 0211228L FUNDS TRANSFER TO DEP 6611861170<br>FROM XFER FROM OPERATING TO MM | 2,000,000.00 |
| 01-25 | ' Fx Contract Db<br>DEAL# 1360035 | 19,587.56 |
| 01-25 | ' Wire Out<br>202101250001625 COMMONWEALTH LAND TITLE INSURANCE<br>REF 2200282000311 PARC AT OPELIKA | 1,240,702.49 |

App. 726

# EXHIBIT I-5

**Borrower's Oath**
(For Residential Housing
but not Section 232 Projects)

**U.S. Department of Housing
and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

**Public Reporting Burden** for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

Date: as of November 1, 2019                Project No. 115-35872

To the U.S. Department of Housing and Urban Development ("HUD"):

(The definition of any capitalized term or word used herein can be found in this Borrower's Oath, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument.)

In accordance with the stated intent of Congress, HUD's regulations implementing the National Housing Act, as amended ("NHA"), and the Regulatory Agreement between Borrower and HUD, the undersigned hereby certifies under oath that so long as the Loan made pursuant to the Security Instrument is insured or held by HUD:

(1) That, to carry out the intent of Section 513 of the NHA, no part of the Mortgaged Property will be rented for a period of less than thirty days or used for transient or hotel purposes, and said Mortgaged Property shall be used principally for residential use;

(2) The Mortgaged Property will not be sold while the Loan insurance is in effect or the Security Instrument is held by HUD unless the purchaser files with HUD a like certification executed by such purchaser under oath;

(3) Borrower has not and will not enter into any agreement with any party other than Lender in conjunction with the Loan transaction that allows for perfection of any portion of the UCC Collateral through control under the UCC;

(4) That to Borrower's knowledge, there are no proposed change(s) of law, ordinance, or governmental regulation (proposed in a formal manner by elected or appointed officials) that, if enacted or promulgated after the commencement of construction/rehabilitation, would require a modification to the Project, and/or prevent the Project from being completed in accordance with the Drawings and Specifications dated <u>December 20, 2018 and last revised September 9, 2019,</u> executed by Borrower and Axia Contracting, LLC and referred to in the Construction Contract.

Previous editions are obsolete                Borrower's Oath                HUD-92478M (6/18)

App. 728

Each signatory below hereby certifies under oath that each of their statements and representations contained in this Borrower's Oath and all their supporting documentation thereto are true, accurate, and complete. This Borrower's Oath has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

D4IN LLC,
a Texas limited liability company

By:   JMJD4 LLC,
      a Delaware limited liability company
      Its Managing Member

By: _____
      Timothy Barton, Manager

Dated: Effective as of November 1, 2019, Executed on November 7th, 2019

**NOTE:  THE FOREGOING CERTIFICATION MUST BE GIVEN UNDER OATH IN ACCORDANCE WITH STATE LAW REQUIREMENTS FOR TAKING AN OATH.**

***Notary Jurat for Borrower***

County of _____*Dallas*_____ )
                           )ss.
State of _____*Texas*_____ )

       Personally appeared before me this ___*7th*___ day of ____*November*____, 2019, Timothy Barton who, **after being duly sworn**, says that he is the Manager of JMJD4 LLC, a Delaware limited liability company, managing member of D4IN LLC, a Texas limited liability company organized and existing under the laws of the Texas and that he/she has authority to execute **under oath** and has so executed the above certification for and on behalf of such a limited liability company, and for himself.

_____
Notary Public

My commission expires: ___*09/24/2022*___

                                                    [SEAL]



Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

NOTARY PUBLIC STATE OF TEXAS

# EXHIBIT I-6

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

## NOTE
## (MULTISTATE)

*HUD Project No. 115-35872*
*HUD Project Name: Parc at Ingleside*

US $25,201,000.00                                     As of November 1, 2019

FOR VALUE RECEIVED, the undersigned, D4IN LLC, a limited liability company organized and existing under the laws of the State of Texas (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Funding Company LLC, a limited liability company organized and existing under the laws of the State of Delaware, the principal sum of Twenty Five MillionTwo Hundred One Thousand and 00/100 Dollars ($25,201,000.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of Three and 59/100 per centum (3.59%).*

1.      **Defined Terms.** As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, *and advances* to protect the security of the Security Instrument under Section 13 of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

App. 732

become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Note rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

Any capitalized term or word used herein but not defined shall have the meaning given to such term or word in the Regulatory Agreement between Borrower and HUD or the Security Instrument.

2.      **Address for Payment.** All payments due under this Note shall be payable in immediately available funds at 419 Belle Air Lane, Warrenton, VA 20186, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

3.      **Payment of Principal and Interest.** Principal and interest shall be paid as follows:

(a)      Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on December 1, 2019, and on the first day of each month thereafter up to and including August 1, 2021  ("**Last Interest Only Payment Date**"). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of Ninety Eight Thousand Nine Hundred Ninety One and 32/100 Dollars (US $98,991.32), shall be payable on the first day of each month beginning on September 1, 2021, ("**Amortization Commencement Date**"), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on August 1, 2061 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise ("**Maturity Date**").

(b)      Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

App. 733

3

4.    **Security.** The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note (**"Security Instrument"**), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

5.    **Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument. Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

6.    **Acceleration.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower. If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable. Lender may exercise this option to accelerate regardless of any prior forbearance. Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

7.    **Late Charge.** If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to two percent (2%) of the unpaid principal and interest due in such month. Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

8.    **Exculpation; Remedies.**

(a)    Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50

---

App. 734

Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)      Notwithstanding Section 8(a) above, Borrower shall be liable to Lender  for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c)      Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

9.      **Voluntary and Involuntary Prepayments.**

(a)      This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1.  In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

(b)    Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)    Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, and (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)    Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)    Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)    If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)    All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

**10.    Costs and Expenses.** Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

11.    **Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

12.    **Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

13.    **Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

14.    **Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

15.    **Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

16.    **Governing Law; Consent to Jurisdiction and Venue.**
(a)    This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

---

App. 737

7

(b)     Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**17.     Rules of Construction.**   The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

**18.     Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

**19.     Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. Section 3701, *et seq*., as amended, when HUD is the holder of the Note.

**20.     Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

App. 738

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

**21. WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

[Signature page follows]

App. 739

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

> D4IN LLC,
> a Texas limited liability company
>
> By:  JMJD4 LLC,
>      a Delaware limited liability company
>      Its Managing Member
>
> By: _____
>      Timothy Barton, Manager

---

App. 740

10

NOTE (Multistate)

State of Texas

D4IN LLC, a Texas limited liability company

To

Greystone Funding Company LLC, a Delaware limited liability company

Project No.: 115-35872

Initially endorsed for insurance under § 221(d)(4) of the National Housing Act, as amended, and regulations published thereunder in effect on August 29, 2019 to the extent of advances approved by HUD.

By: _Mary Walsh_____    Date: _November 15, 2019_

Print Name: _Mary V. Walsh_____
Title:        Authorized Representative
              _Multifamily Regional Director_

At final endorsement, a total sum of $_____ has been approved for insurance hereunder by HUD.

By: _____    Date: _____ , 20___

Print Name: _____
Title:        Authorized Representative

---

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

App. 741

**RIDER 1 TO NOTE**
**FROM**
**D4IN LLC, a Texas limited liability company**
**TO**
**Greystone Funding Company LLC, a Delaware limited liability company**
**In the original principal sum of $25,201,000.00**

1.      This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4IN LLC, a Texas limited liability company (the "Borrower"), to Greystone Funding Company LLC, a Delaware limited liability company (the "Lender") dated as of November 1, 2019 (the "Note").

2.      Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to September 1, 2021.  Borrower shall have the right, on or after September 1, 2021, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  In the event of any prepayment of principal at any time on or after September 1, 2021, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from September 1, 2021 through August 31, 2022 | 10% |
| from September 1, 2022 through August 31, 2023 | 10% |
| from September 1, 2023 through August 31, 2024 | 8% |
| from September 1, 2024 through August 31, 2025 | 7% |
| from September 1, 2025 through August 31, 2026 | 6% |
| from September 1, 2026 through August 31, 2027 | 5% |
| from September 1, 2027 through August 31, 2028 | 4% |
| from September 1, 2028 through August 31, 2029 | 3% |
| from September 1, 2029 through August 31, 2030 | 2% |
| from September 1, 2030 through August 31, 2031 | 1% |
| from September 1, 2031 and thereafter | None |

App. 742

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Maker shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4IN LLC,
a Texas limited liability company

By:  JMJD4 LLC,
      a Delaware limited liability company
      Its Managing Member

By: _____
      Timothy Barton, Manager

**END OF RIDER 1**

# EXHIBIT I-7

1

**693806 DT    Total Pages: 52**

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived.  This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

**Prepared by and Recording Requested by:**
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

**After Recording return to:**
Leslie F. Dominy
Greystone Funding Company LLC
419 Belle Air Lane
Warrenton, VA 20186

## MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

### (Texas)

### HUD Project Number: *115-35872*
### Project Name: *Parc at Ingleside*

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

App. 745

2

## MULTIFAMILY DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

THIS MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS (**"Security Instrument"**), is made as of this 1st day of November, 2019 among D4IN LLC, a limited liability company organized and existing under the laws of the State of Texas, whose address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, as grantor, trustor and borrower (**Borrower**), to Thomas Kelly Derryberry, as trustee (**Trustee**), a person whose address is 504 Autumn Springs Ct, Suite 26, Franklin, TN 37067, for the benefit of Greystone Funding Company LLC, a limited liability company organized and existing under the laws of State of Delaware, whose address is 419 Belle Air Lane, Warrenton, VA 20186 as beneficiary and as Lender (**Lender**).

Borrower, in consideration of the Indebtedness and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee and Trustee's successors and assigns, in trust, with power of sale, the Mortgaged Property, including the Land located in San Patricio County, State of Texas and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Trustee and Trustee's successors and assigns.

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on August 1, 2061, in the principal amount of Twenty Five Million Two Hundred One Thousand and 00/100 Dollars (US $25,201,000.00) (**"Loan"**), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property. Borrower covenants that Borrower shall warrant and defend generally such title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

HUD-94000M (Rev. 06/14)                                    State Modification Addendum

App. 746

3

**Covenants.** Borrower and Lender covenant and agree as follows:

1.    **DEFINITIONS.** The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a)    **"Borrower"** means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally). Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note. Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b)    **"Building Loan Agreement"** means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c)    **"Business Day"** is defined in Section 31.

(d)    **"Claim"** is defined in Section 48(m).

(e)    **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f)    "**Contract of Insurance**" is defined in 24 C.F.R. Part 207, Subpart B.

(g)    **"Environmental Inspections"** is defined in Section 48(h).

(h)    **"Event of Default"** means the occurrence of any event listed in Section 22.

(i)    **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods

App. 747

4

and property, and including but not limited to: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

(j)      **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

(k)      **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

(l)      **"Impositions"** and **"Imposition Deposits"** are defined in Section 8(a).

(m)      **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(n)      **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of this Security Instrument as provided in Section 13.

(o)      **"Indemnitees"** is defined in Section 48(k).

(p)      **"Land"** means the estate in realty described in Exhibit A.

App. 748

5

(q)    **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.  (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)    **"Lender"** means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)    **"Lien"** is defined in Section 17.

(t)    **"Loan"** is defined in the opening paragraphs of this Security Instrument.

(u)    **"Loan Application"** is defined in Section 41.

(v)    **"Loan Documents"** means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)    **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

    (1)    the Land;

    (2)    the Improvements;

    (3)    the Fixtures;

    (4)    the Personalty;

    (5)    all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances

App. 749

6

related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)    all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)    all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)    all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)    all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)   all Rents and Leases;

(11)   all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)   all Imposition Deposits;

App. 750

7

(13)　all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)　all forfeited tenant security deposits under any Lease;

(15)　all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)　all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)　all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above or Section 33 below, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property.  These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Distributions of Surplus Cash and loan repayments, if allowed).

(x)　**"Note"** means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

(y)　**"Notice"** is defined in Section 31.

(z)　**"O&M Program"** is defined in Section 48(b).

(aa)　**"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the

8

Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to:  Reserve for Replacement accounts, bank accounts, Residual Receipts accounts, and investments.

(bb)    **"Principal"** is defined in the Regulatory Agreement.

(cc)    **"Project"** and **"Project Assets"** mean the Mortgaged Property.

(dd)    **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

(ee)    **"Property Jurisdiction"** is defined in Section 30(a).

(ff)    **"Regulatory Agreement"** means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

(gg)    **"Remedial Work"** is defined in Section 48(i).

(hh)    **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past

9

due, or to become due, Residual Receipts, and escrow accounts, however and whenever funded and wherever held.

    (ii)    **"Residual Receipts"** is defined in the Regulatory Agreement.

    (jj)    **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

    (kk)    **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair. During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

    (1)    physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

    (2)    fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

    (3)    fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

    (4)    materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

    (5)    retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

**2.    UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.**

This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as

App. 753

10

Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD. Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral. Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

**3.    ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |
| --- | --- | --- |

App. 754

11

immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents.  For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property.  However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)     After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures.  So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid.  Borrower shall pay to Lender upon demand all Rents to which Lender is entitled.  At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender.  No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice.  Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.  Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 755

12

(c)      Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents.  Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)      If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable.  Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law.  Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property.  Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents.  In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property.  Borrower acknowledges and agrees that

App. 756

13

the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)    If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)    If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)    Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

**4.    ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention

App. 757

14

of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)      Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease.  Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate.  Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)      Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements.  The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession.  Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.  The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)      Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including

App. 758

15

the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect. All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

(f)    Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations. Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender. Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed. All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

(g)    Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

5.    **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

6.    **EXCULPATION.** Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the

App. 759

16

Indebtedness; provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

## 7.   DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.

(a)   Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums:

(1)   an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i)  If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii)  If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)   a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility

App. 760

17

charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)     all payments and deposits mentioned in the two preceding paragraphs of this subsection and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i)  mortgage insurance premium charges under the Contract of Insurance;

(ii) ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii) interest on the Note; and

(iv) amortization of the principal of the Note.

(b)     Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)     Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.  Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

## 8.     IMPOSITION DEPOSITS.

(a)     In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same.  Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same.  All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay

App. 761

18

mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand. In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums due under Section 7(a)(3) shall be credited to Borrower. If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3). The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the "**Imposition Deposits**". The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as "**Impositions**". The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added. Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower for which Imposition Deposits are required. Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)     Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations. Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing. Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or Residual Receipts account (if any). Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note. Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)     If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender. Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender. Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

App. 762

19

(d)     If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or Residual Receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits.  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

**9.     REGULATORY AGREEMENT.**  Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument.  Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

**10.     APPLICATION OF PAYMENTS.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3). Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

**11.     COMPLIANCE WITH LAWS.**  Borrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, Subpart G, and any successor regulations;  including but not limited to those of the foregoing pertaining to:  health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments.  Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11.  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property.  Borrower

App. 763

20

represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**12.    USE OF PROPERTY.**  Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

**13.    PROTECTION OF LENDER'S SECURITY.**

(a)    If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)    Any amounts advanced by Lender for taxes, special assessments, or water rates (which are liens prior to the Security Instrument), for insuring the Project, or for mortgage insurance premiums, which amounts are paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note.  So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under

App. 764

21

Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)     Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

**14.     INSPECTION.** Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

**15.     BOOKS AND RECORDS; FINANCIAL REPORTING.**

(a)     Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments that affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)     If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)     Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time.

(d)     Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year. If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year. Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender. If Borrower fails to provide in a timely manner

App. 765

22

the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness.  Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)     Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

## 16.    TAXES; OPERATING EXPENSES.

(a)     Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)     Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)     As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition.  If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits.  Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

App. 766

23

(d)      Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)      Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

**17.    LIENS; ENCUMBRANCES.** (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("**Lien**") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument.  (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or Residual Receipts, except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

**18.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.**  Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (6/18)

App. 767

24

other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

## 19.   PROPERTY AND LIABILITY INSURANCE.

(a)   Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage. If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note. If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance. If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)   All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. All policies of property damage insurance shall include a non-contributing, non-

---

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (6/18)

App. 768

25

reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

(c)    Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)    All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations. Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)    Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)    In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. Borrower shall notify Lender of any payment received from any insurer. Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured

App. 769

26

hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

(g)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.  Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD.  In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable.  If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)     If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

20.    **CONDEMNATION.**

(a)     Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.  Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and

27

appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1) any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b)     All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note. After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration. No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award. Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

## 21.     TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.

(a)     So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations. Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21. Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 771

28

judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)      If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

**22.    EVENTS OF DEFAULT.**  The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

(a)      Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) of this Security Instrument.

(b)      Covenant Events of Default shall include:

(1)      fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

(2)      the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

(3)      any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right

App. 772

29

or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

(4)     so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)     Lender shall deliver Notice to any Principal(s) of Borrower identified in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide such Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

**23.     REMEDIES CUMULATIVE.** Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**24.     FORBEARANCE.**

(a)     So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note.  However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)     Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by

App. 773

30

applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

**25.    LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

**26.    WAIVER OF STATUTE OF LIMITATIONS.** To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

**27.    WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation

App. 774

31

or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

**28.    FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

**29.    ESTOPPEL CERTIFICATE.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are unmodified and in full force and effect (or, if there have been modifications, that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument; and (f) any additional facts requested by Lender.

**30.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, and solely as to rights and remedies of HUD, as such local or state laws may be preempted by federal law.

(b)    Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal

App. 775

32

courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or this Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

### 31.    NOTICE.

(a)    All notices, demands and other communications (**"Notice"**) under or concerning this Security Instrument shall be in writing.  Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument, and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 31, the term (**"Business Day"**) means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business.  When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day.  Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)    Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31.  Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

App. 776

33

(c)     Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.

**BORROWER:**
D4IN LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Dallas, TX 75234

**PRINCIPAL(S)/RELATED PARTIES:**

Timothy Barton                              JMJD4 LLC
1755 Wittington Place, Suite 340            1755 Wittington Place, Suite 340
Dallas, TX 75234                           Dallas, TX 75234

**LENDER:**
Greystone Funding Company LLC
Attn: General Counsel
419 Belle Air Lane
Warrenton, VA 20186

**32.    SALE OF NOTE; CHANGE IN SERVICER.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower. A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note. If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

**33.    SINGLE ASSET BORROWER.** Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the management and operation of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

App. 777

**34.     SUCCESSORS AND ASSIGNS BOUND.** This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

**35.     JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

**36.     RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

(a)     The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

(b)     No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement. Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

**37.     SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**38.     RULES OF CONSTRUCTION.** The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument. Any reference in this Security Instrument to an **"Exhibit"** or a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the

35

singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term **"including"** means "including, but not limited to."

**39.    LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern; provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

**40.    DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

**41.    NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the **"Loan Application"**) and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of Default.

**42.    ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

**43.    ACCELERATION; REMEDIES.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or

App. 779

36

provided in this Security Instrument or in the Note.  Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing.  Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**PROVISIONS PERTAINING TO SALE AS APPROPRIATE UNDER STATE LAW, IF ANY, ARE ADDRESSED IN ATTACHED FORM STATE ADDENDUM**

     **44.**    **FEDERAL REMEDIES.**  In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. Section 3701, *et seq.*, as amended, when HUD is the holder of the Note.

     **45.**    **REMEDIES FOR WASTE.**  In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

     (a)    the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

     (b)    an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

     (c)    recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security.  So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

     **46.**    **TERMINATION OF HUD RIGHTS AND REFERENCES.**  At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall

App. 780

37

conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance.  The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

**47.   CONSTRUCTION FINANCING.** The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern).  If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby.  All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof.  The Indebtedness shall, at the option of Lender or holder of this Security Instrument and the Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement.  This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

---

App. 781

38

### 48.    ENVIRONMENTAL HAZARDS.

(a)    Definitions:

(1)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (**"PCBs"**) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property.  Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33  U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

(3)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)    Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender (**"O&M Program"**); (2) matters described in

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (6/18)

39

subsection (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

(i)     any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(ii)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

(c)     Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(d)     Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(e)     If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program. All

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (6/18)

App. 783

40

costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)    Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)    to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)    the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)    Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)    no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

App. 784

41

(6)    to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)    Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g)    Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)    Borrower's discovery of any Prohibited Activity or Condition;

(2)    Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)    any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h)    Borrower shall pay promptly the costs of any environmental inspections, tests or audits (**"Environmental Inspections"**) required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and

---

Previous editions are obsolete               HUD MF Security Instrument               HUD-94000M (6/18)

App. 785

42

technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work (**"Remedial Work"**) is necessary to comply with any Hazardous Materials Law applicable to the Mortgaged Property or to its use, operation or improvement, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law. If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so. So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

App. 786

43

(j)      Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)      Borrower shall indemnify [if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender], hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, **"Indemnitees"**) from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise, arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions:

(i)      any breach of any representation or warranty of Borrower in this Section 48;

(ii)     any failure by Borrower to perform or comply with any of its obligations under this Section 48;

(iii)    the existence or alleged existence of any Prohibited Activity or Condition;

(iv)    the actual or alleged violation of any Hazardous Materials Law.

(l)      Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)      Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (**"Claim"**), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to

44

Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)    Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)    any amendment or modification of any Loan Document;

(2)    any extensions of time for performance required by any Loan Document;

(3)    the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)    the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)    the release or substitution in whole or in part of any security for the Indebtedness; and

(6)    Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)    Borrower shall, at its own cost and expense, do all of the following:

(1)    pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48;

(2)    reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)    reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

App. 788

45

(p)　In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)　The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument.  Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)　So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)　To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

App. 789

46

**49.**    State requirements for future advances, credit line or open-end mortgages, if any, are addressed in State Addendum attach hereto.

**ATTACHED EXHIBITS.**  The following Exhibits are attached to this Security Instrument:

|X|    Texas State Addendum

|X|    <u>Exhibit A</u>            Description of the Land (required).

App. 790

47

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed instrument.

D4IN LLC,
a Texas limited liability company

By:   JMJD4 LLC,
      a Delaware limited liability company
      Its Managing Member

By: _____
Timothy Barton, Manager

STATE OF TEXAS          §
                        §
COUNTY OF _Dallas_      §

The foregoing instrument was acknowledged before me on this _12th_ day of November, 2019, by Timothy Barton, Manager of JMJD4 LLC, a Texas limited liability company, managing member of D4IN LLC, a Texas limited liability company.

_____
Notary Public
Printed Name of Notary: _BELLA D. Khusal_

My Commission Expires: _09/24/2022_
[seal]

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

---

App. 791

HUD Project Number: 115-35872
Project Name: Parc at Ingleside

**ADDENDUM**

(Texas)

The following sections are inserted into the Security Instrument and made a part thereof:

43. Accelerations/ Remedies:

If Lender invokes the power of sale, Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction. Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

49. Trustee:

(a)    Trustee may resign by giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Instrument or shall fail or refuse to act in accordance with this Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Instrument. Such appointment may be executed by an authorized officer,

3

agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)    Any successor Trustee appointed pursuant to this Section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)    Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Instrument, including the transmittal and posting of any notices.

THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE DOCUMENT IS TO BE RECORDED AND FILED.

App. 793

HUD Project Number: 115-35872
Project Name: Parc at Ingleside

## EXHIBIT A

### (DESCRIPTION OF THE LAND)

TRACT I:

A 3.038 ACRE, OR 132,327 SQUARE FEET MORE OR LESS, BEING PORTION OF LOT 5 AND ALL OF LOT 6, HARGUS SUBDIVISION, RECORDED IN <u>VOLUME 3, PAGE 54</u>OF MAP RECORDS OF SAN PATRICIO COUNTY, TEXAS DESCRIBED IN A DEED TO ABC LAND AND DEVELOPMENT, INC. (A NEVADA CORPORATION) RECORDED IN DOCUMENT NUMBER <u>671767</u>, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS. SAID 5.270 ACRE TRACT BEING MORE FULLY DESCRIBED AS FOLLOWS, WITH BEARINGS BASED ON THE TEXAS COORDINATE SYSTEM ESTABLISHED FOR THE SOUTH ZONE FROM THE NORTH AMERICAN DATUM OF 1983 NAD 83 (NA2011) EPOCH 2010.00;

BEGINNING: AT A FOUND IRON ROD WITH CAP MARKED "BRISTER" AT THE NORTH CORNER OF SAID 3.038 ACRE TRACT, THE EAST CORNER OF A 3.3495 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN DOCUMENT NUMBER 299383, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS, ON THE SOUTHWEST RIGHT-OF-WAY LINE OF SOUTHERN PACIFIC RAILROAD, 100-FOOT RIGHT-OF-WAY, NO RECORDING INFORMATION FOUND;

THENCE: S 60°05'04" E, ALONG THE COMMON LINE OF SAID 3.038 ACRE TRACT AND SAID SOUTHERN PACIFIC RAILROAD RIGHT-OF-WAY LINE, A DISTANCE OF 305.89 FEET TO A SET "+" IN CONCRETE ON THE EAST CORNER OF SAID 3.038 ON THE NORTHWEST RIGHT-OF-WAY LINE OF AVENUE J, A 60-FOOT PUBLIC RIGHT, NO RECORDING INFORMATION FOUND;

THENCE: DEPARTING THE SOUTHWEST RIGHT-OF-WAY LINE OF SAID SOUTHERN PACIFIC RAILROAD, ALONG THE NORTHWEST RIGHT-OF-WAY LINE OF SAID AVENUE J, THE FOLLOWING BEARINGS AND DISTANCES:

S 33°04'30" W, A DISTANCE OF 94.20 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPEDAWSON";

ALONG A NON-TANGENT CURVE TO THE RIGHT, SAID CURVE HAVING A RADIAL BEARING OF N 51°50'35" W, A RADIUS OF 627.87 FEET, A CENTRAL ANGLE OF 16°40'29", A CHORD BEARING AND DISTANCE OF S 46°29'40" W, 182.08 FEET, FOR AN ARC LENGTH OF 182.73 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

ALONG A REVERSE CURVE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 192.33 FEET, A CENTRAL ANGLE OF 21°49'24", A CHORD BEARING AND DISTANCE OF S 43°55'12" W, 72.81 FEET, FOR AN ARC LENGTH OF 73.26 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

App. 794

S 33°00'30" W, PASSING AT 118.05', A FOUND DRILL HOLE AT THE INTERSECTION OF THE NORTHWEST RIGHT-OF- WAY LINE OF SAID AVENUE J AND THE NORTHEAST RIGHT-OF-WAY LINE OF FIRST STREET (FORMERLY FIFTEENTH STREET), A 50-FOOT PUBLIC RIGHT-OF-WAY AS SHOWN ON SAID HARGUS SUBDIVISION, AND CONTINUING FOR A TOTAL A DISTANCE OF 148.05 FEET TO A CALCULATED POINT IN SAID FIRST STREET;

THENCE: N 56°59'30" W, ALONG SAID FIRST STREET, A DISTANCE OF 248.91 FEET TO A CALCULATED POINT;

THENCE: N 32°59'10" E, PASSING AT 30.00', A FOUND DRILL HOLE ON THE NORTHEAST RIGHT-OF-WAY LINE OF SAID FIRST STREET, AND CONTINUING FOR A TOTAL DISTANCE OF 474.31 FEET TO THE POINT OF

BEGINNING, AND CONTAINING 3.038 ACRES IN THE CITY OF INGLESIDE, SAN PATRICIO COUNTY, TEXAS. SAID TRACT BEING DESCRIBED IN ACCORDANCE WITH A SURVEY MADE ON THE GROUND AND A SURVEY DESCRIPTION AND MAP PREPARED UNDER JOB NUMBER 11561-00 BY PAPE-DAWSON ENGINEERS, INC.


TRACT II:

A 5.270 ACRE, OR 229,546 SQUARE FEET MORE OR LESS, BEING PORTION OF LOTS 2, 4, 5 AND ALL OF LOT 3, HARGUS SUBDIVISION, RECORDED IN VOLUME 3, PAGE 54 OF MAP RECORDS OF SAN PATRICIO COUNTY, TEXAS DESCRIBED IN A DEED TO ABC LAND AND DEVELOPMENT, INC. (A NEVADA CORPORATION) RECORDED IN DOCUMENT NUMBER 671767, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS. SAID 5.270 ACRE TRACT BEING MORE FULLY DESCRIBED AS FOLLOWS, WITH BEARINGS BASED ON THE TEXAS COORDINATE SYSTEM ESTABLISHED FOR THE SOUTH ZONE FROM THE NORTH AMERICAN DATUM OF 1983 NAD 83 (NA2011) EPOCH 2010.00;

BEGINNING: AT A FOUND IRON ROD WITH CAP MARKED "BRISTER" AT THE EAST CORNER OF SAID 5.270 ACRE TRACT, THE NORTH CORNER OF THE EAST ONE-HALF (E/2) OF LOT 2 DESCRIBED IN A DEED RECORDED IN DOCUMENT NUMBER 632609, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS, ON THE SOUTHWEST RIGHT-OF-WAY LINE OF SOUTHERN PACIFIC RAILROAD, 100-FOOT RIGHT-OF-WAY, NO RECORDING INFORMATION FOUND;

THENCE: S 33°00'29" W, PASSING AT 487.03, A FOUND HEX ROD ON THE NORTHEAST RIGHT-OF-WAY LINE OF FIRST STREET (FORMERLY FIFTEENTH STREET), 50-FOOT PUBLIC RIGHT-OF-WAY AS SHOWN ON SAID HARGUS SUBDIVISION, AND CONTINUING FOR A TOTAL DISTANCE OF 517.03 FEET TO A CALCULATED POINT IN SAID FIRST STREET;

THENCE: N 56°59'30" W, ALONG SAID FIRST STREET, A DISTANCE OF 481.57 FEET TO A CALCULATED POINT;

HUD-94000M (Rev 06/13)                                                Legal Description

App. 795

THENCE: N 33°00'30" E, PASSING AT 30.00', A FOUND DRILL HOLE AT THE INTERSECTION OF THE NORTHEAST RIGHT-OF-WAY LINE OF SAID FIRST STREET AND THE SOUTHEAST LINE OF AVENUE J, A 60-FOOT PUBLIC RIGHT-OF-WAY, NO RECORDING INFORMATION FOUND, AND CONTINUING ALONG THE SOUTHEAST RIGHT-OF- WAY LINE OF SAID AVENUE J FOR A TOTAL DISTANCE OF 148.05 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

THENCE: ALONG THE SOUTHEAST RIGHT-OF-WAY LINE OF SAID AVENUE J, THE FOLLOWING BEARINGS AND DISTANCES:

ALONG A TANGENT CURVE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 132.33 FEET, A CENTRAL ANGLE OF 21°49'24", A CHORD BEARING AND DISTANCE OF N 43°55'12" E, 50.10 FEET, FOR AN ARC LENGTH OF 50.40 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

ALONG A REVERSE CURVE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 687.87 FEET, A CENTRAL ANGLE OF 16°54'06", A CHORD BEARING AND DISTANCE OF N 46°22'52" E, 202.18 FEET, FOR AN ARC LENGTH OF 202.91 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

N 33°04'30" E, A DISTANCE OF 100.12 FEET TO A SET 1/2 INCH IRON ROD WITH YELLOW CAP MARKED "PAPEDAWSON" AT THE NORTH CORNER OF SAID 5.270 ACRE TRACT ON THE SOUTHWEST RIGHT-OF-WAY LINE OF SAID SOUTHERN PACIFIC RAILROAD;

THENCE: S 60°05'04" E, ALONG THE SOUTHWEST RIGHT-OF-WAY LINE OF SAID SOUTHERN PACIFIC RAILROAD, A DISTANCE OF 425.83 FEET TO THE POINT OF BEGINNING, AND CONTAINING 5.270 ACRES IN THE CITY OF INGLESIDE, SAN PATRICIO COUNTY, TEXAS. SAID TRACT BEING DESCRIBED IN ACCORDANCE WITH A SURVEY MADE ON THE GROUND AND A SURVEY DESCRIPTION AND MAP PREPARED UNDER JOB NUMBER 11561-00 BY PAPE-DAWSON ENGINEERS, INC.

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Gracie Alaniz-Gonzales
County Clerk
San Patricio County, Texas
11/14/2019 08:56 AM
Fee: $230.00
693806    DT

HUD-94000M (Rev 06/18)

Legal Description

App. 796

# EXHIBIT I-8

**TRANSCONTINENTAL REALTY INVESTORS, LTD**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

June 4, 2019

JMJ Development, LLC
1755 Wittington Place, Suite 340
Farmers Branch, Texas 75234

Re: Transcontinental Realty Investors, Inc. ("Lender") $5,900,000.00 loan
(the "Loan") to JMJ Development, LLC ("Borrower")

Gentlemen:

This letter loan agreement (the "Letter Loan Agreement") is executed by Lender and Borrower and will evidence and govern certain terms and provisions of the Loan. As a condition to closing of the Loan, Borrower shall deliver to Lender or perform the following:

1. Borrower shall execute and deliver to Lender a counterpart of this Letter Loan Agreement, the Promissory Note and the Security Agreement pledging JMJAV LLC and shall cause JMJAV LLC to execute the Security Agreement pledging JMJD4 LLC.
2. Borrower shall cause the Agreement and Acknowledgment attached to the Pledge and Security Agreement to be executed by JMJAV LLC and JMJD4 LLC (the "Pledged Entities").
3. Lender shall have received a closing statement setting forth the source and uses of all funds related to the Loan.
4. Lender shall have received the following documents with respect to each of the Pledged Entities:
   a. Certificate of formation
   b. Operating agreement
   c. Organizational meeting minutes
   d. Certificate of existence from Secretary of State of formation
   e. Certificate of good standing or account status from state of formation
   f. Certificate of qualification to do business in Texas for any foreign entity, along with certificate of account status
   g. All certificates of member interest issued to Guarantor
5. Lender shall have received the following documents with respect to Borrower:
   a. Certificate of formation
   b. Operating agreement
   c. Certified copy of resolutions authorizing the borrowing
   d. Certificate of existence
   e. Certificate of good standing

App. 798

6. Borrower shall have paid all attorneys' fees and other costs incurred by Lender in connection with the Loan.

7. Borrower shall have delivered to Lender such additional documents as Lender may have reasonably requested in connection with the closing of the Loan, including, but not limited to the organizational documents of Borrower and resolutions authorizing the Loan.

8. Lender and Borrower anticipate that the Loan will not be fully funded at closing. From time to time thereafter, Lender may advance additional funds under the Promissory Note in order to provide the Borrower with funds for its ongoing operations. Any such advances shall bear interest and be repayable as set forth in the Promissory Note. Upon request, Borrower shall execute such additional documents or new notes as Lender may reasonably request in order to evidence any such additional advances.

9. "Event of Default", shall mean any event of default under the Promissory Note, Pledge and Security Agreement, Guaranty and under this Letter Loan Agreement and shall also include any event of default related to any financing (the "D4IN Loan") provided to D4IN LLC in connection with the construction and operation of its real property and which is secured by such real property. Upon the occurrence of any default under the D4IN Loan, regardless of whether any party is or may be entitled to cure such default and regardless of whether the holder of such loan has commenced the exercise of remedies, Lender shall be entitled to exercise any and all remedies available under any of the documents evidencing, securing or governing the loan or at law or in equity.

LENDER:

Transcontinental Realty Investors, Inc.

By: _____
Name:_____
Title: _____

BORROWER:

JMJ Development, LLC

By: _____
     Timothy Barton, President

App. 799

# EXHIBIT I-9

**PROMISSORY NOTE**

**$3,800,000.00**                                                   June __4__, 2019

       FOR VALUE RECEIVED, **JMJ DEVELOPMENT, LLC**, a Texas limited liability company ("Borrower"), having an address of 1755 Wittington Place, Suite 340, Farmers Branch, Texas 75234, hereby promises to pay to the order of **TRANSCONTINENTAL REALTY INVESTORS, INC.** (together with its successors and assigns and any subsequent holders of this Promissory Note, the "Lender"), as hereinafter provided, the principal sum of **FIVE MILLION NINE HUNDRED THOUSAND AND NO/100THS DOLLARS ($5,900,000.00)** or so much thereof as may be advanced or readvanced by Lender from time to time hereunder to or for the benefit or account of Borrower, together with interest thereon at the Note Rate (as hereinafter defined), and otherwise in strict accordance with the terms and provisions hereof.

**ARTICLE ONE**
**DEFINITIONS**

       1.1    *Defined Terms*. Any capitalized terms used in this Promissory Note ("Note") are defined as they are introduced or in Section 4.22 hereof. All terms used herein, whether or not defined hereof, and whether used in singular or plural form, shall be deemed to refer to the object of such term whether such is singular or plural in nature, as the context may suggest or require.

**ARTICLE II**
**PAYMENT TERMS**

       2.1    *Payment of Principal and Interest*. Prior to any Event of Default, as defined in Section 2.8 hereof, interest on the principal balance of this Note shall accrue at the rate of **five percent (5.0%)** per annum ("Applicable Rate"). No payments shall be due hereunder until **June 1, 2022** ("Maturity Date"), when the entire remaining unpaid principal balance of this Note and any and all accrued but unpaid interest herein shall be due and payable in full.

       2.2    *Application*. Except as expressly provided herein to the contrary, all payments on this Note shall be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon), including, without limitation, any and all fees owed to Lender, for which either Borrower shall be obligated or Lender shall be entitled pursuant to the provisions of this Note or the other Loan Documents, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the direct order of maturity. If an Event of Default exists under this Note or under any of the other Loan Documents, then Lender may, at the sole option of Lender, apply any such payments, at any time and from time to time, to any of the items specified in clauses (i), (ii) or (iii) above without regard to the order of priority otherwise specified in this Section and any application to the outstanding principal balance hereof may be made in either direct or inverse order of maturity.

       2.3    *Payments*. All payments under this Note made to Lender shall be made on the first (1st) day of each month, without offset, in lawful money of the United States of America, which

shall at the time of payment be legal tender in payment of all debts and dues, public and private. Payments by check or draft shall not constitute payment in immediately available funds until the required amount is actually received by Lender in full. Payments in immediately available funds received by Lender in the place designated for payment on a Business Day prior to 12:00 noon Central time at said place of payment shall be credited prior to the close of business on the Business Day received, while payments received by Lender on a day other than a Business Day or after 12:00 noon Central time on a Business Day shall not be credited until the next succeeding Business Day. If any payment of principal or interest on this Note shall become due and payable on a day other than a Business Day, such payment shall be made on the next succeeding Business Day. Any such extension of time for payment shall be included in computing interest which has accrued and shall be payable in connection with such payment.

2.4    *Computation Period*. Interest on the indebtedness evidenced by this Note shall be computed on the basis of a three hundred sixty (360) day year and shall accrue at the Applicable Rate on the actual number of days elapsed for any whole month in which interest is being calculated, but on the actual number of days for any partial month in which interest is being calculated. In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to the close of business on the Business Day received.

2.5    *Prepayment*. This Note may not be prepaid in part or in full.

2.6    *Unconditional Payment*. Borrower is and shall be obligated to pay all principal, interest and any and all other amounts which become payable under this Note or under any of the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction whatsoever and without any reduction for counterclaim or setoff whatsoever. If at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any Debtor Relief Law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

2.7    *Partial or Incomplete Payments*. Remittances in payment of any part of this Note other than in the required amount in immediately available funds at the place where this Note is payable shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in full in accordance herewith and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the full amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default in the payment of this Note.

2.8    *Interest on Unpaid Interest, Late Payment Charges; Default Interest Rate, Etc.* In the event any payment of interest is not paid on the date when due, interest shall accrue thereon as set forth herein on a compounded basis until paid in full. Further, in the event any Monthly Payment is not paid within **ten (10) days** of the date when due, Borrower shall pay a late payment charge in an amount equal to **five percent (5%)** of the late payment in order to offset Lender's increased administrative costs resulting from such late payment. For so long as any Event of Default exists under this Note or under any of the other Loan Documents, and in addition to all other rights and remedies of Lender hereunder, interest shall accrue on the outstanding principal balance hereof at the Default Interest Rate, and such accrued interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or Event of Default, and such late charges and accrued interest are reasonable estimates of those damages and do not constitute a penalty. Borrower shall also pay an additional $35.00 fee for any check which is not honored.

## ARTICLE III
## EVENT OF DEFAULT AND REMEDIES

3.1    *Event of Default*. The occurrence or happening, at any time and from time to time, of any one or more of the following shall immediately constitute an "Event of Default" under this Note:

(a)    Prior to the Maturity Date, by acceleration or otherwise, Borrower shall fail, refuse or neglect to pay and satisfy, in full and in the applicable method and manner required, any required payment of principal or interest or any other portion of the indebtedness evidenced by this Note as and when the same shall become due and payable or within five (5) days of such date, whether at the stipulated due date thereof, at a date fixed for payment, or ***immediately*** on the Maturity Date, by acceleration or otherwise Borrower shall fail, refuse or neglect to pay and satisfy in full and in the applicable method and manner required, the indebtedness evidenced by this Note; or

(b)    The occurrence of any other default, breach or event of default as defined in or under this Note or any other Loan Document that remains uncured under and pursuant to the provisions of this Note or any other Loan Document.

3.2    *Remedies*. Upon the occurrence of an Event of Default, Lender shall have the immediate right, at the sole discretion of Lender and without notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action (**ALL OF WHICH BORROWER HEREBY EXPRESSLY WAIVES AND RELINQUISHES**) (i) to declare the entire unpaid balance of the indebtedness evidenced by this Note (including, without limitation, the outstanding principal balance hereof, including all sums advanced or accrued hereunder or under any other Loan Document, and all accrued but unpaid interest thereon) at once immediately due and payable (and upon such declaration, the same shall be at once immediately due and payable) and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity, (ii) to foreclose any liens and security interests securing payment hereof or thereof (including, without limitation, any liens and security interests covering any portion of the mortgaged Property), and (iii) to exercise any of Lender's other rights, powers,

Promissory Note
Transcontinental Realty Investors, Inc.                    3

App. 803

recourses and remedies under this Note, under any other Loan Document, or at law or in equity, and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, singly, successively, or concurrently against Borrower or others obligated for the repayment of this Note or any part hereof, or against any one or more of them, or against the mortgaged Property, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, it being agreed by Borrower that the exercise, discontinuance of the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse, and (d) are intended to be, and shall be, nonexclusive. All rights and remedies of Lender hereunder and under the other Loan Documents shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the mortgaged Property or any portion thereof. Without limiting the provisions of Section 4.18 hereof, if this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs and expenses of collection, including, but not limited to, Lender's attorneys' fees, whether or not any legal action shall be instituted to enforce this Note and whether or not such attorneys' fees shall be related to any bankruptcy proceeding of Borrower.

## ARTICLE IV
## GENERAL PROVISIONS

4.1    *No Waiver; Amendment*.  No failure to accelerate the indebtedness evidenced by this Note by reason of an Event of Default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced by this Note or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted under this Note, under any of the other Loan Documents or by any applicable laws.  Borrower hereby expressly waives and relinquishes the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.  The failure to exercise any remedy available to Lender shall not be deemed to be a waiver of any rights or remedies of Lender under this Note or under any of the other Loan Documents, or at law or in equity.  No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender specifically, unequivocally and expressly agrees otherwise in writing.  This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, or modification is sought.

4.2    *Waivers*.    EXCEPT AS SPECIFICALLY PROVIDED IN THE LOAN DOCUMENTS TO THE CONTRARY, BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION OR ANY OTHER NOTICES OR ANY OTHER ACTION. BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO THE BENEFITS OF ANY MORATORIUM, REINSTATEMENT, MARSHALING,

FORBEARANCE, VALUATION, STAY, EXTENSION, REDEMPTION, APPRAISEMENT, EXEMPTION AND HOMESTEAD NOW OR HEREAFTER PROVIDED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA AND OF EACH STATE THEREOF, BOTH AS TO ITSELF AND IN AND TO ALL OF ITS PROPERTY, REAL AND PERSONAL, AGAINST THE ENFORCEMENT AND COLLECTION OF THE OBLIGATIONS EVIDENCED BY THIS NOTE OR BY THE OTHER LOAN DOCUMENTS.

4.3    *Interest Provisions*.

(a)    *Savings Clause*. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note then owing by Borrower to Lender. All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender

to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

4.4    *Use of Funds*.  Borrower hereby warrants, represents and covenants that (i) the loan evidenced by this Note is made to Borrower solely for the purpose of acquiring real property for commercial purposes or carrying on a business or commercial enterprise, (ii) all proceeds of this Note shall be used only for business and commercial purposes, and (iii) no funds disbursed hereunder shall be used for personal, family, agricultural or household purposes.

4.5    *Further Assurances and Corrections*.  From time to time, at the request of Lender, Borrower will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Note or in any other Loan Document or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver, record and/or file (or cause to be executed, acknowledged, delivered, recorded and/or filed) such further documents and instruments (including, without limitation, further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents) and perform such further acts and provide such further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Note and the Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Note and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Note and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

4.6    *Waiver of Jury Trial*. BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

4.7    *Governing Law; Submission to Jurisdiction*.  This Note is executed and delivered as an incident to a lending transaction negotiated and consummated in **Dallas County, Texas**, and shall be governed by and construed in accordance with the laws of the **State of Texas**.  Borrower, for itself and its successors and assigns, hereby irrevocably (i) submits to the nonexclusive jurisdiction of the state and federal courts in **Texas**, (ii) waives, to the fullest extent permitted by law, any objection that it may now or in the future have to the laying of venue of any litigation arising out of or in connection with this Note or any Loan Document brought in the appropriate state or federal court located in **Dallas County, Texas**, (iii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum, and (iv) agrees that any legal proceeding against any party to any of the Loan Documents arising out of or in connection with any of the Loan Documents may be

Promissory Note
Transcontinental Realty Investors, Inc.                6

App. 806

brought in one of the foregoing courts. Borrower hereby agrees that service of process upon Borrower may be made by certified or registered mail, return receipt requested, at its address specified herein. Nothing herein shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrower or with respect to any of Borrower's property in courts in other jurisdictions. The scope of each of the foregoing waivers is intended to be all encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Borrower acknowledges that these waivers are a material inducement to Lender's agreement to enter into the agreements and obligations evidenced by the Loan Documents that Lender has already relied on these waivers and will continue to rely on each of these waivers in related future dealings. The waivers in this Section are irrevocable, meaning that they may not be modified either orally or in writing, and these waivers apply to any future renewals, extensions, amendments, modifications, or replacements in respect of any and all of the applicable Loan Documents. In connection with any litigation, this Note may be filed as a written consent to a trial by the court.

4.8     *Counting of Days*. If any time period referenced hereunder ends on a day other than a Business Day, such time period shall be deemed to end on the next succeeding Business Day.

4.9     *Relationship of the Parties*. Notwithstanding any prior business or personal relationship between Borrower and Lender, or any officer, director or employee of Lender, that may exist or have existed, the relationship between Borrower and Lender is solely that of debtor and creditor, Lender has no fiduciary or other special relationship with Borrower, Borrower and Lender are not partners or joint venturers, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

4.10    *Successors and Assigns*. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them. The terms "Borrower" and "Lender" as used hereunder shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them.

4.11    *Joint and Several Liability*. If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.

4.12    *Time is of the Essence*. Time is of the essence with respect to all provisions of this Note and the other Loan Documents.

4.13    *Headings*. The Article, Section, and Subsection entitlements hereof are inserted for convenience of reference only and shall in no way alter, modify, define, limit, amplify or be used

Promissory Note
Transcontinental Realty Investors, Inc.                    7

App. 807

in construing the text, scope or intent of such Articles, Sections, or Subsections or any provisions hereof.

4.14    *Controlling Agreement*. In the event of any conflict between the provisions of this Note and any of the other Loan Documents, it is the intent of the parties hereto that the provisions of this Note shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note and the other Loan Documents and that this Note and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

4.15    *Notices*. Unless otherwise expressly provided herein, all notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the intended addressee, (iii) by delivery to a reputable independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee, or (iv) by prepaid telegram, telex, telecopier or telefacsimile transmission to the addressee, so long as the same is immediately followed by delivery pursuant to one of the methods under (i) through (iii) above. Notice so mailed shall be effective two (2) days after its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective one (1) day after delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the office or designated place or machine of the intended addressee. For purposes of notice, the addresses of the parties shall be as set forth below; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' prior notice to the other party in the manner set forth herein. Electronic mail and internet websites may be used only to distribute only routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

|  |  |
|---|---|
| If to Borrower: | JMJ Development, LLC<br>1755 Wittington Place, Suite 340<br>Farmers Branch, Texas  75234<br>Attention:    Timothy Barton |
| If to Lender: | Transcontinental Realty Investors, Inc.<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas  75234<br>Attention:    Mr. Randy Johnson |

4.16    *Severability*. If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

4.17    *Right of Setoff.* In addition to all liens upon and rights of setoff against the money, securities, or other property of Borrower given to Lender that may exist under applicable law, Lender shall have and Borrower hereby grants to Lender a lien upon and a right of setoff against all money, securities, and other property of Borrower, now or hereafter in possession of or on deposit with Lender, whether held in a general or special account or deposit, for safe-keeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Borrower. No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by an instrument in writing executed by Lender.

4.18    *Costs of Collection.* If any holder of this Note retains an attorney-at-law in connection with any Event of Default or at maturity or to collect, enforce, or defend this Note or any part hereof, or any other Loan Document in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to the principal balance hereof and all interest hereon, all costs and expenses of collection or incurred by such holder or in any such suit or proceeding, including, but not limited to, reasonable attorneys' fees.

4.19    *Gender.* All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.

4.20    *Statement of Unpaid Balance.* At any time and from time to time, Borrower will furnish promptly, upon the request of Lender, a written statement or affidavit, in form satisfactory to Lender, stating the unpaid balance of the indebtedness evidenced by this Note and that there are no offsets or defenses against full payment of the indebtedness evidenced by this Note and the terms hereof, or if there are any such offsets or defenses, specifying them.

4.21    *Entire Agreement.* THIS NOTE AND THE OTHER LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE HERETO AND THERETO WHICH ARE NOT CONTAINED HEREIN OR THEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE AND THE OTHER LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

4.22    *Definitions.* As used in this Promissory Note, the following terms shall have the following meanings:

Business Day: A weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in **Dallas, Texas**, are authorized or required by law to be closed. Unless otherwise provided, the term "days" when used herein shall mean calendar days.

Charges: All fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law.

Debtor Relief Laws: Title 11 of the United States Code, as now or hereafter in effect, or any other applicable law, domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

Default Interest Rate: A rate per annum equal to the lesser of eighteen percent (18%) or the Maximum Lawful Rate.

Loan Documents: This Note, the Security Instrument, any guaranty agreement, any pledge, profit participation agreement, any financing statements, and such other agreements, documents and instruments now or hereafter governing, securing or guaranteeing any portion of the indebtedness evidenced by this Note or executed by Borrower or any guarantor or indemnitor or any other person or entity in connection with the loan evidenced by this Note or in connection with the payment of the indebtedness evidenced by this Note or the performance and discharge of the obligations related hereto or thereto, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, extensions and supplements hereof or thereof.

Maximum Lawful Rate: The maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction evidenced by this Note and the other Loan Documents.

PE Accounts: All bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited.

Pledged Entities: Each of JMJAV LLC and JMJD4 LLC.

Property: The member interests in certain limited liability companies owned by TRWF LLC and by JMJAV LLC, as more particularly described in the Security Instrument, together with certain other rights, estates, interests, collateral and benefits now or at any time hereafter securing the payment of the indebtedness evidenced by this Note, whether by virtue of the Loan Documents or otherwise.

Security Instrument: The **Security Agreement** dated as of the date hereof, executed by JMJAV LLC for the benefit of JMJ Development, LLC, as beneficiary, relating to and granting a security interest in, the Property, which security interest has been assigned to Lender. The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, the Security Instrument and the other Loan Documents.

*[Signature page to follow]*

Promissory Note
Transcontinental Realty Investors, Inc.                    10

App. 810

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note as of the day and year first written above.

### BORROWER:

**JMJ DEVELOPMENT, LLC**
a Texas limited liability company

By: _____
Timothy Barton, President

# EXHIBIT I-10

**JMJ DEVELOPMENT, LLC**
1755 Wittington Place, Suite 340
Farmers Branch, Texas 75234

June 4, 2019

TRWF LLC
1755 Wittington Place, Suite 340
Farmers Branch, Texas 75234

Re:  JMJ Development, LLC ("Lender") $5,900,000.00 loan
(the "Loan") to TRWF LLC ("Borrower")

Gentlemen:

This letter loan agreement (the "Letter Loan Agreement") is executed by Lender and Borrower and will evidence and govern certain terms and provisions of the Loan. As a condition to closing of the Loan, Borrower shall deliver to Lender or perform the following:

1. Borrower shall execute and deliver to Lender a counterpart of this Letter Loan Agreement, the Promissory Note and the Assignment of Pledge and Security Agreement pledging JMJAV LLC and JMJD4 LLC.
2. Borrower shall cause the Agreement and Acknowledgment attached to the Pledge and Security Agreement to be executed by JMJAV LLC and JMJD4 LLC (the "Pledged Entities").
3. Lender shall have received a closing statement setting forth the source and uses of all funds related to the Loan.
4. Lender shall have received the following documents with respect to each of the Pledged Entities:
   a. Certificate of formation
   b. Operating agreement
   c. Organizational meeting minutes
   d. Certificate of existence from Secretary of State of formation
   e. Certificate of good standing or account status from state of formation
   f. Certificate of qualification to do business in Texas for any foreign entity, along with certificate of account status
   g. All certificates of member interest issued to Guarantor
5. Lender shall have received the following documents with respect to Borrower:
   a. Certificate of formation
   b. Operating agreement
   c. Certified copy of resolutions authorizing the borrowing
   d. Certificate of existence
   e. Certificate of good standing

App. 813

6. Borrower shall have paid all attorneys' fees and other costs incurred by Lender in connection with the Loan.

7. Borrower shall have delivered to Lender such additional documents as Lender may have reasonably requested in connection with the closing of the Loan, including, but not limited to the organizational documents of Borrower and resolutions authorizing the Loan.

8. Lender and Borrower anticipate that the Loan will not be fully funded at closing. From time to time thereafter, Lender may advance additional funds under the Promissory Note in order to provide the Borrower with funds for its ongoing operations. Any such advances shall bear interest and be repayable as set forth in the Promissory Note. Upon request, Borrower shall execute such additional documents or new notes as Lender may reasonably request in order to evidence any such additional advances.

9. "Event of Default", shall mean any event of default under the Promissory Note, Pledge and Security Agreement, Guaranty and under this Letter Loan Agreement and shall also include any event of default related to any financing (the "D4IN Loan") provided to D4IN LLC in connection with the construction and operation of its real property and which is secured by such real property. Upon the occurrence of any default under the D4IN Loan, regardless of whether any party is or may be entitled to cure such default and regardless of whether the holder of such loan has commenced the exercise of remedies, Lender shall be entitled to exercise any and all remedies available under any of the documents evidencing, securing or governing the loan or at law or in equity.

LENDER:

JMJ Development, LLC

By: _____
     Timothy Barton, President

BORROWER:

TRWF LLC

By: _____
     Timothy Barton, President

App. 814

# EXHIBIT I-11

## PROMISSORY NOTE

**$5,900,000.00**                                                        **June 4 , 2019**

FOR VALUE RECEIVED, **TRWF LLC,** a Delaware limited liability company ("Borrower"), having an address of 1755 Wittington Place, Suite 340, Farmers Branch, Texas 75234, hereby promises to pay to the order of **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns and any subsequent holders of this Promissory Note, the "Lender"), as hereinafter provided, the principal sum of **FIVE MILLION NINE HUNDRED THOUSAND AND NO/100THS DOLLARS ($5,900,000.00)** or so much thereof as may be advanced or readvanced by Lender from time to time hereunder to or for the benefit or account of Borrower, together with interest thereon at the Note Rate (as hereinafter defined), and otherwise in strict accordance with the terms and provisions hereof.

### ARTICLE ONE
### DEFINITIONS

1.1     *Defined Terms*.  Any capitalized terms used in this Promissory Note ("Note") are defined as they are introduced or in Section 4.22 hereof.  All terms used herein, whether or not defined hereof, and whether used in singular or plural form, shall be deemed to refer to the object of such term whether such is singular or plural in nature, as the context may suggest or require.

### ARTICLE II
### PAYMENT TERMS

2.1     *Payment of Principal and Interest*.  Prior to any Event of Default, as defined in Section 2.8 hereof, interest on the principal balance of this Note shall accrue at the rate of **five percent (5.0%)** per annum ("Applicable Rate").  No payments shall be due hereunder until **June 1, 2022** ("Maturity Date"), when the entire remaining unpaid principal balance of this Note and any and all accrued but unpaid interest herein shall be due and payable in full.

2.2     *Application*.  Except as expressly provided herein to the contrary, all payments on this Note shall be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon), including, without limitation, any and all fees owed to Lender, for which either Borrower shall be obligated or Lender shall be entitled pursuant to the provisions of this Note or the other Loan Documents, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the direct order of maturity. If an Event of Default exists under this Note or under any of the other Loan Documents, then Lender may, at the sole option of Lender, apply any such payments, at any time and from time to time, to any of the items specified in clauses (i), (ii) or (iii) above without regard to the order of priority otherwise specified in this Section and any application to the outstanding principal balance hereof may be made in either direct or inverse order of maturity.

2.3     *Payments*.  All payments under this Note made to Lender shall be made on the first (1st) day of each month, without offset, in lawful money of the United States of America, which

shall at the time of payment be legal tender in payment of all debts and dues, public and private. Payments by check or draft shall not constitute payment in immediately available funds until the required amount is actually received by Lender in full. Payments in immediately available funds received by Lender in the place designated for payment on a Business Day prior to 12:00 noon Central time at said place of payment shall be credited prior to the close of business on the Business Day received, while payments received by Lender on a day other than a Business Day or after 12:00 noon Central time on a Business Day shall not be credited until the next succeeding Business Day.  If any payment of principal or interest on this Note shall become due and payable on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.  Any such extension of time for payment shall be included in computing interest which has accrued and shall be payable in connection with such payment.

2.4     *Computation Period*.  Interest on the indebtedness evidenced by this Note shall be computed on the basis of a three hundred sixty (360) day year and shall accrue at the Applicable Rate on the actual number of days elapsed for any whole month in which interest is being calculated, but on the actual number of days for any partial month in which interest is being calculated.  In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to the close of business on the Business Day received.

2.5     *Prepayment*.  This Note may not be prepaid in part or in full.

2.6     *Unconditional Payment*.  Borrower is and shall be obligated to pay all principal, interest and any and all other amounts which become payable under this Note or under any of the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction whatsoever and without any reduction for counterclaim or setoff whatsoever.  If at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any Debtor Relief Law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

2.7     *Partial or Incomplete Payments*.  Remittances in payment of any part of this Note other than in the required amount in immediately available funds at the place where this Note is payable shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in full in accordance herewith and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.  Acceptance by Lender of any payment in an amount less than the full amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default in the payment of this Note.

App. 817

2.8    *Interest on Unpaid Interest, Late Payment Charges; Default Interest Rate, Etc*. In the event any payment of interest is not paid on the date when due, interest shall accrue thereon as set forth herein on a compounded basis until paid in full. Further, in the event any Monthly Payment is not paid within **ten (10) days** of the date when due, Borrower shall pay a late payment charge in an amount equal to **five percent** (5%) of the late payment in order to offset Lender's increased administrative costs resulting from such late payment. For so long as any Event of Default exists under this Note or under any of the other Loan Documents, and in addition to all other rights and remedies of Lender hereunder, interest shall accrue on the outstanding principal balance hereof at the Default Interest Rate, and such accrued interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or Event of Default, and such late charges and accrued interest are reasonable estimates of those damages and do not constitute a penalty. Borrower shall also pay an additional $35.00 fee for any check which is not honored.

## ARTICLE III
## EVENT OF DEFAULT AND REMEDIES

3.1    *Event of Default*. The occurrence or happening, at any time and from time to time, of any one or more of the following shall immediately constitute an "Event of Default" under this Note:

(a)    Prior to the Maturity Date, by acceleration or otherwise, Borrower shall fail, refuse or neglect to pay and satisfy, in full and in the applicable method and manner required, any required payment of principal or interest or any other portion of the indebtedness evidenced by this Note as and when the same shall become due and payable or within five (5) days of such date, whether at the stipulated due date thereof, at a date fixed for payment, or ***immediately*** on the Maturity Date, by acceleration or otherwise Borrower shall fail, refuse or neglect to pay and satisfy in full and in the applicable method and manner required, the indebtedness evidenced by this Note; or

(b)    The occurrence of any other default, breach or event of default as defined in or under this Note or any other Loan Document that remains uncured under and pursuant to the provisions of this Note or any other Loan Document.

3.2    *Remedies*. Upon the occurrence of an Event of Default, Lender shall have the immediate right, at the sole discretion of Lender and without notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action (**ALL OF WHICH BORROWER HEREBY EXPRESSLY WAIVES AND RELINQUISHES**) (i) to declare the entire unpaid balance of the indebtedness evidenced by this Note (including, without limitation, the outstanding principal balance hereof, including all sums advanced or accrued hereunder or under any other Loan Document, and all accrued but unpaid interest thereon) at once immediately due and payable (and upon such declaration, the same shall be at once immediately due and payable) and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity, (ii) to foreclose any liens and security interests securing payment hereof or thereof (including, without limitation, any liens and security interests covering any portion of the mortgaged Property), and (iii) to exercise any of Lender's other rights, powers,

recourses and remedies under this Note, under any other Loan Document, or at law or in equity, and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, singly, successively, or concurrently against Borrower or others obligated for the repayment of this Note or any part hereof, or against any one or more of them, or against the mortgaged Property, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, it being agreed by Borrower that the exercise, discontinuance of the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse, and (d) are intended to be, and shall be, nonexclusive. All rights and remedies of Lender hereunder and under the other Loan Documents shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the mortgaged Property or any portion thereof. Without limiting the provisions of Section 4.18 hereof, if this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs and expenses of collection, including, but not limited to, Lender's attorneys' fees, whether or not any legal action shall be instituted to enforce this Note and whether or not such attorneys' fees shall be related to any bankruptcy proceeding of Borrower.

## ARTICLE IV
## GENERAL PROVISIONS

4.1     *No Waiver; Amendment*. No failure to accelerate the indebtedness evidenced by this Note by reason of an Event of Default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced by this Note or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted under this Note, under any of the other Loan Documents or by any applicable laws. Borrower hereby expressly waives and relinquishes the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. The failure to exercise any remedy available to Lender shall not be deemed to be a waiver of any rights or remedies of Lender under this Note or under any of the other Loan Documents, or at law or in equity. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender specifically, unequivocally and expressly agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, or modification is sought.

4.2     *Waivers*. EXCEPT AS SPECIFICALLY PROVIDED IN THE LOAN DOCUMENTS TO THE CONTRARY, BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION OR ANY OTHER NOTICES OR ANY OTHER ACTION. BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO THE BENEFITS OF ANY MORATORIUM, REINSTATEMENT, MARSHALING,

Promissory Note
JMJ Development, LLC--TRWF LLC                    4

FORBEARANCE, VALUATION, STAY, EXTENSION, REDEMPTION, APPRAISEMENT, EXEMPTION AND HOMESTEAD NOW OR HEREAFTER PROVIDED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA AND OF EACH STATE THEREOF, BOTH AS TO ITSELF AND IN AND TO ALL OF ITS PROPERTY, REAL AND PERSONAL, AGAINST THE ENFORCEMENT AND COLLECTION OF THE OBLIGATIONS EVIDENCED BY THIS NOTE OR BY THE OTHER LOAN DOCUMENTS.

4.3    *Interest Provisions.*

(a)    *Savings Clause.* It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note then owing by Borrower to Lender. All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender

to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

4.4    *Use of Funds*. Borrower hereby warrants, represents and covenants that (i) the loan evidenced by this Note is made to Borrower solely for the purpose of acquiring real property for commercial purposes or carrying on a business or commercial enterprise, (ii) all proceeds of this Note shall be used only for business and commercial purposes, and (iii) no funds disbursed hereunder shall be used for personal, family, agricultural or household purposes.

4.5    *Further Assurances and Corrections*. From time to time, at the request of Lender, Borrower will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Note or in any other Loan Document or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver, record and/or file (or cause to be executed, acknowledged, delivered, recorded and/or filed) such further documents and instruments (including, without limitation, further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents) and perform such further acts and provide such further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Note and the Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Note and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Note and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

4.6    *Waiver of Jury Trial*. BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

4.7    *Governing Law; Submission to Jurisdiction*. This Note is executed and delivered as an incident to a lending transaction negotiated and consummated in **Dallas County, Texas**, and shall be governed by and construed in accordance with the laws of the **State of Texas**. Borrower, for itself and its successors and assigns, hereby irrevocably (i) submits to the nonexclusive jurisdiction of the state and federal courts in **Texas**, (ii) waives, to the fullest extent permitted by law, any objection that it may now or in the future have to the laying of venue of any litigation arising out of or in connection with this Note or any Loan Document brought in the appropriate state or federal court located in **Dallas County, Texas**, (iii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum, and (iv) agrees that any legal proceeding against any party to any of the Loan Documents arising out of or in connection with any of the Loan Documents may be

App. 821

brought in one of the foregoing courts. Borrower hereby agrees that service of process upon Borrower may be made by certified or registered mail, return receipt requested, at its address specified herein. Nothing herein shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrower or with respect to any of Borrower's property in courts in other jurisdictions. The scope of each of the foregoing waivers is intended to be all encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Borrower acknowledges that these waivers are a material inducement to Lender's agreement to enter into the agreements and obligations evidenced by the Loan Documents that Lender has already relied on these waivers and will continue to rely on each of these waivers in related future dealings. The waivers in this Section are irrevocable, meaning that they may not be modified either orally or in writing, and these waivers apply to any future renewals, extensions, amendments, modifications, or replacements in respect of any and all of the applicable Loan Documents. In connection with any litigation, this Note may be filed as a written consent to a trial by the court.

4.8    *Counting of Days*. If any time period referenced hereunder ends on a day other than a Business Day, such time period shall be deemed to end on the next succeeding Business Day.

4.9    *Relationship of the Parties*. Notwithstanding any prior business or personal relationship between Borrower and Lender, or any officer, director or employee of Lender, that may exist or have existed, the relationship between Borrower and Lender is solely that of debtor and creditor, Lender has no fiduciary or other special relationship with Borrower, Borrower and Lender are not partners or joint venturers, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

4.10    *Successors and Assigns*. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them. The terms "Borrower" and "Lender" as used hereunder shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them.

4.11    *Joint and Several Liability*. If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.

4.12    *Time is of the Essence*. Time is of the essence with respect to all provisions of this Note and the other Loan Documents.

4.13    *Headings*. The Article, Section, and Subsection entitlements hereof are inserted for convenience of reference only and shall in no way alter, modify, define, limit, amplify or be used

Promissory Note
JMJ Development, LLC--TRWF LLC                    7

App. 822

in construing the text, scope or intent of such Articles, Sections, or Subsections or any provisions hereof.

4.14    *Controlling Agreement*. In the event of any conflict between the provisions of this Note and any of the other Loan Documents, it is the intent of the parties hereto that the provisions of this Note shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note and the other Loan Documents and that this Note and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

4.15    *Notices*. Unless otherwise expressly provided herein, all notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the intended addressee, (iii) by delivery to a reputable independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee, or (iv) by prepaid telegram, telex, telecopier or telefacsimile transmission to the addressee, so long as the same is immediately followed by delivery pursuant to one of the methods under (i) through (iii) above. Notice so mailed shall be effective two (2) days after its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective one (1) day after delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the office or designated place or machine of the intended addressee. For purposes of notice, the addresses of the parties shall be as set forth below; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' prior notice to the other party in the manner set forth herein. Electronic mail and internet websites may be used only to distribute only routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

|  |  |
|---|---|
| If to Borrower: | TRWF LLC<br>1755 Wittington Place, Suite 340<br>Dallas, Texas 75234<br>Attention:    Timothy Barton |
| If to Lender: | JMJ Development, LLC<br>1755 Wittington Place, Suite 340<br>Dallas, Texas 75234<br>Attention:    Mr. Timothy Barton |

4.16    *Severability*. If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

Promissory Note
JMJ Development, LLC--TRWF LLC                                8

4.17    *Right of Setoff.* In addition to all liens upon and rights of setoff against the money, securities, or other property of Borrower given to Lender that may exist under applicable law, Lender shall have and Borrower hereby grants to Lender a lien upon and a right of setoff against all money, securities, and other property of Borrower, now or hereafter in possession of or on deposit with Lender, whether held in a general or special account or deposit, for safe-keeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Borrower.  No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by an instrument in writing executed by Lender.

4.18    *Costs of Collection.*  If any holder of this Note retains an attorney-at-law in connection with any Event of Default or at maturity or to collect, enforce, or defend this Note or any part hereof, or any other Loan Document in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to the principal balance hereof and all interest hereon, all costs and expenses of collection or incurred by such holder or in any such suit or proceeding, including, but not limited to, reasonable attorneys' fees.

4.19    *Gender.*  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.

4.20    *Statement of Unpaid Balance.*  At any time and from time to time, Borrower will furnish promptly, upon the request of Lender, a written statement or affidavit, in form satisfactory to Lender, stating the unpaid balance of the indebtedness evidenced by this Note and that there are no offsets or defenses against full payment of the indebtedness evidenced by this Note and the terms hereof, or if there are any such offsets or defenses, specifying them.

4.21    *Entire Agreement.*  THIS NOTE AND THE OTHER LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE HERETO AND THERETO WHICH ARE NOT CONTAINED HEREIN OR THEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE AND THE OTHER LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

4.22    *Definitions.*  As used in this Promissory Note, the following terms shall have the following meanings:

Business Day:  A weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in **Dallas, Texas**, are authorized or required by law to be closed. Unless otherwise provided, the term "days" when used herein shall mean calendar days.

**Charges:** All fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law.

**Debtor Relief Laws:** Title 11 of the United States Code, as now or hereafter in effect, or any other applicable law, domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

**Default Interest Rate:** A rate per annum equal to the lesser of eighteen percent (18%) or the Maximum Lawful Rate.

**Loan Documents:** This Note, the Security Instrument, any guaranty agreement, any pledge, profit participation agreement, any financing statements, and such other agreements, documents and instruments now or hereafter governing, securing or guaranteeing any portion of the indebtedness evidenced by this Note or executed by Borrower or any guarantor or indemnitor or any other person or entity in connection with the loan evidenced by this Note or in connection with the payment of the indebtedness evidenced by this Note or the performance and discharge of the obligations related hereto or thereto, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, extensions and supplements hereof or thereof.

**Maximum Lawful Rate:** The maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction evidenced by this Note and the other Loan Documents.

**PE Accounts:** All bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited.

**Pledged Entities:** Each of JMJAV LLC and JMJD4 LLC.

**Property:** The member interests in certain limited liability companies owned by TRWF LLC and by JMJAV LLC, as more particularly described in the Security Instrument, together with certain other rights, estates, interests, collateral and benefits now or at any time hereafter securing the payment of the indebtedness evidenced by this Note, whether by virtue of the Loan Documents or otherwise.

**Security Instrument:** The **Security Agreement** dated as of the date hereof, executed by Borrower for the benefit of Lender, as beneficiary, relating to the Property. The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, the Security Instrument and the other Loan Documents.

*[Signature page to follow]*

App. 825

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note as of the day and year first written above.

**<u>BORROWER:</u>**

**TRWF LLC**
a Delaware limited liability company

By: _____
Timothy Barton, President

Promissory Note
JMJ Development, LLC--TRWF LLC                    11

App. 826

# EXHIBIT I-12

## PLEDGE AND SECURITY AGREEMENT

This **PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of June 4, 2019, is from **TRWF LLC**, a Delaware limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns, "**Lender**").

R E C I T A L S:

A.    Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower") and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $5,900,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.    To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below).

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1    Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

Security Agreement
JMJ Development, LLC-TRWF LLC
Page 1

App. 828

(c)     the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)     all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)     Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)     to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)     all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)     all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

(i)     all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any

Security Agreement
JMJ Development, LLC-TRWF LLC                    2

interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)      (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions. As used herein, the following terms shall have the following respective meanings:

(a)      "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)      "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)      "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest. On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by

Security Agreement
JMJ Development, LLC-TRWF LLC                    3

appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law. It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender. All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents. Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct. Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral. Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights. Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application

thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers.  Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

## ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership.  Pledgor owns 100% of the member interests in JMJAV LLC.  Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral.  Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement.  Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained.  Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title.  Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer.  Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement.  Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest.  Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Section 3.6    No Financing Statements.  Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    <u>Certificated Securities</u>.  Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender.  Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities.  Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under <u>Section 1.3</u>.  Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS.  THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE.  PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7.  PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED

PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable.  All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person.  Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto.  There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements.  Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity.  The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto.  Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents.  The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Section 3.10    Authority, Enforceability, Etc.  The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii)

judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject. No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained. This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity. The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor. No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    Transfer Rights. Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights. Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable

Security Agreement
JMJ Development, LLC-TRWF LLC                    8

Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

Security Agreement
JMJ Development, LLC-TRWF LLC              9

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked.  The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights.  Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender:  (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution.  Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights.  Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents.  All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)    Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement.  The acceptance by Lender of this Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative. The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion. Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies. Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

## ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral. In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only. If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral. It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times. Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures. No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable. All other demands, advertisements and notices are hereby irrevocably waived by Pledgor. The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Security Agreement
JMJ Development, LLC-TRWF LLC                11

App. 838

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "**SEC**") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "**Securities Act**"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Security Agreement
JMJ Development, LLC-TRWF LLC                    12

App. 839

Section 5.7    Application of Collateral. All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences. Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations. To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration. If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements. Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance. Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale. If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such

Security Agreement
JMJ Development, LLC-TRWF LLC                13

Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof. Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances. Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder. Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc. No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender. Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any

Security Agreement
JMJ Development, LLC-TRWF LLC                    14

invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices.  All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

**TRWF LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH

Security Agreement
JMJ Development, LLC-TRWF LLC                15

SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14  Termination.  Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15  Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00. As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4IN LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to  exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee  which will document the transfer of control of D4IN LLC.  Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

Section 7.16  Liability of Pledgor.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for

Security Agreement
JMJ Development, LLC-TRWF LLC                    18

App. 845

any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4IN Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4IN Loan;

material physical waste of the Collateral or the D4IN Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4IN Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4IN Property, (B) any awards received in connection with a condemnation of all or a portion of the D4IN Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4IN Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4IN Property which are not delivered to Lender upon a foreclosure of the D4IN Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4DS Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

Security Agreement
JMJ Development, LLC-TRWF LLC                    19

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2) the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4IN Loan" shall mean any loan made to D4IN LLC, and secured by any real property owned by D4IN LLC.

"D4IN Property" means the real property and improvements owned by D4IN LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17   Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4DS Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

Security Agreement
JMJ Development, LLC-TRWF LLC                    20

App. 847

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR**:

TRWF LLC
a Delaware limited liability company

By: _____
Timothy Barton

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---------|----------------|-----------------|
| TRWF LLC | JMJAV LLC | 100% of the member interests in JMJAV LLC |

## Exhibit A

## AGREEMENT AND ACKNOWLEDGMENT

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by TRWF LLC, a Delaware limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.     <u>Representations and Warranties</u>. The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.     <u>Covenants and Agreements</u>.

(a)     <u>Books and Records</u>. The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4IN LLC, containing such detail and information as Lender may request.

(b)     <u>UCC Matters</u>. The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-TRWF LLC                    1

App. 850

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)    Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)    Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)    Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)    Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

Security Agreement
JMJ Development, LLC-TRWF LLC                    2

App. 851

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)      The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.      Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.      No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-TRWF LLC                  3

App. 852

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.      Transfers.  The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender.  In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender.  The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.      Further Assurances.  The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.      Reliance.  This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.      Counterparts.   This Agreement and Acknowledgment may be executed in counterparts.

9.      Miscellaneous.  The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

Security Agreement
JMJ Development, LLC-TRWF LLC                    4

App. 853

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of June __, 2019.

**Pledged Entity:**

**JMJAV LLC**

By: _____
Timothy Barton, President

Security Agreement
JMJ Development, LLC-TRWF LLC                    5

App. 854

## Exhibit B

Organizational Agreements

# EXHIBIT I-13

## PLEDGE AND SECURITY AGREEMENT

This **PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of June _4_, 2019, is from **JMJAV LLC,** a Texas limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns, "**Lender**").

RECITALS:

A.    Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $5,900,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.    To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below).

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1    Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

App. 857

(c)    the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)    all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)    Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)    to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)    all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)    all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

(i)    all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any

Security Agreement
JMJ Development, LLC-JMJAV LLC                    2

interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)    (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions. As used herein, the following terms shall have the following respective meanings:

(a)    "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)    "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)    "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest. On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by

Security Agreement
JMJ Development, LLC-JMJAV LLC                3

App. 859

appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law. It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender. All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents. Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct. Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral. Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights. Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application

Security Agreement
JMJ Development, LLC-JMJAV LLC                4

App. 860

thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers.  Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

## ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership.  Pledgor owns 100% of the member interests in JMJD4 LLC.  Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral.  Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained.  Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title.  Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer.  Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement.  Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest.  Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Section 3.6    No Financing Statements.  Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7 <u>Certificated Securities</u>.  Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender.  Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities.  Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under <u>Section 1.3</u>.  Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS.  THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE.  PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7.  PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED

PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Section 3.10    Authority, Enforceability, Etc. The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity. The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii)

judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1     Transfer Rights.  Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)     Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)     Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)     Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2     Voting Rights.  Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment.  Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable

Security Agreement
JMJ Development, LLC-JMJAV LLC                    8

Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender.  Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights. Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)    Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

App. 866

Section 4.8    <u>Remedies Cumulative</u>.  The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.  Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    <u>Notice of Exercise of Remedies</u>.  Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    <u>Right to Conduct Partial Sale of Collateral</u>.  In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only.  If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral.  It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; <u>provided, however</u>, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times.  Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    <u>Sale Procedures</u>.  No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable.  All other demands, advertisements and notices are hereby irrevocably waived by Pledgor.  The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "**SEC**") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "**Securities Act**"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Security Agreement
JMJ Development, LLC-JMJAV LLC                    12

App. 868

Section 5.7    Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.  If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such

Security Agreement
JMJ Development, LLC-JMJAV LLC                    13

Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof. Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances. Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder. Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc. No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender. Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any

Security Agreement
JMJ Development, LLC-JMJAV LLC                14

App. 870

invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3   Notices.  All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4   Governing Law; Submission to Jurisdiction.

(a)   THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

**JMJAV LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH

SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Security Agreement
JMJ Development, LLC-JMJAV LLC                16

App. 872

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14    Termination.  Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15    Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00. As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4DS LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to  exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee  which will document the transfer of control of D4DS LLC.  Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

Section 7.16    Liability of Pledgor.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents.  The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for

Security Agreement
JMJ Development, LLC-JMJAV LLC                    18

App. 874

any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4IN Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4IN Loan;

material physical waste of the Collateral or the D4IN Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4DINProperty after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4IN Property, (B) any awards received in connection with a condemnation of all or a portion of the D4IN Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4IN Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4IN Property which are not delivered to Lender upon a foreclosure of the D4IN Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4IN Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2) the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4IN Loan" shall mean any loan made to D4IN LLC, and secured by any real property owned by D4IN LLC.

"D4IN Property" means the real property and improvements owned by D4IN LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17    Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4DS Property to Lender for Lender's prior written approval (the "Approved Budget").  Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR**:

JMJAV LLC
a Texas limited liability company

By: _____
Timothy Barton

Security Agreement
JMJ Development, LLC-JMJAV LLC                21

App. 877

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---------|----------------|-----------------|
| JMJAV LLC | JMJD4 LLC | 100% of the member interests in JMJD4 LLC |

## Exhibit A

### AGREEMENT AND ACKNOWLEDGMENT

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by JMJAV LLC, a Texas limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.     Representations and Warranties. The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.     Covenants and Agreements.

    (a)     Books and Records. The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4IN LLC, containing such detail and information as Lender may request.

    (b)     UCC Matters. The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-JMJAV LLC         1

App. 879

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)     Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)     Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)     Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)     Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)    The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.    Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.    No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-JMJAV LLC                3

App. 881

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.    Transfers.  The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender.  In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender.  The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.    Further Assurances.  The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.    Reliance.  This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.    Counterparts.  This Agreement and Acknowledgment may be executed in counterparts.

9.    Miscellaneous.  The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of June___, 2019.

**Pledged Entity:**

**JMJD4 LLC**

By: _____

Timothy Barton, President

## **Exhibit B**

Organizational Agreements

# EXHIBIT I-14

## ASSIGNMENT OF PLEDGE AND SECURITY AGREEMENT

THAT JMJ DEVELOPMENT, LLC, a Texas limited liability company,   ("Assignor"), for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, hereby transfers, assigns and sets over unto TCI, ("Assignee"), all of the right, title and interest of the Assignor in and to the security interests granted pursuant to the following:

(a) Pledge and Security Agreement dated June _4_, 2019, executed by JMJAV LLC to JMJ Development, LLC, granting a security interest in one hundred percent (100%) of the member interests in JMJD4 LLC; and

(b) Pledge and Security Agreement dated June _4_ , 2019, executed by TRWF LLC to JMJ Development, LLC, granting a security interest in one hundred percent (100%) of the member interests in JMJAV LLC.

The above and foregoing Pledge and Security Agreements and the security interests and pledges granted therein are collectively referred to as the "Pledges."

TO HAVE AND TO HOLD the Pledges and above described security deposits and prepaid rents, together with any and all the rights and appurtenances thereto in anywise belonging to Assignor, unto Assignee, its successors, legal representatives and assigns FOREVER and Assignor does hereby bind itself and its legal representatives and successors to WARRANT AND FOREVER DEFEND all and singular the Pledges unto Assignee, its successors, legal representatives and assigns, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof.

This is an absolute and present assignment of the Pledges by Assignor to Assignee. In the event that there is any default under that certain Promissory Note from Assignor to Assignee, then Assignee shall be entitled to all rights as secured party under the Pledges.

Assignor hereby agrees to indemnify and hold harmless Assignee from and against any and all losses incurred by Assignee as a result of claims brought against Assignee, as Assignor's successor in interest in the Pledges hereby assigned, relating to causes of action arising from any actions or omissions of the landlord under the Pledges occurring prior to the date hereof.

EXECUTED this _4_ day of June, 2019

JMJ DEVELOPMENT, LLC
a Texas limited liability company

By: _____
Timothy Barton, President

Assignment of Pledge and Security Agreement     1
JMJ Development to TCI

# EXHIBIT I-15

## PROMISSORY NOTE

**$6,634,490.00**                                                      June  13 , 2019

FOR VALUE RECEIVED, **JMJAV LLC,** a Texas limited liability company ("Borrower"), having an address of 13901 Midway Road, Suite 102, Dallas, Texas 75244; hereby promises to pay to the order of **SOUTHERN PROPERTIES CAPITAL LTD,** a British Virgin Islands corporation (together with its successors and assigns and any subsequent holders of this Promissory Note, the "Lender"), as hereinafter provided, the principal sum of **SIX MILLION SIX HUNDRED THIRTY-FOUR THOUSAND FOUR HUNDRED NINTY AND NO/100s DOLLARS ($6,634,490.00)** or so much thereof as may be advanced or re-advanced by Lender from time to time hereunder to or for the benefit or account of Borrower, together with interest thereon at the Note Rate (as hereinafter defined), and otherwise in strict accordance with the terms and provisions hereof.

## ARTICLE ONE
## DEFINITIONS

1.1 *Defined Terms.* Any capitalized terms used in this Promissory Note ("Note") are defined as they are introduced or in Section 4.22 hereof. All terms used here in, whether or not defined hereof, and whether used in singular or plural form, shall be deemed to refer to the object of such term whether such is singular or plural in nature, as the context may suggest or require.

## ARTICLE II
## PAYMENT TERMS

2.1    *Maturity Date:* This date shall be defined as the earlier of (i) the first day of the month following 30 months after the construction loan is closed for property ("**Real Estate**") in Ingleside, Texas owned or will be owned by D4IN LLC, a Texas limited liability company, and, (ii) seven (7) years from the date hereof.

2.2    *Payment of Principal and Interest.* Prior to any Event of Default, as defined in Section 2.8 hereof, interest on the principal balance of this Note shall accrue at the rate of **five percent (5.0%)** per annum ("Applicable Rate"). No payments shall be due hereunder until the Maturity Date, when the entire remaining unpaid principal balance of this Note and any and all accrued but unpaid interest herein shall be due and payable in full.

2.3    *Application.* Except as expressly provided herein to the contrary, all payments on this Note shall be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon), including , without limitation , any and all fees owed to Lender, for which either Borrower shall be obligated or Lender shall be entitled pursuant to the provisions of this Note or the other Loan Documents, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of all or any portion of the principal balance hereof then outstanding hereunder. If an Event of Default exists under this Note or under any of the other Loan Documents, then Lender may, at the sole option of Lender, apply any such payments, at any time and from time to time, to any of the items specified in clause s (i), (ii) or (iii) above without regard to the order of priority otherwise specified in this Section.

App. 888

2.4    *Payments.* All payments under this Note made to Lender shall be made, without offset, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private. Payments by check or draft shall not constitute payment in immediately available funds until the required amount is actually received by Lender in full. Payments in immediately available funds received by Lender in the place designated for payment on a Business Day prior to 12:00 noon Central time at said place of payment shall be credited prior to the close of business on the Business Day received, while payments received by Lender on a day other than a Business Day or after 12:00 noon Central time on a Business Day shall not be credited until the next succeeding Business Day. If any payment of principal or interest on this Note shall become due and payable on a day other than a Business Day, such payment shall be made on the next succeeding Business Day. Any such extension of time for payment shall be included in computing interest which has accrued and shall be payable in connection with such payment.

2.5    *Computation Period.* Interest on the indebtedness evidenced by this Note shall be computed on the basis of a three hundred sixty (360) day year and shall accrue at the Applicable Rate on the actual number of days elapsed for any whole or partial month in which interest is being calculated. In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to the close of business on the Business Day received.

2.6    *Prepayment.* This Note may be prepaid in part or in full without penalty.

2.7    *Unconditional Payment.* Borrower is and shall be obligated to pay all principal, interest and any and all other amounts which become payable under this Note or under any of the other Loan Documents absolutely and unconditionally and without any abatement, postponement , diminution or deduction whatsoever and without any reduction for counterclaim or setoff whatsoever. If at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any Debtor Relief Law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

2.8    *Partial or Incomplete Payments.* Remittances in payment of any part of this Note other than in the required amount in immediately available funds at the place where this Note is payable shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in full in accordance herewith and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the full amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default in the payment of this Note.

Promissory Note – Parc at Ingleside

App. 889

2.9    *Interest on Unpaid Interest, Late Payment Charges; Default Interest Rate, Etc.* In the event any payment of interest is not paid on the date when due, interest shall accrue thereon as set forth herein until paid in full. For so long as any Event of Default exists under this Note or under any of the other Loan Documents, and in addition to all other rights and remedies of Lender hereunder, interest shall accrue on the outstanding principal balance hereof at the Default Interest Rate, and such accrued interest shall be immediately due and payable.

## ARTICLE III
## EVENT OF DEFAULT AND REMEDIES

3.1 *Event of Default.* The occurrence or happening, at any time and from time to time, of any one or more of the following shall immediately constitute an " Event of Default" under this Note:

(a)    Borrower shall fail, refuse or neglect to pay and satisfy, in full and in the applicable method and manner required, any required payment of principal or interest or any other portion of the indebtedness evidenced by this Note as and when the same shall become due and payable, on the Maturity Date, by acceleration or otherwise Borrower shall fail, refuse or neglect to pay and satisfy in full and in the applicable method and manner required , the indebtedness evidenced by this Note; or

(b)    The occurrence of any other default, breach or event of default as defined in or under this Note or any other Loan Document that remains uncured under and pursuant to the provisions of this Note or any other Loan Document.

3.2 *Remedies.* Upon the occurrence of an Event of Default, provided Lender shall have given Borrower notice of such default, and provided Borrower has not cured such default within five (5) days therefore, Lender shall have the immediate right, at the sole discretion of Lender and without additional notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action **(ALL OF WHICH BORROWER HEREBY EXPRESSLY WAIVES AND RELINQUISHES)** (i) to declare the entire unpaid balance of the indebtedness evidenced by this Note (including, without limitation, the outstanding principal balance hereof , including all sums advanced or accrued hereunder or under any other Loan Document , and all accrued but unpaid interest thereon) at once immediately due and payable (and upon such declaration, the same shall be at once immediately due and payable) and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity , (ii) to foreclose any liens and security interests securing payment hereof or thereof (including, without limitation, any liens and security interests covering any portion of the Property), and (iii) to exercise any of Lender ' s other rights, powers, recourses and remedies under this Note, under any other Loan Document, or at law or in equity, and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, singly, successively , or concurrently against Borrower or others obligated for the repayment of this Note or any part hereof, or against any one or more of them, or against the Property, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, it being agreed by Borrower that the exercise, discontinuance of the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse, and (d) are intended to be, and shall be, nonexclusive. All rights and remedies of Lender hereunder and under the other Loan Documents shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the Property or

Promissory Note -- Parc at Ingleside

3

App. 890

any portion thereof. Without limiting the provisions of Section 4.18 hereof, if this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs and expenses of collection, including, but not limited to, Lender's attorneys' fees, whether or not any legal action shall be instituted to enforce this Note and whether or not such attorneys' fees shall be related to any bankruptcy proceeding of Borrower.

## ARTICLE IV
## GENERAL PROVISIONS

4.1     *No Waiver: Amendment.* No failure to accelerate the indebtedness evidenced by this Note by reason of an Event of Default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced by *this* Note or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted under this Note, under any of the other Loan Documents or by any applicable laws. Borrower hereby expressly waives and relinquishes the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. The failure to exercise any remedy available to Lender shall not be deemed to be a waiver of any rights or remedies of Lender under this Note or under any of the other Loan Documents, or at law or in equity. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender specifically, unequivocally and expressly agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, or modification is sought.

4.2     *Waivers.* EXCEPT AS SPECIFICALLY PROVIDED IN THE LOAN DOCUMENTS TO THE CONTRARY, BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELENQUISH PRESENTMENT FOR PAYMENT, DEMAND , NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION OR ANY OTHER NOTICES OR ANY OTHER ACTION. BORROWERAND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO THE BENEFITS OF ANY MORATORIUM, REINSTATEMENT , MARSHALING, FORBEARANCE, VALUA TION, STAY, EXTENSION, REDEMPTION, APPRAISEMENT, EXEMPTION AND HOMESTEAD NOW OR HEREAFTER PROVIDED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA AND OF EACH STATE THEREOF, BOTH AS TO ITSELF AND IN AND TO ALL OF ITS PROPERTY, REAL AND PERSONAL, AGAINST THE ENFORCEMENT AND COLLECTION OF THE OBLIGATIONS EVIDENCED BY THIS NOTE OR BY THE OTHER LOAN DOCUMENTS.

4.3     *Interest Provisions.*

(a)          *Savings Clause.* It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note (or applicable United States federal   law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas

Promissory Note -- Parc at Ingleside

4

App. 891

law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law , but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however , if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note then owing by Borrower to Lender. All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

4.4     *Use of Funds.* Borrower hereby warrants, represents and covenants that (i) the loan evidenced by this Note is made to Borrower solely for the purpose of acquiring real property for commercial purposes or carrying on a business or commercial enterprise, (ii) all proceeds of this Note shall be used only for business and commercial purposes, and (iii) no funds disbursed hereunder shall be used for personal, family, agricultural or household purposes.

4.5     *Further Assurances and Corrections.* From time to time, at the request of Lender, Borrower will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Note or in any other Loan Document or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver, record and/or file (or cause to be executed, acknowledged, delivered, recorded and/or filed) such further documents and instruments (including, without limitation, further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents) and perform such further acts and provide such

Promissory Note -- Parc at Ingleside

5

App. 892

further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Note and the Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Note and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Note and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

4.6     *Waiver of Jury Trial.* BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES , RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

4.7     *Governing Law; Submission to Jurisdiction.* This Note is executed and delivered as an incident to a lending transaction negotiated and consummated in **Dallas County, Texas,** and shall be governed by and construed in accordance with the laws of the **State of Texas.** Borrower, for itself and its successors and assigns, hereby irrevocably (i) submits to the nonexclusive jurisdiction of the state and federal courts in **Texas,** (ii) waives, to the fullest extent permitted by la w, any objection that it may now or in the future have to the laying of venue of any litigation arising out of or in connection with this Note or any Loan Document brought in the appropriate state or federal court located in **Dallas County, Texas,** (iii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum, and (iv) agrees that any legal proceeding against any party to any of the Loan Documents arising out of or in connection with any of the Loan Documents may be brought in one of the foregoing courts. Borrower hereby agrees that service of process upon Borrower may be made by certified or registered mail, return receipt requested, at its address specified herein. Nothing herein shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrower or with respect to any of Borrower' s property in courts in other jurisdictions. The scope of each of the foregoing waivers is intended to be all encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Borrower acknowledges that these waivers are a material inducement to Lender's agreement to enter into the agreements and obligations evidenced by the Loan Documents that Lender has already relied on these waivers and will continue to rely on each of these waivers in related future dealings. The waivers in this Section are irrevocable, meaning that they may not be modified either orally or in writing, and these waivers apply to any future renewals, extensions, amendments, modifications, or replacements in respect of any and all of the applicable Loan Documents. In connection with any litigation, this Note may be filed as a written consent to a trial by the court.

4.8     *Counting of Days.* If any time period referenced hereunder ends on a day other than a Business Day, such time period shall be deemed to end on the next succeeding Business Day.

Promissory Note – Parc at Ingleside

6

App. 893

4.9 *Relationship of the Parties.* Notwithstanding any prior business or personal relationship between Borrower and Lender, or any officer, director or employee of Lender, that may exist or have existed, the relationship between Borrower and Lender is solely that of debtor and creditor, Lender has no fiduciary or other special relationship with Borrower, Borrower and Lender are not partners or joint venture members, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

4.10 *Successors and Assigns.* The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives , successors , successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them. The terms "Borrower" and "Lender" as used hereunder shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them.

4.11 *Joint and Several Liability.* If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.

4.12 *Time is of the Essence.* Time is of the essence with respect to all provisions of this Note and the other Loan Documents.

4.13 *Headings.* The Article, Section, and Subsection entitlements hereof are inserted for convenience of reference only and shall in no way alter, modify, define, limit , amplify or be used in construing the text, scope or intent of such Articles, Sections, or Subsections or any provisions hereof.

4.14 *Intentionally Deleted.*

4.15 *Notices.* Unless otherwise expressly provided herein, all notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested , (ii) by delivering same in person to the intended addressee, (iii) by delivery to a reputable independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee, or (iv) by prepaid telegram, telex, tele copier or tele facsimile transmission to the addressee, so long as the same is immediately followed by delivery pursuant to one of the methods under (i) through (iii) above. Notice so mailed shall be effective two (2) days after its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective one (1) day after delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the office or designated place or machine of the intended addressee. For purposes of notice, the addresses of the parties shall be as set forth below; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' prior notice to the other party in the manner set forth herein. Electronic mail and internet websites may be used only to distribute only routine

Promissory Note – Parc at Ingleside

7

App. 894

communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

If to Borrower:      JMJAV LLC
                     13901 Midway Road, Suite 102
                     Dallas, Texas 75244

If to Lender:        Southern Properties Capital LTD
                     1603 LBJ Freeway, Suite 800
                     Dallas, Texas 75234

4.16    *Severability.* If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

4.17    *Right of Setoff.* In addition to all liens upon and rights of setoff against the money, securities, or other property of Borrower given to Lender that may exist under applicable law, Lender shall have and Borrower hereby grants to Lender a lien upon and a right of setoff against all money, securities, and other property of Borrower, now or hereafter in possession of or on deposit with Lender, whether held in a general or special account or deposit, for safe- keeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Borrower. No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by an instrument in writing executed by Lender.

4.18    *Costs of Collection.* If any holder of this Note retains an attorney-at-law in connection with any Event of Default or at maturity or to collect , enforce, or defend this Note or any part hereof, or any other Loan Document in any lawsuit or in any probate, reorganization , bankruptcy or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to the principal balance hereof and all interest hereon, all costs and expenses of collection or incurred by such holder or in any such suit or proceeding, including, but not limited to, reasonable attorneys' fees.

4.19    *Gender.* All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.

4.20    *Statement of Unpaid Balance.* At any time and from time to time, Borrower will furnish promptly, upon the request of Lender, a written statement or affidavit, in a form satisfactory to Lender, stating the unpaid balance of the indebtedness evidenced by this Note and that there are no offsets or defenses against full payment of the indebtedness evidenced by this Note and the terms hereof, or if there are any such offsets or defenses, specifying them.

4.21    *Entire Agreement.* THIS NOTE AND THE OTHER LOAN DOCUMENTS

Promissory Note – Parc at Ingleside

8

App. 895

CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE HERETO AND THERETO WHICH ARE NOT CONTAINED HEREIN OR THEREIN ARE SUPERSEDED AND TERMINATED HEREB Y, AND THIS NOTE AND THE OTHER LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRJTTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

4.22    *Definitions.* As used in this Promissory Note, the following terms shall have the following meanings:

Business Day: A weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in Dallas, Texas, are authorized or required by law to be closed. Unless otherwise provided, the term "days" when used herein shall mean calendar days.

Charges: All fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law.

Debtor Relief Laws: Title 11 of the United States Code, as now or hereafter in effect, or any other applicable law , domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership , reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

Default Interest Rate: A rate per annum equal to the lesser of ten percent (10%) or the Maximum Lawful Rate.

Loan Documents: This Note, the Security Instrument, any guaranty agreement , any pledge, financing statements, and such other agreements, documents and instruments now or hereafter governing, securing or guaranteeing any portion of the indebtedness evidenced by this Note or executed by Borrower or any guarantor or indemnitor or any other person or entity in connection with the loan evidenced by this Note or in connection with the payment of the indebtedness evidenced by this Note or the performance and  discharge of the obligations related hereto or thereto, together with any and all renewals, modifications, amendments, restatements, consolidations , substitutions, replacements, extensions and supplements hereof or thereof.

Maximum Lawful Rate: The maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction evidenced by this Note and the other Loan Documents.

Pledged Entity: JMJD4 LLC.

Property: 100% of the membership interests in the Pledged Entity.  The member interests in certain limited liability companies owned by JMJD4 LLC, as more particularly described in the Security Instrument.

Promissory Note – Parc at Ingleside

9

App. 896

<u>Security Instrument:</u> The Security Agreement dated as of the date hereof, executed by Borrower for the benefit of Lender, relating to and granting a security interest in the Property. The indebtedness evidenced by this Note and the obligations created hereby are secured by, the Security Instrument.

*[Remainder of page intentionally left blank.]*

*[Signature page to follow.]*

Promissory Note – Parc at Ingleside

App. 897

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note as of the day and year as noted below.

**BORROWER:**

**JMJD4 LLC**
a Texas limited liability company

By: _____
       Timothy Barton, President

Date signed: June_____ 14th, 2019

**Accepted By:**

**LENDER:**

**SOUTHERN PROPERTIES CAPITAL LTD**
a British Virgin Islands corporation.

By: _____
       Daniel J. Moos, President and CEO

Date signed: June_____ 14, 2019

Promissory Note – Parc at Ingleside

11

App. 898

# EXHIBIT I-16

**SOUTHERN PROPERTIES CAPITAL, LTD**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

June 13, 2019

JMJD4, LLC
JMJAV, LLC
Enoch Investments, LLC
1775 Whittington Place, Suite 340
Farmers Branch, Texas  75234

Re: Parc at Ingleside, Ingleside, Texas ("Property")

Gentlemen:

JMJD4, LLC ("JMJD4") owns 98.75% of the membership interest in D4IN, LLC (the "Company").  JMJAV, LLC ("JMJAV") owns 1% of the membership interest in the Company. Axia Contracting, LLC owns a 0.25% membership interest in the Company.  The Company owns the Property.

JMJD4, Enoch Investments, LLC ("Enoch") and JMJAV agree that provided the developer's fee for the Property has been paid, that upon 10 days written notice to you at the address listed above, Enoch and JMJAV will assign 100% of the membership interests in JMJD4 to Southern Properties Capital, Ltd., or its designee and that upon such assignment and the assignment of JMJAV's interest in the Company, once HUD has approved the transfer, the Promissory Note of even date herewith in the amount of $6,634,490 will be cancelled.

JMJD4, JMJAV and Enoch also agree that at the time of transfer, the Property will be subject to no liens other than the HUD insured first lien encumbering the Property.

Please indicate your acceptance by countersigning this letter.

Very truly yours,

Southern Properties Capital, Ltd.

By:
Name: Daniel J. Moos
Title: President & CEO

1100155 -Letter Agreement - Parc at Ingleside (6712.0020)

App. 900

JMJD4, LLC
JMJAV, LLC
Enoch Investments, LLC
June 13, 2019
Page 22

**ACCEPTED AND AGREED EFFECTIVE
June 13, 2019**

**JMJD4, LLC,**
a Delaware limited liability company

By: _____
    Timothy Barton, President

**JMJAV, LLC,**
a Texas limited liability company

By: _____
    Timothy Barton, Managing Member

**ENOCH INVESTMENTS, LLC,**
a Delaware limited liability company

By: _____
    Timothy Barton, President

1100155 -Letter Agreement - Parc at Ingelside (6712.0020)

App. 901

# EXHIBIT I-17

## PLEDGE AND SECURITY AGREEMENT

This **PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of June 13, _____, 2019, between **JMJAV LLC** a Texas limited liability company ("**Pledgor**") to **SOUTHERN PROPERTIES CAPITAL LTD**, a British Virgin Islands corporation (together with its successors and assigns, "**Lender**").

### R E C I T A L S:

A.    Lender has agreed to make a loan in the amount of $6,634,490 (the "**Loan**") to Pledgor.

B.    To secure Borrower's obligations under the Note, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below).

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1    Collateral. As security for the full and punctual payment of the Note and performance of Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender, and/or its assigns, as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) as described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)    the capital of Pledgor and any and all profits, losses, Distributions (as

Pledge and Security Agreement
Parc at Ingleside

1

App. 903

defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)     all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)     Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)     to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)     all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)     all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

(i)     all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any

Pledge and Security Agreement
Parc at Ingleside

2

App. 904

interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)     (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral.  The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2     Definitions. As used herein, the following terms shall have the following respective meanings:

(a)     "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entity in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)     "**Loan Documents**" means the Note and this Agreement and any other agreement given in connection with the Loan.

(c)     "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(d)     "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Pledge and Security Agreement
Parc at Ingleside

3

App. 905

Section 1.3    Perfection of Security Interest.  Simultaneously with the execution of this Agreement, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.  It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.  All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.  Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.  Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise).  If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral

Pledge and Security Agreement
Parc at Ingleside

4

App. 906

or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers.   Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

### ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership.  Pledgor owns 100% of the membership interests in Pledged Entity.  Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral.  Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other person, other than any such consent that has been obtained.  Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title.  Pledgor will defend Lender's right, title and interest in and to the Collateral against any and all claims and demands.

Section 3.4    No Transfer.  Except for the transfer affected by this Agreement, Pledgor will not transfer the Collateral, or any portion thereof, or suffer or permit any transfer thereof to occur except any made in accordance with the terms of this Agreement.  Any transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest.  Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Section 3.6    No Financing Statements.  Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted

Pledge and Security Agreement
Parc at Ingleside

App. 907

with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    Certificated Securities.    Pledgor represents and warrants that all of the Pledged Equity is issued in the form of certificated securities, Pledgor has delivered to Lender all certificated securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such certificated securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender.    Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing equity interests, or issue new equity interests, other than as certificated securities.    Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any equity interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a certificated security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3.    Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender.    WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITY OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS.    THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE.    PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND

TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable.    All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements.    Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity.    The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto.    Pledgor is not in default of any of its obligations under the Organizational Agreements.    Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Pledge and Security Agreement
Parc at Ingleside

7

App. 909

Section 3.10 <u>Authority, Enforceability, Etc</u>. The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity. The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject. No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained. This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity. The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor. No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    <u>Transfer Rights</u>. Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in <u>Section 5</u> hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in <u>Section 5</u> hereof with respect to each Pledged Entity.

Section 4.2    <u>Voting Rights</u>. Lender may exercise, either by itself or by its nominee or

Pledge and Security Agreement
Parc at Ingleside

8

App. 910

designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest,

Pledge and Security Agreement
Parc at Ingleside

9

App. 911

payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender,(b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights.    Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

Pledge and Security Agreement
Parc at Ingleside

10

App. 912

(b)      Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative. The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion. Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies. Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

## ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral.  In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only. If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral. It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times. Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures. No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is

Pledge and Security Agreement
Parc at Ingleside

11

App. 913

reasonable. All other demands, advertisements and notices are hereby irrevocably waived by Pledgor. The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale.  Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale.  In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon.  The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale.  Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "**SEC**") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "**Securities Act**"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay

Pledge and Security Agreement
Parc at Ingleside

12

App. 914

all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral. All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences. Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations. To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration. If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements. Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance. Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue

Pledge and Security Agreement
Parc at Ingleside

13

App. 915

statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.    If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.  Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances. Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.  Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc. No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender. Any and all of Lender's rights with respect to any

Pledge and Security Agreement
Parc at Ingleside

14

App. 916

Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Loan; (e) the furnishing to or acceptance by Lender of any additional security to secure the Loan; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3   Notices.   Unless otherwise expressly provided herein, all notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested , (ii) by delivering same in person to the intended addressee, (iii) by delivery to a reputable independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee, or (iv) by prepaid telegram, telex, tele copier or tele facsimile transmission to the addressee, so long as the same is immediately followed by delivery pursuant to one of the methods under (i) through (iii) above. Notice so mailed shall be effective two (2) days after its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective one (1) day after delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the office or designated place or machine of the intended addressee. For purposes of notice, the addresses of the parties shall be as set forth below; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' prior notice to the other party in the manner set forth herein. Electronic mail and internet websites may be used  only to distribute only routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

| | |
|---|---|
| If to Pledgor: | JMJAV LLC<br>113901 Midway Road, Suite 102<br>Dallas, Texas 75244 |
| If to Lender: | Southern Properties Capital LTD<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas  75234 |

Section 7.4   Governing Law; Submission to Jurisdiction.

(a)   **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR**

Pledge and Security Agreement
Parc at Ingleside

App. 917

IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.   NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.

Section 7.5    <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    <u>Modification; Waiver in Writing</u>.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Pledge and Security Agreement
Parc at Ingleside

16

App. 918

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement.    Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement.    There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. THE PARTIES HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY, AND IS INTENDED TO ENCOMPASS

Pledge and Security Agreement
Parc at Ingleside

17

INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13 <u>Successors and Assigns</u>. This Agreement and all obligations of the parties hereunder shall be binding upon the successors and assigns of the parties. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14 <u>Termination</u>. Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15 <u>Conversion Option</u>.

(a) For purposes of this Agreement, the following terms shall have the following meanings:

"HUD Borrower Loan" shall mean any loan made to D4IN LLC, and secured by any real property owned by D4IN LLC.

"HUD Borrower" means D4IN LLC, a Texas limited liability company.

"HUD Borrower Property" means the real property and improvements owned by HUD Borrower.

(b) Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(i)    As a condition to the exercise of such option and the closing thereunder ("Closing"), the following conditions shall be satisfied: (aa) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of Collateral, (bb) all fees owed to Borrower or its affiliates shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee. Upon receipt of the Exercise, Notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days

Pledge and Security Agreement
Parc at Ingleside

App. 920

following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender, including that the Collateral is subject to no other liens or encumbrances other than this Agreement and that the HUD Borrower Property is subject to any lien other than the HUD Borrower Loan. At the Closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents.

(ii)    In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender its membership interest in the HUD Borrower, instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (aa) Lender (or Lender's assignee) shall have received any approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the HUD Borrower, (bb) all fees owed Borrower or their affiliates for fees shall have been paid in full, and (cc) payment of $100.00 to exercise the Option, for the Project Transfer. Upon receipt of the Exercise Notice, Pledgor shall assemble all documents related to the HUD Borrower (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the HUD Borrower to Lender, and Pledgor shall cause HUD Borrower to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval). Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the HUD Borrower, as shall be required by and satisfactory to Lender, including that the HUD Borrower shall be subject to no lien or encumbrance other than the HUD Borrower Loan. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents.

(c) At the Closing, the consideration for exercise of the Option shall be that all of the indebtedness evidenced by the Note shall be deemed satisfied  and the Note marked "PAID IN FULL".

Section 7.16 <u>Liability of Pledgor.</u> Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; <u>provided, however,</u> that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the

Pledge and Security Agreement
Parc at Ingleside

19

App. 921

Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the HUD Borrower Loan;

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the HUD Borrower Loan;

material physical waste of the Collateral or the HUD Borrower Property;

the removal or disposal of any portion of the Collateral or any personal property located on the HUD Borrower Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the HUD Borrower Property, (B) any awards received in connection with a condemnation of all or a portion of the HUD Borrower Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the HUD Borrower Property;

any security deposits, advance deposits or any other deposits collected with respect to the HUD Borrower Property which are not delivered to Lender upon a foreclosure of the HUD Borrower Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the HUD Borrower Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under

Pledge and Security Agreement
Parc at Ingleside

20

App. 922

or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2) the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

Section 7.17 <u>Budget Approval.</u>   Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Parc at Ingleside Apartments on the HUD Borrower Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by

Pledge and Security Agreement
Parc at Ingleside

Pledgor, it shall be deemed approved, so as not to delay construction.

Section 7.18 <u>Disbursement under Note</u>.  Disbursement may be made under this Note in any of the following manners:

(a) <u>Direct disbursement of funds from the Lender to Borrower</u>. (This may include funds for predevelopment expenses by third parties acquired by the Borrower.

(b) <u>Grant of land or other assets from the Lender to the Borrower, or</u>

(c) <u>Payments directly to third parties for costs incurred on the HUD Borrower Property</u>. (Examples include developer fees or general contractor fees.

[Pledgor's Signature Appears on Next Page]

Pledge and Security Agreement
Parc at Ingleside

App. 924

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR:**

**JMJAV LLC,**
a Texas limited liability company

By:_____
Timothy Barton, President

**LENDER:**

SOUTHERN PROPERTIES
CAPITAL, LTD.
a British Virgin Islands corporation

By:_____
Daniel J. Moos, President and CEO

[Signature Page to Pledge and Security Agreement]

App. 925

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---------|----------------|-----------------|
| JMJAV LLC | JMJD4 LLC | 98.75% of the managing member interests in D4IN LLC<br><br>1% membership interest in D4IN LLC |

**Exhibit A**

**AGREEMENT AND ACKNOWLEDGMENT**

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by JMJAV LLC ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.    Representations and Warranties.  The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.    Covenants and Agreements.

(a)    Books and Records. The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of the Pledged Entity and of D4IN LLC, containing such detail and information as Lender may request.

(b)    UCC Matters.  The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one

App. 927

(1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)     Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)     Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)     Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)     Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH

AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)     The undersigned Pledged Entity acknowledge that all of the member interest in each of the Pledged Entity has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the Pledged Entity Accounts (the "PE Accounts"). The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entity and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.     Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.     No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any

App. 929

of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.      Transfers.  The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender. In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender. The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.      Further Assurances.  The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.      Reliance.  This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.      Counterparts.  This Agreement and Acknowledgment may be executed in counterparts.

9.      Miscellaneous.  The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

App. 930

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**Pledged Entity:**

**JMJD4 LLC**

By: _____
Timothy Barton, President

Agreed and acknowledged by:

**D4IN LLC**

By: _____
Timothy Barton, President

App. 931

**Exhibit B**

Organizational Agreements

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:10 PM 04/21/2016
FILED 12:10 PM 04/21/2016
SR 20162460137 - File Number 5980421

**STATE** *of* **DELAWARE**
**LIMITED LIABILITY COMPANY**
**CERTIFICATE** *of* **FORMATION**

**First:** The name of the limited liability company is JMJD4 LLC

**Second:** The address of its registered office in the State of Delaware is 1201 Orange Street #600 in the City of Wilmington. Zip code 19899. The name of its Registered agent at such address is Incorp Services, Inc.

**Third:** (Use this paragraph only if the company is to have a specific effective date of dissolution: "The latest date on which the limited liability company is to dissolve is _____.")

**Fourth:** (Insert any other matters the members determine to include herein.)

In Witness Whereof, the undersigned have executed this Certificate of Formation this

21st day of April, 2016.

By: _____
Authorized Person (s)

Name: Saskya Bedoya

App. 933

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Rolando B. Pablos
Secretary of State

## Office of the Secretary of State

### CERTIFICATE OF FILING
### OF

### D4IN LLC
File Number: 803004107

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Formation for the above named Domestic Limited Liability Company (LLC) has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 05/01/2018

Effective: 05/01/2018



Rolando B. Pablos
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555    Fax: (512) 463-5709    Dial: 7-1-1 for Relay Services
Prepared by: Carol Covey    TID: 10306    Document: 810666830003

App. 934

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803004107 05/01/2018
Document #: 810666830003
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**D4IN LLC**

### Article 2 – Registered Agent and Registered Office

☑ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**TRWF**

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**13901 Midway Rd**
**Suite 102  Dallas  TX  75234**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐ A. The limited liability company is to be managed by managers.

**OR**

☑ B. The limited liability company will not have managers. Management of the company is reserved to the members.
The names and addresses of the governing persons are set forth below:

Managing Member 1: (Business Name) **JMJD4**

Address: **13901 Midway Rd Suite 102    Dallas  TX, UMI  75244**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

App. 935

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Saskya Bedoya        13901 Midway Rd Suite 102 Dallas, TX 75244**

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Saskya Bedoya**

Signature of Organizer

**FILING OFFICE COPY**

App. 936

# EXHIBIT I-18

## AMENDMENT TO PLEDGE AND SECURITY AGREEMENT

THIS Amendment to Pledge and Security Agreement is executed effective June 13, 2019 among JMJAV, LLC, a Texas limited liability company ("JMJAV"), Enoch Investments, LLC, a Delaware limited liability company ("Enoch") and Southern Properties Capital, Ltd. ("Lender").

A.   Lender is making a loan to JMJAV in the amount of $6,634,490 pursuant to a Promissory Note of even date herewith.

B.   In connection with the Loan, JMJAV, LLC is executing a Pledge and Security Agreement ("Pledge Agreement") dated June 13, 2019 pledging certain interests described therein.

C.   It is a condition of Lender's funding the Loan that Enoch also pledge certain interests described below.

NOW THEREFORE, for and consideration of the foregoing, ten dollars ($10.00) and other good and valuable consideration, the parties agree as follows:

1.   The Pledge is amended to make Enoch a party to the Pledge. Each of Enoch and JMJAV pledge its interest in the Collateral as defined in the Pledge Agreement, as amended hereunder. The term "Pledgor" as defined in the Pledge shall mean collectively Enoch and JMJAV.

2.   Schedule 1 of the Pledge is replaced by Schedule 1 attached hereto.

3.   All the terms and conditions of the Pledge Agreement shall remain in full force and effect.

[Signatures on next page]

1

AMENDMENT TO PLEDGE AND SECURITY AGREEMENT
1100270

App. 938

App. 939

**PLEDGORS:**

**JMJAV LLC,**
a Texas limited liability company

By: _____
    Timothy Barton, President

**ENOCH INVESTMENTS, LLC**
a Delaware limited liability company

By: _____
    Timothy Barton, President

**LENDER:**

**SOUTHERN PROPERTIES CAPITAL, LTD.**
a British Virgin Islands corporation

By: _____
    Daniel J. Moos, President and CEO

2

## SCHEDULE 1

| Pledgor | Pledged Entity | Entity Interest |
|---|---|---|
| JMJAV LLV | JMJD4, LLC | 1% membership interest in JMJD4, LLC |
| ENOCH INVESTMENTS, LLC | JMJD4, LLC | 99% membership interest in JMJD4, LLC |

3

AMENDMENT TO PLEDGE AND SECURITY AGREEMENT
1100270

App. 940

# EXHIBIT I-19

Uniform Commercial Code
P.O. Box 13193
Austin, Texas 78711-3193

Ruth R. Hughs
Secretary of State

## Office of the Secretary of State

May 13, 2020
Page 1 of 1

|  |  |
| --- | --- |
| Filing Fee: | $30.00 |
| **Total Filing Fee:** | **$30.00** |

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767 -

Re: **Texas UCC Initial Filing Acknowledgment**

The Texas Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed into our system.

Initial Filing Type: **Financing Statement**

Initial Filing Number: **20-0017679567**    Filing Date: **05/13/2020**    Filing Time: **11:56 a.m.**

Lapse Date: **05/13/2025**    Document Number: **970068230002**

| Party Type | Party Name and Address |
| --- | --- |
| Debtor | **ENOCH INVESTMENTS LLC**<br><br>**1755 WITTINGTON PLACE SUITE 340, FARMERS BRANCH, TX, USA, 75234** |
| Secured Party | **SOUTHERN PROPERTIES CAPITAL LTD**<br><br>**1603 LBJ FREEWAY, SUITE 280, FARMERS BRANCH, TX, USA, 75234** |

Please feel free to contact us at 512-475-2703 if you have any questions regarding the above information.

User ID: JHUNT

*Come visit us on the Internet @ https://www.sos.texas.gov/*

Phone  512-475-2703    Fax:  512-475-2812    Dial 7-1-1 for Relay Services

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Date Chin, 214-350-3667**

B. E-MAIL CONTACT AT FILER (optional)
**dchin@bennettweston.com**

C. S
Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **ENOCH INVESTMENTS LLC** | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **1755 Wittington Place Suite 340** | CITY **Farmers Branch** | STATE **TX** POSTAL CODE **75234** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **SOUTHERN PROPERTIES CAPITAL LTD** | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **1603 LBJ Freeway, Suite 280** | CITY **Farmers Branch** | STATE **TX** POSTAL CODE **75234** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**See Exhibit "A" attached hereto and made a part hereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Parc at Windmill Farms - ENOCH INVESTMENTS Secured Interest - DOT UCC - TX SOS Filing**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 943

## EXHIBIT "A"

100% of its interest in JMJD4 LLC which consist of 99% of the membership interest in JMJD4 LLC.

# EXHIBIT I-20

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Date Chin, 214-350-3667

B. E-MAIL CONTACT AT FILER (optional)
dchin@bennettweston.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Bennett, Weston, Lajone & Turner P.C.
Attn: Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas 75234

Delaware Department of State
U.C.C. Filing Section
Filed: 12:46 PM 05/13/2020
U.C.C. Initial Filing No: 2020 3378223

Service Request No: 20203837199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TRWF LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1755 Wittington Place Suite 340 | Farmers Branch | TX | 75234 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable) ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - TRWF Secured Interest - DOT UCC - DE SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 946

## EXHIBIT "A"

100% of its interest in JMJAV LLC which consist of 100% of the membership interest in JMJAV LLC.

# EXHIBIT I-21

FILING NUMBER: 20-0017975435
FILING DATE: 5/14/2020 12:26 PM
DOCUMENT NUMBER: 970482870002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGEMENT TO:

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME  **JMJAV LLC** | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS  **13901 MIDWAY ROAD, SUITE 102-LB243** | CITY  **FARMERS BRANCH** | STATE **TX**  POSTAL CODE **75244** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME  **SOUTHERN PROPERTIES CAPITAL LTD** | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS  **1603 LBJ FREEWAY, SUITE 800** | CITY  **DALLAS** | STATE **TX**  POSTAL CODE **75234** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

100% OF ITS INTEREST IN D4IN LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN D4IN LLC.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|
| 6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: ☐ Agricultural Lien  ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJAV — D4IN — TX — STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 949

# EXHIBIT I-22

FILING NUMBER: 20-0017975172
FILING DATE: 5/14/2020 12:15 PM
DOCUMENT NUMBER: 970482800002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. S...

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJAV LLC | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN JMJD4 LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN JMJD4 LLC.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJAV – JMJD4 – TX – STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 951

# EXHIBIT I-23

███████████
███████████
███████████

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| B. E-MAIL CONTACT AT FILER (optional) |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address) |

⌐ CAPITOL SERVICES, INC. ⌐

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 11:58 AM 05/14/2020**
**U.C.C. Initial Filing No: 2020 3407071**

**Service Request No:  20203897451**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **JMJD4 LLC** | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **13901 MIDWAY ROAD, SUITE 102-LB243** | CITY **FARMERS BRANCH** | STATE **TX** POSTAL CODE **75244** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **SOUTHERN PROPERTIES CAPITAL LTD** | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **1603 LBJ FREEWAY, SUITE 800** | CITY **DALLAS** | STATE **TX** POSTAL CODE **75234** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**100% OF ITS INTEREST IN D4IN LLC WHICH CONSISTS OF 98.75% OF THE MEMBERSHIP INTEREST IN D4IN LLC**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**JMJD4 - D4IN - DE - STATE**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 953

# EXHIBIT I-24

## FIRST MODIFICATION AGREEMENT

This First Modification Agreement ("Agreement") is entered into effective as of the 30th day of June, 2021 ("Effective Date"), by and between **JMJAV, LLC**, a Texas limited liability company ("Borrower") and **SOUTHERN PROPERTIES CAPITAL, LTD**, a British Virgin Islands corporation ("Lender").

### RECITALS

A.      Pursuant to a Promissory Note ("Note") from Borrower to Lender, dated as of June 13, 2019, Lender made a loan of $6,634,490.00 to Borrower.

B.      The parties desire to further amend the Note as more fully described below.

### AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.      The Maturity Date, as such term is defined in the Note is exended to November 1, 2026.

2.      Except as expressly modified and extended hereby, all terms and provisions of the Note are and shall remain unchanged, and the Loan Documents are hereby ratified and confirmed and shall be and shall remain in full force and effect.

3.      Borrower hereby agrees and acknowledges that it is well, justly and truly indebted to Lender pursuant to the terms of the Note, as modified and extended hereby. Borrower hereby promises to pay to Lender or its order the Note in accordance with the terms thereof, as modified, and extended hereby.

4.      Borrower hereby represents and warrants that there are no offsets, claims, counterclaims or defenses which Borrower has against payment and enforcement of the Note, as modified herein.

5.      Notwithstanding anything to the contrary in this Agreement or in the Note, whether now existing or hereafter arising and whether written or oral, it is agreed that the aggregate of all interest and other charges constituting interest and contracted for, chargeable or receivable under the Note or otherwise in connection thereof shall, under no circumstances, exceed the maximum rate of interest permitted by applicable law. In the event the maturity of the Note is accelerated by reason of an election by the holder thereof resulting from a default under the Loan Documents or this Agreement, or by voluntary prepayment by the maker, or otherwise, then earned interest never may include more than the maximum rate of interest permitted by applicable law. If, for any circumstance, any holder of the Note ever shall receive interest or any other charges constituting interest, or adjudicated as constituting interest, the amount, if any, which would exceed the

FIRST MODIFICATION AGREEMENT – Page 1
1179811v. 1  HGH – Parc at Ingleside (6712.0020)

maximum rate of interest permitted by applicable law shall be applied to the reduction of the principal amount owing on the Note or on account of any other principal indebtedness of the maker to the holder of the Note, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal thereof and such other indebtedness, the amount of such excessive interest that exceeds the unpaid balance of principal thereof and such other indebtedness shall be refunded to the maker. All sums paid or agreed to be paid to the holder of the Note for the use, forbearance or detention of the indebtedness of the maker to the holder of such Note shall be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the actual rate on such indebtedness is uniform through the term thereof.

6.     This Agreement shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

7.     This Agreement shall be deemed to have been executed and shall be performed in the State of Texas, and the Note shall continue to be governed by its laws. Borrower irrevocably agrees that, subject to Lender's sole and absolute election, Lender may bring suit, action, or other legal proceedings arising out of the Note in courts located in Texas, whether local, state, or federal. Borrower hereby submits to the jurisdiction of such court(s) and waives any right Borrower may have to request a change of venue or a removal to another court.

8.     This Agreement represents the final agreement between the parties herein and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

App. 956

**BORROWER:**

JMJAV, LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**LENDER:**

SOUTHERN PROPERTIES CAPITAL, LTD,
a British Virgin Islands corporation

By: _____
Erik L. Johnson, President

FIRST MODIFICATION AGREEMENT – Page 3
1179811v. 1 HGH – Parc at Ingleside (6712.0020)

App. 957

# EXHIBIT I-25

**SOUTHERN PROPERTIES CAPITAL LTD.**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

October 3, 2022

**VIA HAND DELIVERY**
ENOCH INVESTMENTS, LLC
JMJAV, LLC
JMJD4, LLC
D4IN, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attn: Timothy Barton

Re: Conversion option for Parc at Ingleside Apartments Project; **EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Parc at Ingleside Apartments, Ingleside, Texas ("Project").

Attached is a proposed purchase contract to effect a transfer from the Project owner, D4IN LLC, to SPC through a deed, once the lender on the Project and HUD have consented to the transfer. Also attached is a check for $100.00 made out to Enoch Investments, LLC and JMJAV, LLC.

Please return the signed contract so we can continue to process TPA approval of the transfer. If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

SOUTHERN PROPERTIES CAPITAL LTD.

By: _____
Bradley J. Muth, President

15519351v1

App. 959

# EXHIBIT I-26

## AGREEMENT FOR PURCHASE AND SALE

This **AGREEMENT FOR PURCHASE AND SALE** (this "**Agreement**"), is made and entered into as of October _____, 2022 (the "Effective Date"), by and between SOUTHERN PROPERTIES CAPITAL LTD., a British Virgin Islands corporation ("**Purchaser**"), and D4IN LLC, a Texas limited liability company ("**Seller**").

## WITNESSETH:

## ARTICLE 1:  AGREEMENT FOR PURCHASE AND SALE

1.1     Seller agrees to sell and cause to be conveyed to Purchaser, and Purchaser agrees to purchase, the following real and personal property (collectively, the "**Project**") on the terms and conditions contained herein:

(a)     The real property located in the City of Ingleside, San Patricio County, State of Texas, described with particularity on Exhibit "A" (the "**Land**") together with all existing buildings, structures, fixtures, amenities and improvements thereon situated including apartment units known as the Parc at Ingleside Apartments, and together with all easements and other rights appurtenant to such Land, as well as Seller's rights, titles and interests in and to the mineral rights for the Land, if any (together, the "**Property**");

(b)     Seller's interest as landlord in all leases and occupancy agreements affecting the Property reflected in the current rent roll attached hereto as Exhibit "C" (the "**Current Rent Roll**"), as updated by the certified Closing Rent Roll to be delivered by Seller to Purchaser at Closing (the "**Leases**") or any space therein and any prepaid rent and Seller's interest in all security deposits and guaranties;

(c)     Seller's right, if any, to the use of the name "Parc at Ingleside Apartments" in connection with the Property and any other trademarks, copyrights, trade names or other intangible rights associated with the Property in which Seller has a transferable right including any telephone numbers associated with on-site management and leasing operations, and website(s) and internet address(es) which relate to the Property (the "**Intangible Property**");

(d)     All of Seller's right, title and interest in and to all items of personal property owned by Seller and located at the Property and used in the operation thereof including, without limitation, plans, specifications,  building supplies, marketing materials, boilers, HVAC equipment, alarms, signage, fittings, appliances, shades, wall-to-wall carpet, draperies, screens and screening, awnings, plants, shrubbery, landscaping, furniture, furnishings, office equipment, lawn care and building maintenance equipment, and other furnishings or items of personal property used in connection with the ownership and operation of the Land (the "**Personal Property**");

(e)     All of Seller's right, title and interest in and to all service contracts and agreements relating to the Property, to the extent such agreements are permitted under this Agreement (the "**Contracts**") (but specifically excluding management and leasing agreements ("**Management and Leasing Agreements**"), which will be terminated by Seller on or before

App. 961

Closing), all rights of actions against previous owners of the Land and Improvements, and any unexpired warranties and guarantees relating to the Personal Property;

      (f)     All of Seller's right, title and interest in and to any permits, certificates of occupancy or other licenses and governmental approvals held by Seller in connection with the ownership or operation of the Project (the "**Permits**"), to the extent that the same are assignable; and

      (g) All escrows and reserves associated with the First Lien (hereinafter defined) for the Project, including, without limitation, the tax and insurance reserves, the MIP reserve and the replacement and repair reserve.

## ARTICLE 2: PURCHASE PRICE

2.1     The purchase price (the "**Purchase Price**") for the Project shall be an amount equal to the First Lien Amount as hereinafter defined, payable as follows:

      Assumption by Purchaser of the unpaid balance of the existing HUD-insured note and first lien mortgage, dated June 13, 2019, encumbering the Property in the original principal amount of $25,201,000.00 ("**First Lien**"). The amount to be assumed will be the outstanding principal balance, plus accrued but unpaid interest, as of Closing ("**First Lien Amount**").

2.2     (a)     Not later than three (3) business days after the Effective Date of this Agreement, Purchaser shall deliver a check in the amount of $1,000.00 ("**Earnest Money Deposit**") to Commonwealth Land Title Insurance Company (the "**Title Company**"), 5949 Sherry Lane, Suite 111, Dallas, Texas 75225, Attn: James P. Lazar ("**Escrow Agent**") to be held in escrow in an interest-bearing account pursuant to the terms of this Agreement pending the Closing.

      (b)     As used in this Agreement, the term "Deposit" shall mean any sums, including the Earnest Money Deposit, and, if applicable, the Closing Extension Deposit, and instruments and accrued interest thereon, if any, held by Escrow Agent hereunder. The Deposit shall be applied to the Purchase Price at the Closing. If Purchaser desires to terminate this Agreement pursuant to a right granted to Purchaser in any section of this Agreement, Purchaser shall effect such termination by giving written notice thereof to Seller and Escrow Agent within any applicable time period provided therefor in this Agreement. Upon receipt of such notice, unless otherwise provided herein, Escrow Agent shall return the Deposit to Purchaser without the requirement of any further notice or instruction, this Agreement shall wholly cease and terminate, and no party to this Agreement shall have any further claim against, or obligation to, any other party to this Agreement except as expressly provided herein, and the lien, if any, of Purchaser against the Project shall automatically cease and terminate. In the event that notice shall not have been given or be deemed to have been given prior to the last day of the Inspection Period (as hereinafter defined) and Seller shall object to the disbursal of the Deposit, the Escrow Agent shall hold the Deposit pending a non-appealable adjudication by a court of competent jurisdiction or by joint written instructions of Seller and Purchaser.

## ARTICLE 3:  PHYSICAL CONDITION OF PROJECT, INSPECTION PERIOD

3.1     Purchaser will inspect the Project during the hereinafter described Inspection Period.  Purchaser acknowledges that Seller has not made, does not make and is unwilling to make any express or implied representations or warranties as to the present, past or future physical condition, income, expenses, operation, legality of occupancy or any other matter affecting or related to the Project except as specifically set forth in this Agreement.  No representation, warranty or covenant made by Seller in this Agreement or any document delivered pursuant hereto shall survive the Closing except as expressly provided in this Agreement.  Purchaser agrees to purchase the Project in its "AS IS" condition (but subject only to the express representations and warranties herein) with a complete waiver of any and all warranties as to the condition of the Project or its fitness for any purpose, other than as expressly provided herein, all in accordance with the waiver language to be included in the Special Warranty Deed conveying the Property to Purchaser (the "**Deed**").

3.2     Any documents, records or information provided to Purchaser in connection with Purchaser's inspection of the Project shall be kept in strictest confidence (but may be disclosed to Purchaser's agents, brokers, accountants, advisors, consultants, attorneys and prospective lenders or investors) and shall be returned to Seller in the event that this Agreement is canceled for any reason.  In the event that Purchaser elects not to proceed with this transaction, Purchaser shall deliver to Seller copies of all reports prepared for Purchaser by third-parties in connection with its inspection, without any representation as to the accuracy thereof, upon receipt of payment from Seller of the actual costs for such reports incurred by Purchaser.

3.3     Seller represents and warrants to Purchaser as of the date of this Agreement as follows:

(a)     Seller is a Texas limited liability company, duly formed, validly existing and in good standing in the state of its formation and is qualified to do business in Texas.

(b)     Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained.

(c)     All Due Diligence Materials delivered in furtherance of Purchaser's inspection of the Project, including all leases, lease correspondence, and rent rolls have been prepared and assembled in the ordinary course of business by Seller's fee manager, are believed to be true, complete and accurate and have been relied upon by Seller.

(d)     The Rent Roll is a true, correct and complete list of all of the Leases and rent roll for the Property.  The rents and other sums due or to become due under each Lease have not been assigned, encumbered or subjected to any lien by Seller. Seller has provided Purchaser with true, correct and complete copies of all the Leases, including all amendments thereto.  To Seller's actual knowledge, which has not been contradicted by any written notice; (i) the Leases have been duly authorized and executed by the landlord, and, by the tenant thereunder, (ii) the Leases are in full force and effect according to the terms set forth therein, (iii) the Leases set forth

AGREEMENT FOR PURCHASE AND SALE – Page 3
15511263 1 – 110596 00024

App. 963

the entire agreement between landlord and tenant with respect to the premises affected thereby; (iv) there are no uncured defaults under the Leases; and (v) the Rent Roll and other financial information prepared by Seller as part of the Seller Deliveries are true and complete in all material respects. Seller has not (i) made any representations to any tenant regarding the condition of the premises covered by any Lease or the compliance of the premises with any applicable governmental regulations, except as expressly set forth in the Leases, (ii) granted any concessions to any tenant not disclosed in such Lease; or (iii) received any written notice of any defaults under the Leases. There are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property other than any agreements explicitly contained in the Leases. The Leases set forth all Tenant inducement costs and commissions that are currently due and payable or which have otherwise accrued with respect to any Lease. Other than as provided for in the Leases, there are no other agreements, oral or written, in connection with any Tenant inducement costs or leasing commissions that may become due and payable in the future in connection with any Lease.

(e)    The operating statements of the Project to be delivered by Seller to Purchaser during the Inspection Period were prepared in the ordinary course of business by Seller's fee manager, are believed to be accurate, and have been relied upon by Seller.

(f)    To the best knowledge of Seller, the Permits have been duly and validly issued, are in full force and effect.

(g)    To the best knowledge of Seller, there is no litigation or arbitration or other legal or administrative suit, action, proceeding of any kind pending against or involving Seller relating to Seller's ownership of the Property or any part thereof which would prevent Seller from conveying the Project in accordance with this Agreement. Except as may be described in the Due Diligence Materials, Seller has not received any notice from any Governmental Authority with respect to any violation of any applicable zoning ordinances and building codes, flood disaster laws and health and environmental laws, rules and regulations (hereinafter collectively called the "Applicable Laws").

(h)    Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

(i)    Seller owns fee simple title to the Property, subject to the exceptions of record.

(j)    Except for the Contracts, there will be no contracts or other agreements which affect or will affect or which are or will be obligations of the Purchaser or the Property after the Close of Escrow. All of the service contracts currently effecting the Property ("Service Contracts") may be terminated without penalty or other payment upon no more than thirty (30) days' notice except for the contract for electrical service.

(k)    To Seller's knowledge, the Property is not in violation of any recorded covenants, conditions, restrictions or other agreements recorded in the Real Property Records of Dallas County, Texas ("Recorded CC&Rs").

(l)    To the best of Seller's knowledge or as described in the Due Diligence Materials (i) the Property is free of hazardous wastes, materials, substances, urea formaldehyde, PCB's and all other toxic, radioactive or hazardous wastes, materials, substances or contaminations in excess of amounts permitted under applicable federal, state and local regulations (collectively, "Hazardous Materials"); and (ii) no Hazardous Materials have been stored, disposed or located upon the Property except in the ordinary course of business for a multi-family residential community.  Without in any way limiting the generality of above, neither the Property nor the Seller are the subject of any pending or, to the best of Seller's knowledge or as described in the Due Diligence Materials or the Violation, threatened investigation or inquiry by any Governmental Authority, or are subject to any remedial obligations under any Applicable Laws pertaining to health or the environment ("Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1987, as amended ("RCRA"), and this representation and warranty would continue to be true and correct following disclosure to any applicable Governmental Authority of all relevant facts, conditions and circumstances pertaining to the Property and/or the Seller.  Seller has taken all steps necessary to determine and has determined that no hazardous substances, solid wastes, or other substances known or suspected to pose a threat to health or the environment ("Hazards") have been disposed of or otherwise released on or to the Property or exist on or within any portion of the Property.  To the knowledge of Seller, or as otherwise disclosed in the Due Diligence Materials, no prior use, either by Seller or the prior owners of the Property, has occurred, which violates any Applicable Environmental Laws.  The use which Seller makes of the Property will not result in the disposal or release of any hazardous substance, solid waste or Hazard on, in or to the Property.  The terms "hazardous substance" and "release" shall each have the meanings specified in CERCLA, and the terms "solid waste" and disposal" (or "disposed") shall each have the meanings specified in RCRA; provided, however, that in the event either that CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided further that, to the extent that the laws of the State of Texas establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader definition shall apply.  To the best of Seller's knowledge and belief, there has been no litigation brought or threatened nor any settlement reached by or with any parties alleging the presence, disposal, release, or threatened release, of any hazard substance, solid wastes or Hazards from the use or operation of the Property.  To the best of Seller's knowledge and belief after diligent investigation and inquiry, the Property is not on any federal or state "Superfund" list, nor subject to any environmentally related liens.

(m)    Except as set forth in the Title Commitment or Due Diligence Materials, there are no unpaid assessments (governmental or otherwise) for sewers, water, paving, electrical power or otherwise affecting the Property (matured or unmatured) and, to the best of Seller's knowledge, no such assessments are threatened.  There are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(n)    At the Closing there will be no unpaid bills or claims in connection with any repair of the Property or other work performed or materials purchased in connection with the Property, or sufficient funds in the reasonable judgment of Purchaser shall be escrowed for such purpose.

AGREEMENT FOR PURCHASE AND SALE    Page 5
15511263.1 – 110596.00024

App. 965

(o)     Seller has not received any written notice from any governmental entity of any violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Seller.

(p)     There are no persons employed by Seller in connection with the operation of the Property, and there are no maintenance, advertising, management, leasing, employment, or service contracts affecting the Property that will be in effect at Closing except for the Contracts unless expressly assumed in writing by Purchaser.  Otherwise, Seller shall terminate any such employee and any such contracts (not expressly assumed by Purchaser) other than the Contracts at or prior to the Closing.

If, at any time prior to Closing, Seller shall discover that any representation or warranty contained in this Article 3.3 is, or has become, inaccurate in any material respect, Seller shall so notify Purchaser in writing (the "Correction Notice"), and Purchaser shall have the right by notice given in writing not more than five (5) business days after receipt of the Correction Notice to terminate this Agreement and receive a refund of the Deposit.  The representations and warranties contained in this Agreement shall survive one (1) year from the Closing Date.

3.4     Purchaser intends to conduct its physical inspection of the Project beginning on the Effective Date of this Agreement and ending at 5:00 p.m. Dallas, Texas time, thirty (30) days after the Effective Date ("**Inspection Period**"). The Purchaser's inspection shall be at the sole cost and expense of Purchaser and at times approved in advance by Seller's manager (not to be unreasonably withheld) so as to minimize disturbance to the operations of the Project, its employees, and guests.  Seller shall reasonably assist with such inspection and shall provide Purchaser with access to the Project, but shall not be obligated to incur any material cost or expense in connection therewith or to furnish any information other than at the place where same is maintained.  During the Inspection Period, Seller shall provide Purchaser with accurate and complete copies of, or permit Purchaser to review at the Property, all books and records in the possession of Seller or its agents relating to the Project, including, without limitation, all of the Leases, Contracts and Permits, all lease files and correspondence, all property tax bills in Seller's possession, utility bills, and repair and maintenance records with respect to the Property and Personal Property.  All information received by Purchaser relating to the Project, Seller or its affiliates shall be kept in strict confidence (subject to the terms above) and used solely for the purpose of determining the advisability of proceeding with the transaction described in this Agreement.  On or before five (5) days after the Title Company's receipt of the Deposit, Seller shall deliver to Purchaser or make the items described on Exhibit "D" (collectively, the "**Due Diligence Materials**") available to Purchaser for Purchaser's review:

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS INSPECTED AND INVESTIGATED THE PROPERTY (OR PRIOR TO THE CLOSING WILL HAVE INSPECTED AND INVESTIGATED THE PROPERTY) AND HAS ENTERED INTO THIS AGREEMENT BASED UPON SUCH INVESTIGATION AND INSPECTION AND PURCHASER'S RIGHT TO CONDUCT THE INSPECTION AND INVESTIGATION PURSUANT TO THIS ARTICLE 3. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE ACT OF SALE,

PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED FOR OR ON BEHALF OF SELLER. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF THE SELLER AND EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, SELLER HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF SUITABILITY, HABITABILITY, CONDITION, ELIGIBILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF AND SELLER HAS NO LIABILITY OF ANY KIND TO PURCHASER ON ACCOUNT OF THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

3.5    In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "**Option**"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties. Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the Deposit is returned to Purchaser.

3.6    If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent at any time during the Inspection Period and have the Deposit, less the Option fee described in Section 3.5, above, returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement. If Purchaser does not give Seller and Escrow Agent written notice on or before 7 p.m. Central Time on the last day of the Inspection Period that Purchaser waives its right to terminate this Agreement pursuant to this Section 3.6, then Purchaser shall be deemed to have terminated this Agreement.

3.7    Purchaser shall have (10) ten days after the Inspection Period ("**Board Approval Period**") to obtain the approval of its Board of Directors to the transaction contemplated hereby. If Purchaser's Board of Directors approves this transaction, it shall give notice of such approval to Purchaser ("**Board Approval Notice**"). If Purchaser does not notify Seller within said period that such approval has been obtained, then this Agreement shall be deemed void ab initio and the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other.

3.8    Covenants.

(a)    Between the date of this Agreement and the Closing Seller shall continue to maintain the Property in accordance with Seller's prior practices, ordinary wear and tear, casualty

losses and condemnation excepted. During the term of this Agreement, Seller shall not take any action which would materially adversely affect the title to the Property.

(b)     Seller will cause fire and extended coverage insurance relating to the Property to be maintained in full force and effect at an amount no less than the full replacement cost of the Property.

(c)     Seller shall continue to operate the Property in accordance with its normal and customary practice after the Effective Date and prior to Closing, so that the Property will be in substantially the same condition on the Closing Date as on the Effective Date, reasonable wear and tear excepted. After the Effective Date, Seller shall not, without approval of Purchaser enter into any new Service Contracts that are not cancelable without any penalty or fee on thirty (30) days' or less notice by Seller. Seller shall terminate all Service Contracts related to the Property prior to Closing, unless Purchaser elects (prior to expiration of the Inspection Period) to assume such Service Contracts. From and after the Effective Date through the Closing, Seller, at its sole cost and expense, shall  (i) not voluntarily subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters, (ii) not make any alterations to the Property, except in the ordinary course of business, all of which Seller shall complete at its sole cost and expense prior to Closing,  (iii) pay for all capital and other improvements which are performed or contracted for by Seller at or prior to Closing, and  (iv) not accept from any tenant payment of rent more than one (1) month in advance, or apply any security deposit to rent or any other default by any tenant. Seller shall continue to lease residential units in accordance with Seller's prior practices and market conditions.

(d)     Seller shall not remove any personal property from the Property without the consent of Seller unless the same is replaced by property of equal or greater value, and will make all necessary repairs and replacements during such time.

3.9     Conditions to Purchaser's Obligations. Purchaser's obligation to purchase the Property shall be conditioned upon the satisfaction of each of the following conditions prior to or simultaneously with the Closing any of which may be waived by written notice from Purchaser to Seller:

(a)     Seller has complied with and otherwise performed the obligations of Seller set forth in this Agreement.

(b)     All representations and warranties of Seller as set forth in this Agreement shall be in all material respects substantively true and correct as of the date hereof and on the date of Closing (except for representations which by their terms are made as of a specific date or refer to a specific date).

AGREEMENT FOR PURCHASE AND SALE – Page 8
15511263.1  110596.00024

App. 968

(c)    Financing

(1)    Seller is the borrower under the First Lien in the original principal amount of $36,240,000.00. The First Lien is secured by a first mortgage lien on the Property. As provided in Section 2 herein, Seller and Purchaser have agreed that the Purchase Price in the amount of the outstanding principal balance thereof shall be paid via Purchaser's assumption of the First Lien. Because the Project will be encumbered by financing insured by HUD, closing of this transaction shall be subject to the approval by HUD and the lender under the First Lien ("**Lender**") of a Transfer of Physical Assets ("**TPA**") of the Project. Any and all documents to be executed by Seller in connection with the TPA shall be subject to Purchaser's approval, not to be unreasonably withheld, conditioned or delayed. From and after the consummation by Seller of the HUD Final Endorsement Closing with respect to the First Lien until the Closing or earlier termination of this Agreement, Seller authorizes Purchaser to contact Lender with respect to facilitating the TPA and assumption of the First Lien ("Loan Assumption"). The "**Financing Contingency**" shall be deemed satisfied when the parties have obtained conditional Lender and HUD approval to the TPA with conditions, including the form of the Loan Assumption documents, approved by Purchaser in its reasonable discretion. Provided Seller has provided Purchaser with all documents necessary including the Due Diligence Documents, Purchaser agrees to file the application for TPA with the Lender by the date that is fourteen (14) days after the Board Approval Period. If Lender requires additional information from Seller or Purchaser, Purchaser shall have a reasonable amount of time after receipt of such information required to make a filing or supplemental filing. In the event that on or before the 180th day following the Board Approval Period (the "**Financing Contingency Deadline**"), the Financing Contingency has not been satisfied, this Agreement will terminate, the Deposit shall be returned to Purchaser, and the parties shall have no further obligations hereunder (except for obligations that are expressly intended to survive termination of this Agreement). At all times prior to satisfaction of the Financing Contingency, whether by the Financing Contingency Deadline or the Extended Financing Contingency Deadline, Seller shall reasonably cooperate with Purchaser in such efforts, including without limitation the execution of any applications which are required to be executed by the existing owner of the Project and the furnishing of any and all information in its possession which is reasonably required by Purchaser in its efforts to obtain approval of the TPA and satisfy the Financing Contingency. Purchaser shall be required to pay all costs, fees, assumption fees, or other charges imposed or incurred by the Lender, HUD or Seller in connection with the TPA and the Loan Assumption, other than Seller's legal fees incurred therewith.

(d)    Purchaser shall at all times have the right to waive any conditions (other than those given under Section 3.9(c) above), provided that no such waiver shall be effective unless such waiver or waivers are in writing; provided that if Closing occurs and Purchaser has actual knowledge of the non-fulfillment of any such condition, such act of consummating Closing shall be deemed a waiver of such known, unfulfilled condition. Any such waiver shall be deemed a release of Seller and any liability of Seller, if any, as a result of the failure of such condition.

## ARTICLE 4: PERMITTED ENCUMBRANCES TO TITLE

4.1    Purchaser agrees to accept title to the Property subject to the following matters (collectively, the "Permitted Encumbrances"):

(a)     Leases and tenancies reflected on the Rent Roll and such further Leases as may be entered into in accordance with this Agreement.

(b)     Liens securing payment of all ad valorem, intangible and other real and personal property taxes, special and general assessments, school taxes, and water and sewer charges against the Property or the Personal Property covered by this Agreement for the tax year in which the Closing Date occurs and subsequent years to the extent such items are properly apportioned under this Agreement, and the lien of any special taxes not entered of record against the Property on the Closing Date.

(c)     Servitudes, easements and restrictive covenants, if any, which are recorded in the land records of the County Clerk of Dallas County, Texas, as of the date hereof and which do not materially affect the marketability of the Property.

(d)     Matters approved or deemed approved pursuant to the terms of this Agreement.

(e)     Zoning ordinances and regulations and building restrictions and regulations affecting the Property on the Closing Date.

(f)     The First Lien.

(g)     All building, subdivision, land sales, securities, ecology, environmental protection and like laws, ordinances, rules and regulations of governmental authorities, including those of any and all regulatory agencies and administrative officials having or asserting jurisdiction over the Property.

## ARTICLE 5: CONDITION OF TITLE, TITLE INSURANCE

5.1     Seller shall promptly obtain from the Title Company through Escrow Agent, and deliver to Purchaser, a title commitment (the "Title Commitment") to issue a TLTA Owner's Policy of Title Insurance (the "Title Policy") insuring Purchaser's title to the Property to be good and indefeasible in the amount of the Purchase Price, containing coverage over all general exceptions subject to only the Permitted Encumbrances.  A copy of the Title Commitment and legible copies of each of the documents of record reflected therein shall be furnished to the attorneys for Purchaser and Seller.  Seller shall also deliver to Purchaser a copy of the Existing Survey.  Within ten (10) days of receipt of the title materials described above, together with the Existing Survey, Purchaser shall give written notice (the "Objection Notice") to the attorney for Seller identifying with particularity any defect of title to which Purchaser objects (the "Objections") separately specifying and setting forth each such Objection.  Seller shall be entitled to reasonable adjournments of the Closing Date not exceeding thirty (30) days in the aggregate, to cure the Objections, unless waived by Purchaser.  If Purchaser gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the Title Commitment which are not objected to in such Objection Notice shall be deemed to be Permitted Encumbrances.

5.2     Seller shall not be required to expend any money or bring any action or proceeding or do any other thing in order to deliver the Project or convey title to the Property as required by this Agreement or the Objection Notice.  If Seller gives Purchaser notice (the "Response Notice")

that Seller is unable or unwilling to convey the Project or title to the Project as required by this Agreement or the Objection Notice, Purchaser may, as its exclusive remedy, elect by written notice given to Seller within five (5) days after the Response Notice is given, either (a) to accept such title as Seller is able to convey without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement, in which event the Deposit and Financing Period Extension Fee shall be returned to Purchaser.

5.3    If Purchaser shall fail to give timely notice of its election to terminate this Agreement, Purchaser shall be deemed to have accepted all matters reflected on the Title Commitment as Permitted Encumbrances.

5.4    Unpaid liens for real estate and personal property taxes for years prior to the fiscal year in which the Closing Date occurs and any other matters which Seller is obligated to pay and discharge at the Closing shall not be deemed objections to title, but the amount thereof chargeable to Seller, plus interest and penalties thereon charged by the taxing authority, if any, shall be deducted from the Purchase Price on the Closing Date and paid to the Title Company with instructions to pay and discharge such matters.

5.5    Closing costs associated with the Closing and typically paid by a seller including, but not limited to, deed stamps, transfer taxes, and Seller's attorneys' fees shall be paid by Seller. Seller shall pay all premiums and other fees associated with the Title Policy and survey to be delivered at Closing. The cost of physical inspection, accounting, audit, and other investigations made in connection with Purchaser's due diligence, Purchaser's attorneys' fees and all other costs associated with the Closing shall be paid by Purchaser.

5.6    Time is of the essence with respect to the provisions of this Section 5.

## ARTICLE 6: CLOSING

6.1    Provided that all of the conditions of this Agreement shall have theretofore been satisfied, the closing (the "**Closing**") of the purchase and sale of the Property shall be conducted at the offices of the Escrow Agent (or at such other location as shall be mutually agreeable to Seller and Purchaser) on the date ("**Closing Date**") that is on or before ten (10) days after the Financing Contingency Deadline.

6.2    Upon Seller's and Purchaser's delivery of all required documents and instruments and payment of the Purchase Price and other amounts required herein, Purchaser and Seller shall prepare and sign a closing statement reflecting the adjustments and payments made and agreements in connection therewith. Seller and Purchaser shall jointly deliver a copy of the closing statement and all of the aforesaid documents to the Title Company which shall do the following:

(a)    Record the Deed and loan documents, if any, associated with this transaction.

(b)    Deliver to Seller and Purchaser or other appropriate party the documents and payments delivered to it as escrow holder for delivery to such party.

(c)    Pay all recording taxes and transfer fees and all filing fees reflected on the closing statement.

(d)    Issue the Title Policy and, if applicable, an endorsement to the existing Lender's Policy of Title Insurance.

(e)    File the reports required by Section 6045 of the Internal Revenue Code and regulations promulgated thereunder.

## ARTICLE 7: DOCUMENTS REQUIRED ON CLOSING DATE

7.1    At or prior to the Closing, Seller shall execute and/or deliver the following to Purchaser through Escrow Agent:

(a)    A Deed in a form reasonably acceptable to Seller and Purchaser and approved by HUD.

(b)    A Blanket Conveyance, Bill of Sale and Assignment, in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Bill of Sale**").

(c)    An Assignment and Assumption of Leases in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Assignment of Leases**"), as well as the hereinafter described Tenant Notification Letter.

(d)    A pro forma of the Title Policy, as described in Section 5.1 of this Agreement.

(e)    Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Purchaser's representative at the Property.

(f)    A rent roll for the Property (the "**Closing Rent Roll**") dated and certified as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of closing.

(g)    The originals or certified copies of the leases and other occupancy agreements described in the Closing Rent Roll.

(h)    All transfer documents (the "**Transfer Documentation**") necessary to assume the First Lien executed by Seller and the Existing Lender and to release Seller and current guarantors.

(i)    Organizational and authority documents satisfactory to the Title Company.

(j)    All costs and fees required to be paid by Seller pursuant to Article 8.

(k)    Such other documents and instruments as may be required by this Agreement or by the Title Company in order to consummate the transactions described in this Agreement and to issue the Title Policy to Purchaser.

(l)     A non-foreign (FIRPTA) affidavit for Seller complying with the requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

(m)     Evidence of termination of those Contracts that are terminable pursuant to Section 3.7(b)(vi).

(n)     An affidavit acceptable to the Title Company reflecting that there are no changes to the Survey except those approved by the Purchaser.

(o)     Such other instruments and affidavits as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

7.2     At or prior to the Closing, Purchaser shall execute and/or deliver the following to Escrow Agent:

(a)     The Purchase Price.

(b)     The Deed.

(c)     The Bill of Sale.

(d)     The Assignment of Leases.

(e)     The Transfer Documentation executed by Purchaser.

(f)     Organizational and authority documents satisfactory to the Title Company.

(g)     A written notice of the acquisition of the Property by Purchaser, originally executed by Seller and Purchaser, which shall be transmitted to all tenants and to other parties affected by the sale and purchase of the Property (the "**Tenant Notification Letter**"). Such notice (in the form of Exhibit "B" hereto) shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices. The said notices shall specify that unapplied security deposits under the tenant leases have been delivered to the Purchaser and that the Purchaser is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits.

(h)     All costs and fees required to be paid by Purchaser pursuant to Article 8.

(i)     Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

(j)     Such other instrument, affidavits, and tax returns as are customarily executed by the purchaser of an interest in real property in connection with the recording of the deed.

AGREEMENT FOR PURCHASE AND SALE · Page 13
15511263.1   110596.00024

App. 973

## ARTICLE 8: APPORTIONMENTS AND ADJUSTMENTS

8.1    Seller shall be responsible for and pay all accrued expenses with respect to the Project accruing up to 11:59 P.M. on the day prior to the Closing Date (the "Adjustment Date") and shall be entitled to receive and retain all revenue from the Project accruing up to the Adjustment Date; provided, however, that if the Closing Date occurs on the last day of the month, the Adjustment Date shall be the Closing Date.

8.2    On the Closing Date, the following adjustments and apportionments shall be made by authorized representatives of the parties in cash as of the Adjustment Date:

(a) Rent payable and paid for the month of Closing shall be prorated as of the Adjustment Date. There shall be no proration of delinquent rentals. After the Closing, Purchaser shall continue to bill tenants for sums reflected on the Closing Rent Roll as past due, shall receive such rents as trustee for Seller, and shall deliver such sums to Seller if, as and when received. Such rents shall be applied first to costs of collection, second to rents due for the Closing Month, third to rents due to Purchaser at the time of receipt, and last to rents due Seller for periods prior to Closing. After the Closing, if Seller receives rents for periods after the Closing Date, it shall remit such sums to Purchaser within two (2) business days of receipt.

(b)    Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any. In the event that either the tax assessment or the tax rate for the current year is not known at Closing, the parties shall prorate at Closing on the basis of the last known values and rates and adjust the prorations once such values or rates become known for the current year. Seller shall pay installments of confirmed assessments that have been levied against the Property and are due and payable as of the Closing. Purchaser shall pay all installments of any special assessments due after Closing.

(c)    Charges under Contracts affecting the Project on the Adjustment Date, and utility charges and relating to the Project, including any payments made to Seller prior to the Closing Date in respect of Contracts, laundry lease or information services, whether characterized as "decorating fees", "sign-up bonuses", "additional rents" or the like.

(d)    Utilities, water and sewer charges on the basis of the period for which assessed.

(e)    Income from vending machines and tenant services, if any.

8.3    At the Closing, Purchaser will receive a credit against the Purchase Price in an amount equal to all unapplied security deposits held under Leases in effect on the Adjustment Date, against Purchaser's receipt and indemnification therefor. Upon making such credit, Purchaser will be deemed to have received all such security deposits and shall be fully responsible for the same as if a cash amount equal to such security deposits were actually delivered to Purchaser. Prior to the Closing, Seller reserves the right to apply security deposits as provided under the respective leases and permitted by applicable law; provided however, Seller shall not apply security deposits for any rentals due for the month in which the Closing Date occurs.

8.4     All other income of the Property, accruing or relating to the period through the Adjustment Date shall be paid to Seller.  All other income of the Property, accruing or relating to the period commencing on the Adjustment Date and thereafter shall be paid to Purchaser.

8.5     All other expenses, such as utilities, maintenance and other operating expenses, incurred in connection with the Property and accruing or relating to the period through the Adjustment Date shall be the responsibility of and paid by Seller.  Seller shall pay the existing amounts due under Construction Contracts.  All other expenses, such as utilities, maintenance and other operating expenses incurred in connection with the Property and accruing or relating to the period commencing on the date of Closing and thereafter shall be the responsibility of and paid by Purchaser.

8.6     At the Closing and subject to the prorations herein provided, Seller shall receive a cash credit in an amount equal to the sum of all amounts held in escrow by holder of the First Lien, including, without limitation, hazard insurance premiums, taxes and MIP reserve or repair and replacement reserve. All escrows associated with the First Lien shall be assigned to Purchaser.

8.7     Walk-Through.  Seven (7) days prior to Closing, Seller and Purchaser will perform a walk-through of all vacant units to determine which ones are not made-ready for rental.

8.8     To the extent that any amount of any of the above items shall not be available for exact proration as of the Closing, the proration at Closing will be based on the best available information and Seller or its representative and Purchaser or its representative shall meet as soon after the Closing as possible, but in no event later than thirty (30) days after Closing, and compute and settle and adjust or readjust the Closing prorations between the parties as of the date of Closing. Rents, if any, collected by Purchaser after the Closing shall be applied first to any amounts due Purchaser and then to the extent such rents relate to the period through and including the day before the day of the Closing shall be paid to Seller. Purchaser agrees to use good faith collection procedures with respect to the collection of any delinquent rentals, but will have no liability for the failure to collect any such amounts and will not be required to incur any material cost, conduct lock-outs or take any other legal action to enforce collection of any such amounts owed to Seller by tenants of the Property. The provisions of this Section 8.6 shall survive Closing.

The provisions of this **ARTICLE 8** shall survive the Closing.

## **ARTICLE 9: REMEDIES**

9.1     If Purchaser breaches its obligation to purchase the Project pursuant to this Agreement, and after receipt of any applicable notice and a five (5) day opportunity to cure, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Purchaser and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the Deposit to Seller which shall retain the same as liquidated damages.  Seller shall not be required to give Purchaser notice of failure to close, on the date provided in this Agreement and Purchaser shall not have any five (5) day grace period therefor.  Seller and Purchaser acknowledge that the amount of damages resulting from a breach of this Agreement by Purchaser would be difficult or impossible to accurately ascertain and that Seller's damages would, in any event, be substantial and would exceed the Deposit.  Upon Seller's receipt of the Deposit,

this Agreement shall wholly cease and terminate, no party to this Agreement shall have any further claim, agreement, or obligation to any other party to this Agreement, and any lien of Purchaser against the Project shall automatically cease, terminate and be released.

9.2     If the sale contemplated by this Agreement is not consummated because of Seller's failure to perform its obligations hereunder, Purchaser shall be entitled, as its exclusive remedy, to elect after notice to Seller and a five (5) day opportunity to cure either (a) to terminate this Agreement and have the Deposit returned to it or (b) to enforce specific performance of Seller's obligations under this Agreement. Purchaser shall not be required to give Seller notice of failure to close, on the date provided in this Agreement and Seller shall not have any five (5) day grace period therefor.

9.3     The non-breaching party shall also be entitled to recover against the breaching party its costs and expenses, including reasonable attorneys' fees and court costs, incurred by such non-breaching party in enforcing any of the remedies hereunder, as determined by a court of competent jurisdiction in Texas.

## ARTICLE 10:  DAMAGE, DESTRUCTION OR CONDEMNATION

10.1     Seller agrees to maintain its present policies of casualty insurance covering the Project in full force and effect from the date of this Agreement through and including the Closing Date.

10.2     If either a substantial part of the improvements on the Land is damaged or destroyed or any part of the Property is taken by condemnation or other power of eminent domain then Purchaser shall have the right to terminate this Agreement based upon such damage, destruction or taking.  If Purchaser does not terminate this Agreement as aforesaid, then on the Closing Date:

(i)     The Purchase Price shall not be reduced, but Seller shall credit the Purchase Price with an amount equal to any sums of money collected by Seller under its policies of casualty insurance or renewals thereof insuring against the loss in question (after deducting any reasonable expenses incurred by Seller in collecting such insurance and any amount that Seller shall have paid or shall be obligated to pay for repairs or restoration of the damage), and Seller shall assign, transfer and set over to Purchaser at Closing all of Seller's right, title and interest in and to its casualty insurance policy or policies with respect to the Property and any further sums payable under said policies, plus the amount of any deductibles; provided that in no event shall the credits and insurance assigned to Purchaser exceed the cost of the unrepaired damage; and

(ii)     Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any awards that may be made for any taking by condemnation or other power of eminent domain.

10.3     For the purposes of this Article, a substantial part of the Improvements on the Land shall be deemed to mean a portion having a value of $100,000 or more or which would require expenditure of $100,000 or more for repair or restoration.

## ARTICLE 11: BROKER

11.1    Purchaser represents and warrants to Seller that neither Purchaser nor any entity related to Purchaser has dealt with any broker or other person or entity who would be entitled to a commission, consulting fee or other brokerage fee in connection with the transactions described in this Agreement.

11.2    Seller represents and warrants to Purchaser that neither Seller nor any entity related to Seller has dealt with any broker or other person or entity that would be entitled to a commission, consulting fee, or other brokerage fee in connection with the transactions described in this Agreement.

11.3    Each party agrees to indemnify, defend and hold the other harmless of and from any loss, cost, damage or expense (including reasonable attorneys' fees and court costs) arising out of any inaccuracy in the representation or warranty made by such party in Sections 11.1 and 11.2 above.

11.4    Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article shall survive the Closing and any prior termination of this Agreement for any reason whatsoever.

## ARTICLE 12: NOTICES

12.1    Any notice given or required to be given pursuant to any provision of this Agreement shall be in writing and shall be personally delivered or sent by facsimile, certified U.S. mail, with return receipt requested, or a reputable commercial courier service guaranteeing overnight delivery, and shall be deemed to have been given upon receipt if personally delivered, or, as the case may be, upon transmittal by facsimile with electronic confirmation of receipt, upon deposit in U.S. mail or upon delivery to such commercial courier, with delivery charges prepaid, if sent by such a courier, in either case addressed as follows:

Seller:            D4IN LLC
                   13901 Midway Road, Suite 102
                   Dallas, Texas 75244
                   Attention:    Timothy Barton
                   Telephone:    972-385-9934
                   E-mail:       TBarton@jmjdevelopment.net

Purchaser:         Southern Properties Capital Ltd.
                   1603 LBJ Freeway, Suite 800
                   Dallas, Texas 75234
                   Attn:   Bradley Muth
                   Phone: 469-522-2366
                   E-mail:bradley.muth@pillarincome.com

AGREEMENT FOR PURCHASE AND SALE - Page 17
15511263.1 – 110596.00024

with a copy to:                Steptoe & Johnson PLLC
                               1603 LBJ Freeway, Suite 750
                               Dallas, Texas 75234
                               Attn:   Jay A. LaJone
                               Phone: 214-373-2556
                               E-mail:jay.lajone@steptoe-johnson.com

12.2    (a)    Either party may, by giving notice to the other in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change or address shall be effective three (3) days after it is given.

(b)    The attorney for each party to this Agreement identified in Article 12.1 may give notices on behalf of his client with the same force and effect as if such notice were given directly by such party.

## ARTICLE 13:  ASSIGNMENT

13.1    Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to a third party.

## ARTICLE 14:  MISCELLANEOUS

14.1    The following matters of general application shall apply to this Agreement and control interpretation notwithstanding any provision apparently to the contrary:

(a)    This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective heirs, successors, legal representatives and permitted assigns.

(b)    Wherever under the terms and provisions of this Agreement the time for performance falls upon a Saturday, Sunday or legal holiday in the state where Seller or Purchaser maintains the office reflected in Article 12 hereof, such time for performance shall be extended to the next business day thereafter.

(c)    This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one and the same agreement.  Escrow Agent is authorized to attach multiple signature pages to a single conformed original.

(d)    The captions at the beginning of the several paragraphs, Sections and Articles are for convenience in locating the context, but are not part of the context.  Unless otherwise specifically set forth in this Agreement to the contrary, all references to Exhibits contained in this Agreement refer to the Exhibits which are attached to this Agreement, all of which Exhibits are incorporated in, and made a part of, this Agreement by reference.  Unless otherwise specifically set forth in this Agreement to the contrary, all references to Articles, Sections, paragraphs and clauses refer to portions of this Agreement.

(e)    If any term or provision of this Agreement shall be held to be illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this

AGREEMENT FOR PURCHASE AND SALE – Page 18
15511263.1 – 110596.00024

App. 978

Agreement shall not be affected thereby, but each such remaining term and provision shall be valid and shall remain in full force and effect.

(f)     This Agreement and the other writings referred to in, or delivered pursuant to, this Agreement, embody the entire understanding and contract between the parties hereto with respect to the Project and supersede any and all prior agreements and understandings between the parties hereto, whether written or oral, formal or informal, with respect to the subject matter of this Agreement.  This Agreement has been entered into after full investigation by each party and its professional advisors, and neither party is relying upon any statement, representation or warranty made by or on behalf of the other which is not expressly set forth in this Agreement.

(g)     No extensions, changes, waivers, modifications or amendments to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, waiver, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever, unless the same is contained in writing and is fully executed by the party against whom such matter is asserted.

(h)     This Agreement shall be governed and interpreted in accordance with the laws of the State where the Property is located.

(i)     Each party hereto shall pay all charges specified to be paid by them pursuant to the provisions of this Agreement and their own attorney's fees in connection with the negotiation, drafting and closing of this Agreement.

(j)     Purchaser and Seller agree that this Agreement has been entered into solely for the benefit of Purchaser and Seller and no other person or entity, it being the intention of Purchaser and Seller that no person or entity not a party to this Agreement shall have any right or standing to (a) bring any action against Purchaser or Seller based on this Agreement, or (b) assume that any provision of this Agreement will be enforced or remain unmodified or unwaived, or (c) assert that it or he is or should be or was intended to be a beneficiary or any provision of this Agreement.

(k)     The parties agree that any actions taken or documents (including this Agreement) signed by any trustee, officer, or director of Seller or Purchaser are undertaken in their fiduciary capacity and no recourse shall be had to the personal assets of any such trustee, officer, or director for enforcement of this Agreement.

(l)     Wherever a time is set forth for performance or notice in this Agreement, time shall be of the essence unless explicitly stated to be otherwise.

(m)     Purchaser and Seller agree that the Property will not be actively marketed and the Seller will not enter into negotiations with any other prospective purchasers while this Agreement is in effect or any contract negotiations are pending.

*[Signature page to follow]*

AGREEMENT FOR PURCHASE AND SALE – Page 19
15511263.1 – 110596.00024

App. 979

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in their names by their respective duly authorized representatives as of the day and year first above written.

Seller:                              **D4IN LLC,**
                                     a Texas limited liability company

                                     By:    _____
                                            Timothy Barton, President

Purchaser:                           **SOUTHERN PROPERTIES CAPITAL LTD.,**
                                     a British Virgin Islands corporation

                                     By:    _____
                                     Name:  _____
                                     Title: _____

## ACKNOWLEDGEMENT OF RECEIPT BY TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of the Agreement on this, the _____ day of _____, 20___, and agrees to accept, hold and disburse the Earnest Money Deposit in accordance with the provisions of the Contract. The undersigned acknowledges that it is not a party to this Agreement and that it is executing below solely for the purpose of the foregoing acknowledgment and agreement.

TITLE COMPANY:

Commonwealth Land Title Insurance Company

By: _____
Name: James P. Lazar
Title: Escrow Agent

## EXHIBITS:

A - Legal Property Description
B - Tenant Notification Letter
C - Current Rent Roll
D - Due Diligence Materials

App. 981

## EXHIBIT "A"

## LEGAL PROPERTY DESCRIPTION

## EXHIBIT "B"

## TENANT NOTIFICATION LETTER

Dated: _____, 20___

_____
_____
.................................
_____

Re: _____ ("Property")

Dear _____:

As of the date of this letter, _____, a _____ and the former owner of the Property ("Seller"), transferred title and possession of the Property to                                      ("Purchaser").

Pursuant to the provisions of Section _____ of the Texas _____, you are hereby notified that Purchaser is responsible for all of the obligations of the landlord under your lease first arising from and after the date hereof. Seller is joining in the execution of this letter to acknowledge the fact that title and possession to the Property and all future responsibilities of the landlord under your lease have been transferred to Purchaser.

From and after the date of this letter, please make all rental checks payable to _____ _____, and deliver same to _____, until otherwise notified in writing.

Sincerely,

PURCHASER:                    _____,
                              a _____

                              By: _____
                              Name: _____
                              Title: _____

AGREEMENT FOR PURCHASE AND SALE    Page 23
15511263.1    110596.00024

App. 983

**ACKNOWLEDGED:**

**SELLER:**

_____,

a _____

By: _____
Name: _____
Title: _____

## EXHIBIT "C"

## CURRENT RENT ROLL

**(see attached)**

EXHIBIT "D"

DUE DILIGENCE MATERIALS

(see attached)

| Item | Received | Comments |
|---|---|---|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement: or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

| Item | Received | Comments |
|---|---|---|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement: or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

AGREEMENT FOR PURCHASE AND SALE    Page 28
15511263.1    110596 00024

App. 988

# EXHIBIT I-27

REORDER 905 - U.S. PATENT NO 5532290, 5575500, 5641183, 5785351, 5984364, 603000

| | | | |
|---|---|---|---|
| Enoch Investments LLC and JMJAV LLC<br>JMJ02 | CHECK PAYMENT NBF | 311668 | DATE    10/03/2022 |

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION_NOTE | SPC Conversion Notice | $ 100.00 |

|  |  | TOTALS: | $ 100.00 |
|---|---|---|---|

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234

---

THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**Southern Properties Capital Ltd**
1603 LBJ Freeway, Suite 800
Dallas, TX 75234          (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS          311668

1-279/260

DATE    10/03/2022

PAY TO THE
ORDER OF    Enoch Investments LLC and JMJAV LLC

AMOUNT
$ 100.00

One Hundred Dollars and 00 Cents

Enoch Investments LLC and JMJAV LLC
Dallas, TX 75234

Alla Dzyuba

⑈311668⑈ ⑆026002794⑆    4104294800⑈

App. 990

# EXHIBIT I-28

Case 3:22-cv-02118-X     Document 251     Filed 05/30/23     Page 303 of 366     PageID 8840

FedEx® Tracking          ⋮

**DELIVERED**

# Tuesday

10/4/2022 at 8:16 am

Signed for by: S.PATEL

⬇ Obtain Proof of delivery

How was your delivery?

☆ ☆ ☆ ☆ ☆

**DELIVERY STATUS**

Delivered ✓

✉ Get Status Updates

**TRACKING ID**

770101862781 ✏ ☆

**FROM**
Dallas, TX US

*Label Created*
10/3/2022 3:45 PM

**PACKAGE RECEIVED BY FEDEX**
ADDISON, TX
10/3/2022 7:02 PM

**IN TRANSIT**
ADDISON, TX
10/4/2022 7:07 AM

**OUT FOR DELIVERY**
ADDISON, TX
10/4/2022 7:07 AM

**DELIVERED**
Dallas, TX US

*DELIVERED*
10/4/2022 at 8:16 AM

↓ View travel history

Manage Delivery         ⌄

App. 992

Case 3:22-cv-02118-X      Document 251      Filed 05/30/23      Page 304 of 366      PageID 8841

Travel history                                                                                    ⌄

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)

Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)

Investor Relations(https://investors.fedex.com/home/default.aspx)

Careers(https://careers.fedex.com/fedex/)

FedEx Blog(https://www.fedex.com/en-us/blog.html)

Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)

Newsroom(https://newsroom.fedex.com/)

Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)

FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)

FedEx Logistics(https://www.fedex.com/en-us/logistics.html)

FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)

ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX** ✉ (https://www.fedex.com/en-us/email.html)   f (Https://www.facebook.com/FedEx/)

🐦 (Https://twitter.com/fedex)   📷 (https://www.instagram.com/fedex/)   in (https://www.linkedin.com/company/fedex)

▶ (https://www.youtube.com/fedex)   📌 (https://www.pinterest.com/FedEx/)

© FedEx 1995-2022

Site Map (https://www.fedex.com/en-us/sitemap.html)       |   Terms of Use (https://www.fedex.com/en-us/terms-of-use.html)       |   Privacy & Security (https://www.fedex.com/en-us/trust-center.html)

App. 993

Case 3:22-cv-02118-X    Document 251    Filed 05/30/23    Page 305 of 366    PageID 8842



A1 PNXA

TRK# 0201

7701 0186 2781

TUE - 04 OCT 8:00A
FIRST OVERNIGHT

TX-US

75244
DFW
ASR

ORIGIN ID:PNXA    (214) 373-2579
MARTHA SELLWOOD
STEPTOE & JOHNSON PLLC
1603 LBJ FREEWAY
#750
DALLAS, TX 75234
UNITED STATES US

SHIP DATE: 03OCT22
ACTWGT: 1.00 LB
CAD: 254212929/INET4530

BILL SENDER

TO TIMOTHY BARTON
ENOCH INVESTMENTS C/O JMJ DEVELOPME
13901 MIDWAY ROAD
SUITE 102
DALLAS TX 75244
(214) 456-8900

INV:
PO:                    DEPT:

REF: 110596 00003 - SPI-BELLWETHER

581 J1/AC5F/FE2D

FedEx
Express

J223022081281uv

**After printing this label:**

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

App. 994

# EXHIBIT I-29

**SOUTHERN**
**PROPERTIES CAPITAL**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

November 3, 2022

Mr. Courtney C. Thomas
Brown Fox　　LLC
8111 Preston Road
Suite 300
Dallas, Texas 75225

　　　Re:　　SEC v. Timothy Barton, et al; Civil Action No. 3:22-CV-2118X (Parc at Ingleside)

Dear Mr. Thomas:

　　This letter is written to you in your capacity as Receiver in the referenced case. Southern Properties Company Ltd. ("Lender") is the lender to JMJAV, LLC in connection with the Parc at Ingleside Apartments, an apartment complex in Ingleside, Texas ("Parc at Ingleside"). By letter dated October 3, 2022 ("Exercise Letter"), a copy of which is attached, Lender exercised its right to acquire ownership of Parc at Ingleside.

　　Lender's right arises under the Pledge and Security Agreement dated June 13, 2019, as amended by Amendment to Pledge and Security Agreement dated the same date (collectively, "Pledge"). Copies are attached. The Pledge secured a loan ("Mezzanine Loan") in the amount of $6,634,490 from JMJAV, LLC to Lender evidenced by the attached Promissory Note. The security interests granted under the Pledge were perfected by the attached UCC-1s. By letter agreement also dated June 13, 2019 (copy attached), JMJAV, Enoch Investments, LLC and JMJD4, LLC also agreed to the assignment of ownership interests in D4IN, LLC, the owner of Parc at Ingleside.

　　Parc at Ingleside is subject to a first mortgage loan ("Mortgage Loan") in the amount of $25,201,000.00 in favor of Greystone Funding Company LLC ("Greystone"), which loan is insured by the US Department of Housing and Urban Development ("HUD"). The Mortgage Loan, as evidenced by a U.S. Department of Housing and Urban Development Regulatory Agreement for Multifamily Projects ("Regulatory Agreement") and a Note ("Note"), both dated November 1, 2019, is secured by a Multifamily Deed of Trust, Assignment of Leases and Rents and Security Agreement ("Deed of Trust," collectively with the Regulatory Agreement and Note referred to as the "Mortgage Documents"). The terms of the Mortgage Documents allow for an assumption of the loan, subject to the approval of both Greystone and HUD. Section 7.15 of the Pledge provides the mechanism under

App. 996

Mr. Courtney C. Thomas
October 28, 2022
Page 2

which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledge contemplates that the parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such purchase must be submitted with the signed TPA application.

In the Exercise Letter, Lender included a proposed Purchase Agreement. Please review this and provide us with any comments.

While we understand that you have been required to review much information in a short time, it is important that this transfer be submitted to Greystone and HUD as soon as possible. The current proceedings and your appointment as Receiver violate the Mortgage Documents, and we believe proceeding with the transfer can resolve this default.

Please contact Mark Cooper (469) 522-4390 at your earliest convenience. Thank you for your help.

Very truly yours,

**SOUTHERN PROPERTIES CAPITAL LTD.**


By: _____
Name: _____
Title: _____


cc:     Enoch Investments, LLC
        JMJAV, LLC
        JMJD4, LLC
        D4IN, LLC

App. 997

# EXHIBIT I-30

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

# NOTE
## (MULTISTATE)

*HUD Project No. 062-35778*
*HUD Project Name: Parc at Opelika*

US $23,661,300.00                                     As of January 1, 2021

FOR VALUE RECEIVED, the undersigned, D4OP LLC, a limited liability company organized and existing under the laws of the State of Texas (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Funding Company LLC, a limited liability company organized and existing under the laws of the State of Delaware, the principal sum of Twenty Three Million Six Hundred Sixty OneThousand Three Hundred and 00/100 Dollars ($23,661,300.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of Two and 99/100 per centum (2.99%).*

1.      **Defined Terms.** As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of the Security Instrument under Section 13 of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they

Previous editions are obsolete                      Note                      HUD-94001M (6/18)

App. 999

become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Note rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

Any capitalized term or word used herein but not defined shall have the meaning given to such term or word in the Regulatory Agreement between Borrower and HUD or the Security Instrument.

    2.    **Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at 419 Belle Air Lane, Warrenton, VA 20186, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

    3.    **Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

    (a)    Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on February 1, 2021, and on the first day of each month thereafter up to and including November 1, 2022  (**"Last Interest Only Payment Date"**). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of Eighty Four Thousand Five Hundred Sixty Seven and 46/100 Dollars (US $84,567.46), shall be payable on the first day of each month beginning on December 1, 2022, (**"Amortization Commencement Date"**), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on November 1, 2062 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (**"Maturity Date"**).

    (b)    Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

App. 1000

4.      **Security.** The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note (**"Security Instrument"**), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

5.      **Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument.  Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

6.      **Acceleration.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower.  If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable.  Lender may exercise this option to accelerate regardless of any prior forbearance.  Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

7.      **Late Charge.** If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to two percent (2%) of the unpaid principal and interest due in such month.  Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses.  Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

8.      **Exculpation; Remedies.**

(a)      Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50

---

Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)    Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender. These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c)    Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

9.    **Voluntary and Involuntary Prepayments.**

(a)    This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1. In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

---

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

App. 1002

(b)      Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)      Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, and (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)      Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)      Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)      If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)      All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

10.    **Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

App. 1003

11.    **Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

12.    **Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

13.    **Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

14.    **Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

15.    **Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

16.    **Governing Law; Consent to Jurisdiction and Venue.**
(a)    This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

App. 1004

(b)    Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**17.    Rules of Construction.**  The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note. Use of the singular in this Note includes the plural and use of the plural includes the singular. As used in this Note, the term **"including"** means "including, but not limited to."

**18.    Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

**19.    Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. Section 3701, *et seq.*, as amended, when HUD is the holder of the Note.

**20.    Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

---

Previous editions are obsolete                     Note                     HUD-94001M (6/18)

App. 1005

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

**21. WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

[Signature page follows]

App. 1006

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

D4OP LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

App. 1007

NOTE (Multistate)

State of Alabama

D4OP LLC, a Texas limited liability company

To

Greystone Funding Company LLC, a Delaware limited liability company

Project No.: 062-35778

Initially endorsed for insurance under § 221(d)(4) of the National Housing Act, as amended, and regulations published thereunder in effect on July 30, 2020 to the extent of advances approved by HUD.

By: _____ Date: Jan 26, 2021

Print Name: Donald A. Billingsley

Title:     Authorized Representative

At final endorsement, a total sum of $_____ has been approved for insurance hereunder by HUD.

By: _____ Date: _____, 20___

Print Name: _____

Title:     Authorized Representative

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

App. 1008

## RIDER 1 TO NOTE
## FROM
## D4OP LLC, a Texas limited liability company
## TO
## Greystone Funding Company LLC, a Delaware limited liability company
## In the original principal sum of $23,661,300.00

1.    This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4OP LLC, a Texas limited liability company (the "Borrower"), to Greystone Funding Company LLC, a Delaware limited liability company (the "Lender") dated as of January 1, 2021 (the "Note").

2.    Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to December 1, 2022. Borrower shall have the right, on or after December 1, 2022, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid. In the event of any prepayment of principal at any time on or after December 1, 2022, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from December 1, 2022 through November 30, 2023 | 10% |
| from December 1, 2023 through November 30, 2024 | 9% |
| from December 1, 2024 through November 30, 2025 | 8% |
| from December 1, 2025 through November 30, 2026 | 7% |
| from December 1, 2026 through November 30, 2027 | 6% |
| from December 1, 2027 through November 30, 2028 | 5% |
| from December 1, 2028 through November 30, 2029 | 4% |
| from December 1, 2029 through November 30, 2030 | 3% |
| from December 1, 2030 through November 30, 2031 | 2% |
| from December 1, 2031 through November 30, 2032 | 1% |
| from December 1, 2032 and thereafter | None |

FHA# 062-35778                Rider 1 to Note                Parc at Opelika

App. 1009

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Borrower shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

The Borrower has executed this Rider to Note on the date first above written.

BORROWER:

D4OP LLC,
a Texas limited liability company

By: _____
    Timothy Barton, President

END OF RIDER 1

# EXHIBIT I-31

**Building Loan Agreement**
    **U.S. Department of Housing and
Urban Development**
Office of Housing
    OMB Approval No. 2502-0598
(Exp. 9/30/2021)

**Public Reporting Burden** for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived.  This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

**HUD Project Number: 062-35778**
**Project Name: Parc at Opelika**

THIS BUILDING LOAN AGREEMENT, made this <u>1st day of January, 2021</u>, by and between D4OP LLC, a limited liability company organized and existing under the laws of the State of Texas, with an office and place of business at 13901 Midway Rd, Suite 102, Dallas, TX 75244-4388, in the County of Dallas, State of Texas (**"Borrower"**), and Greystone Funding Company LLC, a limited liability company organized and existing under the laws of the State of Delaware, having an office and place of business at 419 Belle Air Lane, Warrenton, VA 20186 in County of Fauquier, State of Virginia **"Lender"**).  (The definition of any capitalized term or word used herein can be found in this Building Loan Agreement, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument, except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Building Loan Agreement rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov

App. 1012

WHEREAS, Borrower, as the owner in fee simple of, or the owner of the leasehold estate in, the land (**"Land"**) described in <u>Exhibit A</u> attached to the **Security Instrument**, which <u>Exhibit A</u> is also attached hereto and incorporated herein by reference, has obtained a commitment from Lender for a Loan of <u>Twenty Three Million Six Hundred Sixty One Thousand Three Hundred and 00/100</u> Dollars ($<u>23,661,300.00</u>) to aid Borrower in the construction or rehabilitation on said Land of a Project identified above in accordance with Drawings and Specifications hereinafter referred to, and

WHEREAS, Borrower understands that Lender has received a Firm Commitment from **HUD** for insurance of said Loan under the provisions of the National Housing Act, as amended, and intends upon execution of the hereinafter mentioned Note and Security Instrument to have the Note endorsed for insurance by HUD.  (HUD is not making the Loan.)

NOW, THEREFORE, in consideration of the mutual promises hereinafter set out and of other valuable consideration, the receipt of which is hereby acknowledged, the undersigned agree as follows:

(1) Lender shall make and Borrower shall obtain a Loan in the principal sum of <u>Twenty Three Million Six Hundred Sixty One Thousand Three Hundred and 00/100 Dollars (US $23,661,300.00),</u> to be advanced as hereinafter provided, and to bear interest from the date of each advance at the rate of <u>Two and 99/100 percent (2.99%)</u> per annum.  The Loan shall be evidenced by a credit instrument (**"Note"**) dated <u>January 1, 2021.</u>  The Note shall be payable in monthly installments, and shall have a maturity date of <u>November 1, 2062</u>.  The Note shall be executed by Borrower and payable to Lender, or order, and shall be secured by a Security Instrument, of even date, on the Land described in the Security Instrument.  The Security Instrument shall constitute a valid first lien on said Land and the Improvements to be erected thereon, and the only lien thereon except for liens for taxes and assessments not yet payable and other liens acceptable to Lender and HUD.  Lender shall not advance any Loan funds until Borrower and Lender have submitted to HUD documents required by this Building Loan Agreement and the Firm Commitment to insure advances, and not until HUD has completed the initial endorsement of the Note.

(2) Borrower shall complete, on the Land, by <u>September 26, 2022</u>, a Project in accordance with Drawings dated August 29, 2019 last revised October 16, 2020 and Specifications last revised January 8, 2020 filed with HUD.   Such Drawings and Specifications, which include General Conditions of the Contract for Construction, AIA Document A201 – 2017 (**"General Conditions"**) and the Supplementary Conditions of the Contract for Construction (HUD-92554M), have been initialed by Borrower, Design Architect, Architect administering the Construction Contract (**"Architect"**), the Contractor, the Lender (if applicable), and Contractor's surety or guarantor (if applicable).

(3) Changes in the Drawings and Specifications, or changes by altering or adding to the work contemplated, or orders for extra work shall have the prior written approval of

the Architect.  In addition, any such change or order may be effected only with the prior written approval of Lender and HUD and under such conditions as either Lender or HUD may establish.

(4) (a) Borrower shall make monthly applications on HUD-92403 for advances of Loan proceeds from Lender.  Applications for advances with respect to construction items shall be for amounts equal to (i) the total value of classes of the work acceptably completed; plus (ii) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site, plus (iii) the value of components stored off-site in compliance with Program Obligations; less (iv) ten percent (10%) (**"Holdback"**) as this percentage may be reduced in accordance with the provisions of the Retainage Reduction Rider attached hereto, if applicable and (v) less prior advances.  The values of (i), (ii) and (iii) shall be computed in accordance with the amounts assigned to classes of the work in the Contractor's and/or Mortgagor's Cost Breakdown (HUD-2328) attached to the Construction Contract and also attached hereto as Exhibit B.  Each application shall be filed at least fifteen (15) days before the date the advance is desired, and Borrower shall be entitled thereon only to such amount as may be approved by Lender (and HUD, pursuant to Program Obligations).

(b) Upon completion of the Improvements, including all landscape requirements, off-site utilities and streets, and any incomplete construction work as described in the Escrow Agreement for Incomplete Construction, Borrower shall furnish to Lender and HUD satisfactory evidence that all work requiring inspection by the Property Jurisdiction has been duly inspected and approved by such authorities and by the rating or inspection organization, bureau, association or office having jurisdiction; and that all requisite certificates of occupancy and other approvals to own and operate the Project have been issued.  The balance due Borrower hereunder shall be payable at such time after completion as HUD authorizes the release of the final advance.  However, Lender may withhold final payment until after the expiration of any period that mechanics and materialmen may have for filing liens.

(c) Except as otherwise provided by Program Obligations, Borrower agrees to deposit with Lender cash in the amount of $554,079.00, an amount that has been deemed by HUD to be sufficient, when added to the proceeds of the Loan, to assure completion of the Project and to pay the initial service charge, carrying charges, and legal and organizational expenses incident to the construction of the Project (**"Project Completion Funds"**).  Borrower agrees that Project Completion Funds shall be advanced by Lender as set forth in the disbursement agreement dated January 26, 2021, approved by Lender and HUD and attached hereto as Exhibit C.  Borrower further agrees that Project Completion Funds shall be advanced prior to Loan Proceeds, except as otherwise permitted by Program Obligations and reflected in the disbursement agreement.

(d) Borrower covenants that it shall hold in trust each advance hereunder for application to the items for which such advance was requested and approved.

(e) Except as otherwise provided in Program Obligations, Borrower agrees that the Loan shall at all times remain in balance.  Lender shall, in accordance with the provisions of this Building Loan Agreement, continue to advance to Borrower funds out of the proceeds of the Loan upon insurance thereof by HUD, as long as the Loan

remains in balance and Borrower is not in default hereunder or under the Note or Security Instrument.

(5) Lender shall advance to Borrower out of the funds referred to in (4)(c) above, or out of the proceeds of the Loan, amounts for application to the charges or items set forth in a rider to the disbursement agreement (Exhibit C), but only to the extent that such charges have accrued, or that Borrower is otherwise entitled to payment on account of such items.  If there is no disbursement agreement, then the amounts for application to the charges or items shall be set forth in a schedule attached as Exhibit C.

TOTAL MAXIMUM ADVANCE (Line 45 of Financial Requirements for Closing (HUD-2283)) $25,715,379.00

(6) Borrower shall cause either this instrument, waiver of liens or the Construction Contract under which the Improvements are to be erected (or a memorandum thereof) to be filed in the public records, if the effect thereof shall be to relieve the Mortgaged Property from mechanics' and materialmen's liens.  Before any advance hereunder, Lender may require Borrower to obtain from the Contractor and all subcontractors and materialmen dealing directly with the principal Contractor acknowledgments of payment and releases of lien down to the date covered by the last advance, and concurrently with the final payment for the entire Project.  Such acknowledgments and releases shall be in the form required by local lien laws and shall cover all work done, labor performed and materials (including equipment and fixtures) furnished for the Project.

(7) Borrower shall, as a condition precedent to the first advance hereunder, furnish Lender with a signed, sealed and certified, current survey of the Mortgaged Property and a Lender's title insurance policy (or other evidence of title) in form, substance and amount satisfactory to Lender and HUD.  Said policy (or other title evidence) shall be endorsed so as to cover each and every advance of said Loan at the time of payment thereof and shall show no mechanics' or materialmen's liens against the Mortgaged Property.  Borrower shall furnish duplicate originals of said survey and title policy (or title evidence) to HUD.

(8) Borrower agrees that the Project shall be constructed strictly in accordance with all applicable ordinances and statutes, and in accordance with the requirements of all regulatory authorities, and any rating or inspection organization, bureau, association or office having jurisdiction.  Borrower further agrees that the Project shall be constructed in accordance with the Drawings and Specifications (including any drawings and specifications for off-site improvements) and shall not encroach upon any easement or right-of-way, or the land of others; and that the buildings when erected shall be wholly within the building restriction lines however established, and shall not violate applicable use or other restrictions contained in prior conveyances, zoning ordinances or regulations.  Borrower shall furnish from time to time such evidence with respect thereto as may be required by Lender or HUD and, upon completion of construction, shall furnish a survey, signed, sealed and certified by a registered surveyor that shows the

Project to be entirely on the Land, except for off-site improvements approved by Lender and HUD, and to be free from any such violations.

(9) The Borrower shall have defaulted under this Building Loan Agreement, if, at any time prior to the completion of construction:  (a) Borrower ceases work on the Project for a period of more than twenty (20) days; (b) Borrower fails to complete the erection of the Project substantially in accordance with the Drawings and Specifications within the time period permitted hereunder, as such time period may be extended with the consent of Lender and HUD; (c) Borrower makes changes in the Drawings and Specifications without first securing the written approval required by paragraph 3 hereof; (d) Borrower otherwise fails to comply with the terms of this Building Loan Agreement without first obtaining the written approval of HUD; or (e) an Event of Default occurs under the Security Instrument.  In the event of any such default under this Building Loan Agreement, Lender may, at its option, terminate this Building Loan Agreement or terminate its obligation to make further advances under this Building Loan Agreement; in either such event Lender may use and apply any funds deposited with it by Borrower, regardless of the purpose for which such funds were deposited, in such manner and for such purposes as HUD may prescribe.  Regardless of whether Lender elects to terminate this Building Loan Agreement or its obligation to make further advances as a result of default under this Building Loan Agreement, it may enter into possession of the premises and perform any and all work and labor necessary to complete the Improvements substantially according to the Drawings and Specifications (with such changes as may be approved in writing by HUD), and employ watchmen to protect the premises from injury.  All sums so expended by Lender shall be deemed to have been paid to Borrower and secured by the Security Instrument.  For this purpose, Borrower hereby constitutes and appoints Lender its true and lawful attorney-in-fact, with full power of substitution in the premises, to complete the Project in the name of Borrower.  Borrower hereby empowers said attorney as follows:  (a) to use any funds of Borrower, including any balance that may be held in escrow and any funds that may remain unadvanced hereunder for the purpose of completing the Project in the manner called for by the Drawings and Specifications (with such changes as may be approved in writing by HUD); (b) to make such additions, changes and corrections in the Drawings and Specifications (with written HUD approval) as shall be necessary or desirable to complete the Project in substantially the manner contemplated by the Drawings and Specifications; (c) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for said purposes; (d) to pay, settle or compromise all existing bills and claims that may be liens against the Mortgaged Property, or as may be necessary or desirable for the completion of the Project, or for clearance of title; (e) to execute all applications and certificates in the name of Borrower that may be required by any of the contract documents; (f) to prosecute and defend all actions or proceedings in connection with the Mortgaged Property or the construction of the Project and to take such action and require such performance as it deems necessary under the accepted guaranty of completion; and (g) to do any and every act that Borrower might do in its own behalf.  It is further understood and agreed that this power of attorney, which shall be deemed to be a power coupled with an interest, cannot be revoked.  Borrower hereby assigns and quitclaims to Lender all sums unadvanced under the Security

App. 1016

Instrument and all sums held by Lender in escrow conditioned upon the use of said sums for the completion of the Project, such assignment to become effective only in case of a default by Borrower.

(10)  Borrower shall provide or cause to be provided workers compensation insurance and public liability and other insurance required by applicable law, by the general conditions included in the Drawings and Specifications or by the Security Instrument.  Borrower further agrees to purchase and maintain fire insurance and extended coverage on the Mortgaged Property.  All such policies shall be issued by companies approved by Lender and shall be in form and amounts satisfactory to Lender and HUD.  Such policies shall be endorsed with standard Lender clauses making loss payable to Lender, its successors and assigns; and may be endorsed to make loss during construction payable to the Contractor, as its interest appears.  Lender shall have the right to hold the original policies or duplicate original policies.

(11)  Lender and its agents and HUD and its agents shall, at all times during construction, have the right of entry and free access to the Project and the right to inspect all work done, and materials, equipment, building components and fixtures furnished, installed or stored either on or off the Land, and to inspect all books, subcontracts and records of Borrower.  Lender and HUD have no obligation to make any such inspections.  Any and all such inspections by the Lender or its agents shall solely be for the benefit of Lender and HUD.  Any and all inspections by HUD or its agents shall solely be for the benefit of HUD.  Neither Borrower nor any third party shall have any claims against the Lender, HUD or their respective agents as a result of such inspections.  Neither HUD, nor the Lender, nor any of their respective agents assumes any obligation of the Borrower or any other person or entity with respect to the quality of construction of the Project, compliance of said construction with the Drawings and Specifications or any defects in said construction.

(12)  Borrower shall execute and deliver to Lender a security agreement and financing statements, or other similar instrument, covering the UCC Collateral.

(13)  Borrower shall furnish to Lender assurance of completion of the Project in the form specified by HUD.  Such assurance of completion shall run to Lender as obligee and shall contain a provision granting to Lender the authority to assign all rights thereunder to HUD.

(14) (a)  Borrower understands that the wages to be paid laborers and mechanics employed in the construction of the Project are required by the provisions of Section 212(a) of the National Housing Act, as amended, to be not less than the wages prevailing in the locality in which the work shall be performed for corresponding classes of laborers and mechanics employed on construction of a similar character, as determined by the Secretary of Labor pursuant to the Davis-Bacon Act and as published in the applicable prevailing wage determination.  Borrower hereby states that it has read the determination by the Secretary of Labor and is fully familiar with the same.

App. 1017

(b)  Borrower shall, as a condition precedent to any advance hereunder, submit to Lender (i) with each application for advance prior to the final application, certifications, in form approved by HUD, that all laborers and mechanics employed in the construction of the Project whose work is covered by that or any previous application and who have been paid in whole or in part on account of said employment, have been paid at rates not less those contained in the applicable prevailing wage determination; and (ii) with the final application for advance, certifications in form satisfactory to HUD, that the Project has been fully constructed in accordance with the provisions of this Building Loan Agreement and that all laborers and mechanics employed in the construction of the Project have been paid not less than the said prevailing wage rates.  The applicable prevailing wage determination shall be construed to include every amendment to or modification of the determination that may be published prior to the beginning of construction or day the Note is initially endorsed for insurance, whichever occurs first; provided, that if construction has not begun within ninety (90) days after initial endorsement of the Note, the applicable prevailing wage determination shall include any modification of the determination that may be published prior to the beginning of construction.

(c)  Borrower agrees that should any advances hereunder be ineligible for insurance under the National Housing Act, as amended, by reason of (i) the nonpayment of the said prevailing wage rates, or (ii) violation of any of the applicable labor standards provisions of the regulations of the Secretary of Labor ("Labor Standards"), Lender may withhold from Borrower all payments or advances payable to Borrower hereunder until Borrower establishes to the satisfaction of HUD that all laborers and mechanics or other persons employed in the construction of the Project have been paid said prevailing wage rates and that such violation of the Labor Standards provisions no longer exists. The written statement of any authorized agent of HUD declining to insure any advance of funds hereunder by reason of such nonpayment or violation shall be deemed conclusive proof that such advances are ineligible for mortgage insurance.

(d) In accordance with Article 1 of the Supplementary Conditions of the Contract for Construction, Borrower shall insert the labor standards provisions thereof in any contract made for the construction of the Project, or any part thereof, and shall require the Contractor to insert similar provisions in each subcontract relating to the construction of the Project.

(15)  Lender and Borrower agree that  the Loan shall be reduced by any amount required by the Agreement and Certification (HUD-93305M) between the parties hereto and HUD, which Agreement and Certification is incorporated herein by reference to the same extent as if set forth herein at length.

(16)  Borrower shall furnish such records, papers and documents relating to the Project as Lender or HUD may reasonably require from time to time.

(17)  Borrower shall not transfer, assign or pledge any right or interest in, or title to, any funds deposited by Borrower with Lender, or reserved by Lender for Borrower, without the prior written approval of Lender and HUD.

(18) As used in this instrument, the term **"Lender"** means the entity identified as "Lender" in the first paragraph of the Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the Obligee, or the Trustee(s) and the Beneficiary of the Security Instrument and shall also be deemed to be the mortgagee as defined by Program Obligations.   This Building Loan Agreement shall be binding upon the parties hereto and their respective successors and assigns.

(19) HUD is not a party to this Building Loan Agreement and has no obligation to Borrower or Lender pursuant to this Building Loan Agreement.  HUD, pursuant to the Contract of Insurance, has reserved the right to approve or disapprove certain actions in this Building Loan Agreement to protect the mortgage insurance fund.

(20) To the extent not inconsistent with applicable State law, Borrower's liability under the Building Loan Agreement shall be limited to the same extent as set forth in the Note.

(21) No waiver by the Lender of any default under this Building Loan Agreement will be effective unless such waiver is in writing and signed by the Lender and HUD.  No waiver by the Lender of any default under this Building Loan Agreement will operate as a waiver of any other default or of the same default on a future occasion.  The Lender may delay in exercising or omit to exercise any right or remedy available under this Building Loan Agreement or any other loan document or by law or equity provided without waiving that or any past, present or future remedy.  All rights and remedies of the Lender in this Building Loan Agreement and the other loan documents are cumulative, and none of these rights or remedies are exclusive of any other right or remedy allowed at law or in equity or in any other loan document, and all of these rights and remedies may be exercised and enforced concurrently.

(22)  This Building Loan Agreement and the other loan documents represent the entire agreement between the Lender and the Borrower with respect to the subject matter of this Building Loan Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Building Loan Agreement.  Neither this Building Loan Agreement nor any of the other loan documents may be amended, altered or changed other than in writing signed by the Lender and the Borrower.

(23) Upon assignment by Lender of its interest under this Building Loan Agreement, Lender shall automatically be released from any and all obligations under this Building Loan Agreement that arise after the date of assignment and Borrower shall look solely to the assignee of this Building Loan Agreement for the enforcement of any of Borrower's rights hereunder.

App. 1019

(24) BORROWER AND LENDER EACH (a) AGREE NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS BUILDING LOAN AGREEMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

Each signatory below hereby certifies that each of their statements and representations contained in this Building Loan Agreement and all their supporting documentation thereto are true, accurate, and complete.  This Building Loan Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

**BORROWER**

D4OP LLC,
a Texas limited liability company

By: _____
Timothy Barton, President


*[Lender Signature on Subsequent Page]*


---

Previous editions are obsolete                 Building Loan Agreement                 HUD-92441M (6/18)

11

**LENDER**

GREYSTONE FUNDING COMPANY LLC,
a Delaware limited liability company

By: _____
    Tiffany E. Baymiller, Vice President


Attachments:
           Exhibit A
           Exhibit B
           Exhibit C
           Rider for Retainage Reduction

App. 1022

# Exhibit A
# Legal Description

Tract "A-3-A" of the Fox Run Parkway Development, LLC Subdivision Opelika, Lee County, Alabama

All that certain tract or parcel of land containing 11.95 acres being shown as Tract "A-3-A" on the plat titled A Re-Subdivision of Tracts "A-3", "A-4" & "A-5" of the Re-Subdivision of Tract "A" of the Fox Run Parkway Development, LLC Subdivision as recorded in Plat Book 42 at Page 104 in the Office of the Judge of Probate of Lee County, Alabama, being located in Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama and being more particularly described a follows:

Starting at the locally accepted Southeast corner of the North Half of Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama go Westerly a distance of 4106 feet, more or less, to an iron pin on the Northwesterly right of way of South Fox Run Parkway; thence South 89 degrees 24 minutes 20 seconds West a distance of 494.29 feet to an iron pin on the present North right of way of Tree Avenue; thence North 58 degrees 38 minutes 34 seconds East a distance of 39.10 feet to an iron pin at the Northeast corner of Tract "A-6" of the Fox Run Parkway Development, LLC Subdivision as shown on the plat recorded in Plat Book 41 at Page 176, also being the POINT of BEGINNING of hereinabove described Tract "A-3-A"; thence along the North line of said Tract "A-6" South 89 degrees 24 minutes 20 seconds West a distance of 597.10 feet to an iron pin; thence continue along the North line of said Tract "A-6" North 45 degrees 27 minutes 20 seconds West a distance of 35.44 feet to an iron pin on the East right of way of McCoy Street; thence along the East right of way of McCoy Street North 00 degrees 19 minutes 01 seconds West a distance of 246.57 feet to a concrete monument; thence continue along the East right of way of McCoy Street North 04 degrees 05 minutes 58 seconds West a distance of 498.14 feet to an iron pin; thence continue along the East right of McCoy Street North 00 degrees 23 minutes 36 seconds West a distance of 68.49 feet to an iron pin; thence South 45 degrees 11 minutes 48 seconds East a distance of 70.95 feet to an iron pin; thence North 90 degrees 00 minutes 00 seconds East a distance of 58.71 feet to an iron pin; thence along a curve, concave Southerly, having a radius of 245.00 feet, an arc distance of 89.89 feet, a chord direction of South 79 degrees 29 minutes 20 seconds East and a chord distance of 89.39 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 15.00 feet to an iron pin; thence South 21 degrees 01 minutes 21 seconds West a distance of 60.00 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 174.69 feet to an iron pin; thence along a curve, concave Northerly, having a radius of 220.00 feet; an arc distance of 200.89 feet, a chord direction of North 84 degrees 51 minutes 48 seconds East, and a chord distance of 193.98 feet to an iron pin; thence South 43 degrees 53 minutes 10 seconds East a distance of 636.06 feet to an iron pin; thence South 58 degrees 38 minutes 34 seconds West a distance of 382.74 feet to the POINT of BEGINNING.  Subject to all easements and restrictions of record.

App. 1023

## Contractor's and/or Mortgagor's Cost Breakdown

Schedules of Values

U.S. Department of Housing and
Urban Development
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 12/31/2018)

Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number.

Section 207 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C., 1715r), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contractor and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is used by HUD to facilitate the advances of mortgage proceeds and their monitoring.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Date | Sponsor | |
|---|---|---|
| January 14, 2021 | | D4OP LLC |
| | Building Identification | |
| 062-35778 | | Master |
| Name of Project | | Location |
| The Parc at Opelika | | Opelika, AL |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div | Trade Item | Cost | | Trade Description |
|---|---|---|---|---|---|
| 1 | 3 | Concrete | $ | 1,095,314 | Foundations, Gyp-Crete |
| 2 | 4 | Masonry | $ | 920,000 | Stone |
| 3 | 5 | Metals | $ | 230,000 | Stairs & Rails, Balcony Rail, Canopies |
| 4 | 6 | Rough Carpentry | $ | 4,430,478 | Misc Materials, Framing Materials & Labor, Trusses, Cement Siding |
| 5 | 6 | Finish Carpentry | $ | 533,632 | Trim Materials & Labor |
| 6 | 7 | Waterproofing | $ | 25,000 | TyVek included in rough carpentry |
| 7 | 7 | Insulation | $ | 214,472 | Walls and Attic |
| 8 | 7 | Roofing | $ | 250,947 | Shingles |
| 9 | 7 | Sheet Metal | $ | 15,000 | Gutters & Downspout |
| 10 | 8 | Doors | $ | 535,494 | Interior & Exterior Doors, Door Hardware |
| 11 | 8 | Windows | $ | 59,616 | Vinyl Windows |
| 12 | 8 | Glass | $ | 33,000 | Mirrors & Shower Doors |
| 13 | 9 | Lath and Plaster | $ | - | |
| 14 | 9 | Drywall | $ | 1,355,892 | Drywall Tape, Bed and Texture |
| 15 | 9 | Tile Work | $ | - | |
| 16 | 9 | Acoustical | $ | - | |
| 17 | 9 | Wood Flooring | $ | - | |
| 18 | 9 | Resilient Flooring | $ | 310,320 | Vinyl Plank Flooring |
| 19 | 9 | Painting and Decorating | $ | 409,199 | Painting and Punch, small tools |
| 20 | 10 | Specialties | $ | 143,175 | Fire Extinguishers, Bath Accessories, Shelving Materials, Signage |
| 21 | 11 | Special Equipment | $ | - | |
| 22 | 11 | Cabinets | $ | 506,982 | Cabinets & Granite countertops |
| 23 | 11 | Appliances | $ | 420,000 | Kitchen & Laundry Equipment |
| 24 | 12 | Blinds and Shades, Artwork | $ | 35,000 | Mini Blinds |
| 25 | 12 | Carpets | $ | 49,000 | Carpet |
| 26 | 13 | Special Construction | $ | 296,000 | Fire Sprinklers |
| 27 | 14 | Elevators | $ | - | |
| 28 | 15 | Plumbing and Hot Water | $ | 1,390,751 | Plumbing |
| 29 | 15 | Heat and Ventilation | $ | - | See Line 30 |
| 30 | 15 | Air Conditioning | $ | 735,000 | Heating, Ventilation, Air Conditioning |
| 31 | 16 | Electrical | $ | 1,275,020 | Electrical, Light Fixtures, Communication Circuits |
| 32 | | Subtotal (Structures) | $ | 15,269,292 | |
| 33 | | Accessory Structures | $ | 718,777 | Clubhouse, Carports, Maintenance, & Trash Enclosure |
| 34 | | Total (Lines 32 and 33) | $ | 15,988,069 | |

Previous edition is obsolete

Page 1 of 3

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1024

| Line | Div | Trade Item | Cost | | Trade Description |
|---|---|---|---|---|---|
| 35 | 2 | Earth Work | $ | 615,665 | Clearing, grading, excavating, compaction, pads, and utilites |
| 36 | 2 | Site Utilities | $ | 849,503 | Electric |
| 37 | 2 | Roads and Walks | $ | 532,832 | Paving, curbs & gutters, walks, parking, striping |
| 38 | 2 | Site Improvements | $ | 205,689 | Pool, Site Fence, Signage, & Parking Control Equipment |
| 39 | 2 | Lawns and Planting | $ | 157,639 | Fine grading, topsoil, lawns & shrubs, irrigation |
| 40 | 2 | Unusual Site Condition | | | |

| Line | Div | Trade Item | Cost | | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
|---|---|---|---|---|---|---|---|---|
| 41 | | Total Land Improvements | $ | 2,361,328 | Description | Est. Cost | Description | Est. Cost |
| 42 | | Tot. Struct. & Land Imprvts. | $ | 18,349,397 | | | Earthwork | 5,000.00 |
| 43 | 1 | General Requirements | $ | 1,463,610 | | | Utilites | 0.00 |
| 44 | | Subtotal (Lines 42 and 43) | $ | 19,813,007 | | | Roads & Walks | 66,750.00 |
| 45 | | Builder's Overhead | $ | 396,260 | Total $ | 0.00 | | |
| 46 | | Builder's Profit | $ | - | Other Fees | | Total $ | 71,750.00 |
| 47 | | Subtotal (Lines 44 thru 46) | $ | 20,209,267 | Building Permit Fee | By Owner | Demolition | |
| 48 | | | | | As-Built Survey | 10,000.00 | (costs not included in trade item breakdown) | |
| 49 | | Other Fees | $ | 131,743 | Cost Cert. Fee | 25,000.00 | Description | Est. Cost |
| 50 | | Bond Premium | $ | 170,218 | Builder's Risk | 96,743.00 | | |
| 51 | | Total For All Improvements | $ | 20,511,228 | Water / Sewer Tap Fee | 0.00 | | |
| 52 | | Builder's Profit Paid By Means Other Than Cash | | | | | | |
| 53 | | Total For All Improvements Less Line 52 | $ | 20,511,228 | Total $ | 131,743.00 | Total $ | 0.00 |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

Mortgagor _____ By *174UP LLC, Tim Barton, President* Date 1/14/2021

Contractor By _____ Date 1-14-21
Bakken Contracting CO LLC DBA BC Contracting CO

FHA (Processing Analyst) _____ Date 1-19-21

FHA (Chief Underwriter) EDWARD WALLACE
Digitally signed by EDWARD WALLACE
DN: CN = EDWARD WALLACE C = US O = U.S. Government OU = Department of Housing and Urban Development Office of Housing
Date 2021.01.25 12:49:36 -06'00'

FHA (Chief, Cost Branch or Cost Analyst) VINCENT CADOTTE
Digitally signed by VINCENT CADOTTE
Date: 2021.01.20 16:11:40 -05'00'
Date

## Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each **structure type**. A summation of these structure costs are entered on line 32 of a master form. Land improvements, General Requirements and Fees are completed through line 53 on the master 2328 **only**.

**Date**—Date form was prepared.

**Sponsor**—Name of sponsor or sponsoring organization.

**Project No.**—Eight-digit assigned project number.

**Building Identification**—Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**—Sponsors designated name of project.

**Location**—Street address, city and state.

**Division**—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings. When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on-site conditions considered unusual.

**Cost** - Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**—Enter a brief description of the work included in each trade item.

**Other Fees**—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

App. 1025

**Line 52**—When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

**Non-Residential and Special Exterior Land Improvement Costs**—Describe and enter the cost of each improvement, i.e. on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

**Off-Site Costs**—Enter description and dollar amount including fees and bond premium for off-site improvements.

**Demolition**—Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

**Other Fees**—Enter a brief description of item involved and cost estimate for each item.

**Signatures**—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

App. 1026

## Contractor's and/or Mortgagor's Cost Breakdown
### Schedules of Values

U.S. Department of Housing and
Urban Development
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 12/31/2018)

Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number.

Section 207 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C., 1715r), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contractor and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is used by HUD to facilitate the advances of mortgage proceeds and their monitoring.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Date | Sponsor | |
|---|---|---|
| 01/14/21 | | D4OP LLC |
| **Project No.** | **Building Identification** | |
| 062-35778 | | Building Type I (1 of 4) |
| **Name of Project** | | **Location** |
| The Parc at Opelika | | Opelika, AL |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Trade Item | Cost | Trade Description |
|---|---|---|---|
| 1 | Concrete | 146,869.00 | Foundations, Gyp-Crete |
| 2 | Masonry | 118,982.00 | Stone |
| 3 | Metals | 29,746.00 | Stairs & Railings |
| 4 | Rough Carpentry | 608,317.00 | Misc Materials, Framing Materials & Labor, Trusses, Cement Siding |
| 5 | Finish Carpentry | 73,621.00 | Trim Materials & Labor |
| 6 | Waterproofing | 3,571.00 | Caulking |
| 7 | Insulation | 29,448.00 | Walls and Attic |
| 8 | Roofing | 34,456.00 | Asphalt Shingles, Gutters, & Downspout |
| 9 | Sheet Metal | 2,143.00 | Flashing |
| 10 | Doors | 73,891.00 | Interior & Exterior Doors, Door Hardware |
| 11 | Windows | 8,517.00 | Vinyl Windows |
| 12 | Glass | 4,714.00 | Mirrors & Shower Doors |
| 13 | Lath and Plaster | 0.00 | |
| 14 | Drywall | 186,168.00 | Drywall Tape, Bed and Texture |
| 15 | Tile Work | 0.00 | Tile |
| 16 | Acoustical | 0.00 | |
| 17 | Wood Flooring | 0.00 | |
| 18 | Resilient Flooring | 42,506.00 | LVT |
| 19 | Painting and Decorating | 56,184.00 | Painting and Punch, small tools |
| 20 | Specialties | 20,454.00 | Fire Extinguishers, Bath Accessories, Shelving Materials, Signage |
| 21 | Special Equipment | 0.00 | |
| 22 | Cabinets | 72,426.00 | Cabinets & Granite countertops |
| 23 | Appliances | 60,000.00 | Kitchen & Laundry Equipment |
| 24 | Blinds and Shades, Artwork | 5,000.00 | Mini Blinds |
| 25 | Carpets | 7,000.00 | Carpet |
| 26 | Special Construction | 38,281.00 | Fire Sprinklers |
| 27 | Elevators | 0.00 | |
| 28 | Plumbing and Hot Water | 198,516.00 | Plumbing |
| 29 | Heat and Ventilation | 0.00 | See Line 30 |
| 30 | Air Conditioning | 105,000.00 | Heating, Ventilation, Air Conditioning |
| 31 | Electrical | 182,146.00 | Electrical, Light Fixtures, Communication Circuits |
| 32 | Subtotal (Structures) | 2,107,956 | |
| 33 | Accessory Structures | | |
| 34 | Total (Lines 32 and 33) | | |

Previous edition is obsolete

Page 1 of 3

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1027

| Line | Trade Item | Cost | Trade Description | | | |
|---|---|---|---|---|---|---|
| 35 | Earth Work | | | | | |
| 36 | Site Utilities | | | | | |
| 37 | Roads and Walks | | | | | |
| 38 | Site Improvements | | | | | |
| 39 | Lawns and Planting | | | | | |
| 40 | Unusual Site Condition | | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
| 41 | Total Land Improvements | | | | | |
| 42 | Tot. Struct. & Land Imprvts. | | Description | Est. Cost | Description | Est. Cost |
| 43 | General Requirements | | | | | |
| 44 | Subtotal (Lines 42 and 43) | | | | | |
| 45 | Builder's Overhead | | | | | |
| 46 | Builder's Profit | | Total $ | 0.00 | | |
| 47 | Subtotal (Lines 44 thru 46) | | Other Fees | | Total $ | 0.00 |
| 48 | | | | | Demolition | |
| 49 | Other Fees | | | | (costs not included in trade item breakdown) | |
| 50 | Bond Premium | | | | Description | Est. Cost |
| 51 | Total For All Improvements | | | | | |
| 52 | Builder's Profit Paid By Means Other Than Cash | | | | | |
| 53 | Total For All Improvements Less Line 52 | | Total $ | 0.00 | Total $ | 0.00 |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties...(18.U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| Mortgagor | By TIM BARTON. PRESIDENT DYOP LLC | Date 1/14/2021 |
|---|---|---|
| Contractor Bakken Contracting CO LLC DBA BC Contracting CO | By | Date 1-14-21 |
| FHA (Processing Analyst) | Date 1-19-21 | FHA (Chief, Cost Branch or Cost Analyst) | Date |
| FHA (Chief Underwriter) | | Date |

## Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each **structure type**. A summation of these structure costs are entered on line 32 of a master form. Land improvements, General Requirements and Fees are completed through line 53 on the master 2328 only.

**Date**—Date form was prepared.

**Sponsor**—Name of sponsor or sponsoring organization.

**Project No.**—Eight-digit assigned project number.

**Building Identification**—Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**—Sponsors designated name of project.

**Location**—Street address, city and state.

**Division**—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings. When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on-site conditions considered unusual.
**Cost** - Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**—Enter a brief description of the work included in each trade item.

**Other Fees**—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

App. 1028

Line 52—When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

**Non-Residential and Special Exterior Land Improvement Costs—** Describe and enter the cost of each improvement, i.e. on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

**Off-Site Costs**—Enter description and dollar amount including fees and bond premium for off-site improvements.

**Demolition**—Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

**Other Fees**—Enter a brief description of item involved and cost estimate for each item.

**Signatures**—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

Previous edition is obsolete

Page 3 of 3

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1029

## Contractor's and/or Mortgagor's Cost Breakdown
### Schedules of Values

U.S. Department of Housing and
Urban Development
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 12/31/2018)

Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number.

Section 207 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C., 1715r), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contractor and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is used by HUD to facilitate the advances of mortgage proceeds and their monitoring.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Date | Sponsor | |
|---|---|---|
| 01/14/21 | D40P LLC | |
| Project No. | Building Identification | |
| 062-35778 | | Building Type II (1 of 2) |
| Name of Project | Location | |
| The Parc at Opelika | | Opelika, AL |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div | Trade Item | Cost | Trade Description |
|---|---|---|---|---|
| 1 | 3 | Concrete | 166,536.00 | Foundations, Gyp-Crete |
| 2 | 4 | Masonry | 143,282.00 | Stone |
| 3 | 5 | Metals | 35,820.00 | Stairs & Rails, Balcony Rail, Canopies |
| 4 | 6 | Rough Carpentry | 662,561.00 | Misc Materials, Framing Materials & Labor, Trusses, Cement Siding |
| 5 | 6 | Finish Carpentry | 79,379.00 | Trim Materials & Labor |
| 6 | 7 | Waterproofing | 3,572.00 | Caulking |
| 7 | 7 | Insulation | 32,073.00 | Walls and Attic |
| 8 | 7 | Roofing | 37,528.00 | Asphalt Shingles, Gutters, & Downspout |
| 9 | 7 | Sheet Metal | 2,143.00 | Flashing |
| 10 | 8 | Doors | 79,640.00 | Interior & Exterior Doors, Door Hardware |
| 11 | 8 | Windows | 8,516.00 | Vinyl Windows |
| 12 | 8 | Glass | 4,715.00 | Mirrors & Shower Doors |
| 13 | 9 | Lath and Plaster | 0.00 | |
| 14 | 9 | Drywall | 202,768.00 | Drywall Tape, Bed and Texture |
| 15 | 9 | Tile Work | 0.00 | |
| 16 | 9 | Acoustical | 0.00 | |
| 17 | 9 | Wood Flooring | 0.00 | |
| 18 | 9 | Resilient Flooring | 46,530.00 | LVT |
| 19 | 9 | Painting and Decorating | 61,194.00 | Painting and Punch, small tools |
| 20 | 10 | Specialties | 20,453.00 | Fire Extinguishers, Bath Accessories, Shelving Materials, Signage |
| 21 | 11 | Special Equipment | 0.00 | |
| 22 | 11 | Cabinets | 72,427.00 | Cabinets & Granite countertops |
| 23 | 11 | Appliances | 60,000.00 | Kitchen & Laundry Equipment |
| 24 | 12 | Blinds and Shades, Artwork | 5,000.00 | Mini Blinds |
| 25 | 12 | Carpets | 7,000.00 | Carpet |
| 26 | 13 | Special Construction | 46,100.00 | Fire Sprinklers |
| 27 | 14 | Elevators | 0.00 | |
| 28 | 15 | Plumbing and Hot Water | 198,875.00 | Plumbing |
| 29 | 15 | Heat and Ventilation | 0.00 | See Line 30 |
| 30 | 15 | Air Conditioning | 105,000.00 | Heating, Ventilation, Air Conditioning |
| 31 | 16 | Electrical | 182,145.00 | Electrical, Light Fixtures, Communication Circuits |
| 32 | | **Subtotal (Structures)** | **2,263,257** | |
| 33 | | Accessory Structures | | |
| 34 | | Total (Lines 32 and 33) | | |

Previous edition is obsolete

Page 1 of 3

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1030

| Line | Div | Trade Item | Cost | Trade Description |
|------|-----|-----------|------|-------------------|
| 35 | 2 | Earth Work | | |
| 36 | 2 | Site Utilities | | |
| 37 | 2 | Roads and Walks | | |
| 38 | 2 | Site Improvements | | |
| 39 | 2 | Lawns and Planting | | |
| 40 | 2 | Unusual Site Condition | | |
| 41 | | Total Land Improvements | | |
| 42 | | Tot. Struct. & Land Imprvts. | | |
| 43 | 1 | General Requirements | | |
| 44 | | Subtotal (Lines 42 and 43) | | |
| 45 | | Builder's Overhead | | |
| 46 | | Builder's Profit | | |
| 47 | | Subtotal (Lines 44 thru 46) | | |
| 48 | | | | |
| 49 | | Other Fees | | |
| 50 | | Bond Premium | | |
| 51 | | Total For All Improvements | | |
| 52 | | Builder's Profit Paid By Means Other Than Cash | | |
| 53 | | Total For All Improvements Less Line 52 | | |

| | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
|---|---|---|---|---|
| | Description | Est. Cost | Description | Est. Cost |
| | | | | |
| | | | | |
| | | | | |
| | Total $ | 0.00 | | |
| | Other Fees | | Total $ | 0.00 |
| | | | Demolition (costs not included in trade item breakdown) | |
| | | | Description | Est. Cost |
| | | | | |
| | | | | |
| | Total $ | 0.00 | Total $ | 0.00 |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001; 1010, 1012; 31 U.S.C. 3729, 3802)

| Mortgagor | By TIM BARTON PRESIDENT D4UP UC | Date 1/14/2021 |
|---|---|---|
| Contractor | By | Date 1-14-21 |
| FHA (Processing Analyst)  Date 1-19-21 | FHA (Chief, Cost Branch or Cost Analyst) | Date |
| FHA (Chief Underwriter) | | Date |

## Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each **structure type**. A summation of these structure costs are entered on line 32 of a master form. Land improvements, General Requirements and Fees are completed through line 53 on the master 2328 only.

**Date**—Date form was prepared.

**Sponsor**—Name of sponsor or sponsoring organization.

**Project No.**—Eight-digit assigned project number.

**Building Identification**—Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**—Sponsors designated name of project.

**Location**—Street address, city and state.

**Division**—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings. When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on-site conditions considered unusual.

**Cost** - Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**—Enter a brief description of the work included in each trade item.

**Other Fees**—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

App. 1031

**Line 52**—When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

**Non-Residential and Special Exterior Land Improvement Costs**—Describe and enter the cost of each improvement, i.e. on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

**Off-Site Costs**—Enter description and dollar amount including fees and bond premium for off-site improvements.

**Demolition**—Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

**Other Fees**—Enter a brief description of item involved and cost estimate for each item.

**Signatures**—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

App. 1032

## Contractor's and/or Mortgagor's Cost Breakdown
Schedules of Values

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 12/31/2018)

Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number.

Section 207 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C., 1715r), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contractor and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is used by HUD to facilitate the advances of mortgage proceeds and their monitoring.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Date | Sponsor | |
|---|---|---|
| 01/14/21 | | D4OP LLC |
| **Project No.** | **Building Identification** | |
| 062-35778 | | Building Type III (1 of 1) |
| **Name of Project** | **Location** | |
| The Parc at Opelika | | Opelika, AL |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div | Trade Item | Cost | Trade Description |
|---|---|---|---|---|
| 1 | 3 | Concrete | 174,766.00 | Foundations, Gyp-Crete |
| 2 | 4 | Masonry | 157,508.00 | Stone |
| 3 | 5 | Metals | 39,376.00 | Stairs & Rails, Balcony Rail, Canopies |
| 4 | 6 | Rough Carpentry | 672,088.00 | Misc Materials, Framing Materials & Labor, Trusses, Cement Siding |
| 5 | 6 | Finish Carpentry | 80,390.00 | Trim Materials & Labor |
| 6 | 7 | Waterproofing | 3,572.00 | Caulking |
| 7 | 7 | Insulation | 32,534.00 | Walls and Attic |
| 8 | 7 | Roofing | 38,067.00 | Asphalt Shingles, Gutters, & Downspout |
| 9 | 7 | Sheet Metal | 2,142.00 | Flashing |
| 10 | 8 | Doors | 80,650.00 | Interior & Exterior Doors, Door Hardware |
| 11 | 8 | Windows | 8,516.00 | Vinyl Windows |
| 12 | 8 | Glass | 4,714.00 | Mirrors & Shower Doors |
| 13 | 9 | Lath and Plaster | 0.00 | |
| 14 | 9 | Drywall | 205,684.00 | Drywall Tape, Bed and Texture |
| 15 | 9 | Tile Work | 0.00 | |
| 16 | 9 | Acoustical | 0.00 | |
| 17 | 9 | Wood Flooring | 0.00 | |
| 18 | 9 | Resilient Flooring | 47,236.00 | LVT |
| 19 | 9 | Painting and Decorating | 62,075.00 | Painting and Punch, small tools |
| 20 | 10 | Specialties | 20,453.00 | Fire Extinguishers, Bath Accessories, Shelving Materials, Signage |
| 21 | 11 | Special Equipment | 0.00 | |
| 22 | 11 | Cabinets | 72,424.00 | Cabinets & Granite countertops |
| 23 | 11 | Appliances | 60,000.00 | Kitchen & Laundry Equipment |
| 24 | 12 | Blinds and Shades, Artwork | 5,000.00 | Mini Blinds |
| 25 | 12 | Carpets | 7,000.00 | Carpet |
| 26 | 13 | Special Construction | 50,676.00 | Fire Sprinklers |
| 27 | 14 | Elevators | 0.00 | |
| 28 | 15 | Plumbing and Hot Water | 198,937.00 | Plumbing |
| 29 | 15 | Heat and Ventilation | 0.00 | See Line 30 |
| 30 | 15 | Air Conditioning | 105,000.00 | Heating, Ventilation, Air Conditioning |
| 31 | 16 | Electrical | 182,146.00 | Electrical, Light Fixtures, Communication Circuits |
| 32 | | **Subtotal (Structures)** | 2,310,954 | |
| 33 | | **Accessory Structures** | | |
| 34 | | **Total (Lines 32 and 33)** | | |

Previous edition is obsolete

Page 1 of 3

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1033

| Line | Div | Trade Item | Cost | Trade Description | | | | |
|---|---|---|---|---|---|---|---|---|
| 35 | 2 | Earth Work | | | | | | |
| 36 | 2 | Site Utilities | | | | | | |
| 37 | 2 | Roads and Walks | | | | | | |
| 38 | 2 | Site Improvements | | | | | | |
| 39 | 2 | Lawns and Planting | | | | | | |
| 40 | 2 | Unusual Site Condition | | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
| 41 | | Total Land Improvements | | | | | |
| 42 | | Tot. Struct. & Land Imprvts. | | Description | Est. Cost | Description | Est. Cost |
| 43 | 1 | General Requirements | | | | | |
| 44 | | Subtotal (Lines 42 and 43) | | | | | |
| 45 | | Builder's Overhead | | | | | |
| 46 | | Builder's Profit | | Total $ | 0.00 | | |
| 47 | | Subtotal (Lines 44 thru 46) | | Other Fees | | Total $ | 0.00 |
| 48 | | | | | | Demolition | |
| 49 | | Other Fees | | | | (costs not included in trade item breakdown) | |
| 50 | | Bond Premium | | | | Description | Est. Cost |
| 51 | | Total For All Improvements | | | | | |
| 52 | | Builder's Profit Paid By Means Other Than Cash | | | | | |
| 53 | | Total For All Improvements Less Line 52 | | Total $ | 0.00 | Total $ | 0.00 |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| | | | |
|---|---|---|---|
| Mortgagor | By TimBarton, President DYOP LLC | Date 1/14/2021 |
| Contractor Bakken Contracting CO LLC DBA BC Contracting CO | By | Date 1-14-21 |
| FHA (Processing Analyst) | Date 1-19-21 | FHA (Chief, Cost Branch or Cost Analyst) | Date |
| FHA (Chief Underwriter) | | | Date |

## Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each **structure type**. A summation of these structure costs are entered on line 32 of a master form. Land improvements, General Requirements and Fees are completed through line 53 on the master 2328 only.

**Date**—Date form was prepared.

**Sponsor**—Name of sponsor or sponsoring organization.

**Project No.**—Eight-digit assigned project number.

**Building Identification**—Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**—Sponsors designated name of project.

**Location**—Street address, city and state.

**Division**—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**—This item reflects structures, such as community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings. When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on-site conditions considered unusual.
**Cost** - Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**—Enter a brief description of the work included in each trade item.

**Other Fees**—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

App. 1034

Line 52—When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

**Non-Residential and Special Exterior Land Improvement Costs—** Describe and enter the cost of each improvement, i.e. on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

**Off-Site Costs**—Enter description and dollar amount including fees and bond premium for off-site improvements.

**Demolition**—Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

**Other Fees**—Enter a brief description of item involved and cost estimate for each item.

**Signatures**—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

Previous edition is obsolete

Page 3 of 3

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1035

## Contractor's and/or Mortgagor's Cost Breakdown
### Schedules of Values

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 12/31/2018)

Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number.

Section 207 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C., 1715r), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contractor and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is used by HUD to facilitate the advances of mortgage proceeds and their monitoring.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Date | Sponsor | |
|---|---|---|
| 01/14/21 | | D40P LLC |

| Project No. | Building Identification | |
|---|---|---|
| 062-35778 | | Detached Garages |

| Name of Project | Location | |
|---|---|---|
| The Parc at Opelika | | Opelika, AL |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div | Trade Item | Cost | Trade Description |
|---|---|---|---|---|
| 1 | 3 | Concrete | 17,800.00 | Foundations |
| 2 | 4 | Masonry | 0.00 | |
| 3 | 5 | Metals | 0.00 | |
| 4 | 6 | Rough Carpentry | 20,000.00 | Misc Materials, Framing Materials & Labor, Trusses, Cement Siding |
| 5 | 6 | Finish Carpentry | 0.00 | |
| 6 | 7 | Waterproofing | 0.00 | |
| 7 | 7 | Insulation | 0.00 | |
| 8 | 7 | Roofing | 7,000.00 | Asphalt Shingles, Gutters, & Downspout |
| 9 | 7 | Sheet Metal | 0.00 | |
| 10 | 8 | Doors | 18,650.00 | Interior & Exterior Doors, Door Hardware |
| 11 | 8 | Windows | 0.00 | |
| 12 | 8 | Glass | 0.00 | |
| 13 | 9 | Lath and Plaster | 0.00 | |
| 14 | 9 | Drywall | 0.00 | |
| 15 | 9 | Tile Work | 0.00 | |
| 16 | 9 | Acoustical | 0.00 | |
| 17 | 9 | Wood Flooring | 0.00 | |
| 18 | 9 | Resilient Flooring | 0.00 | |
| 19 | 9 | Painting and Decorating | 0.00 | |
| 20 | 10 | Specialties | 0.00 | |
| 21 | 11 | Special Equipment | 0.00 | |
| 22 | 11 | Cabinets | 0.00 | |
| 23 | 11 | Appliances | 0.00 | |
| 24 | 12 | Blinds and Shades, Artwork | 0.00 | |
| 25 | 12 | Carpets | 0.00 | |
| 26 | 13 | Special Construction | 0.00 | |
| 27 | 14 | Elevators | 0.00 | |
| 28 | 15 | Plumbing and Hot Water | 0.00 | |
| 29 | 15 | Heat and Ventilation | 0.00 | |
| 30 | 15 | Air Conditioning | 0.00 | |
| 31 | 16 | Electrical | 0.00 | |
| 32 | | **Subtotal (Structures)** | 63,450.00 | |
| 33 | | Accessory Structures | | |
| 34 | | Total (Lines 32 and 33) | | |

Previous edition is obsolete

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1036

| Line | Div | Trade Item | Cost | Trade Description |
|------|-----|-----------|------|-------------------|
| 35 | 2 | Earth Work | | |
| 36 | 2 | Site Utilities | | |
| 37 | 2 | Roads and Walks | | |
| 38 | 2 | Site Improvements | | |
| 39 | 2 | Lawns and Planting | | |

| Line | Div | Trade Item | Cost | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
|------|-----|-----------|------|------------|-----------|-------------|----------|
| | | | | Description | Est. Cost | Description | Est. Cost |
| 40 | 2 | Unusual Site Condition | | | | | |
| 41 | | Total Land Improvements | | | | | |
| 42 | | Tot. Struct. & Land Imprvts. | | | | | |
| 43 | 1 | General Requirements | | | | | |
| 44 | | Subtotal (Lines 42 and 43) | | | | | |
| 45 | | Builder's Overhead | | | | | |
| 46 | | Builder's Profit | | Total $ | 0.00 | | |
| 47 | | Subtotal (Lines 44 thru 46) | | Other Fees | | Total $ | 0.00 |
| 48 | | | | | | Demolition (costs not included in trade item breakdown) | |
| 49 | | Other Fees | | | | | |
| 50 | | Bond Premium | | | | Description | Est. Cost |
| 51 | | Total For All Improvements | | | | | |
| 52 | | Builder's Profit Paid By Means Other Than Cash | | | | | |
| 53 | | Total For All Improvements Less Line 52 | | Total $ | 0.00 | Total $ | 0.00 |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| | | Date |
|---|---|---|
| Mortgagor | By Tim Barton, DHLP LLC President | 1/14/2021 |
| Contractor Bakken Contracting CO LLC DBA BC Contracting CO | By | 1-12-21 |
| FHA (Processing Analyst) | Date 1-19-21 | FHA (Chief, Cost Branch or Cost Analyst) | Date |
| FHA (Chief Underwriter) | | Date |

## Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each **structure type**. A summation of these structure costs are entered on line 32 of a master form. Land Improvements, General Requirements and Fees are completed through line 53 on the master 2328 **only**.

**Date**—Date form was prepared.

**Sponsor**—Name of sponsor or sponsoring organization.

**Project No.**—Eight-digit assigned project number.

**Building Identification**—Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**—Sponsors designated name of project.

**Location**—Street address, city and state.

**Division**—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings. When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on-site conditions considered unusual.

**Cost** - Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**—Enter a brief description of the work included in each trade item.

**Other Fees**—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

App. 1037

## Contractor's and/or Mortgagor's Cost Breakdown

Schedules of Values

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 12/31/2018)

Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number.

Section 207 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C., 1715r), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contractor and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is used by HUD to facilitate the advances of mortgage proceeds and their monitoring.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Date | Sponsor | |
|------|---------|---|
| 01/14/21 | D40P LLC | |
| **Project No.** | **Building Identification** | |
| 062-35778 | Carports | |
| **Name of Project** | **Location** | |
| The Parc at Opelika | Opelika, AL | |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div | Trade Item | Cost | Trade Description |
|------|-----|-----------|------|-------------------|
| 1 | 3 | Concrete | 0.00 | |
| 2 | 4 | Masonry | 0.00 | |
| 3 | 5 | Metals | 108,000.00 | Carport Structures |
| 4 | 6 | Rough Carpentry | 0.00 | |
| 5 | 6 | Finish Carpentry | 0.00 | |
| 6 | 7 | Waterproofing | 0.00 | |
| 7 | 7 | Insulation | 0.00 | |
| 8 | 7 | Roofing | 0.00 | |
| 9 | 7 | Sheet Metal | 0.00 | |
| 10 | 8 | Doors | 0.00 | |
| 11 | 8 | Windows | 0.00 | |
| 12 | 8 | Glass | 0.00 | |
| 13 | 9 | Lath and Plaster | 0.00 | |
| 14 | 9 | Drywall | 0.00 | |
| 15 | 9 | Tile Work | 0.00 | |
| 16 | 9 | Acoustical | 0.00 | |
| 17 | 9 | Wood Flooring | 0.00 | |
| 18 | 9 | Resilient Flooring | 0.00 | |
| 19 | 9 | Painting and Decorating | 0.00 | |
| 20 | 10 | Specialties | 0.00 | |
| 21 | 11 | Special Equipment | 0.00 | |
| 22 | 11 | Cabinets | 0.00 | |
| 23 | 11 | Appliances | 0.00 | |
| 24 | 12 | Blinds and Shades, Artwork | 0.00 | |
| 25 | 12 | Carpets | 0.00 | |
| 26 | 13 | Special Construction | 0.00 | |
| 27 | 14 | Elevators | 0.00 | |
| 28 | 15 | Plumbing and Hot Water | 0.00 | |
| 29 | 15 | Heat and Ventilation | 0.00 | |
| 30 | 15 | Air Conditioning | 0.00 | |
| 31 | 16 | Electrical | 0.00 | |
| 32 | | **Subtotal (Structures)** | 108,000.00 | |
| 33 | | Accessory Structures | | |
| 34 | | Total (Lines 32 and 33) | | |

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

Previous edition is obsolete

App. 1038

| Line | Div | Trade Item | Cost | Trade Description | | | |
|---|---|---|---|---|---|---|---|
| 35 | 2 | Earth Work | | | | | |
| 36 | 2 | Site Utilities | | | | | |
| 37 | 2 | Roads and Walks | | | | | |
| 38 | 2 | Site Improvements | | | | | |
| 39 | 2 | Lawns and Planting | | | | | |
| 40 | 2 | Unusual Site Condition | | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | |
| 41 | | **Total Land Improvements** | | | | | |
| 42 | | **Tot. Struct. & Land Imprvts.** | | Description | Est. Cost | Description | Est. Cost |
| 43 | 1 | General Requirements | | | | | |
| 44 | | Subtotal (Lines 42 and 43) | | | | | |
| 45 | | Builder's Overhead | | | | | |
| 46 | | Builder's Profit | | Total $ | 0.00 | | |
| 47 | | Subtotal (Lines 44 thru 46) | | Other Fees | | Total $ | 0.00 |
| 48 | | | | | | Demolition | |
| 49 | | Other Fees | | | | (costs not included in trade item breakdown) | |
| 50 | | Bond Premium | | | | Description | Est. Cost |
| 51 | | Total For All Improvements | | | | | |
| 52 | | Builder's Profit Paid By Means Other Than Cash | | | | | |
| 53 | | Total For All Improvements Less Line 52 | | Total $ | 0.00 | Total $ | 0.00 |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| | | | |
|---|---|---|---|
| Mortgagor | By TIM BAKKEN, DYLW LLC President | | Date 1/14/2021 |
| Contractor Bakken Contracting CO LLC DBA BC Contracting CO | By | | Date 1-14-21 |
| FHA (Processing Analyst) | Date 1-19-21 | FHA (Chief, Cost Branch or Cost Analyst) | Date |
| FHA (Chief Underwriter) | | | Date |

## Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each **structure type**. A summation of these structure costs are entered on line 32 of a master form. Land improvements, General Requirements and Fees are completed through line 53 on the master 2328 **only**.

**Date**—Date form was prepared.

**Sponsor**—Name of sponsor or sponsoring organization.

**Project No.**—Eight-digit assigned project number.

**Building Identification**—Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**—Sponsors designated name of project.

**Location**—Street address, city and state.

**Division**—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings. When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on-site conditions considered unusual.

**Cost** - Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**—Enter a brief description of the work included in each trade item.

**Other Fees**—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

App. 1039

**Line 52**—When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

**Non-Residential and Special Exterior Land Improvement Costs**— Describe and enter the cost of each improvement, i.e. on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

**Off-Site Costs**—Enter description and dollar amount including fees and bond premium for off-site improvements.

**Demolition**—Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

**Other Fees**—Enter a brief description of item involved and cost estimate for each item.

**Signatures**—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

App. 1040

## Contractor's and/or Mortgagor's Cost Breakdown
### Schedules of Values

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB No. 2502-0044 (exp. 12/31/2018)

Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB Control Number.

Section 207 of the National Housing Act (Section 126 of the Housing Act of 1954, Public Law 560, 12 U.S.C., 1715r), authorizes the collection of this information. The information is required for a general contractor when an identity of interest exists between the general contractor and the mortgagor or when the mortgagor is a non-profit entity and a cost plus contract has been used. The information is used by HUD to facilitate the advances of mortgage proceeds and their monitoring.

Privacy Act Notice. The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request.

| Date | Sponsor | |
|---|---|---|
| 01/14/21 | D4OP LLC | |
| **Project No.** | **Building Identification** | |
| 062-35778 | Clubhouse | |
| **Name of Project** | **Location** | |
| The Parc at Opelika | Opelika, AL | |

This form represents the Contractors and/or Mortgagors firm costs and services as a basis for disbursing dollar amounts when insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| Line | Div | Trade Item | Cost | Trade Description |
|---|---|---|---|---|
| 1 | 3 | Concrete | 18,376.00 | Foundations, Gyp-Crete |
| 2 | 4 | Masonry | 50,000.00 | Stone |
| 3 | 5 | Metals | 5,900.00 | Canopies |
| 4 | 6 | Rough Carpentry | 124,522.00 | Misc Materials, Framing Materials & Labor, Trusses, Cement Siding |
| 5 | 6 | Finish Carpentry | 13,218.00 | Trim Materials & Labor |
| 6 | 7 | Waterproofing | 0.00 | Caulking |
| 7 | 7 | Insulation | 6,028.00 | Walls and Attic |
| 8 | 7 | Roofing | 17,053.00 | Asphalt Shingles, Gutters, & Downspout |
| 9 | 7 | Sheet Metal | 0.00 | |
| 10 | 8 | Doors | 13,564.00 | Interior & Exterior Doors, Door Hardware |
| 11 | 8 | Windows | 3,000.00 | Vinyl Windows |
| 12 | 8 | Glass | 24,871.00 | Storefront & Mirrors |
| 13 | 9 | Lath and Plaster | 0.00 | |
| 14 | 9 | Drywall | 38,108.00 | Drywall Tape, Bed and Texture |
| 15 | 9 | Tile Work | 2,000.00 | Tile |
| 16 | 9 | Acoustical | 20,000.00 | Wood Ceiling |
| 17 | 9 | Wood Flooring | 0.00 | |
| 18 | 9 | Resilient Flooring | 10,613.00 | LVT |
| 19 | 9 | Painting and Decorating | 11,501.00 | Painting and Punch, small tools |
| 20 | 10 | Specialties | 63,625.00 | Fire Extinguishers, Bath Accessories, Shelving Materials, Signage |
| 21 | 11 | Special Equipment | 0.00 | Misc. Equipment |
| 22 | 11 | Cabinets | 3,018.00 | Cabinets & Granite countertops |
| 23 | 11 | Appliances | 0.00 | |
| 24 | 12 | Blinds and Shades, Artwork | 0.00 | |
| 25 | 12 | Carpets | 1,000.00 | Carpet |
| 26 | 13 | Special Construction | 0.00 | |
| 27 | 14 | Elevators | 0.00 | |
| 28 | 15 | Plumbing and Hot Water | 20,930.00 | Plumbing |
| 29 | 15 | Heat and Ventilation | 0.00 | See Line 30 |
| 30 | 15 | Air Conditioning | 35,000.00 | Heating, Ventilation, Air Conditioning |
| 31 | 16 | Electrical | 35,000.00 | Electrical, Light Fixtures, Communication Circuits |
| 32 | | **Subtotal (Structures)** | 517,327.00 | |
| 33 | | Accessory Structures | | |
| 34 | | Total (Lines 32 and 33) | | |

Previous edition is obsolete

form HUD-2328 (5/95)
ref. Handbook 4450.1 & 4460.1

App. 1041

| Line | Div | Trade Item | Cost | Trade Description | | | | |
|---|---|---|---|---|---|---|---|---|
| 35 | 2 | Earth Work | | | | | | |
| 36 | 2 | Site Utilities | | | | | | |
| 37 | 2 | Roads and Walks | | | | | | |
| 38 | 2 | Site Improvements | | | | | | |
| 39 | 2 | Lawns and Planting | | | | | | |
| 40 | 2 | Unusual Site Condition | | Nonresidential and Special Exterior Land Improvement (costs included in trade item breakdown) | | Offsite Costs (costs not included in trade item breakdown) | | |
| 41 | | **Total Land Improvements** | | | | | | |
| 42 | | **Tot. Struct. & Land Imprvts.** | | Description | Est. Cost | Description | Est. Cost | |
| 43 | 1 | General Requirements | | | | | | |
| 44 | | **Subtotal** (Lines 42 and 43) | | | | | | |
| 45 | | Builder's Overhead | | | | | | |
| 46 | | Builder's Profit | | Total $ | 0.00 | | | |
| 47 | | **Subtotal** (Lines 44 thru 46) | | Other Fees | | Total $ | 0.00 | |
| 48 | | | | | | Demolition | | |
| 49 | | **Other Fees** | | | | (costs not included in trade item breakdown) | | |
| 50 | | Bond Premium | | | | Description | Est. Cost | |
| 51 | | **Total For All Improvements** | | | | | | |
| 52 | | Builder's Profit Paid By Means Other Than Cash | | | | | | |
| 53 | | **Total For All Improvements** Less Line 52 | | Total $ | 0.00 | Total $ | 0.00 | |

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

Mortgagor _____ By _Tim Bakam, DYOPLLC President_ Date _1/14/2021_

Contractor _____ By _____ Date _1-14-21_
Bakken Contracting CO LLC DBA BC Contracting CO

FHA (Processing Analyst) _____ Date _1-19-21_   FHA (Chief, Cost Branch or Cost Analyst) _____ Date _____

FHA (Chief Underwriter) _____ Date _____

## Instructions for Completing Form HUD-2328

This form is prepared by the contractor and/or mortgagor as a requirement for the issuance of a firm commitment. The firm replacement cost of the project also serves as a basis for the disbursement of dollar amounts when insured advances are requested. A detailed breakdown of trade items is provided along with spaces to enter dollar amounts and trade descriptions.

A separate form is prepared through line 32 for each **structure type**. A summation of these structure costs are entered on line 32 of a master form. Land improvements, General Requirements and Fees are completed through line 53 on the master 2328 only.

**Date**—Date form was prepared.

**Sponsor**—Name of sponsor or sponsoring organization.

**Project No.**—Eight-digit assigned project number.

**Building Identification**—Number(s) or Letter(s) of each building as designated on plans.

**Name of Project**—Sponsors designated name of project.

**Location**—Street address, city and state.

**Division**—Division numbers and trade items have been developed from the cost accounting section of the uniform system.

**Accessory Structures**—This item reflects structures, such as: community, storage, maintenance, mechanical, laundry and project office buildings. Also included are garages and carports or other buildings. When the amount shown on line 33 is $20,000.00 or 2% of line 32 whichever is the lesser, a separate form HUD-2328 will be prepared through line 32 for Accessory Structures.

**Unusual Site Conditions**—This trade item reflects rock excavation, high water table, excessive cut and fill, retaining walls, erosion, poor drainage and other on-site conditions considered unusual.

**Cost** - Enter the cost being submitted by the Contractor or bids submitted by a qualified subcontractor for each trade item. These costs will include, as a minimum, prevailing wage rates as determined by the Secretary of Labor.

**Trade Description**—Enter a brief description of the work included in each trade item.

**Other Fees**—Includable are fees to be paid by the Contractor, such as sewer tap fees not included in the plumbing contract. Fees paid or to be paid by the Mortgagor are not to be included on this form.

**Total For All Improvements**—This is the sum of lines 1 through 50 and is to include the total builder's profit (line 46).

App. 1042

**Line 52**—When applicable, enter that portion of the builder's profit (line 46) to be paid by means other than cash and/or any part of the builder's profit to be waived during construction.

**Non-Residential and Special Exterior Land Improvement Costs**—Describe and enter the cost of each improvement, i.e. on-site parking facilities including individual garages and carports, commercial facilities, swimming pools with related facilities and on-site features provided to enhance the environment and livability of the project and the neighborhood. The Design Representative and Cost Analyst shall collaborate with the mortgagor or his representative in designating the items to be included.

**Off-Site Costs**—Enter description and dollar amount including fees and bond premium for off-site improvements.

**Demolition**—Enter description and dollar amount of demolition work necessary to condition site for building improvements including the removal of existing structures, foundations, utilities, etc.

**Other Fees**—Enter a brief description of item involved and cost estimate for each item.

**Signatures**—Enter the firm name, signature of authorized officer of the contractor and/or mortgagor and date the form was completed.

App. 1043

U S DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
HOUSING - FEDERAL HOUSING COMMISSIONER
**CONTRACTOR'S and/or MORTGAGOR'S**
**LAND IMPROVEMENT COST ESTIMATE**
(SCHEDULES OF VALUES)

Date: January 14, 2021  
Sponsor: D4OP LLC  
Project No.: 062-35178  
Project Name: The Parc at Opelika  
Location: Opelika, AL

This form represents the Contractors and/or Mortgagors item costs and services as a basis for disbursing dollar amounts when the insured advances are requested. Detailed instructions for completing this form are included on the reverse side.

| LINE | TRADE ITEM | ESTIMATED COST | TRADE DESCRIPTION |
|---|---|---|---|
| 1 | EARTHWORK: | $ 615,685 | |
| 2 | Clearing and Grubbing | $ 102,885 | Clearing and Grubbing |
| 3 | Stripping and Piling | $ 37,600 | Strip topsoil and bank for future use |
| 4 | Cut (Incl. Streets & Walks) | $ 38,625 | Site cut of building common areas and streets |
| 5 | Fill | $ 105,762 | |
| 6 | Rock Excavation | $ - | |
| 7 | Bldg. Bulk Excavate. & Backfill | $ 215,000 | Cut, fill and moisture conditioning of building pads |
| 8 | Hauling | $ 35,000 | |
| 9 | Miscellaneous | $ 80,923 | SWPPP |
| 10 | SITE UTILITIES: | $ 849,503 | |
| 11 | Water Supply & Related Items | $ 305,280 | Private water piping, install, backfill and testing, Includes Fire Pump |
| 12 | Sanitary Sewer & Related Items | $ 151,498 | Public and private sanitary sewer piping, install, backfill and testing |
| 13 | Electric Service & Connections | $ 25,000 | |
| 14 | Street & Grounds Lighting | $ 40,000 | |
| 15 | Gas Service & Connections | $ - | |
| 16 | Heating Tunnels | $ - | |
| 17 | Storm Sewer & Drainage | $ 310,660 | |
| 18 | Miscellaneous | $ 17,065 | Misc Testing |
| 19 | ROADS AND WALKS | $ 532,832 | |
| 20 | Curbs and Gutters | $ 85,700 | |
| 21 | Pavement For Vehicular Area | $ 306,632 | Concrete Paving and curbing |
| 22 | Special Area Surfacing | $ - | |
| 23 | Walks, Steps, Handrails, etc | $ 127,000 | Sidewalks |
| 24 | Miscellaneous | $ 13,500 | Marking |
| 25 | SITE IMPROVEMENTS | $ 205,688 | |
| 26 | Equipment for Special Areas | $ - | |
| 27 | Fences, Walls, etc. | $ 15,689 | Fencing, Gates, Access Controls |
| 28 | Trash Collection Stations | $ - | |
| 29 | Street & Entrance Signs | $ 26,500 | Handicap sign & Monumnal sign |
| 30 | Bridges | $ - | |
| 31 | Swimming Pool | $ 158,500 | Pool and pool deck |
| 32 | Mobile Home Pads | $ - | |
| 33 | Miscellaneous | $ 5,000 | Retaing Walls |
| 34 | LAWNS AND PLANTING: | $ 157,639 | |
| 35 | Top Soil & Improvement | $ 5,000 | |
| 36 | Finish Grading | $ 10,000 | |
| 37 | Seeding, Sodding, Sprigging | $ 63,000 | Sod & Seeding |
| 38 | Planting | $ 51,500 | Rock, trees, shrubs and plants |
| 39 | Miscellaneous (Irrigation) | $ 28,139 | Irrigation & Sleeving |
| 40 | TOTAL LAND IMPROVEMENTS | $ 2,361,328 | |
| 41 | * Accessory Structures | | |
| 42 | TOTAL LAND IMPRVTS. & STRUCTS. | $2,361,328 | |
| 43 | General Requirements | | |
| 44 | SUBTOTAL (Lines 42 and 43) | | |
| 45 | Builder's Overhead | | |
| 46 | Builder's Profit | | |
| 47 | SUBTOTAL (Lines 44 thru 46) | | |
| 48 | | | |
| 49 | Other Fees | | |
| 50 | Bond Premium | | |
| 51 | TOTAL FOR ALL IMPROVEMENTS | | |
| 52 | Builder's Profit Paid by Means Other Than Cash | | |
| 53 | TOTAL FOR ALL IMPROVEMENTS (Less Line 52) | | |

| UNUSUAL SITE CONDITIONS (Cost Included in Trade Item Breakdown) | | OFF-SITE COSTS (Costs Not Included in Trade Item Breakdown) | |
|---|---|---|---|
| Description | Est Cost | Description | Est Cost |
| | | | |
| TOTAL $ | 0 | TOTAL $ | 0 |

| REFUNDABLE ITEMS (Costs Included in Trade Item Breakdown) | | DEMOLITION (Costs Not Included in Trade Item Breakdown) | |
|---|---|---|---|
| Description | Est Cost | Description | Est Cost |
| | | | |
| TOTAL $ | 0 | TOTAL $ | 0 |

Side table values:
$ 615,685.00
$ 849,503.00
$ 405,832.00
$ 1,871,000.00    $ 1,871,000

*Execute Standard Form 2328 to Line 33 for each structure type if the amount on Line 41 is significant to Total Land Improvements

Mortgagor: D4OP LLC   By: _____ Date 1-14-2021  
Contractor: Bakken Contracting CO LLC DBA BC Contracting CO   By: _____ Date 1-14-21  
HUD: _____ Date _____  
Chief, Cost Evaluation or Cost Analyst   Dep. Dir for Housing/Service Off. Supervisor

Replaces Previous Edition   HUD-92328-LI (11-81)

Cal E Brann Jr. 1-19-21

App. 1044

The Parc at Opelika General Requirements Breakdown

### General Requirements

| Description of Work | | Budget |
|---|---|---|
| Warranty | $ | 19,700.00 |
| Project Manager | $ | 103,500.00 |
| Superintendent | $ | 234,600.00 |
| Assistant Project Manager | $ | 89,700.00 |
| Assistant Superintendent | $ | 89,700.00 |
| Laborer | $ | 71,760.00 |
| Travel | $ | 36,000.00 |
| Housing | $ | 27,200.00 |
| Management Software | $ | 23,640.00 |
| Project Office | $ | 16,100.00 |
| Storage Containers | $ | 4,000.00 |
| Project Sign | $ | 1,000.00 |
| Office Suppliers | $ | 2,500.00 |
| Drinking Water | $ | 1,600.00 |
| Project Camera | $ | 26,400.00 |
| Small Tools & Consumables | $ | 6,000.00 |
| Mileage/Vehicle | $ | 21,615.00 |
| Construction Material Testing | $ | 50,000.00 |
| Dumpster | $ | 96,000.00 |
| Final Cleaning | $ | 83,700.00 |
| Job Toilets | $ | 27,000.00 |
| Temporary Fence | $ | 34,632.00 |
| Temporary Enclosure | $ | 3,000.00 |
| Fire Extinguishers | $ | 1,200.00 |
| Temporary Water | $ | 5,600.00 |
| Temporary Electrical | $ | 84,000.00 |
| Construction Surveying | $ | 85,000.00 |
| Site Maintenance | $ | 8,000.00 |
| Equipment | $ | 46,000.00 |
| Liability Insurance | $ | 164,463.00 |
| **Total** | $ | **1,463,610.00** |

App. 1045

# Exhibit B
# Contractor's and/or Mortgagor's
# Cost Breakdown (HUD-2328)

App. 1046

# Exhibit C

Parc at Opelika
FHA Project No. 062-35778

Funds and Fees *(unless otherwise noted as shown on 92264)*

| | | |
|---|---|---|
| a) | Architect's fee (design) | $310,600.00 |
| b) | Architect's fee (supervision) | $56,400.00 |
| c) | Other Fees Borrower | $1,298,973.00 |
| d) | Interest during construction | $589,561.00 |
| e) | Real estate taxes during construction | $156,478.00 |
| f) | Insurance during construction | $25,879.00 |
| g) | FHA mortgage insurance premium | $59,153.25 |
| h) | FHA examination fee | $70,983.90 |
| i) | Inspection fee | 118,306.50 |
| j) | Initial service charge | $236,613.00 |
| k) | FF&E | $385,383.00 |
| l) | Permanent loan fee | $28,000.00 |
| m) | Title and recording expense | $100,000.00 |
| n) | Legal | $100,000.00 |
| o) | Organizational | $93,666.00 |
| p) | Cost Certification Fee | $15,000.00 |
| | TOTAL | $3,644,996.65 |

App. 1047

# Retainage Reduction Rider

Project Name:        Parc at Opelika

Project No.:          062-35778


This Retainage Reduction Rider is attached to and made a part of that certain Construction Contract dated simultaneously herewith by and between <u>D4OP LLC, a Texas limited liability company</u> ("**Borrower**"), and Bakken Contracting Co., LLC, a North Dakota limited liability company DBA BC Contracting Co. ("**Contractor**"), for the captioned project ("Project").

1. <u>Amount of Retainage.</u>  In accordance with the HUD Multifamily Accelerated Processing (MAP) Guide, the holdback of ten percent (10%) retainage as set out in item (4) of Article 5, paragraph A of the Construction Contract will be required only until 50% completion. After 50% completion, the retainage may be reduced to 5% until 75% completion, and then may be reduced to 2.5% retainage until the loan reaches Final Endorsement.

2. <u>HUD Requirements.</u>  The requirements for reduction of the retainage after 50% completion are as follows:

   a. The Contractor has no identity-of-interest with the owner that is greater than a 5% equity interest in the ownership entity,

   b. If applicable, prior written consent from the Surety must be obtained and attached to the request for reduction, and

   c. There can be no questions regarding the contractor's performance concerning the quality of work, compliance with the contract and with any change orders or work in progress. The Regional Center or Satellite Director must make the decision to reduce the retainage based on the recommendation of HUD's construction inspector.

   d. Assuming the above conditions are met, and subject to HUD approval, the existing standard of 10% retainage will be required only until 50% completion. After 50% completion the retainage may be reduced from 10% to 5% until 75% completion, and then may be reduced further to 2.5% retainage until the loan reaches Final Endorsement.

App. 1048

# EXHIBIT I-32

## PROMISSORY NOTE

**$5,129,000.00**                                                    **January 13, 2021**

FOR VALUE RECEIVED, **D4OPM, LLC,** a Texas limited liability company, and **ONE MF D4, LLC,** a Texas limited liability company (collectively "Maker"), do hereby promise to pay to the order of **SOUTHERN PROPERTIES CAPITAL LTD**, a British Virgin Islands company ("Payee"), at such place as the holder hereof may from time to time designate in writing, in lawful money of the United States, the principal sum of FIVE MILLION ONE HUNDRED TWENTY-NINE THOUSAND AND NO/100 DOLLARS ($5,129,000.00) or so much of such sum as may be advanced from Payee in its sole discretion from time to time, with interest thereon as provided in this Note.

1.    Certain Definitions. For the purposes hereof, the terms set forth below shall have the following meanings:

a.    "Affiliate" shall mean with respect to any person or entity, any other person or entity who, or which, controls, is controlled or under common control with such person or entity.

b.    "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of Texas, now or at any time hereafter prescribing maximum rates of interest or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of Texas, as the same may be amended from time to time, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of Texas which permit a higher interest rate ceiling hereunder.

c.    "Base Rate" shall mean ten percent (10%) per annum.

d.    "Maturity Date" shall mean January 13, 2023.

e.    "Highest Lawful Rate" shall mean at the particular time in question the lesser of (i) eighteen percent (18%) per annum or, (ii) the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker.

f.    "Loan Documents" shall mean this Note, the Pledge and Security Agreement with Assignment of Rights and all other documents given to evidence or secure the Note.

g.    "Security Agreement" shall mean that certain Pledge and Security Agreement with Assignment of Rights dated of even date herewith given to secure the Note.

PROMISSORY NOTE – Page 1
1162876    Pillar - Parc at Opelika – D4OPM, LLC, and ONE MF D4, LLC (7516.0045)– Note1

App. 1050

2.   Calculation and Payment of Principal and Interest.

    a.   Principal and interest of this Note shall be payable as follows: all accrued but unpaid interest, together with the outstanding principal balance, shall be due and payable in full on the Maturity Date.

    b.   Interest on this Note shall be calculated at the Base Rate on the number of days actually elapsed, but computed as though each year consisted of 360 days.

    c.   If the date for any payment or prepayment hereunder falls on a day which is a Saturday, Sunday or other legal holiday in the State of Texas, then for all purposes of this Note, the same shall be deemed to have fallen on the next following day which is not a Saturday, Sunday or other legal holiday, and such extension of time shall in such case be included in the calculation of interest.

    d.   All payments on this Note pursuant to this paragraph 2 shall be applied first to the payment of any accrued and unpaid Late Charge, as hereinafter defined, then to accrued and unpaid interest and then to the payment of principal; provided, however, if an Event of Default, as hereinafter defined, has occurred and is continuing, payments on this Note shall be applied as Payee shall elect, in Payee's sole discretion.

3.   Prepayment. Maker may prepay all or any part of the principal balance of this Note.

4.   Waiver. Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (i) except as otherwise specifically set forth in this Note, waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (ii) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any party primarily or secondarily liable for the payment of this Note; (iii) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (iv) consent to any extension of time for the payment of this Note, or any installment hereof, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.   Events of Default

    a.   Upon the happening of any of the following events (each an "Event of Default"), Payee may, at its option, by written notice thereof to Maker, declare immediately due and payable the entire principal balance of this Note together with all interest accrued and owing hereon, plus any other sums payable at the time of such declaration

App. 1051

pursuant to this Note, or any instrument securing this Note, including, without limitation, the Security Agreement. Events of Default include the following:

i.     If Maker shall fail to pay any installment of principal and/or interest under this Note as and when same becomes due and payable in accordance with the terms hereof; or

ii.     The occurrence of any Event of Default, as defined in the Security Agreement, or the occurrence of a default under any other document or instrument evidencing, securing or pertaining to the indebtedness evidenced hereby, which remains uncured upon the expiration of any cure period applicable thereto as set forth in the document under which such default occurred; or

iii.     Any default by Maker or any Affiliate of Maker under any loan, advance or other obligation now or hereafter owed or owing to Payee or any Affiliate of Payee.

b.     The failure to exercise the foregoing option upon the happening of one or more Events of Default shall not constitute a waiver of the right to exercise the same or any other option at any subsequent time, and no such failure shall nullify any prior exercise of any such option without the express written consent of Payee.

6.     Collateral. This Note is secured by, among other things, the Pledge and Security Agreement with Assignment of Rights which contains provisions for the acceleration of the maturity hereof upon the happening of certain events.

7.     Default Interest; Late Charge. If any installment of principal and/or interest is not paid on or before the due date thereof or if the entire unpaid principal balance and accrued but unpaid interest is not paid on or before the earlier to occur of the (i) Maturity Date, or, (ii) any accelerated maturity date as permitted hereby, all unpaid amounts of this Note, including principal and interest, shall thereafter bear interest at a rate of interest (the "Default Rate") equal to the Highest Lawful Rate; provided, however, that the obligation to pay such interest is subject to the limitation contained in the following paragraph.

8.     Compliance with Law. All agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date, or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the unpaid

PROMISSORY NOTE – Page 3
1162876 - Pillar - Parc at Opelika – D4OPM, LLC, and ONE MF D4, LLC (7516.0045)– Note1

balance of principal hereof, such excess shall be refunded to Maker. All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law. This paragraph shall control all agreements between Maker and Payee.

9.    Attorneys' Fees and Costs. If an Event of Default shall occur, and in the event that thereafter this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay, and there shall be added to the unpaid principal balance hereof, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees incurred by the holder hereof, on account of such collection, whether or not suit is filed.

10.    Cumulative Rights. No delay on the part of the holder of this Note in the exercise of any power or right under this Note or under any other instrument executed pursuant hereto shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. Enforcement by the holder of this Note of any security for the payment hereof shall not constitute any election by it of remedies so as to preclude the exercise of any other remedy available to it.

11.    Headings. The paragraph headings used in this Note are for convenience of reference only, and shall not affect the meaning or interpretation of this Note.

12.  Notices and Demands. Any notice or demand to be given or to be served upon Maker in connection with this Note must be in writing and may be given by facsimile, overnight delivery service, hand delivery, or certified or registered mail, return receipt requested, properly addressed, with postage prepaid, addressed to Maker as follows:

> D4OPM, LLC
> 13901 Midway Road
> Suite 102
> Farmers Branch, Texas 75244
> Attention: Timothy Barton
>
> ONE MF D4, LLC
> 13901 Midway Road
> Suite 102
> Farmers Branch, Texas 75244
> Attention: Timothy Barton.

or at such other address as Maker may designate from time to time by written notice (specifically notifying of a change of address) given to and received by the holder hereof. Any notice or demand will be deemed given on the day the notice or demand given by Payee, if given by facsimile or hand delivery, the following day is given by overnight delivery service, (which receipt may be evidenced by a delivery service receipt) or two (2) days following the day such notice is deposited in an authorized depository under the care and custody of the United States Postal Service if given by registered or certified mail.

13.  Governing Law. This Note shall be deemed to have been executed and shall be performed in the State of Texas and this Note and the Loan Documents shall be governed by its laws. Maker irrevocably agrees that subject to Payee's sole and absolute election, Payee may bring suit, action, or other legal proceedings arising out of the Loan Documents in a court located in Texas, whether local, state, or federal. Maker hereby submits to the jurisdiction of such court(s) and waives any right maker may have to request a change of venue or a removal to another court.

14.  Successors and Assigns. The term "Payee" shall include all of Payee's successors and assigns to whom the benefits of this Note shall inure.

*[Signature page to follow]*

PROMISSORY NOTE – Page 5
1162876 – Pillar - Parc at Opelika – D4OPM, LLC. and ONE MF D4. LLC (7516.0045)– Note1

App. 1054

MAKER:

**D4OPM, LLC,**
a Texas limited liability company

By:
Name:
Title:

**ONE MF D4, LLC,**
a Texas limited liability company

By:
Name:
Title:

PROMISSORY NOTE – Page 6
1162876 - Pillar - Parc at Opelika - D4OPM. LLC. and ONE MF D4. LLC (7516.0045)– Note1

App. 1055