**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | **CASE NO. 3:22-cv-2118-X** |
| **TIMOTHY BARTON ET AL.,** | § § § | |
| *Defendants,* | § § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § § § | |
| *Relief Defendants.* | § | |

**APPENDIX VOLUME V**

**APP. 1057-1274**

**IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S BRIEF IN SUPPORT OF RESPONSE TO RECEIVER'S MOTION FOR SUMMARY JUDGMENT**

| Ex. No. | Title | App. No. |
|---|---|---|
| Ex. I-33 | Pledge and Security Agreement | App. 1057-1076 |
| Ex. I-34 | Letter Loan Agreement | App. 1078-1079 |
| Ex. I-35 | Windmill Escrow Agreements | App. 1081-1092 |
| Ex. I-36 | Bellwether Escrow Agreements | App. 1094-1105 |
| Ex. I-37 | Windmill Settlement Statement | App. 1107-1111 |
| Ex. I-38 | Bellwether Settlement Statement | App. 1112-1117 |
| Ex. I-39 | Ingleside LOC | App. 1119-1122 |
| Ex. I-40 | Opelika LOC | App. 1124-1135 |
| Ex. I-41 | Ingleside LOC App | App. 1137-1150 |
| Ex. I-42 | Opelika LOC App | App. 1152-1167 |

| Ex. J | Declaration of Bradley Muth | App. 1169-1189 |
|---|---|---|

| Ex. J-1 | Promissory Note | App. 1191-1203 |
|---|---|---|
| Ex. J-2 | Deed of Trust | App. 1205-1257 |
| Ex. J-3 | Windmill Letter Loan Agreement | App. 1259-1261 |

| Ex. J-4 | Windmill Note | App. 1263-1274 |
|---------|---------------|----------------|

**RESPECTFULLY SUBMITTED BY:**

/s/ *Brian K. Norman*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on May 30, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

/s/ *J. Blair Norris*
**J. BLAIR NORRIS**

# EXHIBIT I-33

## PLEDGE AND SECURITY AGREEMENT
## WITH ASSIGNMENT OF RIGHTS

**THIS PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS** (the "Pledge Agreement") is entered into effective as of the 13th day of January, 2021, from **D4OPM, LLC**, a Texas limited liability company ("D4OPM") and **ONE MF D4, LLC**, a Texas limited liability company ("OMD4" and D4OPM and OMD4 are collectively referred to as "Pledgor") to **SOUTHERN PROPERTIES CAPITAL, LTD**, a British Virgin Islands company ("Secured Party").

### Recitals

A.    Secured Party has agreed to make a loan to Pledgor in the amount of $5,129,000.00, to be evidenced by a Promissory Note of even date herewith ("Loan").

B.    A condition of the Loan is that Pledgor delivers this Pledge Agreement to secure the Note.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Secured Party as follows:

1.    Certain Defined Terms.

    a.    Affiliate – shall mean with respect to any person or entity, any other person or entity who, or which, controls, is controlled by or under common control with, such person or entity.

    b.    Code – the Uniform Commercial Code as adopted and in force in the State of Texas, as from time to time in effect.

    c.    Collateral – all of the property and interests in property described in Section 2 hereof, and all other property that now or hereafter secures the payment and performance of any of the Secured Indebtedness (as defined herein below).

    d.    Company – D4OP LLC, a Texas limited Liability Company.

    e.    Note – as defined above.

    f.    Membership Interest – the interest of Pledgor in the Company, consisting of 100% of the Membership Interest in the Company.

    g.    Secured Indebtedness – the debt of Pledgor to Secured Party evidenced by the Note, as the same may be renewed, extended or modified from time to time.

2.    Pledge and Security Interest. As collateral security for the prompt and complete payment and performance when due of the Secured Indebtedness, Pledgor hereby grants to Secured Party, a continuing security interest in all of Pledgor's right, title, and interest in the

following property, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence (the "Collateral"):

a.   The Membership Interest and all certificates, if any, representing same, and all rights, benefits, and privileges of Pledgor as a member in the Companies, and all rights, benefits, and privileges associated with the Membership Interest, including rights to profits, conversions distributions, return of capital, and voting rights;

b.   All accounts and rights now or hereafter attributable to the Membership Interest and operating agreements for the Companies, all rights, benefits, and privileges of Pledgor attributable thereto, including, without limitation, all distributions (whether in the nature of securities, monies, or other property), profits, return of capital, increases, proceeds, fees, preferences, payments, distributions or payments in partial or complete liquidation or redemption, and other rights or benefits of whatever nature made with respect to or attributable to the Membership Interest or which Pledgor is now or may hereafter become entitled to receive or exercise with respect to the Membership Interest;

c.   All subscriptions, warrants, options, and any other rights issued by the Companies or any other person whatsoever upon or in connection with the Membership Interest or any part of the collateral described in this Section 2;

d.   All cash, securities, dividends, increases, distributions and profits received as a result of reclassifications, readjustments, reorganizations, mergers, consolidations, combinations, or changes in the capital structure of the Companies and any other collateral at any time and from time to time received, receivable or otherwise distributed or delivered to Secured Party, and all rights and privileges pertaining thereto;

e.   All securities hereafter delivered to Secured Party in substitution for, or in addition to any of the foregoing, or certificates representing or evidencing such securities, and all cash, securities, instruments, documents, dividends, increases, distributions and profits received therefrom, and any other collateral at any time and from time to time received by, receivable by or otherwise distributed or delivered to Secured Party in respect of or in exchange for any of the collateral described herein;

f.   All substitutes and replacements for the collateral described in this Section 2, and all proceeds (cash and non-cash) arising out of the sale, assignment, exchange, liquidation, collection or other disposition of all or any portion of the Membership Interest, or the assets of the Companies, or the other collateral described in this Section 2, and further including, without limitation, proceeds in the form of accounts, chattel paper, instruments, documents, consumer goods, inventory and equipment; and

g.   All books and records of Pledgor pertaining to any of the above.

Coverage of proceeds, however, does not authorize the sale, assignment, exchange, liquidation or other disposition of any Collateral without the prior written consent of Secured

Party, which consent shall not be unreasonably withheld or delayed. The security interest contained herein is granted to secure the payment and performance of the Secured Indebtedness.

3. Secured Party as Custodian. If requested by Secured Party, Pledgor agrees that it will deposit with Secured Party, duly executed transfer powers in favor of Secured Party or its nominee and will make such arrangements with a transfer agent, satisfactory to Secured Party, as will require such transfer agent, solely upon Secured Party's written request, following any Default (defined below) to register the Membership Interest in the name of the Secured Party or its nominee as provided above and as may otherwise be satisfactory to Secured Party. In addition, Secured Party shall at all times have the right to exchange certificates or instruments representing or evidencing the Membership Interest for certificates or instruments of smaller or larger denominations for any purpose consistent with its performance of this Pledge Agreement.

4. Assignment of Companies' Distributions. In addition to the security interest granted in Section 2 above, Pledgor hereby assigns and transfers to Secured Party from and after a Default all distributions and payments of whatever kind or character Pledgor may be then or thereafter entitled to receive from the Companies (collectively, all such distributions and payments are hereinafter referred to as "Distributions or Payments"), including without limitation, any distributions of escrows or other funds from lenders secured by property owned by the Company, and Pledgor hereby authorizes and directs the Companies to pay such Distributions or Payments directly to Secured Party from and after a Default. Upon receipt of each such Distributions or Payments, Secured Party shall apply such Distributions or Payments as follows: (i) first to the payment of all costs and expenses incurred by Secured Party under this Pledge Agreement or under the Note, (ii) second to reimbursement of Secured Party of any other disbursements made by Secured Party in accordance with this Pledge Agreement, (iii) third to the payment of all accrued and unpaid interest, if any, on the Secured Indebtedness, (iv) fourth, the payment of all other amounts then owing to Secured Party by Pledgor under the Note, and (v) fifth, the remainder of such Distributions or Payments, if any, to be paid to Pledgor. Such distributions shall include, without limitation, any proceeds to which Pledgor is entitled as a result of the sale or other disposition of any assets or collateral of the Companies or of any entity in which the Companies owns an interest or as a result of any financing or refinancing of any indebtedness of the Companies or of any entity in which the Companies owns an interest. Secured Party shall not, by virtue of this assignment, be deemed a member in the Companies.

5. Pledgor's Representations and Warranties. Pledgor represents and warrants to Secured Party as follows:

   a. Pledgor has good right and lawful authority to execute, deliver and perform this Pledge Agreement and to pledge the Collateral under this Pledge Agreement and the execution and performance hereof has been authorized or deemed authorized by all necessary action of Pledgor and the Companies.

   b. No consent or approval of any governmental body or regulatory authority, or of any securities exchange or of any other person is necessary to effect the validity of the rights created hereunder which have not been obtained.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 3
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

App. 1059

c.    There is no financing statement or other document creating or evidencing a lien now on file in any public office covering any of the Collateral nor is there any lien or encumbrance on any of the Collateral. Until the termination of this Pledge Agreement, Pledgor will not execute any such financing statement or statements on any of the Collateral, except as may have been or may hereafter be granted to Secured Party.

d.    No security agreement covering the Collateral, or any part thereof, has been made and no security interest, other than the one created under this Pledge Agreement, has been granted, or to the best knowledge of Grantor has attached or been perfected in the Collateral or any part thereof.

e.    Pledgor's principal place of business is at the address of Pledgor set forth herein.

f.    No bankruptcy or insolvency proceedings are pending by or against Pledgor and there are no outstanding judgments against Pledgor.

h.    Pledgor is the legal and equitable owner of, and has good and indefeasible title to, the Membership Interest free and clear of all liens, security interests, pledges, charges and encumbrances except for the secured interest created by this Pledge Agreement.

i.    This Pledge Agreement, together with all filings and other actions necessary or desirable to perfect and protect such security interest, create a valid and perfected first priority security interest in the Collateral securing the payment and performance of the Secured Indebtedness.

j.    There are no judicial or administrative actions, suits or proceedings pending or threatened against or affecting Pledgor or the Collateral.

k.    This Pledge Agreement constitutes the legal, valid and binding obligation of Pledgor, enforceable in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

6.    Covenants. Pledgor hereby covenants and agrees with Secured Party that, except as may be provided in or with respect to the documents evidencing and/or securing any loan to the Companies from American Bank of Commerce in connection with the acquisition and development of real property by the Companies, as follows:

a.    In the event, for any reason, that the law of any jurisdiction other than the State of Texas becomes or is applicable to the Collateral, or any part thereof, or to any of the Secured Indebtedness, Pledgor agrees to execute and deliver all such instruments and to do all such other things as may be reasonably necessary or reasonably appropriate to preserve, protect and enforce Secured Party's security interest or lien under the law of such other jurisdiction, at least to the same extent as such security interest would be protected under the Code.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 4
1162875_1 – Parc at Opelika – DMOPM, LLC, and OMD4, LLC (17516.0045)

App. 1060

b.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, security, or other instrument, such promissory note, security or instrument shall be immediately pledged to Secured Party under this Pledge Agreement and Pledgor shall deliver to Secured Party such promissory note, security, or instrument, duly endorsed, without recourse, in a manner satisfactory to Secured Party and Pledgor.

c.  Pledgor shall keep the Collateral free from, and will not create, grant, permit, or suffer to exist, any lien, attachment, security interest, sequestration, encumbrance or any other legal or equitable process, or any encumbrance of any kind or character other than the lien and security interest granted in this Pledge Agreement.

d.  Pledgor shall perform in all material respects all obligations, covenants and duties imposed upon Pledgor by the material agreements and instruments constituting part of the Collateral, including all of the material terms, provisions and conditions of the Companies in effect as of the date hereof, as amended, modified, or supplemented from time to time (but without affecting Pledgor's obligations prohibiting such action under this Pledge Agreement), and maintain in full force and effect all such agreements and instruments, and shall not cause, vote to consent to, vote in favor of, take any actions or fail to take any action that results in any amendment, modification, cancellation or limitation of such agreements or instruments.

e.  Pledgor shall not change its name, identity, or corporate structure in any manner which might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of the then applicable provision of the Code unless Pledgor shall have given Secured Party at least 30 days prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by Secured Party to amend such financing statement or continuation statement so that it is not seriously misleading.

f.  Pledgor will not change its principal place of business from the address set forth herein, change the location of any Collateral, or remove the records concerning the Collateral, unless it has given Secured Party at least 30 days prior written notice of its intent to do so and has taken such action as is necessary or advisable in the opinion of Secured Party to cause Secured Party's security interest in the Collateral to continue to be a first priority perfected security interest.

g.  Pledgor shall promptly execute and deliver from time to time to Secured Party all such assignments, certificates, passbooks, stock powers, supplemental writings, notices, financing statements and other items and do all other acts or things as Secured Party may reasonably request in order to comply with the Code and more fully preserve, evidence and perfect the interest herein of Secured Party in the Collateral or in order to enable Secured Party to exercise and enforce its rights hereunder with respect to the pledge and security interests granted herein, including, without limitation, causing, after Default, any or all of the Collateral to be transferred

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 5
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 1061

of record into the name of Secured Party or its nominee (and Secured Party agrees that if any Collateral is transferred into its name or the name of its nominee, Secured Party will thereafter promptly give to Pledgor copies of any notices and communications received by Secured Party or its nominee with respect to the Collateral).

h.    Pledgor shall notify Secured Party in writing, promptly upon Pledgor's learning thereof, of any litigation, proceeding or claim affecting Pledgor, the Companies or the Collateral, and, at Secured Party's request and expense, Pledgor shall appear in and defend such action or proceeding other than an action or proceeding against the Companies.

i.    Pledgor shall promptly pay or cause to be paid when due, all lawful taxes, assessments, levies, contributions, charges, fines and penalties, of every description, attributable to the Collateral or any distribution in respect of any of the Collateral (and, in connection therewith, Pledgor shall be entitled to receive from Secured Party or retain such amount of any distribution from the Companies as Pledgor shall deem reasonably necessary to satisfy any tax obligations), and shall furnish to Secured Party, upon request, evidence of the payment thereof. If any Collateral is levied upon, or taken into custody, or detained by any person whatsoever, Pledgor agrees to immediately notify Secured Party. If Pledgor should, for any reason, fail to pay and discharge promptly any such taxes, assessments, levies, contributions, charges, fines, or penalties, when due, Secured Party shall be authorized to pay the same, with full subrogation by reason of such payment, and the amount so paid, together with interest thereon as provided herein, shall be secured by the security interest herein granted, and Pledgor covenants and agrees, on demand, to repay the amount so paid by Secured Party in payment of such items, together with interest thereon at the applicable rate of interest set forth in the Note, from the date of such payment by Secured Party until said amounts are repaid. Secured Party shall have no liability for any loss, damage or injury resulting from the non-payment of any of such taxes, assessments, levies, contributions, charges, fines, or penalties.

j.    Pledgor will not sell, assign, or transfer any Collateral in any manner or any of Pledgor's rights in the Collateral, or any part thereof, except as expressly permitted in this Pledge Agreement.

k.    If this Pledge Agreement or any provision hereof shall be deemed invalid, in whole or in part, by reason of any present or future law or governmental regulation, or any decision of authoritative court, or shall be deemed by Secured Party, for any reason, ineffective to create or evidence the security interest herein granted, then from time to time, Pledgor shall execute and deliver such other and further instruments, documents or assurances, as in the reasonable judgment of Secured Party and Pledgor may be required to more effectively subject the Collateral to the payment of the Secured Indebtedness and the performance of the terms and provisions of this Pledge Agreement or to effectuate any sale of any Collateral as hereinafter provided.

l.    Pledgor shall promptly furnish Secured Party with any information or writings which Secured Party may reasonably request concerning the Collateral.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS   Page 6
1162875_1 – Parc at Opelika   D4OPM, LLC and OMD4, LLC (7516.0045)

App. 1062

m.    Pledgor shall allow Secured Party, or cause to be allowed to Secured Party, to inspect all records of Pledgor relating to the Collateral, to the Companies, or to the Secured Indebtedness and to make and take away copies of such records for any proper purpose.

n.    If following any Default the Collateral, or any part thereof, is ever converted by its issuer or maker into another type of collateral or if any of the items required to be pledged by Pledgor under Section 2 above, including any money or other proceeds, is ever paid or delivered to or received by Pledgor, then, in any such event, all such collateral, items, money and other proceeds and shall be transferred and delivered to Secured Party by Pledgor (together with, if appropriate, the certificates for any shares or securities duly endorsed in blank or accompanied by undated stock powers duly executed in blank) all of which thereafter shall be held by Secured Party, pursuant to the terms of this Pledge Agreement, as part of the Collateral and Pledgor shall take such other action as Secured Party shall deem necessary or appropriate to duly record the security interests created hereunder in such collateral, items, money, or other proceeds.

o.    Pledgor will not further encumber the Collateral without the consent of Secured Party.

7.    Voting Rights.

a.    Pledgor shall not be entitled to exercise any and all voting and/or consensual rights and powers relating or pertaining to the Collateral or any part thereof for any purpose, without the consent of Secured Party.

b.    Upon the occurrence after the date hereof and during the continuance of a Default, all rights of Pledgor to exercise the voting and/or consensual rights and powers which Pledgor is entitled to exercise pursuant to subsection (a) above shall cease, at the option of Secured Party, and all such rights shall thereupon become vested in Secured Party who shall have the sole and exclusive right and authority to exercise such voting and/or consensual rights and powers. In addition and except as otherwise provided in Section 4 above, Secured Party shall have the right upon occurrence of a Default to notify and direct the issuer of, or obligor under, any of the Collateral to thereafter make all payments, distributions, dividends and any other distributions payable in respect thereof directly to Secured Party. The issuer of, or obligor under, any of the Collateral making such payment or distribution to Secured Party shall be fully protected in relying on a written statement of Secured Party that Secured Party then holds a security interest which entitles Secured Party to receive such payments and distributions. Except as otherwise provided in Section 4 above, any and all money and other collateral paid over to or received by Secured Party pursuant to the provisions of this subsection (d) shall be retained by Secured Party as additional collateral hereunder and may be applied (and upon Pledgor's written request all cash shall permanently be applied) in accordance with the provisions hereof.

8.    Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" or a "Default":

   a.    The occurrence of any default which is not cured following any applicable notice and opportunity to cure by Pledgor under the Note, or the occurrence of any Event of Default or Default under this Pledge Agreement.

   b.    Pledgor shall fail to pay when due any of the Secured Indebtedness which is owed to Secured Party by Pledgor, or the failure of Pledgor to pay when due, any indebtedness, obligations or liabilities now or hereafter due under this Pledge Agreement;

   c.    The discovery by Secured Party that any statement, representation, warranty, or covenant of Pledgor in this Pledge Agreement is false, misleading or erroneous in any material respect when made, if Secured Party relied thereon to its detriment;

   d.    The occurrence of a levy against any of the Collateral under any execution, attachment, sequestration or other writ, or the appointment of a receiver for the Collateral or any part thereof;

   e.    Pledgor shall fail promptly to perform, observe, and keep any of its obligations, covenants or agreements contained in this Pledge Agreement and such failure is not cured before expiration of any applicable cure periods.

9.    Notice required or desired to be given under the terms of this Pledge Agreement shall be in writing, and sent by hand delivery, or overnight receipted courier service, or U.S. certified or registered mail, postage prepaid, return receipt requested, and shall be given to the parties at the following address:

If to Pledgor:        D4OPM, LLC, and OMD4, LLC
                      13901 Midway Road
                      Suite 102
                      Farmers Branch, Texas 75244
                      Attention:    Timothy Barton
                      Telephone:    972-385-9934

If to Secured Party:    Southern Properties Capital LTD
                        1603 LBJ Freeway
                        Suite 800
                        Dallas, Texas 75234

Notice given under this provision by hand delivery or overnight receipted courier service shall be effective as of the date of delivery or first attempted delivery; notice given by U.S. mail as aforesaid shall be deemed effective on the earlier of actual receipt by Pledgor or three (3) business days after deposit in a regularly maintained receptacle of the U.S. Postal Service.

10.    Notwithstanding anything to the contrary contained in this Pledge Agreement or the Note:

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 5
1162375_1    Parc at Opelika    D4OPM. LLC. and OMD4. LLC (7516.0045)

a.   Pledgor shall not be in default under this Pledge Agreement for the failure to pay any sum due thereunder or hereunder, unless and until Pledgor has received a written notice of non-payment from Secured Party and has failed to cure, fully and unqualifiedly, such non-payment within five (5) days after the effective date of such notice (as hereinbelow provided); and

b.   Pledgor shall not be in default under the Note or this Pledge Agreement for the failure to perform or comply with any non-monetary covenant or agreement contained therein or herein, unless and until Pledgor has received written notice of such default from Secured Party and has failed to cure, fully and unqualifiedly, such non-monetary default within thirty (30) days after the effective date of such notice (as hereinbelow provided).

11.   Acceleration of the Secured Indebtedness. Without in any way limiting the right of Secured Party to demand payment of any portion of the Secured Indebtedness payable on demand, upon or at any time after the occurrence of a Default, all or any portion of the Secured Indebtedness due or to become due shall, at the option of Secured Party and without notice or demand by Secured Party, become at once due and payable and Pledgor shall forthwith pay to Secured Party, in addition to any and all sums and charges due, the entire unpaid balance of the Secured Indebtedness owed by Pledgor to Secured Party.

12.   Remedies of Secured Party. Upon the occurrence of a Default:

a.   Secured Party may, at Secured Party's option and at Pledgor's expense, either in Secured Party's own right or in the name of Pledgor and in the same manner and to the same extent that any Pledgor might reasonably so act if this Pledge Agreement had not been made:

b.   demand, sue for, collect, recover, receive and otherwise enforce payment of all proceeds and other sums due and payable in respect of the Collateral, Pledgor hereby requesting and instructing all parties liable to Pledgor in connection with the Collateral to make all payments then due or which may thereafter become due thereunder or thereby to Secured Party, and Pledgor further agreeing that the receipt by Secured Party of any such payments shall be a complete release and discharge of the obligor or obligors thereof to the extent of the payment or payments so made;

i.   do all things requisite, convenient, or necessary to enforce the performance and observance of all rights, remedies and privileges of Pledgor arising from the Collateral, or any part thereof, including, but not limited to, compromising, waiving, excusing, or in any manner releasing or discharging any obligation of any party to or arising from the Collateral;

ii.   take possession of the books, papers, chattel paper, documents of title and accounts of Pledgor, wherever located, relating to the Collateral;

iii.   receive, and Pledgor will forthwith surrender to Secured Party, the possession of the Collateral, and, to the extent permitted by law, Secured Party may

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 9
1162875_1 – Parc at Opelika   D4OPM, LLC, and OMD4, LLC (7516-0045)

App. 1065

itself or by such officers or agents as it may appoint, (a) exercise any voting rights and/or consensual rights and powers relating or pertaining to the Collateral or any part thereof (and Pledgor agrees to take all actions as may be appropriate to give effect thereto), (b) exclude Pledgor, his/its agents and servants from such activities, and (c) do all acts, including the making of contracts, which Secured Party deems necessary for the care or management of the Collateral;

iv.    sue or otherwise collect and receive money with respect to the Collateral; and

v.    exercise any other lawfully available powers or remedies, and do all other things which Secured Party reasonably deems requisite, convenient or necessary or which Secured Party reasonably deems proper to protect the security interest herein granted.

c.    Secured Party may reduce its claim to judgment.

d.    Secured Party may foreclose or otherwise enforce its security interests in all or any part of the Collateral by any available judicial procedure.

e.    At its discretion, Secured Party may retain all or any portion of the Collateral in satisfaction of the Secured Indebtedness whenever the circumstances are such that Secured Party is entitled to do so under the Code.

f.    Secured Party may apply by appropriate judicial proceedings for appointment of a receiver for the Collateral, or any part thereof, and Pledgor hereby consents to any appointment.

g.    After giving Pledgor written notice ten (10) days in advance of the time and place, Secured Party may sell, lease, assign, transfer or otherwise dispose of all or any part of the Collateral at public or private sale, at such place or places as Secured Party deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), without demand of performance or notice of intention to effect any such disposition or (except such notice as is required above or by applicable statute and cannot be waived), and Secured Party or anyone else may be the purchaser, lessee, assignee, or recipient of any or all of the Collateral so disposed of at any public sale (or to the extent permitted by law, at any private sale), and Secured Party may, in its own name or as the irrevocably appointed attorney-in-fact of Pledgor, effectively sell, lease, assign or transfer the Collateral, or any part thereof, absolutely free from any claims or right of whatsoever kind, including any right or equity of redemption of Pledgor, and execute and deliver all necessary assignments, conveyances, bills of sale and other instruments with power to substitute one or more persons or corporations with like power. Any such foreclosure sale, assignment, or transfer shall, to the extent permitted by law, be a perpetual bar, both at law and in equity, against Pledgor and all persons and corporations lawfully claiming by or through or under Pledgor. Any public or private sale may, without notice or publication, be adjourned or caused to be adjourned by Secured Party from time to time by announcement at the time and place

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 10
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 1066

fixed for the sale, and such sale may be made at any time or place to which the same may be adjourned. Upon any sale, Secured Party may bid for and purchase the Collateral, or any part thereof, and upon compliance with the terms of sale may hold, retain, possess and dispose of the Collateral, in its absolute right without further accountability. Secured Party shall have the right, at its option, to have any or all of the Secured Indebtedness as of the date of such sale credited against the amount of its bid. At any such sale it is not necessary to exhibit the Collateral. If any notice, exemption, filing, consent, approval or authorization of any federal, state, municipal or other governmental department, agency or authority should be necessary to effectuate any sale or other disposition of all or any of the Collateral, Pledgor will execute all such applications and other instruments as may be required in connection with applying for, obtaining, and securing any such notice, exemption, filing, consent, approval or authorization and will use its best efforts in connection therewith. Secured Party is authorized at any sale of the Collateral, if Secured Party deems it advisable, to restrict the prospective bidders or purchasers to those persons who will represent and agree that they are purchasing for their own account, for investment, and not with a view to distribution or resale of any of the Collateral. Any sale of the Collateral may be sold in one lot as an entirety or in separate parcels, as Secured Party may determine. The sale of any part of the Collateral will not exhaust Secured Party's power of sale, it being agreed that sales may be made from time to time until all of the Collateral has been sold or until the Secured Indebtedness has been paid in full. Secured Party shall not be obligated to make any sale pursuant to any notice.

h.    Secured Party shall have all of the rights and remedies of a secured party under the Code or under other applicable law, and all other legal and equitable rights to which Secured Party may be entitled, all of which rights and remedies shall be cumulative, and none of which shall be exclusive, and shall be in addition to any other rights or remedies contained in this Pledge Agreement or any other document or instrument.

13.    Restrictions on Sale. Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any private sales to such purchasers may be made at prices and on terms less favorable than those obtainable through public sale without such restrictions, and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale. Pledgor further agrees that Secured Party shall have the right to rely upon the advice and opinion of any member of the National Securities Exchange as to the best price reasonably obtainable upon such private sale and that such reliance shall be conclusive evidence that Secured Party handled such matter in a commercially reasonable manner under the Code.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 11
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD1, LLC (7516.0045)

App. 1067

14. **Private Sale.** Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Pledge Agreement conducted in a commercially reasonable manner. Pledgor waives any claims against Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Indebtedness, even if Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

15. **Notification.** Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Pledgor and to any other person entitled under the Code to notice; provided, that if the Collateral threatens to decline quickly in value or is of a type customarily sold on a recognized market, Secured Party may sell or otherwise dispose of the Collateral without notification, advertisement or other notice of any kind. It is agreed that notice sent or given not less than ten (10) calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purpose of this Pledge Agreement.

16. **Waivers of Appraisement.** In case of the occurrence of any Default, neither Pledgor nor anyone claiming by, through or under Pledgor, to the extent Pledgor may lawfully so agree, shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or redemption law now or hereafter in force in any locality where any of the Collateral is situated for purposes of applicable law, in order to prevent or hinder the enforcement of this Pledge Agreement, or the absolute sale of the Collateral, or the final and absolute putting into possession thereof, immediately after such sale, of the purchaser thereof; and Pledgor in Pledgor's own right and for all who may claim under Pledgor, hereby waives, to the full extent that Pledgor may lawfully do so, the benefit of all such laws and any and all right to have the Collateral marshaled upon any enforcement of the security interest herein granted, and Pledgor agrees that Secured Party or any court having jurisdiction to enforce such security interest may sell the Collateral in parts or as an entirety.

17. **Waiver of Notice.** Pledgor waives notice of the creation, advance, increase, existence, extension, or renewal of, and of any indulgence with respect to, the Secured Indebtedness, waives presentment, demand, notice of dishonor, and protest, waives notice of the amount of the Secured Indebtedness outstanding at any time, notice of any change in financial condition of any person liable for the Secured Indebtedness or any part thereof, notice of any Default or Event of Default, and all other notices respecting the Secured Indebtedness, except as otherwise expressly provided in this Pledge Agreement.

18. **Application of Proceeds.** Except as provided in Section 4 above, Secured Party shall apply the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Secured Party under this Pledge Agreement, as follows:

   a.    First, to the payment of all costs and expenses of any foreclosure and collection hereunder and all proceedings in connection therewith, including reasonable attorneys' fees;

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 12
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC 17516.00451

App. 1068

b. Then, to the reimbursement of Secured Party for all disbursements made by Secured Party for taxes, assessments or liens superior to the security interest hereof and which Secured Party shall reasonably deem expedient to pay;

c. Then, to the reimbursement of Secured Party of any other disbursements made by Secured Party in accordance with the terms hereof;

d. Then, to the amounts then owing and unpaid in respect of the Secured Indebtedness, in such priority as Secured Party may determine in Secured Party's discretion;

e. The remainder of such proceeds, if any, shall be paid to Pledgor or as otherwise required by a court of competent jurisdiction.

If such proceeds shall be insufficient to discharge the entire Secured Indebtedness owing by Pledgor, Secured Party may have any other available legal recourse against Pledgor for the deficiency under the Secured Indebtedness.

19. Enforcement of Secured Indebtedness. Nothing in this Pledge Agreement shall affect or impair the unconditional and absolute right of Secured Party to enforce the Secured Indebtedness as and when the same shall become due in accordance with the terms of the Note.

20. Right of Secured Party to Prevent or Remedy Default. If Pledgor shall fail to perform any of the covenants, conditions and agreements required to be performed and observed by Pledgor under this Pledge Agreement or under the Loan Documents, or in respect of the Collateral, as the case may be, Secured Party (i) may, but shall not be obligated to, take any action Secured Party reasonably deems necessary or desirable to prevent or remedy any such Default by Pledgor or otherwise to protect the security interest of Secured Party under this Pledge Agreement, and (ii) after a Default, shall have the absolute and immediate right to take possession of the Collateral or any part thereof to such extent and as often as Secured Party, in Secured Party's sole discretion, deems necessary or desirable in order to prevent or to cure any such Default by Pledgor, or otherwise to protect the security of this Pledge Agreement. Secured Party may advance or expend such sums of money for the account of Pledgor as Secured Party, in Secured Party's discretion, deems necessary for any such purpose. In no event, however, shall Secured Party have any obligation or duties whatsoever to perform any covenant or agreement of Pledgor contained herein, and any such performance by Secured Party shall be wholly discretionary with Secured Party.

21. Duties of Secured Party. The powers conferred upon Secured Party hereunder are solely to protect Secured Party's interest in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Except for the safe custody of any Collateral in Secured Party's possession and the accounting for money actually received by Secured Party hereunder, Secured Party shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

22. No Liability of Secured Party. Neither the acceptance of this Pledge Agreement by Secured Party, nor the exercise of any rights hereunder by Secured Party, shall be construed in any

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 13
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 1069

way as an assumption by Secured Party of any covenants, representations, warranties, obligations, responsibilities, liabilities, or duties of Pledgor arising in connection with the Collateral assigned hereunder or otherwise bind Secured Party to the performance of any obligations respecting the Collateral, it being expressly understood that Secured Party shall not be obligated to perform, observe or discharge any covenant, warranty, representation, obligation, responsibility, duty, or liability of Pledgor in respect of any of the Collateral, including, but not limited to, appearing in or defending any action, expending any money or incurring any expense in connection therewith.

23. Right of Secured Party to Defend Action Affecting Security. Secured Party may, at its expense, appear in and defend any action or proceeding at law or in equity purporting to affect Secured Party's security interest under this Pledge Agreement.

24. Secured Party's Expenses. All reasonable advances, costs, expenses, charges and attorneys' fees which Secured Party may make, pay or incur under any provision of this Pledge Agreement for the protection of Secured Party's security or for the enforcement of any of Secured Party's rights hereunder, or in foreclosure proceedings commenced and subsequently abandoned, or in any dispute or litigation in which Secured Party may become involved by reason of or arising out of this Pledge Agreement or the Loan Documents, or the Collateral, shall be a part of the Secured Indebtedness and shall be paid by Pledgor to Secured Party, upon demand, and shall bear interest until paid at the applicable rate of interest set forth in the Note, from the date of such payment until repaid by Pledgor.

25. Secured Party's Right of Set-Off. Upon the happening of any event entitling Secured Party to pursue any remedy provided herein or if Secured Party shall be served with garnishment process in which Pledgor shall be named as defendant, whether or not Pledgor shall be in Default hereunder at the time, Secured Party may, but shall not be required to, set-off any indebtedness owing by Secured Party to Pledgor against any of the Secured Indebtedness without first resorting to the security hereunder and without prejudice to any other rights or remedies of Secured Party or Secured Party's security interest herein.

26. No Waiver. In case Secured Party shall have proceeded to enforce any right or remedy hereunder and such proceedings shall have been discontinued or abandoned for any reason, then in every such case, Pledgor and Secured Party shall be restored to their former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of Secured Party shall continue as if no such proceeding had been taken. The failure or delay on the part of Secured Party in exercising any right, remedy or power under this Pledge Agreement or in giving or insisting upon strict performance by Pledgor hereunder or in giving notice hereunder shall not operate as a waiver of the same or any other power or right, and no single or partial exercise of any such power or right shall preclude any other or further exercise thereof or the exercise of any other such power or right. Secured Party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Pledgor of any and all of the terms and provisions of this Pledge Agreement to be performed by Pledgor. The collection and application of proceeds, the entering and taking possession of the Collateral, and the exercise of the rights of Secured Party contained in the Loan Documents, including this Pledge Agreement, shall not cure or waive any default, or affect any notice of default, or invalidate any acts done pursuant to such notice. No waiver by Secured Party of any breach or default of or by any party hereunder shall be

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS - Page 14
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (75160045)

App. 1070

deemed to alter or affect Secured Party's rights hereunder with respect to any prior to subsequent default.

27.   Remedies. No right or remedy herein reserved to Secured Party is intended to be exclusive of any other right or remedy, but each and every such remedy shall be cumulative, not in lieu of, but in addition to, any other rights or remedies given under this Pledge Agreement and all other Loan Documents and at law or in equity. Any and all of Secured Party's rights and remedies may be exercised from time to time and as often as such exercise is deemed necessary or desirable by Secured Party.

28.   Right of Secured Party to Extend Time of Payment, Substitute, Release Security, etc. Without affecting the liability of any person, including Pledgor, for the payment or performance of any of the Secured Indebtedness or the lien of this Pledge Agreement on the Collateral, or the remainder thereof, for the full amount of any indebtedness unpaid, Secured Party may from time to time, without notice or without affecting or impairing any of Secured Party's rights under this Pledge Agreement: (a) release any person liable for the payment or performance of any of the Secured Indebtedness, (b) extend the time or otherwise alter the terms of payment or performance of any of the Secured Indebtedness, (c) accept additional security therefor of any kind, including, without limitation, deeds of trust or mortgages, (d) alter, substitute or release any collateral securing the Secured Indebtedness, (e) resort for the payment or performance of all or any portion of the Secured Indebtedness to its several securities therefor in such order and manner as Secured Party may deem fit, or (f) join in any subordination or other agreement affecting this Pledge Agreement or the lien or charge thereof.

29.   Termination. When all Secured Indebtedness shall have been paid in full, this Pledge Agreement shall terminate and Secured Party shall forthwith cause to be assigned, transferred and delivered, against receipt, but without any recourse, warranty or representation whatsoever by Secured Party (other than such representations and warranties as to ownership and absence of encumbrances as Pledgor may reasonably require), all rights assigned to Secured Party under Section 4 above, and any remaining Collateral and money received in respect thereof, to or on the order of Pledgor.

30.   Miscellaneous.

   a.   This Pledge Agreement may be presented to filing officers for recordation as a financing statement or other document evidencing the security interest created hereunder.

   b.   Regardless of any provision contained in any document or instrument evidencing or securing any Secured Indebtedness, Secured Party shall not be entitled to receive, collect or apply as interest on the Secured Indebtedness an amount which would be usurious and, to this end, in the event of the acceleration of the maturity of the Secured Indebtedness, or any item hereof, a proper credit shall be given for unearned interest and such unearned interest shall be immediately refunded to Pledgor.

   c.   It is agreed that any custom or usage to the contrary notwithstanding, Secured Party shall have the right at all times to enforce the covenants and provisions of this Pledge

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS   Page 15
1162875_1 – Parc at Opelika – D4OPM, LLC and OMD4, LLC (7516.0045)

App. 1071

Agreement in strict accordance with its terms, notwithstanding any conduct or custom by Secured Party in refraining from so doing at any time, or any acceptance by Secured Party of partial performance by Pledgor.

d.    Secured Party's rights, titles, interests, liens and securities under this Pledge Agreement are cumulative of all other rights, titles, interests, liens and securities which Secured Party may now or at any time hereafter hold securing payment of the Secured Indebtedness, or any part thereof.

e.    This Pledge Agreement is binding upon Pledgor and Pledgor's successors and permitted assigns, and shall inure to the benefit of and be enforceable by Secured Party and its respective successors and assigns. Secured Party may assign this Pledge Agreement or any of its rights and powers hereunder, with the Secured Indebtedness, and may assign and/or deliver to any such assignee any of the Collateral therefor and, in the event of such assignment, the assignee shall have all rights and remedies as if originally named in this Pledge Agreement in place of Secured Party and Secured Party shall be thereafter fully discharged from all responsibility hereunder. Pledgor may not assign or transfer Pledgor's rights hereunder without the prior written consent of Secured Party, which consent may be granted or withheld in the sole discretion of Secured Party.

f.    Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in Secured Party's possession if Secured Party takes such action for that purpose as Pledgor requests in writing, but Secured Party shall not be bound to follow such requests.

g.    Pledgor agrees that from time to time upon written request of Secured Party, Pledgor will execute and deliver such further documents and do such other acts and things as Secured Party may reasonably request in order fully to effect the purposes of this Pledge Agreement.

h.    Any notice of sale, disposition or other action by Secured Party required by the Code and sent to Pledgor at Pledgor's address set forth in this preamble of this Pledge Agreement, or at such other address for Pledgor as may from time to time be shown on Secured Party's records, at least ten days prior to such action, shall constitute reasonable notice to Pledgor. Any such notice shall be deemed to have been given on the day it is mailed to such address and shall be sent by certified mail, return receipt requested.

i.    Secured Party shall not be liable for any loss of interest on or any penalty or charge assessed by any depository institution against funds in, payable on or credited to a bank account as a result of Secured Party's exercising any of Secured Party's rights or remedies under this Pledge Agreement.

j.    All representations, warranties and covenants contained in this Pledge Agreement shall survive the execution of this Pledge Agreement and shall terminate upon termination of this Pledge Agreement under Section 29 above, except all

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 16
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

App. 1072

indemnification obligations of Pledgor under this Pledge Agreement shall survive the termination of this Pledge Agreement.

k.  Any provision of this Pledge Agreement found to be prohibited by law shall be ineffective to the extent of such prohibition without invalidating the rest of this Pledge Agreement.

l.  If all or part of the Secured Indebtedness is given in renewal or extension of or applied toward the payment of indebtedness secured by any mortgage, deed of trust, deed to secure debt, pledge, security agreement or other lien, Secured Party shall be, and hereby is, subrogated to all of the rights, titles, security interests and other liens securing the indebtedness so renewed, extended or paid.

m.  After Pledgor executes this Pledge Agreement, it shall be a valid and binding obligation of Pledgor, whether or not Secured Party executes this Pledge Agreement.

n.  No change, amendment, modification, cancellation, or discharge of any provision of this Pledge Agreement shall be valid unless consented to in writing by Secured Party.

o.  Secured Party shall have and be entitled to exercise all such powers hereunder as are delegated to Secured Party hereunder by the terms hereof, together with such powers as are incidental thereto. Secured Party may execute any of Secured Party's rights and duties hereunder by or through sub-agents or employees and shall be entitled to retain counsel and to act in reliance upon the advice of such counsel concerning all matters pertaining to such rights and duties.

p.  Unless the context indicates otherwise, definitions in the Code apply to words and phrases in this Pledge Agreement; if Code definitions conflict, Chapter 9 definitions apply.

31.  **Release of Secured Party.** Secured Party shall not be liable for any action taken or omitted to be taken by Secured Party hereunder or in connection herewith, except for Secured Party's own gross negligence or willful misconduct. Secured Party shall not be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto in connection herewith. Secured Party shall be entitled to rely on any communication, instrument or document believed by Secured Party to be genuine and correct and to have been signed or sent by the proper person or persons. Pledgor agrees to indemnify and hold harmless Secured Party from and against any and all liability incurred by Secured Party hereunder or in connection herewith, unless such liability shall be due to willful misconduct or gross negligence on the part of the Secured Party.

32.  **Governing Law.** This Pledge Agreement and all of the Loan Documents shall be governed by, and shall be construed and enforced in accordance with the laws (other than its choice of law rules) of the State of Texas, except to the extent required to comply with the requirements of laws of states in which collateral pledged to secure the Note is located which are applicable to some of the liens, pledges and security interest which secure the Note.

33. Oral Agreements Ineffective. **THIS PLEDGE AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PLEDGOR AND SECURED PARTY WITH REGARD TO THE SUBJECT MATTER HEREOF, AND THIS PLEDGE AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signature page to follow]*

App. 1074

EXECUTED effective as of the day and year first set forth above.

**PLEDGOR:**

**D4OPM, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

**ONE MF D4, LLC.**
a Texas limited liability company

By: _____
Name: _____
Title: _____

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 19
1162875_1 - Parc at Opelika - D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 1075

## CONSENT OF COMPANY

Company hereby consents to the foregoing, and agrees that it will pay all proceeds it receives, including without limitation, any returns of escrows from any lender on Property owned by Company to Secured Party.

**D4OPM, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 20
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 1076

# EXHIBIT I-34

**Southern Properties Capital LTD**
1603 LJB Freeway
Suite 800
Dallas, Texas 75234

January 22, 2021

D4OP LLC
D4OPM, LLC
ONE MF D4, LLC
13901 Midway Road
Suite 102
Farmers Branch, Texas 75244
Attention: Timothy Barton

Re:    Parc at Opelika, Opelika, Lee County, Alabama ("Property")

Dear Mr. Barton:

D4OP LLC and/or D4OPM, LLC and ONE MF D4, LLC ("Ownership Entities") will own and develop the Property. The undersigned agree that in consideration of a $5,129,000.00 loan ("Loan") made by Southern Properties Capital LTD ("Southern Properties"), that upon written notice, the Ownership Entities will assign ninety-nine and seventy-five one-hundredths percent (99.75%) of the membership interests in the record owner of the Property to Southern Properties or its designee, and that, upon such assignment, provided the Property is subject to no lien other than a first lien approved by Southern Properties, the Loan will be cancelled.

Please indicate your acceptance by countersigning this letter.

Very truly yours,

Southern Properties Capital LTD,
a British Virgin Islands company

By: _____
Name: Erik Johnson
Title: President

LETTER AGREEMENT
1162157_1 – Parc at Opelika

App. 1078

D4OP LLC
D4OPM, LLC
ONE MF D4, LLC
Timothy Barton
January 13, 2021
Page 2

ACCEPTED AND AGREED BY:

**D4OP LLC,**
a Texas limited liability company

By:
Name:
Title:

**D4OPM, LLC,**
a Texas limited liability company

By:
Name:
Title:

**ONE MF D4, LLC,**
a Texas limited liability company

By:
Name:
Title:

Letter Agreement I
1162878-Pillar (Parc at Opelika) 7516.0045

App. 1079

# EXHIBIT I-35

**Escrow Agreement For Operating Deficits**

**U.S. Department of Housing and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR OPERATING DEFICITS** (**"Agreement"**) made this 14th day of  December, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4FR LLC, a Texas limited liability company, (**"Borrower")**, whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX 75234 in connection with HUD Project No. 113-35682, located in the County of Kaufman, State of Texas, which Project will be constructed from the proceeds of a Loan insured by HUD and made by Lender.  (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Operating Deficits, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A.  HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B.  The Firm Commitment is conditioned upon assurance that additional funds be made available for Project purposes, primarily for the absorption of any deficits resulting from the operation of the Project during the initial period of occupancy.

App. 1081

AGREEMENT:

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.  At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $1,410,884.00 (**"Escrow"**).  If the Project is insured pursuant to § 223(f) of the National Housing Act, and if the Firm Commitment so requires, the amount of the Escrow shall include a debt service reserve in accordance with Program Obligations, in the amount of $__N/A___ (**"Debt Service Reserve"**).

2.  It is agreed that the Lender at all times shall control the Escrow, and that the funds in the Escrow may be released or allocated for the purposes indicated in this Agreement and for no other purpose without the prior written approval of HUD.  The Escrow shall take the form of [*specify as applicable*]:

☒    cash, and/or

☐    one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations.

3.  Disbursements from the Escrow may be authorized monthly with written HUD approval to meet any Cash Deficit in the operation of the Project for the time frame set forth in the following paragraph.  The term **"Cash Deficit"** means the shortfall between Rents and Reasonable Operating Expenses.

4.  Any unused balance remaining in the Escrow will be released at Borrower's request and returned to Borrower at the later of twelve (12) months after final endorsement or when the Project has demonstrated to HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months; except unused funds in the Escrow attributable to the Debt Service Reserve, if applicable, will be released once the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.  Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.

5.  The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations.

App. 1082

Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.  The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**                                    **LENDER:**

D4FR LLC,                                         Greystone Servicing Corporation, Inc., a
a Texas limited liability company                 Georgia corporation

                                                              *Please See Counterpart*
                                                  By: ____*Signature Page Attached*____
By: _____                          Lisa Anderson, Vice President
     Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By:_____

_____
Print Name and Title

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Previous editions are obsolete;          Escrow Agreement for Operating Deficits          HUD-92476a-M (06/14)
Replaces form HUD-92476-A (01/03)

App. 1084

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

*Please See Counterpart*

By: ___*Signature Page Attached*___
   Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____
Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc., a Georgia corporation

By: _____
   Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Previous editions are obsolete:          Escrow Agreement for Operating Deficits          HUD-92476a-M (06/14)
Replaces form HUD-92476-A (01/03)

App. 1085

## EXHIBIT "A"

Form of Letter of Credit


Not Applicable

**Escrow Agreement for Working Capital**

**U.S. Department of Housing and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 06/30/2017)

**Public Reporting Burden** for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR WORKING CAPITAL** (**"Agreement"**) made this 14th day of December, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4FR LLC, a Texas limited liability company, (**"Borrower"**), whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, in connection with HUD Project No. 113-35682, located in the County of Kaufman, State of Texas, which Project is being constructed from the proceeds of a Loan insured by HUD and made by Lender.  (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Working Capital, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument, except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A.   HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B.  The Firm Commitment is conditioned upon a working capital escrow being established and funded as indicated below.  This requirement applies to both the profit-motivated and the not-for-profit Borrower.

App. 1087

AGREEMENTS:

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.    At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $1,449,600.00(**"Escrow")**.

2.    It is agreed that the Lender at all times shall control the Escrow.  In the event the Project consists of new construction and the Firm Commitment so requires, the Escrow shall be split equally between a **"Working Capital Amount"** and a **"Construction Contingency Amount"** in accordance with Program Obligations; in situations other than new construction the Escrow shall consist solely of the Working Capital Amount.  The Escrow shall take the form of [*specify as applicable*]:

☒    cash, and/or
☐    one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations.

3.    It is understood that the funds in the Escrow may be released or allocated for the purposes indicated below and for no other purpose without the prior written approval of HUD.

   a.    With respect to the Working Capital Amount:

   (i) the cost of furniture, fixtures, and equipment for the Project that are not paid from Loan proceeds;
   (ii) the cost of marketing and leasing up the Project;
   (iii) for accruals during the course of construction, for interest, mortgage insurance premiums, taxes, ground rents, property insurance premiums and assessments, when funds available for these purposes under the Building Loan Agreement have been exhausted, and also for allocation to such accruals after completion of construction.

   b.    With respect to the Construction Contingency Amount (if applicable):
   (i) cost overruns;
   (ii) HUD approved change orders.

4.    Any unused balance remaining in the Escrow attributable to the Working Capital Amount will be released at Borrower's request and returned to Borrower at the later of twelve (12) months  after final endorsement or when the Project has demonstrated to

App. 1088

HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.  Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.  Any unused balance remaining in the Escrow attributable to the Construction Contingency Amount (if applicable) will be released at Borrower's request and returned to Borrower at final endorsement.

5.      The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations.  Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.      The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

App. 1089

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

By: _____
        Timothy Barton, President

**LENDER:**

GREYSTONE SERVICING CORPORATION, INC.,
a Georgia corporation

*Please See Counterpart*
*Signature Page Attached*

By: _____
        Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

App. 1090

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

*Please See Counterpart*

By: _____ *Signature Page Attached* _____
    Timothy Barton, President

**LENDER:**

GREYSTONE SERVICING CORPORATION, INC.,
a Georgia corporation

By: _____
    Lisa Anderson, Vice President

Attachment: Exhibit "A"

## Warning:

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

EXHIBIT "A"

Form of Letter of Credit

**Not Applicable**

# EXHIBIT I-36

| **Escrow Agreement for Working Capital** | **U.S. Department of Housing and Urban Development** Office of Housing | OMB Approval No. 2502-0598 (Exp. 06/30/2017) |
|---|---|---|

**Public Reporting Burden** for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR WORKING CAPITAL** (**"Agreement"**) made this 26th day of October, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4DS LLC, a Texas limited liability company, (**"Borrower"**), whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, in connection with HUD Project No. 113-35683, located in the County of Dallas, State of Texas, which Project is being constructed from the proceeds of a Loan insured by HUD and made by Lender. (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Working Capital, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument, except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A. HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B. The Firm Commitment is conditioned upon a working capital escrow being established and funded as indicated below. This requirement applies to both the profit-motivated and the not-for-profit Borrower.

App. 1094

AGREEMENTS:

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.    At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $760,848.00 (**"Escrow"**).

2.    It is agreed that the Lender at all times shall control the Escrow.  In the event the Project consists of new construction and the Firm Commitment so requires, the Escrow shall be split equally between a **"Working Capital Amount"** and a **"Construction Contingency Amount"** in accordance with Program Obligations; in situations other than new construction the Escrow shall consist solely of the Working Capital Amount.  The Escrow shall take the form of [*specify as applicable*]:

☒    cash, and/or
☐     one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations.

3.    It is understood that the funds in the Escrow may be released or allocated for the purposes indicated below and for no other purpose without the prior written approval of HUD.

   a.    With respect to the Working Capital Amount:

      (i) the cost of furniture, fixtures, and equipment for the Project that are not paid from Loan proceeds;
      (ii) the cost of marketing and leasing up the Project;
      (iii) for accruals during the course of construction, for interest, mortgage insurance premiums, taxes, ground rents, property insurance premiums and assessments, when funds available for these purposes under the Building Loan Agreement have been exhausted, and also for allocation to such accruals after completion of construction.

   b.    With respect to the Construction Contingency Amount (if applicable):
      (i) cost overruns;
      (ii) HUD approved change orders.

4.    Any unused balance remaining in the Escrow attributable to the Working Capital Amount will be released at Borrower's request and returned to Borrower at the later of twelve (12) months after final endorsement or when the Project has demonstrated to

App. 1095

HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.  Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.  Any unused balance remaining in the Escrow attributable to the Construction Contingency Amount (if applicable) will be released at Borrower's request and returned to Borrower at final endorsement.

5.    The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations.  Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.    The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

*(signatures appear on following page)*

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____
Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation
*Please See Counterpart*
By: _____*Signature Page Attached*_____
Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Escrow Agreement for Working Capital                    HUD-92412M (06/14)

App. 1097

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

*Please See Counterpart*

By: *Signature Page Attached*
_____
Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By:_____

_____

Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation

By: _____
Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

App. 1098

EXHIBIT "A"

Form of Letter of Credit

N/A

**Escrow Agreement
For Operating Deficits**

**U.S. Department of Housing
and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR OPERATING DEFICITS** (**"Agreement"**) made this 26th day of  October, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4DS LLC, a Texas limited liability company, (**"Borrower")**, whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, in connection with HUD Project No. 113-35683, located in the County of Dallas, State of Texas, which Project will be constructed from the proceeds of a Loan insured by HUD and made by Lender.  (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Operating Deficits, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A.  HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B.  The Firm Commitment is conditioned upon assurance that additional funds be made available for Project purposes, primarily for the absorption of any deficits resulting from the operation of the Project during the initial period of occupancy.

AGREEMENT:

App. 1100

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.  At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $570,636.00 (**"Escrow"**).  If the Project is insured pursuant to § 223(f) of the National Housing Act, and if the Firm Commitment so requires, the amount of the Escrow shall include a debt service reserve in accordance with Program Obligations, in the amount of $N/A (**"Debt Service Reserve"**).

2.  It is agreed that the Lender at all times shall control the Escrow, and that the funds in the Escrow may be released or allocated for the purposes indicated in this Agreement and for no other purpose without the prior written approval of HUD.  The Escrow shall take the form of [*specify as applicable*]:

☒        cash, and/or

☐        one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations.

3.  Disbursements from the Escrow may be authorized monthly with written HUD approval to meet any Cash Deficit in the operation of the Project for the time frame set forth in the following paragraph.  The term **"Cash Deficit"** means the shortfall between Rents and Reasonable Operating Expenses.

4.  Any unused balance remaining in the Escrow will be released at Borrower's request and returned to Borrower at the later of twelve (12) months after final endorsement or when the Project has demonstrated to HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months; except unused funds in the Escrow attributable to the Debt Service Reserve, if applicable, will be released once the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.  Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.

5.  The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations.  Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.  The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete.  This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

App. 1102

4

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____
Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation

*Please See Counterpart*
*Signature Page Attached*

By: _____
Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Previous editions are obsolete;            Escrow Agreement for Operating Deficits            HUD-92476a-M (06/14)
Replaces form HUD-92476-A (01/03)

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

*Please See Counterpart*
*Signature Page Attached*

By: _____
    Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____

Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation

By: _____
    Lisa Anderson, Vice President

Attachment:  Exhibit "A"

### Warning:

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Previous editions are obsolete.       Escrow Agreement for Operating Deficits       HUD-92476a-M (06/14)
Replaces form HUD-92476-A (01/03)

App. 1104

EXHIBIT "A"

Form of Letter of Credit

N/A

App. 1105

# EXHIBIT I-37

Parc at Windmill Farms Apartments
FHA Project #: 113-35682

## SETTLEMENT STATEMENT

**SOURCES**

| | |
|---|---|
| Loan Proceeds | 1,631,093.00 |
| Good Faith Deposit | 182,703.00 |
| Borrower's Required Deposit (See Reconciliation) | 2,480,383.78 |
| **TOTAL SOURCES** | $ 4,294,179.78 |

**USES**

1. A check is to be issued to Henderson Design Studio
   Henderson Design Studio                                                    22,500.00
   *This check is to be mailed to:*
   *1330 Turtle Creek Boulevard*
   *Dallas, TX 75207*
   *Reference: Parc at Windmill Farms Apartments*

2. A check is to be issued to HR Sterling, LLC
   Copy, Printing, Postage & Delivery                                          3,460.00
   *This check is to be mailed to:*
   *1755 Wittington Place, Suite 340*
   *Dallas, TX 75234*
   *Reference: Invoice #1753*

3. A check is to be issued to Stantec
   Other Fees - Stantec                                                        9,987.25
   *This check is to be mailed to:*
   *12222 Merit Drive, Suite 400*
   *Dallas, TX 75251*
   *Reference: Invoice #1268959*

4. A wire is to be sent to NE Construction

| | | |
|---|---|---|
| Bond | 253,000.00 | |
| Builder's Risk | 181,000.00 | |
| General Liability | 46,000.00 | |
| Total | | 480,000.00 |

   *This sire is to be sent to:*
   *BBVA Compass/Houston*
   *ABA #: 113010547*
   *Account #: 70703512*
   *Account Name: N.E. Construction, LLP*
   *Reference: Parc at Windmill Farms Apartments*

App. 1107

## SETTLEMENT STATEMENT

5. A check is to be issued to BGO Architects

| | |
|---|---|
| Current Amount Due | 19,390.00 |
| Previous Balance Due | 2,522.69 |
| Reimbursable Expense | 1,737.59 |
| Total | 23,650.28 |

This check is to be mailed to:
4202 Beltway Drive
Addison, TX 75001
Reference: Invoice #17-11001,

6. A check is to be issued to Insurance Professionals of Arizona

Insurance                                    74,025.00

This check is to be mailed to:
3521 E. Brown Rd. Ste 101
Mesa, AZ 85213
Reference: Invoice #APP158439210

7. A check is to be issued to Commonwealth Land Title Insurance Company

Title & Recording                              148,876.25

8. A check is to be issued to Scott K. McDonald, PLLC

Legal                                          12,000.00

This check is to be mailed to:
445 E. FM 1382, Suite 3, PMB 131
Cedar Hill, TX 75104
Reference: Parc at Windmill Farms Apartments

9. A wire is to be sent to Greystone Servicing Corporation, Inc.

| | |
|---|---|
| Working Capital Escrow | 1,449,600.00 |
| Operating Deficit Escrow | 1,410,884.00 |
| Total | 2,860,484.00 |

This wire is to be sent to:
Bank of America, New York
100 N. Tryon St.
Charlotte, NC
ABA #: 026009593
Account #: 000102937183
Account: Greystone Servicing Corporation, Inc.,
    Custodial Clearing Account
Attention: Denise Monteleone, (540)-428- 7206
Address: 419 Belle Air Ln., Warrenton VA 20186
Reference: Parc at Windmill Farms Apartments

App. 1108

## SETTLEMENT STATEMENT

10. A wire is to be sent to <u>Greystone Servicing Corporation, Inc.</u>

| | |
|---|---:|
| Financing Fee | 362,400.00 |
| Placement Fee | 24,997.00 |
| Inspection Fee Reimbursement | 181,200.00 |
| MIP Reimbursement | 90,600.00 |
| Total | 659,197.00 |

*This wire is to be sent to:*
*Bank of America, New York*
*100 N. Tryon St.*
*Charlotte, NC*
*ABA #: 026009593*
*Account #: 334003918489*
*Account: Greystone Servicing Corporation, Inc.*
*Attention: Denise Monteleone, (540)-428-7206*
*Address: 419 Belle Air Ln., Warrenton VA 20186*
*Reference: Parc at Windmill Farms Apartments*

**TOTAL USES**                                      $  4,294,179.78

App. 1109

Parc at Windmill Farms Apartments
FHA Project #:  113-35682

### SETTLEMENT STATEMENT - RECONCILIATION

**A.  Cash Required by the HUD Commitment**       $  5,580,749.00

**B.  Items Not Included, or Invoices Exceeding the HUD Commitment**

| | | |
|---|---|---|
| Title[1] | 0.25 | |
| Subtotal | | $        0.25 |

**C.  Less: Prepaid Items**

| | | |
|---|---|---|
| Good Faith Deposit | (182,703.00) | |
| Other Fees - Borrower [1] | (171,918.75) | |
| Architect Fee [2] | (376,323.72) | |
| Exam Fee [3] | (108,720.00) | |
| Organization | (51,700.00) | |
| Payoff | (2,209,000.00) | |
| Subtotal | | $ (3,100,365.47) |

**Borrower's Required Deposit**       $  2,480,383.78

[1] **Title:** The invoice was $148,876.25 and the loan funded $148,876.00.

[2] **Architect Fee:** The total amount funded is $399,974.00, of which $23,650.28 will be paid at closing and the balance will be reimbursed to the Borrower.

[3] **Exam Fee:** The amount submitted to HUD for the exam fee was $109,622.00, of which the Borrower will be reimbursed $108,720.00 at closing. After closing Greystone will request a reimbursement from HUD to the Borrower in the amount of $902.00.

SOUTHERN PROPERTIES CAPITAL, LTD
December 31, 2017

Page 2
4104294800

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 12-13 | ' Wire Out | 2,480,383.78 |
| | 201712130004505 COMMONWEALTH LAND TITLE | |
| | 2228005339 WINDMILL FARMS | |
| 12-14 | ' Wire Out | 24,351.71 |
| | 201712140002546 COMMONWEALTH LAND TITLE | |
| | 2228005339WINDMILL FARMS | |
| 12-15 | ' Wire Out | 180.00 |
| | 201712150004394 MANPOWER GROUP SOLUTIONS | |
| | INVOICE A 410080 INVOICE A 411018 | |
| 12-15 | Wire Out Intl | 18,000.00 |
| | 201712150004393 GUEST KRIEGER LIMITED | |
| 12-15 | ' Wire Out | 8,349.35 |
| | 201712150004392 ARCHITECTS COLLABORATIVE | |
| | LAKESIDE LOFTS | |
| 12-15 | ' Wire Out | 707,474.15 |
| | 201712150004391 N. E. CONSTRUCTION, LLP | |
| | AW 2 | |
| 12-15 | ' Analysis Results Chg | 570.10 |
| | ANALYSIS ACTIVITY FOR 11/17 | |
| 12-20 | ' Wire Out | 45,000.00 |
| | 201712200003819 REGIS REALTY PRIME | |
| 12-20 | ' Wire Out | 168,000.00 |
| | 201712200003820 T RESIDENTIAL HOLDINGS LLC | |
| | MEDLEY INTEREST REIMBURSEMENT FEB 20 | |
| 12-20 | ' Wire Out | 500,000.00 |
| | 201712200003818 EQK BRIDGEVIEW PLAZA | |
| | TRANSFER OF FUNDS | |

**CREDITS**

| Date | Description | Additions |
|------|-------------|----------:|
| 12-14 | Wire IN | 511,243.49 |
| | 201712140004897 COMMONWEALTH TITLE OF DALLAS INC | |
| | TATTERSALL VILLAGE APARTMENTS | |
| 12-14 | Wire IN | 1,187,905.50 |
| | 201712140004873 COMMONWEALTH TITLE OF DALLAS INC | |
| | OCEANAIRE APARTMENTS | |

**DAILY BALANCES**

| Date | Amount | Date | Amount | Date | Amount |
|------|-------:|------|-------:|------|-------:|
| 11-30 | 5,470,931.62 | 12-07 | 5,193,624.72 | 12-19 | 3,618,187.58 |
| 12-01 | 5,303,431.62 | 12-08 | 5,159,316.08 | 12-20 | 2,865,111.81 |
| 12-04 | 5,259,533.62 | 12-13 | 2,678,434.90 | 12-26 | 2,862,742.19 |
| 12-05 | 5,217,457.85 | 12-14 | 4,353,232.18 | 12-27 | 2,855,425.75 |
| 12-06 | 5,193,999.72 | 12-15 | 3,618,658.58 | | |

*Thank you for banking with Bank Leumi USA*

App. 1111

# EXHIBIT I-38

Bellwether Ridge Apa
FHA Project #:  11:

## SETTLEMENT STATEMENT

### SOURCES

| | |
|---|---|
| Loan Proceeds | 1,115,040.00 |
| Good Faith Deposit | 96,655.00 |
| Borrower's Required Deposit (See Reconciliation) | 996,006.05 |

**TOTAL SOURCES**                                                          $    2,207,

### USES

1. A check is to be issued to <u>Steere CM, Inc.</u>
   Land Use & Zoning                                                                    9,
   *This check is to be mailed to:*
   *2627 Winding View, Suite 100*
   *San Antonio, TX 78260*
   *Reference:  Project #2017-02, Invoice #001*

2. A check is to be issued to <u>HR Sterling, LLC</u>
   Printing & Postage                                                                   3,
   *This check is to be mailed to:*
   *1800 Valley View Lane, Suite 150*
   *Dallas, TX 75234*
   *Reference:  Invoice #1733*

3. A check is to be issued to <u>Stantec</u>
   Stantec                                                                             14,
   *This check is to be mailed to:*
   *12222 Merit Drive, Suite 400*
   *Dallas, TX 75251*
   *Reference:  Invoice #1242247*

4. A check is to be issued to <u>Henderson Design</u>
   Henderson Design                                                                    21,
   *This check is to be mailed to:*
   *Need mailing instructions*
   *Reference:  Bellwether Ridge Apartments*

5. A check is to be issued to <u>NE Construction</u>

   | | |
   |---|---|
   | Bond | 132,000.00 |
   | Builder's Risk | 94,000.00 |
   | General Liability | 24,000.00 |

   Total                                                                              250,
   *This check is to be mailed to:*
   *420 Southfork Drive*
   *Lewisville, TX 75057*
   *Reference:  Bellwether Ridge Apartments*

App. 1113

6. A check is to be issued to <u>BGO Architects</u>
   Architect, Design                                                   50,
   *This check is to be mailed to:*
   *4202 Beltway Drive*
   *Addison, Texas 75001*
   *Reference:  Invoice #17-09003*

7. A check is to be issued to <u>Insurance Professionals of Arizona, LLC</u>
   General Liability                                                   45,
   *This check is to be mailed to:*
   *17812 N. 50th Street*
   *Scotsdale, AZ 85254*
   *Reference:  Application / Policy #APP89569210*

8. A check is to be issued to <u>Commonwealth Land Title Insurance Company</u>
   Title & Recording                                                  107,

9. A check is to be issued to <u>Scott K. McDonald, PLLC</u>
   Legal                                                               15,
   *This check is to be mailed to:*
   *1605 LBJ Freeway, Suite 620*
   *Dallas, TX 75234*
   *Reference:  D4DS LLC -- Bellwether Ridge Loan*

10. A wire is to be sent to <u>Greystone Servicing Corporation, Inc.</u>

| | | |
|---|---|---|
| Working Capital Escrow | 760,848.00 | |
| Operating Deficit Escrow | 570,636.00 | |
| *Total* | | 1,331, |

*This wire is to be sent to:*
*Bank of America*
*ABA #: 026009593*
*Account #: 000102937183*
*Credit: Greystone Servicing Corporation, Inc.,*
   *Custodial Clearing Account*
*Address: 419 Belle Air Ln., Warrenton VA 20186*
*Advise: Denise Monteleone, (540)-428- 7206*
*Reference:  Bellwether Ridge Apartments*

11. A wire is to be sent to <u>Greystone Servicing Corporation, Inc.</u>

| | | |
|---|---|---|
| Financing Fee | 214,940.00 | |
| Inspection Fee Reimbursement | 95,106.00 | |
| MIP Reimbursement | 47,553.00 | |
| Reimbursement to Greystone | 1,515.90 | |
| Total | | 359, |

*This wire is to be sent to:*
*Bank of America, New York*
*100 N. Tryon St.*
*Charlotte, NC*
*ABA #:  026-009-593*
*Account #:  334003918489*
*Account:  Greystone Servicing Corporation, Inc.*
*Attention:  Denise Monteleone  (540)-428-7206*

App. 1114

**ACCEPTED: TITLE AGENT**
**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

By: _____

Name: _____

Date: October _____, 2017

**ACCEPTED: MORTGAGOR**
**D4DS LLC**
a Texas limited liability company

By: _____

    Timothy Barton
    President

Date: October _____, 2017

**ACCEPTED: LENDER**
**GREYSTONE SERVICING CORPORATION, INC.**

By: _Lisa Anderson_____

    Lisa Anderson
    Vice President

Date: October _____, 2017

**WARNING: Federal law provides that anyone who knowingly or willfully submits (or causes to su document containing any false, fictitious, misleading, or fraudulent statement/certification or ent be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction**

Bellwether Ridge Apartments
FHA Project #: 113-35683

### SETTLEMENT STATEMENT - RECONCILIATION

| | | |
|---|---:|---:|
| **A. Cash Required by the HUD Commitment** | | $ 2,762,994.00 |
| **B. Items Not Included, or Invoices Exceeding the HUD Commitment** | | |
| Title [1] | 0.25 | |
| Subtotal | | $ 0.25 |
| **C. Less: Prepaid Items** | | |
| Good Faith Deposit | (96,655.00) | |
| Other Fees - Borrower [2] | (117,490.50) | |
| Bond | (0.20) | |
| Architect Fee [3] | (246,752.40) | |
| Exam Fee | (57,064.00) | |
| Organization [4] | (49,026.10) | |
| Land Payoff | (1,200,000.00) | |
| Subtotal | | $ (1,766,988.20) |
| **Borrower's Required Deposit** | | $ 996,006.05 |

[1] **Title:** The invoice was $107,130.25 and the loan funded $107,130.00

[2] **Other Fees - Borrower:** The invoices from Steere CM, Inc., HR Sterling, LLC, Stantec, and Henderson Design are to be paid at closing and the balance will be reimbursed to the Borrower.

[3] **Architect Fee:** The total amount funded is $297,380.00, of which $50,627.60 will be paid at closing and the balance will be reimbursed to the Borrower.

[4] **Organization:** The loan funded $50,542.00, of which $10,042.00 is organization and $40,500.00 is third party. Of the third party amount, $38,984.10 was prepaid by the Borrower and the remaining balance of $1,515.90 was advanced by Greystone, which will be reimbursed at closing.

App. 1116

SOUTHERN PROPERTIES CAPITAL, LTD             Page 2
October 31, 2017             4104294800

| Date | Description | Subtractions |
|---|---|---|
| 10-02 | ' Wire Out<br>201710020005895 U.S. BANK AS PAYING AGENT FOR<br>T RESIDENTIAL 1837TERM LOAN 1500 | 678,250.00 |
| 10-03 | ' Wire Out<br>201710030003379 BERKADIA<br>PAG APARTMENTS LP OPTION ADVANCE | 1,803,765.00 |
| 10-03 | ' Wire Out<br>201710030003377 BERKADIA<br>WYLIE APARTMENTS LP OPTION ADVANCE | 1,969,729.00 |
| 10-03 | ' Wire Out<br>201710030003378 BERKADIA<br>MCKINNEY POINTE APTS LP OPTION ADVAN | 2,514,270.00 |
| 10-17 | ' Analysis Results Chg<br>ANALYSIS ACTIVITY FOR 09/17 | 539.10 |
| 10-19 | ' Wire Out<br>201710190003844 SHIMONOV AND CO.<br>540192622 | 20,067.63 |
| 10-19 | Wire Out Intl<br>201710190003848 AVITAL BAR-DAYAN<br>DIRECTOR FEE | 8,086.92 |
| 10-19 | Wire Out Intl<br>201710190003849 YOGI CONSULTING AND INVESTMENTS LTD | 8,086.92 |
| 10-19 | Wire Out Intl<br>201710190003850 HARVEST CAPITAL MARKETS LTD | 8,086.92 |
| 10-19 | Wire Out Intl<br>201710190003845 KOST FORER GABBAY AND KASIERER | 25,000.00 |
| 10-19 | ' Wire Out<br>201710190003846 SUNCHASE AMERICAN LTD<br>LOFTS AT REYNOLDS VILLAGE | 151,267.08 |
| 10-23 | ' Wire Out<br>201710230003584 COMMONWEALTH LAND TITLE INSURANCE<br>GF 2228005530B | 996,006.05 |
| 10-23 | ' Wire Out<br>201710230003585 COMMONWEALTH LAND TITLE INSURANCE<br>GF 2228005530A | 1,770,979.91 |
| 10-24 | ' Wire Out<br>201710240003621 ORI GROSSMAN<br>ACCOUNT 67810691695 | 5,000.00 |
| 10-26 | ' Wire Out<br>201710260003231 CMBS PORTFOLIO<br>TATTERSALL APTS | 60,000.00 |
| 10-26 | ' Wire Out<br>201710260003232 CMBS PORTFOLIO<br>OCEANAIRE APTS | 60,000.00 |
| 10-30 | ' Wire Out<br>201710300003553 N. E. CONSTRUCTION, LLP<br>AW 1 | 1,099,535.49 |

App. 1117

# EXHIBIT I-39



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

NOVEMBER 13, 2019

GREYSTONE FUNDING COMPANY LLC (BENEFICIARY)
419 BELLE AIR LANE
WARRENTON, VA 20186

LETTER OF CREDIT NO.:  S30002979
FHA PROJECT NO.: 115-35872
DATE: NOVERMBER 13, 2019

TO WHOM IT MAY CONCERN:

FOR THE ACCOUNT OF PARC AT INGLESIDE ON BEHALF OF D4IN LLC, WE HEREBY
AUTHORIZE YOU OR YOUR TRANSFEREE TO DRAW ON US AT SIGHT UP TO AN
AGGREGATE AMOUNT OF ONE MILLION TWO HUNDRED FIFTY THOUSAND EIGHT HUNDRED
NINEY EIGHT DOLLARS $1,250,898.00

THIS CREDIT IS IRREVOCABLE, UNCONDITIONAL AND TRANSFERABLE. THIS CREDIT
MAY BE TRANSFERRED WITHOUT CHARGE ONE OR MORE TIMES UPON RECEIPT OF YOUR
WRITTEN INSTRUCTIONS SUBMITTED IN ACCORDANCE WITH THE ATTACHED TRANSFER
FORM.

DRAFTS DRAWN UNDER THIS CREDIT MUST SPECIFY THE NUMBER OF THIS CREDIT
AND BE PRESENTED AT THIS OFFICE IDENTIFIED BELOW NOT LATER THAN NOVEMBER
1, 2021. ANY SIGHT DRAFT MAY BE PRESENTED TO US BY ELECTRONIC,
REPROGRAPHIC, COMPUTERIZED OR AUTOMATED SYSTEM, OR BY CARBON COPY, BUT
IN ANY EVENT MUST VISIBLY BEAR THE WORD "ORIGINAL". IF THE DOCUMENT IS
SIGNED, THE SIGNATURE MAY CONSIST OF (OR MAY APPEAR TO US AS) AN
ORIGINAL HANDWRITTEN SIGNATURE, A FACSIMILE SIGNATURE OR ANY OTHER
MECHANICAL OR ELECTRONIC METHOD OF AUTHENTICATION.

THIS CREDIT SETS FORTH IN FULL THE TERMS OF OUR OBLIGATION TO YOU, AND
SUCH UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED OR AMPLIFIED BY ANY
AGREEMENT IN WHICH THIS CREDIT IS REFERRED TO OR TO WHICH THIS CREDIT
RELATES, AND ANY SUCH REFERENCE SHALL NOT BE DEEMED TO INCORPORATE
HEREIN BY REFERENCE ANY AGREEMENT.

WE ENGAGE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE
TERMS OF THIS CREDIT WILL BE DULY HONORED AT BANK LEUMI USA, 350 MADISON
AVENUE, NEW YORK, NY 10017.

_____
AUTHORIZED SIGNATURE

FRAN MARTELL - 677

FIRST VICE PRESIDENT

_____
AUTHORIZED SIGNATURE

FRANK CHU - 323

VICE PRESIDENT

Page 1 of 2

App. 1119



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

OUR REF NO: S30002979        DATE: November 13, 2019


SAMPLE FORM FOR TRANSFER OF LETTER OF CREDIT


TO:   BANK LEUMI USA
      350 MADISON AVENUE
      NEW YORK, NY 10017

DATE:

RE: LETTER OF CREDIT NO. _____ ISSUED BY BANK LEUMI USA, NEW YORK

TO WHOM IT MAY CONCERN:

WE HEREBY TRANSFER TO: _____ ALL RIGHTS TO YOUR
LETTER OF CREDIT NUMBER: _____, SUBJECT TO THE TERMS OF
SUCH CREDIT. ENCLOSED IS THE ORIGINAL LETTER OF CREDIT WHICH SHOULD BE
RETURNED TO US WITH THE ENDORSEMENT OF THIS TRANSFER THEREON.


SIGNED: _____
        AUTHORIZED SIGNATURE
        <BENEFICIARY>



SIGNATURE AUTHENTICATED
_____
 (BANK)
_____
 AUTHORIZED SIGNATURE

App. 1120



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

NOVEMBER 13, 2019

GREYSTONE FUNDING COMPANY LLC (BENEFICIARY)
419 BELLE AIR LANE
WARRENTON, VA 20186

LETTER OF CREDIT NO.:  S30002978
FHA PROJECT NO.: 115-35872
DATE: NOVEMBER 13, 2019

TO WHOM IT MAY CONCERN:

FOR THE ACCOUNT OF PARC AT INGLESIDE ON BEHALF OF D4IN LLC, WE HEREBY
AUTHORIZE YOU OR YOUR TRANSFEREE TO DRAW ON US AT SIGHT UP TO AN
AGGREGATE AMOUNT OF ONE MILLION EIGHTY ONE THOUSAND THREE HUNDRED NINETY
SIX DOLLARS $1,081,396.00.

THIS CREDIT IS IRREVOCABLE, UNCONDITIONAL AND TRANSFERABLE. THIS CREDIT
MAY BE TRANSFERRED WITHOUT CHARGE ONE OR MORE TIMES UPON RECEIPT OF YOUR
WRITTEN INSTRUCTIONS SUBMITTED IN ACCORDANCE WITH THE ATTACHED TRANSFER
FORM.

DRAFTS DRAWN UNDER THIS CREDIT MUST SPECIFY THE NUMBER OF THIS CREDIT
AND BE PRESENTED AT THIS OFFICE IDENTIFIED BELOW NOT LATER THAN NOVEMBER
1, 2021. ANY SIGHT DRAFT MAY BE PRESENTED TO US BY ELECTRONIC,
REPROGRAPHIC, COMPUTERIZED OR AUTOMATED SYSTEM, OR BY CARBON COPY, BUT
IN ANY EVENT MUST VISIBLY BEAR THE WORD "ORIGINAL". IF THE DOCUMENT IS
SIGNED, THE SIGNATURE MAY CONSIST OF (OR MAY APPEAR TO US AS) AN
ORIGINAL HANDWRITTEN SIGNATURE, A FACSIMILE SIGNATURE OR ANY OTHER
MECHANICAL OR ELECTRONIC METHOD OF AUTHENTICATION.

THIS CREDIT SETS FORTH IN FULL THE TERMS OF OUR OBLIGATION TO YOU, AND
SUCH UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED OR AMPLIFIED BY ANY
AGREEMENT IN WHICH THIS CREDIT IS REFERRED TO OR TO WHICH THIS CREDIT
RELATES, AND ANY SUCH REFERENCE SHALL NOT BE DEEMED TO INCORPORATE
HEREIN BY REFERENCE ANY AGREEMENT.

WE ENGAGE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE
TERMS OF THIS CREDIT WILL BE DULY HONORED AT BANK LEUMI USA, 350 MADISON
AVENUE, NEW YORK, NY 10017.

_____
AUTHORIZED SIGNATURE
FRAN MARTELL - 677

FIRST VICE PRESIDENT

_____
AUTHORIZED SIGNATURE
FRANK CHU - 323

VICE PRESIDENT

App. 1121



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

OUR REF NO: S30002978        DATE: November 13, 2019

SAMPLE FORM FOR TRANSFER OF LETTER OF CREDIT

TO:   BANK LEUMI USA
      350 MADISON AVENUE
      NEW YORK, NY 10017

DATE:

RE: LETTER OF CREDIT NO. _____ ISSUED BY BANK LEUMI USA, NEW YORK

TO WHOM IT MAY CONCERN:

WE HEREBY TRANSFER TO: _____ ALL RIGHTS TO YOUR
LETTER OF CREDIT NUMBER: _____, SUBJECT TO THE TERMS OF
SUCH CREDIT. ENCLOSED IS THE ORIGINAL LETTER OF CREDIT WHICH SHOULD BE
RETURNED TO US WITH THE ENDORSEMENT OF THIS TRANSFER THEREON.


SIGNED: _____
        AUTHORIZED SIGNATURE
        <BENEFICIARY>



SIGNATURE AUTHENTICATED
_____
  (BANK)

_____
  AUTHORIZED SIGNATURE

App. 1122

# EXHIBIT I-40

**SIGHT DRAFT**

**ORIGINAL**

Dated: May 25, 2021

To:    Bank Leumi ("Drawee")
        Trade Finance Department
        350 Madison Avenue
        New York, NY 10017

        DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of FIFTY TWO THOUSAND ONE HUNDRED TWENTY TWO DOLLARS AND 30/100 ($52,122.30) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC, beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:

        Bank:  Bank of America, New York
        Address:  100 N. Tryon Street, Charlotte, NC 28255
        ABA #026009593
        Credit: Greystone Funding Company LLC,
            419 Belle Air Lane, Warrenton, VA 20186
        Account # ███████████
        Reference: Parc at Opelika

        DRAWER:

        GREYSTONE FUNDING COMPANY LLC,

By:    _____
        Debi Martin
        Senior Vice President
        May 25, 2021

App. 1124

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By:   _____
      Debi Martin
      Senior Vice President
      May 25, 2021

App. 1125

# SIGHT DRAFT

# ORIGINAL

Dated: January 27, 2022

To:    Bank Leumi ("Drawee")
       Trade Finance Department
       350 Madison Avenue
       New York, NY 10017

      DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of ONE HUNDRED EIGHTEEN THOUSAND FOUR HUNDRED TWENTY ONE DOLLARS AND 33/100 ($118,421.33) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC,  beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:

      Bank:  Bank of America, New York
      Address:  100 N. Tryon Street, Charlotte, NC 28255
      ABA #026009593
      Credit: Greystone Funding Company LLC,
          419 Belle Air Lane, Warrenton, VA 20186
      Account # ▮▮▮▮▮▮▮
      Reference: Parc at Opelika

      DRAWER:

      GREYSTONE FUNDING COMPANY LLC,

      By: _____
          Debi Martin
          Senior Vice President
          January 27, 2022

App. 1126

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,


By:     _____
        Debi Martin
        Senior Vice President
        January 27, 2022

# SIGHT DRAFT

# ORIGINAL

Dated: April 11, 2022

To:    Bank Leumi ("Drawee")
       Trade Finance Department
       350 Madison Avenue
       New York, NY 10017

DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC dated January 22, 2021, as presented to Drawee, for a draw in the amount of SIX THOUSAND SEVEN HUNDRED THIRTY THREE DOLLARS AND 02/100 ($6,733.02) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC, beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:

Bank:  Bank of America, New York
Address:  100 N. Tryon Street, Charlotte, NC 28255
ABA #026009593
Credit: Greystone Funding Company LLC,
       419 Belle Air Lane, Warrenton, VA 20186
Account # ███████████
Reference: Parc at Opelika

DRAWER:

GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       April 11, 2022

App. 1128

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By: _____
        Debi Martin
        Senior Vice President
        April 11, 2022

**SIGHT DRAFT**

**ORIGINAL**

Dated: May 18, 2022

To:    Bank Leumi ("Drawee")
       Trade Finance Department
       350 Madison Avenue
       New York, NY 10017

       DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL
LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of
D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of
ONE HUNDRED EIGHTEEN THOUSAND SIX HUNDRED NINETY ONE DOLLARS
AND 32/100 ($118,691.32) to be paid at sight drawn under Bank Leumi located at 350
Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company
LLC,  beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as
below instructed:

       Bank:  Bank of America, New York
       Address:  100 N. Tryon Street, Charlotte, NC 28255
       ABA #026009593
       Credit: Greystone Funding Company LLC,
           419 Belle Air Lane, Warrenton, VA 20186
       Account # ███████████
       Reference: Parc at Opelika

              DRAWER:

              GREYSTONE FUNDING COMPANY LLC,

       By:    _____
              Debi Martin
              Senior Vice President
              May 18, 2022

App. 1130

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By:  _____
       Debi Martin
       Senior Vice President
       May 18, 2022

# SIGHT DRAFT

# ORIGINAL

Dated: August 23, 2022

To:    Bank Leumi ("Drawee")
       Trade Finance Department
       350 Madison Avenue
       New York, NY 10017

       DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of ONE HUNDRED FIVE THOUSAND FOUR HUNDRED TWENTY THREE DOLLARS AND 39/100 ($105,423.39) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC,  beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:

       Bank:  Bank of America, New York
       Address:  100 N. Tryon Street, Charlotte, NC 28255
       ABA #026009593
       Credit: Greystone Funding Company LLC,
          419 Belle Air Lane, Warrenton, VA 20186
       Account # ▮▮▮▮▮▮▮
       Reference: Parc at Opelika

       DRAWER:

       GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       August 23, 2022

App. 1132

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       August 23, 2022

**SIGHT DRAFT**

**ORIGINAL**

Dated: October 11, 2022

To:    Bank Leumi ("Drawee")
       Trade Finance Department
       350 Madison Avenue
       New York, NY 10017

       DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL
LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of
D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of
THIRTY NINE THOUSAND THREE HUNDRED FIFTY SEVEN DOLLARS AND
66/100 ($39,357.66) to be paid at sight drawn under Bank Leumi located at 350 Madison
Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC,
beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below
instructed:

       Bank:  Bank of America, New York
       Address:  100 N. Tryon Street, Charlotte, NC 28255
       ABA #026009593
       Credit: Greystone Funding Company LLC,
              419 Belle Air Lane, Warrenton, VA 20186
       Account # ██████████
       Reference: Parc at Opelika

              DRAWER:

              GREYSTONE FUNDING COMPANY LLC,

       By:    _____
              Debi Martin
              Senior Vice President
              October 11, 2022

App. 1134

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       October 11, 2022

# EXHIBIT I-41

# leumi

ATTENTION: _____
PLEASE TYPE OR PRINT:

## IRREVOCABLE STANDBY LETTER OF CREDIT APPLICATION AND SECURITY AGREEMENT

GENTLEMEN:                                    DATE _____        L/C NO. _____
PLEASE ISSUE AN IRREVOCABLE LETTER OF CREDIT AS SET FORTH BELOW AND FORWARD THE SAME TO
YOUR CORRESPONDENT OR THE BENEFICIARY (AT YOUR OPTION) BY

[✓] AIRMAIL            [ ] AIRMAIL WITH BRIEF TELEX/CABLE        [ ] FULL TELEX/CABLE OR OTHER
    MESSENGER/COURIER      OR OTHER TELETRANSMISSION METHOD          TELETRANSMISSION METHOD

APPLICANT NAME   Parc at Ingleside on behalf of D4IN, LLC
ADDRESS   _____
          Suite 800
          Dallas, TX 75234

BENEFICIARY NAME   Greystone Funding Company, LLC
ADDRESS   _____
          _____

ADVISING BANK NAME   _____                AMOUNT: $1,081,396
ADDRESS   _____
          _____ SWIFT CODE _____        EXPIRY
                                                      DATE _____

AVAILABLE BY PRESENTATION OF THE FOLLOWING DOCUMENTS. EACH OF WHICH MUST BEAR YOUR L/C NO. (Check
one or more of the following. As appropriate, and completed as directed)

[✓] DRAFT(S) AT SIGHT TO BE DRAWN ON YOU (OR, AT YOUR OPTION, A CORRESPONDENT BANK SELECTED BY YOU),
    WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS

[ ] A WRITTEN STATEMENT PURPORTEDLY SIGNED BY THE BENEFICIARY, READING AS FOLLOWS. (Please indicate
    below the exact wording to appear on the statement to be presented with the draft(s))

[ ] OTHER DOCUMENTS   Please specify below, if any)

(Check one or more of the following, as applicable)

PARTIAL DRAWINGS        [ ] ALLOWED      [ ] NOT ALLOWED
[✓] TERMS AND CONDITIONS OF THE LETTER OF CREDIT TO BE IN THE FORM
    ATTACHED HERETO, WHICH FORMS AN INTEGRAL PART OF THIS
    L/C APPLICATION

[ ] ADDITIONAL CONDITIONS OR INSTRUCTIONS, IF ANY:

UNLESS OTHERWISE EXPRESSLY STATED HEREIN, THIS CREDIT AND ANY AMENDMENTS THERETO SHALL BE
SUBJECT TO: (PLEASE CHECK ONE OF THE BOXES BELOW):

[ ] THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION) PUBLICATION
    NO. 600 OF THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UCP") OR SUCH OTHER VERSION OF
    THE "UCP" AS MAY BE IN EFFECT FROM TIME TO TIME, IN SO FAR AS THE SAME SHALL BE
    APPLICABLE.

[✓] INTERNATIONAL STANDBY PRACTICES (THE "ISP98") PUBLICATION NO. 590 OF THE INTERNATIONAL
    CHAMBER OF COMMERCE OR SUCH OTHER VERSION OF THE ISP98 AS MAY BE IN EFFECT FROM TIME TO
    TIME, IN SO FAR AS THE SAME SHALL BE APPLICABLE.

PLEASE DATE AND OFFICIALLY SIGN THE AGREEMENT ON THE REVERSE SIDE OF THIS APPLICATION IN
CONSIDERATION OF YOUR ISSUING THE REQUEST OF THE UNDERSIGNED YOUR IRREVOCABLE STANDBY LETTER
OF CREDIT (HEREIN CALLED THE "CREDIT"), SUBSTANTIALLY IN ACCORDANCE WITH THE FOREGOING
APPLICATION, THE UNDERSIGNED AGREES AS FOLLOWS

### Irrevocable Standby Letter of Credit Application and Security Agreement

1.  As to drafts payable in United States currency drawn or purporting to be drawn under the Credit, the undersigned
agrees (a) in case of each sight draft, to pay to you at your office at 350 Madison Avenue, 3rd Floor, New York, New
York 10017 (hereinafter called the "Office") in United States currency the amount payable thereon immediately upon
receipt of notice of payment there of, with interest from the time of such payment at the rate of four (4%) percent above
the rate of interest designated by you, and in effect from time to time, as your "Reference Rate", adjusted
when said Reference Rate changes, or at such other rate as is agreed upon in writing between us (but if such interest rate
shall not be lawful with respect to the undersigned, then such rate shall be the highest lawful rate permitted to be charged
by you on a loan to the undersigned), or, if so demanded by you, to so pay to you the amount of such draft in
advance at a time to be determined by you; and (b) in case of each time draft, to pay to you the amount thereof at
your Office, in United States currency not later than two (2) business days prior to its maturity, or, if the draft is

payable elsewhere, then to make such payment at your Office in sufficient time to reach the place of payment in the usual course of the regular mails, not later than two (2) business days prior to maturity. Interest payable hereunder shall be computed on the basis of the actual number of days in a 360-day year. The charging of interest on the basis of a 360-day year results in the payment of more interest than would be required if interest were charged on the basis of the actual number of days in the year. The undersigned acknowledges that the Reference Rate may not necessarily represent the lowest rate charged by you to customers. You are hereby authorized, but not required, to charge the undersigned's account(s) maintained with you for any or all amounts due to you hereunder. For purposes of this Agreement, the term "draft" shall mean any sight or time draft or other document or written statement required for a drawing under the Credit.

2.  As to drafts payable in currency other than United States currency drawn or purporting to be drawn under the Credit, the undersigned agrees (a) in case of each sight draft, to pay to you immediately upon receipt of notice of payment thereof at your office in United States currency the equivalent of the amount payable on each draft at your then selling rate for cable transfers to the place where, and in the currency in which, such draft is payable, with interest at the legal rate or at such other rate as is agreed upon in writing from the time of such payment, or if so demanded by you to pay the same to you in advance at any other time to be determined by you, and (b) in case of each time draft to furnish you at said Office, sufficiently in advance to reach the place of payment in the usual course of the regular mails not later than two (2) business days prior to maturity, with first class banker's demand bills of exchange to be approved by you for the amount and in the currency of such draft and bearing the unqualified endorsement of the undersigned, or if you so request, to pay to you on demand at said office in United States currency the equivalent of the amount of such draft at your then selling rate for demand drafts on, or cable transfers to, the place where, and in the currency in which, such draft is payable. If at the time payment is to be made by the undersigned as aforesaid, there exists no rate of exchange generally current in New York City for cable transfers or demand drafts as hereinbefore provided, the undersigned agrees to pay to you on demand in United States currency the actual cost to you of settlement of your obligation to the payee of the draft or to any holder thereof as the case may be and however and whenever such settlement shall be made by you, including interest on the dollar amount payable by the undersigned from the date of payment of such draft to the date of the undersigned's payment to you. The undersigned shall pay you on demand in United States currency, such amounts as you may be required to expend in order to comply with all governmental exchange, currency control or other laws, orders and regulations of any country now or hereafter applicable to the purchase or sale of and or dealings in, foreign currency.

3.  The undersigned shall pay to you such fees as are set forth on the Addendum attached hereto. The undersigned shall pay to you on demand from time to time any additional amounts necessary (in your sole determination) to indemnify you against any increase in your direct or indirect costs of issuing or maintaining, or any reduction in the net amount to be received by you with respect to, the Credit, whether due to the imposition or modification of any reserve, special deposit or similar requirement (including any assessment for insurance of deposits or of letters of credit), any requirement to pay, or withhold or deduct from any amount payable, any taxes, fees or similar charges, or for any other reason.

4.  Except as expressly stated to the contrary herein, the undersigned agrees: (a) that partial payments may be made under the Credit and that you may honor the relative drafts without inquiry; (b) that notwithstanding the provisions of Article 45 of the UCP or any successor provision thereof, if the Credit provides for drawings available in installments within designated periods and there is a failure to draw under the Credit in any designated period, the Credit will not cease to be available for any subsequent installment, and subsequent installments made in their respective designated periods may be drawn against the Credit and drafts may be accepted and paid with respect to such installments; (c) that you may accept or pay, as complying with the terms of the Credit, any drafts or other documents otherwise in order which may be signed or issued by an administrator, executor, trustee in bankruptcy, debtor in possession, assignee for benefit of creditors, liquidator, receiver or other legal representative of the party who is authorized, under the Credit, to draw or issue any drafts or other documents without being required to inquire as to his authority or appointment; (d) that without limiting any other provisions of this agreement, you and any of your correspondents may accept documents of any character which comply with the provisions, definitions, interpretations and practices contained in "The Uniform Customs and Practice for Documentary Credits", The International Chamber of Commerce Publication as amended from time to time, or which comply with the laws or regulations in force in customs and usages of the place of negotiation; (e) that in the event of any extension of the maturity or time for negotiation or presentation of drafts, acceptances or documents or any other modification of the terms or provisions of the Credit at the request or with the consent of any of the undersigned with or without notification to the others or in the event of any increase in the amount of the Credit at the request of the undersigned, this Agreement shall be binding upon the undersigned with regard to (I) the Credit so increased or otherwise modified, (II) drafts, documents and property covered thereby, and (III) any action taken by you or any of your correspondents in accordance with such extension, increase or other modification; and (f) that you and/or any of your correspondents may accept or pay any draft dated on or before the expiration of any time limit expressed in the Credit, regardless of when drawn and when or whether negotiated, provided the other required documents are dated prior to the expiration date of the Credit.

5.  The undersigned assumes all risks of the acts or omissions of the users of the Credit and all risks of misuse of the Credit. Neither you nor any of your correspondents, agents, representatives or designees shall be liable or responsible in any manner including, without limitation, for any damages, losses or other consequences resulting by reason of, and the undersigned's obligations to you shall not be affected by, (a) the form, validity, accuracy, sufficiency genuineness or legal effect of any draft, claim, document or required statement, or any endorsement thereon, even if such draft, claim, document, statement or endorsement should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (and notwithstanding that the undersigned shall have notified you thereof); (b) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign the Credit or the rights or benefits thereunder or the proceeds thereof, in whole or part, which may prove to be invalid or ineffective for any reason; (c) any loss or delay in the transmission or otherwise of any such draft, claim, document, statement or endorsement, or any proceeds thereof; (d) any act or omission of you or any of your correspondents or of your or their respective agents or employees, other than any such act or omission arising

2

from your or their gross negligence or willful misconduct; (e) any act or omission of the beneficiary of the Credit and the transferee of the Credit, if transferable, (f) the solvency or responsibility of any party issuing any documents in connection with the property; (g) delay in arrival or failure to arrive of either the property or any of the documents relating thereto, (h) delay in giving, or failure to give any notice; (i) any breach of contract between the undersigned and any other party, (j) failure of any draft to bear any reference or adequate reference to the Credit or failure of documents to accompany any draft at negotiation or failure of any person to note the amount of any draft on the reverse side of the Credit or to surrender or take up the Credit or to send forward documents apart from drafts as required by the terms of the Credit, each of which provisions, if contained in the Credit itself, it is agreed may be waived by you; (k) errors, omissions, interruptions or delays in transmission or delivery of any message by mail, cable, telegram, wireless, telex or otherwise, whether or not they be in cipher; (l) errors in translation or errors in interpretation of technical term; (m) any act, error, neglect or default, omission, insolvency or failure in business of any correspondent or for any consequences arising from causes beyond your control; or (n) any payment against presentation of any draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit, provided that such draft, claim, document, required statement or endorsement substantially complies with the terms of the Credit. You shall have sole discretion to decide whether to pay against any draft, claim, document, required statement or endorsement thereon that does not strictly comply, but substantially complies, with the terms of the Credit, provided, however, that the beneficiary of the Credit may not require you to pay against such draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit. In case of any variation between the undersigned's instructions and the requirements of the Credit or between any draft, claim, document, required statement or endorsement thereon accepted by you or your correspondents and the requirements of the Credit for which you are otherwise responsible hereunder, the undersigned shall conclusively be deemed to have waived any right to object to such variation unless, upon the undersigned's receipt of a copy of the Credit or of any such draft, claim, document, required statement or endorsement or notice of such variation, the undersigned immediately delivers to you a written notice of objection specifying each variation to which the undersigned objects and such notice is actually received by you and such receipts acknowledged by the signature of one of your officers. No legal proceeding or action shall be brought by the undersigned against you arising from any such variation unless (i) the undersigned shall have given you written notice of objection, as provided in the preceding sentence, and (ii) such legal proceeding or action shall be commenced in a court of competent jurisdiction sitting in the State and City of New York, within six months after the date when such copy of the Credit or draft, claim, document, required statement or endorsement thereon were delivered or mailed to the undersigned. In furtherance and extension (and not in limitation) of the specific provisions hereinbefore set forth, the undersigned agrees that any action taken or omitted by you or any of your correspondents under or in connection with the Credit or the relative drafts or documents if done in good faith, shall be binding on the undersigned and shall not put you or your correspondents under any resulting liability to the undersigned and the undersigned shall indemnify and hold you and your correspondents, agents and representatives harmless from any claim, loss or liability arising from or in connection with the Credit or the related drafts or documents.

6.   In case the undersigned consents to any overdrafts under any Credit or authorizes payment or acceptance of drafts drawn thereunder with irregular documents attached thereto, or authorizes or consents to any departure from, or modification of the terms of this agreement or the Credit hereunder, this agreement shall be fully binding upon the undersigned in respect thereto and notwithstanding such overdrafts, irregularities or variances, this agreement and the documents shall be, subsist, and remain as though all matters had been done in strict compliance with this agreement and with the Credit. You and your correspondents shall not be liable for any failure by you or anyone else to pay or accept any draft or acceptance under this Credit or for any loss or damage resulting from any censorship, law, control or restriction rightfully or wrongfully exercised by any de facto or de jure domestic or foreign government or agency thereof, declared or undeclared war, or from any other cause, of whatsoever nature, beyond your control or the control of your correspondents, agents or representatives, and the undersigned agrees to indemnify and hold you harmless from any claim, loss, liability or expense arising by reason thereof.

7.   The word "Obligations" as used in this agreement shall mean any and every indebtedness, obligation and liability of the undersigned to you and your claims of every nature and description against the undersigned, whether or not represented by negotiable instruments or other writings, whether arising under this agreement, the Credit or by reason of any other agreement or transaction, whether now existing or hereafter incurred, originally contracted with you and/or with another or others and now or hereafter owing to or acquired in any manner by you, whether contracted by the undersigned alone or jointly or severally with another or others, direct or indirect, absolute or contingent, secured or not secured, matured or not matured.

8.   In order to secure the prompt and unconditional payment of the Obligations, the undersigned hereby grants you a security interest in any and all property of the undersigned in your actual or constructive possession or in transit to you or your correspondents, agents or representatives from or for the undersigned and the proceeds thereof, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into your possession in any other manner for any other reason, and the undersigned agrees to pledge, transfer and deposit with you and grant to you a security interest in such other property as you shall reasonably request to secure payment of the Obligations and to make such payments as you request on account of the Obligations. You are also hereby given a continuing lien and/or right of set-off for the amount of the Obligations, upon or with respect to any and all deposits, general or special, and credits of the undersigned with, and any and all claims of the undersigned against you at any time existing, and you are hereby authorized at any time or times, without prior notice, to apply such deposits or credits, or any part thereof, to payment of the Obligations in such amounts as you may select, although contingent or unmatured, and whether the Collateral is deemed adequate or not. All of the foregoing, together with any property in which you may now or hereafter be granted a security interest, or which may be deposited with you or your agents by the undersigned to secure the Obligations, is herein collectively called "Collateral", and you are hereby authorized to deal therewith in the same manner as if you had sole title thereto. If the undersigned, as registered holder of Collateral, shall become entitled to receive or does receive any stock certificate, option or right, whether as an addition to, in substitution of, or in exchange for, such Collateral, or otherwise, the undersigned agrees to accept same as your agent and to hold same in trust for you, to forthwith deliver the same to you in the exact form received, with the undersigned's endorsement when necessary, to be held by you as Collateral.

3

9. You may, but shall not be obligated to, insure all or any part of the Collateral held by you hereunder against all risks of any kind and the premium thereon shall be paid to you by the undersigned within five days after the demand for the same and you shall have the right to debit the amount of such premium to any balances of the undersigned without notice. If the undersigned fails to pay the premium upon any policy of insurance pledged hereunder or upon any policy of insurance covering any property or Collateral within five days of the due date (without benefit of the grace period), you may, but shall not be obligated to, pay the same without notice to the undersigned and said premium shall be repaid to, or may be debited by you, as above provided. The undersigned agrees to reimburse you upon demand in the event you or any of your correspondents, agents or representatives pay for or incur any expense or liability in connection with the Credit or any draft accepted by you pursuant to this agreement or in relation to any of the matters set forth or referred to herein, including, but not limited to all correspondents' charges and expenses and charges for or incidental to the care, the safekeeping or otherwise of any of the Collateral pursuant to, or in connection with the Credit.

10. The undersigned will at any and all times at your request, sign financing statements, security agreements or other documents with respect to the Collateral as you may reasonably request. The right is expressly granted to you, at your discretion, to file one or more financing statements without the signature of the undersigned under the Uniform Commercial Code naming the undersigned as debtor and you as secured party and indicating therein the types or describing the items of Collateral herein referred to. The undersigned hereby agrees to pay on demand, and authorizes you to charge its account with the cost of any and all filing fees and costs which you deem necessary to incur to protect your interest in the Collateral.

11. The undersigned consents that, without the necessity for any reservation of rights against the undersigned and without notice to or further assert by the undersigned, the liability of any party for or upon Obligations or Collateral may from time to time, in whole or in part, be renewed, extended, modified, premature, compromised, settled for cash, credit or otherwise and upon any terms or conditions you may deem advisable and that you may discharge or release any party from all such liabilities and that any collateral security for any of the Obligations may from time to time, in whole or in part, be exchanged, sold or surrendered by you all without in any way affecting or releasing the liability of the undersigned upon the Obligations. You shall not be liable for any failure to collect or demand payment of or protest or give any notice of non-payment of any of the Collateral or for any delay in so doing, nor shall you be under any obligation to take any action whatsoever with respect to the Collateral or any part thereof. You shall use reasonable care in the custody and preservation of Collateral in your possession but need not take any steps to preserve rights against prior parties or keep the Collateral identifiable. You shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in your possession if you take such action as the undersigned shall reasonably request in writing but in no event shall an omission to do any act which the undersigned fails to request in writing be deemed a failure to exercise such reasonable care and no omission to comply with any request of the undersigned shall be deemed a failure to exercise such reasonable care. Any right of set-off exercised by you shall be deemed to have been exercised immediately upon the occurrence of any event referred to in Paragraph 12 hereof, even though such set-off is made or entered on your books subsequent thereto. You shall have no obligation to comply with any recording re-recording, filing, re-filing or other legal requirement necessary to establish or maintain the validity, priority or enforceability of, or your rights in and to, Collateral, or any part thereof. You may exercise any right of the undersigned with respect to any Collateral. In any statutory or non-statutory proceeding, affecting the undersigned or Collateral, you or your nominee may, whether or not a default exists and regardless of the amount of Obligations, file a proof of claim for the full amount of any Collateral and vote such claim for the full amount thereof (a) for or against any proposal or resolution; (b) for a Trustee or Trustees or for a Committee of Creditors, (c) for the acceptance or rejection of any proposed agreement, plan of reorganization, wage earners' plan, composition or extension, and you or your nominee may receive any payment or distribution and give acquittance therefor and may exchange or release Collateral. Any Collateral held by you hereunder, may without notice and whether or not a default exists, be registered and held in your or your nominee's name. You are hereby granted a power of attorney to endorse the undersigned's name on any and all notes, checks, drafts, bills of exchange, money orders or commercial paper included in the Collateral or representing the proceeds thereof.

12. All monies due or owing to you from the undersigned under this agreement or any other Obligations shall, at your option, become immediately due and payable, without notice or demand and notwithstanding any time or credit otherwise allowed or given to you under this or any other agreement or instrument and the undersigned and all guarantors shall be deemed in default hereunder upon the occurrence of any one of the following events with respect to any one of the undersigned or any guarantor or endorser of any Obligations of any of the undersigned to you: (a) failure to pay any sum upon the due date thereof; (b) if any statement, representation or warranty made in any application, financial statement or other agreement made with, or document delivered to you, shall be false or untrue in any material respect; (c) default in the performance of any condition or provision of this agreement or any other agreement with, or any Obligations to you; (d) death, and if a partnership, death of a partner, (e) insolvency, howsoever evidenced; (f) the making of a general assignment for the benefit of creditors; (g) the filing of any petition or the commencement of any proceedings by or against any of the undersigned or any guarantor of any Obligations, for any relief under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, compositions or extensions; (h) the appointment of a temporary or permanent receiver or trustee or similar legal representative of, or the issuance or making of a writ or order of attachment, against any property or assets; (i) entry of a judgment; (j) the commencement of any proceeding for enforcement of a judgment under Article 52 of the New York Civil Practice Law and Rules or under provisions of any other law; (k) the adoption of any resolution for dissolution or liquidation or the taking of any action for the purpose of such dissolution or liquidation; (l) the suspension of usual business; (m) the failure to deposit any additional collateral security with you upon demand; (n) the failure to pay any premium on any insurance policy pledged, or any insurance policy covering any property pledged with you, or in which you are granted a security interest, within five days after such premium becomes due without benefit of any period of grace; (o) failure forthwith upon demand to furnish any financial information or to permit inspection of books, documents or records of account; (p) failure to pay any tax when due. (q) if at any time in your sole judgment the financial responsibility

4

of any of the undersigned, or of any guarantor of any Obligations of the undersigned shall become impaired or unsatisfactory to you.

13. Upon the happening of any of the events set forth in Paragraph 12, and at any time thereafter, you shall have, in addition to all other rights and remedies, the remedies of a secured party under the New York Uniform Commercial Code. The undersigned shall, upon your request, assemble the Collateral and make it available to you at a place to be designated by you which is reasonably convenient to you and the undersigned. You will give the undersigned notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is to be made by sending notice, as provided below, at least five days before the time of the sale or disposition, which provisions for notice you and the undersigned agree are reasonable. No such notice need be given by you with respect to Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market. You may apply the net proceeds of any sale, lease or other disposition of Collateral after deducting all costs and expenses of every kind incurred therein or incidental to the retaking, holding, preparing for sale, selling, leasing or the like of said Collateral, or in any way relating to the rights of the undersigned thereunder, including attorney's fees hereinafter provided for and legal expenses, to the payment, in whole or in part, in such order as you may elect, of one or more of said Obligations, whether due or not due, absolute or contingent, and if contingent you may retain sufficient of such proceeds to cover the largest aggregate sum which may become due or owing thereunder to you with prospective interest, costs, expenses and counsel fees and you shall not be charged with any interest with respect thereto, and only after so applying such net proceeds and after the payment by you of any other amounts required by law need you account for the surplus, if any. The undersigned shall remain liable to you for the payment of any deficiency, with legal interest, and does hereby waive any and all rights of redemption with relation to the Collateral, to the extent permitted by law.

14. Any notice to you shall be deemed effective only if sent to and received at your office, division or department conducting the transaction or transactions hereunder. Any notice to or demand on and of the undersigned shall be binding on the undersigned and shall be deemed effective if not first otherwise made or given when forwarded by mail, telegraph, cable, radio, telephone or otherwise to the last address or telephone number of any of the undersigned appearing on your books with the same effect as if the same were actually delivered to and received by the undersigned in person. You shall not by any act, delay, omission or otherwise be deemed to have waived any of your rights or remedies hereunder and no waiver whatsoever shall be valid unless in writing, signed by one of your duly authorized officers, and then only to the extent therein set forth. A waiver by you of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which you would otherwise have on any future occasion. No term or provision of this agreement can be changed orally and no executory agreement shall be effective to change or modify or to discharge in whole or in part this agreement unless such executory agreement is in writing and signed by one of your duly authorized officers. All your rights and remedies hereunder shall be cumulative and may be exercised singly or concurrently, and your rights specified herein are in addition to those otherwise created. No delay on your part in exercising any power or right hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right, nor shall you be liable for exercising or failing to exercise any such power or right. The undersigned hereby waives demand, presentment, protest, notice of protest and notice of dishonor of any and all drafts, notes, bills of exchange, checks and other instruments deposited or pledged as Collateral hereunder whether upon inception, maturity, acceleration of maturity or due date, or at any other time, and any and all other notices and demands whatsoever, whether or not relating to such instruments.

15. In the event that you or any of your correspondents, at the request of the undersigned, extend, renew or refinance any of the obligations of the undersigned to you, arising by means of (a) bankers' acceptances created by the acceptance of drafts drawn by the undersigned on you, arising under Paragraphs 1 and 2 hereof; (b) drafts drawn by the beneficiary of the Credit, accepted by you or any of your correspondents; (c) notes made by the undersigned; or (d) otherwise, or in the event that you further extend, renew or refinance, from time to time, any such bankers' acceptances, draft or note, then, and in consideration thereof, the undersigned agrees to pay to you the amount of each bankers acceptance or draft in the manner provided in Paragraphs 1 and 2 hereof for the payment of time drafts drawn under the Credit, or, if a note is involved, then in the manner provided in the note. The undersigned further agrees that with respect to any such extension, renewal or refinancing, all of the terms, conditions, agreements and obligations contained in this agreement shall apply thereto and that you shall have all the rights and remedies set forth in this agreement as well as those set forth in any other document signed by or on behalf of the undersigned. Should the beneficiary under the Credit, upon receipt of advice by cable or otherwise of the issuance of the Credit, but prior to its actual receipt, negotiate drafts by virtue of such advice, such negotiation shall be considered a proper one and shall be included under the terms and subject to all conditions hereof and in addition thereto the undersigned assumes all the risk of the misuse of the Credit.

16. You may, but shall not be obligated to, contest, pay and/or discharge all liens, encumbrances, taxes or assessments on, or claims, actions or demands against, any of the Collateral deposited hereunder without notice to, or the consent of, the undersigned and you may, but shall not be obligated to, take all actions and proceedings in your own name or in the name of the undersigned or of any other appropriate person to remove or contest such liens, encumbrances, claims, actions, demands, taxes or assessments and all sums advanced or paid by you and all costs, attorneys' fees and expenses relating thereto shall be paid by, and chargeable to, the undersigned.

17. The word "property" as used in this agreement, includes goods, merchandise, instruments, documents, securities, funds, choses in action and any and all other forms of property, whether real, personal or mixed, and any right or interest therein and the proceeds thereof. Property in your possession shall include property in possession of any person holding same for you in any manner whatsoever.

18. If any of the undersigned is a partnership, the members thereof shall be individually bound and liable hereunder. If this agreement is signed by two or more parties, it shall be the joint and several agreement of such parties.

19. If the Credit issued by you will provide that it will be available by presentation, to you or to any of your correspondents, of the documents described in the application, unaccompanied by drafts, the undersigned agrees

5

that all reference herein to drafts, documents relative to drafts, and the presentation, acceptance for payment or payment of drafts shall refer to documents presented for payment without drafts, the presentation and acceptance thereof, and payment upon such presentation, and that the undersigned's obligation and your rights, privileges and remedies hereunder shall be the same as though payments had been made upon presentation of drafts drawn under the Credit accompanied by the said documents.

20. The undersigned will bear and pay all expenses of every kind for the enforcement of any of your rights herein mentioned or of any claim or demand by you against the undersigned and/or guarantors and/or any other person, firm or corporation and of any Collateral held by you, and the undersigned will pay to you upon demand any such expenses incurred by you. If an attorney is used to collect or enforce the Obligations or to enforce, declare or adjudicate any rights or obligations under this agreement, or with respect to the Obligations or Collateral, whether by suit, or any other means whatsoever, attorneys' fees incurred by you shall be payable by the undersigned. The undersigned in any litigation (whether or not arising out of or relating to this agreement or to any Obligations) in which you and any of the undersigned shall be adverse parties, waives trial by jury and the right to interpose any defense based on any statute of limitations or any claim of laches, set-off, or counterclaim of any nature or description. Notwithstanding anything to the contrary contained herein, the undersigned hereby indemnifies and holds you harmless from and against any and all claims, actions (including, without limitation, legal proceedings relating to any court order, injunction or other process or decree restraining or seeking to restrain you from paying any amount under the Credit or relating to any attachment or execution in connection with the Credit, any Obligations or Collateral), losses, judgments, amounts and expenses including, without limitation, attorneys' fees, and court costs, ( such claims, actions, losses, etc., hereinafter called collectively "Liabilities") suffered or incurred by you in connection with or arising out of this agreement, any Obligations or the Collateral and regardless of whether such Liabilities relate to claims or actions brought by the undersigned or any third party, including without limitation liabilities suffered or incurred by you in connection with (a) your exercise of any right or remedy granted to you hereunder, by law or otherwise, (b) any claim and the prosecution or defense thereof arising out of or in any way connected to this agreement, and any Obligations or the Collateral, (c) the collection or enforcement of the Obligations, and (d) any of the events or circumstances referred to in Paragraph 5 hereof. In the event of the undersigned or any guarantor of any of the Obligations acts in any way (including but not limited to seeking an injunction or temporary restraining order) to prevent or delay payment by you of a draft or claim, the undersigned: (i) agrees to provide to you on demand such additional collateral in such amount as you, in your sole discretion, shall deem necessary to secure the payment to you of the Obligations; (ii) agrees to bear and pay all expenses of every kind incurred by you, including attorneys' fees, in connection with such action to prevent or delay payment by you of a draft or claim; (iii) consents to your exclusive determination to pay or compromise any claim or obligation of any nature or description relating to the Credit, including without limitation all costs, attorneys' fees, fines, interest, damages or any other charge, expense or liability; and (iv) agrees to indemnify you and to reimburse you on demand for the amount of such payments or compromises together with interest thereon at the rate and on the terms set forth in Paragraph 1 hereof.

21. The term "you" as used throughout this agreement shall be deemed to include the Bank Leumi USA and all its branches or departments wherever located, and any individuals, partnerships or corporations acting as nominee, for, or in behalf of, the Bank Leumi USA and any subsidiary or entity controlled by the Bank Leumi USA and any other subsidiary or entity which is controlled directly or indirectly by any such subsidiary or entity. The term "undersigned", as used throughout this agreement shall include the individual or individuals, association, partnership, corporation, or other entity named herein as "undersigned", and (a) any successor individual or individuals, associations or partnership, corporation, or other entity to which all or substantially all of the business or assets of said undersigned shall have been transferred, (b) in case of a partnership, any new partnership which shall have been created by reason of the admission of any new partner or partners therein or the dissolution of the existing partnership by death, resignation or other withdrawal of any partner, and (c) in the case of a corporation, any other corporation into or with which said undersigned shall have been merged, consolidated, reorganized or absorbed.

22. This agreement is made in the City of New York and shall be construed in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof. In the event that you bring any action or suit in any court of record of New York State or the Federal Government to enforce any or all of the Liabilities of the undersigned or any of your rights hereunder, service of process may be made upon the undersigned by mailing a copy of the summons to the undersigned at the address set forth below, and the undersigned hereby irrevocably submits to the jurisdiction and venue of any New York State or Federal court located in New York City over any action, suit or proceeding arising out of any dispute between the undersigned and you.

23. If any term, condition or provisions of this agreement or of any other agreement or document executed and/or delivered to you is determined to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any other term, condition or provisions of this agreement and all other agreements executed and/or delivered to you and they shall be carried out as if any such invalid or unenforceable term, condition or provision were not embodied herein or therein.

24. You may assign or transfer this agreement and all Collateral and in such event the assignee or transferee thereof shall have the same rights and remedies hereunder as if originally named herein in your place. Upon any such assignment or transfer, you may deliver the Collateral and property held as security or any part thereof to the assignee or transferee, who shall thereupon become vested with all your powers and rights in respect thereof and you shall thereafter be forever relieved and fully discharged from any liability or responsibility with respect to the property transferred, but you shall retain all powers and rights with respect to the property not so transferred. You shall, at all reasonable times and from time to time, be allowed, by or through any of your officers, agents, attorneys or accountants, to examine, inspect and make abstracts from the undersigned's books.

25. Except as otherwise provided herein, the Credit shall be subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication as amended from time to time.

6

App. 1142

26. The undersigned agrees that: (a) any assistance provided by you in the preparation of the terms of the credit was requested by the undersigned and was based solely upon information provided to you by the undersigned, (b) except for information furnished by the undersigned, you have no knowledge of the transaction for which the credit has been obtained, (c) the undersigned has read and understands all of the terms and provisions of the credit and this Letter of Credit Application, and (d) the terms of the credit are in accord with the undersigned's instructions and represent all the conditions that the undersigned has requested as a prerequisite for you to pay under the credit.

By ___Daniel Moos - Chairman & CEO___

Address ___1603 LBJ Frwy___

Suite 800

Dallas, TX  75234

On behalf of:
TRANSCONTINENTAL REALTY INVESTORS, INC.

On behalf of
PARC AT INGLESIDE, ON BEHALF OF D4IN, LLC

FORM 1221 (R6/11)

7

App. 1143

**leumi**

ATTENTION: _____
(PLEASE TYPE OR PRINT)

### IRREVOCABLE STANDBY LETTER OF CREDIT APPLICATION AND SECURITY AGREEMENT

GENTLEMEN                                    DATE _____          L/C NO. _____
PLEASE ISSUE AN IRREVOCABLE LETTER OF CREDIT AS SET FORTH BELOW AND FORWARD THE SAME TO
YOUR CORRESPONDENT OR THE BENEFICIARY (AT YOUR OPTION) BY:

[✓] AIRMAIL          [ ] AIRMAIL WITH BRIEF TELEX/CABLE          [ ] FULL TELEX/CABLE OR OTHER
    MESSENGER/COURIER    OR OTHER TELETRANSMISSION METHOD            TELETRANSMISSION METHOD

APPLICANT NAME  Parc at Ingleside on behalf of D4IN, LLC
ADDRESS  _____
         Suite 800
         Dallas, TX 75234

BENEFICIARY NAME  Greystone Funding Company LLC
ADDRESS  _____
         _____

| ADVISING BANK NAME | AMOUNT $1.250.898 |
| ADDRESS | |
| SWIFT CODE | EXPIRY DATE _____ |

AVAILABLE BY PRESENTATION OF THE FOLLOWING DOCUMENTS, EACH OF WHICH MUST BEAR YOUR L/C NO. (Check
one or more of the following. As appropriate, and completed as desired)

[✓] DRAFT(S) AT SIGHT TO BE DRAWN ON YOU (OR, AT YOUR OPTION, A CORRESPONDENT BANK SELECTED BY YOU),
    WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS

[ ] A WRITTEN STATEMENT PURPORTEDLY SIGNED BY THE BENEFICIARY, READING AS FOLLOWS  (Please indicate
    below the exact wording to appear on the statement to be presented with the draft(s))

_____

_____

[ ] OTHER DOCUMENTS  (Please specify below, if any)

_____

(Check one or more of the following, as applicable)

PARTIAL DRAWINGS          [ ] ALLOWED     [ ] NOT ALLOWED
[✓] TERMS AND CONDITIONS OF THE LETTER OF CREDIT TO BE IN THE FORM
    ATTACHED HERETO, WHICH FORMS AN INTEGRAL PART OF THIS
    L/C APPLICATION

[ ] ADDITIONAL CONDITIONS OR INSTRUCTIONS, IF ANY

_____

UNLESS OTHERWISE EXPRESSLY STATED HEREIN, THIS CREDIT AND ANY AMENDMENTS THERETO SHALL BE
SUBJECT TO: (PLEASE CHECK ONE OF THE BOXES BELOW):

[ ] THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION) PUBLICATION
    NO. 600 OF THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UCP") OR SUCH OTHER VERSION OF
    THE "UCP" AS MAY BE IN EFFECT FROM TIME TO TIME, IN SO FAR AS THE SAME SHALL BE
    APPLICABLE.

[✓] INTERNATIONAL STANDBY PRACTICES (THE "ISP98") PUBLICATION NO. 590 OF THE INTERNATIONAL
    CHAMBER OF COMMERCE OR SUCH OTHER VERSION OF THE ISP98 AS MAY BE IN EFFECT FROM TIME TO
    TIME, IN SO FAR AS THE SAME SHALL BE APPLICABLE.

PLEASE DATE AND OFFICIALLY SIGN THE AGREEMENT ON THE REVERSE SIDE OF THIS APPLICATION IN
CONSIDERATION OF YOUR ISSUING THE REQUEST OF THE UNDERSIGNED YOUR IRREVOCABLE STANDBY LETTER
OF CREDIT (HEREIN CALLED THE "CREDIT"), SUBSTANTIALLY IN ACCORDANCE WITH THE FOREGOING
APPLICATION, THE UNDERSIGNED AGREES AS FOLLOWS:

#### Irrevocable Standby Letter of Credit Application and Security Agreement

1.  As to drafts payable in United Sates currency drawn or purporting to be drawn under the Credit, the undersigned
agrees (a) in case of each sight draft, to pay to you at your office at 350 Madison Avenue, 3rd Floor, New York, New
York, 10017 (hereinafter called the "Office") in United States currency the amount payable thereon immediately upon
receipt et notice of payment there of, with interest from the time of such payment at the rate of four (4%) percent above
the rate of interest designated by you, and in effect from time to time, as your "Reference Rate", adjusted
when said Reference Rate changes, or at such other rate as is agreed upon in writing between us (but if such interest rate
shall not be lawful with respect to the undersigned, then such rate shall be the highest lawful rate permitted to be charged
by you on a loan to the undersigned), or, if so demanded by you, to so pay to you the amount of such draft in
advance at a time to be determined by you; and (b) in case of each time draft, to pay to you the amount thereof at
your Office, in United States currency not later than two (2) business days prior to its maturity, or, if the draft is

payable elsewhere, then to make such payment at your Office in sufficient time to reach the place of payment in the usual course of the regular mails, not later than two (2) business days prior to maturity. Interest payable hereunder shall be computed on the basis of the actual number of days in a 360-day year. The charging of interest on the basis of a 360-day year results in the payment of more interest than would be required if interest were charged on the basis of the actual number of days in the year. The undersigned acknowledges that the Reference Rate may not necessarily represent the lowest rate charged by you to customers. You are hereby authorized, but not required, to charge the undersigned's account(s) maintained with you for any or all amounts due to you hereunder. For purposes of this Agreement, the term "draft" shall mean any sight or time draft or other document or written statement required for a drawing under the Credit.

2. As to drafts payable in currency other than United States currency drawn or purporting to be drawn under the Credit, the undersigned agrees (a) in case of each sight draft, to pay to you immediately upon receipt of notice of payment thereof at your office in United States currency the equivalent of the amount payable on each draft at your then selling rate for cable transfers to the place where and in the currency in which, such draft is payable, with interest at the legal rate or at such other rate as is agreed upon in writing from the time of such payment, or if so demanded by you to pay the same to you in advance at any other time to be determined by you; and (b) in case of each time draft to furnish you at said Office, sufficiently in advance to reach the place of payment in the usual course of the regular mails not later than two (2) business days prior to maturity, with first class banker's demand bills of exchange to be approved by you for the amount and in the currency of such draft and bearing the unqualified endorsement of the undersigned, or if you so request, to pay to you on demand at said office in United States currency the equivalent of the amount of such draft at your then selling rate for demand drafts on, or cable transfers to, the place where, and in the currency in which, such draft is payable. If at the time payment is to be made by the undersigned as aforesaid, there exists no rate of exchange generally current in New York City for cable transfers or demand drafts as hereinbefore provided, the undersigned agrees to pay to you on demand in United States currency the actual cost to you of settlement of your obligation to the payee of the draft or to any holder thereof as the case may be and however and whenever such settlement shall be made by you, including interest on the dollar amount payable by the undersigned from the date of payment of such draft to the date of the undersigned's payment to you. The undersigned shall pay you on demand in United States currency, such amounts as you may be required to expend in order to comply with all governmental exchange, currency control or other laws, orders and regulations of any country now or hereafter applicable to the purchase or sale of and or dealings in, foreign currency.

3. The undersigned shall pay to you such fees as are set forth on the Addendum attached hereto. The undersigned shall pay to you on demand from time to time any additional amounts necessary (in your sole determination) to indemnify you against any increase in your direct or indirect costs of issuing or maintaining, or any reduction in the net amount to be received by you with respect to, the Credit, whether due to the imposition or modification of any reserve, special deposit or similar requirement (including any assessment for insurance of deposits or of letters of credit), any requirement to pay, or withhold or deduct from any amount payable, any taxes, fees or similar charges, or for any other reason.

4. Except as expressly stated to the contrary herein, the undersigned agrees: (a) that partial payments may be made under the Credit and that you may honor the relative drafts without inquiry; (b) that notwithstanding the provisions of Article 45 of the UCP or any successor provision thereof, if the Credit provides for drawings available in installments within designated periods and there is a failure to draw under the Credit in any designated period, the Credit will not cease to be available for any subsequent installment, and subsequent installments made in their respective designated periods may be drawn against the Credit and drafts may be accepted and paid with respect to such installments, (c) that you may accept or pay, as complying with the terms of the Credit, any drafts or other documents otherwise in order which may be signed or issued by an administrator, executor, trustee in bankruptcy, debtor in possession, assignee for benefit of creditors, liquidator, receiver or other legal representative of the party who is authorized, under the Credit, to draw or issue any drafts or other documents without being required to inquire as to his authority or appointment; (d) that without limiting any other provisions of this agreement, you and any of your correspondents may accept documents of any character which comply with the provisions, definitions, interpretations and practices contained in "The Uniform Customs and Practice for Documentary Credits", The International Chamber of Commerce Publication as amended from time to time, or which comply with the laws or regulations in force in customs and usages of the place of negotiation; (e) that in the event of any extension of the maturity or time for negotiation or presentation of drafts, acceptances or documents or any other modification of the terms or provisions of the Credit at the request or with the consent of any of the undersigned with or without notification to the others or in the event of any increase in the amount of the Credit at the request of the undersigned, this Agreement shall be binding upon the undersigned with regard to (I) the Credit so increased or otherwise modified, (II) drafts, documents and property covered thereby, and (III) any action taken by you or any of your correspondents in accordance with such extension, increase or other modification; and (f) that you and/or any of your correspondents may accept or pay any draft dated on or before the expiration of any time limit expressed in the Credit, regardless of when drawn and when or whether negotiated, provided the other required documents are dated prior to the expiration date of the Credit.

5. The undersigned assumes all risks of the acts or omissions of the users of the Credit and all risks of misuse of the Credit. Neither you nor any of your correspondents, agents, representatives or designees shall be liable or responsible in any manner including, without limitation, for any damages, losses or other consequences resulting by reason of, and the undersigned's obligations to you shall not be affected by, (a) the form, validity, accuracy, sufficiency, genuineness or legal effect of any draft, claim, document or required statement, or any endorsement thereon, even if such draft, claim, document, statement or endorsement should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (and notwithstanding that the undersigned shall have notified you thereof); (b) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign the Credit or the rights or benefits thereunder or the proceeds thereof, in whole or part, which may prove to be invalid or ineffective for any reason; (c) any loss or delay in the transmission or otherwise of any such draft, claim, document, statement or endorsement; or any proceeds thereof; (d) any act or omission of you or any of your correspondents or of your or their respective agents or employees, other than any such act or omission arising

from your or their gross negligence or willful misconduct; (e) any act or omission of the beneficiary of the Credit and the transferee of the Credit, if transferable; (f) the solvency or responsibility of any party issuing any documents in connection with the property; (g) delay in arrival or failure to arrive of either the property or any of the documents relating thereto; (h) delay in giving, or failure to give any notice; (i) any breach of contract between the undersigned and any other party; (j) failure of any draft to bear any reference or adequate reference to the Credit or failure of documents to accompany any draft at negotiation or failure of any person to note the amount of any draft on the reverse side of the Credit or to surrender or take up the Credit or to send forward documents apart from drafts as required by the terms of the Credit, each of which provisions, if contained in the Credit itself, it is agreed may be waived by you; (k) errors, omissions, interruptions or delays in transmission or delivery of any message by mail, cable, telegram, wireless, telex or otherwise, whether or not they be in cipher; (l) errors in translation or errors in interpretation of technical term; (m) any act, error, neglect or default, omission, insolvency or failure in business of any correspondent or for any consequences arising from causes beyond your control; or (n) any payment against presentation of any draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit, provided that such draft, claim, document, required statement or endorsement substantially complies with the terms of the Credit. You shall have sole discretion to decide whether to pay against any draft, claim, document, required statement or endorsement thereon that does not strictly comply, but substantially complies, with the terms of the Credit, provided, however, that the beneficiary of the Credit may not require you to pay against such draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit. In case of any variation between the undersigned's instructions and the requirements of the Credit or between any draft, claim, document, required statement or endorsement thereon accepted by you or your correspondents and the requirements of the Credit for which you are otherwise responsible hereunder, the undersigned shall conclusively be deemed to have waived any right to object to such variation unless, upon the undersigned's receipt of a copy of the Credit or of any such draft, claim, document, required statement or endorsement or notice of such variation, the undersigned immediately delivers to you a written notice of objection specifying each variation to which the undersigned objects and such notice is actually received by you and such receipts acknowledged by the signature of one of your officers. No legal proceeding or action shall be brought by the undersigned against you arising from any such variation unless (i) the undersigned shall have given you written notice of objection, as provided in the preceding sentence, and (ii) such legal proceeding or action shall be commenced in a court of competent jurisdiction sitting in the State and City of New York, within six months after the date when such copy of the Credit or draft, claim, document, required statement or endorsement thereon were delivered or mailed to the undersigned. In furtherance and extension (and not in limitation) of the specific provisions hereinbefore set forth, the undersigned agrees that any action taken or omitted by you or any of your correspondents under or in connection with the Credit or the relative drafts or documents if done in good faith, shall be binding on the undersigned and shall not put you or your correspondents under any resulting liability to the undersigned and the undersigned shall indemnify and hold you and your correspondents, agents and representatives harmless from any claim, loss or liability arising from or in connection with the Credit or the related drafts or documents.

6.  In case the undersigned consents to any overdrafts under any Credit or authorizes payment or acceptance of drafts drawn thereunder with irregular documents attached thereto, or authorizes or consents to any departure from, or modification of the terms of this agreement or the Credit hereunder, this agreement shall be fully binding upon the undersigned in respect thereto and notwithstanding such overdrafts, irregularities or variances, this agreement and the documents shall be, subsist, and remain as though all matters had been done in strict compliance with this agreement and with the Credit. You and your correspondents shall not be liable for any failure by you or anyone else to pay any draft or accept or acceptance under this Credit or for any loss or damage resulting from any censorship, law, control or restriction rightfully or wrongfully exercised by any de facto or de jure domestic or foreign government or agency thereof, declared or undeclared war, or from any other cause, of whatsoever nature, beyond your control or the control of your correspondents, agents or representatives, and the undersigned agrees to indemnify and hold you harmless from any claim, loss, liability or expense arising by reason thereof.

7.  The word "Obligations" as used in this agreement shall mean any and every indebtedness, obligation and liability of the undersigned to you and your claims of every nature and description against the undersigned, whether or not represented by negotiable instruments or other writings, whether arising under this agreement, the Credit or by reason of any other agreement or transaction, whether now existing or hereafter incurred, originally contracted with you and/or with another or others and now or hereafter owing to or acquired in any manner by you, whether contracted by the undersigned alone or jointly or severally with another or others, direct or indirect, absolute or contingent, secured or not secured, matured or not matured.

8.  In order to secure the prompt and unconditional payment of the Obligations, the undersigned hereby grants you a security interest in any and all property of the undersigned in your actual or constructive possession or in transit to you or your correspondents, agents or representatives from or for the undersigned and the proceeds thereof, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into your possession in any other manner for any other reason, and the undersigned agrees to pledge, transfer and deposit with you and grant to you a security interest in such other property as you shall reasonably request to secure payment of the Obligations and to make such payments as you request on account of the Obligations. You are also hereby given a continuing lien and/or right of set-off for the amount of the Obligations, upon or with respect to any and all deposits, general or special, and credits of the undersigned with, and any and all claims of the undersigned against you at any time existing, and you are hereby authorized at any time or times, without prior notice, to apply such deposits or credits, or any part thereof, to payment of the Obligations in such amounts as you may select, although contingent or unmatured, and whether the Collateral is deemed adequate or not. All of the foregoing, together with any property in which you may now or hereafter be granted a security interest, or which may be deposited with you or your agents by the undersigned to secure the Obligations, is herein collectively called "Collateral", and you are hereby authorized to deal therewith in the same manner as if you had sole title thereto. If the undersigned, as registered holder of Collateral, shall become entitled to receive or does receive any stock certificate, option or right, whether as an addition to, in substitution of, or in exchange for, such Collateral, or otherwise, the undersigned agrees to accept same as your agent and to hold same in trust for you, to forthwith deliver the same to you in the exact form received, with the undersigned's endorsement when necessary, to be held by you as Collateral

3

9. You may, but shall not be obligated to, insure all or any part of the Collateral held by you hereunder against all risks of any kind and the premium thereon shall be paid to you by the undersigned within five days after the demand for the same and you shall have the right to debit the amount of such premium to any balances of the undersigned without notice. If the undersigned fails to pay the premium upon any policy of insurance pledged hereunder or upon any policy of insurance covering any property or Collateral within five days of the due date (without benefit of the grace period), you may, but shall not be obligated to, pay the same without notice to the undersigned and said premium shall be repaid to, or may be debited by you, as above provided. The undersigned agrees to reimburse you upon demand in the event you or any of your correspondents, agents or representatives pay for or incur any expense or liability in connection with the Credit or any draft accepted by you pursuant to this agreement or in relation to any of the matters set forth or referred to herein, including, but not limited to all correspondents' charges and expenses and charges for or incidental to the care, the safekeeping or otherwise of any of the Collateral pursuant to, or in connection with the Credit.

10. The undersigned will at any and all times at your request, sign financing statements, security agreements or other documents with respect to the Collateral as you may reasonably request. The right is expressly granted to you, at your discretion, to file one or more financing statements without the signature of the undersigned under the Uniform Commercial Code naming the undersigned as debtor and you as secured party and indicating therein the types or describing the items of Collateral herein referred to. The undersigned hereby agrees to pay on demand, and authorizes you to charge its account with the cost of any and all filing fees and costs which you deem necessary to incur to protect your interest in the Collateral.

11. The undersigned consents that, without the necessity for any reservation of rights against the undersigned and without notice to or further assent by the undersigned, the liability of any party for or upon Obligations or Collateral may from time to time, in whole or in part, be renewed, extended, modified, prematured, compromised, settled for cash, credit or otherwise and upon any terms or conditions you may deem advisable and that you may discharge or release any party from all such liabilities and that any collateral security for any of the Obligations may from time to time, in whole or in part, be exchanged, sold or surrendered by you all without in any way affecting or releasing the liability of the undersigned upon the Obligations. You shall not be liable for any failure to collect or demand payment of or protest or give any notice of non-payment of any of the Collateral or for any delay in so doing, nor shall you be under any obligation to take any action whatsoever with respect to the Collateral or any part thereof. You shall use reasonable care in the custody and preservation of Collateral in your possession but need not take any steps to preserve rights against prior parties or keep the Collateral identifiable. You shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in your possession if you take such action as the undersigned shall reasonably request in writing but in no event shall an omission to do any act which the undersigned fails to request in writing be deemed a failure to exercise such reasonable care and no omission to comply with any request of the undersigned shall be deemed a failure to exercise such reasonable care. Any right of set-off exercised by you shall be deemed to have been exercised immediately upon the occurrence of any event referred to in Paragraph 12 hereof, even though such set-off is made or entered on your books subsequent thereto. You shall have no obligation to comply with any recording re-recording, filing, re-filing or other legal requirement necessary to establish or maintain the validity, priority or enforceability of, or your rights in and to, Collateral, or any part thereof. You may exercise any right of the undersigned with respect to any Collateral. In any statutory or non-statutory proceeding, affecting the undersigned or Collateral, you or your nominee may, whether or not a default exists and regardless of the amount of Obligations, file a proof of claim for the full amount of any Collateral and vote such claim for the full amount thereof (a) for or against any proposal or resolution; (b) for a Trustee or Trustees or for a Committee of Creditors; (c) for the acceptance or rejection of any proposed agreement, plan of reorganization, wage earners' plan, composition or extension, and you or your nominee may receive any payment or distribution and give acquittance therefor and may exchange or release Collateral. Any Collateral held by you hereunder, may without notice and whether or not a default exists, be registered and held in your or your nominee's name. You are hereby granted a power of attorney to endorse the undersigned's name on any and all notes, checks, drafts, bills of exchange, money orders or commercial paper included in the Collateral or representing the proceeds thereof.

12. All monies due or owing to you from the undersigned under this agreement or any other Obligations shall, at your option, become immediately due and payable, without notice or demand and notwithstanding any time or credit otherwise allowed or given to you under this or any other agreement or instrument and the undersigned and all guarantors shall be deemed in default hereunder upon the occurrence of any one of the following events with respect to any one of the undersigned or any guarantor or endorser of any Obligations of any of the undersigned to you: (a) failure to pay any sum upon the due date thereof, (b) if any statement, representation or warranty made in any application, financial statement or other agreement made with, or document delivered to you, shall be false or untrue in any material respect; (c) default in the performance of any condition or provision of this agreement or any other agreement with, or any Obligations to you; (c) death, and if a partnership, death of a partner, (e) insolvency, howsoever evidenced; (f) the making of a general assignment for the benefit of creditors; (g) the filing of any petition or the commencement of any proceedings by or against any of the undersigned or any guarantor of any Obligations, for any relief under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, compositions or extensions; (h) the appointment of a temporary or permanent receiver or trustee or similar legal representative of, or the issuance or making of a writ or order of attachment, against any property or assets; (i) entry of a judgment, (j) the commencement of any proceeding for enforcement of a judgment under Article 52 of the New York Civil Practice Law and Rules or under provisions of any other law; (k) the adoption of any resolution for dissolution or liquidation or the taking of any action for the purpose of such dissolution or liquidation, (l) the suspension of usual business; (m) the failure to deposit any additional collateral security with you upon demand; (n) the failure to pay any premium on any insurance policy pledged, or any insurance policy covering any property pledged with you, or in which you are granted a security interest, within five days after such premium becomes due without benefit of any period of grace; (o) failure forthwith upon demand to furnish any financial information or to permit inspection of books, documents or records of account; (p) failure to pay any tax when due; (q) if at any time in your sole judgment the financial responsibility

4

of any of the undersigned, or of any guarantor of any Obligations of the undersigned shall become impaired or unsatisfactory to you.

13. Upon the happening of any of the events set forth in Paragraph 12, and at any time thereafter, you shall have, in addition to all other rights and remedies, the remedies of a secured party under the New York Uniform Commercial Code. The undersigned shall, upon your request, assemble the Collateral and make it available to you at a place to be designated by you which is reasonably convenient to you and the undersigned. You will give the undersigned notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is to be made by sending notice, as provided below, at least five days before the time of the sale or disposition, which provisions for notice you and the undersigned agree are reasonable. No such notice need be given by you with respect to Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market. You may apply the net proceeds of any sale, lease or other disposition of Collateral after deducting all costs and expenses of every kind incurred therein or incidental to the retaking, holding, preparing for sale, selling, leasing or the like of said Collateral, or in any way relating to the rights of the undersigned thereunder, including attorney's fees hereinafter provided for and legal expenses, to the payment, in whole or in part, in such order as you may elect, of one or more of said Obligations, whether due or not due, absolute or contingent, and if contingent you may retain sufficient of such proceeds to cover the largest aggregate sum which may become due or owing thereunder to you with prospective interest, costs, expenses and counsel fees and you shall not be charged with any interest with respect thereto, and only after so applying such net proceeds and after the payment by you of any other amounts required by law need you account for the surplus, if any. The undersigned shall remain liable to you for the payment of any deficiency, with legal interest, and does hereby waive any and all rights of redemption with relation to the Collateral, to the extent permitted by law.

14. Any notice to you shall be deemed effective only if sent to and received at your office, division or department conducting the transaction or transactions hereunder. Any notice to or demand on and of the undersigned shall be binding on the undersigned and shall be deemed effective if not first otherwise made or given when forwarded by mail, telegraph, cable, radio, telephone or otherwise to the last address or telephone number of any of the undersigned appearing on your books with the same effect as if the same were actually delivered to and received by the undersigned in person. You shall not by any act, delay, omission or otherwise be deemed to have waived any of your rights or remedies hereunder and no waiver whatsoever shall be valid unless in writing, signed by one of your duly authorized officers, and then only to the extent therein set forth. A waiver by you of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which you would otherwise have on any future occasion. No term or provision of this agreement can be changed orally and no executory agreement shall be effective to change or modify or to discharge in whole or in part this agreement unless such executory agreement is in writing and signed by one of your duly authorized officers. All your rights and remedies hereunder shall be cumulative and may be exercised singly or concurrently, and your rights specified herein are in addition to those otherwise created. No delay on you part in exercising any power or right hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right, nor shall you be liable for exercising or failing to exercise any such power or right. The undersigned hereby waives demand, presentment, protest, notice of protest and notice of dishonor of any and all drafts, notes, bills of exchange, checks and other instruments deposited or pledged as Collateral hereunder whether upon inception, maturity, acceleration of maturity or due date, or at any other time, and any and all other notices and demands whatsoever, whether or not relating to such instruments.

15. In the event that you or any of your correspondents, at the request of the undersigned, extend, renew or refinance any of the obligations of the undersigned to you, arising by means of (a) bankers' acceptances created by the acceptance of drafts drawn by the undersigned on you, arising under Paragraphs 1 and 2 hereof; (b) drafts drawn by the beneficiary of the Credit, accepted by you or any of your correspondents; (c) notes made by the undersigned; or (d) otherwise, or in the event that you further extend, renew or refinance, from time to time, any such bankers' acceptances, draft or note, then, and in consideration thereof, the undersigned agrees to pay to you the amount of each bankers acceptance or draft in the manner provided in Paragraphs 1 and 2 hereof for the payment of time drafts drawn under the Credit, or, if a note is involved, then in the manner provided in the note. The undersigned further agrees that with respect to any such extension, renewal or refinancing, all of the terms, conditions, agreements and obligations contained in this agreement shall apply thereto and that you shall have all the rights and remedies set forth in this agreement as well as those set forth in any other document signed by or on behalf of the undersigned. Should the beneficiary under the Credit, upon receipt of advice by cable or otherwise of the issuance of the Credit, but prior to its actual receipt, negotiate drafts by virtue of such advice, such negotiation shall be considered a proper one and shall be included under the terms and subject to all conditions hereof and in addition thereto the undersigned assumes all the risk of the misuse of the Credit

16. You may, but shall not be obligated to, contest, pay and/or discharge all liens, encumbrances, taxes or assessments on, or claims, actions or demands against, any of the Collateral deposited hereunder without notice to, or the consent of, the undersigned and you may, but shall not be obligated to, take all actions and proceedings in your own name or in the name of the undersigned or of any other appropriate person to remove or contest such liens, encumbrances, claims, actions, demands, taxes or assessments and all sums advanced or paid by you and all costs, attorneys' fees and expenses relating thereto shall be paid by, and chargeable to, the undersigned.

17. The word "property" as used in this agreement, includes goods, merchandise, instruments, documents, securities, funds, choses in action and any and all other forms of property, whether real, personal or mixed, and any right or interest therein and the proceeds thereof. Property in your possession shall include property in possession of any person holding same for you in any manner whatsoever.

18. If any of the undersigned is a partnership, the members thereof shall be individually bound and liable hereunder. If this agreement is signed by two or more parties, it shall be the joint and several agreement of such parties.

19. If the Credit issued by you will provide that it will be available by presentation, to you or to any of your correspondents, of the documents described in the application, unaccompanied by drafts, the undersigned agrees

5

App. 1148

that all reference herein to drafts, documents relative to drafts, and the presentation, acceptance for payment or payment of drafts shall refer to documents presented for payment without drafts, the presentation and acceptance thereof, and payment upon such presentation, and that the undersigned's obligation and your rights, privileges and remedies hereunder shall be the same as though payments had been made upon presentation of drafts drawn under the Credit accompanied by the said documents.

20. The undersigned will bear and pay all expenses of every kind for the enforcement of any of your rights herein mentioned or of any claim or demand by you against the undersigned and or guarantors and/or any other person, firm or corporation and of any Collateral held by you, and the undersigned will pay to you upon demand any such expenses incurred by you. If an attorney is used to collect or enforce the Obligations or to enforce, declare or adjudicate any rights or obligations under this agreement, or with respect to the Obligations or Collateral, whether by suit, or any other means whatsoever, attorneys' fees incurred by you shall be payable by the undersigned. The undersigned in any litigation (whether or not arising out of or relating to this agreement or to any Obligations) in which you and any of the undersigned shall be adverse parties, waives trial by jury and the right to interpose any defense based on any statute of limitations or any claim of laches, set-off, or counterclaim of any nature or description. Notwithstanding anything to the contrary contained herein, the undersigned hereby indemnifies and holds you harmless from and against any and all claims, actions (including, without limitation, legal proceedings relating to any court order, injunction or other process or decree restraining or seeking to restrain you from paying any amount under the Credit or relating to any attachment or execution in connection with the Credit, any Obligations or Collateral), losses, judgments, amounts and expenses including, without limitation, attorneys' fees, and court costs, ( such claims, actions, losses, etc., hereinafter called collectively "Liabilities") suffered or incurred by you in connection with or arising out of this agreement, any Obligations or the Collateral and regardless of whether such Liabilities relate to claims or actions brought by the undersigned or any third party, including without limitation Liabilities suffered or incurred by you in connection with (a) your exercise of any right or remedy granted to you hereunder, by law or otherwise, (b) any claim and the prosecution or defense thereof arising out of or in any way connected to this agreement, and any Obligations or the Collateral, (c) the collection or enforcement of the Obligations, and (c) any of the events or circumstances referred to in Paragraph 5 hereof. In the event of the undersigned or any guarantor of any of the Obligations acts in any way (including but not limited to seeking an injunction or temporary restraining order) to prevent or delay payment by you of a draft or claim, the undersigned: (i) agrees to provide to you on demand such additional collateral in such amount as you, in your sole discretion, shall deem necessary to secure the payment to you of the Obligations; (ii) agrees to bear and pay all expenses of every kind incurred by you, including attorneys' fees, in connection with such action to prevent or delay payment by you of a draft or claim; (iii) consents to your exclusive determination to pay or compromise any claim or obligation of any nature or description relating to the Credit, including without limitation all costs, attorneys' fees, fines, interest, damages or any other charge, expense or liability; and (iv) agrees to indemnify you and to reimburse you on demand for the amount of such payments or compromises together with interest thereon at the rate and on the terms set forth in Paragraph 1 hereof.

21. The term "you" as used throughout this agreement shall be deemed to include the Bank Leumi USA and all its branches or departments wherever located, and any individuals, partnerships or corporations acting as nominee, for, or in behalf of, the Bank Leumi USA and any subsidiary or entity controlled by the Bank Leumi USA and any other subsidiary or entity which is controlled directly or indirectly by any such subsidiary or entity. The term "undersigned", as used throughout this agreement shall include the individual or individuals, association, partnership, corporation, or other entity named herein as "undersigned", and (a) any successor individual or individuals, associations or partnership, corporation, or other entity to which all or substantially all of the business or assets of said undersigned shall have been transferred, (b) in case of a partnership, any new partnership which shall have been created by reason of the admission of any new partner or partners therein or the dissolution of the existing partnership by death, resignation or other withdrawal of any partner, and (c) in the case of a corporation, any other corporation into or with which said undersigned shall have been merged, consolidated, reorganized or absorbed.

22. This agreement is made in the City of New York and shall be construed in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof. In the event that you bring any action or suit in any court of record of New York State or the Federal Government to enforce any or all of the Liabilities of the undersigned or any of your rights hereunder, service of process may be made upon the undersigned by mailing a copy of the summons to the undersigned at the address set forth below, and the undersigned hereby irrevocably submits to the jurisdiction and venue of any New York State or Federal court located in New York City over any action, suit or proceeding arising out of any dispute between the undersigned and you.

23. If any term, condition or provisions of this agreement or of any other agreement or document executed and/or delivered to you is determined to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any other term, condition or provisions of this agreement and all other agreements executed and/or delivered to you and they shall be carried out as if any such invalid or unenforceable term, condition or provision were not embodied herein or therein.

24. You may assign or transfer this agreement and all Collateral and in such event the assignee or transferee thereof shall have the same rights and remedies hereunder as if originally named herein in your place. Upon any such assignment or transfer, you may deliver the Collateral and property held as security or any part thereof to the assignee or transferee, who shall thereupon become vested with all your powers and rights in respect thereof and you shall thereafter be forever relieved and fully discharged from any liability or responsibility with respect to the property transferred, but you shall retain all powers and rights with respect to the property not so transferred. You shall, at all reasonable times and from time to time, be allowed, by or through any of your officers, agents, attorneys or accountants, to examine, inspect and make abstracts from the undersigned's books.

25. Except as otherwise provided herein, the Credit shall be subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication as amended from time to time.

6

App. 1149

26. The undersigned agrees that: (a) any assistance provided by you in the preparation of the terms of the credit was requested by the undersigned and was based solely upon information provided to you by the undersigned, (b) except for information furnished by the undersigned, you have no knowledge of the transaction for which the credit has been obtained, (c) the undersigned has read and understands all of the terms and provisions of the credit and this Letter of Credit Application, and (d) the terms of the credit are in accord with the undersigned's instructions and represent all the conditions that the undersigned has requested as a prerequisite for you to pay under the credit.

By _Daniel Moos - Chairman & CEO_

Address _1603 LBJ Frwy_

Suite 800

Dallas, TX  75234

On behalf of:
TRANSCONTINENTAL REALTY INVESTORS, INC.

On behalf of:
PARC AT INGLESIDE, ON BEHALF OF D4IN, LLC

FORM 1221 (R6/11)

7

# EXHIBIT I-42

**leumi**

ATTENTION: Bank Leumi - LC Department
(PLEASE TYPE OR PRINT)

**IRREVOCABLE STANDBY LETTER OF CREDIT APPLICATION AND SECURITY AGREEMENT**

GENTLEMEN:                    DATE 1/20/2021                    L/C NO.
PLEASE ISSUE AN IRREVOCABLE LETTER OF CREDIT AS SET FORTH BELOW AND FORWARD THE SAME TO
YOUR CORRESPONDENT OR THE BENEFICIARY (AT YOUR OPTION) BY:

[✔] AIRMAIL                [ ] AIRMAIL WITH BRIEF TELEX/CABLE          [ ] FULL TELEX/CABLE OR OTHER
   MESSENGER/COURIER           OR OTHER TELETRANSMISSION METHOD           TELETRANSMISSION METHOD

APPLICANT NAME: Parc at Opelika on behalf of D4OP LLC
ADDRESS: 1603 LBJ Frwy
         Suite 800
         Dallas, TX  75234

BENEFICIARY NAME: Greystone Funding Company LLC
ADDRESS: 419 Belle Air Lane
         Warranton, VA  20186

ADVISING BANK NAME: _____          AMOUNT: $1,073,963
ADDRESS: _____
                                                       EXPIRY
_____ SWIFT CODE: _____         DATE: 1/31/2024

AVAILABLE BY PRESENTATION OF THE FOLLOWING DOCUMENTS, EACH OF WHICH MUST BEAR YOUR L/C NO. (Check
one or more of the following. As appropriate, and completed as directed)

[✔] DRAFT(S) AT SIGHT TO BE DRAWN ON YOU (OR, AT YOUR OPTION, A CORRESPONDENT BANK SELECTED BY YOU),
    WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

[ ] A WRITTEN STATEMENT PURPORTEDLY SIGNED BY THE BENEFICIARY, READING AS FOLLOWS: (Please indicate
    below the exact wording to appear on the statement to be presented with the draft(s))

_____

_____

_____

[ ] OTHER DOCUMENTS: (Please specify below, if any)

_____

_____

(Check one or more of the following, as applicable)

PARTIAL DRAWINGS    [✔] ALLOWED    [ ] NOT ALLOWED
[✔] TERMS AND CONDITIONS OF THE LETTER OF CREDIT TO BE IN THE FORM
    ATTACHED HERETO, WHICH FORMS AN INTEGRAL PART OF THIS
    L/C APPLICATION

[ ] ADDITIONAL CONDITIONS OR INSTRUCTIONS, IF ANY:

_____

_____

UNLESS OTHERWISE EXPRESSLY STATED HEREIN, THIS CREDIT AND ANY AMENDMENTS THERETO SHALL BE
SUBJECT TO: (PLEASE CHECK ONE OF THE BOXES BELOW):

   [ ] THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION) PUBLICATION
       NO. 600 OF THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UCP") OR SUCH OTHER VERSION OF
       THE "UCP" AS MAY BE IN EFFECT FROM TIME TO TIME, IN SO FAR AS THE SAME SHALL BE
       APPLICABLE.

   [✔] INTERNATIONAL STANDBY PRACTICES (THE "ISP98") PUBLICATION NO. 590 OF THE INTERNATIONAL
       CHAMBER OF COMMERCE OR SUCH OTHER VERSION OF THE ISP98 AS MAY BE IN EFFECT FROM TIME TO
       TIME, IN SO FAR AS THE SAME SHALL BE APPLICABLE.

       PLEASE DATE AND OFFICIALLY SIGN THE AGREEMENT ON THE REVERSE SIDE OF THIS APPLICATION IN
   CONSIDERATION OF YOUR ISSUING THE REQUEST OF THE UNDERSIGNED YOUR IRREVOCABLE STANDY LETTER
   OF CREDIT (HEREIN CALLED THE "CREDIT"), SUBSTANTIALLY IN ACCORDANCE WITH THE FOREGOING
   APPLICATION, THE UNDERSIGNED AGREES AS FOLLOWS:

Irrevocable Standby Letter of Credit Application and Security Agreement

1.    As to drafts payable in United Sates currency drawn or purporting to be drawn under the Credit, the undersigned
agrees (a) in case of each sight draft, to pay to you at your office at 350 Madison Avenue, 3rd Floor, New York, New
York 10017 (hereinafter called the "Office") in United States currency the amount payable thereon immediately upon
receipt of notice of payment there of, with interest from the time of such payment at the rate of four (4%) percent above
the rate of interest designated by you, and in effect from time to time, as your "Reference Rate", adjusted
when said Reference Rate changes, or at such other rate as is agreed upon in writing between us (but if such interest rate
shall not be lawful with respect to the undersigned, then such rate shall be the highest lawful rate permitted to be charged
by you on a loan to the undersigned), or, if so demanded by you, to so pay to you the amount of such draft in
advance at a time to be determined by you; and (b) in case of each time draft, to pay to you the amount thereof at
your Office, in United States currency not later than two (2) business days prior to its maturity, or, if the draft is

App. 1152

payable elsewhere, then to make such payment at your Office in sufficient time to reach the place of payment in the usual course of the regular mails, not later than two (2) business days prior to maturity. Interest payable hereunder shall be computed on the basis of the actual number of days in a 360-day year. The charging of interest on the basis of a 360-day year results in the payment of more interest than would be required if interest were charged on the basis of the actual number of days in the year. The undersigned acknowledges that the Reference Rate may not necessarily represent the lowest rate charged by you to customers. You are hereby authorized, but not required, to charge the undersigned's account(s) maintained with you for any or all amounts due to you hereunder. For purposes of this Agreement, the term "draft" shall mean any sight or time draft or other document or written statement required for a drawing under the Credit.

2. As to drafts payable in currency other than United States currency drawn or purporting to be drawn under the Credit, the undersigned agrees (a) in case of each sight draft, to pay to you immediately upon receipt of notice of payment thereof at your office in United States currency the equivalent of the amount payable on each draft at your then selling rate for cable transfers to the place where, and in the currency in which, such draft is payable, with interest at the legal rate or at such other rate as is agreed upon in writing from the time of such payment, or if so demanded by you to pay the same to you in advance at any other time to be determined by you, and (b) in case of each time draft to furnish you at said Office, sufficiently in advance to reach the place of payment in the usual course of the regular mails not later than two (2) business days prior to maturity, with first class banker's demand bills of exchange to be approved by you for the amount and in the currency of such draft and bearing the unqualified endorsement of the undersigned, or if you so request, to pay to you on demand at said office in United States currency the equivalent of the amount of such draft at your then selling rate for demand drafts on, or cable transfers to, the place where, and in the currency in which, such draft is payable. If at the time payment is to be made by the undersigned as aforesaid, there exists no rate of exchange generally current in New York City for cable transfers or demand drafts as hereinbefore provided, the undersigned agrees to pay to you on demand in United States currency the actual cost to you of settlement of your obligation to the payee of the draft or to any holder thereof as the case may be and however and whenever such settlement shall be made by you, including interest on the dollar amount payable by the undersigned from the date of payment of such draft to the date of the undersigned's payment to you. The undersigned shall pay you on demand in United States currency, such amounts as you may be required to expend in order to comply with all governmental exchange, currency control or other laws, orders and regulations of any country now or hereafter applicable to the purchase or sale of and/or dealings in, foreign currency.

3. The undersigned shall pay to you such fees as are set forth on the Addendum attached hereto. The undersigned shall pay to you on demand from time to time any additional amounts necessary (in your sole determination) to indemnify you against any increase in your direct or indirect costs of issuing or maintaining, or any reduction in the net amount to be received by you with respect to, the Credit, whether due to the imposition or modification of any reserve, special deposit or similar requirement (including any assessment for insurance of deposits or of letters of credit), any requirement to pay, or withhold or deduct from any amount payable, any taxes, fees or similar charges, or for any other reason.

4. Except as expressly stated to the contrary herein, the undersigned agrees: (a) that partial payments may be made under the Credit and that you may honor the relative drafts without inquiry; (b) that notwithstanding the provisions of Article 45 of the UCP or any successor provision thereof, if the Credit provides for drawings available in installments within designated periods and there is a failure to draw under the Credit in any designated period, the Credit will not cease to be available for any subsequent installment, and subsequent installments made in their respective designated periods may be drawn against the Credit and drafts may be accepted and paid with respect to such installments; (c) that you may accept or pay, as complying with the terms of the Credit, any drafts or other documents otherwise in order which may be signed or issued by an administrator, executor, trustee in bankruptcy, debtor in possession, assignee for benefit of creditors, liquidator, receiver or other legal representative of the party who is authorized, under the Credit, to draw or issue any drafts or other documents without being required to inquire as to his authority or appointment; (d) that without limiting any other provisions of this agreement, you and any of your correspondents may accept documents of any character which comply with the provisions, definitions, interpretations and practices contained in "The Uniform Customs and Practice for Documentary Credits", The International Chamber of Commerce Publication as amended from time to time, or which comply with the laws or regulations in force in customs and usages of the place of negotiation; (e) that in the event of any extension of the maturity or time for negotiation or presentation of drafts, acceptances or documents or any other modification of the terms or provisions of the Credit at the request or with the consent of any of the undersigned with or without notification to the others or in the event of any increase in the amount of the Credit at the request of the undersigned, this Agreement shall be binding upon the undersigned with regard to (I) the Credit so increased or otherwise modified, (II) drafts, documents and property covered thereby, and (III) any action taken by you or any of your correspondents in accordance with such extension, increase or other modification; and (f) that you and/or any of your correspondents may accept or pay any draft dated on or before the expiration of any time limit expressed in the Credit, regardless of when drawn and when or whether negotiated, provided the other required documents are dated prior to the expiration date of the Credit.

5. The undersigned assumes all risks of the acts or omissions of the users of the Credit and all risks of misuse of the Credit. Neither you nor any of your correspondents, agents, representatives or designees shall be liable or responsible in any manner including, without limitation, for any damages, losses or other consequences resulting by reason of, and the undersigned's obligations to you shall not be affected by, (a) the form, validity, accuracy, sufficiency, genuineness or legal effect of any draft, claim, document or required statement, or any endorsement thereon, even if such draft, claim, document, statement or endorsement should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (and notwithstanding that the undersigned shall have notified you thereof); (b) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign the Credit or the rights or benefits thereunder or the proceeds thereof, in whole or part, which may prove to be invalid or ineffective for any reason; (c) any loss or delay in the transmission or otherwise of any such draft, claim, document, statement or endorsement, or any proceeds thereof; (d) any act or omission of you or any of your correspondents or of your or their respective agents or employees, other than any such act or omission arising

2

from your or their gross negligence or willful misconduct; (e) any act or omission of the beneficiary of the Credit and the transferee of the Credit, if transferable; (f) the solvency or responsibility of any party issuing any documents in connection with the property; (g) delay in arrival or failure to arrive of either the property or any of the documents relating thereto; (h) delay in giving, or failure to give any notice; (i) any breach of contract between the undersigned and any other party; (j) failure of any draft to bear any reference or adequate reference to the Credit or failure of documents to accompany any draft at negotiation or failure of any person to note the amount of any draft on the reverse side of the Credit or to surrender or take up the Credit or to send forward documents apart from drafts as required by the terms of the Credit, each of which provisions, if contained in the Credit itself, it is agreed may be waived by you; (k) errors, omissions, interruptions or delays in transmission or delivery of any message by mail, cable, telegram, wireless, telex or otherwise, whether or not they be in cipher; (l) errors in translation or errors in interpretation of technical term; (m) any act, error, neglect or default, omission, insolvency or failure in business of any correspondent or for any consequences arising from causes beyond your control; or (n) any payment against presentation of any draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit, provided that such draft, claim, document, required statement or endorsement substantially complies with the terms of the Credit. You shall have sole discretion to decide whether to pay against any draft, claim, document, required statement or endorsement thereon that does not strictly comply, but substantially complies, with the terms of the Credit, provided, however, that the beneficiary of the Credit may not require you to pay against such draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit. In case of any variation between the undersigned's instructions and the requirements of the Credit or between any draft, claim, document, required statement or endorsement thereon accepted by you or your correspondents and the requirements of the Credit for which you are otherwise responsible hereunder, the undersigned shall conclusively be deemed to have waived any right to object to such variation unless, upon the undersigned's receipt of a copy of the Credit or of any such draft, claim, document, required statement or endorsement or notice of such variation, the undersigned immediately delivers to you a written notice of objection specifying each variation to which the undersigned objects and such notice is actually received by you and such receipts acknowledged by the signature of one of your officers. No legal proceeding or action shall be brought by the undersigned against you arising from any such variation unless (i) the undersigned shall have given you written notice of objection, as provided in the preceding sentence, and (ii) such legal proceeding or action shall be commenced in a court of competent jurisdiction sitting in the State and City of New York, within six months after the date when such copy of the Credit or draft, claim, document, required statement or endorsement thereon were delivered or mailed to the undersigned. In furtherance and extension (and not in limitation) of the specific provisions hereinbefore set forth, the undersigned agrees that any action taken or omitted by you or any of your correspondents under or in connection with the Credit or the relative drafts or documents if done in good faith, shall be binding on the undersigned and shall not put you or your correspondents under any resulting liability to the undersigned and the undersigned shall indemnify and hold you and your correspondents, agents and representatives harmless from any claim, loss or liability arising from or in connection with the Credit or the related drafts or documents.

6.  In case the undersigned consents to any overdrafts under any Credit or authorizes payment or acceptance of drafts drawn thereunder with irregular documents attached thereto, or authorizes or consents to any departure from, or modification of the terms of this agreement or the Credit hereunder, this agreement shall be fully binding upon the undersigned in respect thereto and notwithstanding such overdrafts, irregularities or variances, this agreement and the documents shall be, subsist, and remain as though all matters had been done in strict compliance with this agreement and with the Credit. You and your correspondents shall not be liable for any failure by you or anyone else to pay or accept any draft or acceptance under this Credit or for any loss or damage resulting from any censorship, law, control or restriction rightfully or wrongfully exercised by any de facto or de jure domestic or foreign government or agency thereof, declared or undeclared war, or from any other cause, of whatsoever nature, beyond your control or the control of your correspondents, agents or representatives, and the undersigned agrees to indemnify and hold you harmless from any claim, loss, liability or expense arising by reason thereof.

7.  The word "Obligations" as used in this agreement shall mean any and every indebtedness, obligation and liability of the undersigned to you and your claims of every nature and description against the undersigned, whether or not represented by negotiable instruments or other writings, whether arising under this agreement, the Credit or by reason of any other agreement or transaction, whether now existing or hereafter incurred, originally contracted with you and/or with another or others and now or hereafter owing to or acquired in any manner by you, whether contracted by the undersigned alone or jointly or severally with another or others, direct or indirect, absolute or contingent, secured or not secured, matured or not matured.

8.  In order to secure the prompt and unconditional payment of the Obligations, the undersigned hereby grants you a security interest in any and all property of the undersigned in your actual or constructive possession or in transit to you or your correspondents, agents or representatives from or for the undersigned and the proceeds thereof, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into your possession in any other manner for any other reason, and the undersigned agrees to pledge, transfer and deposit with you and grant to you a security interest in such other property as you shall reasonably request to secure payment of the Obligations and to make such payments as you request on account of the Obligations. You are also hereby given a continuing lien and/or right of set-off for the amount of the Obligations, upon or with respect to any and all deposits, general or special, and credits of the undersigned with, and any and all claims of the undersigned against you at any time existing, and you are hereby authorized at any time or times, without prior notice, to apply such deposits or credits, or any part thereof, to payment of the Obligations in such amounts as you may select, although contingent or unmatured, and whether the Collateral is deemed adequate or not. All of the foregoing, together with any property in which you may now or hereafter be granted a security interest, or which may be deposited with you or your agents by the undersigned to secure the Obligations, is herein collectively called "Collateral", and you are hereby authorized to deal therewith in the same manner as if you had sole title thereto. If the undersigned, as registered holder of Collateral, shall become entitled to receive or does receive any stock certificate, option or right, whether as an addition to, in substitution of, or in exchange for, such Collateral, or otherwise, the undersigned agrees to accept same as your agent and to hold same in trust for you, to forthwith deliver the same to you in the exact form received, with the undersigned's endorsement when necessary, to be held by you as Collateral

3

App. 1154

9. You may, but shall not be obligated to, insure all or any part of the Collateral held by you hereunder against all risks of any kind and the premium thereon shall be paid to you by the undersigned within five days after the demand for the same and you shall have the right to debit the amount of such premium to any balances of the undersigned without notice. If the undersigned fails to pay the premium upon any policy of insurance pledged hereunder or upon any policy of insurance covering any property or Collateral within five days of the due date (without benefit of the grace period), you may, but shall not be obligated to, pay the same without notice to the undersigned and said premium shall be repaid to, or may be debited by you, as above provided. The undersigned agrees to reimburse you upon demand in the event you or any of your correspondents, agents or representatives pay for or incur any expense or liability in connection with the Credit or any draft accepted by you pursuant to this agreement or in relation to any of the matters set forth or referred to herein, including, but not limited to all correspondents' charges and expenses and charges for or incidental to the care, the safekeeping or otherwise of any of the Collateral pursuant to, or in connection with the Credit.

10. The undersigned will at any and all times at your request, sign financing statements, security agreements or other documents with respect to the Collateral as you may reasonably request. The right is expressly granted to you, at your discretion, to file one or more financing statements without the signature of the undersigned under the Uniform Commercial Code naming the undersigned as debtor and you as secured party and indicating therein the types or describing the items of Collateral herein referred to. The undersigned hereby agrees to pay on demand, and authorizes you to charge its account with the cost of any and all filing fees and costs which you deem necessary to incur to protect your interest in the Collateral.

11. The undersigned consents that, without the necessity for any reservation of rights against the undersigned and without notice to or further assent by the undersigned, the liability of any party for or upon Obligations or Collateral may from time to time, in whole or in part, be renewed, extended, modified, prematured, compromised, settled for cash, credit or otherwise and upon any terms or conditions you may deem advisable and that you may discharge or release any party from all such liabilities and that any collateral security for any of the Obligations may from time to time, in whole or in part, be exchanged, sold or surrendered by you all without in any way affecting or releasing the liability of the undersigned upon the Obligations. You shall not be liable for any failure to collect or demand payment of or protest or give any notice of non-payment of any of the Collateral or for any delay in so doing, nor shall you be under any obligation to take any action whatsoever with respect to the Collateral or any part thereof. You shall use reasonable care in the custody and preservation of Collateral in your possession but need not take any steps to preserve rights against prior parties or keep the Collateral identifiable. You shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in your possession if you take such action as the undersigned shall reasonably request in writing but in no event shall an omission to do any act which the undersigned fails to request in writing be deemed a failure to exercise such reasonable care and no omission to comply with any request of the undersigned shall be deemed a failure to exercise such reasonable care. Any right of set-off exercised by you shall be deemed to have been exercised immediately upon the occurrence of any event referred to in Paragraph 12 hereof, even though such set-off is made or entered on your books subsequent thereto. You shall have no obligation to comply with any recording re-recording, filing, re-filing or other legal requirement necessary to establish or maintain the validity, priority or enforceability of, or your rights in and to, Collateral, or any part thereof. You may exercise any right of the undersigned with respect to any Collateral. In any statutory or non-statutory proceeding, affecting the undersigned or Collateral, you or your nominee may, whether or not a default exists and regardless of the amount of Obligations, file a proof of claim for the full amount of any Collateral and vote such claim for the full amount thereof: (a) for or against any proposal or resolution; (b) for a Trustee or Trustees or for a Committee of Creditors; (c) for the acceptance or rejection of any proposed agreement, plan of reorganization, wage earners' plan, composition or extension, and you or your nominee may receive any payment or distribution and give acquittance therefor and may exchange or release Collateral. Any Collateral held by you hereunder, may without notice and whether or not a default exists, be registered and held in your or your nominee's name. You are hereby granted a power of attorney to endorse the undersigned's name on any and all notes, checks, drafts, bills of exchange, money orders or commercial paper included in the Collateral or representing the proceeds thereof.

12. All monies due or owing to you from the undersigned under this agreement or any other Obligations shall, at your option, become immediately due and payable, without notice or demand and notwithstanding any time or credit otherwise allowed or given to you under this or any other agreement or instrument and the undersigned and all guarantors shall be deemed in default hereunder upon the occurrence of any one of the following events with respect to any one of the undersigned or any guarantor or endorser of any Obligations of any of the undersigned to you: (a) failure to pay any sum upon the due date thereof; (b) if any statement, representation or warranty made in any application, financial statement or other agreement made with, or document delivered to you, shall be false or untrue in any material respect; (c) default in the performance of any condition or provision of this agreement or any other agreement with, or any Obligations to you; (d) death, and if a partnership, death of a partner, (e) insolvency, howsoever evidenced; (f) the making of a general assignment for the benefit of creditors; (g) the filing of any petition or the commencement of any proceedings by or against any of the undersigned or any guarantor of any Obligations, for any relief under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, compositions or extensions; (h) the appointment of a temporary or permanent receiver or trustee or similar legal representative of, or the issuance or making of a writ or order of attachment, against any property or assets; (i) entry of a judgment; (j) the commencement of any proceeding for enforcement of a judgment under Article 52 of the New York Civil Practice Law and Rules or under provisions of any other law; (k) the adoption of any resolution for dissolution or liquidation or the taking of any action for the purpose of such dissolution or liquidation; (l) the suspension of usual business; (m) the failure to deposit any additional collateral security with you upon demand; (n) the failure to pay any premium on any insurance policy pledged, or any insurance policy covering any property pledged with you, or in which you are granted a security interest, within five days after such premium becomes due without benefit of any period of grace; (o) failure forthwith upon demand to furnish any financial information or to permit inspection of books, documents or records of account; (p) failure to pay any tax when due; (q) if at any time in your sole judgment the financial responsibility

4

of any of the undersigned, or of any guarantor of any Obligations of the undersigned shall become impaired or unsatisfactory to you.

13. Upon the happening of any of the events set forth in Paragraph 12, and at any time thereafter, you shall have, in addition to all other rights and remedies, the remedies of a secured party under the New York Uniform Commercial Code.  The undersigned shall, upon your request, assemble the Collateral and make it available to you at a place to be designated by you which is reasonably convenient to you and the undersigned. You will give the undersigned notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is to be made by sending notice, as provided below, at least five days before the time of the sale or disposition, which provisions for notice you and the undersigned agree are reasonable. No such notice need be given by you with respect to Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market. You may apply the net proceeds of any sale, lease or other disposition of Collateral after deducting all costs and expenses of every kind incurred therein or incidental to the retaking, holding, preparing for sale, selling, leasing or the like of said Collateral, or in any way relating to the rights of the undersigned thereunder, including attorney's fees hereinafter provided for and legal expenses, to the payment, in whole or in part, in such order as you may elect, of one or more of said Obligations, whether due or not due, absolute or contingent, and if contingent you may retain sufficient of such proceeds to cover the largest aggregate sum which may become due or owing thereunder to you with prospective interest, costs, expenses and counsel fees and you shall not be charged with any interest with respect thereto, and only after so applying such net proceeds and after the payment by you of any other amounts required by law need you account for the surplus, if any. The undersigned shall remain liable to you for the payment of any deficiency, with legal interest, and does hereby waive any and all rights of redemption with relation to the Collateral, to the extent permitted by law.

14. Any notice to you shall be deemed effective only if sent to and received at your office, division or department conducting the transaction or transactions hereunder. Any notice to or demand on and of the undersigned shall be binding on the undersigned and shall be deemed effective if not first otherwise made or given when forwarded by mail, telegraph, cable, radio, telephone or otherwise to the last address or telephone number of any of the undersigned appearing on your books with the same effect as if the same were actually delivered to and received by the undersigned in person. You shall not by any act, delay, omission or otherwise be deemed to have waived any of your rights or remedies hereunder and no waiver whatsoever shall be valid unless in writing, signed by one of your duly authorized officers, and then only to the extent therein set forth. A waiver by you of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which you would otherwise have on any future occasion.  No term or provision of this agreement can be changed orally and no executory agreement shall be effective to change or modify or to discharge in whole or in part this agreement unless such executory agreement is in writing and signed by one of your duly authorized officers. All your rights and remedies hereunder shall be cumulative and may be exercised singly or concurrently, and your rights specified herein are in addition to those otherwise created. No delay on you part in exercising any power or right hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right, nor shall you be liable for exercising or failing to exercise any such power or right. The undersigned hereby waives demand, presentment, protest, notice of protest and notice of dishonor of any and all drafts, notes, bills of exchange, checks and other instruments deposited or pledged as Collateral hereunder whether upon inception, maturity, acceleration of maturity or due date, or at any other time, and any and all other notices and demands whatsoever, whether or not relating to such instruments.

15. In the event that you or any of your correspondents, at the request of the undersigned, extend, renew or refinance any of the obligations of the undersigned to you, arising by means of (a) bankers' acceptances created by the acceptance of drafts drawn by the undersigned on you, arising under Paragraphs 1 and 2 hereof; (b) drafts drawn by the beneficiary of the Credit, accepted by you or any of your correspondents; (c) notes made by the undersigned; or (d) otherwise, or in the event that you further extend, renew or refinance, from time to time, any such bankers' acceptances, draft or note, then, and in consideration thereof, the undersigned agrees to pay to you the amount of each bankers acceptance or draft in the manner provided in Paragraphs 1 and 2 hereof for the payment of time drafts drawn under the Credit, or, if a note is involved, then in the manner provided in the note. The undersigned further agrees that with respect to any such extension, renewal or refinancing, all of the terms, conditions, agreements and obligations contained in this agreement shall apply thereto and that you shall have all the rights and remedies set forth in this agreement as well as those set forth in any other document signed by or on behalf of the undersigned. Should the beneficiary under the Credit, upon receipt of advice by cable or otherwise of the issuance of the Credit, but prior to its actual receipt, negotiate drafts by virtue of such advice, such negotiation shall be considered a proper one and shall be included under the terms and subject to all conditions hereof and in addition thereto the undersigned assumes all the risk of the misuse of the Credit

16. You may, but shall not be obligated to, contest, pay and/or discharge all liens, encumbrances, taxes or assessments on, or claims, actions or demands against, any of the Collateral deposited hereunder without notice to, or the consent of, the undersigned and you may, but shall not be obligated to, take all actions and proceedings in your own name or in the name of the undersigned or of any other appropriate person to remove or contest such liens, encumbrances, claims, actions, demands, taxes or assessments and all sums advanced or paid by you and all costs, attorneys' fees and expenses relating thereto shall be paid by, and chargeable to, the undersigned.

17. The word "property" as used in this agreement, includes goods, merchandise, instruments, documents, securities, funds, choses in action and any and all other forms of property, whether real, personal or mixed, and any right or interest therein and the proceeds thereof. Property in your possession shall include property in possession of any person holding same for you in any manner whatsoever.

18. If any of the undersigned is a partnership, the members thereof shall be individually bound and liable hereunder. If this agreement is signed by two or more parties, it shall be the joint and several agreement of such parties.

19. If the Credit issued by you will provide that it will be available by presentation, to you or to any of your correspondents, of the documents described in the application, unaccompanied by drafts, the undersigned agrees

5

App. 1156

that all reference herein to drafts, documents relative to drafts, and the presentation, acceptance for payment or payment of drafts shall refer to documents presented for payment without drafts, the presentation and acceptance thereof, and payment upon such presentation, and that the undersigned's obligation and your rights, privileges and remedies hereunder shall be the same as though payments had been made upon presentation of drafts drawn under the Credit accompanied by the said documents.

20. The undersigned will bear and pay all expenses of every kind for the enforcement of any of your rights herein mentioned or of any claim or demand by you against the undersigned and/or guarantors and/or any other person, firm or corporation and of any Collateral held by you, and the undersigned will pay to you upon demand any such expenses incurred by you. If an attorney is used to collect or enforce the Obligations or to enforce, declare or adjudicate any rights or obligations under this agreement, or with respect to the Obligations or Collateral, whether by suit, or any other means whatsoever, attorneys' fees incurred by you shall be payable by the undersigned. The undersigned in any litigation (whether or not arising out of or relating to this agreement or to any Obligations) in which you and any of the undersigned shall be adverse parties, waives trial by jury and the right to interpose any defense based on any statute of limitations or any claim of laches, set-off, or counterclaim of any nature or description. Notwithstanding anything to the contrary contained herein, the undersigned hereby indemnifies and holds you harmless from and against any and all claims, actions (including, without limitation, legal proceedings relating to any court order, injunction or other process or decree restraining or seeking to restrain you from paying any amount under the Credit or relating to any attachment or execution in connection with the Credit, any Obligations or Collateral), losses, judgments, amounts and expenses including, without limitation, attorneys' fees, and court costs, ( such claims, actions, losses, etc., hereinafter called collectively "Liabilities") suffered or incurred by you in connection with or arising out of this agreement, any Obligations or the Collateral and regardless of whether such Liabilities relate to claims or actions brought by the undersigned or any third party, including without limitation liabilities suffered or incurred by you in connection with (a) your exercise of any right or remedy granted to you hereunder, by law or otherwise, (b) any claim and the prosecution or defense thereof arising out of or in any way connected to this agreement, and any Obligations or the Collateral, (c) the collection or enforcement of the Obligations, and (d) any of the events or circumstances referred to in Paragraph 5 hereof. In the event of the undersigned or any guarantor of any of the Obligations acts in any way (including but not limited to seeking an injunction or temporary restraining order) to prevent or delay payment by you of a draft or claim, the undersigned: (i) agrees to provide to you on demand such additional collateral in such amount as you, in your sole discretion, shall deem necessary to secure the payment to you of the Obligations; (ii) agrees to bear and pay all expenses of every kind incurred by you, including attorneys' fees, in connection with such action to prevent or delay payment by you of a draft or claim; (iii) consents to your exclusive determination to pay or compromise any claim or obligation of any nature or description relating to the Credit, including without limitation all costs, attorneys' fees, fines, interest, damages or any other charge, expense or liability; and (iv) agrees to indemnify you and to reimburse you on demand for the amount of such payments or compromises together with interest thereon at the rate and on the terms set forth in Paragraph 1 hereof.

21. The term "you" as used throughout this agreement shall be deemed to include the Bank Leumi USA and all its branches or departments wherever located, and any individuals, partnerships or corporations acting as nominee, for, or in behalf of, the Bank Leumi USA and any subsidiary or entity controlled by the Bank Leumi USA and any other subsidiary or entity which is controlled directly or indirectly by any such subsidiary or entity. The term "undersigned", as used throughout this agreement shall include the individual or individuals, association, partnership, corporation, or other entity named herein as "undersigned", and (a) any successor individual or individuals, associations or partnership, corporation, or other entity to which all or substantially all of the business or assets of said undersigned shall have been transferred, (b) in case of a partnership, any new partnership which shall have been created by reason of the admission of any new partner or partners therein or the dissolution of the existing partnership by death, resignation or other withdrawal of any partner, and (c) in the case of a corporation, any other corporation into or with which said undersigned shall have been merged, consolidated, reorganized or absorbed.

22. This agreement is made in the City of New York and shall be construed in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof. In the event that you bring any action or suit in any court of record of New York State or the Federal Government to enforce any or all of the Liabilities of the undersigned or any of your rights hereunder, service of process may be made upon the undersigned by mailing a copy of the summons to the undersigned at the address set forth below, and the undersigned hereby irrevocably submits to the jurisdiction and venue of any New York State or Federal court located in New York City over any action, suit or proceeding arising out of any dispute between the undersigned and you.

23. If any term, condition or provisions of this agreement or of any other agreement or document executed and/or delivered to you is determined to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any other term, condition or provisions of this agreement and all other agreements executed and/or delivered to you and they shall be carried out as if any such invalid or unenforceable term, condition or provision were not embodied herein or therein.

24. You may assign or transfer this agreement and all Collateral and in such event the assignee or transferee thereof shall have the same rights and remedies hereunder as if originally named herein in your place. Upon any such assignment or transfer, you may deliver the Collateral and property held as security or any part thereof to the assignee or transferee, who shall thereupon become vested with all your powers and rights in respect thereof and you shall thereafter be forever relieved and fully discharged from any liability or responsibility with respect to the property transferred, but you shall retain all powers and rights with respect to the property not so transferred. You shall, at all reasonable times and from time to time, be allowed, by or through any of your officers, agents, attorneys or accountants, to examine, inspect and make abstracts from the undersigned's books.

25. Except as otherwise provided herein, the Credit shall be subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication as amended from time to time.

6

26. The undersigned agrees that: (a) any assistance provided by you in the preparation of the terms of the credit was requested by the undersigned and was based solely upon information provided to you by the undersigned, (b) except for information furnished by the undersigned, you have no knowledge of the transaction for which the credit has been obtained, (c) the undersigned has read and understands all of the terms and provisions of the credit and this Letter of Credit Application, and (d) the terms of the credit are in accord with the undersigned's instructions and represent all the conditions that the undersigned has requested as a prerequisite for you to pay under the credit.

*Erik Johnson*

By Erik Johnson - CFO

Address 1603 LBJ Frwy

Suite 800

Dallas, TX  75234

On behalf of:
TRANSCONTINENTAL REALTY INVESTORS, INC.

On behalf of:
PARC AT OPELIKA, ON BEHALF OF D4OP LLC

On behalf of:
MID SOUTHERN, LLC

FORM 1221 (R6/11)

7

App. 1158

citrix | RightSignature

**SIGNATURE
CERTIFICATE**

REFERENCE NUMBER

012E E1 DA A 4C47 B38E 6BB4D59621B6

| TRANSACTION DETAILS | DOCUMENT DETAILS |
|---|---|
| **Reference Number**<br>F012EFE1-DAFA-4C47-B38E-6BB4D59621B6 | **Document Name**<br>rrevocab e Standby Letter Of Cred t App cat on ( OD) |
| **Transaction Type**<br>S gnature Request | **Filename**<br>rrevocab e_standby_ etter_of_cred t_app cat on_od_ pdf |
| **Sent At**<br>01/21/2021 13 43 EST | **Pages**<br>7 pages |
| **Executed At**<br>01/21/2021 14 23 EST | **Content Type**<br>app cat on/pdf |
| **Identity Method**<br>ema | **File Size**<br>261 KB |
| **Distribution Method**<br>ema | **Original Checksum**<br>a b ee ae5 d  eaa  e 50 c0a0 8c c8e 8 0e d 0 5b |
| **Signed Checksum**<br>e ae d 0 a e 5ddc8 8 c8 5 0 0 0 0bc 0 a b c e | |
| **Signer Sequencing**<br>D sab ed | |
| **Document Passcode**<br>D sab ed | |

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Er k Johnson | **Status**<br>s gned | **Viewed At**<br>01/21/2021 14 23 EST |
| **Email**<br>er k ohnson@p ar ncome com | **Multi-factor Digital Fingerprint Checksum**<br>5d 8c 0 b 8a 0 ade 8 c 0 08 e a e e 5 | **Identity Authenticated At**<br>01/21/2021 14 23 EST |
| **Components**<br>1 | **IP Address**<br>67 200 141 109 | **Signed At**<br>01/21/2021 14 23 EST |
| | **Device**<br>Chrome v a W ndows | |
| | **Typed Signature**<br>*Erik Johnson* | |
| | **Signature Reference ID**<br>FD8AFE6B | |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 01/21/2021 13 43 EST | Judson Stagner ( udson stagner@p ar ncome com) created document<br>rrevocab e_standby_ etter_of_cred t_app cat on_od_ pdf on Chrome v a W ndows from 67 200 141 109 |
| 01/21/2021 13 43 EST | Er k Johnson (er k ohnson@p ar ncome com) was ema ed a nk to s gn |
| 01/21/2021 14 23 EST | Er k Johnson (er k ohnson@p ar ncome com) v ewed the document on Chrome v a W ndows from 67 200 141 109 |
| 01/21/2021 14 23 EST | Er k Johnson (er k ohnson@p ar ncome com) authent cated v a sess on on Chrome v a W ndows from 67 200 141 109 |
| 01/21/2021 14 23 EST | Er k Johnson (er k ohnson@p ar ncome com) s gned the document on Chrome v a W ndows from 67 200 141 109 |

App. 1159

**leumi**

ATTENTION: Bank Leumi - LC Department
(PLEASE TYPE OR PRINT)

**IRREVOCABLE STANDBY LETTER OF CREDIT APPLICATION AND SECURITY AGREEMENT**

GENTLEMEN:                                          DATE 1/21/2021                    L/C NO.
PLEASE ISSUE AN IRREVOCABLE LETTER OF CREDIT AS SET FORTH BELOW AND FORWARD THE SAME TO
YOUR CORRESPONDENT OR THE BENEFICIARY (AT YOUR OPTION) BY:

☑ AIRMAIL
   MESSENGER/COURIER

☐ AIRMAIL WITH BRIEF TELEX/CABLE
   OR OTHER TELETRANSMISSION METHOD

☐ FULL TELEX/CABLE OR OTHER
   TELETRANSMISSION METHOD

APPLICANT NAME: Parc at Opelika on behalf of D4OP LLC
ADDRESS: 1603 LBJ Frwy
         Suite 800
         Dallas, TX 75234

BENEFICIARY NAME: Greystone Funding Company LLC
ADDRESS: 419 Belle Air Lane
         Warranton, VA 20186

ADVISING BANK NAME: _____
ADDRESS: _____

AMOUNT: $946,452

_____ SWIFT CODE: _____

EXPIRY DATE: 1/31/2024

AVAILABLE BY PRESENTATION OF THE FOLLOWING DOCUMENTS, EACH OF WHICH MUST BEAR YOUR L/C NO. (Check one or more of the following. As appropriate, and completed as directed)

☑ DRAFT(S) AT SIGHT TO BE DRAWN ON YOU (OR, AT YOUR OPTION, A CORRESPONDENT BANK SELECTED BY YOU), WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

☐ A WRITTEN STATEMENT PURPORTEDLY SIGNED BY THE BENEFICIARY, READING AS FOLLOWS: (Please indicate below the exact wording to appear on the statement to be presented with the draft(s))

_____

_____

_____

☐ OTHER DOCUMENTS: (Please specify below, if any)

_____

_____

(Check one or more of the following, as applicable)

PARTIAL DRAWINGS        ☑ ALLOWED        ☐ NOT ALLOWED
☑ TERMS AND CONDITIONS OF THE LETTER OF CREDIT TO BE IN THE FORM
  ATTACHED HERETO, WHICH FORMS AN INTEGRAL PART OF THIS
  L/C APPLICATION

☐ ADDITIONAL CONDITIONS OR INSTRUCTIONS, IF ANY:

_____

_____

UNLESS OTHERWISE EXPRESSLY STATED HEREIN, THIS CREDIT AND ANY AMENDMENTS THERETO SHALL BE SUBJECT TO: (PLEASE CHECK ONE OF THE BOXES BELOW):

☐ THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION) PUBLICATION NO. 600 OF THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UCP") OR SUCH OTHER VERSION OF THE "UCP" AS MAY BE IN EFFECT FROM TIME TO TIME, IN SO FAR AS THE SAME SHALL BE APPLICABLE.

☑ INTERNATIONAL STANDBY PRACTICES (THE "ISP98") PUBLICATION NO. 590 OF THE INTERNATIONAL CHAMBER OF COMMERCE OR SUCH OTHER VERSION OF THE ISP98 AS MAY BE IN EFFECT FROM TIME TO TIME, IN SO FAR AS THE SAME SHALL BE APPLICABLE.

PLEASE DATE AND OFFICIALLY SIGN THE AGREEMENT ON THE REVERSE SIDE OF THIS APPLICATION IN CONSIDERATION OF YOUR ISSUING THE REQUEST OF THE UNDERSIGNED YOUR IRREVOCABLE STANDY LETTER OF CREDIT (HEREIN CALLED THE "CREDIT"), SUBSTANTIALLY IN ACCORDANCE WITH THE FOREGOING APPLICATION, THE UNDERSIGNED AGREES AS FOLLOWS:

Irrevocable Standby Letter of Credit Application and Security Agreement

1.   As to drafts payable in United Sates currency drawn or purporting to be drawn under the Credit, the undersigned agrees (a) in case of each sight draft, to pay to you at your office at 350 Madison Avenue, 3rd Floor, New York, New York 10017 (hereinafter called the "Office") in United States currency the amount payable thereon immediately upon receipt of notice of payment there of, with interest from the time of such payment at the rate of four (4%) percent above the rate of interest designated by you, and in effect from time to time, as your "Reference Rate", adjusted when said Reference Rate changes, or at such other rate as is agreed upon in writing between us (but if such interest rate shall not be lawful with respect to the undersigned, then such rate shall be the highest lawful rate permitted to be charged by you on a loan to the undersigned), or, if so demanded by you, to so pay to you the amount of such draft in advance at a time to be determined by you; and (b) in case of each time draft, to pay to you the amount thereof at your Office, in United States currency not later than two (2) business days prior to its maturity, or, if the draft is

App. 1160

payable elsewhere, then to make such payment at your Office in sufficient time to reach the place of payment in the usual course of the regular mails, not later than two (2) business days prior to maturity. Interest payable hereunder shall be computed on the basis of the actual number of days in a 360-day year. The charging of interest on the basis of a 360-day year results in the payment of more interest than would be required if interest were charged on the basis of the actual number of days in the year. The undersigned acknowledges that the Reference Rate may not necessarily represent the lowest rate charged by you to customers. You are hereby authorized, but not required, to charge the undersigned's account(s) maintained with you for any or all amounts due to you hereunder. For purposes of this Agreement, the term "draft" shall mean any sight or time draft or other document or written statement required for a drawing under the Credit.

2. As to drafts payable in currency other than United States currency drawn or purporting to be drawn under the Credit, the undersigned agrees (a) in case of each sight draft, to pay to you immediately upon receipt of notice of payment thereof at your office in United States currency the equivalent of the amount payable on each draft at your then selling rate for cable transfers to the place where, and in the currency in which, such draft is payable, with interest at the legal rate or at such other rate as is agreed upon in writing from the time of such payment, or if so demanded by you to pay the same to you in advance at any other time to be determined by you, and (b) in case of each time draft to furnish you at said Office, sufficiently in advance to reach the place of payment in the usual course of the regular mails not later than two (2) business days prior to maturity, with first class banker's demand bills of exchange to be approved by you for the amount and in the currency of such draft and bearing the unqualified endorsement of the undersigned, or if you so request, to pay to you on demand at said office in United States currency the equivalent of the amount of such draft at your then selling rate for demand drafts on, or cable transfers to, the place where, and in the currency in which, such draft is payable. If at the time payment is to be made by the undersigned as aforesaid, there exists no rate of exchange generally current in New York City for cable transfers or demand drafts as hereinbefore provided, the undersigned agrees to pay to you on demand in United States currency the actual cost to you of settlement of your obligation to the payee of the draft or to any holder thereof as the case may be and however and whenever such settlement shall be made by you, including interest on the dollar amount payable by the undersigned from the date of payment of such draft to the date of the undersigned's payment to you. The undersigned shall pay you on demand in United States currency, such amounts as you may be required to expend in order to comply with all governmental exchange, currency control or other laws, orders and regulations of any country now or hereafter applicable to the purchase or sale of and/or dealings in, foreign currency.

3. The undersigned shall pay to you such fees as are set forth on the Addendum attached hereto. The undersigned shall pay to you on demand from time to time any additional amounts necessary (in your sole determination) to indemnify you against any increase in your direct or indirect costs of issuing or maintaining, or any reduction in the net amount to be received by you with respect to, the Credit, whether due to the imposition or modification of any reserve, special deposit or similar requirement (including any assessment for insurance of deposits or of letters of credit), any requirement to pay, or withhold or deduct from any amount payable, any taxes, fees or similar charges, or for any other reason.

4. Except as expressly stated to the contrary herein, the undersigned agrees: (a) that partial payments may be made under the Credit and that you may honor the relative drafts without inquiry; (b) that notwithstanding the provisions of Article 45 of the UCP or any successor provision thereof, if the Credit provides for drawings available in installments within designated periods and there is a failure to draw under the Credit in any designated period, the Credit will not cease to be available for any subsequent installment, and subsequent installments made in their respective designated periods may be drawn against the Credit and drafts may be accepted and paid with respect to such installments; (c) that you may accept or pay, as complying with the terms of the Credit, any drafts or other documents otherwise in order which may be signed or issued by an administrator, executor, trustee in bankruptcy, debtor in possession, assignee for benefit of creditors, liquidator, receiver or other legal representative of the party who is authorized, under the Credit, to draw or issue any drafts or other documents without being required to inquire as to his authority or appointment; (d) that without limiting any other provisions of this agreement, you and any of your correspondents may accept documents of any character which comply with the provisions, definitions, interpretations and practices contained in "The Uniform Customs and Practice for Documentary Credits", The International Chamber of Commerce Publication as amended from time to time, or which comply with the laws or regulations in force in customs and usages of the place of negotiation; (e) that in the event of any extension of the maturity or time for negotiation or presentation of drafts, acceptances or documents or any other modification of the terms or provisions of the Credit at the request or with the consent of any of the undersigned with or without notification to the others or in the event of any increase in the amount of the Credit at the request of the undersigned, this Agreement shall be binding upon the undersigned with regard to (I) the Credit so increased or otherwise modified, (II) drafts, documents and property covered thereby, and (III) any action taken by you or any of your correspondents in accordance with such extension, increase or other modification; and (f) that you and/or any of your correspondents may accept or pay any draft dated on or before the expiration of any time limit expressed in the Credit, regardless of when drawn and when or whether negotiated, provided the other required documents are dated prior to the expiration date of the Credit.

5. The undersigned assumes all risks of the acts or omissions of the users of the Credit and all risks of misuse of the Credit. Neither you nor any of your correspondents, agents, representatives or designees shall be liable or responsible in any manner including, without limitation, for any damages, losses or other consequences resulting by reason of, and the undersigned's obligations to you shall not be affected by, (a) the form, validity, accuracy, sufficiency, genuineness or legal effect of any draft, claim, document or required statement, or any endorsement thereon, even if such draft, claim, document, statement or endorsement should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (and notwithstanding that the undersigned shall have notified you thereof); (b) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign the Credit or the rights or benefits thereunder or the proceeds thereof, in whole or part, which may prove to be invalid or ineffective for any reason; (c) any loss or delay in the transmission or otherwise of any such draft, claim, document, statement or endorsement, or any proceeds thereof; (d) any act or omission of you or any of your correspondents or of your or their respective agents or employees, other than any such act or omission arising

2

App. 1161

from your or their gross negligence or willful misconduct; (e) any act or omission of the beneficiary of the Credit and the transferee of the Credit, if transferable; (f) the solvency or responsibility of any party issuing any documents in connection with the property; (g) delay in arrival or failure to arrive of either the property or any of the documents relating thereto; (h) delay in giving, or failure to give any notice; (i) any breach of contract between the undersigned and any other party; (j) failure of any draft to bear any reference or adequate reference to the Credit or failure of documents to accompany any draft at negotiation or failure of any person to note the amount of any draft on the reverse side of the Credit or to surrender or take up the Credit or to send forward documents apart from drafts as required by the terms of the Credit, each of which provisions, if contained in the Credit itself, it is agreed may be waived by you; (k) errors, omissions, interruptions or delays in transmission or delivery of any message by mail, cable, telegram, wireless, telex or otherwise, whether or not they be in cipher; (l) errors in translation or errors in interpretation of technical term; (m) any act, error, neglect or default, omission, insolvency or failure in business of any correspondent or for any consequences arising from causes beyond your control; or (n) any payment against presentation of any draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit, provided that such draft, claim, document, required statement or endorsement substantially complies with the terms of the Credit. You shall have sole discretion to decide whether to pay against any draft, claim, document, required statement or endorsement thereon that does not strictly comply, but substantially complies, with the terms of the Credit, provided, however, that the beneficiary of the Credit may not require you to pay against such draft, claim, document, required statement or endorsement thereon that does not strictly comply with the terms of the Credit. In case of any variation between the undersigned's instructions and the requirements of the Credit or between any draft, claim, document, required statement or endorsement thereon accepted by you or your correspondents and the requirements of the Credit for which you are otherwise responsible hereunder, the undersigned shall conclusively be deemed to have waived any right to object to such variation unless, upon the undersigned's receipt of a copy of the Credit or of any such draft, claim, document, required statement or endorsement or notice of such variation, the undersigned immediately delivers to you a written notice of objection specifying each variation to which the undersigned objects and such notice is actually received by you and such receipts acknowledged by the signature of one of your officers. No legal proceeding or action shall be brought by the undersigned against you arising from any such variation unless (i) the undersigned shall have given you written notice of objection, as provided in the preceding sentence, and (ii) such legal proceeding or action shall be commenced in a court of competent jurisdiction sitting in the State and City of New York, within six months after the date when such copy of the Credit or draft, claim, document, required statement or endorsement thereon were delivered or mailed to the undersigned. In furtherance and extension (and not in limitation) of the specific provisions hereinbefore set forth, the undersigned agrees that any action taken or omitted by you or any of your correspondents under or in connection with the Credit or the relative drafts or documents if done in good faith, shall be binding on the undersigned and shall not put you or your correspondents under any resulting liability to the undersigned and the undersigned shall indemnify and hold you and your correspondents, agents and representatives harmless from any claim, loss or liability arising from or in connection with the Credit or the related drafts or documents.

6.  In case the undersigned consents to any overdrafts under any Credit or authorizes payment or acceptance of drafts drawn thereunder with irregular documents attached thereto, or authorizes or consents to any departure from, or modification of the terms of this agreement or the Credit hereunder, this agreement shall be fully binding upon the undersigned in respect thereto and notwithstanding such overdrafts, irregularities or variances, this agreement and the documents shall be, subsist, and remain as though all matters had been done in strict compliance with this agreement and with the Credit. You and your correspondents shall not be liable for any failure by you or anyone else to pay or accept any draft or acceptance under this Credit or for any loss or damage resulting from any censorship, law, control or restriction rightfully or wrongfully exercised by any de facto or de jure domestic or foreign government or agency thereof, declared or undeclared war, or from any other cause, of whatsoever nature, beyond your control or the control of your correspondents, agents or representatives, and the undersigned agrees to indemnify and hold you harmless from any claim, loss, liability or expense arising by reason thereof.

7.  The word "Obligations" as used in this agreement shall mean any and every indebtedness, obligation and liability of the undersigned to you and your claims of every nature and description against the undersigned, whether or not represented by negotiable instruments or other writings, whether arising under this agreement, the Credit or by reason of any other agreement or transaction, whether now existing or hereafter incurred, originally contracted with you and/or with another or others and now or hereafter owing to or acquired in any manner by you, whether contracted by the undersigned alone or jointly or severally with another or others, direct or indirect, absolute or contingent, secured or not secured, matured or not matured.

8.  In order to secure the prompt and unconditional payment of the Obligations, the undersigned hereby grants you a security interest in any and all property of the undersigned in your actual or constructive possession or in transit to you or your correspondents, agents or representatives from or for the undersigned and the proceeds thereof, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into your possession in any other manner for any other reason, and the undersigned agrees to pledge, transfer and deposit with you and grant to you a security interest in such other property as you shall reasonably request to secure payment of the Obligations and to make such payments as you request on account of the Obligations. You are also hereby given a continuing lien and/or right of set-off for the amount of the Obligations, upon or with respect to any and all deposits, general or special, and credits of the undersigned with, and any and all claims of the undersigned against you at any time existing, and you are hereby authorized at any time or times, without prior notice, to apply such deposits or credits, or any part thereof, to payment of the Obligations in such amounts as you may select, although contingent or unmatured, and whether the Collateral is deemed adequate or not. All of the foregoing, together with any property in which you may now or hereafter be granted a security interest, or which may be deposited with you or your agents by the undersigned to secure the Obligations, is herein collectively called "Collateral", and you are hereby authorized to deal therewith in the same manner as if you had sole title thereto. If the undersigned, as registered holder of Collateral, shall become entitled to receive or does receive any stock certificate, option or right, whether as an addition to, in substitution of, or in exchange for, such Collateral, or otherwise, the undersigned agrees to accept same as your agent and to hold same in trust for you, to forthwith deliver the same to you in the exact form received, with the undersigned's endorsement when necessary, to be held by you as Collateral

3

App. 1162

9.  You may, but shall not be obligated to, insure all or any part of the Collateral held by you hereunder against all risks of any kind and the premium thereon shall be paid to you by the undersigned within five days after the demand for the same and you shall have the right to debit the amount of such premium to any balances of the undersigned without notice. If the undersigned fails to pay the premium upon any policy of insurance pledged hereunder or upon any policy of insurance covering any property or Collateral within five days of the due date (without benefit of the grace period), you may, but shall not be obligated to, pay the same without notice to the undersigned and said premium shall be repaid to, or may be debited by you, as above provided. The undersigned agrees to reimburse you upon demand in the event you or any of your correspondents, agents or representatives pay for or incur any expense or liability in connection with the Credit or any draft accepted by you pursuant to this agreement or in relation to any of the matters set forth or referred to herein, including, but not limited to all correspondents' charges and expenses and charges for or incidental to the care, the safekeeping or otherwise of any of the Collateral pursuant to, or in connection with the Credit.

10. The undersigned will at any and all times at your request, sign financing statements, security agreements or other documents with respect to the Collateral as you may reasonably request. The right is expressly granted to you, at your discretion, to file one or more financing statements without the signature of the undersigned under the Uniform Commercial Code naming the undersigned as debtor and you as secured party and indicating therein the types or describing the items of Collateral herein referred to. The undersigned hereby agrees to pay on demand, and authorizes you to charge its account with the cost of any and all filing fees and costs which you deem necessary to incur to protect your interest in the Collateral.

11. The undersigned consents that, without the necessity for any reservation of rights against the undersigned and without notice to or further assent by the undersigned, the liability of any party for or upon Obligations or Collateral may from time to time, in whole or in part, be renewed, extended, modified, prematured, compromised, settled for cash, credit or otherwise and upon any terms or conditions you may deem advisable and that you may discharge or release any party from all such liabilities and that any collateral security for any of the Obligations may from time to time, in whole or in part, be exchanged, sold or surrendered by you all without in any way affecting or releasing the liability of the undersigned upon the Obligations. You shall not be liable for any failure to collect or demand payment of or protest or give any notice of non-payment of any of the Collateral or for any delay in so doing, nor shall you be under any obligation to take any action whatsoever with respect to the Collateral or any part thereof. You shall use reasonable care in the custody and preservation of Collateral in your possession but need not take any steps to preserve rights against prior parties or keep the Collateral identifiable. You shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in your possession if you take such action as the undersigned shall reasonably request in writing but in no event shall an omission to do any act which the undersigned fails to request in writing be deemed a failure to exercise such reasonable care and no omission to comply with any request of the undersigned shall be deemed a failure to exercise such reasonable care. Any right of set-off exercised by you shall be deemed to have been exercised immediately upon the occurrence of any event referred to in Paragraph 12 hereof, even though such set-off is made or entered on your books subsequent thereto. You shall have no obligation to comply with any recording re-recording, filing, re-filing or other legal requirement necessary to establish or maintain the validity, priority or enforceability of, or your rights in and to, Collateral, or any part thereof. You may exercise any right of the undersigned with respect to any Collateral. In any statutory or non-statutory proceeding, affecting the undersigned or Collateral, you or your nominee may, whether or not a default exists and regardless of the amount of Obligations, file a proof of claim for the full amount of any Collateral and vote such claim for the full amount thereof: (a) for or against any proposal or resolution; (b) for a Trustee or Trustees or for a Committee of Creditors; (c) for the acceptance or rejection of any proposed agreement, plan of reorganization, wage earners' plan, composition or extension, and you or your nominee may receive any payment or distribution and give acquittance therefor and may exchange or release Collateral. Any Collateral held by you hereunder, may without notice and whether or not a default exists, be registered and held in your or your nominee's name. You are hereby granted a power of attorney to endorse the undersigned's name on any and all notes, checks, drafts, bills of exchange, money orders or commercial paper included in the Collateral or representing the proceeds thereof.

12. All monies due or owing to you from the undersigned under this agreement or any other Obligations shall, at your option, become immediately due and payable, without notice or demand and notwithstanding any time or credit otherwise allowed or given to you under this or any other agreement or instrument and the undersigned and all guarantors shall be deemed in default hereunder upon the occurrence of any one of the following events with respect to any one of the undersigned or any guarantor or endorser of any Obligations of any of the undersigned to you: (a) failure to pay any sum upon the due date thereof; (b) if any statement, representation or warranty made in any application, financial statement or other agreement made with, or document delivered to you, shall be false or untrue in any material respect; (c) default in the performance of any condition or provision of this agreement or any other agreement with, or any Obligations to you; (d) death, and if a partnership, death of a partner, (e) insolvency, howsoever evidenced; (f) the making of a general assignment for the benefit of creditors; (g) the filing of any petition or the commencement of any proceedings by or against any of the undersigned or any guarantor of any Obligations, for any relief under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, compositions or extensions; (h) the appointment of a temporary or permanent receiver or trustee or similar legal representative of, or the issuance or making of a writ or order of attachment, against any property or assets; (i) entry of a judgment; (j) the commencement of any proceeding for enforcement of a judgment under Article 52 of the New York Civil Practice Law and Rules or under provisions of any other law; (k) the adoption of any resolution for dissolution or liquidation or the taking of any action for the purpose of such dissolution or liquidation; (l) the suspension of usual business; (m) the failure to deposit any additional collateral security with you upon demand; (n) the failure to pay any premium on any insurance policy pledged, or any insurance policy covering any property pledged with you, or in which you are granted a security interest, within five days after such premium becomes due without benefit of any period of grace; (o) failure forthwith upon demand to furnish any financial information or to permit inspection of books, documents or records of account; (p) failure to pay any tax when due; (q) if at any time in your sole judgment the financial responsibility

4

of any of the undersigned, or of any guarantor of any Obligations of the undersigned shall become impaired or unsatisfactory to you.

13. Upon the happening of any of the events set forth in Paragraph 12, and at any time thereafter, you shall have, in addition to all other rights and remedies, the remedies of a secured party under the New York Uniform Commercial Code. The undersigned shall, upon your request, assemble the Collateral and make it available to you at a place to be designated by you which is reasonably convenient to you and the undersigned. You will give the undersigned notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is to be made by sending notice, as provided below, at least five days before the time of the sale or disposition, which provisions for notice you and the undersigned agree are reasonable. No such notice need be given by you with respect to Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market. You may apply the net proceeds of any sale, lease or other disposition of Collateral after deducting all costs and expenses of every kind incurred therein or incidental to the retaking, holding, preparing for sale, selling, leasing or the like of said Collateral, or in any way relating to the rights of the undersigned thereunder, including attorney's fees hereinafter provided for and legal expenses, to the payment, in whole or in part, in such order as you may elect, of one or more of said Obligations, whether due or not due, absolute or contingent, and if contingent you may retain sufficient of such proceeds to cover the largest aggregate sum which may become due or owing thereunder to you with prospective interest, costs, expenses and counsel fees and you shall not be charged with any interest with respect thereto, and only after so applying such net proceeds and after the payment by you of any other amounts required by law need you account for the surplus, if any. The undersigned shall remain liable to you for the payment of any deficiency, with legal interest, and does hereby waive any and all rights of redemption with relation to the Collateral, to the extent permitted by law.

14. Any notice to you shall be deemed effective only if sent to and received at your office, division or department conducting the transaction or transactions hereunder. Any notice to or demand on and of the undersigned shall be binding on the undersigned and shall be deemed effective if not first otherwise made or given when forwarded by mail, telegraph, cable, radio, telephone or otherwise to the last address or telephone number of any of the undersigned appearing on your books with the same effect as if the same were actually delivered to and received by the undersigned in person. You shall not by any act, delay, omission or otherwise be deemed to have waived any of your rights or remedies hereunder and no waiver whatsoever shall be valid unless in writing, signed by one of your duly authorized officers, and then only to the extent therein set forth. A waiver by you of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which you would otherwise have on any future occasion. No term or provision of this agreement can be changed orally and no executory agreement shall be effective to change or modify or to discharge in whole or in part this agreement unless such executory agreement is in writing and signed by one of your duly authorized officers. All your rights and remedies hereunder shall be cumulative and may be exercised singly or concurrently, and your rights specified herein are in addition to those otherwise created. No delay on you part in exercising any power or right hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right, nor shall you be liable for exercising or failing to exercise any such power or right. The undersigned hereby waives demand, presentment, protest, notice of protest and notice of dishonor of any and all drafts, notes, bills of exchange, checks and other instruments deposited or pledged as Collateral hereunder whether upon inception, maturity, acceleration of maturity or due date, or at any other time, and any and all other notices and demands whatsoever, whether or not relating to such instruments.

15. In the event that you or any of your correspondents, at the request of the undersigned, extend, renew or refinance any of the obligations of the undersigned to you, arising by means of (a) bankers' acceptances created by the acceptance of drafts drawn by the undersigned on you, arising under Paragraphs 1 and 2 hereof; (b) drafts drawn by the beneficiary of the Credit, accepted by you or any of your correspondents; (c) notes made by the undersigned; or (d) otherwise, or in the event that you further extend, renew or refinance, from time to time, any such bankers' acceptances, draft or note, then, and in consideration thereof, the undersigned agrees to pay to you the amount of each bankers acceptance or draft in the manner provided in Paragraphs 1 and 2 hereof for the payment of time drafts drawn under the Credit, or, if a note is involved, then in the manner provided in the note. The undersigned further agrees that with respect to any such extension, renewal or refinancing, all of the terms, conditions, agreements and obligations contained in this agreement shall apply thereto and that you shall have all the rights and remedies set forth in this agreement as well as those set forth in any other document signed by or on behalf of the undersigned. Should the beneficiary under the Credit, upon receipt of advice by cable or otherwise of the issuance of the Credit, but prior to its actual receipt, negotiate drafts by virtue of such advice, such negotiation shall be considered a proper one and shall be included under the terms and subject to all conditions hereof and in addition thereto the undersigned assumes all the risk of the misuse of the Credit

16. You may, but shall not be obligated to, contest, pay and/or discharge all liens, encumbrances, taxes or assessments on, or claims, actions or demands against, any of the Collateral deposited hereunder without notice to, or the consent of, the undersigned and you may, but shall not be obligated to, take all actions and proceedings in your own name or in the name of the undersigned or of any other appropriate person to remove or contest such liens, encumbrances, claims, actions, demands, taxes or assessments and all sums advanced or paid by you and all costs, attorneys' fees and expenses relating thereto shall be paid by, and chargeable to, the undersigned.

17. The word "property" as used in this agreement, includes goods, merchandise, instruments, documents, securities, funds, choses in action and any and all other forms of property, whether real, personal or mixed, and any right or interest therein and the proceeds thereof. Property in your possession shall include property in possession of any person holding same for you in any manner whatsoever.

18. If any of the undersigned is a partnership, the members thereof shall be individually bound and liable hereunder. If this agreement is signed by two or more parties, it shall be the joint and several agreement of such parties.

19. If the Credit issued by you will provide that it will be available by presentation, to you or to any of your correspondents, of the documents described in the application, unaccompanied by drafts, the undersigned agrees

5

App. 1164

that all reference herein to drafts, documents relative to drafts, and the presentation, acceptance for payment or payment of drafts shall refer to documents presented for payment without drafts, the presentation and acceptance thereof, and payment upon such presentation, and that the undersigned's obligation and your rights, privileges and remedies hereunder shall be the same as though payments had been made upon presentation of drafts drawn under the Credit accompanied by the said documents.

20. The undersigned will bear and pay all expenses of every kind for the enforcement of any of your rights herein mentioned or of any claim or demand by you against the undersigned and/or guarantors and/or any other person, firm or corporation and of any Collateral held by you, and the undersigned will pay to you upon demand any such expenses incurred by you. If an attorney is used to collect or enforce the Obligations or to enforce, declare or adjudicate any rights or obligations under this agreement, or with respect to the Obligations or Collateral, whether by suit, or any other means whatsoever, attorneys' fees incurred by you shall be payable by the undersigned. The undersigned in any litigation (whether or not arising out of or relating to this agreement or to any Obligations) in which you and any of the undersigned shall be adverse parties, waives trial by jury and the right to interpose any defense based on any statute of limitations or any claim of laches, set-off, or counterclaim of any nature or description. Notwithstanding anything to the contrary contained herein, the undersigned hereby indemnifies and holds you harmless from and against any and all claims, actions (including, without limitation, legal proceedings relating to any court order, injunction or other process or decree restraining or seeking to restrain you from paying any amount under the Credit or relating to any attachment or execution in connection with the Credit, any Obligations or Collateral), losses, judgments, amounts and expenses including, without limitation, attorneys' fees, and court costs, ( such claims, actions, losses, etc., hereinafter called collectively "Liabilities") suffered or incurred by you in connection with or arising out of this agreement, any Obligations or the Collateral and regardless of whether such Liabilities relate to claims or actions brought by the undersigned or any third party, including without limitation liabilities suffered or incurred by you in connection with (a) your exercise of any right or remedy granted to you hereunder, by law or otherwise, (b) any claim and the prosecution or defense thereof arising out of or in any way connected to this agreement, and any Obligations or the Collateral, (c) the collection or enforcement of the Obligations, and (d) any of the events or circumstances referred to in Paragraph 5 hereof. In the event of the undersigned or any guarantor of any of the Obligations acts in any way (including but not limited to seeking an injunction or temporary restraining order) to prevent or delay payment by you of a draft or claim, the undersigned: (i) agrees to provide to you on demand such additional collateral in such amount as you, in your sole discretion, shall deem necessary to secure the payment to you of the Obligations; (ii) agrees to bear and pay all expenses of every kind incurred by you, including attorneys' fees, in connection with such action to prevent or delay payment by you of a draft or claim; (iii) consents to your exclusive determination to pay or compromise any claim or obligation of any nature or description relating to the Credit, including without limitation all costs, attorneys' fees, fines, interest, damages or any other charge, expense or liability; and (iv) agrees to indemnify you and to reimburse you on demand for the amount of such payments or compromises together with interest thereon at the rate and on the terms set forth in Paragraph 1 hereof.

21. The term "you" as used throughout this agreement shall be deemed to include the Bank Leumi USA and all its branches or departments wherever located, and any individuals, partnerships or corporations acting as nominee, for, or in behalf of, the Bank Leumi USA and any subsidiary or entity controlled by the Bank Leumi USA and any other subsidiary or entity which is controlled directly or indirectly by any such subsidiary or entity. The term "undersigned", as used throughout this agreement shall include the individual or individuals, association, partnership, corporation, or other entity named herein as "undersigned", and (a) any successor individual or individuals, associations or partnership, corporation, or other entity to which all or substantially all of the business or assets of said undersigned shall have been transferred, (b) in case of a partnership, any new partnership which shall have been created by reason of the admission of any new partner or partners therein or the dissolution of the existing partnership by death, resignation or other withdrawal of any partner, and (c) in the case of a corporation, any other corporation into or with which said undersigned shall have been merged, consolidated, reorganized or absorbed.

22. This agreement is made in the City of New York and shall be construed in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof. In the event that you bring any action or suit in any court of record of New York State or the Federal Government to enforce any or all of the Liabilities of the undersigned or any of your rights hereunder, service of process may be made upon the undersigned by mailing a copy of the summons to the undersigned at the address set forth below, and the undersigned hereby irrevocably submits to the jurisdiction and venue of any New York State or Federal court located in New York City over any action, suit or proceeding arising out of any dispute between the undersigned and you.

23. If any term, condition or provisions of this agreement or of any other agreement or document executed and/or delivered to you is determined to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any other term, condition or provisions of this agreement and all other agreements executed and/or delivered to you and they shall be carried out as if any such invalid or unenforceable term, condition or provision were not embodied herein or therein.

24. You may assign or transfer this agreement and all Collateral and in such event the assignee or transferee thereof shall have the same rights and remedies hereunder as if originally named herein in your place. Upon any such assignment or transfer, you may deliver the Collateral and property held as security or any part thereof to the assignee or transferee, who shall thereupon become vested with all your powers and rights in respect thereof and you shall thereafter be forever relieved and fully discharged from any liability or responsibility with respect to the property transferred, but you shall retain all powers and rights with respect to the property not so transferred. You shall, at all reasonable times and from time to time, be allowed, by or through any of your officers, agents, attorneys or accountants, to examine, inspect and make abstracts from the undersigned's books.

25. Except as otherwise provided herein, the Credit shall be subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication as amended from time to time.

6

26. The undersigned agrees that: (a) any assistance provided by you in the preparation of the terms of the credit was requested by the undersigned and was based solely upon information provided to you by the undersigned, (b) except for information furnished by the undersigned, you have no knowledge of the transaction for which the credit has been obtained, (c) the undersigned has read and understands all of the terms and provisions of the credit and this Letter of Credit Application, and (d) the terms of the credit are in accord with the undersigned's instructions and represent all the conditions that the undersigned has requested as a prerequisite for you to pay under the credit.

*Erik Johnson*

By Erik Johnson - CFO

Address 1603 LBJ Frwy

Suite 800

Dallas, TX  75234

On behalf of:
TRANSCONTINENTAL REALTY INVESTORS, INC.

On behalf of:
PARC AT OPELIKA, ON BEHALF OF D4OP LLC

On behalf of:
MID SOUTHERN, LLC

FORM 1221 (R6/11)

7

App. 1166

citrix | RightSignature

**REFERENCE NUMBER**
4769C362 15AA 4EE  B783 C6D3866A96CA

# SIGNATURE CERTIFICATE

| TRANSACTION DETAILS | DOCUMENT DETAILS |
|---|---|
| **Reference Number**<br>4769C362-15AA-4EEF-B783-C6D3866A96CA | **Document Name**<br>rrevocab e Standby Letter Of Cred t App cat on (WC) |
| **Transaction Type**<br>S gnature Request | **Filename**<br>rrevocab e_standby_ etter_of_cred t_app cat on_wc_ pdf |
| **Sent At**<br>01/21/2021 13 45 EST | **Pages**<br>7 pages |
| **Executed At**<br>01/21/2021 14 23 EST | **Content Type**<br>app cat on/pdf |
| **Identity Method**<br>ema | **File Size**<br>265 KB |
| **Distribution Method**<br>ema | **Original Checksum**<br>b c8 e0e  0 5  e5    a8 b  8 cd 858   05d |
| **Signed Checksum**<br>8 cb 8a 5  0 b88 c  50 8 5  cc 5e  c  e 55a8   0dd | |
| **Signer Sequencing**<br>D sab ed | |
| **Document Passcode**<br>D sab ed | |

# SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Er k Johnson<br>**Email**<br>er k ohnson@p ar ncome com<br>**Components**<br>1 | **Status**<br>s gned<br>**Multi-factor Digital Fingerprint Checksum**<br>d 5 c 58  8c  de8 e    ccae a  c  d 5   5 ba 0c 8<br>**IP Address**<br>67 200 141 109<br>**Device**<br>Chrome v a W ndows<br>**Typed Signature**<br><br>*Erik Johnson*<br><br>**Signature Reference ID**<br>FDE0F90B | **Viewed At**<br>01/21/2021 14 22 EST<br>**Identity Authenticated At**<br>01/21/2021 14 23 EST<br>**Signed At**<br>01/21/2021 14 23 EST |

# AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 01/21/2021 13 45 EST | Judson Stagner ( udson stagner@p ar ncome com) created document<br>rrevocab e_standby_ etter_of_cred t_app cat on_wc_ pdf  on Chrome v a W ndows from 67 200 141 109 |
| 01/21/2021 13 45 EST | Er k Johnson (er k ohnson@p ar ncome com) was ema ed a  nk to s gn |
| 01/21/2021 14 22 EST | Er k Johnson (er k ohnson@p ar ncome com) v ewed the document on Chrome v a W ndows from 67 200 141 109 |
| 01/21/2021 14 23 EST | Er k Johnson (er k ohnson@p ar ncome com) authent cated v a sess on on Chrome v a W ndows from 67 200 141 109 |
| 01/21/2021 14 23 EST | Er k Johnson (er k ohnson@p ar ncome com) s gned the document on Chrome v a W ndows from 67 200 141 109 |

App. 1167

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | CASE NO. 3:22-cv-2118-X |
| TIMOTHY BARTON ET AL., | § § § | |
| Defendants, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| Relief Defendants. | § § | |

**DECLARATION OF BRADLEY MUTH
IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S MOTION
FOR INTERVENTION, OPPOSITION TO RECEIVER'S VERIFIED
MOTIONS FOR APPOINTMENT OF APPRAISER, APPROVAL OF
APPRAISERS, APPROVAL OF HEARINGS AND APPROVAL OF SALES
AND BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY
RELIEF WITH RESPECT TO PARC AT WINDMILL FARMS AND
BELLWETHER RIDGE**

"My name is Bradley Muth, I am over the age of twenty-one (21), have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein.

1. I am a real estate executive with over 30 years of experience in development, acquisitions, finance, asset management, and portfolio management. I am the President and Chief Executive Officer of Pillar Income Asset Management ("Pillar"), Transcontinental Realty Investors, Inc. ("TCI"), and American Realty Investors, Inc. ("ARI"). Pillar, TCI, and ARI are national real estate companies publicly traded on the New York Stock Exchange that specialize in the acquisition, development, and management of multifamily and commercial real estate. The

companies also develop raw land for single family home communities. The companies operate a portfolio of hundreds of properties, tens of thousands of multifamily units, and thousands of raw land holdings. I oversee all aspects of investment and operations for the above companies, including Southern Properties Capital, Ltd. ("SPC"). TCI is the 100% passive owner of SPC. When TCI and SPC are stated to perform functions, in certain situations its affiliate Pillar is the effective manager carrying out the functions.

2.      Prior to joining Pillar, TCI, and ARI, I served as Senior Managing Director at ValueRock Realty Partners in California, where I was a member of the firm's Executive and Investment Committees with execution oversight of all development, including ground up and redevelopment activities. Prior to ValueRock, I spent the majority of my career with ING Realty Partners as partner and Managing Principal. In my career, I have overseen the acquisition, development, and portfolio management of over $8 billion in real estate investments, including over 20,000 apartment units across the United States.

**Summary of Business Model**

3.      To provide context, TCI and its affiliates, such as SPC, are in the business of building and managing properties, including multifamily residential projects. One of the business models TCI uses when building properties is to outsource the developer role. There are many business advantages to outsourcing the developer role. For example, by outsourcing the developer role, TCI can operate a leaner corporate structure by reducing personnel and associated expenses, such as payroll and benefits. Another advantage is that TCI can delegate to the outside developer certain responsibilities rather than performing them internally. Responsibilities that TCI can delegate to the developer include negotiating the acquisition of the real property, pursuing zoning, obtaining mortgage financing, and setting up processes. Under TCI's business model, TCI pays

the developer a developer's fee for these services. The developer does not invest or contribute its own money in the project. Once the project is complete and ready for use, the developer transfers the project to TCI or an affiliate. Under this business model, TCI and the developer intend that TCI or an affiliate will subsequently own and manage the project.

4.      TCI has used this business model of outsourcing the developer on a number of projects. TCI has outsourced the developer role to a number of developers, including Timothy Barton ("Barton"). SPC outsourced the developer role to Barton on projects known as Parc at Windmill Farms (Forney) ("Parc at Windmill Farms" or "Parc at Windmill Project") and Bellwether Ridge (DeSoto) ("Bellwether" or "Bellwether Project") (collectively, the "SPC Projects").

5.      As discussed in more detail below, the SPC Projects followed the similar business model, which was that SPC was effectively the primary responsible party and simply outsourced the developer role to Barton, SPC paid Barton a developer fee, Barton obtained HUD mortgage financing, pursued zoning, and provided other developer services. SPC provided the land, funded all of the equity, and managed the construction and operations of the projects. At all times, it was contemplated that after the development stage, Barton would transfer ownership to SPC, who would continue with ownership and management of the properties.

6.      It is important that for the SPC Projects SPC was not merely a passive lender. Rather, SPC identified land sites; oversaw and managed entitlement efforts; controlled and funded planning and design efforts; assembled and maintained required documents for the land development projects; managed and approved the construction process; provided certificates of deposit and cash collateral to obtain Letters of Credit; Funded change orders and costs overruns; and managed the operations and leasing of properties.

7.    As I describe below, TCI's and SPC's financial statements issued during development of the projects evidence the indicia of future ownership from an accounting perspective. The equity financing mechanism that SPC used on the projects was a mezzanine loan in the form of a convertible loan, pursuant to which SPC could, and expected to exercise the option of converting the loan to 100% equity in the project. The low interest rate, 5%, evidences that the conversion feature was part of the consideration SPC bargained for, especially since this capital was contributed to the highest risk tranche of the project's capitalization. This rate is below typical construction loans with a 60% to 70% loan-to-value (LTV) and far below the market required return-on-investment (ROI) on equity funding. Importantly, the mezzanine loans are secured by a pledge of stock, as described below, and perfected by the filing of UCC financing statements.

8.    On October 3, 2022, SPC sent letters exercising its option to convert its loan to equity with respect to Parc at Windmill Farms and Bellwether. Although SPC's exercise remains subject to certain, what I believe to be ministerial, conditions, SPC exercised its option for its ownership right in the SPC Projects.

**Parc at Windmill Farms**

9.    SPC exercised its option to own the apartment complex property known as Parc at Windmill Farms. Parc at Windmill Farms is located in Forney, Texas. It consists of 17 residential buildings and two clubhouses. The residential buildings total 272 units and have total rentable area of approximately 280,000 square feet.

### A. HUD holds the Mortgage Loan on Parc at Windmill Farms

10.    As mentioned, on Parc at Windmill Farms, SPC outsourced the developer role to Barton. Barton used as developer one of his companies, JMJ Development, LLC ("JMJ"). To

Declaration of Bradley Muth

obtain a mortgage loan for Parc at Windmill Farms, Barton used as borrower his company D4FR, LLC, a Texas limited liability company ("D4FR"). D4FR obtained the mortgage loan from the United States Department of Housing and Urban Development ("HUD"). On or about August 25, 2017, D4FR applied for the HUD loan. HUD approved D4FR's application. HUD agreed to provide for Greystone Servicing Corporation, Inc. ("Greystone"), to make the loan and administer to D4FR. The loan was for the principal amount of $36,540,600.00.

11.     Following the commitment from HUD, D4FR executed additional HUD loan documents on or about December 1, 2017, including a Borrower's Oath, Promissory Note, and Deed of Trust. True and correct copies of the Promissory Note and Deed of Trust are attached as **Exhibit 1** and **Exhibit 2.**

### B. SPC's Mezzanine Loan on Parc at Windmill Farms

12.     SPC provided the equity capital to fund the remaining amount necessary for the construction of Parc at Windmill Farms. SPC made a convertible loan to JMJ. SPC and JMJ entered into a Letter Loan Agreement dated December 14, 2017 (the "Windmill Letter Loan Agreement"). A copy of the Windmill Letter Loan Agreement is attached as **Exhibit 3.** It provided that JMJ shall execute and deliver a Promissory Note. JMJ, as borrower, executed a promissory note in favor of SPC, as lender, in the principal amount of $7,300,000.00 (the "Windmill Note"). A copy of the Windmill Note is attached as **Exhibit 4.**

13.     JMJ provided to SPC security for the Windmill Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4FR's parent company, JMJD4, LLC ("JMJD4"). Specifically: TWRF, LLC ("TWRF") holds a 100% membership interest in JMJAV, LLC ("JMJAV"). In turn, JMJAV holds a 1% membership interest in JMJD4, and Enoch Investments, LLC ("Enoch") holds the remaining 99% membership interest in JMJD4. TWRF,

JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4 (collectively, "Windmill Amended and Restated Pledge and Security Agreements"). Copies of the Windmill Amended and Restated Pledge and Security Agreements are attached as **Exhibit 5, Exhibit 6** and **Exhibit 7**. As a result, TRWF, JMJAV and Enoch pledged to JMJ 100% of the member interests in JMJAV and JMJD4, which JMJ assigned to SPC.

14. JMJ signed the Assignment of Pledge and Security Agreement ("Windmill Assignment"). A copy of the Windmill Assignment is attached as **Exhibit 8.** As a result, all of the equity interest in D4FR's parent company, JMJD4, was pledged to SPC (the "Windmill Collateral" or "Windmill Pledged Equity"). Importantly, the Windmill Assignment granted SPC the right to convert the loan to equity, discussed immediately below.

15. Each of the Windmill Amended and Restated Pledge and Security Agreements includes Section 7.15, titled "Conversion Option." Section 7.15 provides a mechanism for SPC to exercise an option to acquire the Windmill Pledged Equity. Section 7.15 states in relevant part:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

16. The Windmill Letter Loan Agreement and Windmill Promissory Note were amended several times as follows:

a. On October 1, 2019, JMJ and SPC signed the First Amendment to Promissory Note adding new requirements for asset management and fees. However, on the same day, JMJ and SPC rescinded this amendment in its entirety. Copies of the Amendment and Rescission are attached as **Exhibit 9** and **Exhibit 10.**

b.    On October 25, 2019, JMJ and SPC signed a First Amendment to the Letter Loan Agreement increasing the prior loan of $7,300,000.00 to $8,300,000.00. A copy of the First Amendment is attached as **Exhibit 11.** They executed a Second Amendment to Promissory Note, to update the loan amount. A copy of the Second Amendment is attached as **Exhibit 12.** They executed a First Amendment to each Pledge and Security Agreement to amend the term "Loan" to refer to increased amount. Copies of the First Amendments are attached as **Exhibit 13.**

c.    On May 1, 2020, JMJ and SPC executed the Third Amendment to Promissory Note to extend the maturity date of the loan to November 1, 2020. A copy of the Third Amendment is attached as **Exhibit 14.**

d.    On November 1, 2020, JMJ and SPC executed the Fourth Amendment to Promissory Note to extend the maturity date to November 1, 2022. A copy of the Fourth Amendment is attached as **Exhibit 15.**

e.    On May 31, 2021, JMJ and SPC signed the Second Amendment to Letter Loan Agreement changing the default provision to provide that an "Event of Default" includes any default under the development agreement. A copy of the Second Amendment is attached as **Exhibit 16.**

17.    On May 13 and 14, 2020, multiple UCC financing statements were filed securing SPC's interest in the membership interests. They were as follows:

- Texas UCC Financing Statement, Filing # 20-0017679567 (Enoch)

- Delaware UCC Financing Statement, Filing # 20203378223 (TRWF)

- Texas UCC Financing Statement, Filing # 20-0017975172 (JMJAV)

- Texas UCC Financing Statement, Filing # 20-0017974808 (JMJAV)

- Delaware UCC Financing Statement, Filing # 20203407113 (JMJD4)

Copies of the Financing Statements are attached as **Exhibit 17**, **Exhibit 18**, **Exhibit 19**, **Exhibit 20** and **Exhibit 21**.

### C. SPC Exercises its Option to Convert its Loan to Equity

18.     SPC exercised its option set forth in the Windmill Amended Pledge and Security Agreements. The option allowed SPC to acquire the equity from D4FR for the consideration of $100.00. SPC exercised its option, thereby converting the loan to an ownership interest to acquire the equity.

19.     On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TRWF, JMJAV, D4FR, and JMJ ("Windmill Exercise Letter"). A copy of the Exercise Letter is attached as **Exhibit 22.** The Windmill Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Windmill Farms, Forney, Texas." SPC attached to the Windmill Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Parc at Windmill Project from D4FR to SPC, once HUD consented to the transfer. A copy of the form of Agreement is attached to **Exhibit 22.** SPC also attached a check for $100.00 as required consideration. A copy of the check is attached to **Exhibit 22.** The letter was delivered on October 4, 2022 at 8:16 am. A copy of the confirmation of receipt is attached as **Exhibit 23.**

20.     After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Parc at Windmill Farms. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (i) the Windmill Exercise

Letter; (ii) the Windmill Amended and Restated Pledge and Security Agreements; (iii) the Windmill Assignment; (iv) the Windmill Note; and (v) the Windmill Letter Loan Agreement and amendments. SPC also provided the Receiver with a description of the HUD loan documents. A copy of the November 3, 2022 letter is attached as **Exhibit 24.**

21.     Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so. SPC wrote:

> The terms of the [HUD] Mortgage Documents allow for an assumption of the loan, subject to the approval of Greystone and HUD. Section 7.15 of the [Windmill Amended and Restatement Pledge Agreements] provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the Parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such a purchase must be submitted with the signed TPA application.

**Bellwether Ridge Project**

22.     SPC exercised its option to own the apartment complex property known as the Bellwether Ridge Apartments ("Bellwether" or "Bellwether Project"). Bellwether is located in Desoto, Texas. It consists of nine residential buildings and one clubhouse. The residential buildings total 150 units with a total rentable area of 140,511 square feet.

### A.  HUD holds the Mortgage Loan on Bellwether

23.     Similar to Parc at Windmill Farms, SPC outsourced the developer role to Barton for the Bellwether Project. Barton used JMJ as developer. To obtain a mortgage loan for Bellwether, Barton used as the borrower his company, D4DS, LLC, a Texas limited liability company ("D4DS"). D4DS obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4DS. The loan was for the principal amount of $19,021,200.00.

24.     To finalize the loan, D4DS executed HUD loan documents on or about October 1, 2017, including a Promissory Note and Deed of Trust. Copies of the Promissory Note and Deed of Trust are attached as **Exhibit 25** and **Exhibit 26.** The Loan was modified to reduce the principal amount to $18,608,100.00.

### B.  SPC's Mezzanine Loan on Bellwether

25.     SPC provided the Bellwether Project with equity financing to fund the construction of the Bellwether Project in the form of a convertible loan. JMJ, as borrower, executed a note in favor of SPC, as lender, in the principal amount of $3,800,000.00 (the "Bellwether Note"). A copy of the Bellwether Note is attached as **Exhibit 27.**

26.     Similar to Parc at Windmill Farms, JMJ provided to SPC security for the Bellwether Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4DS's parent company, JMJD4. Specifically: TWRF holds a 100% membership interest in JMJAV. In turn, JMJAV holds a 1% membership interest in JMJD4, and Enoch holds the remaining 99% membership interest in JMJD4. TWRF, JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4 (collectively, "Bellwether Amended and Restated Pledge and Security Agreements"). Copies of the Bellwether Amended and Restated Pledge and Security Agreements are attached as **Exhibits 28, Exhibit 29** and **Exhibit 30.** As a result, TRWF, JMJAV and Enoch pledged to JMJ 100% of the member interests in JMJAV and JMJD4, which JMJ assigned to SPC.

27.     JMJ signed an Assignment of Pledge and Security Agreement ("Bellwether Assignment"). A copy of the Bellwether Assignment is attached as **Exhibit 31.** As a result, all of the equity interest in D4DS's parent company, JMJD4, was pledged to SPC (the "Bellwether

Collateral" or "Bellwether Pledged Equity"). Importantly, the Bellwether Assignment granted SPC the right to convert the loan to equity, discussed immediately below.

28.    Each of the Bellwether Amended and Restated Pledge and Security Agreements also included Section 7.15's "Conversion Option," granting SPC an option to acquire either the Bellwether Pledged Equity or the Bellwether Project for consideration of $100.00.

29.    On May 13 and 14, 2020, multiple UCC financing statements were filed. They were as follows:

- Texas UCC Financing Statement, Filing # 20-0017679567 (Enoch)

- Delaware UCC Financing Statement, Filing # 20203378223 (TRWF)

- Texas UCC Financing Statement, Filing # 20-0017975172 (JMJAV)

- Texas UCC Financing Statement, Filing # 20-0017192082 (JMJAV)

- Delaware UCC Financing Statement, Filing # 20203275759 (JMJD4)

True and correct copies of the Financing Statements are attached as **Exhibit 32**, **Exhibit 33**, **Exhibit 34**, **Exhibit 35** and **Exhibit 36**.

30.    The following year, on July 6, 2021, pursuant to the Agreement for Purchase and Sale, D4DS agreed to sell Bellwether to SPC affiliate APTS at Bellwether Ridge, LLC ("APTS"). Additionally, the agreement stated that if SPC decided to exercise the Conversion Option, APTS will now be the entity that receives the $100.00 consideration. A copy of the Agreement for Purchase and Sale is attached as **Exhibit 37**.

**C. SPC Exercises its Option to Convert its Loan to Equity.**

31.    SPC exercised its option set forth in the Bellwether Amended Pledge and Security Agreements. The option allowed SPC to acquire the equity for the consideration of $100.00. SPC exercised its option, thereby converting the loan to an ownership interest to acquire the equity.

32.    On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TRWF, JMJAV, JMJD4, D4DS, and JMJ ("Bellwether Exercise Letter"). A copy of the Bellwether Exercise Letter is attached as **Exhibit 38.** The Bellwether Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Bellwether Ridge, DeSoto, Texas." SPC attached to the Bellwether Exercise Letter a "First Amendment to the Purchase and Sale Agreement" to complete the transfer of the Bellwether Project from APTS to SPC, once HUD consented to the transfer. The First Amendment extended the Financing Contingency Period to March 31, 2023, due to HUD taking longer than expected to approve. A copy of the amendment is attached to **Exhibit 38.** SPC also attached a check for $100.00 as required consideration, which is also attached to **Exhibit 38.** The letter was delivered at 8:16 a.m. on October 4, 2022. A copy of the receipt of confirmation is attached as **Exhibit 39.**

33.    After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Bellwether. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (i) the Bellwether Exercise Letter; (ii) the Bellwether Amended and Restated Pledge and Security Agreements; (iii) the Bellwether Assignment; (iv) the Bellwether Note; and (v) the Bellwether Letter Loan Agreement. SPC also provided the Receiver with a description of the HUD loan documents. A copy of the November 3, 2022 Letter is attached as **Exhibit 40.**

34.    Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so. SPC wrote:

> The terms of the [HUD] Mortgage Documents allow for an assumption of the loan, subject to the approval of Greystone and HUD. Section 7.15 of the [Bellwether Amended and Restatement Pledge Agreements] provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the Parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such a purchase must be submitted with the signed TPA application.

**Convertible Debt**

35.    It is helpful to explain convertible debt. With convertible debt, an entity borrows money from a lender, like a typical loan. Unlike a typical loan, however, convertible debt allows the debt to be converted to equity at a later date. This is because the lender will typically offer the loan at a lower rate since the lender can later obtain equity in the company. A debtor sometimes agrees to take on convertible debt if the debtor planned to only temporarily hold the asset, which is what happened here.

36.    For example, Company A borrows money from Bank B. Under the agreement, Bank B obtains the right to convert the debt into 100% company equity. Subsequently, Bank B exercises its right. Because of Bank's B exercise, Bank B now owns 100% of Company A. Company A, conversely, no longer owes money to Bank B.

37.    In this case, SPC extended convertible debt relating to the SPC Projects. This meant that SPC had the right to convert the debt into 100% equity ownership of the SPC Projects. This right was an integral part of the bargain at the time the convertible loans were made (and long before the Receiver was appointed). SPC converted the debt into equity and is now the 100%

equity owner of Bellwether and Parc at Windmill Farms. Functionally, this is different from a traditional loan. The convertible loan carried an interest rate of 5%, which was much lower than the market capped rate of upwards to at least 10% to 15% or more one would expect at the time of the loans, taking into account the nature of the risk of a mezzanine loan of all equity)..

38.     Classifying SPC's interests in the SPC Projects as solely "loans" is inaccurate because it does not provide full context. As shown by the TCI and SPC accounting records, discussed below, SPC effectively treated the properties as investments because it intended on exercising its exclusive right to convert its debt to 100% equity.

**Parc at Windmill Farms and Bellwether were SPC's Investments, not Loans**

39.     Attached to my Declaration as **Exhibit 41** is a copy of SPC's "Audited Consolidated Financial Statements" as of December 31, 2021 ("SPC 2021 Financial Statements"). Attached to my Declaration as **Exhibit 42** is a copy of SPC's "Interim Unaudited Consolidated Financial Statements" as of September 30, 2022 ("SPC Interim 2022 Financial Statements"). These financial statements address Parc at Windmill Farms and Bellwether. The SPC financial statements show that SPC considered Parc at Windmill Farms and Bellwether to effectively be ownership investments, not merely loans.

40.     Before explaining further, some context is crucial. SPC is listed on the Tel Aviv Stock Exchange, not the New York Stock Exchange. Because of this, SPC's financial statements are based on International Financial Reporting Standards ("IFRS"). IFRS uses fair market value instead of historical cost, which is used in the United States. With this in mind, an analysis of SPC's financial statements can be better understood.

41.     To start, Note 10 in the SPC 2021 Financial Statements is titled, "Notes Receivable." Ex. 41 at p. 30. The table, shown below, includes Parc at Windmill Farms and

Bellwether:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $ 10,365 | $ 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $ 79,507 | $ 47,850 | | |

42.    Below the table, the 2021 Financial Statements explain that SPC owns convertible debt in the properties listed in the table, including Parc at Windmill Farms and Bellwether. It states the following:

> "The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property." *Id.*

The 2021 Financial Statements add further explanation, stating:

> "The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued." *Id.*

The 2022 Financial Statements mirror this point, adding:

> "The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals." Ex. 42 at p. 9.

43.    Combining the above statements, and the table, make clear that SPC carried the notes receivable for these convertible loans, not at the loan amounts, but at the value of equity based primarily on the appraised value of the properties, as prescribed by IFRS rules, showing that SPC treated the properties in the way SPC would as owner of the properties.

App. 1183

44. First, SPC owned convertible debt "into a 100% ownership interest" in both properties. Ex. 41 at p. 30. This is different from a typical loan because SPC could, "at its option," obtain 100% ownership interest in both properties. *Id.* SPC did just that on October 3, 2022 when it exercised its option to acquire 100% equity interest in Parc at Windmill Farms and Bellwether.

45. Second, SPC explains that it had the properties valued by "independent external valuation experts" or "third-party appraisals." *Id.;* Ex. 42 at p. 9. If these were simply loans, SPC would not have gone through the process of having the properties appraised for the purpose of determining their carrying values. Such an action is consistent with ownership because SPC was expending resources to ascertain the properties' values, as opposed to simply waiting for a return on its loan.

46. Importantly, SPC expended resources on the properties in many ways other than paying Barton a developer's fee and reimbursing his expenses. SPC utilized in-house staff and resources to participate in the development of both properties. SPC also performed many services for both properties, including, among others, identifying land sites; overseeing and managing entitlement efforts; controlling and funding planning and design efforts; assembling and maintaining required documents for the land development projects; managing and approving the construction process; providing certificates of deposit and cash collateral to obtain Letters of Credit; funding change orders and costs overruns; and managing the operations and leasing of properties.

47. If these were merely loans, then SPC would not have expended extensive resources into completing the above services for both properties. This is shown in SPC's financial statements, which show that SPC carried the notes receivable for the convertible value of the loans, not at the

stated loan amounts, but at the value of equity based on the appraised value of the properties. This demonstrates that SPC treated the properties as it would if it owned the properties.

**Comparing SPC's Financial Statements with TCI 10Ks**

48.     TCI is SPC's parent company. TCI's 10Ks encompass SPC's financial statements. As stated above, TCI is a real estate company that specializes in the acquisition, development, ownership, and management of multifamily and commercial real estate. TCI is a publicly traded company that is listed on the New York Stock Exchange and has public shareholders.

49.     Unlike SPC's financial statements, which are based on international standards, TCI's 10Ks are completed in accordance with Generally Accepted Accounting Principles ("GAAP") and U.S. Securities and Exchange Commission ("SEC") regulations. According to the SEC, per Staff Accounting Bulletin No. 104, revenue can only be recognized when collectability is reasonably assured.

50.     It is important that TCI did not recognize interest income under SPC's mezzanine loans because of the view that TCI, through SPC, would exercise its right of conversion for ownership. TCI would not be expected to recognize the interest income because when it chose to exercise its conversion rights, as it planned, such interest income would have been forgiven, per the mezzanine loans.

51.     This is shown in TCI's 10Ks. In its 10Ks, TCI accrued, but fully reserved, interest income recognition on the convertible loans. Under the SPC mezzanine loans, any uncollected interest income is forgiven in the event of conversion. TCI had the ability and the intent to convert the SPC mezzanine loans into 100% equity interest in Bellwether and Parc at Windmill Farms. TCI, through SPC, exercised its rights. Any interest was forgiven once TCI exercised its

convertible rights. Since TCI planned to exercise its right, it did not recognize interest income on the convertible loans.

52.    As mentioned, TCI 10Ks and SPC's financial statements differ due to TCI being listed on the New York Stock Exchange and SPC being listed on the Tel Aviv Stock Exchange. SPC's financial statements are based on fair market value, whereas TCI's are based on historical cost. The difference between these values is shown in the tables below. Compare the difference in value for the properties between SPC's 2021 financial statements (the first table) and TCI's 2021 10Ks (the second table) for each document's "Notes Receivable" section:

| Borrower / Project | Carrying Value 2021 | 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $ 10,365 | $ 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $ 79,507 | $ 47,850 | | |

| Borrower / Project | Carrying Value 2021 | 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| ABC Land and Development, Inc. | $ 4,408 | $ 4,408 | 9.50 % | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50 % | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00 % | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00 % | 11/1/2026 |
| Forest Pines(1) | 6,472 | 2,869 | 5.00 % | 11/1/2022 |
| Lake Wales | 3,000 | 3,000 | 9.50 % | 6/30/2026 |
| Legacy Pleasant Grove | 496 | 496 | 12.00 % | 10/23/2022 |
| McKinney Ranch | 4,554 | 4,554 | 6.00 % | 9/15/2022 |
| One Realco Land Holding, Inc. | 1,728 | 1,728 | 9.50 % | 6/30/2026 |
| Parc at Ingleside(1) | 3,700 | 2,523 | 5.00 % | 11/1/2026 |
| Parc at Opelika(1) | 2,305 | — | 10.00 % | 1/13/2023 |
| Parc at Windmill Farms(1) | 7,830 | 7,803 | 5.00 % | 11/1/2022 |

53.    If SPC viewed the properties as mere loans, then it would have listed the properties in accordance with the cost of the loan, not the properties' market value. In other words, if SPC viewed the properties as loans, then the carrying value listed in its financial statements would match the carrying value listed in TCI's 10Ks. Instead, SPC had the properties appraised by independent valuators, an act consistent with ownership of the real estate.

Declaration of Bradley Muth

Page 18 of 21

App. 1186

**TCI's 10Ks Also Show that Parc at Windmill Farms is not a Mere Loan**

54.    I am aware that the SEC refers to TCI's 10Ks to assert that SPC's interests in Bellwether and Parc at Windmill Farms amounted to loans. This is not accurate when one considers the comprehensive picture. TCI's 10Ks, as far back as 2018, are attached as exhibits to my Declaration. Attached to my Declaration as **Exhibit 43** is the TCI Form 10-K for fiscal year ended December 31, 2021 ("2021 10K"), as **Exhibit 44** is the TCI Form 10-K for fiscal year ended December 31, 2020 ("2020 10K"), as **Exhibit 45** is the TCI Form 10-K for fiscal year ended December 31, 2019 ("2019 10K"), as **Exhibit 46** is the TCI Form 10-K for fiscal year ended December 31, 2018_ ("2018 10K") and as **Exhibit 47** is the TCI Form 10-K for fiscal year ended December 31, 2017_ ("2017 10K").

55.    In the attached 2020 10K and 2021 10K, TCI describes its interest in Parc at Windmill Farms not as a loan, but as a "note . . . convertible, at our option, into a 100% ownership interest." Ex 43 at p. 42; Ex. 44 at p. 41. The 2018 10K and 2019 10K provide that TCI "intends to service and hold for investment the mortgage notes in [TCI's] portfolio." Ex. 45 at p. 57; Ex. 46 at p. 48. "Servic[ing] and hold[ing] for investment" a convertible loan is not consistent with a mere loan; it is consistent with property ownership.

56.    SPC, which TCI owns, exercised its option on October 3, 2022, when it converted its note for Parc at Windmill Farms into a 100% ownership interest. SPC is now the sole owner of Parc at Windmill Farms.

**TCI's 10Ks also Show that Bellwether is not a Mere Loan**

57.    In its 10Ks, TCI always included Bellwether as a "Notes Receivable" or a "Mortgage Loan." In the 10Ks, there is a table listing all notes receivable TCI owns. TCI had

convertible debt into 100% ownership interest for all entities included in the table. Bellwether was included in each table. An example of such a table is included below. Ex. 43 at p. 42.

**9. Notes Receivable**

The following table summarizes our notes receivables at December 31, 2021 and 2020:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| ABC Land and Development, Inc. | $  4,408 | $  4,408 | 9.50 % | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50 % | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00 % | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00 % | 11/1/2026 |

Under the table, the 2020 10K and the 2021 10K state, "[t]he note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property." Ex. 43 at p. 42; Ex. 44 at p. 41.

58.     SPC had the right to convert its loan regarding Bellwether into 100% equity. TCI withheld recognizing interest income concerning Bellwether because it intended to exercise its right to conversion for Bellwether. SPC did not view Bellwether as a mere loan; it viewed Bellwether as an investment property it intended to, and did, fully acquire.

**VAA Joint Venture.**

59.     SPC commenced development of Parc at Windmill Farms and Bellwether in 2017. Thereafter, more than a year later, in November 2018, TCI formed a joint venture with Macquarie Group, Ltd. The joint venture was Victory Abode Apartments, LLC ("VAA"). VAA held a large portfolio of real estate properties, including properties financed by HUD. The VAA portfolio resulted in TCI reaching its limitation on HUD financing. On or about September 16, 2022, VAA completed the closing on a sale of substantially all of its real estate properties. The VAA sale resulted in bringing TCI back down under HUD limitations and allowed for SPC to proceed to hold additional HUD-financed properties. It is important that until September 16, 2022, SPC was not able to hold additional HUD-financed properties, and that to comply with HUD regulations,

SPC had to wait until after September 16, 2022 to exercise its option to convert Parc at Windmill Farms and Bellwether to equity and keep the existing HUD debt in place.

**Business Records**

60.    I am a custodian of records for SPC, responsible for ensuring that SPC maintains accurate and complete records of its regularly conducted activities. Attached to my Declaration are Exhibits 1 through 47 from SPC. These exhibits were made at or near the time of the events referenced in each exhibit by, or from information transmitted by, someone with knowledge of the facts; were kept by SPC in the course of regularly conducted activity; and were made as part of the regular practice of that activity.

I declare under penalty of perjury that the foregoing is true and correct."

Executed in Dallas County, State of Texas, on the 10th of March 2023.

BRADLEY MUTH

# EXHIBIT J-1

OMB Approval No.2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

# NOTE
# (MULTISTATE)

### HUD Project No. _113-35682_
### HUD Project Name: _Parc at Windmill Farms Apartments_

US $36,240,000.00                     As of December 1, 2017

FOR VALUE RECEIVED, the undersigned, D4FR LLC, a Texas limited liability company ("**Borrower**") jointly and severally (if more than one) promises to pay to the order of Greystone Servicing Corporation, Inc., a Georgia corporation, the principal sum of Thirty Six Million Two Hundred Forty Thousand and 00/100 Dollars (US $36,240,000.00) ("**Loan**"), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, "**Interest Rate**" means the annual rate of Three and 90/100 per centum (3.90%).*

1.      **Defined Terms.** As used in this Note, (a) the term "**Lender**" means the holder of this Note, (b) the term "**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances under Section 13 of the Security Instrument to protect the security of the Security Instrument; (c) the term "**Security Instrument**" has the meaning set forth in Section 4 of this Note; and (d) the term "**Program Obligations**" means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only

App. 1191

to the extent that they interpret, clarify and implement terms in this Note rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site).

The definition of any capitalized term or word used herein can be found in this Note and, if not found in this Note, then found in the Regulatory Agreement between Borrower and HUD and/or the Security Instrument.

2.    **Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at <u>419 Belle Air Lane, Warrenton, VA 20186</u>, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

3.    **Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

(a)  Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on <u>January 1, 2018</u> and on the first day of each month thereafter up to and including <u>February 1, 2020</u> (**"Last Interest Only Payment Date"**). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of <u>One Hundred Forty Nine Thousand Two Hundred Fourteen and 83/100 Dollars (US $149,214.83)</u>, shall be payable on the first day of each month beginning on <u>March 1, 2020</u> (**"Amortization Commencement Date"**), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on February 1, 2060 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (**"Maturity Date"**).

(b)    Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

4.    **Security.**  The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note

("**Security Instrument**"), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

     5.     **Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument. Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

     6.     **Acceleration.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower. If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable. Lender may exercise this option to accelerate regardless of any prior forbearance. Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

     7.     **Late Charge.** If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to <u>two percent</u> of the unpaid principal and interest due in such month. Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

     8.     **Exculpation; Remedies.**

     (a)     Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced

thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)    Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c) Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

9.    **Voluntary and Involuntary Prepayments.**

(a)    This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1.  In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

(b)    Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)    Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, or (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)    Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)    Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)    If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)    All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

10.    **Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

**11.     Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**12.     Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

**13.     Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

**14.     Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

**15.     Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

**16.     Governing Law; Consent to Jurisdiction and Venue.**
(a)     This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

---

App. 1196

(b)    Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**17.    Rules of Construction.**  The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

**18.    Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

**19.    Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. § 3701, *et seq.*, as amended, when HUD is the holder of the Note.

**20.    Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

App. 1197

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

    21.  **WAIVER OF TRIAL BY JURY.  BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**See Rider 1 to Note containing modifications to the Note, attached hereto and incorporated herein by this reference.**

App. 1198

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

App. 1199

NOTE (Multistate)

State of Texas

<u>D4FR LLC</u>

To

<u>Greystone Servicing Corporation, Inc.</u>

Project No.: <u>113-35682</u>

Initially endorsed for insurance under <u>§221(d)(4)</u> of the National Housing Act, as amended, and regulations published thereunder in effect on <u>August 25, 2017</u> to the extent of advances approved by HUD.

By: _____ Date: <u>December 14</u>, 20<u>17</u>

Print Name: Lisa Farmer (Acting)
Title:       <u>Authorized Representative</u>

At final endorsement, a total sum of $_____has been approved for insurance hereunder by HUD.

By: _____ Date: _____ , 20___

Print Name: _____
Title:       <u>Authorized Representative</u>

App. 1200

**RIDER 1 TO NOTE**
**From**
**D4FR LLC**
**TO**
**GREYSTONE SERVICING CORPORATION, INC.**
**In the original principal sum of $36,240,000.00**

1.      This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4FR LLC, a Texas limited liability company (the "Borrower"), to Greystone Servicing Corporation, Inc., a Georgia corporation (the "Lender") dated as of December 1, 2017 (the "Note").

2.      Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to March 1, 2020.  Borrower shall have the right, on or after March 1, 2020, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  In the event of any prepayment of principal at any time on or after March 1, 2020, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from March 1, 2020 through February 28, 2021 | 10% |
| from March 1, 2021 through February 28, 2022 | 10% |
| from March 1, 2022 through February 28, 2023 | 8% |
| from March 1, 2023 through February 29, 2024 | 7% |
| from March 1, 2024 through February 28, 2025 | 6% |
| from March 1, 2025 through February 28, 2026 | 5% |
| from March 1, 2026 through February 28, 2027 | 4% |
| from March 1, 2027 through February 29, 2028 | 3% |
| from March 1, 2028 through February 28, 2029 | 2% |
| from March 1, 2029 through February 28, 2030 | 1% |
| from March 1, 2030 and thereafter | None |

FHA# 113-35682                     Rider 1 to Note                     Parc at Windmill Farms Apartments

App. 1201

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Borrower shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

3.    Notwithstanding the provisions of Paragraph 2 above, the provisions of Paragraph 2 shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms of the Deed of Trust of even date given by Maker to the holder of this Note to secure said indebtedness.  Any prepayment made pursuant to this Paragraph 3 shall be deemed to have been made on the last day of the month in which such payment is received by holder.

[signatures appear on subsequent page]

---

App. 1202

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

By: _____
        Timothy Barton, President

**END OF RIDER 1**

App. 1203

# EXHIBIT J-2

## Kaufman County
### Laura Hughes
### County Clerk

## Instrument Number: 2017-0028852

### DEED OF TRUST

Party: _____ D4FR LLC _____

Billable Pages: 52
Number of Pages: 53

| FILED AND RECORDED – REAL RECORDS | CLERKS COMMENTS |
|---|---|
| **On:** 12/13/2017 at 03:29 PM | E-RECORDING |
| **Document Number:** 2017-0028852 | |
| **Receipt No:** 17-28243 | |
| **Amount:** S 230.00 | |
| **Vol/Pg:** V:5534 P:167 | |



STATE OF TEXAS
COUNTY OF KAUFMAN
I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded in the Official Public Records of Kaufman County, Texas.

*Laura A. Hughes*

Laura Hughes, County Clerk

Recorded By: _____ Kylie Doss _____ , Deputy

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

Record and Return To:
LAWYERS TITLE INSURANCE COMPANY - DFW
16479 DALLAS PKWY STE 390
ADDISON, TX   75001



App. 1205

OMB Approval No. 2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

Privacy Act Notice: The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

222 8005339
**Recording Requested by:**
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

**After Recording return to:**
Leslie F. Dominy
Greystone Servicing Corporation, Inc.
419 Belle Air Lane
Warrenton, VA 20186

**MULTIFAMILY DEED OF TRUST
ASSIGNMENT OF LEASES AND RENTS
AND SECURITY AGREEMENT**

**(Texas)**

**HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments**

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

2

## MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

THIS MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS ("**Security Instrument**"), is made as of this 1st day of December, 2017 among D4FR LLC, a limited liability company organized and existing under the laws of the State of Texas, whose address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, as grantor, trustor and borrower (**Borrower**), to Thomas Kelly Derryberry, as trustee (**Trustee**), a person whose address is 504 Autumn Springs Ct, Suite 26, Franklin, TN 37067, for the benefit of Greystone Servicing Corporation, Inc., as beneficiary and as Lender (**Lender**), a corporation organized and existing under the laws of State of Georgia, whose address is 419 Belle Air Lane, Warrenton, VA 20186.

Borrower, in consideration of the Indebtedness and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee and Trustee's successors and assigns, in trust, with power of sale, the Mortgaged Property, including the Land located in Kaufman County, State of Texas and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Trustee and Trustee's successors and assigns.

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on February 1, 2060, in the principal amount of Thirty Six Million Two Hundred Forty Thousand and 00/100 Dollars (US $36,240,000.00) ("**Loan**"), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property. Borrower covenants that Borrower shall warrant and defend generally such title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

App. 1207

3

**Covenants.** Borrower and Lender covenant and agree as follows:

**1. DEFINITIONS.** The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a)  **"Borrower"** means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally).  Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note.  Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b)  **"Building Loan Agreement"** means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c)  **"Business Day"** is defined in Section 31.

(d)  **"Claim"** is defined in Section 48(m).

(e)  **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f)  **"Contract of Insurance"** is defined in 24 C.F.R. Part 207, Subpart B.

(g) **"Environmental Inspections"** is defined in Section 48(h).

(h) **"Event of Default"** means the occurrence of any event listed in Section 22.

---

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

4

    (i) **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods and property, and including but not limited to: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

    (j)    **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

    (k)    **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

    (l)    **"Impositions"** and **"Imposition Deposits"** are defined in Section 8(a).

    (m)    **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

    (n)    **"Indebtedness"** means the principal, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document including prepayment premiums, late charges, default interest, and advances as provided in Section 13 to protect the security of this Security Instrument.

    (o)    **"Indemnitees"** is defined in Section 48(k).

---

Previous editions are obsolete        HUD MF Security Instrument        HUD-94000M (06/14)

App. 1209

5

(p)     "**Land**" means the estate in realty described in Exhibit A.

(q)     "**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals. (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)     "**Lender**" means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)     "**Lien**" is defined in Section 17.

(t)     "**Loan**" is defined in the opening paragraphs of this Security Instrument.

(u)     "**Loan Application**" is defined in Section 41.

(v)     "**Loan Documents**" means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)     "**Mortgaged Property**" means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

        (1)     the Land;

        (2)     the Improvements;

        (3)     the Fixtures;

        (4)     the Personalty;

---

App. 1210

6

(5)     all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)     all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)     all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)     all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)     all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)    all Rents and Leases;

(11)    all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative

App. 1211

7

housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)    all Imposition Deposits;

(13)    all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)    all forfeited tenant security deposits under any Lease;

(15)    all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)    all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)    all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property. These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Surplus Cash and loan repayments).

(x)    **"Note"** means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

(y)    **"Notice"** is defined in Section 31.

(z)    **"O&M Program"** is defined in Section 48(b).

(aa)    **"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building

App. 1212

8

materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to: Reserve for Replacement accounts, bank accounts, residual receipts accounts, and investments.

(bb) **"Principal"** is defined in 24 C.F.R. 200.215, or any successor regulation.

(cc) **"Project"** and **"Project Assets"** mean the Mortgaged Property.

(dd) **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm, or a successor location to that site).

(ee) **"Property Jurisdiction"** is defined in Section 30(a).

(ff) **"Regulatory Agreement"** means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

---

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

App. 1213

9

(gg)  **"Remedial Work"** is defined in Section 48(i).

(hh)  **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past due, or to become due, residual receipts, and escrow accounts, however and whenever funded and wherever held.

(ii)  **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

(jj)  **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair.  During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

(1)  physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

(2)  fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

(3)  fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

(4)  materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

(5)  retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

App. 1214

10

## 2. UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.

This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD. Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral. Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

App. 1215

11

### 3. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)    After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically

12

terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice. Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution

of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)    If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)    If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)    Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

Case 3:22-cv-02118-X     Document 252     Filed 05/30/23     Page 166 of 221     PageID 9069

14

## 4. ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)     Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)     Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession. Prior to Lender's actual

---

App. 1219

15

entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.  The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)     Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)     Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect.  All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

(f)     Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations.  Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender.  Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed.

All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

App. 1220

16

(g) Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

5. **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

6. **EXCULPATION.** Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

7. **DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.**

(a) Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums:

(1) an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i) If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to

App. 1221

17

accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii) If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)   a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)   all payments and deposits mentioned in the two preceding subsections of this Section and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i) mortgage insurance premium charges under the Contract of Insurance;

(ii) ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii) interest on the Note; and

(iv) amortization of the principal of the Note.

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (06/14)

18

(b)     Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)     Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.  Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

## 8. IMPOSITION DEPOSITS.

(a)     In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same.  Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same.  All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand.  In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums  due under Section 7(a)(3) shall be credited to Borrower.  If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3).  The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the **"Imposition Deposits"**.  The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as **"Impositions"**.  The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added.  Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower

---

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

App. 1223

19

for which Imposition Deposits are required. Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)    Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations. Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing. Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or residual receipts account (if any). Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note. Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)    If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender. Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender. Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)    If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or residual receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits. If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

9.    **REGULATORY AGREEMENT.** Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument. Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

10.    **APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3).

App. 1224

20

Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

11. **COMPLIANCE WITH LAWS.** Borrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, subpart G, and any successor regulations; including but not limited to those of the foregoing pertaining to: health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments. Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11. Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property. Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

12. **USE OF PROPERTY.** Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

App. 1225

21

## 13. PROTECTION OF LENDER'S SECURITY.

(a)    If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)    Any amounts advanced by Lender for taxes, special assessments, water rates, which are liens prior to the Security Instrument, insuring the Project and mortgage insurance premiums, paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note. So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)    Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

14.    INSPECTION. Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

## 15. BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the

App. 1226

22

operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)      If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)      Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time.

(d)      Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year. If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year. Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender. If Borrower fails to provide in a timely manner the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness. Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)      Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

23

## 16.    TAXES; OPERATING EXPENSES.

(a)    Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition.  If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits.  Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

(d)    Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)    Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

App. 1228

24

**17.    LIENS; ENCUMBRANCES.**  (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("**Lien**") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument.  (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or residual receipts, except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

**18.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.**  Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

App. 1229

25

### 19.    PROPERTY AND LIABILITY INSURANCE.

(a)    Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage.  Lender's insurance requirements may change from time to time throughout the term of the Indebtedness.  If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage.  If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note.  If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance.  If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)    All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment.  All such policies shall also be in a form approved by Lender.  All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns.  Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a).  Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums.  At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

App. 1230

26

(c)    Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)    All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations.  Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)    Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)    In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender.  Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable.  Borrower shall notify Lender of any payment received from any insurer.  Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due.  No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM   Page 28 of 53   B: OPR V: 5534 P: 194

27

(g)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.  Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD.  In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable.  If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)    If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

## 20.    CONDEMNATION.

(a)    Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.  Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action.  Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1)

28

any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b)    All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note. After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration. No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award. Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

21.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.

(a)    So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations. Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21. Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)    If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the

App. 1233

29

Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

22.    **EVENTS OF DEFAULT.**  The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

(a)    Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) or (b) of this Security Instrument.

(b)    Covenant Events of Default shall include:

(1)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

(2)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

(3)    any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

(4)    so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

App. 1234

30

under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)    Lender shall deliver to the Principal(s) of Borrower, Notice, as provided in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide the Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

23.    **REMEDIES CUMULATIVE.** Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

24.    **FORBEARANCE.**

(a)    So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note.  However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)    Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other

31

payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

25.    **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

26.    **WAIVER OF STATUTE OF LIMITATIONS.** To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

27.    **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

App. 1236

32

**28.    FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

**29.    ESTOPPEL CERTIFICATE.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are unmodified and in full force and effect  (or, if there have been modifications, that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Security Instrument, and the Note and (so long as the Loan is insured or held by HUD, the Regulatory Agreement) (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, (so long as the Loan is insured or held by HUD, the Regulatory Agreement) and this Security Instrument; and (f) any additional facts requested by Lender.

**30.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located ("**Property Jurisdiction**"), except so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD as such local or state laws may be preempted by federal law.

(b)    Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any

security for the Indebtedness, or this Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

### 31.   NOTICE.

(a)     All notices, demands and other communications ("**Notice**") under or concerning this Security Instrument shall be in writing.  Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument , and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 31, the term ("**Business Day**") means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business.  When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day.  Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)     Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31.  Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

34

(c)    Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.

**BORROWER:**

D4FR LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Dallas, TX 75234

**PRINCIPAL(S):**

Timothy Barton                          TLB 2012 Irrevocable Trust
1755 Wittington Place, Suite 340        Attn: Saskya Bedoya
Dallas, TX  75234                       1755 Wittington Place, Suite 340
                                        Dallas, TX  75234

**LENDER:**

Greystone Servicing Corporation, Inc.
Attn: General Counsel
419 Belle Air Lane
Warrenton, VA 20186

32.    **SALE OF NOTE; CHANGE IN SERVICER.**  The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower.  A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note.  If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

33.    **SINGLE ASSET BORROWER.**  Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the management and operation of the Mortgaged Property, and so long as the Loan is

Previous editions are obsolete                 HUD MF Security Instrument                 HUD-94000M (06/14)

App. 1239

Case 3:22-cv-02118-X     Document 252     Filed 05/30/23     Page 187 of 221     PageID 9090
#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM   Page 36 of 53    B: OPR V: 5534 P: 202

35

insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

34.   **SUCCESSORS AND ASSIGNS BOUND.**  This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

35.   **JOINT AND SEVERAL LIABILITY.**  If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

36.   **RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

(a)   The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower.  Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

(b)   No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement.  Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

37.   **SEVERABILITY; AMENDMENTS.**  The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect.  This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument.  This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

38.   **RULES OF CONSTRUCTION.**  The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.  Any reference in this Security Instrument to an

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM  Page 37 of 53   B: OPR V: 5534 P: 203

36

"**Exhibit**" or a "**Section**" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term "**including**" means "including, but not limited to."

39.    **LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern; provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

40.    **DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

41.    **NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the "**Loan Application**") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of *Default*.

42.    **ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (06/14) |

43.    ACCELERATION; REMEDIES.  If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**[INSERT PROVISIONS PERTAINING TO SALE AS APPROPRIATE UNDER STATE LAW]**

44. FEDERAL REMEDIES.  In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. 3701 *et seq.*, as amended, when HUD is the holder of the Note.

45.    REMEDIES FOR WASTE.  In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

(a)    the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

(b)    an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

(c)    recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security.  So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole

38

discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

46.    **TERMINATION OF HUD RIGHTS AND REFERENCES.** At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance. The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

47.    **CONSTRUCTION FINANCING.** The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern). If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof. The

39

Indebtedness shall, at the option of Lender or holder of this Security Instrument and the Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement.  This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

48.  ENVIRONMENTAL HAZARDS.

(a)  Definitions:

(1)  **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (**"PCBs"**) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)  **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property.  Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM  Page 41 of 53   B: OPR V: 5534 P: 207

40

(3)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)    Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender (**"O&M Program"**); (2) matters described in paragraph (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

(i)    any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(ii)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

(c)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(d)    Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the

41

Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(e)     If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program.  All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)     Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)     to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)     the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)     Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits

App. 1246

42

required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)  no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)  to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)  Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g)  Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)  Borrower's discovery of any Prohibited Activity or Condition;

(2)  Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)  any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM   Page 44 of 53    B: OPR V: 5534 P: 210

43

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h)     Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist.  Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances.  The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections.  Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property.  Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections.  Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale.  Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials

44

Law, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so.  So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(j)    Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)    Borrower shall indemnify and if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender, hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, **"Indemnitees"**) from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise, arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions:

(i)    any breach of any representation or warranty of Borrower in this Section 48;

(ii)    any failure by Borrower to perform or comply with any of its obligations under this Section 48;

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

45

(iii)   the existence or alleged existence of any Prohibited Activity or Condition;

(iv)   the actual or alleged violation of any Hazardous Materials Law.

(l)   Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)   Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding ("**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)   Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)   any amendment or modification of any Loan Document;

(2)   any extensions of time for performance required by any Loan Document;

(3)   the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)   the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)   the release or substitution in whole or in part of any security for the Indebtedness; and

(6)   Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)   Borrower shall, at its own cost and expense, do all of the following:

App. 1250

#2017-0028852 Recording Date: 12/13/2017 03:29:14 PM  Page 47 of 53   B: OPR V: 5534 P: 213

46

(1)     pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48;

(2)     reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)     reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

(p)     In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)     The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument. Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the

47

available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)     So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)     To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

49.    (See Exhibit B)

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Security Instrument:

|X|    Exhibit A         Description of the Land (required).

|X|    Exhibit B         Modifications to Security Instrument

48

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed instrument.

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

STATE OF TEXAS          §
                        §
COUNTY OF Dallas        §

The foregoing instrument was acknowledged before me on this __5__ day of December, 20_17_ by Timothy Barton, President of D4FR LLC, a Texas limited liability company.

[seal]

_____
Notary Public
Printed Name of Notary: Saskya Bedoya

My Commission Expires: July 21, 2018

SASKYA BEDOYA
Notary Public, State of Texas
My Commission Expires
July 21, 2018

App. 1253

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

## EXHIBIT A
### DESCRIPTION OF THE LAND

BEING AN 18.451 ACRE TRACT OF LAND SITUATED IN THE J. HEATH SURVEY, ABSTRACT NO. 227, KAUFMAN COUNTY, TEXAS, AND BEING PART OF THAT TRACT OF LAND CONVEYED TO LEMAN DEVELOPMENT, LTD., PER DEED RECORDED IN VOLUME 1323, PAGE 281 OF THE DEED RECORDS OF KAUFMAN COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1" IRON ROD FOUND FOR CORNER IN THE NORTH RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO. 80 (300' RIGHT-OF-WAY), SAID POINT BEING THE MOST SOUTHERLY SOUTHWEST CORNER OF THE ABOVE CITED LEMAN TRACT, SAID POINT ALSO BEING THE SOUTHEAST CORNER OF A TRACT OF LAND CONVEYED TO PROSPER CAPITAL MANAGEMENT, L.P., PER DEED RECORDED IN VOLUME 1994, PAGE 16 OF THE DEED RECORDS OF KAUFMAN COUNTY, TEXAS;

THENCE N. 45 DEG. 08 MIN. 31 SEC. W. ALONG THE MOST SOUTHERLY SOUTHWEST LINE OF SAID LEMAN TRACT, AND ALONG THE NORTHEAST LINE OF SAID PROSPER CAPITAL TRACT, A DISTANCE OF 582.59 FEET TO A 1/2" IRON ROD FOUND FOR CORNER, SAID POINT BEING THE MOST WESTERLY SOUTHWEST CORNER OF PHASE 1A PER THE RECORDED PLAT OF WINDMILL FARMS, PHASE 1A, 1B & 1C, AS RECORDED IN CABINET 2, PAGE 213 OF THE PLAT RECORDS OF KAUFMAN COUNTY, TEXAS;

THENCE S. 88 DEG. 30 MIN. 09 SEC. E. ALONG THE SOUTH LINE OF SAID WINDMILL FARMS, A DISTANCE OF 1635.57 FEET TO A 1/2" IRON ROD WITH CAP STAMPED "USA INC PROP. COR." FOUND (HEREINAFTER CALLED 1/2" IRON ROD FOUND) FOR CORNER AT THE MOST SOUTHERLY SOUTHEAST CORNER OF SAID WINDMILL FARMS;

THENCE N. 01 DEG. 29 MIN. 51 SEC. E ALONG THE EAST LINE OF SAID WINDMILL FARMS, A DISTANCE OF 349.33 FEET TO A 1/2" IRON ROD FOUND FOR CORNER IN THE SOUTH LINE OF CONCORD DRIVE (85' RIGHT-OF-WAY);

THENCE S. 87 DEG. 47 MIN. 14 SEC. E. ALONG THE SOUTH LINE OF SAID CONCORD DRIVE, A DISTANCE OF 335.85 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE INTERSECTION OF THE SOUTH LINE OF SAID CONCORD DRIVE WITH THE WEST LINE OF WINDMILL FARMS BOULEVARD (120' RIGHT-OF-WAY);

THENCE S. 06 DEG. 11 MIN. 24 SEC. E. ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, A DISTANCE OF 28.75 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE BEGINNING OF A CURVE TO THE RIGHT;

HUD-94000M (08/14)

Legal Description

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM  Page 51 of 53  B: OPR V: 5534 P: 217

THENCE IN A SOUTHERLY DIRECTION, ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, AND ALONG SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 23 DEG. 53 MIN. 42 SEC., A RADIUS OF 940.00 FEET, A CHORD BEARING OF S. 05 DEG. 45 MIN. 27 SEC. W., A CHORD LENGTH OF 389.19 FEET AND AN ARC LENGTH OF 392.02 FEET TO A 1/2" IRON ROD FOUND FOR CORNER AT THE BEGINNING OF A REVERSE CURVE TO THE LEFT;

THENCE IN A SOUTHERLY DIRECTION, ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, AND ALONG SAID CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 16 DEG. 36 MIN. 42 SEC., A RADIUS OF 1,060.00 FEET, A CHORD BEARING OF S. 09 DEG. 23 MIN. 57 SEC. W., A CHORD LENGTH OF 306.25 FEET AND AN ARC LENGTH OF 307.32 FEET TO A 1 /2" IRON ROD FOUND FOR CORNER;

THENCE S. 01 DEG. 05 MIN. 36 SEC. W. ALONG THE WEST LINE OF SAID WINDMILL FARMS BOULEVARD, A DISTANCE OF 25.19 FEET TO A 1" IRON ROD FOUND FOR CORNER IN THE NORTH LINE OF SAID U.S. HIGHWAY NO. 80;

THENCE N. 88 DEG. 30 MIN. 09 SEC. W. ALONG THE NORTH LINE OF SAID HIGHWAY, A DISTANCE OF 1480.84 FEET TO THE POINT OF BEGINNING, AND CONTAINING 18.451 ACRES OF LAND.

HUD-94000M (05/14)                                                                                       Legal Description

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM  Page 52 of 53   B: OPR V: 5534 P: 218

## EXHIBIT B
## MODIFICATIONS TO SECURITY INSTRUMENT

The following modifications are made to the text of the Security Instrument of which this Exhibit is a part:

### ADDENDUM
### Texas

HUD Project Number: 113-35682
Project Name: Parc at Windmill Farms Apartments

The following sections are inserted into the Security Instrument and made a part thereof:

43. Accelerations/ Remedies:

If Lender invokes the power of sale, Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction. Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

49. Trustee:

(a)      Trustee may resign by giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Instrument or shall fail or refuse to act in accordance with this Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Instrument. Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or

HUD-94000M-ADD
Security Instrument - Addendum

App. 1256

#2017-0028852  Recording Date: 12/13/2017 03:29:14 PM   Page 53 of 53    B: OPR V: 5534 P: 219

otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)     Any successor Trustee appointed pursuant to this Section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)     Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Instrument, including the transmittal and posting of any notices.


THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE DOCUMENT IS TO BE RECORDED AND FILED.

HUD-94000M-ADD
Security Instrument - Addendum
#2017-0028852
Filed for Record in Kaufman County TX
12/13/2017 03:29:14 PM

App. 1257

# EXHIBIT J-3

**SOUTHERN PROPERTIES CAPITAL, LTD**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

December ___, 2017

JMJ Development, LLC
1755 Wittington Place, Suite 340
Farmers Branch, Texas 75234

Re:  Southern Properties Capital, LTD ("Lender") $7,300,000.00 loan
(the "Loan") to JMJ Development, LLC ("Borrower")

Gentlemen:

This letter loan agreement (the "Letter Loan Agreement") is executed by Lender and Borrower and will evidence and govern certain terms and provisions of the Loan. As a condition to closing of the Loan, Borrower shall deliver to Lender or perform the following:

1. Borrower shall execute and deliver to Lender a counterpart of this Letter Loan Agreement, the Promissory Note and the Assignment of Pledge and Security Agreement pledging the interest in JMJAV LLC and JMJD4, LLC.
2. All of the member interest in JMJAV LLC and in JMJD4 LLC have been pledged to Borrower by the owners of such member interests, TRWF LLC, JMJAV LLC and Enoch Investments, LLC. Borrower shall execute an Assignment of Pledge and Security Agreement which will assign such pledged member interests to Lender. Borrower shall cause the Agreement and Acknowledgment attached to the Pledge and Security Agreement which has been assigned to Lender to be executed by JMJAV LLC and JMJD4 LLC (the "Pledged Entities").
3. Lender shall have received a closing statement setting forth the source and uses of all funds related to the Loan.
4. Lender shall have received the following documents with respect to each of the Pledged Entities:
   a. Certificate of formation
   b. Operating agreement
   c. Organizational meeting minutes
   d. Certificate of existence from Secretary of State of formation
   e. Certificate of good standing or account status from state of formation
   f. Certificate of qualification to do business in Texas for any foreign entity, along with certificate of account status
   g. All certificates of member interest issued to Guarantor
5. Lender shall have received the following documents with respect to Borrower:
   a. Certificate of formation
   b. Operating agreement

App. 1259

    c. Certified copy of resolutions authorizing the borrowing
    d. Certificate of existence
    e. Certificate of good standing

6. Borrower shall have paid all attorneys' fees and other costs incurred by Lender in connection with the Loan.

7. Borrower shall have delivered to Lender such additional documents as Lender may have reasonably requested in connection with the closing of the Loan, including, but not limited to the organizational documents of Borrower and resolutions authorizing the Loan.

8. Lender and Borrower anticipate that the Loan will not be fully funded at closing. From time to time thereafter, Lender may advance additional funds under the Promissory Note in order to provide the Borrower with funds for its ongoing operations. Any such advances shall bear interest and be repayable as set forth in the Promissory Note. Upon request, Borrower shall execute such additional documents or new notes as Lender may reasonably request in order to evidence any such additional advances.

9. "Event of Default", shall mean any event of default under the Promissory Note, Pledge and Security Agreement, Guaranty and under this Letter Loan Agreement and shall also include any event of default related to any financing (the "D4FR Loan") provided to D4FR, LLC in connection with the construction and operation of its real property and which is secured by such real property. Upon the occurrence of any default under the D4FR Loan, regardless of whether any party is or may be entitled to cure such default and regardless of whether the holder of such loan has commenced the exercise of remedies, Lender shall be entitled to exercise any and all remedies available under any of the documents evidencing, securing or governing the loan or at law or in equity.

LENDER:

Southern Properties Capital, LTD

By: _____
Name:_____
Title: _____

BORROWER:

JMJ Development, LLC

By: _____
    Timothy Barton, President

App. 1261

# EXHIBIT J-4

# PROMISSORY NOTE

**$7,300,000.00**                                                        **December __, 2017**

FOR VALUE RECEIVED, **JMJ DEVELOPMENT, LLC**, a Texas limited liability company ("Borrower"), having an address of 1755 Wittington Place, Suite 340, Farmers Branch, Texas 75234, hereby promises to pay to the order of **SOUTHERN PROPERTIES CAPITAL, LTD**, a British Virgin Islands corporation (together with its successors and assigns and any subsequent holders of this Promissory Note, the "Lender"), as hereinafter provided, the principal sum of **SEVEN MILLION THREE HUNDRED THOUSAND AND NO/100THS DOLLARS ($7,300,000.00)** or so much thereof as may be advanced or readvanced by Lender from time to time hereunder to or for the benefit or account of Borrower, together with interest thereon at the Note Rate (as hereinafter defined), and otherwise in strict accordance with the terms and provisions hereof.

## ARTICLE ONE
## DEFINITIONS

1.1    *Defined Terms*.  Any capitalized terms used in this Promissory Note ("Note") are defined as they are introduced or in Section 4.22 hereof.  All terms used herein, whether or not defined hereof, and whether used in singular or plural form, shall be deemed to refer to the object of such term whether such is singular or plural in nature, as the context may suggest or require.

## ARTICLE II
## PAYMENT TERMS

2.1    *Payment of Principal and Interest*.  Prior to any Event of Default, as defined in Section 2.8 hereof, interest on the principal balance of this Note shall accrue at the rate of **five percent (5.0%)** per annum ("Applicable Rate").  No payments shall be due hereunder until **May 1, 2020** ("Maturity Date"), when the entire remaining unpaid principal balance of this Note and any and all accrued but unpaid interest herein shall be due and payable in full.

2.2    *Application*.  Except as expressly provided herein to the contrary, all payments on this Note shall be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon), including, without limitation, any and all fees owed to Lender, for which either Borrower shall be obligated or Lender shall be entitled pursuant to the provisions of this Note or the other Loan Documents, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the direct order of maturity. If an Event of Default exists under this Note or under any of the other Loan Documents, then Lender may, at the sole option of Lender, apply any such payments, at any time and from time to time, to any of the items specified in clauses (i), (ii) or (iii) above without regard to the order of priority otherwise specified in this Section and any application to the outstanding principal balance hereof may be made in either direct or inverse order of maturity.

Promissory Note
Southern Properties-JMJ Development, LLC                    1

App. 1263

2.3    *Payments*.  All payments under this Note made to Lender shall be made on the first (1ˢᵗ) day of each month, without offset, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private.  Payments by check or draft shall not constitute payment in immediately available funds until the required amount is actually received by Lender in full.  Payments in immediately available funds received by Lender in the place designated for payment on a Business Day prior to 12:00 noon Central time at said place of payment shall be credited prior to the close of business on the Business Day received, while payments received by Lender on a day other than a Business Day or after 12:00 noon Central time on a Business Day shall not be credited until the next succeeding Business Day.  If any payment of principal or interest on this Note shall become due and payable on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.  Any such extension of time for payment shall be included in computing interest which has accrued and shall be payable in connection with such payment.

2.4    *Computation Period*.  Interest on the indebtedness evidenced by this Note shall be computed on the basis of a three hundred sixty (360) day year and shall accrue at the Applicable Rate on the actual number of days elapsed for any whole month in which interest is being calculated, but on the actual number of days for any partial month in which interest is being calculated.  In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to the close of business on the Business Day received.

2.5    *Prepayment*.  This Note may not be prepaid in part or in full.

2.6    *Unconditional Payment*.  Borrower is and shall be obligated to pay all principal, interest and any and all other amounts which become payable under this Note or under any of the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction whatsoever and without any reduction for counterclaim or setoff whatsoever.  If at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any Debtor Relief Law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

2.7    *Partial or Incomplete Payments*.  Remittances in payment of any part of this Note other than in the required amount in immediately available funds at the place where this Note is payable shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in full in accordance herewith and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.  Acceptance by Lender of any payment in an amount less than the full amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default in the payment of this Note.

2.8    *Interest on Unpaid Interest, Late Payment Charges; Default Interest Rate, Etc.* In the event any payment of interest is not paid on the date when due, interest shall accrue thereon as set forth herein on a compounded basis until paid in full. Further, in the event any Monthly Payment is not paid within **ten (10) days** of the date when due, Borrower shall pay a late payment charge in an amount equal to **five percent (5%)** of the late payment in order to offset Lender's increased administrative costs resulting from such late payment. For so long as any Event of Default exists under this Note or under any of the other Loan Documents, and in addition to all other rights and remedies of Lender hereunder, interest shall accrue on the outstanding principal balance hereof at the Default Interest Rate, and such accrued interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or Event of Default, and such late charges and accrued interest are reasonable estimates of those damages and do not constitute a penalty. Borrower shall also pay an additional $35.00 fee for any check which is not honored.

## ARTICLE III
## EVENT OF DEFAULT AND REMEDIES

3.1    *Event of Default.* The occurrence or happening, at any time and from time to time, of any one or more of the following shall immediately constitute an "Event of Default" under this Note:

(a)    Prior to the Maturity Date, by acceleration or otherwise, Borrower shall fail, refuse or neglect to pay and satisfy, in full and in the applicable method and manner required, any required payment of principal or interest or any other portion of the indebtedness evidenced by this Note as and when the same shall become due and payable or within five (5) days of such date, whether at the stipulated due date thereof, at a date fixed for payment, or *immediately* on the Maturity Date, by acceleration or otherwise Borrower shall fail, refuse or neglect to pay and satisfy in full and in the applicable method and manner required, the indebtedness evidenced by this Note; or

(b)    The occurrence of any other default, breach or event of default as defined in or under this Note or any other Loan Document that remains uncured under and pursuant to the provisions of this Note or any other Loan Document.

3.2    *Remedies.* Upon the occurrence of an Event of Default, Lender shall have the immediate right, at the sole discretion of Lender and without notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action (**ALL OF WHICH BORROWER HEREBY EXPRESSLY WAIVES AND RELINQUISHES**) (i) to declare the entire unpaid balance of the indebtedness evidenced by this Note (including, without limitation, the outstanding principal balance hereof, including all sums advanced or accrued hereunder or under any other Loan Document, and all accrued but unpaid interest thereon) at once immediately due and payable (and upon such declaration, the same shall be at once immediately due and payable) and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity, (ii) to foreclose any liens and security interests

securing payment hereof or thereof (including, without limitation, any liens and security interests covering any portion of the mortgaged Property), and (iii) to exercise any of Lender's other rights, powers, recourses and remedies under this Note, under any other Loan Document, or at law or in equity, and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, singly, successively, or concurrently against Borrower or others obligated for the repayment of this Note or any part hereof, or against any one or more of them, or against the mortgaged Property, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, it being agreed by Borrower that the exercise, discontinuance of the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse, and (d) are intended to be, and shall be, nonexclusive. All rights and remedies of Lender hereunder and under the other Loan Documents shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the mortgaged Property or any portion thereof. Without limiting the provisions of Section 4.18 hereof, if this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs and expenses of collection, including, but not limited to, Lender's attorneys' fees, whether or not any legal action shall be instituted to enforce this Note and whether or not such attorneys' fees shall be related to any bankruptcy proceeding of Borrower.

## ARTICLE IV
## GENERAL PROVISIONS

4.1 *No Waiver; Amendment*. No failure to accelerate the indebtedness evidenced by this Note by reason of an Event of Default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced by this Note or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted under this Note, under any of the other Loan Documents or by any applicable laws. Borrower hereby expressly waives and relinquishes the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. The failure to exercise any remedy available to Lender shall not be deemed to be a waiver of any rights or remedies of Lender under this Note or under any of the other Loan Documents, or at law or in equity. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender specifically, unequivocally and expressly agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, or modification is sought.

4.2 *Waivers*. EXCEPT AS SPECIFICALLY PROVIDED IN THE LOAN DOCUMENTS TO THE CONTRARY, BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION OR ANY OTHER NOTICES OR ANY OTHER ACTION. BORROWER

App. 1266

AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO THE BENEFITS OF ANY MORATORIUM, REINSTATEMENT, MARSHALING, FORBEARANCE, VALUATION, STAY, EXTENSION, REDEMPTION, APPRAISEMENT, EXEMPTION AND HOMESTEAD NOW OR HEREAFTER PROVIDED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA AND OF EACH STATE THEREOF, BOTH AS TO ITSELF AND IN AND TO ALL OF ITS PROPERTY, REAL AND PERSONAL, AGAINST THE ENFORCEMENT AND COLLECTION OF THE OBLIGATIONS EVIDENCED BY THIS NOTE OR BY THE OTHER LOAN DOCUMENTS.

4.3    *Interest Provisions*.

(a)    *Savings Clause*. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note then owing by Borrower to Lender. All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the

rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

4.4    *Use of Funds*. Borrower hereby warrants, represents and covenants that (i) the loan evidenced by this Note is made to Borrower solely for the purpose of acquiring real property for commercial purposes or carrying on a business or commercial enterprise, (ii) all proceeds of this Note shall be used only for business and commercial purposes, and (iii) no funds disbursed hereunder shall be used for personal, family, agricultural or household purposes.

4.5    *Further Assurances and Corrections*. From time to time, at the request of Lender, Borrower will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Note or in any other Loan Document or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver, record and/or file (or cause to be executed, acknowledged, delivered, recorded and/or filed) such further documents and instruments (including, without limitation, further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents) and perform such further acts and provide such further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Note and the Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Note and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Note and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

4.6    *Waiver of Jury Trial*. BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

4.7    *Governing Law; Submission to Jurisdiction*. This Note is executed and delivered as an incident to a lending transaction negotiated and consummated in **Dallas County, Texas**, and shall be governed by and construed in accordance with the laws of the **State of Texas**. Borrower, for itself and its successors and assigns, hereby irrevocably (i) submits to the nonexclusive jurisdiction of the state and federal courts in **Texas**, (ii) waives, to the fullest extent permitted by law, any objection that it may now or in the future have to the laying of venue of any litigation arising out of or in connection with this Note or any Loan Document brought in the

Promissory Note
Southern Properties-JMJ Development, LLC                6

App. 1268

appropriate state or federal court located in **Dallas County, Texas,** (iii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum, and (iv) agrees that any legal proceeding against any party to any of the Loan Documents arising out of or in connection with any of the Loan Documents may be brought in one of the foregoing courts. Borrower hereby agrees that service of process upon Borrower may be made by certified or registered mail, return receipt requested, at its address specified herein. Nothing herein shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrower or with respect to any of Borrower's property in courts in other jurisdictions. The scope of each of the foregoing waivers is intended to be all encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Borrower acknowledges that these waivers are a material inducement to Lender's agreement to enter into the agreements and obligations evidenced by the Loan Documents that Lender has already relied on these waivers and will continue to rely on each of these waivers in related future dealings. The waivers in this Section are irrevocable, meaning that they may not be modified either orally or in writing, and these waivers apply to any future renewals, extensions, amendments, modifications, or replacements in respect of any and all of the applicable Loan Documents. In connection with any litigation, this Note may be filed as a written consent to a trial by the court.

4.8     *Counting of Days*. If any time period referenced hereunder ends on a day other than a Business Day, such time period shall be deemed to end on the next succeeding Business Day.

4.9     *Relationship of the Parties*. Notwithstanding any prior business or personal relationship between Borrower and Lender, or any officer, director or employee of Lender, that may exist or have existed, the relationship between Borrower and Lender is solely that of debtor and creditor, Lender has no fiduciary or other special relationship with Borrower, Borrower and Lender are not partners or joint venturers, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

4.10     *Successors and Assigns*. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them. The terms "Borrower" and "Lender" as used hereunder shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them.

4.11     *Joint and Several Liability*. If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.

Promissory Note
Southern Properties-JMJ Development, LLC                    7

4.12    *Time is of the Essence*.  Time is of the essence with respect to all provisions of this Note and the other Loan Documents.

4.13    *Headings*.  The Article, Section, and Subsection entitlements hereof are inserted for convenience of reference only and shall in no way alter, modify, define, limit, amplify or be used in construing the text, scope or intent of such Articles, Sections, or Subsections or any provisions hereof.

4.14    *Controlling Agreement*.  In the event of any conflict between the provisions of this Note and any of the other Loan Documents, it is the intent of the parties hereto that the provisions of this Note shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note and the other Loan Documents and that this Note and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

4.15    *Notices*.  Unless otherwise expressly provided herein, all notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the intended addressee, (iii) by delivery to a reputable independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee, or (iv) by prepaid telegram, telex, telecopier or telefacsimile transmission to the addressee, so long as the same is immediately followed by delivery pursuant to one of the methods under (i) through (iii) above.  Notice so mailed shall be effective two (2) days after its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective one (1) day after delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the office or designated place or machine of the intended addressee.  For purposes of notice, the addresses of the parties shall be as set forth below; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' prior notice to the other party in the manner set forth herein. Electronic mail and internet websites may be used only to distribute only routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

If to Borrower:    JMJ Development, LLC
                   1755 Wittington Place, Suite 340
                   Farmers Branch, Texas  75234
                   Attention:    Timothy Barton

If to Lender:      Southern Properties Capital, LTD
                   1603 LBJ Freeway, Suite 800
                   Dallas, Texas  75234
                   Attention:    Mr. Steven Shelley

4.16    *Severability.* If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

4.17    *Right of Setoff.* In addition to all liens upon and rights of setoff against the money, securities, or other property of Borrower given to Lender that may exist under applicable law, Lender shall have and Borrower hereby grants to Lender a lien upon and a right of setoff against all money, securities, and other property of Borrower, now or hereafter in possession of or on deposit with Lender, whether held in a general or special account or deposit, for safe-keeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Borrower. No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by an instrument in writing executed by Lender.

4.18    *Costs of Collection.* If any holder of this Note retains an attorney-at-law in connection with any Event of Default or at maturity or to collect, enforce, or defend this Note or any part hereof, or any other Loan Document in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to the principal balance hereof and all interest hereon, all costs and expenses of collection or incurred by such holder or in any such suit or proceeding, including, but not limited to, reasonable attorneys' fees.

4.19    *Gender.* All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.

4.20    *Statement of Unpaid Balance.* At any time and from time to time, Borrower will furnish promptly, upon the request of Lender, a written statement or affidavit, in form satisfactory to Lender, stating the unpaid balance of the indebtedness evidenced by this Note and that there are no offsets or defenses against full payment of the indebtedness evidenced by this Note and the terms hereof, or if there are any such offsets or defenses, specifying them.

4.21    *Entire Agreement.* THIS NOTE AND THE OTHER LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE HERETO AND THERETO WHICH ARE NOT CONTAINED HEREIN OR THEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE AND THE OTHER LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF

THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

    4.22   *Definitions*. As used in this Promissory Note, the following terms shall have the following meanings:

    <u>Business Day:</u>  A weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in **Dallas, Texas**, are authorized or required by law to be closed. Unless otherwise provided, the term "days" when used herein shall mean calendar days.

    <u>Charges:</u>  All fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law.

    <u>Debtor Relief Laws:</u>  Title 11 of the United States Code, as now or hereafter in effect, or any other applicable law, domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

    <u>Default Interest Rate</u>: A rate per annum equal to the lesser of eighteen percent (18%) or the Maximum Lawful Rate.

    <u>Loan Documents:</u>  This Note, the Security Instrument, any guaranty agreement, any pledge, profit participation agreement, any financing statements, and such other agreements, documents and instruments now or hereafter governing, securing or guaranteeing any portion of the indebtedness evidenced by this Note or executed by Borrower or any guarantor or indemnitor or any other person or entity in connection with the loan evidenced by this Note or in connection with the payment of the indebtedness evidenced by this Note or the performance and discharge of the obligations related hereto or thereto, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, extensions and supplements hereof or thereof.

<u>Maximum Lawful Rate</u>:  The maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction evidenced by this Note and the other Loan Documents.

<u>PE Accounts</u>:  All bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited.

<u>Pledged Entities</u>:  Each of JMJAV, LLC and JMJD4, LLC.

<u>Property</u>:  The member interests in certain limited liability companies owned by TRWF, LLC and by JMJAV, LLC, as more particularly described in the Security Instrument, together with certain other rights, estates, interests, collateral and benefits now or at any time hereafter securing the payment of the indebtedness evidenced by this Note, whether by virtue of the Loan Documents or otherwise.

<u>Security Instrument</u>:  The **Security Agreement** dated as of the date hereof, executed by JMJAV, LLC for the benefit of JMJ Development, LLC, as beneficiary, relating to and granting a security interest in, the Property, which security interest has been assigned to Lender.   The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, the Security Instrument and the other Loan Documents.

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note as of the day and year first written above.

**BORROWER:**

**JMJ DEVELOPMENT, LLC**
a Texas limited liability company

By: _____
Timothy Barton, President

App. 1274