IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § | CASE NO. 3:22-cv-2118-X |
| TIMOTHY BARTON ET AL., | § § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants.* | § § | |

**APPENDIX VOLUME VI**

**APPS. 1276-2095**

**IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S RESPONSE TO RECEIVER'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S RESPONSE TO RECEIVER'S MOTION FOR SUMMARY JUDGMENT**

| Ex. No. | Title | App. No. |
|---|---|---|
| Ex. 5 | Windmill Amended and Restated Pledge and Security Agreement (TWRF) | Apps. 1276-1304 |
| Ex. 6 | Windmill Amended and Restated Pledge and Security Agreement (JMJAV) | Apps. 1306-1334 |
| Ex. 7 | Windmill Amended and Restated Pledge and Security Agreement (Enoch) | Apps. 1336-1364 |
| Ex. 8 | Assignment of Pledge and Security Agreement | Apps. 1366-1367 |
| Ex. 9 | First Amendment to Promissory Note | Apps. 1369-1370 |
| Ex. 10 | Rescission to First Amendment to Promissory Note | App. 1372 |
| Ex. 11 | First Amendment to Letter Loan Agreement | Apps. 1374-1375 |
| Ex. 12 | Second Amendment to Promissory Note | Apps. 1377-1378 |
| Ex. 13 | First Amendments to Pledge and Security Agreements | Apps. 1380-1385 |
| Ex. 14 | Third Amendment to Promissory Note | Apps. 1387-1389 |
| Ex. 15 | Fourth Amendment to Promissory Note | Apps. 1391-1394 |
| Ex. 16 | Second Amendment to Letter Loan Agreement | Apps. 1398-1398 |

| Ex. 17 | UCC Financing Statement (Enoch) | Apps. 1400-1402 |
|---|---|---|
| Ex. 18 | UCC Financing Statement (TWRF) | Apps. 1404-1405 |
| Ex. 19 | UCC Financing Statement (JMJAV) | App. 1407 |
| Ex. 20 | UCC Financing Statement (JMJAV) | App. 1409 |
| Ex. 21 | UCC Financing Statement (JMJD4) | App. 1411 |
| Ex. 22 | Windmill Exercise Letter and Purchase Agreement | Apps. 1413-1442 |
| Ex. 23 | Confirmation of Receipt | Apps. 1444-1446 |
| Ex. 24 | Letter to Receiver | Apps. 1448-1449 |
| Ex. 25 | Promissory Note | Apps. 1451-1463 |
| Ex. 26 | Deed of Trust | Apps. 1465-1515 |
| Ex. 27 | Bellwether Note | Apps. 1517-1528 |
| Ex. 28 | Bellwether Amended and Restated Pledge and Security Agreement (TWRF) | Apps. 1530-1558 |
| Ex. 29 | Bellwether Amended and Restated Pledge and Security Agreement (JMJAV) | Apps. 1560-1588 |
| Ex. 30 | Bellwether Amended and Restated Pledge and Security Agreement (Enoch) | Apps. 1590-1618 |
| Ex. 31 | Bellwether Assignment | Apps. 1620-1621 |
| Ex. 32 | UCC Financing Statement (Enoch) | Apps. 1623-1625 |
| Ex. 33 | UCC Financing Statement (TWRF) | Apps. 1627-1628 |
| Ex. 34 | UCC Financing Statement (JMJAV) | App. 1630 |
| Ex. 35 | UCC Financing Statement (JMJAV) | Apps. 1632-1633 |
| Ex. 36 | UCC Financing Statement (JMJD4) | Apps. 1635-1636 |
| Ex. 37 | Agreement for Purchase and Sale | Apps. 1638-1676 |
| Ex. 38 | Bellwether Exercise Letter and First Amendment to Purchase Agreement | Apps. 1678-1681 |
| Ex. 39 | Confirmation of Receipt | Apps. 1683-1685 |
| Ex. 40 | Letter to Receiver | Apps. 1687-1688 |
| Ex. 41 | SPC 2021 Financial Statements | Apps. 1690-1739 |
| Ex. 42 | SPC Interim 2022 Financial Statements | Apps. 1741-1762 |
| Ex. 43 | TCI 2021 10K | Apps. 1764-1826 |
| Ex. 44 | TCI 2020 10K | Apps. 1828-1890 |
| Ex. 45 | TCI 2019 10K | Apps. 1892-1967 |
| Ex. 46 | TCI 2018 10K | Apps. 1969-2044 |
| Ex. 47 | TCI 2017 10K | Apps. 2046-2095 |

**RESPECTFULLY SUBMITTED BY:**

/s/ *Brian K. Norman*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161

Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on May 30, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

\_\_\_\_\_ FACSIMILE
\_\_\_\_\_ CERTIFIED MAIL, RRR
\_\_\_\_\_ U.S. FIRST CLASS MAIL
\_\_\_\_\_ HAND DELIVERY
\_X\_\_ ELECTRONIC TRANSMISSION

/s/ *Brian K. Norman*
**BRIAN K. NORMAN**

# EXHIBIT J-5

## AMENDED AND RESTATED

## PLEDGE AND SECURITY AGREEMENT

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of December ___, 2017, is from **TRWF, LLC**, a Delaware limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns, "**Lender**").

### RECITALS:

A.     Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $7,300,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.     To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated December ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1     Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-TRWF, LLC
Page 1

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)    the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)    all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)    Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)    to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)    all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)    all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Security Agreement
JMJ Development, LLC-TRWF, LLC                    2

(i)    all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)    (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions. As used herein, the following terms shall have the following respective meanings:

(a)    "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)    "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Security Agreement
JMJ Development, LLC-TRWF, LLC                    3

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)    "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest.    On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.    It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.    All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.    Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.    Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.    Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.    Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Security Agreement
JMJ Development, LLC-TRWF, LLC                4

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

### ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership. Pledgor owns 100% of the member interests in JMJAV, LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Security Agreement
JMJ Development, LLC-TRWF, LLC                    5

Section 3.6    No Financing Statements. Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    Certificated Securities. Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender. Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities. Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3. Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS. THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE. PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

Security Agreement
JMJ Development, LLC-TRWF, LLC                6

App. 1281

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Security Agreement
JMJ Development, LLC-TRWF, LLC                    7

Section 3.10    Authority, Enforceability, Etc.  The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

## ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    Transfer Rights.  Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights.  Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

Security Agreement
JMJ Development, LLC-TRWF, LLC                    8

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

Security Agreement
JMJ Development, LLC-TRWF, LLC                    9

App. 1284

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights. Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)    Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this

Security Agreement
JMJ Development, LLC-TRWF, LLC                    10

App. 1285

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative.    The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement.   The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise.   Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.   Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies.    Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

## ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral.    In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only. If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral. It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times. Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures.    No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable. All other demands, advertisements and notices are hereby irrevocably waived by Pledgor. The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

Security Agreement
JMJ Development, LLC-TRWF, LLC                     11

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "**SEC**") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "**Securities Act**"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Security Agreement
JMJ Development, LLC-TRWF, LLC                    12

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral. All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences. Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations. To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration. If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements. Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance. Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.    If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof. Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances.    Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder. Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc.    No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender. Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Security Agreement
JMJ Development, LLC-TRWF, LLC                14

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

     Section 7.3    Notices. All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

     Section 7.4    Governing Law; Submission to Jurisdiction.

     (a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

     (b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Security Agreement
JMJ Development, LLC-TRWF, LLC        15

**TRWF, LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.**

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

Security Agreement
JMJ Development, LLC-TRWF, LLC                    16

App. 1291

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

Security Agreement
JMJ Development, LLC-TRWF, LLC                    17

App. 1292

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender.  Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14   Termination.  Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15   Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)      As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4FR, LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to  exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee  which will document the transfer of control of D4FR, LLC.  Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)      In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4FR Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4FR Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4FR Property to Lender or Lender's assignee, and (iv) Each of JMJAV LLC and Enoch Investments, LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4FR LLC, shall also have elected to transfer the D4FR Property to Pledgor.   Upon receipt of such notice, Pledgor

Security Agreement
JMJ Development, LLC-TRWF, LLC                    18

shall assemble all documents related to the D4FR Property and other information related to the D4FR Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4FR Property to Lender, and Pledgor shall cause D4FR to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4FR Property to Lender.

(c)    Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of JMJAV LLC, and Enoch Investments, LLC, by and through D4FR LLC, as the owner of the D4FR Property, shall have the right to transfer and convey the D4FR Property to Lender in lieu of any transfer of the Collateral.

Section 7.16    Liability of Pledgor.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

Security Agreement
JMJ Development, LLC-TRWF, LLC                    19

App. 1294

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4FR Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4FR Loan;

material physical waste of the Collateral or the D4FR Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4FR Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4FR Property, (B) any awards received in connection with a condemnation of all or a portion of the D4FR Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4FR Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4FR Property which are not delivered to Lender upon a foreclosure of the D4FR Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4FR Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

Security Agreement
JMJ Development, LLC-TRWF, LLC                    20

App. 1295

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4FR Loan" shall mean any loan made to D4FR, LLC, and secured by any real property owned by D4FR, LLC.

"D4FR Property" means the real property and improvements owned by D4FR, LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17   Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4FR Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR:**

TRWF, LLC

Security Agreement
JMJ Development, LLC-TRWF, LLC                    21

a Delaware limited liability company

By: _____

Timothy Barton

Security Agreement
JMJ Development, LLC-TRWF, LLC                    22

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---|---|---|
| TRWF, LLC | JMJAV, LLC | 100% of the member interests in JMJAV LLC |

App. 1298

## Exhibit A

## AGREEMENT AND ACKNOWLEDGMENT

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC  (together with its successors, assignees, and designees for the purposes hereof,  "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by TRWF, LLC, a Delaware limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein.  All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.      Representations and Warranties.  The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.      Covenants and Agreements.

(a)      Books and Records.  The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4FR, LLC, containing such detail and information as Lender may request.

(b)      UCC Matters.  The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities in registered form within the meaning of, and governed by, Article 8 (including, without

Security Agreement
Southern Properties-TRWF LLC                    1

App. 1299

limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)    Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)    Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)    Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)    Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED

Security Agreement
JMJ Development, LLC-TRWF, LLC                        2

FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)    The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.    Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.    No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner,

Security Agreement
JMJ Development, LLC-TRWF, LLC                3

App. 1301

as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.      Transfers.  The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender.  In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender.  The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.      Further Assurances.  The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.      Reliance.  This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.      Counterparts.  This Agreement and Acknowledgment may be executed in counterparts.

9.      Miscellaneous.  The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

Security Agreement
JMJ Development, LLC-TRWF, LLC                    4

App. 1302

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of December ___, 2017.

**Pledged Entity:**

**JMJAV, LLC**

By: _____
Timothy Barton, President

Security Agreement
Southern Properties-TRWF LLC                    5

App. 1303

**Exhibit B**

Organizational Agreements

# EXHIBIT J-6

**AMENDED AND RESTATED**

**PLEDGE AND SECURITY AGREEMENT**

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of December ___, 2017, is from **JMJAV, LLC,** a Texas limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC,** a Texas limited liability company (together with its successors and assigns, "**Lender**").

RECITALS:

A.    Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $7,300,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.    To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated December ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1 - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1    Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-JMJAV, LLC
Page 1

App. 1306

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)    the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)    all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)    Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)    to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)    all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)    all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    2

(i)    all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)    (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions. As used herein, the following terms shall have the following respective meanings:

(a)    "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)    "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Security Agreement
JMJ Development, LLC-JMJAV, LLC                3

App. 1308

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)    "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest.  On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.  It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.  All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.  Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.  Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Security Agreement
JMJ Development, LLC-JMJAV, LLC                4

App. 1309

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2   Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

## ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1   Percentage Ownership. Pledgor owns 1% of the member interests in JMJD4, LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2   Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3   Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4   No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5   Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Security Agreement
JMJ Development, LLC-JMJAV, LLC                     5

Section 3.6    No Financing Statements.  Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    Certificated Securities.  Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender.  Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities.  Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3.  Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS.  THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE.  PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    7

App. 1312

Section 3.10    Authority, Enforceability, Etc.  The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

## ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    Transfer Rights.  Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights.  Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    8

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    9

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights. Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)    Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this

Security Agreement
JMJ Development, LLC-JMJAV, LLC                10

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative.  The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.  Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies.  Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral.  In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only.  If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral.  It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times.  Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures.  No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable.  All other demands, advertisements and notices are hereby irrevocably waived by Pledgor.  The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    11

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "SEC") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "Securities Act"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    12

App. 1317

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.  If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.  Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances.  Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.  Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc.  No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.  Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    14

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices.    All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.    TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.    PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    15

**JMJAV, LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.**

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    16

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement.    This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

Security Agreement
JMJ Development, LLC-JMJAV, LLC                17

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14    Termination. Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15    Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)    As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4FR, LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4FR, LLC. Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)    In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4FR Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4FR Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4FR Property to Lender or Lender's assignee, and (iv) Each of Enoch Investments, LLC and TRWF, LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4FR LLC, shall also have elected to transfer the D4FR Property to Pledgor. Upon receipt of such notice, Pledgor

Security Agreement
JMJ Development, LLC-JMJAV, LLC                18

App. 1323

shall assemble all documents related to the D4FR Property and other information related to the D4FR Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4FR Property to Lender, and Pledgor shall cause D4FR to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4FR Property to Lender.

(c)     Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of Enoch Investments, LLC, and TRWF LLC, by and through D4FR LLC, as the owner of the D4FR Property, shall have the right to transfer and convey the D4FR Property to Lender in lieu of any transfer of the Collateral.

Section 7.16   Liability of Pledgor.   Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    19

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4FR Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4FR Loan;

material physical waste of the Collateral or the D4FR Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4FR Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4FR Property, (B) any awards received in connection with a condemnation of all or a portion of the D4FR Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4FR Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4FR Property which are not delivered to Lender upon a foreclosure of the D4FR Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4FR Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)     if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

Security Agreement
JMJ Development, LLC-JMJAV, LLC                20

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

> (1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4FR Loan" shall mean any loan made to D4FR, LLC, and secured by any real property owned by D4FR, LLC.

"D4FR Property" means the real property and improvements owned by D4FR, LLC, including but not limited to the Parc at Windmill Farms Apartments.

Section 7.17    Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Parc at Windmill Farms Apartments on the D4FR Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR:**

JMJAV, LLC

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    21

App. 1326

a Texas limited liability company

By: _____
     Timothy Barton

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---------|----------------|-----------------|
| JMJAV, LLC | JMJD4, LLC | 1% of the member interests in JMJD4, LLC |

Security Agreement
JMJ Development, LLC-JMJAV LLC                23

App. 1328

<u>Exhibit A</u>

**AGREEMENT AND ACKNOWLEDGMENT**

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by JMJAV, LLC, a Texas limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.      <u>Representations and Warranties</u>.  The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.      <u>Covenants and Agreements</u>.

(a)      <u>Books and Records</u>.  The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4FR, LLC, containing such detail and information as Lender may request.

(b)      <u>UCC Matters</u>.  The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-JMJAV LLC                    1

App. 1329

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)  Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)  Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)  Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)  Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)    The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.    Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.    No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-JMJAV, LLC                3

App. 1331

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.     Transfers. The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender. In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender. The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.     Further Assurances. The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.     Reliance. This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.     Counterparts. This Agreement and Acknowledgment may be executed in counterparts.

9.     Miscellaneous. The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

Security Agreement
JMJ Development, LLC-JMJAV, LLC                    4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of December __, 2017.

Pledged Entity:

JMJD4, LLC

By: _____
       Timothy Barton, President

App. 1333

## Exhibit B

## Organizational Agreements

# EXHIBIT J-7

**AMENDED AND RESTATED**

**PLEDGE AND SECURITY AGREEMENT**

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of December ___, 2017, is from  **ENOCH INVESTMENTS, LLC**, a Delaware limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns, "**Lender**").

RECITALS:

A.    Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $7,300,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.    To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated December ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1 - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1    Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC
Page 1

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule I attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)    the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)    all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)    Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)    to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)    all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)    all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        2

(i)    all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)    (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions. As used herein, the following terms shall have the following respective meanings:

(a)    "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)    "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        3

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)    "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest.  On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.  It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.  All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.  Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.  Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        4

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

### ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership. Pledgor owns 99% of the member interests in JMJD4 LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Section 3.6    No Financing Statements.  Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    Certificated Securities.  Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender.  Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities.  Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3.  Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS.  THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE.  PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        6

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          7

App. 1342

Section 3.10    Authority, Enforceability, Etc. The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity. The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject. No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained. This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity. The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor. No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

## ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    Transfer Rights. Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights. Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        8

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment.  Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender.  Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        9

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)    The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights. Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)    Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)    Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC         10

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative.  The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.  Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies.  Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

## ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral.  In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only.  If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral.  It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times.  Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures.  No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable.  All other demands, advertisements and notices are hereby irrevocably waived by Pledgor.  The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        11

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "SEC") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "Securities Act"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        12

App. 1347

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        13

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2     Private Securities Sale.   If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.   Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.   In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1     Further Assurances.   Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.   Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2     No Release, Etc.   No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.   A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.   Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        14

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices.  All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        15

App. 1350

**ENOCH INVESTMENTS, LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.**

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing.    No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender.    All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          16

App. 1351

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8     Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9     Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10     Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11     Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12     Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13     Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC         17

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14    Termination. Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15    Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)    As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4FR LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4FR, LLC. Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)    In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4FR Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4FR Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4FR Property to Lender or Lender's assignee, and (iv) Each of JMJAV LLC and TRWF LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4FR LLC, shall also have elected to transfer the D4FR Property to Pledgor. Upon receipt of such notice, Pledgor shall assemble all

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        18

documents related to the D4FR Property and other information related to the D4FR Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4FR Property to Lender, and Pledgor shall cause D4FR to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4FR Property to Lender.

(c)     Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of JMJAV LLC, and TRWF LLC, by and through D4FR LLC, as the owner of the D4FR Property, shall have the right to transfer and convey the D4FR Property to Lender in lieu of any transfer of the Collateral.

Section 7.16     Liability of Pledgor.     Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          19

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4FR Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4FR Loan;

material physical waste of the Collateral or the D4FR Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4FR Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4FR Property, (B) any awards received in connection with a condemnation of all or a portion of the D4FR Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4FR Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4FR Property which are not delivered to Lender upon a foreclosure of the D4FR Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4FR Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)     if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          20

App. 1355

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

> (1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4FR Loan" shall mean any loan made to D4FR, LLC, and secured by any real property owned by D4FR, LLC.

"D4FR Property" means the real property and improvements owned by D4FR, LLC, including but not limited to the Parc at Windmill Farms Apartments.

Section 7.17    Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Parc at Windmill Farms Apartments on the D4FR Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

<div align="center">[Pledgor's Signature Appears on Next Page]</div>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

<div align="center">

**PLEDGOR:**

ENOCH INVESTMENTS, LLC

</div>

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        21

a Delaware limited liability company

By: _____

Timothy Barton, President

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC      22

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---|---|---|
| ENOCH INVESTMENTS, LLC | JMJD4, LLC | 99% of the member interests in JMJD4, LLC |

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          23

**Exhibit A**

**AGREEMENT AND ACKNOWLEDGMENT**

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by Enoch Investments, LLC, a Delaware limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.     Representations and Warranties.  The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.     Covenants and Agreements.

(a)     Books and Records.  The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4FR, LLC, containing such detail and information as Lender may request.

(b)     UCC Matters.  The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          l

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)    Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)    Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)    Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)    Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        2

App. 1360

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)     The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.     Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.     No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC     3

App. 1361

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.    Transfers. The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender. In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender. The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.    Further Assurances. The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.    Reliance. This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.    Counterparts. This Agreement and Acknowledgment may be executed in counterparts.

9.    Miscellaneous. The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

Amended and Restated Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of December __, 2017.

**Pledged Entity:**

**JMJD4, LLC**

By: _____
Timothy Barton, President

Security Agreement
JMJ Development, LLC-JMJAV LLC                    5

## Exhibit B

### Organizational Agreements

# EXHIBIT J-8

## ASSIGNMENT OF PLEDGE AND SECURITY AGREEMENT

THAT JMJ DEVELOPMENT, LLC, a Texas limited liability company,  ("Assignor"), for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, hereby transfers, assigns and sets over unto Southern Properties Capital, LLC , a British Virgin Islands corporation ("Assignee"), all of the right, title and interest of the Assignor in and to the security interests granted pursuant to the following:

     (a) Pledge and Security Agreement dated December ___, 2017, executed by JMJAV, LLC to JMJ Development, LLC, granting a security interest in one percent (1%) of the member interests in JMJD4 LLC;

     (b) Pledge and Security Agreement dated December ___, 2017, executed by TRWF, LLC to JMJ Development, LLC, granting a security interest in one percent (100%) of the member interests in JMJAV LLC;

     (c) Pledge and Security Agreement dated December ___, 2017, executed by Enoch Investments, LLC to JMJ Development, LLC, granting a security interest in ninety-nine percent (99%) of the member interests in JMJAV, LLC;

     (d) Amended and Restated Pledge and Security Agreement dated December ___, 2017, executed by JMJAV, LLC to JMJ Development, LLC, granting a security interest in one percent (1%) of the member interests in JMJD4 LLC;

     (e) Amended and Restated Pledge and Security Agreement dated December ___, 2017, executed by TRWF, LLC to JMJ Development, LLC, granting a security interest in one percent (100%) of the member interests in JMJAV LLC; and

     (f) Amended and Restated Pledge and Security Agreement dated December ___, 2017, executed by Enoch Investments, LLC to JMJ Development, LLC, granting a security interest in ninety-nine percent (99%) of the member interests in JMJAV, LLC.

The above and foregoing Pledge and Security Agreements and the security interests and pledges granted therein are collectively referred to as the "Pledges."

TO HAVE AND TO HOLD the Pledges and above described security deposits and prepaid rents, together with any and all the rights and appurtenances thereto in anywise belonging to Assignor, unto Assignee, its successors, legal representatives and assigns FOREVER and Assignor does hereby bind itself and its legal representatives and successors to WARRANT AND FOREVER DEFEND all and singular the Pledges unto Assignee, its successors, legal representatives and assigns, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof.

1

Assignment of Pledge and Security Agreement
JMJ Development to Southern Properties

This is an absolute and present assignment of the Pledges by Assignor to Assignee. In the event that there is any default under that certain Promissory Note from Assignor to Assignee, then Assignee shall be entitled to all rights as secured party under the Pledges.

Assignor hereby agrees to indemnify and hold harmless Assignee from and against any and all losses incurred by Assignee as a result of claims brought against Assignee, as Assignor's successor in interest in the Pledges hereby assigned, relating to causes of action arising from any actions or omissions of the landlord under the Pledges occurring prior to the date hereof.

EXECUTED this _____ day of December, 2017

JMJ DEVELOPMENT, LLC
a Texas limited liability company

By: _____
    Timothy Barton, President

2

Assignment of Pledge and Security Agreement
JMJ Development to Southern Properties

App. 1367

# EXHIBIT J-9

## FIRST AMENDMENT TO
## PROMISSORY NOTE

**THIS FIRST AMENDMENT TO PROMISSORY NOTE** (the "Amendment"), dated as of October 1, 2019, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD, a British Virgin Island company (the "Lender").

**WHEREAS**, the Borrower and Lender are parties to that certain Promissory Note, dated December 2017, in the amount of $7,300,000.00 (the "Promissory Note"); and

**WHEREAS**, the Borrower and Lender desire to amend the Promissory by the addition of Article V, Asset Management and Fees.

**NOW THEREFORE,** in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is here agreed by each party hereto as follows:

1.    Amendment to Promissory Note. It is hereby agreed and understood that the Promissory Note shall be amended by adding the following in its entirety:

## ARTICLE V
## ASSET MANAGEMENT AND FEES

5.1    *Asset Management.* Lender shall be responsible for providing Asset Management services (the "Services"), which includes direction to property management to ensure that the Real Estate (also referred to in this Note as the "Property") performs in a manner consistent with the other properties in the portfolio of the Lender.

5.2    *Asset Management Fee.* As compensation for providing the Services described above, Borrower shall pay to the Lender the Net Income of the Property as defined by the Semi-Annual HUD approved Excess Cash Release.

5.3    *Termination Fee.*

(a)    Termination as a Result of a Sale or Transfer of the Property to the Lender. In the event of a sale or transfer of the Property to Lender, the obligation to pay the Asset Management Fee shall terminate as of the date of sale or transfer.

(b)    Termination as a Result of a Sale or Transfer of the Property Other than to the Lender. In the event of a sale or transfer of the Property to any party other than the Lender, the obligation to pay the Asset Management Fee shall terminate as of the date of sale or transfer; provided, however, Lender shall be entitled to receive a payment equal to the HUD Excess Cash Release formula through the Closing Date at the time such Excess Cash payment is distributed.

5.4    *Defined Terms.* All capitalized terms used in this Article V, and not otherwise defined in this Note, shall have the meaning ascribed to such terms in the HUD Regulatory Agreement that governs the HUD insured construction loan obtained by D4FR, LLC for construction of the Project upon the Property.

First Amendment to Promissory Note – Parc at Windmill Farms
JMJ Development, LLC - SPC

1

App. 1369

2. Except as amended hereby, all terms, conditions and provisions of the Promissory Note shall remain in full force and effect as originally written.

IN WITNESS WHEREOF, the parties hereto have duly executed this First Amendment to Promissory Note, as of the date and year first above written.

**BORROWER:**

JMJ Development, LLC
a Texas limited liability company

By: _____
Timothy Barton, President

**Accepted By:**

**LENDER:**

Southern Properties Capital LTD
a British Virgin Island company

By: _____
Daniel J. Moos, President

First Amendment to Promissory Note – Parc at Windmill Farms
JMJ Development, LLC - SPC

2

App. 1370

# EXHIBIT J-10

## RESCISSION OF FIRST AMENDMENT
## TO PROMISSORY NOTE

This **RESCISSION OF FIRST AMENDMENT TO PROMISSORY NOTE**, effective as of October 1, 2019, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD., a British Virgin Island company (the "Lender").

**WHEREAS**, Borrower and Lender are parties to that certain Promissory Note, dated on or about December 14, 2017, in the amount of $7,300,000.00 (the "Promissory Note");

**WHEREAS**, Borrower and Lender are parties to that certain First Amendment to Promissory Note, dated October 1, 2019 (the "Amendment"); and

**WHEREAS**, Borrower and Lender desire to rescind the First Amendment to the Promissory Note which added Article V, Asset Management and Fees to the Promissory Note.

**NOW, THERFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by each party hereto as follows:

1.    Rescission of Amendment to Promissory Note. It is hereby agreed and understood that the First Amendment to the Promissory Note is hereby removed in its entirety and the Promissory Note no longer reflects such amendment.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Rescission of First Amendment to Promissory Note, as of the date and year first above written.

**BORROWER:**

**JMJ DEVELOPMENT, LLC**
a Texas limited liability company

By:_____
Timothy Barton, President

**Accepted By:**

**LENDER:**

**Southern Properties Capital LTD**
a British Virgin Island company

By:_____
Daniel J. Moos, President

K:\Abode\Corps\SPC\Loans (incl Revolving LOC, Options) Convertible Loans Parc at Windmill Farms 100119 Rescission to 1st Amendment (Article V) JMJ Dev to SPC.docx

# EXHIBIT J-11

# FIRST AMENDMENT TO
# LETTER LOAN AGREEMENT

**THIS FIRST AMENDMENT TO LETTER LOAN AGREEMENT** (the "Amendment"), dated as of October 25, 2019, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD, a British Virgin Island company (the "Lender").

**WHEREAS**, the Borrower and Lender are parties to that certain Letter Loan Agreement, dated on or about December 14, 2017 (the "Letter Loan Agreement"), in the amount of $7,300,000.00 (the "Loan");

**WHEREAS,** the Borrower and Lender desire to amend the Letter Loan Agreement by increasing the amount of the Loan to $8,300,000.00.

**NOW THEREFORE,** in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is here agreed by each party hereto as follows:

1. It is hereby agreed and understood that the Letter Loan Agreement shall be amended by increasing the Loan to $8,300,000.00 (the "Amended Loan").

2. Except as amended hereby, all terms, conditions and provisions of the Original Promissory Note shall remain in full force and effect as originally written.

[Signatures on next page]

IN WITNESS WHEREOF, the parties hereto have duly executed this First Amendment to Letter Loan Agreement, as of the date and year first above written.

**BORROWER:**

JMJ Development, LLC
a Texas limited liability company

By: _____
Timothy Barton, President

**Accepted By:**

**LENDER:**

Southern Properties Capital LTD
a British Virgin Island company

By: _____
Daniel J. Moos, President

First Amendment to Letter Loan Agreement – Parc at Windmill Farms
SPC to JMJ Development

2

App. 1375

# EXHIBIT J-12

## SECOND AMENDMENT
## TO PROMISSORY NOTE

**THIS SECOND AMENDMENT TO PROMISSORY NOTE** (the "Amendment"), dated as of October 25, 2019, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD, a British Virgin Island company (the "Lender").

**WHEREAS,** the Borrower and Lender are parties to that certain First Amendment to Promissory Note, dated October 1 2019 (the "First Amendment");

**WHEREAS,** the Borrower and Lender are parties to that certain Promissory Note, dated on or about December 14, 2017, in the amount of $7,300,000.00 (the "Original Promissory Note"); and

**WHEREAS,** the Borrower and Lender desire to amend the Original Promissory Note by increasing the amount of the Original Promissory Note to $8,300,000.00.

**NOW THEREFORE,** in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is here agreed by each party hereto as follows:

1.  It is hereby agreed and understood that the Original Promissory Note shall be amended by increasing the amount to $8,300,000.00.

2.  Except as amended hereby, all terms, conditions and provisions of the Promissory Note and First Amendment shall remain in full force and effect as originally written.

[Signatures on next page]

App. 1377

IN WITNESS WHEREOF, the parties hereto have duly executed this Second Amendment to Promissory Note, as of the date and year first above written.

**BORROWER:**

JMJ Development, LLC
a Texas limited liability company

By: _____
Timothy Barton, President

<u>**Accepted By:**</u>

**LENDER:**

Southern Properties Capital LTD
a British Virgin Island company

By: _____
Daniel J. Moos, President

Second Amendment to Promissory Note – Parc at Windmill Farms
JMJ Development, LLC - SPC

2

App. 1378

# EXHIBIT J-13

## FIRST AMENDMENT TO AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT

THIS First Amendment (the "Amendment") to the Amended and Restated Pledge and Security Agreement (the "Pledge Agreement") is executed effective October 25, 2019 among Enoch Investments LLC, a Delaware limited liability company ("Pledgor") and JMJ Development, LLC, a Texas limited liability company (together with its successors and assigns, "Lender").

**WHEREAS,** pursuant to that certain Letter Agreement, dated on or about December 14, 2017 between TRWF LLC, a Delaware limited liability company (the "Borrower") and Lender, as amended, restated, replaced, supplemented or otherwise modified (the "Loan Agreement"), Lender agreed to make a loan in the amount of $7,300,000.00 (the "Loan") to Borrower.

**WHEREAS,** to secure Borrower's obligations under the Loan Documents, defined as the Note, Pledge Agreement, this Amendment and any other agreement given in connection with the Loan (the "Loan Documents"), Pledgor was required to, among other things, pledge its rights, title and interest in, to and under the Collateral.

**WHEREAS,** the Borrower and Lender desire to amend the Loan Agreement to increase the Loan to $8,300,000.00 (the "Amended Loan") and therefore have obligated Pledgor and Lender to amend the Pledge Agreement via this Amendment. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Documents,

**NOW THEREFORE,** for and consideration of the foregoing, ten dollars ($10.00) and other good and valuable consideration, the parties agree as follows:

1. The term "Loan" as defined in the Pledge shall mean $8,300,000.00 (the "Amended Loan").

2. Except as amended hereby, all terms, conditions and provisions of the Pledge Agreement shall remain in full force and effect as originally written.

[Signatures on next page]

IN WITNESS WHEREOF, the parties hereto have duly executed this First Amendment to Amended and Restated Pledge and Security Agreement, as of the date and year first above written.

PLEDGOR:

ENOCH INVESTMENTS LLC,
a Delaware limited liability company

By:_____
    Timothy Barton, President

LENDER:

JMJ DEVELOPMENT LLC
a Texas limited liability company

By:_____
    Timothy Barton, President

2
AMENDMENT TO AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT
Parc at Windmill Farms-Enoch Investments LLC and JMJ Development LLC

App. 1381

## FIRST AMENDMENT TO AMENDED AND RESTATED
## PLEDGE AND SECURITY AGREEMENT

THIS First Amendment (the "Amendment") to the Amended and Restated Pledge and Security Agreement (the "Pledge Agreement") is executed effective October 25, 2019 among TRWF LLC, a Delaware limited liability company ("Pledgor") and JMJ Development, LLC, a Texas limited liability company (together with its successors and assigns, "Lender").

**WHEREAS**, pursuant to that certain Letter Agreement, dated on or about December 14, 2017 between Pledgor (the "Borrower") and Lender, as amended, restated, replaced, supplemented or otherwise modified (the "Loan Agreement"), Lender agreed to make a loan in the amount of $7,300,000.00 (the "Loan") to Borrower.

**WHEREAS**, to secure Borrower's obligations under the Loan Documents, defined as the Note, Pledge Agreement, this Amendment and any other agreement given in connection with the Loan (the "Loan Documents"), Pledgor was required to, among other things, pledge its rights, title and interest in, to and under the Collateral.

**WHEREAS**, the Borrower and Lender desire to amend the Loan Agreement to increase the Loan to $8,300,000.00 (the "Amended Loan") and therefore have obligated Pledgor and Lender to amend the Pledge Agreement via this Amendment. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Documents,

**NOW THEREFORE**, for and consideration of the foregoing, ten dollars ($10.00) and other good and valuable consideration, the parties agree as follows:

1.    The term "Loan" as defined in the Pledge shall mean $8,300,000.00 (the "Amended Loan").

2.    Except as amended hereby, all terms, conditions and provisions of the Pledge Agreement shall remain in full force and effect as originally written.

[Signatures on next page]

IN WITNESS WHEREOF, the parties hereto have duly executed this First Amendment to Amended and Restated Pledge and Security Agreement, as of the date and year first above written.

PLEDGOR:

TRWF LLC,
a Delaware limited liability company

By:_____
            Timothy Barton, President

LENDER:

JMJ DEVELOPMENT LLC
a Texas limited liability company

By:_____
            Timothy Barton, President

2
AMENDMENT TO AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT
Parc at Windmill Farms-TRWF LLC and JMJ Development LLC

App. 1383

## FIRST AMENDMENT TO AMENDED AND RESTATED
## PLEDGE AND SECURITY AGREEMENT

THIS First Amendment (the "Amendment") to the Amended and Restated Pledge and Security Agreement (the "Pledge Agreement") is executed effective October 25, 2019 among JMJAV, LLC, a Texas limited liability company ("Pledgor") and JMJ Development, LLC, a Texas limited liability company (together with its successors and assigns, "Lender").

**WHEREAS,** pursuant to that certain Letter Agreement, dated on or about December 14, 2017 between TRWF LLC, a Delaware limited liability company (the "Borrower") and Lender, as amended, restated, replaced, supplemented or otherwise modified (the "Loan Agreement"), Lender agreed to make a loan in the amount of $7,300,000.00 (the "Loan") to Borrower.

**WHEREAS,** to secure Borrower's obligations under the Loan Documents, defined as the Note, Pledge Agreement, this Amendment and any other agreement given in connection with the Loan (the "Loan Documents"), Pledgor was required to, among other things, pledge its rights, title and interest in, to and under the Collateral.

**WHEREAS,** the Borrower and Lender desire to amend the Loan Agreement to increase the Loan to $8,300,000.00 (the "Amended Loan") and therefore have obligated Pledgor and Lender to amend the Pledge Agreement via this Amendment. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Documents,

**NOW THEREFORE,** for and consideration of the foregoing, ten dollars ($10.00) and other good and valuable consideration, the parties agree as follows:

1.    The term "Loan" as defined in the Pledge shall mean $8,300,000.00 (the "Amended Loan").

2.    Except as amended hereby, all terms, conditions and provisions of the Pledge Agreement shall remain in full force and effect as originally written.

[Signatures on next page]

1
AMENDMENT TO AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT
Parc at Windmill Farms-JMJAV LLC and JMJ Development LLC

App. 1384

IN WITNESS WHEREOF, the parties hereto have duly executed this First Amendment to Amended and Restated Pledge and Security Agreement, as of the date and year first above written.

PLEDGOR:

**JMJAV LLC,**
a Texas limited liability company

By:_____
Timothy Barton, President

**LENDER:**

**JMJ DEVELOPMENT LLC**
a Texas limited liability company

By:_____
Timothy Barton, President

2

AMENDMENT TO AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT
Parc at Windmill Farms-JMJAV LLC and JMJ Development LLC

App. 1385

# EXHIBIT J-14

## THIRD AMENDMENT TO
## PROMISSORY NOTE

This Third Amendment to the Promissory Note ("Amendment") is entered into effective as of the 1st day of May, 2020 ("Effective Date"), by and between **JMJ DEVELOPMENT, LLC,** a Texas limited liability company ("Borrower") and **SOUTHERN PROPERTIES CAPITAL, LTD,** a British Virgin Islands corporation ("Lender").

### RECITALS

A.     Pursuant to a Promissory Note ("Note") from Borrower to Lender, dated as of December 14, 2017 and the Second Amendment to Promissory Note ("Second Amendment"), dated as of October 25, 2019, Lender made a loan of $8,300,000.00 to Borrower.

B.     The parties desire to amend the Note as more fully described below.

### AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     The Maturity Date, as such term is defined in the Note, is changed to November 1, 2020.

2.     Except as expressly modified and extended hereby, all terms and provisions of the Note are and shall remain unchanged, and the Loan Documents are hereby ratified and confirmed and shall be and shall remain in full force and effect.

3.     Borrower hereby agrees and acknowledges that it is well, justly and truly indebted to Lender pursuant to the terms of the Note, as modified and extended hereby. Borrower hereby promises to pay to Lender or its order the Note in accordance with the terms thereof, as modified, and extended hereby.

4.     Borrower hereby represents and warrants that there are no offsets, claims, counterclaims or defenses which Borrower has against payment and enforcement of the Note, as modified herein.

5.     Notwithstanding anything to the contrary in this Agreement or in the Note, whether now existing or hereafter arising and whether written or oral, it is agreed that the aggregate of all interest and other charges constituting interest and contracted for, chargeable or receivable under the Note or otherwise in connection thereof shall, under no circumstances, exceed the maximum rate of interest permitted by applicable law. In the event the maturity of the Note is accelerated by reason of an election by the holder thereof resulting from a default under the Loan Documents or this Agreement, or by voluntary prepayment by the maker, or otherwise, then earned interest never may include more than the maximum rate of interest permitted by applicable law. If, for any circumstance, any holder of the Note ever shall receive interest or any other charges constituting interest, or adjudicated as

constituting interest, the amount, if any, which would exceed the maximum rate of interest permitted by applicable law shall be applied to the reduction of the principal amount owing on the Note or on account of any other principal indebtedness of the maker to the holder of the Note, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal thereof and such other indebtedness, the amount of such excessive interest that exceeds the unpaid balance of principal thereof and such other indebtedness shall be refunded to the maker. All sums paid or agreed to be paid to the holder of the Note for the use, forbearance or detention of the indebtedness of the maker to the holder of such Note shall be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the actual rate on such indebtedness is uniform through the term thereof.

6.      This Agreement shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

7.      This Agreement shall be deemed to have been executed and shall be performed in the State of Texas, and the Note shall continue to be governed by its laws. Borrower irrevocably agrees that, subject to Lender's sole and absolute election, Lender may bring suit, action, or other legal proceedings arising out of the Note in courts located in Texas, whether local, state, or federal. Borrower hereby submits to the jurisdiction of such court(s) and waives any right Borrower may have to request a change of venue or a removal to another court.

8.      This Agreement represents the final agreement between the parties herein and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

**BORROWER:**

**JMJ DEVELOPMENT, LLC,**
a Texas limited liabilty company

By: _____
Timothy Barton, President

**LENDER:**

**SOUTHERN PROPERTIES CAPITAL, LTD,**
a British Virgin Islands corporation

By: _____
Name: _____
Title: _____

App. 1389

# EXHIBIT J-15

# FOURTH AMENDMENT TO
# PROMISSORY NOTE

This Fourth Amendment to Promissory Note ("Amendment") is entered into effective as of the 1st day of November, 2020 ("Effective Date"), by and between **JMJ DEVELOPMENT, LLC,** a Texas limited liability company ("Borrower") and **SOUTHERN PROPERTIES CAPITAL, LTD,** a British Virgin Islands corporation ("Lender").

## RECITALS

A.   As evidenced by that certain Promissory Note ("Note"), dated on or about December 14, 2017, executed by Borrower and made payable to Lender, Lender made a loan in the amount of $7,300,000.00 to Borrower.

B.   Borrower and Lender subsequently executed a First Amendment to Promissory Note ("First Amendment"), dated as of October 1, 2019, which First Amendment was rescinded in its entirety by a Rescission of First Amendment to Promissory Note, dated as of October 1, 2019, and duly executed by Borrower and Lender.

C.   Borrower and Lender subsequently executed a Second Amendment to Promissory Note ("Second Amendment"), dated as of October 25, 2019, wherein the loan amount was increased from $7,300,000.00 to $8,300,000.00.

D.   Borrower and Lender subsequently executed a Third Amendment to Promissory Note ("Third Amendment"), dated as of May 1, 2020, wherein the maturity date of the Note was extended from May 1, 2020 to November 1, 2020.

E.   Borrower and Lender desire to further amend the Note, as amended by the Second Amendment and the Third Amendment, to extend the maturity date of the Note from November 1, 2020, to November 1, 2022, as more fully described below.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.   The Maturity Date, as such term is defined in the Note, as amended, is changed to November 1, 2022.

2.   Except as expressly modified and extended hereby, all terms and provisions of the Note are and shall remain unchanged, and the Note and all loan documents relating thereto are hereby ratified and confirmed and shall be and shall remain in full force and effect.

3.   Borrower hereby agrees and acknowledges that it is well, justly and truly indebted to Lender

FOURTH AMENDMENT TO PROMISSORY NOTE - Page 1
1161866_1 – Parc at Windmill Farms – SPC - JMJ Loan – Fourth Amendment to Note1 – 6915.0016

App. 1391

pursuant to the terms of the Note, as modified and extended hereby.  Borrower hereby promises to pay to Lender or its order the Note in accordance with the terms thereof, as modified and extended hereby.

4.      Borrower hereby represents and warrants that there are no offsets, claims, counterclaims or defenses which Borrower has against payment and enforcement of the Note, as modified herein.

5.      This Agreement represents the final agreement between the parties herein and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

FOURTH AMENDMENT TO PROMISSORY NOTE - Page 2
1161866_1 – Parc at Windmill Farms – SPC - JMJ Loan – Fourth Amendment to Note1 – 6915.0016

App. 1392

**BORROWER:**

**JMJ DEVELOPMENT, LLC,**
a Texas limited liability company

By: _____
    Timothy Barton, President

App. 1393

**LENDER:**

**SOUTHERN PROPERTIES CAPITAL, LTD,**
a British Virgin Islands corporation

By: _____

Name: ___Erik L. Johnson_____

Title: ___President_____

App. 1394

# EXHIBIT J-16

## SECOND AMENDMENT TO
## LETTER LOAN AGREEMENT

**THIS SECOND AMENDMENT TO LETTER LOAN AGREEMENT** (the "Amendment"), dated May 31, 2021, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD, a British Virgin Island company (the "Lender").

**WHEREAS**, the Borrower and Lender are parties to that certain Letter Loan Agreement, dated on or about December 14, 2017 (the "Letter Loan Agreement"), in the amount of $7,300,000.00 (the "Loan") as evidenced by a Promissory Note of even date therewith, as amended ("Note") and a ;

**WHEREAS**, the Letter Loan Agreement was amended by a First Amendment to Letter Loan Agreement, dated October 25, 2019, to increase the Loan to $8,300,000.00 (the "Amended Loan");

**WHEREAS**, Borrower entered into a Development Agreement with D4FR, LLC, a Texas limited liability company dated November 6, 2017 for the development of the property described therein;

**WHEREAS**, the Borrower and Lender desire to amend the Letter Loan Agreement to add an additional Event of Default, as defined in the Letter Loan Agreement;

**NOW THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by each party hereto as follows:

1. It is hereby agreed and understood that an Event of Default, as defined in the Letter Loan Agreement, shall also mean the following:

   "any event of default under the Development Agreement. Upon the occurrence of any default under the Development Agreement, regardless of whether any party is or may be entitled to cure such default and regardless of whether the either party of the Development Agreement has commenced the exercise of remedies, Lender shall be entitled to exercise any and all remedies available under the Development Agreement or at law or in equity.

SECOND AMENDMENT TO LETTER AGREEMENT – Page 1
117631S_1 JMJ – Parc at Windmill Farms (6915.0016)

2.  Except as amended hereby, all terms conditions and provisions of the Letter Loan Agreement, Note and any other loan document related to the Loan shall remain in full force and effect as originally written.

IN WITNESS WHEREOF, the parties hereto have duly executed this Second Amendment to Letter Loan Agreement, as of the date and year first above written.

BORROWER:

JMJ Development, LLC
a Texas limited liability company

By:  _____
     Timothy Barton, President

LENDER:

Southern Properties Capital LTD
a British Virgin Island company

By:  _____
     Erik Johnson, President

SECOND AMENDMENT TO LETTER AGREEMENT – Page 2
1176315_1 JMJ – Parc at Windmill Farms (6915.0016)

App. 1397

2. Except as amended hereby, all terms conditions and provisions of the Letter Loan Agreement, Note and any other loan document related to the Loan shall remain in full force and effect as originally written.

IN WITNESS WHEREOF, the parties hereto have duly executed this Second Amendment to Letter Loan Agreement, as of the date and year first above written.

BORROWER:

JMJ Development, LLC
a Texas limited liability company

By: _____
Timothy Barton, President

LENDER:

Southern Properties Capital LTD
a British Virgin Island company

By: _____
Erik Johnson, President

App. 1398

# EXHIBIT J-17



Uniform Commercial Code
P.O. Box 13193
Austin,Texas 78711-3193

Ruth R. Hughs
Secretary of State

## Office of the Secretary of State

May 13, 2020
Page 1 of 1
Filing Fee:          $30.00

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767 -

**Total Filing Fee:**      $30.00

Re:  **Texas UCC Initial Filing Acknowledgment**

The Texas Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed into our system.

Initial Filing Type: **Financing Statement**

Initial Filing Number: **20-0017679567**          Filing Date: **05/13/2020**          Filing Time: **11:56 a.m.**

Lapse Date: **05/13/2025**                        Document Number: **970068230002**

| Party Type | Party Name and Address |
|---|---|
| Debtor | **ENOCH INVESTMENTS LLC** |
| | **1755 WITTINGTON PLACE SUITE 340, FARMERS BRANCH, TX, USA, 75234** |
| Secured Party | **SOUTHERN PROPERTIES CAPITAL LTD** |
| | **1603 LBJ FREEWAY, SUITE 280, FARMERS BRANCH, TX, USA, 75234** |

Please feel free to contact us at 512-475-2703 if you have any questions regarding the above information.

User ID: JHUNT

FILING NUMBER: 20-0097679364
FILING DATE: 5/13/2020 11:56 AM
DOCUMENT NUMBER: 970068230002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Date Chin, 214-350-3667**

B. E-MAIL CONTACT AT FILER (optional)
**dchin@bennettweston.com**

C. S

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **ENOCH INVESTMENTS LLC** | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| **1755 Wittington Place Suite 340** | **Farmers Branch** | **TX** \| **75234** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **SOUTHERN PROPERTIES CAPITAL LTD** | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| **1603 LBJ Freeway, Suite 280** | **Farmers Branch** | **TX** \| **75234** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**See Exhibit "A" attached hereto and made a part hereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Parc at Windmill Farms - ENOCH INVESTMENTS Secured Interest - DOT UCC - TX SOS Filing**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 1401

**EXHIBIT "A"**

100% of its interest in JMJD4 LLC which consist of 99% of the membership interest in JMJD4 LLC.

# EXHIBIT J-18

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchin@bennettweston.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Bennett, Weston, Lajone & Turner P.C.
Attn: Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas 75234

Delaware Department of State
U.C.C. Filing Section
Filed: 12:46 PM 05/13/2020
U.C.C. Initial Filing No: 2020 3378223

Service Request No: 20203837199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TRWF LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1755 Wittington Place Suite 340 | Farmers Branch | TX | 75234 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - TRWF Secured Interest - DOT UCC - DE SOS Filing

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 1404

## EXHIBIT "A"

100% of its interest in JMJAV LLC which consist of 100% of the membership interest in JMJAV LLC.

# EXHIBIT J-19

FILING NUMBER: 20-0017975172
FILING DATE: 5/14/2020 12:15 PM
DOCUMENT NUMBER: 970482800002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. S

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL
SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJAV LLC | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX  POSTAL CODE 75244 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX  POSTAL CODE 75234 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN JMJD4 LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN JMJD4 LLC.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJAV – JMJD4 – TX – STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 1407

# EXHIBIT J-20

FILING NUMBER: 20-0017974808
FILING DATE: 5/14/2020 11:53 AM
DOCUMENT NUMBER: 970482710002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL
SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJAV LLC | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS 13901 MIDWAY ROAD SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |
|---|---|---|---|---|

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |
|---|---|---|---|---|

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN D4FR LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN D4FR LLC

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJAV — D4FR — TX — STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 1409

# EXHIBIT J-21

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

┌ CAPITOL SERVICES, INC. ┐

└ ┘

Delaware Department of State
U.C.C. Filing Section
Filed: 12:00 PM 05/14/2020
U.C.C. Initial Filing No: 2020 3407113

Service Request No: 20203897739

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJD4 LLC | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX  POSTAL CODE 75244 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 280 | CITY DALLAS | STATE TX  POSTAL CODE 75234 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:

100% OF ITS INTEREST IN D4FR LLC WHICH CONSISTS OF 98.50% OF THE MEMBERSHIP INTEREST IN D4FR LLC.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJD4 ~ D4FR ~ DE ~ STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

App. 1411

# EXHIBIT J-22

## SOUTHERN PROPERTIES CAPITAL LTD.
### 1603 LBJ Freeway, Suite 800
### Dallas, Texas 75234

October 3, 2022

**VIA HAND DELIVERY**
ENOCH INVESTMENTS, LLC
TRWF LLC
JMJAV, LLC
D4FR, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attn: Timothy Barton

Re:    Conversion option for Parc at Windmill Farms Apartments Project;
       **EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Parc at Windmill Farms, Forney, Texas ("Project").

Attached is a proposed purchase contract to effect a transfer from the Project owner, D4FR LLC to SPC through a deed, once the lender on the Project and HUD have consented to the transfer. Also attached is a check for $100.00 made out to Enoch Investments, LLC, TRWF LLC and JMJAV, LLC.

Please return the signed contract so we can continue to process a TPA approval of the transfer. If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

SOUTHERN PROPERTIES CAPITAL LTD.

By: _____
      Bradley J. Muth, President

15519368v1

App. 1413

Enoch Investments/TRWF/JMJAV
JMJ01

CHECK PAYMENT NBF    311666    DATE    10/03/2022

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION-NOTE_1 | SPC Conversion Notice | $ 100.00 |

| | | TOTALS: | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234

---

THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**Southern Properties Capital Ltd**
1603 LBJ Freeway, Suite 800
Dallas, TX 75234          (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS          311666

1-279/260

DATE   10/03/2022

PAY TO THE
ORDER OF    Enoch Investments/TRWF/JMJAV

AMOUNT
$ 100.00

*One Hundred Dollars and 00 Cents*

Enoch Investments/TRWF/JMJAV
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
Dallas, TX 75234

Alla Dzyuba

⑾311666⑾ ⑆026002794⑇ 4104294800⑾

App. 1414

## AGREEMENT FOR PURCHASE AND SALE

This **AGREEMENT FOR PURCHASE AND SALE** (this "**Agreement**"), is made and entered into as of October ___, 2022 (the "Effective Date"), by and between SOUTHERN PROPERTIES CAPITAL LTD., a British Virgin Islands corporation ("**Purchaser**"), and D4FR LLC, a Texas limited liability company ("**Seller**").

## WITNESSETH:

## ARTICLE 1: AGREEMENT FOR PURCHASE AND SALE

1.1    Seller agrees to sell and cause to be conveyed to Purchaser, and Purchaser agrees to purchase, the following real and personal property (collectively, the "**Project**") on the terms and conditions contained herein:

(a)    The real property located in the City of Forney, Dallas County, State of Texas, described with particularity on Exhibit "A" (the "**Land**") together with all existing buildings, structures, fixtures, amenities and improvements thereon situated including apartment units known as the Parc at Windmill Farms Apartments, and together with all easements and other rights appurtenant to such Land, as well as Seller's rights, titles and interests in and to the mineral rights for the Land, if any (together, the "**Property**");

(b)    Seller's interest as landlord in all leases and occupancy agreements affecting the Property reflected in the current rent roll attached hereto as Exhibit "C" (the "**Current Rent Roll**"), as updated by the certified Closing Rent Roll to be delivered by Seller to Purchaser at Closing (the "**Leases**") or any space therein and any prepaid rent and Seller's interest in all security deposits and guaranties;

(c)    Seller's right, if any, to the use of the name "Parc at Windmill Farms Apartments" in connection with the Property and any other trademarks, copyrights, trade names or other intangible rights associated with the Property in which Seller has a transferable right including any telephone numbers associated with on-site management and leasing operations, and website(s) and internet address(es) which relate to the Property (the "**Intangible Property**");

(d)    All of Seller's right, title and interest in and to all items of personal property owned by Seller and located at the Property and used in the operation thereof including, without limitation, plans, specifications,  building supplies, marketing materials, boilers, HVAC equipment, alarms, signage, fittings, appliances, shades, wall-to-wall carpet, draperies, screens and screening, awnings, plants, shrubbery, landscaping, furniture, furnishings, office equipment, lawn care and building maintenance equipment, and other furnishings or items of personal property used in connection with the ownership and operation of the Land (the "**Personal Property**");

(e)    All of Seller's right, title and interest in and to all service contracts and agreements relating to the Property, to the extent such agreements are permitted under this Agreement (the "**Contracts**") (but specifically excluding management and leasing agreements ("**Management and Leasing Agreements**"), which will be terminated by Seller on or before

Closing), all rights of actions against previous owners of the Land and Improvements, and any unexpired warranties and guarantees relating to the Personal Property;

      (f)    All of Seller's right, title and interest in and to any permits, certificates of occupancy or other licenses and governmental approvals held by Seller in connection with the ownership or operation of the Project (the "**Permits**"), to the extent that the same are assignable; and

      (g) All escrows and reserves associated with the First Lien (hereinafter defined) for the Project, including, without limitation, the tax and insurance reserves, the MIP reserve and the replacement and repair reserve.

## ARTICLE 2: PURCHASE PRICE

2.1    The purchase price (the "**Purchase Price**") for the Project shall be an amount equal to the First Lien Amount as hereinafter defined, payable as follows:

      Assumption by Purchaser of the unpaid balance of the existing HUD-insured note and first lien mortgage, dated December 1, 2017, encumbering the Property in the original principal amount of $36,240,000.00 ("**First Lien**"). The amount to be assumed will be the outstanding principal balance, plus accrued but unpaid interest, as of Closing ("**First Lien Amount**").

2.2    (a)    Not later than three (3) business days after the Effective Date of this Agreement, Purchaser shall deliver a check in the amount of $1,000.00 ("**Earnest Money Deposit**") to Commonwealth Land Title Insurance Company (the "**Title Company**"), 5949 Sherry Lane, Suite 111, Dallas, Texas 75225, Attn: James P. Lazar ("**Escrow Agent**") to be held in escrow in an interest-bearing account pursuant to the terms of this Agreement pending the Closing.

      (b)    As used in this Agreement, the term "Deposit" shall mean any sums, including the Earnest Money Deposit, and, if applicable, the Closing Extension Deposit, and instruments and accrued interest thereon, if any, held by Escrow Agent hereunder. The Deposit shall be applied to the Purchase Price at the Closing. If Purchaser desires to terminate this Agreement pursuant to a right granted to Purchaser in any section of this Agreement, Purchaser shall effect such termination by giving written notice thereof to Seller and Escrow Agent within any applicable time period provided therefor in this Agreement. Upon receipt of such notice, unless otherwise provided herein, Escrow Agent shall return the Deposit to Purchaser without the requirement of any further notice or instruction, this Agreement shall wholly cease and terminate, and no party to this Agreement shall have any further claim against, or obligation to, any other party to this Agreement except as expressly provided herein, and the lien, if any, of Purchaser against the Project shall automatically cease and terminate. In the event that notice shall not have been given or be deemed to have been given prior to the last day of the Inspection Period (as hereinafter defined) and Seller shall object to the disbursal of the Deposit, the Escrow Agent shall hold the Deposit pending a non-appealable adjudication by a court of competent jurisdiction or by joint written instructions of Seller and Purchaser.

## ARTICLE 3:  PHYSICAL CONDITION OF PROJECT, INSPECTION PERIOD

3.1     Purchaser will inspect the Project during the hereinafter described Inspection Period.  Purchaser acknowledges that Seller has not made, does not make and is unwilling to make any express or implied representations or warranties as to the present, past or future physical condition, income, expenses, operation, legality of occupancy or any other matter affecting or related to the Project except as specifically set forth in this Agreement.  No representation, warranty or covenant made by Seller in this Agreement or any document delivered pursuant hereto shall survive the Closing except as expressly provided in this Agreement.  Purchaser agrees to purchase the Project in its "AS IS" condition (but subject only to the express representations and warranties herein) with a complete waiver of any and all warranties as to the condition of the Project or its fitness for any purpose, other than as expressly provided herein, all in accordance with the waiver language to be included in the Special Warranty Deed conveying the Property to Purchaser (the "**Deed**").

3.2     Any documents, records or information provided to Purchaser in connection with Purchaser's inspection of the Project shall be kept in strictest confidence (but may be disclosed to Purchaser's agents, brokers, accountants, advisors, consultants, attorneys and prospective lenders or investors) and shall be returned to Seller in the event that this Agreement is canceled for any reason.  In the event that Purchaser elects not to proceed with this transaction, Purchaser shall deliver to Seller copies of all reports prepared for Purchaser by third-parties in connection with its inspection, without any representation as to the accuracy thereof, upon receipt of payment from Seller of the actual costs for such reports incurred by Purchaser.

3.3     Seller represents and warrants to Purchaser as of the date of this Agreement as follows:

(a)     Seller is a Texas limited liability company, duly formed, validly existing and in good standing in the state of its formation and is qualified to do business in Texas.

(b)     Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained.

(c)     All Due Diligence Materials delivered in furtherance of Purchaser's inspection of the Project, including all leases, lease correspondence, and rent rolls have been prepared and assembled in the ordinary course of business by Seller's fee manager, are believed to be true, complete and accurate and have been relied upon by Seller.

(d)     The Rent Roll is a true, correct and complete list of all of the Leases and rent roll for the Property.  The rents and other sums due or to become due under each Lease have not been assigned, encumbered or subjected to any lien by Seller. Seller has provided Purchaser with true, correct and complete copies of all the Leases, including all amendments thereto.  To Seller's actual knowledge, which has not been contradicted by any written notice; (i) the Leases have been duly authorized and executed by the landlord, and, by the tenant thereunder, (ii) the Leases are in full force and effect according to the terms set forth therein, (iii) the Leases set forth

AGREEMENT FOR PURCHASE AND SALE – Page 3
15510776.1 – 110596.00001

App. 1417

the entire agreement between landlord and tenant with respect to the premises affected thereby; (iv) there are no uncured defaults under the Leases; and (v) the Rent Roll and other financial information prepared by Seller as part of the Seller Deliveries are true and complete in all material respects. Seller has not (i) made any representations to any tenant regarding the condition of the premises covered by any Lease or the compliance of the premises with any applicable governmental regulations, except as expressly set forth in the Leases, (ii) granted any concessions to any tenant not disclosed in such Lease; or (iii) received any written notice of any defaults under the Leases. There are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property other than any agreements explicitly contained in the Leases. The Leases set forth all Tenant inducement costs and commissions that are currently due and payable or which have otherwise accrued with respect to any Lease. Other than as provided for in the Leases, there are no other agreements, oral or written, in connection with any Tenant inducement costs or leasing commissions that may become due and payable in the future in connection with any Lease.

(e)    The operating statements of the Project to be delivered by Seller to Purchaser during the Inspection Period were prepared in the ordinary course of business by Seller's fee manager, are believed to be accurate, and have been relied upon by Seller.

(f)    To the best knowledge of Seller, the Permits have been duly and validly issued, are in full force and effect.

(g)    To the best knowledge of Seller, there is no litigation or arbitration or other legal or administrative suit, action, proceeding of any kind pending against or involving Seller relating to Seller's ownership of the Property or any part thereof which would prevent Seller from conveying the Project in accordance with this Agreement. Except as may be described in the Due Diligence Materials, Seller has not received any notice from any Governmental Authority with respect to any violation of any applicable zoning ordinances and building codes, flood disaster laws and health and environmental laws, rules and regulations (hereinafter collectively called the "Applicable Laws").

(h)    Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

(i)    Seller owns fee simple title to the Property, subject to the exceptions of record.

(j)    Except for the Contracts, there will be no contracts or other agreements which affect or will affect or which are or will be obligations of the Purchaser or the Property after the Close of Escrow. All of the service contracts currently effecting the Property ("Service Contracts") may be terminated without penalty or other payment upon no more than thirty (30) days' notice except for the contract for electrical service.

(k)    To Seller's knowledge, the Property is not in violation of any recorded covenants, conditions, restrictions or other agreements recorded in the Real Property Records of Dallas County, Texas ("Recorded CC&Rs").

App. 1418

(l)     To the best of Seller's knowledge or as described in the Due Diligence Materials (i) the Property is free of hazardous wastes, materials, substances, urea formaldehyde, PCB's and all other toxic, radioactive or hazardous wastes, materials, substances or contaminations in excess of amounts permitted under applicable federal, state and local regulations (collectively, "Hazardous Materials"); and (ii) no Hazardous Materials have been stored, disposed or located upon the Property except in the ordinary course of business for a multi-family residential community.  Without in any way limiting the generality of above, neither the Property nor the Seller are the subject of any pending or, to the best of Seller's knowledge or as described in the Due Diligence Materials or the Violation, threatened investigation or inquiry by any Governmental Authority, or are subject to any remedial obligations under any Applicable Laws pertaining to health or the environment ("Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1987, as amended ("RCRA"), and this representation and warranty would continue to be true and correct following disclosure to any applicable Governmental Authority of all relevant facts, conditions and circumstances pertaining to the Property and/or the Seller.  Seller has taken all steps necessary to determine and has determined that no hazardous substances, solid wastes, or other substances known or suspected to pose a threat to health or the environment ("Hazards") have been disposed of or otherwise released on or to the Property or exist on or within any portion of the Property.  To the knowledge of Seller, or as otherwise disclosed in the Due Diligence Materials, no prior use, either by Seller or the prior owners of the Property, has occurred, which violates any Applicable Environmental Laws.  The use which Seller makes of the Property will not result in the disposal or release of any hazardous substance, solid waste or Hazard on, in or to the Property.  The terms "hazardous substance" and "release" shall each have the meanings specified in CERCLA, and the terms "solid waste" and "disposal" (or "disposed") shall each have the meanings specified in RCRA; provided, however, that in the event either that CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided further that, to the extent that the laws of the State of Texas establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader definition shall apply.  To the best of Seller's knowledge and belief, there has been no litigation brought or threatened nor any settlement reached by or with any parties alleging the presence, disposal, release, or threatened release, of any hazard substance, solid wastes or Hazards from the use or operation of the Property.  To the best of Seller's knowledge and belief after diligent investigation and inquiry, the Property is not on any federal or state "Superfund" list, nor subject to any environmentally related liens.

(m)     Except as set forth in the Title Commitment or Due Diligence Materials, there are no unpaid assessments (governmental or otherwise) for sewers, water, paving, electrical power or otherwise affecting the Property (matured or unmatured) and, to the best of Seller's knowledge, no such assessments are threatened.  There are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(n)     At the Closing there will be no unpaid bills or claims in connection with any repair of the Property or other work performed or materials purchased in connection with the Property, or sufficient funds in the reasonable judgment of Purchaser shall be escrowed for such purpose.

AGREEMENT FOR PURCHASE AND SALE   Page 5
15510776.1   110596.00001

App. 1419

(o)     Seller has not received any written notice from any governmental entity of any violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Seller.

(p)     There are no persons employed by Seller in connection with the operation of the Property, and there are no maintenance, advertising, management, leasing, employment, or service contracts affecting the Property that will be in effect at Closing except for the Contracts unless expressly assumed in writing by Purchaser. Otherwise, Seller shall terminate any such employee and any such contracts (not expressly assumed by Purchaser) other than the Contracts at or prior to the Closing.

If, at any time prior to Closing, Seller shall discover that any representation or warranty contained in this Article 3.3 is, or has become, inaccurate in any material respect, Seller shall so notify Purchaser in writing (the "Correction Notice"), and Purchaser shall have the right by notice given in writing not more than five (5) business days after receipt of the Correction Notice to terminate this Agreement and receive a refund of the Deposit. The representations and warranties contained in this Agreement shall survive one (1) year from the Closing Date.

3.4     Purchaser intends to conduct its physical inspection of the Project beginning on the Effective Date of this Agreement and ending at 5:00 p.m. Dallas, Texas time, thirty (30) days after the Effective Date ("**Inspection Period**"). The Purchaser's inspection shall be at the sole cost and expense of Purchaser and at times approved in advance by Seller's manager (not to be unreasonably withheld) so as to minimize disturbance to the operations of the Project, its employees, and guests. Seller shall reasonably assist with such inspection and shall provide Purchaser with access to the Project, but shall not be obligated to incur any material cost or expense in connection therewith or to furnish any information other than at the place where same is maintained. During the Inspection Period, Seller shall provide Purchaser with accurate and complete copies of, or permit Purchaser to review at the Property, all books and records in the possession of Seller or its agents relating to the Project, including, without limitation, all of the Leases, Contracts and Permits, all lease files and correspondence, all property tax bills in Seller's possession, utility bills, and repair and maintenance records with respect to the Property and Personal Property. All information received by Purchaser relating to the Project, Seller or its affiliates shall be kept in strict confidence (subject to the terms above) and used solely for the purpose of determining the advisability of proceeding with the transaction described in this Agreement. On or before five (5) days after the Title Company's receipt of the Deposit, Seller shall deliver to Purchaser or make the items described on Exhibit "D" (collectively, the "**Due Diligence Materials**") available to Purchaser for Purchaser's review:

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS INSPECTED AND INVESTIGATED THE PROPERTY (OR PRIOR TO THE CLOSING WILL HAVE INSPECTED AND INVESTIGATED THE PROPERTY) AND HAS ENTERED INTO THIS AGREEMENT BASED UPON SUCH INVESTIGATION AND INSPECTION AND PURCHASER'S RIGHT TO CONDUCT THE INSPECTION AND INVESTIGATION PURSUANT TO THIS ARTICLE 3. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE ACT OF SALE,

PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED FOR OR ON BEHALF OF SELLER. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF THE SELLER AND EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, SELLER HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF SUITABILITY, HABITABILITY, CONDITION, ELIGIBILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF AND SELLER HAS NO LIABILITY OF ANY KIND TO PURCHASER ON ACCOUNT OF THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

3.5     In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "**Option**"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties. Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the Deposit is returned to Purchaser.

3.6     If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent at any time during the Inspection Period and have the Deposit, less the Option fee described in Section 3.5, above, returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement. If Purchaser does not give Seller and Escrow Agent written notice on or before 7 p.m. Central Time on the last day of the Inspection Period that Purchaser waives its right to terminate this Agreement pursuant to this Section 3.6, then Purchaser shall be deemed to have terminated this Agreement.

3.7     Purchaser shall have (10) ten days after the Inspection Period ("**Board Approval Period**") to obtain the approval of its Board of Directors to the transaction contemplated hereby. If Purchaser's Board of Directors approves this transaction, it shall give notice of such approval to Purchaser ("**Board Approval Notice**"). If Purchaser does not notify Seller within said period that such approval has been obtained, then this Agreement shall be deemed void ab initio and the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other.

3.8     Covenants.

(a)     Between the date of this Agreement and the Closing Seller shall continue to maintain the Property in accordance with Seller's prior practices, ordinary wear and tear, casualty

losses and condemnation excepted. During the term of this Agreement, Seller shall not take any action which would materially adversely affect the title to the Property.

(b)     Seller will cause fire and extended coverage insurance relating to the Property to be maintained in full force and effect at an amount no less than the full replacement cost of the Property.

(c)     Seller shall continue to operate the Property in accordance with its normal and customary practice after the Effective Date and prior to Closing, so that the Property will be in substantially the same condition on the Closing Date as on the Effective Date, reasonable wear and tear excepted. After the Effective Date, Seller shall not, without approval of Purchaser enter into any new Service Contracts that are not cancelable without any penalty or fee on thirty (30) days' or less notice by Seller. Seller shall terminate all Service Contracts related to the Property prior to Closing, unless Purchaser elects (prior to expiration of the Inspection Period) to assume such Service Contracts. From and after the Effective Date through the Closing, Seller, at its sole cost and expense, shall  (i) not voluntarily subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters,  (ii) not make any alterations to the Property, except in the ordinary course of business, all of which Seller shall complete at its sole cost and expense prior to Closing,  (iii) pay for all capital and other improvements which are performed or contracted for by Seller at or prior to Closing, and  (iv) not accept from any tenant payment of rent more than one (1) month in advance, or apply any security deposit to rent or any other default by any tenant. Seller shall continue to lease residential units in accordance with Seller's prior practices and market conditions.

(d)     Seller shall not remove any personal property from the Property without the consent of Seller unless the same is replaced by property of equal or greater value, and will make all necessary repairs and replacements during such time.

3.9     Conditions to Purchaser's Obligations. Purchaser's obligation to purchase the Property shall be conditioned upon the satisfaction of each of the following conditions prior to or simultaneously with the Closing any of which may be waived by written notice from Purchaser to Seller:

(a)     Seller has complied with and otherwise performed the obligations of Seller set forth in this Agreement.

(b)     All representations and warranties of Seller as set forth in this Agreement shall be in all material respects substantively true and correct as of the date hereof and on the date of Closing (except for representations which by their terms are made as of a specific date or refer to a specific date).

(c)    <u>Financing</u>

(1)    Seller is the borrower under the First Lien in the original principal amount of $36,240,000.00. The First Lien is secured by a first mortgage lien on the Property. As provided in Section 2 herein, Seller and Purchaser have agreed that the Purchase Price in the amount of the outstanding principal balance thereof shall be paid via Purchaser's assumption of the First Lien. Because the Project will be encumbered by financing insured by HUD, closing of this transaction shall be subject to the approval by HUD and the lender under the First Lien ("**Lender**") of a Transfer of Physical Assets ("**TPA**") of the Project. Any and all documents to be executed by Seller in connection with the TPA shall be subject to Purchaser's approval, not to be unreasonably withheld, conditioned or delayed. From and after the consummation by Seller of the HUD Final Endorsement Closing with respect to the First Lien until the Closing or earlier termination of this Agreement, Seller authorizes Purchaser to contact Lender with respect to facilitating the TPA and assumption of the First Lien ("Loan Assumption"). The "**Financing Contingency**" shall be deemed satisfied when the parties have obtained conditional Lender and HUD approval to the TPA with conditions, including the form of the Loan Assumption documents, approved by Purchaser in its reasonable discretion. Provided Seller has provided Purchaser with all documents necessary including the Due Diligence Documents, Purchaser agrees to file the application for TPA with the Lender by the date that is fourteen (14) days after the Board Approval Period. If Lender requires additional information from Seller or Purchaser, Purchaser shall have a reasonable amount of time after receipt of such information required to make a filing or supplemental filing. In the event that on or before the 180th day following the Board Approval Period (the "**Financing Contingency Deadline**"), the Financing Contingency has not been satisfied, this Agreement will terminate, the Deposit shall be returned to Purchaser, and the parties shall have no further obligations hereunder (except for obligations that are expressly intended to survive termination of this Agreement). At all times prior to satisfaction of the Financing Contingency, whether by the Financing Contingency Deadline or the Extended Financing Contingency Deadline, Seller shall reasonably cooperate with Purchaser in such efforts, including without limitation the execution of any applications which are required to be executed by the existing owner of the Project and the furnishing of any and all information in its possession which is reasonably required by Purchaser in its efforts to obtain approval of the TPA and satisfy the Financing Contingency. Purchaser shall be required to pay all costs, fees, assumption fees, or other charges imposed or incurred by the Lender, HUD or Seller in connection with the TPA and the Loan Assumption, other than Seller's legal fees incurred therewith.

(d)    Purchaser shall at all times have the right to waive any conditions (other than those given under Section 3.9(c) above), provided that no such waiver shall be effective unless such waiver or waivers are in writing; provided that if Closing occurs and Purchaser has actual knowledge of the non-fulfillment of any such condition, such act of consummating Closing shall be deemed a waiver of such known, unfulfilled condition. Any such waiver shall be deemed a release of Seller and any liability of Seller, if any, as a result of the failure of such condition.

## ARTICLE 4:  PERMITTED ENCUMBRANCES TO TITLE

4.1    Purchaser agrees to accept title to the Property subject to the following matters (collectively, the "Permitted Encumbrances"):

(a)    Leases and tenancies reflected on the Rent Roll and such further Leases as may be entered into in accordance with this Agreement.

(b)    Liens securing payment of all ad valorem, intangible and other real and personal property taxes, special and general assessments, school taxes, and water and sewer charges against the Property or the Personal Property covered by this Agreement for the tax year in which the Closing Date occurs and subsequent years to the extent such items are properly apportioned under this Agreement, and the lien of any special taxes not entered of record against the Property on the Closing Date.

(c)    Servitudes, easements and restrictive covenants, if any, which are recorded in the land records of the County Clerk of Dallas County, Texas, as of the date hereof and which do not materially affect the marketability of the Property.

(d)    Matters approved or deemed approved pursuant to the terms of this Agreement.

(e)    Zoning ordinances and regulations and building restrictions and regulations affecting the Property on the Closing Date.

(f)    The First Lien.

(g)    All building, subdivision, land sales, securities, ecology, environmental protection and like laws, ordinances, rules and regulations of governmental authorities, including those of any and all regulatory agencies and administrative officials having or asserting jurisdiction over the Property.

## ARTICLE 5:  CONDITION OF TITLE, TITLE INSURANCE

5.1    Seller shall promptly obtain from the Title Company through Escrow Agent, and deliver to Purchaser, a title commitment (the "Title Commitment") to issue a TLTA Owner's Policy of Title Insurance (the "Title Policy") insuring Purchaser's title to the Property to be good and indefeasible in the amount of the Purchase Price, containing coverage over all general exceptions subject to only the Permitted Encumbrances.  A copy of the Title Commitment and legible copies of each of the documents of record reflected therein shall be furnished to the attorneys for Purchaser and Seller.  Seller shall also deliver to Purchaser a copy of the Existing Survey.  Within ten (10) days of receipt of the title materials described above, together with the Existing Survey, Purchaser shall give written notice (the "Objection Notice") to the attorney for Seller identifying with particularity any defect of title to which Purchaser objects (the "Objections") separately specifying and setting forth each such Objection.  Seller shall be entitled to reasonable adjournments of the Closing Date not exceeding thirty (30) days in the aggregate, to cure the Objections, unless waived by Purchaser.  If Purchaser gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the Title Commitment which are not objected to in such Objection Notice shall be deemed to be Permitted Encumbrances.

5.2    Seller shall not be required to expend any money or bring any action or proceeding or do any other thing in order to deliver the Project or convey title to the Property as required by this Agreement or the Objection Notice.  If Seller gives Purchaser notice (the "Response Notice")

AGREEMENT FOR PURCHASE AND SALE – Page 10
15510776.1 – 110596.00001

App. 1424

that Seller is unable or unwilling to convey the Project or title to the Project as required by this Agreement or the Objection Notice, Purchaser may, as its exclusive remedy, elect by written notice given to Seller within five (5) days after the Response Notice is given, either (a) to accept such title as Seller is able to convey without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement, in which event the Deposit and Financing Period Extension Fee shall be returned to Purchaser.

5.3    If Purchaser shall fail to give timely notice of its election to terminate this Agreement, Purchaser shall be deemed to have accepted all matters reflected on the Title Commitment as Permitted Encumbrances.

5.4    Unpaid liens for real estate and personal property taxes for years prior to the fiscal year in which the Closing Date occurs and any other matters which Seller is obligated to pay and discharge at the Closing shall not be deemed objections to title, but the amount thereof chargeable to Seller, plus interest and penalties thereon charged by the taxing authority, if any, shall be deducted from the Purchase Price on the Closing Date and paid to the Title Company with instructions to pay and discharge such matters.

5.5    Closing costs associated with the Closing and typically paid by a seller including, but not limited to, deed stamps, transfer taxes, and Seller's attorneys' fees shall be paid by Seller. Seller shall pay all premiums and other fees associated with the Title Policy and survey to be delivered at Closing.  The cost of physical inspection, accounting, audit, and other investigations made in connection with Purchaser's due diligence, Purchaser's attorneys' fees and all other costs associated with the Closing shall be paid by Purchaser.

5.6    Time is of the essence with respect to the provisions of this Section 5.

## ARTICLE 6: CLOSING

6.1    Provided that all of the conditions of this Agreement shall have theretofore been satisfied, the closing (the "**Closing**") of the purchase and sale of the Property shall be conducted at the offices of the Escrow Agent (or at such other location as shall be mutually agreeable to Seller and Purchaser) on the date ("**Closing Date**") that is on or before ten (10) days after the Financing Contingency Deadline.

6.2    Upon Seller's and Purchaser's delivery of all required documents and instruments and payment of the Purchase Price and other amounts required herein, Purchaser and Seller shall prepare and sign a closing statement reflecting the adjustments and payments made and agreements in connection therewith.  Seller and Purchaser shall jointly deliver a copy of the closing statement and all of the aforesaid documents to the Title Company which shall do the following:

(a)    Record the Deed and loan documents, if any, associated with this transaction.

(b)    Deliver to Seller and Purchaser or other appropriate party the documents and payments delivered to it as escrow holder for delivery to such party.

AGREEMENT FOR PURCHASE AND SALE – Page 11
15510776 1 – 110596.00001

App. 1425

(c)     Pay all recording taxes and transfer fees and all filing fees reflected on the closing statement.

(d)     Issue the Title Policy and, if applicable, an endorsement to the existing Lender's Policy of Title Insurance.

(e)     File the reports required by Section 6045 of the Internal Revenue Code and regulations promulgated thereunder.

## <u>ARTICLE 7: DOCUMENTS REQUIRED ON CLOSING DATE</u>

7.1     At or prior to the Closing, Seller shall execute and/or deliver the following to Purchaser through Escrow Agent:

(a)     A Deed in a form reasonably acceptable to Seller and Purchaser and approved by HUD.

(b)     A Blanket Conveyance, Bill of Sale and Assignment, in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the **"Bill of Sale"**).

(c)     An Assignment and Assumption of Leases in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the **"Assignment of Leases"**), as well as the hereinafter described Tenant Notification Letter.

(d)     A pro forma of the Title Policy, as described in Section 5.1 of this Agreement.

(e)     Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Purchaser's representative at the Property.

(f)     A rent roll for the Property (the **"Closing Rent Roll"**) dated and certified as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of closing.

(g)     The originals or certified copies of the leases and other occupancy agreements described in the Closing Rent Roll.

(h)     All transfer documents (the **"Transfer Documentation"**) necessary to assume the First Lien executed by Seller and the Existing Lender and to release Seller and current guarantors.

(i)     Organizational and authority documents satisfactory to the Title Company.

(j)     All costs and fees required to be paid by Seller pursuant to Article 8.

(k)     Such other documents and instruments as may be required by this Agreement or by the Title Company in order to consummate the transactions described in this Agreement and to issue the Title Policy to Purchaser.

(l)   A non-foreign (FIRPTA) affidavit for Seller complying with the requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

(m)   Evidence of termination of those Contracts that are terminable pursuant to Section 3.7(b)(vi).

(n)   An affidavit acceptable to the Title Company reflecting that there are no changes to the Survey except those approved by the Purchaser.

(o)   Such other instruments and affidavits as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

7.2   At or prior to the Closing, Purchaser shall execute and/or deliver the following to Escrow Agent:

(a)   The Purchase Price.

(b)   The Deed.

(c)   The Bill of Sale.

(d)   The Assignment of Leases.

(e)   The Transfer Documentation executed by Purchaser.

(f)   Organizational and authority documents satisfactory to the Title Company.

(g)   A written notice of the acquisition of the Property by Purchaser, originally executed by Seller and Purchaser, which shall be transmitted to all tenants and to other parties affected by the sale and purchase of the Property (the "**Tenant Notification Letter**"). Such notice (in the form of Exhibit "B" hereto) shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices. The said notices shall specify that unapplied security deposits under the tenant leases have been delivered to the Purchaser and that the Purchaser is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits.

(h)   All costs and fees required to be paid by Purchaser pursuant to Article 8.

(i)   Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

(j)   Such other instrument, affidavits, and tax returns as are customarily executed by the purchaser of an interest in real property in connection with the recording of the deed.

## ARTICLE 8: APPORTIONMENTS AND ADJUSTMENTS

8.1    Seller shall be responsible for and pay all accrued expenses with respect to the Project accruing up to 11:59 P.M. on the day prior to the Closing Date (the "Adjustment Date") and shall be entitled to receive and retain all revenue from the Project accruing up to the Adjustment Date; provided, however, that if the Closing Date occurs on the last day of the month, the Adjustment Date shall be the Closing Date.

8.2    On the Closing Date, the following adjustments and apportionments shall be made by authorized representatives of the parties in cash as of the Adjustment Date:

(a) Rent payable and paid for the month of Closing shall be prorated as of the Adjustment Date. There shall be no proration of delinquent rentals. After the Closing, Purchaser shall continue to bill tenants for sums reflected on the Closing Rent Roll as past due, shall receive such rents as trustee for Seller, and shall deliver such sums to Seller if, as and when received. Such rents shall be applied first to costs of collection, second to rents due for the Closing Month, third to rents due to Purchaser at the time of receipt, and last to rents due Seller for periods prior to Closing. After the Closing, if Seller receives rents for periods after the Closing Date, it shall remit such sums to Purchaser within two (2) business days of receipt.

(b)    Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any. In the event that either the tax assessment or the tax rate for the current year is not known at Closing, the parties shall prorate at Closing on the basis of the last known values and rates and adjust the prorations once such values or rates become known for the current year. Seller shall pay installments of confirmed assessments that have been levied against the Property and are due and payable as of the Closing. Purchaser shall pay all installments of any special assessments due after Closing.

(c)    Charges under Contracts affecting the Project on the Adjustment Date, and utility charges and relating to the Project, including any payments made to Seller prior to the Closing Date in respect of Contracts, laundry lease or information services, whether characterized as "decorating fees", "sign-up bonuses", "additional rents" or the like.

(d)    Utilities, water and sewer charges on the basis of the period for which assessed.

(e)    Income from vending machines and tenant services, if any.

8.3    At the Closing, Purchaser will receive a credit against the Purchase Price in an amount equal to all unapplied security deposits held under Leases in effect on the Adjustment Date, against Purchaser's receipt and indemnification therefor. Upon making such credit, Purchaser will be deemed to have received all such security deposits and shall be fully responsible for the same as if a cash amount equal to such security deposits were actually delivered to Purchaser. Prior to the Closing, Seller reserves the right to apply security deposits as provided under the respective leases and permitted by applicable law; provided however, Seller shall not apply security deposits for any rentals due for the month in which the Closing Date occurs.

8.4     All other income of the Property, accruing or relating to the period through the Adjustment Date shall be paid to Seller. All other income of the Property, accruing or relating to the period commencing on the Adjustment Date and thereafter shall be paid to Purchaser.

8.5     All other expenses, such as utilities, maintenance and other operating expenses, incurred in connection with the Property and accruing or relating to the period through the Adjustment Date shall be the responsibility of and paid by Seller. Seller shall pay the existing amounts due under Construction Contracts. All other expenses, such as utilities, maintenance and other operating expenses incurred in connection with the Property and accruing or relating to the period commencing on the date of Closing and thereafter shall be the responsibility of and paid by Purchaser.

8.6     At the Closing and subject to the prorations herein provided, Seller shall receive a cash credit in an amount equal to the sum of all amounts held in escrow by holder of the First Lien, including, without limitation, hazard insurance premiums, taxes and MIP reserve or repair and replacement reserve. All escrows associated with the First Lien shall be assigned to Purchaser.

8.7     Walk-Through. Seven (7) days prior to Closing, Seller and Purchaser will perform a walk-through of all vacant units to determine which ones are not made-ready for rental.

8.8     To the extent that any amount of any of the above items shall not be available for exact proration as of the Closing, the proration at Closing will be based on the best available information and Seller or its representative and Purchaser or its representative shall meet as soon after the Closing as possible, but in no event later than thirty (30) days after Closing, and compute and settle and adjust or readjust the Closing prorations between the parties as of the date of Closing. Rents, if any, collected by Purchaser after the Closing shall be applied first to any amounts due Purchaser and then to the extent such rents relate to the period through and including the day before the day of the Closing shall be paid to Seller. Purchaser agrees to use good faith collection procedures with respect to the collection of any delinquent rentals, but will have no liability for the failure to collect any such amounts and will not be required to incur any material cost, conduct lock-outs or take any other legal action to enforce collection of any such amounts owed to Seller by tenants of the Property. The provisions of this Section 8.6 shall survive Closing.

The provisions of this **ARTICLE 8** shall survive the Closing.

## **ARTICLE 9: REMEDIES**

9.1     If Purchaser breaches its obligation to purchase the Project pursuant to this Agreement, and after receipt of any applicable notice and a five (5) day opportunity to cure, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Purchaser and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the Deposit to Seller which shall retain the same as liquidated damages. Seller shall not be required to give Purchaser notice of failure to close, on the date provided in this Agreement and Purchaser shall not have any five (5) day grace period therefor. Seller and Purchaser acknowledge that the amount of damages resulting from a breach of this Agreement by Purchaser would be difficult or impossible to accurately ascertain and that Seller's damages would, in any event, be substantial and would exceed the Deposit. Upon Seller's receipt of the Deposit,

this Agreement shall wholly cease and terminate, no party to this Agreement shall have any further claim, agreement, or obligation to any other party to this Agreement, and any lien of Purchaser against the Project shall automatically cease, terminate and be released.

9.2    If the sale contemplated by this Agreement is not consummated because of Seller's failure to perform its obligations hereunder, Purchaser shall be entitled, as its exclusive remedy, to elect after notice to Seller and a five (5) day opportunity to cure either (a) to terminate this Agreement and have the Deposit returned to it or (b) to enforce specific performance of Seller's obligations under this Agreement.  Purchaser shall not be required to give Seller notice of failure to close, on the date provided in this Agreement and Seller shall not have any five (5) day grace period therefor.

9.3    The non-breaching party shall also be entitled to recover against the breaching party its costs and expenses, including reasonable attorneys' fees and court costs, incurred by such non-breaching party in enforcing any of the remedies hereunder, as determined by a court of competent jurisdiction in Texas.

## ARTICLE 10:  DAMAGE, DESTRUCTION OR CONDEMNATION

10.1    Seller agrees to maintain its present policies of casualty insurance covering the Project in full force and effect from the date of this Agreement through and including the Closing Date.

10.2    If either a substantial part of the improvements on the Land is damaged or destroyed or any part of the Property is taken by condemnation or other power of eminent domain then Purchaser shall have the right to terminate this Agreement based upon such damage, destruction or taking.  If Purchaser does not terminate this Agreement as aforesaid, then on the Closing Date:

(i)    The Purchase Price shall not be reduced, but Seller shall credit the Purchase Price with an amount equal to any sums of money collected by Seller under its policies of casualty insurance or renewals thereof insuring against the loss in question (after deducting any reasonable expenses incurred by Seller in collecting such insurance and any amount that Seller shall have paid or shall be obligated to pay for repairs or restoration of the damage), and Seller shall assign, transfer and set over to Purchaser at Closing all of Seller's right, title and interest in and to its casualty insurance policy or policies with respect to the Property and any further sums payable under said policies, plus the amount of any deductibles; provided that in no event shall the credits and insurance assigned to Purchaser exceed the cost of the unrepaired damage; and

(ii)    Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any awards that may be made for any taking by condemnation or other power of eminent domain.

10.3    For the purposes of this Article, a substantial part of the Improvements on the Land shall be deemed to mean a portion having a value of $100,000 or more or which would require expenditure of $100,000 or more for repair or restoration.

## ARTICLE 11: BROKER

11.1   Purchaser represents and warrants to Seller that neither Purchaser nor any entity related to Purchaser has dealt with any broker or other person or entity who would be entitled to a commission, consulting fee or other brokerage fee in connection with the transactions described in this Agreement.

11.2   Seller represents and warrants to Purchaser that neither Seller nor any entity related to Seller has dealt with any broker or other person or entity that would be entitled to a commission, consulting fee, or other brokerage fee in connection with the transactions described in this Agreement.

11.3   Each party agrees to indemnify, defend and hold the other harmless of and from any loss, cost, damage or expense (including reasonable attorneys' fees and court costs) arising out of any inaccuracy in the representation or warranty made by such party in Sections 11.1 and 11.2 above.

11.4   Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article shall survive the Closing and any prior termination of this Agreement for any reason whatsoever.

## ARTICLE 12: NOTICES

12.1   Any notice given or required to be given pursuant to any provision of this Agreement shall be in writing and shall be personally delivered or sent by facsimile, certified U.S. mail, with return receipt requested, or a reputable commercial courier service guaranteeing overnight delivery, and shall be deemed to have been given upon receipt if personally delivered, or, as the case may be, upon transmittal by facsimile with electronic confirmation of receipt, upon deposit in U.S. mail or upon delivery to such commercial courier, with delivery charges prepaid, if sent by such a courier, in either case addressed as follows:

Seller:

D4FR LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attention:   Timothy Barton
Telephone:   972-385-9934
E-mail:   TBarton@jmjdevelopment.net

Purchaser:

Southern Properties Capital Ltd.
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Attn:   Bradley Muth
Phone: 469-522-2366
E-mail:bradley.muth@pillarincome.com

AGREEMENT FOR PURCHASE AND SALE · Page 17
15510776.1   110596.00001

with a copy to:           Steptoe & Johnson PLLC
1603 LBJ Freeway, Suite 750
Dallas, Texas 75234
Attn:   Jay A. LaJone
Phone: 214-373-2556
E-mail:jay.lajone@steptoe-johnson.com

12.2     (a)     Either party may, by giving notice to the other in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change or address shall be effective three (3) days after it is given.

(b)     The attorney for each party to this Agreement identified in Article 12.1 may give notices on behalf of his client with the same force and effect as if such notice were given directly by such party.

## ARTICLE 13: ASSIGNMENT

13.1     Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to a third party.

## ARTICLE 14: MISCELLANEOUS

14.1     The following matters of general application shall apply to this Agreement and control interpretation notwithstanding any provision apparently to the contrary:

(a)     This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective heirs, successors, legal representatives and permitted assigns.

(b)     Wherever under the terms and provisions of this Agreement the time for performance falls upon a Saturday, Sunday or legal holiday in the state where Seller or Purchaser maintains the office reflected in Article 12 hereof, such time for performance shall be extended to the next business day thereafter.

(c)     This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one and the same agreement. Escrow Agent is authorized to attach multiple signature pages to a single conformed original.

(d)     The captions at the beginning of the several paragraphs, Sections and Articles are for convenience in locating the context, but are not part of the context. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Exhibits contained in this Agreement refer to the Exhibits which are attached to this Agreement, all of which Exhibits are incorporated in, and made a part of, this Agreement by reference. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Articles, Sections, paragraphs and clauses refer to portions of this Agreement.

(e)     If any term or provision of this Agreement shall be held to be illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this

AGREEMENT FOR PURCHASE AND SALE – Page 18
15510776 1 – 110596 00001

App. 1432

Agreement shall not be affected thereby, but each such remaining term and provision shall be valid and shall remain in full force and effect.

(f)    This Agreement and the other writings referred to in, or delivered pursuant to, this Agreement, embody the entire understanding and contract between the parties hereto with respect to the Project and supersede any and all prior agreements and understandings between the parties hereto, whether written or oral, formal or informal, with respect to the subject matter of this Agreement.  This Agreement has been entered into after full investigation by each party and its professional advisors, and neither party is relying upon any statement, representation or warranty made by or on behalf of the other which is not expressly set forth in this Agreement.

(g)    No extensions, changes, waivers, modifications or amendments to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, waiver, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever, unless the same is contained in writing and is fully executed by the party against whom such matter is asserted.

(h)    This Agreement shall be governed and interpreted in accordance with the laws of the State where the Property is located.

(i)    Each party hereto shall pay all charges specified to be paid by them pursuant to the provisions of this Agreement and their own attorney's fees in connection with the negotiation, drafting and closing of this Agreement.

(j)    Purchaser and Seller agree that this Agreement has been entered into solely for the benefit of Purchaser and Seller and no other person or entity, it being the intention of Purchaser and Seller that no person or entity not a party to this Agreement shall have any right or standing to (a) bring any action against Purchaser or Seller based on this Agreement, or (b) assume that any provision of this Agreement will be enforced or remain unmodified or unwaived, or (c) assert that it or he is or should be or was intended to be a beneficiary or any provision of this Agreement.

(k)    The parties agree that any actions taken or documents (including this Agreement) signed by any trustee, officer, or director of Seller or Purchaser are undertaken in their fiduciary capacity and no recourse shall be had to the personal assets of any such trustee, officer, or director for enforcement of this Agreement.

(l)    Wherever a time is set forth for performance or notice in this Agreement, time shall be of the essence unless explicitly stated to be otherwise.

(m)    Purchaser and Seller agree that the Property will not be actively marketed and the Seller will not enter into negotiations with any other prospective purchasers while this Agreement is in effect or any contract negotiations are pending.

*[Signature page to follow]*

AGREEMENT FOR PURCHASE AND SALE    Page 19
15510776.1    110596.00001

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in their names by their respective duly authorized representatives as of the day and year first above written.

Seller:        **D4FR LLC,**
               a Texas limited liability company

               By:  _____
               Timothy Barton, President

Purchaser:     **SOUTHERN PROPERTIES CAPITAL LTD.,**
               a British Virgin Islands corporation

               By:    _____
               Name:  _____
               Title: _____

AGREEMENT FOR PURCHASE AND SALE -- Page 20
15510776.1   110596 00001

App. 1434

## ACKNOWLEDGEMENT OF RECEIPT BY TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of the Agreement on this, the _____ day of _____, 20___, and agrees to accept, hold and disburse the Earnest Money Deposit in accordance with the provisions of the Contract. The undersigned acknowledges that it is not a party to this Agreement and that it is executing below solely for the purpose of the foregoing acknowledgment and agreement.

TITLE COMPANY:

Commonwealth Land Title Insurance Company

By: _____
Name: James P. Lazar
Title:   Escrow Agent

## EXHIBITS:

A - Legal Property Description
B - Tenant Notification Letter
C - Current Rent Roll
D - Due Diligence Materials

# EXHIBIT "A"

## <u>LEGAL PROPERTY DESCRIPTION</u>

App. 1436

## EXHIBIT "B"

## TENANT NOTIFICATION LETTER

Dated: _____, 20____

_____

_____

_____

_____

Re: _____ ("Property")

Dear _____:

As of the date of this letter, _____, a _____ and the former owner of the Property ("Seller"), transferred title and possession of the Property to _____ ("Purchaser").

Pursuant to the provisions of Section _____ of the Texas _____, you are hereby notified that Purchaser is responsible for all of the obligations of the landlord under your lease first arising from and after the date hereof.  Seller is joining in the execution of this letter to acknowledge the fact that title and possession to the Property and all future responsibilities of the landlord under your lease have been transferred to Purchaser.

From and after the date of this letter, please make all rental checks payable to _____ _____, and deliver same to _____, until otherwise notified in writing.

Sincerely,

**PURCHASER:**                    _____,

                                  a _____

                                  By: _____
                                  Name: _____
                                  Title: _____

AGREEMENT FOR PURCHASE AND SALE – Page 23
15510776.1 – 110596.00001

App. 1437

**ACKNOWLEDGED:**

**SELLER:**

_____,

a _____

By:      _____
Name:  _____
Title:   _____

App. 1438

# EXHIBIT "C"

## CURRENT RENT ROLL

**(see attached)**

# EXHIBIT "D"

## DUE DILIGENCE MATERIALS

**(see attached)**

| | Item | Received | Comments |
|---|---|---|---|
| | I. General Information (Title, Survey, Etc.) | | |
| 1 | Description of Property: legal description | | |
| 2 | Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 3 | Title documents | | |
| 4 | ALTA Survey | | |
| 5 | As Builts or Building plans (please note if they are located at the property) | | |
| | II. Contracts | | |
| 6 | Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| | Cable | | |
| | Laundry | | |
| | Phone | | |
| | Internet | | |
| | Landscaping | | |
| | Trash removal | | |
| | Pest Control | | |
| | Termite | | |
| | Resident Water/Sewer reimbursement billing | | |
| 7 | Vendor List | | |
| 8 | Permits & License | | |
| 9 | Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 | Management Agreement: or leasing agreements | | |
| 11 | Utility Bills for the Property for the 2 most recent months | | |
| 12 | Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| | III. Financial Information | | |
| 13 | Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report.  Audited financials if a HUD deal - three years | | |
| 14 | Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 | Current Budget | | |
| 16 | Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit.  In Excel the 1st month. | | |
| 17 | Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 | Bank Statements & Reconciliations: last 3 months for property | | |
| 19 | Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 | Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 | All Units report in Excel | | |
| 22 | Rentable Items report | | |

| Item | Received | Comments |
|---|---|---|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement: or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

App. 1442

# EXHIBIT J-23

Case 3:22-cv-02118-X     Document 253     Filed 05/30/23     Page 173 of 824     PageID 9297

FedEx° Tracking          ⋮

**DELIVERED**

# Tuesday

10/4/2022 at 8:16 am

Signed for by: S.PATEL

⬇ Obtain Proof of delivery

How was your delivery?

☆ ☆ ☆ ☆ ☆

**DELIVERY STATUS**

Delivered ✅

✉ Get Status Updates

**TRACKING ID**

770101862781 ✏ ☆

     **FROM**
     Dallas, TX US

     *Label Created*
     10/3/2022 3:45 PM

     **PACKAGE RECEIVED BY FEDEX**
     ADDISON, TX
     10/3/2022 7:02 PM

     **IN TRANSIT**
     ADDISON, TX
     10/4/2022 7:07 AM

     **OUT FOR DELIVERY**
     ADDISON, TX
     10/4/2022 7:07 AM

     **DELIVERED**
     Dallas, TX US

     *DELIVERED*
     10/4/2022 at 8:16 AM

     ↓ View travel history

Manage Delivery          ⌄

App. 1444

Case 3:22-cv-02118-X     Document 253     Filed 05/30/23     Page 174 of 824     PageID 9298

Travel history     ⌄

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)

Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)

Investor Relations(https://investors.fedex.com/home/default.aspx)

Careers(https://careers.fedex.com/fedex/)

FedEx Blog(https://www.fedex.com/en-us/blog.html)

Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)

Newsroom(https://newsroom.fedex.com/)

Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)

FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)

FedEx Logistics(https://www.fedex.com/en-us/logistics.html)

FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)

ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX** ✉ (https://www.fedex.com/en-us/email.html)    f (Https://www.facebook.com/FedEx/)

🐦 (Https://twitter.com/fedex)    📷 (https://www.instagram.com/fedex/)    in (https://www.linkedin.com/company/fedex)

▶ (https://www.youtube.com/fedex)    📌 (https://www.pinterest.com/FedEx/)

© FedEx 1995-2022

Site Map (https://www.fedex.com/en-us/sitemap.html)   |   Terms of Use (https://www.fedex.com/en-us/terms-of-use.html)   |   Privacy & Security (https://www.fedex.com/en-us/trust-center.html)

App. 1445

Case 3:22-cv-02118-X     Document 253     Filed 05/30/23     Page 175 of 824     PageID 9299



**After printing this label:**

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

App. 1446

# EXHIBIT J-24



SOUTHERN
PROPERTIES CAPITAL
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

November 3, 2022

Mr. Courtney C. Thomas
Brown Fox    LLC
8111 Preston Road
Suite 300
Dallas, Texas 75225

      Re:    SEC v. Timothy Barton, et al; Civil Action No. 3:22-CV-2118X (Parc at Windmill Farms)

Dear Mr. Thomas:

This letter is written to you in your capacity as Receiver in the referenced case. Southern Properties Company Ltd. ("Lender") is the lender to JMJ Development, LLC ("Pledgor") in connection with Parc at Windmill Farms, an apartment complex in Forney, Texas ("Parc at Windmill Farms"). By letter dated October 3, 2022 ("Exercise Letter"), a copy of which is attached, Lender exercised its right to acquire ownership of Parc at Windmill Farms.

Lender's right arises under the (i) Amended and Restated Pledge and Security Agreement dated December, 2017, executed by JMJAV, LLC, to Pledgor, pledging one percent (1%) of the membership interests in JMJD4 LLC, (ii) Amended and Restated Pledge and Security Agreement dated December, 2017, executed by TRWF, LLC to Pledgor, pledging one hundred percent (100%) of the membership interests in JMJAV, LLC, and (iii) Amended and Restated Pledge and Security Agreement dated December, 2017, executed by Enoch Investments, LLC to Pledgor, pledging ninety-nine percent (99%) of the membership interests in JMJAV, LLC (collectively, "Pledges"). The Pledges were assigned to Lender by an Assignment of Pledge and Security Agreement, dated December 2017, executed by Pledgor to Lender ("Assignment"). Copies are attached. The Assignment secured a loan ("Mezzanine Loan") in the amount of $8,300,000.00, evidenced by (i) the attached Promissory Note from Pledgor to Lender and its amendments, and (ii) the attached Letter Loan Agreement dated of even date with the Note, as amended by a First Amendment to Letter Loan Agreement, dated October 25, 2019, and a Second Amendment to Letter Loan Agreement dated May 31, 2012. The security interests granted under the Pledge were perfected by

Mr. Courtney C. Thomas
October 28, 2022
Page 2

the attached UCC-1s.

Parc at Windmill Farms is subject to a first mortgage loan ("Mortgage Loan") in the amount of $36,240,000.00 in favor of Greystone Funding Company LLC ("Greystone"), which loan is insured by the US Department of Housing and Urban Development ("HUD"). The Mortgage Loan, as evidenced by a U.S. Department of Housing and Urban Development Regulatory Agreement for Multifamily Projects ("Regulatory Agreement") and a Note ("Note"), both dated December 1, 2017, is secured by a Multifamily Deed of Trust, Assignment of Leases and Rents and Security Agreement ("Deed of Trust," collectively with the Regulatory Agreement and Note referred to as the "Mortgage Documents"). The terms of the Mortgage Documents allow for an assumption of the loan, subject to the approval of both Greystone and HUD. Section 7.15 of the Pledges provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such purchase must be submitted with the signed TPA application.

In the Exercise Letter, Lender included a proposed Purchase Agreement. Given the intervening appointment of you as Receiver, we have prepared a revision to this agreement, which is also included, together with the TPA application. Please review these and provide us with any comments.

While we understand that you have been required to review much information in a short time, it is important that this transfer be submitted to Greystone and HUD as soon as possible. The Mezzanine Loan matured on November 1, 2022, and we believe proceeding with the transfer can resolve this default.

Please contact Mark Cooper (469) 522-4390 at your earliest convenience. Thank you for your help.

Very truly yours,

**SOUTHERN PROPERTIES CAPITAL LTD.**

By:      _____
Name: _____
Title: _____

cc:     Enoch Investments, LLC
        TRWF LLC
        JMJAV, LLC
        D4FR, LLC
        JMJ Development, LLC

App. 1449

# EXHIBIT J-25

OMB Approval No 2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

## NOTE
## (MULTISTATE)

### HUD Project No. *113-35683*
### HUD Project Name: *Bellwether Ridge Apartments*

US $19,021,200.00                    As of October 1, 2017

FOR VALUE RECEIVED, the undersigned, D4DS LLC, a Texas limited liability company (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Servicing Corporation, Inc., a Georgia corporation, the principal sum of Nineteen Million Twenty One Thousand Two Hundred Dollars (US $19,021,200.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of Three and 70/100 per centum (3.70%).*

1.       **Defined Terms.**  As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances under Section 13 of the Security Instrument to protect the security of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Note rather than add

or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site).

The definition of any capitalized term or word used herein can be found in this Note and, if not found in this Note, then found in the Regulatory Agreement between Borrower and HUD and/or the Security Instrument.

   **2.    Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at 419 Belle Air Lane, Warrenton, VA 20186, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

   **3.    Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

   (a)  Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on November 1, 2017 and on the first day of each month thereafter up to and including June 1, 2019 (**"Last Interest Only Payment Date"**). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of Seventy Five Thousand Nine Hundred Eighty Five and 23/100 Dollars (US $75,985.23), shall be payable on the first day of each month beginning on July 1, 2019 (**"Amortization Commencement Date"**), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on June 1, 2059 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (**"Maturity Date"**).

   (b)    Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

   **4.    Security.**  The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note

---

Previous editions are obsolete                    Note                    HUD-94001M (06/14)

("**Security Instrument**"), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

5.    **Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument. Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

6.    **Acceleration.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower. If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable. Lender may exercise this option to accelerate regardless of any prior forbearance. Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

7.    **Late Charge.** If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to <u>two percent</u> of the unpaid principal and interest due in such month. Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

8.    **Exculpation; Remedies.**

(a)    Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced

App. 1453

thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)      Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c) Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

9.      **Voluntary and Involuntary Prepayments.**

(a)      This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1.  In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

(b)     Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)     Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, or (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)     Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)     Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)     If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)     All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

**10.     Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

---

App. 1455

**11.    Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**12.    Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

**13.    Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

**14.    Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

**15.    Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

**16.    Governing Law; Consent to Jurisdiction and Venue.**
    (a)    This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

---

(b)    Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

17.    **Rules of Construction.**    The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

18.    **Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

19.    **Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. § 3701, *et seq.*, as amended, when HUD is the holder of the Note.

20.    **Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

---

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

   21. WAIVER OF TRIAL BY JURY.  BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

See Rider 1 to Note containing modifications to the Note, attached hereto and incorporated herein by this reference.

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

Previous editions are obsolete                                Note                                HUD-94001M (06/14)

App. 1459

NOTE (Multistate)

State of Texas

<u>D4DS LLC</u>

To

<u>Greystone Servicing Corporation, Inc.</u>

Project No.: <u>113-35683</u>

Initially endorsed for insurance under §221(d)(4) of the National Housing Act, as amended, and regulations published thereunder in effect on <u>August 11, 2017</u> to the extent of advances approved by HUD.

By: _____    Date: October <u>26</u> , 2017

Print Name: <u>Kenneth L. Cooper</u>
Title:    <u>Authorized Representative</u>
          <u>Production Division Director</u>

At final endorsement, a total sum of $ <u>18,608,100.⁰⁰/₁₀₀</u> ——— has been approved for insurance hereunder by HUD.

By: _____    Date: <u>October 15</u>, 20<u>22</u>

Print Name: <u>Mike Buis</u>
Title:    <u>Authorized Representative</u>

**RIDER 1 TO NOTE**
**From**
**D4DS LLC**
**TO**
**Greystone Servicing Corporation, Inc.**
**In the original principal sum of $19,021,200.00**

1.    This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4DS LLC, a Texas limited liability company (the "Borrower"), to Greystone Servicing Corporation, Inc., a Georgia corporation (the "Lender") dated as of October 1, 2017 (the "Note").

2.    Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to July 1, 2019. Borrower shall have the right, on or after July 1, 2019, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid. In the event of any prepayment of principal at any time on or after July 1, 2019, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from July 1, 2019 through June 30, 2020 | 10% |
| from July 1, 2020 through June 30, 2021 | 10% |
| from July 1, 2021 through June 30, 2022 | 8% |
| from July 1, 2022 through June 30, 2023 | 7% |
| from July 1, 2023 through June 30, 2024 | 6% |
| from July 1, 2024 through June 30, 2025 | 5% |
| from July 1, 2025 through June 30, 2026 | 4% |
| from July 1, 2026 through June 30, 2027 | 3% |
| from July 1, 2027 through June 30, 2028 | 2% |
| from July 1, 2028 through June 30, 2029 | 1% |
| from July 1, 2029 and thereafter | None |

FHA# 113-35683                    Rider 1 to Note                    Bellwether Ridge Apartments

App. 1461

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Borrower shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**END OF RIDER 1**

FHA# 113-35683                    Rider 1 to Note                    Bellwether Ridge Apartments

App. 1462

a Georgia corporation ...NG CORPORATION, INC.,

PAY TO THE ORDER OF:

_____

WITHOUT RECOURSE:

GREYSTONE SERVICING CORPORATION, INC.

BY: _____
Leslie F. Dominy
Senior Vice President

# EXHIBIT J-26

**ELECTRONICALLY RECORDED  201700300652**
**10/24/2017 10:12:24 AM DT  1/51**

OMB Approval No.2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

 Z Z Z 8 oo 5 5 3o

## Recording Requested by:
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

## After Recording return to:
Leslie F. Dominy
Greystone Servicing Corporation, Inc.
419 Belle Air Lane
Warrenton, VA 20186

## MULTIFAMILY DEED OF TRUST
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

### (Texas)

### *HUD Project Number: 113-35683*
### *Project Name: Bellwether Ridge Apartments*

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

2

# MULTIFAMILY
# DEED OF TRUST,
# ASSIGNMENT OF LEASES AND RENTS AND
# SECURITY AGREEMENT

THIS MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS (**"Security Instrument"**), is made as of this 1st day of October, 2017 among D4DS LLC, a Texas limited liability company, a Limited Liability Company   organized and existing under the laws of State of Texas, whose address is1755 Wittington Place, Suite 340, Dallas, TX  75234, as grantor, trustor and borrower (**Borrower**), to Thomas Kelly Derryberry, as trustee (**Trustee**), a person whose address is 504 Autumn Springs Ct, Suite 26, Franklin, TN 37067, for the benefit of Greystone Servicing Corporation, Inc., as beneficiary and as Lender (**Lender**), a corporation organized and existing under the laws of State of Georgia, whose address is 419 Belle Air Lane, Warrenton, VA 20186.

Borrower, in consideration of the Indebtedness and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee and Trustee's successors and assigns, in trust, with power of sale, the Mortgaged Property, including the Land located in Dallas County, State of Texas and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Trustee and Trustee's successors and assigns.

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on June 1, 2059, in the principal amount of Nineteen Million Twenty One Thousand Two Hundred Dollars (US $19,021,200.00) (**"Loan"**), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property.  Borrower covenants that Borrower shall warrant and defend generally such

App. 1466

3

title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

**Covenants.**  Borrower and Lender covenant and agree as follows:

**1. DEFINITIONS.**  The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a)  **"Borrower"** means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally).  Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note.  Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b)  **"Building Loan Agreement"** means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c)  **"Business Day"** is defined in Section 31.

(d)  **"Claim"** is defined in Section 48(m).

(e)  **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f)  **"Contract of Insurance"** is defined in 24 C.F.R. Part 207, Subpart B.

(g) **"Environmental Inspections"** is defined in Section 48(h).

(h) **"Event of Default"** means the occurrence of any event listed in Section 22.

App. 1467

4

(i) **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods and property, and including but not limited to:  machinery, equipment,  engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

(j)    **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

(k)    **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

(l)    **"Impositions"** and **"Imposition Deposits"** are defined in Section 8(a).

(m)    **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(n)    **"Indebtedness"** means the principal, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document including prepayment premiums, late charges, default interest, and advances as provided in Section 13 to protect the security of this Security Instrument.

5

(o)    **"Indemnitees"** is defined in Section 48(k).

(p)    **"Land"** means the estate in realty described in <u>Exhibit A</u>.

(q)    **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.  (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)    **"Lender"** means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)    **"Lien"** is defined in Section 17.

(t)    **"Loan"** is defined in the opening paragraphs of this Security Instrument.

(u)    **"Loan Application"** is defined in Section 41.

(v)    **"Loan Documents"** means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)    **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

(1)    the Land;

(2)    the Improvements;

(3)    the Fixtures;

(4)    the Personalty;

6

(5)    all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)    all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)    all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)    all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)    all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)    all Rents and Leases;

(11)    all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative

7

housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)    all Imposition Deposits;

(13)    all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)    all forfeited tenant security deposits under any Lease;

(15)    all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)    all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)    all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property. These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Surplus Cash and loan repayments).

(x)    **"Note"** means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

(y)    **"Notice"** is defined in Section 31.

(z)    **"O&M Program"** is defined in Section 48(b).

(aa)    **"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building

8

materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to:  Reserve for Replacement accounts, bank accounts, residual receipts accounts, and investments.

  (bb) **"Principal"** is defined in 24 C.F.R. 200.215, or any successor regulation.

  (cc) **"Project"** and **"Project Assets"** mean the Mortgaged Property.

  (dd) **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm, or a successor location to that site).

  (ee) **"Property Jurisdiction"** is defined in Section 30(a).

  (ff) **"Regulatory Agreement"** means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

9

(gg)   **"Remedial Work"** is defined in Section 48(i).

(hh)   **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past due, or to become due, residual receipts, and escrow accounts, however and whenever funded and wherever held.

(ii)   **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

(jj)   **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair.  During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

(1)   physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

(2)   fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

(3)   fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

(4)   materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

(5)   retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

App. 1473

10

## 2. UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.

This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral.  Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection.  Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require.  Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral.  Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD.  Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral.  Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest.  If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law.  In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies.  This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

App. 1474

11

**3.    ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents.  It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower.  Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require.  Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents.  For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property.  However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)    After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender.  However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures.  So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability.  From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically

---

App. 1475

12

terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid.  Borrower shall pay to Lender upon demand all Rents to which Lender is entitled.  At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender.  No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice.  Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.  Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents.  Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable.  Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution

App. 1476

13

of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law.  Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property.  Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents.  In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property.  Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received.  Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

---

14

## 4.    ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.  It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases.  Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only.  For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property.  However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)    Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease.  Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate.  Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements.  The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession.  Prior to Lender's actual

15

entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.  The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect.  All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

(f)    Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations.  Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender.  Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed.

All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

App. 1479

16

(g)   Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

**5.      PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.**  Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument.  Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

**6.      EXCULPATION.**   Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

**7.      DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.**

(a)      Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums:

(1)      an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i)  If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to

---

17

accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii)  If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)    a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)    all payments and deposits mentioned in the two preceding subsections of this Section and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i)  mortgage insurance premium charges under the Contract of Insurance;

(ii) ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii) interest on the Note; and

(iv) amortization of the principal of the Note.

18

(b)    Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)    Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.  Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

## 8.  IMPOSITION DEPOSITS.

(a)    In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same.  Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same.  All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand.  In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums  due under Section 7(a)(3) shall be credited to Borrower.  If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3).  The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the **"Imposition Deposits"**.  The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as **"Impositions"**.  The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added.  Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower

App. 1482

19

for which Imposition Deposits are required.  Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)    Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations.  Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing.  Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or residual receipts account (if any).  Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note.  Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)    If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender.  Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender.  Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)    If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or residual receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits.  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

**9**.    **REGULATORY AGREEMENT.**  Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument.  Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

**10.**    **APPLICATION OF PAYMENTS.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3).

20

Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

**11.    COMPLIANCE WITH LAWS.**  Borrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, subpart G, and any successor regulations;  including but not limited to those of the foregoing pertaining to:  health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments.  Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11.  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property.  Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**12.    USE OF PROPERTY.**  Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

App. 1484

21

### 13.    PROTECTION OF LENDER'S SECURITY.

(a)    If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)    Any amounts advanced by Lender for taxes, special assessments, water rates, which are liens prior to the Security Instrument, insuring the Project and mortgage insurance premiums, paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note.  So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)    Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

### 14.    INSPECTION.  Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

### 15.    BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the

---

App. 1485

22

operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)      If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)      Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time.

(d)      Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year. If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year. Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender. If Borrower fails to provide in a timely manner the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness. Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)      Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

App. 1486

23

## 16.    TAXES; OPERATING EXPENSES.

(a)    Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition.  If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits.  Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

(d)    Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)    Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

24

**17.    LIENS; ENCUMBRANCES.** (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("**Lien**") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument. (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or residual receipts, except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

**18.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.** Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

App. 1488

25

## 19.   PROPERTY AND LIABILITY INSURANCE.

(a)     Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage.  Lender's insurance requirements may change from time to time throughout the term of the Indebtedness.  If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage.  If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note.  If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance.  If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)     All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment.  All such policies shall also be in a form approved by Lender.  All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns.  Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a).  Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums.  At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

26

(c)     Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)     All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations.  Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)     Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)     In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender.  Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable.  Borrower shall notify Lender of any payment received from any insurer.  Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due.  No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

App. 1490

27

(g)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.  Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD.  In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable.  If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)     If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

## 20.     CONDEMNATION.

(a)     Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.  Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action.  Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1)

28

any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b)    All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note.  After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration.  No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award.  Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

**21.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.**

(a)    So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations.  Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21.  Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)    If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (06/14) |

29

Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

   **22.    EVENTS OF DEFAULT.**  The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

   (a)    Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) or (b) of this Security Instrument.

   (b)    Covenant Events of Default shall include:

        (1)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

        (2)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

        (3)    any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

        (4)    so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required

App. 1493

30

under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)    Lender shall deliver to the Principal(s) of Borrower, Notice, as provided in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide the Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

**23.    REMEDIES CUMULATIVE.**  Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**24.    FORBEARANCE.**

(a)    So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note.  However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)    Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other

App. 1494

31

payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

25.    **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

26.    **WAIVER OF STATUTE OF LIMITATIONS.** To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

27.    **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

32

**28.   FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

**29.   ESTOPPEL CERTIFICATE.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are unmodified and in full force and effect  (or, if there have been modifications, that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Security Instrument, and the Note and (so long as the Loan is insured or held by HUD, the Regulatory Agreement) (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, (so long as the Loan is insured or held by HUD, the Regulatory Agreement) and this Security Instrument; and (f) any additional facts requested by Lender.

**30.   GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)   This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD as such local or state laws may be preempted by federal law.

(b)   Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any

33

security for the Indebtedness, or this Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 31.    NOTICE.

(a)    All notices, demands and other communications (**"Notice"**) under or concerning this Security Instrument shall be in writing.  Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument , and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 31, the term (**"Business Day"**) means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business.  When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day.  Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)    Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31.  Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

App. 1497

34

(c)    Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.


**BORROWER:**
D4DS LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Dallas, TX  75234

**PRINCIPAL(S):**

Timothy Barton                          TLB 2012 Irrevocable Trust
1755 Wittington Place, Suite 340        Attn: Saskya Bedoya
Dallas, TX  75234                       1755 Wittington Place, Suite 340
                                        Dallas, TX  75234

**LENDER:**
Greystone Servicing Corporation, Inc.
Attn: General Counsel
419 Belle Air Lane
Warrenton, VA 20186

**32.    SALE OF NOTE; CHANGE IN SERVICER.**  The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower.  A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note.  If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

**33.    SINGLE ASSET BORROWER.**  Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the

---

35

management and operation of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

**34.    SUCCESSORS AND ASSIGNS BOUND.**  This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

**35.    JOINT AND SEVERAL LIABILITY.**  If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

**36.    RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower.  Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

(b)    No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement.  Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

**37.    SEVERABILITY; AMENDMENTS.**  The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect.  This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument.  This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**38.    RULES OF CONSTRUCTION.**  The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded

App. 1499

36

in construing this Security Instrument. Any reference in this Security Instrument to an **"Exhibit"** or a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term **"including"** means "including, but not limited to."

      39.    **LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern; provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

      40.    **DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

      41.    **NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the **"Loan Application"**) and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of Default.

      42.    **ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or

App. 1500

37

preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

**43.    ACCELERATION; REMEDIES.**  If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**44. FEDERAL REMEDIES.**  In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. 3701 *et seq.*, as amended, when HUD is the holder of the Note.

**45.    REMEDIES FOR WASTE.**  In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

(a)    the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

(b)    an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

(c)    recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security.  So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys'

38

fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

**46.    TERMINATION OF HUD RIGHTS AND REFERENCES.**  At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance.  The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

**47.    CONSTRUCTION FINANCING.**  The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern).  If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby.  All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof.  The Indebtedness shall, at the option of Lender or holder of this Security Instrument and the

App. 1502

39

Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement.  This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

## 48.    ENVIRONMENTAL HAZARDS.

(a)    Definitions:

(1)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (**"PCBs"**) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property.  Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

App. 1503

40

(3)  **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)  Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender (**"O&M Program"**); (2) matters described in paragraph (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

(i)  any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(ii)  any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

(c)  Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(d)  Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the

App. 1504

41

Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(e)     If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program.  All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)     Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)     to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)     the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)     Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits

42

required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)     to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)     Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g)     Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Borrower's discovery of any Prohibited Activity or Condition;

(2)     Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

App. 1506

43

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h)    Borrower shall pay promptly the costs of any environmental inspections, tests or audits (**"Environmental Inspections"**) required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist.  Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances.  The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections.  Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property.  Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections.  Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale.  Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)    If any investigation, site monitoring, containment, clean-up, restoration or other remedial work (**"Remedial Work"**) is necessary to comply with any Hazardous Materials Law that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials

44

Law, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law. If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so. So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(j)      Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)      Borrower shall indemnify, and if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender, hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, **"Indemnitees"**) from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise, arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions:

  (i)      any breach of any representation or warranty of Borrower in this Section 48;

  (ii)     any failure by Borrower to perform or comply with any of its obligations under this Section 48;

45

(iii)     the existence or alleged existence of any Prohibited Activity or Condition;

(iv)     the actual or alleged violation of any Hazardous Materials Law.

(l)     Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (**"Claim"**), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)     Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)     any amendment or modification of any Loan Document;

(2)     any extensions of time for performance required by any Loan Document;

(3)     the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)     the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)     the release or substitution in whole or in part of any security for the Indebtedness; and

(6)     Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)     Borrower shall, at its own cost and expense, do all of the following:

---

App. 1509

46

(1)     pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48;

(2)     reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)     reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

(p)     In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding.  Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)     The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument.  Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the

App. 1510

47

available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)    So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)    To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

**49.**    (See Exhibit B)

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Security Instrument:

|X|    <u>Exhibit A</u>        Description of the Land (required).

|X|    <u>Exhibit B</u>        Modifications to Security Instrument

48

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed instrument.

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

STATE OF TEXAS          §
                                        §
COUNTY OF Dallas    §

The foregoing instrument was acknowledged before me on this ⌊⌊ day of October, 20 17 by Timothy Barton, President of D4DS LLC., a Texas limited liability company.

[seal]

SASKYA BEDOYA
Notary Public, State of Texas
My Commission Expires
July 21, 2018

_____
Notary Public
Printed Name of Notary: Saskya Bedoya

My Commission Expires: July 21, 2018

App. 1512

*HUD Project Number: 113-35683*
*Project Name: Bellwether Ridge Apartments*

**EXHIBIT A**
DESCRIPTION OF THE LAND

TRACT 1:

Being all of LOTS 1A1 AND 3A1, BLOCK A, HUNTINGTON RIDGE, an Addition to the City of DeSoto, Dallas County, Texas, according to the Plat thereof recorded in Instrument Number 201700293233, Official Public Records, Dallas County, Texas.

TRACT 2:

Non-exclusive easement right as created and described in Easement Grant executed by DeSoto Ridge Apartments, Ltd., as Grantor, to Branch Banking and Trust Company, as Grantee, dated December 27, 2013, filed December 31, 2013, under Clerk's File No. 201300390459, Real Property Records, Dallas County, Texas over the following described tract of land:

Lot 2, Block A, Huntington Ridge, an Addition to the City of DeSoto, Dallas County, Texas, according to the Map or Plat thereof recorded under Clerk's File No. 200600427008, Map Records, Dallas County, Texas.

App. 1513

**EXHIBIT B**
MODIFICATIONS TO SECURITY INSTRUMENT

The following modifications are made to the text of the Security Instrument of which this Exhibit is a part:

ADDENDUM
(TEXAS)

HUD Project Number: 113-35683
Project Name: Bellwether Ridge Apartments

The following sections are inserted into the Security Instrument and made a part thereof:
43. Accelerations/ Remedies:

If Lender invokes the power of sale, Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction. Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

49. Trustee:

(a)    Trustee may resign by giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Instrument or shall fail or refuse to act in accordance with this Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Instrument. Such appointment may be executed by an authorized

HUD-94000M-ADD
Security Instrument - Addendum

App. 1514

officer, agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)    Any successor Trustee appointed pursuant to this Section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)    Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Instrument, including the transmittal and posting of any notices.

THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE DOCUMENT IS TO BE RECORDED AND FILED.

**Filed and Recorded**
**Official Public Records**
**John F. Warren, County Clerk**
**Dallas County, TEXAS**
**10/24/2017 10:12:24 AM**
**$226.00**
**201700300652**

HUD-94000M-ADD
Security Instrument - Addendum

App. 1515

# EXHIBIT J-27

## PROMISSORY NOTE

**$3,800,000.00**                                                                October **19**, 2017

FOR VALUE RECEIVED, **JMJ DEVELOPMENT, LLC**, a Texas limited liability company ("Borrower"), having an address of 1755 Wittington Place, Suite 340, Farmers Branch, Texas 75234, hereby promises to pay to the order of **SOUTHERN PROPERTIES CAPITAL, LTD**, a British Virgin Islands corporation (together with its successors and assigns and any subsequent holders of this Promissory Note, the "Lender"), as hereinafter provided, the principal sum of **THREE MILLION EIGHT HUNDRED THOUSAND AND NO/100THS DOLLARS ($3,800,000.00)** or so much thereof as may be advanced or readvanced by Lender from time to time hereunder to or for the benefit or account of Borrower, together with interest thereon at the Note Rate (as hereinafter defined), and otherwise in strict accordance with the terms and provisions hereof.

### ARTICLE ONE
### DEFINITIONS

1.1     *Defined Terms*. Any capitalized terms used in this Promissory Note ("Note") are defined as they are introduced or in Section 4.22 hereof. All terms used herein, whether or not defined hereof, and whether used in singular or plural form, shall be deemed to refer to the object of such term whether such is singular or plural in nature, as the context may suggest or require.

### ARTICLE II
### PAYMENT TERMS

2.1     *Payment of Principal and Interest*. Prior to any Event of Default, as defined in Section 2.8 hereof, interest on the principal balance of this Note shall accrue at the rate of **five percent (5.0%)** per annum ("Applicable Rate"). No payments shall be due hereunder until **May 1, 2020** ("Maturity Date"), when the entire remaining unpaid principal balance of this Note and any and all accrued but unpaid interest herein shall be due and payable in full.

2.2     *Application*. Except as expressly provided herein to the contrary, all payments on this Note shall be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon), including, without limitation, any and all fees owed to Lender, for which either Borrower shall be obligated or Lender shall be entitled pursuant to the provisions of this Note or the other Loan Documents, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the direct order of maturity. If an Event of Default exists under this Note or under any of the other Loan Documents, then Lender may, at the sole option of Lender, apply any such payments, at any time and from time to time, to any of the items specified in clauses (i), (ii) or (iii) above without regard to the order of priority otherwise specified in this Section and any application to the outstanding principal balance hereof may be made in either direct or inverse order of maturity.

App. 1517

2.3    *Payments*.  All payments under this Note made to Lender shall be made on the first (1ˢᵗ) day of each month, without offset, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private.  Payments by check or draft shall not constitute payment in immediately available funds until the required amount is actually received by Lender in full. Payments in immediately available funds received by Lender in the place designated for payment on a Business Day prior to 12:00 noon Central time at said place of payment shall be credited prior to the close of business on the Business Day received, while payments received by Lender on a day other than a Business Day or after 12:00 noon Central time on a Business Day shall not be credited until the next succeeding Business Day. If any payment of principal or interest on this Note shall become due and payable on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.  Any such extension of time for payment shall be included in computing interest which has accrued and shall be payable in connection with such payment.

2.4    *Computation Period*. Interest on the indebtedness evidenced by this Note shall be computed on the basis of a three hundred sixty (360) day year and shall accrue at the Applicable Rate on the actual number of days elapsed for any whole month in which interest is being calculated, but on the actual number of days for any partial month in which interest is being calculated.  In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to the close of business on the Business Day received.

2.5    *Prepayment*. This Note may not be prepaid in part or in full.

2.6    *Unconditional Payment*.  Borrower is and shall be obligated to pay all principal, interest and any and all other amounts which become payable under this Note or under any of the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction whatsoever and without any reduction for counterclaim or setoff whatsoever.  If at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any Debtor Relief Law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

2.7    *Partial or Incomplete Payments*. Remittances in payment of any part of this Note other than in the required amount in immediately available funds at the place where this Note is payable shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in full in accordance herewith and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.  Acceptance by Lender of any payment in an amount less than the full amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default in the payment of this Note.

App. 1518

2.8    *Interest on Unpaid Interest, Late Payment Charges; Default Interest Rate, Etc.* In the event any payment of interest is not paid on the date when due, interest shall accrue thereon as set forth herein on a compounded basis until paid in full. Further, in the event any Monthly Payment is not paid within **ten (10) days** of the date when due, Borrower shall pay a late payment charge in an amount equal to **five percent** (5%) of the late payment in order to offset Lender's increased administrative costs resulting from such late payment. For so long as any Event of Default exists under this Note or under any of the other Loan Documents, and in addition to all other rights and remedies of Lender hereunder, interest shall accrue on the outstanding principal balance hereof at the Default Interest Rate, and such accrued interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or Event of Default, and such late charges and accrued interest are reasonable estimates of those damages and do not constitute a penalty. Borrower shall also pay an additional $35.00 fee for any check which is not honored.

## ARTICLE III
## EVENT OF DEFAULT AND REMEDIES

3.1    *Event of Default.* The occurrence or happening, at any time and from time to time, of any one or more of the following shall immediately constitute an "Event of Default" under this Note:

(a)    Prior to the Maturity Date, by acceleration or otherwise, Borrower shall fail, refuse or neglect to pay and satisfy, in full and in the applicable method and manner required, any required payment of principal or interest or any other portion of the indebtedness evidenced by this Note as and when the same shall become due and payable or within five (5) days of such date, whether at the stipulated due date thereof, at a date fixed for payment, or ***immediately*** on the Maturity Date, by acceleration or otherwise Borrower shall fail, refuse or neglect to pay and satisfy in full and in the applicable method and manner required, the indebtedness evidenced by this Note; or

(b)    The occurrence of any other default, breach or event of default as defined in or under this Note or any other Loan Document that remains uncured under and pursuant to the provisions of this Note or any other Loan Document.

3.2    *Remedies.* Upon the occurrence of an Event of Default, Lender shall have the immediate right, at the sole discretion of Lender and without notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action (**ALL OF WHICH BORROWER HEREBY EXPRESSLY WAIVES AND RELINQUISHES**) (i) to declare the entire unpaid balance of the indebtedness evidenced by this Note (including, without limitation, the outstanding principal balance hereof, including all sums advanced or accrued hereunder or under any other Loan Document, and all accrued but unpaid interest thereon) at once immediately due and payable (and upon such declaration, the same shall be at once immediately due and payable) and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity, (ii) to foreclose any liens and security interests

App. 1519

securing payment hereof or thereof (including, without limitation, any liens and security interests covering any portion of the mortgaged Property), and (iii) to exercise any of Lender's other rights, powers, recourses and remedies under this Note, under any other Loan Document, or at law or in equity, and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, singly, successively, or concurrently against Borrower or others obligated for the repayment of this Note or any part hereof, or against any one or more of them, or against the mortgaged Property, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, it being agreed by Borrower that the exercise, discontinuance of the exercise of or failure to exercise any of the same shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse, and (d) are intended to be, and shall be, nonexclusive. All rights and remedies of Lender hereunder and under the other Loan Documents shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the mortgaged Property or any portion thereof. Without limiting the provisions of Section 4.18 hereof, if this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs and expenses of collection, including, but not limited to, Lender's attorneys' fees, whether or not any legal action shall be instituted to enforce this Note and whether or not such attorneys' fees shall be related to any bankruptcy proceeding of Borrower.

<div align="center">

**ARTICLE IV**
**GENERAL PROVISIONS**

</div>

4.1     *No Waiver; Amendment.* No failure to accelerate the indebtedness evidenced by this Note by reason of an Event of Default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced by this Note or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted under this Note, under any of the other Loan Documents or by any applicable laws. Borrower hereby expressly waives and relinquishes the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. The failure to exercise any remedy available to Lender shall not be deemed to be a waiver of any rights or remedies of Lender under this Note or under any of the other Loan Documents, or at law or in equity. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender specifically, unequivocally and expressly agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, or modification is sought.

4.2     *Waivers.*     EXCEPT AS SPECIFICALLY PROVIDED IN THE LOAN DOCUMENTS TO THE CONTRARY, BORROWER AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF NONPAYMENT OR NONPERFORMANCE, PROTEST, NOTICE OF PROTEST, NOTICE OF INTENT TO ACCELERATE, NOTICE OF ACCELERATION OR ANY OTHER NOTICES OR ANY OTHER ACTION. BORROWER

AND ANY ENDORSERS OR GUARANTORS HEREOF SEVERALLY WAIVE AND RELINQUISH, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO THE BENEFITS OF ANY MORATORIUM, REINSTATEMENT, MARSHALING, FORBEARANCE, VALUATION, STAY, EXTENSION, REDEMPTION, APPRAISEMENT, EXEMPTION AND HOMESTEAD NOW OR HEREAFTER PROVIDED BY THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA AND OF EACH STATE THEREOF, BOTH AS TO ITSELF AND IN AND TO ALL OF ITS PROPERTY, REAL AND PERSONAL, AGAINST THE ENFORCEMENT AND COLLECTION OF THE OBLIGATIONS EVIDENCED BY THIS NOTE OR BY THE OTHER LOAN DOCUMENTS.

4.3   *Interest Provisions.*

(a)   *Savings Clause.* It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note then owing by Borrower to Lender. All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the

App. 1521

rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

4.4     *Use of Funds*. Borrower hereby warrants, represents and covenants that (i) the loan evidenced by this Note is made to Borrower solely for the purpose of acquiring real property for commercial purposes or carrying on a business or commercial enterprise, (ii) all proceeds of this Note shall be used only for business and commercial purposes, and (iii) no funds disbursed hereunder shall be used for personal, family, agricultural or household purposes.

4.5     *Further Assurances and Corrections*. From time to time, at the request of Lender, Borrower will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Note or in any other Loan Document or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver, record and/or file (or cause to be executed, acknowledged, delivered, recorded and/or filed) such further documents and instruments (including, without limitation, further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents) and perform such further acts and provide such further assurances as may be necessary, desirable, or proper, in Lender's opinion, (A) to carry out more effectively the purposes of this Note and the Loan Documents and the transactions contemplated hereunder and thereunder, (B) to confirm the rights created under this Note and the other Loan Documents, (C) to protect and further the validity, priority and enforceability of this Note and the other Loan Documents and the liens and security interests created thereby, and (D) to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents; and (iii) pay all costs in connection with any of the foregoing.

4.6     *Waiver of Jury Trial*. BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

4.7     *Governing Law; Submission to Jurisdiction*. This Note is executed and delivered as an incident to a lending transaction negotiated and consummated in **Dallas County, Texas**, and shall be governed by and construed in accordance with the laws of the **State of Texas**. Borrower, for itself and its successors and assigns, hereby irrevocably (i) submits to the nonexclusive jurisdiction of the state and federal courts in **Texas**, (ii) waives, to the fullest extent permitted by law, any objection that it may now or in the future have to the laying of venue of any litigation arising out of or in connection with this Note or any Loan Document brought in the

Promissory Note
Southern Properties-JMJ Development, LLC                    6

appropriate state or federal court located in **Dallas County, Texas,** (iii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum, and (iv) agrees that any legal proceeding against any party to any of the Loan Documents arising out of or in connection with any of the Loan Documents may be brought in one of the foregoing courts. Borrower hereby agrees that service of process upon Borrower may be made by certified or registered mail, return receipt requested, at its address specified herein. Nothing herein shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrower or with respect to any of Borrower's property in courts in other jurisdictions. The scope of each of the foregoing waivers is intended to be all encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Borrower acknowledges that these waivers are a material inducement to Lender's agreement to enter into the agreements and obligations evidenced by the Loan Documents that Lender has already relied on these waivers and will continue to rely on each of these waivers in related future dealings. The waivers in this Section are irrevocable, meaning that they may not be modified either orally or in writing, and these waivers apply to any future renewals, extensions, amendments, modifications, or replacements in respect of any and all of the applicable Loan Documents. In connection with any litigation, this Note may be filed as a written consent to a trial by the court.

4.8 _Counting of Days._ If any time period referenced hereunder ends on a day other than a Business Day, such time period shall be deemed to end on the next succeeding Business Day.

4.9 _Relationship of the Parties._ Notwithstanding any prior business or personal relationship between Borrower and Lender, or any officer, director or employee of Lender, that may exist or have existed, the relationship between Borrower and Lender is solely that of debtor and creditor, Lender has no fiduciary or other special relationship with Borrower, Borrower and Lender are not partners or joint venturers, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

4.10 _Successors and Assigns._ The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them. The terms "Borrower" and "Lender" as used hereunder shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties, by operation of law or otherwise, and all other persons claiming by, through or under them.

4.11 _Joint and Several Liability._ If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.

4.12    *Time is of the Essence.*  Time is of the essence with respect to all provisions of this Note and the other Loan Documents.

4.13    *Headings.*  The Article, Section, and Subsection entitlements hereof are inserted for convenience of reference only and shall in no way alter, modify, define, limit, amplify or be used in construing the text, scope or intent of such Articles, Sections, or Subsections or any provisions hereof.

4.14    *Controlling Agreement.*  In the event of any conflict between the provisions of this Note and any of the other Loan Documents, it is the intent of the parties hereto that the provisions of this Note shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note and the other Loan Documents and that this Note and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

4.15    *Notices.*  Unless otherwise expressly provided herein, all notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, (ii) by delivering same in person to the intended addressee, (iii) by delivery to a reputable independent third party commercial delivery service for same day or next day delivery and providing for evidence of receipt at the office of the intended addressee, or (iv) by prepaid telegram, telex, telecopier or telefacsimile transmission to the addressee, so long as the same is immediately followed by delivery pursuant to one of the methods under (i) through (iii) above.  Notice so mailed shall be effective two (2) days after its deposit with the United States Postal Service or any successor thereto; notice sent by such a commercial delivery service shall be effective one (1) day after delivery to such commercial delivery service; notice given by personal delivery shall be effective only if and when received by the addressee; and notice given by other means shall be effective only if and when received at the office or designated place or machine of the intended addressee.  For purposes of notice, the addresses of the parties shall be as set forth below; provided, however, that either party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days' prior notice to the other party in the manner set forth herein.  Electronic mail and internet websites may be used only to distribute only routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

If to Borrower:    JMJ Development, LLC
1755 Wittington Place, Suite 340
Farmers Branch, Texas  75234
Attention:    Timothy Barton

If to Lender:    Southern Properties Capital, LTD
1603 LBJ Freeway, Suite 800
Dallas, Texas  75234
Attention:    Mr. Steven Shelley

Promissory Note
Southern Properties-JMJ Development, LLC                        8

App. 1524

4.16    *Severability.* If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

4.17    *Right of Setoff.* In addition to all liens upon and rights of setoff against the money, securities, or other property of Borrower given to Lender that may exist under applicable law, Lender shall have and Borrower hereby grants to Lender a lien upon and a right of setoff against all money, securities, and other property of Borrower, now or hereafter in possession of or on deposit with Lender, whether held in a general or special account or deposit, for safe-keeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Borrower. No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by an instrument in writing executed by Lender.

4.18    *Costs of Collection.* If any holder of this Note retains an attorney-at-law in connection with any Event of Default or at maturity or to collect, enforce, or defend this Note or any part hereof, or any other Loan Document in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Borrower sues any holder in connection with this Note or any other Loan Document and does not prevail, then Borrower agrees to pay to each such holder, in addition to the principal balance hereof and all interest hereon, all costs and expenses of collection or incurred by such holder or in any such suit or proceeding, including, but not limited to, reasonable attorneys' fees.

4.19    *Gender.* All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.

4.20    *Statement of Unpaid Balance.* At any time and from time to time, Borrower will furnish promptly, upon the request of Lender, a written statement or affidavit, in form satisfactory to Lender, stating the unpaid balance of the indebtedness evidenced by this Note and that there are no offsets or defenses against full payment of the indebtedness evidenced by this Note and the terms hereof, or if there are any such offsets or defenses, specifying them.

4.21    *Entire Agreement.* THIS NOTE AND THE OTHER LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE HERETO AND THERETO WHICH ARE NOT CONTAINED HEREIN OR THEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE AND THE OTHER LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF

THE PARTIES HERETO.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

4.22   *Definitions*.  As used in this Promissory Note, the following terms shall have the following meanings:

Business Day:  A weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in **Dallas, Texas**, are authorized or required by law to be closed. Unless otherwise provided, the term "days" when used herein shall mean calendar days.

Charges:  All fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law.

Debtor Relief Laws:  Title 11 of the United States Code, as now or hereafter in effect, or any other applieable law, domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors.

Default Interest Rate: A rate per annum equal to the lesser of eighteen percent (18%) or the Maximum Lawful Rate.

Loan Documents:  This Note, the Security Instrument, any guaranty agreement, any pledge, profit partieipation agreement, any financing statements, and such other agreements, documents and instruments now or hereafter governing, securing or guaranteeing any portion of the indebtedness evidenced by this Note or executed by Borrower or any guarantor or indemnitor or any other person or entity in connection with the loan evidenced by this Note or in connection with the payment of the indebtedness evidenced by this Note or the performance and discharge of the obligations related hereto or thereto, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, extensions and supplements hereof or thereof.

Maximum Lawful Rate:  The maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges made in connection with the transaction evidenced by this Note and the other Loan Documents.

PE Accounts:  All bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited.

Pledged Entities:  Each of JMJAV LLC and JMJD4 LLC.

Property:  The member interests in certain limited liability companies owned by TRWF LLC and by JMJAV LLC, as more particularly described in the Security Instrument, together with certain other rights, estates, interests, collateral and benefits now or at any time hereafter securing the payment of the indebtedness evidenced by this Note, whether by virtue of the Loan Documents or otherwise.

Security Instrument:  The **Security Agreement** dated as of the date hereof, executed by JMJAV LLC for the benefit of JMJ Development, LLC, as beneficiary, relating to and granting a security interest in, the Property, which security interest has been assigned to Lender.   The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, the Security Instrument and the other Loan Documents.

*[Signature page to follow]*

App. 1527

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note as of the day and year first written above.

**BORROWER:**

**JMJ DEVELOPMENT, LLC**
a Texas limited liability company

By: _____
       Timothy Barton, President

App. 1528

# EXHIBIT J-28

**AMENDED AND RESTATED**

**PLEDGE AND SECURITY AGREEMENT**

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of October ___, 2017, is from **TRWF LLC,** a Delaware limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC,** a Texas limited liability company (together with its successors and assigns, "**Lender**").

RECITALS:

A.      Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $3,800,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.      To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated October ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1 - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1      Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-TRWF LLC
Page 1

(a)     The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)     all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)     the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)     all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)     Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)     to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)     all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)     all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Security Agreement
JMJ Development, LLC-TRWF LLC                    2

(i)      all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)      (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions. As used herein, the following terms shall have the following respective meanings:

(a)      "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)      "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Security Agreement
JMJ Development, LLC-TRWF LLC                3

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c) "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest.  On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.  It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.  All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.  Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.  Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Security Agreement
JMJ Development, LLC-TRWF LLC                    4

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

### ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership. Pledgor owns 100% of the member interests in JMJAV LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Security Agreement
JMJ Development, LLC-TRWF LLC                5

Section 3.6    No Financing Statements.  Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    Certificated Securities.  Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender.  Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities.  Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3.  Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS.  THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE.  PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

Security Agreement
JMJ Development, LLC-TRWF LLC                    6

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Security Agreement
JMJ Development, LLC-TRWF LLC                7

Section 3.10    Authority, Enforceability, Etc.  The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

### ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1    Transfer Rights.  Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights.  Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

Security Agreement
JMJ Development, LLC-TRWF LLC                    8

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment.  Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender.  Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3   Power of Attorney.

(a)   Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)   Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c) The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights. Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a) Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b) Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this

Security Agreement
JMJ Development, LLC-TRWF LLC                    10

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative. The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion. Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies. Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

<div align="center">ARTICLE V - SALES OF THE COLLATERAL</div>

Section 5.1    Right to Conduct Partial Sale of Collateral. In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only. If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral. It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times. Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures. No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable. All other demands, advertisements and notices are hereby irrevocably waived by Pledgor. The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "**SEC**") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "**Securities Act**"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Security Agreement
JMJ Development, LLC-TRWF LLC                    12

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7   Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8   Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

## ARTICLE VI - SECURITIES ACT

Section 6.1   Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

Security Agreement
JMJ Development, LLC-TRWF LLC                    13

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.  If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.  Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances.  Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.  Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc.  No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.  Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Security Agreement
JMJ Development, LLC-TRWF LLC                    14

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices. All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.   TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.   PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Security Agreement
JMJ Development, LLC-TRWF LLC                    15

**TRWF LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

Security Agreement
JMJ Development, LLC-TRWF LLC                    16

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender.  Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns.  Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14   Termination.  Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15   Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)     As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4DS LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4DS LLC.  Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)     In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4DS Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4DS Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4DS Property to Lender or Lender's assignee, and (iv) Each of JMJAV LLC and Enoch Investments, LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4DS LLC, shall also have elected to transfer the D4DS Property to Pledgor.   Upon receipt of such notice, Pledgor

Security Agreement
JMJ Development, LLC-TRWF LLC                    18

shall assemble all documents related to the D4DS Property and other information related to the D4DS Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4DS Property to Lender, and Pledgor shall cause D4DS to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4DS Property to Lender.

(c)    Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of JMJAV LLC, and Enoch Investments, LLC, by and through D4DS LLC, as the owner of the D4DS Property, shall have the right to transfer and convey the D4DS Property to Lender in lieu of any transfer of the Collateral.

Section 7.16   Liability of Pledgor.   Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

Security Agreement
JMJ Development, LLC-TRWF LLC                    19

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4DS Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4DS Loan;

material physical waste of the Collateral or the D4DS Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4DS Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4DS Property, (B) any awards received in connection with a condemnation of all or a portion of the D4DS Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4DS Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4DS Property which are not delivered to Lender upon a foreclosure of the D4DS Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4DS Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

Security Agreement
JMJ Development, LLC-TRWF LLC                    20

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

> (1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4DS Loan" shall mean any loan made to D4DS LLC, and secured by any real property owned by D4DS LLC.

"D4DS Property" means the real property and improvements owned by D4DS LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17    Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4DS Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR:**

**TRWF LLC**

Security Agreement
JMJ Development, LLC-TRWF LLC                    21

a Delaware limited liability company

By: _____
    Timothy Barton

Security Agreement
JMJ Development, LLC-TRWF LLC              22

App. 1551

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---------|----------------|-----------------|
| TRWF LLC | JMJAV LLC | 100% of the member interests in JMJAV LLC |

Security Agreement
JMJ Development, LLC-TRWF LLC                    23

## Exhibit A

## AGREEMENT AND ACKNOWLEDGMENT

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by TRWF LLC, a Delaware limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.      Representations and Warranties. The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.      Covenants and Agreements.

(a)      Books and Records. The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4DS LLC, containing such detail and information as Lender may request.

(b)      UCC Matters. The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-TRWF LLC                    1

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)     Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)     Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)     Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)     Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

Security Agreement
JMJ Development, LLC-TRWF LLC                2

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)     The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.     Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.     No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-TRWF LLC                3

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.      Transfers. The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender. In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender. The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.      Further Assurances. The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.      Reliance. This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.      Counterparts. This Agreement and Acknowledgment may be executed in counterparts.

9.      Miscellaneous. The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

Security Agreement
JMJ Development, LLC-TRWF LLC                    4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of October __, 2017.

Pledged Entity:

JMJAV LLC

By: _____
Timothy Barton, President

Security Agreement
JMJ Development, LLC-TRWF LLC                    5

App. 1557

**Exhibit B**

<u>Organizational Agreements</u>

# EXHIBIT J-29

**AMENDED AND RESTATED**

**PLEDGE AND SECURITY AGREEMENT**

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of October ___, 2017, is from **JMJAV LLC**, a Texas limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns, "**Lender**").

R E C I T A L S:

A.    Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower") and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $3,800,000.00 (the "**Loan**") to Borrower. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.    To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated October ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1    Collateral. As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-JMJAV LLC
Page 1

App. 1560

(a)     The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in <u>Schedule 1</u> attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said <u>Schedule 1</u> (collectively, the "**Pledged Equity**");

(b)     all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)     the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)     all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)     Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)     to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)     all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)     all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Security Agreement
JMJ Development, LLC-JMJAV LLC                    2

App. 1561

(i)  all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)  (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2  Definitions. As used herein, the following terms shall have the following respective meanings:

(a)  "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)  "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Security Agreement
JMJ Development, LLC-JMJAV LLC                3

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)     "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3    Perfection of Security Interest.  On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.  It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4    Acts of Lender.  All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5    Custody of Collateral.  Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1    Distributions; Exercise of Rights.  Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Security Agreement
JMJ Development, LLC-JMJAV LLC                4

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

ARTICLE III - REPRESENTATIONS, WARRANTIES AND
COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership. Pledgor owns 100% of the member interests in JMJD4 LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Section 3.6  <u>No Financing Statements</u>.  Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7  <u>Certificated Securities</u>.  Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender.  Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities.  Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under <u>Section 1.3</u>.  Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS.  THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE.  PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

Security Agreement
JMJ Development, LLC-JMJAV LLC                6

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8   Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9   Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Security Agreement
JMJ Development, LLC-JMJAV LLC                    7

App. 1566

Section 3.10    Authority, Enforceability, Etc.  The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

<p style="text-align:center">ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES</p>

If an Event of Default shall occur:

Section 4.1    Transfer Rights.  Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)    Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)    Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)    Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2    Voting Rights.  Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

Security Agreement
JMJ Development, LLC-JMJAV LLC                8

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

Security Agreement
JMJ Development, LLC-JMJAV LLC                    9

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)      The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked. The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4    Management Rights. Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender: (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5    Right of Substitution. Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6    UCC Rights. Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7    Lender Self-Help Rights.

(a)      Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents. All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)      Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement. The acceptance by Lender of this

Security Agreement
JMJ Development, LLC-JMJAV LLC                    10

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8 <u>Remedies Cumulative</u>. The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion. Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9 <u>Notice of Exercise of Remedies</u>. Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

<center>ARTICLE V - SALES OF THE COLLATERAL</center>

Section 5.1 <u>Right to Conduct Partial Sale of Collateral</u>. In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only. If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral. It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; <u>provided</u>, <u>however</u>, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times. Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2 <u>Sale Procedures</u>. No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable. All other demands, advertisements and notices are hereby irrevocably waived by Pledgor. The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

Security Agreement
JMJ Development, LLC-JMJAV LLC                    11

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "**SEC**") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "**Securities Act**"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Security Agreement
JMJ Development, LLC-JMJAV LLC                    12

App. 1571

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

ARTICLE VI - SECURITIES ACT

Section 6.1    Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

Security Agreement
JMJ Development, LLC-JMJAV LLC                    13

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.    If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.  Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances.    Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.  Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc.    No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.  Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Security Agreement
JMJ Development, LLC-JMJAV LLC                    14

App. 1573

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices. All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Security Agreement
JMJ Development, LLC-JMJAV LLC                    15

**JMJAV LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.

Section 7.5   Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6   Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7   Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

Security Agreement
JMJ Development, LLC-JMJAV LLC                16

App. 1575

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

Security Agreement
JMJ Development, LLC-JMJAV LLC                17

App. 1576

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14   Termination. Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15   Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)      As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4DS LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4DS LLC. Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)      In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4DS Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4DS Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4DS Property to Lender or Lender's assignee, and (iv) Each of Enoch Investments, LLC and TRWF LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4DS LLC, shall also have elected to transfer the D4DS Property to Pledgor.   Upon receipt of such notice, Pledgor

Security Agreement
JMJ Development, LLC-JMJAV LLC                    18

shall assemble all documents related to the D4DS Property and other information related to the D4DS Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4DS Property to Lender, and Pledgor shall cause D4DS to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4DS Property to Lender.

(c)    Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of Enoch Investments, LLC, and TRWF LLC, by and through D4DS LLC, as the owner of the D4DS Property, shall have the right to transfer and convey the D4DS Property to Lender in lieu of any transfer of the Collateral.

Section 7.16    Liability of Pledgor.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents.  The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

Security Agreement
JMJ Development, LLC-JMJAV LLC                    19

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4DS Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4DS Loan;

material physical waste of the Collateral or the D4DS Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4DS Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4DS Property, (B) any awards received in connection with a condemnation of all or a portion of the D4DS Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4DS Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4DS Property which are not delivered to Lender upon a foreclosure of the D4DS Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4DS Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

Security Agreement
JMJ Development, LLC-JMJAV LLC                    20

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4DS Loan" shall mean any loan made to D4DS LLC, and secured by any real property owned by D4DS LLC.

"D4DS Property" means the real property and improvements owned by D4DS LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17    Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4DS Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.


**PLEDGOR:**

JMJAV LLC

Security Agreement
JMJ Development, LLC-JMJAV LLC                    21

a Texas limited liability company

By: _____
  Timothy Barton

App. 1581

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---------|----------------|-----------------|
| JMJAV LLC | JMJD4 LLC | 1% of the member interests in JMJD4 LLC |

Security Agreement
JMJ Development, LLC-JMJAV LLC                    23

**Exhibit A**

**AGREEMENT AND ACKNOWLEDGMENT**

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by JMJAV LLC, a Texas limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1.    Representations and Warranties. The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2.    Covenants and Agreements.

    (a)    Books and Records. The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4DS LLC, containing such detail and information as Lender may request.

    (b)    UCC Matters. The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-JMJAV LLC                    1

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)     Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)     Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)     Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)     Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

Security Agreement
JMJ Development, LLC-JMJAV LLC                2

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)    The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.    Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.    No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-JMJAV LLC                3

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.      Transfers.  The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender.  In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender.  The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.      Further Assurances.  The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.      Reliance.  This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.      Counterparts.   This Agreement and Acknowledgment may be executed in counterparts.

9.      Miscellaneous.  The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of October __, 2017.

**Pledged Entity:**

**JMJD4 LLC**

By: _____
    Timothy Barton, President

## Exhibit B

## Organizational Agreements

# EXHIBIT J-30

**AMENDED AND RESTATED**

**PLEDGE AND SECURITY AGREEMENT**

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of October ___, 2017, is from **ENOCH INVESTMENTS, LLC,** a Delaware limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC,** a Texas limited liability company (together with its successors and assigns, "**Lender**").

RECITALS:

A.      Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower")  and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $3,800,000.00 (the "**Loan**") to Borrower.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B.      To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated October ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1     Collateral.  As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC
Page 1

App. 1590

(a)    The legal and beneficial ownership interests in and to (including, without limitation, all Equity Interests) the Persons described in Schedule 1 attached hereto (each, a "**Pledged Entity**") as and to the extent of the pledged Equity Interests described on said Schedule 1 (collectively, the "**Pledged Equity**");

(b)    all rights, privileges, general intangibles, payments intangibles, voting rights, authority and power arising from its interest in the Pledged Equity;

(c)    the capital of Pledgor and any and all profits, losses, Distributions (as defined below), and allocations attributable to the Pledged Equity as well as the proceeds of any Distribution thereof, whether arising under the terms of any Organizational Agreement (as defined below) or otherwise;

(d)    all other payments, if any, due or to become due, to Pledgor and all other present or future claims by Pledgor against any Pledged Entity, or in respect of the Pledged Equity, under or arising out of (i) any Organizational Agreement, (ii) monies loaned or advanced, for services rendered or otherwise, and/or (iii) any other contractual obligations, commercial tort claims, supporting obligations, damages, insurance proceeds, condemnation awards or other amounts due to Pledgor from any Pledged Entity or with respect to the Pledged Equity;

(e)    Pledgor's claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under or arising out of the ownership of the Pledged Equity;

(f)    to the extent permitted by applicable law, Pledgor's rights, if any, in any Pledged Entity pursuant to any Organizational Agreement, or at law, to exercise and enforce every right, power, remedy, authority, option and privilege of Pledgor relating to the Pledged Equity, including without limitation, the right to (i) execute any instruments and to take any and all other action on behalf of and in the name of Pledgor in respect of the Pledged Equity, (ii) exercise any and all voting, consent and management rights of Pledgor in or with respect to any Pledged Entity, (iii) exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval with respect to any Pledged Entity, (iv) enforce or execute any checks, or other instruments or orders of any Pledged Entity, and (v) file any claims and to take any action in connection with any of the foregoing, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of any Pledged Entity;

(g)    all Investment Property (as such term is defined in Section 9-102 of the UCC (as defined below)) issued by or relating to any Pledged Entity, or otherwise relating to the Pledged Equity;

(h)    all additional Equity Interests or other property, securities, or assets now existing or hereafter acquired by Pledgor relating to a Pledged Entity, including, without limitation, as a result of any consolidation, combinations, mergers, reorganizations, acquisitions, exchange offers, recapitalizations of any type, contributions to capital, splits, spin-offs, or similar actions or the exercise of options or other rights relating to the Pledged Equity;

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC         2

(i)     all partnership certificates, member certificates, stock certificate, or any other instrument, note, chattel paper or certificate (including, without limitation, all "certificated securities" within the meaning of Section 8-102 of the UCC) (whether or not qualifying as Investment Property) representing the Pledged Equity in any Pledged Entity and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such certificates or writings, and all options and warrants for the purchase of such Equity Interests now or hereafter held in the name of Pledgor (collectively, "**Certificated Securities**"), and all Certificated Securities in any Pledged Entity from time to time acquired by Pledgor in any manner, and any interest of Pledgor in the entries on the books of any financial intermediary pertaining to such Certificated Securities, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Certificated Securities (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights), and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all right under any Organizational Agreements pertaining to such rights; and

(j)     (i) all "proceeds" (as such term is defined in Section 9-102 of the UCC) of any or all of the foregoing (whether cash or non-cash proceeds, including insurance proceeds), (ii) whatever is receivable or received when any of the Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto and also includes all interest, dividends and other property receivable or received on account of any of the Collateral or proceeds thereof, and in any event, shall include all Distributions or other income from any of the Collateral, all collections thereon or all Distributions with respect thereto, and (iii) all proceeds, products, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the Collateral. The inclusion of proceeds in the Collateral does not authorize Pledgor to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

Section 1.2    Definitions. As used herein, the following terms shall have the following respective meanings:

(a)     "**Distributions**" means all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and payments or economic benefits or interests to which any Pledgor is entitled with respect to the Pledged Equity whether or not received by or otherwise distributed to such Pledgor, whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancing, condemnations or insured losses of the company's assets, the liquidation of the company's assets and affairs, management fees, guaranteed payments, repayment of loans, reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Pledged Equity.

(b)     "**Organizational Agreement**" means the partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement, articles or

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        3

App. 1592

certificate of organization, by-laws, certificate of formation and other organizational or governing documents, as applicable, of any Pledged Entity.

(c)     "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of Texas.

Section 1.3     Perfection of Security Interest.     On or before the Closing Date, Pledgor shall (a) deliver to Lender Certificated Securities representing all of the Pledged Equity, in form and content acceptable to Lender, duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, and enter into such other arrangements as may be necessary to give control of any Investment Property to Lender within the meaning of Section 8-106 of the UCC, (b) cause each Pledged Entity to execute and deliver the Agreement and Acknowledgement attached hereto as Exhibit A (the "**Acknowledgement**"), and (c) promptly take all other actions required to perfect the security interest of Lender in the Collateral under applicable law.  It is the intention of Pledgor and Lender that at all times while the Loan remains outstanding, the Pledged Equity shall constitute Investment Property, and, to that end, Pledgor shall take, and shall cause each Pledged Entity to take, all necessary action to obtain such classification pursuant to the UCC.

Section 1.4     Acts of Lender.     All of the Collateral at any time delivered to Lender pursuant to this Agreement shall be held by Lender subject to the terms, covenants and conditions set forth in the Loan Documents.  Neither Lender nor any of Lender's directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by such party or parties relative to any of the Collateral, except for such party's or parties' own gross negligence or willful misconduct.  Lender shall be entitled to rely in good faith upon any writing or other document (including, without limitation, any telegram or e-mail) or any telephone conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder.

Section 1.5     Custody of Collateral.     Lender shall not have any duty concerning the collection or protection of the Collateral or any income thereon or payments with respect thereto, or concerning the preservation of any rights pertaining thereto beyond exercising reasonable care with respect to the custody of any tangible evidence of the Collateral actually in its possession.

ARTICLE II - POWERS OF PLEDGOR PRIOR TO AN EVENT OF DEFAULT

Section 2.1     Distributions; Exercise of Rights.     Unless an Event of Default has occurred that is continuing, and subject to the terms of the Loan Documents, Pledgor shall be entitled to (a) make payment of any cash Distributions allocable to the Collateral to Lender, in accordance with the terms of the promissory note evidencing the Loan, and (b) exercise (but only in a manner that will not (i) violate or be inconsistent with the terms hereof or of any other Loan Document or (ii) have the effect of impairing the position or interests of Lender) the voting, consent, administration, management and all other powers, rights and remedies of Pledgor with

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          4

respect to the Collateral under the Organizational Agreements of any Pledged Entity (including all other rights and powers thereunder which are pledged hereunder or otherwise). If Pledgor shall become entitled to receive or shall receive from any Pledged Entity (A) any non-cash Distribution as an addition to, on account of, in substitution of, or in exchange for the Collateral or any part thereof, or (B) during the continuance of any Event of Default, any cash Distributions, in either case the same shall immediately be remitted to Lender (in the exact form received, with Pledgor's endorsement or assignment or other instrument as Lender may deem appropriate) to be held as additional Collateral for the Secured Obligations or for application thereto, as applicable, and until so remitted, shall be received and held by Pledgor in trust and as agent for Lender.

Section 2.2    Termination of Powers. Upon the occurrence of an Event of Default that is continuing, all such powers, rights and remedies of Pledgor, which are conditionally permitted pursuant to Section 2.1, shall cease and the provisions of Section 4 hereof shall apply.

### ARTICLE III - REPRESENTATIONS, WARRANTIES AND COVENANTS OF PLEDGOR

Pledgor hereby covenants with Lender, and represents and warrants to Lender, as of the Closing Date as follows:

Section 3.1    Percentage Ownership. Pledgor owns 100% of the member interests in JMJD4 LLC. Pledgor does not have outstanding any options or rights or other agreements to acquire or sell or otherwise transfer all or any portion of any Pledged Equity.

Section 3.2    Title to Collateral. Pledgor validly acquired and is the legal and beneficial owner of the Collateral in which it has granted a security interest, and transferred a collateral interest, herein, free and clear of all Liens except such as are created pursuant to this Agreement. Pledgor has the legal right to pledge and grant a security interest in the Collateral as herein provided without the consent of any other Person, other than any such consent that has been obtained. Pledgor will have like title in, and the right to pledge, any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder.

Section 3.3    Defense of Title. Pledgor will defend Lender's right, title and interest in and to the Collateral against the claims and demands of all other Persons.

Section 3.4    No Transfer. Except for the Transfer effected by this Agreement, Pledgor will not Transfer the Collateral, or any portion thereof, or suffer or permit any Transfer thereof to occur except any made in accordance with the terms of the Loan Agreement. Any Transfer made in violation of the foregoing provisions shall be an immediate Event of Default hereunder without notice or opportunity to cure and shall be void and of no force and effect.

Section 3.5    Perfected Security Interest. Giving effect to this Agreement, Lender has, with respect to all Collateral owned by Pledgor on the Closing Date, and will have with respect to any other property at any time hereafter acquired by Pledgor and pledged to Lender as Collateral hereunder, a valid, perfected and continuing first lien upon and security interest in the Collateral.

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          5

App. 1594

Section 3.6    No Financing Statements. Except for financing statements filed or to be filed in favor of Lender as secured party, or such other financing statements expressly permitted with Lender's prior written consent, which may be withheld in Lender's sole discretion, there are not now, and will not in the future be, and Pledgor will not execute, any financing statements under the UCC covering any or all of the Collateral, and no such financing statements are, or will be, filed in any public office.

Section 3.7    Certificated Securities. Pledgor represents and warrants that all of the Pledged Equity is issued in the form of Certificated Securities, Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Equity, duly indorsed in blank within the meaning of the UCC, and each such Certificated Securities has been in the physical possession of Pledgor at all times prior to such delivery to Lender. Pledgor covenants and agrees that it shall not permit any Pledged Entity to convert existing Equity Interests, or issue new Equity Interests, other than as Certificated Securities. Notwithstanding the foregoing, Pledgor shall promptly notify Lender if any Equity Interests with respect to a Pledged Entity (whether now owned or hereafter acquired by Pledgor) is not evidenced by a Certificated Security, and shall promptly thereafter take all actions required to perfect the security interest of Lender in such Pledged Equity under applicable law as required under Section 1.3. Pledgor further agrees to take such additional actions as Lender deems necessary or desirable to effect the foregoing and to permit Lender to exercise any of its rights and remedies hereunder and agrees to provide an opinion of counsel satisfactory to Lender with respect to any such pledge of Equity Interests which are not Certificated Securities promptly upon request of Lender. WITHOUT LIMITING THE EFFECT OF THE IMMEDIATELY PRECEDING CLAUSE, PLEDGOR HEREBY GRANTS TO LENDER AN IRREVOCABLE PROXY TO VOTE THE PLEDGED EQUITY AND TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED EQUITY WOULD BE ENTITLED (INCLUDING WITHOUT LIMITATION (A) GIVING OR WITHHOLDING WRITTEN CONSENTS, (B) CALLING SPECIAL MEETINGS, (C) VOTING AT SUCH MEETINGS, AND (D) VOTING AT ANY TIME OR PLACE) WITH RESPECT TO ANY ACTION, DECISION, DETERMINATION OR ELECTION BY THE PLEDGED ENTITIES OR THE HOLDERS OF THE RESPECTIVE EQUITY INTERESTS THEREIN THAT THE PLEDGED EQUITY (OR ANY NEW OR ADDITIONAL EQUITY INTEREST IN SUCH PLEDGED ENTITY) BE, OR CEASE TO BE, A CERTIFICATED SECURITY, AND ALL OTHER MATTERS RELATED TO ANY SUCH ACTION, DECISION, DETERMINATION OR ELECTION, WHICH PROXY SHALL BE EFFECTIVE AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED EQUITY ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY OTHER PERSON (INCLUDING THE ISSUER OF THE PLEDGED EQUITY OR ANY OFFICER OR AGENT THEREOF) AS OF THE DATE HEREOF) AND WHICH PROXY SHALL ONLY TERMINATE UPON THE PAYMENT AND PERFORMANCE IN FULL OF THE SECURED OBLIGATIONS. THE FOREGOING PROXY SHALL INCLUDE THE RIGHT TO SIGN PLEDGOR'S NAME (AS A MEMBER, PARTNER OR SHAREHOLDER OF THE PLEDGED ENTITY) TO ANY CONSENT, CERTIFICATE OR OTHER DOCUMENT RELATING TO THE PLEDGED ENTITY THAT APPLICABLE LAW MAY PERMIT OR REQUIRE, TO CAUSE THE PLEDGED EQUITY TO BE VOTED IN ACCORDANCE WITH THE PRECEDING SENTENCE. PLEDGOR HEREBY REVOKES ALL OTHER PROXIES AND POWERS OF ATTORNEY WITH RESPECT TO THE PLEDGED EQUITY THAT PLEDGOR MAY HAVE

APPOINTED OR GRANTED, TO THE EXTENT SUCH PROXIES OR POWERS EXTEND TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. PLEDGOR WILL NOT GIVE A SUBSEQUENT PROXY OR POWER OF ATTORNEY (AND IF GIVEN, WILL NOT BE EFFECTIVE) OR ENTER INTO ANY OTHER VOTING AGREEMENT WITH RESPECT TO THE PLEDGED EQUITY WITH RESPECT TO ANY OF THE MATTERS COVERED BY THE PROXY GRANTED PURSUANT TO THIS SECTION 3.7. THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

Section 3.8    Fully Paid and Non-Assessable. All of the Pledged Equity has been duly authorized and validly created and is subject to no options to purchase or similar rights of any Person. Pledgor is not, and will not become, a party to or otherwise be or become bound by any agreement, other than this Agreement and the other Loan Documents, which restricts in any manner the rights of any present or future holder of any of the Pledged Equity with respect thereto. There are no setoffs, counterclaims or defenses with respect to the Collateral owned by Pledgor and no agreement, oral or written, has been made with any other person or party under which any deduction or discount may be claimed with respect to such Collateral and Pledgor does not know of any fact which would prohibit or prevent such Pledgor assigning or granting a security interest in the Collateral.

Section 3.9    Organizational Agreements. Attached hereto as Exhibit B are true, correct, and complete copies of the Organizational Agreements of each Pledged Entity. The Organizational Agreements are in full force and effect and have not been modified or amended except as attached hereto. Pledgor is not in default of any of its obligations under the Organizational Agreements. Pledgor shall not allow any Pledged Entity to (a) amend any provision of its Organizational Agreements, (b) dissolve, liquidate, wind-up, merge or consolidate with any other entity or (c) Transfer any of its respective assets and properties to any Person except as permitted by the Loan Documents. The Organizational Agreements of each Pledged Entity provide that (i) all owners of Equity Interests therein are authorized to pledge or assign such Equity Interests to Lender, and that such pledge or assignment shall include all voting, management and control rights and is not limited to economic rights; (ii) neither the exercise by Lender of any right or remedy under the Loan Documents, including, foreclosure of the interests, nor the transfer to Lender or its successor or assign of title to any interests in such Pledged Entity, shall constitute a default or breach, or give rise to any right of first refusal or option to purchase under the Organizational Agreement of such Pledged Entity; (iii) until the Debt is paid in full: (A) no owners of Equity Interests in such Pledged Entity shall be entitled to withdraw from such Pledged Entity or assign, encumber, or convey any interest in such Pledged Entity (except in favor of Lender pursuant to the Loan Documents); (B) no Equity Interests in such Pledged Entity shall be created, issued, redeemed, exchanged, diluted or modified; (C) such Pledged Entity shall not be dissolved, either voluntarily or as the result of the withdrawal or removal of any owners of Equity Interests in such Pledged Entity; and (D) the Organizational Agreements of such Pledged Entity shall not be modified or terminated; and (iv) upon realization of the Equity Interests by Lender pursuant to the Loan Documents, Lender has the right to terminate all non-member managers of such Pledged Entity.

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          7

Section 3.10   Authority, Enforceability, Etc.   The execution, delivery and performance of this Agreement by Pledgor will not cause a violation of or a default under the Organizational Agreements of Pledgor or any Pledged Entity.  The execution and delivery of this Agreement and the performance of Pledgor's obligations hereunder will not conflict with or result in a breach of the terms or provisions of any (i) Legal Requirement, (ii) agreement to which any Pledgor or any Pledged Entity is a party or by which any of its assets are bound, or (iii) judgment, decree, arbitration award, or pending litigation to which Pledgor or any Pledged Entity is subject.  No approval by, authorization or consent of, or filing with any Governmental Authority or any other Person is necessary in connection with the execution, delivery and performance by Pledgor of this Agreement, or if such approval, authorization, or consent is necessary, it has been obtained.  This Agreement constitutes the valid and legally binding obligations of Pledgor and is fully enforceable against Pledgor in accordance with its terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and limitations imposed by general principles of equity.  The jurisdiction of organization (as such term is defined in the UCC) and place of business of Pledgor is set forth in the signature block of Pledgor.  No change has been or will be made in the jurisdiction of organization or place of business of Pledgor, except upon at least thirty (30) days' prior notice to Lender.

## ARTICLE IV - EVENTS OF DEFAULT AND REMEDIES

If an Event of Default shall occur:

Section 4.1   Transfer Rights.   Lender shall have the right, at any time and from time to time, to effect the Transfer of any or all of the Collateral, subject only to the provisions of the UCC and any other applicable statute which, in accordance with such statute, cannot be waived, in any one or more of the following ways:

(a)   Register in the name of, or transfer to, Lender, a nominee or nominees, or designee or designees, of Lender (including, without limitation, deposit any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine);

(b)   Sell, resell, assign and deliver, in Lender's sole and absolute discretion, any or all of the Collateral or any other security for the Secured Obligations (whether in whole or in part and at the same or different times) and all right, title and interest, claim and demand therein and right of redemption thereof, at public or private sale, for cash or upon credit (by Lender only), in accordance with the applicable procedures specified in Section 5 hereof; and

(c)   Proceed by a suit or suits at law or in equity to foreclose all or any part of the security interests in the Collateral and sell the Collateral or any portion thereof, under a judgment or decree of a court of competent jurisdiction, retaining during the duration of such judicial enforcement all other rights with respect to the Collateral, including specifically the rights specified hereafter in Section 5 hereof with respect to each Pledged Entity.

Section 4.2   Voting Rights.   Lender may exercise, either by itself or by its nominee or designee, in the name of Pledgor, the rights, powers and remedies granted to Lender hereunder

and under the other Loan Documents in respect of the Collateral at any time prior to effecting the Transfer of such Collateral to Lender or its nominee or designee, or any third party purchasers, as contemplated in Sections 4.1(a) and (b) above, and whether or not any judicial action as contemplated in Sections 4.1(c) above has been commenced or is continuing prior to a final unappealable judgment. Such rights and remedies shall include, without limitation, and Pledgor hereby grants to Lender the right to exercise by delivering notice to Pledgor and the applicable Pledged Entity, (a) all voting, consent, managerial and other rights relating to the Pledged Equity, whether in Pledgor's name or otherwise, including without limitation the right to appoint officers, directors, managers and other similar positions and (b) the right to exercise Pledgor's rights, if any, of conversion, exchange, or subscription, or any other rights, privileges or options pertaining to any of the Pledged Equity, including, without limitation, the right to exchange, at Lender's sole and absolute discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other readjustment of such Pledged Entity, all without liability, except to account for property actually received by Lender. Pledgor hereby irrevocably authorizes and directs each Pledged Entity, on receipt of any such notice (i) to deem and treat Lender or its nominee in all respects as a member, partner or shareholder, as applicable, (and not merely an assignee of a member, partner or shareholder) of such Pledged Entity, entitled to exercise all the rights, powers and privileges (including, without limitation, the right to vote on or take any action with respect to such Pledged Entity matters pursuant to the Organizational Agreement) thereof, to receive all Distributions, to be credited with the capital account and to have all other rights, powers and privileges pertaining to such member, partner or shareholder interest, as applicable, to which Pledgor would have been entitled had Pledgor not executed this Agreement, and (ii) to file an amendment to the Organizational Agreement of such Pledged Entity admitting Lender or such nominee(s) as a member, partner or shareholder in place of Pledgor.

Section 4.3    Power of Attorney.

(a)    Pledgor hereby irrevocably authorizes and empowers Lender, and assigns and transfers to Lender, and constitutes and appoints Lender and any of its assigns, its true and lawful attorney-in-fact and as its agent with full power of substitution for Pledgor to proceed from time to time in Pledgor's name, in order to more fully vest in Lender the rights and remedies provided for herein, in any statutory or non-statutory legal or other proceeding, without limitation, any bankruptcy proceeding, affecting Pledgor, any Pledged Entity or the Collateral.

(b)    Lender and any of its assigns, or their respective nominees, may, to the extent permitted by applicable law, either pursuant to such power-of-attorney or otherwise, take any action and exercise and execute any instrument that it determines necessary or advisable to accomplish the purposes of this Agreement, including without limitation: (i) execute and file proof of claim with respect to any or all of the Collateral against any Pledged Entity and vote such claims with respect to all or any portion of such Collateral (A) for or against any proposal or resolution, (B) for a trustee or trustees or for a receiver or receivers or for a committee of creditors, and/or (C) for the acceptance or rejection of any proposed arrangement, plan of reorganization, composition or extension; (ii) receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Pledgor representing any interest, payment of principal or other distribution payable in respect of the Collateral; (iii) execute endorsements, assignments or other instruments of conveyance or transfer in respect of any other

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC         9

property which is or may become a part of the Collateral hereunder; and (iv) execute releases and negotiate settlements, as appropriate, including on account of, or in exchange for, any or all of the Collateral, or any payment or distribution received by Pledgor, or Lender on Pledgor's behalf.

(c)     The foregoing power-of-attorney is irrevocable and coupled with an interest, and any similar or dissimilar powers previously given by Pledgor in respect of the Collateral or any Pledged Entity to any Person other than Lender are hereby revoked.  The power-of-attorney granted herein shall terminate automatically upon the termination of this Agreement in accordance with the terms hereof.

Section 4.4     Management Rights.  Lender may at such time and from time to time thereafter, without notice to, or consent of, Pledgor or any other Person (to the extent permitted by law), but without affecting any of the Secured Obligations, in the name of Pledgor or in the name of Lender:  (a) notify any other party to make payment and performance directly to Lender, (b) extend the time of payment and performance of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any obligations owing to Pledgor, or claims of Pledgor under any Organizational Agreement of any Pledged Entity, as applicable, (c) file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Organizational Agreement of any Pledged Entity, and (d) execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby.

Section 4.5     Right of Substitution.  Lender shall have the right, without notice to or consent of Pledgor, to become, or to designate its nominee, designee, agent or assignee to become, a partner, member, officer or director, as applicable, of any Pledged Entity, in substitution of any existing Person serving in such capacity.

Section 4.6     UCC Rights.  Lender may exercise all of the rights and remedies of a secured party under the UCC.

Section 4.7     Lender Self-Help Rights.

(a)     Subject to all applicable Legal Requirements, Lender shall have the right, but not the obligation, to take any appropriate action as it, in its reasonable judgment, may deem necessary to (i) cure any Event of Default, (ii) cause any term, covenant, condition or obligation required under this Agreement or other Loan Document to be promptly performed or observed on behalf of Pledgor or (iii) protect the Collateral and any other security obtained pursuant to the other Loan Documents.  All amounts advanced by, or on behalf of, Lender in exercising its rights under this Section 4 (including, without limitation, reasonable legal expenses and disbursements incurred in connection therewith), together with interest thereon at the Default Rate from the date of any such advance, shall be payable by Pledgor, to Lender upon demand therefor and shall be secured by the Collateral.

(b)     Lender shall not be obligated to perform or discharge any obligation of Pledgor or any Pledged Entity as a result of this Agreement.  The acceptance by Lender of this

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          10

App. 1599

Agreement shall not at any time or in any event obligate Lender to (i) appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or (ii) take any action hereunder or thereunder, or expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

Section 4.8    Remedies Cumulative.    The obligations of Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstances or occurrence except as specifically provided in this Agreement.    The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Pledgor or any other Person pledging collateral pursuant to the other Loan Documents or existing at law or in equity or otherwise.    Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.    Lender shall have no duty to exercise any of the aforesaid rights, powers and remedies and shall not be responsible for any failure to do so or delay in so doing.

Section 4.9    Notice of Exercise of Remedies.    Pledgor hereby waives notice of acceptance hereof, and except as otherwise specifically provided herein or required by provision of law which may not be waived, hereby waives any and all notices or demands with respect to any exercise by Lender of any rights or powers which it may have or to which it may be entitled with respect to the Collateral.

## ARTICLE V - SALES OF THE COLLATERAL

Section 5.1    Right to Conduct Partial Sale of Collateral.    In connection with any sale of the Collateral, Lender may grant options and may impose reasonable conditions such as requiring any purchaser to represent that any "securities" constituting any part of the Collateral are being purchased for investment only.    If all or any of the Collateral is sold at any such sale by Lender to a third party upon credit, Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Lender may resell such Collateral.    It is expressly agreed that Lender may exercise its rights with respect to less than all of the Collateral, leaving unexercised its rights with respect to the remainder of the Collateral; provided, however, that such partial exercise shall in no way restrict or jeopardize Lender's right to exercise its rights with respect to the remaining Collateral at a later time or times.    Pledgor hereby waives and releases any and all rights of redemption with respect to the sale of any Collateral.

Section 5.2    Sale Procedures.    No demand, advertisement or notice, all of which are hereby expressly waived by Pledgor, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Pledgor at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Pledgor hereby agrees is reasonable.    All other demands, advertisements and notices are hereby irrevocably waived by Pledgor.    The notice of such sale shall (a) in case of a public sale, state the time and place fixed for such sale, (b) in case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or the portion

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        11

thereof so being sold, first will be offered for sale at such board or exchange and (c) in the case of a private sale, state the date after which such sale may be consummated. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale.

Section 5.3    Adjournment; Credit Sale. Lender shall not be obligated to make any sale of the Collateral if it shall determine, in its sole and absolute discretion, not to do so, regardless of the fact that notice of sale may have been given, and Lender may without notice or publication adjourn any public or private sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public or private sale of all or any portion of the Collateral, unless prohibited by any applicable statute which cannot be waived, Lender (or its nominee or designee) may purchase all or any portion of the Collateral being sold, free and clear of, and discharged from, any trusts, claims, equity or right of redemption of Pledgor, all of which are hereby waived and released to the extent permitted by law, and may make payment therefor by credit against any of the Secured Obligations in lieu of cash or any other obligations.

Section 5.4    Expenses of Sale. In the case of any sale, public or private, of any portion of or all of the Collateral, Pledgor shall be responsible for the payment of all reasonable costs and expenses of every kind for the sale and delivery, including, without limitation, brokers' and reasonable attorneys' fees and disbursements and any tax imposed thereon. The proceeds of the sale of the Collateral shall be available to cover such costs and expenses, and, after deducting such costs and expenses from the proceeds of the sale, Lender shall apply any remaining amounts to the payment of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.5    No Public Registration of Sale. Pledgor is aware that Section 9-610(c) of the UCC may restrict Lender's ability to purchase the Collateral at a private sale. Pledgor is also aware that Securities and Exchange Commission (the "SEC") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (the "Securities Act"). Pledgor is also aware that Lender may wish to purchase certain interests that are sold at a foreclosure sale, and Pledgor believes that such purchases would be appropriate in circumstances in which such interests are sold in conformity with the principles set forth in such No-Action Letters. Section 9-603 of the UCC permits Pledgor to agree on the standards for determining whether Lender has complied with its obligations under Section 9-610. Pursuant to Section 9-603 of the UCC, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in such No-Action Letters (a) shall be considered to be a "public disposition" for purposes of Section 9-610(c) of the UCC; (b) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the interests under the Securities Act, even if Pledgor or any Pledged Entity agree to pay all costs of the registration process; and (c) shall be considered to be commercially reasonable, notwithstanding that Lender purchases such interests at such a sale.

Section 5.6    Receipt of Sales Proceeds. Upon any sale of the Collateral, or any portion thereof, by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        12

judicial process or otherwise), the receipt of the proceeds by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

Section 5.7    Application of Collateral.  All proceeds from the sale of all or any portion of the Collateral, and all Distributions now or at any time hereafter received or retained by Lender pursuant to the provisions of this Agreement shall be applied by Lender to the satisfaction of the Secured Obligations in such order and priority as determined by Lender in its sole and absolute discretion and in accordance with applicable law.

Section 5.8    Preferences.  Lender shall have no obligation to marshal any assets in favor of Pledgor or any other party or against, or in payment of, any or all of the Secured Obligations.  To the extent Pledgor makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Secured Obligations intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

<p style="text-align:center">ARTICLE VI - SECURITIES ACT</p>

Section 6.1    Securities Registration.  If an Event of Default shall have occurred that is continuing and Pledgor shall have received from Lender a written request that Pledgor effect any registration, qualification or compliance under any federal or state securities law or laws with respect to all or any part of the Collateral, and such registration, qualification and/or compliance is required under applicable federal or state securities law or laws, Pledgor as soon as practicable and at its sole expense, agrees to use its best efforts to effect (and keep effective) such registration, qualification and compliance as required under: (a) applicable federal or state securities law or laws and as would permit or facilitate the sale and distribution of such Collateral, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), (b) applicable blue sky or other state securities laws and (c) other government requirements.  Lender shall furnish to Pledgor such information regarding Lender as Pledgor may request in writing and as shall reasonably be required in connection with any such registration, qualification or compliance.  Pledgor will cause Lender to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to Lender such number of prospectuses, offering circulars or other documents incident thereto as Lender from time to time may reasonably request, and will indemnify Lender and all others participating in the distribution of such Collateral against all losses, liabilities, claims or damages caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        13

the same may have been caused by an untrue statement or omission based upon information furnished in writing to Pledgor by Lender expressly for use therein.

Section 6.2    Private Securities Sale.  If at any time when Lender shall determine to exercise its right to sell all or any part of the Collateral pursuant to Section 5, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, Lender may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale (for securities law purposes) in such manner and under such circumstances as Lender may deem necessary or advisable in order that such sale may legally be effected without such registration, provided that at least ten (10) days' notice is given to Pledgor in accordance with the private sale notice provisions of Section 5 hereof.  Without limiting the generality of the foregoing, in any such event Lender, in its sole and absolute discretion (a) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (b) may approach and negotiate with a single potential purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, Lender shall incur no responsibility or liability for selling all or any part of the Collateral at a price which Lender may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration under the Securities Act.

## ARTICLE VII - MISCELLANEOUS PROVISIONS

Section 7.1    Further Assurances.  Pledgor hereby agrees to sign and deliver to Lender financing statements, continuation statements and other documents, agreements, and instruments, in form acceptable to Lender, and do such further acts, as Lender may from time to time reasonably request or which are reasonably necessary to establish and maintain a valid and perfected security interest in the Collateral (and to pay any filing fees relative thereto) or to further assure or confirm Lender's rights hereunder.  Without limiting the foregoing, Pledgor authorizes Lender, to the extent permitted by law, to file such financing statements and amendments thereto and continuations thereof relating to all or any part of the Collateral without the signature of Pledgor (including, to the extent permitted by law, to file a photographic or other reproduction of this Agreement).

Section 7.2    No Release, Etc.  No delay or omission to exercise any remedy, right or power accruing upon a default or an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power of Lender.  Any and all of Lender's rights with respect to any Collateral shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding, among other things: (a) any renewal, extension, amendment or modification of, or addition or supplement to, or deletion from, this Agreement or any other Loan Document or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof; (b) any waiver, consent, delay, extension of

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC      14

App. 1603

time, indulgence or other action or inaction under or in respect of this Agreement or any other Loan Document; (c) any exercise or non-exercise of any right, remedy, power or privilege under or in respect of this Agreement or any other Loan Document; (d) any sale, exchange, release, surrender, or substitution of, or realization upon, any Collateral (except to the extent otherwise specifically agreed to by Lender) or any other security held by Lender to secure the Debt; (e) the furnishing to or acceptance by Lender of any additional security to secure the Debt; or (f) any invalidity, irregularity or unenforceability of all or any part of the Secured Obligations or of any security therefor.

Section 7.3    Notices. All notices, consents, approvals, demands and requests required or permitted hereunder shall be given in the manner set forth in the Loan Agreement.

Section 7.4    Governing Law; Submission to Jurisdiction.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF TEXAS AND THE LOAN WAS MADE BY LENDER AND ACCEPTED BY PLEDGOR IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLE WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, COUNTY OF DALLAS, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  PLEDGOR DOES HEREBY DESIGNATE AND APPOINT:

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        15

App. 1604

**ENOCH INVESTMENTS, LLC**
**1755 Wittington Place, Suite 340**
**Farmers Branch, Texas 75234**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN DALLAS, TEXAS, AND AGREES THAT SERVICE OF PROCESS UPON SUCH AGENT AT SUCH ADDRESS AND NOTICE OF SUCH SERVICE MAILED OR DELIVERED TO PLEDGOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON PLEDGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF TEXAS. PLEDGOR (I) SHALL GIVE PROMPT WRITTEN NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN DALLAS, TEXAS (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN DALLAS, TEXAS OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST PLEDGOR IN ANY OTHER JURISDICTION.

Section 7.5    Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 7.6    Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, nor consent to any departure by Pledgor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Pledgor, shall entitle Pledgor to any other or future notice or demand in the same, similar or other circumstances.

Section 7.7    Number and Gender. All references to sections and exhibits are to sections and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision, article, section or other subdivision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Whenever the context may require, any pronouns used herein

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        16

App. 1605

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8    Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9    Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10    Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11    Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12    Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13    Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC          17

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender.   Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns.  Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14   Termination.  Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15   Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a)   As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4DS LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to  exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee  which will document the transfer of control of D4DS LLC.  Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b)   In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4DS Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4DS Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4DS Property to Lender or Lender's assignee, and (iv) Each of JMJAV LLC and TRWF LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4DS LLC, shall also have elected to transfer the D4DS Property to Pledgor.   Upon receipt of such notice, Pledgor shall assemble all

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC      18

documents related to the D4DS Property and other information related to the D4DS Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4DS Property to Lender, and Pledgor shall cause D4DS to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4DS Property to Lender.

(c)     Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of JMJAV LLC, and TRWF LLC, by and through D4DS LLC, as the owner of the D4DS Property, shall have the right to transfer and convey the D4DS Property to Lender in lieu of any transfer of the Collateral.

Section 7.16   Liability of Pledgor.   Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

fraud or intentional misrepresentation by Pledgor in connection with the Loan or the D4DS Loan (hereinafter defined);

the gross negligence or willful misconduct of Pledgor in connection with the Loan or the D4DS Loan;

material physical waste of the Collateral or the D4DS Property;

the removal or disposal of any portion of the Collateral or any personal property located on the D4DS Property after an Event of Default;

the misappropriation, misapplication or conversion by Pledgor of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the D4DS Property, (B) any awards received in connection with a condemnation of all or a portion of the D4DS Property, (C) any rents following an Event of Default, or (D) any rents paid more than one month in advance;

failure to pay charges for labor or materials or other charges or judgments that can create liens on any portion of the D4DS Property;

any security deposits, advance deposits or any other deposits collected with respect to the D4DS Property which are not delivered to Lender upon a foreclosure of the D4DS Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the leases for the D4DS Property prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; or

(i)    if Pledgor or any affiliate of Pledgor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement or the other Loan Documents; provided that Pledgor shall not be liable to the extent of any applicable loss, damage, cost, expense, liability, claim or other obligation arising solely from a defense of Pledgor or any affiliate of Pledgor raised in good faith.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents,

Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt secured by the Loan Documents or to require that all Collateral shall continue to secure all of the debt owing to Lender in accordance with the Loan Documents, and

the Loan shall be fully recourse to Pledgor

in the event of: (1) Pledgor or Debtor filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (2)

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC       20

the filing of an involuntary petition against Pledgor or Debtor under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law in which Pledgor or Debtor colludes with, or otherwise assists such person, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Pledgor or Debtor from any person; (3) Pledgor or Debtor filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (4) Pledgor or Debtor consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Pledgor or Debtor or any portion of the Property; (5) Pledgor or Debtor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due:

(1) if Pledgor fails to permit review or inspections of the records related to the Collateral, fails to provide financial information, or comply with any representation, warranty or covenant set forth in any of the Loan Documents (2) if Pledgor fails to obtain Lender's prior written consent to any indebtedness or voluntary lien encumbering the Collateral; or (4) if Pledgor fails to obtain Lender's prior written consent to any transfer of the Collateral.

For purposes of this Agreement, the following terms shall have the following meanings:

"D4DS Loan" shall mean any loan made to D4DS LLC, and secured by any real property owned by D4DS LLC.

"D4DS Property" means the real property and improvements owned by D4DS LLC, including but not limited to the Bellwether Ridge Apartments.

Section 7.17    Budget Approval. Pledgor will submit the contract with the general contractor (including the budget contained therein) for the construction of the Bellwether Ridge Apartments on the D4DS Property to Lender for Lender's prior written approval (the "Approved Budget"). Pledgor will not agree to any change orders from the Approved Budget without first obtaining Lender's prior written approval. If any change order to the Approved Budget is not approved or denied by Lender within five (5) Business Days after submission by Pledgor, it shall be deemed approved, so as not to delay construction.

[Pledgor's Signature Appears on Next Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

**PLEDGOR**:

ENOCH INVESTMENTS, LLC

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        21

App. 1610

a Delaware limited liability company

By: _____
Timothy Barton

App. 1611

## Schedule 1

| Pledgor | Pledged Entity | Equity Interest |
|---|---|---|
| ENOCH INVESTMENTS, LLC | JMJD4 LLC | 99% of the member interests in JMJD4 LLC |

App. 1612

<u>**Exhibit A**</u>

## AGREEMENT AND ACKNOWLEDGMENT

THE UNDERSIGNED hereby agrees, acknowledges and consents to the execution and delivery to JMJ Development, LLC, a Texas limited liability company (together with its successors, assignees, and designees for the purposes hereof, "**Lender**"), of the Pledge and Security Agreement to which this Agreement and Acknowledgement is attached (the "**Pledge Agreement**") made by Enoch Investments, LLC, a Delaware limited liability company ("**Pledgor**"), as collateral security for the payment and performance of the Secured Obligations described therein, and the assignment and pledge thereby to Lender by Pledgor of all of each Pledgor's right, title and interest to the Collateral described therein. All capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to such terms in the Pledge Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby represents, warrants, covenants and agrees for the benefit of Lender as follows:

1. <u>Representations and Warranties</u>. The undersigned represents and warrants that (a) the execution and delivery of the Pledge Agreement does not violate any of such undersigned's Organizational Agreements or any other agreement to which such undersigned is a party or by which any of the property of such undersigned is bound, (b) the undersigned has not entered into a control agreement perfecting a security interest in any of the Equity Interests in favor of any other party, (c) the Collateral is not subject to any security interest or lien in favor of any Person other than Lender and has not been pledged, transferred or assigned to, and is not otherwise in the control of, any Person other than Lender, (d) the undersigned does not have any present claim, right of offset, or counterclaim against Pledgor under or with respect to the Collateral or otherwise under any of the undersigned's Organizational Agreements, (e) Pledgor is not in default to the undersigned or otherwise under or in respect of any of their respective obligations under any of such undersigned's Organizational Agreements, and (f) all of the representations and warranties of Pledgor made in the Pledge Agreement are true, accurate and complete in all material respects.

2. <u>Covenants and Agreements</u>.

(a) <u>Books and Records</u>. The undersigned (i) shall cause all of its respective books and records to reflect the pledge of the Collateral to Lender and agrees not to consent to or to permit any transfer thereof or any other action that may be taken by Pledgor that might constitute an Event of Default so long as any of the Secured Obligations remain outstanding, (ii) agrees that Lender and/or its representatives may, upon reasonable advance notice and at any reasonable time during normal business hours, inspect the books, records and properties of such undersigned, and (iii) shall deliver to Lender financial statements of each of the Pledged Entities and of D4DS LLC, containing such detail and information as Lender may request.

(b) <u>UCC Matters</u>. The undersigned confirms, agrees and acknowledges that (i) all of the Pledged Equity in the undersigned is and shall continue to be certificated securities

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC       1

in registered form within the meaning of, and governed by, Article 8 (including, without limitation, Section 8-106) of the UCC, (ii) such Pledged Equity is and shall continue to be evidenced by one (1) certificate issued to Pledgor, as its sole member, (iii) that each such certificate has been validly issued and is fully paid for, (iv) that each such certificate represents and embodies all right, title and interest in and to the Pledged Equity, (v) that each such original certificate that has been physically delivered to Lender, was in the physical possession of Pledgor at all times prior to such delivery to Lender, and has been duly indorsed in blank within the meaning of the UCC, (vi) that each such certificate has not been modified or amended and remains in full force and effect, (vii) that ownership of each such certificate is registered in the respective books and records of the undersigned in the name of Pledgor, subject only to the pledge thereof in favor of Lender as security for the Secured Obligations, (viii) notwithstanding any provisions in the Organizational Agreements, Pledgor is hereby authorized and permitted to pledge, assign and grant a security interest in the Collateral in favor of Lender pursuant to the Pledge Agreement, (ix) this Agreement and Acknowledgment is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the UCC, (x) it shall comply with all instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the UCC, and (xi) no Equity Interest other than those represented and evidenced by such certificates in the undersigned is valid or will be recognized by the undersigned.

(c)    Organizational Agreements. The undersigned shall not suffer or permit its Organizational Agreements to be amended or modified without the prior written consent of Lender. The representations and warranties set forth in Section 3.9 of the Pledge Agreement are true and correct.

(d)    Notices; Defaults. The undersigned shall give Lender a copy of all notices, reports or communications received or given pursuant to its Organizational Agreements promptly after the same shall have been received or contemporaneously with the giving thereof, as the case may be. The undersigned shall permit Lender the right to cure any default by Pledgor under the Organizational Agreements, and no notice of any default by Pledgor with respect to the Organizational Agreements shall be effective unless and until such notice has been received by Lender; provided, however, in no event shall Lender be obligated to cure such default. Lender shall have fifteen (15) days in excess of the amount of time to cure any such default as given to Pledgor under the Organizational Agreements, as measured from the date notice of such default has been received by Lender.

(e)    Proxy. The undersigned acknowledges the powers and proxies granted pursuant to Section 3.7 of the Pledge Agreement and agrees that Lender shall have the sole right during the term of the Pledge Agreement to vote the Pledged Equity with respect to all such matters.

(f)    Restrictive Legend. The undersigned acknowledges and agrees that each certificate representing any of the Pledged Equity shall be marked by the undersigned with a legend reading as follows:

"THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS THE PERSON HOLDING SUCH INTERESTS SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT."

The undersigned agrees that, during the term of the Pledge Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent the interests theretofore represented by a certificate carrying a legend.

(g)    The undersigned Pledged Entities acknowledge that all of the member interest in each of the Pledged Entities has been pledged to Lender in order to secure the Loan (as defined in the Pledge Agreement). Pursuant to the terms of the Loan, payments are to be made thereunder from the PE Accounts. The PE Accounts are defined as all bank accounts, savings accounts, brokerage accounts and any other accounts in the name of or maintained by any of the Pledged Entities and into which any of their funds are deposited. Each of the undersigned hereby consents to and agrees to deliver any funds in any of the PE Accounts to Lender, as required by the promissory note which evidences the Loan and in accordance with the terms thereof.

3.    Events of Default; Sales of Collateral. The undersigned hereby agrees that during the continuance of an Event of Default, (a) all Distributions will be made directly to Lender, (b) Lender shall have the sole and exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Collateral, (c) Lender may take any reasonable action which Lender may deem necessary for the maintenance, preservation and protection of any of the Collateral or Lender's security interests therein, including, without limitation, the right to declare any or all Secured Obligations to be immediately due and payable without demand or notice and the right to transfer any of the Pledged Equity or other Collateral into Lender's name or the name of any designee or nominee of Lender, (d) Lender may dispose of the Collateral in accordance with Articles 8 and 9 of the UCC and the provisions of the Pledge Agreement, in which case, notwithstanding anything to the contrary in the Organizational Agreements, (i) Lender, or its designee or assign, shall automatically be admitted as a shareholder, member or partner, as the case may be, of the undersigned and shall be entitled to receive all benefits and exercise all rights in connection therewith pursuant to the Organizational Agreements of the undersigned, (ii) the undersigned shall recognize Lender (or its designee or assign) as the successor in interest to Pledgor, and (iii) notwithstanding any provisions to the contrary in the Organizational Agreements, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding Distributions receivable by Lender from the undersigned, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Documents.

4.    No Liability. Notwithstanding the security interests of Lender in the Collateral or any of its rights hereunder, (a) Lender shall have no obligation or liability whatsoever for matters

Security Agreement
JMJ Development, LLC-Enoch Investments, LLC        3

in connection with the Pledged Equity arising or occurring, directly or indirectly, prior to Lender's (or its designee's, successor's or assign's) becoming a shareholder, member or partner, as the case may be, of the undersigned, and except to the extent set forth in the Loan Documents, Pledgor shall have no liability for matters in connection with the Pledged Equity arising from events first occurring after Lender's (or its designee's, successor's or assign's) acquisition through foreclosure of the Pledged Equity, and (b) Lender shall not be obligated to perform any of the obligations or duties of Pledgor under any of the undersigned's Organizational Agreements, or to take any action to collect or enforce any claim for payment due Pledgor arising thereunder.

5.      Transfers.  The undersigned acknowledges that the security interest of Lender in the Collateral and all of Lender's rights and remedies under the Pledge Agreement may be freely transferred or assigned by Lender.  In the event of any such transfer or assignment, all of the provisions of this Agreement and Acknowledgment shall inure to the benefit of the transferees, successors, and/or assigns of Lender.  The provisions of this Agreement and Acknowledgment shall likewise be binding upon any and all permitted transferees, successors and assigns of the undersigned.

6.      Further Assurances.  The undersigned shall, from time to time, promptly execute and deliver such further instruments, documents and agreements, and perform such further acts as may be reasonably necessary or proper to carry out and effect the terms of the Pledge Agreement and this Agreement and Acknowledgment.

7.      Reliance.  This Agreement and Acknowledgment is being given to induce Lender to accept the Pledge Agreement and with the understanding that Lender will rely hereon.

8.      Counterparts.  This Agreement and Acknowledgment may be executed in counterparts.

9.      Miscellaneous.  The provisions of Article VII of the Pledge Agreement are hereby incorporated herein by this reference (with all references to Pledgor therein deemed to mean and refer to the undersigned).

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by its duly authorized officer as of October __, 2017.

**Pledged Entity:**

**JMJD4 LLC**

By: _____
Timothy Barton, President

Security Agreement
JMJ Development, LLC-JMJAV LLC                5

App. 1617

## Exhibit B

## Organizational Agreements

# EXHIBIT J-31

## ASSIGNMENT OF PLEDGE AND SECURITY AGREEMENT

THAT JMJ DEVELOPMENT, LLC, a Texas limited liability company,  ("Assignor"), for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, hereby transfers, assigns and sets over unto Southern Properties Capital, LLC , a British Virgin Islands corporation ("Assignee"), all of the right, title and interest of the Assignor in and to the security interests granted pursuant to the following:

(a) Pledge and Security Agreement dated October ___, 2017, executed by JMJAV LLC to JMJ Development, LLC, granting a security interest in one percent (1%) of the member interests in JMJD4 LLC;

(b) Pledge and Security Agreement dated October ___, 2017, executed by TRWF LLC to JMJ Development, LLC, granting a security interest in one percent (100%) of the member interests in JMJAV LLC;

(c) Pledge and Security Agreement dated October ___, 2017, executed by Enoch Investments, LLC to JMJ Development, LLC, granting a security interest in ninety-nine percent (99%) of the member interests in JMJAV LLC;

(d) Amended and Restated Pledge and Security Agreement dated October ___, 2017, executed by JMJAV, LLC to JMJ Development, LLC, granting a security interest in one percent (1%) of the member interests in JMJD4 LLC;

(e) Amended and Restated Pledge and Security Agreement dated October ___, 2017, executed by TRWF, LLC to JMJ Development, LLC, granting a security interest in one percent (100%) of the member interests in JMJAV LLC; and

(f) Amended and Restated Pledge and Security Agreement dated October ___, 2017, executed by Enoch Investments, LLC to JMJ Development, LLC, granting a security interest in ninety-nine percent (99%) of the member interests in JMJAV, LLC.

The above and foregoing Pledge and Security Agreements and the security interests and pledges granted therein are collectively referred to as the "Pledges."

TO HAVE AND TO HOLD the Pledges and above described security deposits and prepaid rents, together with any and all the rights and appurtenances thereto in anywise belonging to Assignor, unto Assignee, its successors, legal representatives and assigns FOREVER and Assignor does hereby bind itself and its legal representatives and successors to WARRANT AND FOREVER DEFEND all and singular the Pledges unto Assignee, its successors, legal representatives and assigns, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof.

1

Assignment of Pledge and Security Agreement
JMJ Development to Southern Properties

App. 1620

This is an absolute and present assignment of the Pledges by Assignor to Assignee. In the event that there is any default under that certain Promissory Note from Assignor to Assignee, then Assignee shall be entitled to all rights as secured party under the Pledges.

Assignor hereby agrees to indemnify and hold harmless Assignee from and against any and all losses incurred by Assignee as a result of claims brought against Assignee, as Assignor's successor in interest in the Pledges hereby assigned, relating to causes of action arising from any actions or omissions of the landlord under the Pledges occurring prior to the date hereof.

EXECUTED this _____ day of October, 2017

                                   JMJ DEVELOPMENT, LLC
                                   a Texas limited liability company

                                   By: _____
                                        Timothy Barton, President

2

Assignment of Pledge and Security Agreement
JMJ Development to Southern Properties

App. 1621

# EXHIBIT J-32

Uniform Commercial Code
P.O. Box 13193
Austin, Texas 78711-3193

Ruth R. Hughs
Secretary of State

## Office of the Secretary of State

May 13, 2020
Page 1 of 1

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767 -

Filing Fee:        $30.00

**Total Filing Fee:**    **$30.00**

Re:  **Texas UCC Initial Filing Acknowledgment**

The Texas Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed into our system.

Initial Filing Type: **Financing Statement**

Initial Filing Number:  **20-0017679567**          Filing Date: **05/13/2020**          Filing Time: **11:56 a.m.**

Lapse Date: **05/13/2025**                    Document Number: **970068230002**

| Party Type | Party Name and Address |
|---|---|
| Debtor | **ENOCH INVESTMENTS LLC** |
|  | **1755 WITTINGTON PLACE SUITE 340, FARMERS BRANCH, TX, USA, 75234** |
| Secured Party | **SOUTHERN PROPERTIES CAPITAL LTD** |
|  | **1603 LBJ FREEWAY, SUITE 280, FARMERS BRANCH, TX, USA, 75234** |

Please feel free to contact us at 512-475-2703 if you have any questions regarding the above information.

User ID: JHUNT

FILING NUMBER: 20-0017679567
FILING DATE: 5/13/2020 11:56 AM
DOCUMENT NUMBER: 970068230002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Date Chin, 214-350-3667**

B. E-MAIL CONTACT AT FILER (optional)
**dchin@bennettweston.com**

C. S
Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **ENOCH INVESTMENTS LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1755 Wittington Place Suite 340 | Farmers Branch | TX / 75234 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **SOUTHERN PROPERTIES CAPITAL LTD** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX / 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Parc at Windmill Farms - ENOCH INVESTMENTS Secured Interest - DOT UCC - TX SOS Filing**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## EXHIBIT "A"

100% of its interest in JMJD4 LLC which consist of 99% of the membership interest in JMJD4 LLC.

# EXHIBIT J-33

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Date Chin, 214-350-3667

B. E-MAIL CONTACT AT FILER (optional)
dchin@bennettweston.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Bennett, Weston, Lajone & Turner P.C.
Attn:  Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234

Delaware Department of State
U.C.C. Filing Section
Filed: 12:46 PM 05/13/2020
U.C.C. Initial Filing No: 2020 3378223

Service Request No:  20203837199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TRWF LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS  1755 Wittington Place Suite 340 | CITY  Farmers Branch | STATE  TX | POSTAL CODE  75234 | COUNTRY  USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS  1603 LBJ Freeway, Suite 280 | CITY  Farmers Branch | STATE  TX | POSTAL CODE  75234 | COUNTRY  USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable)  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - TRWF Secured Interest - DOT UCC - DE SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 1627

## EXHIBIT "A"

100% of its interest in JMJAV LLC which consist of 100% of the membership interest in JMJAV LLC.

# EXHIBIT J-34

FILING NUMBER: 20-0017975172
FILING DATE: 5/14/2020 12:15 PM
DOCUMENT NUMBER: 970482800002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. S

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJAV LLC | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX / POSTAL CODE 75244 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX / POSTAL CODE 75234 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN JMJD4 LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN JMJD4 LLC.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJAV - JMJD4 - TX - STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

App. 1630

# EXHIBIT J-35

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchin@_____

**C. SEN**

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL
SERVICES

20-0017192082
05/08/2020 04:34 PM
FILED
TEXAS
SECRETARY OF STATE
SOS

969280960003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| JMJAV LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 13901 Midway Road Suite 102-LB 243 | Farmers Branch | TX | 75244 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Bellwether Ridge - JMJAV Secured Interest - DOT UCC - TX SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 1632

## EXHIBIT "A"

100% of its interest in D4DS LLC which consist of 1% of the membership interest in D4DS LLC.

# EXHIBIT J-36

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| Date Chin, 214-350-3667 |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |
| dchin@bennettweston.com |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Bennett, Weston, Lajone & Turner P.C.
Attn:  Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234

Delaware Department of State
U.C.C. Filing Section
Filed: 03:07 PM 05/08/2020
U.C.C. Initial Filing No: 2020 3275759

Service Request No:  20203644567

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| JMJD4 LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 13901 Midway Road Suite 102-LB 243 | Farmers Branch | TX / 75244 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| SOUTHERN PROPERTIES CAPITAL LTD | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX / 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Bellwether Ridge - JMJD4 Secured Interest - DOT UCC - DE SOS Filing

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 1635

## EXHIBIT "A"

100% of its interest in D4DS LLC which consist of 98.5% of the membership interest in D4DS LLC.

# EXHIBIT J-37

## AGREEMENT FOR PURCHASE AND SALE

This **AGREEMENT FOR PURCHASE AND SALE** (this "**Agreement**"), is made and entered into as of July 6, 2021 (the "Effective Date"), by and between APTS AT BELLWETHER RIDGE, LLC, a Delaware limited liability company ("**Purchaser**"), and D4DS LLC, a Texas limited liability company ("**Seller**").

## WITNESSETH:

## ARTICLE 1: AGREEMENT FOR PURCHASE AND SALE

1.1     Seller agrees to sell and cause to be conveyed to Purchaser, and Purchaser agrees to purchase, the following real and personal property (collectively, the "**Project**") on the terms and conditions contained herein:

(a)     The real property located in the City of DeSoto, Dallas County, State of Texas, described with particularity on Exhibit "A" (the "**Land**") together with all existing buildings, structures, fixtures, amenities and improvements thereon situated including apartment units known as the Bellwether Ridge Apartments, and together with all easements and other rights appurtenant to such Land, as well as Seller's rights, titles and interests in and to the mineral rights for the Land, if any (together, the "**Property**");

(b)     Seller's interest as landlord in all leases and occupancy agreements affecting the Property reflected in the current rent roll attached hereto as Exhibit "C" (the "**Current Rent Roll**"), as updated by the certified Closing Rent Roll to be delivered by Seller to Purchaser at Closing (the "**Leases**") or any space therein and any prepaid rent and Seller's interest in all security deposits and guaranties;

(c)     Seller's right, if any, to the use of the name "Bellwether Ridge Apartments" in connection with the Property and any other trademarks, copyrights, trade names or other intangible rights associated with the Property in which Seller has a transferable right including any telephone numbers associated with on-site management and leasing operations, and website(s) and internet address(es) which relate to the Property (the "**Intangible Property**");

(d)     All of Seller's right, title and interest in and to all items of personal property owned by Seller and located at the Property and used in the operation thereof including, without limitation, plans, specifications, building supplies, marketing materials, boilers, HVAC equipment, alarms, signage, fittings, appliances, shades, wall-to-wall carpet, draperies, screens and screening, awnings, plants, shrubbery, landscaping, furniture, furnishings, office equipment, lawn care and building maintenance equipment, and other furnishings or items of personal property used in connection with the ownership and operation of the Land (the "**Personal Property**");

(e)     All of Seller's right, title and interest in and to all service contracts and agreements relating to the Property, to the extent such agreements are permitted under this Agreement (the "**Contracts**") (but specifically excluding management and leasing agreements ("**Management and Leasing Agreements**"), which will be terminated by Seller on or before

App. 1638

Closing), all rights of actions against previous owners of the Land and Improvements, and any unexpired warranties and guarantees relating to the Personal Property;

(f)    All of Seller's right, title and interest in and to any permits, certificates of occupancy or other licenses and governmental approvals held by Seller in connection with the ownership or operation of the Project (the "**Permits**"), to the extent that the same are assignable; and

(g) All escrows and reserves associated with the First Lien (hereinafter defined) for the Project, including, without limitation, the tax and insurance reserves, the MIP reserve and the replacement and repair reserve.

## ARTICLE 2:  PURCHASE PRICE

2.1    The purchase price (the "**Purchase Price**") for the Project shall be an amount equal to the First Lien Amount as hereinafter defined, payable as follows:

Assumption by Purchaser of the unpaid balance of the existing HUD-insured note and first lien mortgage, dated October 1, 2017, encumbering the Property in the original principal amount of $19,021,200.00, which amount was reduced to $18,608,100.00 by Modification Agreement, dated October 1, 2020 ("**First Lien**"). The amount to be assumed will be the outstanding principal balance, plus accrued but unpaid interest, as of Closing ("**First Lien Amount**").

2.2    (a)    Not later than three (3) business days after the Effective Date of this Agreement, Purchaser shall deliver a check in the amount of $1,000.00 ("**Earnest Money Deposit**") to Commonwealth Land Title Insurance Company (the "**Title Company**"), 5949 Sherry Lane, Suite 111, Dallas, Texas 75225, Attn: James P. Lazar ("**Escrow Agent**") to be held in escrow in an interest-bearing account pursuant to the terms of this Agreement pending the Closing.

(b)    As used in this Agreement, the term "Deposit" shall mean any sums, including the Earnest Money Deposit, and, if applicable, the Closing Extension Deposit, and instruments and accrued interest thereon, if any, held by Escrow Agent hereunder. The Deposit shall be applied to the Purchase Price at the Closing. If Purchaser desires to terminate this Agreement pursuant to a right granted to Purchaser in any section of this Agreement, Purchaser shall effect such termination by giving written notice thereof to Seller and Escrow Agent within any applicable time period provided therefor in this Agreement. Upon receipt of such notice, unless otherwise provided herein, Escrow Agent shall return the Deposit to Purchaser without the requirement of any further notice or instruction, this Agreement shall wholly cease and terminate, and no party to this Agreement shall have any further claim against, or obligation to, any other party to this Agreement except as expressly provided herein, and the lien, if any, of Purchaser against the Project shall automatically cease and terminate. In the event that notice shall not have been given or be deemed to have been given prior to the last day of the Inspection Period (as hereinafter defined) and Seller shall object to the disbursal of the Deposit, the Escrow Agent shall hold the Deposit pending a non-appealable adjudication by a court of competent jurisdiction or by joint written instructions of Seller and Purchaser.

## ARTICLE 3:  PHYSICAL CONDITION OF PROJECT, INSPECTION PERIOD

3.1     Purchaser will inspect the Project during the hereinafter described Inspection Period.  Purchaser acknowledges that Seller has not made and does not make and is unwilling to make any express or implied representations or warranties as to the present, past or future physical condition, income, expenses, operation, legality of occupancy or any other matter affecting or related to the Project except as specifically set forth in this Agreement.  No representation, warranty or covenant made by Seller in this Agreement or any document delivered pursuant hereto shall survive the Closing except as expressly provided in this Agreement.  Purchaser agrees to purchase the Project in its "AS IS" condition (but subject only to the express representations and warranties herein) with a complete waiver of any and all warranties as to the condition of the Project or its fitness for any purpose, other than as expressly provided herein, all in accordance with the waiver language to be included in the Special Warranty Deed conveying the Property to Purchaser (the "**Deed**").

3.2     Any documents, records or information provided to Purchaser in connection with Purchaser's inspection of the Project shall be kept in strictest confidence (but may be disclosed to Purchaser's agents, brokers, accountants, advisors, consultants, attorneys and prospective lenders or investors) and shall be returned to Seller in the event that this Agreement is canceled for any reason.  In the event that Purchaser elects not to proceed with this transaction, Purchaser shall deliver to Seller copies of all reports prepared for Purchaser by third-parties in connection with its inspection, without any representation as to the accuracy thereof, upon receipt of payment from Seller of the actual costs for such reports incurred by Purchaser.

3.3     Seller represents and warrants to Purchaser as of the date of this Agreement as follows:

(a)     Seller is a Texas limited liability company, duly formed, validly existing and in good standing in the state of its formation and is qualified to do business in Texas.

(b)     Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained.

(c)     All Due Diligence Materials delivered in furtherance of Purchaser's inspection of the Project, including all leases, lease correspondence, and rent rolls have been prepared and assembled in the ordinary course of business by Seller's fee manager, are believed to be true, complete and accurate and have been relied upon by Seller.

(d)     The Rent Roll is a true, correct and complete list of all of the Leases and rent roll for the Property.  The rents and other sums due or to become due under each Lease have not been assigned, encumbered or subjected to any lien by Seller. Seller has provided Purchaser with true, correct and complete copies of all the Leases, including all amendments thereto.  To Seller's actual knowledge, which has not been contradicted by any written notice; (i) the Leases have been duly authorized and executed by the landlord, and, by the tenant thereunder, (ii) the Leases are in full force and effect according to the terms set forth therein, (iii) the Leases set

App. 1640

forth the entire agreement between landlord and tenant with respect to the premises affected thereby; (iv) there are no uncured defaults under the Leases; and (v) the Rent Roll and other financial information prepared by Seller as part of the Seller Deliveries are true and complete in all material respects. Seller has not (i) made any representations to any tenant regarding the condition of the premises covered by any Lease or the compliance of the premises with any applicable governmental regulations, except as expressly set forth in the Leases, (ii) granted any concessions to any tenant not disclosed in such Lease; or (iii) received any written notice of any defaults under the Leases. There are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property other than any agreements explicitly contained in the Leases. The Leases set forth all Tenant inducement costs and commissions that are currently due and payable or which have otherwise accrued with respect to any Lease. Other than as provided for in the Leases, there are no other agreements, oral or written, in connection with any Tenant inducement costs or leasing commissions that may become due and payable in the future in connection with any Lease.

(e) The operating statements of the Project to be delivered by Seller to Purchaser during the Inspection Period were prepared in the ordinary course of business by Seller's fee manager, are believed to be accurate, and have been relied upon by Seller.

(f) To the best knowledge of Seller, the Permits have been duly and validly issued, are in full force and effect.

(g) To the best knowledge of Seller, there is no litigation or arbitration or other legal or administrative suit, action, proceeding of any kind pending against or involving Seller relating to Seller's ownership of the Property or any part thereof which would prevent Seller from conveying the Project in accordance with this Agreement. Except as may be described in the Due Diligence Materials, Seller has not received any notice from any Governmental Authority with respect to any violation of any applicable zoning ordinances and building codes, flood disaster laws and health and environmental laws, rules and regulations (hereinafter collectively called the "Applicable Laws").

(h) Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

(i) Seller owns fee simple title to the Property, subject to the exceptions of record.

(j) Except for the Contracts, there will be no contracts or other agreements which affect or will affect or which are or will be obligations of the Purchaser or the Property after the Close of Escrow. All of the service contracts currently effecting the Property ("Service Contracts") may be terminated without penalty or other payment upon no more than thirty (30) days' notice except for the contract for electrical service.

(k) To Seller's knowledge, the Property is not in violation of any recorded covenants, conditions, restrictions or other agreements recorded in the Real Property Records of Dallas County, Texas ("Recorded CC&Rs").

(l)     To the best of Seller's knowledge or as described in the Due Diligence Materials (i) the Property is free of hazardous wastes, materials, substances, urea formaldehyde, PCB's and all other toxic, radioactive or hazardous wastes, materials, substances or contaminations in excess of amounts permitted under applicable federal, state and local regulations (collectively, "Hazardous Materials"); and (ii) no Hazardous Materials have been stored, disposed or located upon the Property except in the ordinary course of business for a multi-family residential community.   Without in any way limiting the generality of above, neither the Property nor the Seller are the subject of any pending or, to the best of Seller's knowledge or as described in the Due Diligence Materials or the Violation, threatened investigation or inquiry by any Governmental Authority, or are subject to any remedial obligations under any Applicable Laws pertaining to health or the environment ("Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1987, as amended ("RCRA"), and this representation and warranty would continue to be true and correct following disclosure to any applicable Governmental Authority of all relevant facts, conditions and circumstances pertaining to the Property and/or the Seller.   Seller has taken all steps necessary to determine and has determined that no hazardous substances, solid wastes, or other substances known or suspected to pose a threat to health or the environment ("Hazards") have been disposed of or otherwise released on or to the Property or exist on or within any portion of the Property.   To the knowledge of Seller, or as otherwise disclosed in the Due Diligence Materials, no prior use, either by Seller or the prior owners of the Property, has occurred, which violates any Applicable Environmental Laws. The use which Seller makes of the Property will not result in the disposal or release of any hazardous substance, solid waste or Hazard on, in or to the Property.   The terms "hazardous substance" and "release" shall each have the meanings specified in CERCLA, and the terms "solid waste" and disposal" (or "disposed") shall each have the meanings specified in RCRA; provided, however, that in the event either that CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided further that, to the extent that the laws of the State of Texas establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader definition shall apply.   To the best of Seller's knowledge and belief, there has been no litigation brought or threatened nor any settlement reached by or with any parties alleging the presence, disposal, release, or threatened release, of any hazard substance, solid wastes or Hazards from the use or operation of the Property.   To the best of Seller's knowledge and belief after diligent investigation and inquiry, the Property is not on any federal or state "Superfund" list, nor subject to any environmentally related liens.

(m)     Except as set forth in the Title Commitment or Due Diligence Materials, there are no unpaid assessments (governmental or otherwise) for sewers, water, paving, electrical power or otherwise affecting the Property (matured or unmatured) and, to the best of Seller's knowledge, no such assessments are threatened.   There are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(n)     At the Closing there will be no unpaid bills or claims in connection with any repair of the Property or other work performed or materials purchased in connection with the

Property, or sufficient funds in the reasonable judgment of Purchaser shall be escrowed for such purpose.

(o)     Seller has not received any written notice from any governmental entity of any violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Seller.

(p)     There are no persons employed by Seller in connection with the operation of the Property, and there are no maintenance, advertising, management, leasing, employment, or service contracts affecting the Property that will be in effect at Closing except for the Contracts unless expressly assumed in writing by Purchaser.  Otherwise, Seller shall terminate any such employee and any such contracts (not expressly assumed by Purchaser) other than the Contracts at or prior to the Closing.

If, at any time prior to Closing, Seller shall discover that any representation or warranty contained in this Article 3.3 is, or has become, inaccurate in any material respect, Seller shall so notify Purchaser in writing (the "Correction Notice"), and Purchaser shall have the right by notice given in writing not more than five (5) business days after receipt of the Correction Notice to terminate this Agreement and receive a refund of the Deposit.  The representations and warranties contained in this Agreement shall survive one (1) year from the Closing Date.

3.4     Purchaser intends to conduct its physical inspection of the Project beginning on the Effective Date of this Agreement and ending at 5:00 p.m. Dallas, Texas time, thirty (30) days after the Effective Date ("Inspection Period"). The Purchaser's inspection shall be at the sole cost and expense of Purchaser and at times approved in advance by Seller's manager (not to be unreasonably withheld) so as to minimize disturbance to the operations of the Project, its employees, and guests.  Seller shall reasonably assist with such inspection and shall provide Purchaser with access to the Project, but shall not be obligated to incur any material cost or expense in connection therewith or to furnish any information other than at the place where same is maintained.  During the Inspection Period, Seller shall provide Purchaser with accurate and complete copies of, or permit Purchaser to review at the Property, all books and records in the possession of Seller or its agents relating to the Project, including, without limitation, all of the Leases, Contracts and Permits, all lease files and correspondence, all property tax bills in Seller's possession, utility bills, and repair and maintenance records with respect to the Property and Personal Property.  All information received by Purchaser relating to the Project, Seller or its affiliates shall be kept in strict confidence (subject to the terms above) and used solely for the purpose of determining the advisability of proceeding with the transaction described in this Agreement.  On or before five (5) days after the Title Company's receipt of the Deposit, Seller shall deliver to Purchaser or make the items described on Exhibit "D" (collectively, the "Due Diligence Materials") available to Purchaser for Purchaser's review:

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS INSPECTED AND INVESTIGATED THE PROPERTY (OR PRIOR TO THE CLOSING WILL HAVE INSPECTED AND INVESTIGATED THE PROPERTY) AND HAS ENTERED INTO THIS AGREEMENT BASED UPON SUCH INVESTIGATION AND INSPECTION AND

PURCHASER'S RIGHT TO CONDUCT THE INSPECTION AND INVESTIGATION PURSUANT TO THIS ARTICLE 3. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE ACT OF SALE, PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED FOR OR ON BEHALF OF SELLER.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF THE SELLER AND EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, SELLER HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF SUITABILITY, HABITABILITY, CONDITION, ELIGIBILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF AND SELLER HAS NO LIABILITY OF ANY KIND TO PURCHASER ON ACCOUNT OF THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

3.5     In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "**Option**"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties.  Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the Deposit is returned to Purchaser.

3.6     If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent at any time during the Inspection Period and have the Deposit, less the Option fee described in Section 3.5, above, returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement.  If Purchaser does not give Seller and Escrow Agent written notice on or before 7 p.m. Central Time on the last day of the Inspection Period that Purchaser waives its right to terminate this Agreement pursuant to this Section 3.6, then Purchaser shall be deemed to have terminated this Agreement.

3.7     Purchaser shall have (10) ten days after the Inspection Period ("**Board Approval Period**") to obtain the approval of its Board of Managers to the transaction contemplated hereby. If Purchaser's Board of Managers approves this transaction, it shall give notice of such approval to Purchaser ("**Board Approval Notice**").  If Purchaser does not notify Seller within said period that such approval has been obtained, then this Agreement shall be deemed void ab initio and the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other.

App. 1644

3.8   Covenants.

(a)   Between the date of this Agreement and the Closing Seller shall continue to maintain the Property in accordance with Seller's prior practices, ordinary wear and tear, casualty losses and condemnation excepted.  During the term of this Agreement, Seller shall not take any action which would materially adversely affect the title to the Property.

(b)   Seller will cause fire and extended coverage insurance relating to the Property to be maintained in full force and effect at an amount no less than the full replacement cost of the Property.

(c)   Seller shall continue to operate the Property in accordance with its normal and customary practice after the Effective Date and prior to Closing, so that the Property will be in substantially the same condition on the Closing Date as on the Effective Date, reasonable wear and tear excepted.  After the Effective Date, Seller shall not, without approval of Purchaser enter into any new Service Contracts that are not cancelable without any penalty or fee on thirty (30) days' or less notice by Seller.  Seller shall terminate all Service Contracts related to the Property prior to Closing, unless Purchaser elects (prior to expiration of the Inspection Period) to assume such Service Contracts.  From and after the Effective Date through the Closing, Seller, at its sole cost and expense, shall  (i) not voluntarily subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters, (ii) not make any alterations to the Property, except in the ordinary course of business, all of which Seller shall complete at its sole cost and expense prior to Closing,  (iii) pay for all capital and other improvements which are performed or contracted for by Seller at or prior to Closing, and  (iv) not accept from any tenant payment of rent more than one (1) month in advance, or apply any security deposit to rent or any other default by any tenant.  Seller shall continue to lease residential units in accordance with Seller's prior practices and market conditions.

(d)   Seller shall not remove any personal property from the Property without the consent of Seller unless the same is replaced by property of equal or greater value, and will make all necessary repairs and replacements during such time.

3.9   Conditions to Purchaser's Obligations.  Purchaser's obligation to purchase the Property shall be conditioned upon the satisfaction of each of the following conditions prior to or simultaneously with the Closing any of which may be waived by written notice from Purchaser to Seller:

(a)   Seller has complied with and otherwise performed the obligations of Seller set forth in this Agreement.

(b)   All representations and warranties of Seller as set forth in this Agreement shall be in all material respects substantively true and correct as of the date hereof and on the date of Closing (except for representations which by their terms are made as of a specific date or refer to a specific date).

(c)    Financing

(1)    Seller is the borrower under the First Lien in the original principal amount of $19,021,200.00.  The First Lien is secured by a first mortgage lien on the Property.  As provided in Section 2 herein, Seller and Purchaser have agreed that the Purchase Price in the amount of the outstanding principal balance thereof shall be paid via Purchaser's assumption of the First Lien.  Because the Project will be encumbered by financing insured by HUD, closing of this transaction shall be subject to the approval by HUD and the lender under the First Lien ("**Lender**") of a Transfer of Physical Assets ("**TPA**") of the Project.  Any and all documents to be executed by Seller in connection with the TPA shall be subject to Purchaser's approval, not to be unreasonably withheld, conditioned or delayed.  From and after the consummation by Seller of the HUD Final Endorsement Closing with respect to the First Lien until the Closing or earlier termination of this Agreement, Seller authorizes Purchaser to contact Lender with respect to facilitating the TPA and assumption of the First Lien ("Loan Assumption").  The "**Financing Contingency**" shall be deemed satisfied when the parties have obtained conditional Lender and HUD approval to the TPA with conditions, including the form of the Loan Assumption documents, approved by Purchaser in its reasonable discretion.  Provided Seller has provided Purchaser with all documents necessary including the Due Diligence Documents, Purchaser agrees to file the application for TPA with the Lender by the date that is fourteen (14) days after the Board Approval Period.  If Lender requires additional information from Seller or Purchaser, Purchaser shall have a reasonable amount of time after receipt of such information required to make a filing or supplemental filing.  In the event that on or before the 120th day following the Board Approval Period (the "**Financing Contingency Deadline**"), the Financing Contingency has not been satisfied, this Agreement will terminate, the Deposit shall be returned to Purchaser, and the parties shall have no further obligations hereunder (except for obligations that are expressly intended to survive termination of this Agreement).  At all times prior to satisfaction of the Financing Contingency, whether by the Financing Contingency Deadline or the Extended Financing Contingency Deadline, Seller shall reasonably cooperate with Purchaser in such efforts, including without limitation the execution of any applications which are required to be executed by the existing owner of the Project and the furnishing of any and all information in its possession which is reasonably required by Purchaser in its efforts to obtain approval of the TPA and satisfy the Financing Contingency.  Purchaser shall be required to pay all costs, fees, assumption fees, or other charges imposed or incurred by the Lender, HUD or Seller in connection with the TPA and the Loan Assumption, other than Seller's legal fees incurred therewith.

(d)    Purchaser shall at all times have the right to waive any conditions (other than those given under Section 3.9(c) above), provided that no such waiver shall be effective unless such waiver or waivers are in writing; provided that if Closing occurs and Purchaser has actual knowledge of the non-fulfillment of any such condition, such act of consummating Closing shall be deemed a waiver of such known, unfulfilled condition.  Any such waiver shall be deemed a release of Seller and any liability of Seller, if any, as a result of the failure of such condition.

## ARTICLE 4:   PERMITTED ENCUMBRANCES TO TITLE

4.1     Purchaser agrees to accept title to the Property subject to the following matters (collectively, the "Permitted Encumbrances"):

(a)     Leases and tenancies reflected on the Rent Roll and such further Leases as may be entered into in accordance with this Agreement.

(b)     Liens securing payment of all ad valorem, intangible and other real and personal property taxes, special and general assessments, school taxes, and water and sewer charges against the Property or the Personal Property covered by this Agreement for the tax year in which the Closing Date occurs and subsequent years to the extent such items are properly apportioned under this Agreement, and the lien of any special taxes not entered of record against the Property on the Closing Date.

(c)     Servitudes, easements and restrictive covenants, if any, which are recorded in the land records of the County Clerk of Dallas County, Texas, as of the date hereof and which do not materially affect the marketability of the Property.

(d)     Matters approved or deemed approved pursuant to the terms of this Agreement.

(e)     Zoning ordinances and regulations and building restrictions and regulations affecting the Property on the Closing Date.

(f)     The First Lien.

(g)     All building, subdivision, land sales, securities, ecology, environmental protection and like laws, ordinances, rules and regulations of governmental authorities, including those of any and all regulatory agencies and administrative officials having or asserting jurisdiction over the Property.

## ARTICLE 5:   CONDITION OF TITLE, TITLE INSURANCE

5.1     Seller shall promptly obtain from the Title Company through Escrow Agent, and deliver to Purchaser, a title commitment or a preliminary report (the "Title Commitment") to issue a TLTA Owner's Policy of Title Insurance (the "Title Policy") insuring Purchaser's title to the Property to be good and indefeasible in the amount of the Purchase Price, containing coverage over all general exceptions subject to only the Permitted Encumbrances. A copy of the Title Commitment and legible copies of each of the documents of record reflected therein shall be furnished to the attorneys for Purchaser and Seller. Seller shall also deliver to Purchaser a copy of the Existing Survey. Within ten (10) days of receipt of the title materials described above, together with the Existing Survey, Purchaser shall give written notice (the "Objection Notice") to the attorney for Seller identifying with particularity any defect of title to which Purchaser objects (the "Objections") separately specifying and setting forth each such Objection. Seller shall be entitled to reasonable adjournments of the Closing Date not exceeding thirty (30) days in the aggregate, to cure the Objections, unless waived by Purchaser. If Purchaser gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the

Title Commitment which are not objected to in such Objection Notice shall be deemed to be Permitted Encumbrances.

5.2     Seller shall not be required to expend any money or bring any action or proceeding or do any other thing in order to deliver the Project or convey title to the Property as required by this Agreement or the Objection Notice.  If Seller gives Purchaser notice (the "Response Notice") that Seller is unable or unwilling to convey the Project or title to the Project as required by this Agreement or the Objection Notice, Purchaser may, as its exclusive remedy, elect by written notice given to Seller within five (5) days after the Response Notice is given, either (a) to accept such title as Seller is able to convey without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement, in which event the Deposit and Financing Period Extension Fee shall be returned to Purchaser.

5.3     If Purchaser shall fail to give timely notice of its election to terminate this Agreement, Purchaser shall be deemed to have accepted all matters reflected on the Title Commitment as Permitted Encumbrances.

5.4     Unpaid liens for real estate and personal property taxes for years prior to the fiscal year in which the Closing Date occurs and any other matters which Seller is obligated to pay and discharge at the Closing shall not be deemed objections to title, but the amount thereof chargeable to Seller, plus interest and penalties thereon charged by the taxing authority, if any, shall be deducted from the Purchase Price on the Closing Date and paid to the Title Company with instructions to pay and discharge such matters.

5.5     Closing costs associated with the Closing and typically paid by a seller including, but not limited to, deed stamps, transfer taxes, and Seller's attorneys' fees shall be paid by Seller. Seller shall pay all premiums and other fees associated with the Title Policy and survey to be delivered at Closing.  The cost of physical inspection, accounting, audit, and other investigations made in connection with Purchaser's due diligence, Purchaser's attorneys' fees and all other costs associated with the Closing shall be paid by Purchaser.

5.6     Time is of the essence with respect to the provisions of this Section 5.

### ARTICLE 6: CLOSING

6.1     Provided that all of the conditions of this Agreement shall have theretofore been satisfied, the closing (the "Closing") of the purchase and sale of the Property shall be conducted at the offices of the Escrow Agent (or at such other location as shall be mutually agreeable to Seller and Purchaser) on the date ("Closing Date") that is on or before ten (10) days after the Financing Contingency Deadline.

6.2     Upon Seller's and Purchaser's delivery of all required documents and instruments and payment of the Purchase Price and other amounts required herein, Purchaser and Seller shall prepare and sign a closing statement reflecting the adjustments and payments made and agreements in connection therewith.  Seller and Purchaser shall jointly deliver a copy of the closing statement and all of the aforesaid documents to the Title Company which shall do the following:

(a)    Record the Deed and loan documents, if any, associated with this transaction.

(b)    Deliver to Seller and Purchaser or other appropriate party the documents and payments delivered to it as escrow holder for delivery to such party.

(c)    Pay all recording taxes and transfer fees and all filing fees reflected on the closing statement.

(d)    Issue the Title Policy and, if applicable, an endorsement to the existing Lender's Policy of Title Insurance.

(e)    File the reports required by Section 6045 of the Internal Revenue Code and regulations promulgated thereunder.

## ARTICLE 7:  DOCUMENTS REQUIRED ON CLOSING DATE

7.1    At or prior to the Closing, Seller shall execute and/or deliver the following to Purchaser through Escrow Agent:

(a)    A Deed in a form reasonably acceptable to Seller and Purchaser and approved by HUD.

(b)    A Blanket Conveyance, Bill of Sale and Assignment, in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Bill of Sale**").

(c)    An Assignment and Assumption of Leases in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Assignment of Leases**"), as well as the hereinafter described Tenant Notification Letter.

(d)    A pro forma of the Title Policy, as described in Section 5.1 of this Agreement.

(e)    Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Purchaser's representative at the Property.

(f)    A rent roll for the Property (the "**Closing Rent Roll**") dated and certified as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of closing.

(g)    The originals or certified copies of the leases and other occupancy agreements described in the Closing Rent Roll.

(h)    All transfer documents (the "**Transfer Documentation**") necessary to assume the First Lien executed by Seller and the Existing Lender and to release Seller and current guarantors.

(i)    Organizational and authority documents satisfactory to the Title Company.

(j)   All costs and fees required to be paid by Seller pursuant to Article 8.

(k)   Such other documents and instruments as may be required by this Agreement or by the Title Company in order to consummate the transactions described in this Agreement and to issue the Title Policy to Purchaser.

(l)   A non-foreign (FIRPTA) affidavit for Seller complying with the requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

(m)   Evidence of termination of those Contracts that are terminable pursuant to Section 3.7(b)(vi).

(n)   An affidavit acceptable to the Title Company reflecting that there are no changes to the Survey except those approved by the Purchaser.

(o)   Such other instruments and affidavits as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

7.2   At or prior to the Closing, Purchaser shall execute and/or deliver the following to Escrow Agent:

(a)   The Purchase Price.

(b)   The Deed.

(c)   The Bill of Sale.

(d)   The Assignment of Leases.

(e)   The Transfer Documentation executed by Purchaser.

(f)   Organizational and authority documents satisfactory to the Title Company.

(g)   A written notice of the acquisition of the Property by Purchaser, originally executed by Seller and Purchaser, which shall be transmitted to all tenants and to other parties affected by the sale and purchase of the Property (the "**Tenant Notification Letter**"). Such notice (in the form of Exhibit "B" hereto) shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices. The said notices shall specify that unapplied security deposits under the tenant leases have been delivered to the Purchaser and that the Purchaser is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits.

(h)   All costs and fees required to be paid by Purchaser pursuant to Article 8.

(i)     Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

(j)     Such other instrument, affidavits, and tax returns as are customarily executed by the purchaser of an interest in real property in connection with the recording of the deed.

## ARTICLE 8:  APPORTIONMENTS AND ADJUSTMENTS

8.1     Seller shall be responsible for and pay all accrued expenses with respect to the Project accruing up to 11:59 P.M. on the day prior to the Closing Date (the "Adjustment Date") and shall be entitled to receive and retain all revenue from the Project accruing up to the Adjustment Date; provided, however, that if the Closing Date occurs on the last day of the month, the Adjustment Date shall be the Closing Date.

8.2     On the Closing Date, the following adjustments and apportionments shall be made by authorized representatives of the parties in cash as of the Adjustment Date:

(a) Rent payable and paid for the month of Closing shall be prorated as of the Adjustment Date.  There shall be no proration of delinquent rentals.  After the Closing, Purchaser shall continue to bill tenants for sums reflected on the Closing Rent Roll as past due, shall receive such rents as trustee for Seller, and shall deliver such sums to Seller if, as and when received. Such rents shall be applied first to costs of collection, second to rents due for the Closing Month, third to rents due to Purchaser at the time of receipt, and last to rents due Seller for periods prior to Closing.  After the Closing, if Seller receives rents for periods after the Closing Date, it shall remit such sums to Purchaser within two (2) business days of receipt.

(b)     Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any.  In the event that either the tax assessment or the tax rate for the current year is not known at Closing, the parties shall prorate at Closing on the basis of the last known values and rates and adjust the prorations once such values or rates become known for the current year.  Seller shall pay installments of confirmed assessments that have been levied against the Property and are due and payable as of the Closing.  Purchaser shall pay all installments of any special assessments due after Closing.

(c)     Charges under Contracts affecting the Project on the Adjustment Date, and utility charges and relating to the Project, including any payments made to Seller prior to the Closing Date in respect of Contracts, laundry lease or information services, whether characterized as "decorating fees", "sign-up bonuses", "additional rents" or the like.

(d)     Utilities, water and sewer charges on the basis of the period for which assessed.

(e)     Income from vending machines and tenant services, if any.

8.3     At the Closing, Purchaser will receive a credit against the Purchase Price in an amount equal to all unapplied security deposits held under Leases in effect on the Adjustment

App. 1651

Date, against Purchaser's receipt and indemnification therefor. Upon making such credit, Purchaser will be deemed to have received all such security deposits and shall be fully responsible for the same as if a cash amount equal to such security deposits were actually delivered to Purchaser. Prior to the Closing, Seller reserves the right to apply security deposits as provided under the respective leases and permitted by applicable law; provided however, Seller shall not apply security deposits for any rentals due for the month in which the Closing Date occurs.

8.4     All other income of the Property, accruing or relating to the period through the Adjustment Date shall be paid to Seller. All other income of the Property, accruing or relating to the period commencing on the Adjustment Date and thereafter shall be paid to Purchaser.

8.5     All other expenses, such as utilities, maintenance and other operating expenses, incurred in connection with the Property and accruing or relating to the period through the Adjustment Date shall be the responsibility of and paid by Seller. Seller shall pay the existing amounts due under Construction Contracts. All other expenses, such as utilities, maintenance and other operating expenses incurred in connection with the Property and accruing or relating to the period commencing on the date of Closing and thereafter shall be the responsibility of and paid by Purchaser.

8.6     At the Closing and subject to the prorations herein provided, Seller shall receive a cash credit in an amount equal to the sum of all amounts held in escrow by holder of the First Lien, including, without limitation, hazard insurance premiums, taxes and MIP reserve or repair and replacement reserve. All escrows associated with the First Lien shall be assigned to Purchaser.

8.7     Walk-Through.   Seven (7) days prior to Closing, Seller and Purchaser will perform a walk-through of all vacant units to determine which ones are not made-ready for rental.

8.8     To the extent that any amount of any of the above items shall not be available for exact proration as of the Closing, the proration at Closing will be based on the best available information and Seller or its representative and Purchaser or its representative shall meet as soon after the Closing as possible, but in no event later than thirty (30) days after Closing, and compute and settle and adjust or readjust the Closing prorations between the parties as of the date of Closing. Rents, if any, collected by Purchaser after the Closing shall be applied first to any amounts due Purchaser and then to the extent such rents relate to the period through and including the day before the day of the Closing shall be paid to Seller. Purchaser agrees to use good faith collection procedures with respect to the collection of any delinquent rentals, but will have no liability for the failure to collect any such amounts and will not be required to incur any material cost, conduct lock-outs or take any other legal action to enforce collection of any such amounts owed to Seller by tenants of the Property. The provisions of this Section 8.6 shall survive Closing.

The provisions of this **ARTICLE 8** shall survive the Closing.

## ARTICLE 9: REMEDIES

9.1     If Purchaser breaches its obligation to purchase the Project pursuant to this Agreement, and after receipt of any applicable notice and a five (5) day opportunity to cure, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Purchaser and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the Deposit to Seller which shall retain the same as liquidated damages.  Seller shall not be required to give Purchaser notice of failure to close, on the date provided in this Agreement and Purchaser shall not have any five (5) day grace period therefor. Seller and Purchaser acknowledge that the amount of damages resulting from a breach of this Agreement by Purchaser would be difficult or impossible to accurately ascertain and that Seller's damages would, in any event, be substantial and would exceed the Deposit.  Upon Seller's receipt of the Deposit, this Agreement shall wholly cease and terminate, no party to this Agreement shall have any further claim, agreement, or obligation to any other party to this Agreement, and any lien of Purchaser against the Project shall automatically cease, terminate and be released.

9.2     If the sale contemplated by this Agreement is not consummated because of Seller's failure to perform its obligations hereunder, Purchaser shall be entitled, as its exclusive remedy, to elect after notice to Seller and a five (5) day opportunity to cure either (a) to terminate this Agreement and have the Deposit returned to it or (b) to enforce specific performance of Seller's obligations under this Agreement.  Purchaser shall not be required to give Seller notice of failure to close, on the date provided in this Agreement and Seller shall not have any five (5) day grace period therefor.

9.3     The non-breaching party shall also be entitled to recover against the breaching party its costs and expenses, including reasonable attorneys' fees and court costs, incurred by such non-breaching party in enforcing any of the remedies hereunder, as determined by a court of competent jurisdiction in Texas.

## ARTICLE 10: DAMAGE, DESTRUCTION OR CONDEMNATION

10.1     Seller agrees to maintain its present policies of casualty insurance covering the Project in full force and effect from the date of this Agreement through and including the Closing Date.

10.2     If either a substantial part of the improvements on the Land is damaged or destroyed or any part of the Property is taken by condemnation or other power of eminent domain then Purchaser shall have the right to terminate this Agreement based upon such damage, destruction or taking.  If Purchaser does not terminate this Agreement as aforesaid, then on the Closing Date:

(i)     The Purchase Price shall not be reduced, but Seller shall credit the Purchase Price with an amount equal to any sums of money collected by Seller under its policies of casualty insurance or renewals thereof insuring against the loss in question (after deducting any reasonable expenses incurred by Seller in collecting such insurance and any amount that Seller shall have paid or shall be obligated to pay for repairs or restoration of the damage), and

App. 1653

Seller shall assign, transfer and set over to Purchaser at Closing all of Seller's right, title and interest in and to its casualty insurance policy or policies with respect to the Property and any further sums payable under said policies, plus the amount of any deductibles; provided that in no event shall the credits and insurance assigned to Purchaser exceed the cost of the unrepaired damage; and

(ii)    Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any awards that may be made for any taking by condemnation or other power of eminent domain.

10.3    For the purposes of this Article, a substantial part of the Improvements on the Land shall be deemed to mean a portion having a value of $100,000 or more or which would require expenditure of $100,000 or more for repair or restoration.

## ARTICLE 11: BROKER

11.1    Purchaser represents and warrants to Seller that neither Purchaser nor any entity related to Purchaser has dealt with any broker or other person or entity who would be entitled to a commission, consulting fee or other brokerage fee in connection with the transactions described in this Agreement.

11.2    Seller represents and warrants to Purchaser that neither Seller nor any entity related to Seller has dealt with any broker or other person or entity that would be entitled to a commission, consulting fee, or other brokerage fee in connection with the transactions described in this Agreement.

11.3    Each party agrees to indemnify, defend and hold the other harmless of and from any loss, cost, damage or expense (including reasonable attorneys' fees and court costs) arising out of any inaccuracy in the representation or warranty made by such party in Sections 11.1 and 11.2 above.

11.4    Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article shall survive the Closing and any prior termination of this Agreement for any reason whatsoever.

## ARTICLE 12: NOTICES

12.1    Any notice given or required to be given pursuant to any provision of this Agreement shall be in writing and shall be personally delivered or sent by facsimile, certified U.S. mail, with return receipt requested, or a reputable commercial courier service guaranteeing overnight delivery, and shall be deemed to have been given upon receipt if personally delivered, or, as the case may be, upon transmittal by facsimile with electronic confirmation of receipt, upon deposit in U.S. mail or upon delivery to such commercial courier, with delivery charges prepaid, if sent by such a courier, in either case addressed as follows:

AGREEMENT FOR PURCHASE AND SALE    Page 17
1180677 1    Bellwether Ridge    D4DS to Apts at Bellwether Ridge · Agreement for Purchase and Sale6    8025.0024

App. 1654

Seller:                  D4DS LLC
                         1755 Wittington Place, Suite 340
                         Dallas, Texas 75234
                         Attention:    Timothy Barton
                         Telephone:    972-385-9934
                         E-mail:       TBarton@jmjdevelopment.net

Purchaser:               Apts at Bellwether Ridge, LLC
                         1603 LBJ Freeway, Suite 800
                         Dallas, Texas 75234
                         Attn:   Erik L. Johnson
                         Phone: 469-522-4413
                         E-mail:erik.johnson@pillarincome.com

with a copy to:          Bennett, Weston, LaJone & Turner, P.C.
                         1603 LBJ Freeway, Suite 280
                         Dallas, Texas 75234
                         Attn:   Jay A. LaJone
                         Phone: 214-373-2556
                         E-mail:jlajone@bennettweston.com

12.2    (a)    Either party may, by giving notice to the other in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change or address shall be effective three (3) days after it is given.

(b)    The attorney for each party to this Agreement identified in Article 12.1 may give notices on behalf of his client with the same force and effect as if such notice were given directly by such party.

## ARTICLE 13: ASSIGNMENT

13.1    Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to a third party.

## ARTICLE 14: MISCELLANEOUS

14.1    The following matters of general application shall apply to this Agreement and control interpretation notwithstanding any provision apparently to the contrary:

(a)    This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective heirs, successors, legal representatives and permitted assigns.

(b)    Wherever under the terms and provisions of this Agreement the time for performance falls upon a Saturday, Sunday or legal holiday in the state where Seller or Purchaser maintains the office reflected in Article 12 hereof, such time for performance shall be extended to the next business day thereafter.

(c)     This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one and the same agreement.  Escrow Agent is authorized to attach multiple signature pages to a single conformed original.

(d)     The captions at the beginning of the several paragraphs, Sections and Articles are for convenience in locating the context, but are not part of the context.  Unless otherwise specifically set forth in this Agreement to the contrary, all references to Exhibits contained in this Agreement refer to the Exhibits which are attached to this Agreement, all of which Exhibits are incorporated in, and made a part of, this Agreement by reference.  Unless otherwise specifically set forth in this Agreement to the contrary, all references to Articles, Sections, paragraphs and clauses refer to portions of this Agreement.

(e)     If any term or provision of this Agreement shall be held to be illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this Agreement shall not be affected thereby, but each such remaining term and provision shall be valid and shall remain in full force and effect.

(f)     This Agreement and the other writings referred to in, or delivered pursuant to, this Agreement, embody the entire understanding and contract between the parties hereto with respect to the Project and supersede any and all prior agreements and understandings between the parties hereto, whether written or oral, formal or informal, with respect to the subject matter of this Agreement.  This Agreement has been entered into after full investigation by each party and its professional advisors, and neither party is relying upon any statement, representation or warranty made by or on behalf of the other which is not expressly set forth in this Agreement.

(g)     No extensions, changes, waivers, modifications or amendments to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, waiver, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever, unless the same is contained in writing and is fully executed by the party against whom such matter is asserted.

(h)     This Agreement shall be governed and interpreted in accordance with the laws of the State where the Property is located.

(i)     Each party hereto shall pay all charges specified to be paid by them pursuant to the provisions of this Agreement and their own attorney's fees in connection with the negotiation, drafting and closing of this Agreement.

(j)     Purchaser and Seller agree that this Agreement has been entered into solely for the benefit of Purchaser and Seller and no other person or entity, it being the intention of Purchaser and Seller that no person or entity not a party to this Agreement shall have any right or standing to (a) bring any action against Purchaser or Seller based on this Agreement, or (b) assume that any provision of this Agreement will be enforced or remain unmodified or unwaived, or (c) assert that it or he is or should be or was intended to be a beneficiary or any provision of this Agreement.

(k)     The parties agree that any actions taken or documents (including this Agreement) signed by any trustee, officer, or director of Seller or Purchaser are undertaken in

their fiduciary capacity and no recourse shall be had to the personal assets of any such trustee, officer, or director for enforcement of this Agreement.

(l)    Wherever a time is set forth for performance or notice in this Agreement, time shall be of the essence unless explicitly stated to be otherwise.

(m)    Purchaser and Seller agree that the Property will not be actively marketed and the Seller will not enter into negotiations with any other prospective purchasers while this Agreement is in effect or any contract negotiations are pending.

*[Signature page to follow]*

App. 1657

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in their names by their respective duly authorized representatives as of the day and year first above written.

Seller:

**D4DS LLC,**
a Texas limited liability company

By: _____
Timothy Barton, President

Purchaser:

**APTS AT BELLWETHER RIDGE, LLC,**
a Delaware limited liability company

By: _____
Erik L. Johnson, President

AGREEMENT FOR PURCHASE AND SALE   Page 21
1180677 1   Bellwether Ridge   D4DS to Apts at Bellwether Ridge · Agreement for Purchase and Sale6   8025.0024

App. 1658

## ACKNOWLEDGEMENT OF RECEIPT BY TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of the Agreement on this, the 6th day of July, 2021, and agrees to accept, hold and disburse the Earnest Money Deposit in accordance with the provisions of the Contract. The undersigned acknowledges that it is not a party to this Agreement and that it is executing below solely for the purpose of the foregoing acknowledgment and agreement.

TITLE COMPANY:

Commonwealth Land Title Insurance Company

By: _____

Name: James P. Lazar

Title:  Escrow Agent

## EXHIBITS:

A -  Legal Property Description
B -  Tenant Notification Letter
C -  Current Rent Roll
D -  Due Diligence Materials

App. 1659

## EXHIBIT "A"

## LEGAL PROPERTY DESCRIPTION

TRACT 1:

Being all of LOTS 1A1 AND 3A1, BLOCK A, HUNTINGTON RIDGE, an Addition to the City of DeSoto, Dallas County, Texas, according to the Plat thereof recorded in Instrument Number 201700293233, Official Public Records, Dallas County, Texas.

TRACT 2:

Non-exclusive easement right as created and described in Easement Grant executed by Desoto Ridge Apartments, Ltd., as Grantor, to Branch Banking and Trust Company, as Grantee, dated December 27, 2013, filed December 31, 2013, under Clerk's File No. 201300390459. Real Property Records, Dallas County, Texas, over the following described tract of land:

Lot 2, Block A, Huntington Ridge, an Addition to the City of DeSoto, Dallas County, Texas, according to the Map or Plat thereof recorded under Clerk's File No 200600427008, Map Records, Dallas County, Texas.

App. 1660

## EXHIBIT "B"

## TENANT NOTIFICATION LETTER

Dated: _____, 20____

_____
_____
_____
_____

Re:    _____ ("Property")

Dear _____:

    As of the date of this letter, _____, a _____ and the former owner of the Property ("Seller"), transferred title and possession of the Property to _____ ("Purchaser").

    Pursuant to the provisions of Section _____ of the Texas _____, you are hereby notified that Purchaser is responsible for all of the obligations of the landlord under your lease first arising from and after the date hereof. Seller is joining in the execution of this letter to acknowledge the fact that title and possession to the Property and all future responsibilities of the landlord under your lease have been transferred to Purchaser.

    From and after the date of this letter, please make all rental checks payable to _____ _____, and deliver same to _____, until otherwise notified in writing.

                    Sincerely,

**PURCHASER:**                _____,
                        a _____

                        By:    _____
                        Name: _____
                        Title:  _____

App. 1661

**ACKNOWLEDGED:**

**SELLER:**

_____,

a _____

By: _____

Name: _____

Title: _____

AGREEMENT FOR PURCHASE AND SALE   Page 25
1180677_1  Bellwether Ridge  D4DS to Apts at Bellwether Ridge - Agreement for Purchase and Sale6  8025.0024

App. 1662

# EXHIBIT "C"

## CURRENT RENT ROLL

**(see attached)**

App. 1663

OneSite Rents v3.0

08/24/2021  3:42:08PM

**OneSite Reports - Bellwether Ridge**

**RENT ROLL DETAIL**

As of 08/23/2021

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1101 | B2 | N/A | 1157 | Occupied | Wilder, Tiffany | 06/01/2019 06/01/2020 | | 08/31/2021 | 1,759.00 | RENT | 1,439.00 | 0.00 | 1,439.00 | 600.00 | (3.63) |
| | | N/A | | Pending renewal | Wilder, Tiffany | 06/01/2019 09/01/2021 | | 08/31/2022 | | RENT | 1,589.00 * | 0.00 * | 1,589.00 * | 0.00 | 0.00 |
| 1103 | B1 | N/A | 1067 | Occupied | Jackson, Doris | 07/02/2021 07/02/2021 | | 07/31/2022 | 1,689.00 | RENT | 1,654.00 | 0.00 | 1,654.00 | 250.00 | 36.23 |
| 1105 | B1 | N/A | 1067 | Occupied | Perryman, David | 06/13/2020 07/01/2021 | | 06/30/2022 | 1,539.00 | RENT | 1,504.00 | 0.00 | 1,504.00 | 250.00 | (0.63) |
| 1106 | A2 | N/A | 868 | Occupied | Black, Sharon | 03/27/2020 04/01/2021 | | 02/28/2022 | 1,444.00 | RENT | 1,399.00 | 0.00 | 1,399.00 | 400.00 | 1,693.27 |
| 1107 | B2 | N/A | 1157 | Occupied | Jones, Danitra | 07/23/2020 08/01/2021 | | 07/31/2022 | 1,759.00 | RENT | 1,724.00 | 0.00 | 1,724.00 | 250.00 | 0.00 |
| 1201 | B3 | N/A | 1276 | Occupied | Barker, Cheryl | 06/01/2019 06/01/2021 | | 05/31/2022 | 1,879.00 | RENT | 1,659.00 | 0.00 | 1,659.00 | 250.00 | 0.00 |
| 1202 | A2 | N/A | 868 | Occupied | Daniels, Rodney | 06/08/2019 08/01/2020 | | 10/31/2021 | 1,594.00 | RENT | 1,324.00 | 0.00 | 1,324.00 | 150.00 | 0.00 |
| 1203 | B1 | N/A | 1067 | Occupied | Lang, Taniesha | 06/01/2019 06/01/2021 | | 05/31/2022 | 1,539.00 | RENT | 1,469.00 | 0.00 | 1,469.00 | 600.00 | 0.00 |
| 1204 | A2 | N/A | 868 | Occupied | Hill, Virlitra | 05/28/2021 05/28/2021 | | 05/31/2022 | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 0.00 |
| 1205 | B1 | N/A | 1067 | Occupied | Leftridge, Latonya | 06/01/2019 08/01/2021 | | 07/31/2022 | 1,539.00 | RENT | 1,454.00 | 0.00 | 1,454.00 | 600.00 | 0.00 |
| 1206 | A2 | N/A | 868 | Occupied | Smith, Latonia | 05/25/2021 05/25/2021 | | 05/31/2022 | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 0.00 |
| 1207 | B3 | N/A | 1276 | Occupied | Johnson, Kirk | 06/01/2019 06/01/2020 | | 08/31/2021 | 1,879.00 | RENT | 1,559.00 | 0.00 | 1,559.00 | 350.00 | 0.00 |
| | | N/A | | Pending renewal | Johnson, Kirk | 06/01/2019 09/01/2021 | | 08/31/2022 | | RENT | 1,709.00 * | 0.00 * | 1,709.00 * | 0.00 | 0.00 |
| 1208 | A2 | N/A | 868 | Occupied | Ross, Bryant | 06/01/2019 06/01/2021 | | 05/31/2022 | 1,594.00 | RENT | 1,399.00 | 0.00 | 1,399.00 | 250.00 | 0.00 |
| 2102 | B2 | N/A | 1157 | Occupied-NTVL | Larkin, Lisa | 06/01/2019 07/01/2020 | | 09/30/2021 | 1,759.00 | RENT | 1,439.00 | 0.00 | 1,439.00 | 819.00 | 0.00 |
| | | N/A | | Applicant | Gee, Tandria | 10/11/2021 10/11/2021 | | 04/30/2022 | | RENT | 1,759.00 * | 0.00 * | 1,759.00 * | 250.00 | 0.00 |
| 2104 | B1 | N/A | 1067 | Occupied | McMurray, Vinita | 01/29/2021 01/29/2021 | | 02/28/2022 | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,644.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,494.00 | 0.00 | | | |
| 2105 | A1 | N/A | 699 | Occupied | Ashley, Savannah | 05/07/2021 05/07/2021 | | 05/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 2106 | B1 | N/A | 1067 | Occupied | Jackson, Patrick | 07/07/2020 08/01/2021 | | 07/31/2022 | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,629.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,504.00 | 0.00 | | | |
| 2108 | B2 | N/A | 1157 | Occupied | Alridge, Felicia | 04/08/2021 04/08/2021 | | 02/28/2022 | 1,759.00 | RENT | 1,724.00 | 0.00 | 1,724.00 | 250.00 | 0.00 |
| 2201 | A2 | N/A | 868 | Occupied | Rather, Jashida | 07/01/2019 07/01/2021 | | 06/30/2022 | 1,594.00 | RENT | 1,449.00 | 0.00 | 1,449.00 | 250.00 | 0.00 |
| 2202 | B3 | N/A | 1276 | Occupied | Jackson, Jean | 06/15/2021 06/15/2021 | | 06/30/2022 | 1,879.00 | RENT | 1,844.00 | 0.00 | 1,844.00 | 250.00 | 0.00 |
| 2203 | A1 | N/A | 699 | Occupied | Scott, Tammy | 06/01/2019 07/01/2021 | | 06/30/2022 | 1,194.00 | GARAGE | 0.00 | 125.00 | 1,234.00 | 250.00 | (0.41) |
| | | | | | | | | | | RENT | 1,109.00 | 0.00 | | | |
| 2204 | B1 | N/A | 1067 | Occupied-NTVL | Pitterson, Angelique | 08/14/2020 08/14/2020 | | 08/31/2021 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | 0.00 |

* indicates amounts not included in detail totals

App. 1664

OneSite Reports - Bellwether Ridge

08/24/2021  3:42:08PM

**RENT ROLL DETAIL**

mgt-521-003

As of 08/23/2021

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | N/A | | Applicant | Richardson, Torkorein | 09/15/2021 | 09/15/2021 | 09/30/2022 | | RENT | 1,539.00 * | 0.00 * | 1,539.00 * | 250.00 | 0.00 |
| 2205 | A1 | N/A | 699 | Occupied | Spearman, Tammarin | 06/01/2019 | 07/01/2021 | 06/30/2022 | 1,194.00 | RENT | 1,124.00 | 0.00 | 1,124.00 | 150.00 | 0.00 |
| 2206 | B1 | N/A | 1067 | Occupied | Kelly, Amanda | 06/01/2019 | 07/01/2020 | 09/30/2021 | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,494.00 | 350.00 | 0.00 |
| | | | | | | | | | | RENT | 1,369.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Kelly, Amanda | 06/01/2019 | 10/01/2021 | 09/30/2022 | | GARAGE | 0.00 * | 125.00 * | 1,619.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,494.00 * | 0.00 * | | | |
| 2207 | A2 | N/A | 868 | Occupied-NTV | Banks, Richard | 01/23/2021 | 01/23/2021 | 07/31/2021 | 1,594.00 | MTOM | 0.00 | 250.00 | 1,844.00 | 150.00 | 0.00 |
| | | | | | | | | | | RENT | 1,594.00 | 0.00 | | | |
| 2208 | B3 | N/A | 1276 | Occupied | Wallace, Jacqueline | 08/14/2020 | 08/14/2020 | 08/31/2021 | 1,879.00 | RENT | 1,824.00 | 0.00 | 1,824.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Wallace, Jacqueline | 08/14/2020 | 09/01/2021 | 06/30/2022 | | RENT | 1,849.00 * | 0.00 * | 1,849.00 * | 0.00 | 0.00 |
| 3101 | B1 | N/A | 1067 | Occupied | Boston, Erica | 11/11/2019 | 03/09/2021 | 02/28/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 1,469.00 | 1,788.27 |
| 3102 | A3 | N/A | 878 | Occupied | Curtis, Geoffrey | 06/01/2019 | 06/01/2019 | 05/31/2022 | 1,394.00 | RENT | 1,334.00 | 0.00 | 1,334.00 | 300.00 | 0.00 |
| 3103 | A1 | N/A | 699 | Occupied | Thomas, Lindsey | 07/07/2020 | 08/01/2020 | 05/31/2022 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 300.00 | (0.68) |
| 3104 | A1 | N/A | 699 | Occupied | Harrison, Brandon | 08/05/2020 | 08/05/2020 | 11/30/2021 | 1,194.00 | RENT | 1,124.00 | 0.00 | 1,124.00 | 300.00 | 0.00 |
| 3105 | A1 | N/A | 699 | Occupied | Cooks, Antinee | 04/01/2021 | 04/01/2021 | 03/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 3106 | A1 | N/A | 699 | Occupied | Caulk, Robert | 07/09/2021 | 07/09/2021 | 07/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 450.00 | 0.00 |
| 3107 | B1 | N/A | 1067 | Occupied | Clarke, Shawn | 07/06/2019 | 06/01/2021 | 02/28/2022 | 1,539.00 | RENT | 1,479.00 | 0.00 | 1,479.00 | 835.00 | 223.91 |
| 3108 | A3 | N/A | 878 | Occupied-NTVL | Teer, Robert | 08/27/2019 | 10/01/2020 | 05/31/2021 | 1,394.00 | MTOM | 0.00 | 250.00 | 1,629.00 | 150.00 | 0.00 |
| | | | | | | | | | | RENT | 1,379.00 | 0.00 | | | |
| | | N/A | | Applicant | Sullivan, Bianca | 09/16/2021 | 09/16/2021 | 09/30/2022 | | RENT | 1,394.00 * | 0.00 * | 1,394.00 * | 150.00 | 0.00 |
| 3201 | B1 | N/A | 1067 | Occupied | Walker, Latoyia | 09/08/2020 | 09/08/2020 | 09/30/2021 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | (5,858.22) |
| | | N/A | | Pending renewal | Walker, Latoyia | 09/08/2020 | 10/01/2021 | 08/31/2022 | | RENT | 1,519.00 * | 0.00 * | 1,519.00 * | 0.00 | 0.00 |
| 3202 | A3 | N/A | 878 | Occupied-NTV | Jacobs, Thomas | 08/09/2020 | 08/09/2020 | 08/31/2021 | 1,394.00 | RENT | 1,324.00 | 0.00 | 1,324.00 | 150.00 | 0.00 |
| 3203 | A1 | N/A | 699 | Occupied | Davis, Tiffany | 02/29/2020 | 12/01/2020 | 09/30/2021 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 150.00 | (618.27) |
| | | N/A | | Pending renewal | Davis, Tiffany | 02/29/2020 | 10/01/2021 | 07/31/2022 | | RENT | 1,179.00 * | 0.00 * | 1,179.00 * | 0.00 | 0.00 |
| 3204 | A1 | N/A | 699 | Occupied | Tolliver, Kimberlee | 08/01/2019 | 08/01/2021 | 05/31/2022 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 150.00 | 0.00 |
| 3205 | A1 | N/A | 699 | Occupied | Edwards, Lindell | 10/01/2020 | 04/01/2021 | 03/31/2022 | 1,194.00 | RENT | 1,169.00 | 0.00 | 1,169.00 | 350.00 | (0.73) |

* indicates amounts not included in detail totals

App. 1665

OneSite Rents v3.0 

08/24/2021  3:42:08PM

**RENT ROLL DETAIL**

As of 08/23/2021

Page 3 of 10

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3206 | A1 | N/A | 699 | Occupied | Sanders-Seawood, Troie | 07/15/2021  07/15/2021 | | 07/31/2022 | 1,194.00 | PETFEE | 0.00 | 25.00 | 1,204.00 | 650.00 | (36.00) |
| | | | | | | | | | | RENT | 1,179.00 | 0.00 | | | |
| 3207 | B1 | N/A | 1067 | Occupied | Magsby, Katosha | 07/12/2019  07/01/2021 | | 06/30/2022 | 1,539.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 250.00 | 0.00 |
| 3208 | A3 | N/A | 878 | Occupied | Johnson, Dorothy | 11/13/2019  01/01/2021 | | 10/31/2021 | 1,394.00 | GARAGE | 0.00 | 125.00 | 1,484.00 | 662.00 | 0.00 |
| | | | | | | | | | | RENT | 1,359.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Johnson, Dorothy | 11/13/2019  11/01/2021 | | 10/31/2022 | | GARAGE | 0.00 * | 125.00 * | 1,519.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,394.00 * | 0.00 * | | | |
| 3301 | B1 | N/A | 1067 | Occupied | Clark, Holly | 03/20/2020  07/01/2021 | | 04/30/2022 | 1,539.00 | RENT | 1,489.00 | 0.00 | 1,489.00 | 500.00 | 0.00 |
| 3302 | A3 | N/A | 878 | Occupied | Murrell, David | 12/10/2020  12/10/2020 | | 10/31/2021 | 1,394.00 | RENT | 1,339.00 | 0.00 | 1,339.00 | 650.00 | 383.27 |
| 3303 | A1 | N/A | 699 | Occupied | Johnson, Kaleigh | 06/08/2021  05/08/2021 | | 06/30/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 350.00 | 0.00 |
| 3304 | A1 | N/A | 699 | Occupied | Moore, Kristen | 10/08/2020  10/08/2020 | | 10/31/2021 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 350.00 | 0.00 |
| | | N/A | | Pending renewal | Moore, Kristen | 10/08/2020  11/01/2021 | | 10/31/2022 | | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 0.00 | 0.00 |
| 3305 | A1 | N/A | 699 | Occupied | Bailey, Serena | 06/21/2019  08/01/2020 | | 10/31/2021 | 1,194.00 | RENT | 1,024.00 | 0.00 | 1,024.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Bailey, Serena | 06/21/2019  11/01/2021 | | 10/31/2022 | | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 0.00 | 0.00 |
| 3306 | A1 | N/A | 699 | Occupied | Jones, Deirdre | 07/31/2019  09/01/2020 | | 08/31/2021 | 1,194.00 | RENT | 1,124.00 | 0.00 | 1,124.00 | 500.00 | 0.00 |
| | | N/A | | Pending renewal | Jones, Deirdre | 07/31/2019  09/01/2021 | | 08/31/2022 | | RENT | 1,179.00 * | 0.00 * | 1,179.00 * | 0.00 | 0.00 |
| 3307 | B1 | N/A | 1067 | Occupied | Holloway, Parker | 03/26/2020  03/01/2021 | | 02/28/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 250.00 | 0.00 |
| 3308 | A3 | N/A | 878 | Occupied | Matthews, Cedrick | 05/29/2021  05/29/2021 | | 05/31/2022 | 1,394.00 | RENT | 1,379.00 | 0.00 | 1,379.00 | 150.00 | (0.10) |
| 4101 | B1 | N/A | 1067 | Occupied | Krekel, Patrick | 03/19/2021  03/19/2021 | | 03/31/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 300.00 | 0.00 |
| 4102 | A3 | N/A | 878 | Occupied | Rogers, Damisha | 03/12/2021  03/12/2021 | | 03/31/2022 | 1,394.00 | GARAGE | 0.00 | 150.00 | 1,499.00 | 150.00 | (11.73) |
| | | | | | | | | | | RENT | 1,349.00 | 0.00 | | | |
| 4103 | A1 | N/A | 699 | Occupied | McDaniel, Marsh | 09/07/2019  09/07/2019 | | 09/30/2020 | 1,194.00 | MTOM | 0.00 | 250.00 | 1,389.00 | 562.00 | 19,130.56 |
| | | | | | | | | | | RENT | 1,139.00 | 0.00 | | | |
| 4104 | A1 | N/A | 699 | Occupied | Haskins, Emeta | 06/30/2021  06/30/2021 | | 06/30/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 4105 | A1 | N/A | 699 | Occupied | Moore, Rhonda | 09/07/2019  10/01/2020 | | 09/30/2021 | 1,194.00 | RENT | 1,169.00 | 0.00 | 1,169.00 | 250.00 | (0.89) |
| | | N/A | | Pending renewal | Moore, Rhonda | 09/07/2019  10/01/2021 | | 07/31/2022 | | RENT | 1,184.00 * | 0.00 * | 1,184.00 * | 0.00 | 0.00 |
| 4106 | A1 | N/A | 699 | Occupied | Smith, Beverly | 09/11/2020  09/11/2020 | | 08/31/2021 | 1,194.00 | GARAGE | 0.00 | 150.00 | 1,289.00 | 350.00 | (2,394.36) |
| | | | | | | | | | | RENT | 1,139.00 | 0.00 | | | |

* indicates amounts not included in detail totals

App. 1666

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

As of 08/23/2021

Page 4 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N/A | | Pending renewal | Smith, Beverly | 09/11/2020 09/01/2021 | | 08/31/2022 | | GARAGE | 0.00 * | 150.00 * | 1,324.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,174.00 * | 0.00 * | | | |
| 4107 | B1 | N/A | 1067 | Occupied | Jones, Chafine | 08/13/2021 08/13/2021 | | 08/31/2022 | 1,539.00 | RENT | 1,524.00 | 0.00 | 1,524.00 | 250.00 | 0.00 |
| 4108 | A3 | N/A | 878 | Occupied | Carter, Tara | 10/07/2019 07/01/2020 | | 09/30/2021 | 1,394.00 | RENT | 1,324.00 | 0.00 | 1,324.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Carter, Tara | 10/07/2019 10/01/2021 | | 09/30/2022 | | RENT | 1,374.00 * | 0.00 * | 1,374.00 * | 0.00 | 0.00 |
| 4201 | B1 | N/A | 1067 | Occupied | Walker, Margaret | 04/09/2020 05/01/2021 | | 04/30/2022 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 400.00 | (0.91) |
| 4202 | A3 | N/A | 878 | Occupied | Tucker, Charletta | 11/01/2019 12/01/2020 | | 09/30/2021 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 300.00 | (0.26) |
| 4203 | A1 | N/A | 699 | Occupied | Barron, Areyon | 09/28/2019 10/01/2020 | | 09/30/2021 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 662.00 | 0.00 |
| | | N/A | | Pending renewal | Barron, Areyon | 09/28/2019 10/01/2021 | | 09/30/2022 | | RENT | 1,189.00 * | 0.00 * | 1,189.00 * | 0.00 | 0.00 |
| 4204 | A1 | N/A | 699 | Occupied | Harris, Allan | 10/25/2019 11/01/2020 | | 10/31/2021 | 1,194.00 | GARAGE | 0.00 | 125.00 | 1,284.00 | 500.00 | (6.73) |
| | | | | | | | | | | RENT | 1,159.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Harris, Allan | 10/25/2019 11/01/2021 | | 09/30/2022 | | GARAGE | 0.00 * | 125.00 * | 1,309.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,184.00 * | 0.00 * | | | |
| 4205 | A1 | N/A | 699 | Occupied | Williams, Ashley | 07/23/2021 07/23/2021 | | 07/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 150.00 | (1,179.00) |
| 4206 | A1 | N/A | 699 | Occupied | Vega, Esequiel | 10/17/2020 05/01/2021 | | 04/30/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | (0.01) |
| 4207 | B1 | N/A | 1067 | Occupied | Gordon, Andrew | 10/12/2020 10/12/2020 | | 06/30/2021 | 1,539.00 | MTOM | 0.00 | 250.00 | 1,774.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,524.00 | 0.00 | | | |
| 4208 | A3 | N/A | 878 | Occupied | Brown, Christopher | 12/19/2019 04/01/2021 | | 02/28/2022 | 1,394.00 | GARAGE | 0.00 | 125.00 | 1,474.00 | 150.00 | 0.00 |
| | | | | | | | | | | RENT | 1,349.00 | 0.00 | | | |
| 4301 | B1 | N/A | 1067 | Occupied | Willis, Pamela | 09/07/2019 10/01/2020 | | 09/30/2021 | 1,539.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 600.00 | (0.18) |
| 4302 | A3 | N/A | 878 | Occupied | Rivas, Mariah | 02/01/2021 02/01/2021 | | 02/28/2022 | 1,394.00 | RENT | 1,349.00 | 0.00 | 1,349.00 | 300.00 | 9.48 |
| 4303 | A1 | N/A | 699 | Occupied | Brewer, Martin | 08/11/2021 08/11/2021 | | 08/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 150.00 | (1.00) |
| 4304 | A1 | N/A | 699 | Occupied | Griffin, Tanesha | 07/21/2021 07/21/2021 | | 08/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 150.00 | 0.00 |
| 4305 | A1 | N/A | 699 | Occupied | McGrew, Darrell | 08/19/2021 08/19/2021 | | 07/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 150.00 | 0.00 |
| 4306 | A1 | N/A | 699 | Occupied | Cobb, Brittany | 06/17/2021 06/17/2021 | | 06/30/2022 | 1,194.00 | PETFEE | 0.00 | 25.00 | 1,184.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,159.00 | 0.00 | | | |
| 4307 | B1 | N/A | 1067 | Occupied | Murchison, Johnathan | 10/07/2020 10/07/2020 | | 10/31/2021 | 1,539.00 | EMPCONC | 0.00 | (297.00) | 1,187.00 | 0.00 | (1,875.76) |
| | | | | | | | | | | RENT | 1,484.00 | 0.00 | | | |

* indicates amounts not included in detail totals

App. 1667

OneSite Rents v3.0

08/24/2021  3:42:08PM

# RENT ROLL DETAIL

As of 08/23/2021

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 4308 | A3 | N/A | 878 | Occupied | Henderson, Anquaneshia | 05/01/2021 | 05/01/2021 | 04/30/2022 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 450.00 | 0.00 |
| 5101 | A3 | N/A | 878 | Occupied | Richardson, Martha | 05/07/2021 | 05/07/2021 | 05/31/2022 | 1,394.00 | PETFEE | 0.00 | 25.00 | 1,384.00 | 450.00 | 0.30 |
| | | | | | | | | | | RENT | 1,359.00 | 0.00 | | | |
| 5102 | B1 | N/A | 1067 | Occupied | Hunter, Krystal | 05/08/2020 | 06/01/2021 | 05/31/2022 | 1,539.00 | RENT | 1,479.00 | 0.00 | 1,479.00 | 500.00 | (0.63) |
| 5103 | A1 | N/A | 699 | Occupied | Barrett, Katrina | 01/31/2020 | 02/01/2021 | 02/28/2022 | 1,194.00 | RENT | 1,144.00 | 0.00 | 1,144.00 | 500.00 | 0.00 |
| 5104 | A1 | N/A | 699 | Occupied | Emanuel, Cecily | 06/05/2021 | 06/05/2021 | 06/30/2022 | 1,194.00 | GARAGE | 0.00 | 150.00 | 1,309.00 | 150.00 | (1,378.28) |
| | | | | | | | | | | RENT | 1,159.00 | 0.00 | | | |
| 5105 | A1 | N/A | 699 | Occupied | James, Keith | 01/01/2020 | 08/01/2021 | 07/31/2022 | 1,194.00 | RENT | 1,164.00 | 0.00 | 1,164.00 | 1,124.00 | 0.00 |
| 5106 | A1 | N/A | 699 | Occupied-NTVL | Gray, Kendall | 11/29/2019 | 11/01/2020 | 08/31/2021 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 150.00 | 0.00 |
| | | N/A | | Applicant | Moore, Jayla | 09/16/2021 | 09/16/2021 | 09/30/2022 | | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 150.00 | 0.00 |
| 5107 | A3 | N/A | 878 | Occupied | Wyatt, Monique | 12/31/2019 | 05/01/2021 | 03/31/2022 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 300.00 | 0.00 |
| 5108 | B1 | N/A | 1067 | Occupied | Warren, Dundria | 11/30/2019 | 03/01/2021 | 10/31/2021 | 1,539.00 | RENT | 1,489.00 | 0.00 | 1,489.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Warren, Dundria | 11/30/2019 | 11/01/2021 | 08/31/2022 | | RENT | 1,524.00 * | 0.00 * | 1,524.00 * | 0.00 | 0.00 |
| 5201 | A3 | N/A | 878 | Occupied | Gaston, Etta | 04/03/2021 | 04/03/2021 | 04/30/2022 | 1,394.00 | RENT | 1,359.00 | 0.00 | 1,359.00 | 150.00 | 0.00 |
| 5202 | B1 | N/A | 1067 | Occupied | Bailey, Jasmin | 11/25/2019 | 05/11/2021 | 02/28/2022 | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | (81.63) |
| 5203 | A1 | N/A | 699 | Occupied-NTVL | Richardson, Torkorein | 11/15/2019 | 05/01/2021 | 04/30/2022 | 1,194.00 | RENT | 1,174.00 | 0.00 | 1,174.00 | 1,124.00 | 0.00 |
| | | N/A | | Applicant | Stolden, Milihka | 10/01/2021 | 10/01/2021 | 09/30/2022 | | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 450.00 | 0.00 |
| 5204 | A1 | N/A | 699 | Occupied-NTVL | Robinson, Jaylyn | 12/01/2019 | 11/01/2020 | 08/31/2021 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 1,124.00 | 2,874.74 |
| | | N/A | | Applicant | Hollinger, Chanica | 09/15/2021 | 09/15/2021 | 09/30/2022 | | RENT | 1,194.00 * | 0.00 * | 1,194.00 * | 75.00 | 0.00 |
| 5205 | A1 | N/A | 699 | Occupied | Woods, Johnny | 11/27/2019 | 12/01/2020 | 09/30/2021 | 1,194.00 | RENT | 1,139.00 | 0.00 | 1,139.00 | 1,124.00 | 0.00 |
| 5206 | A1 | N/A | 699 | Occupied | Miller, Xavier | 04/09/2021 | 04/09/2021 | 04/30/2022 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 150.00 | 0.00 |
| 5207 | A3 | N/A | 878 | Occupied | Bailey, Stephiane | 08/03/2021 | 08/03/2021 | 08/31/2022 | 1,394.00 | RENT | 1,379.00 | 0.00 | 1,379.00 | 150.00 | 0.00 |
| 5208 | B1 | N/A | 1067 | Occupied | Tubbs, Latasha | 05/22/2020 | 06/01/2021 | 05/31/2022 | 1,539.00 | RENT | 1,479.00 | 0.00 | 1,479.00 | 250.00 | 0.00 |
| 5301 | A3 | N/A | 878 | Occupied | Griffin, Rachel | 05/14/2020 | 06/01/2021 | 05/31/2022 | 1,394.00 | RENT | 1,334.00 | 0.00 | 1,334.00 | 150.00 | 0.00 |
| 5302 | B1 | N/A | 1067 | Occupied | Morton, Katerria | 11/15/2019 | 11/01/2020 | 08/31/2021 | 1,539.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 735.00 | 0.00 |
| | | N/A | | Pending renewal | Morton, Katerria | 11/15/2019 | 09/01/2021 | 06/30/2022 | | RENT | 1,519.00 * | 0.00 * | 1,519.00 * | 0.00 | 0.00 |
| 5303 | A1 | N/A | 699 | Occupied | Whitaker, Christopher | 03/16/2021 | 03/16/2021 | 03/31/2022 | 1,194.00 | GARAGE | 0.00 | 150.00 | 1,299.00 | 500.00 | 0.00 |
| | | | | | | | | | | RENT | 1,149.00 | 0.00 | | | |

* indicates amounts not included in detail totals

App. 1668

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

As of 08/23/2021

Page 6 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 5304 | A1 | N/A | 699 | Occupied | Starks, Jonathan | 06/22/2021 06/22/2021 | | 03/31/2022 | 1,194.00 | RENT | 1,179.00 | 0.00 | 1,179.00 | 1,329.00 | (39.00) |
| 5305 | A1 | N/A | 699 | Occupied | Cyrus, Gorgeous | 03/09/2021 03/09/2021 | | 03/31/2022 | 1,194.00 | RENT | 1,149.00 | 0.00 | 1,149.00 | 300.00 | 0.00 |
| 5306 | A1 | N/A | 699 | Occupied | Green, Desiree | 04/01/2021 04/01/2021 | | 03/31/2022 | 1,194.00 | RENT | 1,159.00 | 0.00 | 1,159.00 | 300.00 | 0.00 |
| 5307 | A3 | N/A | 878 | Occupied | Allen, Dennis | 12/01/2019 03/01/2021 | | 02/28/2022 | 1,394.00 | GARAGE | 0.00 | 125.00 | 1,474.00 | 1,324.00 | 0.00 |
| | | | | | | | | | | RENT | 1,349.00 | 0.00 | | | |
| 5308 | B1 | N/A | 1067 | Occupied | Mills, Sunnhee | 08/13/2021 08/13/2021 | | 08/31/2022 | 1,539.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 250.00 | 0.00 |
| 6102 | B2 | N/A | 1157 | Occupied | Harris, Ernestine | 11/01/2019 08/03/2021 | | 07/31/2022 | 1,759.00 | RENT | 1,664.00 | 0.00 | 1,664.00 | 770.00 | (75.00) |
| 6104 | B1 | N/A | 1067 | Occupied | Brewster, Heather | 10/04/2019 11/01/2020 | | 10/31/2021 | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,654.00 | 1,469.00 | 0.00 |
| | | | | | | | | | | RENT | 1,504.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Brewster, Heather | 10/04/2019 11/01/2021 | | 10/31/2022 | | GARAGE | 0.00 * | 150.00 * | 1,689.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,539.00 * | 0.00 * | | | |
| 6105 | A2 | N/A | 868 | Occupied | Sims, Lenora | 07/01/2020 07/01/2021 | | 06/30/2022 | 1,444.00 | RENT | 1,409.00 | 0.00 | 1,409.00 | 300.00 | 0.00 |
| 6106 | B1 | N/A | 1067 | Occupied | Daniels, Tommie | 10/09/2020 10/09/2020 | | 10/31/2021 | 1,689.00 | GARAGE | 0.00 | 125.00 | 1,759.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,634.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Daniels, Tommie | 10/09/2020 11/01/2021 | | 10/31/2022 | | GARAGE | 0.00 * | 125.00 * | 1,664.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,539.00 * | 0.00 * | | | |
| 6108 | B2 | N/A | 1157 | Occupied | Aycock, Amber | 10/04/2019 11/01/2020 | | 10/31/2021 | 1,759.00 | RENT | 1,474.00 | 0.00 | 1,474.00 | 250.00 | (2.79) |
| 6201 | A2 | N/A | 868 | Occupied | Armstead, Sheniqua | 12/05/2020 12/05/2020 | | 10/31/2021 | 1,594.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 1,689.00 | 0.00 |
| | | N/A | | Pending renewal | Armstead, Sheniqua | 12/05/2020 11/01/2021 | | 08/31/2022 | | RENT | 1,574.00 * | 0.00 * | 1,574.00 * | 0.00 | 0.00 |
| 6202 | B3 | N/A | 1276 | Occupied | Morrison, Brandi | 05/20/2020 06/01/2021 | | 05/31/2022 | 1,879.00 | RENT | 1,819.00 | 0.00 | 1,819.00 | 250.00 | 0.00 |
| 6203 | A2 | N/A | 868 | Occupied | Hendrix, Dora | 03/29/2021 03/29/2021 | | 03/31/2022 | 1,444.00 | RENT | 1,409.00 | 0.00 | 1,409.00 | 150.00 | 0.00 |
| 6204 | B1 | N/A | 1067 | Occupied | Bush, Anthony | 10/19/2019 10/13/2020 | | 10/31/2021 | 1,539.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 500.00 | 0.00 |
| 6205 | A2 | N/A | 868 | Occupied | Bennett, Kirk | 03/13/2020 01/01/2021 | | 09/30/2021 | 1,444.00 | GARAGE | 0.00 | 250.00 | 1,639.00 | 150.00 | 1,933.27 |
| | | | | | | | | | | RENT | 1,389.00 | 0.00 | | | |
| 6206 | B1 | N/A | 1067 | Occupied | Neal, Patrice | 10/03/2019 11/01/2020 | | 07/31/2021 | 1,539.00 | MTOM | 0.00 | 250.00 | 1,789.00 | 500.00 | (1,530.15) |
| | | | | | | | | | | RENT | 1,539.00 | 0.00 | | | |
| 6207 | A2 | N/A | 868 | Occupied | Jackson, Joshua | 10/05/2019 04/01/2021 | | 09/30/2021 | 1,594.00 | GARAGE | 0.00 | 150.00 | 1,699.00 | 600.00 | 0.00 |
| | | | | | | | | | | RENT | 1,549.00 | 0.00 | | | |

* indicates amounts not included in detail totals

App. 1669

OneSite Rents v3.0          OneSite Reports - Bellwether Ridge      Page 7 of 10

08/24/2021  3:42:08PM      **RENT ROLL DETAIL**      mgt-521-003

As of 08/23/2021

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 6208 | B3 | N/A | 1276 | Occupied | Shehedeh, Motasem | 02/26/2021 02/26/2021 | 03/31/2022 | | 1,879.00 | RENT | 1,834.00 | 0.00 | 1,834.00 | 250.00 | 0.00 |
| 7101 | B2 | N/A | 1157 | Occupied | Umstead, Cheryl | 07/15/2019 08/01/2021 | 07/31/2022 | | 1,759.00 | RENT | 1,644.00 | 0.00 | 1,644.00 | 770.00 | 0.00 |
| 7103 | A2 | N/A | 868 | Occupied | Johnson, Karen | 05/27/2021 05/27/2021 | 05/31/2022 | | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 0.00 |
| 7104 | B1 | N/A | 1067 | Occupied | Paulo, Gabrielle | 09/30/2020 09/30/2020 | 09/30/2021 | | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 250.00 | 0.00 |
| | | N/A | | Pending renewal | Paulo, Gabrielle | 09/30/2020 10/01/2021 | 09/30/2022 | | | RENT | 1,524.00 * | 0.00 * | 1,524.00 * | 0.00 | 0.00 |
| 7106 | B1 | N/A | 1067 | Occupied | Harris, Erica | 08/01/2019 09/01/2021 | 08/31/2022 | | 1,689.00 | RENT | 1,514.00 | 0.00 | 1,514.00 | 350.00 | 0.00 |
| | | N/A | | Pending renewal | Harris, Erica | 08/01/2019 09/01/2021 | 08/31/2022 | | | RENT | 1,614.00 * | 0.00 * | 1,614.00 * | 0.00 | 0.00 |
| 7108 | B2 | N/A | 1157 | Occupied | Dugay, Letitia | 08/01/2019 07/01/2021 | 04/30/2022 | | 1,759.00 | RENT | 1,614.00 | 0.00 | 1,614.00 | 250.00 | 0.00 |
| 7201 | A2 | N/A | 868 | Occupied-NTVL | Wright, Quinn | 08/14/2020 08/14/2020 | 08/31/2021 | | 1,594.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 300.00 | 0.00 |
| | | N/A | | Applicant | Taylor, Andrew | 09/15/2021 09/15/2021 | 09/30/2022 | | | PETFEE | 0.00 * | 25.00 * | 1,619.00 * | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,594.00 * | 0.00 * | | | |
| 7202 | B3 | N/A | 1276 | Occupied | Hamilton, Shontae | 07/18/2019 07/01/2021 | 04/30/2022 | | 1,879.00 | RENT | 1,709.00 | 0.00 | 1,709.00 | 350.00 | 0.00 |
| 7203 | A2 | N/A | 868 | Occupied-NTV | Fuentes, Roberto | 10/31/2020 10/31/2020 | 10/31/2021 | | 1,444.00 | PETFEE | 0.00 | 25.00 | 1,414.00 | 450.00 | (1,497.34) |
| | | | | | | | | | | RENT | 1,389.00 | 0.00 | | | |
| 7204 | B1 | N/A | 1067 | Occupied | Robertson, Demerian | 05/23/2020 06/01/2021 | 05/31/2022 | | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,604.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,479.00 | 0.00 | | | |
| 7205 | A2 | N/A | 868 | Occupied | Moore, Gregory | 02/29/2020 03/01/2021 | 02/28/2022 | | 1,444.00 | RENT | 1,399.00 | 0.00 | 1,399.00 | 150.00 | 0.00 |
| 7206 | B1 | N/A | 1067 | Occupied | A Voice LLC, * | 11/14/2020 11/14/2020 | 10/31/2021 | | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,634.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,484.00 | 0.00 | | | |
| 7207 | A2 | N/A | 868 | Occupied | Turner, Diane | 09/05/2019 08/01/2021 | 07/31/2022 | | 1,594.00 | RENT | 1,469.00 | 0.00 | 1,469.00 | 150.00 | 0.00 |
| 7208 | B3 | N/A | 1276 | Occupied | Neal, Terri | 07/15/2019 11/01/2020 | 08/31/2021 | | 1,879.00 | RENT | 1,704.00 | 0.00 | 1,704.00 | 500.00 | 0.00 |
| | | N/A | | Pending renewal | Neal, Terri | 07/15/2019 09/01/2021 | 08/31/2022 | | | RENT | 1,789.00 * | 0.00 * | 1,789.00 * | 0.00 | 0.00 |
| 8102 | B2 | N/A | 1157 | Occupied-NTVL | Price, Valen | 11/01/2019 03/01/2021 | 09/30/2021 | | 1,759.00 | RENT | 1,704.00 | 0.00 | 1,704.00 | 350.00 | 0.00 |
| | | N/A | | Applicant | Gray, Christopher | 10/11/2021 10/11/2021 | 10/31/2022 | | | RENT | 1,759.00 * | 0.00 * | 1,759.00 * | 550.00 | 0.00 |
| 8104 | B1 | N/A | 1067 | Occupied-NTVL | Howard, Rhonda | 11/23/2020 06/01/2021 | 02/28/2022 | | 1,689.00 | RENT | 1,644.00 | 0.00 | 1,644.00 | 550.00 | 1,938.27 |
| | | N/A | | Applicant | White, James | 09/17/2021 09/17/2021 | 09/30/2022 | | | RENT | 1,689.00 * | 0.00 * | 1,689.00 * | 250.00 | 0.00 |
| 8105 | A2 | N/A | 868 | Occupied | Griffin, Lisa | 05/19/2021 05/19/2021 | 05/31/2022 | | 1,444.00 | RENT | 1,409.00 | 0.00 | 1,409.00 | 350.00 | 265.64 |
| 8106 | B1 | N/A | 1067 | Occupied | DONAHUE, ASYA | 10/12/2020 10/12/2020 | 10/31/2021 | | 1,539.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 500.00 | 0.00 |

* indicates amounts not included in detail totals

App. 1670

OneSite Rents v3.0

08/24/2021  3:42:08PM

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

As of 08/23/2021

Page 8 of 10

mgt-521-003

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N/A | | Pending renewal | DONAHUE, ASYA | 10/12/2020 11/01/2021 | | 10/31/2022 | | RENT | 1,539.00 * | 0.00 * | 1,539.00 * | 0.00 | 0.00 |
| 8108 | B2 | N/A | 1157 | Occupied | Bolton, Sedrick | 03/05/2021 03/05/2021 | | 03/31/2022 | 1,759.00 | RENT | 1,714.00 | 0.00 | 1,714.00 | 250.00 | 0.00 |
| 8201 | A2 | N/A | 868 | Occupied | Halley, Phyllis | 03/06/2021 03/06/2021 | | 03/31/2022 | 1,594.00 | PETFEE | 0.00 | 25.00 | 1,574.00 | 450.00 | 0.00 |
| | | | | | | | | | | RENT | 1,549.00 | 0.00 | | | |
| 8202 | B3 | N/A | 1276 | Occupied | Lilly, Earnest | 10/13/2019 08/01/2020 | | 10/31/2021 | 1,879.00 | PETFEE | 0.00 | 25.00 | 1,834.00 | 500.00 | 0.05 |
| | | | | | | | | | | RENT | 1,809.00 | 0.00 | | | |
| 8203 | A2 | N/A | 868 | Occupied | Roy, Princess | 08/19/2021 08/19/2021 | | 08/31/2022 | 1,444.00 | RENT | 1,444.00 | 0.00 | 1,444.00 | 150.00 | (46.00) |
| 8204 | B1 | N/A | 1067 | Occupied | Davis, Horace | 08/21/2021 08/21/2021 | | 08/31/2022 | 1,539.00 | RENT | 1,539.00 | 0.00 | 1,539.00 | 250.00 | (1,539.00) |
| 8205 | A2 | N/A | 868 | Occupied | Murray, Latasha | 05/14/2020 05/14/2020 | | 08/31/2021 | 1,444.00 | RENT | 1,374.00 | 0.00 | 1,374.00 | 150.00 | 0.00 |
| | | N/A | | Pending renewal | Murray, Latasha | 05/14/2020 09/01/2021 | | 08/31/2022 | | RENT | 1,429.00 * | 0.00 * | 1,429.00 * | 0.00 | 0.00 |
| 8206 | B1 | N/A | 1067 | Occupied | Whitaker, Desmond | 06/18/2021 06/18/2021 | | 06/30/2022 | 1,539.00 | GARAGE | 0.00 | 150.00 | 1,654.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,504.00 | 0.00 | | | |
| 8207 | A2 | N/A | 868 | Occupied | Tucker, Randy | 03/15/2021 03/15/2021 | | 03/31/2022 | 1,594.00 | RENT | 1,549.00 | 0.00 | 1,549.00 | 400.00 | 0.00 |
| 8208 | B3 | N/A | 1276 | Occupied | Burton, Riana | 02/20/2021 02/20/2021 | | 02/28/2022 | 1,879.00 | RENT | 1,834.00 | 0.00 | 1,834.00 | 250.00 | 0.00 |
| 9102 | B2 | N/A | 1157 | Occupied | Sowells, LaClent | 04/01/2021 04/01/2021 | | 03/31/2022 | 1,759.00 | RENT | 1,714.00 | 0.00 | 1,714.00 | 750.00 | 2,008.27 |
| 9103 | A2 | N/A | 868 | Occupied | Young, Kevin | 04/13/2020 08/01/2021 | | 05/31/2022 | 1,444.00 | GARAGE | 0.00 | 125.00 | 1,514.00 | 400.00 | 0.00 |
| | | | | | | | | | | RENT | 1,389.00 | 0.00 | | | |
| 9104 | B1 | N/A | 1067 | Occupied-NTVL | Davis, Felicia | 01/20/2021 01/20/2021 | | 07/31/2021 | 1,539.00 | MTOM | 0.00 | 250.00 | 1,789.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,539.00 | 0.00 | | | |
| | | N/A | | Applicant | Sowells, Patrick | 09/10/2021 09/10/2021 | | 09/30/2022 | | RENT | 1,539.00 * | 0.00 * | 1,539.00 * | 250.00 | 0.00 |
| 9106 | B1 | N/A | 1067 | Occupied | Yearwood, Natasha | 01/09/2021 01/09/2021 | | 02/28/2022 | 1,689.00 | RENT | 1,644.00 | 0.00 | 1,644.00 | 250.00 | 0.00 |
| 9108 | B2 | N/A | 1157 | Occupied | McCoy, Jasmine | 11/01/2019 12/01/2020 | | 11/30/2021 | 1,759.00 | RENT | 1,494.00 | 0.00 | 1,494.00 | 500.00 | 0.00 |
| 9201 | A2 | N/A | 868 | Occupied | Branch, Darrin | 07/09/2021 07/09/2021 | | 07/31/2022 | 1,594.00 | RENT | 1,579.00 | 0.00 | 1,579.00 | 150.00 | 0.00 |
| 9202 | B3 | N/A | 1276 | Occupied | Richardson, Eileen | 12/07/2019 04/01/2021 | | 03/31/2022 | 1,879.00 | RENT | 1,734.00 | 0.00 | 1,734.00 | 750.00 | 0.00 |
| 9203 | A2 | N/A | 868 | Occupied | Starling, Kiara | 07/30/2021 07/30/2021 | | 07/31/2022 | 1,444.00 | RENT | 1,444.00 | 0.00 | 1,444.00 | 150.00 | 0.00 |
| 9204 | B1 | N/A | 1067 | Occupied | Smith, Anthony | 11/09/2019 03/01/2021 | | 02/28/2022 | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,619.00 | 250.00 | 0.00 |
| | | | | | | | | | | RENT | 1,494.00 | 0.00 | | | |
| 9205 | A2 | N/A | 868 | Occupied | Irabor, Emmanuel | 06/25/2021 06/25/2021 | | 03/31/2022 | 1,444.00 | RENT | 1,429.00 | 0.00 | 1,429.00 | 150.00 | 1.96 |

* indicates amounts not included in detail totals

App. 1671

OneSite Rents v3.0

08/24/2021  3:42:08PM

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 9206 | B1 | N/A | 1067 | Occupied | Herbert, Ashley | 11/08/2019 11/01/2020 | 08/31/2021 | | 1,539.00 | GARAGE | 0.00 | 125.00 | 1,619.00 | 750.00 | 1.27 |
| | | | | | | | | | | RENT | 1,494.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Herbert, Ashley | 11/08/2019 09/01/2021 | 07/31/2022 | | | GARAGE | 0.00 * | 125.00 * | 1,644.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,519.00 * | 0.00 * | | | |
| 9207 | A2 | N/A | 868 | Occupied | Smith, Jessica | 05/29/2021 05/29/2021 | 06/30/2022 | | 1,594.00 | RENT | 1,579.00 | 0.00 | 1,579.00 | 150.00 | 0.90 |
| 9208 | B3 | N/A | 1276 | Occupied | Davis, Laquecia | 06/24/2020 06/11/2021 | 02/28/2022 | | 1,879.00 | RENT | 1,819.00 | 0.00 | 1,819.00 | 2,059.00 | (4,139.06) |
| totals: | | | | | | | | | 221,490.00 | | 212,380.00 | 4,453.00 | 216,833.00 | 62,225.00 | |

* indicates amounts not included in detail totals

App. 1672

OneSite Reports - Bellwether Ridge

**RENT ROLL DETAIL**

mgt-521-003

As of 08/23/2021

Parameters: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**Amt / SQFT: Market = 140,511 SQFT; Leased = 140,511 SQFT;**

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market + Addl. | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|---|---|---|---|---|---|---|---|---|---|
| A1 | 39 | 699 | 1,194.00 | 1.71 | 1,150.67 | 1.65 | 39 | 100.00 | 0 |
| A2 | 27 | 868 | 1,510.67 | 1.74 | 1,455.11 | 1.68 | 27 | 100.00 | 2 |
| A3 | 18 | 878 | 1,394.00 | 1.59 | 1,352.33 | 1.54 | 18 | 100.00 | 1 |
| B1 | 42 | 1,067 | 1,556.86 | 1.46 | 1,509.00 | 1.41 | 42 | 100.00 | 0 |
| B2 | 12 | 1,157 | 1,759.00 | 1.52 | 1,612.33 | 1.39 | 12 | 100.00 | 0 |
| B3 | 12 | 1,276 | 1,879.00 | 1.47 | 1,762.33 | 1.38 | 12 | 100.00 | 0 |
| totals / averages: | 150 | 937 | 1,476.60 | 1.58 | 1,415.87 | 1.51 | 150 | 100.00 | 3 |

**occupancy and rents summary for current date**

| unit status | Market + Addl. | # units | potential rent |
|---|---|---|---|
| Occupied, no NTV | 202,203.00 | 137 | 193,873.00 |
| Occupied, NTV | 4,432.00 | 3 | 4,307.00 |
| Occupied NTV Leased | 14,855.00 | 10 | 14,200.00 |
| Vacant Leased | | 0 | - |
| Admin/Down | | 0 | - |
| Vacant Not Leased | | 0 | - |
| totals: | 221,490.00 | 150 | 212,380.00 |

**summary billing by transaction code for current date**

| code | amount |
|---|---|
| EMPCONC | (297.00) |
| GARAGE | 3,100.00 |
| MTOM | 1,500.00 |
| PETFEE | 150.00 |
| RENT | 212,380.00 |
| total: | 216,833.00 |

App. 1673

# EXHIBIT "D"

## DUE DILIGENCE MATERIALS

### (see attached)

App. 1674

| Item | Received | Comments |
|---|---|---|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable) | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

AGREEMENT FOR PURCHASE AND SALE · Page 28
1180677_1   Bellwether Ridge   D4DS to Apts at Bellwether Ridge  - Agreement for Purchase and Sale6   8025.0024

App. 1675

| Item | Received | Comments |
|---|---|---|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

AGREEMENT FOR PURCHASE AND SALE   Page 29
1180677_1   Bellwether Ridge   D4DS to Apts at Bellwether Ridge  - Agreement for Purchase and Sale6   8025.0024

App. 1676

# EXHIBIT J-38

**SOUTHERN PROPERTIES CAPITAL LTD.**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

October 3, 2022

**VIA HAND DELIVERY**
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
JMJD4, LLC
D4DS, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attn: Timothy Barton

Re: Conversion option for Bellwether Ridge Project; **EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Bellwether Ridge, DeSoto, Texas ("Project").

As you know, the Apartments at Bellwether Ridge, LLC and D4DS, LLC have previously executed a purchase contract to effect such transfer through a deed, once the lender on the Project and HUD have consented to the transfer. Attached is a proposed First Amendment to such contract together with a check for $100.00 made out to Enoch Investments, LLC, TRWF LLC and JMJAV, LLC.

Please return the signed amendment so we can continue to process the TPA approval. If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

By: _____
Bradley J. Muth, President

15519290v1

App. 1678

**Enoch Investments/TRWF/JMJAV**
JMJ01

| CHECK PAYMENT NBI | 311667 | DATE | 10/03/2022 |

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION_NOTE_| SPC Conversion Notice | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234

| | TOTALS: | $ 100.00 |



THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK · HOLD AT ANGLE TO VIEW

**Southern Properties Capital Ltd**
1603 LBJ Freeway, Suite 800
Dallas, TX 75234          (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS          311667

1-279/260

DATE   10/03/2022

PAY TO THE
ORDER OF   Enoch Investments/TRWF/JMJAV

AMOUNT
$ 100.00

One Hundred Dollars and 00 Cents

Enoch Investments/TRWF/JMJAV
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
Dallas, TX 75234

Alla Dzyuba

⑈311667⑈ ⑈026002794⑈ 4104294800⑈

App. 1679

## FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

This First Amendment to Agreement of Purchase and Sale ("Amendment") is made and entered into this ___ day of October, 2022, by and between **APTS AT BELLWETHER RIDGE, LLC**, a Delaware limited liability company ("Purchaser") and **D4DS LLC**, a Texas limited liability company ("Seller"):

### RECITALS

A.     Pursuant to an Agreement for Purchase and Sale ("Contract") dated July 6, 2021, Seller agreed to sell, and purchaser agreed to buy improved real property located in the City of Desoto, County of Dallas, State of Texas, known as Bellwether Ridge Apartments ("Property").

B.     The parties desire to amend the Contract under the terms and conditions set forth below.

### AGREEMENTS

NOW, THEREFORE, in consideration of ten and no/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     <u>Financing</u>.  The Financing Contingency Period, as such term is defined in the Contract, is hereby amended to expire on March 31, 2023.

2.     <u>Counterparts/Delivery</u>:  This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement.  The parties hereto may execute and deliver this Amendment by forwarding facsimile, telefax, email or other means of copies of this instrument showing execute by the partis sending the same, and the parties agree and intend that such signature shall have the same

1

15515400v1

effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waiver any defense to validity based on any such copies or signatures.

3. Continued Validity. Except as amended hereby, the Agreement is and shall remain in full force and effect as originally written and executed.

4. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

EXECUTED as of the date first written above.

**PURCHASER:**

**APTS AT BELLWETHER RIDGE, LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____
Date: _____

**SELLER:**

**D4DS LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____
Date: _____

2

15515400v1

App. 1681

# EXHIBIT J-39

Case 3:22-cv-02118-X    Document 253    Filed 05/30/23    Page 412 of 824    PageID 9536

FedEx® Tracking

⋮

**DELIVERED**

# Tuesday

10/4/2022 at 8:16 am

Signed for by: S.PATEL

⤓ Obtain Proof of delivery

How was your delivery?

 ☆ ☆ ☆ ☆ ☆

**DELIVERY STATUS**

Delivered ✓

✉ Get Status Updates

**TRACKING ID**

770101862781  ✎ ☆

**FROM**
Dallas, TX US

*Label Created*
10/3/2022 3:45 PM

**PACKAGE RECEIVED BY FEDEX**
ADDISON, TX
10/3/2022 7:02 PM

**IN TRANSIT**
ADDISON, TX
10/4/2022 7:07 AM

**OUT FOR DELIVERY**
ADDISON, TX
10/4/2022 7:07 AM

**DELIVERED**
Dallas, TX US

*DELIVERED*
10/4/2022 at 8:16 AM

↓ View travel history

Manage Delivery                                                                ⌄

App. 1683

Case 3:22-cv-02118-X     Document 253     Filed 05/30/23     Page 413 of 824     PageID 9537

Travel history                                                              ⌄

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)

Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)

Investor Relations(https://investors.fedex.com/home/default.aspx)

Careers(https://careers.fedex.com/fedex/)

FedEx Blog(https://www.fedex.com/en-us/blog.html)

Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)

Newsroom(https://newsroom.fedex.com/)

Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)

FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)

FedEx Logistics(https://www.fedex.com/en-us/logistics.html)

FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)

ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX** ✉ (https://www.fedex.com/en-us/email.html)   f (Https://www.facebook.com/FedEx/)

🐦 (Https://twitter.com/fedex)   📷 (https://www.instagram.com/fedex/)   in (https://www.linkedin.com/company/fedex)

▶ (https://www.youtube.com/fedex)   𝕡 (https://www.pinterest.com/FedEx/)

© FedEx 1995-2022

Site Map (https://www.fedex.com/en-us/sitemap.html)   |   Terms of Use (https://www.fedex.com/en-us/terms-of-use.html)   |   Privacy & Security (https://www.fedex.com/en-us/trust-center.html)

App. 1684

Case 3:22-cv-02118-X    Document 253    Filed 05/30/23    Page 414 of 824    PageID 9538



**After printing this label:**

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

App. 1685

# EXHIBIT J-40



# SOUTHERN
### PROPERTIES CAPITAL

1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

November 3, 2022

Mr. Courtney C. Thomas
Brown Fox     LLC
8111 Preston Road
Suite 300
Dallas, Texas 75225

      Re:     SEC v. Timothy Barton, et al; Civil Action No. 3:22-CV-2118X (Bellwether Ridge)

Dear Mr. Thomas:

This letter is written to you in your capacity as Receiver in the referenced case. Southern Properties Company Ltd. ("Lender") is the lender to JMJ Development, LLC ("Pledgor") in connection with the Bellwether Ridge Apartments, an apartment complex in DeSoto, Texas ("Bellwether Ridge"). By letter dated October 3, 2022 ("Exercise Letter"), a copy of which is attached, Lender exercised its right to acquire ownership of Bellwether Ridge.

Lender's right arises under the (i) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by JMJAV, LLC, to Pledgor, pledging one percent (1%) of the membership interests in JMJD4 LLC, (ii) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by TRWF, LLC to Pledgor, pledging one hundred percent (100%) of the membership interests in JMJAV, LLC, and (iii) Amended and Restated Pledge and Security Agreement dated October, 2017, executed by Enoch Investments, LLC to Pledgor, pledging ninety-nine percent (99%) of the membership interests in JMJAV, LLC (collectively, "Pledges"). The Pledges were assigned to Lender by an Assignment of Pledge and Security Agreement, dated October 2017, executed by Pledgor to Lender ("Assignment"). Copies are attached. The Assignment secured a loan ("Mezzanine Loan") in the amount of $3,800,000.00, evidenced by the attached Promissory Note from Pledgor to Lender, as amended. The security interests granted under the Pledge were perfected by the attached UCC-1s. By letter agreement dated May 5, 2017 (copy attached), JMJAV, JMJD4, LLC, D4DS, LLC and Timothy Barton also agreed to the assignment of ownership interests in D4DS, LLC, the owner of Bellwether Ridge.

Bellwether Ridge is subject to a first mortgage loan ("Mortgage Loan") in the amount of

App. 1687

Mr. Courtney C. Thomas
October 28, 2022
Page 2

$19,021,200.00 in favor of Greystone Funding Company LLC ("Greystone"), which loan is insured by the US Department of Housing and Urban Development ("HUD"). The Mortgage Loan, as evidenced by a U.S. Department of Housing and Urban Development Regulatory Agreement for Multifamily Projects ("Regulatory Agreement") and a Note ("Note"), both dated October 1, 2017, is secured by a Multifamily Deed of Trust, Assignment of Leases and Rents and Security Agreement ("Deed of Trust," collectively with the Regulatory Agreement and Note referred to as the "Mortgage Documents"). The terms of the Mortgage Documents allow for an assumption of the loan, subject to the approval of both Greystone and HUD. Section 7.15 of the Pledges provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such purchase must be submitted with the signed TPA application.

In the Exercise Letter, Lender included a proposed amendment ("Amendment"), which amended the attached Purchase and Sale Agreement that that had been previously signed by D4DS, LLC and Bellwether Ridge, LLC, a wholly owned subsidiary of Lender. The only reason for the Amendment is that HUD took longer to approve the structure than contemplated. Please review the Amendment and let us know any comments.

While we understand that you have been required to review much information in a short time, it is important that this transfer be submitted to Greystone and HUD as soon as possible. The current proceedings and your appointment as Receiver violate the Mortgage Documents, and we believe proceeding with the transfer can resolve this default.

Please contact Mark Cooper (469) 522-4390 at your earliest convenience. Thank you for your help.

Very truly yours,

**SOUTHERN PROPERTIES CAPITAL LTD.**

By: _____
Name: _____
Title: _____

cc:     Enoch Investments, LLC
        TRWF LLC
        JMJAV, LLC
        JMJD4, LLC
        D4DS, LLC
        JMJ Development, LLC

App. 1688

# EXHIBIT J-41

# SOUTHERN PROPERTIES CAPITAL LTD.

## Audited Consolidated Financial Statements

### As of December 31, 2021

### U.S. Dollars in Thousands

### INDEX

|  | PAGE |
|---|---|
| Auditors Report | 1 |
| Consolidated Financial Position | 2 |
| Consolidated Statements of Comprehensive Income | 3 |
| Consolidated Statements of Changes in Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 |
| Appendix | |

App. 1690



**EY**
Building a better
working world

**Kost Forer Gabbay & Kasierer**
144 Menachem Begin Road, Building A,
Tel-Aviv 6492102, Israel

Tel: +972-3-6232525
Fax: +972-3-5622555
ey.com

## AUDITORS' REPORT
## To the Shareholders of
## Southern Properties Capital LTD

We have audited the accompanying consolidated statements of financial position of Southern Properties Capital Ltd. as of December 31, 2021 and 2020 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2021. These financial statements are the responsibility of the Company's board of directors and management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in Israel, including standards prescribed by the Auditor's Regulations (Auditor's Mode of Performance), 1973. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by the board of directors and management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, based on our audits, the financial statements referred to above present fairly, in all material respects, the financial position of the Company and its subsidiaries as of December 31, 2021 and 2020, and the results of their operations, changes in equity and their cash flows for each of the three years in the period ended December 31, 2021, in conformity with International Financial Reporting Standards (IFRS) and with the provision of the Israeli Securities Regulations (Annual Financial Statements), 2010.

Tel-Aviv, Israel
March 29, 2022

KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

App. 1691

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Financial Position**
**(dollars in thousands)**

|  | Note | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Assets |  |  |  |
| Current Assets |  |  |  |
| Cash and cash equivalents |  | $ 50,739 | $ 33,871 |
| Short-term investments | 5 | 16,002 | — |
| Restricted and designated cash | 6 | 8,572 | 35,071 |
| Receivables and other assets |  | 6,761 | 3,828 |
| Due from joint venture |  | — | 2,356 |
|  |  | 82,074 | 75,126 |
| Property held for sale | 21 | 26,750 | — |
|  |  | 108,824 | 75,126 |
| Non-Current Assets |  |  |  |
| Investment properties | 7 | 387,925 | 513,779 |
| Investment in joint venture | 8 | 352,673 | 289,725 |
| Loan receivable | 9 | 7,472 | 14,117 |
| Notes receivable | 10 | 79,507 | 47,850 |
| Advances for acquisition of real estate | 11 | 13,878 | 11,548 |
| Accounts receivable | 12 | 38,095 | 30,742 |
| Restricted and designated cash | 13 | 11,678 | 16,484 |
|  |  | 891,228 | 924,245 |
| Total assets |  | $ 1,000,052 | $ 999,371 |

The accompanying notes are an integral part of these consolidated financial statements.

2

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Financial Position**
**(dollars in thousands)**

| | Note | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| **Liabilities and Equity** | | | |
| Current Liabilities | | | |
| Current portion of mortgages notes payable | 14 | $ 43,854 | $ 14,979 |
| Current portion of bonds payable | 15 | 46,286 | 44,775 |
| Accounts payable | 16 | 14,640 | 29,459 |
| Tenant deposits | | 878 | 1,414 |
| Related party payable | | — | 2,356 |
| | | 105,658 | 92,983 |
| Liabilities attributed to property held for sale | 21 | 13,697 | — |
| | | 119,355 | 92,983 |
| Non-Current Liabilities | | | |
| Mortgages notes payable | 14 | 118,416 | 207,269 |
| Bonds payable | 15 | 143,166 | 193,113 |
| Other long-term liabilities | | — | 2,813 |
| | | 261,582 | 403,195 |
| Total liabilities | | 380,937 | 496,178 |
| Equity | | | |
| Share and additional paid-in capital | 19 | 165,544 | 165,544 |
| Reserve for transactions with controlling shareholder | | 138,664 | 138,664 |
| Retained earnings | | 314,907 | 198,985 |
| Total equity | | 619,115 | 503,193 |
| Total equity and liabilities | | $ 1,000,052 | $ 999,371 |

Date of approval of the financial statements: March 29, 2022

*Brad Muth*
_____
Bradley J. Muth
President and Chairman of the Board

*Erik Johnson*
_____
Erik L. Johnson
Executive Vice President and Chief Financial Officer

3

App. 1693

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Operations**
**(dollars in thousands)**

| | Note | 2021 | 2020 | 2019 |
|---|---|---|---|---|
| | | **Year Ended December 31,** | | |
| Rental revenues | 4,7(b)(2) | $ 40,012 | $ 52,191 | $ 44,935 |
| Property operating expenses | 18(a) | 19,135 | 22,659 | 21,203 |
| Gross profit | | 20,877 | 29,532 | 23,732 |
| General and administrative expense | 18(b) | (6,505) | (5,057) | (5,154) |
| Other income (expense) | 8(d) | (29,600) | — | (10,557) |
| Revaluation of investments | 7 | 22,273 | 1,489 | 11,845 |
| Share of income (loss) from joint venture | 8 | 100,399 | (472) | 38,993 |
| Operating income | | 107,444 | 25,492 | 58,859 |
| Finance income | 18(c) | 37,020 | 11,711 | 8,802 |
| Finance income from Mezz Loan | 8 | 10,153 | 10,538 | 12,396 |
| Finance expense | 18(d) | (32,520) | (28,571) | (35,754) |
| Foreign currency loss | | (6,175) | (13,378) | (15,108) |
| Net income | | $ 115,922 | $ 5,792 | $ 29,195 |
| Comprehensive income | | $ 115,922 | $ 5,792 | $ 29,195 |

The accompanying notes are an integral part of these consolidated financial statements.

4

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Changes in Members' Capital**
**(dollars in thousands)**

| | Share and additional paid-in capital | Reserve for transactions with controlling | Retained Earnings | Total equity |
|---|---|---|---|---|
| Balance at January 1, 2019 | $ 165,544 | $ 138,664 | $ 167,956 | $ 472,164 |
| Comprehensive income | — | — | 29,195 | 29,195 |
| Non-cash dividend | — | — | (3,958) | (3,958) |
| Balance at December 31, 2019 | 165,544 | 138,664 | 193,193 | 497,401 |
| Comprehensive income | — | — | 5,792 | 5,792 |
| Balance at December 31, 2020 | 165,544 | 138,664 | 198,985 | 503,193 |
| Comprehensive income | — | — | 115,922 | 115,922 |
| Balance at December 31, 2021 | $ 165,544 | $ 138,664 | $ 314,907 | $ 619,115 |

The accompanying notes are an integral part of these consolidated financial statements.

5

App. 1695

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Consolidated Statements of Cash Flows**
**(dollars in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020 \*** | **2019 \*** |
| **Operating activities** | | | |
| Net income | $ 115,922 | $ 5,792 | $ 29,195 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | |
| Revaluation of investment properties | (22,273) | (1,489) | (11,845) |
| Earn Out Obligation Adjustment | 29,600 | — | — |
| Share of (income) loss from joint venture | (100,399) | 472 | (37,434) |
| Overlook allowance | — | — | 1,538 |
| Distributions from joint venture | 10,588 | 10,643 | 5,085 |
| Finance income from Mezz loan | (10,153) | (10,538) | (12,396) |
| Finance expenses, net | 1,675 | 30,238 | 42,060 |
| Changes in operating assets and liabilities | | | |
| Receivables, prepaid expenses and other assets | 5,221 | (889) | 5,445 |
| Accounts payable and accrued expenses | (7,233) | 2,067 | 13,654 |
| Other long-term liabilities | — | 2,813 | — |
| Related party payable | — | (135) | (56) |
| Net cash provided by operating activities | 22,948 | 38,974 | 35,246 |
| **Investing activities** | | | |
| Advances on options to purchase real estate | (2,330) | (1,900) | (3,340) |
| Origination and advances on notes receivable | (6,188) | (16,752) | (38,845) |
| Collections from notes and loan receivable | 19,410 | 15,293 | 16,234 |
| Proceeds from sale of receivables | 5,000 | — | — |
| Proceeds from sale of land | 20,366 | 12,854 | 4,218 |
| Proceeds from sale of investment properties | 77,340 | — | — |
| Investment in joint venture | — | (118) | — |
| Additions to investments in real estate | (19,355) | (24,972) | (39,280) |
| Investment in short-term securities | (16,000) | — | — |
| Change in restricted cash | 31,305 | (8,187) | 21,379 |
| Net cash provided by (used in) investing activities | 109,548 | (23,782) | (39,634) |

**Year Ended December 31,**

6

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Cash Flows
### (dollars in thousands)

|  | 2021 | 2020 * | 2019 * |
|---|---|---|---|
| **Financing activities** |  |  |  |
| Proceeds from issuance of bonds payable | — | 19,060 | 73,884 |
| Payments on bonds payable | (56,512) | (23,263) | (22,044) |
| Proceeds from mortgages and notes payable | 20,015 | 14,092 | 23,973 |
| Payments on mortgages and notes payable | (51,671) | (6,130) | (45,240) |
| Payments of interest | (28,317) | (24,348) | (24,253) |
| Foreign exchange of cash on hand | 857 | 1,453 | — |
| Net cash used in financing activities | (115,628) | (19,136) | 6,320 |
| Net increase (decrease) in cash and cash equivalents | 16,868 | (3,944) | 1,932 |
| Cash and cash equivalents at beginning of period | 33,871 | 37,815 | 35,883 |
| Cash and  cash equivalents at end of period | $   50,739 | $   33,871 | $   37,815 |
| Significant non-cash transactions: |  |  |  |
| Non-cash dividend | $         — | $         — | $     3,958 |
| Payable for assets under construction | $         — | $         — | $        305 |
| Receivable from joint venture offset against related party payable | $     2,356 | $         — | $         — |
| Distribution from joint venture applied to earn-out obligation | $     5,441 | $         — | $         — |

* The amounts have been reclassified.

The accompanying notes are an integral part of these consolidated financial statements.

7

App. 1697

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 1. General**

a.   A general description of the Company and its activity:

Southern Properties Capital Ltd. (the Company) was incorporated on August 16, 2016, as a private company limited by shares, in conformity with provisions of the BVI Business Companies Act, 2004. The Company was incorporated for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange (the "TASE"). Upon incorporation, the Company issued one certificate containing 100 common shares with no par value.

The Company and its subsidiaries (the "Company"), operate in the United States and are primarily involved in (i) investing in, developing, constructing and operating income-producing properties of multifamily residential real estate assets and commercial real estate assets, and (ii) investing in land held for capital appreciation.

The Company is a wholly-owned subsidiary of Abode Multi Property, LP, a limited partnership incorporated in the State of Delaware, which is a wholly-owned subsidiary of Transcontinental Realty Investors, Inc. ("TCI"), a company incorporated in the State of Nevada, whose shares are listed for trading on the New York Stock Exchange ("NYSE") under ticker symbol TCI, in conformity with the US Securities Act and with the Security Exchange Commission ("SEC").

b.   As of December 31, 2021, the Company has a consolidated working capital deficiency of approximately $10,531. The deficiency is derived from the non-recourse loan on Stanford Center of $39,331 that matures on February 26, 2022. On March 3, 2022, the lender extended the maturity of the loan to February 26, 2023 (See Note 14).

The Company is also obligated to make bond principal and interest payments of approximately $29,256,  $26,969 and $97,947 on January 31, 2022, July 31, 2022 and January 31, 2023, respectively. The Company expects to fund these payments from cash on hand and short-term investments, which was approximately $42,685 as of the reporting date, cash from operations, and proceeds  from sale or refinance of properties, bond offerings and sale of joint venture properties.

Management and the board of directors have concluded that the Company has the ability to repay its obligations as they become due during the foreseeable future.

c.   Consequences of coronavirus ("COVID-19"):

The Company continues to closely monitor the impact of the COVID-19 pandemic on all aspects of its business and its property portfolio. While COVID-19 has not caused a significant disruptions to the Company's residential real estate operations, it has resulted in a decrease in occupancy and fair value of some of its commercial properties. The future impact of COVID-19 on our business and financial activities will depend on future developments, which at this stage are unpredictable considering the fluctuations of COVID-19 outbreaks and the resulting changes in the markets.

8

App. 1698

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 2. Significant Accounting Policies**

The following accounting policies have been consistently applied in the financial statements for all periods presented, unless otherwise stated.

*Basis of preparation*

The consolidated financial statements are prepared in accordance with International Financial Reporting Standards ("IFRS"). Furthermore, the consolidated financial statements have been prepared in conformity with the provisions of the Israeli Securities Regulations (Annual Financial Statements), 2010.

The consolidated financial statements have been prepared on a cost basis, except for investment properties.

*The operating cycle*

The operating cycle of the Company is one calendar year.

*Consolidated financial statements*

The consolidated financial statements comprise the financial statements of companies that are controlled by the Company (subsidiaries). Control is achieved when the Company is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Potential voting rights are considered when assessing whether an entity has control. The consolidation of the financial statements commences on the date on which control is obtained and ends when such control ceases.

The financial statements of the Company and its subsidiaries are prepared on the same dates and periods. The accounting policies applied in the financial statements of the subsidiaries are uniform and consistent with the policies applied in the consolidated financial statements of the Company. Significant intercompany balances and transactions and gains or losses resulting from intercompany transactions are fully eliminated in the consolidated financial statements.

*Business combinations*

Business combinations are accounted for by applying the acquisition method. The cost of the acquisition is measured at the fair value of the consideration transferred on the acquisition date. Direct acquisition costs are reported on consolidated statement of comprehensive income as they are incurred.

Regarding business combination under common control – see Note 1 above.

*Investments in joint ventures.*

Joint ventures in which the Company has significant influence over the financial and operating policies without having control. The investment in joint ventures is accounted for using the equity method.

Under the equity method, the investment in the joint venture is presented at cost with the addition of post-acquisition changes in the Company share of net assets, including other comprehensive income of the joint venture. Profits and losses resulting from transactions between the Company and the joint venture are eliminated to the extent of the interest in the joint venture.

The financial statements of the Company and of the joint ventures are prepared as of the same dates and periods. The financial statements of the joint venture Victory Abode Apartments, LLC are prepared under accounting principles

9

App. 1699

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

generally accepted in the United States of America ("U.S. GAAP"). The Company adjusted the financial statements of Victory Abode Apartments, LLC in accordance with the Company accounting policy.

The equity method is applied until the loss of significant influence in the joint venture or loss of joint control in the joint venture or classification as held-for-sale.

*Functional currency, presentation currency and foreign currency*

The functional and presentation currency of the financial statements is the USD unless otherwise stated.

The Company determines the functional currency of each Company entity, including companies accounted for at equity method.

Transactions denominated in foreign currency are recorded upon initial recognition of the exchange rate at the date of the transaction. After initial recognition, monetary assets and liabilities denominated in foreign currency are translated at each reporting date into the functional currency based on the exchange rate at that date. Exchange rate differences, other than those capitalized to qualifying assets or accounted for as hedging transactions in equity, are recognized as unrealized profit or loss.

*Cash equivalents:*

Cash equivalents are considered as highly liquid investments, including unrestricted short-term bank deposits with an original maturity of three months or less from the date of investment.

*Short-term deposits and restricted cash*

Short-term deposits and restricted cash are classified as deposits with an original maturity date of more than three months from the date of investment and when the Company places restrictions on the uses. They can also be classified as deposits which do not meet the definition of cash equivalents. The deposits are presented according to their terms of deposit.

*Revenue recognition*

Revenue from contracts with customers is recognized in profit or loss when control over the asset or service is transferred to the customer. The transaction price is the amount of the consideration expected to be received in accordance with the terms of the contract, less the amounts collected in favor of third parties (such as taxes).

In determining the amount of income from customer contracts, the Company examines whether it operates as a principal supplier or as a contract agent. The Company is a major supplier when it controls the goods or services that have not yet been promised and transfer it to the customer. In such cases, the Company recognizes revenue in the gross amount of the consideration.

*Leases*

The criteria for classifying leases as finance or operating leases depend on the substance of the agreements and are made at the inception of the lease in accordance with the following principles as set out in IAS 17.

The Company as lessee:

Finance leases transfer to the Company substantially all the risks and benefits incidental to ownership of the leased asset. The Company did not have any finance leases during the three years ended December 31, 2021.

App. 1700

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

The Company as lessor:

Lease agreements are classified as an operating lease if they do not transfer substantially all the risks and benefits incidental to ownership of the leased asset. Lease payments or lease receipts are recognized as a revenue in profit or loss on a straight-line basis over the lease term.

Minimum rental revenues arising from operating leases on investment properties are accounted for on a straight-line basis over the lease term. Operating lease terms for the Company's investment properties for residential purposes are generally one year or less. Rental revenues attributable to residential leases are recorded when due from tenants and are recognized monthly as they are earned, which is not materially different than on a straight-line basis. Certain lease agreements provide for fixed rental increases which are recognized on a straight-line basis. Certain lease agreements also provide for the reimbursement of certain operating expenses such as real estate taxes, water, electricity and common area maintenance costs by the tenants. The reimbursements are recorded as recoveries revenue.

*Borrowing costs:*

The Company capitalizes borrowing costs that are attributable to the acquisition, construction or restructuring qualifying assets which necessarily take a substantial period of time to get ready for their intended use.

The capitalization of borrowing costs commences when expenditures for the asset as well as the borrowing costs are incurred and the activities to prepare the asset are in progress. It ceases when substantially all the activities to prepare the qualifying asset for its intended use or sale are complete and general borrowing costs based on a weighted capitalization rate.

*Investment properties*

An investment property is an asset (land or a building or both) held by the owner (lessor under an operating lease) or by the lessee under a finance lease to earn rentals or for capital appreciation or both rather than for use in the production or supply of goods or services, for administrative purposes or for sale in the ordinary course of business.

Investment property is derecognized on disposal or when the investment property ceases to be used and no future economic benefits are expected from its disposal. The difference between the net disposal proceeds and the carrying amount of the asset is recognized in profit or loss in the period of the disposal.

Investment property is measured initially at cost, including costs directly attributable to the acquisition. After initial recognition, investment property is measured at fair value which reflects market conditions at the reporting date. Gains or losses arising from changes in the fair value of investment property are included in profit or loss when they arise. Investment property is not systematically amortized.

Investment property under construction for future use as investment property is also measured at fair value, as above, if fair value can be reliably measured. If fair value cannot be reliably measured, due to the nature and risks of the project, then it is measured at cost less impairment losses, if any, until the earlier of the date when the fair value can be reliably measured or the date when construction is complete. The cost basis of investment property under construction includes cost of land; costs of borrowings that are used to finance construction; directly attributable planning and development incremental costs and brokerage fees relating to agreements to lease the property.

App. 1701

**SOUTHERN PROPERTIES CAPITAL LTD.**

### Notes to Consolidated Financial Statements
### (dollars in thousands)

In determining the fair value of investment property, the Company relies periodically on valuations performed by external independent valuation specialists who are experts in real estate valuations and who have the necessary knowledge and experience.

*Financial instruments*

As detailed in Note 2Q2 regarding IFRS No. 9 - "Instruments" (Hereinafter - "the Standard"), the Company elected to apply the provisions of the standard retroactively without restatement comparison numbers. New IFRS standards in place during the year.

1.  Financial assets

    Financial assets are measured at the date of initial recognition at their fair value plus transaction costs which can be directly attributed to the acquisition of the financial asset, except in the case of a financial asset is measured at fair value through profit or loss, in respect of which transaction costs are charged to profit or loss. The Company classifies and measures the debt instruments in its financial statements on the basis of the criteria

    below:

    (A) the business model of the company for the management of financial assets, and

    (B) the contractual cash flow characteristics of the financial asset.

    Financial assets within the scope of the standard are measured at the date of initial recognition at their fair value, plus transaction costs that can be directly attributed to the acquisition of the financial asset, except in the case of a financial asset measured at fair value through profit or loss in respect of which transaction costs are charged to profit or loss.

    (C) The Company measures debt instruments at amortized cost when:

    The Company's business model is the holding of financial assets in order to collect contractual cash flows; and the contractual terms of the financial asset provide entitlement on defined dates to cash flows that are only principal and interest payments in respect of the amount of the principal that has not yet been repaid.

    Subsequent to initial recognition, instruments in this group shall be presented at their cost at cost plus transaction costs directly using the amortized cost method.

2.  Impairment of financial instruments

    The Company examines at each reporting date the provision for loss in respect of financial debt instruments that are not measured at fair value through profit or loss.

    The impairment in respect of debt instruments measured at amortized cost will be charged to profit or loss against provision. The Company has financial assets with short credit periods such as customers, for which it is entitled to implement the relief prescribed in the model, ie., the Company will measure the provision for loss in an amount equal to expected credit losses throughout the life of the instrument. The Company chose to apply the relief regarding these financial assets.

3.  Withdrawal of financial assets

    A financial asset is derecognized only when the contractual rights to the cash flows from the financial asset expire.

<center>12</center>

<center>App. 1702</center>

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

4.  Financial liabilities

On the initial recognition date, the Company measures the financial liabilities within the scope of the Standard at fair value net of transaction costs directly attributable to the issue of the financial liability, except in the case of a financial liability measured at fair value through profit or loss for which transaction costs are charged to profit or loss.

After initial recognition, the Company measures all financial liabilities according to the amortized cost method.

A financial liability is derecognized when and only when it is extinguished - that is, when the obligation specified in the contract is discharged or canceled or expires.

5.  Offsetting financial instruments

Financial assets and financial liabilities are offset and the net amount is presented in the statement of financial position if there is a legally enforceable right to offset the recognized amounts and there is an intention to settle the asset and liability on a net basis or to realize the asset and eliminate the liability simultaneously.

6.  Transactions with controlling shareholders

Assets in respect of which a transaction was executed between the Company and its controlling shareholder or between companies under the same control are recognized on the transaction date at fair value. The difference between the fair value and the consideration determined in the transaction is charged to a separate item in the capital "Fund in respect of transactions with controlling shareholders".

*Fair value measurements:*

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Fair value measurement is based on the assumption that the transaction will take place in the asset's or the liability's principal market, or in the absence of a principal market, in the most advantageous market.

The fair value of an asset or a liability is measured using the assumptions that market participants would use when pricing the asset or liability, assuming that market participants act in their economic best interest.

The Company uses valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximizing the use of relevant observable inputs and minimizing the use of unobservable inputs.

All assets and liabilities measured at fair value or for which fair value is disclosed are categorized into levels within the fair value hierarchy based on the lowest level input that is significant to the entire fair value measurement:

Level 1    -  quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2    -  inputs other than quoted prices included within Level 1 that are observable either directly or indirectly.

Level 3    -  inputs that are not based on observable market data (valuation techniques which use inputs that are not based on observable market data).

13

App. 1703

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Provisions*

A provision in accordance with IAS 37 is recognized when the Company has a present obligation (legal or constructive) as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

The financial statements include a provision for legal claims. A provision for claims is recognized when the Company has a present legal or constructive obligation as a result of a past event. It is more likely than not that an outflow of resources embodying economic benefits will be required by the Company to settle the obligation and a reliable estimate of the obligation amount can be made.

*Taxes*

According to the relevant tax laws in the British Virgin Islands and in the United States of America, the companies in the consolidated group are considered as "pass through" entities. Accordingly, no provision has been made for federal and state income taxes or other income tax benefits in the accompanying financial statements as taxable income and losses are reported in the tax returns of the shareholders.

*Contributions and distributions*

Contributions and distributions consist of amounts due to/from related parties and cash and cash equivalents that did not transfer to the Company from the transferring entities upon the acquisition of properties at the time of the initial public offering (IPO).

14

App. 1704

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 3. Significant Estimates**

Significant accounting judgments, estimates, and assumptions used in the preparation of the financial statements:

In the process of applying the significant accounting policies, the Company has made the following judgments which have the most significant effect on the amounts recognized in the financial statements:

a.   Judgments:

*Classification of leases:*

For the purpose of examining whether a lease should be classified as finance or operating, the Company examines whether the lease essentially transfers all the risks and benefits accompanying the ownership of the asset. The Company examines, inter alia, the existence of an option-purchase option, the lease period relative to the economic life of the asset and the present value of the minimum lease payments in relation to the fair value of the asset.

*Rental revenues:*

Certain lease agreements provide for the reimbursement of certain operating expenses such as real estate taxes, water, electricity and common area maintenance costs by tenants. If the Company acts as an agent and not as a principal, the Company accounts for such leases on the gross basis.

*Transactions with controlling shareholders:*

Assets in respect of which a transaction was executed between the Company and its controlling shareholder or between companies under the same control are recognized on the transaction date at fair value. The difference between the fair value and the consideration determined in the transaction is charged to a separate item in the capital "Reserve in respect of transactions with controlling shareholders".

b.   Estimates and assumptions:

The preparation of the financial statements requires management to make estimates and assumptions that have an effect on the application of the accounting policies and on the reported amounts of assets, liabilities, revenues and expenses. Changes in accounting estimates are recorded in the period in which the estimate is changed.

The key assumptions made in the financial statements concerning uncertainties at the reporting date and the critical estimates computed by the Company that may result in a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

*Investment property:*

Investment property that can be reliably measured is presented at fair value at the reporting date. Changes in its fair value are recognized in profit or loss. Fair value is determined generally by external independent valuation specialists using valuation techniques and assumptions as to estimates of projected future cash flows from the property and estimate of the suitable discount rate for these cash flows. When possible, fair value is determined based on recent real estate transactions with similar characteristics and location of the valued property.

In determining the fair value of investment property, valuation specialists and the Company's management are required to use certain assumptions in order to estimate the future cash flows from the properties regarding the required yield rates on the Group's properties, the future rental rates, occupancy rates, lease renewals, the

15

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

probability of leasing vacant spaces, property operating expenses, the financial strength of tenants and the implications of any investments for future development. Changes in the assumptions that are used to measure investment property may lead to a change in fair value.

16

App. 1706

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Reliable measurement of fair value of investment property under construction:*

In evaluating whether the fair value of investment property under construction can be reliably measured, the Group considers, among others, the following relevant indicators:

1. Is the property being constructed in active market;
2. Are there any price quotations from recent transactions or prior valuations from acquisitions or sales of properties with similar characteristics and geographical location;
3. Has a construction contract been signed with the developer;
4. Have the required building permits been obtained;
5. What percentage of rentable area has been pre-leased to tenants;
6. Are construction costs reliably determinable;
7. Is the value of the completed property reliably determinable.

If after evaluating the above indicators it is determined that the fair value of investment property under construction can be reliably measured, the property is measured at fair value in accordance with the Group's policy for investment property. If fair value cannot be reliably measured, then investment property under construction is measured at cost less, if appropriate, any impairment loss.

c.    Disclosure of new standards in the period prior to their adoption:

*IFRS 3 Business Combinations*

In October 2018, the IASB issued an amendment to the definition of a "business" in IFRS 3, "Business Combinations" ("the Amendment"), in an aim to assist entities in determining whether an acquisition transaction should be accounted for as a business combination or as an acquisition of an asset.

The Amendment consists of the following:

1. Clarification that to meet the definition of a business, an integrated set of activities and assets must include, as a minimum, an input and a substantive process that together significantly contribute to the ability to create output.
2. Removal of the reference to the assessment whether market participants are capable of acquiring the business and continuing to operate it and produce outputs by integrating the business with their own inputs and processes.
3. Introduction of additional guidance and examples to assist entities in assessing whether the acquired processes are substantive.
4. Narrowing the definitions of "outputs" and "business" by focusing on goods and services provided to customers.
5. Introducing an optional concentration test that permits a simplified assessment of whether an acquired set of activities and assets is not a business.
6. The Amendment is to be applied prospectively to all business combinations and asset acquisitions for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after January 1, 2020, with earlier application permitted.

The Company's estimation, implementation of the standard did have a material impact on its financial statements.

17

App. 1707

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

18

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

*Amendments to IAS 1, "Presentation of Financial Statements":*

In January 2020, the IASB issued several amendments to IAS 1, "Presentation of Financial Statements" ("the Amendments") in an aim to clarify the criteria for determining the classification of liabilities as current or non-current.

The Amendments consist of the following clarifications:

1. Clarification of the definition of the right to defer settlement of a liability.
2. Clarification that only the rights an entity has at the end of the reporting period can determine whether it has the right to defer settlement of the liability.
3. Clarification of the means that can be used to settle a liability other than by transfer of cash (such as by transfer of equity instruments).

The Amendments are to be applied retrospectively effective for annual periods beginning on or after January 1, 2020, with earlier application permitted.

The Company's implementation of the standard did not have a material impact on its financial statements.

**Note 4. Operating Segments**

Operating segments are reported in a manner consistent with the internal reporting provided to the Company's chief executive officer or chief operating decision maker ("CODM"). The CODM, is responsible for allocating resources and assessing the performance of the operating segments, and makes strategic decisions.

During 2020, the Company replaced its chief executive officer, and as a result, changed its CODM. The Company has updated its operating segments in accordance with how its new CODM assesses Company performance and allocates resources. The prior CODM had management oversight over the Company and VAA, and therefore included the VAA portfolio in the multifamily operating segment at 100%. The Company's current CODM has limited influence on VAA, and therefore, includes VAA at the Company's 50% pro rata share. In addition, the new CODM does not consider the Company's land sales transaction as an operating segment, and has included its operations in unallocated expenses. The Company has revised prior year amounts to conform with the current presentation.

Management has determined the operating segments based on the reports reviewed by the senior management team in making strategic decisions. For management purposes, the Company considers the business based on the following operating segments:

- Multifamily real estate - purchases and develops investment properties primarily consisting of multifamily apartment complexes or buildings in order to produce rental income or for capital appreciation or both. The segment include the financial information of VAA on a 50% proportion share (See Note 8).

- Commercial real estate - purchases and develops investment properties primarily consisting of offices in order to produce rental income or for capital appreciation or both.

Unallocated represents expenses general and administrative expenses of the Company's corporate office, land sale transactions, finance income from the notes receivable and bank accounts, interest expense from the Series A and Series B bonds and gain (loss) from foreign currency transactions in connection with the bonds.

No reportable operating segments have been aggregated. There are no intercompany transactions between the different segments. Management reviews the operating results of its business units separately for the purpose of making

19

App. 1709

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

decisions about resource allocation and performance assessment. Segment performance is evaluated based on net operating income, which is calculated as rental revenues less property operating expenses.

| | Year Ended December 31, 2021 | | | | |
|---|---|---|---|---|---|
| | Residential | Commercial | Unallocated | Adjustment | Total |
| Rental revenues | $ 85,961 | $ 23,632 | $ — | $ (69,581) | $ 40,012 |
| Property operating expenses | 42,063 | 11,276 | — | (34,204) | 19,135 |
| Gross profit | 43,898 | 12,356 | — | (35,377) | 20,877 |
| General and administrative expenses | (1,100) | (480) | (4,925) | — | (6,505) |
| Other expense | (29,600) | — | — | — | (29,600) |
| Revaluation of investments | 119,658 | (18,226) | 14,046 | (93,205) | 22,273 |
| Income from joint venture | — | — | — | 100,399 | 100,399 |
| Operating income (loss) | 132,856 | (6,350) | 9,121 | (28,183) | 107,444 |
| Finance income | — | — | 37,020 | — | 37,020 |
| Finance income from Mezz Loan | — | — | — | 10,153 | 10,153 |
| Finance expense | (25,090) | (9,125) | (16,335) | 18,030 | (32,520) |
| Gain on foreign currency transactions | — | — | (6,175) | — | (6,175) |
| Net income (loss) | $ 107,766 | $ (15,475) | $ 23,631 | $ — | $ 115,922 |

| | Year Ended December 31, 2020 * | | | | |
|---|---|---|---|---|---|
| | Residential | Commercial | Unallocated | Adjustment | Total |
| Rental revenues | $ 77,172 | $ 36,807 | $ — | $ (61,788) | $ 52,191 |
| Property operating expenses | 37,095 | 15,245 | — | (29,681) | 22,659 |
| Gross profit | 40,077 | 21,562 | — | (32,107) | 29,532 |
| General and administrative expenses | (1,942) | (118) | (4,756) | 1,759 | (5,057) |
| Revaluation of investments | 175 | (18,421) | 17,386 | 2,349 | 1,489 |
| Loss from joint venture | — | — | — | (472) | (472) |
| Operating income | 38,310 | 3,023 | 12,630 | (28,471) | 25,492 |
| Finance income | — | — | 11,711 | — | 11,711 |
| Finance income from Mezz Loan | — | — | — | 10,538 | 10,538 |
| Finance expense | (22,576) | (10,624) | (13,304) | 17,933 | (28,571) |
| Gain on foreign currency transactions | — | — | (13,378) | — | (13,378) |
| Net income (loss) | $ 15,734 | $ (7,601) | $ (2,341) | $ — | $ 5,792 |

- The amounts have been revised to conform to the current presentation

App. 1710

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

| | Residential | Commercial | Unallocated | Adjustment | Total |
|---|---|---|---|---|---|
| | | | Year Ended December 31, 2019 * | | |
| Rental revenues | $ 70,670 | $ 31,952 | $ — | $ (57,687) | $ 44,935 |
| Property operating expenses | 35,098 | 14,826 | — | (28,721) | 21,203 |
| Gross profit | 35,572 | 17,126 | — | (28,966) | 23,732 |
| General and administrative expenses | (1,692) | (19) | (4,976) | 1,533 | (5,154) |
| Other income | — | — | (10,557) | — | (10,557) |
| Revaluation of investments | 48,674 | (1,775) | 7,179 | (42,233) | 11,845 |
| Loss from joint venture | — | — | — | 38,993 | 38,993 |
| Operating income | 82,554 | 15,332 | (8,354) | (30,673) | 58,859 |
| Finance income | 86 | — | 12,493 | (3,777) | 8,802 |
| Finance income from Mezz Loan | — | — | — | 12,396 | 12,396 |
| Finance expense | (21,879) | (12,198) | (23,731) | 22,054 | (35,754) |
| Loss on foreign currency transactions | — | — | (15,108) | — | (15,108) |
| Net income | $ 60,761 | $ 3,134 | $ (34,700) | $ — | $ 29,195 |

- The amounts have been revised to conform to the current presentation

| | Residential | Commercial | Unallocated | Adjustment | Total |
|---|---|---|---|---|---|
| **December 31, 2021** | | | | | |
| Segment assets | 1,023,705 | 173,890 | 632,198 | (829,741) | 1,000,052 |
| Segment liabilities | 682,990 | 54,358 | 212,222 | (568,633) | 380,937 |
| Capital expenditures | 1,694 | 2,117 | 2,809 | — | 6,620 |
| **December 31, 2020 *** | | | | | |
| Segment assets | 897,177 | 268,851 | 553,503 | (720,160) | 999,371 |
| Segment liabilities | 673,722 | 96,190 | 280,881 | (554,615) | 496,178 |
| Capital expenditures | 13,431 | 4,507 | 1,554 | — | 19,492 |

- The amounts have been revised to conform to the current presentation

**Note 5. Short-term Investments**

The Company has an investment in variable denominated floating rate notes with Toyota Motor Credit Corporation. The notes are have no stated maturity and are subject to immediate repayment at the Company's option. At December 31, 2021, the interest rate on the notes was 1.15%.

21

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 6. Restricted Cash - Current**

Current restricted and designated cash consists of the following:

| | December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Designated Cash - Lender Escrow(1) | $ 8,572 | $ 12,597 |
| Restricted Cash - Trustee Reserve(2) | — | 19,743 |
| Restricted Cash - Other Deposits(3) | — | 2,731 |
| | $ 8,572 | $ 35,071 |

1. Pursuant to loan agreements, the Company is required to establish escrows for the payment of insurance, real estate taxes and tenant improvements. Funds are released from the escrow accounts in accordance with the terms of the applicable loan agreements.

2. The Company retained $19,700 from Series A expansion proceeds for its January 2021 bonds principal and interest payment.

3. Letters of credit with Truist Bank for working capital and initial deficit reserves related to two properties that were transferred to VAA in 2019. These letters of credit expired in 2021.

**Note 7. Investment Properties**

a.  Composition:

| | December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Residential | $ 154,096 | $ 197,779 |
| Commercial | 162,800 | 253,000 |
| Land held for appreciation or development | 71,029 | 63,000 |
| | $ 387,925 | $ 513,779 |

Residential real estate consists of multifamily properties that are either stabilized or in lease-up.

App. 1712

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

b.   Movement

|  | Residential | Commercial | Investment Land | Total |
|---|---|---|---|---|
| Balance at January 1, 2019 | $ 176,349 | $ 267,500 | $ 56,915 | $ 500,764 |
| Acquisitions(1) | 5,475 | — | — | 5,475 |
| Improvement | 13,431 | 4,507 | 1,554 | 19,492 |
| Disposal(5) | — | — | (12,854) | (12,854) |
| Straight-line rents | — | (587) | — | (587) |
| Revaluation adjustment | 2,524 | (18,420) | 17,385 | 1,489 |
| Balance at December 31, 2020 | 197,779 | 253,000 | 63,000 | 513,779 |
| Acquisitions | — | — | — | — |
| Improvement | 882 | 2,117 | 2,810 | 5,809 |
| Damages from hurricane(8) | (6,129) | — | — | (6,129) |
| Disposal(3,4,5) | (26,600) | (74,750) | (20,366) | (121,716) |
| Straight-line rents | — | 659 | — | 659 |
| Transfer among segments(6) | (11,539) | — | 11,539 | — |
| Property held for sale(7) | (26,750) | — | — | (26,750) |
| Revaluation adjustment | 26,453 | (18,226) | 14,046 | 22,273 |
| Balance at December 31, 2021 | $ 154,096 | $ 162,800 | $ 71,029 | $ 387,925 |

(1)   On March 5, 2020, the Company purchased EKQ Portage LLC, which owns approximately 49.2 acres of land in Kent, Ohio, from an unrelated third party for $5,350. The purchase price was funded by a $2,000 cash payment and the issuance of a $3,350 note payable that bears interest at 10.0% and matures on November 13, 2024.

(2)   On October 6, 2020, the Company entered into lease termination agreement with 7-Eleven, Inc. ("7-Eleven"), which occupied 23.7% of the rental areas of Browning Place, a pledged property for Series C debentures. The termination agreement provided for an early lease termination on December 31, 2020 in exchange for a termination fee of approximately $5,900, which was included in rental income for 2020.

Concurrently, the Company entered into a new lease with Southwestern Health Clinically Integrated Network for the spaced that was formerly occupied by 7-Eleven. The new lease provides for a 10-year term with a four month rent concession with rents that are approximately $300 more per year that what was paid by 7-Eleven. The Company incurred broker commissions  of $824 in 2020 and expects to pay up to $3,711 in tenant improvement expenditures in 2022.

(3)   On March 30, 2021, the Company sold a 50% ownership interest in the special purpose entity that owned Overlook at Allensville Phase II, a 144 unit multifamily property in Sevierville, Tennessee to Macquarie for $2,551. Concurrent with the sale, the Company and Macquarie, each contributed their 50% ownership interests in the entity into VAA.

(4)   On August 26, 2021, the Company sold 600 Las Colinas, a 512,173 square foot office building in Irving, Texas for $74,750.  The Company used the proceeds from the sale to pay off the $35,946 mortgage note payable on the property, pay debt extinguishment costs of $3,903 and for general corporate purposes.

(5)   During 2021 and 2020, the Company sold 436 and 253 lots of Windmill Farms for a sales price of $20,184 and $12,854, respectively.

(6)   Land for developments was transferred from residential to land held for investment.

(7)   Toulon was classified as held for sale at December 31, 2021 (See note 21).

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

(8)  In 2021, the Company's Landing Bayou property suffered significant damage from Hurricane Ida. As a result, the Company estimates that it will cost approximately $6,129 to repair the damage. The claim is covered by the Company's property insurance policy, which after deduction of $1,036, has been included in receivables and other assets.

(9)  On March 24, 2021, the Company entered into an agreement with a third party to sell portion of undeveloped land in Windmill Farms, Forney Texas, for the total consideration of $10,000 and transaction is expected to close in 2022

c.  The investment property has been pledged to secure mortgages received for financing the  investment property's acquisition.

d.  The Company's real estate is stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the location and category of the property being valued. The fair value was determined with reference to recent real estate transactions for similar properties in the same location as the property owned by the Company and based on the expected future cash flows from the property, if applicable. In assessing cash flows, risk is taken into account by using an investment yield that reflects the property's underlying risks supported by the standard yield in the real estate market and by including adjustments for the specific characteristics of the property and the level of future income therefrom. Land held for capital appreciation and certain investment properties under construction (those for which development activities are underway but construction has not commenced) are generally valued based on comparable sales transactions.

The valuation of real estate under construction using the comparison method or the cash flow discounting method, as it deems appropriate. The determination of fair value is based on the estimated future income from the finished project, using adjusted yields for the significant risks associated with the purchase process. Which are higher than the current returns on similar investment property when finished. The remaining expected costs to be completed, plus entrepreneurial profit, are deducted from the estimated future revenue as stated above.

e.  The following main inputs have been used:

Significant assumptions (on the basis of weighted averages) used in the valuations are presented below:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2021** | | **2020** | |
| *Residential* | | | | |
| Average rent per square foot | $ | 13.40 | $ | 12.38 |
| Capitalization Rate | | 5.52 % | | 5.94 % |
| Vacancy | | 8.59 % | | 4.84 % |
| *Commercial* | | | | |
| Average rent per square foot | $ | 21.31 | $ | 24.12 |
| Capitalization Rate | | 7.19 % | | 7.12 % |
| Vacancy | | 30.08 % | | 16.14 % |

The table below presents the sensitivity of the valuation to changes in the most significant assumptions underlying the valuation of investment properties based on an increase in capitalization rate of 25 basis points:

24

App. 1714

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

| | December 31, | | |
|---|---|---|---|
| | **2021** | | **2020** |
| Residential | $ (7,858) | $ | (6,620) |
| Commercial | $ (3,332) | $ | (5,570) |

The fair value measurement is classified as Level 3 in the fair value hierarchy.

The future aggregate minimum rentals receivable under non-cancellable commercial operating leases are as follows:

| | December 31, | | |
|---|---|---|---|
| | **2021** | | **2020** |
| Less than one year | $ 13,314 | $ | 23,419 |
| One to five years | 24,664 | | 48,256 |
| More than 5 years | 20,008 | | 32,505 |
| | $ 57,986 | $ | 104,180 |

25

App. 1715

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

### Note 8. Investment in Joint Venture

The following table summarizes the Company's investment in joint ventures at December 31, 2021 and 2020:

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
| Share capital and additional paid-in capital | $ 123,899 | $ 130,241 |
| Retained earnings | 137,549 | 35,654 |
| Mezz Loan | 125,384 | 123,830 |
| Earn-Out obligation | (34,159) | — |
|  | $ 352,673 | $ 289,725 |

(a) On November 16, 2018, the Company formed Victory Abode Apartments, LLC ("VAA"), a joint venture with the Summerset Intermediate Holdings 2, a wholly owned subsidiary of Macquarie Group ("Macquarie"). VAA was formed as a result of a sale of the 50% ownership interest in 51 multifamily properties owned by the Company in exchange for a 50% voting interest / 49% profit participation interest ("Class A interest") in VAA and a note payable ("Mezzanine Loan"). Concurrent with the contribution, VAA issued Class B interests with a 2% profits participation interest and no voting rights to Daniel J. Moos ("Class B Member"), the former President and Chief Executive Officer of TCI and Pillar. The Class B Member serves as the Manager of VAA.

The Mezz Loans mature on November 19, 2023 and bear interest-only at LIBOR plus 8.25%. Interest payments are due on February 15 and August 15 of each year. Unpaid accrued interest is capitalized into the Mezz Loans balance. The Mezz Loans are secured by a first lien on 100% of the rights in the entities that hold the properties were contributed to VAA.

In connection with the formation of VAA, ten out of the initial properties were subject to an earn-out provision ("Earn Out") that provides for a remeasurement of value after a two-year period following the completion of construction. Upon the formation of VAA, the Company recorded a liability ("Earn Out Obligation") for the $10,000 advance on the Earn Out that it received from Macquarie.

b.  On February 6, 2019, the Company received $7,400 proration settlement from VAA that was transferred to TCI.

c.  On May 15 2019, the Company recorded an additional $1,100 proration adjustment, resulting in a proration payable of $13,900 to the Company and TCI. VAA settled the payable with a payment of $8,100 to TCI and $5,800 to the Company.

d.  On July 13, 2021, the Company received an arbitration result of its dispute with Macquarie regarding the measurement of the Earn Out. As a result, the Company is required to pay approximately $39,600 to Macquarie to satisfy the Earn Out Obligation, which was recorded as a charge to other expenses of $29,600 during 2021. During the 2021, a $5,441 distribution from VAA was paid directly to Macquarie as a reduction of the Earn Out Obligation.

e.  On November 17, 2021, the Company and Macquarie agreed to pursue a sale of the properties of VAA in accordance with the provisions of the joint venture agreement. The parties have engaged a broker to market the properties and expect to complete the sale in 2022. The parties further agreed that the Company would be able to purchase seven of the properties from the joint venture at an agreed upon market price.

f.  The Company received $13,177 and $10,652 in distributions from the Joint Venture during 2021 and 2020, respectively. The 2021 amount include $3,157 of interest in connection with the Mezz Loan, $2,590 of proceeds from the sale of Overlook at Allensville Phase II and a $7,430 equity distribution. The 2020 amount includes $8,915 of interest in connection with the Mezz loan, a $1,441 equity distribution and $296 of property tax refunds. In addition, $5,441 of interest payments related to the Mezz Loan was paid directly to Macquarie as payment of earn out obligation.

26

App. 1716

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

g. During the period between December 31, 2021 and the report issuance date, a $7,012 distribution from VAA was paid directly to Macquarie as a further reduction of the Earn Out Obligation.

Below is summarized information about the statement of financial position and the statement of income of VAA (100%) in accordance with GAAP:

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| Investment property | $ 1,208,716 | $ 1,217,725 |
| Other assets | 72,151 | 61,472 |
| Total assets | 1,280,867 | 1,279,197 |
| Mortgage notes payable | 854,015 | 830,721 |
| Loans from members (Mezz Loan) | 242,942 | 239,877 |
| Other liabilities | 40,316 | 35,633 |
| Total liabilities | 1,137,273 | 1,106,231 |
| Equity | $ 143,594 | $ 172,966 |

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| Revenues | $ 139,161 | $ 123,576 | $ 115,376 |
| Operating income | $ 73,959 | $ 63,030 | $ 57,932 |
| Net loss | $ (16,686) | $ (26,702) | $ (50,396) |

The following is a reconciliation of the total equity in VAA per United States generally accepted accounting principles ("GAAP") basis to the Company's share of VAA per IFRS.

27

App. 1717

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
| Total equity of joint venture per GAAP | $ 143,594 | $ 172,966 |
| Company's shares of equity | 71,798 | 86,484 |
| IFRS adjustment | 189,305 | 79,063 |
| Equity per IFRS | 261,103 | 165,547 |
| IFRS investment property adjustment | 345 | 348 |
| Mezz Loan and accrued interest | 125,384 | 123,830 |
| Earn out obligation | (34,159) | — |
| Investment in joint venture per IFRS | $ 352,673 | $ 289,725 |

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| Net loss of joint per GAAP (a) | $ (16,686) | $ (26,702) | $ (50,396) |
| Company's share of net loss | (8,343) | (13,351) | (25,198) |
| IFRS investment property adjustment | 108,742 | 12,879 | 64,191 |
| Share of income (loss) per IFRS | $ 100,399 | $ (472) | $ 38,993 |

The financial statements of VAA, prepared in accordance with US GAAP, are attached to the annual financial statements of December 31, 2021.

Pursuant to the joint venture agreement, the Manager will notify the Class A Members of additional capital contributions required to fund the operations of VAA. Additional capital contributions are allocated according to the Class A Members' respective capital ratios, and are included in their ownership basis of the Company.

Distributions of the net cash flow ("Net Cash Flow") from VAA are to be paid at least twice per year according to the following order:

i. A payment to TCI and the Company in payment of $15,000 (the "Cash Credit") which relates to the estimated balances in the operating bank accounts of the properties at closing. The Cash Credit was settled in 2019 (see c above).

ii. A one-time payment of $1,900 to the Class B Member;

iii. To the Class A Members in proportion to, and to the extent of, any preferred return on accrued but unpaid amounts paid by any Class A Member in connection with cost overruns for development properties ("Cost Overrun Contributions") funded by them, at a cumulative monthly compounded return of 18% ("Cost Overrun Preferred Return");

iv. To the Class A Members in proportion to, and to the extent of, any unreturned Cost Overrun Contributions;

App. 1718

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

v.   To establish and replenish an agreed-upon operating reserve of $8,000 (the "Operating Reserve") as needed to fund operating deficits or in any other manner as agreed to by the Class A Members; and

vi.  The balance among the Class A Members and the Class B Member pro rata in proportion to their capital and profit and loss percentages.

In addition, the joint venture agreement provides for the distributions of proceeds from capital events, including the sale of one or more of the multifamily apartment properties, as follows:

i.   To the Company, in payment of a lease guarantee in connection with two specific properties owned by the Joint Venture;

ii.  To the Class A Members in proportion to, and to the extent of, any accrued but unpaid Cost Overrun Preferred Return;

iii. To the Class A Members in proportion to, and to the extent of, any unreturned Cost Overrun Contribution;

iv.  To the Class A Members in proportion to their ownership percentages, until their capital contributions less prior distributions have been fully returned;

v.   To the extent that any portion of the Notes remain outstanding, an amount sufficient to repay those loans; and

vi.  The balance among the Class A Members, the Class B Member, and other Members who may be designated in the course of the Company's operations ("Class C Members") in proportion to their ownership and profit and loss percentages.

**Note 9. Loan Receivable**

On February 13, 2017, TCI assigned its rights under the Mercer Loan and The Mercer Profit Participation Agreement to the Company.  The profits participation agreement was cancelled in 2018, and as a result, the Company obtained full ownership of the single family lots and commercial land referred as Mercer Crossing.

On June 5, 2019, the Company distributed non-cash dividend to TCI by transferring two commercial lots of Mercer Crossing that totaled 9.92 acres and a book value is $3,958. The Company's Board of Directors approved the distribution based on meeting of the distribution requirements.

The Company sold 58, 134 and 161 lots for $8,980, $16,346 and $16,200, resulting in gains on sale of $6,429, $5,700 and $5,100 for the years ended December 31, 2021, 2020 and 2019, respectively. The gains on sale were included in finance income. As of December 31, 2021, the loan receivable balance represents the value of two single family lots that are under contract and 19 acres of commercial land that are available for sale.

**Note 10. Notes Receivable**

The following table summarizes the Company's notes receivable at December 31, 2021 and 2020:

29

App. 1719

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $ 10,365 | $ 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $ 79,507 | $ 47,850 | | |

(1) The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property.

(2) The loan agreement is with HGH Residential, LLC and the borrower is making semi-annual distributions of interest as approved by HUD.

(3) On January 13, 2021, the Company issued a note receivable that is secured by a project to build a 168 unit residential property in Opelika, Alabama. The note provides for borrowings of up to $5,126.

(4) On December 13, 2021, the note was collected in full.

(5) Maturity date is thirty months from the date that the senior loan was provided or seven years from the loan provision date whichever is earlier.

The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued. The fair value measurement is classified as Level 3 in the fair value hierarchy.

**Note 11. Advances for Acquisition of Real Estate**

Below is summarized information about the statement of financial position and the statement

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| ABC Land and Development | $ 2,000 | $ 2,000 |
| Tower Bay Lofts | 11,878 | 9,548 |
| | $ 13,878 | $ 11,548 |

30

App. 1720

**SOUTHERN PROPERTIES CAPITAL LTD.**

### Notes to Consolidated Financial Statements
### (dollars in thousands)

The Company has an option agreement to acquire the ownership of the Tower Bay Lofts, a 308 unit multi-family project located in Lewisville, Texas.

On June 2018, the option agreement was amended and the option price was revised to approximately $5,800 (instead of $10,100, as in the original option agreement), and the balance of $4,086 which was transferred by the Company and was deposited in a restricted escrow account. An additional advance of up to $7,000 may be obtained with the Company's written permission. Upon exercise of the option, the Company is required to pay $50 and final payment which equals to the total equity in the project (estimated to be $12,742) less any advances and the exercise payments. In addition, the Company will assume all liabilities and obligations for the loan on the project held by Berkley Point Capital, LLC in the amount of up to $47,200. The Company may exercise the option at any time, and upon receiving regulatory approval, the title of the property will convey to the Company. In addition, upon exercise of the option, the Company will be entitled to all excess cash flow, if any, from the project until the closing. The Company is entitled to cancel the option agreement at any time and receive the full amount that was paid for the option, plus 10% annual interest.

On March 11, 2019, the Company entered into a purchase option agreement with ABC Land Development, a non-related third party. The price of the purchase option is $2,000. The purchase option entitles the Company to purchase one 6.26 acre parcel of land located in Dallas, Texas and four parcels of land located in Clark County, Nevada totaling 31.53 acres. The future separate agreement will determine the price for each property acquired.

On April 17, 2019, after approval by the Company's Board of Directors, the Company entered into an option agreement with TCI for option to acquire 256 unit multifamily project, Dominion located in Farmers Branch, Texas. In exchange for the option, the Company provided guarantee through $2,000 letter of credit. HGH Residential, LLC is constructing the project with HUD insured financing. For additional information (see Note 13(1)).

**Note 12. Accounts Receivable**

The Company investment in Windmills Farm ("WMF") consists of approximately 1,663 acres of land in Forney, Texas. WMF is being held for capital appreciation. The Company constructs roads, sewage and power and water lines (collectively referred to as "Infrastructure Costs") of WMF in connection with the development of the land for sale to single family home builders.

In accordance with the Texas Water district code and reimbursement agreements, the districts of WMF will reimburse the Company for Infrastructure Costs. According to the agreements, the Districts are required to raise funds until the Company has been fully reimbursed for the costs mentioned above.

The Company expects that the reimbursement of all Infrastructure Costs will be completed by 2025, based on an estimate of 250 houses sold per year at an average selling price of $250. A 10% reduction in the number of houses sold by 2025 or a decline of 10% in the average home price would result in a delay in the full collection of the receivables by approximately one year. The fair value of the receivables approximates its carrying amount and it is classified as Level 3 in the fair value hierarchy.

On October 12, 2020, the Company sold $5,000 of WMF receivables to a third party. The transaction was completed on March 4, 2021.

**Note 13. Restricted Cash - Non-Current**

Non-current restricted and designated cash consists of the following:

31

App. 1721

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
| Designated Cash - Lender Escrow(1) | $ 5,781 | $ 6,922 |
| Restricted Cash - Trustee Reserve(2) | 5,033 | 6,914 |
| Restricted Cash - Other Deposits(3) | 864 | 2,648 |
|  | $ 11,678 | $ 16,484 |

1. The account serves as cash collateral to support to the Company's letter of credit facility with Bank Leumi.

2. Restricted deposit with Trustee for interest reserve and expense cushion for Series A, B, and C Bonds.

3. As part of an option agreement and as an advance payment of the option, as detailed in Note 11, the Company deposited a designated deposit for securing working capital at Tower Bay Lofts. These funds will be released on the date of completion of the construction of the property and repayment of construction loans. Advances from the escrow account were $1,787 and $1,409 in 2021 and 2020, respectively.

App. 1722

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 14. Mortgages Notes Payable**

Below is a summary of our notes and interest payable as of December 31, 2021 and 2020:

| Property/ Entity | Carrying Value 2021 | 2019 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 600 Las Colinas(1) | $         — | $  35,589 | 5.30 % | 11/1/2023 |
| 770 South Post Oak | 11,635 | 11,871 | 4.40 % | 6/1/2025 |
| Athens(2)(5) | 1,155 | 1,155 | 4.00 % | 8/28/2022 |
| Chelsea(3) | 8,460 | 8,630 | 3.40 % | 12/1/2050 |
| EQK Portage - Land | 3,350 | 3,350 | 10.00 % | 11/13/2024 |
| Forest Grove(4)(5) | 7,263 | 7,333 | 3.75 % | 5/5/2024 |
| Landing Bayou(3) | 14,989 | 15,241 | 3.50 % | 9/1/2053 |
| Legacy at Pleasant Grove(3) | 13,352 | 13,653 | 3.60 % | 4/1/2048 |
| Overlook at Allensville Phase II(3)(6) | — | 15,621 | 3.80 % | 5/1/2059 |
| Parc at Denham Springs Phase II(3) | 15,962 | 16,128 | 4.10 % | 2/1/2060 |
| Stanford Center(5)(7) | 38,979 | 39,226 | 6.00 % | 2/26/2022 |
| Sugar Mill Phase III(3) | 9,216 | 9,297 | 4.50 % | 2/1/2060 |
| Toulon(3)(8) | — | 13,974 | 3.20 % | 12/1/2051 |
| Villas at Bon Secour(5)(9) | 19,690 | 10,803 | 3.08 % | 9/1/2031 |
| Vista Ridge(3) | 9,830 | 9,979 | 4.00 % | 8/1/2053 |
| Windmill Farms(10) | 8,389 | 10,398 | 5.00 % | 2/28/2023 |
|  | 162,270 | 222,248 |  |  |
| Less current portion | (43,854) | (14,979) |  |  |
|  | $  118,416 | $207,269 |  |  |

(1)  On August 26, 2021, the loan was paid off in connection with the sale of the underlying property (See Note 7).

(2)  On March 2, 2021, the loan was extended to August 28, 2022.

(3)  The loans are backed by HUD and include mortgage insurance of 0.25% - 0.5% in addition to the nominal interest rate.

(4)  The loan bears interest at prime rate plus 0.5%. The Prime interest rate was 3.25% and 3.25% at December 31, 2021 and 2020, respectively.

(5)  The loan is guaranteed by TCI.

(6)  On March 30, 2021, the loan was assumed by VAA in connection with our contribution of of the underlying property to the joint venture (See Note 8).

(7)  On March 3, 2022 the lender extended the maturity of the loan to February 26, 2023.

(8)  On January 14, 2022, we paid off the loan in connection with the sale of the underlying property (See Note 21). The loan was classified as mortgage on property held for sale at December 31, 2021.

(9)  On August 25, 2021, the Company replaced the existing loan on the property with a new $20,015 loan that bears interest at 3.08% and matures on September 1, 2031. The loan is insured by Fannie Mae.

(10) On March 4, 2021, the loan was extended to February 28, 2023 at an interest of 5%. The loan is guaranteed by American Realty Investors, Inc. ("ARL"), the controlling shareholder of TCI.

App. 1723

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

The carrying value of the mortgage notes payable is net of unamortized borrowing costs of $1,425 and $3,449 at December 31, 2021 and 2020, respectively.

Future maturities on our mortgage notes payable at December 31, 2021 and 2020 are as follows:

| Year Ending December 31 | Principal Payments | | Principal and Interest Payments | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| 2022 | $ 43,854 | $ 14,979 | $ 49,403 | $ 25,026 |
| 2023 | 8,455 | 52,732 | 12,971 | 60,073 |
| 2024 | 12,458 | 37,095 | 13,284 | 43,314 |
| 2025 | 12,693 | 1,943 | 16,131 | 6,226 |
| Thereafter | 86,235 | 118,948 | 137,845 | 185,767 |
| | $ 163,695 | $ 225,697 | $ 229,634 | $ 320,406 |

The fair value of current borrowings approximates their carrying amount, as the impact of discounting is not significant. The fair value of the non-current variable borrowings approximates their carrying value. The carrying value of the non-current fixed borrowings was $126,703 and $195,962 as of December 31, 2021 and 2020, respectively.

The fair value measurement is classified as Level 3 in the fair value hierarchy.

Certain of the Company's borrowings require the maintenance of certain ratios, including debt service coverage. During 2021 and 2020, the Company exceeded the debt service credit requirement ratio for 770 South Post Oak. As a result, the cash receipts from the property will go through a cash trap to secure one month of debt service payment prior to being distributed to the Company. As of the reporting date, the Company is in compliance with all of its other debt covenants.

**Note 15. Bonds Payable**

The outstanding balance of our Bonds at December 31, 2021 and 2020 is as follows:

| Bond Issuance | December 31, | | Rate | Maturity |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | | |
| Series A Bonds(1) | $ 65,563 | $ 95,133 | 7.30 % | 7/31/23 |
| Series B Bonds(1) | 54,019 | 65,318 | 6.80 % | 7/31/25 |
| Series C Bonds(2) | 75,298 | 85,537 | 4.65 % | 1/31/23 |
| | 194,880 | 245,988 | | |
| Less unamortized deferred issuance costs | (5,428) | (8,100) | | |
| | 189,452 | 237,888 | | |
| Less current portion | (46,286) | (44,775) | | |
| Non-current portion | $ 143,166 | $ 193,113 | | |

34

App. 1724

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

(1)  On November 30, 2020, we issued $19,693 in additional bonds for $18,822 in net proceeds.

(2)  The bonds are collateralized by a trust deed in Browning Place, a 625,297 square foot office building in Farmers Branch, Texas.

Future maturities on our bonds payable at December 31, 2021 and 2020 are as follows:

| Year Ending December 31 | Principal Payments | | Principal and Interest Payments | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| 2022 | $ 46,286 | $ 44,775 | $ 57,468 | $ 59,344 |
| 2023 | 121,584 | 44,775 | 127,662 | 56,141 |
| 2024 | 13,505 | 130,310 | 15,118 | 136,486 |
| 2025 | 13,505 | 13,064 | 14,194 | 14,624 |
| 2026 | — | 13,064 | — | 13,732 |
| | $ 194,880 | $ 245,988 | $ 214,442 | $ 280,327 |

**Series A Bonds**

*Financial covenants:*

Until the date of the full payment of bonds and compliance with all other undertaking of the Company toward the holders of bonds according to the deed of trust and the terms of bonds, the Company shall comply at any time with the financial covenants set forth below:

1.  The consolidated equity of the Company (excluding minority interests) shall not be less than $150,000.

2.  The net adjusted financial debt ratio to the net CAP shall not exceed 75%.

3.  From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.

4.  The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 25%.

5.  The scope of the Company's imitated projects in the assets shall not exceed 30% of total assets.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

*The right to immediate repayment:*

There were obligations and immediate repayment grounds set in the deed of trust of the bonds such as violation of the Company's financial covenants for two consecutive quarters (as mentioned above), rating of the bonds, which falls

35

App. 1725

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

below BB (the bonds were rated BBB+ on the day of issuance), an ongoing entity note in the Company's financial statements for two consecutive quarters and failure in complying with other obligations as specified in the deed of trust.

36

App. 1726

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1.  The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $200,000.

2.  The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's last consolidated financial statements (quarterly or annually, as applicable) as of January 1, 2017, with the neutralization of the net revaluation gains/losses (which have not yet been realized) deriving from a change in the fair value of the Company's assets compared to their fair value on September 30, 2016 or to the date on which the assets were acquired, whichever is later. Notwithstanding the foregoing, as of the date of publication of the Company's financial statements as of December 31, 2018, the Company will be permitted to distribute 50% of the attributable income. Provided that in distribution exceeding 30% of the attributable income, the consolidated total cash of the Company, after the dividend distribution, will not be less than the total payments required for fulfillment of the principal payments of the bonds in the 12 months following the distribution date.

3.  Net Adjusted Financial Debt to Adjusted NOI shall not exceed 15.5.

**Series B Bonds**

*Financial covenants:*

The terms of the covenant are identical to the ones of Series A bonds (discussed above) except the following:

1.  The consolidated equity of the Company (excluding minority interests) shall not be less than $165,000.

2.  From the date of issue until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018 - the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.5.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

1.  The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $210,000.

2.  From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 15.5. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 16.

3.  The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 30%.

4.  There is no cause for immediate repayment of the debentures.

5.  On the date of the distribution decision by the board, and according to the last Financial Statements of the Company, annual or quarterly, there are no "warning signs" as defined in regulation 10(b)(14) of the Securities Regulations (Periodic and Immediate Reports), 1970.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds (Series B). The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (BBB+). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1.  The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $180,000.

2.  The Net Adjusted Financial Debt to net CAP shall not exceed a rate of 70%;

3.  The Net Adjusted Financial Debt to Adjusted shall not exceed a rate of 16%;

4.  The Consolidated Equity Capital of the Company (including minority rights) to the Consolidated Total Assets shall not be less than 30%.

If the Company breaches any of the financial covenants pursuant to the financial reports of the Company, the annual interest on the outstanding principal amount of the Debentures will increase by the Additional Interest Rate in respect of the Breach, above the interest rate in effect at the time, prior to the change, in respect of the period from the Date of the Breach until the date of repayment of the outstanding principal amount of the Debentures or until the date of publication of the Company's financial statements pursuant to which the Company is in compliance with that financial covenant, whichever is earlier, provided the interest rate was not increased before that due to the breach of a different financial covenant and/or to a rating downgrade.  If the interest rate was increased before that due to the

38

App. 1728

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

breach of a different financial covenant and/or due to a rating downgrade, if the interest rate increased due to the breach of a financial covenant, the increase will be limited so that the annual interest rate increase will not exceed 1.5%.

39

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Series C Bonds**

*Financial covenants:*

1.  The Consolidated Equity Capital of the Company (excluding minority interests) will not be less than $250,000.

2.  The Net Adjusted Financial Debt ratio to the net CAP shall not exceed 75%.

3.  The Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined below) shall not exceed 17.5.

4.  The volume of the development projects of the Company in the adjusted balance sheet (including the share of the Company in affiliated and jointly controlled companies) shall not exceed 30% of the total adjusted balance sheet.

5.  Beginning on the examination date regarding the 2nd quarter of 2021 (i.e. beginning on the publication date of the second quarter reports for 2021) the Loan/Collateral Ratio, as defined in Section 10 of Appendix 6.1 of the Trust Deed, shall not exceed 80%.

The Company made partial repayments of $9,776 and $2,854 in June 2021 and November 2021, respectively.

*The right to immediate repayment:*

Failure to comply with the Equity Covenant for two consecutive quarters and/or failure to comply with the debt to CAP ratio covenant for two consecutive quarters and/or failure to comply with the Ratio of Financial Debt to NOI Covenant for two consecutive quarters and/or failure to comply with Ratio of Development Projects to Total Balance Sheet Covenant for two consecutive quarters (namely, in respect of all the covenants on two consecutive examination dates), shall constitute grounds for declaring the outstanding balance of the Debentures due and payable.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1.  The Consolidated Equity Capital of the Company (as this term is defined in Section 6.3(1) below) excluding minority interests, according to the Company's consolidated financial statements, which were published prior to the distribution date, less the distributed divided, shall not be less than $350,000.

2.  Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined in Section 6.3(3) below), according to the Company's consolidated financial statements, which were published prior to the distribution date, shall not exceed 16.

40

App. 1730

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

3.  The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's latest Consolidated Financial Statements.

4.  On the date of the Board of Directors decision on the distribution there are no "Warning Signs" as so defined in article 10(b) (14) to the Reports Regulations.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds. The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (A-). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1.5%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1.  The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $300,000

2.  The Net Adjusted Financial Debt to net CAP (shall not exceed 70%).

3.  The Net Adjusted Financial Debt to Adjusted NOI shall not exceed 17.

4.  The ratio of the NOI of the pledged property to the principal balance of bonds shall not be lesser than 5.5% (or 4.5%).

**Note 16. Accounts Payable**

Non-current restricted and designated cash consists of the following:

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
| Interest Payable | $ 6,334 | $ 7,544 |
| Accrued Real Estate taxes | 2,788 | 5,910 |
| Accrued Other Expenses | 5,518 | 16,005 |
|  | $ 14,640 | $ 29,459 |

**Note 17. Related Party Transactions**

a.  General:

The Company has entered into various agreements with Regis Realty Prime, LLC ("Regis"), a related party, to manage, develop and lease its commercial properties. For these services, the Company pays to the related parties the following charges:

*Property Management Fee*

41

App. 1731

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

Monthly management fee of 3% of monthly rent collected for on the properties and to expense reimbursement with respect to providing the management services.

*Leasing Commissions*

In consideration for the property leasing services, Regis is entitled to a fee with respect to any lease signed on the properties, as follows:

1.  A fee of 3.5%-4.5% of rent with respect to the initial lease term and for each expansion of the leased space, as well as a fee of 2%-3% of rent with respect to any lease renewal, for as long as the management company continues to provide Property Leasing Services;

2.  If another broker is party to any specific lease (hereinafter in this sub-section: "the Broker"), the management company's fee would be 2%-2.25% of rent with respect to the initial lease term, for any expansion of the leased space and for any lease renewal; the Broker's fee would be as agreed with the Broker or 4%-4.5% of rent with respect to the initial lease term and any expansion of the leased space, as well as a fee of 2%-4.5% of rent for any lease renewal.

b.  Management services and headquarters agreement after issuance

As a result of a Series A bond issuance, the Company entered into a management and headquarter service agreement ("HQ Agreement") with the Pillar Income Asset Management, Inc. ("Pillar"), a company controlled by TCI, for office services and services for senior management such as Chairman, directors, CEO and CFO and headquarter services that include, among others, bookkeeping and financial services. In return for the services noted above, the Company will pay from January 2019, 0.5% annual of the value of the investment properties in the Company. In addition, after the issuance of the Series A bonds, a one time management fee payment of $500 was made. This agreement replaced previous agreements in which fees were paid for the purchase/sale and refinancing of properties.

In 2019, the company awarded bonuses to eleven employees of the headquarters management company with a total and maximum of $25 for their strenuous work in connection with the issuance of the Company's debentures (Series C).

The Company paid fees in connection with the HQ Agreement of $2,569, $2,504 and $2,200 to Pillar the years ended 2021, 2020 and 2019.

c.  Below is a summary of the related party transactions during 2021, 2020 and 2019:

App. 1732

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2021 | | 2020 | | 2019 | |
| **Revenue** | | | | | | |
| Lease Revenue | $ | 944 | $ | 1,102 | $ | 952 |
| **Expenses** | | | | | | |
| Management fees | $ | 887 | $ | 974 | $ | 966 |
| Management personnel | | 1,003 | | 1,119 | | 1,088 |
| Insurance expense | | 1,580 | | 1,774 | | 1,529 |
| | $ | 3,470 | $ | 3,867 | $ | 3,583 |

43

App. 1733

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

d.      Benefit to key management personnel (including directors):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| **Director compensation** | | | |
| Number of directors | 3 | 3 | 4 |
| Compensation for directors | $        161 | $        175 | $        196 |

e.   Guarantees Granted and transactions

1.   As of December 31, 2021, TCI is a guarantor on the mortgage notes payable on Oceanaire and Tattersall Village, which are owned by VAA.

2.   TCI is a guarantor on the mortgage notes payable on Athens, Forest Grove, Stanford Center and Villas at Bon Secour (See Note 14).  ARL is a guarantor on the mortgage notes payable on Windmill Farms.

3.   On November 12, 2019, TCI entered into an agreement with Bank Leumi USA ("Bank Leumi"). Under the agreement, the Bank Leumi will issue irrevocable standby letters of credit, up to a maximum of $16,000. The letters of credit are intended for the purposes of providing to HUD approved mortgage lenders, in lieu of required escrows, initial operating deficit and working capital, of which the Company has various interest in multi-family construction projects. The Credit Agreement is secured by deposits on account (Note 13) and a land parcel in Kent, Ohio.

4.   On February 8, 2019, the Company canceled the letter of credit that was established on August 2018, in amount of $1,000 to Unified Housing Foundation, Inc. ("UHF"), a non-profit entity that holds Multifamily residential complexes for affordable housing, in return for the Company's option to provide in the future loans bearing interest at the rate of 12% or more to UHF. UHF is classified as a related party with TCI.

5.   During 2019, VAA received refunds of real estate taxes resulting from appeals to various jurisdictions. The outstanding balance at December 31, 2020 is $300.

6.   Regis leased three suites at 770 South Post Oak with total leasable area 13,174 square feet for approximately $9 for the period of November 1, 2019 to December 31, 2020. Regis also leased a suite at Browning Place for $348 for each of 2021, 2020 and 2019.

44

App. 1734

**SOUTHERN PROPERTIES CAPITAL LTD.**

## Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 18. Supplemental Info Comp Income**

a.  Property operating expense:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Management personnel | $ 2,631 | $ 3,599 | $ 3,591 |
| Management Fees | 1,345 | 1,439 | 1,380 |
| Utilities | 2,263 | 2,720 | 2,928 |
| Property Taxes | 4,644 | 7,356 | 6,126 |
| Other | 8,252 | 7,545 | 7,178 |
| | $ 19,135 | $ 22,659 | $ 21,203 |

b.  General and administrative expenses:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Management Fees | $ 2,730 | $ 2,504 | $ 2,250 |
| Legal Fees | 701 | 816 | 835 |
| Professional Fees | 1,551 | 987 | 1,344 |
| Other | 1,523 | 750 | 725 |
| | $ 6,505 | $ 5,057 | $ 5,154 |

App. 1735

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

c.   Finance income:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| Income - Loans Receivable | $ | 2,333 | $ | 6,097 | $ | 5,864 |
| Income - Convertible Loans | | 32,471 | | 4,605 | | 2,317 |
| Other | | 2,216 | | 1,009 | | 621 |
| | $ | 37,020 | $ | 11,711 | $ | 8,802 |

d.   Finance expenses:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| Interest - Mortgages | $ | 9,706 | $ | 10,188 | $ | 11,065 |
| Interest - Bonds | | 13,365 | | 13,671 | | 12,659 |
| Refinance costs | | 5,188 | | — | | 3,799 |
| Amortization - Mortgages | | 262 | | 278 | | 1,390 |
| Amortization - Bonds | | 2,672 | | 2,835 | | 2,714 |
| Finance expense from receivables | | 605 | | 997 | | 3,240 |
| Other | | 722 | | 1,461 | | 1,488 |
| | | 32,520 | | 29,430 | | 36,355 |
| Capitalized Interest | | — | | (859) | | (601) |
| | $ | 32,520 | $ | 28,571 | $ | 35,754 |

**Note 19. Share and Additional Paid-in Capital**

As described in Note 1, the Company was incorporated on August 16, 2016.  At the establishment date, the Company has registered 50,000 common shares with no par value and issued one certificate including 100 common shares with no par value.  On February 15, 2017, the Company issued 5,000 shares with no par value to Abode Multi-Property, L.P. in connection with the transfer of rights.

On May 31, 2019, the Company issued a dividend in kind to TCI in exchange for two commercial lots Mercer Crossing land, approximately 9.92 acres and valued at $3,900, in lieu of attributable profits. The Board of Directors approved the distribution based on the Company's compliance with the distribution test.

App. 1736

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

**Note 20. Financial Instruments**

The fair value of cash, deposits, accounts payable and accrued liabilities approximates their carrying amounts due to their short-term nature.

Credit quality of financial assets:

a.      The carrying amount of accounts receivable represents the maximum credit exposure.

a.      The credit worthiness of tenants is established prior to execution of the signed lease agreements.

a.      Accounts receivable do not have a significant concentration risk.

a.      Credit risk from balances with banks and financial institutions is immaterial.

The Company's activities expose it to various financial risks such as market risk (interest rate risk and price risk), credit risk and liquidity risk. The Company's comprehensive risk plan focuses on activities that reduce to a minimum any possible adverse effects on the Company's financial performance. The accounting policy with respect to these financial instruments is described in Note 2 above. The Company's senior management team oversees the management of these risks.

*Interest rate risk:*

Interest risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates.

The Company's exposure to the risk of changes in market interest rates relates primarily to the Company's long-term liabilities with floating interest. The Company manages its interest rate risk by having a balanced portfolio of fixed and variable rate loans.

*Credit risk:*

Credit risk is the risk that a counterparty will not meet its obligations as a customer or under a financial instrument leading to a loss to the Company. The Company is exposed to credit risk from its operating activities, primarily trade receivables, and from its financing activities, including deposits with banks and other financial institutions, foreign currency transactions and other financial instruments.

The Company maintains cash and cash equivalents, short-term and long-term investments and other financial instruments in various financial institutions located in the United States. The Company diversifies its investments among the financial institutions and the relative credit stability of the financial institutions is evaluated on a regular basis.

As of December 31, 2021 and 2020, cash and cash equivalents consisted solely of cash. All deposits are invested with high quality financial institutions in the United States. See Note 5 for discussion of short-term investments at December 31, 2021.

*Liquidity risk:*

The Company monitors its risk to a shortage of funds using monthly and daily budget tools.

The Company's objective is to maintain a balance between continuity of funding and flexibility through the use of loans from financial institutions and others. The Company monitors the maturity of borrowings closely in order to

47

App. 1737

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

ensure that all borrowings due within the next 12 months will either be refinanced, as is customary in the real estate industry, or repaid of the debt will mature in less than one year.

48

App. 1738

**SOUTHERN PROPERTIES CAPITAL LTD.**

**Notes to Consolidated Financial Statements**
**(dollars in thousands)**

*Price risk:*

The Company is exposed to property price and property rentals risk. The Company is not exposed to the market risk with respect to financial instruments as it does not hold any equity securities. However, the Company does have an investment in convertible notes receivable that Level 3 measurements (see Note 10).

*Cash flow and fair value interest risk:*

As the Company has no significant variable rate interest-bearing assets, its income and operating cash flows are substantially independent of changes in market interest rates.

The Company's interest rate risk primarily arises from long-term borrowings (see Note 14). Borrowings issued at variable rates expose the Company to cash flow interest rate risk.

The Company's cash flow and fair value interest risk are periodically monitored by the

Company's management. The Company analyses the effects of fluctuations in the prevailing levels of market

interest rates on its financial position and cash flows. Interest costs may increase as a result of such changes. They may reduce or create losses in the event that unexpected movements arise. Various scenarios are simulated taking into consideration refinancing, renewal of existing positions, alternative financing and hedging. Based on these scenarios, the Company calculates the impact on profit and loss of a defined interest rate shift. The scenarios are run only for liabilities that represent the major interest-bearing positions.

Tenant accounts receivable and accounts payable and accrued liabilities are interest-free and have settlement dates within one year.

The sensitivity analyses below are based on a change in an assumption while holding all other assumptions constant. In practice, this is unlikely to occur, and changes in some of the assumptions may be correlated – for example, change in interest rate and change in market values.

*Capital risk management:*

The Company's capital consists of borrowings and shareholder's equity. The Company manages capital to ensure it remains within its debt covenants. The Company monitors capital primarily using both (i) a loan to value ratio, which is calculated as the amount of borrowings, gross of deferred financing cost, divided by the book value of the investment properties, and (ii) a debt service coverage ratio, which is calculated as the amount of net operating income divided by the payments on borrowings.

**Note 21. Events After Reporting Period**

On January 14, 2022, we sold Toulon, a 240 unit multifamily property in Gautier, Mississippi for $26,750. The proceeds were used to pay off the mortgage note payable (Note 14) on the property and for general corporate purposes. The property was classified as held for sale on the consolidated statement of position at December 31, 2021.

The Company has evaluated subsequent events through March 29, 2022, the date at which the financial statements were available to be issued.

App. 1739

# EXHIBIT J-42

# SOUTHERN PROPERTIES CAPITAL LTD.

## Interim Unaudited Consolidated Financial Statements

### As of September 30, 2022

### U.S. Dollars in Thousands

## INDEX

|  | PAGE |
|---|---|
| Review of Interim Consolidated Financial Statements | 1 |
| Consolidated Financial Position | 3 |
| Consolidated Statements of Comprehensive Income | 4 |
| Consolidated Statements of Changes in Equity | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Interim Consolidated Financial Statements | 8 |

App. 1741

**Auditors' report on review to the shareholders
of SOUTHERN PROPERTIES CAPITAL LTD.**

**Introduction**

We have reviewed the accompanying financial information of Southern Properties Capital Ltd. ("the Company"), which comprises of the condensed consolidated statements of financial position as of September 30, 2022 and the related condensed consolidated statements of comprehensive income, changes in equity and cash flows for the three and nine months ended September 30, 2022. The Company's board of directors and management are responsible for the preparation and presentation of interim financial information for these interim periods in accordance with IAS 34, "Interim Financial Reporting" and are responsible for the preparation of this interim financial information in accordance with Chapter D of the Securities Regulations (Periodic and Immediate Reports), 1970. Our responsibility is to express a conclusion on this interim financial information based on our review.

**Scope of review**

We conducted our review in accordance with Review Standard 2410 of the Institute of Certified Public Accountants in Israel, "Review of Interim Financial Information Performed by the Independent Auditor of the Entity." A review of interim financial information consists of making inquiries, primarily of persons responsible for financial and accounting matters, and applying analytical and other review procedures. A review is substantially less in scope than an audit conducted in accordance with generally accepted auditing standards in Israel and consequently does not enable us to obtain assurance that we would become aware of all significant matters that might be identified in an audit. Accordingly, we do not express an audit opinion.

**Conclusion**

Based on our review, nothing has come to our attention that causes us to believe that the accompanying interim financial information is not prepared, in all material respects, in accordance with IAS 34.

In addition to the above mentioned, based on our review, nothing has come to our attention that causes us to believe that the accompanying interim financial information does not comply, in all material respects, with the disclosure requirements of Chapter D of the Securities Regulations (Periodic and Immediate Reports), 1970.

Tel-Aviv, Israel                                         KOST FORER GABBAY & KASIERER
November 30, 2022                                    A Member of Ernst & Young Global

1

App. 1742

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Financial Position
#### (dollars in thousands)

| | September 30, | | December 31, |
| | 2022 | 2021 | 2021 |
| | (Unaudited) | | (Audited) |
|---|---:|---:|---:|
| Assets | | | |
| Current Assets | | | |
| Cash and cash equivalents | $ 128,275 | $ 62,018 | $ 50,739 |
| Short-term investments | 75,330 | — | 16,002 |
| Restricted and designated cash | 10,973 | 9,294 | 8,572 |
| Receivables and other assets | 7,372 | 3,014 | 6,761 |
| | 221,950 | 74,326 | 82,074 |
| Property held for sale | — | — | 26,750 |
| | 221,950 | 74,326 | 108,824 |
| Non-Current Assets | | | |
| Investment in real estate | 377,026 | 393,800 | 387,925 |
| Investment in joint venture | 372,108 | 291,481 | 352,673 |
| Loan receivable | 6,998 | 8,658 | 7,472 |
| Notes receivable | 80,160 | 52,116 | 79,507 |
| Advances for acquisition of real estate | 13,241 | 13,875 | 13,878 |
| Accounts receivable | 40,347 | 36,159 | 38,095 |
| Restricted and designated cash | 9,244 | 11,907 | 11,678 |
| | 899,124 | 807,996 | 891,228 |
| Total assets | $ 1,121,074 | $ 882,322 | $ 1,000,052 |

The accompanying notes are an integral part of these consolidated financial statements.

2

App. 1743

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Financial Position
### (dollars in thousands)

| | September 30, | | December 31, |
| | 2022 | 2021 | 2021 |
| | (Unaudited) | | (Audited) |
|---|---|---|---|
| **Liabilities and Equity** | | | |
| **Current Liabilities** | | | |
| Current portion of mortgages and notes payable | $ 49,494 | $ 42,481 | $ 43,854 |
| Current portion of bonds payable | 106,725 | 44,581 | 46,286 |
| Accounts payable | 7,890 | 12,778 | 14,640 |
| Tenant deposits | 781 | 965 | 878 |
| | 164,890 | 100,805 | 105,658 |
| Liabilities attributed to property held for sale | — | — | 13,697 |
| | 164,890 | 100,805 | 119,355 |
| **Non-Current Liabilities** | | | |
| Mortgages and notes payable | 101,556 | 134,436 | 118,416 |
| Bonds payable | 20,772 | 139,617 | 143,166 |
| | 122,328 | 274,053 | 261,582 |
| Total liabilities | 287,218 | 374,858 | 380,937 |
| **Equity** | | | |
| Share and additional paid-in capital | 165,544 | 165,544 | 165,544 |
| Reserve for transactions with controlling shareholder | 138,664 | 138,664 | 138,664 |
| Retained earnings | 529,648 | 203,256 | 314,907 |
| Total equity | 833,856 | 507,464 | 619,115 |
| Total liabilities and equity | $ 1,121,074 | $ 882,322 | $ 1,000,052 |

Date of approval of the financial statements: November 30, 2022

Bradley J. Muth
President and Chairman of the Board

Erik L. Johnson
Executive Vice President and Chief Financial Officer

3

App. 1744

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Operations
### (dollars in thousands)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, |
| | 2022 | 2021 | 2022 | 2021 | 2021 |
|---|---|---|---|---|---|
| | (Unaudited) | | | | (Audited) |
| Rental revenues | $ 7,980 | $ 10,070 | $ 23,553 | $ 31,900 | $ 40,012 |
| Property operating expenses | 4,090 | 5,353 | 11,758 | 15,716 | 19,135 |
| Gross profit | 3,890 | 4,717 | 11,795 | 16,184 | 20,877 |
| General and administrative expense | (1,266) | (1,398) | (4,068) | (4,901) | (6,505) |
| Other expense | — | — | — | (29,600) | (29,600) |
| Revaluation of investments | 4,659 | 7,952 | 72 | (6,351) | 22,273 |
| Share of income from joint venture | 1,479 | 30,986 | 194,878 | 41,793 | 100,399 |
| Operating income | 8,762 | 42,257 | 202,677 | 17,125 | 107,444 |
| Finance income | 2,366 | 1,101 | 3,986 | 4,539 | 37,020 |
| Finance income from Mezz Loan | 2,266 | 2,594 | 7,406 | 7,739 | 10,153 |
| Finance expense | (6,304) | (13,184) | (18,765) | (26,317) | (32,520) |
| Foreign currency gain (loss) | 1,533 | (1,639) | 19,437 | 1,185 | (6,175) |
| Net income | $ 8,623 | $ 31,129 | $ 214,741 | $ 4,271 | $ 115,922 |
| Comprehensive income | $ 8,623 | $ 31,129 | $ 214,741 | $ 4,271 | $ 115,922 |

The accompanying notes are an integral part of these consolidated financial statements.

4

App. 1745

# SOUTHERN PROPERTIES CAPITAL LTD.

## Consolidated Statements of Changes in Members' Capital
### (dollars in thousands)

| | Share and additional paid-in capital | | Reserve for transactions with controlling shareholder | | Retained Earnings | | Total equity | |
|---|---|---|---|---|---|---|---|---|
| **Three Months Ended September 30, 2022 (unaudited)** | | | | | | | | |
| Balance at July 1, 2022 | $ | 165,544 | $ | 138,664 | $ | 521,025 | $ | 825,233 |
| Comprehensive income | | — | | — | | 8,623 | | 8,623 |
| Balance at September 30, 2022 | $ | 165,544 | $ | 138,664 | $ | 529,648 | $ | 833,856 |
| **Three Months Ended September 30, 2021 (unaudited)** | | | | | | | | |
| Balance at July 1, 2021 | $ | 165,544 | $ | 138,664 | $ | 172,127 | $ | 476,335 |
| Comprehensive income | | — | | — | | 31,129 | | 31,129 |
| Balance at September 30, 2021 | $ | 165,544 | $ | 138,664 | $ | 203,256 | $ | 507,464 |
| **Nine Months Ended September 30, 2022 (unaudited)** | | | | | | | | |
| Balance at January 1, 2022 (Audited) | $ | 165,544 | $ | 138,664 | $ | 314,907 | $ | 619,115 |
| Comprehensive income | | — | | — | | 214,741 | | 214,741 |
| Balance at September 30, 2022 | $ | 165,544 | $ | 138,664 | $ | 529,648 | $ | 833,856 |
| **Nine Months Ended September 30, 2021 (unaudited)** | | | | | | | | |
| Balance at January 1, 2021 (Audited) | $ | 165,544 | $ | 138,664 | $ | 198,985 | $ | 503,193 |
| Comprehensive income | | — | | — | | 4,271 | | 4,271 |
| Balance at September 30, 2021 | $ | 165,544 | $ | 138,664 | $ | 203,256 | $ | 507,464 |
| **Year Ended December 31, 2021 (audited)** | | | | | | | | |
| Balance at January 1, 2021 | $ | 165,544 | $ | 138,664 | $ | 198,985 | $ | 503,193 |
| Comprehensive income | | — | | — | | 115,922 | | 115,922 |
| Balance at December 31, 2021 | $ | 165,544 | $ | 138,664 | $ | 314,907 | $ | 619,115 |

The accompanying notes are an integral part of these consolidated financial statements.

5

App. 1746

## SOUTHERN PROPERTIES CAPITAL LTD.

### Consolidated Statements of Cash Flows
### (dollars in thousands)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, 2021 |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | |
| | (Unaudited) | | | | (Audited) |
| **Operating activities** | | | | | |
| Net income | $ 8,623 | $ 31,129 | $ 214,741 | $ 4,271 | $ 115,922 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | | |
| Revaluation of investments | (4,659) | (7,952) | (72) | 6,351 | (22,273) |
| Earn Out Obligation adjustment | — | — | — | 29,600 | 29,600 |
| Share of income from joint venture | (1,479) | (30,986) | (194,878) | (41,793) | (100,399) |
| Distributions from joint venture | 104,008 | — | 104,008 | 10,588 | 10,588 |
| Finance income from Mezz loan | (2,266) | (2,594) | (7,406) | (7,739) | (10,153) |
| Finance expenses, net | 2,405 | 13,722 | (4,658) | 20,593 | 1,675 |
| Changes in operating assets and liabilities | | | | | |
| Receivables, prepaid expenses and other assets | 1,249 | 3,847 | 5,978 | 2,787 | 5,221 |
| Accounts payable and accrued expenses | 86 | (3,352) | (6,508) | (5,532) | (7,233) |
| Net cash provided by operating activities | 107,967 | 3,814 | 111,205 | 19,126 | 22,948 |
| **Investing activities** | | | | | |
| Advances on options to purchase real estate | 570 | (265) | 637 | (2,327) | (2,330) |
| Origination and advances on notes receivable | 302 | (2,463) | (653) | (15,293) | (6,188) |
| Collections from notes and loan receivable | 78,841 | 1,973 | 79,315 | 8,961 | 19,410 |
| Proceeds from sale of receivables | — | — | — | 5,000 | 5,000 |
| Proceeds from sale of land | — | 3,720 | 5,110 | 19,170 | 20,366 |
| Proceeds from sale of investment properties | 11,800 | 74,750 | 38,550 | 77,340 | 77,340 |
| Additions to investments in real estate | (3,393) | (3,323) | (11,022) | (4,407) | (19,355) |
| Investment in short-term securities | (67,850) | — | (99,350) | — | (16,000) |
| Redemption of investment in short-term securities | 500 | — | 40,250 | — | — |
| Change in restricted cash | 1,930 | 3,830 | 33 | 30,354 | 31,305 |
| Net cash provided by investing activities | 22,700 | 78,222 | 52,870 | 118,798 | 109,548 |

6

App. 1747

# SOUTHERN PROPERTIES CAPITAL LTD.

## Consolidated Statements of Cash Flows
### (dollars in thousands)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, 2021 |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | |
| | (Unaudited) | | | | (Audited) |
| **Financing activities** | | | | | |
| Payments on bonds payable | (20,838) | (21,938) | (43,760) | (53,658) | (56,512) |
| Proceeds from mortgages and notes payable | — | 20,015 | — | 20,015 | 20,015 |
| Payments on mortgages and notes payable | (10,085) | (47,479) | (26,411) | (50,668) | (51,671) |
| Payments of interest | (6,379) | (13,145) | (16,368) | (26,323) | (28,317) |
| Foreign exchange of cash on hand | — | (36) | — | 857 | 857 |
| Net cash used in financing activities | (37,302) | (62,583) | (86,539) | (109,777) | (115,628) |
| Net increase in cash and cash equivalents | 93,365 | 19,453 | 77,536 | 28,147 | 16,868 |
| Cash and cash equivalents at beginning of period | 34,910 | 42,565 | 50,739 | 33,871 | 33,871 |
| Cash and cash equivalents at end of period | $ 128,275 | $ 62,018 | $ 128,275 | $ 62,018 | $ 50,739 |
| Significant non-cash transactions: | | | | | |
| Receivable from joint venture offset against related party payable | $ — | $ — | $ — | $ 2,356 | $ 2,356 |

The accompanying notes are an integral part of these consolidated financial statements.

7

App. 1748

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 1. General**

a.   A general description of the Company and its activity:

Southern Properties Capital Ltd. (the Company) was incorporated on August 16, 2016, as a private company limited by shares, in conformity with provisions of the BVI Business Companies Act, 2004. The Company was incorporated for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange (the "TASE"). Upon incorporation, the Company issued one certificate containing 100 common shares with no par value.

The Company and its subsidiaries (the "Company"), operate in the United States and are primarily involved in (i) investing in, developing, constructing and operating income-producing properties of multifamily residential real estate assets and commercial real estate assets, and (ii) investing in land held for capital appreciation.

The Company is a wholly-owned subsidiary of Abode Multi Property, LP, a limited partnership incorporated in the State of Delaware, which is a wholly-owned subsidiary of Transcontinental Realty Investors, Inc. ("TCI"), a company incorporated in the State of Nevada, whose shares are listed for trading on the New York Stock Exchange ("NYSE") under ticker symbol TCI, in conformity with the US Securities Act and with the Security Exchange Commission ("SEC").

These financial statements have been prepared in a condensed format as of September 30, 2022 and for the three and nine months ended September 30, 2022 ("interim consolidated financial statements"), and should be read in conjunction with the Company's annual financial statements as of December 31, 2021 and for the year then ended and the accompanying notes ("annual consolidated financial statements").

b.   Consequences of coronavirus ("COVID-19"):

The Company continues to closely monitor the impact of the COVID-19 pandemic on all aspects of its business and its property portfolio. While COVID-19 has not caused a significant disruptions to the Company's residential real estate operations, it has resulted in a decrease in occupancy and fair value of some of its commercial properties. The future impact of COVID-19 on our business and financial activities will depend on future developments, which at this stage are unpredictable considering the fluctuations of COVID-19 outbreaks and the resulting changes in the markets.

8

App. 1749

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 2. Significant Accounting Policies**

The interim consolidated financial statements have been prepared in accordance with IAS 34, "Interim Financial Reporting" and in accordance with the disclosure requirements of Chapter D of the Securities Regulations (Periodic and Immediate Reports), 1970.

The accounting policies adopted in the preparation of the interim consolidated financial statements are consistent with those followed in the preparation of the consolidated financial statements. However, the Company has changed the current presentation of its financial statement to conform with how it presents financial information in the United States for internal and external purposes. The Company believes that these changes will improve the usefulness of the financial statements by investors in the United States and an internationally. As a result, the Company now presents current assets before non-current assets, and current liabilities before non-current liabilities and equity on its consolidated statements of financial position. Certain reclassifications of prior year amounts have been made to conform with the current presentation.

*Windmill Farms*

The Company accounts for its investment in Windmill Farms as investment property held for capital appreciation. The property is not used in the production or supply of goods or services or for administrative purposes; or sold in the ordinary course of business. From time-to-time the Company may sell portions of the Windmill Farms to third-party home builders, which may require the division of the sold pieces into individual lots and the the preparation of the lots for home construction use.

*Convertible Notes*

The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals. The appraisers determined the fair values of note loans using the income approach, specifically a discounted cash flow analysis. The cash flows were based upon the values provided in the appraisal reports of the underlying properties, net of transaction costs and the senior debt service payments, discounted to the value date. The convertible loan advances were then subtracted from the present value of the remaining equity

**Note 3. Operating Segments**

Operating segments are reported in a manner consistent with the internal reporting provided to the Company's chief executive officer or chief operating decision maker ("CODM"). The CODM, is responsible for allocating resources and assessing the performance of the operating segments, and strategic decisions.

Management has determined the operating segments based on the reports reviewed by the senior management team in making strategic decisions. For management purposes, the Company considers the business based on the following operating segments:

- Multifamily real estate - purchases and develops investment properties primarily consisting of multifamily apartment complexes or buildings in order to produce rental income or for capital appreciation or both. The segment includes the financial information of Victory Abode Apartments, LLC on a 50% proportion share (See Note 4).

- Commercial real estate - purchases and develops investment properties primarily consisting of offices in order to produce rental income or for capital appreciation or both.

9

App. 1750

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

Unallocated items in the tables below represent the cost of the Company's corporate office, land sale transactions (including Windmill farms), the income from its notes receivable and bank accounts, the expense from the bonds and gain (loss) from foreign currency transactions in connection with the bonds. The CODM does not considers its investment in Windmill Farms or its investment in convertible notes to be segment, as the CODM views these investments to be passive investments that are not actively monitored other than periodic valuations.

No reportable operating segments have been aggregated. There are no intercompany transactions between the different segments. Management reviews the operating results of its business units separately for the purpose of making decisions about resource allocation and performance assessment. Segment performance is evaluated based on net operating income, which is calculated as rental revenues less property operating expenses.

| | Three Months Ended September 30, 2022 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 19,863 | $ 4,267 | $ — | $ (16,150) | $ 7,980 |
| Property operating expenses | 10,970 | 2,239 | — | (9,119) | 4,090 |
| Gross profit | 8,893 | 2,028 | — | (7,031) | 3,890 |
| General and administrative expenses | (4,505) | (29) | (1,115) | 4,383 | (1,266) |
| Revaluation of investments | 11,040 | (782) | — | (5,599) | 4,659 |
| Income from joint venture | — | — | — | 1,479 | 1,479 |
| Operating income | 15,428 | 1,217 | (1,115) | (6,768) | 8,762 |
| Finance income | — | — | 2,366 | — | 2,366 |
| Finance income from Mezz Loan | 2,266 | — | — | — | 2,266 |
| Finance expense | (8,832) | (712) | (3,528) | 6,768 | (6,304) |
| Gain on foreign currency transactions | — | — | 1,533 | — | 1,533 |
| Net income | $ 8,862 | $ 505 | $ (744) | $ — | $ 8,623 |

10

App. 1751

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
(dollars in thousands)

| | Three Months Ended September 30, 2021 | | | | |
|---|---|---|---|---|---|
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $  21,946 | $  5,910 | $  — | $  (17,786) | $  10,070 |
| Property operating expenses | 10,743 | 3,411 | — | (8,801) | 5,353 |
| Gross profit | 11,203 | 2,499 | — | (8,985) | 4,717 |
| General and administrative expenses | (464) | (4) | (1,284) | 354 | (1,398) |
| Revaluation of investments | 44,531 | (7,245) | (90) | (29,244) | 7,952 |
| Income from joint venture | — | — | — | 30,986 | 30,986 |
| Operating income (loss) | 55,270 | (4,750) | (1,374) | (6,889) | 42,257 |
| Finance income | — | — | 1,101 | — | 1,101 |
| Finance income from Mezz Loan | — | — | — | 2,594 | 2,594 |
| Finance expense | (5,864) | (5,683) | (5,932) | 4,295 | (13,184) |
| Loss on foreign currency transactions | — | — | (1,639) | — | (1,639) |
| Net income (loss) | $  49,406 | $  (10,433) | $  (7,844) | $  — | $  31,129 |

| | Nine Months Ended September 30, 2022 | | | | |
|---|---|---|---|---|---|
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $  64,141 | $  12,686 | $  — | $  (53,274) | $  23,553 |
| Property operating expenses | 29,753 | 6,640 | — | (24,635) | 11,758 |
| Gross profit | 34,388 | 6,046 | — | (28,639) | 11,795 |
| General and administrative expenses | (10,010) | (40) | (3,605) | 9,587 | (4,068) |
| Revaluation of investments | 202,934 | (7,755) | 1,267 | (196,374) | 72 |
| Income from joint venture | — | — | — | 194,878 | 194,878 |
| Operating income (loss) | 227,312 | (1,749) | (2,338) | (20,548) | 202,677 |
| Finance income | — | — | 3,986 | — | 3,986 |
| Finance income from Mezz Loan | 7,406 | — | — | — | 7,406 |
| Finance expense | (26,281) | (2,142) | (10,890) | 20,548 | (18,765) |
| Gain on foreign currency transactions | — | — | 19,437 | — | 19,437 |
| Net income (loss) | $  208,437 | $  (3,891) | $  10,195 | $  — | $  214,741 |

11

App. 1752

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
(dollars in thousands)

| | Nine Months Ended September 30, 2021 | | | | |
|---|---|---|---|---|---|
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 63,729 | $ 19,373 | $ — | $ (51,202) | $ 31,900 |
| Property operating expenses | 30,238 | 9,741 | — | (24,263) | 15,716 |
| Gross profit | 33,491 | 9,632 | — | (26,939) | 16,184 |
| General and administrative expenses | (628) | (367) | (4,159) | 253 | (4,901) |
| Other expense | (29,600) | — | — | — | (29,600) |
| Revaluation of investments | 49,588 | (18,197) | (1,845) | (35,897) | (6,351) |
| Income from joint venture | — | — | — | 41,793 | 41,793 |
| Operating income (loss) | 52,851 | (8,932) | (6,004) | (20,790) | 17,125 |
| Finance income | — | — | 4,539 | — | 4,539 |
| Finance income from Mezz Loan | — | — | — | 7,739 | 7,739 |
| Finance expense | (17,112) | (8,369) | (13,887) | 13,051 | (26,317) |
| Gain on foreign currency transactions | — | — | 1,185 | — | 1,185 |
| Net income (loss) | $ 35,739 | $ (17,301) | $ (14,167) | $ — | $ 4,271 |

| | Year Ended December 31, 2021 | | | | |
|---|---|---|---|---|---|
| | Multifamily | Commercial | Unallocated * | Adjustment | Total |
| Rental revenues | $ 85,961 | $ 23,632 | $ — | $ (69,581) | $ 40,012 |
| Property operating expenses | 42,063 | 11,276 | — | (34,204) | 19,135 |
| Gross profit | 43,898 | 12,356 | — | (35,377) | 20,877 |
| General and administrative expenses | (1,100) | (480) | (4,925) | — | (6,505) |
| Other expense | (29,600) | — | — | — | (29,600) |
| Revaluation of investments | 119,658 | (18,226) | 14,046 | (93,205) | 22,273 |
| Income from joint venture | — | — | — | 100,399 | 100,399 |
| Operating income (loss) | 132,856 | (6,350) | 9,121 | (28,183) | 107,444 |
| Finance income | — | — | 37,020 | — | 37,020 |
| Finance income from Mezz Loan | — | — | — | 10,153 | 10,153 |
| Finance expense | (25,090) | (9,125) | (16,335) | 18,030 | (32,520) |
| Loss on foreign currency transactions | — | — | (6,175) | — | (6,175) |
| Net income (loss) | $ 107,766 | $ (15,475) | $ 23,631 | $ — | $ 115,922 |

\* General and administrative expenses represents expenses of the Company's corporate office. Revaluation of investments represents the revaluation of its land held for capital appreciation. Finance income represents revaluation of investments in notes receivable and interest income from its notes receivables, investments in short-term investments and bank accounts. Finance expense represents interest expense from the bonds and other unsecured notes payable.

App. 1753

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 4. Investment in Joint Venture**

The Company accounts for its investment in Victory Abode Apartments, LLC ("VAA") using the equity method of accounting.

In connection with the formation of VAA, ten out of the 51 properties acquired were subject to an earn-out provision that provides for a remeasurement of value ("Earn Out") after a two-year period following the completion of construction. Upon the formation of VAA, the Company recorded a liability for the $10,000 advance on the Earn Out that the Company received from Macquarie (see note 18b in the annual financial statements). On July 13, 2021, the Company received an arbitration result of its dispute with Macquarie regarding the measurement of the Earn Out. Following presentation by both parties, the Company's position and claims were declined, and the position of Macquarie was fully accepted. The Company is required to pay approximately $39,600 to Macquarie to satisfy the Earn Out Obligation, which was recorded as a charge to other expenses of $29,600 during the year ended December 31, 2021. In accordance with the VAA agreement, the Company will pay the Earn Out Obligation through its future distributions from VAA. During the nine months ended September 30, 2022, the Company's $34,159 distribution from VAA was paid directly to Macquarie as a reduction of the Earn Out Obligation.

On November 17, 2021, the Company and Macquarie agreed to pursue a sale of the properties of VAA in accordance with the provisions of the joint venture agreement.

On June 17, 2022, the Company, Macquarie and VAA entered into an agreement with the buyer to sell 45 properties ("VAA Sale Portfolio") held by VAA and one property held by the Company.

On September 15, 2022, the Company, VAA, Macquarie and Pillar entered a Distribution and Holdback Property Agreement ("Distribution Agreement"), which provides the timing and ordering of the distribution of the net proceeds from the sale of the VAA Sale Portfolio, the repayment of the Mezzanine Loans, and the distribution of the remaining seven properties of VAA ("Holdback Portfolio").

On September 16, 2022, the Company completed the sale of the VAA Sale Portfolio for $1,810,700, resulting in gain on sale of $738,665 to the joint venture. In connection with sale, we received $182,848 ("First Distribution"). The Distribution Agreement also provides for a distribution of the Holdback Portfolio and an additional cash distribution in the fourth quarter of 2022 ("Second Distribution"), see note 6(c).

13

App. 1754

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

Below is summarized information about the statement of financial position and the statement of income of VAA (100%) in accordance with United States generally accepted accounting principles ("GAAP"):

| | September 30, 2022 | September 30, 2021 | December 31, 2021 |
|---|---|---|---|
| | | (Unaudited) | |
| **Assets** | | | |
| Assets held for sale | $ — | $ 1,132,146 | $ 1,135,769 |
| Investment property | 128,530 | 131,709 | 130,954 |
| Other assets | 629,736 | 13,214 | 14,144 |
| Total assets | $ 758,266 | $ 1,277,069 | $ 1,280,867 |
| **Liabilities and equity** | | | |
| Liabilities on assets held for sale | $ 7,326 | $ 806,064 | $ 807,382 |
| Mortgage notes payable | 69,558 | 70,862 | 70,540 |
| Loans from members (Mezz Loan) | — | 242,942 | 242,942 |
| Other liabilities | 17,521 | 8,403 | 16,409 |
| Total liabilities | 94,405 | 1,128,271 | 1,137,273 |
| Equity | 663,861 | 148,798 | 143,594 |
| Total liabilities and equity | $ 758,266 | $ 1,277,069 | $ 1,280,867 |

14

App. 1755

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

Below is summarized information about the statement of financial position and the statement of income of VAA (100%) in accordance with GAAP:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | 2021 |
| | (Unaudited) | | | | |
| Revenues | $ 3,591 | $ 3,862 | $ 11,932 | $ 11,343 | $ 15,336 |
| Operating income | $ 1,897 | $ 2,218 | $ 7,052 | $ 6,761 | $ 8,592 |
| Net income (loss) | $ 699,288 | $ (4,308) | $ 688,912 | $ (11,482) | $ (16,686) |

The following is a reconciliation of the total equity in VAA per GAAP to the Company's share of VAA per IFRS.

| | September 30, | | December 31, |
|---|---|---|---|
| | 2022 | 2021 | 2021 |
| | (Unaudited) | | |
| Total equity of joint venture per GAAP | $ 663,861 | $ 148,798 | $ 143,594 |
| Company's shares of equity | 332,039 | 74,402 | 71,798 |
| IFRS adjustment | 39,720 | 128,096 | 189,305 |
| Equity per IFRS | 371,759 | 202,498 | 261,103 |
| IFRS investment property adjustment | 349 | 348 | 345 |
| Mezz Loan and accrued interest | — | 122,794 | 125,384 |
| Earn out obligation | — | (34,159) | (34,159) |
| Investment in joint venture per IFRS | $ 372,108 | $ 291,481 | $ 352,673 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | | Year Ended December 31, 2021 |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | |
| | (Unaudited) | | | | |
| Net loss of joint per GAAP (a) | $ 699,288 | $ (4,308) | $ 688,912 | $ (11,482) | $ (16,686) |
| Company's share of net loss | 349,644 | (2,154) | 344,456 | (5,741) | (8,343) |
| IFRS investment property adjustment | (348,165) | 33,140 | (149,578) | 47,534 | 108,742 |
| Share of income per IFRS | $ 1,479 | $ 30,986 | $ 194,878 | $ 41,793 | $ 100,399 |

a. Includes interest expense on Joint Venture Mezz Loan of $5,128 and $5,186 for the three months ended September 30, 2022 and 2021, respectively, and $15,620 and $15,476 for the nine months ended September 30, 2022 and 2021, respectively, and $20,500 for the year ended December 31, 2021.

App. 1756

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 5. Bonds Payable**

The outstanding balance of our Bonds at September 30, 2022 and 2021, and December 31, 2021 is as follows:

| Bond Issuance | September 30, 2022 | September 30, 2021 | December 31, 2021 | Rate | Maturity |
|---|---|---|---|---|---|
| Series A Bonds | $ 28,776 | $ 63,147 | $ 65,563 | 7.30 % | 7/31/23 |
| Series B Bonds | 35,563 | 52,029 | 54,019 | 6.80 % | 7/31/25 |
| Series C Bonds(1) | 66,095 | 75,281 | 75,298 | 4.65 % | 1/31/23 |
| | 130,434 | 190,457 | 194,880 | | |
| Less unamortized deferred issuance costs | (2,937) | (6,259) | (5,428) | | |
| | $ 127,497 | $ 184,198 | $ 189,452 | | |

(1)  The bonds are collateralized by a trust deed in Browning Place, a 625,297 square foot office building in Farmers Branch, Texas.

**Series A Bonds**

*Financial covenants:*

Until the date of the full payment of bonds and compliance with all other undertaking of the Company toward the holders of bonds according to the deed of trust and the terms of bonds, the Company shall comply at any time with the financial covenants set forth below:

1.   The consolidated equity of the Company (excluding minority interests) shall not be less than $150,000.

2.   The net adjusted financial debt ratio to the net CAP shall not exceed 75%.

3.   From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.

4.   The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 25%.

5.   The scope of the Company's imitated projects in the assets shall not exceed 30% of total assets.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

16

App. 1757

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

*The right to immediate repayment:*

There were obligations and immediate repayment grounds set in the deed of trust of the bonds such as violation of the Company's financial covenants for two consecutive quarters (as mentioned above), rating of the bonds, which falls below BB (the bonds were rated BBB+ on the day of issuance), an ongoing entity note in the Company's financial statements for two consecutive quarters and failure in complying with other obligations as specified in the deed of trust.

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1. The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $200,000.

2. The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's last consolidated financial statements (quarterly or annually, as applicable) as of January 1, 2017, with the neutralization of the net revaluation gains/losses (which have not yet been realized) deriving from a change in the fair value of the Company's assets compared to their fair value on September 30, 2016 or to the date on which the assets were acquired, whichever is later. Notwithstanding the foregoing, as of the date of publication of the Company's financial statements as of December 31, 2018, the Company will be permitted to distribute 50% of the distributable income. Provided that in distribution exceeding 30% of the distributable income, the consolidated total cash of the Company, after the dividend distribution, will not be less than the total payments required for fulfillment of the principal payments of the bonds in the 12 months following the distribution date.

3. Net Adjusted Financial Debt to Adjusted NOI shall not exceed 15.5.

**Series B Bonds**

*Financial covenants:*

The terms of the covenant are identical to the ones of Series A bonds (discussed above) except the following:

1. The consolidated equity of the Company (excluding minority interests) shall not be less than $165,000.

2. From the date of issue until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 18. As of the date of publication of the Company's financial statements as of December 31, 2018 - the net adjusted financial debt ratio to the adjusted NOI shall not exceed 17.5.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

17

App. 1758

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1. The consolidated equity of the Company (excluding minority interests) in accordance with the financial statements of the Company published prior to the date of the distribution resolution, net of the distribution, shall not be less than $210,000.

2. From the date of issuance until the date of publication of the Company's financial statements as of December 31, 2018 the net adjusted financial debt ratio to the adjusted NOI shall not exceed 15.5. As of the date of publication of the Company's financial statements as of December 31, 2018, the net adjusted financial debt ratio to the adjusted NOI shall not exceed 16.

3. The consolidated equity of the Company (including minority interests) ratio to the consolidated assets shall not be less than 30%.

4. There is no cause for immediate repayment of the debentures.

5. On the date of the distribution decision by the board, and according to the last Financial Statements of the Company, annual or quarterly, there are no "warning signs" as defined in regulation 10(b)(14) of the Securities Regulations (Periodic and Immediate Reports), 1970.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds (Series B). The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (BBB+). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1. The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $180,000.

2. The Net Adjusted Financial Debt to net CAP shall not exceed a rate of 70%;

3. The Net Adjusted Financial Debt to Adjusted shall not exceed a rate of 16%;

4. The Consolidated Equity Capital of the Company (including minority rights) to the Consolidated Total Assets shall not be less than 30%.

18

App. 1759

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

If the Company breaches any of the financial covenants pursuant to the financial reports of the Company, the annual interest on the outstanding principal amount of the Debentures will increase by the Additional Interest Rate in respect of the Breach, above the interest rate in effect at the time, prior to the change, in respect of the period from the Date of the Breach until the date of repayment of the outstanding principal amount of the Debentures or until the date of publication of the Company's financial statements pursuant to which the Company is in compliance with that financial covenant, whichever is earlier, provided the interest rate was not increased before that due to the breach of a different financial covenant and/or to a rating downgrade. If the interest rate was increased before that due to the breach of a different financial covenant and/or due to a rating downgrade, if the interest rate increased due to the breach of a financial covenant, the increase will be limited so that the annual interest rate increase will not exceed 1.5%.

**Series C Bonds**

*Financial covenants:*

1. The Consolidated Equity Capital of the Company (excluding minority interests) will not be less than $250,000.

2. The Net Adjusted Financial Debt ratio to the net CAP shall not exceed 75%.

3. The Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined below) shall not exceed 17.5.

4. The volume of the development projects of the Company in the adjusted balance sheet (including the share of the Company in affiliated and jointly controlled companies) shall not exceed 30% of the total adjusted balance sheet.

5. Beginning on the examination date regarding the 2nd quarter of 2021 (i.e. beginning on the publication date of the second quarter reports for 2021) the Loan/Collateral Ratio, as defined in Section 10 of Appendix 6.1 of the Trust Deed, shall not exceed 80%.

*The right to immediate repayment:*

Failure to comply with the Equity Covenant for two consecutive quarters and/or failure to comply with the debt to CAP ratio covenant for two consecutive quarters and/or failure to comply with the Ratio of Financial Debt to NOI Covenant for two consecutive quarters and/or failure to comply with Ratio of Development Projects to Total Balance Sheet Covenant for two consecutive quarters (namely, in respect of all the covenants on two consecutive examination dates), shall constitute grounds for declaring the outstanding balance of the Debentures due and payable.

As of the reporting date, the Company is in compliance with the financial covenants set forth above.

19

App. 1760

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

*Distribution restrictions:*

The Company undertakes not to make any distribution (as such term is defined in the Companies Law) and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

1.  The Consolidated Equity Capital of the Company (as this term is defined in Section 6.3(1) below) excluding minority interests, according to the Company's consolidated financial statements, which were published prior to the distribution date, less the distributed divided, shall not be less than $350,000.

2.  Net Adjusted Financial Debt Ratio to the Adjusted NOI (as this term is defined in Section 6.3(3) below), according to the Company's consolidated financial statements, which were published prior to the distribution date, shall not exceed 16.

3.  The distribution amount shall not exceed 30% of the cumulative net income after tax, which was recognized in the Company's latest Consolidated Financial Statements.

4.  On the date of the Board of Directors decision on the distribution there are no "Warning Signs" as so defined in article 10(b) (14) to the Reports Regulations.

*Interest adjustment mechanism:*

The interest rate on bonds is subject to adjustment in the event of change in the rating of bonds. The annual interest rate may increase by increments of 0.25% as a result of downgrades in the credit rating of the bonds below the base rating (A-). The cumulative increase in the interest rate as a result of these events is limited and shall not exceed an aggregate of 1.5%, namely not below BB.

The interest rate will be adjusted due to breach of one of the Financial Covenants as set forth below:

1.  The Consolidated Equity Capital of the Company (excluding minority rights) shall not be less than $300,000

2.  The Net Adjusted Financial Debt to net CAP (shall not exceed 70%).

3.  The Net Adjusted Financial Debt to Adjusted NOI shall not exceed 17.

4.  The ratio of the NOI of the pledged property to the principal balance of bonds shall not be lesser than 5.5% (or 4.5%).

### Note 6. Events During Reporting Period

1.  On January 14, 2022, the Company sold Toulon, a 240 unit multifamily property in Gautier, Mississippi for $26,750. The Company used the proceeds from the sale to pay off the $14,740 mortgage note payable on the property, pay debt extinguishment costs of $590 and for general corporate purposes. The property was classified as held for sale on the consolidated statement of position at December 31, 2021.

2.  On March 3, 2022, the lender extended the loan on Stanford Center to February 26, 2023.

3.  On September 16, 2022, in connection with a sale of properties by VAA (See Note 4 - Investment in Unconsolidated Joint Ventures), the Company sold Sugar Mill Phase III, a 72 unit multifamily property in Baton Rouge, Louisiana for $11,800, resulting in a gain on sale of $1,871. The Company used the proceeds to pay off the $9,551 mortgage note payable on the property, pay debt extinguishment costs of $764 and for general corporate purposes.

20

App. 1761

## SOUTHERN PROPERTIES CAPITAL LTD.

### Notes to Consolidated Financial Statements
### (dollars in thousands)

**Note 7. Events After Reporting Period**

The Company has evaluated subsequent events through November 30, 2022, the date at which the financial statements were available to be issued.

1. On March 3, 2022, the lender extended the loan on Stanford Center to February 26, 2023 and was subsequently paid off on October 21, 2022.

2. On November 1, 2022, subsequent to the date of the financial position, approximately $203.9 million were distributed to the Company and the full control and economical rights to the seven remaining properties of VAA. The Company estimates that the transfer of the formal title in those properties will be completed second quarter of 2023 upon receipt of HUD approval with regard to the existing mortgage loans.

**Note 8. Management Fees**

The Company made payments to the controlling shareholder for services in amount of $485 and $658 for the three months ended September 30, 2022 and 2021, respectively, and $1,455 and $1,927 for the nine months ended September 30, 2022 and 2021, respectively, and $2,730 for the year ended December 31, 2021. For more details regarding the management fee see Note 18 (B) of the Company's Consolidated Financial Statements as of December 31, 2021.

21

App. 1762

# EXHIBIT J-43

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**
**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-09240**

# Transcontinental Realty Investors, Inc.
(Exact name of registrant as specified in its charter)

| **Nevada** | **94-6565852** |
|---|---|
| (State or other jurisdiction of Incorporation or organization) | (IRS Employer Identification Number) |

| **1603 LBJ Freeway,** | **Suite 800** | **Dallas** | **TX** | **75234** |
|---|---|---|---|---|
| (Address of principal executive offices) | | | | (Zip Code) |

**(469) 522-4200**
Registrant's Telephone Number, including area code
Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock | TCI | NYSE |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes        No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes        No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes        No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes        No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company in Rule 12b-2 of the Exchange Act.

Large accelerated filer          Accelerated filer          Non-accelerated filer          Smaller reporting company

Emerging growth Company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.) Yes        No

The aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant was approximately $37.4 million as of the last business day of the registrant's most recently completed second fiscal quarter based upon the price at which the common stock was last sold on that day.

As of March 28, 2021, there were 8,639,316 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. Commission File No. 001-14784
Consolidated Financial Statements of American Realty Investors, Inc. Commission File No. 001-15663

**INDEX TO**
**ANNUAL REPORT ON FORM 10-K**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 7 |
| Item 1B. | Unresolved Staff Comments | 13 |
| Item 2. | Properties | 14 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Mine Safety Disclosures | 17 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 18 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 24 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 24 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |
| Item 9A. | Controls and Procedures | 56 |
| Item 9B. | Other Information | 56 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 57 |
| Item 11. | Executive Compensation | 64 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 65 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 66 |
| Item 14. | Principal Accounting Fees and Services | 67 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 69 |
| Item 16. | Form 10-K Summary | 70 |
| Signatures | | 71 |

2

**FORWARD-LOOKING STATEMENTS**

Certain Statements in this Form 10-K are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. The words "estimate", "plan", "intend",

App. 1765

"expect", "anticipate", "believe", and similar expressions are intended to identify forward-looking statements. These forward-looking statements are found at various places throughout this Report and in the documents incorporated herein by reference. The Company disclaims any intention or obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Although we believe that our expectations are based upon reasonable assumptions, we can give no assurance that our goals will be achieved. Important factors that could cause our actual results to differ from estimates or projections contained in any forward-looking statements are described under Part I, Item 1A. "Risk Factors"

# PART I

## ITEM 1.   BUSINESS

### General

Transcontinental Realty Investors, Inc. (the "Company") is a fully integrated externally managed real estate company. We operate high quality multifamily and commercial properties throughout the southern United States. We also invest in mortgage notes receivable and in land that is either held for appreciation and or development. As used herein, the terms "TCI", "the Company", "We", "Our", or "Us" refer to the Company.

#### Corporate Structure

Substantially all of our assets are held by our wholly-owned subsidiary, Southern Properties Capital Ltd. ("SPC"), which was formed to allow us to raise funds by issuing non-convertible bonds that are listed and traded on the Tel-Aviv Stock Exchange ("TASE").

On November 19, 2018, we formed the Victory Abode Apartments, LLC ("VAA") joint venture with the Macquarie Group ("Macquarie"). In connection with the formation of VAA, we sold a 50% ownership interest in 51 multifamily properties, (collectively referred to herein as the "VAA Portfolio"). VAA assumed all liabilities of the VAA Portfolio. We account for our investment in VAA under the equity method. On November 17, 2021, we entered into a Major Decision with Macquarie to sell all the properties held by VAA (See "Recent Activity - Other Developments").

We own approximately 81.1% of Income Opportunity Realty Investors, Inc. ("IOR"), whose common stock is traded on the NYSE American under the symbol "IOR". Accordingly, we include IOR's financial results in our consolidated financial statements. IOR's primary business is investing in mortgage loans and realty property.

#### Controlling Shareholder

American Realty Investors, Inc. ("ARL"), whose common stock is traded on the NYSE under the symbol "ARL", and its affiliates own in more than 80% of our common stock. Accordingly, our financial results are included in the consolidated financial statements of ARL's in their Form 10-K and tax filings.

As described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", our officers and directors also serve as officers and directors of ARL. ARL has business objectives similar to ours. Our officers and directors owe fiduciary duties to both ARL and us under applicable law. In determining whether a particular investment opportunity will be allocated to ARL or us, management considers the respective investment objectives of each company and the appropriateness of a particular investment in light of each company's existing real estate and mortgage notes receivable portfolio. To the extent that any particular investment opportunity is appropriate to more than one of the entities, the investment opportunity may be allocated to the entity which has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared between the two entities.

3

#### Management

Our business is managed by Pillar Income Asset Management, Inc. ("Pillar") in accordance with an Advisory Agreement that is reviewed annually by our Board of Directors. Pillar is a wholly-owned affiliate of Realty Advisors, Inc. ("RAI"), which is the controlling stockholder of ARL.

Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges our debt and equity financing with third party lenders and investors. They also serve as the contractual "Advisor" and "Cash Manager" to ARL. As the Advisor, Pillar is compensated by us under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". We rely upon the employees of Pillar to render services to us in

App. 1766

In addition, as described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", we compete with related parties of Pillar having similar investment objectives related to the acquisition, development, disposition, leasing and financing of real estate and real estate-related investments. In resolving any potential conflicts of interest which may arise. Pillar has informed us that it intends to exercise its best judgment as to what is fair and reasonable under the circumstances in accordance with applicable law.

*Portfolio Composition*

At December 31, 2021, our property portfolio consisted of:

- Five commercial properties, consisting of four office buildings and one retail property, comprising in aggregate of approximately 1,063,515 square feet;
- Nine multifamily properties owned directly by us, comprising in 1,492 units, excluding apartments being developed;
- Approximately 1,886 acres of developed and undeveloped land; and
- Fifty-two multifamily properties totaling 10,281 units owned by VAA.

**Recent Activity**

The following is a description of our significant real estate and financing transactions during the year ended December 31, 2021:

*Acquisitions and Dispositions*

- On March 30, 2021, we sold a 50% ownership interest in Overlook at Allensville Phase II, a 144 unit multifamily property in Sevierville, Tennessee to Macquarie for $2.6 million, resulting in gain on sale of $1.4 million. Concurrent with the sale, we each contributed our 50% ownership interests in Overlook at Allensville Phase II into VAA.
- On August 26, 2021, we sold 600 Las Colinas, a 512,173 square foot office building in Irving, Texas for $74.8 million, resulting in gain on sale of $27.3 million. We used the proceeds to pay down the mortgage note payable on the property (See "Financing Activities") and for general corporate purposes.
- During the year ended December 31, 2021, we sold a total of 134.7 acres of land from our holdings in Windmill Farms for $20.2 million, in aggregate, resulting in gains on sale of $10.3 million. In addition, we sold 14.09 acres of land from our holdings in Mercer Crossing for $9.0 million, resulting in a gain on sale of $6.4 million.
- On January 14, 2022, we sold Toulon, a 240 unit multifamily property property in Gautier, Mississippi, for $26.8 million. The proceeds were used to pay off the mortgage note payable on the property and for general corporate purposes.

*Financing Activities*

- On March 2, 2021, we extended our $1.2 million loan on Athens to August 28, 2022.
- On March 4, 2021, we extended the maturity of our $8.4 million loan on Windmill Farms to February 28, 2023 at a reduced interest rate of 5%.
- On August 25, 2021, we replaced the existing loan on Villas at Bon Secour with a new $20.0 million loan that bears interest at 3.08% and matures on September 1, 2031.
- On August 26, 2021, we paid off the $35.9 million loan on 600 Las Colinas in connection with the sale of the underlying property (See "Acquisitions and Dispositions").
- On March 3, 2022, we extended our $39.0 million loan on Stanford Center to February 26, 2023.

4

*Development Activities*

During 2021, we spent $15.7 million on our ongoing development of Windmill Farms. Our expenditure included $2.8 million on the development of land lots for sale to single family home builders and $13.0 million on reimbursable infrastructure investments.

We have investment in nine notes receivable that were issued to fund the development of multifamily properties (See Item 2 - Properties). As of December 31, 2021, one of the projects was in construction, two were in lease-up and six were stabilized. In 2021, we advanced $8.6 million on these development notes. Each of these notes are convertible, at our option, into a 100% ownership interest in the underlying property.

During 2021, we advanced $2.3 million on the development of Tower Bay Lofts, which is owned by a third party. We have an agreement that allows us to acquire this project, at our option, for the price of our investment.

App. 1767

*Other Developments:*

During the year ended December 31, 2021, we recorded a loss of $29.6 million on the remeasurements of certain assets ("Earn Out Obligation") that were sold in connection with our investment in VAA.

On November 17, 2021, we entered into a Major Decision with Macquarie to engage a broker and initiate a sale of all the properties held by VAA, which are listed in Item 2. Properties as Joint Venture properties. In connection with the sale, VAA will distribute seven of its existing properties to us (referred to herein as the "Holdback Properties") and we in turn, will contribute one of our properties ("Contributed Property") into the portfolio offered for sale to third-parties. The sales price for the Holdback Properties and Contributed Property will be the estimated value of these properties as stated in the agreement, multiplied by the ratio of the actual sales price of the portion of the VAA Portfolio sold to a third party to the estimated value of the those properties that were provided in the agreement.

Each of the properties in the VAA Portfolio is appraised on an annual basis as part of our filing requirement with the TASE. As of December 31, 2021, the fair value of the VAA Portfolio, based on these appraisals was approximately $1.4 billion. The appraised value reflects an aggregate of individual property appraised value and does not reflect a premium that is sometimes offered in a portfolio sale. These values reflect a compression of cap rates for multifamily properties during the last year. However, there can be no assurances that these values will be realized. The Major Decision agreement will expire on August 1, 2022, if the VAA Portfolio has not been sold.

Our ownership interest in VAA is held by SPC, and is therefore subject to the bond covenants of the three series of bonds that have been issued by SPC. These provisions include restrictions on the distribution of cash from SPC (See Note 12 - Bonds Payable in our consolidated financial statements).

**Business Plan and Investment Policy**

Our business strategy is to maximize long-term value for our stockholders by the acquisition, development and ownership of income-producing multifamily properties in the secondary markets of the Southern United States. We generally hold our investments in real estate for the long term. We seek to maximize the current income and the value of our real estate by maintaining high occupancy levels while charging competitive rents and controlling costs. In the past we have opportunistically acquired commercial properties for income and appreciation. In addition, we also opportunistically acquire land for future development. From time to time and when we believe it appropriate to do so, we sell land and income-producing properties. We also invest in mortgage receivables.

Our income producing real estate is managed by external management companies. Our multifamily properties and one of our commercial properties are managed by various third-party companies and four of our commercial properties are managed by Regis Realty Prime, LLC ("Regis"), collectively the "management companies". The management companies conduct all of the administrative functions associated with our property operations (including billing, collections, and response to resident inquiries). Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement and is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage".

5

We also invest in notes receivables that are collateralized by investments in land and/or multifamily properties. These investments have included notes receivables from Unified Housing Foundation, Inc. ("UHF") Due to our ongoing relationship and our significant investment in the performance of the collateral secured under the notes receivable, we consider UHF to be a related party.

We finance our acquisitions through operating cash flow, proceeds from the sale of land and income-producing properties, and debt, which is financing primarily in the form of property-specific, first-lien mortgage loans from commercial banks and institutional lenders. Most of the mortgage notes payable on our multifamily properties are insured with Department of Housing and Urban Development ("HUD"). HUD back mortgage notes payable generally provides for lower interest rates and longer term than conventional debt. However, HUD insured mortgage notes payable are subject to extensive regulations over the origination and transfers of mortgage notes payable and restrictions on the amount and timing of distribution of cash flows from the underlying real estate. When we sell properties, we may carry a portion of the sales price, generally in the form of a short-term interest bearing seller-financed note receivable, secured by the property being sold. We may also from time to time enter into partnerships or joint ventures with various investors to acquire land or income-producing properties, or to sell interests in some of our properties.

We have increased our portfolio of multifamily properties through ground up development. Since we don't have a fully developed in-house development, we have traditionally partnered with third-party developers ("Developers") to construct multifamily properties on our behalf. We work with the Developer on the location, design, construction budget and initial lease plan for a potential development project ("Development Project"). The construction plan includes a development fee to be paid to the Developer. To ensure that the Development Project is constructed on plan, on time

App. 1768

and on budget, we generally enter into a convertible loan arrangement with the Developer, whereby we advance the out-of-pocket capital for the developer at nominal rate of interest with an option to convert the loan into a 100% ownership interest in the entity that holds the Development Project for a price equal to development cost.

For our land development projects, including Windmill Farms, we have acted as our own general contractor and construction manager. We believe direct involvement in construction enables us to achieve higher construction quality, greater control over construction schedules and cost savings. We actively monitor construction progress to ensure quality workmanship to enable sale of developed lots to third-party home builders.

### Competition

The real estate business is highly competitive and we compete with numerous companies engaged in real estate activities (including certain entities described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence"), some of which have greater financial resources than us. We believe that success against such competition is dependent upon the geographic location of a property, the performance of property-level managers in areas such as leasing and marketing, collection of rents and control of operating expenses, the amount of new construction in the area and the maintenance and appearance of the property. Additional competitive factors include ease of access to a property, the adequacy of related facilities such as parking and other amenities, and sensitivity to market conditions in determining rent levels. With respect to multifamily properties, competition is also based upon the design and mix of the units and the ability to provide a community atmosphere for the residents. We believe that beyond general economic circumstances and trends, the degree to which properties are renovated or new properties are developed in the competing submarket are also competitive factors. Refer to Part I, Item1A. "Risk Factors".

To the extent that we seek to sell any properties, the sales prices for the properties may be affected by competition from other real estate owners and financial institutions also attempting to sell properties in areas where our properties are located, as well as aggressive buyers attempting to dominate or penetrate a particular market.

### Government Regulations

Our properties are subject to various covenants, laws, ordinances and regulations, including regulations relating to common areas, fire and safety requirements, various environmental laws, HUD, the Americans with Disabilities Act and rent control laws.

### Segments

We operate two business segments: the acquisition, development, ownership and management of multifamily properties, and the acquisition, development, ownership and management of commercial properties; which are primarily office properties.

The services for our commercial segment include primarily rental of offfice space and other tenant services, including parking and storage space rental. The services for our multifamily segment include primarily rental of apartments and other tenant services, including parking and storage space rental. See Note 15 to our consolidated financial statements in Item 8 of this Report for more information regarding our segments.

### Human Capital

We have no employees. Employees of Pillar render services to us in accordance with the terms of the Advisory Agreement.

### Available Information

We maintain an internet site at www.transconrealty-invest.com. We make available through our website free of charge Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, reports filed pursuant to Section 16, and amendments to those reports as soon as reasonably practicable after we electronically file or furnish such materials to the Securities and Exchange Commission. In addition, we have posted the charters for our Audit Committee, Compensation Committee, and Governance and Nominating Committee, as well as our Code of Business Conduct and Ethics, Corporate Governance Guidelines on Director Independence and other information on the website. These charters and principles are not incorporated in this Report by reference. We will also provide a copy of these documents free of charge to stockholders upon written request. We issue Annual Reports containing audited financial statements to its common shareholders.

## ITEM 1A.  RISK FACTORS

An investment in our securities involves various risks. All investors should carefully consider the following risk factors, applicable to TCI and

its subsidiaries, in conjunction with the other information in this report before trading our securities.

## FACTORS AFFECTING OUR ASSETS

*The current COVID – 19 pandemic or the future outbreak of other highly infectious or contagious diseases and the timing and effectiveness of vaccine use or other effective medicines could materially and adversely affect our business, financial condition and results of operations.*

Our operating results depend, in large part, on revenues derived from leasing space in our residential multifamily communities to residential tenants and the ability of tenants to generate sufficient income to pay their rents in a timely manner. The market and economic challenges created by the COVID – 19 pandemic and measures implemented to prevent its spread have and may continue to adversely affect our returns and profitability. As a result, our ability to make distributions may be compromised, and we could experience volatility with respect to the market value of our properties and common stock. In some cases, we may be legally required or otherwise agree to restructure tenants' rent obligations and may not be able to do so in terms favorable to us as those currently in place. Further, various city, county and state laws restricting rent increases in times of emergency may come into effect in connection with the pandemic, and numerous state, local, federal and industry-initiated efforts have and may continue to affect our ability to collect rent or enforce remedies for the failure to pay rent, including, among others, limitations or prohibitions on evicting tenants unwilling or unable to pay rent and prohibitions on the ability to collect unpaid rent during certain time frames. Some residents' views about their obligations to pay rent, even when financially capable of meeting the rent obligation, have shifted away from viewing rent as a primary and necessary financial obligation, and this shift may continue or worsen as a result of the eviction moratoriums and the various laws affecting our abilities to collect rent. Additionally, market fluctuations as a result of the pandemic may affect our ability to obtain necessary funds for our operations from current lenders or new borrowings. We may be unable to obtain financing for the acquisition of investments or refinancing for existing assets on satisfactory terms, or at all. Market fluctuations and construction delays, along with increased prices, experienced by our vendors may also negatively impact their ability to provide services to us.

The global impact of the COVID – 19 pandemic continues to evolve rapidly, and the extent of its effect on our operational and financial performance will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration, scope and severity of the pandemic, the actions taken to contain or mitigate its impact, the timing of distribution and effectiveness of vaccines and the willingness and ability of the public to get vaccinated in a timely manner, and the direct and indirect economic effects of the pandemic and related containment measures, among others. Also, to the extent any of these risks and uncertainties adversely impact us in the ways described above or otherwise, they may also have the effect of heightening many of the other risks set forth in this Report.

<center>7</center>

*Adverse events concerning our existing tenants or negative market conditions affecting our existing tenants could have an adverse impact on our ability to attract new tenants, release space, collect rent or renew leases, and thus could adversely affect cash flow from operations and inhibit growth.*

Cash flow from operations depends in part on the ability to lease space to tenants on economically favorable terms. We could be adversely affected by various facts and events over which we have limited or no control, such as:

- lack of demand for space in areas where the properties are located;
- inability to retain existing tenants and attract new tenants;
- oversupply of or reduced demand for space and changes in market rental rates;
- defaults by tenants or failure to pay rent on a timely basis;
- the need to periodically renovate and repair marketable space;
- physical damage to properties;
- economic or physical decline of the areas where properties are located; and
- potential risk of functional obsolescence of properties over time.

At any time, any tenant may experience a downturn in its business that may weaken its financial condition. As a result, a tenant may delay lease commencement, fail to make rental payments when due, decline to extend a lease upon its expiration, become insolvent or declare bankruptcy. Any tenant bankruptcy or insolvency, leasing delay or failure to make rental payments when due could result in the termination of the tenant's lease and material losses to us.

If tenants do not renew their leases as they expire, we may not be able to rent the space. Furthermore, leases that are renewed, and some new leases for space that is re-let, may have terms that are less economically favorable than expiring lease terms, or may require us to incur significant costs, such as renovations, tenant improvements or lease transaction costs. Any of these events could adversely affect cash flow from operations and our ability to make distributions to shareholders and service indebtedness. A significant portion of the costs of owning property, such as real estate

<center>App. 1770</center>

taxes, insurance, and debt service payments, are not necessarily reduced when circumstances cause a decrease in rental income from the properties.

***We may not be able to compete successfully with other entities that operate in our industry.***

We experience a great deal of competition in attracting tenants for the properties and in locating land to develop and properties to acquire.

In our effort to lease properties, we compete for tenants with a broad spectrum of other landlords in each of the markets. These competitors include, among others, publicly-held REITs, privately-held entities, individual property owners and tenants who wish to sublease their space. Some of these competitors may be able to offer prospective tenants more attractive financial terms than we are able to offer.

If the availability of land or high quality properties in our markets diminishes, operating results could be adversely affected.

***We may experience increased operating costs which could adversely affect our financial results and the value of our properties.***

Our properties are subject to increases in operating expenses such as insurance, cleaning, electricity, heating, ventilation and air conditioning, administrative costs and other costs associated with security, landscaping, repairs, and maintenance of the properties. While some current tenants are obligated by their leases to reimburse us for a portion of these costs, there is no assurance that these tenants will make such payments or agree to pay these costs upon renewal or new tenants will agree to pay these costs. If operating expenses increase in our markets, we may not be able to increase rents or reimbursements in all of these markets to offset the increased expenses, without at the same time decreasing occupancy rates. If this occurs, our ability to make distributions to shareholders and service indebtedness could be adversely affected.

***Our ability to achieve growth in operating income depends in part on its ability to develop additional properties or acquire and redevelop or renovate existing properties.***

We intend to continue to develop properties where warranted by market conditions. We have a number of ongoing development and land projects being readied for commencement.

8

Additionally, general construction and development activities include the following risks:

- construction and leasing of a property may not be completed on schedule, which could result in increased expenses and construction costs, and would result in reduced profitability for that property;
- construction costs may exceed original estimates due to increases in interest rates and increased cost of materials, labor or other costs, possibly making the property less profitable because of inability to increase rents to compensate for the increase in construction costs;
- some developments may fail to achieve expectations, possibly making them less profitable;
- we may be unable to obtain, or face delays in obtaining, required zoning, land-use, building, occupancy, and other governmental permits and authorizations, which could result in increased costs and could require us to abandon our activities entirely with respect to a project;
- we may abandon development opportunities after the initial exploration, which may result in failure to recover costs already incurred. If we determine to alter or discontinue its development efforts, future costs of the investment may be expensed as incurred rather than capitalized and we may determine the investment is impaired resulting in a loss;
- we may expend funds on and devote management's time to projects which will not be completed; and
- occupancy rates and rents at newly-completed properties may fluctuate depending on various factors including market and economic conditions, and may result in lower than projected rental rates and reduced income from operations.

***We face risks associated with property acquisitions.***

We have acquired individual properties and various portfolios of properties in the past and intend to continue to do so. Acquisition activities are subject to the following risks:

- when we are able to locate a desired property, competition from other real estate investors may significantly increase the seller's offering price;
- acquired properties may fail to perform as expected;
- the actual costs of repositioning or redeveloping acquired properties may be higher than original estimates;
- acquired properties may be located in new markets where we face risks associated with an incomplete knowledge or understanding of the local market, a limited number of established business relationships in the area and a relative unfamiliarity with local governmental and permitting procedures; and

App. 1771

- we may be unable to quickly and efficiently integrate new acquisitions, particularly acquisitions or portfolios of properties, into existing operations, and results of operations and financial condition could be adversely affected.

We may acquire properties subject to liabilities and without any recourse, or with limited recourse, with respect to unknown liabilities. However, if an unknown liability was later asserted against the acquired properties, we might be required to pay substantial sums to settle it, which could adversely affect cash flow.

***Many of our properties are concentrated in our primary markets and we may suffer economic harm as a result of adverse conditions in those markets.***

Our properties are located principally in specific geographic areas in the southwestern, southeastern, and mid-western United States. Our overall performance is largely dependent on economic conditions in those regions.

Our investments in joint ventures may decrease our ability to manage risk. We conduct some of our operations through a joint venture in which we share control over certain economic and business interests with our joint venture partner. Our joint venture partner may have economic, business or legal interests or goals that are inconsistent with our goals and interests or may be unable to meet their obligations. Failure by us, or an entity in which we have a joint-venture interest, to adequately manage the risks associated with any acquisitions or joint ventures could have a material adverse effect on the financial condition or results of operations of our joint ventures and adversely affect our business, financial condition, results of operations and cash flows.

***We are leveraged and may not be able to meet our debt service obligations.***

9

We had total indebtedness, including bonds and notes payable, at December 31, 2021 of approximately $366.2 million. Substantially all assets have been pledged to secure debt. These borrowings increase the risk of loss because they represent a prior claim on assets and most require fixed payments regardless of profitability. Our leveraged position makes us vulnerable to declines in the general economy and may limit our ability to pursue other business opportunities in the future.

***We may not be able to access financial markets to obtain capital on a timely basis, or on acceptable terms.***

We rely on proceeds from property dispositions and third party capital sources for a portion of our capital needs, including capital for acquisitions and development. The public debt and equity markets are also among the sources upon which we rely. There is no guarantee that we will be able to access these markets or any other source of capital. The ability to access the public debt and equity markets depends on a variety of factors, including:

- general economic conditions affecting these markets;
- our own financial structure and performance;
- the market's opinion of real estate companies in general; and
- the market's opinion of real estate companies that own similar properties.

***We may suffer adverse effects as a result of terms and covenants relating to our indebtedness.***

Required payments on our indebtedness generally are not reduced if the economic performance of the portfolio declines. If the economic performance declines, net income, cash flow from operations and cash available for distribution to stockholders may be reduced. If payments on debt cannot be made, we could sustain a loss or suffer judgments, or in the case of mortgages, suffer foreclosures by mortgagees. Further, some obligations contain cross-default and/or cross-acceleration provisions, which means that a default on one obligation may constitute a default on other obligations.

We anticipate only a small portion of the principal of our debt will be repaid prior to maturity. Therefore, we are likely to refinance a portion of our outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or the terms of any refinancing will not be as favorable as the terms of the maturing debt. If principal balances due at maturity cannot be refinanced, extended, or repaid with proceeds from other sources, such as the proceeds of sales of assets or new equity capital, cash flow may not be sufficient to repay all maturing debt in years when significant "balloon" payments come due.

Our credit facilities and unsecured debt contain customary restrictions, requirements and other limitations on the ability to incur indebtedness, including total debt to asset ratios, secured debt to total asset ratios, debt service coverage ratios, and minimum ratios of unencumbered assets to unsecured debt. Our continued ability to borrow is subject to compliance with financial and other covenants. In addition, failure to comply with such

App. 1772

covenants could cause a default under credit facilities, and we may then be required to repay such debt with capital from other sources. Under those circumstances, other sources of capital may not be available, or be available only on terms that are detrimental to us.

*Our degree of leverage could limit our ability to obtain additional financing or affect the market price of our common stock.*

The degree of leverage could affect our ability to obtain additional financing for working capital, capital expenditures, acquisitions, development or other general corporate purposes. The degree of leverage could also make us more vulnerable to a downturn in business or the general economy.

*An increase in interest rates would increase interest costs on variable rate debt and could adversely impact the ability to refinance existing debt.*

We currently have, and may incur more, indebtedness that bears interest at variable rates. Accordingly, if interest rates increase, so will the interest costs, which could adversely affect cash flow and the ability to pay principal and interest on our debt and the ability to make distributions to shareholders. Further, rising interest rates could limit our ability to refinance existing debt when it matures.

*Unbudgeted capital expenditures or cost overruns could adversely affect business operations and cash flow.*

If capital expenditures for ongoing or planned development projects or renovations exceed expectations, the additional cost of these expenditures could have an adverse effect on business operations and cash flow. In addition, we might not have access to funds on a timely basis to pay for the unexpected expenditures.

<div align="center">10</div>

Construction costs are funded in large part through construction financing, which we may guarantee. Our obligation to pay interest on this financing continues until the rental project is completed, leased-up and permanent financing is obtained, or the project is sold, or the construction loan is otherwise paid. Unexpected delays in completion of one or more ongoing projects could also have a significant adverse impact on business operations and cash flow.

*We may need to sell properties from time to time for cash flow purposes.*

Because of the lack of liquidity of real estate investments generally, our ability to respond to changing circumstances may be limited. Real estate investments generally cannot be sold quickly. In the event that we must sell assets to generate cash flow, we cannot predict whether there will be a market for those assets in the time period desired, or whether we will be able to sell the assets at a price that will allow us to fully recoup its investment. We may not be able to realize the full potential value of the assets and may incur costs related to the early extinguishment of the debt secured by such assets.

*We intend to devote resources to the development of new projects.*

We plan to continue developing new projects as opportunities arise in the future. Development and construction activities entail a number of risks, including but not limited to the following:

- we may abandon a project after spending time and money determining its feasibility;
- construction costs may materially exceed original estimates;
- the revenue from a new project may not be enough to make it profitable or generate a positive cash flow;
- we may not be able to obtain financing on favorable terms for development of a property, if at all;
- we may not complete construction and lease-ups on schedule, resulting in increased development or carrying costs; and
- we may not be able to obtain, or may be delayed in obtaining, necessary governmental permits.

*FACTORS AFFECTING THE INDUSTRY*

*The overall business is subject to all of the risks associated with the real estate industry.*

We are subject to all risks incident to investment in real estate, many of which relate to the general lack of liquidity of real estate investments, including, but not limited to:

- our real estate assets are concentrated primarily in the southwest and any deterioration in the general economic conditions of this region could have an adverse effect;

<div align="right">App. 1773</div>

- changes in interest rates may make the ability to satisfy overall debt service requirements more burdensome;
- lack of availability of financing may render the purchase, sale or refinancing of a property more difficult or unattractive;
- changes in real estate and zoning laws;
- increases in real estate taxes and insurance costs;
- federal or local regulations or rent controls;
- acts of terrorism, and
- hurricanes, tornadoes, floods, earthquakes and other similar natural disasters.

***Our performance and value are subject to risks associated with our real estate assets and with the real estate industry.***

Our economic performance and the value of our real estate assets, and consequently the value of our securities, are subject to the risk that if our properties do not generate revenues sufficient to meet our operating expenses, including debt service and capital expenditures, our cash flow will be adversely affected. The following factors, among others, may adversely affect the income generated by our properties:

- downturns in the national, regional and local economic conditions (particularly increases in unemployment);
- competition from other office, apartment and commercial buildings;
- local real estate market conditions, such as oversupply or reduction in demand for office, apartments or other commercial space;

11

- changes in interest rates and availability of financing;
- vacancies, changes in market rental rates and the need to periodically repair, renovate and re-let space;
- increased operating costs, including insurance expense, utilities, real estate taxes, state and local taxes and heightened security costs;
- civil disturbances, earthquakes and other natural disasters, or terrorist acts or acts of war which may result in uninsured or underinsured losses;
- significant expenditures associated with each investment, such as debt service payments, real estate taxes, insurance and maintenance costs which are generally not reduced when circumstances cause a reduction in revenues from a property;
- declines in the financial condition of our tenants and our ability to collect rents from our tenants; and
- decreases in the underlying value of our real estate.

***Adverse economic and geopolitical conditions and dislocations in the credit markets could have a material adverse effect on our results of operations, and financial condition.***

Our business may be affected by market and economic challenges experienced by the U.S. economy or real estate industry as a whole or by the local economic conditions in the markets in which our properties are located, including the current dislocations in the credit markets and general global economic recession. These current conditions, or similar conditions existing in the future, may adversely affect our results of operations, and financial condition as a result of the following, among other potential consequences:

- the financial condition of our tenants may be adversely affected which may result in tenant defaults under leases due to bankruptcy, lack of liquidity, operational failures or for other reasons;
- significant job losses within our tenants may occur, which may decrease demand for our office space, causing market rental rates and property values to be negatively impacted;
- our ability to borrow on terms and conditions that we find acceptable, or at all, may be limited, which could reduce our ability to pursue acquisition and development opportunities and refinance existing debt, reduce our returns from our acquisition and development activities and increase our future interest expense;
- reduced values of our properties may limit our ability to dispose of assets at attractive prices or to obtain debt financing secured by our properties and may reduce the availability of unsecured loans; and
- one or more lenders could refuse to fund their financing commitment to us or could fail and we may not be able to replace the financing commitment of any such lenders on favorable terms, or at all.

***Real estate investments are illiquid, and we may not be able to sell properties if and when it is appropriate to do so.***

Real estate generally cannot be sold quickly. We may not be able to dispose of properties promptly in response to economic or other conditions. In addition, provisions of the Internal Revenue Code may limit our ability to sell properties (without incurring significant tax costs) in some situations when it may be otherwise economically advantageous to do so, thereby adversely affecting returns to stockholders and adversely impacting our

App. 1774

*General real estate investment risks may adversely affect property income and values.*

Real estate investments are subject to a variety of risks. If the communities and other real estate investments do not generate sufficient income to meet operating expenses, including debt service and Expenditures, cash flow, and the ability to make distributions, the operating income will be adversely affected. Income from the communities may be further adversely affected by, among other things, the following factors:

- changes in the general or local economic climate, including layoffs, plant closings, industry slowdowns, relocations of significant local employers, and other events negatively impacting local employment rates and wages and the local economy;
- local economic conditions in which the communities are located, such as oversupply of housing or a reduction in demand for rental housing;

12

- adverse economic or market conditions due to COVID – 19 pandemic leading to a temporary or permanent move by tenants and/or prospective tenants from locations in which our communities are located;
- the attractiveness and desirability of our communities to tenants, including, without limitation, the size and amenity offerings of our units, our technology offerings and our ability to identify and cost effectively implement new, relevant technologies and to keep up with constantly changing consumer demand for the latest innovations, including any increased requirements due to the significant increase in the number of people who continue to "work from home";
- inflationary environments in which the cost to operate and maintain communities increases at a rate greater than our ability to increase rents or deflationary environments where we may be exposed to declining rents more quickly under our short-term leases;
- competition from other available housing alternatives;
- changes in rent control or stabilization laws or other laws regulating housing and other increasing regulation on people and business in locations where our communities are located;
- our ability to provide for adequate maintenance and insurance;
- declines in the financial condition of our tenants, which may make it more difficult for us to collect rents from some tenants;
- any decline in or tenants' perceptions of the safety, convenience and attractiveness of our communities and the neighborhoods where they are located; and
- changes in interest rates and availability of financing.

As leases at the communities expire, tenants may enter into new leases on terms that are less favorable to us. Income and real estate values may also be adversely affected by such factors as applicable laws, including, without limitation, the Americans with Disabilities Act of 1990, Fair Housing Amendment Act of 1988, permanent and temporary rent controls, rent stabilization laws, other laws regulating housing that may prevent us from raising rents to offset increased operating expenses, and tax laws.

*National and regional economic environments can negatively impact our liquidity and operating results.*

Our forecast for the national economy assumes growth of the gross domestic product of the national economy and the economies of the southeastern and southwestern states. In the event of a recession or other negative economic effects, including as a result of the COVID – 19 pandemic, we could incur reductions in rental rates, occupancy levels, property valuations and increases in operating costs, such as advertising and turnover expenses. Any such recession or similar event may affect consumer confidence and spending and negatively impact the volume and pricing of real estate transactions, which could negatively affect our liquidity and its ability to vary its portfolio promptly in responses to changes to the economy. Further, if residents do not experience increases in their income, they may be unable or unwilling to pay rent increases, and delinquency in rent payments and rent defaults may increase as well as vacancy rates.

## ITEM 1B.    UNRESOLVED STAFF COMMENTS

None.

13

App. 1775

ITEM 2.    PROPERTIES

**Residential Properties**

| Count | Property | Location | Year Constructed | Units | Occupancy |
|---|---|---|---|---|---|
| | **Consolidated Properties** | | | | |
| 1 | Chelsea | Beaumont, TX | 1999 | 144 | 96.5 % |
| 2 | Forest Grove | Bryan, TX | 2020 | 84 | 98.8 % |
| 3 | Landing Bayou | Houma, LA | 2005 | 240 | 42.1 % |
| 4 | Legacy at Pleasant Grove | Texarkana, TX | 2006 | 208 | 96.6 % |
| 5 | Parc at Denham Springs Phase II | Denham Springs, LA | 2010 | 144 | 93.8 % |
| 6 | Sugar Mill Phase III | Baton Rouge, LA | 2015 | 72 | 86.1 % |
| 7 | Toulon | Gautier, MS | 2011 | 240 | 98.8 % |
| 8 | Villas at Bon Secour | Gulf Shores, AL | 2007 | 200 | 96.5 % |
| 9 | Vista Ridge | Tupelo, MS | 2009 | 160 | 96.9 % |
| | | | | 1,492 | |
| | **Joint Venture Properties** | | | | |
| 1 | Abode Red Rock | Las Vegas, NV | 2018 | 308 | 97.1 % |
| 2 | Apalachee Point Villas | Tallahassee, FL | 2018 | 200 | 98.5 % |
| 3 | Blue Lake Villas | Waxahachie, TX | 2002 | 186 | 98.4 % |
| 4 | Blue Lake Villas Phase II | Waxahachie, TX | 2004 | 70 | 97.1 % |
| 5 | Breakwater Bay | Beaumont, TX | 2003 | 176 | 96.6 % |
| 6 | Bridgewood Ranch | Kaufman, TX | 2007 | 106 | 99.1 % |
| 7 | Capitol Hill | Little Rock, AR | 2003 | 156 | 97.4 % |
| 8 | Centennial Village | Oak Ridge, TN | 2011 | 252 | 97.2 % |
| 9 | Crossing at Opelika | Opelika, AL | 2011 | 168 | 97.0 % |
| 10 | Dakota Arms | Lubbock, TX | 2005 | 208 | 97.6 % |
| 11 | Desoto Ranch | DeSoto, TX | 2003 | 248 | 97.6 % |
| 12 | Eagle Crossing | Dallas, TX | 2017 | 150 | 98.0 % |
| 13 | Falcon Lake | Arlington, TX | 2002 | 248 | 98.8 % |
| 14 | Heather Creek | Mesquite, TX | 2003 | 200 | 99.0 % |
| 15 | Lake Forest | Humble, TX | 2004 | 240 | 97.9 % |
| 16 | Lakeside Lofts | Farmers Branch, TX | 2020 | 494 | 96.4 % |
| 17 | Lodge at Pecan Creek | Denton, TX | 2011 | 192 | 97.9 % |
| 18 | Lofts at Reynolds | Asheville, NC | 2012 | 201 | 99.0 % |
| 19 | Mansions of Mansfield | Mansfield, TX | 2008 | 208 | 98.6 % |
| 20 | McKinney Point | McKinney, TX | 2017 | 198 | 98.5 % |
| 21 | Metropolitan | Little Rock, AR | 2008 | 260 | 93.8 % |
| 22 | Mission Oaks | San Antonio, TX | 2006 | 228 | 97.4 % |
| 23 | Northside on Travis | Sherman, TX | 2008 | 200 | 99.0 % |
| 24 | Oak Hollow | Sequin, TX | 2011 | 160 | 97.5 % |
| 25 | Oak Hollow Phase II | Sequin, TX | 2018 | 96 | 95.8 % |
| 26 | Oceanaire | Biloxi, MS | 2009 | 196 | 99.5 % |
| 27 | Overlook at Allensville Square | Sevierville, TN | 2012 | 144 | 97.9 % |
| 28 | Overlook at Allensville Phase II | Sevierville, TN | 2012 | 144 | 98.6 % |
| 29 | Parc at Bentonville | Bentonville, AR | 2017 | 216 | 96.3 % |
| 30 | Parc at Clarksville | Clarksville, TN | 2018 | 168 | 99.4 % |
| 31 | Parc at Denham Springs | Denham Spring, LA | 2007 | 224 | 96.0 % |
| 32 | Parc at Garland | Garland, TX | 2010 | 198 | 99.0 % |
| 33 | Parc at Mansfield | Mansfield, TX | 2017 | 99 | 100.0 % |
| 34 | Parc at Maumelle | Little Rock, AR | 2015 | 240 | 97.5 % |
| 35 | Parc at Metro Center | Nashville, TN | 2005 | 144 | 98.6 % |

App. 1776

14

| Count | Property | Location | Year Constructed | Units | Occupancy |
|---|---|---|---|---|---|
| 36 | Parc at Rogers | Rogers, AR | 2006 | 250 | 96.30 % |
| 37 | Parc at Wylie | Wylie, TX | 2007 | 198 | 98.5 % |
| 38 | Preserve at Pecan Creek | Denton, TX | 2008 | 192 | 97.4 % |
| 39 | Preserve at Prairie Pointe | Lubbock, TX | 2005 | 184 | 96.7 % |
| 40 | Residences at Holland Lake | Weatherford, TX | 2004 | 208 | 97.6 % |
| 41 | Sawgrass Creek | New Port Richey, FL | 2018 | 188 | 99.5 % |
| 42 | Sonoma Court | Rockwall, TX | 2011 | 124 | 99.2 % |
| 43 | Sugar Mill Phase I | Baton Rouge, LA | 2009 | 160 | 83.1 % |
| 44 | Sugar Mill Phase II | Baton Rouge, LA | 2016 | 80 | 77.5 % |
| 45 | Tattersall Village | Hinesville, GA | 2010 | 222 | 96.8 % |
| 46 | Terra Lago | Rowlett, TX | 2018 | 451 | 97.6 % |
| 47 | Tradewinds | Midland, TX | 2015 | 214 | 84.6 % |
| 48 | Villas of Park West I | Pueblo, CO | 2005 | 148 | 97.3 % |
| 49 | Villas of Park West II | Pueblo, CO | 2010 | 112 | 99.1 % |
| 50 | Vistas of Vance Jackson | San Antonio, TX | 2005 | 240 | 97.5 % |
| 51 | Waterford At Summer Park | Rosenberg, TX | 2013 | 196 | 99.0 % |
| 52 | Windsong | Fort Worth, TX | 2003 | 188 | 97.3 % |
| | | | | **10,281** | |
| 61 | Total Mutltifamily Properties | | | **11,773** | |

**Residential Portfolio Composition**

The following table sets forth the location and number of units as of December 31, 2021:

| Location | Company owned No. | Company owned Units | VAA owned No. | VAA owned Units | Total No. | Total Units |
|---|---|---|---|---|---|---|
| Alabama | 1 | 200 | 1 | 168 | 2 | 368 |
| Arkansas | — | — | 5 | 1,122 | 5 | 1,122 |
| Colorado | — | — | 2 | 260 | 2 | 260 |
| Florida | — | — | 2 | 388 | 2 | 388 |
| Georgia | — | — | 1 | 222 | 1 | 222 |
| Louisiana | 3 | 456 | 3 | 464 | 6 | 920 |
| Mississippi | 2 | 400 | 1 | 196 | 3 | 596 |
| North Carolina | — | — | 1 | 201 | 1 | 201 |
| Nevada | — | — | 1 | 308 | 1 | 308 |
| Tennessee | — | — | 5 | 852 | 5 | 852 |
| Texas | 3 | 436 | 30 | 6,100 | 33 | 6,536 |
| | 9 | 1,492 | 52 | 10,281 | 61 | 11,773 |

App. 1777

15

**Commercial Properties**

| Count | Property | Location | Year Constructed | Square Feet | Occupancy |
|---|---|---|---|---|---|
| | **Office Buildings** | | | | |
| 1 | 770 South Post Oak | Houston, TX | 1980 | 95,450 | 53.3 % |
| 2 | Browning Place | Farmers Branch, TX | 1982 | 625,297 | 73.0 % |
| 3 | Senlac | Farmers Branch, TX | 1971 | 2,812 | 100.0 % |
| 4 | Stanford Center | Dallas, TX | 1982 | 333,234 | 67.9 % |
| | | | | 1,056,793 | |
| | **Retail Centers** | | | | |
| 5 | Fruitland Park | Fruitland Park, FL | 1986 | 6,722 | — % |
| 5 | | | | 1,063,515 | |

**Commercial Lease Expirations**

The following table summarizes our commercial lease expirations as of December 31, 2021:

| Year of Lease Expiration | Rentable Square Feet Subject to Expiring Leases | Current Annualized Contractual Rent Under Expiring Leases (1,000s)(1) | Current Annualized Contractual Rent Under Expiring Leases (P.S.F.) | Percentage of Total Square Feet | Percentage of Gross Rentals |
|---|---|---|---|---|---|
| 2022 | 225,945 | $ 13,368 | $ 59.15 | 21.3 % | 23.0 % |
| 2023 | 209,346 | 9,128 | 43.67 | 19.7 % | 15.7 % |
| 2024 | 51,645 | 5,613 | 107.94 | 4.9 % | 9.6 % |
| 2025 | 25,614 | 5,200 | 200.00 | 2.5 % | 8.9 % |
| 2026 | 7,157 | 4,912 | 701.71 | 0.7 % | 8.4 % |
| Thereafter | 205,353 | 20,008 | 97.60 | 19.3 % | 34.4 % |
| | 725,060 | $ 58,229 | | | 100.0 % |

(1)   This amount reflects total rent before any rent abatement and includes expense reimbursements, which may be estimates as of such date.

16

**Land Investments**

App. 1778

| Project | Location | Acres |
|---|---|---|
| **Held for development** | | |
| Athens | Athens, AL | 33 |
| EQK Portage | Kent, OH | 49 |
| McKinney 36 | Collin County, TX | 18 |
| McKinney Heritage | McKinney, TX | 10 |
| Ocean Estates | Gulfport, MS | 12 |
| Willowick | Pensacola, FL | 40 |
| Mercer Crossing Commercial | Farmers Branch, TX | 19 |
| Windmills Farm | Kaufman County, TX | 1,223 |
| Other | Various | 41 |
| | | 1,445 |
| **Held subject to sales contract** | | |
| Mercer Crossing | Farmers Branch, TX | 1 |
| Windmill Farms | Kaufman County, TX | 440 |
| | | 441 |
| | | **1,886** |

## ITEM 3.   LEGAL PROCEEDINGS

In February 2019, Paul Berger ("Berger") filed a lawsuit against us, our directors, our officers and others that alleges that we completed improper sales and/or transfers of property with IOR. Berger requests that we pay off various related party loans to IOR and that IOR then distribute the funds to IOR's stockholders. We intend to vigorously defend against the allegations. The trial for this matter is scheduled for November 2022.

In connection with the formation of VAA, ten of the properties that we contributed to the joint venture were subject to an earn-out provision that provided for a remeasurement of the value of those properties after a two-year period following the completion of construction (the "Earn Out Obligation"). We were unable to reach agreement with our joint venture partner on the remeasured value and as a result, the parties filed for arbitration in accordance with the joint venture agreement. On July 13, 2021, we received the arbitration verdict in connection with our dispute on the measurement of the Earn Out Obligation, which determined that our position and claims were declined, and the position of Macquarie was fully accepted. As a result, we were ordered to pay approximately $39.6 million to Macquarie to satisfy the Earn Out Obligation.

## ITEM 4.   MINE SAFETY DISCLOSURES

Not applicable.

17

## PART II

## ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock is listed and traded on the NYSE under the symbol "TCI". The following table sets forth the high and low sales prices as reported in the consolidated reporting system of the NYSE for the quarters ended:

| | 2021 | | 2020 | |
|---|---|---|---|---|
| | **High** | **Low** | **High** | **Low** |
| First Quarter | $ 25.10 | $ 20.34 | $ 39.86 | $ 16.00 |
| Second Quarter | $ 34.25 | $ 18.61 | $ 40.42 | $ 16.50 |
| Third Quarter | $ 42.40 | $ 30.91 | $ 30.43 | $ 29.99 |
| Fourth Quarter | $ 42.92 | $ 37.20 | $ 32.26 | $ 21.75 |

App. 1779

On March 28, 2022, the closing price of our common stock as reported on the NYSE was $38.71 per share, and was held by approximately 2,046 holders of record.

Our Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, the board determined not to pay any dividends on common stock in December 31, 2021, 2020 or 2019. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including our financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

We have a share repurchase program that allows for the repurchase of up to 1,637,000 shares of our common stock. This repurchase program has no termination date. There were no shares repurchased in 2021 and the program has 650,250 share remaining that can be repurchased as of December 31, 2021.

## ITEM 6.   SELECTED FINANCIAL DATA

Optional and not included.

## ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion should be read in conjunction with our consolidated financial statements and related notes in Part II, Item 8 of this Report. Our results of operations for the year ended December 31, 2021 were affected by the acquisitions and disposition, refinancing activity, development activity as discussed below.

### Management's Overview

We are an externally advised and managed real estate investment company that owns a diverse portfolio of income-producing properties and land held for development throughout the Southern United States. Our portfolio of income-producing properties includes multifamily residential properties, office buildings and other commercial properties. Our investment strategy includes acquiring existing income-producing properties as well as developing new properties on land already owned or acquired for a specific development project.

Our operations are managed by Pillar Income Asset Management, Inc. ("Pillar") in accordance with an Advisory Agreement. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges our debt and equity financing with third party lenders and investors. We rely upon on the employees of Pillar render services to us in accordance with the terms of the Advisory Agreement. Pillar is considered to be a related party due to its common ownership with American Realty Investors, Inc. ("ARL"), who is our controlling shareholder.

18

The following is a summary of our recent acquisition, disposition, financing and development activities:

*Acquisitions and Dispositions*

- On May 31, 2019, we sold Westwood, a 120 unit multifamily property in Mary Ester, Florida for $3.1 million, resulting in a loss on sale of $0.1 million.

- During the year ended December 31, 2019, we sold 105.1 acres of land for an aggregate sales price of $30.0 million and purchased 41.9 acres for an aggregate purchase price of approximately $4.6 million.

- On March 5, 2020, we acquired a 49.2 acres land parcel in Kent, Ohio for $5.4 million that was funded by a $2.0 million cash payment and a $3.4 million note payable that bears interest at 10% and matures on November 13, 2024.

- On May 1, 2020, we sold Villager, a 33 unit multifamily property in Fort Walton, Florida for $2.4 million, resulting in a gain on sale of $1.0 million.

- On July 16, 2020, we sold Farnham Park, a 144 unit multifamily property in Port Arthur, Texas for $13.3 million, resulting in a gain on sale

of $2.5 million.

- On September 14, 2020, we sold Bridge View Plaza, a retail property in La Crosse, Wisconsin for $5.3 million, resulting in a gain on sale of $4.6 million.

- During the year ended December 31, 2020, we sold a total of 58.8 acres of land from our holdings in Windmill Farms for $12.9 million, in aggregate, resulting in gains on sale of $11.1 million. In addition, we sold 26.79 acres of land from our holdings in Mercer Crossing during the year ended December 31, 2020 for $16.3 million, resulting in a gain on sale of $5.7 million.

- On March 30, 2021, we sold a 50% ownership interest in Overlook at Allensville Phase II, a 144 unit multifamily property in Sevierville, Tennessee to Macquarie, for $2.6 million resulting in a gain on sale of $1.4 million. Concurrent with the sale, we each contributed our 50% ownership interests in Overlook at Allensville Phase II into VAA.

- On August 26, 2021, we sold 600 Las Colinas, a 512,173 square foot office building in Irving, Texas for $74.8 million, resulting in a gain on sale of $27.3 million. We used the proceeds to pay down the mortgage note payable on the property (See "Financing Activities") and for general corporate purposes.

- During the year ended December 31, 2021, we sold a total of 134.7 acres of land from our holdings in Windmill Farms for $20.2 million, in aggregate, resulting in gains on sale of $10.3 million. In addition, we sold 14.1 acres of land from our holdings in Mercer Crossing during the year ended December 31, 2021 for $9.0 million, resulting in a gain on sale of $6.4 million.

*Financing Activities*

- On July 28, 2019, we paid off the $41.5 million mortgage note payable on Browning Place, which resulted in a loss on early extinguishment of debt of $5.2 million. Concurrent with the repayment of the mortgage note payable, we issued $78.1 million of Series C bonds (See Note 12 in our consolidated financial statements), which are collateralized by Browning Place, bear interest at 4.65% and mature on January 31, 2023.

- On November 30, 2020, we issued $19.7 million in additional Series A bonds (See Note 12 in our consolidated financial statements) for $18.8 million in net proceeds. We used the proceeds to fund in part our bond payments that were due on January 30, 2021.

- On December 3, 2020, we extended our $14.7 million loan from HSW Partners to June 17, 2021.

- On March 2, 2021, we extended our $1.2 million loan on Athens to August 28, 2022.

- On March 4, 2021, we extended the maturity of our $8.4 million loan on Windmill Farms until February 28, 2023 at a reduced interest rate of 5%.

- On August 25, 2021, we replaced the existing loan on Villas at Bon Secour with a new $20.0 million loan that bears interest at 3.08% and matures on September 1, 2031.

19

- On August 26, 2021, we paid off the $35.9 million loan on 600 Las Colinas in connection with the sale of the underlying property (See "Acquisitions and Dispositions").

- On March 3, 2022, we extended our $39.0 million loan on Stanford Center to February 26, 2023.

*Development Activities*

In 2020, we completed the construction of Parc at Denham Springs Phase II and Sugar Mill Phase III for a total cost of $17.2 million and $14.2 million, respectively.

During 2021, we spent $15.7 million on our ongoing development of Windmill Farms. Our expenditure includes $2.8 million on the development of land lots for sale to single family home developers and $13.0 million on reimbursable infrastructure investments.

We have investment in nine notes receivable that were issued to fund the development of multifamily properties (See Part 1 - Item 2 - Properties). As of December 31, 2021, one of the projects was in construction, two were in lease-up and six were stabilized. In 2021, we advanced

App. 1781

property.

During 2021, we advanced $2.3 million on the development of Tower Bay Lofts, which is owned by a third party. We have an agreement that allows us to purchase this project, at our option, for the price of our investment.

*Other Developments:*

During 2021, we recorded a loss of $29.6 million on the remeasurements of certain assets ("Earn Out Obligation") that were sold in connection with our investment in VAA.

On November 17, 2021, we entered into a Major Decision with Macquarie to engage a broker and initiate a sale of all the properties held by VAA, which are listed in Item 2. Properties as Joint Venture properties. In connection with the sale, VAA will distribute seven of its existing properties to us (referred to herein as the "Holdback Properties") and we in turn, will contribute one of our properties ("Contributed Property") into the portfolio offered for sale to third-parties. The sales price for the Holdback Properties and Contributed Property will be the estimated value of these properties as stated in the agreement, multiplied by the ratio of the actual sales price of the portion of the VAA Portfolio sold to a third party to the estimated value of the those properties that were provided in the agreement.

Each of the properties in the VAA Portfolio is appraised on an annual basis as part of our filing requirement with the TASE. As of December 31, 2021, the fair value of the VAA Portfolio, based on these appraisals was approximately $1.4 billion. The appraised value reflects an aggregate of individual property appraised value and does not reflect a premium that is sometimes offered in a portfolio sale. These values reflect a compression of cap rates for multifamily properties during the last year. However, there can be no assurances that these values will be realized. The Major Decision agreement will expire on August 1, 2022, if the VAA Portfolio has not been sold.

Our ownership interest in VAA is held by SPC, and is therefore subject to the bond covenants of the three series of bonds that have been issued by SPC. These provisions include restrictions on the distribution of cash from SPC (See Note 12 - Bonds Payable in our consolidated financial statements).

**Critical Accounting Policies**

The preparation of our consolidated financial statements in conformity with United States generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Some of these estimates and assumptions include judgments on revenue recognition, estimates for common area maintenance and real estate tax accruals, provisions for uncollectible accounts, impairment of long-lived assets, the allocation of purchase price between tangible and intangible assets, capitalization of costs and fair value measurements. Our significant accounting policies are described in more detail in Note 2—Summary of Significant Accounting Policies in our notes to the consolidated financial statements. However, the following policies are deemed to be critical.

*Fair Value of Financial Instruments*

We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between willing market participants at the measurement date that is other than a forced or liquidation sale, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1—Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2—Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3—Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Related Parties*

We apply ASC Topic 805, "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing our own separate interests, or affiliates of the entity.

*Environmental Matters*

Under various federal, state and local environmental laws, ordinances and regulations, we may be potentially liable for removal or remediation costs, as well as certain other potential costs, relating to hazardous or toxic substances (including governmental fines and injuries to persons and property) where property-level managers have arranged for the removal, disposal or treatment of hazardous or toxic substances. In addition, certain environmental laws impose liability for release of asbestos-containing materials into the air, and third parties may seek recovery for personal injury associated with such materials.

We are not aware of any environmental liability relating to the above matters that would have a material adverse effect on our business, assets or results of operations.

*Inflation*

The effects of inflation on our operations are not quantifiable. Revenues from property operations tend to fluctuate proportionately with inflationary increases and decreases in housing costs. Fluctuations in the rate of inflation also affect sales values of properties and the ultimate gain to be realized from property sales. To the extent that inflation affects interest rates, our earnings from short-term investments, the cost of new financings and the cost of variable interest rate debt will be affected.

**Results of Operations**

Many of the variations in the results of operations, discussed below, occurred because of the transactions affecting our properties described above, including those related to the Lease-Up Properties and the Disposition Properties (each as defined below).

21

For purposes of the discussion below, we define "Same Properties" as those properties that are substantially leased-up and in operation for the entirety of both periods of the comparison. Non-Same Properties for comparison purposes include those properties that have been recently constructed or leased-up ("Lease-up Properties") and properties that have been disposed of ("Disposition Properties"). A developed property is considered leased-up, when it achieves occupancy of 80% or more. We move a property in and out of Same Properties based on whether the property is substantially leased-up and in operation for the entirety of both periods of the comparison. Accordingly, the Same Properties consist of all properties, excluding the Lease-up Properties and the Disposition Properties for the periods of comparison.

For the comparison of the year ended December 31, 2021 to the year ended December 31, 2020, the Lease-up Properties are Forest Grove, Parc at Denham Springs Phase II and Sugar Mill Phase III; and the Disposition Properties are 600 Las Colinas, Overlook at Allensville Phase II, Bridge View Plaza, Farnham Park and Villager.

The following table provides a summary of the results of operations of 2021 and 2020:

| | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **Variance** | |
| Multifamily Segment | | | | | | |
| Revenue | $ | 14,495 | $ | 14,686 | $ | (191) |
| Operating expenses | | (8,167) | | (8,482) | | 315 |
| | | 6,328 | | 6,204 | | 124 |

App. 1783

| Commercial Segment | | | |
|---|---|---|---|
| Revenue | 23,313 | 37,223 | (13,910) |
| Operating expenses | (12,693) | (15,878) | 3,185 |
| | 10,620 | 21,345 | (10,725) |
| Segment operating income | 16,948 | 27,549 | (10,601) |
| Other non-segment items of income (expense) | | | |
| Depreciation and amortization | (11,870) | (14,755) | 2,885 |
| General, administrative and advisory | (24,207) | (17,935) | (6,272) |
| Interest, net | (5,028) | (10,714) | 5,686 |
| Loss on extinguishment of debt | (1,451) | — | (1,451) |
| Loss on foreign currency transactions | (6,175) | (13,378) | 7,203 |
| Gain sale or write down of assets | 23,352 | 32,107 | (8,755) |
| Income (loss) from joint ventures | 14,531 | (519) | 15,050 |
| Other income | 3,977 | 5,109 | (1,132) |
| Net income (loss) | $ 10,077 | $ 7,464 | $ 2,613 |

*Comparison of the year ended December 31, 2021 to the year ended December 31, 2020:*

Our $2.6 million increase in net income in 2021 is primarily attributed to the following:

- The $10.7 million decrease in operating profits in our commercial segment is attributed a decrease of $8.1 million from the Same Properties and $1.9 million from the Disposition Properties. The decrease at the Same Properties is primarily due to a $5.9 million lease termination payment at Browning Place in 2020 and a decline in occupancy. The lease termination payment relates to a former tenant that has been replaced by a new tenant at increased rents.

- The $6.3 million increase in general, administrative and advisory expenses is primarily due to a an increase in advisory fees related to the sale of 600 Las Colinas, the refinance of Villas at Bon Secour (See "Acquisitions and Dispositions" and "Financing Activities" in Management's Overview), and legal costs associated with the VAA Earn Out arbitration.

- The decrease in interest expense, net is primarily due to the repayment of the loan on 600 Las Colinas (See "Acquisitions and Dispositions" and "Financing Activities" in Management's Overview) and the repayment of other notes payable in 2021.

22

- The decrease in loss on foreign currency transactions is due to the decrease in the amount of bonds payable outstanding during 2020 in comparison to 2021, offset in part by the continued decrease in the value of the dollar in comparison to the New Israel Shekel in 2021.

- The $1.5 million loss on extinguishment of debt in 2021 is due to the early extinguishment of our mortgage note payable on 600 Las Colinas and Villas at Bon Secour (See "Financing Activities" in Management's Overview).

- The $8.8 million decrease on gain on sale or remeasurement of assets is primarily due to the $29.6 million charge from the remeasurement of the Earn Out Obligation (See "Acquisitions and Dispositions" in Management's Overview) and a $6.7 million decrease in gain on sale of land in 2021, offset in part by a $28.0 million increase gain on sale of various commercial and multifamily properties in 2021 (See "Acquisitions and Dispositions" in Management's Overview).

- The $15.1 million decrease in loss from joint ventures is due to the increased in occupancy of the various lease-up properties at VAA.

*Comparison of the year ended December 31, 2020 to the year ended* December 31, 2019:

See Item 7 of Part II in our Annual Report on Form 10-K for the year ended December 31, 2020 filed with the SEC on March 26, 2021 for a discussion of our results of operations for the year ended December 31, 2020.

**Liquidity and Capital Resources**

Our principal sources of cash have been, and will continue to be, property operations; proceeds from land and income-producing property sales; collection of mortgage notes receivable; collections of receivables from related companies; refinancing of existing mortgage notes payable; and additional borrowings, including mortgage notes dond bonds payable, and lines of credit.

Our principal liquidity needs are to fund normal recurring expenses; meet debt service and principal repayment obligations including balloon

App. 1784

payments Case 3:22-cv-02118-X    Document 253    Filed 05/30/23    Page 514 of 824    PageID 9638 on maturing debt, fund capital expenditures, including tenant improvements and leasing costs, fund development costs not covered under construction loans; and fund possible property acquisitions.

We anticipates that our cash, cash equivalents and short-term investments as of December 31, 2021, along with cash that will be generated in 2022 from notes and interest receivables, will be sufficient to meet all of our cash requirements. We intends to selectively sell land and income-producing assets, refinance or extend real estate debt and seek additional borrowings secured by real estate to meet our liquidity requirements. Although history cannot predict the future, historically, we have been successful at refinancing and extending a portion of our current maturity obligations.

*Cash Flow Summary*

The following summary discussion of our cash flows is based on the consolidated statements of cash flows in Part II, Item 8. "Consolidated Financial Statements and Supplementary Data" and is not meant to be an all-inclusive discussion of the changes in our cash flows for the periods presented below (dollars in thousands):

|  | Year Ended December 31, | | | | Incr /(Decr) | |
|  | 2021 | | 2020 | | | |
|---|---|---|---|---|---|---|
| Net cash (used in) provided by operating activities | $ | (10,986) | $ | 5,631 | $ | (16,617) |
| Net cash provided by (used in) investing activities | $ | 100,325 | $ | 381 | $ | 99,944 |
| Net cash used in financing activities | $ | (103,585) | $ | (2,306) | $ | (101,279) |

The decrease in cash from operating activities is primarily due to an increase in reimbursable payments on the Windmill Farms project in 2021.

The increase in cash provided by investing activities is primarily due to a $64.6 million increase in proceeds from sale of assets, a $28.0 million decrease in originations and advances on notes receivable, a $13.2 million increase in collection of notes receivable, and a $9.4 million decrease in development and renovation of real estate. The increase in cash proceeds on sale of assets is primarily due to the sale of 600 Las Colinas in 2021 (See "Acquisitions and Dispositions" in Management's Overview).

The increase in cash used in financing activities is primarily due to the $87.2 million increase in payments of mortgages, notes and bonds payable and a $10.7 million decrease in proceeds from mortgages, notes and bonds payable. The increase in payments of mortgages, notes and bonds payable is due to the pay off of the loan on 600 Las Colinas in 2021, the refinancing of Villas at Bon Secour in 2021 (See "Financing Activities" in Management's Overview), and a $34.1 million increase in payments on the bonds payable.

**Funds From Operations ("FFO")**

We use FFO in addition to net income to report our operating and financial results and considers FFO and FFO-diluted as supplemental measures for the real estate industry and a supplement to GAAP measures. The National Association of Real Estate Investment Trusts ("Nareit") defines FFO as net income (loss) (computed in accordance with GAAP), excluding gains (or losses) from sales of properties, plus real estate related depreciation and amortization, impairment write-downs of real estate and write-downs of investments in an affiliate where the write-downs have been driven by a decrease in the value of real estate held by the affiliate and after adjustments for unconsolidated joint ventures. Adjustments for unconsolidated joint ventures are calculated to reflect FFO on the same basis. We also presents FFO excluding the impact of the effects of foreign currency translation.

FFO and FFO on a diluted basis are useful to investors in comparing operating and financial results between periods. This is especially true since FFO excludes real estate depreciation and amortization, as we believe real estate values fluctuate based on market conditions rather than depreciating in value ratably on a straight-line basis over time. We believe that such a presentation also provides investors with a meaningful measure of our operating results in comparison to the operating results of other real estate companies. In addition, we believe that FFO excluding gain (loss) from foreign currency transactions provide useful supplemental information regarding our performance as they show a more meaningful and consistent comparison of our operating performance and allows investors to more easily compare our results.

We believe that FFO does not represent cash flow from operations as defined by GAAP, should not be considered as an alternative to net income as defined by GAAP, and is not indicative of cash available to fund all cash flow needs. We also caution that FFO, as presented, may not be comparable to similarly titled measures reported by other real estate companies.

We compensate for the limitations of FFO by providing investors with financial statements prepared according to GAAP, along with this detailed discussion of FFO and a reconciliation of net income to FFO and FFO-diluted. We believe that to further understand our performance, FFO should be compared with our reported net income and considered in addition to cash flows in accordance with GAAP, as presented in our consolidated

App. 1785

The following reconciles our net income attributable to FFO and FFO-basic and diluted, excluding the loss from foreign currency transactions and the loss on extinguishment of debt for the years ended December 31, 2021, 2020 and 2019 (dollars and shares in thousands):

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2020 | 2019 |
| Net income (loss) attributable to the Company | $ 9,398 | $ 6,669 | $ (26,920) |
| Depreciation and amortization on consolidated assets | 11,870 | 14,755 | 13,379 |
| Gain on sale or write down of assets | (23,352) | (32,107) | (14,809) |
| Gain on sale of land | 16,645 | 23,383 | 14,889 |
| Depreciation and amortization on unconsolidated joint ventures at pro rata share | 11,604 | 11,295 | 20,440 |
| FFO-Basic and Diluted | 26,165 | 23,995 | 6,979 |
| Loss on extinguishment of debt | 1,451 | — | 5,219 |
| Loss on foreign currency transactions | 6,175 | 13,378 | 15,108 |
| FFO-adjusted | $ 33,791 | $ 37,373 | $ 27,306 |

## ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Optional and not included.

## ITEM 8.   CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

### INDEX TO FINANCIAL STATEMENTS

24

| | Page |
| --- | --- |
| **Financial Statements** | |
| Report of Independent Registered Public Accounting Firm (PCAOB ID 782) | 26 |
| Consolidated Balance Sheets at December 31, 2021 and 2020 | 29 |
| Consolidated Statements of Operations for the Years Ended December 31, 2021, 2020 and 2019 | 30 |
| Consolidated Statements of Equity for the Years Ended December 31, 2021, 2020 and 2019 | 31 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2021, 2020 and 2019 | 32 |
| Notes to Consolidated Financial Statements | 33 |
| | |
| **Financial Statement Schedules** | |
| Schedule III—Real Estate and Accumulated Depreciation | 51 |
| Schedule IV—Mortgage Loans Receivable on Real Estate | 53 |

25

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors of and
Stockholders of Transcontinental Realty Investors, Inc.
Dallas, Texas

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Transcontinental Realty Investors, Inc. as of December 31, 2021 and 2020, and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2021, and the related notes and schedules (collectively referred to as the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of American Realty Investors, Inc. as of December 31, 2021 and 2020 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021 in conformity with accounting principles generally accepted in the United States of America.

**Basis of Opinion**

These consolidated financial statements are the responsibility of Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Impairment of investment in real estate*

*Description of the Matter*

The Company's net investment in real estate totaled $296.4 million as of December 31, 2021. As discussed in Note 2 to the consolidated financial statements, the Company periodically assesses whether there has been any impairment in the carrying value of its properties and whenever events or changes in circumstances indicate that the carrying value of a property may not be recoverable. Impairment is recognized on real estate assets held for investment when indicators of impairment are present and the future undiscounted cash flows for a real estate asset are less than its carrying amount, at which time the real estate asset is written down to its estimated fair value.

26

Auditing the Company's impairment assessment for real estate assets was complex because of the subjective auditor judgment necessary in evaluating management's identification of indicators of potential impairment. Our evaluation of management's identification of indicators of impairment

App. 1787

included our related assessment of such indicators, either individually or in combination, in determining whether a triggering event has occurred that requires the Company to evaluate the recoverability of the real estate asset.

*How We Addressed the Matter in Our Audit*

We obtained an understanding of the Company's controls over the Company's real estate asset impairment assessment process. Our testing of the Company's impairment assessment included, among other procedures, evaluating significant judgments applied in determining whether indicators of impairment existed for the Company's real estate assets. Our procedures included obtaining evidence to corroborate such judgments and searching for evidence contrary to such judgments, including searching for significant tenant write-offs or upcoming lease expirations with little prospects for replacement tenants. We also searched for any significant declines in operating results of a real estate asset due that could be a triggering event or an indicator of potential impairment.

### *Collectability of Notes Receivable*

*Description of the Matter*

At December 31, 2021, the Company had notes receivable in the amount of $129.7 million. The Company performs an assessment as to whether or not substantially all of the amounts due under these notes receivable is deemed probable of collection. Subsequently, for notes where the Company concludes that it is not probable that it will collect substantially all payments due under the note, the Company creates an allowance for any amounts not probable of collection.

Auditing the Company's collectability assessment is complex due to the judgment involved in the Company's determination of the collectability of these notes. The determination involves consideration of the terms of the note, whether or not the note is currently performing, and any security for the note.

*How We Addressed the Matter in Our Audit*

We obtained an understanding of the Company's controls over notes receivable and their collectability assessment. Our testing included among other things, confirming selected notes receivable, determining if the notes were performing according to their terms and testing the Company's evaluation of the underlying security interest if necessary.

### *Revenue Recognition (straight-line) for commercial tenants*

*Description of the Matter*

During 2021, the Company recognized office rental revenues and tenant recoveries of $23.3 million and deferred rent receivables of $2.0 million at December 31, 2021. As described in Note 2 to the consolidated financial statements, the Company recognizes revenue from commercial properties on a straight-line basis over the terms of the related leases.

Auditing the Company's straight-line calculations is complex due to the free rent periods, lease amendments and escalation clauses contained in many of the leases.

*How We Addressed the Matter in Our Audit*

We obtained an understanding of the Company's controls over office rental revenues and tenant recoveries, including controls over management's calculation of the straight-line calculation and deferred rent receivable. To test the straight-line rent revenue and deferred rent receivable, we performed audit procedures that included, among others, evaluating the data and assumptions used in determining the calculation and agreeing amounts in the calculation to copies of lease agreements. In addition, we tested the completeness and accuracy of the data that was used in management's straight-line rent and deferred rent receivable calculation.

27

**Emphasis of Liquidity**

As described in the Note 18, management intends to sell income-producing assets, refinance real estate and obtain additional borrowings primarily secured by real estate to meet the Company's liquidity requirements.

**Supplemental Information**

App. 1788

The supplemental information contained in Schedules III and IV has been subjected to audit procedures performed in conjunction with the audit of the Company's financial statements. The supplemental information is the responsibility of the Company's management. Our audit procedures included determining whether the supplemental information reconciles to the financial statements or the underlying accounting and other records, as applicable, and performing procedures to test the completeness and accuracy of the information presented in the supplemental information. In forming our opinion on the supplemental information, we evaluated whether the supplemental information, including its form and content, is presented in conformity with the Security and Exchange Commission's rules. In our opinion, the supplemental information is fairly stated, in all material respects, in relation to the financial statements as a whole.

FARMER, FUQUA & HUFF, PC
Richardson, Texas
March 28, 2021
We have served as the Company's auditor since 2004.

28

## TRANSCONTINENTAL REALTY INVESTORS, INC.
## CONSOLIDATED BALANCE SHEETS
### (Dollars in thousands, except par value amounts)

| | December 31, | |
|---|---|---|
| | 2021 | 2020 |
| **Assets** | | |
| Real estate | $ 296,363 | $ 377,383 |
| Cash and cash equivalents | 50,735 | 36,761 |
| Restricted cash | 21,986 | 50,206 |
| Short-term investments | 16,001 | — |
| Notes receivable (including $68,991 and $62,448 at December 31, 2021 and 2020, respectively, from related parties) | 129,726 | 123,556 |
| Investment in unconsolidated joint ventures | 52,879 | 51,786 |
| Receivable from related parties | 136,715 | 159,777 |
| Other assets (including $4,223 and $3,830 at December 31, 2021 and 2020, respectively, from related parties) | 84,004 | 79,613 |
| Total assets | $ 788,409 | $ 879,082 |
| | | |
| **Liabilities and Equity** | | |
| Liabilities: | | |
| Mortgages and other notes payable | $ 176,750 | $ 236,069 |
| Bonds payable | 189,452 | 237,888 |
| Accounts payable and other liabilities (including $616 and $930 at December 31, 2021 and 2020, respectively, to related parties) | 43,602 | 26,729 |
| Interest payable | 6,416 | 7,550 |
| Deferred revenue | 581 | 9,315 |
| Total liabilities | 416,801 | 517,551 |
| | | |
| Equity: | | |
| Shareholders' equity | | |
| Common stock, $0.01 par value, 10,000,000 shares authorized; 8,639,316 shares issued, 8,639,116 outstanding | 86 | 86 |
| Treasury stock at cost, 200 shares | — | (2) |
| Additional paid-in capital | 260,387 | 260,389 |
| Retained earnings | 90,732 | 81,334 |
| Total shareholders' equity | 351,205 | 341,807 |

App. 1789

| | 2021 | 2019 |
|---|---|---|
| Noncontrolling interest | | 19,724 |
| Total equity | 371,608 | 361,531 |
| Total liabilities and equity | $ 788,409 | $ 879,082 |

The accompanying notes are an integral part of these consolidated financial statements.

29

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Dollars in thousands, except per share amounts)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Revenues: | | | |
| Rental revenues (including $944, $1,083 and $841 for 2021, 2020 and 2019, respectively, from related parties) | $ 37,808 | $ 51,909 | $ 46,231 |
| Other income | 2,966 | 5,113 | 1,823 |
| Total revenue | 40,774 | 57,022 | 48,054 |
| Expenses: | | | |
| Property operating expenses (including $889, $990 and $991 for 2021, 2020 and 2019, respectively, from related parties) | 20,860 | 24,360 | 25,213 |
| Depreciation and amortization | 11,870 | 14,755 | 13,379 |
| General and administrative (including $4,091, $3,869 and $4,144 for 2021, 2020 and 2019, respectively, from related parties) | 12,425 | 9,287 | 8,704 |
| Advisory fee to related party | 11,782 | 8,648 | 8,410 |
| Total operating expenses | 56,937 | 57,050 | 55,706 |
| Net operating loss | (16,163) | (28) | (7,652) |
| Interest income (including $15,950, $19,515 and $17,413 for 2021, 2020 and 2019, respectively, from related parties) | 19,572 | 18,660 | 19,607 |
| Interest expense (including $1,621, $1,581 and $1,999 for 2021, 2020 and 2019, respectively, from related parties) | (24,600) | (29,374) | (31,816) |
| Loss on foreign currency transactions | (6,175) | (13,378) | (15,108) |
| Loss on extinguishment of debt | (1,451) | — | (5,219) |
| Equity in income (loss) from unconsolidated joint ventures | 14,531 | (519) | (2,758) |
| Gain on sale or write-down of assets, net | 23,352 | 32,107 | 14,809 |
| Income tax provision | 1,011 | (4) | 2,000 |
| Net income (loss) | 10,077 | 7,464 | (26,137) |
| Net income attributable to noncontrolling interest | (679) | (795) | (783) |
| Net income (loss) attributable to the Company | 9,398 | 6,669 | (26,920) |
| Earnings per share - basic | | | |
| Basic and diluted | $ 1.09 | $ 0.77 | $ (3.09) |
| Weighted average common shares used in computing earnings per share | | | |
| Basic and diluted | 8,639,316 | 8,639,316 | 8,717,767 |

The accompanying notes are an integral part of these consolidated financial statements.

App. 1790

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENT OF EQUITY**
**(Dollars in thousands, except share amounts)**

| | Common Stock | Treasury Stock | Paid-in Capital | Retained Earnings | Total Shareholders' Equity | Noncontrolling Interest | Total Equity |
|---|---|---|---|---|---|---|---|
| Balance, January 1, 2019 | $ 86 | $ (2) | $ 258,051 | $ 101,585 | $ 359,720 | $ 20,681 | $ 380,401 |
| Net loss | — | — | — | (26,920) | (26,920) | 783 | (26,137) |
| Distribution to equity partner | — | — | (197) | — | (197) | — | (197) |
| Balance, December 31, 2019 | 86 | (2) | 257,854 | 74,665 | 332,603 | 21,464 | 354,067 |
| Net income | — | — | — | 6,669 | 6,669 | 795 | 7,464 |
| Distribution to equity partner | — | — | 2,535 | — | 2,535 | (2,535) | — |
| Balance, December 31, 2020 | 86 | (2) | 260,389 | 81,334 | 341,807 | 19,724 | 361,531 |
| Net income | — | — | — | 9,398 | 9,398 | 679 | 10,077 |
| Cancellation of treasury stock | | 2 | (2) | — | — | — | — |
| Balance, December 31, 2021 | $ 86 | $ — | $ 260,387 | $ 90,732 | $ 351,205 | $ 20,403 | $ 371,608 |

The accompanying notes are an integral part of these consolidated financial statements.

31

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Dollars in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Cash Flow From Operating Activities: | | | |
| Net income (loss) | $ 10,077 | $ 7,464 | $ (26,137) |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | | |
| Gain on sale or write down of assets | (23,352) | (32,107) | (14,809) |
| Loss income on foreign currency transactions | 6,175 | 13,378 | 15,108 |
| Loss on debt extinguishment | 1,451 | — | 5,219 |
| Depreciation and amortization | 15,029 | 18,579 | 15,585 |
| (Recovery) provision for bad debts | (1,017) | 984 | — |
| Equity in (income) loss from unconsolidated joint ventures | (14,531) | 519 | 2,758 |
| Distribution of income from unconsolidated joint ventures | 3,157 | 1,782 | — |
| Changes in assets and liabilities, net of dispositions: | | | |
| Other assets | (12,928) | (7,397) | 798 |
| Related party receivables | 12,572 | 4,389 | (35,257) |
| Accrued interest payable | (2,909) | (1,340) | 2,349 |
| Accounts payable and other liabilities | (4,710) | (620) | (1,361) |

App. 1791

| | | | |
|---|--:|--:|--:|
| Net cash (used in) provided by operating activities | (10,986) | 5,611 | (35,747) |
| **Cash Flow From Investing Activities:** | | | |
| Collection of notes receivable | 17,674 | 4,436 | 13,862 |
| Originations and advances on notes receivable | (4,968) | (33,015) | (21,434) |
| Purchase of short-term investment | (16,000) | — | — |
| Acquisition of real estate | — | — | (3,422) |
| Development and renovation of real estate | (8,070) | (17,505) | (33,730) |
| Deferred leasing costs | (877) | (2,603) | — |
| Proceeds from sale of assets | 105,547 | 40,982 | 28,622 |
| Contribution to unconsolidated joint venture | (411) | — | — |
| Distribution from unconsolidated joint venture | 7,430 | 8,086 | 6,504 |
| Net cash provided by (used in) investing activities | 100,325 | 381 | (9,598) |
| **Cash Flow From Financing Activities:** | | | |
| Proceeds from mortgages, other notes and bonds payable | 20,015 | 30,727 | 103,800 |
| Payments on mortgages, other notes and bonds payable | (118,900) | (31,736) | (73,719) |
| Debt extinguishment costs | (4,086) | — | (3,799) |
| Deferred financing costs | (614) | (1,297) | (4,241) |
| Net cash (used in) provided by financing activities | (103,585) | (2,306) | 22,041 |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (14,246) | 3,706 | (23,304) |
| Cash, cash equivalents and restricted cash, beginning of year | 86,967 | 83,261 | 106,565 |
| Cash, cash equivalents and restricted cash, end of year | $ 72,721 | $ 86,967 | $ 83,261 |

The accompanying notes are an integral part of these consolidated financial statements.

32

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**1. Organization**

As used herein, the terms "the Company", "We", "Our", or "Us" refer to Transcontinental Realty Investors, Inc., a Nevada corporation, which was formed in 1984. Our common stock is listed on the New York Stock Exchange ("NYSE") under the symbol "TCI". We are owned approximately 78% by American Realty Investors, Inc. ("ARL"), whose common stock is listed on the NYSE under the symbol "ARL", and 7% by the parent of ARL.

Our primary business is the acquisition, development and ownership of income-producing residential and commercial properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time, and when we believe it appropriate to do so, we will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents, and leasing office, industrial and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate revenues from gains on sales of income-producing properties and land.

Substantially all of our assets are held by our wholly-owned subsidiary, Southern Properties Capital Ltd. ("SPC"), which was formed to allow us to raise funds by issuing non-convertible bonds that are listed and traded on the Tel-Aviv Stock Exchange ("TASE").

At December 31, 2021, our property portfolio consisted of:

- Five commercial properties consisting of four office buildings and 1 retail property comprising in aggregate of approximately 1,063,515 square feet;

App. 1792

- Nine multifamily properties owned directly by us, comprising in 1,942 units, excluding apartments being developed;

- Approximately 1,875 acres of developed and undeveloped land; and

- Fifty-two multifamily properties totaling 10,281 units owned by our joint venture.

Our day to day operations are managed by Pillar Income Asset Management, Inc. ("Pillar"). Their duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing with third party lenders and investors. All of our employees are Pillar employees. Four of our commercial properties are managed by Regis Realty Prime, LLC ("Regis"). Regis provides leasing, construction management and brokerage services. Our multifamily properties are managed by outside management companies. Pillar and Regis are considered to be related parties (See Note 13 – Related Party Transactions).

## 2. Summary of Significant Accounting Policies

*Basis of presentation*

These consolidated financial statements have been prepared in accordance with generally accepted accounting principles ("GAAP") in the United States of America.

We consolidate entities in which we are considered to be the primary beneficiary of a variable interest entity ("VIE") or have a majority of the voting interest of the entity. We have determined that we are a primary beneficiary of the VIE when we have (i) the power to direct the activities of a VIE that most significantly impacts its economic performance, and (ii) the obligations to absorb losses or the right to receive benefits that could potentially be significant to the VIE. In determining whether we are the primary beneficiary, we consider qualitative and quantitative factors, including ownership interest, management representation, ability to control decision and other contractual rights. We account for entities in which we have less than a controlling financial interest or entities where we are not deemed to be the primary beneficiary under the equity method of accounting. Accordingly, we include our share of the net earnings or losses of these entities in our results of operations.

33

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

*Real estate, depreciation, and impairment*

Real estate assets are stated at the lower of depreciated cost or fair value, if deemed impaired. Major replacements and betterments are capitalized and depreciated over their estimated remaining useful lives. Depreciation is computed on a straight-line basis over the useful lives of the properties (buildings and improvements—10 to 40 years; furniture, fixtures and equipment—5 to 10 years).

We assess whether an indicator of impairment in the value of our real estate exists by considering expected future operating income, trends and prospects, as well as the effects of demand, competition and other economic factors. Such factors include projected rental revenue, operating costs and capital expenditures as well as estimated holding periods and capitalization rates. If an impairment indicator exists, the determination of recoverability is made based upon the estimated undiscounted future net cash flows, excluding interest expense. The amount of impairment loss, if any, is determined by comparing the fair value, as determined by a discounted cash flows analysis, with the carrying value of the related assets. We generally hold and operate our income producing real estate long-term, which decreases the likelihood of their carrying values not being recoverable. Real estate classified as held for sale are measured at the lower of the carrying amount or fair value less cost to sell.

*Real estate held for sale*

We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their carrying amount or their estimated fair value, less estimated costs to sell. We did not have any real estate assets classified as held for sale at December 31, 2021 or 2020.

*Cost capitalization*

The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. We also capitalize development costs including costs directly related to planning, developing, initial leasing and constructing a property as well as interest, property

App. 1793

taxes, insurance, and other direct project costs incurred during the period of development. Capitalized costs also include direct and indirect costs clearly associated with the project. Indirect costs include real estate taxes, insurance and certain shared administrative costs. In assessing the amounts of direct and indirect costs to be capitalized, allocations are made to projects based on estimates of the actual amount of time spent on each activity. Indirect costs not clearly associated with specific projects are expensed as period costs.

We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

*Deferred leasing costs*

We capitalize leasing costs on our commercial properties, which include commissions paid to outside brokers, legal costs incurred to negotiate and document a lease agreement and any internal costs that may be applicable. We allocate these costs to individual tenant leases and amortize them over the related lease term.

34

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

*Fair value measurement*

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between willing market participants at the measurement date that is other than in a forced or liquidation sale. In determining fair value we apply the following hierarchy:

Level 1 —Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2 —Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3 —Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Related parties*

Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

*Recognition of revenue*

Rental revenue includes fixed minimum rents, reimbursement of operating costs and other leasing income. Rental revenue for residential property, which is generally leased for twelve months or less, is recorded when due from residents, whereas rental revenue for commercial properties, which is generally leased for more than twelve months, is recognized on a straight-line basis over the terms of the related leases.

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

*Cash and Cash Equivalents and Restricted Cash*

We consider all highly liquid investments with an original maturity of three months or less when purchased to be cash equivalents, for which cost approximates fair value. Restricted cash includes cash balances held in escrow by financial institutions under the terms of certain secured notes payable and certain unsecured bonds payable.

*Concentration of credit risk*

We maintain our cash balances at commercial banks and through investment companies, the deposits that are insured by the Federal Deposit Insurance Corporation (FDIC). At December 31, 2021 and 2020, we maintained balances in excess of the insured amount.

35

## TRANSCONTINENTAL REALTY INVESTORS, INC.

## NOTES TO FINANCIAL STATEMENTS

**(Dollars in thousands, except per share amounts)**

*Income taxes*

We are a "C" corporation" for U.S. federal income tax purposes. However, we are included in the May Realty Holdings, Inc. (the "MRHI") consolidated group for tax purposes. We have a tax sharing agreement that specifies the manner in which the group will share the consolidated tax liability and also how certain tax attributes are to be treated among members of the group.

*Comprehensive income (loss)*

Net income (loss) and comprehensive income (loss) are the same for the year ended December 31, 2021, 2020 and 2019.

*Use of estimates*

In the preparation of consolidated financial statements in conformity with GAAP, it is necessary for management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expense for the year ended. Actual results could differ from those estimates.

**Recent accounting pronouncements.**

In October 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities*. This standard is intended to improve the accounting when considering indirect interests held through related parties under common control for determining whether fees paid to decision makers and service providers are variable interests. The adoption of the standard on January 1, 2020, did not have a material impact on our financial position and results of operations.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting*. The standard provides guidance, optional expedients and exceptions that reference London Interbank Offered Rate ("LIBOR") or another reference rate expected to be discontinued due to reference rate reform. The standard was effective upon issuance and can be applied through December 31, 2022. We have mortgage notes payable with interest rates that reference LIBOR, and therefore, we will adopt this standard when LIBOR is discontinued.

On April 10, 2020, the FASB issued a Staff Q&A ("Q&A") related to the application of the lease guidance in ASC 842 for the accounting impact of lease concessions related to the COVID-19 pandemic. The Q&A, allows an entity to make an election to account for lease concessions related to the effects of the COVID-19 as though enforceable rights and obligations for those concessions existed. As a result of this election, an entity will not have to analyze each lease to determine whether enforceable rights and obligations for concessions exist in the lease and can elect to apply or not apply the lease modification guidance in ASC 842, as long as the concessions do not result in a substantial increase in the rights of the lessor or the obligations of the lessee. Our adoption of the guidance of the Q&A did not have a significant impact on our consolidated financial statements during the year ended December 31, 2021.

App. 1795

36

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

### 3. Earnings Per Share

Earnings per share ("EPS") has been computed by dividing net income available to common shares by the weighted-average number of common shares outstanding during the period.

The following table provides our basic and diluted EPS calculation:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| Net income (loss) | $ | 10,077 | $ | 7,464 | $ | (26,137) |
| Net income attributable to noncontrolling interest | | (679) | | (795) | | (783) |
| Net income (loss) attributable to the Company | | 9,398 | | 6,669 | | (26,920) |
| Weighted-average common shares outstanding-basic and diluted | | 8,639 | | 8,639 | | 8,718 |
| EPS - attributable to common shares- basic and diluted | $ | 1.09 | $ | 0.77 | $ | (3.09) |

### 4. Supplemental Cash Flows Information

The following presents the schedule of interest paid and other supplemental cash flow information:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| Cash paid for interest | $ | 24,471 | $ | 27,127 | $ | 29,430 |
| Cash - beginning of year | | | | | | |
| Cash and cash equivalents | $ | 36,761 | $ | 51,179 | $ | 36,358 |
| Restricted cash | | 50,206 | | 32,082 | | 70,207 |
| | $ | 86,967 | $ | 83,261 | $ | 106,565 |
| Cash - end of year | | | | | | |
| Cash and cash equivalents | $ | 50,735 | $ | 36,761 | $ | 51,179 |
| Restricted cash | | 21,986 | | 50,206 | | 32,082 |
| | $ | 72,721 | $ | 86,967 | $ | 83,261 |
| Proceeds from mortgages, notes and bonds payable | | | | | | |
| Proceeds from mortgages and notes payable | $ | 20,015 | $ | 10,942 | $ | 25,675 |
| Proceeds from bonds | | — | | 19,785 | | 78,125 |
| | $ | 20,015 | $ | 30,727 | $ | 103,800 |
| Payment of mortgages, notes and bonds payable | | | | | | |
| Recurring payment on mortgages and notes payable | $ | 65,242 | $ | 12,144 | $ | 51,977 |
| Bond payments | | 53,658 | | 19,592 | | 21,742 |
| | $ | 118,900 | $ | 31,736 | $ | 73,719 |

App. 1796

37

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

The following is a schedule of noncash investing and financing activities:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| Assets contributed to joint venture | $ | 18,608 | $ | — | $ | — |
| Liabilities assumed by joint venture | $ | 15,606 | $ | — | $ | — |
| Notes receivable received in exchange for related party receivable | $ | 9,259 | $ | — | $ | — |
| Distribution from joint venture applied to Earn Out Obligation | $ | 5,441 | $ | — | $ | — |
| Property acquired in exchange for note payable | $ | — | $ | 3,350 | $ | 1,155 |
| Note receivable issued in exchange for property | $ | — | $ | 1,761 | $ | — |
| Debt assumed in sale of properties | $ | — | $ | 8,238 | $ | — |
| Property acquired in exchange for note receivable | $ | — | $ | — | $ | 1,800 |

## 5. Operating Segments

Our segments are based on the internal reporting that we review for operational decision-making purposes. We operate in two reportable segments: (i) the acquisition, development, ownership and management of multifamily properties ("Residential Segment") and (ii) the acquisition, ownership and management of commercial real estate properties ("Commercial Segment"). The services for our segments include rental of property and other tenant services, including parking and storage space rental. Asset information by segment is not reported because we do not use this measure to assess performance or make decisions to allocate resources. Therefore, depreciation and amortization expense is not allocated among segments. General and administrative expenses, advisory fees, interest income and interest expense are not included in segment profit as our internal reporting addresses these items on a corporate level.

The following table presents our profit by reportable segment:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| Residential Segment | | | | | | |
| Revenue | $ | 14,495 | $ | 14,686 | $ | 13,517 |
| Operating expenses | | (8,167) | | (8,482) | | (8,824) |
| Profit from segment | | 6,328 | | 6,204 | | 4,693 |
| Commercial Segment | | | | | | |
| Revenue | | 23,313 | | 37,223 | | 32,714 |
| Operating expenses | | (12,693) | | (15,878) | | (16,389) |
| Profit from segment | | 10,620 | | 21,345 | | 16,325 |
| Total profit from all segments | $ | 16,948 | $ | 27,549 | $ | 21,018 |

The following table reconciles our profit by reportable segment to net income (loss):

38

App. 1797

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| Profit from reportable segments | $ 16,948 | $ 27,549 | $ 21,018 |
| Other non-segment items of income (expense) | | | |
| Depreciation and amortization | (11,870) | (14,755) | (13,379) |
| General and administrative | (12,425) | (9,287) | (8,704) |
| Advisory fee to related party | (11,782) | (8,648) | (8,410) |
| Other income | 2,966 | 5,113 | 1,823 |
| Interest income | 19,572 | 18,660 | 19,607 |
| Interest expense | (24,600) | (29,374) | (31,816) |
| Loss on foreign currency transactions | (6,175) | (13,378) | (15,108) |
| Loss on extinguishment of debt | (1,451) | — | (5,219) |
| Equity in income (loss) from unconsolidated joint ventures | 14,531 | (519) | (2,758) |
| Gain on sale or write-down of assets, net | 23,352 | 32,107 | 14,809 |
| Income tax provision | 1,011 | (4) | 2,000 |
| Net income (loss) | $ 10,077 | $ 7,464 | $ (26,137) |

The table below reconciles our segment information to the corresponding amounts in our consolidated balance sheets:

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| Segment assets | $ 263,937 | $ 342,965 |
| Real estate | 63,945 | 65,149 |
| Investment in unconsolidated joint ventures | 52,879 | 51,786 |
| Notes receivable | 129,726 | 123,556 |
| Receivable from related parties | 136,715 | 159,777 |
| Cash and other non-segment assets | 141,207 | 135,849 |
| Total assets | $ 788,409 | $ 879,082 |

## 6. Lease Revenue

We lease our multifamily properties and commercial properties under agreements that are classified as operating leases. Our multifamily leases generally include minimum rents and charges for ancillary services. Our commercial property leases generally included minimum rents and recoveries for property taxes and common area maintenance. Minimum rental revenues are recognized on a straight-line basis over the terms of the related leases.

The following table summarizes the components of rental revenue for the years ended December 31, 2021, 2020 and 2019:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| Fixed component | $ 35,555 | $ 49,974 | $ 43,749 |
| Variable component | 2,253 | 1,935 | 2,482 |
| Total rental revenue | $ 37,808 | $ 51,909 | $ 46,231 |

App. 1798

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

The following table summarizes the future rental payments to us from under non-cancelable leases, which excludes multifamily leases, which typically have a term of one-year or less:

| Year | Amount |
|------|-------:|
| 2022 | $ 13,368 |
| 2023 | 9,128 |
| 2024 | 5,613 |
| 2025 | 5,200 |
| 2026 | 4,912 |
| Thereafter | 20,008 |
| Total | $ 58,229 |

## 7. Real Estate Activity

At December 31, 2021 and 2020, our real estate investment is comprised of the following:

| | December 31, | |
|------|------:|------:|
| | **2021** | **2020** |
| Land | $ 67,348 | $ 78,755 |
| Building and improvements | 219,327 | 297,644 |
| Tenant improvements | 21,364 | 30,935 |
| Construction in progress | 51,091 | 49,895 |
| Total cost | 359,130 | 457,229 |
| Less accumulated deprecation | (62,933) | (82,418) |
| Total real estate, net | 296,197 | 374,811 |
| Property held for sale | 166 | 2,572 |
| Total real estate | $ 296,363 | $ 377,383 |

Our property held for sale consists of land parcels at Mercer Crossing that are currently under contract for sale and our construction in progress consists of development of Windmill Farms.

Gain on sale or write-down of assets, net consists of the following:

| | For the Year Ended December 31, | | |
|------|------:|------:|------:|
| | **2021** | **2020** | **2019** |
| Land(1) | $ 16,645 | $ 23,383 | $ 14,889 |
| Residential properties(2) | 9,110 | 3,702 | (80) |
| Commercial properties(3) | 27,196 | 4,610 | — |
| Other(4) | (29,599) | 412 | — |
| | $ 23,352 | $ 32,107 | $ 14,809 |

App. 1799

40

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

(1)   Includes the gain sale of lots related to our investment in Windmill Farms, Mercer Crossing and other land holdings.

(2)   Includes the gain from the sale of a 50% ownership interest in Overlook at Allensville Phase II (See Note 9 – Investment in Unconsolidated Joint Ventures) and the gains on the sale of various multifamily properties that had previously been deferred (See Note 16 – Deferred Income).

(3)   On August 26, 2021, we sold 600 Las Colinas, a 512,173 square foot office building in Irving, Texas for $74,750, resulting in gain on sale of $27,270. We used the proceeds to pay down the mortgage note payable on the property (See Note 10 - Mortgages and Other Notes Payable) and for general corporate purposes.

On May 1, 2020, we sold Villager, a 33 unit multifamily property in Fort Walton, Florida for $2,426, resulting in a gain on sale of $898. The sales price was funded by the issuance of a $1,761 note receivable and the assumption of a $665 mortgage note payable on the property. On July 16, 2020, we sold Farnham Park, a 144 unit multifamily property in Port Arthur, Texas for $13,300, resulting in a gain on sale of $2,684. The sales price was funded by cash payment of $4,215 and the assumption of the $9,085 mortgage note payable on the property.

(4)   Includes a $29,600 loss on the remeasurement of the Earn Out Obligation in connection with our investment in VAA (See Note 9 - Investment in Unconsolidated Joint Ventures).

## 8. Short-term Investments

The Company has an investment in variable denominated floating rate notes with a a a financial institution. The notes are have no stated maturity and are subject to immediate repayment at the Company's option. At December 31, 2021, the interest rate on the notes was 1.15%.

41

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

## 9. Notes Receivable

The following table summarizes our notes receivables at December 31, 2021 and 2020:

| Borrower / Project | Carrying Value | | Interest Rate | Maturity Date |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | | |
| ABC Land and Development, Inc. | $     4,408 | $     4,408 | 9.50 % | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50 % | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00 % | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00 % | 11/1/2026 |
| Forest Pines(1) | 6,472 | 2,869 | 5.00 % | 11/1/2022 |
| Lake Wales | 3,000 | 3,000 | 9.50 % | 6/30/2026 |
| Legacy Pleasant Grove | 496 | 496 | 12.00 % | 10/23/2022 |
| McKinney Ranch | 4,554 | 4,554 | 6.00 % | 9/15/2022 |
| One Realco Land Holding, Inc. | 1,728 | 1,728 | 9.50 % | 6/30/2026 |
| Parc at Ingleside(1) | 3,700 | 2,523 | 5.00 % | 11/1/2026 |

App. 1800

| | | | | |
|---|---:|---:|---:|---:|
| Parc at Opelika(2) | 3,305 | — | 10.00 % | 1/13/2023 |
| Parc at Windmill Farms(1) | 7,830 | 7,803 | 5.00 % | 11/1/2022 |
| Phillips Foundation for Better Living, Inc.(2) | — | 61 | 12.00 % | 3/31/2023 |
| Phillips Foundation for Better Living, Inc.(2) | 813 | — | 12.00 % | 3/31/2024 |
| Plum Tree(1) | 1,537 | 857 | 5.00 % | 4/26/2026 |
| Riverview on the Park Land, LLC | 1,045 | 1,045 | 9.50 % | 6/30/2026 |
| RNC Portfolio, Inc. | — | 8,853 | 5.00 % | 9/1/2024 |
| Spartan Land | 5,907 | 5,907 | 12.00 % | 1/16/2023 |
| Spyglass of Ennis(1) | 5,319 | 5,360 | 5.00 % | 11/1/2022 |
| Steeple Crest(1) | 6,498 | 6,498 | 5.00 % | 8/1/2026 |
| Unified Housing Foundation(2)(3) | 2,881 | 2,880 | 12.00 % | 6/30/2023 |
| Unified Housing Foundation(2)(3) | 212 | 212 | 12.00 % | 6/30/2023 |
| Unified Housing Foundation(2)(3) | 6,831 | 6,831 | 12.00 % | 6/30/2023 |
| Unified Housing Foundation(2)(3) | 10,401 | 10,896 | 12.00 % | 6/30/2023 |
| Unified Housing Foundation(2)(3) | 10,096 | 10,096 | 12.00 % | 3/31/2022 |
| Unified Housing Foundation(2)(3) | 6,990 | 6,990 | 12.00 % | 3/31/2023 |
| Unified Housing Foundation(2)(3) | 3,615 | 3,615 | 12.00 % | 5/31/2023 |
| Unified Housing Foundation(2)(3) | 17,172 | 19,139 | 12.00 % | 12/31/2032 |
| Unified Housing Foundation(2)(3) | 6,521 | — | 12.00 % | 3/31/2024 |
| Unified Housing Foundation(2)(3) | 1,549 | — | 12.00 % | 4/30/2024 |
| Unified Housing Foundation(2)(3) | 183 | — | 12.00 % | 6/30/2024 |
| | $ 129,726 | $ 123,556 | | |

(1)   The note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property.

(2)   The borrower is determined to be a related party due to our significant investment in the performance of the collateral secured by the notes receivable.

(3)   Principal and interest payments on the notes from Unified Housing Foundation, Inc. ("UHF") are funded from surplus cash flow from operations, sale or refinancing of the underlying properties and are cross collateralized to the extent that any surplus cash available from any of the properties underlying the notes.

42

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**10. Investment in Unconsolidated Joint Ventures**

On November 16, 2018, we formed Victory Abode Apartments, LLC ("VAA"), a joint venture with the Macquarie Group ("Macquarie"). VAA was formed as a result of a sale of the 50% ownership interest in 51 multifamily properties owned by us in exchange for a 50% voting interest / 49% profit participation interest ("Class A interest") in VAA and a note payable ("Mezzanine Loan"). Concurrent with the Contribution, VAA issued Class B interests with a 2% profits participation interest and no voting rights to Daniel J. Moos, our former President and Chief Executive Officer ("Class B Member"). The Class B Member serves as the Manager of VAA.

Interest on the Mezzanine loan is limited to cash generated from the properties and matures concurrently with the termination of VAA. Accordingly, we account for our interest in the Mezzanine Loan as additional equity interest and includes any interest payments accrued as income from unconsolidated joint ventures.In connection with the formation of VAA, ten out of the initial properties were subject to an earn-out provision ("Earn Out") that provides for a remeasurement of value after a two-year period following the completion of construction. Upon the formation of VAA, we recorded a liability ("Earn Out Obligation") for the $10,000 advance on the Earn Out that we received from Macquarie.

On March 30, 2021, we sold a 50% ownership interest in Overlook at Allensville Phase II, a 144 unit multifamily property in Sevierville,

App. 1801

Tennessee to Macquarie for $2,651 resulting in gain on sale of $3,417. Concurrent with the sale, we each contributed our 50% ownership interests in Overlook at Allensville Phase II into VAA.

On July 13, 2021, we received the arbitration result of a dispute regarding the measurement of the Earn Out Obligation. Our position and claims were declined, and the position of Macquarie was fully accepted. As a result, we are required to pay approximately $39,600 to Macquarie to satisfy the Earn Out Obligation, and therefore, recorded a charge of $29,600 during the year ended December 31, 2021 (See Note 7 – Real Estate Activity). In accordance with the joint venture operating agreement, the Earn Out Obligation will be paid from our share of future distributions from VAA, which generally occur each six months. In July 2021, our $5,441 distribution from VAA was paid directly to Macquarie as a reduction of the Earn Out Obligation.

On November 17, 2021, we entered into a Major Decision with Macquarie to engage a broker and initiate a sale of all the properties held by the VAAoperties. In connection with the sale, VAA will distribute seven of its existing properties to us (referred to herein as the "Holdback Properties") and we in turn, will contribute one of our properties ("Contributed Property") into the portfolio offered for sale to third-parties. The remaining forty-five properties as referred to herein as the VAA Portfolio. The sales price for the Holdback Properties and Contributed Property will be the estimated value of these properties as stated in the agreement, multiplied by the ratio of the actual sales price of the VAA Portfolio over the estimated value of the portfolio as stated in the agreement.

Each of the properties in the VAA Portfolio is appraised on an annual basis as part of our filing requirement with the TASE. As of December 31, 2021, the fair value of the VAA Portfolio, based on these appraisals was $1.4 billion. The appraised value reflects an aggregate of individual property appraised value and does not reflect a premium that is sometimes offered in a portfolio sale. These values reflects a compression of cap rates for multifamily properties during the last year. However, there can be no assurances that these values will be realized. The Major Decision agreement will terminate on August 1, 2022, if the VAA Portfolio has not been sold.

43

## TRANSCONTINENTAL REALTY INVESTORS, INC.

### NOTES TO FINANCIAL STATEMENTS

### (Dollars in thousands, except per share amounts)

The following is a summary of our investment in unconsolidated joint ventures:

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| *Condensed Balance Sheets of VAA* | | |
| Assets | | |
| Real estate | $ 1,208,716 | $ 1,217,725 |
| Other assets | 72,151 | 61,472 |
| Total assets | $ 1,280,867 | $ 1,279,197 |
| Liabilities and Partners Capital | | |
| Mortgage notes payable | $ 854,015 | $ 830,721 |
| Mezzanine notes payable | 242,942 | 239,878 |
| Other liabilities | 40,316 | 35,632 |
| Our share of partners' capital | 71,800 | 84,983 |
| Outside partner's capital | 71,794 | 87,983 |
| Total liabilities and partners' capital | $ 1,280,867 | $ 1,279,197 |

App. 1802

| | | |
|---|---|---|
| Our share of partners' capital | $ 71,800 | $ 84,983 |
| Our share of Mezzanine note payable and accrued interest | 125,306 | 123,752 |
| Basis adjustment (1) | (144,227) | (156,949) |
| Total investment in unconsolidated joint ventures | $ 52,879 | $ 51,786 |

(1)    We amortize the difference between the cost of our investment in unconsolidated joint ventures and the book value of our underlying equity into income on a straight-line basis consistent with the lives of the underlying assets.

The following is a summary of our (loss) income from investments in unconsolidated joint venture:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| *Condensed Statements of Operations of VAA* | | | |
| Revenue | | | |
| Rental revenue | $ 131,455 | $ 117,336 | $ 109,746 |
| Other revenue | 7,706 | 6,240 | 5,631 |
| Total revenue | 139,161 | 123,576 | 115,377 |
| Expenses | | | |
| Operating expenses | 72,001 | 62,919 | 60,516 |
| Depreciation and amortization | 31,073 | 30,456 | 43,942 |
| Interest | 55,129 | 56,903 | 61,315 |
| Total expenses | 158,203 | 150,278 | 165,773 |
| Net loss | $ (19,042) | $ (26,702) | $ (50,396) |
| Our share of net income (loss) in unconsolidated joint venture | $ 14,531 | $ (519) | $ (2,758) |

44

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**11. Mortgages and Other Notes Payable**

Below is a summary of our notes and interest payable as of December 31, 2021 and 2020:

| | Carrying Value | | Interest | Maturity |
|---|---|---|---|---|
| Property/ Entity | 2021 | 2020 | Rate | Date |
| 600 Las Colinas(1) | $ — | $ 35,589 | 5.30 % | 11/1/2023 |
| 770 South Post Oak | 11,635 | 11,871 | 4.40 % | 6/1/2025 |
| Athens(2) | 1,155 | 1,155 | 4.00 % | 8/28/2022 |
| Chelsea | 8,037 | 8,194 | 3.40 % | 12/1/2050 |
| EQK Portage - Land | 3,350 | 3,350 | 10.00 % | 11/13/2024 |
| HSW Partners(3) | — | 14,690 | 9.50 % | 6/17/2021 |
| Forest Grove(4) | 7,263 | 7,333 | 3.75 % | 5/5/2024 |
| Landing Bayou | 14,407 | 14,643 | 3.50 % | 9/1/2053 |
| Legacy at Pleasant Grove | 13,352 | 13,653 | 3.60 % | 4/1/2048 |
| McKinney 36 Land | — | 820 | 8.00 % | 6/30/2022 |
| Overlook at Allensville Phase II(5) | — | 15,621 | 3.80 % | 5/1/2059 |
| Parc at Denham Springs Phase II | 15,962 | 16,128 | 4.10 % | 2/1/2060 |

App. 1803

| | | | | |
|---|---|---|---|---|
| RCM HC Enterprises(3) | 1,986 | | 9.50 % | 12/17/2026 |
| Stanford Center(6) | 38,979 | 39,093 | 6.00 % | 2/26/2022 |
| Sugar Mill Phase III | 9,216 | 9,298 | 4.50 % | 2/1/2060 |
| Toulon(7) | 13,697 | 13,975 | 3.20 % | 12/1/2051 |
| Villas at Bon Secour(8) | 19,492 | 10,280 | 3.08 % | 9/1/2031 |
| Vista Ridge | 9,830 | 9,979 | 4.00 % | 8/1/2053 |
| Windmill Farms(9) | 8,389 | 10,397 | 5.00 % | 2/28/2023 |
| | $ 176,750 | $ 236,069 | | |

(1)   On August 26, 2021, we paid off the loan in connection with the sale of the underlying property (See Note 7 - Real Estate Activity).

(2)   On March 2, 2021, the loan was extended to August 28, 2022.

(3)    On June 4, 2021, the lender assumed the remaining $1,986 balance of our loan from HSW Partners and extended the maturity to December 17, 2026.

(4)    The loan bears interest at prime rate plus 0.5%.

(5)    On March 30, 2021, the loan was assumed by VAA in connection with our contribution of the underlying property to the joint venture (See Note 9 – Investment in Unconsolidated Joint Ventures).

(6)    On March 3, 2022, the loan was extended to February 26, 2023.

(7)    On January 14, 2022, we paid off the loan in connection with the sale of the underlying property (See Note 20 - Subsequent Events).

(8)    On August 25, 2021, we replaced the existing loan on the property with a new $20,015 loan that bears interest at 3.08% and matures on September 1, 2031.

(9)    On March 4, 2021, the loan was extended to February 28, 2023 at an interest rate of 5%.

Interest payable at December 31, 2021 and 2020, was $1,147 and $1,123, respectively. We capitalized interest of $3,733 and $2,305 during the years ended December 31, 2021 and 2020, respectively.

All of the above mortgages and other notes payable are collateralized by the underlying property. In addition, we have guaranteed the loans on Athens, Forest Grove, Stanford Center and Villas at Bon Secour.

45

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

There are various land mortgages, secured by the property, that are in the process of a modification or extension to the original note due to expiration of the loan. We are working with our existing lenders and new lenders to modify, extend the loans before they become due or refinancing the loans with terms that are similar to the existing agreement.

Future principal payments due on our notes payable at December 31, 2021 are as follows:

| Year | Amount |
|---|---|
| 2022 | $ 44,120 |
| 2023 | 4,355 |
| 2024 | 9,444 |
| 2025 | 13,021 |
| 2026 | 2,172 |
| Thereafter | 107,308 |
| | 180,420 |
| Deferred finance cost | (3,670) |
| | $ 176,750 |

**12. Bonds Payable**

App. 1804

We have issued three series of nonconvertible Bonds ("Bonds") through SPC which are traded through the BASE. The Bonds are denominated in New Israeli Shekels ("NIS") and provide for semiannual principal and interest payments through maturity.

In connection with the Bonds, we incurred a loss on foreign currency transactions of $6,175, $13,378, and $15,108, for the years ended December 31, 2021, 2020 and 2019, respectively. We have hedging agreement that effectively prevents the exchange rate for the NIS to the U.S. Dollar from falling below 2.7.

The outstanding balance of our Bonds at December 31, 2021 and 2020 is as follows:

| | December 31, | | | |
|---|---|---|---|---|
| Bond Issuance | 2021 | 2020 | Interest Rate | Maturity |
| Series A Bonds(1) | $ 65,563 | $ 95,133 | 7.30 % | 7/31/23 |
| Series B Bonds(1) | 54,019 | 65,318 | 6.80 % | 7/31/25 |
| Series C Bonds(2) | 75,298 | 85,537 | 4.65 % | 1/31/23 |
| | 194,880 | 245,988 | | |
| Less unamortized deferred issuance costs | (5,428) | (8,100) | | |
| | $ 189,452 | $ 237,888 | | |

(1) The bonds are collateralized by the assets of SPC.

(2) The bonds are collateralized by a trust deed in Browning Place, a 625,297 square foot office building in Farmers Branch, Texas.

The aggregate maturities of our Bonds are as follows:

| Year | Amount |
|---|---|
| 2022 | $ 46,286 |
| 2023 | 121,584 |
| 2024 | 13,505 |
| 2025 | 13,505 |
| | $ 194,880 |

The Bonds include a number of covenants, including restrictions on the amount of cash that can distributed from SPC. As of December 31, 2021, we were in compliance with our bond covenants.

46

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**13. Related Party Transactions**

We engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions of real estate. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

Pillar and Regis are wholly owned by an affiliates of the MRHI, which also owns approximately 90.8% of ARL. Pillar is compensated for advisory services in accordance with an agreement. Regis receives property management fees and leasing commissions in accordance with the terms of its property-level management agreement. In addition, Regis is entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement.

Rental income includes $944, $1,083 and $841 for the years ended December 31, 2021, 2020 and 2019, respectively, for office space leased to Pillar and Regis.

Property operating expense includes $889, $990 and $991 for the years ended December 31, 2021, 2020 and 2019, respectively, for management fees on commercial properties payable to Regis.

App. 1805

General and administrative expense includes $4,091, $3,869 and $4,144 for the years ended December 31, 2021, 2020 and 2019, respectively, for employee compensation and other reimbursable costs payable to Pillar.

Advisory fees paid to Pillar were $11,782, $8,648 and $8,410 for the years ended December 31, 2021, 2020 and 2019, respectively.

Notes receivable are includes amounts held by UHF and Pillar (See Note 8 – Notes Receivable). UHF is determined to be a related party due to our significant investment in the performance of the collateral secured by the notes receivable. Interest income on these notes was $15,950, $19,515 and $17,413 for the years ended December 31, 2021, 2020 and 2019, respectively.

Interest expense on notes payable to Pillar was $1,621, $1,581 and $1,999 for the years ended December 31, 2021, 2020 and 2019, respectively.

Related party receivables represents amounts outstanding from Pillar for loans and advances, net of unreimbursed fees, expenses and costs as provided above.

## 14. Noncontrolling Interests

The noncontrolling interest represents the third party ownership interest in Income Opportunity Realty Investors, Inc. ("IOR"). Shares of IOR are listed on the NYSE American under the symbol of IOR. We owned 81.1% in in IOR during the years ended December 31, 2021, 2020 and 2019.

## 15. Stockholders Equity

Our decision to declare dividends on common stock is determined on an annual basis following the end of each year. In accordance with that policy, no dividends on our common stock were declared for 2021, 2020 or 2019. Future distributions to common stockholders will be determined in light of conditions then existing, including our financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by our board of directors.

47

TRANSCONTINENTAL REALTY INVESTORS, INC.

NOTES TO FINANCIAL STATEMENTS

(Dollars in thousands, except per share amounts)

## 16. Deferred Income

In previous years, we sold properties to related parties where we had continuing involvement in the form of management or financial assistance associated with the sale of the properties. Because of the continuing involvement associated with the sale, the sales criteria for the full accrual method was not met, and as such, we deferred the gain recognition and accounted for the transactions by applying the finance, deposit, installment or cost recovery methods, as appropriate. The gains on these transactions have been deferred until the properties are sold to a non-related third party. As of December 31, 2021, we had a deferred gain of $581.

## 17. Income Taxes

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined on the basis of the differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date. We recognize deferred tax assets to the extent that we believe these assets are more likely than not to be realized. In making such a determination, we consider all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If we determine that we would be able to realize our deferred tax assets in the future in excess of their net recorded amount, we would make an adjustment to the deferred tax asset valuation allowance, which would reduce the provision for income taxes. We record uncertain tax positions on the basis of a two-step process whereby (1) we determine whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions that meet the more-likely-than-not recognition threshold, we recognize the largest amount of tax benefit that is more than 50 percent likely to be realized upon ultimate settlement with the related tax authority.

The (benefit) expense for income taxes consists of:

App. 1806

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| Current: | | | | | | |
| Federal | $ | (1,011) | $ | — | $ | — |
| State | | — | | 4 | | — |
| Deferred and Other: | | | | | | |
| Federal | | — | | — | | (2,000) |
| State | | — | | — | | — |
| Total tax expense (benefit) | $ | (1,011) | $ | 4 | $ | (2,000) |

48

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

The reconciliation between our effective tax rate on income from operations and the statutory rate is as follows:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| Income tax (benefit) expense at federal statutory rate | $ | 2,373 | $ | 1,568 | $ | (5,909) |
| State and local income taxes net of federal tax benefit | | — | | 4 | | — |
| AMT refund | | (1,011) | | — | | — |
| Permanent differences | | (1,758) | | (1,766) | | (2,406) |
| Timing differences | | | | | | |
| Deferred gains | | (4,893) | | (878) | | (588) |
| Basis difference on fixed assets | | (720) | | 1,307 | | — |
| Other basis/timing differences | | (2,729) | | 2,296 | | 3,173 |
| Generation (use) of net operating loss carryforwards | | 7,727 | | (2,527) | | 3,730 |
| Calculated income tax expense (benefit) | $ | (1,011) | $ | 4 | $ | (2,000) |
| Effective tax rate | | — % | | — % | | 0.6 % |

We are subject to taxation in the United States and various states and foreign jurisdictions.  As of December 31, 2021, our tax years for 2021, 2020, and 2019 are subject to examination by the tax authorities.  With few exceptions, as of December 31, 2020, we are no longer subject to U.S federal, state, local, or foreign examinations by tax authorities for the years before 2016.

Components of the Net Deferred Tax Asset or Liability

| | | December 31, | |
|---|---|---|---|
| | | 2021 | 2020 |
| Cumulative foreign currency translation loss | $ | 1,088 | 3,818 |
| Basis difference for fixed assets | | 706 | 1,426 |
| Deferred gain | | (2,937) | 1,956 |
| Net operating loss carryforward | | 15,146 | 7,107 |
| | | 14,003 | 14,307 |
| Less: valuation allowance | | (14,003) | (6,480) |
| | $ | — | $ 7,827 |

We have state net operating losses in many of the various states in which we operate.

We assess the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing

App. 1807

deferred tax assets. At December 31, 2021, we had net deferred tax asset due to tax deductions available to us in future years. However, as we could not determine that it was more likely than not that we would realize the benefit of the deferred tax asset, we established a 100% valuation allowance.

## 18. Commitments and Contingencies

We believe that we will generate excess cash from property operations in the next twelve months; such excess, however, might not be sufficient to discharge all of our obligations as they become due. We intend to sell income-producing assets, refinance real estate and obtain additional borrowings primarily secured by real estate to meet our liquidity requirements.

We were the primary guarantor, on a $24,300 mezzanine loan between UHF and a lender. The guarantee was removed on January 29, 2021, concurrent with the repayment of the loan by UHF. We are are also a guarantor on the mortgage notes payable on two properties in that are owned by VAA (See Note 10 - Investment in Unconsolidated Joint Ventures) and four that are owned directly by us (See Note 11 - Mortgages and Other Notes Payable).

<center>49</center>

<center>

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

</center>

In February 2019, a lawsuit was brought by Paul Berger ("Berger") against us and others that alleges that we completed improper sales and/or transfers of property with IOR. Berger requests that we pay off various related party loans to IOR and that IOR then distribute the funds to its shareholders. We intend to vigorously defend against the allegations. The trial for this matter is set for November 2022.

## 19. Quarterly Results of Operations

The following is a tabulation of our quarterly results of operations for the years December 31, 2021, 2020 and 2019. Quarterly results presented may differ from those previously reported in our Form 10-Q due to the reclassification of the operations.

| | 2021 Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | **March 31,** | **June 30,** | **September 30,** | **December 31,** |
| Revenues | $ 11,828 | $ 10,795 | $ 10,034 | $ 8,117 |
| Net operating loss | (2,226) | (5,225) | (4,558) | (4,154) |
| Net income (loss) attributable to the Company | 22,632 | (30,733) | 26,246 | (8,747) |
| EPS - basic and diluted | $ 2.62 | $ (3.56) | $ 3.04 | $ (1.01) |

| | 2020 Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | **March 31,** | **June 30,** | **September 30,** | **December 31,** |
| Revenues | $ 12,753 | $ 13,431 | $ 12,159 | $ 18,679 |
| Net operating income (loss) | (3,146) | 635 | (1,537) | 4,020 |
| Net (loss) income attributable to the Company | 4,613 | (4,158) | 7,693 | (1,479) |
| EPS - basic and diluted | $ 0.53 | $ (0.48) | $ 0.88 | $ (0.17) |

## 20. Subsequent Events

On January 14, 2022, we sold Toulon, a 240 unit multifamily property property in Gautier, Mississippi for $26,750. The proceeds were used to pay off the mortgage note payable on the property and for general corporate purposes.

The date to which events occurring after December 31, 2021, the date of the most recent balance sheet, have been evaluated for possible adjustments to the financial statements or disclosure is March 28, 2021, which is the date of which the financial statements were available to be issued. There are no subsequent events that would require an adjustment to the financial statements.

<center>50</center>

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**SCHEDULE III - REAL ESTATE AND ACCUMULATED DEPRECIATION**
**December 31, 2021**

| Property/Location | Encumbrances | Initial Cost Land | Initial Cost Buildings | Cost Capitalized Subsequent to Acquisition | Gross Amount Carried at End of Year Land | Gross Amount Carried at End of Year Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired |
|---|---|---|---|---|---|---|---|---|---|---|
| *Multifamily* | | | | | | | | | | |
| Chelsea | $ 8,037 | $ 1,225 | $ 11,230 | $ 17 | $ 1,231 | $ 11,241 | $ 12,472 | $ 893 | 1999 | 2018 |
| Forest Grove | 7,263 | 1,440 | 10,234 | 32 | 1,440 | 10,266 | 11,706 | 410 | 2020 | 2020 |
| Landing Bayou | 14,407 | 2,011 | 18,255 | (5,962) | 2,011 | 12,293 | 14,304 | 1,425 | 2005 | 2018 |
| Legacy at Pleasant Grove | 13,352 | 2,005 | 18,109 | 57 | 2,033 | 18,138 | 20,171 | 3,237 | 2006 | 2018 |
| Parc at Denham Springs Phase II | 15,962 | 1,505 | 16,975 | — | 1,505 | 16,975 | 18,480 | 873 | 2010 | 2009 |
| Sugar Mill Phase III | 9,216 | 576 | 9,755 | (15) | 576 | 9,740 | 10,316 | 382 | 2015 | 2015 |
| Toulon | 13,697 | 1,621 | 20,107 | 411 | 1,993 | 20,146 | 22,139 | 5,279 | 2011 | 2014 |
| Villas at Bon Secour | 19,492 | 2,715 | 15,385 | 52 | 2,715 | 15,437 | 18,152 | 1,318 | 2007 | 2018 |
| Vista Ridge | 9,830 | 1,339 | 13,398 | 6 | 1,339 | 13,404 | 14,743 | 2,590 | 2009 | 2018 |
| | 111,256 | 14,437 | 133,448 | (5,402) | 14,843 | 127,640 | 142,483 | 16,407 | | |
| *Commercial* | | | | | | | | | | |
| 770 South Post Oak | 11,635 | 1,763 | 16,312 | 672 | 1,763 | 16,984 | 18,747 | 3,037 | 1970 | 2015 |
| Browning Place | 75,298 | 5,096 | 49,441 | 14,453 | 5,096 | 63,894 | 68,990 | 28,140 | 1984 | 2005 |
| Stanford Center | 38,979 | 20,278 | 25,876 | 6,224 | 20,278 | 32,100 | 52,378 | 15,275 | 2007 | 2008 |
| Other | — | 646 | 74 | — | 646 | 74 | 720 | 74 | | |
| | 125,912 | 27,783 | 91,703 | 21,349 | 27,783 | 113,052 | 140,835 | 46,526 | | |
| *Developed and Undeveloped Land* | | | | | | | | | | |
| Mercer Crossing | — | 2,999 | — | — | 2,999 | — | 2,999 | — | | 2018 |
| Windmill Farms | 8,389 | 43,608 | — | 2,159 | 45,767 | — | 45,767 | — | | 2006 |
| Other | 6,491 | 19,608 | — | 7,604 | 27,212 | — | 27,212 | — | | |
| | 14,880 | 66,215 | — | 9,763 | 75,978 | — | 75,978 | — | | |
| | $ 252,048 | $108,435 | $225,151 | $ 25,710 | $118,604 | $ 240,692 | $359,296 | $ 62,933 | | |

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**SCHEDULE III - REAL ESTATE AND ACCUMULATED DEPRECIATION**
**As of December 31, 2021**

| | 2021 | 2020 | 2019 |
|---|---|---|---|

App. 1809

Reconciliation of Real Estate

| | | | | | | |
|---|---|---|---|---|---|---|
| Balance at January 1, | | $ | 459,801 | $ | 477,963 | $ | 463,732 |
| Additions | | | 5,814 | | 21,223 | | 92,964 |
| Deductions | | | (106,319) | | (39,385) | | (78,733) |
| Balance at December 31, | | $ | 359,296 | $ | 459,801 | $ | 477,963 |
| | | | | | | | |
| Reconciliation of Accumulated Depreciation | | | | | | | |
| Balance at January 1, | | | 82,418 | | 90,173 | | 79,228 |
| Additions | | | 10,820 | | 12,188 | | 13,379 |
| Deductions | | | (30,305) | | (19,943) | | (2,434) |
| Balance at December 31, | | $ | 62,933 | $ | 82,418 | $ | 90,173 |

52

# TRANSCONTINENTAL REALTY INVESTORS, INC.

## NOTES TO FINANCIAL STATEMENTS

### (Dollars in thousands, except per share amounts)

### SCHEDULE IV - MORTGAGE LOANS
### December 31, 2021

| Description | Interest Rate | Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount | Carrying Value |
|---|---|---|---|---|---|---|
| **Convertible loans** | | | | | | |
| Autumn Breeze | 5.00% | 7/1/2022 | No payments until maturity or conversion | $ 24,756 | $ 2,486 | $ 2,486 |
| Bellwether Ridge | 5.00% | 11/1/2026 | No payments until maturity or conversion | 18,070 | 3,967 | 3,967 |
| Forest Pines | 5.00% | 11/1/2022 | No payments until maturity or conversion | 26,407 | 6,472 | 6,472 |
| Parc at Ingleside | 5.00% | 11/1/2026 | No payments until maturity or conversion | 25,201 | 3,700 | 3,700 |
| Parc at Opelika | 10.00% | 1/13/2023 | No payments until maturity or conversion | 23,661 | 2,305 | 2,305 |
| Parc at Windmill Farms | 5.00% | 11/1/2022 | No payments until maturity or conversion | 35,524 | 7,830 | 7,830 |
| Plum Tree | 5.00% | 4/26/2026 | No payments until maturity or conversion | 17,105 | 1,537 | 1,537 |
| Spyglass of Ennis | 5.00% | 11/1/2022 | No payments until maturity or conversion | 22,793 | 5,319 | 5,319 |
| Steeple Crest | 5.00% | 8/1/2026 | No payments until maturity or conversion | 11,529 | 6,498 | 6,498 |
| | | | | 205,046 | 40,114 | 40,114 |
| **Land loans** | | | | | | |
| ABC Land and Development, Inc. | 9.50% | 6/30/2026 | No payments until maturity | — | 4,408 | 4,408 |
| ABC Paradise, LLC | 9.50% | 6/30/2026 | No payments until maturity | — | 1,210 | 1,210 |
| Lake Wales | 9.50% | 6/30/2026 | No payments until maturity | — | 3,000 | 3,000 |
| Legacy Pleasant Grove | 12.00% | 10/23/2022 | No payments until maturity | — | 496 | 496 |
| McKinney Ranch | 6.00% | 9/15/2022 | No payments until maturity | — | 4,554 | 4,554 |
| One Realco Land Holding, Inc. | 9.50% | 6/30/2026 | No payments until maturity | — | 1,728 | 1,728 |
| Riverview on the Park Land, LLC | 9.50% | 6/30/2026 | No payments until maturity | — | 1,045 | 1,045 |

App. 1810

| Description | Interest Rate | Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount | Carrying Value |
|---|---|---|---|---|---|---|
| Spartan Land | 12.00% | 1/16/2023 | No payments until maturity | — | 5,907 | 5,907 |
| | | | | — | 22,348 | 22,348 |
| **Subsidized housing** | | | | | | |
| Phillips Foundation for Better Living, Inc. | 12.00% | 3/31/2024 | Payments from excess property cash flows | — | 813 | 813 |
| Unified Housing Foundation | 12.00% | 6/30/2023 | Payments from excess property cash flows | — | 2,881 | 2,881 |
| Unified Housing Foundation | 12.00% | 6/30/2023 | Payments from excess property cash flows | — | 212 | 212 |
| Unified Housing Foundation | 12.00% | 6/30/2023 | Payments from excess property cash flows | — | 6,831 | 6,831 |
| Unified Housing Foundation | 12.00% | 6/30/2023 | Payments from excess property cash flows | — | 10,401 | 10,401 |

53

TRANSCONTINENTAL REALTY INVESTORS, INC.

NOTES TO FINANCIAL STATEMENTS

(Dollars in thousands, except per share amounts)

| Description | Interest Rate | Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount | Carrying Value |
|---|---|---|---|---|---|---|
| Unified Housing Foundation | 12.00% | 3/31/2022 | Payments from excess property cash flows | — | 10,096 | 10,096 |
| Unified Housing Foundation | 12.00% | 3/31/2023 | Payments from excess property cash flows | — | 6,990 | 6,990 |
| Unified Housing Foundation | 12.00% | 5/31/2023 | Payments from excess property cash flows | — | 3,615 | 3,615 |
| Unified Housing Foundation | 12.00% | 12/31/2032 | Payments from excess property cash flows | 96,929 | 17,172 | 17,172 |
| Unified Housing Foundation | 12.00% | 3/31/2024 | Payments from excess property cash flows | — | 6,521 | 6,521 |
| Unified Housing Foundation | 12.00% | 4/30/2024 | Payments from excess property cash flows | — | 1,549 | 1,549 |
| Unified Housing Foundation | 12.00% | 6/30/2024 | Payments from excess property cash flows | — | 183 | 183 |
| | | | | 96,929 | 67,264 | 67,264 |
| | | | | $ 301,975 | $ 129,726 | $ 129,726 |

54

TRANSCONTINENTAL REALTY INVESTORS, INC.

NOTES TO FINANCIAL STATEMENTS

(Dollars in thousands, except per share amounts)

App. 1811

**SCHEDULE IV - MORTGAGE LOANS**
**As of December 31,**

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| Balance at January 1, | $ 123,556 | $ 112,357 | $ 83,541 |
| Additions | 18,844 | 26,535 | 59,241 |
| Deductions | (12,674) | (15,336) | (30,425) |
| Balance at December 31, | $ 129,726 | $ 123,556 | $ 112,357 |

55

## ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A.   CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Principal Executive and Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e)) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Principal Executive and Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our Principal Executive and Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. There are inherent limitations to the effectiveness of any system of internal control over financial reporting. These limitations include the possibility of human error, the circumvention of overriding of the system and reasonable resource constraints. Because of its inherent limitations, our internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with policies or procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, management used the criteria set forth in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Based on management's assessments and those criteria, management has concluded that Company's internal control over financial reporting was effective as of December 31, 2021.

This annual report does not include an attestation report of our registered public accounting firm regarding internal control over financial report. Management's report was not subject to attestation by our registered public accounting firm pursuant to temporary rules of the SEC that permit us to provide only management's report in this annual report.

### Changes in Internal Control over Financial Reporting

In preparation for management's report on internal control over financial reporting, we documented and tested the design and operating effectiveness of our internal control over financial reporting. There were no changes in our internal controls over financial reporting (as such term is defined in Exchange Act Rule 13a-15(f)) that occurred during the quarter ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B.   OTHER INFORMATION

App. 1812

56

---

## PART III

## ITEM 10.  DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

**Directors**

The affairs of the Company are managed by our Board of Directors. The Directors are elected at the annual meeting of stockholders or appointed by the incumbent Board and serve until the next annual meeting of stockholders or until a successor has been elected or approved.

An objective is for a majority of our Board to be independent directors. For a director to be considered independent, the Board must determine that the director does not have any direct or indirect material relationship with the Company. The Board has established guidelines to assist it in determining director independence which conform to, or are more exacting than, the independence requirements in the New York Stock Exchange ("NYSE") listing rules. The independence guidelines are set forth in our "Corporate Governance Guidelines". The text of this document has been posted on our internet website at www.transconrealty-invest.com ("Investor Relations Website") and is available in print to any shareholder who requests it. In addition to applying these guidelines, the Board will consider all relevant facts and circumstances in making an independence determination.

We have adopted a code of conduct that applies to all Directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Stockholders may find our code of conduct on our website by going to our Investor Relations Website. We will post any amendments to the code of conduct, as well as any waivers that are required to be disclosed by the rules of the Security Exchange Commission (the "SEC") or the NYSE on our website.

Our Board of Directors has adopted charters for our Audit, Compensation and Governance and Nominating Committees of the Board of Directors. Stockholders may find these documents on our website by going to our Investor Relations Website. You may also obtain a printed copy of the materials referred to by contacting us at the following address:

Transcontinental Realty Investors, Inc.
Attn: Investor Relations
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Telephone: 469-522-4200

All members of the Audit Committee and Nominating and Corporate Governance Committees must be independent directors. Members of the Audit Committee must also satisfy additional independence requirements, which provide (i) that they may not accept, directly or indirectly, any consulting, advisory, or compensatory fee from the Company or any of its subsidiaries other than their director's compensation (other than in their capacity as a member of the Audit Committee, the Board of Directors, or any other committee of the Board), and (ii) no member of the Audit Committee may be an "affiliated person" of the Company or any of its subsidiaries, as defined by the SEC.

Our current directors are listed below, together with their ages, terms of service, all positions and offices with us and our current advisor, Pillar, their principal occupations, business experience and directorships with other companies during the last five years or more. The designation "affiliated", when used below with respect to a director, means that the director is an officer, director or employee of Pillar, an officer of the Company, or an officer or director of a related party of the Company. The designation "independent", when used below with respect to a Director, means that the Director is neither an officer of the Company nor a director, officer or employee of Pillar (but may be a director of the Company, although the Company may have certain business or professional relationships with such Director as discussed in Item 13. Certain Relationships and Related Transactions, and Director Independence.

HENRY A. BUTLER, age 71, Director, Independent, since November 2005 and Chairman of the Board since May 2009

Retired (since April 30, 2019); Mr. Butler served as Vice President for Pillar from April 2011 to April 30, 2019. Mr. Butler has been a Director of the Company since November 2005 and Chairman of the Board since May 2009. He also served as Chairman of the Board since May 2009 and as a Director since July 2003 of ARL, and Chairman of the Board since May 2011 and a Director since February 2011 of IOR.

WILLIAM J. HOGAN, age 64, Director, Independent, since February 2020

Retired (since December 31, 2020); Registered Representative and Investment Advisor Representative from January 2013 to December 2020 by Cetera Advisor Networks LLC, a general securities and investment advisory firm, with an office in San Antonio, Texas. From November 2009 through December 2012, Mr. Hogan was a registered representative, employed by Financial Network Investment Corp. in San Antonio, Texas. He holds Series 7 (General Securities Representative), Series 63 (Uniform Securities Agent State Law) and Series 65 (Investment Advisor) licenses issued by Financial Industry Regulatory Authority ("FINRA"). Mr. Hogan was elected as a director of the Company and ARL on January 28, 2020 effective February 1, 2020.

ROBERT A. JAKUSZEWSKI, age 59, Director, Independent, since November 2005

Mr. Jakuszewski has served as a Territory Manager for Artesa Labs since April 2015. He was a Medical Specialist from January 2014 to April 2015 for VAYA Pharma, Inc., Senior Medical Liaison from January 2013 to July 2013 for Vein Clinics of America, and the Vice President of Sales and Marketing from September 1998 to December 2012 for New Horizons Communications, Inc. Mr. Jakuszewski has been a Director of the Company since November 2005. He has also been a Director of ARL since November 2005 and a Director of IOR since March 2004.

TED R. MUNSELLE, age 66, Director, Independent, since February 2004

Mr. Munselle has been Vice President and Chief Financial Officer of Landmark Nurseries, Inc. since October 1998. On February 17, 2012, he was appointed as a member of the Board of Directors for Spindletop Oil & Gas Company and as Chairman of their Audit Committee. Spindletop's stock is traded on the Over-the-Counter (OTC) market. Mr. Munselle has been a Director of the Company since February 2004. He has also served as Director of ARL since February 2004 and Director of IOR since May 2009. Mr. Munselle is qualified as an Audit Committee financial expert within the meaning of SEC regulations and the Board of Directors has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the NYSE. Mr. Munselle is a Certified Public Accountant.

BRADFORD A. PHILLIPS, age 56, Director, since March 2021

Mr. Phillips has been the Chief Executive Officer since 2008 and Chairman since 1999 of LBL Group of Insurance Companies. He has served as President of Midland Securities, LLC, a Dallas, TX based broker/dealer since 2002. Prior to joining LBL Group, he served as President of InterFirst Capital Corporation of Los Angeles, California. Mr. Phillips holds a number of securities licenses, including the Series 4 (Options Principal), Series 7 (General Securities License), Series 24 (General Securities Principal), Series 27 (Financial and Operations Principal), Series 53 (Municipal Securities Principal), Series 55 (Equity Trading Principal), and Series 63 (Blue Sky Securities License). He has also been a Director of ARL since March 2021.

RAYMOND D. ROBERTS, SR., age 90, Director, Independent, since June 2016

Mr. Roberts is currently retired. Mr. Roberts has served as Director of the Company since June 2, 2016. He has also served as Director of ARL and IOR since June 2, 2016. For more than five years prior to December 31, 2014, he was Director of Aviation of Steller Aviation, Inc., a privately held corporation engaged in the business of aircraft (Boeing 737) and logistical management.

**Board Meetings and Committees**

The Board of Directors held five meetings during 2021. For such year, no incumbent director attended fewer than 75% of the aggregate of (1) the total number of meetings held by the Board during the period for which he or she had been a director and (2) the total number of meetings held by all committees of the Board on which he or she served during the period that he served. Under our Corporate Governance Guidelines, each Director is expected to dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties, including by attending meetings of the stockholders of the Company, the Board and Committees of which he is a member. The Board of Directors has standing Audit, Compensation and Governance and Nominating Committees.

The members of the Board of Directors on the date of this Report and the Committees of the Board on which they serve are identified below:

| Director | Audit Committee | Governance and Nominating Committee | Compensation Committee |
|---|---|---|---|
| Henry A. Butler | | | |
| William J. Hogan | X | X | X |
| Robert A. Jakuszewski | X | Chair | X |
| Ted R. Munselle | Chair | X | X |
| Bradford A. Phillips | | | |
| Raymond D. Roberts, Sr. | X | X | Chair |

*Audit Committee*

The Audit Committee is responsible for review and oversight of our operating and accounting procedures. Our Audit Committee charter is available on our Investor Relations website (www.transconrealty-invest.com). The Audit Committee is an "audit committee" for purposes of Section 3(a)(58) of the Exchange Act. All of the current members of the Audit Committee are independent within the meaning of the SEC Regulations, the listing standards of the NYSE and our Corporate Governance Guidelines. Mr. Ted R. Munselle, the chairman of our Audit Committee, is qualified as an Audit Committee financial expert within the meaning of SEC Regulations, and the Board has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the NYSE. All of the members of the Audit Committee meet the experience requirements of the listing standards of the NYSE. The Audit Committee met five times during 2021.

*Governance and Nominating Committee*

The Governance and Nominating Committee is responsible for developing and implementing policies and practices relating to corporate governance, including reviewing and monitoring implementation of our Corporate Governance Guidelines. In addition, the Committee develops and reviews background information on candidates for the Board and makes recommendations to the Board regarding such candidates. The Committee also prepares and supervises the Board's annual review of director independence and the Board's performance self-evaluation. The Charter of the Governance and Nominating Committee was adopted on March 17, 2004 and is available on our Investor Relations Website. The Governance and Nominating Committee met three times during 2021.

*Compensation Committee*

The Compensation Committee is responsible for overseeing the policies of the Company relating to compensation to be paid by the Company to our principal executive officer and any other officers designated by the Board and make recommendations to the Board with respect to such policies, produce necessary reports and executive compensation for inclusion in our Proxy Statement in accordance with applicable rules and regulations and to monitor the development and implementation of succession plans for the principal executive officers and other key executives and make recommendations to the Board with respect to such plans. The charter of our Compensation Committee is available on our Investor Relations Website. All of the members of the Compensation Committee are independent within the meaning of the listing standards of the NYSE and our Corporate Governance Guidelines. The Compensation Committee is to be comprised of at least two directors who are independent of Management and the Company. The Compensation Committee met two times during 2021.

**Presiding Director**

The primary responsibility of our presiding director is to preside over periodic executive sessions of the Board in which Management directors and other members of Management do not participate. The presiding director also advises the Chairman of the Board and, as appropriate, Committee Chairs with respect to agendas and information needs relating to Board and Committee meetings, provides advice with respect to the selection of Committee Chairs and performs other duties that the Board may from time to time delegate to assist the Board in fulfillment of its responsibilities.

The day following the annual meeting of stockholders held December 16, 2021 representing all stockholders of record dated November 4, 2021, the full Board met and re-appointed Ted R. Munselle as Presiding Director, to serve in such position until the Company's next annual meeting of stockholders to be held subsequently in 2022.

**Determination of Directors' Independence**

Our Corporate Governance Guidelines ("Guidelines") meet or exceed the new listing standards adopted during that year by the NYSE. The full text of our Guidelines can be found on our Investor Relations Website.

Pursuant to the Guidelines, the Board undertook its annual review of director independence in May 2021 and during this review, the Board considered transactions and relationships between each director or any member of his or her immediate family and the Company and its subsidiaries and related parties, including those reported under Certain Relationships and Related Transactions below. The Board also examined transactions and relationship between directors or their related parties and members of our senior management or their related parties. As provided in the Guidelines, the purpose of such review was to determine whether such relationships or transactions were inconsistent with the determination that the director is independent.

As a result of these reviews, the Board affirmatively determined of the then directors, Messrs. Butler, Munselle, Hogan, Jakuszewski and Roberts are each independent of the Company and its Management under the standards set forth in the Corporate Governance Guidelines.

**Executive Officers**

Executive officers of the Company are listed below, all of whom are employed by Pillar. None of the executive officers receive any direct remuneration from the Company nor do any hold any options granted by the Company. Their positions with the Company are not subject to a vote of stockholders. In addition to the following executive officers, the Company has several vice presidents and assistant secretaries who are not listed herein. The ages, terms of service and all positions and offices with the Company, Pillar, other related entities, other principal occupations, business experience and directorships with other publicly-held companies during the last five years or more are set forth below. No family relationships exist among any of the executive officers or directors of the Company.

BRADLEY J. MUTH, 65

Mr. Muth has served as the President and Chief Executive Officer of the Company, ARL and IOR since December 16, 2021. He has also been President and Chief Executive Officer of Pillar since October 18, 2021. Prior to joining the Company, he served as Senior Managing Director, Capital Markets and Development of ValueRock Realty Partners, a national real estate investment services firm, focusing on value-ad commercial real estate throughout California, Hawaii and Arizona. Prior thereto, from December 2014 to June 2019, he was Senior Managing Director, Portfolio and Asset Management of Madison Marquette, a leading commercial real estate investment manager, service provider, developer and operator of real property. From 2012 to 2014, he was Chief Investment Officer of Buckingham Companies, a real estate investment firm engaged in the multifamily sector. Mr. Muth, from 1994 to 2012, was Managing Principal or Senior Managing Partner of ING/Concert Realty Partners, a real estate investment and operations firm. He is also a CPA.

ERIK L. JOHNSON, 54

Mr. Johnson has served as the Executive Vice President and Chief Financial Officer of the Company and ARL since December 16, 2021. He has also been Chief Financial Officer of IOR since December 16, 2021 and of Pillar since June 29, 2020. Prior to joining the Company, he served as Vice President of Financial Reporting at Macerich (NYSE: MAC) and has served as the Chief Accounting Officer of North American Scientific, Inc. He began his career as an auditor with PricewaterhouseCoopers and is a CPA.

LOUIS J. CORNA, 74

Mr. Corna has served as Executive Vice President, General Counsel/Tax Counsel and Secretary of the Company, ARL and IOR since February 2004. He has also been Executive Vice President since March 2011 and Secretary since December 2010 of Pillar. Mr. Corna was also a Director and Vice President from June 2004 to December 2010 and Secretary from January 2005 to December 2010 of First Equity Properties, Inc.

**Code of Ethics**

We have adopted a code of ethics entitled "Code of Business Conduct and Ethics" that applies to all directors, officers, and employees (including those of our Advisor). In addition, we have adopted a code of ethics entitled "Code of Ethics for Senior Financial Officers" that applies to the principal executive officer, president, principal financial officer, chief financial officer, chief accounting officer, and controller. The text of these documents has been posted on our Investor Relations Website and are available in print to any stockholder who requests them.

**Compliance with Section 16(a) of the Exchange Act**

Under the securities laws of the United States, the directors, executive officers, and any persons holding more than 10% of our shares of Common

stock are required to report their share ownership and any changes in that ownership to the SEC. Specific due dates for these reports have been established and we are required to report any failure to file by these dates. All of these filing requirements were satisfied by our directors, executive officers, and 10% holders during the fiscal year ending December 31, 2021. In making these statements, we have relied on the written representations of our incumbent directors and executive officers, 10% holders and copies of the reports that they have filed with the SEC.

**The Advisor**

Pillar has been our Advisor and Cash Manager since April 30, 2011.  Although the Board of Directors is directly responsible for managing the affairs of the Company, and for setting the policies which guide it, our day-to-day operations are performed by Pillar, as the contractual advisor, under the supervision of the Board.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors.  Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with our business plan and investment policy.  Pillar also serves as an Advisor and Cash Manager to ARL and IOR.  As the contractual advisor, Pillar is compensated under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  We have no employees and as such, employees of Pillar render services to us in accordance with the terms of the Advisory Agreement.

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the MRHI. The beneficiaries of the MRHI are the children of the late Gene E. Phillips.

Under the Advisory Agreement, Pillar is required to annually formulate and submit, for Board approval, a budget and business plan containing a twelve-month forecast of operations and cash flow, a general plan for asset sales and purchases, lending, foreclosure and borrowing activity, and other investments. Pillar is required to report quarterly to the Board on TCI's performance against the business plan. In addition, all transactions require prior Board approval, unless they are explicitly provided for in the approved business plan or are made pursuant to authority expressly delegated to Pillar by the Board.

The Advisory Agreement also requires prior Board approval for the retention of all consultants and third party professionals, other than legal counsel. The Advisory Agreement provides that Pillar shall be deemed to be in a fiduciary relationship to our stockholders; contains a broad standard governing Pillar's liability for losses incurred by us; and contains guidelines for Pillar's allocation of investment opportunities as among itself, the Company and other entities it advises. Pillar is a company of which Messrs. Muth, Johnson and Corna serve as executive officers.

The Advisory Agreement provides for Pillar to be responsible for our day-to-day operations and to receive, as compensation for basic management and advisory services, a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value (total assets less allowance for amortization, depreciation or depletion and valuation reserves).

In addition to base compensation, Pillar receives the following forms of additional compensation:

(1)  an annual net income fee equal to 7.5% of our net income as an incentive for successful investment and management of our assets;

(2)  an annual incentive sales fee to encourage periodic sales of appreciated real property at optimum value equal to 10.0% of the amount, if any, by which the aggregate sales consideration for all real estate sold by us during such fiscal year exceeds the sum of:

(a)  the cost of each such property as originally recorded in our books for tax purposes (without deduction for depreciation, amortization or reserve for losses);

(b)  capital improvements made to such assets during the period owned; and

(c)  all closing costs (including real estate commissions) incurred in the sale of such real estate; provided however, no incentive fee shall be paid unless (a) such real estate sold in such fiscal year, in the aggregate, has produced an 8.0% simple annual return on the net investment including capital improvements, calculated over the holding period before depreciation and inclusive of operating income and sales consideration, and (b) the aggregate net operating income from all real estate owned for each of the prior and current fiscal years shall be at least 5.0% higher in the current fiscal year than in the prior fiscal year;

(3)  an acquisition commission, from an unaffiliated party of any existing mortgage or loan, for supervising the acquisition, purchase or long-term lease of real estate equal to the lesser of:

App. 1817

(a) up to 1.0% of the cost of acquisition, inclusive of commissions, if any, paid to non-affiliated brokers; or

(b) the compensation customarily charged in arm's-length transactions by others rendering similar property acquisition services as an ongoing public activity in the same geographical location and for comparable property, provided that the aggregate purchase price of each property (including acquisition fees and real estate brokerage commissions) may not exceed such property's appraised value at acquisition;

(4) a construction fee equal to 6.0% of the so-called "hard costs" only of any costs of construction on a completed basis, based upon amounts set forth as approved on any architect's certificate issued in connection with such construction, which fee is payable at such time as the applicable architect certifies other costs for payment to third parties. The phrase "hard costs" means all actual costs of construction paid to contractors, subcontractors and third parties for materials or labor performed as part of the construction but does not include items generally regarded as "soft costs," which are consulting fees, attorneys' fees, architectural fees, permit fees and fees of other professionals; and

(5) reimbursement of certain expenses incurred by the advisor in the performance of advisory services.

The Advisory Agreement also provides that Pillar receive the following forms of compensation:

(1) a mortgage or loan acquisition fee with respect to the acquisition or purchase from an unaffiliated party of any existing mortgage loan by us equal to the lesser of:

(a) 1.0% of the amount of the mortgage or loan purchased; or

(b) a brokerage or commitment fee which is reasonable and fair under the circumstances. Such fee will not be paid in connection with the origination or funding of any mortgage loan by us; and

(2) a mortgage brokerage and equity refinancing fee for obtaining loans or refinancing on properties equal to the lesser of:

(a) 1.0% of the amount of the loan or the amount refinanced; or

(b) a brokerage or refinancing fee which is reasonable and fair under the circumstances; provided, however, that no such fee shall be paid on loans from Pillar, or a related party of Pillar, without the approval of our Board of Directors. No fee shall be paid on loan extensions.

Under the Advisory Agreement, all or a portion of the annual advisory fee must be refunded by the Advisor if our operating expenses (as defined in the Advisory Agreement) exceed certain limits specified in the Advisory Agreement based on our book value, net asset value and net income during the fiscal year.

62

The Advisory Agreement requires Pillar to pay us, one-half of any compensation received from third parties with respect to the origination, placement or brokerage of any loan made by us; provided, however, that the compensation retained by Pillar, or any affiliate of Pillar, shall not exceed the lesser of (1) 2.0% of the amount of the loan commitment or (2) a loan brokerage and commitment fee which is reasonable and fair under the circumstances.

The Advisory Agreement further provides that Pillar shall bear the cost of certain expenses of its employees, excluding fees paid to our Directors; rent and other office expenses of both Pillar and us (unless we maintains office space separate from that of Pillar); costs not directly identifiable to our assets, liabilities, operations, business or financial affairs; and miscellaneous administrative expenses relating to the performance by Pillar of its duties under the Advisory Agreement.

If and to the extent that we request Pillar, or any director, officer, partner, or employee of Pillar, to render services for us other than those required to be rendered by the Advisory Agreement, Pillar separately would be compensated for such additional services on terms to be agreed upon between such party and us from time to time. As discussed below, under "Property Management and Real Estate Brokerage," Regis Realty Prime, LLC ("Regis") manages our commercial properties and provides brokerage services.

We have a Cash Management Agreement with Pillar that provides that all of our funds are delivered to Pillar which has a deposit liability to us

App. 1818

and is responsible for payment of all payables and investment of all excess funds which earn interest at the Wall Street Journal prime rate plus 1.0% per annum, as set quarterly on the first day of each calendar quarter. Borrowings for our benefit bear the same interest rate. The term of the Cash Management Agreement is coterminous with the Advisory Agreement, and is automatically renewed each year unless terminated with the Advisory Agreement. We believe that the terms of the Advisory Agreement are at least as fair as could be obtained from unaffiliated third parties.

Situations may develop in which our interests are in conflict with those of one or more directors or officers in their individual capacities, or of Pillar, or of their respective related parties. In addition to services performed for us, as described above, Pillar actively provides similar services as agent for, and advisor to, other real estate enterprises, including persons and entities involved in real estate development and financing, including ARL and IOR. The Advisory Agreement provides that Pillar may also serve as advisor to other entities.

As advisor, Pillar is a fiduciary of our public investors. In determining to which entity a particular investment opportunity will be allocated, Pillar will consider the respective investment objectives of each entity and the appropriateness of a particular investment in light of each such entity's existing mortgage note and real estate portfolios and business plan. To the extent any particular investment opportunity is appropriate to more than one such entity, such investment opportunity will be allocated to the entity that has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among various entities. Refer to Part III, Item 13 "Certain Relationships and Related Transactions, and Director Independence".

Pillar may assign the Advisory Agreement with our prior consent.

The principal executive officers of Pillar are set forth below:

| Name | Officers |
| --- | --- |
| Bradley J. Muth | President and Chief Executive Officer |
| Erik L. Johnson | Executive Vice President and Chief Financial Officer |
| Louis J. Corna | Executive Vice President and Secretary |

### Property Management

Regis manages four of our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

<div align="center">63</div>

### Real Estate Brokerage

Regis provides real estate brokerage services to us on a non-exclusive basis, and is entitled to receive a real estate commission for property purchases and sales in accordance with the following sliding scale of total fees to be paid:

(1)     maximum fee of 4.5% on the first $2.0 million of any purchase or sale transaction of which no more than 3.5% is to be paid to Regis;

(2)     maximum fee of 3.5% on transaction amounts between $2.0 million to $5.0 million of which no more than 3.0% is to be paid to Regis;

(3)     maximum fee of 2.5% on transaction amounts between $5.0 million to $10.0 million of which no more than 2.0% is to be paid to Regis; and

(4)     maximum fee of 2.0% on transaction amounts in excess of $10.0 million of which no more than 1.5% is to be paid to Regis.

## ITEM 11.   EXECUTIVE COMPENSATION

We have no employees, payroll or benefit plans and pay no compensation to our executive officers. Our executive officers are also officers and employees of Pillar, our Advisor, and are compensated by Pillar. Such executive officers perform a variety of services for Pillar and the amount of their compensation is determined solely by Pillar. Pillar does not allocate the cash compensation of its officers among the various entities for which it

<div align="right">App. 1819</div>

serves as advisor. Refer to Item 10. "Directors, Executive Officers and Corporate Governance" for a more detailed discussion of the compensation payable to Pillar by us.

The only remuneration paid by us is to our directors who are not officers or employees of Pillar or its related companies. The Independent Directors (1) review our business plan to determine that it is in the best interest of our stockholders, (2) review the advisory contract, (3) supervise the performance of the advisor and review the reasonableness of the compensation paid to the advisor in terms of the nature and quality of services performed, (4) review the reasonableness of our total fees and expenses and (5) select, when necessary, a qualified independent real estate appraiser to appraise properties acquired.

Each non-affiliated Director is entitled to receive an annual retainer of $12,000, with the Chairman of the Audit Committee to receive a one-time annual fee of $500. Directors who are also employees of the Company or its advisor receive no additional compensation for service as a Director.

During December 31, 2021, $66,300 was paid to non-employee Directors in total Directors' fees. The fees paid to the directors are as follows: Henry A. Butler $7,500; William J. Hogan, $11,000; Robert A. Jakuszewski, $15,600; Ted R. Munselle, $16,600 and Raymond D. Roberts, Sr., $15,600.

64

## ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

### Security Ownership of Certain Beneficial Owners

The following table sets forth the ownership of our common stock, both beneficially and of record, both individually and in the aggregate, for those persons or entities known to be beneficial owners of more than 5.0% of the outstanding shares of our common stock as of the close of business on March 28, 2021.

|  | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** | |
|---|---|---|---|
| **American Realty Investors, Inc.**(1)(2)<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 6,771,718 | 78.4 | % |
| **Transcontinental Realty Acquisition Corporation**(2)<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 1,383,226 | 16.0 | % |
| **Realty Advisors, LLC** (3)<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 621,728 | 7.2 | % |

\*   "Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.
\*\*  Percentage is based upon 8,639,316 shares of Common stock outstanding at March 28, 2021.
(1)    Includes 5,383,192 shares (62.3%) directly owned by American Realty Investors, Inc.
(2)    Includes 1,383,226 shares owned by Transcontinental Realty Acquisition Corporation, which is a wholly-owned subsidiary of ARL.
(3)    Includes 341,200 shares owned by RAI and 280,528 shares owned by Arcadia Energy, Inc., which is a wholly-owned subsidiary of RAI.

### Security Ownership of Management.

The following table sets forth the ownership of our common stock, both beneficially and of record, both individually and in the aggregate, for our directors and executive officers as of the close of business on March 28, 2021.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** | |
|---|---|---|---|
| Henry A. Butler | — | — | % |

App. 1820

| Name | | |
|------|---|---|
| Louis J. Corna | — | % |
| William J. Hogan | — | — | % |
| Robert A. Jakuszewski | — | — | % |
| Erik L. Johnson | — | — | % |
| Ted R. Munselle | — | — | % |
| Bradley J. Muth | — | — | % |
| Bradford A. Phillips | — | — | % |
| Raymond D. Roberts, Sr. | — | — | % |
| All Directors and Executive Officers as a group (9 individuals) | — | — | % |

\*    Beneficial Ownership" means the sole power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\*    Percentages are based upon 8,639,316 shares of Common Stock outstanding at March 28, 2021.

65

## ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

### Policies with Respect to Certain Activities

Article 14 of our Articles of Incorporation provides that we shall not, directly or indirectly, contract or engage in any transaction with (1) any director, officer or employee of the Company, (2) any director, officer or employee of the advisor, (3) the advisor, or (4) any affiliate or associate (as such terms are defined in Rule 12b-2 under the Exchange Act of any of the aforementioned persons, unless (a) the material facts as to the relationship among or financial interest of the relevant individuals or persons and as to the contract or transaction are disclosed to or are known by our Board of Directors or the appropriate committee thereof and (b) our Board of Directors or committee thereof determines that such contract or transaction is fair to the Company and simultaneously authorizes or ratifies such contract or transaction by the affirmative vote of a majority of our independent directors entitled to vote thereon.

Article 14 defines an "Independent Director" (for purposes of that Article) as one who is neither an officer or employee of the Company, nor a director, officer or employee of our advisor.

Our policy is to have such contracts or transactions approved or ratified by a majority of the disinterested Directors with full knowledge of the character of such transactions, as being fair and reasonable to the stockholders at the time of such approval or ratification under the circumstances then prevailing. Such Directors also consider the fairness of such transactions to the Company. We believes that, to date, such transactions have represented the best investments available at the time and they were at least as advantageous to us as other investments that could have been obtained.

We may enter into future transactions with entities, the officers, directors, or stockholders of which are also officers, directors, or stockholders of the Company, if such transactions would be beneficial to our operations and consistent with our then-current investment objectives and policies, subject to approval by a majority of disinterested Directors as discussed above.

We do not prohibit its officers, directors, stockholders, or related parties from engaging in business activities of the types conducted by the Company.

### Certain Business Relationships

Pillar is our Advisor and Cash Manager since April 30, 2011.  Although the Board of Directors is directly responsible for managing our affairs, and for setting the policies which guide it, our day-to-day operations are performed by Pillar, as the contractual advisor, under the supervision of the Board.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors.  Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with our business plan and investment policy.  Pillar also serves as an Advisor and Cash Manager to ARL and IOR.  As the contractual advisor, Pillar is compensated under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  We have no employees and as such, employees of Pillar render services to us in accordance with the terms of the Advisory Agreement.

Pillar is owned by RAI, which is owned by MRHI, which is owned by the May Trust.

All of our directors also serve as Directors of ARL and IOR. Our executive officers also serve as executive officers of ARL. As such, they owe

App. 1821

fiduciary duties to that entity as well as to Pillar under applicable law. ARL has the same relationship with Pillar as does the Company. Mr. Daniel J. Moos is the sole Manager and Class B 2% income Member of Victory Abode Apartments, LLC, and until August 2020, was the President of the Company, ARL and IOR.

Effective since January 1, 2011, Regis manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

At December 31, 2021, we owned approximately 81.1% of the outstanding common shares of IOR.

We are part of a tax sharing and compensating agreement with respect to federal income taxes among the Company, ARL, and IOR and their subsidiaries. In accordance with the agreement, our expense (benefit) in each year is calculated based on the amount of losses absorbed by taxable income multiplied by the maximum statutory tax rate of 21%.

66

We have a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. We have also invested in surplus cash notes receivables from UHF and have sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

**Related Party Transactions**

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interest of our company.

In 2021, we paid Pillar advisory fees of $5.8 million, net income fees of $0.4 million and cost reimbursements of $3.6 million.

We paid property management fees, construction management fees and leasing commissions of $0.9 million to Regis in 2021. In addition, SPC is part of a management service agreement with the controlling shareholder owned company in which SPC for an annual payment of 0.5% on the value of the investment properties receives from the Advisor office space, administrative and management services. During 2021, SPC paid management fees to Pillar in the amount of $2.5 million.

As of December 31, 2021, we had notes and interest receivables of $67.3 million and $3.9 million, respectively, due from related parties. Refer to Part 2, Item 8. Note 9 – Notes Receivable of our consolidated financial statements. During the current period, we recognized interest income of $6.3 million, originated $10.9 million, received $1.3 million principal payments, and received interest payments of $6.8 million from these related party notes receivables.

We were the primary guarantor, on a $24.3 million mezzanine loan between UHF and a lender. The guarantee was removed on January 29, 2021, concurrent with the repayment of the loan by UHF.

We received rental revenue $0.9 million, for the years ended December 31, 2021 for office space leased to Pillar and Regis.

From time to time, we have made advances and/or borrowing to/from other related parties, which generally have not had specific repayment terms, did not bear interest, are unsecured, and have been reflected our financial statements as other assets or other liabilities. We charge interest on the outstanding balance of funds advanced from us. The interest rate, set at the beginning of each quarter, is the prime rate plus 1.0% on the average daily cash balances advanced. At December 31, 2021, we had a receivable from Pillar in the amount of $136.7 million.

**Director Independence**

See "Determination of Director Independence" under Item 10 above to which reference is made.

**ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES**

For the years ended December 31, 2021 and 2020, we were billed by Farmer, Fuqua and Huff, L.P. for services in the following categories:

App. 1822

Audit Fees. Fees for audit services were $299,900 and $198,250 for the years ended December 31, 2021 and 2020, respectively. These are fees for professional services performed by the principal auditor for the audit of the Company's annual financial statements and review of financial statements included in the Company's 10-Q filings and services that are normally provided in connection with statutory and regulatory filing or engagement.

Audit-Related Fees. No fees for audit-related services were paid for the years ended December 31, 2021 and 2020. These are fees for assurance and related services performed by the principal auditor that are reasonably related to the performance of the audit or review of the Company's financial statements. These services include attestations by the principal auditor that are not required by statute or regulation and consulting on financial accounting/reporting standards.

<div align="center">67</div>

Tax Fees. Fees for tax services were $— and $11,850 for the years ended December 31, 2021 and 2020, respectively. These are fees for professional services performed by the principal auditor with respect to tax compliance, tax planning, tax consultation, returns preparation and review of returns. The review of tax returns includes the Company and its consolidated subsidiaries.

All Other Fees. No other fees were paid for the years ended December 31, 2021 and 2020. These are fees for other permissible work performed by the principal auditor that do not meet the above category descriptions.

All services rendered by the principal auditors are permissible under applicable laws and regulations and were pre-approved by either the Board of Directors or the Audit Committee, as required by law. The fees paid to the principal auditors for the services described in the above table fall under the categories listed below:

These services are actively monitored (as to both spending level and work content) by the Audit Committee to maintain the appropriate objectivity and independence in the principal auditor's core work, which is the audit of the Company's consolidated financial statements.

The Audit Committee has established policies and procedures for the approval and pre-approval of audit services and permitted non-audit services. The Audit Committee has the responsibility to engage and terminate our independent auditors, to pre-approve their performance of audit services and permitted non-audit services, to approve all audit and non-audit fees, and to set guidelines for permitted non-audit services and fees. All fees for 2021 and 2020 were pre-approved by the Audit Committee or were within the pre-approved guidelines for permitted non-audit services and fees established by the Audit Committee, and there were no instances of waiver of approved requirements or guidelines during the same periods.

Our Audit Committee has adopted a pre-approval policy of audit and non-audit services (the "Policy"), which sets forth the procedures and conditions pursuant to which services to be performed by the independent auditor are to be pre-approved. Consistent with the SEC rules establishing two different approaches to pre-approving non-prohibited services, the Policy of the Audit Committee covers Pre-approval of audit services, audit-related services, international administration tax services, non-U.S. income tax compliance services, pension and benefit plan consulting and compliance services, and U.S. tax compliance and planning. At the beginning of each fiscal year, the Audit Committee will evaluate other known potential engagements of the independent auditor, including the scope of work proposed to be performed and the proposed fees, and will approve or reject each service, taking into account whether services are permissible under applicable law and the possible impact of each non-audit service on the independent auditor's independence from management. Typically, in addition to the generally pre-approved services, other services would include due diligence for an acquisition that may or may not have been known at the beginning of the year. The Audit Committee has also delegated to any member of the Audit Committee designated by the Board or the financial expert member of the Audit Committee responsibilities to pre-approve services to be performed by the independent auditor not exceeding $25,000 in value or cost per engagement of audit and non-audit services, and such authority may only be exercised when the Audit Committee is not in session.

<div align="center">68</div>

**PART IV**

<div align="right">App. 1823</div>

(a)    The following documents are filed as part of this Report:

    1.    *Financial Statements*

        Reports of Independent Registered Public Accounting Firms
        Consolidated Balance Sheets as of December 31, 2021 and 2020
        Consolidated Statements of Operations for the Years Ended December 31, 2021, 2020, and 2019
        Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2021, 2020, and 2019
        Consolidated Statements of Cash Flows for the Years Ended December 31, 2021, 2020, and 2019
        Notes to Financial Statements

    2.    *Financial Statement Schedules*

        Schedule III—Real Estate and Accumulated Depreciation
        Schedule IV—Mortgage Loan Receivables on Real Estate

*(b)    Exhibits*

69

The following documents are filed as Exhibits to this Report:

| Exhibit Number | Description |
|---|---|
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.3 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998). |
| 3.4 | Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.5 | Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| 3.6 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001). |
| 3.7 | By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.8 | Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof. |
| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14.0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.1* | Subsidiaries of the Registrant. |

App. 1824

| | |
|---|---|
| 31.1* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Executive Officer. |
| 31.2* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Financial Officer. |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

\* Filed herewith.

## ITEM 16.   FORM 10-K SUMMARY

Not applicable

70

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TRANSCONTINENTAL REALTY INVESTORS, INC.

Dated: March 28, 2021　　　　　　　　By:　/s/ ERIK L. JOHNSON
　　　　　　　　　　　　　　　　　　　Erik L. Johnson
　　　　　　　　　　　　　　　　　　　Executive Vice President and Chief Financial Officer
　　　　　　　　　　　　　　　　　　　(Principal Financial Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ HENRY A. BUTLER<br>Henry A. Butler | Chairman of the Board and Director | March 28, 2021 |
| /s/ WILLIAM J. HOGAN<br>William J. Hogan | Director | March 28, 2021 |
| /s/ ROBERT A. JAKUSZEWSKI<br>Robert A. Jakuszewski | Director | March 28, 2021 |
| /s/ TED R. MUNSELLE<br>Ted R. Munselle | Director | March 28, 2021 |
| /s/ BRADFORD A. PHILLIPS<br>Bradford A. Phillips | Director | March 28, 2021 |
| /s/ RAYMOND D. ROBERTS, SR.<br>Raymond D. Roberts, Sr. | Director | March 28, 2021 |
| /s/ BRADLEY J. MUTH<br>Bradley J. Muth | President and Chief Executive Officer<br>(Principal Executive Officer) | March 28, 2021 |
| /s/ ERIK L. JOHNSON | Executive Vice President and Chief Financial Officer | March 28, 2021 |

App. 1825

Erik L. Johnston
(Principal Financial Officer)

71

# EXHIBIT J-44

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**
**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-09240**

# Transcontinental Realty Investors, Inc.
(Exact name of registrant as specified in its charter)

| **Nevada** | **94-6565852** |
|---|---|
| (State or other jurisdiction of Incorporation or organization) | (IRS Employer Identification Number) |

| **1603 LBJ Freeway,** | **Suite 800** | **Dallas** | **TX** | **75234** |
|---|---|---|---|---|
| (Address of principal executive offices) | | | | (Zip Code) |

**(469) 522-4200**
Registrant's Telephone Number, including area code
Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock | TCI | NYSE |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes        No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes        No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes        No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes        No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company in Rule 12b-2 of the Exchange Act.

Large accelerated filer        Accelerated filer        Non-accelerated filer        Smaller reporting company
Emerging growth Company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.) Yes        No

The aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant was approximately $37.4 million as of the last business day of the registrant's most recently completed second fiscal quarter based upon the price at which the common stock was last sold on that day.

As of March 24, 2021, there were 8,639,516 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. Commission File No. 001-14784
Consolidated Financial Statements of American Realty Investors, Inc. Commission File No. 001-15663

**INDEX TO**
**ANNUAL REPORT ON FORM 10-K**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 13 |
| Item 2. | Properties | 13 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Mine Safety Disclosures | 17 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 18 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 24 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 24 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |
| Item 9A. | Controls and Procedures | 56 |
| Item 9B. | Other Information | 56 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 57 |
| Item 11. | Executive Compensation | 64 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 65 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 66 |
| Item 14. | Principal Accounting Fees and Services | 67 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 69 |
| Item 16. | Form 10-K Summary | 70 |
| Signatures | | 71 |

**FORWARD-LOOKING STATEMENTS**

Certain Statements in this Form 10-K are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of

App. 1829

1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. The words "estimate", "plan", "intend", "expect", "anticipate", "believe", and similar expressions are intended to identify forward-looking statements. The forward-looking statements are found at various places throughout this Report and in the documents incorporated herein by reference. The Company disclaims any intention or obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Although we believe that our expectations are based upon reasonable assumptions, we can give no assurance that our goals will be achieved. Important factors that could cause our actual results to differ from estimates or projections contained in any forward-looking statements are described under Part I, Item 1A. "Risk Factors"

# PART I

## ITEM 1.   BUSINESS

### General

Transcontinental Realty Investors, Inc. (the "Company") is a fully integrated externally managed real estate company. We operate high quality multifamily and commercial properties throughout the southern United States. We also invest in mortgage notes receivable and in land that is either held for appreciation and or development. As used herein, the terms "TCI", "the Company", "We", "Our", or "Us" refer to the Company.

*Corporate Structure*

Substantially all of our assets are held by our wholly-owned subsidiary, Southern Properties Capital Ltd ("SPC"), which was formed to allow us to raise funds by issuing non-convertible bonds that are listed and traded on the Tel-Aviv Stock Exchange.

On November 19, 2018, we formed the Victory Abode Apartments, LLC ("VAA") joint venture with the Macquarie Group ("Macquarie"). In connection with the formation of VAA, we sold a 50% ownership interest in 52 multifamily properties, (collectively referred to herein as the "VAA Portfolio"). VAA assumed all liabilities of the VAA Portfolios. We account for our investment in VAA under the equity method.

We own approximately 81.1% of Income Opportunity Realty Investors, Inc. ("IOR"), whose common stock is traded on the NYSE American under the symbol "IOR". Accordingly, we include IOR's financial results in our consolidated financial statements. IOR's primary business is investing in mortgage loans.

*Controlling Shareholder*

American Realty Investors, Inc. ("ARL"), whose common stock is traded on the NYSE under the symbol "ARL", and its affiliates own in more than 80% of our common stock. Accordingly, our financial results are included in the consolidated financial statements of ARL's in their Form 10-K and in their tax filings.

As described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", our officers and directors also serve as officers and directors of ARL. ARL has business objectives similar to ours. Our officers and directors owe fiduciary duties to both ARL and us under applicable law. In determining whether a particular investment opportunity will be allocated to ARL or us, management considers the respective investment objectives of each company and the appropriateness of a particular investment in light of each company's existing real estate and mortgage notes receivable portfolio. To the extent that any particular investment opportunity is appropriate to more than one of the entities, the investment opportunity may be allocated to the entity which has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among all three or two of the entities.

*Management*

Our business is managed by Pillar Income Asset Management, Inc. ("Pillar") in accordance with an Advisory Agreement that is reviewed annually by our Board of Directors. Pillar is a wholly-owned affiliate of Realty Advisors, Inc. ("RAI"), which is the controlling stockholder of ARL.

3

Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges our debt and equity financing with third party lenders and investors. They also serve as the contractual Advisor and Cash Manager to ARL. As the contractual advisor, Pillar is compensated by us under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". We have no employees. Employees of Pillar render services to us in accordance with the terms of the Advisory Agreement.

App. 1830

In addition, as described in Part III, Item 13, "Certain Relationships and Related Transactions, and Director Independence", we compete with related parties of Pillar having similar investment objectives related to the acquisition, development, disposition, leasing and financing of real estate and real estate-related investments. In resolving any potential conflicts of interest which may arise, Pillar has informed us that it intends to exercise its best judgment as to what is fair and reasonable under the circumstances in accordance with applicable law.

*Portfolio Composition*

At December 31, 2020, our portfolio of income-producing properties consisted of:

- Six commercial properties consisting of five office buildings and 1 retail property comprising in aggregate of approximately 1,575,685 square feet;
- Ten multifamily properties owned directly by us comprising in 1,636 units, excluding apartments being developed;
- Approximately 1,961 acres of developed and undeveloped land; and
- Fifty-one multifamily properties totaling 9,888 units owned by VAA.

**Recent Activity**

The following is a description of the Company's significant real estate and financing transactions during the year ended December 31, 2020:

*Acquisitions and Dispositions*

- On March 5, 2020, we acquired a 49.2 acres land parcel in Kent, Ohio for $5.4 million that was funded by a $2.0 million cash payment and a $3.4 million note payable that bears interest at 10% and matures on November 13, 2024.

- On May 1, 2020, we sold Villager, a 33 unit multifamily property in Fort Walton, Florida for $2.4 million, resulting in a gain on sale of $1.0 million.

- On July 16, 2020, we sold Farnham Park, a 144 unit multifamily property in Port Arthur, Texas for $13.3 million, resulting in a gain on sale of $2.7 million.

- On September 14, 2020, we sold Bridge View Plaza, a 122,205 square foot retail property in La Crosse, Wisconsin for $5.3 million, resulting in a gain on sale of $4.6 million.

- During the year ended December 31, 2020, we sold a total of 58.8 acres of land from our holdings in Windmill Farms for a total of $12.9 million, resulting in a total gain on sale of $11.1 million. In addition, we sold a total of 26.8 acres of land from our holdings in Mercer Crossing during the year ended December 31, 2020 for a total of $15.8 million, resulting in a total gain on sale of $10.3 million.

*Financing Activities*

- On November 30, 2020, we issued $19.7 million in additional Series A bonds (See Note 11 in our consolidated financial statements) for $18.8 million in net proceeds.

- On December 3, 2020, we extended our $14.7 million HSW Partners loan to June 17, 2021.

- On March 2, 2021, we extended our $1.2 million loan on Athens to August 28, 2022.

- On March 4, 2021, we received a commitment from our lender to extend the maturity of our $10.4 million loan on Windmill Farms until February 28, 2023 and at the reduced interest rate of 5%.

4

*Development Activities*

During the year ended December 31, 2020, we completed the construction of Parc at Denham Springs Phase II and Sugar Mill Phase III for a total cost of $17.2 million and $14.2 million, respectively.

At December 31, 2020, our apartment projects in development included (dollars in thousands):

App. 1831

| Property | Location | No. of Units | Costs to Date (1) | Total Projected Costs (1) |
|---|---|---|---|---|
| Athens | Athens, AL | 232 | 270 | 34,800 |
| Heritage McKinney | McKinney, TX | 170 | 231 | 24,650 |
| Total | | 402 | $ 501 | $ 59,450 |

(1) Costs include construction hard costs, construction soft costs and loan borrowing costs.

**Business Plan and Investment Policy**

Our business strategy is to maximize long-term value for our stockholders by the acquisition, development and ownership of income-producing multifamily properties in the secondary markets of the Southern United States. We generally hold our investments in real estate for the long term. We seek to maximize the current income and the value of our real estate by maintaining high occupancy levels while charging competitive rents and controlling costs. In the past we have opportunistically acquired commercial properties for income and appreciation. In addition, we also opportunistically acquire land for future development. From time to time and when we believe it appropriate to do so, we sell land and income-producing properties. We also invest in mortgage receivables.

Our income producing real estate is managed by external management companies. Our multifamily properties are managed by various third-party companies and our commercial properties are managed by Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), collectively the "management companies". The management companies conduct all of the administrative functions associated with our property operations (including billing, collections, and response to resident inquiries). Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement and is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage".

We also invest in notes receivables that are collateralized by investments in land and/or multifamily properties. These investments have included notes receivables from Unified Housing Foundation, Inc. ("UHF") Due to our ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, we consider UHF to be a related party.

We finance our acquisitions through operating cash flow, proceeds from the sale of land and income-producing properties, and debt financing primarily in the form of property-specific, first-lien mortgage loans from commercial banks and institutional lenders. Most of the mortgage notes payable on our multifamily properties are insured with Department of Housing and Urban Development ("HUD"). HUD back mortgage notes payable generally provides for lower interest rates and longer term than conventional debt. However, HUD insured mortgage notes payable are subject to extensive regulations over the origination and transfers of mortgage notes payable and restrictions on the amount and timing of distribution of cash flows from the underlying real estate. When we sell properties, we may carry a portion of the sales price, generally in the form of a short-term interest bearing seller-financed note receivable, secured by the property being sold. We may also from time to time enter into partnerships or joint ventures with various investors to acquire land or income-producing properties, or to sell interests in some of our properties.

We have increased our portfolio of multifamily properties through ground up development. Since we don't have a fully developed in-house development, we have traditionally partnered with third-party developers ("Developers") to construct multifamily properties on our behalf. We work with the Developer on the location, design, construction budget and initial lease plan for a potential development project ("Development Project"). The construction plan includes a development fee to be paid to the Developer. To ensure that the Development Project is constructed on plan, on time and on budget, we generally enter into a convertible loan arrangement with the Developer, whereby we advance the out-of-pocket capital to the developer at nominal rate of interest with an option to convert the loan into a 100% ownership interest in the entity that holds the Development Project for a price equal to development cost.

5

For our land development projects, including Windmill Farms, we have acted as our own general contractor and construction manager. We believe direct involvement in construction enables us to achieve higher construction quality, greater control over construction schedules and cost savings. We actively monitor construction progress to ensure quality workmanship to enable sale of developed lots to third-party home builders.

**Competition**

The real estate business is highly competitive and we compete with numerous companies engaged in real estate activities (including certain entities described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence"), some of which have greater financial resources than us. We believe that success against such competition is dependent upon the geographic location of a property, the

App. 1832

performance of property-level managers in areas such as leasing and marketing, collection of rents and control of operating expenses, the amount of new construction in the area and the maintenance and appearance of the property. Additional competitive factors include ease of access to a property, the adequacy of related facilities such as parking and other amenities, and sensitivity to market conditions in determining rent levels. With respect to multifamily properties, competition is also based upon the design and mix of the units and the ability to provide a community atmosphere for the residents. We believe that beyond general economic circumstances and trends, the degree to which properties are renovated or new properties are developed in the competing submarket are also competitive factors. Refer to Part I, Item1A. "Risk Factors".

To the extent that we seek to sell any properties, the sales prices for the properties may be affected by competition from other real estate owners and financial institutions also attempting to sell properties in areas where our properties are located, as well as aggressive buyers attempting to dominate or penetrate a particular market.

### Government Regulations

Our properties are subject to various covenants, laws, ordinances and regulations, including regulations relating to common areas, fire and safety requirements, various environmental laws, HUD, the ADA and rent control laws.

### Segments

We operate two business segments: the acquisition, development, ownership and management of multifamily properties, and the acquisition, development, ownership and management of commercial properties; which are primarily office properties. The services for our office segment include primarily rental of office space and other tenant services, including parking and storage space rental. The services for our multifamily segment include primarily rental of apartments and other tenant services, including parking and storage space rental. See Note 15 to our consolidated financial statements in Item 8 of this Report for more information regarding our segments.

### Human Capital

We have no employees. Employees of Pillar render services to us in accordance with the terms of the Advisory Agreement.

### Available Information

We maintain an internet site at www.transconrealty-invest.com. We make available through our website free of charge Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, reports filed pursuant to Section 16, and amendments to those reports as soon as reasonably practicable after we electronically file or furnish such materials to the Securities and Exchange Commission. In addition, we have posted the charters for our Audit Committee, Compensation Committee, and Governance and Nominating Committee, as well as our Code of Business Conduct and Ethics, Corporate Governance Guidelines on Director Independence and other information on the website. These charters and principles are not incorporated in this Report by reference. We will also provide a copy of these documents free of charge to stockholders upon written request. The Company issues Annual Reports containing audited financial statements to its common shareholders.

### ITEM 1A.   RISK FACTORS

An investment in our securities involves various risks. All investors should carefully consider the following risk factors, applicable to TCI and its subsidiaries in conjunction with the other information in this report before trading our securities.

### FACTORS AFFECTING OUR ASSETS

*The current COVID – 19 pandemic or the future outbreak of other highly infectious or contagious diseases and the timing and effectiveness of vaccine distribution or other effective medicines could materially and adversely affect our business, financial condition and results of operations.*

The outbreak of COVID – 19, which is present in nearly all regions of the world, including the United States and the specific regions in which our residential apartment communities are located, has created considerable instability and disruption in the U. S. and world economies. Considerable uncertainty still surrounds COVID – 19, including when the pandemic will conclude, how quickly vaccines will be safely and widely distributed, the effectiveness of such vaccines, the potential short-term and long-term effects, including but not limited to shifts in consumer housing demand based on geography, affordability, housing type (e.g., multifamily versus single family), and unit type (e.g., studio in the office versus multi-bedroom),

App. 1833

mainly resulting from the paradigm shift of work culture, the decentralization of corporate headquarters and the success of "work from home" models. Moreover, local, state and national measures taken to limit the spread of COVID – 19, including "social distancing" and other restrictions on travel, congregation and business operations, have already resulted in significant negative economic impacts. The prolonged impact of COVID – 19 on the U. S. and world economies remains uncertain but has resulted in increased health issues and mortality rates, increased unemployment, and a worldwide economic downturn, the duration and scope of which cannot currently be predicted. The extent to which our financial condition or operating results will continue to be affected by the COVID – 19 pandemic will largely depend on future demand and developments, which are highly uncertain and cannot be accurately predicted.

Our operating results depend, in large part, on revenues derived from leasing space in our residential multifamily communities to residential tenants and the ability of tenants to generate sufficient income to pay their rents in a timely manner. The market and economic challenges created by the COVID – 19 pandemic and measures implemented to prevent its spread have and may continue to adversely affect our returns and profitability. As a result, our ability to make distributions may be compromised, and we could experience volatility with respect to the market value of our properties and common stock. The spread of COVID – 19 has resulted in increases in unemployment and mass layoffs, and some tenants have experienced deteriorating financial conditions and are unwilling or unable to pay all or part of their rent on a timely basis, or at all, and the continued spread of COVID – 19 as well as a sustained economic downturn may result in further increases or sustainment of these situations. In some cases, we may be legally required or otherwise agree to restructure tenants' rent obligations and may not be able to do so in terms favorable to us as those currently in place. Further, various city, county and state laws restricting rent increases in times of emergency may come into effect in connection with the COVID – 19 pandemic, and numerous state, local, federal and industry-initiated efforts have and may continue to affect our ability to collect rent or enforce remedies for the failure to pay rent, including, among others, limitations or prohibitions on evicting tenants unwilling or unable to pay rent and prohibitions on the ability to collect unpaid rent during certain time frames. Additionally, eviction moratoriums have passed at various formats at every level of government, and while we strive to comply, given some of the conflicting standards and unclear requirements, strict compliance may be difficult. Some residents' views about their obligations to pay rent, even when financially capable of meeting the rent obligation, have shifted away from viewing rent as a primary and necessary financial obligation, and this shift may continue or worsen as a result of the eviction moratoriums and the various laws affecting our abilities to collect rent. In the event of tenant nonpayment, default or bankruptcy, we may incur costs in protecting our investment and re-leasing our property and have limited ability to renew existing leases or sign new leases at projected rents. Additionally, market fluctuations as a result of the COVID – 19 pandemic may affect our ability to obtain necessary funds for our operations from current lenders or new borrowings. We may be unable to obtain financing for the acquisition of investments or refinancing for existing assets on satisfactory terms, or at all. In addition, moratoriums on construction and macroeconomic factors have caused some construction delays and may cause construction contractors to be unable to perform and governmental inspections and approvals to be delayed or postponed, which may cause a delivery date of certain development projects or investments in third-party development projects to be materially extended. Market fluctuations and construction delays experienced by our vendors may also negatively impact their ability to provide services to us. Further, while we carry general liability, pollution and property insurance, along with other insurance policies, and may provide some coverage for any losses or costs incurred in connection with the COVID – 19 pandemic, given the novelty of the issue and scale of losses incurred throughout the world, there is no guarantee that we will be able to recover all or any portion of our losses and costs under these policies.

<center>7</center>

The global impact of the COVID – 19 pandemic continues to evolve rapidly, and the extent of its effect on our operational and financial performance will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration, scope and severity of the pandemic, the actions taken to contain or mitigate its impact, the timing of distribution and effectiveness of vaccines and the willingness and ability of the public to get vaccinated in a timely manner, and the direct and indirect economic effects of the pandemic and related containment measures, among others. Also, to the extent any of these risks and uncertainties adversely impact us in the ways described above or otherwise, they may also have the effect of heightening many of the other risks set forth in this Report.

***Adverse events concerning our existing tenants or negative market conditions affecting our existing tenants could have an adverse impact on our ability to attract new tenants, release space, collect rent or renew leases, and thus could adversely affect cash flow from operations and inhibit growth.***

Cash flow from operations depends in part on the ability to lease space to tenants on economically favorable terms. We could be adversely affected by various facts and events over which we have limited or no control, such as:

- lack of demand for space in areas where the properties are located;
- inability to retain existing tenants and attract new tenants;
- oversupply of or reduced demand for space and changes in market rental rates;
- defaults by tenants or failure to pay rent on a timely basis;
- the need to periodically renovate and repair marketable space;
- physical damage to properties;

- economic or physical decline of the areas where properties are located; and
- potential risk of functional obsolescence of properties over time.

At any time, any tenant may experience a downturn in its business that may weaken its financial condition. As a result, a tenant may delay lease commencement, fail to make rental payments when due, decline to extend a lease upon its expiration, become insolvent or declare bankruptcy. Any tenant bankruptcy or insolvency, leasing delay or failure to make rental payments when due could result in the termination of the tenant's lease and material losses to us.

If tenants do not renew their leases as they expire, we may not be able to rent the space. Furthermore, leases that are renewed, and some new leases for space that is re-let, may have terms that are less economically favorable than expiring lease terms, or may require us to incur significant costs, such as renovations, tenant improvements or lease transaction costs. Any of these events could adversely affect cash flow from operations and our ability to make distributions to shareholders and service indebtedness. A significant portion of the costs of owning property, such as real estate taxes, insurance, and debt service payments, are not necessarily reduced when circumstances cause a decrease in rental income from the properties.

***We may not be able to compete successfully with other entities that operate in our industry.***

We experience a great deal of competition in attracting tenants for the properties and in locating land to develop and properties to acquire.

In our effort to lease properties, we compete for tenants with a broad spectrum of other landlords in each of the markets. These competitors include, among others, publicly-held REITs, privately-held entities, individual property owners and tenants who wish to sublease their space. Some of these competitors may be able to offer prospective tenants more attractive financial terms than we are able to offer.

If the availability of land or high quality properties in our markets diminishes, operating results could be adversely affected.

***We may experience increased operating costs which could adversely affect our financial results and the value of our properties.***

Our properties are subject to increases in operating expenses such as insurance, cleaning, electricity, heating, ventilation and air conditioning, administrative costs and other costs associated with security, landscaping, repairs, and maintenance of the properties. While some current tenants are obligated by their leases to reimburse us for a portion of these costs, there is no assurance that these tenants will make such payments or agree to pay these costs upon renewal or new tenants will agree to pay these costs. If operating expenses increase in our markets, we may not be able to increase rents or reimbursements in all of these

8

markets to offset the increased expenses, without at the same time decreasing occupancy rates. If this occurs, our ability to make distributions to shareholders and service indebtedness could be adversely affected.

***Our ability to achieve growth in operating income depends in part on its ability to develop additional properties or acquire and redevelop or renovate existing properties.***

We intend to continue to develop properties where warranted by market conditions. We have a number of ongoing development and land projects being readied for commencement.

Additionally, general construction and development activities include the following risks:

- construction and leasing of a property may not be completed on schedule, which could result in increased expenses and construction costs, and would result in reduced profitability for that property;
- construction costs may exceed original estimates due to increases in interest rates and increased cost of materials, labor or other costs, possibly making the property less profitable because of inability to increase rents to compensate for the increase in construction costs;
- some developments may fail to achieve expectations, possibly making them less profitable;
- we may be unable to obtain, or face delays in obtaining, required zoning, land-use, building, occupancy, and other governmental permits and authorizations, which could result in increased costs and could require us to abandon our activities entirely with respect to a project;
- we may abandon development opportunities after the initial exploration, which may result in failure to recover costs already incurred. If we determine to alter or discontinue its development efforts, future costs of the investment may be expensed as incurred rather than capitalized and we may determine the investment is impaired resulting in a loss;
- we may expend funds on and devote management's time to projects which will not be completed; and

App. 1835

- occupancy rates and rents at newly-completed properties may fluctuate depending on various factors including market and economic conditions, and may result in lower than projected rental rates and reduced income from operations.

*We face risks associated with property acquisitions.*

We acquire individual properties and various portfolios of properties and intend to continue to do so. Acquisition activities are subject to the following risks:

- when we are able to locate a desired property, competition from other real estate investors may significantly increase the seller's offering price;
- acquired properties may fail to perform as expected;
- the actual costs of repositioning or redeveloping acquired properties may be higher than original estimates;
- acquired properties may be located in new markets where we face risks associated with an incomplete knowledge or understanding of the local market, a limited number of established business relationships in the area and a relative unfamiliarity with local governmental and permitting procedures; and
- we may be unable to quickly and efficiently integrate new acquisitions, particularly acquisitions of portfolios of properties, into existing operations, and results of operations and financial condition could be adversely affected.

We may acquire properties subject to liabilities and without any recourse, or with limited recourse, with respect to unknown liabilities. However, if an unknown liability was later asserted against the acquired properties, we might be required to pay substantial sums to settle it, which could adversely affect cash flow.

*Many of our properties are concentrated in our primary markets and we may suffer economic harm as a result of adverse conditions in those markets.*

Our properties are located principally in specific geographic areas in the southwestern, southeastern, and mid-western United States. Our overall performance is largely dependent on economic conditions in those regions.

Our investments in joint ventures may decrease our ability to manage risk. We conduct some of our operations through a joint venture in which we share control over certain economic and business interests with our joint venture partner. Our joint

9

venture partner may have economic, business or legal interests or goals that are inconsistent with our goals and interests or may be unable to meet their obligations. Failure by us, or an entity in which we have a joint-venture interest, to adequately manage the risks associated with any acquisitions or joint ventures could have a material adverse effect on the financial condition or results of operations of our joint ventures and adversely affect our business, financial condition, results of operations and cash flows.

*We are leveraged and may not be able to meet our debt service obligations.*

We had total indebtedness, including bonds and notes payable, at December 31, 2020 of approximately $474.0 million. Substantially all assets have been pledged to secure debt. These borrowings increase the risk of loss because they represent a prior claim on assets and most require fixed payments regardless of profitability. Our leveraged position makes us vulnerable to declines in the general economy and may limit our ability to pursue other business opportunities in the future.

*We may not be able to access financial markets to obtain capital on a timely basis, or on acceptable terms.*

We rely on proceeds from property dispositions and third party capital sources for a portion of our capital needs, including capital for acquisitions and development. The public debt and equity markets are also among the sources upon which we rely. There is no guarantee that we will be able to access these markets or any other source of capital. The ability to access the public debt and equity markets depends on a variety of factors, including:

- general economic conditions affecting these markets;
- our own financial structure and performance;
- the market's opinion of real estate companies in general; and
- the market's opinion of real estate companies that own similar properties.

App. 1836

*We may suffer adverse effects as a result of terms and covenants relating to our indebtedness.*

Required payments on our indebtedness generally are not reduced if the economic performance of the portfolio declines. If the economic performance declines, net income, cash flow from operations and cash available for distribution to stockholders may be reduced. If payments on debt cannot be made, we could sustain a loss or suffer judgments, or in the case of mortgages, suffer foreclosures by mortgagees. Further, some obligations contain cross-default and/or cross-acceleration provisions, which means that a default on one obligation may constitute a default on other obligations.

We anticipate only a small portion of the principal of our debt will be repaid prior to maturity. Therefore, we are likely to refinance a portion of our outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or the terms of any refinancing will not be as favorable as the terms of the maturing debt. If principal balances due at maturity cannot be refinanced, extended, or repaid with proceeds from other sources, such as the proceeds of sales of assets or new equity capital, cash flow may not be sufficient to repay all maturing debt in years when significant "balloon" payments come due.

Our credit facilities and unsecured debt contain customary restrictions, requirements and other limitations on the ability to incur indebtedness, including total debt to asset ratios, secured debt to total asset ratios, debt service coverage ratios, and minimum ratios of unencumbered assets to unsecured debt. Our continued ability to borrow is subject to compliance with financial and other covenants. In addition, failure to comply with such covenants could cause a default under credit facilities, and we may then be required to repay such debt with capital from other sources. Under those circumstances, other sources of capital may not be available, or be available only on terms that are detrimental to us.

***Our degree of leverage could limit our ability to obtain additional financing or affect the market price of our common stock.***

The degree of leverage could affect our ability to obtain additional financing for working capital, capital expenditures, acquisitions, development or other general corporate purposes. The degree of leverage could also make us more vulnerable to a downturn in business or the general economy.

***An increase in interest rates would increase interest costs on variable rate debt and could adversely impact the ability to refinance existing debt.***

We currently have, and may incur more, indebtedness that bears interest at variable rates. Accordingly, if interest rates increase, so will the interest costs, which could adversely affect cash flow and the ability to pay principal and interest on our

10

debt and the ability to make distributions to shareholders. Further, rising interest rates could limit our ability to refinance existing debt when it matures.

***Unbudgeted capital expenditures or cost overruns could adversely affect business operations and cash flow.***

If capital expenditures for ongoing or planned development projects or renovations exceed expectations, the additional cost of these expenditures could have an adverse effect on business operations and cash flow. In addition, we might not have access to funds on a timely basis to pay for the unexpected expenditures.

Construction costs are funded in large part through construction financing, which we may guarantee. Our obligation to pay interest on this financing continues until the rental project is completed, leased-up and permanent financing is obtained, or the project is sold, or the construction loan is otherwise paid. Unexpected delays in completion of one or more ongoing projects could also have a significant adverse impact on business operations and cash flow.

***We may need to sell properties from time to time for cash flow purposes.***

Because of the lack of liquidity of real estate investments generally, our ability to respond to changing circumstances may be limited. Real estate investments generally cannot be sold quickly. In the event that we must sell assets to generate cash flow, we cannot predict whether there will be a market for those assets in the time period desired, or whether we will be able to sell the assets at a price that will allow us to fully recoup its investment. We may not be able to realize the full potential value of the assets and may incur costs related to the early extinguishment of the debt secured by such assets.

***We intend to devote resources to the development of new projects.***

We plan to continue developing new projects as opportunities arise in the future. Development and construction activities entail a number of

App. 1837

- we may abandon a project after spending time and money determining its feasibility;
- construction costs may materially exceed original estimates;
- the revenue from a new project may not be enough to make it profitable or generate a positive cash flow;
- we may not be able to obtain financing on favorable terms for development of a property, if at all;
- we may not complete construction and lease-ups on schedule, resulting in increased development or carrying costs; and
- we may not be able to obtain, or may be delayed in obtaining, necessary governmental permits.

## FACTORS AFFECTING THE INDUSTRY

### The overall business is subject to all of the risks associated with the real estate industry.

We are subject to all risks incident to investment in real estate, many of which relate to the general lack of liquidity of real estate investments, including, but not limited to:

- our real estate assets are concentrated primarily in the southwest and any deterioration in the general economic conditions of this region could have an adverse effect;
- changes in interest rates may make the ability to satisfy overall debt service requirements more burdensome;
- lack of availability of financing may render the purchase, sale or refinancing of a property more difficult or unattractive;
- changes in real estate and zoning laws;
- increases in real estate taxes and insurance costs;
- federal or local regulations or rent controls;
- acts of terrorism, and
- hurricanes, tornadoes, floods, earthquakes and other similar natural disasters.

11

### Our performance and value are subject to risks associated with our real estate assets and with the real estate industry.

Our economic performance and the value of our real estate assets, and consequently the value of our securities, are subject to the risk that if our properties do not generate revenues sufficient to meet our operating expenses, including debt service and capital expenditures, our cash flow will be adversely affected. The following factors, among others, may adversely affect the income generated by our properties:

- downturns in the national, regional and local economic conditions (particularly increases in unemployment);
- competition from other office, apartment and commercial buildings;
- local real estate market conditions, such as oversupply or reduction in demand for office, apartments or other commercial space;
- changes in interest rates and availability of financing;
- vacancies, changes in market rental rates and the need to periodically repair, renovate and re-let space;
- increased operating costs, including insurance expense, utilities, real estate taxes, state and local taxes and heightened security costs;
- civil disturbances, earthquakes and other natural disasters, or terrorist acts or acts of war which may result in uninsured or underinsured losses;
- significant expenditures associated with each investment, such as debt service payments, real estate taxes, insurance and maintenance costs which are generally not reduced when circumstances cause a reduction in revenues from a property;
- declines in the financial condition of our tenants and our ability to collect rents from our tenants; and
- decreases in the underlying value of our real estate.

### Adverse economic and geopolitical conditions and dislocations in the credit markets could have a material adverse effect on our results of operations, and financial condition.

Our business may be affected by market and economic challenges experienced by the U.S. economy or real estate industry as a whole or by the

App. 1838

local economic conditions in the markets in which our properties are located, including the current dislocations in the credit markets and general global economic recession. These current conditions, or similar conditions existing in the future, may adversely affect our results of operations, and financial condition as a result of the following, among other potential consequences:

- the financial condition of our tenants may be adversely affected which may result in tenant defaults under leases due to bankruptcy, lack of liquidity, operational failures or for other reasons;

- significant job losses within our tenants may occur, which may decrease demand for our office space, causing market rental rates and property values to be negatively impacted;

- our ability to borrow on terms and conditions that we find acceptable, or at all, may be limited, which could reduce our ability to pursue acquisition and development opportunities and refinance existing debt, reduce our returns from our acquisition and development activities and increase our future interest expense;

- reduced values of our properties may limit our ability to dispose of assets at attractive prices or to obtain debt financing secured by our properties and may reduce the availability of unsecured loans; and

- one or more lenders could refuse to fund their financing commitment to us or could fail and we may not be able to replace the financing commitment of any such lenders on favorable terms, or at all.

***Real estate investments are illiquid, and we may not be able to sell properties if and when it is appropriate to do so.***

Real estate generally cannot be sold quickly. We may not be able to dispose of properties promptly in response to economic or other conditions. In addition, provisions of the Internal Revenue Code may limit our ability to sell properties (without incurring significant tax costs) in some situations when it may be otherwise economically advantageous to do so, thereby adversely affecting returns to stockholders and adversely impacting our ability to meet our obligations.

12

***General real estate investment risks may adversely affect property income and values.***

Real estate investments are subject to a variety of risks. If the communities and other real estate investments do not generate sufficient income to meet operating expenses, including debt service and Expenditures, cash flow, and the ability to make distributions, the operating income will be adversely affected. Income from the communities may be further adversely affected by, among other things, the following factors:

- changes in the general or local economic climate, including layoffs, plant closings, industry slowdowns, relocations of significant local employers, and other events negatively impacting local employment rates and wages and the local economy;

- local economic conditions in which the communities are located, such as oversupply of housing or a reduction in demand for rental housing;

- adverse economic or market conditions due to COVID – 19 pandemic leading to a temporary or permanent move by tenants and/or prospective tenants from locations in which our communities are located;

- the attractiveness and desirability of our communities to tenants, including, without limitation, the size and amenity offerings of our units, our technology offerings and our ability to identify and cost effectively implement new, relevant technologies and to keep up with constantly changing consumer demand for the latest innovations, including any increased requirements due to the significant increase in the number of people who continue to "work from home";

- inflationary environments in which the cost to operate and maintain communities increases at a rate greater than our ability to increase rents or deflationary environments where we may be exposed to declining rents more quickly under our short-term leases;

- competition from other available housing alternatives;

- changes in rent control or stabilization laws or other laws regulating housing and other increasing regulation on people and business in locations where our communities are located;

- our ability to provide for adequate maintenance and insurance;

- declines in the financial condition of our tenants, which may make it more difficult for us to collect rents from some tenants;

- any decline in or tenants' perceptions of the safety, convenience and attractiveness of our communities and the neighborhoods where they are located; and

- changes in interest rates and availability of financing.

As leases at the communities expire, tenants may enter into new leases on terms that are less favorable to us. Income and real estate values may also be adversely affected by such factors as applicable laws, including, without limitation, the Americans with Disabilities Act of 1990, Fair Housing

App. 1839

Amendment Act of 1988, permanent and temporary rent controls, rent stabilization laws, other laws regulating housing that may prevent us from raising rents to offset increased operating expenses, and tax laws.

*National and regional economic environments can negatively impact our liquidity and operating results.*

Our forecast for the national economy assumes growth of the gross domestic product of the national economy and the economies of the southeastern and southwestern states. In the event of a recession or other negative economic effects, including as a result of the COVID – 19 pandemic, we could incur reductions in rental rates, occupancy levels, property valuations and increases in operating costs, such as advertising and turnover expenses. Any such recession or similar event may affect consumer confidence and spending and negatively impact the volume and pricing of real estate transactions, which could negatively affect our liquidity and its ability to vary its portfolio promptly in responses to changes to the economy. Further, if residents do not experience increases in their income, they may be unable or unwilling to pay rent increases, and delinquency in rent payments and rent defaults may increase as well as vacancy rates.

## ITEM 1B.  UNRESOLVED STAFF COMMENTS

None.

13

## ITEM 2.  PROPERTIES

### Multifamily Properties

| Count | Property | Location | Year Constructed | Units | Occupancy |
|---|---|---|---|---|---|
| | **Consolidated Properties** | | | | |
| 1 | Chelsea | Beaumont, TX | 1999 | 144 | 91.7 % |
| 2 | Forest Grove | Bryan, TX | 2020 | 84 | 100.0 % |
| 3 | Landing Bayou | Houma, LA | 2005 | 240 | 92.2 % |
| 4 | Legacy at Pleasant Grove | Texarkana, TX | 2006 | 208 | 93.3 % |
| 5 | Overlook at Allenville Phase II | Sevierville, TN | 2012 | 144 | 94.1 % |
| 6 | Parc at Denham Springs Phase II | Denham Springs, LA | 2010 | 144 | 83.3 % |
| 7 | Sugar Mill Phase III | Baton Rouge, LA | 2015 | 72 | 41.7 % |
| 8 | Toulon | Gautier, MS | 2011 | 240 | 97.2 % |
| 9 | Villas at Bon Secour | Gulf Shores, AL | 2007 | 200 | 96.4 % |
| 10 | Vista Ridge | Tupelo, MS | 2009 | 160 | 98.2 % |
| | | | | 1,636 | |
| | **Joint Venture Properties** | | | | |
| 1 | Abode Red Rock | Las Vegas, NV | 2018 | 308 | 90.2 % |
| 2 | Apalachee Point Villas | Tallahassee, FL | 2018 | 200 | 91.4 % |
| 3 | Blue Lake Villas | Waxahachie, TX | 2002 | 186 | 94.9 % |
| 4 | Blue Lake Villas Phase II | Waxahachie, TX | 2004 | 70 | 94.0 % |
| 5 | Breakwater Bay | Beaumont, TX | 2003 | 176 | 92.3 % |
| 6 | Bridgewood Ranch | Kaufman, TX | 2007 | 106 | 96.0 % |
| 7 | Capitol Hill | Little Rock, TX | 2003 | 156 | 91.8 % |
| 8 | Centennial Village | Oak Ridge, TN | 2011 | 252 | 97.8 % |
| 9 | Crossing as Opelika | Opelika, AL | 2011 | 168 | 96.2 % |
| 10 | Dakota Arms | Lubbock, TX | 2005 | 208 | 94.7 % |
| 11 | Desoto ranch | DeSoto, TX | 2003 | 248 | 95.1 % |
| 12 | Eagle Crossing | Dallas, TX | 2017 | 150 | 96.5 % |
| 13 | Falcon Lake | Arlington, TX | 2002 | 248 | 96.0 % |

App. 1840

| Count | Property | Location | Year Constructed | Units | Occupancy |
|---|---|---|---|---|---|
| 14 | Heather Creek | Mesquite, TX | 2003 | 200 | 96.7 % |
| 15 | Lake Forest | Humble, TX | 2004 | 240 | 92.5 % |
| 16 | Lakeside Lofts | Farmers Branch, TX | 2020 | 245 | 89.7 % |
| 17 | Lodge at Pecan Creek | Denton, TX | 2011 | 192 | 93.3 % |
| 18 | Lofts at Reynolds | Asheville, NC | 2012 | 201 | 96.9 % |
| 19 | Mansions of Mansfield | Mansfield, TX | 2008 | 208 | 95.0 % |
| 20 | McKinney Point | McKinney, TX | 2017 | 198 | 93.6 % |
| 21 | Metropolitan | Little rock, AR | 2008 | 260 | 91.4 % |
| 22 | Mission Oaks | San Antonio, TX | 2006 | 228 | 94.6 % |
| 23 | Northside on Travis | Sherman, TX | 2008 | 200 | 93.2 % |
| 24 | Oak Hollow | Sequin, TX | 2011 | 160 | 92.5 % |
| 25 | Oak Hollow Phase II | Sequin, TX | 2018 | 96 | 90.7 % |
| 26 | Oceanaire | Biloxi, MS | 2009 | 196 | 95.8 % |
| 27 | Overlook at Allensville Square | Sevierville, TX | 2012 | 144 | 95.5 % |
| 28 | Parc at Bentonville | Bentonville, AR | 2017 | 216 | 94.5 % |
| 29 | Parc at Clarksville | Clarksville, TN | 2018 | 168 | 96.3 % |
| 30 | Parc at Denham Springs | Denham Spring, LA | 2007 | 224 | 90.0 % |
| 31 | Parc at Garland | Garland, TX | 2010 | 198 | 94.7 % |
| 32 | Parc at Mansfield | Mansfield, TX | 2017 | 99 | 93.5 % |
| 33 | Parc at Maumelle | Little Rock, AR | 2015 | 240 | 96.5 % |
| 34 | Parc at Metro Center | Nashville, TN | 2005 | 144 | 85.9 % |
| 35 | Parc at Rogers | Rogers, AR | 2006 | 250 | 93.3 % |

14

| Count | Property | Location | Year Constructed | Units | Occupancy |
|---|---|---|---|---|---|
| 36 | Parc at Wylie | Wylie, TX | 2007 | 198 | 93.5 % |
| 37 | Preserve at Pecan Creek | Denton, TX | 2008 | 192 | 90.2 % |
| 38 | Preserve at Prairie Pointe | Lubbock, TX | 2005 | 184 | 96.5 % |
| 39 | Residences at Holland Lake | Weatherford, TX | 2004 | 208 | 92.2 % |
| 40 | Sawgrass Creek | New Port Richey, FL | 2018 | 188 | 95.9 % |
| 41 | Sonoma Court | Rockwall, TX | 2011 | 124 | 94.9 % |
| 42 | Sugar Mill Phase I | Baton Rouge, LA | 2009 | 160 | 68.8 % |
| 43 | Sugar Mill Phase II | Baton Rouge, LA | 2016 | 80 | 71.0 % |
| 44 | Tattersall Village | Hinesville, GA | 2010 | 222 | 90.0 % |
| 45 | Terra Lago | Rowlett, TX | 2018 | 451 | 87.4 % |
| 46 | Tradewinds | Midland, TX | 2015 | 214 | 85.4 % |
| 47 | Villas of Park West I | Pueblo, CO | 2005 | 148 | 95.4 % |
| 48 | Villas of Park West II | Pueblo, CO | 2010 | 112 | 94.6 % |
| 49 | Vistas of Vance Jackson | San Antonio, TX | 2005 | 240 | 93.5 % |
| 50 | Waterford At Summer Park | Rosenberg, TX | 2013 | 196 | 95.2 % |
| 51 | Windsong | Fort Worth, TX | 2003 | 188 | 94.1 % |
| | | | | **9,888** | |
| 61 | Total Mutltifamily Properties | | | **11,524** | |

**Multifamily Portfolio Composition**

App. 1841

The following table sets forth the location and number of units as of December 31, 2020:

| Location | Company owned No. | Company owned Units | VAA owned No. | VAA owned Units | Total No. | Total Units |
|---|---|---|---|---|---|---|
| Alabama | 1 | 200 | 1 | 168 | 2 | 368 |
| Arkansas | — | — | 4 | 966 | 4 | 966 |
| Colorado | — | — | 2 | 260 | 2 | 260 |
| Florida | — | — | 2 | 388 | 2 | 388 |
| Georgia | — | — | 1 | 222 | 1 | 222 |
| Louisiana | 3 | 456 | 3 | 464 | 6 | 920 |
| Mississippi | 2 | 400 | 1 | 196 | 3 | 596 |
| North Carolina | — | — | 1 | 201 | 1 | 201 |
| Nevada | — | — | 1 | 308 | 1 | 308 |
| Tennessee | 1 | 144 | 3 | 564 | 4 | 708 |
| Texas | 3 | 436 | 32 | 6,151 | 35 | 6,587 |
| | 10 | 1,636 | 51 | 9,888 | 61 | 11,524 |

15

**Commercial Properties**

| Count | Property | Location | Year Constructed | Square Feet | Occupancy |
|---|---|---|---|---|---|
| | **Office Buildings** | | | | |
| 1 | 600 Las Colinas | Irving, TX | 1984 | 512,173 | 79.4 % |
| 2 | 770 South Post Oak | Houston, TX | 1980 | 95,438 | 83.9 % |
| 3 | Browning Place | Farmers Branch, TX | 1982 | 625,297 | 87.0 % |
| 4 | Senlac | Farmers Branch, TX | 2025 | 2,821 | 100.0 % |
| 5 | Stanford Center | Dallas, TX | 1982 | 333,234 | 90.9 % |
| | | | | 1,568,963 | |
| | **Retail Centers** | | | | |
| 1 | Fruitland Park | Fruitland Park, FL | 2025 | 6,722 | 100.0 % |
| 6 | | | | 1,575,685 | |

**Commercial Lease Expirations**

The following table summarizes our commercial lease expirations as of December 31, 2020:

| Year of Lease | Rentable Square Feet Subject to | Current Annualized Contractual Rent Under Expiring Leases | Current Annualized Contractual Rent Under Expiring | Percentage of Total | Percentage of Gross |
|---|---|---|---|---|---|

| Expiration | Expiring Leases | Leasing Rent (000s) | Leases ($/SF) | Square Feet | Rentals |
|---|---|---|---|---|---|
| 2021 | 134,027 | $ 2,923 | $ 21.81 | 8.5 % | 10.9 % |
| 2022 | 295,412 | 6,737 | 22.81 | 18.7 % | 25.0 % |
| 2023 | 296,233 | 4,815 | 16.26 | 18.8 % | 17.9 % |
| 2024 | 129,926 | 3,039 | 23.39 | 8.2 % | 11.3 % |
| 2025 | 149,448 | 3,569 | 23.88 | 9.5 % | 13.3 % |
| Thereafter | 287,491 | 5,821 | 20.25 | 18.2 % | 21.6 % |
| | 1,292,537 | $ 26,904 | | 81.9 % | 100.0 % |

(1)   Represents the monthly contractual base rent and recoveries from tenants under existing leases as of December 31, 2020, multiplied by twelve. This amount reflects total rent before any rent abatement and includes expense reimbursements, which may be estimates as of such date.

16

**Land Investments**

| Project | Location | Acres |
|---|---|---|
| **Held for Development** | | |
| EQK Portage | Kent, OH | 49 |
| McKinney 36 | Collin County, TX | 18 |
| Ocean Estates | Gulfport, MS | 12 |
| Willowick | Pensacola, FL | 40 |
| Mercer Crossing Commercial | Farmers Branch, TX | 19 |
| Windmills Farm | Kaufman County, TX | 1,555 |
| Other | Various | 40 |
| | | 1,733 |
| **Held subject to sales contract** | | |
| Mercer Crossing | Farmers Branch, TX | 15 |
| Windmill Farms | Kaufman County, TX | 213 |
| | | 228 |
| | | **1,961** |

## ITEM 3.   LEGAL PROCEEDINGS

We were the plaintiff in a lawsuit against Dynex Commercial, Inc. ("Dynex") for failure to fulfill certain loan commitments. In January 2015, the court awarded us with a judgment of $49.0 million. We are pursuing all legal means to collect this award. However, due to the uncertainty of the collectability of the award, the receivable has been fully reserved.

In February 2019, Paul Berger ("Berger") filed a lawsuit against the Company, its directors, its officers and others that alleges that we completed improper sales and/or transfers of property with IOR. Berger requests that we pay off various related party loans to IOR and that IOR then distribute the funds to IOR's stockholders. We intend to vigorously defend against the allegations.

In connection with the formation of VAA, ten of the properties that we contributed to the joint venture are subject to an earn-out provision that provides for a remeasurement of the value of those properties after a two-year period following the completion of construction. As of December 31, 2020, we have recorded a liability of $10.0 million, which we believe is the amount that will be required to settle our obligation. We have been unable to reach agreement with our joint venture partner on the remeasured value. As a result, the parties have filed for arbitration in accordance with the joint venture agreement.

App. 1843

Not applicable.

17

---

## PART II

### ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock is listed and traded on the NYSE under the symbol "TCI". The following table sets forth the high and low sales prices as reported in the consolidated reporting system of the NYSE American for the quarters ended:

|  | 2020 | | 2019 | |
|  | High | Low | High | Low |
| --- | --- | --- | --- | --- |
| First Quarter | $ 39.86 | $ 16.00 | $ 38.34 | $ 27.60 |
| Second Quarter | $ 40.42 | $ 16.50 | $ 34.01 | $ 22.85 |
| Third Quarter | $ 30.43 | $ 29.99 | $ 33.15 | $ 23.00 |
| Fourth Quarter | $ 32.26 | $ 21.75 | $ 41.50 | $ 27.00 |

On March 22, 2021, the closing price of our common stock as reported on the NYSE was $21.50 per share, and was held by approximately 2,149 holders of record.

Our Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, the board determined not to pay any dividends on common stock in December 31, 2020, 2019 or 2018. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including our financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

We have a share repurchase program that allows for the repurchase of up to 1,637,000 shares of our common stock. This repurchase program has no termination date. There were no shares repurchased for the year ended December 31, 2020 and the program has 650,250 share remaining that can be repurchased as of December 31, 2020.

### ITEM 6.   SELECTED FINANCIAL DATA

Optional and not included.

### ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion should be read in conjunction with our consolidated financial statements and related notes in Part II, Item 8 of this Report. Our results of operations for the year ended December 31, 2020 were affected by the acquisitions and disposition, refinancing activity, development activity as discussed below.

**Management's Overview**

We are an externally advised and managed real estate investment company that owns a diverse portfolio of income-producing properties and land held for development throughout the Southern United States. Our portfolio of income-producing properties includes residential apartment communities, office buildings and other commercial properties. Our investment strategy includes acquiring existing income-producing properties as well as developing new properties on land already owned or acquired for a specific development project.

Our operations are managed by Pillar Income Asset Management, Inc. ("Pillar") in accordance with an Advisory Agreement. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges our debt and equity financing with third party lenders and investors. We have no employees. Employees of Pillar render services to us in accordance with the terms of the Advisory Agreement. Pillar is considered to be a related party due to its common ownership with American Realty Investors,

Inc. ("ARL"), who is our controlling shareholder.      Case 3:22-cv-02118-X      Document 253      Filed 05/30/23      Page 574 of 824      PageID 9698

18

The following is a summary of our recent acquisition, disposition, financing and development activities:

*Acquisitions and Dispositions*

- On November 19, 2018, we formed the Victory Abode Apartments, LLC ("VAA") joint venture with the Macquarie Group ("Macquarie"). In connection with the formation of VAA, we sold a 50% ownership interest in certain multifamily apartment projects to Macquarie for a $236.8 million cash payment, resulting in a gain on sale of assets of $154.1 million. We then immediately transferred our respective ownership interests in the multifamily apartments ("VAA Portfolio") to VAA in exchange for a 50% voting interest / 49% profit participation interest ("Class A interest") in VAA and note payable ("Mezzanine Loan") in accordance with the terms of a contribution agreement (the "Contribution"). Upon completion of the Contribution, VAA owned and controlled 52 multifamily apartments. VAA assumed all liabilities of those properties, including mortgage debt insured by the Department of Housing and Urban Development ("HUD").

- On May 31, 2019, we sold Westwood, a 120 unit multifamily property in Mary Ester, Florida for $3.1 million, resulting in a loss on the sale of $0.1 million.

- During the year ended December 31, 2019, we sold 105.1 acres of land for an aggregate sales price of $30.0 million and purchased 41.9 acres for an aggregate purchase price of approximately $4.6 million.

- On March 5, 2020, we acquired a 49.2 acres land parcel in Kent, Ohio for $5.4 million that was funded by a $2.0 million cash payment and a $3.4 million note payable that bears interest at 10% and matures on November 13, 2024.

- On May 1, 2020, we sold Villager, a 33 unit multifamily property in Fort Walton, Florida for $2.4 million, resulting in a gain on sale of $1.0 million.

- On July 16, 2020, we sold Farnham Park, a 144 unit multifamily property in Port Arthur, Texas for $13.3 million, resulting in a gain on sale of $2.7 million.

- On September 14, 2020, we sold Bridge View Plaza, a retail property in La Crosse, Wisconsin for $5.3 million, resulting in a gain on sale of $4.6 million.

- During the year ended December 31, 2020, we sold a total of 58.8 acres of land from our holdings in Windmill Farms for $12.9 million, in aggregate, resulting in gains on sale of $11.1 million. In addition, we sold 26.8 acres of land from our holdings in Mercer Crossing during the year ended December 31, 2020 for $15.8 million, resulting in a gain on sale of $10.3 million.

*Financing Activities*

- On February 15, 2018, we issued $39.2 million in Series B bonds (See Note 11 in our consolidated financial statements) that bear interest at 6.80% and mature on July 31, 2025. The proceeds were used to fund development activity, pay down debt and other general corporate purposes.

- On July 19, 2018, we issued an additional $19.8 million of Series B bonds (See Note 11 in our consolidated financial statements) in a private placement. We used the proceeds from the issuance to fund our development activities.

- On July 28, 2019, we paid off the $41.5 million mortgage note payable on Browning Place, which resulted in a loss on early extinguishment of debt of $5.2 million. Concurrent with the repayment of the mortgage note payable, we issued $78.1 million of Series C bonds (See Note 11 in our consolidated financial statements), which are collateralized by Browning Place, bear interest at 4.65% and mature on January 31, 2023.

- On November 30, 2020, issued $19.7 million in additional Series A bonds (See Note 11 in our consolidated financial statements) for $18.8 million in net proceeds. We used the proceeds to fund in part our bond payments that were due on January 30, 2021.

- On December 3, 2020, we extended our $14.7 million loan from HSW Partners to June 17, 2021.

- On March 2, 2021, we extended our $1.2 million loan on Athens to August 28, 2022.

19

- On March 4, 2021, we received a commitment from our lender to extend the maturity of our $10.4 million loan on Windmill Farms until February 28, 2023 at a reduced interest rate of 5%.

*Development Activities*

During the year ended December 31, 2020, we completed the construction of Parc at Denham Springs Phase II and Sugar Mill Phase III for a total cost of $17.2 million and $14.2 million, respectively.

Our current developments projects at December 31, 2020, are as follow: (dollars in thousands)

| Property | Location | No. of Units | Costs to Date (1) | Total Projected Costs (1) |
|---|---|---|---|---|
| Athens | Athens, AL | 232 | 270 | 34,800 |
| Heritage McKinney | McKinney, TX | 170 | 231 | 24,650 |
| Total | | 402 | $ 501 | $ 59,450 |

(1) Costs include construction hard costs, construction soft costs and loan borrowing costs.

**Critical Accounting Policies**

The preparation of our consolidated financial statements in conformity with United States generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Some of these estimates and assumptions include judgments on revenue recognition, estimates for common area maintenance and real estate tax accruals, provisions for uncollectible accounts, impairment of long-lived assets, the allocation of purchase price between tangible and intangible assets, capitalization of costs and fair value measurements. Our significant accounting policies are described in more detail in Note 2—Summary of Significant Accounting Policies in our notes to the consolidated financial statements. However, the following policies are deemed to be critical.

*Fair Value of Financial Instruments*

We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions define fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1—Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2—Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3—Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

App. 1846

20

*Related Parties*

We apply ASC Topic 805, "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing our own separate interests, or affiliates of the entity.

*Environmental Matters*

Under various federal, state and local environmental laws, ordinances and regulations, we may be potentially liable for removal or remediation costs, as well as certain other potential costs, relating to hazardous or toxic substances (including governmental fines and injuries to persons and property) where property-level managers have arranged for the removal, disposal or treatment of hazardous or toxic substances. In addition, certain environmental laws impose liability for release of asbestos-containing materials into the air, and third parties may seek recovery for personal injury associated with such materials.

We are not aware of any environmental liability relating to the above matters that would have a material adverse effect on our business, assets or results of operations.

*Inflation*

The effects of inflation on our operations are not quantifiable. Revenues from property operations tend to fluctuate proportionately with inflationary increases and decreases in housing costs. Fluctuations in the rate of inflation also affect sales values of properties and the ultimate gain to be realized from property sales. To the extent that inflation affects interest rates, our earnings from short-term investments, the cost of new financings and the cost of variable interest rate debt will be affected.

**Results of Operations**

Many of the variations in the results of operations, discussed below, occurred because of the transactions affecting our properties described above, including those related to the Lease-Up Properties and the Disposition Properties (each as defined below).

For purposes of the discussion below, we define "Same Properties" as those properties that are substantially leased-up and in operation for the entirety of both periods of the comparison. Non-Same Properties for comparison purposes include those properties that have been recently constructed or leased-up ("Lease-up Properties") and properties that have been disposed of ("Disposition Properties"). A developed property is considered leased-up, when it achieves occupancy of 80% or more.We move a property in and out of Same Properties based on whether the property is substantially leased-up and in operation for the entirety of both periods of the comparison. Accordingly, the Same Properties consist of all properties, excluding the Lease-up Properties and the Disposition Properties for the periods of comparison.

For the comparison of the year ended December 31, 2020 to the year ended December 31, 2019, the Lease-up Properties are Forest Grove, Parc at Denham Springs Phase II and Sugar Mill Phase III; and the Disposition Properties are Bridge View Plaza, Farnham Park and Villager.

The following table shows the total number of income-producing properties, and other key financial measures as of December 31, 2020 and 2019:

|  | For the Years Ended December 31, | | |
|  | 2020 | 2019 | Variance |
|---|---|---|---|
| Multifamily Segment | | | |
| Revenue | $ 14,686 | $ 13,517 | $ 1,169 |
| Operating expenses | (8,482) | (8,824) | 342 |
|  | 6,204 | 4,693 | 1,511 |
| Commercial Segment | | | |
| Revenue | 37,223 | 32,714 | 4,509 |
| Operating expenses | (15,878) | (16,389) | 511 |
|  | 21,345 | 16,325 | 5,020 |
| Segment operating income | 27,549 | 21,018 | 6,531 |
| Other non-segment items of income (expense) | | | |
| Depreciation and amortization | (14,755) | (13,379) | (1,376) |
| General, administrative and advisory | (17,935) | (17,114) | (821) |
| Interest, net | (10,714) | (12,209) | 1,495 |
| Loss on extinguishment of debt | — | (5,219) | 5,219 |
| (Loss) gain on foreign currency transactions | (13,378) | (15,108) | 1,730 |
| Gain sale or write down of assets | 32,107 | 14,809 | 17,298 |
| Income (loss) from joint ventures | (519) | (2,758) | 2,239 |
| Other income | 5,109 | 3,823 | 1,286 |
| Net income (loss) | $ 7,464 | $ (26,137) | $ 33,601 |

*Comparison of the year ended December 31, 2020 to the year ended December 31, 2019:*

Our $33.6 million increase in net income during the year ended December 31, 2020 is primarily attributed to the following:

- The $1.5 million increase in operating profits in our multifamily segment is primarily due a $2.1 million increase at our Lease-Up Properties offset in part by a decrease at our Disposition Properties. The increase in profit at our Lease-Up Properties is due to an increase in occupancy at Overlook at Allenville Phase II, Parc at Denham Springs Phase II and Forest Grove in 2020.

- The $5.0 million increase in operating profits in our commercial segment is primarily due to a $6.0 million lease termination payment at Browning Place offset in part by a decrease in rental revenue at our Same Properties due to a decline in occupancy. The lease termination payment relates to a former tenant that has been replaced by a new tenant at increased rents.

- The $5.2 million loss on extinguishment of debt in 2019 is due to the early extinguishment of our mortgage note payable on Browning Place (See "Financing Activities" in Management's Overview).

- The $17.3 million increase in gain on sale of assets is due to an increase of $10.3 million sales of land; the sale of Bridge View Plaza, Farnham Park and Villager in 2020 (See "Acquisitions and Dispositions" in Management's Overview); and the recognition of $3.0 million in gain in 2020 from sales that had been previously deferred.

- The $2.2 million decrease in loss from joint ventures is due to the increased in occupancy of the various lease-up properties at VAA.

*Comparison of the year ended December 31, 2019 to the year ended December 31, 2018:*

See Item 7 of Part II in our Annual Report on Form 10-K for the year ended December 31, 2019 filed with the SEC on March 30, 2020 for a discussion of our results of operations for the year ended December 31, 2019.

**Liquidity and Capital Resources**

Our principal sources of cash have been, and will continue to be, property operations; proceeds from land and income-producing property sales; collection of mortgage notes receivable; collections of receivables from related companies; refinancing of existing mortgage notes payable; and additional borrowings, including mortgage notes and bonds payable, and lines of credit.

Our principal liquidity needs are to fund normal recurring expenses; meet debt service and principal repayment obligations including balloon payments on maturing debt; fund capital expenditures, including tenant improvements and leasing costs; fund development costs not covered under construction loans; and fund possible property acquisitions.

We anticipates that our cash and cash equivalents as of December 31, 2020, along with cash that will be generated in 2021 from notes and interest receivables, will be sufficient to meet all of our cash requirements. We intends to selectively sell land and income-producing assets, refinance or extend real estate debt and seek additional borrowings secured by real estate to meet our liquidity requirements. Although history cannot predict the future, historically, we have been successful at refinancing and extending a portion of our current maturity obligations.

*Cash Flow Summary*

The following summary discussion of our cash flows is based on the consolidated statements of cash flows in Part II, Item 8. "Consolidated Financial Statements and Supplementary Data" and is not meant to be an all-inclusive discussion of the changes in our cash flows for the periods presented below (dollars in thousands):

|  | Year Ended December 31, | | Incr /(Decr) |
|---|---|---|---|
|  | **2020** | **2019** |  |
| Net cash provided by (used in) operating activities | $ 5,631 | $ (35,747) | $ 41,378 |
| Net cash provided by (used in) investing activities | $ 381 | $ (9,598) | $ 9,979 |
| Net cash (used in) provided by financing activities | $ (2,306) | $ 22,041 | $ (24,347) |

The increase in cash from operating activities is primarily due to the $35.3 million decrease in receivable from related parties in 2019.

The increase in cash provided by investing activities is primarily due to a $16.2 million decrease in development and renovation of real estate and a $12.4 million increase in proceeds from sale of assets offset in part by a $11.6 million decrease in originations and advances on notes receivable and a $9.4 million decrease in collection of notes receivable.

The increase in cash used in financing activities is primarily due to a $73.1 million decrease in proceeds from mortgages, notes and bonds payable offset in part by a $42.0 million decrease in payments of mortgages, notes and bonds payable. The decrease in proceeds and payment on mortgage, notes and bonds payable is due to the refinancing of Browning Place in 2019 (See "Financing Activities" in Management's Overview).

**Funds From Operations ("FFO")**

We use FFO in addition to net income to report our operating and financial results and considers FFO and FFO-diluted as supplemental measures for the real estate industry and a supplement to GAAP measures. The National Association of Real Estate Investment Trusts ("Nareit") defines FFO as net income (loss) (computed in accordance with GAAP), excluding gains (or losses) from sales of properties, plus real estate related depreciation and amortization, impairment write-downs of real estate and write-downs of investments in an affiliate where the write-downs have been driven by a decrease in the value of real estate held by the affiliate and after adjustments for unconsolidated joint ventures. Adjustments for unconsolidated joint ventures are calculated to reflect FFO on the same basis. We also presents FFO excluding the impact of the effects of foreign currency translation.

App. 1849

FFO and FFO on a diluted basis are useful to investors in comparing operating and financial results between periods. This is especially true since FFO excludes real estate depreciation and amortization, as we believe real estate values fluctuate based on market conditions rather than depreciating in value ratably on a straight-line basis over time. We believe that such a presentation also provides investors with a meaningful measure of our operating results in comparison to the operating results of other real estate companies. In addition, we believe that FFO excluding gain (loss) from foreign currency transactions provide useful supplemental information regarding our performance as they show a more meaningful and consistent comparison of our operating performance and allows investors to more easily compare our results.

We believe that FFO does not represent cash flow from operations as defined by GAAP, should not be considered as an alternative to net income as defined by GAAP, and is not indicative of cash available to fund all cash flow needs. We also caution that FFO, as presented, may not be comparable to similarly titled measures reported by other real estate companies.

We compensate for the limitations of FFO by providing investors with financial statements prepared according to GAAP, along with this detailed discussion of FFO and a reconciliation of net income to FFO and FFO-diluted. We believe that to further understand our performance, FFO should be compared with our reported net income and considered in addition to cash flows in accordance with GAAP, as presented in our consolidated financial statements.

The following reconciles our net income attributable to FFO and FFO-basic and diluted, excluding (loss) gain from foreign currency transactions for the years ended December 31, 2020, 2019 and 2018 (dollars and shares in thousands):

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Net income (loss) attributable to the Company | $ 6,669 | $ (26,920) | $ 180,550 |
| Depreciation and amortization on consolidated assets | 14,755 | 13,379 | 22,761 |
| Gain on sale or write down of assets | (32,107) | (14,809) | (171,530) |
| Gain on sale of land | 23,383 | 14,889 | 17,404 |
| Depreciation and amortization on unconsolidated joint ventures at pro rata share | 3,291 | 238 | (1,863) |
| FFO-Basic and Diluted | 15,991 | (13,223) | 47,322 |
| Loss on extinguishment of debt | — | 5,219 | — |
| Loss (gain) on foreign currency transaction | 13,378 | 15,108 | (12,399) |
| FFO-adjusted | $ 29,369 | $ 7,104 | $ 34,923 |

## ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Optional and not included.

24

## ITEM 8.   CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

### INDEX TO FINANCIAL STATEMENTS

| | Page |
| --- | --- |
| **Financial Statements** | |

| | Page |
| --- | --- |
| Report of Independent Registered Public Accounting Firm | 26 |
| Consolidated Balance Sheets at December 31, 2020 and 2019 | 29 |
| Consolidated Statements of Operations for the Years Ended December 31, 2020, 2019 and 2018 | 30 |
| Consolidated Statements of Equity for the Years Ended December 31, 2020, 2019 and 2018 | 31 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2020, 2019 and 2018 | 32 |

App. 1850

**Financial Statement Schedules**

Schedule III—Real Estate and Accumulated Depreciation     51

Schedule IV—Mortgage Loans Receivable on Real Estate     53

25

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors of and
Stockholders of Transcontinental Realty Investors, Inc.
Dallas, Texas

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Transcontinental Realty Investors, Inc. and Subsidiaries as of December 31, 2020 and 2019, and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2020, and the related notes and schedules (collectively referred to as the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of American Realty Investors, Inc. as of December 31, 2020 and 2019 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020 in conformity with accounting principles generally accepted in the United States of America.

**Basis of Opinion**

These consolidated financial statements are the responsibility of Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Impairment of investment in real estate*

*Description of the Matter*

App. 1851

The Company's net investment in real estate totaled $5.7 billion as of December 31, 2020. As discussed in Note 2 to the consolidated financial statements, the Company periodically assesses whether there has been any impairment in the carrying value of its properties and whenever events or changes in circumstances indicate that the carrying value of a property may not be recoverable. Impairment is recognized on real estate assets held for investment when indicators of impairment are present and the future undiscounted cash flows for a real estate asset are less than its carrying amount, at which time the real estate asset is written down to its estimated fair value.

26

Auditing the Company's impairment assessment for real estate assets was complex because of the subjective auditor judgment necessary in evaluating management's identification of indicators of potential impairment. Our evaluation of management's identification of indicators of impairment included our related assessment of such indicators, either individually or in combination, in determining whether a triggering event has occurred that requires the Company to evaluate the recoverability of the real estate asset.

*How We Addressed the Matter in Our Audit*

We obtained an understanding of the Company's controls over the Company's real estate asset impairment assessment process. Our testing of the Company's impairment assessment included, among other procedures, evaluating significant judgments applied in determining whether indicators of impairment existed for the Company's real estate assets. Our procedures included obtaining evidence to corroborate such judgments and searching for evidence contrary to such judgments, including searching for significant tenant write-offs or upcoming lease expirations with little prospects for replacement tenants. We also searched for any significant declines in operating results of a real estate asset due that could be a triggering event or an indicator of potential impairment.

***Collectability of Notes Receivable***

*Description of the Matter*

At December 31, 2020, the Company had notes receivable in the amount of $123.5 million. The Company performs an assessment as to whether or not substantially all of the amounts due under these notes receivable is deemed probable of collection. Subsequently, for notes where the Company concludes that it is not probable that it will collect substantially all payments due under the note, the Company creates an allowance for any amounts not probable of collection.

Auditing the Company's collectability assessment is complex due to the judgment involved in the Company's determination of the collectability of these notes. The determination involves consideration of the terms of the note, whether or not the note is currently performing, and any security for the note.

*How We Addressed the Matter in Our Audit*

We obtained an understanding of the Company's controls over notes receivable and their collectability assessment. Our testing included among other things, confirming selected notes receivable, determining if the notes were performing according to their terms and testing the Company's evaluation of the underlying security interest if necessary.

***Revenue Recognition (straight-line) for commercial tenants***

*Description of the Matter*

During 2020, the Company recognized office rental revenues and tenant recoveries of $37.2 million and recorded tenant receivables of $.1 million and deferred rent receivables of $3.2 million at December 31, 2020. As described in Note 2 to the consolidated financial statements, the Company recognizes revenue from commercial properties on a straight-line basis over the terms of the related leases.

Auditing the Company's straight-line calculations is complex due to the free rent periods, lease amendments and escalation clauses contained in many of the leases.

*How We Addressed the Matter in Our Audit*

We obtained an understanding of the Company's controls over office rental revenues and tenant recoveries, including controls over management's calculation of the straight-line calculation and deferred rent receivable. To test the straight-line rent revenue and deferred rent receivable, we

performed audit procedures that included, among others, evaluating the data and assumptions used in determining the calculation and agreeing amounts in the calculation to copies of lease agreements. In addition, we tested the completeness and accuracy of the data that was used in management's straight-line rent and deferred rent receivable calculation.

<div align="center">27</div>

## Emphasis of Liquidity

As described in the Note 17, management intends to sell income-producing assets, refinance real estate and obtain additional borrowings primarily secured by real estate to meet the Company's liquidity requirements.

## Supplemental Information

The supplemental information contained in Schedules III and IV has been subjected to audit procedures performed in conjunction with the audit of the Company's financial statements. The supplemental information is the responsibility of the Company's management. Our audit procedures included determining whether the supplemental information reconciles to the financial statements or the underlying accounting and other records, as applicable, and performing procedures to test the completeness and accuracy of the information presented in the supplemental information. In forming our opinion on the supplemental information, we evaluated whether the supplemental information, including its form and content, is presented in conformity with the Security and Exchange Commission's rules. In our opinion, the supplemental information is fairly stated, in all material respects, in relation to the financial statements as a whole.

FARMER, FUQUA & HUFF, PC
Richardson, Texas
March 24, 2021
We have served as the Company's auditor since 2004.

<div align="center">28</div>

<div align="center">

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(dollars in thousands, except par value amounts)**

</div>

| | December 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Assets | | | | |
| Real estate | $ | 377,383 | $ | 387,790 |
| Cash and cash equivalents | | 36,761 | | 51,179 |
| Restricted cash | | 50,206 | | 32,082 |
| Notes receivable (including $62,448 and $53,027 at December 31, 2020 and 2019, respectively, from related parties) | | 123,556 | | 112,357 |
| Investment in unconsolidated joint ventures | | 51,786 | | 81,780 |
| Receivable from related parties | | 159,777 | | 141,541 |
| Other assets | | 79,613 | | 59,189 |
| Total assets | $ | 879,082 | $ | 865,918 |
| | | | | |
| Liabilities and Equity | | | | |
| Liabilities: | | | | |
| Mortgages and other notes payable | $ | 236,069 | $ | 241,527 |

<div align="right">App. 1853</div>

| | 2020 | 2019 |
|---|---|---|
| Bonds payable | 237,888 | 723,265 |
| Accounts payable and other liabilities (including $930 and $935 at December 31, 2020 and 2019, respectively, to related parties) | 26,729 | 30,361 |
| Interest payable | 7,550 | 7,230 |
| Deferred revenue | 9,315 | 9,468 |
| Total liabilities | 517,551 | 511,851 |
| | | |
| Equity: | | |
| Shareholders' equity | | |
| Common stock, $0.01 par value, 10,000,000 shares authorized; 8,639,516 shares issued, 8,639,316 outstanding | 87 | 87 |
| Treasury stock at cost, 200 shares | (2) | (2) |
| Additional paid-in capital | 260,388 | 257,853 |
| Retained earnings | 81,334 | 74,665 |
| Total shareholders' equity | 341,807 | 332,603 |
| Noncontrolling interest | 19,724 | 21,464 |
| Total equity | 361,531 | 354,067 |
| Total liabilities and equity | $ 879,082 | $ 865,918 |

The accompanying notes are an integral part of these consolidated financial statements.

29

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Dollars in thousands, except per share amounts)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| Revenues: | | | |
| Rental revenues (including $1,083, $841 and $737 for 2020, 2019 and 2018, respectively, from related parties) | $ 51,909 | $ 46,231 | $ 113,944 |
| Other income | 5,113 | 1,823 | 35,161 |
| Total revenue | 57,022 | 48,054 | 149,105 |
| Expenses: | | | |
| Property operating expenses (including $990, $991 and $943 for 2020, 2019 and 2018, respectively, from related parties) | 24,360 | 25,213 | 59,420 |
| Depreciation and amortization | 14,755 | 13,379 | 22,761 |
| General and administrative (including $3,869, $4,144 and $4,578 for 2020, 2019 and 2018, respectively, from related parties) | 9,287 | 8,704 | 11,359 |
| Advisory fee to related party | 8,648 | 8,410 | 11,294 |
| Total operating expenses | 57,050 | 55,706 | 104,834 |
| Net operating (loss) income | (28) | (7,652) | 44,271 |
| Interest income (including $19,515, $17,413 and $13,132 for 2020, 2019 and 2018, respectively, from related parties) | 18,660 | 19,607 | 15,793 |
| Interest expense (including $1,581, $1,999 and $423 for the year ended 2020, 2019 and 2018, respectively, from related parties) | (29,374) | (31,816) | (58,872) |
| (Loss) gain on foreign currency transactions | (13,378) | (15,108) | 12,399 |
| Loss on extinguishment of debt | — | (5,219) | — |

App. 1854

| | | | |
|---|---|---|---|
| Equity in (loss) income from unconsolidated joint ventures | (509) | (2,759) | 1,129 |
| Gain on sale or write-down of assets, net | 32,107 | 14,809 | 171,530 |
| Income tax provision | (4) | 2,000 | (3,210) |
| Net income (loss) | 7,464 | (26,137) | 183,040 |
| Net (income) attributable to noncontrolling interest | (795) | (783) | (1,590) |
| Net income (loss) attributable to the Company | 6,669 | (26,920) | 181,450 |
| Preferred dividend | — | — | (900) |
| Net income (loss) attributable to common shares | $ 6,669 | $ (26,920) | $ 180,550 |
| Earnings per share - basic | | | |
| Basic and diluted | $ 0.77 | $ (3.09) | $ 20.71 |
| Weighted average common shares used in computing earnings per share | | | |
| Basic and diluted | 8,639,316 | 8,717,767 | 8,717,767 |

The accompanying notes are an integral part of these consolidated financial statements.

30

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENT OF EQUITY**
**For the Three Years Ended December 31, 2020**
**(audited, dollars in thousands, except share amounts)**

| | Common Stock | Treasury Stock | Paid-in Capital | Retained Earnings | Total Shareholders' Equity | Noncontrolling Interest | Total Equity |
|---|---|---|---|---|---|---|---|
| Balance, January 1, 2018 | $ 87 | $ (2) | $ 268,950 | $ (79,865) | $ 189,170 | $ 19,091 | $ 208,261 |
| Net income | — | — | — | 181,450 | 181,450 | 1,590 | 183,040 |
| Series D preferred stock dividends (9% per year) | — | — | (900) | — | (900) | — | (900) |
| Redemption of Series D preferred stock | — | — | (10,000) | — | (10,000) | — | (10,000) |
| Balance, December 31, 2018 | 87 | (2) | 258,050 | 101,585 | 359,720 | 20,681 | 380,401 |
| Net loss | — | — | — | (26,920) | (26,920) | 783 | (26,137) |
| Distribution to equity partner | — | — | (197) | — | (197) | — | (197) |
| Balance, December 31, 2019 | 87 | (2) | 257,853 | 74,665 | 332,603 | 21,464 | 354,067 |
| Net income | — | — | — | 6,669 | 6,669 | 795 | 7,464 |
| Adjustment to noncontrolling interest | — | — | 2,535 | — | 2,535 | (2,535) | — |
| Balance, December 31, 2020 | $ 87 | $ (2) | $ 260,388 | $ 81,334 | $ 341,807 | $ 19,724 | $ 361,531 |

The accompanying notes are an integral part of these consolidated financial statements.

31

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

App. 1855

(Dollars in thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| Cash Flow From Operating Activities: | | | |
| Net income (loss) | $ 7,464 | $ (26,137) | $ 183,040 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Gain on sale or write down of assets | (32,107) | (14,809) | (171,530) |
| Loss (gain) income on foreign currency transactions | 13,378 | 15,108 | (12,399) |
| Loss on debt extinguishment | — | 5,219 | — |
| Depreciation and amortization | 18,579 | 15,585 | 30,749 |
| Provision for bad debts | 984 | — | — |
| Equity in loss (income ) from unconsolidated joint ventures | 519 | 2,758 | (1,129) |
| Distribution of income from unconsolidated joint ventures | 1,782 | — | — |
| Changes in assets and liabilities, net of dispositions: | | | |
| Other assets | (7,397) | 798 | (112,221) |
| Related party receivables | 4,389 | (35,257) | (14,995) |
| Accrued interest payable | (1,340) | 2,349 | (2,307) |
| Accounts payable and other liabilities | (620) | (1,361) | (80,395) |
| Net cash provided by (used in) operating activities | 5,631 | (35,747) | (181,187) |
| Cash Flow From Investing Activities: | | | |
| Collection of notes receivable | 4,436 | 13,862 | 6,541 |
| Originations and advances on notes receivable | (33,015) | (21,434) | (16,801) |
| Acquisition of real estate | — | (3,422) | (10,558) |
| Development and renovation of real estate | (17,505) | (33,730) | (85,055) |
| Deferred leasing costs | (2,603) | — | |
| Proceeds from sale of assets | 40,982 | 28,622 | 253,498 |
| Distribution from unconsolidated joint ventures | 8,086 | 6,504 | — |
| Net cash provided by (used in) investing activities | 381 | (9,598) | 147,625 |
| Cash Flow From Financing Activities: | | | |
| Proceeds from mortgages, other notes and bonds payable | 30,727 | 103,800 | 182,558 |
| Payments on mortgages, other notes and bonds payable | (31,736) | (73,719) | (124,616) |
| Debt extinguishment costs | — | (3,799) | — |
| Deferred financing costs | (1,297) | (4,241) | (5,257) |
| Preferred stock dividends | — | — | (900) |
| Net cash (used in) provided by financing activities | (2,306) | 22,041 | 51,785 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 3,706 | (23,304) | 18,223 |
| Cash, cash equivalents and restricted cash, beginning of period | 83,261 | 106,565 | 88,342 |
| Cash, cash equivalents and restricted cash, end of period | $ 86,967 | $ 83,261 | $ 106,565 |

The accompanying notes are an integral part of these consolidated financial statements.

32

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

App. 1856

**1. Organization**

As used herein, the terms "the Company", "We", "Our", or "Us" refer to Transcontinental Realty Investors, Inc., a Nevada corporation which was formed in 1984. Our common stock is listed and trades on the New York Stock Exchange ("NYSE") under the symbol "TCI". We are owned approximately 78% by American Realty Investors, Inc. ("ARL"), whose common stock is traded on the NYSE under the symbol "ARL", and 7% by the parent of ARL.

Our primary business is the acquisition, development and ownership of income-producing multifamily and commercial properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time and when we believe it appropriate to do so, we will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents, and leasing office, industrial and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate revenues from gains on sales of income-producing properties and land.

Substantially all of our assets are held by our wholly-owned subsidiary, Southern Properties Capital Ltd ("SPC"), which was formed to allow us to raise funds by issuing non-convertible bonds that are listed and traded on the Tel-Aviv Stock Exchange ("TASE").

At December 31, 2020, our portfolio of income-producing properties consisted of:

● Six commercial properties consisting of five office buildings and 1 retail property comprising in aggregate of approximately 1,600,000 square feet;

● Ten multifamily properties owned directly by us comprising in 1,639 units, excluding apartments being developed;

● Approximately 1,980 acres of developed and undeveloped land; and

● Fifty-one multifamily properties totaling 10,137 units owned by our 50% owned investment in VAA.

Our day to day operations are managed by Pillar Income Asset Management, Inc. ("Pillar"). Their duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing with third party lenders and investors. All of the Companies employees are Pillar employees. Our commercial properties are managed by Regis Realty Prime, LLC ("Regis"). Regis provides leasing, construction management and brokerage services. Our multifamily properties are managed by outside management companies. Pillar and Regis are considered to be related parties (See Note 12 – Related Party Transactions).

**2. Summary of Significant Accounting Policies**

*Basis of presentation*

These consolidated financial statements have been prepared in accordance with generally accepted accounting principles ("GAAP") in the United States of America.

We consolidate entities in which we are considered to be the primary beneficiary of a variable interest entity ("VIE") or have a majority of the voting interest of the entity. We have determined that we are a primary beneficiary of the VIE when we have (i) the power to direct the activities of a VIE that most significantly impacts its economic performance, and (ii) the obligations to absorb losses or the right to receive benefits that could potentially be significant to the VIE. In determining whether we are the primary beneficiary, we consider qualitative and quantitative factors, including ownership interest, management representation, ability to control decision and other contractual rights. We account for entities in which we have less than a controlling financial interest or entities where we are not deemed to be the primary beneficiary under the equity method of accounting. Accordingly, we include our share of the net earnings or losses of these entities in our results of operations.

33

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

Certain prior year amounts have been reclassified to conform to the current year presentation on the consolidated balance sheets, consolidated statements of operations and the consolidated statements of cash flows.

App. 1857

*Real estate, depreciation, and impairment*

Real estate assets are stated at the lower of depreciated cost or fair value, if deemed impaired. Major replacements and betterments are capitalized and depreciated over their estimated remaining useful lives. Depreciation is computed on a straight-line basis over the useful lives of the properties (buildings and improvements—10 to 40 years; furniture, fixtures and equipment—5 to 10 years).

We assess whether an indicator of impairment in the value of our real estate exists by considering expected future operating income, trends and prospects, as well as the effects of demand, competition and other economic factors. Such factors include projected rental revenue, operating costs and capital expenditures as well as estimated holding periods and capitalization rates. If an impairment indicator exists, the determination of recoverability is made based upon the estimated undiscounted future net cash flows, excluding interest expense. The amount of impairment loss, if any, is determined by comparing the fair value, as determined by a discounted cash flows analysis, with the carrying value of the related assets. We generally hold and operate our income producing real estate long-term, which decreases the likelihood of their carrying values not being recoverable. Real estate classified as held for sale are measured at the lower of the carrying amount or fair value less cost to sell.

*Real estate held for sale*

We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their carrying amount or their estimated fair value, less estimated costs to sell. We did not have any real estate assets classified as held for sale at December 31, 2020 or 2019.

*Cost capitalization*

The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. We also capitalize development costs including costs directly related to planning, developing, initial leasing and constructing a property as well as interest, property taxes, insurance, and other direct project costs incurred during the period of development. Capitalized costs also include direct and certain indirect costs clearly associated with the project. Indirect costs include real estate taxes, insurance and certain shared administrative costs. In assessing the amounts of direct and indirect costs to be capitalized, allocations are made to projects based on estimates of the actual amount of time spent on each activity. Indirect costs not clearly associated with specific projects are expensed as period costs.

We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

*Deferred leasing costs*

We capitalize leasing costs on our commercial properties, which include commissions paid to outside brokers, legal costs incurred to negotiate and document a lease agreement and any internal costs that may be applicable. We allocate these costs to individual tenant leases and amortize them over the related lease term.

*Fair value measurement*

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date. In determining fair value we apply the following hierarchy:

Level 1 —Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

34

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

Level 2 —Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3 —Unobservable inputs that are significant to the fair value measurement.

App. 1858

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Related parties*

Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

*Recognition of revenue*

Rental revenue includes fixed minimum rents, reimbursement of operating costs and other leasing income. Rental revenue for residential property, which is generally leased for twelve months or less, is recorded when due from residents, whereas rental revenue for commercial properties, which is generally leased for more than twelve months, is recognized on a straight-line basis over the terms of the related leases.

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

*Cash and Cash Equivalents and Restricted Cash*

We consider all highly liquid investments with an original maturity of three months or less when purchased to be cash equivalents, for which cost approximates fair value. Restricted cash includes cash balances held in escrow by financial institutions under the terms of certain secured notes payable and certain unsecured bonds payable.

*Concentration of credit risk*

We maintain our cash balances at commercial banks and through investment companies, the deposits that are insured by the Federal Deposit Insurance Corporation (FDIC). At December 2020 and 2019, the Company maintained balances in excess of the insured amount.

*Income taxes*

We are a "C" corporation" for U.S. federal income tax purposes. However, we are included in the May Realty Holdings, Inc. (the "MRHI") consolidated group for tax purposes. We have a tax sharing agreement that specifies the manner in which the group will share the consolidated tax liability and also how certain tax attributes are to be treated among members of the group.

*Comprehensive income (loss)*

Net income (loss) and comprehensive income (loss) are the same for the year ended December 31, 2020, 2019 and 2018.

35

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

*Use of estimates*

In the preparation of consolidated financial statements in conformity with GAAP, it is necessary for management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expense for the year ended. Actual results could differ from those estimates.

**Recent accounting pronouncements.**

In October 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities*. This standard is intended to improve the accounting when considering indirect interests held through related parties under common control for determining whether fees paid to decision makers and service providers are variable interests. The adoption of the standard on January 1, 2020, did not have a material impact on our financial position and results of operations.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting*. The standard provides guidance, optional expedients and exceptions that reference London Interbank Offered Rate ("LIBOR") or another reference rate expected to be discontinued due to reference rate reform. The standard was effective upon issuance and can be applied through December 31, 2022. We have mortgage notes payable with interest rates that reference LIBOR, and therefore, we will adopt this standard when LIBOR is discontinued.

On April 10, 2020, the FASB issued a Staff Q&A ("Q&A") related to the application of the lease guidance in ASC 842 for the accounting impact of lease concessions related to the COVID-19 pandemic. The Q&A, allows an entity to make an election to account for lease concessions related to the effects of the COVID-19 as though enforceable rights and obligations for those concessions existed. As a result of this election, an entity will not have to analyze each lease to determine whether enforceable rights and obligations for concessions exist in the lease and can elect to apply or not apply the lease modification guidance in ASC 842, as long as the concessions do not result in a substantial increase in the rights of the lessor or the obligations of the lessee. Our adoption of the guidance of the Q&A did not have a significant impact on our consolidated financial statements during the year ended December 2020.

## 3. Earnings Per Share

Earnings per share ("EPS") has been computed by dividing net income available to common shares, adjusted for preferred dividends, by the weighted-average number of common shares outstanding during the period.

The following table provides our basic and diluted EPS calculation:

|  | For the Year Ended December 31, | | |
|  | **2020** | **2019** | **2018** |
|---|---|---|---|
| Net income (loss) | $ 7,464 | $ (26,137) | $ 183,040 |
| Net (income) attributable to noncontrolling interest | (795) | (783) | (1,590) |
| Net income (loss) attributable to the Company | 6,669 | (26,920) | 181,450 |
| Preferred dividend | — | — | (900) |
| Net income (loss) attributable to common shares | $ 6,669 | $ (26,920) | $ 180,550 |
| Weighted-average common shares outstanding-basic and diluted | 8,639 | 8,718 | 8,718 |
| EPS - attributable to common shares- basic and diluted | $ 0.77 | $ (3.09) | $ 20.71 |

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

## 4. Supplemental Cash Flows Information

The following presents the schedule of interest paid and other supplemental cash flow information:

|  | For the Year Ended December 31, | | |
|  | **2020** | **2019** | **2018** |
|---|---|---|---|
| Cash paid for interest | $ 27,127 | $ 29,430 | $ 61,587 |
| Cash - Beginning of period |  |  |  |

App. 1860

| | | | | | |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 51,179 | $ | 36,358 | 42,705 |
| Restricted cash | | 32,082 | | 70,207 | 45,637 |
| | $ | 83,261 | $ | 106,565 | $ 88,342 |
| **Cash - End of Period** | | | | | |
| Cash and cash equivalents | $ | 36,761 | $ | 51,179 | $ 36,358 |
| Restricted cash | | 50,206 | | 32,082 | 70,207 |
| | $ | 86,967 | $ | 83,261 | $ 106,565 |
| **Proceeds from mortgages, notes and bonds payable** | | | | | |
| Proceeds from mortgages and notes payable | $ | 10,942 | $ | 25,675 | $ 123,345 |
| Proceeds from bonds | | 19,785 | | 78,125 | 59,213 |
| | $ | 30,727 | $ | 103,800 | $ 182,558 |
| **Payment of mortgages, notes and bonds payable** | | | | | |
| Recurring payment on mortgages and notes payable | $ | 12,144 | $ | 51,977 | $ 124,616 |
| Bond payments | | 19,592 | | 21,742 | — |
| | $ | 31,736 | $ | 73,719 | $ 124,616 |

The following is a schedule of noncash investing and financing activities:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| Property acquired in exchange for note payable | $ 3,350 | $ 1,155 | $ 1,895 |
| Note receivable issued in exchange for property | 1,761 | — | — |
| Property acquired in exchange for note receivable | — | 1,800 | 1,735 |
| Debt assumed in sale of properties | 8,238 | — | 31,175 |

## 5. Operating Segments

Our segments are based on the internal reporting that we review for operational decision-making purposes. We operate in two reportable segments: (i) the acquisition, development, ownership and management of multifamily properties and (ii) the acquisition, ownership and management of commercial real estate properties. The services for our multifamily segment include rental of apartments and other tenant services, including parking and storage space rental. Asset information by segment is not reported because we do not use this measure to assess performance or make decisions to allocate resources. Therefore, depreciation and amortization expense is not allocated among segments. General and administrative expenses, advisory fees, interest income and interest expense are not included in segment profit as our internal reporting addresses these items on a corporate level.

37

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

The following table presents our profit by reportable segment:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| **Multifamily Segment** | | | |
| Revenue | $ 14,686 | $ 13,517 | $ 80,821 |

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| Operating expenses | (3,482) | (8,829) | (42,588) |
| Profit from segment | 6,204 | 4,693 | 38,233 |
| **Commercial Segment** | | | |
| Revenue | 37,223 | 32,714 | 33,123 |
| Operating expenses | (15,878) | (16,389) | (16,832) |
| Profit from segment | 21,345 | 16,325 | 16,291 |
| Total profit from all segments | $ 27,549 | $ 21,018 | $ 54,524 |

The following table reconciles our profit by reportable segment to net income (loss):

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| Profit from reportable segments | $ 27,549 | $ 21,018 | $ 54,524 |
| Other non-segment items of income (expense) | | | |
| Depreciation and amortization | (14,755) | (13,379) | (22,761) |
| General and administrative | (9,287) | (8,704) | (11,359) |
| Advisory fee to related party | (8,648) | (8,410) | (11,294) |
| Other income | 5,113 | 1,823 | 35,161 |
| Interest income | 18,660 | 19,607 | 15,793 |
| Interest expense | (29,374) | (31,816) | (58,872) |
| (Loss) gain on foreign currency transactions | (13,378) | (15,108) | 12,399 |
| Loss on extinguishment of debt | — | (5,219) | — |
| Equity in (loss) income from unconsolidated joint ventures | (519) | (2,758) | 1,129 |
| Gain on sale or write-down of assets, net | 32,107 | 14,809 | 171,530 |
| Income tax provision | (4) | 2,000 | (3,210) |
| Net income (loss) | $ 7,464 | $ (26,137) | $ 183,040 |

38

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

The table below reconciles our segment information to the corresponding amounts in our consolidated balance sheets:

| | December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Segment assets | $ 342,965 | $ 348,404 |
| Real estate | 65,149 | 70,006 |
| Investment in unconsolidated joint ventures | 51,786 | 81,780 |
| Notes receivable | 123,556 | 112,357 |
| Receivable from related parties | 159,777 | 141,541 |
| Cash and other non-segment assets | 135,849 | 111,830 |
| Total assets | $ 879,082 | $ 865,918 |

**6. Lease Revenue**

App. 1862

We lease our multifamily properties and commercial properties under agreements that are classified as operating leases. Our multifamily leases generally include minimum rents and charges for ancillary services. Our commercial property leases generally included minimum rents and recoveries for property taxes and common area maintenance. Minimum rental revenues are recognized on a straight-line basis over the terms of the related leases.

The following table summarizes the components of rental revenue for the years ended December 2020, 2019 and 2018:

|  | For the Year Ended December 31, | | |
|  | 2020 | 2019 | 2018 |
|---|---|---|---|
| Fixed component | $ 49,974 | $ 43,749 | $ 112,203 |
| Variable component | 1,935 | 2,482 | 1,741 |
| Total rental revenue | $ 51,909 | $ 46,231 | $ 113,944 |

The following table summarizes the future rental payments to us from under non-cancelable leases. The table exclude multifamily leases, which typically have a term of one-year or less:

| Year | Amount |
|---|---|
| 2021 | $ 23,419 |
| 2022 | 21,363 |
| 2023 | 16,003 |
| 2024 | 10,889 |
| 2025 | 6,938 |
| Thereafter | 25,566 |
| Total | $ 104,178 |

39

TRANSCONTINENTAL REALTY INVESTORS, INC.

NOTES TO FINANCIAL STATEMENTS

(Dollars in thousands, except per share amounts)

**7. Real Estate Activity**

At December 31, 2020 and 2019, our real estate investment is comprised of the following:

|  | December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Land | $ 50,759 | $ 49,887 |
| Building and improvements | 297,644 | 286,280 |
| Tenant improvements | 30,935 | 49,431 |
| Construction in progress | 77,891 | 84,399 |
| Total cost | 457,229 | 469,997 |
| Less accumulated deprecation | (82,418) | (90,173) |
| Total real estate, net | 374,811 | 379,824 |
| Property held for sale | 2,572 | 7,966 |
| Total real estate | $ 377,383 | $ 387,790 |

Our property held for sale consists of land parcels at Mercer Crossing that are currently under contract for sale.

We continue to invest in the development of multifamily properties. During the year ended December 31, 2020, we invested $17,505 related to the construction and development projects.

Gain on sale or write-down of assets, net consists of the following:

| | | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** | |
| Land(1) | $ | 23,383 | $ | 14,889 | $ | 17,404 | |
| Multifamily(2) | | 3,702 | | (80) | | 154,126 | |
| Commercial(3) | | 4,610 | | — | | — | |
| Other(4) | | 412 | | — | | — | |
| | $ | 32,107 | $ | 14,809 | $ | 171,530 | |

(1)   Includes the sale of lots related to our investment in Windmill Farms, Mercer Crossing and other land holdings.

(2)    On May 1, 2020, we sold Villager, a 33 unit multifamily property in Fort Walton, Florida for $2,426, resulting in a gain on sale of $960. The sales price was funded by the issuance of a $1,761 note receivable and the assumption of the $665 mortgage note payable on the property (See Note 10 – Mortgages and Other Notes Payable). On July 16, 2020, we sold Farnham Park, a 144 unit multifamily property in Port Arthur, Texas for $13,300, resulting in a gain on the sale of of $2,742. The sales price was funded by cash payment of $4,215 and the assumption of the $9,085 mortgage note payable on the property (See Note 10 – Mortgages and Other Notes Payable).

(3)   On September 14, 2020, we sold Bridge View Plaza, a 122,205 square foot retail center in La Crosse, Wisconsin for $5,250, resulting in a gain on sale of $4,610. The proceeds from the sale were used to pay off the $3,375 mortgage note payable on the property (See Note 10 – Mortgages and Other Notes Payable) and for general corporate purposes.

(4)   Includes the write-off of development costs.

40

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**8. Notes Receivable**

The following table summarizes our notes receivables at December 31, 2020 and 2019:

| Borrower / Project | | Carrying Value | | | Interest Rate | Maturity Date |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | |
| ABC Land and Development, Inc. | $ | 4,408 | $ | 4,408 | 9.50 % | 6/30/21 |
| ABC Paradise, LLC | | 1,210 | | 1,210 | 9.50 % | 6/30/21 |
| Autumn Breeze(1) | | 1,867 | | 1,302 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1) | | 3,858 | | 3,765 | 5.00 % | 11/1/21 |
| Forest Pines(1) | | 2,869 | | 2,868 | 5.00 % | 11/1/22 |
| JEM Holdings, Inc. | | — | | 300 | 6.00 % | 7/1/16 |
| Lake Wales | | 3,000 | | 3,000 | 9.50 % | 6/30/21 |
| Legacy Pleasant Grove | | 496 | | 496 | 12.00 % | 10/23/22 |
| McKinney Ranch | | 4,554 | | 4,554 | 6.00 % | 9/15/22 |
| One Realco Land Holding, Inc. | | 1,728 | | 1,728 | 9.50 % | 6/30/21 |
| Oulad-Chikh Family Trust | | — | | 174 | 8.00 % | 3/1/21 |
| Parc at Ingleside(1) | | 2,523 | | 1,531 | 5.00 % | 12/1/21 |

App. 1864

| | | | | |
|---|---|---:|---:|---|
| Parc at Windmill Farms(1) | | 7,805 | 7,602 | 5.00 % | 11/1/22 |
| Phillips Foundation for Better Living, Inc.(2) | — | 314 | 12.00 % | 3/31/22 |
| Phillips Foundation for Better Living, Inc.(2) | 61 | — | 12.00 % | 3/31/23 |
| Plum Tree(1) | 857 | 413 | 5.00 % | 4/26/26 |
| Riverview on the Park Land, LLC | 1,045 | 1,045 | 9.50 % | 6/30/21 |
| RNC Portfolio, Inc. | 8,853 | 8,802 | 5.00 % | 9/1/24 |
| Spartan Land | 5,907 | 5,907 | 12.00 % | 1/16/23 |
| Spyglass of Ennis(1) | 5,360 | 5,288 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 6,498 | 6,665 | 5.00 % | 8/1/21 |
| Unified Housing Foundation, Inc. (2)(3) | 2,880 | 3,793 | 12.00 % | 7/31/21 |
| Unified Housing Foundation, Inc. (2)(3) | 212 | 212 | 12.00 % | 8/30/21 |
| Unified Housing Foundation, Inc. (2)(3) | 6,831 | 6,831 | 12.00 % | 10/31/21 |
| Unified Housing Foundation, Inc. (2)(3) | 10,896 | 10,926 | 12.00 % | 12/31/21 |
| Unified Housing Foundation, Inc. (2)(3) | 10,096 | 10,096 | 12.00 % | 3/31/22 |
| Unified Housing Foundation, Inc. (2)(3) | 6,990 | — | 12.00 % | 3/31/23 |
| Unified Housing Foundation, Inc. (2)(3) | 3,615 | — | 12.00 % | 5/31/23 |
| Unified Housing Foundation, Inc. (2)(3) | 19,139 | 19,127 | 12.00 % | 12/31/32 |
| | $ 123,556 | $ 112,357 | | |

(1)   The note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property.

(2)    The borrower is determined to be a related party due to our significant investment in the performance of the collateral secured by the notes receivable.

(3)    Principal and interest payments on the notes from Unified Housing Foundation, Inc. ("UHF") are funded from surplus cash flow from operations, sale or refinancing of the underlying properties and are cross collateralized to the extent that any surplus cash available from any of the properties underlying the notes.

41

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**9. Investment in Unconsolidated Joint Ventures**

On November 19, 2018, we formed the VAA joint venture with the Macquarie Group ("Macquarie"). In connection with the formation of VAA, we sold a 50% ownership interest in certain multifamily properties to Macquarie for a $236.8 million cash payment, resulting in a gain on sale of assets of $154.1 million. We then immediately transferred our respective ownership interests in the multifamily projects ("VAA Portfolio") to VAA in exchange for a 50% voting interest / 49% profit participation interest ("Class A interest") in VAA and note payable ("Mezzanine Loan") in accordance with the terms of a contribution agreement (the "Contribution"). Upon completion of the Contribution, VAA owned and controlled 52 multifamily properties. VAA assumed all liabilities of those properties, including mortgage debt insured by the Department of Housing and Urban Development ("HUD").

Concurrent with the Contribution, VAA issued Class B interests with a 2% profits participation interest and no voting rights to Daniel J. Moos, our former President and Chief Executive Officer ("Class B Member"). The Class B Member serves as the Manager of VAA.

Interest on the Mezzanine loan is limited to cash generated from the properties and matures concurrently with the termination of VAA. Accordingly, we account for our interest in the Mezzanine Loan as additional equity interest and includes any interest payments accrued as income from unconsolidated joint ventures.

On December 31, 2018, we purchased 900,000 shares of ARL Series A convertible preferred shares ("ARL Preferred Shares") from Realty Advisors, Inc. ("RAI"). On December 22, 2020, we transferred our ownership of the ARL Preferred Shares and the ARL common shares that we had

App. 1865

previously acquired to RAI for $18,858 and $3,747, respectively. RAI has a controlling ownership interest in ARL and is therefore deemed a related party. The transfer was recorded at cost as an increase to related party receivable.

The following is a summary of our investment in unconsolidated joint ventures:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2020 | | 2019 |
| *Condensed Balance Sheets of VAA* | | | |
| Assets | | | |
| Real estate | $ 1,217,725 | $ | 1,242,957 |
| Other assets | 63,102 | | 62,222 |
| Total assets | $ 1,280,827 | $ | 1,305,179 |
| Liabilities and Partners Capital | | | |
| Mortgage notes payable | $ 830,721 | $ | 832,858 |
| Mezzanine notes payable | 239,878 | | 240,422 |
| Other liabilities | 37,262 | | 30,790 |
| Our share of partners' capital | 84,983 | | 99,775 |
| Outside partner's capital | 87,983 | | 101,334 |
| Total liabilities and partners' capital | $ 1,280,827 | $ | 1,305,179 |
| *Investment in unconsolidated joint ventures* | | | |
| Our share of partners' capital | $ 84,983 | $ | 99,775 |
| Our share of Mezzanine note payable | 119,939 | | 120,211 |
| Basis adjustment (1) | (153,136) | | (160,838) |
| Our investment in unconsolidated joint ventures | 51,786 | | 59,148 |
| Investment ARL common shares | — | | 606 |
| Investment in ARL preferred shares | — | | 22,026 |
| Total investment in unconsolidated joint ventures | $ 51,786 | $ | 81,780 |

42

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

(1) We amortize the difference between the cost of our investment in unconsolidated joint ventures and the book value of our underlying equity into income on a straight-line basis consistent with the lives of the underlying assets.

The following is a summary of our (loss) income from investments in unconsolidated joint ventures:

| | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2020 | | 2019 | | 2018 |
| *Condensed Statements of Operations of VAA* | | | | | |
| Revenue | | | | | |
| Rental revenue | $ 117,336 | $ | 109,746 | $ | 11,568 |
| Other revenue | 5,779 | | 5,631 | | 1,319 |
| Total revenue | 123,115 | | 115,377 | | 12,887 |
| Expenses | | | | | |
| Operating expenses | 62,458 | | 60,516 | | 9,827 |
| Depreciation and amortization | 30,456 | | 43,942 | | 6,987 |
| Interest | 56,903 | | 61,315 | | 5,795 |
| Total expenses | 149,817 | | 165,773 | | 22,609 |
| Net loss | $ (26,702) | $ | (50,396) | $ | (9,722) |

Our share of net (loss) income in unconsolidated joint ventures ... $ (519) $ (2,758) $ 1,129

43

# TRANSCONTINENTAL REALTY INVESTORS, INC.

## NOTES TO FINANCIAL STATEMENTS

### (Dollars in thousands, except per share amounts)

## 10. Mortgages and Other Notes Payable

Below is a summary of our notes and interest payable as of December 31, 2020 and 2019:

| Property/ Entity | Carrying Value 2020 | Carrying Value 2019 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 600 Las Colinas | $ 35,589 | $ 36,302 | 5.30 % | 11/1/2023 |
| 770 South Post Oak | 11,871 | 12,077 | 4.40 % | 6/1/2025 |
| Bridge View Plaza(1) | — | 3,824 | 7.75 % | 11/1/2020 |
| Chelsea | 8,194 | 8,749 | 3.40 % | 12/1/2050 |
| EQK Portage - Land(2) | 3,350 | — | 10.00 % | 11/13/2024 |
| HSW Partners(3) | 14,690 | 13,032 | 9.50 % | 6/17/2021 |
| Farnham Park(4) | — | 9,144 | 3.39 % | 12/1/2050 |
| Forest Grove(5) | 7,333 | 1,390 | 3.75 % | 5/5/2024 |
| Landing Bayou | 14,643 | 15,467 | 3.50 % | 9/1/2053 |
| Athens(6) | 1,155 | 1,155 | 5.90 % | 8/28/2022 |
| Legacy at Pleasant Grove | 13,653 | 13,944 | 3.60 % | 4/1/2048 |
| McKinney 36 Land | 820 | 944 | 8.00 % | 6/30/2022 |
| Overlook at Allenville Phase II | 15,621 | 15,798 | 3.80 % | 5/1/2059 |
| Parc at Denham Springs Phase II | 16,128 | 14,785 | 4.10 % | 2/1/2060 |
| Stanford Center(7) | 39,093 | 39,255 | 6.00 % | 2/26/2022 |
| Sugar Mill Phase III | 9,298 | 5,908 | 4.50 % | 2/1/2060 |
| Toulon | 13,975 | 14,219 | 3.20 % | 12/1/2051 |
| Villager(8) | — | 556 | 2.50 % | 3/1/2043 |
| Villas at Bon Secour | 10,280 | 11,026 | 4.00 % | 1/1/2022 |
| Vista Ridge | 9,979 | 10,122 | 4.00 % | 8/1/2053 |
| Windmill Farms(9) | 10,397 | 13,830 | 6.00 % | 2/28/2023 |
| | $ 236,069 | $ 241,527 | | |

(1) On September 14, 2020, we paid off the loan in connection with the sale of the underlining property (See Note 7 – Real Estate Activity).

(2) On March 5, 2020, we acquired 49.2 acres of land in Kent, Ohio in exchange for the note payable.

(3) On, December 3, 2020, we extended the maturity on the loan to June 17, 2021.

(4) On July 16, 2020, the loan was assumed by a third party in connection with the sale of the underlying property (See Note 7 – Real Estate Activity).

(5) The loan bears interest at prime rate plus 0.5%.

(6) On March 2, 2021, the loan was extended to August 28, 2022.

(7) On May 1, 2020, the loan was extended to February 26, 2022.

(8) On May 1, 2020, the loan was assumed by a third party in connection to sale of the underlying property (See Note 7 – Real Estate Activity).

(9) On March 4, 2021, the loan was extended to February 28, 2023 at an interest of 5%.

Interest payable at December 31, 2020 and 2019, was $723 and $844, respectively. We capitalized interest of $858 and $438 during the years ended December 31, 2020 and 2019, respectively.

44

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

There are various land mortgages, secured by the property, that are in the process of a modification or extension to the original note due to expiration of the loan. We are working with our existing lenders and new lenders to modify, extend the loans before they become due or refinancing the loans with terms that are similar to the existing agreement.

As of December 31, 2020, we were in compliance with all our loan covenants.

Future principal payments due on our notes payable at December 31, 2020 are as follows:

| Year | | Amount |
|---|---|---|
| 2021 | $ | 14,079 |
| 2022 | | 14,403 |
| 2023 | | 37,690 |
| 2024 | | 2,575 |
| 2025 | | 12,927 |
| Thereafter | | 159,580 |
| | | 241,254 |
| Deferred finance cost | | (5,185) |
| | $ | 236,069 |

**11. Bonds Payable**

We have issued three series of nonconvertible bonds ("Bonds") through SPC, which are traded on the TASE. The Bonds are denominated in New Israeli Shekels ("NIS") and provide for semiannual principal and interest payments through maturity.

On February 2, 2020, the S&P Global Ratings of our Series A and Series C bonds increased to 'ilA-' from 'ilBBB+'. In addition, the rating on our Series C bonds increased to 'ilA' from 'ilA-' rating due to the expectation of continued improvement in coverage ratios and the expansion of our portfolio.

In connection with the Bonds, we incurred a (loss) gain on foreign currency transactions of $(13,378), $(15,108), and $12,399, for the years ended December 31, 2020, 2019 and 2018, respectively. From September 23, 2019 to December 31, 2019, we had hedging agreement that effectively prevented the exchange rate for the NIS to the U.S. Dollar from falling below three.

The outstanding balance of our Bonds at December 31, 2020 and 2019 is as follows:

| | December 31, | | | |
|---|---|---|---|---|
| **Bond Issuance** | **2020** | **2019** | **Interest Rat** | **Maturity** |
| Series A Bonds(1)(2) | $ 95,133 | $ 92,653 | 7.30 % | 7/31/23 |
| Series B Bonds(3) | 65,318 | 60,764 | 6.80 % | 7/31/25 |
| Series C Bonds(2) | 85,537 | 79,572 | 4.65 % | 1/31/23 |
| | 245,988 | 232,989 | | |
| Less unamortized deferred issuance costs | (8,100) | (9,724) | | |
| | $ 237,888 | $ 223,265 | | |

(1)    On November 30, 2020, we issued $19,693 in additional bonds for $18,822 in net proceeds.

(2)    The bonds are collateralized by the assets of SPC.

(3)    The bonds are collateralized by a trust deed in Browning Place, a 625,297 square foot office building in Farmers Branch, Texas.

App. 1868

45

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

The aggregate maturities of our Bonds are as follows:

| Year | | Amount |
|------|---|-------:|
| 2021 | $ | 44,775 |
| 2022 | | 44,775 |
| 2023 | | 130,310 |
| 2024 | | 13,064 |
| 2025 | | 13,064 |
| | $ | 245,988 |

As of December 31, 2020, we were in compliance with our bond covenants.

## 12. Related Party Transactions

We engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions of real estate. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

Pillar and Regis are wholly owned by an affiliates of the MRHI, which also owns approximately 91% of ARL. Pillar is compensated for advisory services in accordance with an agreement. Regis receives property management fees and leasing commissions in accordance with the terms of its property-level management agreement. In addition, Regis is entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement.

Rental income includes $1,083, $841 and $737 for the years ended December 31, 2020, 2019 and 2018, respectively, for office space leased to Pillar and Regis.

Property operating expense includes $990, $991 and $943 for the years ended December 31, 2020, 2019 and 2018, respectively, for management fees on commercial properties payable to Regis.

General and administrative expense includes $3,869, $4,144 and $4,578 for the years ended December 31, 2020, 2019 and 2018, respectively, for employee compensation and other reimbursable costs payable to Pillar.

Advisor fees paid to Pillar were $8,648, $8,410 and $11,294 for the years ended December 31, 2020, 2019 and 2018, respectively.

Notes receivable are includes amounts held by UHF and Pillar (See Note 8 – Notes Receivable). UHF is determined to be a related party due to our significant investment in the performance of the collateral secured by the notes receivable. Interest income on these notes was $19,515, $17,413 and $13,132 for the years ended December 31, 2020, 2019 and 2018, respectively.

Interest expense on notes payable to Pillar was $1,581, $1,999 and $423 for the years ended December 31, 2020, 2019 and 2018, respectively.

Related party receivables represents amounts outstanding from Pillar for loans and advances, net of unreimbursed fees, expenses and costs as provided above.

App. 1869

## TRANSCONTINENTAL REALTY INVESTORS, INC.

### NOTES TO FINANCIAL STATEMENTS

**(Dollars in thousands, except per share amounts)**

### 13. Noncontrolling Interests

The noncontrolling interest represents the third party ownership interest in Income Opportunity Realty Investors, Inc. ("IOR"). Shares of of IOR are listed on the New York stock exchange under the symbol of IOR. We owned 18.9% in in IOR during the years ended December 31, 2020, 2019 and 2018.

### 14. Stockholders Equity

*Dividends:*

Our decision to declare dividends on common stock are determined on an annual basis following the end of each year. In accordance with that policy, no dividends on our common stock were declared for 2020, 2019, or 2018. Future distributions to common stockholders will be determined in light of conditions then existing, including our financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by our board of directors.

*Preferred Stock:*

In November 2006, we issued 100,000 shares of Series D Preferred Stock with a liquidation preference of $100 per share. The preferred stock is not convertible into any other security, requires dividends payable at the initial rate of 7% annually. The dividend rate increases ratably from 7% to 9% in future periods and can be redeemed at any point after September 30, 2011. During the year ended December 31, 2018, all 100,000 shares of Series D Preferred Stock were redeemed for $17,200, of which $7,200 was accrued unpaid dividends. At December 31, 2020, 2019 and 2018, there were no preferred shares outstanding.

### 15. Deferred Income

In previous years, we have sold properties to related parties where we have had continuing involvement in the form of management or financial assistance associated with the sale of the properties. Because of the continuing involvement associated with the sale, the sales criteria for the full accrual method is not met, and as such we have deferred some or all of the gain recognition and accounted for the sale by applying the finance, deposit, installment or cost recovery methods, as appropriate, until the sales criteria is met. The gains on these transactions have been deferred until the properties are sold to a non-related third party. As of December 31, 2020, we had a deferred gain of $9,315.

### 16. Income Taxes

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined on the basis of the differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date. We recognize deferred tax assets to the extent that we believe these assets are more likely than not to be realized. In making such a determination, we consider all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If we determine that we would be able to realize our deferred tax assets in the future in excess of their net recorded amount, we would make an adjustment to the deferred tax asset valuation allowance, which would reduce the provision for income taxes. We record uncertain tax positions on the basis of a two-step process whereby (1) we determine whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions that meet the more-likely-than-not recognition threshold, we recognize the largest amount of tax benefit that is more than 50 percent likely to be realized upon ultimate settlement with the related tax authority.

## TRANSCONTINENTAL REALTY INVESTORS, INC.

App. 1870

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

The (benefit) expense for income taxes consists of:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| Current: | | | |
| Federal | — | — | $ 42,805 |
| State | 4 | — | 1,210 |
| Deferred and Other: | | | |
| Federal | — | (2,000) | (40,805) |
| State | — | — | — |
| Total tax expense (benefit) | $ 4 | $ (2,000) | $ 3,210 |

The reconciliation between our effective tax rate on income from operations and the statutory rate is as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| Income tax (benefit) expense at federal statutory rate | $ 1,568 | $ (5,909) | $ 39,113 |
| State and local income taxes net of federal tax benefit | 4 | — | 1,210 |
| Permanent differences | (1,766) | (2,406) | (143) |
| Timing differences | | | |
| Installment note on land sale | — | — | (2,876) |
| Allowance for losses on note | — | — | (383) |
| Deferred gains | (878) | (588) | (9,417) |
| Basis difference on fixed assets | 1,307 | — | 23,675 |
| Other basis/timing differences | 2,296 | 3,173 | (7,164) |
| Generation (use) of net operating loss carryforwards | (2,527) | 3,730 | (40,805) |
| Calculated income tax expense (benefit) | $ 4 | $ (2,000) | $ 3,210 |
| Effective tax rate | — % | — % | 0.6 % |

We are subject to taxation in the United States and various states and foreign jurisdictions.  As of December 31, 2020, our tax years for 2019, 2018, and 2017 are subject to examination by the tax authorities.  With few exceptions, as of December 31, 2020, we are no longer subject to U.S federal, state, local, or foreign examinations by tax authorities for the years before 2016.

The 2020 and 2019 effective tax rate is driven primarily by the passing of the Tax Cuts and Jobs Act by congress on December 22, 2017.  This act reduced the statutory tax rate for corporations to 21%, starting in 2019. As a result, our tax assets were remeasured to reflect the new tax rate for future years with the impact on the 2018 provision for income taxes.

48

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

Components of the Net Deferred Tax Asset or Liability

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |

| | | |
|---|---:|---:|
| Cumulative foreign currency translation loss | $ 3,818 | 1,522 |
| Basis difference for fixed assets | 1,426 | — |
| Deferred gain | 1,956 | 1,988 |
| Net operating loss carryforward | 7,107 | 9,633 |
| | 14,307 | 13,143 |
| Less: valuation allowance | (14,307) | (6,480) |
| | $ — | $ 6,663 |
| | | |
| Deferred gain | $ — | $ — |
| Basis differences for fixed assets | — | 6,663 |
| Total Deferred Tax Liability | $ — | $ 6,663 |
| | | |
| Current net deferred tax asset | — | 6,663 |
| Long-term net deferred tax liability | — | (6,663) |
| | $ — | $ — |

We have state net operating losses in many of the various states in which we operate.

We assess the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. At December 31, 2020, we had a net deferred tax asset due to tax deductions available to us in future years. However, as we could not determine that it was more likely than not that we would realize the benefit of the deferred tax asset, we established a 100% valuation allowance.

## 17. Commitments and Contingencies

We believe that we will generate excess cash from property operations in the next twelve months; such excess, however, might not be sufficient to discharge all of our obligations as they become due. We intend to sell income-producing assets, refinance real estate and obtain additional borrowings primarily secured by real estate to meet our liquidity requirements.

We were the primary guarantor, on a $24,300 mezzanine loan between UHF and a lender. The guarantee was remove on January 29, 2021, concurrent with the repayment of the loan by UHF.

We were the plaintiff in a lawsuit against Dynex Commercial, Inc. ("Dynex") for failure to fulfill certain loan commitments. In January 2015, the court awarded us with a judgment of $24,800. We are pursuing all legal means to collect this award. However, due to the uncertainty of the collectability of the award, the receivable has been fully reserved.

In February 2019, we were charged in a lawsuit brought by Paul Berger ("Berger") that alleges that we completed improper sales and/or transfers of property with Income Opportunity Realty Investors, Inc. ("IOR"), our consolidated subsidiary. Berger requests that we pay off various related party loans to IOR and that IOR then distribute the funds to its shareholders. We intend to vigorously defend against the allegations.

In connection with the formation of VAA, ten of the properties that we contributed to the joint venture are subject to an earn-out provision that provides for a remeasurement of the value of those properties after a two-year period following the completion of construction. As of December 31, 2020, we have recorded a liability of $10,000, which we believe is the amount that will be required to settle our obligation. We have been unable to reach agreement with our joint venture partner on the remeasured value. As a result, the parties have filed for arbitration in accordance with the joint venture agreement.

49

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

## 18. Quarterly Results of Operations

The following is a tabulation of our quarterly results of operations for the years 2020, 2019 and 2018. Quarterly results presented may differ from

those previously reported in our Form 10-Q due to the reclassification of the operations.

|  | 2020 Quarter Ended | | | |
|---|---|---|---|---|
|  | March 31, | June 30, | September 30, | December 31, |
| Revenues | $ 12,753 | $ 13,431 | $ 12,159 | $ 18,679 |
| Net operating (loss) income | (3,146) | 635 | (1,537) | 4,020 |
| Net income (loss) attributable to the Company | 4,613 | (4,158) | 7,693 | (1,479) |
| Net income (loss) attributable to the Company per share - basic and diluted | $ 0.53 | $ (0.48) | $ 0.88 | $ (0.17) |

|  | 2019 Quarter Ended | | | |
|---|---|---|---|---|
|  | March 31, | June 30, | September 30, | December 31, |
| Revenues | $ 15,821 | $ 12,528 | $ 13,397 | $ 6,308 |
| Net operating income (loss) | 2,639 | (2,692) | 449 | (8,048) |
| Net (loss) income attributable to the Company | (5,609) | (6,345) | (7,787) | (7,179) |
| Net (loss) income attributable to the Company per share - basic and diluted | $ (0.64) | $ (0.73) | $ (0.89) | $ (0.83) |

## 19. Subsequent Events

The date to which events occurring after December 31, 2020, the date of the most recent balance sheet, have been evaluated for possible adjustments to the financial statements or disclosure is March 24, 2021, which is the date of which the financial statements were available to be issued. There are no subsequent events that would require an adjustment to the financial statements.

50

## TRANSCONTINENTAL REALTY INVESTORS, INC.

### NOTES TO FINANCIAL STATEMENTS

### (Dollars in thousands, except per share amounts)

### SCHEDULE III - REAL ESTATE AND ACCUMULATED DEPRECIATION
### December 31, 2020

| Property/Location | Encumbrances | Initial Cost Land | Initial Cost Buildings | Cost Capitalized Subsequent to Acquisition | Gross Amount Carried at End of Year Land | Gross Amount Carried at End of Year Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired |
|---|---|---|---|---|---|---|---|---|---|---|
| *Multifamily* | | | | | | | | | | |
| Chelsea | $ 8,194 | $ 1,225 | $ 11,230 | $ 6 | $ 1,231 | $ 11,230 | $ 12,461 | $ 596 | 1999 | 2018 |
| Forest Grove | 7,333 | 1,440 | 10,234 | 26 | 1,440 | 10,260 | 11,700 | 150 | 2020 | 2020 |
| Landing Bayou | 14,643 | 2,011 | 18,255 | 14 | 2,011 | 18,269 | 20,280 | 948 | 2005 | 2018 |
| Legacy at Pleasant Grove | 13,653 | 2,005 | 18,109 | — | 2,005 | 18,109 | 20,114 | 2,761 | 2006 | 2014 |
| Overlook at Allenville Phase II | 15,621 | 2,410 | 17,033 | 12 | 2,410 | 17,045 | 19,455 | 749 | 2012 | 2015 |
| Parc at Denham Springs Phase II | 16,128 | 1,505 | 16,975 | — | 1,505 | 16,975 | 18,480 | 449 | 2010 | 2009 |
| Sugar Mill Phase III | 9,298 | 576 | 9,755 | 7 | 576 | 9,762 | 10,338 | 138 | 2015 | 2015 |
| Toulon | 13,975 | 1,621 | 20,107 | 372 | 1,993 | 20,107 | 22,100 | 4,775 | 2011 | 2009 |
| Villas at Bon Secour | 10,280 | 2,715 | 15,385 | — | 2,715 | 15,385 | 18,100 | 929 | 2007 | 2018 |
| Vista Ridge | 9,979 | 1,339 | 13,398 | — | 1,339 | 13,398 | 14,737 | 2,241 | 2009 | 2015 |
|  | 119,104 | 16,847 | 150,481 | 437 | 17,225 | 150,540 | 167,765 | 13,736 | | |
| *Development* | | | | | | | | | | |
| Forest Pines | — | 3,600 | — | 301 | 3,600 | 301 | 3,901 | — | | 2020 |

App. 1873

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Heritage McKinney | — | 3,037 | — | 231 | 3,037 | 231 | 3,268 | — | | 2017 |
| | — | 6,637 | — | 532 | 6,637 | 532 | 7,169 | — | | |
| *Commercial* | | | | | | | | | | |
| 600 Las Colinas | 35,589 | 5,751 | 55,460 | 9,609 | 5,751 | 65,069 | 70,820 | 27,702 | 1984 | 2005 |
| 770 South Post Oak | 11,871 | 1,763 | 16,312 | 615 | 1,763 | 16,927 | 18,690 | 2,465 | 1970 | 2015 |
| Browning Place | 85,537 | 5,096 | 49,441 | 14,428 | 5,096 | 63,869 | 68,965 | 24,624 | 1984 | 2005 |
| Stanford Center | 39,093 | 20,278 | 25,876 | 6,223 | 20,278 | 32,099 | 52,377 | 13,817 | 2007 | 2008 |
| Other | — | 646 | 74 | — | 646 | 74 | 720 | 74 | | |
| | 172,090 | 33,534 | 147,163 | 30,875 | 33,534 | 178,038 | 211,572 | 68,682 | | |
| *Land* | | | | | | | | | | |
| Mercer Crossing | — | 5,406 | — | — | 5,406 | — | 5,406 | — | | 2008 |
| Windmill Farms | 10,397 | 43,973 | — | 4,329 | 48,302 | — | 48,302 | — | | 2011 |
| Other | 5,325 | 16,571 | — | 3,016 | 19,587 | — | 19,587 | — | | |
| | 15,722 | 65,950 | — | 7,345 | 73,295 | — | 73,295 | — | | |
| | $ 306,916 | $122,968 | $297,644 | $ 39,189 | $130,691 | $ 329,110 | $459,801 | $ 82,418 | | |

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**SCHEDULE III - REAL ESTATE AND ACCUMULATED DEPRECIATION**
**As of December 31, 2019**

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| Reconciliation of Real Estate | | | |
| Balance at January 1, | $ 477,963 | $ 463,732 | $ 1,165,662 |
| Additions | 21,223 | 92,964 | 175,996 |
| Deductions | (39,385) | (78,733) | (877,926) |
| Balance at December 31, | $ 459,801 | $ 477,963 | $ 463,732 |
| | | | |
| Reconciliation of Accumulated Depreciation | | | |
| Balance at January 1, | 90,173 | 79,228 | 177,546 |
| Additions | 12,188 | 13,379 | 22,761 |
| Deductions | (19,943) | (2,434) | (121,079) |
| Balance at December 31, | $ 82,418 | $ 90,173 | $ 79,228 |

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

App. 1874

**SCHEDULE IV - MORTGAGE LOANS**

**December 2020**

| Description | Interest Rate | Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount | Carrying Value |
|---|---|---|---|---|---|---|
| **Convertible loans** | | | | | | |
| Autumn Breeze | 5.00% | 7/1/2022 | No payments until maturity or conversion | $ — | $ 1,867 | $ 1,867 |
| Bellwether Ridge | 5.00% | 11/1/2021 | No payments until maturity or conversion | — | 3,858 | 3,858 |
| Forest Pines | 5.00% | 11/1/2022 | No payments until maturity or conversion | — | 2,869 | 2,869 |
| Parc at Ingleside | 5.00% | 12/1/2021 | No payments until maturity or conversion | — | 2,523 | 2,523 |
| Parc at Windmill Farms | 5.00% | 11/1/2022 | No payments until maturity or conversion | — | 7,803 | 7,803 |
| Plum Tree | 5.00% | 4/26/2026 | No payments until maturity or conversion | — | 857 | 857 |
| Spyglass of Ennis | 5.00% | 11/1/2022 | No payments until maturity or conversion | — | 5,360 | 5,360 |
| Steeple Crest | 5.00% | 8/1/2021 | No payments until maturity or conversion | — | 6,498 | 6,498 |
| | | | | — | 31,635 | 31,635 |
| **Land loans** | | | | | | |
| ABC Land and Development, Inc. | 9.50% | 6/30/2021 | No payments until maturity | — | 4,408 | 4,408 |
| ABC Paradise, LLC | 9.50% | 6/30/2021 | No payments until maturity | — | 1,210 | 1,210 |
| Lake Wales | 9.50% | 6/30/2021 | No payments until maturity | — | 3,000 | 3,000 |
| Legacy Pleasant Grove | 12.00% | 10/23/2022 | No payments until maturity | — | 496 | 496 |
| McKinney Ranch | 6.00% | 9/15/2022 | No payments until maturity | — | 4,554 | 4,554 |
| One Realco Land Holding, Inc. | 9.50% | 6/30/2021 | No payments until maturity | — | 1,728 | 1,728 |
| Riverview on the Park Land, LLC | 9.50% | 6/30/2021 | No payments until maturity | — | 1,045 | 1,045 |
| RNC Portfolio, Inc. | 5.00% | 9/1/2024 | No payments until maturity | — | 8,853 | 8,853 |
| Spartan Land | 12.00% | 1/16/2023 | No payments until maturity | — | 5,907 | 5,907 |
| | | | | — | 31,201 | 31,201 |
| **Subsidized housing** | | | | | | |
| Phillips Foundation for Better Living, Inc. | 12.00% | 3/31/2023 | Payments from excess property cash flows | — | 61 | 61 |
| Unified Housing Foundation, Inc. | 12.00% | 7/31/2021 | Payments from excess property cash flows | — | 2,880 | 2,880 |
| Unified Housing Foundation, Inc. | 12.00% | 8/30/2021 | Payments from excess property cash flows | — | 212 | 212 |
| Unified Housing Foundation, Inc. | 12.00% | 10/31/2021 | Payments from excess property cash flows | — | 6,831 | 6,831 |
| Unified Housing Foundation, Inc. | 12.00% | 12/31/2021 | Payments from excess property cash flows | — | 10,896 | 10,896 |
| Unified Housing Foundation, Inc. | 12.00% | 3/31/2022 | Payments from excess property cash flows | — | 10,096 | 10,096 |

53

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

App. 1875

| Description | Interest Rate | Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount | Carrying Value |
|---|---|---|---|---|---|---|
| Unified Housing Foundation, Inc. | 12.00% | 3/31/2023 | Payments from excess property cash flows | — | 6,990 | 6,990 |
| Unified Housing Foundation, Inc. | 12.00% | 5/31/2023 | Payments from excess property cash flows | — | 3,615 | 3,615 |
| Unified Housing Foundation, Inc. | 12.00% | 12/31/2032 | Payments from excess property cash flows | — | 19,139 | 19,139 |
| | | | | — | 60,720 | 60,720 |
| | | | | $ — | $ 123,556 | $ 123,556 |

54

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

**(Dollars in thousands, except per share amounts)**

**SCHEDULE IV - MORTGAGE LOANS**
**As of December 31,**

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| Balance at January 1, | $ 112,357 | $ 83,541 | $ 70,166 |
| Additions | 26,535 | 59,241 | 15,123 |
| Deductions | (15,336) | (30,425) | (1,748) |
| Balance at December 31, | $ 123,556 | $ 112,357 | $ 83,541 |

55

**ITEM 9.   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.   CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Principal Executive and Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e)) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Principal Executive and Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our Principal Executive and Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

App. 1876

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. There are inherent limitations to the effectiveness of any system of internal control over financial reporting. These limitations include the possibility of human error, the circumvention of overriding of the system and reasonable resource constraints. Because of its inherent limitations, our internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with policies or procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2020. In making this assessment, management used the criteria set forth in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Based on management's assessments and those criteria, management has concluded that Company's internal control over financial reporting was effective as of December 31, 2020.

This annual report does not include an attestation report of our registered public accounting firm regarding internal control over financial report. Management's report was not subject to attestation by our registered public accounting firm pursuant to temporary rules of the SEC that permit us to provide only management's report in this annual report.

**Changes in Internal Control over Financial Reporting**

In preparation for management's report on internal control over financial reporting, we documented and tested the design and operating effectiveness of our internal control over financial reporting. There were no changes in our internal controls over financial reporting (as such term is defined in Exchange Act Rule 13a-15(f)) that occurred during the quarter ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.    OTHER INFORMATION**

Not applicable.

56

**PART III**

**ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

**Directors**

The affairs of the Company are managed by our Board of Directors. The Directors are elected at the annual meeting of stockholders or appointed by the incumbent Board and serve until the next annual meeting of stockholders or until a successor has been elected or approved.

An objective is for a majority of our Board to be independent directors. For a director to be considered independent, the Board must determine that the director does not have any direct or indirect material relationship with the Company. The Board has established guidelines to assist it in determining director independence which conform to, or are more exacting than, the independence requirements in the New York Stock Exchange ("NYSE") listing rules. The independence guidelines are set forth in our "Corporate Governance Guidelines". The text of this document has been posted on our internet website at www.transconrealty-invest.com ("Investor Relations Website") and is available in print to any shareholder who requests it. In addition to applying these guidelines, the Board will consider all relevant facts and circumstances in making an independence determination.

We have adopted a code of conduct that applies to all Directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Stockholders may find our code of conduct on our website by going to our Investor Relations Website. We will post any amendments to the code of conduct, as well as any waivers that are required to be disclosed by the rules of the Security Exchange Commission (the "SEC") or the NYSE on our website.

Our Board of Directors has adopted charters for our Audit, Compensation and Governance and Nominating Committees of the Board of Directors. Stockholders may find these documents on our website by going to our Investor Relations Website. You may also obtain a printed copy of the materials referred to by contacting us at the following address:

App. 1877

Transcontinental Realty Investors, Inc.
Attn: Investor Relations
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Telephone: 469-522-4200

All members of the Audit Committee and Nominating and Corporate Governance Committees must be independent directors. Members of the Audit Committee must also satisfy additional independence requirements, which provide (i) that they may not accept, directly or indirectly, any consulting, advisory, or compensatory fee from the Company or any of its subsidiaries other than their director's compensation (other than in their capacity as a member of the Audit Committee, the Board of Directors, or any other committee of the Board), and (ii) no member of the Audit Committee may be an "affiliated person" of the Company or any of its subsidiaries, as defined by the SEC.

Our current directors are listed below, together with their ages, terms of service, all positions and offices with us and our current advisor, Pillar, their principal occupations, business experience and directorships with other companies during the last five years or more. The designation "affiliated", when used below with respect to a director, means that the director is an officer, director or employee of Pillar, an officer of the Company, or an officer or director of a related party of the Company. The designation "independent", when used below with respect to a Director, means that the Director is neither an officer of the Company nor a director, officer or employee of Pillar (but may be a director of the Company, although the Company may have certain business or professional relationships with such Director as discussed in Item 13. Certain Relationships and Related Transactions, and Director Independence.

HENRY A. BUTLER, age 70, Director, Affiliated, since November 2005 and Chairman of the Board since May 2009

Retired (since April 30, 2019); Mr. Butler served as Vice President for Pillar from April 2011 to April 30, 2019. Mr. Butler has been a Director of the Company since November 2005 and Chairman of the Board since May 2009. He also served as Chairman of the Board since May 2009 and as a Director since July 2003 of ARL and Chairman of the Board since May 2011 and a Director since February 2011 of IOR.

<center>57</center>

WILLIAM J. HOGAN, age 63, Director, Independent, since February 2020

Registered Representative and Investment Advisor Representative, employed (since January 2013) by Cetera Advisor Networks LLC, a general securities and investment advisory firm, with an office in San Antonio, Texas. From November 2009 through December 2012, Mr. Hogan was a registered representative, employed by Financial Network Investment Corp. in San Antonio, Texas. He holds Series 7 (General Securities Representative), Series 63 (Uniform Securities Agent State Law) and Series 65 (Investment Advisor) licenses issued by Financial Industry Regulatory Authority ("FINRA"). Mr. Hogan was elected as a director of the Company and ARL on January 28, 2020 effective February 1, 2020.

ROBERT A. JAKUSZEWSKI, age 58, Director, Independent, since November 2005

Mr. Jakuszewski is currently has served as a Territory Manager for Artesa Labs since April 2015. He was a Medical Specialist from January 2014 to April 2015 for VAYA Pharma, Inc., Senior Medical Liaison from January 2013 to July 2013 for Vein Clinics of America, and the Vice President of Sales and Marketing from September 1998 to December 2012 for New Horizons Communications, Inc. Mr. Jakuszewski has been a Director of the Company since November 2005. He has also been a Director of ARL since November 2005 and a Director of IOR since March 2004.

TED R. MUNSELLE, age 64, Director, Independent, since February 2004

Mr. Munselle has been Vice President and Chief Financial Officer of Landmark Nurseries, Inc. since October 1998. On February 17, 2012, he was appointed as a member of the Board of Directors for Spindletop Oil & Gas Company and as Chairman of their Audit Committee. Spindletop's stock is traded on the Over-the-Counter (OTC) market. Mr. Munselle has been a Director of the Company since February 2004. He has also served as Director of ARL since February 2004 and Director of IOR since March 2009. Mr. Munselle is qualified as an Audit Committee financial expert within the meaning of SEC regulations and the Board of Directors has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the NYSE. Mr. Munselle is a Certified Public Accountant.

BRADFORD A. PHILLIPS, age 55, Director, since March 2021

Mr. Phillips has been the Chief Executive Officer and Chairman of LBL Group of Insurance Companies since 1999. He has served as President

<div align="right">App. 1878</div>

of Midland Securities, LLC a Dallas, TX based broker/dealer since 2002. Prior to joining LBL Group, he served as President of InterFirst Capital Corporation of Los Angeles, California. Mr. Phillips holds a number of securities licenses, including the Series 4 (Options Principal), Series 7 (General Securities License), Series 24 (General Securities Principal), Series 27 (Financial and Operations Principal), Series 53 (Municipal Securities Principal), Series 55 (Equity Trading Principal), and Series 63 (Blue Sky Securities License). He has also been a Director of ARL since March 2021.

RAYMOND D. ROBERTS, SR.., age 89, Director, Independent, since June 2016

Mr. Roberts is currently retired. Mr. Roberts has served as Director of the Company since June 2, 2016. He has also served as Director of ARL and IOR since June 2, 2016. For more than five years prior to December 31, 2014, he was Director of Aviation of Steller Aviation, Inc., a privately held corporation engaged in the business of aircraft (Boeing 737) and logistical management.

**Board Meetings and Committees**

The Board of Directors held five meetings during 2020. For such year, no incumbent director attended fewer than 75% of the aggregate of (1) the total number of meetings held by the Board during the period for which he or she had been a director and (2) the total number of meetings held by all committees of the Board on which he or she served during the period that he served. Under our Corporate Governance Guidelines, each Director is expected to dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties, including by attending meetings of the stockholders of the Company, the Board and Committees of which he is a member. The Board of Directors has standing Audit, Compensation and Governance and Nominating Committees.

The members of the Board of Directors on the date of this Report and the Committees of the Board on which they serve are identified below:

| Director | Audit Committee | Governance and Nominating Committee | Compensation Committee |
|---|---|---|---|
| Henry A. Butler | | | |
| William J. Hogan | X | X | X |
| Robert A. Jakuszewski | X | Chair | X |
| Ted R. Munselle | Chair | X | X |
| Bradford A. Phillips | | | |
| Raymond D. Roberts, Sr. | X | X | Chair |

Audit Committee.    The Audit Committee is responsible for review and oversight of our operating and accounting procedures. Our Audit Committee charter is available on our Investor Relations website (www.transconrealty-invest.com). The Audit Committee is an "audit committee" for purposes of Section 3(a)(58) of the Exchange Act. All of the current members of the Audit Committee are independent within the meaning of the SEC Regulations, the listing standards of the NYSE and our Corporate Governance Guidelines. Mr. Ted R. Munselle, a the chairman of our Audit Committee, is qualified as an Audit Committee financial expert within the meaning of SEC Regulations, and the Board has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the NYSE. All of the members of the Audit Committee meet the experience requirements of the listing standards of the NYSE. The Audit Committee met five times during 2020.

Governance and Nominating Committee.    The Governance and Nominating Committee is responsible for developing and implementing policies and practices relating to corporate governance, including reviewing and monitoring implementation of our Corporate Governance Guidelines. In addition, the Committee develops and reviews background information on candidates for the Board and makes recommendations to the Board regarding such candidates. The Committee also prepares and supervises the Board's annual review of director independence and the Board's performance self-evaluation. The Charter of the Governance and Nominating Committee was adopted on March 17, 2004 and is available on our Investor Relations Website. The Governance and Nominating Committee met two during 2020.

Compensation Committee.    The Compensation Committee is responsible for overseeing the policies of the Company relating to compensation to be paid by the Company to our principal executive officer and any other officers designated by the Board and make recommendations to the Board with respect to such policies, produce necessary reports and executive compensation for inclusion in our Proxy Statement in accordance with applicable rules and regulations and to monitor the development and implementation of succession plans for the principal executive officers and other key executives and make recommendations to the Board with respect to such plans. The charter of our Compensation Committee is available on our

App. 1879

Investor Relations Website. All of the members of the Compensation Committee are independent within the meaning of the listing standards of the NYSE and our Corporate Governance Guidelines. The Compensation Committee is to be comprised of at least two directors who are independent of Management and the Company. The Compensation Committee met two during 2020.

### Presiding Director

The primary responsibility of our presiding director is to preside over periodic executive sessions of the Board in which Management directors and other members of Management do not participate. The presiding director also advises the Chairman of the Board and, as appropriate, Committee Chairs with respect to agendas and information needs relating to Board and Committee meetings, provides advice with respect to the selection of Committee Chairs and performs other duties that the Board may from time to time delegate to assist the Board in fulfillment of its responsibilities.

The day following the annual meeting of stockholders held December 16, 2020 representing all stockholders of record dated November 2, 2020, the full Board met and re-appointed Ted R. Munselle as Presiding Director, to serve in such position until the Company's next annual meeting of stockholders to be held subsequently in 2021.

<div align="center">59</div>

### Determination of Director's Independence

Our Corporate Governance Guidelines ("Guideines") meet or exceed the new listing standards adopted during that year by the NYSE. The full text of our Guideines can be found on our Investor Relations Website.

Pursuant to the Guideines, the Board undertook its annual review of director independence in February 2020 and during this review, the Board considered transactions and relationships between each director or any member of his or her immediate family and the Company and its subsidiaries and related parties, including those reported under Certain Relationships and Related Transactions below. The Board also examined transactions and relationship between directors or their related parties and members of our senior management or their related parties. As provided in the Guideines, the purpose of such review was to determine whether such relationships or transactions were inconsistent with the determination that the director is independent. Prior to this election as director, on January 28, 2020, the Board undertook a similar review with respect to Mr. Hogan.

As a result of these reviews, the Board affirmatively determined of the then directors, Messrs. Munselle, Hogan, Jakuszewski and Roberts are each independent of the Company and its Management under the standards set forth in the Corporate Governance Guidelines.

### Executive Officers

Executive officers of the Company are listed below, all of whom are employed by Pillar. None of the executive officers receive any direct remuneration from the Company nor do any hold any options granted by the Company. Their positions with the Company are not subject to a vote of stockholders. In addition to the following executive officers, the Company has several vice presidents and assistant secretaries who are not listed herein. The ages, terms of service and all positions and offices with the Company, Pillar, other related entities, other principal occupations, business experience and directorships with other publicly-held companies during the last five years or more are set forth below. No family relationships exist among any of the executive officers or directors of the Company.

ERIK L. JOHNSON, 53

Mr. Johnson has served as the Executive Vice President and Chief Financial Officer of the Company and ARL since August 17, 2020. He has also been Chief Financial Officer of Pillar since June 29, 2020. Prior to joining the Company, he served as Vice President of Financial Reporting at Macerich (NYSE: MAC) and has served as the Chief Accounting Officer of North American Scientific, Inc. He began his career as an auditor with PricewaterhouseCooppers and is a CPA.

LOUIS J. CORNA, 73

Mr. Corna has served as Executive Vice President, General Counsel/Tax Counsel and Secretary of the Company, ARL and IOR since February 2004. He has also been Executive Vice President since March 2011 and Secretary since December 2010 of Pillar. Mr. Corna was also a Director and Vice President from June 2004 to December 2010 and Secretary from January 2005 to December 2010 of First Equity Properties, Inc.

ALLA DZYUBA, 44

Mrs. Dzyuba has served as the Vice President and Chief Accounting Officer of the Company, ARL, and Southern Properties Capital, LLC, our wholly owned subsidiary ("SPC"), since July 2019 as well as Director for SPC since April 2018. Mrs. Dzyuba has been employed by Pillar since June 2004, she has over fifteen years of real estate accounting and financial reporting experience, including six years of broker-dealer regulatory reporting experience.

In addition to the foregoing executive officers, we have several vice presidents and assistant secretaries that are not listed herein. Since the August 14, 2020 resignation of Daniel J. Moos, age 70, the offices of President and Chief Executive Officer has been vacant. Mr. Moos was President (from April 2007 and August 14, 2020) and Chief Executive Officer (from March 2010 until August 14, 2020). At the time of his resignation, Mr. Moos advised that his resignation was not the result of any disagreement with the Company, its management, the Board of Directors, or any committee of the Board with respect to procedure, policies or operations.

<div style="text-align:center">60</div>

## Code of Ethics

We have adopted a code of ethics entitled "Code of Business Conduct and Ethics" that applies to all directors, officers, and employees (including those of our Advisor). In addition, we have adopted a code of ethics entitled "Code of Ethics for Senior Financial Officers" that applies to the principal executive officer, president, principal financial officer, chief financial officer, chief accounting officer, and controller. The text of these documents has been posted on our Investor Relations Website and are available in print to any stockholder who requests them.

## Compliance with Section 16(a) of the Exchange Act

Under the securities laws of the United States, the directors, executive officers, and any persons holding more than 10% of our shares of Common stock are required to report their share ownership and any changes in that ownership to the SEC. Specific due dates for these reports have been established and we are required to report any failure to file by these dates. All of these filing requirements were satisfied by our directors, executive officers, and 10% holders during the fiscal year ending December 31, 2020. In making these statements, we have relied on the written representations of our incumbent directors and executive officers, 10% holders and copies of the reports that they have filed with the SEC.

## The Advisor

Pillar has been our Advisor and Cash Manager since April 30, 2011. Although the Board of Directors is directly responsible for managing the affairs of the Company, and for setting the policies which guide it, our day-to-day operations are performed by Pillar, as the contractual advisor, under the supervision of the Board. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors. Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with our business plan and investment policy. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". We have no employees and as such, employees of Pillar render services to us in accordance with the terms of the Advisory Agreement.

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the MRHI. The beneficiaries of the MRHI are the children of the late Gene E. Phillips.

Under the Advisory Agreement, Pillar is required to annually formulate and submit, for Board approval, a budget and business plan containing a twelve-month forecast of operations and cash flow, a general plan for asset sales and purchases, lending, foreclosure and borrowing activity, and other investments. Pillar is required to report quarterly to the Board on TCI's performance against the business plan. In addition, all transactions require prior Board approval, unless they are explicitly provided for in the approved business plan or are made pursuant to authority expressly delegated to Pillar by the Board.

The Advisory Agreement also requires prior Board approval for the retention of all consultants and third party professionals, other than legal counsel. The Advisory Agreement provides that Pillar shall be deemed to be in a fiduciary relationship to our stockholders; contains a broad standard governing Pillar's liability for losses incurred by us; and contains guidelines for Pillar's allocation of investment opportunities as among itself, the Company and other entities it advises. Pillar is a company of which Messrs. Johnson and Corna serve as executive officers, and for which Mr. Moos previously served as an executive officer.

The Advisory Agreement provides for Pillar to be responsible for our day-to-day operations and to receive, as compensation for basic

management and advisory services, a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value (total assets less allowance for amortization, depreciation or depletion and valuation reserves).

In addition to base compensation, Pillar receives the following forms of additional compensation:

(1)  an annual net income fee equal to 7.5% of our net income as an incentive for successful investment and management of our assets;

(2)  an annual incentive sales fee to encourage periodic sales of appreciated real property at optimum value equal to 10.0% of the amount, if any, by which the aggregate sales consideration for all real estate sold by us during such fiscal year exceeds the sum of:

(a)  the cost of each such property as originally recorded in our books for tax purposes (without deduction for depreciation, amortization or reserve for losses);

(b)  capital improvements made to such assets during the period owned; and

(c)  all closing costs (including real estate commissions) incurred in the sale of such real estate; provided however, no incentive fee shall be paid unless (a) such real estate sold in such fiscal year, in the aggregate, has produced an 8.0% simple annual return on the net investment including capital improvements, calculated over the holding period before depreciation and inclusive of operating income and sales consideration, and (b) the aggregate net operating income from all real estate owned for each of the prior and current fiscal years shall be at least 5.0% higher in the current fiscal year than in the prior fiscal year;

(3)  an acquisition commission, from an unaffiliated party of any existing mortgage or loan, for supervising the acquisition, purchase or long-term lease of real estate equal to the lesser of:

(a)  up to 1.0% of the cost of acquisition, inclusive of commissions, if any, paid to non-affiliated brokers; or

(b)  the compensation customarily charged in arm's-length transactions by others rendering similar property acquisition services as an ongoing public activity in the same geographical location and for comparable property, provided that the aggregate purchase price of each property (including acquisition fees and real estate brokerage commissions) may not exceed such property's appraised value at acquisition;

(4)  a construction fee equal to 6.0% of the so-called "hard costs" only of any costs of construction on a completed basis, based upon amounts set forth as approved on any architect's certificate issued in connection with such construction, which fee is payable at such time as the applicable architect certifies other costs for payment to third parties. The phrase "hard costs" means all actual costs of construction paid to contractors, subcontractors and third parties for materials or labor performed as part of the construction but does not include items generally regarded as "soft costs," which are consulting fees, attorneys' fees, architectural fees, permit fees and fees of other professionals; and

(5)  reimbursement of certain expenses incurred by the advisor in the performance of advisory services.

The Advisory Agreement also provides that Pillar receive the following forms of compensation:

(1)  a mortgage or loan acquisition fee with respect to the acquisition or purchase from an unaffiliated party of any existing mortgage loan by us equal to the lesser of:

(a)  1.0% of the amount of the mortgage or loan purchased; or

(b)  a brokerage or commitment fee which is reasonable and fair under the circumstances. Such fee will not be paid in connection with the origination or funding of any mortgage loan by us; and

(2)  a mortgage brokerage and equity refinancing fee for obtaining loans or refinancing on properties equal to the lesser of:

(a)  1.0% of the amount of the loan or the amount refinanced; or

(b)  a brokerage or refinancing fee which is reasonable and fair under the circumstances; provided, however, that no such fee shall

be paid on loans from Pillar, or a related party of Pillar, without the approval of our Board of Directors. No fee shall be paid on loan extensions.

Under the Advisory Agreement, all or a portion of the annual advisory fee must be refunded by the Advisor if our operating expenses (as defined in the Advisory Agreement) exceed certain limits specified in the Advisory Agreement based on our book value, net asset value and net income during the fiscal year.

The Advisory Agreement requires Pillar to pay us, one-half of any compensation received from third parties with respect to the origination, placement or brokerage of any loan made by us; provided, however, that the compensation retained by Pillar, or

62

any affiliate of Pillar, shall not exceed the lesser of (1) 2.0% of the amount of the loan commitment or (2) a loan brokerage and commitment fee which is reasonable and fair under the circumstances.

The Advisory Agreement further provides that Pillar shall bear the cost of certain expenses of its employees, excluding fees paid to our Directors; rent and other office expenses of both Pillar and us (unless we maintains office space separate from that of Pillar); costs not directly identifiable to our assets, liabilities, operations, business or financial affairs; and miscellaneous administrative expenses relating to the performance by Pillar of its duties under the Advisory Agreement.

If and to the extent that we request Pillar, or any director, officer, partner, or employee of Pillar, to render services for us other than those required to be rendered by the Advisory Agreement, Pillar separately would be compensated for such additional services on terms to be agreed upon between such party and us from time to time. As discussed below, under "Property Management and Real Estate Brokerage," Regis Realty Prime, LLC, ("Regis") manages our commercial properties and provides brokerage services.

We have a Cash Management Agreement with Pillar that provides that all of our funds are delivered to Pillar which has a deposit liability to us and is responsible for payment of all payables and investment of all excess funds which earn interest at the Wall Street Journal prime rate plus 1.0% per annum, as set quarterly on the first day of each calendar quarter. Borrowings for our benefit bear the same interest rate. The term of the Cash Management Agreement is coterminous with the Advisory Agreement, and is automatically renewed each year unless terminated with the Advisory Agreement. We believe that the terms of the Advisory Agreement are at least as fair as could be obtained from unaffiliated third parties.

Situations may develop in which our interests are in conflict with those of one or more directors or officers in their individual capacities, or of Pillar, or of their respective related parties. In addition to services performed for us, as described above, Pillar actively provides similar services as agent for, and advisor to, other real estate enterprises, including persons and entities involved in real estate development and financing, including ARL and IOR. The Advisory Agreement provides that Pillar may also serve as advisor to other entities.

As advisor, Pillar is a fiduciary of our public investors. In determining to which entity a particular investment opportunity will be allocated, Pillar will consider the respective investment objectives of each entity and the appropriateness of a particular investment in light of each such entity's existing mortgage note and real estate portfolios and business plan. To the extent any particular investment opportunity is appropriate to more than one such entity, such investment opportunity will be allocated to the entity that has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among various entities. Refer to Part III, Item 13 "Certain Relationships and Related Transactions, and Director Independence".

Pillar may assign the Advisory Agreement only with our prior consent.

The principal executive officers and directors of Pillar are set forth below:

| Name | Officers |
|---|---|
| Erik L. Johnson | Chief Financial Officer |
| Gina H. Kay | Executive Vice President and Chief Accounting Officer |
| Louis J. Corna | Executive Vice President and Secretary |

**Property Management**

Regis manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

App. 1883

We engage third party companies to lease and manage our apartment properties for a fee of 6.0% or less of the monthly gross rents collected on the residential properties under their management.

**Real Estate Brokerage**

Regis provides real estate brokerage services to us on a non-exclusive basis, and is entitled to receive a real estate commission for property purchases and sales in accordance with the following sliding scale of total fees to be paid:

(1)    maximum fee of 4.5% on the first $2.0 million of any purchase or sale transaction of which no more than 3.5% is to be paid to Regis;

(2)    maximum fee of 3.5% on transaction amounts between $2.0 million to $5.0 million of which no more than 3.0% is to be paid to Regis;

(3)    maximum fee of 2.5% on transaction amounts between $5.0 million to $10.0 million of which no more than 2.0% is to be paid to Regis; and

(4)    maximum fee of 2.0% on transaction amounts in excess of $10.0 million of which no more than 1.5% is to be paid to Regis.

## ITEM 11.    EXECUTIVE COMPENSATION

We have no employees, payroll or benefit plans and pay no compensation to our executive officers. Our executive officers are also officers and employees of Pillar, our Advisor, and are compensated by Pillar. Such executive officers perform a variety of services for Pillar and the amount of their compensation is determined solely by Pillar. Pillar does not allocate the cash compensation of its officers among the various entities for which it serves as advisor. Refer to Item 10. "Directors, Executive Officers and Corporate Governance" for a more detailed discussion of the compensation payable to Pillar by us.

The only remuneration paid by us is to our directors who are not officers or employees of Pillar or its related companies. The Independent Directors (1) review our business plan to determine that it is in the best interest of our stockholders, (2) review the advisory contract, (3) supervise the performance of the advisor and review the reasonableness of the compensation paid to the advisor in terms of the nature and quality of services performed, (4) review the reasonableness of our total fees and expenses and (5) select, when necessary, a qualified independent real estate appraiser to appraise properties acquired.

Each non-affiliated Director is entitled to receive an annual retainer of $12,000, with the Chairman of the Audit Committee to receive a one-time annual fee of $500. Directors who are also employees of the Company or its advisor receive no additional compensation for service as a Director.

During 2020, $54,300 was paid to non-employee Directors in total Directors' fees. The fees paid to the directors are as follows: Henry A. Butler $5,800; William J. Hogan, $12,000;Robert A. Jakuszewski, $12,000; Ted R. Munselle, $12,500 and Raymond D. Roberts, Sr., $12,000.

## ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

**Security Ownership of Certain Beneficial Owners**

The following table sets forth the ownership of our common stock, both beneficially and of record, both individually and in the aggregate, for

those persons or entities known to be beneficial owners of more than 5.0% of the outstanding shares of our common stock as of the close of business on March 24, 2021.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** | |
|---|---|---|---|
| **American Realty Investors, Inc.(1)(2)** 1603 LBJ Freeway, Suite 800 Dallas, Texas 75234 | 6,771,718 | 78.4 | % |
| **Transcontinental Realty Acquisition Corporation(2)** 1603 LBJ Freeway, Suite 800 Dallas, Texas 75234 | 1,383,226 | 16.0 | % |
| **Realty Advisors, LLC (3)** 1603 LBJ Freeway, Suite 800 Dallas, Texas 75234 | 621,728 | 7.2 | % |

\* "Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\* Percentage is based upon 8,639,516 shares of Common stock outstanding at March 24, 2021.

(1) Includes 5,383,192 shares (62.3%) directly owned by American Realty Investors, Inc.

(2) Includes 1,383,226 shares owned by Transcontinental Realty Acquisition Corporation, which is a wholly-owned subsidiary of ARL.

(3) Includes 341,200 shares owned by RAI and 280,528 shares owned by Arcadia Energy, Inc., which is a wholly-owned subsidiary of RAI.

**Security Ownership of Management.**

The following table sets forth the ownership of our common stock, both beneficially and of record, both individually and in the aggregate, for our directors and executive officers as of the close of business on March 24, 2021.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** | |
|---|---|---|---|
| Henry A. Butler | — | — | % |
| Louis J. Corna | — | — | % |
| Alla Dzyuba | — | — | % |
| William J. Hogan | — | — | % |
| Erik L. Johnson | — | — | % |
| Robert A. Jakuszewski | — | — | % |
| Ted R. Munselle | — | — | % |
| Bradford A. Phillips | — | — | % |
| Raymond D. Roberts, Sr. | — | — | % |
| All Directors and Executive Officers as a group (7 individuals) | — | — | % |

\* Beneficial Ownership" means the sole power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\* Percentages are based upon 8,639,516 shares of Common Stock outstanding at March 24, 2021.

65

## ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

**Policies with Respect to Certain Activities**

Article 14 of our Articles of Incorporation provides that we shall not, directly or indirectly, contract or engage in any transaction with (1) any director, officer or employee of the Company, (2) any director, officer or employee of the advisor, (3) the advisor, or (4) any affiliate or associate (as such terms are defined in Rule 12b-2 under the Exchange Act of any of the aforementioned persons, unless (a) the material facts as to the relationship

App. 1885

among or financial interest of the relevant individuals or persons and as to the contract or transaction are disclosed to, or are known by our Board of Directors or the appropriate committee thereof and (b)our Board of Directors or committee thereof determines that such contract or transaction is fair to the Company and simultaneously authorizes or ratifies such contract or transaction by the affirmative vote of a majority of our independent directors entitled to vote thereon.

Article 14 defines an "Independent Director" (for purposes of that Article) as one who is neither an officer or employee of the Company, nor a director, officer or employee of our advisor.

Our policy is to have such contracts or transactions approved or ratified by a majority of the disinterested Directors with full knowledge of the character of such transactions, as being fair and reasonable to the stockholders at the time of such approval or ratification under the circumstances then prevailing. Such Directors also consider the fairness of such transactions to the Company. We believes that, to date, such transactions have represented the best investments available at the time and they were at least as advantageous to us as other investments that could have been obtained.

We may enter into future transactions with entities, the officers, directors, or stockholders of which are also officers, directors, or stockholders of the Company, if such transactions would be beneficial to our operations and consistent with our then-current investment objectives and policies, subject to approval by a majority of disinterested Directors as discussed above.

We do not prohibit its officers, directors, stockholders, or related parties from engaging in business activities of the types conducted by the Company.

### Certain Business Relationships

Pillar is our Advisor and Cash Manager since April 30, 2011.  Although the Board of Directors is directly responsible for managing our affairs, and for setting the policies which guide it, our day-to-day operations are performed by Pillar, as the contractual advisor, under the supervision of the Board.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors.  Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with our business plan and investment policy.  Pillar also serves as an Advisor and Cash Manager to ARL and IOR.  As the contractual advisor, Pillar is compensated under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  We have no employees and as such, employees of Pillar render services to us in accordance with the terms of the Advisory Agreement.

Pillar is owned by Realty Advisors, LLC, which is owned by RAI, which is owned by MRHI, which is owned by the May Trust.

All of our directors also serve as Directors of ARL and IOR. Our executive officers also serve as executive officers of ARL. As such, they owe fiduciary duties to that entity as well as to Pillar under applicable law. ARL has the same relationship with Pillar, as does the Company. Mr. Daniel J. Moos is the sole Manager and Class B 2% income Member of Victory Abode Apartments LLC, and until August 2020, was the President of ARL, TCI and IOR.

Effective since January 1, 2011, Regis manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

At December 31, 2020, we owned approximately 81.1% of the outstanding common shares of IOR.

We are part of a tax sharing and compensating agreement with respect to federal income taxes among ARL, TCI and IOR and their subsidiaries. In accordance with the agreement, our expense (benefit) in each year is calculated based on the amount of losses absorbed by taxable income multiplied by the maximum statutory tax rate of 21%.

66

We have a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. We have also invested in surplus cash notes receivables from UHF and have sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

### Related Party Transactions

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not

limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interest of our company.

In 2020, we paid Pillar advisory fees of $5.8 million, net income fees of $0.4 million and cost reimbursements of $3.6 million.

We paid property management fees, construction management fees and leasing commissions of $1.0 million to Regis in 2020.  In addition, SPC is part of a management service agreement with the controlling shareholder owned company in which SPC for an annual payment of 0.5% on the value of the investment properties receives from the Advisor office space, administrative and management services. During 2020, SPC paid management fees to Pillar in the amount of $2.5 million.

As of December 31, 2020, the we had notes and interest receivables of $63.3 million and $3.9 million, respectively, due from related parties. Refer to Part 2, Item 8. Note 8 – Notes Receivable of our consolidated financial statements. During the current period, we recognized interest income of $6.3 million, originated $10.9 million, received $1.3 million principal payments, and received interest payments of $6.8 million from these related party notes receivables.

We were the primary guarantor, on a $24.3 million mezzanine loan between UHF and a lender. The guarantee was remove on January 29, 2021, concurrent with the repayment of the loan by UHF.

We received rental revenue $1.1 million,for the years ended December 31, 2020 for office space leased to Pillar and Regis.

From time to time, we have made advances and/or borrowing to/fom other related parties, which generally have not had specific repayment terms, did not bear interest, are unsecured, and have been reflected our financial statements as other assets or other liabilities. We charge interest on the outstanding balance of funds advanced from us. The interest rate, set at the beginning of each quarter, is the prime rate plus 1.0% on the average daily cash balances advanced. At December 31, 2020, we had a receivable from ARL in the amount of $142.1 million.

### Director Independence

See "Determination of Director Independence" under Item 10 above to which reference is made.

## ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES

For the years ended December 31, 2020 and 2019, we were billed by Farmer, Fuqua and Huff, L.P. for services in the following categories:

Audit Fees. Fees for audit services were $198,250 and $227,755 for the years ended December 31, 2020 and 2019, respectively. These are fees for professional services performed by the principal auditor for the audit of the Company's annual financial statements and review of financial statements included in the Company's 10-Q filings and services that are normally provided in connection with statutory and regulatory filing or engagement.

Audit-Related Fees. No fees for audit-related services were paid for the years ended December 31, 2020 and 2019.  These are fees for assurance and related services performed by the principal auditor that are reasonably related to the performance of the audit or review of the Company's financial statements. These services include attestations by the principal auditor that are not required by statute or regulation and consulting on financial accounting/reporting standards.

Tax Fees. Fees for tax services were $11,850 and $12,377 for the years ended December 31, 2020 and 2019, respectively.. These are fees for professional services performed by the principal auditor with respect to tax compliance, tax planning, tax consultation, returns preparation and review of returns. The review of tax returns includes the Company and its consolidated subsidiaries.

All Other Fees. No other fees were paid for the years ended December 31, 2020 and 2019. These are fees for other permissible work performed by the principal auditor that do not meet the above category descriptions.

All services rendered by the principal auditors are permissible under applicable laws and regulations and were pre-approved by either the Board of Directors or the Audit Committee, as required by law. The fees paid to the principal auditors for the services described in the above table fall under the categories listed below:

App. 1887

These services are actively monitored (as to both spending level and work content) by the Audit Committee to maintain the appropriate objectivity and independence in the principal auditor's core work, which is the audit of the Company's consolidated financial statements.

The Audit Committee has established policies and procedures for the approval and pre-approval of audit services and permitted non-audit services. The Audit Committee has the responsibility to engage and terminate our independent auditors, to pre-approve their performance of audit services and permitted non-audit services, to approve all audit and non-audit fees, and to set guidelines for permitted non-audit services and fees. All fees for 2020 and 2019 were pre-approved by the Audit Committee or were within the pre-approved guidelines for permitted non-audit services and fees established by the Audit Committee, and there were no instances of waiver of approved requirements or guidelines during the same periods.

Our Audit Committee has adopted a pre-approval policy of audit and non-audit services (the "Policy"), which sets forth the procedures and conditions pursuant to which services to be performed by the independent auditor are to be pre-approved. Consistent with the SEC rules establishing two different approaches to pre-approving non-prohibited services, the Policy of the Audit Committee covers Pre-approval of audit services, audit-related services, international administration tax services, non-U.S. income tax compliance services, pension and benefit plan consulting and compliance services, and U.S. tax compliance and planning. At the beginning of each fiscal year, the Audit Committee will evaluate other known potential engagements of the independent auditor, including the scope of work proposed to be performed and the proposed fees, and will approve or reject each service, taking into account whether services are permissible under applicable law and the possible impact of each non-audit service on the independent auditor's independence from management. Typically, in addition to the generally pre-approved services, other services would include due diligence for an acquisition that may or may not have been known at the beginning of the year. The Audit Committee has also delegated to any member of the Audit Committee designated by the Board or the financial expert member of the Audit Committee responsibilities to pre-approve services to be performed by the independent auditor not exceeding $25,000 in value or cost per engagement of audit and non-audit services, and such authority may only be exercised when the Audit Committee is not in session.

# PART IV

# ITEM 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES

(a)    The following documents are filed as part of this Report:

1.    *Financial Statements*

Reports of Independent Registered Public Accounting Firms
Consolidated Balance Sheets as of December 31, 2020 and 2019
Consolidated Statements of Operations for the Years Ended December 31, 2020, 2019, and 2018
Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2020, 2019, and 2018
Consolidated Statements of Cash Flows for the Years Ended December 31, 2020, 2019, and 2018
Notes to Financial Statements

2.    *Financial Statement Schedules*

Schedule III—Real Estate and Accumulated Depreciation
Schedule IV—Mortgage Loan Receivables on Real Estate

(b)    *Exhibits*

App. 1888

The following documents are filed as Exhibits to this Report:

| Exhibit Number | Description |
|---|---|
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.3 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998). |
| 3.4 | Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.5 | Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| 3.6 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001). |
| 3.7 | By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.8 | Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof. |
| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14.0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.0* | Subsidiaries of the Registrant. |
| 31.1* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Executive and Financial Officer. |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

* Filed herewith.

## ITEM 16.    FORM 10-K SUMMARY

Not applicable

70

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TRANSCONTINENTAL REALTY INVESTORS, INC.

Dated: March 24, 2021                    By:    /s/  ERIK L. JOHNSON

Erik L. Johnson
Executive Vice President and Chief Financial Officer

App. 1889

(Principal Executive and Financial Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ HENRY A. BUTLER<br>Henry A. Butler | Chairman of the Board and Director | March 24, 2021 |
| /s/ WILLIAM J. HOGAN<br>William J. Hogan | Director | March 24, 2021 |
| /s/ ROBERT A. JAKUSZEWSKI<br>Robert A. Jakuszewski | Director | March 24, 2021 |
| /s/ TED R. MUNSELLE<br>Ted R. Munselle | Director | March 24, 2021 |
| /s/ BRADFORD A. PHILLIPS<br>Bradford A. Phillips | Director | March 24, 2021 |
| /s/ RAYMOND D. ROBERTS, SR.<br>Raymond D. Roberts, Sr. | Director | March 24, 2021 |
| /s/ ERIK L. JOHNSON<br>Erik L. Johnson | Executive Vice President and Chief Financial Officer<br>(Principal Executive and Financial Officer) | March 24, 2021 |
| /s/ ALLA DZYUBA<br>Alla Dzyuba | Vice President and Chief Accounting Officer | March 24, 2021 |

71

App. 1890

# EXHIBIT J-45

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-09240**

# Transcontinental Realty Investors, Inc.

**(Exact name of registrant as specified in its charter)**

| Nevada | 94-6565852 |
|---|---|
| **(State or other jurisdiction of Incorporation or organization)** | **(IRS Employer Identification Number)** |

| 1603 LBJ Freeway, Suite 800 | |
|---|---|
| **Dallas, Texas** | **75234** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(469) 522-4200**
**Registrant's Telephone Number, including area code**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | TCI | NYSE |

**Securities registered pursuant to Section 12(g) of the Act:**
NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes      No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes      No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes      No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes      No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company"

App. 1892

**Large accelerated filer**  **Accelerated filer**
**Non‑accelerated filer**  **Smaller reporting company**
**Emerging growth Company**

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b‑2 of the Exchange Act.) Yes      No

Based on the last sale at the close of business on June 30, 2019, the aggregate market value of the registrant's common stock held by non‑affiliates of the registrant was approximately $24,391,302. The basis of the calculation does not constitute a determination by the Registrant as defined in Rule 405 of the Securities Act of 1933, as amended, such calculation, if made as of a date within sixty days of this filing, would yield a different value.

As of March 25, 2020, there were 8,717,767 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. Commission File No. 001‑14784
Consolidated Financial Statements of American Realty Investors, Inc. Commission File No. 001‑15663

**INDEX TO
ANNUAL REPORT ON FORM 10-K**

|  |  | **Page** |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 21 |
| Item 4. | Mine Safety Disclosures | 22 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| Item 6. | Selected Financial Data | 24 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 37 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 39 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 78 |
| Item 9A. | Controls and Procedures | 78 |
| Item 9B. | Other Information | 78 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 79 |
| Item 11. | Executive Compensation | 87 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 88 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 89 |
| Item 14. | Principal Accounting Fees and Services | 91 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 93 |
| Item 16. | Form 10-K Summary | 95 |

App. 1893

2

## FORWARD-LOOKING STATEMENTS

**Certain Statements in this Form 10-K are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. The words "estimate", "plan", "intend", "expect", "anticipate", "believe", and similar expressions are intended to identify forward-looking statements. The forward-looking statements are found at various places throughout this Report and in the documents incorporated herein by reference. The Company disclaims any intention or obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Although we believe that our expectations are based upon reasonable assumptions, we can give no assurance that our goals will be achieved. Important factors that could cause our actual results to differ from estimates or projections contained in any forward-looking statements are described under Part I, Item 1A. "Risk Factors".**

## PART I

## ITEM 1.  *BUSINESS*

### General

As used herein, the terms "TCI", "the Company", "We", "Our", or "Us" refer to Transcontinental Realty Investors, Inc. a Nevada corporation which was formed in 1984. The Company is headquartered in Dallas, Texas and its common stock is listed and trades on the New York Stock Exchange ("NYSE") under the symbol "TCI".

TCI is a "C" corporation for U.S. federal income tax purposes and files an annual consolidated income tax return with American Realty Investors, Inc. ("ARL"), whose common stock is traded on the NYSE under the symbol "ARL". Subsidiaries and affiliates of ARL own in excess of 80% of the Company's common stock. ARL and one of its subsidiaries own 78.38% and the parent of ARL owns 7.11% of the Company. Accordingly, TCI's financial results are consolidated with those of ARL's on Form 10-K and related Consolidated Financial Statements. ARL's common stock is listed and trades on the New York Stock Exchange under the symbol "ARL".

On July 17, 2009, the Company acquired an additional 2,518,934 shares of common stock of Income Opportunity Realty Investors, Inc. ("IOR"), and in doing so, increased its ownership from approximately 25% to over 80% of the shares of common stock of IOR outstanding. Upon acquisition of the additional shares in 2009, IOR's results of operations began to be consolidated with those of the Company for tax and financial reporting purposes. As of December 31, 2019, TCI owned 81.23% of the outstanding IOR common shares. Shares of IOR common stock are listed and traded on the NYSE American under the symbol "IOR".

TCI's Board of Directors are responsible for directing the overall affairs of TCI and for setting the strategic policies that guide the Company. As of April 30, 2011, the Board of Directors delegated the day-to-day management of the Company to Pillar Income Asset Management, Inc. ("Pillar"), a Nevada corporation, under a written Advisory Agreement that is reviewed annually by TCI's Board of Directors. The directors of TCI are also directors of ARL and four are also directors of IOR. The Chairman of the Board of Directors of TCI also serves as the Chairman of the Board of Directors of ARL and IOR. The officers of TCI also serve as officers of ARL, IOR and Pillar.

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is Realty Advisors, Inc. ("RAI"), a Nevada corporation, the sole shareholder of which is May Realty Holdings, Inc. ("MRHI", formerly known as Realty Advisors Management, Inc.), effective August 7, 2014), a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external contractual Advisor and Cash Manager.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as the contractual Advisor and Cash Manager to ARL and IOR.  As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

3

Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), manages our commercial properties and provides brokerage services. Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage". TCI engages third-party companies to lease and manage its apartment properties.

Southern Properties Capital Ltd. ("Southern" or "SPC") is a wholly owned subsidiary of TCI that was incorporated on August 16, 2016 for the purpose of

raising funds by issuing debentures that cannot be converted into any other security are listed and traded on the Tel-Aviv Stock Exchange ("TASE"). Southern operates in the United States and is primarily involved in investing in, developing, constructing and operating income-producing properties of multi-family residential real estate assets. Southern is included in the consolidated financial statements of TCI.

On January 1, 2012, the Company entered into a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

On November 19, 2018, we executed an agreement between the Macquarie Group ("Macquarie") and SPC and TCI to create a joint venture, Victory Abode Apartments, LLC ("VAA") to address existing and future demand for quality multifamily residential housing through acquisition and development of sustainable Class A multifamily housing in focused secondary and tertiary markets. In connection with the formation of the joint venture, SPC and TCI contributed a portfolio of 49 income producing apartment complexes, and 3 development projects in various stages of construction and received cash consideration of $236.8 million. At the time of the transfer of the properties, the joint venture assumed all liabilities of those properties, including mortgage debt to the Department of Housing and Urban Development ("HUD").

VAA is equally owned and controlled by Abode JVP, LLC, a wholly-owned subsidiary of SPC and Summerset Intermediate Holdings 2 LLC ("Summerset"), a wholly-owned indirect subsidiary of Macquarie. Pursuant to the Agreement, Abode JVP, LLC and Summerset each own voting and profit participation rights of 50% and 49%, respectively ("Class A Members"). The remaining 2% of the profit participation interest is held by Daniel J. Moos TCI's President and Chief Executive Officer ("Class B Member") who serves also as the Manager of the joint venture.

Our primary business is the acquisition, development and ownership of income-producing residential and commercial real estate properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time and when we believe it appropriate to do so, we will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents, and leasing office, industrial and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate revenues from gains on sales of income-producing properties and land.

At December 31, 2019, our portfolio of income-producing properties consisted of:

- Seven commercial properties consisting of five office buildings and two retail properties comprising in aggregate of approximately 1.7 million square feet;
- Ten residential apartment communities owned directly by us comprising in 1,657 units, excluding apartments being developed;
- Approximately 1,951 acres of developed and undeveloped land; and
- Fifty-one residential apartment communities totaling 9,888 units owned by our 50% owned investee VAA.

<center>4</center>

The following table sets forth the location of our real estate held for investment (income-producing properties only) by asset type as of December 31, 2019:

| Location | Apartments (Company owned) | | Apartments (VAA owned) | | Commercial (Company owned) | |
|---|---|---|---|---|---|---|
| | No. | Units | No. | Units | No. | SF |
| Alabama | 1 | 200 | 1 | 168 | — | — |
| Arkansas | — | — | 5 | 1,122 | — | — |
| Colorado | — | — | 2 | 260 | — | — |
| Florida | 1 | 33 | 2 | 388 | 1 | 6,722 |
| Georgia | — | — | 1 | 222 | — | — |
| Louisiana | 2 | 384 | 3 | 464 | — | — |
| Mississippi | 2 | 400 | 1 | 196 | — | — |
| North Carolina | — | — | 1 | 201 | — | — |
| Nevada | — | — | 1 | 308 | — | — |
| Tennessee | 1 | 144 | 4 | 708 | — | — |
| Texas-Greater Dallas-Ft Worth | — | — | 19 | 3,709 | 4 | 1,473,634 |
| Texas-Greater Houston | — | — | 2 | 416 | 1 | 95,329 |
| Texas-Other | 3 | 496 | 9 | 1,726 | — | — |
| Wisconsin | — | — | — | — | 1 | 122,205 |
| **Total** | **10** | **1,657** | **51** | **9,888** | **7** | **1,697,890** |

We finance our acquisitions primarily through operating cash flow, proceeds from the sale of land and income-producing properties, and debt financing primarily in the form of property-specific, first-lien mortgage loans from commercial banks and institutional lenders. We finance our development projects principally with short-term, variable-rate construction loans that are refinanced with the proceeds of long-term, fixed-rate amortizing mortgages when the development has been completed and occupancy has been stabilized. When we sell properties, we may carry a portion of the sales price, generally in the form

of a short-term interest-bearing seller-financed note receivable, secured by the property being sold. We may also combine to integrate into partnerships or joint ventures with various investors to acquire land or income-producing properties, or to sell interests in some of our properties.

We join with third-party development companies to construct residential apartment communities. At December 31, 2019, TCI and VAA had five and one apartment projects in development. The third-party developer typically holds a general partner, as well as a limited partner interest in a limited partnership formed for the purpose of building a single property, while we generally take a limited partner interest in the limited partnership. We may contribute land to the partnership as part of our equity contribution or we may contribute the necessary funds to the partnership to acquire the land. We are required to fund all required equity contributions while the third-party developer is responsible for obtaining construction financing, hiring a general contractor and for the overall management, successful completion, initial lease-up and delivery of the project. We generally bear all the economic risks and rewards of ownership in these partnerships and therefore include these partnerships in our consolidated financial statements. The third-party developer is paid a developer fee typically equal to a percentage of the construction costs. When the project reaches stabilized occupancy, we acquire the third-party developer's partnership interests in exchange for any remaining unpaid developer fees.

5

At December 31, 2019, our apartment projects in development included (dollars in thousands):

| Property | Location | No. of Units | Costs to Date [1] | Total Projected Costs [1] |
|---|---|---|---|---|
| Sugar Mill III | Addis, LA | 72 | $ 7,417,244 | $ 10,014,582 |
| Parc at Denham Springs Phase II | Denham Springs, LA | 144 | 17,791,765 | 18,767,871 |
| Forest Pines II (Forest Grove) | Bryan, TX | 84 | 4,843,342 | 11,258,990 |
| LD Athens | Athens, Al | 232 | 81,372 | 30,519,021 |
| McKinney Heritage | McKinney, TX | 176 | 88,931 | 24,767,176 |
| **Total** | | **708** | **$ 30,222,654** | **$ 95,327,640** |

[1] Costs include construction hard costs, construction soft costs and loan borrowing costs.

We have made investments in a number of large tracts of undeveloped and partially developed land and intend to continue to improve these tracts of land for our own development purposes or make the improvements necessary to ready the land for sale to other developers.

At December 31, 2019, our investments in undeveloped and partially developed land consisted of the following (dollars in thousands):

| Location | Acquired | Acres | Cost | Intended Use |
|---|---|---|---|---|
| Dallas, TX | 1996-2013 | 11.57 | 3,057 | Mixed use |
| Farmers Branch, TX | 2008 | 60.62 | 10,966 | Mixed use |
| Kaufman County, TX | 2011 | 1,781.83 | 49,238 | Mixed use |
| Various | 1990-2008 | 96.97 | 6,742 | Various |
| **Total Land Holdings** | | **1,950.99** | **$ 70,003** | |

6

## Significant Real Estate Acquisitions/Dispositions and Financings

The following is a description of the Company's significant real estate and financing transactions during the year ended December 31 2019:

- Sold 35.9 acres of land located in Farmers Branch, Texas for an aggregate sales price of $18.9 million and recognized a gain on the sale of $9.0 million.

- Sold 29.4 acres of land located in Forney, Texas for a total sales price of $5.0 million and recognized a gain on the sale of approximately $4.1 million.

- Sold 10.33 acres of land located in Dallas, Texas for a total sales price of $2.1 million and recognized a gain on the sale of approximately $0.4 million.

- Sold 6.25 acres of land located in Nashville, Tennessee for a total sales price of $2.3 million and recognized a gain on the sale of approximately $0.9 million.

- Sold 23.24 acres of land located in Fort Worth, Texas for a total sales price of $1.8 million and recognized a gain on the sale of approximately $0.5 million.

App. 1896

- Sold a multifamily residential property, located in Mary Ester, Florida for a total sales price of $3.1 million out of which $1.8 million represents land received with a total acreage of 1.27 acres located in Riverside, California in exchange for a note receivable of the same value. The Company recognized a loss from this sale of approximately $0.08 million.

- Purchased 33.05 acres of land in Athens, Alabama for a total purchase price of $2.1 million, out of which $0.9 million was paid in cash and the remaining balance of $1.2 million was issued as a note payable. The note payable matures in eighteen months and bears an annual interest rate of 5.91%.

- Purchased from a third party 8.94 acres of land located in Collin County, Texas for a total purchase price of $2.5 million.

- Purchased an option to buy 37.8 acres of land (6.3 acres located in Collin County, Texas and 31.5 acres located in Clark County, Nevada) for $2.0 million from a third party land developer.

- Sold fresh water district receivables related to infrastructure development work, located in Kaufman County, Texas for $12.0 million. No gain or loss was recognized from the sale of these receivables.

- Purchased notes receivables from related parties for an aggregate purchase price of $29.0 million. No gain or loss was recognized from the purchase of the notes receivables (refer to Note 5).

- Issued Series C bonds on the TASE in the amount of NIS 275 million (or approximately $78.1 million), bearing an annual interest of 4.65%. The interest will be paid on January 31 and July 31 of each of the years 2020 through 2023, with the bond principal payment due in 2023. From the proceeds from the sale of the Series C bonds the Company paid off the mortgage debt of $41.5 million related to one of its commercial buildings used as collateral for this issuance.

The Company continues to invest in the development of apartment projects. During the year ended December 31, 2019, TCI has invested $28.5 million related to the construction or predevelopment of various apartment complexes and capitalized $0.8 million of interest costs.

---

7

**Business Plan and Investment Policy**

Our business objective is to maximize long-term value for our stockholders by investing in residential and commercial real estate through the acquisition, development and ownership of apartments, commercial properties and land. We intend to achieve this objective through acquiring and developing properties in multiple markets and operating as an industry-leading landlord. We believe this objective will provide the benefits of enhanced investment opportunities, economies of scale and risk diversification, both in terms of geographic market and real estate product type. We believe our objective will also result in continuing access to favorably priced debt and equity capital. In pursuing our business objective, we seek to achieve a combination of internal and external growth while maintaining a strong balance sheet and employing a strategy of financial flexibility. We maximize the value of our apartments and commercial properties by maintaining high occupancy levels while charging competitive rental rates, controlling costs and focusing on tenant retention. We also pursue attractive development opportunities either directly or in partnership with other investors.

For our portfolio of commercial properties, we generate increased operating cash flow through annual contractual increases in rental rates under existing leases. We also seek to identify best practices within our industry and across our business units in order to enhance cost savings and gain operating efficiencies. We employ capital improvement and preventive maintenance programs specifically designed to reduce operating costs and increase the long-term value of our real estate investments.

We seek to acquire properties consistent with our business objectives and strategies. We execute our acquisition strategy by purchasing properties which management believes will create stockholder value over the long-term. We will also sell properties when management believes value has been maximized or when a property is no longer considered an investment to be held long-term.

We are continuously in various stages of discussions and negotiations with respect to development, acquisition, and disposition of projects. The consummation of any current or future development, acquisition, or disposition, if any, and the pace at which any may be completed cannot be assured or predicted.

Substantially all of our properties are owned by subsidiary companies, many of which are single-asset entities. This ownership structure permits greater access to financing for individual properties and permits flexibility in negotiating a sale of either the asset or the equity interests in the entity owning the asset. From time-to-time, our subsidiaries have invested in joint ventures with other investors, creating the possibility of risks that do not exist with properties solely owned by a TCI subsidiary. In those instances where other investors are involved, those other investors may have business, economic, or other objectives that are inconsistent with our objectives, which may in turn, require us to make investment decisions different from those if we were the sole owner.

Real estate generally cannot be sold quickly. We may not be able to promptly dispose of properties in response to economic or other conditions. To offset this challenge, selective dispositions have been a part of our strategy to maintain an efficient investment portfolio and to provide additional sources of capital. We finance acquisitions through mortgages, internally generated funds, and, to a lesser extent, property sales. Those sources provide the bulk of funds for future

acquisitions. We may purchase properties by assuming existing loans secured by the acquired property. When properties are acquired in such a manner, we customarily seek to refinance the asset in order to properly leverage the asset in a manner consistent with our investment objectives.

Our businesses are not generally seasonal with regard to real estate investments. Our investment strategy seeks both current income and capital appreciation. Our plan of operation is to continue, to the extent our liquidity permits, to make equity investments in income-producing real estate such as apartments and commercial properties. We may also invest in the debt or equity securities of real estate-related entities. We intend to pursue higher risk, higher reward investments, such as improved and unimproved land where we can obtain reasonably-priced financing for substantially all of a property's purchase price. We intend to continue the development of apartment properties in selected markets in Texas and in other locations where we believe adequate levels of demand exist. We intend to pursue sales opportunities for properties in stabilized real estate markets where we believe our properties' value has been maximized. We also intend to be an opportunistic seller of properties in markets where demand exceeds current supply. Although we no longer actively seek to fund or purchase mortgage loans, we may, in selected instances, originate mortgage loans or we may provide purchase money financing in conjunction with a property sale.

8

Our Board of Directors has broad authority under our governing documents to make all types of investments, and we may devote available resources to particular investments or types of investments without restriction on the amount or percentage of assets that may be allocated to a single investment or to any particular type of investment, and without limit on the percentage of securities of any one issuer that may be acquired. Investment objectives and policies may be changed at any time by the Board without stockholder approval.

The specific composition from time-to-time of our real estate portfolio owned by TCI directly and through our subsidiaries depends largely on the judgment of management to changing investment opportunities and the level of risk associated with specific investments or types of investments. We intend to maintain a real estate portfolio that is diversified by both location and type of property.

**Competition**

The real estate business is highly competitive and TCI competes with numerous companies engaged in real estate activities (including certain entities described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence"), some of which have greater financial resources than TCI. We believe that success against such competition is dependent upon the geographic location of a property, the performance of property-level managers in areas such as leasing and marketing, collection of rents and control of operating expenses, the amount of new construction in the area and the maintenance and appearance of the property. Additional competitive factors include ease of access to a property, the adequacy of related facilities such as parking and other amenities, and sensitivity to market conditions in determining rent levels. With respect to apartments, competition is also based upon the design and mix of the units and the ability to provide a community atmosphere for the residents. We believe that beyond general economic circumstances and trends, the degree to which properties are renovated or new properties are developed in the competing submarket are also competitive factors. Refer to Part I, Item1A. "Risk Factors".

To the extent that TCI seeks to sell any properties, the sales prices for the properties may be affected by competition from other real estate owners and financial institutions also attempting to sell properties in areas where TCI's properties are located, as well as aggressive buyers attempting to dominate or penetrate a particular market.

As described above and in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", the officers and directors of TCI serve as officers and directors of ARL and IOR. Both ARL and IOR have business objectives similar to those of TCI. TCI's officers and directors owe fiduciary duties to both IOR and ARL as well as to TCI under applicable law. In determining whether a particular investment opportunity will be allocated to TCI, IOR, or ARL, management considers the respective investment objectives of each Company and the appropriateness of a particular investment in light of each Company's existing real estate and mortgage notes receivable portfolio. To the extent that any particular investment opportunity is appropriate to more than one of the entities, the investment opportunity may be allocated to the entity which has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among all three or two of the entities.

In addition, as described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", TCI competes with related parties of Pillar having similar investment objectives related to the acquisition, development, disposition, leasing and financing of real estate and real estate-related investments. In resolving any potential conflicts of interest which may arise, Pillar has informed TCI that it intends to exercise its best judgment as to what is fair and reasonable under the circumstances in accordance with applicable law.

We have historically engaged in and will continue to engage in certain business transactions with related parties, including but not limited to asset acquisitions and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interests of the Company.

9

**Available Information**

App. 1898

TCI maintains an internet site at *http://www.transconrealty-invest.com*. We make available through our website free of charge Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, reports filed pursuant to Section 16 and amendments to those reports as soon as reasonably practicable after we electronically file or furnish such materials to the Securities and Exchange Commission. In addition, we have posted the charters for our Audit Committee, Compensation Committee and Governance and Nominating Committee, as well as our Code of Business Conduct and Ethics, Corporate Governance Guidelines on Director Independence and other information on the website. These charters and principles are not incorporated in this Report by reference. We will also provide a copy of these documents free of charge to stockholders upon written request. The Company issues Annual Reports containing audited financial statements to its common shareholders.

---

10

---

**ITEM 1A.   *RISK FACTORS***

An investment in our securities involves various risks. All investors should carefully consider the following risk factors, applicable to TCI and its subsidiaries in conjunction with the other information in this report before trading our securities.

**Risk Factors Related to our Business**

***Our business may be impacted as a result of the pandemic impact the coronavirus ("COVID 19") may have in the U.S. and global economy.***

During 2020, a strain of coronavirus ("COVID – 19") was reported worldwide, resulting in decreased economic activity and concerns about the pandemic, which would adversely affect the broader global economy. The Company is taking all necessary steps to keep our business premises, tenants, vendors and employees in a safe environment and are constantly monitoring the impact of COVID – 19.  At this point, the extent to which COVID – 19 may impact the global economy and our business is uncertain, but pandemics or other significant public health events could have a material adverse effect on our business and results of operations.

***Adverse events concerning our existing tenants or negative market conditions affecting our existing tenants could have an adverse impact on our ability to attract new tenants, release space, collect rent or renew leases, and thus could adversely affect cash flow from operations and inhibit growth.***

Cash flow from operations depends in part on the ability to lease space to tenants on economically favorable terms. We could be adversely affected by various facts and events over which the Company has limited or no control, such as:

- lack of demand for space in areas where the properties are located;

- inability to retain existing tenants and attract new tenants;

- oversupply of or reduced demand for space and changes in market rental rates;

- defaults by tenants or failure to pay rent on a timely basis;

- the need to periodically renovate and repair marketable space;

- physical damage to properties;

- economic or physical decline of the areas where properties are located; and

- potential risk of functional obsolescence of properties over time.

At any time, any tenant may experience a downturn in its business that may weaken its financial condition. As a result, a tenant may delay lease commencement, fail to make rental payments when due, decline to extend a lease upon its expiration, become insolvent or declare bankruptcy. Any tenant bankruptcy or insolvency, leasing delay or failure to make rental payments when due, could result in the termination of the tenant's lease and material losses to the Company.

If tenants do not renew their leases as they expire, we may not be able to rent the space. Furthermore, leases that are renewed, and some new leases for space that is re-let, may have terms that are less economically favorable than expiring lease terms, or may require us to incur significant costs, such as renovations, tenant improvements or lease transaction costs. Any of these events could adversely affect cash flow from operations and our ability to make distributions to shareholders and service indebtedness. A significant portion of the costs of owning property, such as real estate taxes, insurance, and debt service payments, are not necessarily reduced when circumstances cause a decrease in rental income from the properties.

***We may not be able to compete successfully with other entities that operate in our industry.***

We experience a great deal of competition in attracting tenants for the properties and in locating land to develop and properties to acquire.

App. 1899

In our effort to lease properties, we compete for tenants with a broad spectrum of other landlords in each of the markets. These competitors include, among others, publicly-held REITs, privately-held entities, individual property owners and tenants who wish to sublease their space. Some of these competitors may be able to offer prospective tenants more attractive financial terms than we are able to offer.

11

If the availability of land or high quality properties in our markets diminishes, operating results could be adversely affected.

*We may experience increased operating costs which could adversely affect our financial results and the value of our properties* .

Our properties are subject to increases in operating expenses such as insurance, cleaning, electricity, heating, ventilation and air conditioning, administrative costs and other costs associated with security, landscaping, repairs, and maintenance of the properties. While some current tenants are obligated by their leases to reimburse us for a portion of these costs, there is no assurance that these tenants will make such payments or agree to pay these costs upon renewal or new tenants will agree to pay these costs. If operating expenses increase in our markets, we may not be able to increase rents or reimbursements in all of these markets to offset the increased expenses, without at the same time decreasing occupancy rates. If this occurs, our ability to make distributions to shareholders and service indebtedness could be adversely affected.

*Our ability to achieve growth in operating income depends in part on our ability to develop additional properties* .

We intend to continue to develop properties where warranted by market conditions. We have a number of ongoing development and land projects being readied for commencement.

Additionally, general construction and development activities include the following risks:

- construction and leasing of a property may not be completed on schedule, which could result in increased expenses and construction costs, and would result in reduced profitability for that property;

- construction costs may exceed original estimates due to increases in interest rates and increased cost of materials, labor or other costs, possibly making the property less profitable because of inability to increase rents to compensate for the increase in construction costs;

- some developments may fail to achieve expectations, possibly making them less profitable;

- we may be unable to obtain, or face delays in obtaining, required zoning, land-use, building, occupancy, and other governmental permits and authorizations, which could result in increased costs and could require us to abandon our activities entirely with respect to a project;

- we may abandon development opportunities after the initial exploration, which may result in failure to recover costs already incurred. If we determine to alter or discontinue its development efforts, future costs of the investment may be expensed as incurred rather than capitalized and we may determine the investment is impaired resulting in a loss;

- we may expend funds on and devote management's time to projects which will not be completed; and

- occupancy rates and rents at newly-completed properties may fluctuate depending on various factors including market and economic conditions, and may result in lower than projected rental rates and reduced income from operations.

*We face risks associated with property acquisitions.*

We acquire individual properties and various portfolios of properties and intend to continue to do so. Acquisition activities are subject to the following risks:

- when we are able to locate a desired property, competition from other real estate investors may significantly increase the seller's offering price;

- acquired properties may fail to perform as expected;

12

- the actual costs of repositioning or redeveloping acquired properties may be higher than original estimates;

- acquired properties may be located in new markets where we face risks associated with an incomplete knowledge or understanding of the local market, a limited number of established business relationships in the area and a relative unfamiliarity with local governmental and permitting procedures; and

App. 1900

- we may be unable to quickly and efficiently integrate new acquisitions, particularly acquisitions of portfolios of properties, into existing operations, and results of operations and financial condition could be adversely affected.

We may acquire properties subject to liabilities and without any recourse, or with limited recourse, with respect to unknown liabilities. However, if an unknown liability was later asserted against the acquired properties, we might be required to pay substantial sums to settle it, which could adversely affect cash flow.

***Many of our properties are concentrated in our primary markets and the Company may suffer economic harm as a result of adverse conditions in those markets.***

Our properties are located principally in specific geographic areas in the southwestern, southeastern, and mid-western United States. The Company's overall performance is largely dependent on economic conditions in those regions.

***Our investments in joint ventures may decrease our ability to manage risk.***

We conduct some of our operations through a joint venture in which we share control over certain economic and business interests with our joint venture partner. Our joint venture partner may have economic, business or legal interests or goals that are inconsistent with our goals and interests or may be unable to meet their obligations. Failure by us, or an entity in which we have a joint-venture interest, to adequately manage the risks associated with any acquisitions or joint ventures could have a material adverse effect on the financial condition or results of operations of our joint ventures and adversely affect our business, financial condition, results of operations and cash flows.

***We are leveraged and may not be able to meet our debt service obligations.***

We had total indebtedness, including bonds and notes payable, at December 31, 2019 of approximately $493.3 million. Substantially all assets have been pledged to secure debt. These borrowings increase the risk of loss because they represent a prior claim on assets and most require fixed payments regardless of profitability. Our leveraged position makes us vulnerable to declines in the general economy and may limit the Company's ability to pursue other business opportunities in the future.

***We may not be able to access financial markets to obtain capital on a timely basis, or on acceptable terms.***

We rely on proceeds from property dispositions and third party capital sources for a portion of our capital needs, including capital for acquisitions and development. The public debt and equity markets are among the sources upon which the Company relies. There is no guarantee that we will be able to access these markets or any other source of capital. The ability to access the public debt and equity markets depends on a variety of factors, including:

- general economic conditions affecting these markets;

- our own financial structure and performance;

- the market's opinion of real estate companies in general; and

- the market's opinion of real estate companies that own similar properties;

13

***We may suffer adverse effects as a result of terms and covenants relating to the Company's indebtedness.***

Required payments on our indebtedness generally are not reduced if the economic performance of the portfolio declines. If the economic performance declines, net income, cash flow from operations and cash available for distribution to stockholders may be reduced. If payments on debt cannot be made, we could sustain a loss or suffer judgments, or in the case of mortgages, suffer foreclosures by mortgagees. Further, some obligations contain cross-default and/or cross-acceleration provisions, which means that a default on one obligation may constitute a default on other obligations.

We anticipate only a small portion of the principal of its debt will be repaid prior to maturity. Therefore, we are likely to refinance a portion of its outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or the terms of any refinancing will not be as favorable as the terms of the maturing debt. If principal balances due at maturity cannot be refinanced, extended, or repaid with proceeds from other sources, such as the proceeds of sales of assets or new equity capital, cash flow may not be sufficient to repay all maturing debt in years when significant "balloon" payments come due.

Our credit facilities and unsecured debt contain customary restrictions, requirements and other limitations on the ability to incur indebtedness, including total debt to asset ratios, secured debt to total asset ratios, debt service coverage ratios, and minimum ratios of unencumbered assets to unsecured debt. Our continued ability to borrow is subject to compliance with financial and other covenants. In addition, failure to comply with such covenants could cause a default under credit facilities, and we may then be required to repay such debt with capital from other sources. Under those circumstances, other sources of capital may not be available, or be available only on unattractive terms.

***Our degree of leverage could limit our ability to obtain additional financing or affect the market price of our common stock.***

App. 1901

The degree of leverage could affect our ability to obtain additional financing for working capital, capital expenditures, acquisitions, development or other general corporate purposes. The degree of leverage could also make us more vulnerable to a downturn in business or the general economy.

***An increase in interest rates would increase interest costs on variable rate debt and could adversely impact the ability to refinance existing debt.***

We currently have, and may incur more, indebtedness that bears interest at variable rates. Accordingly, if interest rates increase, so will the interest costs, which could adversely affect cash flow and the ability to pay principal and interest on our debt and the ability to make distributions to shareholders. Further, rising interest rates could limit our ability to refinance existing debt when it matures.

***Unbudgeted capital expenditures or cost overruns could adversely affect business operations and cash flow.***

If capital expenditures for ongoing or planned development projects or renovations exceed expectations, the additional cost of these expenditures could have an adverse effect on business operations and cash flow. In addition, we might not have access to funds on a timely basis to pay the unexpected expenditures.

Construction costs are funded in large part through construction financing which the Company may guarantee. The Company's obligation to pay interest on this financing continues until the rental project is completed, leased up and permanent financing is obtained, or the project is sold or the construction loan is otherwise paid. Unexpected delays in completion of one or more ongoing projects could also have a significant adverse impact on business operations and cash flow.

***We may need to sell properties from time to time for cash flow purposes.***

Because of the lack of liquidity of real estate investments, our ability to respond to changing circumstances may be limited and generally real estate investments cannot be sold quickly. In the event that we must sell assets to generate cash flow, we cannot predict whether there will be a market for those assets in the time period desired, or whether we will be able to sell the assets at a price that will allow the Company to fully recoup its investment. We may not be able to realize the full potential value of the assets and may incur costs related to the early pay-off of the debt secured by such assets.

<div align="center">14</div>

***We intend to devote resources to the development of new projects.***

We plan to continue developing new projects as opportunities arise in the future. Development and construction activities entail a number of risks, including but not limited to the following:

- we may abandon a project after spending time and money determining its feasibility;

- construction costs may materially exceed original estimates;

- the revenue from a new project may not be enough to make it profitable or generate a positive cash flow;

- we may not be able to obtain financing on favorable terms for development of a property, if at all;

- we may not complete construction and lease-ups on schedule, resulting in increased development or carrying costs; and

- we may not be able to obtain, or may be delayed in obtaining, necessary governmental permits.

***The overall business is subject to all of the risks associated with the real estate industry*** .

We are subject to all risks incident to investment in real estate, many of which relate to the general lack of liquidity of real estate investments, including, but not limited to:

- our real estate assets are concentrated primarily in the southwest and any deterioration in the general economic conditions of this region could have an adverse effect;

- changes in interest rates may make the ability to satisfy debt service requirements more burdensome;

- lack of availability of financing may render the purchase, sale or refinancing of a property more difficult or unattractive;

- changes in real estate and zoning laws;

- increases in real estate taxes and insurance costs;

- federal or local economic or rent control;

- acts of terrorism; and

- hurricanes, tornadoes, floods, earthquakes and other similar natural disasters.

***Our performance and value are subject to risks associated with our real estate assets and with the real estate industry.***

Our economic performance and the value of our real estate assets, and consequently the value of our securities, are subject to the risk that if our properties do not generate revenues sufficient to meet our operating expenses, including debt service and capital expenditures, our cash flow will be adversely affected. The following factors, among others, may adversely affect the income generated by our properties:

- downturns in the national, regional and local economic conditions (particularly increases in unemployment);

15

- competition from other office and commercial buildings;

- local real estate market conditions, such as oversupply or reduction in demand for office or other commercial space;

- changes in interest rates and availability of financing;

- vacancies, changes in market rental rates and the need to periodically repair, renovate and re-let space;

- increased operating costs, including insurance expense, utilities, real estate taxes, state and local taxes and heightened security costs;

- civil disturbances, earthquakes and other natural disasters, or terrorist acts or acts of war which may result in uninsured or underinsured losses;

- significant expenditures associated with each investment, such as debt service payments, real estate taxes, insurance and maintenance costs which are generally not reduced when circumstances cause a reduction in revenues from a property;

- declines in the financial condition of our tenants and our ability to collect rents from our tenants; and

- decreases in the underlying value of our real estate.

16

***Adverse economic conditions and dislocations in the credit markets could have a material adverse effect on our results of operations, and financial condition.***

Our business may be affected by market and economic challenges experienced by the U.S. economy or real estate industry as a whole or by the local economic conditions in the markets in which our properties are located, including the current dislocations in the credit markets and general global economic recession. These current conditions, or similar conditions existing in the future, may adversely affect our results of operations, and financial condition as a result of the following, among other potential consequences:

- the financial condition of our tenants may be adversely affected which may result in tenant defaults under leases due to bankruptcy, lack of liquidity, operational failures or for other reasons;

- significant job losses within our tenants may occur, which may decrease demand for our office space, causing market rental rates and property values to be negatively impacted;

- our ability to borrow on terms and conditions that we find acceptable, or at all, may be limited, which could reduce our ability to pursue acquisition and development opportunities and refinance existing debt, reduce our returns from our acquisition and development activities and increase our future interest expense;

- reduced values of our properties may limit our ability to dispose of assets at attractive prices or to obtain debt financing secured by our properties and may reduce the availability of unsecured loans; and

- one or more lenders could refuse to fund their financing commitment to us or could fail and we may not be able to replace the financing commitment of any such lenders on favorable terms, or at all.

***Real estate investments are illiquid, and we may not be able to sell properties if and when it is appropriate to do so.***

App. 1903

Real estate generally cannot be sold quickly. We may not be able to dispose of properties promptly in response to economic or other conditions. In addition, provisions of the Internal Revenue Code may limit our ability to sell properties (without incurring significant tax costs) in some situations when it may be otherwise economically advantageous to do so, thereby adversely affecting returns to stockholders and adversely impacting our ability to meet our obligations.

**ITEM 1B.  *UNRESOLVED STAFF COMMENTS***

None.

17

**ITEM 2.  *PROPERTIES***

On December 31, 2019, our portfolio consisted of seventeen income-producing properties consisting of ten apartment communities totaling 1,657 units, seven commercial properties consisting of five office buildings and two retail centers. In addition, we own or control 1,951 acres of improved and unimproved land held for future development or sale.

The average annual rental and other property revenue per square foot is $13.36 for the Company's residential apartment portfolio and $25.61 for the commercial portfolio. Through our joint venture VAA we have a 50 percent ownership interest to a portfolio of fifty-one income-producing properties with a total of 9,888 units, which generated an average annual rental revenue of $14.74 per square foot.

The table below shows information relating to those properties in which we own or have an ownership interest through subsidiaries, all of which are suitable and adequate for the purpose for which each is utilized:

| Residential Apartments | Location | Units | Occupancy |
|---|---|---|---|
| Chelsea | Beaumont, TX | 144 | 90.97% |
| Farnham Park | Port Arthur, TX | 144 | 95.83% |
| Landing Bayou | Houma, LA | 240 | 89.58% |
| Legacy at Pleasant Grove | Texarkana, TX | 208 | 88.94% |
| Toulon | Gautier, MS | 240 | 98.33% |
| Villager | Fort Walton, FL | 33 | 90.91% |
| Villas at Bon Secour Apts | Gulf Shores, AL | 200 | 92.00% |
| Vista Ridge | Tupelo, MS | 160 | 93.13% |
| Overlook at Allensville Phase II | Sevierville, TN | 144 | 89.58% |
| Parc at Denham Springs Phase II | Denham Springs, LA | 144 | 5.56% |
| **10** | ***Total Apartment Units*** | **1,657** | |

| Office Buildings | Location | SqFt | Occupancy |
|---|---|---|---|
| 600 Las Colinas | Irving, TX | 512,173 | 79.43% |
| 770 South Post Oak | Houston, TX | 95,438 | 83.85% |
| Browning Place (Park West I) | Farmers Branch, TX | 625,297 | 87.03% |
| Senlac (VHP) | Farmers Branch, TX | 2,821 | 100.00% |
| Stanford Center | Dallas, TX | 333,234 | 90.91% |
| **5** | ***Total Office Buildings*** | **1,568,963** | |

| Retail Centers | Location | SqFt | Occupancy |
|---|---|---|---|
| Bridgeview Plaza | LaCrosse, WI | 122,205 | 37.25% |
| Fruitland Park | Fruitland Park, FL | 6,722 | 100.00% |
| **2** | ***Total Retail Centers*** | **128,927** | |
| | ***Total Commercial*** | **1,697,890** | |

18

Our joint venture investee VAA, owns the following residential properties:

| Residential Apartments | Location | Units | Occupancy |
|---|---|---:|---:|
| Abode Red Rock Apartments | Las Vegas, NV | 308 | 83.04% |
| Apalachee Point Villas Apartments | Tallahassee, FL | 200 | 91.88% |
| Blue Lake Villas Apartments | Waxahachie, TX | 186 | 90.78% |
| Blue Lake Villas Apartments Phase II | Waxahachie, TX | 70 | 89.02% |
| Breakwater Bay Apartments. | Beaumont, TX | 176 | 97.53% |
| Bridgewood Ranch Apartments | Kaufman, TX | 106 | 94.39% |
| Capitol Hill Apartments | Little Rock, AR | 156 | 91.17% |
| Centennial Village Apartments | Oak Ridge,TN | 252 | 94.83% |
| Crossings at Opelika Apartments | Opelika, AL | 168 | 97.29% |
| Dakota Arms Apartments | Lubbock, TX | 208 | 96.17% |
| Desoto Ranch Apartments | DeSoto, TX | 248 | 92.61% |
| Eagle Crossing Apartments | Dallas, TX | 150 | 97.63% |
| Falcon Lake Apartments | Arlington, TX | 248 | 95.30% |
| Heather Creek Apartments | Mesquite, TX | 200 | 96.64% |
| Lake Forest Apartments | Humble, TX | 240 | 90.67% |
| Lakeside Lofts | Farmers Branch, TX | 245 | 0.00% |
| Lodge at Pecan Creek Apartments | Denton, TX | 192 | 95.04% |
| Lofts at Reynolds Apartments | Asheville, NC | 201 | 93.87% |
| Mansions Of Mansfield Apartments | Mansfield, TX | 208 | 96.38% |
| McKinney Point Apartments | McKinney, TX | 198 | 91.96% |
| Metropolitan Apartments | Little Rock, AR | 260 | 92.40% |
| Mission Oaks Apartments | San Antonio, TX | 228 | 92.17% |
| Northside on Travis Apartments | Sherman, TX | 200 | 90.03% |
| Oak Hollow Phase I Apartments | Seguin, TX | 160 | 88.08% |
| Oak Hollow Phase II Apartments | Seguin, TX | 96 | 86.61% |
| Oceanaire Apartments | Biloxi, MS | 196 | 94.76% |
| Overlook At Allensville Square Apartments Phase I | Sevierville, TN | 144 | 92.66% |
| Parc at Wylie Apartments | Wylie, TX | 198 | 92.09% |
| Parc at Bentonville Apartments | Bentonville, AR | 216 | 92.60% |
| Parc at Clarksville Apartments | Clarksville, TN | 168 | 91.45% |
| Parc at Denham Springs Apartments Phase I | Denham Spring, LA | 224 | 95.86% |
| Parc at Garland Apartments | Garland, TX | 198 | 94.68% |
| Parc at Mansfield Apartments | Mansfield, TX | 99 | 94.87% |
| Parc at Maumelle Apartments | Little Rock, AR | 240 | 94.51% |
| Parc at Metro Center Apartments | Nashville, TN | 144 | 97.48% |
| Parc at Rogers Apartments | Rogers, AR | 250 | 92.99% |
| Preserve at Pecan Creek Apartments | Denton, TX | 192 | 89.65% |
| Preserve at Prairie Pointe Apartments | Lubbock, TX | 184 | 95.94% |
| Residences at Holland Lake Apartments | Weatherford, TX | 208 | 94.45% |
| Sawgrass Creek Apartments | New Port Richey, FL | 188 | 92.73% |
| Sonoma Court Apartments | Rockwall, TX | 124 | 89.98% |
| Sugar Mill Apartments, Phase I | Baton Rouge, LA | 160 | 76.24% |
| Sugar Mill Apartments, Phase II | Addis, LA | 80 | 76.59% |
| Tattersall Village Apartments | Hinesville, GA | 222 | 93.76% |
| Terra Lago Apartments | Rowlett, TX | 451 | 69.45% |
| Tradewinds Apartments | Midland, TX | 214 | 94.36% |
| Villas of Park West Apartments Phase I | Pueblo, CO | 148 | 95.27% |
| Villas of Park West Apartments Phase II | Pueblo, CO | 112 | 93.77% |
| Vistas Of Vance Jackson Apartments | San Antonio, TX | 240 | 94.50% |
| Waterford at Summer Park Apartments | Rosenberg, TX | 196 | 93.49% |
| Windsong Apartments | Fort Worth, TX | 188 | 93.15% |
| *51* | **Total Apartment Units** | **9,888** | |

**Development Project**

| | | | |
|---|---|---:|---|
| Lakeside Lofts Apartments | Farmers Branch, TX | 249 | |
| | **Grand total** | 10,137 | |

19

App. 1905

**Commercial Lease Expirations**

The following table summarizes our commercial lease expirations as of December 31, 2019:

| Year of Lease Expiration | Rentable Square Feet Subject to Expiring Leases | Current Annualized [1] Contractual Rent Under Expiring Leases | Current Annualized [1] Contractual Rent Under Expiring Leases (P.S.F.) | Percentage of Total Square Feet | Percentage of Gross Rentals |
|---|---|---|---|---|---|
| 2020 | 139,905 | $ 3,082,003 | $ 22.03 | 8.2% | 10.9% |
| 2021 | 123,629 | 2,344,184 | 18.96 | 7.3% | 8.3% |
| 2022 | 267,882 | 5,981,809 | 22.33 | 15.8% | 21.1% |
| 2023 | 362,224 | 6,035,138 | 16.66 | 21.3% | 21.3% |
| 2024 | 271,071 | 6,010,250 | 22.17 | 16.0% | 21.2% |
| 2025 | 125,667 | 2,909,360 | 23.15 | 7.4% | 10.3% |
| 2026 | 30,505 | 793,130 | 26.00 | 1.8% | 2.8% |
| Thereafter | 56,926 | 1,152,892 | 20.25 | 3.4% | 4.1% |
| Total | 1,377,809 | $ 28,308,766 | | 81.2% | 100% |

(1) Represents the monthly contractual base rent and recoveries from tenants under existing leases as of December 31, 2019, multiplied by twelve. This amount reflects total rent before any rent abatements and includes expense reimbursements, which may be estimates as of such date.

The table below shows information related to the land parcels we own as of December 31, 2019:

| Land | Location | Acres |
|---|---|---|
| Dedeaux | Gulfport, MS | 9.90 |
| Dominion Mercer Phase II | Farmers Branch, TX | 5.29 |
| Gautier | Gautier, MS | 3.46 |
| Lacy Longhorn | Farmers Branch, TX | 4.86 |
| Lake Shore Villas | Humble, TX | 1.35 |
| Lubbock | Lubbock, TX | 2.87 |
| McKinney 36 | Collin County, TX | 17.89 |
| Minivest | Dallas, TX | 0.23 |
| Nicholson Croslin | Dallas, TX | 0.80 |
| Nicholson Mendoza | Dallas, TX | 0.35 |
| Ocean Estates | Gulfport, MS | 11.79 |
| T Palm Desert | Riverside, California | 1.27 |
| Travis Ranch | Kaufman County, TX | 8.66 |
| Union Pacific Railroad | Dallas, TX | 0.04 |
| Willowick | Pensacola, FL | 39.78 |
| Mercer Crossing | Farmers Branch, TX | 19.00 |
| Windmills Farm | Kaufman County, TX | 1,701.05 |
| | *Total Land/Development* | 1,828.59 |

| Land Subject to Sales Contract | Location | Acres |
|---|---|---|
| Mercer Crossing | Farmers Branch, TX | 41.62 |
| Windmill Farms | Kaufman County, TX | 80.78 |
| | *Total Land Subject to Sales Contract* | 122.40 |
| | *Total Land* | **1,950.99** |

**ITEM 3.    *LEGAL PROCEEDINGS***

**ART and ART Midwest, Inc.**

While the Company and all entities in which the Company has a direct or indirect equity interest are not parties to or obligated in any way for the outcome, a formerly owned entity (American Realty Trust, Inc.) and its former subsidiary (ART Midwest, Inc.) have been engaged since 1999 in litigation with Mr.

App. 1906

David Clapper and entities related to Mr. Clapper (collectively, the "Clapper Parties"). The matter originally involved a transaction in which ART Midwest, Inc. was to acquire eight residential apartment complexes from the Clapper Parties. Through the years, a number of rulings, both for and against American Realty Trust, Inc. "ART" and ART Midwest, Inc., were issued. In October 2011, a ruling was issued under which the Clapper Parties received a judgment for approximately $74 million, including $26 million in actual damages and $48 million interest. The ruling was against ART and ART Midwest, Inc., but no other entity. During February 2014, the Court of Appeals affirmed a portion of the judgment in favor of the Clapper Parties, but also ruled that a double counting of a significant portion of the damages had occurred and remanded the case back to the trial court to recalculate the damage award, as well as pre- and post-judgment interest thereon. Subsequently, the trial court recalculated the damage award, reducing it to approximately $59 million, inclusive of actual damages and then current interest. ART was also a significant owner of a partnership interest in the partnership that was awarded the initial damages in this matter.

The Clapper Parties subsequently filed a new lawsuit against ARI, its subsidiary EQK Holdings, Inc. "EQK", and ART. The Clapper Parties seek damages from ARL for payment by ART to ARL of ART's stock in EQK in exchange for a release of the Antecedent Debt owed by ART to ARI. In February 2018 the court determined that this legal matter should not have been filed in federal court and therefore granted motions to dismiss on jurisdictional grounds. In June 2018, the court overruled its own grant of motions to dismiss and reinstated the case. We continue to vigorously defend the case and management believes it has defenses to the claims. The case has not been set for trial.

 In 2005, ART filed suit against a major national law firm over the initial transaction. That action was initially abated while the principal case with the Clapper Parties was pending, but the abatement was recently lifted. The trial court subsequently dismissed the case on procedural grounds, but ART has filed a notice of appeal. The appeal was heard in February 2018 and the case was subsequently appealed to the Texas Supreme Court. The application for Review is still pending with the Texas Supreme Court. In January 2012, the Company sold all of the issued and outstanding stock of ART to an unrelated party for a promissory note in the amount of $10 million. At December 31, 2012, the Company fully reserved and valued such note at zero.

**Dynex Capital, Inc.**

On July 20, 2015, the 68th Judicial District Court in Dallas County, Texas issued its Final Judgment in Cause No. DC-03-00675, styled Basic Capital Management, Inc., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. v. Dynex Commercial, Inc. The case, which was litigated for more than a decade, had its origin with Dynex Commercial making loans to Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. (subsidiaries of Continental Mortgage & Equity Trust ("CMET"), an entity which merged into TCI in 1999 after the original suit was filed). Under the original loan commitment, $160 million in loans were to be made to the entities. The loans were conditioned on the execution of a commitment between Dynex Commercial and Basic Capital Management, Inc. ("Basic").

An original trial in 2004, which also included Dynex Capital, Inc. as a defendant, resulted in a jury awarding damages in favor of Basic for "lost opportunity," as well as damages in favor of ART and in favor of TCI and its subsidiaries for "increased costs" and "lost opportunity." The original Trial Court judge ignored the jury's findings, however, and entered a "Judgment Notwithstanding the Verdict" ("JNOV") in favor of the Dynex entities (the judge held the Plaintiffs were not entitled to any damages from the Dynex entities). After numerous appeals by all parties, Dynex Capital, Inc. was ultimately dismissed from the case and the remaining claims against Dynex Commercial were remanded to the Trial Court for a new judgment consistent with the jury's findings. The Court entered the new Final Judgment against Dynex Commercial, Inc. on July 20, 2015.

21

The Final Judgment entered against Dynex Commercial, Inc. on July 20, 2015 awarded Basic was $0.256 million in damages, plus pre-judgment interest of $0.192 million for a total amount of $0.448 million. The Judgment awarded ART was $14.2 million in damages, plus pre-judgment interest of $10.6 million for a total amount of $24.8 million. The Judgment awarded TCI was $11.1 million, plus pre-judgment interest of $8.4 million for a total amount of $19.5 million. The Judgment also awarded Basic, ART, and TCI post-judgment interest at the rate of 5% per annum from April 25, 2014 until the date their respective damages were paid. Lastly, the Judgement awarded Basic, ART, and TCI was $1.6 million collectively in attorneys' fees from Dynex Commercial, Inc.

TCI is working with counsel to identify assets and collect on the Final Judgment against Dynex Commercial, Inc., as well as pursue additional claims, if any, against Dynex Capital, Inc. Post judgment interest continues to accrue.

**Berger Litigation**

On February 4, 2019, an individual claiming to be a stockholder holding 7,900 shares of Common Stock of Income Opportunity Realty Investors, Inc. ("IOR") filed a Complaint in the United States District Court for the Northern District of Texas, Dallas Division, individually and allegedly derivatively on behalf of IOR, against Transcontinental Realty Investors, Inc. ("TCI"), American Realty Investors, Inc. ("ARL"), (TCI is a shareholder of IOR, ARL is a shareholder of TCI) Pillar Income Asset Management, Inc. ("Pillar"), ( collectively the "Companies"), certain officers and directors of the Companies ("Additional Parties") and two other individuals. The Complaint filed alleges that the sale and/or exchange of certain tangible and intangible property between the Companies and IOR during the last ten years of business operations constitutes a breach of fiduciary duty by the one or more of Companies, the Additional Defendants and/or the directors of IOR. The case alleges other related claims. The Plaintiff seeks certification as a representative of IOR and all of its shareholders, unspecified damages, a return to IOR of various funds and an award of costs, expenses, disbursements (including Plaintiff's attorneys' fees) and prejudgment and post-judgment interest. The named Defendants intend to vigorously defend the action, deny all of the allegations of the Complaint, and believe the allegations to be

App. 1907

wholly without merit. The Defendants have filed motions to dismiss the case in its entirety in ranges of on February 26, 2021, the Court denied IOR's demand futility motion. The remainder of the motions to dismiss are pending.

*Litigation*. The ownership of property and provision of services to the public as tenants entails an inherent risk of liability. Although the Company and its subsidiaries are involved in various items of litigation incidental to and in the ordinary course of its business, in the opinion of management, the outcome of such litigation will not have a material adverse impact upon the Company's financial condition, results of operation or liquidity.

**ITEM 4.    *MINE SAFETY DISCLOSURES***

Not applicable.

<div align="center">22</div>

<div align="center">PART II</div>

**ITEM 5.    *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES***

TCI's Common stock is listed and traded on the NYSE American under the symbol "TCI". The following table sets forth the high and low sales prices as reported in the consolidated reporting system of the NYSE American for the quarters ended:

|  | 2019 | | 2018 | |
| --- | --- | --- | --- | --- |
|  | **High** | **Low** | **High** | **Low** |
| First Quarter | $ 38.34 | $ 27.60 | $ 46.00 | $ 25.14 |
| Second Quarter | $ 34.01 | $ 22.85 | $ 52.00 | $ 23.90 |
| Third Quarter | $ 33.15 | $ 23.00 | $ 38.25 | $ 28.36 |
| Fourth Quarter | $ 41.50 | $ 27.00 | 37.42 | $ 26.73 |

On March 25, 2020, the closing price of TCI's common stock as reported on the NYSE American was $22.00 per share, and was held by approximately 2,290 holders of record.

TCI's Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, the board determined not to pay any dividends on common stock in 2019, 2018 or 2017. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including the Company's financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

In December 1989, the Board of Directors approved a share repurchase program, authorizing the repurchase of a total of 687,000 shares of TCI's Common stock. In June 2000, the Board increased this authorization to 1,387,000 shares. On August 10, 2010, the Board of Directors approved an increase in the share repurchase program for up to an additional 250,000 shares of common stock which resulted in a total authorization under the repurchase program for up to 1,637,000 shares of our common stock. This repurchase program has no termination date. There were no shares repurchased for the year ended December 31, 2019.

In November 2006, TCI issued 100,000 shares of Series D Preferred Stock with a liquidation preference of $100 per share. The preferred stock is not convertible into any other security, requires dividends payable at the initial rate of 7% annually. The dividend rate increases ratably from 7% to 9% in future periods and can be redeemed at any point after September 30, 2011.

During the fourth quarter of 2018, all 100,000 shares of Series D Preferred Stock were redeemed for $17.2 million, of which $7.2 million was accrued unpaid dividends. At December 31, 2019 and 2018, there were no preferred shares outstanding.

<div align="center">23</div>

**ITEM 6.    *SELECTED FINANCIAL DATA***

The following table sets forth selected consolidated financial data derived from our audited financial statements for each of the five years in the period ended December 31, 2019. The data presented below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" set forth in Part II, Item 7 of this Annual Report and the consolidated financial statements and the accompanying notes set forth in Part II, Item 8 of this Annual Report.

<div align="center">**For the Years Ended December 31,**</div>

<div align="right">App. 1908</div>

| | | 2019 | | 2018 | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (dollars in thousands, except share and per share amounts) | | | | | |
| **EARNINGS DATA** | | | | | | | | | | | |
| Rental and other property revenues | $ | 47,970 | $ | 120,955 | $ | 125,233 | $ | 118,471 | $ | 102,220 |
| Total operating expenses | | 55,706 | | 104,834 | | 105,128 | | 100,824 | | 92,919 |
| Operating (loss) income | | (7,736) | | 16,121 | | 20,105 | | 17,647 | | 9,301 |
| Other expenses | | (35,210) | | (1,401) | | (49,967) | | (36,628) | | (36,095) |
| (Loss) income before gain on formation of joint venture, gain on land sales, non-controlling interest, and taxes | | (42,946) | | 14,720 | | (29,862) | | (18,981) | | (26,794) |
| Gain on disposition of 50% interest in VAA | | — | | 154,126 | | — | | — | | — |
| (Loss) gain on income producing properties | | (80) | | — | | 9,842 | | 16,207 | | 18,911 |
| Gain on land sales | | 14,889 | | 17,404 | | 4,884 | | 3,121 | | — |
| Income tax benefit (expense) | | 2,000 | | (3,210) | | (180) | | (24) | | (517) |
| Net (loss) income from continuing operations | | (26,137) | | 183,040 | | (15,316) | | 323 | | (8,400) |
| Net (loss) income from discontinuing operations | | — | | — | | — | | (1) | | 896 |
| Net (loss) income | | (26,137) | | 183,040 | | (15,316) | | 322 | | (7,504) |
| Net income attributable to non-controlling interest | | (783) | | (1,590) | | (499) | | (285) | | (132) |
| Net (loss) income attributable to Transcontinental Realty Investors, Inc. | | (26,920) | | 181,450 | | (15,815) | | 37 | | (7,636) |
| Preferred dividend requirement | | — | | (900) | | (900) | | (900) | | (900) |
| Net (loss) income applicable to common shares | $ | (26,920) | $ | 180,550 | $ | (16,715) | $ | (863) | $ | (8,536) |
| | | | | | | | | | | | |
| **PER SHARE DATA** | | | | | | | | | | | |
| **Earnings per share - basic** | | | | | | | | | | | |
| (Loss) income from continuing operations | $ | (3.00) | $ | 20.89 | $ | (1.86) | $ | (0.07) | $ | (1.08) |
| Income (loss) from discontinued operations | | — | | — | | — | | — | | 0.10 |
| Net (loss) income applicable to common shares | $ | (3.09) | $ | 20.71 | $ | (1.92) | $ | (0.10) | $ | (0.98) |
| Weighted average common shares used in computing earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 |
| | | | | | | | | | | | |
| **Earnings per share - diluted** | | | | | | | | | | | |
| (Loss) income from continuing operations | $ | (3.00) | $ | 20.89 | $ | (1.86) | $ | (0.07) | $ | (1.08) |
| Income (loss) from discontinued operations | | — | | — | | — | | — | | 0.10 |
| Net (loss) income applicable to common shares | $ | (3.09) | $ | 20.71 | $ | (1.92) | $ | (0.10) | $ | (0.98) |
| Weighted average common shares used in computing diluted earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 |
| | | | | | | | | | | | |
| **BALANCE SHEET DATA** | | | | | | | | | | | |
| Real estate, net | $ | 387,790 | $ | 384,504 | $ | 979,870 | $ | 891,173 | $ | 844,019 |
| Notes and interest receivable, net | | 120,986 | | 83,541 | | 70,166 | | 79,308 | | 69,551 |
| Investment in VAA | | 59,148 | | 68,399 | | — | | — | | — |
| Total assets | | 865,918 | | 862,380 | | 1,313,422 | | 1,185,914 | | 1,110,204 |
| Notes and interest payable | | 246,546 | | 277,237 | | 894,482 | | 841,516 | | 779,434 |
| Bonds and interest payable | | 229,722 | | 158,574 | | 113,047 | | — | | — |
| Shareholders' equity | | 354,067 | | 380,401 | | 208,261 | | 224,477 | | 225,055 |
| Book value per share | | 40.61 | | 43.64 | | 23.89 | | 25.75 | | 25.82 |

24

## ITEM 7.    *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

The following discussion should be read in conjunction with the financial statements and notes thereto appearing elsewhere in this report.

The Annual Report on Form 10-K contains forward-looking statements within the meaning of the federal securities laws, principally, but not only, under the captions "Business", "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." We caution investors that any forward-looking statements in this report, or which management may make orally or in writing from time to time, are based on management's beliefs and on assumptions made by, and information currently available to, management. When used, the words "anticipate", "believe", "expect", "intend", "may", "might", "plan", "estimate", "project", "should", "will", "result" and similar expressions which do not relate solely to historical matters are intended to identify forward-looking statements. These statements are subject to risks, uncertainties and assumptions and are not guarantees of future performance, which

may be affected by known and unknown risks, trends, uncertainties and factors that are beyond our control. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. We caution you that, while forward-looking statements reflect our good faith beliefs when we make them, they are not guarantees of future performance and are impacted by actual events when they occur after we make such statements. We expressly disclaim any responsibility to update our forward-looking statements, whether as a result of new information, future events or otherwise. Accordingly, investors should use caution in relying on past forward-looking statements, which are based on results and trends at the time they are made, to anticipate future results or trends.

Some of the risks and uncertainties that may cause our actual results, performance or achievements to differ materially from those expressed or implied by forward-looking statements include, among others, the following:

- general risks affecting the real estate industry (including, without limitation, the inability to enter into or renew leases, dependence on tenants' financial condition, and competition from other developers, owners and operators of real estate);

- risks associated with the availability and terms of financing and the use of debt to fund acquisitions and developments;

- failure to manage effectively our growth and expansion into new markets or to integrate acquisitions successfully;

- risks and uncertainties affecting property development and construction (including, without limitation, construction delays, cost overruns, inability to obtain necessary permits and public opposition to such activities);

- risks associated with downturns in the national and local economies, increases in interest rates, and volatility in the securities markets;

- costs of compliance with the Americans with Disabilities Act and other similar laws and regulations;

- potential liability for uninsured losses and environmental contamination;

- risks associated with our dependence on key personnel whose continued service is not guaranteed; and

- the other risk factors identified in this Form 10-K, including those described under the caption "Risk Factors."

The risks included here are not exhaustive. Other sections of this report, including Part I Item 1A. "Risk Factors," include additional factors that could adversely affect our business and financial performance. Moreover, we operate in a very competitive and rapidly changing environment. New risk factors emerge from time to time and it is not possible for management to predict all such risk factors, nor can we assess the impact of all such risk factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. Given these risks and uncertainties, investors should not place undue reliance on forward-looking statements as a prediction of actual results. Investors should also refer to our quarterly reports on Form 10-Q for future periods and current reports on Form 8-K as we file them with the SEC, and to other materials we may furnish to the public from time to time through Forms 8-K or otherwise.

25

**Overview**

We are an externally advised and managed real estate investment company that owns a diverse portfolio of income-producing properties and land held for development. The Company's portfolio of income-producing properties includes residential apartment communities, office buildings and other commercial properties. Our investment strategy includes acquiring existing income-producing properties as well as developing new properties on land already owned or acquired for a specific development project.

We acquire land primarily in urban in-fill locations or high-growth suburban markets. We are an active buyer and seller of real estate.

During the year ended December 31, 2019, the Company sold 105.1 acres of land for an aggregate sales price of $30.0 million and purchased 41.9 acres for an aggregate purchase price of approximately $4.6 million. In addition, the Company acquired 1.27 acres of land in exchange for a note receivable with a face value of $1.8 million.

We sold a multifamily residential property, located in Mary Ester, Florida for a total sales price of $3.1 million, and recognized a loss on the sale of $0.08 million.

The Company purchased an option to buy 37.8 acres of land (6.3 acres located in Collin County, Texas and 31.5 acres located in Clark County, Nevada) for $2.0 million from a third party land developer.

We advanced $21.4 million to several developers with the option to purchase the residential properties under construction at a future date, and sold fresh water district receivables related to infrastructure development work at Windmill Farms, located in Kaufman County, Texas for $12.0 million.

App. 1910

As of December 31, 2019, we owned 8,687 units in ten residential apartment communities, and seven commercial properties comprising of approximately 1.7 million rentable square feet. In addition, we own approximately 1,951 acres of land held for development. The Company currently owns income-producing properties and land in eight states.

We finance our acquisitions primarily through operating cash flow, proceeds from the sale of land and income-producing properties and debt financing primarily in the form of property-specific first-lien mortgage loans from commercial banks and institutional lenders. We finance our development projects principally with short-term, variable interest rate construction loans that are converted to long-term, fixed rate amortizing mortgages when the development project is completed and occupancy has been stabilized. The Company will, from time to time, also enter into partnerships with various investors to acquire income-producing properties or land and to sell interests in some of its wholly-owned properties. When the Company sells assets, it may carry a portion of the sales price generally in the form of a short-term, interest bearing seller-financed note receivable. The Company generates operating revenues primarily by leasing apartment units to residents and leasing office, retail and industrial space to commercial tenants.

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

<center>26</center>

Since April 30, 2011, Pillar is the Company's external Advisor and Cash Manager under a contractual arrangement that is reviewed annually by our Board of Directors. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for TCI's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual Advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Effective since January 1, 2011, Regis manages our commercial properties and provides brokerage services. Regis is entitled to receive a fee for its property management and brokerage services. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage." The Company contracts with third-party companies to lease and manage our apartment communities.

**Critical Accounting Policies**

We present our financial statements in accordance with generally accepted accounting principles in the United States ("GAAP").

The accompanying Consolidated Financial Statements include our accounts, our subsidiaries, generally all of which are wholly-owned, and all entities in which we have a controlling interest.

For entities in which we have less than a controlling financial interest or entities where we are not deemed to be the primary beneficiary, the entities are accounted for using the equity method of accounting. Accordingly, our share of the net earnings or losses of these entities are included in consolidated net income. TCI's investment in ARL is accounted for under the equity method.

In accordance with the VIE guidance in ASC 810 "Consolidations," the Company consolidated ten multifamily residential properties at December 31, 2019 and nine at December 31, 2018, located throughout the United States ranging from 1,657 units to 1,489 units. Assets totaling approximately $478 million and approximately $464 million at December 31, 2019 and 2018, respectively, are consolidated and included in "Real estate, at cost" on the balance sheet and are all collateral for their respective mortgage notes payable, none of which are recourse to the partnership in which they are in or to the Company.

**Real Estate**

Upon acquisitions of real estate, we assess the fair value of acquired tangible and intangible assets, including land, buildings, tenant improvements, "above-" and "below-market" leases, origination costs, acquired in-place leases, other identified intangible assets and assumed liabilities in accordance with ASC Topic 805 "Business Combinations", and allocate the purchase price to the acquired assets and assumed liabilities, including land at appraised value and buildings at replacement cost.

We assess and consider fair value based on estimated cash flow projections that utilize appropriate discount and/or capitalization rates, as well as available market information. Estimates of future cash flows are based on a number of factors including the historical operating results, known and anticipated trends, and market and economic conditions. The fair value of the tangible assets of an acquired property considers the value of the property as if it were vacant. We also consider an allocation of purchase price of other acquired intangibles, including acquired in-place leases that may have a customer relationship intangible value, including (but not limited to) the nature and extent of the existing relationship with the tenants, the tenants' credit quality and expectations of lease renewals. Based on our acquisitions to date, our allocation to customer relationship intangible assets has been immaterial.

We record acquired "above-" and "below-market" leases at their fair values (using a discount rate which reflects the risks associated with the leases acquired) equal to the difference between (1) the contractual amounts to be paid pursuant to each in-place lease and (2) management's estimate of fair market lease

<div align="right">App. 1911</div>

rates for each corresponding in-place lease, measured over a period equal to the remaining term of the lease for above-market leases and the initial term plus the term of any below-market fixed rate renewal options for below-market leases.

Other intangible assets acquired include amounts for in-place lease values that are based on our evaluation of the specific characteristics of each tenant's lease. Factors to be considered include estimates of carrying costs during hypothetical expected lease-up periods considering current market conditions, and costs to execute similar leases. In estimating carrying costs, we include real estate taxes, insurance and other operating expenses and estimates of lost rentals at market rates during the expected lease-up periods, depending on local market conditions. In estimating costs to execute similar leases, we consider leasing commissions, legal and other related expenses.

Transfers to or from our parent, ARL, or other related parties reflect a basis equal to the cost basis in the asset at the time of the sale.

**Depreciation and Impairment**

Real estate is stated at depreciated cost. The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. Costs directly related to the development of properties are capitalized. Capitalized development costs include interest, property taxes, insurance, and other direct project costs incurred during the period of development.

A variety of costs are incurred in the acquisition, development and leasing of properties. After determination is made to capitalize a cost, it is allocated to the specific component of a project that is benefited. Determination of when a development project is substantially complete and capitalization must cease involves a degree of judgment. Our capitalization policy on development properties is guided by ASC Topic 835-20 "Interest - Capitalization of Interest" and ASC Topic 970 "Real Estate—General". The costs of land and buildings under development include specifically identifiable costs. The capitalized costs include pre-construction costs essential to the development of the property, development costs, construction costs, interest costs, real estate taxes, salaries and related costs and other costs incurred during the period of development. We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

Management reviews its long-lived assets used in operations for impairment when there is an event or change in circumstances that indicates impairment in value. An impairment loss is recognized if the carrying amount of its assets is not recoverable and exceeds its fair value. Fair value is determined by a recent appraisal, comparable based upon prices for similar assets, executed sales contract, a present value and/or a valuation technique based upon a multiple of earnings or revenue. If such impairment is present, an impairment loss is recognized based on the excess of the carrying amount of the asset over its fair value. The evaluation of anticipated cash flows is highly subjective and is based in part on assumptions regarding future occupancy, rental rates and capital requirements that could differ materially from actual results in future periods. If we determine that impairment has occurred, the affected assets must be reduced to their fair value. We did not record any impairment charges for the years ended December 31, 2019 and 2018.

**Real Estate Assets Held for Sale**

We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their carrying amount or their estimated fair value, less estimated costs to sell. We did not have any real estate assets classified as held for sale at December 31, 2019 or 2018.

Any properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors, disclosed in Item 1 "Significant Real Estate Acquisitions/Dispositions and Financing." Any sale transaction where the guidance reflects that a sale had not occurred, the asset involved in the transaction, including the debt, if appropriate, and property operations, remained on the books of the Company. We continue to charge depreciation to expense as a period costs for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

**Investment in Unconsolidated Real Estate Ventures**

Except for ownership interests in variable interest entities, we account for our investments in unconsolidated real estate ventures under the equity method of accounting because the Company exercises significant influence over, but does not control, these entities. These investments are recorded initially at cost, as investments in unconsolidated real estate ventures, and subsequently adjusted for equity in earnings and cash contributions and distributions. Any difference between the carrying amount of these investments on the Company's balance sheet and the underlying equity in net assets is amortized as an adjustment to

equity in earnings of unconsolidated real estate ventures over the life of the related asset. Under the equity method of accounting, our net equity is reflected within the Consolidated Balance Sheets, and our share of net income or loss from the joint ventures is included within the Consolidated Statements of Operations. The joint venture agreements may designate different percentage allocations among investors for profits and losses; however, our recognition of joint venture income or loss generally follows the joint venture's distribution priorities, which may change upon the achievement of certain investment return thresholds. For ownership interests in variable interest entities, the Company consolidates those in which we are the primary beneficiary.

### Recognition of Rental Income

Rental income for commercial property leases is recognized on a straight-line basis over the respective lease terms. In accordance with ASC Topic 805, we recognize rental revenue of acquired in-place "above-"and "below-market" leases at their fair values over the terms of the respective leases. On our Consolidated Balance Sheets, we include as a receivable the excess of rental income recognized over rental payments received pursuant to the terms of the individual commercial lease agreements.

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

Rental revenue for multi-family real estate property leases is recorded when due from residents and is recognized monthly as earned, which is not materially different than on a straight-line basis as lease terms are normally for periods of one year or less. An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

Other revenue primarily consists of garage, parking, and utility-related fees; termination and late charge fees; non-refundable fees; and various other revenue amounts related to rental activities. Those revenue amounts are recognized when the service is provided.

### Leases

The Company is party to leases as a lessor of residential apartment communities and commercial buildings. The Company adopted ASU 2016-02, Leases, as of January 1, 2019 using the prospective adoption approach, applying the provisions of the new standard to existing leases as of the date of adoption.

Lessor Considerations

The Company evaluated leases in which it is the lessor, which are comprised of residential apartment community leases. The accounting model for lessors did not significantly change as a result of ASU 2016-02, with the impacts primarily related to the accounting for sales-type and direct financing leases. The Company evaluated its residential leases determining that they continue to be operating leases. For lease agreements that provide for rent concessions and/or scheduled fixed and determinable rent increases, rental income is recognized on a straight-line basis over the non - cancelable term of the lease. The Company's residential lease term is generally one year.

Additionally, for the Company's residential leases, which are comprised of the lease component and common area maintenance as a non-lease component, the Company determined that (1) the leases are operating leases, (2) the lease component is the predominant component, and (3) that all components of its operating leases share the same timing and pattern of transfer.

Implementation Considerations and Impact

As discussed above, the Company elected to apply certain lessor practical expedients allowed under the standard including:

- by class of underlying asset for residential leases, to not separate non-lease components from lease components and instead to account for each separate lease and non-lease component as a single lease component;

- to exclude costs paid by lessees directly to third parties on behalf of the Company; and

- to exclude sales taxes and other similar taxes assessed by a government authority and collected by the Company from the lessee.

### Revenue Recognition on the Sale of Real Estate

Sales and the associated gains or losses of real estate assets are recognized in accordance with the provisions of ASC Topic 360-20, "Property, Plant and Equipment—Real Estate Sale". The specific timing of a sale is measured against various criteria in ASC 360-20 related to the terms of the transaction and any continuing involvement in the form of management or financial assistance associated with the properties. If the sales criteria for the full accrual method are not met, we defer some or all of the gain recognition and account for the continued operations of the property by applying the finance, leasing, deposit, installment or cost recovery methods, as appropriate, until the sales criteria are met.

App. 1913

**Non-performing Notes Receivable**

We consider a note receivable to be non-performing when the maturity date has passed without principal repayment and the borrower is not making interest payments in accordance with the terms of the agreement.

**Interest Recognition on Notes Receivable**

We record interest income as earned in accordance with the terms of the related loan agreements.

**Allowance for Estimated Losses**

We assess the collectability of notes receivable on a periodic basis, the assessment consists primarily of an evaluation of cash flow projections of the borrower to determine whether estimated cash flows are sufficient to repay principal and interest in accordance with the contractual terms of the note. We recognize impairments on notes receivable when it is probable that principal and interest will not be received in accordance with the contractual terms of the loan. The amount of the impairment to be recognized generally is based on the fair value of the partnership's real estate that represents the primary source of loan repayment. Refer to Note 5 "Notes and Interest Receivable" for details on our notes receivable.

**Fair Value of Financial Instruments**

We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions define fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

<div align="center">30</div>

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1 — Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2 — Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3 — Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

**Related parties**

We apply ASC Topic 805, "Business Combination", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

**Results of Operations**

The discussion of our results of operations is based on management's review of operations, which is based on our segments. Our segments consist of apartments, commercial buildings, land and other. For discussion purposes, we break these segments down into the following sub-categories; same property portfolio, acquired properties, and developed properties in the lease-up phase. The same property portfolio consists of properties that were held by us for the entire period for both years being compared. The acquired property portfolio consists of properties that we acquired but have not held for the entire period for both periods being compared. Developed properties in the lease-up phase consist of completed projects that are being leased-up. As we complete each phase of the project, we lease-up that phase and include those revenues in our continued operations. Once a developed property becomes leased-up (80% or more) and is held the entire period for both years under comparison, it is considered to be included in the same property portfolio. Income- producing properties that we have sold during the year are reclassified to discontinued operations for all periods presented. The other segment consists of revenue and operating expenses related to the notes receivable and corporate entities.

The following discussion is based on our Consolidated Statements of Operations for the years ended December 31, 2019, 2018, and 2017 as included in Item 8. "Consolidated Financial Statements and Supplementary Data". Continuing operations relates to income-producing properties that were held during

<div align="right">App. 1914</div>

The following table shows the total number of income-producing properties, and other key financial measures as of December 31, 2019, 2018 and 2017:

|  | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| **Residential properties (Company owned)** | | 10 | | 9 | | 51 |
| Residential properties (total apartment units) | | 1,657 | | 1,489 | | 8,606 |
| Residential - average annual rental revenue per sqf | $ | 13.36 | $ | 6.53 | $ | 11.83 |
| **VAA joint venture - residential properties** | | 51 | | 49 | | — |
| VAA residential properties (total apartment units) | | 9,888 | | 9,192 | | — |
| VAA residential - average annual rental revenue per sqf | $ | 14.74 | $ | 12.83 | $ | — |
| **Commercial properties (Company owned)** | | 7 | | 7 | | 7 |
| Commercial properties - total sqf | | 1,697,890 | | 1,697,890 | | 1,697,890 |
| Commercial - average annual rental revenue per sqf | $ | 25.61 | $ | 19.80 | $ | 18.55 |

31

*Comparison of the year ended December 31, 2019 to the year ended December 31, 2018:*

For the year ended December 31, 2019, we reported net loss applicable to common shares of $26.9 million or $3.09 per share compared to a net income applicable to common shares of $180.6 million or $20.71 per share for the year ended December 31, 2018.

**Revenues**

Rental and other property revenues were $47.9 million for the year ended December 31, 2019, compared to $121.0 million for the same period in 2018. The $73.1 million decrease is primarily due to a decrease in the amount of multifamily residential apartment buildings currently in our portfolio of ten as compared to forty-eight multifamily residential apartment buildings for the period January 1 through November 19, 2018 as a result of the deconsolidation of forty-nine residential apartment properties that were sold into the VAA Joint Venture on November 19, 2018. As the assets are now treated as unconsolidated investments, our share of rental revenues is part of income from unconsolidated investments in the current period and are no longer treated as rental income (Refer to Note 2).

**Expenses**

Property operating expenses decreased by $34.2 million to $25.2 million for the year ended December 31, 2019 as compared to $59.4 million for the same period in 2018. The decrease in property operating expenses is primarily due to the deconsolidation of forty-nine residential apartment properties that were sold into the VAA Joint Venture during the fourth quarter of 2018 which resulted in a decrease in salary and related payroll expenses of $6.7 million, real estate taxes of $11.6 million, management fees paid to third parties of $2.6 million and other general property operating and maintenance expenses of $13.3 million.

Depreciation and amortization decreased by $9.4 million to $13.4 million during the year ended December 31, 2019 as compared to $22.8 million for the same period in 2018. This decrease is primarily due to the deconsolidation of the residential apartments in connection with our previous sale and contribution of our interests to the VAA Joint Venture.

General and administrative expense was $10.9 million for the year ended December 31, 2019, compared to $11.4 million for the same period in 2018. The decrease of $0.5 million in general and administrative expenses is the result of a decrease in fees paid to our Advisors of $0.4 million and other general and administrative expenses of $0.1 million.

Net income fee was $0.4 million for the year ended December 31, 2019. This represents a decrease of $0.2 million compared to the prior year net income fee of $0.6 million. The net income fee paid to Pillar is calculated at 7.5% of net income.

Advisory fees were $5.8 million for the year ended December 31, 2019. This represents a decrease of $4.9 million compared to the prior year advisory fees of $10.7 million. Advisory fees are computed based on a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value.

**Other income (expense)**

Interest income was $19.6 million for the year ending December 31, 2019, compared to $15.8 million for the same period in 2018. The increase of $3.8 was primarily due to an increase of $2.4 million in interest on receivable owed from our Advisors, and $1.4 in interest on notes receivable from other related parties.

Other income was $0.084 million for the year ending December 31, 2019, compared to $28.2 million for the same period in 2018. For the year ending December 31, 2019, we recognized a gain of approximately $8.1 million as a result of deferred income associated with the sale of property in previous years, received cash proceeds of $0.2 million from the collection of tax increment incentives from the city of Farmers Branch, Texas related to infrastructure

App. 1915

development work at Mercer Crossing and recognized miscellaneous income of approximately $1.1 million, offset by general expenses of approximately $9.3 million. For the same period a year ago, we received insurance proceeds of $7.6 million on Mahogany Run Golf Course, recognized a gain of $17.6 million as a result of deferred income related to the sale of land, and recognized miscellaneous income of approximately $2.2 million.

<center>32</center>

Mortgage and loan interest expense was $31.8 million for the year ending December 31, 2019, compared to $58.9 million for the same period in 2018. The decrease of $27.1 million is due to the deconsolidation of residential apartment properties into the VAA Joint Venture which were encumbered by mortgage debt.

Foreign currency transaction was a loss of $15.1 million for the year ending December 31, 2019, as compared to a gain of $12.4 million for the same period in 2018. The loss is due to the unfavorable exchange rate between the Israel Shekels and the U.S. Dollar related to our Israel Shekels denominated bonds and the increase in our bonds obligations during the year ended December 31, 2019 as compared to the same period a year ago.

Loss on debt extinguishment was $5.2 million in 2019 with no comparable amount in 2018. The loss is the result of debt borrowing costs write-off of $1.4 million and prepayment penalty of approximately $3.9 million associated with the payment of $41.5 million of mortgage debt related to one of our commercial building.

Loss from unconsolidated investments was a net of $2.8 million for the year ending December 31, 2019 as compared to net earnings of $1.1 million for the year ended December 31, 2018. The loss from unconsolidated investments in 2019, was driven primarily from our share in the losses reported by our joint venture VAA of $2.8 million (Refer to Note 2).

Loss from the sale of income-producing property increased for the year ending December 31, 2019 as compared to the same period a year ago. During the year ended December 31, 2019, we sold a multifamily residential property for a sales price of $3.1 million and recorded a loss of $0.08 million. During year ended December 31, 2018, we sold six multifamily residential properties at an aggregate sales price of $8.5 million and recorded no gain or loss from the sale.

Gain on land sales decreased by $2.5 million for the year ending December 31, 2019, to $14.9 million as compared to $17.4 million for the same period a year ago. During the year ending December 31, 2019, we sold 105.1 acres of land for an aggregate sales price of $30.0 million and recorded a gain of $14.9 million.  For the same period a year ago, we sold approximately 112.2 acres of land for an aggregate sales price of $43.3 million and recorded a gain of $17.4 million.

***Comparison of the year ended December 31, 2018 to the year ended December 31, 2017:***

For the year ended December 31, 2018, we reported net income applicable to common shares of $180.6 million or $20.71 per share compared to a net loss applicable to common shares of $16.7 million or ($1.92) per share for the year ended December 31, 2017. The current year net income applicable to common shares includes a gain on the formation of the joint venture VAA of $154.1 million. Current year net income also includes gain on sales of land of $17.4 million and no gain on sales of income-producing properties, compared to the prior year net loss which included gain on sales of income producing properties of $9.8 million and gain on land sales of $4.9 million.

**Revenues**

Rental and other property revenues were $121.0 million for the year ended December 31, 2018. This represents a decrease of $4.2 million, as compared to the prior year revenues of $125.2 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

**Expenses**

Property operating expenses were $59.4 million for the year ended December 31, 2018. This represents a decrease of $3.7 million, compared to the prior year operating expenses of $63.1 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

<center>33</center>

Depreciation and amortization expenses were $22.8 million for the year ended December 31, 2018. This represents a decrease of $2.8 million compared to prior year depreciation of $25.6 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

General and administrative expenses were $11.4 million for the year ended December 31, 2018. This represents an increase of $5.1 million compared to the prior year expenses of $6.3 million. The increase in general and administrative expenses was due primarily to an increase in fees paid to our Advisors of

approximately $5.3 million, general fees of approximately $1.5 million associated with finalizing the formation of the joint venture, legal and regulatory fees of $0.8 million and general and professional fees of approximately $1.0 million.

Net income fee was $0.6 million for the year ended December 31, 2018. This represents an increase of $0.3 million compared to the prior year net income fee of $0.3 million. The net income fee paid to Pillar is calculated at 7.5% of net income.

Advisory fees were $10.7 million for the year ended December 31, 2018. This represents an increase of $0.7 million compared to the prior year advisory fees of $10.0 million. Advisory fees are computed based on a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value.

**Other income (expense)**

Interest income was $15.8 million for the year ending December 31, 2018 compared to $13.9 million for the year ended December 31, 2017 for an increase of $1.9 million. This increase was primarily due to an increase of $2.7 million in interest on receivable owed from our Advisors, offset by a decrease of $0.8 in interest on notes receivable from other related parties.

Other income was $28.2 million and $0.6 million for the years ended December 31, 2018 and 2017, respectively. The increase of $27.6 million was primarily due to a $17.6 million gain recognized in September 2018 for deferred income associated with the sale of assets, as well as income of approximately $7.6 million from insurance proceeds on Mahogany Run Golf Course.

Mortgage and loan interest expense was $58.9 million for the year ended December 31, 2018. This represents a decrease of $1.0 million compared to the prior year expense of $59.9 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

No gain on sales of income producing properties was recognized during the year ended December 31, 2018. Gain on sale of income-producing properties was $9.8 million for the year ended December 31, 2017, attributable to the recognition of deferred gain.

Gain on land sales was $17.4 million and $4.9 million for the years ended December 31, 2018 and 2017, respectively. The increase of approximately $12.5 million was primarily due to sales of land at Mercer Crossing recognized in 2018.

Gain on disposition of 50% interest in VAA was $154.1 million for the year ended December 31, 2018. There was no such gain in prior years, the gain was the result of the contribution of fifty-two properties to the joint venture VAA.

**Liquidity and Capital Resources**

**General**

Our principal liquidity needs are:

- fund normal recurring expenses;

- meet debt service and principal repayment obligations including balloon payments on maturing debt;

- fund capital expenditures, including tenant improvements and leasing costs;

- fund development costs not covered under construction loans; and

- fund possible property acquisitions.

Our principal sources of cash have been and will continue to be:

- property operations;

- proceeds from land and income-producing property sales;

- collection of mortgage notes receivable;

- collections of receivables from related companies;

- refinancing of existing mortgage notes payable; and

- additional borrowings, including mortgage notes payable, and lines of credit.

App. 1917

It is important to realize that the current status of the banking industry has had a significant effect on our industry. The banks' willingness and/or ability to originate loans affects our ability to buy and sell property, and refinance existing debt. We are unable to foresee the extent and length of this down-turn. A continued and extended decline could materially impact our cash flows. We draw on multiple financing sources to fund our long-term capital needs. We generally fund our development projects with construction loans, which are converted to traditional mortgages upon completion of the project.

We may also issue additional equity securities, including common stock. Management anticipates that our cash and cash equivalents as of December 31, 2019, along with cash that will be generated in 2020 from notes and interest receivables, will be sufficient to meet all of our cash requirements. Management intends to selectively sell land and income-producing assets, refinance or extend real estate debt and seek additional borrowings secured by real estate to meet its liquidity requirements. Although history cannot predict the future, historically, we have been successful at refinancing and extending a portion of the Company's current maturity obligations.

Management reviews the carrying values of TCI's properties and mortgage notes receivable at least annually and whenever events or a change in circumstances indicate that impairment may exist. Impairment is considered to exist if, in the case of a property, the future cash flow from the property (undiscounted and without interest) is less than the carrying amount of the property. The property review generally includes: (1) selective property inspections; (2) a review of the property's current rents compared to market rents; (3) a review of the property's expenses; (4) a review of maintenance requirements; (5) a review of the property's cash flow; (6) discussions with the manager of the property; and (7) a review of properties in the surrounding area. For notes receivable, impairment is considered to exist if it is probable that all amounts due under the terms of the note will not be collected. If impairment is found to exist, a provision for loss is recorded by a charge against earnings. The note receivable review includes an evaluation of the collateral property securing such note.

**Cash Flow Summary**

The following summary discussion of our cash flows is based on the Consolidated Statements of Cash Flows in Part II, Item 8. "Consolidated Financial Statements and Supplementary Data" and is not meant to be an all-inclusive discussion of the changes in our cash flows for the periods presented below (dollars in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | Incr /(Decr) |
| Net cash (used in) operating activities | $ (35,747) | $ (181,187) | $ 145,440 |
| Net cash (used in) provided by investing activities | $ (9,598) | $ 147,625 | $ (157,223) |
| Net cash provided by financing activities | $ 22,041 | $ 51,785 | $ (29,744) |

35

The primary use of cash for operations is daily operating costs, general and administrative expenses, advisory fees, and land holding costs. Our primary source of cash from operating activities is from rental income on properties.

Our primary cash outlays for investing activities are for construction and development, acquisition of land and income-producing properties, and capital improvements to existing properties. Our primary sources of cash from investing activities are from the proceeds on the sale of land and income-producing properties.

Our primary cash outlays for investing activities are for construction and development, acquisition of land and income-producing properties, and capital improvements to existing properties. During the year ended December 31, 2019, we advanced $21.4 million toward various notes receivable, purchased land for development for $3.4 million, and invested approximately $33.7 million for the construction and development of new properties and improvement of income producing properties. For the year ended December 31, 2018, we advanced $16.8 million toward various notes receivable and invested $85.1 million for development of new properties and improvement of income producing properties.

Our primary sources of cash from investing activities are from the proceeds on the sale of land and income-producing properties. During the year ended December 31, 2019, we received aggregate sales proceeds of $27.3 million from the sale of 105.1 acres of land and recorded a gain of $15.1 million, received $13.9 in payments from related party note receivables, and sold a residential property for which we received cash proceeds of $1.3 million and a plot of land valued at $1.8 million. For the year ended December 31, 2018, we received aggregate sales proceeds of $11.9 million from the sale of approximately 112 acres of land and recorded a gain on the sale of $17.4 million. In addition, we received aggregate sale proceeds of $4.9 million from the sale of seven income producing properties and a golf course, $236.8 million from the formation of the joint venture with Macquarie, and collected $6.5 million from a related party note receivable.

Our primary sources of cash from financing activities are from proceeds on notes payables. Our primary cash outlays are for recurring debt payments and payments on maturing notes payable.

For the year ended December 31, 2019, the increase in cash flow from financing activities was due to proceeds from borrowings of $25.7 million, and $78.1 million from the sale of nonconvertible Series C Bonds by Southern, offset by payments to our notes payable of $51.9 million and bond payments of $21.7 million.

App. 1918

For the year ended December 31, 2018, the increase in cash flow from financing activities was due primarily to proceeds from borrowings of $123.3 million, and proceeds received from the sale of nonconvertible Series B Bonds by Southern of $59.2 million, offset by payments to our notes payable of $124.6 million.

**Equity Investments**

TCI has from time to time purchased shares of IOR and ARL. The Company may purchase additional equity securities of IOR and ARL through open market and negotiated transactions to the extent TCI's liquidity permits. Equity securities of ARL and IOR held by TCI may be deemed "restricted securities" under Rule 144 of the Securities Act of 1933 ("Securities Act"). Accordingly, TCI may be unable to sell such equity securities other than in a registered public offering or pursuant to an exemption under the Securities Act for a one-year period after they are acquired. Such restrictions may reduce TCI's ability to realize the full fair value of such investments if TCI attempted to dispose of such securities in a short period of time.

TCI also holds a voting and profit participation right of 50% and 49%, respectively in VAA. VAA actively participates in the development and/or acquisitions of Class A multi-family assets.

<center>36</center>

**Contractual Obligations**

The following table represents our contractual obligations at December 31, 2019 (in thousands):

|  | Total | 2020 | 2021 | 2022 | 2023 | 2024 | Thereafter |
|---|---|---|---|---|---|---|---|
| Notes and interest payable [1] | $ 334,132 | $ 36,592 | $ 63,775 | $ 18,920 | $ 41,951 | $ 5,401 | $ 167,493 |
| Bonds and interest payable [1] | 276,642 | 37,317 | 47,573 | 45,057 | 120,324 | 13,599 | 12,772 |
| Total | $ 610,774 | $ 73,909 | $ 111,348 | $ 63,977 | $ 162,275 | $ 19,000 | $ 180,265 |

[1] TCI's long-term debt may contain financial covenants that, if certain thresholds are not met, could allow the lender to accelerate principal payments or cause the note to become due immediately.

**Environmental Matters**

Under various federal, state and local environmental laws, ordinances and regulations, TCI may be potentially liable for removal or remediation costs, as well as certain other potential costs, relating to hazardous or toxic substances (including governmental fines and injuries to persons and property) where property-level managers have arranged for the removal, disposal or treatment of hazardous or toxic substances. In addition, certain environmental laws impose liability for release of asbestos-containing materials into the air, and third parties may seek recovery for personal injury associated with such materials.

Management is not aware of any environmental liability relating to the above matters that would have a material adverse effect on TCI's business, assets or results of operations.

**Inflation**

The effects of inflation on TCI's operations are not quantifiable. Revenues from property operations tend to fluctuate proportionately with inflationary increases and decreases in housing costs. Fluctuations in the rate of inflation also affect sales values of properties and the ultimate gain to be realized from property sales. To the extent that inflation affects interest rates, TCI's earnings from short-term investments, the cost of new financings and the cost of variable interest rate debt will be affected.

**ITEM 7A.   *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK***

TCI's primary market risk exposure consists of changes in interest rates on borrowings under our debt instruments that bear interest at variable rates that fluctuate with market interest rates and maturing debt that has to be refinanced. TCI's future operations, cash flow and fair values of financial instruments are also partially dependent on the then existing market interest rates and market equity prices.

As of December 31, 2019, our outstanding notes payable consisted of approximately $253.1 million, out of which $249.2 million were notes with fixed interest rates and $3.9 million represented a note with a variable interest rate of 9.75%. Our overall weighted average interest rate at December 31, 2019 and 2018 was 4.9% and 7.1%, respectively.

TCI's interest rate sensitivity position is managed by the capital markets department. Interest rate sensitivity is the relationship between changes in market interest rates and the fair value of market rate sensitive assets and liabilities. TCI's earnings are affected as changes in short-term interest rates affect its cost of variable-rate debt and maturing fixed-rate debt.

If market interest rates for our variable-rate debt average 600 basis points more in 2020 than they did during 2019, TCI's interest expense would increase and net income would decrease by $0.036 million. This amount is determined by considering the impact of hypothetical interest rates on TCI's borrowing cost. The analysis does not consider the effects of the reduced level of overall economic activity that could exist in such an environment. Further, in the event of a change of such magnitude, management would likely take actions to further mitigate its exposure to the change. However, due to the uncertainty of the specific actions that would be taken and their possible effects, the sensitivity analysis assumes no change in TCI's financial structure.

37

The following table contains exposures at December 31, 2019. Anticipation of exposures or risk on positions that could possibly arise was not considered. TCI's ultimate interest rate risk and its effect on operations will depend on future capital market exposures, which cannot be anticipated with a probable assurance level (dollars in thousands):

| | 2020 | 2021 | 2022 | 2023 | 2024 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| **Note Receivable** | | | | | | | |
| **Fixed interest rate - fair value** | | | | | | | $  114,182 |
| Instrument's maturities | $    54,807 | $    33,328 | $    5,096 | $    — | $    — | $    20,951 | $  114,182 |
| Interest | 10,442 | 6,833 | 3,126 | 2,514 | 2,514 | 2,514 | $  27,943 |
| Weighted Average Rate | 6.59% | 11.12% | 12.00% | 12.00% | 12.00% | 12.00% | |
| | | | | | | | |
| **Notes Payable:** | | | | | | | |
| **Variable Rate - fair value** | | | | | | | $  3,908 |
| Instrument's maturities | $    3,908 | $    — | $    — | $    — | $    — | $    — | $  347 |
| Interest | 347 | — | — | — | — | — | 2,467 |
| Average interest rate [(1)] | 9.75% | — | — | — | — | — | |
| | | | | | | | |
| **Fixed interest rate - fair value** | | | | | | | $  249,207 |
| Instrument's maturities | $    22,074 | $    55,393 | $    13,437 | $    36,770 | $    1,995 | $    119,538 | $  249,207 |
| Interest | 10,263 | 8,382 | 5,483 | 5,181 | 3,406 | 47,954 | $  80,669 |
| Average interest rate | 8.73% | 5.90% | 3.99% | 5.22% | 3.63% | 3.74% | |

(1) Interest rates on variable rate notes payable are equal to the variable rates in effect on December 31, 2019.

38

ITEM 8.      *CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

**INDEX TO FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| **Financial Statements** | |

| Report of Independent Registered Public Accounting Firm | 40 |
| Consolidated Balance Sheets—December 31, 2019 and 2018 | 41 |
| Consolidated Statements of Operations—Years Ended December 31, 2019, 2018 and 2017 | 42 |
| Consolidated Statements of Shareholders' Equity—Years Ended December 31, 2019, 2018 and 2017 | 43 |
| Consolidated Statements of Cash Flows—Years Ended December 31, 2019, 2018 and 2017 | 44 |
| Statements of Consolidated Comprehensive Income (Loss) – Years Ended December 31, 2019, 2018 and 2017 | 45 |
| Notes to Consolidated Financial Statements | 46 |

**Financial Statement Schedules**

App. 1920

All other schedules are omitted because they are not required, are not applicable or the information required is included in the Financial Statements or the notes thereto.

---

---

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors of and
Stockholders of Transcontinental Realty Investors, Inc.
Dallas, Texas

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Transcontinental Realty Investors, Inc. and Subsidiaries as of December 31, 2019 and 2018, and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2019, and the related notes and schedules collectively referred to as the "consolidated financial statements." In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Transcontinental Realty Investors, Inc. as of December 31, 2019 and 2018 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with U.S. generally accepted accounting principles.

**Basis of Opinion**

These consolidated financial statements are the responsibility of Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of Liquidity**

As described in the Note 17, Transcontinental Realty Investors, Inc.'s management intends to sell land and income-producing properties and refinance or extend debt secured by real estate to meet the Company's liquidity needs.

**Supplemental Information**

The supplemental information contained in Schedules III and IV has been subjected to audit procedures performed in conjunction with the audit of the Company's financial statements. The supplemental information is the responsibility of the Company's management. Our audit procedures included determining whether the supplemental information reconciles to the financial statements or the underlying accounting and other records, as applicable, and performing procedures to test the completeness and accuracy of the information presented in the supplemental information. In forming our opinion on the supplemental information, we evaluated whether the supplemental information, including its form and content, is presented in conformity with the Security and Exchange Commission's rules. In our opinion, the supplemental information is fairly stated, in all material respects, the financial date required to be set forth therein in relation to the financial statements as a whole.

FARMER, FUQUA & HUFF, PC
Richardson, Texas
March 30, 2020
We have served as the Company's auditor since 2004.

---

---

TRANSCONTINENTAL REALTY INVESTORS, INC.
CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|  | 2019 | 2018 |
|  | (dollars in thousands, except share and par value amounts) | |
| **Assets** | | |
| Real estate, at cost | $ 469,997 | $ 461,718 |
| Real estate subject to sales contracts at cost | 7,966 | 2,014 |
| Less accumulated depreciation | (90,173) | (79,228) |
| Total real estate | 387,790 | 384,504 |
|  | | |
| Notes and interest receivable (including $57,260 in 2019 and $51,945 in 2018 from related parties) | 120,986 | 83,541 |
| Cash and cash equivalents | 51,179 | 36,358 |
| Restricted cash | 32,082 | 70,207 |
| Investment in VAA | 59,148 | 68,399 |
| Investment in other unconsolidated investees | 22,632 | 22,172 |
| Receivable from related parties | 141,541 | 133,642 |
| Other assets | 50,560 | 63,557 |
| Total assets | $ 865,918 | $ 862,380 |
|  | | |
| **Liabilities and Shareholders' Equity** | | |
| Liabilities: | | |
| Notes and interest payable | $ 246,546 | $ 277,237 |
| Bonds and bond interest payable | 229,722 | 158,574 |
| Deferred revenue (including $9,468 in 2019 and $17,522 in 2018 to related parties) | 9,468 | 17,522 |
| Deferred tax liability | — | 2,000 |
| Accounts payable and other liabilities (including $935 in 2019 and $3 in 2018 to related parties) | 26,115 | 26,646 |
| Total liabilities | 511,851 | 481,979 |
|  | | |
| Shareholders' equity: | | |
| Common stock, $0.01 par value, authorized 10,000,000 shares; issued 8,717,967 shares in 2019 and 2018; outstanding 8,717,767 shares in 2019 and 2018 | 87 | 87 |
| Treasury stock at cost, 200 shares in 2019 and 2018 | (2) | (2) |
| Paid-in capital | 257,853 | 258,050 |
| Retained earnings | 74,665 | 101,585 |
| Total Transcontinental Realty Investors, Inc. shareholders' equity | 332,603 | 359,720 |
| Non-controlling interest | 21,464 | 20,681 |
| Total shareholders' equity | 354,067 | 380,401 |
| Total liabilities and shareholders' equity | $ 865,918 | $ 862,380 |

The accompanying notes are an integral part of these consolidated financial statements.

41

TRANSCONTINENTAL REALTY INVESTORS, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS

|  | For the Years Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|  | (dollars in thousands, except per share amounts) | | |
| **Revenues:** | | | |
| Rental and other property revenues (including $841, $767 and $839 for the years ended 2019, 2018 and 2017, respectively, from related parties) | $ 47,970 | $ 120,955 | $ 125,233 |
|  | | | |
| **Expenses:** | | | |
| Property operating expenses (including $991, $943 and $929 for the years ended 2019, 2018 and 2017, respectively, from related parties) | 25,213 | 59,420 | 63,056 |

App. 1922

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Depreciation and amortization | | | 25,558 |
| General and administrative (including $4,144, $4,578 and $3,120 for the years ended 2019, 2018 and 2017, respectively, from related parties) | 10,951 | 11,359 | 6,269 |
| Net income fee to related party | 357 | 631 | 250 |
| Advisory fee to related party | 5,806 | 10,663 | 9,995 |
| Total operating expenses | 55,706 | 104,834 | 105,128 |
| Net operating (loss) income | (7,736) | 16,121 | 20,105 |
| | | | |
| **Other income (expenses):** | | | |
| Interest income (including $17,413, $13,132 and $11,485 for the years ended 2019, 2018 and 2017, respectively, from related parties) | 19,607 | 15,793 | 13,862 |
| Other income | 84 | 28,150 | 625 |
| Mortgage and loan interest (including $1,999, $423 and $1,174 for the year ended 2019, 2018 and 2017, respectively, from related parties) | (31,816) | (58,872) | (59,944) |
| Foreign currency transaction (loss) gain | (15,108) | 12,399 | (4,536) |
| Loss on debt extinguishment | (5,219) | — | — |
| Equity (loss) earnings from VAA | (2,774) | 44 | — |
| Earnings from other unconsolidated investees | 16 | 1,085 | 26 |
| Total other expenses | (35,210) | (1,401) | (49,967) |
| (Loss) income before gain on disposition of 50% interest in VAA, gain on land sales, non-controlling interest, and taxes | (42,946) | 14,720 | (29,862) |
| | | | |
| Gain on disposition of 50% interest in VAA | — | 154,126 | — |
| (Loss) gain on sale of income producing properties | (80) | — | 9,842 |
| Gain on land sales | 14,889 | 17,404 | 4,884 |
| Net (loss) income from continuing operations before taxes | (28,137) | 186,250 | (15,136) |
| Income tax expense - current | — | (1,210) | (180) |
| Income tax benefit (expense) - deferred | 2,000 | (2,000) | — |
| Net (loss) income from continuing operations | (26,137) | 183,040 | (15,316) |
| Net (loss) income | (26,137) | 183,040 | (15,316) |
| Net (income) attributable to non-controlling interest | (783) | (1,590) | (499) |
| Net (loss) income attributable to Transcontinental Realty Investors, Inc. | (26,920) | 181,450 | (15,815) |
| Preferred dividend requirement | — | (900) | (900) |
| Net (loss) income applicable to common shares | $ (26,920) | $ 180,550 | $ (16,715) |
| | | | |
| **Earnings per share - basic** | | | |
| Net (loss) income from continuing operations | $ (3.00) | $ 20.89 | $ (1.86) |
| Net (loss) income applicable to common shares | $ (3.09) | $ 20.71 | $ (1.92) |
| | | | |
| **Earnings per share - diluted** | | | |
| Net (loss) income from continuing operations | $ (3.00) | $ 20.89 | $ (1.86) |
| Net (loss) income applicable to common shares | $ (3.09) | $ 20.71 | $ (1.92) |
| | | | |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 |
| **Amounts attributable to Transcontinental Realty Investors, Inc.** | | | |
| Net (loss) income from continuing operations | $ (26,137) | $ 183,040 | $ (15,316) |
| Net (loss) income applicable to common shares | $ (26,920) | $ 180,550 | $ (16,715) |

The accompanying notes are an integral part of these consolidated financial statements.

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY**
**For the Three Years Ended December 31, 2019**
**(audited, dollars in thousands, except share amounts)**

| | Total | Comprehensive | Common Stock | | Treasury | Paid-in | Retained | Non-controlling |
|---|---|---|---|---|---|---|---|---|

| | Equity | Income (Loss) | Shares | Amount | Stock | Capital | Earnings | Interest |
|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2016 | $ 224,477 | $ (64,852) | 8,717,967 | $ 87 | $ (2) | $ 269,849 | $ (64,050) | $ 18,592 |
| Net loss | (15,316) | (15,316) | — | — | — | — | (15,815) | 499 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | (900) | — | — |
| Balance, December 31, 2017 | $ 208,261 | $ (80,168) | 8,717,967 | $ 87 | $ (2) | $ 268,949 | $ (79,865) | $ 19,091 |
| Net income | 183,040 | 181,450 | — | — | — | — | 181,450 | 1,590 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | (900) | — | — |
| Redemption of Series D preferred stock | (10,000) | — | — | — | — | (9,999) | — | — |
| Balance, December 31, 2018 | $ 380,401 | $ 101,282 | 8,717,967 | $ 87 | $ (2) | $ 258,050 | $ 101,585 | $ 20,681 |
| Distribution to equity partner | (197) | — | — | — | — | (197) | — | — |
| Net loss | (26,137) | (26,920) | — | — | — | — | (26,920) | 783 |
| Balance, December 31, 2019 | $ 354,067 | $ 74,362 | 8,717,967 | $ 87 | $ (2) | $ 257,853 | $ 74,665 | $ 21,464 |

The accompanying notes are an integral part of these consolidated financial statements.

43

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(unaudited)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| | (dollars in thousands) | | |
| **Cash Flow From Operating Activities:** | | | |
| Net (loss) income | $ (26,137) | $ 183,040 | $ (15,316) |
| Adjustments to reconcile net (loss) income to net cash (used in) operating activities: | | | |
| Gain on disposition of 50% inerest in VAA | — | (154,126) | — |
| Loss (gain) on sale of income-producing properties | 80 | — | (9,842) |
| Foreign currency transaction loss (gain) | 15,108 | (12,399) | 4,536 |
| Loss on debt extinguishment | 5,219 | — | — |
| Gain on sale of land | (14,889) | (17,404) | (4,884) |
| Depreciation and amortization | 13,379 | 22,761 | 25,558 |
| Amortization of deferred borrowing costs | 662 | 4,994 | 3,574 |
| Amortization of bond issuance costs | 1,544 | 2,994 | 971 |
| Loss (earnings) from joint venture | 2,774 | (44) | — |
| Earnings from other unconsolidated investees | (16) | (1,085) | (26) |
| (Increase) decrease in assets: | | | |
| Accrued interest receivable | (8,916) | (22,601) | (668) |
| Other assets | (1,149) | (105,531) | (1,433) |
| Prepaid expense | 10,237 | 19,124 | (5,661) |
| Rent receivables | 626 | (3,213) | 543 |
| Related party receivables | (35,257) | (14,995) | (9,972) |
| Increase (decrease) in liabilities: | | | |
| Accrued interest payable | 2,349 | (2,307) | 4,573 |
| Other liabilities | (1,361) | (80,395) | (17,027) |
| Net cash (used in) operating activities | (35,747) | (181,187) | (25,074) |
| | | | |
| **Cash Flow From Investing Activities:** | | | |
| Proceeds from disposition of 50% interest in VAA | — | 236,752 | — |
| Proceeds from notes receivable | 13,862 | 6,541 | 26,230 |
| Originations or advances on notes receivable | (21,434) | (16,801) | (16,420) |
| Acquisition of land held for development | (3,422) | — | — |
| Acquisition of income-producing properties | — | (10,558) | (37,044) |
| Distribution from equity investee | 6,701 | — | — |
| Distributions to equity partner | (197) | — | — |
| Proceeds from sale of income-producing properties | 1,296 | 4,889 | — |
| Proceeds from sale of land | 27,326 | 11,857 | 6,301 |

App. 1924

| | | | |
|---|---:|---:|---:|
| Improvement of income-producing properties | (5,457) | (3,908) | (64,443) |
| Construction and development of new properties | (28,473) | (81,367) | (12,936) |
| Net cash (used in) provided by investing activities | (9,598) | 147,625 | (98,312) |
| | | | |
| **Cash Flow From Financing Activities:** | | | |
| Proceeds from notes payable | 25,675 | 123,345 | 135,116 |
| Recurring payment of principal on notes payable | (10,446) | (124,616) | (83,070) |
| Payment on commercial note payable | (41,531) | — | — |
| Debt extinguishment costs | (3,799) | — | — |
| Proceeds from bonds | 78,125 | 59,213 | 115,335 |
| Bond payments | (21,742) | — | — |
| Bond issuance costs | (4,241) | (5,257) | (6,887) |
| Deferred financing costs | — | — | (3,599) |
| Preferred stock dividends - Series D | — | (900) | (900) |
| Net cash provided by financing activities | 22,041 | 51,785 | 155,995 |
| | | | |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (23,304) | 18,223 | 32,609 |
| Cash, cash equivalents and restricted cash, beginning of period | 106,565 | 88,342 | 55,733 |
| Cash, cash equivalents and restricted cash, end of period | $ 83,261 | $ 106,565 | $ 88,342 |
| | | | |
| **Supplemental disclosures of cash flow information:** | | | |
| Cash paid for interest | $ 29,430 | $ 61,587 | $ 49,791 |
| | | | |
| **Schedule of noncash investing and financing activities:** | | | |
| Land received in exchange for note receivable | $ 1,800 | $ — | $ — |
| Notes receivable received from sale of income-producing properties | $ — | $ 1,735 | $ — |
| Seller financing note - acquisition of income-producing properties | $ — | $ 1,895 | $ — |
| Notes payable issued on acquisition of income-producing properties | $ — | $ 31,175 | $ — |
| Notes payable issued on acquisition of land | $ 1,155 | $ — | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

44

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | **2019** | **2018** | **2017** |
| | (dollars in thousands) | | |
| Net (loss) income | $ (26,137) | $ 183,040 | $ (15,316) |
| Total comprehensive (loss) income | (26,137) | 183,040 | (15,316) |
| Comprehensive (income) attributable to non-controlling interest | (783) | (1,590) | (499) |
| Comprehensive (loss) income attributable to Transcontinental Realty Investors, Inc. | $ (26,920) | $ 181,450 | $ (15,815) |

The accompanying notes are an integral part of these consolidated financial statements.

45

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

The accompanying Consolidated Financial Statements of Transcontinental Realty Investors, Inc. "TCI" and consolidated entities have been prepared in conformity with accounting principles generally accepted in the United States of America, the most significant of which are described in Note 1. "Summary of Significant Accounting Policies." The Notes to Consolidated Financial Statements are an integral part of the Consolidated Financial Statements. The data

presented in the Notes to Consolidated Financial Statement are as of December 31 of each year and for the year then ended, unless otherwise indicated. Dollar amounts in tables are in thousands, except per share amounts.

Certain prior year amounts have been reclassified to conform to the current year presentation on the consolidated statements of operations, consolidated balance sheets and the consolidated statements of cash flows.

## NOTE 1.    *ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES*

***Organization and business.***    TCI, a Nevada corporation, is headquartered in Dallas, Texas and its common stock trades on the New York Stock Exchange ("NYSE American") under the symbol "TCI".

TCI is a "C" corporation for U.S. federal income tax purposes and files an annual consolidated income tax return with American Realty Investors, Inc. "ARL", whose common stock is traded on the NYSE American under the symbol "ARL". Subsidiaries of ARL own approximately 78.38% of the Company's common stock.

In 2009, the Company acquired an additional 2,518,934 shares of common stock of Income Opportunity Realty Investors, Inc. "IOR", and in doing so, increased its ownership from approximately 25% to over 80% of the shares of common stock of IOR outstanding. Upon acquisition of the additional shares in 2009, IOR's results of operations began consolidating with those of the Company for tax and financial reporting purposes. As of December 31, 2019, TCI owned 81.23% of the outstanding IOR common shares. Shares of IOR are traded on the New York Exchange ("NYSE American") under the symbol "IOR".

TCI's Board of Directors are responsible for directing the overall affairs of TCI and for setting the strategic policies that guide the Company. As of April 30, 2011, the Board of Directors delegated the day-to-day management of the Company to Pillar Income Asset Management, Inc. ("Pillar"), a Nevada corporation, under a written Advisory Agreement that is reviewed annually by TCI's Board of Directors. The directors of TCI are also directors of ARL and IOR. The Chairman of the Board of Directors of TCI also serves as the Chairman of the Board of Directors of ARL and IOR. The officers of TCI also serve as officers of ARL, IOR and Pillar.

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is Realty Advisors, Inc. "RAI", a Nevada corporation, the sole shareholder of which is May Realty Holdings, Inc. ("MRHI", formerly known as Realty Advisors Management, Inc. "RAMI", effective August 7, 2014), a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARL and IOR.  As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

<div align="center">46</div>

Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), manages our commercial properties and provides brokerage services. Regis receives property management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage".  TCI engages third-party companies to lease and manage its apartment properties.

Southern Properties Capital Ltd. ("Southern") is a wholly owned subsidiary of TCI that was incorporated on August 16, 2016 for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange. Southern operates in the United States and is primarily involved in investing in, developing, constructing and operating income-producing properties of multi-family residential real estate assets. Southern is included in the consolidated financial statements of TCI.

On January 1, 2012, the Company entered into a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

On November 19, 2018, we executed an agreement between the Macquarie Group ("Macquarie") and Southern and TCI to create a joint venture, Victory Abode Apartments, LLC ("VAA") to address existing and future demand for quality multifamily residential housing through acquisition and development of sustainable Class A multifamily housing in focused secondary and tertiary markets. In connection with the formation of the joint venture, Southern and TCI contributed a portfolio of 47 income producing apartment complexes, and 5 development projects in various stages of construction and received cash consideration of $236.8 million. At the time of the transfer of the properties, the joint venture assumed all liabilities of those properties, including mortgage debt to the Department of Housing and Urban Development ("HUD").

VAA is equally owned and controlled by Abode JVP, LLC, a wholly-owned subsidiary of Southern and Summerset Intermediate Holdings 2 LLC

<div align="right">App. 1926</div>

("Summerset"), a wholly-owned indirect subsidiary of Macquarie. Pursuant to the Agreement, Abode TPO LLC and Summerset each own voting and profit participation rights of 50% and 49%, respectively ("Class A Members").  The remaining 2% of the profits interest is held by Daniel J. Moos, who serves as the President and Chief Executive officer of the Company ("Class B Member") and Manager of the joint venture.

Our primary business is the acquisition, development and ownership of income-producing residential and commercial real estate properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time and when we believe it appropriate to do so, we will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents and leasing office and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate income from gains on sales of income-producing properties and land. At December 31, 2019, we owned ten residential apartment communities comprising of 1,657 units, seven commercial properties comprising an aggregate of approximately 1.7 million rentable square feet, an investment in 1,951 acres of undeveloped and partially developed land. In addition, our joint venture VAA owns fifty-one residential apartment communities comprised of 9,888 units.

<div align="center">47</div>

*Basis of presentation*.   The Company presents its financial statements in accordance with generally accepted accounting principles in the United States ("GAAP"). The accompanying Consolidated Financial Statements include our accounts, our subsidiaries, generally all of which are wholly-owned, and all entities in which we have a controlling interest. Arrangements that are not controlled through voting or similar rights are accounted for as a Variable Interest Entity (VIE), in accordance with the provisions and guidance of ASC Topic 810 "Consolidation", whereby we have determined that we are a primary beneficiary of the VIE and meet certain criteria of a sole general partner or managing member as identified in accordance with Emerging Issues Task Force ("EITF") Issue 04-5, Investor's Accounting for an Investment in a Limited Partnership when the Investor is the Sole General Partner and the Limited Partners have Certain Rights ("EITF 04-5"). VIEs are generally entities that lack sufficient equity to finance their activities without additional financial support from other parties or whose equity holders as a group lack adequate decision making ability, the obligation to absorb expected losses or residual returns of the entity, or have voting rights that are not proportional to their economic interests. The primary beneficiary generally is the entity that provides financial support and bears a majority of the financial risks, authorizes certain capital transactions, or makes operating decisions that materially affect the entity's financial results. All significant intercompany balances and transactions have been eliminated in consolidation.

In determining whether we are the primary beneficiary of a VIE, we consider qualitative and quantitative factors, including, but not limited to: the amount and characteristics of our investment; the obligation or likelihood for us or other investors to provide financial support; our and the other investors' ability to control or significantly influence key decisions for the VIE; and the similarity with and significance to the business activities of us and the other investors. Significant judgments related to these determinations include estimates about the current future fair values and performance of real estate held by these VIEs and general market conditions.

For entities in which we have less than a controlling financial interest or entities where it is not deemed to be the primary beneficiary, the entities are accounted for using the equity method of accounting. Accordingly, our share of the net earnings or losses of these entities are included in consolidated net income. TCI's investments in ARL and VAA are accounted for under the equity method.

The Company in accordance with the VIE guidance in ASC 810 "Consolidations" consolidates ten and nine multifamily residential properties located throughout the United States at December 31, 2019 and December 31, 2018, respectively, with total units of 1,657 and 1,489, respectively.  Assets totaling $477.9 million and $463.7 million at December 31, 2019 and 2018, respectively, are consolidated and included in "Real estate, at cost" on the balance sheet and are all collateral for their respective mortgage notes payable, none of which are recourse to the partnership in which they are in or to the Company.

*Real estate, depreciation, and impairment*.   Real estate assets are stated at the lower of depreciated cost or fair value, if deemed impaired. Major replacements and betterments are capitalized and depreciated over their estimated remaining useful lives. Depreciation is computed on a straight-line basis over the useful lives of the properties (buildings and improvements—10-40 years; furniture, fixtures and equipment—5-10 years). We continually evaluate the recoverability of the carrying value of its real estate assets using the methodology prescribed in ASC Topic 360, "Property, Plant and Equipment," Factors considered by management in evaluating impairment of its existing real estate assets held for investment include significant declines in property operating profits, annually recurring property operating losses and other significant adverse changes in general market conditions that are considered permanent in nature. Under ASC Topic 360, a real estate asset held for investment is not considered impaired if the undiscounted, estimated future cash flows of an asset (both the annual estimated cash flow from future operations and the estimated cash flow from the theoretical sale of the asset) over its estimated holding period are in excess of the asset's net book value at the balance sheet date. If any real estate asset held for investment is considered impaired, a loss is provided to reduce the carrying value of the asset to its estimated fair value.

Properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors. For sales transactions where the guidance reflects a sale did not occur, the asset involved in the transaction, including the debt, if applicable, and property operations, remain on the books of the Company. We continue to charge depreciation to expense as a period cost for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

*Real estate held for sale*.   We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their carrying amount or their estimated fair value, less estimated costs to sell. We did not have any real estate assets classified as held for sale at December 31, 2019 or 2018.

<div align="right">App. 1927</div>

48

Effective as of January 1, 2015, we adopted the revised guidance in Accounting Standards Update No. 2014-08 regarding discontinued operations. For sales of real estate or assets classified as held for sale after January 1, 2015, we will evaluate whether a disposal transaction meets the criteria of a strategic shift and will have a major effect on our operations and financial results to determine if the results of operations and gains on sale of real estate will be presented as part of our continuing operations or as discontinued operations in our consolidated statements of operations. If the disposal represents a strategic shift, it will be classified as discontinued operations for all periods presented; if not, it will be presented in continuing operations.

Any properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors, disclosed in Item 1 "Significant Real Estate Acquisitions/Dispositions and Financing." Any sale transaction where the guidance reflects that a sale had not occurred, the asset involved in the transaction, including the debt, if appropriate, and property operations, remained on the books of the Company. We continue to charge depreciation to expense as a period costs for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

*Cost capitalization.*    The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. Costs directly related to planning, developing, initial leasing and constructing a property are capitalized and classified as Real Estate in the Consolidated Balance Sheets. Capitalized development costs include interest, property taxes, insurance, and other direct project costs incurred during the period of development.

A variety of costs are incurred in the acquisition, development and leasing of properties. After determination is made to capitalize a cost, it is allocated to the specific component of a project that is benefited. Determination of when a development project is substantially complete and capitalization must cease involves a degree of judgment. Our capitalization policy on development properties is guided by ASC Topic 835-20 "Interest – Capitalization of Interest" and ASC Topic 970 "Real Estate - General". The costs of land and buildings under development include specifically identifiable costs. The capitalized costs include pre-construction costs essential to the development of the property, development costs, construction costs, interest costs, real estate taxes, salaries and related costs and other costs incurred during the period of development. We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

We capitalize leasing costs which include commissions paid to outside brokers, legal costs incurred to negotiate and document a lease agreement and any internal costs that may be applicable. We allocate these costs to individual tenant leases and amortize them over the related lease term.

*Fair value measurement*.    We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions define fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1 —Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2 —Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

49

Level 3 —Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Related parties.* We apply ASC Topic 805, "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

***Recognition of Revenue.*** Our revenues, which are composed largely of rental income, include rents reported on a straight-line basis over the lease term. In accordance with ASC 805 "Business Combinations", we recognize rental revenue of acquired in-place "above-" and "below-market" leases at their fair values over the terms of the respective leases.

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

Rental revenue for residential property leases is recorded when due from residents and is recognized monthly as earned, which is not materially different than on a straight-line basis as lease terms are generally for periods of one year or less. An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

Sales and the associated gains or losses related to real estate assets are recognized in accordance with the provisions of ASC Topic 360-20, "Property, Plant and Equipment—Real Estate Sale." The specific timing of a sale is measured against various criteria in ASC 360-20 related to the terms of the transaction and any continuing involvement in the form of management or financial assistance associated with the properties. If the sales criteria for the full accrual method are not met, the Company defers some or all of the gain recognition and accounts for the continued operations of the property by applying the finance, leasing, deposit, installment or cost recovery methods, as appropriate, until the sales criteria are met.

***Non-performing notes receivable.*** We consider a note receivable to be non-performing when the maturity date has passed without principal repayment and the borrower is not making interest payments in accordance with the terms of the agreement.

***Interest recognition on notes receivable***. We record interest income as earned in accordance with the terms of the related loan agreements.

***Allowance for estimated losses***. We assess the collectability of notes receivable on a periodic basis, the assessment consists primarily of an evaluation of cash flow projections of the borrower to determine whether estimated cash flows are sufficient to repay principal and interest in accordance with the contractual terms of the note. We recognize impairments on notes receivable when it is probable that principal and interest will not be received in accordance with the contractual terms of the loan. The amount of the impairment to be recognized generally is based on the fair value of the partnership's real estate that represents the primary source of loan repayment. Refer to Note 5 "Notes and Interest Receivable" for details on our notes receivable.

***Cash equivalents.*** For purposes of the Consolidated Statements of Cash Flows, all highly liquid investments purchased with an original maturity of three months or less are considered to be cash equivalents.

<div align="center">50</div>

***Restricted cash.*** Restricted cash is comprised primarily of cash balances held in escrow by financial institutions under the terms of certain secured notes payable and certain unsecured bonds payable.

***Concentration of credit risk.*** The Company maintains its cash balances at commercial banks and through investment companies, the deposits of which are insured by the Federal Deposit Insurance Corporation (FDIC). At December 31, 2019 and 2018, the Company maintained balances in excess of the insured amount.

***Earnings per share***. Income (loss) per share is presented in accordance with ASC 620 "Earnings per Share" and is computed based upon the weighted average number of shares of common stock outstanding during each year.

***Use of estimates.*** In the preparation of Consolidated Financial Statements in conformity with GAAP, it is necessary for management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements and the reported amounts of revenues and expense for the year ended. Actual results could differ from those estimates.

***Income taxes***. The Company is a "C" corporation" for U.S. federal income tax purposes. The Company and the rest of the ARL group are included in the MRHI, consolidated group for tax purposes. TCI is a member of a tax sharing agreement that specifies the manner in which the group will share the consolidated tax liability and also how certain tax attributes are to be treated among members of the group.

***Recent accounting pronouncements***.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes.* The amendments in this Update simplify the accounting for income taxes by removing certain exceptions from ASC 740. Also, the amendments in this Update simplify the accounting for income taxes by requiring that an entity recognize a franchise tax (or similar tax) that is partially based on income as an income-based tax, requiring that an entity evaluate when a step up in the tax basis of goodwill should be considered part of the business combination, and other targeted changes. The effective date of the amendments is for fiscal years, and interim periods within those years, beginning after December 15, 2020. The Company is currently evaluating the impact that the adoption of ASU 2019-12 may have on its consolidated financial statements.

<div align="right">App. 1929</div>

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities*. This standard is intended to improve the accounting when considering indirect interests held through related parties under common control for determining whether fees paid to decision makers and service providers are variable interests. The effective date of the amendments is for fiscal years, and interim periods within those years, beginning after December 15, 2019. The new standard must be adopted retrospectively with early adoption permitted. The Company does not expect the adoption of this ASU to have a material impact on its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement* that eliminates, adds and modifies certain disclosure requirements for fair value measurements. The effective date of the standard is for fiscal periods, and interim periods within those years, beginning after December 15, 2019. The amendments on changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively. All other amendments should be applied retrospectively. Early adoption is permitted. The Company does not expect the adoption of this ASU to have a material impact on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842). The standard amends the existing lease accounting guidance and requires lessees to recognize a lease liability and a right-of-use asset for all leases (except for short-term leases that have a duration of one year or less) on their balance sheets. Lessees will continue to recognize lease expense in a manner similar to current accounting. For lessors, accounting for leases under the new guidance is substantially the same as in prior periods, but eliminates current real estate-specific provisions and changes the treatment of initial direct costs. Entities are required to use a modified retrospective approach for leases that exist or are entered into after the beginning of the earliest comparable period presented, with an option to elect certain transition relief. ASU 2016-02 was effective for reporting periods beginning after December 15, 2018. The adoption of ASU 2016-02 did not have a material impact on the Company's financial position and results of operations.

<center>51</center>

In May 2014, Accounting Standards Update ("ASU") No. 2014-09 ("ASU 2014-09"), "Revenue from Contracts with Customers," was issued. This new guidance established a new single comprehensive revenue recognition model and provides for enhanced disclosures. Under the new policy, the nature, timing and amount of revenue recognized for certain transactions could differ from those recognized under existing accounting guidance. This new standard does not affect revenue recognized under lease contracts. ASU 2014-09 is effective for reporting periods beginning after December 15, 2017. As the majority of the Company's revenue is from rental revenue related to leases, the Company has determined that the adoption of this Standard was immaterial to the consolidated financial statements and related disclosures.

## NOTE 2.  *INVESTMENT IN VAA*

On November 19, 2018, we executed an agreement between the Macquarie Group ("Macquarie") and Southern and TCI to create a joint venture, Victory Abode Apartments, LLC ("VAA") to address existing and future demand for quality multifamily residential housing through acquisition and development of sustainable Class A multifamily housing in focused secondary and tertiary markets. In connection with the formation of the joint venture, Southern and TCI contributed a portfolio of 47 income producing apartment complexes, and 5 development projects in various stages of construction. TCI received cash consideration of $236.8 million and recognized a gain of approximately $154.1 million. At the time of the transfer of the properties, the joint venture assumed all liabilities of those properties, including mortgage debt to the Department of Housing and Urban Development ("HUD").

VAA is equally owned and controlled by Abode JVP, LLC, a wholly-owned subsidiary of Southern and Summerset Intermediate Holdings 2 LLC ("Summerset"), a wholly-owned indirect subsidiary of Macquarie. Pursuant to the Agreement, Abode JVP, LLC and Summerset each own voting and profit participation rights of 50% and 49%, respectively ("Class A Members"). The remaining 2% of the profit participation interest is held by Daniel J. Moos TCI's President and Chief Executive Officer ("Class B Member") who serves also as the Manager of the joint venture. In addition, upon the closing of the agreement the Class B Member received a payment of $1.9 million.

The Company accounts for VAA as an equity method investment. Under the equity method of accounting, our net equity is reflected within the Consolidated Balance Sheets, and our share of net income or loss from the joint ventures is included within the Consolidated Statements of Operations. The joint venture agreements may designate different percentage allocations among investors for profits and losses; however, our recognition of joint venture income or loss generally follows the joint venture's distribution priorities, which may change upon the achievement of certain investment return thresholds.

The following is a summary of the financial position and results of operations of VAA (dollars in thousands):

| | As of December 31, | |
| --- | --- | --- |
| **Balance Sheet** | **2019** | **2018** |
| Net real estate assets | $ 1,242,957 | $ 1,257,557 |
| Other assets | 62,222 | 67,020 |
| Debt, net | (832,779) | (791,225) |
| Other liabilities | (271,291) | (280,288) |
| Total equity | (201,109) | (253,064) |

<div align="right">App. 1930</div>

| Results of Operations | For the Year Ended December 31, 2019 | | For the period November 19 to December 31, 2018 | |
|---|---|---|---|---|
| Total revenue | $ | 115,377 | $ | 12,887 |
| Total property, operating, and maintenance expenses | | (56,967) | | (4,507) |
| Interest expense | | (61,487) | | (5,818) |
| Depreciation and Amortization | | (43,942) | | (6,987) |
| Total other expense | | (3,377) | | (5,297) |
| Net loss | $ | (50,396) | $ | (9,722) |

52

The following is a reconciliation from VAA's net loss to TCI's equity in earnings of VAA (dollars in thousands):

| | For the Year Ended December 31, 2019 | | For the period November 19 to December 31, 2018 | |
|---|---|---|---|---|
| VAA net loss | $ | (50,396) | $ | (9,722) |
| *Adjustments to reconcile to income (loss) from VAA* | | | | |
| Interest expense on mezzanine loan | | 25,014 | | 2,815 |
| In-place lease intangibles - amortization expense | | 14,703 | | 3,983 |
| Depreciation basis differences | | 5,132 | | 3,012 |
| **Net loss** | $ | (5,547) | $ | 88 |
| Percentage ownership in VAA | | 50% | | 50% |
| Loss from VAA | $ | (2,774) | $ | 44 |

The following table sets forth the location of our real estate held for investment (income-producing properties only) by asset type as of December 31, 2019:

| | Apartments | |
|---|---|---|
| Location | No. | Units |
| Alabama | 1 | 168 |
| Arkansas | 5 | 1,122 |
| Colorado | 2 | 260 |
| Florida | 2 | 388 |
| Georgia | 1 | 222 |
| Louisiana | 3 | 464 |
| Mississippi | 1 | 196 |
| North Carolina | 1 | 201 |
| Nevada | 1 | 308 |
| Tennessee | 4 | 708 |
| Texas-Greater Dallas-Ft Worth | 19 | 3,709 |
| Texas-Greater Houston | 2 | 416 |
| Texas-Other | 9 | 1,726 |
| **Total** | **51** | **9,888** |

At December 31, 2019, our apartment projects in development included (dollars in thousands):

| Property | Location | No. of Units | Costs to Date [1] | | Total Projected Costs [1] | |
|---|---|---|---|---|---|---|
| Lakeside Lofts apartments | Farmers Branch, TX | 249 | $ | 50,357 | $ | 80,622 |
| Total | | **249** | **$** | **50,357** | **$** | **80,622** |

(1) Costs include construction hard costs, construction soft costs and loan borrowing costs.

During 2019, the Company received $19.4 million cash distribution from VAA as a result of the annual surplus cash computation from its HUD collateralized residential properties and other amounts owed to the Company as agreed to in the joint venture operating agreement.

App. 1931

**NOTE 3.    *REAL ESTATE***

At December 31, 2019 and 2018, TCI's real estate investment is comprised of the following (dollars in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Apartments | $    156,173 | $    126,274 |
| Apartments under construction | 22,363 | 27,261 |
| Commercial properties | 229,424 | 224,167 |
| Land held for development | 62,037 | 84,016 |
| Real estate subject to sales contract | 7,966 | 2,014 |
| Total real estate, at cost, less impairment | $    477,963 | $    463,732 |
| Less accumulated deprecation | (90,173) | (79,228) |
| Total real estate, net of depreciation | $    387,790 | $    384,504 |

Expenditures for repairs and maintenance are charged to operations as incurred. Significant betterments are capitalized. When assets are sold or retired, their costs and related accumulated depreciation are removed from the accounts with the resulting gains or losses reflected in net income or loss for the period.

Depreciation is computed on a straight line basis over the estimated useful lives of the assets as follows:

| | |
| --- | --- |
| Land improvements | 25 to 40 years |
| Buildings and improvements | 10 to 40 years |
| Tenant improvements | Shorter of useful life or terms of related lease |
| Furniture, fixtures and equipment | 3 to 7 years |

*Fair Value Measurement*

The Company applies the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. The Company is required to assess the fair value of its consolidated real estate assets with indicators of impairment. The value of impaired real estate assets is determined using widely accepted valuation techniques, including discounted cash flow analyses on the expected cash flow of each asset, as well as the income capitalization approach, which considers prevailing market capitalization rates, analyses of recent comparable sales transactions, information from actual sales negotiations and bona fide purchase offers received from third parties. The methods used to measure fair value may produce an amount that may not be indicative of net realizable value or reflective of future values. Furthermore, although the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

The fair value measurements used in these evaluations are considered to be Level 2 and 3 valuations within the fair value hierarchy in the accounting rules, as there are significant observable (Level 2) and unobservable inputs (Level 3). Examples of Level 2 inputs the Company utilizes in its fair value calculations are appraisals and bona fide purchase offers from third parties. Examples of Level 3 inputs the Company utilizes in its fair value calculations are discount rates, market capitalization rates, expected lease rental rates, timing of new leases, an estimate of future sales prices and comparable sales prices of similar assets, if available. There was no provision for impairment during the years ended December 31, 2019, 2018 and 2017.

The following is a description of the Company's significant real estate transactions for the year ended December 31, 2019:

- Sold 35.9 acres of land located in Farmers Branch, Texas for an aggregate sales price of $18.9 million and recognized a gain on the sale of $9.0 million.

- Sold 29.4 acres of land located in Forney, Texas for a total sales price of $5.0 million and recognized a gain on the sale of approximately $4.1 million.

- Sold 10.33 acres of land located in Dallas, Texas for a total sales price of $2.1 million and recognized a gain on the sale of approximately $0.4 million.

App. 1932

- Sold 6.25 acres of land located in Nashville, Tennessee for a total sales price of $2.3 million and recognized a gain on the sale of approximately $0.9 million.

- Sold 23.24 acres of land located in Fort Worth, Texas for a total sales price of $1.8 million and recognized a gain on the sale of approximately $0.5 million.

- Sold a multifamily residential property, located in Mary Ester, Florida for a total sales price of $3.1 million out of which $1.8 million represents land received with a total acreage of 1.27 acres located in Riverside, California in exchange for a note receivable of the same value. The Company recognized a loss from this sale of approximately $0.08 million.

- Purchased 33.05 acres of land in Athens, Alabama for a total purchase price of $2.1 million, out of which $0.9 million was paid in cash and the remaining balance of $1.2 million was issued as a note payable. The note payable matures in eighteen months and bears an annual interest rate of 5.91%.

- Purchased from a third party 8.94 acres of land located in Collin County, Texas for a total purchase price of $2.5 million.

- Purchased an option to buy 37.8 acres of land (6.3 acres located in Collin County, Texas and 31.5 acres located in Clark County, Nevada) for $2.0 million from a third party land developer.

The Company continues to invest in the development of apartment projects. During the year ended December 31, 2019, TCI has invested $28.5 million related to the construction and development of various apartment complexes and capitalized $0.8 million of interest costs.

<center>55</center>

**NOTE 4.**  *SUPPLEMENTAL CASH FLOW INFORMATION*

For the years ended December 31, 2019 and 2018, the Company paid interest of $29.4 million and $61.6 million, respectively.

Cash and cash equivalents, and restricted cash for fiscal year ended 2019 and 2018 was $83.3 million and $106.6 million, respectively. The following is a reconciliation of the Company's cash and cash equivalents, and restricted cash to the total presented in the consolidated statement of cash flows:

|  | December 31, | |
|---|---|---|
|  | 2019 | 2018 |
| Cash and cash equivalents | $ 51,179 | $ 36,358 |
| Restricted cash (cash held in escrow) | 15,540 | 37,946 |
| Restricted cash (certificate of deposits) | 3,759 | 9,688 |
| Restricted cash (held with Trustee) | 12,783 | 22,573 |
| Total cash, cash equivalents and restricted cash | $ 83,261 | $ 106,565 |

Amounts included in restricted cash represent funds required to meet contractual obligations with certain financial institutions for the payment of reserve replacement and tax and insurance escrow. In addition, restricted cash includes funds to the Bond's Trustee for payment of principal and interests.

<center>56</center>

**NOTE 5.**  *NOTES AND INTEREST RECEIVABLE*

A portion of our assets are invested in mortgage notes receivable, principally secured by real estate. We may originate mortgage loans in conjunction with providing purchase money financing of property sales. Notes receivable are generally collateralized by real estate or interests in real estate and personal guarantees of the borrower and, unless noted otherwise, are so secured. Management intends to service and hold for investment the mortgage notes in our portfolio. A majority of the notes receivable provide for principal to be paid at maturity (dollars in thousands).

| Borrower | Maturity Date | Interest Rate | Amount | Security |
|---|---|---|---|---|
| Performing loans: | | | | |
| Prospectus Endeavors 4, LLC | 01/23 | 12.00% | 5,907 | Secured |
| Prospectus Endeavors 6, LLC | 10/22 | 12.00% | 496 | Secured |

| | | | | |
|---|---|---|---|---|
| Oulan-Cumar Family Trust | 06/20 | 8.00% | 74 | Secured |
| H198, LLC (McKinney Ranch Land) | 09/20 | 6.00% | 4,554 | Secured |
| Forest Pines | 11/20 | 5.00% | 2,868 | Secured |
| Spyglass Apartments of Ennis, LP | 11/20 | 5.00% | 5,288 | Secured |
| Bellwether Ridge | 05/20 | 5.00% | 3,765 | Secured |
| Parc at Windmill Farms | 05/20 | 5.00% | 7,602 | Secured |
| Autumn Breeze | 10/21 | 5.00% | 1,302 | Secured |
| Plum Tree | 10/21 | 5.00% | 413 | Secured |
| Ingleside | 12/21 | 5.00% | 1,531 | Secured |
| RNC | 09/24 | 5.00% | 8,802 | Secured |
| Revolving Line of Credit Steeple Crest | 10/20 | 5.00% | 6,665 | Secured |
| RAI PFBL 2018 Purch Fee Note Weatherford | 12/21 | 12.00% | 525 | Secured |
| Unified Housing Foundation, Inc. (Echo Station) [1] | 12/32 | 12.00% | 1,481 | Secured |
| Unified Housing Foundation, Inc. (Lakeshore Villas) [1] | 12/32 | 12.00% | 2,000 | Secured |
| Unified Housing Foundation, Inc. (Lakeshore Villas) [1] | 12/32 | 12.00% | 6,369 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 1,953 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 2,000 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 4,000 | Secured |
| Unified Housing Foundation, Inc. (Timbers of Terrell) [1] | 12/32 | 12.00% | 1,323 | Secured |
| Unified Housing Foundation, Inc. [1] | 12/21 | 12.00% | 10,401 | Unsecured |
| Unified Housing Foundation, Inc. [1] | 06/20 | 12.00% | 5,314 | Unsecured |
| Unified Housing Foundation, Inc. [1] | 03/22 | 12.00% | 4,782 | Unsecured |
| Unified Housing Foundation, Inc. (Lakeshore Villas) [1] | 07/21 | 12.00% | 838 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 07/21 | 12.00% | 773 | Secured |
| Unified Housing Foundation, Inc. (Marquis at Vista Ridge) [1] | 07/21 | 12.00% | 839 | Secured |
| Unified Housing Foundation, Inc. (Timbers at the Park) [1] | 07/21 | 12.00% | 432 | Secured |
| Unified Housing Foundation, Inc. (Trails at White Rock) [1] | 07/21 | 12.00% | 913 | Secured |
| Unified Housing Foundation, Inc. (Bella Vista) [1] | 08/21 | 12.00% | 212 | Secured |
| Unified Housing Foundation, Inc. [1] | 10/21 | 12.00% | 6,831 | Unsecured |
| Other related party notes | Various | Various | 3,553 | Various secured interests |
| Other non-related party notes | Various | Various | 10,276 | Various secured interests |
| Accrued interest | | | 8,629 | |
| **Total Performing** | | | $ 122,811 | |
| Allowance for estimated losses | | | (1,825) | |
| **Total** | | | $ 120,986 | |

[1] Related party notes

As of December 31, 2019, the obligors on $54.0 million of the mortgage notes receivable portfolio were due from related entities. The Company recognized $6.9 million of interest income from these related party notes receivables. In addition, during the quarter ended June 30, 2019, TCI purchased notes receivables with a face value of $29.0 million (out of which $1.0 million represented accrued interest receivables) from related parties.

As of December 31, 2019, none of the mortgage notes receivable portfolio were non-performing.

The Company has various notes receivable from Unified Housing foundation, Inc. "UHF". UHF is determined to be a related party due to our significant investment in the performance of the collateral secured under the notes receivable. Payments are due from surplus cash flow from operations, sale or refinancing of the underlying properties. These notes are cross collateralized to the extent that any surplus cash available from any of the properties underlying these notes will be used to repay outstanding interest and principal for the remaining notes. Furthermore, any surplus cash available from any of the properties UHF owns, besides the properties underlying these notes, can be used to repay outstanding interest and principal for these notes. The allowance on the notes was a purchase allowance that was netted against the notes when acquired.

## NOTE 6.    *INVESTMENT IN UNCONSOLIDATED JOINT VENTURES AND INVESTEES*

Investments in unconsolidated subsidiaries, jointly owned companies and other investees in which we have a 20% to 50% ownership interest or otherwise exercise significant influence are carried at cost, adjusted for the Company's proportionate share of their undistributed earnings or losses, via the equity

Our interest in the common stock of ARL in the amount of 0.90% is accounted for under the equity method.

The summary data presented below includes our investments accounted for under the equity method, except for our investment in VAA which is discussed in detail in Note 2 'Investment in VAA'.

The following is a summary of the financial position and results of operations from our unconsolidated parent (dollars in thousands):

|  | | December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | | 2019 | | 2018 | | 2017 |
| **ARL** | | | | | | |
| Real estate, net of accumulated depreciation | $ | — | $ | 549 | $ | 12,349 |
| Notes receivable | | 35,213 | | 42,517 | | 41,928 |
| Other assets | | 67,441 | | 66,712 | | 126,238 |
| Notes payable | | (8,327) | | (9,637) | | (6,507) |
| Other liabilities | | (26,947) | | (21,123) | | (102,014) |
| Shareholders' equity/partners capital | | (67,380) | | (79,018) | | (71,994) |

|  | | For the Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | | 2019 | | 2018 | | 2017 |
| Rents, interest and other income | $ | 12,569 | $ | 7,132 | $ | 9,193 |
| Depreciation | | — | | — | | (157) |
| Operating expenses | | (3,765) | | (2,420) | | (3,149) |
| Gain on land sales | | 1,016 | | — | | 4,765 |
| Interest expense | | (8,043) | | (7,191) | | (6,228) |
| Income (loss) from continuing operations | $ | 1,777 | $ | (2,479) | $ | 4,424 |
| Net income (loss) | $ | 1,777 | $ | (2,479) | $ | 4,424 |
|  | | | | | | |
| Company's proportionate share of income (loss) | $ | 16 | $ | (22) | $ | 40 |

During the fourth quarter of 2018, TCI purchased from RAI 900,000 shares of ARL Series A convertible Preferred Stock for $9.0 million. The Series A Preferred Stock may be converted into common stock at 90.0% of the average daily closing price of ARL's common stock for the prior 20 trading days.

The investment in ARL convertible Preferred Stock is being carried at the Company's cost of $9 million and is included in investment in other unconsolidated investees. Additionally, TCI purchased from RAI $9.9 million accrued unpaid dividends related to the ARL Series A convertible Preferred Stock which is carried at the cost and included in investment in unconsolidated investees on the balance sheet.

58

**NOTE 7.**    *NOTES AND INTEREST PAYABLE*

Below is a summary of our notes and interest payable as of December 31, 2019 and 2018 (dollars in thousands):

|  | | December 31, | | |
| --- | --- | --- | --- | --- |
|  | | 2019 | | 2018 |
| Apartments | $ | 120,024 | $ | 94,759 |
| Apartments under Construction | | 9,017 | | 14,402 |
| Commercial | | 92,838 | | 135,951 |
| Land | | 14,806 | | 22,200 |
| Real estate held for sale | | — | | 376 |
| Corporate and other notes | | 16,430 | | 18,130 |
| Total notes payable | $ | 253,115 | $ | 285,818 |
| Less: unamortized deferred borrowing costs | | (7,342) | | (9,425) |
| Total outstanding notes payable, net | $ | 245,773 | $ | 276,393 |
| Accrued Interest | | 773 | | 844 |
| Total notes payable, net and accrued interest | $ | 246,546 | $ | 277,237 |

Future principal payments due (including scheduled amortization payments and payments due upon maturity) on the Company's notes payable at December 31, 2019 are as follows (in thousands):

App. 1935

| Year | Amount |
|---|---|
| 2020 | $ 25,982 |
| 2021 | 55,393 |
| 2022 | 13,437 |
| 2023 | 36,770 |
| 2024 | 1,995 |
| Thereafter | 119,538 |
| Total | $ 253,115 |

Interest payable at December 31, 2019 and 2018, was $.08 million and $.09 million, respectively. Our debt has interest rates ranging from 2.5% to 9.75% per annum with maturity dates between 2021 and 2059. The mortgages were collateralized by deeds of trust on real estate having a net carrying value of $311.5 million.

There are various land mortgages, secured by the property, that are in the process of a modification or extension to the original note due to expiration of the loan. We are in constant contact with these lenders, working together in order to modify the terms of these loans and we anticipate a timely resolution that is similar to the existing agreement or subsequent modification.

In conjunction with the development of various apartment projects and other developments, we drew down $28.5 million and $81.0 million in construction loans during the year ended December 31, 2019, and 2018, respectively.

<center>59</center>

**NOTE 8.** *BONDS AND BONDS INTEREST PAYABLE*

In August 2016, Southern Properties Capital LTD ("Southern"), a British Virgin Islands corporation was incorporated for the purpose of raising funds by issuing Bonds to be traded on the Tel Aviv Stock Exchange ("TASE"). The Company transferred certain residential and commercial properties located in the United States to Southern, its wholly owned subsidiary.

On February 13, 2017, Southern filed a final prospectus with the TASE for an offering and sale of nonconvertible Series A Bonds to be issued by Southern. The bonds are obligations of Southern. During the year ended December 31, 2017 on three separate occasions Southern issued nonconvertible Series A Bonds with a total value of approximately NIS400 million New Israeli Shekels ("NIS") or approximately $115 million dollars. The Series A Bonds have a stated interest rate of 7.3%. At March 31, 2018 the effective interest rate is 9.17%. The bonds require semi-annual equal installments on January 31 and July 31 of each year from 2019 to 2023 (inclusive). The interest will be repaid on January 31 and July 31 of each of the years 2018 to 2023 (inclusive), with the first payment commencing on July 31, 2017.

On January 25, 2018, interest payment of approximately NIS 14.6 million (or approximately $4.3 million) was paid to the Series A bondholders.

On February 15, 2018, Southern issued Series B bonds in the amount of NIS 137.7 million par value (approximately $39.2 million as of February 15, 2018). The Series B bonds are registered on the TASE. The bonds are reported in NIS and bear annual interest rate of 6.8%. Interest shall be repaid January 31 and July 31 of each of the years 2019 to 2023 (inclusive), first payment commencing on July 31, 2018. The principal shall be repaid in ten equal installments on January 31 and July 31 of each of the years from 2021 to 2025 (inclusive). A total bond issuance cost of $1.4 million was incurred. The effective interest rate is 7.99%.

On July 19, 2018, Southern closed a private placement of its Series B bonds in the amount of NIS 72.3 million (or approximately $19.8 million). The bonds are reported in NIS, are registered on the TASE, bear an annual interest rate of 6.8% and have an effective interest rate of 9.60%. Interest will be paid on January 31 and July 31 of each of the years 2019 and 2013 (inclusive). The principal will be repaid in ten equal installment on January 31 and July 31 of each of the years from 2021 to 2012 (inclusive). The Company incurred bonds issuance costs of approximately $1.9 million.

On July 26, 2018, interest payment of approximately NIS 18.9 million (or approximately $5.2 million) was paid to the Series A and B bondholders.

On July 28, 2019, SPC issued Series C bonds in the amount of NIS 275 million (or approximately $78.1 million). The bonds are reported in NIS, and registered on the TASE, and bear an annual interest of 4.65%. The interest will be paid on January 31 and July 31 of each of the years 2020 through 2023, with the principal payment due in 2023. The Company incurred bond issuance costs of approximately $4.2 million.

On September 23, 2019, Southern entered into a foreign exchange risk hedging transaction agreement with Bank Leumi with the aim of hedging the risk that the NIS exchange rate against the dollar will fall below 3, thereby reducing the exposure of the bonds (Series A, B and C) to exchange rate volatility. The term of the agreement is six months and the face value of the transaction is NIS 664 million ($ 221 million). The hedge transaction costs as well as the fair value as of December 31, 2019 were immaterial.

During the year ended December 31, 2019, the Company made payments of $21.8 million and $11.6 million on bond principal and interests, respectively.

<div align="right">App. 1936</div>

On January 27, 2020, the Company made payments of NIS 60.6 million in bond principal on the Series A and interests on the Series A, B, C (or approximately $17.6 million).

On February 2, 2020, S&Global Ratings announced the increase of the Company's issuer rating to 'ilA-' from 'ilBBB+' for Bonds (Series A and B). In addition, Series C bond rating (secured by one of SPC's commercial properties) increase to 'ilA' from 'ilA-' rating due to the expectation of continued improvement in coverage ratios and the expansion of Company's portfolio.

<div align="center">60</div>

The outstanding balance of these Bonds at December 31, 2019 and 2018 is as follows:

| | December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| Bonds (Series A) | $ 92,653 | $ 106,686 |
| Bonds (Series B) | 39,844 | 36,740 |
| Bonds (Series B expansion) | 20,920 | 19,290 |
| Bonds (Series C) | 79,572 | — |
| **Total outstanding bonds** | $ 232,989 | $ 162,716 |
| Less: deferred bond issuance costs | (9,724) | (8,179) |
| **Total outstanding bonds, net** | 223,265 | 154,537 |
| Accrued Interest | 6,457 | 4,037 |
| **Total oustanding bonds, net and accrued interest** | $ 229,722 | $ 158,574 |

The aggregate maturities of the bonds are as follows:

| Year | Agrregage Maturities |
| --- | --- |
| 2020 | $ 23,148 |
| 2021 | 35,301 |
| 2022 | 35,301 |
| 2023 | 114,873 |
| 2024 | 12,153 |
| Thereafter | 12,213 |
| | $ 232,989 |

The recorded unrealized gain or loss is reflected as a separate line item to highlight the fact that it is a non-cash transaction until such time as actual payment of principal and interest on the bonds is made. For the year ended December 31, 2019 and 2018, the Company recorded a loss on foreign currency transaction of approximately $15.1 million, and a gain of $12.4 million, respectively.

**NOTE 9.    *RELATED PARTY TRANSACTIONS AND FEES***

We apply ASC Topic 805, "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, the sole shareholder of which is MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to TCI and IOR.  As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Effective January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties and provides brokerage services. Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage".   TCI engages third-party companies to lease and manage its apartment properties.

Below is a description of the related party transactions and fees between Pillar and Regis:

Fees, expenses and revenue paid to and/or received from our advisor:

| | For the year ended December 31, | | |
| | 2019 | 2018 | 2017 |
| | (dollars in thousands) | | |
| Fees: | | | |
| Advisory | $ 5,806 | $ 10,663 | $ 9,995 |
| Mortgage brokerage and equity refinancing | — | 852 | 1,551 |
| Net income fee | 357 | 631 | 250 |
| | $ 6,163 | $ 12,146 | $ 11,796 |
| Other Expense: | | | |
| Cost reimbursements | $ 6,687 | $ 4,398 | $ 2,895 |
| Interest paid (received) | (8,475) | (7,404) | (4,859) |
| | $ (1,788) | $ (3,006) | $ (1,964) |
| Revenue: | | | |
| Rental | $ 1,311 | $ 1,178 | $ 783 |

Fees paid to Regis and related parties:

| | For the year ended December 31, | | |
| | 2019 | 2018 | 2017 |
| | (dollars in thousands) | | |
| Fees: | | | |
| Property Sales/Acquisition | $ 318 | $ 43,856 | $ 9,819 |
| Property management, construction management and leasing commissions | 165 | 540 | 963 |
| Real estate brokerage | 71 | 2,068 | 1,369 |
| | $ 554 | $ 46,464 | $ 12,151 |

The Company received rental revenue of $1.3 million, $1.2 million, and $0.8 million in the years ended December 31, 2019, 2018, and 2017, respectively, from Pillar and its related parties for properties owned by the Company.

As of December 31, 2019, the Company had notes and interest receivable, net of allowances of $54.0 million and $3.2 million, respectively, due from UHF, a related party. During 2019, the Company recognized interest income of $6.9 million, originated $21.4 million, received $12.4 million in principal payments, and received interest payments of $7.6 million from these related party notes receivables.

On January 1, 2012, the Company entered into a development agreement with UHF, a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

The Company is the primary guarantor, on a $25.0 million mezzanine loan between UHF and a lender. In addition, ARL, and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2019 UHF was in compliance with the covenants to the loan agreement.

The Company is part of a tax sharing and compensating agreement with respect to federal income taxes between ARL, TCI and IOR and their subsidiaries that was entered into in July of 2009. That agreement continued until August 31, 2012, at which time a new tax sharing and compensating agreement was entered into by ARL, TCI, IOR and MRHI for the remainder of 2012 and subsequent years. The expense (benefit) in each year was calculated based on the

In addition, SPC is part of a management service agreement with the controlling shareholder owned company in which SPC for an annual payment of 0.5% on the value of the investment properties receives from the Advisor office space, administrative and management services. During 2019, SPC paid management fees to Pillar in the amount of $2.2 million.

The following table reconciles the beginning and ending balances of accounts receivable from and (accounts payable) to related parties as of December 31, 2019 (dollars in thousands):

|  | Pillar | ARL | Total |
|---|---|---|---|
| Related party receivable, beginning balance, December 31, 2018 | $ — | $ 133,642 | $ 133,642 |
| Cash transfers | 29,395 | — | 29,395 |
| Advisory fees | (5,806) | — | (5,806) |
| Net income fee | (357) | — | (357) |
| Fees and commissions | (71) | — | (71) |
| Cost reimbursements | (6,687) | — | (6,687) |
| Interest income | — | 8,475 | 8,475 |
| Notes receivable purchased | (28,669) | — | (28,669) |
| Expenses (paid)/received by advisor | 9,073 | — | 9,073 |
| Financing (mortgage payments) | — | — | — |
| Sales/Purchases Commissions | (318) | — | (318) |
| Intercompany property transfers | 2,864 | — | 2,864 |
| Income tax expense | — | — | — |
| Deferred tax asset | — | — | — |
| Purchase of obligations | — | — | — |
| Related party receivable, ending balance, December 31, 2019 | $ (576) | $ 142,117 | $ 141,541 |

## NOTE 10. DEFERRED INCOME

In previous years, the Company has sold properties to related parties where we have had continuing involvement in the form of management or financial assistance associated with the sale of the properties. Because of the continuing involvement associated with the sale, the sales criteria for the full accrual method is not met, and as such the Company has deferred some or all of the gain recognition and accounted for the sale by applying the finance, deposit, installment or cost recovery methods, as appropriate, until the sales criteria is met. The gains on these transactions have been deferred until the properties are sold to a non-related third party. As of December 31, 2019, we had a deferred gain of $9.5 million.

## NOTE 11.   *DIVIDENDS*

TCI's Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, no dividends on TCI's common stock were declared for 2019, 2018, or 2017. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including the Company's financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

## NOTE 12.   *PREFERRED STOCK*

In November 2006, TCI issued 100,000 shares of Series D Preferred Stock with a liquidation preference of $100 per share. The preferred stock is not convertible into any other security, requires dividends payable at the initial rate of 7% annually. The dividend rate increases ratably from 7% to 9% in future periods and can be redeemed at any point after September 30, 2011.

During the fourth quarter of 2018, all 100,000 shares of Series D Preferred Stock were redeemed for $17.2 million, of which $7.2 million was accrued unpaid dividends. At December 31, 2019 and 2018, there were no preferred shares outstanding.

## NOTE 13.   *INCOME TAXES*

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined on the basis of the differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the

App. 1939

differences and expected reversal. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income during the period that includes the enactment date. We recognize deferred tax assets to the extent that we believe these assets are more likely than not to be realized. In making such a determination, we consider all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If we determine that we would be able to realize our deferred tax assets in the future in excess of their net recorded amount, we would make an adjustment to the deferred tax asset valuation allowance, which would reduce the provision for income taxes. We record uncertain tax positions in accordance with ASC 740 on the basis of a two-step process whereby (1) we determine whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions that meet the more-likely-than-not recognition threshold, we recognize the largest amount of tax benefit that is more than 50 percent likely to be realized upon ultimate settlement with the related tax authority.

(Loss) income from continuing operations before income taxes

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| | (In thousands) | | |
| | $ (28,137) | $ 186,250 | $ (15,136) |

The (benefit) expense for income taxes consists of:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| | (In thousands) | | |
| Current: | | | |
| Federal | $ — | $ 42,805 | $ (5,603) |
| State | — | 1,210 | 10 |
| | | | |
| Deferred and Other: | | | |
| Federal | (2,000) | (40,805) | 5,603 |
| State | — | — | 170 |
| Total tax (benefit) expense | $ (2,000) | $ 3,210 | $ 180 |

64

The reconciliation between the Company's effective tax rate on income from continuing operations and the statutory rate is as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| | (In thousands) | | |
| Income tax (benefit) expense at federal statutory rate | $ (5,909) | $ 39,113 | $ (5,603) |
| State and local income taxes net of federal tax benefit | | 1,210 | 10 |
| Permanent differences | (2,406) | (143) | — |
| Timing differences | | | |
| Installment note on land sale | — | (2,876) | (1,917) |
| Allowance for losses on note | — | (383) | (256) |
| Deferred gains | (588) | (9,417) | (7,723) |
| Basis difference on fixed assets | — | 23,675 | 10,082 |
| Other basis/timing differences | 3,173 | (7,164) | (16) |
| Generation (use) of net operating loss carryforwards | 5,730 | (42,805) | 5,603 |
| Calculated income tax expense | $ — | $ 1,210 | $ 180 |
| Effective tax rate | 0.0% | 0.6% | N/A |

The company is subject to taxation in the United States and various states and foreign jurisdictions.  As of December 31, 2019, the Company's tax years for 2018, 2017, and 2016 are subject to examination by the tax authorities.  With few exceptions, as of December 31, 2019, the Company is no longer subject to U.S federal, state, local, or foreign examinations by tax authorities for the years before 2016.

The 2019 and 2018 effective tax rate is driven primarily by the passing of the Tax Cuts and Jobs Act by congress on December 22, 2017.  This act reduced the statutory tax rate for corporations from 35% to 21% starting in 2018. As a result, the tax assets of TCI had to be re-priced to reflect the new tax rate for future years with the impact on the 2017 provision for income taxes.

App. 1940

| | | Years Ended December 31, | | |
|---|---|---|---|---|
| | | 2019 | | 2018 |
| | | (In thousands) | | |
| **Deferred Tax Assets:** | | | | |
| Cumulative foreign currency translation loss | $ | 1,522 | $ | — |
| Deferred gain | | 1,988 | | — |
| Net operating loss carryforward | | 9,633 | | 3,904 |
| **Total Deferred Tax Assets** | | 13,143 | | 3,904 |
| Less: valuation allowance | | (6,480) | | — |
| **Total net deferred tax assets** | $ | 6,663 | $ | 3,904 |
| | | | | |
| **Deferred Tax Liabilities:** | | | | |
| Deferred gain | $ | — | $ | 2,603 |
| Basis differences for fixed assets | | 6,663 | | 3,301 |
| Total Deferred Tax Liability | $ | 6,663 | $ | 5,904 |
| | | | | |
| **Net deferred tax asset (liability)** | $ | — | $ | (2,000) |
| | | | | |
| Current net deferred tax asset | | 6,663 | | 3,904 |
| Long-term net deferred tax liability | | 6,663 | | 5,904 |
| **Net deferred tax liability** | $ | — | $ | (2,000) |

**Operating Loss and Tax Credit Carryforwards**

We have state NOLs in many of the various states in which we operate.

**Valuation Allowance**

Management assesses the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. At December 31, 2019 TCI had a net deferred tax asset due to tax deductions available to it in future years. However, as management could not determine that it was more likely than not that TCI would realize the benefit of the deferred tax asset, a 100% valuation allowance was established.

**NOTE 14.   *FUTURE MINIMUM RENTAL INCOME UNDER OPERATING LEASES***

TCI'S real estate operations include the leasing of commercial properties (office buildings, industrial warehouses and retail centers). These leases expire at various dates through 2029. The following is a schedule of minimum future rents on non-cancelable operating leases at December 31, 2019 (dollars in thousands):

| Year | Amount |
|---|---|
| 2020 | 26,208 |
| 2021 | 23,558 |
| 2022 | 20,382 |
| 2023 | 14,882 |
| 2024 | 8,861 |
| Thereafter | 7,109 |
| Total | $ 101,000 |

**NOTE 15.   *OPERATING SEGMENTS***

Our segments are based on management's method of internal reporting which classifies its operations by property type. The segments are commercial, apartments, land and other. Significant differences among the accounting policies of the operating segments as compared to the Consolidated Financial Statements principally involve the calculation and allocation of administrative expenses. Management evaluates the performance of each of the operating segments and allocates resources to them based on their operating income and cash flow.

Items of income that are not reflected in the segments are interest, other income, equity in partnerships and gains on sale of real estate. Expenses that are not reflected in the segments are provision for losses, advisory, net income and incentive fees, general and administrative, non-controlling interests and net loss

App. 1941

The segment labeled as "Other" consists of revenue and operating expenses related to the notes receivable and corporate debt.

<div align="center">66</div>

Presented below is the Company's reportable segments' operating income including segment assets and expenditures for the years 2019, 2018 and 2017 (dollars in thousands):

| For the Year Ended December 31, 2019 | Commercial Properties | Apartments | Land | Other | Total |
|---|---|---|---|---|---|
| Rental and other property revenues | $ 32,707 | $ 15,257 | $ — | $ 6 | $ 47,970 |
| Property operating expenses | (15,805) | (8,375) | (255) | (778) | (25,213) |
| Depreciation | (10,229) | (3,150) | — | — | (13,379) |
| Mortgage and loan interest | (7,018) | (4,069) | (1,000) | (19,729) | (31,816) |
| Loss on debt extinguishment | (5,219) | — | — | — | (5,219) |
| Interest income | — | — | — | 19,607 | 19,607 |
| Loss on sale of income producing property | — | (80) | — | — | (80) |
| Gain on land sales | — | — | 14,889 | — | 14,889 |
| Segment operating (loss) income | $ (5,564) | $ (417) | $ 13,634 | $ (894) | $ 6,759 |
| | | | | | |
| Capital expenditures | $ 5,257 | $ 25,001 | $ 3,489 | $ — | $ 33,747 |
| Assets | $ 229,424 | $ 178,536 | $ 70,003 | $ — | $ 477,963 |
| | | | | | |
| **Property Sales** | | | | | |
| Sales price | $ — | $ 3,096 | $ 30,012 | $ — | $ 33,108 |
| Cost of sale | — | (3,176) | (15,123) | — | (18,299) |
| (Loss) gain on sales | $ — | $ (80) | $ 14,889 | $ — | $ 14,809 |

| For the Year Ended December 31, 2018 | Commercial Properties | Apartments | Land | Other | Total |
|---|---|---|---|---|---|
| Rental and other property revenues | $ 33,113 | $ 87,832 | $ — | $ 10 | $ 120,955 |
| Property operating expenses | (16,558) | (42,134) | (275) | (453) | (59,420) |
| Depreciation | (9,530) | (13,217) | — | (14) | (22,761) |
| Mortgage and loan interest | (7,662) | (20,671) | (318) | (30,221) | (58,872) |
| Interest income | — | — | — | 15,793 | 15,793 |
| Gain on land sales | — | — | 17,404 | — | 17,404 |
| Segment operating income (loss) | $ (637) | $ 11,810 | $ 16,811 | $ (14,885) | $ 13,099 |
| | | | | | |
| Capital expenditures | $ 8,246 | $ 16,954 | $ — | $ — | $ 25,200 |
| Assets | $ 153,018 | $ 143,500 | $ 84,016 | $ 3,970 | $ 384,504 |
| | | | | | |
| **Property Sales** | | | | | |
| Sales price | $ 2,313 | $ 8,512 | $ 43,311 | $ — | $ 54,136 |
| Cost of sale | (2,313) | (8,512) | (25,907) | — | (36,732) |
| Gain on land sales | $ — | $ — | $ 17,404 | $ — | $ 17,404 |

| For the Twelve Months Ended December 31, 2017 | Commercial Properties | Apartments | Land | Other | Total |
|---|---|---|---|---|---|
| Rental and other property revenues | $ 32,323 | $ 92,807 | $ 87 | $ 16 | $ 125,233 |
| Property operating expenses | (17,724) | (43,677) | (667) | (988) | (63,056) |
| Depreciation | (9,200) | (16,354) | — | (4) | (25,558) |
| Mortgage and loan interest | (7,528) | (22,346) | (1,588) | (28,482) | (59,944) |
| Interest income | — | — | — | 13,862 | 13,862 |
| Recognition of deferred gain on sale of income producing properties | — | 9,842 | — | — | 9,842 |
| Gain on land sales | — | — | 4,884 | — | 4,884 |
| Segment operating income (loss) | $ (2,129) | $ 20,272 | $ 2,716 | $ (15,596) | $ 5,263 |
| | | | | | |
| Capital expenditures | $ 3,157 | $ 1,402 | $ 609 | $ — | $ 5,168 |

<div align="right">App. 1942</div>

| Assets | | | | | | | | | 26,852 | | 25,824 | | | | 979,870 |

**Property Sales**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales price | $ | — | $ | — | $ | 11,177 | $ | — | $ | 11,177 |
| Cost of sale | | — | | — | | (6,293) | | — | | (6,293) |
| Recognized prior deferred gain | | — | | 9,842 | | — | | — | | 9,842 |
| Gain on sale | $ | — | $ | 9,842 | $ | 4,884 | $ | — | $ | 14,726 |

The table below reconciles the segment information to the corresponding amounts in the Consolidated Statements of Operations:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Segment operating income | $ 6,759 | $ 13,099 | $ 5,263 |
| Other non-segment items of income (expense) | | | |
| General and administrative | (10,951) | (11,359) | (6,269) |
| Net income fee to related party | (357) | (631) | (250) |
| Advisory fee to related party | (5,806) | (10,663) | (9,995) |
| Other income | 84 | 28,150 | 625 |
| Gain on formation of joint venture | — | 154,126 | — |
| Foreign currency translation (loss) gain | (15,108) | 12,399 | (4,536) |
| (Loss) earnings from joint venture | (2,774) | 44 | — |
| Earnings from other unconsolidated investees | 16 | 1,085 | 26 |
| Income tax benefit (expense) | 2,000 | (3,210) | (180) |
| Net (loss) income from continuing operations | $ (26,137) | $ 183,040 | $ (15,316) |

The table below reconciles the segment information to the corresponding amounts in the Consolidated Balance Sheets:

| | As of December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Segment assets | $ 387,790 | $ 384,504 | $ 979,870 |
| Investments in unconsolidated subsidiaries and investees | 81,780 | 90,571 | 2,472 |
| Notes and interest receivable | 120,986 | 83,541 | 70,166 |
| Other assets and receivables | 275,362 | 303,764 | 260,914 |
| Total assets | $ 865,918 | $ 862,380 | $ 1,313,422 |

**NOTE 16.  *QUARTERLY RESULTS OF OPERATIONS***

The following is a tabulation of TCI's quarterly results of operations for the years 2019, 2018 and 2017. Quarterly results presented may differ from those previously reported in TCI's Form 10-Q due to the reclassification of the operations of properties sold or held for sale to discontinued operations in accordance with ASC topic 360:

| | Three Months Ended 2019 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| Total operating revenues | $ 11,929 | $ 11,840 | $ 11,883 | $ 12,318 |
| Total operating expenses | 13,182 | 15,220 | 12,948 | 14,356 |
| Operating loss | (1,253) | (3,380) | (1,065) | (2,038) |
| Other expense | (6,389) | (4,639) | (11,841) | (12,341) |
| (Loss) income before gain on formation of joint venture, gain on sales, non-controlling interest, and taxes | (7,642) | (8,019) | (12,906) | (14,379) |
| (Loss) on sale of income producing properties | — | (80) | — | — |

App. 1943

| | March 31, | June 30, | September 30, | December 31, |
|---|---|---|---|---|
| Gain on land sales | | | | 5,400 |
| Income tax benefit - deferred | — | — | — | 2,000 |
| Net (loss) income from continued operations | (5,426) | (5,966) | (7,766) | (6,979) |
| Net loss | (5,426) | (5,966) | (7,766) | (6,979) |
| Less: net (loss) attributable to non-controlling interest | (183) | (379) | (21) | (200) |
| Net loss applicable to common shares | $ (5,609) | $ (6,345) | $ (7,787) | $ (7,179) |
| | | | | |
| **PER SHARE DATA** | | | | |
| **Earnings per share - basic** | | | | |
| (Loss) income from continued operations | $ (0.62) | $ (0.68) | $ (0.89) | $ (0.81) |
| Net (loss) income applicable to common shares | $ (0.64) | $ (0.73) | $ (0.89) | $ (0.83) |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |
| | | | | |
| **Earnings per share - diluted** | | | | |
| (Loss) income from continued operations | $ (0.62) | $ (0.68) | $ (0.89) | $ (0.81) |
| Net (loss) income applicable to common shares | $ (0.64) | $ (0.73) | $ (0.89) | $ (0.83) |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

| | Three Months Ended 2018 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| Total operating revenues | $ 31,082 | $ 31,607 | $ 33,505 | $ 24,761 |
| Total operating expenses | 25,894 | 26,966 | 27,734 | 24,240 |
| Operating income | 5,188 | 4,641 | 5,771 | 521 |
| Other (expense) income | (6,624) | 2,731 | 5,896 | (3,404) |
| (Loss) income before gain on formation of joint venture, gain on sales, non-contolling interest, and taxes | (1,436) | 7,372 | 11,667 | (2,883) |
| Gain on formation of joint venture | — | — | — | 154,126 |
| Gain on land sales | 1,335 | — | 12,243 | 3,826 |
| Income tax expense | — | — | (792) | (2,418) |
| Net (loss) income from continued operations | (101) | 7,372 | 23,118 | 152,651 |
| Net (loss) income | (101) | 7,372 | 23,118 | 152,651 |
| Less: net (loss) attributable to non-controlling interest | (132) | (126) | (915) | (417) |
| Preferred dividend requirement | (222) | (224) | (227) | (227) |
| Net (loss) income applicable to common shares | $ (455) | $ 7,022 | $ 21,976 | $ 152,007 |
| | | | | |
| **PER SHARE DATA** | | | | |
| **Earnings per share - basic** | | | | |
| (Loss) income from continued operations | $ (0.05) | $ 0.81 | $ 2.52 | $ 17.44 |
| Net (loss) income applicable to common shares | $ (0.05) | $ 0.81 | $ 2.52 | $ 17.44 |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |
| | | | | |
| **Earnings per share - diluted** | | | | |
| (Loss) income from continued operations | $ (0.05) | $ 0.81 | $ 2.52 | $ 17.44 |
| Net (loss) income applicable to common shares | $ (0.05) | $ 0.81 | $ 2.52 | $ 17.44 |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

69

| | Three Months Ended 2017 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| Total operating revenues | $ 31,535 | $ 31,302 | $ 31,491 | $ 30,905 |
| Total operating expenses | 26,337 | 25,460 | 25,725 | 27,606 |

App. 1944

| | | | | |
|---|---|---|---|---|
| Operating income (loss) | 5,198 | 7,842 | 5,766 | 3,299 |
| Other expense | (10,658) | (15,613) | (8,967) | (14,729) |
| Loss before gain on sales, non-contolling interest, and taxes | (5,460) | (9,771) | (3,201) | (11,430) |
| Gain (loss) on sale of income producing properties | — | — | 9,841 | 1 |
| Gain (loss) on land sales | 445 | (476) | 530 | 4,385 |
| Income tax benefit (expense) | — | — | — | (180) |
| Net income (loss) from continued operations | (5,015) | (10,247) | 7,170 | (7,224) |
| Net income (loss) | (5,015) | (10,247) | 7,170 | (7,224) |
| Less: net (income) loss attributable to non-controlling interest | (119) | (163) | (96) | (121) |
| Preferred dividend requirement | (222) | (224) | (224) | (230) |
| Net (loss) income applicable to common shares | $ (5,356) | $ (10,634) | $ 6,850 | $ (7,575) |

**PER SHARE DATA**

**Earnings per share - basic**

| | | | | |
|---|---|---|---|---|
| Loss from continued operations | $ (0.61) | $ (1.22) | $ 0.79 | $ (0.88) |
| Net income (loss) applicable to common shares | $ (0.61) | $ (1.22) | $ 0.79 | $ (0.88) |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

**Earnings per share - diluted**

| | | | | |
|---|---|---|---|---|
| Loss from continued operations | $ (0.61) | $ (1.22) | $ 0.79 | $ (0.88) |
| Net income (loss) applicable to common shares | $ (0.61) | $ (1.22) | $ 0.79 | $ (0.88) |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

70

## NOTE 17.   *COMMITMENTS AND CONTINGENCIES AND LIQUIDITY*

*Liquidity.*      Management believes that TCI will generate excess cash from property operations in 2020; such excess, however, might not be sufficient to discharge all of TCI's obligations as they become due. Management intends to sell income-producing assets, refinance real estate and obtain additional borrowings primarily secured by real estate to meet its liquidity requirements.

*Guarantees*. The Company is the primary guarantor, on a $25.0 million mezzanine loan between UHF and a lender. In addition, ARL, and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2019 UHF was in compliance with the covenants to the loan agreement.

*Partnership Buyouts*.      TCI is the limited partner in various partnerships related the construction of residential properties. As permitted in the respective partnership agreements, TCI intends to purchase the interests of the general and any other limited partners in these partnerships subsequent to the completion of these projects. The amounts paid to buy out the nonaffiliated partners are limited to development fees earned by the non-affiliated partners, and are set forth in the respective partnership agreements.

### ART and ART Midwest, Inc.

While the Company and all entities in which the Company has a direct or indirect equity interest are not parties to or obligated in any way for the outcome, a formerly owned entity (American Realty Trust, Inc.) and its former subsidiary (ART Midwest, Inc.) have been engaged since 1999 in litigation with Mr. David Clapper and entities related to Mr. Clapper (collectively, the "Clapper Parties"). The matter originally involved a transaction in 1998 in which ART Midwest, Inc. was to acquire eight residential apartment complexes from the Clapper Parties. Through the years, a number of rulings, both for and against American Realty Trust, Inc. "ART" and ART Midwest, Inc., were issued. In October 2011, a ruling was issued under which the Clapper Parties received a judgment for approximately $74 million, including $26 million in actual damages and $48 million interest. The ruling was against ART and ART Midwest, Inc., but no other entity. During February 2014, the Court of Appeals affirmed a portion of the judgment in favor of the Clapper Parties, but also ruled that a double counting of a significant portion of the damages had occurred and remanded the case back to the trial court to recalculate the damage award, as well as pre- and post-judgment interest thereon. Subsequently, the trial court recalculated the damage award, reducing it to approximately $59 million, inclusive of actual damages and then current interest. ART was also a significant owner of a partnership interest in the partnership that was awarded the initial damages in this matter.

The Clapper Parties subsequently filed a new lawsuit against ARI, its subsidiary EQK Holdings, Inc. "EQK", and ART. The Clapper Parties seek damages from ARL for payment by ART to ARL of ART's stock in EQK in exchange for a release of the Antecedent Debt owed by ART to ARI. In February 2018 the court determined that this legal matter should not have been filed in federal court and therefore granted motions to dismiss on jurisdictional grounds. In June 2018, the court overruled its own grant of motions to dismiss and reinstated the case. We continue to vigorously defend the case and management believes it has defenses to the claims. The case has not been set for trial.

In 2005, ART filed suit against a major national law firm over the initial transaction. That action was initially abated while the principal case with the Clapper

App. 1945

Parties was pending and the abatement was recently lifted. The trial court subsequently dismissed the case on procedural grounds. ART has filed a notice of appeal. The appeal was heard in February 2018 and the case was subsequently appealed to the Texas Supreme Court. The application for Review is still pending with the Texas Supreme Court. In January 2012, the Company sold all of the issued and outstanding stock of ART to an unrelated party for a promissory note in the amount of $10 million. At December 31, 2012, the Company fully reserved and valued such note at zero.

**Dynex Capital, Inc.**

On July 20, 2015, the 68th Judicial District Court in Dallas County, Texas issued its Final Judgment in Cause No. DC-03-00675, styled Basic Capital Management, Inc., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. v. Dynex Commercial, Inc. The case, which was litigated for more than a decade, had its origin with Dynex Commercial making loans to Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. (subsidiaries of Continental Mortgage & Equity Trust ("CMET"), an entity which merged into TCI in 1999 after the original suit was filed). Under the original loan commitment, $160 million in loans were to be made to the entities. The loans were conditioned on the execution of a commitment between Dynex Commercial and Basic Capital Management, Inc. ("Basic").

An original trial in 2004, which also included Dynex Capital, Inc. as a defendant, resulted in a jury awarding damages in favor of Basic for "lost opportunity," as well as damages in favor of ART and in favor of TCI and its subsidiaries for "increased costs" and "lost opportunity." The original Trial Court judge ignored the jury's findings, however, and entered a "Judgment Notwithstanding the Verdict" ("JNOV") in favor of the Dynex entities (the judge held the Plaintiffs were not entitled to any damages from the Dynex entities). After numerous appeals by all parties, Dynex Capital, Inc. was ultimately dismissed from the case and the remaining claims against Dynex Commercial were remanded to the Trial Court for a new judgment consistent with the jury's findings. The Court entered the new Final Judgment against Dynex Commercial, Inc. on July 20, 2015.

The Final Judgment entered against Dynex Commercial, Inc. on July 20, 2015 awarded Basic was $0.256 million in damages, plus pre-judgment interest of $0.192 million for a total amount of $0.448 million. The Judgment awarded ART was $14.2 million in damages, plus pre-judgment interest of $10.6 million for a total amount of $24.8 million. The Judgment awarded TCI was $11.1 million, plus pre-judgment interest of $8.4 million for a total amount of $19.5 million. The Judgment also awarded Basic, ART, and TCI post-judgment interest at the rate of 5% per annum from April 25, 2014 until the date their respective damages were paid. Lastly, the Judgement awarded Basic, ART, and TCI was $1.6 million collectively in attorneys' fees from Dynex Commercial, Inc.

TCI is working with counsel to identify assets and collect on the Final Judgment against Dynex Commercial, Inc., as well as pursue additional claims, if any, against Dynex Capital, Inc. Post judgment interest continues to accrue.

**Berger Litigation**

On February 4, 2019, an individual claiming to be a stockholder holding 7,900 shares of Common Stock of Income Opportunity Realty Investors, Inc. ("IOR") filed a Complaint in the United States District Court for the Northern District of Texas, Dallas Division, individually and allegedly derivatively on behalf of IOR, against Transcontinental Realty Investors, Inc. ("TCI"), American Realty Investors, Inc. ("ARL"), (TCI is a shareholder of IOR, ARL is a shareholder of TCI) Pillar Income Asset Management, Inc. ("Pillar"), ( collectively the "Companies"), certain officers and directors of the Companies ("Additional Parties") and two other individuals. The Complaint filed alleges that the sale and/or exchange of certain tangible and intangible property between the Companies and IOR during the last ten years of business operations constitutes a breach of fiduciary duty by the one or more of Companies, the Additional Defendants and/or the directors of IOR. The case alleges other related claims. The Plaintiff seeks certification as a representative of IOR and all of its shareholders, unspecified damages, a return to IOR of various funds and an award of costs, expenses, disbursements (including Plaintiff's attorneys' fees) and prejudgment and post-judgment interest. The named Defendants intend to vigorously defend the action, deny all of the allegations of the Complaint, and believe the allegations to be wholly without any merit. The Defendants have filed motions to dismiss the case in its entirety in June 2019. On February 26, 2020, the Court denied IOR's demand futility motion. The remainder of the motions to dismiss are pending.

*Litigation.* The ownership of property and provision of services to the public as tenants entails an inherent risk of liability. Although the Company and its subsidiaries are involved in various items of litigation incidental to and in the ordinary course of its business, in the opinion of management, the outcome of such litigation will not have a material adverse impact upon the Company's financial condition, results of operation or liquidity.

**NOTE 18.  *EARNINGS PER SHARE***

*Earnings per share.*   Earnings per share ("EPS") have been computed pursuant to the provisions of ASC 260 "Earnings per Share." Basic EPS is calculated by dividing income available to common shareholders by the weighted-average number of common shares outstanding during the period. Shares issued during the period shall be weighted for the portion of the period that they were outstanding.

App. 1946

Prior to July 9, 2014, TCI had 30,000 shares of Series C cumulative convertible preferred stock issued and outstanding. These 30,000 shares were owned by RAI, a related party, and had accrued dividends unpaid of $0.9 million. The stock had a liquidation preference of $100.00 per share and could be converted into common stock at 90% of the daily average closing price of the common stock for the prior five trading days. On July 9, 2014, RAI converted all 30,000 shares into the requisite number of shares of common stock. The conversion resulted in the issuance of 304,298 new shares of common stock. The effects of the Series C Cumulative Convertible Preferred Stock are no longer included in the dilutive earnings per share calculation for the current period, but are considered in the calculation for the prior periods if applying the if-converted method is dilutive.

As of December 31, 2019 and 2018, there are no preferred stock or stock options that are required to be included in the calculation of EPS.

**NOTE 19.   *SUBSEQUENT EVENTS***

On February 2, 2020, S&P Global Ratings announced the increase of the Company's issuer rating to 'ilA-' from 'ilBBB+' for Bonds (Series A and B). In addition, Series C bond rating (secured by one of SPC's commercial properties) increase to 'ilA' from 'ilA-' rating due to the expectation of continued improvement in coverage ratios and the expansion of Company's portfolio.

During 2020, a strain of coronavirus ("COVID – 19") was reported worldwide, resulting in decreased economic activity and concerns about the pandemic, which would adversely affect the broader global economy. The Company is taking all necessary steps to keep our business premises, tenants, vendors and employees in a safe environment and are constantly monitoring the impact of COVID – 19.  At this point, the extent to which COVID – 19 may impact the global economy and our business is uncertain, but pandemics or other significant public health events could have a material adverse effect on our business and results of operations.

The date to which events occurring after December 31, 2019, the date of the most recent balance sheet, have been evaluated for possible adjustments to the financial statements or disclosure is March 30, 2020, which is the date of which the financial statements were available to be issued. There are no subsequent events that would require an adjustment to the financial statements.

<center>73</center>

<div align="right">**Schedule III**</div>

<center>

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**December 31, 2019**

</center>

| Property/Location | Encumbrances | Initial Cost Land | Initial Cost Buildings | Cost Capitalized Subsequent to Acquisition Improvements | Asset Impairment | Gross Amount of Which Carried at End of Year Land | Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired | Life on Which Depreciation In Latest Statement of Operation is Computed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Properties Held for Investment Apartments** | | | | | | | | | | | | |
| Legacy at Pleasant Grove, Texarkana, TX | $ 13,944 | $ 2,005 | $ 17,892 | $ 217 | $ — | $ 2,005 | $ 18,109 | $ 20,114 | $ 2,289 | 2006 | 12/14 | 40 years |
| Toulon, Gautier, MS | 19,575 | 1,621 | 20,107 | 372 | — | 1,621 | 20,479 | 22,100 | 4,273 | 2011 | 9/09 | 40 years |
| Villager, Ft. Walton, FL | 672 | 141 | 1,267 | — | — | 141 | 1,267 | 1,408 | 148 | 1972 | 6/15 | 40 years |
| Villas at Bon Secour, Gulf Shores, AL | 11,212 | 2,715 | 15,385 | — | — | 2,715 | 15,385 | 18,100 | 545 | 2007 | 7/18 | 40 years |
| Vista Ridge, Tupelo, MS | 10,252 | 1,339 | 13,398 | — | — | 1,339 | 13,398 | 14,737 | 1,893 | 2009 | 10/15 | 40 years |
| Chelsea, Beaumont, TX | 8,794 | 1,225 | 11,025 | 160 | — | 1,225 | 11,185 | 12,410 | 303 | 1999 | 11/18 | 40 years |
| Overlook at Allensville Phase II, Sevierville, TN | 15,829 | 2,411 | 17,005 | — | — | 2,411 | 17,005 | 19,416 | 319 | 2012 | 11/15 | 40 years |
| Landing, Houma, LA | 15,484 | 2,012 | 18,115 | 25 | — | 2,012 | 18,140 | 20,152 | 491 | 2005 | 12/18 | 40 years |
| Farnham Park, Port | | | | | | | | | | | | |

<div align="right">App. 1947</div>

| Description | Encumbrances | Land | Building & Improvements | Costs Capitalized Subsequent | Adjustments | Land | Building | Total | Accumulated Depreciation | Date Constructed | Date Acquired | Life |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aurther, TX | | | | | | | | | | | | 40 years |
| Parc at Denham Springs Phase II, Denham Springs, LA | 15,079 | 1,502 | 12,486 | 3,508 | — | 1,502 | 15,994 | 17,496 | 50 | 2010 | 11/9 | 40 years |
| **Total Apartments Held for Investment** | **$ 120,024** | **$ 15,981** | **$ 135,766** | **$ 4,426** | **$ —** | **$ 15,981** | **140,192** | **$156,173** | **$ 10,562** | | | |
| **Apartments Under Construction** | | | | | | | | | | | | |
| Forest Pines, Bryan, TX | — | 5,040 | — | 301 | — | 5,040 | 301 | 5,341 | — | — | — | — |
| Sugar Mill III, Addis, LA | 6,302 | 576 | — | 7,023 | — | 576 | 7,023 | 7,599 | — | — | 11/15 | — |
| McKinney Apts at Heritage, McKinney, TX | — | 2,481 | — | 89 | — | 2,481 | 89 | 2,570 | — | — | 6/17 | — |
| Forest Pines Phase II (Forest Grove), Bryan, TX | 1,560 | — | — | 4,674 | — | — | 4,674 | 4,674 | — | — | 4/19 | — |
| LD Athens Lindsay Ln, Athens, LA | 1,155 | 2,098 | — | 81 | — | 2,098 | 81 | 2,179 | — | — | 9/19 | — |
| **Total Apartments Under Construction** | **$ 9,017** | **$ 10,195** | **$ —** | **$ 12,168** | **$ —** | **$ 10,195** | **12,168** | **$ 22,363** | **$ —** | | | |
| **Commercial** | | | | | | | | | | | | |
| 600 Las Colinas, Las Colinas, TX | 37,215 | 5,751 | 51,759 | 20,143 | — | 5,751 | 71,902 | 77,653 | 32,858 | 1984 | 8/05 | 40 years |
| 770 South Post Oak, Houston, TX | 12,178 | 1,763 | 15,834 | 697 | — | 1,763 | 16,531 | 18,294 | 2,117 | 1970 | 7/15 | 40 years |
| Bridgeview Plaza, LaCrosse, WI | 3,908 | — | — | 1,207 | — | — | 1,207 | 1,207 | 804 | 1979 | 3/03 | 40 years |
| Browning Place (Park West I), Farmers Branch, TX | | 5,096 | 45,868 | 26,645 | — | 5,096 | 72,513 | 77,609 | 29,867 | 1984 | 4/05 | 40 years |
| Fruitland Plaza, Fruitland Park, FL | | 23 | — | 83 | — | 23 | 83 | 106 | 71 | — | 5/92 | 40 years |
| Senlac VHP, Farmers Branch, TX | | 622 | — | 142 | — | 622 | 142 | 764 | 142 | — | 8/05 | 40 years |
| Stanford Center, Dallas, TX | 39,537 | 20,278 | 34,862 | 8,251 | (9,600) | 20,278 | 33,513 | 53,791 | 13,752 | — | 6/08 | 40 years |
| **Total Commercial Held for Investment** | **$ 92,838** | **$ 33,533** | **$ 148,323** | **$ 57,168** | **$ (9,600)** | **$ 33,533** | **195,891** | **$229,424** | **$ 79,611** | | | |
| **Land** | | | | | | | | | | | | |
| Dedeaux, Gulfport, MS | — | 1,612 | — | 46 | (38) | 1,612 | 8 | 1,620 | — | — | 10/06 | — |
| Gautier, Gautier, MS | — | 202 | — | — | — | 202 | — | 202 | — | — | 7/98 | — |
| Lake Shore Villas, Humble, TX | — | 81 | — | 3 | — | 81 | 3 | 84 | — | — | 3/02 | — |
| Lubbock, Lubbock, TX | — | 234 | — | — | — | 234 | — | 234 | — | — | 1/04 | — |
| Ocean Estates, Gulfport, MS | — | 1,418 | — | 390 | — | 1,418 | 390 | 1,808 | — | — | 10/07 | — |
| Union Pacific Railroad, Dallas, TX | — | 130 | — | — | — | 130 | — | 130 | — | — | 3/04 | — |
| Willowick, Pensacola, FL | — | 137 | — | — | — | 137 | — | 137 | — | — | 1/95 | — |
| Windmill Farms, Kaufman County, TX | 13,861 | 55,668 | — | 13,913 | (20,343) | 55,668 | (6,430) | 49,238 | — | — | 11/11 | — |
| T Palm Desert, Riverside, CA | — | 1,800 | — | — | — | 1,800 | — | 1,800 | — | — | 9/19 | — |
| Lacy Longhorn, Farmers Branch, | | | | | | | | | | | | |

App. 1948

| Property | | | | | | | | | | Date | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TX Minivest, Dallas, TX | — | 7 | — | — | | 7 | — | 7 | — | — | 4/13 | — |
| Nicholson Croslin, Dallas, TX | — | 184 | — | — | (118) | 184 | (118) | 66 | — | — | 10/98 | — |
| Nicholson Mendoza, Dallas, TX | — | 80 | — | — | (51) | 80 | (51) | 29 | — | — | 10/98 | — |
| Mercer Crossing, Farmers Branch, TX | — | 10,966 | — | — | | 10,966 | — | 10,966 | — | — | 1/08 | — |
| McKinney 36, Collin County, TX | 945 | 635 | — | 161 | (19) | 635 | 142 | 777 | — | — | 1/98 | — |
| Travis Ranch, Kaufman County, TX | — | 80 | — | — | — | 80 | — | 80 | — | — | 8/08 | — |
| Dominion Mercer Phase II, Farmers Branch, TX | — | 2,440 | — | 111 | (135) | 2,440 | (24) | 2,416 | — | — | 3/99 | — |
| **Total Land Held for Investment** | $ 14,806 | $ 76,843 | $ — | $ 14,624 | $ (21,464) | $ 76,843 | $ (6,840) | $ 70,003 | $ — | | | |
| **Total Properties Held for Investment** | $ 236,685 | $136,552 | $ 284,089 | $ 88,386 | $ (31,064) | $136,552 | $ 341,411 | $477,963 | $ 90,173 | | | |

74

<div align="right">

**SCHEDULE III**
**(Continued)**

</div>

<div align="center">

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**As of December 31, 2019**

</div>

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Reconciliation of Real Estate | | | |
| Balance at January 1, | $ 463,732 | $ 1,165,662 | 1,066,603 |
| Additions | | | |
| Acquisitions, improvements and construction | 92,964 | 175,996 | 129,483 |
| Deductions | | | |
| Sale of real estate | (78,733) | (877,926) | (30,424) |
| Balance at December 31, | $ 477,963 | $ 463,732 | $ 1,165,662 |
| | | | |
| Reconciliation of Accumulated Depreciation | | | |
| Balance at January 1, | 79,228 | 177,546 | 165,597 |
| Additions | | | |
| Depreciation | 13,379 | 22,761 | 25,558 |
| Deductions | | | |
| Sale of real estate | (2,434) | (121,079) | (13,609) |
| Balance at December 31, | $ 90,173 | $ 79,228 | 177,546 |

75

<div align="right">

**SCHEDULE IV**

</div>

<div align="center">

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**MORTGAGE LOANS**
**December 31, 2019**

</div>

<div align="right">

App. 1949

</div>

| Description | Interest Rate | Final Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount of Mortgage | Carrying Amount of Mortgage | Principal or Loans Subject to Delinquent Principal or Interest |
|---|---|---|---|---|---|---|---|
| | | | | | (dollars in thousands) | | |
| Prospectus Endeavors 4, LLC | 12.00% | Jan-23 | Excess cash flow | — | 5,907 | 5,907 | — |
| Prospectus Endeavors 6, LLC | 12.00% | Oct-22 | Excess cash flow | — | 496 | 496 | — |
| Oulan-Chikh Family Trust | 8.00% | Mar-21 | Excess cash flow | — | 174 | 174 | — |
| **H198, LLC** | 6.00% | Sep-20 | Excess cash flow | — | 4,554 | 4,554 | — |
| McKinney Ranch Land | | | | | | | |
| Forest Pines | 5.00% | Nov-20 | Excess cash flow | — | — | 2,868 | — |
| Spyglass Apartments of Ennis, LP | 5.00% | Nov-20 | Excess cash flow | — | 5,083 | 5,288 | — |
| Bellwether Ridge | 5.00% | May-20 | Excess cash flow | — | 3,429 | 3,765 | — |
| Parc at Windmill Farms | 5.00% | May-20 | Excess cash flow | — | 6,066 | 7,602 | — |
| RAI PFBL 2018 Purch Fee Note Weatherford | 12.00% | Dec-21 | Excess cash flow | | | 525 | — |
| **Unified Housing Foundation, Inc. (Echo Station)** | 12.00% | Dec-32 | Excess cash flow | 9,719 | 2,794 | 1,481 | — |
| 100% Interest in UH of Temple, LLC | | | | | | | — |
| **Unified Housing Foundation, Inc. (Lakeshore Villas/HFS of Humble, LLC)** | 12.00% | Dec-32 | Excess cash flow | 15,965 | 2,959 | 2,000 | — |
| 100% Interest in HFS of Humble, LLC | | | | | | | — |
| **Unified Housing Foundation, Inc. (Lakeshore Villas/HFS of Humble, LLC) (31.5% of cash flow)** | 12.00% | Dec-32 | Excess cash flow | 15,756 | 8,836 | 6,369 | — |
| Interest in Unified Housing Foundation Inc. | | | | | | | — |
| **Unified Housing Foundation, Inc. (Limestone Ranch/UH of Vista Ridge,LLC)** | 12.00% | Dec-32 | Excess cash flow | — | — | 1,953 | — |
| **Unified Housing Foundation, Inc. (Limestone Ranch/UH of Vista Ridge,LLC)** | 12.00% | Dec-32 | Excess cash flow | — | — | 2,000 | — |
| **Unified Housing Foundation, Inc. (Limestone Ranch/UH of Vista Ridge,LLC)** | 12.00% | Dec-32 | Excess cash flow | — | — | 4,000 | — |
| **Unified Housing Foundation, Inc. (Timbers of Terrell)** | 12.00% | Dec-32 | Excess cash flow | 7,294 | 1,702 | 1,323 | — |

App. 1950

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 100% Interest in UHF of Terrell, LLC | | | | | | | |
| **Unified Housing Foundation, Inc (2015 Advisory Fee)** | 12.00% | Dec-21 | Excess cash flow | — | — | 3,994 | — |
| **Unified Housing Foundation, Inc (2008-2014 Advisory Fee)** | 12.00% | Dec-21 | Excess cash flow | — | — | 6,407 | — |
| **Unified Housing Foundation, Inc (2018 Advisory Fee)** | 12.00% | Jun-20 | Excess cash flow | — | — | 5,314 | — |
| **Unified Housing Foundation, Inc** RAI UHF 2019 Advisory Fee Note | 12.00% | Mar-22 | Excess cash flow Excess cash flow | — | — | 4,782 | — |
| **Unified Housing Foundation, Inc** 2018 Refin Fee (Lakeshore Villas) | 12.00% | Jul-21 | Excess cash flow Excess cash flow | — | — | 838 | — |
| **Unified Housing Foundation, Inc** 2018 Refin Fee (Limestone Ranch) | 12.00% | Jul-21 | Excess cash flow Excess cash flow | — | — | 773 | — |
| **Unified Housing Foundation, Inc** 2018 Refin Fee (Marquis @ Vista Ridge) | 12.00% | Jul-21 | Excess cash flow Excess cash flow | — | — | 839 | — |
| **Unified Housing Foundation, Inc** 2018 Refin Fee (Timbers at the Park) | 12.00% | Jul-21 | Excess cash flow Excess cash flow | — | — | 432 | — |
| **Unified Housing Foundation, Inc** 2018 Refin Fee (Trails @ White Rock) | 12.00% | Jul-21 | Excess cash flow | — | — | 913 | — |
| **Unified Housing Foundation, Inc** 2018 Refin Fee (Bella Vista) | 12.00% | Aug-21 | Excess cash flow | — | — | 212 | — |
| **Unified Housing Foundation, Inc** 2017 Fees on Sale LSC/SR/PKCR | 12.00% | Oct-21 | Excess cash flow | — | — | 1,980 | — |
| **Unified Housing Foundation, Inc** 2017 Fees on Profit LSC/SR/PKCR | 12.00% | Oct-21 | Excess cash flow | — | — | 4,851 | — |
| **Various related party notes** | Various | Various | Excess cash flow | — | — | 3,553 | — |
| **Various non-related party notes** | Various | Various | Excess cash flow | — | — | 28,989 | — |
| | | | | | | $ 114,182 | |
| | | | | | Accrued interest | 8,629 | |
| | | | | | Allowance for estimated losses | (1,825) | |
| | | | | | | $ 120,986 | |

App. 1951

(1) Fully reserved

---

76

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**MORTGAGE LOANS**
**As of December 31,**

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Balance at January 1, | $ 83,541 | $ 70,166 | $ 81,133 |
| Additions | | | |
| New mortgage loans | 49,671 | 13,123 | 16,422 |
| Increase (decrease) of interest receivable on mortgage loans | 9,576 | 6,329 | 668 |
| Deductions | | | |
| Amounts received | (21,589) | (6,077) | (26,230) |
| Non-cash reductions | (213) | — | (1,827) |
| Balance at December 31, | $ 120,986 | $ 83,541 | $ 70,166 |

---

77

---

ITEM 9.  *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE*

None.

ITEM 9A.  *CONTROLS AND PROCEDURES*

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Principal Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e)) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our Principal Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. There are inherent limitations to the effectiveness of any system of internal control over financial reporting. These limitations include the possibility of human error, the circumvention of overriding of the system and reasonable resource constraints. Because of its inherent limitations, our internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2019. In making this assessment, management used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Based on management's assessments and those criteria, management has concluded that Company's internal control over financial reporting was effective as of December 31, 2019.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial report.

App. 1952

Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this annual report.

### Changes in Internal Control over Financial Reporting

In preparation for management's report on internal control over financial reporting, we documented and tested the design and operating effectiveness of our internal control over financial reporting. There were no changes in our internal controls over financial reporting (as such term is defined in Exchange Act Rule 13a-15(f)) that occurred during the quarter ended December 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. OTHER INFORMATION

Not applicable.

<center>78</center>

<center>PART III</center>

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

### Directors

The affairs of TCI are managed by a Board of Directors. The Directors are elected at the annual meeting of stockholders or appointed by the incumbent Board and serve until the next annual meeting of stockholders or until a successor has been elected or approved.

It is the Board's objective that a majority of the Board consists of independent directors. For a director to be considered independent, the Board must determine that the director does not have any direct or indirect material relationship with TCI. The Board has established guidelines to assist it in determining director independence which conform to, or are more exacting than, the independence requirements in the New York Stock Exchange listing rules. The independence guidelines are set forth in TCI's "Corporate Governance Guidelines". The text of this document has been posted on TCI's internet website at (www.transconrealty-invest.com) and is available in print to any shareholder who requests it. In addition to applying these guidelines, the Board will consider all relevant facts and circumstances in making an independence determination.

TCI has adopted a code of conduct that applies to all Directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Stockholders may find our code of conduct on our website by going to our website address at (www.transconrealty-invest.com). We will post any amendments to the code of conduct, as well as any waivers that are required to be disclosed by the rules of the SEC or the New York Stock Exchange on our website.

Our Board of Directors has adopted charters for our Audit, Compensation and Governance and Nominating Committees of the Board of Directors. Stockholders may find these documents on our website by going to the website address at (www.transconrealty-invest.com). You may also obtain a printed copy of the materials referred to by contacting us at the following address:

<center>
Transcontinental Realty Investors, Inc.<br>
Attn: Investor Relations<br>
1603 LBJ Freeway, Suite 800<br>
Dallas, Texas 75234<br>
Telephone: 469-522-4200
</center>

All members of the Audit Committee and Nominating and Corporate Governance Committees must be independent directors. Members of the Audit Committee must also satisfy additional independence requirements, which provide (i) that they may not accept, directly or indirectly, any consulting, advisory, or compensatory fee from TCI or any of its subsidiaries other than their director's compensation (other than in their capacity as a member of the Audit Committee, the Board of Directors, or any other committee of the Board), and (ii) no member of the Audit Committee may be an "affiliated person" of TCI or any of its subsidiaries, as defined by the Securities and Exchange Commission.

The current directors of TCI are listed below, together with their ages, terms of service, all positions and offices with TCI and its current advisor, Pillar, their principal occupations, business experience and directorships with other companies during the last five years or more. The designation "affiliated", when used below with respect to a director, means that the director is an officer, director or employee of Pillar, an officer of the Company, or an officer or director of a related party of the Company. The designation "independent", when used below with respect to a Director, means that the Director is neither an officer of the Company nor a director, officer or employee of Pillar (but may be a director of the Company, although the Company may have certain business or professional relationships with such Director as discussed in Item 13. Certain Relationships and Related Transactions, and Director Independence.

<center>79</center>

**HENRY A. BUTLER,** age 69, Director, Affiliated, since November 2005 and Chairman of the Board since May 2009 Retired (since April 30, 2019); Mr. Butler served as Vice President for Pillar Income Asset Management, LLC from April 2011 to April 30, 2019. Mr. Butler has been a Director of the Company since November 2005 and Chairman of the Board since May 2009. He also served as Chairman of the Board since May 2009 and as a Director since July 2003 of ARL and Chairman of the Board since May 2011 and a Director since February 2011 of IOR.

**WILLIAM J. HOGAN,** age 62, Director, Independent, since February 2020

Registered Representative and Investment Advisor Representative, employed (since January 2013) by Cetera Advisor Networks LLC, a general securities and investment advisory firm, with an office in San Antonio, Texas. From November 2009 through December 2012, Mr. Hogan was a registered representative, employed by Financial Network Investment Corp. in San Antonio, Texas. He holds Series 7 (General Securities Representative), Series 63 (Uniform Securities Agent State Law) and Series 65 (Investment Advisor) licenses issued by Financial Industry Regulatory Authority ("FINRA"). Mr. Hogan was elected as a director of the Company and TCI on January 28, 2020 effective February 1, 2020.

**ROBERT A. JAKUSZEWSKI,** age 57, Director, Independent, since November 2005

Mr. Jakuszewski is currently has served as a Territory Manager for Artesa Labs since April 2015. He was a Medical Specialist from January 2014 to April 2015 for VAYA Pharma, Inc., Senior Medical Liaison from January 2013 to July 2013 for Vein Clinics of America, and the Vice President of Sales and Marketing from September 1998 to December 2012 for New Horizons Communications, Inc. Mr. Jakuszewski has been a Director of the Company since November 2005. He has also been a Director of ARL since November 2005 and a Director of IOR since March 2004.

**TED R. MUNSELLE,** age 64, Director, Independent, since February 2004

Mr. Munselle has been Vice President and Chief Financial Officer of Landmark Nurseries, Inc. since October 1998. On February 17, 2012, he was appointed as a member of the Board of Directors for Spindletop Oil & Gas Company and as Chairman of their Audit Committee. Spindletop's stock is traded on the Over-the-Counter (OTC) market. Mr. Munselle has been a Director of the Company since February 2004. He has also served as Director of ARL since February 2004 and Director of IOR since March 2009. Mr. Munselle is qualified as an Audit Committee financial expert within the meaning of SEC regulations and the Board of Directors of TCI has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the NYSE. Mr. Munselle is a Certified Public Accountant.

**RAYMOND D. ROBERTS, SR.,** age 88, Director, Independent, since June 2016

Mr. Roberts is currently retired. Mr. Roberts has served as Director of the Company since June 2, 2016. He has also served as Director of ARL and IOR since June 2, 2016. For more than five years prior to December 31, 2014, he was Director of Aviation of Steller Aviation, Inc., a privately held corporation engaged in the business of aircraft (Boeing 737) and logistical management.

**Board Meetings and Committees**

The Board of Directors held five meetings during 2019. For such year, no incumbent director attended fewer than 75% of the aggregate of (1) the total number of meetings held by the Board during the period for which he or she had been a director and (2) the total number of meetings held by all committees of the Board on which he or she served during the period that he served. Under TCI's Corporate Governance Guidelines, each Director is expected to dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties, including by attending meetings of the stockholders of the Company, the Board and Committees of which he is a member. The Board of Directors has standing Audit, Compensation and Governance and Nominating Committees.

*Audit Committee.*    The current Audit Committee was formed on February 19, 2004, and its function is to review TCI's operating and accounting procedures. A charter of the Audit Committee has also been adopted by the Board. The charter of the Audit Committee was adopted on February 19, 2004, and is available on the Company's Investor Relations website *(www.transconrealty-invest.com)*. The Audit Committee is an "audit committee" for purposes of Section 3(a)(58) of the Securities Exchange Act of 1934. The current members of the Audit Committee, all of whom are independent within the meaning of the SEC Regulations, the listing standards of the New York Stock Exchange, Inc. and TCI's Corporate Governance Guidelines, are Messrs. Jakuszewski, Munselle (Chairman) and Roberts. Mr. Ted R. Munselle, a member of the Committee, is qualified as an Audit Committee financial expert within the meaning of SEC Regulations, and the Board has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the New York Stock Exchange, Inc. All of the members of the Audit Committee meet the experience requirements of the listing standards of the New York Stock Exchange. The Audit Committee met five times during 2019.

*Governance and Nominating Committee.*    The Governance and Nominating Committee is responsible for developing and implementing policies and practices relating to corporate governance, including reviewing and monitoring implementation of TCI's Corporate Governance Guidelines. In addition, the Committee develops and reviews background information on candidates for the Board and makes recommendations to the Board regarding such candidates.

App. 1954

The Committee also prepares and supervises the Board's annual review of director independence and the Board's performance self-evaluation. The Charter of the Governance and Nominating Committee was adopted on March 17, 2004 and is available on the Company's Investor Relations website (*www.transconrealty-invest.com*). The current members of the Committee are Messrs. Munselle and Jakuszewski (Chairman) and Roberts. The Governance and Nominating Committee met twice during 2019.

*Compensation Committee*. The Compensation Committee is responsible for overseeing the policies of the Company relating to compensation to be paid by the Company to the Company's principal executive officer and any other officers designated by the Board and make recommendations to the Board with respect to such policies, produce necessary reports and executive compensation for inclusion in the Company's Proxy Statement in accordance with applicable rules and regulations and to monitor the development and implementation of succession plans for the principal executive officers and other key executives and make recommendations to the Board with respect to such plans. The charter of the Compensation Committee was adopted on March 17, 2004, and is available on the Company's Investor Relations website (*www.transconrealty-invest.com*). The current members of the Compensation Committee are Messrs. Roberts (Chairman) and Jakuszewski and Munselle. All of the members of the Compensation Committee are independent within the meaning of the listing standards of the NYSE American and the Company's Corporate Governance Guidelines. The Compensation Committee is to be comprised of at least two directors who are independent of Management and the Company. The Compensation Committee met twice during 2019.

The members of the Board of Directors on the date of this Report and the Committees of the Board on which they serve are identified below:

| Director | Audit Committee | Governance and Nominating Committee | Compensation Committee |
|---|---|---|---|
| Robert A. Jakuszewski | X | Chair | X |
| Ted R. Munselle | Chair | X | X |
| Raymond D. Roberts. Sr | X | X | Chair |
| Henry A. Butler | | | |
| William J. Hogan | | | |

**Presiding Director**

In March 2004, the Board created a new position of presiding director, whose primary responsibility is to preside over periodic executive sessions of the Board in which Management directors and other members of Management do not participate. The presiding director also advises the Chairman of the Board and, as appropriate, Committee Chairs with respect to agendas and information needs relating to Board and Committee meetings, provides advice with respect to the selection of Committee Chairs and performs other duties that the Board may from time to time delegate to assist the Board in fulfillment of its responsibilities.

The day following the annual meeting of stockholders held December 11, 2019 representing all stockholders of record dated November 1, 2019, the full Board met and re-appointed Ted R. Munselle as Presiding Director, to serve in such position until the Company's next annual meeting of stockholders to be held subsequently in 2020.

**Determination of Director's Independence**

In February 2004, the Board adopted its Corporate Governance Guidelines. The Guidelines adopted by the Board meet or exceed the new listing standards adopted during that year by the New York Stock Exchange. The full text of the Guidelines can be found on the Company's Investor Relations website (*www.transconrealty-invest.com*).

Pursuant to the Guidelines, the Board undertook its annual review of director independence in March, 2019 and during this review, the Board considered transactions and relationships between each director or any member of his or her immediate family and TCI and its subsidiaries and related parties, including those reported under Certain Relationships and Related Transactions below. The Board also examined transactions and relationship between directors or their related parties and members of TCI's senior management or their related parties. As provided in the Guidelines, the purpose of such review was to determine whether such relationships or transactions were inconsistent with the determination that the director is independent. Prior to this election as director, on January 28, 2020, the Board undertook a similar review with respect to Mr. Hogan.

81

As a result of these reviews, the Board affirmatively determined of the then directors, Messrs. Munselle, Hogan, Jakuszewski and Roberts are each independent of the Company and its Management under the standards set forth in the Corporate Governance Guidelines.

**Executive Officers**

Executive officers of the Company are listed below, all of whom are employed by Pillar. None of the executive officers receive any direct remuneration from the Company nor do any hold any options granted by the Company. Their positions with the Company are not subject to a vote of stockholders. In addition to the following executive officers, the Company has several vice presidents and assistant secretaries who are not listed herein. The ages, terms of service and all positions and offices with the Company, Pillar, other related entities, other principal occupations, business experience and directorships with other publicly-held companies during the last five years or more are set forth below. No family relationships exist among any of the executive officers or directors of the Company.

App. 1955

**DANIEL J. MOOS, 69**

Mr. Moos has served as President since April 2007 and Chief Executive Officer since March 2010 of IOR, ARL and TCI. Mr. Moos has also served as Prime's President since April 2007, Secretary since June 2011 and Treasurer since October 2013. He has also served as a Director since December 2016, President since December 2010, Chief Executive Officer since March 2011 and Treasurer since October 2013 of Pillar.

**LOUIS J. CORNA, 72**

Mr. Corna has served as Executive Vice President, General Counsel/Tax Counsel and Secretary since February 2004 of IOR, ARL and TCI. He has also been Executive Vice President since March 2011 and Secretary since December 2010 of Pillar. Mr. Corna was also a Director and Vice President from June 2004 to December 2010 and Secretary from January 2005 to December 2010 of First Equity Properties, Inc., a Nevada corporation with securities registered under Section 12(g) of the Exchange Act.

**ALLA DZYUBA, 43**

Mrs. Dzyuba has served as Vice President and Chief Accounting Officer of ARL, TCI and Southern Properties Capital, Ltd (TCI wholly owned BVI subsidiary) ("SPC") since July 2019 as well as Director for SPC since April 2018. Mrs. Dzyuba has been employed by Pillar since June 2004, she has over fifteen years of real estate accounting and financial reporting experience, including six years of broker-dealer regulatory reporting experience.

**Code of Ethics**

TCI has adopted a code of ethics entitled "Code of Business Conduct and Ethics" that applies to all directors, officers, and employees (including those of the contractual Advisor to TCI). In addition, TCI has adopted a code of ethics entitled "Code of Ethics for Senior Financial Officers" that applies to the principal executive officer, president, principal financial officer, chief financial officer, principal accounting officer, and controller. The text of these documents has been posted on TCI's internet website at *(www.transconrealty-invest.com)* and are available in print to any stockholder who requests them.

82

**Compliance with Section 16(a) of the Securities Exchange Act of 1934**

Under the securities laws of the United States, the directors, executive officers, and any persons holding more than 10% of TCI's shares of Common stock are required to report their share ownership and any changes in that ownership to the Securities and Exchange Commission (the "Commission"). Specific due dates for these reports have been established and TCI is required to report any failure to file by these dates. All of these filing requirements were satisfied by TCI's directors, executive officers, and 10% holders during the fiscal year ending December 31, 2019. In making these statements, TCI has relied on the written representations of its incumbent directors and executive officers and its 10% holders and copies of the reports they have filed with the Commission.

**The Advisor**

Pillar has been TCI's Advisor and Cash Manager since April 30, 2011.  Although the Board of Directors is directly responsible for managing the affairs of TCI, and for setting the policies which guide it, the day-to-day operations of TCI are performed by Pillar, as the contractual advisor, under the supervision of the Board.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors.  Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with TCI's business plan and investment policy.  Pillar also serves as an Advisor and Cash Manager to ARL and IOR.  As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  TCI has no employees and as such, employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust.

The May Trust is a Trust, the beneficiaries of which are the children of the late Gene E. Phillips.

Under the Advisory Agreement, Pillar is required to annually formulate and submit, for Board approval, a budget and business plan containing a twelve-month forecast of operations and cash flow, a general plan for asset sales and purchases, lending, foreclosure and borrowing activity, and other investments. Pillar is required to report quarterly to the Board on TCI's performance against the business plan. In addition, all transactions require prior Board approval, unless they are explicitly provided for in the approved business plan or are made pursuant to authority expressly delegated to Pillar by the Board.

The Advisory Agreement also requires prior Board approval for the retention of all consultants and third party professionals, other than legal counsel. The Advisory Agreement provides that Pillar shall be deemed to be in a fiduciary relationship to the TCI stockholders; contains a broad standard governing Pillar's liability for losses incurred by TCI; and contains guidelines for Pillar's allocation of investment opportunities as among itself, TCI and other entities it advises. Pillar is a company of which Messrs. Moos and Corna serve as executive officers.

App. 1956

The Advisory Agreement provides for Pillar to be responsible for the day-to-day operations of TCI and to receive, as compensation for basic management and advisory services, a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value (total assets less allowance for amortization, depreciation or depletion and valuation reserves).

In addition to base compensation, Pillar receives the following forms of additional compensation:

(1)  an annual net income fee equal to 7.5% of TCI's net income as an incentive for successful investment and management of the Company's assets;

<div align="center">83</div>

---

(2)  an annual incentive sales fee to encourage periodic sales of appreciated real property at optimum value equal to 10.0% of the amount, if any, by which the aggregate sales consideration for all real estate sold by TCI during such fiscal year exceeds the sum of:

   (a)  the cost of each such property as originally recorded in TCI's books for tax purposes (without deduction for depreciation, amortization or reserve for losses);

   (b)  capital improvements made to such assets during the period owned; and

   (c)  all closing costs (including real estate commissions) incurred in the sale of such real estate; provided however, no incentive fee shall be paid unless (a) such real estate sold in such fiscal year, in the aggregate, has produced an 8.0% simple annual return on the net investment including capital improvements, calculated over the holding period before depreciation and inclusive of operating income and sales consideration, and (b) the aggregate net operating income from all real estate owned for each of the prior and current fiscal years shall be at least 5.0% higher in the current fiscal year than in the prior fiscal year;

(3)  an acquisition commission, from an unaffiliated party of any existing mortgage or loan, for supervising the acquisition, purchase or long-term lease of real estate equal to the lesser of:

   (a)  up to 1.0% of the cost of acquisition, inclusive of commissions, if any, paid to non-affiliated brokers; or

   (b)  the compensation customarily charged in arm's-length transactions by others rendering similar property acquisition services as an ongoing public activity in the same geographical location and for comparable property, provided that the aggregate purchase price of each property (including acquisition fees and real estate brokerage commissions) may not exceed such property's appraised value at acquisition;

(4)  a construction fee equal to 6.0% of the so-called "hard costs" only of any costs of construction on a completed basis, based upon amounts set forth as approved on any architect's certificate issued in connection with such construction, which fee is payable at such time as the applicable architect certifies other costs for payment to third parties. The phrase "hard costs" means all actual costs of construction paid to contractors, subcontractors and third parties for materials or labor performed as part of the construction but does not include items generally regarded as "soft costs," which are consulting fees, attorneys' fees, architectural fees, permit fees and fees of other professionals; and

(5)  reimbursement of certain expenses incurred by the advisor in the performance of advisory services.

The Advisory Agreement also provides that Pillar receive the following forms of compensation:

(1)  a mortgage or loan acquisition fee with respect to the acquisition or purchase from an unaffiliated party of any existing mortgage loan by TCI equal to the lesser of:

   (a)  1.0% of the amount of the mortgage or loan purchased; or

   (b)  a brokerage or commitment fee which is reasonable and fair under the circumstances. Such fee will not be paid in connection with the origination or funding of any mortgage loan by TCI; and

(2)  a mortgage brokerage and equity refinancing fee for obtaining loans or refinancing on properties equal to the lesser of:

   (a)  1.0% of the amount of the loan or the amount refinanced; or

   (b)  a brokerage or refinancing fee which is reasonable and fair under the circumstances; provided, however, that no such fee shall be paid on loans from Pillar, or a related party of Pillar, without the approval of TCI's Board of Directors. No fee shall be paid on loan extensions.

<div align="right">App. 1957</div>

Under the Advisory Agreement, all or a portion of the annual advisory fee must be refunded by the Advisor if the operating expenses of TCI (as defined in the Advisory Agreement) exceed certain limits specified in the Advisory Agreement based on the book value, net asset value and net income of TCI during the fiscal year.

The Advisory Agreement requires Pillar to pay to TCI, one-half of any compensation received from third parties with respect to the origination, placement or brokerage of any loan made by TCI; provided, however, that the compensation retained by Pillar, or any affiliate of Pillar, shall not exceed the lesser of (1) 2.0% of the amount of the loan commitment or (2) a loan brokerage and commitment fee which is reasonable and fair under the circumstances.

The TCI Advisory Agreement further provides that Pillar shall bear the cost of certain expenses of its employees, excluding fees paid to TCI's Directors; rent and other office expenses of both Pillar and TCI (unless TCI maintains office space separate from that of Pillar); costs not directly identifiable to TCI's assets, liabilities, operations, business or financial affairs; and miscellaneous administrative expenses relating to the performance by Pillar of its duties under the Advisory Agreement.

If and to the extent that TCI shall request Pillar, or any director, officer, partner, or employee of Pillar, to render services for TCI other than those required to be rendered by the Advisory Agreement, Pillar separately would be compensated for such additional services on terms to be agreed upon between such party and TCI from time to time. As discussed below, under "Property Management and Real Estate Brokerage," effective January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties and provides brokerage services under similar terms as the previous agreements with Triad and Regis Realty I.

TCI entered into a Cash Management Agreement with Pillar on April 30, 2011 to further define the administration of the Company's day-to-day investment operations, relationship contacts, flow of funds and deposit and borrowing of funds. Under the Cash Management Agreement, all funds of the Company are delivered to Pillar which has a deposit liability to the Company and is responsible for payment of all payables and investment of all excess funds which earn interest at the Wall Street Journal prime rate plus 1.0% per annum, as set quarterly on the first day of each calendar quarter. Borrowings for the benefit of the Company bear the same interest rate. The term of the Cash Management Agreement is coterminous with the Advisory Agreement, and is automatically renewed each year unless terminated with the Advisory Agreement. TCI's management believes that the terms of the Advisory Agreement are at least as fair as could be obtained from unaffiliated third parties.

Situations may develop in which the interests of TCI are in conflict with those of one or more directors or officers in their individual capacities, or of Pillar, or of their respective related parties. In addition to services performed for TCI, as described above, Pillar actively provides similar services as agent for, and advisor to, other real estate enterprises, including persons and entities involved in real estate development and financing, including ARL and IOR. The Advisory Agreement provides that Pillar may also serve as advisor to other entities.

As advisor, Pillar is a fiduciary of TCI's public investors. In determining to which entity a particular investment opportunity will be allocated, Pillar will consider the respective investment objectives of each entity and the appropriateness of a particular investment in light of each such entity's existing mortgage note and real estate portfolios and business plan. To the extent any particular investment opportunity is appropriate to more than one such entity, such investment opportunity will be allocated to the entity that has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among various entities. Refer to Part III, Item 13 "Certain Relationships and Related Transactions, and Director Independence".

Pillar may assign the Advisory Agreement only with the prior consent of TCI.

The principal executive officers and directors of Pillar are set forth below:

| Name | Directors/Officer(s) |
| --- | --- |
| Daniel J. Moos | President, Chief Executive Officer, Treasurer, Director |
| Gina H. Kay | Executive Vice President, Chief Accounting Officer |
| Louis J. Corna | Executive Vice President, Secretary |

<div align="center">85</div>

**Property Management**

Since January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

TCI engages third-party companies to lease and manage our apartment properties for a fee of 6.0% or less of the monthly gross rents collected on the residential properties under their management.

<div align="right">App. 1958</div>

Regis provides real estate brokerage services to TCI on a non-exclusive basis, and is entitled to receive a real estate commission for property purchases and sales in accordance with the following sliding scale of total fees to be paid:

(1)  maximum fee of 4.5% on the first $2.0 million of any purchase or sale transaction of which no more than 3.5% is to be paid to Regis;

(2)  maximum fee of 3.5% on transaction amounts between $2.0 million-$5.0 million of which no more than 3.0% is to be paid to Regis;

(3)  maximum fee of 2.5% on transaction amounts between $5.0 million-$10.0 million of which no more than 2.0% is to be paid to Regis; and

(4)  maximum fee of 2.0% on transaction amounts in excess of $10.0 million of which no more than 1.5% is to be paid to Regis.

86

## ITEM 11.  *EXECUTIVE COMPENSATION*

TCI has no employees, payroll or benefit plans and pays no compensation to its executive officers. The executive officers of TCI, who are also officers or employees of Pillar, TCI's advisor, are compensated by Pillar. Such executive officers perform a variety of services for Pillar and the amount of their compensation is determined solely by Pillar. Pillar does not allocate the cash compensation of its officers among the various entities for which it serves as advisor. Refer to Item 10. "Directors, Executive Officers and Corporate Governance" for a more detailed discussion of the compensation payable to Pillar by TCI.

The only remuneration paid by TCI is to the directors who are not officers or employees of Pillar or its related companies. The Independent Directors (1) review the business plan of TCI to determine that it is in the best interest of TCI's stockholders, (2) review the advisory contract, (3) supervise the performance of the advisor and review the reasonableness of the compensation paid to the advisor in terms of the nature and quality of services performed, (4) review the reasonableness of the total fees and expenses of TCI and (5) select, when necessary, a qualified independent real estate appraiser to appraise properties acquired.

Effective February, 2011, each non-affiliated Director is entitled to receive an annual retainer of $12,000, with the Chairman of the Audit Committee to receive a one-time annual fee of $500. Directors who are also employees of the Company or its advisor receive no additional compensation for service as a Director.

During 2019, $40,388 was paid to non-employee Directors in total Directors' fees. The fees paid to the directors are as follows: Robert A. Jakuszewski, $12,000; Ted R. Munselle, $12,500; Henry A. Butler $3,888; and, Raymond D. Roberts, Sr., $12,000.

### Director's Stock Option Plan

TCI established a Director's Stock Option Plan ("Director's Plan") for the purpose of attracting and retaining Directors who are not officers or employees of TCI or Pillar. The Director's Plan provides for the grant of options that are exercisable at fair market value of TCI's Common stock on the date of grant. The Director's Plan was approved by stockholders at their annual meeting on October 10, 2000, following which each then-serving Independent Director was granted options to purchase 5,000 shares of Common stock of TCI. On January 1 of each year, each Independent Director receives options to purchase 5,000 shares of Common stock. The options are immediately exercisable and expire on the earlier of the first anniversary of the date on which a Director ceases to be a Director or 10 years from the date of grant. The Director's Plan was terminated by the Board of Directors on December 15, 2005. As of December 31, 2015, there were 5,000 shares of stock options outstanding which were exercisable at $14.25 per share.  These options expired unexercised January 1, 2016.

87

## ITEM 12.  *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT*

### Security Ownership of Certain Beneficial Owners

The following table sets forth the ownership of TCI's Common stock, both beneficially and of record, both individually and in the aggregate, for those persons or entities known to be beneficial owners of more than 5.0% of the outstanding shares of Common stock as of the close of business on March 30, 2020.

| | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** |
|---|---|---|
| **American Realty Investors, Inc.**[(1)(2)] | 5,383,192 | 62.31% |

App. 1959

1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

| | | |
|---|---|---|
| **Transcontinental Realty Acquisition Corporation**[2]<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 1,383,226 | 16.01% |
| **Realty Advisors, LLC** [3]<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 608,984 | 7.05% |

\*  "Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\*  Percentage is based upon 8,639,516 shares of Common stock outstanding at March 25, 2020.

(1)  Includes 5,383,192 shares (62.31%) directly owned by American Realty Investors, Inc. "ARL" directly, over which the directors al ARL may be deemed to be beneficial owners by virtue of their positions as directors of ARL. The directors of ARL disclaim beneficial ownership of such shares.

(2)  Includes 1,383,226 shares owned by Transcontinental Realty Acquisition Corporation ("TRAC"), which is a wholly owned subsidiary of ARL, over which each of the directors of TRAC, Daniel J. Moos and Alla Dzyuba may be deemed to be beneficial owners by virtue of their positions as directors of TRAC. The directors of TRAC disclaim beneficial ownership of such shares.

(3)  Includes 336,000 shares owned by RAI and 272,984 shares owned by AEI, over which the executive officers of RAI may be deemed to be the beneficial owners by virtue of their positions. The executive officers of RAI disclaim beneficial ownership of such shares.

**Security Ownership of Management.**

The following table sets forth the ownership of TCI's Common stock, both beneficially and of record, both individually and in the aggregate, for the directors and executive officers of TCI as of the close of business on March 30, 2020.

| Name of Beneficial Owner | Amount and<br>Nature of<br>Beneficial<br>Ownership* | Approximate<br>Percent of<br>Class** |
|---|---|---|
| Alla Dzyuba | 5,992,176[1][3] | 69.36% |
| Henry A. Butler | 5,383,192[1] | 62.31% |
| Louis J. Corna | 5,992,176[1][3] | 69.36% |
| Robert A. Jakuszewski | 5,383,192[1] | 62.31% |
| Daniel J. Moos | 7,875,402[1][2][3] | 85.37% |
| Ted R. Munselle | 5,383,192[1] | 62.31% |
| Raymond D. Roberts, Sr. | 5,383,192[1] | 62.31% |
| All Directors and Executive Officers as a group (7 individuals) | 7,375,402[1][2][3] | 85.37% |

\*  Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\*  Percentages are based upon 8,639,516 shares of Common Stock outstanding at March 25, 2020.

(1)  Includes 5,383,192 shares owned by ARL and 1,383,226 shares owned by TRAC, over which the executive officers and members of the Board of Directors of ARL may be deemed to be the beneficial owners by virtue of their positions as executive officers and members of the Board of Directors of ARL. The executive officers and current members of the Board of Directors of ARL disclaim beneficial ownership of such shares.

(2)  Daniel J. Moos owns 295,000 shares of Common Stock and is the President and Chief Executive Officer of ARL, the Company, RAI and MRHI.

(3)  Includes 336,000 shares owned by RAI and 272,984 shares owned by AEI, over which the executive officers of RAI may be deemed to be the beneficial owners by virtue of their positions. The executive officers of RAI disclaim beneficial ownership of such shares.

**ITEM 13.    *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE***

**Policies with Respect to Certain Activities**

Article 14 of TCI's Articles of Incorporation provides that TCI shall not, directly or indirectly, contract or engage in any transaction with (1) any director, officer or employee of TCI, (2) any director, officer or employee of the advisor, (3) the advisor, or (4) any affiliate or associate (as such terms are defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended) of any of the aforementioned persons, unless (a) the material facts as to the relationship

App. 1960

among or financial interest of the relevant individuals or persons and as to the contract or transaction are disclosed to or are known by TCI's Board of Directors or the appropriate committee thereof and (b) TCI's Board of Directors or committee thereof determines that such contract or transaction is fair to TCI and simultaneously authorizes or ratifies such contract or transaction by the affirmative vote of a majority of independent directors of TCI entitled to vote thereon.

Article 14 defines an "Independent Director" (for purposes of that Article) as one who is neither an officer or employee of TCI, nor a director, officer or employee of TCI's advisor.

TCI's policy is to have such contracts or transactions approved or ratified by a majority of the disinterested Directors with full knowledge of the character of such transactions, as being fair and reasonable to the stockholders at the time of such approval or ratification under the circumstances then prevailing. Such Directors also consider the fairness of such transactions to TCI. Management believes that, to date, such transactions have represented the best investments available at the time and they were at least as advantageous to TCI as other investments that could have been obtained.

TCI may enter into future transactions with entities, the officers, directors, or stockholders of which are also officers, directors, or stockholders of TCI, if such transactions would be beneficial to the operations of TCI and consistent with TCI's then-current investment objectives and policies, subject to approval by a majority of disinterested Directors as discussed above.

TCI does not prohibit its officers, directors, stockholders, or related parties from engaging in business activities of the types conducted by TCI.

**Certain Business Relationships**

Pillar has been TCI's Advisor and Cash Manager since April 30, 2011. Although the Board of Directors is directly responsible for managing the affairs of TCI, and for setting the policies which guide it, the day-to-day operations of TCI are performed by Pillar, as the contractual advisor, under the supervision of the Board. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors. Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with TCI's business plan and investment policy. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees and as such, employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

89

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust.

All of TCI's directors also serve as Directors of ARL and IOR. The executive officers of TCI also serve as executive officers of ARL and IOR. As such, they owe fiduciary duties to that entity as well as to Pillar under applicable law. ARL has the same relationship with Pillar, as does TCI. Mr. Daniel J. Moos is the sole Manager and Class B 2% income Member of Victory Abode Apartments LLC, and owes fiduciary duties to VAA as well as ARL, TCI and IOR.

Effective since January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

At December 31, 2019, TCI owned approximately 81.23% of the outstanding common shares of IOR.

The Company is part of a tax sharing and compensating agreement with respect to federal income taxes among ARL, TCI and IOR and their subsidiaries. That agreement continued until August 31, 2012, at which time a new tax sharing and compensating agreement was entered into by ARL, TCI, IOR and MRHI for the remainder of 2012 and subsequent years. The expense (benefit) in each year was calculated based on the amount of losses absorbed by taxable income multiplied by the maximum statutory tax rate of 21%.

The Company has a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

**Related Party Transactions**

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interest of our company.

App. 1961

In 2019, the Company paid advisory fees of $5.9 million, net income fees of $0.4 million, mortgage brokerage and equity refinancing fees of $0.5 million, and cost reimbursements of $6.7 million.

The Company paid property management fees, construction management fees and leasing commissions of $0.2 million to Regis in 2019.  In addition, SPC is part of a management service agreement with the controlling shareholder owned company in which SPC for an annual payment of 0.5% on the value of the investment properties receives from the Advisor office space, administrative and management services. During 2019, SPC paid management fees to Pillar in the amount of $2.2 million.

During 2019, the Company received $19.4 million cash distribution from VAA as a result of the annual surplus cash computation from its HUD collaterized residential properties and other amounts owed to the Company as agreed to in the joint venture operating agreement.

In accordance with the provisions of the VAA Joint Venture Agreement dated November 19, 2018, Southern and TCI are expected to receive approximately $14 million ($6 million and $8 million, respectively) for the cash balances remaining in the transferred properties as of the date of the transaction. The cash balance was determined and agreed upon by the partners in the joint venture, and based on the estimated bank balances on the day of closing. Additionally, VAA did not purchase the accounts receivable or the utilities' and other deposits. These items as well as the reconciliation of the expense pro-rations will result in additional adjustments being required, subject to the consent of both parties. On February 6, 2019, Abode JVP, LLC, a fully owned subsidiary of SPC, received $7.4 million related to the cash credit and transferred it to TCI. On May 15, 2019, Members of the Joint Venture agreed to record approximately $1.1 million of pro-ration adjustments and on July 25,2019, the remaining outstanding balance has been paid in full.

As of December 31, 2019, the Company had notes and interest receivables, net of allowances, of $54.0 million and $3.2 million, respectively, due from related parties. Refer to Part 2, Item 8. Note 5. "Notes and Interest Receivable". During the current period, the Company recognized interest income of $6.9 million, originated $21.4 million, received $12.4 million principal payments, and received interest payments of $7.6 million from these related party notes receivables.

<center>90</center>

The Company is the primary guarantor on a $25.0 million mezzanine loan between UHF and a lender. In addition, TCI, ARL, and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2019 UHF was in compliance with the covenants to the loan agreement.

**Operating Relationships**

The Company received rental revenue of $1.3 million, $1.2 million, and $0.8 million in the years ended December 31, 2019, 2018, and 2017, respectively, from Pillar and its related parties for properties owned by the Company.

**Advances and Loans**

From time to time, TCI and its related parties have made advances to each other, which generally have not had specific repayment terms, did not bear interest, are unsecured, and have been reflected in TCI's financial statements as other assets or other liabilities. TCI and the advisor charge interest on the outstanding balance of funds advanced to or from TCI. The interest rate, set at the beginning of each quarter, is the prime rate plus 1.0% on the average daily cash balances advanced. At December 31, 2019, TCI has a receivable from ARL in the amount of $142.1 million.

**Director Independence**

See "Determination of Director Independence" under Item 10 above to which reference is made.

**ITEM 14.      PRINCIPAL ACCOUNTING FEES AND SERVICES**

The following table sets for the aggregate fees for professional services rendered to TCI and its subsidiaries for the year ended December 31, 2019 and 2018 by TCI's principal accounting firms: Farmer, Fuqua and Swalm and Associates, P.C.

| | 2019 | | 2018 | |
| --- | --- | --- | --- | --- |
| | Farmer, Fuqua & Huff, L.P. | Swalm & Associates, P.C. (*) | Farmer, Fuqua & Huff, L.P. | Swalm & Associates, P.C. (*) |
| Audit Fees | $       227,755 | $        53,024 | $       551,996 | $        72,210 |
| Tax Fees | 12,377 | — | 38,304 | — |
| Total | $       240,132 | $        53,024 | $       590,300 | $        72,210 |

(*) Fees related to IOT

The audit fees for 2019 and 2018 were for professional services rendered for the audits and reviews of the consolidated financial statements of TCI and its subsidiaries. Tax fees for 2019 and 2018 were for services related to federal and state tax compliance and advice.

All services rendered by the principal auditors are permissible under applicable laws and regulations and were pre-approved by either the Board of Directors or the Audit Committee, as required by law. The fees paid to the principal auditors for the services described in the above table fall under the categories listed below:

*Audit Fees.*    These are fees for professional services performed by the principal auditor for the audit of the Company's annual financial statements and review of financial statements included in the Company's 10-Q filings and services that are normally provided in connection with statutory and regulatory filing or engagement.

*Audit-Related Fees.*    These are fees for assurance and related services performed by the principal auditor that are reasonably related to the performance of the audit or review of the Company's financial statements. These services include attestations by the principal auditor that are not required by statute or regulation and consulting on financial accounting/reporting standards.

<div align="center">91</div>

*Tax Fees.*    These are fees for professional services performed by the principal auditor with respect to tax compliance, tax planning, tax consultation, returns preparation and review of returns. The review of tax returns includes the Company and its consolidated subsidiaries.

*All Other Fees.*    These are fees for other permissible work performed by the principal auditor that do not meet the above category descriptions.

These services are actively monitored (as to both spending level and work content) by the Audit Committee to maintain the appropriate objectivity and independence in the principal auditor's core work, which is the audit of the Company's consolidated financial statements.

The Audit Committee has established policies and procedures for the approval and pre-approval of audit services and permitted non-audit services. The Audit Committee has the responsibility to engage and terminate TCI's independent auditors, to pre-approve their performance of audit services and permitted non-audit services, to approve all audit and non-audit fees, and to set guidelines for permitted non-audit services and fees. All fees for 2019 and 2018 were pre-approved by the Audit Committee or were within the pre-approved guidelines for permitted non-audit services and fees established by the Audit Committee, and there were no instances of waiver of approved requirements or guidelines during the same periods.

Under the Sarbanes-Oxley Act of 2002 (the "SOX Act"), and the rules of the Securities and Exchange Commission (the "SEC"), the Audit Committee of the Board of Directors is responsible for the appointment, compensation and oversight of the work of the independent auditor. The purpose of the provisions of the SOX Act and the SEC rules for the Audit Committee role in retaining the independent auditor is two-fold. First, the authority and responsibility for the appointment, compensation and oversight of the auditors should be with directors who are independent of management. Second, any non-audit work performed by the auditors should be reviewed and approved by these same independent directors to ensure that any non-audit services performed by the auditor do not impair the independence of the independent auditor. To implement the provisions of the SOX Act, the SEC issued rules specifying the types of services that an independent may not provide to its audit client, and governing the Audit Committee's administration of the engagement of the independent auditor. As part of this responsibility, the Audit Committee is required to pre-approve the audit and non-audit services performed by the independent auditor in order to assure that they do not impair the auditor's independence. Accordingly, the Audit Committee has adopted a pre-approval policy of audit and non-audit services (the "Policy"), which sets forth the procedures and conditions pursuant to which services to be performed by the independent auditor are to be pre-approved. Consistent with the SEC rules establishing two different approaches to pre-approving non-prohibited services, the Policy of the Audit Committee covers Pre-approval of audit services, audit-related services, international administration tax services, non-U.S. income tax compliance services, pension and benefit plan consulting and compliance services, and U.S. tax compliance and planning. At the beginning of each fiscal year, the Audit Committee will evaluate other known potential engagements of the independent auditor, including the scope of work proposed to be performed and the proposed fees, and will approve or reject each service, taking into account whether services are permissible under applicable law and the possible impact of each non-audit service on the independent auditor's independence from management. Typically, in addition to the generally pre-approved services, other services would include due diligence for an acquisition that may or may not have been known at the beginning of the year. The Audit Committee has also delegated to any member of the Audit Committee designated by the Board or the financial expert member of the Audit Committee responsibilities to pre-approve services to be performed by the independent auditor not exceeding $25,000 in value or cost per engagement of audit and non-audit services, and such authority may only be exercised when the Audit Committee is not in session.

<div align="center">92</div>

**PART IV**

**ITEM 15.**    *EXHIBITS, FINANCIAL STATEMENT SCHEDULES*

    (a)    The following documents are filed as part of this Report:

        1.    *Financial Statements*

Reports of Independent Registered Public Accounting Firm
Consolidated Balance Sheets—December 31, 2019 and 2018
Consolidated Statements of Operations—Years Ended December 31, 2019, 2018, and 2017
Consolidated Statements of Stockholders' Equity—Years Ended December 31, 2019, 2018, and 2017
Consolidated Statements of Cash Flows—Years Ended December 31, 2019, 2018, and 2017
Statements of Consolidated Comprehensive Income (Loss) – Years Ended December 31, 2019, 2018, and 2017
Notes to Financial Statements

2. *Financial Statement Schedules*

Schedule III—Real Estate and Accumulated Depreciation
Schedule IV—Mortgage Loan Receivables on Real Estate

All other schedules are omitted because they are not applicable or because the required information is shown in the Consolidated Financial Statements or the Notes thereto.

3. *Incorporated Financial Statements*

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. (incorporated by reference to Item 8 of Income Opportunity Realty Investors, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019.

Consolidated Financial Statements of American Realty Investors, Inc. (incorporated by reference to Item 8 of American Realty Investors, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019).

(b) *Exhibits*

The following documents are filed as Exhibits to this Report:

| Exhibit Number | Description |
|---|---|
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.3 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998). |
| 3.4 | Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |

| | |
|---|---|
| 3.5 | Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| 3.6 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001). |
| 3.7 | By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.8 | Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof. |

**Exhibit**

| Number | Description |
|---|---|
| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14.0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.0* | Subsidiaries of the Registrant. |
| 31.1* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Executive Officer. |
| 31.2* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Financial and Accounting Officer. |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

\* Filed herewith.

### ITEM 16.   FORM 10-K SUMMARY

Optional and not included herein.

<center>95</center>

<center>SIGNATURES</center>

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

<div align="right">

TRANSCONTINENTAL REALTY INVESTORS, INC.

</div>

Dated: March 30, 2020                    By:     /s/  ALLA DZYUBA

**Alla Dzyuba**
**Vice President and Chief Accounting Officer**
**(Principal Financial Officer)**

**Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.**

| Signature | Title | Date |
|---|---|---|
| /s/ HENRY A. BUTLER | Chairman of the Board and Director | March 30, 2020 |
| **Henry A. Butler** | | |
| /s/ WILLIAM J. HOGAN | Director | March 30, 2020 |
| **William J. Hogan** | | |
| /s/ RAYMOND D. ROBERTS, SR. | Director | March 30, 2020 |
| **Raymond D. Roberts, Sr.** | | |
| /s/ ROBERT A. JAKUSZEWSKI | Director | March 30, 2020 |
| **Robert A. Jakuszewski** | | |
| /s/ TED R. MUNSELLE | Director | March 30, 2020 |
| **Ted R. Munselle** | | |
| | President and Chief Executive Officer (Principal Executive | March 30, 2020 |

/s/ DANIEL J. MOOS

**Daniel J. Moos**

| | | |
|---|---|---|
| /s/ ALLA DZYUBA | Vice President and Chief Accounting Officer (Principal Financial Officer) | March 30, 2020 |

**Alla Dzyuba**

---

96

---

**ANNUAL REPORT ON FORM 10-K**
**EXHIBIT INDEX**
**For the Year Ended December 31, 2019**

| Exhibit Number | Description |
|---|---|
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.3 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998). |
| 3.4 | Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.5 | Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| 3.6 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001). |
| 3.7 | By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.8 | Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof.) |
| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14.0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.1* | Subsidiaries of the Registrant. |
| 31.1* | Certification Pursuant to Rule 13a-14(a) and 15d-14 under the Securities Exchange Act of 1934, as amended of Principal Executive Officer. |
| 31.2* | Certification Pursuant to Rule 13a-14(a) and 15d-14 under the Securities Exchange Act of 1934, as amended of Principal Financial and Accounting Officer |
| 32.1* | Certification pursuant to 18 U.S.C. Section 1350. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

\*    Filed herewith.

App. 1966

# EXHIBIT J-46

10-K 1 tci-10k_123118.htm ANNUAL REPORT

---

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-09240**

---

# Transcontinental Realty Investors, Inc.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Nevada** | **94-6565852** |
| **(State or other jurisdiction of** | **(IRS Employer** |
| **Incorporation or organization)** | **Identification Number)** |

| | |
|---|---|
| **1603 LBJ Freeway, Suite 800** | |
| **Dallas, Texas** | **75234** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(469) 522-4200**
**Registrant's Telephone Number, including area code**
**Securities registered pursuant to Section 12(b) of the Act:**

| *Title of Each Class* | *Name of each exchange on which registered* |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes        No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes        No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes        No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes        No

App. 1969

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

**Large accelerated filer**                                    **Accelerated filer**
**Non-accelerated filer**                                      **Smaller Reporting Company**
                                                               **Emerging Growth Company**

If an emerging growth company, indicate by check mark if the registrant has elected not to use extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.) Yes      No

Based on the last sale at the close of business on June 30, 2018, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $45,527,090. The basis of the calculation does not constitute a determination by the Registrant as defined in Rule 405 of the Securities Act of 1933, as amended, such calculation, if made as of a date within sixty days of this filing, would yield a different value.

As of March 31, 2019, there were 8,717,767 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. Commission File No. 001-14784
Consolidated Financial Statements of American Realty Investors, Inc. Commission File No. 001-15663

---

**INDEX TO
ANNUAL REPORT ON FORM 10-K**

|                |                                                                                                            | **Page** |
|----------------|------------------------------------------------------------------------------------------------------------|----------|
| **PART I**     |                                                                                                            |          |
| Item 1.        | Business                                                                                                   | 3        |
| Item 1A.       | Risk Factors                                                                                               | 9        |
| Item 1B.       | Unresolved Staff Comments                                                                                  | 14       |
| Item 2.        | Properties                                                                                                 | 15       |
| Item 3.        | Legal Proceedings                                                                                          | 18       |
| Item 4.        | Mine Safety Disclosures                                                                                    | 18       |
| **PART II**    |                                                                                                            |          |
| Item 5.        | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19       |
| Item 6.        | Selected Financial Data                                                                                    | 20       |
| Item 7.        | Management's Discussion and Analysis of Financial Condition and Results of Operation                        | 21       |
| Item 7A.       | Quantitative and Qualitative Disclosures About Market Risk                                                  | 30       |
| Item 8.        | Consolidated Financial Statements and Supplementary Data                                                    | 32       |
| Item 9.        | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure                        | 68       |
| Item 9A.       | Controls and Procedures                                                                                     | 68       |
| Item 9B.       | Other Information                                                                                           | 68       |

App. 1970

## PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 69 |
| Item 11. | Executive Compensation | 76 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 76 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 78 |
| Item 14. | Principal Accounting Fees and Services | 80 |

## PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 82 |
| Signatures | | 84 |

2

---

**FORWARD-LOOKING STATEMENTS**

**Certain Statements in this Form 10-K are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. The words "estimate", "plan", "intend", "expect", "anticipate", "believe", and similar expressions are intended to identify forward-looking statements. The forward-looking statements are found at various places throughout this Report and in the documents incorporated herein by reference. The Company disclaims any intention or obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Although we believe that our expectations are based upon reasonable assumptions, we can give no assurance that our goals will be achieved. Important factors that could cause our actual results to differ from estimates or projections contained in any forward-looking statements are described under Part I, Item 1A. "Risk Factors".**

## PART I

### ITEM 1.   *BUSINESS*

### General

As used herein, the terms "TCI", "the Company", "We", "Our", or "Us" refer to Transcontinental Realty Investors, Inc. a Nevada corporation which was formed in 1984. The Company is headquartered in Dallas, Texas and its common stock is listed and trades on the New York Stock Exchange ("NYSE") under the symbol "TCI".

TCI is a "C" corporation for U.S. federal income tax purposes and files an annual consolidated income tax return with American Realty Investors, Inc. ("ARL"), whose common stock is traded on the NYSE under the symbol "ARL". Subsidiaries and affiliates of ARL own in excess of 80% of the Company's common stock. ARL and one of its subsidiaries own 77.68% and the parent of ARL owns 6.98% of the company. Accordingly, TCI's financial results are consolidated with those of ARL's on Form 10-K and related Consolidated Financial Statements. ARL's common stock is listed and trades on the New York Stock Exchange under the symbol "ARL".

On July 17, 2009, the Company acquired an additional 2,518,934 shares of common stock of Income Opportunity Realty Investors, Inc. ("IOR"), and in doing so, increased its ownership from approximately 25% to over 80% of the shares of common stock of IOR outstanding. Upon acquisition of the additional shares in 2009, IOR's results of operations began to be consolidated with those of the Company for tax and financial reporting purposes. As of December 31, 2018, TCI owned 81.25% of the outstanding IOR common shares. Shares of IOR common stock are listed and traded on the NYSE American under the symbol "IOR".

At the time of the acquisition, the historical accounting value of IOR's assets was $112 million and liabilities were $43 million. In that the shares of IOR acquired by TCI were from a related party, the values recorded by TCI are IOR's historical accounting values at the date of transfer. The Company's fair valuation of IOR's assets and liabilities at the acquisition date approximated IOR's book value. The net difference between the purchase price and historical accounting basis of the assets and liabilities acquired is $25.6 million and has been reflected by TCI as deferred income. The deferred income will be recognized upon the sale of the land that IOR held on its books as of the date of sale, to an independent third party.

TCI's Board of Directors are responsible for directing the overall affairs of TCI and for setting the strategic policies that guide the Company. As of April 30, 2011, the Board of Directors delegated the day-to-day management of the Company to Pillar Income Asset Management, Inc. ("Pillar"), a Nevada corporation, under a written Advisory Agreement that is reviewed annually by TCI's Board of Directors. The directors of TCI are also

App. 1971

directors of ARL and IOR. The Chairman of the Board of Directors of TCI also serves as the Chairman of the Board of Directors of ARL and IOR. The officers of TCI also serve as officers of ARL, IOR and Pillar.

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is Realty Advisors, Inc. ("RAI"), a Nevada corporation, the sole shareholder of which is May Realty Holdings, Inc. ("MRHI", formerly known as Realty Advisors Management, Inc.), effective August 7, 2014), a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

---

3

---

Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), manages our commercial properties and provides brokerage services. Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage". TCI engages third-party companies to lease and manage its apartment properties.

Southern Properties Capital Ltd. ("Southern" or "SPC") is a wholly owned subsidiary of TCI that was incorporated on August 16, 2016 for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange ("TASE"). Southern operates in the United States and is primarily involved in investing in, developing, constructing and operating income-producing properties of multi-family residential real estate assets. Southern is included in the consolidated financial statements of TCI.

On January 1, 2012, the Company entered into a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

On November 19, 2018, we executed an agreement between the Macquarie Group ("Macquarie") and SPC and TCI to create a joint venture, Victory Abode Apartments, LLC ("VAA") to address existing and future demand for quality multifamily residential housing through acquisition and development of sustainable Class A multifamily housing in focused secondary and tertiary markets. In connection with the formation of the joint venture, SPC and TCI contributed a portfolio of 49 income producing apartment complexes, and 3 development projects in various stages of construction and received cash consideration of $236.8 million. At the time of the transfer of the properties, the joint venture assumed all liabilities of those properties, including mortgage debt to the Department of Housing and Urban Development ("HUD").

VAA is equally owned and controlled by Abode JVP, LLC, a wholly-owned subsidiary of SPC and Summerset Intermediate Holdings 2 LLC ("Summerset"), a wholly-owned indirect subsidiary of Macquarie. Pursuant to the Agreement, Abode JVP, LLC and Summerset each own voting and profit participation rights of 50% and 49%, respectively ("Class A Members"). The remaining 2% of the profit participation interest is held by Daniel J. Moos TCI's President and Chief Executive Officer ("Class B Member") who serves also as the Manager of the joint venture.

Our primary business is the acquisition, development and ownership of income-producing residential and commercial real estate properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time and when we believe it appropriate to do so, we will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents, and leasing office, industrial and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate revenues from gains on sales of income-producing properties and land.

At December 31, 2018, our income-producing properties consisted of:

- Seven commercial properties consisting of five office buildings and two retail properties comprising in aggregate of approximately 1.7 million square feet;

- Nine residential apartment communities comprising 1,489 units, excluding apartments being developed.

- Forty nine residential apartment communities totaling 9,192 units owned by our 50% owned investee VAA.

App. 1972

The following table sets forth the location of our real estate held for investment (income-producing properties only) by asset type as of December 31, 2018:

| Location | Apartments (Company owned) No. | Units | Apartments (VAA owned) No. | Units | Commercial (Company owned) No. | SF |
|---|---|---|---|---|---|---|
| Alabama | 1 | 200 | 1 | 168 | — | — |
| Arkansas | — | — | 5 | 1,122 | — | — |
| Colorado | — | — | 2 | 260 | — | — |
| Florida | 2 | 153 | 2 | 388 | 1 | 6,722 |
| Georgia | — | — | 1 | 222 | — | — |
| Louisiana | 1 | 240 | 3 | 464 | — | — |
| Mississippi | 2 | 400 | 1 | 196 | — | — |
| North Carolina | — | — | 1 | 201 | — | — |
| Nevada | — | — | 1 | 308 | — | — |
| Tennessee | — | — | 4 | 708 | — | — |
| Texas-Greater Dallas-Ft Worth | — | — | 13 | 2,384 | 4 | 1,473,634 |
| Texas-Greater Houston | — | — | 1 | 176 | 1 | 95,329 |
| Texas-Other | 3 | 496 | 14 | 2,595 | — | — |
| Wisconsin | — | — | — | — | 1 | 122,205 |
| **Total** | **9** | **1,489** | **49** | **9,192** | **7** | **1,697,890** |

We finance our acquisitions primarily through operating cash flow, proceeds from the sale of land and income-producing properties, and debt financing primarily in the form of property-specific, first-lien mortgage loans from commercial banks and institutional lenders. We finance our development projects principally with short-term, variable-rate construction loans that are refinanced with the proceeds of long-term, fixed-rate amortizing mortgages when the development has been completed and occupancy has been stabilized. When we sell properties, we may carry a portion of the sales price, generally in the form of a short-term interest bearing seller-financed note receivable, secured by the property being sold. We may also from time to time enter into partnerships or joint ventures with various investors to acquire land or income-producing properties, or to sell interests in some of our properties.

We join with third-party development companies to construct residential apartment communities. At December 31, 2018, TCI and VAA each had three apartment projects in development. The third-party developer typically holds a general partner, as well as a limited partner interest in a limited partnership formed for the purpose of building a single property, while we generally take a limited partner interest in the limited partnership. We may contribute land to the partnership as part of our equity contribution or we may contribute the necessary funds to the partnership to acquire the land. We are required to fund all required equity contributions while the third-party developer is responsible for obtaining construction financing, hiring a general contractor and for the overall management, successful completion, initial lease-up and delivery of the project. We generally bear all the economic risks and rewards of ownership in these partnerships and therefore include these partnerships in our consolidated financial statements. The third-party developer is paid a developer fee typically equal to a percentage of the construction costs. When the project reaches stabilized occupancy, we acquire the third-party developer's partnership interests in exchange for any remaining unpaid developer fees.

At December 31, 2018, our apartment projects in development included (dollars in thousands):

| Property | Location | No. of Units | Costs to Date [1] | Total Projected Costs [1] |
|---|---|---|---|---|
| Sugar Mill III | Addis, LA | 72 | $ 787 | $ 11,862 |
| Parc at Denham Springs Phase II | Denham Springs, LA | 144 | 6,532 | 18,768 |
| Overlook at Allensville Phase II | Sevierville, TN | 144 | 12,646 | 20,244 |
| **Total** | | **360** | **$ 19,965** | **$ 50,874** |

(1) Costs include construction hard costs, construction soft costs and loan borrowing costs.

We have made investments in a number of large tracts of undeveloped and partially developed land and intend to continue to improve these tracts of land for our own development purposes or make the improvements necessary to ready the land for sale to other developers.

At December 31, 2018, our investments in undeveloped and partially developed land consisted of the following (dollars in thousands):

| Location | Acquired | Acres | Cost | Intended Use |
|---|---|---|---|---|
| Dallas, TX | 1996-2013 | 21 | $ 1,008 | Mixed use |
| Farmers Branch, TX | 2008 | 137 | 25,892 | Mixed use |
| Kaufman County, TX | 2011 | 1,963.68 | 51,961 | Mixed use |
| Various | 1990-2008 | 192 | 9,027 | Various |
| **Total Land Holdings** | | **2,313.68** | **$ 87,888** | |

5

## Significant Real Estate Acquisitions/Dispositions and Financings

A summary of some of the significant transactions for the year ended December 31, 2018, are discussed below:

### *Purchases*

During the year ended December 31, 2018, the Company purchased through one of its subsidiaries, seven residential apartment communities. A multi-family 80 unit community located in Baton Rouge, LA for a total purchase price of $12 million, paid through a seller's financing note of $1.9 million, issuance of note payable of $8.6 million, and exercising an option to purchase of $1.5 million paid in the previous year. A multi-family 99 unit residential apartment community located in Mansfield, TX for a total purchase price of $14.8 million, paid through a seller's financing note of $2.3 million, and an issuance of a note payable of $11.0 million. A multi-family 200 unit residential apartment community located in Gulf Shores, AL for a total purchase price of $18.1 million, paid through an issuance of a note payable of $11.5 million. A multi-family 144 unit residential apartment community located in Beaumont, TX for a total purchase price of $12.3 million. A multi-family 240 unit residential apartment community located in Houma, LA for a total purchase price of $20.1 million. A multi-family 208 unit residential apartment community located in Texarkana, TX for a total purchase price of $14.7 million. A multi-family 160 unit residential apartment community located in Tupelo, MS for a total purchase price of $11.1 million.

### *Sales*

For the year ended December 31, 2018, TCI sold 62 acres of land to an independent third party for a total sales price of $3.0 million and recorded a gain of $1.3 million from the land sale. In the second quarter, a golf course comprising approximately 96.09 acres sold for an aggregate sales price of $2.3 million, out of which, $0.6 million was received in cash and $1.7 million in note receivables. During the first quarter, the Company sold six income-producing properties to a related party for an aggregate purchase price of $8.5 million, out of which, $2.1 million was received in cash and $6.4 million in note receivables. During the fourth quarter, the Company sold one income-producing property to a related party for a purchase price of $2.2 million. No gain or loss was recorded from the sale of income-producing properties.

In addition, on November 19, 2018, TCI through one of its subsidiaries formed VAA a joint venture with Macquarie. In connection with the formation of the joint venture, TCI contributed fifty-two properties and received a cash consideration of $236.8 million from Macquarie for a voting and profit participation right of 50% and 49%, respectively, 2% of the profits interest is held by Daniel J. Moos, who serves as the President and Chief Executive officer of the Company ("Class B Member") and Manager of the joint venture. The Company recognized a gain of approximately $154.1 million from the sale of the contributed properties to the joint venture.

### *Mercer Crossing*

In addition to the real estate sales noted above the Company recorded sales from a development project known as Mercer Crossing.

At November 2015, our real estate land holdings at Mercer Crossing consisted of land developable into residential homes and commercial projects, located in Farmers Branch, Texas. In November 2015, the Company entered into a sales contract with an unrelated party. The contract was for all of the developable land owned by the Company. In addition, IOR and ARL also sold land in this transaction. Total consideration for the sale was $75 million. The agreement among the parties to this transaction provides for TCI to hold the subordinated note from the buyer in the amount of $50 million. At the closing, due to the inadequate down payment from the buyer and the level of seller financing involved, the transaction was accounted for under the deposit method. Under the deposit method, no revenue is recognized and the asset sold remains on the books until the criteria for full revenue recognition are met.

During the third quarter of 2018, due to significant cumulative sales of real estate to unrelated third parties and cash received by TCI, the criteria for recording full accrual accounting had been met. Through the period ended August 21, 2018, approximately $28.1 million of the assets previously held by the Company were sold, resulting in a gain of $7.5 million.

On August 22, 2018 the Company reacquired all the unsold portions of the real estate from the November 2015 transaction for the amount that remained from the original sales price.

During the period August 23, 2018 through December 31, 2018 additional Mercer Crossing real estate was sold for $11.7 million resulting in a net gain on sale of real estate of $5.6 million.

<div align="center">6</div>

As of December 31, 2018, the Company has approximately 86 acres of land, at various locations that were sold to related parties in multiple transactions. These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets. Due to the related party nature of the transactions TCI has deferred the recording of the sales in accordance with ASC 360-20.

We continue to invest in the development of apartment projects. During the year ended December 31, 2018, we have invested $14.8 million related to the construction or predevelopment of various apartment complexes and capitalized $0.1 million of interest costs.

**Business Plan and Investment Policy**

Our business objective is to maximize long-term value for our stockholders by investing in residential and commercial real estate through the acquisition, development and ownership of apartments, commercial properties and land. We intend to achieve this objective through acquiring and developing properties in multiple markets and operating as an industry-leading landlord. We believe this objective will provide the benefits of enhanced investment opportunities, economies of scale and risk diversification, both in terms of geographic market and real estate product type. We believe our objective will also result in continuing access to favorably priced debt and equity capital. In pursuing our business objective, we seek to achieve a combination of internal and external growth while maintaining a strong balance sheet and employing a strategy of financial flexibility. We maximize the value of our apartments and commercial properties by maintaining high occupancy levels while charging competitive rental rates, controlling costs and focusing on tenant retention. We also pursue attractive development opportunities either directly or in partnership with other investors.

For our portfolio of commercial properties, we generate increased operating cash flow through annual contractual increases in rental rates under existing leases. We also seek to identify best practices within our industry and across our business units in order to enhance cost savings and gain operating efficiencies. We employ capital improvement and preventive maintenance programs specifically designed to reduce operating costs and increase the long-term value of our real estate investments.

We seek to acquire properties consistent with our business objectives and strategies. We execute our acquisition strategy by purchasing properties which management believes will create stockholder value over the long-term. We will also sell properties when management believes value has been maximized or when a property is no longer considered an investment to be held long-term.

We are continuously in various stages of discussions and negotiations with respect to development, acquisition, and disposition of projects. The consummation of any current or future development, acquisition, or disposition, if any, and the pace at which any may be completed cannot be assured or predicted.

Substantially all of our properties are owned by subsidiary companies, many of which are single-asset entities. This ownership structure permits greater access to financing for individual properties and permits flexibility in negotiating a sale of either the asset or the equity interests in the entity owning the asset. From time-to-time, our subsidiaries have invested in joint ventures with other investors, creating the possibility of risks that do not exist with properties solely owned by a TCI subsidiary. In those instances where other investors are involved, those other investors may have business, economic, or other objectives that are inconsistent with our objectives, which may in turn, require us to make investment decisions different from those if we were the sole owner.

Real estate generally cannot be sold quickly. We may not be able to promptly dispose of properties in response to economic or other conditions. To offset this challenge, selective dispositions have been a part of our strategy to maintain an efficient investment portfolio and to provide additional sources of capital. We finance acquisitions through mortgages, internally generated funds, and, to a lesser extent, property sales. Those sources provide the bulk of funds for future acquisitions. We may purchase properties by assuming existing loans secured by the acquired property. When properties are acquired in such a manner, we customarily seek to refinance the asset in order to properly leverage the asset in a manner consistent with our investment objectives.

<div align="right">App. 1975</div>

Our businesses are not generally seasonal with regard to real estate investments. Our investment strategy seeks both current income and capital appreciation. Our plan of operation is to continue, to the extent our liquidity permits, to make equity investments in income-producing real estate such as apartments and commercial properties. We may also invest in the debt or equity securities of real estate-related entities. We intend to pursue higher risk, higher reward investments, such as improved and unimproved land where we can obtain reasonably-priced financing for substantially all of a property's purchase price. We intend to continue the development of apartment properties in selected markets in Texas and in other locations where we believe adequate levels of demand exist. We intend to pursue sales opportunities for properties in stabilized real estate markets where we believe our properties' value has been maximized. We also intend to be an opportunistic seller of properties in markets where demand exceeds current supply. Although we no longer actively seek to fund or purchase mortgage loans, we may, in selected instances, originate mortgage loans or we may provide purchase money financing in conjunction with a property sale.

<div align="center">7</div>

Our Board of Directors has broad authority under our governing documents to make all types of investments, and we may devote available resources to particular investments or types of investments without restriction on the amount or percentage of assets that may be allocated to a single investment or to any particular type of investment, and without limit on the percentage of securities of any one issuer that may be acquired. Investment objectives and policies may be changed at any time by the Board without stockholder approval.

The specific composition from time-to-time of our real estate portfolio owned by TCI directly and through our subsidiaries depends largely on the judgment of management to changing investment opportunities and the level of risk associated with specific investments or types of investments. We intend to maintain a real estate portfolio that is diversified by both location and type of property.

**Competition**

The real estate business is highly competitive and TCI competes with numerous companies engaged in real estate activities (including certain entities described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence"), some of which have greater financial resources than TCI. We believe that success against such competition is dependent upon the geographic location of a property, the performance of property-level managers in areas such as leasing and marketing, collection of rents and control of operating expenses, the amount of new construction in the area and the maintenance and appearance of the property. Additional competitive factors include ease of access to a property, the adequacy of related facilities such as parking and other amenities, and sensitivity to market conditions in determining rent levels. With respect to apartments, competition is also based upon the design and mix of the units and the ability to provide a community atmosphere for the residents. We believe that beyond general economic circumstances and trends, the degree to which properties are renovated or new properties are developed in the competing submarket are also competitive factors. Refer to Part I, Item 1A. "Risk Factors".

To the extent that TCI seeks to sell any properties, the sales prices for the properties may be affected by competition from other real estate owners and financial institutions also attempting to sell properties in areas where TCI's properties are located, as well as aggressive buyers attempting to dominate or penetrate a particular market.

As described above and in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", the officers and directors of TCI serve as officers and directors of ARL and IOR. Both ARL and IOR have business objectives similar to those of TCI. TCI's officers and directors owe fiduciary duties to both IOR and ARL as well as to TCI under applicable law. In determining whether a particular investment opportunity will be allocated to TCI, IOR, or ARL, management considers the respective investment objectives of each Company and the appropriateness of a particular investment in light of each Company's existing real estate and mortgage notes receivable portfolio. To the extent that any particular investment opportunity is appropriate to more than one of the entities, the investment opportunity may be allocated to the entity which has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among all three or two of the entities.

In addition, as described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", TCI competes with related parties of Pillar having similar investment objectives related to the acquisition, development, disposition, leasing and financing of real estate and real estate-related investments. In resolving any potential conflicts of interest which may arise, Pillar has informed TCI that it intends to exercise its best judgment as to what is fair and reasonable under the circumstances in accordance with applicable law.

We have historically engaged in and will continue to engage in certain business transactions with related parties, including but not limited to asset acquisitions and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interests of the Company.

<div align="right">App. 1976</div>

**Available Information**

TCI maintains an internet site at *http://www.transconrealty-invest.com*. We make available through our website free of charge Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, reports filed pursuant to Section 16 and amendments to those reports as soon as reasonably practicable after we electronically file or furnish such materials to the Securities and Exchange Commission. In addition, we have posted the charters for our Audit Committee, Compensation Committee and Governance and Nominating Committee, as well as our Code of Business Conduct and Ethics, Corporate Governance Guidelines on Director Independence and other information on the website. These charters and principles are not incorporated in this Report by reference. We will also provide a copy of these documents free of charge to stockholders upon written request. The Company issues Annual Reports containing audited financial statements to its common shareholders.

<div align="center">8</div>

---

**ITEM 1A.   *RISK FACTORS***

An investment in our securities involves various risks. All investors should carefully consider the following risk factors in conjunction with the other information in this report before trading our securities.

**Risk Factors Related to our Business**

*Adverse events concerning our existing tenants or negative market conditions affecting our existing tenants could have an adverse impact on our ability to attract new tenants, release space, collect rent or renew leases, and thus could adversely affect cash flow from operations and inhibit growth.*

Cash flow from operations depends in part on the ability to lease space to tenants on economically favorable terms. We could be adversely affected by various facts and events over which the Company has limited or no control, such as:

- lack of demand for space in areas where the properties are located;

- inability to retain existing tenants and attract new tenants;

- oversupply of or reduced demand for space and changes in market rental rates;

- defaults by tenants or failure to pay rent on a timely basis;

- the need to periodically renovate and repair marketable space;

- physical damage to properties;

- economic or physical decline of the areas where properties are located; and

- potential risk of functional obsolescence of properties over time.

At any time, any tenant may experience a downturn in its business that may weaken its financial condition. As a result, a tenant may delay lease commencement, fail to make rental payments when due, decline to extend a lease upon its expiration, become insolvent or declare bankruptcy. Any tenant bankruptcy or insolvency, leasing delay or failure to make rental payments when due, could result in the termination of the tenant's lease and material losses to the Company.

If tenants do not renew their leases as they expire, we may not be able to rent the space. Furthermore, leases that are renewed, and some new leases for space that is re-let, may have terms that are less economically favorable than expiring lease terms, or may require us to incur significant costs, such as renovations, tenant improvements or lease transaction costs. Any of these events could adversely affect cash flow from operations and our ability to make distributions to shareholders and service indebtedness. A significant portion of the costs of owning property, such as real estate taxes, insurance, and debt service payments, are not necessarily reduced when circumstances cause a decrease in rental income from the properties.

*We may not be able to compete successfully with other entities that operate in our industry.*

We experience a great deal of competition in attracting tenants for the properties and in locating land to develop and properties to acquire.

<div align="right">App. 1977</div>

In our efforts to lease properties, we compete for tenants with a broad spectrum of other landlords in each of the markets. These competitors include, among others, publicly-held REITs, privately-held entities, individual property owners and tenants who wish to sublease their space. Some of these competitors may be able to offer prospective tenants more attractive financial terms than we are able to offer.

If the availability of land or high quality properties in our markets diminishes, operating results could be adversely affected.

*We may experience increased operating costs which could adversely affect our financial results and the value of our properties.*

Our properties are subject to increases in operating expenses such as insurance, cleaning, electricity, heating, ventilation and air conditioning, administrative costs and other costs associated with security, landscaping, repairs, and maintenance of the properties. While some current tenants are obligated by their leases to reimburse us for a portion of these costs, there is no assurance that these tenants will make such payments or agree to pay these costs upon renewal or new tenants will agree to pay these costs. If operating expenses increase in our markets, we may not be able to increase rents or reimbursements in all of these markets to offset the increased expenses, without at the same time decreasing occupancy rates. If this occurs, our ability to make distributions to shareholders and service indebtedness could be adversely affected.

<div align="center">9</div>

---

*Our ability to achieve growth in operating income depends in part on our ability to develop additional properties.*

We intend to continue to develop properties where warranted by market conditions. We have a number of ongoing development and land projects being readied for commencement.

Additionally, general construction and development activities include the following risks:

- construction and leasing of a property may not be completed on schedule, which could result in increased expenses and construction costs, and would result in reduced profitability for that property;

- construction costs may exceed original estimates due to increases in interest rates and increased cost of materials, labor or other costs, possibly making the property less profitable because of inability to increase rents to compensate for the increase in construction costs;

- some developments may fail to achieve expectations, possibly making them less profitable;

- we may be unable to obtain, or face delays in obtaining, required zoning, land-use, building, occupancy, and other governmental permits and authorizations, which could result in increased costs and could require us to abandon our activities entirely with respect to a project;

- we may abandon development opportunities after the initial exploration, which may result in failure to recover costs already incurred. If we determine to alter or discontinue its development efforts, future costs of the investment may be expensed as incurred rather than capitalized and we may determine the investment is impaired resulting in a loss;

- we may expend funds on and devote management's time to projects which will not be completed; and

- occupancy rates and rents at newly-completed properties may fluctuate depending on various factors including market and economic conditions, and may result in lower than projected rental rates and reduced income from operations.

*We face risks associated with property acquisitions.*

We acquire individual properties and various portfolios of properties and intend to continue to do so. Acquisition activities are subject to the following risks:

- when we are able to locate a desired property, competition from other real estate investors may significantly increase the seller's offering price;

- acquired properties may fail to perform as expected;

- the actual costs of repositioning or redeveloping acquired properties may be higher than original estimates;

- acquired properties may be located in new markets where we face risks associated with an incomplete knowledge or understanding of

<div align="right">App. 1978</div>

the local market, a limited number of established business relationships in the area and a relative unfamiliarity with local governmental and permitting procedures; and

- we may be unable to quickly and efficiently integrate new acquisitions, particularly acquisitions of portfolios of properties, into existing operations, and results of operations and financial condition could be adversely affected.

We may acquire properties subject to liabilities and without any recourse, or with limited recourse, with respect to unknown liabilities. However, if an unknown liability was later asserted against the acquired properties, we might be required to pay substantial sums to settle it, which could adversely affect cash flow.

<center>10</center>

*Many of our properties are concentrated in our primary markets and the Company may suffer economic harm as a result of adverse conditions in those markets.*

Our properties are located principally in specific geographic areas in the southwestern, southeastern, and mid-western United States. The Company's overall performance is largely dependent on economic conditions in those regions.

*Our investments in joint ventures may decrease our ability to manage risk.*

We conduct some of our operations through a joint venture in which we share control over certain economic and business interests with our joint venture partner. Our joint venture partner may have economic, business or legal interests or goals that are inconsistent with our goals and interests or may be unable to meet their obligations. Failure by us, or an entity in which we have a joint-venture interest, to adequately manage the risks associated with any acquisitions or joint ventures could have a material adverse effect on the financial condition or results of operations of our joint ventures and adversely affect our business, financial condition, results of operations and cash flows.

*We are leveraged and may not be able to meet our debt service obligations.*

We had total indebtedness, including bonds and notes payable, at December 31, 2018 of approximately $449.4 million. Substantially all assets have been pledged to secure debt. These borrowings increase the risk of loss because they represent a prior claim on assets and most require fixed payments regardless of profitability. Our leveraged position makes us vulnerable to declines in the general economy and may limit the Company's ability to pursue other business opportunities in the future.

*We may not be able to access financial markets to obtain capital on a timely basis, or on acceptable terms.*

We rely on proceeds from property dispositions and third party capital sources for a portion of our capital needs, including capital for acquisitions and development. The public debt and equity markets are among the sources upon which the Company relies. There is no guarantee that we will be able to access these markets or any other source of capital. The ability to access the public debt and equity markets depends on a variety of factors, including:

- general economic conditions affecting these markets;

- our own financial structure and performance;

- the market's opinion of real estate companies in general; and

- the market's opinion of real estate companies that own similar properties;

*We may suffer adverse effects as a result of terms and covenants relating to the Company's indebtedness.*

Required payments on our indebtedness generally are not reduced if the economic performance of the portfolio declines. If the economic performance declines, net income, cash flow from operations and cash available for distribution to stockholders may be reduced. If payments on debt cannot be made, we could sustain a loss or suffer judgments, or in the case of mortgages, suffer foreclosures by mortgagees. Further, some obligations contain cross-default and/or cross-acceleration provisions, which means that a default on one obligation may constitute a default on other obligations.

We anticipate only a small portion of the principal of its debt will be repaid prior to maturity. Therefore, we are likely to refinance a portion of its outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or the terms of any refinancing will not be as

favorable as the terms of the maturing debt. If principal balances due at maturity cannot be refinanced, extended, or repaid with proceeds from other sources, such as the proceeds of sales of assets or new equity capital, cash flow may not be sufficient to repay all maturing debt in years when significant "balloon" payments come due.

Our credit facilities and unsecured debt contain customary restrictions, requirements and other limitations on the ability to incur indebtedness, including total debt to asset ratios, secured debt to total asset ratios, debt service coverage ratios, and minimum ratios of unencumbered assets to unsecured debt. Our continued ability to borrow is subject to compliance with financial and other covenants. In addition, failure to comply with such covenants could cause a default under credit facilities, and we may then be required to repay such debt with capital from other sources. Under those circumstances, other sources of capital may not be available, or be available only on unattractive terms.

***Our degree of leverage could limit our ability to obtain additional financing or affect the market price of our common stock.***

The degree of leverage could affect our ability to obtain additional financing for working capital, capital expenditures, acquisitions, development or other general corporate purposes. The degree of leverage could also make us more vulnerable to a downturn in business or the general economy.

***An increase in interest rates would increase interest costs on variable rate debt and could adversely impact the ability to refinance existing debt.***

We currently have, and may incur more, indebtedness that bears interest at variable rates. Accordingly, if interest rates increase, so will the interest costs, which could adversely affect cash flow and the ability to pay principal and interest on our debt and the ability to make distributions to shareholders. Further, rising interest rates could limit our ability to refinance existing debt when it matures.

***Unbudgeted capital expenditures or cost overruns could adversely affect business operations and cash flow.***

If capital expenditures for ongoing or planned development projects or renovations exceed expectations, the additional cost of these expenditures could have an adverse effect on business operations and cash flow. In addition, we might not have access to funds on a timely basis to pay the unexpected expenditures.

Construction costs are funded in large part through construction financing which the Company may guarantee. The Company's obligation to pay interest on this financing continues until the rental project is completed, leased up and permanent financing is obtained, or the project is sold or the construction loan is otherwise paid. Unexpected delays in completion of one or more ongoing projects could also have a significant adverse impact on business operations and cash flow.

***We may need to sell properties from time to time for cash flow purposes.***

Because of the lack of liquidity of real estate investments, our ability to respond to changing circumstances may be limited and generally real estate investments cannot be sold quickly. In the event that we must sell assets to generate cash flow, we cannot predict whether there will be a market for those assets in the time period desired, or whether we will be able to sell the assets at a price that will allow the Company to fully recoup its investment. We may not be able to realize the full potential value of the assets and may incur costs related to the early pay-off of the debt secured by such assets.

***We intend to devote resources to the development of new projects.***

We plan to continue developing new projects as opportunities arise in the future. Development and construction activities entail a number of risks, including but not limited to the following:

- we may abandon a project after spending time and money determining its feasibility;

- construction costs may materially exceed original estimates;

- the revenue from a new project may not be enough to make it profitable or generate a positive cash flow;

- we may not be able to obtain financing on favorable terms for development of a property, if at all;

- we may not complete construction and lease-ups on schedule, resulting in increased development or carrying costs; and

- we may not be able to obtain, or may be delayed in obtaining, necessary governmental permits.

App. 1980

*The overall business is subject to all of the risks associated with the real estate industry.*

We are subject to all risks incident to investment in real estate, many of which relate to the general lack of liquidity of real estate investments, including, but not limited to:

- our real estate assets are concentrated primarily in the southwest and any deterioration in the general economic conditions of this region could have an adverse effect;

- changes in interest rates may make the ability to satisfy debt service requirements more burdensome;

- lack of availability of financing may render the purchase, sale or refinancing of a property more difficult or unattractive;

---

12

---

- changes in real estate and zoning laws;

- increases in real estate taxes and insurance costs;

- federal or local economic or rent control;

- acts of terrorism; and

- hurricanes, tornadoes, floods, earthquakes and other similar natural disasters.

*Our performance and value are subject to risks associated with our real estate assets and with the real estate industry.*

Our economic performance and the value of our real estate assets, and consequently the value of our securities, are subject to the risk that if our properties do not generate revenues sufficient to meet our operating expenses, including debt service and capital expenditures, our cash flow will be adversely affected. The following factors, among others, may adversely affect the income generated by our properties:

- downturns in the national, regional and local economic conditions (particularly increases in unemployment);

- competition from other office and commercial buildings;

- local real estate market conditions, such as oversupply or reduction in demand for office or other commercial space;

- changes in interest rates and availability of financing;

- vacancies, changes in market rental rates and the need to periodically repair, renovate and re-let space;

- increased operating costs, including insurance expense, utilities, real estate taxes, state and local taxes and heightened security costs;

- civil disturbances, earthquakes and other natural disasters, or terrorist acts or acts of war which may result in uninsured or underinsured losses;

- significant expenditures associated with each investment, such as debt service payments, real estate taxes, insurance and maintenance costs which are generally not reduced when circumstances cause a reduction in revenues from a property;

- declines in the financial condition of our tenants and our ability to collect rents from our tenants; and

- decreases in the underlying value of our real estate.

---

13

---

App. 1981

*Adverse economic conditions and dislocations in the credit markets could have a material adverse effect on our results of operations, and financial condition.*

Our business may be affected by market and economic challenges experienced by the U.S. economy or real estate industry as a whole or by the local economic conditions in the markets in which our properties are located, including the current dislocations in the credit markets and general global economic recession. These current conditions, or similar conditions existing in the future, may adversely affect our results of operations, and financial condition as a result of the following, among other potential consequences:

- the financial condition of our tenants may be adversely affected which may result in tenant defaults under leases due to bankruptcy, lack of liquidity, operational failures or for other reasons;

- significant job losses within our tenants may occur, which may decrease demand for our office space, causing market rental rates and property values to be negatively impacted;

- our ability to borrow on terms and conditions that we find acceptable, or at all, may be limited, which could reduce our ability to pursue acquisition and development opportunities and refinance existing debt, reduce our returns from our acquisition and development activities and increase our future interest expense;

- reduced values of our properties may limit our ability to dispose of assets at attractive prices or to obtain debt financing secured by our properties and may reduce the availability of unsecured loans; and

- one or more lenders could refuse to fund their financing commitment to us or could fail and we may not be able to replace the financing commitment of any such lenders on favorable terms, or at all.

*Real estate investments are illiquid, and we may not be able to sell properties if and when it is appropriate to do so.*

Real estate generally cannot be sold quickly. We may not be able to dispose of properties promptly in response to economic or other conditions. In addition, provisions of the Internal Revenue Code may limit our ability to sell properties (without incurring significant tax costs) in some situations when it may be otherwise economically advantageous to do so, thereby adversely affecting returns to stockholders and adversely impacting our ability to meet our obligations.

**ITEM 1B.   *UNRESOLVED STAFF COMMENTS***

None.

14

**ITEM 2.   *PROPERTIES***

On December 31, 2018, our portfolio consisted of sixteen income-producing properties consisting of nine apartment communities totaling 1,489 units, seven commercial properties consisting of five office buildings and two retail centers. In addition, we own or control 3,199 acres of improved and unimproved land held for future development or sale. The average annual rental and other property revenue dollar per square foot is $6.53 for the Company's residential apartment portfolio and $19.80 for the commercial portfolio. Through our joint venture VAA we have a 50 percent ownership interest to a portfolio of forty nine income-producing properties with a total of 8,887 units, which generated an average annual rental revenue of $12.83 per square foot. The table below shows information relating to those properties in which we own or have an ownership interest, all of which are suitable and adequate for the purpose for which each is utilized:

| Residential Apartments | Location | Units | Occupancy |
|---|---|---|---|
| Chelsea | Beaumont, TX | 144 | 95.14% |
| Farnham Park | Port Arthur, TX | 144 | 94.44% |
| Landing Bayou | Houma, LA | 240 | 77.08% |
| Legacy at Pleasant Grove | Texarkana, TX | 208 | 91.83% |
| Toulon | Gautier, MS | 240 | 99.17% |
| Villager | Fort Walton, FL | 33 | 100.00% |
| Villas at Bon Secour | Gulf Shores, AL | 200 | 99.00% |
| Vista Ridge | Tupelo, MS | 160 | 93.75% |
| Westwood | Mary Ester FL | 120 | 99.17% |
| *9* | *Total Apartment Units* | **1,489** | |

App. 1982

| Office Buildings | Location | SqFt | Occupancy |
|---|---|---:|---:|
| 600 Las Colinas | Irving, TX | 512,210 | 86.75% |
| 770 South Post Oak | Houston, TX | 95,329 | 86.95% |
| Browning Place (Park West I) | Farmers Branch, TX | 625,378 | 98.15% |
| Senlac (VHP) | Farmers Branch, TX | 2,812 | 100.00% |
| Stanford Center | Dallas, TX | 333,234 | 97.79% |
| *5* | *Total Office Buildings* | **1,568,963** | |

| Retail Centers | Location | SqFt | Occupancy |
|---|---|---:|---:|
| Bridgeview Plaza | LaCrosse, WI | 122,205 | 89.45% |
| Fruitland Park | Fruitland Park, FL | 6,722 | 100.00% |
| *2* | *Total Retail Centers* | **128,927** | |
| | *Total Commercial* | **1,697,890** | |

15

Our joint venture investee VAA, owns the following residential properties:

| Residential Apartments | Location | Units | Occupancy |
|---|---|---:|---:|
| Adobe Red Rock | Las Vegas, NV | 308 | 41.60% |
| Apalachee Point | Tallahassee, FL | 200 | 96.24% |
| Blue Lake Villas | Waxahachie, TX | 186 | 93.25% |
| Blue Lake Villas Phase II | Waxahachie, TX | 70 | 92.92% |
| Breakwater Bay | Beaumont, TX | 176 | 92.72% |
| Bridgewood Ranch | Kaufman, TX | 106 | 95.75% |
| Capitol Hill | Little Rock, AR | 156 | 92.80% |
| Centennial Village | Oak Ridge,TN | 252 | 91.00% |
| Crossings Of Opelika | Opelika, AL | 168 | 94.83% |
| Dakota Arms | Lubbock, TX | 208 | 93.23% |
| Desoto Ranch | DeSoto, TX | 248 | 92.21% |
| Eagle Crossing | Dallas, TX | 150 | 95.46% |
| Falcon Lakes | Arlington, TX | 248 | 94.67% |
| Heather Creek | Mesquite, TX | 200 | 93.76% |
| Lake Forest | Humble, TX | 240 | 94.29% |
| Lodge At Pecan Creek | Denton, TX | 192 | 89.05% |
| Lofts at Reynolds Village | Asheville, NC | 201 | 93.90% |
| Mansions Of Mansfield | Mansfield, TX | 208 | 97.38% |
| McKinney Point | McKinney, TX | 198 | 95.24% |
| Metropolitan | Little Rock, AR | 260 | 92.41% |
| Mission Oaks | San Antonio, TX | 228 | 94.09% |
| Northside On Travis | Sherman, TX | 200 | 94.00% |
| Oak Hollow Phase I | Seguin, TX | 160 | 92.81% |
| Oak Hollow Phase II | Seguin, TX | 96 | 86.74% |
| Oceanaire | Biloxi, MS | 196 | 93.87% |
| Overlook At Allensville | Sevierville, TN | 144 | 95.26% |
| Parc @ Wylie | Wylie, TX | 198 | 92.99% |
| Parc at Bentonville | Bentonville, AR | 216 | 88.96% |
| Parc At Clarksville | Clarksville, TN | 168 | 95.21% |
| Parc At Denham Springs | Denham Spring, LA | 224 | 90.78% |
| Parc at Garland | Garland, TX | 198 | 94.97% |
| Parc at Mansfield | Mansfield, TX | 99 | 96.65% |
| Parc At Maumelle | Little Rock, AR | 240 | 90.18% |
| Parc At Metro Center | Nashville, TN | 144 | 98.61% |
| Parc At Rogers | Rogers, AR | 250 | 94.82% |
| Preserve At Pecan Creek | Denton, TX | 192 | 95.13% |
| Preserve At Prairie Pointe | Lubbock, TX | 184 | 93.65% |
| Residences At Holland Lake | Weatherford, TX | 208 | 95.08% |

App. 1983

| | | | |
|---|---|---|---|
| Sawgrass Creek | New Port Richey, FL | 88 | 90.57% |
| Sonoma Court | Rockwall, TX | 124 | 93.35% |
| Sugar Mill Phase I | Baton Rouge, LA | 160 | 89.25% |
| Sugar Mill Phase II | Addis, LA | 80 | 87.95% |
| Tattersall Village | Hinesville, GA | 222 | 90.03% |
| Tradewinds | Midland, TX | 214 | 97.31% |
| Villas At Park West I | Pueblo, CO | 148 | 91.84% |
| Villas At Park West II | Pueblo, CO | 112 | 94.53% |
| Vistas Of Vance Jackson | San Antonio, TX | 240 | 92.35% |
| Waterford At Summer Park | Rosenberg, TX | 196 | 96.50% |
| Windsong | Fort Worth, TX | 188 | 96.15% |
| *49* | **Total Apartment Units** | **9,192** | |

16

## Commercial Lease Expirations

The following table summarizes our commercial lease expirations as of December 31, 2018:

| Year of Lease Expiration | Rentable Square Feet Subject to Expiring Leases | Current Annualized[1] Contractual Rent Under Expiring Leases | Current Annualized[1] Contractual Rent Under Expiring Leases (P.S.F.) | Percentage of Total Square Feet | Percentage of Gross Rentals |
|---|---|---|---|---|---|
| 2019 | 250,228 | $ 4,392,415 | $ 17.55 | 14.7% | 14.3% |
| 2020 | 132,376 | 2,786,951 | 21.05 | 7.8% | 9.1% |
| 2021 | 135,017 | 2,800,861 | 20.74 | 8.0% | 9.1% |
| 2022 | 237,489 | 5,184,674 | 21.83 | 14.0% | 16.9% |
| 2023 | 339,701 | 5,717,047 | 16.83 | 20.0% | 18.6% |
| 2024 | 237,549 | 4,979,956 | 20.96 | 14.0% | 16.2% |
| 2025 | 113,829 | 2,604,020 | 22.88 | 6.7% | 8.5% |
| 2026 | 23,432 | 609,232 | 26.00 | 1.4% | 2.0% |
| Thereafter | 56,926 | 1,627,426 | 28.59 | 3.4% | 5.3% |
| **Total** | **1,526,547** | **$ 30,702,582** | | **90.0%** | **100%** |

(1) Represents the monthly contractual base rent and recoveries from tenants under existing leases as of December 31, 2018, multiplied by twelve. This amount reflects total rent before any rent abatements and includes expense reimbursements which may be estimates as of such date.

The table below shows information related to the land parcels we own as of December 31, 2018:

| Land | Location | Acres |
|---|---|---|
| 2427 Valley View Ln | Farmers Branch, TX | 0.19 |
| Bonneau Land | Farmers Branch, TX | 5.01 |
| Cooks Lane | Fort Worth, TX | 23.24 |
| Dedeaux | Gulfport, MS | 10.00 |
| Dominion Mercer | Farmers Branch, TX | 3.16 |
| Gautier | Gautier, MS | 3.46 |
| Lacy Longhorn | Farmers Branch, TX | 3.04 |
| Lake Shore Villas | Humble, TX | 19.51 |
| Lubbock | Lubbock, TX | 2.86 |
| McKinney 36 | Collin County, TX | 19.17 |
| Minivest | Dallas, TX | 0.23 |
| Mira Lago | Farmers Branch, TX | 6.55 |
| Nashville | Nashville, TN | 6.25 |
| Nicholson Croslin | Dallas, TX | 0.80 |
| Nicholson Mendoza | Dallas, TX | 0.35 |

App. 1984

| Ocean Estates | Gulfport, MS | 12.00 |
|---|---|---|
| Texas Plaza | Irving, TX | 10.33 |
| Travis Ranch | Kaufman County, TX | 8.66 |
| Travis Ranch Retail | Kaufman County, TX | 8.13 |
| Union Pacific Railroad | Dallas, TX | 0.04 |
| Valley View 34 | Farmers Branch, TX | 1.31 |
| Whorton Land | Bentonville, AR | 64.44 |
| Willowick | Pensacola, FL | 39.78 |
| Windmill Farms | Kaufman County, TX | 1,855.68 |
| | *Total Land/Development* | *2,104.18* |

**Land Subject to Sales**

| Contract | Location | Acres |
|---|---|---|
| Dominion Tract | Farmers Branch, TX | 6.33 |
| Mercer Crossing | Farmers Branch, TX | 186.59 |
| Windmill Farms | Kaufman County, TX | 108.00 |
| | *Total Land Subject to Sales Contract* | **300.92** |
| | *Total Land* | **2,405.10** |

17

**ITEM 3.    *LEGAL PROCEEDINGS***

**Dynex Capital, Inc.**

On July 20, 2015, the 68th Judicial District Court in Dallas County, Texas issued its Final Judgment in Cause No. DC-03-00675, styled Basic Capital Management, Inc., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. v. Dynex Commercial, Inc. The case, which was litigated for more than a decade, had its origin with Dynex Commercial making loans to Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. (subsidiaries of Continental Mortgage & Equity Trust ("CMET"), an entity which merged into TCI in 1999 after the original suit was filed). Under the original loan commitment, $160 million in loans were to be made to the entities. The loans were conditioned on the execution of a commitment between Dynex Commercial and Basic Capital Management, Inc. ("Basic").

An original trial in 2004, which also included Dynex Capital, Inc. as a defendant, resulted in a jury awarding damages in favor of Basic for "lost opportunity," as well as damages in favor of ART and in favor of TCI and its subsidiaries for "increased costs" and "lost opportunity." The original Trial Court judge ignored the jury's findings, however, and entered a "Judgment Notwithstanding the Verdict" ("JNOV") in favor of the Dynex entities (the judge held the Plaintiffs were not entitled to any damages from the Dynex entities). After numerous appeals by all parties, Dynex Capital, Inc. was ultimately dismissed from the case and the remaining claims against Dynex Commercial were remanded to the Trial Court for a new judgment consistent with the jury's findings. The Court entered the new Final Judgment against Dynex Commercial, Inc. on July 20, 2015.

The Final Judgment entered against Dynex Commercial, Inc. on July 20, 2015 awarded Basic $0.256 million in damages, plus pre-judgment interest of $0.192 million for a total amount of $0.448 million. The Judgment awarded ART $14.2 million in damages, plus pre-judgment interest of $10.6 million for a total amount of $24.8 million. The Judgment awarded TCI $11.1 million, plus pre-judgment interest of $8.4 million for a total amount of $19.5 million. The Judgment also awarded Basic, ART, and TCI post-judgment interest at the rate of 5% per annum from April 25, 2014 until the date their respective damages are paid. Lastly, the Judgement awarded Basic, ART, and TCI $1.6 million collectively in attorneys' fees from Dynex Commercial, Inc.

The Company is working with counsel to identify assets and collect on the Final Judgment against Dynex Commercial, Inc., as well as explore possible additional claims, if any, against Dynex Capital, Inc.

**Berger Litigation**

On February 4, 2019, an individual claiming to be a stockholder holding 7,900 shares of Common Stock of Income Opportunity Realty Investors, Inc. ("IOR") filed a Complaint in the United States District Court for the Northern District of Texas, Dallas Division, individually and allegedly derivatively on behalf of IOR, against Transcontinental Realty Investors, Inc. ("TCI"), American Realty Investors, Inc. ("ARL"), (TCI is a shareholder of IOR, ARL is a shareholder of TCI) Pillar Income Asset Management, Inc. ("Pillar"), ( collectively the "Companies"), certain

App. 1985

officers and directors of the Companies ("Additional Parties") and two other individuals. The Complaint filed alleges that the sale and/or exchange of certain tangible and intangible property between the Companies and IOR during the last ten years of business operations constitutes a breach of fiduciary duty by the one or more of Companies, the Additional Defendants and/or the directors of IOR. The case alleges other related claims. The Plaintiff seeks certification as a representative of IOR and all of its shareholders, unspecified damages, a return to IOR of various funds and an award of costs, expenses, disbursements (including Plaintiff's attorneys' fees) and prejudgment and post-judgment interest. The named Defendants intend to vigorously defend the action, deny all of the allegations of the Complaint, and believe the allegations to be wholly without any merit. While only in the early stages of defending the case, it is not clear that Plaintiff owns any shares of Common Stock of IOR or would be a proper representative of IOR or a class of minority stockholders.

*Litigation.* The ownership of property and provision of services to the public as tenants entails an inherent risk of liability. Although the Company and its subsidiaries are involved in various items of litigation incidental to and in the ordinary course of its business, in the opinion of management, the outcome of such litigation will not have a material adverse impact upon the Company's financial condition, results of operation or liquidity.

## ITEM 4.    *MINE SAFETY DISCLOSURES*

Not applicable.

<center>18</center>

---

<center>**PART II**</center>

## ITEM 5.    *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*

TCI's Common stock is listed and traded on the NYSE American under the symbol "TCI". The following table sets forth the high and low sales prices as reported in the consolidated reporting system of the NYSE American for the quarters ended:

|                | 2018 | | 2017 | |
|----------------|------:|------:|------:|------:|
|                | High | Low | High | Low |
| First Quarter  | $ 46.00 | $ 25.14 | $ 21.50 | $ 11.94 |
| Second Quarter | $ 52.00 | $ 23.90 | $ 27.64 | $ 16.50 |
| Third Quarter  | $ 38.25 | $ 28.36 | $ 29.69 | $ 20.37 |
| Fourth Quarter | $ 37.42 | $ 26.73 | $ 35.00 | $ 26.39 |

On March 15, 2019, the closing price of TCI's common stock as reported on the NYSE American was $34.70 per share, and was held by approximately 3,700 holders of record.

TCI's Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, the board determined not to pay any dividends on common stock in 2018, 2017 or 2016. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including the Company's financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

In December 1989, the Board of Directors approved a share repurchase program, authorizing the repurchase of a total of 687,000 shares of TCI's Common stock. In June 2000, the Board increased this authorization to 1,387,000 shares. On August 10, 2010, the Board of Directors approved an increase in the share repurchase program for up to an additional 250,000 shares of common stock which resulted in a total authorization under the repurchase program for up to 1,637,000 shares of our common stock. This repurchase program has no termination date. There were no shares repurchased for the year ended December 31, 2018.

In November 2006, TCI issued 100,000 shares of Series D Preferred Stock with a liquidation preference of $100 per share. The preferred stock is not convertible into any other security, requires dividends payable at the initial rate of 7% annually. The dividend rate increases ratably from 7% to 9% in future periods and can be redeemed at any point after September 30, 2011.

During the fourth quarter of 2018, all 100,000 shares of Series D Preferred Stock were redeemed for $17.2 million, of which $7.2 million was accrued unpaid dividends. At December 31, 2018, there were no preferred shares outstanding.

<center>19</center>

---

The following table sets forth selected consolidated financial data derived from our audited financial statements for each of the five years in the period ended December 31, 2018. The data presented below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" set forth in Part II, Item 7 of this Annual Report and the consolidated financial statements and the accompanying notes set forth in Part II, Item 8 of this Annual Report.

| | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2018** | **2017** | **2016** | **2015** | **2014** |
| | **(dollars in thousands, except share and per share amounts)** | | | | |
| **EARNINGS DATA** | | | | | |
| Rental and other property revenues | $ 120,955 | $ 125,233 | $ 118,471 | $ 102,220 | $ 75,858 |
| Total operating expenses | 104,834 | 105,128 | 100,824 | 92,919 | 75,087 |
| Operating income | 16,121 | 20,105 | 17,647 | 9,301 | 771 |
| Other expenses | (1,401) | (49,967) | (36,628) | (36,095) | (17,613) |
| Income (loss) before gain on disposition of 50% interest in VAA, gain on land sales, non-controlling interest, and taxes | 14,720 | (29,862) | (18,981) | (26,794) | (16,842) |
| Gain on disposition of 50% interest in VAA | 154,126 | — | — | — | — |
| Gain on sale of income producing properties | — | 9,842 | 16,207 | 18,911 | 561 |
| Gain on land sales | 17,404 | 4,884 | 3,121 | — | — |
| Income tax (expense) benefit | (3,210) | (180) | (24) | (517) | 20,390 |
| Net income (loss) from continuing operations | 183,040 | (15,316) | 323 | (8,400) | 4,109 |
| Net income (loss) from discontinuing operations | — | — | (1) | 896 | 37,868 |
| Net income (loss) | 183,040 | (15,316) | 322 | (7,504) | 41,977 |
| Net income attributable to non-controlling interest | (1,590) | (499) | (285) | (132) | (399) |
| Net income (loss) attributable to Transcontinental Realty Investors, Inc. | 181,450 | (15,815) | 37 | (7,636) | 41,578 |
| Preferred dividend requirement | (900) | (900) | (900) | (900) | (1,005) |
| Net income (loss) applicable to common shares | $ 180,550 | $ (16,715) | $ (863) | $ (8,536) | $ 40,573 |
| | | | | | |
| **PER SHARE DATA** | | | | | |
| **Earnings per share - basic** | | | | | |
| Income (loss) from continuing operations | $ 20.71 | $ (1.92) | $ (0.10) | $ (1.08) | $ 0.32 |
| Income (loss) from discontinued operations | — | — | — | 0.10 | 4.42 |
| Net income (loss) applicable to common shares | $ 20.71 | $ (1.92) | $ (0.10) | $ (0.98) | $ 4.74 |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 | 8,559,370 |
| | | | | | |
| **Earnings per share - diluted** | | | | | |
| Income (loss) from continuing operations | $ 20.71 | $ (1.92) | $ (0.10) | $ (1.08) | $ 0.32 |
| Income (loss) from discontinued operations | — | — | — | 0.10 | 4.42 |
| Net income (loss) applicable to common shares | $ 20.71 | $ (1.92) | $ (0.10) | $ (0.98) | $ 4.74 |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 | 8,559,370 |
| | | | | | |
| **BALANCE SHEET DATA** | | | | | |
| Real estate, net | $ 384,504 | $ 979,870 | $ 891,173 | $ 844,019 | $ 689,121 |
| Notes and interest receivable, net | 83,541 | 70,166 | 79,308 | 69,551 | 83,457 |
| Investment in VAA | 68,399 | — | — | — | — |
| Total assets | 862,380 | 1,313,422 | 1,185,914 | 1,110,204 | 930,405 |
| Notes and interest payable | 277,237 | 894,482 | 841,516 | 779,434 | 608,917 |
| Bonds and interest payable | 158,574 | 113,047 | — | — | — |
| Shareholders' equity | 380,401 | 208,261 | 224,477 | 225,055 | 233,448 |
| Book value per share | 43.64 | 23.89 | 25.75 | 25.82 | 27.27 |

App. 1987

Case 3:22-cv-02118-X Document 253 Filed 05/30/23 Page 717 of 824 PageID 9941

The following discussion should be read in conjunction with the financial statements and notes thereto appearing elsewhere in this report.

The Annual Report on Form 10-K contains forward-looking statements within the meaning of the federal securities laws, principally, but not only, under the captions "Business", "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." We caution investors that any forward-looking statements in this report, or which management may make orally or in writing from time to time, are based on management's beliefs and on assumptions made by, and information currently available to, management. When used, the words "anticipate", "believe", "expect", "intend", "may", "might", "plan", "estimate", "project", "should", "will", "result" and similar expressions which do not relate solely to historical matters are intended to identify forward-looking statements. These statements are subject to risks, uncertainties and assumptions and are not guarantees of future performance, which may be affected by known and unknown risks, trends, uncertainties and factors that are beyond our control. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. We caution you that, while forward-looking statements reflect our good faith beliefs when we make them, they are not guarantees of future performance and are impacted by actual events when they occur after we make such statements. We expressly disclaim any responsibility to update our forward-looking statements, whether as a result of new information, future events or otherwise. Accordingly, investors should use caution in relying on past forward-looking statements, which are based on results and trends at the time they are made, to anticipate future results or trends.

Some of the risks and uncertainties that may cause our actual results, performance or achievements to differ materially from those expressed or implied by forward-looking statements include, among others, the following:

- general risks affecting the real estate industry (including, without limitation, the inability to enter into or renew leases, dependence on tenants' financial condition, and competition from other developers, owners and operators of real estate);

- risks associated with the availability and terms of financing and the use of debt to fund acquisitions and developments;

- failure to manage effectively our growth and expansion into new markets or to integrate acquisitions successfully;

- risks and uncertainties affecting property development and construction (including, without limitation, construction delays, cost overruns, inability to obtain necessary permits and public opposition to such activities);

- risks associated with downturns in the national and local economies, increases in interest rates, and volatility in the securities markets;

- costs of compliance with the Americans with Disabilities Act and other similar laws and regulations;

- potential liability for uninsured losses and environmental contamination;

- risks associated with our dependence on key personnel whose continued service is not guaranteed; and

- the other risk factors identified in this Form 10-K, including those described under the caption "Risk Factors."

The risks included here are not exhaustive. Other sections of this report, including Part I Item 1A. "Risk Factors," include additional factors that could adversely affect our business and financial performance. Moreover, we operate in a very competitive and rapidly changing environment. New risk factors emerge from time to time and it is not possible for management to predict all such risk factors, nor can we assess the impact of all such risk factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. Given these risks and uncertainties, investors should not place undue reliance on forward-looking statements as a prediction of actual results. Investors should also refer to our quarterly reports on Form 10-Q for future periods and current reports on Form 8-K as we file them with the SEC, and to other materials we may furnish to the public from time to time through Forms 8-K or otherwise.

**Overview**

We are an externally advised and managed real estate investment company that owns a diverse portfolio of income-producing properties and land held for development. The Company's portfolio of income-producing properties includes residential apartment communities, office buildings and other commercial properties. Our investment strategy includes acquiring existing income-producing properties as well as developing new properties on land already owned or acquired for a specific development project. We acquire land primarily in in-fill locations or high-growth suburban markets. We are an active buyer and seller of real estate and during 2018 we acquired $103.1 million and sold $57.9 million of land and

income-producing properties. As of December 31, 2018, we owned 1,469 units in nine residential apartment communities and seven commercial properties comprising approximately 1.7 million rentable square feet. In addition, we own 2,405 acres of land held for development. The Company currently owns income-producing properties and land in six states.

We finance our acquisitions primarily through operating cash flow, proceeds from the sale of land and income-producing properties and debt financing primarily in the form of property-specific first-lien mortgage loans from commercial banks and institutional lenders. We finance our development projects principally with short-term, variable interest rate construction loans that are converted to long-term, fixed rate amortizing mortgages when the development project is completed and occupancy has been stabilized. The Company will, from time to time, also enter into partnerships with various investors to acquire income-producing properties or land and to sell interests in some of its wholly-owned properties. When the Company sells assets, it may carry a portion of the sales price generally in the form of a short-term, interest bearing seller-financed note receivable. The Company generates operating revenues primarily by leasing apartment units to residents and leasing office, retail and industrial space to commercial tenants.

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

Since April 30, 2011, Pillar is the Company's external Advisor and Cash Manager under a contractual arrangement that is reviewed annually by our Board of Directors. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for TCI's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual Advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Effective since January 1, 2011, Regis manages our commercial properties and provides brokerage services.  Regis is entitled to receive a fee for its property management and brokerage services. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage."  The Company contracts with third-party companies to lease and manage our apartment communities.

## Critical Accounting Policies

We present our financial statements in accordance with generally accepted accounting principles in the United States ("GAAP").

The accompanying Consolidated Financial Statements include our accounts, our subsidiaries, generally all of which are wholly-owned, and all entities in which we have a controlling interest.

For entities in which we have less than a controlling financial interest or entities where we are not deemed to be the primary beneficiary, the entities are accounted for using the equity method of accounting. Accordingly, our share of the net earnings or losses of these entities are included in consolidated net income. TCI's investment in ARL is accounted for under the equity method.

In accordance with the VIE guidance in ASC 810 "Consolidations," the Company consolidated nine multifamily residential properties at December 31, 2018 and fifty-one at December 31, 2017, located throughout the United States ranging from 153 units to 496 units.  Assets totaling approximately $462 million and approximately $1,113 million at December 31, 2018 and 2017, respectively, are consolidated and included in "Real estate, at cost" on the balance sheet and are all collateral for their respective mortgage notes payable, none of which are recourse to the partnership in which they are in or to the Company.

22

## Real Estate

Upon acquisitions of real estate, we assess the fair value of acquired tangible and intangible assets, including land, buildings, tenant improvements, "above-" and "below-market" leases, origination costs, acquired in-place leases, other identified intangible assets and assumed liabilities in accordance with ASC Topic 805 "Business Combinations", and allocate the purchase price to the acquired assets and assumed liabilities, including land at appraised value and buildings at replacement cost.

We assess and consider fair value based on estimated cash flow projections that utilize appropriate discount and/or capitalization rates, as well as available market information. Estimates of future cash flows are based on a number of factors including the historical operating results, known and anticipated trends, and market and economic conditions. The fair value of the tangible assets of an acquired property considers the value of the

App. 1989

property as if it were vacant. We also consider an allocation of purchase price of other acquired intangibles, including acquired in-place leases that may have a customer relationship intangible value, including (but not limited to) the nature and extent of the existing relationship with the tenants, the tenants' credit quality and expectations of lease renewals. Based on our acquisitions to date, our allocation to customer relationship intangible assets has been immaterial.

We record acquired "above-" and "below-market" leases at their fair values (using a discount rate which reflects the risks associated with the leases acquired) equal to the difference between (1) the contractual amounts to be paid pursuant to each in-place lease and (2) management's estimate of fair market lease rates for each corresponding in-place lease, measured over a period equal to the remaining term of the lease for above-market leases and the initial term plus the term of any below-market fixed rate renewal options for below-market leases.

Other intangible assets acquired include amounts for in-place lease values that are based on our evaluation of the specific characteristics of each tenant's lease. Factors to be considered include estimates of carrying costs during hypothetical expected lease-up periods considering current market conditions, and costs to execute similar leases. In estimating carrying costs, we include real estate taxes, insurance and other operating expenses and estimates of lost rentals at market rates during the expected lease-up periods, depending on local market conditions. In estimating costs to execute similar leases, we consider leasing commissions, legal and other related expenses.

Transfers to or from our parent, ARL, or other related parties reflect a basis equal to the cost basis in the asset at the time of the sale.

**Depreciation and Impairment**

Real estate is stated at depreciated cost. The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. Costs directly related to the development of properties are capitalized. Capitalized development costs include interest, property taxes, insurance, and other direct project costs incurred during the period of development.

A variety of costs are incurred in the acquisition, development and leasing of properties. After determination is made to capitalize a cost, it is allocated to the specific component of a project that is benefited. Determination of when a development project is substantially complete and capitalization must cease involves a degree of judgment. Our capitalization policy on development properties is guided by ASC Topic 835-20 "Interest - Capitalization of Interest" and ASC Topic 970 "Real Estate—General". The costs of land and buildings under development include specifically identifiable costs. The capitalized costs include pre-construction costs essential to the development of the property, development costs, construction costs, interest costs, real estate taxes, salaries and related costs and other costs incurred during the period of development. We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

Management reviews its long-lived assets used in operations for impairment when there is an event or change in circumstances that indicates impairment in value. An impairment loss is recognized if the carrying amount of its assets is not recoverable and exceeds its fair value. Fair value is determined by a recent appraisal, comparable based upon prices for similar assets, executed sales contract, a present value and/or a valuation technique based upon a multiple of earnings or revenue. If such impairment is present, an impairment loss is recognized based on the excess of the carrying amount of the asset over its fair value. The evaluation of anticipated cash flows is highly subjective and is based in part on assumptions regarding future occupancy, rental rates and capital requirements that could differ materially from actual results in future periods. If we determine that impairment has occurred, the affected assets must be reduced to their fair value. We did not record any impairment charges for the years ended December 31, 2018 and 2017.

23

**Real Estate Assets Held for Sale**

We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their carrying amount or their estimated fair value, less estimated costs to sell. We did not have any real estate assets classified as held for sale at December 31, 2018 or 2017.

Any properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors, disclosed in Item 1 "Significant Real Estate Acquisitions/Dispositions and Financing." Any sale transaction where the guidance reflects that a sale had not occurred, the asset involved in the transaction, including the debt, if appropriate, and property operations, remained on the books of the Company. We continue to charge depreciation to expense as a period costs for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

Except for ownership interests in variable interest entities, we account for our investments in unconsolidated real estate ventures under the equity method of accounting because the Company exercises significant influence over, but does not control, these entities. These investments are recorded initially at cost, as investments in unconsolidated real estate ventures, and subsequently adjusted for equity in earnings and cash contributions and distributions. Any difference between the carrying amount of these investments on the Company's balance sheet and the underlying equity in net assets is amortized as an adjustment to equity in earnings of unconsolidated real estate ventures over the life of the related asset. Under the equity method of accounting, our net equity is reflected within the Consolidated Balance Sheets, and our share of net income or loss from the joint ventures is included within the Consolidated Statements of Operations. The joint venture agreements may designate different percentage allocations among investors for profits and losses; however, our recognition of joint venture income or loss generally follows the joint venture's distribution priorities, which may change upon the achievement of certain investment return thresholds. For ownership interests in variable interest entities, the Company consolidates those in which we are the primary beneficiary.

**Recognition of Rental Income**

Rental income for commercial property leases is recognized on a straight-line basis over the respective lease terms. In accordance with ASC Topic 805, we recognize rental revenue of acquired in-place "above-"and "below-market" leases at their fair values over the terms of the respective leases. On our Consolidated Balance Sheets, we include as a receivable the excess of rental income recognized over rental payments received pursuant to the terms of the individual commercial lease agreements.

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

Rental revenue for residential property leases is recorded when due from residents and is recognized monthly as earned, which is not materially different than on a straight-line basis as lease terms are generally for periods of one year or less. An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

**Revenue Recognition on the Sale of Real Estate**

Sales and the associated gains or losses of real estate assets are recognized in accordance with the provisions of ASC Topic 360-20, "Property, Plant and Equipment—Real Estate Sale". The specific timing of a sale is measured against various criteria in ASC 360-20 related to the terms of the transaction and any continuing involvement in the form of management or financial assistance associated with the properties. If the sales criteria for the full accrual method are not met, we defer some or all of the gain recognition and account for the continued operations of the property by applying the finance, leasing, deposit, installment or cost recovery methods, as appropriate, until the sales criteria are met.

24

**Non-performing Notes Receivable**

We consider a note receivable to be non-performing when the maturity date has passed without principal repayment and the borrower is not making interest payments in accordance with the terms of the agreement.

**Interest Recognition on Notes Receivable**

We record interest income as earned in accordance with the terms of the related loan agreements.

**Allowance for Estimated Losses**

We assess the collectability of notes receivable on a periodic basis, the assessment consists primarily of an evaluation of cash flow projections of the borrower to determine whether estimated cash flows are sufficient to repay principal and interest in accordance with the contractual terms of the note. We recognize impairments on notes receivable when it is probable that principal and interest will not be received in accordance with the contractual terms of the loan. The amount of the impairment to be recognized generally is based on the fair value of the partnership's real estate that represents the primary source of loan repayment. Refer to Note 5 "Notes and Interest Receivable" for details on our notes receivable.

**Fair Value of Financial Instruments**

We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions

App. 1991

define fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1   — Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2   — Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3   — Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

### Related parties

We apply ASC Topic 805, "Business Combination", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

### Results of Operations

The discussion of our results of operations is based on management's review of operations, which is based on our segments. Our segments consist of apartments, commercial buildings, land and other. For discussion purposes, we break these segments down into the following sub-categories; same property portfolio, acquired properties, and developed properties in the lease-up phase. The same property portfolio consists of properties that were held by us for the entire period for both years being compared. The acquired property portfolio consists of properties that we acquired but have not held for the entire period for both periods being compared. Developed properties in the lease-up phase consist of completed projects that are being leased-up. As we complete each phase of the project, we lease-up that phase and include those revenues in our continued operations. Once a developed property becomes leased-up (80% or more) and is held the entire period for both years under comparison, it is considered to be included in the same property portfolio. Income- producing properties that we have sold during the year are reclassified to discontinued operations for all periods presented. The other segment consists of revenue and operating expenses related to the notes receivable and corporate entities.

The following discussion is based on our Consolidated Statements of Operations for the years ended December 31, 2018, 2017, and 2016 as included in Item 8. "Consolidated Financial Statements and Supplementary Data". Continuing operations relates to income-producing properties that were held during those years as adjusted for sales in the subsequent years.

At December 31, 2018, 2017 and 2016, we owned or had interests in a portfolio of nine, fifty-nine and fifty-nine income-producing properties, respectively. The total property portfolio represents all income-producing properties held as of December 31 for the year presented. The table below shows the number of income-producing properties held by year:

|  | 2018 | 2017 | 2016 |
|---|---|---|---|
| Continued operations | 9 | 59 | 59 |
| Total property portfolio | 9 | 59 | 59 |

*Comparison of the year ended December 31, 2018 to the year ended December 31, 2017:*

For the year ended December 31, 2018, we reported net income applicable to common shares of $180.1 million or $20.71 per share compared to a net loss applicable to common shares of $16.7 million or ($1.92) per share for the year ended December 31, 2017. The current year net income applicable to common shares includes a gain on disposition of our 50% interest in VAA of $154.1 million. Current year net income also includes gain on sales of land of $17.4 million and no gain on sales of income-producing properties, compared to the prior year net loss which included gain on sales of income producing properties of $9.8 million and gain on land sales of $4.9 million.

App. 1992

**Revenues**

Rental and other property revenues were $121.0 million for the year ended December 31, 2018. This represents a decrease of $4.2 million, as compared to the prior year revenues of $125.2 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

**Expenses**

Property operating expenses were $59.4 million for the year ended December 31, 2018. This represents a decrease of $3.7 million, compared to the prior year operating expenses of $63.1 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

Depreciation and amortization expenses were $22.8 million for the year ended December 31, 2018. This represents a decrease of $2.8 million compared to prior year depreciation of $25.6 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

General and administrative expenses were $11.4 million for the year ended December 31, 2018. This represents an increase of $5.1 million compared to the prior year expenses of $6.3 million. The increase in general and administrative expenses was due primarily to an increase in fees paid to our Advisors of approximately $1.5 million, general fees of approximately $1.5 million associated with finalizing the formation of the joint venture, legal and regulatory fees of $0.8 million and general and professional fees of approximately $1.0 million.

Net income fee was $0.6 million for the year ended December 31, 2018. This represents an increase of $0.3 million compared to the prior year net income fee of $0.3 million. The net income fee paid to Pillar is calculated at 7.5% of net income.

Advisory fees were $10.7 million for the year ended December 31, 2018. This represents an increase of $0.7 million compared to the prior year advisory fees of $10.0 million. Advisory fees are computed based on a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value.

**Other income (expense)**

Interest income was $15.8 million for the year ending December 31, 2018 compared to $13.9 million for the year ended December 31, 2017 for an increase of $1.9 million. This increase was primarily due to an increase of $2.7 million in interest on receivable owed from our Advisors, offset by a decrease of $0.8 in interest on notes receivable from other related parties.

<center>26</center>

Mortgage and loan interest expense was $58.9 million for the year ended December 31, 2018. This represents a decrease of $1.0 million compared to the prior year expense of $59.9 million. The decrease is primarily due to the contribution of fifty-two properties to the joint venture VAA on November 19, 2018.

No gain on sales of income producing properties was recognized during the year ended December 31, 2018. Gain on sale of income-producing properties was $9.8 million for the year ended December 31, 2017, attributable to the recognition of deferred gain.

Gain on land sales was $17.4 million and $4.9 million for the years ended December 31, 2018 and 2017, respectively. The increase of approximately $12.5 million was primarily due to sales of land at Mercer Crossing recognized in 2018.

Other income was $28.2 million and $0.6 million for the years ended December 31, 2018 and 2017, respectively. The increase of $27.6 million was primarily due to a $17.6 million gain recognized in September 2018 for deferred income associated with the sale of assets, as well as income of approximately $7.6 million from insurance proceeds on Mahogany Run Golf Course.

Gain on disposition of 50% interest in VAA was $154.1 million for the year ended December 31, 2018. There was no such gain in prior years, the gain was the result of the contribution of fifty-two properties to the joint venture VAA.

***Comparison of the year ended December 31, 2017 to the year ended December 31, 2016:***

For the year ended December 31, 2017, we reported net loss applicable to common shares of $16.7 million or ($1.92) per diluted earnings per share compared to a net loss applicable to common shares of $0.9 million or ($0.10) per diluted earnings per share for the year ended December 31, 2016. The current year net loss applicable to common shares of $16.7 million included gain on sale of income-producing properties of $9.8

million and gain on land sales of $4.9 million compared to the prior year net loss applicable to common shares of $0.9 million which included gain on land sales of $3.1 million.

## Revenues

Rental and other property revenues were $125.2 million for the year ended December 31, 2017. This represents an increase of $6.7 million, as compared to the prior year revenues of $118.5 million. The change by segment is an increase in the apartment portfolio of $6.2 million and an increase in the commercial portfolio of approximately $0.5 million. We purchased four apartment communities during the year ended December 31, 2016, which produced rental revenue of $8.3 million and $2.0 million during the years ended December 31, 2017 and 2016, respectively, for a net increase of $6.3 million. In addition, we purchased one apartment property during 2017 that produced revenues of $0.8 million in rental revenues.

## Expenses

Property operating expenses were $63.1 million for the year ended December 31, 2017. This represents an increase of $1.2 million, as compared to the prior year operating expenses of $61.9 million. The growth in our apartment portfolio resulted in a $2.9 million increase in property operating expenses. The Company added a net 723 units during 2016 and 201 units during 2017. Property operating expenses for our commercial portfolio decreased $1.8 million. In addition, we had a decrease in property operating expenses for our land portfolio of $1.0 million.

Depreciation and amortization expenses were $25.6 million for the year ended December 31, 2017. This represents an increase of $1.9 million as compared to prior year depreciation of $23.7 million. The increase is primarily due to the growth in our apartment portfolio which had an increase of $1.6 million year-over-year.

General and administrative expenses were $6.3 million for the year ended December 31, 2017. This represents an increase of $0.8 million, as compared to the prior year expenses of $5.5 million.

Net income fee remained constant at $0.3 million for the year ended December 31, 2017 and 2016. The net income fee paid to Pillar is calculated at 7.5% of net income.

Advisory fees were $10.0 million for the year ended December 31, 2017. This represents an increase of $0.5 million compared to the prior year advisory fees of $9.5 million. Advisory fees are computed based on a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value.

## Other income (expense)

Interest income was $13.9 million for the year ending December 31, 2017 compared to $14.7 million for the year ended December 31, 2016 for a decrease of $0.8 million. This decrease was primarily due to a decrease of $2.3 in interest on notes receivable, partially offset by a $1.3 million increase in interest on receivable owed from Advisor.

---

27

---

Mortgage and loan interest expense was $59.9 million for the year ended December 31, 2017. This represents an increase of $6.8 million compared to the prior year expense of $53.1 million. The change by segment is an increase in the other portfolio of $9.7 million, an increase in the commercial portfolio of $0.4 million, partially offset by a decrease in the apartment portfolio of $3.0 million and a decrease in the land portfolio of $0.2 million. Within the other portfolio, the increase is due to incurring new mezzanine debt obligations. Within the apartment portfolio, the majority of the increase is due to the acquisition of a new property, partially offset by the refinancing of six loans during 2017 at lower rates.

The gain on sale of income-producing properties $9.8 million was attributable to recognition of deferred gains for the year ended December 31, 2017. During 2016, the Company sold one apartment community located in Irving, Texas to an independent third party for a total sales price of $8.1 million and one apartment community located in Topeka, Kansas to an independent third party for a total sales price of $12.3 million. We recorded an aggregate gain of $16.2 million from the sale of these two properties. The Company also sold an industrial warehouse consisting of approximately 177,805 square feet. The sale resulted in a loss of approximately $0.2 million.

Gain on land sales was $4.9 million and $3.1 million for the years ended December 31, 2017 and 2016, respectively. During 2016, we sold a combined 129.7 acres of land located in Forney, Texas, McKinney, Texas, Farmers Branch, Texas and Nashville, Tennessee to independent third parties for a total sales price of $29.1 million. We recorded an aggregate $3.1 million gain from the land sales. During 2015, we sold 578.8 acres of land in six transactions for a sales price of $102.9 million and recorded a gain of $18.9 million.

## Liquidity and Capital Resources

**General**

Our principal liquidity needs are:

- fund normal recurring expenses;

- meet debt service and principal repayment obligations including balloon payments on maturing debt;

- fund capital expenditures, including tenant improvements and leasing costs;

- fund development costs not covered under construction loans; and

- fund possible property acquisitions.

Our principal sources of cash have been and will continue to be:

- property operations;

- proceeds from land and income-producing property sales;

- collection of mortgage notes receivable;

- collections of receivables from related companies;

- refinancing of existing mortgage notes payable; and

- additional borrowings, including mortgage notes payable, and lines of credit.

It is important to realize that the current status of the banking industry has had a significant effect on our industry. The banks' willingness and/or ability to originate loans affects our ability to buy and sell property, and refinance existing debt. We are unable to foresee the extent and length of this down-turn. A continued and extended decline could materially impact our cash flows. We draw on multiple financing sources to fund our long-term capital needs. We generally fund our development projects with construction loans, which are converted to traditional mortgages upon completion of the project.

We may also issue additional equity securities, including common stock. Management anticipates that our cash as of December 31, 2018, along with cash that will be generated in 2019 from notes and interest receivables, will be sufficient to meet all of our cash requirements. Management intends to selectively sell land and income-producing assets, refinance or extend real estate debt and seek additional borrowings secured by real estate to meet its liquidity requirements. Although history cannot predict the future, historically, we have been successful at refinancing and extending a portion of the Company's current maturity obligations.

<div align="center">28</div>

Management reviews the carrying values of TCI's properties and mortgage notes receivable at least annually and whenever events or a change in circumstances indicate that impairment may exist. Impairment is considered to exist if, in the case of a property, the future cash flow from the property (undiscounted and without interest) is less than the carrying amount of the property. The property review generally includes: (1) selective property inspections; (2) a review of the property's current rents compared to market rents; (3) a review of the property's expenses; (4) a review of maintenance requirements; (5) a review of the property's cash flow; (6) discussions with the manager of the property; and (7) a review of properties in the surrounding area. For notes receivable, impairment is considered to exist if it is probable that all amounts due under the terms of the note will not be collected. If impairment is found to exist, a provision for loss is recorded by a charge against earnings. The note receivable review includes an evaluation of the collateral property securing such note.

**Cash Flow Summary**

The following summary discussion of our cash flows is based on the Consolidated Statements of Cash Flows in Part II, Item 8. "Consolidated Financial Statements and Supplementary Data" and is not meant to be an all-inclusive discussion of the changes in our cash flows for the periods presented below (dollars in thousands):

**December 31,**

| | 2018 | 2017 | Variance |
|---|---|---|---|
| Net cash (used in) operating activities | $ (181,187) | $ (25,074) | $ (156,113) |
| Net cash provided by (used in) investing activities | $ 147,625 | $ (98,312) | $ 245,937 |
| Net cash provided by financing activities | $ 51,785 | $ 155,995 | $ (104,210) |

The primary use of cash for operations is daily operating costs, general and administrative expenses, advisory fees, and land holding costs. Our primary source of cash from operating activities is from rental income on properties.

Our primary cash outlays for investing activities are for construction and development, acquisition of land and income-producing properties, and capital improvements to existing properties. Our primary sources of cash from investing activities are from the proceeds on the sale of land and income-producing properties. During the year ended December 31, 2018, we advanced $16.8 million toward various notes receivable, purchased income-producing properties for $10.6 million, and invested approximately $85.1 million for the development of new properties and improvement of income producing properties. In addition, we received $236.8 million from the formation of the joint venture with Macquarie. For the year ended December 31, 2017, we advanced $16.4 million toward various notes receivable, purchased income-producing properties for $37.0 million, and invested approximately $77.4 million for the development of new properties and improvement of income producing properties, offset by proceeds from notes receivables of $26.2 million.

Our primary sources of cash from financing activities are from proceeds on notes payables. Our primary cash outlays are for recurring debt payments and payments on maturing notes payable. For the year ended December 31, 2018, the increase in cash flow from financing activities was due primarily to proceeds from borrowings of $123.3 million, and proceeds received from the sale of nonconvertible Series B Bonds by Southern of $59.2 million, offset by payments to our notes payable of $124.6 million. For the year ended December 31, 2017, the increase in cash flow from financing activities was due primarily to proceeds from borrowings of $135.2 million, and proceeds from the issuance of Series A bonds for $115.3 million, offset by payments to notes payable of $83.1 million and bond issuance and financing costs payments of approximately $10.5 million.

**Equity Investments**

TCI has from time to time purchased shares of IOR and ARL. The Company may purchase additional equity securities of IOR and ARL through open market and negotiated transactions to the extent TCI's liquidity permits. Equity securities of ARL and IOR held by TCI may be deemed "restricted securities" under Rule 144 of the Securities Act of 1933 ("Securities Act"). Accordingly, TCI may be unable to sell such equity securities other than in a registered public offering or pursuant to an exemption under the Securities Act for a one-year period after they are acquired. Such restrictions may reduce TCI's ability to realize the full fair value of such investments if TCI attempted to dispose of such securities in a short period of time.

TCI also holds a voting and profit participation right of 50% and 49%, respectively in VAA. VAA actively participates in the development and/or acquisitions of Class A multi-family assets.

29

**Contractual Obligations**

The following table represents our contractual obligations at December 31, 2018 (in thousands):

| | Total | 2019 | 2020 | 2021 | 2022 | 2023 | Thereafter |
|---|---|---|---|---|---|---|---|
| Notes and interest payable [1] | $ 407,206 | $ 51,265 | $ 19,925 | $ 53,010 | $ 44,553 | $ 38,451 | $ 200,002 |
| Bonds and interest payable [1] | 197,238 | 32,593 | 31,062 | 40,554 | 38,238 | 32,231 | 22,560 |
| Total | $ 604,444 | $ 83,858 | $ 50,987 | $ 93,564 | $ 82,791 | $ 70,682 | $ 222,562 |

[1] The notes and bonds contain financial covenants that, if certain thresholds are not met, could allow the lender to accelerate principal payments or cause the note to become due immediately.

**Environmental Matters**

Under various federal, state and local environmental laws, ordinances and regulations, TCI may be potentially liable for removal or remediation costs, as well as certain other potential costs, relating to hazardous or toxic substances (including governmental fines and injuries to persons and property) where property-level managers have arranged for the removal, disposal or treatment of hazardous or toxic substances. In addition, certain environmental laws impose liability for release of asbestos-containing materials into the air, and third parties may seek recovery for personal injury associated with such materials.

App. 1996

Management is not aware of any environmental liability relating to the above matters that would have a material adverse effect on TCI's business, assets or results of operations.

**Inflation**

The effects of inflation on TCI's operations are not quantifiable. Revenues from property operations tend to fluctuate proportionately with inflationary increases and decreases in housing costs. Fluctuations in the rate of inflation also affect sales values of properties and the ultimate gain to be realized from property sales. To the extent that inflation affects interest rates, TCI's earnings from short-term investments, the cost of new financings and the cost of variable interest rate debt will be affected.

**ITEM 7A.    *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK***

TCI's primary market risk exposure consists of changes in interest rates on borrowings under our debt instruments that bear interest at variable rates that fluctuate with market interest rates and maturing debt that has to be refinanced. TCI's future operations, cash flow and fair values of financial instruments are also partially dependent on the then existing market interest rates and market equity prices.

As of December 31, 2018, our outstanding notes payable consisted of approximately $285.8 million, including $244.6 million of fixed-rate notes and a variable-rate note of approximately $41.9 million with an interest rate of 5.34%. Our overall weighted average interest rate at December 31, 2018 and 2017 was 7.1% and 5.5%, respectively.

TCI's interest rate sensitivity position is managed by the capital markets department. Interest rate sensitivity is the relationship between changes in market interest rates and the fair value of market rate sensitive assets and liabilities. TCI's earnings are affected as changes in short-term interest rates affect its cost of variable-rate debt and maturing fixed-rate debt.

If market interest rates for variable-rate debt average 100 basis points more in 2019 than they did during 2018, TCI's interest expense would increase and net income would decrease by $0.4 million. This amount is determined by considering the impact of hypothetical interest rates on TCI's borrowing cost. The analysis does not consider the effects of the reduced level of overall economic activity that could exist in such an environment. Further, in the event of a change of such magnitude, management would likely take actions to further mitigate its exposure to the change. However, due to the uncertainty of the specific actions that would be taken and their possible effects, the sensitivity analysis assumes no change in TCI's financial structure.

<div align="center">30</div>

The following table contains exposures that existed at December 31, 2018. Anticipation of exposures or risk on positions that could possibly arise was not considered. TCI's ultimate interest rate risk and its effect on operations will depend on future capital market exposures, which cannot be anticipated with a probable assurance level (dollars in thousands):

| | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | Thereafter | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Note Receivable** | | | | | | | | | | | | | | |
| Fixed interest rate - fair value | | | | | | | | | | | | | $ | 122,571 |
| Instrument's maturities | $ | 18,203 | $ | 38,030 | $ | 174 | $ | — | $ | — | $ | 66,164 | $ | 122,571 |
| Interest | | 11,192 | | 6,323 | | 3,950 | | 4,383 | | 4,383 | | 39,445 | $ | 69,676 |
| Average Rate | | 9% | | 8% | | 9% | | 8% | | 8% | | 8% | | |
| | | | | | | | | | | | | | | |
| **Notes Payable:** | | | | | | | | | | | | | | |
| Variable Rate - fair value | | | | | | | | | | | | | $ | 41,892 |
| Instrument's maturities | $ | 617 | $ | 645 | $ | 687 | $ | 39,943 | $ | — | $ | — | $ | 41,892 |
| Interest | | 2,232 | | 2,191 | | 1,078 | | — | | — | | — | $ | 5,501 |
| Average interest rate [(1)] | | 5.34% | | 5.34% | | 5.34% | | 5.34% | | — | | — | | |
| | | | | | | | | | | | | | | |
| Fixed interest rate - fair value | | | | | | | | | | | | | $ | 243,926 |
| Instrument's maturities | $ | 36,807 | $ | 8,178 | $ | 42,515 | $ | 3,362 | $ | 37,259 | $ | 115,805 | $ | 243,926 |
| Interest | | 10,926 | | 8,912 | | 8,730 | | 1,248 | | 1,191 | | 84,195 | $ | 115,202 |
| Average interest rate | | 7.14% | | 7.32% | | 5.87% | | 4.38% | | 5.22% | | 3.80% | | |

[(1)]   Interest rates on variable rate notes payable are equal to the variable rates in effect on December 31, 2018.

<div align="right">App. 1997</div>

**ITEM 8.**    *CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

<div align="center">

**INDEX TO FINANCIAL STATEMENTS**

</div>

|  | Page # |
|---|---|
| **Financial Statements** | |
| Report of Independent Registered Public Accounting Firm | 33 |
| Consolidated Balance Sheets—December 31, 2018 and 2017 | 34 |
| Consolidated Statements of Operations—Years Ended December 31, 2018, 2017 and 2016 | 35 |
| Consolidated Statements of Shareholders' Equity—Years Ended December 31, 2018, 2017 and 2016 | 36 |
| Consolidated Statements of Cash Flows—Years Ended December 31, 2018, 2017 and 2016 | 37 |
| Statements of Consolidated Comprehensive Income (Loss) – Years Ended December 31, 2018, 2017 and 2016 | 38 |
| Notes to Consolidated Financial Statements | 39 |
| | |
| **Financial Statement Schedules** | |
| Schedule III—Real Estate and Accumulated Depreciation | 64 |
| Schedule IV—Mortgage Loans Receivable on Real Estate | 66 |

All other schedules are omitted because they are not required, are not applicable or the information required is included in the Financial Statements or the notes thereto.

<div align="center">

32

</div>

<div align="center">

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

</div>

To the Board of Directors of and
Stockholders of Transcontinental Realty Investors, Inc.
Dallas, Texas

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Transcontinental Realty Investors, Inc. and Subsidiaries as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2018, and the related notes and schedules collectively referred to as the "consolidated financial statements." In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Transcontinental Realty Investors, Inc. as of December 31, 2018 and 2017 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with U.S. generally accepted accounting principles.

**Basis of Opinion**

These consolidated financial statements are the responsibility of Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of Liquidity**

As described in the Note 16, Transcontinental Realty Investors, Inc.'s management intends to sell land and income-producing properties and refinance or extend debt secured by real estate to meet the Company's liquidity needs.

**Supplemental Information**

The supplemental information contained in Schedules III and IV has been subjected to audit procedures performed in conjunction with the audit of the Company's financial statements. The supplemental information is the responsibility of the Company's management. Our audit procedures included determining whether the supplemental information reconciles to the financial statements or the underlying accounting and other records, as applicable, and performing procedures to test the completeness and accuracy of the information presented in the supplemental information. In forming our opinion on the supplemental information, we evaluated whether the supplemental information, including its form and content, is presented in conformity with the Security and Exchange Commission's rules. In our opinion, the supplemental information is fairly stated, in all material respects, the financial date required to be set forth therein in relation to the financial statements as a whole.

FARMER, FUQUA & HUFF, PC
Richardson, Texas
March 31, 2019

We have served as the Company's auditor since 2004.

<div align="center">33</div>

## TRANSCONTINENTAL REALTY INVESTORS, INC.
## CONSOLIDATED BALANCE SHEETS

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| | **(dollars in thousands, except share and par value amounts)** | |
| **Assets** | | |
| Real estate, at cost | $ 461,718 | $ 1,112,721 |
| Real estate subject to sales contracts at cost | 2,014 | 45,739 |
| Less accumulated depreciation | (79,228) | (178,590) |
| Total real estate | 384,504 | 979,870 |
| | | |
| Notes and interest receivable (including $51,945 in 2018 and $45,155 in 2017 from related parties) | 83,541 | 70,166 |
| Cash and cash equivalents | 36,358 | 33,563 |
| Restricted cash | 70,207 | 54,779 |
| Investment in joint venture | 68,399 | — |
| Investment in other unconsolidated investees | 22,172 | 2,472 |
| Receivable from related party | 133,642 | 111,665 |
| Other assets | 63,557 | 60,907 |
| Total assets | $ 862,380 | $ 1,313,422 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Liabilities: | | |
| Notes and interest payable | $ 277,237 | $ 892,149 |
| Notes related to real estate held for sale | — | 376 |
| Notes related to real estate subject to sales contracts | — | 1,957 |
| Bonds and bond interest payable | 158,574 | 113,047 |
| Deferred revenue (including $21,034 in 2018 and $40,574 in 2017 to related parties) | 17,522 | 60,949 |
| Deferred tax liability | 2,000 | — |
| Accounts payable and other liabilities (including $3 in 2018 and $7,236 in 2017 to related parties) | 26,646 | 36,683 |
| Total liabilities | 481,979 | 1,105,161 |
| | | |
| Shareholders' equity: | | |
| Preferred Stock, Series D: $0.01 par value, authorized 100,000 shares; issued 100,000 shares in | | |

| | 2018 | 2017 |
|---|---|---|
| 2018 and 2017; outstanding 0 shares in 2018 and 100,000 shares in 2017 (liquidation preference $100 per share) | — | 1 |
| Common stock, $0.01 par value, authorized 10,000,000 shares; issued 8,717,967 shares in 2018 and 2017; outstanding 8,717,767 shares in 2018 and 2017 | 87 | 87 |
| Treasury stock at cost, 200 shares in 2018 and 2017 | (2) | (2) |
| Paid-in capital | 258,050 | 268,949 |
| Retained earnings (deficit) | 101,585 | (79,865) |
| Total Transcontinental Realty Investors, Inc. shareholders' equity | 359,720 | 189,170 |
| Non-controlling interest | 20,681 | 19,091 |
| Total shareholders' equity | 380,401 | 208,261 |
| Total liabilities and shareholders' equity | $ 862,380 | $ 1,313,422 |

The accompanying notes are an integral part of these consolidated financial statements.

34

## TRANSCONTINENTAL REALTY INVESTORS, INC.
## CONSOLIDATED STATEMENTS OF OPERATIONS

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| | (dollars in thousands, except per share amounts) | | |
| **Revenues:** | | | |
| Rental and other property revenues (including $767, $839 and $708 for the years ended 2018, 2017 and 2016, respectively, from related parties) | $ 120,955 | $ 125,233 | $ 118,471 |
| | | | |
| **Expenses:** | | | |
| Property operating expenses (including $943, $929 and $865 for the years ended 2018, 2017 and 2016, respectively, from related parties) | 59,420 | 63,056 | 61,918 |
| Depreciation and amortization | 22,761 | 25,558 | 23,683 |
| General and administrative (including $4,578, $3,120 and $3,574 for the years ended 2018, 2017 and 2016, respectively, from related parties) | 11,359 | 6,269 | 5,476 |
| Net income fee to related party | 631 | 250 | 257 |
| Advisory fee to related party | 10,663 | 9,995 | 9,490 |
| Total operating expenses | 104,834 | 105,128 | 100,824 |
| Net operating income | 16,121 | 20,105 | 17,647 |
| | | | |
| **Other income (expenses):** | | | |
| Interest income (including $13,132, $11,485 and $13,348 for the years ended 2018, 2017 and 2016, respectively, from related parties) | 15,793 | 13,862 | 14,670 |
| Other income (expense) | 28,150 | 625 | 1,816 |
| Mortgage and loan interest (including $423, $1,174 and $568 for the year ended 2018, 2017 and 2016, respectively, from related parties) | (58,872) | (59,944) | (53,088) |
| Foreign currency transaction gain (loss) | 12,399 | (4,536) | — |
| Equity earnings from VAA | 44 | — | — |
| Earnings (losses) from other unconsolidated investees | 1,085 | 26 | (26) |
| Total other expenses | (1,401) | (49,967) | (36,628) |
| Income (loss) before gain on disposition of 50% interest in VAA, gain on land sales, non-controlling interest, and taxes | 14,720 | (29,862) | (18,981) |
| | | | |
| Gain on disposition of 50% interest in VAA | 154,126 | — | — |
| Gain on sale of income producing properties | — | 9,842 | 16,207 |
| Gain on land sales | 17,404 | 4,884 | 3,121 |
| Net income (loss) from continuing operations before taxes | 186,250 | (15,136) | 347 |
| Income tax expense - current | (1,210) | (180) | (24) |
| Income tax expense - deferred | (2,000) | — | — |

App. 2000

| | | | |
|---|---|---|---|
| Net income (loss) from continuing operations | 183,040 | (15,316) | 323 |
| Discontinued operations: | | | |
|   Net income (loss) from discontinued operations | — | — | (2) |
|   Income tax benefit (expense) from discontinued operations | — | — | 1 |
|   Net income (loss) from discontinued operations | — | — | (1) |
| Net income (loss) | 183,040 | (15,316) | 322 |
| Net (income) attributable to non-controlling interest | (1,590) | (499) | (285) |
| Net income (loss) attributable to Transcontinental Realty Investors, Inc. | 181,450 | (15,815) | 37 |
| Preferred dividend requirement | (900) | (900) | (900) |
| Net income (loss) applicable to common shares | $ 180,550 | $ (16,715) | $ (863) |
| | | | |
| **Earnings per share - basic** | | | |
|   Net income (loss) from continuing operations | $ 20.71 | $ (1.92) | $ (0.10) |
|   Net income (loss) applicable to common shares | $ 20.71 | $ (1.92) | $ (0.10) |
| | | | |
| **Earnings per share - diluted** | | | |
|   Net income (loss) from continuing operations | $ 20.71 | $ (1.92) | $ (0.10) |
|   Net income (loss) applicable to common shares | $ 20.71 | $ (1.92) | $ (0.10) |
| | | | |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 |
| | | | |
| **Amounts attributable to Transcontinental Realty Investors, Inc.** | | | |
|   Net income (loss) from continuing operations | $ 181,450 | $ (15,815) | $ 38 |
|   Net income from discontinued operations | — | — | (1) |
|   Net income (loss) applicable to Transcontinental Realty, Investors, Inc. | $ 181,450 | $ (15,815) | $ 37 |

The accompanying notes are an integral part of these consolidated financial statements.

35

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**For the Three Years Ended December 31, 2018**
**(audited, dollars in thousands, except share amounts)**

| | Total Equity | Comprehensive Income (Loss) | Preferred Stock | Common Stock Shares | Common Stock Amount | Treasury Stock | Paid-in Capital | Retained Deficit | Non-controlling Interest |
|---|---|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2015** | $ 225,055 | $ (65,174) | $ 1 | 8,717,967 | $ 87 | $ (2) | $ 270,749 | $ (64,087) | $ 18,307 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | — | (900) | — | — |
| Net income | 322 | 322 | — | — | — | — | — | 37 | 285 |
| **Balance, December 31, 2016** | $ 224,477 | $ (64,852) | $ 1 | 8,717,967 | $ 87 | $ (2) | $ 269,849 | $ (64,050) | $ 18,592 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | — | (900) | — | — |
| Net loss | (15,316) | (15,316) | — | — | — | — | — | (15,815) | 499 |
| **Balance, December 31, 2017** | $ 208,261 | $ (80,168) | $ 1 | 8,717,967 | $ 87 | $ (2) | $ 268,949 | $ (79,865) | $ 19,091 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | — | (900) | — | — |
| Redemption of Series D preferred stock | (10,000) | — | (1) | — | — | — | (9,999) | — | — |
| Net income | 183,040 | 181,450 | — | — | — | — | — | 181,450 | 1,590 |
| **Balance, December 31, 2018** | $ 380,401 | $ 101,282 | $ — | 8,717,967 | $ 87 | $ (2) | $ 258,050 | $ 101,585 | $ 20,681 |

The accompanying notes are an integral part of these consolidated financial statements.

36

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(unaudited)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | (dollars in thousands) | | |
| **Cash Flow From Operating Activities:** | | | |
| Net income (loss) | $ 183,040 | $ (15,316) | $ 322 |
| Adjustments to reconcile net loss applicable to common shares to net cash flows from operating activities: | | | |
| Gain on disposition of 50% interest in VAA | (154,126) | — | — |
| Gain on sale of income-producing properties | — | (9,842) | (16,207) |
| Gain on sale of land | (17,404) | (4,884) | (3,121) |
| Depreciation and amortization | 22,761 | 25,558 | 23,683 |
| Amortization of deferred borrowing costs | 4,994 | 3,574 | 4,314 |
| Amortization of bond issuance costs | 2,994 | 971 | — |
| Equity earnings from VAA | (44) | — | — |
| Earnings from other unconsolidated investees | (1,085) | (26) | (26) |
| (Increase) decrease in assets: | | | |
| Accrued interest receivable | (22,601) | (668) | (922) |
| Other assets | (105,531) | (1,433) | (2,388) |
| Prepaid expense | 19,124 | (5,661) | (9,238) |
| Rent receivables | (3,213) | 543 | 2,840 |
| Related party receivables | (14,995) | (9,972) | (11,134) |
| Increase (decrease) in liabilities: | | | |
| Accrued interest payable | (2,307) | 4,573 | 20 |
| Other liabilities | (92,794) | (12,491) | 14,062 |
| Net cash (used in) operating activities | (181,187) | (25,074) | 2,205 |
| | | | |
| **Cash Flow From Investing Activities:** | | | |
| Proceeds from disposition of 50% interest in VAA | 236,752 | — | — |
| Proceeds from notes receivable | 6,541 | 26,230 | 2,867 |
| Originations or advances on notes receivable | (16,801) | (16,420) | (11,703) |
| Acquisition of land held for development | — | — | (12,508) |
| Acquisition of income-producing properties | (10,558) | (37,044) | (79,736) |
| Proceeds from sale of income-producing properties | 4,889 | — | 21,850 |
| Proceeds from sale of land | 11,857 | 6,301 | 29,128 |
| Investment in unconsolidated real estate entities | — | — | 2,797 |
| Improvement of land held for development | — | — | (3,023) |
| Improvement of income-producing properties | (3,688) | (64,443) | (5,702) |
| Construction and development of new properties | (81,367) | (12,936) | (10,836) |
| Net cash provided by (used in) investing activities | 147,625 | (98,312) | (66,866) |
| | | | |
| **Cash Flow From Financing Activities:** | | | |
| Proceeds from notes payable | 123,345 | 135,116 | 242,215 |
| Recurring payment of principal on notes payable | (107,866) | (83,070) | (20,205) |
| Payments on maturing notes payable | (16,750) | — | (160,745) |
| Proceeds from bonds | 59,213 | 115,335 | — |
| Bond issuance costs | (5,257) | (6,887) | — |
| Deferred financing costs | — | (3,599) | 798 |
| Preferred stock dividends - Series D | (900) | (900) | (900) |
| Net cash provided by financing activities | 51,785 | 155,995 | 61,163 |
| | | | |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 18,223 | 32,609 | (3,498) |
| Cash, cash equivalents and restricted cash, beginning of period | 88,342 | 55,733 | 59,231 |
| Cash, cash equivalents and restricted cash, end of period | $ 106,565 | $ 88,342 | $ 55,733 |

App. 2002

**Supplemental disclosures of cash flow information:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Cash paid for interest | $ | 61,587 | $ | 49,791 | $ | 43,986 |

**Schedule of noncash investing and financing activities:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Notes receivable received from sale of income-producing properties | $ | 1,735 | $ | — | $ | — |
| Seller financing note - acquisition of income-producing properties | $ | 1,895 | $ | — | $ | — |
| Notes payable issued on acquisition of income-producing properties | $ | 31,175 | $ | — | $ | — |

The accompanying notes are an integral part of these consolidated financial statements.

37

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(unaudited)**

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | **2018** | **2017** | | **2016** |
| | | (dollars in thousands) | | | |
| Net income (loss) | $ | 183,040 | $ | (15,316) $ | 322 |
| Comprehensive income attributable to non-controlling interest | | (1,590) | | (499) | (285) |
| Comprehensive income (loss) attributable to Transcontinental Realty Investors, Inc. | $ | 181,450 | $ | (15,815) $ | 37 |

The accompanying notes are an integral part of these consolidated financial statements.

38

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

The accompanying Consolidated Financial Statements of Transcontinental Realty Investors, Inc. "TCI" and consolidated entities have been prepared in conformity with accounting principles generally accepted in the United States of America, the most significant of which are described in Note 1. "Summary of Significant Accounting Policies." The Notes to Consolidated Financial Statements are an integral part of the Consolidated Financial Statements. The data presented in the Notes to Consolidated Financial Statements are as of December 31 of each year and for the year then ended, unless otherwise indicated. Dollar amounts in tables are in thousands, except per share amounts.

Certain prior year amounts have been reclassified to conform to the current year presentation on the consolidated statements of operations, consolidated balance sheets and the consolidated statements of cash flows.

**NOTE 1.** *ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES*

*Organization and business.* TCI, a Nevada corporation, is headquartered in Dallas, Texas and its common stock trades on the New York Stock Exchange ("NYSE American") under the symbol "TCI".

TCI is a "C" corporation for U.S. federal income tax purposes and files an annual consolidated income tax return with American Realty Investors, Inc. "ARL", whose common stock is traded on the NYSE American under the symbol "ARL". Subsidiaries of ARL own approximately 77.68% of the Company's common stock.

In 2009, the Company acquired an additional 2,518,934 shares of common stock of Income Opportunity Realty Investors, Inc. "IOR", and in doing so, increased its ownership from approximately 25% to over 80% of the shares of common stock of IOR outstanding. Upon acquisition of the additional shares in 2009, IOR's results of operations began consolidating with those of the Company for tax and financial reporting purposes. As of December 31, 2017, TCI owned 81.25% of the outstanding IOR common shares. Shares of IOR are traded on the New York Exchange ("NYSE

App. 2003

At the time of the acquisition, the historical accounting value of IOR's assets was $112 million and liabilities were $43 million. In that the shares of IOR acquired by TCI were from a related party, the values recorded by TCI are IOR's historical accounting values at the date of transfer. The Company's fair valuation of IOR's assets and liabilities at the acquisition date approximated IOR's book value. The net difference between the purchase price and historical accounting basis of the assets and liabilities acquired was $25.9 million and has been reflected by TCI as deferred income. The deferred income will be recognized upon the sale of the land that IOR held on its books as of the date of sale, to an independent third party.

TCI's Board of Directors is responsible for directing the overall affairs of TCI and for setting the strategic policies that guide the Company. As of April 30, 2011, the Board of Directors delegated the day-to-day management of the Company to Pillar Income Asset Management, Inc. ("Pillar"), a Nevada corporation under a written Advisory Agreement that is reviewed annually by TCI's Board of Directors. The directors of TCI are also directors of ARL and IOR. The Chairman of the Board of Directors of TCI also serves as the Chairman of the Board of Directors of ARL and IOR. The officers of TCI also serve as officers of ARL, IOR and Pillar.

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is Realty Advisors, Inc. "RAI", a Nevada corporation, the sole shareholder of which is May Realty Holdings, Inc. ("MRHI", formerly known as Realty Advisors Management, Inc. "RAMI", effective August 7, 2014), a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), manages our commercial properties and provides brokerage services. Regis receives property management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage". TCI engages third-party companies to lease and manage its apartment properties.

Southern Properties Capital Ltd. ("Southern") is a wholly owned subsidiary of TCI that was incorporated on August 16, 2016 for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange ("TASE"). Southern operates in the United States and is primarily involved in investing in, developing, constructing and operating income-producing properties of multi-family residential real estate assets. Southern is included in the consolidated financial statements of TCI.

On January 1, 2012, the Company entered into a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

On November 19, 2018, we executed an agreement between the Macquarie Group ("Macquarie") and Southern and TCI to create a joint venture, Victory Abode Apartments, LLC ("VAA") to address existing and future demand for quality multifamily residential housing through acquisition and development of sustainable Class A multifamily housing in focused secondary and tertiary markets. In connection with the formation of the joint venture, Southern and TCI contributed a portfolio of 49 income producing apartment complexes, and 3 development projects in various stages of construction and received cash consideration of $236.8 million. At the time of the transfer of the properties, the joint venture assumed all liabilities of those properties, including mortgage debt to the Department of Housing and Urban Development ("HUD").

VAA is equally owned and controlled by Abode JVP, LLC, a wholly-owned subsidiary of Southern and Summerset Intermediate Holdings 2 LLC ("Summerset"), a wholly-owned indirect subsidiary of Macquarie. Pursuant to the Agreement, Abode JVP, LLC and Summerset each own voting and profit participation rights of 50% and 49%, respectively ("Class A Members"). The remaining 2% of the profits interest is held by Daniel J. Moos, who serves as the President and Chief Executive officer of the Company ("Class B Member") and Manager of the joint venture.

Our primary business is the acquisition, development and ownership of income-producing residential and commercial real estate properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time and when we

believe it appropriate to do so. We will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents and leasing office and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate income from gains on sales of income-producing properties and land. At December 31, 2018, we owned nine residential apartment communities comprising of 1,489 units, seven commercial properties comprising an aggregate of approximately 1.7 million rentable square feet, an investment in 2,405 acres of undeveloped and partially developed land. In addition, our joint venture VAA owns forty-nine residential apartment communities comprised of 9,192 units.

*Basis of presentation*.    The Company presents its financial statements in accordance with generally accepted accounting principles in the United States ("GAAP"). The accompanying Consolidated Financial Statements include our accounts, our subsidiaries, generally all of which are wholly-owned, and all entities in which we have a controlling interest. Arrangements that are not controlled through voting or similar rights are accounted for as a Variable Interest Entity (VIE), in accordance with the provisions and guidance of ASC Topic 810 "Consolidation", whereby we have determined that we are a primary beneficiary of the VIE and meet certain criteria of a sole general partner or managing member as identified in accordance with Emerging Issues Task Force ("EITF") Issue 04-5, Investor's Accounting for an Investment in a Limited Partnership when the Investor is the Sole General Partner and the Limited Partners have Certain Rights ("EITF 04-5"). VIEs are generally entities that lack sufficient equity to finance their activities without additional financial support from other parties or whose equity holders as a group lack adequate decision making ability, the obligation to absorb expected losses or residual returns of the entity, or have voting rights that are not proportional to their economic interests. The primary beneficiary generally is the entity that provides financial support and bears a majority of the financial risks, authorizes certain capital transactions, or makes operating decisions that materially affect the entity's financial results. All significant intercompany balances and transactions have been eliminated in consolidation.

In determining whether we are the primary beneficiary of a VIE, we consider qualitative and quantitative factors, including, but not limited to: the amount and characteristics of our investment; the obligation or likelihood for us or other investors to provide financial support; our and the other investors' ability to control or significantly influence key decisions for the VIE; and the similarity with and significance to the business activities of us and the other investors. Significant judgments related to these determinations include estimates about the current future fair values and performance of real estate held by these VIEs and general market conditions.

<div align="center">40</div>

For entities in which we have less than a controlling financial interest or entities where it is not deemed to be the primary beneficiary, the entities are accounted for using the equity method of accounting. Accordingly, our share of the net earnings or losses of these entities are included in consolidated net income. TCI's investments in ARL and VAA are accounted for under the equity method.

The Company in accordance with the VIE guidance in ASC 810 "Consolidations" consolidates nine and fifty-one multifamily residential properties located throughout the United States at December 31, 2018 and December 31, 2017, respectively, with total units of 1,489 and 8,427, respectively. Assets totaling approximately $461.7 million and approximately $1,112.7 million at December 31, 2018 and 2017, respectively, are consolidated and included in "Real estate, at cost" on the balance sheet and are all collateral for their respective mortgage notes payable, none of which are recourse to the partnership in which they are in or to the Company.

*Real estate, depreciation, and impairment*.    Real estate assets are stated at the lower of depreciated cost or fair value, if deemed impaired. Major replacements and betterments are capitalized and depreciated over their estimated remaining useful lives. Depreciation is computed on a straight-line basis over the useful lives of the properties (buildings and improvements—10-40 years; furniture, fixtures and equipment—5-10 years). We continually evaluate the recoverability of the carrying value of its real estate assets using the methodology prescribed in ASC Topic 360, "Property, Plant and Equipment," Factors considered by management in evaluating impairment of its existing real estate assets held for investment include significant declines in property operating profits, annually recurring property operating losses and other significant adverse changes in general market conditions that are considered permanent in nature. Under ASC Topic 360, a real estate asset held for investment is not considered impaired if the undiscounted, estimated future cash flows of an asset (both the annual estimated cash flow from future operations and the estimated cash flow from the theoretical sale of the asset) over its estimated holding period are in excess of the asset's net book value at the balance sheet date. If any real estate asset held for investment is considered impaired, a loss is provided to reduce the carrying value of the asset to its estimated fair value.

Properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors. For sales transactions where the guidance reflects a sale did not occur, the asset involved in the transaction, including the debt, if applicable, and property operations, remain on the books of the Company. We continue to charge depreciation to expense as a period cost for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

*Real estate held for sale*.    We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present

<div align="right">App. 2005</div>

the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their carrying amount or their estimated fair value, less estimated costs to sell. We did not have any real estate assets classified as held for sale at December 31, 2018 or 2017.

Effective as of January 1, 2015, we adopted the revised guidance in Accounting Standards Update No. 2014-08 regarding discontinued operations. For sales of real estate or assets classified as held for sale after January 1, 2015, we will evaluate whether a disposal transaction meets the criteria of a strategic shift and will have a major effect on our operations and financial results to determine if the results of operations and gains on sale of real estate will be presented as part of our continuing operations or as discontinued operations in our consolidated statements of operations. If the disposal represents a strategic shift, it will be classified as discontinued operations for all periods presented; if not, it will be presented in continuing operations.

Any properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors, disclosed in Item 1 "Significant Real Estate Acquisitions/Dispositions and Financing." Any sale transaction where the guidance reflects that a sale had not occurred, the asset involved in the transaction, including the debt, if appropriate, and property operations, remained on the books of the Company. We continue to charge depreciation to expense as a period costs for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

*Cost capitalization.*    The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. Costs directly related to planning, developing, initial leasing and constructing a property are capitalized and classified as Real Estate in the Consolidated Balance Sheets. Capitalized development costs include interest, property taxes, insurance, and other direct project costs incurred during the period of development.

---

41

---

A variety of costs are incurred in the acquisition, development and leasing of properties. After determination is made to capitalize a cost, it is allocated to the specific component of a project that is benefited. Determination of when a development project is substantially complete and capitalization must cease involves a degree of judgment. Our capitalization policy on development properties is guided by ASC Topic 835-20 "Interest – Capitalization of Interest" and ASC Topic 970 "Real Estate - General". The costs of land and buildings under development include specifically identifiable costs. The capitalized costs include pre-construction costs essential to the development of the property, development costs, construction costs, interest costs, real estate taxes, salaries and related costs and other costs incurred during the period of development. We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

We capitalize leasing costs which include commissions paid to outside brokers, legal costs incurred to negotiate and document a lease agreement and any internal costs that may be applicable. We allocate these costs to individual tenant leases and amortize them over the related lease term.

*Fair value measurement*.   We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions define fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1—Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2—Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3—Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Related parties*. We apply ASC Topic 805 "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

*Recognition of revenue*. Our revenues, which are composed largely of rental income, include rents reported on a straight-line basis over the lease term. In accordance with ASC 805 "Business Combinations", we recognize rental revenue of acquired in-place "above-" and "below-market" leases at their fair values over the terms of the respective leases.

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

Rental revenue for residential property leases is recorded when due from residents and is recognized monthly as earned, which is not materially different than on a straight-line basis as lease terms are generally for periods of one year or less. An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

Sales and the associated gains or losses related to real estate assets are recognized in accordance with the provisions of ASC Topic 360-20, "Property, Plant and Equipment—Real Estate Sale." The specific timing of a sale is measured against various criteria in ASC 360-20 related to the terms of the transaction and any continuing involvement in the form of management or financial assistance associated with the properties. If the sales criteria for the full accrual method are not met, the Company defers some or all of the gain recognition and accounts for the continued operations of the property by applying the finance, leasing, deposit, installment or cost recovery methods, as appropriate, until the sales criteria are met.

<center>42</center>

*Non-performing notes receivable.* We consider a note receivable to be non-performing when the maturity date has passed without principal repayment and the borrower is not making interest payments in accordance with the terms of the agreement.

*Interest recognition on notes receivable*. We record interest income as earned in accordance with the terms of the related loan agreements.

*Allowance for estimated losses*. We assess the collectability of notes receivable on a periodic basis, the assessment consists primarily of an evaluation of cash flow projections of the borrower to determine whether estimated cash flows are sufficient to repay principal and interest in accordance with the contractual terms of the note. We recognize impairments on notes receivable when it is probable that principal and interest will not be received in accordance with the contractual terms of the loan. The amount of the impairment to be recognized generally is based on the fair value of the partnership's real estate that represents the primary source of loan repayment. Refer to Note 5 "Notes and Interest Receivable" for details on our notes receivable.

*Cash equivalents.* For purposes of the Consolidated Statements of Cash Flows, all highly liquid investments purchased with an original maturity of three months or less are considered to be cash equivalents.

*Restricted cash.* Restricted cash is comprised primarily of cash balances held in escrow by financial institutions under the terms of certain secured notes payable and certain unsecured bonds payable.

*Concentration of credit risk.* The Company maintains its cash balances at commercial banks and through investment companies, the deposits of which are insured by the Federal Deposit Insurance Corporation (FDIC). At December 31, 2017 and 2016, the Company maintained balances in excess of the insured amount.

*Earnings per share*. Income (loss) per share is presented in accordance with ASC 620 "Earnings per Share" and is computed based upon the weighted average number of shares of common stock outstanding during each year.

*Use of estimates.* In the preparation of Consolidated Financial Statements in conformity with GAAP, it is necessary for management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements and the reported amounts of revenues and expense for the year ended. Actual results could differ from those estimates.

<div align="right">App. 2007</div>

*Income taxes*.    The Company is a "C" corporation" for U.S. federal income tax purposes. The Company and the rest of the ARL group are included in the MRHI, consolidated group for tax purposes. TCI is a member of a tax sharing agreement that specifies the manner in which the group will share the consolidated tax liability and also how certain tax attributes are to be treated among members of the group.

43

*Recent accounting pronouncements*.

In May 2014, Accounting Standards Update ("ASU") No. 2014-09 ("ASU 2014-09"), "Revenue from Contracts with Customers," was issued. This new guidance established a new single comprehensive revenue recognition model and provides for enhanced disclosures. Under the new policy, the nature, timing and amount of revenue recognized for certain transactions could differ from those recognized under existing accounting guidance. This new standard does not affect revenue recognized under lease contracts. ASU 2014-09 is effective for reporting periods beginning after December 15, 2017. The Company does not believe the adoption of this guidance had a material impact on its financial statements.

In February 2016, FASB issued ASU 2016-02 ("ASU 2016-02"), Leases. This guidance establishes a new model for accounting for leases and provides for enhanced disclosures. ASU 2016-02 is effective for reporting periods beginning after December 15, 2018. The Company is currently evaluating the impact of the adoption of ASU 2016-02 on its financial position and results of operations, if any.

In August 2016, the FASB issued ASU 2016-15, Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments, which addresses how certain cash receipts and cash payments are presented and classified in the statement of cash flows. The ASU is effective for fiscal years beginning after December 15, 2017, including interim periods within those years; however, early adoption is permitted. Entities must apply the guidance retrospectively to all periods presented but may apply it prospectively if retrospective application would be impracticable. The Company adopted this standard effective on January 1, 2018. ASU 2016-15 will impact our presentation of operating, investing and financing activities related to certain cash receipts and payments on our consolidated statements of cash flows.

In November 2016, the FASB issued ASU 2016-18, Statement of Cash Flows (Topic 230): Restricted Cash, which clarifies guidance on the classification and presentation of changes in restricted cash. The ASU is effective for reporting periods beginning after December 15, 2017, with early adoption permitted, and will be applied retrospectively to all periods presented. Upon adoption, restricted cash balances will be included along with cash and cash equivalents as of the end of the period and beginning period, respectively, in the Company's consolidated statement of cash flows for all periods presented. Upon adoption, separate line items showing changes in restricted cash balances will be eliminated from the Company's consolidated statement of cash flows. The Company adopted this guidance effective on January 1, 2018. ASU 2016-18 will impact our presentation of operating, investing and financing activities related to restricted cash on our consolidated statements of cash flows.

In January 2017, the FASB issued ASU 2017-01, Business Combinations (Topic 805): Clarifying the Definition of a Business, which clarifies the definition of a business when evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The ASU is effective for reporting periods beginning after December 15, 2017, with early adoption permitted. The Company expects that acquisitions of real estate or in-substance real estate will not meet the revised definition of a business and thus will be treated as asset acquisitions. Acquisition costs for those acquisitions that are not businesses will be capitalized rather than expensed. The Company adopted this guidance effective January 1, 2018. The Company does not believe the adoption of this guidance will have a material impact on its consolidated financial statements.

In February 2017, the FASB issued ASU 2017-05, Other Income – Gains and Losses from the Derecognition of Nonfinancial Assets (Topic 610-20), which requires that all entities account for the derecognition of a business in accordance with ASC 810, including instances in which the business is considered in-substance real estate. The ASU requires the Company to measure at fair value any retained interest in a partial sale of real estate. The ASU is effective for annual periods, and interim periods therein, beginning after December 15, 2017. The Company adopted ASU 2017-05 effective January 1, 2018. The Company does not believe the adoption of this guidance will have a material impact on its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement that eliminates, adds and modifies certain disclosure requirements for fair value measurements. The effective date of the standard is for fiscal periods, and interim periods within those years, beginning after December 15, 2019. The amendments on changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively. All other amendments should be applied retrospectively. Early adoption is permitted. The Company is currently evaluating the impact that the adoption of ASU 2018-13 may have on its consolidated financial statements.

44

**NOTE 2.** *INVESTMENT IN VAA*

On November 19, 2018, we executed an agreement between the Macquarie Group ("Macquarie") and SPC and TCI to create a joint venture, Victory Abode Apartments, LLC ("VAA") to address existing and future demand for quality multifamily residential housing through acquisition and development of sustainable Class A multifamily housing in focused secondary and tertiary markets. In connection with the formation of the joint venture, SPC and TCI contributed a portfolio of 49 income producing apartment complexes, and 3 development projects in various stages of construction. TCI received cash consideration of $236.8 million and recognized a gain of approximately $154.1 million. At the time of the transfer of the properties, the joint venture assumed all liabilities of those properties, including mortgage debt to the Department of Housing and Urban Development ("HUD").

VAA is equally owned and controlled by Abode JVP, LLC, a wholly-owned subsidiary of SPC and Summerset Intermediate Holdings 2 LLC ("Summerset"), a wholly-owned indirect subsidiary of Macquarie. Pursuant to the Agreement, Abode JVP, LLC and Summerset each own voting and profit participation rights of 50% and 49%, respectively ("Class A Members"). The remaining 2% of the profit participation interest is held by Daniel J. Moos TCI's President and Chief Executive Officer ("Class B Member") who serves also as the Manager of the joint venture. In addition, upon the closing of the agreement the Class B Member received a one time consideration payment of $1.9 million.

The Company accounts for VAA as an equity method investment. Under the equity method of accounting, our net equity is reflected within the Consolidated Balance Sheets, and our share of net income or loss from the joint ventures is included within the Consolidated Statements of Operations. The joint venture agreements may designate different percentage allocations among investors for profits and losses; however, our recognition of joint venture income or loss generally follows the joint venture's distribution priorities, which may change upon the achievement of certain investment return thresholds.

The following is a summary of the financial position and results of operations of VAA (dollars in thousands):

| VAA | | December 31, 2018 |
|---|---|---|
| **Balance Sheet** | | |
| Net real estate assets | $ | 1,257,557 |
| Other assets | | 67,020 |
| Debt, net | | (791,225) |
| Other liabilities | | (280,288) |
| Total equity | | (253,064) |

| | | For the period November 19 to December 31, 2018 |
|---|---|---|
| **Results of Operations** | | |
| Total revenue | $ | 12,887 |
| Total property, operating, and maintenance expenses | | (4,507) |
| Total other expense | | (18,102) |
| Net loss | $ | (9,722) |

The following is a reconciliation from VAA's net loss to TCI's equity in earnings of VAA (dollars in thousands):

| | | For the period November 19 to December 31, 2018 |
|---|---|---|
| VAA net loss | $ | (9,722) |
| *Adjustments to reconcile to earnings from VAA* | | |
| Interest expense on mezzanine loan | | 2,815 |
| In-place lease intangibles - amortization expense | | 3,983 |
| Depreciation basis differences | | 3,012 |
| **Adjusted net income** | $ | 88 |
| Percentage ownership in VAA | | 50% |
| Earnings from VAA | $ | 44 |

The following table shows the location of properties owned by VAA:

| | Apartments |
|---|---|

| Location | No. | Units |
|---|---|---|
| Alabama | 1 | 168 |
| Arkansas | 6 | 1,320 |
| Colorado | 2 | 260 |
| Florida | 2 | 388 |
| Georgia | 1 | 222 |
| Louisiana | 3 | 464 |
| Mississippi | 1 | 196 |
| Nevada | 1 | 308 |
| North Carolina | 1 | 201 |
| Tennessee | 4 | 708 |
| Texas-Greater Dallas-Ft Worth | 13 | 2,323 |
| Texas-Greater Houston | 1 | 176 |
| Texas-Other | 13 | 2,458 |
| **Total** | **49** | **9,192** |

At December 31, 2018, our apartment projects in development included (dollars in thousands):

| Property | Location | No. of Units | Costs to Date [1] | Total Projected Costs [1] |
|---|---|---|---|---|
| Terra Lago apartments | Rowlett, TX | 451 | 66,395 | $ — |
| Lakeside lofts apartments | Farmers Branch, TX | 494 | 50,357 | 80,622 |
| Sawgrass Creek apartments Phase II | Tampa, FL | 143 | 25,113 | 26,799 |
| Total | | **1,088** | **$ 141,865** | **$ 107,421** |

[1] Costs include construction hard costs, construction soft costs and loan borrowing costs.

45

## NOTE 3. *REAL ESTATE*

A summary of our real estate owned as of the end of the year is listed below (dollars in thousands):

| | 2018 | 2017 |
|---|---|---|
| Apartments | $ 126,274 | $ 737,661 |
| Apartments under construction | 25,289 | 104,791 |
| Commercial properties | 224,167 | 200,803 |
| Land held for development | 84,016 | 69,466 |
| Real estate subject to sales contract | 3,986 | 45,739 |
| Total real estate, at cost, less impairment | 463,732 | 1,158,460 |
| Less accumulated deprecation | (79,228) | (178,590) |
| **Total real estate, net of depreciation** | **$ 384,504** | **$ 979,870** |

Expenditures for repairs and maintenance are charged to operations as incurred. Significant betterments are capitalized. When assets are sold or retired, their costs and related accumulated depreciation are removed from the accounts with the resulting gains or losses reflected in net income or loss for the period.

Depreciation is computed on a straight line basis over the estimated useful lives of the assets as follows:

| | |
|---|---|
| Land improvements | 25 to 40 years |
| Buildings and improvements | 10 to 40 years |
| Tenant improvements | Shorter of useful life or terms of related lease |
| Furniture, fixtures and equipment | 3 to 7 years |

The Company applies the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. The Company is required to assess the fair value of its consolidated real estate assets with indicators of impairment. The value of impaired real estate assets is determined using widely accepted valuation techniques, including discounted cash flow analyses on the expected cash flow of each asset, as well as the income capitalization approach, which considers prevailing market capitalization rates, analyses of recent comparable sales transactions, information from actual sales negotiations and bona fide purchase offers received from third parties. The methods used to measure fair value may produce an amount that may not be indicative of net realizable value or reflective of future values. Furthermore, although the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

The fair value measurements used in these evaluations are considered to be Level 2 and 3 valuations within the fair value hierarchy in the accounting rules, as there are significant observable (Level 2) and unobservable inputs (Level 3). Examples of Level 2 inputs the Company utilizes in its fair value calculations are appraisals and bona fide purchase offers from third parties. Examples of Level 3 inputs the Company utilizes in its fair value calculations are discount rates, market capitalization rates, expected lease rental rates, timing of new leases, an estimate of future sales prices and comparable sales prices of similar assets, if available. There was no provision for impairment during the years ended December 31, 2018, 2017 and 2016.

The highlights of our significant real estate transactions for the year ended December 31, 2018, are discussed below.

### *Purchases*

During the year ended December 31, 2018, the Company purchased through one of its subsidiaries, eight residential apartment communities. A multi-family 80 unit community located in Baton Rouge, LA for a total purchase price of $12 million, paid through a seller's financing note of $1.9 million, issuance of note payable of $8.6 million, and exercising an option to purchase of $1.5 million paid in the previous year. A multi-family 99 unit residential apartment community located in Mansfield, TX for a total purchase price of $14.8 million, paid through a seller's financing note of $2.3 million, and an issuance of a note payable of $11.0 million. A multi-family 200 unit residential apartment community located in Gulf Shores, AL for a total purchase price of $18.1 million, paid through an issuance of a note payable of $11.5 million. A multi-family 144 unit residential apartment community located in Beaumont, TX for a total purchase price of $12.3 million. A multi-family 240 unit residential apartment community located in Houma, LA for a total purchase price of $20.1 million. A multi-family 208 unit residential apartment community located in Texarkana, TX for a total purchase price of $14.7 million. A multi-family 160 unit residential apartment community located in Tupelo, MS for a total purchase price of $11.1 million.

### *Sales*

For the year ended December 31, 2018, TCI sold 62 acres of land to an independent third party for a total sales price of $3.0 million and recorded a gain of $1.3 million from the land sale. In the second quarter, a golf course comprising approximately 96.09 acres sold for an aggregate sales price of $2.3 million, out of which, $0.6 million was received in cash and $1.7 million in note receivables. During the first quarter, the Company sold six income-producing properties to a related party for an aggregate purchase price of $8.5 million, out of which $2.1 million was received in cash and $6.4 million in note receivables. During the fourth quarter, the Company sold one income-producing properties to a related party for a purchase price of $2.2 million No gain or loss was recorded from the sale of income-producing properties.

46

In addition, on November 19, 2018 TCI through one of its subsidiaries formed VAA a joint venture with Macquarie. In connection with the formation of the joint venture, TCI contributed fifty-two properties and received a cash consideration of $236.8 million from Macquarie for a voting and profit participation right of 50% and 49%, respectively, 2% of the profits interest is held by Daniel J. Moos, who serves as the President and Chief Executive officer of the Company ("Class B Member") and Manager of the joint venture. The Company recognized a gain of approximately $154.1 million from the sale of the contributed properties to the joint venture.

### *Mercer Crossing*

In addition to the real estate sales noted above the Company recorded sales from a development project known as Mercer Crossing.

At November 2015, our real estate land holdings at Mercer Crossing consisted of land developable into residential homes and commercial projects, located in Farmers Branch, Texas. In November 2015, the Company entered into a sales contract with an unrelated party. The contract was for all of the developable land owned by the Company. In addition, IOR and ARL also sold land in this transaction. Total consideration for the sale was $75 million. The agreement among the parties to this transaction provides for TCI to hold the subordinated note from the buyer in the amount of

$50 million. At the closing, due to the inadequate down payment from the buyer and the use of seller financing involved, the transaction was accounted for under the deposit method. Under the deposit method, no revenue is recognized and the asset sold remains on the books until the criteria for full revenue recognition are met.

During the third quarter of 2018, due to significant cumulative sales of real estate to unrelated third parties and cash received by TCI, the criteria for recording full accrual accounting had been met. Through the period ended August 21, 2018 approximately $28.1 million of the assets previously held by the Company were sold, resulting in a gain of $7.5 million.

On August 22, 2018 the Company reacquired all the unsold portions of the real estate from the November 2015 transaction for the amount that remained from the original sales price.

During the period August 23, 2018 through December 31, 2018 additional Mercer Crossing real estate was sold for $11.7 million resulting in a net gain on sale of real estate of $5.6 million.

As of December 31, 2018, the Company has approximately 86 acres of land, at various locations that were sold to related parties in multiple transactions.  These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets.  Due to the related party nature of the transactions TCI has deferred the recording of the sales in accordance with ASC 360-20.

We continue to invest in the development of apartment projects. During the year ended December 31, 2018, we have invested $14.8 million related to the construction or predevelopment of various apartment complexes and capitalized $0.1 million of interest costs.

**NOTE 4.**   *SUPPLEMENTAL CASH FLOW INFORMATION*

For the years ended December 31, 2018 and 2017, the Company paid interest of $61.6 million and $36.4 million, respectively.

Cash and cash equivalents, and restricted cash for fiscal year ended 2018 and 2017 was $106.6 million and $88.5 million, respectively. The following is a reconciliation of the Company's cash and cash equivalents, and restricted cash to the total presented in the consolidated statement of cash flows:

|  | December 31, | |
|---|---|---|
|  | **2018** | **2017** |
| Cash and cash equivalents | $ 36,358 | $ 33,563 |
| Restricted cash (cash held in escrow) | 37,946 | 44,705 |
| Restricted cash (certificate of deposits) | 9,688 | 5,651 |
| Restricted cash (held with Trustee) | 22,573 | 4,423 |
| **Cash and cash equivalents and restricted cash** | **$ 106,565** | **$ 88,342** |

Amounts included in restricted cash represent funds required to meet contractual obligations with certain financial institutions for the payment of reserve replacement and tax and insurance escrow. In addition, restricted cash includes funds to the Bond's Trustee for payment of principal and interests.

**NOTE 5.**   *NOTES AND INTEREST RECEIVABLE*

A portion of our assets are invested in mortgage notes receivable, principally secured by real estate. We may originate mortgage loans in conjunction with providing purchase money financing of property sales. Notes receivable are generally collateralized by real estate or interests in real estate and personal guarantees of the borrower and, unless noted otherwise, are so secured. Management intends to service and hold for investment the mortgage notes in our portfolio. A majority of the notes receivable provide for principal to be paid at maturity (dollars in thousands).

| Borrower | Maturity Date | Interest Rate | Amount | Security |
|---|---|---|---|---|
| Performing loans: | | | | |
| H198, LLC (Las Vegas Land) | 01/20 | 12.00% | 5,907 | Secured |
| H198, LLC (Legacy at Pleasant Grove Land) | 10/19 | 12.00% | 496 | Secured |
| Oulan-Chikh Family Trust | 03/21 | 8.00% | 174 | Secured |

App. 2012

| H198, LLC (McKinney Ranch Land) | 09/20 | 6.00% | 4,554 | Secured |
|---|---|---|---|---|
| Forest Pines | 09/19 | 5.00% | 2,223 | Secured |
| Spyglass Apartments of Ennis, LP | 11/19 | 5.00% | 5,083 | Secured |
| Bellwether Ridge | 05/20 | 5.00% | 3,429 | Secured |
| Parc at Windmill Farms | 05/20 | 5.00% | 6,066 | Secured |
| Unified Housing Foundation, Inc. (Echo Station) [1] | 12/32 | 12.00% | 1,481 | Secured |
| Unified Housing Foundation, Inc. (Lakeshore Villas) [1] | 12/32 | 12.00% | 2,000 | Secured |
| Unified Housing Foundation, Inc. (Lakeshore Villas) [1] | 12/32 | 12.00% | 6,369 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 1,953 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 2,000 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 4,000 | Secured |
| Unified Housing Foundation, Inc. (Timbers of Terrell) [1] | 12/32 | 12.00% | 1,323 | Secured |
| Unified Housing Foundation, Inc. (Tivoli) [1] | 12/32 | 12.00% | 6,140 | Secured |
| Unified Housing Foundation, Inc. [1] | 12/19 | 12.00% | 10,401 | Unsecured |
| Unified Housing Foundation, Inc. [1] | 06/20 | 12.00% | 11,075 | Unsecured |
| Other related party notes | Various | Various | 2,290 | Various secured interests |
| Other non-related party notes | Various | Various | 1,631 | Various secured interests |
| Accrued interest | | | 6,771 | |
| **Total Performing** | | $ | **85,366** | |
| Allowance for estimated losses | | | (1,825) | |
| **Total** | | $ | **83,541** | |

[1] Related party notes

[2] An allowance was taken for estimated losses at full value of note.

As of December 31, 2018, the obligors on $49.0 million or 57.4% of the mortgage notes receivable portfolio were due from related entities. The Company recognized $5.7 million of interest income from these related party notes receivables.

As of December 31, 2018, none of the mortgage notes receivable portfolio were non-performing.

The Company has various notes receivable from Unified Housing foundation, Inc. "UHF". UHF is determined to be a related party due to our significant investment in the performance of the collateral secured under the notes receivable. Payments are due from surplus cash flow from operations, sale or refinancing of the underlying properties. These notes are cross collateralized to the extent that any surplus cash available from any of the properties underlying these notes will be used to repay outstanding interest and principal for the remaining notes. Furthermore, any surplus cash available from any of the properties UHF owns, besides the properties underlying these notes, can be used to repay outstanding interest and principal for these notes. The allowance on the notes was a purchase allowance that was netted against the notes when acquired.

48

## NOTE 6.    *INVESTMENT IN UNCONSOLIDATED JOINT VENTURES AND INVESTEES*

Investments in unconsolidated subsidiaries, jointly owned companies and other investees in which we have a 20% to 50% ownership interest or otherwise exercise significant influence are carried at cost, adjusted for the Company's proportionate share of their undistributed earnings or losses, via the equity method of accounting. ARL is our parent company and is an unconsolidated joint venture.

Investments accounted for via the equity method consists of the following, except for VAA which is discussed in Note 2.

| | Percentage ownership as of December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| American Realty Investors, INC. [1] | 0.90% | 0.90% | 0.90% |

[1] Unconsolidated investment in parent company

The following is a summary of the financial position and results of operations of ARL (dollars in thousands). Summary data presented below excludes investments in VAA. For additional information refer to Note 2.

|  | | December 31, | | | | |
|---|---|---|---|---|---|---|
|  | | 2018 | | 2017 | | 2016 |
| **ARL** | | | | | | |
| Real estate, net of accumulated depreciation | $ | 549 | $ | 12,349 | $ | 14,504 |
| Notes receivable | | 42,517 | | 41,928 | | 47,257 |
| Other assets | | 66,712 | | 126,238 | | 127,001 |
| Notes payable | | (9,637) | | (6,507) | | (9,485) |
| Other liabilities | | (21,123) | | (102,014) | | (111,707) |
| Shareholders' equity/partners capital | | (79,018) | | (71,994) | | (67,570) |

|  | | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
|  | | 2018 | | 2017 | | 2016 |
| Rents, interest and other income | $ | 7,132 | $ | 9,193 | $ | 7,251 |
| Depreciation | | — | | (157) | | (175) |
| Operating expenses | | (2,420) | | (3,149) | | (3,633) |
| Gain on land sales | | — | | 4,765 | | — |
| Interest expense | | (7,191) | | (6,228) | | (6,274) |
| Income (loss) from continuing operations | $ | (2,479) | $ | 4,424 | $ | (2,831) |
| Net income (loss) | $ | (2,479) | $ | 4,424 | $ | (2,831) |
|  | | | | | | |
| Company's proportionate share of income (loss) [1] | $ | (22) | $ | 40 | $ | (25) |

(1)   Income (loss) represents continued and discontinued operations

During the fourth quarter of 2018, TCI purchased from RAI 900,000 shares of ARL Series A convertible Preferred Stock for $9.0 million. The Series A Preferred Stock may be converted into common stock at 90.0% of the average daily closing price of ARL's common stock for the prior 20 trading days.

The investment in ARL convertible Preferred Stock is being carried at the Company's cost of $9 million and is included in investment in other unconsolidated investees. Additionally, TCI purchased from RAI $9.9 million accrued unpaid dividends related to the ARL Series A convertible Preferred Stock which is carried at the cost and included in investment in unconsolidated investees on the balance sheet.

**NOTE 7.**   *NOTES AND INTEREST PAYABLE*

Below is a summary of our notes and interest payable as of December 31, 2018 (dollars in thousands):

|  | | Notes Payable | | Accrued Interest | | Total |
|---|---|---|---|---|---|---|
| Apartments | $ | 94,759 | $ | 270 | $ | 95,029 |
| Apartments under Construction | | 14,402 | | — | | 14,402 |
| Commercial | | 135,951 | | 450 | | 136,401 |
| Land | | 22,200 | | 124 | | 22,324 |
| Real estate held for sale | | 376 | | — | | 376 |
| Other | | 18,130 | | — | | 18,130 |
|  | | | | | | |
| **Total** | $ | 285,818 | $ | 844 | $ | 286,662 |
|  | | | | | | |
| Unamortized deferred borrowing costs | | (9,425) | | — | | (9,425) |
|  | $ | 276,393 | $ | 844 | $ | 277,237 |

The following table summarizes our contractual obligations for principal payments as of December 31, 2018 (dollars in thousands):

|  | Year | Amount |
|---|---|---|

App. 2014

| | | |
|---|---|---|
| 2019 | $ | 38,107 |
| 2020 | | 8,822 |
| 2021 | | 43,202 |
| 2022 | | 43,304 |
| 2023 | | 37,260 |
| Thereafter | | 115,123 |
| **Total** | $ | **285,818** |

Interest payable at December 31, 2018 was $0.8 million. Our debt has interest rates ranging from 2.5% to 9.5% per annum with maturity dates between 2019 and 2055. The mortgages were collateralized by deeds of trust on real estate having a net carrying value of $384.5 million.

During 2018 the Company refinanced or modified one loan with a total principal balance of $40.0 million. The refinancing resulted in a lower interest rate and the extension of the term of the loan. The transaction provides for lower monthly payments over the term of loan.

There are various land mortgages, secured by the property, that are in the process of a modification or extension to the original note due to expiration of the loan. We are in constant contact with these lenders, working together in order to modify the terms of these loans and we anticipate a timely resolution that is similar to the existing agreement or subsequent modification.

In conjunction with the development of various apartment projects and other developments, we drew down $81.0 million in construction loans during the year ended December 31, 2018.

50

**NOTE 8.**    *BONDS AND BONDS INTEREST PAYABLE*

In August 2016, Southern Properties Capital LTD ("Southern"), a British Virgin Islands corporation was incorporated for the purpose of raising funds by issuing Bonds to be traded on the TASE.  The Company transferred certain residential and commercial properties located in the United States to Southern, its wholly owned subsidiary.

On February 13, 2017, Southern filed a final prospectus with the TASE for an offering and sale of nonconvertible Series A Bonds to be issued by Southern. The bonds are obligations of Southern.  During the year ended December 31, 2017 on three separate occasions Southern issued nonconvertible Series A Bonds with a total value of approximately NIS400 million New Israeli Shekels ("NIS") or approximately $115 million dollars.  The Series A Bonds have a stated interest rate of 7.3%.  At March 31, 2018 the effective interest rate is 9.17%. The bonds require semi-annual equal installments on January 31 and July 31 of each year from 2019 to 2023 (inclusive). The interest will be repaid on January 31 and July 31 of each of the years 2018 to 2023 (inclusive), with the first payment commencing on July 31, 2017.

On January 25, 2018, interest payment of approximately NIS 14.6 million (or approximately $4.3 million) was paid to the Series A bondholders.

On February 15, 2018, Southern issued Series B bonds in the amount of NIS 137.7 million par value (approximately $39.2 million as of February 15, 2018). The Series B bonds are registered on the TASE. The bonds are reported in NIS and bear annual interest rate of 6.8%. Interest shall be repaid January 31 and July 31 of each of the years 2019 to 2023 (inclusive), first payment commencing on July 31, 2018. The principal shall be repaid in ten equal installments on January 31 and July 31 of each of the years from 2021 to 2025 (inclusive). A total bond issuance cost of $1.4 million was incurred. The effective interest rate is 7.99%.

On July 19, 2018, Southern closed a private placement of its Series B bonds in the amount of NIS 72.3 million (or approximately $19.8 million). The bonds are reported in NIS, are registered on the TASE, bear an annual interest rate of 6.8% and have an effective interest rate of 9.60%. Interest will be paid on January 31 and July 31 of each of the years 2019 and 2013 (inclusive). The principal will be repaid in ten equal installment on January 31 and July 31 of each of the years from 2021 to 2012 (inclusive). The Company incurred bonds issuance costs of approximately $1.9 million.

On July 26, 2018, interest payment of approximately NIS 18.9 million (or approximately $5.2 million) was paid to the Series A and B bondholders.

In December 2018, the Company deposited $16.2 million with the bond Trustee for upcoming January 2019 Series A and B bonds principal and interest payments.

The outstanding balance of these Bonds at December 31, 2018 is as follows:

| | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|
| Bonds (Series A) | $ | 106,686 | $ | 115,336 |
| Bonds (Series B) | | 36,740 | | — |
| Bonds (Series B expansion) | | 19,290 | | — |
| Less: deferred issuance expense, net | | (8,179) | | (5,916) |
| Accrued Interest | | 4,037 | | 3,627 |
| | $ | 158,574 | $ | 113,047 |

b.    Aggregate maturities are as follows:

| | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|
| First year | $ | 21,345 | $ | — |
| Second Year | | 21,345 | | 23,067 |
| Third year | | 32,550 | | 23,067 |
| Fourth year | | 32,550 | | 23,067 |
| Fifth year | | 32,550 | | 23,067 |
| Thereafter | | 22,376 | | 23,068 |
| | $ | 162,716 | $ | 115,336 |

The funds were used primarily for the acquisition and development of additional real estate operations in the United States. The funds were raised and will be repaid in NIS, however the funds raised have been converted to US dollars. The Company records unrealized gains or losses each quarter based upon the relative exchange values of the US dollar and the NIS; however, no gain or loss will be realized until a conversion from US dollars to NIS actually occurs in the future. The recorded unrealized gain or loss is reflected as a separate line item to highlight the fact that it is a non-cash transaction until such time as actual payment of principal and interest on the bonds is made. For the year ended December 31, 2018, the Company recorded a gain on foreign currency transaction of approximately $12.4 million.

51

**NOTE 9.    *RELATED PARTY TRANSACTIONS AND FEES***

We apply ASC Topic 805, "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, the sole shareholder of which is MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to TCI and IOR.  As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor".  TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement

Effective January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"),  the sole member of which is Realty Advisors, LLC, manages our commercial properties and provides brokerage services. Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. Refer to Part III, Item 10.

App. 2016

companies to lease and manage its apartment properties.

Below is a description of the related party transactions and fees between Pillar and Regis:

Fees, expenses and revenue paid to and/or received from our advisor:

|  | 2018 | 2017 | 2016 |
|---|---|---|---|
|  | (dollars in thousands) | | |
| Fees: | | | |
| Advisory | $ 10,663 | $ 9,995 | $ 9,490 |
| Mortgage brokerage and equity refinancing | 852 | 1,551 | 775 |
| Net income | 631 | 250 | 257 |
|  | $ 12,146 | $ 11,796 | $ 10,522 |
| Other Expense: | | | |
| Cost reimbursements | $ 4,398 | $ 2,895 | $ 3,228 |
| Interest received | (7,404) | (4,859) | (4,216) |
|  | $ (3,006) | $ (1,964) | $ (988) |
| Revenue: | | | |
| Rental | $ 1,178 | $ 783 | $ 708 |

52

Fees paid to Regis and related parties:

|  | 2018 | 2017 | 2016 |
|---|---|---|---|
|  | (dollars in thousands) | | |
| Fees: | | | |
| Property acquisition | $ 43,856 | $ 9,819 | $ 10,776 |
| Property management, construction management and leasing commissions | 540 | 963 | 888 |
| Real estate brokerage | 2,068 | 1,369 | 787 |
|  | $ 46,464 | $ 12,151 | $ 12,451 |

The Company received rental revenue of $1.2 million, $0.8 million, and $0.7 million in the years ended December 31, 2018, 2017, and 2016, respectively, from Pillar and its related parties for properties owned by the Company.

As of December 31, 2018, the Company had notes and interest receivable of $49.0 million due from UHF, a related party. During 2018, the Company recognized interest income of $5.7 million, originated $5.3 million, received no principal payments, and received interest payments of $6.1 million from these related party notes receivables.

On January 1, 2012, the Company entered into a development agreement with UHF, a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

The Company is the primary guarantor, on a $39.1 million mezzanine loan between UHF and a lender. In addition, ARL, and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2018 UHF was in compliance with the covenants to the loan agreement.

The Company is part of a tax sharing and compensating agreement with respect to federal income taxes between ARL, TCI and IOR and their subsidiaries that was entered into in July of 2009. That agreement continued until August 31, 2012, at which time a new tax sharing and compensating agreement was entered into by ARL, TCI, IOR and MRHI for the remainder of 2012 and subsequent years. The expense (benefit) in each year was calculated based on the amount of losses absorbed by taxable income multiplied by the maximum statutory tax rate of 21%.

The following table reconciles the beginning and ending balances of accounts receivable from and (accounts payable) to related parties as of December 31, 2018 (dollars in thousands):

App. 2017

| | Filer | ARL | Total |
|---|---|---|---|
| Related party receivable, December 31, 2017 | $ — | $ 111,665 | $ 111,665 |
| Cash transfers | 71,034 | — | 71,034 |
| Advisory fees | (10,662) | — | (10,662) |
| Net income fee | (631) | — | (631) |
| Fees and commissions | (2,919) | — | (2,919) |
| Cost reimbursements | (4,398) | — | (4,398) |
| Interest income | — | 7,229 | 7,229 |
| Notes receivable purchased | (5,314) | — | (5,314) |
| Expenses (paid)/received by advisor | 1,221 | — | 1,221 |
| Financing (mortgage payments) | 10,273 | — | 10,273 |
| Sales/Purchases transactions | (43,856) | — | (43,856) |
| Related party receivable, December 31, 2018 | $ 14,748 | $ 118,894 | $ 133,642 |

As of December 31, 2018, the Company has approximately 86 acres of land, at various locations that were sold to related parties in multiple transactions. These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets.

<div align="center">53</div>

**NOTE 10.**  *DIVIDENDS*

TCI's Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, no dividends on TCI's common stock were declared for 2018, 2017, or 2016. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including the Company's financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

**NOTE 11.**  *PREFERRED STOCK*

In November 2006, TCI issued 100,000 shares of Series D Preferred Stock with a liquidation preference of $100 per share. The preferred stock is not convertible into any other security, requires dividends payable at the initial rate of 7% annually. The dividend rate increases ratably from 7% to 9% in future periods and can be redeemed at any point after September 30, 2011.

During the fourth quarter of 2018, all 100,000 shares of Series D Preferred Stock were redeemed for $17.2 million, of which $7.2 million was accrued unpaid dividends. At December 31, 2018, there were no preferred shares outstanding.

<div align="center">54</div>

**NOTE 12.**  *INCOME TAXES*

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined on the basis of the differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date. We recognize deferred tax assets to the extent that we believe these assets are more likely than not to be realized. In making such a determination, we consider all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If we determine that we would be able to realize our deferred tax assets in the future in excess of their net recorded amount, we would make an adjustment to the deferred tax asset valuation allowance, which would reduce the provision for income taxes. We record uncertain tax positions in accordance with ASC 740 on the basis of a two-step process whereby (1) we determine whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions that meet the more-likely-than-not recognition threshold, we recognize the largest amount of tax benefit that is more than 50 percent likely to be realized upon ultimate settlement with the related tax authority.

For financial reporting purposes, income before income taxes were:

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | (in thousands) | | |
| TOTAL | $ 186,250 | $ (15,136) | $ 345 |

The expense (benefit) for income taxes consists of:

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | (in thousands) | | |
| Current: | | | |
| Federal | $ 42,805 | $ (5,603) | 121) |
| State | 1,210 | 10 | — |
| | | | |
| Deferred and other: | | | |
| Federal | (40,805) | 5,603 | (98) |
| State | | 170 | — |
| | | | |
| Total Tax Expense | $ 3,210 | $ 180 | $ 23 |
| | 55 | | |

The reconciliation between the Company's effective tax rate on income from continuing operations and the statutory rate is as follows:

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | (in thousands) | | |
| Income tax expense (benefit) at federal statutory rate | $ 39,113 | $ (5,603) | $ 121 |
| State and local income taxes net of federal tax benefit | 1,210 | 10 | — |
| Permanent differences | (143) | — | — |
| Timing differences | | | |
| Installment note on land sale | (2,876) | (1,917) | — |
| Allowance for losses on notes | (383) | (256) | — |
| Deferred gains | (9,417) | (7,723) | — |
| Basis difference on fixed assets | 23,675 | 10,082 | — |
| Other basis/timing differences | (7,164) | (16) | — |
| Use/generation of net operating loss carryforwards | (42,805) | 5,603 | (97) |
| Calculated income tax expense | 1,210 | 180 | 24 |
| Effective Tax Rate | 0.6% | N/A | 6.9% |

The company is subject to taxation in the United States and various states and foreign jurisdictions. As of December 31, 2018, the Company's tax years for 2017, 2016, and 2015 are subject to examination by the tax authorities. With few exceptions, as of December 31, 2018, the Company is no longer subject to U.S federal, state, local, or foreign examinations by tax authorities for the years before 2015.

The 2018 and 2017 effective tax rate is driven primarily by the passing of the Tax Cuts and Jobs Act by congress on December 22, 2017. This act reduced the statutory tax rate for corporations from 35% to 21% starting in 2018. As a result, the tax assets of TCI had to be re-priced to reflect the new tax rate for future years with the impact on the 2017 provision for income taxes.

**Components of the Net Deferred Tax Asset or Liability**

| | Years Ended December 31 | |
|---|---|---|
| | **2018** | **2017** |
| | (in thousands) | |
| Allowance for losses on notes | $ — | $ 383 |
| Installment note on land sale | — | 2,876 |
| Deferred gain | — | 6,814 |
| Net operating loss carryforward | 3,904 | 46,709 |

App. 2019

| | | |
|---|---:|---:|
| Subtotal | 3,904 | 56,782 |
| Less: valuation allowance | — | (29,806) |
| **Total net deferred tax assets** | **3,904** | **26,976** |
| | | |
| Deferred gain | 2,603 | — |
| Basis differences for fixed assets | 3,301 | 26,976 |
| **Total deferred tax liability** | **5,904** | **26,976** |
| | | |
| **Net deferred tax asset (liability)** | **(2,000)** | **—** |
| | | |
| Current net deferred tax asset | 3,904 | 26,976 |
| Long-term net deferred tax liability | $    5,904 | $    26,976 |
| **Net deferred tax asset (liability)** | **(2,000)** | **—** |

**Operating Loss and Tax Credit Carryforwards**

We have state NOLs in many of the various states in which we operate.

**Valuation Allowance**

Management assesses the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. At December 31, 2018, 2017 and 2016 TCI had a net deferred tax asset due to tax deductions available to it in future years. However, as management could not determine that it was more likely than not that TCI would realize the benefit of the deferred tax asset, a 100% valuation allowance was established.

**NOTE 13.** *FUTURE MINIMUM RENTAL INCOME UNDER OPERATING LEASES*

TCI'S real estate operations include the leasing of commercial properties (office buildings, industrial warehouses and retail centers). These leases expire at various dates through 2029. The following is a schedule of minimum future rents on non-cancelable operating leases at December 31, 2018 (dollars in thousands):

| Year | Amount |
|:---:|---:|
| 2019 | 27,346 |
| 2020 | 23,805 |
| 2021 | 21,249 |
| 2022 | 18,033 |
| 2023 | 12,825 |
| Thereafter | 13,983 |
| **Total** | $    **117,241** |

**NOTE 14.** *OPERATING SEGMENTS*

Our segments are based on management's method of internal reporting which classifies its operations by property type. The segments are commercial, apartments, land and other. Significant differences among the accounting policies of the operating segments as compared to the Consolidated Financial Statements principally involve the calculation and allocation of administrative expenses. Management evaluates the performance of each of the operating segments and allocates resources to them based on their operating income and cash flow.

Items of income that are not reflected in the segments are interest, other income, equity in partnerships and gains on sale of real estate. Expenses that are not reflected in the segments are provision for losses, advisory, net income and incentive fees, general and administrative, non-controlling interests and net loss from discontinued operations before gains on sale of real estate.

The segment labeled as "Other" consists of revenue and operating expenses related to the notes receivable and corporate debt.

Presented below is the Company's reportable segments' operating income including segment assets and expenditures for the years 2018, 2017 and

| For the Year Ended December 31, 2018 | Commercial Properties | | Apartments | | Land | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Rental and other property revenues | $ | 33,113 | $ | 87,832 | $ | — | $ | 10 | $ | 120,955 |
| Property operating expenses | | (16,558) | | (42,134) | | (275) | | (453) | | (59,420) |
| Depreciation | | (9,530) | | (13,217) | | — | | (14) | | (22,761) |
| Mortgage and loan interest | | (7,662) | | (20,671) | | (318) | | (30,221) | | (58,872) |
| Interest income | | — | | — | | — | | 15,793 | | 15,793 |
| Gain on land sales | | — | | — | | 17,404 | | — | | 17,404 |
| Segment operating income (loss) | $ | (637) | $ | 11,810 | $ | 16,811 | $ | (14,885) | $ | 13,099 |
| Capital expenditures | | 8,246 | | 16,954 | | — | | — | | 25,200 |
| Assets | $ | 153,018 | $ | 143,500 | $ | 84,016 | $ | 3,970 | $ | 384,504 |
| **Property Sales** | | | | | | | | | | |
| Sales price | $ | — | $ | — | $ | 43,311 | $ | — | $ | 43,311 |
| Cost of sale | | — | | — | | (25,907) | | — | | (25,907) |
| Gain on land sales | $ | — | $ | — | $ | 17,404 | $ | — | $ | 17,404 |

<center>57</center>

| For the Twelve Months Ended December 31, 2017 | Commercial Properties | | Apartments | | Land | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Rental and other property revenues | $ | 32,323 | $ | 92,807 | $ | 87 | $ | 16 | $ | 125,233 |
| Property operating expenses | | (17,724) | | (43,677) | | (667) | | (988) | | (63,056) |
| Depreciation | | (9,200) | | (16,354) | | — | | (4) | | (25,558) |
| Mortgage and loan interest | | (7,528) | | (22,346) | | (1,588) | | (28,482) | | (59,944) |
| Interest income | | — | | — | | — | | 13,862 | | 13,862 |
| Recognition of deferred gain on sale of income producing properties | | — | | 9,842 | | — | | — | | 9,842 |
| Gain on land sales | | — | | — | | 4,884 | | — | | 4,884 |
| Segment operating income (loss) | $ | (2,129) | $ | 20,272 | $ | 2,716 | $ | (15,596) | $ | 5,263 |
| Capital expenditures | $ | 3,157 | $ | 1,402 | $ | 609 | $ | — | $ | 5,168 |
| Assets | $ | 137,157 | $ | 726,852 | $ | 115,205 | $ | 656 | $ | 979,870 |
| **Property Sales** | | | | | | | | | | |
| Sales price | $ | — | $ | — | $ | 11,177 | $ | — | $ | 11,177 |
| Cost of sale | | — | | — | | (6,293) | | — | | (6,293) |
| Recognized prior deferred gain | | — | | 9,842 | | — | | — | | 9,842 |
| Gain on sale | $ | — | $ | 9,842 | $ | 4,884 | $ | — | $ | 14,726 |

| For the Twelve Months Ended December 31, 2016 | Commercial Properties | | Apartments | | Land | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Rental and other property revenues | $ | 31,864 | $ | 86,603 | $ | — | $ | 4 | $ | 118,471 |
| Property operating expenses | | (19,476) | | (40,786) | | (1,634) | | (22) | | (61,918) |
| Depreciation | | (8,924) | | (14,759) | | — | | — | | (23,683) |
| Mortgage and loan interest | | (7,167) | | (25,381) | | (1,746) | | (18,794) | | (53,088) |
| Interest income | | — | | — | | — | | 14,670 | | 14,670 |
| Gain (loss) on sale of income producing properties | | (238) | | 16,445 | | — | | — | | 16,207 |
| Gain on land sales | | — | | — | | 3,121 | | — | | 3,121 |
| Segment operating income (loss) | $ | (3,941) | $ | 22,122 | $ | (259) | $ | (4,142) | $ | 13,780 |
| Capital expenditures | $ | 4,577 | $ | 863 | $ | 269 | $ | — | $ | 5,709 |
| Assets | $ | 148,689 | $ | 624,433 | $ | 118,051 | $ | — | $ | 891,173 |
| **Property Sales** | | | | | | | | | | |
| Sales price | $ | 1,500 | $ | 20,350 | $ | 29,128 | $ | — | $ | 50,978 |
| Cost of sale | | (1,738) | | (3,905) | | (26,007) | | — | | (31,650) |

App. 2021

| Gain on sale | $ | (238) | $ | 16,445 | $ | 3,126 | $ | 19,328 |
|---|---|---|---|---|---|---|---|---|

The table below reflects the reconciliation of segment information to the corresponding amounts in the Consolidated Statements of Operations (dollars in thousands):

| | | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| Segment operating income (loss) | $ | 13,099 | $ | 5,263 | $ | 13,780 |
| Other non-segment items of income (expense) | | | | | | |
| General and administrative | | (11,359) | | (6,269) | | (5,476) |
| Net income fee to related party | | (631) | | (250) | | (257) |
| Advisory fee to related party | | (10,663) | | (9,995) | | (9,490) |
| Other income | | 28,150 | | 625 | | 1,816 |
| Gain on disposition of 50% interest in VAA | | 154,126 | | — | | — |
| Foreign currency translation gain (loss) | | 12,399 | | (4,536) | | — |
| Earnings from VAA | | 44 | | — | | — |
| Earnings (losses) from other unconsolidated investees | | 1,085 | | 26 | | (26) |
| Income tax benefit (expense) | | (3,210) | | (180) | | (24) |
| Net income (loss) from continuing operations | $ | 183,040 | $ | (15,316) | $ | 323 |

The table below reflects the reconciliation of segment information to the corresponding amounts in the Consolidated Balance Sheets (dollars in thousands):

| | | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| Segment assets | $ | 384,504 | $ | 979,870 | $ | 891,173 |
| Investments in unconsolidated subsidiaries and investees | | 90,571 | | 2,472 | | 2,446 |
| Notes and interest receivable | | 83,541 | | 70,166 | | 79,308 |
| Other assets and receivables | | 303,764 | | 260,914 | | 212,987 |
| Total assets | $ | 862,380 | $ | 1,313,422 | $ | 1,185,914 |

58

## NOTE 15.  *QUARTERLY RESULTS OF OPERATIONS*

The following is a tabulation of TCI's quarterly results of operations for the years 2018, 2017 and 2016. Quarterly results presented may differ from those previously reported in TCI's Form 10-Q due to the reclassification of the operations of properties sold or held for sale to discontinued operations in accordance with ASC topic 360:

| | | Three Months Ended 2018 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **March 31,** | | **June 30,** | | **September 30,** | | **December 31,** |
| | | (dollars in thousands, except share and per share amounts) | | | | | | |
| Total operating revenues | $ | 31,082 | $ | 31,607 | $ | 33,505 | $ | 24,761 |
| Total operating expenses | | 25,894 | | 26,966 | | 27,734 | | 24,240 |
| Operating income | | 5,188 | | 4,641 | | 5,771 | | 521 |
| Other (expense) income | | (6,624) | | 2,731 | | 5,896 | | (3,404) |
| (Loss) income before gain on formation of joint venture, gain on sales, non-contolling interest, and taxes | | (1,436) | | 7,372 | | 11,667 | | (2,883) |
| Gain on disposition of 50% interest in VAA | | — | | — | | — | | 154,126 |
| Gain on land sales | | 1,335 | | — | | 12,243 | | 3,826 |
| Income tax expense | | — | | — | | (792) | | (2,418) |
| Net (loss) income from continued operations | | (101) | | 7,372 | | 23,118 | | 152,651 |
| Net (loss) income | | (101) | | 7,372 | | 23,118 | | 152,651 |
| Less: net (loss) attributable to non-controlling interest | | (132) | | (126) | | (915) | | (417) |
| Preferred dividend requirement | | (222) | | (224) | | (227) | | (227) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Net (loss) income applicable to common shares | $ | (455) | $ | 7,022 | $ | 21,970 | $ | 152,007 |

| PER SHARE DATA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Earnings per share - basic** | | | | | | | | |
| (Loss) income from continued operations | $ | (0.05) | $ | 0.81 | $ | 2.52 | $ | 17.44 |
| Net (loss) income applicable to common shares | $ | (0.05) | $ | 0.81 | $ | 2.52 | $ | 17.44 |
| Weighted average common shares used in computing earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 |
| **Earnings per share - diluted** | | | | | | | | |
| (Loss) income from continued operations | $ | (0.05) | $ | 0.81 | $ | 2.52 | $ | 17.44 |
| Net (loss) income applicable to common shares | $ | (0.05) | $ | 0.81 | $ | 2.52 | $ | 17.44 |
| Weighted average common shares used in computing diluted earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 |

| | Three Months Ended 2017 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| Total operating revenues | $ 31,535 | $ 31,302 | $ 31,491 | $ 30,905 |
| Total operating expenses | 26,337 | 25,460 | 25,725 | 27,606 |
| Operating income (loss) | 5,198 | 5,842 | 5,766 | 3,299 |
| Other expense | (10,658) | (15,613) | (8,967) | (14,729) |
| Loss before gain on sales, non-contolling interest, and taxes | (5,460) | (9,771) | (3,201) | (11,430) |
| Gain (loss) on sale of income producing properties | — | — | 9,841 | 1 |
| Gain (loss) on land sales | 445 | (476) | 530 | 4,385 |
| Income tax benefit (expense) | — | — | — | (180) |
| Net income (loss) from continued operations | (5,015) | (10,247) | 7,170 | (7,224) |
| Net income (loss) | (5,015) | (10,247) | 7,170 | (7,224) |
| Less: net (income) loss attributable to non-controlling interest | (119) | (163) | (96) | (121) |
| Preferred dividend requirement | (222) | (224) | (224) | (230) |
| Net (loss) income applicable to common shares | $ (5,356) | $ (10,634) | $ 6,850 | $ (7,575) |

| PER SHARE DATA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Earnings per share - basic** | | | | | | | | |
| Loss from continued operations | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ | (0.88) |
| Net income (loss) applicable to common shares | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ | (0.88) |
| Weighted average common shares used in computing earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 |
| **Earnings per share - diluted** | | | | | | | | |
| Loss from continued operations | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ | (0.88) |
| Net income (loss) applicable to common shares | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ | (0.88) |
| Weighted average common shares used in computing diluted earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 |

60

| | Three Months Ended 2016 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| Total operating revenues | $ 28,903 | $ 30,521 | $ 29,776 | $ 29,271 |
| Total operating expenses | 24,823 | 24,751 | 25,429 | 25,821 |
| Operating income (loss) | 4,080 | 5,770 | 4,347 | 3,450 |
| Other expense | (9,054) | (7,901) | (9,309) | (10,364) |
| Loss before gain on sales, non-controlling interest, and taxes | (4,974) | (2,131) | (4,962) | (6,914) |

| | | | | |
|---|---|---|---|---|
| Gain (loss) on sale of income producing properties | (234) | 3,368 | | 11,283 |
| Gain (loss) on land sales | 1,652 | 1,719 | 555 | (805) |
| Income tax benefit (expense) | 1 | — | (25) | — |
| Net income (loss) from continued operations | (3,565) | 4,756 | (4,432) | 3,564 |
| Net loss from discontinued operations | 2 | — | — | (3) |
| Net income (loss) | (3,563) | 4,756 | (4,432) | 3,561 |
| Less: net (income) loss attributable to non-controlling interest | 23 | (97) | (114) | (97) |
| Preferred dividend requirement | (222) | (224) | (227) | (227) |
| Net (loss) income applicable to common shares | $ (3,762) | $ 4,435 | $ (4,773) | $ 3,237 |
| | | | | |
| **PER SHARE DATA** | | | | |
| **Earnings per share - basic** | | | | |
| Loss from continued operations | $ (0.43) | $ 0.51 | $ (0.55) | $ 0.37 |
| Income from discontinued operations | — | — | — | — |
| Net income (loss) applicable to common shares | $ (0.43) | $ 0.51 | $ (0.55) | $ 0.37 |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |
| | | | | |
| **Earnings per share - diluted** | | | | |
| Loss from continued operations | $ (0.43) | $ 0.51 | $ (0.55) | $ 0.37 |
| Income from discontinued operations | — | — | — | — |
| Net income (loss) applicable to common shares | $ (0.43) | $ 0.51 | $ (0.55) | $ 0.37 |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

61

**NOTE 16.**   *COMMITMENTS AND CONTINGENCIES AND LIQUIDITY*

*Liquidity.*      Management believes that TCI will generate excess cash from property operations in 2019; such excess, however, will not be sufficient to discharge all of TCI's obligations as they become due. Management intends to sell income-producing assets, refinance real estate and obtain additional borrowings primarily secured by real estate to meet its liquidity requirements.

*Partnership Buyouts*.      TCI is the limited partner in various partnerships related the construction of residential properties. As permitted in the respective partnership agreements, TCI intends to purchase the interests of the general and any other limited partners in these partnerships subsequent to the completion of these projects. The amounts paid to buy out the nonaffiliated partners are limited to development fees earned by the non-affiliated partners, and are set forth in the respective partnership agreements.

**Dynex Capital, Inc.**

On July 20, 2015, the 68th Judicial District Court in Dallas County, Texas issued its Final Judgment in Cause No. DC-03-00675, styled Basic Capital Management, Inc., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. v. Dynex Commercial, Inc. The case, which was litigated for more than a decade, had its origin with Dynex Commercial making loans to Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. (subsidiaries of Continental Mortgage & Equity Trust ("CMET"), an entity which merged into TCI in 1999 after the original suit was filed). Under the original loan commitment, $160 million in loans were to be made to the entities. The loans were conditioned on the execution of a commitment between Dynex Commercial and Basic Capital Management, Inc. ("Basic").

An original trial in 2004, which also included Dynex Capital, Inc. as a defendant, resulted in a jury awarding damages in favor of Basic for "lost opportunity," as well as damages in favor of ART and in favor of TCI and its subsidiaries for "increased costs" and "lost opportunity." The original Trial Court judge ignored the jury's findings, however, and entered a "Judgment Notwithstanding the Verdict" ("JNOV") in favor of the Dynex entities (the judge held the Plaintiffs were not entitled to any damages from the Dynex entities). After numerous appeals by all parties, Dynex Capital, Inc. was ultimately dismissed from the case and the remaining claims against Dynex Commercial were remanded to the Trial Court for a new judgment consistent with the jury's findings. The Court entered the new Final Judgment against Dynex Commercial, Inc. on July 20, 2015.

The Final Judgment entered against Dynex Commercial, Inc. on July 20, 2015 awarded Basic $0.256 million in damages, plus pre-judgment interest of $0.192 million for a total amount of $0.448 million. The Judgment awarded ART $14.2 million in damages, plus pre-judgment interest

of $10.6 million for a total amount of $24.8 million. The Judgment awarded TCI $14.1 million plus pre-judgment interest of $5.4 million for a total amount of $19.5 million. The Judgment also awarded Basic, ART, and TCI post-judgment interest at the rate of 5% per annum from April 25, 2014 until the date their respective damages are paid. Lastly, the Judgement awarded Basic, ART, and TCI $1.6 million collectively in attorneys' fees from Dynex Commercial, Inc.

The Company is working with counsel to identify assets and collect on the Final Judgment against Dynex Commercial, Inc., as well as explore possible additional claims, if any, against Dynex Capital, Inc.

**Berger Litigation**

On February 4, 2019, an individual claiming to be a stockholder holding 7,900 shares of Common Stock of Income Opportunity Realty Investors, Inc. ("IOR") filed a Complaint in the United States District Court for the Northern District of Texas, Dallas Division, individually and allegedly derivatively on behalf of IOR, against Transcontinental Realty Investors, Inc. ("TCI"), American Realty Investors, Inc. ("ARL"), (TCI is a shareholder of IOR, ARL is a shareholder of TCI) Pillar Income Asset Management, Inc. ("Pillar"), ( collectively the "Companies"), certain officers and directors of the Companies ("Additional Parties") and two other individuals. The Complaint filed alleges that the sale and/or exchange of certain tangible and intangible property between the Companies and IOR during the last ten years of business operations constitutes a breach of fiduciary duty by the one or more of Companies, the Additional Defendants and/or the directors of IOR. The case alleges other related claims. The Plaintiff seeks certification as a representative of IOR and all of its shareholders, unspecified damages, a return to IOR of various funds and an award of costs, expenses, disbursements (including Plaintiff's attorneys' fees) and prejudgment and post-judgment interest. The named Defendants intend to vigorously defend the action, deny all of the allegations of the Complaint, and believe the allegations to be wholly without any merit. While only in the early stages of defending the case, it is not clear that Plaintiff owns any shares of Common Stock of IOR or would be a proper representative of IOR or a class of minority stockholders.

<hr>

62

<hr>

*Litigation.* The ownership of property and provision of services to the public as tenants entails an inherent risk of liability. Although the Company and its subsidiaries are involved in various items of litigation incidental to and in the ordinary course of its business, in the opinion of management, the outcome of such litigation will not have a material adverse impact upon the Company's financial condition, results of operation or liquidity.

*Guarantees.* The Company is the primary guarantor on a $39.1 million mezzanine loan between UHF and a lender. In addition, ARL and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2018, UHF was in compliance with the covenants to the loan agreement.

**NOTE 17.   *EARNINGS PER SHARE***

***Earnings per share.***   Earnings per share ("EPS") have been computed pursuant to the provisions of ASC 260 "Earnings per Share." Basic EPS is calculated by dividing income available to common shareholders by the weighted-average number of common shares outstanding during the period. Shares issued during the period shall be weighted for the portion of the period that they were outstanding.

Prior to July 9, 2014, TCI had 30,000 shares of Series C cumulative convertible preferred stock issued and outstanding. These 30,000 shares were owned by RAI, a related party, and had accrued dividends unpaid of $0.9 million. The stock had a liquidation preference of $100.00 per share and could be converted into common stock at 90% of the daily average closing price of the common stock for the prior five trading days. On July 9, 2014, RAI converted all 30,000 shares into the requisite number of shares of common stock. The conversion resulted in the issuance of 304,298 new shares of common stock. The effects of the Series C Cumulative Convertible Preferred Stock are no longer included in the dilutive earnings per share calculation for the current period, but are considered in the calculation for the prior periods if applying the if-converted method is dilutive.

As of December 31, 2018, there are no preferred stock or stock options that are required to be included in the calculation of EPS.

**NOTE 18.   *SUBSEQUENT EVENTS***

The date to which events occurring after December 31, 2018, the date of the most recent balance sheet, have been evaluated for possible adjustments to the financial statements or disclosure is March 31, 2019, which is the date of which the financial statements were available to be issued. There are no subsequent events that would require an adjustment to the financial statements.

<hr>

63

<hr>

**Schedule III**

App. 2025

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**December 31, 2018**

| Property/Location | Encumbrances | Initial Cost Land | Initial Cost Buildings | Cost Capitalized Subsequent to Acquisition Improvements | Asset Impairment | Gross Amount of Which Carried at End of Year Land | Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired | Life on Which Depreciation In Latest Statement of Operation is Computed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Properties Held for Investment** **Apartments** | | | | | | | | | | | | |
| Legacy at Pleasant Grove, Texarkana, TX | | 2,005 | 17,892 | 217 | — | 2,005 | 18,109 | 20,114 | 1,817 | 2006 | 12/14 | 40 years |
| Toulon, Gautier, MS | | 1,621 | 20,107 | 372 | — | 1,621 | 20,479 | 22,100 | 3,770 | 2011 | 9/09 | 40 years |
| Villager, Ft. Walton, FL | | 141 | 1,267 | — | — | 141 | 1,267 | 1,408 | 116 | 1972 | 6/15 | 40 years |
| Villas at Bon Secour, Gulf Shores, AL | | 2,715 | 15,385 | — | — | 2,715 | 15,385 | 18,100 | 160 | 2007 | 7/18 | 40 years |
| Vista Ridge, Tupelo, MS | | 1,339 | 13,398 | — | — | 1,339 | 13,398 | 14,737 | 1,544 | 2009 | 10/15 | 40 years |
| Westwood, Mary Ester, FL | | 692 | 6,650 | — | — | 692 | 6,650 | 7,342 | 596 | 1972 | 6/15 | 40 years |
| Chelsea, Beaumont, TX | | 1,225 | 11,025 | — | — | 1,225 | 11,025 | 12,250 | 23 | 1999 | 11/18 | 40 years |
| Farnham Park, Port Aurther, TX | | 1,010 | 9,086 | — | — | 1,010 | 9,086 | 10,096 | — | | 11/18 | 40 years |
| Landing, Houma, LA | | 2,012 | 18,115 | — | — | 2,012 | 18,115 | 20,127 | 38 | | 12/18 | 40 years |
| **Total Apartments Held for Investment** | $ — | $ 12,760 | $ 112,925 | $ 589 | $ — | $ 12,760 | $ 113,514 | $ 126,274 | $ 8,064 | | | |
| **Apartments Under Construction** | | | | | | | | | | | | |
| Apalache Point | | — | — | 21 | — | — | 21 | 21 | — | — | | — |
| Overlook at Allensville Square II, Sevierville, TN | | 1,933 | — | 12,567 | — | 1,933 | 12,567 | 14,500 | — | — | 11/15 | — |
| Forest Pines | | 5,040 | — | 300 | — | 5,040 | 300 | 5,340 | — | — | 6/17 | — |
| Parc at Denham | | 714 | — | 4,138 | — | 714 | 4,138 | 4,852 | — | | | — |
| Sugar Mill II | | 576 | — | — | — | 576 | — | 576 | — | — | | — |
| **Total Apartments Under Construction** | $ — | $ 8,263 | $ — | $ 17,026 | $ — | $ 8,263 | $ 17,026 | $ 25,289 | $ — | $ | | |

| Property/Location | Encumbrances | Initial Cost Land | Initial Cost Buildings | Cost Capitalized Subsequent to Acquisition Improvements | Asset Impairment | Gross Amount of Which Carried at End of Year Land | Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired | Life on Which Depreciation In Latest Statement of Operation is Computed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Commercial** | | | | | | | | | | | | |
| 600 Las Colinas, Las Colinas, TX | | 5,751 | 51,759 | 19,317 | — | 5,751 | 71,076 | 76,827 | 29,896 | 1984 | 8/05 | 40 years |
| 770 South Post Oak, Houston, TX | | 1,763 | 15,834 | 412 | — | 1,763 | 16,246 | 18,009 | 1,619 | 1970 | 7/15 | 40 years |
| Bridgeview Plaza, LaCrosse, WI | | — | — | 1,157 | — | — | 1,157 | 1,157 | 710 | 1979 | 3/03 | 40 years |
| Browning Place (Park West I), Farmers Branch, TX | | 5,096 | 45,868 | 22,848 | — | 5,096 | 68,716 | 73,812 | 26,556 | 1984 | 4/05 | 40 years |
| Mahogany Run Golf Course, US Virgin Islands | | — | — | — | — | — | — | — | 15 | 1981 | 11/14 | 40 years |
| Thermalloy | 224 | | | | | | | | | | | |
| Fruitland Plaza, Fruitland Park, FL | | 23 | — | 83 | — | 23 | 83 | 106 | 62 | — | 05/92 | 40 years |
| Senlac VHP, Farmers Branch, TX | | 622 | — | 142 | — | 622 | 142 | 764 | 142 | — | 8/05 | 40 years |
| Stanford Center, Dallas, TX | | 20,278 | 34,862 | 7,953 | (9,600) | 20,278 | 33,215 | 53,493 | 12,148 | — | 6/08 | 40 years |
| **Total Commercial Held for Investment** | $ 224 | $ 33,533 | $ 148,323 | $ 51,912 | $ (9,600) | $ 33,533 | $ 190,635 | $ 224,168 | $ 71,148 | | | |
| **Land** | | | | | | | | | | | | |
| Bonneau Land, Farmers Branch, TX | — | 1,309 | — | — | — | 1,309 | — | 1,309 | — | — | 12/14 | — |
| Cooks Lane, Fort Worth, TX | — | 1,094 | — | — | — | 1,094 | — | 1,094 | — | — | 6/04 | — |
| Dedeaux, Gulfport, MS | 0 | 1,612 | — | 46 | (38) | 1,612 | 8 | 1,620 | — | — | 10/06 | — |
| Gautier Land, Gautier, MS | — | 202 | — | — | — | 202 | — | 202 | — | — | 7/98 | — |
| Lake Shore Villas, Humble, TX | — | 81 | — | 3 | — | 81 | 3 | 84 | — | — | 3/02 | — |
| Lubbock Land, Lubbock, TX | — | 234 | — | — | — | 234 | — | 234 | — | — | 1/04 | — |
| Nakash, Malden, MO | — | 113 | — | — | — | 113 | — | 113 | — | — | 1/93 | — |
| Nashville, Nashville, TN | — | 662 | — | 59 | — | 662 | 59 | 721 | — | — | 6/02 | — |
| Ocean Estates, Gulfport, MS | — | 1,418 | — | 390 | — | 1,418 | 390 | 1,808 | — | — | 10/07 | — |
| Texas Plaza Land, Irving, TX | — | 1,738 | — | — | (238) | 1,738 | (238) | 1,500 | — | — | 12/06 | — |
| Union Pacific Railroad Land, Dallas, TX | — | 130 | — | — | — | 130 | — | 130 | — | — | 3/04 | — |
| Willowick Land, Pensacola, FL | — | 137 | — | — | — | 137 | — | 137 | — | — | 1/95 | — |

App. 2026

| Property | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Windmill Farms Land, Kaufman County, TX | — | 56,796 | — | 13,911 | (20,343) | 56,796 | (6,432) | 50,364 | | — | 11/11 | — |
| 2427 Valley View Ln, Farmers Branch, TX | — | 76 | — | — | — | 76 | — | 76 | | — | 7/12 | — |
| Lacy Longhorn Land, Farmers Branch, TX | 0 | 1,169 | — | (760) | — | 1,169 | (760) | 409 | | — | 6/04 | — |
| Minivest Land, Dallas, TX | — | 7 | — | — | — | 7 | — | 7 | | — | 4/13 | — |
| Mira Lago, Farmers Branch, TX | — | 59 | — | 15 | — | 59 | 15 | 74 | | — | 5/01 | — |
| Nicholson Croslin, Dallas, TX | — | 184 | — | (118) | — | 184 | (118) | 66 | | — | 10/98 | — |
| Nicholson Mendoza, Dallas, TX | — | 80 | — | (51) | — | 80 | (51) | 29 | | — | 10/98 | — |
| Valley View 34 (Mercer Crossing), Farmers Branch, TX | — | 1,173 | — | (945) | — | 1,173 | (945) | 228 | | — | 8/08 | — |
| Mercer Crossing Land L2876 | — | 12,029 | — | — | — | 12,029 | — | 12,029 | | — | | |
| Mercer Crossing Land L2877 | — | 2,834 | — | — | — | 2,834 | — | 2,834 | | — | | |
| Dominion Mercer, Farmers Branch, TX | — | 3,801 | — | 2,774 | — | 3,801 | 2,774 | 6,575 | | — | 10/16 | — |
| McKinney 36, Collin County, TX | — | 635 | — | 161 | (19) | 635 | 142 | 777 | | — | 1/98 | — |
| McKinney Ranch Land | 5,183 | — | — | — | — | — | — | — | | | | |
| Travis Ranch Land, Kaufman County, TX | — | 80 | — | — | — | 80 | — | 80 | | — | 8/08 | — |
| Travis Ranch Retail, Kaufman City, TX | — | 1,517 | — | — | — | 1,517 | — | 1,517 | | — | 8/08 | — |
| **Total Land Held for Investment** | $ 5,183 | $ 89,170 | $ — | $ 15,485 | $ (20,638) | $ 89,170 | $ (5,153) | $ 84,017 | $ — | | | |
| **Corporate Departments/Investments/Misc.** | | | | | | | | | | | | |
| TCI - Corporate | 78,134 | — | — | — | — | — | — | — | | 16 | | |
| **Total Corporate Departments/Investments/Misc.** | $ 78,134 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ 16 | | | |
| **Total Properties Held for Investment** | $ 83,541 | $ 143,726 | $ 261,248 | $ 85,012 | $ (30,238) | $ 143,726 | $ 316,022 | $ 459,748 | $ 79,228 | | | |
| **Properties Held for Sale** | | | | | | | | | | | | |
| **Commercial** | | | | | | | | | | | | |
| **Total Commercial Held for Sale** | — | — | — | — | — | — | — | — | — | | | |
| **Total Properties Held for Sale** | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | | | |
| **Properties Subject to Sales Contract Apartments** | | | | | | | | | | | | |
| **Total Apartments Subject to Sales Contract** | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | | | |
| **Commercial** | | | | | | | | | | | | |
| **Total Commercial Subject to Sales Contract** | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | | | |
| **Land** | | | | | | | | | | | | |
| Dominion Tract, Dallas, TX | 0 | 2,440 | — | 53 | (133) | 2,440 | (80) | 2,360 | | — | 3/99 | — |
| Hollywood Casino Tract I, Farmers Branch, TX | 0 | (3) | — | 0 | — | (3) | — | (3) | | — | 6/02 | — |
| Whorton Land, Bentonville, AR | — | 3,510 | — | 568 | (2,451) | 3,510 | (1,883) | 1,627 | | — | 6/05 | — |
| **Total Land Subject to Sales Contract** | $ — | $ 5,947 | $ — | $ 621 | $ (2,584) | $ 5,947 | $ (1,963) | $ 3,984 | $ — | | | |
| **Total Properties Subject to Sales Contract** | $ — | $ 5,947 | $ — | $ 621 | $ (2,584) | $ 5,947 | $ (1,963) | $ 3,984 | $ — | | | |
| **Land Sold** | | | | | | | | | | | | |
| **Total Land Sold** | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | | | |
| **TOTAL: Real Estate** | $ 83,541 | $ 149,673 | $ 261,248 | $ 85,633 | $ (32,822) | $ 149,673 | $ 314,059 | $ 463,732 | $ 79,228 | | | |

64

## REAL ESTATE AND ACCUMULATED DEPRECIATION
### As of December 31, 2018

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| | (dollars in thousands) | | |
| **Reconciliation of Real Estate** | | | |
| Balance at January 1, | $ 1,165,662 | $ 1,066,603 | $ 1,003,545 |
| Additions | | | |
| Acquisitions, improvements and construction | 175,996 | 129,483 | 112,762 |
| Deductions | | | |
| Sale of real estate | (877,926) | (30,424) | (49,704) |
| Asset impairments | — | — | — |
| Balance at December 31, | $ 463,732 | $ 1,165,662 | $ 1,066,603 |

App. 2027

| Reconciliation of Accumulated Depreciation | | | | | | |
|---|---|---|---|---|---|---|
| Balance at January 1, | $ | 177,546 | $ | 165,597 | $ | 150,038 |
| Additions | | | | | | |
| Depreciation | | 22,761 | | 24,417 | | 23,277 |
| Deductions | | | | | | |
| Sale of real estate | | (121,079) | | (12,468) | | (7,718) |
| Balance at December 31, | $ | 79,228 | $ | 177,546 | $ | 165,597 |

65

**SCHEDULE IV**

## TRANSCONTINENTAL REALTY INVESTORS, INC.
## MORTGAGE LOANS RECEIVABLE
### December 31, 2018

| Description | Interest Rate | Final Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount of Mortgage | Carrying Amount of Mortgage | Principal or Loans Subject to Delinquent Principal or Interest |
|---|---|---|---|---|---|---|---|
| | | | | | (dollars in thousands) | | |
| **H198, LLC** | 12.00% | Jan-19 | Excess cash flow | $  — | $  5,907 | $  5,907 | — |
| Las Vegas Land | | | | | | | |
| **H198, LLC** | 12.00% | Oct-19 | Excess cash flow | — | 496 | 496 | — |
| Legacy at Pleasant Grove | | | | — | | | |
| **H198, LLC** | 12.00% | Oct-19 | Excess cash flow | — | 4,554 | 4,554 | — |
| McKinney Ranch Land | 6% | Sep-20 | | — | | | |
| **Forest Pines** | 5% | Sep-19 | Excess cash flow | — | 2,223 | 2,223 | |
| **Spyglass Apartments of Ennis, LP** | 5% | Nov-19 | Excess cash flow | — | 5,083 | 5,083 | |
| **Bellwether Ridge** | 5% | May-20 | Excess cash flow | — | 3,429 | 3,429 | |
| **Parc at Windmill Farms** | 5% | May-20 | Excess cash flow | — | 6,066 | 6,067 | |
| **Unified Housing Foundation, Inc. (Echo Station)** | 12.00% | Dec-32 | Excess cash flow | 9,719 | 1,809 | 1,481 | — |
| 100% Interest in UH of Temple, LLC | | | | | | | |
| **Unified Housing Foundation, Inc. (Lakeshore Villas/HFS of Humble, LLC) (31.5% of cash flow)** | 12.00% | Dec-32 | Excess cash flow | 15,756 | 8,836 | 6,369 | — |
| Interest in Unified Housing Foundation Inc. | | | | | | | |
| **Unified Housing Foundation, Inc. (Limestone Ranch)** | 12.00% | Dec-32 | Excess cash flow | 18,641 | 12,335 | 7,953 | — |
| 100% Interest in UH of Vista Ridge, LLC | | | | | | | |
| **Unified Housing Foundation, Inc. (Timbers of Terrell)** | 12.00% | Dec-32 | Excess cash flow | 7,294 | 1,702 | 1,323 | — |
| 100% Interest in UH of Terrell, LLC | | | | | | | |
| **Unified Housing Foundation, Inc. (Tivoli)** | 12.00% | Dec-32 | Excess cash flow | 10,398 | 10,742 | 6,140 | — |
| 100% Interest in UH of Tivoli, LLC | | | | | | | |
| **Oulan-Chikh Family Trust** | 8.00% | 21-Mar | | — | 174 | 174 | — |
| **Unified Housing Foundation, Inc. (Lakeshore Villas/HFS of Humble, LLC) (68.5% of cash flow)** | 12.00% | Dec-32 | Excess cash flow | 15,965 | 2,189 | 2,000 | — |
| **Unified Housing Foundation, Inc (2015 Advisory Fee)** | 12.00% | Dec-19 | Excess cash flow | — | 3,994 | 3,994 | — |
| **Unified Housing Foundation, Inc (2008-2014 Advisory Fee)** | 12.00% | Dec-19 | Excess cash flow | — | 6,407 | 6,407 | — |
| **Unified Housing Foundation, Inc (2017 Advisory Fee)** | 12.00% | Jun-19 | Excess cash flow | — | 5,760 | 5,760 | — |
| **Unified Housing Foundation, Inc (2018 Advisory Fee)** | 12.00% | Jun-21 | Excess cash flow | — | 5,314 | 5,314 | — |
| **Various related party notes** | various | various | Excess cash flow | — | 2,890 | 2,890 | — |
| **Various non-related party notes** | various | various | | — | 1,031 | 1,031 | — |
| | | | | | | $  78,595 | |
| | | | | Accrued interest | | 6,771 | |
| | | | | Allowance for estimated losses | | (1,825) | |
| | | | | | | $  83,541 | |

66

**SCHEDULE IV**
**(Continued)**

## TRANSCONTINENTAL REALTY INVESTORS, INC.
## MORTGAGE LOANS RECEIVABLE
### As of December 31,

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Balance at January 1, | $  70,166 | $  81,133 | $  71,376 |
| Additions | | | |

App. 2028

| | | | |
|---|---|---|---|
| New mortgage loans | | | 11,703 |
| Increase (decrease) of interest receivable on mortgage loans | 6,329 | 668 | 9,878 |
| Deductions | | | |
| Amounts received | (6,077) | (26,230) | (11,824) |
| Non-cash reduction | — | (1,827) | — |
| Balance at December 31, | $ 83,541 | $ 70,166 | $ 81,133 |

67

## ITEM 9.  *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE*

None.

## ITEM 9A.  *CONTROLS AND PROCEDURES*

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Principal Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e)) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Principal Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our Principal Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. There are inherent limitations to the effectiveness of any system of internal control over financial reporting. These limitations include the possibility of human error, the circumvention of overriding of the system and reasonable resource constraints. Because of its inherent limitations, our internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Based on management's assessments and those criteria, management has concluded that Company's internal control over financial reporting was effective as of December 31, 2018.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial report. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this annual report.

**Changes in Internal Control over Financial Reporting**

In preparation for management's report on internal control over financial reporting, we documented and tested the design and operating effectiveness of our internal control over financial reporting. There were no changes in our internal controls over financial reporting (as such term is defined in Exchange Act Rule 13a-15(f)) that occurred during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B.  *OTHER INFORMATION*

Not applicable.

App. 2029

**PART III**

**ITEM 10.** *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

**Directors**

The affairs of TCI are managed by a Board of Directors. The Directors are elected at the annual meeting of stockholders or appointed by the incumbent Board and serve until the next annual meeting of stockholders or until a successor has been elected or approved.

It is the Board's objective that a majority of the Board consists of independent directors. For a director to be considered independent, the Board must determine that the director does not have any direct or indirect material relationship with TCI. The Board has established guidelines to assist it in determining director independence which conform to, or are more exacting than, the independence requirements in the New York Stock Exchange listing rules. The independence guidelines are set forth in TCI's "Corporate Governance Guidelines". The text of this document has been posted on TCI's internet website at (www.transconrealty-invest.com) and is available in print to any shareholder who requests it. In addition to applying these guidelines, the Board will consider all relevant facts and circumstances in making an independence determination.

TCI has adopted a code of conduct that applies to all Directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Stockholders may find our code of conduct on our website by going to our website address at (www.transconrealty-invest.com). We will post any amendments to the code of conduct, as well as any waivers that are required to be disclosed by the rules of the SEC or the New York Stock Exchange on our website.

Our Board of Directors has adopted charters for our Audit, Compensation and Governance and Nominating Committees of the Board of Directors. Stockholders may find these documents on our website by going to the website address at (www.transconrealty-invest.com). You may also obtain a printed copy of the materials referred to by contacting us at the following address:

<div align="center">

Transcontinental Realty Investors, Inc.
Attn: Investor Relations
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Telephone: 469-522-4200

</div>

All members of the Audit Committee and Nominating and Corporate Governance Committees must be independent directors. Members of the Audit Committee must also satisfy additional independence requirements, which provide (i) that they may not accept, directly or indirectly, any consulting, advisory, or compensatory fee from TCI or any of its subsidiaries other than their director's compensation (other than in their capacity as a member of the Audit Committee, the Board of Directors, or any other committee of the Board), and (ii) no member of the Audit Committee may be an "affiliated person" of TCI or any of its subsidiaries, as defined by the Securities and Exchange Commission.

The current directors of TCI are listed below, together with their ages, terms of service, all positions and offices with TCI and its current advisor, Pillar, their principal occupations, business experience and directorships with other companies during the last five years or more. The designation "affiliated", when used below with respect to a director, means that the director is an officer, director or employee of Pillar, an officer of the Company, or an officer or director of a related party of the Company. The designation "independent", when used below with respect to a Director, means that the Director is neither an officer of the Company nor a director, officer or employee of Pillar (but may be a director of the Company, although the Company may have certain business or professional relationships with such Director as discussed in Item 13. Certain Relationships and Related Transactions, and Director Independence.

**HENRY A. BUTLER,** age 68, Director, Affiliated, since November 2005 and Chairman of the Board since May 2009

Mr. Butler has served as Vice President for Pillar Income Asset Management, LLC since April 2011, Mr. Butler has been a Director of the Company since November 2005 and Chairman of the Board since May 2009. He has also served as Chairman of the Board since May 2009 and as a Director since July 2003 of ARL and Chairman of the Board since May 2011 and a Director since February 2011 of IOR.

<div align="center">69</div>

**ROBERT A. JAKUSZEWSKI,** age 56, Director, Independent, since November 2005

<div align="right">App. 2030</div>

Mr. Jakuszewski is currently has served as a Territory Manager for Altesa Labs since April 2015. He was a Medical Specialist from January 2014 to April 2015 for VAYA Pharma, Inc., Senior Medical Liaison from January 2013 to July 2013 for Vein Clinics of America, and the Vice President of Sales and Marketing from September 1998 to December 2012 for New Horizons Communications, Inc. Mr. Jakuszewski has been a Director of the Company since November 2005. He has also been a Director of ARL since November 2005 and a Director of IOR since March 2004.

**TED R. MUNSELLE,** age 63, Director, Independent, since February 2004

Mr. Munselle has been Vice President and Chief Financial Officer of Landmark Nurseries, Inc. since October 1998. On February 17, 2012, he was appointed as a member of the Board of Directors for Spindletop Oil & Gas Company and as Chairman of their Audit Committee. Spindletop's stock is traded on the Over-the-Counter (OTC) market. Mr. Munselle has been a Director of the Company since February 2004. He has also served as Director of ARL since February 2004 and Director of IOR since March 2009. Mr. Munselle is qualified as an Audit Committee financial expert within the meaning of SEC regulations and the Board of Directors of IOR has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the NYSE American. Mr. Munselle is a Certified Public Accountant.

**RAYMOND D. ROBERTS, SR.,** age 87, Director, Independent, since June 2016

Mr. Roberts is currently retired. Mr. Roberts has served as Director of the Company since June 2, 2016. He has also served as Director of ARL and IOR since June 2, 2016. For more than five years prior to December 31, 2014, he was Director of Aviation of Steller Aviation, Inc., a privately held corporation engaged in the business of aircraft (Boeing 737) and logistical management.

**Board Meetings and Committees**

The Board of Directors held six meetings during 2017. For such year, no incumbent director attended fewer than 75% of the aggregate of (1) the total number of meetings held by the Board during the period for which he or she had been a director and (2) the total number of meetings held by all committees of the Board on which he or she served during the period that he served. Under TCI's Corporate Governance Guidelines, each Director is expected to dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties, including by attending meetings of the stockholders of the Company, the Board and Committees of which he is a member. The Board of Directors has standing Audit, Compensation and Governance and Nominating Committees.

*Audit Committee*. The current Audit Committee was formed on February 19, 2004, and its function is to review TCI's operating and accounting procedures. A charter of the Audit Committee has also been adopted by the Board. The charter of the Audit Committee was adopted on February 19, 2004, and is available on the Company's Investor Relations website *(www.transconrealty-invest.com)*. The Audit Committee is an "audit committee" for purposes of Section 3(a)(58) of the Securities Exchange Act of 1934. The current members of the Audit Committee, all of whom are independent within the meaning of the SEC Regulations, the listing standards of the New York Stock Exchange, Inc. and TCI's Corporate Governance Guidelines, are Messrs. Jakuszewski, Munselle (Chairman) and Roberts. Mr. Ted R. Munselle, a member of the Committee, is qualified as an Audit Committee financial expert within the meaning of SEC Regulations, and the Board has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the New York Stock Exchange, Inc. All of the members of the Audit Committee meet the experience requirements of the listing standards of the New York Stock Exchange. The Audit Committee met five times during 2017.

*Governance and Nominating Committee*. The Governance and Nominating Committee is responsible for developing and implementing policies and practices relating to corporate governance, including reviewing and monitoring implementation of TCI's Corporate Governance Guidelines. In addition, the Committee develops and reviews background information on candidates for the Board and makes recommendations to the Board regarding such candidates. The Committee also prepares and supervises the Board's annual review of director independence and the Board's performance self-evaluation. The Charter of the Governance and Nominating Committee was adopted on March 22, 2004 and is available on the Company's Investor Relations website (*www.transconrealty-invest.com*). The current members of the Committee are Messrs. Munselle and Jakuszewski (Chairman) and Roberts. The Governance and Nominating Committee met twice during 2017.

*Compensation Committee*. The Compensation Committee is responsible for overseeing the policies of the Company relating to compensation to be paid by the Company to the Company's principal executive officer and any other officers designated by the Board and make recommendations to the Board with respect to such policies, produce necessary reports and executive compensation for inclusion in the Company's Proxy Statement in accordance with applicable rules and regulations and to monitor the development and implementation of succession plans for the principal executive officers and other key executives and make recommendations to the Board with respect to such plans. The charter of the Compensation Committee was adopted on March 22, 2004, and is available on the Company's Investor Relations website (*www.transconrealty-invest.com*). The current members of the Compensation Committee are Messrs. Roberts (Chairman) and Jakuszewski and Munselle. All of the members of the Compensation Committee are independent within the meaning of the listing standards of the NYSE American and the Company's Corporate

Governance Guidelines. The Compensation Committee is to be comprised of at least two directors who are independent of Management and the Company. The Compensation Committee met twice during 2017.

The members of the Board of Directors on the date of this Report and the Committees of the Board on which they serve are identified below:

| | Audit Committee | Governance and Nominating Committee | Compensation Committee |
|---|---|---|---|
| Robert A. Jakuszewski | X | Chair | X |
| Ted R. Munselle | Chair | X | X |
| Raymond D. Roberts, Sr. | X | X | Chair |
| Henry A. Butler | | | |

## Presiding Director

In March 2004, the Board created a new position of presiding director, whose primary responsibility is to preside over periodic executive sessions of the Board in which Management directors and other members of Management do not participate. The presiding director also advises the Chairman of the Board and, as appropriate, Committee Chairs with respect to agendas and information needs relating to Board and Committee meetings, provides advice with respect to the selection of Committee Chairs and performs other duties that the Board may from time to time delegate to assist the Board in fulfillment of its responsibilities.

The day following the annual meeting of stockholders held December 12, 2018 representing all stockholders of record dated November 5, 2018, the full Board met and re-appointed Ted R. Munselle as Presiding Director, to serve in such position until the Company's next annual meeting of stockholders to be held subsequently in 2019.

## Determination of Director's Independence

In February 2004, the Board adopted its Corporate Governance Guidelines. The Guidelines adopted by the Board meet or exceed the new listing standards adopted during that year by the New York Stock Exchange. The full text of the Guidelines can be found on the Company's Investor Relations website (*www.transconrealty-invest.com*).

Pursuant to the Guidelines, the Board undertook its annual review of director independence in March, 2018 and during this review, the Board considered transactions and relationships between each director or any member of his or her immediate family and TCI and its subsidiaries and related parties, including those reported under Certain Relationships and Related Transactions below. The Board also examined transactions and relationship between directors or their related parties and members of TCI's senior management or their related parties. As provided in the Guidelines, the purpose of such review was to determine whether such relationships or transactions were inconsistent with the determination that the director is independent.

As a result of this review, the Board affirmatively determined of the then directors, Messrs. Munselle, Jakuszewski and Roberts are each independent of the Company and its Management under the standards set forth in the Corporate Governance Guidelines.

## Executive Officers

Executive officers of the Company are listed below, all of whom are employed by Pillar. Mr. Bertcher is employed by New Concept Energy, Inc "NCE". None of the executive officers receive any direct remuneration from the Company nor do any hold any options granted by the Company. Their positions with the Company are not subject to a vote of stockholders. In addition to the following executive officers, the Company has several vice presidents and assistant secretaries who are not listed herein. The ages, terms of service and all positions and offices with the Company, Pillar, other related entities, other principal occupations, business experience and directorships with other publicly-held companies during the last five years or more are set forth below. No family relationships exist among any of the executive officers or directors of the Company.

71

## DANIEL J. MOOS, 68

Mr. Moos has served as President since April 2007 and Chief Executive Officer since March 2010 of IOR, ARL and TCI. Mr. Moos has also served as Prime's President since April 2007, Secretary since June 2011 and Treasurer since October 2013. He has also served as a Director since December 2016, President since December 2010, Chief Executive Officer since March 2011 and Treasurer since October 2013 of Pillar.

## GENE S. BERTCHER, 70

Mr. Bertcher has served as Executive Vice President since May 2008, Chief Financial Officer since November 2009 and Treasurer since October 2013 of IOR, ARL and TCI. Mr. Bertcher has also served in the following capacities for New Concept Energy, Inc. "NCE", a Nevada corporation which has its common stock listed on the NYSE American: Director since June 2006, Chairman of the Board since December 2006, Chief Executive Officer since December 2006, President since November 2004, Chief Financial Officer since November 1989, Treasurer since November 1989 and Secretary since October 2012. Mr. Bertcher has been employed by NCE since November 1989. He is a Certified Public Accountant.

## LOUIS J. CORNA, 71

Mr. Corna has served as Executive Vice President, General Counsel/Tax Counsel and Secretary since February 2004 of IOR, ARL and TCI. He has also been Executive Vice President since March 2011 and Secretary since December 2010 of Pillar. Mr. Corna was also a Director and Vice President from June 2004 to December 2010 and Secretary from January 2005 to December 2010 of First Equity Properties, Inc., a Nevada corporation with securities registered under Section 12(g) of the Exchange Act.

### Code of Ethics

TCI has adopted a code of ethics entitled "Code of Business Conduct and Ethics" that applies to all directors, officers, and employees (including those of the contractual Advisor to TCI). In addition, TCI has adopted a code of ethics entitled "Code of Ethics for Senior Financial Officers" that applies to the principal executive officer, president, principal financial officer, chief financial officer, principal accounting officer, and controller. The text of these documents has been posted on TCI's internet website at *(www.transconrealty-invest.com)* and are available in print to any stockholder who requests them.

### Compliance with Section 16(a) of the Securities Exchange Act of 1934

Under the securities laws of the United States, the directors, executive officers, and any persons holding more than 10% of TCI's shares of Common stock are required to report their share ownership and any changes in that ownership to the Securities and Exchange Commission (the "Commission"). Specific due dates for these reports have been established and TCI is required to report any failure to file by these dates. All of these filing requirements were satisfied by TCI's directors, executive officers, and 10% holders during the fiscal year ending December 31, 2017. In making these statements, TCI has relied on the written representations of its incumbent directors and executive officers and its 10% holders and copies of the reports they have filed with the Commission.

### The Advisor

Pillar has been TCI's Advisor and Cash Manager since April 30, 2011. Although the Board of Directors is directly responsible for managing the affairs of TCI, and for setting the policies which guide it, the day-to-day operations of TCI are performed by Pillar, as the contractual advisor, under the supervision of the Board. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors. Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with TCI's business plan and investment policy. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees and as such, employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust.

The May Trust is a Trust, the beneficiaries of which are the children of Gene E. Phillips. Mr. Phillips is not an officer, manager or Director of Pillar, Realty Advisors, LLC, RAI, MRHI or ARL, nor is he a Trustee of the May Trust.

72

Under the Advisory Agreement, Pillar is required to annually formulate and submit, for Board approval, a budget and business plan containing a twelve-month forecast of operations and cash flow, a general plan for asset sales and purchases, lending, foreclosure and borrowing activity, and other investments. Pillar is required to report quarterly to the Board on TCI's performance against the business plan. In addition, all transactions require prior Board approval, unless they are explicitly provided for in the approved business plan or are made pursuant to authority expressly delegated to Pillar by the Board.

The Advisory Agreement also requires prior Board approval for the retention of all consultants and third party professionals, other than legal counsel. The Advisory Agreement provides that Pillar shall be deemed to be in a fiduciary relationship to the TCI stockholders; contains a broad standard governing Pillar's liability for losses incurred by TCI; and contains guidelines for Pillar's allocation of investment opportunities as among

itself, TCI, and other entities to advise. Pillar is a company of which Messrs. Woods, Bertcher, Cogut, and Crozier serve as executive officers.

The Advisory Agreement provides for Pillar to be responsible for the day-to-day operations of TCI and to receive, as compensation for basic management and advisory services, a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value (total assets less allowance for amortization, depreciation or depletion and valuation reserves).

In addition to base compensation, Pillar receives the following forms of additional compensation:

(1)  an annual net income fee equal to 7.5% of TCI's net income as an incentive for successful investment and management of the Company's assets;

(2)  an annual incentive sales fee to encourage periodic sales of appreciated real property at optimum value equal to 10.0% of the amount, if any, by which the aggregate sales consideration for all real estate sold by TCI during such fiscal year exceeds the sum of:

    (a)  the cost of each such property as originally recorded in TCI's books for tax purposes (without deduction for depreciation, amortization or reserve for losses);

    (b)  capital improvements made to such assets during the period owned; and

    (c)  all closing costs (including real estate commissions) incurred in the sale of such real estate; provided however, no incentive fee shall be paid unless (a) such real estate sold in such fiscal year, in the aggregate, has produced an 8.0% simple annual return on the net investment including capital improvements, calculated over the holding period before depreciation and inclusive of operating income and sales consideration, and (b) the aggregate net operating income from all real estate owned for each of the prior and current fiscal years shall be at least 5.0% higher in the current fiscal year than in the prior fiscal year;

(3)  an acquisition commission, from an unaffiliated party of any existing mortgage or loan, for supervising the acquisition, purchase or long-term lease of real estate equal to the lesser of:

    (a)  up to 1.0% of the cost of acquisition, inclusive of commissions, if any, paid to non-affiliated brokers; or

    (b)  the compensation customarily charged in arm's-length transactions by others rendering similar property acquisition services as an ongoing public activity in the same geographical location and for comparable property, provided that the aggregate purchase price of each property (including acquisition fees and real estate brokerage commissions) may not exceed such property's appraised value at acquisition;

(4)  a construction fee equal to 6.0% of the so-called "hard costs" only of any costs of construction on a completed basis, based upon amounts set forth as approved on any architect's certificate issued in connection with such construction, which fee is payable at such time as the applicable architect certifies other costs for payment to third parties. The phrase "hard costs" means all actual costs of construction paid to contractors, subcontractors and third parties for materials or labor performed as part of the construction but does not include items generally regarded as "soft costs," which are consulting fees, attorneys' fees, architectural fees, permit fees and fees of other professionals; and

(5)  reimbursement of certain expenses incurred by the advisor in the performance of advisory services.

73

The Advisory Agreement also provides that Pillar receive the following forms of compensation:

(1)  a mortgage or loan acquisition fee with respect to the acquisition or purchase from an unaffiliated party of any existing mortgage loan by TCI equal to the lesser of:

    (a)  1.0% of the amount of the mortgage or loan purchased; or

    (b)  a brokerage or commitment fee which is reasonable and fair under the circumstances. Such fee will not be paid in connection with the origination or funding of any mortgage loan by TCI; and

(2)  a mortgage brokerage and equity refinancing fee for obtaining loans or refinancing on properties equal to the lesser of:

App. 2034

(a) 1.0% of the amount of the loan or the amount refinanced; or

    (b) a brokerage or refinancing fee which is reasonable and fair under the circumstances; provided, however, that no such fee shall be paid on loans from Pillar, or a related party of Pillar, without the approval of TCI's Board of Directors. No fee shall be paid on loan extensions.

Under the Advisory Agreement, all or a portion of the annual advisory fee must be refunded by the Advisor if the operating expenses of TCI (as defined in the Advisory Agreement) exceed certain limits specified in the Advisory Agreement based on the book value, net asset value and net income of TCI during the fiscal year.

The Advisory Agreement requires Pillar to pay to TCI, one-half of any compensation received from third parties with respect to the origination, placement or brokerage of any loan made by TCI; provided, however, that the compensation retained by Pillar, or any affiliate of Pillar, shall not exceed the lesser of (1) 2.0% of the amount of the loan commitment or (2) a loan brokerage and commitment fee which is reasonable and fair under the circumstances.

The TCI Advisory Agreement further provides that Pillar shall bear the cost of certain expenses of its employees, excluding fees paid to TCI's Directors; rent and other office expenses of both Pillar and TCI (unless TCI maintains office space separate from that of Pillar); costs not directly identifiable to TCI's assets, liabilities, operations, business or financial affairs; and miscellaneous administrative expenses relating to the performance by Pillar of its duties under the Advisory Agreement.

If and to the extent that TCI shall request Pillar, or any director, officer, partner, or employee of Pillar, to render services for TCI other than those required to be rendered by the Advisory Agreement, Pillar separately would be compensated for such additional services on terms to be agreed upon between such party and TCI from time to time. As discussed below, under "Property Management and Real Estate Brokerage," effective January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties and provides brokerage services under similar terms as the previous agreements with Triad and Regis Realty I.

TCI entered into a Cash Management Agreement with Pillar on April 30, 2011 to further define the administration of the Company's day-to-day investment operations, relationship contacts, flow of funds and deposit and borrowing of funds. Under the Cash Management Agreement, all funds of the Company are delivered to Pillar which has a deposit liability to the Company and is responsible for payment of all payables and investment of all excess funds which earn interest at the Wall Street Journal prime rate plus 1.0% per annum, as set quarterly on the first day of each calendar quarter. Borrowings for the benefit of the Company bear the same interest rate. The term of the Cash Management Agreement is coterminous with the Advisory Agreement, and is automatically renewed each year unless terminated with the Advisory Agreement. TCI's management believes that the terms of the Advisory Agreement are at least as fair as could be obtained from unaffiliated third parties.

Situations may develop in which the interests of TCI are in conflict with those of one or more directors or officers in their individual capacities, or of Pillar, or of their respective related parties. In addition to services performed for TCI, as described above, Pillar actively provides similar services as agent for, and advisor to, other real estate enterprises, including persons and entities involved in real estate development and financing, including ARL and IOR. The Advisory Agreement provides that Pillar may also serve as advisor to other entities.

As advisor, Pillar is a fiduciary of TCI's public investors. In determining to which entity a particular investment opportunity will be allocated, Pillar will consider the respective investment objectives of each entity and the appropriateness of a particular investment in light of each such entity's existing mortgage note and real estate portfolios and business plan. To the extent any particular investment opportunity is appropriate to more than one such entity, such investment opportunity will be allocated to the entity that has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among various entities. Refer to Part III, Item 13 "Certain Relationships and Related Transactions, and Director Independence".

<div align="center">74</div>

Pillar may assign the Advisory Agreement only with the prior consent of TCI.

The principal executive officers and directors of Pillar are set forth below:

| Name | Directors/Officer(s) |
|------|----------------------|
| Daniel J. Moos | President, Chief Executive Officer, Treasurer, Director |
| Gene S. Bertcher | Executive Vice President, Chief Accounting Officer |
| Louis J. Corna | Executive Vice President, Secretary, Tax Counsel, General Legal Counsel |

**Property Management**

Since January 1, 2012, Regis Realty Prime, LLC, d/b/a Regis Property Management, LLC ("Regis"), the sole member of Pillar Realty Advisors, LLC, manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

TCI engages third-party companies to lease and manage our apartment properties for a fee of 6.0% or less of the monthly gross rents collected on the residential properties under their management.

**Real Estate Brokerage**

Regis provides real estate brokerage services to TCI on a non-exclusive basis, and is entitled to receive a real estate commission for property purchases and sales in accordance with the following sliding scale of total fees to be paid:

(1)  maximum fee of 4.5% on the first $2.0 million of any purchase or sale transaction of which no more than 3.5% is to be paid to Regis;

(2)  maximum fee of 3.5% on transaction amounts between $2.0 million-$5.0 million of which no more than 3.0% is to be paid to Regis;

(3)  maximum fee of 2.5% on transaction amounts between $5.0 million-$10.0 million of which no more than 2.0% is to be paid to Regis; and

(4)  maximum fee of 2.0% on transaction amounts in excess of $10.0 million of which no more than 1.5% is to be paid to Regis.

**ITEM 11.    *EXECUTIVE COMPENSATION***

TCI has no employees, payroll or benefit plans and pays no compensation to its executive officers. The executive officers of TCI, who are also officers or employees of Pillar, TCI's advisor, are compensated by Pillar. Such executive officers perform a variety of services for Pillar and the amount of their compensation is determined solely by Pillar. Pillar does not allocate the cash compensation of its officers among the various entities for which it serves as advisor. Refer to Item 10. "Directors, Executive Officers and Corporate Governance" for a more detailed discussion of the compensation payable to Pillar by TCI.

The only remuneration paid by TCI is to the directors who are not officers or employees of Pillar or its related companies. The Independent Directors (1) review the business plan of TCI to determine that it is in the best interest of TCI's stockholders, (2) review the advisory contract, (3) supervise the performance of the advisor and review the reasonableness of the compensation paid to the advisor in terms of the nature and quality of services performed, (4) review the reasonableness of the total fees and expenses of TCI and (5) select, when necessary, a qualified independent real estate appraiser to appraise properties acquired.

Effective February, 2011, each non-affiliated Director is entitled to receive an annual retainer of $12,000, with the Chairman of the Audit Committee to receive a one-time annual fee of $500. Directors who are also employees of the Company or its advisor receive no additional compensation for service as a Director.

During 2017, $36,500 was paid to non-employee Directors in total Directors' fees. The fees paid to the directors are as follows: Robert A. Jakuszewski, $12,000; Ted R. Munselle, $12,500; and, Raymond D. Roberts, Sr., $12,000.

**Director's Stock Option Plan**

TCI established a Director's Stock Option Plan ("Director's Plan") for the purpose of attracting and retaining Directors who are not officers or employees of TCI or Pillar. The Director's Plan provides for the grant of options that are exercisable at fair market value of TCI's Common stock on the date of grant. The Director's Plan was approved by stockholders at their annual meeting on October 10, 2000, following which each then-serving Independent Director was granted options to purchase 5,000 shares of Common stock of TCI. On January 1 of each year, each Independent Director receives options to purchase 5,000 shares of Common stock. The options are immediately exercisable and expire on the earlier of the first anniversary of the date on which a Director ceases to be a Director or 10 years from the date of grant. The Director's Plan was terminated by the Board of Directors on December 15, 2005. As of December 31, 2015, there were 5,000 shares of stock options outstanding which were exercisable at $14.25 per share.  These options expired unexercised January 1, 2016.

**ITEM 12.    *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT***

**Security Ownership of Certain Beneficial Owners**

The following table sets forth the ownership of TCI's Common stock, both beneficially and of record, both individually and in the aggregate, for those persons or entities known to be beneficial owners of more than 5.0% of the outstanding shares of Common stock as of the close of business on March 31, 2019.

| | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** |
|---|---|---|
| American Realty Investors, Inc.[1][2]<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 6,767,418 | 77.63% |
| Transcontinental Realty Acquisition Corporation[2]<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 1,383,226 | 15.87% |
| Realty Advisors, LLC [3]<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 608,984 | 6.98% |

76

---

\* "Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\* Percentage is based upon 8,717,767 shares of Common stock outstanding at March 31, 2019.

[1] Includes 5,384,192 shares (61.76%) directly owned by American Realty Investors, Inc. "ARL" directly, over which the directors al ARL may be deemed to be beneficial owners by virtue of their positions as directors of ARL. The directors of ARL disclaim beneficial ownership of such shares.

[2] Includes 1,383,226 shares owned by Transcontinental Realty Acquisition Corporation ("TRAC"), which is a wholly owned subsidiary of ARL, over which each of the directors of TRAC, Daniel J. Moos and Gene S. Bertcher may be deemed to be beneficial owners by virtue of their positions as directors of TRAC. The directors of TRAC disclaim beneficial ownership of such shares.

[3] Includes 336,000 shares owned by RAI and 272,984 shares owned by AEI, over which the executive officers of RAI may be deemed to be the beneficial owners by virtue of their positions. The executive officers of RAI disclaim beneficial ownership of such shares.

**Security Ownership of Management.**

The following table sets forth the ownership of TCI's Common stock, both beneficially and of record, both individually and in the aggregate, for the directors and executive officers of TCI as of the close of business on March 31, 2019.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** |
|---|---|---|
| Gene S. Bertcher | 7,375,402[1][3] | 84.60% |
| Henry A. Butler | 6,767,418[1] | 77.63% |
| Louis J. Corna | 7,375,402[1][3] | 84.60% |
| Robert A. Jakuszewski | 6,767,418[1] | 77.63% |
| Daniel J. Moos | 7,665,402[1][2][3] | 87.92% |
| Ted R. Munselle | 6,767,418[1] | 77.63% |
| Raymond D. Roberts, Sr. | 6,767,418[1] | 77.63% |
| All Directors and Executive Officers as a group (7 individuals) | 7,665,402[1][2][3] | 87.92% |

---

\* Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\* Percentages are based upon 8,717,767 shares of Common Stock outstanding at March 31, 2019.

(1) Includes 5,583,142 shares owned by ARL and 1,888,226 shares owned by RAI, over which the executive officers and members of the Board of Directors of ARL may be deemed to be the beneficial owners by virtue of their positions as executive officers and members of the Board of Directors of ARL. The executive officers and current members of the Board of Directors of ARL disclaim beneficial ownership of such shares.

(2) Daniel J. Moos owns 295,000 shares of Common Stock and is the President and Chief Executive Officer of ARL, the Company, RAI and MRHI.

(3) Includes 336,000 shares owned by RAI and 272,984 shares owned by AEI, over which the executive officers of RAI may be deemed to be the beneficial owners by virtue of their positions. The executive officers of RAI disclaim beneficial ownership of such shares.

<div align="center">77</div>

## ITEM 13.   *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE*

### Policies with Respect to Certain Activities

Article 14 of TCI's Articles of Incorporation provides that TCI shall not, directly or indirectly, contract or engage in any transaction with (1) any director, officer or employee of TCI, (2) any director, officer or employee of the advisor, (3) the advisor, or (4) any affiliate or associate (as such terms are defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended) of any of the aforementioned persons, unless (a) the material facts as to the relationship among or financial interest of the relevant individuals or persons and as to the contract or transaction are disclosed to or are known by TCI's Board of Directors or the appropriate committee thereof and (b) TCI's Board of Directors or committee thereof determines that such contract or transaction is fair to TCI and simultaneously authorizes or ratifies such contract or transaction by the affirmative vote of a majority of independent directors of TCI entitled to vote thereon.

Article 14 defines an "Independent Director" (for purposes of that Article) as one who is neither an officer or employee of TCI, nor a director, officer or employee of TCI's advisor.

TCI's policy is to have such contracts or transactions approved or ratified by a majority of the disinterested Directors with full knowledge of the character of such transactions, as being fair and reasonable to the stockholders at the time of such approval or ratification under the circumstances then prevailing. Such Directors also consider the fairness of such transactions to TCI. Management believes that, to date, such transactions have represented the best investments available at the time and they were at least as advantageous to TCI as other investments that could have been obtained.

TCI may enter into future transactions with entities, the officers, directors, or stockholders of which are also officers, directors, or stockholders of TCI, if such transactions would be beneficial to the operations of TCI and consistent with TCI's then-current investment objectives and policies, subject to approval by a majority of disinterested Directors as discussed above.

TCI does not prohibit its officers, directors, stockholders, or related parties from engaging in business activities of the types conducted by TCI.

### Certain Business Relationships

Pillar has been TCI's Advisor and Cash Manager since April 30, 2011.  Although the Board of Directors is directly responsible for managing the affairs of TCI, and for setting the policies which guide it, the day-to-day operations of TCI are performed by Pillar, as the contractual advisor, under the supervision of the Board.  Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors. Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with TCI's business plan and investment policy. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees and as such, employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust.

All of TCI's directors also serve as Directors of ARL and IOR. The executive officers of TCI also serve as executive officers of ARL and IOR. As such, they owe fiduciary duties to that entity as well as to Pillar under applicable law. ARL has the same relationship with Pillar, as does TCI. Mr. Bertcher is an officer, director and employee of NCE and as such also owes fiduciary duties to NCE as well as ARL, TCI and IOR under applicable law. Daniel J. Moos is the sole Manager and Class B 2% income Member of Victory Abode Apartments LLC, and owes fiduciary duties to VAA as well as ARL, TCI and IOR.

Effective since January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it

<div align="right">App. 2038</div>

manages, and leasing commissions of 6.0% or less in accordance with the terms of its property asset management agreement.

At December 31, 2018, TCI owned approximately 81.12% of the outstanding common shares of IOR.

---

78

---

The Company is part of a tax sharing and compensating agreement with respect to federal income taxes among ARL, TCI and IOR and their subsidiaries. That agreement continued until August 31, 2012, at which time a new tax sharing and compensating agreement was entered into by ARL, TCI, IOR and MRHI for the remainder of 2012 and subsequent years. The expense (benefit) in each year was calculated based on the amount of losses absorbed by taxable income multiplied by the maximum statutory tax rate of 21%.

The Company has a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

**Related Party Transactions**

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interest of our company.

According to the VAA Joint Venture Agreement, Southern and TCI are expected to receive approximately $14 million ($6 million and $8 million, respectively) for the cash balances remaining in the transferred properties as of the date of the transaction. The balance was determined and agreed upon by the partners in the joint venture, and based on the estimated bank balances on the day of closing. Additionally, VAA did not purchase the accounts receivable or the utilities' and other deposits. These items as well as the reconciliation of the expense pro-rations will result in additional adjustments being required, subject to the consent of both parties. On February 6, 2019, Abode JVP, LLC, a fully owned subsidiary of Southern, received $7.4 million related to the cash credit and transferred it to TCI. Per the agreement, the true up pro-rations are required to be completed by May 18, 2019.

In 2018, the Company paid advisory fees of $10.7 million, net income fees of $0.6 million, mortgage brokerage and equity refinancing fees of $2.9 million, and cost reimbursements of $4.4 million.

The Company paid property management fees, construction management fees and leasing commissions of $0.5 million to Regis in 2018.

As of December 31, 2018, the Company had notes and interest receivables, net of allowances, of $49.0 million and $5.7 million, respectively, due from related parties. Refer to Part 2, Item 8. Note 5. "Notes and Interest Receivable". During the current period, the Company recognized interest income of $5.7 million, originated $5.3 million, received no principal payments, and received interest payments of $6.1 million from these related party notes receivables.

The Company is the primary guarantor on a $39.1 million mezzanine loan between UHF and a lender. In addition, TCI, ARL, and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2018 UHF was in compliance with the covenants to the loan agreement.

As of December 31, 2018, the Company had 86 acres of land, at various locations that were sold to related parties in multiple transactions. These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets. Due to the related party nature of the transactions TCI has deferred the recording of the sales in accordance with ASC 360-20.

**Operating Relationships**

The Company received rental revenue of $1.2 million, $0.8 million, and $0.7 million in the years ended December 31, 2018, 2017, and 2016, respectively, from Pillar and its related parties for properties owned by the Company.

**Advances and Loans**

From time to time, TCI and its related parties have made advances to each other, which generally have not had specific repayment terms, did not bear interest, are unsecured, and have been reflected in TCI's financial statements as other assets or other liabilities. TCI and the advisor charge interest on the outstanding balance of funds advanced to or from TCI. The interest rate, set at the beginning of each quarter, is the prime rate plus 1.0% on the average daily cash balances advanced. At December 31, 2018, TCI has a receivable from ARL in the amount of $118.9 million.

## ITEM 14.    *PRINCIPAL ACCOUNTING FEES AND SERVICES*

The following table sets for the aggregate fees for professional services rendered to or for TCI for the years 2018 and 2017 by TCI's principal accounting firms, Farmer, Fuqua and Huff, L.P. and Swalm and Associates, P.C.:

| Type of Fee | 2018 | | 2017 | |
| | Farmer, Fuqua & Huff | Swalm & Associates | Farmer, Fuqua & Huff | Swalm & Associates |
| --- | --- | --- | --- | --- |
| Audit Fees | $    551,996 | $    72,210(1) | $    597,447 | $    72,136(1) |
| Tax Fees | 38,304 | — | 39,760 | — |
| Total | $    590,300 | $    72,210 | $    637,207 | $    72,136 |

(1)   All IOT

The audit fees for 2018 and 2017 were for professional services rendered for the audits and reviews of the consolidated financial statements of TCI and its subsidiaries. Tax fees for 2017 and 2016 were for services related to federal and state tax compliance and advice.

All services rendered by the principal auditors are permissible under applicable laws and regulations and were pre-approved by either the Board of Directors or the Audit Committee, as required by law. The fees paid to the principal auditors for the services described in the above table fall under the categories listed below:

*Audit Fees.*    These are fees for professional services performed by the principal auditor for the audit of the Company's annual financial statements and review of financial statements included in the Company's 10-Q filings and services that are normally provided in connection with statutory and regulatory filing or engagement.

*Audit-Related Fees.*    These are fees for assurance and related services performed by the principal auditor that are reasonably related to the performance of the audit or review of the Company's financial statements. These services include attestations by the principal auditor that are not required by statute or regulation and consulting on financial accounting/reporting standards. As of December 31, 2018 the Company incurred $0.6 million of audit related fees in connection to assurance and related services of subsidiary.

*Tax Fees.*    These are fees for professional services performed by the principal auditor with respect to tax compliance, tax planning, tax consultation, returns preparation and review of returns. The review of tax returns includes the Company and its consolidated subsidiaries.

*All Other Fees.*    These are fees for other permissible work performed by the principal auditor that do not meet the above category descriptions.

These services are actively monitored (as to both spending level and work content) by the Audit Committee to maintain the appropriate objectivity and independence in the principal auditor's core work, which is the audit of the Company's consolidated financial statements.

The Audit Committee has established policies and procedures for the approval and pre-approval of audit services and permitted non-audit services. The Audit Committee has the responsibility to engage and terminate TCI's independent auditors, to pre-approve their performance of audit services and permitted non-audit services, to approve all audit and non-audit fees, and to set guidelines for permitted non-audit services and fees. All fees for 2018 and 2017 were pre-approved by the Audit Committee or were within the pre-approved guidelines for permitted non-audit services and fees established by the Audit Committee, and there were no instances of waiver of approved requirements or guidelines during the same periods.

Under the Sarbanes-Oxley Act of 2002 (the "SOX Act"), and the rules of the Securities and Exchange Commission (the "SEC"), the Audit Committee of the Board of Directors is responsible for the appointment, compensation and oversight of the work of the independent auditor. The purpose of the provisions of the SOX Act and the SEC rules for the Audit Committee role in retaining the independent auditor is two-fold. First, the authority and responsibility for the appointment, compensation and oversight of the auditors should be with directors who are independent of management. Second, any non-audit work performed by the auditors should be reviewed and approved by these same independent directors to ensure that any non-audit services performed by the auditor do not impair the independence of the independent auditor. To implement the provisions of the SOX Act, the SEC issued rules specifying the types of services that an independent may not provide to its audit client, and governing the Audit Committee's administration of the engagement of the independent auditor. As part of this responsibility, the Audit Committee

is required to pre-approve the audit and non-audit services performed by the independent auditor in order to assure that they do not impair the auditor's independence. Accordingly, the Audit Committee has adopted a pre-approval policy of audit and non-audit services (the "Policy"), which sets forth the procedures and conditions pursuant to which services to be performed by the independent auditor are to be pre-approved. Consistent with the SEC rules establishing two different approaches to pre-approving non-prohibited services, the Policy of the Audit Committee covers Pre-approval of audit services, audit-related services, international administration tax services, non-U.S. income tax compliance services, pension and benefit plan consulting and compliance services, and U.S. tax compliance and planning. At the beginning of each fiscal year, the Audit Committee will evaluate other known potential engagements of the independent auditor, including the scope of work proposed to be performed and the proposed fees, and will approve or reject each service, taking into account whether services are permissible under applicable law and the possible impact of each non-audit service on the independent auditor's independence from management. Typically, in addition to the generally pre-approved services, other services would include due diligence for an acquisition that may or may not have been known at the beginning of the year. The Audit Committee has also delegated to any member of the Audit Committee designated by the Board or the financial expert member of the Audit Committee responsibilities to pre-approve services to be performed by the independent auditor not exceeding $25,000 in value or cost per engagement of audit and non-audit services, and such authority may only be exercised when the Audit Committee is not in session.

<center>81</center>

## PART IV

### ITEM 15. *EXHIBITS, FINANCIAL STATEMENT SCHEDULES*

(a) The following documents are filed as part of this Report:

1. *Financial Statements*

Reports of Independent Registered Public Accounting Firms
Consolidated Balance Sheets—December 31, 2018 and 2017
Consolidated Statements of Operations—Years Ended December 31, 2018, 2017, and 2016
Consolidated Statements of Stockholders' Equity—Years Ended December 31, 2018, 2017, and 2016
Consolidated Statements of Cash Flows—Years Ended December 31, 2018, 2017, and 2016
Statements of Consolidated Comprehensive Income (Loss) – Years Ended December 31, 2018, 2017, and 2016
Notes to Financial Statements

2. *Financial Statement Schedules*

Schedule III—Real Estate and Accumulated Depreciation
Schedule IV—Mortgage Loan Receivables on Real Estate

All other schedules are omitted because they are not applicable or because the required information is shown in the Consolidated Financial Statements or the Notes thereto.

3. *Incorporated Financial Statements*

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. (incorporated by reference to Item 8 of Income Opportunity Realty Investors, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2018.

Consolidated Financial Statements of American Realty Investors, Inc. (incorporated by reference to Item 8 of American Realty Investors, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2018).

(b) *Exhibits*

The following documents are filed as Exhibits to this Report:

| Exhibit Number | Description |
| --- | --- |
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated |

by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000).

3.3 Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998).

3.4 Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000).

3.5 Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001).

3.6 Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001).

3.7 By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991).

3.8 Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof.

82

| Exhibit Number | Description |
|---|---|
| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14.0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.0* | Subsidiaries of the Registrant. |
| 31.1* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Executive Officer. |
| 31.2* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Financial and Accounting Officer. |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

---

* Filed herewith.

83

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TRANSCONTINENTAL REALTY INVESTORS, INC.

Dated: March 31, 2019                                   By: /s/ GENE S BERTCHER

**Gene S. Bertcher**
**Executive Vice President and Chief Financial Officer**
**(Principal Financial and Accounting Officer)**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|

App. 2042

| /s/ HENRY A. BUTLER | Chairman of the Board and Director | March 31 , 2019 |
| --- | --- | --- |

**Henry A. Butler**

| /s/ RAYMOND D. ROBERTS, SR. | Director | March 31 , 2019 |
| --- | --- | --- |

**Raymond D. Roberts, Sr.**

| /s/ ROBERT A. JAKUSZEWSKI | Director | March 31 , 2019 |
| --- | --- | --- |

**Robert A. Jakuszewski**

| /s/ TED R. MUNSELLE | Director | March 31 , 2019 |
| --- | --- | --- |

**Ted R. Munselle**

| /s/ DANIEL J. MOOS | President and Chief Executive Officer (Principal Executive Officer) | March 31 , 2019 |
| --- | --- | --- |

**Daniel J. Moos**

| /s/ GENE S. BERTCHER | Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | March 31 , 2019 |
| --- | --- | --- |

**Gene S. Bertcher**

84

**ANNUAL REPORT ON FORM 10-K**
**EXHIBIT INDEX**
**For the Year Ended December 31, 2018**

| Exhibit Number | Description |
| --- | --- |
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.3 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998). |
| 3.4 | Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.5 | Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| 3.6 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001). |
| 3.7 | By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.8 | Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof.) |

App. 2043

| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14.0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.1* | Subsidiaries of the Registrant. |
| 31.1* | Certification Pursuant to Rule 13a-14(a) and 15d-14 under the Securities Exchange Act of 1934, as amended of Principal Executive Officer. |
| 31.2* | Certification Pursuant to Rule 13a-14(a) and 15d-14 under the Securities Exchange Act of 1934, as amended of Principal Financial and Accounting Officer |
| 32.1* | Certification pursuant to 18 U.S.C. Section 1350. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

---

\*    Filed herewith.

85

App. 2044

# EXHIBIT J-47

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2017

OR

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number 001-09240

---

# Transcontinental Realty Investors, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Nevada** | **94-6565852** |
| **(State or other jurisdiction of** | **(IRS Employer** |
| **Incorporation or organization)** | **Identification Number)** |
| **1603 LBJ Freeway,** | |
| **Suite 300, Dallas, Texas** | **75234** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(469) 522-4200**
**Registrant's Telephone Number, including area code**
**Securities registered pursuant to Section 12(b) of the Act:**

| *Title of Each Class* | *Name of each exchange on which registered* |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes        No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes        No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes        No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes        No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act

| | |
|---|---|
| **Large accelerated filer** | **Accelerated filer** |
| **Non-accelerated filer**        **(Do not check  if smaller reporting company)** | **Smaller Reporting Company** |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.) Yes      No

The aggregate market value of the shares of voting and non-voting common equity held by non-affiliates of the Registrant, computed by reference to the closing price at which the common equity was last sold which was the sales price of the Common stock on the New York Stock Exchange as of December 31, 2017 (the last business day of the Registrant's most recently completed second fiscal quarter) was $13,555,912 based upon a total of 1,361,049 shares held as of December 31, 2017 by persons believed to be non-affiliates of the Registrant. The basis of the calculation does not constitute a determination by the Registrant as defined in Rule 405 of the Securities Act of 1933, as amended, such calculation, if made as of a date within sixty days of this filing, would yield a different value.

As of March 30, 2018, there were 8,717,767 shares of common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE:

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. Commission File No. 001-14784
Consolidated Financial Statements of American Realty Investors, Inc. Commission File No. 001-15663

App. 2046

**INDEX TO**
**ANNUAL REPORT ON FORM 10-K**

| | | **Page** |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 13 |
| Item 2. | Properties | 14 |
| Item 3. | Legal Proceedings | 16 |
| Item 4. | Mine Safety Disclosures | 16 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 17 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operation | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 28 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 30 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 62 |
| Item 9A. | Controls and Procedures | 62 |
| Item 9B. | Other Information | 62 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 63 |
| Item 11. | Executive Compensation | 69 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 69 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 70 |
| Item 14. | Principal Accounting Fees and Services | 72 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 73 |
| Signatures | | 75 |

2

---

**FORWARD-LOOKING STATEMENTS**

**Certain Statements in this Form 10-K are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. The words "estimate", "plan", "intend", "expect", "anticipate", "believe", and similar expressions are intended to identify forward-looking statements. The forward-looking statements are found at various places throughout this Report and in the documents incorporated herein by reference. The Company disclaims any intention or obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Although we believe that our expectations are based upon reasonable assumptions, we can give no assurance that our goals will be achieved. Important factors that could cause our actual results to differ from estimates or projections contained in any forward-looking statements are described under Part I, Item 1A. "Risk Factors".**

PART I

ITEM 1.   *BUSINESS*

**General**

As used herein, the terms "TCI", "the Company", "We", "Our", or "Us" refer to Transcontinental Realty Investors, Inc. a Nevada corporation which was formed in 1984. The Company is headquartered in Dallas, Texas and its common stock is listed and trades on the New York Stock Exchange ("NYSE") under the symbol "TCI".

TCI is a "C" corporation for U.S. federal income tax purposes and files an annual consolidated income tax return with American Realty Investors, Inc. ("ARL"), whose common stock is traded on the NYSE under the symbol "ARL". Subsidiaries and affiliates of ARL own in excess of 80% of the Company's common stock. ARL and one of its subsidiaries own 77.63% and the parent of ARL owns 3.49% of the company. Accordingly, TCI's financial results are consolidated with those of ARL's on Form 10-K and related Consolidated Financial Statements. ARL's common stock is listed and trades on the New York Stock Exchange under the symbol "ARL". We have no employees.

On July 17, 2009, the Company acquired an additional 2,518,934 shares of common stock of Income Opportunity Realty Investors, Inc. ("IOR"), and in doing so, increased its ownership from approximately 25% to over 80% of the shares of common stock of IOR outstanding. Upon acquisition of the additional shares in 2009, IOR's results of operations began to be consolidated with those of the Company for tax and financial reporting purposes. As of December 31, 2017, TCI owned 81.25% of the outstanding IOR common shares. Shares of IOR common stock are listed and traded on the NYSE American under the symbol "IOR".

At the time of the acquisition, the historical accounting value of IOR's assets was $112 million and liabilities were $43 million. In that the shares of IOR acquired by TCI were from a related party, the values recorded by TCI are IOR's historical accounting values at the date of transfer. The Company's fair valuation of IOR's assets and liabilities at the acquisition date approximated IOR's book value. The net difference between the purchase price and historical accounting basis of the assets and liabilities acquired is $25.6 million and has been reflected by TCI as deferred income. The deferred income will be recognized upon the sale of the land that IOR held on its books as of the date of sale, to an independent third party.

TCI's Board of Directors are responsible for directing the overall affairs of TCI and for setting the strategic policies that guide the Company. As of April 30, 2011, the Board of Directors delegated the day-to-day management of the Company to Pillar Income Asset Management, Inc. ("Pillar"), a Nevada corporation, under a written Advisory Agreement that is reviewed annually by TCI's Board of Directors. The directors of TCI are also directors of ARL and IOR. The Chairman of the Board of Directors of TCI also serves as the Chairman of the Board of Directors of ARL and IOR. The officers of TCI also serve as officers of ARL, IOR and Pillar.

App. 2047

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, Inc., a Nevada limited liability company, the sole member of which is Realty Advisors, LLC, a Nevada corporation, the sole shareholder of which is May Realty Holdings, Inc. ("MRHI", formerly known as Realty Advisors Management, Inc.), effective August 7, 2014), a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARI and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), manages our commercial properties and provides brokerage services. Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. See Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage". TCI engages third-party companies to lease and manage its apartment properties.

Southern Properties Capital Ltd. ("Southern") is a wholly owned subsidiary of TCI that was incorporated on August 16, 2016 for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange. Southern operates in the United States and is primarily involved in investing in, developing, constructing and operating income-producing properties of multi-family residential real estate assets. Southern is included in the consolidated financial statements of TCI.

On January 1, 2012, the Company entered into a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

<div align="center">3</div>

Our primary business is the acquisition, development and ownership of income-producing residential and commercial real estate properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time and when we believe it appropriate to do so, we will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents, and leasing office, industrial and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate revenues from gains on sales of income-producing properties and land.

At December 31, 2017, our income-producing properties consisted of:

- Seven commercial properties consisting of five office buildings and two retail properties comprising in aggregate of approximately 1.7 million square feet;

- A golf course comprising approximately 96.09 acres; and

- Fifty-one residential apartment communities comprising 8,427 units, excluding apartments being developed.

The following table sets forth the location of our real estate held for investment (income-producing properties only) by asset type as of December 31, 2017:

| | Apartments | | Commercial | |
|---|---|---|---|---|
| Location | No. | Units | No. | SF |
| Alabama | 1 | 168 | | |
| Arkansas | 5 | 938 | | |
| Colorado | 2 | 260 | | |
| Florida | 3 | 198 | 1 | 6,722 |
| Georgia | 1 | 222 | | |
| Louisiana | 2 | 384 | | |
| Mississippi | 9 | 924 | | |
| North Carolina | 1 | 201 | | |
| Tennessee | 4 | 708 | | |
| Texas-Greater Dallas-Ft Worth | 11 | 1,962 | 4 | 1,473,634 |
| Texas-Greater Houston | 2 | 416 | 1 | 95,329 |
| Texas-San Antonio | 2 | 468 | | |
| Texas-Other | 8 | 1.578 | | |
| Wisconsin | | | 1 | 122,205 |
| **Total** | **51** | **8,427** | **7** | **1,697,890** |

We finance our acquisitions primarily through operating cash flow, proceeds from the sale of land and income-producing properties, and debt financing primarily in the form of property-specific, first-lien mortgage loans from commercial banks and institutional lenders. We finance our development projects principally with short-term, variable-rate construction loans that are refinanced with the proceeds of long-term, fixed-rate amortizing mortgages when the development has been completed and occupancy has been stabilized. When we sell properties, we may carry a portion of the sales price generally in the form of a short-term, interest bearing seller-financed note receivable, secured by the property being sold. We may also from time to time enter into partnerships or joint ventures with various investors to acquire land or income-producing properties or to sell interests in some of our properties.

We join with third-party development companies to construct residential apartment communities. At December 31, 2017, we had fourteen apartment projects in development. The third-party developer typically holds a general partner, as well as a limited partner interest in a limited partnership formed for the purpose of building a single property while we generally take a limited partner interest in the limited partnership. We may contribute land to the partnership as part of our equity contribution or we may contribute the necessary funds to the partnership to acquire the land. We are required to fund all required equity contributions while the third-party developer is responsible for obtaining construction financing, hiring a general contractor and for the overall management, successful completion, initial lease-up and delivery of the project. We generally bear all the economic risks and rewards of ownership in these partnerships and therefore include these partnerships in our consolidated financial statements. The third-party developer is paid a developer fee typically equal to a percentage of the construction costs. When the project reaches stabilized occupancy, we acquire the third-party developer's partnership interests in exchange for any remaining unpaid developer fees.

<div align="center">4</div>

At December 31, 2017, our apartment projects in development included (dollars in thousands):

| Property | Location | No. of Units | Costs to Date [1] | Total Projected Costs [1] |
|---|---|---|---|---|

| Terra Lago | Rowlett, TX | 347 | $ | 7,530 | $ | 40,695 |
|---|---|---|---|---|---|---|
| Parc at Bentonville | Bentonville, AR | 216 | $ | 85 | $ | 27,710 |
| Lakeside Lofts | Farmers Branch, TX | 494 | $ | 5,079 | $ | 78,550 |
| Eagle Crossing | Dallas, TX | 153 | $ | 81 | $ | 20,670 |
| Parc at Garland | Garland, TX | 198 | $ | 81 | $ | 26,007 |
| Parc at Wylie | Wylie, TX | 198 | $ | 195 | $ | 28,212 |
| Apalache Point | Tallahassee, FL | 200 | $ | 149 | $ | 30,251 |
| Overlook at Allensville Square Phase II | Sevierville, TN | 144 | $ | 525 | $ | 20,244 |
| McKinney Point | McKinney, TX | 198 | $ | 137 | $ | 29,846 |
| Dominion at Mercer Crossing | Farmers Branch, TX | 256 | $ | 2,995 | $ | 46,115 |
| Abode Red Rock Properties | Las Vegas, NV | 308 | $ | 28,095 | $ | 58,880 |
| Oak Hollow Phase II | Seguin, TX | 96 | $ | 5,535 | $ | 10,723 |
| Sawgrass Phase II | New Point Richey, FL | 80 | $ | 3,772 | $ | 20,719 |
| Forest Pines | Bryan, TX | 240 | $ | 269 | $ | 31,535 |
| Total | | 3,228 | $ | 89,134 | $ | 495,837 |

(1) Costs include construction hard costs, construction soft costs and loan borrowing costs.

We have made investments in a number of large tracts of undeveloped and partially developed land and intend to continue to improve these tracts of land for our own development purposes or make the improvements necessary to ready the land for sale to other developers.

At December 31, 2017, our investments in undeveloped and partially developed land consisted of the following (dollars in thousands):

| Location | Date(s) Acquired | Acres | | Cost | Primary Intended Use |
|---|---|---|---|---|---|
| McKinney, TX | 1997-2008 | 10 | $ | 777 | Mixed use |
| Dallas, TX | 1996-2013 | 94 | $ | 15,765 | Mixed use |
| Farmers Branch, TX | 2008-2016 | 269 | $ | 43,519 | Mixed use |
| Kaufman County, TX | 2011 | 2,849 | $ | 43,809 | Mixed use |
| Various | 1990-2008 | 244 | $ | 10,669 | Various |
| **Total Land Holdings** | | **3,466** | | **114,539** | |

5

**Significant Real Estate Acquisitions/Dispositions and Financings**

A summary of some of the significant transactions for the year ended December 31, 2017, are discussed below:

*Purchases*

During the year ended December 31, 2017, the Company acquired one income-producing apartment property from a third party in the state of North Carolina, increasing the total number of units by 201, for a combined purchase price of $36.7 million. In addition, we acquired one land parcel for future development for a total purchase price of $5.4 million, adding 18.5 acres to the development portfolio.

*Sales*

As of December 31, 2017, the Company has approximately 66.7 acres of land, at various locations that were sold to related parties in multiple transactions. These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets. Due to the related party nature of the transactions, TCI has deferred the recording of the sales in accordance with ASC 360-20.

We continue to invest in the development of apartment projects. During the year ended December 31, 2017, we have expended $69.8 million related to the construction or predevelopment of various apartment complexes and capitalized $2.4 million of interest costs.

6

**Business Plan and Investment Policy**

Our business objective is to maximize long-term value for our stockholders by investing in residential and commercial real estate through the acquisition, development and ownership of apartments, commercial properties and land. We intend to achieve this objective through acquiring and developing properties in multiple markets and operating as an industry-leading landlord. We believe this objective will provide the benefits of enhanced investment opportunities, economies of scale and risk diversification, both in terms of geographic market and real estate product type. We believe our objective will also result in continuing access to favorably priced debt and equity capital. In pursuing our business objective, we seek to achieve a combination of internal and external growth while maintaining a strong balance sheet and employing a strategy of financial flexibility. We maximize the value of our apartments and commercial properties by maintaining high occupancy levels while charging competitive rental rates, controlling costs and focusing on tenant retention. We also pursue attractive development opportunities either directly or in partnership with other investors.

For our portfolio of commercial properties, we generate increased operating cash flow through annual contractual increases in rental rates under existing leases. We also seek to identify best practices within our industry and across our business units in order to enhance cost savings and gain operating efficiencies. We employ capital improvement and preventive maintenance programs specifically designed to reduce operating costs and increase the long-term value of our real estate investments.

We seek to acquire properties consistent with our business objectives and strategies. We execute our acquisition strategy by purchasing properties which management believes will create stockholder value over the long-term. We will also sell properties when management believes value has been maximized or when a property is no longer considered an investment to be held long-term.

We are continuously in various stages of discussions and negotiations with respect to development, acquisition, and disposition of projects. The consummation of any current or future development, acquisition, or disposition, if any, and the pace at which any may be completed cannot be assured or predicted.

Substantially all of our properties are owned by subsidiary companies, many of which are single-asset entities. This ownership structure permits greater access to financing for individual properties and permits flexibility in negotiating a sale of either the asset or the equity interests in the entity owning the asset. From time-to-time, our subsidiaries have invested in joint ventures with other investors, creating the possibility of risks that do not exist with properties solely owned by a TCI subsidiary. In those instances where other investors are involved, those other investors may have business, economic, or other objectives that are inconsistent with our objectives, which may in turn, require us to make investment decisions different from those if we were the sole owner.

Real estate generally cannot be sold quickly. We may not be able to promptly dispose of properties in response to economic or other conditions. To offset this challenge, selective dispositions have been a part of our strategy to maintain an efficient investment portfolio and to provide additional sources of capital. We finance acquisitions through mortgages, internally generated funds, and, to a lesser extent, property sales. Those sources provide the bulk of funds for future acquisitions. We may purchase properties by assuming existing loans secured by the acquired property. When properties are acquired in such a manner, we customarily seek to refinance the asset in order to properly leverage the asset in a manner consistent with our investment objectives.

Our businesses are not generally seasonal with regard to real estate investments. Our investment strategy seeks both current income and capital appreciation. Our plan of operation is to continue, to the extent our liquidity permits, to make equity investments in income-producing real estate such as apartments and commercial properties. We may also invest in the debt or equity securities of real estate-related entities. We intend to pursue higher risk, higher reward investments, such as improved and unimproved land where we can obtain reasonably-priced financing for substantially all of a property's purchase price. We intend to continue the development of apartment properties in selected markets in Texas and in other locations where we believe adequate levels of demand exist. We intend to pursue sales opportunities for properties in stabilized real estate markets where we believe our properties' value has been maximized. We also intend to be an opportunistic seller of properties in markets where demand exceeds current supply. Although we no longer actively seek to fund or purchase mortgage loans, we may, in selected instances, originate mortgage loans or we may provide purchase money financing in conjunction with a property sale.

Our Board of Directors has broad authority under our governing documents to make all types of investments, and we may devote available resources to particular investments or types of investments without restriction on the amount or percentage of assets that may be allocated to a single investment or to any particular type of investment, and without limit on the percentage of securities of any one issuer that may be acquired. Investment objectives and policies may be changed at any time by the Board without stockholder approval.

The specific composition from time-to-time of our real estate portfolio owned by TCI directly and through our subsidiaries depends largely on the judgment of management to changing investment opportunities and the level of risk associated with specific investments or types of investments. We intend to maintain a real estate portfolio that is diversified by both location and type of property.

**Competition**

The real estate business is highly competitive and TCI competes with numerous companies engaged in real estate activities (including certain entities described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence"), some of which have greater financial resources than TCI. We believe that success against such competition is dependent upon the geographic location of a property, the performance of property-level managers in areas such as leasing and marketing, collection of rents and control of operating expenses, the amount of new construction in the area and the maintenance and appearance of the property. Additional competitive factors include ease of access to a property, the adequacy of related facilities such as parking and other amenities, and sensitivity to market conditions in determining rent levels. With respect to apartments, competition is also based upon the design and mix of the units and the ability to provide a community atmosphere for the residents. We believe that beyond general economic circumstances and trends, the degree to which properties are renovated or new properties are developed in the competing submarket are also competitive factors. See also Part I, Item1A. "Risk Factors".

7

To the extent that TCI seeks to sell any properties, the sales prices for the properties may be affected by competition from other real estate owners and financial institutions also attempting to sell properties in areas where TCI's properties are located, as well as aggressive buyers attempting to dominate or penetrate a particular market.

As described above and in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", the officers and directors of TCI serve as officers and directors of ARL and IOR. Both ARL and IOR have business objectives similar to those of TCI. TCI's officers and directors owe fiduciary duties to both IOR and ARL as well as to TCI under applicable law. In determining whether a particular investment opportunity will be allocated to TCI, IOR, or ARL, management considers the respective investment objectives of each Company and the appropriateness of a particular investment in light of each Company's existing real estate and mortgage notes receivable portfolio. To the extent that any particular investment opportunity is appropriate to more than one of the entities, the investment opportunity may be allocated to the entity which has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among all three or two of the entities.

In addition, as described in Part III, Item 13. "Certain Relationships and Related Transactions, and Director Independence", TCI competes with related parties of Pillar having similar investment objectives related to the acquisition, development, disposition, leasing and financing of real estate and real estate-related investments. In resolving any potential conflicts of interest which may arise, Pillar has informed TCI that it intends to exercise its best judgment as to what is fair and reasonable under the circumstances in accordance with applicable law.

We have historically engaged in and will continue to engage in certain business transactions with related parties, including but not limited to asset acquisitions and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interests of the Company.

**Available Information**

TCI maintains an internet site at *http://www.transconrealty-invest.com*. We make available through our website free of charge Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, reports filed pursuant to Section 16 and amendments to those reports as soon as reasonably practicable after we electronically file or furnish such materials to the Securities and Exchange Commission. In addition, we have posted the charters for our Audit Committee, Compensation Committee and Governance and Nominating Committee, as well as our Code of Business Conduct and Ethics, Corporate Governance Guidelines on Director Independence and other information on the website. These charters and principles are not incorporated in this Report by reference. We will also provide a copy of these documents free of charge to stockholders upon written request. The Company issues Annual Reports containing audited financial statements to its common shareholders.

8

**ITEM 1A.  *RISK FACTORS***

An investment in our securities involves various risks. All investors should carefully consider the following risk factors in conjunction with the other information in this report before trading our securities.

**Risk Factors Related to our Business**

***Adverse events concerning our existing tenants or negative market conditions affecting our existing tenants could have an adverse impact on our ability to attract new tenants, release space, collect rent or renew leases, and thus could adversely affect cash flow from operations and inhibit growth.***

Cash flow from operations depends in part on the ability to lease space to tenants on economically favorable terms. We could be adversely affected by various facts and events over which the Company has limited or no control, such as:

- lack of demand for space in areas where the properties are located;

- inability to retain existing tenants and attract new tenants;

App. 2050

- oversupply of or reduced demand for space and changes in market rental rates;

- defaults by tenants or failure to pay rent on a timely basis;

- the need to periodically renovate and repair marketable space;

- physical damage to properties;

- economic or physical decline of the areas where properties are located; and

- potential risk of functional obsolescence of properties over time.

At any time, any tenant may experience a downturn in its business that may weaken its financial condition. As a result, a tenant may delay lease commencement, fail to make rental payments when due, decline to extend a lease upon its expiration, become insolvent or declare bankruptcy. Any tenant bankruptcy or insolvency, leasing delay or failure to make rental payments when due, could result in the termination of the tenant's lease and material losses to the Company.

If tenants do not renew their leases as they expire, we may not be able to rent the space. Furthermore, leases that are renewed, and some new leases for space that is re-let, may have terms that are less economically favorable than expiring lease terms, or may require us to incur significant costs, such as renovations, tenant improvements or lease transaction costs. Any of these events could adversely affect cash flow from operations and our ability to make distributions to shareholders and service indebtedness. A significant portion of the costs of owning property, such as real estate taxes, insurance, and debt service payments, are not necessarily reduced when circumstances cause a decrease in rental income from the properties.

***We may not be able to compete successfully with other entities that operate in our industry.***

We experience a great deal of competition in attracting tenants for the properties and in locating land to develop and properties to acquire.

In our effort to lease properties, we compete for tenants with a broad spectrum of other landlords in each of the markets. These competitors include, among others, publicly-held REITs, privately-held entities, individual property owners and tenants who wish to sublease their space. Some of these competitors may be able to offer prospective tenants more attractive financial terms than we are able to offer.

If the availability of land or high quality properties in our markets diminishes, operating results could be adversely affected.

***We may experience increased operating costs which could adversely affect our financial results and the value of our properties***.

Our properties are subject to increases in operating expenses such as insurance, cleaning, electricity, heating, ventilation and air conditioning, administrative costs and other costs associated with security, landscaping, repairs, and maintenance of the properties. While some current tenants are obligated by their leases to reimburse us for a portion of these costs, there is no assurance that these tenants will make such payments or agree to pay these costs upon renewal or new tenants will agree to pay these costs. If operating expenses increase in our markets, we may not be able to increase rents or reimbursements in all of these markets to offset the increased expenses, without at the same time decreasing occupancy rates. If this occurs, our ability to make distributions to shareholders and service indebtedness could be adversely affected.

<center>9</center>

***Our ability to achieve growth in operating income depends in part on our ability to develop additional properties***.

We intend to continue to develop properties where warranted by market conditions. We have a number of ongoing development and land projects being readied for commencement.

Additionally, general construction and development activities include the following risks:

- construction and leasing of a property may not be completed on schedule, which could result in increased expenses and construction costs, and would result in reduced profitability for that property;

- construction costs may exceed original estimates due to increases in interest rates and increased cost of materials, labor or other costs, possibly making the property less profitable because of inability to increase rents to compensate for the increase in construction costs;

- some developments may fail to achieve expectations, possibly making them less profitable;

- we may be unable to obtain, or face delays in obtaining, required zoning, land-use, building, occupancy, and other governmental permits and authorizations, which could result in increased costs and could require us to abandon our activities entirely with respect to a project;

- we may abandon development opportunities after the initial exploration, which may result in failure to recover costs already incurred. If we determine to alter or discontinue its development efforts, future costs of the investment may be expensed as incurred rather than capitalized and we may determine the investment is impaired resulting in a loss;

- we may expend funds on and devote management's time to projects which will not be completed; and

- occupancy rates and rents at newly-completed properties may fluctuate depending on various factors including market and economic conditions, and may result in lower than projected rental rates and reduced income from operations.

***We face risks associated with property acquisitions.***

We acquire individual properties and various portfolios of properties and intend to continue to do so. Acquisition activities are subject to the following risks:

- when we are able to locate a desired property, competition from other real estate investors may significantly increase the seller's offering price;

- acquired properties may fail to perform as expected;

- the actual costs of repositioning or redeveloping acquired properties may be higher than original estimates;

- acquired properties may be located in new markets where we face risks associated with an incomplete knowledge or understanding of the local market, a limited number of established business relationships in the area and a relative unfamiliarity with local governmental and permitting procedures; and

- we may be unable to quickly and efficiently integrate new acquisitions, particularly acquisitions of portfolios of properties, into existing operations, and results of operations and financial condition could be adversely affected.

We may acquire properties subject to liabilities and without any recourse, or with limited recourse, with respect to unknown liabilities. However, if an unknown liability was later asserted against the acquired properties, we might be required to pay substantial sums to settle it, which could adversely affect cash flow.

***Many of our properties are concentrated in our primary markets and the Company may suffer economic harm as a result of adverse conditions in those markets.***

Our properties are located principally in specific geographic areas in the southwestern, southeastern, and mid-western United States. The Company's overall performance is largely dependent on economic conditions in those regions.

***We are leveraged and may not be able to meet our debt service obligations.***

We had total indebtedness at December 31, 2017 of approximately $1,025.5 million. Substantially all assets have been pledged to secure debt. These borrowings increase the risk of loss because they represent a prior claim on assets and most require fixed payments regardless of profitability. Our leveraged position makes us vulnerable to declines in the general economy and may limit the Company's ability to pursue other business opportunities in the future.

10

***We may not be able to access financial markets to obtain capital on a timely basis, or on acceptable terms.***

We rely on proceeds from property dispositions and third party capital sources for a portion of our capital needs, including capital for acquisitions and development. The public debt and equity markets are among the sources upon which the Company relies. There is no guarantee that we will be able to access these markets or any other source of capital. The ability to access the public debt and equity markets depends on a variety of factors, including:

- general economic conditions affecting these markets;

- our own financial structure and performance;

- the market's opinion of real estate companies in general; and

- the market's opinion of real estate companies that own similar properties.

***We may suffer adverse effects as a result of terms and covenants relating to the Company's indebtedness.***

Required payments on our indebtedness generally are not reduced if the economic performance of the portfolio declines. If the economic performance declines, net income, cash flow from operations and cash available for distribution to stockholders may be reduced. If payments on debt cannot be made, we could sustain a loss or suffer judgments, or in the case of mortgages, suffer foreclosures by mortgagees. Further, some obligations contain cross-default and/or cross-acceleration provisions, which means that a default on one obligation may constitute a default on other obligations.

We anticipate only a small portion of the principal of its debt will be repaid prior to maturity. Therefore, we are likely to refinance a portion of its outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or the terms of any refinancing will not be as favorable as the terms of the maturing debt. If principal balances due at maturity cannot be refinanced, extended, or repaid with proceeds from other sources, such as the proceeds of sales of assets or new equity capital, cash flow may not be sufficient to repay all maturing debt in years when significant "balloon" payments come due.

Our credit facilities and unsecured debt contain customary restrictions, requirements and other limitations on the ability to incur indebtedness, including total debt to asset ratios, secured debt to total asset ratios, debt service coverage ratios, and minimum ratios of unencumbered assets to unsecured debt. Our continued ability to borrow is subject to compliance with financial and other covenants. In addition, failure to comply with such covenants could cause a default under credit facilities, and we may then be required to repay such debt with capital from other sources. Under those circumstances, other sources of capital may not be available, or be available only on unattractive terms.

***Our degree of leverage could limit our ability to obtain additional financing or affect the market price of our common stock.***

The degree of leverage could affect our ability to obtain additional financing for working capital, capital expenditures, acquisitions, development or other general corporate purposes. The degree of leverage could also make us more vulnerable to a downturn in business or the general economy.

***An increase in interest rates would increase interest costs on variable rate debt and could adversely impact the ability to refinance existing debt.***

We currently have, and may incur more, indebtedness that bears interest at variable rates. Accordingly, if interest rates increase, so will the interest costs, which could adversely affect cash flow and the ability to pay principal and interest on our debt and the ability to make distributions to shareholders. Further, rising interest rates could limit our ability to refinance existing debt when it matures.

***Unbudgeted capital expenditures or cost overruns could adversely affect business operations and cash flow.***

If capital expenditures for ongoing or planned development projects or renovations exceed expectations, the additional cost of these expenditures could have an adverse effect on business operations and cash flow. In addition, we might not have access to funds on a timely basis to pay the unexpected expenditures.

Construction costs are funded in large part through construction financing which the Company may guarantee. The Company's obligation to pay interest on this financing continues until the rental project is completed, leased up and permanent financing is obtained, or the project is sold or the construction loan is otherwise paid. Unexpected delays in completion of one or more ongoing projects could also have a significant adverse impact on business operations and cash flow.

***We may need to sell properties from time to time for cash flow purposes.***

Because of the lack of liquidity of real estate investments, our ability to respond to changing circumstances may be limited and generally real estate investments cannot be sold quickly. In the event that we must sell assets to generate cash flow, we cannot predict whether there will be a market for those assets in the time period desired, or whether we will be able to sell the assets at a price that will allow the Company to fully recoup its investment. We may not be able to realize the full potential value of the assets and may incur costs related to the early pay-off of the debt secured by such assets.

11

***We intend to devote resources to the development of new projects.***

We plan to continue developing new projects as opportunities arise in the future. Development and construction activities entail a number of risks, including but not limited to the following:

- we may abandon a project after spending time and money determining its feasibility;

- construction costs may materially exceed original estimates;

- the revenue from a new project may not be enough to make it profitable or generate a positive cash flow;

- we may not be able to obtain financing on favorable terms for development of a property, if at all;

- we may not complete construction and lease-ups on schedule, resulting in increased development or carrying costs; and

- we may not be able to obtain, or may be delayed in obtaining, necessary governmental permits.

***The overall business is subject to all of the risks associated with the real estate industry***.

We are subject to all risks incident to investment in real estate, many of which relate to the general lack of liquidity of real estate investments, including, but not limited to:

- our real estate assets are concentrated primarily in the southwest and any deterioration in the general economic conditions of this region could have an adverse effect;

- changes in interest rates may make the ability to satisfy debt service requirements more burdensome;

- lack of availability of financing may render the purchase, sale or refinancing of a property more difficult or unattractive;

- changes in real estate and zoning laws;

- increases in real estate taxes and insurance costs;

- federal or local economic or rent control;

- acts of terrorism; and

- hurricanes, tornadoes, floods, earthquakes and other similar natural disasters.

***Our performance and value are subject to risks associated with our real estate assets and with the real estate industry.***

Our economic performance and the value of our real estate assets, and consequently the value of our securities, are subject to the risk that if our properties do not generate revenues sufficient to meet our operating expenses, including debt service and capital expenditures, our cash flow will be adversely affected. The following factors, among others, may adversely affect the income generated by our properties:

- downturns in the national, regional and local economic conditions (particularly increases in unemployment);

- competition from other office and commercial buildings;

- local real estate market conditions, such as oversupply or reduction in demand for office or other commercial space;

- changes in interest rates and availability of financing;

- vacancies, changes in market rental rates and the need to periodically repair, renovate and re-let space;

- increased operating costs, including insurance expense, utilities, real estate taxes, state and local taxes and heightened security costs;

- civil disturbances, earthquakes and other natural disasters, or terrorist acts or acts of war which may result in uninsured or underinsured losses;

- significant expenditures associated with each investment, such as debt service payments, real estate taxes, insurance and maintenance costs which are generally not reduced when circumstances cause a reduction in revenues from a property;

- declines in the financial condition of our tenants and our ability to collect rents from our tenants; and

- decreases in the underlying value of our real estate.

***Adverse economic conditions and dislocations in the credit markets could have a material adverse effect on our results of operations, and financial condition.***

Our business may be affected by market and economic challenges experienced by the U.S. economy or real estate industry as a whole or by the local economic conditions in the markets in which our properties are located, including the current dislocations in the credit markets and general global economic recession. These current conditions, or similar conditions existing in the future, may adversely affect our results of operations, and financial condition as a result of the following, among other potential consequences:

- the financial condition of our tenants may be adversely affected which may result in tenant defaults under leases due to bankruptcy, lack of liquidity, operational failures or for other reasons;

- significant job losses within our tenants may occur, which may decrease demand for our office space, causing market rental rates and property values to be negatively impacted;

- our ability to borrow on terms and conditions that we find acceptable, or at all, may be limited, which could reduce our ability to pursue acquisition and development opportunities and refinance existing debt, reduce our returns from our acquisition and development activities and increase our future interest expense;

- reduced values of our properties may limit our ability to dispose of assets at attractive prices or to obtain debt financing secured by our properties and may reduce the availability of unsecured loans; and

- one or more lenders could refuse to fund their financing commitment to us or could fail and we may not be able to replace the financing commitment of any such lenders on favorable terms, or at all.

App. 2053

*Real estate investments are illiquid, and we may not be able to dispose of properties when it is appropriate to do so.*

Real estate generally cannot be sold quickly. We may not be able to dispose of properties promptly in response to economic or other conditions. In addition, provisions of the Internal Revenue Code may limit our ability to sell properties (without incurring significant tax costs) in some situations when it may be otherwise economically advantageous to do so, thereby adversely affecting returns to stockholders and adversely impacting our ability to meet our obligations.

**ITEM 1B.**   *UNRESOLVED STAFF COMMENTS*

None.

13

**ITEM 2.**   *PROPERTIES*

On December 31, 2017, our portfolio consisted of sixty-one income-producing properties consisting of fifty-three apartment complexes totaling 8,606 units, seven commercial properties consisting of five office buildings and two retail centers; and a golf course. In addition, we own or control approximately 3,466 acres of improved and unimproved land for future development or sale. The average annual rental and other property revenue dollar per square foot is $11.83 for the Company's residential apartment portfolio and $18.55 for the commercial portfolio. The table below shows information relating to those properties in which we own or have an ownership interest:

**Transcontinental Realty Investors, Inc**
**Annual Reports**
**Item 2 Properties List**
**For The Twelve Months Ending December 31, 2017**

| Residential Apartments | Location | Units | Occupancy |
|---|---|---|---|
| Anderson Estates | Oxford, MS | 48 | 91.70% |
| Blue Lake Villas I | Waxahachie, TX | 186 | 98.90% |
| Blue Lake Villas II | Waxahachie, TX | 70 | 98.60% |
| Breakwater Bay | Beaumont, TX | 176 | 90.90% |
| Bridgewood Ranch | Kaufman, TX | 106 | 97.20% |
| Capitol Hill | Little Rock, AR | 156 | 92.90% |
| Centennial Village | Oak Ridge TN | 252 | 99.20% |
| Crossing at Opelika | Opelika AL | 168 | 98.20% |
| Curtis Moore Estates | Greenwood, MS | 104 | 77.90% |
| Dakota Arms | Lubbock, TX | 208 | 95.20% |
| David Jordan Phase II | Greenwood, MS | 32 | 78.10% |
| David Jordan Phase III | Greenwood, MS | 40 | 87.50% |
| Desoto Ranch | DeSoto, TX | 248 | 97.20% |
| Falcon Lakes | Arlington, TX | 248 | 98.00% |
| Heather Creek | Mesquite, TX | 200 | 98.50% |
| Lake Forest | Houston, TX | 240 | 95.80% |
| Legacy at Pleasant Grove | Texarkana, TX | 208 | 93.30% |
| Lodge at Pecan Creek | Denton, TX | 192 | 94.80% |
| Lofts at Reynolds Village | Asheville, NC | 201 | 97.50% |
| Mansions of Mansfield | Mansfield, TX | 208 | 97.60% |
| Metropolitan | Little Rock, AR | 260 | 87.30% |
| Mission Oaks | San Antonio, TX | 228 | 96.10% |
| Monticello Estate | Monticello, AR | 32 | 90.60% |
| Northside on Travis | Sherman, TX | 200 | 97.00% |
| Oak Hollow | Seguin TX | 160 | 94.40% |
| Oceanaire | Biloxi, MS | 196 | 94.40% |
| Overlook at Allensville | Sevierville TN | 144 | 96.50% |
| Parc at Clarksville | Clarksville, TN | 168 | 96.40% |
| Parc at Denham Springs | Denham Springs, LA | 224 | 94.60% |
| Parc at Maumelle | Little Rock, AR | 240 | 93.80% |
| Parc at Metro Center | Nashville, TN | 144 | 98.60% |
| Parc at Rogers | Rogers, AR | 250 | 96.40% |
| Preserve at Pecan Creek | Denton, TX | 192 | 94.30% |
| Preserve at Prairie Point | Lubbock, TX | 184 | 97.80% |
| Residences at Holland Lake | Weatherford TX | 208 | 97.60% |
| Riverwalk Phase I | Greenville, MS | 32 | 96.90% |
| Riverwalk Phase II | Greenville, MS | 72 | 91.70% |
| Sawgrass Creek | New Port Richey, FL | 45 | 95.56% |
| Sonoma Court | Rockwall, TX | 124 | 99.20% |
| Sugar Mill | Baton Rouge, LA | 160 | 100.00% |
| Tattersall Village | Hinesville, GA | 222 | 96.40% |
| Toulon | Gautier, MS | 240 | 92.10% |
| Tradewinds | Midland TX | 214 | 97.70% |
| Villager | Fort Walton FL | 33 | 97.00% |
| Villas at Park West I | Pueblo, CO | 148 | 100.00% |
| Villas at Park West II | Pueblo, CO | 112 | 100.00% |
| Vista Ridge | Tupelo MS | 160 | 96.90% |
| Vistas of Vance Jackson | San Antonio, TX | 240 | 97.10% |
| Waterford at Summer Park | Rosenberg TX | 196 | 92.30% |
| Westwood | Mary Ester FL | 120 | 98.30% |
| Windsong | Fort Worth, TX | 188 | 98.40% |
| *51* | *Total Apartment Units* | **8,427** | **95.18%** |

App. 2054

| Office Buildings | Location | SqFt | Occupancy |
|---|---|---|---|
| 600 Las Colinas | Las Colinas, TX | 512,210 | 92.36% |
| 770 South Post Oak | Houston, TX | 95,329 | 86.43% |
| Browning Place (Park West I) | Farmers Branch, TX | 625,378 | 77.53% |
| Senlac (VHP) | Farmers Branch, TX | 2,812 | 100.00% |
| Stanford Center | Dallas, TX | 333,234 | 97.79% |
| **5** | **Total Office Buildings** | **1,568,963** | |

| Retail Centers | Location | SqFt | Occupancy |
|---|---|---|---|
| Bridgeview Plaza | LaCrosse, WI | 122,205 | 87.36% |
| Fruitland Park | Fruitland Park, FL | 6,722 | 100.00% |
| **2** | **Total Retail Centers** | **128,927** | |
| | | | |
| | **Total Commercial** | **1,697,890** | |

| Golf Course | Location | Acres | |
|---|---|---|---|
| Mahogany Run Golf Course | St. Thomas, US Virgin Islands | 96.09 | |
| **1** | **Total Golf Course** | **96.09** | |

*Golf course had 96.09 acres, but it suffered extensive damage in a hurricane and is no longer operating.*

**Lease Expirations**

The table below shows the lease expirations of the commercial properties over a nine-year period and thereafter:

| Year of Lease Expiration | Rentable Square Feet Subject to Expiring Leases | Current Annualized (1) Contractual Rent Under Expiring Leases | Current Annualized(1) Contractual Rent Under Expiring Leases (P.S.F.) | Percentage of Total Square Feet | Percentage of Gross Rentals |
|---|---|---|---|---|---|
| 2018 | 172,297 | 3,647,957 | $ 21.17 | 10.1% | 13.4% |
| 2019 | 298,377 | 5,299,974 | $ 17.76 | 17.6% | 19.6% |
| 2020 | 119,770 | 2,523,397 | $ 21.07 | 7.1% | 9.3% |
| 2021 | 125,086 | 2,561,127 | $ 20.47 | 7.4% | 9.4% |
| 2022 | 236,901 | 5,118,961 | $ 21.61 | 14.0% | 18.9% |
| 2023 | 172,346 | 2,344,412 | $ 13.60 | 10.2% | 8.7% |
| 2024 | 61,044 | 996,807 | $ 16.33 | 3.6% | 3.7% |
| 2025 | 113,829 | 2,604,020 | $ 22.88 | 6.7% | 9.6% |
| 2026 | 14,445 | 375,570 | $ 26.00 | 0.9% | 1.4% |
| Thereafter | 80,074 | 1,627,426 | $ 20.32 | 4.7% | 6.0% |
| **Total** | **1,394,169** | **$ 27,099,651** | | **82.3%** | **100%** |

(1) Represents the monthly contractual base rent and recoveries from tenants under existing leases as of December 31, 2017, multiplied by twelve. This amount reflects total rent before any rent abatements and includes expense reimbursements, which may be estimates as of such date.

14

The table below shows information related to the land parcels we own as of December 31, 2017:

| Land | Location | Acres |
|---|---|---|
| 2427 Valley View Ln | Farmers Branch, TX | 0.31 |
| Audubon | Adams County, MS | 48.20 |
| Bonneau Land | Farmers Branch, TX | 8.39 |
| Cooks Lane | Fort Worth, TX | 23.24 |
| Dedeaux | Gulfport, MS | 10.00 |
| Denham Springs | Denham Springs, LA | 4.38 |
| Dominion Mercer | Farmers Branch, TX | 5.29 |
| Gautier | Gautier, MS | 3.46 |
| Hollywood Casino Tract II | Farmers Branch, TX | 11.36 |
| Lacy Longhorn | Farmers Branch, TX | 5.08 |
| Lake Shore Villas | Humble, TX | 19.51 |
| Lubbock | Lubbock, TX | 2.86 |
| Manhattan Land | Farmers Branch, TX | 8.79 |
| McKinney 36 | Collin County, TX | 9.58 |
| Minivest | Dallas, TX | 0.23 |
| Nashville | Nashville, TN | 6.25 |
| Nicholson Croslin | Dallas, TX | 0.80 |
| Nicholson Mendoza | Dallas, TX | 0.35 |
| Ocean Estates | Gulfport, MS | 12.00 |
| Senlac | Farmers Branch, TX | 8.49 |
| Texas Plaza | Irving, TX | 10.33 |
| Travis Ranch | Kaufman County, TX | 8.66 |
| Travis Ranch Retail | Kaufman County, TX | 8.13 |
| Union Pacific Railroad | Dallas, TX | 0.04 |
| Valley View 34 (Mercer Crossing) | Farmers Branch, TX | 2.19 |

App. 2055

| | Location | Acres |
|---|---|---|
| Windmills Farms | Kaufman County, TX | 2,831.87 |
| *Total Land/Development* | | *3,089.57* |

| Land Subject to Sales Contract | Location | Acres |
|---|---|---|
| Dominion Tract | Dallas, TX | 10.59 |
| Hollywood Casino Tract I | Farmers Branch, TX | 10.96 |
| LaDue | Farmers Branch, TX | 8.01 |
| Three Hickory | Farmers Branch, TX | 6.60 |
| Travelers | Farmers Branch, TX | 193.17 |
| Walker/Cummings | Dallas County, TX | 82.59 |
| Whorton | Bentonville, AR | 64.44 |
| *Total Land Subject to Sales Contract* | | 376.36 |
| *Total Land* | | 3,465.93 |

15

---

## ITEM 3.   *LEGAL PROCEEDINGS*

**Dynex Capital, Inc.**

On July 20, 2015, the 68th Judicial District Court in Dallas County, Texas issued its Final Judgment in Cause No. DC-03-00675, styled Basic Capital Management, Inc., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. v. Dynex Commercial, Inc. The case, which was litigated for more than a decade, had its origin with Dynex Commercial making loans to Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. (subsidiaries of Continental Mortgage & Equity Trust ("CMET"), an entity which merged into TCI in 1999 after the original suit was filed). Under the original loan commitment, $160 million in loans were to be made to the entities. The loans were conditioned on the execution of a commitment between Dynex Commercial and Basic Capital Management, Inc. ("Basic").

An original trial in 2004, which also included Dynex Capital, Inc. as a defendant, resulted in a jury awarding damages in favor of Basic for "lost opportunity," as well as damages in favor of ART and in favor of TCI and its subsidiaries for "increased costs" and "lost opportunity." The original Trial Court judge ignored the jury's findings, however, and entered a "Judgment Notwithstanding the Verdict" ("JNOV") in favor of the Dynex entities (the judge held the Plaintiffs were not entitled to any damages from the Dynex entities). After numerous appeals by all parties, Dynex Capital, Inc. was ultimately dismissed from the case and the remaining claims against Dynex Commercial were remanded to the Trial Court for a new judgment consistent with the jury's findings. The Court entered the new Final Judgment against Dynex Commercial, Inc. on July 20, 2015.

The Final Judgment entered against Dynex Commercial, Inc. on July 20, 2015 awarded Basic $0.256 million in damages, plus pre-judgment interest of $0.192 million for a total amount of $0.448 million. The Judgment awarded ART $14.2 million in damages, plus pre-judgment interest of $10.6 million for a total amount of $24.8 million. The Judgment awarded TCI $11.1 million, plus pre-judgment interest of $8.4 million for a total amount of $19.5 million. The Judgment also awarded Basic, ART, and TCI post-judgment interest at the rate of 5% per annum from April 25, 2014 until the date their respective damages are paid. Lastly, the Judgement awarded Basic, ART, and TCI $1.6 million collectively in attorneys' fees from Dynex Commercial, Inc.

The Company is working with counsel to identify assets and collect on the Final Judgment against Dynex Commercial, Inc., as well as explore possible additional claims, if any, against Dynex Capital, Inc.

*Litigation.* The ownership of property and provision of services to the public as tenants entails an inherent risk of liability. Although the Company and its subsidiaries are involved in various items of litigation incidental to and in the ordinary course of its business, in the opinion of management, the outcome of such litigation will not have a material adverse impact upon the Company's financial condition, results of operation or liquidity.

## ITEM 4.   *MINE SAFETY DISCLOSURES*

Not applicable.

16

---

## PART II

## ITEM 5.   *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*

TCI's Common stock is listed and traded on the NYSE American under the symbol "TCI". The following table sets forth the high and low sales prices as reported in the consolidated reporting system of the NYSE American for the quarters ended:

| | 2017 | | 2016 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| First Quarter | $ 21.50 | $ 11.94 | $ 11.62 | $ 8.35 |
| Second Quarter | $ 27.64 | $ 16.50 | $ 12.84 | $ 8.38 |
| Third Quarter | $ 29.69 | $ 20.37 | $ 11.90 | $ 9.10 |
| Fourth Quarter | $ 35.00 | $ 26.39 | $ 12.66 | $ 9.41 |

On March 20, 2018, the closing price of TCI's common stock as reported on the NYSE American was $40.46 per share, and was held by approximately 3,700 holders of record.

TCI's Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, the board determined not to pay any dividends on common stock in 2017, 2016 or 2015. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including the Company's financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

In December 1989, the Board of Directors approved a share repurchase program, authorizing the repurchase of a total of 687,000 shares of TCI's Common stock. In June 2000, the Board increased this authorization to 1,387,000 shares. On August 10, 2010, the Board of Directors approved an increase in the share repurchase program for up to an additional 250,000 shares of common stock which resulted in a total authorization under the repurchase program for up to 1,637,000 shares of our common stock. This repurchase program has no termination date. There were no shares repurchased for the year ended December 31, 2017.

App. 2056

17

**ITEM 6.**      *SELECTED FINANCIAL DATA*

| | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2017** | **2016** | **2015** | **2014** | **2013** |
| | (dollars in thousands, except share and per share amounts) | | | | |
| **EARNINGS DATA** | | | | | |
| Total operating revenues | $ 125,233 | $ 118,471 | $ 102,220 | $ 75,858 | $ 77,351 |
| Total operating expenses | 105,128 | 100,824 | 92,919 | 75,087 | 82,722 |
| Operating income (loss) | 20,105 | 17,647 | 9,301 | 771 | (5,371) |
| Other expenses | (49,967) | (36,628) | (36,095) | (17,613) | (36,626) |
| Loss before gain on sales, non-controlling interest, and taxes | (29,862) | (18,981) | (26,794) | (16,842) | (41,997) |
| Gain (loss) on land sales | 4,884 | 3,121 | 18,911 | 561 | (1,073) |
| Gain on sale of income-producing properties | 9,842 | 16,207 | — | — | — |
| Income tax benefit (expense) | (180) | (24) | (517) | 20,390 | 40,949 |
| Net income (loss) from continuing operations | (15.316) | 323 | (8,400) | 4,109 | (2,121) |
| Net income (loss) from discontinued operations | | (1) | 896 | 37,868 | 61,630 |
| Net income (loss) | (15,316) | 322 | (7,504) | 41,977 | 59,509 |
| Net income attributable to non-controlling interest | (499) | (285) | (132) | (399) | (979) |
| Net income (loss) attributable to Transcontinental Realty Investors, Inc. | (15,815) | 37 | (7,636) | 41,578 | 58,530 |
| Preferred dividend requirement | (900) | (900) | (900) | (1,005) | (1,110) |
| Net income (loss) applicable to common shares | $ (16,715) | $ (863) | $ (8,536) | $ 40,573 | $ 57,420 |
| | | | | | |
| **PER SHARE DATA** | | | | | |
| **Earnings per share - basic** | | | | | |
| Income (loss) from continuing operations | $ (1.92) | $ (0.10) | $ (1.08) | $ 0.32 | $ (0.50) |
| Income (loss) from discontinued operations | 0.00 | 0.00 | 0.10 | 4.42 | 7.33 |
| Net income (loss) applicable to common shares | $ (1.92) | $ (0.10) | $ (0.98) | $ 4.74 | $ 6.83 |
| Weighted average common share used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,559,370 | 8,413,469 |
| | | | | | |
| **Earnings per share - diluted** | | | | | |
| Income (loss) from continuing operations | $ (1.92) | $ (0.10) | $ (1.08) | $ 0.32 | $ (0.50) |
| Income (loss) from discontinued operations | — | (0.00) | 0.10 | 4.42 | 7.33 |
| Net income (loss) applicable to common shares | $ (1.92) | $ (0.10) | $ (0.98) | $ 4.74 | $ 6.83 |
| Weighted average common share used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,559,370 | 8,413,469 |
| | | | | | |
| **BALANCE SHEET DATA** | | | | | |
| Real estate, net | $ 979,870 | $ 891,173 | $ 844,019 | $ 689,121 | $ 695,802 |
| Notes and interest receivable, net | 70,166 | 79,308 | 69,551 | 83,457 | 67,907 |
| Total assets | 1,313,422 | 1,185,914 | 1,110,204 | 930,405 | 897,671 |
| Notes and interest payables | 1,007,529 | 841,516 | 779,434 | 608,917 | 602,845 |
| Stockholders' equity | 208,261 | 224,477 | 225,055 | 233,448 | 191,570 |
| Book value per share | 23.89 | 25.75 | 25.82 | 27.27 | 22.77 |

18

**ITEM 7.**   *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

The following discussion should be read in conjunction with the financial statements and notes thereto appearing elsewhere in this report.

The Annual Report on Form 10-K contains forward-looking statements within the meaning of the federal securities laws, principally, but not only, under the captions "Business", "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." We caution investors that any forward-looking statements in this report, or which management may make orally or in writing from time to time, are based on management's beliefs and on assumptions made by, and information currently available to, management. When used, the words "anticipate", "believe", "expect", "intend", "may", "might", "plan", "estimate", "project", "should", "will", "result" and similar expressions which do not relate solely to historical matters are intended to identify forward-looking statements. These statements are subject to risks, uncertainties and assumptions and are not guarantees of future performance, which may be affected by known and unknown risks, trends, uncertainties and factors that are beyond our control. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. We caution you that, while forward-looking statements reflect our good faith beliefs when we make them, they are not guarantees of future performance and are impacted by actual events when they occur after we make such statements. We expressly disclaim any responsibility to update our forward-looking statements, whether as a result of new information, future events or otherwise. Accordingly, investors should use caution in relying on past forward-looking statements, which are based on results and trends at the time they are made, to anticipate future results or trends.

Some of the risks and uncertainties that may cause our actual results, performance or achievements to differ materially from those expressed or implied by forward-looking statements include, among others, the following:

- general risks affecting the real estate industry (including, without limitation, the inability to enter into or renew leases, dependence on tenants' financial condition, and competition from other developers, owners and operators of real estate);

- risks associated with the availability and terms of financing and the use of debt to fund acquisitions and developments;

- failure to manage effectively our growth and expansion into new markets or to integrate acquisitions successfully;

App. 2057

- risks and uncertainties affecting property development and construction (including, without limitation, construction delays, cost overruns, inability to obtain necessary permits and public opposition to such activities);

- risks associated with downturns in the national and local economies, increases in interest rates, and volatility in the securities markets;

- costs of compliance with the Americans with Disabilities Act and other similar laws and regulations;

- potential liability for uninsured losses and environmental contamination;

- risks associated with our dependence on key personnel whose continued service is not guaranteed; and

- the other risk factors identified in this Form 10-K, including those described under the caption "Risk Factors."

The risks included here are not exhaustive. Other sections of this report, including Part I Item 1A. "Risk Factors," include additional factors that could adversely affect our business and financial performance. Moreover, we operate in a very competitive and rapidly changing environment. New risk factors emerge from time to time and it is not possible for management to predict all such risk factors, nor can we assess the impact of all such risk factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. Given these risks and uncertainties, investors should not place undue reliance on forward-looking statements as a prediction of actual results. Investors should also refer to our quarterly reports on Form 10-Q for future periods and current reports on Form 8-K as we file them with the SEC, and to other materials we may furnish to the public from time to time through Forms 8-K or otherwise.

**Overview**

We are an externally advised and managed real estate investment company that owns a diverse portfolio of income-producing properties and land held for development. The Company's portfolio of income-producing properties includes residential apartment communities, office buildings and other commercial properties. Our investment strategy includes acquiring existing income-producing properties as well as developing new properties on land already owned or acquired for a specific development project. We acquire land primarily in in-fill locations or high-growth suburban markets. We are an active buyer and seller of real estate and during 2017 we acquired $41.7 million and sold $11.2 million of land and income-producing properties. As of December 31, 2017, we owned 8,427 units in fifty-one residential apartment communities, seven commercial properties comprising approximately 1.7 million rentable square feet, and a golf course. In addition, we own 3,466 acres of land held for development. The Company currently owns income-producing properties and land in eleven states as well as in the U.S. Virgin Islands.

19

We finance our acquisitions primarily through operating cash flow, proceeds from the sale of land and income-producing properties and debt financing primarily in the form of property-specific first-lien mortgage loans from commercial banks and institutional lenders. We finance our development projects principally with short-term, variable interest rate construction loans that are converted to long-term, fixed rate amortizing mortgages when the development project is completed and occupancy has been stabilized. The Company will, from time to time, also enter into partnerships with various investors to acquire income-producing properties or land and to sell interests in some of its wholly-owned properties. When the Company sells assets, it may carry a portion of the sales price generally in the form of a short-term, interest bearing seller-financed note receivable. The Company generates operating revenues primarily by leasing apartment units to residents and leasing office, retail and industrial space to commercial tenants.

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

Since April 30, 2011, Pillar is the Company's external Advisor and Cash Manager under a contractual arrangement that is reviewed annually by our Board of Directors. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for TCI's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual Advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Effective since January 1, 2011, Regis manages our commercial properties and provides brokerage services. Regis is entitled to receive a fee for its property management and brokerage services. See Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage." The Company contracts with third-party companies to lease and manage our apartment communities.

**Critical Accounting Policies**

We present our financial statements in accordance with generally accepted accounting principles in the United States ("GAAP").

The accompanying Consolidated Financial Statements include our accounts, our subsidiaries, generally all of which are wholly-owned, and all entities in which we have a controlling interest.

For entities in which we have less than a controlling financial interest or entities where we are not deemed to be the primary beneficiary, the entities are accounted for using the equity method of accounting. Accordingly, our share of the net earnings or losses of these entities are included in consolidated net income. TCI's investment in ARL is accounted for under the equity method.

In accordance with the VIE guidance in ASC 810 "Consolidations," the Company consolidated fifty-one multifamily residential properties at December 31, 2017 and fifty at December 31, 2016, located throughout the United States ranging from 32 units to 260 units. Assets totaling approximately $484 million and approximately $442 million at December 31, 2017 and 2016, respectively, are consolidated and included in "Real estate, at cost" on the balance sheet and are all collateral for their respective mortgage notes payable, none of which are recourse to the partnership in which they are in or to the Company.

20

**Real Estate**

Upon acquisitions of real estate, we assess the fair value of acquired tangible and intangible assets, including land, buildings, tenant improvements, "above-" and "below-market" leases, origination costs, acquired in-place leases, other identified intangible assets and assumed liabilities in accordance with ASC Topic 805 "Business Combinations", and allocate the purchase price to the acquired assets and assumed liabilities, including land at appraised value and buildings at replacement cost.

We assess and consider fair value based on estimated cash flow projections that utilize appropriate discount and/or capitalization rates, as well as available market information. Estimates of future cash flows are based on a number of factors including the historical operating results, known and anticipated trends, and market and economic conditions. The fair value of the tangible assets of an acquired property considers the value of the property as if it were vacant. We also consider an allocation of purchase price of other acquired intangibles, including acquired in-place leases that may have a customer relationship intangible value, including (but not limited to) the nature and extent of the existing relationship with the tenants, the tenants' credit quality and expectations of lease

App. 2058

renewals. Based on the acquisition, the value of our allocation to customer relationship intangible assets has been immaterial.

We record acquired "above-" and "below-market" leases at their fair values (using a discount rate which reflects the risks associated with the leases acquired) equal to the difference between (1) the contractual amounts to be paid pursuant to each in-place lease and (2) management's estimate of fair market lease rates for each corresponding in-place lease, measured over a period equal to the remaining term of the lease for above-market leases and the initial term plus the term of any below-market fixed rate renewal options for below-market leases.

Other intangible assets acquired include amounts for in-place lease values that are based on our evaluation of the specific characteristics of each tenant's lease. Factors to be considered include estimates of carrying costs during hypothetical expected lease-up periods considering current market conditions, and costs to execute similar leases. In estimating carrying costs, we include real estate taxes, insurance and other operating expenses and estimates of lost rentals at market rates during the expected lease-up periods, depending on local market conditions. In estimating costs to execute similar leases, we consider leasing commissions, legal and other related expenses.

Transfers to or from our parent, ARL, or other related parties reflect a basis equal to the cost basis in the asset at the time of the sale.

### Depreciation and Impairment

Real estate is stated at depreciated cost. The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. Costs directly related to the development of properties are capitalized. Capitalized development costs include interest, property taxes, insurance, and other direct project costs incurred during the period of development.

A variety of costs are incurred in the acquisition, development and leasing of properties. After determination is made to capitalize a cost, it is allocated to the specific component of a project that is benefited. Determination of when a development project is substantially complete and capitalization must cease involves a degree of judgment. Our capitalization policy on development properties is guided by ASC Topic 835-20 "Interest - Capitalization of Interest" and ASC Topic 970 "Real Estate—General". The costs of land and buildings under development include specifically identifiable costs. The capitalized costs include pre-construction costs essential to the development of the property, development costs, construction costs, interest costs, real estate taxes, salaries and related costs and other costs incurred during the period of development. We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

Management reviews its long-lived assets used in operations for impairment when there is an event or change in circumstances that indicates impairment in value. An impairment loss is recognized if the carrying amount of its assets is not recoverable and exceeds its fair value. Fair value is determined by a recent appraisal, comparable based upon prices for similar assets, executed sales contract, a present value and/or a valuation technique based upon a multiple of earnings or revenue. If such impairment is present, an impairment loss is recognized based on the excess of the carrying amount of the asset over its fair value. The evaluation of anticipated cash flows is highly subjective and is based in part on assumptions regarding future occupancy, rental rates and capital requirements that could differ materially from actual results in future periods. If we determine that impairment has occurred, the affected assets must be reduced to their face value.

### Real Estate Assets Held for Sale

We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their carrying amount or their estimated fair value, less estimated costs to sell. We did not have any real estate assets classified as held for sale at December 31, 2017 or 2016.

21

Effective as of January 1, 2015, we adopted the revised guidance in Accounting Standards Update No. 2014-08 regarding discontinued operations. For sales of real estate or assets classified as held for sale after January 1, 2015, we will evaluate whether a disposal transaction meets the criteria of a strategic shift and will have a major effect on our operations and financial results to determine if the results of operations and gains on sale of real estate will be presented as part of our continuing operations or as discontinued operations in our consolidated statements of operations. If the disposal represents a strategic shift, it will be classified as discontinued operations for all periods presented; if not, it will be presented in continuing operations.

Any properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors, disclosed in Item 1 "Significant Real Estate Acquisitions/Dispositions and Financing." Any sale transaction where the guidance reflects that a sale had not occurred, the asset involved in the transaction, including the debt, if appropriate, and property operations, remained on the books of the Company. We continue to charge depreciation to expense as a period costs for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

### Investment in Unconsolidated Real Estate Ventures

Except for ownership interests in variable interest entities, we account for our investments in unconsolidated real estate ventures under the equity method of accounting because the Company exercises significant influence over, but does not control, these entities. These investments are recorded initially at cost, as investments in unconsolidated real estate ventures, and subsequently adjusted for equity in earnings and cash contributions and distributions. Any difference between the carrying amount of these investments on the Company's balance sheet and the underlying equity in net assets is amortized as an adjustment to equity in earnings of unconsolidated real estate ventures over the life of the related asset. Under the equity method of accounting, our net equity is reflected within the Consolidated Balance Sheets, and our share of net income or loss from the joint ventures is included within the Consolidated Statements of Operations. The joint venture agreements may designate different percentage allocations among investors for profits and losses; however, our recognition of joint venture income or loss generally follows the joint venture's distribution priorities, which may change upon the achievement of certain investment return thresholds. For ownership interests in variable interest entities, the Company consolidates those in which we are the primary beneficiary.

### Recognition of Rental Income

Rental income for commercial property leases is recognized on a straight-line basis over the respective lease terms. In accordance with ASC Topic 805, we recognize rental revenue of acquired in-place "above-"and "below-market" leases at their fair values over the terms of the respective leases. On our Consolidated Balance Sheets, we include as a receivable the excess of rental income recognized over rental payments actually received pursuant to the terms of the individual commercial lease agreements.

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

Rental income for residential property leases is recorded when due from residents and is recognized monthly as earned, which is not materially different than on a straight-line basis as lease terms are generally for periods of one year or less. An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

### Revenue Recognition on the Sale of Real Estate

Sales and the associated gains or losses of real estate assets are recognized in accordance with the provisions of ASC Topic 360-20, "Property, Plant and Equipment—Real Estate Sale". The specific timing of a sale is measured against various criteria in ASC 360-20 related to the terms of the transaction and any continuing involvement in the form of management or financial assistance associated with the properties. If the sales criteria for the full accrual method are not met, we defer some or all of the gain recognition and account for the continued operations of the property by applying the finance, leasing, deposit, installment or cost recovery methods, as appropriate, until the sales criteria are met.

**Non-performing Notes Receivable**

We consider a note receivable to be non-performing when the maturity date has passed without principal repayment and the borrower is not making interest payments in accordance with the terms of the agreement.

**Interest Recognition on Notes Receivable**

We record interest income as earned in accordance with the terms of the related loan agreements.

22

**Allowance for Estimated Losses**

We assess the collectability of notes receivable on a periodic basis, of which the assessment consists primarily of an evaluation of cash flow projections of the borrower to determine whether estimated cash flows are sufficient to repay principal and interest in accordance with the contractual terms of the note. We recognize impairments on notes receivable when it is probable that principal and interest will not be received in accordance with the contractual terms of the loan. The amount of the impairment to be recognized generally is based on the fair value of the partnership's real estate that represents the primary source of loan repayment. See Note 3 "Notes and Interest Receivable" for details on our notes receivable.

**Fair Value of Financial Instruments**

We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions define fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1    —    Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2    —    Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3    —    Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

**Related parties**

We apply ASC Topic 805, "Business Combination", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

**Results of Operations**

The discussion of our results of operations is based on management's review of operations, which is based on our segments. Our segments consist of apartments, commercial buildings, land and other. For discussion purposes, we break these segments down into the following sub-categories; same property portfolio, acquired properties, and developed properties in the lease-up phase. The same property portfolio consists of properties that were held by us for the entire period for both years being compared. The acquired property portfolio consists of properties that we acquired but have not held for the entire period for both periods being compared. Developed properties in the lease-up phase consist of completed projects that are being leased-up. As we complete each phase of the project, we lease-up that phase and include those revenues in our continued operations. Once a developed property becomes leased-up (80% or more) and is held the entire period for both years under comparison, it is considered to be included in the same property portfolio. Income- producing properties that we have sold during the year are reclassified to discontinued operations for all periods presented. The other segment consists of revenue and operating expenses related to the notes receivable and corporate entities.

The following discussion is based on our Consolidated Statements of Operations for the years ended December 31, 2017, 2016, and 2015 as included in Item 8. "Consolidated Financial Statements and Supplementary Data". The prior year's property portfolios have been adjusted for subsequent sales. Continuing operations relates to income-producing properties that were held during those years as adjusted for sales in the subsequent years.

23

At December 31, 2017, 2016 and 2015, we owned or had interests in a portfolio of fifty-nine, fifty-eight and fifty-seven income-producing properties, respectively. The total property portfolio represents all income-producing properties held as of December 31 for the year presented. Sales subsequent to year end represent properties that were held as of year-end for the years presented, but sold in subsequent years. Continued operations represents all properties that have not been reclassed to discontinued operations as of December 31, 2017 for the year presented. The table below shows the number of income-producing properties held by year:

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Continuing operations | 59 | 58 | 57 |
| Held for sale/subsequent sales | — | — | — |
| Total property portfolio | 59 | 58 | 57 |

*Comparison of the year ended December 31, 2017 to the year ended December 31, 2016:*

For the year ended December 31, 2017, we reported net loss applicable to common shares of $16.7 million or ($1.92) per diluted earnings per share compared to a net loss applicable to common shares of $0.9 million or ($0.10) per diluted earnings per share for the year ended December 31, 2016. The current year net loss applicable to common shares of $16.7 million included gain on sale of income-producing properties of $9.8 million and gain on land sales of $4.9 million compared to the prior year net loss applicable to common shares of $0.9 million which included gain on land sales of $3.1 million.

**Revenues**

App. 2060

Rental and other property revenues were $122.1 million for the year ended December 31, 2017. This represents an increase of $6.7 million as compared to the prior year revenues of $115.5 million. The change by segment is an increase in the apartment portfolio of $6.2 million and an increase in the commercial portfolio of approximately $0.5 million. We purchased four apartment communities during the year ended December 31, 2016, which produced rental revenue of $8.3 million and $2.0 million during the years ended December 31, 2017 and 2016, respectively, for a net increase of $6.3 million. In addition, we purchased one apartment property during 2017 that produced revenues of $0.8 million in rental revenues.

**Expenses**

Property operating expenses were $63.1 million for the year ended December 31, 2017. This represents an increase of $1.2 million, as compared to the prior year operating expenses of $61.9 million. The growth in our apartment portfolio resulted in a $2.9 million increase in property operating expenses. The Company added a net 723 units during 2016 and 201 units during 2017. Property operating expenses for our commercial portfolio decreased $1.8 million. In addition, we had a decrease in property operating expenses for our land portfolio of $1.0 million.

Depreciation and amortization expenses were $25.6 million for the year ended December 31, 2017. This represents an increase of $1.9 million as compared to prior year depreciation of $23.7 million. The increase is primarily due to the growth in our apartment portfolio which had an increase of $1.6 million year-over-year.

General and administrative expenses were $6.3 million for the year ended December 31, 2017. This represents an increase of $0.8 million, as compared to the prior year expenses of $5.5 million.

Net income fee remained constant at $0.3 million for the year ended December 31, 2017 and 2016. The net income fee paid to Pillar is calculated at 7.5% of net income.

Advisory fees were $10.0 million for the year ended December 31, 2017. This represents an increase of $0.5 million compared to the prior year advisory fees of $9.5 million. Advisory fees are computed based on a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value.

**Other income (expense)**

Interest income was $13.9 million for the year ending December 31, 2017 compared to $14.7 million for the year ended December 31, 2016 for a decrease of $0.8 million. This decrease was primarily due to a decrease of $2.3 in interest on notes receivable, partially offset by a $1.3 million increase in interest on receivable owed from Advisor.

Mortgage and loan interest expense was $59.9 million for the year ended December 31, 2017. This represents an increase of $6.8 million compared to the prior year expense of $53.1 million . The change by segment is an increase in the other portfolio of $9.7 million, an increase in the commercial portfolio of $0.4 million, partially offset by a decrease in the apartment portfolio of $3.0 million and a decrease in the land portfolio of $0.2 million . Within the other portfolio, the increase is due to incurring new mezzanine debt obligations. Within the apartment portfolio, the majority of the increase is due to the acquisition of a new property, partially offset by the refinancing of six loans during 2017 at lower rates.

24

The gain on sale of income-producing properties $9.8 million was attributable to recognition of deferred gains for the year ended December 31, 2017. During 2016, the Company sold one apartment community located in Irving, Texas to an independent third party for a total sales price of $8.1 million and one apartment community located in Topeka, Kansas to an independent third party for a total sales price of $12.3 million. We recorded an aggregate gain of $16.2 million from the sale of these two properties. The Company also sold an industrial warehouse consisting of approximately 177,805 square feet. The sale resulted in a loss of approximately $0.2 million.

Gain on land sales was $4.9 million and $3.1 million for the years ended December 31, 2017 and 2016, respectively. During 2016, we sold a combined 129.7 acres of land located in Forney, Texas, McKinney, Texas, Farmers Branch, Texas and Nashville, Tennessee to independent third parties for a total sales price of $29.1 million. We recorded an aggregate $3.1 million gain from the land sales. During 2015, we sold 578.8 acres of land in six transactions for a sales price of $102.9 million and recorded a gain of $18.9 million.

***Comparison of the year ended December 31, 2016 to the year ended December 31, 2015:***

For the year ended December 31, 2016, we reported net loss applicable to common shares of $0.9 million or ($0.10) per diluted earnings per share compared to a net income applicable to common shares of $8.5 million or ($0.98) per diluted earnings per share for the same period ended 2015. The net loss applicable to common shares of $0.9 million for the year ended December 31, 2016 included gain on sale of income-producing properties of $16.2 million and gain on land sales of $3.1 million compared to the prior year net loss applicable to common shares of $8.5 million which included gain on land sales of $18.9 million and net income from discontinued operations of $0.9 million**.**

**Revenues**

Rental and other property revenues were $118.5 million for the year ended December 31, 2016. This represents an increase of $16.3 million compared to the prior year revenues of $102.2 million. The change by segment is an increase in the apartment portfolio of $13.8 million and an increase in the commercial portfolio of $2.5 million. We purchased 12 apartment communities during the year ended December 31, 2015, which produced rental revenue of $21.7 million and $10.2 million during the years ended December 31, 2016 and 2015, respectively, for a net increase of $11.5 million. In addition, we purchased four apartment properties during 2016 that produced revenues of $2.0 million and we had a decrease in rental revenue of approximately $0.9 million for two apartment communities sold during 2016. The $2.5 million increase in revenues for the commercial portfolio was primarily due to the acquisition of a commercial building in Houston, Texas late in the second quarter of 2015.

**Expenses**

Property operating expenses were $61.9 million for the year ended December 31, 2016. This represents an increase of $9.6 million compared to the prior year operating expenses of $52.3 million. The growth in our apartment portfolio resulted in a $6.3 million increase in property operating expenses. The Company added a net 2,145 units during 2015 and 723 units during 2016. Property operating expenses for our commercial portfolio increased $2.6 million due to the acquisition of an office building in Houston, Texas late in the second quarter of 2015. In addition, we had an increase in property operating expenses for our land portfolio of $0.9 million.

Depreciation and amortization expenses were $23.7 million for the year ended December 31, 2016. This represents an increase of $2.4 million compared to depreciation of $21.3 million for the year ended December 31, 2015. The increase is primarily due to the growth in our apartment portfolio which had an increase of $2.3 million year-over-year.

General and administrative expenses remained constant at $5.5 million for the years ended December 31, 2016 and 2015.

There was no provision for impairment of real estate assets for the year ended December 31, 2016 compared to the prior year provision of $5.3 million, related to the golf course and related assets located in the U.S. Virgin Islands.

Net income fee was $0.3 million for the year ended December 31, 2016. This represents an increase of $0.1 million compared to the net income fee of $0.2 million for the year ended December 31, 2015. The net income fee paid to Pillar is calculated at 7.5% of net income.

Advisory fees were $9.5 million for the year ended December 31, 2016. This represents an increase of $1.1 million compared to the advisory fees of $8.4 million for the year ended December 31, 2015. Advisory fees are computed based on a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value.

25

**Other income (expense)**

Interest income was $14.7 million for the year ending December 31, 2016 compared to $10.7 million for the year ended December 31, 2015 for an increase of $4.0 million. This increase was primarily due to an increase in amount receivable owed from our Advisor .

Mortgage and loan interest expense was $53.1 million for the year ended December 31, 2016. This represents an increase of $6.6 million compared to the prior year expense of $46.5 million. The change by segment is an increase in the other portfolio of $6.9 million, an increase in the apartment portfolio of $1.9 million and an increase in the commercial portfolio of $0.3 million, partially offset by a decrease in the land portfolio of $2.5 million . Within the other portfolio, the increase is due to incurring new mezzanine debt obligations. Within the apartment portfolio, the majority of the increase is due to the acquisition of new properties, partially offset by the refinancing of five loans during 2016 at lower rates.

Gain on sale of income-producing properties was $16.2 million for the year ended December 31, 2016. During 2016, the Company sold one apartment community located in Irving, Texas to an independent third party for a total sales price of $8.1 million and one apartment community located in Topeka, Kansas to an independent third party for a total sales price of $12.3 million. We recorded an aggregate gain of $16.2 million from the sale of these two properties. The Company also sold an industrial warehouse consisting of approximately 177,805 square feet. The sale resulted in a loss of approximately $0.2 million.

Gain on land sales was $3.1 million and $18.9 million for the years ended December 31, 2016 and 2015, respectively. During 2016, we sold a combined acres of land located in Forney, Texas, McKinney, Texas, Farmers Branch, Texas and Nashville, Tennessee to independent third parties for a total sales price of $29.1 million. We recorded an aggregate $3.1 million gain from the land sales. During 2015, we sold 578.8 acres land in six transactions for a sales price of $102.9 million and recorded a gain of $18.9 million.

**Discontinued Operations**

Prior to January 1, 2015, we applied the provisions of ASC 360, "Property, Plant and Equipment", which required that long-lived assets that are to be disposed of by sale be measured at the lesser of (1) book value or (2) fair value less cost to sell. In addition, it required that one accounting model be used for long-lived assets to be disposed of by sale and broadened the presentation of discontinued operations to include more disposal transactions.

There were no sales of income-producing properties during 2017 or 2016 that met the criteria for discontinued operations. Amounts included in discontinued operations represent the residual amounts from sales classified as discontinued operations prior to January 1, 2015. The following table summarizes revenue and expense information for the properties sold that qualified as discontinued operations (dollars in thousands):

|  | For the Years Ended December 31, | |
|  | 2016 | 2015 |
|---|---|---|
| **Revenues:** | | |
| Rental and other property revenues | $ — | $ 355 |
| | — | 355 |
| **Expenses:** | | |
| Property operating expenses | 2 | (345) |
| Depreciation | — | — |
| General and administrative | — | 99 |
| Total operating expenses | 2 | (246) |
| | | |
| **Other income (expense):** | | |
| Other income (expense) | — | 45 |
| Mortgage and loan interest | — | (2) |
| Loan charges and prepayment penalties | — | — |
| Earnings from unconsolidated subsidiaries and investees | — | — |
| Litigation settlement | — | — |
| Total other expenses | — | 43 |
| | | |
| Income (loss) from discontinued operations before gain on sale of real estate and taxes | (2) | 644 |
| Gain on sale of real estate from discontinued operations | — | 735 |
| Income tax expense | 1 | (483) |
| Income from discontinued operations | $ (1) | $ 896 |

26

**Liquidity and Capital Resources**

**General**

Our principal liquidity needs are:

- fund normal recurring expenses;

- meet debt service and principal repayment obligations including balloon payments on maturing debt;

- fund capital expenditures, including tenant improvements and leasing costs;

- fund development costs not covered under construction loans; and

- fund possible property acquisitions.

Our principal sources of cash have been and will continue to be:

- property operations;

- proceeds from land and income-producing property sales;

- collection of mortgage notes receivable;

App. 2062

- collections of receivables from related companies;

- refinancing of existing mortgage notes payable; and

- additional borrowings, including mortgage notes payable, and lines of credit.

It is important to realize that the current status of the banking industry has had a significant effect on our industry. The banks' willingness and/or ability to originate loans affects our ability to buy and sell property, and refinance existing debt. We are unable to foresee the extent and length of this down-turn. A continued and extended decline could materially impact our cash flows. We draw on multiple financing sources to fund our long-term capital needs. We generally fund our development projects with construction loans, which are converted to traditional mortgages upon completion of the project.

We may also issue additional equity securities, including common stock. Management anticipates that our cash as of December 31, 2017, along with cash that will be generated in 2018 from notes and interest receivables, will be sufficient to meet all of our cash requirements. Management intends to selectively sell land and income-producing assets, refinance or extend real estate debt and seek additional borrowings secured by real estate to meet its liquidity requirements. Although history cannot predict the future, historically, we have been successful at refinancing and extending a portion of the Company's current maturity obligations.

Management reviews the carrying values of TCI's properties and mortgage notes receivable at least annually and whenever events or a change in circumstances indicate that impairment may exist. Impairment is considered to exist if, in the case of a property, the future cash flow from the property (undiscounted and without interest) is less than the carrying amount of the property. The property review generally includes: (1) selective property inspections; (2) a review of the property's current rents compared to market rents; (3) a review of the property's expenses; (4) a review of maintenance requirements; (5) a review of the property's cash flow; (6) discussions with the manager of the property; and (7) a review of properties in the surrounding area. For notes receivable, impairment is considered to exist if it is probable that all amounts due under the terms of the note will not be collected. If impairment is found to exist, a provision for loss is recorded by a charge against earnings. The note receivable review includes an evaluation of the collateral property securing such note.

**Cash Flow Summary**

The following summary discussion of our cash flows is based on the Consolidated Statements of Cash Flows in Part II, Item 8. "Consolidated Financial Statements and Supplementary Data" and is not meant to be an all-inclusive discussion of the changes in our cash flows for the periods presented below (dollars in thousands):

|  | 2017 | 2016 | Variance |
|---|---|---|---|
| Net cash provided by (used in) operating activities | $ (32,484) | $ 8,038 | $ (40,522) |
| Net cash provided by (used in) investing activities | (98,312) | (66,866) | (31,446) |
| Net cash provided by (used in) financing activities | 155,995 | 61,163 | 94,832 |

The primary use of cash for operations is daily operating costs, general and administrative expenses, advisory fees, and land holding costs. Our primary source of cash from operating activities is from rental income on properties.

27

Our primary cash outlays for investing activities are for construction and development, acquisition of land and income-producing properties, and capital improvements to existing properties. Our primary sources of cash from investing activities are from the proceeds on the sale of land and income-producing properties. During the year ended December 31, 2017, we acquired one apartment property and one developmental land property.

Our primary sources of cash from financing activities are from proceeds on notes payables. Our primary cash outlays are for recurring debt payments and payments on maturing notes payable.

**Equity Investments**

TCI has from time to time purchased shares of IOR and ARL. The Company may purchase additional equity securities of IOR and ARL through open market and negotiated transactions to the extent TCI's liquidity permits.

Equity securities of ARL and IOR held by TCI may be deemed "restricted securities" under Rule 144 of the Securities Act of 1933 ("Securities Act"). Accordingly, TCI may be unable to sell such equity securities other than in a registered public offering or pursuant to an exemption under the Securities Act for a one-year period after they are acquired. Such restrictions may reduce TCI's ability to realize the full fair value of such investments if TCI attempted to dispose of such securities in a short period of time.

**Contractual Obligations**

We have contractual obligations and commitments primarily with regards to the payment of mortgages. The following table aggregates our expected contractual obligations and commitments and includes items not accrued, per GAAP, through the term of the obligation such as interest expense and operating leases. Our aggregate obligations subsequent to December 31, 2017, are shown in the table below (dollars in thousands):

|  | Total | 2018 | 2019 | 2020 | 2021-2022 | Thereafter |
|---|---|---|---|---|---|---|
| Long-term debt obligation [1] | $ 910,157 | $ 79,838 | $ 101,134 | $ 64,254 | $ 60,010 | $ 604,921 |
| Capital lease obligation | — | — | 1 | — | — | — |
| Operating lease obligation | 30,941 | 504 | 514 | 524 | 1,603 | 27,796 |
| Total | $ 941,098 | $ 80,342 | $ 101,649 | $ 64,778 | $ 61,613 | $ 632,717 |

[1] TCI's long-term debt may contain financial covenants that, if certain thresholds are not met, could allow the lender to accelerate principal payments or cause the note to become due immediately.

**Environmental Matters**

Under various federal, state and local environmental laws, ordinances and regulations, TCI may be potentially liable for removal or remediation costs, as well as certain other potential costs, relating to hazardous or toxic substances (including governmental fines and injuries to persons and property) where property-level managers have arranged for the removal, disposal or treatment of hazardous or toxic substances. In addition, certain environmental laws impose liability for release of asbestos-containing materials into the air, and third parties may seek recovery for personal injury associated with such materials.

Management is not aware of any environmental liability relating to the above matters that would have a material adverse effect on TCI's business, assets or results of operations.

**Inflation**

App. 2063

The effects of inflation on TCI's operations are not quantifiable. Revenues from property operations tend to fluctuate proportionately with inflationary increases and decreases in housing costs. Fluctuations in the rate of inflation also affect sales values of properties and the ultimate gain to be realized from property sales. To the extent that inflation affects interest rates, TCI's earnings from short-term investments, the cost of new financings and the cost of variable interest rate debt will be affected.

## ITEM 7A.   *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

TCI's primary market risk exposure consists of changes in interest rates on borrowings under our debt instruments that bear interest at variable rates that fluctuate with market interest rates and maturing debt that has to be refinanced. TCI's future operations, cash flow and fair values of financial instruments are also partially dependent on the then existing market interest rates and market equity prices.

As of December 31, 2017, our $910.2 million debt portfolio consisted of approximately $844.9 million of fixed-rate debt and approximately $63.3 million of variable-rate debt with interest rates ranging from 1.00% to 12.0%. Our overall weighted average interest rate at December 31, 2017 and 2016 was 5.5% and 4.79%, respectively.

TCI's interest rate sensitivity position is managed by the capital markets department. Interest rate sensitivity is the relationship between changes in market interest rates and the fair value of market rate sensitive assets and liabilities. TCI's earnings are affected as changes in short-term interest rates affect its cost of variable-rate debt and maturing fixed-rate debt.

28

If market interest rates for variable-rate debt average 100 basis points more in 2017 than they did during 2016, TCI's interest expense would increase and net income would decrease by $0.8 million. This amount is determined by considering the impact of hypothetical interest rates on TCI's borrowing cost. The analysis does not consider the effects of the reduced level of overall economic activity that could exist in such an environment. Further, in the event of a change of such magnitude, management would likely take actions to further mitigate its exposure to the change. However, due to the uncertainty of the specific actions that would be taken and their possible effects, the sensitivity analysis assumes no change in TCI's financial structure.

The following table contains only those exposures that existed at December 31, 2017. Anticipation of exposures or risk on positions that could possibly arise was not considered. TCI's ultimate interest rate risk and its effect on operations will depend on future capital market exposures, which cannot be anticipated with a probable assurance level (dollars in thousands):

| | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Thereafter | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | | | |
| Market securities at fair value | | | | | | | | | | | | | | |
| Notes Receivable | | | | | | | | | | | | | | |
| Fixed interest rate - fair value | | | | | | | | | | | | | $ | 65,165 |
| Instruments' maturities | $ | 12,169 | $ | 11,519 | $ | 8,412 | $ | 174 | $ | — | $ | 32,892 | $ | 65,165 |
| Interest | | 7,962 | | 6,509 | | 4,938 | | 3,956 | | 3,942 | | 47,305 | | 74,612 |
| Average Rate | | 10.35% | | 10.77% | | 11.12% | | 11.98% | | 12.00% | | 12.00% | | |

| | 2018 | 2019 | 2020 | 2021 | 2022 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| **Notes Payable** | | | | | | | |
| Variable interest rate-fair value | | | | | | | $  40,035 |
| | | | | | | | |
| Instrument's maturities | — | 30,816 | — | — | — | — | 30,816 |
| Instrument's amortization | 7,444 | 620 | 231 | 241 | 159 | 524 | 9,219 |
| Interest | 1,878 | 1,725 | 74 | 59 | 46 | 60 | 3,842 |
| Average rate | 5.44% | 5.37% | 6.44% | 6.47% | 6.50% | 6.50% | |
| | | | | | | | |
| Fixed interest rate-fair value | | | | | | | $  870,122 |
| | | | | | | | |
| Fixed interest rate notes | | | | | | | |
| Instrument's maturities | 4,151 | 231 | 3,637 | 35,920 | | 10,418 | 54,357 |
| Instrument's amortization | 68,244 | 69,467 | 60,386 | 12,644 | 11,045 | 593,979 | 815,765 |
| Interest | 32,167 | 26,600 | 21,259 | 19,617 | 17,635 | 779,749 | 897,027 |
| Average rate | 5.91% | 5.19% | 4.10% | 3.80% | 3.67% | 3.57% | |

29

## ITEM 8.     *CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

**INDEX TO FINANCIAL STATEMENTS**

| | Page # |
|---|---|
| **Financial Statements** | |
| Report of Independent Registered Public Accounting Firm | 31 |
| Consolidated Balance Sheets—December 31, 2017 and 2016 | 32 |
| Consolidated Statements of Operations—Years Ended December 31, 2017, 2016 and 2015 | 33 |
| Consolidated Statements of Shareholders' Equity—Years Ended December 31, 2017, 2016 and 2015 | 34 |
| Consolidated Statements of Cash Flows—Years Ended December 31, 2017, 2016 and 2015 | 35 |
| Statements of Consolidated Comprehensive Income (Loss) – Years Ended December 31, 2017, 2016 and 2015 | 36 |
| Notes to Consolidated Financial Statements | 37 |
| | |
| **Financial Statement Schedules** | |
| Schedule III—Real Estate and Accumulated Depreciation | 56 |
| Schedule IV—Mortgage Loans on Real Estate | 60 |

All other schedules are omitted because they are not required, are not applicable or the information required is included in the Financial Statements or the notes thereto.

App. 2064

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors of and
Stockholders of Transcontinental Realty Investors, Inc.
Dallas, Texas

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Transcontinental Realty Investors, Inc. and Subsidiaries as of December 31, 2017 and 2016, and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes and schedules collectively referred to as the "consolidated financial statements." In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Transcontinental Realty Investors, Inc. as of December 31, 2017 and 2016 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with U.S. generally accepted accounting principles.

**Basis of Opinion**

These consolidated financial statements are the responsibility of Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Emphasis of Liquidity**

As described in the Note 14, Transcontinental Realty Investors, Inc.'s management intends to sell land and income-producing properties and refinance or extend debt secured by real estate to meet the Company's liquidity needs.

**Supplemental Information**

The supplemental information contained in Schedules III and IV has been subjected to audit procedures performed in conjunction with the audit of the Company's financial statements. The supplemental information is the responsibility of the Company's management. Our audit procedures included determining whether the supplemental information reconciles to the financial statements or the underlying accounting and other records, as applicable, and performing procedures to test the completeness and accuracy of the information presented in the supplemental information. In forming our opinion on the supplemental information, we evaluated whether the supplemental information, including its form and content, is presented in conformity with the Security and Exchange Commission's rules. In our opinion, the supplemental information is fairly stated, in all material respects, the financial date required to be set forth therein in relation to the financial statements as a whole.

FARMER, FUQUA & HUFF, PC

Richardson, Texas
March 30, 2018

We have served as the Company's auditor since 2004.

31

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| | (dollars in thousands, except share and par value amounts) | |
| **Assets** | | |
| Real estate, at cost | $ 1,112,721 | $ 998,498 |
| Real estate subject to sales contracts at cost, net of depreciation ($0 in 2017 and $0 in 2016) | 45,739 | 46,956 |
| Less accumulated depreciation | (178,590) | (154,281) |
| Total real estate | 979,870 | 891,173 |
| Notes and interest receivable | | |
| Performing (including $45,155 in 2017 and $66,066 in 2016 from related parties) | 70,166 | 79,308 |
| Total notes and interest receivable | 70,166 | 79,308 |
| Cash and cash equivalents | 42,705 | 17,506 |
| Restricted cash | 45,637 | 38,227 |
| Investments in unconsolidated subsidiaries and investees | 2,472 | 2,446 |
| Receivable from related party | 111,665 | 101,649 |
| Other assets | 60,907 | 55,605 |
| Total assets | $ 1,313,422 | $ 1,185,914 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Liabilities: | | |
| Notes and interest payable | $ 892,149 | $ 835,528 |

App. 2065

| Notes related to subject to sales contracts | | |
|---|---|---|
| | 1,957 | 5,612 |
| Bond and bond interest payable | 113,047 | — |
| Deferred revenue (including $40,574 in 2017 and $50,689 in 2016 from related parties) | 60,949 | 71,065 |
| Accounts payable and other liabilities (including $7,236 in 2017 and $6,487 in 2016 from related parties) | 36,683 | 48,856 |
| | 1,105,161 | 961,437 |

Shareholders' equity:

| | | |
|---|---|---|
| Preferred stock, Series C: $0.01 par value, authorized 10,000,000 shares, issued and outstanding zero shares in 2017 and 2016 (liquidation preference $100 per share).  Series D: $0.01 par value, authorized, issued and outstanding 100,000 shares in 2017 and 2016 (liquidation preference $100 per share) | 1 | 1 |
| Common Stock, $0.01 par value, authorized 10,000,000 shares, issued 8,717,967 shares in 2017 and 2016 and outstanding 8,717,767 in 2017 and 2016 | 87 | 87 |
| Treasury stock at cost, 200 shares in 2017 and 2016 | (2) | (2) |
| Paid-in capital | 268,949 | 269,849 |
| Retained earnings | (79,865) | (64,050) |
| Total Transcontinental Realty Investors, Inc. shareholders' equity | 189,170 | 205,885 |
| Non-controlling interest | 19,091 | 18,592 |
| Total shareholders' equity | 208,261 | 224,477 |
| Total liabilities and shareholders' equity | $ 1,313,422 | $ 1,185,914 |

The accompanying notes are an integral part of these consolidated financial statements.

32

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | (dollars in thousands, except per share amounts) | | |
| **Revenues:** | | | |
| Rental and other property revenues (including $839, $708 and $726 for the year ended 2017, 2016 and 2015, respectively, from related parties) | $ 125,233 | $ 118,471 | $ 102,220 |
| **Expenses:** | | | |
| Property operating expenses (including $929, $865 and $740 for the year ended 2017, 2016 and 2015, respectively, from related parties) | 63,056 | 61,918 | 52,257 |
| Depreciation and amortization | 25,558 | 23,683 | 21,299 |
| General and administrative (including $3,120, $3,574 and $3,105 for the year ended 2017, 2016 and 2015, respectively, from related parties) | 6,269 | 5,476 | 5,508 |
| Provision on impairment of real estate assets | — | — | 5,300 |
| Net income fee to related party | 250 | 257 | 187 |
| Advisory fee to related party | 9,995 | 9,490 | 8,368 |
| Total operating expenses | 105,128 | 100,824 | 92,919 |
| Net operating income | 20,105 | 17,647 | 9,301 |
| **Other income (expense):** | | | |
| Interest income (including $11,485, $13,348 and $10,071 for the year ended 2017, 2016 and 2015, respectively, from related parties) | 13,862 | 14,670 | 10,687 |
| Other income | 625 | 1,816 | 71 |
| Mortgage and loan interest (including $0, $568, and $0 for the year ended 2017, 2016 and 2015, respectively, from related parties) | (59,944) | (53,088) | (46,541) |
| Foreign currency translation loss | (4,536) | — | (1) |
| Income (loss) from unconsolidated joint ventures and investees | 26 | (26) | 41 |
| Litigation settlement | — | — | (352) |
| Total other expenses | (49,967) | (36,628) | (36,095) |
| Loss before gain on sales, non-controlling interest and taxes | (29,862) | (18,981) | (26,794) |
| Gain on sale of income-producing properties (including recognition of $9,842, $0, and $0 previously deferred gains in 2017, 2016, 2015, respectively) | 9,842 | 16,207 | — |
| Gain on land sales | 4,884 | 3,121 | 18,911 |
| Net income (loss) from continuing operations before taxes | (15,136) | 347 | (7,883) |
| Income tax benefit (expense) | (180) | (24) | (517) |
| Net income (loss) from continuing operations | (15,316) | 323 | (8,400) |
| Discontinued operations: | | | |
| Net income (loss) from discontinued operations | — | (2) | 644 |
| Gain on sale of real estate from discontinued operations | — | — | 735 |
| Income tax expense from discontinued operations | — | 1 | (483) |
| Net income from discontinued operations | — | (1) | 896 |
| Net income (loss) | (15,316) | 322 | (7,504) |
| Net income attributable to non-controlling interest | (499) | (285) | (132) |
| Net income (loss) attributable to Transcontinental Realty Investors, Inc. | (15,815) | 37 | (7,636) |
| Preferred dividend requirement | (900) | (900) | (900) |
| Net income (loss) applicable to common shares | $ (16,715) | $ (863) | $ (8,536) |
| **Earnings per share - basic** | | | |
| Net income (loss) from continuing operations | $ (1.92) | $ (0.10) | $ (1.08) |
| Net income from discontinued operations | — | — | 0.10 |
| Net income (loss) applicable to common shares | $ (1.92) | $ (0.10) | $ (0.98) |

App. 2066

**Earnings per share - diluted**

| | | | | | |
|---|---|--:|---|--:|---|--:|
| Net income (loss) from continuing operations | $ | (1.92) | $ | (0.10) | $ | (1.08) |
| Net income from discontinued operations | | — | | — | | 0.10 |
| Net income (loss) applicable to common shares | $ | (1.92) | $ | (0.10) | $ | (0.98) |
| | | | | | | |
| Weighted average common shares used in computing earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 |
| Weighted average common shares used in computing diluted earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 |
| | | | | | | |
| **Amounts attributable to Transcontinental Realty Investors, Inc.** | | | | | | |
| Net income (loss) from continuing operations | $ | (15,815) | $ | 38 | $ | (8,532) |
| Net income (loss) from discontinued operations | | — | | (1) | | 896 |
| Net income (loss) | $ | (15,815) | $ | 37 | $ | (7,636) |

The accompanying notes are an integral part of these consolidated financial statements.

33

## TRANSCONTINENTAL REALTY INVESTORS, INC.
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
### For the Three Years Ended December 31, 2017
#### (dollars in thousands)

| | Total | Comprehensive Income (Loss) | Preferred Stock | Common Stock Shares | Common Stock Amount | Treasury Stock | Paid-in Capital | Retained Earnings | Non-Controlling Interest |
|---|--:|--:|--:|--:|--:|--:|--:|--:|--:|
| **Balance, December 31, 2014** | $ 233,448 | $ (57,670) | $ 1 | 8,717,967 | $ 87 | $ (2) | $ 271,649 | $ (56,451) | $ 18,164 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | — | (900) | — | — |
| Net income (loss) | (7,504) | (7,504) | — | — | — | — | — | (7,636) | 132 |
| Contributions from non-controlling interests | 11 | — | — | — | — | — | — | — | 11 |
| Repurchase/sale of treasury shares, net | — | — | — | — | — | — | — | — | — |
| **Balance, December 31, 2015** | $ 225,055 | $ (65,174) | $ 1 | 8,717,967 | $ 87 | $ (2) | $ 270,749 | $ (64,087) | $ 18,307 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | — | (900) | — | — |
| Net income | 322 | 322 | — | — | — | — | — | 37 | 285 |
| **Balance, December 31, 2016** | $ 224,477 | $ (64,852) | $ 1 | 8,717,967 | $ 87 | $ (2) | $ 269,849 | $ (64,050) | $ 18,592 |
| Series D preferred stock dividends (9.0% per year) | (900) | — | — | — | — | — | (900) | — | — |
| Net income (loss) | (15,316) | (15,316) | — | — | — | — | — | (15,815) | 499 |
| **Balance, December 31, 2017** | $ 208,261 | $ (80,168) | $ 1 | 8,717,967 | $ 87 | $ (2) | $ 268,949 | $ (79,865) | $ 19,091 |

The accompanying notes are an integral part of these consolidated financial statements.

34

## TRANSCONTINENTAL REALTY INVESTORS, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | | For the Years Ended December 31, | | |
|---|---|--:|--:|--:|
| | | 2017 | 2016 | 2015 |
| | | (dollars in thousands) | | |
| **Cash Flow From Operating Activities:** | | | | |
| Net income (loss) | $ | (15,316) | $ 322 | $ (7,504) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | |
| (Gain) loss on sale of land | | (4,884) | (3,121) | (18,911) |
| Gain on sale of income producing properties | | (9,842) | (16,207) | (735) |
| Depreciation and amortization | | 25,558 | 23,683 | 21,299 |
| Provision on impairment of notes receivable and real estate assets | | — | — | 5,300 |
| Amortization of deferred borrowing costs | | 3,574 | 4,314 | 2,684 |
| Amortization of Series A bonds issuance costs | | 971 | — | — |
| Earnings from unconsolidated subsidiaries and investees | | (26) | (26) | (132) |
| (Increase) decrease in assets: | | | | |
| Accrued interest receivable | | (668) | (922) | 586 |
| Other assets | | (1,433) | (2,388) | 4,204 |
| Prepaid expense | | (5,661) | (9,238) | (13,615) |
| Escrow | | (8,584) | 7,584 | 2,684 |
| Earnest money | | 856 | (571) | (905) |
| Rent receivables | | 543 | 2,840 | 2,104 |
| Related party receivables | | (9,972) | (11,134) | (40,153) |
| Increase (decrease) in liabilities: | | | | |
| Accrued interest payable | | 4,573 | 20 | (710) |
| Other liabilities | | (12,173) | 12,882 | (7,115) |
| Net cash provided by (used in) operating activities | | (32,484) | 8,038 | (50,919) |

App. 2067

**Cash Flow From Investing Activities:**

| | | | |
|---|---|---|---|
| Proceeds from notes receivables | 26,230 | 2,867 | 10,669 |
| Originations of notes receivables | (16,420) | (11,703) | (18,055) |
| Acquisition of land held for development | — | (12,508) | — |
| Acquisition of income producing properties | (37,044) | (79,736) | (207,313) |
| Proceeds from sales of income producing properties | — | 21,850 | |
| Proceeds from sale of land | 6,301 | 29,128 | 107,299 |
| Investment in unconsolidated real estate entities | — | 2,797 | (596) |
| Improvement of land held for development | — | (3,023) | (6,158) |
| Improvement of income producing properties | (64,443) | (5,702) | (8,952) |
| Construction and development of new properties | (12,936) | (10,836) | (16,717) |
| Net cash provided by (used in) investing activities | (98,312) | (66,866) | (139,823) |

**Cash Flow From Financing Activities:**

| | | | |
|---|---|---|---|
| Proceeds from Series A bonds payable | 115,335 | — | — |
| Proceeds from notes payable | 135,116 | 242,215 | 403,309 |
| Recurring amortization of principal on notes payable | (83,070) | (20,205) | (15,545) |
| Payments on maturing notes payable | — | (160,745) | (186,128) |
| Deferred financing costs | (3,599) | 798 | (7,035) |
| Distributions to non-controlling interests | — | — | 11 |
| Common stock issuance | — | — | — |
| Preferred stock dividends - Series C | — | — | — |
| Bond issuance costs | (6,887) | — | — |
| Preferred stock dividends - Series D | (900) | (900) | (900) |
| Net cash provided by (used in) financing activities | 155,995 | 61,163 | 193,712 |

| | | | |
|---|---|---|---|
| Net increase (decrease) in cash and cash equivalents | 25,199 | 2,335 | 2,970 |
| Cash and cash equivalents, beginning of period | 17,506 | 15,171 | 12,201 |
| Cash and cash equivalents, end of period | $ 42,705 | $ 17,506 | $ 15,171 |

**Supplemental disclosures of cash flow information:**

| | | | |
|---|---|---|---|
| Cash paid for interest | $ 49,791 | $ 43,986 | $ 38,787 |
| Cash paid for taxes | $ — | $ — | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

35

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**For the Three Years Ended December 31,**

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Net income (loss) | $ (15,316) | $ 322 | $ (7,504) |
| Comprehensive income attributable to non-controlling interest | (499) | (285) | (132) |
| Comprehensive income (loss) attributable to Transcontinental Realty Investors, Inc. | $ (15,815) | $ 37 | $ (7,636) |

The accompanying notes are an integral part of these consolidated financial statements.

36

**TRANSCONTINENTAL REALTY INVESTORS, INC.**

**NOTES TO FINANCIAL STATEMENTS**

The accompanying Consolidated Financial Statements of Transcontinental Realty Investors, Inc. "TCI" and consolidated entities have been prepared in conformity with accounting principles generally accepted in the United States of America, the most significant of which are described in Note 1. "Summary of Significant Accounting Policies." The Notes to Consolidated Financial Statements are an integral part of the Consolidated Financial Statements. The data presented in the Notes to Consolidated Financial Statements are as of December 31 of each year and for the year then ended, unless otherwise indicated. Dollar amounts in tables are in thousands, except per share amounts.

Certain balances for 2016 and 2015 have been reclassified to conform to the 2017 presentation.

**NOTE 1.   *ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES***

***Organization and business.***   TCI, a Nevada corporation, is headquartered in Dallas, Texas and its common stock trades on the New York Stock Exchange ("NYSE American") under the symbol "TCI".

TCI is a "C" corporation for U.S. federal income tax purposes and files an annual consolidated income tax return with American Realty Investors, Inc. "ARL", whose common stock is traded on the NYSE American under the symbol "ARL". Subsidiaries of ARL own approximately 77.68% of the Company's common stock.

In 2009, the Company acquired an additional 2,518,934 shares of common stock of Income Opportunity Realty Investors, Inc. "IOR", and in doing so, increased its ownership from approximately 25% to over 80% of the shares of common stock of IOR outstanding. Upon acquisition of the additional shares in 2009, IOR's results of operations began consolidating with those of the Company for tax and financial reporting purposes. As of December 31, 2017, TCI owned 81.25% of the outstanding IOR common shares. Shares of IOR are traded on the New York Exchange ("NYSE American") under the symbol "IOR".

App. 2068

At the time of the acquisition, the historical accounting value of IOR's assets was $112 million and liabilities were $43 million. In that the shares of IOR acquired by TCI were from a related party, the values recorded by TCI are IOR's historical accounting values at the date of transfer. The Company's fair valuation of IOR's assets and liabilities at the acquisition date approximated IOR's book value. The net difference between the purchase price and historical accounting basis of the assets and liabilities acquired was $25.9 million and has been reflected by TCI as deferred income. The deferred income will be recognized upon the sale of the land that IOR held on its books as of the date of sale, to an independent third party.

TCI's Board of Directors is responsible for directing the overall affairs of TCI and for setting the strategic policies that guide the Company. As of April 30, 2011, the Board of Directors delegated the day-to-day management of the Company to Pillar Income Asset Management, Inc. ("Pillar"), a Nevada corporation under a written Advisory Agreement that is reviewed annually by TCI's Board of Directors. The directors of TCI are also directors of ARL and IOR. The Chairman of the Board of Directors of TCI also serves as the Chairman of the Board of Directors of ARL and IOR. The officers of TCI also serve as officers of ARL, IOR and Pillar.

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is Realty Advisors, Inc. "RAI", a Nevada corporation, the sole shareholder of which is May Realty Holdings, Inc. ("MRHI", formerly known as Realty Advisors Management, Inc. "RAMI", effective August 7, 2014), a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), manages our commercial properties and provides brokerage services. Regis receives property management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. See Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage". TCI engages third-party companies to lease and manage its apartment properties.

Southern Properties Capital Ltd. ("Southern") is a wholly owned subsidiary of TCI that was incorporated on August 16, 2016 for the purpose of raising funds by issuing debentures that cannot be converted into shares on the Tel-Aviv Stock Exchange. Southern operates in the United States and is primarily involved in investing in, developing, constructing and operating income-producing properties of multi-family residential real estate assets. Southern is included in the consolidated financial statements of TCI.

On January 1, 2012, the Company entered into a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

Our primary business is the acquisition, development and ownership of income-producing residential and commercial real estate properties. In addition, we opportunistically acquire land for future development in in-fill or high-growth suburban markets. From time to time and when we believe it appropriate to do so, we will also sell land and income-producing properties. We generate revenues by leasing apartment units to residents and leasing office and retail space to various for-profit businesses as well as certain local, state and federal agencies. We also generate revenues from gains on sales of income-producing properties and land. At December 31, 2017, we owned fifty-three residential apartment communities comprising of 8,427 units, seven commercial properties comprising an aggregate of approximately 1.7 million rentable square feet, an investment in 3,466 acres of undeveloped and partially developed land, and a golf course comprising of approximately 96.1 acres.

37

**Basis of presentation**.   The Company presents its financial statements in accordance with generally accepted accounting principles in the United States ("GAAP"). The accompanying Consolidated Financial Statements include our accounts, our subsidiaries, generally all of which are wholly-owned, and all entities in which we have a controlling interest. Arrangements that are not controlled through voting or similar rights are accounted for as a Variable Interest Entity (VIE), in accordance with the provisions and guidance of ASC Topic 810 "Consolidation", whereby we have determined that we are a primary beneficiary of the VIE and meet certain criteria of a sole general partner or managing member as identified in accordance with Emerging Issues Task Force ("EITF") Issue 04-5, Investor's Accounting for an Investment in a Limited Partnership when the Investor is the Sole General Partner and the Limited Partners have Certain Rights ("EITF 04-5"). VIEs are generally entities that lack sufficient equity to finance their activities without additional financial support from other parties or whose equity holders as a group lack adequate decision making ability, the obligation to absorb expected losses or residual returns of the entity, or have voting rights that are not proportional to their economic interests. The primary beneficiary generally is the entity that provides financial support and bears a majority of the financial risks, authorizes certain capital transactions, or makes operating decisions that materially affect the entity's financial results. All significant intercompany balances and transactions have been eliminated in consolidation.

In determining whether we are the primary beneficiary of a VIE, we consider qualitative and quantitative factors, including, but not limited to: the amount and characteristics of our investment; the obligation or likelihood for us or other investors to provide financial support; our and the other investors' ability to control or significantly influence key decisions for the VIE; and the similarity with and significance to the business activities of us and the other investors. Significant judgments related to these determinations include estimates about the current future fair values and performance of real estate held by these VIEs and general market conditions.

For entities in which we have less than a controlling financial interest or entities where it is not deemed to be the primary beneficiary, the entities are accounted for using the equity method of accounting. Accordingly, our share of the net earnings or losses of these entities are included in consolidated net income. TCI's investment in ARL is accounted for under the equity method.

The Company in accordance with the VIE guidance in ASC 810 "Consolidations" consolidates fifty-one and fifty multifamily residential properties located throughout the United States at December 31, 2017 and December 31, 2016, respectively, with total units of 8,427 and 8226, respectively. Assets totaling approximately $483.7 million and approximately $442 million at December 31, 2017 and 2016, respectively, are consolidated and included in "Real estate, at cost" on the balance sheet and are all collateral for their respective mortgage notes payable, none of which are recourse to the partnership in which they are in or to the Company.

**Real estate, depreciation, and impairment**.   Real estate assets are stated at the lower of depreciated cost or fair value, if deemed impaired. Major replacements and betterments are capitalized and depreciated over their estimated useful lives. Depreciation is computed on a straight-line basis over the useful lives of the properties (buildings and improvements—10-40 years; furniture, fixtures and equipment—5-10 years). We continually evaluate the recoverability of the carrying value of its real estate assets using the methodology prescribed in ASC Topic 360, "Property, Plant and Equipment," Factors considered by management in evaluating impairment of its existing real estate assets held for investment include significant declines in property operating profits, annually recurring property operating losses and other significant adverse changes in general market conditions that are considered permanent in nature. Under ASC Topic 360, a real estate asset held for investment is not considered impaired if the undiscounted, estimated future cash flows of an asset (both the annual estimated cash flow from future operations and the estimated cash flow from the theoretical sale of the asset) over its estimated holding period are in excess of the asset's net book value at the balance sheet date. If any real estate asset held for investment is considered impaired, a loss is provided to reduce the carrying value of the asset to its estimated fair value.

Properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors. For sales transactions where the guidance reflects a sale did not occur, the asset involved in the transaction, including the debt, if applicable, and property operations, remain on the books of the Company. We continue to charge depreciation to expense as a period cost for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

**Real estate held for sale**.   We classify properties as held for sale when certain criteria are met in accordance with GAAP. At that time, we present the assets and obligations of the property held for sale separately in our consolidated balance sheet and we cease recording depreciation and amortization expense related to that property. Properties held for sale are reported at the lower of their

App. 2069

carrying amount or their estimated fair value, less estimated costs to sell, we did not have any real estate assets classified as held for sale at December 31, 2014 or 2015.

38

Effective as of January 1, 2015, we adopted the revised guidance in Accounting Standards Update No. 2014-08 regarding discontinued operations. For sales of real estate or assets classified as held for sale after January 1, 2015, we will evaluate whether a disposal transaction meets the criteria of a strategic shift and will have a major effect on our operations and financial results to determine if the results of operations and gains on sale of real estate will be presented as part of our continuing operations or as discontinued operations in our consolidated statements of operations. If the disposal represents a strategic shift, it will be classified as discontinued operations for all periods presented; if not, it will be presented in continuing operations.

Any properties that are treated as "subject to sales contract" on the Consolidated Balance Sheets and are listed in detail in Schedule III, "Real Estate and Accumulated Depreciation" are those in which we have not recognized the legal sale according to the guidance in ASC 360-20 due to various factors, disclosed in Item 1 "Significant Real Estate Acquisitions/Dispositions and Financing." Any sale transaction where the guidance reflects that a sale had not occurred, the asset involved in the transaction, including the debt, if appropriate, and property operations, remained on the books of the Company. We continue to charge depreciation to expense as a period costs for the property until such time as the property has been classified as held for sale in accordance with guidance reflected in ASC 360-10-45 "Impairment or Disposal of Long-Lived Assets."

*Cost capitalization.*     The cost of buildings and improvements includes the purchase price of property, legal fees and other acquisition costs. Costs directly related to planning, developing, initial leasing and constructing a property are capitalized and classified as Real Estate in the Consolidated Balance Sheets. Capitalized development costs include interest, property taxes, insurance, and other direct project costs incurred during the period of development.

A variety of costs are incurred in the acquisition, development and leasing of properties. After determination is made to capitalize a cost, it is allocated to the specific component of a project that is benefited. Determination of when a development project is substantially complete and capitalization must cease involves a degree of judgment. Our capitalization policy on development properties is guided by ASC Topic 835-20 "Interest – Capitalization of Interest" and ASC Topic 970 "Real Estate - General". The costs of land and buildings under development include specifically identifiable costs. The capitalized costs include pre-construction costs essential to the development of the property, development costs, construction costs, interest costs, real estate taxes, salaries and related costs and other costs incurred during the period of development. We consider a construction project as substantially completed and held available for occupancy upon the receipt of certificates of occupancy, but no later than one year from cessation of major construction activity. We cease capitalization on the portion (1) substantially completed and (2) occupied or held available for occupancy, and we capitalize only those costs associated with the portion under construction.

We capitalize leasing costs which include commissions paid to outside brokers, legal costs incurred to negotiate and document a lease agreement and any internal costs that may be applicable. We allocate these costs to individual tenant leases and amortize them over the related lease term.

*Fair value measurement*.   We apply the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. These provisions define fair value as the price that would be received to sell an asset or paid to transfer a liability in a transaction between market participants at the measurement date, establish a hierarchy that prioritizes the information used in developing fair value estimates and require disclosure of fair value measurements by level within the fair value hierarchy. The hierarchy gives the highest priority to quoted prices in active markets (Level 1 measurements) and the lowest priority to unobservable data (Level 3 measurements), such as the reporting entity's own data.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability as of the measurement date and includes three levels defined as follows:

Level 1   —   Unadjusted quoted prices for identical and unrestricted assets or liabilities in active markets.

Level 2   —   Quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3   —   Unobservable inputs that are significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Related parties.* We apply ASC Topic 805, "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

*Recognition of revenue*.   Our revenues, which are composed largely of rental income, include rents reported on a straight-line basis over the lease term. In accordance with ASC 805 "Business Combinations", we recognize rental revenue of acquired in-place "above-" and "below-market" leases at their fair values over the terms of the respective leases.

39

Reimbursements of operating costs, as allowed under most of our commercial tenant leases, consist of amounts due from tenants for common area maintenance, real estate taxes and other recoverable costs, and are recognized as revenue in the period in which the recoverable expenses are incurred. We record these reimbursements on a "gross" basis, since we generally are the primary obligor with respect to purchasing goods and services from third-party suppliers; we have discretion in selecting the supplier and have the credit risk with respect to paying the supplier.

Rental income for residential property leases is recorded when due from residents and is recognized monthly as earned, which is not materially different than on a straight-line basis as lease terms are generally for periods of one year or less. An allowance for doubtful accounts is recorded for all past due rents and operating expense reimbursements considered to be uncollectible.

Sales and the associated gains or losses related to real estate assets are recognized in accordance with the provisions of ASC Topic 360-20, "Property, Plant and Equipment—Real Estate Sale." The specific timing of a sale is measured against various criteria in ASC 360-20 related to the terms of the transaction and any continuing involvement in the form of management or financial assistance associated with the properties. If the sales criteria for the full accrual method are not met, the Company defers some or all of the gain recognition and accounts for the continued operations of the property by applying the finance, leasing, deposit, installment or cost recovery methods, as appropriate, until the sales criteria are met.

*Non-performing notes receivable.*   We consider a note receivable to be non-performing when the maturity date has passed without principal repayment and the borrower is not making interest payments in accordance with the terms of the agreement.

*Interest recognition on notes receivable*.   We record interest income as earned in accordance with the terms of the related loan agreements.

*Allowance for estimated losses*.   We assess the collectability of notes receivable on a periodic basis, of which the assessment consists primarily of an evaluation of cash flow projections of the borrower to determine whether estimated cash flows are sufficient to repay principal and interest in accordance with the contractual terms of the note. We recognize impairments on notes receivable when it is probable that principal and interest will not be received in accordance with the contractual terms of the loan. The amount of the impairment to be recognized generally is based on the fair value of the partnership's real estate that represents the primary source of loan repayment. See Note 3 "Notes and Interest Receivable" for details on our notes receivable.

*Cash equivalents.*   For purposes of the Consolidated Statements of Cash Flows, all highly liquid investments purchased with an original maturity of three months or less are considered to be cash

App. 2070

**Restricted cash.**    Restricted cash is comprised primarily of cash balances held in escrow by financial institutions under the terms of certain secured notes payable and certain unsecured bonds payable.

**Concentration of credit risk.**   The Company maintains its cash balances at commercial banks and through investment companies, the deposits of which are insured by the Federal Deposit Insurance Corporation (FDIC). At December 31, 2017 and 2016, the Company maintained balances in excess of the insured amount.

 **Earnings per share**.   Income (loss) per share is presented in accordance with ASC 620 "Earnings per Share" and is computed based upon the weighted average number of shares of common stock outstanding during each year.

**Use of estimates.**   In the preparation of Consolidated Financial Statements in conformity with GAAP, it is necessary for management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements and the reported amounts of revenues and expense for the year ended. Actual results could differ from those estimates.

**Income taxes**.    The Company is a "C" corporation" for U.S. federal income tax purposes. The Company and the rest of the ARL group are included in the MRHI, consolidated group for tax purposes. TCI is a member of a tax sharing agreement that specifies the manner in which the group will share the consolidated tax liability and also how certain tax attributes are to be treated among members of the group.

**Recent accounting pronouncements**.

In May 2014, Accounting Standards Update ("ASU") No. 2014-09 ("ASU 2014-09"), "Revenue from Contracts with Customers," was issued. This new guidance established a new single comprehensive revenue recognition model and provides for enhanced disclosures. Under the new policy, the nature, timing and amount of revenue recognized for certain transactions could differ from those recognized under existing accounting guidance. This new standard does not affect revenue recognized under lease contracts. ASU 2014-09 is effective for reporting periods beginning after December 15, 2017. The Company is currently evaluating the impact the adoption of this guidance has on its financial position and results of operations, if any.

In February 2016, Accounting Standards Update No. 2016-02 ("ASU 2016-02"), "Leases" was issued. This new guidance establishes a new model for accounting for leases and provides for enhanced disclosures. ASU 2016-02 is effective for reporting periods beginning after December 15, 2018. The Company is currently evaluating the impact the adoption of this guidance, if any, on its financial position and results of operations.

<center>40</center>

## NOTE 2.   REAL ESTATE

A summary of our real estate owned as of the end of the year is listed below (dollars in thousands):

|  | 2017 | 2016 |
|---|---:|---:|
| Apartments | $ 737,661 | $ 697,732 |
| Apartments under construction | 104,791 | 25,288 |
| Commercial properties | 200,803 | 204,384 |
| Land held for development | 69,466 | 71,094 |
| Real estate subject to sales contract | 45,739 | 46,956 |
| Total real estate, at cost, less impairment | 1,158,460 | 1,045,454 |
| Less accumulated depreciation | (178,590) | (154,281) |
| **Total real estate, net of depreciation** | **$ 979,870** | **$ 891,173** |

Expenditures for repairs and maintenance are charged to operations as incurred. Significant betterments are capitalized. When assets are sold or retired, their costs and related accumulated depreciation are removed from the accounts with the resulting gains or losses reflected in net income or loss for the period.

Depreciation is computed on a straight line basis over the estimated useful lives of the assets as follows:

| | |
|---|---|
| Land improvements | 25 to 40 years |
| Buildings and improvements | 10 to 40 years |
| Tenant improvements | Shorter of useful life or terms of related lease |
| Furniture, fixtures and equipment | 3 to 7 years |

*Fair Value Measurement*

The Company applies the guidance in ASC Topic 820, "Fair Value Measurements and Disclosures," to the valuation of real estate assets. The Company is required to assess the fair value of its consolidated real estate assets with indicators of impairment. The value of impaired real estate assets is determined using widely accepted valuation techniques, including discounted cash flow analyses on the expected cash flow of each asset, as well as the income capitalization approach, which considers prevailing market capitalization rates, analyses of recent comparable sales transactions, information from actual sales negotiations and bona fide purchase offers received from third parties. The methods used to measure fair value may produce an amount that may not be indicative of net realizable value or reflective of future values. Furthermore, although the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

The fair value measurements used in these evaluations are considered to be Level 2 and 3 valuations within the fair value hierarchy in the accounting rules, as there are significant observable (Level 2) and unobservable inputs (Level 3). Examples of Level 2 inputs the Company utilizes in its fair value calculations are appraisals and bona fide purchase offers from third parties. Examples of Level 3 inputs the Company utilizes in its fair value calculations are discount rates, market capitalization rates, expected lease rental rates, timing of new leases, an estimate of future sales prices and comparable sales prices of similar assets, if available.

| December 31, 2015 | Fair Value | Fair Value Measurements Using (dollars in thousands): | | |
|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 |
| Commercial | $ 3,000 | $ — | $ — | $ 3,000 |

There was no provision for impairment during the years ended December 31, 2017 and 2016.

<div align="right">App. 2071</div>

41

The highlights of our significant real estate transactions for the year ended December 31, 2017, are discussed below.

*Purchases*

During the year ended December 31, 2017, the Company acquired one income-producing apartment property from a third party in the state of North Carolina, increasing the total number of units by 201, for a combined purchase price of $36.7 million. In addition, we acquired one land parcel for future development for a total purchase price of $5.4 million, adding 18.5 acres to the development portfolio.

*Sales*

As of December 31, 2017, the Company has approximately 66.7 acres of land, at various locations that were sold to related parties in multiple transactions. These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets. Due to the related party nature of the transactions, TCI has deferred the recording of the sales in accordance with ASC 360-20.

We continue to invest in the development of apartment projects. During the year ended December 31, 2017, we have expended $69.8 million related to the construction or predevelopment of various apartment complexes and capitalized $2.4 million of interest costs.

42

**NOTE 3.    *NOTES AND INTEREST RECEIVABLE***

A portion of our assets are invested in mortgage notes receivable, principally secured by real estate. We may originate mortgage loans in conjunction with providing purchase money financing of property sales. Notes receivable are generally collateralized by real estate or interests in real estate and personal guarantees of the borrower and, unless noted otherwise, are so secured. Management intends to service and hold for investment the mortgage notes in our portfolio. A majority of the notes receivable provide for principal to be paid at maturity (dollars in thousands).

As of December 31, 2017, the obligors on $45.1 million or 64.3% of the mortgage notes receivable portfolio were due from related entities. The Company recognized $3.7 million of interest income from these related party notes receivables.

As of December 31, 2017, none of the mortgage notes receivable portfolio were non-performing.

The Company has various notes receivable from Unified Housing foundation, Inc. "UHF". UHF is determined to be a related party due to our significant investment in the performance of the collateral secured under the notes receivable. Payments are due from surplus cash flow from operations, sale or refinancing of the underlying properties. These notes are cross collateralized to the extent that any surplus cash available from any of the properties underlying these notes will be used to repay outstanding interest and principal for the remaining notes. Furthermore, any surplus cash available from any of the properties UHF owns, besides the properties underlying these notes, can be used to repay outstanding interest and principal for these notes. The allowance on the notes was a purchase allowance that was netted against the notes when acquired.

| Borrower | Maturity Date | Interest Rate | Amount | Security |
|---|---|---|---|---|
| Performing loans: | | | | |
| H198, LLC (Las Vegas Land) | 01/20 | 12.00% | $ 5,907 | Secured |
| H198, LLC (McKinney Ranch Land) | 09/18 | 6.00% | 4,290 | Secured |
| Oulan-Chikh Family Trust | 03/21 | 8.00% | 174 | Secured |
| Spyglass Apartments of Ennis | 11/19 | 5.00% | 4,522 | Secured |
| Bellwether Ridge | 05/20 | 5.00% | 2,954 | Secured |
| Parc at Windmill Farms | 05/20 | 5.00% | 2,505 | Secured |
| Unified Housing Foundation, Inc. (Echo Station) [1] | 12/32 | 12.00% | 1,481 | Secured |
| Unified Housing Foundation, Inc. (Lakeshore Villas) [1] | 12/32 | 12.00% | 2,000 | Secured |
| Unified Housing Foundation, Inc. (Lakeshore Villas) [1] | 12/32 | 12.00% | 6,368 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 6,000 | Secured |
| Unified Housing Foundation, Inc. (Limestone Ranch) [1] | 12/32 | 12.00% | 1,953 | Secured |
| Unified Housing Foundation, Inc. (Timbers of Terrell) [1] | 12/32 | 12.00% | 1,323 | Secured |
| Unified Housing Foundation, Inc. (Tivoli) [1] | 12/32 | 12.00% | 6,138 | Secured |
| Unified Housing Foundation, Inc. [1] | 12/18 | 12.00% | 3,994 | Unsecured |
| Unified Housing Foundation, Inc. [1] | 12/18 | 12.00% | 6,407 | Unsecured |
| Unified Housing Foundation, Inc. [1] | 06/20 | 12.00% | 5,760 | Unsecured |
| Other related party notes [1] | Various | Various | 465 | Various unsecured interests |
| Other non-related party notes | Various | Various | 796 | Various secured interests |
| Other non-related party notes | Various | Various | 983 | Various unsecured interests |
| Accrued interest | | | 6,146 | |
| **Total Performing** | | | $ 70,166 | |

(1) Related Party notes

43

**NOTE 4.    *INVESTMENT IN UNCONSOLIDATED JOINT VENTURES AND INVESTEES***

Investments in unconsolidated subsidiaries, jointly owned companies and other investees in which we have a 20% to 50% interest or otherwise exercise significant influence are carried at cost, adjusted for the Company's proportionate share of their undistributed earnings or losses, via the equity method of accounting. ARL is our parent company and is considered as an unconsolidated joint venture.

App. 2072

Investments accounted for via the equity method consists of the following:

| | Percentage ownership as of December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| American Realty Investors, Inc. [1] | 0.90% | 0.90% | 0.90% |

(1)    Unconsolidated investment in parent company

Our interest in the common stock of ARL in the amount of 0.90% is accounted for under the equity method. Accordingly, the investment is carried at cost, adjusted for the company's proportionate share of earnings or losses.

The following is a summary of the financial position and results of operations of ARL (dollars in thousands):

| | For the Twelve Months Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| **Unconsolidated Subsidiaries** | **2017** | | **2016** | | **2015** | |
| Real estate, net of accumulated depreciation | $ | 12,349 | $ | 14,504 | $ | 14,232 |
| Notes Receivable | | 41,928 | | 47,257 | | 50,692 |
| Other assets | | 126,238 | | 127,001 | | 127,497 |
| Notes payable | | (6,507) | | (9,485) | | (25,233) |
| Other liabilities | | (102,014) | | (111,707) | | (98,440) |
| Shareholders' equity/partners' capital | | (71,994) | | (67,570) | | (68,748) |
| | | | | | | |
| Rents and interest and other income | $ | 9,193 | $ | 7,251 | $ | 11,990 |
| Depreciation | | (157) | | (175) | | (192) |
| Operating expenses | | (3,149) | | (3,633) | | (4,414) |
| Gain on land sales | | 4,765 | | — | | 2,737 |
| Interest expense | | (6,228) | | (6,274) | | (5,936) |
| Income (loss) from continuing operations | | 4,424 | | (2,831) | | 4,185 |
| Income from discontinued operations | | — | | — | | 1 |
| Net income (loss) | $ | 4,424 | $ | (2,831) | $ | 4,186 |
| | | | | | | |
| Company's proportionate share of income (loss) [1] | $ | 40 | $ | (25) | $ | 38 |

(1)    Income (loss) represents continued and discontinued operations

44

## NOTE 5.    *NOTES AND INTEREST PAYABLE*

Below is a summary of our notes and interest payable as of December 31, 2017 (dollars in thousands):

| | Notes Payable | | Accrued Interest | | Total Debt | |
|---|---|---|---|---|---|---|
| Apartments | $ | 566,576 | $ | 1,585 | $ | 568,161 |
| Apartments under construction | $ | 78,683 | | 113 | $ | 78,796 |
| Commercial | $ | 126,955 | $ | 622 | $ | 127,577 |
| Land | $ | 16,705 | $ | 200 | $ | 16,905 |
| Real estate subject to sales contract | $ | 1,449 | $ | 508 | $ | 1,957 |
| Mezzanine financing | $ | 110,172 | $ | 453 | $ | 110,625 |
| Other | $ | 9,617 | $ | 78 | $ | 9,695 |
| | | | | | | |
| **Total** | **$** | **910,157** | **$** | **3,559** | **$** | **913,716** |
| | | | | | | |
| Unamortized deferred borrowing costs | | (19,234) | | — | | (19,234) |
| | $ | 890,923 | $ | 3,559 | $ | 894,482 |

The following table summarizes our contractual obligations for principal payments as of December 31, 2017 (dollars in thousands):

| Year | Amount | |
|---|---|---|
| 2018 | $ | 79,838 |
| 2019 | | 101,134 |
| 2020 | | 64,255 |
| 2021 | | 48,806 |
| 2022 | | 11,205 |
| Thereafter | | 604,919 |
| **Total** | **$** | **910,157** |

Interest payable at December 31, 2017 was $3.6 million. Our debt has interest rates ranging from 2.5% to 12.0% per annum with maturity dates between 2018 and 2055. The mortgages were collateralized by deeds of trust on real estate having a net carrying value of $980.0 million.

During the year 2017 the Company refinanced or modified six loans with a total principal balance of $84.9 million. The refinancing resulted in lower interest rates and the extension of the term of the loan. The modifications resulted in lower interest rates. The transactions provide for lower monthly payments over the term of loans.

There are various land mortgages, secured by the property, that are in the process of a modification or extension to the original note due to expiration of the loan. We are in constant contact with these lenders, working together in order to modify the terms of these loans and we anticipate a timely resolution that is similar to the existing agreement or subsequent modification.

In conjunction with the development of various apartment projects and other developments, we drew down $63 million in construction loans during the year ended December 31, 2017.

App. 2073

In August 2016 Southern Properties Capital LTD ("Southern"), a British Virgin Islands corporation was incorporated for the purpose of raising funds by issuing Bonds to be traded on the Tel Aviv Stock Exchange ("TASE"). The Company transferred certain residential and commercial properties located in the United States to Southern, its wholly owned subsidiary. On February 13, 2017, Southern filed a final prospectus with the TASE for an offering and sale of nonconvertible Series A Bonds to be issued by Southern. The bonds are unsecured obligations of Southern. During 2017 on three separate occasions Southern issued nonconvertible Series A Bonds which in total amounted to approximately NIS400 million New Israeli Shekels ("NIS") which converted to approximately $115 million dollars. The Series A Bonds have a stated interest rate of 7.3%. At December 31, 2017 the effective interest rate is 9.17%. The bonds require semi-annual equal installments on January 31 and July 31 of each year from 2019 to 2023 (inclusive). The interest will be repaid on January 31 and July 31 of each of the years 2018 to 2023 (inclusive), first payment commenced on July 31, 2017.

a.      Consisting of the following:

| | December 31, | |
| | 2017 | 2016 |
|---|---|---|
| Bonds (Series A) | $ 115,336 | — |
| Less; deferred issuance expense, net | (5,916) | — |
| Accrued Interest | 3,627 | — |
| | $ 113,047 | — |

b.      Aggregate maturities are as follows:

| | December 31, | |
| | 2017 | 2016 |
|---|---|---|
| 2018 | $ — | — |
| 2019 | 23,067 | — |
| 2020 | 23,067 | — |
| 2021 | 23,067 | — |
| 2022 | 23,067 | — |
| Thereafter | 23,068 | — |
| | $ 115,336 | — |

The funds were used principally for the acquisition and development of additional real estate operations in the United States. The funds were raised and will be repaid in NIS however the funds raised have been converted to US dollars. The Company records unrealized gains or losses each quarter based upon the relative exchange values of the US dollar and the NIS; however, no gain or loss will be realized until a conversion from US dollars to NIS actually occurs in the future. The recorded unrealized gain or loss is reflected as a separate line item to highlight the fact that it is a non-cash transaction until such time as actual payment of principal and interest on the bonds is made. For 2017 the Company reflected an unrealized foreign currency loss of $4.5 million related to debenture transactions.

**NOTE 7.   *RELATED PARTY TRANSACTIONS AND FEES***

We apply ASC Topic 805, "Business Combinations", to evaluate business relationships. Related parties are persons or entities who have one or more of the following characteristics, which include entities for which investments in their equity securities would be required, trust for the benefit of persons including principal owners of the entities and members of their immediate families, management personnel of the entity and members of their immediate families and other parties with which the entity may deal if one party controls or can significantly influence the decision making of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests, or affiliates of the entity.

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in our best interest.

45

Since April 30, 2011, Pillar, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, the sole shareholder of which is MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust, became the Company's external Advisor and Cash Manager. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities. Pillar also arranges, for the Company's benefit, debt and equity financing with third party lenders and investors. Pillar also serves as an Advisor and Cash Manager to TCI and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees. Employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement

Effective January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties and provides brokerage services. Regis receives property management fees, construction management fees and leasing commissions in accordance with the terms of its property-level management agreement. Regis is also entitled to receive real estate brokerage commissions in accordance with the terms of a non-exclusive brokerage agreement. See Part III, Item 10. "Directors, Executive Officers and Corporate Governance – Property Management and Real Estate Brokerage". TCI engages third-party companies to lease and manage its apartment properties.

Below is a description of the related party transactions and fees between Pillar and Regis:

Fees, expenses and revenue paid to and/or received from our advisor:

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Fees: | | | |
| Advisory | $ 9,995 | $ 9,490 | $ 8,368 |
| Mortgage brokerage and equity refinancing | 1,551 | 775 | 1,524 |
| Net income | 250 | 257 | 187 |
| Property acquisition | — | — | 921 |
| | $ 11,796 | $ 10,522 | $ 11,000 |
| Other Expense: | | | |
| Cost reimbursements | $ 2,895 | $ 3,228 | $ 2,925 |
| Interest paid (received) | (4,859) | (4,216) | (3,352) |

App. 2074

Revenue:

| | | | | | | |
|---|---|---|---|---|---|---|
| Rental | $ | 783 | $ | 708 | $ | 726 |

Fees paid to Regis and related parties:

| | | 2017 | | 2016 | | 2015 |
|---|---|---|---|---|---|---|
| | | | (dollars in thousands) | | | |
| Fees: | | | | | | |
| Property acquisition | $ | 9,819 | $ | 10,776 | $ | 1,932 |
| Property management, construction management and leasing commissions | | 963 | | 888 | | 682 |
| Real estate brokerage | | 1,369 | | 787 | | 1,105 |
| | $ | 12,151 | $ | 12,451 | $ | 3,719 |

The Company received rental revenue of $0.8 million in each of the three years ended December 31, 2017 from Pillar and its related parties for properties owned by the Company.

As of December 31, 2017, the Company had notes and interest receivables of interest receivable of $45.1 million due from UHF, a related party. During the current period, the Company recognized interest income of $6.5 million, originated $5.8 million, received principal payments of $26.1 million and received interest payments of $5.3 million from these related party notes receivables.

On January 1, 2012, the Company entered into a development agreement with UHF, a non-profit corporation that provides management services for the development of residential apartment projects in the future. This development agreement was terminated December 31, 2013. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

The Company is the primary guarantor, on a $39.1 million mezzanine loan between UHF and a lender. In addition, ARI, and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2017 UHF was in compliance with the covenants to the loan agreement.

46

The Company is part of a tax sharing and compensating agreement with respect to federal income taxes between ARL, TCI and IOR and their subsidiaries that was entered into in July of 2009. That agreement continued until August 31, 2012, at which time a new tax sharing and compensating agreement was entered into by ARL, TCI, IOR and MRHI for the remainder of 2012 and subsequent years. The expense (benefit) in each year was calculated based on the amount of losses absorbed by taxable income multiplied by the maximum statutory tax rate of 21%.

The following table reconciles the beginning and ending balances of accounts receivable from and (accounts payable) to related parties as of December 31, 2017 (dollars in thousands):

| | | Pillar | | ARL | Total |
|---|---|---|---|---|---|
| Related party receivable, December 31, 2016 | $ | — | $ | 101,649 | $101,649 |
| Cash transfers | | 36,175 | | — | 36,175 |
| Advisory fees | | (9,995) | | — | (9,995) |
| Net income fee | | (250) | | — | (250) |
| Fees and commissions | | (2,921) | | — | (2,921) |
| Cost reimbursements | | (2,895) | | — | (2,895) |
| Interest income | | — | | 4,859 | 4,859 |
| Notes receivable purchased | | (447) | | | (447) |
| Expenses paid by advisor | | (36) | | — | (36) |
| Financing (mortgage payments) | | (4,656) | | — | (4,656) |
| Sales/Purchases transactions | | (9,818) | | — | (9,818) |
| Income tax expense | | 5,593 | | — | 5,593 |
| Related party receivable, December 31, 2017 | $ | 10,750 | $ | 106,508 | $117,258 |

As of December 31, 2017, the Company has approximately 66.7 acres of land, at various locations that were sold to related parties in multiple transactions. These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets. Due to the related party nature of the transactions TCI has deferred the recording of the sales in accordance with ASC 360-20.

**NOTE 8.  DIVIDENDS**

TCI's Board of Directors established a policy that dividend declarations on common stock would be determined on an annual basis following the end of each year. In accordance with that policy, no dividends on TCI's common stock were declared for 2017, 2016, or 2015. Future distributions to common stockholders will be determined by the Board of Directors in light of conditions then existing, including the Company's financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board.

47

**NOTE 9.  INCOME TAXES**

We account for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined on the basis of the differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date. We recognize deferred tax assets to the extent that we believe these assets are more likely than not to be realized. In making such a determination, we consider all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If we determine that we would be able to realize our deferred tax assets in the future in excess of their net recorded amount, we would make an adjustment to the deferred tax asset valuation allowance, which would reduce the provision for income taxes. We record uncertain tax positions in accordance with ASC 740 on the basis of a two-step process whereby (1) we determine whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions that meet the more-likely-than-not recognition threshold, we recognize the largest amount of tax benefit that is more than 50 percent likely to be realized upon ultimate settlement with the related tax authority.

For financial reporting purposes, income before income taxes were:

Years Ended December 31

| | | 2016 | | |
|---|---|---|---|---|
| | | (in thousands) | | |
| TOTAL | $ (15,136) | $ 345 | $ (7,239) | |

The expense (benefit) for income taxes consists of:

| | | Years Ended December 31 | | | | |
|---|---|---|---|---|---|---|
| | | **2017** | | **2016** | | **2015** |
| | | (in thousands) | | | | |
| Current: | | | | | | |
| Federal | $ | (5,603) | $ | 121 | $ | (2,534) |
| State | | 10 | | — | | — |
| Deferred and other: | | | | | | |
| Federal | | 5,603 | | (98) | | 3,534 |
| State | | 170 | | — | | — |
| Total Tax Expense | $ | 180 | $ | 23 | $ | 1,000 |

48

The reconciliation between the Company's effective tax rate on income from continuing operations and the statutory rate is as follows:

| | | Years Ended December 31 | | | | |
|---|---|---|---|---|---|---|
| | | **2017** | | **2016** | | **2015** |
| | | (in thousands) | | | | |
| Income tax expense (benefit) at federal statutory rate | $ | (5,603) | $ | 121 | $ | (2,759) |
| State and local income taxes net of federal tax benefit | | 10 | | — | | — |
| Repricing of deferred assets due to change in future rates | | (19,871) | | — | | — |
| Change in valuation allowance | | 25,644 | | (97) | | 3,276 |
| Calculated income tax (benefit) expense | | 180 | | 24 | | 517 |
| Effective Tax Rate | | N/A | | 6.9% | | N/A |

The company is subject to taxation in the United States and various states and foreign jurisdictions. As of December 31, 2017, the Company's tax years for 2016, 2015, and 2014 are subject to examination by the tax authorities. With few exceptions, as of December 31, 2017, the Company is no longer subject to U.S federal, state, local, or foreign examinations by tax authorities for the years before 2014.

The 2017 effective tax rate is driven primarily by the passing of the Tax Cuts and Jobs Act by congress. This act has reduced the statutory tax rate for corporations from 35% to 21% starting in 2018. As a result, the tax assets of TCI had to be re-priced to reflect the new rate for future years with the impact impacting the 2017 provision for income taxes.

**Components of the Net Deferred Tax Asset or Liability**

| | | Years Ended December 31 | | |
|---|---|---|---|---|
| | | 2017 | | 2016 |
| | | (in thousands) | | |
| Allowance for losses on notes | $ | 383 | $ | 639 |
| Installment note on land sale | | 2,876 | | 4,793 |
| Deferred gain | | 6,814 | | 14,537 |
| Net operating loss carryforward | | 46,709 | | 66,015 |
| Subtotal | | 56,782 | | 85,984 |
| Less:  valuation allowance | | (29,806) | | (48,926) |
| **Total net deferred tax assets** | | **26,976** | | **37,058** |
| Basis differences for fixed assets | | 26,976 | | 37,058 |
| **Total deferred tax liability** | | **26,976** | | **37,058** |
| **Net deferred tax asset (liability)** | | **—** | | **—** |
| Current net deferred tax asset | | 26,976 | | 37,058 |
| Long-term net deferred tax liability | $ | 26,976 | $ | 37,058 |
| **Net deferred tax asset (liability)** | | **—** | | **—** |

**Operating Loss and Tax Credit Carryforwards**

We have federal income tax NOL carryforwards related to our domestic operations of approximately $189 million on a standalone basis, which have an indefinite life. We also have state NOLs in many of the various states in which we operate.

**Valuation Allowance**

Management assesses the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. At December 31, 2017, 2016 and 2015 TCI had a net deferred tax asset due to tax deductions available to it in future years. However, as management could not determine that it was more likely than not that TCI would realize the benefit of the deferred tax asset, a valuation allowance was established.

49

**NOTE 10.   *FUTURE MINIMUM RENTAL INCOME UNDER OPERATING LEASES***

TCI'S real estate operations include the leasing of commercial properties (office buildings, industrial warehouses and retail centers). The leases thereon expire at various dates through 2025. The

App. 2076

following is a schedule of minimum future rents on non-cancellable operating leases at December 31, 2017 (dollars in thousands):

| Year | | Amount |
|------|---|-------:|
| 2018 | $ | 25,042 |
| 2019 | | 19,828 |
| 2020 | | 15,869 |
| 2021 | | 13,643 |
| 2022 | | 10,634 |
| Thereafter | | 16,686 |
| **Total** | **$** | **101,702** |

## NOTE 11.   *OPERATING SEGMENTS*

Our segments are based on management's method of internal reporting which classifies its operations by property type. The segments are commercial, apartments, land and other. Significant differences among the accounting policies of the operating segments as compared to the Consolidated Financial Statements principally involve the calculation and allocation of administrative expenses. Management evaluates the performance of each of the operating segments and allocates resources to them based on their operating income and cash flow.

Items of income that are not reflected in the segments are interest, other income, equity in partnerships and gains on sale of real estate. Expenses that are not reflected in the segments are provision for losses, advisory, net income and incentive fees, general and administrative, non-controlling interests and net loss from discontinued operations before gains on sale of real estate.

The segment labeled as "Other" consists of revenue and operating expenses related to the notes receivable and corporate debt.

Presented below is the Company's reportable segments' operating income including segment assets and expenditures for the years 2017, 2016 and 2015 (dollars in thousands):

| For the Year Ended December 31, 2017 | | Commercial Properties | | Apartments | | Land | | Other | | Total |
|---|---|---:|---|---:|---|---:|---|---:|---|---:|
| Rental and other property revenues | $ | 32,323 | $ | 92,807 | $ | 87 | $ | 16 | $ | 125,233 |
| Property operating expenses | | (17,724) | | (43,677) | | (667) | | (988) | | (63,056) |
| Depreciation | | (9,200) | | (16,354) | | — | | (4) | | (25,558) |
| Mortgage and loan interest | | (7,528) | | (22,346) | | (1,588) | | (28,482) | | (59,944) |
| Interest income | | — | | — | | — | | 13,862 | | 13,862 |
| Recognition of deferred gain on sale of income producing properties | | — | | 9,842 | | — | | — | | 9,842 |
| Gain on land sales | | — | | — | | 4,884 | | — | | 4,884 |
| Segment operating income (loss) | $ | (2,129) | $ | 20,272 | $ | 2,716 | $ | (15,596) | $ | 5,263 |
| Capital expenditures | $ | 3,157 | $ | 1,402 | $ | 609 | $ | — | $ | 5,168 |
| Assets | $ | 137,157 | $ | 726,852 | $ | 115,205 | $ | 656 | $ | 979,870 |
| **Property Sales** | | | | | | | | | | |
| Sales price | $ | — | $ | — | $ | 11,177 | $ | — | $ | 11,177 |
| Less: Cost of sale | | — | | — | | (6,293) | | — | | (6,293) |
| Recognized prior deferred gain | | — | | 9,842 | | — | | — | | 9,842 |
| Gain on sale | $ | — | $ | 9,842 | $ | 4,884 | $ | — | $ | 14,726 |

50

| For the Year Ended December 31, 2016 | | Commercial Properties | | Apartments | | Land | | Other | | Total |
|---|---|---:|---|---:|---|---:|---|---:|---|---:|
| Rental and other property revenues | $ | 31,864 | $ | 86,603 | $ | — | $ | 4 | $ | 118,471 |
| Property operating expenses | | (19,476) | | (40,786) | | (1,634) | | (22) | | (61,918) |
| Depreciation | | (8,924) | | (14,759) | | — | | — | | (23,683) |
| Mortgage and loan interest | | (7,167) | | (25,381) | | (1,746) | | (18,794) | | (53,088) |
| Interest income | | — | | — | | — | | 14,670 | | 14,670 |
| Gain (loss) on sale of income producing properties | | (238) | | 16,445 | | — | | — | | 16,207 |
| Gain on land sales | | — | | — | | 3,121 | | — | | 3,121 |
| Segment operating income (loss) | $ | (3,941) | $ | 22,122 | $ | (259) | $ | (4,142) | $ | 13,780 |
| Capital expenditures | $ | 4,577 | $ | 863 | $ | 269 | $ | — | $ | 5,709 |
| Assets | $ | 148,689 | $ | 624,433 | $ | 118,051 | $ | — | $ | 891,173 |
| **Property Sales** | | | | | | | | | | |
| Sales price | $ | 1,500 | $ | 20,350 | $ | 29,128 | $ | — | $ | 50,978 |
| Less: Cost of sale | | (1,738) | | (3,905) | | (26,007) | | — | | (31,650) |
| Gain (loss) on sale | $ | (238) | $ | 16,445 | $ | 3,121 | $ | — | $ | 19,328 |

| For the Year Ended December 31, 2015 | | Commercial Properties | | Apartments | | Land | | Other | | Total |
|---|---|---:|---|---:|---|---:|---|---:|---|---:|
| Rental and other property revenues | $ | 29,308 | $ | 72,809 | $ | — | $ | 103 | $ | 102,220 |
| Property operating expenses | | (16,838) | | (34,437) | | (712) | | (270) | | (52,257) |
| Depreciation | | (8,861) | | (12,438) | | — | | — | | (21,299) |
| Mortgage and loan interest | | (6,891) | | (23,506) | | (4,214) | | (11,930) | | (46,541) |
| Interest income | | — | | — | | — | | 10,687 | | 10,687 |
| Gain on land sales | | — | | — | | 18,911 | | — | | 18,911 |
| Segment operating income (loss) | $ | (3,282) | $ | 2,428 | $ | 13,985 | $ | (1,410) | $ | 11,721 |
| Capital expenditures | $ | 8,118 | $ | 1,780 | $ | 2,621 | $ | — | $ | 12,519 |
| Assets | $ | 153,270 | $ | 553,860 | $ | 136,889 | $ | — | $ | 844,019 |
| **Property Sales** | | | | | | | | | | |
| Sales price | $ | — | $ | 11,129 | $ | 102,898 | $ | — | $ | 114,027 |
| Less: Cost of sale | | — | | (10,394) | | (83,987) | | — | | (94,381) |
| Gain on sale | $ | — | $ | 735 | $ | 18,911 | $ | — | $ | 19,646 |

App. 2077

The table below reflects the reconciliation of segment information to the corresponding amounts in the Consolidated Statements of Operations (dollars in thousands):

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Segment operating income | $ 5,263 | $ 13,780 | $ 11,721 |
| Other non-segment items of income (expense) | | | |
| General and administrative | (6,269) | (5,476) | (5,508) |
| Provision on impairment of real estate assets | — | — | (5,300) |
| Net income fee to related party | (250) | (257) | (187) |
| Advisory fee to related party | (9,995) | (9,490) | (8,368) |
| Other income | (3,911) | 1,816 | 70 |
| Loss from unconsolidated joint ventures and investees | 26 | (26) | 41 |
| Litigation settlement | — | — | (352) |
| Income tax benefit (expense) | 5,252 | (24) | (517) |
| Net income (loss) from continuing operations | $ (9,884) | $ 323 | $ (8,400) |

51

The table below reflects the reconciliation of segment information to the corresponding amounts in the Consolidated Balance Sheets (dollars in thousands):

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Segment assets | $ 979,870 | $ 891,173 | $ 844,019 |
| Investments in real estate partnerships | 2,472 | 2,446 | 5,243 |
| Notes and interest receivable | 70,166 | 79,308 | 69,551 |
| Other assets | 266,166 | 212,987 | 191,391 |
| Total assets | $ 1,318,674 | $ 1,185,914 | $ 1,110,204 |

## NOTE 12. *DISCONTINUED OPERATIONS*

Effective January 1, 2015, the Company adopted the provisions of ASU 2014-08, which changed the criteria of ASC 360 related to determining which disposals quality to be accounted for as discontinued operations and modified related reporting and disclosure requirements. Disposals representing a strategic shift in operations that have a major effect on a company's operations and financial results will be presented as discontinued operations.

There were no sales of income-producing properties during 2017 or 2016 that met the criteria for discontinued operations. Amounts included in discontinued operations represent the residual amounts from sales classified as discontinued operations prior to January 1, 2015. The following table summarizes revenue and expense information for the properties sold that qualified as discontinued operations (d ollars in thousands):

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Revenues:** | | | |
| Rental and other property revenues | $ — | $ — | $ 355 |
| | — | — | 355 |
| **Expenses:** | | | |
| Property operating expenses | — | — | (345) |
| General and administrative | — | 2 | 99 |
| Total operating expenses | — | 2 | (246) |
| | | | |
| **Other income (expense):** | | | |
| Other income (expense) | — | — | 45 |
| Mortgage and loan interest | — | — | (2) |
| Total other expenses | — | — | 43 |
| | | | |
| Loss from discontinued operations before gain on sale of real estate and taxes | — | (2) | 644 |
| Gain on sale of real estate from discontinued operations | — | — | 735 |
| Income tax benefit (expense) | — | 1 | (483) |
| Income (loss) from discontinued operations | $ — | $ (1) | $ 896 |

52

## NOTE 13. *QUARTERLY RESULTS OF OPERATIONS*

The following is a tabulation of TCI's quarterly results of operations for the years 2017, 2016 and 2015. Quarterly results presented may differ from those previously reported in TCI's Form 10-Q due to the reclassification of the operations of properties sold or held for sale to discontinued operations in accordance with ASC topic 360:

| | For the Three Months Ended 2017 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| **2017** | | | | |
| Revenue and other property revenues | $ 31,535 | $ 31,302 | $ 31,491 | $ 30,905 |
| Total operating expenses | 26,337 | 25,460 | 25,725 | 27,606 |
| Operating income | 5,198 | 5,842 | 5,766 | 3,299 |
| Other expenses | (10,658) | (15,613) | (8,967) | (14,729) |
| Loss before gain on land sales, non-controlling interest, and taxes | (5,460) | (9,771) | (3,201) | (11,430) |
| Gain on sale of income-producing properties | — | — | 9,841 | 1 |

App. 2078

| | | | | | | |
|---|---|---|---|---|---|---|
| Gain (loss) on land sales | | 415 | | 178 | | 4,385 |
| Income tax benefit | | — | | — | | — | (180) |
| Net income (loss) | | (5,015) | | (10,247) | | 7,170 | (7,224) |
| Net (loss) attributable to non-controlling interest | | (119) | | (163) | | (96) | (121) |
| Preferred dividend requirement | | (222) | | (224) | | (224) | (230) |
| Net income (loss) applicable to common shares | $ | (5,356) | $ | (10,634) | $ | 6,850 | $ (7,575) |

**PER SHARE DATA**

**Earnings per share - basic**

| | | | | | | |
|---|---|---|---|---|---|---|
| Income (loss) from continuing operations | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ (0.88) |
| Loss from discontinued operations | | — | | — | | — | — |
| Net income (loss) applicable to common shares | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ (0.88) |
| Weighted average common shares used in computing earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | 8,717,767 |

**Earnings per share - diluted**

| | | | | | | |
|---|---|---|---|---|---|---|
| Income (loss) from continuing operations | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ (0.88) |
| Loss from discontinued operations | | — | | — | | — | — |
| Net income (loss) applicable to common shares | $ | (0.61) | $ | (1.22) | $ | 0.79 | $ (0.88) |
| Weighted average common shares used in computing diluted earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | 8,717,767 |

| | For the Three Months Ended 2016 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| **2016** | | | | |
| Revenue and other property revenues | $ 28,903 | $ 30,521 | $ 29,776 | $ 29,271 |
| Total operating expenses | 24,823 | 24,751 | 25,429 | 25,821 |
| Operating income | 4,080 | 5,770 | 4,347 | 3,450 |
| Other expenses | (9,054) | (7,901) | (9,309) | (10,364) |
| Loss before gain on land sales, non-controlling interest, and taxes | (4,974) | (2,131) | (4,962) | (6,914) |
| Gain (loss) on sale of income-producing properties | (244) | 5,168 | — | 11,283 |
| Gain (loss) on land sales | 1,652 | 1,719 | 555 | (805) |
| Income tax benefit (expense) | 1 | — | (25) | — |
| Net income (loss) from continuing operations | (3,565) | 4,756 | (4,432) | 3,564 |
| Net income (loss) from discontinued operations | 2 | — | — | (3) |
| Net income (loss) | (3,563) | 4,756 | (4,432) | 3,561 |
| Net income (loss) attributable to non-controlling interest | 23 | (97) | (114) | (97) |
| Preferred dividend requirement | (222) | (224) | (227) | (227) |
| Net income (loss) applicable to common shares | $ (3,762) | $ 4,435 | $ (4,773) | $ 3,237 |

**PER SHARE DATA**
**Earnings per share - basic**

| | | | | |
|---|---|---|---|---|
| Net income (loss) applicable to common shares | $ (0.43) | $ 0.51 | $ (0.55) | $ 0.37 |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

**Earnings per share - diluted**

| | | | | |
|---|---|---|---|---|
| Net income (loss) applicable to common shares | $ (0.43) | $ 0.51 | $ (0.55) | $ 0.37 |
| Weighted average common shares used in computing diluted earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

53

| | For the Three Months Ended 2015 | | | |
|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, |
| | (dollars in thousands, except share and per share amounts) | | | |
| **2015** | | | | |
| Revenue and other property revenues | $ 22,304 | $ 23,756 | $ 27,539 | $ 28,621 |
| Total operating expenses | 19,264 | 19,310 | 24,613 | 29,732 |
| Operating income (loss) | 3,040 | 4,446 | 2,926 | (1,111) |
| Other expenses | (6,398) | (5,243) | (11,211) | (13,243) |
| Loss before gain on land sales, non-controlling interest, and taxes | (3,358) | (797) | (8,285) | (14,354) |
| Gain on land sales | 2,876 | 1,250 | 997 | 13,788 |
| Income tax benefit (expense) | 102 | (12) | 274 | (881) |
| Net income (loss) from continuing operations | (380) | 441 | (7,014) | (1,447) |
| Net income (loss) from discontinuing operations | 190 | (22) | 508 | 220 |
| Net income (loss) | (190) | 419 | (6,506) | (1,227) |
| Net (loss) attributable to non-controlling interest | 295 | (281) | (95) | (51) |
| Preferred dividend requirement | (222) | (224) | (227) | (227) |
| Net income (loss) applicable to common shares | $ (117) | $ (86) | $ (6,828) | $ (1,505) |

**PER SHARE DATA**
**Earnings per share - basic**

| | | | | |
|---|---|---|---|---|
| Loss from continuing operations | $ (0.04) | $ (0.01) | $ (0.84) | $ (0.19) |
| Income from discontinued operations | 0.02 | — | 0.06 | 0.02 |
| Net loss applicable to common shares | $ (0.02) | $ (0.01) | $ (0.78) | $ (0.17) |
| Weighted average common shares used in computing earnings per share | 8,717,767 | 8,717,767 | 8,717,767 | 8,717,767 |

**Earnings per share - diluted**

| | | | | |
|---|---|---|---|---|
| Loss from continuing operations | $ (0.04) | $ (0.01) | $ (0.84) | $ (0.19) |

App. 2079

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income from discontinued operations | | | | | | | 0.02 | | | 0.02 |
| Net loss applicable to common shares | $ | (0.02) | $ | (0.01) | $ | (0.78) | $ | (0.17) |
| Weighted average common shares used in computing diluted earnings per share | | 8,717,767 | | 8,717,767 | | 8,717,767 | | 8,717,767 |

**NOTE 14.   COMMITMENTS AND CONTINGENCIES AND LIQUIDITY**

*Liquidity.*    Management believes that TCI will generate excess cash from property operations in 2018; such excess, however, will not be sufficient to discharge all of TCI's obligations as they become due. Management intends to sell income-producing assets, refinance real estate and obtain additional borrowings primarily secured by real estate to meet its liquidity requirements.

*Partnership Buyouts.*    TCI is the limited partner in various partnerships related the construction of residential properties. As permitted in the respective partnership agreements, TCI intends to purchase the interests of the general and any other limited partners in these partnerships subsequent to the completion of these projects. The amounts paid to buy out the nonaffiliated partners are limited to development fees earned by the non-affiliated partners, and are set forth in the respective partnership agreements.

**Dynex Capital, Inc.**

On July 20, 2015, the 68th Judicial District Court in Dallas County, Texas issued its Final Judgment in Cause No. DC-03-00675, styled Basic Capital Management, Inc., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. v. Dynex Commercial, Inc. The case, which was litigated for more than a decade, had its origin with Dynex Commercial making loans to Continental Poydras Corp., Continental Common, Inc. and Continental Baronne, Inc. (subsidiaries of Continental Mortgage & Equity Trust ("CMET"), an entity which merged into TCI in 1999 after the original suit was filed). Under the original loan commitment, $160 million in loans were to be made to the entities. The loans were conditioned on the execution of a commitment between Dynex Commercial and Basic Capital Management, Inc. ("Basic").

An original trial in 2004, which also included Dynex Capital, Inc. as a defendant, resulted in a jury awarding damages in favor of Basic for "lost opportunity," as well as damages in favor of ART and in favor of TCI and its subsidiaries for "increased costs" and "lost opportunity." The original Trial Court judge ignored the jury's findings, however, and entered a "Judgment Notwithstanding the Verdict" ("JNOV") in favor of the Dynex entities (the judge held the Plaintiffs were not entitled to any damages from the Dynex entities). After numerous appeals by all parties, Dynex Capital, Inc. was ultimately dismissed from the case and the remaining claims against Dynex Commercial were remanded to the Trial Court for a new judgment consistent with the jury's findings. The Court entered the new Final Judgment against Dynex Commercial, Inc. on July 20, 2015.

<div align="center">54</div>

The Final Judgment entered against Dynex Commercial, Inc. on July 20, 2015 awarded Basic $0.256 million in damages, plus pre-judgment interest of $0.192 million for a total amount of $0.448 million. The Judgment awarded ART $14.2 million in damages, plus pre-judgment interest of $10.6 million for a total amount of $24.8 million. The Judgment awarded TCI $11.1 million, plus pre-judgment interest of $8.4 million for a total amount of $19.5 million. The Judgment also awarded Basic, ART, and TCI post-judgment interest at the rate of 5% per annum from April 25, 2014 until the date their respective damages are paid. Lastly, the Judgement awarded Basic, ART, and TCI $1.6 million collectively in attorneys' fees from Dynex Commercial, Inc.

The Company is working with counsel to identify assets and collect on the Final Judgment against Dynex Commercial, Inc., as well as explore possible additional claims, if any, against Dynex Capital, Inc.

*Litigation.* The ownership of property and provision of services to the public as tenants entails an inherent risk of liability. Although the Company and its subsidiaries are involved in various items of litigation incidental to and in the ordinary course of its business, in the opinion of management, the outcome of such litigation will not have a material adverse impact upon the Company's financial condition, results of operation or liquidity.

*Guarantees.* The Company is the primary guarantor on a $39.1 million mezzanine loan between UHF and a lender. In addition, ARI and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2017, UHF was in compliance with the covenants to the loan agreement.

**NOTE 15.   EARNINGS PER SHARE**

*Earnings per share.*    Earnings per share ("EPS") have been computed pursuant to the provisions of ASC 260 "Earnings per Share." Basic EPS is calculated by dividing income available to common shareholders by the weighted-average number of common shares outstanding during the period. Shares issued during the period shall be weighted for the portion of the period that they were outstanding.

Prior to July 9, 2014, TCI had 30,000 shares of Series C cumulative convertible preferred stock issued and outstanding. These 30,000 shares were owned by RAI, a related party, and had accrued dividends unpaid of $0.9 million. The stock had a liquidation preference of $100.00 per share and could be converted into common stock at 90% of the daily average closing price of the common stock for the prior five trading days. On July 9, 2014, RAI converted all 30,000 shares into the requisite number of shares of common stock. The conversion resulted in the issuance of 304,298 new shares of common stock. The effects of the Series C Cumulative Convertible Preferred Stock are no longer included in the dilutive earnings per share calculation for the current period, but are considered in the calculation for the prior periods if applying the if-converted method is dilutive.

As of December 31, 2017, there are no preferred stock or stock options that are required to be included in the calculation of EPS.

**NOTE 16.   SUBSEQUENT EVENTS**

The date to which events occurring after December 31, 2017, the date of the most recent balance sheet, have been evaluated for possible adjustments to the financial statements or disclosure is March 30, 2018, which is the date of which the financial statements were available to be issued. There are no subsequent events that would require an adjustment to the financial statements.

On February 15, 2018, Southern issued Series B bonds in the amount of NIS 137.7 million par value (approximately $39.4 million as of February 15, 2018). The Series B bonds are registered on the TASE. The bonds are reported in NIS and bear stated annual interest rate of 6.8%. Interest shall be repaid January 31 and July 31 of each of the years 2019 to 2023 (inclusive), first payment commencing on July 31, 2018. The principal shall be repaid in ten equal installments on January 31 and July 31 of each of the years from 2021 to 2025 (inclusive). The total bond issuance cost incurred is $1.4 million.

In March 2018, the Company and a substantial financial institution ("Macquarie") entered into an agreement to form a special purpose entity ("Joint Venture") that would principally own and operate the existing TCI Class A multifamily residential portfolio that is currently owned 100% by Company's subsidiaries.  The Joint Venture would also actively participate in the development and/or acquisitions of additional Class A assets. It is anticipated that the Southern and Macquarie would each have a 49% ownership interest and a 50% voting interest in the Joint Venture.  The remaining 2% ownership interest would be allotted to Daniel J. Moos, the current President and Chief Executive Officer of TCI and Abode Properties The completion of agreement is subject to the approval of certain regulators.

<div align="center">55</div>

**Schedule III**

<div align="center">App. 2080</div>

**UNITED DEVELOPMENT FUNDING IV, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**December 31, 2017**

| Property/Location | Encumbrances | Initial Cost | | Cost Capitalized Subsequent to Acquisition | Asset Impairment | Gross Amounts of Which Carried at End of Year | | | Accumulated Depreciation | Date of Construction | Date Acquired | Life on Which Depreciation In Latest Statement of Operation is Computed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Land | Buildings | Improvements | Asset Impairment | Land | Building & Improvements | Total | | | | |
| | | | | | (dollars in thousands) | | | | | | | |
| **Properties Held for Investment** | | | | | | | | | | | | |
| **Apartments** | | | | | | | | | | | | |
| Anderson Estates, Oxford, MS | 769 | 378 | 2,683 | 313 | — | 378 | 2,996 | 3,374 | 799 | 2003 | 01/06 | 40 years |
| Blue Lake Villas I, Waxahachie, TX | 10,448 | 526 | 11,057 | 19 | — | 526 | 11,076 | 11,602 | 4,088 | 2003 | 01/02 | 40 years |
| Blue Lake Villas II, Waxahachie, TX | 3,769 | 287 | 4,451 | 45 | — | 287 | 4,496 | 4,783 | 1,139 | 2004 | 01/04 | 40 years |
| Breakwater Bay, Beaumont, TX | 9,112 | 740 | 10,435 | 63 | — | 740 | 10,498 | 11,238 | 3,390 | 2004 | 05/03 | 40 years |
| Bridgewood Ranch, Kaufman, TX | 6,233 | 762 | 6,856 | 57 | — | 762 | 6,913 | 7,675 | 1,730 | 2007 | 04/08 | 40 years |
| Capitol Hill, Little Rock, AR | 8,740 | 1,860 | 7,948 | 55 | — | 1,860 | 8,003 | 9,863 | 2,713 | 2003 | 03/03 | 40 years |
| Centennial, Oak Ridge, TN | 20,518 | 2,570 | 22,589 | — | — | 2,570 | 22,589 | 25,159 | 1,365 | 2011 | 07/14 | 40 years |
| Curtis Moore Estates, Greenwood, MS | 14,498 | 847 | 5,733 | 285 | — | 847 | 6,018 | 6,865 | 628 | 2003 | 01/06 | 40 years |
| Crossing at Opelika, Opelika, AL | 1,399 | 1,606 | 14,451 | — | — | 1,606 | 14,451 | 16,057 | 1,939 | 2015 | 12/15 | 40 years |
| Dakota Arms, Lubbock, TX | 12,194 | 921 | 12,644 | 358 | — | 921 | 13,002 | 13,923 | 4,195 | 2004 | 01/04 | 40 years |
| David Jordan Phase II, Greenwood, MS | 551 | 277 | 1,521 | 70 | — | 277 | 1,591 | 1,868 | 506 | 1999 | 01/06 | 40 years |
| David Jordan Phase III, Greenwood, MS | 556 | 439 | 2,115 | 64 | — | 439 | 2,179 | 2,618 | 649 | 2003 | 01/06 | 40 years |
| Desoto Ranch, DeSoto, TX | 14,877 | 1,472 | 17,856 | 65 | — | 1,472 | 17,921 | 19,393 | 6,225 | 2002 | 05/02 | 40 years |
| Falcon Lakes, Arlington, TX | 13,352 | 1,437 | 15,095 | 449 | — | 1,437 | 15,544 | 16,981 | 5,946 | 2001 | 10/01 | 40 years |
| Heather Creek, Mesquite, TX | 10,976 | 1,345 | 12,015 | 141 | — | 1,345 | 12,156 | 13,501 | 3,934 | 2003 | 03/03 | 40 years |
| Holland Lake, Weatherford, TX | 11,510 | 1,450 | 14,612 | 342 | — | 1,450 | 14,954 | 16,404 | 976 | 2004 | 05/14 | 40 years |
| Lake Forest, Houston, TX | 11,808 | 927 | 12,267 | 1,361 | — | 927 | 13,628 | 14,555 | 4,282 | 2004 | 01/04 | 40 years |
| Legacy at Pleasant Grove, Texarkana, TX | 14,495 | 2,005 | 17,892 | 217 | — | 2,005 | 18,109 | 20,114 | 1,384 | 2006 | 12/14 | 40 years |
| Lodge at Pecan Creek, Denton, TX | 15,959 | 1,349 | 16,180 | — | — | 1,349 | 16,180 | 17,529 | 2,494 | 2011 | 10/05 | 40 years |
| Lofts at Reynolds Village, Asheville, NC | 28,230 | 3,704 | 34,000 | — | — | 3,704 | 34,000 | 37,704 | 212 | 2012 | 10/17 | 40 years |
| Mansions of Mansfield, Mansfield, TX | 15,084 | 977 | 17,799 | 75 | — | 977 | 17,874 | 18,851 | 3,916 | 2009 | 09/05 | 40 years |
| Metropolitan Apartments, North Little Rock, AR | 25,233 | 3,323 | 29,857 | — | — | 3,323 | 29,857 | 33,180 | 1,109 | 2010 | 06/16 | 40 years |
| Mission Oaks, San Antonio, TX | 14,433 | 1,266 | 16,627 | 212 | — | 1,266 | 16,839 | 18,105 | 4,495 | 2005 | 05/05 | 40 years |
| Monticello Estate, Monticello, AR | 431 | 285 | 1,493 | 15 | — | 285 | 1,508 | 1,793 | 460 | 2001 | 01/06 | 40 years |
| Northside on Travis, Sherman, TX | 12,873 | 1,300 | 14,560 | 27 | — | 1,300 | 14,587 | 15,887 | 3,038 | 2009 | 10/07 | 40 years |
| Oak Hollow, Sequin, TX | 11,680 | 1,435 | 12,403 | — | — | 1,435 | 12,403 | 13,838 | 775 | 2011 | 07/14 | 40 years |
| Oceanaire Apartments, Biloxi, MS | 10,791 | 1,384 | 12,575 | — | — | 1,384 | 12,575 | 13,959 | 318 | 2009 | 12/16 | 40 years |
| Overlook at Allensville, Sevierville, TN | 12,079 | 1,228 | 12,296 | — | — | 1,228 | 12,296 | 13,524 | 881 | 2012 | 10/15 | 40 years |
| Parc at Clarksville, Clarksville, TN | 12,441 | 587 | 14,300 | 103 | — | 587 | 14,403 | 14,990 | 3,385 | 2007 | 06/02 | 40 years |
| Parc at Denham Springs, Denham Springs, LA | 18,249 | 1,022 | 20,188 | 100 | — | 1,022 | 20,288 | 21,310 | 3,517 | 2011 | 07/07 | 40 years |
| Parc at Maumelle, Little Rock, AR | 15,438 | 1,710 | 17,688 | 218 | — | 1,710 | 17,906 | 19,616 | 5,248 | 2006 | 12/04 | 40 years |
| Parc at Metro Center, Nashville, TN | 10,148 | 1,044 | 12,226 | 472 | — | 1,044 | 12,698 | 13,742 | 3,672 | 2006 | 05/05 | 40 years |
| Parc at Rogers, Rogers, AR | 20,004 | 1,482 | 22,993 | 450 | (3,180) | 1,482 | 20,263 | 21,745 | 4,836 | 2007 | 04/04 | 40 years |

App. 2081

| Property/Location | Encumbrances | Land | Buildings | Improvements | Asset Impairment | Land | Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired | Life |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Preserve at Pecan Creek, Denton, TX | 14,006 | 902 | 16,626 | 42 | — | 902 | 16,668 | 17,570 | 3,893 | 2008 | 10/05 | 40 years |
| Preserve at Prairie Pointe, Lubbock, TX | 9,928 | 1,074 | 10,604 | 178 | — | 1,074 | 10,782 | 11,856 | 748 | 2005 | 04/15 | 40 years |
| Riverwalk Phase I, Greenville, MS | 272 | 199 | 1,537 | 5 | — | 199 | 1,542 | 1,741 | 503 | 2003 | 01/06 | 40 years |
| Riverwalk Phase II, Greenville, MS | 1,053 | 297 | 4,007 | 163 | — | 297 | 4,170 | 4,467 | 1,572 | 2003 | 01/06 | 40 years |
| Sawgrass Creek, New Port Richey, FL | — | 784 | 7,056 | — | — | 784 | 7,056 | 7,840 | 249 | 2008 | 08/16 | 40 years |
| Sonoma Court, Rockwall, TX | 10,456 | 941 | 11,074 | 62 | — | 941 | 11,136 | 12,077 | 1,779 | 2011 | 07/10 | 40 years |
| Sugar Mill, Baton Rouge, LA | 11,031 | 1,437 | 13,367 | 205 | — | 1,437 | 13,572 | 15,009 | 2,838 | 2009 | 08/08 | 40 years |
| Tattersall Village, Hinesville, GA | 20,025 | 2,670 | 23,766 | — | — | 2,670 | 23,766 | 26,436 | 594 | 2010 | 12/16 | 40 years |
| Toulon, Gautier, MS | 20,104 | 1,993 | 20,107 | — | — | 1,993 | 20,107 | 22,100 | 3,267 | 2011 | 09/09 | 40 years |
| Tradewinds, Midland, TX | 13,882 | 3,313 | 20,073 | — | — | 3,313 | 20,073 | 23,386 | 1,250 | 2015 | 06/15 | 40 years |
| Villager, Ft. Walton, FL | 713 | 141 | 1,267 | — | — | 141 | 1,267 | 1,408 | 85 | 1972 | 06/15 | 40 years |
| Villas at Park West I, Pueblo, CO | 10,250 | 1,171 | 10,453 | — | — | 1,171 | 10,453 | 11,624 | 806 | 2005 | 12/14 | 40 years |
| Villas at Park West II, Pueblo, CO | 9,278 | 1,463 | 13,060 | — | — | 1,463 | 13,060 | 14,523 | 1,007 | 2010 | 12/14 | 40 years |
| Vista Ridge, Tupelo, MS | 10,530 | 1,339 | 13,398 | — | — | 1,339 | 13,398 | 14,737 | 1,197 | 2009 | 10/15 | 40 years |
| Vistas of Vance Jackson, San Antonio, TX | 14,834 | 1,327 | 16,540 | 279 | — | 1,327 | 16,819 | 18,146 | 5,159 | 2004 | 01/04 | 40 years |
| Waterford, Roseberg, TX | 16,940 | 2,341 | 20,880 | 47 | — | 2,341 | 20,927 | 23,268 | 1,305 | 2013 | 06/14 | 40 years |
| Westwood, Mary Ester, FL | 3,938 | 693 | 6,650 | 0 | — | 693 | 6,650 | 7,343 | 429 | 1972 | 06/15 | 40 years |
| Windsong, Fort Worth, TX | 10,459 | 790 | 11,526 | 69 | — | 790 | 11,595 | 12,385 | 4,019 | 2002 | 07/03 | 40 years |
| **Total Apartments Held for Investment** | **$ 566,577** | **$ 64,820** | **$ 669,395** | **$ 6,626** | **$ (3,180)** | **$ 64,820** | **$ 672,841** | **$ 737,661** | **$ 114,944** | | | |

56

Schedule III
(Continued)

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**December 31, 2017**

| Property/Location | Encumbrances | Initial Cost Land | Initial Cost Buildings | Cost Capitalized Subsequent to Acquisition Improvements | Asset Impairment | Gross Amounts of Which Carried at End of Year Land | Gross Amounts of Which Carried at End of Year Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired | Life on Which Depreciation In Latest Statement of Operation is Computed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Apartments Under Construction** | | | | | | | | | | | | |
| Abode Red Rock | 22,945 | 6,039 | — | 28,095 | — | 6,039 | 28,095 | 34,134 | — | — | 01/17 | — |
| Apalache Point | — | — | — | 150 | — | — | 150 | 150 | — | — | | — |
| Eagle Crossing | — | — | — | 81 | — | — | 81 | 81 | — | — | | — |
| Forest Pines | — | 5,040 | — | 269 | — | 5,040 | 269 | 5,309 | — | — | 06/17 | — |
| Lakeside Lofts, Farmers Branch, TX | 1 | — | — | 5,079 | — | — | 5,079 | 5,079 | — | — | 08/17 | — |
| McKinney Point | — | — | — | 138 | — | — | 138 | 138 | — | — | 10/17 | — |
| Parc at Bentonville | — | — | — | 86 | — | — | 86 | 86 | — | — | 08/17 | — |
| Parc at Garland | — | — | — | 81 | — | — | 81 | 81 | — | — | 08/17 | — |
| Parc at Wylie | — | — | — | 195 | — | — | 195 | 195 | — | — | 08/17 | — |
| Oak Hollow II | 5,475 | 1,046 | — | 4,622 | — | 1,046 | 4,622 | 5,668 | — | — | 04/17 | — |
| Overlook at Allensville Square II, Sevierville, TN | — | 1,843 | — | 530 | — | 1,843 | 530 | 2,373 | — | — | 11/15 | — |
| Sawgrass II | 1,007 | — | — | 3,772 | — | — | 3,772 | 3,772 | — | — | 06/17 | — |
| Terra Lago, Rowlett, TX | 39,042 | 5,588 | — | 42,137 | — | 5,588 | 42,137 | 47,725 | — | — | 11/15 | — |
| **Total Apartments Under Construction** | **$ 68,470** | **$ 19,556** | **$ —** | **$ 85,235** | **$ —** | **$ 19,556** | **$ 85,235** | **$ 104,791** | **$ —** | | | |
| **Commercial** | | | | | | | | | | | | |
| 600 Las Colinas, Las Colinas, TX | 38,600 | 5,751 | 51,759 | 18,573 | — | 5,751 | 70,332 | 76,083 | 26,899 | 1984 | 08/05 | 40 years |
| 770 South Post Oak, | | | | | | | | | | | | |

App. 2082

| Description | Encumbrances | Initial Cost: Land | Initial Cost: Buildings & Improvements | Cost Capitalized Subsequent | (Adjustment) | Gross Amount: Land | Gross Amount: Buildings & Improvements | Gross Amount: Total | Accumulated Depreciation | Date of Construction | Date Acquired | Depreciable Life |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Houston, TX | 2,600 | 1,178 | 15,834 | 700 | 705 | 1,104 | 892 | 1,122 | 755 | 1970 | 07/05 | 40 years |
| Bridgeview Plaza, LaCrosse, WI | 4,906 | — | — | 1,134 | — | — | 1,134 | 1,134 | 616 | 1979 | 03/03 | 40 years |
| Browning Place (Park West I), Farmers Branch, TX | 42,473 | 5,096 | 45,868 | 15,571 | — | 5,096 | 61,439 | 66,535 | 23,746 | 1984 | 04/05 | 40 years |
| Mahogany Run Golf Course, US Virgin Islands | — | 418 | 6,037 | 148 | (5,300) | 418 | 885 | 1,303 | 502 | 1981 | 11/14 | 40 years |
| Fruitland Plaza, Fruitland Park, FL | — | 23 | — | 83 | — | 23 | 83 | 106 | 54 | — | 05/92 | 40 years |
| Senlac VHP, Farmers Branch, TX | — | 622 | — | 142 | — | 622 | 142 | 764 | 140 | — | 08/05 | 40 years |
| Stanford Center, Dallas, TX | 28,000 | 3,878 | 34,862 | 7,871 | (9,600) | 3,878 | 33,133 | 37,011 | 10,567 | — | 06/08 | 40 years |
| **Total Commercial Held for Investment** | $ 126,579 | $ 17,551 | $ 154,360 | $ 43,792 | $ (14,900) | $ 17,551 | $ 183,252 | $ 200,803 | $ 63,646 | | | |
| **Land** | | | | | | | | | | | | |
| Dominion Mercer, Farmers Branch, TX | 11,125 | 4,040 | | 3,609 | — | 4,040 | 3,609 | 7,649 | — | — | 10/16 | — |
| 2427 Valley View Ln, Farmers Branch, TX | — | 76 | — | — | — | 76 | — | 76 | — | — | 07/12 | — |
| Audubon, Adams County, MS | — | 519 | — | 296 | — | 519 | 296 | 815 | — | — | 03/07 | — |
| Bonneau Land, Farmers Branch, TX | — | 1,309 | — | — | — | 1,309 | — | 1,309 | — | — | 12/14 | — |
| Cooks Lane, Fort Worth, TX | 157 | 1,094 | — | — | — | 1,094 | — | 1,094 | — | — | 06/04 | — |
| Dedeaux, Gulfport, MS | — | 1,612 | — | 46 | (38) | 1,612 | 8 | 1,620 | — | — | 10/06 | — |
| Denham Springs, Denham Springs, LA | 61 | 714 | — | — | — | 714 | — | 714 | — | — | 08/08 | — |
| Gautier Land, Gautier, MS | — | 202 | — | — | — | 202 | — | 202 | — | — | 07/98 | — |
| Hollywood Casino Land Tract II, Farmers Branch, TX | — | 6,940 | — | 1,346 | (3,747) | 6,940 | (2,401) | 4,539 | — | — | 03/08 | — |
| Lacy Longhorn Land, Farmers Branch, TX | — | 1,169 | — | — | (760) | 1,169 | (760) | 409 | — | — | 06/04 | — |
| Lake Shore Villas, Humble, TX | — | 81 | — | 3 | — | 81 | 3 | 84 | — | — | 03/02 | — |
| Lubbock Land, Lubbock, TX | — | 234 | — | — | — | 234 | — | 234 | — | — | 01/04 | — |
| Mandahl Bay Land | — | 667 | — | — | — | 667 | — | 667 | — | — | 01/05 | — |
| McKinney 36, Collin County, TX | 1,211 | 635 | — | 161 | (19) | 635 | 142 | 777 | — | — | 01/98 | — |
| Minivest Land, Dallas, TX | — | 7 | — | — | — | 7 | — | 7 | — | — | 04/13 | — |
| Mira Lago, Farmers Branch, TX | — | 59 | — | 15 | — | 59 | 15 | 74 | — | — | 05/01 | — |
| Nakash, Malden, MO | — | 113 | — | — | — | 113 | — | 113 | — | — | 01/93 | — |
| Nashville, Nashville, TN | — | 662 | — | 59 | — | 662 | 59 | 721 | — | — | 06/02 | — |
| Nicholson Croslin, Dallas, TX | — | 184 | — | — | (118) | 184 | (118) | 66 | — | — | 10/98 | — |
| Nicholson Mendoza, Dallas, TX | — | 80 | — | — | (51) | 80 | (51) | 29 | — | — | 10/98 | — |
| Ocean Estates, Gulfport, MS | — | 1,418 | — | 390 | — | 1,418 | 390 | 1,808 | — | — | 10/07 | — |
| Senlac Land Tract II, Farmers Branch, TX | — | 656 | — | — | — | 656 | — | 656 | — | — | 08/05 | — |
| Texas Plaza Land, Irving, TX | — | 1,738 | — | — | (238) | 1,738 | (238) | 1,500 | — | — | 12/06 | — |
| Travis Ranch Land, Kaufman County, TX | 307 | 80 | — | — | — | 80 | — | 80 | — | — | 08/08 | — |
| Travis Ranch Retail, Kaufman City, TX | — | 1,517 | — | — | — | 1,517 | — | 1,517 | — | — | 08/08 | — |
| Union Pacific Railroad Land, Dallas, TX | — | 130 | — | — | — | 130 | — | 130 | — | — | 03/04 | — |
| Valley View 34 (Mercer Crossing), Farmers Branch, TX | — | 1,173 | — | — | (945) | 1,173 | (945) | 228 | — | — | 08/08 | — |
| Willowick Land, Pensacola, FL | — | 137 | — | — | — | 137 | — | 137 | — | — | 01/95 | — |
| Windmill Farms Land, Kaufman County, TX | 14,922 | 48,378 | — | 14,209 | (20,376) | 48,378 | (6,167) | 42,211 | — | — | 11/11 | — |
| **Total Land Held for Investment** | $ 27,783 | $ 75,624 | $ — | $ 20,134 | $ (26,292) | $ 75,624 | $ (6,158) | $ 69,466 | $ — | | | |

57

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**December 31, 2017**

| Property/Location | Encumbrances | Initial Cost Land | Buildings | Cost Capitalized Subsequent to Acquisition Improvements | Asset Impairment | Gross Amounts of Which Carried at End of Year Land | Building & Improvements | Total | Accumulated Depreciation | Date of Construction | Date Acquired | Life on Which Depreciation In Latest Statement of Operation is Computed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Corporate Departments/Investments/Misc.** | | | | | | | | | | | | |
| TCI - Corporate | 119,786 | — | — | — | — | — | — | — | — | — | — | — |
| **Total Corporate Departments/Investments/Misc.** | $ 119,786 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | — | | | |
| | | | | | | | | | | | | |
| **Total Properties Held for Investment** | $ 909,195 | $177,551 | $ 823,755 | $ 155,787 | $ (44,372) | $177,551 | $ 935,170 | $1,112,721 | $ 178,590 | | | |
| | | | | | | | | | | | | |
| **Properties Held for Sale** | | | | | | | | | | | | |
| **Commercial** | | | | | | | | | | | | |
| Dunes Plaza, Michigan City, IN | 376 | — | — | — | — | — | — | — | — | 1978 | 03/92 | 40 years |
| **Total Commercial Held for Sale** | $ 376 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | — | | | |
| | | | | | | | | | | | | |
| **Total Properties Held for Sale** | $ 376 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | — | | | |
| | | | | | | | | | | | | |
| **Properties Subject to Sales Contract** | | | | | | | | | | | | |
| **Apartments** | | | | | | | | | | | | |
| | | | | | | — | — | — | | | | |
| **Total Aparments Subject to Sales Contract** | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | — | | | |
| | | | | | | | | | | | | |
| **Commercial** | | | | | | | | | | | | |
| | | | | — | | | | | | — | | |
| **Total Commercial Subject to Sales Contract** | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | — | | | |
| | | | | | | | | | | | | |
| **Land** | | | | | | | | | | | | |
| Dominion Tract, Dallas, TX | $ 1,079 | $ 3,931 | $ — | 53 | (1,624) | 2,360 | $ — | 2,360 | $ — | — | 03/99 | — |
| Hollywood Casino Tract I, Farmers Branch, TX | 420 | 5,281 | — | 124 | (3,302) | 2,103 | $ — | 2,103 | — | — | 06/02 | — |
| LaDue Land, Farmers Branch, TX | — | 1,900 | — | — | (55) | 1,845 | $ — | 1,845 | — | — | 07/98 | — |
| Three Hickory Land, Farmers Branch, TX | — | 1,202 | — | — | — | 1,202 | $ — | 1,202 | — | — | 03/14 | — |
| Travelers Land, Farmers Branch, TX | — | 21,511 | — | 4 | — | 21,515 | $ — | 21,515 | — | — | 11/06 | — |
| Travelers Land, Farmers Branch, TX | — | 6,891 | — | — | (4,978) | 1,913 | $ — | 1,913 | — | — | 11/06 | — |
| Walker Land, Dallas County, TX | — | 19,728 | — | 71 | (6,624) | 13,175 | $ — | 13,175 | — | — | 09/06 | — |
| Whorton Land, Bentonville, AR | — | 3,510 | — | 567 | (2,451) | 1,626 | $ — | 1,626 | — | — | 06/05 | — |
| **Total Land Subject to Sales Contract** | $ 1,499 | $ 63,954 | $ — | $ 819 | $ (19,034) | $ 45,739 | $ — | $ 45,739 | — | | | |
| | | | | | | | | | | | | |
| **Total Properties Subject to Sales Contract** | $ 1,499 | $ 63,954 | $ — | $ 819 | $ (19,034) | $ 45,739 | $ — | $ 45,739 | — | | | |
| | | | | | | | | | | | | |
| **Land Sold** | | | | | | | | | | | | |
| | $ — | $ — | $ — | — | — | $ — | $ — | $ — | — | — | — | — |
| **Total Land Sold** | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | — |
| | | | | | | | | | | | | |
| **TOTAL: Real Estate** | $ 911,070 | $241,505 | $ 823,755 | $ 156,606 | $ (63,406) | $223,290 | $ 935,170 | $1,158,460 | $ 178,590 | | | |

58

**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**As of December 31, 2017**

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | | (dollars in thousansds) | |

Reconciliation of Real Estate

App. 2084

| | | | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| Balance at January 1, | | | $ 1,084,454 | 982,827 | 804,489 |
| Additions | | | | | |
| Acquisitions, improvements and construction | | | 119,925 | 112,763 | 222,423 |
| Deductions | | | | | |
| Sale of real estate | | | (6,919) | (50,136) | (38,785) |
| Asset impairments | | | — | — | (5,300) |
| Balance at December 31, | | | $ 1,158,460 | $ 1,045,454 | $ 982,827 |
| | | | | | |
| Reconciliation of Accumulated Depreciation | | | | | |
| Balance at January 1, | | | $ 154,281 | $ 138,808 | $ 115,368 |
| Additions | | | | | |
| Depreciation | | | 24,309 | 22,180 | 25,565 |
| Deductions | | | | | |
| Sale of real estate | | | — | (6,707) | (2,125) |
| Balance at December 31, | | | $ 178,590 | $ 154,281 | $ 138,808 |

59

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**MORTGAGE LOANS**
**December 31, 2017**

| Description | Interest Rate | Final Maturity Date | Periodic Payment Terms | Prior Liens | Face Amount of Mortgate | Carrying Amount of Mortgage | Principal Amounts of Loans Subject To Delinquent Principal or Interest |
|---|---|---|---|---|---|---|---|
| | | | | | (dollars in thousands) | | |
| **H198, LLC** | 12.00% | 01/20 | | — | 5,907 | 5,907 | — |
| Las Vegas Land | | | | | | | |
| **H198, LLC** | 12.00% | 01/20 | | | | 4,290 | — |
| McKinney Ranch Land | | | | | | | |
| **Spyglass Apartments of Ennis** | 5.00% | 11/19 | | | | 4,522 | — |
| **Bellwether Ridge** | 5.00% | 05/20 | | | | 2,954 | — |
| **Parc at Windmill Farms** | 5.00% | 05/20 | | | | 2,505 | — |
| **Oulan-Chikh Family Trust** | 8.00% | 3/21 | Excess cash flow | — | 174 | 174 | — |
| **Unified Housing Foundation, Inc. (Echo Station)** | 12.00% | 12/32 | Excess cash flow | 9,719 | 1,809 | 1,481 | — |
| 100% Interest in UH of Temple, LLC | | | | | | | |
| **Unified Housing Foundation, Inc. (Lakeshore Villas/HFS of Humble, LLC) (31.5% of cash flow)** | 12.00% | 12/32 | Excess cash flow | 15,756 | 8,836 | 6,368 | — |
| Interest in Unified Housing Foundation Inc. | | | | | | | |
| **Unified Housing Foundation, Inc. (Limestone Ranch)** | 12.00% | 12/32 | Excess cash flow | 18,641 | 12,335 | 7,953 | — |
| 100% Interest in UH of Vista Ridge, LLC | | | | | | | |
| **Unified Housing Foundation, Inc. (Timbers of Terrell)** | 12.00% | 12/32 | Excess cash flow | 7,294 | 1,702 | 1,323 | — |
| 100% Interest in UH of Terrell, LLC | | | | | | | |
| **Unified Housing Foundation, Inc. (Tivoli)** | 12.00% | 12/32 | Excess cash flow | 10,398 | 12,761 | 6,139 | — |
| 100% Interest in UH of Tivoli, LLC | | | | | | | |
| **Unified Housing Foundation, Inc. (Lakeshore Villas/HFS of Humble, LLC) (68.5% of cash flow)** | 12.00% | 12/32 | Excess cash flow | 15,756 | 2,189 | 2,000 | — |
| **Unified Housing Foundation, Inc (2017 Advisory Fee)** | 12.00% | 06/20 | Excess cash flow | — | 1,261 | 5,760 | — |
| **Unified Housing Foundation, Inc.** | 12.00% | 12/18 | Excess cash flow | — | 3,994 | 3,994 | — |
| **Unified Housing Foundation, Inc.** | 12.00% | 12/18 | Excess cash flow | — | 6,407 | 6,407 | — |
| **Various related party notes** | various | various | Excess cash flow | — | 1,420 | 465 | — |
| **Various non-related party notes** | various | various | | — | 496 | 796 | — |
| **Various non-related party notes** | various | various | | — | 4,742 | 981 | — |
| | | | | | | $ 64,019 | |
| | | | | | Accrued interest | 6,147 | |
| | | | | | | $ 70,166 | |

60

**TRANSCONTINENTAL REALTY INVESTORS, INC.**
**MORTGAGE LOANS**
**As of December 31,**

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (dollars in thousands) | | |
| Balance at January 1, | $ 79,308 | $ 71,376 | $ 85,447 |

App. 2085

| Additions | | | | | | |
|---|---|---|---|---|---|---|
| New mortgage loans | | 16,422 | | 11,703 | | 18,055 |
| Funding of existing loans | | — | | — | | — |
| Increase (decrease) of interest receivable on mortgage loans | | 668 | | 9,878 | | 6,994 |
| Deductions | | | | | | |
| Amounts received | | (26,230) | | (11,824) | | (12,475) |
| Non-cash reduction(*) | | (2) | | (1,825) | | (26,645) |
| Cost of mortgages sold | | — | | — | | — |
| Balance at December 31, | $ | 70,166 | $ | 79,308 | $ | 71,376 |

<div align="center">61</div>

---

### ITEM 9.  *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE*

None.

### ITEM 9A.  *CONTROLS AND PROCEDURES*

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Principal Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e)) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Principal Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our Principal Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. There are inherent limitations to the effectiveness of any system of internal control over financial reporting. These limitations include the possibility of human error, the circumvention of overriding of the system and reasonable resource constraints. Because of its inherent limitations, our internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. In making this assessment, management used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on management's assessments and those criteria, management has concluded that Company's internal control over financial reporting was effective as of December 31, 2017.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial report. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this annual report.

**Changes in Internal Control over Financial Reporting**

In preparation for management's report on internal control over financial reporting, we documented and tested the design and operating effectiveness of our internal control over financial reporting. There were no changes in our internal controls over financial reporting (as such term is defined in Exchange Act Rule 13a-15(f)) that occurred during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B.  *OTHER INFORMATION*

Not applicable.

<div align="center">62</div>

---

<div align="center">**PART III**</div>

### ITEM 10.  *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

**Directors**

The affairs of TCI are managed by a Board of Directors. The Directors are elected at the annual meeting of stockholders or appointed by the incumbent Board and serve until the next annual meeting of stockholders or until a successor has been elected or approved.

It is the Board's objective that a majority of the Board consists of independent directors. For a director to be considered independent, the Board must determine that the director does not have any direct or indirect material relationship with TCI. The Board has established guidelines to assist it in determining director independence which conform to, or are more exacting than, the independence requirements in the New York Stock Exchange listing rules. The independence guidelines are set forth in TCI's "Corporate Governance Guidelines". The text of this document has been posted on TCI's internet website at (*http://www.transconrealty-invest.com*) and is available in print to any shareholder who requests it. In addition to applying these guidelines, the Board will consider all relevant facts and circumstances in making an independence determination.

TCI has adopted a code of conduct that applies to all Directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Stockholders may find our code of conduct on our website by going to our website address at (*http://www.transconrealty-invest.com*). We will post any amendments to the code of conduct, as well as any waivers that are required to be disclosed by the rules of the SEC or the New York Stock Exchange on our website.

Our Board of Directors has adopted charters for our Audit, Compensation and Governance and Nominating Committees of the Board of Directors. Stockholders may find these documents on our website by going to the website address at (*http://www.transconrealty-invest.com*). You may also obtain a printed copy of the materials referred to by contacting us at the following address:

<div align="center">Transcontinental Realty Investors, Inc.</div>

<div align="right">App. 2086</div>

Attn: Investor Relations
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Telephone: 469-522-4200

All members of the Audit Committee and Nominating and Corporate Governance Committees must be independent directors. Members of the Audit Committee must also satisfy additional independence requirements, which provide (i) that they may not accept, directly or indirectly, any consulting, advisory, or compensatory fee from TCI or any of its subsidiaries other than their director's compensation (other than in their capacity as a member of the Audit Committee, the Board of Directors, or any other committee of the Board), and (ii) no member of the Audit Committee may be an "affiliated person" of TCI or any of its subsidiaries, as defined by the Securities and Exchange Commission.

The current directors of TCI are listed below, together with their ages, terms of service, all positions and offices with TCI and its current advisor, Pillar, their principal occupations, business experience and directorships with other companies during the last five years or more. The designation "affiliated", when used below with respect to a director, means that the director is an officer, director or employee of Pillar, an officer of the Company, or an officer or director of a related party of the Company. The designation "independent", when used below with respect to a Director, means that the Director is neither an officer of the Company nor a director, officer or employee of Pillar (but may be a director of the Company, although the Company may have certain business or professional relationships with such Director as discussed in Item 13. Certain Relationships and Related Transactions, and Director Independence.

**HENRY A. BUTLER,** age 67, Director, Affiliated, since February 2011 and Chairman of the Board since May 2011

Mr. Butler has served as Vice President Land Sales for Pillar Income Asset Management, LLC since April 2011, and its predecessor, Prime Income Asset Management, LLC from July 2003 to April 2011. Mr. Butler has been a Director of the Company since February 2011 and Chairman of the Board since May 2011. He has also served as Chairman of the Board since May 2009 and as a Director since July 2003 of ARL and Chairman of the Board since May 2009 and a Director since December 2001 of TCI.

**ROBERT A. JAKUSZEWSKI,** age 55, Director, Independent, since March 2004.

Mr. Jakuszewski is currently has served as a Territory Manager for Artesa Labs since April 2015. He was a Medical Specialist from January 2014 to April 2015 for VAYA Pharma, Inc., Senior Medical Liaison from January 2013 to July 2013 for Vein Clinics of America, and the Vice President of Sales and Marketing from September 1998 to December 2012 for New Horizons Communications, Inc. Mr. Jakuszewski has been a Director of the Company since March 2004. He has also been a Director of ARL since November 2005 and a Director of TCI since November 2005.

<div align="center">63</div>

**TED R. MUNSELLE,** age 62, Director, Independent, since May 2009

Mr. Munselle has been Vice President and Chief Financial Officer of Landmark Nurseries, Inc. since October 1998. On February 17, 2012, he was appointed as a member of the Board of Directors for Spindletop Oil & Gas Company and as Chairman of their Audit Committee. Spindletop's stock is traded on the Over-the-Counter (OTC) market. Mr. Munselle has been a Director of the Company since May 2009. He has also served as Director of ARL since February 2004 and Director of TCI since February 2004. Mr. Munselle is qualified as an Audit Committee financial expert within the meaning of SEC regulations and the Board of Directors of IOR has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the NYSE American. Mr. Munselle is a Certified Public Accountant.

**RAYMOND D. ROBERTS, SR.,** age 86, Director, Independent, since June 2016

Mr. Roberts is currently retired. Mr. Roberts has served as Director of the Company since June 2, 2016. He has also served as Director of ARL and TCI since June 2, 2016. For more than five years prior to December 31, 2014, he was Director of Aviation of Steller Aviation, Inc., a privately held corporation engaged in the business of aircraft (Boeing 737) and logistical management.

**Board Meetings and Committees**

The Board of Directors held eight meetings during 2017. For such year, no incumbent director attended fewer than 75% of the aggregate of (1) the total number of meetings held by the Board during the period for which he or she had been a director and (2) the total number of meetings held by all committees of the Board on which he or she served during the period that he served. Under TCI's Corporate Governance Guidelines, each Director is expected to dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties, including by attending meetings of the stockholders of the Company, the Board and Committees of which he is a member. The Board of Directors has standing Audit, Compensation and Governance and Nominating Committees.

*Audit Committee.*   The current Audit Committee was formed on February 19, 2004, and its function is to review TCI's operating and accounting procedures. A charter of the Audit Committee has also been adopted by the Board. The charter of the Audit Committee was adopted on February 19, 2004, and is available on the Company's Investor Relations website *(www.transconrealty-invest.com)*. The Audit Committee is an "audit committee" for purposes of Section 3(a)(58) of the Securities Exchange Act of 1934. The current members of the Audit Committee, all of whom are independent within the meaning of the SEC Regulations, the listing standards of the New York Stock Exchange, Inc. and TCI's Corporate Governance Guidelines, are Messrs. Jakuszewski, Munselle (Chairman) and Roberts. Mr. Ted R. Munselle, a member of the Committee, is qualified as an Audit Committee financial expert within the meaning of SEC Regulations, and the Board has determined that he has accounting and related financial management expertise within the meaning of the listing standards of the New York Stock Exchange, Inc. All of the members of the Audit Committee meet the experience requirements of the listing standards of the New York Stock Exchange. The Audit Committee met five times during 2017.

*Governance and Nominating Committee.*   The Governance and Nominating Committee is responsible for developing and implementing policies and practices relating to corporate governance, including reviewing and monitoring implementation of TCI's Corporate Governance Guidelines. In addition, the Committee develops and reviews background information on candidates for the Board and makes recommendations to the Board regarding such candidates. The Committee also prepares and supervises the Board's annual review of director independence and the Board's performance self-evaluation. The Charter of the Governance and Nominating Committee was adopted on March 22, 2004 and is available on the Company's Investor Relations website (*www.transconrealty-invest.com*). The current members of the Committee are Messrs. Munselle and Jakuszewski (Chairman) and Roberts. The Governance and Nominating Committee met twice during 2017.

*Compensation Committee.*   The Compensation Committee is responsible for overseeing the policies of the Company relating to compensation to be paid by the Company to the Company's principal executive officer and any other officers designated by the Board and make recommendations to the Board with respect to such policies, produce necessary reports and executive compensation for inclusion in the Company's Proxy Statement in accordance with applicable rules and regulations and to monitor the development and implementation of succession plans for the principal executive officers and other key executives and make recommendations to the Board with respect to such plans. The charter of the Compensation Committee was adopted on March 22, 2004, and is available on the Company's Investor Relations website (*www.transconrealty-invest.com*). The current members of the Compensation Committee are Messrs. Roberts (Chairman) and Jakuszewski and Munselle. All of the members of the Compensation Committee are independent within the meaning of the listing standards of the NYSE American and the Company's Corporate Governance Guidelines. The Compensation Committee is to be comprised of at least two directors who are independent of Management and the Company. The Compensation Committee met twice during 2017.

<div align="center">64</div>

The members of the Board of Directors on the date of this Report and the Committees of the Board on which they serve are identified below:

| | Audit Committee | Governance and Nominating Committee | Compensation Committee |
| --- | --- | --- | --- |
| Robert A. Jakuszewski | X | Chair | X |

<div align="right">App. 2087</div>

Ted R. Munselle
Raymond D. Roberts. Sr
Henry A. Butler

Chair

X
X

X
X

**Presiding Director**

In March 2004, the Board created a new position of presiding director, whose primary responsibility is to preside over periodic executive sessions of the Board in which Management directors and other members of Management do not participate. The presiding director also advises the Chairman of the Board and, as appropriate, Committee Chairs with respect to agendas and information needs relating to Board and Committee meetings, provides advice with respect to the selection of Committee Chairs and performs other duties that the Board may from time to time delegate to assist the Board in fulfillment of its responsibilities.

The day following the annual meeting of stockholders held December 13, 2017 representing all stockholders of record dated November 2, 2017, the full Board met and re-appointed Ted R. Munselle as Presiding Director, to serve in such position until the Company's next annual meeting of stockholders to be held subsequently in 2018.

**Determination of Director's Independence**

In February 2004, the Board adopted its Corporate Governance Guidelines. The Guidelines adopted by the Board meet or exceed the new listing standards adopted during that year by the New York Stock Exchange. The full text of the Guidelines can be found on the Company's Investor Relations website (*www.transcontrealty-invest.com*).

Pursuant to the Guidelines, the Board undertook its annual review of director independence in May, 2017 and during this review, the Board considered transactions and relationships between each director or any member of his or her immediate family and TCI and its subsidiaries and related parties, including those reported under Certain Relationships and Related Transactions below. The Board also examined transactions and relationship between directors or their related parties and members of TCI's senior management or their related parties. As provided in the Guidelines, the purpose of such review was to determine whether such relationships or transactions were inconsistent with the determination that the director is independent.

As a result of this review, the Board affirmatively determined of the then directors, Messrs. Munselle, Jakuszewski and Roberts are each independent of the Company and its Management under the standards set forth in the Corporate Governance Guidelines.

**Executive Officers**

Executive officers of the Company are listed below, all of whom are employed by Pillar. Mr. Bertcher is employed by New Concept Energy, Inc "NCE". None of the executive officers receive any direct remuneration from the Company nor do any hold any options granted by the Company. Their positions with the Company are not subject to a vote of stockholders. In addition to the following executive officers, the Company has several vice presidents and assistant secretaries who are not listed herein. The ages, terms of service and all positions and offices with the Company, Pillar, other related entities, other principal occupations, business experience and directorships with other publicly-held companies during the last five years or more are set forth below. No family relationships exist among any of the executive officers or directors of the Company.

**DANIEL J. MOOS, 67**

Mr. Moos has served as President since April 2007 and Chief Executive Officer since March 2010 of IOR, ARL and TCI. Mr. Moos has also served as Prime's President since April 2007, Secretary since June 2011 and Treasurer since October 2013. He has also served as a Director since December 2016, President since December 2010, Chief Executive Officer since March 2011 and Treasurer since October 2013 of Pillar.

**GENE S. BERTCHER, 69**

Mr. Bertcher has served as Executive Vice President since February 2008, Chief Financial Officer since May 2008 and Treasurer since October 2013 of IOR, ARL and TCI. Mr. Bertcher has also served in the following capacities for New Concept Energy, Inc. "NCE", a Nevada corporation which has its common stock listed on the NYSE American: Director since June 1999, Chairman of the Board since December 2006, Chief Executive Officer since December 2006, President since November 2004, Chief Financial Officer since November 1989, Treasurer since November 1989 and Secretary since October 2012. Mr. Bertcher has been employed by NCE since November 1989. He is a Certified Public Accountant.

65

**LOUIS J. CORNA, 70**

Mr. Corna has served as Executive Vice President, General Counsel/Tax Counsel and Secretary since February 2004 of IOR, ARL and TCI. He has also been Executive Vice President-Tax since April 2011 and Secretary since December 2010 of Pillar. Mr. Corna was also a Director and Vice President from June 2004 to December 2010 and Secretary from January 2005 to December 2010 of First Equity Properties, Inc., a Nevada corporation with securities registered under Section 12(g) of the Exchange Act.

**Code of Ethics**

TCI has adopted a code of ethics entitled "Code of Business Conduct and Ethics" that applies to all directors, officers, and employees (including those of the contractual Advisor to TCI). In addition, TCI has adopted a code of ethics entitled "Code of Ethics for Senior Financial Officers" that applies to the principal executive officer, president, principal financial officer, chief financial officer, principal accounting officer, and controller. The text of these documents has been posted on TCI's internet website at (www.transconrealty-invest.com) and are available in print to any stockholder who requests them.

**Compliance with Section 16(a) of the Securities Exchange Act of 1934**

Under the securities laws of the United States, the directors, executive officers, and any persons holding more than 10% of TCI's shares of Common stock are required to report their share ownership and any changes in that ownership to the Securities and Exchange Commission (the "Commission"). Specific due dates for these reports have been established and TCI is required to report any failure to file by these dates. All of these filing requirements were satisfied by TCI's directors, executive officers, and 10% holders during the fiscal year ending December 31, 2017. In making these statements, TCI has relied on the written representations of its incumbent directors and executive officers and its 10% holders and copies of the reports they have filed with the Commission.

**The Advisor**

Pillar has been TCI's Advisor and Cash Manager since April 30, 2011. Although the Board of Directors is directly responsible for managing the affairs of TCI, and for setting the policies which guide it, the day-to-day operations of TCI are performed by Pillar, as the contractual advisor, under the supervision of the Board. Pillar's duties include, but are not limited to, locating, evaluating and recommending real estate and real estate-related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors. Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with TCI's business plan and investment policy. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees and as such, employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust.

App. 2088

The May Trust is a Trust, the beneficiaries of which are the children of Gene E. Phillips. Mr. Phillips is not an officer, manager or Director of Pillar, Realty Advisors, LLC, RAI, MRHI or ARL, nor is he a Trustee of the May Trust.

Under the Advisory Agreement, Pillar is required to annually formulate and submit, for Board approval, a budget and business plan containing a twelve-month forecast of operations and cash flow, a general plan for asset sales and purchases, lending, foreclosure and borrowing activity, and other investments. Pillar is required to report quarterly to the Board on TCI's performance against the business plan. In addition, all transactions require prior Board approval, unless they are explicitly provided for in the approved business plan or are made pursuant to authority expressly delegated to Pillar by the Board.

The Advisory Agreement also requires prior Board approval for the retention of all consultants and third party professionals, other than legal counsel. The Advisory Agreement provides that Pillar shall be deemed to be in a fiduciary relationship to the TCI stockholders; contains a broad standard governing Pillar's liability for losses incurred by TCI; and contains guidelines for Pillar's allocation of investment opportunities as among itself, TCI and other entities it advises. Pillar is a company of which Messrs. Moos, Bertcher, Corna, and Crozier serve as executive officers.

The Advisory Agreement provides for Pillar to be responsible for the day-to-day operations of TCI and to receive, as compensation for basic management and advisory services, a gross asset fee of 0.0625% per month (0.75% per annum) of the average of the gross asset value (total assets less allowance for amortization, depreciation or depletion and valuation reserves).

In addition to base compensation, Pillar receives the following forms of additional compensation:

(1)  an annual net income fee equal to 7.5% of TCI's net income as an incentive for successful investment and management of the Company's assets;

(2)  an annual incentive sales fee to encourage periodic sales of appreciated real property at optimum value equal to 10.0% of the amount, if any, by which the aggregate sales consideration for all real estate sold by TCI during such fiscal year exceeds the sum of:

66

(a)  the cost of each such property as originally recorded in TCI's books for tax purposes (without deduction for depreciation, amortization or reserve for losses);

(b)  capital improvements made to such assets during the period owned; and

(c)  all closing costs (including real estate commissions) incurred in the sale of such real estate; provided however, no incentive fee shall be paid unless (a) such real estate sold in such fiscal year, in the aggregate, has produced an 8.0% simple annual return on the net investment including capital improvements, calculated over the holding period before depreciation and inclusive of operating income and sales consideration, and (b) the aggregate net operating income from all real estate owned for each of the prior and current fiscal years shall be at least 5.0% higher in the current fiscal year than in the prior fiscal year;

(3)  an acquisition commission, from an unaffiliated party of any existing mortgage or loan, for supervising the acquisition, purchase or long-term lease of real estate equal to the lesser of:

(a)  up to 1.0% of the cost of acquisition, inclusive of commissions, if any, paid to non-affiliated brokers; or

(b)  the compensation customarily charged in arm's-length transactions by others rendering similar property acquisition services as an ongoing public activity in the same geographical location and for comparable property, provided that the aggregate purchase price of each property (including acquisition fees and real estate brokerage commissions) may not exceed such property's appraised value at acquisition;

(4)  a construction fee equal to 6.0% of the so-called "hard costs" only of any costs of construction on a completed basis, based upon amounts set forth as approved on any architect's certificate issued in connection with such construction, which fee is payable at such time as the applicable architect certifies other costs for payment to third parties. The phrase "hard costs" means all actual costs of construction paid to contractors, subcontractors and third parties for materials or labor performed as part of the construction but does not include items generally regarded as "soft costs," which are consulting fees, attorneys' fees, architectural fees, permit fees and fees of other professionals; and

(5)  reimbursement of certain expenses incurred by the advisor in the performance of advisory services.

The Advisory Agreement also provides that Pillar receive the following forms of compensation:

(1)  a mortgage or loan acquisition fee with respect to the acquisition or purchase from an unaffiliated party of any existing mortgage loan by TCI equal to the lesser of:

(a)  1.0% of the amount of the mortgage or loan purchased; or

(b)  a brokerage or commitment fee which is reasonable and fair under the circumstances. Such fee will not be paid in connection with the origination or funding of any mortgage loan by TCI; and

(2)  a mortgage brokerage and equity refinancing fee for obtaining loans or refinancing on properties equal to the lesser of:

(a)  1.0% of the amount of the loan or the amount refinanced; or

(b)  a brokerage or refinancing fee which is reasonable and fair under the circumstances; provided, however, that no such fee shall be paid on loans from Pillar, or a related party of Pillar, without the approval of TCI's Board of Directors. No fee shall be paid on loan extensions.

Under the Advisory Agreement, all or a portion of the annual advisory fee must be refunded by the Advisor if the operating expenses of TCI (as defined in the Advisory Agreement) exceed certain limits specified in the Advisory Agreement based on the book value, net asset value and net income of TCI during the fiscal year.

The Advisory Agreement requires Pillar to pay to TCI, one-half of any compensation received from third parties with respect to the origination, placement or brokerage of any loan made by TCI; provided, however, that the compensation retained by Pillar, or any affiliate of Pillar, shall not exceed the lesser of (1) 2.0% of the amount of the loan commitment or (2) a loan brokerage and commitment fee which is reasonable and fair under the circumstances.

The TCI Advisory Agreement further provides that Pillar shall bear the cost of certain expenses of its employees, excluding fees paid to TCI's Directors; rent and other office expenses of both Pillar and TCI (unless TCI maintains office space separate from that of Pillar); costs not directly identifiable to TCI's assets, liabilities, operations, business or financial affairs; and miscellaneous administrative expenses relating to the performance by Pillar of its duties under the Advisory Agreement.

If and to the extent that TCI shall request Pillar, or any director, officer, partner, or employee of Pillar, to render services for TCI other than those required to be rendered by the Advisory Agreement, Pillar separately would be compensated for such additional services on terms to be agreed upon between such party and TCI from time to time. As discussed below, under "Property Management and Real Estate Brokerage," effective January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties and provides brokerage services under similar terms as the previous agreements with Triad and Regis Realty I.

App. 2089

TCI entered into a Cash Management Agreement with Pillar on April 30, 2011 to further define the administration of the Company's day-to-day investment operations, relationship contacts, flow of funds and deposit and borrowing of funds. Under the Cash Management Agreement, all funds of the Company are delivered to Pillar which has a deposit liability to the Company and is responsible for payment of all payables and investment of all excess funds which earn interest at the Wall Street Journal prime rate plus 1.0% per annum, as set quarterly on the first day of each calendar quarter. Borrowings for the benefit of the Company bear the same interest rate. The term of the Cash Management Agreement is coterminous with the Advisory Agreement, and is automatically renewed each year unless terminated with the Advisory Agreement. TCI's management believes that the terms of the Advisory Agreement are at least as fair as could be obtained from unaffiliated third parties.

Situations may develop in which the interests of TCI are in conflict with those of one or more directors or officers in their individual capacities, or of Pillar, or of their respective related parties. In addition to services performed for TCI, as described above, Pillar actively provides similar services as agent for, and advisor to, other real estate enterprises, including persons and entities involved in real estate development and financing, including ARL and IOR. The Advisory Agreement provides that Pillar may also serve as advisor to other entities.

As advisor, Pillar is a fiduciary of TCI's public investors. In determining to which entity a particular investment opportunity will be allocated, Pillar will consider the respective investment objectives of each entity and the appropriateness of a particular investment in light of each such entity's existing mortgage note and real estate portfolios and business plan. To the extent any particular investment opportunity is appropriate to more than one such entity, such investment opportunity will be allocated to the entity that has had funds available for investment for the longest period of time, or, if appropriate, the investment may be shared among various entities. See Part III, Item 13 "Certain Relationships and Related Transactions, and Director Independence".

Pillar may assign the Advisory Agreement only with the prior consent of TCI.

The principal executive officers and directors of Pillar are set forth below:

| Name | Directors/Officer(s) |
|---|---|
| Daniel J. Moos | President, Chief Executive Officer, Treasurer, Director |
| Gene S. Bertcher | Executive Vice President, Chief Accounting Officer |
| Louis J. Corna | Executive Vice President, Secretary, Tax Counsel, General Legal Counsel |

**Property Management**

Since January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

TCI engages third-party companies to lease and manage our apartment properties for a fee of 6.0% or less of the monthly gross rents collected on the residential properties under their management.

**Real Estate Brokerage**

Regis provides real estate brokerage services to TCI on a non-exclusive basis, and is entitled to receive a real estate commission for property purchases and sales in accordance with the following sliding scale of total fees to be paid:

(1) maximum fee of 4.5% on the first $2.0 million of any purchase or sale transaction of which no more than 3.5% is to be paid to Regis;

(2) maximum fee of 3.5% on transaction amounts between $2.0 million-$5.0 million of which no more than 3.0% is to be paid to Regis;

(3) maximum fee of 2.5% on transaction amounts between $5.0 million-$10.0 million of which no more than 2.0% is to be paid to Regis; and

(4) maximum fee of 2.0% on transaction amounts in excess of $10.0 million of which no more than 1.5% is to be paid to Regis.

<center>68</center>

**ITEM 11.    *EXECUTIVE COMPENSATION***

TCI has no employees, payroll or benefit plans and pays no compensation to its executive officers. The executive officers of TCI, who are also officers or employees of Pillar, TCI's advisor, are compensated by Pillar. Such executive officers perform a variety of services for Pillar and the amount of their compensation is determined solely by Pillar. Pillar does not allocate the cash compensation of its officers among the various entities for which it serves as advisor. See Item 10. "Directors, Executive Officers and Corporate Governance" for a more detailed discussion of the compensation payable to Pillar by TCI.

The only remuneration paid by TCI is to the directors who are not officers or employees of Pillar or its related companies. The Independent Directors (1) review the business plan of TCI to determine that it is in the best interest of TCI's stockholders, (2) review the advisory contract, (3) supervise the performance of the advisor and review the reasonableness of the compensation paid to the advisor in terms of the nature and quality of services performed, (4) review the reasonableness of the total fees and expenses of TCI and (5) select, when necessary, a qualified independent real estate appraiser to appraise properties acquired.

Effective February, 2011, each non-affiliated Director is entitled to receive an annual retainer of $12,000, with the Chairman of the Audit Committee to receive a one-time annual fee of $500. Directors who are also employees of the Company or its advisor receive no additional compensation for service as a Director.

During 2017, $36,500 was paid to non-employee Directors in total Directors' fees. The fees paid to the directors are as follows: Robert A. Jakuszewski, $12,000; Ted R. Munselle, $12,500; and, Raymond D. Roberts, Sr., $12,000.

**Director's Stock Option Plan**

TCI established a Director's Stock Option Plan ("Director's Plan") for the purpose of attracting and retaining Directors who are not officers or employees of TCI or Pillar. The Director's Plan provides for the grant of options that are exercisable at fair market value of TCI's Common stock on the date of grant. The Director's Plan was approved by stockholders at their annual meeting on October 10, 2000, following which each then-serving Independent Director was granted options to purchase 5,000 shares of Common stock of TCI. On January 1 of each year, each Independent Director receives options to purchase 5,000 shares of Common stock. The options are immediately exercisable and expire on the earlier of the first anniversary of the date on which a Director ceases to be a Director or 10 years from the date of grant. The Director's Plan was terminated by the Board of Directors on December 15, 2005. As of December 31, 2015, there were 5,000 shares of stock options outstanding which were exercisable at $14.25 per share. These options expired unexercised January 1, 2016.

**ITEM 12.    *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT***

**Securities Authorized for Issuance Under Equity Compensation Plans**

<div align="right">App. 2090</div>

**Security Ownership of Certain Beneficial Owners**

The following table sets forth the ownership of TCI's Common stock, both beneficially and of record, both individually and in the aggregate, for those persons or entities known to be beneficial owners of more than 5.0% of the outstanding shares of Common stock as of the close of business on March 30, 2018.

| | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** |
|---|---|---|
| American Realty Investors, Inc.[1][2]<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 6,767,420 | 77.63% |
| Transcontinental Realty Acquisition Corporation[2]<br>1603 LBJ Freeway, Suite 800<br>Dallas, Texas 75234 | 1,383,226 | 15.87% |

\*   "Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\*  Percentage is based upon 8,717,767 shares of Common stock outstanding at March 20, 2018.

(1)  Includes 5,384,194 shares (61.76%) directly owned by American Realty Investors, Inc. "ARL" directly, over which the directors al ARL may be deemed to be beneficial owners by virtue of their positions as directors of ARL. The directors of ARL disclaim beneficial ownership of such shares.

(2)  Includes 1,383,226 shares owned by Transcontinental Realty Acquisition Corporation ("TRAC"), which is a wholly owned subsidiary of ARL, over which each of the directors of TRAC, Daniel J. Moos and Gene S. Bertcher may be deemed to be beneficial owners by virtue of their positions as directors of TRAC. The directors of TRAC disclaim beneficial ownership of such shares.

(3)  Each of the directors of ARL, Henry A. Butler, Raymond D. Roberts, Sr., Robert A. Jakuszewski and Ted R. Munselle may be deemed to be the beneficial owners by virtue of their positions as current directors of ARL. The directors of ARL disclaim such beneficial ownership.

<center>69</center>

**Security Ownership of Management.**

The following table sets forth the ownership of TCI's Common stock, both beneficially and of record, both individually and in the aggregate, for the directors and executive officers of TCI as of the close of business on March 30, 2018.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership* | Approximate Percent of Class** |
|---|---|---|
| Gene S. Bertcher | 6,767,420(1) | 77.6% |
| Henry A. Butler | 6,767,420(1) | 77.6% |
| Louis J. Corna | 6,767,420(1) | 77.6% |
| Robert A. Jakuszewski | 6,767,420(1) | 77.6% |
| Daniel J. Moos | 7,057,420(1) | 84.2% |
| Ted R. Munselle | 6,767,420(1) | 77.6% |
| Raymond D. Roberts, Sr. | 6,767,420(1) | 77.6% |
| All Directors and Executive Officers as a group (7 individuals) | 6,767,420(1) | 77.6% |

\*   "Beneficial Ownership" means the sole or shared power to vote, or to direct the voting of, a security or investment power with respect to a security, or any combination thereof.

\*\*  Percentages are based upon 8,717,767 shares of Common stock outstanding at March 30, 2018.

(1)  Daniel J. Moos owns 290,000 of Common Stock.

**ITEM 13.    *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE***

**Policies with Respect to Certain Activities**

Article 14 of TCI's Articles of Incorporation provides that TCI shall not, directly or indirectly, contract or engage in any transaction with (1) any director, officer or employee of TCI, (2) any director, officer or employee of the advisor, (3) the advisor, or (4) any affiliate or associate (as such terms are defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended) of any of the aforementioned persons, unless (a) the material facts as to the relationship among or financial interest of the relevant individuals or persons and as to the contract or transaction are disclosed to or are known by TCI's Board of Directors or the appropriate committee thereof and (b) TCI's Board of Directors or committee thereof determines that such contract or transaction is fair to TCI and simultaneously authorizes or ratifies such contract or transaction by the affirmative vote of a majority of independent directors of TCI entitled to vote thereon.

Article 14 defines an "Independent Director" (for purposes of that Article) as one who is neither an officer or employee of TCI, nor a director, officer or employee of TCI's advisor.

TCI's policy is to have such contracts or transactions approved or ratified by a majority of the disinterested Directors with full knowledge of the character of such transactions, as being fair and reasonable to the stockholders at the time of such approval or ratification under the circumstances then prevailing. Such Directors also consider the fairness of such transactions to TCI. Management believes that, to date, such transactions have represented the best investments available at the time and they were at least as advantageous to TCI as other investments that could have been obtained.

TCI may enter into future transactions with entities, the officers, directors, or stockholders of which are also officers, directors, or stockholders of TCI, if such transactions would be beneficial to the operations of TCI and consistent with TCI's then-current investment objectives and policies, subject to approval by a majority of disinterested Directors as discussed above.

TCI does not prohibit its officers, directors, stockholders, or related parties from engaging in business activities of the types conducted by TCI.

**Certain Business Relationships**

Pillar has been TCI's Advisor and Cash Manager since April 30, 2011. Although the Board of Directors is directly responsible for managing the affairs of TCI, and for setting the policies which guide it, the day-to-day operations of TCI are performed by Pillar, as the contractual advisor, under the supervision of the Board. Pillar's duties include, but are not limited to, locating, evaluating and

<div align="right">App. 2091</div>

recommending real estate and real estate related investment opportunities and arranging debt and equity financing for the Company with third party lenders and investors. Additionally, Pillar serves as a consultant to the Board with regard to their decisions in connection with TCI's business plan and investment policy. Pillar also serves as an Advisor and Cash Manager to ARL and IOR. As the contractual advisor, Pillar is compensated by TCI under an Advisory Agreement that is more fully described in Part III, Item 10. "Directors, Executive Officers and Corporate Governance – The Advisor". TCI has no employees and as such, employees of Pillar render services to TCI in accordance with the terms of the Advisory Agreement.

70

Pillar is a Nevada corporation, the sole shareholder of which is Realty Advisors, LLC, a Nevada limited liability company, the sole member of which is RAI, a Nevada corporation, MRHI, a Nevada corporation, the sole shareholder of which is a trust known as the May Trust.

All of TCI's directors also serve as Directors of ARL and IOR. The executive officers of TCI also serve as executive officers of ARL and IOR. As such, they owe fiduciary duties to that entity as well as to Pillar under applicable law. ARL has the same relationship with Pillar, as does TCI. Mr. Bertcher is an officer, director and employee of NCE and as such also owes fiduciary duties to NCE as well as ARL, TCI and IOR under applicable law.

Effective since January 1, 2011, Regis Realty Prime, LLC, dba Regis Property Management, LLC ("Regis"), the sole member of which is Realty Advisors, LLC, manages our commercial properties for a fee of 3.0% or less of the monthly gross rents collected on the commercial properties it manages, and leasing commissions of 6.0% or less in accordance with the terms of its property-level management agreement.

At December 31, 2017, TCI owned approximately 81.25% of the outstanding common shares of IOR.

The Company is part of a tax sharing and compensating agreement with respect to federal income taxes among ARL, TCI and IOR and their subsidiaries. That agreement continued until August 31, 2012, at which time a new tax sharing and compensating agreement was entered into by ARL, TCI, IOR and MRHI for the remainder of 2012 and subsequent years. The expense (benefit) in each year was calculated based on the amount of losses absorbed by taxable income multiplied by the maximum statutory tax rate of 21%.

The Company has a development agreement with Unified Housing Foundation, Inc. "UHF" a non-profit corporation that provides management services for the development of residential apartment projects in the future. The Company has also invested in surplus cash notes receivables from UHF and has sold several residential apartment properties to UHF in prior years. Due to this ongoing relationship and the significant investment in the performance of the collateral secured under the notes receivable, UHF has been determined to be a related party.

**Related Party Transactions**

The Company has historically engaged in and may continue to engage in certain business transactions with related parties, including but not limited to asset acquisition and dispositions. Transactions involving related parties cannot be presumed to be carried out on an arm's length basis due to the absence of free market forces that naturally exist in business dealings between two or more unrelated entities. Related party transactions may not always be favorable to our business and may include terms, conditions and agreements that are not necessarily beneficial to or in the best interest of our company.

In 2017, the Company paid advisory fees of $10.0 million, net income fees of $0.3 million, mortgage brokerage and equity refinancing fees of $1.6 million, cost reimbursements of $2.9 million, and received interest income of $4.9 million from Pillar.

The Company paid property management fees, construction management fees and leasing commissions of $1.0 million to Regis in 2017.

As of December 31, 2017, the Company had notes and interest receivables, net of allowances, of $70.2 million and $70.2 million, respectively, due from related parties. See Part 2, Item 8. Note 3. "Notes and Interest Receivable". During the current period, the Company recognized interest income of $4.9 million, originated $28.8 million, received principal payments of $6.9 million and received interest payments of $4.8 million from these related party notes receivables.

The Company is the primary guarantor on an $39.1 million mezzanine loan between UHF and a lender. In addition, TCI, ARL, and an officer of the Company are limited recourse guarantors of the loan. As of December 31, 2017 UHF was in compliance with the covenants to the loan agreement.

Below are transactions that involve a related party:

As of December 31, 2017, the Company had 66.7 acres of land, at various locations that were sold to related parties in multiple transactions. These transactions are treated as "subject to sales contract" on the Consolidated Balance Sheets. Due to the related party nature of the transactions TCI has deferred the recording of the sales in accordance with ASC 360-20.

**Operating Relationships**

The Company received rental revenue of $0.8 million in 2017, $0.7 million in 2016, and $0.7 million in 2015 from Pillar and its related parties for properties owned by the Company.

71

**Advances and Loans**

From time to time, TCI and its related parties have made advances to each other, which generally have not had specific repayment terms, did not bear interest, are unsecured, and have been reflected in TCI's financial statements as other assets or other liabilities. TCI and the advisor charge interest on the outstanding balance of funds advanced to or from TCI. The interest rate, set at the beginning of each quarter, is the prime rate plus 1.0% on the average daily cash balances advanced. At December 31, 2017, TCI has a receivable from ARL in the amount of $111.7 million.

**ITEM 14.  *PRINCIPAL ACCOUNTING FEES AND SERVICES***

The following table sets for the aggregate fees for professional services rendered to or for TCI for the years 2017 and 2016 by TCI's principal accounting firms, Farmer, Fuqua and Huff, L.P. and Swalm and Associates, P.C.:

| | 2017 | | 2016 | |
| | Farmer, Fuqua & Huff | Swalm & Associates | Farmer, Fuqua & Huff | Swalm & Associates |
| Type of Fee | | | | |
|---|---|---|---|---|
| Audit Fees | $ 597,447 | $ 72,136(1) | $ 575,563 | $ 60,551(1) |
| Tax Fees | 39,760 | — | 36,725 | — |
| Total | $ 637,207 | $ 72,136 | $ 612,288 | $ 60,551 |

(1) All IOT

App. 2092

The audit fees for 2017 and 2016 were for professional services rendered for the audit and review of the consolidated financial statements of TCI and its subsidiaries. The fees for 2017 and 2016 were for services related to federal and state tax compliance and advice.

All services rendered by the principal auditors are permissible under applicable laws and regulations and were pre-approved by either the Board of Directors or the Audit Committee, as required by law. The fees paid to the principal auditors for the services described in the above table fall under the categories listed below:

*Audit Fees.*    These are fees for professional services performed by the principal auditor for the audit of the Company's annual financial statements and review of financial statements included in the Company's 10-Q filings and services that are normally provided in connection with statutory and regulatory filing or engagement.

*Audit-Related Fees.*    These are fees for assurance and related services performed by the principal auditor that are reasonably related to the performance of the audit or review of the Company's financial statements. These services include attestations by the principal auditor that are not required by statute or regulation and consulting on financial accounting/reporting standards. As of December 31, 2017 the Company incurred $0.3 million of audit related fees in connection to assurance and related services of subsidiary.

*Tax Fees.*    These are fees for professional services performed by the principal auditor with respect to tax compliance, tax planning, tax consultation, returns preparation and review of returns. The review of tax returns includes the Company and its consolidated subsidiaries.

*All Other Fees.*    These are fees for other permissible work performed by the principal auditor that do not meet the above category descriptions.

These services are actively monitored (as to both spending level and work content) by the Audit Committee to maintain the appropriate objectivity and independence in the principal auditor's core work, which is the audit of the Company's consolidated financial statements.

The Audit Committee has established policies and procedures for the approval and pre-approval of audit services and permitted non-audit services. The Audit Committee has the responsibility to engage and terminate TCI's independent auditors, to pre-approve their performance of audit services and permitted non-audit services, to approve all audit and non-audit fees, and to set guidelines for permitted non-audit services and fees. All fees for 2017 and 2016 were pre-approved by the Audit Committee or were within the pre-approved guidelines for permitted non-audit services and fees established by the Audit Committee, and there were no instances of waiver of approved requirements or guidelines during the same periods.

Under the Sarbanes-Oxley Act of 2002 (the "SOX Act"), and the rules of the Securities and Exchange Commission (the "SEC"), the Audit Committee of the Board of Directors is responsible for the appointment, compensation and oversight of the work of the independent auditor. The purpose of the provisions of the SOX Act and the SEC rules for the Audit Committee role in retaining the independent auditor is two-fold. First, the authority and responsibility for the appointment, compensation and oversight of the auditors should be with directors who are independent of management. Second, any non-audit work performed by the auditors should be reviewed and approved by these same independent directors to ensure that any non-audit services performed by the auditor do not impair the independence of the independent auditor. To implement the provisions of the SOX Act, the SEC issued rules specifying the types of services that an independent may not provide to its audit client, and governing the Audit Committee's administration of the engagement of the independent auditor. As part of this responsibility, the Audit Committee is required to pre-approve the audit and non-audit services performed by the independent auditor in order to assure that they do not impair the auditor's independence. Accordingly, the Audit Committee has adopted a pre-approval policy of audit and non-audit services (the "Policy"), which sets forth the procedures and conditions pursuant to which services to be performed by the independent auditor are to be pre-approved. Consistent with the SEC rules establishing two different approaches to pre-approving non-prohibited services, the Policy of the Audit Committee covers Pre-approval of audit services, audit-related services, international administration tax services, non-U.S. income tax compliance services, pension and benefit plan consulting and compliance services, and U.S. tax compliance and planning. At the beginning of each fiscal year, the Audit Committee will evaluate other known potential engagements of the independent auditor, including the scope of work proposed to be performed and the proposed fees, and will approve or reject each service, taking into account whether services are permissible under applicable law and the possible impact of each non-audit service on the independent auditor's independence from management. Typically, in addition to the generally pre-approved services, other services would include due diligence for an acquisition that may or may not have been known at the beginning of the year. The Audit Committee has also delegated to any member of the Audit Committee designated by the Board or the financial expert member of the Audit Committee responsibilities to pre-approve services to be performed by the independent auditor not exceeding $25,000 in value or cost per engagement of audit and non-audit services, and such authority may only be exercised when the Audit Committee is not in session.

<div align="center">72</div>

## PART IV

**ITEM 15.**    ***EXHIBITS, FINANCIAL STATEMENT SCHEDULES***

(a)    The following documents are filed as part of this Report:

1.    *Financial Statements*

Reports of Independent Registered Public Accounting Firms
Consolidated Balance Sheets—December 31, 2017 and 2016
Consolidated Statements of Operations—Years Ended December 31, 2017, 2016, and 2015
Consolidated Statements of Stockholders' Equity—Years Ended December 31, 2017, 2016, and 2015
Consolidated Statements of Cash Flows—Years Ended December 31, 2017, 2016, and 2015
Statements of Consolidated Comprehensive Income (Loss) – Years Ended December 31, 2017, 2016, and 2015
Notes to Financial Statements

2.    *Financial Statement Schedules*

Schedule III—Real Estate and Accumulated Depreciation
Schedule IV—Mortgage Loan Receivables on Real Estate

All other schedules are omitted because they are not applicable or because the required information is shown in the Consolidated Financial Statements or the Notes thereto.

3.    *Incorporated Financial Statements*

Consolidated Financial Statements of Income Opportunity Realty Investors, Inc. (incorporated by reference to Item 8 of Income Opportunity Realty Investors, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2017.

Consolidated Financial Statements of American Realty Investors, Inc. (incorporated by reference to Item 8 of American Realty Investors, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2017).

(b)    *Exhibits*

The following documents are filed as Exhibits to this Report:

**Exhibit**

| Number | Description |
|---|---|
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.3 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998). |
| 3.4 | Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.5 | Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| 3.6 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001). |
| 3.7 | By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.8 | Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof. |

| Exhibit Number | Description |
|---|---|
| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14.0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.0* | Subsidiaries of the Registrant. |
| 31.1* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Executive Officer. |
| 31.2* | Certification Pursuant to Rule 13a-14(a) under the Securities and Exchange Act of 1934 as amended of Principal Financial and Accounting Officer. |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

* Filed herewith.

## SIGNATURES

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

TRANSCONTINENTAL REALTY INVESTORS, INC.

Dated: March 30, 2018

By: /s/ GENE S BERTCHER

**Gene S. Bertcher**
**Executive Vice President and Chief Financial Officer**
**(Principal Financial and Accounting Officer)**

**Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.**

| Signature | Title | Date |
|---|---|---|
| /s/ HENRY A. BUTLER | Chairman of the Board and Director | March 30, 2018 |
| **Henry A. Butler** | | |
| /s/ RAYMOND D. ROBERTS, SR. | Director | March 30, 2018 |
| **Raymond D. Roberts, Sr.** | | |
| /s/ ROBERT A. JAKUSZEWSKI | Director | March 30, 2018 |
| **Robert A. Jakuszewski** | | |
| /s/ TED R. MUNSELLE | Director | March 30, 2018 |
| **Ted R. Munselle** | | |

App. 2094

| /s/ DANIEL J. MOOS | President and Chief Executive Officer (Principal Executive Officer) | March 30, 2018 |
|---|---|---|

**Daniel J. Moos**

| /s/ GENE S. BERTCHER | Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | March 30, 2018 |
|---|---|---|

**Gene S. Bertcher**

75

**ANNUAL REPORT ON FORM 10-K**
**EXHIBIT INDEX**
**For the Year Ended December 31, 2017**

| Exhibit Number | Description |
|---|---|
| 3.0 | Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to Exhibit No. 3.1 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.1 | Certificate of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., (incorporated by reference to the Registrant's Current Report on Form 8-K, dated June 3, 1996). |
| 3.2 | Certificate of Amendment of Articles of Incorporation of Transcontinental Realty Investors, Inc., dated October 10, 2000 (incorporated by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.3 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc., setting forth the Certificate of Designations, Preferences and Rights of Series A Cumulative Convertible Preferred Stock, dated October 20, 1998 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 1998). |
| 3.4 | Certificate of Designation of Transcontinental Realty Investors, Inc., setting forth the Voting Powers, Designations, Preferences, Limitations, Restriction and Relative Rights of Series B Cumulative Convertible Preferred Stock, dated October 23, 2000 (incorporation by reference to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000). |
| 3.5 | Certificate of Designation of Transcontinental Realty Investors, Inc., Setting for the Voting Powers, Designating, Preferences, Limitations, Restrictions and Relative Rights of Series C Cumulative Convertible Preferred Stock, dated September 28, 2001 (incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001). |
| 3.6 | Articles of Amendment to the Articles of Incorporation of Transcontinental Realty Investors, Inc. Decreasing the Number of Authorized Shares of and Eliminating Series B Preferred Stock dated December 14, 2001 (incorporated by reference to Exhibit 3.7 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 2001). |
| 3.7 | By-Laws of Transcontinental Realty Investors, Inc. (incorporated by reference to Exhibit No. 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 31, 1991). |
| 3.8 | Certificate of designation of Transcontinental Realty Investors, Inc. setting forth the Voting Powers, Designations, Preferences Limitations, Restrictions and Relative rights of Series D Cumulative Preferred Stock filed August 14, 2006 with the Secretary of State of Nevada (incorporated by reference to Registrants current report on Form 8-K for event dated November 21, 2006 at Exhibit 3.8 thereof.) |
| 10.0 | Advisory Agreement dated as of April 30, 2011, between Transcontinental Realty Investors, Inc. and Pillar Income Asset Management LLC (incorporated by reference to Exhibit 10.0 to the Registrant's Current Report on Form 8-K for event occurring April 30, 2011). |
| 10.1 | Leman Development Ltd. and Kaufman Land Partners, Ltd. (incorporated by reference to Registrant's current report in Form 8-K dated November 21, 2006 at Exhibit 10.1 thereof. |
| 14 .0 | Code of Ethics for Senior Financial Officers (incorporated by reference to Exhibit 14.0 to Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2004). |
| 21.1* | Subsidiaries of the Registrant. |
| 31.1* | Certification Pursuant to Rule 13a-14(a) and 15d-14 under the Securities Exchange Act of 1934, as amended of Principal Executive Officer. |
| 31.2* | Certification Pursuant to Rule 13a-14(a) and 15d-14 under the Securities Exchange Act of 1934, as amended of Principal Financial and Accounting Officer |
| 32.1* | Certification pursuant to 18 U.S.C. Section 1350. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

\*   Filed herewith.

76

App. 2095