UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

CASE NO. 3:22-cv-2118-X

-------------------------------------------x

SECURITIES & EXCHANGE COMMISSION,

Plaintiffs,

v.

TIMOTHY BARTON, et al.,

Defendants.

-------------------------------------------x

TRANSCRIPT OF THE HEARING

BEFORE THE HONORABLE BRANTLEY STARR

UNITED STATES DISTRICT JUDGE

Dallas, Texas

March 20, 2023

2:03 p.m.

A P P E A R A N C E S:


FOR THE PLAINTIFF:

        SECURITIES & EXCHANGE COMMISSION
              801 Cherry Street
              Suite 1900
              Fort Worth, Texas 76102
        BY:  KEEFE M. BERNSTEIN, ESQ.
              bernsteink@sec.gov
              (817) 900-2607


FOR THE DEFENDANT BARTON:

        HUNTON ANDREWS KURTH, LLP
              2200 Pennsylvania Avenue NW
              Suite 905
              Washington, DC  20037
        BY:  MICHAEL J. EDNEY, ESQ.
              TED HUFFMAN, ESQ.
              medney@HuntonAK.com
              (202) 778-2204


FOR THE RECEIVER:

        BROWN FOX, LLP
              8111 Preston Road
              Suite 300
              Dallas, Texas  75225
        BY:  CHARLENE KOONCE, ESQ.
              charlene@brownfoxlaw.com
              (214) 327-5000

ON BEHALF OF THE JUDGMENT CREDITOR DAVID RAMOLIA:


        CHANDLER & SHAVIN, PLLC
                12377 Merit Drive, Suite 880
                Dallas, TX 75251
        BY:   CORINNA PIA CHANDLER, ESQ.
                chandler@chandlershavin.com
                (972) 863-9063

COURT REPORTER:   MS. KELLI ANN WILLIS, RPR, CRR, CSR
                  United States Court Reporter
                  1100 Commerce Street
                  Room 1528
                  Dallas, Texas  75242
                  livenotecrr@gmail.com


          Proceedings reported by mechanical

stenography and transcript produced by computer.


                          * * * *

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          March 20, 2023                                    Page 5

                        - P R O C E E D I N G S -

                                    -o-

                THE COURT SECURITY OFFICER:  All rise.

                THE COURT:  Thank you.

                You can be seated.

                Okay.  I'm calling for a hearing in Case
No. 3:22-CV-2118-X.  That is Securities and Exchange
Commission versus Barton, et al.

                Let's go ahead and do appearances, first
for the Receiver.

                MS. KOONCE:  Good afternoon, your Honor.
Charlene Koonce for the Receiver, Cort Thomas.

                THE COURT:  Thank you.

                And how about for Mr. Barton?

                MR. EDNEY:  Good afternoon, your Honor.

                Michael Edney and Ted Huffman from the
Hutton Andrews Kirth form for Mr. Barton.

                THE COURT:  Okay.  Thank you, Mr. Lindy
(sic).

                And is anyone here on behalf of the
Commission?

                MR. BERNSTEIN:  Yes, your Honor.  Keefe
Bernstein on behalf of the SEC.

                THE COURT:  Thank you, Mr. Bernstein for
standing up and speaking loudly.  I appreciate that.

Case 3:22-cv-02118-X   Document 257   Filed 06/08/23   Page 6 of 41   PageID 10018

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          March 20, 2023                          Page 6

Does anyone else here want to make an appearance?

MS. CHANDLER:  Corinna Chandler, here on behalf of judgment creditor, David Ramolia.

THE COURT:  Okay.  Thank you.

And anyone else?

Okay.  So y'all know I set this hearing to address the issue of whether or not to approve the sale of property that is the Marigold Suites at 13636 Goldmark Drive in Dallas, Texas, so I issued an order earlier today on some of the predicate issues on the sale of the property.

So really, we are here to do a couple of things.  One, to figure out if there is any competing bid that is at least 10 percent higher than that current bid that we are considering; and two, determine whether that sale of the property is in the best interest of the receivership; and three, if so, to approve the sale.

So with that, I will turn it over to the Receiver to hear what we have as an update as far as competing offers and whether or not you are think it is in the best interest.

MS. KOONCE:  Thank you, your Honor.

My recollection is your okay with us

United States District Court
Northern District of Texas - Dallas Division                    06-08-2023 3:22PM

standing at the podium?

THE COURT:  What I will say is you can either sit at the table or stand at the podium, but if you sit -- if you stand at the table, then you are far away from the microphone.

MS. KOONCE:  I can't address a judge without standing.  Sorry.

THE COURT:  It is fine.  It is fine.  No worries.

MS. KOONCE:  As the Court has requested an update, we did not receive any competing offers on the Marigold property, so the only contract that we had to consider is the one that was presented with the motion, Docket 167.

The Receiver did comply with the governing statute, which is 28 U.S. 2001 by publishing notice of this hearing more than 10 days in advance of the hearing.  We submitted the proof of publication with the Reply and that was at Docket 194.

The property was marketed through a brokerage firm and the offer that we received is the only offer.  In addition, it exceeds the average appraised value by more than $1 million.

With respect to the sale being in the best interests of the estate, I think the issue that is

most prevalent or probably most pressing on the Court right now is why now, why sell this property now?

Obviously, the price is in excess of what is required by the statute and it is, again, the best price.

The reason this property needs to be sold now, your Honor, is that it is losing money every single month.  It has from the minute Mr. Thomas was appointed as the Receiver.  The property is in poor condition.  The buyer is going to substantially renovate, if not completely demolish and start again.

We had property insurance, commercial coverage was canceled before our appointment and the property insurance that we got in place is $14,000 a month and it is necessary.  We have already had a claim exist on that policy.

In addition, there are continuing repairs for heating, air conditioning, for windows.  We cannot ever obtain a full occupancy unless there are substantial renovations and the estate does not have the assets or the time to supervise those repairs.

Additionally, as I said, taxes are continuing to come due.  We've paid the taxes to

Dallas County, but there are additional taxes that are owed to Richardson Independent School District.

As the Court is aware, there is one lien on the property.  And the Receivership has not been paying the mortgage on that property based on the stay included in the Receivership order, but nonetheless, the amounts are that owed to that lender continue to accrue.

And if we don't sell the property at some point, what is owed to them the mortgagor will eat up the equity, or at least continue to erode the equity that would otherwise be obtained by the receivership estate, if we sell the property.

In short, your Honor, there is no reason not to sell this property now.  In other words, it will also fund necessary expenses for the Receivership including a forensic accounting, which assumes that we at some point obtain the access to the entity's accounting records, which will be necessary for that.

But these funds are needed to continue operating this estate and a sale now preserves assets rather than wasting he them.

I'm happy to address any more specific questions, if the Court has any.

THE COURT:  You've covered everything on my mind, Ms. Koonce, so thank you for your presentation.

Okay.  And I suppose we should hear from Barton next, so you can speak to me either from the table sitting down or from the podium standing up.  Your call.

MR. EDNEY:  I appreciate that, your Honor.

Thank you.

THE COURT:  You bet.  Thank you, Mr. Lindy.

MR. EDNEY:  It is Edney.

THE COURT:  I'm sorry.

MR. EDNEY:  Edney.  E-D-N-E-Y.

THE COURT:  Got it.  You can butcher my name anytime you want, Mr. Edney.

MR. EDNEY:  Oh, that is a hard one.  It is a hard name to butcher.

THE COURT:  It is a single symbol; it is hard to mess up.

MR. EDNEY:  Well, thank you very much, your Honor, from hearing from us today.  I want to speak briefly about this particular property.

This property was purchased more than 10 years ago, well before the 2017 commencement of the

alleged activities in this case.  It has been fully revenue producing and a functioning property during that period and has not been a drain on other Barton corporate resources.  As a matter of fact, it has been a net contributor.

This property, in our view, is not properly part of the Receivership estate under the Janvey v. Adams standard, which is something that we have presented to your Honor in the past.

But, you know, we have had these debates about other properties, where they have been significantly developed during the time the lender funds were coming in after 2017, that they were purchased during that period that time.  This is not one of those properties.

And this property has been around for quite some time and is really out there in the outer orbit in the Barton corporate family, far away from, I think any legitimate allegations of commingling. It is not a defendant in this case; it is not a relief defendant.

And your Honor, I don't think that there has been anybody competent evidence that it received lender funds.

I want to turn to the evidence or the

assertions that have been put forward on that point. And I think they fall into two categories. One is that page 10 of the SEC's Hahn declaration, the September 26th, 2022 submission. There, there is a one-bullet sentence suggesting that Goldmark Hospitality, the corporate entity here, received commingled lender funds.

And then the other basis is page 8 and 9 of the Receiver's reply brief, which tries to put some detail on this. And I think -- I think what it shows is the attenuation of this asset from the allegations in this case.

If you trace it through on page 8, and I will note that there is no affidavit here, there is no documentary evidence, there is not even a verified brief that we usually see from the receiver; these are just assertions.

But they assert there was a $2.2 million payment out of the Wall entities; these are the entities receiving lender funds in August 2018; a $600,000 payment to JMJ Development, which is Mr. Barton's main development entity, that month; and then two months later, almost two months later, in September 29, 2018, they traced this payment of $200,000 to Goldmark in order to fund the

installation of some solar panels on top of the building.

We don't see, even in this kind of asserted description, any evidence of how much money JMJ was receiving from other sources during this period much less whether these payments were illegitimate or not properly earned.  And that is the type of analysis that the Fifth Circuit's decision in Janvey v. Adams looks for.

Now, Judge, whatever the merits were of relying on these kind of SEC assertions in the Hahn declaration, the assertions and briefing to put properties like this into the receivership estate in the first place and safeguard them, make sure we knew where they were, make sure we knew what was happening to them, make sure we knew where they were going.

Whatever the merits of that, you know, this is really where the rubber hits the road, because here this property is going to be sold and you are already hearing from the Receiver what he plans to do with the proceeds, which is to use it for general receivership purposes, really its investigation.

And frankly, in our view, we think it is

now time for that Janvey evidentiary hearing to occur before confirming the sale of this property, but even if you allow the sale to go forward, before any of the proceeds of this sale are released for general receivership purposes.

Again, this is -- this is Pluto.  This is -- this is not even a planet, Judge.  It is -- Pluto is not a planet anymore, I guess.

THE COURT:  I know.  We were all taught it was a planet.  We have got an estoppel claim against it being declassified.

MR. EDNEY:  I mean, this is -- I understand there is a theory that in this case that there is a lot of gravitational forces of the sun here and the sun is the -- is these lender proceeds that occurred in 2017 through 2019.  You know, we disagree with that thesis, but even accepting it for a moment, you know, there was other stuff going on in the Barton universe and this was one of those other things.

I mean, this is a property that -- that was born well before the -- the Chinese lender funds came in and it was -- it was a self-sustaining property, a property that was a net contributor to the Barton corporate families, not certainly --

certainly not a drain or an opportunity to syphon off funds from any of these Chinese lender.  We are not saying that happened in any case, but here -- here it is way out in outer orbit.

So in this particular case, I mean, I don't want to sound like I'm kind of beating a dead horse or raising this argument every time we come into this courtroom, but you are going to hear it with regard to this and you are going to hear it with regard to the kind of on hold apartment transactions.

Because these are -- these are -- these are purchases and projects that started before the alleged lender funds came in.  They are -- they -- the evidence, we believe, will show that -- that they -- they were siloed off and -- and it is self-operating and not a drain.  And these are the type of resources -- these are the types of assets that we really think are on the outer perimeter, way out there, and shouldn't be in the receivership estate.

And Judge, you know, for better or for worse, Mr. Barton -- Mr. Barton has, you know, has kind of his entire net worth plunged into these real estate projects and this is one of them.

And he's facing criminal charges that we are contesting, but he's not going to have the resources to contest those.  And it is properties like this, and either retaining them for ourselves, or -- or -- or selling them ourselves and having -- having the proceeds available for the defense of this case, or the Court maintaining the proceeds of the sale of this property and having them available for the defense of this case is really going to be crucial to his due process rights.

Because you know, the reality is, I know there is a public defenders out there and CJA lawyers and they do great jobs.  But this is a case with terabytes and terabytes of documents that are coming in from the Government.  It is a case where a white collar criminal defendant could end up rolling over whether or not he's responsible or guilty for the charges because he simply doesn't have the commensurate resources with the FBI and the federal government to defend it.

And one of the reasons, if that happens, that he will not be able to do so is because outer orbit assets like this have been taken by the receivership estate and not made available for the defense of this matter.

Your Honor, turning back to -- that is an important question about what happens to the proceeds, but as a matter of property rights, the people that own and control this property, including Mr. Barton's son and, you know, Mr. Barton does have a hand in controlling its management, although not its ownership.

They would not sell this property but-for the receivership intervention.  This is a property that was functioning.  We dispute what the Receiver is saying about its self-stainability.  And we would have done what people do with properties like this, is when tenants move out, we -- we turn the unit, we paint it, put carpet in it, and re-rent it out.

And I understand the Receiver doesn't want to engage in that process.  That is what we would have done and at the appropriate time, these folks would have redeveloped this property, you know, as a much more significant profit than the five and a half million in gross proceeds or the two and a half million dollars in net proceeds that are here today.

We are -- we are very interested in making sure that the value of this property is maximized, whether it is for purposes of compensating whoever thinks they need to be compensated for the

receivership or otherwise.  We want to this to have its highest value.

Judge, we also have concerns about whether this property was marketed in a manner that is consistent with the best interests of the receivership estate.

Mr. Barton has pressed potential sellers to go to the receiver with higher offers.  I'm a little surprised to hear that none of those came to fruition.  But one thing we don't see in the record here, Judge, is a suggestion that this was professionally marketed.

They said they hired a broker.  But we -- we looked.  And you know, I wish I could put some documents before you to show the absence of evidence, but we looked at the traditional places where one would market a property like this.  And the real estate professionals tell me that that is the Loop Net Internet site, that is the Co-Star Internet site.  That would even be the Internet site of the alleged broker in this case, Dunlop Walker.  And there is not a reference to this property anywhere on those websites.

So you know, we have a concern without further evidence put forward by the Receiver that a

real professional process was run here.

Now, did the Receiver get the three appraisals?  Absolutely.  Is it higher than the mean of those appraisals?  It is.

Has there been a notice in the back in the Dallas Morning News that this it property is going to be sold in 10 days?  There was.

But the additional inquiry are we proceeding here in a manner that is consistent with the best interests of the receivership estate.  And again, I think your Honor should look to the Receiver for some evidence of a more professional marketing effort here.

And we say that, I think, regardless about what happens to this property.  We think this property should be retained by us.  We don't think it should be part of the receivership estate.  We think if it is sold, its proceeds should be maintained for Mr. Barton for use in defending him against the Government's charges.

But even if the proceeds are used to compensate those who say they need to be compensated through the receivership, Mr. Barton has every interest in making sure that that -- that value is as high as possible.  We have serious concerns that

the process run here isn't leading to that result.

But, Judge, this doesn't need to be a -- a secret process.  And I know it is not secret, in the sense that here we are in open court, albeit behind two layers of security guards for everybody to come in and see and to participate, if they want.

But that is now how commercial real estate is marketed in this city.  I mean, commercial real estate is marketed through a process that involves publicity.  And these properties have been marketed a little bit in the shadows, notwithstanding the notice in the newspaper.  You know, you have got to -- you have got to market these properties and advertise them.  And we don't see any indicia of that in the traditional ways.

And, you know, I think you are going to see it when it comes to the apartment properties, you know, where much more money is at stake, you know, more serious offers are coming in.  Perhaps that didn't happen in the 10 days available here, but I think -- I think -- I think it is worth asking those questions of the Receiver about -- about whether that rigorous process has been gone through and perhaps hit the pause button on this.  Hit the pause button on it to make sure it has been properly

marketed.

And Judge, going back to my original point, hitting the pause button to make sure that we have the Janvey v. Adams showing with regard to this property.

Because whatever you think of the other properties, this property -- this property was born well before the allegations this case.  And I think kind of the traditional indicia would suggest that this is something that -- that is kind of way out there and further removed from the allegations in this case than many of the other things that we may be discussing at later times.

So your Honor, I would be happy to -- I know that is a mouthful that I just put out there. It is -- it does track our position papers, but I would be happy to answer any questions that your Honor might have.  You know, just to be clear about what we are asking here, we are asking for Janvey v. Adams evidentiary hearing before confirmation of the sale.

Barring that, Judge, if you confirm this sale, we are asking for that hearing to occur before any distribution of proceeds are released from this Court from the sale and we are asking for, you know,

a harder in inquiry here as to whether this has been professionally marketed in a manner that maximizes value for the estate.

THE COURT:  Thank you, Mr. Edney.

I don't have any specific questions beyond what you already addressed.

I will channel a couple of your questions back to counsel for the Receiver, Ms. Koonce.

So thank you.

MR. EDNEY:  I appreciate that, your Honor.

Thank you very much.

THE COURT:  Okay.

Ms. Koonce, the two questions that I wanted to let you have a chance to answer were, was it marketed only on the dark web or in the shadows, as that framing was?  So describe the marking procedures.  And two, any need for an evidentiary hearing before sale or before distribution of the proceeds?

MS. KOONCE:  Thank you, your Honor.

No.  It was not marketed on the dark web. We retained a listing broker.  I'm going to defer to Mr. Thomas because we have siloed some of the work on these matters and he interacted with the broker. He can speak more to the marketing.

But I would like to say, like Mr. Barton, it is absolutely in the estate's best interest to maximize the value of every property.  We don't have any interest in doing this on the down-low or doing this in a way that would minimize the amount that is recovered.  So I think we are aligned there, and this is the best offer that we received following the marketing that Mr. Thomas can address.

THE COURT:  You can stay wherever you are at and go wherever you want to.  That is fine.

MR. THOMAS:  For space purposes, I will stay here, your Honor.

THE COURT:  Okay.

MR. THOMAS:  So we hired Walker Dunlap to market the property.  They began soft marketing it before it went to market while they were preparing their pitch dec, essentially, their materials.

In the interim, we received the three appraisals that appraised the property at four and a half million.  We received several offers around or slightly below that four-and-a-half-million-dollar number.

And then we have this buyer, who is very interested and was willing to pay $1 million over the appraised value.  So rather than going to

market, potentially losing that buyer, we decided it was in the best interest of the receivership estate to go ahead and do that deal.  That's what the broker advised us, was what we should do and it was the best offer he believed that we would receive.

So that is what we pursued.

THE COURT:  Understood.

And just as final confirmation, I know we heard from counsel for Barton, that they reached out to different prospects they had.

You have not received any competing officers from those leads, have you?

MR. THOMAS:  We received lots of communications; no one was ultimately willing to submit an offer.

THE COURT:  Understood.

Okay.  So I think you have answered my question on marketing.  So now my question is, evidentiary hearing.  Do we need one?  Do we need one before the sale?  Do we need one before the distribution of the proceeds?

MS. KOONCE:  No, your Honor.  We don't need another hearing on this, certainly not an evidentiary hearing.

As the Court is aware, Goldmark

Hospitality is an entity that was named in the original receivership order based on the limited amount of tracing that the SEC was able to do.

Mr. Edney here has referred to this planet as being out on Pluto, but down here on Planet Earth, what we are concerned about is satisfying the investors for the losses that they have incurred and the losses that are absolutely unrebutted that Mr. Barton owes a minimum of $26 million to these investors.

And, again, down here on Planet Earth, the only assets that are available to satisfy those investors are the assets that have been placed in receivership.

We don't have extensive tracing yet for every single property, in large part because Mr. Barton is holding the credentials to the accounting information hostage. But what we do have is some tracing that was performed by the SEC in advance of the receivership order, that the Court relied on in determining which entities were placed in receivership.

And those entities include the entities that are controlled by Mr. Barton. We have a concession that Goldmark Hospitality is one of those

entities.

His liability at this point is absolutely uncontested.  There is no controverting evidence.  And in order to have even a hope of satisfying some of those claims, most of those claims, and creditors like Mr. Ramolia, we have to sell these properties.

It is in the best interest of the estate to sell the property now.  We don't need another hearing.  But I can tell the Court that we have undertaken some analysis in advance of this hearing, just based on the limited bank records that we have been able to obtain and we have discovered additional funds that were used to maintain this property, not just the funds that were addressed in the Reply.

We expect to continue finding that same information based, in no small part, on the extensive commingling that occurred between every single entity that Mr. Barton operated.

Your Honor, all of the information that is required by the statute, all of the information that is necessary for the Court to consider this sale has already been presented, not just in this motion, but in prior documents where the receiver did submit sworn information.

And there is no reason -- there is nothing suspicion about us not verifying a reply because the last reply that we submitted that that was verified, we got a complaint and said that there was going to be surreply, which has still not then provided.

So we didn't verify that, so that we didn't have a complaint that we were providing evidence in a reply.

But the Court has everything necessary here, everything that is required by the statute, everything that demonstrates why this sale is in the best interest of the estate now and we ask that the Court approve the sale.

THE COURT:  Understood.

Commission.  Should we hear from the Commission on any topic?

Mr. Bernstein?

MR. BARTON:  Your Honor, I will be brief.

The SEC does not oppose the motion.  And I will direct the Court back to Ms. Hahn's original declaration in this case where she included Goldmark Hospitality as one of the entities that benefited from investor funds.

I don't believe that the property was initially purchased with investor funds, but

investor funds went to Goldmark Hospitality to benefit the property subsequent to the initial purchase is my understanding from Ms. Hahn's declaration.

          And I'm also happy to answer any questions the Court may have about the SEC's position on the motion.

          THE COURT:  Understood.

          Thank you for addressing that.  So I think you have covered everything you need to from my perspective.

          MR. BERNSTEIN:  Thank you, your Honor.

          THE COURT:  Okay.

          MR. EDNEY:  May I be briefly heard for a moment?

          THE COURT:  You've got one minute.  But normally I don't two rounds for a civil hearing; it is their motion, their burden.

          MR. EDNEY:  I understand.

          Your Honor, just three quick points.

          First of all, you know, look, I think -- I think you just heard from the Receiver that they have received communications in recent days since thing this has been out there in public notice of the last 10 days of additional interest.

I think it would be in the best interest of the estate to let though communications come to fruition and see whether they mature into a serious offer.  I mean, this is moving pretty quick in real estate sale purposes, terms.  And you know, I think -- I think you heard about a soft marketing campaign.  You know, I think what you are hearing is that this thing didn't really go to market.  And I think it is in the best interest of the estate to make sure it does.

Second, liability in this case is not unrebutted.  I think Ms. Koonce has just got this thing all the way backwards, okay?

She needs to show, if she wants to take property, that that property received investors funds.  She can't just say that Mr. Barton owes these folks a bunch of money.  You know, if he does, let the SEC come and prove it.  And when it does and they obtain a judgment, they can try to enforce that judgment against Mr. Barton and his assets.

But until that time, they can't just willy-nilly, you know, suck in everything Mr. Barton has and say, well, if he touches it or if it belongs to him, it belongs to the receivership estate.

No.  To do that prejudgment under

Janvey v. Adams, you need to establish that that corporate entity received investor funds. It is the race, it is the property that matters, not the liability. And I think -- I think what you heard from Ms. Koonce in a nutshell demonstrates some of the problems with the scope of this receivership and in this why a Janvey v. Adams hearing in this particular property would matter.

Third, and finally, I want to clear up something about this accounting database. We do not have access to the accounting database. We don't know what the credentials are, we don't know how to get into it.

There is an accountant. I understand that Mr. Thomas is trying to get in touch with him. You know, we are not -- we are not permitted to go out and talk to potential witnesses. We have conditions of release that says that we can't do that. I don't know what they want us to do, Judge.

But -- but they need to stop using the accounting database as an excuse to say that they are not making their case and kind of blaming us for it. Because that is not where the blame belongs on that particular issue.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Edney.

I need to make some findings.

First is more formulaic.  Based on what we have heard here today, I find that there is not a competing bid that is at least 10 percent higher than the current contract price.

The second finding is more complicated.  That is whether or not the sale is in the receiver's best interest.  I believe it is, as a whole.  I believe the value of the asset is depreciating, rather than appreciating, given the monthly costs on financing and property insurance and the condition of the property, needing repair in order to regain full occupancy.

Is it part of the receivership estate?

I believe that it is.  I believe they have made their showing, pages 8 and 9 of the reply and the Hahn affidavit, of commingling of funds, of use of the investors funds at issue to continue to maintain the property.

So I believe they made the showing that they need to.  Do we need an evidentiary hearing?  In my view, not yet.

If we needed an evidentiary hearing, I would make your client take the stand, too, and I

don't think I can make him overcome his Fifth Amendment right.

So I think what I have seen in the reply, page 8 and 9, and for the Hahn declaration is sufficient to show that this property is properly subjected to the receivership estate, and that its sale at this point in time is in the best interest of the estate.

I get your argument that waiting for a longer period of time could be beneficial to the value of any sale, but the statute imposes the deadlines and the publication requirements that it does.  And I think setting a new floor that the statute doesn't set is not really something I'm interested in doing.

So I will say those two things.  One, there is no competing offer that is 10 percent higher or more; and two, I believe the sale of this property is in the best interest of the receivership.

Based on those findings, I will go ahead and approve the sale.

So I understand you will still make an argument before there is a distribution of proceeds, that we should come back for an evidentiary hearing

and I think you can make that argument.  I don't think I have to reject that argument right now, but the sale is hereby approved.

All right.  Thank you for being here.

Does anyone else have anything else to flag for me?

Okay.  Thank you for being here and court is now in recess.

THE COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 2:33 p.m.)

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                              March 20, 2023                                    Page 34

C E R T I F I C A T E


I, Kelli Ann Willis, RPR, CRR, CSR

certify that the foregoing is a transcript from the

record of the proceedings in the foregoing entitled

matter.

I further certify that the transcript

fees format comply with those prescribed by the

Court and the Judicial Conference of the United

States.

This 8th day of June 2023.

s/ Kelli Ann Willis
Official Court Reporter
The Northern District of Texas
Dallas Division

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X　　　　　　　　　March 20, 2023　　　　　　　　　Index: $1..button

**$**

**$1** 7:23 23:24
**$14,000** 8:16
**$2.2** 12:18
**$200,000** 12:25
**$26** 25:9
**$600,000** 12:21

**-**

**-o-** 5:2

**1**

**10** 6:15 7:17 10:24 12:3 19:7 20:20 28:25 31:5 32:17
**13636** 6:10
**167** 7:14
**194** 7:19

**2**

**2001** 7:16
**2017** 10:25 11:13 14:16
**2018** 12:20,24
**2019** 14:16
**2022** 12:4
**26th** 12:4
**28** 7:16
**29** 12:24
**2:33** 33:10

**3**

**3:22-CV-2118-X** 5:7

**8**

**8** 12:8,13 31:17 32:4

**9**

**9** 12:8 31:17 32:4

**A**

**absence** 18:15
**absolutely** 19:3 23:2 25:8 26:2
**accepting** 14:17
**access** 9:18 30:11
**accountant** 30:14
**accounting** 9:17,19 25:17 30:10,11,21
**accrue** 9:8
**activities** 11:1
**Adams** 11:8 13:9 21:4,20 30:1,7
**addition** 7:22 8:19
**additional** 9:1 19:8 26:13 28:25
**Additionally** 8:24
**address** 6:8 7:6 9:24 23:8
**addressed** 22:6 26:14
**addressing** 28:9
**advance** 7:17 25:19 26:10
**advertise** 20:14
**advised** 24:4
**affidavit** 12:14 31:18
**afternoon** 5:11,15
**ahead** 5:9 24:3 32:21
**air** 8:20
**albeit** 20:4
**aligned** 23:6
**allegations** 11:19 12:12 21:8,11
**alleged** 11:1 15:14 18:21

**Amendment** 32:2
**amount** 23:5 25:3
**amounts** 9:7
**analysis** 13:8 26:10
**Andrews** 5:17
**anymore** 14:8
**anytime** 10:16
**apartment** 15:10 20:17
**appearance** 6:2
**appearances** 5:9
**appointed** 8:10
**appointment** 8:15
**appraisals** 19:3,4 23:19
**appraised** 7:23 23:19,25
**appreciating** 31:11
**approve** 6:8,19 27:13 32:22
**approved** 33:3
**argument** 15:7 32:9,24 33:1,2
**assert** 12:18
**asserted** 13:4
**assertions** 12:1,17 13:11,12
**asset** 12:11 31:10
**assets** 8:23 9:23 15:18 16:23 25:12,13 29:20
**assumes** 9:18
**attenuation** 12:11
**August** 12:20
**average** 7:22
**aware** 9:3 24:25

**B**

**back** 17:1 19:5 21:2 22:8 27:20 32:25
**backwards** 29:13

**bank** 26:11
**Barring** 21:22
**Barton** 5:8,14,17 10:5 11:3,18 14:19,25 15:23 17:5 18:7 19:19,23 23:1 24:9 25:9,17,24 26:19 27:18 29:16,20,22
**Barton's** 12:22 17:5
**based** 9:5 25:2 26:11,17 31:3 32:21
**basis** 12:8
**beating** 15:6
**began** 23:15
**behalf** 5:20,23 6:4
**believed** 24:5
**belongs** 29:23,24 30:23
**beneficial** 32:10
**benefit** 28:2
**benefited** 27:22
**Bernstein** 5:22,23,24 27:17 28:12
**bet** 10:10
**bid** 6:15,16 31:5
**bit** 20:11
**blame** 30:23
**blaming** 30:22
**born** 14:22 21:7
**briefing** 13:12
**briefly** 10:23 28:14
**broker** 18:13,21 22:22,24 24:4
**brokerage** 7:21
**building** 13:2
**bunch** 29:17
**burden** 28:18
**but-for** 17:8
**butcher** 10:15,18
**button** 20:24,25 21:3

**buyer** 8:11 23:23 24:1

---

## C

**call** 10:7

**calling** 5:6

**campaign** 29:7

**canceled** 8:15

**carpet** 17:14

**case** 5:6 11:1,20 12:12 14:13 15:3,5 16:7,9,13, 15 18:21 21:8,12 27:21 29:11 30:22

**categories** 12:2

**chance** 22:14

**Chandler** 6:3

**channel** 22:7

**charges** 16:1,18 19:20

**Charlene** 5:12

**Chinese** 14:22 15:2

**Circuit's** 13:8

**city** 20:8

**civil** 28:17

**CJA** 16:12

**claim** 8:18 14:10

**claims** 26:5

**clear** 21:18 30:9

**client** 31:25

**Co-star** 18:19

**collar** 16:16

**commencement** 10:25

**commensurate** 16:19

**commercial** 8:14 20:7, 8

**commingled** 12:7

**commingling** 11:19 26:18 31:18

**Commission** 5:8,21 27:15,16

**communications** 24:14 28:23 29:2

**compensate** 19:22

**compensated** 17:25 19:22

**compensating** 17:24

**competent** 11:23

**competing** 6:15,22 7:11 24:11 31:5 32:17

**complaint** 27:4,7

**completely** 8:12

**complicated** 31:7

**comply** 7:15

**concern** 18:24

**concerned** 25:6

**concerns** 18:3 19:25

**concession** 25:25

**concluded** 33:10

**condition** 8:11 31:12

**conditioning** 8:20

**conditions** 30:17

**confirm** 21:22

**confirmation** 21:20 24:8

**confirming** 14:2

**consistent** 18:5 19:9

**contest** 16:3

**contesting** 16:2

**continue** 9:8,11,21 26:16 31:19

**continuing** 8:19,25

**contract** 7:12 31:6

**contributor** 11:5 14:24

**control** 17:4

**controlled** 25:24

**controlling** 17:6

**controverting** 26:3

**Corinna** 6:3

**corporate** 11:4,18 12:6 14:25 30:2

**Cort** 5:12

**costs** 31:11

**counsel** 22:8 24:9

**County** 9:1

**couple** 6:13 22:7

**court** 5:3,4,13,18,24 6:5 7:2,8,10 8:2 9:3,25 10:1,10,13,15,19 14:9 16:7 20:4 21:25 22:4,12 23:9,13 24:7,16,25 25:20 26:9,22 27:9,13, 14,20 28:6,8,13,16 31:1 33:7,9

**courtroom** 15:8

**coverage** 8:15

**covered** 10:1 28:10

**credentials** 25:17 30:12

**creditor** 6:4

**creditors** 26:5

**criminal** 16:1,16

**crucial** 16:10

**current** 6:16 31:6

---

## D

**Dallas** 6:10 9:1 19:6

**dark** 22:15,21

**database** 30:10,11,21

**David** 6:4

**days** 7:17 19:7 20:20 28:23,25

**dead** 15:6

**deadlines** 32:12

**deal** 24:3

**debates** 11:10

**dec** 23:17

**decided** 24:1

**decision** 13:9

**declaration** 12:3 13:12 27:21 28:4 32:4

**declassified** 14:11

**defend** 16:20

**defendant** 11:20,21 16:16

**defenders** 16:12

**defending** 19:19

**defense** 16:6,9,25

**defer** 22:22

**demolish** 8:12

**demonstrates** 27:11 30:5

**depreciating** 31:10

**describe** 22:16

**description** 13:4

**detail** 12:10

**determine** 6:17

**determining** 25:21

**developed** 11:12

**development** 12:21,22

**direct** 27:20

**disagree** 14:17

**discovered** 26:12

**discussing** 21:13

**dispute** 17:10

**distribution** 21:24 22:18 24:21 32:24

**District** 9:2

**Docket** 7:14,19

**documentary** 12:15

**documents** 16:14 18:15 26:24

**dollars** 17:21

**down-low** 23:4

**drain** 11:3 15:1,17

**Drive** 6:10

**due** 8:25 16:10

**Dunlap** 23:14

**Dunlop** 18:21

---

**E**

---

**E-D-N-E-Y** 10:14

**earlier** 6:11

**earned** 13:7

**Earth** 25:6,11

**eat** 9:10

**Edney** 5:15,16 10:8,12, 14,16,17,21 14:12 22:4, 10 25:4 28:14,19 31:1

**effort** 19:13

**end** 16:16

**enforce** 29:19

**engage** 17:16

**entire** 15:24

**entities** 12:19,20 25:21,23 26:1 27:22

**entity** 12:6,22 25:1 26:19 30:2

**entity's** 9:19

**equity** 9:11,12

**erode** 9:11

**essentially** 23:17

**establish** 30:1

**estate** 7:25 8:22 9:13, 22 11:7 13:13 15:21,25 16:24 18:6,18 19:10,17 20:7,9 22:3 24:2 26:7 27:12 29:2,5,9,24 31:15 32:6,8

**estate's** 23:2

**estoppel** 14:10

**et al** 5:8

**evidence** 11:23,25 12:15 13:4 15:15 18:16, 25 19:12 26:3 27:8

**evidentiary** 14:1 21:20 22:17 24:19,24 31:22, 24 32:25

**exceeds** 7:22

**excess** 8:4

**Exchange** 5:7

**excuse** 30:21

**exist** 8:18

**expect** 26:16

**expenses** 9:16

**extensive** 25:15 26:18

---

**F**

---

**facing** 16:1

**fact** 11:4

**fall** 12:2

**families** 14:25

**family** 11:18

**FBI** 16:19

**federal** 16:19

**figure** 6:14

**final** 24:8

**finally** 30:9

**financing** 31:12

**find** 31:4

**finding** 26:16 31:7

**findings** 31:2 32:21

**fine** 7:8 23:10

**firm** 7:21

**flag** 33:6

**floor** 32:13

**folks** 17:17 29:17

**forces** 14:14

**forensic** 9:17

**form** 5:17

**formulaic** 31:3

**forward** 12:1 14:3 18:25

**four-and-a-half-million-dollar** 23:21

**framing** 22:16

**frankly** 13:25

**fruition** 18:10 29:3

**full** 8:21 31:14

**fully** 11:1

**functioning** 11:2 17:10

**fund** 9:16 12:25

**funds** 9:21 11:13,24 12:7,20 14:22 15:2,14 26:13,14 27:23,25 28:1 29:16 30:2 31:18,19

---

**G**

---

**general** 13:23 14:5

**Goldmark** 6:10 12:5,25 24:25 25:25 27:21 28:1

**Good** 5:11,15

**governing** 7:15

**government** 16:15,20

**Government's** 19:20

**gravitational** 14:14

**great** 16:13

**gross** 17:20

**guards** 20:5

**guess** 14:8

**guilty** 16:17

---

**H**

---

**Hahn** 12:3 13:11 31:18 32:4

**Hahn's** 27:20 28:3

**half** 17:20 23:20

**hand** 17:6

**happen** 20:20

**happened** 15:3

**happening** 13:16

**happy** 9:24 21:14,17 28:5

**hard** 10:17,18,20

**harder** 22:1

**hear** 6:21 10:4 15:8,9 18:9 27:15

**heard** 24:9 28:14,22 29:6 30:4 31:4

**hearing** 5:6 6:7 7:17,18 10:22 13:21 14:1 21:20, 23 22:18 24:19,23,24 26:9,10 28:17 29:7 30:7 31:22,24 32:25

**heating** 8:20

**high** 19:25

**higher** 6:15 18:8 19:3 31:5 32:18

**highest** 18:2

**hired** 18:13 23:14

**hit** 20:24

**hits** 13:19

**hitting** 21:3

**hold** 15:10

**holding** 25:17

**Honor** 5:11,15,22 6:24 8:8 9:14 10:8,22 11:9, 22 17:1 19:11 21:14,18 22:10,20 23:12 24:22 26:20 27:18 28:12,20 30:25

**hope** 26:4

**horse** 15:7

**Hospitality** 12:6 25:1, 25 27:22 28:1

**hostage** 25:18

**Huffman** 5:16

**Hutton** 5:17

---

**I**

---

**illegitimate** 13:7

**important** 17:2

**imposes** 32:11

**include** 25:23

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          March 20, 2023                  Index: included..occupancy

**included** 9:6 27:21

**including** 9:17 17:4

**incurred** 25:7

**Independent** 9:2

**indicia** 20:14 21:9

**information** 25:18 26:17,20,21,25

**initial** 28:2

**initially** 27:25

**inquiry** 19:8 22:1

**installation** 13:1

**insurance** 8:14,16 31:12

**interacted** 22:24

**interest** 6:18,23 19:24 23:2,4 24:2 26:7 27:12 28:25 29:1,9 31:9 32:7, 19

**interested** 17:22 23:24 32:15

**interests** 7:25 18:5 19:10

**interim** 23:18

**Internet** 18:19,20

**intervention** 17:9

**investigation** 13:24

**investor** 27:23,25 28:1 30:2

**investors** 25:7,10,13 29:15 31:19

**involves** 20:9

**issue** 6:8 7:25 30:24 31:19

**issued** 6:10

**issues** 6:12

**J**

**Janvey** 11:8 13:9 14:1 21:4,19 30:1,7

**JMJ** 12:21 13:5

**jobs** 16:13

**judge** 7:6 13:10 14:7 15:22 18:3,11 20:2 21:2,22 30:19

**judgment** 6:4 29:19,20

**K**

**Keefe** 5:22

**kind** 13:3,11 15:6,10,24 21:9,10 30:22

**Kirth** 5:17

**knew** 13:15,16

**Koonce** 5:11,12 6:24 7:6,10 10:2 22:8,13,20 24:22 29:12 30:5

**L**

**large** 25:16

**lawyers** 16:13

**layers** 20:5

**leading** 20:1

**leads** 24:12

**legitimate** 11:19

**lender** 9:8 11:12,24 12:7,20 14:15,22 15:2, 14

**liability** 26:2 29:11 30:4

**lien** 9:3

**limited** 25:2 26:11

**Lindy** 5:18 10:11

**listing** 22:22

**longer** 32:10

**looked** 18:14,16

**Loop** 18:19

**losing** 8:8 24:1

**losses** 25:7,8

**lot** 14:14

**lots** 24:13

**loudly** 5:25

**M**

**made** 16:24 31:17,21

**main** 12:22

**maintain** 26:13 31:20

**maintained** 19:19

**maintaining** 16:7

**make** 6:1 13:14,15,16 20:25 21:3 29:10 31:2, 25 32:1,23 33:1

**making** 17:22 19:24 30:22

**management** 17:6

**manner** 18:4 19:9 22:2

**Marigold** 6:9 7:12

**market** 18:17 20:13 23:15,16 24:1 29:8

**marketed** 7:20 18:4,12 20:8,9,10 21:1 22:2,15, 21

**marketing** 19:13 22:25 23:8,15 24:18 29:6

**marking** 22:16

**materials** 23:17

**matter** 11:4 16:25 17:3 30:8

**matters** 22:24 30:3

**mature** 29:3

**maximize** 23:3

**maximized** 17:23

**maximizes** 22:2

**merits** 13:10,18

**mess** 10:20

**Michael** 5:16

**microphone** 7:5

**million** 7:23 12:18 17:20,21 23:20,24 25:9

**mind** 10:2

**minimize** 23:5

**minimum** 25:9

**minute** 8:9 28:16

**moment** 14:18 28:15

**money** 8:8 13:4 20:18 29:17

**month** 8:9,17 12:22

**monthly** 31:11

**months** 12:23

**Morning** 19:6

**mortgage** 9:5

**mortgagor** 9:10

**motion** 7:14 26:23 27:19 28:7,18

**mouthful** 21:15

**move** 17:13

**moving** 29:4

**N**

**named** 25:1

**needed** 9:21 31:24

**needing** 31:13

**net** 11:5 14:24 15:24 17:21 18:19

**News** 19:6

**newspaper** 20:12

**nonetheless** 9:7

**note** 12:14

**notice** 7:16 19:5 20:12 28:24

**notwithstanding** 20:11

**number** 23:22

**nutshell** 30:5

**O**

**obtain** 8:21 9:18 26:12 29:19

**obtained** 9:12

**occupancy** 8:21 31:14

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          March 20, 2023                    Index: occur..receiver's

occur 14:2 21:23

occurred 14:16 26:18

offer 7:21,22 23:7 24:5,
15 29:4 32:17

offers 6:22 7:11 18:8
20:19 23:20

OFFICER 5:3 33:9

officers 24:12

one-bullet 12:5

open 20:4

operated 26:19

operating 9:22

opportunity 15:1

oppose 27:19

orbit 11:18 15:4 16:23

order 6:11 9:6 12:25
25:2,20 26:4 31:13

original 21:2 25:2
27:20

outer 11:17 15:4,19
16:22

overcome 32:1

owed 9:2,7,10

owes 25:9 29:16

ownership 17:7

**P**

p.m. 33:10

pages 31:17

paid 8:25

paint 17:14

panels 13:1

papers 21:16

part 11:7 19:17 25:16
26:17 31:15

participate 20:6

past 11:9

pause 20:24,25 21:3

pay 23:24

paying 9:5

payment 12:19,21,24

payments 13:6

people 17:4,12

percent 6:15 31:5
32:17

performed 25:19

perimeter 15:19

period 11:3,14 13:6
32:10

permitted 30:16

perspective 28:11

pitch 23:17

place 8:16 13:14

places 18:16

planet 14:7,8,10 25:4,5,
11

plans 13:22

plunged 15:24

Pluto 14:6,8 25:5

podium 7:1,3 10:6

point 9:10,18 12:1 21:3
26:2 32:7

points 28:20

policy 8:18

poor 8:10

position 21:16 28:6

potential 18:7 30:17

potentially 24:1

predicate 6:11

prejudgment 29:25

preparing 23:16

presentation 10:3

presented 7:13 11:9
26:23

preserves 9:22

pressed 18:7

pressing 8:1

pretty 29:4

prevalent 8:1

price 8:4,6 31:6

prior 26:24

problems 30:6

procedures 22:17

proceeding 19:9

proceedings 33:10

proceeds 13:22 14:4,
15 16:6,7 17:3,20,21
19:18,21 21:24 22:19
24:21 32:24

process 16:10 17:16
19:1 20:1,3,9,23

producing 11:2

professional 19:1,12

professionally 18:12
22:2

professionals 18:18

profit 17:19

projects 15:13,25

proof 7:18

properly 11:7 13:7
20:25 32:5

properties 11:11,15
13:13 16:3 17:12 20:10,
13,17 21:7 26:6

property 6:9,12,17
7:12,20 8:2,7,10,14,16
9:4,5,9,13,15 10:23,24
11:2,6,16 13:20 14:2,
21,24 16:8 17:3,4,8,9,
18,23 18:4,17,22 19:6,
15,16 21:5,7 23:3,15,19
25:16 26:8,14 27:24
28:2 29:15 30:3,8
31:12,13,20 32:5,19

prospects 24:10

prove 29:18

provided 27:5

providing 27:7

public 16:12 28:24

publication 7:18 32:12

publicity 20:10

publishing 7:16

purchase 28:3

purchased 10:24
11:14 27:25

purchases 15:13

purposes 13:23 14:5
17:24 23:11 29:5

pursued 24:6

put 12:1,9 13:12 17:14
18:14,25 21:15

**Q**

question 17:2 24:18

questions 9:25 20:22
21:17 22:5,7,13 28:5

quick 28:20 29:4

**R**

race 30:3

raising 15:7

Ramolia 6:4 26:6

re-rent 17:14

reached 24:9

real 15:24 18:18 19:1
20:7,8 29:4

reality 16:11

reason 8:7 9:14 27:1

reasons 16:21

receive 7:11 24:5

received 7:21 11:23
12:6 23:7,18,20 24:11,
13 28:23 29:15 30:2

receiver 5:10,12 6:21
7:15 8:10 12:17 13:21
17:10,15 18:8,25 19:2,
12 20:22 22:8 26:24
28:22

receiver's 12:9 31:8

**receivership** 6:18 9:4,
  6,13,17 11:7 13:13,23
  14:5 15:20 16:24 17:9
  18:1,6 19:10,17,23 24:2
  25:2,14,20,22 29:24
  30:6 31:15 32:6,20

**receiving** 12:20 13:5

**recent** 28:23

**recess** 33:8

**recollection** 6:25

**record** 18:10

**records** 9:19 26:11

**recovered** 23:6

**redeveloped** 17:18

**reference** 18:22

**referred** 25:4

**regain** 31:13

**regard** 15:9,10 21:4

**reject** 33:2

**release** 30:18

**released** 14:4 21:24

**relied** 25:20

**relief** 11:21

**relying** 13:11

**removed** 21:11

**renovate** 8:12

**renovations** 8:22

**repair** 31:13

**repairs** 8:19,23

**reply** 7:19 12:9 26:15
  27:2,3,8 31:17 32:3

**requested** 7:10

**required** 8:5 26:21
  27:10

**requirements** 32:12

**resources** 11:4 15:18
  16:3,19

**respect** 7:24

**responsible** 16:17

**result** 20:1

**retained** 19:16 22:22

**retaining** 16:4

**revenue** 11:2

**Richardson** 9:2

**rights** 16:10 17:3

**rigorous** 20:23

**rise** 5:3 33:9

**road** 13:19

**rolling** 16:16

**rounds** 28:17

**rubber** 13:19

**run** 19:1 20:1

---

### S

**safeguard** 13:14

**sale** 6:9,12,17,19 7:24
  9:22 14:2,3,4 16:8
  21:21,23,25 22:18
  24:20 26:22 27:11,13
  29:5 31:8 32:7,11,18,22
  33:3

**satisfy** 25:12

**satisfying** 25:6 26:4

**School** 9:2

**scope** 30:6

**seated** 5:5

**SEC** 5:23 13:11 25:3,19
  27:19 29:18

**SEC's** 12:3 28:6

**secret** 20:3

**Securities** 5:7

**security** 5:3 20:5 33:9

**self-operating** 15:17

**self-stainability** 17:11

**self-sustaining** 14:23

**sell** 8:2 9:9,13,15 17:8
  26:6,8

**sellers** 18:7

**selling** 16:5

**sense** 20:4

**sentence** 12:5

**September** 12:4,24

**set** 6:7 32:14

**setting** 32:13

**shadows** 20:11 22:15

**short** 9:14

**show** 15:15 18:15
  29:14 32:5

**showing** 21:4 31:17,21

**shows** 12:11

**sic** 5:19

**significant** 17:19

**significantly** 11:12

**siloed** 15:16 22:23

**simply** 16:18

**single** 8:9 10:19 25:16
  26:19

**sit** 7:3,4

**site** 18:19,20

**sitting** 10:6

**slightly** 23:21

**small** 26:17

**soft** 23:15 29:6

**solar** 13:1

**sold** 8:7 13:20 19:7,18

**son** 17:5

**sound** 15:6

**sources** 13:5

**space** 23:11

**speak** 10:5,23 22:25

**speaking** 5:25

**specific** 9:24 22:5

**stake** 20:18

**stand** 7:3,4 31:25

**standard** 11:8

**standing** 5:25 7:1,7
  10:6

**start** 8:12

**started** 15:13

**statute** 7:16 8:5 26:21
  27:10 32:11,14

**stay** 9:6 23:9,12

**stop** 30:20

**stuff** 14:18

**subjected** 32:6

**submission** 12:4

**submit** 24:15 26:24

**submitted** 7:18 27:3

**subsequent** 28:2

**substantial** 8:22

**substantially** 8:11

**suck** 29:22

**sufficient** 32:5

**suggest** 21:9

**suggesting** 12:5

**suggestion** 18:11

**Suites** 6:9

**sun** 14:14,15

**supervise** 8:23

**suppose** 10:4

**surprised** 18:9

**surreply** 27:5

**suspicion** 27:2

**sworn** 26:25

**symbol** 10:19

**syphon** 15:1

---

### T

**table** 7:3,4 10:6

**talk** 30:17

**taught** 14:9

**taxes** 8:24,25 9:1

**Ted** 5:16

**tenants** 17:13

**terabytes** 16:14

**terms** 29:5

**Texas** 6:10

**theory** 14:13

**thesis** 14:17

**thing** 18:10 28:24 29:8, 13

**things** 6:14 14:20 21:12 32:16

**thinks** 17:25

**Thomas** 5:12 8:9 22:23 23:8,11,14 24:13 30:15

**time** 8:23 11:12,14,17 14:1 15:7 17:17 29:21 32:7,10

**times** 21:13

**today** 6:11 10:22 17:21 31:4

**top** 13:1

**topic** 27:16

**touch** 30:15

**touches** 29:23

**trace** 12:13

**traced** 12:24

**tracing** 25:3,15,19

**track** 21:16

**traditional** 18:16 20:15 21:9

**transactions** 15:11

**turn** 6:20 11:25 17:13

**turning** 17:1

**type** 13:8 15:18

**types** 15:18

### U

**U.S.** 7:16

**ultimately** 24:14

**uncontested** 26:3

**understand** 14:13 17:15 28:19 30:14 32:23

**understanding** 28:3

**Understood** 24:7,16 27:14 28:8

**undertaken** 26:10

**unit** 17:13

**universe** 14:19

**unrebutted** 25:8 29:12

**update** 6:21 7:11

### V

**verified** 12:16 27:3

**verify** 27:6

**verifying** 27:2

**versus** 5:8

**view** 11:6 13:25 31:23

### W

**waiting** 32:9

**Walker** 18:21 23:14

**Wall** 12:19

**wanted** 22:14

**wasting** 9:23

**ways** 20:15

**web** 22:15,21

**websites** 18:23

**white** 16:16

**willy-nilly** 29:22

**windows** 8:20

**witnesses** 30:17

**words** 9:15

**work** 22:23

**worries** 7:9

**worse** 15:23

**worth** 15:24 20:21

### Y

**y'all** 6:7

**years** 10:25