# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

v.

TIMOTHY BARTON,                               C.A. No.: 3:22-cv-2118-X
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,                                 Jury Trial Demanded
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

                    Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

                    Relief Defendants.

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION
FOR APPOINTMENT OF A RECEIVER, FOR A PRELIMINARY INJUNCTION
AND ANCILLARY RELIEF, AND TO LIFT STAY FOR LIMITED PURPOSE,
<u>AND BRIEF IN SUPPORT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ..................................................................................... iv

I.      INTRODUCTION ................................................................................. 1

II.     PROCEDURAL BACKGROUND ......................................................... 2

III.    FACTUAL SUMMARY ......................................................................... 3

        A.  The Wall Offerings ....................................................................... 3

        B.  The Barton Defendants Defrauded Investors ............................... 5

            1. Misappropriation of investor funds ........................................ 5

            2. Inflation of property purchase prices ..................................... 8

            3. Worthless guarantee .............................................................. 10

            4. Lulling statements ................................................................. 11

        C.  The Barton Entities ..................................................................... 11

            1. Commingling and dissipation ................................................ 11

            2. The Receivership Entities ...................................................... 12

            3. Other Barton Entities likely received or benefitted from investor funds ............... 14

IV.    ARGUMENT AND AUTHORITIES .................................................... 15

        A.  The Barton Defendants Committed Securities Fraud ................. 15

        B.  Receivership Is Warranted Under the *Netsphere* Factors ......... 19

            1. Clear necessity to protect the defrauded investors' interest in property .............. 19

            2. Legal and less drastic equitable remedies are inadequate .................................... 21

            3. The benefits of a receivership outweigh the burdens on the affected parties ....... 21

        C.  A Preliminary Injunction is Also Warranted ............................. 22

D.  Sworn Accounting and Preservation Order ...............................................25

E.  The Court Should Lift the Stay for the Limited Purpose of This Motion.................25

V.    CONCLUSION..............................................................................................25

# TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Aaron v. SEC,*
   446 U.S. 680 (1980) ........................................................................ 15

*Broad v. Rockwell, Int'l Corp.,*
   642 F.2d 929 (5th Cir. 1981) (en banc) ...................................... 16

*CFTC v. American Metals Exch. Corp.,*
   991 F.2d 71 (3d Cir. 1993) ........................................................... 22

*EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.,*
   821 F.2d 1085 (5th Cir. 1987) ..................................................... 23

*Enterprise Intern, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
   762 F.2d 464 (5th Cir. 1985) ....................................................... 24

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) ................................................................. 15,16

*FDIC v. Faulkner,*
   991 F.2d 262 (5th Cir. 1993) ....................................................... 22

*Federal Sav. & Loan Ins. Corp. v. Dixon,*
   835 F. 2d 554 (5th Cir. 1987) ..................................................... 24

*Netsphere, Inc. v. Baron,*
   703 F.3d 296 (5th Cir. 2012) ....................................... 2, 3, 19, 22

*Porter v. Warner Holding Co.,*
   328 U.S. 395 (1946) ...................................................................... 23

*Reves v. Ernst & Young,*
   494 U.S. 56 (1990) ........................................................................ 17

*SEC v. Barton,*
   2023 WL 5618997, --- F.4th --- (5th Cir. 2023) .................... 19, 22

*SEC v. Brooks,*
   1999 WL 493052 (N.D. Tex. July 12, 1999) ............................. 18

*SEC v. Complete Bus. Sols. Grp., Inc.,*
   44 F.4th 1326 (11th Cir. 2022) ................................................... 19

*SEC v. Fehn,*
   97 F.3d 1276 (9th Cir. 1996) ....................................................... 15

*SEC v. Gann,*
    565 F.3d 932 (5th Cir. 2009) ........................................................................... 15

*SEC v. Glenn W. Turner Enterprises, Inc.,*
    474 F.2d 476 (9th Cir. 1973) ........................................................................... 16

*SEC v. International Swiss Inv. Corp.,*
    895 F.2d 1272 (9th Cir. 1990) ......................................................................... 25

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2nd Cir. 1972) ........................................................................ 16

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers,*
    2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) ................................................... 15

*SEC v. Seghers,*
    298 F. App'x 318 (5th Cir. 2008) .................................................................... 16

*SEC v. Sethi,*
    910 F.3d 198 (5th Cir. 2018) ........................................................................... 16

*SEC v. Smart,*
    2011 WL 2297659 (D. Utah June 8, 2011) .................................................... 17

*SEC v. Straub,*
    921 F.Supp.2d 244 (S.D.N.Y. Oct. 2, 2009) .................................................. 15

*SEC v. The Better Life Club of America, Inc.,*
    995 F. Supp. 167 (D.D.C. 1998), *aff'd*, 203 F.3d 54 (D.C. Cir. 1999) ........... 16, 17

*SEC v. Tyler,*
    2002 WL 32538418 (N.D. Tex. Feb. 21, 2002) ............................................. 17

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990) .......................................................................... 25

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) ........................................................................................ 16

*Smith v. SEC,*
    653 F.3d 121 (2d Cir. 2011) ............................................................................ 23

*Southland Sec. Corp. v. INSpire Ins. Solution, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ........................................................................... 16

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ........................................................................................ 16

Federal Statutes

Securities Exchange Act of 1934

Section 3(a)(10)
  [15 U.S.C. § 78c(a)(10)] ............................................................................. 16

Section 10(b),
  [15 U.S.C. § 78j(b)] ............................................................................. 15, 16

Section 21(d)(5),
  [15 U.S.C. § 78u(d)(5)] ....................................................................... 19, 22

Securities Act of 1933

Section 2(a)(1),
  [15 U.S.C. § 77b(a)(1)] .............................................................................. 16

Section 17(a),
  [15 U.S.C. § 77q(a)] .......................................................................... 15, 16, 19

Other
Rule 10b-5
  [17 C.F.R. § 240.10b-5] ..................................................................... 15, 16

The Securities and Exchange Commission ("SEC") submits this Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose, and Brief in Support, and respectfully shows the Court as follows:

## I.     INTRODUCTION

Timothy Barton ("Barton"), a Texas-based real estate developer, raised approximately $26 million from over 100 investors – most of whom are Chinese nationals – in unregistered, fraudulent securities offerings related to real-estate investments in Texas.[1]

Barton offered and sold investment loans issued by a series of special-purpose "Wall" entities he controls.  Barton promised that the Wall entities would use investors' funds, together with funds from the Wall entities themselves, to purchase specific parcels of land at specific prices set forth in the offering materials.  He also promised investors that they would get their principal back in two years along with annual interest payments.

Instead, Barton misappropriated nearly all the investor funds, misusing them to, among other things, purchase properties in the names of other entities he controlled, pay undisclosed fees and commissions, pay expenses associated with unrelated real estate development projects, and fund his lifestyle.  Barton also inflated the land purchase prices in the offering materials, which: (a) enabled him to raise more money from investors; (b) overstated the value of the assets securing the investments; and (c) concealed that the Wall entities were not actually contributing any funds themselves.

Among his misappropriations, Barton, acting through various entities that he controls,

---

[1] To implement the scheme, Barton partnered with Defendants Stephen Wall ("Wall"), an experienced Texas home builder, and Haoqiang (Michael) Fu ("Fu"), a Chinese businessman.  Because the SEC is only seeking relief related to Barton and his controlled entities, this Motion does not directly address Fu's and Wall's roles in the fraud.  At a high level, and among other acts, Fu marketed the investments to Chinese investors and misused investor funds to pay himself undisclosed fees and commissions, and Wall lent his name to the project and helped to provide the inflated land prices.

misused a significant portion of the investor funds to purchase or otherwise benefit real property interests. The property interests could potentially result in a recovery for investors. However, there is an imminent and substantial risk to the value of these assets if an independent third party is not put in place to protect them. For that reason, the SEC respectfully requests that the Court appoint a receiver over the entities ("Receivership Entities") that Barton directly or indirectly controls that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation. As demonstrated below, this receivership is warranted under the factors set out in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).

Barton has extensively commingled, transferred, dissipated, and encumbered investor funds and assets purchased with investor funds. As a result, and as a result of Barton's non-cooperation and outright interference, the SEC cannot yet demonstrate all of the Barton-controlled entities that received, or otherwise benefitted from, Barton's fraudulent activities that are the subject of this litigation. Thus, the SEC further requests that the Court enter a preliminary injunction that enjoins Barton, and any persons in active concert or participation with him, from transferring or dissipating any assets of the entities that he directly or indirectly controls that are not placed in the receivership. This additional relief will appropriately preserve the status quo while the SEC and the receiver attempt to trace Barton's ill-gotten gains. To aid in these tracing efforts, the SEC also requests that the Court order Barton to provide a sworn accounting and prohibit him for altering or destroying relevant documents.

## II.    PROCEDURAL BACKGROUND

On September 23, 2022, the SEC filed its Complaint in this action. (Dkt. 1) On September 26, 2022, the SEC moved the Court for the appointment of a receiver over the entities Barton directly or indirectly controls. (Dkt. 6) On October 18, 2022, the Court granted the

SEC's motion and appointed a receiver ("Receiver").  (Dkt. 29)  On November 2, 2022, the

United States Attorney's Office for the Northern District of Texas filed a motion to stay the

litigation (but not the receivership), which the Court granted.  (Dkts. 44, 64)  Barton then

appealed the Court's order appointing the receiver.

On June 28, 2023, the Fifth Circuit vacated the Court's order appointing the receiver,

effective 90 days after the issuance of its mandate.  On August 31, 2023, the mandate issued, and

the Court ordered (1) the SEC to file a motion for entry of a new receivership by September 7,

2023, and (2) the current Receiver to file a declaration providing all information relevant to, or

that he believes will assist the Court's consideration of, a proposed new receivership order.  (Dkt.

305).[2]  On September 5, 2023, the Receiver filed the declaration ("Thomas Dec.").  (Dkt. 308).

### III.    FACTUAL SUMMARY

#### A.  The Wall Offerings.

Barton is a Texas-based real estate developer who controls Carnegie, the Wall Entities,

DJD, LDG001, and over 100 other related entities (collectively, "Barton Entities").[3]  *See* May

24, 2021 Investigative Testimony of Timothy Barton ("Barton Tr.") at 172:3-173:2; 173:19-

174:5; 192:8-193:24; 200:17-22; 236:8-16 (App. 231-233; 240-243); List of Barton-Controlled

Entities (App. 23-24); Thomas Dec. at ¶¶ 33, 35-36, 55.[4]

---

[2] On July 16, 2023, the Court issued an order requiring the SEC's motion for entry of a new receivership to (1) request appointment of a receiver under the factors set out in *Netsphere*, (2) request injunctive relief, and (3) provide a basis for the inclusion of entities in the receivership that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.  (Dkt. 293)

[3] The "Wall Entities" refer to Defendants Wall007, LLC ("Wall 7"), Wall009, LLC ("Wall 9"), Wall010, LLC ("Wall 10"), Wall011, LLC ("Wall 11"), Wall012, LLC ("Wall 12"), Wall016, LLC ("Wall 16"), Wall017, LLC ("Wall 17"), Wall018, LLC ("Wall 18"), and Wall019, LLC ("Wall 19").  Carnegie refers to Defendant Carnegie Development, LLC.  Carnegie, the Wall Entities, and Barton are collectively referred to as the "Barton Defendants." "DJD and LDG00" refer to Relief Defendants DJD Land Partners, LLC and LDG001, LLC, respectively.

[4] The SEC's evidence in support of this motion is set forth in: (1) its **previously filed Appendix** in Support of its Expedited Motion for Appointment of Receiver ("App. __") (Dkt. 7-9); (2) its **Supplemental Appendix** in Support of this Motion **submitted herewith** ("Supp. App. __"); and (3) the **Thomas Dec.** (Dkt. 308).

From approximately March 2017 through June 2019, Barton, acting through Carnegie and the Wall Entities, raised at least approximately $26 million from over 100 investors in securities offerings related to real estate investments in Texas.  *See* Declaration of Carol Hahn ("Hahn Dec.") at ¶ 14.  (App. 6)

The investments were offered through a series of investment contracts styled as "Agency and Loan Agreements" ("Loan Agreements") that each Wall Entity issued as the offering entity. *See, e.g.,* Wall 9 Loan Agreement at 1 (App. 25); Wall 12 Loan Agreement at 1.  (App. 49)

Though dealing with separate parcels of land, the Loan Agreements followed a similar template and contained similar terms.  Each Wall Entity:

- borrowed a fixed amount from individual investors;

- promised to repay the funds after two years;

- promised to pay interest after the first and second years;

- promised regular progress reports;

- represented that the invested funds would be combined with other investors' funds and funds contributed by the offering entity itself (or, for Wall 7, contributed by Fu and Wall);

- the combined funds would be used to acquire a specific parcel of land identified in the loan agreement;

- specified the purchase price of the land; and

- pledged the Wall Entities' membership interests as collateral to secure the investments.

*See, e.g.,* Wall 9 Loan Agreement at 1-7.  (App. 25-31)

Barton developed, authorized, and approved the contents of the Loan Agreements, and he

4

signed the Loan Agreements on behalf of Carnegie, the managing member of each of the Wall Entities. *Id.* at 8 (App. 32)*; see also* August 27, 2017 Loan Agreement Approval Email at 1 (App. 143); July 20, 2021 Investigative Testimony of Haoqiang (Michael) Fu ("Fu Tr.") at 153:9-12. (App. 263).

Fu, acting directly or through personnel at his company, solicited Chinese investors living in China and in one or more U.S. states via emails, social media applications (*e.g.*, "WeChat"), internet sites, telephone and VOIP calls, and in-person presentations using the Loan Agreements, written investor presentations, and oral pitches. *See, e.g.,* Wall 10 Investor Presentation (with English translation) (App. 66-109); Wall 12 Investor Presentation (Chinese only) (App. 110-142); Fu Tr. at 30:1-14; 30:25-31:15; 139:15-24; 153:17-19; 157:14-158:18. (App. 260-265)

Investors invested money to obtain a fixed investment return, and their funds were pooled with other investors' funds (and were also supposed to be pooled with funds from the Wall Entities). *See, e.g.,* Wall 9 Loan Agreement at 1-2 (App. 25-26); Hahn Dec. at ¶ 15. (App. 6-7)

These were entirely passive investments: the investors had no role or say in the operations or management of the Wall Entitles or the underlying real-estate projects, and the investors were entirely dependent upon, and expecting to profit solely from, the Barton Defendants' and Wall's expertise and efforts to manage the real-estate ventures. *See, e.g.,* January 25, 2021 Investigative Transcript of Stephen Wall ("Wall Tr.") at 53:19-54:14 (App. 271-272); Barton Tr. at 294:3-296:17. (App. 247-249)

**B. The Barton Defendants Defrauded Investors.**

**1. Misappropriation of investor funds.**

Each of the Loan Agreements represented that *all* investor funds would be used to buy a specific, identified piece of land. For example, the Wall 12 Loan Agreement represented that

investor funds:

> **shall be used to acquire 172 acres located in Fort Worth ETJ, Parker County, State of Texas for residential lot development known as Lyons Ranch ("Property")**.  The Property has a purchase price of $5,250,000 and the balance of funds will be provided by Borrower. (emphasis added)

Wall 12 Loan Agreement at 2 (App. 50); *see also* March 9, 2022 Investigative Testimony of investor Hong Chen ("Chen Tr.") at 36:2-38-1 (App. 285-287); March 15, 2022 Investigative Testimony of investor Sun Yun ("Yun Tr.") at 5:25-6:13; 23:10-24:6; 26:7-25; 30:22-31-7. (App. 299-305)

These representations were false.  Of the approximately $26.3 million raised, only two Wall Entities (Wall 7 and Wall 9) actually purchased the properties described in their agreements for a total purchase price of approximately $2.6 million.  Hahn Dec. at ¶ 17.  (App. 7)

Even in those two limited instances, neither Wall 7 nor Wall 9 used its own investors' funds to purchase its property, and instead used commingled funds from one or more other offerings.  *Id*.  (App. 7)  None of the other Wall Entities acquired the properties described in their respective agreements.  *Id*. at ¶ 22.  (App. 9)

Instead, Barton misappropriated and misused the remaining approximately $23.7 million of investor funds to, among other things:

- pay personal expenses of Barton and his family, including exorbitant credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- to make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies (including LDG001 and DJD) and using funds from a different Wall Entity;[5]

- pay professional fees (such as engineering, surveying, and land development) for, in most cases, properties unrelated to the offerings; and

- make payments to Wall.

Hahn Dec. at ¶¶ 22-27 (App. 9-11); *see also* Barton Tr. at 345:7-14; 346:4-11; 349:1-350:17; 357:8-24 (App. 250-254); Thomas Dec. at ¶¶ 199-204.

Barton controlled the bank accounts for the Wall Entities and Carnegie, and he had signatory authority over most of the accounts. Hahn Dec. at ¶ 12 (App. 5-6); *see also* Barton Tr. at 178:2-12; 181:2-6; 187:12-190:20 (App. 234-239); Fu Tr. at 192:4-18. (App. 266) Barton often directed his administrative assistant to make the improper transfers. *See* Barton Tr. at 178:2-12 (App. 234); March 10, 2022 Investigative Testimony of Saskya Bedoya ("Bedoya Tr.") at 129:14-130:20 (App. 277-278); June 27, 2017, November 15, 2017, and January 9, 2019 Examples of Barton Payment Instruction Emails. (App. 152-155)

A significant portion of the investor funds were misused to purchase real property interests. Hahn Dec. at ¶¶ 33-36 & Ex. B. (App. 14 & 17) Barton also took out loans on properties acquired with investor funds, and he used the loan proceeds (which were also

---

[5] LDG001 used commingled investor funds to purchase the property that the Wall 18 Loan Agreement stated Wall 18 was supposed to purchase, and DJD used the proceeds of a partial sale of a property purchased with investor funds to purchase the property that the Wall 11 Loan Agreement represented that Wall 11 was supposed to purchase. Hahn Dec. at ¶¶ 23-24. (App. 9)

commingled with investor funds) to, among other things, purchase other properties, support his businesses, and fund his lifestyle. *Id.* at ¶ 29-30. (App. 12-13)

Despite promising to make annual interest payments and to return investors' principal, the Barton Defendants never returned any of the principal to investors as promised and failed to pay over 80% of the promised interest payments. Hahn Dec. at ¶ 28. (App. 11-12)

Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements, he received copies of Loan Agreements, and he was a signatory to the Loan Agreements. Barton knew the investor funds were being misused and misappropriated, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes.

### 2. Inflation of property purchase prices.

The Loan Agreements represented that the Wall Entity would purchase a specific parcel of land with the investor funds and represented that the offering entity would also contribute money to fund the purchase.

For example, the Wall 9 Loan Agreement had a total offering amount of $2,320,000. It represented that the purchase price for the property was $2,900,000, and the offering entity would fund the difference between the offering amount and the purchase price:

> [The Loans] shall be used to acquire 100 acres located in Venus, Texas for residential lot development known as Venus 100 located on Country Rd 501 and West of FM157 in Venus, Texas ("Property"). **The Property has a purchase price of $2,900,000 and the balance of funds will be provided by Borrower**. (emphasis added)

Wall 9 Loan Agreement at 2. (App. 26)

The representations about the purchase prices were also false. The disclosed purchase prices were inflated. At the time of the offerings, the Barton Defendants had already secured, or

were in the process of negotiating, purchase prices for the properties that were significantly lower than the prices set forth in the Loan Agreements. Hahn Dec. at ¶¶ 31-32. (App. 13-14)

For example, Wall 10 issued a Loan Agreement on October 18, 2017 that set a land purchase price of $4,400,000. Wall 10 Loan Agreement at 2. (App. 34) However, Barton had already executed a contract months earlier to purchase the Wall 10 property for $2,200,000. *See* May 2, 2017 Lost Creek Price Email at 1 (App. 157); Lost Creek Land Sale Contract at 1 and 13 (App. 195 & 207).[6]

As another example, Wall 11 issued a Loan Agreement on February 7, 2018 that set a land purchase price of $2,950,000. *See* Wall 11 Loan Agreement at 2. (App. 42) Yet, Barton had already executed a contract months earlier to purchase the Wall 11 property for $1,577,125. *See* Anastasia Land Sale Contract at 1 and 8 (App. 219 & 226).

Barton knew that the inflated purchase prices were being provided to investors, because he, Fu, and Wall secretly agreed to inflate the prices. *See* August 29, 2016 Wall to Barton Markup Email at 1 (App. 160); February 28, 2019 Wall to Fu and Barton Markup Email at 1 (App. 176); November 3, 2016 Fu to Wall Markup Email (forwarded to Barton) at 1-4. (App. 177-179). Further, as discussed above, he was involved in the underlying purchase negotiations (or received details on the purchase transactions) setting the actual prices, and he executed the Loan Agreements containing the inflated prices.

By overstating the purchase prices, Barton could use the inflated prices to raise more funds from investors in each offering. The inflated purchase prices also created the false appearance that the investments were safer than they were. The Loan Agreements pledged the

---

[6] The Wall 9 property purchase price referenced in the previous paragraph was also inflated. The actual purchase price was approximately $1,014,900. *See* Hahn Dec. at ¶ 32. (App. 13)

Wall Entities' membership interests to secure the investments. *See, e.g.,* Wall 9 Loan Agreement at 6. (App. 30) Barton led investors to believe that the Wall Entities were obtaining properties at the higher prices that could be sold to pay back investors via their share of the membership interests if necessary, when in fact the properties, and thus the Wall Entities, had far lower actual values.

The representations about the contributions of the Wall Entities' funds were also false. Neither the Wall Entities nor any of the other Defendants contributed funds towards the purchase of the properties. Hahn Dec. at ¶ 31. (App. 13) The inflation of the purchase prices was used to mask this misrepresentation. Indeed, in the two instances where the Wall Entities actually purchased their specified properties, no developer contribution was necessary to pay the balance of the difference between the offering amount and the purchase price, because the actual purchase price was lower than the offering amount. Hahn Dec. at ¶¶ 17, 32. (App. 7 & 13-14)

### 3. Worthless guarantee.

The Loan Agreements for many of the offerings also included a purported corporate guarantee by one of Barton's other entities, JMJ Holdings, for "up to the principal loan amount in the event of default." *See, e.g.,* Wall 10 Loan Agreement at 6 (App. 38); Wall 12 Loan Agreement at 6. (App. 54)

Barton approved the guarantees after learning that certain Chinese investors considered them to be an important consideration for their investment decisions. *See* January 23, 2019 Barton Guarantee Email at 1. (App. 181) Barton also executed a balance sheet purportedly showing that JMJ Holdings had total assets of more than $100 million. *See, e.g.,* Wall 10 Investor Presentation at 27 (App. 92); Wall 12 Investor Presentation at 19 (App. 128); Chen Tr. at 48:16-49:24. (App. 288-289) The purported guarantees were simply more deception. In

reality, JMJ Holdings is a dormant company that has never done any business or had any assets. Barton Tr. at 252:22-253:18; 254:1-24.  (App. 244-246)

### 4.  Lulling statements

The Loan Agreements required the Wall Entities to provide investors with quarterly progress reports about the status of the relevant real estate developments.  One of Barton's other controlled entities, JMJ Development, acting on behalf of the Wall Entities, sent investors progress reports that misrepresented the actual status of the projects.  For example, a fourth quarter 2019 update sent to investors stated that "all of [the Wall Entities] appear to be tracking with the initial … development plans."  2019 Q4 Lender Update at 2 (App. 184); *see also* Yun Tr. at 33:7-16; 34:20-35:7; 36:4-14.  (App. 306-309)  Yet, most of the properties were never actually acquired by a Wall Entity, much less developed as planned.

### C.  The Barton Entities

### 1.  Commingling and dissipation

Before the Court ordered the current receivership, Barton engaged in extensive commingling and transferring of funds and properties between and among the Barton Entities. Hahn Dec. at ¶¶ 16-30, 37 (App. 7-13, 15); Thomas Dec. at ¶¶ 22-32 & Exs. 1 & 2, 199-204; *supra* 5-8.  Barton treated his controlled entities as one, fungible piggybank, using their assets as he saw fit, including to fund his lifestyle and other business ventures.  *Id.*  Barton continued to misuse investor funds even after the SEC filed its Complaint, and until the Receiver was appointed.  *See, e.g.,* Thomas Dec. at ¶ 200.  Further, the Receiver found less than $75,000 in cash available in the Barton Entities' bank accounts upon his appointment, despite the fact that at least several million dollars in receipts flowed into the Barton Entities during the 12-months

immediately preceding the entry of the current receivership.  Thomas Dec. at ¶¶ 20, 191; Order
Denying Motion to Stay Pending Appeal at 8.  (Dkt. 132)

In addition to his direct misuse of assets, Barton failed to protect the properties.  Because
Barton misused funds, he did not deploy those funds for the benefit of the properties.  As a
result, the Barton Entities are cash-starved, and one or more of the properties were in a state of
disrepair and not current on property insurance or other obligations when the Receiver took
possession of them last year.  Thomas Dec. at ¶¶ 104-105, 191, 201, 207-210.  Substantially all
of the properties are encumbered with liens, and because Barton failed to pay lenders and other
creditors, several properties are facing foreclosure and the Barton Entities are embroiled in
approximately 35 lawsuits.  *Id.* at ¶¶ 18, 20, 191, 212-216, 228.  The properties have also been
declining in value.  *Id.* at ¶¶ 207, 236.

It is uncertain, and in fact unlikely, that Barton and the Barton Entities hold assets
sufficient to satisfy an order requiring the Barton Defendants to disgorge their ill-gotten gains for
the benefit of investors.  *Id.* at ¶¶ 191-196, 205-206.  The current Receiver has undertaken efforts
to preserve the remaining value of the Barton Entities' assets, including by, among other actions:
(a) obtaining insurance for the properties; (b) valuing, marketing, and selling property interests to
maximize their values; and (c) beginning to settle claims.  *See, e.g., Id.* at ¶¶ 191, 207-212.
However, those efforts are far from complete, and the assets remain at significant risk.  The
properties, which are in various stages of development, need competent management in place to
develop, operate, maintain, and/or sell them.  *Id.* at ¶¶ 212, 226-227.

### 2.  The Receivership Entities

The Receivership Entities are listed at <u>Exhibit B</u> to the Supplemental Hahn Declaration

and in the proposed Receivership Order submitted herewith.  Supp. Hahn Dec. at Ex. B.[7]  (Supp. App. 11-12)  Barton controls the Receivership Entities.  *See supra* at 3.

As set forth in the Thomas Declaration, the Hahn Declaration, and the Supplemental Hahn Declaration, each of the Receivership Entities received or benefitted from assets traceable to Barton's fraudulent activities that are the subject of this litigation.  *See* Thomas Dec. at ¶¶ 53-59, 71, 77, 80-84, 91, 95, 97, 103, 117, 120-126, 129-131, 139, 146-162, 164, 167, 170, 177-179 & Exs. 3-27; Hahn Dec. at ¶ 37 & Ex. C (App. 15 & 18); Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5-10)

Many of the Receivership Entities: (1) received investor funds; (2) hold property where investor funds were used in whole or in part to purchase the property, pay down the mortgage on the property, develop the property, or pay for property expenses or operations; (3) held property purchased in whole or in part with investor funds and now hold proceeds of the sales or contractual rights or claims relating thereto; and/or (4) received loan proceeds from loans secured with properties purchased in whole or in part with investor funds.  *Id.*

The other Receivership Entities (as well as many of the above-referenced Receivership Entities) otherwise benefitted from assets traceable to the fraudulent securities offerings at issue. For example, Barton used investor funds to pay employees who secured financing for the Receivership Entities' real estate projects, worked on the projects, and managed the properties. *See, e.g.*, Thomas Dec. at ¶¶ 81, 103.  Investor funds were also used to maintain the corporate offices of the Receivership Entities.  *See, e.g.*, *Id.* at ¶ 81.

---

[7] The Receiver identified several additional entities for potential inclusion in the receivership at Paragraphs 184-188 of the Thomas Declaration.  At this time, the SEC is not moving to include most of those entities in the receivership. However, tracing efforts are ongoing, and the SEC (or the receiver if appointed) may move to add some or all of those entities as additional information is obtained.

As another example, several Receivership Entities were able to obtain loans by using property purchased with investor funds and held by other Receivership Entities to establish their credit.  Thomas Dec. at ¶¶ 81-82.  Other Receivership Entities benefitted from investor funds, because they obtained participation interests in developments that received investor funds.  *Id.* at 180.  Still others benefitted, because they are the owners or beneficial interest holders (*e.g.*, a trust) of another Receivership Entity that received investor funds or property purchased with investor funds.  *Id.* at ¶¶ 181-182.

### 3.  Other Barton Entities likely received or benefitted from investor funds

The SEC, the current Receiver, and the current Receiver's retained professionals have been working to determine whether additional Barton Entities have received or benefitted from assets traceable to Barton's fraud.  These efforts are ongoing.  *See, e.g.,* Thomas Dec. at ¶¶ 43, 188; Supp. Hahn Dec. at ¶ 6.  (Supp. App. 3-4)  Barton's extensive commingling, transferring, and encumbering of investor funds and assets obtained with investor funds has made these tracing efforts difficult.  *See, e.g.,* Thomas Dec. at ¶¶ 22-32; Hahn Dec. at ¶ 37 (App. 15); Supp. Hahn Dec. at ¶ 6. (Supp. App. 3-4)

Barton has compounded the problem he created by refusing to comply with the current Receivership Order.  In violation of the Receivership Order, Barton has failed to provide critical information to the Receiver, and he is also actively obstructing the Receiver's efforts to obtain assets and perform a complete tracing analysis.  Thomas Dec. at ¶¶ 19, 40-41, 45, 197.  However, the successful tracing efforts to-date indicate that the SEC, and a receiver if appointed, would likely be able to trace funds or benefits to additional Barton Entities if they are provided a reasonable, unobstructed opportunity to perform additional analysis.

## IV.    ARGUMENT AND AUTHORITIES

### A. The Barton Defendants Committed Securities Fraud

The SEC alleges that the Barton Defendants violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] prohibits fraud in the offer or sale of a security, and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] prohibit fraud in connection with the purchase or sale of any security.

To establish a violation under these sections, the SEC must prove by a preponderance of the evidence: (1) that in connection with the purchase, offer, or sale of any security; (2) the Barton Defendants made a material misrepresentation or omission of material fact, or employed a fraudulent device; (3) with the requisite mental state.  *See generally SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009); *SEC v. Seghers*, 298 F. App'x 319, 327-28 (5th Cir. 2008).[8]

Liability arises not only from affirmative representations but also from failures to disclose material information.  *See SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (the antifraud provisions impose a "duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or voluntered, not misleading.").

Establishing violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 require proof of scienter.  *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst &*

---

[8] Both statutes require that securities be offered or sold through the use of interstate communications, commerce, or the mails.  The Loan Agreements were offered and sold using wires, emails, phone calls, and internet applications. *Supra* at 5; Hahn Dec. at ¶ 15 (App. 6); *see also SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce"); *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No. 08CV1402, 2009 WL 3233110, at *4 (E.D.N.Y. Oct. 2, 2009) (holding that wire transfers were instrumentalities of interstate commerce).

*Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).  To prove scienter, the SEC need only show the defendant acted with "severe recklessness."  *SEC v. Sethi,* 910 F.3d 198, 206 (5th Cir. 2018) (citing *Broad v. Rockwell, Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981) (en banc)).[9] Negligence is sufficient to show a violation of Sections 17(a)(2) and (3) of the Securities Act. *See Aaron*, 446 U.S. at 701-02.

To establish violations of Sections 17(a) and 10(b) and Rule 10b-5 based on misrepresentations or omissions, the facts at issue must be material.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *Id; SEC v. Seghers*, 298 F. App'x 318, 328 (5th Cir. 2008).

The evidence set forth in support of this motion establishes that the SEC is likely to succeed on the merits of its claims that the Barton Defendants violated the antifraud provisions of the federal securities laws.

*First*, the Barton Defendants offered and sold securities.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other instruments, any "investment contract" or "note."  15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).

The Loan Agreements are "investment contracts."[10]  The investors invested money that was pooled in a common enterprise with the expectation of investment returns based and dependent solely on the efforts of the promoters.  *Supra* at 4-5; *see also SEC v. The Better Life*

---

[9] A company's scienter can be imputed from individuals who control it.  *See Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1089, n.3 (2nd Cir. 1972); *Southland Sec. Corp. v. INSpire Ins. Solution, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

[10] An investment contract exists where: (1) individuals are led to invest money; (2) in a common enterprise; and (3) with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves.  *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99 (1946).  Courts do not take the word "solely" literally. *See, e.g.*, *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973).

*Club of America, Inc.*, 995 F. Supp. 167, 173-174 (D.D.C. 1998), *aff'd*, 203 F.3d 54 (D.C. Cir. 1999) (holding loan agreements in which investors contributed funds to common enterprise with expectation of receiving profits based solely on the efforts of the promoters were securities, and finding it "hard to imagine a more perfect example" of an "investment contract").

The Loan Agreements are also securities, because they are "notes." "The Supreme Court has held that the definition of 'note' may 'be viewed as a relatively broad term that encompasses instruments with widely varying characteristics,' and as with the term 'security,' the definition of 'note' looks to the economic reality and surrounding circumstances of a transaction." *SEC v. Tyler*, 2002 WL 32538418, at *3 (N.D. Tex. Feb. 21, 2002) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 59 (1990)). Here, the Loan Agreements evidence a promise to pay a financial return on set terms and are notes in economic substance. *See Id.* (holding letters outlining maturity date and annual rate of return for viaticals investment were both notes and investment contracts); *SEC v. Smart*, No. 2:09-CV-00224, 2011 WL 2297659, at 12-14 (D. Utah June 8, 2011) (note agreements that pooled investor funds and promised fixed returns were securities as either investment contracts or notes). The subscription agreements provided to several investors also represented that the investment was a note. *See, e.g.,* Wall 19 Subscription Agreement at 1 ("I hereby subscribe to the Note (promissory note) as co-lender.") (App. 57).

*Second*, the Barton Defendants made material misstatements and omissions and engaged in deceptive acts in connection with the offer, purchase, and sale of the securities:

- The Barton Defendants falsely told investors that the Wall Entities would use their money to purchase specific parcels of land, but then misappropriated the money and spent it on a litany of improper purposes. A reasonable investor would consider the fact that their investment would not be used for the represented investment purpose

17

important in deciding whether to invest. *SEC v. Brooks*, No. 3:99-cv-1326-D, 1999 WL 493052 at *2 (N.D. Tex. July 12, 1999) (misrepresentations about use of investor funds are material); *see also* Chen Tr. at 36:2-38-1 (App. 285-287); Yun Tr. at 23:10-24:6; 26:7-25.  (App. 301-303)

- The Barton Defendants misstated the land purchase prices.  A reasonable investor would consider the fact that the promoter was intentionally inflating the value of the collateral securing their investments important in deciding whether to invest.

- The Barton Defendants falsely told the investors that the Wall Entities would be contributing funds towards the land purchases.  A reasonable investor would consider the fact that the promoter was lying about putting its own money into a venture side-by-side with the investors important in deciding whether to invest.  *See, e.g.,* Chen Tr. at 63:5-64:21; 65:8-12.  (App. 290-292)

- The Barton Defendants claimed to certain investors that their investments were fully guaranteed by one of Barton's other companies but omitted that the guaranteeing company had no assets.  A reasonable investor would consider the fact that he or she was receiving a worthless guarantee important in deciding whether to invest.

*Third*, Barton acted with scienter.  Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements and he was a signatory to the Loan Agreements.  Barton knew the investor funds were being misused, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes.  Barton also knew that the inflated purchase prices were being provided to investors, because he agreed to the scheme with Fu and Wall, he was involved in underlying purchase negotiations setting the actual prices, and he executed the Loan Agreements containing the

18

inflated prices.  Finally, Barton knew that the company he was using to guarantee the investments had no assets.[11]

### B.  A Receivership Is Warranted Under the *Netsphere* Factors

In *Netsphere,* the Fifth Circuit "catalogued the various contexts where receiverships are used, including 'cases of non-compliance with SEC regulations, [where] a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors.'"  *SEC v. Barton*, 2023 WL 5618997, *3 --- F.4th --- (5th Cir. 2023) (citing *Netsphere*, 703 F.3d at 306).  To establish that a receivership is justified under *Netsphere*, the SEC must show: "(1) a clear necessity to protect the defrauded investors' interest in property, (2) legal and less drastic equitable remedies are inadequate, and (3) the benefits of receivership outweigh the burdens on the affected parties."  *Id.* (citing *Netsphere*, 703 F.3d at 305).[12]  These factors are readily satisfied here.

### 1.  Clear necessity to protect the defrauded investors' interest in property.

A receivership is a clear necessity to protect the defrauded investors' interests in property.  A receiver is necessary to manage the Receivership Entities' assets, which include an operating hotel, several apartment complexes, and development projects.  Before the Court ordered the current receivership, Barton misused these assets, including by using investor funds for personal expenses rather than to protect and maximize the value of the properties.  *See supra*

---

[11] The evidence of scienter here is overwhelming.  However, the SEC's antifraud claims under Sections 17(a)(2) and (3) of the Securities Act only require a showing of negligence.  There is no question that Barton did not exercise reasonable care in his use of investor funds and in making the other misstatements and omissions.

[12] *See also* Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)] ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.); *SEC v. Complete Bus. Sols. Grp., Inc.*, 44 F.4th 1326, 1334 (11th Cir. 2022) (recognizing that "the appointment of a receiver is a well-established equitable remedy available to the SEC" under Exchange Act Section 21(d)(5)).

at 5-8, 11-12.  Several of the properties have been left in a state of disrepair or are facing

foreclosure, and the properties are declining in value.  *Id.* at 12.  The current Receiver has not yet

completed his work, and the fundamental problems facing the Receivership Entities remain.

Absent a receiver to manage, maximize, and protect the properties' values, the investors' interest

in these properties is at substantial risk.

Further, the Receivership Entities and their assets continue to be mired in liens, lawsuits,

and foreclosures that threaten to further diminish the value of the assets.  *Id.*  A receiver would

have the power to stay litigation and foreclosures, and to defend, pursue, and compromise

claims.  These powers are critical to protecting the investors' interests in the properties.  It is

unlikely that Barton and the Barton Entities, much less the Receivership Entities, hold assets

sufficient to satisfy an order requiring the Barton Defendants to disgorge their ill-gotten gains for

the benefit of investors.  *Id.*  A receiver is therefore necessary to marshal and maximize the

available property assets and claims.

In addition, based on Barton's prior misconduct, it is also highly likely, if not certain, that

Barton will continue to dissipate or conceal assets if he is left in control of the Receivership

Entities.  As the Court has previously found:

> And in direct contradiction of Barton's narrative, the Receiver notes that his
> "[e]xtensive efforts to identify all Receivership Entity bank accounts have
> resulted in recovery of less than $75,000 in cash to date, despite the fact that the
> Receiver is aware of several million dollars in receipts flowing into the
> Receivership Entities during the last twelve months alone."  Clearly, imposing a
> receivership to prevent dissipation and asset flight was, and continues to be, a
> clear necessity.

Order Denying Motion to Stay Pending Appeal at 8.  (Dkt. 132)  Barton would be in a position to

transfer or hide the assets (including outside the jurisdiction of this Court), pledge or further

encumber assets, and/or liquidate and misuse assets for his benefit and without Court

supervision.

20

### 2. Legal and less drastic equitable remedies are inadequate.

There are no legal or less drastic equitable measures that that will protect investors and address the risks to their interests in property discussed above. Without Court protection, Barton will continue to misuse and dissipate assets. However, merely enjoining Barton from misusing and dissipating the assets is not enough, because, as discussed above, the entities have no cash, many of the properties require active management, and an independent third party must be put in place to marshal, manage, and maximize the available assets and claims.[13] Barton has previously proposed a monitorship. Yet, a monitorship is clearly inadequate in this situation. At the outset, it puts Barton, the person who orchestrated the wide-ranging fraud, misused investor funds, and mismanaged assets, back in a primary management position, and then relies on a monitor to catch his misconduct. In any event, a monitor would not have the powers necessary to protect the investors' interests, including, but not limited to, the power to stay litigation and foreclosures, investigate and trace assets, sell assets to generate cash, and investigate, pursue, and settle claims.

### 3. The benefits of a receivership outweigh the burdens on the affected parties.

The benefits of a receivership are substantial. It would put a competent, independent party in place to maximize the value of the available assets and claims for the benefit of defrauded investors, and a receivership will stay litigation and foreclosures, among other protections, that are necessary to protect the assets. At the same time, it would oust Barton – the perpetrator of the extensive fraud detailed above – from control over the entities, assets, and claims at issue. Barton has identified no burden beyond his contention that he could manage the

---

[13] Barton has also failed to comply with previous court orders, and there is no assurance that he will not do so again even if enjoined. This is yet another reason that means other than a receivership are insufficient. A receivership would take control of the properties.

properties or their sale better than the current receiver.  However, the evidence shows otherwise, and there is no benefit to putting the party that committed fraud back in control of his fraudulent enterprise.  Further, Barton would still be in a position to make recommendations to the receiver on property issues, which the receiver would evaluate using appropriate business judgment.[14]

The evidence demonstrates that the Receivership Entities received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation (*see supra* at 12-14), and that the Court should place those entities in receivership under the factors set out in *Netsphere* and pursuant to Section 21(d)(5) of the Exchange Act.

### C.  A Preliminary Injunction is Also Warranted

Because the SEC cannot yet demonstrate all of the Barton-controlled entities that received or otherwise benefitted from Barton's ill-gotten gains, the SEC is also seeking "an injunction freezing asset transfers while it trace[s] the funds and determine[s] which entities should be placed in the receivership."  *Barton*, 2023 WL 5618997, at *5 (discussing *FDIC v. Faulkner*, 991 F.2d 262, 267-68 (5th Cir. 1993)); *see also CFTC v. American Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993) ("Because a freeze is designed to preserve the status quo by preventing the dissipation and diversion of assets, we will allow the freeze to remain in effect until the district court determines whether it can make an informed determination of the amount of unlawful proceeds retained by [the defendant], and, if it can, what that amount may approximate.  The district court can then decide to maintain, remove or modify the freeze.").

Specifically, the SEC seeks a preliminary injunction that enjoins Barton – and, pursuant to FED. R. CIV. P. 65(d)(2), any other persons who are in active concert or participation with him

---

[14] Barton has also claimed that the current Receiver's fees and costs are too high.  While all receiverships incur fees and costs, the receiver's fees and costs would be subject to both interim and final Court approval.

– from transferring, selling, dissipating, assigning, concealing, pledging, withdrawing, alienating, encumbering, incurring debt upon, disposing of, or diminishing the value of any funds, property, or other assets of any entity that he directly or indirectly controls that is not placed in receivership.  Such a preliminary injunction is appropriate and necessary for the benefit of investors.  15 U.S.C. § 78u(d)(5); *see Porter v. Warner Holding Co.*, 328 U.S. 395, 397-98 (1946) (having "invoked the jurisdiction of the District Court to enjoin [illegal] acts and practices, … all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction"); *see also* 15 U.S.C. § 77v(a); 15 U.S.C. § 78aa.

As described above, the SEC has made a substantial showing that it is likely to succeed on the merits of its claims that Barton violated the federal securities laws.  Moreover, the threatened injury if the preliminary injunction is denied also far outweighs any harm that will result if the asset freeze is not granted, and the preliminary injunction is indisputably in the public interest.  Again, the harm at issue is the dissipation of assets that will preclude a recovery for defrauded investors.  This interest far outweighs any potential harm that Barton may suffer if the status quo is maintained and Barton is enjoined from transferring assets held in his controlled entities.  It is also in the public interest to protect defrauded investors.

Finally, because a preliminary injunction preventing the transferring of assets is a provisional remedy intended to preserve the status quo, the SEC need not demonstrate irreparable harm.  *See, e.g., Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) ("Where an asset freeze is involved, the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws.").  But even were that not so, irreparable harm is presumptively established by a showing of a statutory violation. *See, e.g., EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987).

In any event, beyond that presumption there is a clear likelihood of irreparable harm without the requested preliminary injunction. The SEC is seeking equitable relief for the benefit of investors. The threatened harm is the further dissipation of the assets that are the subject of this litigation, and such dissipation would impair the Court's ability to grant an effective remedy. More specifically, as a result of Barton's extensive commingling of funds, transferring of properties, and interference with tracing efforts, the SEC cannot yet identify and demonstrate all of the Barton Entities that received or benefitted from investor funds. However, the fact that the SEC and the current Receiver have, despite Barton's extensive commingling and refusal to provide tracing information, already identified numerous entities that have received or benefitted from investor funds indicates that, given time, additional entities will likely be added to the list.

Moreover, based on Barton's prior conduct, it is also highly likely that Barton will continue to dissipate or conceal assets held by those entities if he is not enjoined. Further, it is unlikely that the value of the Barton Entities' assets – which are encumbered with liens and claims and have been declining in value – exceed the approximately $26 million that investors lost as a result of Barton's fraud. Thus, without the injunction, it is likely that Barton would dissipate assets traceable to the fraud at issue in this litigation and render them unrecoverable to satisfy the SEC's equitable remedies for the benefit of investors. *See Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F. 2d 554, 560 (5th Cir. 1987) (upholding preliminary injunction prohibiting defendants from dissipating assets pending resolution of claims for equitable relief); *see also Enterprise Intern, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464 (5th Cir. 1985) ("The absence of an available remedy by which the movant can later recover monetary damages, however, may also be sufficient to show irreparable injury.").

For the foregoing reasons, the SEC is entitled to a preliminary injunction.

**D. Sworn Accounting and Preservation Order**

The SEC also requests that the Court order Barton to provide a sworn accounting and to preserve all relevant documents throughout the litigation.  The accounting and preservation orders will further the purpose of the requested injunction by assisting the SEC and the Receiver in tracing assets to and among the Barton Entities.  *See SEC v. International Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Unifund SAL*, 910 F.2d 1028, 1040, n.11 (2d Cir. 1990); 15 U.S.C. § 78u(d)(5).

**E. The Court Should Lift the Stay for the Limited Purpose of This Motion.**

The Court ordered the SEC to file this motion, and it is therefore appropriate to lift the stay for the limited purpose of adjudicating this motion.

## VI.    CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's motion and grant the SEC such other or further relief as this Court may deem just, proper, and equitable.

Dated: September 7, 2023

Respectfully submitted,

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein
Texas Bar No. 24006839
James E. Etri
Texas Bar No. 24002061
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2607 (KMB phone)
(817) 978-4927 (facsimile)
bernsteink@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission

## <u>CERTIFICATE OF SERVICE</u>

I affirm that on September 7, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

<u>*/s/ Keefe M. Bernstein*</u>
Keefe M. Bernstein