# LOAN AGREEMENT

THIS LOAN AGREEMENT is made and entered into as of November 14, 2019 (the "Effective Date") by **TEXAS BRAND BANK** ("Bank"), and **GOLDMARK HOSPITALITY, LLC**, a Texas limited liability company ("Borrower").

## RECITALS:

A.      Borrower has requested that Bank extend credit to Borrower as described in this Agreement. Bank is willing to make such credit available to Borrower upon and subject to the provisions, terms, and conditions hereinafter set forth.

B.      Subject to and upon the terms and conditions of this Agreement, Bank has agreed to lend to Borrower the amounts herein described for the purposes set forth below.

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises, the covenants, representations, warranties and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

## ARTICLE ONE

## DEFINITIONS AND USE OF TERMS

1.1     *Definitions*. As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report or other Loan Documents made or delivered pursuant to this Agreement, the following terms will have the meanings given such terms in Article One.

"Advance" means a disbursement by Bank, whether by journal entry, deposit to Borrower's account, check to third party or otherwise of any of the proceeds of the Loan, or any insurance proceeds.

"Affiliate" means, as to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more any class of voting stock of such Person, or (c) that controls ten percent (10%) or more of the voting stock of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise; provided, however, in no event shall Bank be deemed an Affiliate of Borrower.

"Agreement" means this Loan Agreement, as the same may from time to time be amended, supplemented, replaced or restated.

"Approved Purpose" means that the proceeds of the Loan must be used as part of the funds necessary to (a) refinance the existing indebtedness encumbering the Property, (b) reimburse Borrower for the cost of making certain capital improvements to Property, (c) pay closing costs related to the Loan, and (d) provide Borrower with a return of a portion of its equity in the Property.

"Bank" means Texas Brand Bank and its successors and assigns, in whole or in part.

LOAN AGREEMENT
L:\50423\251\Loan Agreement.doc

**EXHIBIT**

**A**

PAGE 1

App. 001

"Borrower" means the Person identified as such in the introductory paragraph hereof, and its successors and assigns.

"Business Day" means a day other than a Saturday, Sunday or a day on which Bank is authorized to be closed.  Unless otherwise provided, the term "days" means calendar days.

"Closing Date" means the Effective Date.

"Code" means the Uniform Commercial Code of the State of Texas or other applicable jurisdiction as it may be amended and in effect from time to time.

"Committed Sum" is defined in Section 2.1.

"Debt" means, with respect to any Person and as of any applicable date of determination, all indebtedness, obligations and liabilities of such Person, whether matured or unmatured, due or to become due, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, including all items that should be classified as liabilities in accordance with GAAP.  In the case of Borrower, the term "Debt" shall include, without limitation, the Indebtedness.

"Debtor Relief Laws" means Title 11 of the United States Code, as now or hereafter in effect, or any other applicable law, domestic or foreign, as now or hereafter in effect, relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement or composition, extension or adjustment of debts, or similar laws affecting the rights of creditors generally from time to time in effect.

"Deed of Trust" means the Deed of Trust, Security Agreement-Financing Statement encumbering the Property to secure payment and performance of the Indebtedness and the Obligations, as such may be amended, restated, supplemented or otherwise modified from time to time.

"Disposition" means any sale, Lease (except as permitted in the Loan Documents), exchange, assignment, conveyance, transfer, trade, or other disposition of all or any portion of the Property (or any interest therein).

"Effective Date" means the date set forth in the introductory paragraph hereof.

"Event of Default" has the meaning set forth in Article Six hereof and in the other Loan Documents.

"Financial Statements" means all balance sheets, income statements, statements of profit and loss, statements of cash flow, statements of sources and uses of funds, and other financial data, statements and reports (whether of Borrower, any Guarantor, or any other Person or otherwise) which are required to, have been, or may from time to time hereafter, be furnished to Bank, for the purposes of, or in connection with, this Agreement.

"GAAP" means generally accepted accounting principles, applied on a consistent basis, set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board which are applicable in the circumstances as of the date in question; and the requisite that such principles be applied on a consistent basis means that the accounting principles observed in a current period are comparable in all

LOAN AGREEMENT                                                                 PAGE 2
L:\50423\251\Loan Agreement.doc

App. 002

material respects to those applied in a preceding period, except the extent that a deviation therefrom is expressly permitted by this Agreement.

"Governmental Authority" means the United States, the state, the county, the city or any other political subdivision in which the Property is located, and any court or political subdivision, agency, or instrumentality having jurisdiction over Borrower, any Guarantor or any of the Property.

"Guarantor" means Timothy Barton and any Person who from time to time guarantees the payment or performance of all or any part of the Indebtedness or the Obligations.

"Guaranty" means each Guaranty Agreement executed by a Guarantor, guaranteeing all or any portion of the Indebtedness or the Obligations, as such may be amended, restated, supplemented or otherwise modified from time to time.

"Impositions" means: (i) all real estate and personal property taxes, charges, assessments, standby fees, excises, and levies and any interest, costs, or penalties with respect thereto, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever which at any time prior to or after the execution hereof may be assessed, levied, or imposed upon the Property or the ownership, use, occupancy, or enjoyment thereof, or any portion thereof, or the sidewalks, streets, or alleyways adjacent thereto; (ii) any charges, fees, license payments, or other sums payable for or under any easement, license, or agreement maintained for the benefit of the Property; (iii) water, gas, sewer, electricity, and other utility charges and fees relating to the Property; and (iv) assessments and charges arising under any subdivision, condominium, planned unit development, or other declarations, restrictions, regimes, or agreements affecting the Property.

"Improvements" means the improvements situated on the Land.

"Indebtedness" means all present and future indebtedness, obligations, and liabilities, including all direct and contingent obligations arising under letters of credit, banker's acceptances, bank guaranties and similar instruments, net obligations under any swap contract, overdrafts, Automated Clearing House obligations, and other financial accommodations which could be considered a liability under GAAP, and all renewals, extensions, and modifications thereof, or any part thereof, in each case now owed or hereafter owing to Bank by Borrower, and all interest accruing thereon and costs, expenses, and all attorneys' fees paid or incurred by Bank in the enforcement or collection thereof, regardless of whether such indebtedness, obligations, and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, due or to become due, or joint and several, including, but not limited to, all indebtedness, obligations, and liabilities evidenced, secured, or arising from time to time under or pursuant to any of the Loan Documents, and all renewals and extensions thereof, or any part thereof, and all present and future amendments thereto. "Indebtedness," however, does not include any Debt which is covered by the federal Truth-in-Lending Act.

"Land" means the real property described in **Exhibit "A"**.

"Leases" means any and all leases, subleases, licenses, concessions, or other agreements (whether written or oral, or now or hereafter in effect) which grant to third parties a possessory interest in and to, or the right to use or occupy, all or any part of the Property, together with all security, including letters of credit, and other deposits or payments made in connection therewith.

"Legal Requirements" means (i) any and all present and future judicial decisions, statutes, rulings, rules, regulations, permits, certificates, or ordinances of any Governmental Authority in any way applicable to Borrower, any Guarantor or the Property, including, without limiting the generality

of the foregoing, the ownership, use, occupancy, possession, construction, operation, maintenance, alteration, repair, or reconstruction thereof, (ii) any and all covenants, conditions, and restrictions contained in any deeds, other forms of conveyance, or in any other instruments of any nature that relate in anyway or are applicable to the Property or the ownership, use, or occupancy thereof, (iii) Borrower's or any Guarantor's present or subsequently effective bylaws and articles of incorporation, operating agreement or regulations and articles of organization or partnership, limited partnership, joint venture, trust, or other form of business association agreement, and (iv) any and all Leases and other contracts (written or oral), of any nature that relate in any way to the Property and to which Borrower or any Guarantor may be bound.

"Lien" means any valid and enforceable interest in any property, whether real, personal or mixed, securing an indebtedness, obligation or liability owed to or claimed by any Person other than the owner of such property, whether such indebtedness is based on the common law or any statute, ordinance or contract and including, but not limited to, liens created by or pursuant to, a security interest, pledge, mortgage, assignment, conditional sale, trust receipt, lease, consignment or bailment for security purposes.

"Loan" means the loan made by Bank to Borrower pursuant to this Agreement.

"Loan Documents" means this Agreement, the Note, the Deed of Trust, each Guaranty, the Security Agreement, and any other agreements, instruments and documents evidencing, securing, guaranteeing or pertaining to the Loan as shall from time to time be executed and delivered to Bank by Borrower or any other party pursuant to this Agreement, including, without limitation, any future amendments hereto, or restatements hereof, or pursuant to the terms of any of the other loan documents, together with any and all renewals, extensions, and restatements of, and amendments and modifications to, any such agreements, documents, and instruments.

"Material Adverse Effect" means any set of circumstances or event which with respect to any Person (a) could reasonably be expected to have any material adverse effect whatsoever upon the validity, performance, or enforceability of any Loan Document against such Person, (b) is or could reasonably be expected to have a material adverse effect upon the condition (financial or otherwise), properties, liabilities (actual or contingent), business operations of such Person, (c) could reasonably be expected to materially impair the ability of such Person to fulfill its obligations under the terms and conditions of the Loan Documents.

"Maximum Lawful Rate" means the maximum non-usurious rate of interest (or, if the context so requires, an amount calculated at such rate) which Bank is allowed to contract for, charge, take, reserve, or receive in this transaction under applicable federal or state (whichever is higher) law from time to time in effect after taking into account, to the extent required by applicable federal or state (whichever is higher) law from time to time in effect, any and all relevant payments or charges under the Loan Documents.

"Note" means the Promissory Note made by Borrower and payable to the order of Bank in the maximum principal amount of and evidencing the Loan, as such may be amended, increased, replaced, restated, renewed and extended from time to time.

"Obligated Party" means the Borrower, each Guarantor and any other Person who is or becomes party to or makes any agreement, instrument or document that guarantees or secures payment and performance of any of the Indebtedness, and/or the Obligations or any part thereof.

App. 004

"Obligations" means any and all of the covenants, conditions, warranties, representations and other obligations (other than to repay the Indebtedness) made or undertaken by Borrower or any Obligated Party to Bank as set forth in the Loan Documents, or any other agreement as to which Borrower is granted a possessory interest in the Property.

"Origination Fee" means the amount of $25,842.49 to be paid to Bank in consideration of the agreement of Bank to make the proceeds of the Loan available to Borrower as provided in this Agreement. The Origination Fee shall be paid to Bank on of the Closing Date.

"Permitted Encumbrances" has the meaning assigned to such term in the Deed of Trust.

"Person" means any individual, firm, corporation, limited liability company, association, partnership, joint venture, trust, other entity, unincorporated organization or Governmental Authority.

"Principal Balance" means the aggregate unpaid balance of all Advances of the Loan and all other principal indebtedness, if any, under the Note at the time in question.

"Property" means the Land, the Improvements and all other property, real and personal, now or hereafter subject to a Right, or Lien in favor of Bank, as any of the foregoing are described herein, in the Deed of Trust or in any of the other Loan Documents.

"Rights" means any rights, remedies, powers, and privileges exercisable by Bank under any of the Loan Documents, in each case whether at law, in equity, or otherwise.

"Security Agreement" means the Security Agreement of even date herewith, from Borrower for the benefit of Bank covering the collateral therein described.

"Subordinated Debt" means all Debt of Borrower, whether now existing or hereafter incurred, which is subordinate in right of payment to the Indebtedness, pursuant to a written agreement executed by such parties required by, and in form and content satisfactory to, Bank.

"Subsidiary(ies)" means any entity more than fifty percent (50%) of whose ownership, equity or voting interest now or hereafter is owned directly or indirectly by Borrower or any Subsidiary or may be voted by Borrower or any Subsidiary.

"Survey" means a survey of the Land consisting of a plat and field notes, prepared by a licensed surveyor acceptable to Bank and the Title Company which survey shall: (a) reflect the actual dimensions of the Land, the gross and net area of the Land, the location of any easements, rights-of-way, setback lines, encroachments or overlaps thereof or thereover and the outside boundary lines of any Improvements located thereon; (b) identify by recording reference any easements, setback lines or other matters referred to in the title commitment issued by the Title Company; (c) include the surveyor's registration number and seal and the date of the Survey; (d) include a surveyor's certificate acceptable to Bank within its reasonable discretion; (e) reflect that the Land has access to and from a publicly dedicated street, roadway or highway; (f) be sufficient to cause the Title Company to delete the "survey exception" in Schedule B of the Title Policy to the extent permitted by the rules of the State Board of Insurance; and (g) reflect the area, including the boundaries thereof, within the Land that has been designated by the Federal Insurance Administration, the Army Corps of Engineers or any other Governmental Authority as being subject to special or increased flood hazards.

"Taxes" means all taxes (including withholding), assessments, fees, levies, impositions, imposts, duties, deductions, withholdings, or other charges of any nature whatsoever from time to time or

at any time imposed by any laws or by any Governmental Authority, excluding state and local sales and use taxes.

"Title Company" means the title company or title companies specified in **Exhibit "C"**.

"Title Policy" means a loan policy (or policies) of title insurance, and any reinsurance agreement (or agreements) issued by the Title Company in accordance with **Exhibit "C"**.

1.2     Headings.  The headings, captions, and arrangements used in any of the Loan Documents are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify, or modify the terms of the Loan Documents, nor to affect the meaning thereof.

1.3     Number and Gender of Words.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.  Reference herein to Borrower shall mean, jointly and severally, each Person comprising same.

1.4     Articles, Sections and Exhibits.  All references herein to "Articles" and "Sections" are, unless specified otherwise, references to articles and sections of this Agreement.  All references herein to an "Exhibit" or "Schedule" are references to exhibits or schedules attached hereto, all of which are made a part hereof for all purposes, the same as if set forth herein verbatim, it being understood that if any exhibit or schedule attached hereto, which is to be executed and delivered, contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained and as contemplated herein prior to or at the time of the execution and delivery thereof.  The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section; and the word "including," as used herein, shall mean "including, without limitation."

## ARTICLE TWO

## COMMITMENT TO LEND

2.1     *Commitment to Lend*.  Subject to and upon the terms, covenants, and conditions hereof, Bank hereby agrees to lend to Borrower an aggregate sum (the "Committed Sum") of the lesser of (a) $2,584,249.00; or (b) seventy percent (70%) of the appraised value of the Property based upon the appraisal described in **Exhibit "B"** attached hereto.  Bank may, in Bank's sole discretion, disburse Loan proceeds by journal entry to pay interest and financing costs and disburse Loan proceeds directly to third parties to pay costs or expenses required to be paid by Borrower pursuant to this Agreement.  All disbursements of Loan proceeds by Bank by journal entry to pay interest or financing costs, and all disbursements of Loan proceeds directly by Bank to third parties to pay costs or expenses required to be paid by Borrower pursuant to this Agreement, shall constitute Advances to Borrower.  Any Loan amount(s) repaid may not be reborrowed.

2.2     *Interest*.  Interest shall accrue on the Loan at the rate specified in the Note shall be computed on the Principal Balance which exists from time to time and shall be computed with respect to each Advance only from the date of the Advance.

2.3     *Conditions to Closing*.  As conditions precedent to the Advance of the proceeds of the Loan, Borrower must satisfy the conditions required hereby and Bank must have received and approved all of the documents, certificates and other items specified in **Exhibit "B"**, together with such other documents, certificates and items as Bank may require from time to time.  In addition, Borrower shall

LOAN AGREEMENT                                                                                      PAGE 6
L:\50423\251\Loan Agreement.doc

App. 006

provide to Bank evidence which is reasonably satisfactory to Bank that Borrower has contributed the required Borrower's Equity towards the acquisition of the Property. Bank, at Bank's option, may waive any of the preceding or elect not to require any of the preceding. All conditions precedent to the obligation of Bank to advance the proceeds of the Loan are imposed solely for the benefit of Bank.

## ARTICLE THREE

## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Bank as follows:

3.1     *Financial Statements*. The Financial Statements are true, correct and complete as of the dates specified therein and fully and accurately present the financial condition of Borrower as of the dates specified therein. Since the date of the Financial Statements most recently submitted to Bank by Borrower, no material adverse change has occurred in the financial condition of Borrower nor, except as heretofore disclosed in writing to Bank, has Borrower incurred any material liability, direct or indirect, fixed or contingent. Borrower is solvent. Neither Borrower nor any Obligated Party has any material Debt, other contingent liabilities, liabilities for taxes, any long-term lease obligations or unusual forward or long-term commitments, or any transaction or obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph.

3.2     *Suits, Actions, Etc.* There are no actions, suits or proceedings pending or to the best of Borrower's knowledge threatened before or by any Governmental Authority against or affecting Borrower or the Property, or involving the validity, enforceability or priority of any of the Loan Documents except as has been disclosed in writing to Bank. Borrower is not, and the execution and delivery of the Loan Documents and consummation of the transactions contemplated hereby and the performance or satisfaction of any of the terms or conditions hereof and of the other Loan Documents will not cause Borrower to be, in violation of or in default with respect to any Legal Requirement or in default (or provide cause for acceleration of indebtedness) under any agreement or restriction to which Borrower is a party or by which Borrower or the Property may be bound.

3.3     *Status of Borrower; Valid and Binding Obligations*. If Borrower is a corporation, limited liability company, partnership or other entity, Borrower is and shall until the Indebtedness is fully discharged continue to (a) be duly organized and validly existing and in good standing under the laws of the state of its organization, and in good standing under Texas law, (b) be in compliance with all conditions prerequisite to its lawfully doing business in Texas, and (c) possess all power and authority necessary to own and operate the Property. All of the Loan Documents, upon execution and delivery will constitute valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms except as the enforcement thereof may be limited by Debtor Relief Laws.

3.4     *Title to the Property*. Borrower holds good and indefeasible fee simple title to the Land and all Improvements thereon, free and clear of any Liens and subject only to the Permitted Encumbrances.

3.5     *Purpose of Loan*. The proceeds of the Loan will be used solely for the purposes specified in the Approved Purpose.

3.6     *No Failure To Disclose*. No representation or warranty made by Borrower or any other Obligated Party under this Agreement or any other Loan Document and no document, instrument or certificate furnished, to be furnished or caused or to be furnished by Borrower or any other Obligated Party to Bank in anticipation of or pursuant to this Agreement or any other Loan Document contains or

LOAN AGREEMENT                                                                                              PAGE 7
L:\50423\251\Loan Agreement.doc

App. 007

will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

3.7     *Taxes*. All federal, state, foreign, and other Tax returns of Borrower required to be filed have been filed, all federal, state, foreign, and other Taxes imposed upon Borrower which are due and payable have been paid, and no material amounts of Taxes not reflected on such returns are payable by Borrower, other than Taxes being contested in good faith by appropriate legal proceedings.

3.8     *Consents, Approvals and Filings, Etc.*  Except as have been previously obtained or as otherwise expressly provided in this Agreement, no authorization, license, or formal exemption from, any Governmental Authority or other Person, is required in connection with the execution and performance by Borrower or any other Obligated Party of any Loan Document.

3.9     *Contracts, Agreements and Leases*. To the best of Borrower's knowledge, Borrower is not in default (nor has any event occurred which, with the passing of time or the giving of notice, or both, would cause a default) under any material contract or Lease to which it is a party or by which it or any of its properties or assets are bound, where such default would have a Material Adverse Effect.

3.10     *Relationship*. The relationship between Borrower and Bank is solely that of borrower and lender, and Bank has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between Borrower and Bank to be other than that of borrower and lender.

3.11     *No Assignment*. Borrower has made no previous assignment of its right to or interest in the Leases or the rents due thereunder.

3.12     *Compliance with Legal Requirements*. The Improvements comply and will comply with all applicable Legal Requirements, and the use to which Borrower is using and intends to use the Land and Improvements complies with and will comply with such Legal Requirements. Borrower has obtained or applied for all consents or approvals necessary to comply with all Legal Requirements.

3.13     *Disclaimer of Permanent Financing*. Borrower acknowledges and agrees that Bank has not made any commitments, either express or implied, to extend the term of the Loan past its stated maturity date or to provide Borrower with any permanent financing, except to the extent, if any, that the same is expressly stated in this Agreement or in the other Loan Documents.

## ARTICLE FOUR

## AFFIRMATIVE COVENANTS

Borrower covenants and agrees with Bank that, so long as any of the Indebtedness or Obligations remain outstanding, or Bank has any further obligation under any of the Loan Documents:

4.1     *Hazard and Other Insurance*.

(a)     Borrower shall obtain and maintain the insurance coverage required by **Exhibit "D"** and any other Loan Documents and shall furnish to Bank promptly upon request a certificate or certificates from the respective insurer(s) setting forth the nature and extent of all such insurance maintained by Borrower and, a certified copy of the original policy, including all endorsements thereto, and a satisfactory certificate of insurance with premiums fully paid. Any such insurance may be evidenced by blanket insurance policies covering the Property and other property and assets, provided

LOAN AGREEMENT                                                          PAGE 8
L:\50423\251\Loan Agreement.doc

that each policy otherwise complies with the requirements of the Loan Documents and specifies the amount (if less than all) of the total coverage that is allocated to the Property. Borrower shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained hereunder unless Bank is included thereon under a standard mortgagee clause (without contribution) acceptable to Bank, with loss payable as provided herein. All insurance shall be primary without right of contribution from any other insurance that may be carried by Borrower or Bank and all of the provisions thereof shall operate in the manner as if there were a separate policy covering each insured. Borrower shall immediately notify Bank whenever any such separate insurance is taken out and shall promptly deliver to Bank any policy or certificate of such separate insurance.

(b)     Not later than ten (10) days before the expiration date of any such insurance policy, Borrower shall deliver to Bank a binder or certificate of the insurer evidencing the renewal or replacement of that policy, with premiums fully paid together with (in the case of a renewal) a copy of all endorsements to the policy affecting the Property and not previously delivered to Bank, or (in the case of a replacement) an original or certified copy of the replacement policy. Borrower shall pay all premiums on policies required hereunder as they become due and payable and promptly deliver to Bank evidence satisfactory to Bank, in Bank's sole discretion, of the timely payment thereof. Borrower shall at all times comply with the requirements of the insurance policies required hereunder and of the issuers of such policies and of any board of fire underwriters or similar body as applicable to or affecting the Property.

(c)     If Borrower fails to obtain and/or maintain the insurance required under the Loan Documents, (i) Borrower shall indemnify and hold Bank harmless from and against any damage, loss, liability, claim, cost and expense resulting from all risks that would have been covered by the required insurance if so maintained, (ii) if any loss occurs, Bank shall nevertheless be entitled to the benefit of all insurance covering the loss and held by or for Borrower, to the same extent as if it had been made payable to Bank, and (iii) Bank has the Right (but not the obligation) to obtain such insurance at Borrower's expense, which may at Bank's election be coverage for Bank's interest in the Property only (excluding Borrower's equity in the Property, if any), or such other amount as Bank may determine in Bank's sole discretion, and the costs and expenses so expended by Bank shall be due and payable by Borrower on demand, as part of the Indebtedness, even if in excess of the amount set forth in Section 2.1, and secured by the Loan Documents. **TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) BORROWER IS REQUIRED TO (i) KEEP THE PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME BANK AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, BORROWER MUST, IF REQUIRED BY BANK, DELIVER TO BANK A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BANK MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT BORROWER'S EXPENSE.**

(d)     Upon any foreclosure of the Deed of Trust or transfer of title to the Property in lieu of foreclosure, all of Borrower's Right, title and interest in and to the insurance policies referred to in this Section (including unearned premiums) and all proceeds payable thereunder shall thereupon vest in the purchaser at foreclosure or other such transferee to the extent permissible under such policies.

(e)     Bank has the Right (but not the obligation) to make proof of loss for, settle and adjust any claim under, and receive the proceeds of, all insurance for loss of or damage to the Property,

and the costs and expenses (including reasonable attorneys' fees), appraisal costs, and consultant fees incurred by Bank in the adjustment and collection of insurance proceeds shall be due and payable by Borrower on demand, as part of the Indebtedness, even if in excess of the amount set forth in Section 2.1, and secured by the Loan Documents. Bank shall not be, under any circumstances, liable or responsible for failure to collect or exercise diligence in the collection of any of such proceeds or for the obtaining, maintaining or adequacy of any insurance or for failure to see to the proper application of any amount paid over to Borrower. Provided there is no Event of Default hereunder, Borrower will have full authority to exercise the Right granted under this Section, subject to the consent of Bank, not to be unreasonably withheld.

(f)     Borrower shall take all action necessary or desirable or requested by Bank to obtain the benefit of any insurance proceeds lawfully or equitably payable to Borrower or Bank in connection with any loss of or damage to the Property and shall apply such insurance proceeds to the payment of the Indebtedness, unless otherwise consented to in writing by Bank. The unpaid portion of the Indebtedness shall remain in full force and effect and the payment thereof shall not be excused.

4.2     *Compliance with Legal Requirements*. Borrower shall timely comply with all Legal Requirements and shall deliver evidence thereof to Bank, if requested by Bank. Borrower shall assume full responsibility for the compliance of the Property with all Legal Requirements, notwithstanding any approvals by Bank. Bank shall have no obligation or responsibility for any matter incident to the Property.

4.3     *Utilities; Access*. Borrower represents that (a) all utility services necessary for the operation of the Improvements for their intended purposes are available for connection to the Improvements, and (b) either all roads necessary for access to and from the Property have been completed or the necessary rights-of-way therefor have been acquired by the appropriate Governmental Authority or dedicated to the public use and accepted by such Governmental Authority.

4.4     *Correction of Defects*. Borrower shall correct or cause to be corrected (a) any material defect in the Improvements, (b) any material departure of the Improvements from the Legal Requirements or the requirements of any Lease, if applicable, or (c) any encroachment by any part of the Improvements or any structure located on the Land on any building line, easement, property line, or restricted area.

4.5     *Notices by Governmental Authority; Fire and Casualty Losses, Etc.* Borrower shall timely comply with and promptly furnish to Bank true and complete copies of any notice or claim by any Governmental Authority pertaining to the Property. Borrower shall promptly notify Bank of any fire or other casualty or any notice of taking or eminent domain action or proceeding affecting the Property.

4.6     *Costs and Expenses*. Borrower shall pay when due all costs and expenses required to be paid by Borrower under this Agreement and the other Loan Documents.

4.7     *Additional Documents*. Borrower shall execute and deliver to Bank, from time to time as required by Bank, such other agreements, instruments and documents as shall reasonably be necessary or requested by Bank to provide the Rights and remedies to Bank granted or provided for by the Loan Documents.

4.8     *Financial Statements; Inspection of Books and Records; Other Reports*. Borrower shall, unless Bank otherwise consents in writing, furnish to Bank or cause to be furnished to Bank the following:

App. 010

(a)    Within sixty (60) days after the last day of each fiscal year of Borrower, beginning with the end of Borrower's next fiscal year, internally prepared Financial Statements showing the financial position and results of operations of Borrower as of, and for the year ended on, such last day, together with the certificate of the chief financial officer of Borrower that all of such Financial Statements present fairly the financial position of Borrower as of the last day of such fiscal year and the results of the operations and the cash flow of Borrower for the fiscal year then ended in accordance with the cash basis of accounting. Each such Financial Statement shall contain at least a balance sheet of Borrower as at the end of such fiscal year and statements of income, cash flow, retained earnings, and contingent liabilities. In addition, Borrower shall provide to Bank a true, correct and complete copy of Borrower's federal income tax return and a true, correct and complete copy of each amended tax return for each fiscal year of Borrower from and after the date hereof, within fifteen (15) days after same has been filed with the Internal Revenue Service (provided, however, if Borrower shall have duly filed for an extension of the filing deadline for such tax return, Borrower shall promptly furnish evidence thereof to Bank);

(b)    If Guarantor is a natural person, on an annual basis, within thirteen (13) months of the date of the then most recent Financial Statement provided to Bank, Financial Statements showing the financial position of Guarantor as of the most recent calendar year, together with Guarantor's signed statement that all of such Financial Statements present fairly the financial position of Guarantor as of the last day of such calendar year. Each such Financial Statement shall be on Bank's standard Financial Statement form (or an acceptable alternate) and contain at least a balance sheet of Guarantor as at the end of such calendar year and related statements of cash flow and contingent liabilities. In addition, Borrower shall cause Guarantor to provide to Bank a true, correct and complete copy of Guarantor's federal income tax return and a true, correct and complete copy of each amended tax return for each fiscal year of Guarantor from and after the date hereof within fifteen (15) days after same has been filed with the Internal Revenue Service (provided, however, if Guarantor shall have duly filed for an extension of the deadline for such tax return, Guarantor shall promptly furnish evidence thereof to Bank). Each federal income tax return shall include all schedules and addenda thereto and in addition shall include copies of all Forms K-1 and Forms W-2 issued to Guarantor;

(c)    On a semi-annual basis, within forty-five (45) days of the end of each semi-annual period, commencing as of the end of the next semi-annual period, for the Borrower, an operating statement, a summary report of semi-annual collections, the current semi-annual period's budget, year to date activity, year to date budget, a statement of contingent liabilities, in form and substance acceptable to Lender, and all other matters as Lender may reasonably request;

(d)    Within forty-five (45) days after the end of each semi-annual period, or more often upon request of Bank, Borrower shall provide to Bank a written statement (rent roll) certified as true, correct, and complete by Borrower, containing the following information for each tenant of the Property: tenant name; suite or unit number; commencement and expiration date; base rent payable by such tenant; whether the tenant is in default under the subject lease, including the nature of any such default, as applicable; and other pertinent information which Bank may reasonably request; and

(e)    Additional Financial Statements, financial information and other information as Bank may reasonably request from time to time.

4.9    *Financial Information*.    All representations and warranties set forth in the Loan Documents with respect to any Financial Statements or other financial information concerning Borrower, any Obligated Party, the Property, or otherwise, shall apply to all such information delivered to Bank by Borrower, any Obligated Party, or any Person purporting to be an officer, director, employee, attorney, agent or other representative thereof, regardless of the method of transmission to Bank and whether or not signed by Borrower, such Obligated Party, or such Person.

LOAN AGREEMENT                                                                                    PAGE 11
L:\50423\251\Loan Agreement.doc

App. 011

4.10   *Compliance with Leases and Material Contracts*. Subject to the provisions contained in the Deed of Trust, Borrower shall comply with all terms and conditions of the Leases, if any, and all other lease or rental agreements covering any premises or property (real or personal) wherein any of the Property is or may be located, and any Legal Requirement, except where the failure to so comply could not cause a Material Adverse Effect.

4.11   *No Liability of Bank*. Bank shall have no liability, obligation or responsibility with respect to the Improvements or any other Property. Bank shall not be obligated to inspect the Property and any inspection conducted by Bank is solely for the benefit of Bank and does not give rise to any duty of Bank to report or relay the results of any such inspections to Borrower or otherwise create any liability of Bank to Borrower. Bank shall not be liable for any failure to protect or insure the Improvements, or for the performance of any obligation of Borrower or any other Obligated Party. Nothing herein or in any other Loan Document, nor any other action taken by Bank, including, without limitation, any Advance made by Bank or acceptance of any document or instrument by Bank, shall be construed as a representation or warranty, express or implied, to any party by Bank. Further, Bank shall not have, and has not assumed, and by its execution and delivery of this Agreement hereby expressly disclaims any liability or responsibility for the payment or performance of any indebtedness or obligations of Borrower, and no term or condition hereof, or of any of the Loan Documents, shall be construed otherwise. Bank has no liability or obligation in connection with the Property and Loan Documents except to disburse Loan proceeds as herein agreed.

4.12   *Defense of Actions*. Bank may (but shall not be obligated to) commence, appear in or defend any action or proceeding purporting to affect the Loan, the Property or the respective Rights and obligations of Bank or Borrower pursuant to this Agreement. Bank may (but shall not be obligated to) pay all necessary expenses, including reasonable attorney's fees and expenses incurred in connection with any such proceedings or actions, which Borrower agrees to repay to Bank upon demand.

4.13   *Restrictions and Annexation*. Borrower shall not impose any restrictive covenants or encumbrances upon the Property, execute or file any subdivision plat affecting the Property or consent to the annexation of the Property to any city without the prior written consent of Bank.

4.14   *Maintenance of Entity Existence, Assets and Business; Continuance of Present Business*. Borrower shall preserve and maintain its existence and all of its leases, licenses, permits, franchises, qualifications, and rights that are necessary or desirable in the ordinary conduct of its business. Borrower will conduct its business in an orderly and efficient manner in accordance with good business practices. Borrower shall keep or cause to be kept all of Borrower's assets which are useful and necessary in their respective businesses in good repair, working order and condition, and will make or cause to be made all necessary repairs, renewals and replacements as may be reasonably required. Borrower shall carry on and conduct its business in substantially the same fields as such business is now and has heretofore been carried on.

4.15   *Tax Receipts*. To the extent applicable, Borrower shall furnish to Bank receipts or tax statements marked "paid" to evidence the payment of all Taxes levied on the Property before the date on which such taxes become delinquent.

4.16   *Incumbency*. Borrower shall from time to time, at the request of Bank, certify to Bank the names, signatures and positions of all persons authorized to execute and deliver any of the Loan Documents.

LOAN AGREEMENT                                                                                              PAGE 12
L:\50423\251\Loan Agreement.doc

App. 012

4.17    *Depository Relationship*.  To induce Bank to establish the interest rates provided for in the Note, and if and to the extent permitted by applicable laws, Borrower shall use and maintain Bank as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

## ARTICLE FIVE

## NEGATIVE COVENANTS

Borrower covenants and agrees that, so long as any of the Indebtedness or Obligations remain outstanding, or Bank has any commitment to make Advances hereunder or any other obligation under the Loan Documents:

5.1    *Debt*.  Borrower will not, directly or indirectly, incur, create, assume, or permit to exist, any Debt, except:

(a)    Debt to Bank;

(b)    Debt which exists on the Closing Date which has been disclosed to Bank in writing prior to the Closing Date;

(c)    Trade Debt incurred in the ordinary course of business;

(d)    Subordinated Debt; and

(e)    Purchase money Debt and other unsecured Debt not to exceed $100,000.00 in the aggregate in any calendar year.

5.2    *Contingent Liabilities*.  Borrower will not, directly or indirectly, assume, guarantee, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any Person (other than Borrower) except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

5.3    *Limitation on Liens*.  Borrower will not, directly or indirectly, incur, create, assume, or permit to exist any Lien upon the Property or any of its property, assets, or revenues, whether now owned or hereafter acquired, except:

(a)    The Permitted Encumbrances;

(b)    Encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not (individually or in the aggregate) materially affect the value of the assets encumbered thereby or materially impair the ability of Borrower to use such assets in their respective businesses, and none of which is violated in any material respect by existing or proposed structures or land use;

(c)    Liens for taxes, assessments, or other governmental charges which are being contested in good faith and for which adequate reserves have been established;

(d)    Liens resulting from good faith deposits to secure payments of workmen's compensation or other social security programs or to secure the performance of tenders, statutory

LOAN AGREEMENT                                                                                   PAGE 13
L:\50423\251\Loan Agreement.doc

App. 013

obligations, surety and appeal bonds, bids, or contracts (other than for payment of Debt), or Leases made in the ordinary course of business; and

(e)    Purchase money Liens on specific personal property to secure Debt used to acquire such property to the extent permitted in Section 5.1.

5.4    *Mergers, Etc.*  Borrower will not, directly or indirectly, (a) become a party to a merger or consolidation, or (b) purchase or otherwise acquire all or any part of the assets of any Person or any shares, or other evidence of beneficial ownership of any Person, or (c)wind-up, dissolve, or liquidate.

5.5    *Restricted Payments*.  Upon the occurrence of an Event of Default hereunder, Borrower will not, directly or indirectly, declare or pay any dividends or make any other payment or distribution (in cash, property, or obligations) on account of its equity interests, or redeem, purchase, retire, or otherwise acquire any of its equity interests, or set apart any money for a sinking or other analogous fund for any dividend or other distribution on its equity interests or for any redemption, purchase, retirement, or other acquisition of any of its equity interests, or incur any obligation (contingent or otherwise) to do any of the foregoing.  Notwithstanding the foregoing, Borrower may, with respect to any calendar year, distribute to the owners of its equity interests a cash distribution equal to the federal income tax attributable to the income arising during such year as a result of such ownership, provided that no Event of Default exists at the time of, or would result after giving effect to, any such distribution.

5.6    *Loans and Investments*.  Borrower will not, directly or indirectly, make any advance, loan, extension of credit, or capital contribution to or investment in, or purchase, any stock, bonds, notes, debentures, or other securities of, any Person, except:

(a)    readily marketable direct obligations of the United States of America or any agency thereof with maturities of one year or less from the date of acquisition; and

(b)    fully insured depository accounts maintained at a commercial bank operating in the United States of America.

5.7    *Limitation on Issuance of Equity*.  Borrower will not, directly or indirectly, at any time issue, sell, assign, or otherwise dispose of (a) any of its equity interests, (b) any securities exchangeable for or convertible into or carrying any rights to acquire any of its equity interests, or (c) any option, warrant, or other right to acquire any of its equity interests.

5.8    *Transactions With Affiliates*.  Borrower will not, directly or indirectly, enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate of Borrower, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business, or pursuant to a transaction which is otherwise expressly permitted under this Agreement and upon fair and reasonable terms no less favorable to Borrower than would be obtained in a comparable arm's-length transaction with a Person not an Affiliate of Borrower.

5.9    *Nature of Business*.  Borrower will not engage in any business other than the businesses in which it is engaged as of the Closing Date.

5.10    *No Negative Pledge*.  Borrower will not enter into or permit to exist any arrangement or agreement, other than pursuant to this Agreement or any Loan Document, which directly or indirectly prohibits or limits Borrower from creating or incurring a Lien on any of its assets, whether now owned or hereafter acquired.

LOAN AGREEMENT                                                                                              PAGE 14
L:\50423\251\Loan Agreement.doc

App. 014

5.11    *Judgments*.  Borrower will not allow any judgment for the payment of money in excess of $25,000.00 rendered against it to remain undischarged or unsuperseded for a period of thirty (30) days during which execution shall not be effectively stayed.

## ARTICLE SIX

## EVENT OF DEFAULT

The term "Event of Default," as used herein, shall include the occurrence of any one or more of the following events:

6.1    *Payment of Indebtedness*.  The failure of Borrower to pay the Indebtedness, or any part thereof, or any sum of money in accordance with the Loan Documents, within five (5) business days after notice is given to Borrower, on the date on which the payment is due.

6.2    *Covenants*.  The failure of Borrower or any Obligated Party punctually and properly to perform, observe or comply with (a) any covenant contained in Article Five or (b) any of the Obligations or any other covenant, agreement, undertaking or condition contained in this Agreement or any other Loan Document (other than covenants to pay any sum of money in accordance with the Loan Documents), which failure is not otherwise specifically addressed in this Section, and such failure continues for a period of thirty (30) days after the date Bank sends notice to Borrower of such failure; provided, however, that if the default is not reasonably able to be cured within thirty (30) days, Borrower shall have a reasonable period to make such cure not to exceed one hundred twenty (120) months, provided that Borrower is diligently pursuing such cure and the cure is completed as soon as reasonably possible.

6.3    *Voluntary Debtor Relief*.  Borrower or any Obligated Party shall (a) execute an assignment for the benefit of creditors or take any action in furtherance thereof, or be or become adjudicated as bankrupt or insolvent, or (b) generally not, or be unable to, or admit in writing its inability to pay, or fail to pay, its debts generally as they become due, or (c) file a voluntary petition, or commence any other case, proceeding or other action pursuant to, or voluntarily seek the benefit or benefits of or relief under, any Debtor Relief Law or take any action in furtherance thereof, or (d) apply for or seek, acquiesce in, consent to or suffer the appointment of a receiver, trustee, custodian, liquidator or other similar official of it or of the Property or any part thereof or of any significant portion of its other property, or (e) institute or voluntarily be or become a party to any other proceeding seeking to effect a suspension or having the effect of suspending any of the Rights of Bank granted or referred to in the Loan Documents or of the trustee under the Deed of Trust or take any action in furtherance thereof or (f) file an answer admitting the material allegations of or consenting to, or default in, a petition filed against it in any liquidation, conservatorship, bankruptcy, reorganization, rearrangement, or other insolvency proceedings.

6.4    *Involuntary Proceedings*.  The filing of a petition, case, proceeding or other action against Borrower or any Obligated Party as a debtor under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or liquidator of it or of the Property or any part thereof or of any significant portion of its other property or seeking to effect a suspension or having the effect of suspending any of the Rights of Bank granted or referred to in the Loan Documents or of the trustee under the Deed of Trust and (a) Borrower or any Obligated Party admits, acquiesces in or fails to contest diligently the material allegations thereof, or (b) the petition, case, proceeding or other action results in entry of an order for relief or order granting the relief sought against it, or (c) the petition, case,

LOAN AGREEMENT                                                                                          PAGE 15
L:\50423\251\Loan Agreement.doc

App. 015

proceeding or other action is not permanently dismissed or discharged on or before the earlier of trial thereon or sixty (60) days next following the date of its filing.

6.5    *Other Debt*.  Borrower shall default in the due and punctual payment of the principal of or the interest on any Debt or other mortgage, deed of trust, security agreement or other security instrument (other than the Indebtedness) with Bank, secured or unsecured, or in the due performance or observance of any covenant or condition of any indenture or other agreement executed in connection therewith, and such default shall have continued beyond any period of grace or cure provided with respect thereto.

6.6    *Levy*.  The levy against the Property or any part thereof, or against any significant portion of Borrower's or any Obligated Party's other property, of any execution, garnishment, attachment, sequestration or other writ or similar proceeding which is not permanently dismissed or discharged within sixty (60) days after the levy.

6.7    *Misrepresentation*.  Any statement, representation or warranty heretofore or hereafter made by Borrower or any Obligated Party in this Agreement or any other Loan Document or in any other document or any statement or representation made in any certificate, report, or opinion delivered to Bank pursuant to or in connection with the Loan Documents, is false, misleading, or erroneous in any material respect at the time made.

6.8    *Abandonment*.  Abandonment of any portion of the Land or Improvements.

6.9    *Judgment*.  Borrower or any Obligated Party shall allow any judgment for the payment of money in excess of $25,000.00 rendered against it, him or her, as applicable, to remain undischarged or unsuperseded for a period of thirty (30) days during which execution shall not be effectively stayed.

6.10    *Dissolution or Death*.  The dissolution, liquidation, termination or forfeiture of the Right to do business of Borrower or any Obligated Party for any reason whatsoever or the death or incapacity of an individual Borrower or Obligated Party.

6.11    *Non-Compliance with Legal Requirements*.  A determination by Bank of any failure of any part of the Improvements to comply with any Legal Requirement, or the requirements of any Lease, if applicable, in any material respect.

6.12    *Fraudulent Transfer*.  Borrower shall have (i) concealed, removed, or permitted to be concealed or removed any part of its property with the intent to hinder, delay or defraud any of its creditors, or (ii) made or suffered a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, or (iii) suffered or permitted while insolvent (under any applicable definition of the term) any creditor to obtain a Lien upon any of its property through legal proceedings or distraint which Lien is not permanently vacated within thirty (30) days from the date thereof.

6.13    *Destruction or Condemnation of Improvements*.  If any portion of the Improvements is demolished, destroyed, or substantially damaged, or any portion of the Land or Improvements is taken or threatened to be taken by eminent domain, so that in any event, in Bank's sole judgment, the same cannot be restored or rebuilt with available funds to the condition existing immediately prior to such demolition, destruction, or damage within a reasonable period of time.

6.14    *Defaults on Other Debt or Agreements*.  Borrower shall fail to make any payment when due on or in respect of any Debt owing to any Person (other than Bank) or to perform, observe or comply

LOAN AGREEMENT                                                                                          PAGE 16
L:\50423\251\Loan Agreement.doc

App. 016

with any covenant, agreement or other obligation to be performed, observed or complied with by Borrower in any agreement between Borrower and any other Person (subject to any grace and/or cure periods provided therein), which failure could reasonably be expected to have a material adverse effect on the business, operations, condition (financial or otherwise), or assets of Borrower, the ability of Borrower to pay and perform any of the Indebtedness or Obligations under any Loan Document to which it is a party or by which it is bound or the enforceability of any Loan Document.

6.15    *Other Agreements with Bank.*  A default or event of default shall occur and be continuing after the expiration of any applicable grace, notice, and cure periods under any other written agreement (which is not a Loan Document) between Bank and Borrower or any other Obligated Party.

6.16    *Tax Lien Loan.*  (a) Borrower shall obtain a loan to pay all or any portion of the ad valorem taxes accrued and/or accruing against the Property or any portion thereof (a "Tax Lien Loan"), (b) Borrower shall execute a deed of trust or other lien instrument encumbering the Property or any portion thereof to secure a Tax Lien Loan, or (c) any taxing authority shall assign its lien securing the payment of ad valorem taxes accrued and/or accruing against the Property or any portion thereof to a third party to secure or collateralize a Tax Lien Loan.

6.17    *Change in Ownership.*  Any of the record or beneficial ownership of Borrower shall have been transferred, assigned or hypothecated to any Person, when compared to such ownership as of the Closing Date.

6.18    *Section 2.4.*  Borrower commits the Event of Default set forth in Section 2.4 in this Agreement.

6.19    *Application to Guarantors.*  The occurrence of any event referred to in Sections 6.5, 6.9, 6.12, 6.14 or 6.17 above with respect to any Guarantor (as if such Guarantor were "Borrower" in such Sections).

## ARTICLE SEVEN

## CERTAIN RIGHTS AND REMEDIES OF BANK

7.1    *Rights Upon Event of Default.*  If any Event of Default shall occur and be continuing or upon the final maturity of the Note, Bank may, without notice, terminate its commitment to Advance and declare the Indebtedness or any party thereof to be immediately due and payable, and the same shall thereupon become immediately due and payable, without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by Borrower; provided, however, that upon the occurrence of an Event of Default under Sections 6.3 or 6.4, Bank's commitment to Advance shall automatically terminate, and the Indebtedness shall become immediately due and payable without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by Borrower. If any Event of Default shall occur and be continuing, Bank may exercise all Rights and remedies available to it in law or in equity, under the Loan Documents, or otherwise.

7.2    *Performance by Bank.*  Should any covenant, duty, or agreement of Borrower fail to be performed in accordance with the terms of the Loan Documents, Bank may, at its option, perform, or attempt to perform, such covenant, duty or agreement on behalf of Borrower. In such event, Borrower shall pay to Bank on demand any amount expended by Bank in such performance or attempted performance, together with interest thereon at the Maximum Lawful Rate from the date of such

expenditure by Bank until paid. Notwithstanding the foregoing, it is expressly understood that Bank does not assume and shall never have any liability or responsibility for the performance of any duties of Borrower hereunder. Without limiting the generality of the foregoing, upon the occurrence of an Event of Default, Bank shall have the Right, in addition to any other Right of Bank, but not the obligation, in its own name or in the name of Borrower, to enter into possession of the Property; to perform all work necessary to satisfy the requirements of any Lease, if applicable; and to employ watchmen and other safeguards to protect the Property. Borrower hereby appoints Bank as the attorney-in-fact of Borrower with full power of substitution, and in the name of Borrower if Bank elects to do so, upon the occurrence of an Event of Default, to (a) use such sums as are necessary, including any proceeds of the Loan to perform all work necessary to satisfy the Legal Requirements and the requirements of any Lease, if applicable, (b) endorse the name of Borrower on any checks or drafts representing proceeds of the insurance policies required hereunder, or other checks or instruments payable to Borrower with respect to the Property, (c) do every act with respect to the Property which Borrower may do, and (d) prosecute or defend any action or proceeding incident to the Property. The power-of-attorney granted hereby is a power coupled with an interest, is irrevocable and shall not terminate upon disability of the principal. Bank shall have no obligation to undertake any of the foregoing actions, and if Bank should do so, it shall have no liability to Borrower for the sufficiency or adequacy of any such actions taken by Bank.

7.3    *Bank Not in Control*. None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Bank the Right or power to exercise control over the affairs and/or management of Borrower, the power of Bank being limited to the Rights to exercise the remedies referred to in the other Sections of this Article; provided that if Bank becomes the owner of any stock of any entity, whether through foreclosure or otherwise, Bank shall be entitled to exercise such legal Rights as it may have by being a shareholder of such entity.

7.4    *Waivers*. The acceptance by Bank at any time and from time to time of part payment on the Indebtedness shall not be deemed to be a waiver of any Event of Default then existing. No waiver by Bank of any Event of Default shall be deemed to be a waiver of any other then existing or subsequent Event of Default. No waiver by Bank of any of its Rights hereunder, in the other Loan Documents or otherwise shall be considered a waiver of any other or subsequent Right of Bank. No delay or omission by Bank in exercising any Right under the Loan Documents or otherwise shall impair such Right or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such Right exhaust the same or preclude other or further exercise thereof or the exercise of any other Right under the Loan Documents or otherwise.

7.5    *Cumulative Rights*. All Rights available to Bank under the Loan Documents shall be cumulative of and in addition to all other Rights of Bank at law, in equity or otherwise whether or not the Indebtedness is due and payable and whether or not Bank shall have instituted any suit for collection, foreclosure or other action in connection with the Loan Documents.

7.6    *Setoff*. At any time an Event of Default exists, Bank shall be entitled to exercise the Rights of setoff and/or banker's lien against the interest of Borrower in and to each and every account, and other property of Borrower which are in the possession of Bank to the extent of the full amount of the Indebtedness, whether or not any such Indebtedness is then due. The rights and remedies of Bank hereunder are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Bank may have.

7.7    *Receiver*. At any time an Event of Default exists, Bank, as a matter of right and without regard to the sufficiency of the security for repayment of the Indebtedness and performance and discharge of the Obligations, without notice to any Borrower or Obligated Party, and without any showing of insolvency, fraud, or mismanagement on the part of any Borrower or Obligated Party, and further without

LOAN AGREEMENT                                                                                                    PAGE 18
L:\50423\251\Loan Agreement.doc

the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, shall be entitled to the appointment of a receiver or receivers of or for Borrower or the Property or any part thereof, including the rents therefrom, and each Borrower and Obligated Party hereby irrevocably consents to the appointment of a receiver or receivers and agrees not to oppose, directly or indirectly, Bank's efforts to obtain same.  Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters.

**7.8    _BORROWER'S INDEMNITY._  BORROWER SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS BANK, EACH AFFILIATE OF BANK, AND EACH OF ITS AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, ATTORNEYS, SUCCESSORS, AND ASSIGNS AND THE TRUSTEE UNDER THE DEED OF TRUST (COLLECTIVELY, THE "INDEMNIFIED PARTIES") FROM AND AGAINST ANY AND ALL LOSSES, LIABILITIES, DAMAGES, CLAIMS, PENALTIES, JUDGMENTS, DISBURSEMENTS, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), ACTIONS, PROCEEDINGS, OR DISPUTES INCURRED OR SUFFERED OR TO WHICH ANY OF THEM MAY BECOME SUBJECT WHICH DIRECTLY OR INDIRECTLY ARISE FROM OR RELATE TO:**

**(i)    THE NEGOTIATION, EXECUTION, DELIVERY, PERFORMANCE, ADMINISTRATION, OR ENFORCEMENT OF ANY OF THE LOAN DOCUMENTS;**

**(ii)    ANY OF THE TRANSACTIONS CONTEMPLATED BY THE LOAN DOCUMENTS;**

**(iii)    ANY BREACH BY BORROWER OR ANY OTHER OBLIGATED PARTY OF ANY REPRESENTATION, WARRANTY, COVENANT, OR OTHER AGREEMENT CONTAINED IN ANY OF THE LOAN DOCUMENTS;**

**(iv)    THE PRESENCE, RELEASE, THREATENED RELEASE, DISPOSAL, REMOVAL, OR CLEANUP OF ANY HAZARDOUS MATERIAL LOCATED ON, ABOUT, WITHIN OR AFFECTING ANY OF THE PROPERTIES OR ASSETS OF THE BORROWER OR ANY OTHER OBLIGATED PARTY;**

**(v)    ANY LITIGATION CONCERNING THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE PROPERTY, OR ANY INTEREST OF BORROWER OR BANK THEREIN, OR THE RIGHT OF OCCUPANCY THEREOF BY BORROWER OR BANK, WHETHER OR NOT ANY SUCH LITIGATION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;**

**(vi)    ANY DISPUTE, INCLUDING DISPUTES AS TO THE DISBURSEMENT OF PROCEEDS OF THE NOTE NOT YET DISBURSED, AMONG OR BETWEEN BORROWER OR OTHER PARTNERS OR VENTURERS OF BORROWER IF BORROWER IS A GENERAL OR LIMITED PARTNERSHIP, OR AMONG OR BETWEEN ANY EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS OR MANAGERS OF BORROWER IF BORROWER IS A CORPORATION OR LIMITED LIABILITY COMPANY OR PARTNERSHIP, OR AMONG OR BETWEEN ANY MEMBERS, TRUSTEES OR OTHER RESPONSIBLE PARTIES IF BORROWER IS AN ASSOCIATION, TRUST OR OTHER ENTITY;**

App. 019

(vii)    ANY ACTION TAKEN OR NOT TAKEN BY BANK OR TRUSTEE WHICH IS ALLOWED OR PERMITTED UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS RELATING TO BORROWER, THE PROPERTY, OR OTHERWISE IN CONNECTION WITH THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, THE PROTECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST OR OTHER RIGHT, REMEDY OR RECOURSE CREATED OR AFFORDED BY THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS; AND

(viii)    ANY ACTION BROUGHT BY BANK AGAINST BORROWER UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, WHETHER OR NOT SUCH ACTION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT; PROVIDED, HOWEVER, IF BANK DOES NOT PREVAIL IN SUCH MATTER, BORROWER SHALL NOT BE LIABLE FOR BANK'S COSTS OR ATTORNEY'S FEES IN SUCH MATTER.

WITHOUT LIMITING ANY PROVISION OF THIS AGREEMENT OR OF ANY OTHER LOAN DOCUMENT, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH PERSON TO BE INDEMNIFIED UNDER THIS SECTION SHALL BE INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS' FEES) ARISING OUT OF OR RESULTING FROM THE SOLE CONTRIBUTORY OR ORDINARY NEGLIGENCE OF SUCH PERSON; PROVIDED, HOWEVER, THE INDEMNITIES PROVIDED IN THIS SECTION 7.7 DO NOT EXTEND TO LOSSES, LIABILITIES, CLAIMS, OR DAMAGES CAUSED BY BANK'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

BANK MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTECT OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND TO ADVISE AND DEFEND BANK WITH RESPECT TO ANY SUCH ACTIONS AND OTHER MATTERS. BORROWER SHALL REIMBURSE BANK FOR THEIR RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED. ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY BANK. ANY PAYMENTS NOT MADE WITHIN FIVE (5) DAYS AFTER WRITTEN DEMAND THEREFOR SHALL BEAR INTEREST AT THE EVENT OF DEFAULT RATE FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID. THE PROVISIONS OF THIS <u>SECTION 7.7</u> SHALL SURVIVE REPAYMENT OF THE INDEBTEDNESS AND PERFORMANCE OF THE OBLIGATIONS, THE RELEASE OF THE LIEN OF THE DEED OF TRUST, ANY FORECLOSURE (OR ACTION IN LIEU OF FORECLOSURE), THE TRANSFER BY BORROWER OF ANY OR ALL OF ITS RIGHT, TITLE AND INTEREST IN OR TO THE PROPERTY AND THE EXERCISE BY BANK OF ANY AND ALL REMEDIES SET FORTH HEREIN OR IN ANY OTHER LOAN DOCUMENT FOR A PERIOD OF EIGHTEEN (18) MONTHS AFTER SUCH EVENT.

7.9    *Limitation of Liability.*    Neither Bank nor any Affiliate, officer, director, employee, attorney, or agent of Bank shall have any liability with respect to, and Borrower hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by the Borrower in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this

LOAN AGREEMENT                                                                                                    PAGE 20
L:\50423\251\Loan Agreement.doc

App. 020

Agreement or any of the other Loan Documents. Borrower hereby waives, releases, and agrees not to sue Bank or any of Bank's Affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.

**ARTICLE EIGHT**

**MISCELLANEOUS**

8.1    *Notices*.    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including by facsimile transmission) and mailed, faxed, or delivered, to the address or facsimile number specified for notices on the signature page below or to such other address as shall be designated by such party in a notice to the other parties. All such other notices and other communications shall be deemed to have been given or made upon the earliest to occur of (a) actual receipt by the intended recipient, or (b) (i) if delivered by hand or courier, when signed for by the designated recipient, (ii) if delivered by mail, upon deposit in the mail, postage prepaid, and (iii) if delivered by facsimile when sent and receipt has been confirmed by telephone. Electronic mail and internet websites may be used only to distribute routine communications, such as Financial Statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

8.2    *Form and Number of Documents*.    Each agreement, document, instrument, or other writing to be furnished to Bank under any provision of this Agreement must be in form and substance and in such number of counterparts as may be satisfactory to Bank and its counsel.

8.3    *Survival*.    All covenants, agreements, undertakings, representations, and warranties made in any of the Loan Documents shall survive all closings under the Loan Documents and shall continue in full force and effect so long as any part of the Indebtedness remains and, except as otherwise indicated, shall not be affected by any investigation made by any party. Notwithstanding anything contained herein to the contrary, the covenants, agreements, undertakings, representations, and warranties made in Section 4.10 and Section 7.7 shall survive the expiration or termination of this Agreement, regardless of the means of such expiration or termination.

8.4    ***GOVERNING LAW; PLACE OF PERFORMANCE***.    **THE LOAN DOCUMENTS ARE BEING EXECUTED AND DELIVERED, AND ARE INTENDED TO BE PERFORMED, IN THE STATE OF TEXAS, AND THE LAWS OF SUCH STATE AND OF THE UNITED STATES SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THE LOAN DOCUMENTS, EXCEPT TO THE EXTENT OTHERWISE SPECIFIED IN ANY OF THE LOAN DOCUMENTS. THIS AGREEMENT, ALL OF THE OTHER LOAN DOCUMENTS, AND ALL OF THE OBLIGATIONS OF BORROWER UNDER ANY OF THE LOAN DOCUMENTS ARE PERFORMABLE IN DALLAS COUNTY, TEXAS. VENUE OF ANY LITIGATION INVOLVING THIS AGREEMENT OR ANY LOAN DOCUMENT SHALL BE MAINTAINED IN AN APPROPRIATE STATE OR FEDERAL COURT LOCATED IN DALLAS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES. BORROWER AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT ITS ADDRESS SPECIFIED HEREIN. NOTHING HEREIN SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF**

**BORROWER'S PROPERTY IN COURTS IN OTHER JURISDICTIONS. THE SCOPE OF EACH OF THE FOREGOING WAIVERS IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. BORROWER ACKNOWLEDGES THAT THESE WAIVERS ARE A MATERIAL INDUCEMENT TO BANK'S AGREEMENT TO ENTER INTO AGREEMENTS AND OBLIGATIONS EVIDENCED BY THE LOAN DOCUMENTS, THAT BANK HAS ALREADY RELIED ON THESE WAIVERS AND WILL CONTINUE TO RELY ON EACH OF THESE WAIVERS IN RELATED FUTURE DEALINGS. THE WAIVERS IN THIS SECTION ARE IRREVOCABLE, MEANING THAT THEY MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THESE WAIVERS APPLY TO ANY FUTURE RENEWALS, EXTENSIONS, AMENDMENTS, MODIFICATIONS, OR REPLACEMENTS IN RESPECT OF THE APPLICABLE LOAN DOCUMENT. IN CONNECTION WITH ANY LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

       8.5     *Maximum Interest*. It is expressly stipulated and agreed to be the intent of Borrower and Bank at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by the Note or any Loan Document, and the Related Indebtedness (or applicable United States federal law to the extent that it permits Bank to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (a) contracted for, charged, taken, reserved or received pursuant to the Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Bank related to the transaction or transactions that are the subject matter of the Loan Documents, (b) contracted for, charged, taken, reserved or received by reason of Bank's exercise of the option to accelerate the maturity of the Note and/or any and all indebtedness paid or payable by Borrower to Bank pursuant to any Loan Document other than the Note (such other indebtedness being referred to in this Section as the "Related Indebtedness"), or (c) Borrower will have paid or Bank will have received by reason of any prepayment by Borrower of the Note and/or the Related Indebtedness, then it is Borrower's and Bank's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Bank shall be credited on the principal balance of the Note and/or the Related Indebtedness (or, if the Note and the Related Indebtedness have been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if the Note has been paid in full before the end of the stated term of the Note, then Borrower and Bank agree that Bank shall, with reasonable promptness after Bank discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against the Note and/or any Related Indebtedness then owing by Borrower to Bank. Borrower hereby agrees that as a condition precedent to any claim or counterclaim (in which event such proceeding shall be abated for such time period) seeking usury penalties against Bank, Borrower will provide written notice to Bank, advising Bank in reasonable detail of the nature and amount of the violation, and Bank shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note to which the alleged violation relates and/or the Related Indebtedness then owing by Borrower to Bank. All sums contracted for, charged, taken, reserved or received by Bank for the use, forbearance or detention of any debt evidenced by the Note and/or the Related Indebtedness shall, to the extent permitted by applicable law, be

LOAN AGREEMENT                                           PAGE 22
L:\50423\251\Loan Agreement.doc

amortized or spread, using the actuarial method, throughout the stated term of the Note and/or the Related Indebtedness (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or the Related Indebtedness does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Note and/or the Related Indebtedness for so long as debt is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code which regulates certain revolving credit loan accounts and revolving triparty accounts apply to the Note and/or any of the Related Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Bank to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

8.6     *Ceiling Election*.  To the extent that Bank is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on the Note and/or any other portion of the Indebtedness, Bank will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended.  To the extent federal law permits Bank to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Bank will rely on federal law instead of such Chapter 303 for the purpose of determining the Maximum Lawful Rate.  Additionally, to the extent permitted by applicable law now or hereafter in effective, Bank may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

8.7     *Invalid Provisions*.  If any provision of any of the Loan Documents is held to be illegal, invalid, or unenforceable under present or future laws effective during the term thereof, such provision shall be fully severable, the appropriate Loan Document shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof; and the remaining provisions thereof shall remain in full force and effect and shall not be effected by the illegal, invalid, or unenforceable provision or by its severance therefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

8.8     *Entirety and Amendments*.  This instrument embodies the entire agreement between the parties relating to the subject matter hereof (except documents, agreements and instruments delivered or to be delivered in accordance with the express terms hereof), supersedes all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed jointly by Borrower and Bank and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

8.9     *Multiple Counterparts*.  This Agreement has been executed in a number of identical counterparts, each of which constitutes an original and all of which constitute, collectively, one agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

8.10     *Parties Bound*.  This Agreement shall be binding upon and inure to the benefit of Borrower, Bank and their respective successors and assigns; provided that Borrower may not, without the prior written consent of Bank, assign any of its Rights, duties, or obligations hereunder.  No term or provision of this Agreement shall inure to the benefit of any Person other than Borrower and Bank and their respective successors and assigns; consequently, no Person other than Borrower and Bank and their respective successors and assigns, shall be entitled to rely upon, or to raise as a defense, in any manner

LOAN AGREEMENT                                                              PAGE 23
L:\50423\251\Loan Agreement.doc

App. 023

whatsoever, the failure of Borrower or Bank to perform, observe, or comply with any such term or provision.

8.11    *Bank's Consent or Approval*.  Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of judgment of Bank is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole discretion of Bank, and (b) deemed to have been given only by a specific writing intended for that purpose and executed by Bank.  Each provision for consent, approval, inspection, review, or verification by Bank is for Bank's own purposes and benefit only.

8.12    *Sale of Participations*.  Bank may, from time to time and without notice to Borrower, sell or offer to sell the Indebtedness, or interests therein, to one or more assignees or participants and Bank is hereby authorized to disseminate and disclose any information (whether or not confidential or proprietary in nature) Bank now has or may hereafter obtain pertaining to Borrower, the Indebtedness or the Loan Documents (including, without limitation, any credit or other information regarding Borrower, any of its principals, or any other person or entity liable, directly or indirectly, for any part of the Loan, to (a) any assignee or participant or any prospective assignee or prospective participant, (b) any regulatory body having jurisdiction over Bank or the Indebtedness, and (c) any other persons or entities as may be necessary or appropriate in Bank's reasonable judgment).  Bank, as a courtesy to Borrower, will endeavor to notify Borrower of any such assignees or participants, or prospective assignees or participants, to which Bank disseminates any of the information described above.

8.13    *Loan Agreement Governs*.  In the event of any conflict between the terms of this Agreement and any terms of any other Loan Document, the terms of this Agreement shall govern.  All of the Loan Documents are by this reference incorporated into this Agreement.

8.14    ***WAIVER OF JURY TRIAL***.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF BANK IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF.

8.15    ***WAIVER OF FRAUDULENT INDUCEMENT***. NEITHER BANK NOR ANY AFFILIATE OF BANK HAS MADE ANY REPRESENTATION, WARRANTY OR STATEMENT TO BORROWER IN ORDER TO INDUCE BORROWER TO EXECUTE THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.  BORROWER HEREBY EXPRESSLY WAIVES ANY CLAIM OF FRAUDULENT INDUCEMENT TO EXECUTE THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS AND FURTHER DISCLAIMS ANY RELIANCE OR STATEMENTS ON OR REPRESENTATIONS OF BANK IN WAIVING SUCH CLAIM.

8.16    ***WAIVER OF CONSEQUENTIAL, PUNITIVE AND SPECULATIVE DAMAGES***. BORROWER AND BANK AGREE THAT, IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, EACH MUTUALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY CLAIM FOR CONSEQUENTIAL, PUNITIVE OR SPECULATIVE DAMAGES.

8.17 ***STATUTE OF FRAUDS NOTICE.*** **THIS WRITTEN LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

8.18 *ATTORNEY FEE AGREEMENT AND REPRESENTATION DISCLAIMER ACKNOWLEDGMENT.* Legal instruments involved in the above-referenced Loan have been prepared for the BANK by the law firm of Shackelford, Bowen, McKinley & Norton, LLP (the "Firm"). As part of the obligation of the Borrower to pay the reasonable expenses of the Bank in connection with the Loan, the undersigned hereby agree to pay, at closing, the legal fees and related expenses charged to Bank by the Firm in connection with the preparation of the aforementioned legal instruments. The undersigned acknowledge that the Firm has acted only as counsel to Bank, and has not, in any manner, undertaken to represent or render legal counsel to the undersigned with respect to the Loan or the Property, or with respect to any of the documents or instruments being executed in connection therewith. The undersigned have been and are hereby advised to obtain legal counsel of their own choice to represent them in this transaction.

[Signature Page Follows]

EFFECTIVE as of the Effective Date.

**BANK:**

TEXAS BRAND BANK

By: _____
Name: _____
Title: _____

Address for Notices:
1919 S. Shiloh Road, Suite 100, LB30
Garland, Texas 75042
Att'n: William E. Lowe


**BORROWER:**

GOLDMARK HOSPITALITY, LLC,
a Texas limited liability company

By: Enoch Investments, LLC,
    a Delaware limited liability company,
    its Sole Member and Managing Member

By: _____
    Timothy Barton, its Managing Member

Address for Notices:
13901 Midway Road, Suite 102-243
Farmers Branch, Texas 75244
Att'n: Timothy Barton


## LIST OF EXHIBITS AND SCHEDULES

EXHIBIT A   -   Land
EXHIBIT B   -   Conditions Precedent
EXHIBIT C   -   Title Policy Requirements
EXHIBIT D   -   Insurance Requirements

EXHIBIT "A"
TO
**LOAN AGREEMENT**

**Description of Land**

BEING all of Lot 3, Block A/7761 of CARLETON HOUSE, an addition to the City of Dallas, Dallas County, Texas, recorded in Volume 80137, Page 261, of the Map Records of Dallas County, Texas, and being all of that same tract of land described in Foreclosure Deed to Goldmark Hospitality, LLC, recorded in Instrument Number 201100196546 of the Deed Records of Dallas County, Texas, and said lot being more particularly described as follows:

BEGINNING at a 5/8" iron rod found at the northernmost corner of a corner cut-off line at the intersection of the southeast R.O.W. line of Goldmark Drive (a 60' R.O.W.) with the southwest R.O.W. line of Midpark Road (a 60' R.O.W.); said point being the beginning of a curve to the right having a central angle of 1 3°1 8'00" and a radius of 320.00' bearing S 32°19'00" W;

THENCE around said curve and along the southwest line of Midpark Road, a distance of 74.11' to a 1/2" iron rod found for corner;

THENCE S 44°23'00" E, 179.69' along the southwest line of Midpark Road to a PK nail found at the north corner of Lot 1, Block A/7761 of La Quinta-Midpark Addition, an addition to the City of Dallas, Texas, recorded in Volume 76201, Page 1 of the Map Records of Dallas County, Texas;

THENCE S 45°37'00" W, 590.05' along the northwest line of said Lot 1 to a cross found for corner in a northeast line of Lot 4, Block A/7761 of Section Five, Keystone Park Addition, an addition to the City of Dallas, Texas, recorded in Volume 92208, Page 2836 of the Map Records of Dallas County, Texas;

THENCE N 44°23'00" W, 263.00' along a northeast line of said Lot 4 to a 5/8" iron rod found for corner in the southeast line of Goldmark Drive;

THENCE N 45°37'00" E, 569.02' along the southeast line of Goldmark Drive to a 5/8" iron rod found at the south corner of a corner cut-off line;

THENCE N 83°31'43" E, 15.77' along said cut-off line to the POINT OF BEGINNING and CONTAINING 154,828.37 square feet or 3.5544 acres of land, more or less.

**EXHIBIT "B"**
**TO**
**LOAN AGREEMENT**

This Agreement.

The Note.

The Deed of Trust.

A Guaranty from Timothy Barton.

The Security Agreement.

The other Loan Documents, as applicable.

The Title Policy.

If Borrower is an entity:

(a)    A copy of the organizational documents for the entity.

(b)    A certificate of incumbency, in a form acceptable to Bank, of all agents of the entity who will be authorized to execute any of the Loan Documents on behalf of Borrower and Guarantor, dated the Closing Date, and in a form acceptable to Bank.

(c)    A copy of resolutions of the Borrower and each other Obligated Party that is a corporation, limited liability company, partnership or other entity, approving and authorizing the Loan Documents and the transactions contemplated by this Agreement, duly adopted by the governing body of each such entity, accompanied by a certificate of an authorized representative of each such entity, dated the Closing Date, that such copy is a true and correct copy of resolutions duly adopted at a meeting of the governing body of each such entity and that such resolutions have not been amended or revoked in any respect and are in full force and effect as of the Closing Date.

Such other satisfactory evidence as Bank shall require that all necessary action on the part of Borrower and each other Obligated Party has been taken with respect to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby so that this Agreement and all other Loan Documents to be executed and delivered by or on behalf of Borrower or any other Obligated Party will be valid and binding upon Borrower and each such Obligated Party.

The Survey bearing a date not earlier than 180 days prior to the Closing Date.

Financing Statements with respect to the security interests granted in the Loan Documents, together with evidence of the priority of the respective security interests perfected thereby. Borrower hereby irrevocably authorizes Bank at any time and from time to time to prepare and file one or more financing statements regarding the Land and the Improvements.

The Origination Fee in the amount of $25,842.49, in cash.

EXHIBIT "B" TO LOAN AGREEMENT                                                PAGE EXHB-1
L:\50423\251\Loan Agreement.doc

App. 028

An appraisal of the Property by a qualified MAI appraiser approved by Bank, in form, scope and substance satisfactory to Bank, showing a "completed value" of not less than $3,691,785.00.

Insurance Policies, certificates and binders required pursuant to Section 4.1 and **Exhibit D** to this Agreement.

Financial Statements.

EXHIBIT "B" TO LOAN AGREEMENT                                                PAGE EXHB-2
L:\50423\251\Loan Agreement.doc

App. 029

**EXHIBIT "C"**
**TO**
**LOAN AGREEMENT**

The Title Company:    Stewart Title Guaranty Company

**Title Policy Requirements**

Borrower shall deliver to Bank, at Borrower's expense, for Texas property, a Texas loan policy of title insurance (Form T-2), acceptable to Bank and Bank's counsel. The Title Policy shall (a) show "Texas Brand Bank" as the insured mortgagee, (b) insure the Lien of the Deed of Trust as a first lien against the Land and Improvements in the full amount of the Loan, (c) delete the exception for matters which a current survey would show, and all "standard" exceptions which can be deleted, to the fullest extent authorized under applicable title insurance rules and Borrower shall satisfy all requirements therefor, (d) contain (i) no exception for standby fees or real estate taxes other than standby fees and real estate taxes for the year in which the Closing Date occurs to the extent the same are not then due and payable in which case the same shall be endorsed "not yet due and payable" and (ii) no exception for subsequent assessments for prior years, (e) provide full coverage against mechanic's liens to the extent authorized by applicable title insurance rules and Borrower shall satisfy all requirements therefor, (f) contain only such exceptions (regardless of rank or priority) Bank approves, and Borrower shall cause to be delivered to Bank true, complete and fully legible copies of all recorded instruments shown as exceptions, including the subdivision plat (if any) and any restrictive covenants, (g) insure that no restrictive covenants shown in the Title Policy have been violated, and that no violation of the restrictions will result in a reversion or forfeiture of title, (h) insure that the lands shown in the required Survey are one and the same as the lands encumbered by the Deed of Trust, and that all recorded easements and other exceptions locatable on the ground are located as shown on the Survey, (i) insure that indefeasible or marketable (as coverage is available) fee simple title to the Land and Improvements is vested in Borrower, (j) contain such endorsements Bank requires and are available under applicable title insurance rules and Borrower shall satisfy all requirements therefor, (k) insure any easements, leasehold estates or other matters appurtenant to or benefiting the Land and/or the Improvements as part of the insured estate and not show the same as exceptions, (l) provide the recording information for the UCC financing statement (if any) filed in the real estate records of the county where the Land is located, and (m) insure the zoning of, and the Right of access to, the Land to the extent authorized under applicable title insurance rules and Borrower shall satisfy all requirements therefor.

Borrower shall be solely responsible for satisfying the requirements of the Title Company necessary to allow the Company to issue the Title Policy required by this Agreement. The conditions to Bank's obligation to make the Loan will not be satisfied if the Title Policy required by this Agreement is not, or cannot be, issued, whether caused by Borrower's failure to satisfy the underwriter's requirements or otherwise.

App. 030

# EXHIBIT "D"
# TO
# LOAN AGREEMENT

## Insurance Requirements

Borrower shall maintain with responsible insurance companies having at least an A Policyholder's Rating and a Financial Size Rating of XII by Alfred M. Best Company (or another company approved by Bank) the following:

1.    Hazard Insurance.  Insurance with respect to all insurable Property against loss or damage by fire, lightning, windstorm, explosion, hail, tornado, collapse, riot, riot attending a strike, sprinkler leakage, civil commotion, damage from aircraft and vehicles, and smoke damage and loss or damage from such hazards as are presently included in so called "extended coverage" and against vandalism and malicious mischief and against such other insurable hazards as may be required by Bank for the benefit of Borrower and Bank as named insured and/or loss payees.  The amount of such insurance shall be the full replacement cost of the buildings, improvements, furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Property, without deduction for depreciation.  Full replacement cost, as used herein, means, with respect to the buildings and improvements, the cost of replacing the buildings and improvements, exclusive of the cost of excavations, foundations and footings below the first floor slab grade, but including the cost of debris removal, and means, with respect to such furniture, furnishings, fixtures, equipment and other items, the cost of replacing same.  Each such policy shall contain a replacement cost endorsement and such other endorsements as are sufficient to prevent Borrower and Bank from becoming a coinsurer with respect to such buildings and improvements.  Such insurance shall be "*All-Risk*" form.

2.    Flood Insurance.  If and to the extent any of the Property is located in a flood hazard area, a federal flood insurance policy in an amount equal to the lesser of the amount of the Loan or the maximum amount available.

3.    Other.  Such other insurance on the Property, or any replacements or substitutions thereof, or additions thereto, and in such amounts as may from time to time be required by Bank against other insurable hazards or casualties which at the time are commonly insured against in the case of premises similarly situated, due regard being given to the height and type of the buildings and improvements, or any replacements or substitutions therefor, or additions thereto, and their construction, location, use and occupancy.  Bank may also require Borrower to maintain comprehensive general liability insurance for owners and contractors in amounts and form acceptable to Bank.

4.    Contracts.  With respect to any Contractor performing work in connection with the Improvements such insurance as Bank shall reasonably require, including, but not limited to, Worker's Compensation Insurance for statutory limits.

All insurance policies shall be "*occurrence*" based policies, issued and maintained by Insurers, in amounts, with deductibles, and in form satisfactory to Bank, shall require not less than thirty (30) days' prior written notice to Bank of any cancellation lapse, expiration, reduction or other change of coverage, and shall provide, if possible, for payment of all costs and expenses incurred by Bank in the event of any contested claim.  Without limiting the discretion of Bank with respect to required endorsements to insurance policies, all such policies for loss or damage to the Property shall contain a standard mortgagee clause (without contribution) naming Bank as mortgagee with loss proceeds payable to Bank.  All such policies also shall provide that the validity and enforceability of such policies will not be affected by, and the proceeds of such policies will be payable to Bank notwithstanding any (i) act, failure to act, or

EXHIBIT "D" TO LOAN AGREEMENT                                                                PAGE EXHD-1
L:\50423\251\Loan Agreement.doc

App. 031

negligence of the insured, (ii) any violation of any warranty, declaration or condition contained in any such policy by the insured, (iii) the occupancy or use of the Property for purposes more hazardous than permitted by the terms of the policy, (iv) the exercise of the power of sale or any foreclosure or other action or proceeding taken by Bank pursuant to the Loan Documents, or (v) any change in title to or ownership of the Property.  In the case of policies of *"extended coverage"* insurance carried by a lessee of the Property for the benefit of Borrower, Borrower will upon request of Bank cause such policies to be endorsed to provide for payment of proceeds to Bank as its interests may appear.