IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON | § § | **Response in Opposition to Motion** |
| CARNEGIE DEVELOPMENT, LLC | § | **to Appoint Receiver** |
| WALL007, LLC | § | |
| WALL009, LLC | § | |
| WALL010, LLC | § | |
| WALL011, LLC | § | |
| WALL012, LLC | § | |
| WALL016, LLC | § | |
| WALL017, LLC | § | |
| WALL018, LLC | § | |
| WALL019, LLC | § | |
| HAOQIANG FU (a/k/a MICHAEL FU) | § | |
| STEPHEN T. WALL | § | |
| | § | |
| Defendants, | § | |
| | § | |
| DJD LAND PARTNERS, LLC | § | |
| LDG001, LLC | § | |
| | § | |
| Relief Defendants. | § | |

**MAXIMILIEN BARTON AND RELATED ENTITIES' RESPONSE
TO PLAINTIFF'S MOTION FOR APPOINTMENT OF A RECEIVER,
FOR A PRELIMINARY INJUNCTION AND ANCILLARY RELIEF,
AND TO LIFT STAY FOR LIMITED PURPOSE [ECF NO. 309]**

Interested Parties Maximilien Barton, Gillespie Villas LLC, Venus59 LLC, TRTX

Properties LLC, MXBA LLC, Titan Investments LLC, TC Hall, LLC, and Titan 2022

Investment, LLC, by counsel, (the "Max Barton Entities") file this Response in Opposition to

Plaintiff's Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary

Relief, and to Lift Stay for Limited Purpose, ECF No. 309 (the "SEC's Motion").

-1-

## I.    INTRODUCTION

The Court is already familiar with the facts and background of this case, as reiterated in the SEC's Motion and Defendant's Response, so the Max Barton Entities will not belabor the history.  Crucial to the Max Barton Entities, however, is that they are not named parties in this litigation or in the underlying criminal matter, nor are they alleged to have actively participated in any alleged scheme to defraud.  Max Barton seeks only to control his own companies so that he may attempt to make a living and pursue his own independent business aspirations.

Max Barton is willing to work with the Receiver as necessary to protect any assets that are properly subjected to a receivership under the governing standards, but asserts that receivership over the Max Barton Entities is improper and unnecessary.  It is improper because the government has not shown that the Max Barton Entities are in possession of funds or assets credibly traceable to any allegedly defrauded investors.  Even the convoluted series of funds transfers the government attempts to proffer reflect, at absolute worst, low-dollar transfers spanning years of operations—and most are presented absent the context of what other transactions and business those entities were engaged in during the relevant periods.  Nor is receivership the proper remedy even if the Court accepted the SEC's submissions, since the amount of money the Max Barton Entities have allegedly received would not warrant such a drastic seizure.  In this light, placing the Max Barton Entities into receivership would not be equitable; it would be a blunt-force tool that grossly overestimates the Max Barton Entities' relationship to this litigation, and it would constitute an illegal taking.

At bottom, there is insufficient evidence provided to show that the Max Barton Entities are in possession of funds or assets traceable to the alleged fraud, and Max Barton should not be stripped of his property and his businesses based on tenuous transactions non-Max Barton

Entities had with other non-Max Barton Entities five years or more ago. Accordingly, the Max Barton Entities respectfully request that the Court deny the SEC's Motion with respect to the Max Barton Entities.

## II.     GOVERNING LAW

Receivership is an "extraordinary remedy" that is "justified only where there is a clear necessity to protect a party's interest in property." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305–06 (5th Cir. 2012). That is why courts generally "lack[] jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy." *Sec. & Exch. Comm'n v. Barton*, 79 F.4th 573, 580 (5th Cir. 2023) (quoting *Netsphere*, 703 F.3d at 310). Instead, receivership is appropriate only where, at a minimum, the following factors are satisfied: "1) a clear necessity to protect the defrauded investors' interest in property, 2) legal and less drastic equitable remedies are inadequate, and 3) the benefits of receivership outweigh the burdens on the affected parties." *Id.* at 578–79 (citing *Netsphere*, 703 F.3d at 305).

Of course, the Fifth Circuit decided both *Netsphere* and *Barton* in the context of appeals by an actual defendant. Here, the Max Barton Entities are not defendants—in fact, they are not named parties at all. That is why the Max Barton Entities lodged their own, separate appeal raising arguments about the appropriate test for receivership over the property of non-parties. *See* ECF No. 130.

The Max Barton Entities maintain that the lodestar for imposing receiverships over non-party property, or property owned by non-parties, is Judge Fitzwater's analysis in *Securities and Exchange Commission v. Faulkner*, No. 3:16-CV-1735-D, 2018 WL 4362729 (N.D. Tex. Sept. 12, 2018). In *Faulkner*, defendants were accused of a securities-fraud scheme that victimized investors and involved a host of entities. *See, e.g.*, *Sec. & Exch. Comm'n v. Faulkner*, No. 3:16-CV-1735-D, 2017 WL 4238705, at *1 (N.D. Tex. Sept. 25, 2017), *order clarified*, No. 3:16-CV-

-3-

1735-D, 2020 WL 584614 (N.D. Tex. Feb. 6, 2020).  From the outset, Judge Fitzwater applied a tailored approach, "appointing a temporary receiver over the oil and gas assets of Faulkner" and two of his companies and limiting the receivership to entities "to which the unrebutted evidence indicate[d]" Faulkner may have transferred tainted funds.  *Faulkner*, 2018 WL 4362729, at \*1.

As here, the *Faulkner* receiver later moved to expand the receivership.  *Id.* at \*2.  Judge Fitzwater denied inclusion of at least one entity on the basis that the entity "ha[d] no assets to preserve for future disgorgement to investors."  *Id.* a \*3.  The court reasoned that "a federal court may decline to place an entity in receivership where that entity has no assets, ***even if the entity has been used to perpetrate fraud***."  *Id.* (emphasis added) (citing  *United States v. Scott*, 667 Fed. Appx. 702, 703 (10th Cir. 2016) (memorandum opinion); *Miller v. Up In Smoke, Inc.*, 2010 WL 5095812, at \*9 (N.D. Ind. Dec. 8, 2010)).  The court also noted that it might change its decision "[i]f the Receiver can later prove that [the entity] ***is in possession of any assets traceable to*** . . . ***investors*** . . . ."  *Id.* at \*4 (emphasis added).

Judge Fitzwater then considered whether to impose receivership over "certain non-party entities."  *Id.*  The court explained that it could "exercise its equitable powers over an entity that has ***not*** engaged in wrongdoing, but nonetheless '(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'"  *Id.* (emphasis in original) (quoting *Janvey v. Adams*, 588 F.3d 831, 835 n.2 (5th Cir. 2009)).  Judge Fitzwater thus noted that he would "include in the receivership estate the assets of any non-party entity that is (i) controlled by Faulkner ***and*** (ii) in possession of funds traceable to . . . investors."  *Id.* at \*5 (emphasis added).  A review of Judge Fitzwater's remaining analysis demonstrates his careful attention to both the issue of control ***and*** the issue of possession of funds or assets traceable to investors.

*Faulkner* is a clear presentation of the governing law applicable to this case. And while the Max Barton Entities' appeal remains pending, the Fifth Circuit's decision in Defendant Tim Barton's appeal vindicates the argument that funds tracing is the *sine qua non* of receiverships. *See, e.g.*, *Barton*, 79 F.4th at 580–81 ("Should the district court decide that a new receivership is justified on remand, it can only extend over entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.").

Moreover, it is especially important in the non-party context for the Commission to show that the Max Barton Entities not only received ill-gotten funds but that the entities also have no legitimate claim to the funds. *Janvey*, 588 F.3d at 834. Accordingly, case law requires the Commission to show that the Max Barton Entities (1) are controlled by Timothy Barton *and* (2) are in possession of funds traceable to the alleged fraud *and* (3) have no legitimate claim to any such funds that may be in their possession.

Finally, while Fifth Circuit cases addressing the manner in which a court should assess funds-tracing in this specific context are lacking, it has held in other contexts that a transfer does not involve tainted funds unless it could not be made without using those funds. *See, e.g.*, *United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000) (recognizing "aggregate amount" approach under which a transfer involves tainted funds only if the transfer exceeds the amount of untainted funds in an account).

### III.    ARGUMENT

**A.    The Government Fails to Show that the Max Barton Entities Are In Possession of Funds Traceable to Alleged Fraud**

The Commission bears the burden to demonstrate that the Max Barton Entities are *currently in possession* of assets traceable to the alleged fraud. *See Faulkner*, 2018 WL

4362729, at *3.  The Commission has failed to do so and receivership over these entities is, therefore, impermissible.

### Gillespie Villas, LLC

The Commission, relying on the Receiver's declaration of September 5, 2023, ECF No. 308 (the "Thomas Decl."), alleges the funds-tracing requirement is satisfied with respect to Gillespie Villas, LLC as follows: "The Gillespie Property was purchased using the proceeds of Wall Investor Funds received from the sale of the Marine Creek Property and the Winter Haven property, both of which were purchased using Wall Investor Funds."  Thomas Decl. ¶ 164.

The Commission's tracing requirement is not satisfied by way of the Winter Haven Property.  Seagoville Farms, LLC is alleged to have benefitted some time in 2017 from investor funds in the form of "Wall Investor Funds" being used, "in part," to purchase the "Seagoville Property."  *See* Thomas Decl. at ¶ 158.  The Receiver's evidence of this tracing is laid out in Exhibit 23.

The Max Barton Entities are not privy to the accuracy of these transactions, but the government's own exhibits do not establish that investor funds ever reached Gillespie Villas or benefitted it.  The schematic in Exhibit 23 suggests up to $1.3 million was transferred from a Wall Entity to Seagoville Farms, LLC to purchase the Seagoville Property.  But elsewhere the Receiver admits that the sale of the Seagoville Property netted over $3.4 million for Seagoville Farms, LLC, nearly *triple* the amount of alleged investor funds that were purportedly used to help buy the property.  *See* Thomas Decl. Ex. 18.  That same schematic then suggests that, in 2018, only $1.1 million was transferred from Seagoville Farms, LLC to Carnegie Development, LLC, which had a balance of nearly $200,000 prior to the Seagoville deposit.  *Id.*  Accordingly, even assuming it is true that $1.3 million of investor funds were tied up in the Seagoville

Property, Seagoville still would have had nearly double that amount in its account after transferring $1.1 million to Carnegie Development. For this reason alone, the government has not provided any proof that the money transferred to Carnegie is traceable to the allegedly defrauded investors. In turn, the slightly more than $311,000 that Exhibit 18 says was later transferred from Carnegie to First American Title Company (representing less than a third of what was received by Carnegie from Seagoville Farms, LLC) is *a fortiori* not traceable to any alleged fraud. So, even if it is correct that Carnegie contributed just over $311,000 to the Winter Haven Property, *id.*, that is not remotely sufficient to deem the Winter Haven Property traceable to investor funds. *See Davis*, 226 F.3d at 357.

Moreover, Exhibit 25 suggests that, in 2022, AVG West (which supposedly held proceeds from the sale of the Winter Haven Property) contributed $2 million to Broadview Holdings, LLC. *See* Thomas Decl. Ex. 25. If this is true, it appears the Winter Haven Property sold for millions of dollars while Carnegie had only contributed a mere $311,000 to that property. Thus, even setting aside the legal defect with the connection between the Carnegie contribution to Winter Haven and the allegedly defrauded investors, the sale of the Winter Haven Property netted many multiples of what Carnegie contributed. In this light, it cannot be said as a matter of law that the $2 million from AVG West to Broadview is traceable to investors as opposed to profit from the real estate sale.

Plus, Broadview ultimately is alleged to have contributed only $1.04 million to the Gillespie Property—only half of what Broadview received from AVG West. This means that, even if every dime of the $311,000 contributed by Carnegie to the Winter Haven Property were traceable to a defrauded investor (and it is not for the reasons above), Broadview Holdings retained more than enough funds (nearly $1 million) after its contribution to the Gillespie

Property to repay what Carnegie had allegedly contributed to the Winter Haven Property. This again breaks the tracing chain. Moreover, important omitted context is that the contribution by Broadview to the Gillespie Property was a legitimate loan, which Gillespie is still obligated to repay. *See* M. Barton Resp., ECF No. 53, at 6–7. This context raises two further issues of great importance. First, because the contribution was a loan, Gillespie has a legitimate claim to the funds, even if they were traceable (they are not). Gillespie's legitimate claims to the funds as a bona fide borrower independently defeats receivership. *Janvey*, 588 F.3d at 834. Second, if the government's only concern is, as it should be, preserving funds traceable to investors, the government could seek an order accelerating repayment of the loan. That would be an appropriately tailored remedy to preserve assets, as opposed to dispossessing Max Barton completely to ultimately sell his entire Gillespie Property. Regardless, the disjointed path of the Winter Haven Property fails entirely to demonstrate that funds contributed by Wall Entities in 2017 to Seagoville Farms, LLC can be traced with any credibility to the purchase of the Gillespie Property five years later.

The same kinds of accounting issues infect other exhibits, including those regarding the Marine Creek Property. Exhibit 16 purports to show approximately $565,000 flowing from Wall Entities in December 2018 to Carnegie Development, LLC. *See* Thomas Decl. Ex. 16. Within days, Carnegie is alleged to have transferred approximately $375,000 to JMJ Development, LLC. *Id.* JMJ Development, LLC is finally alleged to have contributed $135,000 to Mansions Apartment Homes at Marine Creek, LLC on December 13, 2018. *Id.* Then on May 6, 2022— ***five years later***—Mansions Apartment Homes at Marine Creek is alleged to have contributed $200,000 to Broadview Holdings, LLC from the sale of Mansions Apartment Homes. Thomas Decl. Ex. 25. Based on these facts alone, the Court is expected to assume that the $135,000 from

JMJ Development, LLC sat with Marine Creek for five years and identify that single transfer as a linchpin of traceability to the Gillespie Property, notwithstanding (1) the lack of information about what funds flowed into and out of Marine Creek in the intervening five years, (2) what percentage of the sale of Mansions Apartment Homes a transfer of $200,000 reflects, and (3) the fact that, as described above, AVG West, LLC purportedly transferred $2 million in untraceable funds to Broadview days after the $200,000 transfer from Marine Creek. This third point is critical because it is clear that Broadview would have had enough cash after contributing $1.04 million to the Gillespie Property to pay back both the $311,000 that Carnegie allegedly contributed to the Winter Have Property purchase *and* the $200,000 that Marine Creek contributed to Broadview, thereby breaking both tracing chains. At the very least, the government has not shown that the transfers from Broadview could only have been made with investor funds. *See Davis*, 226 F.3d at 357.

Finally, and additionally, the government has certainly not shown that Gillespie Villas, LLC is ***still in possession*** of any such funds or assets. But under the Fifth Circuit's mandate in *Barton*, holding investor funds is the *sine qua non* of receivership over any entity the government is targeting. Nor has the government even attempted to demonstrate that Gillespie Villas, LLC lacks any legitimate claim to any of the funds of which it ***is*** in possession. *Janvey*, 588 F.3d at 834. Receivership over Gillespie Villas, LLC is, therefore, impermissible.

### TC Hall, LLC

The government's tracing analysis with respect to TC Hall is no better. It appears to boil down to assertions that (1) Gillespie Villas, LLC contributed to the purchase of the TC Hall Property, and (2) Broadview Holdings paid earnest money to the title company that serviced the purchase of the TC Hall Property. Thomas Decl. ¶¶ 167–69. For several reasons, these bases

fail to establish that TC Hall, LLC received funds or assets traceable to the allegedly defrauded investors.

First, the funds and property held by Gillespie Villas cannot be traced to the allegedly defrauded investors due to the multiple fatal defects discussed above. The fact that Gillespie Villas may have contributed in some way to the purchase of the TC Hall Property, therefore, is of no moment in the tracing analysis.

Next, the government does not explain how the earnest money (or any other funds) Broadview Holdings allegedly contributed to the TC Hall Property purchase are traceable to investors. The government simply notes that transfers were made from Broadview Holdings to the title company servicing the purchase of the TC Hall Property and apparently expects that to establish that those Broadview Holdings funds were tainted. But that is not how tracing works. *See Davis*, 226 F.3d at 357.

Nor does the government's account even consider the nature of the transaction it identifies. The government does not address whether the earnest money purportedly contributed by Broadview was ultimately returned to Broadview at closing, as earnest money often is. In fact, the government does not say where that earnest money went after closing—the government does not allege, for example, that the Broadview earnest money reverted to TC Hall, LLC, let alone that TC Hall is still ***in possession of*** such funds. Traceability here cannot possibly rest on contributions toward funds to be held in earnest, which contributions are never themselves traced back to investors. The failure to trace this earnest money defeats receivership on this basis.

Meanwhile, the Receiver's declaration unfairly represents that "TC Hall, LLC also received not less than $1.4 million from Broadview Holdings, LLC and JMJ Development," Thomas Decl. ¶ 169, when ***TC Hall*** received no such contribution. Instead, the Receiver appears

to be attempting to reframe expenditures purportedly made by Broadview Holdings and JMJ Development on the TC Hall Property "long before TC Hall was formed," *id.* ¶ 168, as direct funding that "TC Hall, LLC . . . received," *id.* ¶ 169.  To represent that TC Hall "received" a dollar amount based on money invested in a property before TC Hall even existed, when TC Hall *purchased* the property for value, is an unwarranted sleight of hand.

Finally, even if the government had shown that contributions from Gillespie Villas, LLC and Broadview Holdings could be traced back to the allegedly defrauded investors, it must also show that TC Hall, LLC was not entitled to the funds.  It has not done so.  At any rate, because TC Hall was a bona fide purchase of the TC Hall Property, the government cannot, and has not attempted to, show that TC Hall is in possession of tainted funds or assets to which it is not entitled.

### Venus59, LLC

The government's treatment of Venus59 fares no better.  The one specific transaction the government identifies for Venus59 to demonstrate traceability is a $23,325.62 payment in September 2022 "in reference to a loan."  Thomas Decl. ¶ 171.  As with TC Hall, the government makes no effort to trace these funds back to allegedly defrauded investors.  To the contrary, the check the Receiver references states in the memo line that the payment is for the "Return of Loan."  *See* ECF No. 74-2, at 208.  Thus, the only evidence the Receiver proffers for Venus59, LLC affirmatively indicates that the funds from Broadview to Venus59 was the return of funds *that originated with Venus59*, not defrauded investors.  Far from supporting an order giving the Receiver control over Venus59, this single transaction counsels *against* it.

The Max Barton Entities also understand that Exhibit 27 to the Thomas Declaration is intended to establish that Venus59, LLC is in possession of funds or assets traceable to the

-11-

investors, but that exhibit fails to explain how.  The exhibit refers to Venus59 only in a box marked "R&D Ledger," and the arrow pointing to that box makes no attempt to establish any kind of intelligible connection to it.  Moreover, and in any event, the schematic demonstrates that JMJ Development, LLC had a balance of almost $20,000 before transferring only $10,000 to Silver Star Title.  Accordingly, the transfer to Silver Star Title cannot maintain the link of traceability, as the government apparently intends it to do.  *See Davis*, 226 F.3d at 357.

There is no tracing that supports receivership of Venus59, LLC.  In fact, the Receiver admits when discussing the development around the Venus59 Property that, **"*[e]xcept for Venus59, LLC***, these parcels were all bought using Wall Investor Funds or proceeds from sales of other properties bought with Wall Investor Funds."  Thomas Decl. ¶ 120 (emphasis added).  The Receiver notes his "investigation of Venus59, LLC is ongoing" and reverts to the argument rejected by the Fifth Circuit that general and "extensive comingling" is sufficient to justify a receivership.  *Id.* ¶ 120 n.17; *accord id.* ¶ 170 ("[M]y accountants' efforts to trace Venus 59, LLC funds is ongoing.").  *See Barton*, 79 F.4th at 580 ("Because it alleges that Barton has engaged in extensive commingling of funds, [the SEC] claims that Barton's control is an effective proxy for placing an entity in the receivership even if it had not yet traced the funds to that entity.").  The government is wrong.  *Janvey*, 588 F.3d at 834; *Davis*, 226 F.3d at 357.

As Max Barton shared in an earlier filing, it is possible that funds were loaned to MXBA, LLC by an entity directly or indirectly controlled by Timothy Barton to assist in the closing on the Venus59 land.  But that money would have been paid out to assist with specific closing costs and would not still be in the possession of Venus59, LLC.[1]  And any such contributions, it is important to note, would pale in comparison to the vast majority of the funding for the deal that came from independent sources wholly unconnected to Defendant Barton.  *See* ECF No. 74-2, at

---

[1] ONE SF Residential made a one-time $10 capital contribution to Venus59.

220–21.  Plus, even if such funds were loaned, and even if such funds were still in the possession of Venus59, LLC (which they are not), the government would need to establish that such funds are traceable to the alleged fraud, and it has not.

### TRTX Properties, LLC

The government makes no effort to trace funds from allegedly defrauded investors to TRTX Properties, LLC, and there is no evidence in the record of such traceability.  Instead, the government lumps TRTX into a strained "Category G" of entities that owned or managed other entities that may have received funds from yet other entities that may have received funds from allegedly defrauded investors or entities with funds traceable to such investors.  Thomas Decl. ¶¶ 173, 181.

This argument does nothing but waste everyone's time and resources.  Again, this is not how tracing works—the Fifth Circuit said just two months ago that the government must trace *funds*, not relationships, management, or control.  Simply asserting that TRTX Properties, LLC was "[l]isted as manager of Goldmark Hospitality LLC in one or more filings with the Texas Secretary of State," Thomas Decl. ¶ 71 n.45, does not *remotely* establish the flow of any funds to TRTX from Goldmark whatsoever, let alone funds traceable to allegedly defrauded investors.  Conflating management with funds traceability is precisely why the government lost on appeal, and the government's attempt to rely on control is, therefore, nothing but an invitation for this Court to avoid the Fifth Circuit's mandate.

The Fifth Circuit set forth clear requirements in *Securities and Exchange Commission v. Barton*, 79 F.4th 573 (5th Cir. 2023) to protect individuals like Max Barton from being unfairly deprived of their property and liberty to work, and the government fails to meet the requirements.  Receivership over TRTX Properties must be denied as a matter of law.

-13-

*MXBA, LLC[2]*

As with TRTX Properties, LLC, the government does not claim to have traced or be able to trace any funds or assets of which MXBA, LLC is currently in possession to allegedly defrauded investors. Instead, the government lumps MXBA, LLC into "Category G" and identifies MXBA's addresses, employees, members, and officers. *See* Thomas Decl. ¶¶ 174–75. Once again, the government re-urges the exact arguments held insufficient by the Fifth Circuit in *Barton* and fails to produce the evidence of traceability required, almost as if the *Barton* opinion never issued.

Receivership over MXBA, LLC is impermissible as a matter of law.

*Titan Investments, LLC and Titan 2022 Investment, LLC*

As to the Titan entities, the government again primarily relies on evidence of control and management. *See* Thomas Decl. ¶ 176. This does not satisfy the requirement of funds tracing for the reasons set forth above.

The Receiver also asserts that "Titan Investments . . . attempted to purchase multiple pieces of property using Broadview Holdings funds." *Id.* ¶ 177. There are several problems with this assertion as a basis for tracing. First, the Receiver conspicuously uses the term "attempted" to purchase, apparently admitting that the accused purchase was never made. That, in turn, indicates the Titan entities never benefited from or received any tainted funds or assets, even assuming earnest money could plausibly bear the weight of a tracing analysis.

And it cannot, since the Receiver never says what happened to that earnest money. It is disingenuous to represent to the Court that an entity attempted to buy property "using Broadview

---

[2] The Receiver also lists MXBA, Managed, LLC and MXBA Services, LLC—two additional Max Barton entities—in his declaration, Thomas Decl. ¶¶ 188, but the government has excluded them from its receivership motion, Mot. 13 n.7. Nor would either of those entities be included in the government's requested injunction. *Id.* at 22–23. Max Barton reserves the right to oppose any future motion by the government aimed at these entities, which will seek to intervene should the need arise.

-14-

Holdings funds" when the only allegation relates to earnest money, because earnest money is not always *purchase* money. Sometimes earnest money is returned at closing, sometimes it is contributed toward a downpayment, sometimes it is transferred to escrow. Without knowing the details of the "attempted" sale the government relies on, Thomas Decl. ¶ 176, the government has given the parties and the Court nothing but inuendo. That failure is crucial because the very point of a receivership is to follow and preserve the funds of those who were defrauded—as the Fifth Circuit has already held in this case—and if earnest money were returned to Broadview, then it would make no sense to place the Titan entities in receivership on the basis of investor funds that were returned to Broadview.

Finally, it is worth mentioning that the government seeks to justify a receivership over the Titan entities on the basis of the same $200,000 received by Broadview on May 6, 2020 that the Receiver wants to use to justify traceability to Gillespie Villas, LLC. That $200,000 to Broadview does not establish traceability for the reason set forth above, and it certainly cannot be used to justify traceability for every payment that later came from Broadview.

Receivership over Titan Investments, LLC and Titan 2022 Investment, LLC must be denied as a matter of law.

### Goldmark Hospitality, LLC

The primary basis for tracing offered with respect to Goldmark Hospitality, LLC relates to an alleged $200,000 payment from JMJ Development, LLC to Goldmark Hospitality in September 2018. *See* Thomas Decl. Ex. 9. This payment is supposed to be traceable to allegedly defrauded investors because JMJ Development received a payment the same day from Carnegie Development, LLC, which also allegedly received payment the same day from a Wall Entity. The problem, however, is that JMJ Development is shown to have had a prior balance of

at least $191,198.87 on the day it supposedly sent $200,000 to Goldmark.  On these facts alone, the Court can speculate, at most, that just under $9,000 of potentially tainted funds made their way to Goldmark through this reported series of transactions.  Of course, no other context is provided regarding whether those funds were returned, whether Goldmark was rightfully entitled to them, whether Goldmark is still possession of them, or whether JMJ Development received any other deposits that same day.

## B.    The Burdens of Placing the Max Barton Entities into Receivership Far Outweigh Any Benefit

The government must also demonstrate that "the benefits of receivership outweigh the burdens on the affected parties."  *Barton*, 79 F.4th at 578–79 (citing *Netsphere*, 703 F.3d at 305).  With respect to the Max Barton Entities, the burdens far outweigh the benefits.

The Max Barton Entities are not defendants, and they are not alleged to have actively participated in defrauding investors.  For much of the relevant time period, Max Barton was in school.  Now that he has begun his own, independent career, he respectfully seeks the protection of the Court from an attempt at an overinclusive receivership.

Even were the government's funds-tracing efforts not utterly inadequate—and for all the reasons explained above, they are—the Max Barton Entities should not be subject to a receivership because its burdens would far outweigh its benefits.  These entities represent Max Barton's businesses and his current opportunities to earn an income.  Even if some of their funding came from investors, the government has never even attempted to prove that *all* of their funding did so, and placing Max Barton's companies into receivership will wipe out all of his own investments.  Indeed, while the government has often touted its interest here as preserving the status quo, in fact the Receiver has repeatedly attempted to sell properties and assets, going so far as to attempt to sell personal items belonging to Max Barton himself.  There is simply no

reason for that drastic approach when other options—such as requiring the Max Barton Entities to place funds in escrow equal to whatever amount of tainted funds the government can actually prove they received without any claim to them—are plain.

Meanwhile, the benefits of receivership over the Max Barton Entities are minimal.  As an initial matter, the weak connections and assumptions that undergird the supposed tracing analyses described above cannot overcome the great burden a receivership imposes on Max Barton and the Max Barton Entities.  Furthermore, the balance between the alleged value of the defendants' scheme as compared to the amounts of monies supposedly traceable to the Max Barton Entities similarly cannot overcome the weight of the burden of receivership here.  For example, receivership over Venus59, LLC surely cannot be justified by Broadview *repaying a loan* for a mere $26,000 when the Receiver claims the alleged fraud totals well over one thousand times that amount.  Indeed, all of the transactions identified by the government as allegedly establishing traceability for the Max Barton Entities are mere minor pieces of much larger, often multimillion dollar deals involving multiple sources of independent financing from non-Barton individuals and entities. This is why receivership over the Max Barton Entities would be inequitable—imagine stripping Max Barton (a non-defendant) of his property and selling his businesses due to a $10,000 check that has highly questionable linkages to an alleged fraud scheme he is not even accused of knowing about.

The burdens of placing the Max Barton Entities into receivership outweigh the benefits of doing so and the receivership over these entities should be denied.  To the extent the Court finds traceability established based on discrete transactions in identifiable sums, Max Barton is more than willing to engage in discussions about a workable solution to protecting investors' funds,

but he maintains that seizing and selling all of his businesses is unwarranted and unjustified as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, the Max Barton Entities respectfully request that the Court deny the SEC's Motion, ECF No. 309, with respect to the Max Barton Entities.

Dated: October 2, 2023

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

/s/ Nathan Baum
**Nathan Baum**
Texas State Bar No. 24082665
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Nathan.baum@nortonrosefulbright.com
Phone: 214-855-7487
Fax: 214-855-8200

**Samuel Ramer**
*Pro Hac to Be Sought*
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
samuel.ramer@nortonrosefulbright.com
Phone: 202-662-0214
Fax: 202-662-4643

**Chris Cooke**
Texas State Bar No. 24129241
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
christopher.cooke@nortonrosefulbright.com
Phone: 210-270-7175
Fax: 210-270-7205

COUNSEL FOR MAXIMILIEN BARTON, GILLESPIE VILLAS LLC, VENUS59 LLC, TRTX PROPERTIES LLC, MXBA LLC, TITAN INVESTMENTS LLC, TC Hall, LLC, TITAN 2022 INVESTMENT, LLC

-18-

## <u>CERTIFICATE OF SERVICE</u>

On October 2, 2023 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Chris Cooke*
Christopher R. Cooke
